# No. 22-1998

# In the United States Court of Appeals for the Third Circuit

MONIQUE RUSSELL; JASMINE RIGGINS; ELSA M. POWELL; DESIRE EVANS

*Appellants*

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Appellee*

On Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## JOINT APPENDIX
## VOLUME III, PAGES JA563 TO JA1037

JANET, JANET & SUGGS
    Patrick A. Thronson
    Brenda A. Harkavy
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

CONRAD O'BRIEN PC
    Nicholas M. Centrella
    Robin S. Weiss
1500 Market Street, Suite 3900
Philadelphia, PA 19102
(215) 864-9600

***Counsel for Appellants***

MORGAN, LEWIS & BOCKIUS LLP
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

***Counsel for Appellee***

***Additional Counsel on Inside Cover***

THE LAW OFFICES OF PETER G. ANGELOS, P.C.
        Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, MD 21201
(410) 649-2027

THE COCHRAN FIRM
        Karen Evans
        David Haynes
 1666 K Street NW
 Suite 1150
 Washington, DC 20006
 (202) 682-5800

SCHOCHOR AND STATON, P.A.
        Scott Kurlander
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Z LAW, LLC
        Cory L. Zajdel
2345 York Road, Suite #B-13
Timonium, MD 21093
(443) 213-1977

***Counsel for Appellants***

# TABLE OF CONTENTS

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| *Volume I* | | | |
| 1-1 | Petitioner's Notice of Appeal (3d Cir. No. 22-1998) | 5/24/2022 | JA1 |
| 102 | ORDER Cancelling Oral Arguments on Motion for Summary Judgment and Class Certification Motions | 3/22/2022 | JA4 |
| 103 | Memorandum Opinion | 5/19/2022 | JA5 |
| 104 | ORDER Granting Defendants' Motion for Summary Judgment (ECF No. 81) | 5/19/2022 | JA24 |
| 57 | Memorandum Opinion | 3/23/2020 | JA25 |
| 58 | Order | 3/23/2020 | JA53 |
| 10-1 | Order, No. 20-8024 (3d Cir. May 11, 2020) | 5/11/2020 | JA54 |
| 5-1 | Petitioners' Concise Summary of the Case | 6/2/2022 | JA56 |
| — | District Court Docket | Printed 9/8/2022 | JA59 |
| *Volume II, Pages JA79 to JA562* | | | |
| 1 | Civil Cover Sheet | 12/31/2018 | JA79 |
| | Designation Forms | | JA80 |
| | Defendant's Notice of Removal | | JA83 |
| | Exhibit A: Plaintiffs' Class Action Civil Complaint (Phila. Ct. Com. Pl. No. 181101690) | | JA90 |
| | Exhibit A | | JA113 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
|  | Exhibit B |  | JA119 |
|  | Exhibit C |  | JA122 |
| 7 | Answer to Class Action Civil Complaint and Affirmative Defenses | 2/6/2019 | JA126 |
| 32 | Motion for Class Certification | 10/7/2019 | JA167 |
| 32-1 | Memorandum of Law in Support of Motion for Class Certification |  | JA169 |
| 32-2 | Certificate of Service |  | JA199 |
| 32-3 | Exhibit 1 |  | JA200 |
| 32-4 | Exhibit 2 |  | JA202 |
| 32-5 | Exhibit 3 |  | JA204 |
| 32-6 | Exhibit 4 |  | JA207 |
| 32-7 | Exhibit 5 |  | JA210 |
| 32-8 | Exhibit 6 |  | JA215 |
| 32-9 | Exhibit 7 |  | JA217 |
| 32-10 | Exhibit 8 |  | JA238 |
| 32-11 | Exhibit 9 |  | JA241 |
| 32-12 | Exhibit 10 |  | JA245 |
| 32-13 | Exhibit 11 |  | JA251 |
| 32-14 | Exhibit 12 |  | JA253 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-15 | Exhibit 13 | | JA255 |
| 32-16 | Exhibit 14 | | JA257 |
| 32-17 | Exhibit 15 | | JA259 |
| 32-18 | Exhibit 16 | | JA262 |
| 32-19 | Exhibit 17 | | JA267 |
| 32-20 | Exhibit 18 | | JA272 |
| 32-21 | Exhibit 19 | | JA274 |
| 32-22 | Exhibit 20 | | JA276 |
| 32-23 | Exhibit 21 | | JA278 |
| 32-24 | Exhibit 22 | | JA280 |
| 32-25 | Exhibit 23 | | JA283 |
| 32-26 | Exhibit 24 | | JA286 |
| 32-27 | Exhibit 25 | | JA288 |
| 32-28 | Exhibit 26 | | JA290 |
| 32-29 | Exhibit 27 | | JA292 |
| 32-30 | Exhibit 28 | | JA294 |
| 32-31 | Exhibit 29 | | JA296 |
| 32-32 | Exhibit 30 | | JA303 |
| 32-33 | Exhibit 31 | | JA314 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-34 | Exhibit 32 | | JA317 |
| 32-35 | Exhibit 33 | | JA325 |
| 32-36 | Exhibit 34 | | JA383 |
| 32-37 | Exhibit 35 | | JA419 |
| 32-38 | Exhibit 36 | | JA459 |
| 32-39 | Exhibit 37 | | JA490 |
| 32-40 | Exhibit 38 | | JA525 |
| 32-41 | Exhibit 40 | | JA532 |
| *Volume III, Pages JA563 to JA1037* | | | |
| 32-42 | Exhibit 41 | | JA563 |
| 32-43 | Exhibit 42 | | JA571 |
| 32-44 | Exhibit 43 | | JA579 |
| 32-45 | Exhibit 44 | | JA604 |
| 32-46 | Exhibit 45 | | JA628 |
| 33 | Exhibit 39 to Motion to Certify Class | 10/8/2019 | JA698 |
| 39 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification | 10/28/2019 | JA707 |
| 39-1 | Exhibit 1: Verification Papers - University of Ibadan | | JA743 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 39-2 | Exhibit 2: Verification Papers – University of Benin | | JA749 |
| 39-3 | Exhibit 3: October 14, 2019 Expert Report from Dr. Mark A. Smith | | JA755 |
| 39-4 | Exhibit 4: October 14, 2019 Expert Report from dr. Laurence H. Beck | | JA772 |
| 39-5 | Exhibit 5: March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital | | JA796 |
| 39-6 | Exhibit 6: Howard University Hospital Certificate of Completion of Residency for John-Charles Nosa Akoda MD | | JA798 |
| 39-7 | Exhibit 7: January 31, 2014 Letter to John-Charles Akoda from American Board of Obstetrics and Gynecology | | JA800 |
| 39-8 | Exhibit 8: May 22, 2002 Letter to Dr. Oluwafemi Charles Igberase from William C. Kelly | | JA802 |
| 39-9 | Exhibit 9: November 7, 2000 Letter to State of Maryland Board of Physician Assurance from Meridian Health System | | JA805 |
| 39-10 | Exhibit 10: May 5, 2017 Virginia Department of Health Professions Report | | JA807 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 50-1 | Exhibit 11 (Redacted): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA811 |
| 50-2 | Exhibit 12 (Redacted): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA836 |
| 50-3 | Exhibit 13 (Redacted): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA863 |
| 50-4 | Exhibit 14 (Redacted): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA887 |
| 39-15 | Exhibit 15: Email from Kara Corrado to Lisa Cover, Suzann Paolini, and Roman Mizak (March 18, 2016) | | JA911 |
| 39-16 | Exhibit 16: Email from Kara Corrado to Lisa Cover (Nov. 29, 2016) | | JA915 |
| 39-17 | Exhibit 17: Notice #101 from Lisa Cover (March 1, 2017) | | JA920 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 50-5 | Exhibit 18 (Redacted): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA924 |
| 46-6 | Exhibit 19 (Unredacted): Plaintiff Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA954 |
| 46-7 | Exhibit 20 (Unredacted): Plaintiff Jasmine Riggins' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA984 |
| 46-8 | Exhibit 21 (Redacted): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1008 |
| 39-22 | Exhibit 22: February 26, 2018 Expert Report from Dr. Thomas Bojko | | JA1033 |
| *Volume IV, Pages JA1038 to JA1517* | | | |
| 39-23 | Exhibit 23: Docket from Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) | | JA1038 |
| 39-24 | Exhibit 24: Stipulation of Dismissal, CAL 17-2271 | | JA1053 |
| 50-6 | Exhibit 25 (Redacted): Questionnaire Responses | | JA1058 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 46-10 | Exhibit 26 (Redacted): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1124 |
| 50-7 | Exhibit 27 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1132 |
| 46-12 | Exhibit 28 (Redacted): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins conducted by Dr. Gladys Fenichel | | JA1141 |
| 46-13 | Exhibit 29 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel | | JA1147 |
| 50-8 | Exhibit 30 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel | | JA1154 |
| 46-15 | Exhibit 31 (Redacted): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel | | JA1164 |
| 46-16 | Exhibit 32 (Redacted): September 23, 2019 Expert Report from Dr, Jay Goldberg | | JA1168 |
| 39-33 | Exhibit 33: Facebook Comments Produced by Plaintiff Monique Russell | | JA1179 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 39-34 | Exhibit 34: October 14, 2019 Rebuttal Expert Report from Dr. Susan McDonald | | JA1183 |
| 39-35 | Exhibit 35: Jalloh et al v. Chaudry et al, CAL 16-22162 (Cir. Ct. Prince George's Cty, MD) – Complaint | | JA1214 |
| 50-9 | Exhibit 36 (Redacted): September 5, 2019 Transcript of Deposition of Desire Evans | | JA1236 |
| 50-10 | Exhibit 37 (Redacted): September 6, 2019 Transcript of Deposition of Elsa Powell | | JA1285 |
| 39-38 | Exhibit 38: Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) – First Amended Class Action Complaint | | JA1315 |
| 39-39 | Text of Proposed Order | | JA1339 |
| 47 | Reply Memorandum of Law in Support of Motion for Class Certification | 11/11/2019 | JA1340 |
| 47-1 | Exhibit 1 | | JA1362 |
| | Exhibit 2 | | JA1365 |
| | Exhibit 3 | | JA1367 |
| 48 | Defendant Educational Commission for Foreign Medical Graduates' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification | 11/18/2019 | JA1371 |
| 63 | Transcript of Proceedings Held on January 30, 2020 | 4/6/2020 | JA1381 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 5-1 | Response in Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), No. 20-8024 (3d Cir. No. 20-8024) | 4/20/2020 | JA1469 |
| 9 | Reply in Support of Petition for Permission to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 4/27/2020 | JA1501 |
| *Volume V (Under Seal), Pages JA1518 to JA1908* | | | |
| 40 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification (Under Seal) | 10/28/2019 | JA1518 |
| | Exhibit 11 (Under Seal): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1554 |
| | Exhibit 12 (Under Seal): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1579 |
| | Exhibit 13 (Under Seal): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1606 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit 14 (Under Seal): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1630 |
| | Exhibit 18 (Under Seal): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1654 |
| | Exhibit 21 (Under Seal): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1684 |
| | Exhibit 25 (Under Seal): Questionnaire Responses | | JA1709 |
| | Exhibit 26 (Under Seal): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1775 |
| | Exhibit 27 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1783 |
| | Exhibit 28 (Under Seal): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins, conducted by Dr. Gladys Fenichel | | JA1792 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit 29 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel | | JA1798 |
| | Exhibit 30 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel | | JA1805 |
| | Exhibit 31 (Under Seal): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel | | JA1815 |
| | Exhibit 32 (Under Seal): September 23, 2019 Expert Report from Dr, Jay Goldberg | | JA1819 |
| | Exhibit 36 (Under Seal): September 5, 2019 Transcript of Deposition of Desire Evans | | JA1830 |
| | Exhibit 37 (Under Seal): September 6, 2019 Transcript of Deposition of Elsa Powell | | JA1879 |
| *Volume VI – Pages JA1909 to JA4931* | | | |
| 1-1 | Petition by Educational Commission for Foreign Medical Graduates for Leave to Appeal Pursuant to Fed. R. Civ. P. 23(f) (3d Cir. No. 20-8024) | 4/6/2020 | JA1909 |
| 10-1 | Order Granting Petition for Leave to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 05/11/2020 | JA1943 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 10-2 | Notice Grant of Permission for Leave to Appeal | 05/11/2020 | JA1944 |
| 20 | Brief of Appellant and Joint Appendix | 09/02/2020 | JA1945 |
| 26 | Addendum to Brief of Appellant | 09/04/2020 | JA2012 |
| 34 | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Appellant | 09/09/2020 | JA2016 |
| 47 | Brief of Appellees | 11/02/2020 | JA2044 |
| 49 | Reply Brief of Appellants | 11/23/2020 | JA2125 |
| 64 | Transcript of Oral Argument Before the Honorable Luis Felipe Restrepo, the Honorable Stephanos Bibas, the Honorable David James Porter United States Circuit Court Judges | 02/25/2021 | JA2161 |
| 65 | Opinion Order Remanding Case to the United States District Court for the Eastern District of Pennsylvania | 09/24/2021 | JA2202 |
| 79 | Plaintiffs' Supplemental Memorandum in Support of Class Certification | 12/10/2021 | JA2234 |
| 80 | Defendant's Supplemental Brief in Opposition to Class Certification | 12/10/2021 | JA2254 |
| 81 | Defendant's Motion for Summary Judgment | 12/10/2021 | JA2280 |
| 82 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs Expert Dr. Annie Steinberg | 12/10/2021 | JA2334 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---------|----------------------|------------|------|
| 83 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 12/10/2021 | JA2542 |
| 84 | Defendants' Unopposed Motion to Seal | 12/10/2021 | JA2810 |
| 85 | Statement of Undisputed Material Facts in Support of Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 12/10/2021 | JA2818 |
| 86 | Defendant Educational Commission for Foreign Medical Graduates' Notice of Exhibits | 12/11/2021 | JA3079 |
| 92 | Joint Stipulation re ECF 82 | 01/14/2022 | JA3914 |
| 93 | Plaintiffs' Response in Opposition to Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 01/14/2022 | JA3916 |
| 94 | Plaintiffs' Response in Opposition to Defendant's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/14/2022 | JA4271 |
| 95 | Plaintiffs' Response to Defendant's Supplemental Brief in Opposition to Class Certification | 01/14/2022 | JA4514 |
| 96 | Defendant's Opposition Brief in Response to Plaintiffs' Supplemental Brief Regarding Class Certification | 01/14/2022 | JA4530 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 98 | Defendant's Reply in Support of Motion for Summary Judgment | 01/28/2022 | JA4550 |
| 99 | Defendant's Reply in Support of its Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/28/2022 | JA4687 |
| 100 | Order rescheduling Oral Argument on summary judgment and class certification is Rescheduled for March 29, 2022 | 01/31/2022 | JA4702 |
| 101 | Plaintiffs' Sur-Reply In Support of its Opposition to Defendant Educational Commission for Foreign Medical Graduates Motion for Summary Judgment | 02/11/2022 | JA4703 |
| 102 | Order Cancelling Oral Argument on summary judgment and class certification motions, currently scheduled for March 29, 2022, is Cancelled | 03/22/22 | JA4715 |
|  | Petitioner's Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit, No. 21-948 (Supreme Court of the United States, No. 21-948) | 12/23/2021 | JA4716 |
|  | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 01/28/2022 | JA4824 |

# TABLE OF CONTENTS
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| | Respondents' Brief in Opposition, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/08/2022 | JA4853 |
| | Reply for Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/26/2022 | JA4899 |
| | Order Denying Petitioner's Petition for Writ of Certiorari, No. 21-948 (Supreme Court of the United States, No. 21-948) | 05/16/2022 | JA4923 |

EXHIBIT 41

**Jerry Williamson, M.D., F.A.A.P., M.J., CHC., LHRM**

**24 Falconwood Court Fort Myers, Florida 33919**

 **Expert  Report:** Jerry Williamson M.D. FAAP. MJ.CHC.LHRM

**September 22, 2019**

**Re: Monique Russell, Jasmine Riggins, Elsa Powell, Desire Evans v. Educational Commission for Foreign Medical Graduates**

The following report is supported by over 40 years of both formal education and experience as a physician and administrator. My formal education accomplishments include my degree as a Doctor of Medicine, my master's in healthcare jurisprudence, and certifications in healthcare compliance and risk management. I have practiced clinical medicine in my specialty, pediatrics, in which I am Board Certified.

I have held administrative positions as a  Chief Medical Officer, Medical Director, and Vice President for Medical Affairs in both the ambulatory and inpatient settings. In these positions I served on and chaired credentialing committees. Based on my experience in these roles, I became knowledgeable concerning the primary source credentialing process of the ECFMG, as it applies to the standard of care.   In 2005, as CMO and Director of the Biomedical Informatics Program, I directed the implementation of an EMR for an FQHC, assisting in the development of policies and procedures. During this period, I was Co-Medical Director of the Community Health Center Alliance Electronic Medical Record Clinical Committee. This committee assisted other organizations in their development and implementation of EMR's. I also served as a Meaningful Use Clinician Champion to The Center for the Advancement of Health Information Technology, a Regional Extension Center in Florida.

I have been a national speaker for the past 25 years, with a focus on patient safety, communication inadequacies in health care, and the prevention of medical errors. My roles have included Clinical Instructor in the Department of Pediatrics, University of South Florida College of Medicine, Clinical Assistant Professor in the Department of Pediatrics at NOVA Southeastern University, College of Osteopathic Medicine, Clinical Associate Professor of Physician Assistant Sciences, College of Allied Health, NOVA Southeastern University, Clinical Assistant Professor of Pediatrics, and Clinical Clerkship Training Coordinator at The Florida State University College of Medicine, and Clinical Assistant Professor at the Florida State University College of Medicine, Department of Clinical Sciences, Family Medicine Residency Program. In 2012, I was the Recipient of the *"Heroes in Healthcare Award"* for Administrative Excellence in Healthcare, from the Naples Daily News.

1

I had the opportunity to review the following documents that were provided to me from the law firm Janet, Janet & Suggs:

- Kara Corrado, 09/10/2019 Deposition Transcript with Exhibits 1-9
- William C. Kelly 08/20/2019 Deposition Transcript with Exhibits  1-53
- Class Action Civil Complaint and Exhibits
- Stephen S. Seeling 09/06/2019 Deposition
- Timeline of Events
- 1996 Information Booklet ECGMG
- Answer to Class Action Civil Complaint and Affirmative Defenses
- Defendant's Objections and Responses to Plaintiffs' Requests for Admissions of Facts and Genuineness of Documents
- Defendant's Objections and Responses to Plaintiffs' Second Requests for Admissions of Genuineness of Documents
- USMLE Letter (02-05-18); ECFMG Credentials Committee Document (11-30-16); U.S. DOJ Plea Agreement with Attachment A-Stipulated Facts; ECFMG  Irregularity Report (09-1992) and Sanctions Update (11-30-16); ECFMG Press Release re: Launching Electronic Verification of Medical Credentials
- ECFMG emails

**Summary of Facts:**

1. Credentialing  of healthcare practitioners is a screening process verifying that a physician is who he/she claims to be, and qualified to practice his or her profession. The process ensures that physicians have the education, knowledge, and competence to provide quality patient care. This is accomplished by obtaining the physician's essential information using primary source verification, to determine the accuracy of a qualification or documents reported by a physician. If the process fails for whatever reason, patient safety and quality is compromised, and patient harm may result. Primary source can be accomplished via direct correspondence, telephone  and computer verification, and reports from credentials verification organizations. Credentialing organizations must be aware of any red flags, and immediately investigate them to avoid serious consequences.

2. The Educational Commission for Foreign Medical Graduates (ECFMG)  is an organization that credentials international medical graduates for residency opportunities in the United States providing they have met all the requirements. This includes verifying

2

JA565

successful completion of medical school, and passing standardized examinations administered by the United States Medical Licensing Examination (USMLE), a Clinical skills Assessment Examination, and an English Test to determine competency in English.

3. Utilizing primary source verification, ECFMG documents the authenticity of the applicant's diploma, the medical school transcript, and any letters of recommendation. Once this process is successfully completed, ECFMG will provide the applicant a certificate of completion. Once the applicant begins applying to residency programs , ECFMG acts as "the deans office" (See Deposition William Kelly) and provides the residency program with a status report.

4. In 1991, Olufafemi Charles Igberase came to the U.S. from Nigeria, and submitted an application to ECFMG for certification. Over the next several years he used false identities, false social security numbers, false birthdates, false diplomas, and a false passport to obtain ECFMG certification.

5. In 1996, a third application was submitted by Igberase to ECFMG under the alias of John Charles Akoda. His application was accepted, so in 1998 after receiving ECFMG Certification, he applied for a residency position at Jersey Shore Medical Center (JSMC) and was accepted under the name John Charles Akoda and began his residency in July 1998.

6. During an on-site meeting in September 2000 at ECFMG's office, Akoda admitted to William Kelly, Manager of the Medical Education Credential Department at ECFMG,  that he used Igberase's social security number. Approximately three months later, JSMC advised ECFMG that Akoda was dismissed from their residency program for using a false social security number and false green card.

7. In 2006 Igberase applied and secured a residency at Howard University Hospital under the Akoda alias, using a false social security number. He completed his residency at Howard Hospital in 2011, and he applied for a Maryland license using the name Charles John Nosa Akoda. The information provided to the Maryland Licensing Board included a fake social security number, and fake passport.

8. In 2011 he became a staff member at Prince George's Hospital Center and began patient care in November 2011 under this fraudulent identity. The following year he was denied enrollment in The Center for Medicare and Medicaid Services (CMS) due to submitting an inaccurate social security number. While using the Akoda name, he practiced obstetrics and gynecology from 2008 through 2016. This included a private practice setting as well as employment with Dimensions Healthcare Associates.

3

JA566

9. In June 2016, law enforcement conducted a search at Igberase's residence, medical office, and vehicle. They found a variety of fraudulent and altered documents. In November 2016, he signed a plea agreement admitting to misuse of a social security number.

10. The following month ECFMG revoked Akoda's certification. In March 2017, he was sentenced by the U.S. District Court for the District of Maryland. This resulted in the termination of his staff privileges at Prince George's Hospital, and the revocation of his Maryland license based upon his felony conviction.

11. The current class action lawsuit is based on allegations that Igberase performed inappropriate physical examinations of a sexual nature on women, creating boundary violations.

12. The key question that must be resolved is whether ECFMG's actions or failure to act resulted in foreseeable injuries or damages to Class Members.

**Analysis of Facts and Opinion:**

1. ECFMG in its Subject Notice #101 dated March 1, 2017-Irregular Behavior Cases and Associated Actions & Sanctions states the following:
*The educational Commission for Foreign Medical Graduates (ECFMG) of the United States works on behalf of domestic and International medical regulatory authorities to protect the public through its programs and services, including primary source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs, or services to be **Irregular behavior.***

2. The 1996 ECFMG Certification and Application Information Booklet addresses the issue of Irregular Behavior. It states that: *Irregular behavior includes all actions on the part of applicants and/ or examinees, or by others when solicited by an applicant and/or examinee, that subvert or attempt to subvert the examination process.* It describes specific examples of irregular behavior and includes *falsifying information on application or registration forms;* This booklet is provided to all the applicants seeking ECFMG and USLME certification.

3. Accrediting organizations such as the Joint Commission has stated the following:
*The Joint Commission, the organization that evaluates and accredits U.S. health care organizations and programs, has determined that direct verification with ECFMG of a physician's certification status satisfies The Joint Commission's requirement for primary-source verification of medical school completion for graduates of international medical schools. ECFMG's Certification Verification Service (CVS) provides this primary-source confirmation of an individual's ECFMG certification status to medical licensing*

4

*authorities, residency programs, hospitals, or other organizations that, in the judgment*
*of ECFMG, have a legitimate interest in such information.*

4. There are several regulatory organizations including the Maryland Board of Physicians
   and numerous hospitals including Howard University Hospital and Prince George's
   Hospital Center that rely and trust the judgements of the ECFMG. Therefore, in this
   case, ECFMG owed a duty to the residency programs and the state licensing agencies to
   comprehensively review an application for certification. When ECFMG learned that
   Igberase was using a false social security number, and he admitted to doing so, it was
   imperative that they act as a prudent credentialing organization and comprehensively
   investigate this physician's background. .

5. ECFMG had a duty to determine whether the documents provided by Igberase and his
   aliases strongly suggested that Igberase and Akoda was one in the same individual.
   ECFMG breached that duty by failing to learn and appropriately act on that information.

6. There were several opportunities for ECFMG to intercede, still they breached the
   standard of care in the following ways:

   a. When Igberase had a face to face meeting at ECFMG in September 2000 and
      provided a false passport. ECFMG failed to authenticate the document.

   b. ECFMG failed to act when they learned that he misused his social security number.

   c. ECFMG neglected to compare the photographs in Igberase and Akoda's application.
      That would have confirmed they were the same person.

   d. ECFMG requested confirmation to authenticate three alleged letters of reference
      provided by Akoda, and the parties never returned a response. Nonetheless, ECFMG
      provided primary source verification to Howard University Hospital.

   e. ECFMG provided primary source verification to the Maryland Board of Physicians
      and Prince George's County Hospital without notifying them of their doubts
      surrounding Akoda's identity and credentials.

7. The December 22, 2000 Memorandum for the file From William Kelly to Stephen Seeling
   J.D. is difficult to comprehend . It was created as a memorandum for the file since
   William Kelly believed it should not be part of the official file. The memorandum was
   based on his discussion with James McCorkel M.D., Vice President for Academic Affairs,
   at the Jersey Shore Medical Center Residency Program. Dr. McCorkel believed Igberase
   and Akoda were one an the same person. Mr. Kelly confirmed he believed this as well

5

but stated in the Memorandum that he does not believe there is enough information for the Credentials Committee. He goes on to say  *I sent Igberase an email and who should reply, but Akoda!*

8.  As stated previously, ECFMG has many organizations that rely on their information and trust they are receiving accurate information when making decisions based on the information they receive from ECFMG. Not including critical information in the official file, places these organizations at a disadvantage. Another example of ECFMG's failure to act in a reasonable and prudent manner.

9.  By not being more assertive in their investigation in this matter, and not escalating their concerns to their Credentialing Committee, ECFMG certified Acoda and assisted him in his acceptance to the Howard University residency program. Additionally, this permitted him to obtain a Maryland License to practice medicine and obtain privileges at Prince George's Hospital. Unfortunately, ECFMG's failure to act in a reasonable and prudent way permitted Acoda to practice medicine and increase the risk of harm to the plaintiffs in this class action lawsuit, and perhaps others.

10. It was not until December 2016 when ECFMG revoked Akoda's certificate (0-482-700-2) based upon his plea agreement with United States, citing the same conduct Igberase had admitted to in 2000. ECFMG's failure to properly investigate the matter, directly resulted in foreseeable injuries to Igberase/Akoda's patients.

11. ECFMG had a duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. However, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety. Patients have a right to receive medical treatment from physician's who have obtained ECFMG certification legitimately, not through falsities and misrepresentations.

**Conclusion:**

There were several missed opportunities to address the many irregularities in the Igberase/Acoda applications. Unfortunately, these missed opportunities, permitted this unqualified individual with multiple fraudulent identities to practice medicine for years. ECFMG breached its duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. Additionally, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety.

6

**Disclaimer:**

My conclusions are based on the information that I was able to review, that was provided to date, and I reserve the right to change my opinions based on any additional information that I receive.

Respectfully,

Jerry Williamson M.D. FAAP,MJ,CHC, LHRM

EXHIBIT 42

JA571

# CHRISTIANE TELLEFSEN MD

301 Saint Paul Place
Suite 815 POB
Baltimore, MD  21202
CTellefsen@aol.com
Telephone: (410) 323-8767
Facsimile: (410) 560-7247

September 20, 2019

Danielle S. Dinsmore, Esquire
The Law Offices of Peter Angelos, P.C.
100 North Charles Street
Baltimore, Maryland  21201

                              Re:    "Charles Akoda" Cases

Dear Ms. Dinsmore:

        At your request, I have evaluated three plaintiffs in a lawsuit related to the activities of
Charles Akoda.  The plaintiffs are among multiple obstetric and gynecologic patients who were
evaluated or treated by Akoda in Prince George's County. These plaintiffs learned at some point
after their treatment that he had fraudulently obtained his medical license by using different Social
Security numbers and assuming false identities. He has since been convicted and served time for
fraud. Many of these plaintiffs also complained that Akoda behaved in a sexually inappropriate
manner with them, making them feel uncomfortable or disturbed.

        Akoda reported going through medical school in Nigeria and was certified by the
Educational Commission for Foreign Medical Graduates (ECFMG). He later completed a residency
at Howard University Hospital using his fake identity. The plaintiffs have filed suit against the
ECFMG for failure to properly vet and certify this man. What follows is a brief summary of these
evaluations as well as a discussion about the nature of their alleged traumatic exposure and
subsequent symptoms. For the individual summaries I have used code names for privacy, with a key
attached in an addendum.

Qualifications of Examiner:

        You have a copy of my Curriculum Vitae and Case List which states my qualifications to
perform this examination. This also lists my publications. I charge $500 per hour for any time spent
on this case. Over more than 30 years of practice, I have evaluated hundreds of cases in which there
have been allegations of sexual assault or inappropriate sexual behavior, with many of the victims
being in fiduciary relationships with the perpetrators. I have evaluated victims and perpetrators in

Dinsmore/Charles Akoda cases: September 20, 2019
Page 2 of 7

both forensic and clinical contexts. My experience has included evaluations of individuals who have been subjected to sexual assault, battery, inappropriate sexual touching, or surreptitious sexual surveillance as well as other professional boundary violations.

Summary:

The Akoda cases center on allegations of boundary violations, betrayal of trust by a treating physician and inappropriate sexual behavior. Boundaries are an important aspect of a therapeutic relationship between a patient and their physician. The boundary allows for a professional distance that fosters mutual respect between patient and physician. Sexual or inappropriate physical contact between a physician and patient is a profound boundary violation, as it exploits the dependency of the patient on the physician and the inherent power differential.

Patients trust that their individual physicians are working in their interest. This trust leads to a belief that they will not be taken advantage of, used for the physicians' own personal gain or have their confidences revealed. The physician patient relationship is founded upon this trust which allows patients to be vulnerable, to share intimacies and to be touched for medical purposes. When this trust is violated, the patient suffers a betrayal that may have myriad emotional consequences.

Individuals who have been sexually abused by physicians or other authority figures often develop characteristic symptoms, which may occur soon after the victimization or with a delayed onset. These symptoms and conditions may include depression, anxiety, paranoia, sleep disturbances and nightmares, reliving phenomena, self-harm, self-doubt and poor self-esteem. Many victims report feeling shame and guilt over these situations and often blame themselves for allowing the assault or situation to occur. Many of these victims berate themselves for getting involved with their victimizer and question their ongoing judgment. Many find it difficult to develop trusting relationships with subsequent caregivers, or may avoid future care. Some women develop symptoms of Posttraumatic Stress Disorder or Adjustment Disorders with characteristic reliving phenomena, heightened general anxiety, numbing and fears.

Likewise, patients place trust in institutions that employ physicians or otherwise certify their qualifications or competence. When that trust is broken, similar symptoms may arise, not the least of which may be an inability to trust in any doctor they see in the future or their sponsoring or associated facilities.

These cases are additionally complicated by being obstetric care. The breach of trust has an impact on the mother child relationship, with a high potential for guilt and self-recrimination over not protecting their babies. That these cases involve prenatal care and deliveries at which other family members participated or were present provides potential for further trauma. This may lead to an additional emotional burden of coping with shame and embarrassment in front of partners and family members.

Dinsmore/Charles Akoda cases: September 20, 2019
Page 3 of 7

Interview Summaries:

*Plaintiff Alpha*:

I saw her in my office in Baltimore on September 19, 2019 for a ninety-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Prince George's Hospital Center and Charles Akoda's outpatient treatment, as well as her deposition.

This 27-year-old woman underwent what she perceived as routine treatment with Charles Akoda in 2012. He provided her with prenatal care and performed her C-section. She did however believe her recovery was more painful than her recovery after her other two C-sections. She worried that a surgical mishap on his part might have led to this pain. She reported shock and dismay after learning of Charles Akoda's false identity. This was intense at first and subsequently has diminished but lingered. She has a recurrence of her shock, anger and dismay when she thinks about the situation, and these thoughts may arise unbidden. It has not otherwise interfered with her ability to function in her life and she has not had symptoms to such an extent that she sought any psychiatric treatment. She had an uneventful subsequent pregnancy and delivery with another physician.

Her description of these events suggest that while she has had ongoing emotional distress from the situation, it has not progressed to a diagnosable mental disorder. She reported having a heightened sense of apprehension about new physicians and other people in whom she needs to place trust in her life. She is far more cautious than she used to be and finds herself avoiding treatment if she has an inkling of discomfort, which she had not done previously.

*Plaintiff Bravo*:

I saw her in my office in Baltimore on September 13, 2019 for a ninety-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Kaiser Permanente and Prince George's Hospital Center, as well as her deposition.

This 32-year-old woman was a patient of Charles Akoda for prenatal care. He performed her delivery and then a D&C after a postpartum hemorrhage at Prince George's Hospital Center. She reported feeling uncomfortable around him during her prenatal care, enough so that she requested a chaperone during his examinations. She attributed the hemorrhage to his care, in that she had not had this problem with any of her other deliveries. She became dismayed, shocked and ultimately angry when she learned that he was not who he said he was and that his credentials were fake. She keeps a cellphone photograph of the blood clots from her hemorrhage, which serves as a frequent reminder of her traumatic experience and leads to painful reliving. She feels betrayed. She has become suspicious of any other professionals she allows in to her life. Her symptoms have not interfered with her day-to-day functioning but have caused ongoing distress. Her distrust of doctors led her to decline an appropriate examination because of her fearfulness and discomfort.

Dinsmore/Charles Akoda cases: September 20, 2019
Page 4 of 7

Her condition is most consistent with the psychiatric disorder, Adjustment Disorder with Anxiety. She would, more likely than not, benefit from a course of psychotherapy to assist her in processing what happened to her and promote less avoidant future behavior.

*Plaintiff Charlie*:

I saw her in my office in Baltimore on September 16, 2019 for a two-hour and thirty-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Prince George's Hospital Center, psychiatric records from Ijeoma Nnamani, MD as well as her deposition.

Charlie is a 40 year old woman who reported increasing problems with anxiety and depressed mood after her delivery which Akoda attended. She reported difficulty concentrating and an inability to be touched. She was evaluated by several psychiatrists who diagnosed her with Anxiety and Mood Disorders and treated her with antidepressants and anti-anxiety and sleep medications. She has also had an attempt at psychotherapy but has felt uncomfortable with this male therapist and does not feel like she has gotten much relief from that process. She continues to have depressed and anxious mood, poor concentration, excessive guilt and insomnia.

She attributed a lot of her anxiety symptoms to her reaction to having been Charles Akoda's patient, in terms of his identity theft. However, she also reported feeling like he was sexually inappropriate with her during her delivery. She said he began stimulating her clitoris in front of her husband and mother in the delivery room. She continues to ruminate about this situation and blames herself for not having said anything. At the time she felt confused, embarrassed, humiliated and disgusted by his actions which interfered with the joy of giving birth to her first child. Since the birth, she has been unable to reestablish her sex life with her husband, a loss she fears will lead to marital strife in the future.

Her condition is complicated by a number of other factors in her life, one of which is her difficult work schedule and the coordination of her and her husband's working hours. This lack of coordination exacerbates her problems with sleep. She has reported difficulty initiating sleep but she also has limited time available to her to sleep.

The other complicating factor is the more recent development of what sounds like, from her description, a pseudotumor cerebri, which is still being evaluated. She has been having headaches and a worsening of her already poor concentration. She is currently attempting to make a decision about going through with a lumbar puncture which is typically a necessary procedure to evaluate for this potential diagnosis. She has resisted having this test because of her ongoing concerns about trust with physicians. This is a particularly difficult test for her in that it requires her to expose her lower back to a physician with whom she has no ongoing relationship, while facing away and not being able to see what is happening. She has cancelled the appointment for the test several weeks ago and has not yet responded to the doctor's office's calls to reschedule it.

Her collection of symptoms is most consistent with a psychiatric diagnosis of Mood Disorder. This diagnosis accounts for the multiple sources of her symptoms. Her condition arose in

Dinsmore/Charles Akoda cases: September 20, 2019
Page 5 of 7

the postpartum period suggesting some hormonal contribution, but it has continued now for several years. She also now has new onset of a probable pseudotumor the symptoms of which have intensified her existing symptoms of depression.

She also has elements of a stress disorder, most likely Adjustment Disorder with Mixed Disturbance of Behavior. She reported many of her symptoms began because of her perception of Akoda's inappropriate actions during her delivery. She attributes her subsequent sex aversion and fear of being touched to this event. Her condition was then complicated by the shocking news about Charles Akoda's identity theft. Her fears about doctors and being touched is now having a direct negative impact on her evaluation for the pseudotumor. If this condition is left untreated, it could lead to blindness, other severe health problems or death.

She is currently in psychiatric treatment for medication management with a psychiatric nurse practitioner. Her situation, however, is tremendously complicated. She would benefit from treatment with a psychiatrist. Because of her history with Charles Akoda, she would benefit from a psychiatrist who could see her for both medications and the psychotherapy. She also has a potentially life-threatening medical condition now that needs to be addressed as soon as possible. She would benefit from more emergent psychiatric support to get her through this diagnostic process for her neurologic condition.

Analysis:

The three examined cases represent a spectrum of conditions with varying severity related to their experience with Charles Akoda. All of the women reported shock, dismay, anger, recrimination and guilt. They were all immediately distressed when they learned of his arrest and have had waxing and waning degrees of distress and horror over the subsequent years. Their level of distress tends to re-emerge with events in their lives that remind them of the experience.

Alpha reported having no symptoms unless she was thinking about the case, at which point she would have moments of intense anger, anxiety and tearfulness. Apart from that, this plaintiff has no interference with her day-to-day function. She has ongoing but intermittent emotional distress from the experience with Charles Akoda.

Bravo reported similar symptoms but in a more lingering fashion. This plaintiff also reported inappropriate sexual behavior that made her uncomfortable during her prenatal visits. She remains concerned that the complication of postpartum hemorrhage that she had with her delivery was somehow related to Charles Akoda's care. She, too, continues with intermittent symptoms of anger, confusion and concern for the future, but with frequent intrusive or unbidden memories. Her condition is diagnosable as an Adjustment Disorder.

Adjustment Disorders are diagnosed when various psychiatric symptoms arise in the face of stress. By definition, the condition continues until the stress is removed. Adjustment Disorders are related to Posttraumatic Stress Disorder but differ in that the inciting stress is not life-threatening as it would be in Posttraumatic Stress Disorder. Other than that, symptoms may be very similar and

Dinsmore/Charles Akoda cases: September 20, 2019
Page 6 of 7

include emotional distress, heightened general anxiety, sleep disturbance, re-living phenomena, avoidance and myriad other symptoms, such as anger and behavioral disturbances.

Charlie represents a more extreme emotional response to the situation. Her condition is also complicated by a number of other factors and stressors in her life and the recent development of other serious health problems. This plaintiff is clearly suffering from a Mood Disorder that has been diagnosed by her practitioners as Major Depression. Clearly this Mood Disorder was exacerbated by her experience with Charles Akoda. Her condition is impairing and currently endangering her physical health. She would benefit from assessment and treatment with a psychiatrist skilled in both psychosomatics as well as trauma.

I trust this addresses your concerns. I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath. Please feel free to contact me if you have any questions.

Sincerely,

Christiane Tellefsen, M.D.

Dinsmore/Charles Akoda cases: September 20, 2019
Page 7 of 7

Appendix

| PLAINTIFF | PRIVACY DESIGNATION |
|---|---|
| JASMINE RIGGINS | Alpha |
| ELSA POWELL | Bravo |
| DESIREE EVANS | Charlie |

EXHIBIT 43

JA579

**Annie Steinberg, M.D.**
**The Bridge**
**31 N. Narberth Avenue**
**Narberth, PA 19072**

September 23, 2019.

Brent Ceryes, Esq.
Jonathan Schochor, Esq.
Schochor, Federico & Staton, P.A.
1211 Saint Paul Street
Baltimore, Maryland  21202

Re: 'Akoda' Matter

Dear Mr. Ceryes, Mr. Schochor and colleagues:

Pursuant to your request, I have reviewed the information provided and gathered additional information from the claimants involved in this matter.  In this correspondence, I offer my synthesis of the findings in this matter to date.  My findings will include the process by which this matter was assessed (in the aggregate) with respect to the individual plaintiffs and will outline the degree to which women treated by "Dr. Akoda" report have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery.  I will also opine on current psychological issues that relate to the subject incidents and their consequences.

While the contents of this correspondence are subject to amendment or supplementation with the availability of new or additional information, this report incorporates information from the individual responses to a self-administered questionnaire completed by over 300 women who have come forth as former patients of "Dr. Akoda", now plaintiffs in this matter, and will also address issues from the larger collective or summative perspective.  Individual narratives will be included in this report without grammatical correction and precisely as written by the class member.

## 1. Background

Oluwafemi Charles Igberase practiced medicine in Maryland as an obstetrician and gynecologist between 2008 and 2016, treating more than 1,000 patients after fraudulently obtaining a medical license under the name John Charles Akoda.

Igberase had immigrated to the United States from Nigeria in 1991.  Little is known about his life, medical education, and training in Nigeria.  Between 1991 and 1999, Igberase applied for and obtained at least three different Social Security numbers using different names and birth dates. Between 1992 and 1997, he also applied for and received three separate certifications from the Educational Commission for Foreign Medical Graduates (ECFMG), again using different names, birthdates, Social Security numbers, and falsified passports.  His first certification was

subsequently revoked and the second certification invalidated based on ECFMG's conclusion that he had provided false information.   In 1997, using the name John Charles Akoda, Igberase applied for and received a third certification.

'Akoda' a/k/a "Oluwafemi Igeberase," has since admitted to using various fictious identities, including the 'Akoda' identity, as well as a variety of fake identification documents, including a fake passport, a fraudulent social security number, fraudulent or altered medical transcripts, fraudulent or altered diplomas, and fraudulent letters of recommendation, in order to obtain ECFMG certification, obtain admission to residency programs and ultimately act as an obstetrician/gynecologist, performing medical and surgical procedures and gynecologic examinations on patients.  Through his conduct, he circumvented the lawful process designed to ensure the competency and character of foreign medical graduates, placing patients at risk.

A lawsuit has been filed against the Educational Commission for Foreign Medical Graduates, which was made aware in 2000 that 'Akoda' had used a fraudulent social security number in documentation submitted to ECFMG and the Jersey Shore residency program.  ECFMG was also made aware at that time that 'Akoda' had admitted to previously using other aliases, including the "Igberase" identity.  ECFMG had previously revoked the ECFMG certification of "Igberase" as a result of false statements he made on ECFMG applications.

It has been alleged that ECFMG was negligent in failing to investigate and take appropriate action to revoke the ECFMG certification issued to 'Akoda' after having been made aware of these and other concerns, and that as a result of this negligence, the women who encountered him as patients seeking obstetrical and gynecologic care have suffered significant emotional distress, including the distress they experienced upon learning that the individual they trusted to render medical care was not a lawfully-licensed physician, and had engaged in substantial fraud in order to become their obstetrician/gynecologist.   Additionally, clients have identified concerns regarding potential inappropriate behavior and conduct.

ECFMG was established to ensure that international medical graduates have the education, credentials, and knowledge necessary to enter medical residency and fellowship programs in the United States.  To receive certification, applicants are required to pass examinations administered by USMLE as well as an English examination, and to submit their medical diplomas for review.  'Akoda' has claimed that he attended medical school in Nigeria, although STAT news was unable to verify this claim.

With his ECFMG certification in hand, in 1998, Igbarase (using the name Akoda) applied for and was accepted into a residency program at Jersey Shore Medical Center (JSMC) but was dismissed in 2000.  He then used a different Social Security number to apply for a residency at Howard University in 2006.  He was admitted to this program and completed the residency in 2011.  Later that year, using the name Charles John Nosa Akoda, a falsified Social Security number, a fake permanent residence card, and a fake Nigerian passport, he applied for and received a Maryland medical license.

Using these same fake documents as well as a fake Maryland driver's license and fake letters of recommendation, he obtained privileges and became a member of the medical staff at Prince

George's Hospital Center (PGHC). Between February and June of 2012, he was also employed by Dimensions Healthcare Associates, Inc.

In 2016, law enforcement searched the residence, medical office, and vehicle of the man posing as "Dr. Akoda," where they found fraudulent documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates. Igberase signed a plea agreement admitting to the misuse of a Social Security number. Igberase's 'Akoda' ECFMG certification was then revoked, and he was sentenced to 6 months incarceration, 3 years of supervised release, home detention for 6 months, and a file of $100. In 2017, Prince George's Hospital Center terminated his medical privileges and the Maryland Board of Physicians revoked his medical license on the basis of fraud and a felony conviction.

As a result of Igbarase's ability to fraudulently gain admission to residency programs and become employed as a physician, he was able to practice obstetrics and gynecology between 2008 and 2016, delivering care to approximately 1000 women at Howard University, Prince George's Hospital Center, and the practices of A. G. Chaudry, M.D. and Javaka Moore, M.D.

Legal action was filed on December 10, 2018 in the Court of Common Pleas of Philadelphia County and thereafter removed to Federal District Court for the Eastern District of Pennsylvania, claiming that ECFMG's negligent certification of the man known as Dr. Akoda enabled him to violate the boundaries of trust with his patients, causing physical pain, emotional anguish, fear, anxiety, humiiation, embarrassment, and other physical and emotional injuries; and that these damages have resulted in both economic and non-economic damages.

### 2. Description of Evaluation Process

Forensic psychiatric consultation was requested to assess the potential damages, if any, that class members may have experienced concerning the actions of "Dr. Akoda." A 60-item survey questionnaire was designed by this psychiatrist/writer which you distributed securely to your clients (with names removed and an identification number provided). The results of this survey questionnaire and a provisional analysis of the results are offered in this correspondence.

"Dr. Akoda" had at least 1000 patients between 2008 and 2016. Approximately 575 patients who were treated by the man they knew as Dr. Akoda had come forward for legal representation by your firm and other law firms working cooperatively, and these 575 individuals had been vetted and identified as class members. In an effort to evaluate the presence and severity of injuries sustained by the Plaintiffs' class, this psychiatrist developed a 60 item standardized questionnaire suitable for on-line administration to gather consistent and reliable data across class members.

Following the digitization of the electronic questionnaire, link and report portal setup, the secure hosting of the form and form data, the 60 item questionnaire was sent electronically to identified class members. Collected demographic information included age, partner status, primary language, ethnicity, and type of health insurance; as well as information about patients' experiences with the person they knew as Dr. Akoda. Questions were written in plain language

to ensure clarity and understanding among all claimants regardless of their educational background.

Sections of the questionnaire addressed demographic information and 8 topical domains:
1) Meeting "Dr. Akoda" and the experience of being his patient
2) Trust in "Dr. Akoda"
3) Experiences of "Dr. Akoda" during his gynecological exam and related care
4) Unusual behaviors by "Dr. Akoda"
5) Learning about the charges against "Dr. Akoda"
6) Impact of experience with "Dr. Akoda" on respondents' mental and physical health
7) Impact of experience with "Dr. Akoda" on other aspects of respondents' lives
8) Other factors that may have influenced the degree of harm, such as previous experience with abuse.

Respondents were provided with checkboxes to ensure that the questionnaire could be completed in approximately 15 minutes. Multiple choice responses were utilized throughout the questionnaire so as to facilitate quantitative analysis. Text boxes were also available for many questions to enable respondents to provide additional details, and respondents were offered the option of including a statement. A secure custom application had been developed to capture electronically the answers to the questionnaire and could be viewed real time to facilitate accurate data collection, documentation, and quantitative analysis, as well as to collate the summary statements for a more qualitative examination.

Confirmed patients/class members were contacted by e-mail and given instructions for logging on and completing the questionnaire. A total of 575 presumed patients were sent the email and 306 returned the questionnaire, with 292 completed fully; 14 of the questionnaires were missing one or more responses. This synthesis analyzed the data when 305 questionnaires were returned. Summary statements were offered by 131 women. In order to assess the aggregate severity and distribution of potential damages among the entire Plaintiffs' class, the response rate and sample size would be more than adequate to provide reasonable confidence intervals for the percentages of Plaintiffs in each of several categories of damage severity but this exceeded the scope of this report. Statistically reliable information was also gathered in a mode that ensured an equal opportunity for each class member to communicate her experience related to "Dr. Akoda."

This analysis incorporates only some of the data collected, represented here with both numerical/quantitative information as well as qualitative data in the form of narrative or selected quotes. Some topical sections have a sample of quotes by individual women; the quotes are presented in large quantities so as to demonstrate the consistency of experiences among the Plaintiffs.

## 3. Results

*"I really don't Trust no male doctors he mess up that I trusted him with my body and he wasn't even who say he was…"*

JA583

This section summarizes statistically the results of the questionnaire. Although 306 class members started the questionnaire, some did not answer every question; thus, the percentages calculated reflect responses only from those who answered a particular question. For questions where multiple answers were allowed, the percentages are calculated based on the total number of results rather than the total number of responses.

### a. Patient demographics

The women seen by "Dr. Akoda" vary in age from 22 to 59, with a median age of 35. The vast majority of patients (89%) identified themselves as African American and used English as their primary language (96%). An additional 10 patients were mixed or biracial, six were Hispanic, two were Caucasian, and one was Asian. Most patients (57%) were single; 43% were married or in a long-term relationship. During the time in when they were treated by "Dr. Akoda", 73% were on Medicaid, 21% had private insurance, and 5% had no insurance.

### b. Patients' experiences with Akoda

Respondents were asked how they became a patient of "Dr. Akoda." Most (55%) said they had gone to see another doctor but were re-assigned to see "Dr. Akoda" instead. About 6% were referred by another doctor, and another 6% found his name on a list of doctors; 5% walked into the clinic; and 4% were referred by a family member. The remaining 24% became his patient through other means.

More than half (59%) of claimants reported that they saw "Dr. Akoda" at the medical practice of Dr. A.G. Chaudry, 31% reported that they encountered him at PGHC, and 11% reported that they saw him somewhere else, although none reported seeing him at JSMC, Howard University Hospital, or the medical practice of Dr. Moore.

A few respondents saw "Dr. Akoda" before 2012, but most saw him between 2012 and 2016. Forty-three percent (43%) saw him more than 5 times, and another 37% saw him between two and five times. About 20% saw him only one time. Approximately half (50%) of these appointments were for prenatal, delivery, and postnatal obstetric visits. Other reasons for seeing "Dr. Akoda" included routine annual gynecological care (26%), surgery (13%), and other medical care (11%).

### c. Perceived trustworthiness

Initially, patients expressed a high level of trust in "Dr. Akoda," with 79% saying they initially trusted him. However, about 75% of those who indicated initial trust in him reported that their trust changed at some point, very often for a change in his demeanor that left them uncomfortable, a rude or sexualized comment that they did not fully understand but was out of the range of what they had previously experienced. Reasons given for this loss of trust are illustrated in Figure 1. About 29% of patients indicated they felt scared or threatened by "Dr. Akoda" during their time in his care. Vignettes offered later in this report elaborate on the prevalence of "Dr. Akoda's" disrespectful posture with his patients during routine health care maintenance as well as during tumultuous deliveries.

5

JA584

**Figure 1. Changes in perceived trustworthiness of "Dr. Akoda"**



2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply)

He was rude, 40
It was just something about...., 106
He made sexual comments, 37
He hurt me, 24
Pelvic exams were too long, 49
Other, 127

383 responses in 291 results

### d.  Pelvic and breast exams

Class members were asked how "Dr. Akoda's" pelvic and breast exams compared with other doctors' exams before or since they saw him. For pelvic exams, responses were evenly split between those who responded that there was no difference in the exams and the exams being perceived as worse than other doctors.  About 2% said they liked "Dr. Akoda's" pelvic exams better than previous pelvic exams they had experienced.  43% of women said "Dr. Akoda's" pelvic exams were more painful, while 10% said they were less painful. Most (74%) patients reported that Akoda's breast exams were similar to those of other doctors, but 23% indicated that they were worse, e.g., rougher, longer, or sexualized).

Also explored is whether or not a nurse or chaperone was present during pelvic exams and whether "Dr. Akoda" always wore gloves, since both are considered standard practice.  Many patients (58%) said there was always or sometimes a nurse or chaperone in the room during pelvic examinations, although about 23% reported that a nurse or chaperone was never present and about 19% of the respondents did not remember.  About 25% said the nurse or chaperone never stayed throughout the examination and about 30% said she never stood in a place where she could see the examination.  10% of patients said he sometimes or always performed a pelvic exam without using gloves.

### e.  "Dr. Akoda's" inappropriate behavior

Nearly half (46%) of patients said they were uncomfortable during or after the exam and about 62% said they considered changing doctors.  About 30% said "Dr. Akoda" touched them in a way that felt uncomfortable or wrong and 24% said he "talked dirty" or made sexual or otherwise inappropriate comments.  Eight patients said they felt sexually aroused or had an orgasmic response during the examination.  Asked if patients who felt that "Dr. Akoda's" behavior had been

6

JA585

inappropriate ever told anyone, who they told, and why they may not have told anyone.   Of the 46% of patients who said they told someone, most told a family member,

128(46%) patients said they told someone about Akoda's inappropriate comments or behavior. They most often told a family member (48%) or friend (27%). Several told a nurse or other healthcare provider (8%), another doctor (6%), an administrator (<1%), or someone else (11%). 53% of patients did not tell anyone for reasons illustrated in Figure 2.

**Figure 2.  Reasons for not telling anyone about "Dr. Akoda's" inappropriate behavior**



150 responses in 291 results

      **f.    Learning about the charges against "Dr. Akoda"**

Most patients first learned that charges had been made against Dr. Akoda through the news media, either from something viewed on the television (59%), heard on the radio (16%), or read in the newspaper (2%).  About 12% heard about it from a friend, and a few (2%) received a call from a healthcare provider. Figure 3 illustrates the feelings of patients when they heard about these charges:

**Figure 3. Patients' feelings upon learning about the charges against "Dr. Akoda"**



819 responses in 291 results

Only 8 patients said they were not upset about what they heard. The reasons other patients gave for being upset are shown in Figure 4.

JA586

**Figure 4. Reasons patients were upset about what "Dr. Akoda" did**



546 responses in 291 results

g.  **Emotional and physical distress experienced as a result of "Dr. Akoda's" conduct**

Survey questions explored the emotional distress experienced by class members.  In response to the global question of whether, when, and for how long class members experienced emotional distress as a result of Akoda's conduct or from learning that he may not have been a licensed doctor and had falsified documents to obtain certification, 89% said they did experience emotional distress.  Of these, nearly half (47%) indicated that their emotional distress occurred only after learning about the charges against him. 84% of respondents indicated that they still experience emotional distress.

Emotional distress was also experienced physically by class members.  65% of respondents reported intense physical reactions such as rapid heartbeat, shortness of breath, or excessive sweating when reminded of being treated by Akoda.  More than half (55%) said these physical manifestations occurred only after learning about the charges against him and 70% said they have persisted.

Most class members (79%) reported having upsetting thoughts, memories, or dreams of being treated by Akoda, with 54% indicating this only occurred after learning about the charges against him and 84% saying these upsetting thoughts still occur.  75% said they try to avoid thoughts or feelings about what happened with Akoda, and 39% said they find it hard to recall some aspects of what transpired.

Class members were asked whether and when they experienced specific signs or symptoms of post-traumatic stress.  These results (rounded to the nearest percent) are presented in Table 1,

**Table 1. Signs and Symptoms of Post-traumatic Stress experienced by patients of Dr. Akoda**

| Symptom | Yes, only in the past month | Yes, only prior to the past month | Yes, both in the past month and prior | No |
|---|---|---|---|---|
| Mood changes or depression | 4% | 6% | 49% | 41% |

| | | | |
|---|---|---|---|
| Reduced interest or pleasure with important activities | 3% | 6% | 38% | 53% |
| Irritability or anger | 7% | 9% | 53% | 31% |
| Difficulty concentrating | 5% | 5% | 42% | 49% |
| Feeling jumpy, overly alert, or easily startled | 4% | 5% | 37% | 55% |
| Trouble sleeping, bad dreams, or nightmares | 4% | 8% | 42% | 46% |
| Embarrassment, shame, or humiliation | 6% | 5% | 56% | 33% |
| Trouble making decisions | 4% | 3% | 27% | 66% |
| Overuse of drugs or alcohol | <1% | 1% | 5% | 94% |
| Discomfort with body or reduced self-care | 4% | 6% | 36% | 53% |

Class members also reported a variety of physical symptoms that they attributed to Dr. Akoda's conduct. These are summarized in Figure 5. These symptoms were described as mild by 26% of respondents, moderate by 53%, and severe by 21%.

**Figure 5. Physical symptoms experienced as a result of Dr. Akoda's conduct**



Most class members (82%) have not received any psychological, psychiatric, or medical treatment for symptoms arising from their experience with Akoda. Among those who have received treatment, these treatments included non-psychiatric medication (46%), psychiatric medication

9

JA588

(17%), and therapy or counseling (37%). Only slightly more than half of class members (158 individuals) described receiving psychiatric or medical diagnoses that they believed were related to their experience with Akoda. These included Major Depressive Disorder in 64 patients, Anxiety Disorder in 52 patients, Post-Traumatic Stress Disorder in 30 patients, and Substance Abuse in 12 patients.

### h.   Loss of trust and aversion to medical care

The vast majority of class members (94%) said that their experience with Dr. Akoda affected their trust in doctors. They were also asked how this experience affected their use of medical care. More than half said it has changed how often they visit and obstetrician/gynecologist (53%) and/or has affected the medical choices or decisions they make (53%). Slightly fewer said it has changed how often they visit any doctor (45%) and/or has affected the types of specialists they see (49%). Only 8% said it has not affected their use of medical care.

### i.   Effects on non-medical aspects of life

 Many class members reported that their experience with Dr. Akoda affected other non-medical aspects of their lives as well. 46% said they were concerned about their daughters going to see an obstetrician/gynecologist; 27% said it has affected their relationship with a spouse or partner; and 6% said it had affected their relationship with their children.  Only 23% said it had not affected non-medical aspects of their lives.

Some class members (21%) reported that their experience with Dr. Akoda had negatively affected their work lives. For example, 13% of respondents said they were not able to go to work for some period of time. Others said they missed work deadlines (6%), quit their jobs (3%), or were fired (2%).

About 32% of class members reported effects on their social life, for example, avoiding friends, neighbors, and relatives (21%); avoiding certain types of social events (24%); avoiding certain neighborhoods (10%), not reading mail or email (5%), and not retuning messages and phone calls (11%). Thirty class members (10%) said they were afraid of or avoided leaving home.

### j.   Prior vulnerabilities

Since previous experiences with violence or abuse may make individuals especially vulnerable to subsequent abuse, class members were asked about prior experiences.  26% reported that they had been threatened by somebody (6% declined to answer), 19% said they had experienced or witnessed violence in their own homes (4% declined to answer), 17% said they had been forced to have sex or been threatened with violence if they didn't (9% declined to answer), and 22% said they had been sexually abused in other ways. (9% declined to answer)


### 4.   Analysis of Damages

*Boundary Violations in Gynecological Care*

It is well established in the literature that sexual contact between physicians and their patients can have devastating consequences for the patients (Dehlendorf and Wolfe, 1998, Feldman-

10

JA589

Summers and Jones, 1984).  Patients' responses to physician sexual misconduct has been examined specifically in the context of gynecological care and sexually abusive internal examinations and found to impact on patients in specific ways (Burgess, A.W.,1981).  Sexual exploitation, defined as situations in which a person is used primarily for another person's gratification, profit or selfish purpose, was explored with interviews of women who had been exploited with intentional genital manipulation during internal gynecological examinations over an eight year span of time.

In this matter, 'Dr. Akoda' was perceived to have lengthy exams by some, with misuse of his hands, and occasional absence of a nurse during the examination.   The claimants consistently describe physical discomfort, feeling disrespected, a sense of powerlessness, annoyance, anger, and shame.  Some women described a feeling of being degraded and exploited, and felt that their credibility was at risk, emphasizing the unequal power status.

In this matter, women reported negative experiences during their time in care with 'Dr. Akoda, including physical and emotional discomfort with the genital examination (prolonged duration, painful exam, absence of gloves, the departure of the chaperone, sexualized touching of the vagina and clitoris, rude, inappropriate, and crude sexual comments, and overly personal interactions:

*"I just wanna say that this whole situation has changed my life. It puts me in a place to where I'm uncomfortable about going to the doctors. Only because Dr. Akoda did what he did to me. This man did exams on me he barely used gloves I feel so violated. I only remember him using gloves 4 times out of my whole pregnancy that was only in the beginning. But when I started getting into my second trimester and at the end of it he didn't use gloves and in my 3rd trimester he never used them."*

*"I went to his office when i was over 1 5weeks pregnant after the pap smear the female lady stepped out and i was putting on my clothes and he slapped my ass telling me i have big buttocks. I felt so sad and i cried on leaving which was my second visit to him."*

*"My doctor (s) were not available to come to the hospital and so he was the doctor they told me would delivery my daughter. After delivering my daughter, my husband kept talking about how uncomfortable he was with him as the doctor. He felt that he was touching my inappropriately and not doing some things correctly. After a while, we forgot all about it and moved on thinking that maybe that was what was suppose to happen. Like a year later, we received word about a fake doctor at PG Hospital and when the person showed us that picture, my husband immediately knew that was the doctor that deliver my daughter. Once getting the paperwork from the hospital, it was confirmed!"*

*"I'd also like to elaborate on #6t. After my pelvic exam in which he smelled his fingers. I grew very self conscience of my body and vaginal health. I couldn't understand why he would do that and never explained why. I was too ashamed to ask but I noticed that major decrease in my libido after that experience."*

*"I am small breasted and during the breast exam he stated that they were so small I shouldn't have a problem finding anything!  I was very embarrassed and couldn't wait to leave. I didn't get another yearly exam for two years."*

11

"During my appointment with Akoda, my fiancé was in the room with us, once he saw that Akoda had no gloves on during my removal of the Mirana and breast exam, he asked him "aren't you suppose to have gloves on?" and Akoda stated no, My fiancé got uncomfortable and frustrated and left the room. After the door closed Akoda stated "he is a very jealous man". I will never forget how he look, and how his hands were extremely ashy."

"Then one day I went for office visit and he told me to stop having more babies that I could kill myself if I keep having more babies. Then I was really upset and reported the case to Dr. Chaudry and when I got home I also reported to my husband who accompanied me to the clinic on my next visit. Dr. Chaudry asked him to apologized to me which he did that very day in the presence of my husband."

"My oldest daughter would accompany me to my appointments and would always tell me there was something about him that didn't sit well with her. He made a comment about the size of my vagina and uterus that made me feel disgusting and dirty. The day he scheduled my induction he also told me he had 11 other inducements that day and that he would be leaving for Africa the next day which according to him was his birthday. He rushed me and even suggested I have a C-Section, I told him he was going to be patient and wait for my child and I would not allow him to cut me. My daughter is now a thriving 7 year old second grader, but as a parent I always fear what her future holds as a result of him having ever touched her with his sick, in-educated, moral less hands."

"He is a demon doctor he let me go in shock while on the eximanation table while i went unconcious he had his han in me and then went up on me lying still unconcious he ripped the point of my cloterist wide open saying how that you have three children and still so neat. I told him that l was seperated from my husband for seveteen years and hoping for him to come back. He dr okada is a real Deamon."

Sexual contact between physicians and patients violates the fiduciary nature of the relationship that requires physicians to act in the best interest of their patients; fiduciary actually being a legal term that is applied to a professional in whom the patient places her trust. Most physicians adhere to one or more sets of ethics codes, depending on the professional organizations to which they belong. An example of such a code would be the American Medical Association's "Principles of Medical Ethics," which notes, "The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obligations to other groups, and to advocate for their patients' welfare." It is not clear if Igberase received the necessary training and supervision in medical school to be knowledgeable about the physician's Code of Ethics.

The AMA Code specifically addresses sexual misconduct in the practice of medicine and states that, "sexual contact that occurs concurrent with the physician-patient relationship constitutes sexual misconduct. Sexual interactions between physician and patients detract from the goals of the physician/patient relationship and may exploit the vulnerability of the patient, may obscure the physician's objective judgement concerning the patient's health care and ultimately, may be detrimental to the patient's well being."

JA591

The Code of Professional Ethics of the American College of Obstetrics and Gynecology is another example of the provision of rules for ethical conduct to the members of a professional organization.  The code of this organization, one to which 'Dr. Akoda' may or may not have belonged, also addresses the fiduciary nature of the relationship, and states clearly that, "sexual misconduct on the part of the obstetrician–gynecologist is an abuse of professional power and a violation of patient trust."'Akoda's' reported irregular pelvic examinations, protracted and painful examinations (some without gloves), inappropriate comments, and intentional vaginal, clitoral, and breast stimulation together suggest the abuse of power with a vulnerable population.

*Disrespect and Adverse Clinical Outcomes*

The power imbalance and vulnerability of his patients did not yield a confrontation by his work colleagues of the very significant misconduct and abuse of power; many of the vignettes offered by claimants suggest blatant disrespect for and neglect of claimants so great that it was described as a factor adversely affecting the clinical outcome:

*"I was scheduled to have an induction from Dr. Javaka Moore's office and Dr Akoda was the delivering doctor at that time. He was very rude and pushy. He kept telling me to shut up and hurry up and push the baby out because he had somewhere to be and didn't have time for me all night. He kept saying if I didn't hurry up he was going to perform a C Section . He just kept saying that over and over. So halfway during my delivery the baby was coming out and he just left me there for a few with the baby half way in and half way out and i was telling him that that was so painful and he told me to shut up and stop crying like a baby."*

*"My overall experience with Dr. Akoda was completely terrifying! I feared for my child's life and safety as he failed to perform the necessary c-section procedure after he discovered that my child was in complete distress during my labor in March of 2016. Dr. Akoda did not show any concern. As a result of Dr. Akodas negligence, my child was born with his umbilical cord wrapped around his neck, strangling him and blocking his airways preventing him from breathing. I thought my child was DEAD! He was completely blue in the face! He had swallowed his own urine and feces!"*

*"Akoda was the doctor that delivered my son 2015. He took over because my actual doctor was out of town...I believe. He left me (in active labor) went home and returned late evening the next day to attend to me (so uncalled for). I almost lost my son and my life during the process. I felt sick and was admitted at PG hospital after emergency C-section was done of me for about 5 days with tons of blood transfusion."*

*"Dr. Akoda made decisions in the delivery room that affected both me and my son. He tried to break my water after it already broke. I felt a sharp paid and started to bleed profusely. He then attempted to deliver my son without any antibiotic even though my chart stated I was gbs positive. My son suffered an infection and had to be hospitalized at 2 weeks old due to this."*

*"My delivery process was rushed I was not giving the time to go through the different phases of labor as I have intended. Instead Dr Akoda, came into my room and brook my water after one hour of being admitted and he stated, "I want to help you speed up this process." After breaking*

JA592

*my water, Dr. Akoda told me not to tell the nurse. the nurse came into my room and asked me what he just did and I told her that he broke my water. The nurse stated "why would he do that." My trust for Dr. Akoda was broken after he rushed my delivery because he wanted to live [leave] and did not want another doctor to take over. I was hurt and broken but I was thankful that I came out of the delivery room alive after everything I went through while laying in that delivery table. First my epidural was no longer effective at the time of the surgery and I could feel Dr. Akoda cutting my stomach. I screamed in pain and he said that I should not be feeling anything but pressure. Second I was finally put to sleep with general anesthesia because I was in so much pain. The day after my surgery, Dr. Akoda, came to my room and stated "You are lucky to be alive" "I have been a medical doctor for many years and I have never had a difficult surgery as yours." Dr. Akoda also stated that if it was not for his years of experience he would have performed a hysterectomy on me and advised that I should plan on not having kids again in the future. This statement has tormented my husband and I for the past three years. My experience at Prince George's Hospital and with Dr. Akoda was rough and I was afraid to ever become pregnant and to have to ever go through the same thing I went through during delivery."*

*"Dr Akota told me I was pregnant in my tubes and performed surgery on me and couldn't find the baby and I was drugged up and put to sleep and I don't know what happens after that I woke up in my room in a lot of pain then hours or next day dr akota came into my room and gave me a shot in my arm and said he couldn't find the baby so I started going off on him saying he cut me open for nothing then dr akota gave me a shot in my arm saying that shot is to kill the baby and so I can bleed it out I bleed for days weeks and in a hole lot of pain and all I can think of was what really happened to me while I was drugged up under the Anastasia and if dr akota didn't know what he was doing and if I was really pregnant in my tubes I think bout all this since the day it all happened."*

*"Dr. Akoda did some things to me that I know now were completely wrong. He did NOT properly medicate me because I rememmer the whole C-Section. I felt the whole thing I screamed and cried through the whole thing. Also, he cut my son while he was coming out of me and he still has the scar to this day. I don't remember much from my sons first 3 month of life. And I Learned when I had my daughter, there is pain med that will make you forgot things. He scared me and I will never forgive him!"*

*"As I'm typing this I'm experiencing so many emotions at this time.It's so hard and very painful just thinking about Akoda I'm feeling sick. He was rude and unprofessional,I was told that I should have my tubes tied because I have a Nigerian husband with to many kids.He said if I don't tie my tubes I would be pregnant again because Nigerians love making babies, that was on my first visit in 2013.I pray this comes to a end soon because just thinking about him makes me angry,sad sick and betrayal."*

*"A life time mental exhaustion remains in my family due to an unwanted outcome .. My family and I have to cared for my son forever and it makes me depressed on a daily basis. And sometimes I get worried about the c-section if it was done right. I also suffered placenta previa during my pregnancy and was never diagnosed by Dr Akoda until it happened and was diagnosed at the hospital! And moreover Dr Akoda lied to me and he failed to answer my*

JA593

*questions after the birth of my so . I am still angry and grieving about what happened to my son."*

While all misconduct is a fiduciary failure, 'Dr. Akoda' recognized the extreme power imbalance and his capacity to control his patients in their most exposed and defenseless moments.  A physician associated with a powerful institution, he likely found his female patients looking up to him because of his social status; this also resulted in an imbalance of credibility; when questioning themselves about what had transpired, they would presume that they had only imagined misconduct.  Furthermore, his patient population was a very vulnerable group of women; 89% African American and 73% Medicaid recipients, 19% reported having experienced domestic violence; 17% had been forced at some point to engage in sexual relations; and 22% reported having been sexually abused in other ways in the past.  While it is possible (likely even) that the above percentages are not independent – women may have said yes to multiple types of abuse and may have been thinking of the same events, these figures are not surprising and do lend support to the premise that his patients were a particularly vulnerable population and that his physical and sexual misconduct and betrayal of trust would be high impact event.

   *Emotional Distress Upon Learning of Fraud Allegations Against 'Akoda'*

While some wondered if his behavior (e.g. protracted pelvic examinations) were the source of some damage or the etiology of precipitated labor or miscarriage, most women experienced an array of powerful sentiments after learning that 'Dr. Akoda's name and medical credentials were falsified.  The majority experienced shock, anger, sadness embarrassment and a sense of betrayal, acute emotional distress upon learning of the allegations against 'Akoda.'  Only eight patients (of 306 respondents) reported not feeling upset.  65% reported intense physical reactions when reminded of being treated by 'Akoda.'  79% reported re-experiencing with upsetting thoughts, memories and dreams of being treated by 'Akoda' and 75% reported attempts to avoid thinking about what had transpired and the implications of his fraudulent credentials.

*"Every time i think or talk about this situation, i cry, i cant concentrate, i cant sleep and my body tingles and go numb. I trusted him and he betrayed my trust of care, i was comfortable thinking i can depend on my doctor, who i thought had my best interest for me and the delivery of my child. The fact that i have to live knowing his credentials and education is false and someone did not do their job thoroughly, to be one of so many women who are victimized is very stressful. to know he delivered my daughter and now i have to live with this thought and knowing he is a fake doctor with false credentials and my daughter was delivered by a fake doctor. No matter how old she gets this will taunt me and i will have this uncomfortable feeling i would get from him and the thought of it all for the rest of my life. I am crying typing this this is so upsetting, i want this to be over it seems like a bad nightmare that just will not end. when will this be over!!"*

*"He would hint and say, my private area is loose. I can do some exercises to tighten. While fully undressed, he'd take the full blue blanket off my complete body. Thought was weird, the first time, walking away thinking I was over thinking the situation. Second time, he became extra talkative and friendly, even coming to the front desk as I checked out to joke. What finally did it, when my daughter came out the examine room, to say, I think that doctor was flirting with me. After her pregnancy, we both moved to another location/doctor. Eventually after knowing Dr,*

*Akoda would be doing my paps instead of the other doctor I left seeing him. He made me feel weird and even today, I hate and am right now contemplating if I can trust this male foreign doctor I have, if he is a fraud, or do I just not have pap smears done. Which I know I'm only hurting myself by not doing so. Have to make a decision soon. I'm thinking, I'd rather take the chance with a woman at least she has the same private parts as I. But I am left feeling embarrassed about my body. Wondering which of my insurance choices are truly licensed before exposing myself to them again. The nurses would leave the room when I was examined after taking my vitals. Yes, his exams were more painful than what i was used to. Before finding out who he is, I just thought maybe the pain was coming from my body changing as he said my pelvic is dropping. As well as my vagina is tilted. (TMI). I still remember him examining my breast. Just the thought. I hate to think about it. I talk with my daughter to help us get through this. The worst, he also prescribed us prescription drugs.  Were they right or wrong?  The thoughts are endless."*

*"The visits with Dr. Akoda were so painful it often left me sore and wondering if my baby was ok. It felt like pure hell and I dread going back to the office because of how rough the dilated checkups were. I would always cry after I left his office it was a horrible feeling. And now I feel like I have PTSD when I step inside a doctors office for a OBGYN visit because of the pain he puts me through, I'm always gripping the seat during the checkup and feels like my heart is beating a million miles a minute."*

*"My experience with Akoda has made it very difficult to trust doctors or to be examined by a medical doctor. I have avoided women's health care, such as gynecological exams, and have only gone to see a gynecologist in an emergency situation since discovering that Akoda was a fake doctor and that multiple gatekeepers accepted his fake documents and credentials. Since discovering this information, I have experienced a lot of anxiety, resulting in insomnia, lack of concentration at times, and even back pain."*

Altered mood and post-traumatic responses to learning of allegations against Akoda also included a state of arousal with nightmares, irritability, hyperalertness, to name but a few.  Most (82%) have not accessed mental health services, however, more than half of the class members described receiving psychiatric or medical diagnoses that they believed to be related to their experiences with Akoda, as noted below Figure 5 earlier in this report.

*"My experience with Charles Akoda has truly been very traumatizing. It has effected the way I approach my medical care, my social life, and I've had plenty of nightmares about him. I don't know who I can trust. It has improved slightly but when I think about him I get chills down spine. How could this have happened? I look at my sons birth certificate and I see his name and it puts me in bad state of mind."*

*"Dr. Akoda took away the full enjoyments of my son birth, by his actions. The nightmares interrupted my time with my spouse and caused emotional stress on my family. How can you not lose sleep with such roaming around in her head??? When I saw his face on the news, it was something you can't prepare for... I would then go online to check hospital website for my health information to confirm, it was him. Once that confirmation was done, I started screaming and*

16

JA595

*bursting into tears and when my son came in my view , it really hit me, because, his birth will*
forever be scarred and he will know later in life, he was a victim of fraud in his birth."

*"I think it's a shame that he got away with this so long I haven't been able to go to a GYN doctor*
*sense I have a therapist and a psychiatrist now and trust issues with any male doctors."*

*"He used to wear Creed cologne and another strong scent like Tom Ford. I asked him the scent*
*and whenever i smell it on a male I instantly get a sick feeling to my stomach because i think of*
*Dr.Akota. This scent that Would make a female attracted to a man, something i would want to*
*buy a boyfriend, something arousing now makes me so nauseas and nervous. The smell of*
*betrayal. He would always smell like he just put it on and would always be eating a breath mint."*

### Betrayal of Trust

Trust has been defined as "a psychological state comprising the intention to accept vulnerability
based upon positive expectations of the intentions or behaviors of another" (Rousseau, Sitkin,
Burt, & Camerer 1998).  This definition includes three key components: a relationship of
dependency, vulnerability of at least one party, and confident expectations or beliefs by at least
one party that the other will behave towards him or her in a positive manner (Koehler &
Gershoff, 2003).  However, sometimes those whom one trusts instead actively cause the very
harm they were entrusted to prevent; the response to such a betrayal varies, although fight or
flight behaviors are common.

The impact of "Dr. Akoda's" betrayal of the trust his patients had placed in him was
multidimensional, with profound feelings of hurt and disappointment that his name and his
credentials were not real, and that he was not the doctor they thought him to be.

*"I am angry to hear that we lost this man as lied to many of us we trusted with our body's ,babies*
*we as mother are expect to be safe when we go to the doctors to trust them feel comfort while we*
*are going through this Journey to bring life in to the world , my self being a previous*
*rape/molested victim it's hard for me to trust how am i suppose to be comfortable knowing that*
*this person as completely lied."*

*"I feel lied to and i feel angry that i put my trust in a doctor who was suppose to help me but*
*instead lied and could have killed my self and my child."*

a.    <u>Loss of Trust in medical providers, aversion to medical care, system's failure to protect</u>

The fraud perpetrated by 'Akoda' resulted in 94% of claimants affirming that their trust in
physicians has been impacted, and more than half acknowledged that it had changed their use of
medical care.  were the obvious feelings that doctors can't be trusted, the resultant avoidance of
medical care and of male providers.  This negative impact directly creates a barrier to accessible
medical care, of particular significance given that cancer and other diseases are already detected
late and more often associated with poor outcome in this demographic.

17

*"This was a horrible expereince in my life. To be diagnised and hav a doctor with his hand in my private area holding my uterus and not being certified to make any decisions or do any procedures was allows to practice medicine and be involved in such a personal aspect in a womens and babies life. The instutuions and the Mr. Akoda or whatever his name is should be held accountable fully. How we trust any physician or hospital again after the did not properly veet and investiagate the people they hire to make life-altering changes."*

*"At the moment, i still feel sad and betrayed with the medical profession board for allowing me to go through this betrayal and risk twice. I have put my life and that of my two daughters at the highest risk and perhaps the surgical procedures i went through were not in the first place necessary."*

*"Learning that he is not a real doctor has really made me scared for my children when seeing other doctors. Also i think about what if something went wrong when he was delivering my son. I feel violated that he was able to get so close to my personal area and even touch me and then to find out that he is not licensed is really scary."*

*"I saw Akoda on days that Dr. Chaudry wasn't available. I sat straight up in the bed on that morning and screamed when I saw his picture and heard his name about 5 am on FOX 5 news!!. As I think back about me allowing some man to touch me... I feel like this a case of rape! I am extremely disgusted, humiliated and disappointed amongst other things. I initially allowed my daughter, now 23, to go to this practice. I am so glad that she never experienced Akoda but even she is upset and traumatized and scared. its bad enough for me at 49! It has definitely made me rethink my position with drs. He should be in jail for life. He raped hundreds of women!"*

A common belief expressed by the claimants is that 'Dr. Akoda's' clinical practice was the cause of perinatal trauma and stress, and ultimately, problems for the newborn infant later in life.

*"...This ordeal has impacted my life greatly. After waiting hours to push, we were told that our baby was in distress with the umbilical chord wrapped around her neck. Instead of expediting the delivery, we waited all day into the evening. Finally, I was rushed in for an emergency C-section. In the process of the C-section, Dr. Akoda was arguing with the medical staff. He even dropped a tool on the floor so they had to count every tool to ensure that one wasn't left inside of me. Our daughter was silent, limp and blue when she was delivered. This was very scary because she didn't make a sound or move. She was sent to the NICU immediately, where she resided for a week. The whole enjoyable experience of her being placed in our arms, rooming and being discharged with me was stripped from us. We were looking forward to a safe delivery. Upon my initial engagement with Dr. Akoda, I felt uneasy. This was my second live birth and I knew something wasn't right with him or the experience. He was abrasive, rude and unprofessional. I experienced a miscarriage less than a year after delivering my daughter that Akoda delivered. I never had a miscarriage before this ordeal. We have been trying to conceive and haven't been able to ever since. I truly believe it has something to do with the treatment from Akoda. My lower abdomen is still numb. I should have never been under the care of Akoda. A man that practiced under false pretenses. We can't reverse time, but justice can be served for the negative impact that this ordeal has caused me and my family."*

*"Not once were any of those [previous] doctors rough with the way they inserted the speculums. Nor how they put their fingers in your vagina, and never has a doctor ever pressed downward in my vagina, there is nothing truly there. It was like he was scratching my insides. So I am not sure if he used a glove or not. There was no conversation, so I can't tell you what was on this mans mind. I bleed for an hour that day, and was wondering why he had to be so rough. Why he would never talk the whole time. It was like an awkward silence. Regardless, of what kind of doctor he was somewhere else, medicine is practiced differently all over the world. Everyone has to go through a process for a reason and this man thought his way was the best way and skipped the formalities of American ways. He violated and performed aggressive exams that only reminded me of times I was sexually asasulted. That's how rough and cold the exam was."*


b.    <u>Loss of Trust in Obstetrician-Gynecologists</u>

Obstetrics-gynecology specialists were identified as particularly untrustworthy, with a reduction in visits for care reported by 53% of respondents.  The lingering mistrust of practitioners appeared to pose a continuing barrier to appropriate health care, particularly with avoidance of gynecological care; some reported a particular concern about daughters' consultation with this subspecialist.

*"I am contemplating having another child with my husband, but my experience with Dr. Akoda has made me an emotional wreck every time I think about it. It is now affecting my marriage because my husband wants more children but I am terrified. I am terrified because I had a C-section, something that now in hindsight, I believe I did not need. Dr. Akoda talked about a c-section very early in my pregnancy without a medical need. There was no medical reason earlier on that suggested I may need it, yet he continuously talked about it and suggested it.In the end he came into the hospital the day after my induction instead of Dr. Chaudry who was scheduled to deliver my baby. He told my husband and I a story of Dr. Chaudry forcing a vaginal delivery the day before causing a birth defect and that why he was not present. He suggested we have a C-section to prevent the same because if he forces a vaginal delivery for a baby as big as ours he will bare no responsibility. In the end our daughter was delivered via c-section by him because of the fear he instilled in us regarding natural birth. He told us she was too big to be delivered vaginally and turned out to weigh 7lbs 12 ounces and not the 9lbs he mentioned. "*

*"Because of Akoda every time I go to a physician I want to know what school and see their certification for them to be doctors I don't trust any doctor anymore I never felt so violated in my life I trusted somebody they saw my intimate areas and wasn't even a doctor never been so betrayed in my life because of this doctor I don't go to OBGYN I avoid any type of check up if is* not necessary because of my trust issue."

*"I had prior shared with Dr. Akoda that my husband had a vasectomy but because of our desire of wanting more, we would begin the process of having a reversal. He at that time offed to give me some medication to help my husband's sperm count rise that would help. I then thought something was off but never 2nd guessed it. But my 2nd experience with him, he was telling me I was pregnant. As soon as I showed my excitement he stated that I was having a miscarriage. But*

19

JA598

*when he walked out only to return with this lack of compassion of me taking what just happen to me just to pass me a prescription following the words of " take this to complete the flushing process". I was so offended I stormed out crying. I called my husband not knowing how to explain what just happened. Mind you, My husband thinking we can't have any kids almost had him questioning my faithfulness to our marriage. Well, I had no choice but to explain what was just told to me. I just remember crying for a while. As a mother of two already I couldn't even be a mother to them. I was not myself because I was having this fight in my mind of was I or was I not. I ended up at the hospital the next day looking crazy to the doctors and nurses. I was told there were no signs of me ever being pregnant. My whole experience has been one that I can't forget about. I still don't know if I was or not but If I was did he do something to hurt our chances?!"*

Betrayal Trauma

*"Question I have is why??? If you can legitimately be a doctor, why you didn't do it the right way, why do it by fraudulent means??? That alone shows, he shouldn't have been able to use fraudulent documents, if the ones that license had truly vetted his credentials for something so important."*

Betrayal is the violation of implicit or explicit trust. The closer and/ or more necessary the relationship, the greater the degree of betrayal. Much of what is traumatic to human beings involves some degree of betrayal. The phrase 'betrayal trauma' can be used to refer to a kind of trauma independent of the reaction to the trauma. It occurs when the people or institutions on which a person depends for survival significantly violate that person's trust or well being. Physical, sexual, and emotional abuse perpetrated by an individual who is in a caregiving position are examples of betrayal trauma.

Betrayal trauma theory is a theory that predicts that the degree to which a negative event represents a betrayal by a trusted and needed other will influence the way in which that event is processed (Freyd, 1996). It posits that there is a social utility in remaining unaware of abuse when the perpetrator is a caregiver; that under certain conditions, betrayal necessitates a 'blindness' in which the person does not have a conscious awareness of the betrayal, and that the response to the trauma of the betrayal significantly influences the encoding of the experience and the accessibility of the experience to awareness, as well as the psychological response. Some people come to allow themselves to fully realize that they have been betrayed a long time after the event, and this recovery from the betrayal only begins when the individual forms a new understanding of a remembered event.

Self-interest would seem to demand that individuals would be highly sensitive to betrayal. As a general rule, to the extent that you are able to choose with whom to engage, you would want to avoid those who had previously betrayed you. However, in certain kinds of abusive betrayals, removal is not perceived to be a viable option, the person doing the betraying is someone who is believed to be vital and the individual feels that he or she cannot afford *not* to trust. The ability to detect and acknowledge betrayal may need to be stifled for the greater goal, and it is perceived that it may be more advantageous to be blind to the betrayal.

Being sensitive to betrayal brings pain, and the pain can be great.  When the betrayer is someone on whom we are dependent, one either must block the awareness or experience the distress.  Perpetrators can take advantage and even enhance the likelihood of the natural inclination of victims to block awareness and to forget.  Forced silence, prohibition of contact and communication with others, is a common component of abusive behaviors.

The effects of betrayal are widespread and lasting, varying depending on the nature of the betrayal (Rachman, 2010).  A harmful disclosure of information, for example, can cause distress, punitive thoughts, and anger.  Infidelity may cause shock, loss, distress, ruminative pre-occupation, self-doubting, lowered self-esteem, and anger.  A failure to provide expected assistance causes distress, disbelief, ruminations, and anger.  Dishonesty causes anger, distress, and punitive thoughts.  In some extreme cases, betrayal can cause PTSD-like symptoms such as emotional numbing, distress, avoidance of reminders, intrusive images, rumination, foreshortened future, a morbid pre-occupation with the breach of trust, self-doubt, and anger.  Betrayal can also leave the violated person feeling polluted and can be triggered by images or memories of the violation or the violator.  This feeling of contamination occurs because victims feel degraded and humiliated, and the feelings of degradation leave them feeling sullied and polluted.

**Summary of Findings and Opinion**

For all of the reasons outlined above, it is this examiner's professional opinion, within a reasonable degree of certainty, based on the aggregate data gathered with over three hundred class members, that the fraudulent behavior of Oluwafemi Charles Igberase constituted the intent to harm unknowing women who entrusted him with the most intimate parts of their body selves and the most important moments of their lives.  His objectification of their bodies for his own stimulation and/or sadistic control is an additional aspect of wrongdoing that resulted in the infliction of emotional distress.  The misconduct of Oluwafemi Charles Igberase (fraudulently known as Dr. Akoda) has resulted in varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions; for some, even more broadly applied.

Some of Igberase's patients were particularly vulnerable due to the prevalence of prior trauma and peri-traumatic psychological processes due to the imbalance of power and betrayal trauma.  A history of childhood abuse, female gender, low socioeconomic status and social disadvantage, psychiatric history, and various types of previous adversity are all factors that may have enhanced the risk of symptoms for individual class members. Using the dataset to address these risk factors for severity of damages was beyond the scope of this endeavor,

The consistency and intensity of the narrative content across three hundred women both affirms the veracity of the histories and reported symptoms experienced as a result of learning of their doctor's fraudulent activities.  The presence of a substantial percentage of neutral responses further enhances the credibility of the findings and renders less likely the prospect that the

JA600

litigation itself has led to exaggerative patient reports. Some of the narratives suggest frank medical malpractice, though this, too, was beyond the scope of this consultation and report. At a minimum, the fraudulent misconduct and exploitation of patients committed by Igberase has been a significant contributing factor to the well- being and current clinical status of many of the women he exploited.

I am a Pediatrician and Child and Adolescent Psychiatrist with a Clinical Professor faculty appointment in the Department of Psychiatry at The Perelman School of Medicine at the University of Pennsylvania. For 19 years, I worked at The School of Medicine and the Children's Hospital of Philadelphia (CHOP) where I served in both the Department of Child and Adolescent Psychiatry and the Division of Child Development and Rehabilitation in the Department of Pediatrics. Since September of 2006, I have been in the private practice of adult and child psychiatry and consult to community based mental health agencies.

While my curriculum vitae largely reflects my academic research pursuits, my clinical work bears relevance to this matter:
- In mass tort claims involving the transgressions of physicians, I have served as forensic psychiatry consultant and expert for the plaintiff, the defense, the claims administrator, and the judge assigned to disburse funds.
- In my clinical practice have treated hundreds of adults and children who have experienced trauma, abuse, and neglect; including sexual abuse.
- I have been granted support from the Pew Charitable Trusts in the past to conduct best interest evaluations in the City of Philadelphia, and continue to be funded by the Van Pelt Foundation to conduct trainings for family court judges, as well as child protection agencies on the issues of trauma, abuse, and neglect, and the resulting sequela and treatment of trauma.
- I have presented nationally on the complexity of these evaluations and best practices.
- I have lectured about and recently authored a chapter on abuse and neglect in a 2012 textbook of Forensic Psychiatry.
- I currently direct the Child Forensic Psychiatry track in the Forensic Psychiatry fellowship at the Perelman School of Medicine at the University of Pennsylvania.

I have completed additional training in adolescent medicine, forensic psychiatry, pediatric forensic psychiatry, and am board certified in four areas: Pediatrics, Adult Psychiatry, Child and Adolescent Psychiatry and (specialization in Forensic Psychiatry. I am a former Robert Wood Johnson Clinical Scholar and Picker/Commonwealth Scholar, having focused on issues related to vulnerability, resilience and childhood disabilities.

Consistent with Federal Rule 26, I have included a complete statement of my opinions and the basis and reasons for them; the data considered in forming them; the records reviewed that support my opinion. I have appended the questionnaire used to collect the data that informed this consultation as well as the statements over 100 class members offered when completing the questionnaires; the complete dataset is available upon request.

I have attached my curriculum vitae as well as a list of cases in which I have testified as an expert at trial or by deposition. I have billed for 27 hours as compensation for this forensic psychiatric consultation and my hourly rate is $600/hour. I was assisted in this assessment by

22

JA601

two colleagues, Lisa Bain and Stephen Ehrlich.  Lisa Bain is a science writer and her hourly rate is $125/hour; she worked 25 hours on the development of this assessment tool and data analysis. Stephen Ehrlich is an information technology consultant whose charge was $2300 for his role in the development and digitalization of the on-line self-administered questionnaire, link and report portal setup, secure hosting of the data management form for archiving, organizing and quantitatively analyzing the dataset, and assistance with data analysis.

The above opinions have been rendered within a reasonable degree of medical certainty, based on the review of materials provided to me.  If provided with additional information, this report would be revised to incorporate new data.

Thank you for the opportunity to review this matter and render an opinion.  Should questions arise regarding this correspondence, or if I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Annie Steinberg, M.D. (signed electronically)
_____
Annie Steinberg, M.D.
Clinical Professor, Department of Psychiatry
Perelman School of Medicine at the University of Pennsylvania

**Attachments**
Attachment 1- Questionnaire
Attachment 2- Summary Statements

23

JA602

**References**

American College of Obstetrics and Gynecology (2011).   Washington, D.C.

American Medical Association (2001). Council on Ethics and Judicial Affairs: Code of Medical
Ethics: Current Opinions with Annotations. Chicago, IL.

Bloom, J.D., Nadelson, C. Notman, M.T. (1999) Physician Sexual Misconduct. American
Psychiatric Press, Washington, D.C.

Burgess, A.W. (1981). Physician Sexual Misconduct and Patients' Responses. *American Journal
of Psychiatry* 138: 10, 1335- 1342.

Dehlendorf, C.E. & Wolfe, S.M.(1996). Physicians Disciplined for Sex-Related Offenses.
*Journal of the American Medical Association* 279: 23, 1883-1888.

Feldman-Summers S. & Jones, G. (1984). Psychological impact of sexual contact between
therapists or other health care practitioners and their clients. Journal of Consulting and
Clinical Psychology 52: 1054-1061.

Freyd, J. (1996). Betrayal Trauma.  Harvard University Press, Cambridge, MA.

Koehler, J.J., & Gershoff, A.D. (2003). Betrayal aversion: When agents of protection become
agents of harm. *Organizational Behavior and Human Decision Process*, *90*, 244-261.
doi:10.1016/S0749-5978(02)00518-6

Rachman, S. (2010). Betrayal: A psychology analysis.*Behavior and Research Therapy*, *48*, 304
311. doi: doi:10.1016/j.brat.2009.12.002

Redleaf, A. (2008).  Boundaries in Healthcare. International Health Publishing, U.S.A.

Rousseau, D. M., Sitkin, S. B., Burt, R. S., & Camerer, C. (1998). Not so different after all: A
cross-discipline view of trust. *Academy of Management Review*, *23*(3), 393-404.
Retrieved from http://portal.psychology.uoguelph.ca/faculty/gill/7140/
WEEK_3_Jan.25/ Rousseau,Sitkin, Burt, & Camerer_AMR1998.pdf

JA603

EXHIBIT 44

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

| | | |
|---|---|---|
| MONIQUE RUSSELL, et al. | * | |
| Plaintiffs | * | |
| v. | * | Case No.: CAL17-22761 |
| DIMENSIONS HEALTH CORPORATION | * | |
| Defendant | * | |

## ANSWERS TO INTERROGATORIES

TO:          MONIQUE RUSSELL, PLAINTIFF

FROM:      DIMENSIONS HEALTH CORPORATION, INC.,
                 DEFENDANT

Defendant Dimensions Health Corporation ("Defendant" or "DHC"), by and through its attorneys, Joseph B. Chazen, Gina M. Smith, Samuel T. Wolf, and Meyers, Rodbell & Rosenbaum, P.A., serves these Answers to Interrogatories and states:

A.       These Interrogatories are answered to the best of Defendant's ability; however, Defendant reserves the right to amend its answers upon acquiring further information or to clarify the information provided, if necessary.

B.       The word usage and sentence structure of these answers is not necessarily that of the Defendant, but may be that of Defendant's attorney who assisted in preparation of these answers.

C.       These Interrogatories are answered in accordance with the Maryland Rules of Procedure and are not necessarily answered in accordance with Plaintiff's instructions.

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
ERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}

## GENERAL OBJECTIONS

1.     Defendant objects to each Interrogatory to the extent that it seeks to elicit information protected against disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other rule of privilege or confidentiality provided by law.

2.     Defendant objects to each Interrogatory to the extent that it seeks to impose burdens not contemplated by the Maryland Rules of Civil Procedure or to alter or expand the obligations there under.

3.     By making the responses set forth herein, Defendant does not concede that the information requested is relevant to this action. Defendant expressly reserves its right to object to further discovery into the subject matter of any of these Interrogatories and to the introduction into evidence of any answer or portion thereof.

4.     Defendant, therefore, objects to each and every Interrogatory for the above reasons and hereby explicitly incorporates these General Objections into each of its responses.

## ANSWERS TO INTERROGATORIES

1.     State the name, title and business address of the person answering these interrogatories, specifying the Interrogatory answers to which each person participated in answering.

**ANSWER:**     These answers to interrogatories were drafted by DHC's undersigned attorneys. Information not in undersigned counsel's possession, including identified non-privileged documents relied on or incorporated in these answers, was secured through and compiled by Eslanda Dasher, Esq., DHC's former Vice President of Risk, Claims & Insurance Management. The answers to interrogatories were reviewed and signed on behalf of DHC by:

> Ron Laxton, DNP, RN
> Senior Vice president Clinical Services &
> Chief Nurse Executive
> Dimensions Health Corporation

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                    2

Cheverly, Maryland 20785

2.    Identify all persons who has or is likely to have personal knowledge of any fact alleged in the Class Action Complaint, and state the name, title, business address, job description, job duties and subject matter of the personal knowledge possessed by each such person.

**ANSWER:**    DHC objects to the Interrogatory to the extent it seeks information about any patient other than Named Plaintiffs Russell and Riggins, because: (a) information about other patients is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence unless and until a class is certified; and (b) protected health information about any person other than Russell and Riggins cannot be disclosed without violating HIPAA and Maryland statutes. At this time, DHC refuses to provide information relating to any patient other than Russell or Riggins. Without waiving and subject to the objection and refusal stated above, the persons identified below may have knowledge of facts relating to the credentialing and peer review process for Charles J. Akoda:

Michael A. Taylor
Former Medical Staff Specialist
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Diane Frye
Credentials Specialist
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Catherine Reed-Fink, CPCS
Retired Credentials Supervisor
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Alexia Jones
Former Medical Staff Specialist
Dimensions Health Corporation

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

3001 Hospital Drive
Cheverly, MD 20785

Jennifer Bell, CPMSM, CPSC
Director Medical Affairs
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Lauren Rodgers, M.D.
Chair Department of OB/GYN (2010-2015)
OB/GYN Peer Review Committee, and
Medical Executive Committee (2010-2015)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Carnell Cooper, M.D.
Vice President
Medical Affairs/Medical Education (2012-2017)
Chair Medical Staff Quality Oversight Committee (2011-2016)
Credentials Committee (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Hema Yadla, M.D.
Interim Vice President (2011-2012)
Medical Affairs
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Ali Khan, M.D.
Chairman Credentials Committee
of the Medical Staff (2012-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Abdul Chaudry, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Chair Department of OB/GYN (2015 to present)
Medical Executive Committee
Dimensions Health Corporation

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                    4

JA608

3001 Hospital Drive
Cheverly, MD 20785

James Chelsey, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Vicken Poochikian, M.D.
Medical Executive Committee,
Member–at–large (2013-2015) and
Credentials Committee (2013-2016)
of the Medical Staff
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

S.J. Rao, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Dionne Hutchinson
Medical Staff Coordinator (2013 to present)
Credentials Committee
of the Medical Staff
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Henry Adegbulugbe, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Harbhajan Arjwat, M.D.
Medical Executive Committee (2012-2014) and
Credentials Committee
of the Medical Staff (2012-2016)
Dimensions Health Corporation

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    5

3001 Hospital Drive
Cheverly, MD 20785

Konrad Dawson, M.D.
Member–at-large
Medical Executive Committee (2013-2015) and
Credentials Committee
of the Medical Staff (2012-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Sagar Nootheti, M.D.
Credentials Committee
of the Medical Staff (2013-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Medhi Sattarian, M.D.
Credentials Committee
of the Medical Staff (2011-2013)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Said Daee, M.D.
Credentials Committee
of the Medical Staff (2011)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Gurdeep Chhabra, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

James Chesley, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIDALE PARK, MARYLAND 20737-1385
(301) 699-5800

(297291.DOCX)                                              6

Willie Blair, M.D.
Credentials Committee
of the Medical Staff (2011)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Jagdeep Singh, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Chitra Venkatraman, M.D.
Credentials Committee
of the Medical Staff (2012-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Mirmala Yadla, M.D.
Credentials Committee
of the Medical Staff (2011-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Mukemi Abdella, M.D.
Member-at-large
Medical Executive Committee (2014 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Kanwaljit Ahuja, M.D.
Member-at-large
Medical Executive Committee (2014 – present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Bijan Bahmanyar, M.D.
Chair Surgery
Medical Executive Committee (2012-2016)

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(300) 699-5800

Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Gurdeep Chhabra, M.D.
Chair Internal Medicine
Medical Executive Committee (2015 –present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Alan Harvey, M.D.
Chair Anesthesiology
Medical Executive Committee (2014-Present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Ellen Manlucu, M.D.
Chair Pathology
Medical Executive Committee (2006 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Doug Mayo, M.D.
Chair Emergency Medicine (2012- present)
Medical Executive Committee
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Nooredin Mirmirani, M.D.
Chair Psychiatry
Medical Executive Committee (2003 – 2015)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Khodadad Modjtabi, M.D.
Member-at-large
Medical Executive Committee (2013 to 2017)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                  8

JA612

Lipishree Nayak, M.D.
President-Elect (2014-2016)
President Medical Staff (2016 to present)
Chair Department of Internal Medicine (2008-2006)
Medical Executive Committee (2004 – present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Uchenna Mwaneri, M.D.
Chair Orthopedics
Medical Executive Committee (2015 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Imran Siddiqi, M.D.
Chair Critical Care
Medical Executive Committee (2013 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Gurmeet Sidhu, M.D.
Chair Medical Imaging
Medical Executive Committee (2005 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Jamie Brown, M.D.
Medical Director Cardiac Surgery May 2014
Medical Executive Committee – Ex Officio (2014 – present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Frederick Corder, M.D.
Chair Pediatrics
Medical Executive Committee (1987 – present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Garrett Martin, M.D.

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
UITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
IDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    9

Medical Director HMG Ex-Officio
Medical Executive Committee (2014-2015)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Brajendra Misa, M.D.
Member-at-large
Medical Executive Committee (2014-2016)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Nader Tavakoli, M.D.,
Chair Family Medicine
Medical Executive Committee (2015 to present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Ronnie Sean Benoit, M.D.
Medical Director Trauma
Ex-Officio
Medical Executive Committee (2014-present)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Candace Hanrahan
VP Patient Care Service
Ex-Officio
Medical Executive Committee (2014-2017)
Dimensions Health Corporation
3001 Hospital Drive
Cheverly, MD 20785

Additionally, pursuant to Rule 2-421(c), Dimensions incorporates the medical records it is producing in response to Plaintiffs' Request for Production of Documents, which contain information identifying persons who likely have knowledge of facts pertaining to Russell and Riggins' medical care.

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
UITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
DALE PARK, MARYLAND 20737-1385
(301) 699-5800

(297291.DOCX)                    10

JA614

3.     For each witness you have retained or specially employed to provide expert testimony in this case, or employed by you whose duties regularly involve giving expert testimony and whom you expect to testify at trial provide a complete statement of the opinions to be expressed and the basis and reasons therefore.

**ANSWER:**     Trial experts will be disclosed in Defendant's Expert Designation, which will be served in accordance with the Court's scheduling order, and when it serves its Expert Designation, Plaintiffs should construe it as a supplement to this answer.

4.     If you intend to rely upon any documents or other tangible things to support a position that you have taken or intend to take in the action including any defenses or claim for damages provide a brief description by category and location, of all such documents and other tangible things, and identify all persons having possession, custody, or control of them.

**ANSWER:**     DHC objects to the extent this Interrogatory seeks the mental impressions of trial counsel, which are protected work product. Without waiving and subject to the objection stated above, pursuant to Maryland Rule 2-421(c), DHC incorporates in answer to this Interrogatory its Response to Request for Production of Documents.

5.     Identify all persons who has or is likely to have personal knowledge about Dimensions' actions in hiring and/or employing Akoda and state the name, title, job description, job duties, and subject matter of the information possessed by that person.

**ANSWER:**     No such person exists because DHC never hired or employed Akoda.

6.     Identify each data field captured by Dimensions' computer system with respect to Patients and explain the meaning of each data field captured.

**ANSWER:**     DHC objects because this Interrogatory is vague and ambiguous. It is uncertain what "computer system" Russell refers to in the interrogatory, as DHC has many computer systems. It is uncertain what "data fields" Russell is interested in knowing about. Each database contains multiple data fields. DHC objects because the interrogatory is overbroad and unduly burdensome as it would take many hours to explain each and every data field in each and

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    11

every database, most of which speak for themselves and need no explanation. DHC objects because all of information sought by the interrogatory is irrelevant to this case and is not reasonably calculated to lead to the discovery of admissible evidence. DHC objects because information about any patient other than Russell and Riggins is: (a) irrelevant and not reasonably calculated to lead to the discovery of admissible evidence prior to class certification; and (b) cannot be disclosed without violating HIPAA and Maryland statutes governing patient privacy.

   7.    State the number of patients.

   **ANSWER:**    DHC objects because the interrogatory is overbroad in timeframe and scope. DHC objects because, prior to class certification, the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving and subject to the objections stated above, during the time Akoda had privileges at Prince George's Hospital Center, DHC's records show that he treated approximately 712 patients. DHC continues to search its files and reserves the right to supplement this answer as appropriate.

   8.    State the number of Patients that Akoda performed a childbirth.

   **ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. DHC objects because the wording of the interrogatory does not make sense. It seems that Russell means to ask how many patients Akoda delivered at Prince George's Hospital Center, and that is how DHC will interpret the interrogatory in answering it.

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    12

JA616

Without waiving and subject to the objections stated above, according to Dimensions records, during the time Akoda had privileges at Prince George's Hospital Center, Akoda delivered 639 patients. Defendant continues to search its files and reserves the right to supplement this answer as appropriate.

9.     State the number of Patients that Akoda performed a childbirth that was completed through vaginal delivery.

**ANSWER:**     DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. DHC objects because the wording of the interrogatory does not make sense. Although the interrogatory is unclear, it seems that Russell means to ask how many patients Akoda delivered vaginally at Prince George's Hospital Center, and that is how DHC will interpret the interrogatory in answering it. Without waiving and subject to the objections stated above, according to Dimensions records, during the time Akoda had privileges at Prince George's Hospital Center, he performed vaginal deliveries on 361 patients. Defendant continues to search its files and reserves the right to supplement this answer as appropriate.

10.     State the number of Patients that Akoda performed a childbirth that was completed through cesarean section.

**ANSWER:**     DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    13

JA617

discovery of admissible evidence. Dimensions objects because the wording of the interrogatory does not make sense. Although the interrogatory is unclear, it seems that Russell means to ask how many cesarean section procedures Akoda performed at Prince George's Hospital Center, and that is how DHC will interpret the interrogatory in answering it. Without waiving and subject to the objections stated above, according to Dimensions' records, during the time Akoda had privileges at Prince George's Hospital Center, he performed 278 cesarean section procedures. Defendant continues to search its files and reserves the right to supplement this answer as appropriate.

11.    State the number of Patients Akoda performed a childbirth that was completed through an unplanned emergency cesarean section.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. DHC objects because the wording of the interrogatory does not make sense. DHC objects because the interrogatory is overbroad and unduly burdensome. Although the interrogatory is unclear, it seems that Russell means to ask for the number of patients whom Akoda delivered via cesarean section in circumstances under which: (a) a cesarean section had not been planned in advance; and (b) a cesarean section was performed due to fetal or maternal complications that arose during delivery, and that is how DHC will interpret the interrogatory in answering it. Without waiving and subject to the objections stated above, according to Dimensions records, during the time Akoda had privileges at Prince George's Hospital Center, he performed cesarean section procedures on 278 patients. Because Akoda's

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                    14

JA618

patients came from the private practice(s) with which he was affiliated, and because Dimensions does not have access to prenatal and plan-of-care records maintained by Akoda's private practice(s), Dimensions is unable to ascertain which of those 278 cesarean section procedures might have been planned in advance and which might have been performed on an unplanned and emergent basis.

12.    State the aggregate amount billed by Dimensions for medical services to Patients.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. DHC objects that the interrogatory is overbroad and unduly burdensome. Without waiving and subject to the objections stated above, pursuant to Rule 2-421(c), DHC incorporates Russell and Riggins' medical billing statements which are being produced in response to Russell's request for production of documents.


13.    Identify each insurance provider that were billed for Akoda's services for Patients.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. DHC objects because the interrogatory is overbroad,

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

JA619

unlimited in timeframe and scope, and is unduly burdensome. Without waiving and subject to these objections, DHC did not bill for Charles J. Akoda's services.

14.    Identify each payment made to Akoda or his employers or agents for medical services provided to Patients.

**ANSWER:**   DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because the interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving and subject to these objections, DHC never paid Akoda or his employers or agents for services Akoda provided to Patients. DHC has no basis to know who might have paid "Akoda or his employers or agents" for medical services Akoda provided to his patients.

15.    State all facts concerning Akoda's employment relationship with Dimensions.

**ANSWER:**   DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. Without waiving and subject to this objection, Akoda never had an employment relationship with DHC.

16.    Identify all attempts to add Akoda onto insurance panels, including but not limited to the Center of Medicare and Medicaid Services and the results of each attempt.

**ANSWER:**   DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. Without waiving and

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                          16

JA620

subject to this objection, DHC never "attempt[ed] to add Akoda onto insurance panels." DHC
never employed Akoda.


17.    State the date Dimensions first became aware that Akoda was under investigation
by federal or state agencies for identity related crimes.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is
allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating
to the exact same subject matter, which remains pending in HCADRO. Without waiving and
subject to this objection, on or about June 15, 2016, Harghajan Arjwat, M.D. informed Director
of Medical Affairs Jennifer Bell that Akoda had been picked up by the FBI. On or about June 28,
2016, a Drug Enforcement Agency officer investigating Akoda informed Corporate Compliance
Officer Meredith Harrison that Akoda was being held in a federal detention without bail.
Harrison was advised that the arrest was related to identity fraud.


18.    Identity [sic] each person responsible for supervising Akoda at Dimensions and
what supervision was provided to Akoda at Dimensions by each supervisor.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is
allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating
to the exact same subject matter, which remains pending in HCADRO. DHC objects because the
interrogatory is unlimited as to timeframe and scope. DHC objects because the information
sought is irrelevant and not reasonably calculated to lead to the discovery of admissible
evidence.  Without waiving and subject to these objections, DHC did not "supervise" Akoda.
Akoda was a licensed physician and board certified obstetrician and gynecologist who had
privileges at Prince George's Hospital Center ("PGHC"). He was never DHC's agent, servant, or
employee. DHC had no right to responsibility to supervise or control Akoda's conduct in his

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                              17

JA621

practice of medicine, and DHC did not do so. Like any physician with privileges to practice at

PGHC, Akoda was subject to review and evaluation of his competencies, skills, and the quality

and appropriateness of the care he provided. The scope and extent of such review and evaluation

is stated in the Hospital Bylaws, which are being produced in response to Russell's request for

production, and which are incorporated in this answer pursuant to Rule 2-421(c).

      19.    State the start and end dates on which Akoda was approved to perform medical services on Patients.

      **ANSWER:**   DHC objects because Russell has exceeded the 30 interrogatories she is

allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating

to the exact same subject matter, which remains pending in HCADRO. Without waiving and

subject to this objection, Akoda was granted privileges on October 12, 2011. Dr. Akoda's

privileges lapsed on October 1, 2016 when he did not renew his physician's license on or before

September 30, 2016. The last day Dr. Akoda encountered any patient at Prince George's

Hospital Center was almost four months earlier, on June 8, 2016.

      20.    Provide the following information in paper and electronically readable format for each Patient:

      a.     Dates of the Medical Service;
      b.     Name of the Patient;
      c.     Address of Patient;
      d.     Type of Medical Services Provided; and
      e.     Amount billed for Medical Service.

      **ANSWER:**   DHC objects because Russell has exceeded the 30 interrogatories she is

allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating

to the exact same subject matter, which remains pending in HCADRO. DHC objects because the

interrogatory seeks information that is irrelevant and not reasonably calculated to lead to the

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400·BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}              18

discovery of admissible evidence in the absence of class certification. DHC objects because the interrogatory seeks the protected health information of patients other than Russell and Riggins, who are non-parties and who have not authorized the release of their protected health information; thus information pertaining to any patient other than Russell or Riggins cannot be provided without violating HIPAA and Maryland statues governing patient privacy, and DHC refuses to provide information concerning other patients. Without waiving and subject to these objections and refusal, pursuant to Rule 2-421(c), DHC refer Russell to her and Riggins' hospital bills produced in response to Russell's request for production of documents. Those bills do not include services performed by Akoda, because DHC did not bill for Akoda's services as Akoda was not DHC's agent, servant, or employee. If patients were billed for Dr. Akoda's services, they were billed by Dr. Akoda or one of the private practices with which he was affiliated.

21.    State Dimensions' policy or regular practice concerning the destruction, disposal and/or retention of any documents requested in this litigation.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. Without waiving and subject to this objection, pursuant to Rule 2-421(c), see DHC's records retention policy, which is produced in response to Russell's request for production of documents.

22.    If you contend that you did not violate any law as alleged in the Class Action Complaint, state all facts concerning such contention.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                    19

to the exact same subject matter, which remains pending in HCADRO. DHC objects to the extent Russell and Riggins attempt to shift the burden of proof. DHC objects to the extent Russell seeks to require DHC to produce information that is privileged and is undiscoverable and inadmissible under Md. Health Occ. Code Ann. § 1-401, which DHC refuses to do. Without waiving and subject to these objections, the First Amended Class Action Complaint does not allege that DHC violated any law. DHC did not violate any law. If Plaintiffs contend that Dimensions did violate a law, they bear the burden of proving their allegation. At all times relevant to this litigation, Akoda: (a) was certified by the ECFMG, which conducts primary source verifications of all foreign medical graduates before awarding them certification; (b) had completed a residency in obstetrics and gynecology at Howard University, during which time he was named resident of the year; (c) was licensed as a physician by the Maryland Board of Physicians and Virginia Board of Medicine; and (d) possessed the necessary credentials from the U.S. Drug Enforcement Administration and Maryland Department of Health and Mental Hygiene to prescribe medicine. Additionally, Akoda was board certified in obstetrics and gynecology.

23.    If you contend that the facts of Russell's situation are not common to and/or typical of the factual situations of other Patients, state all facts concerning such contention.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects to the extent Russell seeks to shift the burden of proof to DHC. Without waiving and subject to these objections, Russell's "situation" is not common to or typical of the factual situations of other Patients in that her presentation and obstetric needs for labor and delivery are unique. Russell

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                        20

JA624

had a right to choose and select her own private obstetrician. She chose Javaka Moore and his practice with which Dr. Akoda was affiliated. The factors Russell considered in making her selection of obstetrician and practice group are personal and specific to her. Her interactions with Akoda prior to delivery, if any, are personal to her and are likely different than the pre-delivery interactions other patients might have had with Dr. Akoda, especially with regard to patients for whom Dr. Akoda provided extensive prenatal care in his private practice outside of Prince George's Hospital Center. In further answer to this interrogatory, pursuant to Rule 2-421(c), see Russell and Riggins' medical records, which are being produced in response to Russell's request for production of documents.

24.    If you contend that Russell is not similarly situated to other Patients, state all facts concerning such contention.

**ANSWER:**    DHC objects because Russell has exceeded the 30 interrogatories she is allowed to ask under Rule 2-421(a). She asked 23 interrogatories in her HCADRO claim relating to the exact same subject matter, which remains pending in HCADRO. DHC objects because this interrogatory is vague and ambiguous and seeks to shift the burden of proof to DHC. Without waiving and subject to these objections, see answer to interrogatory no. 23.

25.    If you contend that individual and discrete questions of law or fact predominate over questions of law or fact common to all Patients, state all facts concerning such contention.

**ANSWER:**    See objections and answers to interrogatories 23 and 24.

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400·BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                          21

JA625

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

_02/08/2018_
Date

_Ronald Laxton_
Ronald Laxton, DNP, RN
Senior Vice President Clinical Services &
Chief Nurse Executive
Dimensions Health Corporation

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
6801 KENILWORTH AVENUE
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800

{297291.DOCX}                                        22

Respectfully submitted,

**MEYERS, RODBELL & ROSENBAUM, P.A.**

Joseph B. Chazen
jchazen@mrrlaw.net

Gina M. Smith
gsmith@mrrlaw.net

Samuel T. Wolf
swolf@mrrlaw.net
6801 Kenilworth Avenue, Suite 400
Riverdale Park, MD 20737
(301) 699-5800
(301) 778-5746 Facsimile

## CERTIFICATE OF SERVICE

I certify that on this ____ day of February 2018, a copy of these answers to interrogatories was mailed to:

Cory L. Zajdel
Z Law, LLC
2345 York Road, Suite B-13
Timonium, Maryland 21093

Jay D. Miller
Law Offices of Peter G. Angelos, P.C.
100 North Charles Street, 20th Floor
Baltimore, Maryland 21201

Gina M. Smith

LAW OFFICES
MEYERS, RODBELL
& ROSENBAUM, P.A.
SUITE 400-BERKSHIRE BUILDING
8801 KENILWORTH AVENUE
ERDALE PARK, MARYLAND 20737-4385
(301) 699-5800

{297291.DOCX}                    23

JA627

EXHIBIT 45

JA628



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

# Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    - - -
 4  MONIQUE RUSSELL, JASMINE :  Case No.
    RIGGINS, ELSA M. POWELL  :
 5  AND DESIRE EVANS,        :  2:18-cv-05629-JW
                             :
 6          Plaintiffs,      :
                             :
 7        vs.               :  Hon. Joshua D. Wolson
                             :
 8  EDUCATIONAL COMMISSION   :
    FOR FOREIGN MEDICAL      :
 9  GRADUATES,               :
                             :
10          Defendant.       :
11                    - - -
12             September 10, 2019
13                    - - -
14         Oral deposition of KARA CORRADO, taken
15    at the offices of MORGAN LEWIS BOCKUS, LLP,
16  1701 Market Street, Philadelphia, Pennsylvania
17       beginning at 10:48 a.m., before
18   Jennifer L. McDonald, a Professional Reporter
19  and a Notary Public in and for the Commonwealth
20             of Pennsylvania.
21                    - - -
22    VERITEXT NATIONAL COURT REPORTING COMPANY
               MID-ATLANTIC REGION
23       1801 Market Street - Suite 1800
         Philadelphia, Pennsylvania 19103
24
```

Page 2

1 A P E A R A N C E S :
2
  JANET, JANET, & SUGGS, LLC
3 BY: PATRICK A THRONSON, ESQ
  Executive Centre At Hooks Kane
4 4 Reservoir Circle Suite 200
  Baltimore, Maryland 21208
5 (410) 653-3200
  PThronson@JJSjustice.com
6 Representing the Plaintiff
7 MORGAN LEWIS & BOCKUS LLP
  BY: ELISA P McENROE, ESQ
8 1701 Market Street
  Philadelphia, Pennsylvania 19103
9 (215) 963-5176
  elisa mcenroe@morganlewis com
10 Representing the Defendant ECFMG
11 SCHOCHOR FEDERICO & STATON, P A
  BY: BRENT CERYES, ESQ
12 1211 St Paul Street
  Baltimore, Maryland 21202
13 (410) 234-1000
  bceryes@sfspa.com
14 Representing the Plaintiff Monique Russell
15
  LAW OFFICES OF PETER G ANGELOS
16 BY: PAUL M VETTORI, ESQ
  One Charles Center
17 100 N Charles Street, 22nd Floor
  Baltimore, Maryland 21201
18 (410) 649-2000
  pvettori@lawpga com
19 Representing the Plaintiff Jasmine Riggins
20
21
22
23
24

Page 3

1          I N D E X
2            - - -
3 Testimony of: KARA CORRADO
4 By Mr. Thronson                    5, 247
5 By Ms. McEnroe                      238
6
7
8            - - -
9        E X H I B I T S
10           - - -
11 EXHIBIT NUMBER   DESCRIPTION      PAGE MARKED
12
13 CORRADO-1  Notice of Deposition         7
14 CORRADO-2  Credential procedures draft    67
15 CORRADO-3  Email 8-6-18               94
16 CORRADO-4  Email 1-17-18             112
17 CORRADO-5  University of Benin documents  216
18 CORRADO-6  Email 2-12-18             227
19 CORRADO-7  Letter dated 8-29-2000       238
20 CORRADO-8  Email 11-27-17            252
21 CORRADO-9  Email 11-28-16            255
22
23           - - -
24

Page 4

1        DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4 Page  Line
5   8    12
6  235   13
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9 Page  Line   Description
10  71   10  Table of contents
11 126   21  Diplomas
12
13 STIPULATIONS
14 Page  Line
15   5    1
16
17
18 QUESTIONS MARKED
19 Page  Line
20 None
21
22
23
24

Page 5

1        (It is hereby stipulated and
2    agreed by and between counsel that
3    sealing, certification and filing are
4    waived; and that all objections, except
5    as to the form of the question, are
6    reserved until the time of trial.)
7            - - -
8        KARA CORRADO, after having been
9    first duly sworn, was examined and
10   testified as follows:
11           - - -
12       DIRECT EXAMINATION
13           - - -
14 BY MR. THRONSON:
15   Q.     Would you please state your
16 name?
17   A.     Kara Corrado.
18   Q.     Ms. Corrado, my name is Patrick
19 Thronson.  I'm an attorney representing the
20 plaintiffs in a lawsuit that's been brought
21 against ECFMG.  We met briefly before the
22 deposition, and I appreciate you being here
23 today.
24       As I understand it, you are here

2 (Pages 2 - 5)

KARA CORRADO

Page 6
1 as a representative of ECFMG?
2      A.   Yes, that's correct.
3      Q.   You're providing testimony today
4 in the capacity of a representative of ECFMG?
5      A.   Yes.
6      Q.   So for clarity sake, I will try
7 to refer, ask questions as refer to ECFMG, but
8 if I happen to say "U" or something like that,
9 if you could just interpret that as referring
10 to ECFMG I'd appreciate that?
11     A.   Yes.
12     Q.   Do you work at ECFMG?
13     A.   Yes.
14     Q.   Can you tell us what ECFMG
15 stands for?
16     A.   Educational Commission for
17 Foreign Medical Graduates.
18     Q.   What is your position there?
19     A.   I'm the Vice President for
20 Operations.
21     Q.   Is it fair to say you're an
22 officer of ECFMG?
23          MS. McENROE:  Objection to form.
24          You can answer, if you know.

Page 7
1          THE WITNESS:  I don't know.
2 BY MR. THRONSON:
3      Q.   Is vice president of ECFMG
4 considered an officer of ECFMG?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  I am an executive
7     at ECFMG.
8 BY MR. THRONSON:
9      Q.   You understand that ECFMG is
10 responsible for producing a witness today who's
11 prepared to testify as to all of the matters
12 that were designated in the notice of
13 deposition?
14     A.   Yes.
15     Q.   Let me provide that to you.
16          MR. THRONSON:  We'll mark this.
17               - - -
18          (Whereupon the document was
19     marked, for identification purposes, as
20     Exhibit Number CORRADO-1.)
21               - - -
22 BY MR. THRONSON:
23     Q.   Ms. Corrado, you've seen this
24 notice before?

Page 8
1      A.   Yes.
2      Q.   Do you have full authority to
3 speak on behalf of ECFMG with respect to the
4 matters of inquiry that are identified within
5 the notice?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  Yes.
8 BY MR. THRONSON:
9      Q.   Who designated you to testify
10 today?
11          MS. McENROE:  Objection to form,
12     and I instruct her not to answer to the
13     extent it reveals conversations with
14     counsel on the basis of privilege.
15 BY MR. THRONSON:
16     Q.   Let me ask it this way:  Did
17 anyone at ECFMG designate you or make the
18 decision that you would be designated as a
19 representative of ECFMG to testify today?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Representing ECFMG
22     at proceedings like this is part of my
23     job duties.
24 BY MR. THRONSON:

Page 9
1      Q.   Did you confer with anyone at
2 ECFMG who made the decision to have you
3 designated as a corporate representative today?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  I spoke with my
6     senior vice president.
7 BY MR. THRONSON:
8      Q.   Who's that?
9      A.   Lisa Cover.
10     Q.   Did she make that decision?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  I don't know.
13 BY MR. THRONSON:
14     Q.   What did you all talk about?
15     A.   I told her I had a deposition
16 today.
17     Q.   What did she say?
18     A.   Okay.
19     Q.   Did you talk about your
20 testimony at all?
21     A.   No.
22     Q.   Did you talk about the notice of
23 deposition at all?
24     A.   Other than the fact that it

KARA CORRADO

Page 10

1  existed, no.
2      Q.    You are aware that the answers
3  you give to my questions today will be binding
4  upon ECFMG?
5          MS. McENROE:  Objection to form;
6      calls for a legal conclusion.
7          You may answer.
8          THE WITNESS:  Yes.
9  BY MR. THRONSON:
10     Q.    Do you agree to have your
11  answers to my questions be binding upon ECFMG?
12         MS. McENROE:  Objection to form;
13     calls for a legal conclusion.
14         THE WITNESS:  Yes.
15  BY MR. THRONSON:
16     Q.    Can you describe your current
17  job responsibilities?
18     A.    As I said, I'm the Vice
19  President for Operations.  In that role I
20  oversee a number of ECFMG's programs and
21  services which include our international
22  credential services which is known as EPIC; our
23  ECFMG certification program; our medical
24  education resources team, which is a team that

Page 11

1  reviews and contacts medical schools; and our
2  special investigations team, and I'm
3  responsible for -- as the staff for our
4  irregular behavior proceedings at ECFMG.
5      Q.    When you say you oversee EPIC,
6  does that mean that you oversee credentialing
7  and primary-source verification of -- strike
8  that.
9          When you say that you oversee
10  EPIC, does that apply to the certification
11  process as a whole?
12     A.    Yes.  So it does apply to
13  ECFMG's primary-source verification of
14  credentials.
15     Q.    So it's fair to say that you
16  oversee the primary-source verification
17  function of ECFMG?
18     A.    Yes.
19     Q.    How long have you held that
20  responsibility?
21     A.    I have been responsible for some
22  of the programs that have primary-source
23  verification in them for -- I'm sorry, I have
24  to think about it for a second -- about seven

Page 12

1  or eight years, and within the last two years,
2  I assumed responsibility for all of the lines
3  of service that we have that use primary-source
4  verification.
5      Q.    Who was your predecessor in that
6  role in terms of overseeing the primary-source
7  verification function at ECFMG?
8      A.    So our structure is a little bit
9  different than it had been in the past, but my
10  prior direct supervisor was William Kelly.
11     Q.    How has your structure changed?
12         MS. McENROE:  Objection to form.
13  BY MR. THRONSON:
14     Q.    As you refer to?
15     A.    There are a number of new
16  departments and new lines of services.  So we
17  have a senior vice president now, when we only
18  had a vice president of operations in the past.
19     Q.    You are a senior vice president?
20     A.    I'm a vice president.
21     Q.    You're a vice president, okay.
22  The senior vice president was Lisa Cover?
23     A.    Is Lisa Cover.
24     Q.    Is Lisa Cover, okay.  You

Page 13

1  mentioned another -- commission in responsible
2  for primary-source verification and the medical
3  education resource team, special investigations
4  team, and also you're responsible as staff for
5  the irregular behavior; is that right?
6      A.    Yes, that's right.
7      Q.    I think there was one more that
8  I missed?  As if that wasn't enough.
9      A.    Maybe the ECFMG certification
10  program that's generally the areas of
11  responsibility that I have.
12     Q.    How would you distinguish your
13  responsibilities in the ECFMG certification
14  program from your responsibilities in
15  overseeing the primary-source verification of
16  ECFMG?
17     A.    How do I distinguish them?
18     Q.    I guess, how are they different,
19  or are they different?
20     A.    The primary-source verification
21  that we do for medical education credentials is
22  the same process regardless of the service that
23  we are doing primary-source verification for.
24  So the process that we use in the ECFMG

4 (Pages 10 - 13)

JA634

KARA CORRADO

Page 14

1 certification program, is the same process that
2 the team that is working on our international
3 credential services, it is the same process.
4      Q.      How long have you overseen the
5 ECFMG certification program?
6      A.      Since -- it's about seven or
7 eight years. Since around -- I'm sorry, let me
8 think about it. No, it's about four or five
9 years.
10      Q.      Who was your predecessor in that
11 role?
12      A.      That would have been William
13 Kelly.
14      Q.      You mentioned also the medical
15 education resource team, can you describe that
16 responsibility for me?
17      A.      Yes. That team is the team that
18 communicates with medical schools and
19 hospitals, institutions around the world to
20 collect information that we use in our
21 primary-source verification.
22      Q.      What kind of information?
23      A.      They will reach out to the
24 medical school officials to determine who are

Page 15

1 the officials of the school, who's the dean,
2 what their signatures look like, what the
3 school seal looks like, and to ask any
4 questions about the medical education at that
5 school; any questions that we may have, that
6 our staff may have.
7      Q.      About how often does the medical
8 education resources team reach out to an
9 individual school to update information about
10 deans, seals, signatures, that kind of thing?
11      A.      So they reach out on an ad hoc
12 basis depending upon the circumstances. So if
13 it's a new school and we don't know who the
14 officials are, then we, as part of the process
15 of adding a new school, will reach out to get
16 the list.
17          If we receive forms that are
18 signed by an official of the school that has
19 the same title as someone on the list, we will
20 reach out to the school to see if that -- if
21 it's the dean, has the dean been replaced, and
22 get an updated contact information.
23      Q.      Does that occur every time you
24 receive an application from an ECFMG candidate

Page 16

1 for certification?
2      A.      Only if the school -- sorry, do
3 you mean, do we reach out to determine who the
4 officials are every time we get an application?
5      Q.      Right.
6      A.      Okay. So, no. Only if the
7 school is a new school. So if we don't already
8 have the information on file, then we will
9 reach out. If you are an applicant from a
10 school and we've already seen hundreds of
11 classmates of yours, then we don't reach out to
12 the school again because we know who the
13 responsible parties are.
14      Q.      How does ECFMG become aware if
15 there's been a change of deans at a school?
16      A.      We become aware in a variety of
17 ways. Sometimes there are many schools that
18 will reach out to us proactively because they
19 know we would ask for that information.
20          As I mentioned earlier,
21 sometimes we will see there is a new signatory
22 on a form and before we can accept it, we will
23 clarify with the school if there's been a
24 change; and occasionally, periodically we will

Page 17

1 send out a request to the school if we haven't
2 had an update or if there's some other reason
3 that the coordinator is reaching out to the
4 school. They may notice the list is five years
5 old and while they are reaching out to ask
6 another question, they may ask is everything
7 up-to-date.
8      Q.      What does the special
9 investigations team do?
10      A.      The special investigations team
11 handles the review of investigation into
12 irregular behavior and also requests for
13 exceptions to ECFMG. They are also responsible
14 for reviewing any potential matches to the
15 specially designated national list which is the
16 department of treasury for OFAC.
17      Q.      Just skipping back, how long has
18 the medical education resources team existed?
19      A.      It has existed as a department
20 for about four years.
21      Q.      Prior to its existence as a
22 department, was there any other department that
23 performed all of the functions that the medical
24 education resources team currently performs?

5 (Pages 14 - 17)

JA635

KARA CORRADO

Page 18

1    A.    Yes.  The department that
2 processed applications for examinations and for
3 ECFMG certification they would do the same type
4 of reach out to medical schools.
5    Q.    Why was -- why the change in
6 organizational structure to create a separate
7 medical education resources team?
8          MS. McENROE:  Objection to form.
9          You may answer.
10         THE WITNESS:  In our
11    credentialing verification services over
12    probably the last five years or so, we
13    have increased the number of regulatory
14    authorities that use our services.  In
15    doing that, we've increased the volume
16    and it became apparent to us that we
17    needed to have individuals fully focused;
18    their whole job would be to communicate
19    with medical schools and to get
20    information from them.
21 BY MR. THRONSON:
22    Q.    How long has that special
23 investigations team existed?
24    A.    The special investigations team

Page 19

1 has existed as the department of special
2 investigations for about the same amount of
3 time, four to five years.
4    Q.    Why did it come to be?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  So, similar to the
7    answer that I just gave you about the
8    medical education resources team, we
9    increased our volume of credentials that
10    we are verifying and exponentially that
11    would increase the number of
12    investigations that we would need to do.
13         So there wasn't a department
14    called special investigations prior to
15    that time, however, there were personnel
16    assigned to the same type of work.
17 BY MR. THRONSON:
18    Q.    So obviously in this case as you
19 probably know we're talking about a period of
20 time from 1992 to 2017, in terms of conduct and
21 issues that are the focus of the case.  You are
22 aware of that?
23    A.    Yes.
24    Q.    Do you know over that period of

Page 20

1 time any individuals who were responsible for
2 the functions of the special investigations
3 team?
4    A.    Yes.
5    Q.    Who were they?
6    A.    They were William Kelly and
7 Steve Seeling.  That would have been sometime
8 around '98 that Steve would have had oversight
9 as he was the vice president of operations.
10         Bill, or Bill Kelly, he was
11 responsible, as far as I know, during that time
12 period from '92 to -- well, to 2016 I think,
13 when he retired.  So he was involved in that
14 process during that time period.
15    Q.    Any other individuals you know
16 that were involved, that had a special
17 investigative team type role from 1992 to the
18 time in which the special investigations team
19 as a department was created?
20    A.    Yes.  So I started working on
21 those types of cases in 2008.  In a similar
22 role that my special investigations team does
23 now.
24         MR. VETTORI:  I didn't hear --

Page 21

1          THE WITNESS:  2008.
2          MR. VETTORI:  Thank you, very
3    much.
4          THE WITNESS:  Now, we have
5    Virginia Kesting who is currently in the
6    special investigations department.  She
7    was working on those types of cases
8    probably from around 2001, around that
9    time period; and there was another woman
10    prior to that who is long retired who did
11    administrative work in coordinating the
12    meetings of the medical education
13    credentials committee.
14 BY MR. THRONSON:
15    Q.    Do you remember her name?
16    A.    Her name was Connie.  I don't
17 remember her last name, I'm sorry.
18    Q.    That's fine.  Anybody else?
19    A.    Not that I'm aware of.
20    Q.    Have you been deposed before?
21    A.    About this or in general?
22    Q.    Yes.
23    A.    No, I don't think so.
24    Q.    Have you testified at trial

6 (Pages 18 - 21)

JA636

KARA CORRADO

Page 22

1 before?
2    A.    Yes.
3    Q.    How many times?
4    A.    I testified before a grand jury.
5 Is that what you're asking about?
6    Q.    Any type of court proceeding?
7    A.    So twice, I think.
8    Q.    So you testified; one time was
9 before a grand jury?
10   A.    Yes.
11   Q.    Did that involve this case?
12   A.    No.
13   Q.    What type of matter generally
14 did it involve?
15        MS. McENROE:  Objection.  Just
16   to preserve the record and make sure -- I
17   don't know what sort of instructions you
18   were provided in conjunction with the
19   Grand Jury and whether the subject of it
20   is allowed to be public or not.
21        So I just want to make sure that
22   you are comfortable with providing the
23   responses to the questions that you've
24   been asked.

Page 23

1        THE WITNESS:  Okay.
2        MS. McENROE:  If you're not, you
3   don't have to.
4        THE WITNESS:  Okay.
5        MR. THRONSON:  Usually grand
6   jury secrecy doesn't apply to the
7   witness.
8        MS. McENROE:  She also just
9   testified it has nothing to do with this
10  case.
11        THE WITNESS:  I don't remember
12  what the instructions were.  It was a
13  long time ago.
14 BY MR. THRONSON:
15   Q.    Was it a matter that was similar
16 at all to this case?
17   A.    No.
18   Q.    Did it involve ECFMG
19 certification of a physician?
20   A.    No.
21   Q.    You mentioned another matter
22 that you testified in, what was that?
23   A.    That was a preliminary
24 injunction hearing.

Page 24

1    Q.    What type of matter?
2    A.    That is related to -- it's a
3 matter regarding a medical school.
4    Q.    Had you provided any other
5 testimony under oath besides those two
6 occasions and our conversation today?
7    A.    No.  Not that I can recall.
8    Q.    Have you ever reviewed any
9 matters as an expert witness?
10   A.    No.
11   Q.    Did you prepare for the
12 deposition today?
13   A.    In what way?  Sorry.
14   Q.    I guess, let me ask this.  I'm
15 sure you did.  How did you prepare for the
16 deposition today?
17   A.    I looked over the documents.
18   Q.    Which documents?
19   A.    The legal documents and also the
20 bunch of documents from the file.
21   Q.    The legal documents mean filings
22 in this case?
23   A.    Yes.
24   Q.    To your knowledge, did all the

Page 25

1 documents that you reviewed to the best of the
2 your recollection have a Bates stamp on them?
3    A.    Yes, to the best of my
4 recollection.
5    Q.    Did you review any material that
6 you're aware that a privilege is being asserted
7 regarding...
8        MS. McENROE:  Objection to form.
9        MR. THRONSON:  Let me ask that
10 differently.
11 BY MR. THRONSON:
12   Q.    Did you review any information
13 that is privileged or that ECFMG might assert a
14 claim of privilege about?
15   A.    Not that I can recall.
16   Q.    About how many hours did you
17 spend reviewing today -- preparing for the
18 deposition today?  Sorry.
19   A.    Probably around eight.
20   Q.    Did you do anything else besides
21 review the documents in preparation for the
22 deposition today?
23   A.    No.
24   Q.    Just to cover my bases.  Did you

7 (Pages 22 - 25)

JA637

KARA CORRADO

Page 26

1 speak with anyone about the deposition today?
2    A.    Yes.
3    Q.    Who did you speak to?
4    A.    Elisa and Matthew.
5    Q.    Anybody else?
6    A.    No.
7    Q.    I guess you had a brief
8 conversation with Lisa Cover?
9    A.    Oh, yes. I mean with respect to
10 I'm not going to be at work today because I
11 have a deposition.
12    Q.    Anyone else besides her at
13 ECFMG?
14    A.    I probably told -- my admin
15 probably told the team I was at a deposition
16 today.
17    Q.    So the only people you spoke to
18 about the substance of the deposition were
19 counsel for ECFMG at Morgan Lewis?
20    A.    Yes.
21    Q.    Did you learn any facts from
22 counsel that you weren't aware of in your
23 review of the documents or your experience
24 regarding the matters that are an issue in this

Page 27

1 case?
2          MS. McENROE: Objection to form.
3    I'll just caution you not to devil with
4    privileged information. Counsel is
5    specifically asking about facts you may
6    have learned, as opposed to advice or
7    substantive input or whatnot, guidance.
8          MR. THRONSON: Exactly.
9          THE WITNESS: So there were no
10    new facts that I learned.
11 BY MR. THRONSON:
12    Q.    About how much time did you
13 spend with Counsel in preparation for the
14 deposition today?
15    A.    About the same amount of time,
16 maybe a little bit less.
17    Q.    Same amount of time?
18    A.    I'm sorry. As I answered
19 previously, in looking over the document.
20    Q.    So you spent about 8 hours
21 reviewing documents --
22    A.    And about 7 maybe with Counsel.
23    Q.    Okay. Did anyone provide you
24 any information in writing regarding subjects

Page 28

1 that are -- I guess in preparation for the
2 deposition today?
3    A.    I'm sorry. Can you say that
4 again?
5    Q.    You mentioned you didn't speak
6 with anyone other than Counsel about the
7 substance of the deposition. Did you
8 correspond with anyone in writing about the
9 substance of the deposition?
10    A.    No.
11    Q.    Do you believe that everything
12 possible has been done to investigate and
13 gather all information known or reasonably
14 available to ECFMG to respond fully and
15 completely to the matters of inquiry listed on
16 the notice of deposition?
17          MS. McENROE: Objection to form.
18          THE WITNESS: Yes, that's my
19    understanding.
20 BY MR. THRONSON:
21    Q.    To ensure that a court and jury
22 would have all the information available for it
23 to make a determination of the facts on the law
24 in this case, do you think anything else could

Page 29

1 have been done to gather information relevant
2 to this case?
3          MS. McENROE: Objection to form.
4 BY MR. THRONSON:
5    Q.    Relevant to the matters of
6 inquiry in the notice of deposition?
7          MS. McENROE: Objection to form.
8          THE WITNESS: Not that I'm aware
9    of.
10 BY MR. THRONSON:
11    Q.    Are there any documents that you
12 believe have not been made available to the
13 plaintiffs?
14    A.    No.
15    Q.    What has been your involvement
16 in the litigation so far apart from testifying
17 today?
18          MS. McENROE: Objection to form;
19    just insofar it could divulge privileged
20    communications, but separate from that
21    you may answer in terms of the nuts and
22    bolts of things you might have done.
23          THE WITNESS: For the
24    litigation?

8 (Pages 26 - 29)

JA638

KARA CORRADO

Page 30

1          MR. THRONSON:  Right.
2          THE WITNESS:  So I have not been
3    involved other than helping to produce
4    documents, locating the file, organizing,
5    those types of things.
6  BY MR. THRONSON:
7      Q.     I believe you may have assisted
8  in providing answers to interrogatories?
9      A.     Yes.
10     Q.     Did you help in drafting the
11  answer to the Complaint or providing
12  information regarding the answer to the
13  Complaint?
14     A.     Yes.
15     Q.     When did you first become aware
16  of the lawsuit?
17     A.     So I can't remember the date,
18  but right around at time the information was
19  provided to ECFMG.
20     Q.     Is that lawsuit the only claim
21  that you are aware of that has been asserted or
22  that you're aware of as a potential claim
23  against ECFMG regrading the conduct of Igberase
24  Akoda?

Page 31

1      A.     I am not aware of any other
2  litigation that ECFMG is involved in.
3      Q.     Are you aware of any other
4  litigation that ECFMG is involved in regarding
5  the allegations that ECFMG negligently
6  performed it's function in terms of
7  primary-source verification of a physician or
8  something similar?
9          MS. McENROE:  Objection to form.
10         THE WITNESS:  No, not that I'm
11   aware of.
12  BY MR. THRONSON:
13     Q.     Are you aware of any claim in
14  the past that's been asserted against ECFMG
15  regarding, alleging, that ECFMG negligently
16  certified an international medical graduate?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  Not that I'm aware
19   of.
20  BY MR. THRONSON:
21     Q.     Could you give me your
22  educational background since high school?
23     A.     I have a bachelors degree in
24  international relations with a minor in Eastern

Page 32

1  European studies and Russian from Saint Joe's
2  University in Philadelphia.  I also have a law
3  degree from Temple University and a Master of
4  Liberal Arts from the University of
5  Pennsylvania.
6      Q.     When did you get your law
7  degree?
8      A.     2007.
9      Q.     Your MLA what is that?
10     A.     The master of liberal arts?
11     Q.     Right.
12     A.     Which school or...
13     Q.     I guess was it for writing or --
14     A.     It's a liberal arts master
15  degree so it covered a variety of essentially
16  electives in college of general studies at the
17  University of Pennsylvania so there is no
18  specific major or focus in the degree.
19     Q.     Why did you pursue that degree?
20     A.     I pursued that degree shortly
21  after I graduated from Saint Joe's because I
22  was not sure what I wanted to do in terms of
23  continuing my education; and to be perfectly
24  honest with you, the program was easy and you

Page 33

1  didn't have to take GREs to get into it and I
2  thought it would look good on my resume if I
3  had a degree from the University of
4  Pennsylvania.
5      Q.     That sounds great.  What jobs
6  have you held since you graduated from college?
7      A.     So I starting working at ECFMG
8  two months after I graduated from college.
9      Q.     What year was that?
10     A.     1998.
11     Q.     Okay.
12     A.     I left because I moved in 1999,
13  and I worked at Gucci as a sales associate, and
14  then I came back to Philadelphia in 2001 and
15  started working at ECFMG again in May of 2001
16  until now.
17     Q.     Do you know approximately when
18  you left ECFMG?
19     A.     September 1999.
20     Q.     Was there any other reason other
21  than your relocation?
22     A.     No.
23     Q.     Why did you decide to come back?
24     A.     Because my wedding was called

9 (Pages 30 - 33)

KARA CORRADO

Page 34

1 off so I came back to Philadelphia, to home.
2      Q.      Can you tell me what your
3 positions were at ECFMG both before and after;
4 I guess in your initial employment and then
5 your second?
6      A.      Yes.  I was hired as an
7 applicant information services representative.
8 Then when I came back -- I got that job and
9 that's what I left in 1999 as.
10            When I came back in 2001, I got
11 the same job back as an applicant information
12 services representative.  I was promoted in
13 that same department to a senior advisor, I
14 think the title was.
15            Then I was assistant manager of
16 the credentials department, and I was assistant
17 manger of the registration and credentials
18 department.  Then I was the manager of the
19 operations program development department.
20 Then I became director of credentialing
21 services.  Then assistant vice president for
22 operations, and then vice president for
23 operations.
24      Q.      Can you remind me of about when

Page 35

1 you became director of credentialing services?
2      A.      Around 2013.
3      Q.      Before that, it sounds like you
4 had some supervisory authority over the
5 credentialing functioning at ECFMG.  When did
6 you -- I guess you started out in terms of a
7 managerial type role as an assistant manager of
8 the credentials department?
9      A.      That's correct.
10      Q.      When did that happen?
11      A.      2004.
12      Q.      Then can you kind of give me the
13 years, I guess, between 2004 and 2013 as to
14 when your positions changed?
15      A.      Sure.  2004 to 2005 it was about
16 one year I was the assistant manager of the
17 credentials department.  Then the registration
18 department and the credentials department
19 merged so I became the assistant manager of the
20 merged departments which was registration and
21 credentials.
22            Then in 2008 I became the
23 manager of the operations program development,
24 and then around 2013 I became director of

Page 36

1 credential services -- I'm sorry, assistant
2 vice president in 2015 or '16.  And then vice
3 president in 2018; give or take.
4      Q.      Understood.  Understood.  You
5 mentioned earlier one other job responsibility
6 that you were responsible as staff with respect
7 to the irregular behavior function of ECFMG.
8 Is that a fair way to describe it?
9      A.      Yes.
10      Q.      Can you tell me what your role
11 is there?
12      A.      My role is to run the, from a
13 staff perspective, I run the administrative
14 hearing that we have at our board of trustees
15 which is the medical education credentials
16 committee.
17            I'm responsible for sending out
18 charges of irregular behavior.  So I have
19 oversight of the team that are doing the
20 investigations, the letters go out under my
21 name; and that also includes exceptions,
22 requests for exceptions to our policies, that
23 committee hears both types of matters.
24      Q.      How long have you held that

Page 37

1 position?
2      A.      About four years in running the,
3 you know, in direct oversight in running the
4 administrative hearing.
5      Q.      Who preceded you in that role?
6      A.      That was Bill Kelly.
7      Q.      Is there anyone that works
8 alongside of you as staff in irregular behavior
9 function?
10      A.      So alongside you mean, has the
11 same responsibilities or works --
12      Q.      Is there any other staff?
13      A.      Yes.  The special investigations
14 department.
15      Q.      You may have told me this, I'm
16 sorry, but who else works in the special
17 investigations department?
18      A.      There's a manager, Scott Mealey,
19 and there are three case managers.
20      Q.      Can you spell Mr. Mealey's name?
21      A.      Yes, M-e-a-l-e-y.
22      Q.      Who are the three case managers?
23      A.      Virginia Kesting, Rosemary
24 Carlin, and Svetlana Gridneva.

10 (Pages 34 - 37)

KARA CORRADO

Page 38

1    Q.    Is the medical education
2 credentials committee a committee of the board
3 above trustees?
4    A.    Yes, it's a subcommittee.
5    Q.    So its membership is comprised
6 entirely of members of the board of trustees?
7            MS. McENROE:  Objection to form.
8            THE WITNESS:  Yes.
9 BY MR. THRONSON:
10    Q.    About how long has that
11 committee existed?
12    A.    Since about 1986.
13    Q.    Before your current, I guess,
14 managerial role in overseeing the irregular
15 behavior function, did you work as staff with
16 respect to that function at ECFMG?
17            MS. McENROE:  Objection to form.
18            THE WITNESS:  Yes.
19 BY MR. THRONSON:
20    Q.    What roles did you have in that;
21 is it a department of ECFMG?
22            MS. McENROE:  Objection to form.
23            THE WITNESS:  So the special
24    investigations is a department.  Prior to

Page 39

1    special investigations and the addition
2    of case managers, it fell under the
3    purview of the associate vice president,
4    who was Bill Kelly, and I, at the time, a
5    manager of operations program
6    development.
7            So Bill, myself, and Virginia
8    Kesting, who reported to me, we were the
9    folks working on the irregular behavior.
10    So in that respect when I was working for
11    Bill, I was staff.
12 BY MR. THRONSON:
13    Q.    When did you get involved in
14 work on irregular behavior matters?
15    A.    That was around 2008 when I
16 moved -- changed position.
17    Q.    So the staff for the irregular
18 behavior is part of the special investigations
19 team?
20    A.    That is the special
21 investigations team now, yes.
22    Q.    Okay.  Got it.  How does ECFMG
23 serve the public?
24            MS. McENROE:  Objection to form.

Page 40

1            THE WITNESS:  ECFMG serves the
2    public in a number of ways.  Our original
3    program which was the certification
4    program severs the public in ensuring
5    that those physicians that are educated
6    outside of the U.S. and Canada meet
7    certain minimum requirements in order to
8    enter an accredited residency program in
9    the United States.
10            We also serve the public in
11    facilitating an appropriate review of
12    them, at the same time making sure that
13    we are efficient about doing it, because
14    IMGs -- or International Medical
15    Graduates represent about 25 percent of
16    the physicians that are working in the
17    United States.
18            So it's important from a
19    physician-workforce point of view to make
20    sure we have qualified physicians.  So in
21    those two broad ways I would say that we
22    serve the public.
23 BY MR. THRONSON:
24    Q.    How does ECFMG serve medical

Page 41

1 residency programs?
2            MS. McENROE:  Objection to form.
3            THE WITNESS:  So ECFMG has a
4    certification program that is required
5    for entrance into ACGME accredited
6    residency programs.
7 BY MR. THRONSON:
8    Q.    Any other ways in which ECFMG
9 severs medical residency programs?
10            MS. McENROE:  Objection to form.
11            THE WITNESS:  So we also have an
12    exchange visitor sponsorship program.  We
13    are responsible for physicians who are
14    seeking residency and training in the
15    United States on a J-1 nonimmigracy
16    step.
17 BY MR. THRONSON:
18    Q.    Beyond the ways in which you
19 serve medical residency programs that you
20 described, how else does ECFMG serve hospitals?
21            MS. McENROE:  Objection to form.
22            THE WITNESS:  I don't know that
23    I would say that we serve hospitals,
24    however, we do provide a service for

11 (Pages 38 - 41)

JA641

KARA CORRADO

Page 42

1    employers that will verify the
2    certification status of an IMG which is
3    typically required when physicians, who
4    are IMGs, are attempting to get
5    credentialing privileges at hospitals.
6  BY MR. THRONSON:
7    Q.     Hospitals rely on ECFMG to
8  provide that service?
9         MS. McENROE:  Objection to form.
10        THE WITNESS:  I think that
11   hospitals, either in-house or through a
12   third party, CVO, collect the
13   verification information on the
14   physicians which include the verification
15   report of an ECFMG certified physician.
16 BY MR. THRONSON:
17   Q.     Do hospitals -- strike that.  Do
18 hospitals rely on ECFMG to provide
19 primary-source verification of a physician's
20 medical credentials as part of the application
21 process?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I'm not sure if
24   hospitals have a requirement to

Page 43

1    primary-source verified medical education
2    credentials.
3         If they do, they can use an
4    ECFMG certification report to indicate
5    whether or not a physician is certified
6    by ECFMG which would include
7    primary-source verification of their
8    medical education credentials.
9  BY MR. THRONSON:
10   Q.     You're aware that hospitals do
11 use ECFMG for that purpose?
12   A.     Yes.
13        MS. McENROE:  Objection to form.
14 BY MR. THRONSON:
15   Q.     Do a lot of hospitals use ECFMG
16 for that purpose?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  So I don't know
19   that I could say what the hospital's
20   purpose is in using the certification
21   report, but I can tell you that
22   physicians are required to be ECFMG
23   certified; and as part of the
24   credentialing process, the hospitals will

Page 44

1    typically verify that information.
2         So, yes, lots of hospitals are
3    requesting reports from us as part of
4    their routine, I think, credentialing of
5    the physicians that are working in their
6    hospitals.
7  BY MR. THRONSON:
8    Q.     What's in an ECFMG report to the
9  hospital?
10   A.     The status report would contain
11   the physician's name; date of birth; the name
12   of the medical school, and the country of the
13   medical school where they went to school; their
14   year of graduation; whether or not they are
15   ECFMG certified, and what the validity of that
16   certification is, whether it's valid
17   indefinitely or expired, et cetera; and there
18   may be score information on examinations, it
19   depends on who the recipient of the report is.
20   Q.     Was that also true back in the
21 late 1990s when Akoda was applying for
22 residency programs?
23   A.     Yes.
24   Q.     Was that also true in the

Page 45

1 mid-2000s when Akoda was applying for residency
2 programs?
3   A.    Yes.
4   Q.     During those two time frames, I
5 guess, from 1996 to the present, is it fair to
6 say that ECFMG undertook to provide medical
7 residency programs with information regarding
8 ECFMG certification and acted essentially as a
9 dean's office for those programs?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  So it's fair to
12   say that ECFMG would provide the
13   certification status reports to residency
14   programs to which the physician would
15   apply.
16        In some cases that's electronic
17   and in some cases it was paper, depending
18   upon the year.
19 BY MR. THRONSON:
20   Q.     Is it fair to say that from 1996
21 to the present -- let me back up.  Why is that
22 service that you provided to medical residency
23 programs, that we've been discussing, why is
24 that important?

12 (Pages 42 - 45)

KARA CORRADO

Page 46

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  The certification
3    verification service?
4          MR. THRONSON:  Right.
5          THE WITNESS:  Because the ACGME
6    which is the accreditation council for
7    graduate medical education, determined
8    that it would use ECFMG certification for
9    international medical graduates as one of
10   the requirements for entrance into those
11   residency programs.
12   BY MR. THRONSON:
13   Q.    Is it important to promote
14   public health?
15   A.    I don't -- I think it's
16   important because it demonstrates to the
17   program that that physician has met the minimum
18   requirements to enter GME in the United States.
19   Q.    Why is that important?
20   A.    That's important because the
21   organizations like the residency programs have
22   the requirement that there is a standard, a
23   minimum standard, for those physicians because
24   there's a variance in medical education

Page 47

1    worldwide.
2          So I don't know when the ACGME
3    determined that in order to accept
4    international graduates they would have this
5    requirement of certification; but I think it's
6    important for them from a credentialing
7    perspective to make sure to know what the
8    status of the person is entering their program.
9    Q.    Part of ECFMG's mission is to
10   promote public health, correct?
11   A.    Part of ECFMG's mission is to
12   promote public health and to protect the
13   public, yes.
14   Q.    Is part of ECFMG's mission also
15   to promote patient safety?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  ECFMG's mission is
18   broader in terms of what we state about
19   the improvement of the world's health
20   essentially.
21   BY MR. THRONSON:
22   Q.    Why is primary-source
23   verification of an applicant's identity and
24   credentials important?

Page 48

1          MS. McENROE:  Objection.
2          THE WITNESS:  Primary-source
3    verification of an applicant's medical
4    education credentials is the best
5    practice in medical regulation.
6          So the international association
7    of medical regulatory authorities has
8    indicated to regulatory authorities
9    around the world that it's the best
10   practice, you should go directly to the
11   source to determine if someone has an
12   education that they purport to have or
13   not.
14   BY MR. THRONSON:
15   Q.    That's been true from 1996 to
16   the present, at least?
17   A.    Yes, that's true.  Well, I don't
18   know if the international association has
19   promoted it since then, but for ECFMG that has
20   been our practice since 1996 until now.
21   Q.    Sounds like, also, ECFMG has
22   undertaken a responsibility to provide
23   hospitals with information regarding ECFMG
24   certification of applicants, correct?

Page 49

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  So we have a
3    service that hospitals can use to verify
4    certification status of physicians.
5    BY MR. THRONSON:
6    Q.    About how long has that service
7    existed?
8    A.    I don't know when the service
9    started, but the service was in existence at
10   least from the 1990s, early 1990s onward.  I
11   believe it existed even prior to that.  I just
12   don't have knowledge as to when exactly the
13   program started.
14   Q.    You are aware that hospitals
15   have an obligation to verify credentials of
16   physicians who apply to a hospital for medical
17   privileges?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  That's my
20   understanding.
21   BY MR. THRONSON:
22   Q.    Is it also your understanding
23   that the joint commission has opined that
24   hospitals can rely on reports from ECFMG to

13 (Pages 46 - 49)

KARA CORRADO

Page 50

1 satisfy that obligation?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  I'm aware that the
4     joint commission has recognized the
5     ECFMG's certification status report as
6     meeting their requirements for
7     primary-source verification of
8     credentials.
9 BY MR. THRONSON:
10    Q.    Is that -- the service that
11 we've been discussing, that ECFMG provides to
12 hospitals, is that also part of ECFMG's role in
13 promoting public health as it sees it?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  I'm sorry.  Can
16    you ask me that again?
17 BY MR. THRONSON:
18    Q.    Sure.  Does the service you
19 provide to hospitals, in terms of information
20 about ECFMG certification, does that align with
21 the organization's role in promoting public
22 health and safety?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  So I think that

Page 51

1     aligns to our mission as it relates to
2     public health in that we are certifying
3     the authenticity of a certificate, or the
4     validity of a certificate, to the
5     hospital so they have that information so
6     they can, as I mentioned earlier, bring
7     on the physician if that's part of their
8     requirements.
9 BY MR. THRONSON:
10    Q.    Is it fair to say that ECFMG
11 supplements a hospital's function of verifying
12 the credentials of medical residents and
13 doctors?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  I don't know what
16    the process is for all the hospitals or
17    all the residency programs.  So I don't
18    know that I could say that.
19 BY MR. THRONSON:
20    Q.    It sounds like ECF -- you are
21 aware that as part of a credentialing process
22 the hospital or residency program will request
23 information from ECFMG regarding whether an
24 applicant is ECFMG certified?

Page 52

1    A.    Yes.
2    Q.    And you are aware that that's
3 part of the hospital's process of determining
4 whether a hospital will grant medical
5 privileges to physicians to practice at that
6 hospital?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  Yes, that's my
9     understanding.
10 BY MR. THRONSON:
11    Q.    Do you believe patients have the
12 right to be treated by physicians who are
13 appropriately credentialed?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  Yes.
16 BY MR. THRONSON:
17    Q.    Do you believe patients have the
18 right to be treated by a physician who did not
19 obtain ECFMG certification through
20 misrepresentations?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  So the question is
23    do I...
24 BY MR. THRONSON:

Page 53

1    Q.    Sure.  Do you believe patients
2 have the right to be treated by physicians who
3 did not obtain ECFMG certification through
4 misrepresentations?
5         MS. McENROE:  Objection to form.
6 BY MR. THRONSON:
7    Q.    That is who obtained ECFMG
8 certification by providing accurate
9 information?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  So you're asking,
12    if they have the right not to be; is that
13    what you said?  I'm sorry.
14 BY MR. THRONSON:
15    Q.    No, it's okay.  It's my fault.
16 Do you believe that patients have the right to
17 not be treated by physicians who have obtained
18 ECFMG certification based on false pretenses?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  Yes.
21 BY MR. THRONSON:
22    Q.    Do you believe in providing the
23 services that we've been discussing to
24 hospitals and residency programs that ECFMG is

14 (Pages 50 - 53)

KARA CORRADO

Page 54

1  obligated to exercise reasonable care in
2  performing those services?
3           MS. McENROE:  Objection to form;
4  calls for legal conclusion as does this
5  whole line of questioning.
6           THE WITNESS:  So ECFMG has a set
7  of policies and procedures that it
8  enforces when it is processing applicants
9  or certifying them.
10 BY MR. THRONSON:
11     Q.     Okay.  Is following -- does
12 ECFMG have the obligation to follow those
13 policies and procedures?
14           MS. McENROE:  Objection to form;
15 also calls for legal conclusion.
16           THE WITNESS:  I mean ECFMG, I
17 think, like any organization will follow
18 it's policies and procedures and the
19 staff will follow the policies and
20 procedures, and in the course of their
21 normal work will be working to make sure
22 they are appropriately following those
23 policies and procedures.
24 BY MR. THRONSON:

Page 55

1     Q.     Can you tell me about the
2  various categories of policies and procedures
3  that have applied perhaps at different times
4  from 1996 to the present with respect to ECFMG
5  certification of IMGs?
6           MS. McENROE:  Objection to form;
7  calls for a narrative.
8           You can answer if you can.
9           THE WITNESS:  So there are
10    myriad policies and procedures that would
11    apply to ECFMG certification.  Is there a
12    specific one or type of policy that you
13    are interested in?
14 BY MR. THRONSON:
15     Q.     What I'm thinking of, is there a
16 set of policies on irregular behavior called
17 irregular behavior policies; is there a set of
18 policies called how to perform primary-source
19 verification of the diploma?
20           Just sort of broad categories of
21 policies or names of sets of policies?
22           MS. McENROE:  Objection to form.
23           THE WITNESS:  So ECFMG has
24    irregular behavior policies and

Page 56

1      procedures, and we also have an
2      information booklet that's updated yearly
3      that contains all of the policies related
4      to ECFMG certification; eligibility for
5      certification, eligibility for
6      examinations, and those types of
7      policies.
8  BY MR. THRONSON:
9      Q.     How about -- strike that.  Has
10 it had irregular behavior policies continuously
11 from 1996 to the present?
12     A.     Yes, that's my understanding.
13     Q.     Are there any internal irregular
14 behavior polices that are not necessarily
15 published on a website or in a booklet for the
16 benefit of IMGs?
17           So basically internal procedures
18 that govern the operation of ECFMG with respect
19 to irregular behavior?
20           MS. McENROE:  Objection to form.
21           THE WITNESS:  So there are
22      policies that are published on the
23      website, but there are also procedures
24      that staff would follow in terms of

Page 57

1      preparing cases for the committee and
2      sending letters out and things like that
3      that are not necessarily published.
4  BY MR. THRONSON:
5      Q.     One of the things that we've
6  been seeking in this case is just to get all
7  the relevant sets of polices and procedures,
8  and we have gotten some, but I'm trying to get
9  a sense of the universe of documents that might
10 be relevant to this case just so we have a full
11 picture of what ECFMG polices are.
12           So if we were to, say, request
13 polices from the organization obviously one set
14 of polices that we would request would be --
15 actually have some meaning, would be a request
16 for the irregular behavior policies and
17 procedures, right?
18           MS. McENROE:  Objection to form.
19           THE WITNESS:  (Nonverbal
20      response.)
21 BY MR. THRONSON:
22     Q.     Is there another set of polices
23 called -- that governs when to refer cases to
24 the credentialing committee?

15 (Pages 54 - 57)

KARA CORRADO

Page 58

1    A.     There are procedures that we
2  follow that would govern that.
3    Q.     What are those called?
4    A.     I'm not sure that they
5  necessarily have a set name.  It would just be
6  our internal procedures.
7    Q.     Do you remember the title of any
8  of those internal procedures or a number?
9    A.     We have a draft, a document that
10 is labeled draft procedures that captures the
11 procedures for irregular behavior.
12   Q.     What does -- can you sort of
13 generally describe what that draft procedure
14 document contains?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  It essentially
17    contains guidelines in reviewing cases or
18    matters that come before the staff when
19    are working on those investigations; how
20    we process the investigations.
21 BY MR. THRONSON:
22   Q.     The organization uses that draft
23 document essentially as a formal policy
24 governing the performance of irregular behavior

Page 59

1  investigations and referrals to the committee?
2       MS. McENROE:  Objection to form.
3       THE WITNESS:  Those procedures
4    are the procedures we follow, and have
5    followed, for quite some time in
6    reviewing the investigations of an
7    irregular behavior and referring matters
8    to the committee.
9  BY MR. THRONSON:
10   Q.     Are you aware of any other
11 irregular -- procedures that apply to how to
12 conduct irregular behavior investigations or
13 when to refer matters to a committee that have
14 applied from 1996 to the present, besides the
15 policy labeled "draft policy" that you just
16 mentioned?
17   A.     Not that I'm aware of.
18   Q.     How long has the policy that you
19 mentioned been in effect?
20   A.     The document I mentioned is, and
21 I might be splitting hairs, but it's
22 procedures.
23       So we have an irregular behavior
24 policy that governs the process that we publish

Page 60

1  on our website and that is given to
2  individuals.
3       The document that I'm referring
4  to that says "draft" is the procedures that
5  staff had been doing probably -- was probably
6  drafted around 2015 time frame, was put to
7  paper in 2015.
8    Q.     Did any procedure exist before
9  that time that applied to how the organization
10 should conduct irregular behavior
11 investigations and when the staff should refer
12 matters to the creds committee?
13   A.     Yes, those procedures that were
14 documented in 2015 were the procedures that
15 staff had been using at least since I started
16 working directly on cases of irregular
17 behavior, which is 2008 onward, and my
18 understanding would be prior to that as well.
19 I just wasn't working on those cases then.
20   Q.     So is it fair to say that up
21 until 2015, those procedures were a custom of
22 the organization in terms of how to conduct
23 investigations and when to refer matters to the
24 committee and then they were written down in

Page 61

1  2015 in the document that we've been talking
2  about?
3       MS. McENROE:  Objection to form.
4       THE WITNESS:  So I don't know if
5    I would characterize them as a custom,
6    but they were documented together in
7    2015.
8       But when I started working on
9    irregular behavior cases those procedures
10    were -- I was trained on those procedures
11    and how to conduct the case.
12 BY MR. THRONSON:
13   Q.     Was there a written policy --
14 sorry, written procedure that predated the 2015
15 procedure?
16       MS. McENROE:  Objection to form.
17       THE WITNESS:  Not that I
18    recall.
19 BY MR. THRONSON:
20   Q.     So as part of your training in
21 how to conduct irregular behavior
22 investigations prior to 2015, you weren't
23 trained on a particular written procedure; fair
24 to say?

16 (Pages 58 - 61)

JA646

KARA CORRADO

Page 62

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  No.  Not that I
3     recall other than the irregular behavior
4     policies and procedures that we have
5     written.
6  BY MR. THRONSON:
7      Q.     So 2015 is the first time that
8  an irregular behavior procedure, which included
9  procedures for referring matters to the
10  credentials committee, was written down at
11  ECFMG?
12      A.     To my knowledge -- I don't know.
13  I believe so.  If they were written down
14  previously, I didn't see them; or they would
15  have been in communications from someone to
16  another person.
17      Q.     What do you mean by that?
18      A.     I don't know what people did
19  before I started working on those cases.  I
20  guess what I'm trying to say is, I don't know
21  if I can say they were never written down
22  before, because I don't know what individuals
23  may or may not have done before me, but I have
24  not seen a set of written procedures prior to

Page 63

1  that time.
2      Q.     So to the best of your knowledge
3  both individually and as a representative of
4  ECFMG, 2015 was the first time that an
5  irregular behavior procedure, including a
6  procedure for referring matters to the
7  credentials committee, was actually written
8  down at ECFMG; to the best of your knowledge?
9          MS. McENROE:  Objection to form.
10          THE WITNESS:  To the best of my
11     knowledge 2015 is when we documented the
12     procedures that we were using as staff to
13     process investigations for irregular
14     behavior.
15  BY MR. THRONSON:
16      Q.     What caused the organization to
17  write those procedures down in 2015?
18      A.     So William Kelly, who was the
19  vice president of operation at the time, he had
20  been doing that work for a very long time and
21  he was retiring and so as part of his
22  retirement he was still doing some consulting
23  for ECFMG, and one of the things I asked him to
24  do was to document all of the procedures in

Page 64

1  writing for us because his knowledge of the
2  organization, historically, not just irregular
3  behavior procedures but things that the
4  organization had done, so when he was fully
5  gone we would have that resource.
6      Q.     Did anyone else contribute to
7  the drafting of those procedures?
8      A.     No.
9      Q.     So it's fair to say, before that
10  procedure was drafted what the procedure was
11  for irregular behavior at ECFMG was essentially
12  what Bill Kelly decided to do?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  No, I would not
15     characterize it that way.
16          What is documented in 2015 is a
17     set of procedures the organization had
18     used.  Bill had used those procedures,
19     but not independently.  So he would have
20     been consulting with his superior others
21     at the organization.  He wouldn't just
22     act on his own to create procedures.
23  BY MR. THRONSON:
24      Q.     Understood.

Page 65

1          MR. THRONSON:  Obviously we'll
2     be requesting a copy of the --
3          MS. McENROE:  I believe we
4     produced that already.  We produced that
5     this morning, I think.  Oh, great, I have
6     hard copies for you.
7          Also, we've been going for about
8     an hour and 20 minutes, and I think we
9     might have lunch ready if there's a good
10     time to take a break?
11          MR. THRONSON:  Can we spend
12     about 5 more minutes to close out this
13     line of questioning; is that okay?
14          THE WITNESS:  That's fine.
15  BY MR. THRONSON:
16      Q.     Why has the -- is there a reason
17  that the policy, at least on the face of it,
18  had remained a draft policy?
19          MS. McENROE:  Objection to form.
20          THE WITNESS:  No other reason
21     than we didn't change the title on the
22     Microsoft Word document.
23  BY MR. THRONSON:
24      Q.     So for all intents and purposes

17 (Pages 62 - 65)

KARA CORRADO

Page 66

1  it's a final policy?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  I would say it
4  captures the procedure that we follow.
5  Off the top of my head, not looking at it
6  right now, I don't know if there are
7  other sort of processes that are not
8  documented in there, but it's generally
9  the guidelines that we use for
10  investigations.
11  BY MR. THRONSON:
12      Q.     Are there any other polices
13  from -- strike that.  Are there any other
14  procedures, from 1996 to the present, that
15  ECFMG has used with respect to investigations
16  of irregular behavior and determinations as to
17  whether to refer a matter to the credentials
18  committee other than the 2015 written policy --
19  written procedures we've been discussing?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  Not that I'm aware
22  of.
23  BY MR. THRONSON:
24      Q.     Does ECFMG have any procedures,

Page 67

1  written procedures, regarding -- tell you what,
2  let me strike that.  Let's take a break.  I'll
3  look at the document, and then we can
4  reconvene.
5             - - -
6         (Whereupon there was a recess in
7  the proceeding from 12:09 p.m. to 12:51
8  p.m.)
9             - - -
10         MR. THRONSON:  Back on the
11  record.  We'll mark this.
12             - - -
13         (Whereupon the document was
14  marked, for identification purposes, as
15  Exhibit Number CORRADO-2.)
16             - - -
17  BY MR. THRONSON:
18      Q.     Ms. Corrado, before we left off
19  we were discussing a credentials procedure that
20  was drafted in 2015.
21         Ma'am, the court reporter has
22  marked a document as exhibit 2, and I'll
23  represent to you this document contains all the
24  production we were provided, supplement

Page 68

1  production we were provided by defendants this
2  morning.
3         The first roughly 10 pages of
4  it, from Bates 10198 to 10208, does that
5  comprise the 2015 procedure we were talking
6  about?
7      A.     Yes.
8      Q.     It looks like there are a few
9  attachments to the procedure that are --
10  attachment 1 is referenced on page 10207,
11  that's a sample text to a third part in
12  response to an allegation.  Do you see that?
13      A.     I'm sorry.  Which page?
14      Q.     10207.  In the middle of the
15  page there, you'll see there's a reference to
16  an attachment?
17      A.     Yes, I see it.
18      Q.     Then on page 10205 there's a
19  reference to attachment 2 at the bottom of that
20  page.  Apparently attachment 2 is a sample
21  charge letter to an applicant.  Do you see
22  that?
23      A.     Yes.
24      Q.     It doesn't appear that those

Page 69

1  attachments are in this production.  Other than
2  those attachments, does what you have in front
3  of you as Exhibit 2 contain the complete 2015
4  policy we've been discussing?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  Yes, this appears
7  to be the document from 2015.
8  BY MR. THRONSON:
9      Q.     On page 11 there are -- I guess
10  I'm wondering if the policy is incomplete or if
11  content was intended to be added to it?
12         It looks like there are some --
13  there's a charge of falsified credential,
14  charge of falsified student status, falsified
15  credentials, other consideration of ongoing
16  investigations.
17         Do you see that text?
18      A.     (Nonverbal response.)
19      Q.     Are those prospective of
20  sections to be added to the policy?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  I am not sure.
23  BY MR. THRONSON:
24      Q.     Let me ask you, what do you

18 (Pages 66 - 69)

KARA CORRADO

Page 70

1 think those represent?
2      A.    Can I have a minute?
3      Q.    Yes.  Of course.  Take all the
4 time you need.
5      A.    I am not sure what the intent
6 would have been by Bill in these, but my
7 educated guess would be these are types of
8 tools -- these are types of cases that we
9 typically see of irregular behavior.
10     Q.    If you turn back to the first
11 page of the policy...
12          MS. McENROE:  Objection.
13          MR. THRONSON:  I'm sorry, what
14 is the objection?
15          MS. McENROE:  You kept calling
16 it a policy.  I went through it
17 extensively this morning, it's a
18 procedure not a policy.
19          MR. THRONSON:  Okay, fair
20 enough.
21 BY MR. THRONSON:
22     Q.    Apparently this belongs to a set
23 of ECFMG credentials procedures; is that
24 correct?

Page 71

1      A.    Yes.
2      Q.    It's labeled Section 5 of those
3 procedures, correct?
4      A.    This does, yes.
5      Q.    So are there other sections of
6 the ECFMG credentials procedures?
7      A.    I believe there are other
8 sections.
9          MR. THRONSON:  I'd like to
10 request a table of contents for those
11 procedures.
12          MS. McENROE:  We can investigate
13 if a table of contents exists.
14          MR. THRONSON:  If not that, then
15 the whole set.
16 BY MR. THRONSON:
17     Q.    Do you recall the headings of
18 the other sections or generally what the other
19 sections contain?
20     A.    Only one which would have been,
21 I believe, our procedures on exceptions to
22 credentialing policies, but I don't remember
23 the other ones.
24     Q.    All right.  Are there -- do you

Page 72

1 recall any others among the ECFMG credentials
2 procedures that bear on investigating
3 allegations of irregular behavior?
4      A.    I don't believe so.
5      Q.    Do you remember any other
6 section of the procedures that bear on the
7 question of when to refer a matter to the
8 medical education credentials committee?
9      A.    I don't believe so.
10     Q.    The document refers to the ECFMG
11 medical education and credentials committee
12 policies and procedures.  Is that a separate
13 set of policies and procedures?
14     A.    Yes.  That is a set of policies
15 and procedures that are published and provided
16 to the applicants when they are charged with
17 irregular behavior.
18     Q.    Are there any other policies and
19 procedures or polices that the credentials
20 committee -- that apply to the credentials
21 committee that are not published?
22     A.    Yes.  There is an appeals
23 procedure that is not published on our website
24 but it is given to any individual along with a

Page 73

1 decision letter when a determination of
2 irregular behavior is made.
3      Q.    Anything else?
4      A.    There are no other policies
5 related to irregular behavior that applies to
6 the credentials committee.
7      Q.    Does the credentials committee
8 itself have any policies and procedures that
9 govern when an allegation of irregular behavior
10 should be forwarded to the committee for
11 investigation and review?
12     A.    The irregular behavior policies
13 and procedures that we have are the ones that
14 govern the committee.
15     Q.    In Exhibit 2, in front of you?
16     A.    No.  The ones that are
17 referenced in here, the medical education
18 credentials committee polices and procedures.
19     Q.    Okay.
20     A.    Which are the irregular behavior
21 procedures that are published right now online,
22 those policies.
23     Q.    Do those published polices also
24 govern staff?

19 (Pages 70 - 73)

JA649

KARA CORRADO

Page 74

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  I wouldn't say
3    they govern staff, but those are the
4    policies and procedures that staff use
5    when reviewing irregular behavior and
6    when we are communicating with
7    applicants.
8  BY MR. THRONSON:
9        Q.    Has that been true from '96 to
10   the present?
11       A.    Do you mean specifically this
12   policy?
13       Q.    I mean the policies that are
14   published regarding irregular behavior.  Has
15   the committee staff, such as yourself, followed
16   those polices from '96 to the present?
17       A.    That's my understanding.
18       Q.    Does Exhibit 2 vary at all from
19   the historical practice of the credentials
20   committee and credentials committee staff with
21   respect to investigations of irregular behavior
22   and referrals to the credentials committee?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  Not that I'm aware

Page 75

1    of.
2  BY MR. THRONSON:
3        Q.    So Mr. Kelly, in drafting this
4    document, never indicated to you that this is
5    something new that I'm putting in here, I think
6    we should change how we're doing a particular
7    thing?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  Not that I recall.
10   BY MR. THRONSON:
11       Q.    According to these procedures
12   when should an allegation of irregular behavior
13   be referred to the credentials committee?
14       MS. McENROE:  Objection to form.
15   BY MR. THRONSON:
16       Q.    By these procedures I mean the
17   ones in Exhibit 2.
18       A.    There is, on page 4, an
19   indication to send the allegation of irregular
20   behavior which in quotes we call "the charge
21   letter to the applicant."
22       Q.    Can you show me the language you
23   are referring to; read it for me?
24       A.    The bottom of page 4.  The very

Page 76

1    last two italicized phrases.
2        Q.    I see that.  So I'm interested
3    in knowing when staff becomes aware of an
4    allegation of irregular behavior, is there
5    anything in Exhibit 2 that indicates when staff
6    should refer that allegation to the credentials
7    committee?
8        MS. McENROE:  Objection to form.
9  BY MR. THRONSON:
10       Q.    Or under what circumstances the
11   staff should refer to the --
12       A.    The document -- the procedures
13   are documenting walking through the process of
14   the investigation which starts with determining
15   whether the irregular behavior relates to
16   ECFMG, whether the source of the allegation is
17   credible, and the process you go through when
18   this comes to the source of the allegation.
19       Q.    Is it ECFMG's position that if
20   staff determines an allegation is credible,
21   that allegation should be forwarded to the
22   credentials committee?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  So the policies

Page 77

1        and procedures on irregular behavior
2        indicate that if staff determines there
3        is sufficient evidence of irregular
4        behavior the matter will be referred to
5        the credentials committee.
6  BY MR. THRONSON:
7        Q.    Is that language in this
8    procedure; is it written down somewhere else?
9        A.    So that language without sitting
10   and reading through here, I don't know for sure
11   if it's in this document or not; but it is in
12   the medical education credentials committee
13   polices and procedures on irregular behavior.
14       Q.    Okay.  Can you say that for me
15   again, if staff determines that there is
16   sufficient evidence; is that what you said?
17       A.    That is what I said, yes.
18       Q.    What is sufficient evidence?
19       A.    Sufficient evidence, it depends
20   on the case.  For example, if it's a falsified
21   credential and the school responded and said
22   the diploma is false, then that response would
23   be sufficient evidence to make an allegation of
24   irregular behavior on a falsified credential.

20 (Pages 74 - 77)

JA650

KARA CORRADO

Page 78

1    Q.    Okay.  I'd like to walk through
2  some -- strike that.  Has it been ECFMG's
3  procedure since 1996 that if staff determines
4  that an allegation is supported by sufficient
5  evidence that the allegation is referred to the
6  credentials committee?
7    A.    That is my understanding, yes.
8    Q.    Does the evidence have to be in
9  a particular form?  For example, does there
10  have to be a particular kind of documentary
11  evidence, or does that depend on the case?
12    A.    It depends on the case.
13    Q.    On page 6 of the polices and
14  procedures, this is Bates 10203, the procedure
15  reads "if the third party is not already
16  provided the appropriate identifying
17  information about the individual" -- so on and
18  so forth -- "ECFMG staff must determine whether
19  the individual is an applicant to ECFMG for any
20  program or service such as ECFMG certification,
21  EPIC, et cetera.  To do this staff must use all
22  the appropriate search functions to query all
23  ECFMG databases," and it mentions AMES, OASIS,
24  and EPIC as examples of those databases.

Page 79

1        Can you tell me about what each
2  of those databases are, what the acronym stands
3  for and what the databases do?
4    A.    I believe that the example --
5  the uses of these -- these are programs,
6  software programs for ECFMG.  So I don't know
7  that they are really databases.  They obviously
8  feed from a database, but I don't believe they
9  are the names of a database.
10        AMES is a program that our staff
11  uses to process records.  OASIS is an external
12  facing portal that applicants can use to check
13  on their application status and their
14  certification status of ECFMG, and EPIC is our
15  electronic portfolio of international
16  credentials which has a variety of software
17  programs that we use.  It's not in the name of
18  a program.
19    Q.    Are there any databases that
20  ECFMG uses in the course of the certification
21  process?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I assume so, yes.
24  BY MR. THRONSON:

Page 80

1    Q.    Do you know the names of any of
2  those databases?
3    A.    I don't know if we have a name
4  for the database or if there's multiple
5  databases.  We have a variety of software
6  programs that we use, and this is saying to
7  make sure we check in each of our lines of
8  service to see if the applicant exists in those
9  lines of service.
10    Q.    As a general matter, if a charge
11  letter is sent to an applicant should the
12  matter be referred to the credentials committee
13  for review?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  That is our
16  current process.
17  BY MR. THRONSON:
18    Q.    How long has that been a
19  process?
20    A.    That has been the process at
21  least since I've been working with the
22  credentials committee which is since 2008, and
23  I believe prior to that probably somewhere
24  around the late 90s early 2000s.

Page 81

1    Q.    So you believe that was also the
2  process in the late 90s, early 2000s?
3    A.    Yes.
4    Q.    Okay.  Do you know of any --
5  strike that.  Do you know of any circumstances
6  where you would -- where ECFMG would vary from
7  that process?
8        MS. McENORE:  Objection to form.
9  BY MR. THRONSON:
10    Q.    That is, would vary from the
11  process of once a charge letter is sent to an
12  applicant to refer the matter to the
13  credentials committee for investigation?
14    A.    Prior to -- like I said, I think
15  it was around '99, 2000 that the matter would
16  be referred.
17        Let me just clarify.  Unless
18  there was some exculpatory evidence that we
19  discovered after we sent the charge letter,
20  then we would withdraw the charge letter and it
21  wouldn't be referred to the credentials
22  committee; but prior to that there are cases
23  where we contacted the applicant to ask them to
24  provide information about an allegation or an

21 (Pages 78 - 81)

JA651

KARA CORRADO

Page 82

1 anomaly. In some of those cases they were not
2 referred to the committee, if that applicant
3 did not respond.
4        Q.      If the applicant did not respond
5 they were not referred to the committee?
6        A.      In some cases. Right, you asked
7 me if we always referred them.
8        Q.      Sure.
9        A.      And the answer is no, because
10 there are some cases that are old, prior to my
11 time, that we contacted the individual about
12 the allegation but they are not necessarily
13 referred to the credentials committee.
14       Q.      Do you know why they were not
15 referred to the credentials committee in those
16 cases?
17       A.      I don't.
18       Q.      But as a general rule after a
19 charge letter was sent, the matter was referred
20 to the credentials committee as a matter of
21 course?
22             MS. McENROE: Objection to form.
23             THE WITNESS: Yes.
24 BY MR. THRONSON:

Page 83

1        Q.      Obviously this case has a long
2 history and we covered a lot of this in the
3 deposition of William Kelly. Did you happen to
4 read that deposition?
5        A.      I did not.
6        Q.      Was it made available to you for
7 review?
8        A.      No.
9        Q.      Do you know that it had taken
10 place?
11       A.      No.
12       Q.      Did ask you for a transcript?
13       A.      No, I did not.
14       Q.      Why not?
15             MS. McENROE: Objection to form.
16             THE WITNESS: I don't know. I
17       didn't ask for one.
18 BY MR. THRONSON:
19       Q.      You didn't feel it was important
20 for your testimony today?
21             MS. McENROE: Objection to form.
22             THE WITNESS: I don't think I
23       thought about it to be perfectly honest.
24 BY MR. THRONSON:

Page 84

1        Q.      I'd like to go through some of
2 the history and just so we can orientate
3 ourselves, is it ECFMG's understanding that the
4 names Charles Nosa Akoda, Igberase Oluwafemi
5 Charles, and Oluwafemi Charles Igberase were
6 names used by the same person?
7        A.      That is our understanding which
8 is based on the information that we got from
9 the plea that he signed.
10       Q.      Do you know what that
11 individual's given name was at birth?
12             MS. McENROE: Objection to form.
13             THE WITNESS: I do not know what
14       his given name was at birth.
15 BY MR. THRONSON:
16       Q.      Does the organization have an
17 opinion as to where he was born?
18             MS. McENROE: Objection to form.
19             THE WITNESS: We would only have
20       information that he provided to us about
21       where he was born.
22 BY MR. THRONSON:
23       Q.      Did he receive any medical
24 education before enrolling in a residency

Page 85

1 program?
2        A.      ECFMG has documentation that the
3 medical school officials verified to us that he
4 completed medical education at a school in
5 Nigeria, and they verified his final medical
6 diploma to us.
7        Q.      Is it ECFMG's position that
8 Akoda actually graduated from the University of
9 Benin?
10       A.      So ECFMG's position on that is
11 that an individual with that name submitted a
12 diploma which was source verified by the
13 medical school officials, which indicated that
14 the diploma was authentic and confirmed that
15 the person named on that diploma graduated from
16 their medical school. I believe it was Benin,
17 I can't remember, but assuming that's the
18 school on the diploma.
19       Q.      You are aware that same
20 individual, under the Igberase name, supplied a
21 medical degree from -- submitted a diploma from
22 the University of Ibadan as part of his
23 application --
24             MS. McENROE: Objection to form.

22 (Pages 82 - 85)

KARA CORRADO

Page 86

1         THE WITNESS:  Yes, so an
2    individual named -- well, one of his name
3    is Igberase, applied to ECFMG and
4    submitted a diploma which was source
5    verified by the University of Ibadan
6    indicating that he had attended medical
7    school there and the diploma was
8    authentic.
9 BY MR. THRONSON:
10    Q.    Does ECFMG believe Akoda
11 Igberase attended both the University of Ibadan
12 and the University of Benin?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  ECFMG has two
15    diplomas for Igberase in his file that
16    were source verified by the medical
17    school officials.  Whether or not he
18    attended both of those medical schools,
19    that particular person that presented
20    those diplomas, I wouldn't know.
21 BY MR. THRONSON:
22    Q.    So the only -- if I'm
23 understanding you correctly, ECFMG doesn't take
24 a position on where Igberase Akoda actually

Page 87

1 went to medical school beyond that ECFMG
2 received these two diplomas that were source
3 verified by the institution?
4    A.    Yes, that's correct.
5    Q.    Does ECFMG have any information
6 apart from the source verification of those
7 diplomas that would indicate where this
8 individual actually went to medical school, if
9 anywhere?
10    A.    All of the information we have
11 about his medical education, aside from the
12 verification of the diploma by the medical
13 school's officials, would have been provided by
14 him on his applications to ECFMG.
15    Q.    So just to be totally clear,
16 apart from having these two diplomas that were
17 source verified by the institution and ECFMG's
18 belief, ECFMG can't say where and when this
19 individual, Akoda Igberase, went to medical
20 school, if anywhere?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  We could only
23    provide the information that the school
24    verified to us, which would include the

Page 88

1    graduation date on the diploma.
2 BY MR. THRONSON:
3    Q.    How did you obtain source
4 verification from the school?
5    A.    For those diplomas?
6    Q.    For those diplomas.
7    A.    We followed our processes at the
8 time for source verification which was to send
9 a copy of the diploma to the medical school
10 directly with a form for the school official to
11 complete, it's a safety paper form, and a
12 prepaid envelope, -- I'm sorry, it's not a
13 prepaid envelope, but an envelope addressed to
14 ECFMG to be returned to us.
15    Q.    At this time, did you also
16 request, we're talking about between 1992 to
17 2000, did you also request verification of
18 whether an individual was registered as a
19 medical practitioner or licensed to practice
20 medicine in his or her home country?
21    A.    The credentialing requirements
22 for certification at that time included source
23 verification of the diploma only, and the
24 individual was required to also submit a copy

Page 89

1 of their certificate of their full registration
2 or license, but those were not source-verified.
3    Q.    Why not?
4    A.    I don't know why they were not,
5 but the decision prior to me had been source
6 verification of diploma with a submission of
7 the license, which is not a requirement now.
8    Q.    Why did it cease becoming a
9 requirement?
10    A.    We introduced a clinical skills
11 assessment examination in 1998, and at that
12 time the organization determined it did not
13 need the license or certificate of registration
14 from an international medical graduate when it
15 introduced a clinic skill assessment which is
16 an in-person exam simulated with patients.
17    Q.    It has never been a requirement
18 for international medical graduates applying
19 for ECFMG certification to provide government
20 issued photoed identification, correct?
21    A.    It is a requirement to submit
22 photo identification currently, but it was not
23 in the past.
24    Q.    When did it become a

23 (Pages 86 - 89)

KARA CORRADO

Page 90

1 requirement?
2      A.      It varies based on the service.
3 So the international credential services, EPIC,
4 when that program was launched, which I believe
5 was I was in 2012 or 2013, part of the
6 requirement was to submit a copy of the
7 passport and have it notarized -- an
8 identification form notarized and for ECFMG
9 certification that became part of the
10 requirement in 2017, I believe, or 2018; maybe
11 2018, more recently.
12      Q.      Why did it become a requirement?
13      A.      We were looking across our
14 processes and programs and we wanted to
15 standardize it, work towards standardization,
16 and bring, like have a notary -- the process is
17 essentially the same as it had been but we
18 wanted to tighten it up in terms of having one
19 notary that we contract with to provide
20 notarization of the identification forms to us.
21      Q.      Is that a separate requirement,
22 in terms of ECFMG now has a requirement that an
23 applicant provide government issued photo
24 identification if I'm understanding you right?

Page 91

1      A.      Yes, to ECFMG.
2      Q.      I'm sorry -- right that it is
3 supplied to ECFMG.  There's a separate
4 requirement that the applicant used, I believe,
5 Notary Cam?
6      A.      (Nonverbal response.)
7      MS. McENROE:  Is that a "yes"?
8      THE WITNESS:  Yes.
9 BY MR. THRONSON:
10      Q.      Why was that Notary Cam
11 introduced?
12      A.      The requirement to use Notary
13 Cam?
14      Q.      Right.
15      A.      So Notary Cam is a vendor in the
16 United States that provides online notary
17 services.  They also have an ability -- they
18 have a database of passports so they know what
19 the passport should look like, and we decided
20 to use an online -- one notary that we knew in
21 order to essentially improve the process that
22 we've had over the years.
23      Over the years we've introduced
24 a number of improvement to all of our processes

Page 92

1 essentially and that was one of them for
2 identification.
3      Q.      Why do you think it wasn't
4 introduced beforehand?
5      MS. McENROE:  Objection to form.
6      THE WITNESS:  I believe it was
7 not introduced beforehand because,
8 frankly, of system restraints.
9 BY MR. THRONSON:
10      Q.      What do you mean by that?
11      A.      It is a technology matter, so to
12 speak, that we -- it was a project that we had
13 sort of in the pipeline for a while, and it
14 goes through a process with IT, and updating
15 the system to be able to accept those things
16 electronically took some time.
17      Q.      Why do you think the government
18 issued photo ID requirement was not a
19 requirement until 2017, 2018?
20      MS. McENROE:  Objection to form.
21      THE WITNESS:  So presenting the
22 government ID was a requirement prior to
23 this in the sense that as part of the
24 identification of the individual on an

Page 93

1 application they were required to appear
2 in front of a notary, first class
3 magistrate, Consul official or a medical
4 school official and provide their
5 identification to that individual to
6 notarize or sign off on their application
7 form, but they were not submitted to
8 ECFMG.
9 BY MR. THRONSON:
10      Q.      Where was it submitted?
11      A.      I assume it would be submitted
12 to the notary -- right -- you have to show up
13 to the notary and the instructions to the
14 notary indicate that they are certifying that
15 the person before them, based on their
16 government issued ID or other form of
17 identification, is that person.
18      Q.      Was the notary supposed to send
19 that documentation directly to ECFMG?
20      A.      The -- no, I don't belive so.
21      Q.      I wanted to go back to the issue
22 of the diplomas.  I believe that there were
23 some emails that were produced in production
24 from defense counsel in this case.

24 (Pages 90 - 93)

KARA CORRADO

Page 94

1          One of them I'd like to mark as
2    Exhibit 3, please.
3              - - -
4          (Whereupon the document was
5      marked, for identification purposes, as
6      Exhibit Number CORRADO-3.)
7              - - -
8    BY MR. THRONSON:
9      Q.    So Ms. Corrado, I'm handing you
10   a copy of what's been marked as Exhibit 3.
11   This is Bates 3206 to 3209, and it appears to
12   be an exchange between you and -- initially a
13   few physicians, Nigerian physicians, and then
14   the most recent response on the exhibit is
15   between you and physician Dr. Okwukenye; is
16   that right?
17     A.    Yes.
18     Q.    Dr. Henry?
19     A.    Dr. Henry, yes.
20     Q.    It appears that you submitted
21   diplomas and certificates of full registration
22   that most of which it appears have been source
23   verified to Dr. Henry to take a look at, right?
24     A.    Yes.

Page 95

1      Q.    First of all, how did you meet
2    Dr. Henry?
3      A.    Dr. Henry is, I believe, he is
4    the registrar of the Medical and Dental Council
5    of Nigeria.  The Medical and Dental Council of
6    Nigeria is one of the medical regulatory
7    authorities that uses our credentialing
8    verification services for applicants that are
9    applying to Nigeria for licensure in Nigeria.
10         So Dr. Henry has been one of our
11   point people in that relationship in providing
12   the services to the medical council.
13     Q.    Got it.  Has the Medical and
14   Dental Council of Nigeria been in existence
15   since at least 1996?
16     A.    That's my understanding.
17     Q.    How did you meet doctor Henry?
18     A.    I met Dr. Henry aside from
19   email, but in person I met him at a conference.
20     Q.    It looks like the AMCOA
21   Conference in Ghana?
22     A.    Yes, I met him at AMCOA, but I
23   might have met him at a previous conference of
24   AMCOA.

Page 96

1      Q.    About how long do you think
2    you've known him?
3      A.    Probably around three years.
4    I'm not sure off the top of my head when they
5    signed on with us.  So from the time
6    essentially that the medical and dental council
7    signed on, Dr. Henry was the point person.  I
8    would have known him through email and then
9    when I met him at conferences that we both
10   attended.
11     Q.    What is the AMCOA Conference?
12     A.    That is the Association of
13   Medical Councils of Africa.
14     Q.    So it looks like you provided
15   copies of various diplomas and certificates of
16   full registrations that are listed on pages
17   3206 and 3207?
18     A.    Yes.
19     Q.    Those included diplomas and
20   certificates of full registration from the
21   individual Johnbull Enosakhare Akoda as well as
22   Charles Olufemi Igberase and Charles Igberase
23   Oluwafemi, correct?
24     A.    Yes.  All of the names that are

Page 97

1    listed in the emails.
2      Q.    Got it.  Dr. Henry said he would
3    -- he was out of the office but would verify
4    these by Thursday?
5      A.    (Nonverbal response.)
6          MS. McENROE:  Is that a "yes"?
7          THE WITNESS:  Yes.  Sorry.
8    BY MR. THRONSON:
9      Q.    I don't have a response from
10   him.  Did he respond to you?
11     A.    Yes.  In here you mean or?
12     Q.    Subsequent to this email, did
13   you have correspondences with him?
14     A.    Not about this.  Not about this
15   that I'm aware of.
16     Q.    Did he ever give an opinion as
17   to whether any of the documents that you sent
18   him were authentic?
19     A.    He did not.
20     Q.    Did you ever follow up with him
21   to ask again?
22     A.    Yes, I believe I did in an
23   email.
24     Q.    Do you know about when you did

25 (Pages 94 - 97)

JA655

KARA CORRADO

Page 98

1 that?
2    A.    Probably a few months after
3 that.
4    Q.    Did he respond?
5    A.    I don't think he responded.
6    Q.    Has he every gotten back to you
7 about his opinion about whether the documents
8 you sent him were authentic?
9    A.    No.
10   Q.    Have you sent any of the
11 documents that are identified in this email
12 chain in Exhibit 3 to anybody else to get their
13 opinion on whether they were authentic?
14   A.    No.
15   Q.    Why did you send them to
16 Dr. Henry?
17   A.    Dr. Igberase applied to our
18 international credential services after the
19 issue that he had and his licenses were revoked
20 in the States.  He applied to use our services
21 indicating he was applying to Nigeria, and I
22 believe Ireland for licensure.
23         As part of our regular process
24 and procedure when an individual that has

Page 99

1 engaged in irregular behavior in any of our
2 programs and services uses our international
3 credentialing services and indicates they are
4 going to apply to another jurisdiction, we will
5 reach out to our partners at that jurisdiction
6 to let them know that an individual with an
7 annotation of irregular behavior has indicated
8 that they are going to apply to that regulatory
9 authority for licensure.
10        So that was the original email,
11 was notifying them that he had applied, and I'm
12 sorry, I think I lost the question.
13   Q.    That's fine.  So it looks like,
14 if the email is accurate, that while you were
15 at AMCOA, you discussed the case of
16 Dr. Igberase and Dr. Akoda with him, and this
17 was after the notification to the MDCN on June
18 29th --
19   A.    Yes.  Yes.  Sorry.
20   Q.    So why did you bring the case up
21 with him?
22   A.    So because he was applying to
23 them, we gave them the heads up about it, so
24 they could make a decision.  If he continued

Page 100

1 the process in Nigeria, the medical and dental
2 council would make a decision about his
3 application for licensure with a full
4 understanding of the information that we had
5 about this particular physician.
6         So when I met Dr. Henry in Ghana
7 we discussed this case because he had the
8 email, and I asked him if we could provide all
9 the documents to him because the individual,
10 you know, Dr. Igberase, was using our
11 credentialing services to apply to us, what
12 appeared to apply to other jurisdictions
13 seeking medical licensure.
14   Q.    Okay.  So it looks like you
15 provided the initial notification on June 29th,
16 then you had a conversation with him at the
17 conference that essentially grew out of that
18 initial notification?
19   A.    Yes, that is right.
20   Q.    He said that the medical council
21 could verify the documents that were submitted
22 to ECFMG by this individual, according to the
23 email here; is that right?
24   A.    Yes.

Page 101

1    Q.    Why did he offer, or why did you
2 ask him to do that?
3    A.    So because Dr. Igberase appeared
4 to be engaging in our credentialing services,
5 we would then be verifying these documents to
6 other organizations, and I wanted to cross
7 check the information.
8         We also hadn't ever necessarily
9 verified the registration certificates with the
10 medical and dental council.  Those had not been
11 previously source verified so I was looking to
12 source verify those as well, and then we could
13 put those in Dr. Igberase's account and send
14 out the verification of them to the regulatory
15 authorities he was applying to.
16   Q.    So even though the registrations
17 apparently had been verified as authentic by
18 deans at the schools Ibadan and Benin, that
19 didn't constitute source verification; correct?
20   A.    That is correct.
21   Q.    As he says in his email,
22 however, no dean in the world can verify full
23 registration.
24         Is that accurate?

26 (Pages 98 - 101)

KARA CORRADO

Page 102

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  That's what
3    Dr. Henry told me about their process in
4    Nigeria.  So I assume that whoever he's
5    representing in Nigeria can't do that.
6    BY MR. THRONSON:
7      Q.      Does ECFMG agree that deans are
8    not able to verify full registration at least
9    in Nigeria?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  ECFMG will use the
12    issuing institution as the primary
13    source.  So we would not typically verify
14    a certificate of registration with a
15    medical school unless it was issued by
16    the medical school in some capacity, or
17    we were otherwise instructed by the
18    primary area source to the verification
19    with another organization.
20    BY MR. THRONSON:
21      Q.      Why in this case were the
22    certificates of full registration provided by
23    Igberase Akoda verified with the deans of these
24    schools instead of the MDCN?

Page 103

1      A.      So it wouldn't have been instead
2    of this time, because we weren't source
3    verifying registration or licensure.
4          So I don't know why the staff
5    person sent those along with the diploma to the
6    school.  In looking at the file, my assumption
7    would be they were stapled together with the
8    diploma so they just stapled it to the form and
9    mailed it to the school.
10          When it came back, since that
11    was a document that came back with the
12    verification we left it, but we would not have
13    considered it source verified or primary-source
14    verified.
15      Q.      The only way to determine --
16    strike that.  The best way to determine if a
17    document submitted by applicants is to
18    primary-source verify it; is that fair to say?
19          MS. McENROE:  Objection to form.
20          THE WITNESS:  That is our
21    process.  We will primary-source verify
22    credentials.
23    BY MR. THRONSON:
24      Q.      When, if ever, did it become

Page 104

1    ECFMG's process to source verify medical
2    registration?
3      A.      ECFMG, for ECFMG certification,
4    does not require source verification of
5    licensure or registration because it's not a
6    requirement for certification.
7      Q.      That ended in '98?
8      A.      Submission of the licensure
9    ended in '98.  We provide source verification
10    of registration certificates and licensure for
11    other regulatory authorities and other partners
12    that do require that, and outsource their
13    credentialing verification to us.
14          We are still verifying
15    certificates of registration and licensure
16    today, but not because it's a requirement of
17    ECFMG certification.
18      Q.      Let's go down the list here, and
19    I'd like to know ECFMG's position on whether
20    these documents are authentic or not.
21          So the MBBS diploma issued in
22    1987 to Charles Oluwafemi Igberase, I have
23    copies if you want, but you're probably very
24    well familiar with them -- that diploma issued

Page 105

1    in '87 from the University of Ibadan, in
2    ECFMG'S belief, is that diploma authentic?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  The very first one
5    you're talking about, correct, 19 --
6          MR. THRONSON:  Right.
7          THE WITNESS:  -- '87?
8          It's ECFMG's position that that
9    diploma has been source verified as
10    authentic.  We have no reason to believe
11    otherwise that it is not.
12    BY MR. THRONSON:
13      Q.      The second item on the list,
14    certificate of full registration, issued to
15    Charles Olufemi Igberase 1989, does ECFMG
16    believe that that certification of full
17    registration is authentic?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  ECFMG does not
20    have information to determine whether
21    this document is authentic or not because
22    we would verify it with a primary source.
23    BY MR. THRONSON:
24      Q.      Was it ECFMG's policy when it

27 (Pages 102 - 105)

JA657

KARA CORRADO

Page 106

1  required provision -- submission of the
2  certificates to have some verification of the
3  authenticity of the certificate of
4  registration?
5       A.    Not to my knowledge.  We did not
6  require a source verification of the
7  registration or license.
8       Q.    Why was that?
9       A.    I don't know.
10      Q.    Who would know?
11           MS. McENROE:  Objection to form.
12           THE WITNESS:  I don't know.
13 BY MR. THRONSON:
14      Q.    The third item on the list, the
15 MBBS diploma allegedly issued in '96 to Charles
16 Igberase Oluwafemi from the University of
17 Ibadan, what is ECFMG's position as to the
18 authenticity to that document?
19      A.    So ECFMG has no information
20 about the authenticity of that document.
21      Q.    So ECFMG doesn't take a position
22 either way?
23      A.    Correct.
24      Q.    The fourth item, the MBBS

Page 107

1  diploma, allegedly issued to Johnbull
2  Enosakhare Akoda in 1988 from the University of
3  Benin, what is ECFMG's position as to the
4  authenticity of that document?
5       A.    ECFMG's position is that this
6  document, the MBBS diploma, is authentic based
7  on the information that was provided to us from
8  the primary source at the medical school.
9       Q.    Does ECFMG have any reason to
10 believe that that diploma issued to Akoda is
11 not authentic?
12      A.    ECFMG has no reason to believe
13 that that diploma is not authentic.
14      Q.    The fifth -- strike that.  Does
15 ECFMG -- is it ECFMG's position that the '87
16 diploma from Ibadan, the '96 diploma from
17 Ibadan, and the '88 diploma from Benin were all
18 obtained by the same person?
19           MS. McENROE:  Objection to form.
20 BY MR. THRONSON:
21      Q.    Do you understand what I'm
22 asking, that one person actually graduated from
23 all those schools?
24      A.    Yes.  We don't have information

Page 108

1  that we could take a position that one
2  individual graduated from all of those schools.
3           What we have is an individual
4  submitted those documents to ECFMG, and they
5  were verified as authentic.
6       Q.    Does ECFMG have any reason to
7  believe that one individual, a single
8  individual, did not obtain those three diplomas
9  from schools, from the three schools -- or from
10 Ibadan or Benin?
11           MS. McENROE:  Objection to form.
12           THE WITNESS:  So, again, ECFMG
13      doesn't have any information on which to
14      take a position on how those documents or
15      those educations were obtained.
16           What we have is an individual
17      that submitted documents to us that were
18      source verified to us as authentic.
19 BY MR. THRONSON:
20      Q.    I may have already asked this
21 but just to be sure.  ECFMG has cooperated in
22 at least one federal, criminal investigation
23 regarding this matter; right?
24      A.    Yes.

Page 109

1       Q.    Has it cooperated in any other
2  investigations concerning this matter?
3       A.    I think it was part of the same
4  investigation, the Maryland Board of Physicians
5  reached out to us initially, I believe, about
6  requesting information on these two physicians.
7       Q.    During the course of that
8  process, including in a plea agreement, did
9  ECFMG obtain any additional insight as to the
10 authenticity of the five documents listed in
11 Exhibit 3?
12           MS. McENROE:  Objection to form.
13           THE WITNESS:  So at the time
14      when we reviewed the file for the medical
15      board, the information we have here is
16      the same information we had then which is
17      those documents were verified as
18      authentic.  We didn't have any reason to
19      believe they were not authentic.
20 BY MR. THRONSON:
21      Q.    The fifth document listed, the
22 certificate of full registration, allegedly
23 issued to Johnbull Enosakhare Akoda, in 1989,
24 does ECFMG take a position as to whether that

28 (Pages 106 - 109)

KARA CORRADO

Page 110

1  document is authentic?
2      A.    ECFMG does not have enough
3  information to take a position on whether that
4  document is authentic or not, because it hasn't
5  been primary-source verified.
6      Q.    Does ECFMG take a position as to
7  whether any transcripts provided by this
8  applicant, on these various applications, are
9  authentic or not?
10     A.    I am not aware that ECFMG has
11 any transcripts for him unless they were
12 submitted through the -- they may have been
13 submitted through the residency application
14 service program; but I don't believe we ever
15 source verified a medical school transcript for
16 Dr. Igberase, because it wasn't a requirement
17 at the time he was certified.
18     Q.    Did it ever become a
19 requirement?
20     A.    Yes.
21     Q.    When did that happen?
22     A.    Approximately 2004.
23     Q.    Are you aware of any other cases
24 where allegations have been made of irregular

Page 111

1  behavior concerning applicants who presented
2  diplomas from the University of Ibadan?
3      A.    None that I can recall.  Our
4  falsified credentials are -- we get falsified
5  credentials from all different parts of the
6  world so I don't know off the top of my head if
7  we ever had someone else from that medical
8  school that submitted a falsified credential.
9      Q.    Do you know, both individually
10 and as a representative of ECFMG, if anyone has
11 been investigated for irregular behavior and
12 that person has submitted a diploma from the
13 University of Benin?
14     A.    My answer would be the same as
15 the last, that I don't know of the cases that
16 we reviewed over all time if there were any;
17 it's possible, but any school essentially is
18 possible.  We get fraudulent credentials from
19 different areas of the world.
20     Q.    You've received them from
21 Nigeria before?
22     A.    I don't know.  I'd have to
23 check.
24     Q.    I wanted you to review another

Page 112

1  email.
2          I'll have this marked as Exhibit
3  4.
4              -  -  -
5          (Whereupon the document was
6      marked, for identification purposes, as
7      Exhibit Number CORRADO-4.)
8              -  -  -
9  BY MR. THRONSON:
10     Q.    So Exhibit 4, I'll represent to
11 you is another document we received in the
12 course of discovery in this case, and it
13 appears to be an email exchange involving --
14 among staff in the special investigations team
15 at ECFMG; is that right?
16     A.    That's right.
17     Q.    So it appears that an individual
18 named Saraogi Chirag pulled data concerning the
19 University of Ibadan and the University of
20 Benin?
21     A.    I'm sorry, is that a question?
22     Q.    Yes.
23     A.    Yes, he did.
24     Q.    Are you aware of that project?

Page 113

1      A.    Yes.
2      Q.    What was it about?
3      A.    This was a review of these two
4  medical schools -- the applicants to ECFMG to
5  determine if there were any open cases of an
6  allegation of irregular behavior of another
7  anomaly.
8      Q.    Was this motivated by the Akoda
9  matter?
10     A.    Yes.
11     Q.    What were the findings, if any,
12 of this investigation; what did you all
13 conclude?
14     A.    If I recall correctly, there
15 were no other incidents of irregular behavior
16 or abnormalities.
17     Q.    No other incidents in the
18 history of the organization?
19     A.    No.  Not including people that
20 we maybe had already concluded a case on, but
21 was this anything from the past that had been
22 open and not concluded.
23     Q.    Got it.  Okay.  So the
24 conclusion that there weren't any other

29 (Pages 110 - 113)

JA659

KARA CORRADO

Page 114

1  incidents of irregular behavior from applicants
2  submitting credentials from these two
3  universities, that only applied to open cases
4  that hadn't yet been resolved by the
5  organization?
6      A.    Yes.
7      Q.    I want to just go through the
8  timeline a little bit of what happened here.
9  There are a lot of documents that you can refer
10 to in the -- review of exhibits from the
11 deposition of Bill Kelly.  If you need to
12 verify something in reference to my questions,
13 please feel free to do so.
14          My understanding is that
15 Igberase first applied to ECFMG in 1992?
16     A.    I believe that's correct.
17     Q.    He ultimately received a
18 certificate in 1993?
19     A.    Yes.
20     Q.    Then ECFMG received a separate
21 application from an individual, the same
22 individual going by the name Igberase Charles
23 in 1994?
24     A.    Yes.

Page 115

1      Q.    That certificate was issued to
2  him, I believe, in approximately 1995?
3      A.    Yes.
4      Q.    Then the creds committee, the
5  committee of medical education credentials,
6  revoked that certificate in '95?
7      A.    Yes.  Around that -- after that
8  meeting, yes.
9      Q.    Then it appears that the same
10 individual -- I have a letter it's Exhibit 7 to
11 the Kelly deposition -- where the creds
12 committee announced it's revocation of that
13 certificate in December 1995?
14     A.    Yes.
15     Q.    Then the same individual,
16 according to exhibit 23 of the Kelly
17 deposition, applied as Akado in 1996?
18     A.    Yes.  So we received an
19 application from Johnbull Akado in '96.
20     Q.    He did not provide a social
21 security number on this application, correct?
22     A.    Yes, that's correct.
23     Q.    Was it a requirement at that
24 time to provide one?

Page 116

1      A.    No.
2      Q.    Was it a requirement to state
3  one if you had one?
4      A.    No.
5      Q.    He indicated that he had not
6  taken an ECFMG examination before, correct?
7      A.    That's correct.
8      Q.    That statement was false?
9      A.    Yes.
10     Q.    In making that false statement,
11 that constituted irregular behavior?
12     A.    In making the false statement?
13     Q.    That he had never taken the
14 examination before?
15     A.    That would constitute evidence
16 of irregular behavior.
17     Q.    In fact, it was that same type
18 of irregular behavior that ultimately led to
19 the Igberase and Charles certificates being
20 revoked, correct?
21     A.    That's correct.
22     Q.    On page 705 of Exhibit 23 there
23 is a box for office use only in the lower
24 left-hand corner of the page.  Can you tell me

Page 117

1  what those various codes and numbers mean?
2      A.    I cannot tell you.
3      Q.    Who can?
4      A.    I don't know if there's anyone
5  that works at ECFMG that would know at this
6  point in time.
7      Q.    Then this individual, under the
8  Igberase moniker, took an appeal from the
9  revocation of ECFMG certificates March 7, 1996?
10         MS. McENROE:  Are you referring
11     to a specific exhibit you want her to
12     look at?
13         MR. THRONSON:  Sure Exhibit 9.
14         THE WITNESS:  Yes.
15 BY MR. THRONSON:
16     Q.    It appears that ECFMG, the
17 appeals committee, a review committee?
18     A.    Yes.
19     Q.    They affirmed the decision of
20 the creds committee that limited the period of
21 revocation to five years?
22     A.    That's correct.
23     Q.    Why did they do that?
24     A.    I don't know what their thought

30 (Pages 114 - 117)

KARA CORRADO

Page 118

1 process was.
2    Q.    With respect to the 1996
3 application which is Exhibit 23, what was done
4 to -- you mentioned earlier that ECFMG
5 attempted primary-source verification with a
6 medical school, the University of Benin and
7 also verification of the medical registration
8 with Benin.
9        Did ECFMG conduct any other
10 investigation or inquiry with respect to this
11 application to determine whether it was true
12 and accurate in any or all respects?
13    A.    ECFMG staff would have processed
14 this application in accordance with the
15 procedures that were in effect at the time to
16 determine if there was another applicant in the
17 database with this same information or name.
18    Q.    How would it do that?
19    A.    The staff person would search
20 the database we had at the time, the system we
21 were using. I don't know the specifics of how
22 that system worked.
23    Q.    Did the staff ever investigate
24 or inquire into whether the material (phonetic)

Page 119

1 steel was authentic or suspicious in any way?
2    A.    Not that I'm aware of. It was
3 processed as any other application would be
4 processed; with the same level of scrutiny.
5    Q.    So then in Exhibit 24, Akoda
6 applies again, my recollection is that he
7 either applied too late or he was a no show for
8 one round of exams and so applied again, and
9 this time indicated that he had taken an
10 examine previously, or he applied before;
11 correct?
12    A.    Yes.
13    Q.    Would ECFMG staff have compared
14 the contents of this application to the
15 contents of the previous application to see if
16 there were any red flags?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  The staff would
19      have updated any information the
20      applicant had provided in the system.  So
21      generally speaking they wouldn't look at
22      the paper application because it would be
23      in the file.
24        They would look at what was in

Page 120

1    the system that had been data entered
2    when the last person processed the last
3    application.
4 BY MR. THRONSON:
5    Q.    What data information was
6 entered?
7    A.    Not all of the information on
8 the application is data entered.  So the
9 biographic information, name, address, date of
10 birth, social security number is provided.  In
11 the application software we would indicate
12 whether they were a student or a graduate, test
13 center information.  Their fees would have been
14 entered into the payment system.
15        We did not key in any secondary
16 school information.  We would key in the
17 medical school degree, school information,
18 attended state's information, birth place, and
19 citizenship would be collected as well.
20    Q.    Was the clerkship information
21 entered?
22    A.    No.  It was also not required to
23 be completed.
24    Q.    So -- I'm wondering how to

Page 121

1 reconcile that statement with the statement
2 right at the top, under part A, all items on
3 all sides of the application must be filled out
4 completely for initial and reexamination or
5 application will not be accepted.
6    A.    Yes.  There were fields in here
7 that might not necessarily be applicable to
8 each person.
9        So as a matter of process, they
10 were not required when we received the
11 application; they would not have caused a
12 rejection because that would have impeded the
13 applicant over information that wasn't
14 necessarily relevant to their registration for
15 exam, and at that time we only gave exams, I
16 think, twice or three times a year so it could
17 be a problem if you missed the exam
18 registration.
19        So only the relevant information
20 we needed was required.
21    Q.    If you take a look, compare it
22 to 23 and 24 for a moment.  Just the clinical
23 clerkships under both.  So I'm wondering if
24 you'll agree that the clinical clerkship

31 (Pages 118 - 121)

JA661

KARA CORRADO

Page 122

1 information provided on page 706 of Exhibit 23
2 differs from the clinical clerkship information
3 provided on page 646 of Exhibit 24?
4         MS. McENROE:  Objection to form.
5         THE WITNESS:  In what way?
6 BY MR. THRONSON:
7     Q.    So for example, the hospital and
8 the clinic in Exhibit 23, General Hospital
9 Warri; Exhibit 24, Specialist Hospital,
10 Benin/Warri?
11    A.    So I would say that how the
12 information is presented is different, but I
13 wouldn't be able to say whether that was the
14 same hospital or not.
15    Q.    Would it matter to ECFMG?
16    A.    Not as it related to
17 certification or registration for examination.
18    Q.    So under surgery for example, on
19 Exhibit 23, Akoda wrote he did a clerkship at
20 the Echos General Hospital Warri with
21 Dr. Henderson; and on Exhibit 24, he did it at
22 the Specialist Hospital Benin, Warri with
23 Dr. Eddiblekia (phonetic) -- or something like
24 that, but it's not Henderson, correct?

Page 123

1     A.    Correct.
2     Q.    If ECFMG staff had gone back and
3 looked the at the paper applications and
4 compared this, these two applications in that
5 respect would that have prompted additional
6 investigation into this applicant?
7         MS. McENROE:  Objection to form,
8     calls for speculation.
9         THE WITNESS:  No.  As I said the
10    clerkships were not required, and they
11    could have been partial clerkships.  So
12    it might not necessarily be not true that
13    he had different surgery clerkships in
14    the same year.
15 BY MR. THRONSON:
16    Q.    So it would not be part of
17 ECFMG's procedures to contact the applicant to
18 ask the applicant about this?
19    A.    Not about clerkships, no.
20    Q.    It would not be part of ECFMG's
21 procedures to contact these hospitals to verify
22 that this individual had completed clerkships
23 at these hospitals?
24    A.    That was not part of our

Page 124

1 requirement or process.
2     Q.    Has it ever been?
3     A.    Not to my knowledge.
4     Q.    Has it ever been part of ECFMG's
5 process to inquire, to ask an applicant about,
6 when confronted with inconsistent information,
7 about clerkships?
8     A.    No.
9     Q.    When ECFMG received the
10 applications in Exhibit 23 and 24, did it check
11 them against it's credentials reference
12 library?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  My understanding
15    of the process at the time was that the
16    credential would be checked against the
17    reference library.
18        Whether the person who was
19    processing these applications did that, I
20    was not there so I wouldn't be able to
21    say yes; but that was the process.
22 BY MR. THRONSON:
23    Q.    Does ECFMG take a position
24 either way as to whether information submitted

Page 125

1 by this applicant, Akoda, was checked against
2 ECFMG reference library?
3     A.    So I would say the diploma would
4 have been checked against the reference
5 library.
6     Q.    How about the registration?
7     A.    We would not check the
8 registration against the library.  I don't
9 believe that certificates of registration were
10 in the library at that time.
11    Q.    What did ECFMG do at the time
12 this application was submitted to make sure
13 that the credentials library was -- am I using
14 that term correctly?
15    A.    Yes.
16    Q.    Okay -- that the credentials
17 library was up-to-date with the most current
18 signatures that were being used on diplomas at
19 various schools?
20    A.    There were processes in place to
21 have the staff update the library with copies
22 of verified credentials.  So if the format was
23 the same on a diploma as the year before and
24 the official verified it, they would send a

32 (Pages 122 - 125)

KARA CORRADO

Page 126

1  copy of that diploma that had been verified to
2  the person that was responsible for putting the
3  documents into the library.
4          The library at that time was not
5  electronic. So it was a paper file library
6  that could be accessed by the staff if they
7  needed to cross reference.
8      Q.    Are historical samples of the
9  diplomas maintained? For example, could you
10 take the diploma from the University of Benin,
11 Exhibit 25 from Kelly deposition, and go into
12 the reference library and say, hey, in '96 did
13 ECFMG have a document on file where these
14 signatures match the document that was in the
15 reference library?
16     A.    So ECFMG has historical
17 information on diplomas.
18     Q.    So it's the kind of record it
19 would typically maintain?
20     A.    Yes.
21          MR. THRONSON: I'd like to
22     request that also.
23          MS. McENROE: Any new requests
24     that haven't been produced, if you can

Page 127

1      put that in writing and we can evaluate
2      it following the deposition, that would
3      be fine.
4          MR. THRONSON: We'll see if
5      they're actually new, but we can work
6      that out later.
7  BY MR. THRONSON:
8      Q.    It looks -- if you could just
9  turn to Exhibit 31. So this is a letter from
10 Steve Steeling to James McCorkle dated
11 August 22, 2000.
12     A.    Yes.
13     Q.    On the second paragraph of the
14 letter it reads, the social security number he,
15 Akoda, provided ECFMG in 1998 is 9065. Is that
16 ECFMG's understanding as well?
17         MS. McENROE: Objection to form.
18         THE WITNESS: I would say, yes,
19     if that's what we put in the letter at
20     that time.
21 BY MR. THRONSON:
22     Q.    Do you know how that social
23 security number was provided to ECFMG?
24     A.    I do not, unless it was on an

Page 128

1  application.
2      Q.    If you could turn to Exhibit 33.
3  This is a request for permanent revalidation of
4  standard ECFMG certificate?
5      A.    Yes.
6      Q.    It looks here there's a social
7  security number -- there's an initial number
8  crossed out, then there's another number, it's
9  either 4065 or 9065 to my eye. Do you think
10 that's where ECFMG was provided that social
11 security number?
12     A.    That's probably where the social
13 security number came from.
14     Q.    Can you explain what Exhibit 33
15 is?
16     A.    Exhibit 33 is a request for
17 permanent revalidation of the standard ECFMG
18 certificate.
19         At the time that Dr. Akoda was
20 ECFMG certified, the certificate had an
21 expiration date and it was based on the
22 validity of the English language test. So a
23 test of the English language was a requirement
24 for certification, and that would only be valid

Page 129

1  for a two-year period.
2          When the individual entered an
3  ACGME accredited program, they could then
4  request, on the basis of entering that training
5  program, a revalidation sticker for an
6  indefinite status so that they would not have
7  to continually revalidate the English
8  examination.
9          So this form is a request from
10 John Akoda requesting that revalidation sticker
11 for his certificate so that his status would be
12 updated to valid indefinitely.
13     Q.    It looks like that request was
14 approved by ECFMG?
15     A.    Yes.
16     Q.    Can you tell who approved it by
17 the signature on the page?
18     A.    No, I cannot.
19     Q.    Looks like the document asks for
20 notarization but is not notarized, correct?
21     A.    It doesn't appear to be
22 notarized. Whether there was an institutional
23 seal that was raised on that and you cannot see
24 on the copy I don't know.

33 (Pages 126 - 129)

KARA CORRADO

Page 130

1    Q.      When ECFMG received a request
2  like this, would it look anything up in the
3  system about the applicant before granting the
4  request?
5    A.      ECFMG would process these in the
6  system, the information you would be looking up
7  would be related to the certification status;
8  keying in the ID number and pulling up the
9  correct record.
10   Q.      Is part of that process -- was
11 it the procedure of ECFMG to verify that the
12 applicant's name was consistent between the
13 request for permanent revalidation and the name
14 that was on file for the applicant?
15   A.      That was not part of the process
16 that I'm aware of.
17   Q.      Was it the process of ECFMG to
18 verify that the date of birth given on the
19 request for permanent revalidation was
20 consistent with the date of birth on file with
21 ECFMG for the applicant?
22   A.      Not that I'm aware of.
23   Q.      Was there -- did ECFMG have any
24 requirements for its staff as to verifying

Page 131

1  information on a request for permanent
2  revalidation was consistent with information
3  that it had on file for the applicant?
4    A.      I don't know what the specific
5  procedures were in terms of processing these
6  requests.
7    Q.      Obviously the name on this
8  application, John Charles Akoda, is different
9  than John Nosa Akoda?
10   A.      Yes.
11   Q.      The date of birth of
12 4/17/63 that's on the request for permanent
13 revalidation is different than the date of
14 birth that Akoda gave on his applications to
15 ECFMG of --
16   A.      Yes.
17   Q.      Now there's a difference between
18 the name on Akoda's diploma which you can see
19 on Exhibit 25.  The name on the diploma is
20 Johnbull Enosakhare Akoda?
21   A.      Yes.
22   Q.      And that's different obviously
23 then John Nosa Akoda?
24   A.      Yes.  It appears to be the

Page 132

1  expanded versions of the names.
2    Q.      How do you know it's the
3  expanded version of the name?
4    A.      John is part of the name of
5  Johnbull and Nosa is part of the name
6  Enosakhare.
7    Q.      Obviously you can have
8  circumstances where an applicant's name
9  differed between a diploma and an application
10 the difference was benign and didn't reflect
11 anything about the authenticity of the
12 application, or the trustworthiness of it, or
13 the trustworthiness of the diploma; right?
14   A.      Yes.  You're asking me if we can
15 have benign variations in the name?
16   Q.      Right.
17   A.      Yes, there could be variation in
18 the name from the diploma to the name on the
19 applicant record.
20   Q.      There can also be variations
21 between the diploma and the name on the
22 applicant record that are not benign that may
23 suggest misconduct on the part of the applicant
24 or third parties, correct?

Page 133

1    A.      Yes.  If someone submitted a
2  diploma with a totally different name.  I don't
3  know if I would characterize it as benign or
4  not benign, but it would raise a question.
5    Q.      Did ECFMG take any steps at this
6  time when it was faced with an application,
7  where the name on the application differed from
8  the name on the diploma, to determine whether
9  that difference, as we've characterized it, was
10 benign or not?
11   A.      At the time, the processes would
12 have allowed for cultural variations in names,
13 and in shortening names, like Johnbull -- so
14 would not have seemed incongruent with the
15 person whose name was on the application.
16         If the diploma name was Johnbull
17 and he's applying as John, the name of record
18 would be sent to the medical school when
19 verifying this diploma.  So the name of record,
20 if it varied, would be on the form that the
21 school would be verifying with this diploma
22 attached to it.
23   Q.      The name of the record being the
24 name on the application?

34 (Pages 130 - 133)

KARA CORRADO

Page 134

1    A.    Yes.
2    MS. McENROE:  We've been going
3  for about an hour and 40 minutes, is this
4  a good time to take a short break.
5    MR. THRONSON:  Sure.
6    - - -
7    (Whereupon there was a brief
8  recess in the proceeding.)
9    - - -
10    MR. THRONSON:  Back on.
11 BY MR. THRONSON:
12    Q.    Ms. Corrado, looking at Exhibit
13 25 in front of you.  You'll see there's a stamp
14 on it, received August 11, 2011, by the
15 Maryland Board of Physicians.
16    Do you know why that stamp is
17 there and why a Maryland Board of Physicians
18 document is in the ECFMG files?
19    MS. McENROE:  Objection to form.
20    THE WITNESS:  I don't know.  The
21 Maryland Board of Physicians would have
22 been responsible for licensing Dr. Akoda.
23 My understanding of their current
24 process, is that as part of the

Page 135

1 application process for an international
2 medical graduate they have to source
3 verify the medical education credentials.
4    Maryland currently has a form
5 where they will either accept the
6 verification through the Federation of
7 State Medical Boards or directly
8 themselves.  So they have a form that
9 they require the individual to send to
10 the medical school and must be sent back
11 directly to Maryland.
12    So I don't know why the Maryland
13 Board of Physician's copy is in this
14 file.
15 BY MR. THRONSON:
16    Q.    Okay.  Would it have happened as
17 the result of any criminal investigation that
18 ECFMG cooperated in?
19    A.    I don't -- I don't know.
20    My understanding of what -- when
21 we have requests on information about the case,
22 particularly -- I know we got a request from
23 the board of physicians in about the 2014 time
24 period.

Page 136

1 I'm not aware of anything prior
2 to that, so I can't speculate.
3    Q.    What was the request that you
4 got in 2014 about?
5    A.    The Maryland Board reached out
6 to us for, I believe, file copies or specific
7 copies of documents on Dr. Akoda and
8 Dr. Igberase.
9    Q.    Do you know why?
10    A.    I don't know.  I don't know.
11 There's an email, I think about it.
12    Q.    Yeah, there was a reference, I
13 believe, in one of these emails to the
14 information you had provided the board in 2014,
15 and there was a detective in one of the emails
16 who was in a sex crimes unit or sexual assault
17 unit.
18    Do you recall any sex crimes or
19 sexual assaults investigation that ECFMG
20 provided information in connection with or
21 participated in?
22    MS. McENROE:  Objection to form.
23    You mean specifically for Dr. Igberase
24    and Dr. Akoda?

Page 137

1    MR. THRONSON:  Correct.
2    THE WITNESS:  There was a
3    request around that same time period from
4    an individual, law enforcement, that I
5    think was in a sex crimes unit.
6 BY MR. THRONSON:
7    Q.    Do you know any of the details
8 or allegations that prompted that request?
9    A.    I do not.  ECFMG's procedure
10 when it comes to a request from law enforcement
11 is generally to cooperate with law enforcement.
12    So if a law enforcement official
13 reaches out and indicates to us that they have
14 an active investigation about an individual, we
15 will provide the information that they seek if
16 appropriate and if we have it.
17    Q.    Do you know what information you
18 provided in connection with that investigation?
19    A.    I believe we provided -- the
20 files we provided would be included in the
21 documents that are in this, in the binders.
22    Q.    So we got a little over 10,000
23 pages.  Do you think you gave all of that or...
24    A.    If they requested for the file,

35 (Pages 134 - 137)

KARA CORRADO

Page 138

1 we would have give them a copy of his file,
2 both files for those individuals.  If they only
3 requested specific pieces of the file, like an
4 application, then we would give them that.  It
5 just depends on what they're looking for.
6    Q.    Just to close this out.  So
7 there was an investigation that the Maryland
8 Board of Physicians was doing that was around
9 the 2014 time period?
10    A.    That's my understanding from
11 their communication.
12    Q.    Were you involved in responding
13 to the inquiries from the Maryland Board?
14    A.    No, I was not.
15    Q.    Do you know what information was
16 provided?
17    A.    I know what information was
18 provided in the sense we provided the file.  I
19 just don't know which parts of it at this
20 particular moment were provided; but what they
21 asked for we would have provided.
22    Q.    Do you know what the outcome
23 was?
24    A.    I do not; other than at the end

Page 139

1 of all of this, his Maryland license was
2 revoked.
3    Q.    Do you know what the outcome of
4 the sex crimes investigation was?
5    A.    I do not.
6    Q.    At some point you were contacted
7 by a federal law enforcement?
8    A.    Yes.
9    Q.    Who contacted you and when?
10    A.    I'm sorry, I don't remember the
11 name of the agent; and it was sometime, I
12 think, in the 2015 or 2016 time period.
13    Q.    That was FBI or U.S. Attorney's
14 Office?
15    A.    I believe it was -- I'm not
16 sure.  I think there's communication that we
17 have in there.  I don't want to misrepresent
18 who reached out to us; but yes, a federal
19 agency reached out to us in that time period.
20    MR. THRONSON:  I have not seen
21 it, but we can talk about that.
22 BY MR. THRONSON:
23    Q.    What was your understanding of
24 the purpose of the investigation?

Page 140

1    A.    My understanding is that the
2 authorities were reviewing a matter involving
3 Dr. Igberase and Dr. Akoda and that there was
4 some type of potential fraud.  They asked us
5 for information, and they asked us not to
6 provide information to anyone about their
7 investigation, because they were worried about
8 not being able to catch him.  I think that's
9 generally the knowledge that I have of that
10 request.
11    Q.    Not being able to catch him
12 because he would flee the country?
13    A.    I'm not sure.  It appeared from
14 the information that we have from them they
15 were trying to catch him, for a lack of better
16 words, and they were worried that he somehow
17 would be able to slip through.  If he had got
18 any notice that someone was looking at his
19 record, it might tip him off.
20    Q.    Did you understand that to be a
21 legal obligation that you had to not notify
22 anyone about the investigation, or not notify
23 anyone about the potential fraud that Igberase
24 may have committed?

Page 141

1    MS. McENROE:  Objection to form.
2    THE WITNESS:  I would say that
3 we generally cooperate with law
4 enforcement.  So if they asked us not to
5 do anything or not to provide information
6 to other parties we would generally do
7 what they ask of us.
8 BY MR. THRONSON:
9    Q.    Do you know generally what
10 information you provided to law enforcement in
11 connection to that investigation; 2015, 2016?
12    A.    So we would have provided the
13 files to the authorities on that investigation.
14    Q.    The files, as I understand it,
15 there are two hard files that we had the
16 opportunity to go through today that are under
17 the Igberase applicant number and Akado
18 applicant number, right?
19    A.    Yes.
20    Q.    What other files does ECFMG
21 maintain relative to Akado?
22    A.    Those are the hard copy file and
23 there would be an electronic file which would
24 have copies of some of the documents in there.

36 (Pages 138 - 141)

JA666

KARA CORRADO

Page 142

1    We started doing electronic
2 files after Dr. Igberase came through our
3 system. So all of his information would be in
4 paper file, and then if he had communicated
5 with us after that time, that would be in the
6 electronic file and we would, when law
7 enforcement asked, combine those two things.
8    Q.    Is there a software program you
9 use to access the electronic file?
10    A.    Yeah. I forget what it's
11 called, but you can access the scanned
12 documents.
13    Q.    They are stored on a hard drive
14 somewhere at ECFMG?
15    A.    I don't know if they are on a
16 hard drive.
17    Q.    Or the cloud?
18    A.    But, yes, they are stored
19 somewhere in the electronic file.
20    Q.    Then is there a separate
21 electronic file that contains perhaps internal
22 memos about Akoda, deliberations, things of
23 that nature?
24    A.    The file, the record I should

Page 143

1 say in our system, may include comments from
2 our staff that are progressing, that wouldn't
3 necessarily be in the electronic file. Those
4 are more operational kind of comments, you
5 know, process this, send it there.
6    The decision of the medical
7 education credentials committee are kept in the
8 applicant's file, but the minutes from the
9 meeting are not kept in the applicant's file.
10 So that would be the only other record, if you
11 will, of the applicant's irregular behavior.
12    Q.    Everything else would be in the
13 applicant's file?
14    A.    It would be in the file. It
15 would be in the system, the electronic system.
16    Q.    Going back to our story. When
17 did ECFMG first become aware that Akoda. Sorry
18 I'm skipping around.
19    When did ECFMG first become
20 aware that Akoda engaged in irregular behavior?
21    MS. McENROE: Objection to form.
22    THE WITNESS: There was
23    allegation that he had used a social
24    security number that was not his, and

Page 144

1    that was reported to us by the residency
2    program at the time. So at that time
3    there would have been a review of that
4    scenario to determine if there was
5    sufficient evidence of irregular
6    behavior. If he had violated any of our
7    policies or provided any false documents
8    or anything like that to ECFMG.
9 BY MR. THRONSON:
10    Q.    If you turn to Exhibit 34, this
11 is a letter from James McCorkle at Jersey Shore
12 Medical Center to Rice Holmes at ECFMG sent and
13 received on August 11, 2000. This contains, I
14 believe, the information you were just
15 discussing about Akoda was using a social
16 security number that was issued to Igberase.
17    In the first paragraph McCorkle
18 reports that Akoda admitted using these various
19 names, Igberase, Charles Igberase and also
20 having admitted to using three birth dates.
21    Do you see that information?
22    A.    I do.
23    Q.    Did I characterize that
24 accurately?

Page 145

1    A.    Yes.
2    Q.    He mentions the social security
3 number 9065. That's the same number on the
4 request to permanently revalidate his
5 certificate that we looked at earlier, right?
6    A.    Yes, I believe it was.
7    Q.    So is this the first date on
8 which ECFMG became aware that Akoda might have
9 engaged in irregular behavior when it got this
10 letter?
11    MS. McENROE: Objection to form.
12    THE WITNESS: Yes. Either on or
13    about this date. I don't know if he
14    called before that and then faxed this
15    over.
16 BY MR. THRONSON:
17    Q.    There wasn't anything before
18 this?
19    A.    Not that I'm aware of.
20    Q.    In the procedures we were
21 discussing earlier regarding irregular
22 behavior, there's a discussion about what makes
23 a credible allegation and an allegation that's
24 considered not credible.

37 (Pages 142 - 145)

KARA CORRADO

Page 146

1    Is an allegation that's reported
2 by a vice president of academic affairs at a
3 residency program typically considered
4 credible?
5    MS. McENROE:  Objection to form.
6    THE WITNESS:  So it depends on
7    what the information is.  If the
8    credibility of the individual -- I would
9    say it just depends on what the
10    information is they are providing to us;
11    but generally if it's a residency program
12    director who's signing it that we can
13    follow up with, it would be something we
14    would follow up on.
15 BY MR. THRONSON:
16    Q.    Have you reviewed the
17 correspondence with Jersey Shore and the notes
18 that William Kelly made in the file regarding
19 his conversations with Jersey Shore?
20    A.    Yes.
21    Q.    It appears that Akoda came to
22 visit Kelly around September 27, 2000, and this
23 is -- you can see a memo about this Exhibit 41.
24 Exhibit 41 to Kelly's deposition is a memo to

Page 147

1 file regarding Akoda.  Have you reviewed this
2 document before?
3    A.    Yes.
4    Q.    It is as I described?
5    A.    Yes.
6    Q.    So according to Kelly, he
7 admitted -- Akoda admitted to using Igberase
8 Charles's social security number?
9    A.    Yes.
10    Q.    So at that point surely
11 Dr. McCorkle's allegation that Akoda had
12 submitted a false social security number would
13 have been regarded as credible by ECFMG?
14    A.    That he submitted a false social
15 security number to the program, yes.
16    Q.    And he also submitted that false
17 social security number to ECFMG, correct?
18    A.    If...
19    Q.    On the request for permanent
20 certification at least if you turn to...
21    A.    Yes, because that's -- well,
22 that's the social security number that the
23 program -- that form is usually completed by
24 the program coordinator.

Page 148

1    So whether he or she filled it
2 out based on the information he provided to
3 Jersey Shore, then it was sent to ECFMG.
4    Q.    Got it.  So at some point -- but
5 before this memo was released and before the
6 request for permanent recertification, Akoda
7 had submitted a social security number to ECFMG
8 that he represented was his, but it wasn't;
9 right?
10    MS. McENROE:  Objection to form.
11    THE WITNESS:  So the answer to
12    that question is yes, but that wasn't
13    something that was known to us at that
14    time, when we received this form.
15 BY MR. THRONSON:
16    Q.    But by September 27, 2000, when
17 Kelly wrote this memorandum, that was known to
18 ECFMG?
19    A.    Right.  We would have known that
20 he presented that social security number to the
21 program, and that he claimed that it wasn't
22 his, that it was Igberase's.
23    Q.    ECFMG would have known around
24 that time that Akoda submitted a false social

Page 149

1 security number to ECFMG itself, correct?
2    A.    It would depend on whether -- I
3 mean we would have known, yeah.  I think we put
4 that in the letter to them, we got the social
5 security number.  So if -- if we knew because
6 they advised us that he had used the other
7 social security number that that was not his
8 social security number, yes.
9    Q.    If you turn to Exhibit 31, this
10 is the letter we were talking about earlier.
11 Exhibit 31 to the Kelly deposition from Steve
12 Seeling to James McCorkle.  In the second
13 paragraph Steve Seeling states the social
14 security number he provided ECFMG in 1998 is
15 9065?
16    A.    Yes, I see that.
17    Q.    Providing a false social
18 security number or using a false social
19 security number can be a federal, criminal
20 offense; correct?
21    MS. McENROE:  Objection to form;
22    calls for a legal conclusion.
23    THE WITNESS:  That's my
24    understanding, yes.

KARA CORRADO

Page 150

1 BY MR. THRONSON:
2    Q.    At least based on the plea
3 agreement and so fourth --
4    A.    Yes.
5    Q.    Right, and it was also one of
6 the reasons that Akoda was ultimately kicked
7 out of the Jersey Shore residency, right?
8    A.    Yes.
9    Q.    Under ECFMG's judgement would
10 providing a false social security number to
11 ECFMG at that time have constituted irregular
12 behavior?
13    A.    I think it would depend on the
14 circumstances around how the information was
15 provided and what evidence we had of that.
16    Q.    Do you have a sense of what,
17 after ECFMG became aware that -- well, let me
18 back up.  You said it would depend on the
19 circumstances.  So under the circumstances of
20 this case, is it ECFMG's position that Akoda
21 providing a false social security number to
22 ECFMG in 1998 constituted irregular behavior?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  What I know is

Page 151

1    that it constituted the allegation from
2    the residency program; constituted enough
3    information for us to do an investigation
4    on that, but we did not have sufficient
5    evidence of the irregular behavior to
6    charge him with irregular behavior.
7        So there would be a policy tie
8    to the provision of false information.
9    For example, I don't know where anybody
10    lives, you could put an address on the
11    application that is not really your
12    address.  You might be using someone
13    else's address that you know.  I don't
14    know that that necessarily constitutes
15    irregular.
16        So if I have evidence of -- if
17    someone wrote a social security number on
18    the application and maybe the number is
19    off, I don't have any way to verify
20    whether the social security is valid or
21    not.
22        So if you were providing a false
23    number to us, in addition to other pieces
24    of information, that would show that you

Page 152

1    were trying to subvert our processes like
2    Dr. Igberase did in using different
3    pieces of information in order to subvert
4    the policy that you can't retake the
5    exam, then you would have evidence of
6    irregular behavior.
7 BY MR. THRONSON:
8    Q.    How about giving a false name on
9 an application, would you agree that in
10 applying for ECFMG certification in 1996 that
11 an individual identified himself as John Nosa
12 Akoda and that's a false name?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  Someone applied to
15    ECFMG in 1996 and used the name John Nosa
16    Akoda, and based on the facts that were
17    stipulated in plea bargain Igberase has
18    stated that he used John Nosa Akoda's
19    name.
20 BY MR. THRONSON:
21    Q.    It appears that Kelly suspected
22 in 2000 that Akoda and Igberase were the same
23 person, right?
24    A.    Yes.  He, I think, had a

Page 153

1 suspicion.
2    Q.    McCorkle did as well?
3    A.    That's my understanding based on
4 the notes from the file.
5    Q.    Obviously Akoda -- it was
6 irregular behavior for Akoda to retake
7 examinations that he had already taken,
8 correct?
9        MS. McENROE:  Objection to form.
10        THE WITNESS:  It would be a
11    policy violation.  So if we had the
12    evidence to prove that he wasn't two
13    different people, then we would charge
14    him with irregular behavior which is what
15    the review that happened at that time was
16    intended to look at; is there sufficient
17    evidence here that we can demonstrate he
18    is the same person to charge with
19    irregular behavior.
20        After that review, there was at
21    that time and subsequently not evidence
22    to make the allegation.
23 BY MR. THRONSON:
24    Q.    Let's look at Exhibit 49.  So

39 (Pages 150 - 153)

JA669

KARA CORRADO

Page 154

1 this is a memorandum from the file that Kelly
2 wrote separately, "since I did not think it
3 should be made part of the official file"?
4        A.    I don't think that's what I
5 have.
6        Q.    I'm sorry, 48. So you have
7 Kelly Exhibit 48 in front of you?
8        A.    Yes, I do.
9        Q.    This is the memo that Kelly
10 wrote to file on December 22, 2000, that was
11 not made part of the official file?
12        MS. McENROE:  Just for
13    clarification you said "to file," are you
14    introducing a document?
15        MR. THRONSON:  Right.  It says,
16    "attached is a copy of the memorandum for
17    the file, this memorandum is being
18    written separately since I did not think
19    it should be made part of the official
20    file."
21        THE WITNESS:  That's what it
22    says, yes.
23 BY MR. THRONSON:
24        Q.    So I guess my first question is,

Page 155

1 what is the difference between the official
2 file and the file?
3        A.    I'm not aware of what
4 Mr. Kelly's intentions were in terms of two
5 separate files.
6        My understanding is that this is
7 a document -- he wanted to document the
8 discussion that he had with McCorkle, but it
9 wouldn't be made part of the official file in
10 terms of, I guess, potentially giving a copy of
11 the file.
12        Sometimes applicants require a
13 copy of the file or if someone else required it
14 in the normal course of credentialing.  If they
15 needed something it wouldn't be part of the
16 official file.
17        Q.    Where was it stored at ECFMG;
18 where was it filed?
19        A.    I believe it was filed in a
20 paper file with Dr. Akoda's file.
21        Q.    I would have thought that would
22 be the official file.  I guess are we talking
23 about multiple files pertaining to Akoda?
24        MS. McENROE:  Objection to form.

Page 156

1        THE WITNESS:  The
2    investigations -- I think what this may
3    be referring to now -- and I'm sorry to
4    clarify this.  When we start an
5    investigation on an individual, generally
6    because there's a lot of information that
7    we are collecting, we used to collect the
8    information in, and in a manila file like
9    this.  That would be kept, in a sense,
10    with the official paper file of the
11    individual, in the office of the person
12    who was reviewing it.
13        So if Mr. Kelly was working on a
14    case, he would have the official file and
15    then there would probably be a working
16    file for the investigation that would
17    contain information relevant to the
18    investigation that was ongoing.  So that
19    would be my assumption on what Mr. Kelly
20    is indicating here.
21        Ultimately those files are
22    marked with the individual's name and so
23    they are stored -- if the person has a
24    paper file they're stored probably inside

Page 157

1    the paper file, which is where I assume
2    this was.
3 BY MR. THRONSON:
4        Q.    Is there a separate
5 investigative file today which pertains to
6 Igberase or Akoda?
7        A.    No.
8        Q.    Who decides whether something is
9 made part of the official file or separate
10 investigative file?
11        A.    Currently today, the case
12 managers will crean ane electronic file they
13 can work out of when they receive information,
14 but all that information becomes part of the
15 individual's official electronic file.
16        So if I'm working on a case and
17 I have email correspondence and I have
18 correspondence with the school, I keep it in an
19 electronic file that is shared in that
20 investigative department.  Then once that case
21 is concluded all of that information is put
22 into the official electronic file.  So it's
23 just like a working file that ultimately ends
24 up in the official file.

40 (Pages 154 - 157)

JA670

KARA CORRADO

Page 158

1    Q.    So today everything that was in
2 the working file's correspondence to this case
3 should be in the hard files?
4    A.    Yes.
5    Q.    So in the third paragraph Kelly
6 goes through some evidence, he talks about his
7 belief that Akoda and Igberase are one and the
8 same, right?
9    A.    Yes.
10    Q.    And states that Akoda admitted
11 in writing that he used Igberase's social
12 security number, correct?
13    A.    Yes.
14    Q.    And he also admitted that in
15 person when he visited the office on September
16 27, 2000, I think we went over that?
17    A.    Yes.  Yes, sorry.
18    Q.    He said, I don't think this is
19 enough for the committee.  Is that also ECFMG's
20 position at this time, that the evidence as of
21 December 22, 2000, that was reasonably
22 available to ECFMG, was not enough to refer the
23 case to the credentials committee?
24    A.    Yes.  I did not review it at

Page 159

1 this time, but I reviewed the file again when
2 the federal authorities reached out to us, and
3 I came to the same conclusion that there was
4 not sufficient evidence based to make the
5 allegation of irregular behavior based on the
6 file and the information that ECFMG had.
7          We ultimately connected the two
8 together, once Igberase stipulated that he
9 provided that name to us and represented
10 himself as such to us.
11    Q.    Kelly also mentions that he
12 wrote to Igberase and Akoda responded, correct?
13    A.    Yes.
14    Q.    Would it have been inappropriate
15 for Kelly to refer this case to the credentials
16 committee at this point?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  I wouldn't use the
19    term inappropriate, but I would use the
20    term it didn't have sufficient evidence
21    for an allegation to be made to refer to
22    the committee because it was a suspicion
23    at the time, and we had not specific
24    evidence other than him saying, I'm not

Page 160

1    that person, that was consistent with
2    what we understood he told the residency
3    program, that it was his cousin, and he
4    appeared in the office with the passport
5    and the driver's license to demonstrate
6    he was a separate person.
7 BY MR. THRONSON:
8    Q.    He says at the end of the
9 letter, we need to brainstorm on this one --
10 this memo, sorry, we need to brainstorm on this
11 one, maybe Shirley Williams can sit in.  Who is
12 Shirley Williams?
13    A.    Shirley Williams was an employee
14 at ECFMG.  She has retired.  In her latest
15 roles for quite sometime, at least 10 years,
16 she was a board secretary to FAIMER which is
17 the Foundation for the Advancement of
18 International Medical Education and Research
19 which is ECFMG's foundation.  Prior to that,
20 sometime earlier in her career, and she worked
21 at ECFMG for I think over 30 years, she worked
22 on, I think, the cases that were related to
23 restricting records of irregular behavior if
24 they came from the  USMLE program.  She may

Page 161

1 have been an admin support for the board or for
2 the committee as well, but I'm not sure what
3 her specific role was.
4    Q.    Did ECFMG do anything to
5 determine whether the passport and
6 international driving certified that Akoda
7 provided to ECFMG in 2000 were genuine or
8 authentic?
9    A.    Other than their appearance of
10 being genuine or authentic, no.
11    Q.    What would it have done to
12 investigate -- what did it do to investigate
13 the appear -- when you say appearance were
14 there particular things that ECFMG assessed
15 from the document?
16    A.    My assumption would be that if
17 Dr. Akoda came in with a photocopy of a
18 passport and tried to pass it as an original
19 that would have triggered a question about it.
20          So I don't know that we were
21 looking at any specific details on the
22 passport, but if somebody hands you a passport
23 it looked and felt to Mr. Kelly to be an actual
24 passport and driver's license.

41 (Pages 158 - 161)

KARA CORRADO

Page 162

1    Q.    Does ECFMG inquire of any other
2 organizations today or entities to confirm the
3 validity of government issued documents such as
4 passports?
5    A.    Today as part of our
6 identification process and our work with Notary
7 Cam, we may reach out to a third party to help
8 validate passports and we use software to help
9 validate.
10         Not that it's -- the software
11 doesn't determine if it's a validly issued
12 passport, it determines whether the features of
13 the passport appear as they should.  So the
14 system is picking up if there could be any
15 potential abnormalities in the passport.
16    Q.    If you could turn briefly to
17 Exhibit 42.  This is a photocopy of the
18 passport that Akoda provided to ECFMG in
19 September of 2000?
20    A.    Yes.
21    Q.    You note that it lists the place
22 of birth as Lagos?
23    A.    Yes, that's what it says.
24    Q.    If you look at Exhibit 23, turn

Page 163

1 to page two of that.  This is an application
2 that Akoda submitted to ECFMG?
3    A.    Yes.
4    Q.    What's the place of birth listed
5 there?
6    A.    Benin City, Nigeria.
7    Q.    Those are different cities?
8    A.    Yes, that's my understanding.
9    Q.    If you turn to Exhibit 15, it's
10 an application that Igberase submitted to
11 ECFMG?
12    A.    Yes.
13    Q.    Dated, I guess, he signed it
14 10/18/2000 on the last page?
15    A.    Yes.
16    Q.    Turn to the third page of the
17 application Bates 3467?
18    A.    Yes.
19    Q.    I'm sorry.  The first page of it
20 3465.  What's the place of birth that Igberase
21 listed on his application?
22    A.    Lagos, Nigeria.
23    Q.    Obviously this is an exercise
24 that Mr. Kelly could have done at the time?

Page 164

1         MS. McENROE:  Objection to form.
2         THE WITNESS:  You mean look at
3    the birth places on the applications?
4 BY MR. THRONSON:
5    Q.    Yeah, could compare the birth
6 place listed on the passport to the birth
7 places listed on these two applications?
8    A.    Sure he could have done that.
9 He may have done that, but we wouldn't have the
10 information to know which is the correct city
11 of birth.
12    Q.    Could Mr. Kelly also have
13 compared, or anyone at ECFMG compared the
14 photograph on the passport with the photographs
15 accompanying the applications of Akoda,
16 Igberase?
17         MS. McENROE:  Objection to form;
18    calls for speculation.
19         THE WITNESS:  You could have.
20    It's not sort of presented to you right
21    there when you pull up the record, so you
22    have to look through the file to see a
23    photograph of the individual.
24    Q.    Did ECFMG ever take any action

Page 165

1 to verify that the passport was authentic?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  No.
4 BY MR. THRONSON:
5    Q.    Does it take the position today
6 that the passport that Akoda provided is
7 authentic?
8    A.    No, based on the information
9 that was stipulated to in the plea bargain that
10 he said, I presented a false passport to ECFMG.
11    Q.    Did it ever compare the
12 photographs accompanying the application of
13 Igberase and Akoda to assess if, to determine
14 if there was additional evidence in those
15 photographs to suggest that these two
16 applicants may be, in fact, the same
17 individual?
18    A.    It's likely that we would have
19 looked at the photographs but the photographs
20 would have been years apart, and we are not
21 necessarily experts in determining whether this
22 photograph is a photograph of that same person
23 so the could have looked similar.  The person
24 who is reviewing the file might say, yeah they

42 (Pages 162 - 165)

KARA CORRADO

Page 166

1 look similar, but there would be no way for us
2 to know if it was the same person in those
3 photographs.
4    Q.    If they were similar, that would
5 be additional evidence that could substantiate
6 the allegation of irregular behavior?
7        MS. McENROE: Objection to form.
8        THE WITNESS: It could.
9 BY MR. THRONSON:
10    Q.    So you don't know for sure one
11 way or the other if that was ever done?
12    A.    My assumption would be that it
13 was. When we were investigating, we would look
14 at the files together.
15    Q.    We were looking earlier at
16 Exhibit 46. So it appears in this memo that
17 Kelly is referring -- I'm sorry.
18        MR. VETTORI: 48.
19        MR. THRONSON: 48. While you're
20 at it could you also pull out 36.
21 BY MR. THRONSON:
22    Q.    So let's first look at 36. The
23 Kelly deposition. This is a letter from
24 Mr. Kelly to Akoda dated August 22, 2000?

Page 167

1    A.    Yes.
2    Q.    This is what would be referred
3 to as a charging letter from ECFMG?
4    A.    Yes.
5    Q.    Is it ECFMG's position that --
6    A.    Sorry, can I just clarify that.
7 This is a letter -- I just want to take a
8 minute to read it. Yes. Sorry, yes.
9    Q.    Yes, it is a --
10    A.    Yes, it could be considered a
11 charge letter.
12    Q.    And in the letter -- take all
13 the time that you'd like to read it -- but
14 Kelly adverts to an allegation that Akoda may
15 have recently, previously applied to ECFMG
16 using the Igberase and Charles names, correct?
17    A.    Yes.
18    Q.    And he also refers to Akoda's
19 representation -- strike that. On the second
20 page Kelly wrote, ECFMG requires an explanation
21 from you in writing within 15 days of your
22 receipt of this letter. Did ECFMG ever receive
23 that explanation?
24    A.    ECFMG received the explanation

Page 168

1 in person from Dr. Akoda to Mr. Kelly, and I
2 believe maybe an email. I'm just not sure of
3 the time frame and I don't think it was within
4 the 15 days.
5    Q.    Then he wrote, the information
6 in your ECFMG file together with your
7 explanation and any other material you submit
8 will be referred to the ECFMG committee on
9 medical education credentials for review at its
10 next scheduled meeting.
11        Did I read that correctly?
12    A.    Yes.
13    Q.    So at the time of writing this
14 letter Kelly apparently believed there was
15 sufficient information to refer Akoda's file to
16 the credentialing committee for review?
17    A.    Yes. Well, he's writing to him
18 telling him about the allegation and asking him
19 for an explanation and then saying it would be
20 referred to the committee, yes.
21    Q.    When was it first referred to
22 the committee after Kelly sent this letter in
23 August 22, 2000?
24    A.    So it wasn't referred to the

Page 169

1 committee, because on the basis of the
2 information that Kelly subsequently gathered
3 from Akoda the determination was made that
4 there wasn't enough evidence to refer it to the
5 committee because Akoda had indicated that he
6 was a cousin of Igberase's; he brought the
7 passport in and the driver's license in which
8 the ECFMG believed to be authentic, which
9 demonstrated to us at the time that he was a
10 separate person from Igberase; and that we had
11 no other evidence to refer the matter to the
12 committee.
13        So if he had within 15 days
14 said, yes, I did that, he would have admitted
15 to doing it, and then we would have referred
16 it. We had nothing except for his explanation
17 that was consistent with what he had provided
18 previously to the residency program,
19 supplemented by the in-office visit with what
20 appeared to be the authentic identification
21 documents. So it wasn't referred to the
22 committee at that time.
23    Q.    When was Akoda's case first
24 referred to the committee aft -- I guess when

43 (Pages 166 - 169)

JA673

KARA CORRADO

Page 170

1 was the first time after 2000 it was referred
2 to the committee?
3       A.       So technically it was not
4 referred to the committee for a decision as an
5 information item, because when we received a
6 copy of the plea bargain in which Igberase
7 stipulated the fact that he had presented the
8 false passport to ECFMG and that he had used
9 this alias, John Nosa Akoda, that was
10 sufficient evidence then to demonstrate that
11 this person is the same person; and this person
12 Igberase already had his certificate
13 permanently revoked.
14             So it wasn't necessary to charge
15 Akoda, which essentially would have been
16 Igberase, with irregular behavior and go
17 through the committee process, because he had
18 already been permanently barred and had his
19 certificate permanently revoked.
20             So as we normally do when we
21 have consolidations of records, we would
22 consolidate the file, that is to say these
23 files belong together, because they belong to
24 the same person, and any annotation of

Page 171

1 irregular behavior that was already there would
2 carry over to Akoda.  So essentially we
3 consolidated the file, revoked the certificate
4 because it was -- it should not have been
5 obtained.  He was not eligible to obtain that
6 certificate because he had admitted to being
7 Igberase at that point.  The update was
8 provided to the committee to let them know that
9 this action had been taken by ECFMG to revoke
10 the other certificate.
11       Q.       As I recall that was an update
12 in approximately November 2016?
13       A.       Yes.
14       Q.       So before that update in
15 November of 2016, did the members of the
16 credentials committee have any awareness of the
17 Akoda matter?
18       A.       No.
19       Q.       Did the board of trustees have
20 any awareness the Akoda matter?
21       A.       No.
22       Q.       Who knew about it?
23             MS. McENROE:  Objection to form.
24             THE WITNESS:  I knew about it,

Page 172

1 counsel knew about it.  Our senior vice
2 president knew about it.  The specialty
3 investigations committee would have known
4 about it, because they -- I would have
5 asked them to collect the documents or
6 the file, and that's part of their job
7 when we get subpoenas, so they would have
8 been aware of the request from law
9 enforcement in the case; and potentially
10 some of the executive team, if the senior
11 vice president shared that with the
12 executive team.
13 BY MR. THRONSON:
14       Q.       How about before federal law
15 enforcement got involved, 2015, 2106 as we
16 discussed, who knew at least about Mr. Kelly's
17 suspicion or the possibility as he expressed in
18 his December 2000 memorandum, not withstanding
19 Akoda's provision of the passport, his belief
20 that Akoda and Igberase might be the same
21 person, who knew about that from 2000 until the
22 feds got involved in 2015?
23             MS. McENROE:  Objection to form.
24             THE WITNESS:  I would say Steve

Page 173

1 Seeling, who was the vice president of
2 operations would have known about that.
3             Then Virginia Kesting would have
4 been doing the administrative work on the
5 file, so by that token she may have known
6 about that conversation or been in the
7 room when they were having the
8 conversation.  Other than that, I'm not
9 aware of anyone else who worked on
10 irregular behavior files that would have
11 known about it.  Unless he did brainstorm
12 with Shirley Williams he might have done
13 that, but the file doesn't reflect that.
14 BY MR. THRONSON:
15       Q.       So it appears in the December
16 2000 memorandum that Kelly wrote to Seeling,
17 he's contemplating some additional
18 investigation or some additional action that
19 ECFMG might take to gather additional evidence
20 to rule out the possibility that Akoda is
21 Igberase; is that fair to say?
22             MS. McENROE:  Objection to form.
23             THE WITNESS:  I believe that
24 Mr. Kelly was trying to think about what

44 (Pages 170 - 173)

JA674

KARA CORRADO

Page 174

1    other way we could get evidence to
2    substantiate that these two people were
3    the same person.
4 BY MR. THRONSON:
5    Q.    What other efforts after this
6 point, but before the federal investigation,
7 did ECFMG undertake in that regard; that is to
8 determine whether Igberase and Akoda are the
9 same person?
10    A.    I am not aware of any other
11 steps that we took in this investigation other
12 than it was an open investigation, such that if
13 we had gotten any future evidence that we could
14 still go back and make the allegation of
15 irregular behavior.
16    Q.    So as a representative of ECFMG,
17 you're saying that ECFMG is not aware of any
18 additional steps that it took between December
19 of 2000 and 2015, 2016 timeframe to determine
20 whether Akoda and Igberase were the same
21 person?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  Yes, that's my
24    understanding.  We had -- the file was

Page 175

1    restricted internally, it was flagged, so
2    that if anything came in it would be
3    passed along to the case managers; and I
4    believe around the 2006 time frame when
5    Akoda applied for residency, we sent his
6    -- he had submitted letters of
7    recommendation, and we sent those for
8    verification.  That was a process we
9    followed in investigations of irregular
10    behavior generally as a matter of course
11    that if there was some ongoing
12    investigation, even if it was unrelated
13    to that, we'd send the letters for
14    verification, so we did do that.
15 BY MR. THRONSON:
16    Q.    There was no response to those
17 letters, the request for verification of
18 letters of recommendation, correct?
19    A.    Correct.
20    Q.    That tended to increase the
21 index of suspicions as to whether those letters
22 are genuine?
23    A.    Generally, not.  It's difficult
24 for us sometimes to get a response from

Page 176

1 physicians who are working and busy, so it
2 doesn't necessarily indicate that they are not
3 authentic.  Usually when they are not
4 authentic, that's when the office will reach
5 out to us to say they are not authentic.
6    Q.    Did ECFMG call those physicians
7 who allegedly wrote the letters of
8 recommendations?
9    A.    I'm not aware that the file
10 documents that.  I don't know, it's possible.
11    Q.    You haven't seen it documented
12 anywhere?
13    A.    No.
14    Q.    Why not do any additional
15 investigation from 2015 as to whether Akoda and
16 Igberase are the same person?
17        MS. McENROE:  Objection to form.
18 BY MR. THRONSON:
19    Q.    From ECFMG's perspective, why
20 not do that?
21    A.    So the reason that we would not
22 have done it would be, at the time that we
23 didn't have any other way or venue; or had not
24 contemplated a way or venue that we could

Page 177

1 substantiate this evidence or allegation
2 independently.
3        So like I said, if something
4 came in, the file was still restricted and it
5 would get referred to the group that was
6 reviewing the investigation, but there was no
7 other abnormality in the file to the extent
8 about -- there was no other accusation to say
9 that his credentials were not authentic or that
10 he didn't pass the exams, none of that was
11 alleged.  So the only allegation that we had
12 would have been related to our policy about not
13 being able to retake exams that he had already
14 taken.
15    Q.    So in essence, ECFMG didn't do
16 anything else to verify that Akoda and
17 Igberase, whether Akoda and Igberase were the
18 same person -- strike that.
19        In essence, ECFMG didn't do
20 anything else between 2000 and 2015 to
21 determine whether Akoda and Igberase were the
22 same person because from ECFMG's perspective
23 there was nothing else that could have been
24 done?

45 (Pages 174 - 177)

JA675

KARA CORRADO

Page 178

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  So I think from
3  our perspective, there was nothing that
4  we had that would substantiate that they
5  were the same person, and we did not have
6  a way to prove it otherwise.
7  BY MR. THRONSON:
8    Q.    So ECFMG's view is that there's
9  nothing in the file up till this point, 2000,
10  either in Igberase's file or Akoda's, that
11  would substantiate that Akoda and Igberase are
12  the same person?
13        I'm talking about through
14  December of 2000, there's nothing ECFMG had
15  that would substantiate that conclusion; is
16  that what you're saying?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  What I'm saying
19  is, while the staff who were reviewing it
20  had a suspicion that he was the same
21  person, they didn't have sufficient
22  evidence to allege irregular behavior,
23  and in weighing that in the
24  investigation, in terms of all the

Page 179

1  processes that he would go through, there
2  wasn't at that time anything else to do.
3        For example, he got into a
4  residency training program who presumably
5  checked his information and vetted him in
6  a way that they were supposed to.  He got
7  licensed by the licensing board, so the
8  licensing board would have done its due
9  diligence on him.  He would have gone
10  through all of those steps.
11        Like I said, there was no
12  accusation that he was not -- that his
13  diploma was not authentic, or that he had
14  not received his medical education.  So
15  at the time, considering all of those
16  factors, there was not enough to charge
17  him with irregular behavior.
18  BY MR. THRONSON:
19    Q.    He got into the residency
20  program in part by information that ECFMG
21  supplied regarding his ECFMG certification,
22  correct?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  So he got into the

Page 180

1  residency program presumably on his
2  merits, his own merits, and we would have
3  verified it, as we do with all residency
4  programs.
5        What his certification status
6  was, which was true at the time that we
7  verified it to them, he had a certificate
8  that was issued to him in that name, and
9  it was valid.
10  BY MR. THRONSON:
11    Q.    That was information that -- the
12  certification information that ECFMG supplied,
13  that was one of the pieces of information that
14  Howard University had before when determining
15  whether to accept this person into its
16  residency program, correct?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  Yes.  They would
19  have received a status report through the
20  regular residency application process.
21  BY MR. THRONSON:
22    Q.    The same is true for the
23  Maryland Board of Physicians, in determining
24  whether to grant Igberase, Akoda a license to

Page 181

1  practice medicine it would have had before it
2  information supplied by ECFMG regarding his
3  ECFMG certification status?
4    A.    Yes.
5    Q.    The same is true for Prince
6  George's County Hospital?
7    A.    Yes.  I believe they requested a
8  verification of his certification status.
9    Q.    Did ECFMG ever tell anyone
10  outside of the organization of the suspicion of
11  at least one of it's staff members, perhaps
12  more, that Igberase and Akoda were the same
13  person, before the law enforcement
14  investigation?
15    A.    Before the law enforcement, not
16  that I'm aware of.  I don't think it would have
17  necessarily been appropriate for them to do
18  that if we didn't feel that we had evidence
19  that they were the same person, because we
20  could potentially be providing information that
21  was not substantiated that may have an impact
22  on a physician's career or on residency
23  program.
24    Q.    Did ECFMG ever notify anyone

46 (Pages 178 - 181)

KARA CORRADO

Page 182

1 outside of the organization, before the law
2 enforcement investigation, that Jersey Shore
3 had dismissed him from their residency program?
4        A.     Not that I'm aware of.
5        Q.     Why not?
6        A.     Why didn't we tell anyone about
7 a potential suspicion?
8        Q.     Why didn't you tell anyone that
9 he had been dismissed from his residency
10 program among other things, providing --
11        A.     That kind of information, that's
12 not within our scope or responsibility to
13 report loss of residency, I assume.  Well,
14 maybe not loss, but residents are dismissed
15 from their programs for a variety of reasons.
16 Unless they are a J-1, which he was not, we
17 don't get that kind of information or keep it
18 on a regular basis, and it's not in our scope
19 to report that to other organizations.
20        Q.     If this same set of facts came
21 before ECFMG today, came before your
22 department, would you handle it the same way?
23            MS. McENROE:  Objection to form;
24     calls for speculation.

Page 183

1            THE WITNESS:  If it was exactly
2     identical as this, I would have come to
3     the same conclusion.  In fact, I did in
4     2016; when I looked at it again, I didn't
5     see that we had sufficient evidence to
6     make the allegation of irregular
7     behavior.
8 BY MR. THRONSON:
9        Q.     So essentially ECFMG's position
10 is if this all happened again today, we would
11 handle it exactly the same way as we did from
12 2015?
13            MS. McENROE:  Objection to form.
14            THE WITNESS:  I don't think we
15     could say that only because the processes
16     are not the same; the application process
17     is not the same; the technology that we
18     use is not the same.
19            So from that -- in that respect
20     I couldn't say we a hundred percent do
21     every single thing the same way, but we
22     come to the same conclusion that there
23     wasn't sufficient evidence.  We have
24     cases where there's not sufficient

Page 184

1        evidence to make allegations on a number
2        of things.
3 BY MR. THRONSON:
4        Q.     At the time when this case
5 happened in 2000, I guess when the question of
6 whether Akoda and Igberase were the same person
7 was being considered, were there other
8 allegations of irregular behavior in which
9 ECFMG affirmatively sought out evidence beyond
10 what would normally have been in an applicant's
11 file?
12            Essentially were there
13 circumstances under which it sought out
14 evidence or made phone calls, interviews of a
15 type that it didn't do here?
16            MS. McENROE:  Objection to form.
17            THE WITNESS:  Not that I'm aware
18     of.  Our investigations would follow the
19     same process or procedure; but each
20     investigation is different, each case is
21     different, so who we would reach out to
22     might change or how we reach out to them
23     might change, but the general guiding
24     principles of the investigation would be

Page 185

1        the same.
2 BY MR. THRONSON:
3        Q.     Today -- well, we are talking
4 about the draft, the policy and procedure on --
5        A.     Yes.
6        Q.     Exhibit 2 earlier, and if I
7 understand your testimony correctly the
8 substance -- that policy was essentially what
9 ECFMG followed between 2000 and the time that
10 this policy was drafted in 2015, even if it
11 wasn't written down before 2015?
12        A.     So just to clarify, this policy
13 would have been the published policy on
14 irregular behavior, and these would have been
15 the procedures that --
16        Q.     Right.  Sorry.
17        A.     That's okay -- that we followed,
18 and the organization followed prior to 2015
19 when these were documented.
20        Q.     You mentioned a restricted file
21 earlier, and I wanted to get more clarification
22 on that.  Were both Igberase's and Akoda's
23 files restricted before the federal
24 investigation began?

47 (Pages 182 - 185)

KARA CORRADO

Page 186

1    A.    Yes.
2    Q.    When was Akoda's first
3  restricted?
4    A.    Akoda's file would have been
5  first restricted when McCorkle reached out to
6  us with the allegation.  So it would be at the
7  start of an investigation.  Part of our
8  procedure, in the system, is to restrict the
9  file when we conduct an investigation.
10         Igberase's would be restricted
11  because there had been an investigation and a
12  finding of irregular behavior.  So his would
13  stay restricted.
14    Q.    What's the purpose of
15  restricting a file?
16    A.    The restriction is really an
17  operational procedure.  Such that it prevents
18  other staff in the organization from maybe
19  update information, processing applications,
20  any of that without first contacting the
21  investigative team that are doing the review of
22  it.  So it serves that purpose.  When we start
23  an investigation just to make sure if there's
24  any contact from that individual so we know

Page 187

1  about it, the people that are investigating
2  know about it.
3         It will also serve to -- it will
4  also serve as a flag in our certification
5  verification service that when a request comes
6  in electronically the file is restricted, they
7  have to be reviewed manually.  The system will
8  not automatically generate a report.
9         We do that so we can put the
10  annotation of irregular behavior onto the
11  report before it goes out to the recipient for
12  those individuals we have already determined
13  having irregular behavior.
14         There's a number of other
15  reasons that we use it internally just to keep
16  people from processing, but it's an operational
17  internal process, the restrictions.
18    Q.    Okay.  Let's take a look at
19  Exhibit 52, please, of the Kelly deposition.
20  Can you identify this document?
21    A.    This is a printout of one of our
22  internal programs.
23    Q.    It's the applicant status
24  program?

Page 188

1    A.    Yes.
2    Q.    At the bottom there's a date of
3  10/15/2014.  Do you know the significance of
4  that?
5    A.    That is likely when we first
6  produced a copy of this for the Maryland Board,
7  when they requested information.
8    Q.    So there's a date on the
9  left-hand column, left most column, does that
10  refer to the date an application was first
11  restricted?
12    A.    So what this column is is a date
13  that a restriction was put on the account.
14    Q.    Then there's a reason column,
15  and it appears that in 2000 it was restricted
16  because -- well, before we get there.  Sorry.
17  So column two is the reason for the
18  restriction?
19    A.    Yes.
20    Q.    The next column is the level of
21  restriction?
22    A.    Yes.
23    Q.    I see 3s and 1, 4.  What do
24  those numbers mean?

Page 189

1    A.    The numbers refer to the type of
2  access that would be granted when that level of
3  restriction is placed on the account.
4         So for example, a level 1
5  restriction is a read only.  So anybody who
6  would normally have access to the file would
7  still have access to the file and can see all
8  the information, they can't make any changes to
9  it.
10         It goes up from there.  Level 2
11  is, if you have a staff role you can't see
12  anything, but the manager -- you can read only,
13  but the manager would have rights if the
14  manager of the team wanted to do something.
15         It goes up from there.  So level
16  3 and 4 will prevent internal staff, other than
17  the investigation team, from being able to
18  process anything in the record and from seeing
19  most of the information in the record.
20    Q.    Why would you want to prevent
21  staff from seeing the information in the
22  record?
23    A.    If we're doing an investigation,
24  we don't want staff inadvertently providing

48 (Pages 186 - 189)

JA678

KARA CORRADO

Page 190

1 information to the individual, in certain
2 cases, not in all cases, that might jeopardize
3 the investigation.  Like if the person called
4 into our call center, if the account is
5 restricted, the phone representative will
6 contact special investigations who will either
7 take the call or advise them on how they can
8 respond appropriately.
9     Q.    Did Igberase, Akoda -- strike
10 that.  Did Akoda have any in-person contact
11 with anyone working at ECFMG other than, I
12 suppose, the occasions on which he took the
13 examination and his meeting with William Kelly
14 on September 27, 2000?
15     A.    None that I'm aware of.  His
16 file only documents the office visit that he
17 made with Mr. Kelly.
18     Q.    Did you have any awareness of
19 any telephone contact that he had with anyone
20 at ECFMG at any time?
21     A.    I'm not aware to answer the
22 question specifically, because we don't
23 catalogue every telephone call in our system.
24 So it's entirely possible that he called to ask

Page 191

1 questions about getting registered or anything
2 like that.
3     Q.    Did he know anyone personally at
4 ECFMG either as a friend or relative?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  Not that I'm aware
7 of.
8 BY MR. THRONSON:
9     Q.    Did he have any business
10 relationship with ECFMG or anyone at ECFMG?
11     A.    Not that I'm aware of.
12     Q.    Turning back to Exhibit 52, then
13 there's a column called release dates.  What
14 does that refer to?
15     A.    That is when the restriction is
16 released.  So the restrictions -- just to
17 clarify something about the restrictions and
18 the reasons and the levels.  There's not
19 necessarily a specific meaning to which reason
20 the person chose or the level between 3 and 4
21 in terms of what the restriction is.
22         So it's not as if the reasons,
23 invested the investigation into a different
24 area.  It's just a feature that's built into

Page 192

1 the system.
2         The release date is when we
3 release the restriction to either put a new
4 restriction on or to provide some service that
5 we've determined can be provided, despite the
6 fact the person is restricted.
7         So you would generally see that
8 the dates coincide with when it was
9 re-released, and then it would be re-restricted
10 again would generally be related to some
11 service or some point of contact.
12     Q.    Then there's a column -- well, I
13 guess, who would make the determination as to
14 whether a restriction should be released; who
15 made that determination over this time period?
16     A.    Bill Kelly would have made the
17 determination as the individual who had
18 oversight for the areas of investigation.  I
19 mean would have directed, you know, Ms. Kesting
20 to go ahead and process whatever request had
21 come in at that time.
22     Q.    Do the comments refer to the
23 reason that an applicant is restricted?
24     A.    Generally, yes.  That's a note

Page 193

1 that our team will put in there that other
2 staff can see, and that is also sometimes a
3 note for ourselves so we know which
4 investigation it is.
5     Q.    So it appears in essence if you
6 compare the restrictions date the release date,
7 the application was restricted continuously
8 from August 17, 2000, through September 13,
9 2011, right?
10     A.    Yes.
11     Q.    Do you know why it was
12 repeatedly released and then re-restricted?
13     A.    Yes.  Initially it looks like
14 Shirley had restricted the file then when
15 Mr. Kelly, when the case, I think, was bumped
16 up to him, he re-restricted it, put his own
17 notation in.  So he would have released her
18 restriction, and put his own on there, because
19 the case would go to him.
20         Then these releases by Virginia
21 Kesting, these, I believe, coincide with
22 requests from organizations or from Dr. Akoda
23 to verify his ECFMG certification status.
24     Q.    Was the information that's

49 (Pages 190 - 193)

KARA CORRADO

Page 194

1  reflected in the comments, that ECFMG's belief
2  that the applicant may have a previous ID
3  Number ever communicated to anyone outside
4  organization -- sorry, let me ask that
5  differently.
6            Was any of the information that
7  ECFMG provided annotated to reflect that
8  comment of the information in the comments in
9  Exhibit 52?
10           MS. McENROE:  Objection to form.
11           THE WITNESS:  No, because that
12      wouldn't have been consistent with our
13      process or procedure.  A determination of
14      irregular behavior hadn't been made, so
15      we wouldn't put an annotation on the
16      report.
17  BY MR. THRONSON:
18      Q.    What's the difference between a
19  level 3 and a level 4?
20      A.    I'm not sure, but it's
21  negligible.  It has to do with, like I said,
22  operationally who has access to view the
23  information in the system.
24           So it has to do with roles.

Page 195

1  Three and 4, there are only certain people who
2  have the role 4.  If you have a role in the
3  system, based on the level you can still see
4  the information if you have that level.  So it
5  would have just been a smaller group of people
6  who had access to see; but in terms of the
7  prevention of services it would have been the
8  same between the two restrictions.
9       Q.    It looks like the application --
10  the applicant file of Akoda was released on
11  September 13, 2011, and then it was not
12  re-restricted after that time.  Is that your
13  understanding?
14      A.    I believe it was re-restricted
15  at some point after that time.
16      Q.    Okay.  Well, at least -- so the
17  date of this document, Kelly Exhibit --
18      A.    Yes, 2014.
19      Q.    Right, so at least between 2011
20  and 2014 it was not re-restricted?
21      A.    Yes.  That's what it appears on
22  here, right.
23      Q.    Do you know why?
24      A.    I don't.  I don't know why.

Page 196

1  It's possible that they forgot to re-restrict
2  it just in terms of the process.
3       Q.    Between December of 2000 and the
4  commencement of the federal criminal
5  investigation, 2015, 2016, did ECFMG receive
6  any additional information that would tend to
7  dispel the suspicion that Akoda and Igberase
8  are not the same person?
9       A.    Before?  You said, before?
10      Q.    Yeah, between December 2000 and
11  2015, did ECFMG receive any exculpatory
12  information regarding Akoda or Igberase as to
13  this question whether they were the same
14  person?
15           MS. McENROE:  Objection to form.
16           THE WITNESS:  So the information
17      that we had during that time period, was
18      the same information that we had when we
19      made the review initially in 2000.
20  BY MR. THRONSON:
21      Q.    Okay.  What other information
22  would ECFMG reasonably have expected to come in
23  between 2000 and 2015 regarding this question
24  of whether Igberase and Akoda were the same

Page 197

1  person?
2           MS. McENROE:  Objection to form.
3           THE WITNESS:  What other
4      information would we have expected?
5           MR. THRONSON:  Yeah.
6           THE WITNESS:  I don't know.  It
7      could be anything.
8  BY MR. THRONSON:
9       Q.    Is there any organization that
10  is better situated than ECFMG to determine
11  whether the applicant, who identified himself
12  as Igberase Charles, and the applicant who
13  identified himself as Akoda, were in fact the
14  same applicant?
15           MS. McENROE:  Objection to form.
16           THE WITNESS:  So the
17      verification of the identity of someone
18      who is showing up at the residency
19      program would be on the residency program
20      or the hospital, would be my assumption.
21           If they are hiring the
22      individual, they're not relying on ECFMG
23      to say that we identified -- that they
24      don't have to do their own review of who

50 (Pages 194 - 197)

KARA CORRADO

Page 198

1    that person; is that what you're asking?
2  BY MR. THRONSON:
3      Q.    Who is better situated?  Are you
4  saying the hospitals are in a better
5  position to answer -- strike that.
6           Were the hospitals in this case
7  in a better position to answer whether Igberase
8  and Akoda are the same person; are you
9  contending they were?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  What I'm saying
12    is, each organization has its own process
13    to verify identities or certification of
14    identities.
15          We would not -- those processes
16    would differ.  We are not hiring the
17    person so whatever the requirements would
18    be for identity, for VISA status, for any
19    of those things, it wouldn't be
20    appropriate for us to check those because
21    it's not within our scope of the
22    certification program.
23          For example, other than the J-1
24    visas we sponsor, we don't confirm to

Page 199

1    residency programs that those individuals
2    have the appropriate visas to be in the
3    United States.
4           It is the responsibility of the
5    individual and then the organization
6    that's hiring them to do that kind of
7    identification and review of the
8    individual.
9           I don't know that one is in a
10    better position than the other.  It's
11    just that each organization has different
12    processes and ways to certify identities
13    and records.
14  BY MR. THRONSON:
15      Q.    So is it your contention, that
16  it would have been inappropriate for ECFMG to
17  do further investigation into this question of
18  identity, to determine whether Igberase and
19  Akoda are the same person?
20          MS. McENROE:  Objection to form.
21          MR. THRONSON:  Are you saying
22    that it would have been inappropriate?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  I wouldn't use the

Page 200

1    word inappropriate, but it wasn't part of
2    our process to go further or to see if
3    some -- I don't know what other
4    organization we could have gone to at the
5    time to see if the two people were the
6    same; if that's what you are asking.
7  BY MR. THRONSON:
8      Q.    Could you have consulted with
9  someone from the Nigeria Consulate to determine
10  if the passport was authentic from their
11  perspective?
12          MS. McENROE:  Objection to form.
13          THE WITNESS:  I suppose we could
14    have, but that wasn't part of our process
15    at the time.
16  BY MR. THRONSON:
17      Q.    Could you have called any of the
18  references that Akoda gave to determine whether
19  the letters of recommendation were authentic?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  We could have, and
22    we may have.  I just don't have any
23    documentation in the file that we made
24    the phone calls.

Page 201

1  BY MR. THRONSON:
2      Q.    Obviously you could have
3  compared the photos between the two
4  applications to see if they resemble each
5  other?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  Yes, we could.  We
8    did when we reviewed the file.  We would
9    have looked at both photographs when we
10    reviewed the file in 2000 in the
11    investigation, but again we would -- the
12    photos could be -- they could look like
13    each other, but I look like my cousin,
14    right, so they are not definitive in and
15    of themselves to say they are the same
16    person.
17          We are not expert in being able
18    to do that between two photographs.
19  BY MR. THRONSON:
20      Q.    So you're saying that, ECFMG did
21  look through both applications; the
22  applications that Igberase Charles submitted
23  and the applications that Akoda submitted?
24      A.    In 2000 --

51 (Pages 198 - 201)

JA681

KARA CORRADO

Page 202

1    Q.    Yes.
2    A.    Yes, that would have been done.
3 We would have looked at both files.
4    Q.    Is that inquiry documented
5 anywhere; that step, did anyone write down, hey
6 I that; this is the result?
7    A.    No.  It would have been in the
8 hard copy file if it was written down.
9    Q.    Have you seen any document like
10 that, that would reflect that those two
11 documents were compared?
12    A.    No.
13    Q.    That would have been normal
14 procedure at the time to do that, to compare
15 two files if there was an allegation that ECFMG
16 received that two applicants might, in fact, be
17 the same person?
18    A.    Oh, yes.
19    Q.    What else would have been
20 standard procedure at that time for ECFMG to do
21 if it were presented with such an allegation?
22    A.    You mean the investigation
23 steps; like what would we do to investigate if
24 somebody potentially was using a different

Page 203

1 identity?
2    Q.    Right.
3    A.    We would look at the information
4 that was given to us; so where did the
5 information come from, request follow-up
6 information if possible from that source
7 depending on who the source was.  Then we would
8 review both files to see if there was any
9 evidence between the two files that they were
10 the same person; which is what happened with
11 Igberase two or three times.
12        We did that same review and you
13 saw the information crossed, and then we wrote
14 to him, and he responded, yes, I did it; that
15 was me.  So those are generally the steps we
16 would go through.
17        In Akoda's case, we did that.
18 And he said, it's not me; and it's my cousin --
19 right -- and I'm in the office, and here's my
20 passport that's demonstrating I'm a different
21 person; and yes, I used his social security
22 number but it's not me.
23        So we follow the same steps in
24 the process.

Page 204

1    Q.    Did you ever reach out to the
2 alleged cousin after Akoda came into the
3 office?
4    A.    You mean Igberase?
5    Q.    Yeah, and describe the
6 situation, say we have this allegation, Akoda
7 showed up, he says you're his cousin, and used
8 his social security number, is that true?
9    A.    I don't believe that we did
10 that.
11    Q.    Why not?
12    A.    I don't know.
13    Q.    So essentially if I understand
14 it, ECFMG's reason for believing that it
15 compared the two files of Akoda and Igberase at
16 the time in 2000, is that that was the standard
17 practice?
18    A.    In investigations like that,
19 yes.
20    Q.    But there is no direct evidence
21 that you are aware of that that was, in fact,
22 performed?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  Correct.

Page 205

1        MS. McENROE:  We've been going
2 for about an hour an 45 minutes.
3        MR. THRONSON:  Okay.  Yes, let's
4 take a break.
5            - - -
6        (Whereupon there was a brief
7 recess in the proceeding.)
8            - - -
9        MR. THRONSON:  Back on.
10 BY MR. THRONSON:
11    Q.    Ms. Corrado, I'd like you to
12 take a look at Exhibit 47 from the Kelly
13 deposition, please.
14    A.    Yes.  Okay.  I have it.
15    Q.    Have you seen this document
16 before?
17    A.    Yes.
18    Q.    What is it?
19    A.    This is a summary of information
20 on Igberase Akoda prepared by ECFMG staff.
21    Q.    When was that prepared?
22    A.    This would have been prepared in
23 2014, I believe when the Maryland Board reached
24 out to us for information.

52 (Pages 202 - 205)

JA682

KARA CORRADO

Page 206

1    Q.      Who prepared it?
2    A.      I believe Virginia Kesting would
3 have prepared it.
4    Q.      Did you review it around that
5 time, 2014?
6    A.      I did not review it in 2014.
7    Q.      When did you first see it?
8    A.      I reviewed it in 2015 or 2016,
9 sometimes in that timeframe when the federal
10 authorities reached out to us.
11   Q.      Why was it generated?
12   A.      It was generated to assist with
13 the review of the files at that time.
14   Q.      The review of the files that
15 ECFMG was going to provide to Maryland Board of
16 Physicians?
17   A.      Yes.
18   Q.      Was the issue of whether
19 Igberase and Akoda were the same person, was
20 that issue part of the Maryland Board of
21 Physicians investigation?
22         MS. McENROE:  Object to form.
23         THE WITNESS:  I don't recall if
24    they said in their message to us what

Page 207

1    they were investigating.
2 BY MR. THRONSON:
3    Q.      Did ECFMG provide any
4 information to the Maryland Board of Physicians
5 -- strike that.  Did ECFMG provide files of
6 both Igberase, also know as Charles, and John
7 Nosa Akoda to the Maryland Board of Physicians?
8    A.      Yes.  Whatever they requested we
9 would have provided to them.
10   Q.      Did ECFMG provide this document
11 to the Maryland Board of Physicians, Exhibit
12 47?
13   A.      I don't think so.
14   Q.      Did ECFMG provide this document
15 to anyone outside of the organization?
16   A.      Other than in production for
17 this matter, not that I'm aware of.  It's an
18 internal document.
19   Q.      Who was it provided to at ECFMG?
20 After staff, you believe Ms. Kesting for
21 example generated...
22   A.      Yes, I believe that Ms. Kesting
23 generated this when the request came in so that
24 Mr. Kelly could review the matter again and

Page 208

1 what the information was as it pertained to
2 both individuals since the request came in from
3 Maryland for the file.
4         That's generally part of our
5 procedure.  If we get a request from someone we
6 take a look at the file to see what information
7 we have about it; if we flagged it in any way.
8    Q.      Did ECFMG communicate to
9 Maryland Board of Physicians it's suspicion
10 that Igberase and Akoda might be the same
11 person?
12   A.      I don't think so.
13   Q.      Is ECFMG responsible in any way
14 for confirming that an applicant is who she or
15 he say he or she is?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  So as part of the
18    application process, we have an identity
19    section for the individual to certify to
20    their identity, which the process has
21    evolved over time.
22 BY MR. THRONSON:
23   Q.      What has it evolved into?
24   A.      The process is, as I was

Page 209

1 describing earlier, we originally had a notary
2 or a medical school official certify to the
3 identity and to the information on the
4 application.
5         That has since evolved where we
6 are still using a notary, but we have a notary
7 vendor and we require the individual to submit
8 a copy of their passport to us as part of
9 their initial application to ECFMG.
10   Q.      You've reviewed the applications
11 that Igberase and Charles submitted to the
12 ECFMG?
13   A.      Yes.
14   Q.      You've seen photographs that
15 were submitted in connection with those
16 applications?
17   A.      Yes.
18   Q.      And obviously you've also seen
19 the photographs that were submitted to
20 accompany Akoda's applications, correct?
21   A.      Yes.
22   Q.      Is it ECFMG's position that any
23 of those photographs are photographs of --
24 strike that.

53 (Pages 206 - 209)

KARA CORRADO

Page 210

1  Does ECFMG deny that the
2  photographs of Igberase and Charles are
3  photographs of the same person who identified
4  himself as Akoda?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  Based on the
7  information that we have now, that he
8  admitted to using the John Nosa Akoda
9  name, our understanding is that he
10 submitted both of those applications and
11 submitted both of those photographs.
12        We don't have any way of
13 verifying whether it's him in the
14 photographs, but he submitted them on
15 behalf of those applications.
16 BY MR. THRONSON:
17    Q.    Did the individual who
18 identified himself as Igberase and Charles take
19 all of the ECFMG examinations that he
20 represented that he sat for?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  So yes, he was
23 certified.  So the individual took the
24 exams and passed them.

Page 211

1 BY MR. THRONSON:
2    Q.    You're certain also that Akoda
3 took the exams and passed them too; the
4 organization is certain that, for example, no
5 one else took the exams in Akoda's place?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  Based on the
8  information that we had, that the test
9  center would verify identity, we would
10 rely on that.  So if there was no report
11 that he wasn't the person that showed up
12 at the test center...
13 BY MR. THRONSON:
14    Q.    There was a reference in one of
15 the documents to a ECFMG pink card, what is
16 that?
17    A.    A pink card?
18    Q.    A pink card.  There was an
19 irregularity report -- we can dig it out --
20 that Igberase didn't have a pink card so he
21 supplied a Maryland driver's license instead?
22    A.    Yes.  So when the exams were
23 given in paper and pencil, they were given only
24 two times a year, when ECFMG registered an

Page 212

1  individual you would get a permit, and that
2  permit which was pink in some years, had a
3  photograph of you on it and your information.
4        It was part of the application
5  that you filled out when you sent to ECFMG, you
6  were required to fill that out.  So once you
7  were registered, the permit would be mailed to
8  you so that you would take it to the center and
9  appear at the center with the permit; and it
10 was a very strictly followed rule that you had
11 to have the permit issued by ECFMG in order to
12 take the exam.
13        However, because it's high
14 stakes and it's only two times a year, if the
15 person lost the permit or forgot the permit
16 they would generally, the staff at the test
17 center, would call into ECFMG offices and
18 advise the person didn't have it, they would
19 check to see if the person was registered, and
20 then they would tell them they could use a
21 driver's license or another form of
22 identification to admit the individual to the
23 center.
24    Q.    In 1996 and 1997 when Akoda took

Page 213

1 ECFMG exams, did ECFMG operate the test centers
2 where you took the exams?
3    A.    I would have to look at the
4 exams he took.  Specifically I can't remember
5 if they were USMLE examinations or if they were
6 the FMGMF examinations.
7    Q.    USMLE was step 3 at that time,
8 no?
9    A.    So USMLE had at the time 3
10 exams, which was a basic science Step 1;
11 clinical knowledge which is Step 2; and
12 clinical skills -- I'm sorry, they didn't have
13 clinical skills at that time.
14        They had Step 3 which was an
15 exam that you would take in order to fulfil one
16 of the requirements for licensure in the state.
17 Generally you would take it after you got into
18 a residency program.
19    Q.    Were there any exams in '96 and
20 '97 that ECFMG administered?
21    A.    I don't belive so.  I'm not sure
22 of the exact date when we stopped administering
23 the FMGFM exam.
24    Q.    Who was responsible for

54 (Pages 210 - 213)

KARA CORRADO

Page 214

1 verifying a test taker's identity at the test
2 centers in '96 and '97?
3    A.    The individuals at the test
4 center.
5    Q.    Were those under contract with
6 ECFMG?
7    A.    That I don't know.  I'm not sure
8 how the process worked for those test centers.
9    Q.    How many employees does ECFMG
10 have?
11    A.    Roughly I think a thousand,
12 somewhere around there.  A good portion of
13 them, more than half are part-time standardized
14 patients that work in the Step 2 CF clinical
15 skills examination.
16    Q.    Do you know how many employees
17 ECFMG has apart from those part-time patients?
18    A.    So full-time ECFMG employees?
19    Q.    Right.
20    A.    I believe around, I believe,
21 it's around 200; somewhere around 200, 300.
22    Q.    Is it fair to say that fees
23 submitted by applicants to take ECFMG
24 examinations or other fees associated with

Page 215

1 their applications is a source of revenue for
2 ECFMG?
3         MS. McENROE:  Objection to form.
4         THE WITNESS:  Yes.
5 BY MR. THRONSON:
6    Q.    That also applies -- does ECFMG
7 charge a fee to residency programs to submit an
8 ECFMG report to the residency program for an
9 applicant?
10    A.    No, there is no fee for the
11 report to be sent to the residency program.
12    Q.    There are fees for ERAS tokens?
13    A.    Yes.
14    Q.    Do you charge fees to medical
15 boards to obtain information?
16    A.    There's a fee, yes, whether it's
17 the board requesting it or the physician
18 requesting it, there's a fee for the report to
19 go to the board.
20    Q.    Do you have any reason -- does
21 ECFMG have any reason to disagree that the
22 Maryland Board of Physicians, Howard
23 University, and Prince George's University
24 Hospital relied, at least in part, on

Page 216

1 information supplied by ECFMG when making it's
2 decisions regarding the medical practice of
3 Akoda?
4         MS. McENROE:  Objection to form.
5         THE WITNESS:  So, yes, those
6    organizations would have, I assume, taken
7    into account the status report we sent to
8    them as part of making their decision.
9 BY MR. THRONSON:
10    Q.    So you don't disagree with my
11 statement?  You agree they would have taken
12 that information into account?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  Yes.
15 BY MR. THRONSON:
16    Q.    I want to ask about this
17 document here.
18          -  -  -
19         (Whereupon the document was
20    marked, for identification purposes, as
21    Exhibit Number CORRADO-5.)
22          -  -  -
23    Q.    Ms. Corrado, I'm handing you the
24 original that corresponds to a copy that's

Page 217

1 being marked as Exhibit 5 to the deposition,
2 and I'm wondering if you can identify it for
3 me?
4         I'll represent to you that it
5 was a document that we reviewed in looking at
6 the -- the material in the original file of
7 Akoda before we took the deposition today.
8         Can you identify what it is?
9    A.    Yes.  This appears to be a copy
10 of the University of Benin Diploma for
11 Dr. Akoda; a copy of the certificate of full
12 registration for Dr. Akoda; a correspondence
13 from ECFMG from 1996 to Dr. Akoda; and a
14 statement of account which was generated by
15 ECFMG for Dr. Akoda; and it looks like another
16 copy of the certificate of full registration
17 for Dr. Akoda.
18    Q.    Is the first page of Exhibit 5,
19 the original, is that the original diploma from
20 the institution?
21    A.    No, I don't believe so.
22    Q.    Did ECFMG ever receive an
23 original copy of the diploma from the
24 University of Benin that was allegedly issued

55 (Pages 214 - 217)

JA685

KARA CORRADO

Page 218

1 to Akoda?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  No.  We required
4     applicants to send us copies.  In fact,
5     we discourage them from sending us the
6     originals so that they wouldn't lose them
7     in the mail.  We would ask for two
8     photocopies of the degree.
9 BY MR. THRONSON:
10    Q.    Is that the copy that ECFMG
11 claims it sent to the University of Benin to be
12 verified?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  I would have to
15    look at the diploma that we sent, that
16    was attached to the verification.
17          I believe he applied.  He had an
18    application prior to this, so there may
19    have been another copy of the same
20    document that he submitted at that time
21    that could have been the one that was
22    sent.  If it wasn't, this would have been
23    the one that was sent.  I assume that if
24    there's two copies of them, they're the

Page 219

1     same.
2 BY MR. THRONSON:
3    Q.    So at no point in evaluating
4 Akoda's credentials and qualifications did
5 ECFMG receive an original or a certified copy
6 of his diploma or registration certificate,
7 correct?
8          MS. McENROE:  Objection to form.
9          THE WITNESS:  That's correct.
10 BY MR. THRONSON:
11    Q.    Is that the practice today?
12    A.    To require a photocopy of a
13 diploma?
14    Q.    Yes, to not work with original
15 or certified copies.
16    A.    Yes.  So we require a photocopy
17 because we will source verify it with the
18 institution.  We don't require it to be a
19 certified copy because we're going to go to the
20 primary source and verify it.
21    Q.    Has ECFMG ever confronted a
22 situation in which an institution mistakenly
23 source verified a diploma as being genuine?
24          MS. McENROE:  Objection to form.

Page 220

1          THE WITNESS:  Not that I can
2     recall.
3 BY MR. THRONSON:
4    Q.    I know you have not reviewed the
5 deposition of Bill Kelly, but I wanted to just
6 ask you about a couple aspects of his
7 testimony.
8          There is a transcript in the
9 front of that binder, Ms. McEnroe.
10          MS. McENROE:  What page are you
11    reading from?
12          MR. THRONSON:  The first is page
13    157 starting on line 21.
14 BY MR. THRONSON:
15    Q.    So this is the deposition of
16 Mr. Kelly on August 20, 2019.  Mr. Vettori
17 asked him, and it continues on to 158, so if he
18 had been referred to the --
19          MS. McENROE:  Hold on.  Which
20    line?
21          MR. THRONSON:  21.
22 BY MR. THRONSON:
23    Q.    "So if he had been referred to
24 the credentials committee would he have been

Page 221

1 charged with irregular behavior for using
2 someone else's social security number?
3          MS. McENROE:  Objection to form.
4          ANSWER:  The irregular behavior
5 he would have been charged with would be
6 providing false information to ECFMG on an
7 application among other things."
8          So do you agree with that
9 testimony?
10    A.    Yes, it would have been
11 providing false information to an application
12 to ECFMG among other things.
13    Q.    You believe that would have
14 occurred had he been referred based on the
15 information that ECFMG had in 2000?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  I'm sorry.  Are
18    you asking me if that would have been the
19    charge if we sent a letter to him?
20          MR. THRONSON:  Right.  I guess.
21    I'll tell you what, I'll withdraw that
22    question.
23 BY MR. THRONSON:
24    Q.    Are you aware if the document in

56 (Pages 218 - 221)

JA686

KARA CORRADO

Page 222

1 Exhibit 5 --
2        MS. McENROE: Can I put the
3 transcript away?
4        MR. THRONSON: Sorry. There's
5 one more page I'll ask about first. Page
6 185 to 86.
7        MS. McENROE: 185 to 186?
8        MR. THRONSON: Yes.
9 BY MR. THRONSON:
10  Q.    On line 15 Mr. Vettori asked --
11       MR. VETTORI: I think it's
12 Mr. Ceryes.
13 BY MR. THRONSON:
14  Q.    Ceryes, okay.
15       "And would you agree that ECFMG
16 plays an important role in public health by
17 verifying that physicians who come here to
18 practice medicine have the necessary and
19 requisite credentials to do so?
20       MS. McENROE: Objection to form.
21       ANSWER: That is part of it, to
22 protect the American public."
23       Do you agree with that statement
24 by Mr. Kelly?

Page 223

1  A.    Yes.
2  Q.    Then Mr. Ceryes continued:
3 "In another role that ECFMG
4 plays is detecting or endeavoring to detect
5 when an individual lacks the -- well, when an
6 individual has not been honest in presenting
7 their identity or credentials.
8       Objection to form.
9       MR. CERYES: Fair."
10       Then Mr. Kelly responded "yes."
11 Do you agree with Mr. Kelly's statement?
12  A.    I'm not sure that I would agree
13 with this statement as it's phrased.
14       ECFMG's review of applicants
15 that attempt to subvert it's policies and
16 procedures is an important role that it has,
17 but specifically that we have a role to detect
18 whether an individual is or isn't that
19 individual isn't part of our certification
20 program.
21       So our certificate program is
22 about eligibility for the exams and for
23 credentials. I don't know that I would agree
24 with it as it's phrased this way.

Page 224

1  Q.    So if you were to break down the
2 question Mr. Ceryes asked on 185, 22 to 186, 1;
3 which part of that do you not agree with? Are
4 there certain words you can X out of it to make
5 it a statement you agree with?
6       MS. McENROE: Objection to form.
7 The witness just answered that question.
8       THE WITNESS: I wouldn't be --
9 it's not a sentence I would pull words
10 out of. I would rephrase it as I just
11 mentioned.
12 BY MR. THRONSON:
13  Q.    If you took out the words
14 "identity or" is it a sentence -- a question
15 you would agree with?
16       MS. McENROE: Objection to form;
17 asked and answered.
18       THE WITNESS: I don't think in
19 the way that it's presented here, I would
20 agree with it even with the word taken
21 out. I would rephrase it.
22 BY MR. THRONSON:
23  Q.    Akoda's certification was
24 revoked in approximately December of 2016?

Page 225

1  A.    Yes.
2  Q.    Then his case was brought before
3 the USMLE committee on individual review?
4  A.    I believe so, yes.
5  Q.    That committee made a
6 determination on his case; is that right?
7  A.    That is my understanding.
8  Q.    What's your understanding of the
9 decision that they made?
10  A.    I don't know what their decision
11 was. I'd have to look at the letter that they
12 would have sent to him and what the specifics
13 of their findings were.
14  Q.    What's the relationship between
15 that committee and the creds committee of
16 ECFMG?
17  A.    The committee for individualized
18 review is a committee that is comprised of
19 members representing the USMLE program.
20       The USMLE program which is
21 owned, and the exams are administered by, the
22 National Board of Medical Examiners and the
23 Federation of State Medical Boards. So they
24 have representatives from their board of

57 (Pages 222 - 225)

KARA CORRADO

Page 226

1  trustees, that are on that committee to review
2  allegations of irregular behavior; and they
3  also have members of ECFMG's board on that
4  committee as well to review irregular behavior.
5        If there is an irregular
6  behavior that relates to USMLE policies or
7  something in their jurisdiction, they will take
8  an independent action to review and make a
9  determination of irregular behavior.
10       So if we have information and
11 the allegation is related to an USMLE
12 application, then we will refer the case to
13 them for their review as well, so they can
14 determine whether they want to take an action
15 against the individual from their perspective
16 in accordance with their policies and
17 procedures.
18       Q.    Is the committee on individual
19 review and the ECFMG creds committee, are those
20 separate and independent --
21       A.    Yes.
22       Q.    So it's not like one has a
23 superior position over the other?
24       A.    That's correct.  They are

Page 227

1  separate, independent for each of the
2  organizations.
3        MR. THRONSON:  I'd like to mark
4     exhibit 6.
5             -  -  -
6        (Whereupon the document was
7     marked, for identification purposes, as
8     Exhibit Number CORRADO-6.)
9             -  -  -
10 BY MR. THRONSON:
11       Q.    I'm handing you what the court
12 reporter marked as exhibit 6.  This is a
13 document produced to us, that is a decision
14 summary from the committee for individualized
15 review; does that seem right to you?
16       A.    Yes.
17       Q.    Then on the last page of the
18 exhibit, Bates 9158, it appears that the
19 committee made a finding of irregular behavior,
20 minimum 5 year bar, with state medical board
21 sponsorship required, told beginning
22 12/12/2017.  What does that mean?
23       A.    That means that they have found
24 irregular behavior, so he will have a notation

Page 228

1  on his USMLE transcript that he engaged in
2  irregular behavior.  He is barred for a minimum
3  of 5 years from taking USMLE examinations, and
4  after five years they will only consider
5  letting him take the exam if a state medical
6  board sponsors him or if they request on his
7  behalf that they want him to take the
8  examination, and that time period starts as of
9  12/12/2017.
10       Q.    This individual has had his
11 ECFMG certificate permanently revoked, right?
12       A.    That's correct.
13       Q.    And he's barred from future
14 ECFMG examinations?
15       A.    That's correct.
16       Q.    And he would need to apply -- he
17 would need to obtain an ECFMG certificate in
18 order to practice medicine again in the United
19 States, correct?
20       A.    That is correct.  Unless he went
21 to a U.S. medical school over again.  If he
22 enrolled in a U.S. medical school, then he
23 wouldn't need an ECFMG certificate; but he
24 would have the bar or whatever restraints that

Page 229

1  the USLME put on him.
2        Q.    Do you believe that's the
3     possibility they're taking into account in
4     imposing a 5 year bar, as opposed to a lifetime
5     bar?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  I can't speak for
8     the committee for individualized review
9     on what their sanctions are, whether they
10    follow the same sanctions for the same
11    types of case.  So I don't know what
12    their reasoning was in giving him that
13    particular bar.
14 BY MR. THRONSON:
15       Q.    So from your standpoint Akoda
16 can't practice medicine in the United States
17 unless he attends and graduates from a US
18 medical school, correct?
19       A.    Correct, and he gets the state
20 board sponsorship to take the exams again, and
21 the USMLE allows him to take the exams again.
22 So it's not -- this is not a fait accompli.  He
23 would only be able to petition them with these
24 things and they could still tell him no.

58 (Pages 226 - 229)

JA688

KARA CORRADO

Page 230

1    Q.    Igberase and Akoda both needed
2 ECFMG certification in order to be able to --
3 strike that.  The individual identifying
4 himself as Igberase and Akoda needed ECFMG
5 certification to be able to practice medicine
6 in the United States, correct?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  I would say he
9        needed a license to practice medicine,
10       but as an international medical graduate,
11       part of the requirements for him to get
12       into a training program, which would be a
13       requirement for licensure and to take
14       Step 3, was that he have a valid ECFMG
15       certificate.
16 BY MR. THRONSON:
17    Q.    So an ECFMG certificate was a
18 necessary condition for him to be able to
19 practice medicine in --
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  Generally
22       speaking, unless the state board made an
23       exception for him.  The state boards, the
24       regulatory authorities, have autonomy and

Page 231

1    the authority to issue a license to
2 whomever they want to; it's within their
3 regulation.
4        So generally speaking, yes, an
5 international medical graduate would have
6 to have an ECFMG certificate; but that's
7 not to say a licensing board couldn't
8 take its own decision to license him
9 without it.
10 BY MR. THRONSON:
11    Q.    Could Akoda have gotten into the
12 residency program at Howard without ECFMG
13 certification?
14       MS. McENROE:  Objection to form.
15       THE WITNESS:  If it's an ACGME
16       accredited program, then ECFMG
17       certification would have been required.
18       I don't know if they would make
19       exceptions to that or not, but
20       certification is required for entrance
21       into an ACGME accredited programs; and
22       assuming Howard is an ACGME accredited
23       program.
24 BY MR. THRONSON:

Page 232

1    Q.    To obtain a medical license to
2 practice in Maryland ECFMG certification was
3 required, correct?
4    A.    That's my understanding.  As
5 part of their requirements, they needed
6 verification of his ECFMG certificate status.
7    Q.    Is ECFMG aware of any route
8 other than through ECFMG certification that
9 Akoda would have been able to obtain a place in
10 the residency program at Howard?
11       MS. McENROE:  Objection to form.
12       THE WITNESS:  Only if Howard
13       waived that requirement for him.
14 BY MR. THRONSON:
15    Q.    Is that typically done?
16    A.    I don't think so; but if you're
17 asking me if there's any other possible way,
18 that would be the only way I can think of for
19 him.
20    Q.    You're not contending that
21 Howard regularly waives that requirement?
22    A.    No.
23    Q.    Or did back then?
24    A.    No.

Page 233

1    Q.    Are you aware of any other
2 routes, beside through ECFMG certification, by
3 which Akoda could have obtained a license to
4 practice medicine in Maryland?
5    A.    Other than the exception process
6 by the licensing board, that I sort of just
7 described, no.
8    Q.    Do you know if Maryland has that
9 exception process?
10    A.    I do not know.
11    Q.    Have you ever spoken with Akoda?
12    A.    No, I don't believe so.
13    Q.    If ECFMG had believed that the
14 letters of recommendation it received in
15 connection with Akoda's eras*** application,
16 residency application, were not authentic,
17 would ECFMG have had an obligation to inform
18 the residency programs to which he was a part
19 of?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  I wouldn't say
22       that we would have an obligation, but if
23       we determine that letters of
24       recommendation were fraudulent, we would

59 (Pages 230 - 233)

JA689

KARA CORRADO

Page 234

1    report it to the residency programs.  It
2    would be reported to residency programs
3    in general through our official
4    notification process.
5  BY MR. THRONSON:
6       Q.    Is the public entitled to have
7  confidence that ECFMG is acting in a reasonably
8  prudent fashion in assessing and verifying the
9  credentials and qualifications of international
10 medical graduates?
11      MS. McENROE:  Objection to form;
12   calls for legal conclusion.
13      THE WITNESS:  I wouldn't say
14   that they're entitled.  I would say that
15   they may have an expectation that ECFMG
16   or any organization is following its
17   procedures appropriately et cetera.
18 BY MR. THRONSON:
19      Q.    Should they have that
20 confidence?
21      MR. McENROE:  Objection to form.
22      THE WITNESS:  I mean, yes, I
23   think they could have that expectation.
24 BY MR. THRONSON:

Page 235

1       Q.    Should they have that
2  expectation from 1996 to the present?
3       MS. McENROE:  Objection to form.
4       THE WITNESS:  You mean in
5    general, yeah, I don't think their
6    expectations have changed.
7  BY MR. THRONSON:
8       Q.    We've taken a few breaks during
9  the deposition did you confer with Counsel
10 about the substance of the deposition during
11 those breaks?
12      MS. McENROE:  Objection to form.
13   I instruct you not to answer to the
14   extent it divulge privileged information,
15   but generally speaking you can give a
16   sort of general answer.
17      THE WITNESS:  Yes, and no, in
18   that we talked about other things that
19   were not related to this deposition.
20 BY MR. THRONSON:
21      Q.    So you talked about other things
22 not related to the deposition.  Did you also
23 talk about the testimony that you have given in
24 the deposition?

Page 236

1       MS. McENROE:  Objection, same
2  objection.
3       THE WITNESS:  I did raise a
4    question about the way that I phrased an
5    answer earlier, and whether I could
6    clarify that.  So it was related to a
7    question you had asked in the beginning
8    about, does the American public have the
9    right to have a physician that has been
10   appropriately vetted, something like
11   that.
12      In looking back, I thought I
13   would not have agreed with the words "the
14   right," but that they would have an
15   expectation.  I asked Counsel about
16   whether I could clarify that.
17 BY MR. THRONSON:
18      Q.    Anything else?
19      A.    No.
20      Q.    Did any procedural safeguards at
21 ECFMG fail in the process of certifying Akoda,
22 and then it's subsequent history with Akoda?
23      MS. McENROE:  Objection to form.
24      THE WITNESS:  No, I don't belive

Page 237

1  so.
2  BY MR. THRONSON:
3       Q.    Have you seen any evidence in
4  the file that specifically indicates that the
5  verified -- the document that purports to be an
6  authentication of the diploma from Benin was
7  sent by Benin?
8       A.    I don't recall if there is an
9  envelope in the file or not.  So to that
10 extent, I don't know other than to say, whether
11 there is an envelope present or not, the
12 process, at the time and still is, if it's not
13 returned directly from the school we do not
14 accept it.
15      Q.    Okay.  Pass the witness.
16      MS. McENROE:  Can we take a
17   quick break so I can go over my notes?
18      MR. THRONSON:  Sure.
19         - - -
20      (Whereupon there was a brief
21   recess in the proceeding.)
22         - - -
23      MS. McENROE:  Back on.
24         - - -

60 (Pages 234 - 237)

KARA CORRADO

Page 238

1          (Whereupon the document was
2     marked, for identification purposes, as
3     Exhibit Number CORRADO-7.)
4              - - -
5          CROSS-EXAMINATION
6              - - -
7 BY MS. McENROE:
8     Q.     Ms. Corrado, my name is Elisa
9 McEnroe.  We are acquainted; that's correct?
10    A.     Yes.
11    Q.     I am counsel for ECFMG, you
12 understand that?
13    A.     Yes.
14    Q.     I have a couple of very narrow
15 questions, I'm hoping, about some testimony
16 that you gave today.  Do you understand that?
17    A.     Yes.
18    Q.     I'm handing you what I've marked
19 as CORRADO-7.  Do you recognize that letter?
20    A.     Yes.
21    Q.     What is it?
22    A.     This is a letter from Dr. Akoda
23 responding to Mr. Kelly's August 22, 2000,
24 letter in which he alleged that he was using

Page 239

1 Igberase's information.
2     Q.     You were asked some questions a
3 little bit earlier today regarding whether and
4 when Dr. Akoda responded to the letter from
5 Mr. Kelly dated August 22, 2000.  Do you recall
6 that?
7     A.     Yes.
8     Q.     Does this refresh your
9 recollection for that testimony?
10    A.     Yes.  So I think I said that he
11 had not responded within the requisite 15 days,
12 but looking at the receipt date on this it
13 appears that he did.
14    Q.     There was some discussion
15 earlier today about what it means to have a
16 finding of irregular behavior for false
17 information on an application.  Do you remember
18 generally that kind of testimony?
19    A.     Yes.
20    Q.     Can you clarify what could
21 constitute irregular behavior for false
22 information on an application to ECFMG?
23    A.     False information on an
24 application for ECFMG would, could consist of

Page 240

1 indicating to ECFMG that you had not taken an
2 exam previously when you had taken an exam.
3          It could also refer to your
4 medical school attendance and graduation if
5 when we sourced verified your diploma, it was
6 inauthentic.
7     Q.     Could an inaccurate address be
8 considered by ECFMG to be false information
9 that would constitute irregular behavior?
10    A.     That is not something that we
11 would consider irregular behavior.
12    Q.     What about the location of the
13 birth?
14    A.     No.
15    Q.     What about social security
16 number?
17    A.     No.
18    Q.     Is it possible for there to be
19 information that is false on an ECFMG
20 application that might constitute a violation
21 of law, but would not constitute a basis for
22 irregular behavior for ECFMG?
23    A.     Yes, that's possible.
24    Q.     Does ECFMG make allegations of

Page 241

1 irregular behavior for applicants' violations
2 of law just because they are a violation of
3 law?  So for example, rape or murder?
4     A.     No.  The criminal activities of
5 applicants are not within our jurisdiction for
6 irregular behavior.
7     Q.     There was a lot of discussion
8 today about ECFMG certification, correct?
9     A.     Yes.
10    Q.     What does an ECFMG certificate
11 signify?
12    A.     An ECFMG certificate signifies,
13 that the individual has met minimum
14 requirements which includes passing medical
15 licensing examinations, as well as meeting our
16 credentialing requirements.
17         It signifies to an ACGME
18 accredited residency program that the
19 individual has met those requirements for
20 admission to GME, and it is part of the
21 requirements for eligibility for Step 3 and for
22 licensure.
23    Q.     Does an ECFMG certificate
24 signify certification of an applicant's

61 (Pages 238 - 241)

JA691

KARA CORRADO

Page 242

1 identity to a recipient of a ECFMG status
2 report indicating there's an ECFMG certificate
3 in place?
4      A.      No.
5      Q.      What do you mean by that?
6      A.      So when we certify the status of
7 an ECFMG certificate, we are not certifying to
8 the organization necessarily the identity of
9 the individual, but that an individual with
10 that name and date of birth has met the
11 requirements for certification and what the
12 validity is of their certificate and where they
13 went to medical school.
14      Q.      Is ECFMG certifying to the
15 recipients of the ECFMG certification
16 information that the applicant's social
17 security number is accurate?
18      A.      No.
19      Q.      Is ECFMG certifying to the
20 recipient of the ECFMG certification that the
21 location of the birth is accurate?
22      A.      No.
23      Q.      Is ECFMG certifying to the
24 recipients of the ECFMG certification status

Page 243

1 that the clinical clerkships are accurate as
2 represented on ECFMG's application?
3      A.      No.
4      Q.      Is it ECFMG's expectations that
5 individuals from the public rely on ECFMG
6 certification for any purpose?
7      A.      I'm sorry, can you say that
8 again?
9      Q.      Yes.  Is it ECFMG's expectation
10 that individuals from the public rely on ECFMG
11 status for any purpose?
12      A.      No.
13      Q.      So can an individual off the
14 street or who is examining the credentials of a
15 potential physician they want to go see, are
16 they entitled to contact ECFMG and ask about a
17 physician's certification status?
18      A.      No.  We would not release a
19 physician's certification status or a status
20 report to a member of the public.
21      Q.      Would ECFMG release a
22 certification status report to the individual
23 himself?
24      A.      No.

Page 244

1      Q.      To whom would ECFMG release a
2 ECFMG certification status report?
3      A.      To residency programs, licensing
4 boards, and other organizations that are
5 employing the physician as a physician.
6      Q.      Like hospitals and --
7      A.      Hospitals, right, CVOs that are
8 working on behalf of the hospitals.
9      Q.      Is it ECFMG's expectation that
10 recipients of ECFMG certification get
11 additional credentials before laying hands on
12 patients independently?  I can restate that if
13 you need?
14      A.      Yes, can you.
15      Q.      Yes.  So what I'm asking is
16 there was a lot of questions today about
17 whether an ECFMG certificate was necessary for
18 an applicant to do other things, for example go
19 to a residency program.  Do you remember that
20 testimony?
21      A.      Yes.
22      Q.      Is it ECFMG's understanding that
23 an ECFMG certificate is sufficient for an
24 applicant to treat patients?

Page 245

1      A.      No, it's not sufficient.
2      Q.      What else would be required
3 under ECFMG's expectations?
4      A.      So ECFMG certification is one of
5 the initial steps in the process for an
6 international medical graduate to ultimately
7 practice medicine in the United States.
8              While ECFMG certification may be
9 required for entrance into residency or for
10 licensure, it is not the only requirement that
11 the residency programs and the licensing boards
12 have in order to admit those individuals to
13 their programs or to license those individuals.
14      Q.      So to make sure I understand.
15 After an applicant gets an ECFMG certificate,
16 do they take any other board exams?
17      A.      Yes.  They need to take USMLE
18 Step 3.  So essentially they have to become
19 ECFMG certified which is the beginning of the
20 process, taking the examinations required for
21 certification; have their credentials source
22 verified; go through the residency application
23 process; get accepted to a residency program,
24 and meet whatever requirements the residency

62 (Pages 242 - 245)

KARA CORRADO

Page 246

1 programs has.
2        They can then apply for Step 3,
3 and they have to be certified and meet the
4 eligibility requirements that the Federation of
5 State Medical Boards has for Step 3; complete
6 their training and then again meet whatever
7 requirements the licensing board would have on
8 them to be licensed.
9     Q.     You said "complete training,"
10 what do you mean by that?
11     A.     Graduate medical education
12 training is generally a requirement for
13 licensure in all states.
14     Q.     So in other words, would that be
15 like a residency program, for example?
16     A.     Yes, residency program.
17     Q.     So are the applicants coming
18 through ECFMG still in graduate medical
19 education as they are proceeding forward; do
20 they still have more education requirements
21 after they get an ECFMG certificate?
22     A.     To be licensed in the U.S., yes.
23     Q.     Is -- FSMB, that's an acronym
24 you just used, what does that stand for?

Page 247

1     A.     That is the Federation of State
2 Medical Boards.
3     Q.     Is that an entity under ECFMG's
4 control?
5     A.     No.
6     Q.     That's a separate entity?
7     A.     Yes.
8     Q.     Thank you.
9          I have no further questions of
10 this witness.
11          MR. THRONSON:  Just a few follow
12 ups to echo a few of Counsel's questions.
13          - - -
14          REDIRECT EXAMINATION
15          - - -
16 BY MR. THRONSON:
17     Q.     Is it ECFMG's expectation that
18 state medical boards will rely on reports of
19 ECFMG certification status for any purpose?
20     A.     Yes.  To meet the requirement
21 that the board might have for ECFMG
22 certification.
23     Q.     Is it ECFMG's expectation that
24 residency programs, such as that at Howard

Page 248

1 University, would rely on ECFMG status for any
2 purpose?
3     A.     Yes, to demarcate that that
4 person met the certification so they could
5 enter GME among whatever other requirements the
6 program had.
7     Q.     It is ECFMG's expectation that
8 hospitals that are considering whether to grant
9 clinical privileges to a physician rely on
10 ECFMG status for any purpose?
11     A.     I think it would be fair to say
12 that they have the same expectation as the
13 licensing board and the residency programs have
14 on the status reports; on ECFMG providing
15 information about certificate status.
16     Q.     The status report that was
17 provided to the Howard residency program
18 regarding Akoda, what was all the information
19 that that status report contained?
20     A.     The status report would contain,
21 his name; his USMLE identification number; his
22 medical school; the year he graduated; the
23 country of medical school; the validity of his
24 ECFMG certificate, what the status is; whether

Page 249

1 it expired or valid indefinitely; and when it
2 was issued.
3     Q.     If there were any finding of
4 irregular behavior, would the status report
5 contain an annotation reflecting that finding?
6     A.     Yes.
7     Q.     Any other information that the
8 status report contains, in that was submitted
9 to the Howard Residency Program?
10     A.     The status report to the
11 residency program may have had the dates that
12 he passed the USMLE examinations; and that
13 would be for the exams that met ECFMG's
14 examination requirement, but we would not
15 include scores to the residency program because
16 they would get those through a USMLE
17 transcript.
18     Q.     Any other information?
19     A.     No, electronically through the
20 system I don't believe there's any other
21 information.
22     Q.     ECFMG also provided status
23 reports to the Maryland Board -- a status
24 report to the Maryland Board of Physicians,

63 (Pages 246 - 249)

JA693

KARA CORRADO

Page 250

1  right?
2      A.      Yes.
3      Q.      Would that status report have
4  contained all the information that you just
5  mentioned?
6      A.      Yes.
7      Q.      Would it have been the same
8  status report that was sent to them?
9      A.      It would have been the same
10  status report, yes.  In terms of the
11  information that is on it, it's in a different
12  format.  When Howard gets it electronically,
13  it's not a PDF it's data; and when the Maryland
14  board gets it, it would be in more of a PDF
15  format --
16      Q.      Okay.
17      A.      -- the substance is the same.
18      Q.      Any additional information that
19  was on the report to the Maryland Board of
20  Physicians?
21      A.      Other than, our -- we have some
22  disclaimers at the bottom, but other than that
23  there's no other information that I recall.
24      Q.      What are the disclaimers?

Page 251

1      A.      They are disclaimers about
2  ensuring that the requesting organization has
3  the authorization from the physician to request
4  the information about them.
5      Q.      Anything else?
6      A.      Not that I can recall.
7      Q.      ECFMG also sent that status
8  report regarding Akoda to Prince George's
9  County Hospital, right?
10      A.      Yes.
11      Q.      Was that status report identical
12  to the one sent to Howard University?
13      A.      Yes.
14      Q.      Did it contain any additional
15  information, or did it omit any information?
16      A.      It is all the same.
17      Q.      I just have some very brief
18  questions about two emails.
19      MS. McENROE:  Counsellor, I just
20  want to check, if this is outside the
21  scope of my cross, just in the interest
22  of everybody's time, trying to understand
23  how this fits into the course of how
24  you're conducting today's deposition.

Page 252

1      MR. THRONSON:  I don't think so.
2  If you want to make that objection you
3  can.
4      MS. McENROE:  Let me take a look
5  real quick.  I do object.  I'm just
6  wondering what your nexus is to the
7  redirect examination?
8      MR. THRONSON:  I think it --
9  it's about the concerns -- it concerns
10  identity verification; it concerns the
11  role of ECFMG in doing that.  If you want
12  to put your objection on the record,
13  that's fine.
14      MS. McENROE:  Yes, just for the
15  sake of everybody's afternoon and
16  childcare obligations, I'm objecting to
17  the redirect examination being beyond the
18  scope of the cross-examination; preserve
19  any other objections that I have to
20  specific questions.
21          -  -  -
22      (Whereupon the document was
23  marked, for identification purposes, as
24  Exhibit Number CORRADO-8.)

Page 253

1          -  -  -
2  BY MR. THRONSON:
3      Q.      This is an email that you sent
4  to Lisa Cover, Marc Malachesky, and Tracy Gill
5  dated 11/27/2017?
6      A.      Yes.
7      Q.      And in it you appeared to have
8  attached information, it was an update, I
9  believe, to the creds committee regarding the
10  Akoda matter?
11      A.      Yes.
12      Q.      You said in the third paragraph,
13  I think this case is the "worse case scenario,"
14  for applicants who attempt to establish new
15  identities.
16      What did you mean by "worse case
17  scenario"?
18      A.      This is an applicant
19  representing to us that he has a different
20  identity or defrauding us.  That this case was
21  a worse case scenario of that, that he was able
22  to defraud ECFMG with a wholly new identity and
23  that it was important for us to continue to
24  make the enhancements to our overall process.

64 (Pages 250 - 253)

KARA CORRADO

Page 254

1  Q.    Is it ECFMG's position that
2  implementation -- or that Notary Cam technology
3  had been available earlier, been implemented
4  earlier, that it could have detected the fraud
5  at an earlier point?
6         MS. McENROE:  Objection to form;
7  calls for speculation.
8         THE WITNESS:  It would have been
9  more difficult for an individual to
10 present themselves to us with a wholly
11 different identity.
12        So I don't think it will a
13 hundred percent stop that.  I think it
14 will help to reduce it.
15 BY MR. THRONSON:
16 Q.    I see in some of the documents
17 you refer to an IV process.  Do you know what's
18 meant by that?
19 A.    Depends on what documents it's
20 in.  We refer to irregular behavior and special
21 investigations as IV, but the organization
22 generally looks at IV as the information
23 booklet.  So I don't know which document.
24 Q.    This is my last question.  I

Page 255

1  understand this will probably also be taken
2  subject to objection.
3         MS. McENROE:  Same objection.
4         MR. THRONSON:  I'd like this
5  email to be marked as Exhibit 9.
6         -  -  -
7         (Whereupon the document was
8  marked, for identification purposes, as
9  Exhibit Number CORRADO-9.)
10        -  -  -
11 BY MR. THRONSON:
12 Q.    Exhibit 9 represents an email
13 chain that involves correspondence between you
14 and Lisa Cover and you and Amy Buono and some
15 other individuals at -- that are State Medical
16 Boards, National Board of Medical Examiners;
17 fair to say?
18 A.    Yes.
19 Q.    You were asked by Amy Buono can
20 you provide an update as to the work you've
21 done so far with the US Attorney's Office?
22 A.    Yes, she asked that.
23 Q.    You asked Lisa, you weren't sure
24 what more to share then "we provided insight

Page 256

1  and information to Maryland".  Then you wrote
2  "I'm sensitive to the current issues related to
3  our IB."  What did you mean by that?
4  A.    Oh, that is related to the
5  contract that we have with the National Board
6  of Medical Examiners and the Federation of
7  State Medical Boards.  We have separate
8  processes, we talked about the committee for
9  individualized review.
10        In the past we adjudicated the
11 cases in a different way, in that we referred
12 them to the committee for individualized
13 review, and then they would be remanded, after
14 a determination was made they would be
15 remanded, for a sanction to be set.  We changed
16 that process because it was inefficient, so
17 it's related to that.
18 Q.    So there are contracts that
19 exist between ECFMG and the Federation of State
20 Medical Boards related to the irregular
21 behavior processes?
22 A.    The contract is related to
23 ECFMG's role in determining the eligibility for
24 international medical graduates to take the

Page 257

1  United States Medical Licensing Examination.
2         So the USMLE program has
3  essentially contracted with ECFMG to do that
4  for international medical graduates.  So we
5  will enforce their eligibility requirements, as
6  well as our own requirements for certification
7  on international medical graduates.  That's
8  really related to efficiencies in the
9  examination process.
10        There were a number of
11 examinations in the past.  Licensing boards
12 used to give their own exams, ECFMG had exams,
13 and when the USMLE examinations were introduced
14 in the mid 90s, the licensing boards all
15 decided that they would use those examinations
16 to make the process more efficient for
17 physicians.
18        Then ECFMG at that time also
19 agreed to use the USMLE examination to meet its
20 examination requirements for certification.  So
21 in that process, the USMLE program agreed to
22 have ECFMG determine eligibility on its USMLE's
23 programs' behalf, for international medical
24 graduates.

65 (Pages 254 - 257)

KARA CORRADO

Page 258

1    Q.    So contractual arrangement began
2 in the mid 90s and has continued through until
3 today?
4    A.    Yes.
5    Q.    That's all the questions I have.
6        MS. McENROE:  Nothing further
7    from us.
8            - - -
9        (Witness excused.)
10           - - -
11    (Deposition concluded at 6:13 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 259

1    C E R T I F I C A T E
2
    COMMONWEALTH OF PENNSYLVANIA:
3
    COUNTY OF PHILADELPHIA:
4
5    I, Jennifer L  McDonald, a Notary
    Public within and for the County and State
6    aforesaid, do hereby certify that the foregoing
    deposition of KARA CORRADO was taken before me,
7    pursuant to notice, at the time and place
    indicated; that said deponent was by me duly
8    sworn to tell the truth, the whole truth, and
    nothing but the truth; that the testimony of
9    said deponent was correctly recorded in machine
    shorthand by me and thereafter transcribed
10    under my supervision with computer-aided
    transcription; that the deposition is a true
11    record of the testimony given by the witness;
    and that I am neither of counsel nor kin to any
12    party in said action, nor interested in the
    outcome thereof
13
    WITNESS my hand and official seal this
14    16th day of September 2019
15
16
17    _Jennifer L McDonald_
    Jennifer L  McDonald,
18        Notary Public
19
20
21
22
23
24

Page 260

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10        You are signing same subject to the
11    changes you have noted on the errata sheet,
12    which will be attached to your deposition.
13        It is imperative that you return the
14    original errata sheet to the deposing attorney
15    within thirty (30) days of receipt of the
16    deposition transcript by you.  If you fail to
17    do so, the deposition transcript may be deemed
18    to be accurate and may be used in court.
19
20
21
22
23
24

Page 261

1            - - - - -
2        E R R A T A
            - - - - -
3  PAGE   LINE   CHANGE
4  ___ ___ _____
5  Reason for
6  Change:_____
7  ___ ___ _____
8  Reason for
9  Change:_____
10  ___ ___ _____
11  Reason for
12  Change:_____
13  ___ ___ _____
14  Reason for Change:
15  _____
16  ___ ___ _____
17  Reason for Change:
18  _____
19  ___ ___ _____
20  Reason for Change:
21  _____
22  ___ ___ _____
23  Reason for Change:
24  _____

66 (Pages 258 - 261)

KARA CORRADO

```
                                    Page 262
1          ACKNOWLEDGMENT OF DEPONENT
2     I, _____, do hereby
3  certify that I have read the foregoing pages __
4  to ___ and that the same is a correct
5  transcription of the answers given by me to the
6  questions therein propounded, except for the
7  corrections or changes in form or substance, if
8  any, noted in the attached Errata Sheet.
9
10  _____   _____
11 DATE      SIGNATURE
12
13
14       Subscribed and sworn to before
15 me this _____ day of _____,
16 2017.
17
18       My commission expires:
19       _____
20       _____
21       Notary Public
22
23
24
```

EXHIBIT 39

**John C. Hyde, Ph.D., FACHE**
**Health Care Consultant**
**4301 Highway 35 North**
**Forest, MS  39074**

September 23, 2019

Ms. Karen E. Evans
The Cochran Firm
Attorneys at Law
110 New York Ave., NW
Suite 340, West Tower
Washington, DC  20005

Dear Ms. Evans

This opinion has been prepared in regards to the matter of: ***Russell, et al v. Educational Commission for Foreign Medical Graduates, Case No. 2:18-cv-05629-JW.***  Currently, I am an adjunct Professor of Healthcare Administration at the George Washington University teaching healthcare management at the graduate level on a part-time basis; and, a full-time consultant in the field of healthcare administration. Recently, I retired as a full-time university Professor of health services administration and clinical outcomes research within an academic medical center campus; with former appointments in the School of Health Related Professions and the School of Medicine at the University of Mississippi Medical Center; and, in the School of Business at the University of Mississippi. My academic activities involved: teaching graduate-level students in areas of healthcare management; conducting health services research focusing on management and clinical outcomes analysis; and, providing expertise and consultations to the healthcare community at large. I have taught graduate level healthcare administration/outcome classes for the past 28+ years. My doctorate, master, and bachelor degrees are all in the area of healthcare administration. I have presented research findings at the regional, national and international levels and published articles, books and monographs related to various areas of healthcare delivery. I have provided lectures and addresses to international, national and regional audiences in areas of healthcare administration.

Additionally, I have approximately 10 years' experience as a practicing healthcare administrator and multi-system executive with specific knowledge and expertise in the areas of physician credentialing/privileging, credential verification organizations, primary source verification, regulators, and overall healthcare management procedures. I am board-certified as a Certified Healthcare Executive (***FACHE- Fellow***) by the **American College of Healthcare Executives** in the specialty of health care administration.

Attached is my Curriculum Vitae which includes a list of all publications I have authored, including those dealing with the credentialing process.

John C. Hyde, Ph.D.   Page 1 of 8     9/19/2019

In the preparation of this preliminary opinion, I have examined the documents and information listed below and based my opinions on my professional knowledge of prevailing and prudent standards of healthcare administration which ultimately require an exercise of reasonable application of the process of Credentials Verification and use of Primary Sources:

**DOCUMENTS/INFORMATION REVIEWED**:

Documents Received from Howard University
Documents Received from ECFMG
Documents Received from ABOG Production
ECFMG Information Booklet, ECFMG Certification and Application, 1996
Complaint
Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (2017)
 Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (2017)
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
ECFMG Complaint
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
Hallock JA & Kostis JB (2006). **Celebrating 50 Years of Experience: An ECFMG Perspective,** Academic Medicine, 81(12): S7-S16.
**Hospital Accreditation Standards**, The Joint Commission, 2008.
American Medical Association: **Joint Commission acceptance of AMA Physician Masterfile Data**, 2004.
**Credentialing by Medicare Advantage Organizations**, presented by E. Enriquez, Nurse Consultant, CMS Region II,

**Depositions Reviewed:**

Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)

Based upon a review of these identified documents/information, coupled with my knowledge, training, education, experience and understanding of the practice of healthcare management, I have formulated the following opinions in this matter. These opinions have been based on regulations and industry standards that guide, and should guide the operations of a credentialing verification organization (CVO), such as Educational Commission for Foreign Medical Graduates (ECFMG).

**SUMMARY OF EVENTS**

1.   ECFMG received two applications from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. The first on January 3, 1996, and again on August 30, 1996.

2.  After he successfully completed the required examinations, ECFMG issued certificate number 0-553-258-5 to "Dr.".Akoda. At some time in 1998, he provided ECFMG with social security number xxx-xx- 9065.

3.  Akoda entered the graduate residency program at Jersey Shore Medical Center on July 1, 1998. Shortly thereafter,, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program.

4.  On September 2, 1998, ECFMG sent a validated form.

5.  About two years later, in 2000, ECFMG was notified that the Jersey Shore Medical Center graduate residency program where Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Jersey Shore Medical Center that Akoda had provided ECFMG with social security no. xxx-xx-9065 which was the same number Akoda provided to Jersey Shore Medical Center.

6.  On August 22, 2000, ECFMG acknowledged in a letter to Akoda that it had received information alleging that Akoda may have engaged in irregular behavior.

7.  Thereafter ECFMG sent a letter to Akoda acknowledging receipt of information from Jersey Shore to which Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. As proof of his identity,   Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

8.  Ultimately, Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number and because the green card he provided to the hospital was inconsistent with the other green card he provided. The social security number "Dr."Akoda used belonged to Charles Igberase, "his cousin".

9.  In December of 2000, an employee of ECFMG, William Kelly, wrote a memo which he said should NOT be made a part of the official file, to the VP of Operations at ECFMG, Stephen Seeling. In that memo, Mr. Kelly advised Mr. Seeling that both he and Jersey Shore believed Igberase and Akoda were the same person.  Then, curiously, Mr. Kelly concluded that there was not enough information for the ECFMG Credentials Committee.

10.   Thereafter in October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center's residency program. He provided three letters of reference.  ECFMG attempted to verify the authenticity of these three letters of reference but was unsuccessful. It is not the usual practice of ECFMG to seek to verify the authenticity of letters of reference from its applicants.

11.   Akoda successfully completed a graduate residency program at Howard University Medical Center, was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center.

12.    To obtain a license to practice medicine in Maryland, Akoda was required to submit, among other essential components, a valid ECFMG certificate.

13.    However, ECFMG should never have issued an ECFMG certificate to Charles Nosa Akoda.

14.    At the time of Akoda was issued an ECFMG certificate, ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias). ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias) and that he had: a) previously lied about not taking the required examinations, b) rearranging his name, c) that he had been dismissed from the Jersey Shore residency program he used a false social security number to apply to the hospital ( his 'cousin' Charles Igberase) and used two green cards documenting different numbers, names, expiration dates, and dates of birth for "Dr. Akoda and his certification had been previously revoked; d) that his ECFMG certification had been previously revoked; that there were irregularities regarding the authenticity of his medical school diplomas, and references.

15.    On June 1, 2016, U.S. Attorney's office indicted Mr. Akoda for fraud and aggravated identity theft, citing eleven aliases including Charles John Nosa Akoda.

16.    Using search warrants, law enforcement officers searched the home of Mr. Akoda on June 9, 2016, and discovered false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. They also found other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

17.    On October 19, 2016, Mr. Akoda was indicted again on a charge of social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.

18.    Mr. Akoda ultimately entered into a plea bargain agreement and pled guilty to social security fraud on November 15, 2016.

19. In the spring of 2017, Mr. Akoda's license to practice medicine in Virginia and Maryland was revoked.


**AREAS OF EXAMINATION/RESPONSES**

1.   **ECFMG Mission/Requirements**
         Since 1974, the Educational Commission for Foreign Medical Graduates (ECFMG) has promoted to the American public their preeminent, and exclusive, role in assuring: ***"quality health care for the public by <u>certifying</u> international [foreign] medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals"***. As such, this organization serves as the de facto credentials verification organization for

international [formerly foreign] medical graduates through primary source certification of the applicant's international medical education, international training, and successful completion of the United States Medical Licensure Examination (USMLE)- steps 1 and 2 and English proficiency; through administration of the testing process and subsequent applicant certification to graduate medical education sites for potential placement in postgraduate medical training programs--all of which is required for medical practice within the U.S.

In 1986, the ECFMG Board required that the medical diplomas of all graduates applying for ECFMG Certification be primary source verified with the medical school that issued the diploma. This required the ECFMG to physically send a letter to the medical school that issued the diploma and for the issuing medical school *"to attest to the veracity of the individual and the document being proffered"*. This was required by ECFMG to ensure that all diplomas would undergo this scrutiny--obviously to validate the authenticity of the individual and their successful completion of medical school training, along with the issuing medical school.

Fraudulent and misleading information submitted to the ECFMG is currently covered under its Policies and Procedures Regarding Irregular Behavior. This prescriptive set of policies and procedures defines and addresses what constitutes irregular behaviors. As stated, *"Irregular behavior includes <u>all</u> actions or attempted actions of the part of applicants, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG . . ."*. When confronted with irregular behavior, it is incumbent on ECFMG to properly and thoroughly investigated, analyze and address such behaviors. Without proper resolution of the issues, ECFMG cannot fulfill its mission to the public mandating an international/foreign medical school graduate that possess all the requisite qualifications to pursue U.S. medical practice.

## 2.   **Duties of Credentials Verification Organizations**

A healthcare CVO (credentials verification organization) as the name implies provides assurances to those entities that utilize their findings in making decisions on granting medical training program enrollment, licensure and ultimately medical practice privileges. In the late 1980's, JCAHO (former name of current, The Joint Commission) published conditions under which a CVO could be used by a hospital. According to the Joint Commission, a CVO is *"Any organization that provides information on an individual's professional credentials. An organization that bases a decision in part on information obtained from a CVO should have confidence in the completeness, accuracy and timeliness of information"*.  Additionally, other CVOs within the healthcare industry such as the American Medical Association Physician Masterfile and Federation of State Medical Boards, among others, provide information that maintains these same criteria and likewise is based on primary source verification concerning vital information such as the issues of this matter. The National Committee for Quality Assurance (NCQA) has formalized and certifies CVOs. At the present time, there are

JA703

over 90 CVOs that have gained NCQA CVO Certification. Under prevailing CVO requirements, a CVO must assure the accuracy and completeness of the information that is provided. From a primary source perspective, foreign medical school education must be from the primary source.

The Centers for Medicare and Medicaid Services (CMS), has specified that primary source verification is required for: licensure, education and board certification (if applicable) in granting Medicare Advantage participation. They defined primary source as: ***"an organization or entity with legal responsibility for originating a document and ensuring the accuracy of the information it conveys"***.

As such, this concept of primary source verification entails that the CVO, in this case ECFMG, must be assured that the applicant does in fact possess a valid and authentic medical degree and other identification and credentials must undertake all efforts to make this assurance before certifying the applicant to further U.S. training, or medical licensure.

3.  **Professional/Organizational Negligence**

As developed above, the administrative standards for credentialing IMGs allowing for participation in the ECFMG program requires participation in the ECFMG to follow their mission and fulfill its duty to patients in that their actions will serve to assure all foreign educated physicians are properly and thoroughly investigated and deemed eligible for ECFMG Certification to pursue U.S. postgraduate medical education. Without this certification, there should never be an individual allowed to participate in such a program; and, therefore, there would never be fraudulent IMG physicians that progressed through ECFMG to practice U.S. medicine.


**ECFMG failed to act in a reasonable and prudent manner in the following ways**:

A.      As a fundamental matter, ECFMG was required to develop or adopt written policies and procedures and checklist for the certification of IMGs. Written policies and procedures for the investigation of allegations of irregular behavior would ensure reasonable and consistent application of defined criteria.
B.      ECFMG failed to investigate obvious discrepancies that raised the question of fraud and the identity of the applicant. For example, ECFMG failed to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG; the relationship between Igberase and Akoda, to name a few.
C.      ECFMG failed to follow through on its suspicions about the authenticity of the letters of recommendations.

D.      Curiously, ECFMG failed to adequately and with reasonable diligence investigate the allegations made by Dr. McCorkel and refer Akoda to the Medical Education Credentials Committee.

E.      ECFMG did not even follow its own procedures as noted in the 8/22/2000 charge letter sent to Akoda.

F.      ECFMG failed to investigate the social security number provided to ECFMG by Akoda.

G.      ECFMG obtained photographs of all applicants yet failed to compare photographs of Igberase and Akoda in its files when they had suspicions that they might be the same person.

H.      ECFMG missed a golden opportunity to discover if Akoda and Igberase( aka multiple alias) were the same person.

I.      ECFMG also failed to determine the authenticity of the passport and green card provided to Mr. Kelly by Akoda on 9/27/2000.

J.      ECFMG failed to follow up on its conclusion that Igberase and Akoda were the same person even though a memo with this conclusion was created by ECFMG employee Mr. Kelly.

K.      Instead, ECFMG negligently chose to bury this information in a memo that was not to be placed in the file.

It is my opinion, with a reasonable degree of professional certainty, ECFMG should have written policies and procedures for the certification of IMG should have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications and the other obvious discrepancies in the applications.

In my opinion, with a reasonable degree of professional certainty, an appropriate investigation would have resulted in referral of this matter to the ECFMG medical education credentials committee. An appropriate and reasonable investigation of the allegations and obvious discrepancies in the applications should have been conducted by ECFMG, and this matter should have been referred to the Medical Education Credentials Committee. This committee should have then found that Akoda engaged in irregular behavior, which should have then resulted in his certification being revoked.

With a high degree of professional certainty, it is my opinion that the above breaches of duties, by ECFMG caused Akoda to be certified by ECFMG, which allowed him to be accepted into a residency, secure a medical license in MD and gain access to and directly cause harm the plaintiffs and the members of the class. These actions and omissions were violations of the Standards of Care. Without the negligent ECFMG certification, Akoda would not have been accepted into a residency at Howard University Hospital; he would not have obtained a Maryland license; and he would not have been granted privileges at PG Hospital to care for Plaintiff and members of the class.

I reserve the right to alter, supplement or reverse these opinions should additional information be forthcoming.

John C. Hyde, Ph.D.    Page 7 of 8    9/19/2019

Attached is my Rule 26 case list.

I am billing my time for review and preparation of my report at $ 375per hour and my time for deposition at $ 1,425 for a three (3) hour deposition and $ 3,750 for one day of trial, plus travel, meals, and lodging expenses.

Respectfully,

*John C. Hyde*

John C. Hyde, Ph.D., FACHE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>Defendant. | Civil Action No. 18-5629<br><br>Honorable Joshua D. Wolson |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Dated: October 28, 2019

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA707

## TABLE OF CONTENTS

Page

I.      FACTS RELEVANT TO THE MOTION .................................................... 2

        A.      ECFMG's Certification And Irregular Behavior Processes................... 2

        B.      The Medical Field Uses ECFMG Certification For Limited Purposes.................. 3

        C.      John Nosa Akoda And His Aliases ....................................................... 4

                1.      *Oluwafemi Charles Igberase and Oluwafemi Igberase Charles* ............. 5

                2.      *John Nosa Akoda* ...................................................................... 5

        D.      This Lawsuit.................................................................................... 7

II.     LEGAL STANDARD.................................................................................. 9

III.    ARGUMENT .......................................................................................... 11

        A.      Issue Certification Is Not Appropriate Because There Is No Meaningful
                Commonality And Individual Issues Of Fact And Law Predominate. ................ 11

                1.      *Duty and Breach* .................................................................... 13

                2.      *Causation* ............................................................................. 14

                3.      *Statute of Limitations Defense* ................................................. 17

        B.      A Class Action Is Neither Superior Nor Manageable And Will Not Lead
                To Judicial Efficiency. ......................................................................... 18

        C.      Plaintiffs' Claims Are Not Typical Of Other Claims. ....................................... 20

        D.      Plaintiffs Are Not Adequate Class Representatives............................................. 21

        E.      Plaintiffs Cannot Satisfy Rule 23's Inherent Ascertainability Requirement. ...... 23

        F.      For All Of The Foregoing Reasons, The *Gates* Factors Weigh Against
                Issue Certification Under Rule 23(C)(4)............................................... 24

IV.     CONCLUSION........................................................................................ 25

        APPENDIX - CONTENTS OF EXHIBITS ............................................................. 27

JA708

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  370 F. Supp. 3d 826 (E.D. Tenn. 2019) ................................................................16

*In re "Agent Orange" Prod. Liability Litig.*,
  818 F.2d 145 (2d Cir. 1987) ................................................................................17

*Alban v. Fiels*,
  61 A.3d 867 (Md. 2013) ......................................................................................20

*Althaus ex rel. Althaus v. Cohen*,
  756 A.2d 1166 (Pa. 2000) ...................................................................................13

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................21, 22

*Arch v. Am. Tobacco Co., Inc.*,
  175 F.R.D. 469 (E.D. Pa. 1997) .....................................................................16, 17

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ................................................................................18

*Blain v. Smithkline Beecham Corp.*,
  240 F.R.D. 179 (E.D. Pa. 2007) .................................................................16, 19, 20

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ................................................................................23

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
  867 F.3d 434 (3d Cir. 2017) ................................................................................23

*Com. of Puerto Rico v. M/V Emily S.*,
  158 F.R.D. 9 (D.P.R. 1994) .................................................................................12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .....................................................................................9, 10, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................14

*Eckroth v. Pennsylvania Elec., Inc.*,
  12 A.3d 422 (Pa. Super. 2010) ............................................................................15

JA709

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Erisoty v. Rizik*,
    No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) .......................................................17

*Exxon Mobil Corp. v. Albright*,
    71 A.3d 30 (Md. 2013) ..........................................................................................................15

*Gasoline Prods. Co. v. Champlin Refining Co.*,
    283 U.S. 494 (1931)........................................................................................................18, 24

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011)........................................................................................11, 16, 24

*Georgine v. Amchem Prods., Inc.*,
    83 F.3d 610 (3d Cir. 1996).................................................................................................19, 20

*Gonzalez v. Corning*,
    885 F.3d 186 (3d Cir. 2018)................................................................................................11, 13

*Hammersmith v. TIG Ins. Co.*,
    480 F.3d 220 (3d Cir. 2007)........................................................................................................20

*Hartford Ins. v. Manor Inn of Bethesda*,
    642 A.2d 219 (Md. 1994) ................................................................................................13, 15

*Hobbs v. Northeast Airlines, Inc.*,
    50 F.R.D. 76 (E.D. Pa. 1970)..............................................................................................19

*Hyderi v. Washington Mut. Bank, FA*,
    235 F.R.D. 390 (N.D. Ill. 2006)...........................................................................................12

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)..........................................................................................10, 13

*Jane Doe No. 1 v. Johns Hopkins Hosp'l*,
    No. 24-C-13-001041 (Balt. City Cir. Ct.) ...............................................................................22

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)................................................................................................................20

*Martin v. Behr*,
    896 F.3d 405 (6th Cir. 2018) .................................................................................................16

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015)....................................................................................................10

JA710

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Processed Egg Prods. Antitrust Litig.,*
     312 F.R.D. 124 (E.D. Pa. 2015) ...................................................................................19

*Pryer v. C.O. 3 Slavic,*
     251 F.3d 448 (3d Cir. 2001) .................................................................................18, 24

*Rader v. Teva,*
     276 F.R.D. 524 (D. Nev. 2011) ............................................................................12, 21

*Remsburg v. Montgomery,*
     831 A.2d 18 (Md. 2003) .............................................................................................14

*Romero v. Allstate Ins. Co.,*
     52 F. Supp. 3d 715 (E.D. Pa. 2014) ....................................................................10, 19

*Spence v. Bd. of Ed. of Christina Sch. Dist.,*
     806 F.2d 1198 (3d Cir. 1986) ............................................................................. *passim*

*In re Suboxone Antitrust Litig.,*
     MDL 2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019) ........................................10

*Sweet v. Pfizer,*
     232 F.R.D. 360 (C.D. Cal. 2005) ...............................................................................19

*In re Three Mile Island Litig.,*
     87 F.R.D. 433 (M.D. Pa. 1980) ..............................................................12, 15, 17, 18

*Toney v. Chester Cty. Hosp'l,*
     961 A.2d 192 (Pa. Super. 2008) .................................................................................15

*Tulp v. Educ'l Comm'n for Foreign Med. Graduates,*
     Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) ...........................3

*Wal-Mart, Inc. v. Dukes,*
     564 U.S. 338 (2011) ......................................................................................10, 12, 13

*Weiley v. Albert Einstein Med. Ctr.,*
     51 A.3d 202 (Pa. Super. 2012) ...................................................................................14

**Other Authorities**

45 C.F.R. § 164.316(b)(2) ....................................................................................................24

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

-iv-

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Fed. R. Evid. 702 ...........................................................................................................14

Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:43 (2012) .........................................10

U.S. Const., amend. VII...............................................................................................................25

JA712

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") opposes Plaintiffs' Motion for Class Certification, ECF 32 (the "Motion"). Implicitly acknowledging that their negligence-based claims seeking damages for emotional distress allegedly experienced by more than 1,000 different class members could not possibly satisfy the requirements of Federal Rule of Civil Procedure 23, Plaintiffs attempt an end-run around Rules 23(a) and (b) and propose to certify only a "limited issue" class under Rule 23(c)(4). The Court should reject this attempt.

Plaintiffs purport to offer two "options" for certification, but each would bifurcate the case in the same unworkable way. In the first phase, a jury would address on a class-wide basis certain questions not capable of class-wide resolution relating to duty, breach, and whether ECFMG's conduct in issuing an ECFMG Certificate to a doctor using the name John Nosa Akoda in the mid-1990s was "capable of" causing class members to experience emotional distress when they later learned that Dr. Akoda went by different names and pleaded guilty to misuse of a Social Security number in 2016. *See* ECF 32-1 at 14-15 ("Option A," purporting to certify question of "liability"); *id.* at 11 ("Option B," purporting to certify nine (9) sub-issues relating to the question of "liability"). In the second phase—even if Option A or Option B were certified—Plaintiffs concede that more than a thousand mini-trials on individualized issues would still be required. Among the critical issues affecting Plaintiffs' claims that apparently would be left for "another day"—actually, many, many other days—are individualized questions relating to: the existence or absence of any cognizable emotional distress injury in a particular class member (evidence already exists that some have no cognizable injury); specific causation, *i.e.*, whether ECFMG's alleged conduct solely, directly, and proximately caused a particular class member's emotional distress (assuming there is a cognizable injury); the extent of any such emotional distress; any affirmative defenses of ECFMG related to a particular class member's claims (such as statute of limitations); and whether damages are to be awarded and, if so, in what amount. *See* ECF 32-1 at 15.

JA713

Neither class Plaintiffs propose can be certified consistent with Rule 23.  The issues Plaintiffs propose to certify are at once so broad that they sweep in too many individualized and variable issues of fact and law to warrant certification, and so narrow that they would not materially advance resolution of the case.  Moreover, certifying an issue class here would be an unprecedented extension of the Third Circuit's jurisprudence regarding class certification and emotional distress damages.  Courts in the Third Circuit have **never** tried a limited issue class like this centered on emotional distress liability because emotional distress liability and damages are "**too interwoven to allow a fair determination of damages apart from liability.**"  *Spence v. Bd. of Ed. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (emphasis added).  For those reasons and others set forth in detail below, the Court should deny class certification.

## I.    FACTS RELEVANT TO THE MOTION

### A.    ECFMG's Certification and Irregular Behavior Processes

ECFMG is a Philadelphia-based private non-profit organization that promotes quality health care for the public by, among other things, certifying eligible graduates of international medical schools ("IMGs") who have met certain minimum requirements as ready to enter U.S. graduate medical education (usually residency programs).  *See* ECF 32-3.  At the relevant time, those minimum requirements included passing grades on an English exam and two substantive exams (Step 1 and Step 2 of the United States Medical Licensing Examination ("USMLE")) and a primary-source verified medical school diploma.  *See* ECF 32-5; ECF 32-46 at 88:21-89:2.  To primary source verify an IMG's medical school diploma, ECFMG would send a copy of the diploma directly to the issuing medical school, which would inform ECFMG whether the IMG applying to ECFMG was issued that diploma.  ECF 32-46 at 88:7-14; *see, e.g.*, Exs. 1 & 2.

For various reasons, IMGs and others sometimes try to subvert ECFMG's processes.

2

JA714

ECFMG calls that "irregular behavior"[1] and has a process for evaluating suspected irregular behavior.  The process is set forth in various ECFMG policies and procedures.  ECF 32-46 at 55:23-56:7; *see, e.g.*, ECF 32-14.  The process is intended to ensure the integrity of ECFMG's programs and services while affording process and procedure to the accused.[2]

When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused.  ECF 32-46 at 81:22-82:13, 146:11-14, 203:3-16.  ECFMG is not a government enforcement or investigative agency and uses the tools at its disposal to determine whether a suspicion of irregular behavior is well founded.  *Id.* at 76:12-77:5.  If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee (a sub-committee of ECFMG's Board of Trustees) for a formal determination on the merits.  *Id.* at 76:24-77:5.  Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations.  *Id.* at 181:9-23.

If an IMG is found to have engaged in irregular behavior, ECFMG annotates the individual's record and can, *inter alia*, limit the IMG's participation in ECFMG programs and services or withhold or revoke existing ECFMG Certificates.  ECF 32-14.

B.    **The Medical Field Uses ECFMG Certification For Limited Purposes.**

ECFMG Certification status information is not made available to members of the general

---

[1] ECFMG defines "irregular behavior" as "all actions or attempted actions on the part of applicants . . . or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG."  ECF 32-14.

[2] *See Tulp v. Educ'l Comm'n for Foreign Med. Graduates*, Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) (granting summary judgment for ECFMG because ECFMG's irregular behavior procedures afford sufficient process to the accused) (Beetlestone, J.).

3

public.  ECF 32-46 at 243:18-20.  Rather, it is made available only to certain third parties in the medical field like residency programs, hospitals, licensing boards, and employers.  *Id.* at 244:1-8. At the relevant time, ECFMG Certification status reports contained the IMG's name, date of birth, medical school name and country, graduation year, certification status, and certain examination scores (depending on the recipient).  *Id.* at 44:10-23.  These reports did not (and were not expected to) verify an IMG's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character.  *Id.* at 198:16-22, 200:13-15, 240:18-241:6, 242:6-243:3, 244:22-245:13.

Recipients of ECFMG Certification status reports use them for a limited purpose as part of their own processes. The information provided by ECFMG is by no means the only information used by hospitals, programs and employers when evaluating IMGs.  *See id.* at 198:11-199:13.  To the contrary, they consider significant things like (1) in-person interviews; (2) information provided directly by the IMG; (3) letters of recommendation; (4) skills assessments or additional examinations; (5) reports from prior educational or training programs; (6) medical school transcripts; (7) information obtained as part of a background check; (8) ongoing performance monitoring. Ex. 3 at 3-6; Ex. 4 at 5-8.  ECFMG is not responsible for any of that information.

 C. **John Nosa Akoda And His Aliases**

Plaintiffs are former patients of an obstetrician/gynecologist ("OB/GYN") whom ECFMG certified in 1996 based on his undisputed passing of Steps 1 and 2 of the USMLE and the primary source verification of a diploma by the University of Benin.  ECF 32-1 at 4; Ex 2.  After obtaining ECFMG Certification, but prior to treating Plaintiffs, the doctor successfully: (1) passed Step 3 of the USMLE (ECF 32-34 at 5); (2) was admitted to a residency program (Ex. 5); (3) completed that residency program (Ex. 6); (4) became licensed to practice medicine (ECF 32-34 at 4); (5) was awarded hospital privileges and hired by several medical offices (*id.*); and (6) achieved Board

certification in his specialty (Ex. 7). As ECFMG and Plaintiffs came to later learn, that doctor committed Social Security fraud and went by several different names. ECF 32-32.

### 1.   *Oluwafemi Charles Igberase and Oluwafemi Igberase Charles*

In 1992, the doctor applied to ECFMG using the name Oluwafemi Charles Igberase. ECF 32-7. He presented ECFMG with a medical school diploma that was primary source verified by the University of Ibadan. Ex. 1. Though he failed the USMLE exams several times, he ultimately passed them and thereby earned his ECFMG Certificate (No. 482-700-2). ECF 32-10. Despite this, he was unable to gain admission to a residency program. ECF 32-12 at 1-2.

In 1994, apparently believing that his exam history kept him from residency, *id.*, the doctor applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles. ECF 32-32 at 9. To wipe clean his record of failed examinations, he misrepresented that he had never applied to ECFMG before and managed to obtain a new application number, pass the USMLE exams again, and obtain a new ECFMG Certificate (No. 0-519-573-0). ECF 32-9 at 13.

Misrepresenting application history with ECFMG can constitute irregular behavior. *Id.* at 14. When confronted by ECFMG, the doctor admitted that he had previously applied to ECFMG, despite representing otherwise on his application. *Id.* at 15-16. In accordance with its irregular behavior policies and procedures, ECFMG determined that he had engaged in irregular behavior and promptly (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. *Id.* at 2-4. The doctor later submitted additional fraudulent applications to ECFMG using other variations of the names Oluwafemi, Charles, and Igberase. ECF 32-17; Ex. 8. ECFMG identified the fraud, refused to even process those applications, and instead barred him from ever again applying to ECFMG. *Id.*

### 2.   *John Nosa Akoda*

In 1996, the doctor applied yet again to ECFMG, this time using a wholly different name

("John Nosa Akoda"), a different diploma from a different Nigerian medical school (University of Benin), and other different personal information.  ECF 32-19; ECF 32-20; ECF 32-32 at 10.  On his application, the doctor misrepresented his ECFMG application history and made no reference to the Igberase or Charles applications.  ECF 32-19.  After he passed the required exams and the University of Benin primary source verified the diploma, he received an ECFMG Certificate (No. 0-553-258-5) as Dr. Akoda.  Ex 2; ECF 32-21.

Dr. Akoda then entered a residency program at the Jersey Shore Medical Center ("JSMC").  ECF 32-32 at 10.  An unnamed "source" apparently told JSMC that Dr. Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase.  ECF 32-23.  When JSMC tried to verify the Social Security number that Dr. Akoda provided directly in his residency paperwork, JSMC discovered that it belonged to Charles Igberase.  *Id.*  After JSMC shared limited information with ECFMG, ECFMG conducted its own investigation to determine if Dr. Akoda and Dr. Igberase were the same person.  ECF 32-24; ECF 32-25; ECF 32-46 at 150:24-151:6.  ECFMG staff spoke with a JSMC official and with Dr. Akoda himself.  ECF 32-24; ECF 32-25; ECF 32-27; ECF 32-28.  ECFMG determined that some of JSMC's information was inaccurate, *see* ECF 32-24 (ECFMG had no record of sending ECFMG Certification status reports to the residency programs about which JSMC had inquired), and Dr. Akoda provided explanations and supporting hard-copy documentation in person to demonstrate that he and Dr. Igberase were not the same person.  ECF 32-26; ECF 32-27.  Despite some suspicions at the time, ECFMG staff determined that there was insufficient evidence to bring Dr. Akoda before the ECFMG Medical Education Credentials Committee on an allegation that he was Dr. Igberase.  ECF 32-29; ECF 32-46 at 150:24-151:6.  JSMC ultimately discharged Dr. Akoda in 2000 because of perceived discrepancies involving his Social Security number and green card (which was not part of his ECFMG application).  ECF 32-28.  At the same time, JSMC notified the Maryland

6

Board of Physicians about those discrepancies. Ex. 9. ECFMG continued to investigate Dr. Akoda but took no adverse action against him because ECFMG had insufficient evidence of irregular behavior. ECF 32-46 at 150:24-151:6; ECF 32-31.

Years later, in 2006, Dr. Akoda was accepted to a residency program at Howard University Hospital ("Howard"). Ex. 5. He completed his residency in 2011 and obtained medical licenses from Maryland and Virginia. ECF 32-32 at 10; Ex. 10. Dr. Akoda then obtained privileges at Prince George's Hospital Center ("PGHC") and worked with medical practices run by Dr. Abdul Chaudry and Dr. Javaka Moore. *See, e.g.*, Exs. 11-14 at Rog 1. Each of these entities—although aware of Dr. Akoda's ECFMG Certification—would have used its own process to evaluate Dr. Akoda's training and credentials. Ex. 3 at 6. Notably, **none** of these entities evaluated Dr. Akoda using the name on his ECFMG Certificate ("John Nosa Akoda"). *See, e.g.*, Ex. 6 ("John-**Charles** Nosa Akoda"); Ex. 10 ("**Charles** John Akoda"); ECF 32-34 ("**Charles** J.N. Akoda").

In 2014, ECFMG received a subpoena from a U.S. Attorney's office regarding Dr. Akoda. Ex. 15. ECFMG cooperated with the investigation and followed instructions from federal authorities **not** to impede the investigation and **not** to take adverse action against Dr. Akoda while the investigation was ongoing. *Id.*; Ex. 16. Law enforcement did not stop Dr. Akoda from practicing medicine while their investigation spanned almost two years.

In November 2016, Dr. Akoda pleaded guilty to misuse of a Social Security number and stipulated that he and Oluwafemi Charles Igberase were the same person. ECF 32-32. With that admission, ECFMG promptly consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. ECF 32-33; Ex. 17.

### D.    This Lawsuit

Plaintiffs are former patients of Dr. Akoda for whom Dr. Akoda was either their regular doctor or the doctor who happened to be "on-call" at the hospital when they gave birth. Plaintiffs

7

JA719

contend that ECFMG was negligent in its certification and investigation of Dr. Akoda, and that ECFMG's actions directly caused them to suffer emotional distress upon learning of Dr. Akoda's conduct. *See* ECF 32-1 at 1-2. Plaintiffs (and their counsel) now seek to pursue claims for negligence and negligent infliction of emotional distress on behalf of a proposed class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J Akoda M.D.)." *Id.* at 10.[3] As defined, the putative class includes individuals who encountered Dr. Akoda (1) before and after he came to the United States, (2) while he was a resident at JSMC, (3) while he was a resident at Howard, (4) before and after he was licensed, (5) before and after he was Board certified, (6) before and after he obtained privileges at PGHC, (7) before and after he was hired by private practices, and (8) before and after ECFMG was instructed by federal authorities not to take adverse action against him.

Dr. Akoda performed a variety of procedures on class members, ranging from mere examinations to vaginal deliveries to major surgeries. Ex. 25. Class members experienced a range of reactions both to the treatment rendered by Dr. Akoda and to the discovery of the charges against Dr. Akoda: some class members claimed emotional distress both **before** and **after** learning of the charges against Dr. Akoda; some claimed emotional distress only **after** learning of the charges; and others claimed no emotional distress whatsoever. *Id.* Individualized assessments of each class member will be necessary to determine whether any particular class member suffers from

---

[3] This litigation follows a proposed class action against Dimensions Health Corporation and others who operated PGHC, where Dr. Akoda practiced. *See Russell et al v. Dimensions Corp., et al.*, CAL 17-22761 (Prince George's Cty. Cir. Ct., Md.); *see Dews et al v. Dimensions Healthcare Sys., et al.,* CAL 17-37091 (Prince George's Cty. Cir. Ct., Md.). Plaintiffs in this case were also plaintiffs or class members in those cases. Exs. 18-21 at Rog 10. Those cases alleged that Dimensions was the "sole and proximate cause" of Plaintiffs' injuries. *E.g.*, Ex. 38 ¶ 81; *see* Ex. 22. Soon after moving for class certification and receiving the defendants' summary judgment motion—and without receiving any compensation—Plaintiffs abandoned their claims against Dimensions and stipulated to the dismissal of that case without prejudice. Ex. 23; Ex. 24.

JA720

emotional distress caused by ECFMG.  Exs 26-31.  This is evident from the Plaintiffs themselves:



*Monique Russell.* ███████████████████████████████████████ Ex. 32 at 9.  Ms. Russell acknowledges that the consequences of Dr. Akoda's treatment were "minor," Ex. 27 at 7, and that Dr. Akoda rendered treatment that "really was best/necessary."  Ex. 33 at 4. ██████████████████████████████████████ Ex. 27 at 7.  Nonetheless, she feels a responsibility to "stand up for women who were subjected to trauma."  *Id.*

*Jasmine Riggins.* ████████████████ Ex. 32 at 8. ██████████████████████ *Id.*; Ex. 28 at 2. ████████████████████ *Id.* at 2. ██████████████ *Id.* at 4; Ex. 31 at 1-2.

*Elsa Powell.* ████████████████████ Ex.  29  at  2. ██████████ Ex. 32 at 6. ████████████████████ Ex. 29 at 3. ████████████ *Id.* at 4, 6; Ex. 31 at 2.

*Desire Evans.* ██████████ Ex 32 at 4. ██████████ Ex. 30 at 2-3. ████████████████ *Id.*  at 5, 7. ██████████ *Id.* at 7. ██████ *Id.* at 8.

## II.    **LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23."  *Id.* (quoting *Wal-Mart, Inc. v. Dukes*, 564 U.S. 338,

9

350 (2011)); *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 n.14, 320-21 (3d Cir. 2008).  The Court must conduct a "rigorous analysis" to determine whether a party seeking to certify a class has carried its burden under Rule 23.  *Dukes*, 564 U.S. at 351.

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Id.* at 349.  To satisfy Rule 23(a), Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Those four requirements— known as numerosity, commonality, typicality, and adequacy—"effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Dukes*, 564 U.S. at 349.

Plaintiffs must also satisfy at least one subsection of Rule 23(b).  *See Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 345; *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370 (3d Cir. 2015).  Rule 23(b)(3) covers "individualized monetary claims," *Dukes*, 564 U.S. at 362, like those asserted by Plaintiffs here, and requires Plaintiffs to show that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Implicitly recognizing that they cannot satisfy Rule 23(b)(3), Plaintiffs suggest that they can avoid its requirements altogether by seeking to certify an issue class under Rule 23(c)(4).  But Plaintiffs' reliance on Rule 23(c)(4) does not obviate their need to satisfy Rule 23(b)(3).  *See In re Suboxone Antitrust Litig.*, MDL 2445, 2019 WL 4735520, at *18 (E.D. Pa. Sept. 27, 2019) ("Certification of particular issues under Rule 23(c)(4) is only proper if the other requirements of Rule 23(a) and (b) are first met."); *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) (same); *see also* Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:43 (2012) (Rule

10

23(c)(4) "should never be. . .used to 'fix' manifest Rule 23(b)(3) predominance problems presented where key issues going to liability require individualized proof.").[4]

"[A] court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272 (3d Cir. 2011) (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200-01 (3d Cir. 2009)). The Third Circuit has provided the following "non-exclusive list of factors" that "should guide courts" as they apply Rule 23(c)(4):

> (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; (4) the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Id.* at 273.

## III.    **ARGUMENT**

### A.    **Issue Certification Is Not Appropriate Because There Is No Meaningful Commonality And Individual Issues Of Fact And Law Predominate.**

The issues that Plaintiffs propose to certify for class treatment encompass so many individualized questions of fact and law that they do not warrant certification under Rules 23(a) or

---

[4] There is a Circuit split about the relationship between Rules 23(b) and 23(c)(4), and the Third Circuit purports not to have "join[ed] either camp." *Gates*, 655 F.3d at 272-73. But the Third Circuit has embraced a view of Rule 23(c)(4) that effectively limits issue class certification to cases where a party satisfies the predominance, superiority, and manageability elements of Rule 23(b)(3). *Id.*; *see Gonzalez v. Corning*, 885 F.3d 186, 202-03 (3d Cir. 2018) (citing "the same reasons" for affirming denials of certification under Rules 23(b)(3) and 23(c)(4)).

JA723

23(b)(3). No court in the Third Circuit has **ever** certified and tried a limited issue class centered on emotional distress liability because with respect to the claims of even a single plaintiff, emotional distress liability and damages are "**too interwoven to allow a fair determination of damages apart from liability.**" *Spence*, 806 F.2d at 1202 (emphasis added). It is obvious, then, that "the idiosyncratic nature of emotional distress claims" make them "diverse and personal" and "unsuitable for class certification." *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441-42 n.16 (M.D. Pa. 1980) ("*In re TMI*"). The overwhelming weight of authority from courts across the country agrees.[5]

Plaintiffs have identified a set of abstract questions that they contend are "common," but "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original). Identifying common questions is not enough to satisfy Rule 23(a) because "[a]ny competently crafted class action complaint literally raises common 'questions.'" *Id.* at 349. Rather, common questions will satisfy Rule 23(a) only if they are "capable of class[-]wide resolution" and "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Rule 23(b)(3)'s predominance requirement is "even more demanding" than Rule 23(a)'s exacting commonality requirement. *Comcast*, 569 U.S. at 34. The Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or

---

[5] *See, e.g.*, *Rader v. Teva*, 276 F.R.D. 524, 530–31 (D. Nev. 2011) ("The emotional distress claims of thousands of proposed class members defeat class certification in this case because emotional distress is necessarily an individualized inquiry, and the amount of damages in such cases 'is not susceptible to a mathematical or formulaic calculation.'"); *Hyderi v. Washington Mut. Bank, FA*, 235 F.R.D. 390, 397 (N.D. Ill. 2006) (emotional distress claims are a "highly plaintiff-specific issue"); *Com. of Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 14 (D.P.R. 1994) (emotional distress claims are "intractably individual in character").

12

individual issues predominate in a given case." *In re Hydrogen Peroxide*, 552 F.3d at 311.

Whether analyzed under the framework Rule 23(a) or Rule 23(b)(3), Plaintiffs' proposed issue classes do not warrant certification because they lack commonality and individualized questions of law and fact predominate. *See Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."). Notwithstanding Plaintiffs' attempts to circumscribe the scope of their proposed issue class, even those limited issues articulated by Plaintiffs present an array of individualized issues that would overwhelm any class-wide analysis and prevent the attainment of common answers to the supposedly common questions.

### 1.    *Duty and Breach*

Whether ECFMG owed or breached a duty to any particular class member (of the more than 1,000 class members claimed by Plaintiffs) is "not capable of class[-]wide resolution," *Dukes*, 564 U.S. at 350, and certainly does not predominate over individualized inquiries. Regardless of whether the question is stated generally as in Option A (*i.e.*, whether ECFMG owed or breached a duty) or narrowly as in Option B (*i.e.*, whether ECFMG owed or breached a duty under various particular theories), *see* ECF 32-1 at 10-11, the answer will vary depending on which state's law applies (which itself presents an obstacle to class certification, *see infra* Part III.B) and whether the class member's alleged injury was a reasonably foreseeable result of ECFMG's conduct. *See, e.g.*, *Hartford Ins. v. Manor Inn of Bethesda*, 642 A.2d 219, 226 (Md. 1994).[6] Here, determining whether it was foreseeable that ECFMG's conduct would cause a particular class member to be treated by Dr. Akoda and then to suffer emotional distress upon learning of the charges against Dr.

---

[6] To the extent Pennsylvania law might apply, *see infra* Part III.B, it similarly requires a foreseeability analysis to determine whether a duty exists. *See, e.g.*, *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000).

Akoda is rife with individualized issues incapable of class treatment, including:

***When and where each class member encountered Dr. Akoda.*** Class members encountered Dr. Akoda while he was (1) in Nigeria before he applied for ECFMG certification; (2) a resident at JSMC; (3) a resident at Howard; (4) a physician with privileges at PGHC; (5) an employee at Dr. Moore's office; (6) an employee at Dr. Chaudry's office; (7) a licensed physician; and/or (8) Board certified. Class members also encountered Dr. Akoda before and after ECFMG was instructed by federal authorities not to take adverse action against him. With each additional third party that independently assessed Dr. Akoda's credentials and permitted him to treat patients, it becomes less foreseeable that ECFMG's conduct might cause Dr. Akoda to treat patients or cause emotional distress. To the extent Plaintiffs contend that the duty might arise from ECFMG's relationships with third parties, ECF 32-1 at 11, each would require individualized consideration. Thus, a class member who was treated by Dr. Akoda in Nigeria or as a resident at JSMC would have to present markedly different evidence on the question of ECFMG's duty than a class member who was treated by Dr. Akoda at PGHC when he worked for Dr. Moore or Dr. Chaudry as a fully licensed and Board-certified OB/GYN.

***How each class member was treated and/or examined by Dr. Akoda.*** Plaintiffs (and their experts[7]) cannot dispute that class members had a wide variety of experiences with Dr. Akoda under a wide variety of circumstances. ECF 32-44 at 21. Class members' interactions with Dr. Akoda ranged from allegedly "positive" medical examinations to allegedly inappropriate comments or contact. *See* Ex. 25. Whether it was foreseeable that ECFMG's conduct would result in Dr. Akoda treating and/or mistreating a particular class member in the particular way that factored into that class member's alleged emotional distress is an individualized issue not capable of class-wide resolution through common evidence.

***Each class member's relationship to ECFMG.*** Plaintiffs had no knowledge of ECFMG until after their alleged injuries. Exs. 11-14 at Rog 7. No court has ever held that ECFMG owes a duty to members of the general public (like Plaintiffs) to ensure that IMGs who receive an ECFMG Certificates will in fact, or are qualified to, provide appropriate medical treatment. Whether ECFMG owed such a duty may turn on the specific relationship (if any) between each class member and ECFMG. *See, e.g., Remsburg v. Montgomery*, 831 A.2d 18, 27 (Md. 2003).[8]

        **2.**      **Causation**

Determining liability on a class-wide basis would require a finding of both actual and

---

[7] Many of the opinions articulated by Plaintiffs' experts should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See, e.g.*, Ex. 34 at 3. But because Plaintiffs have not argued that the substance of their experts' opinions support class certification, ECFMG has not moved to exclude them at this time. ECFMG reserves the right to do so in connection with its motion for summary judgment.

[8] *See also, e.g., Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217-19 (Pa. Super. 2012).

proximate causation on a class-wide basis. *See Hartford Ins. Co.*, 642 A.2d at 229-30.[9]  "When more than one act of negligence arguably could be responsible for the injury, the question is whether the second in point of time superseded the first, *i.e.*, did that act intervene and supersede the original act of negligence, thus terminating its role in the causation chain?"  *Id.*  Here, there are innumerable individualized questions implicated in the issue of causation, including:

> ***When and where each class member encountered Dr. Akoda.***  Each decision by an above-listed third party to supervise, credential, privilege, or hire Dr. Akoda—based on its own investigations, assessments, and criteria—was a potential break in the causal chain that would eliminate ECFMG's liability.  A class member who was treated by Dr. Akoda in Nigeria or as a resident at JSMC would have to present markedly different evidence on causation than a class member who was treated by Dr. Akoda at PGHC when he worked for Dr. Moore or Dr. Chaudry as a fully licensed and Board-certified OB/GYN.

> ***How each class member was treated and/or examined by Dr. Akoda.***  Whether a class member's emotional distress was actually and proximately caused by ECFMG's conduct would likely turn on whether the class member had minimal or extensive exposure to Dr. Akoda and whether the jury believes that Dr. Akoda's decision to treat or examine the class member in a particular way broke the causal chain between ECFMG and the alleged emotional distress.  It is not capable of class-wide resolution through common proof.

> ***How each class member's background affected the alleged emotional distress.***  The existence, onset, and interplay of an individual's alleged emotional distress is an overwhelmingly individualized inquiry.  Whether alleged emotional distress (if proven to exist) was attributable to treatment by Dr. Akoda or the result of a preexisting mental health issue is impossible to determine through common evidence.  This is evident from just the claims of the named Plaintiffs: ████████████████████████████████████████████████████████████████████████████████████████████████████████  *See* Exs. 26-31.

> ***Whether class members experienced physical injury.***  To recover for emotional distress, Plaintiffs must show that ECFMG's conduct caused not only emotional distress, but also an "objective and demonstrable physical injury."  *Exxon Mobil Corp. v. Albright*, 71 A.3d 30 (Md. 2013).[10]  The nature of any alleged physical injury that might support the recovery of emotional distress damages (and whether such injury is causally related to both the alleged negligence and emotional distress) can vary widely and is not suited to class-wide resolution.  *See In re TMI*, 87 F.R.D. at 441-42 ("[A] class action is not the superior method for adjudication of the claims for physical injury related to emotional distress.").

---

[9] *See also, e.g.*, *Eckroth v. Pennsylvania Elec., Inc.*, 12 A.3d 422, 427 (Pa. Super. 2010).

[10] *See also, e.g.*, *Toney v. Chester Cty. Hosp'l*, 961 A.2d 192, 200 (Pa. Super. 2008).

Plaintiffs try to side step these fundamental causation problems by limiting their proposed issue classes to questions of general causation (*i.e.*, whether ECFMG's conduct was **capable** of causing emotional distress) and leaving questions of specific causation (*i.e.*, whether ECFMG's conduct **actually** caused emotional distress) for thousands of separate mini-trials.  But in tort cases like this, courts "have routinely refused to certify common questions of general causation."  *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 185 n.19 (E.D. Pa. 2007); *see, e.g.*, *Gates*, 655 F.3d at 273 (affirming refusal to certify a "liability-only issue class when it found liability inseverable from other issues that would be left for follow-up proceedings"); *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 488-89 (E.D. Pa. 1997) (finding that "general causation" question of whether cigarettes are capable of being addictive is not common under Rule 23(a)(2)).  "Any hope of efficiency would be subverted by the individual and unique circumstances of each member's case which are inextricably intertwined with the general causation issue."  *Blain*, 240 F.R.D. at 192.

Separating concepts of general and specific causation is especially inappropriate for a putative class centered on allegations of emotional distress where there is no meaningful distinction between the evidence bearing on both inquiries.  Emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct."  *Spence*, 806 F.2d at 1202.  This case is completely unlike the out-of-Circuit chemical exposure cases cited by Plaintiffs (ECF 32-1 at 15) in which common evidence arguably could be presented to answer the question of whether, as a matter of scientific literature and study, sufficient evidence existed to establish whether exposure to a particular chemical **can** cause a particular diagnosable condition, and leaving for later whether the chemical **did** cause such a condition in a particular person.  *See Martin v. Behr*, 896 F.3d 405 (6th Cir. 2018); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826 (E.D. Tenn. 2019).  Moreover,

16

Case: 22-1998    Document: 22-3    Page: 185    Date Filed: 09/08/2022

Case 2:18-cv-05629-JDW    Document 39    Filed 10/28/19    Page 23 of 36

those cases are outliers. *See, e.g.*, *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 164 (2d Cir. 1987) (rejecting "general causation" issue certification because the relevant and "highly individualistic" question was whether exposure to Agent Orange "*did* cause harm and to whom"); *Arch*, 175 F.R.D. at 488-89 ("Unless it is proven that cigarettes always cause or never cause addiction, 'the resolution of the general causation question accomplishes nothing for any individual plaintiff.'"). Plaintiffs here have not (and cannot) come forward with evidence speaking specifically to the question of general causation as opposed to specific causation. Rather, the "causes of the injuries alleged" must "be assessed on a plaintiff-by-plaintiff basis." *In re TMI*, 87 F.R.D. at 441-42; *see Spence*, 806 F.2d at 1202; Exs. 26-31.

### 3. *Statute of Limitations Defense*

For many class members, the two-year statute of limitations began to run no later than November 2016, when Dr. Akoda's guilty plea became public and class members knew or should have known of Dr. Akoda's conduct and any emotional distress they might have experienced from that knowledge. *See Erisoty v. Rizik*, No. 93-6215, 1995 WL 91406, at *10 n.4 (E.D. Pa. Feb. 23, 1995) (applying Pennsylvania's two-year limitations period for torts over Maryland's three-year limitations period for torts). But there are class members whose claims may be time-barred because they allegedly suffered emotional distress caused by Dr. Akoda **before** November 2016. Ex. 25. Indeed, one class member actually filed a lawsuit seeking emotional distress damages resulting from her treatment by Dr. Akoda in early 2016—months **before** Dr. Akoda was even arrested. Ex. 35. Whether and to what extent she (or other class members claiming emotional distress **before** November 2016) learned of the charges against Dr. Akoda **outside** the two-year limitations period applicable in this case presents an important individualized issue not capable of class-wide resolution through common proof. "[D]etermining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification."

17

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998). Thus, individualized questions of law and fact bearing on ECFMG's statute of limitations defense preclude certification under Rule 23(a) or 23(b)(3).

> **B.    A Class Action Is Neither Superior Nor Manageable And Will Not Lead To Judicial Efficiency.**

A class action is not the superior method for adjudicating emotional distress claims because of the "likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways" such that "an action conducted nominally as a class action would degenerate into practice into multiple lawsuits separately tried." Fed. R. Civ. P. 23, advisory committee's note; *see In re TMI*, 87 F.R.D. at 441-42. On this record, the Court cannot find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), for three reasons.

*First*, emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Spence*, 806 F.2d at 1202. The Third Circuit has "steadfastly" disapproved of separate **_individual_** trials for liability and damages "where a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3d Cir. 2001); *see Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931) (separate trials on liability and damages "would amount to a denial of a fair trial" where issues are "interwoven" and "cannot be submitted to the jury independently"). This concern would only be exacerbated by attempting to have a separate liability trial on a **_class-wide_** basis for the reasons that commonality under Rule 23(a) and predominance under Rule 23(b)(3) are lacking. *See supra* Part III.A. Plaintiffs have offered no efficient way to isolate meaningful issues for class treatment. Plaintiffs

18

have offered no trial plan or other explanation about how they expect to try either proposed issue class in a manageable way, and they concede (as they must) that there will still be thousands of mini-trials even if an issue class is certified. *See* ECF 32-1 at 25. Any attempt by Plaintiffs to narrow further the scope of any issue class would eliminate any efficiency gains that even arguably arise from class treatment. *See Romero*, 52 F. Supp. 3d at 738 (issue certification not appropriate where it would not materially advance the litigation).

**Second**, issue certification would ignore each class member's significant interest in controlling her own litigation. This interest is particularly strong in personal injury and emotional distress cases and where discovery will involve intrusive IMEs and highly sensitive mental health and gynecological issues. *See, e.g.*, *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) (strong interest class members have in controlling own personal injury lawsuits disfavors certification); *Blain*, 240 F.R.D. at 191-92 (same); *Sweet v. Pfizer*, 232 F.R.D. 360, 373 (C.D. Cal. 2005) ("[T]he class members appear to have large stakes in the litigation, as the alleged harm has affected such aspects of their lives as their marriages and finances."). Each class member's interest is also strengthened in this case because "there is a wide range of choice of the strategy and tactics of the litigation," including choices about which defendants to pursue and when. *See Hobbs v. Northeast Airlines, Inc.*, 50 F.R.D. 76, 79 (E.D. Pa. 1970). Each class member should be able to decide whether to focus litigation efforts on Dr. Akoda and/or the institutions that employed him.

**Third**, choice-of-law issues in this case render it unmanageable. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 164-65 (E.D. Pa. 2015) (finding application of 21 state laws unmanageable). Plaintiffs contend that Pennsylvania law should apply to all class members because Pennsylvania has rejected the *lex loci delicti* rule and Plaintiffs' counsel are "unaware" of any relevant conflicts between the laws of Pennsylvania and other states. ECF 32-1 at 22-23. Neither of these arguments hold water. There are material differences between the laws

19

JA731

of Pennsylvania (where ECFMG is located) and the laws of jurisdictions where Plaintiffs and class

members interacted with Dr. Akoda and ultimately suffered their alleged injuries (such as Nigeria,

Maryland, New Jersey, and Washington, DC).  For example, unlike Pennsylvania, Maryland—the

jurisdiction where each of the named Plaintiffs was treated by Dr. Akoda, where Dr. Akoda was

licensed to practice medicine, and where 3 of the 4 named Plaintiffs reside—"does not recognize

the tort of negligent infliction of emotional distress." *Alban v. Fiels*, 61 A.3d 867, 876 (Md. 2013);

*see Blain*, 240 F.R.D. at 195 ("Negligent infliction of emotional distress claims vary greatly among

the states.").   In such situations, Pennsylvania[11] generally applies a "flexible" choice-of-law

analysis that "permits analysis of the policies and interests underlying the particular issue before

the court" and applies the law of the state with the "most interest in the problem." *Hammersmith*

*v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines, Inc.*, 203

A.2d 796, 805-06 (Pa. 1964)).  Here, Maryland has a greater interest than Pennsylvania in whether

a Maryland resident treated in Maryland by a doctor licensed in Maryland can recover for

emotional distress arising from that treatment, so Maryland law applies to (and bars) Plaintiffs'

emotional distress claims.  Similar analyses would be required based on each class member's

particular circumstances, precluding a finding of superiority or manageability under Rule 23(b)(3).

### C.     Plaintiffs' Claims Are Not Typical Of Other Claims.

Rule 23(a)'s typicality requirement "is intended to preclude certification of those cases

where the legal theories of the named plaintiffs potentially conflict with those of the absentees."

*Georgine*, 83 F.3d at 631.  Here, Plaintiffs' claims are not typical of other claims in two respects.

***First***, Plaintiffs were all treated after Dr. Akoda had completed the Howard residency

program, was licensed to practice medicine in Maryland and Virginia, became Board certified in

---

[11] Because the Court is sitting in diversity, the choice of law rules of the forum state apply.
*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

JA732

his specialty, obtained privileges at PGHC, and was hired by a private medical office.  Plaintiffs'
claims are clearly **not** typical of class members who were treated by Dr. Akoda at any point along
that chain of events or, alternatively, in Nigeria before he ever applied to ECFMG.

*Second*, each Plaintiff is seeking only emotional distress damages; Dr. Akoda's treatment
resulted in a healthy child, a healthy mother, and no physical injury.  *See* Ex. 32 at 10.  Having
disavowed all other claims, Plaintiffs are not in a position to pursue the interests of class members
who allegedly suffered in other ways at the hands of Dr. Akoda.  *See* Ex. 25.  Indeed, if a class is
certified here, class members would be precluded from later pursuing claims that could have been
asserted in this class action.  *See Rader*, 276 F.R.D. at 529 ("insurmountable conflict" resulting
from named plaintiff's choice to pursue limited relief "jeopardiz[es] the class members' ability to
subsequently pursue other claims" and renders named plaintiff inadequate representative).

### D.     Plaintiffs Are Not Adequate Class Representatives.

Rule 23(a)'s adequacy requirement is designed "to uncover conflicts of interest between
named parties and the class they seek to represent."  *Amchem Prods. v. Windsor*, 521 U.S. 591,
625 (1997).  Here, Plaintiffs are not adequate class representatives for three reasons.

*First*, Plaintiffs (and their counsel) previously sought to represent a similar class of
individuals in lawsuits against Dimensions Health Corp. ("Dimensions") and others who operated
PGHC, the hospital where Dr. Akoda actually treated and examined patients.  *See supra* at 8 n. 3.
But just before a class certification hearing in those cases—and without securing any relief for
themselves or the putative class—Plaintiffs dismissed their claims without prejudice. Exs. 23 &
24.  If Plaintiffs were not willing to represent the putative class in pursuing claims against the
hospital whose negligence was the "sole and proximate cause" of putative class members' alleged
injuries, Ex. 38 ¶ 81, and, according to Plaintiffs' own expert in that case, "directly and
proximately resulted in injuries, damages, and permanent disability" to putative class members,

Ex. 22, it is unclear why they would faithfully pursue more attenuated claims against ECFMG.[12]

**Second**, Plaintiffs are not adequate class representatives because, despite claiming that ECFMG was a direct and proximate cause of every class member's alleged injuries, Plaintiffs fundamentally misunderstand what ECFMG actually does. During their depositions, Plaintiffs testified that they believed ECFMG was a government agency (ECF 32-36 at 51:15-52:1), issued medical licenses (Ex. 37 at 90:22-91:11), was responsible for verifying passports and immigration information (Ex. 36 at 80:8-82:4), and was responsible for conducting criminal background checks (ECF 32-37 at 28:3-7 ). None of that is true. If Plaintiffs are to represent the putative class and make informed decisions about settlement and trial, they must understand ECFMG's role in the medical field and not operate under the misimpression that ECFMG is something that it is not.

**Third**, Plaintiffs claim to suffer emotional distress, but they seek to represent class members who may not yet (or ever) suffer emotional distress. Such class members may not feel aggrieved by having been treated by Dr. Akoda, may have no recollection of having ever been treated by Dr. Akoda, or may not know of the charges against Dr. Akoda. In fact, some class members might suffer emotional distress only upon receiving notice of this class action, if it is certified. Because of these conflicts, Plaintiffs are not adequate class representatives for the proposed class. *See Amchem*, 521 U.S. at 625-26 (finding inadequate representation where currently injured plaintiffs sought to represent plaintiffs who had not yet suffered an injury).

---

[12] ECFMG is not challenging that Plaintiffs' counsel satisfies the adequacy requirement of Rule 23(a), but ECFMG adamantly rejects the suggestion that the case against it is "a similar class action" to *Jane Doe No. 1 v. Johns Hopkins Hosp'l*, No. 24-C-13-001041 (Balt. City Cir. Ct.), ECF 32-1 at 18, which was a case against Johns Hopkins Hospital for failing to discover, stop, and report a physician who secretly recorded women during pelvic exams **while the physician worked at Johns Hopkins Hospital**. If anything, *Jane Doe No. 1* would have been more akin to Plaintiffs' lawsuit against **Dimensions** (which operated PGHC where Dr. Akoda treated and/or examined each of the Plaintiffs and many putative class members), had Plaintiffs not dismissed their own putative class action against Dimensions and others in exchange for nothing.

### E.    Plaintiffs Cannot Satisfy Rule 23's Inherent Ascertainability Requirement.

Rule 23's inherent "ascertainability" requirement mandates a rigorous analysis of whether the proposed classes are "currently and readily ascertainable based on objective criteria." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). "To satisfy this standard, plaintiff must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017). The ascertainability requirement is important because it: (1) "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members," (2) "protects absent class members by facilitating the best notice practicable . . ." and (3) "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Carrera*, 727 F.3d at 305-06. Plaintiffs fail to satisfy Rule 23's inherent ascertainability requirement in two respects.

*First*, Plaintiffs have defined a class that includes "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)," ECF 32-1 at 10, but the term "examined and/or treated in any manner" is hopelessly vague and lacking objective criteria. If Dr. Akoda, while a resident, participated in a supervised examination, was that patient "examined" by Dr. Akoda? If Dr. Akoda was asked to consult on a diagnosis for another doctor's patient, was that patient "treated" by Dr. Akoda?

*Second*, Plaintiffs have not identified a reliable method for identifying putative class members. Plaintiffs contend that "[m]embers of the class can be identified through records of medical treatment, which will show when and how patients were treated by Igberase," ECF 32-1 at 19, but Plaintiffs do not represent to have medical records relating to Dr. Akoda's patients in Nigeria (before Dr. Akoda came to the United States) or at Howard (where Dr. Akoda started his

23

JA735

residency in 2007) or from the medical offices of Dr. Moore or Dr. Chaudry (where Dr. Akoda started working in 2011). Plaintiffs cannot represent that such records even exist because the legal obligation to retain such records has expired. *See* 45 C.F.R. 164.316(b)(2) (HIPAA requires covered entities to retain records for only 6 years).

**F.    For All Of The Foregoing Reasons, The *Gates* Factors Weigh Against Issue Certification Under Rule 23(C)(4).**

Rule 23(c)(4) "both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified" and—much like Rule 23(a) and Rule 23(b)(3)—authorizes courts "to treat common things in common and to distinguish the distinguishable." *Gates*, 655 F.3d at 272. Many of the factors guiding the application of Rule 23(c)(4) overlap with issues already discussed, and all factors weigh against certifying an issue class in this case.

Emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Spence*, 806 F.2d at 1202. The Third Circuit has "steadfastly" refused to separate liability from damages even in **individual** emotional distress cases because to do so in a case involving "a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability." *Pryer*, 251 F.3d at 455; *see Gasoline Prods. Co.*, 283 U.S. at 500. It would be exponentially more problematic to try to separate liability from damages to address **thousands** of such cases at once. Indeed, Plaintiffs' proposed issue classes implicate highly individualized questions—including both threshold choice-of-law questions and merits questions—that are not capable of class-wide resolution through common proof. *See supra* Part III.A-B. Accordingly, "common issues . . . are not divisible from the individual issues," *Gates*, 655 F.3d at 273, and issue certification is not appropriate based on the type of claims and issues presented (Factor 1), the overall complexity of

24

the case (Factor 2), the substantive law (Factor 4), the unfairness that would result from trying to split emotional distress liability and damages issues (Factor 7), and the kinds of evidence to be presented on the certified issues (Factor 9).

Nor would issue certification result in any efficiency gains.  Setting aside that the supposedly "common" issues identified by Plaintiffs in reality present innumerable variations of law and fact that are incapable of class-wide resolution, *see supra* Part III.A, the proposed issue classes are still too narrow to advance the litigation in any material way because it is undisputed that thousands of mini-trials about important issues—including issues overlapping with those to be tried on a class-wide basis, such as foreseeability and causation—will be necessary if an issue class is certified.  *See supra* Part III-B.  Any bifurcation of general causation from specific causation or of liability from damages would also present a Seventh Amendment problem because the issues are "too interwoven," *Spence*, 806 F.2d at 1202, and would likely result in a later jury reexamining the findings of a prior jury.  The remedies sought by each class member do not favor issue certification because they are not indivisible and granting or not granting relief to any claimant will not as a practical matter determine the claims of others.  But to the extent any decisions are made in individual trials, it is possible they will have precedential and/or preclusive effect as appropriate with respect to similarly situated individuals who choose to bring claims against ECFMG, which diminishes the need for issue certification.  Due to the fact that issue certification would not promote efficiency (Factor 3), the risk that issue certification would violate the Seventh Amendment (Factor 5), the potential efficiencies resulting from individual adjudications (Factor 6), the minimal impact of individual proceedings on the claims of others (Factor 8), and the kind of evidence to be presented (Factor 9), issue certification is inappropriate.

IV.    **CONCLUSION**

The Court should deny Plaintiffs' Motion and not certify either proposed issue class.

25

JA737

Dated: October 28, 2019

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for*
*Foreign Medical Graduates*

26

JA738

**APPENDIX –  CONTENTS OF EXHIBITS**

| Ex. | Document |
|---|---|
| 1. | Verification Papers – University of Ibadan |
| 2. | Verification Papers – University of Benin |
| 3. | October 14, 2019 Expert Report from Dr. Mark A. Smith |
| 4. | October 14, 2019 Expert Report from Dr. Laurence H. Beck |
| 5. | March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital |
| 6. | Howard University Hospital Certificate of Completion of Residency for John-Charles Nosa Akoda MD |
| 7. | January 31, 2014 Letter to John-Charles Akoda from American Board of Obstetrics and Gynecology |
| 8. | May 22, 2002 Letter to Dr. Oluwafemi Charles Igberase from William C. Kelly |
| 9. | November 7, 2000 Letter to State of Maryland Board of Physician Assurance from Meridian Health System |
| 10. | May 5, 2017 Virginia Department of Health Professions Report |
| 11. | Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 12. | Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 13. | Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 14. | Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 15. | Email from Kara Corrado to Lisa Cover, Suzann Paolini, and Roman Mizak (March 18, 2016) |
| 16. | Email from Kara Corrado to Lisa Cover (Nov. 29, 2016) |
| 17. | Notice #101 from Lisa Cover (March 1, 2017) |

JA739

**Appendix – Contents of Exhibits (cont.)**

| Ex. | Document |
|---|---|
| 18. | Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 19. | Plaintiff Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 20. | Plaintiff Jasmine Riggins' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 21. | Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 22. | February 26, 2018 Expert Report from Dr. Thomas Bojko |
| 23. | Docket from *Russell et al v. Dimensions Health Corporation*, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) |
| 24. | Stipulation of Dismissal, CAL 17-22761 |
| 25. | Questionnaire Responses |
| 26. | September 25, 2019 Expert Report from Dr. Gladys Fenichel |
| 27. | September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel |
| 28. | September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins, conducted by Dr. Gladys Fenichel |
| 29. | September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel |
| 30. | September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel |
| 31. | October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel |
| 32. | September 23, 2019 Expert Report from Dr, Jay Goldberg |
| 33. | Facebook Comments Produced by Plaintiff Monique Russell |
| 34. | October 14, 2019 Rebuttal Expert Report from Dr. Susan McDonald |
| 35. | *Jalloh et al v. Chaudry et al*, CAL 16-22162 (Cir. Ct. Prince George's Cty, MD) – Complaint |

JA740

**Appendix – Contents of Exhibits (cont.)**

| Ex. | Document |
|-----|----------|
| 36. | September 5, 2019 Transcript of Deposition of Desire Evans |
| 37. | September 6, 2019 Transcript of Deposition of Elsa Powell |
| 38. | *Russell et al v. Dimensions Health Corporation*, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) – First Amended Class Action Complaint |

29

JA741

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on this date, I caused true and correct copies of the foregoing

document to be served via electronic filing upon all counsel of record via the ECF system and/or

e-mail.


DATED:  October 28, 2019                    */s/ Brian W. Shaffer*_____
                                            Brian W. Shaffer

# EXHIBIT 1

JA743

RECEIVED *nmcq*

JUL 1 3 1992

ECFMG

**RETURN TO:**     ECFMG
                   3624 Market Street
                   Philadelphia, PA 19104-2685
                   U.S.A.

**Re:** *482-700-2*
*Dr. Oluwafemi*
*Charles Ogberase*

I hereby certify that the attached diploma or other credential for the individual
noted above is authentic and correct and that I am authorized to certify this on
behalf of this institution.

_____          3rd June, 1992
**Signature**                            **Date**

JUDE  UZOMA  OHAERI
**Name (Please Print or Type)**

SUB-DEAN (UNDERGRADUATE)  ✓
**Title**

COLL OF MED, UNIVERSITY OF IBADAN, NIGERIA.
**Name of Medical School**



I <u>cannot</u> certify that the diploma or other credential for the individual noted
above is authentic and correct because _____

_____

_____

_____

_____          _____
**Signature**                            **Date**

_____
**Name (Please Print or Type)**

_____
**Title**

_____          **Seal**
**Name of Medical School**

**Form 399A**
**March 1987**

Confidential



University of Ibadan

Charles Olufemi Igwerese

having fulfilled all the requirements of the University
and passed the prescribed examinations has this day
been admitted to the degree of

Bachelor of Medicine
and
Bachelor of Surgery

VICE-CHANCELLOR

REGISTRAR

DATE    June 19, 1987

0-483-700-2

RECEIVED

JUL 13 1992

ECFMG

University of Ibadan

Charles Olufemi [illegible]

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

Bachelor of Medicine

and

Bachelor of Surgery

DEAN (UNDERGRADUATE)
FACULTY OF CLINICAL SCIENCES
& DENTISTRY
COLLEGE OF MEDICINE
UNIVERSITY OF IBADAN
[illegible]

CHAIRMAN [illegible]

REGISTRAR

# University of Ibadan



*Charles Olufemi Igbecaese*

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

## Bachelor of Medicine

and

## Bachelor of Surgery

VICE-CHANCELLOR

DATE *June 19, 1987*

REGISTRAR

Confidential

ECFMG_RUSS_0004005

JA747

482-700

RECEIVED
APR - 6 1992
ECFMG

Confidential

ECFMG_RUSS_0004006

JA748

# EXHIBIT 2

JA749

RECEIVED

APR 22 1996

JUL 29 1996

ECFMG

| Return to: | ECFMG | Re: | 0-553-258-5 |
| | 3624 Market Street | | |
| | Philadelphia PA 19104-2685 | | DR John Nosa Akoda |
| | USA | | |

I hereby certify that the attached diploma or other credential for the individual noted above is authentic and correct and that I am authorized to certify this on behalf of this institution.

_____     | 21st MAY 1996
Signature                                              Date

PROFESSOR L.I. OJGWU, FRCP.
Name (Printed or Typed)

DEAN   FACULTY OF MEDICINE
Title

UNIVERSITY OF BENIN, BENIN CITY, NIGERIA
Name of Medical School


I cannot certify that the diploma or other credential for the individual noted above is authentic and correct because:

_____

_____

_____

_____

_____
Signature                                              Date

_____
Name (Printed or Typed)

_____
Title                                                      Seal

_____
Name of Medical School


Form 399A--English
Rev. August 1995

Confidential

JA750

# MEDICAL AND DENTAL COUNCIL OF NIGERIA

25, Ahmed Onibudo Street, Victoria Island, Lagos.

Certificate of Full Registration as a Medical Practitioner

NIGERIA.

Certificate No. **F** 15575

3rd January, 19 89.

| Name | Address | Date of Registration | Qualifications |
|---|---|---|---|
| AKODA, Johnbull Enosakhare | 1, Akoda Street, Oselu Quarters, Benin—City. | 19 89. — January 3rd | M.B., B.S. 1987, U. Benin. |

I HEREBY CERTIFY THAT this is a true Copy of the entry of the above specified Name in the Medical & Dental Council of Nigeria Register, and that the prescribed fee of Sixty Naira has been duly received for such Registration.



Registrar

Confidential

RECEIVED

JAN 3 1996

ECFMG

ECFMG_RUSS_0004018

JA752

# UNIVERSITY OF BENIN



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October 1987*

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE-CHANCELLOR

Confidential

RECEIVED

JAN 3 1996

553-258

# EXHIBIT 3

JA755

October 14, 2019

Elisa P. McEnroe, Esq.
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103-2921

Re: *Russell et al. v. Educational Commission for Foreign Medical Graduates*,
No. 2:18-cv-05629

Dear Ms. McEnroe,

I was asked to review the case of *Russell et al. v. Educational Commission for Foreign Medical Graduates* (ECFMG) as an expert witness in hospital administration, graduate medical education, organized medical staffs, and credentialing. I was asked to opine on the processes that a foreign medical graduate must go through after ECFMG certification when applying for graduate education (residency and fellowship training) and, subsequent application for membership and privileges at a U.S. hospital.

I am qualified to offer an evaluation of this case due to my extensive experience and training in the subject areas. I have been a practicing surgeon in Southern California since July 1982. From 1982 through 2007, I practiced General and Vascular Surgery in private practice in Palm Springs, California with privileges at Desert Regional Medical Center and Eisenhower Medical Center. During that time, I was also the Medical Director and Managing General Partner of Desert Surgery Center, a multispecialty ambulatory surgery center, from 1988 to 2004. I began consulting in healthcare in 2002. From 2002 to 2007, I worked as a consultant for The Greeley Company. In 2007, I decided to close my private practice and became a Clinical Assistant Professor of Surgery at the University of California, Irvine where I practice and teach residents and medical students one week a month. My remaining time is spent in healthcare consulting. My major areas of interest in consulting are organized medical staffs, quality, peer review, credentialing and

JA756

privileging and automated data processing. I have attached my full CV as
Appendix A for further details in these areas.

My compensation for these endeavors is outlined on my fee schedule attached as
Appendix B.

The documents that I reviewed for these opinions are listed in Appendix C.

A list of all cases in which I testified as an expert at trial or by deposition over the
last 4 years is attached as Appendix D.

ECFMG provides a number of services relevant to a foreign medical graduate's
(FMG's) pathway into clinical practice in the United States, including primary-
source verification of foreign medical school diplomas.  ECFMG certification is a
screening mechanism for ensuring that an FMG has met certain minimum criteria.

Once the FMG obtains his or her ECFMG certification, he or she will usually be
applying for a graduate medical position through the National Residency Match
Program (NRMP)/Accreditation Council for Graduate Medical Education (ACGME)
process if he/she wants to practice in the U.S. It is a requirement of those
programs that an FMG hold an EFCMG certificate to be able to enter the
residency process. However, the FMG applicant will also need to complete the
NRMP application, obtain interviews at an ACGME-approved institution with a
desired residency, and be rated by those institutions for a position match. The
NRMP application includes supporting documentation such as Medical Student
Performance Evaluation (MSPE), medical school transcript, Letters of Reference,
Photograph, USMLE (United States Medical Licensing Examination in 3 parts)
transcript and the ECFMG certificate.

During the interview process, the FMG goes through a series of interviews with
review of all information in the application (of which the ECFMG certificate is only
one item as noted above).  These interviews are with multiple faculty typically and
are designed to elicit information about the applicant's aspirations, program
desires such as research, and ultimate goals. At the same time, the applicant gets
to learn about the institution's programs, objectives and residency culture. This
enables both sides to make rational rating decisions as most institutions will then
rate their applicants while the applicants rate the institutions. These are all

submitted to NRMP, which applies its match algorithms to fill the residency position.

If an FMG is accepted for a residency, he or she is subjected to the ongoing review requirements set up by the ACGME. Each residency institution has to file an annual progression report on each resident with milestone achievements identified. Milestones are developed for each specialty but are based on the Six Core General Competencies and then applied to each level of residency from beginner to most advanced and ready to graduate out of residency. Thus, an annual report for any given resident is a complex report on multiple performance measurements that require judgment and explanation. In addition to these reports by the faculty, most specialties have an annual examination (e.g. ABSITE for surgery, IM-ITE for internal medicine) that is another check on the resident's progress.

All patient care delivered by residents is conducted under ongoing oversight by the faculty which puts the faculty in a position to know the strengths and weaknesses of the resident. Additionally, as an employee of the residency program, each resident is subject to normal employee processes such as payroll, taxes, visas if appropriate, healthcare programs and other conditions and requirements of employment.

If the FMG successfully completes all years of the residency fulfilling all requirements as determined both by ACGME and the institution's faculty, he or she may graduate the residency.[1]

Typically, at some point early in the residency, states like Maryland and Virginia require that the resident obtain a state medical license of some variety. This is another application process for which an FMG will need to supply a variety of information, including but certainly not limited to his or her ECFMG certificate. In addition, the state board typically requires information about education, clinical training, disciplinary actions, criminal record, practice impairments and a photograph among other data points. The state medical board or licensing agency

---

[1] At this point, the FMG may be ready to go out into practice or they may desire additional training through a fellowship. The process for entering a fellowship program is similar to the residency process with an application, interviews and match process. Once fellowship is completed in like manner, the FMG is ready to go out for practice of medicine. Fellowship is not required for all FMGs.

will consider the information, may or may not require interviews, and may or may not require a separate examination before issuing a medical license. Since medical licenses are state based, often times, applicants may need to obtain multiple licenses as their training hospitals may cross state lines.

When specialty training is complete, an FMG clinical graduate will be eligible for specialty board certification. The most recognized and accepted is the boards under the umbrella of the American Board of Medical Specialties (ABMS). Each specialty has its own application process but it tends to mirror similar types of information collected by state medical boards. ECFMG certification status is just one data point among many in such applications. This is evidenced in particular by looking at the American Board of Obstetrics and Gynecology's process in utilizing many sources of data in reaching its decision to grant Board Certification status.

When the graduate resident or fellow is applying for hospital medical staff membership and privileges, they will need to undergo an even more rigorous credentialing process. One part of this credential program will be the checking of the ECFMG certificate status. However, this is but one piece of information checked. Licensure, training, board status, personal references, and any clinical performance data available will also be evaluated. There may be in person interviews as well. The applicant typically will need to provide evidence of malpractice coverage and clinical coverage by other practitioners on staff. The credentials are usually reviewed at multiple levels, starting with the specialty service or department. They then may be reviewed by a Credentials committee as well as a Medical Executive Committee (MEC) for final recommendations. These recommendations are then transmitted by the MEC to the Board or Governing Authority which makes the final decision.

Once the FMG is on staff at a hospital, his or her clinical competence is immediately evaluated through a focused review process commonly known as FPPE (Focused Professional Practice Evaluation). If the FMG practitioner is successful here, they are then evaluated for clinical competence in an Ongoing Profession Practice Evaluation (OPPE) that is carried out more than once a year, typically every 6-8 months in most hospitals.

The FMG will need to renew his or her membership and privileges on regular intervals. The FMG's performance data, malpractice information and any other

relevant data will be reviewed in a fashion similar to the initial application with the final decision coming from the Governing Board.


Opinions

1. While ACGME residency programs require ECFMG certification for an FMG to be eligible, ECFMG certification is by no means the only or even the significant information point regarding an FMG's ability to practice medicine in the US.
2. Residencies and Fellowships should, and typically do, look for information regarding an FMG's background, character and aspirations, which requires gathering a large amount of data to see if he or she will be a fit for an institution's particular specialty training program. Residencies and Fellowships gather this data from a variety of sources. The ECFMG certificate is just one data point for them to check.
3. Hospitals should, and typically do, check the validity of training, quality of clinical care and goodness of character to see if the applicant matches the hospital's goals and requirements of their physicians when the Hospital is granting initial membership and privileges. Hospitals get this information from a variety of sources. A current ECFMG certificate is but one piece of information available to them.
4. Current clinical competence is a responsibility of the ACGME and institutional faculty during training and of the organized medical staff for hospital practice. Current clinical competence is determined based on an assessment of a wide array of information from a variety of sources. A current ECFMG certificate is only a single point of information in a large sea of performance data.
5. An FMG working as a resident or with privileges at a hospital is subject to normal employee processes such as payroll, taxes, healthcare programs and other conditions and requirements of employment. In connection with those processes, residency programs and hospitals should, and typically do, gather a wide variety of information about the FMG from a variety of sources other than ECFMG.

JA760

I reserve the right to add to or modify these opinions if I am given further information to review.

Respectfully submitted,

Mark A. Smith, MD, MBA, FACS

Appendix A

CURRICULUM VITAE

Mark A. Smith, M.D., M.B.A., F.A.C.S., FACHE                    Licenses

PA MD- 025431-E (Inactive)
CA00G47011 (Active)
747 Camino Norte                    Board Certification-  Gen'l Surg,
Vascular Surgery
Palm Springs, CA 92262                    American Board of Surgery- 1983
Home Telephone- (760) 320-3851                    Recertified- 1990, 2004

Cell Phone- (760) 275-8204
Email- Vascu@aol.com

Certification Vascular Surgery-
November 1984
Recertified- 2013

Fellow of the American College of
Surgeons- October, 1985- Present

Married- Bonnie Heinen Smith                    Special Certification in Laser Asst
Children- 2 Daughters (Lisa, Lindsay)                    Angioplasty – January 1988

Certified- American Board of
Quality Assurance and Utili-
Zation  Review
Physicians- July 2005-  Dec.2015

Certified- Fellow of the American
College of Healthcare Executive, Januar
2011

Certified- Graduate Gemologist (GG),
May, 2015

Certified Specialist in Wine (CSW),
August, 2017

Certified Professional Healthcare Qualit
Dec. 2017

JA762

Education

| | | |
|---|---|---|
| Haverford Senior High School<br>Havertown, PA | 9/66- 6/69 | Diploma |
| University of Michigan<br>Ann Arbor, Michigan | 9/69- 8/72 | B.S. Zoology |
| Jefferson Medical College<br>Philadelphia, PA | 9/72- 6/76 | M.D. |
| University of Phoenix<br>Phoenix, AR | 1/92- 3/94 | M.B.A. |

Training

Internship

| | | |
|---|---|---|
| University California San Diego Medical Center<br>225 W. Dickinson Street<br>San Diego, CA<br>Marshall Orloff, M.D. | 7/76- 6/77 | Surgery |

Residency

| | | |
|---|---|---|
| University of Kansas Medical Center<br>39th and Rainbow Blvd.<br>Kansas City, KS<br>William Jewell, M.D. | 7/77- 6/81 | General Surgery |

Fellowship

| | | |
|---|---|---|
| Hospital of the University of Pennsylvania<br>34th and Spruce Streets<br>Philadelphia, PA<br>L. Henry Edmunds, M.D. | 7/81- 12/81 | Cardiothoracic Surgery |
| Hospital of the University of Pennsylvania<br>34th and Spruce Streets<br>Philadelphia, PA<br>Brooke Roberts, M.D. | 1/82- 6/82 | Vascular Surgery |

JA763

Employment

| | |
|---|---|
| Private Practice- Vascular and General Surgery | 7/82- 3/2007 |
| Coachella Valley Surgical Associates | |
| 1100 N. Palm Canyon Drive | |
| #208 | |
| Palm Springs, CA 92262 | |

Medical Director and Managing General Partner          12/88- 8/2004
Desert Surgery Center
1190 N. Palm Canyon Drive
Palm Springs, CA 92262

Senior Consultant                                                        3/2002- 12/2007
Practice Director, Credentialing                                 1/2008- 6/30/2009
The Greeley Company
200 Hoods Lane
Marblehead, MA  01945

Independent Healthcare Consultant                          7/1/2009- Present
HG HealthCare Consultants, LLC.

Assistant Professor of Surgery,                                 9/2007- Present
Division of Vascular Surgery
UCI Medical Center
333 City Blvd., Suite 1600
Orange, CA 92868

Chief Medical Officer                                                  9/2011- 3/2014
Verisys Corporation
1001 N. Fairfax Street
Suite 640
Alexandria, VA 22314

Chief Medical Consultant                                          3/2012- 3/2015
Morrisey Associates, Inc.
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

VP & Chief Medical Officer                                    3/2015- 12/2015
Morrisey Associates, Inc./Morcare
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

VP & Chief Medical Officer                                    1/2016- 1/31/2017
Morcare LLC.
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

Senior Medical Consultant                                     2/1/2017- 12/31/2017
Morrisey Associates Inc., A Healthstream Company

Chief Medical Officer                                         1/1/2018- 2/1/2019
Humanus Inc.

Hospital Appointments

Desert Regional Medical Center                     Active Staff   7/82- 12/2007
1150 N. Indian Canyon Drive                        Emeritus Staff  1/2008- Present
Palm Springs, CA 92262

Eisenhower Medical Center                          Active Staff   9/82- 12/2007
39000 Bob Hope Drive
Rancho Mirage, CA 92270

UCI Medical Center                                 Provisional Staff  5/08- 8/09
100 City Drive                                     Active Staff  8/09- Present
Orange, CA 92868

Hospital Positions

President Elect- DRMC                               July 1988- June 1990

President- DRMC                                    July 1990- June 1992

Past President- DRMC                               July 1992- June 1994

JA765

| | |
|---|---|
| Chief of Surgery- DRMC | July 1993- June 1995 |
| Chairman, Peer Review Committee | July 2004- Jan, 2007 |
| Medical Director, Cardiac Surgery DRMC | August 2004- September, 2006 |
| Co-Surgeon Champion, NSQIP for University of California Irvine Medical Center, Department of Surgery | August 2010- 2012 |

Professional Memberships

American College of Surgeons, Fellow

American College of Physician Executives, Member

American College of Healthcare Executives, Fellow

Southern California Vascular Surgical Society, Member

National Association of Healthcare Quality, Member

Society of Vascular Surgery, Active Member

Other Memberships

Airplane Owner and Pilot's Association

Experimental Aircraft Association

American Philatelic Association, Life Member

Palm Springs Air Museum

Association Naval Aviators

United States Tennis Association

Defense Orientation Conference Association, Member since 1995

Interests

> Art Collecting, Reading, Flying, Tennis, Stamp Collecting
>
> Gemology, Sailing, Vintage Cars

Past Associations, Positions

> Palm Springs Desert Museum, Member of Board of Directors 1993-95
>
> Desert Surgery Center, General Partner and Medical Director 1987- 2004
>
> Palm Springs Professional Building, General Partner 1988- 1998

Publications

Assessing the Competency of Low Volume Providers, Smith, MA and Pelletier, S, HCPro, 2009

Effective Peer Review, Marder, R and Smith, MA, HCPro, 2005

Effective Peer Review 2nd Edition, Marder, R, Smith, M. and Sheff, R., HCPro, 2007

Proctoring and Focused Professional Practice Evaluation. Marder, R., Smith, MA, and Sagin, T., HCPro, 2006

Proctoring and FPPE, Marder, R and Smith, MA, HCPro, 2009

Measuring Physician Competency, Marder, R, Smith M.A., Smith, M. and Searcy, V., HCPro, 2007

Core Privileges for Physicians, Crimp, W, Pelletier, S., Searcy, V. and Smith, M, HCPro, 2007

The Credentials Committee Manual, Smith, M.A., HCPro, 2016

Effective Peer Review 4th Edition, Marder, R, HCPro, 2017. Contributed chapter on approach to team performance measurement

Optimal Resources for Surgical Quality and Safety, Editors Hoyt, D. and Ko, C., American College of Surgeons, 2017. Contributing Author.

Seminars

Multiple seminars delivered on various topics related to Medical Staff including effective Medical Staff leadership, credentialing and privileging, peer review, surgical team summit, proctoring, physician performance profiles

Redesign of peer review system at approximately 75 hospitals in last fifteen years.

Keynote Speaker for Morrisey Users Conference, August 2010, "Moving from Competence to Excellence … Improving Patient Safety through Automation"

Faculty, American Association of Physician Leadership (previously American College of Physician Executives) 2011- Present

Member of Faculty Advisory Council, AAPL, August 2015- July, 2019

Faculty, Credentialing Resource Center, April 2017- present

Worked with ECRI on a number of evaluations and presentations  under their Patient Safety Organization

Appendix B  Compensation

Legal Fee Schedule for Mark A. Smith, MD


Document Review and Letters: $500/hr
Deposition in my town- $600/hr
Traveling deposition or Trial Testimony- $6000/dy + travel expenses

Appendix C-  Documents reviewed for these opinions

1   Reports and CVs of:
   a.  Williamson, Jerry
   b.  Markenson, David
   c.  Burroughs, Jonathan
   d.  Hyde, John


2   Website of the Accreditation Council for Graduate Medical Education-
    www.acgme.org
3   Website of the National Residency Matching Program (NRMP)-
    www.nrmp.org
4   Website of the Medical Board of California- www.mbc.ca.gov
5   Website of the American Board of Medical Specialties- www.abms.org
6   Website of Educational Commission for Foreign Medical Graduates-
    www.ecfmg.org
7   Records from the American Board of Obstetrics and Gynecology
    (ABOG_nonparty_000001-00082)

JA770

Appendix D- Cases in Which Dr. Smith has testified or been deposed in the last four years


Toranto v. Jaffurs et. al.- (Paul Plevin is the law firm that I worked with)- Deposition in May, 2019

Rosenberg Fair Hearing Testimony- (Durham Jones and Pinegar is the law firm I worked with)- February, 2019

JA771

# **EXHIBIT 4**

# Laurence H. Beck, MD, FACP

## 529 Broad Acres Road; Narberth PA 19072

October 14, 2019

Dear Elisa McEnroe:

In re: Russell et al v. ECFMG

I have been asked by Elisa McEnroe of Morgan, Lewis & Bockius LLP to review

documents and other materials related to the above litigation, and to provide my

expert opinion in such matters.  In particular, I have been asked to provide expert

opinion on the processes involved, after an International Medical Graduate (IMG)

receives certification from the ECFMG, in applying for, and receiving, (1)

acceptance into a residency training program; (2) hospital staff privileges; (3)

state licensure to practice medicine independently; and (4) Board certification in a

medical specialty.

I have separately submitted my curriculum vitae, including publications.  I have

had no publications in the previous 10 years.

I have not participated as an expert witness at trial or by deposition in the

previous 4 years.

JA773

I have been contracted for this work at the rate of $500 per hour.

In preparing this report, I have reviewed the expert reports of Dr. John Charles Hyde, Dr. Jonathan Burroughs, Dr. David Markenson, and Dr. Jerry Williamson.  In addition, I have reviewed current published material from the Virginia Board of Medicine and the Maryland Board of Physicians concerning the process and requirements for an IMG to apply for a state license to practice medicine. I have reviewed published criteria from the American Board of Obstetrics and Gynecology, as well as from the American Board of Medical Specialties.  I have also reviewed correspondence and records concerning Dr. Akoda from Jersey Shore Medical Center (Jersey Shore Medical Center 000006-000010).  I have also reviewed correspondence and records concerning Dr. Akoda from the American Board of Obstetrics and Gynecology (ABOG nonparty 000001-000082).

Most importantly, I have drawn on my expertise in the matters related to the above issues.  This expertise includes 50 years of leadership and practice of medicine in Pennsylvania, the District of Columbia, and Florida.  During that time, I have held numerous leadership positions requiring participation in, and knowledge of, credentialing of IMG's, including: (1) Chairman of the Residency Selection Committee at the University of Pennsylvania School of Medicine; (2)

Program Director of Internal Medicine Residency at the Hospital of the University of Pennsylvania; (3) Chairman of the Departments of Medicine [at the University of Pennsylvania, Philadelphia Veterans Administration Hospital, Geisinger Medical Center, Georgetown University Medical Center, and Cleveland Clinic Florida] and (4) Associate Chief of Staff of a Hospital [Georgetown University Hospital].  I am Board Certified by the American Board of Internal Medicine (ABIM).

For an IMG to practice medicine in any State in the United States, he/she must pass through numerous steps of application and acceptance.

1. He/she must apply to and be accepted into a residency accredited by the ACGME (Accreditation Council for Graduate Medical Education). In order to be considered as a candidate, the IMG must have, in addition to certification by the ECFMG, numerous other documents and undergo scrutiny in several areas, as iterated below.

2. To receive a license to practice medicine in the State of Maryland and/or the Commonwealth of Virginia, the IMG must (in addition to ECFMG certification) have graduated from an approved medical school, must be of "good moral character", must have completed at least 2 years of an

accredited residency, and satisfy numerous other criteria, as spelled out

below.

3. To be accepted as Staff at a Hospital in either of those jurisdictions, the

   IMG must have an unrestricted state license to practice medicine, and must

   meet numerous other criteria, as iterated below.

4. To achieve Board certification in a medical specialty (which is a voluntary

   decision, and not required for state licensure), the candidate must pass a

   certifying examination and be evaluated in numerous other categories, as

   iterated below.

At each of these steps, the program or institution has a specific set of

requirements, which include verification of credentials and usually a personal

interview. For application to a residency program, it is the responsibility of the

residency program administration to ensure verification of primary-source

credentials.  Typical additional requirements include: an in-person interview,

letters of reference (with contact information for each writer), a current

photograph, an up-to-date CV [curriculum vitae], evidence of proficiency in

spoken and written English, review of visa status (usually J-1 or green card), and

review of any prior residency, with a letter of recommendation from its program

director.  Following review of an application, the candidate and the residency

program must participate in the National Residency Matching Program (NRMP), wherein each party submits a rank order list of their preference (the list of residency programs for the applicant; the list of candidates for the residency program).

Although it is sufficient for the residency program to accept primary source credential verification via ECFMG certification (or their ERAS program) for the medical credentials, the residency program must pursue the other requirements via their own resources.  Based on my extensive knowledge and experience, the above requirements are typical of residency programs in the United States, and represent, in my opinion, a medical profession and industry standard.

An IMG's application to the Virginia and/or Maryland Board of Physicians for a license to practice requires ECFMG certification, as well as numerous other requirements. For either state, there is a personal interview, with verification of identity, reporting of all post-graduation residency or fellowship training, with letter(s) of recommendation from the program director(s), medical school transcripts (usually directly from the medical school), scores of FLEX or Step 3 of the USMLE, employment record from the date of medical school graduation, report of any disciplinary action, and competency in written and spoken English.

Each state also has a separate written licensure exam.  The Maryland Board of

Physicians states also "The Board requires primary source verification from

medical schools, postgraduate training programs, national licensing entities

(USMLE, FSMB, NBME, etc) and other state boards".  Again, based on my

extensive knowledge and experience, the above requirements are typical of state

medical licensure boards in the United States, and represent, in my opinion, a

medical profession and industry standard.

Similarly, Hospital staff privileges require a separate application process which,

for the IMG, requires ECFMG certification, but also (usually) an interview, as well

as a number of other areas of review, including one or more personal references

with contact information for each, a current photograph, certificates of

completion from all residencies and fellowships, letter of recommendation from

program director(s), Social Security number, valid passport and/or birth

certificate, malpractice insurance history, all licenses, including DEA certificate, a

2-year case log, fingerprinting for federal background check, and a urine drug

screen.  Furthermore, after achieving hospital staff privileges, all physicians are

evaluated on an ongoing basis, usually by the Medical Director's office, on their

clinical performance, demeanor, and interactions with patients and staff.  Based

on my extensive knowledge and experience, the above requirements are typical

of hospitals in the United States, and represent, in my opinion, a medical

profession and industry standard.

Certification by an American Board of a medical specialty requires a process

involving examination, review of credentials, and evidence of satisfactory

performance in that specialty.  Typically, for the American Board of Obstetrics and

Gynecology, that requires passing a written and oral examination, undergoing a

personal interview, review of academic credentials, review of case logs over the

previous years, letters of recommendation from residency and fellowship

directors, and consideration of any disciplinary action, criminal, or immoral

behavior that comes to their attention. Following successful Board certification, a

candidate must comply with annual requirements for ongoing educational

modules as part of the MOC (maintenance of certification) process.

 Dr. Akoda passed both the written and oral examinations of the ABOG, and his

credentials were initially approved, so that he was given a one-year Board

certification.  He successfully complied with the MOC requirements for the first

year after his certification, but then failed to continue that activity.  As a result,

the ABOG did not renew his certification.  Subsequently, upon learning of his

JA779

criminal behavior, it revoked entirely his Board certification.  All these activities

were instigated by the ABOG and were not dependent upon input from ECFMG.

CONCLUSIONS

In reviewing the chronology of Dr. Akoda's progression through the above steps

leading to medical residency acceptance at Jersey Shore Medical Center and at

Howard University, licensure in Virginia and Maryland, staff privileges at Prince

George's Hospital Center, and certification by the American Board of Obstetrics

and Gynecology, there were numerous opportunities for the above institutions to

suspect and investigate Dr. Akoda's fraudulent behavior, except that these

opportunities appear to have been repeatedly hidden, or covered up, by Dr.

Akoda, through his apparent lies, false documents, and evasiveness.  As an

example, the residency program director at Howard University certainly should,

and I believe, would have pursued the question of why Dr. Akoda had left his third

year of residency at Jersey Shore Medical Center.  He/she should, and I believe,

would have called the program director at Jersey Shore Medical Center and

learned that Dr. Akoda was dismissed from that program.   It is likely that the

Howard University program did not pursue this discrepancy because they were

unaware of this history (because Dr. Akoda apparently either lied or failed to
report it, on his application or in a personal interview).

Although residency programs, hospital staff boards, and state medical boards may
rely on the ECFMG certification for verification of certain medical credentials,
they must use their own resources to ascertain the validity of the numerous other
requirements of acceptance (letters of recommendation, visas, social security
information, etc.).  There is no expectation of these institutions to receive
additional information from the ECFMG after they have documented that the
certificate is valid.

The primary or root cause of Dr. Akoda's movement through the system, licensure
and ability to practice medicine at Prince George's Hospital Center was Dr. Akoda
himself and his fraudulent and criminal activities.  These activities effectively hid
the inaccuracies and lies from all concerned, from the ECFMG, through to the
residencies, hospital staff, and state Boards of Medicine.  Any alleged harm to
patients resulting from his repeatedly dishonest behavior are directly due to his
dishonest behavior.

Sincerely yours,

*Laurence H. Beck, MD*

Laurence H. Beck, MD

**August 2019**
**Curriculum Vitae**
Laurence H. Beck, M.D. , (retired)
Last Office Address: Department of Internal Medicine
Cleveland Clinic Florida Health and Wellness Center
525 Okeechobee Boulevard
West Palm Beach, Florida 33401
Telephone Numbers: (561) 804-0200 (work)
(561) 804-0222 (fax)
**Home Address**:
529 Broad Acres Road;
Narberth PA 19072
Social Security Number: xxxx
Date of Birth: April 3, 1941
Place of Birth: Wilmington, DE
Marital Status: Married: Joan McDonald Beck
Children: Laurence H. Beck, Jr., M.D., Ph.D. 1968
Katherine G. Beck, M.D. 1970
David M. Beck, M.D. 1984
**Licensure**: Massachusetts, 1967 (Expired 12/31/69)
Pennsylvania, 1972 (#MD-013995-E; Expired: 12/31/94)
District of Columbia, (#20811) (Expired 12/31/2000)
Florida (ME 78867) effective through Jan 31, 2017
Specialty Certification: American Board of Internal Medicine, 1972
American Board of Internal Medicine, Nephrology, 1974


**Education**:
9/58 - 6/62 B.A. magna cum laude, Amherst College
9/62 - 6/66 M.D.magna cum laude, Harvard Medical School
Postgraduate Training and Fellowship Appointments:
6/66 - 6/67 Intern in Medicine, Massachusetts General Hospital, Boston, MA
Chairman: Alexander Leaf, M.D.
6/67 - 6/68 Assistant Resident in Medicine, Massachusetts General Hospital,
Boston, MA - Chairman: Alexander Leaf, M.D.
7/70 - 6/73 Postdoctoral Trainee, Renal-Electrolyte Section, Department of Medicine,
University of Pennsylvania School of Medicine,
Chief: Martin Goldberg, M.D.
**Faculty Appointments**:
7/73 - 6/79 Assistant Professor of Medicine, Department of Medicine, University
of Pennsylvania School of Medicine
7/79 - 6/83 Associate Professor of Medicine, University of Pennsylvania School
of Medicine
7/83 - 6/88 Professor of Medicine, University of Pennsylvania School of Medicine
7/83 - 6/86 Adjunct Professor of Medicine, Medical College of Pennsylvania

7/86 - 6/88 Sylvan Eisman Professor of Medicine, University of Pennsylvania

7/86 - 6/88 Clinical Preceptor, School of Nursing, University of Pennsylvania

7/89 - 6/94 Professor of Medicine, Jefferson Medical College, Thomas Jefferson University

6/94 - 8/99 Professor of Medicine, Georgetown University Medical Center

11/00 -6/12 Professor of Clinical Internal Medicine, Ohio State University College of Medicine

5/03 -6/12 Affiliate Professor of Medicine University of South Florida

3/14-current Adjunct Professor of Medicine, University of Pennsylvania, Perelman School of Medicine

**Other Academic Appointments:**

7/73 - 6/76 Chief, Renal-Electrolyte Section, Pennsylvania Hospital

1975 - 88 Internship Selection Committee in Medicine (Chairman 1976-82), Hospital of the University of Pennsylvania

7/75 - 6/82 Education Officer, Department of Medicine, Hospital of the University of Pennsylvania

1977-82 Medical Board, Hospital of the University of Pennsylvania

1978-82 Associate Chairman (for Curriculum), Department of Medicine, Hospital of the University of Pennsylvania

1981-88 Committee on Appointments and Promotions, Department of Medicine Hospital of the University of Pennsylvania

1982-86 Vice-Chairman, Department of Medicine, University of Pennsylvania School of Medicine

1982-86 Chief, Medical Service, Veterans Administration Medical Center, Philadelphia, Pennsylvania (PVAMC)

1983-86 Strategic Planning Board. (Chairman), Veterans Administration Medical Center,
Philadelphia, Pennsylvania

1986-88 Director, Program in Geriatric Medicine, University of Pennsylvania

1987-88 Counselor to the President for Health Policy, University of Pennsylvania

1987-88 Medical Director, Foulkeways Life Care Community, Gwynedd, Pennsylvania

1987-88 Director, Ralston-Penn Center

1988-90 Chairman, Departments of Medicine, Geisinger Health System

1990-94 Executive Vice-President, Clinical Program & Process Improvement, Geisinger Health System

1994-99 Chief, Division of General Internal Medicine, Georgetown University Medical Center

1999 -2007 Chairman, Dept of Internal Medicine, Cleveland Clinic Florida

2004 - 07 Chairman, Division of Medicine, Cleveland Clinic Florida

2007-12 Medical Director, Cleveland Clinic Florida Health and Wellness Center

**Awards, Honors, and Membership in Honorary Societies:**

1961 Phi Beta Kappa

1961 Sigma XI
1965 Alpha Omega Alpha
1974 Edward Viner Teaching Award, Pennsylvania Hospital
1975 Medical Student Government Clinical Teaching Award,
University of Pennsylvania
1978 Donna K. McCurdy House Staff Teaching Award, University of
Pennsylvania
1979 Lindback Foundation Teaching Award, University of Pennsylvania
1980 Top Doctor, Philadelphia Magazine
1984 Dripps Memorial Teaching Award, University of Pennsylvania
1990 Blockley-Osler Award for Excellence in Teaching, Jefferson Medical
College
1992 Second Annual Health and Wellness Award, The Quadrangle,
Haverford, Pennsylvania
1996 Top Doctor, Washingtonian Magazine
1998 Inclusion in The Best Doctors in America
1999 Lawrence H. Kyle House Staff Teaching Award; Department of Medicine,
Georgetown University Medical Center
2004-12 Best Doctors in Florida
Membership and Positions in Professional and Scientific Societies:
**National Societies:**
American Society of Nephrology 1972-1999
International Society of Nephrology 1972-1988
American Federation for Medical Research 1971-1988
Society for Research and Education in Primary Care Internal Medicine

(Scientific Program Chairman, 1980); now Society for General Internal
Medicine (SGIM) 1978-1999
American College of Physicians (Fellow) 1978-current; Regional
Representative for the University of Pennsylvania Department of Medicine
(1985-88); Governors
Advisory Committee (1989-92)
Society for Medical Decision-Making 1975-1999
American Geriatrics Society 1985-1990; (Member, Education Committee
and Public Policy Committee; Co-Chair, Geriatric Education Retreat,
Jasper, Alberta (August1998)
Gerontological Society of America 1985-1990
American Board of Internal Medicine (Pre-Test Committee 1988-91;
Ad-Hoc Test Committee 1992-94)
American Medical Association 1996-current
American Group Practice Association 1988-1994
Reviewer, American College of Physicians, Medical Knowledge Self-
Assessment Program (1993-94)
National Board of Medical Examiners (Step 3 CCS Committee 1995-2006;

Step C IRC Committee 2006 -current)
Peer Review Appeals Panel, Residency Review Committee in Medicine,
ACGME, Chicago, Ill. 1990-2000
**Local Societies:**
Philadelphia Chapter, ADRDA (Member, Scientific Advisory Board, 1987-
88)
Northeastern Pennsylvania Chapter, ADRDA (Member, Advisory Board,
1988-91)
Philadelphia College of Medicine, Section on Geriatrics/Gerontology, 1987-
88
Pennsylvania Medical Society 1988-94
Montour County Medical Society 1988-94
Palm Beach County Medical Society 2007-current
**Editorial Positions:**
1984-86 Editor, Internal Medicine Newsletter (E-Journal, Amnet, American
Medical Network)
1987-90 Editorial Board, Journal of Gerontology, Medical Science
1988-93 Editorial Board, Annals of Internal Medicine
1999 -2003 Editorial Board, Advances in Renal Replacement Therapy
2016- Review Board, HealthWeb Navigator (HNW)

Ad hoc manuscript reviewer for various journals over the course of career, including:
Journal of Clinical Investigation, Annals of Internal Medicine, American
Journal of Medicine, New England Journal of Medicine, Archives of Internal
Medicine,
Journal of General Internal Medicine, Journal of the American
Geriatrics Society. In last 4 years (2000-2014) reviews only for JGIM and
Annals of Internal Medicine
**University and Hospital Service:**
1975-83 Member, Curriculum Committee, University of Pennsylvania School of
Medicine (Chairman, 1978-83)
1975-88 Career Counseling Committee for Medicine (Chairman 1977-82)
1977-88 Graduate Medical Education Subcommittee of the Long-range
Planning Committee of the School of Medicine
1979-88 Undergraduate Medical Education Subcommittee of the Long-range
Planning Committee of the School of Medicine

1979-88 Affiliated Hospitals Subcommittee of the Long-range Planning
Committee of the School of Medicine
1986-88 Students Standards Committee, School of Medicine
1987-88 Search Committee (Chairman): Dept. of Anesthesia, University of
Pennsylvania
1988 University of Pennsylvania Committee on AIDS Policy (Chairman)
1988-92 Finance Committee, Geisinger Clinic

1988-90 Benefits Committee, Geisinger Clinic
1988-92 Board of Governors, Geisinger Clinic
1988-92 Finance Committee, Geisinger Medical Center
1988-90 Benefits Committee, Geisinger Medical Center
1988-92 Governance Committee, Geisinger Medical Center
1991-92 Clinical Program Committee (Chairman), Geisinger Health System
1993-94 Executive Management Staff, Geisinger Health System
1993-94 Operations Committee, Geisinger Health System
1993-94 Clinical Practice Committee (Co-Chair), Geisinger
1994-99 Quality Council (Chair), Georgetown University Medical Center
1994-99 Associate Medical Director, Georgetown University Medical Center
1996-99 Chair, Clinical Resource Steering Committee, Georgetown University
Medical Center
1996-99 Chair, Quality Patient Care Coordinating Committee, Georgetown
University Medical Center
1996-99 Executive Staff, Georgetown University Medical Center
2000-03 Board of Governors, Cleveland Clinic Florida
2000 -07 Performance Improvement Council (Chair), Cleveland Clinic Florida
2003 -07 Chair, Peer Review Committee (Chair), Cleveland Clinic Florida
**Non-medical Organizations**
2014 Advisory Board, Naxion (national market research firm)
**Teaching Activities (previous):**
1. University of Pennsylvania:
Director, Internal Medicine Residency
Director, Clerkship in Medicine
Preceptor, Internal Medicine Clinic
4-6 months/year inpatient attending in general internal medicine and nephrology
Lectures in numerous courses in Pathophysiology, Geriatrics, Internal Medicine
Board Review, Medical Decision-making
2. Jefferson Medical College:
1-2 months per year inpatient attending, general internal medicine
Preceptor, 3rd. year clerkship students
Preceptor, resident clinic
3. Georgetown University:
1-2 months per year inpatient attending, general internal medicine

Preceptor, general medicine resident clinic; day per week

Resident Morning Report (one day/week)
Group Leader, Problem Based Learning, 1st year basic science courses
4. Cleveland Clinic Florida:
Morning Report; once per week
General Medicine resident clinic preceptor; ½ day per week
Outpatient resident teaching; daily

Inpatient attending/teaching rounds; 4 months per year
Member, Graduate Education Committee
Co-Chair, Continuing Education Committee
Current teaching activities:
Inpatient teaching/attending of Univ. of Pa medical students and residents at
Philadelphia VA Medical Center, 4 weeks per year.
4. Lectures by invitation (since 1987):
March 6, 1987 The Aging Kidney - Medical College of Virginia and
Geriatric Education Center at Virginia Commonwealth
University, Richmond, VA
March 19, 1987 Alzheimer's Diseases Park Towne Residents Association,
Philadelphia, PA
April 4-5, 1987 Kidney function and disease in the elderly" and The kidney
and uric acid disorders; American College of Physicians
Annual Meeting, New Orleans, LA
April 12, 1987 Psychologic & Emotional Aspects of Getting Older - St.
Peter's Men's Club Great Valley, PA
May 14, 1987 Decision Analysis in Geriatric Medicine - American
Geriatrics Society Annual Meeting, New Orleans, LA
June 11, 1987 The demography of aging, York Hospital Medical Grand
Rounds, York, PA
October 8, 1987 Calcium and phosphorus disorders - Presbyterian Medical
Center, Philadelphia, PA
December 3, 1987 Use of video tapes in residency teaching - Teaching
Internal Medicine Annual Workshop, American College of
Physicians, Meeting, New Orleans, LA
February 19, 1988 Drug-induced renal syndromes" - Riddle Memorial
Hospital, Media, PA
March, 3-5, 1988 Urinary incontinence in the elderly, Renal function and
disease in the elderly. - American College of Physicians
Annual Meeting, New York City
March 19, 1988 Health maintenance and disease prevention in the
elderly. Geriatric Board Review Course, Lancaster, PA
March 24, 1988 Why don't old people live longer? York Hospital, York, PA
June 3, 1988 Appropriate utilization of electrolytes, BUN, creatinine, and
urinalysis. Common Diagnostic Tests Symposium, Case
Western Reserve School of Medicine, Cleveland, Ohio

Sept. 1, 1988 Health promotion and disease prevention in the elderly.
Cooper University of Medicine and Dentistry of New
Jersey, Camden, NJ
November 8, 1988 Renal disease and dysfunction in the elderly, Health
promotion in the elderly, The Medical Center, Beaver, PA
June 12, 1989 Principal Speaker: Geisinger Medical Center House Staff

Graduation

June 14-15, 1989 Visiting Professor, Division of General Medicine, Cleveland
Metropolitan General Hospital, Cleveland, Ohio

Sept. 15, 1989 Serum electrolytes, BUN and creatinine American College
of Physicians Course: Which Tests and Why? A Science of
Diagnostic Testing for the Cost Containment Era.
Rochester, NY

Sept. 28-29, 1989 Visiting Professor, Williamsport Hospital, Williamsport, PA

November 8, 1989 Disorders of uric acid metabolism. Contemporary Issues in
Internal Medicine - Danville, PA

March 11-14, 1990 Kidney disease and Dysfunction of the Elderly and
Hyponatremia and Hypernatremia: Diagnosis and
Management and Disorders of Uric Acid Metabolism
Internal Medicine Seminar, Orlando, Florida

May 23, 1990 Kidney function & disease in the elderly Urinary
Incontinence Geisinger Wyoming Valley Hospital

June 26-28, 1990 Older Adult Round Table; Health Maintenance in the Older
Adult with Renal Disease; Philadelphia, PA

Aug. 30-31, 1990 Growing old with your kidneys - Medical Grand Rounds;
Dartmouth Medical Center, Hanover, NH

January 28, 1991 Disorders of Uric Acid Metabolism - Medical Grand
Rounds; Pennsylvania Hospital, Philadelphia, PA

February 9, 1991 Disorders of Water Metabolism: Hypo-and-Hypernatremia,
16th Annual Concepts in Clinical Practice, 1991, Days Inn,
Danville, PA

March 6, 1991 Dementia, Contemporary Issues in Internal Medicine,
Geisinger Medical Center, Danville, PA

April 25, 1991 Growing old with your kidneys - Medical Grand Rounds
Jefferson Medical College, Philadelphia, PA

May 9-11, 1991 Renal Disease & Dysfunction in the Elderly and
Dehydration: Pathophysiology and Management - 48th
Annual Scientific Meeting of American Geriatrics Society.
Chicago, IL

Sept. 25, 1992 Memory Loss, Dementia, and Alzheimer's Disease, the
Quadrangle, Haverford, PA

April 22-24, 1992 Screening for Renal Disease - National Kidney Foundation,
Chicago, IL

June 2, 1993 Geisinger's Integrated System and Managed Care
University of Pittsburgh, Pittsburgh, PA

June 28-29, 1993 The Geisinger Integrated Health Care System - Keystone
Executive Forum, Denver, Colorado

October 1, 1993 Clinical Guidelines - Why Do We Need Them? - Visiting
Professor, Williamsport Hospital, Williamsport, PA

Dec. 9-10, 1993 The Geisinger Integrated Delivery System - Executive
Forum on Physician and Hospital Integration - Scottsdale,
AZ
April 18, 1994 Integrated Health Systems, Executive Staff, Georgetown
University Medical Center

June 27-28, 1994 The Geisinger Integrated Delivery System, Executive
Forum (Quorum); Coronado, CA
Feb. 13-15, 1995 Building an IDN: The Physician Perspective, Mercy Health
Services Assembly; Ponte Vedra Beach, FL
July 8-12, 1996 Course Director, ACP Washington Area Internal Medicine
Board Review Course; Washington, DC
Nov. 3-5, 1996 Course Director, Primary and/or Principal Care for the
ESRD patient. American Society of Nephrology; New
Orleans, LA
May 15, 1997 Genitourinary and fluid-electrolyte issues in the elderly. -
Internal Medicine Grand Rounds; Henry Ford Hospital,
Detroit, Michigan
July 7-11, 1997 Course Director: Washington, D.C., Internal Medicine
Board Review Course
August 18, 1997 Cost-Effectiveness approach to cardiovascular
interventions in the elderly; International Association of
Gerontology Congress, Singapore
July 13-17, 1998 Course Director: Washington, D.C., Internal Medicine
Board Review Course
August 3, 1998 Fluid and electrolyte balance in the elderly.; Geriatric
Education Retreat; (American Geriatrics Society and
Hartford Foundation), Jasper, Alberta, Canada
October 19, 1998 Examining the Needs and Challenges of Academic
Medical
Centers (round table member); Sonoma Mission Inn,
Sonoma,
California
November 17, 1998 Disease Management Round Table; University of
Pennsylvania
Health System; Philadelphia, PA
February 5, 1999 Primary Care National Advisory Council: Dallas, Texas
April 23 - 24, 1999 Preventive Medicine Update and Screening and the
Periodic Health Exam; American College of Physicians
Annual Session, New Orleans, LA.
July 12 - 16, 1999 Course Director: Washington, D.C. Internal Medicine
Board Review Course
October 12-13, 1999 Visiting Professor and C. Thorpe Ray Grand Rounds
speaker at Tulane University Medical Center

April 14, 2000 Update in Preventive Medicine, American College of
Physicians Annual Session, Philadelphia, PA
March 29, 2001 Update in Preventive Medicine, American College of
College of Physicians Annual Session, New Orleans, LA
March 30, 2001 Screening and the Annual Physical Examination, American
College of Physicians Annual Session, New Orleans, LA

**Principal Investigator of Grants:**

Delaware Valley Geriatric Education Center, Bureau of Health Manpower (HHS), 1985-
88 Veterans Administration Geriatric Physician Fellowship Program. Veterans
Administration, 1986-91.
Resident Physician Training Program in Geriatrics, Administration on Aging, 1986-87
Essay exam of clinical judgment and decision-making skills. American Board of Internal
Medicine, 1987-89.
Training Grant, (Training Physicians for Leadership in Academic Geriatrics); John A.
Hartford Foundation; 1988-91.
Training Grant (Faculty Training Project in Geriatric Medicine and Dentistry), Bureau of
Health Professions (HHS), 1988-91.
Co-Investigator:
Outcome Assessment; Patients with Biliary Tract Disease; AHCPR:
Grant # 1 PO1 HS 06481-01; 1990-95; 10% effort.
Develop, Apply, and Review Criteria and Educational Outreach Programs
Based upon Practice Guidelines (AHCPR/AMPRC): 1992-94; 10% effort.
High cost Medicare Beneficiaries, Kaiser Foundation, 2.5% effort, 1995-96.
Project Phoenix: Scrutinizing a Telemedicine Testbed. National Library of Medicine
(Seong K. Mun, Ph.D., principal investigator); 6.25% effort 1996-99.
An Educational Model for Tomorrow: The Kaiser Permanente-Georgetown University
Residency for Primary Care Physicians in Managed Care" Pew Charitable Trust.
5% effort 1997-2000

**Bibliography:**

Original Papers, Review, Editorials:

1. Yost, HT Jr., Glickman RM, Beck, LH: Studies on the effects of irradiation of
cellular particulates. IV. The time sequence of phosphorylation changes in
vivo. Biological Bulletin 1964; 127: 173-185.
2. Yost, HT Jr., Richmond SS, Beck LH: Studies in the effects of irradiation of
cellular particulates. V. Acceleration of recovery of phosphorylation of
polyanions. Biological Bulletin, 1964; 127:526-537.
3. Nathan DG, Beck LH, Hampers CL, Merrill JR: Erythrocyte production and
metabolism in anephric and uremic men. Ann. N.Y. Acad. Sci. 1968; 149:539-
543.
4. Nathan DG, Beck LH, Hampers CL, Button L: Hematopoiesis in renal failure. In
Kidney Hormones, Academic Press, 411-429, 1971.
5. Beck LH, Goldberg M: The effects of acetazolamide and parathyroidectomy on
tubular reabsorption of sodium, calcium and phosphate. Am J. Physiol.

1973:224:1136-1142.

6. Agus ZS, Gardner LB, Beck LH, Goldberg M: The effects of parathyroid Hormone on the interrelationships between renal tubular reabsorption of calcium, phosphate, and sodium. Am J. Physiol. 1973; 224:1143-1148.

7. Goldberg M, Beck LH, Puschett JB, Schubert JJ: Sites of action of benzothiadiazines, furosemide and ethacrynic acid. Excerpta Medica, International Congress Series No. 1973; 268:135-144.

8. Beck LH, Senesky D, Goldberg M: Sodium-independent active potassium reabsorption in proximal tubule of the dog. J. Clin. Invest. 1973: 52:2641-2645.

9. Beck LH, Goldberg M: Mechanism of the blunted phosphaturia in saline-loaded thyroparathyroidectomized dogs. Kidney Int. 1974; 6:18-23.

10. Beck LH, Goldberg M: Diuretic Therapy. Primary Care 1974; 1:165-178.

11. Goldfarb S, Beck LH, Agus ZS, Goldberg M: Tubular sites of action of dibutyryl cyclic AMP on renal phosphate reabsorption. In Phosphate Metabolism: Kidney and Bone: Nouvelle Imprimerie Fournie, Paris, pp. 135-144, 1976.

12. Mitnick PD, Beck LH: Hypouricemia and malignancy: a new case of xanthinuria. Arch. Int. Med. 1979; 137-1187.

13. Beck LH: Hypouricemia in the syndrome of inappropriate antidiuretic hormone secretion. NEJM 1979; 301:528-530.

14. Rudnick MR, Coyle JF, Beck LH, McCurdy DK: Acute massive hydrothoraxy complicating peritoneal dialysis, report of 2 cases and a review of the literature. Clin. Nephrol. 1979; 12:38-44.

15. Beck LH: Edema states and the use of diuretics. Med.Clin. N. Amer. 1981: 65:291-301.

16. Beck LH: Clinical disorders of uric acid metabolism. Med. Clin. N. Amer. 1981; 65:401-411.

17. Beck LH, Kaplan NM, Moroczek WJ, Paulschock BZ: When potassium is needed. Patient Care 1982; 16:63-94.

18. Williams SV, Eisenberg JM, Kitz, DS, Carroll JG, Beck, LH, Rubin SI, Ruff GE: Teaching cost-effective diagnostic test use to medical students. Medical Care 1984; 22:535-542.

19. Cebul RD, Beck LH, Carroll JG, Eisenberg JM, Schwartz JS, Strasser AM, Williams SV: A course in clinical decision-making adaptable to diverse audiences. Med Decis. Making 1984; 4:285-296.

20. Beck LH: An elderly man with renal failure. Medical Grand Rounds 1984; 3:128-141.

21. Beck LH: Requiem for gouty nephropathy. Kidney Internat. 1986; 3:128-141.

22. Beck LH, Lavizzo-Mourey RJ: Geriatric Hypernatremia. Ann. Int. Med. 1987: 107:768-769.

23. Beck LH: Renal function and disease in the elderly. Del Med J. 1988; 60:363-368.

24. Beck LH: Maintaining health with renal disease or dysfunction.

Geriatrics. 1988; 43 (Suppl):66-74.

25. Beck LH: Geriatric Medicine 1989 - Where are we now? Pennsylvania
Med. 1989; 92(11):34-36.

26. Siegler EL, Beck LH: Stiffness: a pathophysiologic approach to diagnosis and
treatment. J. Gen. Internal Med. 1989; 4:533-540.

27. Beck LH. Perioperative renal, fluid, and electrolyte management. Clin. Geriatric
Med. 6(3); 557-69. August 1990


28. Lavizzo-Mourey R, Beck LH, Diserens D, et al. Integrating residency training
in geriatrics into existing out-patient curricula. J. Gen. Intern. Med. 1990;
5:126-131.

29. Norcini JJ, Diserens D, Day SC, Cebul RD, Schwartz JS, Beck LH, Webster GD,
Schnabel TG, and Elstein A. The Validity of an Essay Test of Clinical
Judgment. Proceedings of the 29th Annual Conference on Research in
Medical Education. Academic Medicine. 1990 (Sept. Suppl), 65(9): S41-2.

30. Day SC, Norcini JJ, Diserens D, Cebul RD, Schwartz JS, Beck LH, Webster GD,
Schnabel TG, and Elstein A. The Validity of an Essay Test of Clinical
Judgment. Proceedings of the 29th Annual Conference on Research in
Medical Education. Academic Medicine. 1990 (Sept. Suppl), 65(9):S39-S40.

Chapters, Other Publications

31. Goldberg M, Agus ZS, Beck, LH: Interrelationship of renal handling of sodium,
calcium, and phosphate. Chapter in Recent Advances in Renal Physiology
and Pharmacology; University Park Press, Baltimore, pp. 111-124, 1974.

32. Beck LH, Goldberg M: Diuretics. Chapter in the Merck Manual, 13th Edition,
1977.

33. Beck LH, Earley LE, Stein J: Obstructive uropathy. Chapter in Diseases of the
Kidney; Little, Brown, and Company, Boston, pp. 877-892, 1979.

34. Beck LH: Review of Clinical Internal Medicine. Reller LB, Shan SA, and Schrier
RW (eds.). NEJM 1979; 301:844.

35. Beck LH: Diuretic Drugs. Chapter in Clinically Important Adverse Interactions.
Cliff LE and Petrie JC (eds.), Elsevier North Holland Biomedical Press,
Amsterdam, pp. 61-77, 1980.

36. Beck LH, Goldberg M: Diuretics. Chapter in the Merck Manual 14th Edition
Rahway, NJ, 1982.

37. Beck LH: Postoperative Acute Renal Failure. Chapter in Medical Care of the
Surgical Patient (Goldmann DR et al., eds), J.B. Lippincott Co., Philadelphia,
pp. 201- 217, 1982.

38. Beck LH: Dehydration. In World Book Encyclopedia, Chicago, IL. 1986.

39. Beck HL, Kassirer JP: Serum electrolytes, serum osmolality, blood urea nitrogen,
and serum creatinine. In Common Diagnostic Tests: Use and Interpretation.
(Sox HC, Editor). Amer. Coll. of Physicians Press. 1987.

40. Beck LH: Kidney Function in the Older Adult. Center for the Study of Aging
Newsletter, University of Pennsylvania, Spring 1987.

41. Beck LH: Kidney function and disease in the elderly. Hosp. Pract. 1988;

60:363-368.

42. Beck LH: Urinary Incontinence. Chapter in Practicing Prevention in the Elderly. Hanley & Belfus, Inc., Philadelphia. pp 183-185, 1989.

43. Beck LH, Burkart JM: Aging changes in renal function. Chapter 55 in Principles of Geriatric Medicine and Gerontology, 2nd Edition. McGraw-Hill Book Company. 1989.

44. Burkart JM, Beck LH: Renal diseases in the elderly. Chapter 56 in Principles of Geriatric Medicine and Gerontology, 2nd Edition. Mc-Graw Hill Book Company. 1989.

45. Beck LH, Kassirer JP: Serum electrolytes, serum osmolality, blood urea nitrogen, and serum creatinine. In Common Diagnostic Tests: Use and Interpretation, 2nd Edition. (Sox HC, Editor). American College of Physicians Press, 1990.

46. Beck LH. The Geisinger Integrated Health Systems: A Guide to Successful Strategies for Hospital and Physician Collaboration. Thompson Publishing Group. 1993; p 53-96.

47. Beck LH. Postoperative acute renal failure. Chapter in Goldmann DR, et al (ed.) Perioperative Medicine. Mc-Graw Hill, Inc., New York, 1994.

48. Beck LH. Aging changes in renal function. In Hazzard WR et al (eds.). Principles of Geriatric Medicine and Gerontology. 3rd Edition. McGraw-Hill, Inc., New York, 1994.

49. Beck LH. Diagnosing and managing renal disease in the elderly. Long-term Care Forum, 1995; 5(3): 1-15.

50. Beck LH. Renal Diseases in Reuben DB, et al (eds). Geriatrics Review Syllabus; American Geriatrics Society, New York, 1996.

51. Beck LH. Quality of Care. Chapter in Internal Medicine, (ed Stein J, pp: 16-22); Mosby-Year Book Inc., St. Louis MO. 1998.

52. Beck LH. Cost-Effectiveness Approach to Cardiovascular Interventions in the Elderly. Chapter in Vascular Disease in the Elderly; pp 129-141. Parthenon Publishing, London. 1998.

53. Beck LH. Changes in renal function with aging; pp: 199-210. In Beck LH (editor). Genitourinary Problems; Clinics in Geriatric Medicine. W.B. Saunders Co., Philadelphia, 1998.

54. Beck LH. Aging changes in renal function. In Hazzard W.R. et al (eds). Principles of Geriatric Medicine and Gerontology. 4th Edition; pp: 767-776. McGraw-Hill, Inc. New York. 1999.

55. Beck LH. Fluid and Electrolyte Balance in the Elderly. Geriatric Nephrology Urology. 1999; 9: 11-14

56. Beck LH. and Kumar SP. Update in Preventative Medicine. Ann Intern Med. 1999; 131:681-687.

57. Periodic Health Examination and Screening Tests in the Adult. Hospital Practice 1999; 34: 117-126

58. Luke RG, Beck LH. Gerontologizing nephrology. J. American Society of Nephrology1999; 10: 1824-27

59. Beck LH. Introduction: Primary Care of The End-Stage Renal Disease Patient. Adv. Renal Repl. Therapy 2000:7:193-194.

60. Beck LH. Screening and preventive health practices for the ESRD patient. Adv Renal Repl Ther. 2000; 7:195-201
61. Beck L.H. Fluid and electrolyte balance in the elderly.
In Oreopoulos DG (ed), Nephrology and Geriatrics Integrated. Kluwer Academic Publishers, Netherlands, 2000.
62. Beck LH. Training and Education. In Oreopoulos DG (ed.), Nephrology and Geriatric. Integrated. Kluwer Academic Publishers, Netherlands, 2000.
63. Beck L.H. The Aging Kidney. Defending a delicate balance of fluid and electrolytes. Geriatrics 2000; 55:26-32
64. Beck LH. Update in preventive medicine. Ann Intern Med. 2001; 134:128-35.
65. Beck LH. Should the actual or the corrected serum sodium be used to calculate the anion gap in diabetic ketoacidosis? Cleveland Clin J Med. 2001; 68 (Aug): 673-674.
66. Haffizulla JM, Haffizulla FS, Haffizulla KD, Beck LH. A dangerous encounter with naphthalene. Hospital Physician 2002 Nov; 38(11):61-64.
67. Beck L.H. Renal system, fluid and electrolytes. Chapter in Current Geriatric Diagnosis & Treatment (Landefeld CS et al, editors). Mc Graw-Hill: New York (2004).
Books:
Cebul RD, Beck LH: Teaching Clinical Decision-Making. Prager Press.
New York, 1985.
Educational Videotapes:
Beck LH: Hydrogen Ion Regulation: Respiratory and Metabolic Acidosis. NCME Telecourse # 324, 1979.

# <u>EXHIBIT 5</u>



2041 Georgia Avenue, N.W.    202/865-6100
Washington, D.C. 20060    202/745-3731 fax

HOWARD
UNIVERSITY
HOSPITAL

March 16, 2007

John-Charles Akoda, M.D.
P.O. Box 744
Carrolton, VA  23314

Dear Dr. John-Charles Akoda:

The Department of Obstetrics and Gynecology at Howard University is pleased to inform
you that you have matched for the categorical first year postgraduate position for the
academic year 2007-2008. It is requested that you submit evidence of legal residence in
the United States to the office a soon as possible.

Please contact Dr. Grace Ansah at Howard University International Services
202.806.7517, if there is a need for you to be sponsored for an H-1 Visa.

All residents will receive from the department a contract that enumerates compensation,
benefits and the responsibilities of both parties, yourself and Howard University Hospital,
the hospital's orientation packet from the Graduate Medical Education Office, as well as
a packet from Howard University Hospital, Human Resources Department in the near
future.

Please sign below to accept this offer and attach information that will confirm the most
appropriate mailing address and telephone numbers and a current email address that will
allow us to maintain contact with you. You may fax your signed letter back to the
attention of Ms. Angela Taylor, at 202.865.4171 and mail the hard copy.

Congratulations and welcome to the Howard University Hospital family.

Sincerely,

Olanrewaju Adeyiga, M.D.
Chair and Program Director
Department if Obstetrics and Gynecology

Accept: _____

Date: 3/26/07

HU 000256

Howard University Hospital0000000256

JA797

# EXHIBIT 6

JA798

HOWARD UNIVERSITY HOSPITAL AND AFFILIATED HOSPITALS
WASHINGTON, DISTRICT OF COLUMBIA

THIS IS TO CERTIFY THAT

## JOHN-CHARLES NOSA AKODA, MD

HAS SATISFACTORILY COMPLETED FOUR YEARS
OF POSTGRADUATE MEDICAL EDUCATION IN

## DEPARTMENT OF OBSTETRICS AND GYNECOLOGY

THROUGH OUR TRAINING PROGRAMS AT HOWARD UNIVERSITY.

JULY 1, 2007 - JUNE 30, 2011



DIRECTOR, GRADUATE MEDICAL EDUCATION

PRESIDENT OF THE UNIVERSITY

PROGRAM DIRECTOR

SECRETARY OF THE UNIVERSITY

HU 000016

Howard University Hospital0000000016

JA799

# **<u>EXHIBIT 7</u>**



Larry C. Gilstrap, III, M.D.
Executive Director
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX  75204
Phone: (214) 871-1619
Fax: (214) 871-1943

January 31, 2014

John-Charles Akoda, M.D.



Dear Dr. Akoda,

Congratulations!  In recognition of your fulfillment of all requirements, you are now a
Diplomate of The American Board of Obstetrics and Gynecology, Inc. Your certification is
effective January 31, 2014 through December 31, 2014. Your certificate must be renewed
annually by completion of all the assignments in the ABOG Maintenance of Certification
(MOC) process.

Please carefully review the spelling of your name on this letter as that name will be printed on
the certificate you will receive.  If there is a correction, please notify our office no later than
February 14, 2014.  If you have not heard from the printer regarding your diploma by April 30,
2014, please contact the Board office.

You may apply for the 2014 MOC process at www.abog.org. There is no fee for MOC for the
first year.  However, if you are not an ACOG fellow or junior fellow, you must pay for the
category I CME credit, as that is a benefit of ACOG membership.

We hope you will maintain an active interest in the specialty, and you will continue to improve
the care of women.

Best Wishes,

Larry C. Gilstrap III, MD

Larry Gilstrap, III M.D.
Executive Director


LG

ABOG ID: 9025829

Incorporated 1930
A founding member of The American Board of Medical Specialties
www.abog.org

610240

CONFIDENTIAL

ABOG_nonparty_000046

JA801

# **EXHIBIT 8**

JA802

PROCESSED



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900  ●  FAX: 215-386-9767  ●  INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

May 22, 2002

Dr. Oluwafemi Charles Igberase
c/o Gwendolyn Mensah
3516 Darthmoor Lane
Olney, MD 20832

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Igberase:

On behalf of the ECFMG Medical Education Credentials Committee, I am writing to inform you the Committee has completed its second review regarding your alleged irregular behavior in connection with the response to Item 1 on the application for the USMLE Step 1 received by ECFMG on October 23, 2000. With that application, you were applying for the USMLE Step 1 that you had previously taken and passed. This review by the ECFMG Committee was on remand from the USMLE Committee on Irregular Behavior.

The ECFMG Medical Education Credentials Committee previously reviewed this matter in April 2001. On May 3, 2001, I wrote to advise you that the ECFMG Committee took action to extend the length of the revocation of your Standard for a yet to be specified period of time, to refer this new matter to the USMLE Committee on Irregular Behavior for its review and to review this matter again after the USMLE Committee's decision.

At its subsequent review in May 2002, the ECFMG Medical Education Credentials Committee took action to revoke permanently your Standard ECFMG Certificate.

In accordance with ECFMG policies and procedures, an annotation that you engaged in irregular behavior will be included in your ECFMG record. This annotation shall appear on your ECFMG Certification Verification Service Report and ECFMG Status Report. In addition, ECFMG will report the determination of irregular behavior and permanent revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards, state medical licensing authorities, directors of graduate medical education programs and other interested entities.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG_RUSS_0003801

JA803

Case 2:18-cv-05629-JDW   Document 39-3   Filed 10/26/19   Page 3 of 8

Dr. Oluwafemi Charles Igberase
May 22, 2002
Page 2


      As noted in the enclosed ECFMG Rules of Appellate Procedure, decisions of the
ECFMG Medical Education Credentials Committee may be appealed within the time
limit specified, i.e., within 60 days of the date of this notification.


                          Sincerely,


                          William C. Kelly
                          Manager, Medical Education
                          Credentials Department

/wck
Enclosure

ECFMG_RUSS_0003802

JA804

# **EXHIBIT 9**



BRICK HOSPITAL
JERSEY SHORE MEDICAL CENTER
POINT PLEASANT HOSPITAL
RIVERVIEW MEDICAL CENTER

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

November 7, 2000

State of Maryland Board of Physician Assurance
4201 Patterson Avenue, P.O. Box 2571
Baltimore, Maryland 21215

RE:  John Charles Nosa Akoda
       aka John-Charles Nosa-Igberase Akoda
       aka Charles Johnbull Nosakhare Akoda
       aka Charles N. Akoda
       aka Charles J. Akoda

To Whom It May Concern:

We have discovered in the file of John Charles Nosa Akoda, M.D., a third-year resident
in Internal  Medicine at Jersey Shore Medical Center, an application for initial medical
licensure in the State of Maryland.  That application includes a Social Security Number
which Dr. Akoda has stated is not his own.

Having earlier suspended Dr. Akoda we have now made a decision to terminate him
effective November 21, 2000, for reasons as specified in our letter (and attachment) to the
New Jersey State Board of Medical Examiners.  Dr. Akoda was afforded his due-process
rights of appeal of his termination, but the time for receipt of such an appeal has now
been exhausted.

Very truly yours,

Anna Marie Sesso, M.D., M.P.H.
Associate Director of Academic Affairs

 Copy to:  New Jersey State Board of Medical Examiners

Jersey Shore Medical Center000006

JA806

# **EXHIBIT 10**

JA807



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000123578941
Process Date:  05/05/2017
Page: 1    of    3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

## AKODA, CHARLES JOHN

### DEPARTMENT OF HEALTH PROFESSIONS

| STATE LICENSURE ACTION | Date of Action: 04/25/2017 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - SUSPENSION OF LICENSE | - CRIMINAL CONVICTION |

| **A. REPORTING ENTITY** | | |
|---|---|---|
| | Entity Name: | DEPARTMENT OF HEALTH PROFESSIONS |
| | Address: | 9960 MAYLAND DR STE 300 |
| | | PERIMETER CENTER |
| | City, State, Zip: | RICHMOND, VA 23233-1485 |
| | Country: | |
| | Name or Office: | JAMES L. BANNING, DIRECTOR |
| | Title or Department: | ADMINISTRATIVE PROCEEDINGS DIVISION |
| | Telephone: | (804) 367-4402 |
| | Entity Internal Report Reference: | 177618 |
| | Type of Report: | INITIAL |

| **B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)** | | |
|---|---|---|
| | Subject Name: | AKODA, CHARLES JOHN |
| | Other Name(s) Used: | |
| | Gender: | UNKNOWN |
| | Date of Birth: | ▉▉▉▉▉ |
| | Organization Name: | |
| | Work Address: | |
| | City, State, ZIP: | |
| | Organization Type: | |
| | Home Address: | ▉▉ ▉▉ |
| | City, State, ZIP: | ▉▉▉▉▉▉ |
| | Deceased: | NO |
| | Federal Employer Identification Numbers (FEIN): | |
| | Social Security Numbers (SSN): | ▉▉▉▉ |
| | Individual Taxpayer Identification Numbers (ITIN): | |
| | National Provider Identifiers (NPI): | |
| | Professional School(s) & Year(s) of Graduation: | BENIN U-NIGERIA (1987) |
| | Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| | State License Number, State of Licensure: | 0101250081, VA |
| | Specialty: | UNSPECIFIED |
| | Drug Enforcement Administration (DEA) Numbers: | |
| | Unique Physician Identification Numbers (UPIN): | |
| | Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| | Business Address of Affiliate: | |
| | City, State, ZIP: | |
| | Nature of Relationship(s): | |

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL

ABOG_nonparty_000017

JA808

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000123578941
Process Date: 05/05/2017
Page: 2    of    3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

| | |
|---|---|
| **C. INFORMATION REPORTED** | |
| Type of Adverse Action: | STATE LICENSURE |
| Basis for Action: | CRIMINAL CONVICTION (19) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | DHP OF VA ACTION |
| Adverse Action Classification Code(s): | SUSPENSION OF LICENSE (1135) |
| Date Action Was Taken: | 04/25/2017 |
| Date Action Became Effective: | 04/25/2017 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Agency Action: Mandatory Suspension.   Virginia License Number: 0101250081.   A printable copy of the order detailing this case can be found by selecting the license look up at the Virginia Department of Health Professions website. When you get to the license look up page, enter the Virginia License Number listed above in the License Number field in License Look Up, then click the Search button. The public information for that licensee will be displayed. If a red YES appears under the Additional Public Information heading, click on it and follow the links to access the Order. If you do not have web access, you can telephone 804 367 4444 to provide the license number and a copy of the Order will be mailed to you. |
| Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of Patient(s)?: | NO |

☐ Subject identified in Section B has appealed the reported adverse action.

| | |
|---|---|
| **D. SUBJECT STATEMENT** | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |

| | |
|---|---|
| **E. REPORT STATUS** | Unless a box below is checked, the subject of this report identified in Section B has not contested this report. |

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL

ABOG_nonparty_000018

JA809

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000123578941
Process Date: 05/05/2017
Page: 3    of    3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

☐ At the request of the subject identified in Section B, this report was reviewed by
the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision
is shown below:

| | |
|---|---|
| Date of Original Submission: | 05/05/2017 |
| Date of Most Recent Change: | 05/05/2017 |

**F. SUPPLEMENTAL
SUBJECT
INFORMATION ON
FILE WITH DATA
BANK**

The following information was not provided by the reporting entity identified in Section A of this report.  The
information was submitted to the Data Bank from other sources and is intended to supplement the information
contained in this report.

The Data Bank attempted to notify the Subject Identified in Section B on 05/05/2017 at the address below, but the
attempt was unsuccessful.

14909 DOWNEY CT
BOWIE, MD 20721

**This report is maintained under the provisions of:** Section 1921

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the
provisions of Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for
the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law.
For additional information or clarification, contact the reporting entity identified in Section A.

━━━━━━━━━━━━━━━━━━━━━━  **END OF REPORT**  ━━━━━━━━━━━━━━━━━━━━━━

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL

ABOG_nonparty_000019

JA810

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF DESIRE EVANS'S SUPPLEMENTAL**
**ANSWERS TO FIRST SET OF INTERROGATORIES**
**AND SUPPLEMENTAL RESPONSES**
**TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Desire Evans, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition. Without waiving this objection, the Plaintiff was a patient of Akoda during her labor on March 17, 2016 and the subsequent delivery of her infant. The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda. The Plaintiff went to Prince George's Hospital Center for her delivery because her primary OBGYN treated patients there.**

### SUPPLEMENTAL ANSWER:

***Subject to and without waiving these objections, all medical records in the possession of the Plaintiff and her counsel have been produced to ECFMG. The Defendant is again referred to the medical records of the Plaintiff for detailed information concerning her treatment by Igberase.***

### INTERROGATORY NO. 7:

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States,

2

including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services. Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud. Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff is relying on her attorneys for the specific facts related to the ECFMG certification process. She had no prior knowledge of ECFMG in particular.*

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition. Plaintiff's contacts with Akoda are reflected in the medial records which are being produced. The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of**

3

JA814

ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, the Plaintiff has communicated generally with members of her family, including her husband, Michael Evans, her mother, Renee Clifto, and her cousin, Terel Newton. The Plaintiff can recall no other discoverable communications other than those set forth in these responses.  The Plaintiffs deposition in the Dimensions matter has been previously produced.*

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

**Plaintiff adopts by reference her Answer to Interrogatory No. 2.  The amount of these damages is for the jury to determine.  Plaintiff seeks damages for these injuries as determined by the jury.**

**SUPPLEMENTAL ANSWER**

*Plaintiff has lost substantial time from work since her pregnancy, caused by the emotional distress associated with Igeberase's conduct.  The Plaintiffs are obtaining tax documentation to provide further support for this claim, which will be provided upon receipt.*

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

4

JA815

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

<u>**SUPPLEMENTAL ANSWER:**</u>

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements.*

<u>**INTERROGATORY NO. 12:**</u>

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

<u>**ANSWER:**</u>

**Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery. Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records. Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

<u>**SUPPLEMENTAL ANSWER:**</u>

*Subject to and without waiving these objections, attachment A is a list of persons represented by Schochor, Federico & Staton, P.A.*

<u>**INTERROGATORY NO. 15:**</u>

5

JA816

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant.  Without waiving this objection, the Plaintiff had received medical care from Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, and in addition to the Plaintiff's prior discovery responses, Plaintiff has received medical care in the past from -Danielle Waldrop, M.D./Javaka Moore, M.D., -Dionne Lucas, PA-C, -Southern Maryland Hospital, Washington Hospital Center and Shanda Smith, M.D.  Medical records from these providers are being provided.  The Plaintiff is currently seeing Ebony Cross, M.D., a psychiatrist.*

### SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

#### General Objections

1.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and

6

conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from

7

these responses as a result of mistake, error, oversight or inadvertence.

10.    These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.    The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff. Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.    The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant. Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The Plaintiffs have provided a copy of the Complaint in this matter and the Defendant's Answer.*

8

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is vague, overly broad and unduly burdensome. Moreover, documents filed in the Dimensions litigation are readily obtainable from the Prince George's County Circuit Court. Other documents, including attorney work product and documents concerning expert witnesses in that matter, are beyond the scope of discovery in this matter. The Plaintiff is not is possession of any documents or other communications responsive to this request.*

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation are available.*

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

9

JA820

**Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case.  If Defendant will clarify it, Plaintiff will attempt to respond.**

SUPPLEMENTAL RESPONSE:

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12*

REQUEST NO. 10:

All documents relating to ECFMG.

RESPONSE:

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

SUPPLEMENTAL RESPONSE:

*Objection is made to this response as it is vague.  The materials relating to ECFMG in the possession of the Plaintiff or her counsel were obtained from the Defendant ECFMG, or are otherwise in the possession of the Defendant ECFMG.*

REQUEST NO. 20:

All documents relating to Dimensions Healthcare Associates and Akoda.

RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

SUPPLEMENTAL RESPONSE:

*Objection is made to this response as it is vague, overbroad and unduly burdensome, and to the extent it seeks information protected by attorney work product.  Documents filed in*

10

JA821

*litigation with Dimensions Healthcare are readily obtainable from the Prince George's County*

*Circuit Court in Maryland.*

## REQUEST NO. 21:

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## SUPPLEMENTAL RESPONSE:

*Objection is made to this request to the extent it seeks confidential documents concerning settlement discussions, including materials produced for mediation, to include mediation statements and expert reports produced for purposes of mediation. Objection is further made to this request to the extent it seeks correspondence between counsel as it is beyond the scope of discovery and represents attorney work product. Documents filed in litigation with Dimensions Healthcare are readily obtainable from the Prince George's County Circuit Court in Maryland.*

## REQUEST NO. 30:

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

## RESPONSE:

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

## SUPPLEMENTAL RESPONSE:

11

JA822

*Objection is further made to this request as it seeks attorney work product.  Subject to*

*and without waiving these objections, to the extent any such discoverable documents exist, they*

*will or have been produced.*

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.
**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to**

**produce any documents on the grounds that she is not making any claim for lost income.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, the Plaintiff is currently collecting tax*

*returns, which will be provided upon receipt.*

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the**

**requested documents on the grounds that it is overly broad and burdensome in that it is not**

**limited in time or scope and that it seeks information that is not relevant to any claim or**

**defense in this action.  To the extent the Plaintiff receives treatment concerning her condition**

**and injuries relevant to this lawsuit, these documents will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records in the possession of*

*the Plaintiff and her counsel have been produced.*

**REQUEST NO. 36:**

JA823

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records and bills in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records and bills in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

13

JA824

Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.

SUPPLEMENTAL RESPONSE:

Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Dimensions litigation.

REQUEST NO. 42:

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

RESPONSE:

Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.

SUPPLEMENTAL RESPONSE:

Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.

REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

14

JA825

**RESPONSE:**

Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.

**SUPPLEMENTAL RESPONSE:**

*There are no financial arrangements with anyone other than Plaintiff's attorneys, as set forth in response to Interrogatory No. 11.*

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

Any discoverable documents responsive to this request will be produced.

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is overly broad and vague.  Without waiving this objection, the Plaintiff is seeking to obtain tax returns, which will be provided upon receipt.*

CONRAD & O'BRIEN, P.C.


  */s/ Nicholas M. Centrella*
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100

15

JA826

Telephone: (215) 864-9600
Fax: (215) 864-9620

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschoehor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.com
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

June 17, 2019

16

JA827

## VERIFICATION

I, Desire Evans, hereby aver that the factual statements in the foregoing Supplemental *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Supplemental Answers* are made subject to the penalties relating to unsworn falsification to authorities.

_____
Desire Evans

Dated: June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic

mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

/s/ Nicholas M. Centrella
Nicholas M. Centrella

June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic

mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

/s/ Nicholas M. Centrella
Nicholas M. Centrella

June 17, 2019

**EXHIBIT A: Represented Clients of Schochor, Federico & Staton, P.A.**

| <u>Last Name</u> | <u>First name</u> | <u>DOB</u> |
|---|---|---|
| Achike | Nkemdilim | |
| Aikens | Regina | |
| Alex-Jimda | Olajomoke | |
| Allen | Angel | |
| Allen | Darnisha | |
| Allen | Jovanna | |
| Allen | Krystin | |
| Allen | Tyhee | |
| Alleyne | Martina | |
| Anderson | Keira | |
| Anderson | Latoya | |
| Andrews | Dnia | |
| Anthony | Deborah | |
| Anthony | Ivori | |
| Anthony | Londyn | |
| Ashu | Grace | |
| Ballard | Monique | |
| Balmes | Yolanda | |
| Beard | Pauline | |
| Becoats-Greer | Shantanette | |
| Bennett | Aisha | |
| Berger | Richelle | |
| Bowman | Vanessa | |
| Boykin | Michelle | |
| Bradwell | Tanina | |
| Brame | Shatore | |
| Braxton | Shaunte | |
| Brice | Christina | |
| Britton | Janis | |
| Brooks | Stacey | |
| Brown | Yolanda | |
| Butler | Onikaia | |
| Calliham | Kristen | |
| Carey | Tishana | |
| Carroll | DeTanicha | |
| Cavers | Ada | |
| Cavers | Sabrina | |
| Chase | Chamoney | |
| Chase | Chavonne | |
| Chase | Tameia | |
| Collins | Tamu | |

JA831

| | |
|---|---|
| Crawford | Tiffany |
| Damilare-Raji | Temitope |
| Davis | Towana |
| Davison | Dawn |
| Day | Kavonna |
| Dew | Briana |
| Dews | Christina |
| Drewery | Dekwarna |
| Driver | Myeshia |
| Durant | Tasia |
| Ellis | Princess |
| Evans | Desire |
| Faulkner | Samuella |
| Ferrell | Sade |
| Ferrell | Shavonne |
| Fiti | Tele |
| Ford | Marquette |
| Francis | Priyanka |
| Frazier | Nyia |
| Freeman-Taylor | Octavia |
| Garay | Jocelyn |
| Gaymon | Latisa |
| Gibbs | Gabrielle |
| Glover | Donita |
| Godby | Vanessa |
| Goldston | Darmeshia |
| Gordon | Antaja |
| Hall | Shannon |
| Hammond | Angelique |
| Harrell | Alecia |
| Harris | Dynita |
| Harris | Myah |
| Harrison-Gray | Deveda |
| Hayes | Chanita |
| Henry | Shaquella |
| Hines | Sonya |
| Holder | Kimisha |
| Holmes | Naqirah |
| Hooker | Ronnetta |
| Hughes-Keen | LaTonya |
| Igbalajobi | Oluwaseyi |
| Ihuoma | Adewunmi |
| Jackson | Lakisha |
| Jacob | Darlene |

JA832

| | |
|---|---|
| Jallow | Amie |
| Jay | Chantell |
| Jefferies | April |
| Jeffries | Lisa |
| Johnson | Brittany |
| Johnson | Krishanna |
| Johnson | Sandra |
| Johnson | Shynese |
| Johnson | Tierra |
| Jones | Kiwannah |
| Jones | Londra |
| Jones | Shamere / Dezmond Jones |
| Jones | Shamika |
| Kamara | Isata |
| Kamara | Maiatu / Isatu Sillah |
| Kamara | Veronica |
| Keemer-Gray | Nicole |
| King | Demetrice |
| King | Latashia |
| Kyles | Tameka |
| Lacy | Tamara |
| Lawal | Adejumoke |
| Layo | Titi |
| Lee (now Gogarty) | Jessica |
| | |
| Lewis | Natasha |
| Logan | Chadiamond |
| Lowery | Alisha |
| Lozano | Siomara |
| Lynch | Ashley |
| Magruder | Tatyana |
| Maiden | Brittany |
| Martin | Shirnelle |
| Mason | LaQuonda |
| Mathis | Felicia |
| McCarthy | Kharesia |
| Miles | Jammie |
| Miles | Jasmine |
| Miller | Jasmine |
| Mitchell | Savanna |
| Molua | Irene |
| Moyler | Jovan |
| Ndiformutieh | Victorine |

JA833

| | |
|---|---|
| Nkengfack | Josephine |
| Nwalokomobi / Mgbolu | Imilar |
| Nyanzu | Diana |
| Omogbadegun | Ibironke |
| Oswald | Mariah |
| Otis | Jacqueline |
| Oyesiji | Jubril |
| Parker | Ericka |
| Perkins | Iysha |
| Petty | Arlene |
| Plater | Portia |
| Powell | Elsa |
| Powell | Tyeisha |
| Reynolds | Monique |
| Robinson | Jamie |
| Robinson | Janni |
| Rouse | Autumn |
| Scott | Dajzhe |
| Sesay | Finda |
| Shaw | Lakisha |
| Shearin | Sherita |
| Simmons | Jasmine |
| Simmons | Jennifer |
| Simms | Katrina |
| Simms | Natasha |
| Smith | Patria |
| Smith | Tyissha |
| Smith-Buani | Yema |
| Smith-Reynolds | Allanda |
| Spears | Nishika |
| Spriggs | Charmisa |
| Streater | Roneka |
| Strong | Adoniqua |
| Stubbs | Andrea |
| Tazi | Anyinkeng |
| Terry | Pasche |
| Thornes | Quiana |
| Tinsley | Jazmine |
| Townes | Danielle |
| Tyler | Rhonda |
| Tyler | TaNeishia |
| Udefiagbon | Bukola |
| Vail-Pardich | Jamesha |

JA834

| | |
|---|---|
| Valentine | Diamisha |
| Vaughan | Aurelia |
| Velasquez | Carmen |
| Walston | Crystal |
| Ward | Danielle |
| Warrick | Brittany |
| White | Jerica |
| Wilcox | Joyce |
| Williams | Amber |
| Williams | LaShanta |
| Williams | Latisha |
| Williams | Mercedes |
| Wimberly | Lisa |
| Wimpye | Briana |
| Wingfield | Ashleigh |
| Woo | Mary |
| Woodfork | April |
| Wright | April |
| Young | Tina |

JA835

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MONIQUE RUSSELL, JASMINE RIGGINS,     \*
ELSA M. POWELL AND DESIRE EVANS,

                           \*      Case No. 2:18-cv-05629-WB

         Plaintiffs

                           \*      Hon. Wendy Beetlestone

     v.

                           \*

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES        \*

     Defendant                  \*

      \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF ELSA POWELL'S SUPPLEMENTAL
ANSWERS TO FIRST SET OF INTERROGATORIES
AND SUPPLEMENTAL RESPONSES
TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

      Plaintiff, Elsa Powell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

      The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys.  Furthermore, the precise word usage and sentence structure is that of the executing party's attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

      Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

<div align="center">

**SUPPLEMENTAL ANSWERS TO INTERROGATORIES**

</div>

**INTERROGATORY NO. 1:**

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

**ANSWER:**

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition.  Without waiving this objection, the Plaintiff was treated by Akoda during portions of her prenatal care, beginning in approximately April of 2014, during her labor on September 17, 2014, for the subsequent delivery of her infant, and for post-natal care through January of 2015.  The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda.  The Plaintiff was referred to the practice of Abdul Chaudry, M.D. for prenatal care by another obstetrician-gynecologist, which is where she first encountered Akoda.**

**SUPPLEMENTAL ANSWER:**

***Subject to and without waiving these objections, all medical records in the possession of the Plaintiff and her counsel have been produced to ECFMG.  The Defendant is again referred to the medical records of the Plaintiff for detailed information concerning her treatment by Igberase.***

<div align="center">2</div>

**INTERROGATORY NO. 2:**

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

**ANSWER:**

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiff's loss to her marital relationship. This Plaintiff has in the past, is presently, and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety, as a result of learning that Akoda was a fraud. This Plaintiff will also be claiming economic damages for past, present and future medical expenses, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiff's life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.**

**The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct. She first learned this information from another patient of Adbul Chaudry M.D.'s practice in late 2018. She subsequently looked up information about Akoda on the internet.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has not seen any health care providers for treatment of these injuries.*

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States,

including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services.  Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud.  Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff is relying on her attorneys for the specific facts related to the ECFMG certification process.   She had no prior knowledge of ECFMG in particular.*

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition.  Plaintiff's contacts with Akoda are reflected in the medial records which are being produced.   The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

4

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, the Plaintiff has communicated generally with members of her family, specifically, her husband, Gregory Powell, and a friend, Latisa Gaymon..  The Plaintiff can recall no other discoverable communications other than those set forth in these responses.  The Plaintiffs deposition in the Dimensions matter has been previously produced.*

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

**Plaintiff adopts by reference her Answer to Interrogatory No. 2.  The amount of these damages is for the jury to determine.  Plaintiff seeks damages for these injuries as determined by the jury.**

**SUPPLEMENTAL ANSWER:**

*Plaintiff is not making a claim for economic damages.*

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

JA841

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses.  There are no other financial arrangements.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

**Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery.  Plaintiff's counsel represents numerous persons who are putative members of the class.  Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records.    Plaintiff is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, attachment A is a list of persons represented by Schochor, Federico & Staton, P.A.*

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

JA842

**ANSWER:**

Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant.  Without waiving this objection, to date, the Plaintiff has not undergone medical treatment from health care providers relating to the emotional distress she has sustained in this matter.

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has not sought treatment from any health care provider for the injuries she is seeking to recover in this litigation.  Plaintiff has received medical care in the past from Sandy Clemente, M.D., whose office is at Kaiser Permanente's Camp Springs Medical Center, which is located at 6104 Old Branch Ave Temple Hills, MD 20748.  Dr. Clemente is Plaintiff's primary care physician (PCP).  Plaintiff received care from Kaiser Permanente's Marlow Heights Medical Center, which is located at 5100 Auth Way, Camp Springs, MD 20746, for prenatal care.  She was primarily seen by Brian Kingsley, M.D. during her prenatal course in 2015-2016.  Plaintiff delivered her fifth child at Kaiser Permanente's Washington Hospital Center which is located at 110 Irving St NW, Washington, DC 20010.  Plaintiff received medical care from Kaiser Permanente's Fair Oaks Medical Center which is located at 12255 Fair Lakes Pkwy, Fairfax, VA 22033,* ▮▮▮▮ *on December 5, 2016.  Plaintiff received medical care from Kaiser Permanent's Camp Springs Medical Center on January 22, 2018 for left hip and back pain and for a TDAP (diphtheria, tetanus and acellular pertussis) vaccination.  She was seen by Emily Lo, M.D. during that visit.  Plaintiff sought treatment from Medstar Medical Group's Waldorf facility, located at 12090 Old*

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*Ms. Powell saw Dr. Abdul Chaudry for prenatal care beginning on August 25, 2014 at his office located at 6005 Landover Road, Suite 5, Cheverly, Maryland 20785.  Ms. Powell underwent a dilatation and curettage procedure for postpartum hemorrhage on September 17, 2014 that was performed by Dr. Charles Akoda at Prince Georges Hospital Center located at 3001 Hospital Drive, Cheverly, Maryland 20785. Ms. Powell saw Dr. Chaudry at his office for postnatal care on October 14, 2014, October 21, 2014, October 28, 2014 and November 18, 2014.*

### SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

#### General Objections

1.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.    Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

8

JA844

4.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiff's possession, custody or control.

5.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.     To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.     Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.     These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.     Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The Plaintiff has provided a copy of the Complaint in this matter and the Defendant's Answer.*

**REQUEST NO. 4:**

10

JA846

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

***Objection is made to this request as it is vague, overly broad and unduly burdensome. Moreover, documents filed in the Dimensions litigation are readily obtainable from the Prince George's County Circuit Court. Other documents, including attorney work product and documents concerning expert witnesses in that matter, are beyond the scope of discovery in this matter.***

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

***The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation have been produced.***

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

11

**Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case.  If Defendant will clarify it, Plaintiff will attempt to respond.**

**<u>SUPPLEMENTAL RESPONSE:</u>**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**<u>REQUEST NO. 10:</u>**

All documents relating to ECFMG.

**<u>RESPONSE:</u>**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**<u>SUPPLEMENTAL RESPONSE:</u>**

*Objection is made to this request as it is vague.  The materials relating to ECFMG in the possession of the Plaintiff or her counsel were obtained from the Defendant ECFMG, or are otherwise in the possession of the Defendant ECFMG.*

**<u>REQUEST NO. 20:</u>**

All documents relating to Dimensions Healthcare Associates and Akoda.

**<u>RESPONSE:</u>**

**Plaintiff adopts by reference her response to Request No. 5.**

**<u>SUPPLEMENTAL RESPONSE:</u>**

*Objection is made to this response as it is vague, overbroad and unduly burdensome, and to the extent it seeks information protected by attorney work product.  Documents filed in*

JA848

*litigation with Dimensions Healthcare are readily obtainable from the Prince George's County*

*Circuit Court in Maryland.*

**REQUEST NO. 21:**

     All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

     **Plaintiff adopts by reference her response to Request No. 5.**

**SUPPLEMENTAL RESPONSE:**

     *Objection is made to this request to the extent it seeks confidential documents concerning settlement discussions, including materials produced for mediation, to include mediation statements and expert reports produced for purposes of mediation.  Objection is further made to this request to the extent it seeks correspondence between counsel as it is beyond the scope of discovery and represents attorney work product.  Documents filed in litigation with Dimensions Healthcare are readily obtainable from the Prince George's County Circuit Court in Maryland.*

**REQUEST NO. 30:**

     All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

     **Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**SUPPLEMENTAL RESPONSE:**

13

JA849

*Objection is further made to this request as it seeks attorney work product.  Subject to and without waiving these objections, to the extent any such discoverable documents exist, they will or have been produced.*

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection**.  **Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents on the grounds that she is not making any claim for lost income.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant or discoverable.*

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.  To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be produced.**

**SUPPLEMENTAL RESPONSE:**

14

JA850

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury.   All medical records in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation.  Plaintiff has no bills or expense documentation.*

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action.  To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation.  Plaintiff has no bills or expense documentation.*

**REQUEST NO. 41:**

JA851

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Akoda litigation.*

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a)

16

providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

   **Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**SUPPLEMENTAL RESPONSE:**

   *There are no financial arrangements with anyone other than Plaintiff's attorneys, as set forth in response to Interrogatory No. 11.*

**REQUEST NO. 44:**

   All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

   **Any discoverable documents responsive to this request will be produced.**

**SUPPLEMENTAL RESPONSE:**

   *Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

JA853

CONRAD & O'BRIEN, P.C.

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschochor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

June 17, 2019

JA855

**<u>VERIFICATION</u>**

I, Elsa Powell, hereby aver that the factual statements in the foregoing Supplemental *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Supplemental Answers* are made subject to the penalties relating to unsworn falsification to authorities.

_____

Elsa Powell

Dated: June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic

mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

June 17, 2019

**EXHIBIT A: Represented Clients of Schochor, Federico & Staton, P.A.**

| Last Name | First name | DOB |
|-----------|------------|-----|
| Achike | Nkemdilim | |
| Aikens | Regina | |
| Alex-Jimda | Olajomoke | |
| Allen | Angel | |
| Allen | Darnisha | |
| Allen | Jovanna | |
| Allen | Krystin | |
| Allen | Tyhee | |
| Alleyne | Martina | |
| Anderson | Keira | |
| Anderson | Latoya | |
| Andrews | Dnia | |
| Anthony | Deborah | |
| Anthony | Ivori | |
| Anthony | Londyn | |
| Ashu | Grace | |
| Ballard | Monique | |
| Balmes | Yolanda | |
| Beard | Pauline | |
| Becoats-Greer | Shantanette | |
| Bennett | Aisha | |
| Berger | Richelle | |
| Bowman | Vanessa | |
| Boykin | Michelle | |
| Bradwell | Tanina | |
| Brame | Shatore | |
| Braxton | Shaunte | |
| Brice | Christina | |
| Britton | Janis | |
| Brooks | Stacey | |
| Brown | Yolanda | |
| Butler | Onikaia | |
| Calliham | Kristen | |
| Carey | Tishana | |
| Carroll | DeTanicha | |
| Cavers | Ada | |
| Cavers | Sabrina | |
| Chase | Chamoney | |
| Chase | Chavonne | |
| Chase | Tameia | |
| Collins | Tamu | |

| | |
|---|---|
| Crawford | Tiffany |
| Damilare-Raji | Temitope |
| Davis | Towana |
| Davison | Dawn |
| Day | Kavonna |
| Dew | Briana |
| Dews | Christina |
| Drewery | Dekwarna |
| Driver | Myeshia |
| Durant | Tasia |
| Ellis | Princess |
| Evans | Desire |
| Faulkner | Samuella |
| Ferrell | Sade |
| Ferrell | Shavonne |
| Fiti | Tele |
| Ford | Marquette |
| Francis | Priyanka |
| Frazier | Nyia |
| Freeman-Taylor | Octavia |
| Garay | Jocelyn |
| Gaymon | Latisa |
| Gibbs | Gabrielle |
| Glover | Donita |
| Godby | Vanessa |
| Goldston | Darmeshia |
| Gordon | Antaja |
| Hall | Shannon |
| Hammond | Angelique |
| Harrell | Alecia |
| Harris | Dynita |
| Harris | Myah |
| Harrison-Gray | Deveda |
| Hayes | Chanita |
| Henry | Shaquella |
| Hines | Sonya |
| Holder | Kimisha |
| Holmes | Naqirah |
| Hooker | Ronnetta |
| Hughes-Keen | LaTonya |
| Igbalajobi | Oluwaseyi |
| Ihuoma | Adewunmi |
| Jackson | Lakisha |
| Jacob | Darlene |

| | |
|---|---|
| Jallow | Amie |
| Jay | Chantell |
| Jefferies | April |
| Jeffries | Lisa |
| Johnson | Brittany |
| Johnson | Krishanna |
| Johnson | Sandra |
| Johnson | Shynese |
| Johnson | Tierra |
| Jones | Kiwannah |
| Jones | Londra |
| Jones | Shamere / Dezmond Jones |
| Jones | Shamika |
| Kamara | Isata |
| Kamara | Maiatu / Isatu Sillah |
| Kamara | Veronica |
| Keemer-Gray | Nicole |
| King | Demetrice |
| King | Latashia |
| Kyles | Tameka |
| Lacy | Tamara |
| Lawal | Adejumoke |
| Layo | Titi |
| Lee (now Gogarty) | Jessica |
| | |
| Lewis | Natasha |
| Logan | Chadiamond |
| Lowery | Alisha |
| Lozano | Siomara |
| Lynch | Ashley |
| Magruder | Tatyana |
| Maiden | Brittany |
| Martin | Shirnelle |
| Mason | LaQuonda |
| Mathis | Felicia |
| McCarthy | Kharesia |
| Miles | Jammie |
| Miles | Jasmine |
| Miller | Jasmine |
| Mitchell | Savanna |
| Molua | Irene |
| Moyler | Jovan |
| Ndiformutieh | Victorine |

JA860

| | |
|---|---|
| Nkengfack | Josephine |
| Nwalokomobi / Mgbolu | Imilar |
| Nyanzu | Diana |
| Omogbadegun | Ibironke |
| Oswald | Mariah |
| Otis | Jacqueline |
| Oyesiji | Jubril |
| Parker | Ericka |
| Perkins | Iysha |
| Petty | Arlene |
| Plater | Portia |
| Powell | Elsa |
| Powell | Tyeisha |
| Reynolds | Monique |
| Robinson | Jamie |
| Robinson | Janni |
| Rouse | Autumn |
| Scott | Dajzhe |
| Sesay | Finda |
| Shaw | Lakisha |
| Shearin | Sherita |
| Simmons | Jasmine |
| Simmons | Jennifer |
| Simms | Katrina |
| Simms | Natasha |
| Smith | Patria |
| Smith | Tyissha |
| Smith-Buani | Yema |
| Smith-Reynolds | Allanda |
| Spears | Nishika |
| Spriggs | Charmisa |
| Streater | Roneka |
| Strong | Adoniqua |
| Stubbs | Andrea |
| Tazi | Anyinkeng |
| Terry | Pasche |
| Thornes | Quiana |
| Tinsley | Jazmine |
| Townes | Danielle |
| Tyler | Rhonda |
| Tyler | TaNeishia |
| Udefiagbon | Bukola |
| Vail-Pardich | Jamesha |

| | |
|---|---|
| Valentine | Diamisha |
| Vaughan | Aurelia |
| Velasquez | Carmen |
| Walston | Crystal |
| Ward | Danielle |
| Warrick | Brittany |
| White | Jerica |
| Wilcox | Joyce |
| Williams | Amber |
| Williams | LaShanta |
| Williams | Latisha |
| Williams | Mercedes |
| Wimberly | Lisa |
| Wimpye | Briana |
| Wingfield | Ashleigh |
| Woo | Mary |
| Woodfork | April |
| Wright | April |
| Young | Tina |



JA862

# **EXHIBIT 13**

JA863

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF JASMINE RIGGINS' SUPPLEMENTAL ANSWERS TO FIRST**
**SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES TO**
**FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Jasmine Riggins, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Supplemental Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

<u>**SUPPLEMENTAL ANSWERS TO INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

<u>**SUPPLEMENTAL ANSWER:**</u>

**Plaintiff believes, but is not certain, that she recalls the dates she saw Akoda in his office and the dates she was at Prince Georges' Hospital Center where Akoda delivered her baby, Messiah Denver Brown, by C-section on March 18, 2013. Her best recollection is that Akoda provided prenatal care from August 2012 to March 18, 2013. Plaintiff refers Defendant to the medical records which Plaintiff is producing. Plaintiff chose Dr. Chaudry's practice because it was conveniently located. She was never treated by Dr. Chaudry but rather by Akoda.**

*The prenatal records from Dr. Abdul Chaudry were produced to ECFMG. They indicate that Plaintiff first saw Akoda on 10/15/2012. These records appear to indicate that Plaintiff had pre-natal visits on 10/23/2012; 12/03/2012; 12/20/2012; 12/31/2012; 1/17/2013; 2/19/2013; 2/22/2013; 3/01/2013; 3/13/2013; and 3/18/2013. These records are bates stamped 0000001995-0000002026.*

<u>**INTERROGATORY NO. 2:**</u>

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

JA865

**SUPPLEMENTAL ANSWER:**

Plaintiff has suffered financial, physical and emotional injuries.  In addition to these injuries, Akoda's surgery on Plaintiff has limited her birth control options.  Plaintiff requested a tubal ligation to ensure against future pregnancies and she was denied due to the tissue damage caused by Akoda's surgery.  Plaintiff suffered extreme pain for several months after Akoda's surgery.  After returning to work and continuing for a few months, approximately twice a week Plaintiff was unable to complete her work shift, leaving work two hours early, because of the extreme pain, that at times would cause her to double over, and resulted in lost income.  Plaintiff had confidence and trust in her OB/GYN provider, Abdul Chaudry, M.D., that the doctors working under his practice and that treated her were, at the very least, legitimately credentialed, legally licensed, possessed the proper education and were real doctors.  In addition, Plaintiff had confidence and trust in Prince George's Hospital Center that the doctors given privileges at their facility to perform surgery would also, at the very least, be legitimately credentialed, legally licensed, possess the proper education and were real doctors.  Akoda performed a C-section on Plaintiff on March 18, 2013, when he was not legitimately credentialed, used fraud to obtain a medical license, and did not graduate from a medical school.  Upon learning Akoda was a fraud, impersonating a doctor, Plaintiff felt extremely violated, betrayed, embarrassed, sad, very angry and shocked.  As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

*Plaintiff has not seen any health care providers for treatment of these injuries.*
*Plaintiff began experiencing these injuries when she learned in July 2017 that Akoda was not*

3

*really a doctor. Plaintiff learned this from Monique Russell. Plaintiff is seeking only non-*

*economic damages.*

### INTERROGATORY NO. 7:

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

### SUPPLEMENTAL ANSWER:

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

*Plaintiff is relying on her attorneys for these allegations and Plaintiff has no personal*

*knowledge of them.*

### INTERROGATORY NO. 9:

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

### SUPPLEMENTAL ANSWER:

**Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these**

**damages is for the jury to determine. Plaintiff seeks damages for these injuries as**

**determined by the jury.**

*Plaintiff is not making a claim for economic damages.*

### INTERROGATORY NO. 11:

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

4

**SUPPLEMENTAL ANSWER:**

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements. All clients retained by the Law Offices of Peter G. Angelos, P.C., the Law Offices of David Ellin and Z Law, LLC have signed the same retainer agreement.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**SUPPLEMENTAL ANSWER:**

Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

*Attachment A is a list of persons represented jointly by the Law Office of Peter G. Angelos, P.A., the Law Offices of David Ellin and Z Law, LLC.*

5

JA868

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**SUPPLEMENTAL ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome. As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda. It is not limited in time or scope and seeks information that is not relevant.**

*Subject to and without waiving these objections, Plaintiff has not sought treatment from any health care provider for the injuries she is seeking to recover in this litigation. Plaintiff has received medical care in the past from Charter Health Care, a clinic in the District of Columbia, and following the delivery of her child by Akoda from Unity Health Care, another clinic in the District of Columbia. Plaintiff has two other children: Santana* ▮▮▮▮▮▮ *and Taniya* ▮▮▮▮▮▮▮ *and the Plaintiff has terminated two other pregnancies.*

### SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

#### General Objections

1.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

6

JA869

3.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.      These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.      The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.      The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**SUPPLEMENTAL RESPONSE:**

**None.**

*The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation will be produced.*

8

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case. If Defendant will clarify it, Plaintiff will attempt to respond.**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

*Subject to and without waiving these objections, to the extent any such documents exist, they will or have been produced.*

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**SUPPLEMENTAL RESPONSE:**

JA872

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.**

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant.*

## REQUEST NO. 35:

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

## SUPPLEMENTAL RESPONSE:

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury.  The only medical care Plaintiff can recall is in connection with her pregnancies and deliveries.*

## REQUEST NO. 36:

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation.  Plaintiff has no bills or expense documentation.*

10

JA873

## REQUEST NO. 37:

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

## REQUEST NO. 41:

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

## SUPPLEMENTAL RESPONSE:

**Objection.  Plaintiff has not obtained any statements.  Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

*Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Akoda litigation.*

## REQUEST NO. 42:

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

## SUPPLEMENTAL RESPONSE:

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on**

11

JA874

the grounds that it requests documents which are not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

## REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

## SUPPLEMENTAL RESPONSE:

**Plaintiff adopts by reference her response to Request No. 42.**

*There are no financial arrangements with anyone other than Plaintiff's attorneys.*

## REQUEST NO. 44:

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

JA875

CONRAD & O'BRIEN, P.C.


_/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620


LAW OFFICES OF PETER G. ANGELOS, P.C.


_/s/ Paul M. Vettori_____
Jay D. Miller (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
Danielle S. Dinsmore (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
Paul M. Vettori (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
One Charles Center
100 North Charles Street
Baltimore, MD  21201
Telephone: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff, Jasmine Riggins*

Dated: June 13, 2019

13

JA876

## VERIFICATION

I, Jasmine Riggins, hereby aver that the factual statements in the foregoing *Answers to Interrogatories* are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Jasmine Riggins

Dated: June 13, 2019

14

JA877

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories and Document Requests* to be served on the

following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com


/s/ *Nicholas M. Centrella*_____
Nicholas M. Centrella


June /3 , 2019

15

JA878

**ATTACHMENT A TO SUPPLEMENTAL DISCOVERY RESPONSES**

**NAME**                                    **D/O/B**

| Name |
|------|
| Abudu, Yemis |
| Adams, Jonae |
| Adebayo, Atinuke O. |
| Adebayo, Titilope |
| Adekanbi, Comfort |
| Adeoye, Aebola |
| Adesalu, Folasade |
| Adigwe, Susan |
| Akinwekomi, Taiwo |
| Akosile, Abosede |
| Alleyne, Dionne |
| Anderson, Fatama |
| Andrews, Ivona |
| Arrey, Gennette Nker |
| Ashton, Jennifer |
| Atemnkeng, Precilia |
| Ayodele, Olushola |
| Ayoola, Abeni |
| Azienwi, Marie Takem |
| Bailey, Lameche |
| Barnes, Whitney |
| Barney, (Burc) Kededra |
| Bell, Jimekiah |
| Bendu, Makala |
| Benford, (Walder) Tiffany |
| Benjamin, Daneylle |
| BienAime, Lise |
| Bonaparte, Karen |
| Bowden, Natasha |
| Braima, Memunatu |
| Braxton, Jovan |
| Briscoe, Myeshia |
| Broomes, To Asia |
| Brown, Brittney |
| Brown, Christine |
| Brown, Sharon |
| Brown, Shaunelle |

| NAME | D/O/B |
|---|---|
| Brown, Tiffany | |
| Bryant, Ladorsha | |
| Burris, Donika | |
| Burris, Rainelle | |
| Butler, Renee | |
| Byrd, Sekeithia | |
| Caldwell, Amisha | |
| Calix, Karina | |
| Coleman, Rashena | |
| Coley, Takia | |
| Collins, Jayde | |
| Cosby, Taylor | |
| Craig, Candace | |
| Derricott, Tiara | |
| Donnell, Tyche | |
| Davis, Renita | |
| Daniels, Brittany | |
| Davis, Amoni | |
| Davis, Ashle | |
| Davis, Stefanie | |
| Deville, Ashley | |
| Deville, Ebony | |
| Deville, Tiffany | |
| Diamond, Ashley | |
| Dinga, Andin | |
| Dunham, Deneise | |
| Eley, Marra | |
| Faison, Markinda | |
| Felder, Andrea | |
| Felix, Altagracia | |
| Ferguson, Darnisha | |
| Ferguson, Zenea | |
| Fornah, Fatu | |
| Franklin, Alexis | |
| Franklin, Khenae | |
| Fungafat, Tandika | |
| Garcia, Yancia | |

| NAME | D/O/B |
|------|-------|
| Gaskins, Richana | |
| Gibbs, Gabrielle | |
| Gines, Jasmine | |
| Ginyard, Angela | |
| Goldston, Shadona | |
| Gonzales, Hazzmin | |
| Green, Crystal | |
| Grier, Gethsamane | |
| Hall, Asia | |
| Hall, Monica | |
| Hansberry, Yvette | |
| Harley, Ashley | |
| Harper, Aqueba | |
| Harper, Deshonta | |
| Harris, Dayshelle | |
| Harris, Kimberly | |
| Harrison, Charnika | |
| Hearst, Lashell | |
| Henry, Lazett | |
| Henry, Shaquella | |
| Herron, Angela | |
| Holder, Kimberly | |
| Hudson, Chanell | |
| Ifekoya, Adeola | |
| Jackson, Danielle | |
| Jalloh, Ramatulie | |
| Jawla, Dalla | |
| Jenkins-Williams, Tris | |
| Jimason, Tasha | |
| Jobe, Princess | |
| Johnson, Alonda | |
| Johnson, Deidra | |
| Johnson, Jasmine | |
| Johnson, Keisha | |
| Jones, Carol | |
| Jones, Jasmine | |
| Jordan-Worthy, Krytiseya | |

JA882

| NAME | D/O/B |
|---|---|
| Judd, Yvonnda | |
| Kaffo, Urowoli (Lucy) | |
| Kamara, Etta | |
| Kamara, Isatu | |
| Kanu, Fatmata | |
| King, Leia | |
| Knox-Stokes, Ashanta | |
| Koroma, Bridgetta | |
| Koroma, Margaret | |
| Kosh, Charmayne | |
| Kosh, Nia | |
| Kwi, Courage | |
| Langford, Deja | |
| Leslie, Hazel | |
| Lewis, Dawnesheia | |
| Lindsay, Chelsey | |
| Little, Ciera | |
| Lofland, Zymira | |
| Lovell, Erica | |
| Madubuatta, Miriam Ada | |
| Martin, Crystal | |
| Mathis, Markquonda | |
| Maynard, LaChey | |
| Mayo, Tamia | |
| McAllister, Tara | |
| McGee, Lakenyatta | |
| McKnight, Denia | |
| McLaughlin, Ann Marie | |
| Metts, Torquesa | |
| Moorman, Shanita | |
| Morgan, Patricia | |
| Nickens, Klea | |
| Nadav, Mattu | |
| Nguti, Mirabel | |
| Nkeng, Sylvia | |
| Oakes, Ashley | |
| Olukoga, Emily | |

| NAME | D/O/B |
|---|---|
| Oni, Abimbola | |
| Palmer, Brittany | |
| Parker, Jazzman | |
| Parker, Sylvia | |
| Pitts, Ashley | |
| Platt, Endia | |
| Powell, Tina | |
| Proctor, Latika | |
| Proctor, Shabray | |
| Proctor, Shamika | |
| Randall, Amina | |
| Ray-Gie, Trayeshia | |
| Reed, Brishona | |
| Reeves, Chimere | |
| Reid, Patricia | |
| Riggins, Jasmine | |
| Robbins, Lashawnda | |
| Robinson, Clara | |
| Ross, Dinah | |
| Rush, Shartae | |
| Russell, Monique | |
| Sambola, Arku | |
| Samuel, Titilayo | |
| Savoy, Keyona | |
| Savoy, Sheika | |
| Sawyer, Racquetta | |
| Sawyer, Ursula | |
| Scarbourough, Micaela | |
| Seegars, Toniesha | |
| Sesay, Finda | |
| Shobowale, Oritoke | |
| Simpkins, Leslei | |
| Simpson, Felicia | |
| Smith, Jalisa M. | |
| Smith, Iris Samone | |
| Smith, Tammy | |
| Snowden, Caprice | |

| NAME | D/O/B |
|------|-------|
| Snowden, Imani | |
| Sorrell, Tiara | |
| Spencer, Cassandra | |
| Spencer, Faatimah | |
| Spencer, Nafiysha | |
| Spriggs, Tiara | |
| Stagg, Shanika | |
| Stallings, Lynette | |
| Stallings, Christina | |
| Stocks, Artavia | |
| Streater, Roneka | |
| Sykes, Tyiesha | |
| Taylor, Chauntice | |
| Taylor, Latiffany | |
| Thomas, Tanja | |
| Thomas, Victoria | |
| Thomas-Walker, Carla | |
| Thornton, Lisa | |
| Tilghman, Chantell | |
| Tilghman, Chernell | |
| Tilghman, Faith | |
| Toure-Davis, Nathalie | |
| Tyler, Alexa | |
| Valentine, Diamisha | |
| Van-Overbeek, April Cain | |
| Veney, Lauren | |
| Wade, Britnee | |
| Wade, Kayla | |
| Walker, Alicea | |
| Wallace, Shelly | |
| Walton, Aisha | |
| Ward, Iesha | |
| Watts, Ericka | |
| White, Shavonda | |
| Whitley, Alexis Joanne | |
| Williams, Alexis | |
| Williams, Apryl Monet | |

**NAME**                                **D/O/B**

| Williams, Candice | |
|---|---|
| Williams, Lynette | |
| Williams, Michelle | |
| Williamson, Keyinoshia | |
| Wilson, Breanna | |
| Woodfolk, (nee Torri) | |

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF MONIQUE RUSSELL'S SUPPLEMENTAL ANSWERS TO
FIRST SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES
TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Monique Russell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Supplemental Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

JA888

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### SUPPLEMENTAL ANSWER:

**Akoda was the on-call physician when Plaintiff presented at PGHC on May 25, 2016.  Akoda delivered Plaintiff's son, Luka Romero Russell, on May 25, 2016.**

*Plaintiff did not choose Akoda as her doctor.  She was a patient of Moore & Associates.  Akoda did not provide prenatal care to Plaintiff.*

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### SUPPLEMENTAL ANSWER:

**Plaintiff has suffered severe and substantial emotional injuries as a result of the negligence described in the Complaint.  As a survivor of ███████████████ Plaintiff had made great progress with regard to issues of trust and with violations or encroachments on her personal space, especially with regard to her body, previous to her interactions with Akoda.  However, upon learning that Akoda was not in fact a licensed physician, her trust issues were exacerbated and came back in full force.  These trust issues have flowed over into Plaintiff's marriage, interfering with her intimacy with her husband**

2

as she finds it very difficult to engage in sexual relations with him. Plaintiff not only feels violated by Akoda, but also feels she was sexually and physically abused by him. Akoda performed vaginal examinations on Plaintiff during labor and performed Cesarean section surgery on her to deliver her child. Before learning the truth about Akoda, Plaintiff had worked hard to overcome her deep fear and distrust, and to develop and maintain confidence and trust in her OB/GYN provider, Moore & Associates, believing that the doctors working under the practice and that treated her were, at the very least, legitimately credentialed, legally licensed, and possessed the proper education necessary in the practice of medicine. On June 19, 2017, Plaintiff was horrified and devastated to discover Akoda was not a "real" doctor. She became obsessed with her search for understanding of how Akoda received privileges at Prince George's Hospital to touch her, and to "cut into her." Plaintiff's search for understanding of this situation has created in her a substantial distrust of doctors and because of this distrust, she is now unable to seek medical treatment. This lack of trust was amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda before allowing him to perform surgeries in its hospital. Plaintiff's lack of trust is impeding her ability to select any new health or mental care provider, and consequently, seeking medical and mental health care for the emotional trauma she has suffered. She continues to cope daily with her feelings of violation and harm as best she can, but has been emotionally devastated by this situation. As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

*Plaintiff has not seen any health care providers for treatment of these injuries. Plaintiff began experiencing these injuries when she learned in June 2017 that Akoda was not*

*really a doctor. Plaintiff learned from an online Moore & Associates website when she*

*searched for the name of the doctor who delivered her son that Akoda's photograph had been*

*removed. She then located the hospital paperwork showing Akoda's name and she then*

*searched the internet to see where he was practicing. Through this search Plaintiff found a*

*U.S. Justice Department press release detailing Akoda's criminal charges. Plaintiff is seeking*

*only non-economic damages.*

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**SUPPLEMENTAL ANSWER:**

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

*Plaintiff is relying on her attorneys for these allegations and Plaintiff has no personal*

*knowledge of them.*

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**SUPPLEMENTAL ANSWER:**

**Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these**

**damages is for the jury to determine. Plaintiff seeks damages for these injuries as**

**determined by the jury.**

*Plaintiff is not making a claim for economic damages.*

4

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**SUPPLEMENTAL ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements. All clients retained by the Law Offices of Peter G. Angelos, P.C., the Law Offices of David Ellin and Z Law, LLC have signed the same retainer agreement.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**SUPPLEMENTAL ANSWER:**

**Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

5

JA892

*Attachment A is a list of persons represented jointly by the Law Office of Peter G.*

*Angelos, P.A., the Law Offices of David Ellin and Z Law, LLC.*

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**SUPPLEMENTAL ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome. As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda. It is not limited in time or scope and seeks information that is not relevant.**

*Plaintiff is able at present to recall the following medical history:*

- *For the past ten years, Plaintiff's family doctor has been Mark Major, M.D., 1300 Spring Street, Silver Spring, MD 20910*

- *Shelly Williams, M.D., 8241 Georgia Avenue, Silver Spring, MD 20910 was Plaintiff's family doctor before Dr. Major*

- *Shawn Howell, M.D., 2311 M Street NW, Washington DC was Plaintiff's cardiologist, who diagnosed her with vasovagal syncope. After the diagnosis, Plaintiff did not see Dr. Howell again until her pregnancy*

- *Danielle Waldrop, M.D., 7525 Greenway Center Drive, Suite 216, Greenbelt, MD 20770 was Plaintiff's Ob-Gyn during her pregnancy*

- *ATI Physical Therapy, 2900 Belcrest Center Drive, Suite 104-A, Hyattsville, MD 20782 (treatment for back pain)*

6

JA893

- ***Silver Spring Medical Center, 11301 Amherst Avenue, Suite 102, Silver Spring,***

  ***MD 20902 (physical therapy following motor vehicle accident).***

## SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

### General Objections

1.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks
to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to each of Defendant's requests to the extent that the request is
vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to
the discovery of admissible evidence.

3.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks
documents that are publicly available or that Defendant may more directly, easily, and
conveniently obtain from other sources.

4.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks
documents beyond Plaintiffs' possession, custody or control.

5.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks
the production of materials or the disclosure of information protected from discovery by the
attorney-client privilege, the work product doctrine, or any other applicable protections.  The
inadvertent production of materials or information subject to the protections of the attorney-
client privilege, the attorney work product doctrine, or similar privileges or protections from
discovery shall not constitute a waiver of any such privileges or protections.

6.     To the extent that Defendant requests documents and information that constitute
sensitive, confidential, or proprietary information, Plaintiff will produce such documents only
after the execution of a suitable confidentiality agreement between the parties.

JA894

7.    Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.    These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.    Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.    These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.    The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.    The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and

JA895

every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant. Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case. If Defendant will clarify it, Plaintiff will attempt to respond.**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

*Subject to and without waiving these objections, to the extent any such documents exist, they will or have been produced.*

**REQUEST NO. 34:**

JA896

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**SUPPLEMENTAL RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.**

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant.*

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**SUPPLEMENTAL RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury.  Plaintiff's medical records relating to the history set out in response to interrogatory no. 15 are not relevant.*

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**SUPPLEMENTAL RESPONSE:**

**The requested documents will be produced.**

10

JA897

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**SUPPLEMENTAL RESPONSE:**

**The requested documents will be produced.**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**SUPPLEMENTAL RESPONSE:**

**Objection. Plaintiff has not obtained any statements. Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

*Subject to and without waiving these objections, Plaintiff has not made any sworn statements in the Akoda litigation.*

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**SUPPLEMENTAL RESPONSE:**

JA898

Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**SUPPLEMENTAL RESPONSE:**

Plaintiff adopts by reference her response to Request No. 42.

*There are no financial arrangements with anyone other than Plaintiff's attorneys.*

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**SUPPLEMENTAL RESPONSE:**

The requested documents will be produced.

*Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

JA899

CONRAD & O'BRIEN, P.C.

_/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620


LAW OFFICES OF PETER G. ANGELOS, P.C.


_/s/ Paul M. Vettori_____
Jay D. Miller (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
Danielle S. Dinsmore (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
Paul M. Vettori (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
One Charles Center
100 North Charles Street
Baltimore, MD  21201
Telephone: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff, Monique Russell*

Dated: June _13_, 2019

13

**VERIFICATION**

I, Monique Russell, hereby aver that the factual statements in the foregoing

*Supplemental Answers to Interrogatories* are true and correct to the best of my knowledge,

information and belief, and that these Answers are made subject to the penalties relating to

unsworn falsification to authorities.

_____
Monique Russell

Dated: June ___7___ , 2019

14

JA901

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories and Document Requests* to be served on the

following via electronic mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

/s/ *Nicholas M. Centrella*
Nicholas M. Centrella

June ⎯⎯ , 2019

JA902

ATTACHMENT A TO SUPPLEMENTAL DISCOVERY RESPONSES

| NAME | D/O/B |
| --- | --- |
| Abudu, Yemis | |
| Adams, Jonae | |
| Adebayo, Atinuke O. | |
| Adebayo, Titilope | |
| Adekanbi, Comfort | |
| Adeoye, Aebola | |
| Adesalu, Folasade | |
| Adigwe, Susan | |
| Akinwekomi, Taiwo | |
| Akosile, Abosede | |
| Alleyne, Dionne | |
| Anderson, Fatama | |
| Andrews, Ivona | |
| Arrey, Gennette Nker | |
| Ashton, Jennifer | |
| Atemnkeng, Precilia | |
| Ayodele, Olushola | |
| Ayoola, Abeni | |
| Azienwi, Marie Takem | |
| Bailey, Lameche | |
| Barnes, Whitney | |
| Barney, (Burc) Kededra | |
| Bell, Jimekiah | |
| Bendu, Makala | |
| Benford, (Walder) Tiffany | |
| Benjamin, Daneylle | |
| BienAime, Lise | |
| Bonaparte, Karen | |
| Bowden, Natasha | |
| Braima, Memunatu | |
| Braxton, Jovan | |
| Briscoe, Myeshia | |
| Broomes, To Asia | |
| Brown, Brittney | |
| Brown, Christine | |
| Brown, Sharon | |
| Brown, Shaunelle | |

| NAME | D/O/B |
|------|-------|
| Brown, Tiffany | |
| Bryant, Ladorsha | |
| Burris, Donika | |
| Burris, Rainelle | |
| Butler, Renee | |
| Byrd, Sekeithia | |
| Caldwell, Amisha | |
| Calix, Karina | |
| Coleman, Rashena | |
| Coley, Takia | |
| Collins, Jayde | |
| Cosby, Taylor | |
| Craig, Candace | |
| Derricott, Tiara | |
| Donnell, Tyche | |
| Davis, Renita | |
| Daniels, Brittany | |
| Davis, Amoni | |
| Davis, Ashle | |
| Davis, Stefanie | |
| Deville, Ashley | |
| Deville, Ebony | |
| Deville, Tiffany | |
| Diamond, Ashley | |
| Dinga, Andin | |
| Dunham, Deneise | |
| Eley, Marra | |
| Faison, Markinda | |
| Felder, Andrea | |
| Felix, Altagracia | |
| Ferguson, Darnisha | |
| Ferguson, Zenea | |
| Fornah, Fatu | |
| Franklin, Alexis | |
| Franklin, Khenae | |
| Fungafat, Tandika | |
| Garcia, Yancia | |

| NAME | D/O/B |
|------|-------|
| Gaskins, Richana | |
| Gibbs, Gabrielle | |
| Gines, Jasmine | |
| Ginyard, Angela | |
| Goldston, Shadona | |
| Gonzales, Hazzmin | |
| Green, Crystal | |
| Grier, Gethsamane | |
| Hall, Asia | |
| Hall, Monica | |
| Hansberry, Yvette | |
| Harley, Ashley | |
| Harper, Aqueba | |
| Harper, Deshonta | |
| Harris, Dayshelle | |
| Harris, Kimberly | |
| Harrison, Charnika | |
| Hearst, Lashell | |
| Henry, Lazett | |
| Henry, Shaquella | |
| Herron, Angela | |
| Holder, Kimberly | |
| Hudson, Chanell | |
| Ifekoya, Adeola | |
| Jackson, Danielle | |
| Jalloh, Ramatulie | |
| Jawla, Dalla | |
| Jenkins-Williams, Tris | |
| Jimason, Tasha | |
| Jobe, Princess | |
| Johnson, Alonda | |
| Johnson, Deidra | |
| Johnson, Jasmine | |
| Johnson, Keisha | |
| Jones, Carol | |
| Jones, Jasmine | |
| Jordan-Worthy, Krytiseya | |

| NAME | D/O/B |
|------|-------|
| Judd, Yvonnda | |
| Kaffo, Urowoli (Lucy) | |
| Kamara, Etta | |
| Kamara, Isatu | |
| Kanu, Fatmata | |
| King, Leia | |
| Knox-Stokes, Ashanta | |
| Koroma, Bridgetta | |
| Koroma, Margaret | |
| Kosh, Charmayne | |
| Kosh, Nia | |
| Kwi, Courage | |
| Langford, Deja | |
| Leslie, Hazel | |
| Lewis, Dawnesheia | |
| Lindsay, Chelsey | |
| Little, Ciera | |
| Lofland, Zymira | |
| Lovell, Erica | |
| Madubuatta, Miriam Ada | |
| Martin, Crystal | |
| Mathis, Markquonda | |
| Maynard, LaChey | |
| Mayo, Tamia | |
| McAllister, Tara | |
| McGee, Lakenyatta | |
| McKnight, Denia | |
| McLaughlin, Ann Marie | |
| Metts, Torquesa | |
| Moorman, Shanita | |
| Morgan, Patricia | |
| Nickens, Klea | |
| Nadav, Mattu | |
| Nguti, Mirabel | |
| Nkeng, Sylvia | |
| Oakes, Ashley | |
| Olukoga, Emily | |

| NAME | D/O/B |
|------|-------|
| Oni, Abimbola | |
| Palmer, Brittany | |
| Parker, Jazzman | |
| Parker, Sylvia | |
| Pitts, Ashley | |
| Platt, Endia | |
| Powell, Tina | |
| Proctor, Latika | |
| Proctor, Shabray | |
| Proctor, Shamika | |
| Randall, Amina | |
| Ray-Gie, Trayeshia | |
| Reed, Brishona | |
| Reeves, Chimere | |
| Reid, Patricia | |
| Riggins, Jasmine | |
| Robbins, Lashawnda | |
| Robinson, Clara | |
| Ross, Dinah | |
| Rush, Shartae | |
| Russell, Monique | |
| Sambola, Arku | |
| Samuel, Titilayo | |
| Savoy, Keyona | |
| Savoy, Sheika | |
| Sawyer, Racquetta | |
| Sawyer, Ursula | |
| Scarbourough, Micaela | |
| Seegars, Toniesha | |
| Sesay, Finda | |
| Shobowale, Oritoke | |
| Simpkins, Leslei | |
| Simpson, Felicia | |
| Smith, Jalisa M. | |
| Smith, Iris Samone | |
| Smith, Tammy | |
| Snowden, Caprice | |

JA908

| NAME | D/O/B |
|---|---|
| Snowden, Imani | |
| Sorrell, Tiara | |
| Spencer, Cassandra | |
| Spencer, Faatimah | |
| Spencer, Nafiysha | |
| Spriggs, Tiara | |
| Stagg, Shanika | |
| Stallings, Lynette | |
| Stallings, Christina | |
| Stocks, Artavia | |
| Streater, Roneka | |
| Sykes, Tyiesha | |
| Taylor, Chauntice | |
| Taylor, Latiffany | |
| Thomas, Tanja | |
| Thomas, Victoria | |
| Thomas-Walker, Carla | |
| Thornton, Lisa | |
| Tilghman, Chantell | |
| Tilghman, Chernell | |
| Tilghman, Faith | |
| Toure-Davis, Nathalie | |
| Tyler, Alexa | |
| Valentine, Diamisha | |
| Van-Overbeek, April Cain | |
| Veney, Lauren | |
| Wade, Britnee | |
| Wade, Kayla | |
| Walker, Alicea | |
| Wallace, Shelly | |
| Walton, Aisha | |
| Ward, Iesha | |
| Watts, Ericka | |
| White, Shavonda | |
| Whitley, Alexis Joanne | |
| Williams, Alexis | |
| Williams, Apryl Monet | |

JA909

| NAME | D/O/B |
|---|---|
| Williams, Candice | |
| Williams, Lynette | |
| Williams, Michelle | |
| Williamson, Keyinoshia | |
| Wilson, Breanna | |
| Woodfolk, (nee Torri) | |

JA910

# <u>EXHIBIT 15</u>

JA911

Message
_____

| | |
|---|---|
| **From:** | Corrado, Kara [/O=ECFMG/OU=PHILADELPHIA/CN=RECIPIENTS/CN=KOLEYN] |
| **Sent:** | 3/18/2016 8:20:18 AM |
| **To:** | Cover, Lisa [/O=ECFMG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cover, Lisa5df]; Paolini, Suzann [/O=ECFMG/OU=Philadelphia/cn=Recipients/cn=SPaolini] |
| **CC:** | Mizak, Roman [/O=ECFMG/OU=Philadelphia/cn=Recipients/cn=RMizak] |
| **Subject:** | RE: Prince George's County Police Department-Federal investigation |

Hi all,

Igbarse is a name that familiar to me – he was a creds committee case from about 15 years ago. I'll follow up with Virginia to see if there is additional background to help with context.

Kara

_____

Ms. Kara Corrado, J.D.
Director, Credentials Services
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

_____

**From:** Cover, Lisa
**Sent:** Thursday, March 17, 2016 6:14 PM
**To:** Paolini, Suzann; Corrado, Kara
**Cc:** Mizak, Roman
**Subject:** Re: Prince George's County Police Department-Federal investigation

Great, let's connect w Kara in the am.

Sent from my iPhone

On Mar 17, 2016, at 5:33 PM, Paolini, Suzann <SPaolini@ECFMG.org> wrote:

> Lisa,
>
> No, he didn't elaborate on documentation previously received. I recorded the call, and he was pretty specific about next steps, so we can listen to the call tomorrow.
>
> This is a complex case and it appears that Dr. Charles is well known to the Credentials Committee. We have three recorded instances for which there has been allegation that Dr. Charles provided a false response to item 1 on an application for the USMLE and applied to take a Step that he had already passed. Our records also indicate that he received two ECFMG certificates, obviously obtained by falsifying information on subsequent applications.
>
> In addition Naima, who took the initial call from Detective Evan, was able to locate an additional Identification number under the name Oluwafemi Charles Igberase, 0-482-700-2, and has request for this file. Once we have the additional file we'll be in a better position to determine what the authorities might be looking for.
>
> I'll be in all day tomorrow so just let me know when you'd like to discuss this case.

Have a good evening!
Suzann

---

**From:** Cover, Lisa
**Sent:** Thursday, March 17, 2016 1:34 PM
**To:** Paolini, Suzann
**Subject:** RE: Prince George's County Police Department-Federal investigation

Did he receive the information that we sent to the agency in 2014?   Did he say what more he wants
from us?

---

**From:** Paolini, Suzann
**Sent:** Thursday, March 17, 2016 1:32 PM
**To:** Cover, Lisa
**Subject:** FW: Prince George's County Police Department-Federal investigation

Lisa,

Here is the request from Detective Evans.  He indicated that his preference would be to come to the office
to discuss this case and have the ability to conference in the Maryland AG's office.

Applicant details:
USMLE ID # 05532585
Certified 8/18/97
Medical school - University of Benin School of Medicine, NIGERIA
Citizenship – Nigerian
Exams for certification:
Step 2 CK – 8/28/96 (P)
English      - 8/28/96 (P)
Step 1       - 6/11/97 (P)

Address as of 5/30/2011
3013 Kasar Ct
Waldorf MD 20603

Suzann

---

**From:** Evans, Kenneth P. [mailto:KPEvans@co.pg.md.us]
**Sent:** Thursday, March 17, 2016 12:58 PM
**To:** Paolini, Suzann
**Subject:** Prince George's County Police Department-Federal investigation

Dear Susan,

Attached are the copies of the Federal Subpoena and response from your Custodian of Records.  Please
get back to me when you can, either by phone or email is fine.  Again, thank you for calling back so
quickly today in this matter.

ECFMG_RUSS_0003415

JA913

**Detective Evans  #2434**
**Prince George's County Police Department**
**Criminal Investigation Division**
**Sexual Assault Unit**
**301-772-4908 main**
**301-772-4273 direct**

---

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

---

Confidential

# **<u>EXHIBIT 16</u>**

Message

| From: | Corrado, Kara [/O=ECFMG/OU=PHILADELPHIA/CN=RECIPIENTS/CN=KOLEYN] |
|---|---|
| **Sent**: | 11/29/2016 11:30:07 AM |
| **To**: | Cover, Lisa [/O=ECFMG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cover, Lisa5df] |
| **Subject**: | RE: Google Alert - "educational commission for foreign medical graduates" |

Will do.

_____
Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

**From:** Cover, Lisa
**Sent:** Tuesday, November 29, 2016 11:29 AM
**To:** Corrado, Kara
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

> **Privileged**

Lisa

**From:** Corrado, Kara
**Sent:** Tuesday, November 29, 2016 11:14 AM
**To:** Cover, Lisa
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Lisa – please review!     **Privileged**

**Privileged**

_____
Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG

ECFMG_RUSS_0007347

JA916

3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

---

**From:** Amy Buono [mailto:ABuono@NBME.org]
**Sent:** Wednesday, November 23, 2016 12:09 PM
**To:** Corrado, Kara; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Hi Kara,

Glad to know you are already aware of the case.  Can you provide an update as to the work you've done so far with the US Attorney's Office?

Thanks again and Happy Thanksgiving!

Amy

---

**From:** Corrado, Kara [mailto:KCorrado@ecfmg.org]
**Sent:** Wednesday, November 23, 2016 11:31 AM
**To:** Amy Buono; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Hi Amy,

We have been involved with this case and worked closely with the US Attorney's Office in Maryland on it.  At Maryland's request, we did not move forward in our irregular behavior process until Maryland had completed its investigation. We are now moving forward with our process.  As soon as we complete our irregular behavior process, we will certainly provide you with an update.

Have a happy thanksgiving!

Kara

_____
Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

---

**From:** Amy Buono [mailto:ABuono@NBME.org]
**Sent:** Wednesday, November 23, 2016 10:37 AM
**To:** Corrado, Kara; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** FW: Google Alert - "educational commission for foreign medical graduates"

Confidential

Good morning Kara and Lisa,

Hope you are well and taking some time off for the holiday.

I'm passing along the below notice from the US Attorney's Office in Maryland re: an individual who sat for USMLE under different aliases and allegedly obtained multiple fraudulent ECFMG Certifications.  After you have conducted an investigation, please let me know your findings.

The aliases we've identified in USMLE records are:

**Oluwafemi Charles Igberase**, USMLE ID 0-482-700-2  (There is Irregular Behavior listed under this identity.)

**John Nosa Akoda**, USMLE ID 0-553-258-5

-Amy

---

**From:** Shelley Green
**Sent:** Tuesday, November 22, 2016 3:34 PM
**To:** Gerry Dillon; 'David Johnson (FSMB)'; Amy Buono; Mary Beth St. John; Suzanne Williams
**Cc:** Trish Weaver
**Subject:** FW: Google Alert - "educational commission for foreign medical graduates"

I thought you would be interested in the information below concerning prosecution of an individual who obtained fraudulent ECFMG certifications in the 1990s and a medical license in 2011.  We are looking into his interactions with USMLE.

https://www.justice.gov/usao-md/pr/bowie-man-pleads-guilty-misusing-social-security-number-fraudulently-obtain-medical

---

NEWS

Bowie Man Pleads Guilty to Faking Medical License
Patch.com
Between 1992 and 1998, Igberase obtained three certifications from the **Educational Commission for Foreign Medical Graduates** under different ...

G+ f  ⚹  Flag as irrelevant

See more results | Edit this alert

*This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.*

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

ECFMG_RUSS_0007350

# **EXHIBIT 17**

 **ECFMG®**

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

**Date:** March 1, 2017

| To: | |
|---|---|
| American Medical Association | Health Professions Council of South Africa |
| Australian Health Practitioner Regulation Agency | Medical and Dental Council of Nigeria |
| Australian Medical Council | Medical and Dental Practitioners Council of Zimbabwe |
| Australian State and Territory Medical Boards | Medical Council of Canada |
| Bahamas Medical Council | Medical Council of Ireland |
| Canadian Provincial Medical Licensing Boards | Medical Council of New Zealand |
| Danish Patient Safety Authority | National Board of Medical Examiners |
| Dubai Health Authority | National Resident Matching Program |
| Dutch Individual Healthcare Professions Register | Norwegian Directorate of Health |
| Electronic Residency Application Service, AAMC | Other Medical Regulatory Authorities |
| Federation of Medical Regulatory Authorities of Canada | Seychelles Medical and Dental Council |
| Federation of State Medical Boards of the United States | Uganda Medical and Dental Practitioners Council |
| General Medical Council of the United Kingdom | U.S. Graduate Medical Education Staff |
| | U.S. State Medical Licensing Authorities |

**From:** Lisa L. Cover, MHA    *Lisa L. Cover*
Senior Vice President for Business Development & Operations

**Subject:** Notice #101 – Irregular Behavior Cases and Associated Actions & Sanctions

The Educational Commission for Foreign Medical Graduates (ECFMG®) of the United States works on behalf of domestic and international medical regulatory authorities to protect the public through its programs and services, including primary-source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs or services to be *irregular behavior.* The Medical Education Credentials Committee of the ECFMG Board of Trustees reviews allegations of irregular behavior and makes determinations about them in accordance with its policies and procedures. The following are actions and sanctions issued by the Medical Education Credentials Committee.

We hope that you find this information helpful as you work to protect the public. If you have any questions, please do not hesitate to contact me at lcover@ecfmg.org or 001-215-823-2107.

| Date of Action | Name & Identification # | Determination |
|---|---|---|
| *INDIVIDUALS FOUND TO HAVE ENGAGED IN IRREGULAR BEHAVIOR* | | |
| | | |

**Concerns Other Applicants**

ECFMG® is an organization committed to promoting excellence in international medical education.

ECFMG Actions,
Notification #101
Page 2 of 3

**Concerns Other Applicants**

*INDIVIDUAL WITH A CHANGE IN SANCTION*

**Concerns Other Applicants**

ECFMG_RUSS_0006449

JA922

ECFMG Actions,
Notification #101
Page 3 of 3

| UPDATE ON INDIVIDUAL SANCTIONED BY ECFMG | | |
|---|---|---|
| November 30, 2016 | AKODA, JOHN NOSA<br><br>ECFMG/USMLE 0-553-258-5<br><br>**Also Known As:** IGBERASE, OLUWAFEMI CHARLES*<br><br>ECFMG/USMLE 0-482-700-2<br><br>**Also Known As:** OLUWAFEMI, CHARLES IGBERASE*<br><br>ECFMG/USMLE 0-519-573-0<br><br>***Standard ECFMG Certificate had previously been permanently revoked by ECFMG.** | **Description**<br>• As part of an October 2016 plea agreement with the United States, applicant admitted to previously providing a falsified passport to ECFMG which he used to obtain ECFMG Certification under the alias John Nosa Akoda.<br><br>**Actions Taken & Sanctions**<br>• Permanent revocation of Standard ECFMG Certificate.<br>• Permanent annotation included on reports sent by ECFMG. |

ECFMG_RUSS_0006450

JA923

# **EXHIBIT 18**

JA924

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | | |
| | * | Hon. Wendy Beetlestone |
| v. | * | |
| | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| | * | |
| Defendant | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**PLAINTIFF DESIRE EVANS'S ANSWERS TO FIRST SET OF
INTERROGATORIES AND RESPONSES TO FIRST SET OF
<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

Plaintiff, Desire Evans, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

JA925

By providing information in response to the interrogatories, Plaintiff does not admit the

relevance or admissibility of any of the information supplied but instead reserves the right to object

to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Describe in detail each and every instance in which you were a patient of Akoda,
including how you chose Akoda as your doctor, the date you were a patient, and the specific
nature of the treatments and examinations performed.

**ANSWER:**

**Objection is made to this interrogatory as it overly broad and unduly burdensome,**

**and concerns matters which are more appropriately addressed by deposition.  Without**

**waiving this objection, the Plaintiff was a patient of Akoda during her labor on March 17,**

**2016 and the subsequent delivery of her infant.  The Plaintiff further refers Defendant to the**

**Plaintiff's medical records for details relating to her care and treatment by Akoda.  The**

**Plaintiff went to Prince George's Hospital Center for her delivery because her primary**

**OBGYN treated patients there.**

**INTERROGATORY NO. 2:**

Describe in detail the alleged injuries for which you are seeking to recover in this
litigation, including when you first became aware of those injuries, how you became aware of
those injuries, whether you have seen any health care provider for treatment of those alleged
injuries and if so, who and when, and each and every aspect of those injuries.

**ANSWER:**

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as**

**well as Plaintiffs' loss to her marital relationship.  This Plaintiff has in the past, is presently,**

**and will in the future continue to suffer excruciating emotional anguish as well as fear and**

**anxiety, as a result of learning that Akoda was a fraud.  This Plaintiff will also be claiming**

2

JA926

economic damages for past, present and future medical expenses, lost wages, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiffs' life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.

The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct. She first learned this information from the radio. She subsequently looked up information about Akoda on the internet.

The Plaintiff is undergoing care from a psychologist, Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D. and is currently taking ███████████████ ████████████ This answer will be supplemented as discovery proceeds.

**INTERROGATORY NO. 3:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 5, 10-47 and 69-69.

ECFMG holds itself out as protecting the public through its programs and services, including primary-source verification of physician credentials. ECFMG undertook to render certification services and primary source verification services, among others, for Igberase on multiple occasions, under multiple identifies, and to represent to Howard University

3

JA927

Hospital, Prince George's Hospital Center, the Maryland Board of Physicians, among others, that Igberase was a bona fide medical doctor.

ECFMG owed a duty to Plaintiffs and other members of the Class to carefully review Igberase's multiple applications for certification, appropriately perform primary source verification and to carefully investigate Igberase when it was informed that Igberase was using a false social security number, potentially a false name, and other false documentation.

The Plaintiffs' investigation is ongoing.

**INTERROGATORY NO. 4:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 70-80.

ECFMG, in breach of its duty to the Plaintiffs and Putative Class Members, failed to detect that Igberase's medical school diploma was in the name of Johnbull Enosakhare Akoda, not John Charles Akoda or John Charles Nosa Akoda or John Nosa Akoda, all names used in documents submitted by Akoda.

ECFMG was negligent in failing to learn that Akoda was Igberase. Among other things, ECFMG knew that in August 2000 allegations had been made to the JSMC that Akoda and Igberase were the same person. The JSMC notified ECFMG of this and told ECFMG that Akoda was using Igberase's social security number.

Igberase appeared at the offices of ECFMG on September 27, 2000 and told ECFMG that Igberase was his cousin and admitted he had used Igberase's social security number

4

JA928

"pending INS clearance of his own social security number."  Additionally, the passport Igberase provided to ECFMG at that meeting contained one too few numbers and could not have been valid.

There was no effort by ECFMG to authenticate the passport.  In breach of its duty, ECFMG failed to take any action against Igberase for this misuse of a social security number.

Further in breach of its duty, ECFMG failed to compare the photograph of Igberase in its files with the person claiming to be Akoda who was sitting in ECFMG's office in Philadelphia.  Had ECFMG done so, ECFMG would have known that Akoda and Igberase are the same person.

ECFMG, in breach of its duty, failed to advise the Howard University Hospital residency program, the Maryland Board of Physicians or Prince George's Hospital Center of the information in its files that Igberase may have had a previous certification that was revoked, that ECFMG had investigated whether Akoda is Igberase or that Igberase was barred under another certification.

ECFMG, in breach of its duty, and in breach of its own policies and procedures regarding irregular behavior, failed to take reasonable steps to verify the truth of the references submitted by Igberase when he applied for the residency program at Howard University Hospital under the Akoda identity.  In 2006 Igberase submitted three (3) letters of recommendations through ERAS under the Akoda identity.  ECFMG sent letters to each of the references, with copies of their respective alleged letters of recommendations, seeking to learn if they were authentic.  ECFMG did not receive responses from the supposed references.  Nevertheless, ECFMG provided primary source verification to Howard University Hospital about "Akoda" – a fictitious identity.

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint.**

**The numerous breaches of duty by ECFMG led to the fraudulent certification of Igberase, under various names, but for which he would not have been admitted to the Howard University Hospital residency program, he would not have received a Maryland medical license, he would not have obtained privileges at Prince George's Hospital Center, he would not have been able to practice medicine, and he would not have been able to cause the harms to Plaintiffs.**

**ECFMG's numerous breaches of duty increased the risk of harm to Plaintiffs and other members of the Class by Igberase's conduct.**

**As a direct, proximate, immediate and foreseeable result of ECFMG's conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matters more appropriately addressed at deposition. Without waiving this**

JA930

objection, the named Plaintiff contends that all care and treatment provided by Akoda was inappropriate, including but not limited to the fact that he was not an appropriately licensed and credentialed physician.  He oversaw this Plaintiff's labor care, including the performance of intrusive pelvic examinations, and he performed the Plaintiff's delivery.

Prior to delivery, the Plaintiff felt that Akoda was unprofessional, and was made uncomfortable by the way he touched her.  Her husband also felt uncomfortable with Akoda's conduct.  Additionally, while Ms. Evans was pushing, Akoda started manipulating the Plaintiff's clitoris.  Akoda told Ms. Evans that he had to get her aroused, which would help the baby come out.

Ms. Evans feels as though she was sexually molested, particularly given what is now known about Akoda.  The baby was ultimately delivered via c-section.  He was not properly licensed, credentialed or qualified to provide any of this case.  This Plaintiff would never have exposed herself or her child to a non-health care provider had she been appropriately advised that he was not a validly licensed or credentialed physician. This answer will be supplemented as discovery proceeds.

The Defendant is further referred to the medical records.

Plaintiffs investigation is ongoing.

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

7

JA931

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services.  Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud.  Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.**

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition.  Plaintiff's contacts with Akoda are reflected in the medial records which are being produced.    The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.**

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

8

JA932

Plaintiff adopts by reference her Answer to Interrogatory No. 2. The amount of these damages is for the jury to determine. Plaintiff seeks damages for these injuries as determined by the jury.

**INTERROGATORY NO. 10:**

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

**ANSWER:**

Objection is made to this request as it seeks to elicit information which goes beyond the proper scope of discovery. Without waiving this objection, the Plaintiff is a named class representative in a class action filed in the Circuit Court for Prince George's County, Maryland, *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

9

JA933

Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery.  Plaintiff's counsel represents numerous persons who are putative members of the class.  Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records.   Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

The Plaintiff's attorneys assisted in the preparation of these answers.

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

In addition to the plaintiff and her attorneys, the Defendant is referred to the Plaintiff's initial disclosures. This Plaintiff's family and treating health care providers may have personal knowledge of her care and treatment by Akoda, as well as her current injuries. These include her husband, Michael Evans, as well as her mother, Renee Clifton.  This answer will be supplemented as discovery proceeds.

**INTERROGATORY NO. 15:**

JA934

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant.  Without waiving this objection, the Plaintiff had received medical care from Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D.**

**INTERROGATORY NO. 16:**

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as fact witnesses a trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as expert witnesses at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 18:**

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

11

**Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection. By way of further answer, and without waiver, discovery and Plaintiffs' investigation are still continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.**

## DOCUMENT REQUESTS

### General Objections

1.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.    Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

12

JA936

6.     To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.     Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.     These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.     Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.    These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.    The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of

JA937

Plaintiff.

12.    The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

JA938

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced.  Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement.   To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

15

JA939

**Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case.  If Defendant will clarify it, Plaintiff will attempt to respond.**

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

**RESPONSE:**

**Objection.  This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the records deposition subpoena served on ECFMG, there are none.**

**REQUEST NO. 12:**

16

JA940

All documents about JSMC and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 13:**

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

**Objection. This request is overly broad and unduly burdensome. Without waiver, any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced limited to the class members in this case.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

17

JA941

**Objection.  This request appears to be duplicative of other requests to which Plaintiff**

**has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 17:**

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of**

**the Plaintiff or her counsel will be produced.**

**REQUEST NO. 18:**

All documents relating to A.G. Chaudry, M.D. and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of**

**the Plaintiff or her counsel will be produced. Other than the medical records, none.**

**REQUEST NO. 19:**

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 21:**

18

JA942

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 22:**

All documents relating to the Maryland Board of Physicians and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by attorney client privilege or the work product doctrine.  Without waiving this objection, any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel he requested documents will be produced.**

**REQUEST NO. 25:**

19

JA943

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 26:**

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by attorney client privilege or the work product doctrine, without waiving this objection. The Defendant is referred to the medical records.**

**REQUEST NO. 29:**

20

JA944

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

**Objection is made to the request to the extent it concerns a medical and/or legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine.  Without waiving this objection, the Defendant is referred to the medical records.**

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**Objection is made to this request to the extent it calls for a legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine.  Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

21

JA945

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection is made to this request as it is overly broad and not properly limited in time and scope. Without waiving this objection, documentation to support the Plaintiff's claim for lost wages will be produced as it is received.**

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

JA946

**RESPONSE:**

Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.  To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, and are in the possession of Plaintiff or her counsel, these documents will be produced.

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

Documents addressing the Plaintiffs examination and treatment of alleged injuries will be provided as they are received.

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action.  Medical bills related to examination and treatment for her injuries relevant to this lawsuit will be provided as they are recieved.

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

23

JA947

**RESPONSE:**

      **None.**

**REQUEST NO. 39:**

      All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

      **Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

**REQUEST NO. 40:**

      All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

**RESPONSE:**

      **Objection is made to the extent that any documents responsive to this request were prepared in anticipation of litigation or at the request of counsel.  Any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 41:**

      All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

      **Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-**

24

JA948

**product doctrine. Without waiving this objection, the Plaintiff Desire Evans has not**

**obtained any statements from ECFMG.**

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds**

**that it seeks documents protected from discovery by the attorney-client privilege and on the**

**grounds that it requests documents which are not relevant to any claim or defense in this**

**action.**

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds**

**that it seeks documents protected from discovery by the attorney-client privilege and on**

**the grounds that it requests documents which are not relevant to any claim or defense in**

**this action.**

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating

JA949

each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

    **Any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 45:**

    All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

**RESPONSE:**

    **Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product.  Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 46:**

    All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

    **Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product.  Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 47:**

    All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

    **Plaintiff has not decided what documents it will introduce at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).**

JA950

CONRAD & O'BRIEN, P.C.

     _/s/ Nicholas M. Centrella_____

Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor_____
Jonathan Schochor (Admitted Pro Hac Vice )
jschoehor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

Dated: March 29, 2019

27

JA951

**VERIFICATION**

I, Desire Evans, hereby aver that the factual statements in the foregoing *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Answers* are made subject to the penalties relating to unsworn falsification to authorities.


_____
Desire Evans

Dated: March 28, 2019

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

Dated: March 29, 2019

# **EXHIBIT 19**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | | |
| | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| | * | |
| Defendant | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF ELSA POWELL'S ANSWERS TO FIRST SET OF**
**INTERROGATORIES AND RESPONSES TO FIRST SET OF**
**REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Elsa Powell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

JA955

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition. Without waiving this objection, the Plaintiff was treated by Akoda during portions of her prenatal care, beginning in approximately April of 2014, during her labor on September 17, 2014, for the subsequent delivery of her infant, and for post-natal care through January of 2015. The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda. The Plaintiff was referred to the practice of Abdul Chaudry, M.D. for prenatal care by another obstetrician-gynecologist, which is where she first encountered Akoda.**

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### ANSWER:

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiffs' loss to her marital relationship. This Plaintiff has in the past, is presently,**

JA956

and will in the future continue to suffer excruciating emotional anguish as well as fear and
anxiety, as a result of learning that Akoda was a fraud.  This Plaintiff will also be claiming
economic damages for past, present and future medical expenses, future health and life care
needs, including but not limited to psychiatric and/or psychological counseling.  Copies of
billing invoices for prior medical care will be provided as they become available.  Copies of
Plaintiffs' life care plan and economic report will be provided upon completion.  This answer
will be supplemented as discovery proceeds.

The Plaintiff first experienced her injuries and damages relevant to this matter upon
learning about Akoda's fraudulent conduct.  She first learned this information from another
patient of Adbul Chaudry M.D.'s practice in late 2018.  She subsequently looked up
information about Akoda on the internet.

**INTERROGATORY NO. 3:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed
a duty to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and
calls for a legal conclusion.  Without waiving this objection, the facts that support these
allegations are set forth in the Complaint, including but not limited to paragraphs 5, 10-47
and 69-69.

ECFMG holds itself out as protecting the public through its programs and services,
including primary-source verification of physician credentials. ECFMG undertook to render
certification services and primary source verification services, among others, for Igberase on
multiple occasions, under multiple identifies, and to represent to Howard University

3

Hospital, Prince George's Hospital Center, the Maryland Board of Physicians, among others, that Igberase was a bona fide medical doctor.

ECFMG owed a duty to Plaintiffs and other members of the Class to carefully review Igberase's multiple applications for certification, appropriately perform primary source verification and to carefully investigate Igberase when it was informed that Igberase was using a false social security number, potentially a false name, and other false documentation.

The Plaintiffs' investigation is ongoing.

**INTERROGATORY NO. 4:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 70-80.

ECFMG, in breach of its duty to the Plaintiffs and Putative Class Members, failed to detect that Igberase's medical school diploma was in the name of Johnbull Enosakhare Akoda, not John Charles Akoda or John Charles Nosa Akoda or John Nosa Akoda, all names used in documents submitted by Akoda.

ECFMG was negligent in failing to learn that Akoda was Igberase. Among other things, ECFMG knew that in August 2000 allegations had been made to the JSMC that Akoda and Igberase were the same person. The JSMC notified ECFMG of this and told ECFMG that Akoda was using Igberase's social security number.

Igberase appeared at the offices of ECFMG on September 27, 2000 and told ECFMG that Igberase was his cousin and admitted he had used Igberase's social security number

4

JA958

"pending INS clearance of his own social security number."  Additionally, the passport Igberase provided to ECFMG at that meeting contained one too few numbers and could not have been valid.

There was no effort by ECFMG to authenticate the passport.  In breach of its duty, ECFMG failed to take any action against Igberase for this misuse of a social security number.

Further in breach of its duty, ECFMG failed to compare the photograph of Igberase in its files with the person claiming to be Akoda who was sitting in ECFMG's office in Philadelphia.  Had ECFMG done so, ECFMG would have known that Akoda and Igberase are the same person.

ECFMG, in breach of its duty, failed to advise the Howard University Hospital residency program, the Maryland Board of Physicians or Prince George's Hospital Center of the information in its files that Igberase may have had a previous certification that was revoked, that ECFMG had investigated whether Akoda is Igberase or that Igberase was barred under another certification.

ECFMG, in breach of its duty, and in breach of its own policies and procedures regarding irregular behavior, failed to take reasonable steps to verify the truth of the references submitted by Igberase when he applied for the residency program at Howard University Hospital under the Akoda identity.  In 2006 Igberase submitted three (3) letters of recommendations through ERAS under the Akoda identity.  ECFMG sent letters to each of the references, with copies of their respective alleged letters of recommendations, seeking to learn if they were authentic.  ECFMG did not receive responses from the supposed references.  Nevertheless, ECFMG provided primary source verification to Howard University Hospital about "Akoda" – a fictitious identity.

5

JA959

## INTERROGATORY NO. 5:

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

## ANSWER:

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint.

The numerous breaches of duty by ECFMG led to the fraudulent certification of Igberase, under various names, but for which he would not have been admitted to the Howard University Hospital residency program, he would not have received a Maryland medical license, he would not have obtained privileges at Prince George's Hospital Center, he would not have been able to practice medicine, and he would not have been able to cause the harms to Plaintiffs.

ECFMG's numerous breaches of duty increased the risk of harm to Plaintiffs and other members of the Class by Igberase's conduct.

As a direct, proximate, immediate and foreseeable result of ECFMG's conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages.

## INTERROGATORY NO. 6:

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

## ANSWER:

Objection is made to this request as it is overly broad and unduly burdensome, and concerns matters more appropriately addressed at deposition. Without waiving this

JA960

**objection, the named Plaintiff contends that all care and treatment provided by Akoda was inappropriate, including but not limited to the fact that he was not an appropriately licensed and credentialed physician.   He oversaw this Plaintiff's labor care, including the performance of intrusive pelvic examinations, and he performed the Plaintiff's delivery.**

**Akoda's demeanor during her examines was flirtatious, and during one examination, told the Plaintiff that she had "nice breasts."  He oversaw aspects of Plaintiff's prenatal, oversaw her labor care, performed intrusive pelvic examinations, breast exams, and her child's delivery.  He was not properly licensed, credentialed or qualified to provide any of this case.  This Plaintiff would never have exposed herself or her child to a non-health care provider had she been appropriately advised that he was not a validly licensed or credentialed physician. This answer will be supplemented as discovery proceeds.  The Defendant is further referred to the medical records.**

**Plaintiffs investigation is ongoing.**

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services.  Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications**

7

JA961

necessary to practice medicine on the basis of identity fraud.  Plaintiff naturally assumed

Akoda was a physician who had been lawfully credentialed.

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and

concerns matter better addressed through deposition.  Plaintiff's contacts with Akoda are

reflected in the medial records which are being produced.    The Plaintiff has had no

communication with any medical licensing board, employee, agent or representative of

ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the

matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

Plaintiff adopts by reference her Answer to Interrogatory No. 2.  The amount of these

damages is for the jury to determine.    Plaintiff seeks damages for these injuries as

determined by the jury.

**INTERROGATORY NO. 10:**

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

8

JA962

**ANSWER:**

**Objection is made to this request as it seeks to elicit information which goes beyond the proper scope of discovery.  Without waiving this objection, the Plaintiff is a named class representative in a class action filed in the Circuit Court for Prince George's County, Maryland,** *Dews et al. v. Dimensions Healthcare System, et. al,* **Case No. CAL-17-37091.**

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

**Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery.  Plaintiff's counsel represents numerous persons who are putative members of the class.  Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records.   Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class,**

9

JA963

**but are not aware of their identities. Plaintiff believes that there are approximately 1,000**

**patients seen or treated by Akoda.**

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

**The Plaintiff's attorneys assisted in the preparation of these answers.**

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

**In addition to the plaintiff and her attorneys, the Defendant is referred to the**

**Plaintiff's initial disclosures. The Plaintiff's husband was also present with her for certain**

**doctor's appointments.**

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and**

**unduly burdensome, and is not limited in time or scope and seeks information that is not**

**relevant.  Without waiving this objection, to date, the Plaintiff has not undergone medical**

treatment from health care providers relating to the emotional distress she has sustained in this matter.

**INTERROGATORY NO. 16:**

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as fact witnesses a trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as expert witnesses at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 18:**

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

**Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection. By way of further answer, and without waiver, discovery and Plaintiffs' investigation are still continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.**

**DOCUMENT REQUESTS**

11

JA965

**General Objections**

1.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.      Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

12

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.      These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.      The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.      The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

JA967

**REQUEST NO. 1:**

      All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

      **Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 2:**

      All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

**RESPONSE:**

      **Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 3:**

      All pleadings filed in Akoda litigation.

**RESPONSE:**

      **Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 4:**

      All documents relating to Akoda Litigation.

**RESPONSE:**

      **Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

14

JA968

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced.  Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement.   To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

**Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case.  If Defendant will clarify it, Plaintiff will attempt to respond.**

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

**RESPONSE:**

15

**Objection.  This request appears to be duplicative of other requests to which**

**Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying
the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the records deposition subpoena served on ECFMG, there are none.**

**REQUEST NO. 12:**

All documents about JSMC and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 13:**

JA970

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

**Objection. This request is overly broad and unduly burdensome. Without waiver, any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced limited to the class members in this case.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

**Objection.  This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 17:**

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

17

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 18:**

All documents relating to A.G. Chaudry, M.D. and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced. Other than the medical records, none.**

**REQUEST NO. 19:**

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 21:**

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 22:**

All documents relating to the Maryland Board of Physicians and Akoda.

18

JA972

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by**

**attorney client privilege or the work product doctrine.  Without waiving this objection, any**

**discoverable documents responsive to this request which are in the possession of the**

**Plaintiff or her counsel he requested documents will be produced.**

**REQUEST NO. 25:**

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 26**

19

JA973

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by attorney client privilege or the work product doctrine, without waiving this objection. The Defendant is referred to the medical records.**

**REQUEST NO. 29:**

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

**Objection is made to the request to the extent it concerns a medical and/or legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, the Defendant is referred to the medical records.**

JA974

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**Objection is made to this request to the extent it calls for a legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. Without waiving this objection, this request appears**

21

JA975

to be duplicative of other requests to which Plaintiff has responded that, if she has any such

documents, they will be produced.

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection**.  **Upon advice of counsel, Plaintiff objects to this request and declines to**

**produce any documents on the grounds that she is not making any claim for lost income.**

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the**

**requested documents on the grounds that it is overly broad and burdensome in that it is not**

**limited in time or scope and that it seeks information that is not relevant to any claim or**

**defense in this action.  To the extent the Plaintiff receives treatment concerning her condition**

**and injuries relevant to this lawsuit, these documents will be produced.**

**REQUEST NO. 36:**

22

JA976

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 39:**

All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

23

JA977

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

<u>**REQUEST NO. 40:**</u>

All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

<u>**RESPONSE:**</u>

**Objection is made to the extent that any documents responsive to this request were prepared in anticipation of litigation or at the request of counsel.  Any discoverable documents responsive to this request will be produced.**

<u>**REQUEST NO. 41:**</u>

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

<u>**RESPONSE:**</u>

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.**

<u>**REQUEST NO. 42:**</u>

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

<u>**RESPONSE:**</u>

24

JA978

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 45:**

All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

**RESPONSE:**

25

JA979

**Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 46:**

All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

**Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 47:**

All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

**Plaintiff has not decided what documents it will introduce at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).**

CONRAD & O'BRIEN, P.C.

 _/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

26

JA980

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschoehor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

Dated: March 29, 2019

**VERIFICATION**

    I, Elsa Powell, hereby aver that the factual statements in the foregoing *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Answers* are made subject to the penalties relating to unsworn falsification to authorities.

                                     _____
                                       Elsa Powell

Dated: March 28, 2019

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

Dated: March 29, 2019

JA983

# EXHIBIT 20

JA984

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,          *
ELSA M. POWELL AND DESIRE EVANS,
                                           *       Case No. 2:18-cv-05629-WB
        Plaintiffs
                                           *       Hon. Wendy Beetlestone
    v.                                       *

EDUCATIONAL COMMISSION FOR                 *
FOREIGN MEDICAL GRADUATES
                                           *
        Defendant                        *

    *    *    *    *    *    *    *    *    *    *    *

### PLAINTIFF JASMINE RIGGINS' ANSWERS TO FIRST SET OF INTERROGATORIES AND RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

      Plaintiff, Jasmine Riggins, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

      The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys.  Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

      Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

      By providing information in response to the interrogatories, Plaintiff  does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

**ANSWER:**

**Plaintiff believes, but is not certain, that she recalls the dates she saw Akoda in his office and the dates she was at Prince Georges' Hospital Center where Akoda delivered her baby, Messiah Denver Brown, by C-section on March 18, 2013. Her best recollection is that Akoda provided prenatal care from August 2012 to March 18, 2013. Plaintiff refers Defendant to the medical records which Plaintiff is producing. Plaintiff chose Dr. Chaudry's practice because it was conveniently located. She was never treated by Dr. Chaudry but rather by Akoda.**

**INTERROGATORY NO. 2:**

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

**ANSWER:**

**Plaintiff has suffered financial, physical and emotional injuries. In addition to these injuries, Akoda's surgery on Plaintiff has limited her birth control options. Plaintiff requested a tubal ligation to ensure against future pregnancies and she was denied due to the tissue damage caused by Akoda's surgery. Plaintiff suffered extreme pain for several months after Akoda's surgery. After returning to work and continuing for a few months, approximately twice a week Plaintiff was unable to complete her work shift, leaving work two hours early, because of the extreme pain, that at times would cause her to double over,**

2

and resulted in lost income.  Plaintiff had confidence and trust in her OB/GYN provider, Abdul Chaudry, M.D., that the doctors working under his practice and that treated her were, at the very least, legitimately credentialed, legally licensed, possessed the proper education and were real doctors.  In addition, Plaintiff had confidence and trust in Prince George's Hospital Center that the doctors given privileges at their facility to perform surgery would also, at the very least, be legitimately credentialed, legally licensed, possess the proper education and were real doctors.  Akoda performed a C-section on Plaintiff on March 18, 2013, when he was not legitimately credentialed, used fraud to obtain a medical license, and did not graduate from a medical school.  Upon learning Akoda was a fraud, impersonating a doctor, Plaintiff felt extremely violated, betrayed, embarrassed, sad, very angry and shocked.  As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

### INTERROGATORY NO. 3:

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.

### ANSWER:

The facts that support these allegations are set forth in the Complaint.  See, e.g., paragraphs 5, 10-47, and 68-69.  Plaintiff's investigation is continuing.

### INTERROGATORY NO. 4:

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

### ANSWER:

The facts that support these allegations are set forth in the Complaint.  See, e.g., paragraphs 70-80.  Plaintiff's investigation is continuing.

3

JA987

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Plaintiff adopts by reference her answer to Interrogatory No. 4.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Based on information obtained by counsel, Plaintiff believes that, with respect to**

**certain class members, Akoda made lewd comments and inappropriate touchings.**

**Plaintiff's investigation is continuing.**

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

JA988

**ANSWER:**

      **Plaintiff spoke with Monique Russell.  Plaintiff's contacts with Akoda are reflected**

**in the medial records which are being produced.**

**INTERROGATORY NO. 9:**

      Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

      **Plaintiff adopts by reference her answer to interrogatory no. 2.  The amount of these**

**damages is for the jury to determine.  Plaintiff seeks damages for these injuries as**

**determined by the jury.**

**INTERROGATORY NO. 10:**

      Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

**ANSWER:**

      **Plaintiff is a named class representative in two class action cases filed in the Circuit**

**Court for Prince George's County, Maryland.  They are both captioned "Monique Russell,**

**et al. v. Dimensions Health Corp."  They are Case Nos. CAL 17-22761 and CAL 18-07863.**

**INTERROGATORY NO. 11:**

      Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

JA989

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

My attorneys assisted in the preparation of these answers.

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

6

**In addition to the named plaintiffs and my attorneys, those persons or entities identified in Plaintiff's initial disclosures.  Further, Lisa Williams, Messiah Brown's grandmother, took Plaintiff to several of her doctor appointments with Akoda.  Plaintiff's sister, Candis Riggins, attended one of Plaintiff's doctor appointments with Akoda. Plaintiff's mother, Felicia Riggins, went with Plaintiff to her last OB visit, which was on the day Plaintiff was admitted to Prince George's Hospital Center, to deliver her infant.**

**Lisa Williams
2722 Lorring Drive
Forestville, MD 20747**

**Candis Riggins
6004 Springhill Drive
Greenbelt, MD 20770**

**Felicia Riggins
Address Unavailable**

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome.  As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda.  It is not limited in time or scope and seeks information that is not relevant.**

**INTERROGATORY NO. 16:**

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

7

JA991

**ANSWER:**

**Plaintiff has not determined who she may call as fact witnesses a trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3) or as otherwise ordered by the Court.**

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as expert witnesses at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2).**

**INTERROGATORY NO. 18:**

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

**Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection.  By way of further answer, and without waiver, discovery and Plaintiff's investigation are continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.**

## DOCUMENT REQUESTS

### General Objections

1.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.    Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

8

3.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

JA993

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

JA994

**RESPONSE:**

> **The requested documents will be produced.**

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

> **The requested documents will be produced.**

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

> **The requested documents will be produced.**

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

> **Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement.  To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

> **None.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

11

**Objection.  This request is ambiguous, overbroad and seeks documents which are**

**not proportionate to the needs of this case.  If Defendant will clarify it, Plaintiff will**

**attempt to respond.**

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or
examinations performed by Akoda.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request.  This request**

**also appears to be duplicative of other requests to which Plaintiff has responded that, if she**

**has any such documents, they will be produced.**

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying
the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the records deposition subpoena served on ECFMG, there are none.**

JA996

**REQUEST NO. 12:**

All documents about JSMC and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 13:**

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request.  This request also appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

13

JA997

**REQUEST NO. 17:**

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 18:**

All documents relating to A.G. Chaudry, M.D. and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 19:**

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 21:**

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 22:**

All documents relating to the Maryland Board of Physicians and Akoda.

14

JA998

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 25:**

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 26:**

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

15

JA999

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

    **None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

    **None.**

**REQUEST NO. 29:**

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

    **None.**

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

    **Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

16

JA1000

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

JA1001

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.**

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.**

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

18

JA1002

None.

**REQUEST NO. 39:**

All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

**REQUEST NO. 40:**

All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

**Objection.  Plaintiff has not obtained any statements.  Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

**REQUEST NO. 42:**

JA1003

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 42.**

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 45:**

All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

20

JA1004

**RESPONSE:**

      **The requested documents will be produced.**

**REQUEST NO. 46:**

      All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

      **The requested documents will be produced.**

**REQUEST NO. 47:**

      All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

      **Plaintiff has not decided what documents she will introduce at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).**

                       CONRAD & O'BRIEN, P.C.

                       */s/ Nicholas M. Centrella*
                       Nicholas M. Centrella, Esquire (ID No. 67666)
                       ncentrella@conradobrien.com
                       Howard M. Klein, Esquire (ID No. 33632)
                       Benjamin O. Present, Esquire (ID No. 322682)
                       1500 Market Street
                       Centre Square, West Tower, Suite 3900
                       Philadelphia, PA 19102-2100
                       Telephone: (215) 864-9600
                       Fax: (215) 864-9620

Dated: March 29, 2019

LAW OFFICES OF PETER G. ANGELOS, P.C.

_/s/ Jay D. Miller_
**Jay D. Miller** (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
**Danielle S. Dinsmore** (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
**Paul M. Vettori** (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
**One Charles Center**
**100 North Charles Street**
**Baltimore, MD  21201**
**Telephone: (410) 649-2000**
**Fax: (410) 649-2150**
*Attorneys for Plaintiff, Jasmine Riggins*

## VERIFICATION

I, Jasmine Riggins, hereby aver that the factual statements in the foregoing *Answers to Interrogatories* are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Jasmine Riggins

Dated:  March 25, 2019

24

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com


/s/ *Nicholas M. Centrella*
Nicholas M. Centrella


March 29, 2019

JA1007

# **<u>EXHIBIT 21</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MONIQUE RUSSELL, JASMINE RIGGINS,     *
ELSA M. POWELL AND DESIRE EVANS,

                                 *      Case No. 2:18-cv-05629-WB

          Plaintiffs

                                 *      Hon. Wendy Beetlestone

     v.                              *

EDUCATIONAL COMMISSION FOR        *
FOREIGN MEDICAL GRADUATES

          Defendant                  *

       *     *     *     *     *     *     *     *     *     *     *

**PLAINTIFF MONIQUE RUSSELL'S ANSWERS TO FIRST SET OF**
**INTERROGATORIES AND RESPONSES TO FIRST SET OF**
**<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

      Plaintiff, Monique Russell, pursuant to Federal Rules Civil Procedure 26, 33 and 34,

serves the following Answers to First Set of Interrogatories propounded by the defendant.

      The information supplied in these answers is not based solely on the knowledge of the

executing party, but includes, where applicable, that of her agents, representatives and, unless

privileged, attorneys.  Furthermore, the precise word usage and sentence structure is that of the

executing party's' attorneys and does not purport to be, and is not necessarily, the exact language

of the executing party.

      Plaintiff objects to the instructions and definitions that accompany the interrogatories to

the extent that those instructions and definitions impose upon her obligations beyond those

imposed by the Federal Rules of Civil Procedure.

**<u>ANSWERS TO INTERROGATORIES</u>**

**<u>INTERROGATORY NO. 1:</u>**

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

**ANSWER:**

**Akoda was the on-call physician when Plaintiff presented at PGHC on May 25, 2016.  Akoda delivered Plaintiff's son, Luko Romero Russell, on May 25, 2016.**

**INTERROGATORY NO. 2:**

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

**ANSWER:**

**Plaintiff has suffered severe and substantial emotional injuries as a result of the negligence described in the Complaint.  As a survivor of ███████████, Plaintiff had made great progress with regard to issues of trust and with violations or encroachments on her personal space, especially with regard to her body, previous to her interactions with Akoda.  However, upon learning that Akoda was not in fact a licensed physician, her trust issues were exacerbated and came back in full force.  These trust issues have flowed over into Plaintiff's marriage, interfering with her intimacy with her husband as she finds it very difficult to engage in sexual relations with him.  Plaintiff not only feels violated by Akoda, but also feels she was sexually and physically abused by him.  Akoda performed vaginal examinations on Plaintiff during labor and performed Cesarean section surgery on her to deliver her child.  Before learning the truth about Akoda, Plaintiff had worked hard to overcome her deep fear and distrust, and to develop and maintain confidence and trust in her OB/GYN provider, Moore & Associates, believing that the**

2

doctors working under the practice and that treated her were, at the very least, legitimately credentialed, legally licensed, and possessed the proper education necessary in the practice of medicine.    On June 19, 2017, Plaintiff was horrified and devastated to discover Akoda was not a "real" doctor. She became obsessed with her search for understanding of how Akoda received privileges at Prince George's Hospital to touch her, and to "cut into her." Plaintiff's search for understanding of this situation has created in her a substantial distrust of doctors and because of this distrust, she is now unable to seek medical treatment.  This lack of trust was amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda before allowing him to perform surgeries in its hospital.  Plaintiff's lack of trust is impeding her ability to select any new health or mental care provider, and consequently, seeking medical and mental health care for the emotional trauma she has suffered.  She continues to cope daily with her feelings of violation and harm as best she can, but has been emotionally devastated by this situation.  As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.


**INTERROGATORY NO. 3:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.


**ANSWER:**

The facts that support these allegations are set forth in the Complaint.  See, e.g., paragraphs 5, 10-47, and 68-69.  Plaintiff's investigation is continuing.

**INTERROGATORY NO. 4:**

3

JA1011

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

**ANSWER:**

**The facts that support these allegations are set forth in the Complaint.  See, e.g., paragraphs 70-80.  Plaintiff's investigation is continuing.**

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Plaintiff adopts by reference her answer to Interrogatory No. 4.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Based on information obtained by counsel, Plaintiff believes that, with respect to certain class members, Akoda made lewd comments and inappropriate touchings. Plaintiff's investigation is continuing.**

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Plaintiff would not have permitted Akoda to touch her or deliver her son if she had known he was not a real physician. Plaintiff naturally assumed Akoda was a real physician.**

4

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

On July 5, 2017, Plaintiff met with Javaka Moore, M.D. and asked him why patients were not notified that Akoda was a fraud and was operating with a fraudulently obtained medical license. Dr. Moore stated that it was not his place to share that information. Dr. Moore stated he had worked alongside Akoda during Akoda's residency. Plaintiff inquired of Dr. Moore if he had done a background check on Akoda before hiring him, and Dr. Moore answered that he had not, but perhaps in the future he would need to do this. In addition, Plaintiff spoke to Jasmine Riggins and Amber Wingfield Loftin on a "Mommy Group" on Facebook. Plaintiff's contacts with Akoda are reflected in the medial records which are being produced. As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these damages is for the jury to determine. Plaintiff seeks damages for these injuries as determined by the jury.

JA1013

**INTERROGATORY NO. 10:**

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

**ANSWER:**

**Plaintiff was involved in a car accident in 2013. Plaintiff was a passenger. The claim was against USAA (policyholder: Christina L. Therrien). Case resolved in court in Plaintiff's favor.**

**Plaintiff is a named class representative in two class action cases filed in the Circuit Court for Prince George's County, Maryland. They are both captioned "Monique Russell, et al. v. Dimensions Health Corp." They are Case Nos. CAL 17-22761 and CAL 18-07863.**

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

**Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's**

6

**counsel as members of the putative class.  Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda.  Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

**My attorneys assisted in the preparation of these answers.**

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

**In addition to the named plaintiffs and my attorneys, those persons or entities identified in Plaintiff's initial disclosures.**

**Christopher Russell, husband – present for labor and delivery, can attest to Plaintiff's emotional injuries**

**Marcia Russell – present during most of the labor**

**Emily Smith (doula)– present during first 24 hours of labor**

**Nicole Bruno (doula) – relieved Emily Smith and present during balance of labor**

7

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome.  As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda.  It is not limited in time or scope and seeks information that is not relevant.**

**INTERROGATORY NO. 16:**

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as fact witnesses a trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3) or as otherwise ordered by the Court.**

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as expert witnesses at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2).**

**INTERROGATORY NO. 18:**

8

JA1016

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

**Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection. By way of further answer, and without waiver, discovery and Plaintiff's investigation are continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.**

## DOCUMENT REQUESTS

### General Objections

1.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.      Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections. The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from

9

discovery shall not constitute a waiver of any such privileges or protections.

6.     To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.     Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.     These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.     Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative

JA1018

acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.    The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**The requested documents will be produced.**

11

JA1019

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

**Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement. To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**None.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

**Objection. This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case. If Defendant will clarify it, Plaintiff will attempt to respond.**

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request. This request also appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

12

JA1020

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the records deposition subpoena served on ECFMG, there are none.**

**REQUEST NO. 12:**

All documents about JSMC and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 13:**

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

13

JA1021

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request.  This request also appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 17:**

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 18:**

All documents relating to A.G. Chaudry, M.D. and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 19:**

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 21:**

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 22:**

All documents relating to the Maryland Board of Physicians and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

JA1023

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 25:**

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 26:**

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**None.**

**REQUEST NO. 29:**

JA1024

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

   **None.**

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

   **Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

   **This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

   **Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents**

17

JA1025

that may be responsive to this request.  This request appears to be duplicative of other

requests to which Plaintiff has responded that, if she has any such documents, they will be

produced.

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to**

**produce any documents other than the documents showing the time she may have missed**

**from work for a brief period of time after her surgery.**

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to**

**produce the requested documents on the grounds that it is overly broad and burdensome in**

**that it is not limited in time or scope and that it seeks information that is not relevant to**

**any claim or defense in this action.**

**REQUEST NO. 36:**

JA1026

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**
**None.**

**REQUEST NO. 39:**

All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

**REQUEST NO. 40:**

All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

**RESPONSE:**

19

JA1027

**The requested documents will be produced.**

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

**Objection.  Plaintiff has not obtained any statements.  Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

20

JA1028

**Plaintiff adopts by reference her response to Request No. 42.**

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 45:**

All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 46:**

All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 47:**

All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

**Plaintiff has not decided what documents she will introduce at trial.  Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).**

JA1029

CONRAD & O'BRIEN, P.C.


 _/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620




LAW OFFICES OF PETER G. ANGELOS, P.C.


*/s/ Jay D. Miller_____*
Jay D. Miller (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
Danielle S. Dinsmore (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
Paul M. Vettori (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
One Charles Center
100 North Charles Street
Baltimore, MD  21201
Telephone: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff, Jasmine Riggins*


Dated: March 29, 2019

22

JA1030

## VERIFICATION

I, Monique Russell, hereby aver that the factual statements in the foregoing *Answers to Interrogatories* are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Monique Russell

Dated:  March 27, 2019

JA1031

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com


/s/ *Nicholas M. Centrella*
Nicholas M. Centrella


March 29, 2019

JA1032

# **EXHIBIT 22**

| | | |
|---|---|---|
| MONIQUE RUSSELL, et al., | * | IN THE |
|     Claimants | * | HEALTH CARE |
| v. | * | ALTERNATIVE DISPUTE |
| DIMENSIONS HEALTH CORPORATION, | * | RESOLUTION OFFICE |
|     Healthcare Provider | * | HCA NO. 2017-400 |

   *     *     *     *     *     *     *     *     *     *     *     *

## CLAIMANTS' CERTIFICATE OF MERIT

1.    I, Thomas Bojko, am competent to testify.

2.    I have reviewed the captioned Class Action Amended Statement of Claim, the Final Decision and Order of the Board of Maryland Board of Physicians, the Department of Justice materials, the proceedings of the criminal case against Dr. Charles Akoda/Igberase, and/or other related materials regarding the above-captioned case.

3.    I certify that there have been violations of the applicable standards of administrative care by Dimensions Health Corporation, and Dimensions Health Corporation d/b/a Prince George's Hospital Center, individually and through their duly authorized agents, apparent agents, servants and/or employees including, but not limited to, Charles J. Akoda/Oluwafemi Charles Igberase which have directly and proximately resulted in the damages, injuries and permanent disability to the Claimants, and other similarly situated.

4.    I further certify that I am an expert in Health Care Administration and Credentialing/Privileging; that I have clinical and administrative experience; and have provided consultation relating to the issues involved in this litigation and/or have taught healthcare administration and credentialing/privileging in the fields of health care in which the Defendants have provided care and/or provided treatment to the Claimants, within five (5) years of the date of the alleged acts or omissions giving rise to this cause of action.

Plaintiffs0000005671

5.     I do not devote more than 20% of my annual professional activities to activities that directly involve testimony in personal injury and corporate negligence claims.

Thomas Bojko, M.D., M.S., J.D.

Plaintiffs0000005672



Thomas Bojko, MD, MS, JD

President & Managing Partner

February 26, 2018

Paul Vettori, Esq.
Law Offices of Peter G. Angelos, P.C.
One Charles Center
100 N. Charles Street – 20th Floor
Baltimore, MD 21201

Re:    Monique Russell, et al. v. Dimensions Health Corporation

Dear Mr. Vettori:

This is to acknowledge that after a review of materials involved in the above-referenced case, I have concluded that there have been violations of the applicable standards of administrative care by Dimensions Health Corporation d/b/a Prince George's Hospital Center, individually and through their duly authorized agents, apparent agents, servants and/or employees including, but not limited to, Charles J. Akoda/Oluwafemi Charles Igberase ("Akoda"), which have directly and proximately resulted in injuries, damages, and permanent disability to the Claimants and others similarly situated.

It is my opinion that the Defendants breached the applicable standards of administrative care by negligently failing to use required and reasonable care to investigate, credential, grant privileges, monitor and supervise their medical personnel including, but not limited to, Akoda and to discover, stop and report any professional misconduct of which they should have known. As a direct and proximate result of the Defendants' continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability.  Had the Defendants complied with the applicable standards of administrative care the Claimants, and others similarly situated, would not have suffered their injuries, damages and permanent disability.

I am an expert in Healthcare Administration and in Credentialing/privileging.  I have had experience, provided consultation relating to practice and/or taught healthcare administration in the applicable specialties or related specialties of health care, within five (5) years of the date of the alleged acts and/or omissions giving rise to the causes of action.

Accordingly, I have concluded that the case filed before the Health Care Alternative Dispute Resolution Office of Maryland is meritorious.  I also acknowledge that less than twenty percent of my annual professional time directly involves testimony in personal injury or corporate negligence claims.

This report represents a broad summary of my opinions for purposes of certifying the merits of this matter.  I specifically reserve the right to modify, amend and/or supplement my

Plaintiffs0000005673

opinions as further information about this case is made available to me through discovery and/or other means.

Very truly yours,

Dr. Thomas Bojko

Plaintiffs0000005674

JA1037