# No. 22-1998

## In the United States Court of Appeals for the Third Circuit

MONIQUE RUSSELL; JASMINE RIGGINS; ELSA M. POWELL; DESIRE EVANS

*Appellants*

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Appellee*

On Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

### JOINT APPENDIX VOLUME IV, PAGES JA1038 TO JA1517

JANET, JANET & SUGGS
    Patrick A. Thronson
    Brenda A. Harkavy
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

CONRAD O'BRIEN PC
    Nicholas M. Centrella
    Robin S. Weiss
1500 Market Street, Suite 3900
Philadelphia, PA 19102
(215) 864-9600

*Counsel for Appellants*

MORGAN, LEWIS & BOCKIUS LLP
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Appellee*

***Additional Counsel on Inside Cover***

THE LAW OFFICES OF PETER G. ANGELOS, P.C.
    Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, MD 21201
(410) 649-2027

THE COCHRAN FIRM
    Karen Evans
    David Haynes
 1666 K Street NW
 Suite 1150
 Washington, DC 20006
 (202) 682-5800

SCHOCHOR AND STATON, P.A.
    Scott Kurlander
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Z LAW, LLC
    Cory L. Zajdel
2345 York Road, Suite #B-13
Timonium, MD 21093
(443) 213-1977

**Counsel for Appellants**

## TABLE OF CONTENTS

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | ***Volume I*** | | |
| 1-1 | Petitioner's Notice of Appeal (3d Cir. No. 22-1998) | 5/24/2022 | JA1 |
| 102 | ORDER Cancelling Oral Arguments on Motion for Summary Judgment and Class Certification Motions | 3/22/2022 | JA4 |
| 103 | Memorandum Opinion | 5/19/2022 | JA5 |
| 104 | ORDER Granting Defendants' Motion for Summary Judgment (ECF No. 81) | 5/19/2022 | JA24 |
| 57 | Memorandum Opinion | 3/23/2020 | JA25 |
| 58 | Order | 3/23/2020 | JA53 |
| 10-1 | Order, No. 20-8024 (3d Cir. May 11, 2020) | 5/11/2020 | JA54 |
| 5-1 | Petitioners' Concise Summary of the Case | 6/2/2022 | JA56 |
| — | District Court Docket | Printed 9/8/2022 | JA59 |
| | ***Volume II, Pages JA79 to JA562*** | | |
| 1 | Civil Cover Sheet | 12/31/2018 | JA79 |
| | Designation Forms | | JA80 |
| | Defendant's Notice of Removal | | JA83 |
| | Exhibit A: Plaintiffs' Class Action Civil Complaint (Phila. Ct. Com. Pl. No. 181101690) | | JA90 |
| | Exhibit A | | JA113 |

i

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
|  | Exhibit B |  | JA119 |
|  | Exhibit C |  | JA122 |
| 7 | Answer to Class Action Civil Complaint and Affirmative Defenses | 2/6/2019 | JA126 |
| 32 | Motion for Class Certification | 10/7/2019 | JA167 |
| 32-1 | Memorandum of Law in Support of Motion for Class Certification |  | JA169 |
| 32-2 | Certificate of Service |  | JA199 |
| 32-3 | Exhibit 1 |  | JA200 |
| 32-4 | Exhibit 2 |  | JA202 |
| 32-5 | Exhibit 3 |  | JA204 |
| 32-6 | Exhibit 4 |  | JA207 |
| 32-7 | Exhibit 5 |  | JA210 |
| 32-8 | Exhibit 6 |  | JA215 |
| 32-9 | Exhibit 7 |  | JA217 |
| 32-10 | Exhibit 8 |  | JA238 |
| 32-11 | Exhibit 9 |  | JA241 |
| 32-12 | Exhibit 10 |  | JA245 |
| 32-13 | Exhibit 11 |  | JA251 |
| 32-14 | Exhibit 12 |  | JA253 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-15 | Exhibit 13 | | JA255 |
| 32-16 | Exhibit 14 | | JA257 |
| 32-17 | Exhibit 15 | | JA259 |
| 32-18 | Exhibit 16 | | JA262 |
| 32-19 | Exhibit 17 | | JA267 |
| 32-20 | Exhibit 18 | | JA272 |
| 32-21 | Exhibit 19 | | JA274 |
| 32-22 | Exhibit 20 | | JA276 |
| 32-23 | Exhibit 21 | | JA278 |
| 32-24 | Exhibit 22 | | JA280 |
| 32-25 | Exhibit 23 | | JA283 |
| 32-26 | Exhibit 24 | | JA286 |
| 32-27 | Exhibit 25 | | JA288 |
| 32-28 | Exhibit 26 | | JA290 |
| 32-29 | Exhibit 27 | | JA292 |
| 32-30 | Exhibit 28 | | JA294 |
| 32-31 | Exhibit 29 | | JA296 |
| 32-32 | Exhibit 30 | | JA303 |
| 32-33 | Exhibit 31 | | JA314 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-34 | Exhibit 32 | | JA317 |
| 32-35 | Exhibit 33 | | JA325 |
| 32-36 | Exhibit 34 | | JA383 |
| 32-37 | Exhibit 35 | | JA419 |
| 32-38 | Exhibit 36 | | JA459 |
| 32-39 | Exhibit 37 | | JA490 |
| 32-40 | Exhibit 38 | | JA525 |
| 32-41 | Exhibit 40 | | JA532 |
| *Volume III, Pages JA563 to JA1037* | | | |
| 32-42 | Exhibit 41 | | JA563 |
| 32-43 | Exhibit 42 | | JA571 |
| 32-44 | Exhibit 43 | | JA579 |
| 32-45 | Exhibit 44 | | JA604 |
| 32-46 | Exhibit 45 | | JA628 |
| 33 | Exhibit 39 to Motion to Certify Class | 10/8/2019 | JA698 |
| 39 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification | 10/28/2019 | JA707 |
| 39-1 | Exhibit 1: Verification Papers - University of Ibadan | | JA743 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 39-2 | Exhibit 2: Verification Papers – University of Benin | | JA749 |
| 39-3 | Exhibit 3: October 14, 2019 Expert Report from Dr. Mark A. Smith | | JA755 |
| 39-4 | Exhibit 4: October 14, 2019 Expert Report from dr. Laurence H. Beck | | JA772 |
| 39-5 | Exhibit 5: March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital | | JA796 |
| 39-6 | Exhibit 6: Howard University Hospital Certificate of Completion of Residency for John-Charles Nosa Akoda MD | | JA798 |
| 39-7 | Exhibit 7: January 31, 2014 Letter to John-Charles Akoda from American Board of Obstetrics and Gynecology | | JA800 |
| 39-8 | Exhibit 8: May 22, 2002 Letter to Dr. Oluwafemi Charles Igberase from William C. Kelly | | JA802 |
| 39-9 | Exhibit 9: November 7, 2000 Letter to State of Maryland Board of Physician Assurance from Meridian Health System | | JA805 |
| 39-10 | Exhibit 10: May 5, 2017 Virginia Department of Health Professions Report | | JA807 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 50-1 | Exhibit 11 (Redacted): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA811 |
| 50-2 | Exhibit 12 (Redacted): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA836 |
| 50-3 | Exhibit 13 (Redacted): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA863 |
| 50-4 | Exhibit 14 (Redacted): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA887 |
| 39-15 | Exhibit 15: Email from Kara Corrado to Lisa Cover, Suzann Paolini, and Roman Mizak (March 18, 2016) | | JA911 |
| 39-16 | Exhibit 16: Email from Kara Corrado to Lisa Cover (Nov. 29, 2016) | | JA915 |
| 39-17 | Exhibit 17: Notice #101 from Lisa Cover (March 1, 2017) | | JA920 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 50-5 | Exhibit 18 (Redacted): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA924 |
| 46-6 | Exhibit 19 (Unredacted): Plaintiff Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA954 |
| 46-7 | Exhibit 20 (Unredacted): Plaintiff Jasmine Riggins' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA984 |
| 46-8 | Exhibit 21 (Redacted): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1008 |
| 39-22 | Exhibit 22: February 26, 2018 Expert Report from Dr. Thomas Bojko | | JA1033 |
| *Volume IV, Pages JA1038 to JA1517* | | | |
| 39-23 | Exhibit 23: Docket from Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) | | JA1038 |
| 39-24 | Exhibit 24: Stipulation of Dismissal, CAL 17-2271 | | JA1053 |
| 50-6 | Exhibit 25 (Redacted): Questionnaire Responses | | JA1058 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 46-10 | Exhibit 26 (Redacted): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1124 |
| 50-7 | Exhibit 27 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1132 |
| 46-12 | Exhibit 28 (Redacted): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins conducted by Dr. Gladys Fenichel | | JA1141 |
| 46-13 | Exhibit 29 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel | | JA1147 |
| 50-8 | Exhibit 30 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel | | JA1154 |
| 46-15 | Exhibit 31 (Redacted): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel | | JA1164 |
| 46-16 | Exhibit 32 (Redacted): September 23, 2019 Expert Report from Dr, Jay Goldberg | | JA1168 |
| 39-33 | Exhibit 33: Facebook Comments Produced by Plaintiff Monique Russell | | JA1179 |

## TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 39-34 | Exhibit 34: October 14, 2019 Rebuttal Expert Report from Dr. Susan McDonald | | JA1183 |
| 39-35 | Exhibit 35: Jalloh et al v. Chaudry et al, CAL 16-22162 (Cir. Ct. Prince George's Cty, MD) – Complaint | | JA1214 |
| 50-9 | Exhibit 36 (Redacted): September 5, 2019 Transcript of Deposition of Desire Evans | | JA1236 |
| 50-10 | Exhibit 37 (Redacted): September 6, 2019 Transcript of Deposition of Elsa Powell | | JA1285 |
| 39-38 | Exhibit 38: Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) – First Amended Class Action Complaint | | JA1315 |
| 39-39 | Text of Proposed Order | | JA1339 |
| 47 | Reply Memorandum of Law in Support of Motion for Class Certification | 11/11/2019 | JA1340 |
| 47-1 | Exhibit 1 | | JA1362 |
| | Exhibit 2 | | JA1365 |
| | Exhibit 3 | | JA1367 |
| 48 | Defendant Educational Commission for Foreign Medical Graduates' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification | 11/18/2019 | JA1371 |
| 63 | Transcript of Proceedings Held on January 30, 2020 | 4/6/2020 | JA1381 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 5-1 | Response in Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), No. 20-8024 (3d Cir. No. 20-8024) | 4/20/2020 | JA1469 |
| 9 | Reply in Support of Petition for Permission to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 4/27/2020 | JA1501 |
| *Volume V (Under Seal), Pages JA1518 to JA1908* | | | |
| 40 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification (Under Seal) | 10/28/2019 | JA1518 |
| | Exhibit 11 (Under Seal): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1554 |
| | Exhibit 12 (Under Seal): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1579 |
| | Exhibit 13 (Under Seal): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1606 |

x

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit 14 (Under Seal): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1630 |
| | Exhibit 18 (Under Seal): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1654 |
| | Exhibit 21 (Under Seal): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1684 |
| | Exhibit 25 (Under Seal): Questionnaire Responses | | JA1709 |
| | Exhibit 26 (Under Seal): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1775 |
| | Exhibit 27 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1783 |
| | Exhibit 28 (Under Seal): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins, conducted by Dr. Gladys Fenichel | | JA1792 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit 29 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel | | JA1798 |
| | Exhibit 30 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel | | JA1805 |
| | Exhibit 31 (Under Seal): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel | | JA1815 |
| | Exhibit 32 (Under Seal): September 23, 2019 Expert Report from Dr, Jay Goldberg | | JA1819 |
| | Exhibit 36 (Under Seal): September 5, 2019 Transcript of Deposition of Desire Evans | | JA1830 |
| | Exhibit 37 (Under Seal): September 6, 2019 Transcript of Deposition of Elsa Powell | | JA1879 |
| *Volume VI – Pages JA1909 to JA4931* | | | |
| 1-1 | Petition by Educational Commission for Foreign Medical Graduates for Leave to Appeal Pursuant to Fed. R. Civ. P. 23(f) (3d Cir. No. 20-8024) | 4/6/2020 | JA1909 |
| 10-1 | Order Granting Petition for Leave to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 05/11/2020 | JA1943 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 10-2 | Notice Grant of Permission for Leave to Appeal | 05/11/2020 | JA1944 |
| 20 | Brief of Appellant and Joint Appendix | 09/02/2020 | JA1945 |
| 26 | Addendum to Brief of Appellant | 09/04/2020 | JA2012 |
| 34 | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Appellant | 09/09/2020 | JA2016 |
| 47 | Brief of Appellees | 11/02/2020 | JA2044 |
| 49 | Reply Brief of Appellants | 11/23/2020 | JA2125 |
| 64 | Transcript of Oral Argument Before the Honorable Luis Felipe Restrepo, the Honorable Stephanos Bibas, the Honorable David James Porter United States Circuit Court Judges | 02/25/2021 | JA2161 |
| 65 | Opinion Order Remanding Case to the United States District Court for the Eastern District of Pennsylvania | 09/24/2021 | JA2202 |
| 79 | Plaintiffs' Supplemental Memorandum in Support of Class Certification | 12/10/2021 | JA2234 |
| 80 | Defendant's Supplemental Brief in Opposition to Class Certification | 12/10/2021 | JA2254 |
| 81 | Defendant's Motion for Summary Judgment | 12/10/2021 | JA2280 |
| 82 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs Expert Dr. Annie Steinberg | 12/10/2021 | JA2334 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 83 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 12/10/2021 | JA2542 |
| 84 | Defendants' Unopposed Motion to Seal | 12/10/2021 | JA2810 |
| 85 | Statement of Undisputed Material Facts in Support of Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 12/10/2021 | JA2818 |
| 86 | Defendant Educational Commission for Foreign Medical Graduates' Notice of Exhibits | 12/11/2021 | JA3079 |
| 92 | Joint Stipulation re ECF 82 | 01/14/2022 | JA3914 |
| 93 | Plaintiffs' Response in Opposition to Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 01/14/2022 | JA3916 |
| 94 | Plaintiffs' Response in Opposition to Defendant's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/14/2022 | JA4271 |
| 95 | Plaintiffs' Response to Defendant's Supplemental Brief in Opposition to Class Certification | 01/14/2022 | JA4514 |
| 96 | Defendant's Opposition Brief in Response to Plaintiffs' Supplemental Brief Regarding Class Certification | 01/14/2022 | JA4530 |

## TABLE OF CONTENTS
### (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 98 | Defendant's Reply in Support of Motion for Summary Judgment | 01/28/2022 | JA4550 |
| 99 | Defendant's Reply in Support of its Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/28/2022 | JA4687 |
| 100 | Order rescheduling Oral Argument on summary judgment and class certification is Rescheduled for March 29, 2022 | 01/31/2022 | JA4702 |
| 101 | Plaintiffs' Sur-Reply In Support of its Opposition to Defendant Educational Commission for Foreign Medical Graduates Motion for Summary Judgment | 02/11/2022 | JA4703 |
| 102 | Order Cancelling Oral Argument on summary judgment and class certification motions, currently scheduled for March 29, 2022, is Cancelled | 03/22/22 | JA4715 |
|  | Petitioner's Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit, No. 21-948 (Supreme Court of the United States, No. 21-948) | 12/23/2021 | JA4716 |
|  | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 01/28/2022 | JA4824 |

## **TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| | Respondents' Brief in Opposition, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/08/2022 | JA4853 |
| | Reply for Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/26/2022 | JA4899 |
| | Order Denying Petitioner's Petition for Writ of Certiorari, No. 21-948 (Supreme Court of the United States, No. 21-948) | 05/16/2022 | JA4923 |

Case 2:18-cv-05629-JDW   Document 39-23   Filed 10/28/19   Page 1 of 15

# EXHIBIT 23

Case Information

Circuit Court of Maryland

Go Back Now

**Case Information**

Court System:**Circuit Court for Prince George's County – Civil System**
Case Number:**CAL17–22761**
Case Description:**Russell vs Riggins**
Case Type:**Tort**
Filing Date:**09/11/2017**
Case Status:**Case Closed Statistically**

**Plaintiff/Petitioner Information**

Party Type: **Plaintiff**   Party No.: **1**
Name: **Monique Russell**
Address: **2811 63rd Place**
City:       **Cheverly**   State: **MD**   Zip Code: **20785**
Party Type: **Plaintiff**   Party No.: **2**
Name: **Jasmine Riggins**
Address: **312 37th Street, Apt. #304**
City:       **Washington**   State: **DC**   Zip Code: **20019**

**Defendant/Respondent Information**

Party Type: **Defendant**   Party No.: **3**
Name: **Dimensions Health Corporation**
Address: **Sv: Eslanda Dasher**
City:       **Laurel**   State: **MD**   Zip Code: **20707**

## Attorney Information

Name:           **Mark D Maneche**
Attorney Type: **Attorney**
Address:        **901 Dulaney Valley Road**
City:           **Towson**   State: **MD**   Zip Code: **21204**
Name:           **Natalie C Magdeburger**
Attorney Type: **Attorney**
Address:        **901 Dulaney Valley Road**
City:           **Towson**   State: **MD**   Zip Code: **21204**
Name:           **Gregory K Kirby**
Attorney Type: **Attorney**
Address:        **Pessin Katz Law P.A.**
City:           **Towson**   State: **MD**   Zip Code: **21204**
Name:           **Elliott D Petty**
Attorney Type: **Attorney**
Address:        **Pessin Katz Law, P.A.**
City:           **Towson**   State: **MD**   Zip Code: **21204**
Name:           **Cory L Zajdel**
Attorney Type: **Attorney**
Address:        **2345 York Road**
City:           **Timonium**   State: **MD**   Zip Code: **21093**
Name:           **Brian M Cathell**
Attorney Type: **Attorney**
Address:        **Pessin Katz Law, P.A.**
City:           **Towson**   State: **MD**   Zip Code: **21204**

**Court Scheduling Information**

Event Type: **Hearing**

JA1039

Event Date: **08/05/2019**  Start Time: **08:45:00**
Result:       **Hearing Moot**  Result Date: **07/30/2019**

Event Type: **Motions Hearing**
Event Date: **01/24/2019**  Start Time: **13:30:00**
Result:       **Motions Hearing Held**  Result Date: **01/24/2019**

Event Type: **Motions Hearing**
Event Date: **07/30/2019**  Start Time: **09:00:00**
Result:       **Motions Hearing Held**  Result Date: **07/30/2019**

Event Type: **Status Hearing**
Event Date: **07/10/2018**  Start Time: **08:45:00**
Result:       **Status Conference Held**  Result Date: **07/10/2018**

Event Type: **Status Hearing**
Event Date: **09/18/2018**  Start Time: **08:45:00**
Result:       **Status Conference Held**  Result Date: **09/18/2018**

Event Type: **Status Hearing**
Event Date: **12/11/2018**  Start Time: **08:45:00**
Result:       **Status Conference Held**  Result Date: **12/11/2018**

Event Type: **Status Hearing**
Event Date: **01/22/2019**  Start Time: **09:00:00**
Result:       **Status Conference Held**  Result Date: **01/22/2019**

Event Type: **Status Hearing**
Event Date: **11/13/2018**  Start Time: **08:45:00**
Result:       **Status Conference Moot**  Result Date: **09/18/2018**

Event Type: **Try By Date**
Event Date: **01/04/2019**  Start Time: **09:00:00**
Result:       **Civil Try by Date Complied**  Result Date: **10/27/2017**

Event Type: **Hearing**
Event Date: **09/11/2019**  Start Time: **10:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Motions Hearing**
Event Date: **09/12/2019**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Motions Hearing**
Event Date: **01/22/2020**  Start Time: **08:45:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Motions Hearing**
Event Date: **03/23/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial First On Assigned**
Event Date: **05/04/2020**  Start Time: **08:45:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/05/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/06/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/07/2020**  Start Time: **09:00:00**

JA1040

Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/11/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/12/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/13/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/14/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/18/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

Event Type: **Trial Carry Over**
Event Date: **05/19/2020**  Start Time: **09:00:00**
Result:       **Trial Moot**  Result Date: **09/10/2019**

**Dockets**

*(Each Document listed. Documents are listed in Document No./Sequence No. order)*

Date:           **09/11/2017**
Document Name: **CaseType: Damages/Other Tort**
Docket Text:

Date:           **09/11/2017**
Document Name: **Complaint and Jury Demand**
Docket Text:     **001 Class Action Suit ag e 9/18/17 (tagged to Green)**

Date:           **09/11/2017**
Document Name: **Plaintiff"s Information Sheet**
Docket Text:     **002 ag e 9/18/17**

Date:           **09/18/2017**
Document Name: **Summons Issued For Defendant**
Docket Text:     **003 One Summons issued for def ag e 9/18/17**

Date:           **10/02/2017**
Document Name: **Notice of Discovery**
Docket Text:     **004 notice of discovery ; fd/nb618 e: 10/4/17 (green)**

Date:           **10/02/2017**
Document Name: **Affidavit of Service, fd**
Docket Text:     **005 as to dimensions health corp ; fd/nb618 e: 10/4/17 (green)**

Date:           **10/23/2017**
Document Name: **Notice of Removal, fd**
Docket Text:     **007 Notice of filing notice of removal,fd./jmr (Green) e:10-27-17**

Date:           **10/23/2017**
Document Name: **Return of Service,fd**
Docket Text:     **006 SV: Dimensions Health Corporation S/O Eslanda Dasher, Laurel Regional Hospital Corporate Finance Department,fd./jmr (Green) e:10-27-17**

Date:           **10/27/2017**
Document Name: **Civil Case Closure Form, Fd.**

JA1041

| | |
|---|---|
| Docket Text: | **008 fd./jmr (Green)** |

| | |
|---|---|
| Date: | **10/27/2017** |
| Document Name: | **CaseDisp: Removed** |
| Docket Text: | |

| | |
|---|---|
| Date: | **10/27/2017** |
| Document Name: | **Civil Try by Date Complied** |
| Docket Text: | |

| | |
|---|---|
| Date: | **12/11/2017** |
| Document Name: | **Reopen: Ord Remand US DC,fd** |
| Docket Text: | **009 fd/smb e.12/13/2017** |

| | |
|---|---|
| Date: | **12/18/2017** |
| Document Name: | **Amended Complaint, Fd.** |
| Docket Text: | **010 First amended class action complaint fd. kbp e 12/20/17** |

| | |
|---|---|
| Date: | **01/02/2018** |
| Document Name: | **Motion To Dismiss, Fd.** |
| Docket Text: | **011 motion to dimiss first amended class action complaint hearing requested w/memorandum in support of motion and exhibit (case tagged for judge clarke w/hold) fd./emt364 e 1-10-18** |

| | |
|---|---|
| Date: | **01/10/2018** |
| Document Name: | **NoticeRef:Atty App Fee Sent,fd** |
| Docket Text: | **012 mailed to atty joseph chazen fd./emt364 e 1-10-18** |

| | |
|---|---|
| Date: | **01/09/2018** |
| Document Name: | **Certificate Regarding Disc** |
| Docket Text: | **013 fd/hmb e: 01-10-2018** |

| | |
|---|---|
| Date: | **01/23/2018** |
| Document Name: | **Appearance Fee** |
| Docket Text: | **013 appearance fee paid for defendant; fd/nb618 e: 1/30/18 (Clarke)** |

| | |
|---|---|
| Date: | **02/05/2018** |
| Document Name: | **Reply, filed** |
| Docket Text: | **014 Plantiffs response in opposition to defendants motion to dismiss plantiffs first amended class action complaint and request for hearing,fd./jmr (Clarke) Tagged Judge Clarke e:2-8-18** |

| | |
|---|---|
| Date: | **02/12/2018** |
| Document Name: | **Motion to Compel, fd** |
| Docket Text: | **015 Plantiff Monique Russells Motion to compel discovery and Immediate Sanctions,fd./jmr (Clakre) Tagged Judge Clarke Hold e:2-14-18** |

| | |
|---|---|
| Date: | **02/13/2018** |
| Document Name: | **Certificate Regarding Disc** |
| Docket Text: | **016 fd./jmr (Clarke) e:2-15-18** |

| | |
|---|---|
| Date: | **02/16/2018** |
| Document Name: | **Opposition to Motion, fd** |
| Docket Text: | **017 Defendants opposition to plantiffs motion to compel dsicovery and for immediate sanctions hearing requested,fd./jmr (Clarke) Tagged Judge Clarke e:2-21-18** |

| | |
|---|---|
| Date: | **02/20/2018** |
| Document Name: | **Reply, filed** |
| Docket Text: | **018 Reply to plantiffs opposition to motion to dismiss first amended class action complaint,fd./jmr (Clarke) e:2-21-18** |

| | |
|---|---|
| Date: | **02/20/2018** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **019 fd./jmr (Clarke) e:2-21-18** |

JA1042

| Date: | 02/23/2018 |
|---|---|
| Document Name: | Line, filed |
| Docket Text: | 020 Line-withdrawing plantiff monique russells motion to comepl discovery and for immdeiate sanctions,fd./jmr (Clarke) e:2-28-18 |

| Date: | 03/15/2018 |
|---|---|
| Document Name: | NoticeRef:Atty App Fee Sent,fd |
| Docket Text: | 021 Notice to strike and enter appearance of counsel on behalf of defendant dimenstons health corproation,fd./jmr Appearance fee sent too: Elliot D Petty (Clarke) e:3-15-18 |

| Date: | 04/13/2018 |
|---|---|
| Document Name: | Motion, filed |
| Docket Text: | 022 Motion Consolidate,fd./jmr (Cal Mgmt) Tagged Judge Davey e:4-17-18 |

| Date: | 05/10/2018 |
|---|---|
| Document Name: | Civil Daily Sheet, Filed |
| Docket Text: | 023 D/S dated 5/8/18; Defendants' Motion (short) for Stay for 180 Days in CAL17-37091, CAL18-07863, and CAL17-22761 – GRANTED. Status Hearing, held. Judge Davey; CS-D2022. Reset July 10, 2018 at 8:45am for Status Conference before Judge Davey for all cases noted. Reset September 18, 2018 at 8:45am for Status Conference before Judge Davey for all cases notes. Reset November 13, 2018 at 8:45am for Status Conference before Judge Davey for all cases noted., fd./sfw |

| Date: | 07/10/2018 |
|---|---|
| Document Name: | Status Conference Held |
| Docket Text: | case remains set for status conf 9-18-18 at 8:45am. b/Judge Davey |

| Date: | 07/12/2018 |
|---|---|
| Document Name: | Notice of Hearing, filed |
| Docket Text: | 024 notice of hearing (crc) fd/sc e':7/13/18 |

| Date: | 07/19/2018 |
|---|---|
| Document Name: | Civil Daily Sheet, Filed |
| Docket Text: | 025 D/S dated 7/10/18; Status Hearing, held. Judge Davey; CS-D2022. Cases remains set for Status Conference September 18, 2018 at 8:45am before Judge Davey., fd./sfw |

| Date: | 09/18/2018 |
|---|---|
| Document Name: | Status Conference Held |
| Docket Text: | |

| Date: | 09/18/2018 |
|---|---|
| Document Name: | Status Conference Moot |
| Docket Text: | r/s 12-11-18 at 8:45am. status hearing b/Judge Davey |

| Date: | 09/19/2018 |
|---|---|
| Document Name: | Civil Daily Sheet, Filed |
| Docket Text: | 026 D/S dated 9/18/18; Status Hearing, held. Judge Davey; CS-D2025. Previous Status Hearing set for November 13, 2018 to be removed from the Docket. Reset to December 11, 2018 at 8:45am for Status Hearing before Judge Davey., fd./sfw |

| Date: | 09/20/2018 |
|---|---|
| Document Name: | Notice of Hearing, filed |
| Docket Text: | 027 Hearing on 12/11/18,fd./jmr e:9-21-18 |

| Date: | 12/11/2018 |
|---|---|
| Document Name: | Status Conference Held |
| Docket Text: | |

| Date: | 12/27/2018 |
|---|---|
| Document Name: | Civil Daily Sheet, Filed |
| Docket Text: | 028 Civil Daily Sheet dated 12-11-2018 Status Hearing held. Judge Davey; CS-D2022 Court to Issue Scheduling Order, fd./klb e: 12-27-2018 |

| Date: | 12/27/2018 |
|---|---|
| Document Name: | Order of Court, filed |
| Docket Text: | 029 Order of Court dated 12/17/18, Ordered by Judge Davey that the Plaintiff's Second Motion to Defer Dismissal is hereby GRANTED, fd./klb e: 12-27-2018 cc: Jay D. Miller, Cory L. Zajdel, and David Ellin |

| Date: | 12/27/2018 |
|---|---|
| Document Name: | Scheduling Order Filed |
| Docket Text: | 030 May 4-19, 2020 Jury Trial, fd./klb e: 12-27-2018 |

| Date: | 01/22/2019 |
|---|---|
| Document Name: | Status Conference Held |
| Docket Text: | r/s motion to JAN 24, 2019 AT 1:30pm |

| Date: | 01/24/2019 |
|---|---|
| Document Name: | Motions Hearing Held |
| Docket Text: | MOTION RESERVED |

| Date: | 02/05/2019 |
|---|---|
| Document Name: | Order of Court, filed |
| Docket Text: | 031 Order of Court dated 01/31/2019, ORDERED, that Plaintiffs' Motion is DENIED; and it is further, ORDERED, that Defendants' Motion Protective Order is GRANTED, pursuant to Maryland Code Health Occ. Art. 1-401, Plaintiffs are precluded from obtaining or attempting to obtain from Defendant the records, files, and proceedings, includings any documents, notes, materials, minutes, information, data, and/or communications or information held by Prince George's County Hospital's Credentials Committee. F.D./EJ cc: Copies emailed by chambers to N. Magdeburger, P. Federico, J. Schohor and P. Vettori |

| Date: | 01/18/2019 |
|---|---|
| Document Name: | Line, filed |
| Docket Text: | 032 letter addressed to circuit court from natalie c magdeburger of pk law dated 1/18/19 fd./emt364 e 2-26-19 |

| Date: | 02/26/2019 |
|---|---|
| Document Name: | Expert Designation |
| Docket Text: | 033 Plaintiffs' Preliminary Designation of Expert Witnesses as to class certification cmc e2/28/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 034 Defendants' Notice to take Videotaped Deposition for Desire Evans (AKA Clifton) cmc e3/21/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 035 Defendants' Notice to Take Videotaped Deposition of Marqette Ford cmc e3/21/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 036 Notice to take videotaped Deposition of Latisa Gaymon cmc e3/21/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 037 Notice to take videotaped Deposoition of Angelique Hammond cmc e3/21/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 038 Notice to take videotaped Deposition of Shannon Hall cmc e3/21/19 |

| Date: | 03/19/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 039 Notice to take videotaped Deposition of Nagira (aka Naqika) Holmes cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 040 Notice to take videotaped Deposition of Elsa Powell cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 041 Notice to take videotaped Deposition of Jerica White cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 042 Notice to take videotaed Depostion of Mercedes Williams cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 043 Notice to take videotaped Deposition of Christina Dews cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 044 Notice to take videotaped Deposition of Monique Russell cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 045 Notice to take videotaped Deposition of Jasmine Riggins cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 046 Amended Notice to take videotaped Deposition of Mercedes Williams cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 047 Defendants' Amended Notice to take videotaped deposition of Shannon Hall cmc e3/27/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 048 Amended Notice to take videotaped Deposition of Nagira (aka Naqika) Holmes cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 049 Amended Notice to take videotaped Deposition of Latisa Gaymon cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 050 Amended Notice to take Videotaped Deposition of Elsa Powell cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 051 Amended Notice to take videotaped Deposition of Christina Dews cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/19/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 052 Amended Notice to take videotaped Deposition of Desire Evans (aka Clifton) cmc e3/21/19 |

| | |
|---|---|
| Date: | 03/29/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 053 fd./sfw e - 4/2/19 |

| | |
|---|---|
| Date: | 03/29/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 054 fd./sfw e - 4/2/19 |

JA1045

| Date: | 04/01/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 055 Notice of Service of Discovery Material, fd./sfw e – 4/2/19 |

| Date: | 04/02/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 056 Notice of Service of Discovery, fd./sfw e – 4/4/19 |

| Date: | 04/08/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 057 notice of service of discovery hmb/fd e: 4/18/2019 |

| Date: | 04/08/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 058 notice of service of discovery hmb/fd e: 4/18/2019 |

| Date: | 04/10/2019 |
|---|---|
| Document Name: | Motion, filed |
| Docket Text: | 059 motion for protective order to quash subpoenas directed to monique ballard and shamika jones tagged for davey hmb.fd e: 4/18/2019 |

| Date: | 04/10/2019 |
|---|---|
| Document Name: | Motion, filed |
| Docket Text: | 060 motion to shorten time tagged for davey hmb/fd e: 4/19/2019 |

| Date: | 04/29/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 061 Notice of Service of Discovery fd./ bvc e 05-03-19 (Davey) |

| Date: | 04/22/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 062 Notice of Service of Discovery fd./ bvc e 05-08-19 (Davey) |

| Date: | 04/22/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 063 Notice of Service of Discovery fd./ bvc e 05-09-19 (Davey) |

| Date: | 04/22/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 064 Notice of Service of Discovery fd./ bvc e 05-09-19 (Davey) |

| Date: | 04/22/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 065 Notice of Service of Discovery fd./ bvc e 05-09-19 (Davey) |

| Date: | 05/06/2019 |
|---|---|
| Document Name: | Notice of Service, fd |
| Docket Text: | 066 Notice of Service of Discovery fd./ bvc e 05-09-19 (Davey) |

| Date: | 05/10/2019 |
|---|---|
| Document Name: | Motion to Compel, fd |
| Docket Text: | 067 Dimensions Healthcare's Motion to Compel and request for hearing,fd.acc e 5/15/19 (Davey-tagged) |

| Date: | 05/21/2019 |
|---|---|
| Document Name: | Order of Court, filed |
| Docket Text: | 068 Judge Davey on 4/23/19; ORDERED that the Plaintiffs' Motion for Protective Order is WITHDRAWN; and it is further, ORDERED that the Plaintiffs' counsel shall make Ms. Ballard and Ms. Jones available for deposition as a reasonal located and at a mutually agreeable date before May 8, 2019; and it is further, ORDERED that the Defendants' experts shall be available for deposition at a reasonale located and at a mutually agreeable date before June 24, 2019; and it is further, ORDERED that the Scheduling Order dated December 17, 2018 "Section III. March 29, 2019 – Defendants to forward to Plaintiffs' Counsels all class certification expert witnesses and dates available for depositions (all deposition of Defendants' experts must be completed within 45 days of notification)" is hereby MODIFIED |

JA1046

to permit the depositions of the Defendants' experts prior to June 24, 2019., fd./sfw (cc: P. Thronson, Esq., N. Magdeburger, Esq., G. Kirby, Esq. and J. Schochor, Esq.)

| | |
|---|---|
| Date: | 05/21/2019 |
| Document Name: | Order of Court, filed |
| Docket Text: | 069 Judge Davey on 4/23/19; ORDERED that Monique Russell, et al. v. Dimensions Health Corp., et al. (CAL17-22761), Jane Doe No. 1, et al v. Dimensions Health Corp., et al. (CAL17-37092, and Monique Russell, et al. v. Dimensions Health Corpor., et al. (Cal18-07863) are hereby CONSOLIDATED., fd./sfw (cc: P. Thronson, Esq., N. Magdeburger, Esq., G. Kirby, Esq. and J. Schochor, Esq.) |

| | |
|---|---|
| Date: | 05/24/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 070 Plaintiff Jasmine Riggins responses to defendants second request for production of documents fd kbp e 5/30/19 (davey) |

| | |
|---|---|
| Date: | 05/24/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 071 Plaintiff Jasmine Riggins responses to defendants requests for admissions fd kbp e 5/30/19 (davey) |

| | |
|---|---|
| Date: | 05/24/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 072 Plaintiff Monique Russells's responses to defendant's second request for production of documents fd kbp e 5/30/19 (davey) |

| | |
|---|---|
| Date: | 05/24/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 073 Plaintiff Monique Russells's responses to defendant's requests for admissions fd kbp e 5/30/19 (davey) |

| | |
|---|---|
| Date: | 05/28/2019 |
| Document Name: | Opposition to Motion, fd |
| Docket Text: | 074 Plaintiffs' Opposition to Defendants' Motion to Compel Report of Dr. Steinberg fd./ bvc e 05-31-19 (Davey) Tagged for Engel |

| | |
|---|---|
| Date: | 06/04/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 075 copy of Plaintiffs Second Request for Production of Documents of the Defendants, Dimensions Healthcare System and Dimensions Health Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-07-19 |

| | |
|---|---|
| Date: | 06/04/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 076 copy of Plaintiff, Mercedes Williams' Response to Requests for Production of Documents of Defendant, Dimensions Healthcare Corporation (Judge Davey) fd/djg e06-07-19 |

| | |
|---|---|
| Date: | 06/04/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 077 copy of Plaintiff, Jerica White's Response to Requests for Production of Documents of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's County Hospital (Judge Davey) fd/djg e06-07-19 |

| | |
|---|---|
| Date: | 06/04/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 078 copy of Plaintiff, Latisa Gaymon's Response to Request for Production of Documents of Defendant Dimensions Healthcare Corporation d/b/a Prince George's County Hospital (Judge Davey) fd/djg e06-07-19 |

| | |
|---|---|
| Date: | 06/04/2019 |
| Document Name: | Notice of Service, fd |
| Docket Text: | 079 copy of Plaintiff, Naquirah Holmes' Response to Requests for Production of Documents of |

| | |
|---|---|
| Text: | **Defendant, Dimensions Healthcare Corporation d/b/a Prince George's County Hospital (Judge Davey) fd/djg e06-07-19** |

| | |
|---|---|
| Date: | **06/04/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **080 copy of Plaintiff, Desire Evans' Response to Requests for Production of Documents of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-07-19** |

| | |
|---|---|
| Date: | **06/04/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **081 copy of Plaintiffs Requests for Admissions of Facts and Genuineness of Documents fd/djg e06-07-19** |

| | |
|---|---|
| Date: | **06/10/2019** |
| Document Name: | **Response to Opp to Motion...fd** |
| Docket Text: | **082 Response to Plaintiffs' Opposition to Dimensions' Motion to Compel. No Order attached. (Judge Davey) fd/djg e06-11-19** |

| | |
|---|---|
| Date: | **06/12/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **083 copy of Plaintiff, Latisa Gaymon's Response to Requests for Admissions of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-13-19** |

| | |
|---|---|
| Date: | **06/12/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **084 copy of Plaintiff, Desire Evans' Response to Requests for Admissions of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-13-19** |

| | |
|---|---|
| Date: | **06/12/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **085 copy of Plaintiff, Elsa Powell's Response to Requests for Admissions of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-13-19** |

| | |
|---|---|
| Date: | **06/12/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **086 copy of Plaintiff, Christina Dews' Response to Requests for Admissions of Defendant, Dimensions Healthcare Corporation d/b/a Prince George's Hospital Center (Judge Davey) fd/djg e06-13-19** |

| | |
|---|---|
| Date: | **06/20/2019** |
| Document Name: | **Motion, filed** |
| Docket Text: | **087 Defendant, Dimensions Healthcare's Motion to Preclude the Opinions and Testimony of Plaintiffs' Expert, Susan Fiester, M.D., at the Class Certification Hearing Scheduled for 08-05-19 under Reed/Frye and Maryland Rule 5-702 and Request for a Reed/Frye Evidentiary Hearing with the Memorandum in Support of its Motion and multiple exhibits attached. (Tagged for Judge Davey – No Hold) (Judge Davey) fd/djg e06-21-19** |

| | |
|---|---|
| Date: | **06/25/2019** |
| Document Name: | **Motion to Strike, fd** |
| Docket Text: | **088 Defendant's Motion to Strike Plaintiffs' Expert Witness, Susan J. Fiester, M.D. and Request for Hearing with multiple Exhibits (Tagged for Judge Engel – Hold) (Judge Davey) fd/djg e06-26-19** |

| | |
|---|---|
| Date: | **07/01/2019** |
| Document Name: | **Motion, filed** |
| Docket Text: | **089 Motion for Class Certification pursuant to Maryland Rule 2-231(B)(1)(B), or in the Alternative, Motion to Certify specific Common Issues for Class Treatment pursuant to Maryland Rule 2-231(E) with attached Memorandum in Support of Joint Motion for Class Certification, Request for Hearing, Certificate of Service, and Multiple Exhibits (Tagged for Judge Engel) (Davey Admin.) fd/djg e07-01-19** |

JA1048

| | |
|---|---|
| Date: | **07/02/2019** |
| Document Name | **Motion For Postponement Fd.** |
| Docket Text | **090 Defendants' Motion to Postpone August 5, 2019 Class Certification Hearing and Request for Hearing (Tagged for Judge Hill) (Judge Davey) fd/djg e07-03-19** |

| | |
|---|---|
| Date: | **07/02/2019** |
| Document Name | **Notice of Service, fd** |
| Docket Text | **091 copy of Defendants' Response to Plaintiffs' Requests for Admissions of Facts and Genuineness of Documents (Judge Davey) fd/djg e07-03-19** |

| | |
|---|---|
| Date: | **07/11/2019** |
| Document Name | **Opp To Motion To Strike, fd** |
| Docket Text | **092 Plaintiffs' Opposition to Defendants' Motion to Strike Plaintiffs' Expert Witness, Susan J. Fiester, M.D., and Request for Hearing (Tagged for Judge Engel) (Judge Davey) fd/djg e07-11-19** |

| | |
|---|---|
| Date: | **07/15/2019** |
| Document Name | **Opposition to Motion, fd** |
| Docket Text | **093 Plaintiffs' Opposition to Defendants' Motion to Postpone August 5, 2019 Class Certification Hearing (Tagged for Judge Davey) (Judge Davey) fd/djg e07-15-19** |

| | |
|---|---|
| Date: | **07/15/2019** |
| Document Name | **Motion, filed** |
| Docket Text | **094 Plaintiffs' Motion to Preclude the Testimony of the Defendants' Experts in Psychiatry at the Class Certification Hearing with exhibits attached. (Tagged for Judge Engel) (Judge Davey) fd/djg e07-16-19** |

| | |
|---|---|
| Date: | **07/15/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **095 Notice of Service of Discovery Materials (Judge Davey) fd/djg e07-16-19** |

| | |
|---|---|
| Date: | **07/08/2019** |
| Document Name: | **Exhibit/Exhibits, Fd.** |
| Docket Text | **096 Exhibits to Plaintiffs' Opposition to Defendants' Dimensions Healthcare's Motion to Preclude the Opions and Testimony of Plaintiffs' Expert Susan Fiester, M.D., at the Class Certification Hearing filed on 07-8-19. (Judge Davey) fd/djg e07-19-19** |

| | |
|---|---|
| Date: | **07/08/2019** |
| Document Name: | **Exhibit/Exhibits, Fd.** |
| Docket Text | **097 Exhibits to Plaintiffs' Opposition to Defendants' Motion to Postpone August 5, 2019 Class Certification Hearing filed on 07-15-19 (Judge Davey) fd/djg e07-19-19** |

| | |
|---|---|
| Date: | **07/22/2019** |
| Document Name: | **Notice of Hearing, filed** |
| Docket Text: | **098 Notice of Hearing and Trial Dates set (Judge Davey) fd/djg e07-22-19** |

| | |
|---|---|
| Date: | **07/22/2019** |
| Document Name | **Motion for Reconsideration** |
| Docket Text | **099 Defendants' Motion for Reconsideration of this Honorable Court's Order Denying Motion to Compel (Tagged for Judge Engel) (Judge Davey) fd/djg e07-30-19** |

| | |
|---|---|
| Date: | **07/29/2019** |
| Document Name: | **Reply, filed** |
| Docket Text | **100 Defendants' Reply to Opposition to Motion to Postpone August 5, 2019 Class Certification Hearing (Judge Davey) fd/djg e07-30-19** |

| | |
|---|---|
| Date: | **07/29/2019** |
| Document Name: | **Opposition to Motion, fd** |
| Docket Text | **101 Defendant's Opposition to Plaintiffs' Motion to Preclude Defendants' Experts in the Area of Pschiatry at Class Certification Hearing and Request for Hearing (Judge Davey) fd/djg e07-30-19** |

JA1049

| | |
|---|---|
| Date: | **07/29/2019** |
| Document Name: | **Response to Opp to Motion...fd** |
| Docket Text: | **102 Response to Plaintiffs' Opposition to Dimensions' Motion to Preclude the Opinions and Testimony of Plaintiffs' Expert Susan Fiester, M.D., at the Class Certificateion Hearing Scheduled for August 5, 2019 and Request for a Reed/Frye Evidentiary Hearing (Judge Davey) fd/djg e07-30-19** |

| | |
|---|---|
| Date: | **07/29/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **103 Notice of Service of Discovery Material (Judge Davey) fd/djg e07-30-19** |

| | |
|---|---|
| Date: | **07/29/2019** |
| Document Name: | **Notice of Service, fd** |
| Docket Text: | **104 Notice of Service of Discovery Material (Judge Davey) fd/djg e07-30-19** |

| | |
|---|---|
| Date: | **07/30/2019** |
| Document Name: | **Motions Hearing Held** |
| Docket Text: | |

| | |
|---|---|
| Date: | **07/30/2019** |
| Document Name: | **Hearing Moot** |
| Docket Text: | |

| | |
|---|---|
| Date: | **07/31/2019** |
| Document Name: | **Order of Court, filed** |
| Docket Text: | **105 Order of Court dated July 9, 2019, Ordered by Judge Davey that the the Defendant's Motion to Compel is Denied, fd,/klb e: 07-31-2019 cc: Natalie Magadeburger, Esquire Elliott D. Petty, Esquire Mark D. Maneche, Esquire Gregory K. Kirby, Esquire** |

| | |
|---|---|
| Date: | **07/31/2019** |
| Document Name: | **Civil Daily Sheet, Filed** |
| Docket Text: | **106 Civil Daily Sheet dated 07/30/2019 Plantiffs withdraw expert witness, Susan Fiester. Hearing on Pending Motions Defendant's Motion (Short) for Reconsideration of Motion to Compel-Denied Judge Davey; CS-2025 Plaintiff's Motion to Preclude the Testimony of the Defendant's Experts in Psychiatry at the Class Certification Hearing-Denied Defendant's Dimensions Healthcare's Motion to Preclude the Opinions and Testimony of Plaintiff's Expert Susan Fiester, M.D. at the Class Certification Hearing-Moot. Defendant's Motion to Strike Plaintiff's Expert Witness-Susan J. Fiester, M.D.-Moot Reset to September 11, 2019 at 10:00am for 3 hour Class Certification Hearing and September 12, 2019 at 9:00am for 3 hour Motions Hearing before Judge Davey. Motions date of August 5, 2019 is to be taken out of assignment, fd./klb e: 07-31-2019** |

| | |
|---|---|
| Date: | **08/01/2019** |
| Document Name: | **Notice of Hearing, filed** |
| Docket Text: | **107 Notice of Hearings scheduled for above case. (Judge Davey) fd/djg e08-01-19** |

| | |
|---|---|
| Date: | **08/01/2019** |
| Document Name: | **Mot: Partial Summary Judg, fd** |
| Docket Text: | **108 Defendants' Motion for Partial Judgment Summary Judgment as to Patients of Dr. Akoda not treated by Dr. Akoda at Prince George's Hospital Center and Request for Hearing, fd/djg (Davey) e08-15-19 Tagged for Judge Davey** |

| | |
|---|---|
| Date: | **08/01/2019** |
| Document Name: | **Mot For Summary Judgment, fd** |
| Docket Text: | **109 Defendants' Motion for Summary Judgment and Request for Hearing, fd/djg (Davey) e08-15-19 Tagged for Judge Davey** |

| | |
|---|---|
| Date: | **08/01/2019** |
| Document Name: | **Memorandum of Law, fd** |
| Docket Text: | **110 Defendants' Memorandum of Law in Opposition to Motion for Class Certification, fd/djg (Davey) e08-15-19 Tagged for Judge Davey** |

| | |
|---|---|
| Date: | **09/05/2019** |
| Document Name: | **Stipulation/Ln of Dismissal,fd** |
| Docket Text: | **111 fd./klb e: 09-10-2019** |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Civil Case Closure Form, Fd.** |
| Docket Text: | **112 fd./klb e: 09-10-2018** |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **CaseDisp: Dismissed** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

| Date: | **09/10/2019** |
|---|---|
| Document Name: | **Trial Moot** |
| Docket Text: | |

JA1051

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland Rules, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

JA1052

# **EXHIBIT 24**

JA1053

## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

MONIQUE RUSSELL, *et al.*       *
    *Plaintiff(s)*          *
v.                          *    CAL17-22761
DIMENSIONS HEALTH CORP., *et al.*  *
    *Defendant(s)*         *
*******************************************************************

CHRISTINA DEWS, *et al.*        *
    *Plaintiff(s)*          *
v.                          *    CAL17-37091
DIMENSIONS HEALTH CORP., *et al.*  *
    *Defendant(s)*         *
*******************************************************************

MONIQUE RUSSELL, *et al.*       *
    *Plaintiff(s)*          *
v.                          *    CAL18-07863
DIMENSIONS HEALTH CORP., *et al.*  *
    *Defendant(s)*         *

### STIPULATION OF DISMISSAL WITHOUT PREJUDICE

Plaintiffs, Monique Russell, Jasmine Riggins, Christina Dews, Desire Evans, Elsa Powell, Latisa Gaymon, and Naquirah Holmes and the Defendants Dimensions Healthcare System, d/b/a Dimensions Health Corporation and Dimensions Health Corporation d/b/a Prince George's Hospital Center, stipulate to the dismissal without prejudice of the above-referenced matter.

The parties further agree and stipulate that the filing of Case Nos. CAL 17-22761 CAL 18-07863 and CAL 17-37091, the earliest of which was filed on September 7, 2017, had the effect of tolling any applicable statutes of limitations, statutes of repose, or other time based defenses on behalf of patients of Oluwafemi Charles Igberase a/k/a Charles Akoda during the pendency of this litigation as to claims arising out of the Defendants' credentialing, supervising, retaining and employment of Oluwafemi Charles Igberase a/k/a Charles Akoda and those claims set forth in the Plaintiffs' Class Action Complaints. The parties further agree that the tolling of such statutes of limitations, statutes of repose or other time based defenses shall end with the filing of this dismissal

1

Plaintiffs0000118680

as to all putative or absent class members  except those individuals specifically identified by separate agreement.

As a result, this dismissal without prejudice will not prejudice putative or absent class members, as these individuals maintain the ability to file claims/lawsuits to the extent that their statute of limitations had not yet expired as of September 7, 2017 and that they make any such filing prior to the time that their claims would be barred with addition of the period of tolling between September 7, 2017 and the date of this dismissal.

Respectfully submitted,

Jonathan Schochor, Esq. CPF #7406010179
Brent P. Ceryes, Esq. CPF #1112130163
Schochor, Federico and Staton, P.A.
The Paulton
1211 Saint Paul Street
Baltimore, Maryland  21202
(410) 234-1000
jschochor@sfspa.com
bceryes@sfspa.com

Jay D. Miller, Esq. CPF #8712010427
jmiller@lawpga.com
Paul M. Vettori, Esq. CPF #7012010190
pvettori@lawpga.com
Danielle S. Dinsmore, Esq.
CPF #0306200003
ddinsmore@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649 - 2000

2

*Karen Evans /BPC*
David Haynes, Esq. CPF #0312220004
Karen Evans, Esq. CPF #9712150006
The Cochran Firm
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC, 20005
DHaynes@cochranfirm.com
KEvans@cochranfirm.com

*Patrick Thronson /BPC*
Howard A. Janet, Esq.  CPF #7905010072
Patrick Thronson, Esq.  CPF #1312190237
Janet, Janet & Suggs, LLC
4 Reservior Circle, Suite 200
Baltimore, Maryland  21208
(410) 654-3200
Hjanet@jjsjustice.com
PThronson@jjsjustice.com

Natalie Magdeburger
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland  21204
(410) 938-8800

*Attorney for the Defendants*

3

Plaintiffs0000118682

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on this 3rd day of September, 2019, a copy of the aforegoing

Stipulation of Dismissal Without Prejudice was mailed to Natalie Magdeburger, Esquire, Pessin

Katz Law, P.A., 901 Dulaney Valley Road, Suite 400, Towson, Maryland 21204.

_____
Jonathan Schochor, Esq. CPF #7406010179
Brent P. Ceryes, Esq. CPF #1112130163
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000 - office
(410) 234-1010 - fax
jschochor@sfspa.com
bceryes@sfspa.com
*Attorneys for the Plaintiffs*

1

Plaintiffs0000118683

# **EXHIBIT 25**

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11101532 |
| Status | Complete |
| Login Username | aureliavaughan@yahoo.com |
| 1a. How did you become Dr. Akoda's patient? | Found name on list of doctors |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | I don't remember |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | • Routine annual gynecological checkups<br>• Visits for other medical care |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • He made sexual comments<br>• Other<br>• But I figured because he posed as a GYN doctor, it was normal. |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Always |
| 3d. Did she stay throughout the examination? | Always |
| 3e. Was she standing in a place where she could see the pelvic examination? | Always |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |

| | |
|---|---|
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | No |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, less painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| No. (below, please indicate why you didn't tell anyone. Check all that apply) | I didn't know what to do |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I heard about it on the radio |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Betrayed |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, both before and after I learned of the charges against him. |

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, only in the past month |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |

| | |
|---|---|
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | I have not experienced any of these symptoms |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has changed how often I visit an ob/gyn |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | It has not affected other parts of my life. |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 04 |
| YY | 19 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |

| | |
|---|---|
| **9e. When you were treated by Dr. Akoda, what type of health insurance did you have?** | Private insurance |
| **Statement:** | I still can not believe until this day that he was even hired as a OBGYN doctor, for such confidential matters such as a women's private area...how could a person be hired to handle these kinds of matters, and not be affected later on down the line. I am emotionally distraught and feel very violated by the trust of Prince Georges Community Hospital Affiliates. |
| **Last Update** | 2019-09-11 11:59:05 |
| **Start Time** | 2019-09-11 11:30:55 |
| **Finish Time** | 2019-09-11 11:59:05 |
| **IP** | 50.234.115.104 |
| **Browser** | Chrome |
| **OS** | Windows |
| **Referrer** | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11101674 |
| Status | Complete |
| Login Username | ksimms18@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2013 |
| 1d. About how many times did you see him? | One time |
| 1e. What types of visits did you have with him? (Check all that apply) | • Routine annual gynecological checkups<br>• Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | It was just something about him |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Negative (e.g., he was more rough, longer exams, sexual talk and/or touch) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Negative (Dr. Akoda more rough, insensitive, longer exams, sexual talk and/or touch) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Never |
| 3d. Did she stay throughout the examination? | Never |
| 3e. Was she standing in a place where she could see the pelvic examination? | Never |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |

| | |
|---|---|
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | Yes |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, more painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | Yes |
| Yes (please indicate who you told. Check all that apply) | I told a family member |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | Betrayed |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, both in the past month and prior to the past month |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |

| | |
|---|---|
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | Weight gain or weight loss |
| 6u. How severe were your physical symptoms? | mild |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 6x. Please describe any psychiatric or medical diagnoses you have received that you believe are related to your experience with Dr. Akoda. | Anxiety (Anxiety Disorder) |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has changed how often I visit an ob/gyn |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | It has not affected other parts of my life. |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 07 |
| YY | 80 |

| | |
|---|---|
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Private insurance |
| Last Update | 2019-09-11 12:22:42 |
| Start Time | 2019-09-11 12:10:09 |
| Finish Time | 2019-09-11 12:22:42 |
| IP | 174.204.0.188 |
| Browser | Safari |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11104971 |
| Status | Complete |
| Login Username | oates.destiny@yahoo.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2013 |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | No |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | It was just something about him |
| 2c. If you answered no to question 2a but at some point began to trust him, what happened that changed? (Check all that apply) | It was just something about him |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Negative (e.g., he was more rough, longer exams, sexual talk and/or touch) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Sometimes |
| 3d. Did she stay throughout the examination? | Sometimes |
| 3e. Was she standing in a place where she could see the pelvic examination? | Sometimes |

| | |
|---|---|
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Sometimes |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, more painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | No |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | Yes |
| Yes (please indicate who you told. Check all that apply) | I told a family member |
| No. (below, please indicate why you didn't tell anyone. Check all that apply) | Other |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Betrayed |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |

JA1070

| | |
|---|---|
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | No |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |

| | |
|---|---|
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | I have not experienced any of these symptoms |
| 6u. How severe were your physical symptoms? | mild |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda? | Non-psychiatric medication |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has affected the types of medical specialists I will go to see |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | I am concerned about my daughter going to an ob/gyn |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | Decline to answer |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |

| | |
|---|---|
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 11 |
| YY | 93 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |
| Last Update | 2019-09-12 12:22:32 |
| Start Time | 2019-09-12 12:08:57 |
| Finish Time | 2019-09-12 12:22:32 |
| IP | 172.58.190.227 |
| Browser | Chrome |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11105168 |
| Status | Complete |
| Login Username | shayof3@comcast.net |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2012 |
| 1d. About how many times did you see him? | More than 5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • Other<br>• Noth really nothing that I can pen point. |
| 2c. If you answered no to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • Other<br>• N/A |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Never |
| 3d. Did she stay throughout the examination? | Never |
| 3e. Was she standing in a place where she could see the pelvic examination? | Never |

JA1074

| | |
|---|---|
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | I don't know or remember |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | No |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | No |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| No. (below, please indicate why you didn't tell anyone. Check all that apply) | Other |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I heard about it on the radio |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | No |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | No |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | No |
| 6h. Is it hard for you to recall some aspects of what transpired? | Yes |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |

| | |
|---|---|
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6u. How severe were your physical symptoms? | mild |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda? | Non-psychiatric medication |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | No |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • Other:<br>• Never went back to that office |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | It has not affected other parts of my life. |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 08 |
| YY | 78 |
| 9b. Your marital status | married or in long-term relationship |

| | |
|---|---|
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |
| Last Update | 2019-09-12 13:20:38 |
| Start Time | 2019-09-12 13:04:40 |
| Finish Time | 2019-09-12 13:20:38 |
| IP | 107.77.203.48 |
| Browser | Chrome |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

### Akoda Questionnaire

| | |
|---|---|
| Reference # | 11107546 |
| Status | Complete |
| Login Username | takia334@yahoo.com |
| 1a. How did you become Dr. Akoda's patient? | • Other:<br>• Went into labor and Dr. Akoda was the on<br>  call Dr doing deliveries. |
| 1b. Where did you see Dr. Akoda? | Prince George's Hospital Center |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2016 |
| 1d. About how many times did you see him? | One time |
| 1e. What types of visits did you have with him? (Check all that apply) | Surgery |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Always |
| 3d. Did she stay throughout the examination? | Always |
| 3e. Was she standing in a place where she could see the pelvic examination? | I don't know or remember |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |

| | |
|---|---|
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | No |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | No |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | No |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | No |

| | |
|---|---|
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | No |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | No |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | No |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has not affected my use of medical care. |

| | |
|---|---|
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | It has not affected other parts of my life. |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 08 |
| YY | 79 |
| 9b. Your marital status | married or in long-term relationship |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Private insurance |
| Last Update | 2019-09-13 11:05:33 |
| Start Time | 2019-09-13 10:52:56 |
| Finish Time | 2019-09-13 11:05:33 |
| IP | 71.163.126.95 |
| Browser | Chrome |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11126381 |
| Status | Complete |
| Login Username | markquonda.mathis@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | I don't remember |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | • Routine annual gynecological checkups<br>• Visits for other medical care |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | He made sexual comments |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | Yes |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Negative (Dr. Akoda more rough, insensitive, longer exams, sexual talk and/or touch) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Never |
| 3d. Did she stay throughout the examination? | Never |
| 3e. Was she standing in a place where she could see the pelvic examination? | Never |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |

| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | Yes |
|---|---|
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | No |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | Yes |
| Yes (please indicate who you told. Check all that apply) | I told a family member |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | Shocked |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, before I learned of the charges against him. |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | No |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | No |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |

| | |
|---|---|
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | I have not experienced any of these symptoms |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • Other:<br>• It affected the gender doctors I will go see |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 01 |
| YY | 90 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Private insurance |
| Last Update | 2019-09-19 16:46:26 |

| | |
|---|---|
| Start Time | 2019-09-19 16:31:51 |
| Finish Time | 2019-09-19 16:46:26 |
| IP | 172.58.185.126 |
| Browser | Chrome |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11126448 |
| Status | Complete |
| Login Username | feldergamini75@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2014 |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Visits for other medical care |
| 2a. Did you trust Dr. Akoda? | No |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • It was just something about him<br>• Other<br>• He told me I'd better hurry to have a baby.  It was the way he said it.  It hurt my feelings.  I cried in the car after I left the appointment. |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 4e. Did you ever consider changing doctors? | Yes |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | Betrayed |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, before I learned of the charges against him. |

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, both before and after I learned of the charges against him. |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | Yes, both in the past month and prior to the past month |
| 6j. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6k. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6l. Have you felt irritable or angry? | Yes, both in the past month and prior to the past month |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |

JA1089

| | |
|---|---|
| 6q. Do you have trouble making decisions? | Yes, only in the past month |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | Yes, both in the past month and prior to the past month |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | • Headache/dizziness<br>• Fatigue or insomnia<br>• Other:<br>• I became severely anemic, low energy, hair loss, shortness of breathe, insomnia, pelvic pain, depression due to symptoms |
| 6u. How severe were your physical symptoms? | severe |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | No |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • Other:<br>• I get a second opinion |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | • Other:<br>• At that time, I was severely anemic, losing alot of blood during my cycles and Dr. Akoda refused to perform surgery to remove the fibroids. Therefore, I was always tired, in pain during menstrual cycle, had hair loss and disinterested in life |
| 7d. Has your experience with Dr. Akoda affected your work life? | Yes |
| 7e. In what way has your experience with Dr. Akoda affected your work life (Check all that apply)? | • I was not able to go to work for awhile<br>• I quit my job<br>• Other:<br>• Due to the heavy bleeding, dizziness, low energy, fatigue and insomnia and the fact that I had to wear a white labcoat for work I had to quit |
| 7f. Did your experience with Dr. Akoda affect your social life? | Yes |

| | |
|---|---|
| 7g. In what way did your experience with Dr. Akoda affected your social life? (Check all that apply) | • I avoided certain types of social events.<br>• I was afraid of or avoided leaving home.<br>• I didnt want to bleed on the furniture or through my clothes |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 02 |
| YY | 72 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |

| Statement: | My reason for visiting Dr. Akoda was to request ███████████. He refused and wrote me a prescription. I returned 3 months later because my symptoms were worse. He refused again. I suffered for over another year until I could not any longer. But this time Dr. Chaudry was in the office. Dr. Chaudry agreed I needed surgery. The surgery was approved and Dr. Chaudry performed the surgery for me in "less than 30 days" from that visit.

I believe Dr. Akoda's judgement was incorrect and insensitive due to the nature of the symptoms and difficulties I repeatedly expressed to him I was experiencing on both visits.

His comment to me was both incorrect and insensitive. He told me I was getting to old to have a baby and I'd better hurry up. I cried when I left his office.

I suffered unnecessarily due to Dr. Akoda's misjudgement and insensitivity. |
|---|---|
| Last Update | 2019-09-19 17:40:40 |
| Start Time | 2019-09-19 16:40:42 |
| Finish Time | 2019-09-19 17:40:40 |
| IP | 76.114.220.213 |
| Browser | Firefox |
| OS | Windows |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11116015 |
| Status | Complete |
| Login Username | tiffanygardner90@hotmail.com |
| 1a. How did you become Dr. Akoda's patient? | • Other:<br>• My obgyn doctor was not available to deliver my baby |
| 1b. Where did you see Dr. Akoda? | Prince George's Hospital Center |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2015 |
| 1d. About how many times did you see him? | One time |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Negative (e.g., he was more rough, longer exams, sexual talk and/or touch) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Always |
| 3d. Did she stay throughout the examination? | Always |
| 3e. Was she standing in a place where she could see the pelvic examination? | I don't know or remember |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |

JA1093

| | |
|---|---|
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, more painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | I don't know or remember |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry<br>• Betrayed |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |

| | |
|---|---|
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | No |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | Yes, both in the past month and prior to the past month |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, both in the past month and prior to the past month |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | I have not experienced any of these symptoms |

JA1095

| | |
|---|---|
| 6u. How severe were your physical symptoms? | mild |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda? | Non-psychiatric medication |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has changed how often I visit an ob/gyn |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | Yes |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 06 |
| YY | 90 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11115083 |
| Status | Complete |
| Login Username | mariahmarie92@yahoo.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2013 |
| 1d. About how many times did you see him? | More than 5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • Other<br>• Medical advice was questionable in retrospect during my prenatal care. |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | I don't know or remember |
| 3d. Did she stay throughout the examination? | I don't know or remember |
| 3e. Was she standing in a place where she could see the pelvic examination? | I don't know or remember |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | I don't know or remember |

| | |
|---|---|
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | I don't know or remember |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | No |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | No |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | No |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| No. (below, please indicate why you didn't tell anyone. Check all that apply) | Other |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | Betrayed |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I worry that he may have hurt my baby |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, only after I learned of the charges against him |

JA1098

| | |
|---|---|
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | Yes, only after I learned of the charges against him |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | Yes |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | No |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | No |
| 6h. Is it hard for you to recall some aspects of what transpired? | Yes |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | Yes, both in the past month and prior to the past month |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |

| | |
|---|---|
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | Yes, both in the past month and prior to the past month |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | I have not experienced any of these symptoms |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has changed how often I visit an ob/gyn |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | I am concerned about my daughter going to an ob/gyn |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | Yes |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 08 |
| YY | 92 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | Biracial |

JA1100

| | |
|---|---|
| **9e. When you were treated by Dr. Akoda, what type of health insurance did you have?** | Medicaid |
| **Statement:** | In retrospect to being seen by akoda when I switched from my previous doctor at about six months pregnant. I had a ultrasound done for tremendous pain i was experiencing in my pelvic area . The ultrasound technician advised that i be put on bed rest for the remainder of my pregnancy because my cervix was already dilating . Akoda however advised against that and told me i would be fine resuming regular activities . Looking back i fear that his advice could have caused me to go into early labor had other events in my life caused me to not be working at that time ultimately allowing me to stay home anyway for the remainder of my pregnancy . |
| **Last Update** | 2019-09-16 23:30:57 |
| **Start Time** | 2019-09-16 22:55:08 |
| **Finish Time** | 2019-09-16 23:30:57 |
| **IP** | 172.56.3.43 |
| **Browser** | Safari |
| **OS** | Mobile |
| **Referrer** | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11114329 |
| Status | Complete |
| Login Username | hazelleslie31@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | 2013 |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Routine annual gynecological checkups |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • He was rude<br>• He made sexual comments<br>• He hurt me<br>• Pelvic exams were too long |
| 2c. If you answered no to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • He was rude<br>• He made sexual comments<br>• He hurt me<br>• Pelvic exams were too long |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | Yes |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Negative (e.g., he was more rough, longer exams, sexual talk and/or touch) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Never |
| 3d. Did she stay throughout the examination? | Never |
| 3e. Was she standing in a place where she could see the pelvic examination? | Never |

| | |
|---|---|
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Always |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | Yes |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | I don't know or remember |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, more painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | Yes |
| Yes (please indicate who you told. Check all that apply) | • I told a nurse or other healthcare provider<br>• I told an administrator<br>• I told another doctor<br>• I told a family member<br>• I told a friend<br>• I told someone else |
| 5a. How did you first learn that charges were made against Dr. Akoda? | Other: |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry<br>• Betrayed<br>• Sad<br>• Other: |

| | |
|---|---|
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | • I feel that he betrayed my trust.<br>• I think he may have hurt me physically<br>• I think he performed unnecessary procedures on me |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, both before and after I learned of the charges against him. |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | Yes, both before and after I learned of the charges against him. |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | Yes |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, both before and after I learned of the charges against him. |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | Yes, both in the past month and prior to the past month |
| 6j. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6k. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6l. Have you felt irritable or angry? | Yes, both in the past month and prior to the past month |

| 6m. Have you had difficulty concentrating? | Yes, both in the past month and prior to the past month |
| --- | --- |
| 6n. Have you felt jumpy, overly alert, or easily startled? | Yes, both in the past month and prior to the past month |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | Yes, both in the past month and prior to the past month |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, both in the past month and prior to the past month |
| 6q. Do you have trouble making decisions? | Yes, both in the past month and prior to the past month |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | • Headache/dizziness<br>• High blood pressure<br>• Abdominal pain, nausea, reflux, ulcers, constipation<br>• Fatigue or insomnia<br>• Weight gain or weight loss<br>• Numbness, loss of enjoyment in life, or loss of libido<br>• Pain, trembling and/or nervous tics |
| 6u. How severe were your physical symptoms? | severe |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | Yes |
| 6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda? | • Therapy or counseling<br>• Psychiatric medication |
| 6x. Please describe any psychiatric or medical diagnoses you have received that you believe are related to your experience with Dr. Akoda. | • Depression (Major Depressive Disorder)<br>• Anxiety (Anxiety Disorder)<br>• PTSD (Post Traumatic Stress Disorder) |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |

| | |
|---|---|
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • It has not affected my use of medical care.<br>• It has changed how often I visit any doctor<br>• It has changed how often I visit an ob/gyn<br>• It has affected the types of medical specialists I will go to see<br>• It has affected the medical choices or decisions I make |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | • It has not affected other parts of my life.<br>• I am concerned about my daughter going to an ob/gyn |
| 7d. Has your experience with Dr. Akoda affected your work life? | Yes |
| 7e. In what way has your experience with Dr. Akoda affected your work life (Check all that apply)? | • I was not able to go to work for awhile<br>• Other: |
| 7f. Did your experience with Dr. Akoda affect your social life? | Yes |
| 7g. In what way did your experience with Dr. Akoda affected your social life? (Check all that apply) | • I avoided certain types of social events.<br>• I avoided certain neighborhoods and locations.<br>• I was afraid of or avoided leaving home. |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 10 |
| YY | 44 |
| 9b. Your marital status | single |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |

| | |
|---|---|
| **Statement:** | He is a demon doctor he let me go in shock while on the eximanation table while i went unconcious he had his han in me and then went up on me lying still unconcious he ripped the point of my cloterist wide open saying how that you have three children and still so neat. I told him that I was seperated from my husband for seveteen years and hoping for him to come back. He dr okada is a real. Deamon. Sign. Hazel. Leslie |
| **Last Update** | 2019-09-17 10:09:58 |
| **Start Time** | 2019-09-17 08:45:23 |
| **Finish Time** | 2019-09-17 10:09:58 |
| **IP** | 172.58.184.171 |
| **Browser** | Chrome |
| **OS** | Mobile |
| **Referrer** | https://fs4.formsite.com/res/formLoginReturn |

JA1107

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11111273 |
| Status | Complete |
| Login Username | trayeshia.raygie@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Walked into clinic |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | • 2013<br>• 2014 |
| 1d. About how many times did you see him? | More than 5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Sometimes |
| 3d. Did she stay throughout the examination? | Sometimes |
| 3e. Was she standing in a place where she could see the pelvic examination? | Always |
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Sometimes |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | No |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |

| | |
|---|---|
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | No |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, less painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | No |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| 5a. How did you first learn that charges were made against Dr. Akoda? | • Other:<br>• I had seen his face on the metro bus and then i looked up his name and founf out |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | Shocked |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, only after I learned of the charges against him |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | No |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | Yes, only after I learned of the charges against him |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | No |

| | |
|---|---|
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | Yes |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | No |
| 6p. Do you feel embarrassed, shame, or humiliated? | No |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | • Other: <br> • No |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |

| | |
|---|---|
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | It has changed how often I visit an ob/gyn |
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | I am concerned about my daughter going to an ob/gyn |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 08 |
| YY | 91 |
| 9b. Your marital status | married or in long-term relationship |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |
| Statement: | I just really trusted him i was even looking for him when i got pregnant the second time in 2016 with my son i cant believe that he would be so careless with women and their babies thats very upsetting and it hurts what if something happen to me or my daughter how would someone explain that to me now i only go to women doctors or midwifes i dont trust men doctors at all |

JA1111

| | |
|---|---|
| Last Update | 2019-09-15 12:50:05 |
| Start Time | 2019-09-15 12:38:35 |
| Finish Time | 2019-09-15 12:50:05 |
| IP | 71.200.81.189 |
| Browser | Chrome |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/form_login.html |

Akoda Questionnaire

| | |
|---|---|
| Reference # | 11110182 |
| Status | Complete |
| Login Username | queenbritt85@gmail.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | • 2014<br>• 2015 |
| 1d. About how many times did you see him? | 2-5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | • Routine annual gynecological checkups<br>• Surgery |
| 2a. Did you trust Dr. Akoda? | No |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • It was just something about him<br>• Pelvic exams were too long |
| 2c. If you answered no to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • It was just something about him<br>• Pelvic exams were too long |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | Yes |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Negative (e.g., he was more rough, longer exams, sexual talk and/or touch) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Negative (Dr. Akoda more rough, insensitive, longer exams, sexual talk and/or touch) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Never |
| 3d. Did she stay throughout the examination? | Never |
| 3e. Was she standing in a place where she could see the pelvic examination? | Never |

| | |
|---|---|
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Always |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | Yes |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | Yes |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | Yes, more painful |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | No |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | No |
| No. (below, please indicate why you didn't tell anyone. Check all that apply) | I didn't know what to do |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I heard about it on the radio |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry<br>• Betrayed<br>• Sad |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | • I feel that he betrayed my trust.<br>• I think he may have hurt me physically<br>• I think he performed unnecessary procedures on me |

| | |
|---|---|
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, both before and after I learned of the charges against him. |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | Yes, both before and after I learned of the charges against him. |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | Yes |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, both before and after I learned of the charges against him. |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | Yes, both in the past month and prior to the past month |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | Yes, both in the past month and prior to the past month |
| 6j. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6k. Have you experienced less interest or pleasure with important activities? | Yes, both in the past month and prior to the past month |
| 6l. Have you felt irritable or angry? | Yes, both in the past month and prior to the past month |
| 6m. Have you had difficulty concentrating? | Yes, both in the past month and prior to the past month |
| 6n. Have you felt jumpy, overly alert, or easily startled? | Yes, both in the past month and prior to the past month |

| | |
|---|---|
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | Yes, both in the past month and prior to the past month |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, both in the past month and prior to the past month |
| 6q. Do you have trouble making decisions? | Yes, both in the past month and prior to the past month |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | Yes, both in the past month and prior to the past month |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | • Headache/dizziness<br>• Chest pain or shortness of breath<br>• Abdominal pain, nausea, reflux, ulcers, constipation<br>• Fatigue or insomnia<br>• Weight gain or weight loss<br>• Numbness, loss of enjoyment in life, or loss of libido<br>• Pain, trembling and/or nervous tics |
| 6u. How severe were your physical symptoms? | severe |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | Yes |
| 6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda? | Psychiatric medication |
| 6x. Please describe any psychiatric or medical diagnoses you have received that you believe are related to your experience with Dr. Akoda. | • Depression (Major Depressive Disorder)<br>• Anxiety (Anxiety Disorder) |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • Other:<br>• I haven't seen a gynecologist in 3 years. |

| | |
|---|---|
| 7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply) | • It has affected my relationship with my spouse or partner.<br>• It has affected my relationships with my children |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | Yes |
| 7g. In what way did your experience with Dr. Akoda affected your social life? (Check all that apply) | • I avoided friends, neighbors, and relatives.<br>• I avoided certain types of social events.<br>• I didn't return messages and phone calls. |
| 8a. Have you ever been threatened by somebody? | Yes |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |
| MM | 08 |
| YY | 85 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |

JA1117

### Akoda Questionnaire

| | |
|---|---|
| Reference # | 11107167 |
| Status | Complete |
| Login Username | toni_seegars10@yahoo.com |
| 1a. How did you become Dr. Akoda's patient? | Went to see other doctor in practice but saw Dr. Akoda instead. |
| 1b. Where did you see Dr. Akoda? | At the medical practice of Dr. A.G. Chaudry |
| 1c. During which of the following years did you see Dr. Akoda? (Check all that apply) | • 2013<br>• 2014 |
| 1d. About how many times did you see him? | More than 5 times |
| 1e. What types of visits did you have with him? (Check all that apply) | Prenatal, delivery, and postnatal obstetric visits |
| 2a. Did you trust Dr. Akoda? | Yes |
| 2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply) | • It was just something about him<br>• He made sexual comments<br>• Other<br>• Not always was there a female nurse called in during examinations |
| 2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'? | No |
| 3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him? | Neutral (e.g., No difference) |
| 3b. How did his breast examination compare with other doctors' exams before/after you saw him? | Neutral (No difference) |
| 3c. Was there always a nurse or chaperone in the room during pelvic examinations? | Sometimes |
| 3d. Did she stay throughout the examination? | Always |
| 3e. Was she standing in a place where she could see the pelvic examination? | Always |

| | |
|---|---|
| 3f. Did Dr. Akoda ever perform a pelvic exam without using gloves? | Never |
| 3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care? | Yes |
| 3h. Did you ever feel sexually aroused or have an orgasmic response to the examination? | No |
| 4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed? | No |
| 4b. Did anything ever make you feel uncomfortable in the office during or after the exam? | Yes |
| 4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors? | No |
| 4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate? | Yes |
| 4e. Did you ever consider changing doctors? | Yes |
| 4f. Did you tell anyone about things he said or did that were inappropriate? | Yes |
| Yes (please indicate who you told. Check all that apply) | • I told a family member<br>• I told a friend |
| 5a. How did you first learn that charges were made against Dr. Akoda? | I saw something about it on TV or the internet |
| 5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply) | • Shocked<br>• Angry<br>• Betrayed<br>• Sad<br>• Other:<br>• Distraught, traumatized |
| 5c. If you are upset about what Dr. Akoda did, why? (Check all that apply) | I feel that he betrayed my trust. |

| | |
|---|---|
| 6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes, only after I learned of the charges against him |
| 6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real? | Yes |
| 6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty? | No |
| 6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda? | Yes |
| 6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? | Yes, only after I learned of the charges against him |
| 6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda? | Yes |
| 6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda? | No |
| 6h. Is it hard for you to recall some aspects of what transpired? | No |
| 6i. Have you experienced mood changes or depression? | No |
| 6j. Have you experienced less interest or pleasure with important activities? | No |
| 6k. Have you experienced less interest or pleasure with important activities? | No |
| 6l. Have you felt irritable or angry? | No |
| 6m. Have you had difficulty concentrating? | No |
| 6n. Have you felt jumpy, overly alert, or easily startled? | No |

| | |
|---|---|
| 6o. Do you have trouble sleeping or bad dreams or nightmares? | Yes, only in the past month |
| 6p. Do you feel embarrassed, shame, or humiliated? | Yes, both in the past month and prior to the past month |
| 6q. Do you have trouble making decisions? | No |
| 6r. Do you overuse drugs or alcohol? | No |
| 6s. Have you felt uncomfortable with your body or not cared for yourself as you should? | No |
| 6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)? | Fatigue or insomnia |
| 6u. How severe were your physical symptoms? | mild |
| 6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda? | No |
| 7a. Has your experience with Dr. Akoda affected your trust in doctors? | Yes, it has led me to not trust doctors |
| 7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply) | • It has affected the medical choices or decisions I make<br>• Other:<br>• More aware and alert about doctors, practices |
| 7d. Has your experience with Dr. Akoda affected your work life? | No |
| 7f. Did your experience with Dr. Akoda affect your social life? | No |
| 8a. Have you ever been threatened by somebody? | No |
| 8b. Have you ever experienced or witnessed violence in your own home in years past? | No |
| 8c. Have you ever been forced to have sex or been threatened with violence if you didn't? | No |
| 8d. Have you ever been sexually abused in other ways? | No |

JA1121

| | |
|---|---|
| MM | 03 |
| YY | 88 |
| 9b. Your marital status | single |
| 9c. Is English your main language? | Yes |
| 9d. Your ethnicity | African-American |
| 9e. When you were treated by Dr. Akoda, what type of health insurance did you have? | Medicaid |
| Statement: | An issue I had with Dr. Akoda, was when I came in with a health concern, I told/showed him an reaction I was having. Without treating me first he assumed it was a specific STD so he then prescribed me medication on that visit. I immediately felt confused and angry with what he told me. I just listened because he was the doctor. When I returned for my prenatal visit he then stated that what he though I had, I in fact didn't have from testing results.   Even though he prescribed me medication to take before knowing for sure. |
| Last Update | 2019-09-13 13:20:37 |
| Start Time | 2019-09-13 12:58:24 |
| Finish Time | 2019-09-13 13:20:37 |
| IP | 69.250.197.75 |
| Browser | Safari |
| OS | Mobile |
| Referrer | https://fs4.formsite.com/res/formLoginReturn |

| | |
|---|---|
| | |
| 11118165 | The night of the delivery, the nurses refused to help. Although I was contracting, she was trying to get me discharged. She disconnected the pull string in my room because she said she wasnt going to keep coming. I delivered my son on the toilet by myself at the hospital because no one would help. My boyfriend started yelling that I was having the baby. After I pulled/caught my son coming out of me, Dr Akoda leisurely walked around the corner and said looks like you had a baby, you made my job easy tonight, good job......I delivered my own child, I did his job for him. Ad I proceeded to curse him out, I asked to see the nurse who was trying to discharge me. I delivered my son 6 hours after arriving to the hospital. |
| | |

JA1123

# **<u>EXHIBIT 26</u>**

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 25, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

> **RE:  MONIQUE RUSSELL ET AL V. EDUCATIONAL COMMISSION FOR**
> **FOREIGN  MEDICAL GRADUATES**
> **NUMBER:  2:18-cv-05629**
>
> **ELSA POWELL**
> **MONIQUE RUSSELL**
> **DESIRE EVANS**
> **JASMINE RIGGINS**

Dear Ms. McEnroe:

I had the opportunity to see the above-named plaintiffs for individual psychiatric evaluations, and I have written four individual reports regarding Ms. Powell, Ms. Russell, Ms. Evans, and Ms. Riggins.

Ms. Powell, Ms. Russell, Ms. Evans, and Ms. Riggins had healthy babies delivered by Dr. Akoda, and each woman has a personal story regarding the Complaint that includes unique personal histories, stressors, and circumstances. The women apparently share a belief that Dr. Akoda was a "fake doctor" without certification to work as a doctor.  It is my opinion that none of the women has a psychiatric disorder or disability related to the allegations in the Complaint. Ms. Powell denied a history of psychiatric or psychological treatment.  Ms. Powell has a happy family, a good job, and positive plans for her future. Ms. Russell acknowledged that she was not hurt by Dr. Akoda, but she has felt a responsibility to "stand up for women who were subjected to trauma." Ms. Russell has a personal history of ███████████████, but she did not seek any mental health treatment in relation to her childbirth experience with Dr. Akoda.  Ms. Russell also has a good job, a healthy son, a strong marriage, and plans for her future.  Ms. Riggins said that she did not have any problems with the treatment provided by Dr. Akoda during her pregnancy and that the care she received from Dr. Akoda was no different from the treatment from the doctors who delivered her two other children.  Ms. Riggins denied a history of any mental health treatment and denied any plan to see a psychiatrist or a psychologist.

RE:  Powell, Russell, Evans, Riggins
Page 2

Ms. Evans has a different personal history in regard to psychiatric/psychological treatment; however, Ms. Evans does not have a psychiatric disorder related to the allegations in the Complaint.  Ms. Evans said that she is under the impression that Dr. Akoda may not have been a doctor.  She said she does not know if he is a doctor, or if he has any certification.  It is my opinion that Ms. Evans' reported concerns about Dr. Akoda in relation to the Complaint would not cause her to experience a psychiatric disorder or an exacerbation of her documented psychiatric disorder of major depression.

It is my opinion the four individuals that I saw for four independent psychiatric evaluations presented four different personal histories about their medical experiences with Dr. Akoda.  It is my opinion the facts and circumstances surrounding each plaintiff presented unique and individualized situations.  It is my opinion that it is not possible to determine through common evidence or analysis that the plaintiffs' varied medical experiences with Dr. Akoda caused any alleged emotional distress. Rather it is my opinion that individualized assessments are necessary to determine whether any particular plaintiff suffers from emotional distress and/or whether such emotional distress is related to the allegations in the Complaint, medical experiences with Dr. Akoda, or conduct by the Educational Commission for Foreign Medical Graduates.

My hourly rate for non-testimonial services is $450/hour.  My hourly rate for deposition testimony is $1,000/hour, with a minimum payment of $2,000.  My rate for court testimony is $5,000 and expenses.  I have attached a copy of my CV and a list of cases in which I have testified from June 2014 to June 2019.

The opinions noted in this letter and the attached reports have been stated within a reasonable degree of medical certainty.

Sincerely,

Gladys S. Fenichel, MD

JA1126

**CURRICULUM VITAE**

**January 2019**

**<u>Gladys Susan Fenichel, M.D., M.A.</u>**

| | |
|---|---|
| Office Address: | 210 Kent Road<br>Ardmore, PA 19003 |
| Phone Number: | 610 649-8940 |
| Fax Number: | 610 649-5071 |

| | | |
|---|---|---|
| Education: | 1970-1972 | Brandeis University |
| | 1972-1973 | B.A. University of Pennsylvania |
| | 1974-1978 | M.D. Temple University |
| | 1981-1983 | M.A. Sociology<br>University of Pennsylvania |

**<u>Postgraduate Training and Fellowship Appointments</u>:**

| | |
|---|---|
| 1978-1979 | Resident in Medicine, Temple University Hospital |
| 1979-1982 | Resident in Psychiatry, Hospital of the University of Pennsylvania |
| 1981-1983 | Robert Wood Johnson Foundation Clinical Scholars Program - V.A. Scholar |

**<u>Faculty Appointments - University of Pennsylvania</u>:**

| | |
|---|---|
| 7/1/79  3/1/83 | Assistant Instructor in Psychiatry |
| 4/1/83  6/30/85 | Clinical Associate in Psychiatry |
| 7/1/85- 6/30/99 | Clinical Assistant Professor, Psychiatry |
| 7/1/99 | Clinical Associate Professor, Psychiatry |

**<u>Specialty Certification</u>:**

| | |
|---|---|
| 1983 | American Board of Psychiatry and Neurology |

**<u>Licensure</u>:**   Pennsylvania MD-023493E

**<u>Hospital Affiliation</u>:**   Hospital of the University of Pennsylvania
Bryn Mawr Hospital 1986 - 1995

**<u>Memberships in Professional and Scientific Societies</u>:**

American Psychiatric Association

<u>2</u>

**Major Teaching and Clinical Responsibilities at the University of Pennsylvania:**

    1.    Preceptor Medicine 100:       The Doctor-Patient Relationship
    2.    Preceptor Medicine 200:       Psychiatric Interview
    3.    Provision of out-patient treatment to HUP house staff
    4.    Preceptor


**By Invitation:**

    American Board of Psychiatry and Neurology, Part II Examiner
        1997-2002.

**Bibliography:**

    Original Papers:

        Fenichel GS, Murphy JB:  Factors that predict psychiatric consultation in the
        Emergency Department.  Medical Care 23:  235-265;1985.

        Hunt DD, Fenichel GS, Baker V, Featherstone JH: Contrasts in the Professional
        Identities of Psychiatrists and Internists.  J Med Ed 59:894-899;1984.

        Murphy JG, Fenichel GS, Jacobson S:  Psychiatry in the emergency department:  factors
        affecting treatment and disposition.  American Journal of Emergency Medicine 2:309-
        314;1984.

    Abstracts:
        Fenichel GS, Murphy JG, Wigton RS, Schwartz JS:
        Results of physician decision-making using conjoint analysis compared to decision-
        making in actual practice.  Society for Medical Decision Making, November 1984.

        Fenichel GS, Murphy JG:  Factors that predict psychiatric consultation in the emergency
        department. Robert Wood Johnson Clinical Scholars Program, November 1983.

        Fenichel GS:  Clinical scholarship and examples from the social sciences:  sociology in
        medicine.  Robert Wood Johnson Clinical Scholars Program, November 1983.

    Reviews:
        Fenichel, GS:  <u>Why Psychiatry Is A Branch of Medicine</u>. Samuel Guze.
        Oxford University Press,  Annals of Internal Medicine, 119:864; 1993.

Case 2:18-cv-05629-JDW   Document 46-10   Filed 11/06/19   Page 6 of 8

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

Testimony June 2014-June 2019

| ClaimantLast | ClaimantFirst | ApptDate | RefCompany | DefAtty | ClaimNo |
|---|---|---|---|---|---|
| Strohl | Mark A. | 6/17/14 | Inservco - Self Insured Accounts | The Chartwell Law Offices | 400P024372 |
| Harrison | Barbara | 8/28/14 | Amtrust Group | Nauly, Scaricamazza & McDevitt, LLC | 110-111-11568 |
| Jastrzebski | Brandy | 9/2/14 | Travelers Insurance Company | Cipriani & Werner PC | EUS9739 |
| Kellett | Chester | 9/4/14 | AmeriHealth Casualty | Greenbaum & Pinto Law Offices | 11104501 |
| Moyer | Bruce | 9/8/14 | Inservco - Commonwealth of Pennsylvania | Swartz Campbell | 400W012695 |
| Allen | Jaudon | 10/6/14 | Cottingham & Butler Claims Services, Inc. | The Chartwell Law Offices | FFIWC1037942 |
| Reyes | Ana | 10/9/14 | Faegre Baker Daniels | Faegre Baker Daniels | |
| Reyes | Ana | 10/9/14 | Faegre Baker Daniels | Faegre Baker Daniels | |
| Shearer | Robert | 10/20/14 | Inservco - Self Insured Accounts | Lavery Law | 245HBG0043 |
| Koch | Sanjuana | 11/17/14 | Inservco - Commonwealth of Pennsylvania | Goldfein & Joseph | 400W024729 |
| Soto | Rogue | 11/25/14 | ESIS | Fallon Van Horn LLC | C395C7166522 |
| Lavigna | Lawrence | 12/10/14 | Occupational Resource Specialists | Metz Lewis, LLC | 10010618533 |
| Kolody | Melissa | 12/12/14 | PMA Insurance Group | Sand & Saidel | W000363521 |
| Fall | Linnell | 1/8/15 | AmeriHealth Casualty | Marshall, Dennehey, Warner, Coleman & Goggin | 3751141746 |
| Floyd | Shamina S. | 1/16/15 | Inservco - Self Insured Accounts | Sand & Saidel | 4000009760 |
| Agostine | John | 1/30/15 | ACS Claims Services | Office of Chief Counsel | UEG1-7994 |
| Perez | Nancy | 2/5/15 | AmeriHealth Casualty | Holsten & Associates | 10011360175 |
| Alexander | Aaron | 3/4/15 | AIG | Haddix and Associates | 555-126185 |
| Rowen | Heather | 3/25/15 | The Chartwell Law Offices | The Chartwell Law Offices | 2620002252 |
| Crowers | Beverly | 3/31/15 | Inservco - Self Insured Accounts | Goldfein & Joseph | 400W057837 |
| Fandino | Neyla | 4/1/15 | Inservco - Commonwealth of Pennsylvania | Swartz Campbell | 4000001200 |
| Bredel-Ross | Loretta | 5/12/15 | AVI Risk Services, LLC | Hill Wallack LLP | 079094830 |
| Rein | Jeffrey | 6/4/15 | Weber Gallagher Simpson Stapleton Fires & Newby | Weber Gallagher Simpson Stapleton Fires & Newby | 186518019-001 |
| Pivariunas- Ciocco | Patricia | 6/23/15 | PMA Insurance Group | DelCollo & Mazzanti, LLC | 910529072 |

JA1129

| Last Name | First Name | Date | Company | Law Firm | Claim Number |
|---|---|---|---|---|---|
| Payne | Coreen | 8/6/15 | AmeriHealth Casualty | Carpenter, McCadden & Lane, LLP | 3061135180 |
| Edwards | John | 8/26/15 | Swartz Campbell | Swartz Campbell | 007197-096149 |
| Hampton | Shara | 9/17/15 | Inservco - Self Insured Accounts | The Chartwell Law Offices | 4000015889 |
| Gillen | Frank | 9/21/15 | WorkPartners | Raffaele Puppio LLP | PTCCONV450201300006567 |
| Polk | Rachel | 10/14/15 | Inservco - Commonwealth of Pennsylvania | Sand & Saidel | 400W001221 |
| White | Colette | 11/18/15 | AVI Risk Services, LLC | Weber Gallagher Simpson Stapleton Fires & Newby | 079091055 |
| Johnson-Bryant | Dawn | 12/4/15 | Inservco - Self Insured Accounts | Naulty, Scaricamazza & McDevitt, LLC | 3230019225 |
| Alcis | Yolette | 3/2/16 | Carpenter, McCadden & Lane, LLP | Hill Wallack LLP | 301-42462020260001 |
| Tucker | Fyresta | 3/3/16 | Carpenter, McCadden & Lane, LLP | Hill Wallack LLP | YLT77953C |
| Zeleznick | George | 3/10/16 | Liberty Mutual Insurance Company | | 22231786 |
| Beach | Laura | 5/3/16 | Weber Gallagher Simpson Stapleton Fires & Newby | Weber Gallagher Simpson Stapleton Fires & Newby | C494 C 277695 0 |
| Bartolomei | Lois | 5/12/16 | Weber Gallagher Simpson Stapleton Fires & Newby | | 1850277546 |
| Pride | Dolores | 5/24/16 | Cipriani & Werner PC | Cipriani & Werner PC | 011502-007882-wc-01 |
| Vicenty | Carlos | 6/7/16 | AIG | The Chartwell Law Offices | 710-952067 |
| Jeffries | James | 8/17/16 | WorkPartners | Weber Gallagher Simpson Stapleton Fires & Newby | PTC2014029063 |
| Dean | Cameron | 8/23/16 | LeClair Ryan | LeClair Ryan | 103283WC2014 |
| Glasser | Victoria | 9/15/16 | ESIS | Law Office of Michael W. Simon, III | 9716 395 545259 0 |
| Spencer | Arif | 10/6/16 | Inservco - Self Insured Accounts | J P Mascaro & Sons | 2800002024 |
| Trotta | Michael | 12/6/16 | Inservco - Commonwealth of Pennsylvania | Goldfein & Joseph | 4000011529 |
| Cloak | Rosemary | 12/7/16 | AmeriHealth Casualty | Kent & McBride, PC | 3751131412 |
| Sones | Karen | 12/14/16 | Inservco - Commonwealth of Pennsylvania | Dethlefs Pykosh & Murphy | 400W036355 |
| Bernardo | Anthony | 1/11/17 | Inservco - Commonwealth of Pennsylvania | Dethlefs Pykosh & Murphy | 4000007409 |
| Power | Thomas J | 1/26/17 | AVI Risk Services, LLC | Sand & Saidel | 035097105 |
| Paolini | Barbara Anne | 3/22/17 | The Chartwell Law Offices | The Chartwell Law Offices | 1850283678 |
| Vasquez | Evelyn | 5/31/17 | AVI Risk Services, LLC | Grim, Biehn & Thatcher | 068099115 |
| Kneisley | Kevin | 9/7/17 | DelCollo & Mazzanti, LLC | DelCollo & Mazzanti, LLC | 2011106961 |
| Perez | Moises | 9/12/17 | Connors O'Dell, LLP | Connors O'Dell, LLP | WC390C71411 |
| Rumer | Teri | 10/11/17 | GENEX Services, LLC | Zirulnik, Sherlock & DeMille | 21250019 |
| Shuff | Allison | 10/18/17 | Lavery Law | Lavery Law | 2450002125 |
| Foley | Christine | 10/19/17 | MES Solutions | Carpenter, McCadden & Lane, LLP | 0071971109342WC01 |
| Nyankon | Samuel | 11/1/17 | PMA Insurance Group | Weber Gallagher Simpson Stapleton Fires & Newby | W00742203 |
| Heil | Gail | 12/11/17 | Rulis & Bochicchio | Rulis & Bochicchio | 201230000077 |

JA1130

Case 2:18-cv-05629-JDW   Document 46-10   Filed 11/06/19   Page 8 of 8

| McCoy (Henderson) | Tasha | | | |
| Bruno | Angelique | 1/23/18 | Inservco - Commonwealth of Pennsylvania | Goldfein & Joseph | 4000023131 |
| Tipton | Deborah | 2/13/18 | DelCollo & Mazzanti, LLC | DelCollo & Mazzanti, LLC | W001025476 |
| Spriggs | Mark | 2/14/18 | Carpenter, McCadden & Lane, LLP | Carpenter, McCadden & Lane, LLP | 201701710 |
| Pierce | Christopher L. | 3/12/18 | Connors O'Dell, LLP | Connors O'Dell, LLP | 006852-000004-WC-06 |
| Slone | Autumn | 3/13/18 | Cipriani & Werner PC | Cipriani & Werner PC | 003938-004049-WC-01 |
| Rimmer | Cassandra | 4/19/18 | Inservco - Commonwealth of Pennsylvania | Goldfein & Joseph | 4000021231 |
| Polk | Rachel | 5/15/18 | AmeriHealth Casualty | Swartz Campbell | 4051160237247 |
| Diaz | Carmen | 6/13/18 | Inservco - Commonwealth of Pennsylvania | Sand & Saidel | 400W001221 |
| Somerville | Cassandra | 6/20/18 | Cipriani & Werner PC | Cipriani & Werner PC | 188494312 |
| Fofi | David | 9/11/18 | Gallagher Bassett Services, Inc | Sherry Law Firm, PC | 005485010243WC01 |
| Wright | Nashia | 11/14/18 | Amtrust Group | McCormick Law Firm | 0901160005826 |
| Bresko | Robert | 11/26/18 | Inservco - Self Insured Accounts | J P Mascaro & Sons | 2800002217 |
| Williams | Nsegah | 12/12/18 | Connors O'Dell, LLP | Connors O'Dell, LLP | 002601-002031-WC-01 |
| Palmer | Nicole | 12/17/18 | Inservco - Self Insured Accounts | Carpenter, McCadden & Lane, LLP | 3230023286 |
| Lynch | Leticia | 1/9/19 | Inservco - Commonwealth of Pennsylvania | The Chartwell Law Offices | 4000013590 |
| Travaline | Margaret | 4/4/19 | Cipriani & Werner PC | Cipriani & Werner PC | 17D27F203170 |
| | | 5/20/19 | Schaff & Young, PC | Schaff & Young, PC | C395C7356723 |

JA1131

# EXHIBIT 27

JA1132

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

**RE: Monique Russell et al. v. Educational Commission for Foreign Medical Graduates**

Dear Ms. McEnroe,

On September 17, 2019, I had the opportunity to see Monique Russell for an independent psychiatric evaluation.

The examination was requested to comment on Ms. Russell's psychiatric condition in relation to the Complaint in *Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Russell that the evaluation was not for purposes of treatment and that it was not a confidential examination. I discussed with Ms. Russell that I would prepare a report based on the psychiatric evaluation and review of records.

In preparation of this report I have reviewed the following documents:

1.  Medical Records:
    Plaintiffs0000000932 – Plaintiffs0000001133;
    Plaintiffs0000001243 – Plaintiffs0000001685;
    Plaintiffs0000001686 – Plaintiffs0000001839;
    Plaintiffs0000001840 – Plaintiffs0000001845;
    Plaintiffs0000001846 – Plaintiffs0000001994;
    Plaintiffs0000005338 – Plaintiffs0000005429;
    Plaintiffs0000067757 – Plaintiffs0000067847;
    Plaintiffs0000118654 – Plaintiffs0000118679
2.  Complaint in *Russell et al. v. ECFMG*
3.  Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4.  Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5.  Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)

RE:  Monique Russell
Page 2

6.  Monique Russell's Responses to Defendants' Request for Admissions in CAL 18-07863
    (7/10/2018)

**HISTORY REPORTED BY MONIQUE RUSSELL:**

Monique Russell (date of birth ▮▮▮▮▮▮▮) stated that she instigated the lawsuit *Russell et al v. ECFMG* because of her feeling that she was violated by the man who had identified himself as Dr. Akoda.  She said that Dr. Akoda was not a real doctor, and there is no real evidence that this man had attended medical school.  Ms. Russell said that she read the "transcripts" from his federal trial.  She said that she believes that Dr. Akoda had faked his way into residency programs.  Ms. Russell said it is her opinion that "without consent she was subjected to assault."  As a consequence of her reported experience with Dr. Akoda, Ms. Russell said she feels that she cannot trust the medical system or doctors.  Ms. Russell said that she believes that Dr. Akoda had three different Social Security numbers and three different names.  Ms. Russell said that she believes Dr. Akoda had applied to take the medical board examinations three times.  Ms. Russell said that she does not know if Dr. Akoda could have had his license reinstated in another state.

Ms. Russell said that Dr. Akoda was not her doctor.  She said that she had chosen to have her OB treatment with Dr. Danielle Waldrop at the practice of Javaka Moore, M.D.  Ms. Russell said that she had expected that either Dr. Moore or Dr. Waldrop would deliver her baby, but it was Dr. Akoda who was in the delivery room.  Ms. Russell said that she later wanted to recommend Dr. Waldrop to a friend who was looking for an obstetrician.  Ms. Russell said that she had told this friend that if she went to the practice with Dr. Waldrop and Dr. Akoda was still in the practice, she may be treated by Dr. Akoda, and Ms. Russell had not had a good experience with him.  Ms. Russell said that when she looked for information about Dr. Moore's practice, she saw that Dr. Akoda was not on the list of practitioners.  Ms. Russell said that in June 2017, she began an investigation and found a release from the Justice Department regarding Dr. Akoda.  Ms. Russell said that she was blown away and horrified.  She said that she spent days and nights trying to make sense of the available information.  Ms. Russell questioned how it was possible that this "alleged doctor" had delivered her child.  Ms. Russell acknowledged that the consequences to her regarding the treatment she received from Dr. Akoda were, "For me, minor."  Ms. Russell said that she read about another lawsuit against Dr. Akoda alleging that there were permanent injuries to a child as a consequence of his treatment.  Ms. Russell said Dr. Akoda should never have had access to women.

Ms. Russell said that when she learned this information about Dr. Akoda, she was reminded of prior trauma and abuse.  She said that she was ▮▮▮▮▮▮▮▮ when she was a child and again when she was in her early twenties.

Ms. Russell said that she does not have regular gynecologic appointments.  Ms. Russell said that she has problems with trust in regard to the credentials of doctors.  Ms. Russell said that the experience with Dr. Akoda has gotten in the way of family planning.  She said that she wanted other children, but she has not had gynecologic treatment.  Ms. Russell also said that she does not know if the caesarean section was medically necessary.  She said that there was no damage to her son, but she questions the medical decision that Dr. Akoda made.

RE:  Monique Russell
Page 3

Ms. Russell had a doula in the delivery room.  Her husband and her mother-in-law were also in the delivery room.  Ms. Russell said that she did not like Dr. Akoda's behavior.  She said that he would come into the delivery room and talk to her husband and not to her.  She said that she found him to be really misogynistic. Ms. Russell said that she told her husband that if Dr. Akoda spoke to him one more time about her vagina, then they would need a different doctor.  Ms. Russell said that after her husband spoke to Dr. Akoda, he began to talk to her, but she said that she did not like him.

Ms. Russell said that she was in labor for 32 hours.  She said that she was given antibiotics after 18 hours because her water had broken.  She said that she was only 1 cm dilated and she was started on Pitocin.  Ms. Russell said that she had horrible contractions, but she still did not dilate.  Dr. Akoda suggested an epidural hoping that the epidural would relax her and help with the contractions.  Ms. Russell said that the baby went into distress.  Although the baby's stats went back to normal, Dr. Akoda recommended an emergency caesarean section.  Ms. Russell repeated that she trusted that Dr. Akoda was a real doctor.  Ms. Russell said that looking back, she does not know if she had an unnecessary surgery.  Ms. Russell said that she continues to have itching at the scar from the surgery.  Ms. Russell said when she thinks about the caesarean section, she thinks that Dr. Akoda was rough, and he was "playing football with my organs."  Ms. Russell said that she was discharged from the hospital after three days.  She said that her husband took two weeks off and she had help from a postpartum doula and her mother-in-law.

Ms. Russell said that she had an appointment with Dr. Waldrop for an IUD when her son was six months old.  In response to the question of how the experience with Dr. Akoda affected her family planning, Ms. Russell said that she found it hard to be intimate with her husband after she learned about Dr. Akoda.

Ms. Russell said that she thinks she went back to see Dr. Moore after she learned about the charges against Dr. Akoda.  She described the visit as a meeting with Dr. Moore, and not a medical appointment.  Ms. Russell said that she questioned Dr. Moore about why she had not been notified about Dr. Akoda's federal charges, and Dr. Moore told her that it was not his practice's responsibility to notify the patients.  Ms. Russell said that she disagreed.  Ms. Russell said that she believes it was someone's job to notify patients about Dr. Akoda.  Ms. Russell said that Dr. Moore was not defensive, but rather surprised about her questions.  Ms. Russell said that she was really angry and really in shock.

Ms. Russell then provided additional information of what she has learned about Dr. Akoda.  She said that Dr. Akoda did not have an office practice with Dr. Moore, but he worked in Dr. Chaudry's practice.  She said that Dr. Akoda delivered babies for Dr. Moore's practice and for Dr. Chaudry.  Ms. Russell said that Dr. Akoda's office and home were raided. Ms. Russell said that multiple passports were found, along with a machine to create diplomas.  Ms. Russell said that she has to have her fingerprints checked every two years to be a Washington, DC public school teacher.  Ms. Russell said that she does not understand how Dr. Akoda was able to apply to ECFMG three times, especially after he was kicked out of a residency program in New Jersey when it was discovered he was a fraud.  Ms. Russell said that she believes that this information about the New Jersey residency was reported to ECFMG.  She said that after "this reported doctor" was kicked out of the New Jersey program, he reapplied to ECFMG using different

RE:  Monique Russell
Page 4

names and different Social Security numbers.  Ms. Russell said that Dr. Akoda got through ECFMG and was able to finish an OB/GYN residency program at Howard University.  She said that Dr. Akoda met Dr. Chaudry and Dr. Moore, who were both attendings at Howard University.  Ms. Russell said that in between Dr. Akoda's first residency program and the residency at Howard, Dr. Akoda had worked in Florida as a nurse.  She said again there is no evidence that he had graduated from medical school.

Ms. Russell said that she believes that she was the first patient who found out about Dr. Akoda's identity and criminal charges.  Ms. Russell said that she chose an attorney who was recommended to her by a friend.

Ms. Russell said that she would like to get pregnant again, but she does not have a doctor.  She said that she did have complications (bleeding and cramping) with her IUD in 2018 or 2019.  She said that a doctor removed the IUD at an urgent care in Costa Rica.  Ms. Russell said that she was really anxious about the IUD removal.  She said that she did look up information about the doctor, and she leaned the doctor was American-trained.  Ms. Russell said that the experience was okay.

Ms. Russell described her mood noting that she is a pretty positive person.  She tries to keep things in perspective.  Ms. Russell said that she does not sleep enough, but she has a toddler and a demanding job.  Ms. Russell said she does focus on self-care.  She said that she walks one to two miles every day and that she does yoga.  Ms. Russell said that she gets up between 5:00 a.m. – 5:30 a.m.  She said that she tries to go to sleep by 10:00 p.m. – 11:00 p.m. and she does sleep through the night.  Ms. Russell said that she does not have problems with her appetite.  She said her concentration is fine.  She said she is able to experience pleasure.  Ms. Russell said she enjoys her job, and she likes to walk, hike, do yoga, and read.  Ms. Russell said that she has a lot of plans for her future with her husband and son.

Ms. Russell said that in a way she feels lucky.  She said that the situation could have been worse.  She acknowledged there were no physical consequences to the medical experience with Dr. Akoda.  She said the experience with Dr. Akoda brought up past trauma ████████ ████████  Ms. Russell said that the suffering she experienced may be less than what other women experienced, but she feels a responsibility to stand up for other women who had trauma as a consequence of their experiences with Dr. Akoda.  Ms. Russell repeated that she remains concerned that Dr. Akoda will try to practice medicine again.  Ms. Russell wants to make sure in any way she can that it will be impossible for Dr. Akoda to practice medicine again.

**PAST MEDICAL HISTORY**

Ms. Russell said that she had an emergency appendectomy in 2000.  She said her appendix did not rupture.

Ms. Russell had ████████ in 2004.

In 2005, Ms. Russell had bleeding and ████████████████  This was not a planned pregnancy.

RE:  Monique Russell
Page 5

In 2012, Ms. Russell had an unplanned pregnancy.  She did not plan to terminate the pregnancy.
She had ▇▇▇▇▇▇▇ at six weeks.

Ms. Russell said when she became pregnant with her son, she spoke to doctors and nurses about
her history of miscarriages.    Ms. Russell said that she learned that women often have
miscarriages before they know they are pregnant.  Ms. Russell said that she was not concerned
about her history of miscarriages with her pregnancy with her son.

Ms. Russell said that her pregnancy with her son was challenging.  She said that she had early
bleeding.    She had an evaluation with a high-risk pregnancy doctor, and she was closely
monitored in the first trimester.  Ms. Russell said that at 6.5 months, she developed problems
with vomiting; she would throw up whenever she ate, but she continued to gain weight.

Ms. Russell has a condition known as vasovagal syncope that she was diagnosed with when she
was in her thirties.  She said that she had to be careful during her pregnancy for dizzy spells.  Ms.
Russell said that she learned what to do when she felt dizzy, and she was able to watch for
triggers.  Ms. Russell said that in the last two months of her pregnancy, she was on modified
bedrest.  She said that she was able to work from home.  Ms. Russell said that she has only had
one vasovagal episode since her son was born.

Ms. Russell said that she has a history of chronic back pain that she believes is stress related.
Ms. Russell said that she developed back pain after her sister died such that she could not walk.
Ms. Russell said that she learned breathing techniques and has been doing daily meditation for
many years.  Ms. Russell said that when her son was about one year old, she developed back
pain again, and she had a course of physical therapy.

## PAST PSYCHIATRIC HISTORY:

Ms. Russell said that she had counseling growing up. She said that she was five years old when
she and her sister were adopted, and four years later, her parents adopted a baby girl.  Ms.
Russell said that her biological sister had problems with acting out, and they had counseling.

Ms. Russell said that she was sexually molested by a family member when she was six or seven
years old.  She said that she did not report the abuse until she was 15 years old.  Ms. Russell said
she reported the abuse when her baby sister was the same age as when the assault happened to
her. Ms. Russell said that the first person she told was a male guidance counselor, and the
guidance counselor called Ms. Russell's parents and the police.  Ms. Russell said she wanted to
make sure that her sister was protected.  Ms. Russell said that the guidance counselor started a
support group for young girls who were victims of sexual abuse or assault.

Ms. Russell said that she was sexually assaulted as an adult when she was in her early twenties.
She said that this was date rape. Ms. Russell said this was perhaps her third date with this man.
She said that he did not listen when she told him to stop, and he apologized to her afterward.
Ms. Russell said that she did not see a counselor and that she does not know if she dealt with the

RE:  Monique Russell
Page 6

consequences of this reported date rape effectively.  Ms. Russell said later on that she did some personal work to examine her relationships and her underlying beliefs.

Ms. Russell said that her adopted sister had depression and committed suicide at the age of 21 in 2007.  Ms. Russell said that her sister had a history of prior suicide attempts that Ms. Russell believes were calls for attention.  Ms. Russell said that she did not go to counseling when her sister committed suicide. Ms. Russell said her family doctor prescribed ████ and she took the medication for six months after the suicide of her sister. Ms. Russell said that she did not see the suicide coming.  Ms. Russell said that she had trouble functioning after her sister's suicide.  She said that she was then a student at the University of Maryland and that she was also working. She said that her professors and her employer were understanding, and she had a really strong network of friends.

**SOCIAL HISTORY:**

Ms. Russell said that she lives in Costa Rica and works at a private international school as the curriculum coordinator for early childhood to fifth grade. Ms. Russell said that her contract is up in August 2020.  She said she thinks that she will renew the contract and stay in Costa Rica.  She said that she can stay in one place for up to five years working for this company.

Ms. Russell said that her undergraduate degree is from the University of Maryland in studio arts and education.  Ms. Russell said that she was certified in 2009 to teach early childhood to third grade.  She has a Master of Arts in Teaching from Trinity University that she completed in 2014. She said that in this program she took a deep dive into literacy instruction.  Ms. Russell said that she has bounced back from jobs supporting teachers to teaching in the classroom.  She said in 2014, she was working as an instructional specialist in the Washington, DC public schools.

Ms. Russell said that she grew up in a Catholic family, and she became a Quaker in her early twenties.  She said that she knew by the age of 13 that she did not believe in Catholicism.  She said that her mother told her not to proceed with confirmation if she did not believe in all the tenets.  Ms. Russell said that she and her sister tried out different houses of worship. She said when she went to a Quaker meeting, she realized this was home.  Ms. Russell said that she has a home meeting in Washington, DC. There is a Quaker settlement three or four hours from where she lives in Costa Rica, but she has not gone to meetings.

Ms. Russell said that she met her husband on a dating site in 2014.  She said that they went on three dates in three days, and they knew that this was it.  She said he proposed after five months. Ms. Russell said she and her husband met in February 2014, and they were married on October 3, 2014.  She said that she was 35 and he was the man of her dreams.

Ms. Russell said that her husband is a DJ, and he travels to Washington, DC to work at weddings.  She said that he cannot work in Costa Rica because of his visa.  Ms. Russell said she always wanted to live in Costa Rica.  She said that the culture is warm and family-oriented.  She said that she works from 7:30 a.m. until 4:30 p.m. and her son is in school from 7:30 a.m. until 3:00 p.m.

RE:  Monique Russell
Page 7

**MENTAL STATUS EXAMINATION:**

Mental status examination revealed a casually groomed 42-year-old woman who appeared younger than her stated age.  Her speech was goal-directed and spontaneous, and she easily established rapport.  Ms. Russell provided a detailed history and explained how she had learned about the federal charges against Dr. Akoda.

Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  Ms. Russell said in a way she feels lucky that what happened to her with Dr. Akoda was not worse.  She said that she had no physical consequences from the birth of her son. She said that she feels responsible to stand up for women who were subjected to trauma.  Ms. Russell revealed a full range of affect appropriate to content.  She denied a history of suicidal ideation.

Ms. Russell denied a history of anxiety attacks.

Memory, intelligence, and fund of knowledge were grossly within normal limits.

**REVIEW OF RECORDS:**

I have reviewed the records identified at the start of the report.  There were no records that referred to any psychiatric or psychological treatment or complaints of anxiety or depression to a treating doctor.

**SUMMARY AND IMPRESSION:**

It is my opinion Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint.

Ms. Russell related a past history of counseling and treatment with the ███████████ ████████████  She reported a history of seeking treatment and medication at times of stress. Ms. Russell did not engage in treatment related to learning information about Dr. Akoda. Ms. Russell acknowledged that the consequences in regard to the treatment she received from Dr. Akoda were, "For me, minor."

It is my opinion Ms. Russell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  She has strong relationships with her husband and her son, and she is optimistic about her future. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Russell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.

RE:  Monique Russell
Page 8

I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/cl

# **<u>EXHIBIT 28</u>**

JA1141

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 25, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE:  *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe:

On September 20, 2019, I had the opportunity to see Jasmine Riggins for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Riggins's psychiatric condition in relation to the Complaint in *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Riggins that I would prepare a report based on the psychiatric evaluation and review of records.  I discussed with Ms. Riggins that the examination was not for purposes of treatment and I was not her doctor.

In preparation of this report I have reviewed the following documents:

1. Medical Records: Plaintiffs0000001134 – Plaintiffs0000001242; Plaintiffs0000001995 – Plaintiffs0000002026; Plaintiffs0000006394 – Plaintiffs0000006512; Plaintiffs0000007418 – Plaintiffs0000007425; Plaintiffs0000007426 – Plaintiffs0000007652
2. Complaint in *Russell et al. v. ECFMG*
3. Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)
6. Jasmine Riggins's Responses to Requests for Admission, CAL 18-07863
7. Jasmine Riggins's Answers to Interrogatories, CAL 18-07863 (3/29/2019)
8. Deposition of Jasmine Riggins, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (4/1/2019)

RE:  JASMINE RIGGINS
Page 2

**HISTORY REPORTED BY JASMINE RIGGINS:**

Jasmine Riggins (████████████) said that she is involved in the current litigation because her son was delivered by a man who is "not a doctor." Ms. Riggins said that Dr. Akoda falsified information that he was a doctor. Ms. Riggins said she was in a Facebook group called Embracing Mommies. Ms. Riggins said she did not recall when she joined this Facebook group. Ms. Riggins said that she would check the Facebook group Embracing Mommies a couple times a week for notifications and information that could be helpful for her and her children. Ms. Riggins said she believes that she saw a Facebook post about Dr. Akoda sometime in 2016. Ms. Riggins said that the post was written by Monique Russell. Ms. Riggins said she did not recall the exact words from the post; but she recognized the name Dr. Akoda and wanted to get more information. Ms. Riggins said she learned that Dr. Akoda is not a doctor. Ms. Riggins said that she had communicated with Ms. Russell on Facebook, but she had never met Ms. Russell in person until they appeared for depositions on the same day.

Ms. Riggins said that she has three children. Her oldest child, Santana, was born on 07/25/19 at Howard University Hospital. Ms. Riggins said she moved to Maryland, and she chose Dr. Abdul Chaudry's practice for her second pregnancy. She said Dr. Akoda was a physician in the practice and he was her doctor during the pregnancy. Ms. Riggins said she did not have any problems with the treatment during her pregnancy. Ms. Riggins said that she needed an emergency c-section and her son Messiah was born on 03/18/13. Ms. Riggins explained that her mother went with her to a prenatal OB appointment with Dr. Akoda. Ms. Riggins had reported a decrease in fetal movement, and she said she was told to go to the hospital to deliver her baby.

Ms. Riggins said she was in the hospital for four or five days after she delivered Messiah, and she said that she continued to have pain for a couple months after he was born. Ms. Riggins said that she had been working at a bowling alley 20 hours a week during her pregnancy with Messiah, and she went back to work a few months after Messiah was born. Ms. Riggins said that she did not have concerns about her treatment with Dr. Akoda in the prenatal visits, during the c-section, or after his birth. She did have a post-delivery visit with Dr. Akoda.

Ms. Riggins said she stopped seeing any doctors for medical or gynecologic treatment until she became pregnant with her third child. Ms. Riggins said she started prenatal care a couple months after she learned that she was pregnant. Her daughter Taniya was born on 10/02/17 at Washington Hospital Center. She said the pregnancy was good. She said she had a scheduled c-section and she did not have problems after the c-section. She said she has a current gynecologist at Unity Health Care. Ms. Riggins said that the medical care provided by Dr. Akoda was no different from the treatment from the doctors who delivered her first child and her third child.

Ms. Riggins said when she learned about the lawsuit, she felt embarrassed that something like this had happened, that Dr. Akoda was not really a doctor. Ms. Riggins said that her everyday life did not change.

Ms. Riggins said she tries not to think about the lawsuit. Ms. Riggins said she feels upset for the women who had complications as a result of the care provided by Dr. Akoda, but she does not

RE:  JASMINE RIGGINS
Page 3

know any of these women.  Ms. Riggins said that she does not like the fact that Dr. Akoda looked at her private area, and he was not supposed to do that.  She said that she feels frustrated, angry, and very sad.  She said it is frustrating that she trusted Dr. Akoda, and she should not have trusted him because he is not a doctor.  Ms. Riggins did not have any specific information about ECFMG.  Ms. Riggins said that she has felt like she is part of a Lifetime Movie because Dr. Akoda was her doctor during her second pregnancy and delivered her son, and he was not a real doctor.

Ms. Riggins said that her mood is okay most of the time.  She said her sleep is okay.  Sometimes she said she feels "bothered" when she thinks about Dr. Akoda and the lawsuit.  Ms. Riggins said she did not read any newspaper articles about Dr. Akoda.  She said that she has only read information that she received from her attorney.  Ms. Riggins denied problems with her appetite and she said her concentration is pretty good.  She said she is able to experience pleasure and loves to be active with her children.  Ms. Riggins said she has never had suicidal ideation or anxiety attacks.

Ms. Riggins discussed her thoughts about her future.  She thinks about her career, and she wants to own a home.  She wants to continue to do what she can for her children.  Ms. Riggins said her children are her future.  She said that she and her boyfriend are good in regard to their intimate relationship.  Ms. Riggins said that she thinks that probably there were a few weeks after she found out about Dr. Akoda that she was "not in the mood."

**MEDICAL HISTORY**:

Ms. Riggins said that she had asthma as a child, and she believes that she had a hospitalization for asthma when she was a child.  Ms. Riggins said that she has not had problems with asthma for years, and she does not have an inhaler.

Ms. Riggins also said that she has low iron.  She was told about her low iron by her primary care physician at Unity Health Care.

Ms. Riggins denied a history of any psychiatric problems or history of treatment with a psychiatrist, psychologist, or counselor.  Ms. Riggins said she has never been diagnosed with depression, anxiety, or other psychiatric disorder.

**SOCIAL HISTORY**:

Ms. Riggins said she left high school in 12th grade because she did not have enough help to take care of her son, Santana.  Ms. Riggins said that Santana and Messiah have the same father and she has a joint custody arrangement with him.

Ms. Riggins said that she thought that she had received a GED.  She said she had paid $57 to a company and she took the test for a GED.  Ms. Riggins said that she received a certificate that she had a GED, but the certificate was not valid.  The company had falsified the document, and the company is now out of business.  Ms. Riggins said she did not remember the year she first took the test for the GED.

RE:  JASMINE RIGGINS
Page 4

Ms. Riggins said that she is now in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.  Ms. Riggins said that she will be in this program for approximately two and a half years.  She said the program has a daycare center and Ms. Riggins takes her daughter Taniya to the daycare center when she is in school.  Ms. Riggins said that she is at the Goodwill Center approximately four hours a day, Monday to Thursday.

Ms. Riggins denied a history of any physical, mental, or sexual abuse.  She denied a history of alcohol abuse or drug use.  Ms. Riggins said that her mother has seven biological children and her father has seven biological children.  Her mother and father had two children together.  Ms. Riggins denied a family history of depression, anxiety, or substance abuse.

**MENTAL STATUS EXAMINATION**:

Mental status examination revealed a 27-year-old woman who paid attention to her appearance evidenced by her clothes, jewelry, and makeup.  Ms. Riggins answered questions in a spontaneous fashion, but she said she would not answer a question about Facebook contacts with Ms. Russell unless she called her attorney.

Ms. Riggins described her mood as most of the time okay.  Her affect was full.  She had tears in her eyes when she talked about her feelings of embarrassment when she learned that Dr. Akoda was not a real doctor.  She denied suicidal ideation.  She denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS**:

The file did not include any records regarding psychiatric or psychological treatment.

The records included multiple notes from a primary care physician that included the Patient Health Questionnaire 2. The scores were always two or lower, indicating that Ms. Riggins did not have problems with depression or anxiety or need for counseling.  (Dates of PHQ 2: 09/07/17, 09/23/16, 10/13/17, 11/09/17, 04/18/19)

**IMPRESSION:**

It is my opinion that Ms. Riggins does not have any psychiatric disorder, and in particular, she does not have a psychiatric disorder causally related to her allegations in the Complaint *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

In support of this opinion, Ms. Riggins discussed her history and her current well-being. She denied a history of any mental health treatment, and she denied a plan to see a psychiatrist or a psychologist. Ms. Riggins said that she did not have any problems with the treatment provided by Dr. Akoda during her pregnancy and with the delivery of her second child. Ms. Riggins said that the care she received from Dr. Akoda was no different from the treatment from the doctors

RE:  JASMINE RIGGINS
Page 5

who delivered her first child and her third child.  Ms. Riggins is in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.   Ms. Riggins discussed her strong relationships with her partner and her children and goals for her future and for her family.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.  I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/plr

JA1146

# <u>**EXHIBIT 29**</u>

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE: *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe:

On September 10, 2019, I had the opportunity to see Elsa Powell for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Powell's psychiatric condition in relation to the Complaint in *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the evaluation, I discussed with Ms. Powell that the evaluation was not for purposes of treatment and it was not a confidential examination.  I discussed with Ms. Powell that I would prepare a report based on psychiatric evaluation and review of records.

In preparation for this report, I have reviewed the following records:

1.  Medical Records: Plaintiffs0000000572 – Plaintiffs0000000929; Plaintiffs0000006174 – Plaintiffs0000006363; Plaintiffs0000118377 – Plaintiffs0000118653
2.  Complaint in *Russell et al. v. ECFMG*
3.  Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4.  Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5.  Deposition of Elsa Powell (9/6/2019)
6.  Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7.  Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8.  Deposition of Elsa Powell in CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9.   Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10.  Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

RE:  Elsa Powell
Page 2

**HISTORY REPORTED BY ELSA POWELL:**

Elsa Powell (date of birth ███████) said that she understood that the examination was requested,
"To see my state of mind with this situation."  I asked Ms. Powell to explain the "situation."
Ms. Powell said that she had a doctor whom she understood to be somebody other than who he
was.  Ms. Powell said the doctor had fake names and Social Security numbers.  Ms. Powell said
that it hurt her because she had trusted him.  Ms. Powell said that she does not know his name and
he was not Dr. Akoda.  Ms. Powell said she knew him as Dr. Akoda and that was not his real name.
She said that she has felt betrayed.  Ms. Powell said that she does not know who this person was
whom she allowed to examine her body and deliver her child.  Ms. Powell said that she had
complications with the childbirth, and Dr. Akoda did surgery.  Ms. Powell said that she thanks
God that she did not pass away.  Ms. Powell said that she just feels really mad because he was not
locked up.  Ms. Powell said she questions who allowed him to practice with fake names, and she
believes that someone should be responsible.  Ms. Powell said that she believes that she was one
of Dr. Akoda's "victims" because he lied about who he was and he touched "our body parts."
Ms. Powell said that it is hard to explain, but she felt shocked.  She repeated that she feels angry.
Ms. Powell acknowledged that there are moments when she is okay.  She said that she has put her
feelings aside in relation to her anger.  She said that she has not talked to anybody about her
feelings because "everybody depends on me."

Ms. Powell said a friend called her and told her that Dr. Akoda was not really Dr. Akoda.
Ms. Powell said that she then heard the story on the news about Dr. Akoda.  Ms. Powell said that
her friend told her to call a particular number to talk to attorneys.  Ms. Powell said that she was
told that his credentials were fake.  She said that she feels bad that she did not check Dr. Akoda's
credentials.  She said that he preyed on innocent woman.  She said that this is more than nothing.

Ms. Powell said that she was very focused on delivering a healthy baby, and Dr. Akoda did deliver
a healthy baby.  Ms. Powell said she is not knocking what he did as a doctor, but he lied to all of
these vulnerable women.  Ms. Powell said that she views him as a predator, and she said that the
women were his target.  Ms. Powell said that she has never read anything about the doctor's
training, but she said he had a fake Social Security number and a fake name. She said that he did
a very serious procedure and that she questions whether he lied about the procedure.  She said he
is a fraud to her and that he did not have any respect for "[m]e and all the patients he saw."  She
said that no one wants to feel that she is lied to.  She repeated that Dr. Akoda had examined her
body and that she trusted him.

Ms. Powell said Dr. Chaudhry was supposed to be her doctor, but she never saw Dr. Chaudhry;
she saw Dr. Akoda.  She said that she saw Dr. Akoda first when she was 5½ to 6 months pregnant.
Ms. Powell said that her pregnancy was not a high-risk pregnancy.  She said that she has had low
iron since she was 16.  She said that the last appointment with Dr. Akoda was at her six-week
checkup after Jaiden was born.

Ms. Powell said that after she had Jaiden, she was bleeding a lot.  She said that she was not married
to Jaiden's father, who is now her husband. Ms. Powell said that she was alone in the hospital.
Ms. Powell said she was rushed to the operating room.  She recalled that she was told to count

JA1149

RE:  Elsa Powell
Page 3

backwards from five and when she woke up, there were tubes everywhere.  She recalled that she was crying.  Ms. Powell said that she saw Dr. Akoda the day after the surgery and that he told her to take iron pills.  She said Dr. Chaudhary came in the second day post-op.

Ms. Powell said that there were no complications in regard to Jaiden.  She reported that he was a healthy boy who weighed 8 pounds, 5 ounces, and that the complications were after Jaiden's delivery.  Ms. Powell said that she saw Dr. Akoda for her six-week checkup.  He told her she had an ovarian cyst.  She said he did a procedure in the office.

Ms. Powell said that she thought Dr. Akoda was very flirtatious.  Ms. Powell said that she requested that a nurse be present when he did examinations.  Ms. Powell said that he made comments about her breasts.  She recalled that she spoke to a nurse about Dr. Akoda, but she did not make any formal complaint.

Ms. Powell said that when Jaiden was about four or five months old, she moved, her health insurance changed, and she was pregnant with her fifth child, Tatiana.  She said that she had a different doctor and a different hospital for the delivery of Tatiana.  She reported that Tatiana was born with an enlarged kidney.  Ms. Powell said that she knew before the delivery from ultrasounds that Tatiana had a kidney problem.  She reported that Tatiana had surgery before she was one year old and needs ultrasounds once a year.

Ms. Powell said that her oldest child, Lucy Mercedes, is 14 years old; her second child, Nester, is 13 years old; and her third child is Josiah Rodriguez.  She said that Josiah's father is career military and lives in North Carolina.  Ms. Powell said that "Powell" is her married name.  She said that she was not married to Mr. Powell when Jaiden was born and again, he was not at the delivery. Ms. Powell said that Jaiden and Tatiana have the same father.

Ms. Powell said that she works full time for a security company at the National Institutes of Health.  She said that she works from 9 p.m. to 5 a.m.  She said that her husband is a police officer, and his current shift is 11:30 p.m. to 7:30 a.m.  Ms. Powell said that she is home in the morning with her four older children before they go to school and that Tatiana is home with her all day.

Ms. Powell described herself as independent and a great, great mother.  She said that she is strict.  Ms. Powell said she works hard and that her main concern is her children.  Ms. Powell said that she is a loner and is not the type of person who chills with friends.  She said that she just enjoys spending time home with her children.  Ms. Powell said that she is very caring, likes to help people, and will give a person the shirt off of her back.

Ms. Powell described her mood as up and down.  She said that she is not depressed but she is not one to talk too much about her feelings.  Ms. Powell said that she does not sleep very much because of her work schedule and taking care of her kids.  She said that in her opinion, a good night's sleep would be four hours.  She said that she is 5 feet, 4 inches tall and that her weight is up and down, ranging from 180 pounds to 204 pounds.  She said her concentration is good.  She said that she enjoys her family, sleep, and time with her husband.  She denied suicidal ideation.  She denied the experience of anxiety attacks.

RE:  Elsa Powell
Page 4

Ms. Powell said that she has never been evaluated or had treatment with a psychiatrist or psychologist.  Ms. Powell said that she has an appointment scheduled through her attorney for a psychiatric evaluation on September 13, 2019.  Ms. Powell denied a history of drug use or alcohol abuse.  She denied a history of physical, mental, or sexual abuse.

**MEDICAL HISTORY:**

Ms. Powell said that she has a primary care physician through Kaiser, but she does not go to doctors' appointments.  She said that she has thalassemia alpha trait.  She said that she tries to eat food high in iron and takes iron pills.  She said that she does not see a hematologist.

Ms. Powell said that she has not been evaluated by a gynecologist since her six-week follow-up appointment after Tatiana was born.

Ms. Powell said that ████████████████ in 2010.  She said that she was given the wrong medication at CVS and this caused complications.  She acknowledged she did not know she was pregnant at the time ██████████████  Ms. Powell said a doctor had given her pain medication, but CVS gave her the wrong prescription.  She said that she ███████████ the same night that she got the prescription, and there was a lawsuit related to the wrong prescription, which settled out of court.

Ms. Powell said that she has recently been evaluated at urgent care for pain in her left side.  She said that she had an enlarged spleen.  Ms. Powell said that she needs to follow-up about this problem.  She said that she was only diagnosed with thalassemia when she was pregnant with Tatiana.  She said that she had an MRI scheduled through urgent care.

**SOCIAL HISTORY:**

Ms. Powell said that she grew up in Massachusetts.  Her parents split up when she was seven years old.  Ms. Powell said she has three brothers from her mother's relationship with her father.  Ms. Powell said her mother had three sons in another relationship.  She said that she is close to all of her siblings.

Ms. Powell said that she met Lucy and Nester's father when he was on vacation in Massachusetts.  She said that she moved in with his family in Virginia.  Ms. Powell said that she received her high school diploma in 2005 when she was living with Lucy and Nester's father's family.  She said that she left Nester and Lucy's father because he was cheating.  Ms. Powell said that she returned to Massachusetts for about a year, but the kids' father wanted to see them, and she moved back to Virginia.  Ms. Powell said that she met Josiah's father in Virginia when she was working as a waitress.  She said that she returned to Virginia and worked two jobs while she was in school.  She said that Josiah's father was in the military, and when he had orders to go to Alaska, they ended the relationship.  Ms. Powell said that she met her current husband at the local firehouse where he was her training lieutenant.  She said that her husband regrets that he was not at Jaiden's delivery.

RE:  Elsa Powell
Page 5

Ms. Powell described a traumatic event in 2009 or 2010.  She began to cry.  She said that she lived in a house with two apartments, and the whole house burned down.  She said that she lost everything except her passport and $200.  Ms. Powell was in school at the time at Everest College, and she was studying Homeland Security.  She said she believes that God saved her life.  She said she did not see a psychiatrist or psychologist, and she repeated that she is not one who likes to talk about feelings.  Ms. Powell said people describe her as a brick wall, including her husband, her family, and coworkers.

Ms. Powell said she stopped school in 2013, and it would only take two months to finish her degree at Kaplan.  She said she does not want to work for Homeland Security now.  She said she is planning to take classes in Maryland to receive certification to work as an interpreter in the courthouse.  She would like to work in Virginia. Ms. Powell said that there is a high population of Hispanics in Virginia and she will be able to earn $40 to $60 an hour.

Ms. Powell said that she was in a minor motor vehicle accident when she was pregnant with Jaiden.  She said that it was a love tap really.  She said no one was hurt.  She said she hit the other car, and she was sued.

Ms. Powell denied a family history of psychiatric disorders or substance abuse.

**MENTAL STATUS EXAMINATION:**

Mental status examination revealed a casually groomed 32-year-old woman.  Her speech was goal-directed and spontaneous.  She easily established rapport.

Ms. Powell described her mood stating that she feels just really mad when she thinks about her experiences with Dr. Akoda.  In general, she is happy with her family.  She said that she is not depressed.  She said she is not one who talks much about her feelings.  Her affect was full and appropriate to content.  She cried during the evaluation when she talked about the house fire and losing everything except her passport and $200.  She said, "I'm a tough cookie."

Ms. Powell denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS:**

I have reviewed the records identified at the start of the report.  At this time there are no medical records related to psychiatric complaints or treatment, and as such I will not comment on a review of any records.

RE:  Elsa Powell
Page 6

**SUMMARY AND IMPRESSION:**

It is my opinion that Ms. Powell does not have any psychiatric disorder causally related to Ms. Powell's allegations in the Complaint.  The conclusion is based on the following facts:

1. Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis.
2. Ms. Powell does not have a history of any psychiatric/psychological treatment in relation to the issues in the Complaint or related to other stressors that she reported.
3. Ms. Powell is doing well with her marriage, children, and job, and she has clear plans for the future in regard to her career.
4. Ms. Powell said that she had no complaints about the doctor's treatment during delivery, surgery after delivery, or the post-delivery checkup.

It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the issues in the Complaint.   Although Ms. Powell testified that she almost lost her life because of a fake doctor whom she thought was a doctor, Ms. Powell said during the evaluation that Dr. Akoda delivered a healthy baby.  She had a procedure after Jaiden was born, and there were no complications from that procedure.  She saw Dr. Akoda for a visit after Jaiden was born, and Dr. Akoda did another procedure.  Ms. Powell did not have any complications or complaints about the medical treatment.

It is my opinion Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis.  Ms. Powell described herself as independent and a great, great mother.  She works hard.  Her main concern is her children, and she said her children are doing well.  She has a steady job and she is also planning to receive certification to work as an interpreter in the Virginia court system.  She has done the research and there is a large Hispanic population in the area where she plans to work.  It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/dmb

# EXHIBIT 30

JA1154

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE:  *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe:

On September 9, 2019, I had the opportunity to see Desire Evans for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Evans' psychiatric condition in relation to the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Evans that the examination was not for purposes of treatment and it was not a confidential examination.  I discussed with Ms. Evans that I would prepare a report based on the psychiatric evaluation and review of records.

The file included the following documents:

1. Medical Records: Plaintiffs0000000001 – Plaintiffs0000000571; Plaintiffs0000005735 – Plaintiffs0000006016
2. Complaint in *Russell et al. v. ECFMG* (12/31/2018)
3. Desire Evans' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Desire Evans' Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5. Deposition of Desire Evans (9/5/2019)
6. Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7. Desire Evans Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8. Deposition of Desire Evans, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9. Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10. Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

RE:  Desire Evans
Page 2

**HISTORY REPORTED BY DESIRE EVANS:**

Desire Evans (███████████████████) said that she is involved in a lawsuit because the doctor who delivered her son had "identity fraud."  Ms. Evans said that he used different names and Social Security numbers to obtain his certification.

Ms. Evans said she assumed that Dr. Akoda had hurt other women because she felt that he had hurt her during the delivery of her son.  Ms. Evans said that when she heard an ad telling anyone who had been Dr. Akoda's patient to call a phone number, Ms. Evans assumed that Dr. Akoda had touched other women inappropriately.  Ms. Evans said that when she called the number, she learned that the lawsuit was not, per se, malpractice.  Ms. Evans said that it is her understanding that Dr. Akoda failed several certification tests, and he had reapplied using different Social Security numbers and names.  Ms. Evans said she believes that Dr. Akoda was trying to degrade people.  Ms. Evans could not understand why Dr. Akoda continued to submit applications to ECFMG using different names.  Ms. Evans continued, "How do you even know he is who he said he was?  I still don't know who he is."  Ms. Evans said that the experience with Dr. Akoda affected her.  Ms. Evans said that she lost complete trust in the medical field and has problems with trust.  For example, she said she did not feel comfortable going in a car with a driver she did not know, and her husband took off from work to drive her to the independent psychiatric examination.

Ms. Evans said that her prenatal care was at the practice of Javaka Moore, MD. She said that during her pregnancy, she had to go to the practice chosen by Medicaid.  She said she saw Dr. Moore and nurse practitioners.  She said she had started to dilate at five months, and she was treated with progesterone.  Ms. Evans said she was scheduled to be induced because she was two weeks past her due date.  Ms. Evans said she expected that Dr. Moore would deliver her baby. She said she met Dr. Akoda on the day of the induction.  She said a nurse had put in the epidural and given her Pitocin.  She said she did not meet Dr. Akoda until her water broke, and at that time, she was in labor.

Ms. Evans said that Dr. Akoda was the only doctor in and out of the delivery room.  She said that when her labor was not progressing, Dr. Akoda began to stimulate her clitoris.  Ms. Evans said she questioned what he was doing, and he told her and her husband that this stimulation would help the baby come out.  Ms. Evans said she was in labor and this felt weird and uncomfortable. Ms. Evans said she thinks the nurse was in the delivery room.  Ms. Evans said she was not in stirrups at that time, but rather her mother and her husband were holding her legs.  Ms. Evans repeated that Dr. Akoda made her feel uncomfortable.  Ms. Evans said that she had an emergency C-section.

Ms. Evans had a six-week checkup with the nurse practitioner.  Ms. Evans said that she had severe back and leg pain after the epidural, and she said she still has sciatic pain.  She talked about the sciatic pain at her six-week checkup.  She did not say anything about Dr. Akoda's behavior during the delivery of her son.

Ms. Evans said she has not had any follow-up gynecologic care since her son was born.  She said, "I don't want anyone touching me down there."  Ms. Evans said that she lost trust after the

RE:  Desire Evans
Page 3

delivery because her doctor did not show up, and the doctor who delivered her son was "another doctor who was supposed to be a doctor."  She said that she was uncomfortable with how he touched her.  Ms. Evans said she does not see a primary care physician.  She said she has been in treatment with a psychiatrist and a psychologist, and she has blood pressure and weight checks.

Ms. Evans began to cry.  She said that she and her husband have only had sex two or three times since her son was born.  She said that she feels uncomfortable if he tries to touch her.  She said that her husband loves her.  Ms. Evans said she is trying to work through this, and it is embarrassing.

Ms. Evans has Family Medical Leave for diagnoses of anxiety, depression, and posttraumatic stress disorder, and she has ADA accommodations for anxiety.  Ms. Evans said that Dr. Ebony Cross is her psychiatrist, and she has been in treatment with Dr. Cross since April 2019.  Ms. Evans said that her medications include ███████████████████████████████ ████████████████████████████████████.  Ms. Evans said that she has really bad anxiety that affects her sleep.  She said that she does not believe she had postpartum depression.  She said that she believes her problem was a consequence of losing complete trust in the medical field.

Ms. Evans said she has been in treatment with Dr. Donato for two years.  Ms. Evans said that Dr. Donato has recommended YouTube videos about stress.  Ms. Evans said that she is not a person who opens up to other people, and she does not like to talk about herself.  She said that she schedules appointments with Dr. Donato as needed, and he completes forms for ADA and FMLA.  Ms. Evans said that her ADA accommodations allow her to work from home, and her Family Medical Leave accommodations allow her to take days off for doctors' appointments and anxiety.  She can be out of work eight hours a day, three days a week.  Ms. Evans said that she probably works 26 to 30 hours a week.  Ms. Evans was crying as she related her history.  Ms. Evans said that her ADA accommodations are permanent, but her FMLA leave requires updates.

Ms. Evans said that she will sometimes talk to Dr. Donato on the phone.  She said that she spoke to her previous psychiatrist, Dr. Shanda Smith, on the phone.  Ms. Evans said that it is her anxiety that keeps her up and it is her anxiety that affects her ability to focus.  She said, "I walk around with a big ball of stress."

Ms. Evans said that she had anxiety after the hospital experience, and she had serious trust issues about everything after the experience with Dr. Akoda.  She said that her problems with trust increased when she learned about a lawsuit regarding Dr. Akoda.

Ms. Evans said that Dr. Donato referred her for a psychiatric evaluation with Dr. Nnamani.  Ms. Evans said that she had only one appointment with Dr. Nnamani because the office was one hour from Ms. Evans' home.  Ms. Evans said that Dr. Nnamani diagnosed her with posttraumatic stress disorder.  Ms. Evans said that she has a lot of pent up trauma and there was no specific abuse, but neglect.  Ms. Evans said that she grew up in the church and her grandmother was a Pentecostal pastor who passed away in 2007.  Ms. Evans said that she was 19 years old in 2007, through her date of birth shows that she would have been 28 years old in 2007.  Ms. Evans said that her mother was 19 or 20 years old when Ms. Evans was born, and Ms. Evans' grandmother

RE:  Desire Evans
Page 4

was the constant person in her life.  Ms. Evans said that she and her grandmother had everyday
bible study.  Ms. Evans said 50 or 60 people followed her grandmother's preaching.  Ms. Evans
said that after her grandmother died, she lost faith.  Ms. Evans said that her grandmother was the
most faithful servant of God, and she was a perfect human being.  Ms. Evans said that her
grandmother had breast cancer.  Ms. Evans said she thought God was going to heal her
grandmother, and she did not have any treatment.  Ms. Evans was crying.  She said she did not
go back to the church after her grandmother's death.

Ms. Evans said that she had other trauma related to her brother.  She said that she felt that she had
to raise him.  Ms. Evans said that she does not believe her mother acted in an intentional way not
to care for her and her brother, but her mother was not available to raise her or her brother.

Ms. Evans said she did not have trust issues with doctors before the birth of her son.  Ms. Evans
said that she had trust issues with God.  She repeated that since the birth of her son, she is not
interested in sex.  She said that she does not want to be touched by anyone.  Ms. Evans said that
she believes her husband has looked at her in a different way since the childbirth experience.
She said that she has not wanted to talk about her experience in labor with her husband.  She said
that she feels that this is her issue.

Ms. Evans described her mood as a big ball of stress.  She said that she has dreams that are very
scary.  She said that she cannot pinpoint the content of the dreams, and they are not recurring
dreams.  In response to a question about her appetite, she commented that she is fat.  She said
that she is 5 feet, 3 inches tall and she weighs 180 pounds.  She said that she started gaining
weight after she had her son and she weighed 156 pounds after her son was born.  Ms. Evans
said she feels a little better because she had recently lost 15 pounds.  She reported that she eats
late at night, and she believes that this contributes to the weight gain.  Ms. Evans said that she
has problems with her concentration.  She said that she feels she is all over the place, and it is
hard to stay on task.  Ms. Evans said that she has problems with energy.  She said that she tries to
have a good time with Peyton and other family members.  Ms. Evans said that she does not have
suicidal thoughts.  Ms. Evans said she can feel the most depressed in the world, but she will then
focus on her son and her husband.  Ms. Evans said that she has anxiety attacks, but she does not
know what causes them.  She said that when she feels the anxiety increasing, she takes a
Klonopin.

Ms. Evans said that everything scares her.  Ms. Evans said that she did not have her son
vaccinated until he was three years old because of her fears.  She said that she feels every day is
Halloween, and she is terrified of the world.  She said that her feelings of terror increased after
her son was born.  She reported that she does not like to be around people, and she does not like
to leave the house because everything worries her.

Ms. Evans returned to discussing the lawsuit.  Ms. Evans said that Dr. Akoda said he was a
doctor.  Ms. Evans said that she is now under the impression that he may not be a doctor.  Ms.
Evans said that she feels she was harmed and that Dr. Akoda touched her in an inappropriate way
during the delivery.  She repeated that she does not know if he is a doctor, and she does not know
if he has the certification necessary to be a doctor.

RE:  Desire Evans
Page 5

**PAST MEDICAL/PAST PSYCHIATRIC HISTORY:**

In June 2014, Ms. Evans fell down wooden stairs.  She said that there were 15 steep steps in her apartment.  She said that she lost her footing.  She said that she did not lose consciousness and did not go to the hospital right away.  Ms. Evans said that she realized that she was having a significant problem with her back and her legs.  She said that she told her husband that it was bad, and she went to the emergency room.  She said that she was in the hospital for five days.  She said that she had a lot of tests.  She said that she had occupational therapy and physical therapy before she was discharged.  She said that she did not have any physical therapy after her discharge, and she did not have any follow-up.  Ms. Evans said that she and her husband live in a three-bedroom house with her office in the basement.  She said there are stairs in the house, and all the stairs are carpeted.

████████████████████████████  She said that she just wanted to move out; she did not want to co-parent with her mother any longer.  Ms. Evans said that she has always been the adult.  She said that she told her mother that she had taken ████████ of Tylenol PM, and her mother took her to the hospital.  Ms. Evans said that she tried to explain that she had not taken any pills, but she was treated in the hospital ████████████████████  Ms. Evans said that she was given charcoal.  She said that she had taken ████████  She said her stupidity got her into the situation.  Ms. Evans said that she believes that this was an involuntary hospitalization.  She said that she believes she was treated with fluoxetine.  Ms. Evans said that she knew there was nothing wrong with her, and she did not have any follow-up.

Ms. Evans said she did not have any psychiatric or psychological treatment until she began treatment with Dr. Smith in January 2018.

**SOCIAL HISTORY:**

Ms. Evans said that she has been married for four years, but she and her husband have been together for seven years.  Their son, Peyton, was born on March 17, 2016.  She said that her husband has three children from a previous relationship, including a 15-year-old boy, an 11-year-old boy, and a 7-year-old girl.

Ms. Evans reported that she has been working for Blue Cross Blue Shield in customer service since June 2015. She was not hired to a permanent position until January 2016 and she did not have any maternity leave.  She said that she took off eight weeks and was then able to work from home.

Ms. Evans said that she is studying cybersecurity at Strayer University.  She said that she takes two classes a semester and has gotten all A's.  Ms. Evans said that she believes she can finish her degree in three or four years.  Ms. Evans said she wants to work in the private sector.  She said that she is concerned about issues related to voting.  She said that her grandmother always worked at the polls, and her grandmother was very politically involved.

Ms. Evans said that she has a good job with health benefits.  She said that all the calls are recorded, and five calls a month are reviewed.  She said that the job is micromanaged.  She said

RE:  Desire Evans
Page 6

that she needs to be on the phone 82% of the time.  She said that she cannot be longer than seven minutes on any call, and she only has two minutes to enter the information.

Ms. Evans said that she and her husband, a bus driver, get along well.  She said that he is really laid back.  Ms. Evans described her son Peyton as "awesome," very active, and headstrong.

Ms. Evans said that her mother is 61 years old, healthy, and works in a doctor's office.  She said that her father has been in and out of jail for drugs and robbery.  She said that her parents were divorced in 2008.

Ms. Evans said that she left school at 16 or 17.  She said that she wanted to help her mom.  She said that she got a high school diploma and studied a trade to be a nursing assistant.

Ms. Evans denied the use of alcohol.  She denied the use of drugs, including marijuana.  [Note: Ms. Evans had reported to Dr. Smith that she was using daily marijuana to help with sleep.]

**MENTAL STATUS EXAMINATION:**

Mental status examination revealed a casually groomed 40-year-old woman.  Her speech was goal-directed and spontaneous.  Although Ms. Evans discussed her problems with trust, she spoke in a spontaneous fashion, provided a detailed personal history, and easily established rapport.

Ms. Evans described her mood as a big ball of stress.  Her affect was labile with frequent crying.  She denied suicidal ideation.  She would never leave her husband and her son.

Ms. Evans said that she has anxiety attacks.  She cannot identify a precipitant.  She said that she has vivid dreams, but she does not recall the content of the dreams.

Ms. Evans said that Dr. Donato sent her to a psychiatrist who diagnosed posttraumatic stress disorder.  Ms. Evans said that the posttraumatic stress disorder relates to all the previous trauma.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS:**

I have reviewed the records identified at the start of the report.  The following summaries of information reported in medical records focus on the provided records that referred to psychiatric complaints.

1.  Shanda Smith, MD

Ms. Evans had a new patient evaluation on January 17, 2018.  The chief complaint was depression and anxiety.  Ms. Evans was self-referred after consultation with a primary care doctor.  Ms. Evans reported feeling anxious and depressed for most of her life, but worse over the past year since her birthday in March.  Ms. Evans reported significant anxiety, described as

RE:  Desire Evans
Page 7

excess worry that was difficult to control.  Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping.  Ms. Evans seemed to cry out of the blue for no reason.  Ms. Evans had passive thoughts of death related to hopelessness but denied any intent or plans because of her strong attachment to her two-year-old son.  Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite.  Ms. Evans had poor focus because of anxiety and thoughts jumping around.  Ms. Evans was working at home so she could watch her son.  He was growing more active, and this was becoming more of a challenge.  Ms. Evans denied any specific stressors or changes.  She did note that she was not satisfied with her life.  She said she could not focus or pursue her goals because of anxiety.  She described herself as very private.  Her husband was aware of her depression, but she felt he did not know how to respond.

In regard to past psychiatric history, Ms. Evans reported histories of symptoms on and off throughought her adult life.  She had one suicide attempt by overdose in 2009.  She was admitted to a psychiatric hospital for about five days.  Ms. Evans was started on fluoxetine but stopped it soon after discharge.  There was no additional or continued care.

Ms. Evans reported that when her parents were divorced, she functioned as a parent to her younger brother, who was nine years younger.

The diagnosis was major depressive disorder, recurrent, severe, with anxious stress, and unhealthy substance behavior, referring to daily marijuana use to help with sleep.  The treatment plan was for Prozac and hydroxyzine as needed for sleep and severe anxiety.  There would be a video visit on February 16, 2018 and a psychotherapy appointment on January 19, 2018.

The records included correspondence from Ms. Evans to Dr. Smith regarding medication.  The plan was to stop hydroxyzine and prescribe trazodone.

The appointment on February 6, 2018 was a structured telephone medication management visit.  Ms. Evans reported initial improvement in mood.  She was not crying as much since starting Prozac, but about one and a half weeks after increasing to 20 mg, her anxiety increased.  The plan was to continue Prozac and use Ativan sparingly for severe anxiety and palpitations.  She was taking Prozac 20 mg and trazodone 50 mg at bedtime as needed.

Dr. Smith completed a Family Medical Leave form dated January 22, 2018.  The diagnosis was major depressive disorder, recurrent episodes, severe, with anxious stress.  The recommendation was for unplanned leave twice a month for eight hours.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

2.  Shah Associates Family Practice

The records included a note from Dionne Lucas, PAC dated July 25, 2016.  Ms. Evans was a new patient to the practice.  Ms. Evans was complaining of feeling sad all the time and having severe anxiety.  She had a baby in March 2016, and since then she had not been able to sleep.  Ms. Evans was afraid to drive a car.  She was afraid of walking down steps with her son because

RE:  Desire Evans
Page 8

she thought she might drop him.  She was afraid to let her son be watched by other people.  She was losing hair.  She had not been able to go into work since her maternity leave ended.  When Ms. Evans saw her gynecologist, she was given a note for reasonable accommodation, which allowed her to work from home until August 1, 2016.  Ms. Evans was asking for an updated letter and evaluation for this complaint.

Ms. Evans said before she had her baby, she did not have any issues with anxiety and depression.  Her husband and mother were described as very supportive.  During her pregnancy, Ms. Evans started to complain of lower back pain that would shoot down her left leg.  The symptoms continued.  She said it was like a vibrating cell phone in her left back pocket.  She had not used any medication for this complaint.  She had reached her pre-pregnancy weight.  Her only injuries to the back occurred during the summer of 2015 from C3 to C5, affecting the right side.

Ms. Evans said her lower back had never been an issue.  Her past history included depression, anxiety, and anemia.  She was taking naproxen every 12 hours and sertraline 50 mg.  She said she had been gaining weight.  She was fatigued.  She was not able to fall asleep or stay asleep.  The impression was depression, anxiety, possibly postpartum.  She was started on Zoloft 50 mg.  Ms. Evans was given information to consult a mental health professional.  She received a note extending reasonable accommodations until the week of September 12, 2016.  She had lumbago and sciatica.  She had an order for an x-ray of the lumbar spine and an appointment for a nerve conduction study.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

## SUMMARY AND IMPRESSION:

It is my opinion that Ms. Evans does not have a psychiatric disorder related to the allegations in the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.  It is my opinion Ms. Evans has psychiatric conditions of major depression and panic disorder, documented in the available records, but there is no relation between those psychiatric conditions and the allegations in the Complaint.  Ms. Evans discussed her feelings about the inappropriate behavior of Dr. Akoda during the delivery of her son.  Ms. Evans acknowledged that she did not report this behavior to another treating doctor or nurse or discuss her feelings about Dr. Akoda with her husband.  Ms. Evans said that her husband, her mother, and a nurse were in the delivery room and aware of Dr. Akoda's treatment during the delivery.  Ms. Evans did not file a malpractice complaint about Dr. Akoda in relation to the delivery of her son.

Ms. Evans has ADA and FMLA accommodations for conditions of depression and anxiety. The symptoms of major depression and panic disorder were documented in the psychiatric report from Shanda Smith, MD, regarding the new patient evaluation on January 17, 2018.  This report did not include any reference to Dr. Akoda or ongoing litigation.  The chief complaints were depression and anxiety.  Ms. Evans reported feeling anxious and depressed for most of her life.  Ms. Evans reported significant anxiety, described as excess worry that was difficult to control.  Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping.  Ms. Evans seemed to cry out of the blue for no reason.  Ms. Evans had ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ related to hopelessness but denied any intent or plans because of her strong

RE:  Desire Evans
Page 9

attachment to her two-year-old son.  Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite.  Ms. Evans had poor focus because of anxiety and thoughts jumping around.

During the evaluation, Ms. Evans said that the current lawsuit relates to a question about Dr. Akoda's "several different names and Social Security numbers," but she could not identify how this allegation has caused her to experience depression and anxiety or cause an increase in her depression and anxiety.

Although Ms. Evans reported ongoing depression and anxiety, she has many strengths.  She described a strong marriage and her love for her "awesome" son Peyton.  Ms. Evans continues to work, and she is also in school.  She believes she can finish her degree in three or four years.  Ms. Evans wants to work in the private sector and is concerned about issues related to voting.

In conclusion, it is my opinion that Ms. Evans does not have a psychiatric disorder causally related to her allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*, and there was no exacerbation of Ms. Evans' psychiatric conditions as a consequence of the allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.  I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD
GSF/jne

# <u>EXHIBIT 31</u>

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

October 14, 2019

Elisa P. McEnroe
Morgan Lewis
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

**RE: MONIQUE RUSSELL ET AL V. EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES**
**NUMBER:  2:18-cv-05629**

Dear Ms. McEnroe:

I had the opportunity to see Elsa Powell, Monique Russell, Desire Evans, and Jasmine Riggins for independent psychiatric evaluations and I prepared reports regarding each individual evaluation and a conclusion regarding the four evaluations.

I have now reviewed documents from Christiane Tellefsen, MD identified as RE: "Charles Akoda" cases. Dr. Tellefsen referred to her evaluation of three plaintiffs in a lawsuit against ECFMG involving allegations around Dr. Charles Akoda. I have also reviewed a document from Annie Steinberg, MD identified as RE: Akoda Matter, and the preliminary transcript of Dr. Steinberg's deposition on October 10, 2019.  I have also reviewed medical records from Ijeoma Nnamani, MD regarding a psychiatric evaluation of Desire Evans on September 24, 2018 and treatment records from Paul Donato, PhD from Advanced Mental Health Services from July 11, 2018 to August 1, 2019 related to Desire Evans. The records from Dr. Nnamani and Dr. Donato were provided after I submitted the report dated September 23, 2019.  The information reflected in my initial report (including my hourly rates in this matter, my CV, and the list of cases in which I have testified from June 2014 to June 2019) apply with equal force to this rebuttal report.

**IMPRESSION:**

It remains my opinion that the four individuals that I saw for four independent psychiatric evaluations presented four different personal histories regarding their medical experiences with Dr. Akoda, and it remains my opinion that none of the individuals has a psychiatric disorder as a direct consequence of the actions of ECFMG in regard to Dr. Akoda. The expert reports of Dr. Tellefsen and Dr. Steinberg do not change any of my opinions.

Dr. Tellefsen provided summaries of the evaluations she performed of Jasmine Riggins, Elsa Powell, and Desire Evans.  Dr. Tellefsen did not evaluate Monique Russell as I did.  Dr. Tellefsen

RE:  Monique Russell et al v. Educational Commission for Foreign Graduates
Page 2

agreed with me that Ms. Riggins does not have a diagnosable psychiatric disorder.  Dr. Tellefsen acknowledged that learning about Dr. Akoda's "false identity" did not interfere with Ms. Riggins's ability to function in her daily life, and she (Ms. Riggins) reported that she had never sought any mental health treatment.

Dr. Tellefsen recognized that Elsa Powell does not had any psychiatric symptoms that have interfered with her day-to-day functioning. Ms. Powell had a fifth baby after the delivery of her fourth child by Dr. Akoda. Dr. Tellefsen opined that Ms. Powell had a psychiatric disorder of an adjustment disorder with anxiety.  Dr. Tellefsen did not refer to the diagnostic criteria for an adjustment disorder.  The criteria for an adjustment disorder, as noted in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), require that an individual develops emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within three months of the onset of the stressor(s).  Dr. Tellefsen did not specify the stressor that would have caused Ms. Powell emotional distress/anxiety within three months of recognizing a stressor. It is more important that if the purported stressor was learning about Dr. Akoda's identity and litigation**,** Ms. Powell did not describe any symptoms that would suggest any psychiatric diagnosis in reaction to this information. Ms. Powell did not report any complaints about Dr. Akoda's treatment during the delivery, surgery after delivery, or post-delivery checkup, and she (Ms. Powell) has never engaged in mental health treatment.

In contrast to Ms. Russell, Ms. Riggins, and Ms. Powell, Desire Evans does have a documented ██████████████████████████████████████████████; however, there is no information to support an opinion that Ms. Evans's well-established ███████ conditions had any relationship to the Complaint *in Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*.  This conclusion is supported in the treatment records from Ijeoma Nnamani, MD and Paul Donato, PhD. The consultation report from Dr. Nnamani and the treatment notes from Dr. Donato did not refer to Dr. Akoda, stress related to the delivery of Ms. Evans's son, or problems with trust of doctors as contributing to her significant depression and anxiety.  None of Ms. Evans's treating doctors has suggested that she has a mood disorder associated with the delivery of her son by Dr. Akoda.

The report from Annie Steinberg, MD included a survey of individuals who claimed they were patients of Dr. Akoda.  Dr. Steinberg did not provide validity criteria to allow reliance on the conclusions opined in the summary report.  At her deposition, Dr. Steinberg acknowledged that it was never her intention to present psychiatric diagnoses of any individual woman in this matter, and she could never diagnose a person on the basis of a response to a questionnaire. Dr. Steinberg testified that she assumed that the women were patients of Dr. Akoda. Dr. Steinberg also assumed that the fifty percent of the group who had not responded to the survey would have had similar responses as the women who completed the survey.  Dr. Steinberg testified that the experience with Dr. Akoda was a contributing factor to the well-being and current clinical status of many of the women Dr. Akoda "exploits."  But Dr. Steinberg had not met a single woman treated by Dr. Akoda and she was not providing a psychiatric diagnosis in regard to the individuals' well-being. Dr. Steinberg testified the survey questions were related to the consequences of Dr. Akoda's "fraudulent identify" and not to the medical treatment he had provided. Accordingly, nothing in Dr. Steinberg's report changes any of my opinions regarding each of the four individuals that I saw for independent psychiatric evaluations.

RE:  Monique Russell et al v. Educational Commission for Foreign Graduates
Page 3

It is my opinion that the introduction to the survey and the questions in the survey had implicit bias against Dr. Akoda. Dr. Steinberg testified that she had edited the letter sent to would-be survey respondents, but the letter was written by the attorney seeking to represent a class of women who by self-report had a history of treatment with Dr. Akoda.

It is my opinion the four individuals that I saw for four independent psychiatric evaluations presented four different personal histories about their medical experiences with Dr. Akoda.  None of the four individuals I saw for individual psychiatric examinations described loss of trust in medical providers and health care institutions related to the allegations in the Complaint *Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*. It remains my opinion that individual assessments are necessary to determine whether any particular patient who had treatment with Dr. Akoda suffers from emotional distress and/or whether such emotional distress is related to the allegations in the Complaint, medical experiences with Dr. Akoda, or conduct by ECFMG.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/cl

Case 2:18-cv-05629-JDW   Document 46-16   Filed 11/06/19   Page 1 of 11

# EXHIBIT 32

# 8005 Navajo Street, Philadelphia, PA 19118

September 23, 2019

Brian Shaffer, Esq.
Elisa McEnroe, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**Re:  Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" / ECFMG**

Dear Counsel,

I have completed my initial review of the above case, including the following records:

- Records produced by Howard University Hospital
- Guilty Plea
- Records produced by the American Board of Obstetricians and Gynecologists ("ABOG")
- Records of Desire Evans
    - Plaintiffs0000000001 – Plaintiffs0000000571
    - Plaintiffs0000005735 – Plaintiffs0000006016
    - Complaint and Notice of Removal to EDPA
    - Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
    - Desire Evans's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
    - Deposition of Desire Evans
    - Documents Related to Maryland Litigation
    - Class Action Complaint in CAL 17-34091
    - Desire Evans's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Elsa Powell
    - Plaintiffs0000000572 – Plaintiffs0000000929
    - Plaintiffs0000006174 – Plaintiffs0000006363
    - Plaintiffs0000118377 – Plaintiffs0000118653
    - Complaint and Notice of Removal to EDPA
    - Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents

- o Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Elsa Powell
  - o Documents Related to Maryland Litigation
  - o Class Action Complaint in CAL 17-37091
  - o Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Jasmine Riggins
  - o Plaintiffs0000001134 – Plaintiffs0000001242
  - o Plaintiffs0000001995 – Plaintiffs0000002026
  - o Plaintiffs0000006394 – Plaintiffs0000006512
  - o Plaintiffs0000007418 – Plaintiffs0000007425
  - o Plaintiffs0000007426 – Plaintiffs0000007652
  - o Complaint and Notice of Removal to EDPA
  - o Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Jasmine Riggins
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863
  - o Jasmine Riggins's Responses to Requests for Admission in CAL 18-07863
  - o Jasmine Riggins's Answers to Interrogatories in CAL 18-07863
  - o Deposition of Jasmine Riggins in CAL 17-22761, CAL 17-37091, and CAL 18-07863
- Records of Monique Russell
  - o Plaintiffs0000000932 – Plaintiffs0000001133
  - o Plaintiffs0000001243 – Plaintiffs0000001685
  - o Plaintiffs0000001686 – Plaintiffs0000001839
  - o Plaintiffs0000001840 – Plaintiffs0000001845
  - o Plaintiffs0000001846 – Plaintiffs0000001994
  - o Plaintiffs0000005338 – Plaintiffs0000005429
  - o Plaintiffs0000067757 – Plaintiffs0000067847
  - o Plaintiffs0000118654 – Plaintiffs0000118679
  - o Complaint and Notice of Removal to EDPA
  - o Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Monique Russell
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863

2

    o   Monique Russell's Responses to Defendants' Requests for
Admissions in CAL 18-07863

I have been requested to review materials provided by counsel for the Educational Commission for Foreign Medical Graduates ("ECFMG") regarding four patients who were treated by Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" ("Dr. Akoda").

For time spent on this matter, I will be compensated $400 per hour for reviewing materials and writing a report; $2,000 for deposition testimony; and $4,000 for trial testimony.

I have attached a copy of my CV. I have also attached a list of trial and deposition testimony within the past four years.

---

JA1171

**Desire Evans**

**Summary**

At the time of her 3/17/16 delivery, Ms. Evans was a 36-year-old gravida 3 para 0-0-2-0 at 41 weeks. She had a past history of depression and anxiety, attempted suicide in 2009, and used marijuana daily.

On 3/16/16, Dr. Akoda was the assigned OB/GYN when Ms. Evans's labor was induced at Prince George's Hospital. Dr. Akoda was the only OB/GYN who treated her during her labor and delivery. (Evans Dep. 83-86.)  Her prenatal care was not provided by Dr. Akoda, but rather by Dr. Javaka Moore. (Evans Dep. 97.)

Ms. Evans's labor was induced / augmented with Cytotec and Pitocin.

She received an epidural.

She progressed to completely dilated. Extensive caput was noted.

Dr. Akoda recommended cesarean delivery due to a non-reassuring FHT and arrest of descent.

On 3/17/16, Dr. Akoda performed a cesarean section. Delivery resulted in a healthy 6 pound 14 ounce baby boy (Peyton) with Apgar scores of 8 and 9 at 1 and 5 minutes, respectively. EBL was 400 ml. There were no intra-operative complications.

Ms. Evans has no complaints about her incision. (Evans Dep. 95-96.)

Her post-operative course was uneventful.

On 3/20/16, POD#3, she was discharged.

She was later diagnosed with depression and anxiety. (Evans Dep. 102.)

On 1/17/18, she had an appointment with Shanda Smith, MD, at Kaiser Permanente Largo Medical Center for a psychiatric evaluation. "*I just told her that I felt uncomfortable and that I was touched in a way* (by Dr. Akoda) *that I felt was inappropriate and I didn't know how to deal with it*." (Evans Dep. 128.) She stated, "*he was, like, fondling my clitoris, saying that he needed to do that in order to stimulate me to push the baby.*" She stated that Dr. Akoda did this several times. (Evans Dep. 132-34.) Her husband and mother were present.

At age three, Peyton was a healthy child. (Evans Dep. 26.)

Ms. Evans did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a radio ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A cesarean section with no complications resulted in delivery of a healthy baby. Ms. Evans had no post-operative complications.

JA1173

## Elsa Powell

**Summary**

In 2014, Ms. Powell was treated by Dr. Akoda during prenatal visits and her labor and delivery. She was a 30-year-old gravida 4 para 3-0-0-3.

When she arrived at a scheduled prenatal appointment with Dr. Abdul Chaudry, "*they said that Dr. Chaudry had to step out, but Dr. Akoda was there*." She then saw Dr. Akoda every couple of weeks and then weekly for her remaining prenatal visits. (Powell Dep. 40.)

She stated that Dr. Akoda was flirtatious with her at her prenatal visits. He examined her breasts and made "*comments about I have nice breasts and stuff like that. So then I felt uncomfortable. … I was eight months pregnant at that time.*" She then asked for a nurse to be present for her next exam. She states that this occurred "*a few times.*" She did not request to be seen by a different doctor. (Powell Dep. 51-53.)

On 9/17/14, at 39+ weeks, Dr. Akoda induced Ms. Powell's labor at Prince George's Hospital. She had no support people with her.

She had a vaginal delivery of a healthy baby boy (Jaiden).

She reported having vaginal bleeding and passing blood clots several hours after her delivery. After she informed a nurse, Dr. Akoda came to evaluate her and diagnosed her with a postpartum hemorrhage.

On 9/18/14, Dr. Akoda performed a suction dilation and curettage ("D&C") under general anesthesia. EBL was 250 ml. Findings were "*Extensive amounts of cauliflower-like lesions in the vagina. … The lower uterine segments were not contracted. Bleeding from the upper part of the cervix and significant oozing from the cauliflower-like lesions from the vagina.*" The vagina was packed with gauze at the end of the surgery. (Powell Dep. 46.)

Ms. Powell stated that she was anemic and uncertain if she received a blood transfusion. She stated that she asked but did not receive an answer from Dr. Akoda. (Powell Dep. 49.)

On 9/19/14, postpartum day #2, Ms. Powell was doing well. She had minimal bleeding. Her vital signs were stable. Her hemoglobin was 9.3. She was discharged. She was to follow up in six weeks.

JA1174

Ms. Powell stated that at her postpartum visit, Dr. Akoda treated an ovarian cyst in the office. She was then in pain for three or four days.

Jaiden is a healthy boy.

Ms. Powell did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a friend who saw a TV ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson.  A vaginal delivery resulted in delivery of a healthy baby. Ms. Powell had a postpartum hemorrhage that was due to uterine atony and ███████████████████ Dr. Akoda appropriately performed a D&C and packed the vagina with gauze. ████████ result from a ████████████████████████. Such ████████ commonly bleed after delivery.

**Jasmine Riggins**

**Summary**

Between August 2012 and March 2013, Ms. Riggins was a patient of Dr. Akoda at Dimensions Healthcare.

On 3/18/13, she presented for a scheduled repeat elective cesarean section to Dimensions Healthcare. She was a 20-year-old gravida 4 para 1-0-2-1 at 40+ weeks. Her pregnancy was complicated by gonorrhea x 2 and late presentation for prenatal care. She had one prior cesarean section and two prior elective abortions.

Dr. Akoda performed a repeat elective cesarean section. Delivery occurred of an 8+ pound male with Apgar scores of 9 and 9 at 1 and 5 minutes, respectively. Extensive adhesions were noted. EBL was 1,300 ml. No intra-operative complications were noted.

She had no post-operative complications.

On 3/21/13, POD #3, she was discharged.

Ms. Riggins did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a Facebook post by Monique Russell in 2017.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. An elective repeat cesarean section with no complications resulted in delivery of a healthy baby. She had no post-operative complications.

JA1176

**Monique Russell**

**Summary**

At the time of her 5/25/16 delivery, she was a 38-year-old gravida 4 para 0-0-3-0 at 37+ weeks. ██████████████████████████████ ████████████████████ and stress-related back pain. (Russell Dep. 63-64, 79.)

At 37+ weeks, she presented to Prince George's Hospital with ruptured membranes.

Due to a non-reassuring FHT remote from delivery (2 cm), Dr. Akoda recommended a cesarean section. Ms. Russell's husband did not agree with the need for a cesarean section, but Ms. Russell listened to Dr. Akoda. (Russell Dep. 26, 37.)

On 5/25/16, Dr. Akoda performed a cesarean section at Prince George's Hospital. Delivery occurred of a 7+ pound male (Luka) with Apgar scores of 9 and 9 at 1 and 5 minutes, repectively. EBL was 400 ml. No intra-operative complications were noted.

Ms. Russell had no post-operative complications.

On 5/28/16, POD #3, she was discharged.

Luka is a healthy child.

Ms. Russell did not file a medical malpractice lawsuit against Dr. Akoda. Soon after the delivery she discovered an online press release from the Department of Justice about Dr. Akoda.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A cesarean section with no complications appropriately performed due to non-reassuring FHT remote from delivery resulted in a healthy baby. Ms. Russell had no post-operative complications.

9

**Conclusions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. All four of the women's deliveries resulted in healthy babies and good outcomes. The only complication, a postpartum hemorrhage due primarily to bleeding from ██████████ ████, was not caused by Dr. Akoda and was appropriately treated by Dr. Akoda.

Review of the records reveals that Dr. Akoda successfully completed an OB/GYN residency training program at Howard University Hospital. Dr. Akoda met requirements, including written and oral examinations, to become board certified by the American Board of Obstetrics and Gynecology ("ABOG"). He also successfully completed requirements for ABOG's board recertification via the Maintenance of Certification ("MOC") program through 2015.

All opinions stated are with a reasonable degree of medical certainty.

Sincerely,

Jay Goldberg, MD, MSCP
Professor of OB/GYN

JA1178

# EXHIBIT 33

JA1179





**Monique Russell**
Exactly. The state of Virginia suspended his license based on the federal conviction, but his Maryland license expired while he was awaiting trial.

2 yrs    Like    Reply    More



**Karlena Walker**
I can't believe it was just suspended and not outright revoked permanently.

2 yrs    Like    Reply    More



**Monique Russell**
Same here. The letter they wrote said that in order to reinstate the license, he would have to re-apply and fay the applicable fees. My FIL (who is a lawyer) thinks that is just CYA language and that they would not reinstate it. But something should be noted on the MD board. Also, I want to see background checks as a part of the process of getting a license. Checking SS numbers and fingerprinting could have kept him from being able to do this.

2 yrs    Like    Reply    More



**Nakki A. Price**
I mean, is it even clear that he had some medical training?! I read the link above and that wasn't clear.

Plaintiffs0000140253



10:49

84%

2 yrs    **Like**    Reply    More



**HoneyDip Dani**
I think people should contact their personal lawyer at this point.

2 yrs    Like    Reply    More



**Monique Russell**
Honestly, I'm not sure there's much to do at this point. I've been in touch with a lawyer. He's been convicted at the federal level, and we've spoken to the US Attorney who prosecuted the case. He's basically said it's over and done with, and he doubts he's still in the country. So I'm not sure if the state would pursue criminal charges. However, he's used at least 4 different social security numbers and a number of different names over the years to keep practicing under fraudulent licenses in MD and VA. If enough of his patients are identified, it could make way for a class action lawsuit, but individually, there's not much that can be done. However, I've found at least 1 settlement for a negligence claim against him. If there are others, those women could re-open their cases and fight for more money because he should have never been operating on them.

2 yrs    **Like**    **Reply**    More

    Write a reply...    Reply

    

10:52  82%



**Karlena Walker**

**Monique Russell** This is horrifying. I am so, so, sorry you're having to deal with this. My only hope is that it opens more eyes and allows structures to be put in place that can prevent this from happening again. It's hard enough to trust medical professionals as it is, without the stress of worrying if your doctor actually earned their license. I don't know what I can do to help, but please let me know. *hugs*

 2

2 yrs      Love      Reply      More



**Monique Russell**

**Karlena Walker** Thanks, chica. I do consider myself lucky. Luka is perfect, and I seem to be healing as expected, though this really makes me second-guess things. I was in labor for 32 hours and ended up needing an emergency c-section. I think the route we went really was best/ necessary. But, what about mothers like the one in that settlement above, mothers who had complications or whose babies sustained injuries? They should know that he might be at fault for that. They have a right to know, and no one is notifying patients.

 1

2 yrs      Like      Reply      More



**Ebony Scott-Bey Cutchin**

Monique Russell, the State of Maryland now requires

Plaintiffs0000140255

        

JA1182

# <u>EXHIBIT 34</u>

Case 2:18-cv-05629-JDW    Document 39-34    Filed 10/28/19    Page 2 of 31

# Expert Rebuttal by
# Susan Schwartz McDonald, Ph.D.
# on a Survey Conducted for Plaintiffs by
# Annie Steinberg, MD

October, 2019



# TABLE OF CONTENTS

**Page**

I.  **INTRODUCTION** ..................................................................................... 3

    A. Scope of Testimony and Summary of Opinions  ............................... 3

    B. Professional Credentials and Compensation  .................................... 3

    C. Basis for my Opinions ......................................................................... 5

II.  **Survey Definitions and Methodological Requirements**  ....................... 6

    A. What is a 'Survey'?  ............................................................................ 6

    B. Overview of Deficiencies in the Steinberg Survey  ........................... 7

III.  **Specific Deficiencies of the Steinberg Survey** ....................................... 9

IV.  **Conclusions** .......................................................................................... 21

    **Appendix A:** CV of Susan Schwartz McDonald, Ph.D.

JA1185

## I.  Introduction

### A.  Scope of Testimony and Summary of Opinions

I was retained by Morgan Lewis as an expert witness on behalf of Defendant in *Monique Russell et al. v Educational Commission for Foreign Medical Graduates*, class action litigation which has been brought in the Eastern District of Pennsylvania.  Specifically, my charge is to offer rebuttal testimony to a survey conducted on behalf of Plaintiffs by Dr. Annie Steinberg, a psychiatrist whose survey of putative class members purports to assess harm suffered by Plaintiffs as a result of their experiences under the care of "Dr. Akoda".  I note that my testimony is not offered in rebuttal to any allegations regarding Dr. Akoda's credentials or the circumstances under which he practiced medicine. My testimony as a survey methodology expert is focused exclusively on the *validity of the survey assessment* made by Dr. Steinberg, and its meaningfulness as a vehicle for measuring psychological harm and other life consequences experienced by Plaintiffs, either as individuals or as a class.  My testimony also makes no assumptions about the legal purpose or relevance of Dr. Steinberg's data and conclusions.

I base my opinions on my graduate training in the social sciences, my professional expertise in the field of survey science, and my applied experience as a research professional who has been chief executive of a highly respected, century-old marketing and opinion research firm, and has authored and supervised thousands of complex surveys relied on by corporations, government agencies, and courts over a span of nearly four decades.  Also relevant to this rebuttal analysis is my expertise in *qualitative* research, having conducted many thousands of qualitative interviews in my career and co-authored the field's first standard text on qualitative interview techniques.

Based on my expertise in survey design, implementation, analysis, and interpretation, I have concluded that Dr. Steinberg's survey is not simply amateurish; it is so methodologically deficient and so biasing as to lack validity as a survey measurement tool.  Due to numerous disabling methodological flaws, none of the statistics generated by this survey can be taken at face value or serve as the basis for conclusions, even with a confidence interval applied.

### B.  Professional Credentials and Compensation

I am President and CEO of NAXION, a century-old marketing research and consulting organization that advises companies on product development, brand strategy, and other strategic marketing activities.  As an expert in marketing and opinion research, I consult to companies on a variety of strategic issues including brand health, opportunity assessment, innovation, commercialization strategy, and lifecycle management.  My marketing and research experience encompass assignments designed to improve customer experience and strengthen brand reputation, as well as develop and commercialize new market offerings in a number of industries – particularly Healthcare, Consumer products, and Financial services.

Survey research is a principal tool in a large number of these engagements, and I am relied on by clients and colleagues for my expertise in designing and developing surveys with complex

objectives, many of which are used to measure opinions and behaviors within challenging or sensitive populations.  Throughout my career, I have personally designed and conducted thousands of surveys, many of them in the service of developing new products, optimizing product configuration, projecting demand or measuring public health consequences of product usage. I have also consulted and testified frequently on the application and interpretation of survey research to adjudicate claims under the Lanham Act (as well as decide patent claims) and my survey work has been utilized by government agencies like FDA and FTC, as well as USPTO. I am quite familiar with the specialized issues associated with collecting data on patient experience with diagnosis and disease progression, interactions with healthcare professionals, and recollections of their healthcare "journey." Throughout my career, I have conducted hundreds of surveys with healthcare consumers and patients of all kinds (including some who have received psychiatric diagnoses).  I have also worked on the development and application of survey tools designed to measure patient-reported outcomes (PROs).

Although my professional focus is on commercial application, not academics, I make regular podium appearances and have lectured extensively on research methodology and marketing at major universities (e.g., University of Pennsylvania and Princeton University), commercial organizations, and industry-training programs sponsored by major professional organizations—for instance, the Council of American Survey Research Organizations (CASRO), the Pharmaceutical Marketing Research Group (PMRG), Healthcare Marketing and Communications Council (HMC), and the Advertising Research Foundation (ARF).  I have also served as Chair of the Board of Directors of CASRO, the trade association of the US marketing and survey-research industry, recently renamed The Insights Association. In my decade of CASRO board service, I was actively involved in the development of standards for survey research, both ethical and technical. Currently, I am a trustee of The Wistar Institute, the world's second oldest incubator of biomedical research discoveries, as well as President of the Board of The Chamber Orchestra of Philadelphia.

My professional marketing career has been spent at NAXION, known until 2014 as National Analysts Worldwide, and previously a division of the global commercial and technology consulting firm Booz•Allen & Hamilton, where I was a partner and vice president.  My tenure at Booz•Allen included a period during which I served as the leader of that firm's worldwide pharmaceutical-industry practice.  NAXION traces its roots directly to the world's first business intelligence unit and progenitor of the survey research discipline (1911).  Some of the nation's first commercial and government sponsored surveys were conducted by National Analysts (and its predecessor company, Curtis Publishing) and the firm is known to have shaped the opinion research and marketing research fields through the development of probability sampling and other landmark survey techniques, as well as the genesis of the focus group. In 1992, National Analysts became an independent entity, under my co-ownership, and is now an Employee-Owned Stock Ownership Corporation (ESOP) of which I am majority shareholder.  Renamed NAXION, the firm retains the same ownership and management structure, and the same corporate mission.  It has consistently been listed as one of the AMA "Top 40" market research firms in the US.

4

I received my BA degree magna cum laude, Phi Beta Kappa, from Smith College, and my MA and doctoral degrees from the University of Pennsylvania's Annenberg School for Communication, where my studies were concentrated in the field of social psychology and communications theory. I am the author of a text on market research and of numerous publications and speeches on marketing and market research methodology.  A complete copy of my vitae along with a list of publications authored in the past ten years, and testimony and depositions taken in the past five years is included in Exhibit 1.

I am being compensated for my work in this case at my customary fee of $675 per hour.  My compensation is in no way contingent on the outcome of the case.

### C. Basis for my Opinions

In order to form my opinions, I have reviewed the following documents and materials:

- Complaint in *Russell et al. v. ECFMG*
- Answer in *Russell et al. v. ECFMG*
- Report of Annie Steinberg, MD, with Attached Questionnaire
- CV of Annie Steinberg, MD
- List of Testimony by Annie Steinberg, MD
- Rough Transcript of Deposition of Annie Steinberg, MD (10/10/2019)
- Emails0003-0004 from Exhibit 4 to the Deposition of Annie Steinberg, MD (10/10/2019)
- "Akoda Questionnaire Blank" (provided by Plaintiffs' counsel)
- "Akoda Summary Statements" (provided by Plaintiffs' counsel)

I note that, as of this writing, I have not been provided with an electronic database for the survey and have therefore not been able to manipulate or query the data to confirm Dr. Steinberg's limited statistical analyses, or to perform any of my own.  Her claim not to have such a database at her disposal is highly unusual insofar as survey programs produce readily manipulated databases as a matter of course.  (Manual inspection of individual data files does not lend itself to statistical tabulations or efficient review.)  I have also not seen actual screen shots of the survey or had an opportunity to gain direct experience with the survey programming.  Especially in light of my inability to access an electronic database at this moment of submission, I reserve the right to add or amend my rebuttal report, as relevant, if additional data, or other survey documents of any kind, are made available to me.

JA1188

## II. Survey Definition and Methodological Requirements

### A. What is a 'Survey'?

As a measurement tool of the social or behavioral sciences, survey research is guided by a set of principles and long-established best practices that aspire to justify the term "survey science". If you want to learn something about a large number of people and to feel confident that you've accurately measured what you set out to measure, it's not enough to ask them the same set of questions and then count the answers. Experience in other forms of research (e.g., experimental or clinical trial design, or proficient use of existing diagnostic tools to conduct clinical research) does not generalize to expertise in survey measurement without specific survey training.

A survey collects data from a representative subset based on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about the broader universe. Whether conducted on-line (the majority), by phone, or in person, survey questionnaires are highly structured, carefully constructed measurement instruments that ask respondents the same questions in a uniform way --with allowance made for necessary skip patterns to avoid posing nonsensical or irrelevant questions based on prior responses.

In light of Dr. Steinberg's propensity to use the term "survey" loosely to characterize large *qualitative* inquiries as well as quantitative inquiries, it may be just as important to describe what surveys are *not*. While surveys may incorporate some open-ended questions to allow respondents to express certain ideas in their own words, surveys do not accommodate customized and nuanced probing, even with the best artificial intelligence built in. Even when conducted in person (and these days, surveys rarely are), surveys afford no latitude for an interviewer to improvise. This disciplined, consistent approach to question structure justifies statistical analysis – and makes it legitimate to generalize from the survey sample statistics to a broader population.

By contrast, qualitative research is a process that seeks depth and nuance at the expense of statistical generalization. Qualitative interviews are shaped by a *semi-structured* interview protocol which, by definition, must allow for improvisation and probing based on the particular answers given by respondents in their own words. Qualitative interviews will also reflect stylistic differences among the interviewers who guide the conversation. The implications are that qualitative questioning is not necessarily or consistently uniform and the conversation between interviewer and subject unfolds in varied ways. There is room for techniques that cannot be employed in a "survey" and the standards of data validity can be more permissive in deference to the nature of the process. It does not qualify as survey *measurement*.

Indeed, qualitative research may be done in many settings for many objectives – but no matter how many interviews are conducted in a qualitative study – we do not call it a "survey" as that term is commonly used. Social scientists reserve that word for a type of research whose mission is to count answers for purposes of statistical generalization, and which therefore require a precisely

6

and tightly constructed measurement instrument.  It appears that Dr. Steinberg has had very limited experience with that kind of research.

Most of the principles that qualify a survey as valid for any purpose fall under several broad headings:  (1) sampling reliability, which enables us to project from a subset to an entire population; (2) survey validity, which allows us to feel confident we have correctly measured what we set out to measure without introducing bias; and (3) proper statistical analysis, which enables us to characterize the sample in aggregate and draw correct interpretations and conclusions from the data.

It is not clear to me what "rules of the road" were guiding Dr. Steinberg in the design of her "survey" (she failed to articulate any) but survey scientists agree that for a survey to provide an accurate, statistically projectable picture of a population, the following criteria must be met:

- The universe must be properly defined in a way that is relevant to the inquiry, and survey participants must be sampled in a way that is appropriately inclusive and unbiased to ensure statistical *reliability* – i.e., allowing us to put a confidence interval around the findings.

- All questions (and survey materials) must be clearly written; consistently asked; and non-biasing in order for the findings to be deemed *valid* – i.e., allowing us to conclude that we have accurately measured what we mean to measure without skewing or distorting the data.

- Appropriate statistics need to be employed, calculations correctly made, and findings properly and contextually interpreted in order to ensure accuracy of the conclusions – i.e., allowing us to use survey numbers to paint a meaningful picture of the population, not just a numerical picture.

## B.  Overview of Deficiencies in the Steinberg Survey

*Surveys can run afoul of these guidelines in a number of ways but most of my objections to Dr. Steinberg's survey fall under the heading of measurement validity and interpretation.*  The survey is poorly constructed, improperly executed, and riddled with errors known to distort the data.  The data have been under-analyzed and misinterpreted through a lens of overt and unapologetic bias.

Any study with these deficiencies cannot help but lead to unreliable and largely self-fulfilling conclusions – even if the data are correctly tabulated – but a study that aims to survey potential plaintiffs in a class action case has special vulnerabilities based on sensitizing context and self-interested participation.  In short, Dr. Steinberg's survey has produced very little worth knowing, and nothing that can be relied on for important insight into the population studied.

7

JA1190

Research is often hypothesis-driven, and Dr. Steinberg's survey explicitly was.  She was specifically hired to put numbers to her hypotheses concerning the traumatic effects and life changes experienced by women receiving care from Dr. Akoda.  Being guided by hypotheses is certainly not *per se* a bad thing, but only so long as care is taken to avoid *creating* the results one aims to measure.  Survey measurement, like any tool that relies on the answers to questions, is highly prone to response bias because the act of formulating answers is an interpretive process.  Participants are sensitive to signals and assumptions about what researchers might want of them, and these influences can shape their responses in ways both tacit and explicit.

A good survey researcher, no matter how deeply committed to her viewpoints and hypotheses, must do everything possible to guard against response bias in designing her instrument, lest research become an instrument of prophecy fulfillment, not scientific inquiry.  Dr. Steinberg's avowed commitment to proving preconceptions, combined with her evident lack of expertise in survey methodology, produced a study afflicted with nearly as many problems as there were survey questions.  Chapter III enumerates and illustrates them in detail.

JA1191

### III. Specific Deficiencies of the Steinberg Survey

There are numerous ways in which survey questions can specifically fail to meet threshold standards of validity – so many ways, in fact, that it may be easier to write a bad survey than a good one.  Survey questions can be unclear or confusing. They can be lacking in precision.  They can be priming or biasing (whether intentional or not) in ways that increase acquiescence or plant ideas. They can fail to provide appropriate response options, or those options can themselves be biasing.  They can be sequenced in ways that allow early responses or questions to influence responses to questions downstream.  In all these ways, and some more besides, Dr. Steinberg (and her associate, Lisa Bain) wrote a bad survey.  And because a bad survey still produces *numbers* -- however off the mark or meaningless they may be – it is an inherently dangerous thing to rely on. It has the look of something authentic, but the data can be a mirage.

- ***The Steinberg Survey context was inherently prone to produce certain types of response bias, and there was nothing to mitigate that bias – or even encourage candor and reflection – in the scanty instructions provided to respondents.***

  The creation of a "survey environment" begins with the invitation to participate and instructions regarding how to take it.  The general goal is to encourage participation by creating confidence that data will be treated respectfully and confidentially; to anticipate and minimize technical difficulties in advance; to secure data of good quality by encouraging candor and thoughtfulness; and to discourage respondents from attempting to "please" the researcher with specific kinds of responses.

  For instance, in surveys used for forensic purposes, it is routine to advise respondents to pay close attention, feel free to withhold an answer if they are not sure, and avoid relying on the opinions of others. In drafting surveys that require significant recall, care is taken to help respondents find their own way back to past events by establishing clear timeframes and by using techniques to help retrieve accurate memories, not promote false ones.

  Most surveys, however, are directed at respondents *without* serious personal "skin in the game" – i.e., the participants are consumers or voters, not alleged victims or financial stakeholders – and as a rule, most surveys are not dedicated, as this one was, to gathering recollections and emotions experienced before and after a specific event (learning of Dr. Akoda's fraud. This survey invitation was sent by lawyers and represented to participants as necessary "*so that we can proceed with your case*."  Notably, those same attorneys were individuals who had a hand in relaying to them the circumstances surrounding Dr. Akoda's imprisonment and claims regarding his credentials.

  Dr. Steinberg is not a survey researcher, but as a psychiatrist, she must have been aware of these potential biasing effects.  Rather than making efforts to minimize them, she seems, based on her deposition testimony, to have welcomed them, bringing her own confirmation biases to bear in construction of the survey and analysis of the data.  The introductory comments did not encourage respondents to take their time (indeed, respondents were

9

JA1192

informed that the survey was unlikely to take more than 10 minutes even though, perhaps, it should have taken more); nor were they given orientation instructions regarding the time frames at issue and the importance of differentiating feelings and experiences *before* versus *after* they learned of the charges against Dr. Akoda. Indeed, a commonly used approach in such surveys is to address time frames separately without segueing back and forth between them to avoid conflation.  This survey "time-traveled" at will.

In short, no precautions were taken to foster accurate retrospection or accommodate the possibility of a respondent having had positive experiences with Dr. Akoda.  On the contrary, this "survey" was really an instrument for eliciting evidentiary testimony from putative class members in litigation, and in that sense, was a prophecy meant to be self-fulfilling.

- **The survey was <u>not pretested</u> with respondents for clarity of content nor for accuracy of programming, despite the sensitivity of the material and the avowed need to accommodate low literacy levels.**

A cardinal rule of survey science is the importance of a pretest to ensure not just that survey program mechanics are in working order, but equally important, to confirm that respondents understand the questions and the instructions.  A pretest requires that at least five eligible survey respondents be asked to take the survey as they would in their own environment, and then be the subject of what, in survey science, is referred to as a "cognitive debrief".  In a cognitive debrief, pretest respondents are encouraged to identify questions or instructions that puzzled or confused them and are also proactively probed for comprehension of key concepts and phrases – either in person or by phone or "Skype".  Respondents' screens are typically tracked real-time during the pretest so that the interviewer can observe the answers as they are recorded and then follow up with appropriate debrief questions.

A cognitive debrief is, itself, a qualitative interview, guided by a protocol *developed specifically for the survey at issue* based on potential concerns a research team might have about certain difficult questions and concepts.  Surveys often undergo some revisions based on pretest feedback because it is not uncommon for researchers to discover that there are comprehension problems – even with questions they anticipate will be entirely clear. Sometimes a second pretest is needed to confirm the efficacy of revisions.  It is considered professionally irresponsible to omit the pretest step – even in the fast-paced world of commercial research, where critical business deadlines and decisions place a premium on rapid turnaround.

Lack of time is no excuse for omitting a pretest, especially when (a) the survey population is understood to include disproportionate numbers of women who are under-privileged, (b) the survey population does not comprise proficient and experienced survey-takers (e.g., a survey panel); and (c) respondents and are being asked highly sensitive questions for purposes of legal adjudication, where validity standards must be all the higher. Dr. Steinberg acknowledges that her aim was to write a survey geared to "third-grade" reading level – and potentially, to low levels of computer literacy as well.  It is a rather extraordinary act of hubris for a

researcher to assume she can accomplish that without a pretest, even if she has prior experience interviewing people with that level of reading proficiency. Each survey is different, with different question structures and language, and different instructions for question completion. Researchers need to exercise due diligence by pretesting before they go live, since there is no opportunity for course-correction once the survey is underway.

Had Dr. Steinberg conducted a pretest, she might well have discovered that phrases like "emotional well-being" were not consistently interpreted by respondents, or that respondents did not understand the importance of honoring skip patterns, or that they did not grasp some of her time frame references. She might also have discovered that some of the answer categories she supplied were inadequate to accommodate the range of likely and relevant responses. A researcher who neglects to conduct a pretest runs the risk of making survey errors that would compromise or invalidate the survey altogether.

- ***Dr. Steinberg avoided questions that would have allowed for measurement of intensity via rating scales, and instead, collected largely binary responses to questions that were often "stacked" with more than one "yes" option to prompt the expected or desired answer.***

The vast majority of questions in this survey require women to indicate whether they do (did) or do not (did not) have specific reactions or feelings about Dr. Akoda and what symptoms or consequences they have experienced. A prime example is the survey question concerning whether women trusted Dr. Akoda, asked as a simple yes/no question even though trust could be said to reside in a situational context or along an intensity continuum, and is clearly situated at points in time. The word, "trust", is itself a complex idea, with multiple connotations, even in the context of a physician-patient relationship where trust in motivation/care, trust in medical competence, and trust in personal integrity are not necessarily the same things.

Another noteworthy example is the question that asks whether survey participants' experience with Dr. Akoda has affected trust in *doctors generally* (7a). Here, again, just two answer options are offered: "yes, it has led me not to trust doctors" and "no". This is a "textbook" illustration of how _not_ to ask a question. It consistently leads with an affirmative response option and amplifies the "yes" with a single extreme statement that now obliges us to assume that every respondent who gave that response now trusts no physicians at all. The possibility of exercising greater caution, greater attention to credentials or recommendations, or any other nuanced version of "yes" has been effectively excluded by the heavy-handed wording of that answer.

Other survey questions that pursued *impact* (6a-t) are also all yes/no questions but often with a twist: here response options were typically proliferated to accommodate multiple time frames in a way that allowed Dr. Steinberg to offer three "yes" answer options (only before, only after, both) stacked up against a single "no" (Q's 6a-t). The idea of balancing response options so as not to create a positive or negative bias is also survey research canon, since we

11

know that respondents are statistically more like to select a type of answer option that is offered more frequently than another.

The 6g-s questions on impact also illustrate Dr. Steinberg's focus on an arbitrary time frame to proliferate three "yes" options (past month, prior, both) accompanied (always at the bottom) by a single "no". While bearing no clear relationship to the point at which any of these women learned of problems with Dr. Akoda's credentials, this time frame was nonetheless targeted for measurement over the frequency or intensity of *symptoms*. We don't know from the responses whether those symptoms have been experienced daily or just once, and how intense they may have been – and, of course, we do not know how many women were unsure if they had those symptoms or when since it was not measured (see commentary below). It is also worth noting that this arbitrary last month vs prior timeframe was inserted without warning after a series of time frame questions that focused on before and after learning of the charges against Dr. Akoda. It is poor practice to change question or answer structures in that way without fair warning since people readily develop response habits and often fail to notice changes.

Dr. Steinberg may have stacked the deck even higher by failing to rotate the position of "yes" and "no" responses anywhere. (There is a known bias toward "yes" in many circumstances, especially if it is consistently positioned first.) Indeed, I find no evidence of question or response rotation in any place where it might be considered appropriate, despite the fact that survey software platforms make this a fairly easy operation to perform and the principle of response rotation is routinely honored in all forensic surveys.

- ***Dr. Steinberg's failure to consistently offer "don't know" or "can't recall" options wherever in the survey they were appropriate violates another cardinal rule of survey design***.

If there is a possibility that respondents may not recall or know the answer to a question, or they might conceivably be on the fence about something, the survey researcher needs to provide a response option to accommodate that, since the absence of a "don't know/not sure/can't recall" ("DK/NS") response option has been shown to have demonstrable effects on the results. Binary (yes/no) questions, in particular, need to provide hesitant or fence-sitting respondents with some refuge.

Not *every* survey question requires a DK/NS option (e.g., age and residency, occupation, or routine product purchase) but any question that requires significant recall or complex assessment should allow respondents to take refuge in uncertainty. Otherwise, respondents are forced to provide an answer that does not accurately reflect how they feel or what they recall. The omission sends a signal that respondents *ought* to remember, *ought* to have definite feelings, even if they don't. Uncertainty or hesitation can be made to seem illegitimate.

JA1195

Dr. Steinberg's survey was comprised extensively of questions requiring recall of events that may have happened years ago, questions involving medical practice, and many other questions about past or current emotions for which respondents did not necessarily have clear answers.  Examples include whether they trusted Dr. Akoda, whether they ever felt scared or threatened by him, or whether they were ever made to feel uncomfortable in his presence.  Dr. Steinberg *did* include a don't know or remember option for a number of other similar questions – for example, regarding use of gloves or sexual arousal during an exam, or physical and emotional symptoms diagnosed since their experiences with Dr. Akoda.  It is not clear whether she failed to appreciate the basic principle or was merely disinclined to honor it in some places.  The absence of a "don't know" or "not sure" option for important questions has, in my experience, been grounds for disqualifying surveys altogether.

That is because survey data that make no provision for "don't know" or "not sure" will overstate the percentage of definitive responses in directions that favor social acquiescence.  Respondents who would otherwise have picked a "don't know" or "not sure" response are more likely, when they can't, to choose a response they perceive is socially acceptable or likely to please an interviewer. The implicit bias can be quite powerful – especially for people asked to take a survey that will help attorneys proceed with their case.

There is no clear rationale for when and why Dr. Steinberg offered "know/can't recall/not sure" response options but her suggestion at her deposition that they add time to the survey are, at best, pretextual.  The absence of a relevant response option can actually i*ncrease* response time as respondents struggle to decide in which direction they might want to err.

- **Where Dr. Steinberg supplied substantive answers, the deck was frequently stacked with loaded language and biasing response sets.**

A striking example is 5b, which asks respondents how they felt when they heard about the charges against Dr. Akoda.  This question would have been better handled as an open-ended one since the number of emotions one might envision would comprise a long list.  Instead, Dr. Steinberg chose to offer four negative words ("shocked", "angry", "betrayed", "sad") along with "neutral" – a peculiar term that might better have been expressed as "indifferent").  In that way, she deprived respondents of the chance to express themselves fully from the outset before she had primed them, and she made it more challenging for them to select other words that might have offered us more insight on their own feelings. It is not clear how many respondents actually checked "other" or took the opportunity to specify, but the easy thing for anyone to do was select one of the four negative words already provided. A woman who was mildly disconcerted or incredulous or had some other reaction not captured by Dr. Steinberg's options had to work harder than others to express her point of view.

In much the same way, a question asking why women did not tell anyone about inappropriate things said by Dr. Akoda (4f) provides words like "ashamed" or "embarrassed" but does not offer respondents the option of saying that they were not much bothered by the interactions or they weren't sure they interpreted them correctly, etc.

13

JA1196

Another different form of bias can be seen in questions that asked respondents to compare Dr. Akoda's pelvic and breast exams with exams given by other physicians (3a-b). Both questions provided three categories – "positive", "neutral", "negative" – but gratuitously offered examples of the negative (more rough, insensitive, longer, sexual talk and/or touch) to help define it in a suggestive way. There are several things wrong with this pair of questions. First, there should have been no prompts at all in the answer categories about what negative might mean. Second, respondents should have been allowed to explain in their own words what about their personal experience was negative. Trained survey researchers understand the need to be judicious about when and how open-ended questions are utilized, but if ever there were a case for soliciting open-ended responses, this was it. Without benefit of respondent commentary here, we have only the words Dr. Steinberg herself supplied. All other possible interpretations or objections have been ruled out of hand.

In addition, it is well-established that survey respondents take tacit clues from certain aspects of question construction to detect a preferred response to which they should acquiesce. Longer, more fully elaborated responses tend to be favored, just as proliferation of negative responses increases the odds that a negative response will be chosen.

Notably, so too does gratuitous repetition of questions. Regardless of how women responded to Q. 3a, they had another opportunity to indicate whether they found Dr. Akoda's exams more or less *painful* than others in Q. 4c, accompanied this time by a priming statement: "Pelvic exams are never fun, but…". It's not clear what effect this language actually had, if any, but if Dr. Steinberg felt conviction about its value in orienting respondents, Q. 3a would have been the spot in which to introduce it.

- ***Dr. Steinberg neglected to program skip patterns and did not necessarily use them appropriately, allowing (or sometimes compelling) respondents to answer questions for which they were arguably ineligible.***

One of the many boons of on-line surveys is that even the most basic survey software platforms can be programmed to guide respondents through the survey with automated skip patterns. Dr. Steinberg's technical assistant evidently did not avail himself of this option, or at least did not do so consistently, and the hazards are illustrated in the Q. 2 (trust) series.

After a few introductory questions about where they had seen Dr. Akoda and for what purposes, the survey asks respondents in Q. 2a if they trusted Dr. Akoda. This is a fairly stark way of broaching the topic of the "relationship" (as this section is labeled) because it goes straight to the heart of the claims, without allowing respondents to offer a general evaluation of the quality of care they received from Dr. Akoda. As a simple yes/no question, without any clarifying time frame or "don't know" option, it is also a highly *biasing* way of broaching the topic.

It turns out that 79% of respondents said yes to Q. 2a, a finding which Dr. Steinberg couches as *initial* trust – even though nowhere in the question is the word "initial" or a synonym used; the

14

question is completely non-specific as to timeframe.  Respondents who said *yes* were then given a second bite of the apple with a follow-up "If you answered yes to question 2a but at some point began not to trust him, what happened that changed?"  The question is highly suggestive.

Things look even worse when we consider the potential reasons offered for ceasing to trust Dr. Akoda: four specific options (rudeness, pain, sexual comments long pelvic exams) topped by the blandly uninformative, "just something about him" (an option chosen by roughly a third of the sample).  That curious list is notable for the omission of many plausible reasons for ceasing to trust a physician, which might have included specific advice offered, a failure to respond to calls, medical outcomes, etc.  Since the focus was apparently on establishing sexually inappropriate or abusive physical contact as precipitating factors, Dr. Steinberg's response categories were limited to those ideas.

Thanks to that second bite, almost no one could get through this series without ultimately affirming lack of trust in Dr. Akoda.  The 79% who trusted him "initially" was reduced to roughly 20% of the sample once respondents had been asked the follow-up (my calculation based on Dr. Steinberg's own reported statistics).  By the time respondents reached Q, 2d (ever feel scared or threatened during care, yes/no), they were primed to respond in hyperbolic ways about Dr. Akoda.

Another instance in which the survey conspicuously failed to take advantage of the software to skip responses is 5c, where respondents are asked *if* you are upset about what Dr. Akoda did, why?  No attempt was made to exclude people who had given a neutral response in 5b, which meant that virtually everyone was vectored into this question -- even if they were not, in fact, upset.  The question offers four reasons (no opportunity to elaborate or say "other") before nodding to the people who should not have been asked this question by providing them with a "not upset" response at the bottom.  Dr. Steinberg presumed everyone in the sample was upset, or should have been upset, and here, as elsewhere, the survey means to preordain or prove it.

- ***While Dr. Steinberg's answer categories were frequently inadequate to the question and/or biasing, she did not provide any analysis of the other-specific responses, depriving us of insight about respondents who were "disenfranchised" by the answer options supplied.***

Dr. Steinberg's agenda for the survey was evidenced in close-ended response categories that featured certain themes prominently and excluded others of equal relevance. In most cases, however, respondents appear to have had the option to choose "other" and to specify an answer if they chose to.  Unfortunately, the data have not been coded and tabulated.

Surveys tend to ration their reliance on open-end response options, including "other-specify", for various reasons.  The need to code verbal responses introduces another step with its own challenges and complications, but we frequently offer an "other-specify" option to spare

15

respondents the effort of force-fitting themselves into places they don't comfortably belong. Here, especially, the "other-specify" respondents hold special interest, given the answer categories Dr. Steinberg chose to provide.

And, indeed, we have reason to suppose a fair number of respondents did make use of "other", if responses to 1a are any indication. Even when devising a question as apparently benign as the one that asked how patients originally came to Akoda, Dr. Steinberg managed both to proliferate redundant options and miss enough possibilities to produce 24% "other". As a general rule, the appearance of large numbers of "other" responses is a signal that the pre-specified response categories have not been adequate to the job. Thus, even if we begin with no intention of coding those miscellaneous "other" answers, percentages above 20% encourage a review in order to further elucidate the data patterns. There is, however, no evidence that Dr. Steinberg looked at any of the open-ends she collected.

Respondents answering Q. 1c regarding types of visits did *not* have that "other-specify" option, even though her scant three answer categories exclude meaningful possibilities, such as visits for symptoms, fertility, or contraception, among other possibilities. Here, as in many other places, a pretest would have been helpful – to the extent there was actual interest in knowing the answers to this question. It is not clear what use Dr. Steinberg meant to make of it.

Another noteworthy example of a question that might have profited from an "other-specify" option is 5a, concerning how respondents initially learned of the charges against Dr. Akoda. One option conspicuous for its absence is an attorney or someone representing Plaintiffs in the case. This would have been useful information to have in assessing the data.

- ***While ostensibly geared to a 'third-grade reading level', this survey posed questions which many women of <u>any</u> education or reading proficiency level, much less more challenged respondents, would be hard-pressed to answer.***

There is reason to doubt that many women have a clear view of how long a pelvic exam should take – especially since duration of that exam can depend on age, symptomatology, and other reasons for the visit, creating significant variance and equally significant recall challenges. There is also reason to question whether a patient of any education level could necessarily have discerned whether a chaperone was positioned in a place from which she could see the exam, especially when lying prone. People are notoriously poor judges of time and vantage point – and, as Dr. Steinberg so accurately puts it, pelvics are "never fun". They prompt thoughts and emotions of many sorts, including anxiety about the outcome. It is a large leap of research faith to imagine that the answers given by respondents to such questions can be relied on, especially in a general survey context that primed negative responses.

One of the more egregious examples of questions to which no woman could have a reliable answer is the series of questions designed to elicit physical symptoms experienced "as a result of Dr. Akoda's conduct" (6t-6x). Women are not being asked merely whether they have been

16

diagnosed with high blood pressure but whether they have been diagnosed as a result of those experiences. For starters, anyone who believes she has been diagnosed with one or more symptoms on the list for other reasons has no place to signal that, so every answer here counts against Dr. Akoda as the cause, regardless of whether he was. More important, however, the question boldly presumes that *anyone* (physician or patient) could know whether a diagnosis of high blood pressure or PTSD or "major depressive disorder" was "as a result" of experiences with Dr. Akoda (or revelations about him). This is not a survey population equipped to make that determination or likely to have speculated about it unless prompted to do so. If a respondent perceived a connection, the perception might not be accurate; and whether or not founded, it is quite likely to have been fostered by the experience of taking this survey rather than a product of respondent's own ingoing thought process about experiences of being treated by Dr. Akoda.

Compounding error with bias, Dr. Steinberg asked a single follow-up question about severity for all "your physical symptoms" (of which over a dozen were listed), leaving the respondent to, first, assess whether any symptom might actually qualify as mild/moderate/severe, and then, second, to ponder over how to respond if different symptoms had varying degrees of severity. Failure to provide opportunity for specific reporting creates bias toward "severity" insofar as it invites people to aggregate. Bias aside, it is more vivid evidence of poor survey technique. Data from all these symptom questions should be disregarded.

- ***While intrepid in asking questions that respondents truly could not answer, Dr. Steinberg omitted asking some meaningful ones that they could reasonably have been expected to answer, and which would have elucidated their experiences.***

It is noteworthy that Dr. Steinberg asked numerous questions about symptoms and life consequences she sought to attribute to experiences with Dr. Akoda but asked nothing about any medical harm they attribute to his care except a question that first built a negative frame ("if you are upset about what Dr. Akoda did, why?") and also failed to ask why they chose to remain in his care.

In an impartial survey of this population, respondents would have been asked at the outset for their assessment of the quality of care they received, any medical consequences they perceived as a result of his care, and even emotional distress linked to those consequences. Some of these lines of questioning would properly have begun as open-ended to enable respondents to express their own opinions and experiences without the biasing effects of Dr. Steinberg's questions. We would have learned whether they switched doctors at any point and why; and if they did not switch, why not. We also would have learned more about the circumstances under which they first heard about Dr. Akoda.

Finally, we could have gained more insight into the demographic backgrounds of these women, including their income status, education, employment, whether they have children (and how many had been delivered by Dr. Akoda). Insurance can be a proxy of sorts for some

demographic measures, but it is far from definitive.  There were nearly as many relevant things Dr. Steinberg omitted to ask as *irrelevant* things she chose to include.

The argument that this survey needed to be 10 minutes long lacks credibility.  It was not engineered to be especially efficient (for lack of survey design expertise) and while response rate is, in general, influenced by survey length, there is no evidence that response rate among a putative class with a stake in the outcome is so sensitive to length, nor that 10 minutes would be a critical number.  Dr. Steinberg could have written a meaningful 15-minute survey that extracted more information.  And if she were so concerned about maximizing response rate, she could have checked how many other questionnaires had been completed at any point in her analysis. There is no single number in her report that proves a point, no threshold statistic she has identified as meaningful.  Competent data processing could have reached back and integrated "stragglers" into the survey database with ease.

- **Dr. Steinberg's analysis is striking both for its superficiality and its wanton misattribution of causality.**

Having had no access to a computerized database, I am going to assume for the moment that the statistics in Dr. Steinberg's report have been correctly calculated.  It hardly matters, in any event, because statistical calculations applied to distorted or nonsensical data are not meaningful, even when the math is correct.

It is noteworthy that Dr. Steinberg presented (and quite possibly performed) only a very superficial analysis of the database – and perhaps only some portions of it.  There is no evidence that she used cross-tabulation to look at subgroups and establish whether responses were plausibly linked to circumstances and how (ob vs gyn care, length of experience with Dr. Akoda, etc.).  These are the sorts of ad hoc analyses that are routinely employed both to develop keen insights and also to establish face validity of the data.  (Here, lacking automated skip patterns, we have no way of establishing whether people who answered certain questions had met the relevant conditions of eligibility.  We also have no way of linking the kind of behaviors they experienced with the kinds of outcomes or symptoms they report – all relevant to provide a meaningful picture of the sample.)

To the extent that she is made aware of contradictions in the data, Dr. Steinberg's approach is to rationalize, rather than analyze, by invoking the argument that feelings are potentially so complex, one cannot expect consistency.  If that theory holds any water, then even a well-done survey may be inappropriate to the task of fully understanding people's experiences and feelings.  Surveys are instruments whose measurement validity and quantitative interpretation demands that we make practical assumptions about our ability to tabulate and interpret responses to each question.  Response inconsistency may be deemed "data" leading to elucidation in qualitative or clinical evaluations, but it cannot be taken as an indication of measurement "success" or insight in quantitative surveys. It is taken as a sign of measurement error.

Dr. Steinberg's lack of thorough statistical analysis is primarily an error of omission, serious though it may be.  Dr. Steinberg's critical error of *commission* is her unjustified (and unscientific) presumption of causality where none can legitimately be assumed. A key example is her insistence on linking physical symptoms and life outcomes to Dr. Akoda based on respondents' own reporting of a link (itself, shaped by lack of knowledge and survey bias) or – worse yet – her assumption that anything negative event reported by this survey population post-Akoda *must* be laid at his doorstep.  In any given timeframe, some proportion of people in a population will experience depression, job loss, or a diagnosis of hypertension.  Dr. Steinberg makes no attempt to control for that in her analysis, taking on face value both the accuracy of the event reporting and the meaningfulness of respondents' own primed attributions.

In considering how spurious these relationships are likely to be, it is also important to take note of something Dr. Steinberg herself likes to feature:  the special psychological vulnerability of this population based on reporting of prior abuse or threat.  Unaccountably, the questions that address the topic (series 8) are flagged as highly personal -- no more so, I would argue, than many others that preceded them – and respondents are invited to decline to answer.  That, though, is a small point relative to the interpretation she makes of their significance.  Dr. Steinberg features prior abuse and threat as a *source of elevated risk* from experiences with Dr. Akoda when, in fact, a history of abuse could quite easily be interpreted as the *source* of whatever sequelae -- including depression or job loss – Dr. Steinberg attributes directly to Dr. Akoda. As survey researchers should know, association is not causality – and, in this case, we cannot be sure what is real association and what is distortion.

In deflecting criticism of bias, Dr. Steinberg points to the fact not everyone in the sample agrees with everything or reports every adverse outcome – in other words, not all respondents have been influenced by the circumstances of the survey (evident self-interest) or the design of the questions to acquiesce.  There is a substantial degree of diversity in responses, suggesting considerable heterogeneity of experience, emotions, and ostensible outcomes, but for Dr. Steinberg, there should be cold comfort in that. The idea that not everyone was led by survey bias to the same responses neither validates the data nor precludes the likelihood that some or many were.  It is hard to imagine a survey so successful in engineering false acquiescence that every single respondent, or even necessarily half, can be led to "yea-say."  There is too large a corpus of study confirming the effects of survey bias to dismiss the issue.  And indeed, the challenge of measuring its effects is what makes survey bias so insidious.  You cannot easily measure them without deliberate experimentation or cross-study comparison, but you can legitimately assume they are present.

Under the heading of unanalyzed data, I point finally to the many open-ended commentaries provided by survey participants that describe their experiences with Dr. Akoda and their emotional responses to those experiences.  I understand that Dr. Steinberg has not chosen to code and tabulate them but, rather, to offer them as a form of narrative.  The difficulty is that the reporting in some of them appear to have face validity or interpretability (allowing a

19

patient to go into "shock" on the examining table and "ripping open" her clitoris) while others are confused or confusing accounts of obstetrical care that seem, in instances, unrelated to Dr. Akoda.  There is anger and complaint, to be sure, but not all of it necessarily rings true or fair. Dr. Steinberg seems to regard herself as primarily a conduit for this outpouring without offering any strategy for interpretation and validation.

- **_Finally, we need to be cautious in discounting concerns about non-response bias in a survey of putative class members – and to challenge the premise that these results would be statistically generalizable, even if the survey were properly conducted_**.

The sample size studied appears large enough to represent the universe of potential class members.  The question we need to ask is whether it is representative enough.  Survey research as a discipline and the applied fields in which it is used (from polling to market research) are forced routinely to consider non-response bias and sampling reliability.  The general public is sometimes made aware of these issues when the accuracy of political polling numbers comes into focus but while non-response bias almost looms over us, survey researchers are largely forced to behave (apply statistics and make interpretations) "as if" non-response bias were not an issue – however optimistic or unjustified that may be.

In this case, however, we are looking at a very particular kind of survey universe and a very particular source of potential non-response bias, insofar as women who chose not to respond may include disproportionately large numbers of patients who do not feel aggrieved.  I call out this concern less to add yet another criticism of Dr. Steinberg's methodology than to flag a legitimate intellectual challenge. I don't know enough about how the sampling frame was developed by the attorneys to offer commentary on what systematic bias may have been introduced or not but even if there had been no systematic sampling bias, we cannot rule out significant non-response bias based on self-selection.

All that said, it almost doesn't matter.  Regardless of whether self-selection is an actual problem here (i.e., in the event that  non-responders over-represented women may have expressed no interest in joining the class or expressed interest but ultimately opted out of the survey), the data from those who _were_ surveyed cannot be put to obvious use because the survey measurement instrument employed was, itself, so seriously flawed. Repeated mismeasurement generates untrustworthy statistics.

20

JA1203

## IV. Conclusions

Dr. Annie Steinberg is undoubtedly an accomplished professional in her own field, but she is not an accomplished practitioner of survey research. It may have seemed to her that her skill in conducting qualitative interviews and general experience in clinical research would have conferred some survey research credentials by casual exposure, but it did not. Survey research is a distinct discipline and skillset, and anyone who develops survey data for forensic purposes needs to have mastered it. Even when hypothesis-driven, it needs to honor principles of measurement integrity and proficiency. Dr. Steinberg's methodologically flawed and overtly biasing survey did not.

As a clinician, Dr. Steinberg has approached the very idea of survey research in a way that reflects her own distinct background. She approached it as a vehicle for eliciting data and testimony from women whom she believes to have suffered serious harm at the hands of Dr. Akoda – including PTSD – although she disclaims any intent to diagnose women individually or the class as a whole. With that mission in mind, she regarded any signal of grievance or harm – no matter how extracted from survey respondents – as "data" merely because she asked many people the same questions in the same ways using a computer program designed to conduct "surveys".

This was *not*, however, an impartial survey meant to fully understand a particular population of women. It was a survey meant to prove a point in any way possible. There are many sources of data and ways for an advocate to prove a case in litigation, but the survey research science should not be pressed into service – and misappropriated – for those purposes. What Dr. Steinberg has proffered as survey research is neither high-quality survey research (as survey scientists understand it), nor testimony that has been subjected to cross-examination or critical interpretation.

The problem with poorly constructed, biased survey is that every single number comes into question. We cannot know how far from reality, or validity, each number is. We know only that there are grounds to doubt them all and no available mechanism for measuring how far off they really are. The sample size might imply that the confidence intervals around these numbers is small but, in reality, problems with the survey methodology would suggest that the confidence interval is ultimately irrelevant.

While we can't necessarily attach reliable numbers or percentages to key issues pursued in Dr. Steinberg's research, what we *take* from her survey is that this sample of putative plaintiffs is diverse in many ways – with respect to their experiences, their impressions, and their reactions. Not all have been harmed and not all have been affected -- or affected in the same ways. Beyond that, conclusions are difficult to draw.

21

\*   \*   \*   \*   \*

Susan Schwartz McDonald

October 14, 2019

# Appendix A





**Susan Schwartz McDonald, Ph.D.**
*President & CEO*

As CEO of **NA**XION, and leader of the firm's Healthcare practice, Susan is a marketing strategist whose areas of expertise include demand forecasting and product optimization, pricing, market segmentation, brand positioning and portfolio strategy.  She is known for her marketing ingenuity and her track record in guiding commercialization of paradigm-changing technologies that require new market models, including some of the industry's most important global brands.   Other sectors in which she has extensive experience include OTC pharmaceuticals and consumer products – both packaged goods and technology-driven categories.

As a respected expert on brand marketing, Susan also directs the Litigation Support practice of **NA**XION.  In that context, she is frequently called upon to conduct surveys and testify as a marketing methodology expert in cases pertaining to trademark confusion, secondary meaning, patent infringement, brand dilution, and deceptive advertising.  The focus of her work in that area is often the process of brand development and the factors promoting strong, distinctive brand identity.

Much of Susan's 35-year marketing career was spent at Booz•Allen & Hamilton, a worldwide management and technology consulting firm, of which she was a Vice President for over five years.   She lectures and writes frequently on marketing issues and market research techniques, and has contributed to medical journals as well as marketing texts.  Susan is also coauthor of a standard text on qualitative research methods, *The Group Depth Interview: Principles and Practice* (Simon & Schuster/Prentice Hall).  Her early professional years were spent as a journalist and a poet, contributing regularly to a number of major magazines and newspapers, including *National Review* and *Harper's*.

Susan is the 2011-2012 Past Chair of the CASRO Board of Directors, the trade association of the US marketing and survey research industry, recently renamed The Insights Association. Currently, she is a trustee of The Wistar Institute, the world's oldest incubator of biomedical discoveries in cancer and immunology, and a member of the Advisory Board to the marketing research program of the Rutgers University Graduate School of Business. She is also President of the Board of the Chamber Orchestra of Philadelphia.

Susan holds M.A. and Ph.D. degrees from the Annenberg School for Communication, University of Pennsylvania, where she was trained in communications theory and social psychology.  Her B.A. was awarded magna cum laude, Phi Beta Kappa, from Smith College.

**SUSAN SCHWARTZ McDONALD**

**MARKETING PUBLICATIONS**

BOOKS AND BOOK CHAPTERS

The Group Depth Interview:  Principles and Practice, Goldman, A. E., & McDonald, S. S., Prentice-Hall, Inc., Englewood Cliffs, New Jersey, 1987.

"Evaluation of Federally Funded Family-Planning Programs," Program Evaluation at HEW: Research Versus Reality (265-310) Henry, Nicholas, Marcel Dekker, Inc., New York, Basel, 1979.

Market Segmentation, Handbook of Business Strategy (second edition), Glass, Harold E., Editor, Warren Gorham & Lamont, Boston, Massachusetts, January 1991.

ARTICLES, PAPERS AND SPEECHES

Strategies of Segmentation Research, Proceedings of the Tenth Attitude Research Conference, Goldman, A. E., & McDonald, S. S., American Marketing Association, 30-42, 1979.

The Psychology of Consumer Promotions, presented at the meeting of the Promotion Marketing Association of America, Inc., New York, NY, March 1982.

Targeting and Research Development:  Matching New Products and New Solutions, Product Development and Management Association, Minneapolis, MN, March 1982.

Practices, Strategies, and Motivations in Treatment of Rheumatoid Arthritis, Goldman, A. E., & McDonald, S. S., The American Journal of Medicine, December 1983.

Position and Forecasting for New Medical Products:  The Application of Segmentation and Conjoint Analyses, The Joint Meeting of the Pharmaceutical and the Medical Surgical Marketing Research Groups, Chicago, IL, October 1985.

The Case Against Peer Influence Groups, Medical Marketing and Media, 23, 13, 4-8, October 1988.

An Introduction to Market Segmentation, International Association of Business Communications, Harrisburg Chapter, November 1988.

Successful Needs/Benefits Segmentation:  A User's Guide, The Journal of Consumer Marketing, Greenberg, M. G., and McDonald, S. S., 6, 29-36, Summer 1989.

Brand Equity:  Working Toward a Disciplined Methodology for Measurement, Advertising Research Foundation, New York, NY, January 1990.

Continued …

*Getting Your Client to 'Buy Into' Marketing Research*, Pharmaceutical Market Research Group Meeting, Spring 1990, Philadelphia, PA.

*The Morning After:  Market Research Problems and How to Avoid Them*, Pharmaceutical Market Research Group Developmental Seminar, Fairfield, New Jersey, June 1990.

*Contamination in Qualitative Research*, presented at the 47th Annual Conference of the American Association for Public Opinion Research, St. Petersburg, Florida, May 1992.

*Multivariate Techniques*, Pharmaceutical Market Research Group, Developmental Seminar: Quantitative Research - Design and Analysis, Philadelphia, PA, June 1992.

*Making Optimal Use of Your Sales and Marketing Levers,* presented at the Institute for International Research conference on "Marketing and Sales Force Reengineering," Philadelphia, PA, September 1994.

*Another Look at Managed Care:  Reassessing Their Priorities ... and Ours,* presented at the Pharmaceutical Marketing Research Group Meeting on "Redesigning Marketing Research in a Restructured Environment," Philadelphia, PA, April 30 - May 3, 1995.

*How to Design and Implement Successful Pricing Research:  Counsel and Caveats from the Trenches,* presented at the Professional Pricing Society, 6th Annual Pricing Conference, Chicago, IL, October 1995; reprinted in The Journal of Professional Pricing, 13, 3, 2004.

*Charting the New Product Development Course:  A Market Research Case Study Workshop*, conducted at the Institute for International Research's 2nd Annual Pharmaceutical Marketing Research Roundtable, Philadelphia, PA, November 1996.

*The Positioning Research Ritual:  When Not to Bother At All,* presented at the Pharmaceutical Marketing Research Group Fall '98 Meeting, Baltimore, MD, September 1998.

*Project Conception:  Questioning Your Client/Designing the Study*, presented at the CASRO Advanced Project Directors Training Conference, Philadelphia, PA, September 14, 2000.

*Transforming Market Strategy into Marketing Action:  An Overview of Primary Research Techniques*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, November 2001.

*The Positioning Paradox:   When Words Hold Ideas Captive,* presented at the Pharmaceutical Marketing Research Group Fall '02 Meeting, Tysons Corner, VA, October 2002.

*The Long and Winding Road:  Market Research in Support of Creative Concept Development*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, October 2004 and May 2007.

*Continued…*

*Taking Care of Business:  Defending Pharmaceutical Market Research against the Perils of Industry Regulation,* presented at the Pharmaceutical Marketing Research Group 2006 Spring Conference, Las Vegas, NV, March 5-7, 2006.

*AE Reporting in the Market Research Industry:  An Update on the Still-Gathering Storm,* presented at the Pharmaceutical Marketing Research Group Fall 2006 Conference, Baltimore, MD, September 10-12, 2006.

*A "Brief History of Time" in the Pharmaceutical Industry … And a Quick Peek into the Future,* presented at the Market Research Association Philadelphia Chapter Meeting, Philadelphia, PA, May 2007.

*Improving Survey Efficiency:  Understanding the Relationships Among Standard Measures of Concept Evaluations,* Polster, M., McDonald, S. & Boldry, J., poster presented at 2009 PBIRG Annual General Meeting, Phoenix, AZ, May 17-20, 2009.

*Evaluation of GLP-1 Product Attributes in Treating People with Type 2 Diabetes in US:  Comparing Time Trade-off and Willingness to Pay Methodologies,* Zanutto, E., Conner, C., Polster, M., McDonald, S. & Hammer, M, poster presented at ISPOR 14th Annual Meeting, Orlando, FL, May 18, 2009.

*Reinventing the Market Research Function:  In a Disruptive Era of Change, Old-fashioned Intuition Still Counts,* McDonald, S. and Sharma, S., <u>Pharmaceutical Executive,</u> January 2010.

*Assessing Drug Treatment Preferences of Patients with Crohn's Disease:  A Conjoint Analysis,* Lichtenstein, G.R., Waters, H., Kelly, J., McDonald, S., Zanutto, E, Hendricks, D. and Rahman, M. <u>The Patient:  Patient-Centered Outcomes Research</u>, 2010.

*Much not Understood about Physicians, and Even Less about Patients and MCOs,* <u>Pharma Market Research Report</u>, February 2010.

*The True Importance of Derived Importance for In-line Pharmaceutical Products:  Putting a Valuable Tool into Context,* Polster, M., and McDonald, S., in PBIRG's Perspective, Vol. 12 No. 1.

*When a Single Measure Is Sufficient:  Optimizing Survey Efficiency in Concept Evaluation Research,* Boldry, J., Polster, M. & McDonald, S., poster presented at 2010 AAPOR Conference, Chicago, IL, May 13-16, 2010.

*Understanding and Surviving the Regulatory Environment:  A 'State of the Union' Perspective,* Pharmaceutical Marketing Research Group Webinar, May 20, 2010.

*A Comparison of Preferences for Two GLP-1 Products − Liraglutide and Exenatide − for the Treatment of Type 2 Diabetes,* Polster, M., Zanutto, E., McDonald, S., Conner, C. & Hammer, M., <u>Journal of Medical Economics</u>, 2010 13(4):655-661.

*Continued…*

JA1210

*MD Attitude Segmentation:  Can You Ever Get There from Here?*  Presented at the PharMArket Research Conference, Parsippany, NJ, February 2011.

*The Quantum Mechanics of Brand: What You See – and Don't See – with Derived Importance Analysis*. Polster, M. and McDonald, S. April 2011.

*The Art of the Ask in Forecast Modeling: Implications of 'Allocation' vs. 'Discrete Choice' Projections.* Polster, M. and McDonald, S. January, 2012.

*DTC ROI:  When We Advertise to Consumers, What Do They Hear?*  Presented at the PharMArket Research Conference, Parsippany, NJ, February 2012.

*The Impact of Nausea and Vomiting of Pregnancy on Quality of Life:  Report of a National Consumer Survey and Recommendations for Improving Care,* Clark, S., Hughes, B., and McDonald, S., <u>Obstetrical and Gynecological Survey</u>, September 2013, Vol. 68, No. 9, Supplement 1:S1-S10.

*The End of Pharma Marketing – or a New Beginning?*  Sharma, S., and McDonald, S., <u>Pharmaceutical Executive,</u> February 2015.

*Using Data to Make Decisions:  Ten Things I've Learned in 35 Years.*  Presented at the MSMR Alumni Market Research Conference, Arlington, TX, April 2015.

*When Size Matters … And What You Can Do About It:  Mapping the Dark Frontiers of 'Small Data' Modeling.*  Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*The 'Art of the Ask' in Choice Modeling:  Discrete Choice vs Allocation.*  Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*New PhRMA Campaign 'Goes Boldly' But Treads Unevenly.* May 2017.

*Ten New Year's Resolutions for Using Data to Make Marketing Decisions.* January 2018.

*Is Market Research Really Getting Emotional? Discovering What Implicit Metrics Actually Measure.* July 2018.

*The Elusive System 1.  Can We Truly Measure Its Role in Consumer Behavior?* March 2019

*A New Manifesto for the Insights Industry.  Let's Stop Hawking Vocabulary and Commit to Selling Truly Good ideas.*  April 2019

*Continued…*

**SUSAN SCHWARTZ McDONALD**
**TESTIMONY/DEPOSITION ACTIVITY SUMMARY**

**(2013 - Present)**

Serenity Pharmaceuticals, LLC, et al., Counterclaim-Plaintiffs v. Ferring B.V., et al.,
Counterclaim Defendants
U.S. District Court for the Southern District of New York
C.A. No. 1:17-cv-09922 (RWS), ECF Case
*Deposition on behalf of Counterclaim-Plaintiffs* (November 27, 2018)

J-B Weld Company, LLC, Plaintiff v. The Gorilla Glue Company, Defendant
U.S. District Court for the Northern District of Georgia
Atlanta Division
Case No.  17-CV-03946-LMM
*Deposition on behalf of Plaintiff (July 10, 2018)*

Forever 21, Inc., Plaintiff v. Gucci America, Inc., et al., Defendants
U.S. District Court of California, Western Division
Case No.  2:17-cv-04706-FMO-E
*Deposition on behalf of Defendants (June 28, 2018, New York)*

MARS, Incorporated, et al., Plaintiffs v. The J.M. Smucker Company, et al., Defendants
U.S. District Court for the Eastern District of Virginia Alexandria Division
No. 1:16-cv-1451 (CMH/MSN)
*Deposition on behalf of Defendants (July 12, 2017, Philadelphia)*

Adidas America, Inc., et al., Plaintiffs v. TRB Acquisitions, LLC, et al., Defendants
U.S. District Court, District of Oregon Portland Division
No. 3:15-cv-02113-SI
*Deposition on behalf of Defendants (May 31, 2017, Philadelphia)*

Pinterest, Inc., Plaintiff v. Pintrips, Inc., Defendant
U.S. District Court for the Northern District of California
No. CV 113-04608-PS-KAW
*Deposition on behalf of Defendant (January 14, 2015, Philadelphia)*
*Testimony on behalf of Defendant (May 26, 2015, San Francisco)*

In the Matter of Investigation:  Certain Footwear Products
U.S. International Trade Commission
No. 337-TA-936
*Deposition (May 21, 2015, Washington, DC)*

JA1212

HM Electronics, Inc., Plaintiff v. R.F. Technologies, Inc., Defendant
U.S. District Court, Southern District of California
No. CV12-2884-BAS (MDD)
*Deposition on behalf of Defendant (November 24, 2014, Philadelphia)*

OraLabs, Inc., Plaintiff v. The Kind Group LLC, Defendant
U.S. District Court for the District of Colorado
Civil Action No. 1:13-cv-00170-PAB-KLM
*Deposition on behalf of Defendant (July 24, 2014, Philadelphia)*

Healthcare Royalty Partners, L.P. (f/k/a Cowen Healthcare Royalty Partners, L.P.),
Plaintiff v. Shionogi Inc., LLC, Defendant
Supreme Court of the State of New York, New York County
Index No. 650424/2012
*Deposition on behalf of Plaintiff (June 18, 2014, New York)*

Zest IP Holdings; Zest Anchors, LLC, Plaintiffs v. Implant Direct Mfg., LLC;
Implant Direct LLC; Implant Direct International, Defendants
U.S. District Court, Southern District of California
No. 10-0541 LAB (WVG)
*Deposition on behalf of Plaintiffs (June 3, 2014, Chicago)*

T-Mobile US, Inc., T-Mobile USA, Inc. and Deutsche Telekom AG, Plaintiffs v.
Aio Wireless LLC, Defendant
U.S. District Court for the Southern District of Texas, Houston Division
Civil Action No. 4:13-cv-2478
*Deposition on behalf of Plaintiffs (October 21, 2013, Philadelphia)*

Case 2:18-cv-05629-JDW   Document 39-35   Filed 10/28/19   Page 1 of 22

# EXHIBIT 35



| RAMATULIE JALLOH and<br>KOMBOH S. KAMARA,<br>9963 Goodluck Road, Apt. T1<br>Seabrook, Maryland 20706 | * | IN THE CIRCUIT COURT OF |
| :-- | :-- | :-- |
| | * | MARYLAND FOR |
| Plaintiffs, | * | PRINCE GEORGE'S COUNTY |
| | * | |
| vs. | * | |
| | * | |
| ABDUL G. CHAUDRY, M.D.<br>6005 Landover Road, Suite 5<br>Cheverly, Maryland 20785 | * | |
| | * | |
| CHARLES J. AKODA, M.D.<br>6005 Landover Road, Suite 5<br>Cheverly, Maryland 20785 | * | |
| | * | |
| Defendants. | * | Case No.: CAL16-22162 |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### COMPLAINT

Plaintiffs, Ramatulie Jalloh and Komboh S. Kamara, by their attorneys, Danielle S.

Dinsmore, Marissa B. Joelson, and the Law Offices of Peter G. Angelos, P.C., sue Defendants,

Abdul G. Chaudry, M.D., Charles J. Akoda, M.D., and any and all other agents, servants and/or

employees of Defendant, Abdul G. Chaudry, M.D., and for reasons say:

### FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

1.    This action originated in the Health Claims Alternative Dispute Resolution Office

pursuant to Courts & Judicial Proceedings Article 3-2A-01, et seq.

2.    Pursuant to Article 3-2A-06A, the Plaintiffs filed a written Waiver of Arbitration,

and an Order of Transfer was issued by the Health Claims Alternative Dispute Resolution Office.

A copy of this Order of Transfer is annexed hereto as Exhibit 1.

JA1215

3.    The venue in this action is Prince George's County, Maryland, based upon the Defendants' place of business.

4.    Plaintiffs are residents of Prince George's County, Maryland.

5.    At all times mentioned herein, Defendant, Abdul G. Chaudry, M.D. ("Dr. Chaudry") was licensed as a physician in the State of Maryland, specializing in the practice of Obstetrics and Gynecology, who represented to the public and to the Plaintiffs that he possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent and competent physicians practicing under the same or similar circumstances as those involving the Plaintiffs.

6.    At all times mentioned herein, Dr. Chaudry operated a medical practice as a sole proprietor doing business as "A.G. Chaudry, M.D.," specifically, the practice of Obstetrics and Gynecology.

7.    At all times mentioned herein, Defendant Charles J. Akoda, M.D. ("Dr. Akoda") was licensed as a physician in the State of Maryland, specializing in the practice of Obstetrics and Gynecology, who represented to the public and to the Plaintiffs that he possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent and competent physicians practicing under the same or similar circumstances as those involving the Plaintiffs.

8.    At all times herein mentioned, Dr. Akoda was acting individually and as the actual and/or apparent agent, servant and/or employee of A.G. Chaudry, M.D., and was acting in the course and scope of his employment and/or agency by/with A.G. Chaudry, M.D. A.G. Chaudry, M.D. held Dr. Akoda out as its agent, servant and/or employee.

9.    On or about October 26, 2012, Plaintiff Ramatulie Jalloh ("Ms. Jalloh") became a patient of Dr. Chaudry's medical practice for a pregnancy. Dr. Chaudry, Dr. Akoda, and other

2

actual and/or apparent agents, servants and/or employees of A.G. Chaudry, M.D. continued to provide obstetrical care to Ms. Jalloh at various times throughout her pregnancy.

10.    On or about October 31, 2012, Ms. Jalloh presented to Dr. Chaudry's medical practice with urinary complaints and was thought to have a urinary tract infection.

11.    On or about November 27, 2012, Ms. Jalloh returned to Dr. Chaudry's medical practice and a sonogram estimated gestational age to be 13 weeks, two days. Her estimated date of confinement (EDC) was adjusted from June 19, 2013 to June 2, 2013.

12.    After a visit on December 12, 2012, in which she complained of a headache, Ms. Jalloh was next seen in the office on January 18, 2013. A fetal anatomical sonogram appears to have been performed and interpreted in Dr. Chaudry's office. Estimated gestational age based on the sonogram appeared to be 20 weeks, one day. An AFP Tetra was drawn and a gestational age of 21 weeks, one day was used which did not correspond to either the gestational age of the ultrasound performed that day or the ultrasound performed on November 27, 2012 (20 weeks, 5 days). The AFP Tetra was reported as Down syndrome screening risk of 1 in 2,517, with maternal age based risk of 1 in 193.

13.    Ms. Jalloh's next visit to Dr. Chaudry's office was on February 13, 2013, at assigned gestational age of 24 weeks, 5 days. Because the examiner on this day was unable to locate a fetal heart, an ultrasound was done on February 15, 2013, but no measurements were noted.

14.    After experiencing third trimester bleeding and found to have placenta previa, Ms. Jalloh eventually delivered on May 13, 2013 via cesarean section. The baby was thereafter found to have Down syndrome, cardiac abnormalities, and Hirshsprung disease.

3

15.    Dr. Chaudry and/or Dr. Akoda failed to offer to Ms. Jalloh appropriate first trimester testing on October 26, 2012, October 31, 2012, and on November 27, 2012, given her advanced maternal age, for the prenatal detection of Down syndrome.

16.    Given Ms. Jalloh's advanced maternal age, the obstetrical care provided at Dr. Chaudry's medical practice by Dr. Chaudry and/or Dr. Akoda also deviated from the applicable standards of care by failing to refer the patient to a suitably qualified health care provider for a detailed second trimester fetal anatomical exam of care. This breach would apply to any of the health care providers that rendered treatment to Ms. Jalloh at her visits at Dr. Chaudry's medical practice on November 27, 2012, December 12, 2012, or on January 18, 2013.

17.    It was also a breach in the standard of care for Dr. Chaudry, Dr. Akoda, and/or any other agents, servants and/or employees, to fail to retain the ultrasound images from the sonograms performed at Dr. Chaudry's medical practice. Although no images were retained of the January 18, 2013 study performed, at a minimum, a Ventricular Septal Defect (VSD) should have been detected on that sonogram. A normal four-chambered heart was documented as present on January 18, 2013, however, the fetus had a peri-membranous VSD which was moderate to large. As such, some cardiac abnormality should have been apparent to any competent care provider interpreting the January 18, 2013 study in accordance with the standard of care as a normal four-chambered heart could not have been seen accurately. As such, any other the health care providers, including, but not limited to, Dr. Chaudry, Dr. Akoda, and any other actual and/or apparent agents, servants and/or employees of A.G. Chaudry, M.D. were negligent in improperly interpreting the results of the January 18, 2013 ultrasound study.

18.    As a result of the breaches in the standards of care as set forth herein by Dr. Chaudry, Dr. Akoda, and/or any and all actual and/or apparent agents, servants and/or employees

4

of A.G. Chaudry, M.D., the Plaintiffs were deprived of adequate information necessary to make a fully informed decision as to whether or not to continue a pregnancy carrying a fetus with Down syndrome. Had the Plaintiffs been offered appropriate testing in a timely fashion for the prenatal detection of Down syndrome, they would have opted for same, and it is more likely than not that such testing would have led to and resulted in the prenatal diagnosis of Down syndrome and as such, the option of terminating Ms. Jalloh's pregnancy would have been exercised by the Plaintiffs.

19.     The Defendants, Dr. Chaudry, Dr. Akoda, and any other actual and/or apparent agents, servants and/or employees of A.G. Chaudry, M.D., owed to Plaintiffs a duty to exercise the degree of care, skill and judgment expected of competent health care providers acting in the same or similar circumstances, which duties included, among other things: to properly and timely offer first trimester screening and/or testing for Down syndrome to the Plaintiff at her prenatal visits during her first trimester on October 26, 2012, October 31, 2012, and on November 27, 2012; to properly and timely advise the Plaintiff of the availability of all prenatal testing for Down syndrome that was appropriate under the circumstances as well as the purpose of those tests; to properly take heed of the fact that the Plaintiff was a high risk patient based on her advanced maternal age; to properly and timely offer appropriate screening and/or testing based upon the Plaintiff's advanced maternal age; to properly and timely refer the patient to a suitably qualified health care provider for a detailed second trimester fetal anatomical exam of care on November 27, 2012, December 12, 2012 or on January 18, 2013; to offer to perform genetic counseling or refer the patient for genetic counseling due to Plaintiff's advanced maternal age; to properly and timely detect a VSD on the sonogram performed on January 18, 2013; to properly and timely interpret the results of the sonogram performed on January 18,

2013; to properly and timely interpret the results of any and all sonograms performed; to

appropriately retain any and all ultrasound imaging performed; to timely provide the Plaintiff

with all information necessary to make informed and reasoned decisions concerning the

condition and/or health of a fetus; to allow the Plaintiff to exercise the option as to whether or

not to terminate a pregnancy carrying a fetus with Down syndrome; in properly communicating

with the Plaintiffs; to properly perform, provide accurate information for and timely interpret

any and all tests and studies, including but not limited to ultrasounds, related to the prenatal

detection of Down syndrome; to properly employ due, reasonable, and appropriate skills and

care in the examination, treatment and management of the patient; to perform a proper and

timely examination of the patient; to take proper heed of the patient's present condition, signs,

symptoms, and complaints; in keeping apprised of current medical literature and standards; in

complying with the official recommendations of the American College of Obstetricians and

Gynecologists that a screening strategy that incorporates first trimester screening and/or testing

for Down syndrome be offered to all women who seek prenatal care in the first trimester; in

properly performing an extensive and accurate physical examination of the Plaintiff; to properly

supervise the agents, servants and/or employees of the Defendants, and to exercise the degree of

care, skill and diligence to which this Plaintiff was entitled - all of which the Defendants failed to

do.

20.     As a direct and proximate result of the negligence of the Defendants, Dr.

Chaudry, Dr. Akoda, and any other actual and/or apparent agents, servants and/or employees of

A.G. Chaudry, M.D., the Plaintiffs have suffered, and will continue to suffer, serious and

permanent injuries, including, among other things, the wrongful birth of a baby with Down

syndrome; the wrongful birth of a baby with Hirschsprung disease associated with Downs

6

syndrome; the burdens and responsibilities associated with parenting a child suffering from

Down syndrome and Hirshsprung disease; parenting a child with lifelong physical and mental

disabilities, including, but not limited to, severe and permanent gastrointestinal, cardiac and

respiratory issues, as well as the permanent placement of a gastrostomy tube; the significant cost

of providing their child with frequent medical care and attention, continued hospitalizations since

birth, numerous surgical procedures, need for rehabilitation and ongoing nursing care, special

education, various therapies, and other special needs for the rest of that child's life; were caused

to suffer significant mental anguish, emotional distress and anxiety and will so be caused in the

future; will be caused to spend countless hours at medical institutions for their child's care;

significant loss of earnings; were caused to be incapacitated from attending their usual duties and

will so be caused in the future; was caused to incur past and future medical and hospital

expenses, and the loss of enjoyment of life.

    21.    The negligence as described herein was the sole and proximate cause of all

injuries and damages sustained by Plaintiffs without any negligence or want of care on the part

of Plaintiffs contributing thereto.

    22.    If the Defendants had complied with the applicable standards of care, the losses

and damages described herein would have been avoided.  The timely use of indicated and proper

tests and studies, procedure and protocols, techniques, safety measures, and precautions would

have allowed Plaintiffs to have the information necessary in order to make a fully informed

decision as to whether or not to terminate a pregnancy carrying a fetus with Down syndrome.

This option would have been exercised had Plaintiffs not been improperly deprived of relevant

information.  Plaintiffs' severe and permanent injuries and damages would have been avoided

JA1221

completely with appropriate and timely utilized testing, referrals, techniques, procedures, and diagnosis.

## COUNT I

### (Negligence - Plaintiffs v. Abdul G. Chaudry, M.D.)

23.    Paragraphs 1 through 22 are adopted by reference in this Count I.

24.    Defendant Abdul G. Chaudry, M.D. negligently deviated from the appropriate standard of medical care by:

a) failing to properly and timely offer first trimester screening and/or testing for Down syndrome to the Plaintiff at her prenatal visits during her first trimester on October 26, 2012, October 31, 2012, and on November 27, 2012;

b) failing to properly and timely advise the Plaintiff of the availability of all prenatal testing for Down syndrome that was appropriate under the circumstances as well as the purpose of those tests;

c) failing to properly take heed of the fact that the Plaintiff was a high risk patient based on her advanced maternal age;

d) failing to properly and timely offer appropriate screening and/or testing based upon the Plaintiff's advanced maternal age;

e) failing to properly and timely refer the patient to a suitably qualified health care provider for a detailed second trimester fetal anatomical exam of care on November 27, 2012, December 12, 2012 or on January 18, 2013;

f) failing to offer to perform genetic counseling or refer the patient for genetic counseling due to Plaintiff's advanced maternal age;

8

g) failing to properly and timely detect a VSD on the sonogram performed on January 18, 2013;

h) failing to properly and timely interpret the results of the sonogram performed on January 18, 2013;

i) failing to properly and timely interpret the results of any and all sonograms performed;

j) failing to appropriately retain any and all ultrasound imaging performed;

k) failing to timely provide the Plaintiff with all information necessary to make informed and reasoned decisions concerning the condition and/or health of a fetus;

l) failing to allow the Plaintiff to exercise the option as to whether or not to terminate a pregnancy carrying a fetus with Down syndrome;

m) failing to properly communicate with the Plaintiffs;

n) failing to properly perform, provide accurate information for and timely interpret any and all tests and studies, including but not limited to ultrasounds, related to the prenatal detection of Down syndrome;

o) failing to properly employ due, reasonable, and appropriate skills and care in the examination, treatment and management of the patient;

p) failing to perform a proper and timely examination of the patient;

q) failing to take proper heed of the patient's present condition, signs, symptoms, and complaints;

r) failing to keep apprised of current medical literature and standards;

s) failing to comply with the official recommendations of the American College of Obstetricians and Gynecologists that a screening strategy that incorporates first trimester

9

screening and/or testing for Down syndrome be offered to all women who seek prenatal care in

the first trimester;

t) failing to properly perform an extensive and accurate physical examination of the

Plaintiff;

u) failing to properly supervise the agents, servants and/or employees of the Defendants,

and

v) failing to exercise the degree of care, skill and diligence to which this Plaintiff was

entitled - all of which the Defendants failed to do.

25.     As a direct and proximate result of the aforesaid negligence of Defendant Abdul

G. Chaudry, M.D., the Plaintiffs have suffered, and will continue to suffer, serious and

permanent injuries, including, among other things, the wrongful birth of a baby with Down

syndrome; the wrongful birth of a baby with Hirschsprung disease associated with Downs

syndrome; the burdens and responsibilities associated with parenting a child suffering from

Down syndrome; parenting a child with lifelong physical and mental disabilities, including, but

not limited to, severe and permanent gastrointestinal, cardiac and respiratory issues, as well as

the permanent placement of a gastrostomy tube; the significant cost of providing their child with

frequent medical care and attention, continued hospitalizations since birth, numerous surgical

procedures, need for rehabilitation and ongoing nursing care, special education, various

therapies, and other special needs for the rest of that child's life; were caused to suffer significant

mental anguish, emotional distress and anxiety and will so be caused in the future; will be caused

to spend countless hours at medical institutions for their child's care; significant loss of earnings;

were caused to be incapacitated from attending their usual duties and will so be caused in the

JA1224

future; was caused to incur past and future medical and hospital expenses, and the loss of enjoyment of life.

WHEREFORE, Plaintiffs, Ramatulie Jalloh and Komboh S. Kamara, claim more than Seventy-Five Thousand ($75,000.00) Dollars in compensatory damages plus interest and costs against Defendant Abdul G. Chaudry, M.D.

## COUNT II

### (Negligence - Plaintiffs v. Charles J. Akoda, M.D.)

26.    Paragraphs 1 through 25 are adopted by reference in this Count II.

27.    Defendant Charles J. Akoda, M.D. negligently deviated from the appropriate standard of medical care by:

a) failing to properly and timely offer first trimester screening and/or testing for Down syndrome to the Plaintiff at her prenatal visits during her first trimester on October 26, 2012, October 31, 2012, and on November 27, 2012;

b) failing to properly and timely advise the Plaintiff of the availability of all prenatal testing for Down syndrome that was appropriate under the circumstances as well as the purpose of those tests;

c) failing to properly take heed of the fact that the Plaintiff was a high risk patient based on her advanced maternal age;

d) failing to properly and timely offer appropriate screening and/or testing based upon the Plaintiff's advanced maternal age;

e) failing to properly and timely refer the patient to a suitably qualified health care provider for a detailed second trimester fetal anatomical exam of care on November 27, 2012, December 12, 2012 or on January 18, 2013;

11



f) failing to offer to perform genetic counseling or refer the patient for genetic counseling due to Plaintiff's advanced maternal age;

g) failing to properly and timely detect a VSD on the sonogram performed on January 18, 2013;

h) failing to properly and timely interpret the results of the sonogram performed on January 18, 2013;

i) failing to properly and timely interpret the results of any and all sonograms performed;

j) failing to appropriately retain any and all ultrasound imaging performed;

k) failing to timely provide the Plaintiff with all information necessary to make informed and reasoned decisions concerning the condition and/or health of a fetus;

l) failing to allow the Plaintiff to exercise the option as to whether or not to terminate a pregnancy carrying a fetus with Down syndrome;

m) failing to properly communicate with the Plaintiffs;

n) failing to properly perform, provide accurate information for and timely interpret any and all tests and studies, including but not limited to ultrasounds, related to the prenatal detection of Down syndrome;

o) failing to properly employ due, reasonable, and appropriate skills and care in the examination, treatment and management of the patient;

p) failing to perform a proper and timely examination of the patient;

q) failing to take proper heed of the patient's present condition, signs, symptoms, and complaints;

r) failing to keep apprised of current medical literature and standards;

12

JA1226

s) failing to comply with the official recommendations of the American College of Obstetricians and Gynecologists that a screening strategy that incorporates first trimester screening and/or testing for Down syndrome be offered to all women who seek prenatal care in the first trimester;

t) failing to properly perform an extensive and accurate physical examination of the Plaintiff;

u) failing to properly supervise the agents, servants and/or employees of the Defendants, and

v) failing to exercise the degree of care, skill and diligence to which this Plaintiff was entitled - all of which the Defendants failed to do.

28.     As a direct and proximate result of the aforesaid negligence of Defendant Charles J. Akoda, M.D., the Plaintiffs have suffered, and will continue to suffer, serious and permanent injuries, including, among other things, the wrongful birth of a baby with Down syndrome; the wrongful birth of a baby with Hirschsprung disease associated with Downs syndrome; the burdens and responsibilities associated with parenting a child suffering from Down syndrome; parenting a child with lifelong physical and mental disabilities, including, but not limited to, severe and permanent gastrointestinal, cardiac and respiratory issues, as well as the permanent placement of a gastrostomy tube; the significant cost of providing their child with frequent medical care and attention, continued hospitalizations since birth, numerous surgical procedures, need for rehabilitation and ongoing nursing care, special education, various therapies, and other special needs for the rest of that child's life; were caused to suffer significant mental anguish, emotional distress and anxiety and will so be caused in the future; will be caused to spend countless hours at medical institutions for their child's care; significant loss of earnings; were

13

JA1227

caused to be incapacitated from attending their usual duties and will so be caused in the future;

was caused to incur past and future medical and hospital expenses, and the loss of enjoyment of

life.

WHEREFORE, Plaintiffs, Ramatulie Jalloh and Komboh S. Kamara, claim more than

Seventy-Five Thousand ($75,000.00) Dollars in compensatory damages plus interest and costs

against Defendant Charles J. Akoda, M.D.

## COUNT III

### (Negligence – Respondeat Superior – Plaintiffs v. Abdul G. Chaudry, M.D.)

29.     Paragraphs 1 through 28 are adopted by reference in this Count III.

30.     Defendant Abdul G. Chaudry, M.D., his agents, servants and/or employees,

including, but not limited to Charles J. Akoda, M.D., negligently deviated from the appropriate

standard of medical care by:

a) failing to properly and timely offer first trimester screening and/or testing for Down

syndrome to the Plaintiff at her prenatal visits during her first trimester on October 26, 2012,

October 31, 2012, and on November 27, 2012;

b) failing to properly and timely advise the Plaintiff of the availability of all prenatal

testing for Down syndrome that was appropriate under the circumstances as well as the purpose

of those tests;

c) failing to properly take heed of the fact that the Plaintiff was a high risk patient based

on her advanced maternal age;

d) failing to properly and timely offer appropriate screening and/or testing based upon the

Plaintiff's advanced maternal age;

14

JA1228

e) failing to properly and timely refer the patient to a suitably qualified health care provider for a detailed second trimester fetal anatomical exam of care on November 27, 2012, December 12, 2012 or on January 18, 2013;

f) failing to offer to perform genetic counseling or refer the patient for genetic counseling due to Plaintiff's advanced maternal age;

g) failing to properly and timely detect a VSD on the sonogram performed on January 18, 2013;

h) failing to properly and timely interpret the results of the sonogram performed on January 18, 2013;

i) failing to properly and timely interpret the results of any and all sonograms performed;

j) failing to appropriately retain any and all ultrasound imaging performed;

k) failing to timely provide the Plaintiff with all information necessary to make informed and reasoned decisions concerning the condition and/or health of a fetus;

l) failing to allow the Plaintiff to exercise the option as to whether or not to terminate a pregnancy carrying a fetus with Down syndrome;

m) failing to properly communicate with the Plaintiffs;

n) failing to properly perform, provide accurate information for and timely interpret any and all tests and studies, including but not limited to ultrasounds, related to the prenatal detection of Down syndrome;

o) failing to properly employ due, reasonable, and appropriate skills and care in the examination, treatment and management of the patient;

p) failing to perform a proper and timely examination of the patient;

15

q) failing to take proper heed of the patient's present condition, signs, symptoms, and complaints;

r) failing to keep apprised of current medical literature and standards;

s) failing to comply with the official recommendations of the American College of Obstetricians and Gynecologists that a screening strategy that incorporates first trimester screening and/or testing for Down syndrome be offered to all women who seek prenatal care in the first trimester;

t) failing to properly perform an extensive and accurate physical examination of the Plaintiff;

u) failing to properly supervise the agents, servants and/or employees of the Defendants, and

v) failing to exercise the degree of care, skill and diligence to which this Plaintiff was entitled - all of which the Defendants failed to do.

31.     As a direct and proximate result of the aforesaid negligence of Defendant Abdul G. Chaudry, M.D., his agents, servants and/or employees, the Plaintiffs have suffered, and will continue to suffer, serious and permanent injuries, including, among other things, the wrongful birth of a baby with Down syndrome; the wrongful birth of a baby with Hirschsprung disease associated with Downs syndrome; the burdens and responsibilities associated with parenting a child suffering from Down syndrome; parenting a child with lifelong physical and mental disabilities, including, but not limited to, severe and permanent gastrointestinal, cardiac and respiratory issues, as well as the permanent placement of a gastrostomy tube; the significant cost of providing their child with frequent medical care and attention, continued hospitalizations since birth, numerous surgical procedures, need for rehabilitation and ongoing nursing care, special

16

education, various therapies, and other special needs for the rest of that child's life; were caused

to suffer significant mental anguish, emotional distress and anxiety and will so be caused in the

future; will be caused to spend countless hours at medical institutions for their child's care;

significant loss of earnings; were caused to be incapacitated from attending their usual duties and

will so be caused in the future; was caused to incur past and future medical and hospital

expenses, and the loss of enjoyment of life.

32.     Defendant Abdul G. Chaudry, M.D. is liable for the negligence of his agents,

servants, and/or employees, including, but not limited to Dr. Akoda.

WHEREFORE, Plaintiffs, Ramatulie Jalloh and Komboh S. Kamara, claim more than

Seventy-Five Thousand ($75,000.00) Dollars in compensatory damages plus interest and costs

against Defendant Abdul G. Chaudry, M.D., his agents, servants and/or employees.

<div align="center">

**COUNT IV**

**(Negligence – Apparent Agency – Plaintiffs v. Abdul G. Chaudry, M.D.)**

</div>

33.     Paragraphs 1 through 32 are adopted by reference in this Count IV.

34.     At all times herein relevant, Defendant Charles J. Akoda, and other various health

care providers in Dr. Chaudry's practice, including those individuals who interpreted the

ultrasounds performed in Dr. Chaudry's office, were acting as the apparent agents of Defendant

Abdul G, Chaudry, M.D., with regard to the care and treatment of the Plaintiffs. At those times,

the Plaintiffs were under the reasonable belief that Dr. Akoda and other agents, servants and/or

employees were acting under the control, supervision and/or authority of Defendant Abdul G.

Chaudry, M.D. and that Dr. Chaudry and his practice held themselves out to the public, and in

particular, to the Plaintiffs as a full service physician's practice capable of providing competent

medical care to patients seeking treatment from said facility. Additionally, Defendant Abdul G.

<div align="center">17</div>

Chaudry, M.D. did not take any affirmative measures to advise the Plaintiff that Dr. Akoda or any other agents, servants and/or employees who treated the Plaintiffs at his facility were not acting as his employees, agents and/or representatives in connection with the care and treatment rendered to the Plaintiffs. Defendant Abdul G. Chaudry, M.D. is vicariously liable for the negligence of its apparent agents, servants and/or employees.

WHEREFORE, Plaintiffs, Ramatulie Jalloh and Komboh S. Kamara, claim more than Seventy-Five Thousand ($75,000.00) Dollars in compensatory damages plus interest and costs against Defendant Abdul G. Chaudry, M.D., his agents, servants and/or employees.

LAW OFFICES OF PETER G. ANGELOS, P.C.

By: _____
Danielle S. Dinsmore, Esquire
Marissa B. Joelson, Esquire
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
*Attorneys for Plaintiffs*
*Ramatulie Jalloh and Komboh S. Kamara*

18

# EXHIBIT 1

| | |
|---|---|
| RAMATULIE JALLOH and<br>KOMBOH S. KAMARA | * BEFORE THE |
| | * |
| | * HEALTH CARE |
| Claimants | * |
| | * ALTERNATIVE DISPUTE |
| v. | * |
| | * RESOLUTION OFFICE |
| ABDUL G. CHAUDRY, M.D., et al. | * |
| | * |
| Health Care Providers | * HCA No.: 2016-181 |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * *

### ORDER OF TRANSFER

The Claimants, by and through counsel, having elected a Waiver of Arbitration

under the provisions of Annotated Code of Maryland, Courts and Judicial Proceedings,

Article, § 3-2A-06B, it is this _____20th_____ day of   April, 2016, by the Health Care

Alternative Dispute Resolution Office,

ORDERED, that this case shall be and is hereby, transferred to the United States

District Court, or to the Circuit Court of the appropriate venue.

_____
HARRY L. CHASE, DIRECTOR
Health Care Alternative Dispute Resolution Office

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that copies of the above ORDER OF TRANSFER have been

mailed, postage prepaid, to all counsel.

_____
HARRY L. CHASE, DIRECTOR

JA1234

RAMATULIE JALLOH and
KOMBOH S. KAMARA,
9963 Goodluck Road, Apt. T1
Seabrook, Maryland 20706

    Plaintiffs,

    vs.

ABDUL G. CHAUDRY, M.D.
6005 Landover Road, Suite 5
Cheverly, Maryland 20785

CHARLES J. AKODA, M.D.
6005 Landover Road, Suite 5
Cheverly, Maryland 20785

    Defendants.

*   IN THE CIRCUIT COURT OF

*   MARYLAND FOR

*   PRINCE GEORGE'S COUNTY

*

*

*

*

*

*

*   Case No.:_____

*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ELECTION OF JURY TRIAL

Plaintiffs hereby request that the above-captioned case be tried before a jury.

LAW OFFICES OF PETER G. ANGELOS, P.C.

By: _____
Danielle S. Dinsmore, Esquire
Marissa B. Joelson, Esquire
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
*Attorneys for Plaintiffs*
*Ramatulie Jalloh and Komboh S. Kamara*

# **<u>EXHIBIT 36</u>**

Desire Evans

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    --------------------------------x

 5    MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 6    ELSA M. POWELL, and DESIRE EVANS,    18-5629

 7         Plaintiffs,                     Honorable

                                          Joshua D. Wolson

 8    v.

 9    EDUCATIONAL COMMISSION FOR FOREIGN

10    MEDICAL GRADUATES,

11         Defendant.

12    --------------------------------x

13

14

15          VIDEOTAPED DEPOSITION OF DESIRE EVANS

16                    Washington, D.C.

17              Thursday, September 5, 2019

18

19

20

21

22

23            GOLKOW LITIGATION SERVICES

24         T 877.370.3377 | F 917.591.5672

25                 deps@golkow.com
```

JA1237

Desire Evans

|  | Page 2 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 | Thursday, September 5, 2019 |
| 6 | 10:32 a.m. |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 | The following is the transcript of the |
| 12 | videotaped deposition of DESIRE EVANS held at the |
| 13 | offices of Morgan, Lewis & Bockius, LLP, 1111 |
| 14 | Pennsylvania Avenue, NW, Washington, DC 20004. |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 | Reported by: Linda S. Kinkade, RDR CRR RMR RPR CSR |
| 20 | Registered Diplomate Reporter, Nationally Certified |
| 21 | Realtime Reporter, Registered Professional Reporter |
| 22 | with Merit Distinction, Certified Shorthand Reporter |
| 23 | (CA), Notary Public, within and for the District of |
| 24 | Columbia, and official duly authorized to administer |
| 25 | oaths and/or affirmations. |

|  | Page 4 |
|---|---|
| 1 | A P P E A R A N C E S (continued): |
| 2 |  |
| 3 | On Behalf of Defendant EDUCATIONAL COMMISSION FOR |
| 4 | FOREIGN MEDICAL GRADUATES: |
| 5 | Morgan, Lewis & Bockius, LLP |
| 6 | 1701 Market Street |
| 7 | Philadelphia, Pennsylvania 19103 |
| 8 | (215) 963-5609 |
| 9 | By: Elisa P. McEnroe, Esq. |
| 10 | By: Matthew D. Klayman, Esq. |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 | Also present: |
| 23 | Crystal Strawbridge, Videographer |
| 24 |  |
| 25 |  |

|  | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 |  |
| 3 |  |
| 4 | On Behalf of Plaintiffs MONIQUE RUSSELL, JASMINE |
| 5 | RIGGINS, ELSA M. POWELL, and DESIRE EVANS: |
| 6 | Schochor, Federico and Staton, P.A. |
| 7 | 1211 St. Paul Street |
| 8 | Baltimore, Maryland 21202 |
| 9 | (410) 234-1000 |
| 10 | By: Brent Ceryes, Esq. |
| 11 |  |
| 12 |  |
| 13 | -and- |
| 14 |  |
| 15 | Law Offices of Peter G. Angelos |
| 16 | One Charles Center |
| 17 | 100 N. Charles Street |
| 18 | Baltimore, Maryland 21201 |
| 19 | (410) 649-2000 |
| 20 | By: Paul M. Vettori, Esq. |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 5 |
|---|---|
| 1 | INDEX OF EXAMINATION |
| 2 |  |
| 3 | EXAMINATION OF DESIRE EVANS          PAGE |
| 4 | BY MS. MCENROE          8 |
| 5 | BY MR. CERYES          181 |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

JA1238

|  | Page 6 |
|---|---|

```
 1           E X H I B I T S
 2
 3  NO.       DESCRIPTION         PAGE
 4  Exhibit 1    Amended Notice of Deposition of ...  60
 5         Plaintiff Desire Evans
 6  Exhibit 2    History and Physical Examination ..  100
 7         re Desire Evans
 8  Exhibit 3    Medical Records re Desire Evans ...  108
 9         Smith 000001 - Smith 000283
10  Exhibit 4    Civil Action re Russell, et al. ...  148
11         v. ECFMG
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

|  | Page 7 |
|---|---|

```
 1         P R O C E E D I N G S
 2      VIDEO SPECIALIST: We're now on the record.
 3  My name is Crystal Strawbridge. I'm a videographer
 4  for Golkow Litigation Services. Today's date is
 5  September 5th, 2019, and the time is 10:32 a.m.
 6      This video deposition is being held at 1111
 7  Pennsylvania Avenue, northwest, Washington, D.C., in
 8  the matter of Monique Russell, et al. v. Educational
 9  Commission for Foreign Medical Graduates, Civil Action
10  number 18-5629, for the United States District Court,
11  for the Eastern District of Pennsylvania. The
12  deponent is Desire Evans.
13      Will counsel please identify themselves.
14      MR. CERYES: Brent Ceryes on behalf of the
15  plaintiff.
16      MR. VETTORI: Paul Vettori on behalf of the
17  plaintiffs.
18      MS. MCENROE: Good morning. Elisa McEnroe
19  for Morgan, Lewis & Bockius on behalf of defendant
20  Educational Commission for Foreign Medical Graduates,
21  and today I have with me my colleague, Matt Klayman.
22      VIDEO SPECIALIST: The court reporter is
23  Linda Kinkade and will now swear in the witness.
24  //
25  //
```

|  | Page 8 |
|---|---|

```
 1           DESIRE EVANS,
 2      having been first duly sworn and/or affirmed
 3  on their oath, was thereafter examined and testified
 4  as follows:
 5           EXAMINATION
 6  BY MS. MCENROE:
 7      Q. Good morning, Ms. Evans.
 8      A. Good morning.
 9      Q. My name is Elisa McEnroe, counsel for the
10  Educational Commission for Foreign Medical Graduates.
11  We met briefly this morning for the first time; is
12  that correct?
13      A. Yes, ma'am.
14      Q. Could you please state and spell your name
15  for the record?
16      A. Desire, D-E-S-I-R-E, Evans, E-V-A-N-S.
17      Q. Great. And your birthday is ▮▮▮▮▮
18  ▮ ▮    is that correct?
19      A. Yes, ma'am.
20      Q. That makes you ▮ years old?
21      A. Yes.
22      Q. Thank you.
23      A. Tell everybody.
24      Q. We'll mark parts of the deposition
25  confidential as needed.
```

|  | Page 9 |
|---|---|

```
 1      And you understand that you're here today
 2  because you filed a lawsuit against my client, the
 3  Educational Commission for Foreign Medical Graduates,
 4  correct?
 5      A. Yes, ma'am.
 6      Q. Because of the nature of the allegations in
 7  the lawsuit, certain of the topics we discuss today
 8  may be particularly sensitive for you. And so I want
 9  to let you know that, if you need to take a break or
10  you need to take a minute, you just let us know. This
11  is not meant to be a marathon today. I want to make
12  sure you're in a position to be able to tell the truth
13  and a full answer every time I ask a question. Do you
14  understand?
15      A. Yes, ma'am.
16      Q. If at any time today you do need to take a
17  break, I just ask that the question that's pending be
18  answered, and then I'd be happy to take a break.
19  Okay?
20      A. Yes, ma'am.
21      Q. And you've been deposed before?
22      A. Yes, ma'am.
23      Q. So you generally have a sense of how this
24  works?
25      A. Yes, ma'am.
```

Desire Evans

Page 10

1    Q. I'm going to ask you some questions. I'm
2  going to ask that you give me answers.
3    A. Yes, ma'am.
4    Q. And it works best if we don't talk on top
5  of each other, correct?
6    A. Yes, ma'am.
7    Q. Great. And so you've been deposed
8  previously. How many times?
9    A. One time.
10    Q. Okay. And was that on March 28th, 2019?
11    A. Yes.
12    Q. And was that in connection with another
13  lawsuit that you had filed?
14    A. Yes.
15    Q. Against whom?
16    A. Dimensions Health Systems, I believe.
17    Q. In Maryland?
18    A. Yes.
19    Q. And you understand that there's a
20  deposition transcript that came out of that
21  deposition?
22    A. Yes.
23    Q. Have you seen that deposition transcript?
24    A. Yes.
25    Q. Do you confirm that what you testified to

Page 11

1  in that Dimensions deposition is true and correct?
2    A. Yes.
3      MR. CERYES: Objection to the breadth of
4  the question.
5    You can answer.
6    A. Yes.
7    Q. And from time to time your counsel will
8  object, so we'll just give him a second in case he
9  needs to get those in.
10    So, is that correct, that you confirmed that
11  you told the truth at the Dimensions deposition?
12    A. Yes.
13      MR. CERYES: Same objection.
14    Q. Anything you'd like to change or clarify
15  from your testimony as you recall from the deposition
16  in the Dimensions matter?
17      MR. CERYES: Same objection.
18    A. No.
19    Q. To help save some time, I may not ask you
20  every question that was asked there, but if there is
21  something in particular that, as we proceed today, you
22  remember that you would like to correct about either
23  your testimony today or your testimony at the
24  Dimensions deposition, I ask that you please let us
25  know. Okay?

Page 12

1    A. Yes, ma'am.
2    Q. Otherwise, we're going to take that
3  everything you tell us today and everything you told
4  the court when you were deposed in the Dimensions
5  litigation was the truth. Do you understand?
6    A. Yes, ma'am.
7    Q. Is there any reason that you can't tell the
8  truth today?
9    A. No, ma'am.
10    Q. Okay. Are you taking any medications that
11  make you confused or foggy at the moment?
12    A. I am on medication, but I haven't taken
13  anything today.
14    Q. And so your memory is clear?
15    A. Yes.
16    Q. Have you ever used a different last name
17  than Evans?
18    A. My maiden name is Clifton.
19    Q. And so at a point in time did you use the
20  name Desire Nichole Clifton?
21    A. Yes.
22    Q. Is it fair to say that you changed your
23  name because you got married?
24    A. Yes, ma'am.
25    Q. And when was that?

Page 13

1    A. I got married December 31st, 2015.
2    Q. To whom?
3    A. Michael Evans.
4    Q. And is he still your husband?
5    A. Yes, ma'am.
6    Q. And is he the father of the child that
7  we'll discuss a little bit later today that you have?
8    A. Yes, ma'am.
9    Q. Great. And what is that child's name?
10    A. Peyton Alexander Evans.
11    Q. And you still have your dog?
12    A. Huh?
13    Q. And you still have your dog?
14    A. Yes.
15    Q. Okay. Great. Do you have any other
16  children living with you?
17    A. No, ma'am.
18    Q. Do you have any other biological children
19  that you've birthed?
20    A. No, ma'am.
21    Q. What is Mr. Evans' profession?
22    A. He is a bus operator for Metro.
23    Q. For Metro. Great. And has that been
24  consistent over time?
25    A. Well, he just started working there. He

Page 14

1 was previously a supervisor for Circulator, a
2 different transportation place in D.C., but same line
3 of work.
4 Q. So he was a bus driver previously as well?
5 A. Well, he was a road supervisor. He was
6 promoted from a bus driver to a road supervisor, but
7 he went to Metro as a bus driver.
8 Q. And since you guys were married has he
9 worked in the transportation industry?
10 A. Yes.
11 Q. And does he work full-time?
12 A. Yes.
13 Q. Does he have any FMLA or ADA leave that
14 he's on at the moment?
15 A. No.
16 Q. Has he ever to your knowledge had FMLA or
17 ADA leave?
18 A. During the birth of our child he did FMLA.
19 Q. And how long did he take?
20 A. I don't remember. Maybe two weeks. It
21 wasn't long.
22 Q. Is your current address 4057 Parker Court
23 in Waldorf, Maryland?
24 A. Yes, ma'am.
25 Q. You previously testified at the Dimensions

Page 15

1 deposition about your education and your professional
2 background, so I'm not going to get into all of those
3 details just to save us a little bit of time, but I am
4 going to do some of the just basic nuts and bolts to
5 make sure I have an understanding. Is that fair?
6 A. Yes.
7 Q. You graduated high school in 1997; is that
8 correct?
9 A. Yes, ma'am.
10 Q. And you attended Strayer University to
11 study cybersecurity; is that correct?
12 A. Current.
13 Q. Have you finished that program of study?
14 A. No, ma'am. I'm currently there.
15 Q. And when are you scheduled to finish?
16 A. '22.
17 Q. 2022?
18 A. Yes, 2022. I'm on the dean's list too.
19 Q. Congratulations.
20 A. Thank you.
21 Q. Is that a part-time schedule? How does
22 that work with your work?
23 A. No, so it's online school. I go -- it's
24 Monday through Friday. I just have to complete my
25 assignment, you know. They set assignments before the

Page 16

1 end of the week. So it's a full-time schedule.
2 Q. So to restate it just to make sure I
3 understand, do you log in from a computer terminal at
4 home?
5 A. Yes.
6 Q. And you complete the coursework as it fits
7 your schedule?
8 A. Yes.
9 Q. And that's a full-time course load, Monday
10 through Friday?
11 A. Yes. Yes.
12 Q. How many hours a day Monday through Friday
13 would you estimate you spend on your studies?
14 A. Four and a half.
15 Q. Hours?
16 A. Yes, four and a half hours.
17 Q. Thank you. Does that involve other
18 homework outside of that, or is that inclusive of all
19 of your work for Strayer University each day?
20 A. That's -- that's my just for Strayer
21 University each day.
22 Q. And you said that's just for Strayer
23 University. Do you do other work as well?
24 A. Well, I work from home, so once I get off
25 of work from working for BlueCross BlueShield, I start

Page 17

1 doing my Strayer work.
2 Q. And the BlueCross BlueShield job that you
3 just mentioned, is that the same job that you had when
4 you were deposed in the Dimensions litigation?
5 A. Yes, ma'am.
6 Q. Are you in the same position you were in
7 then?
8 A. Yes, ma'am.
9 Q. So that's the senior customer service
10 advisor; is that correct?
11 A. Yes, ma'am.
12 Q. How many hours a day would you estimate you
13 work for BlueCross BlueShield?
14 A. Eight.
15 Q. Monday through Friday?
16 A. Yes.
17 Q. Do any of your job responsibilities for
18 BlueCross BlueShield bleed into the weekend?
19 A. No.
20 Q. Is it shift work for BlueCross BlueShield,
21 like you have a certain time you're supposed to be on
22 and then you get off at a certain time?
23 A. Yes, 8:30 to 5:00.
24 Q. Is that a preset schedule?
25 A. Yes.

Desire Evans

Page 18

1    Q.  And you mentioned that you work from out of
2  your home; is that correct?
3    A.  Yes.
4    Q.  Tell me a little bit about your office
5  setup at home.
6    A.  It's just an office.  It's in the down --
7  downstairs area of my home.
8    Q.  Is it a separate room?
9    A.  Yeah, it's a separate room.
10   Q.  With a door that closes?
11   A.  Yes, ma'am.  I have -- it's a setup
12  office -- a desk, printer, shredder, TV.
13   Q.  I presume a telephone?
14   A.  Yeah, telephone.
15   Q.  You spend a lot of time on the telephone in
16  that job?
17   A.  Yes.
18   Q.  Is that the majority of your job is spent
19  on the telephone?
20   A.  It is, yes.
21   Q.  And just very briefly, in terms of your job
22  responsibilities, as a senior customer service
23  advisor, I understand you spend a lot of time on the
24  phone.  What is it, just generally speaking, you're
25  doing when you're on the phone?

Page 19

1    A.  Help answering questions for insured
2  members, so fixing the claims.  I have a long list of
3  duties.
4    Q.  But, generally, sort of contained within
5  that universe?
6    A.  Yes.
7    Q.  How long have you had the job with
8  BlueCross BlueShield?
9    A.  Since, I want to say, June 25th, 2015.  I
10  might -- the day might be wrong, but it was June 2015.
11   Q.  That was before you had your son, correct?
12   A.  Yes.
13   Q.  Prior to having your son did you work from
14  home?
15   A.  No.
16   Q.  Did you work in an office setting?
17   A.  Yes.
18   Q.  Where was that office?
19   A.  In Fairfax, Virginia.
20   Q.  How far is that from where you reside, or
21  resided at the time, I should say?
22   A.  About an hour, 45 minutes to an hour.
23   Q.  Hour or 45-minute commute each way?
24   A.  Yes.
25   Q.  Would you drive?

Page 20

1    A.  Yes.
2    Q.  When did you stop working out of the
3  office?
4    A.  I want to -- after I had my son.  I want to
5  say maybe two months after I had my son.
6    Q.  Did you take time out of work for the birth
7  of your child?
8    A.  I did.
9    Q.  How long?
10   A.  I stopped working in February, at the end
11  of February.  I want to say maybe four weeks prior.
12   Q.  You stopped four weeks before you had your
13  son?
14   A.  I believe it was four weeks prior, yes.
15   Q.  And then how long were you out after you
16  had your son?
17   A.  Another maybe additional 30 days.  I can't
18  really remember.
19   Q.  After you had your son, did you return to
20  work in the office physically for
21  BlueCross BlueShield?
22   A.  No.
23   Q.  Did you switch directly to working from
24  home for them?
25   A.  Yes.

Page 21

1    Q.  And when did you start your studying for
2  your cybersecurity certificate from Strayer
3  University?
4    A.  In April of this year.
5    Q.  So that would be April 2019?
6    A.  2019, yes.
7    Q.  How old is your son, Peyton?
8    A.  Three.  I was trying to make sure I started
9  in April.  I have to think about -- I'm not sure if it
10  was in April -- I'm not sure if I started the spring
11  or the winter semester.
12   Q.  But 2019 either way?
13   A.  2019, yes.
14   Q.  So either winter or spring 2019 for sure.
15   A.  Yes.
16   Q.  Thank you.  I appreciate you keeping your
17  answers precise.
18     So Peyton is three years old, you said?
19   A.  Yes, ma'am.
20   Q.  And what is his schedule like?  Does he
21  have a childcare provider other than you and your
22  husband?  Does he go to daycare?
23   A.  No, he doesn't go to daycare.  He just
24  recently, since my husband started working for Metro,
25  started going to his grandmoms' house during the day

Desire Evans

Page 22

1  so I can work and concentrate on school.
2      Q.  Is that your mom or is that your husband's
3  mom?
4      A.  Both.
5      Q.  Oh.
6      A.  Mondays and Fridays he's with my mother and
7  Tuesdays, Wednesdays and Thursdays he's with my
8  husband's mother.
9      Q.  What kind of hours?
10     A.  Six in the morning until 5 p.m.
11     Q.  So it's about 6 a.m. to 5 p.m.?
12     A.  Yes, ma'am.
13     Q.  And how far do those grandmothers live from
14  where you reside?
15     A.  My mother lives about ten minutes away, and
16  my husband's mother lives here in D.C., so about an
17  hour.
18     Q.  When did this arrangement with the
19  grandmother childcare, I'll call it that, begin?  When
20  did that start?
21     A.  I want to say approximately 11 weeks ago
22  when my husband started for Metro.
23     Q.  So for the period of time between when
24  Peyton was born and about 11 weeks ago when he started
25  having some care during the day from his grandmothers,

Page 23

1  were you primarily responsible for his childcare?
2      A.  Yes.
3      Q.  So there was a period of time when you were
4  working full-time for BlueCross BlueShield, doing
5  full-time studies at Strayer University, and having
6  full childcare responsibilities as well?
7      A.  Yes.  Yes.
8      Q.  Prior to your husband joining Metro, what
9  was the company you said he worked for?
10     A.  Circulator First Transit is the actual...
11     Q.  Where was that located?
12     A.  Here in D.C.
13     Q.  And you said that's about an hour from your
14  home?
15     A.  Yes.
16     Q.  What kind of hours did he work when he was
17  at Circulator First Transit?
18     A.  He worked evening hours.
19     Q.  And what does that mean?
20     A.  So that was like 5 to 1.
21     Q.  5 p.m. to 1 a.m.?
22     A.  Yeah, 5 p.m. to 1 p.m. and on the weekends
23  8 p.m. to 4 a.m.
24     Q.  I want to make sure I got the first --
25  during the weekdays, when was it?

Page 24

1      A.  About 5 p.m. to 1 p.m. -- I mean 5 p.m. to
2  1 a.m.  Excuse me.
3      Q.  1 a.m., great, okay.  Just trying to make
4  sure we're on the same page.
5      So he was working the night shift?
6      A.  Yes.
7      Q.  Is he working the night shift currently
8  with Metro?
9      A.  It fluctuates, because he's still in his 90
10  days in training.  So he doesn't really have a set
11  schedule yet.
12     Q.  And what is his commute like now that he's
13  working for Metro?
14     A.  It's about -- it's the same.  It's about 45
15  minutes to an hour.
16     Q.  Prior to 11 weeks ago when you began using
17  the grandmothers' help for caring for Peyton during
18  the day, did you have any other adult help while you
19  were working or in school for watching Peyton?  So did
20  you have any babysitters, someone from the
21  neighborhood who would come, like a nanny?
22     A.  No, just my husband.
23     Q.  Just you and your husband?
24     A.  Yes, ma'am.
25     Q.  When your husband was working for

Page 25

1  Circulator and he was working the night shift, when
2  would he sleep?
3      A.  Never.  That's the truth.  He literally was
4  working 20 hours a day at a point, like going from one
5  job to the next because he was doing Metro at the same
6  time.
7      So he would get home around 2:00 in the
8  morning, go to sleep maybe around 3:00, be up again by
9  4:30, 5:00 so he could be out to take Peyton by 6.
10     Q.  To take him to --
11     A.  His grandmom's house.
12     Q.  The grandmothers.  But before --
13     A.  Before that, before that, he was -- he was
14  still working two jobs, so he was still having the
15  same amount of sleep, get home around 1:30 or get home
16  around 2:00, be asleep by 3:00, up by 4:30, 5:00, so
17  he can go to Metro.
18     Q.  So before he was working at Metro when he
19  was working at Circulator, was he working another job
20  as well?
21     A.  He was working overtime at Circulator.
22  Sometimes working double shifts.
23     Q.  And when you say "double shifts," you mean
24  he would work the night shift and the day shift?
25     A.  Yes, ma'am.

Desire Evans

Page 26

1      Q.  Is he doing that also now that he's working
2   at Metro?
3      A.  No.  Now he's just working one job.
4      Q.  Why the switch 11 weeks ago to have the
5   grandmother care?
6      A.  Because my husband was no longer going to
7   be able to be there during the day and his schedule
8   was going to be unpredictable.  So in order for me to
9   be able to work and be productive, I needed someone --
10  I needed help because I couldn't -- Peyton is three
11  now, so it's not like I could lay him down for a nap.
12  He's running all -- he's very, very active.  So he
13  needed to be with other adults, other children, so we
14  decided to try to do that.
15     Q.  When he was -- when your husband was
16  working at Circulator, how frequently was he working
17  overtime so he was doing double shifts?
18     A.  He would work overtime Thursday, Fridays,
19  and Saturdays.  So mostly on Fridays and Saturdays, he
20  would go in around -- he would go in around maybe 8:30
21  in the morning and work until 4:30 in the morning.
22     Q.  And then he'd have an hour commute home?
23     A.  Mm-hmm.  Yes.  I'm sorry.
24     Q.  Thank you.  You remember well from your
25  last deposition to give oral responses.

Page 27

1      A.  Yes, ma'am.
2      Q.  I appreciate that.  Thank you.
3         So we talked a little bit about your husband's
4   sleep.  Let's talk a quick minute about your sleep
5   between your work and your childcare responsibilities.
6         When Peyton came home from the hospital, did he
7   sleep through the night?
8      A.  At -- yeah, he was a pretty good baby.
9      Q.  He was a pretty good baby?  Were you
10  breastfeeding?
11     A.  Yes.
12     Q.  And did you have to get up in the night to
13  feed him?
14     A.  Yes.
15     Q.  How frequently approximately at the
16  beginning?
17     A.  About every three hours.  I would actually
18  have to wake him up to feed him.
19     Q.  Has Peyton stayed a good sleeper?
20     A.  No.
21     Q.  You laughed and said that.  So what do you
22  mean by that?
23     A.  No, now -- now it's -- I mean, once he goes
24  to sleep, it's fine.  It's just a struggle to get him
25  to go to sleep just because he thinks he's going to

Page 28

1   miss something.
2      Q.  And what time is bedtime for him at your
3   house?
4      A.  I try 8:00.
5      Q.  P.m.?
6      A.  P.m., yes.  That's my goal.
7      Q.  And when is, realistically, when he sets
8   his head down to sleep?
9      A.  Around 9:30-ish, 10:00, depends on what
10  time his dad gets in the house sometimes, because
11  sometimes I can't get him to go to sleep until he sees
12  his dad.
13     Q.  Sure.  And so when is he sleeping until
14  once he goes to sleep?  When does he wake up?
15     A.  He'll sleep until he gets to his grandmom's
16  house, because we don't really wake him up in the
17  morning.  We just take him out of the bed and take him
18  straight to his grandmom's house so we don't wake him
19  up.
20        So he sleeps through the night until he gets to
21  his grandmom's house, and she will do whatever she
22  does.
23     Q.  Does he still nap?
24     A.  Yes.
25     Q.  About how long?

Page 29

1      A.  About an hour and a half, two hours
2   depending.
3      Q.  Once a day or twice a day?
4      A.  Once a day.
5      Q.  On the weekends also?
6      A.  No.
7      Q.  Okay.  So that's just during the weekday?
8      A.  Yeah, just on the weekday.  I let him have
9   free time during the weekend, unless he's tired.  If
10  he's tired, I don't stop him from taking a nap, but I
11  don't force naps on weekend.
12     Q.  When were you most recently treated by a
13  doctor for anything?
14     A.  I'm treated by a doctor now.  The last time
15  I went to the doctor --
16     Q.  Correct.
17     A.  -- was, I want to say, August 1st maybe --
18     Q.  For what?
19     A.  -- August 2nd.  I went to see my
20  psychologist, Dr. Donato.
21     Q.  Why?
22     A.  He's my psychologist and I speak to him
23  often, and it was time to review my FMLA.
24     Q.  You say you speak to him often.  Are you
25  talking by telephone, in person?

JA1244

Desire Evans

|  | Page 30 |
|---|---|

1  A. Both.

2  Q. How frequently do you speak to Dr. Donato?

3  A. Sometimes, depending on how much I need

4  him, twice a week sometimes or twice a month. It

5  depends. It just really depends. I don't really have

6  a set time to talk to him.

7  Q. How do you arrange speaking with him?

8  A. I can just call the front desk and just let

9  them know that I need to speak to him, and he'll

10  either call me back or we can set up an appointment.

11  Q. Dr. Donato works in a practice?

12  A. Yes.

13  Q. And they have a reception area, it sounds

14  like?

15  A. Yes.

16  Q. Where is Dr. Donato's office located?

17  A. In 600 Post Office Road in Waldorf,

18  Maryland.

19  Q. How far is that from your home?

20  A. About five minutes.

21  Q. When did you first start seeing Dr. Donato?

22  A. I don't remember the exact date. I want to

23  say it was like April of '18 maybe. I can't really

24  remember the month, but it was 2018.

25  Q. Around spring of 2018?

|  | Page 31 |
|---|---|

1  A. Spring or summer, somewhere around there,

2  2018.

3  Q. Besides Dr. Donato, are you currently under

4  the care of any physicians?

5  A. Yes, I'm also seeing Ebony Cross. She is a

6  psychiatrist and medication management.

7  Q. How often do you see Dr. Cross?

8  A. Once a month.

9  Q. Is that a regularly scheduled appointment?

10  A. Well, we schedule it at the end of each

11  appointment, so it's not like a set date.

12  Q. So you'll schedule it out the next time

13  each time you're there?

14  A. Yes.

15  Q. And do you physically go see Dr. Cross in

16  person?

17  A. Yes.

18  Q. You mentioned medication management from

19  Dr. Cross. Does Dr. Donato prescribe you medication

20  as well?

21  A. No, he cannot prescribe medication.

22  Q. Besides Dr. Donato and Dr. Cross, are you

23  presently under the care of any other physicians?

24  A. No.

25  Q. Do you currently have an ob/gyn?

|  | Page 32 |
|---|---|

1  A. No.

2  Q. And you understand, when I use the phrase

3  "ob/gyn," I mean obstetrician/gynecologist?

4  A. Yes, ma'am.

5  Q. It's okay with you if I use the term

6  ob/gyn?

7  A. Yes, ma'am.

8  Q. It's a little easier for me to say, so I

9  appreciate that.

10  Do you have a primary care physician?

11  A. I have one assigned to me from my

12  insurance. Do I see her? No.

13  Q. What do you mean you have one assigned to

14  you from your insurance?

15  A. So I have an HMO, so they have to assign

16  you a primary care physician through the insurance.

17  Q. And who is your primary care physician

18  assigned to you from your HMO?

19  A. Dainty Jackson.

20  Q. Have you ever seen Dr. Jackson?

21  A. I saw her once, yes.

22  Q. When was that?

23  A. Maybe September of '17 maybe. I really

24  don't remember.

25  Q. Do you remember your purpose for visiting

|  | Page 33 |
|---|---|

1  with Dr. Jackson?

2  A. I needed blood work for medication

3  management.

4  Q. Blood work from medication management by

5  whom?

6  A. From -- at the time I was seeing Shanda --

7  what was her name? My goodness.

8  Q. Would that be Dr. Smith?

9  A. Shanda Smith from Kaiser.

10  Q. Are you still seeing Dr. Smith?

11  A. No.

12  Q. When did you start seeing Dr. Smith, do you

13  recall?

14  A. February -- I don't know if it was '17 or

15  '18. I don't remember the year, ma'am. I'm sorry.

16  Q. Do you remember when you stopped seeing

17  Dr. Smith?

18  A. It was in -- so I want to say it was '18,

19  because I started -- stopped seeing her right before I

20  started seeing Dr. Donato, which was in, like, June --

21  April, June-ish.

22  Q. So I just want to make sure that I'm

23  understanding. So are you saying you believe you

24  started seeing Dr. Smith approximately in February

25  2018?

JA1245

Page 34

1    A. Mm-hmm.
2    Q. That's correct?
3    A. Yes. Yes. I'm sorry. Yes.
4    Q. And you made the decision to switch from
5 Dr. Smith to Dr. Donato; is that correct?
6    A. My insurance changed, so I had to.
7    Q. Was it an issue of having a physician in
8 network?
9    A. Correct. We were using my husband's
10 insurance at first and he had Kaiser, so we had to use
11 Kaiser.
12    Q. And then you switched insurance?
13    A. Yes, through my own employer.
14    Q. I presume that was BlueCross BlueShield
15 Insurance?
16    A. Yes, ma'am.
17    Q. Okay. Were you covered by insurance when
18 you delivered Peyton?
19    A. I had Medicaid.
20    Q. Even though you were working for
21 BlueCross BlueShield?
22    A. I was a temp at the time.
23    Q. Ah. Okay. So when you first started
24 working for BlueCross BlueShield, were you a full-time
25 employee?

Page 35

1    A. So I started as a temp in June.
2    Q. Of what year?
3    A. Of 2015. I became permanent in January of
4 2016. But my benefits didn't kick in until April of
5 2016.
6    Q. So when you had Peyton, you were a
7 full-time employee and not a temp, but you didn't have
8 your benefits accruing yet?
9    A. Correct.
10    Q. Okay. And then did you switch from being
11 on BlueCross BlueShield to being on your husband's
12 insurance?
13    A. No.
14    Q. Can you explain how that worked?
15    A. So -- so I went to my -- I went to my
16 husband's insurance, because we weren't -- we weren't
17 married when I got pregnant with Peyton, so I needed
18 my own insurance. So I was on Medicaid. Once we got
19 married and Peyton came, then we -- then I went to my
20 husband's insurance, and then I switched to
21 BlueCross BlueShield.
22    Q. I see. When was Peyton born?
23    A. In March of '16.
24    Q. When in March of '16?
25    A. March 17. Excuse me.

Page 36

1    Q. I have it marked down that you were married
2 on December 31st, 2015. Is that not correct?
3    A. Mm-hmm.
4    Q. That is correct?
5    A. Correct.
6    Q. So you were married to your husband in
7 December 2015?
8    A. Right, and had Peyton in March of '16.
9    Q. And you had him in March of '16?
10    A. Right. I was seven months pregnant when we
11 got married.
12    Q. I see. I want to back up a minute, because
13 I got a little off on to a different topics. Back to
14 doctors you're currently being treated by.
15      So you mentioned that you're currently being
16 treated by Drs. Donato and Cross.
17    A. Yes.
18    Q. And you technically have a primary care
19 physician assigned to you, but you do not go to
20 Dr. Jackson for treatment; is that correct?
21    A. Correct.
22    Q. Are you currently being seen by any other
23 physicians?
24    A. No.
25    Q. In the time between when you had Peyton and

Page 37

1 now, have you seen any other physicians besides
2 Dr. Smith we just talked about?
3    A. Besides going to the ER?
4    Q. We'll get to that in one quick second.
5    A. No.
6    Q. And you mentioned going to the ER. When
7 did you go to the emergency room?
8    A. It was before the last deposition. So I
9 want to say maybe March of '19.
10    Q. For what reason did you go to the emergency
11 room?
12 ███████████████████████████████████
13 ███████████████████████████████████
14 ███████████████████████████████████
15    Q. Did that visit to the emergency room result
16 in an overnight stay at the hospital?
17    A. No.
18 █████████████████████████████████████
19 ███████████████████████████ ob/gyn.
20
21    Q. And did you have an ob/gyn in March of
22 2019?
23    A. No.
24    Q. Did you actually go see an ob/gyn for
25 treatment in March of 2019?

Desire Evans

Page 38

1    A. No.
2    Q. Did you have health insurance in March of
3  2019?
4    A. Yes.
5  ██████████████████████████████
6
7    A. Yes.
8    Q. Besides going to the emergency room in
9  ████████████████████████████████
10 ████████████████████████████████
11 ██████
12 ████
13    A. No.
14    Q. Prior to giving birth to Peyton, what
15 physicians were you treated by?
16    A. Javaka Moore was my OB, and I really didn't
17 have a primary care. Everything was basically done
18 through the ob/gyn.
19    Q. When did Dr. Moore become your ob/gyn?
20    A. In June of 2015.
21    Q. And pardon me for not knowing this, but is
22 Dr. Moore a woman or a man?
23    A. A man.
24    Q. Did you see Dr. Moore prior to becoming
25 pregnant with Peyton?

Page 39

1    A. No.
2    Q. How far along in your pregnancy with Peyton
3  did you become a patient of Dr. Moore's?
4    A. Seven weeks?
5    Q. When you saw him, was Dr. Moore a member of
6  a medical practice?
7    A. Yes.
8    Q. Were you ever treated by any other doctors
9  in Dr. Moore's practice?
10    A. No.
11    Q. Were you ever seen by any doctors other
12 than Dr. Moore in his practice?
13    A. Yes, but I don't know her name.
14    Q. And when you say you were seen by her, did
15 you have an appointment and she covered that
16 appointment?
17    A. Yes.
18    Q. Did you ever see any other medical
19 professionals in connection with your pregnancy? And
20 what I mean is somebody like a midwife or a doula.
21    A. No.
22    Q. Do you know what a doula is?
23    A. Yes, ma'am.
24    Q. Do you know what a midwife does?
25    A. Yes, ma'am.

Page 40

1    Q. When did you stop being a patient of
2  Dr. Moore's?
3    A. After I had my son, so -- I never went
4  back.
5    Q. When you say you never went back, what do
6  you mean?
7    A. After I had my child, I never went back to
8  that practice.
9    Q. The other doctor you mentioned in
10 Dr. Moore's practice who you were seen by, that was a
11 woman doctor, you said?
12    A. Yes. I think it was -- her first name was
13 Donna. I'm not one hundred percent sure. Caucasian
14 lady.
15    Q. Donna, you said?
16    A. I think.
17    Q. Thank you.
18    A. Diane, Donna, something like that.
19    Q. Probably started with a D?
20    A. It definitely started with a D.
21    Q. How did you come to be a patient of
22 Dr. Moore's?
23    A. It was assigned by Medicaid.
24    Q. When you say that Dr. Moore was assigned by
25 Medicaid, do you mean Dr. Moore in particular or

Page 41

1  Dr. Moore's practice?
2    A. Dr. Moore's practice.
3    Q. Do you know how many doctors were in
4  Dr. Moore's practice?
5    A. I do not.
6    Q. Do you know if Dr. Moore's practice was
7  affiliated with any hospitals?
8    A. I do not. Well, I'm lying. I'm lying. So
9  during the -- not lying.
10    I'm sorry. That was wrong. I didn't mean to
11 say it.
12    So during the time that they were setting up
13 my -- my induction --
14    Q. Yep.
15    A. -- they were saying that he was affiliated
16 with Dimensions Hospital, but I didn't know that prior
17 to that.
18    Q. Thank you. So when you said that when they
19 were setting up the induction, who do you mean they
20 were?
21    A. Like the front desk at the doctor's office.
22    Q. At Dr. Moore's office?
23    A. Yes.
24    Q. Is it fair to say that, when you were
25 setting up your induction at Dr. Moore's office, they

JA1247

Desire Evans

Page 42

1  explained to you that you would be induced at Prince
2  George's Hospital?
3        A.  Correct.
4        Q.  When you were setting up your induction
5  with Dr. Moore's practice, did they tell you what
6  physician would be doing your induction?
7        A.  I was under the impression it would be
8  Dr. Moore.
9        Q.  Did they tell you, though --
10       A.  No.
11       Q.  -- who it would be?
12       A.  But I was under the impression it would be
13  Dr. Moore.
14       Q.  What time of day, if you remember, were you
15  scheduled to have your induction?
16       A.  I was scheduled at 8 a.m.
17       Q.  Do you remember what day of the week it
18  was?
19       A.  I want to say maybe a Thursday.
20       Q.  Having looked at your medical records, is
21  it correct that you did actually go to Prince George's
22  Hospital to be induced?
23       A.  Yes.
24       Q.  And was that at the scheduled time that you
25  had arranged with Dr. Moore's office?

Page 43

1        A.  No.  They called me and rescheduled me to a
2  later time.
3        Q.  How much later?
4        A.  Two.
5        Q.  Two days?
6        A.  No, at 2:00.
7        Q.  Oh, 2:00 in the afternoon?
8        A.  Yeah, because they were -- they were saying
9  they were going to call me and let me know, but I was
10  already two weeks past due at that time, so I wasn't
11  having that.  So I said I'll just come up there and
12  sit and wait until you guys are ready.
13       Q.  So did you go at 2 p.m. to be induced?
14       A.  I went around 11:30, so I sat there until
15  they took me back.
16       Q.  At Prince George's Hospital?
17       A.  At Prince George's Hospital.
18       Q.  Aside from Dr. Moore, who you mentioned
19  having been treated by prior to delivering Peyton,
20  were you under the care of any other physicians or
21  psychiatrists at the time?
22       A.  No.
23       Q.  Any psychologists you were being treated
24  by?
25       A.  No.

Page 44

1        Q.  And was that while you were pregnant with
2  your son?
3        A.  What?
4        Q.  The time period we're talking about.
5        A.  Yes.
6        Q.  Prior to being pregnant with your son, have
7  you ever been treated by a psychologist or a
8  psychiatrist?
9        A.  No.
10       Q.  When your insurance set you up with
11  Dr. Moore's practice, how did Dr. Moore come to be
12  your physician in particular?
13          MR. CERYES:  Objection, foundation.
14       You can answer.
15       A.  Huh?
16          MR. CERYES:  You can answer.
17       A.  Oh.  He just came in the room.  I wasn't --
18  I didn't ask for him or anything.  He just was the
19  doctor assigned to me at the practice.
20       Q.  Did you do any research into the physicians
21  at the practice Dr. Moore was a part of?
22       A.  No.
23       Q.  Did you do any research into Dr. Moore's
24  credentials or background?
25       A.  No.

Page 45

1        Q.  Did you do any research into Dr. Moore's
2  educational history?
3        A.  No.
4        Q.  Did you do any research into whether
5  Dr. Moore was board certified?
6        A.  No.
7        Q.  Did you talk to any of his other patients,
8  Dr. Moore's?
9        A.  No.
10       Q.  Prior to having Dr. Moore as your
11  physician, had you ever previously been treated by an
12  ob/gyn?
13       A.  Previously?
14       Q.  Yeah.
15       A.  Like anytime in my life?
16       Q.  Anytime in your life.
17       A.  Yes.
18       Q.  And who was that?
19       A.  I don't remember their names.
20       Q.  Okay.  But other ob/gyn's previously in
21  your life?
22       A.  Mm-hmm.  Yes, ma'am.
23       Q.  Do you remember doing any research into any
24  of their credentials or educational background?
25       A.  No.

Desire Evans



Page 46

1    Q. Do you remember doing any research into any
2  of their certifications or whether they were a member
3  of any board?
4    A. No.
5    Q. It sounded like before Dr. Moore you had
6  seen more than one ob/gyn previously; is that correct?
7    A. Mm-hmm.
8    Q. Can you estimate for me about how many you
9  think you've seen over the course of your life?
10   A. Maybe two.
11   Q. Do you remember if they were male
12 physicians or woman physicians?
13   A. Women physicians.
14   Q. Both women physicians?
15   A. (Nodding head up and down.)
16   Q. Having had another moment to think about
17 it, do you remember either of their names?
18   A. No.  I do know that Dr. Moore is the only
19 male ob/gyn I've ever had.  That I can attest to.
20   Q. Do you remember any medical practice or
21 hospital that those two prior ob/gyn's were affiliated
22 with?
23   A. No.
24   Q. Prior to delivering Peyton, had you been
25 pregnant previously?

Page 47

4    Q. And were you treated by an ob/gyn during
5  that experience?

8    Q. Did you have a specific ob/gyn attending to
9  you?
10   A. I mean, not that I can remember.  I wasn't
11 going to an office, no, at that time.

13   Q. Did you go to the emergency room?
14   A. I did.

17   A. Right.

22   Q. Do you remember when that occurred?
23   A. Approximately one year prior to having
24 Peyton.
25   Q. Aside from the [redacted] you testified

Page 48

1  about from March 2019 and the [redacted]
2  about a year before you had Peyton, have you ever
3  otherwise been treated in an emergency room?
4    A. Oh, yes. I'm sorry. [redacted]
5    Q. [redacted] you said?
6    A. Yes, the [redacted]
7  [redacted] I'm sorry.  I
8  forgot about that.
9    Q. Did you go to the emergency room for that?
10   A. I did.
11   Q. That was May of 2019?
12   A. Mm-hmm.  Yes.
13   Q. Were you treated by a physician then?
14   A. Yes.
15   Q. What kind of treatment did they give you
16 for [redacted]
17 [redacted]

Page 49

1    A. Yes.
2    Q. So aside from the [redacted] the
3  [redacted] and the [redacted] have you otherwise
4  ever gone to the emergency room for yourself?
5    A. Not that I can remember.
6    Q. Did you go to the emergency room for
7  falling down the steps?
8    A. I did.
9    Q. Can you tell me about that?
10   A. I'm sorry.  That was in 2014 or '15.  I
11 fell down the steps, and I had a ruptured disc, I
12 believe.  I was in the hospital for a week.
13   Q. Was that a back injury?
14   A. Back injury, yes.
15   Q. Where were you when you fell down the
16 steps?
17   A. I was at home.  I was living in Oxon Hill
18 at the time.
19   Q. This is a different home than where you
20 live now?
21   A. Yes.
22   Q. Were those interior steps or exterior
23 steps?
24   A. Interior steps.
25   Q. Were those carpeted or was there other kind

JA1249

Desire Evans

Page 50

1  of material on them?
2    A. No, just a wooden step.
3    Q. So hardwood?
4    A. Mm-hmm.
5    Q. In the home you live now, is that where
6  you've lived since you had Peyton?
7    A. No, we moved. We bought that house in
8  April.
9    Q. Of what year?
10    A. I'm sorry, ma'am.
11    Q. It's okay.
12    A. 2018. We've been there for a little bit
13  over a year.
14    Q. And did you move directly from the place
15  you had lived when you fell down the steps to where
16  you live now?
17    A. No. So we lived in a place where I fell
18  down the steps, and then we moved to Waldorf, which
19  was -- do you need the address?
20    Q. If you would just describe it so I can talk
21  about it generally, that's fine.
22    A. Holly Station. Moved there, stayed there
23  for about a year, and then we moved in with my mother,
24  which was also in Waldorf.
25    Q. Is that where you reside now?

Page 51

1    A. No. We stayed --
2    Q. So you moved again?
3    A. We stayed there for about a year, and then
4  we moved to where I live now.
5    Q. And that's about a five-, ten-minute drive
6  from your house now, you said?
7    A. Yes.
8    Q. In which of those homes did you live when
9  you delivered Peyton?
10    A. In Holly Station.
11    Q. Was it a house or an apartment?
12    A. Apartment -- a townhouse.
13    Q. Did it have steps?
14    A. Yes.
15    Q. And what was the covering, if any, on those
16  steps?
17    A. Carpet.
18    Q. Carpet. And how many floors was the Holly
19  Station home?
20    A. Two.
21    Q. And your mother's home, does it have
22  interior steps?
23    A. Yes.
24    Q. Is it a standalone house?
25    A. It's a townhouse also.

Page 52

1    Q. Townhouse also? What kind of covering are
2  there on the steps?
3    A. Wood.
4    Q. And where you live now, is that an
5  apartment, a townhouse?
6    A. A house.
7    Q. And are there interior steps?
8    A. Yes.
9    Q. And what are those covered with?
10    A. Carpet.
11    Q. Going back to your fall, and you said that
12  was in 2014 or 2015; is that correct?
13    A. Mm-hmm, yes.
14    Q. Do you remember what time of year it was?
15    A. I don't. I don't want to make up anything.
16  I just want to say between July and September maybe.
17    Q. Of which year, do you remember?
18    A. No, I don't. 2014, '15, somewhere around
19  there.
20    Q. And you mentioned you were hospitalized for
21  five days; is that correct?
22    A. Yes.
23    Q. And did you only injure your back during
24  that fall?
25    A. Yes.

Page 53

1    Q. What kind of treatment did you receive for
2  your back?
3    A. They really didn't treat me at all. They
4  just kept me there under observation and gave me a lot
5  of medication, and then gave me PT while I was there.
6    Q. And by "PT" do you mean physical therapy?
7    A. Physical therapy, yes.
8    Q. Did you do physical therapy after you left?
9    A. No.
10    Q. Why not?
11    A. I didn't have any insurance, I don't think,
12  at that time.
13    Q. Did you do any follow-up visits with anyone
14  about your back?
15    A. I had one follow-up visit, and that was so
16  I can return to work.
17    Q. Okay. So that was to get permission to go
18  to work?
19    A. Yes.
20    Q. Because at that time you were working in an
21  office setting, correct?
22    A. Correct.
23    Q. When you were discharged from the hospital
24  from your back injury, did they recommend to you that
25  you continue doing physical therapy?

Desire Evans

Page 54

1    A. I don't recall. I don't recall.
2    Q. When you were discharged from the hospital
3  after your back injury, did you continue taking
4  medication?
5    A. The medication that was prescribed to me,
6  yes.
7    Q. Do you recall how long after you left the
8  hospital you continued to take medication relating to
9  your back injury?
10    A. I don't know. Maybe, I don't know, 30 days
11  maybe, I'm not -- I'm not 100 percent sure.
12    Q. Are you still on medication relating to
13  your back injury?
14    A. No.
15    Q. When you were pregnant with Peyton, were
16  you on medication relating to your back injury?
17    A. No.
18    Q. When you were pregnant with Peyton, were
19  you on any medication?
20    A. No. ████████████ does that count?
21    Q. Anything you were on.
22    A. Progesterone, yes.
23    Q. And what were you being treated for?
       ████████████████████████████
       ████████████████████████████

Page 55

1    A. Yes.
    ████████████████████████████
    ████████████████████████████
    ████████████████████████████
6    A. No.
7    Q. Any other emergency room visits in your
8  life that you remember having had other than the ones
9  you've talked about already today?
10    A. Not that I can recall. I really don't
11  remember.
12    Q. Any other hospitalizations that you've ever
13  had other than for delivering Peyton and relating to
14  your back injury you've already testified about?
15    A. No.
16    Q. Have you ever taken FMLA leave?
17    A. Yes.
18    Q. Are you presently taking any leave for
19  FMLA?
20    A. Yes.
21    Q. Could you explain to me what you're taking
22  for FMLA at the present time?
23    A. I have, like my condition, the reason why
24  I'm --
25    Q. Well, I'm first asking about how that

Page 56

1  impacts on your schedule, so how many hours a week
2  maybe or in a day.
3    A. Okay. So I'm scheduled for eight hours of
4  FMLA a day three days a week, so 24 hours a week of
5  FMLA.
6    Q. And who -- have you seen a doctor in
7  connection with getting paperwork relating to that?
8    A. Mm-hmm, Dr. Donato.
9    Q. When did you first get that FMLA leave from
10  Dr. Donato?
11    A. June, maybe June of last year, June of
12  2018, I'm assuming.
13    Q. Around that summertime?
14    A. Yes, ma'am.
15    Q. Prior to that, were you on FMLA leave?
16    A. No.
17    Q. Prior to the FMLA leave that you're on now
18  for which you've gotten paperwork from Dr. Donato,
19  have you ever been on FMLA leave?
20    A. No.
21    Q. Are you currently on any ADA leave?
22    A. Yes.
23    Q. Can you tell me about that?
24    A. ADA is the reason why I work from home. So
25  they afford me the opportunity to, you know, work from

Page 57

1  home and not have to travel into the office.
2    Q. Is that the accommodation you have through
3  the ADA?
4    A. Yes.
5    Q. Do you have any other accommodations
6  through the ADA?
7    A. No.
8    Q. Do you have any doctor paperwork that you
9  had to get in order to have that accommodation awarded
10  to you?
11    A. Yes.
12    Q. And from who?
13    A. Dr. Donato.
14    Q. When did you get that?
15    A. Excuse me. Sorry. Around the same time.
16    Q. At the same visit?
17    A. Yeah.
18    Q. Prior to the ADA leave that you just
19  described, had you ever been on ADA leave before?
20    A. No.
21    Q. Had you ever had any ADA accommodations
22  before?
23    A. No, ma'am.
24    Q. We discussed a little bit earlier today
25  that you've been deposed in a matter concerning

JA1251

Desire Evans

Page 58

1  Dimensions.  Do you remember that?
2      A.  Yes, ma'am.
3      Q.  And it's fair to say you were a plaintiff
4  in that matter?
5      A.  Yes, ma'am.
6      Q.  Aside from that lawsuit and aside from this
7  lawsuit, have you ever been involved in any other
8  lawsuit?
9      A.  No, ma'am.
10     Q.  Have you ever sued anybody other than ECFMG
11 and Dimensions?
12     A.  No, ma'am.
13     Q.  Have you ever been a defendant in any
14 lawsuit?
15     A.  No, ma'am.
16     Q.  Have you ever been a defendant in any
17 criminal matters?
18     A.  No, ma'am.
19     Q.  Have you ever been a witness in any civil
20 or criminal matters that you went to testify like at a
21 trial or a hearing?
22     A.  No, ma'am.
23     Q.  In the Dimensions litigation, is it fair to
24 say that, just like in this litigation, you're what
25 you would consider a Class representative?

Page 59

1      A.  Yes, ma'am.
2      Q.  Do you know what that means?
3      A.  Yes, ma'am.
4      Q.  Other than the Dimensions litigation and
5  this litigation, have you ever been a Class
6  representative?
7      A.  No, ma'am.
8      Q.  Have you ever considered being a Class
9  representative in any litigation besides Dimensions
10 and the ECFMG litigation?
11     A.  No, ma'am.
12     Q.  Do you know what the allegations are in the
13 litigation against Dimensions?
14     A.  Yes, ma'am.
15     Q.  And have you ever reviewed the complaint
16 that was filed in that case?
17     A.  Yes, ma'am.
18     Q.  Do you believe the allegations in the
19 complaint against Dimensions are true and correct?
20     A.  Yes, ma'am.
21     Q.  Have you provided discovery responses in
22 the Dimensions litigation?
23     A.  Yes, ma'am.  Yes, ma'am.
24     Q.  Were those responses true and correct?
25     A.  Yes, ma'am.

Page 60

1      Q.  Aside from a lawsuit, have you ever made a
2  claim for injury against anybody, any business, any
3  workplace?
4      A.  No, ma'am.
5      Q.  Any person?
6      A.  No.
7      Q.  Have you ever made a workers' compensation
8  claim?
9      A.  No, ma'am.
10     Q.  Have you ever suffered an injury at work?
11     A.  No, ma'am.
12     Q.  Have you ever suffered, aside from the
13 issues involved in this litigation, have you ever
14 suffered any physical, emotional, or sexual abuse from
15 any person?
16     A.  No, ma'am.
17     Q.  Have you ever been the victim of a crime?
18     A.  No, ma'am.
19     Q.  I would like to hand you what I'm going to
20 mark as Exhibit 1.
21         (Exhibit 1 marked for
22         identification: Amended Notice of
23         Deposition of Plaintiff Desire Evans)
24     Q.  Have you ever seen this document before?
25     A.  Yes.

Page 61

1      Q.  And this is the Amended Notice of
2  Deposition of Plaintiff Desire Evans.  Do you see
3  that?
4      A.  Yes.
5      Q.  And that's you?
6      A.  Yes.
7      Q.  And you're appearing today pursuant to this
8  deposition notice to be deposed?
9      A.  Yes.
10     Q.  So like I'm going to do a couple times
11 today, we've been going about an hour, so we'll take a
12 quick break, if that's okay.
13         MR. CERYES:  Sounds good.
14         VIDEO SPECIALIST:  We're going off the
15 record at 11:28.
16         (Proceedings recessed)
17         VIDEO SPECIALIST:  We're back on the record
18 at 11:39.
19 BY MS. MCENROE:
20     Q.  Ms. Evans, I want to ask you whether you
21 have ever been treated by a psychiatrist named
22 Dr. Nnamani.  Am I saying that correctly?
23     A.  Yeah.
24     Q.  Are you currently being treated by
25 Dr. Nnamani?

Desire Evans

Page 62

1    A.  No.  That was one visit.
2    Q.  One visit?
3    A.  One visit.
4    Q.  Okay.  And when was that?
5    A.  I was -- I want to say maybe September
6  of -- had to be '18 because we're in '19 now.  I was
7  referred to her by Dr. Donato.
8    Q.  For what purpose?
■■■■■■■■■■■
10    Q.  You mentioned you only went to her one
11  time?
12    A.  Yes.
13    Q.  Why did you only go to her one time?
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■
17    Q.  And did you choose to switch then to a
18  different physician?
19    A.  Yes.  That's when I switched to Ebony
20  Cross.
21    Q.  So it was your choice to switch from
22  Dr. Nnamani to Dr. Cross?
23    A.  Yes.
24    Q.  What kind of considerations did you take
25  into account when you were deciding to switch from

Page 63

1  Dr. Nnamani to Dr. Cross?
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■
6    Q.  You weren't clicking; is that a fair way to
7  say it?
8    A.  No.  Yeah.
9    Q.  Did you feel uncomfortable being treated by
10  Dr. Nnamani?
11    A.  A little.
12    Q.  Why?  Do you know?
13    A.  Just certain --
14    I can answer this?
15    MR. CERYES:  To the best of your
16  understanding.
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■
22    Q.  Is she a woman doctor?
23    A.  Yes.
24    Q.  And Ms. Cross -- sorry.  Dr. Cross is a
25  woman doctor as well?

Page 64

1    A.  Yes.
■■■■■■■■■■■■■■■■■■
4    A.  Mm-hmm.
■■■■■■■■■■■■■■
6    A.  Maybe for the past two years.
7    Q.  When did you get your driver's license?
8    A.  When I was 19.
9    Q.  So about 21 years ago?
10    A.  Tell everybody.
11    Q.  So you've been -- but you've been driving
12  for over 20 years?
13    A.  Mm-hmm.
■■■■■■■■■■■■■■■■
16    A.  No.
■■■■■■■■■■■■■■  what
18  do you mean?
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■

Page 65

■■■■■■
2    A.  Yes.
3    Q.  You said that began around two years ago?
4    A.  Yeah, about.
5    Q.  Do you have an estimation of more
6  specifically when?
7    A.  No.  No, it's just something that's getting
8  increasingly worse.  I can't really put a time stamp
9  on the exact time that it started.  It's just been
10  something that's been getting increasingly worse from
11  ■■■■■■
12    Q.  So including the driving, but more than
13  that?
14    A.  Yes.
15    Q.  And so you would say you had that to some
16  extent before two years ago, is that right ■■■■■
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■
25  to having had your son?



Desire Evans

**Page 66**

1     A. Not that I could identify ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4     Q. Prior to having your son did you ever have
5  depression?
6     A. No.
7     Q. Prior to having your son have you ever had
8  any treatment by any psychiatrist or psychologist?
9     A. No.
10    Q. A school counselor?
11    A. About depression?
12    Q. Or anxiety.
13    A. No.
14    Q. School counselor for anything else?
15    A. School stuff.
16    Q. Okay. When you were switching from
17  Dr. Nnamani to Dr. Cross, how did you find Dr. Cross?
18    A. I found Dr. Cross through another provider
19  within Dr. Donato's office, so -- because she was --
20  she goes to her. So she told me that I should try her
21  out, because she was more of a -- she was -- she just
22  said that she was a good psychiatrist and she
23  recommended her.
24    Q. Fair to say it was more of like a
25  word-of-mouth kind of recommendation?

**Page 67**

1     A. Yes.
2     Q. Did you do any research about Dr. Cross
3  before you started going to her?
4     A. Nothing besides talking to the people that
5  I knew that she went to, that go to her, no.
6     Q. Did you Google her?
7     A. No. Yeah, I did actually Google her.
8     Q. Did you see where she went to school?
9     A. No.
10    Q. What did you see when you Googled
11  Dr. Cross?
12    A. Just the practices that she has.
13    Q. The areas that she treats?
14    A. Mm-hmm.
15    Q. Anything else?
16    A. No, ma'am.
17    Q. Did you do any research into Dr. Donato
18  before you went to see her?
19    A. No.
20    Q. No Googling?
21    A. No.
22    Q. Did you do any research into Dr. Moore
23  either before you saw him or once you started being
24  treated by him?
25    A. No.

**Page 68**

1     Q. You never Googled him?
2     A. Nope.
3     Q. Aside from Dr. Cross, you mentioned that
4  you had done a little bit of research into -- do you
5  know if you ever known where any of your physicians
6  have attended medical school?
7     A. No.
8     Q. Have you ever asked that you know of?
9     A. No.
10    Q. Do you know if any of your physicians
11  you've been treated by have gone to medical school
12  outside of the United States?
13    A. No.
14    Q. Do you think some of them could have, you
15  just don't know?
16    A. I can't -- I don't know.
17    Q. You don't know one way or the other?
18    A. Right. Yeah, I wouldn't know to have to
19  ask that question. I would think that I could take
20  them at their word that they have done the things that
21  they say they did.
22    Q. Right, but you never, like, looked to see
23  did Dr. Moore go to -- I'm making this up -- Johns
24  Hopkins or Harvard or something?
25    A. Nope.

**Page 69**

1     Q. Okay. Do you have any medical doctors in
2  your family?
3     A. I do.
4     Q. Who is a medical doctor in your family?
5     A. Terrell Newton.
6     Q. How is Dr. Newton related to you?
7     A. He's my cousin.
8     Q. On which side, your mom's side or your
9  dad's side?
10    A. My mom's side.
11    Q. An aunt's child or an uncle's child?
12    A. Aunt.
13    Q. So it's your mom's sister's son?
14    A. Yep. Yes, ma'am.
15    Q. Any other physicians in your family?
16    A. No.
17    Q. And what does Dr. Newton's specialize in?
18    A. He's an anesthesiologist.
19    Q. Where does he practice?
20    A. I don't know. He has his own practice in
21  Florida for pain management.
22    Q. In Florida?
23    A. Yeah. I don't know the name of it.
24    Q. Do you know where Dr. Newton went to
25  medical school?

JA1254

Desire Evans

Page 70

1      A. North Carolina.
2      Q. In the United States?
3      A. Yes. What's the school down in North
4  Carolina? I can't think of the name of the school.
5  It's a school in North Carolina.
6      Q. But a medical school in North Carolina?
7      A. Mm-hmm.
8      Q. And Dr. Newton is not an ob/gyn?
9      A. No.
10     Q. Are you friends with any other medical
11 doctors?
12     A. No.
13     Q. Are you acquainted with or know anybody who
14 went to medical school outside of the United States?
15     A. No.
16     Q. You understand that my client, the
17 Educational Commission for Foreign Medical Graduates,
18 is the defendant in this case, correct?
19     A. Yes.
20     Q. Is it okay if I refer to them as ECFMG?
21     A. Yes, ma'am.
22     Q. You'll know what I'm talking about?
23     A. Yes, ma'am.
24     Q. Prior to meeting counsel in connection with
25 this lawsuit or the Maryland lawsuit, had you ever

Page 71

1  heard of ECFMG before?
2      A. No.
3      Q. Do you have any understanding of what ECFMG
4  does?
5      A. Yes.
6      Q. And from where did you get that
7  understanding?
8      MR. CERYES: Objection.
9      MS. MCENROE: Not asking for specifics.
10 I'm just asking generally where she got the
11 understanding from.
12     Q. I'm not trying to get into specific
13 conversations you had with counsel, but I'm just
14 trying to understand from where did you get that
15 understanding?
16     MR. CERYES: I'll allow you to answer it.
17     A. From counsel.
18     Q. Aside from conversations you had with
19 counsel, have you learned anything about ECFMG outside
20 of what counsel told you?
21     A. Well, I did -- once I found out what their
22 responsibilities were, I did look them up, yes.
23     Q. So you Googled them?
24     A. Yes.
25     Q. And you read some information about ECFMG

Page 72

1  on the Internet?
2      A. Yes.
3      Q. Do you remember what you read on the
4  Internet?
5      A. Just what their job responsibilities were,
6  where they are located.
7      Q. Was that from the ECFMG website?
8      A. Yeah. I just Googled.
9      Q. You said you looked up what the job
10 responsibilities were for ECFMG. What do you mean by
11 that?
12     A. I wanted to know exactly what kind of
13 company it was. So not exactly -- I didn't look up,
14 you know, exactly job responsibility, but what kind of
15 company it was and what they performed, what they did.
16     Q. What do you mean by what kind of company
17 they are?
18     A. So I just knew that it was some kind of
19 credentialing company or something, but I wasn't sure.
20 Like, I wasn't 100 percent sure of the nature of the
21 company, so I wanted to know exactly what the nature
22 of the company was.
23     Q. And when did you conduct this Internet
24 research, before you met counsel or after you met
25 counsel?

Page 73

1      A. After.
2      Q. When did you first meet the counsel that
3  represents you in this litigation and in the
4  Dimensions litigation?
5      A. I don't remember. Was it November? I
6  think the first meeting was in November.
7      Q. Of what year?
8      A. '18?
9      You don't know? You can't help me.
10     MR. CERYES: Do your best.
11     A. I'm sorry.
12     Q. Do you remember how you came to meet
13 counsel?
14     A. Yeah. I heard an ad.
15     Q. You heard an advertisement for a law firm?
16     A. An advertisement, uh-huh.
17     Q. Do you remember for which law firm?
18     A. For Schochor, Federico and Staton.
19     Q. And you said you heard it. How did you
20 hear it?
21     A. Actually my husband heard it on the radio.
22     Q. When was that?
23     A. Ma'am, I'm old. You keep asking me all
24 these dates. I don't know. I don't know. Maybe
25 summer of 2018 maybe.

Desire Evans

Page 74

1  Q. Did you hear the radio advertisement at any
2  time personally?
3  A. Yes. I heard it after the fact, yes.
4  Q. When you say "after the fact" --
5  A. Well, after my husband heard it.
6  Q. Did you hear it? Did you personally hear
7  it before you contacted counsel?
8  A. Yes.
9  Q. What did the radio advertisement say?
10  A. If you were seen by Charles Akoda, give us
11  a call, something to that effect.
12  Q. Did it say anything about why?
13  A. I don't think it went into detail.
14  Q. Was the firm that was advertised in that
15  radio advertisement the same firm that you then
16  reached out to?
17  A. Yes.
18  Q. Had you consulted with any other lawyers?
19  A. No.
20  Q. You mentioned earlier that you conducted
21  some Internet research into ECFMG. Do you remember
22  that discussion?
23  A. Yes.
24  Q. Do you know what it means for a foreign
25  medical graduate to be certified by ECFMG?

Page 75

1  A. Yes.
2  Q. To you what does that mean?
3  A. To me it means that they have completed
4  everything that they were supposed to do successfully
5  in order to gain the certification from ECFMG to
6  practice.
7  Q. Do you understand or -- strike that.
8  Do you have an understanding of whether or not
9  a foreign medical graduate can come to the
10  United States, get an ECFMG certification, and then
11  practice medicine, or if they have to do something
12  else before that?
13  A. My understanding is you have to do
14  something before that.
15  Q. Do you know what that something is?
16  A. Certifications, some kind of testing?
17  Q. Okay. Do you know what a residency program
18  is --
19  A. I do.
20  Q. -- for a physician? What does that mean to
21  you?
22  A. A residency program is kind of like an
23  internship for doctors.
24  Q. And that's still medical education. Do you
25  understand that?

Page 76

1  A. Mm-hmm.
2  Q. Is that a yes?
3  A. Yes.
4  Q. Okay. And the medical care -- strike that.
5  Where Peyton was delivered, was that in
6  Maryland?
7  A. Yes.
8  Q. And do you have an understanding of whether
9  Maryland requires physicians to be licensed by the
10  State of Maryland to practice medicine there?
11  A. No. I would assume that they would.
12  Q. So you think that they do.
13  A. Yeah.
14  Q. Okay. So that's just what I'm trying to
15  ask. Do you have an understanding that the State of
16  Maryland requires physicians doing medical care there
17  to be licensed by the state?
18  A. Yes.
19  Q. Okay. Have you ever heard of the
20  United States Medical Licensing Examinations?
21  Sometimes it's called USMLE.
22  A. No.
23  Q. Do you have any understanding that, in
24  order to become a physician in the United States,
25  graduates of medical school need to take what's called

Page 77

1  medical boards?
2  A. Yes.
3  Q. Do you have an understanding of whether
4  some physicians can get additional credentialing by
5  becoming board certified?
6  A. No.
7  Q. Okay. So you've never heard like he's a
8  board -- he's board certified in --
9  A. Yes.
10  Q. -- and then a specialty?
11  A. Yes.
12  Q. You've heard that before?
13  A. Yes, I've heard that before.
14  Q. Okay. And what does that mean to you?
15  A. That they were certified by some type of
16  medical board.
17  Q. Okay. Do you know whether Dr. Akoda --
18  when I say "Dr. Akoda," do you know who I'm referring
19  to?
20  A. Yes.
21  Q. Okay. Do you know whether Dr. Akoda took
22  any United States medical licensing examinations?
23  MR. CERYES: Objection, foundation. You
24  can answer to the extent you're able.
25  A. Yeah. I mean, I'm assuming he did, yes.

JA1256

Desire Evans

Page 78

1    Q. Okay. Do you know whether Dr. Akoda passed
2  the USMLE components?
3       MR. CERYES: Same objection.
4    A. If he passed, after failing? Yes.
5    Q. So you're asserting that you think that
6  Dr. Akoda failed them.
7    A. I don't -- I mean, that's my assumption.
8  That's --
9    Q. Why is that your assumption?
10   A. Because I read through the documents that
11  were given to me.
12   Q. What documents were given to you?
13   A. The discovery and things like that.
14   Q. What discovery was given to you?
15   A. From my -- this stuff (indicating) that
16  my -- that my counsel gave to me.
17   Q. Okay. What did they show you that made you
18  think that Dr. Akoda had failed examinations?
19      MR. CERYES: I'm going to object to the
20  extent I think we're getting into attorney-client
21  privilege. I can proffer to you what she's talking
22  about, if that's helpful.
23   Q. Were these documents that were produced in
24  this litigation? Did they have Bates-stamped numbers
25  on the bottom?

Page 79

1       MR. CERYES: Are you asking me?
2       MS. MCENROE: I'm asking whoever will tell
3  me.
4       MR. CERYES: I think what she's referring
5  to is the complaint.
6       MS. MCENROE: The complaint.
7    A. The complaint.
8    Q. Okay. So you've seen the allegations
9  drafted as by counsel --
10   A. Correct.
11   Q. -- about Dr. Akoda.
12   A. Correct.
13   Q. Okay. Have you ever seen underlying
14  original documents -- and by "original," I mean they
15  could be copies -- but underlying documents regarding
16  Dr. Akoda's credentials?
17   A. No.
18   Q. Have you ever seen his medical school
19  diploma?
20   A. No.
21   Q. Were you lead to believe he did not
22  graduate from medical school?
23   A. I wasn't lead to believe anything. I'm
24  just going off of what I read in the complaint myself,
25  ma'am.

Page 80

1    Q. Right. So those are allegations in the
2  complaint.
3    A. Mm-hmm.
4    Q. Did you write the complaint?
5    A. No.
6    Q. Do you know who wrote the complaint?
7    A. My counsel, I would assume.
8    Q. Okay. Do you know whether any of the other
9  physicians you've ever been treated by in your life
10  have been ECFMG certified?
11   A. I don't know.
12   Q. You don't know one way or the other?
13   A. No.
14   Q. Do you know if, as part of ECFMG
15  certification program, it verifies Social Security
16  numbers?
17   A. No. Well, I'm assuming that they do.
18   Q. You're assuming they do?
19   A. I would hope so.
20   Q. On what basis?
21   A. Because you have someone coming from
22  another country, how else are you going to identify
23  them besides their identification number, which is
24  their Social.
25   Q. Do you know for a fact whether as part of

Page 81

1  its certification program ECFMG verifies birth
2  certificates?
3    A. I would assume they should.
4    Q. On what basis are these assumptions made
5  on?
6    A. Because how else are you going to identify
7  someone without those identification things?
8    Q. And you think that ECFMG's purpose is to
9  verify identification documentation?
10   A. Yes.
11   Q. Do you know if, as part of its
12  certification program, ECFMG verifies green cards?
13   A. I don't know, but I would assume they
14  would.
15   Q. Do you know whether if, as part of its
16  certification programs, ECFMG verifies state medical
17  licenses?
18   A. I would assume they would.
19   Q. Same basis?
20   A. Yes.
21   Q. And do you know whether for a fact, as part
22  of its certification program, ECFMG verifies board
23  certifications?
24   A. I would assume as well.
25   Q. Okay. So is it your understanding that

JA1257

Page 82

1 ECFMG is responsible for verifying any piece of
2 identifying information about a foreign medical
3 graduate?
4     A. Absolutely.
5         MR. CERYES:  Object to the extent I think
6 we're getting into expert testimony, but you can
7 answer to the best of your understanding.
8         MS. MCENROE:  Well, I'm asking about the
9 witness's understanding, so I think that's a fair --
10     A. Yes.
11     Q. So on what basis do you have that
12 understanding?
13     A. The basis that if you are -- if someone is
14 going to be caring over someone medically, that I
15 would assume that they would do their due diligence to
16 find out that this person is who they say they are,
17 and you would have to go through all of those things
18 to make sure that this person is exactly who they are
19 stating to be.
20     Q. Is it fair to say that, when you were
21 treated by Dr. Akoda, you had not heard of ECFMG?
22     A. Correct.
23     Q. Is it fair to say that we're here today
24 because of Dr. Akoda's treatment of you?
25         MR. CERYES:  Objection, form, foundation.

Page 83

1         You can answer, if you understand the question.
2     Q. I'm not trying to make this a hard one.
3 I'm just trying to transition to another general area.
4         Have you ever been treated by a doctor who
5 called himself Dr. Akoda?
6     A. Yes.
7     Q. When was that?
8     A. March 16th into 17th of 2008 -- '16.
9 Jesus, '16.
10     Q. Why were you being treated by Dr. Akoda,
11 for what condition?
12     A. Delivery, pregnancy.
13     Q. How did you come to be treated by
14 Dr. Akoda?
15     A. He was the doctor on call, I guess.
16     Q. Where?
17     A. At Dimensions Health Systems.
18     Q. Earlier today we were discussing you being
19 induced to have your labor; is that correct?
20     A. Yes.
21     Q. Was Dr. Akoda the doctor that induced you
22 to labor?
23     A. No.  The nurse -- a nurse gave me the
24 medication.
25     Q. So you were originally seen by another

Page 84

1 medical professional to get that process started?
2     A. By another -- mm-hmm, yes.
3     Q. And that would have been Pitocin; is that
4 correct?
5     A. Yes.  Yes, ma'am.
6     Q. How did you react to the Pitocin?  Did that
7 work for you?
8     A. Yes.
9     Q. How long were you in labor?
10     A. Twenty-two, 24 hours, 26 hours, somewhere
11 between there.
12     Q. And did you spend a period of that time
13 pushing?
14     A. Twelve hours.
15     Q. Twelve hours.  Was Dr. Akoda your physician
16 the entire 22, 24, 26 hours that you were in labor?
17     A. Yes.
18     Q. Did you see any other ob/gyn's during your
19 labor or delivery?
20     A. No.
21     Q. You already made reference to one nurse.
22 Do you recall being treated by nurses while you were
23 laboring and delivering?
24     A. Yes.
25     Q. Do you recall about how many?

Page 85

1     A. Two.
2     Q. At any one time or over the course of time?
3     A. Over the course of time.  It was shift
4 work.
5     Q. Do you remember the names?
6     A. I do not.
7     Q. Were the nurses men or women?
8     A. Women.
9     Q. Can you tell me about when you first met
10 Dr. Akoda?
11     A. He just came in and introduced himself, and
12 I guess -- I don't remember -- asked me a few
13 questions and then --
14     Q. Sure.  Did you ask -- oh, go ahead.
15     A. And then said that he was going to prepare
16 the room for delivery.
17     Q. Did he actually prepare the room for
18 delivery?
19     A. He and another nurse.
20     Q. What did they do to prepare the room for
21 delivery?
22     A. They brought in like a little table and
23 some supplies and moved my bed from where it was into
24 like the middle of the floor.
25     Q. How far along was this in the 22, 24, or 26

Desire Evans

Page 86

1  hours you were describing for your labor?
2        Q.  So I got there around -- so this was
3  approximately 10:00 in the morning on the 17th.  So I
4  got there the day before on the 16th around 11:30, and
5  I was taken back around 1:00-ish.
6        Q.  Were you being treated by Dr. Akoda before
7  you got taken back?
8        A.  No.
9        Q.  Were you being treated by any ob/gyn before
10  you got taken back?
11        A.  No.
12        Q.  When you first met Dr. Akoda, did you ask
13  him at all about his credentials or his background?
14        A.  No.
15        Q.  Did you at any point ask him about his
16  background or his experience?
17        A.  No.
18        Q.  About his credentials?
19        A.  I was in labor, ma'am.  No.
20        Q.  I understand.  I'm just asking questions.
21        A.  Oh.  No.
22        Q.  Do you know whether Dr. Akoda completed a
23  residency program?
24        A.  I don't know.
25        Q.  You don't know?

Page 87

1        A.  No.
2        Q.  Do you know whether Dr. Akoda was board
3  certified by the American Board of Obstetrics and
4  Gynecology?
5        A.  No.
6        Q.  So I want to talk a little bit more about
7  your labor and delivery experience.  About how long
8  between when Dr. Akoda started treating you and you
9  delivered Peyton, about how long was that period of
10  time?
11        A.  About 11, 12 hours or so.
12        Q.  Was Dr. Akoda in the room with you that
13  entire time?
14        A.  No.
15        Q.  Okay.  Did he come in and out of the room?
16        A.  Yes.
17        Q.  Approximately how many times, do you know?
18        A.  No, ma'am.
19        Q.  Was it on a regular schedule or was it just
20  sort of --
21        A.  Just -- from my understanding, he was the
22  only physician there, so he was delivering other
23  babies.
24        Q.  Did a nurse stay with you the entire time?
25        A.  They were both in and out.  No one was in

Page 88

1  the room with me for the entire time.
2        Q.  Was your husband with you?
3        A.  Yes.
4        Q.  Was your mother with you?
5        A.  Yep.
6        Q.  Was anybody else with you?
7        A.  No.
8        Q.  Did your husband and mother remain with
9  you --
10        A.  Yes.
11        Q.  -- barring bathroom trips or whatnot the
12  entire time?
13        A.  Yes, uh-huh.
14        Q.  Does your husband have any other children
15  besides Peyton?
16        A.  Mm-hmm.
17        Q.  How many children does he have?
18        A.  Three.
19        Q.  Do they reside with you?
20        A.  No.
21        Q.  How old are they?
22        A.  Fifteen, eleven, and seven.
23        Q.  And seven?
24        A.  Yeah.
25        Q.  Okay.  Are they boys or girls?

Page 89

1        A.  Mixed, two boys and one girl.
2        Q.  And how old is the girl?
3        A.  The girl is seven.
4        Q.  Okay.  So the older two are boys.
5        A.  Yes.
6        Q.  Do you know if your husband was present for
7  their deliveries?
8        A.  I don't know.
9        Q.  Are the three of them with the same mother?
10        A.  No.
11        Q.  Okay.  Do any of them share a mom?
12        A.  Yes, two of them.
13        Q.  Which two?
14        A.  The two boys have the same mom.
15        Q.  How many children does your mother have?
16        A.  Two.
17        Q.  Do you know if that's the number of
18  children she delivered?
22        A.  No, I don't know.
23        Q.  So you have one sibling?
24        A.  Yes.
25        Q.  Is it a brother or a sister?

JA1259

Desire Evans

Page 90

1    A. A brother.
2    Q. Older or younger?
3    A. Younger.
4    Q. And he's not a physician?
5    A. No.
6    Q. What does he do?
7    A. He is a general manager for a nightclub.
8    Q. In the area?
9    A. Yes.
10   Q. Does he have any children?
11   A. No.
12   Q. About how much time total would you
13   estimate you spent with Dr. Akoda?
14   A. Out of that 12 hours, I want to say maybe
15   eight hours.
16   Q. So he was with you for eight out of the 12
17   hours?
18   A. Yeah, in and out. I was having
19   difficulties pushing, so he was in and out trying to,
20   you know, he would come in and then leave and then
21   come back, leave and then come back, and try to get me
22   to push again, that type of situation.
23   Q. Got it. Okay. And each time he would come
24   in, approximately how long would he be in the room
25   for, a couple minutes at a time?

Page 91

1    A. Maybe 10, 15 minutes.
2    Q. And you testified that you were pushing for
3    a long time; is that correct?
4    A. Yes.
5    Q. Okay. I apologize for the personal nature
6    of this question, but were your legs in stirrups or
7    were people holding your feet?
8    A. They were holding my feet.
9    Q. And who was holding your feet?
10   A. My mom and my husband.
11   Q. So your mom was holding one and your
12   husband was holding the other?
13   A. Yes, ma'am. At a later point there was a
14   nurse there holding -- holding my other leg while my
15   husband was down there with Dr. Akoda.
16   Q. Okay. So that was one of the two nurses
17   you were talking about --
18   A. Yes.
19   Q. -- who was holding one of the legs --
20   A. Yes.
21   Q. -- while your husband was standing next to
22   Dr. Akoda?
23   A. Yes.
24   Q. And how long was your husband standing next
25   to Dr. Akoda while he treated you and a nurse held

Page 92

1    your leg?
2    A. During that particular time, I want to say
3    it might have been around 30 minutes, because at that
4    time the baby's head started coming out but kept going
5    back in. So he stayed in the room for a little bit
6    longer at that -- at that time.
7    Q. Did he use forceps or any other tools in
8    that way?
9    A. No.
10   Q. Did you have an epidural during your labor?
11   A. Mm-hmm.
12   Q. Is that a yes?
13   A. Yes, ma'am. Sorry.
14   Q. Around what time during this whole process
15   do you remember getting an epidural?
16   A. The epidural was the night before, so I
17   want to say maybe 11 or 12 in the evening after they
18   had given me the first dosage of Pitocin.
19   Q. So 11 or 12 the night before you delivered?
20   A. Yes.
21   Q. After you got the epidural, were you
22   connected to an IV?
23   A. Mm-hmm. Yes.
24   Q. Is that yes? And you were confined to your
25   bed; is that correct?

Page 93

1    A. Yes.
2    Q. Did the epidural work? Were your legs
3    numb?
4    A. Yes.
5    Q. Yes. Okay. You ultimately ended up having
6    a C-section; is that correct?
7    A. Yes.
8    Q. And do you understand whether they used the
9    C-section as the anesthesia -- I'm sorry. Strike
10   that.
11   Do you know whether they used the epidural as
12   the anesthesia for your C-section or if they gave you
13   something else?
14   A. They gave me something else.
15   Q. And did you remain awake during your
16   C-section?
17   A. Yes.
18   Q. Who conducted your C-section?
19   A. Dr. Akoda.
20   Q. So when you were laboring and your mom and
21   husband had one foot and then later the nurse swapped
22   in for your husband, were you laying on your back?
23   A. Yes.
24   Q. And did you have a sheet over your legs --
25   A. Well.

JA1260

Page 94

1    Q. -- a blanket or something?
2    A. Yeah. I mean, it wasn't over my legs any
3  longer because my legs was up, but, yeah, it was one
4  covering my stomach area.
5    Q. And were you able to see your baby's head
6  coming in and out --
7    A. Yes.
8    Q. -- over your tummy?
9    A. Well, because I was up.
10   Q. How were you positioned?
11   A. I was like up.
12   Q. If you could describe it a little. We have
13  the video camera, but it would be helpful if you could
14  describe it as well.
15   A. I wasn't laying flat. I mean, I was on my
16  back, but I was kind of in a C kind of position.
17   Q. Yep.
18   A. So my body was up like this, and they were
19  holding my legs like this. So I was pushing -- they
20  were -- it's hard to explain.
21   Q. Yeah.
22   A. They were pulling my legs back this way
23  trying to get the baby out.
24   Q. Yep.
25   A. So I'm up like, and they were pulling my

Page 95

1  legs back. Does that make sense?
2    Q. Got it. I think it does. So if I can
3  articulate it correctly, was your -- you were seated
4  somewhat with your legs elevated.
5    A. Yes.
6    Q. And you were pushing?
7    A. Yes. Yes.
8    Q. Is that correct?
9    A. Yes.
10   Q. And did you actually see the baby's head
11  when it was coming in and out?
12   A. Yeah, I saw it twice.
13   Q. And did Peyton have hair when he was
14  delivered?
15   A. A lot. He still has a lot.
16   Q. Peyton was delivered healthy?
17   A. Yes.
18   Q. Any issues or concerns from breastfeeding?
19   A. No.
20   Q. Was he a good eater?
21   A. Yes.
22   Q. How was your labor and delivery recovery
23  yourself?
24   A. It was okay.
25   Q. How was your C-section incision?

Page 96

1    A. It was okay.
2    Q. You had no infection?
3    A. No.
4    Q. How long after you had Peyton did you go
5  back to working? And I understand you were working
6  from home, but did you return to working?
7    A. I want to say -- I want to say I was out
8  for maybe two months, but I'm not 100 percent sure.
9  I'm pretty sure it was like eight weeks.
10   Q. Do you know if there were any medical
11  students or residents present for your labor or
12  delivery?
13   A. I don't recall.
14   Q. Is it possible that there could have been
15  other medical professionals coming in and out the
16  room?
17   A. It's possible.
18   Q. Do you know who placed your epidural? Was
19  it an anesthesiologist?
20   A. Yes.
21   Q. So that was a doctor different from
22  Dr. Akoda?
23   A. Yes.
24   Q. Was that doctor, the anesthesiologist,
25  present during your C-section, do you know?

Page 97

1    A. I don't think it was the same doctor.
2    Q. But was there an anesthesiologist --
3    A. Yes.
4    Q. -- present during your C-section?
5    A. Yes. Yes, because they gave me additional
6  medication before.
7    Q. You mentioned earlier that, when you came
8  in for your induction or when you scheduled your
9  induction, you expected you would be delivered by
10  Dr. Moore; is that correct?
11   A. Yes.
12   Q. When did you learn that that was not going
13  to happen?
14   A. When Dr. Akoda came in the room and said
15  that he was going to be delivering my baby.
16   Q. So you didn't find that out beforehand?
17   A. No.
18   Q. Did you ask any questions about why
19  Dr. Moore would not be delivering your baby?
20   A. No. At that point I just wanted the baby
21  out.
22   Q. How long did you stay in the hospital after
23  you had Peyton?
24   A. Five days? Five days.
25   Q. Do you know if that was the standard length

Desire Evans

Page 98

1  of time or if you stayed any longer for any reason?
2      A. I believe that's the standard length of
3  time for a C-section.
4      Q. Did Peyton remain in the hospital with you
5  that whole time?
6      A. Yes.
7      Q. Is Prince George's Hospital a rooming in
8  hospital?  Do you know what that means?
9      A. No.
10     Q. Did they have the baby sleep with you in
11  your hospital room?
12     A. Yes.  Yes.
13     Q. Was he sleeping while he was in the
14  hospital at least some of the time?
15     A. Yes.
16     Q. Did he need to be treated with anything
17  initially when he was born?  Did he have jaundice or
18  any of those types of newborn things?
19     A. No, huh-uh.
20     Q. You said he was good?
21     A. He was good, yes.
22     Q. And did a pediatrician come to treat Peyton
23  while you were in the hospital, do you remember?
24  Treat, or I should say observe.
25     A. Yeah.

Page 99

1      Q. Yep.
2      A. Yeah.
3      Q. After you delivered, did any ob/gyn's come
4  to visit you?  Did Dr. Moore come and see you at any
5  time during those five days?
6      A. No.
7      Q. Did any other physicians come to you?
8      A. No, just had a nurse after that.
9      Q. Just a nurse?
10     A. (Nodding head up and down.)
11     Q. Okay.  Did anyone talk to you about
12  postpartum depression when you were being released
13  from the hospital or during your hospital stay?
14     A. Not that I can remember, no.
15     Q. Do you know what postpartum depression is?
16     A. Yes.
17     Q. Do you believe you've suffered ever from
18  postpartum depression?
19     A. No.
20     Q. Have you ever spoken to any of your
21  training psychologists or psychiatrists about
22  postpartum depression?
23     A. No.
24     Q. Were you ever treated by somebody named
25  Dionne Lucas?  Maybe a physician's assistant.

Page 100

1      A. Dionne Lucas...
2      Q. I might be saying the name wrong.  It's
3  D-I-O-N-N-E.
4      A. I believe I went to her for a physical.  I
5  don't remember when, though.

8              (Exhibit 2 marked for
9              identification: History and Physical
10             Examination re Desire Evans)
11         MR. CERYES:  Thank you.
12     Q. Ms. Evans, I'm handing you a copy of some
13  medical records that we've received in discovery in
14  this case.  So you'll see the first page is an
15  Affidavit of Authentication of Records.  Do you see
16  that?
17     A. Mm-hmm.  Yes.
18     Q. And you'll see at the bottom there's a
19  little number that starts with the word "plaintiffs."
20     A. Yes.
21     Q. And then a number of zeros and then it says
22  5833.  Do you see that at the way bottom, Plaintiffs'
23  5833, all the way at the bottom?
24     A. Oh, yeah, yeah, yeah.
25     Q. So that's what we call a Bates stamp.  So

Page 101

1  if I refer you to a Bates stamp, it's the individually
2  numbered page number specific for this litigation.
3  Okay?
4      A. Mm-hmm.
5      Q. Do you see that?
6      A. Yes.
7      Q. Okay.  And I'd like to direct you to the
8  second page in that document, which at the top says
9  History and Physical Examination.  Do you see that?
10     A. Mm-hmm.
11     Q. Okay.  And you said yes?
12     A. Yes.
13     Q. Okay.  And at the top it says DOS and then
14  July 25th, 2016.  Do you see that?
15     A. Yes.
16     Q. Is that around the time you think you saw
17  Dionne Lucas?
18     A. Yes.
19     Q. And to help refresh your recollection, if
20  you take a look at the very next page, you'll see that
21  the document was electronically signed by Dionne Lucas
22  two days after that date.  Do you see that?
23     A. Yes.
24     Q. Does that sound familiar to you that you
25  would have been treated by this physician's assistant

Desire Evans

Page 102

1  in July 2016?
2      A. Yes.
3      Q. And looking back to the page that has
4  History and Physical Examination at the top, do you
5  see that?
6      A. Mm-hmm.
7      Q. There's a section that says, History of
8  Present Illness. Is that correct? Do you see that?
9  I'd like to direct you to the first paragraph there,
10 and it starts -- do you see where I am?
11     A. Mm-hmm.
12     Q. It says, "this is a new patient to our
13 practice. She is complaining of feeling sad all the
14 time and having severe anxiety. She just had a baby
15 in 03/16 and since then has not been able to sleep."
16 Do you see that?
17     A. Mm-hmm. Yes.
18     Q. Did you say yes? Is that correct for what
19 you presented to Dionne Lucas for when you went to see
20 her?
21     A. Yes.
22     Q. The next sentence goes on to say, "She is
23 afraid to drive her car. She is afraid of walking
24 down the steps with her son because she thinks she
25 might drop him. She is afraid to let her son be

Page 103

1  watched by other people." Do you see that?
2      A. Yes.
3      Q. And was that accurate to how you were
4  feeling at the time?
5      A. Yes.
6      Q. Did you get help having others watch Peyton
7  when he was an infant?
8      A. What do you mean "get help," like mental
9  help?
10     Q. No, I'm sorry, I mean physical help. Did
11 you have others come watch him and so that you could
12 get a break, take a shower?
13     A. Yeah, like my family, my mom, my husband.
14     Q. Your family. And how frequently would
15 others come in to help watch Peyton?
16     A. Daily. Having other people watch him, like
17 sending him to daycare, like that's what --
18     Q. So your concern was not letting other
19 people outside of your family watch him?
20     A. Yes, yes.
21     Q. Okay. And then it continues to say, "she
22 is losing her hair." Do you see where I am?
23     A. Mm-hmm.
24     Q. "And has not been able to go into work
25 since her maternity leave ended. When she saw her

Page 104

1  gynecologist, they gave her a note for reasonable
2  accommodation, which allowed her to work from home
3  until August 1st, 2016." Do you see that?
4      A. Yes.
5      Q. Which gynecologist gave you a note to work
6  from home?
7      A. I believe that that was Donna from
8  Dr. Moore's office.
9      Q. Is that a gynecologist at Dr. Moore's
10 office?
11     A. Well, that's the gynecological office, so I
12 would assume that she's a gynecologist.
13     (Clarification by reporter.)
14     Q. So that was the other ob/gyn at Dr. Moore's
15 practice you testified about having met with earlier?
16     A. Yes.
17     Q. And did you see her after you delivered
18 Peyton?
19     A. For my six-week checkup, I believe.
20     Q. And so you went to Dr. Moore's practice but
21 saw the other ob/gyn after you delivered Peyton; is
22 that correct?
23     A. Yes.
24     Q. Is that the only time you saw that other
25 doctor besides Dr. Moore at Dr. Moore's practice?

Page 105

1      A. Yes.
2      Q. It was after you had delivered?
3      A. (Nodding head up and down.)
4      Q. That's a yes?
5      A. Yes. Sorry.
6      Q. Thank you. Did any doctor or nurse talk to
7  you about hair loss after delivery?
8      A. No.
9      Q. Has anyone ever -- any physician ever
10 talked to you about hair loss after delivery?
11     A. No.
12     Q. The document goes on to say, "she is
13 asking --" Do you see where I am?
14     A. Uh-huh.
15     Q. "She is asking for an updated letter and
16 evaluation/treatment for this complaint. Prior to
17 having her baby she did not have any issues with
18 anxiety or depression." Do you see that?
19     A. Yes.
20     Q. And then going on to the next page there,
21 there is a section that's called "Impression/Plan."
22 Do you see that?
23     A. Yes.
24     Q. And the first bullet point there says,
25 "depression/anxiety" and then in parentheses,

JA1263

Page 106

1  "possible postpartum." Do you see that?
2      A. Yes.
3      Q. And so are you saying that the physician's
4  assistant, Dionne Lucas, who you saw in July 2016 did
5  not talk to you about postpartum depression?
6      A. No.
7      Q. Was this physician's assistant who you saw
8  the first medical professional you discussed your
9  anxiety with or your depression with after delivering
10  Peyton?
11      A. Yes.
12      Q. On that same paragraph I was just talking
13  about, the number 1 under Impression/Plan, do you see
14  that?
15      A. Yes.
16      Q. The last sentence says, "a reassessment
17  during the week of 090516 will be made in our office."
18  Do you see that?
19      A. Yes.
20      Q. And did you actually go back for that
21  reassessment?
22      A. No.
23      Q. And the sentence before that says, "I have
24  written her a note extending the reasonable
25  accommodations until the week of 09-12-2016." Do you

Page 107

1  see that?
2      A. Yes.
3      Q. So this was in July, and this visit you
4  came out of it with a note extending your
5  accommodations to work from home until mid September;
6  is that a fair summary?
7      A. Yes.
8      Q. Do you recall now, having seen these
9  medical records, does it refresh your recollection at
10  all about how long you stayed out on maternity leave
11  or when you returned to work?
12      A. No, because I was -- I still returned to
13  work; I just was working from home.
14      Q. Right. I'm sorry. I used rather imprecise
15  language.
16      So what I meant was return to the workforce.
17  So returning to working.
18      A. Yes.
19      Q. So do you remember with any more precision
20  having now seen this note of medical treatment in July
21  when it is after you delivered Peyton you returned to
22  the workforce?
23      A. Yeah, I was still working.
24      Q. So you were working?
25      A. Yeah.

Page 108

1      Q. As of July?
2      A. Yeah.
3      Q. Do you know how long you had been working
4  since your delivery with Peyton as of this time?
5      A. I was out of work for like eight weeks.
6      Q. Okay.
7          (Exhibit 3 marked for
8          identification: Medical Records re
9          Desire Evans
10          Smith 000001 - Smith 000023)
11      Q. Ms. Evans, I'm going to hand you some more
12  medical records that were produced to us in this
13  litigation for you. And you'll see the very first
14  page is a certification of medical records from Kaiser
15  Permanente. Do you see that?
16      A. Yes.
17      Q. Turning to the second page of that
18  document, so it has a Bates number ending in 5736 at
19  the bottom, do you see that?
20      A. Yes.
21      Q. Okay. It's double-sided. Thank you.
22      There's a big redacted box up top. Do you know
23  what that's covering?
24      A. No.
25      Q. These are records for you visiting

Page 109

1  Dr. Shanda Smith. Do you see that? On that second
2  page, right under the redaction box, it says, under
3  "Provider Name," "Smith, Shanda J, (MD)." Do you see
4  that?
5      A. Yes.
6      Q. And this was the Dr. Smith you referred to
7  a little bit earlier this morning; is that correct?
8      A. Yes.
9      Q. Have you ever seen these medical records
10  before?
11      A. No.
12      Q. Can you remind me, how is it that you first
13  came to meet Dr. Smith?
14      A. I had Kaiser and she was one of the doctors
15  there.
16      Q. When you say you had Kaiser, that was your
17  insurance company?
18      A. Yes.
19      Q. They referred you to her?
20      A. Yes.
21      Q. And how did they come to refer her to you?
22  So how did they know you were looking for a doctor
23  like Dr. Smith?
24      A. I called and asked for a doctor. I called
25  to make an appointment, and she was the doctor that

Page 110

1   was assigned to me.
2       Q.  So these records appear to me to have begun
3   from, at least what we can see, in early 2018.  Does
4   that line up with when you believe you first started
5   seeing Dr. Smith, or do you believe you had seen her
6   prior to that?
7       A.  No, I believe I said February of '18.
8       Q.  February of '18.  Okay.  So January of '18
9   is sort of in the ballpark?
10      A.  Yeah.  Yes.
11      Q.  I'd like to direct your attention to the
12  document Bates-stamped ending in 5742, 5742, and
13  you'll see there's a section there in the middle that
14  starts with the words "Progress Notes," it's like a
15  heading.  Do you see that?  Is that a yes?
16      A.  Yes.
17      Q.  And it says, it's from Shanda Smith, MD, on
18  January 17th, 2018 at 4:10 p.m.  Do you see that?
19      A.  Yes.
20      Q.  And then it says it was signed, right?
21      A.  Mm-hmm, yes.
22      Q.  And it says, "Psychiatric Evaluation, new
23  evaluation"; is that correct?
24      A.  Yes.
25      Q.  So this, just trying to orient the timing,

Page 111

1   was after you had delivered Peyton, correct?
2       A.  Correct.
3       Q.  And was it before or after you had met
4   Plaintiffs' counsel in connection with this or the
5   Maryland litigation?
6       A.  Before.
7       Q.  Before you had met counsel.
8       A.  (Nodding head up and down.)
9       Q.  So continuing down the page from where we
10  were, it says "depression and anxiety."  Do you see
11  that?
12      A.  Yes.
13      Q.  Okay.  And it says, "Desire N. Evans" --
14  and that's you, right?
15      A.  Yes.
16      Q.  -- ██████████  who presents
17  voluntarily to Kaiser Permanente Largo Medical Center
18  Behavioral Health for psychiatric evaluation."  That's
19  correct, you presented voluntarily, correct?
20      A.  Yes.
21      Q.  "She is self-referred after consultation
22  with her primary care doctor, Dilasha Katwal MD, MD."
23  Do you see that?
24      A.  Yes.
25      Q.  Is that the primary care physician you were

Page 112

1   referring to earlier, or is that a different doctor?
2       A.  No, I never saw this doctor.  This could
3   have been -- Kaiser also assigns you doctors, so that
4   could have just been a doctor that was listed on my
5   Kaiser card at the time.
6       Q.  So that would have been from the insurance
7   company's perspective --
8       A.  Correct.
9       Q.  -- who they told you your primary --
10      A.  My primary care is, correct.
11      Q.  And did you ever go to a primary care
12  physician when you had your Kaiser insurance?
13      A.  No.
14      Q.  And then it goes on to say, "Desire N.
15  Evans is a ██████████  who
16  presents for psychiatric evaluation."  Do you see
17  where I am?
18      A.  Yes.

Page 113

1       A.  I wouldn't say most of my life, no.
2       Q.  But at any time prior to this had you felt
3   anxious/depressed?
4       A.  As I mentioned, normal anxious, but nothing
5   that I would need to seek help for, no.
6       Q.  So you think that these medical records are
7   inaccurate?
8           MR. CERYES:  Objection, form, foundation.
9       A.  Yes.
10      Q.  It goes on to say, "reports significant
11  anxiety described as excess worry that is difficult to
12  control, intermittent panic," it looks like that's
13  "sx's," which I think is a medical terminology, then
14  in parentheses it says, "SOB/palpitations/insolable
15  weeping."  Do you see that?
16      A.  Mm-hmm.
17      Q.  Is that yes?
18      A.  Yes.
19      Q.  And then it says, "cries seemingly out of
20  the blue for no reason."  Is that part that I just
21  read accurate?
22      A.  Yes.

Desire Evans



Page 114

1  attachment to her two-year-old son," quote, 'he keeps
2  me going,'" end quote.  Do you see that?
3      A.  Yes.
4      Q.  Was that accurate?
5      A.  I guess, yes.
6      Q.  Then it goes on to say, "endorses depressed
7  mood, anhedonia," I think it's another medical term,
8  then "initial/middl ███████████████████████████
10  that?                            ██████ you see
11      A.  Yes.
12      Q.  Aside from the medical word that I don't
13  know what it means -- but if you do you can tell me --
14  is that accurate?
15      A.  Yes.
16      Q.  And then it says, "also poor focus at times
17  because of anxiety/thoughts jumping around"; is that
18  correct?
19      A.  Yes.
20      Q.  And then it says, "works from home so she
21  can watch her son but he's growing more --
22  growing/more active and this is becoming more of a
23  challenge"; is that correct?
24      A.  Correct.
25      Q.  So this is from January 2018, and then it

Page 115

1  was only up until 11 weeks ago you started getting
2  more help outside of yourself and your husband for
3  watching your son during the day?
4      A.  Correct.
5      Q.  Then the next thing is it goes on to say,
6  "denies any specific stressors/changes.  Does note not
7  feeling satisfied with where she is in life.  'I have
8  so many ideas,' end quote.  Says she cannot focus or
9  pursue any of her goals ████████████  Do you
10  see that?
11      A.  Yes.
12      Q.  Is that accurate?
13      A.  Yes.
14      Q.  And was that before you were doing your
15  coursework at Strayer University?
16      A.  Yes.
17      Q.  It goes on to say, "patient describes
18  herself as very private. ██████████████████
20  mother as well, but their response is to give her
21  space, and she often can be short/easily irritated,
22  which pushes them away"; is that correct?
23      A.  Yes.
24      Q.  And then it says, ████████████████████"; is

Page 116

1  that correct?
2      A.  Yes.
8      A.  Correct.
9      Q.  Then it goes on to say, "Past Psychiatric
10  History."  Do you see where I am?
11      A.  Yes.
12      Q.  And it says, "Hx," which I think might be
13  history, "of symptoms on/off throughout adult life."
14  Do you see that?
15      A.  Yes.
16      Q.  And you think that's not correct?
17      A.  No.
18      Q.  What do you mean "no"?
19      A.  Because it wasn't -- it wasn't that kind of
20  situation.  My mom and -- my mom and dad -- ████████

Page 117

1      Q.  When you say it was being forced on you,
2  what do you mean?
3      A.  Like my -- people trying to make it seem
4  like I was a certain way.  Like I have a stigma on me
5  that I have an attitude or that type of thing, where I
6  don't.
9      A.  No.
10      Q.  So when you said that they were trying to
11  put it on you -- tell me if I'm misstating things --
12  when you said they were trying to put it on you so
13  that you would talk to someone about it, what did you
14  mean about so that you would talk to someone about it?
20  go stay with my grandmom.
21      Q.  And how old were you approximately when
22  this was happening?
23      A.  I don't know.  Sixteen maybe.

JA1266

Case 2:18-cv-05629-JDW   Document 50-9   Filed 11/26/19   Page 32 of 49



Desire Evans



Page 122

5    A.  Ebony Cross.
6    Q.  Dr. Cross?

Page 124

Page 125

Do you take Peyton to a pediatrician?
11    A.  No.  I took Peyton the last time -- I took
12    Peyton on -- in March for the first time since he was
13    six months, because I was thinking about putting him
14    in daycare and he needed shots.

16    A.  Yes.
17    Q.  So he was about two and a half years old
18    when you took him to the pediatrician; is that
19    correct?
20    A.  Yes.
21    Q.  Was he diagnosed with anything when you
22    took him to the pediatrician?
23    A.  No.
24    Q.  Does he have any developmental or
25    neurological delays?

JA1268

Desire Evans

Page 126

1    A. No.  I'm not a doctor, but --
2    Q. That you know of.
3    A. No, I don't think -- I think he's a normal
4  three-year-old, I guess.
5    Q. When you took him to the pediatrician about
6  six months ago, was he measuring on anticipated
7  schedule?
8    A. Yes.
9    Q. Did you take him to the pediatrician when
10  he was an infant?
11    A. Yes.
12    Q. And when you took him last six months ago,
13  how long had it been since you had taken him to the
14  pediatrician before that?
15    He was six months.
16    Q. When he was six months old?
17    A. Mm-hmm.
18    Q. Okay.  Did you take him back to the same
19  pediatrician when he was two and a half?
20    A. Yes.
21    Q. In the document that I've handed you marked
22  as Exhibit 3, on the page ending 5743 -- so that was
23  the page we were just last looking at -- in the middle
24  there's a section that says ████████████  Do you
25  see that?

Page 127

1    A. Mm-hmm.
2    Q. And then there's a section that says ████
███████  Do you see where I am?
4    A. Yes.
5    Q. And it says, ██████████████████
██████  Do you see that?
7    A. Yes.
8    Q. Is that referring to ████████
9    A. Yes.
██████████████████████████
12    A. No.
13    MR. CERYES:  I'm going to object and advise
14  you not to answer any questions ████████████
███████
16    A. Oh.  Sorry.
17    MR. CERYES:  Okay.
18    Q. Were you working at the time in January
19  2018 when you went to go see Dr. Smith --
20    A. Yes.
21    Q. -- for BlueCross BlueShield?
22    A. Yes.
██████████████████████
25    MR. CERYES:  Objection, form, foundation,

Page 128

1  and I'm going to advise you not to answer that
2  question.
3    Q. So you're going to accept your counsel's
4  instruction not to answer?
5    A. Yes.
6    Q. So we looked in these records from
7  Dr. Smith, and I could not find any mention of
8  Dr. Akoda.  Did you mention your experience with
9  Dr. Akoda to Dr. Smith?
10    A. Yes.
11    Q. What did you tell her?
12    A. I just told her that I felt uncomfortable
13  and that I was touched in a way that I felt
14  inappropriate and I didn't know how to deal with it.
15    Q. Did you tell her by whom?
16    A. No.
17    Q. Did you explain to her that it was during
18  your delivery of your son?
19    A. Mm-hmm.
20    Q. Yes?  You said you felt uncomfortable and
21  you believed you were touched inappropriately; is that
22  correct?
23    A. Yes.
24    Q. Did you say something else too?  I may not
25  have gotten it down.

Page 129

1    A. No, that's what I said.
2    Q. Do you believe you told her the name
3  Dr. Akoda at that time?
4    A. No.
5    Q. Did you believe you told her that it was
6  your obstetrician/gynecologist at the time?
7    A. I told her during the delivery of my son.
8    Q. And did you mention it was a doctor?
9    A. Mm-hmm, yes.
10    Q. Is that yes?  Thank you.
11    Within the same Exhibit 3, if you could turn
12  back to the page ending in 5741, which is just
13  flipping it back a page, there's a section that says
14  "Obstetric History."  Do you see that?
15    A. Mm-hmm.
16    Q. Is that a yes?
17    A. Yes.
18    Q. And it says, "Obstetric History."  "The
19  patient has not been asked about pregnancy."  Do you
20  see that?
21    A. Mm-hmm, yes.
22    Q. And you believe that's incorrect; you did
23  talk about your labor and delivery at least?
24    MR. CERYES:  Objection, form, foundation.
25    You can answer.

JA1269

Desire Evans

Page 130

1    A. Yes. She didn't ask.
2    Q. She didn't ask?
3    A. Right, she didn't ask, but I told her why I
4  was feeling the way that I was feeling.
5    Q. Okay. And you explained to her that it was
6  connected with your obstetric history?
7    A. Yes.
8    Q. Did she say anything in response to you
9  when you told her that you had felt uncomfortable or
10  you were touched inappropriately during your delivery
11  of Peyton?
12    A. Just about how I felt about it and how I
13  felt it was affecting me, and I just told her that I
14  didn't want to be touched. And I also explained
15  how -- to her how it was affecting my relationship
16  with my husband.
17    Q. What did you tell her in January of 2018
18  about how your experience during your delivery of
19  Peyton has affected your relationship with your
20  husband?
21    A. Because I don't want anybody to touch me,
22  and we wanted to have another baby, so that was not an
23  option anymore.
24    Q. Is that still the case?
25    A. Yes.

Page 131

1    Q. When's the last time you engaged in sexual
2  relations with your husband?
3    A. Eight months ago.
4    Q. From now?
5    A. Yeah.
6    Q. Eight months ago prior? Are you still
7  trying to have a baby?
8    A. No.
9    Q. Did you want to have a baby in January of
10  2018 when you met with Dr. Smith?
11    A. Well, we wanted to -- after I had my son,
12  that was -- I no longer wanted to have another baby.
13    Q. So if I can say it back to you, and you can
14  tell me if I said it the right way.
15    So is it fair to say that, prior to having
16  Peyton, you had intended to have more than one child,
17  but after having delivered him you only wanted to stay
18  with having one child?
19    A. Correct.
20    Q. And we've made some vague references to
21  it -- and I know this may not be the easiest thing to
22  talk about -- but for the record and just so that I
23  fully understand, can you please describe to me the
24  experience with Dr. Akoda that you're talking about
25  with him touching you during your delivery?

Page 132

1    A. He was -- he was, like, fondling my
2  clitoris, saying that he needed to do that in order to
3  stimulate me to push the baby.
4    Q. And he verbalized that to you?
5    A. Yeah, because my husband asked him what was
6  he doing.
7    Q. And were your husband and mother and the
8  delivery nurses in the room at the same time this was
9  occurring?
10    A. Yes. I don't -- I don't remember if the
11  delivery nurse was in there, but my husband for sure
12  and my mother for sure.
13    Q. Was this during the time that your husband
14  was standing next to Dr. Akoda?
15    A. Yes.
16    Q. And so was the delivery nurse holding one
17  of your legs at that time?
18    MR. CERYES: Objection, foundation.
19    Q. Well, we talked about it earlier. I can
20  restate the question.
21    A. Yes. Yes.
22    Q. So during the time your husband was
23  standing --
24    A. I'm not -- see, I'm not one hundred percent
25  sure because there was a point where they were holding

Page 133

1  my legs and there was a point where we were just
2  laying there, he was trying to get me to relax and to
3  push. So I don't really know if the nurse was in
4  there at that particular moment.
5    Q. Okay. And was it one moment when this
6  happened with Dr. Akoda?
7    A. I mean, he -- no. He did it several times,
8  but it was only spoken of one time because he made it
9  seem like that was the normal.
10    Q. Did your husband ask him about it the first
11  time that it happened?
12    A. Mm-hmm.
13    Q. Is that a yes?
14    A. Yes.
15    MR. CERYES: Let us know if you need to
16  take a break at any time.
17    A. I'm all right.
18    MR. CERYES: Okay. I'll get some tissues.
19    MS. MCENROE: Do we have a box?
20    A. Thank you.
21    Q. When Dr. Akoda was stimulating your
22  clitoris, how long did each instance of that last, do
23  you know?
24    A. I don't know. A few seconds maybe.
25    Q. And do you have an estimation of how many

Desire Evans

Page 134

1    times that happened?
2        A. Several.
3        Q. Were you ever alone with Dr. Akoda in the
4    room?
5        A. No.
6        Q. Other than taking Pitocin -- which was used
7    to start your induction, correct?
8        A. Yes.
9        Q. -- and the experience we were just talking
10   about with Dr. Akoda, did your medical professional
11   team try any other ways to help speed along your
12   delivery?
13       A. No.
14       Q. Did they feed you spicy food? I don't
15   know. Just anything you can remember.
16       A. No, no.
17       Q. Okay. Do you know if they continued
18   treating you with Pitocin as you were pushing?
19       A. I don't remember.
20       Q. If you remember.
21       A. I don't remember.
22       Q. Is your mother married?
23       A. No.
24       Q. Does she have a boyfriend?
25       A. Yes.

Page 135

1        Q. Has she had that boyfriend for a while?
2        A. Yes.
3        Q. For about how long?
4        A. Over ten years.
5        Q. Do you guys get along, you and your
6    mother's boyfriend?
7        A. He's okay.
8        Q. Directing you back to the exhibit we were
9    just looking at, which I think was Exhibit 3, take a
10   look at the page ending in 50. It's a little further
11   along in the document. Let me know when you get
12   there. And they are double-sided again.
13       A. Okay.
14       Q. Are you there?
15       A. Mm-hmm. Yes.
16       Q. And this in the middle of the page says,
17   "Telephone Contact Summary." Do you see that?
18       A. Yes.
19       Q. And it's from February 6th, 2018. Do you
20   see that?
21       A. Yes.
22       Q. Do you believe you spoke with Dr. Smith in
23   or around February 6th, 2018 by telephone?
24       A. Yes, I guess. I mean, if she says so, I
25   guess. I don't remember.

Page 136

1        Q. Do you have any reason to think you didn't?
2        A. No.
3        Q. And there's -- it then says "encounter
4    documentation." Do you see that? Right above --
5        A. Yes.
6        Q. -- where it says scheduled telephone --
7    "medication management visit." Do you see that?
8        A. Yes.
9        Q. And it says, "patient called for scheduled
10   follow-up, symptoms assessment and medication review."
11   Does that refresh your recollection of having spoken
12   to Dr. Smith?
13       A. Yes.
14       Q. "Chart and history reviewed,
15
16
17
18
19
20
21
22
23
24
25       A. Yes.

Page 137

1
2        A. Yes.
3        Q. Because of those -- the side effects?
4        A. Yes.
5        Q. It goes on to say:
6
7
8
9
10
11
12
13
14
15   Do you see that?
16       A. Yes.
17       Q. Is that all accurate?
18       A. Yes.
19       Q. Is the home that you were buying at that
20   time the home you now live in?
21       A. Yes.
22       Q. At the time you delivered Peyton were you
23   dissatisfied with Dr. Akoda's care?
24       A. Yes.
25       Q. Tell me about that.

Page 138

1   A. I felt like he was inappropriately touching
2   me, which made me uncomfortable for the rest of my
3   stay there.
4   Q. Did you tell anybody about that?
5   A. Outside of the people in the room, no.
6   Q. When you say outside the people in the
7   room, did you tell anybody about that who was in the
8   room?
9   A. No. Well, my husband was there, and I told
10  my mom. And she really didn't know, like, she wasn't
11  fully aware of what was going on until we explained it
12  to her.
13  Q. Okay. Even though she had been present in
14  the room?
15  A. Mm-hmm.
16  Q. That's a yes?
17  A. Yes.
18  Q. And did your husband, do you know, if he
19  said anything to anybody about Dr. Akoda's conduct
20  that you've described while you were at the hospital?
21  A. No, not that I'm aware of.
22  Q. Have you ever spoken to an ob/gyn about the
23  treatment you got from Dr. Akoda?
24  A. No.
25  Q. Have you ever talked to any psychiatrist or

Page 139

1   psychologist about the details of treatment from
2   Dr. Akoda?
3   A. Yes.
4   Q. Have you ever gotten a medical opinion from
5   any of them on the medical treatment from Dr. Akoda?
6   A. No.
7   MS. MCENROE: So it's about 1:00. It might
8   be a good time to take a lunch break.
9   VIDEO SPECIALIST: We're going off the
10  record at 1:04.
11  (Proceedings recessed)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1   AFTERNOON SESSION
2   VIDEO SPECIALIST: We're back on the record
3   at 1:44.
4   EXAMINATION (resumed)
5   BY MS. MCENROE:
6   Q. Good afternoon, Ms. Evans.
7   A. Good afternoon.
8   Q. You understand you're still under oath?
9   A. Yes.
10  Q. And you need to still tell the truth?
11  A. Yes.
12  Q. What did you do, if anything, to prepare
13  for today's deposition?
14  A. Nothing.
15  Q. Did you meet with counsel?
16  A. Oh, we had a phone call just about dates
17  and times.
18  MR. CERYES: Don't discuss any information
19  about what we discussed, but I'll let you share that.
20  A. No, we just talked about what time to be
21  there and that time of situation.
22  Q. And when did you speak with counsel about
23  the deposition?
24  A. Yesterday.
25  Q. For how long?

Page 141

1   A. Fifteen, 20 minutes.
2   Q. Is yesterday the first you had learned that
3   you were going to be deposed in this case?
4   A. No.
5   MR. CERYES: I'm going to object. I think
6   we're getting into attorney-client privileged
7   material.
8   MS. MCENROE: Sure. That's not my
9   intention. So let me just restate it this way.
10  Q. Prior to your short phone call yesterday,
11  had you previously prepared for today's deposition by
12  speaking with counsel?
13  A. No. I just received the phone call that I
14  would be getting a phone call yesterday about the
15  deposition today.
16  Q. Okay. Did you do anything to prepare for
17  your deposition in the Dimensions matter?
18  A. No.
19  Q. Did you review any documents in preparation
20  for today?
21  A. No, nothing that I already didn't have.
22  Q. And what do you already have about this
23  case?
24  A. Nothing particular to this case, but I
25  reviewed my previous deposition.

Desire Evans

| Page 142 | Page 144 |
|---|---|
| 1  Q. So you have a copy of that deposition<br>2  transcript?<br>3  A. Yes.<br>4  Q. And you reviewed that deposition transcript<br>5  before your deposition today?<br>6  A. Mm-hmm.<br>7  Q. Is that a yes?<br>8  A. Yes, ma'am.  Sorry.<br>9  Q. Do you have a copy of the complaint in this<br>10  case?<br>11  A. I don't have my own copy, no.<br>12  Q. Have you reviewed it recently?<br>13  A. Yes.<br>14  Q. Do you remember when you most recently saw<br>15  the complaint in this case?<br>16  A. No.<br>17  MR. CERYES:  Object.  Again, I think we're<br>18  getting into attorney-client material.  I'm not sure<br>19  any of this is relevant or discoverable.<br>20  MS. MCENROE:  Well, it's publicly available<br>21  information.  The complaint can be found online.<br>22  MR. CERYES:  Sure.<br>23  MS. MCENROE:  I'm just --<br>24  Q. I'm not trying to ask what your counsel<br>25  told you, but you don't personally have a copy of the | 1  gotten to the point where she has retained counsel,<br>2  and in terms of any other communication she has had<br>3  with her firm, that was for purposes of being<br>4  represented in this matter.<br>5  MS. MCENROE:  Right.<br>6  MR. CERYES:  So the details, the times and<br>7  the dates --<br>8  MS. MCENROE:  -- is not privileged.  It's<br>9  all information that should be on a privilege log or<br>10  could be put on a privilege log, if you were doing<br>11  that.<br>12  So I didn't ask her what you talked about or<br>13  what you told her.  I'm just asking if she met with<br>14  anybody in person after she spoke to them on the<br>15  telephone.<br>16  MR. CERYES:  I'll let you answer that<br>17  question.<br>18  A. Yes.<br>19  Q. Do you remember when that was?<br>20  A. I do not.<br>21  Q. Until you first communicated with<br>22  counsel -- strike that.<br>23  Do you have any understanding of whether or not<br>24  Dr. Akoda has pleaded guilty to any crimes in a court<br>25  of law? |

| Page 143 | Page 145 |
|---|---|
| 1  complaint in this case?<br>2  A. No.<br>3  Q. Did you read and verify it before it was<br>4  filed?<br>5  A. Read and verify?<br>6  Q. Yeah.<br>7  A. I believe it was shown to me, yeah, before.<br>8  Q. Did you review it before it was filed?<br>9  A. Yes.<br>10  (Clarification by reporter.)<br>11  Q. We discussed earlier today that you met<br>12  your counsel as a result of a radio ad that you heard;<br>13  is that correct?<br>14  A. Yes.<br>15  Q. And first your husband heard the radio ad<br>16  and then you heard the radio ad; is that accurate?<br>17  A. Yes.<br>18  Q. Thereafter, how did you make contact with<br>19  counsel?<br>20  A. I called him.<br>21  Q. On the telephone?<br>22  A. Yes, ma'am.<br>23  Q. Did you meet anybody in person?<br>24  MS. MCENROE:  That's not privileged.<br>25  MR. CERYES:  I think it is.  I think we've | 1  A. Yes.<br>2  Q. Could you tell me about that?<br>3  A. I saw on the Internet that he got six<br>4  months in jail.<br>5  Q. Do you know for what?<br>6  A. No.  I'm not exactly sure what he was<br>7  charged with.<br>8  Q. So have you read the indictment?<br>9  A. No, I haven't read it.<br>10  Q. Have you read his guilty plea?<br>11  A. No.<br>12  Q. Do you have any understanding of whether or<br>13  not he was found to have committed Social Security<br>14  fraud?<br>15  A. No, I do not.<br>16  Q. Do you have any understanding of whether or<br>17  not his criminal conviction had anything to do with<br>18  practicing medicine without a license?<br>19  A. I do not.<br>20  Q. You don't know one way or the other?<br>21  A. No.<br>22  Q. Did you ever look into that?<br>23  A. Briefly.  I just saw that he got six months<br>24  in jail, but I don't know anything -- anything in<br>25  depth about it. |

Desire Evans

Page 146

1    Q.  Did you read an article about him getting
2  six months in jail?
3    A.  I saw it on the news and then I looked it
4  up.
5    Q.  You saw it on the news on the television?
6    A.  Yes.
7    Q.  And when you say you saw it on the news, do
8  you recall what news station you were watching?
9    A.  No, just local news.
10    Q.  Do you watch a particular station?
11    A.  Fox, I guess.
12    Q.  And you don't believe that they mentioned
13  what he actually went to jail for?
14    A.  If they do -- if they did, I don't recall.
15  I just remember the timing, six months.  That's what
16  stuck out to me.
17    Q.  The six months?
18    A.  Yep.
19    Q.  But not what it was that he was -- actually
20  pleaded guilty to.
21    A.  Right.  I know it wasn't what he did to me.
22    Q.  What do you mean by that?
23    A.  I wasn't -- for how I felt that I was
24  treated, I know that he wasn't in jail for that, so
25  that was my concern.

Page 147

1    Q.  Did you ever pursue trying to have criminal
2  charges brought up against him for what he did to you?
3    A.  No.  I -- no.
4    Q.  Did you ever pursue a medical malpractice
5  suit against Dr. Akoda?
6    A.  No.
7    Q.  Did you ever pursue litigation or a lawsuit
8  against Dr. Akoda himself?
9    A.  No.
10    Q.  Sitting here today, do you know where
11  Dr. Akoda went to medical school?
12    A.  No.
13    Q.  Sitting here today, do you know whether
14  Dr. Akoda went to medical school?
15    A.  No.
16    Q.  Sitting here today -- strike that.
17    Until you had heard or -- strike that.
18    Comparing the timing between when you heard the
19  radio ad and when you saw on the news that Dr. Akoda
20  had gone to jail, which happened first?
21    A.  The radio ad.
22    Q.  To make sure I'm understanding, so you
23  first contacted counsel in connection with the lawsuit
24  against Dimensions and then eventually ECFMG before
25  you heard about Dr. Akoda having pleaded guilty and

Page 148

1  serving six months in jail; is that correct?
2    A.  Correct.
3    Q.  Do you know how long it was in between
4  those two things?
5    A.  No.
6    Q.  Were they close in time?
7    A.  I mean, everything happened pretty fast, so
8  I would say so.  I would say -- I would say within two
9  months or so.
10    Q.  Until you had heard the radio ad for the
11  law firm, had you had any suspicion that Dr. Akoda did
12  not go to medical school?
13    A.  No.
14    Q.  And until you had heard the radio ad, did
15  you have any reason to believe that Dr. Akoda was not
16  a licensed physician?
17    A.  No.
18        (Exhibit 4 marked for
19        identification: Civil Action re
20        Russell, et al. v. ECFMG)
21        MS. MCENROE:  Do you want a copy for Paul
22  also?
23        MR. CERYES:  No, that's okay.
24    Q.  Ms. Evans, I'm handing you what has been
25  marked as Exhibit 4.  Do you recognize this document?

Page 149

1  You can take a minute and look at it.
2    A.  Yes.
3    Q.  What is it?
4    A.  The complaint.
5    Q.  So this is the complaint in the lawsuit
6  that you and some others have filed against the
7  Educational Commission for Foreign Medical Graduates,
8  correct?
9    A.  Yes.
10    Q.  And just so the record is clear, this is
11  the Philadelphia Court of Common Pleas complaint that
12  has since been removed to federal court.
13    And, Ms. Evans, you testified that you saw this
14  before it was filed, correct?
15    A.  Yes.
16    Q.  And I'd like to direct your attention
17  within that document -- it might be easier to find it
18  from the back.  Actually it may be the very last page.
19    If you flip all the way to the very last page,
20  the back of the documents, I think it's the page after
21  that one you're looking at.  Is that your signature?
22    A.  Yes.
23    Q.  Okay.  And at the top of it, it says
24  "Verification."  Do you see that?
25    A.  Yes.

Desire Evans

Page 150

1    Q.  And it says, "I verify that the statements
2  made in this complaint are true and correct to the
3  best of my knowledge and belief."  Do you see that?
4    A.  Yes.
5    Q.  "I understand that false statements herein
6  are made subject to the penalties of 18 Pa. C.S.
7  Section 4904 relating to unsworn falsification to
8  authorities."  Do you see that?
9    A.  Yes.
10   Q.  It's dated November 9th, 2018, and that's
11 your signature, correct?
12   A.  Yes.
13   Q.  So earlier I had asked if you had reviewed
14 and verified the complaint.  Does this refresh your
15 recollection that you did verify the complaint?
16   A.  Yes.
17   Q.  Is it still your belief today that the
18 information about which you have knowledge and belief
19 that's contained in the complaint is true and
20 accurate?
21   A.  Yes.
22   Q.  Are there things contained in the complaint
23 as you recall it that you did not have knowledge or
24 belief about?
25   A.  No.

Page 151

1    Q.  So the information in here is all stuff you
2  knew to be true yourself?
3      MR. CERYES:  Objection, form, foundation.
4    A.  From what I read through, yes.  I didn't
5  find anything that I didn't agree with.
6    Q.  I see.  So is it fair, just to make sure I
7  understand, to say that you had no reason to disagree
8  with any of the information in here?
9    A.  Correct.
10   Q.  But is it also fair to say that there are
11 some things in here about which you did not have
12 personal independent knowledge?
13   A.  Correct.
14   Q.  Okay.  Sitting here today, do you know of
15 anything contained in the complaint that you now
16 believe to be false or inaccurate?
17   A.  No.
18   Q.  I'd like to direct your attention, you'll
19 see within the document there are paragraph numbers,
20 so if you keep flipping until the meat of the
21 complaint gets started, there are paragraph numbers.
22 Could you please flip to paragraph 43?
23     That paragraph reads -- are you there?  I'll
24 give you a second.
25   A.  One second.

Page 152

1    Q.  It's on page 9.
2    A.  Okay.
3    Q.  That paragraph reads:
4      "The Plaintiff Desire Evans was a
5      patient of Igberase on or about March
6      17th, 2016.  Igberase delivered her
7      child on that date at Prince George's
8      Hospital Center."
9    Do you see that?
10   A.  Yes.
11   Q.  And Ms. Desire Evans, that's referring to
12 you; is that correct?
13   A.  Yes.
14   Q.  And do you understand that Dr. Igberase is
15 another way to refer to Dr. Akoda as used in this
16 complaint?
17   A.  Yes.
18   Q.  So is that correct as written in paragraph
19 43?
20   A.  Yes.
21   Q.  All right.  So I want to direct you --
22 sorry.  We're going to hop around in this document a
23 little bit.
24     I want to direct you all the way back to the
25 beginning of the complaint, so it will be page 2 at

Page 153

1  the bottom.  And you'll see there's a heading that
2  says "Class Action Civil Complaint."  Do you see that?
3    A.  Yes.
4    Q.  And there are a number of plaintiffs
5  listed, including Desire Evans.  Do you see that?
6    A.  Yes.
7    Q.  And then it says, "on their own behalf and
8  on behalf of all others similarly situated through
9  their undersigned attorneys."  Do you see that?
10   A.  Yes.
11   Q.  Do you have an understanding of what that
12 means, the on their own behalf and on behalf of all
13 others similarly situated?
14   A.  Yes.
15   Q.  What does that mean?
16   A.  Not only am I speaking for myself but
17 everyone who was affected.
18   Q.  And when you say "everyone who was
19 affected," what do you mean?
20   A.  Everyone who was affected by Dr. Akoda
21 Igberase, whatever -- everyone that was affected by
22 his actions.
23   Q.  When you say "affected by his actions,"
24 what do you mean?
25   A.  Everyone that -- everyone that he treated,

Desire Evans

Page 154

1  everyone who saw him, everyone who -- all of his
2  patients.
3      Q. Do you think that all of his patients had
4  the same experience you did?
5      A. I don't know.
6      Q. Have you ever spoken to any of Dr. Akoda or
7  Dr. Igberase's other patients?
8      A. No.
9      Q. Have you ever met another person who has
10 been treated or had seen Dr. Akoda?
11     A. No.
12     Q. And I'm going to use the name Dr. Akoda,
13 but you understand that's also to include
14 Dr. Igberase, as we've been discussing?
15     A. Mm-hmm, yes.
16     Q. I'd like to direct you back to paragraph
17 44. So that's on the top of page 10 of the complaint.
18 Do you see where I am?
19     A. Yes.
20     Q. It reads:
21        "The Plaintiffs and others similarly
22        situated chose Igberase, who they
23        knew as Akoda, as their
24        obstetrician/gynecologist, on the
25        basis of their belief that Akoda had

Page 155

1        obtained all necessary credentials
2        and certifications required of
3        physicians practicing in the
4        United States, including
5        certification from ECFMG."
6  Do you see that?
7      A. Yes.
8      Q. Is that true of yourself?
9      A. No.
10     Q. What do you mean by that?
11     A. I didn't choose Dr. Akoda.
12     Q. Did you have any knowledge about his
13 credentials when he came to start treating you?
14     A. No.
15     MR. CERYES: Objection, form, foundation.
16     Q. Did you have any knowledge about his
17 certifications when he came to treat you?
18     A. No.
19     Q. I'd like to direct you to paragraph 45, so
20 I'm just going to keep reading, if you're on the same
21 page.
22     It says, "None of Igberase's patients,
23 including those at Howard University Hospital, Prince
24 George's Hospital Center, and the medical practice of
25 Abdul G. Chaudry, M.D., knew Igberase's true identity

Page 156

1  but rather knew him as Akoda." Do you see that?
2      A. Yes.
3      Q. Is it true that you knew Dr. Igberase as
4  Dr. Akoda?
5      A. Correct.
6      Q. Do you know if anybody else knew of
7  Dr. Akoda actually being Dr. Igberase when they were
8  treated by him?
9      MR. CERYES: Objection, form, foundation.
10     A. I'm not aware.
11     MS. MCENROE: Well, it says none of the
12 patients knew and she's a plaintiff in this case.
13     MR. CERYES: But you said anyone, not just
14 patients, which would refer potentially to ECFMG
15 personnel.
16     Q. Sure. So let me -- let me restate that.
17     Do you know if any of Dr. Igberase's patients
18 knew he was Dr. Igberase when he was using the name
19 Dr. Akoda?
20     A. I'm not -- I've never spoken to anyone
21 else.
22     Q. Do you know about any consents that
23 Dr. Igberase or Dr. Akoda's patients provided to him
24 in connection with their treatment?
25     A. No.

Page 157

1      Q. I'd like to direct you to paragraph 47.
2  It's still on page 10. It starts:
3        "On many occasions, Igberase
4        penetrated his patients with parts of
5        his body through the vaginal canal
6        and through the stomach in performing
7        medical services. Additionally,
8        Igberase performed inappropriate
9        examinations of a sexual nature while
10       utilizing inappropriate and explicit
11       sexual language.
12       Igberase's penetrations of his
13       patients were clear boundary
14       violations."
15 Do you see that?
16     A. Yes.
17     Q. So I have a couple questions. I just want
18 to clarify. It says with parts of his body that he
19 penetrated his patients. Did Dr. Akoda penetrate you
20 with anything other than his hands or his fingers?
21     A. No.
22     Q. He didn't ever penetrate you with his
23 penis?
24     A. No.
25     Q. And when it says that he penetrated you

Page 158

1 through the stomach, was that in connection with
2 performing a C-section?
3      A.  Yes.
4      Q.  Did Dr. Igberase use explicit sexual
5 language with you?
6      A.  I felt the language was inappropriate,
7 calling me "Baby" and "Mama" and stuff like that.
8      Q.  So besides calling you "Baby" and "Mama,"
9 was there any other inappropriate language that
10 Dr. Akoda used with you?
11      A.  No.
12      Q.  I'm sorry.  I didn't hear you.
13      A.  No.  I'm sorry.
14      Q.  Thank you.  The last sentence in that
15 paragraph says, "Igberase's penetrations of his
16 patients were clear boundary violations."  Do you see
17 that?
18      A.  Yes.
19      Q.  Did the words "clear boundary violations"
20 come from you?  Are those words you used?
21      A.  I didn't say them.
22      Q.  Do you know what's meant here by "clear
23 boundary violations"?
24      A.  Yeah.
25      Q.  What?

Page 159

1      A.  Touching, touching someone and talking to
2 them in the way that he did is not -- is a boundary
3 violation between patient and provider, so 100
4 percent.
5      Q.  Are you characterizing your C-section as a
6 boundary violation?
7      A.  I'm characterizing the way that he touched
8 me prior to my C-section being a boundary violation.
9      Q.  And when you say that, are you specifically
10 referring to the clitoral stimulation?
11      A.  Yes.
12      Q.  To any other part of his treatment?
13      MR. CERYES:  Objection, foundation.
14 You can answer.
15      A.  No.
16      Q.  Moving on to paragraph 48, still on page
17 10, you'll see there's a heading that says "Class
18 Action Allegations P.a. Rule 1702."  Do you see where
19 that is?
20      A.  Yes.
21      Q.  Paragraph 48 says, "Named Plaintiffs bring
22 this action on behalf of a class which consists of."
23 Do you see where I am?
24      A.  Yes.
25      Q.  And then it says, "All patients examined

Page 160

1 and/or treated in any manner by Oluwafemi Charles
2 Igberase," and then in parentheses it says "(a/k/a
3 Charles J. Akoda M.D.)."  Do you see that?
4      A.  Yes.
5      Q.  And we already talked about that you have
6 not met any other person who is defined in that class;
7 is that correct?
8      A.  Correct.
9      Q.  Have you ever spoken or corresponded with
10 anybody else that is defined in that class that you
11 know of?
12      A.  No.
13      Q.  Have you ever met with, in person or on a
14 videoconference or by telephone, anybody else who is
15 defined in that class that you know of?
16      A.  No.
17      MR. CERYES:  Objection, asked and answered.
18      Q.  Moving along to page 11, paragraph 54 says,
19 "Named Plaintiffs will fairly and adequately assert
20 and protect the interests of the Class under the
21 criteria set forth in Rule 1709.  The interests of
22 named Plaintiffs and of all other members of the Class
23 are identical."  Do you see that?
24      A.  Yes.
25      Q.  Do you know if your interests and those of

Page 161

1 everybody else who has been treated by Dr. Akoda are
2 identical?
3      MR. CERYES:  Objection, form, foundation.
4      A.  I don't know.
5      Q.  Do you know if any of Dr. Akoda's patients
6 were satisfied with his treatment?
7      A.  I don't know.
8      Q.  Do you think it's possible?
9      MR. CERYES:  Objection, form, foundation.
10      A.  I don't know.
11      MR. CERYES:  Calls for speculation.
12      Q.  In paragraph 55 it says, "Named Plaintiffs
13 are cognizant of their duties and responsibilities to
14 the Class."  Do you see that?
15      A.  Yes, ma'am.
16      Q.  Earlier today I think I asked you if you
17 knew what your responsibilities were as a Named
18 Plaintiff.  Do you remember that?
19      A.  Yes, ma'am.
20      Q.  What are those responsibilities?
21      A.  Just to give my account to the best of my
22 knowledge and to represent everyone else that feels
23 the same.
24      Q.  Did you also provide any input for
25 discovery responses in this case?

JA1277

Desire Evans

Page 162

1      A. Did I do what?
2      Q. Provide input for any discovery responses
3  in this case.
4      A. I don't understand that question.
5      MR. CERYES: Objection to form.
6      Q. Have you ever heard the word
7  "interrogatories"?
8      A. Yes. Oh, yes.
9      Q. Did you provide any input to support the
10  drafting of responses to interrogatories in this case?
11     A. Yes.
12     Q. Having done that and having given input on
13  the complaint, which I think we talked about earlier
14  today, have you done anything else in furtherance of
15  your role as a named plaintiff in this lawsuit?
16     A. No.
17     Q. Aside from showing up today?
18     A. Right. No, besides this kind of stuff
19  here.
20     Q. So I'd like to move to paragraph 65 at the
21  bottom of page 12. It says:
22     "The likelihood that individual
23     members of the Class will prosecute
24     separate actions is remote. Also,
25     because most Class members do not

Page 163

1      know that a claim against ECFMG
2      exists."
3      Did I read that correctly?
4      A. Yes.
5      Q. We talked earlier about the allegations in
6  this lawsuit being about alleged boundary violations
7  by Dr. Akoda; is that correct?
8      A. Yes.
9      Q. Is it your belief that members of the Class
10  don't know that their boundaries were violated by
11  Dr. Akoda?
12     MR. CERYES: Objection, form, foundation.
13  You can answer.
14     A. No, I can't say that. I wouldn't imagine
15  them joining a class if they didn't feel like their
16  boundaries were violated.
17     Q. Do you know if every single one of
18  Dr. Akoda's patients feels as if they had their
19  boundaries violated?
20     A. I do not know that.
21     Q. What are you hoping to get out of this
22  lawsuit?
23     MR. CERYES: Objection.
24     A. What I'm hoping is for someone to take
25  responsibility or maybe even do their job a little bit

Page 164

1  more diligently next time. Because this situation
2  affected not only me but a lot of other people. And I
3  believe that, if it was done correctly, that none of
4  us would be going through this.
5      So I just want whoever this person is to pay
6  for what he's done, and I want -- I want the facility
7  that is supposed to make sure these people are who
8  they are, I want them to make sure that they are doing
9  that.
10     Q. When you refer to a male, "he," in your
11  last answer, were you referring to saying about
12  Dr. Akoda?
13     A. Correct.
14     Q. Are you specifically seeking money from
15  ECFMG in this lawsuit?
16     A. I'm not seeking --
17     MR. CERYES: Objection, form, foundation.
18  The complaint says what we're seeking on behalf of
19  Ms. Evans and the Class.
20     MS. MCENROE: I'm allowed to ask the
21  witness about the damages she is seeking, if any.
22     A. Yes. Yeah, because I missed work. I've
23  had doctors' appointments. I've had a lot of things
24  that I was affected by.
25     Q. Have you done any calculation of how much

Page 165

1  money that is?
2      A. No.
3      Q. Have you collected up any invoices or bills
4  from any of those experiences to be able to help
5  catalog what that might be?
6      A. I haven't collected them, but they're
7  readily available, if I needed anything.
8      Q. So what injury, if any, did you experience
9  as a result of ECFMG's conduct?
10     MR. CERYES: Objection, form, foundation,
11  calls for somewhat of a legal conclusion, but you can
12  answer.
13     A. Okay. I feel that, because of them, I'm
14  afraid to seek a doctor. I don't know who to trust.
15  I don't know who to send my son to. Because if the
16  places that are supposed to be doing these
17  credentialing, if I can't trust what they're telling
18  me, I don't really know how to do my own investigation
19  to find out if a doctor is really a doctor or who they
20  say they are. So it has diminished my trust in the
21  medical profession.
22     Q. Do you have a belief that Dr. Akoda is not
23  a doctor?
24     MR. CERYES: Objection.
25     A. Yes.

JA1278

Desire Evans

Page 166

1    Q. From where did you get that belief?
2    A. Well, from the fact that he's using two
3  different names, we really don't even know who he is,
4  so I don't know -- I can't say what he's done.
5    Q. Right. But you used a different name
6  before you got married, right?
7    A. That's different. My name is going to
8  change as a woman. Unless his name is hyphenated, I
9  can't really see that is the same.
10    Q. Do you think there are no scenarios in
11  which someone could use a different name and still be
12  a physician?
13      MR. CERYES: Objection, form, foundation.
14    A. Use a different name along with a different
15  Social? No.
16    Q. Do you know if any of the other physicians
17  who have ever treated you have you ever had
18  convictions for any crimes?
19    A. No, I do not.
20    Q. Do you know if any of them have ever been
21  convicted for tax fraud?
22    A. No, I do not.
23    Q. Do you know if any of them have ever been
24  convicted for not paying their housekeeper or their
25  nanny aboveboard?

Page 167

1    A. No, ma'am.
2    Q. Do you know if any of them have ever smoked
3  pot?
4    A. No. No, ma'am.
5    Q. Do you believe that doing any of those
6  things would make them any less of a doctor than they
7  were when they treated you?
8      MR. CERYES: Objection, form.
9    A. I don't think -- I don't think one has
10  anything to do with the other, but no.
11    Q. So Social Security fraud would have nothing
12  to do with whether someone was actually a doctor.
13    A. Using someone else's Social Security
14  number? Absolutely. Because you don't know who that
15  person is. You have no idea who you're dealing with.
16  You're born with one Social Security number. That
17  doesn't never change.
18    Q. Do you know the process for a foreign-born
19  individual to obtain a Social Security number in the
20  United States?
21    A. No, but I do believe, once you get it, it
22  doesn't change.
23    Q. Do you -- so you draw a line between a
24  doctor committing tax fraud and a doctor committing
25  Social Security fraud?

Page 168

1    A. Yes.
2    Q. Do you draw -- where do you draw the line
3  compared to insurance fraud? Is that okay for a
4  doctor or not okay for a doctor?
5    A. No, I mean, nothing is okay. However, when
6  you're dealing with other -- when you're dealing with
7  people's lives and you're treating people, you should
8  be who you say you are.
9    So him having tax fraud has nothing to do with
10  him faking his identity and telling me that he's
11  somebody that he's not. It's not the same.
12    So he should pay for whatever crime he commits,
13  absolutely, but lying about your identity to become a
14  doctor or whatever he did is a totally different
15  situation.
16    Q. Is that something you believe or something
17  someone told you?
18    A. That's what I believe.
19    Q. And you think it's okay to be treated by a
20  doctor who smoked pot?
21      MR. CERYES: Objection, form, foundation,
22  relevance.
23      MS. MCENROE: Well, it's a violation of law
24  and I'm allowed to explore. This is squarely at issue
25  for the claims she has brought in this case.

Page 169

1    A. Depends on which state they live in because
2  smoking pot is not illegal everywhere.
3    Q. Is smoking pot legal in Maryland?
4    A. No, but it's legal in D.C.
5    Q. So it's not that you have an issue with
6  your doctor breaking the law necessarily; it's that
7  you have an issue specifically with Social Security
8  fraud.
9      MR. CERYES: Objection to form.
10    A. I have -- I have an issue with not knowing
11  who was treating me, yes.
12    Q. But it's not an issue of whether the doctor
13  has the skills to treat you; it's about whether the
14  doctor is who they say they are when they're treating
15  you. Is that right?
16      MR. CERYES: Objection to form.
17    A. I wouldn't know if they really had the
18  skills if they're not using their correct identity.
19    Q. So if a doctor cuts open your abdomen,
20  completes a C-section, and mommy and baby both come
21  out healthy, you doubt that that person is a doctor?
22      MR. CERYES: Objection, form.
23    A. Yeah.
24    Q. And if someone completed a residency
25  program, which is part of medical graduate education,

JA1279

Page 170

1  you still doubt that that person's a doctor?
2       MR. CERYES:  Objection, form, foundation.
3       A.  Yes.
4       Q.  And if a person completed all the
5  substantive examinations required to become a
6  physician in the United States, do you still doubt
7  that that person is a doctor?
8       MR. CERYES:  Objection to form, foundation.
9       A.  Yes, when you're using a different
10  identity, who is to say it was the same person every
11  time that they went to take the certification?
12  Because obviously the facility is not checking to make
13  sure this is the same person or to see if this person
14  has been there before.
15       So I don't know if that was the same person
16  that took all of those residencies or that went
17  through those programs.  I have no idea.
18       Q.  So you are doubting that Dr. Akoda who
19  completed the residency is not who actually delivered
20  your baby?
21       A.  That's not what I'm saying.  What I'm
22  saying is, is that he could have gotten -- there's a
23  lot of people who know how to deliver babies who
24  didn't go through medical training, like it happens
25  all the time.  People give birth in the back of taxi

Page 171

1  cabs.  It happens all the time.  It's something that
2  people can do.
3       So he could have had some kind of other
4  training, I'm not sure, but I don't know who he is and
5  I don't know what school he went to.  I don't know
6  anything about that because he chose to use a
7  different identity.
8       Q.  Did you ask any of those questions before
9  he delivered your baby?
10       A.  I didn't know I had to.
11       Q.  Did -- have you ever heard of a taxi driver
12  delivering a baby by C-section?
13       A.  No.
14       Q.  Have you ever heard of a taxi driver
15  completing a residency program who is not a physician?
16       A.  Nope.
17       Q.  What do the words "excruciating emotional
18  anguish" mean to you?
19       A.  How I feel when I have to talk about what
20  Dr. Akoda did to me.
21       Q.  Are those your words?  Are those words that
22  you would use naturally?
23       A.  No.  It's how I feel, though.
24       Q.  Trying to speed this up a little.  Sorry.
25       Did you feel differently about your birth

Page 172

1  experience of Peyton before you heard the radio ad
2  than you did after you heard the radio ad?
3       A.  No.  That was the reason why my husband
4  told me about the radio ad is because it was something
5  that was in our discussion since we had Peyton and we
6  didn't know how to deal with it.
7       Q.  What do you mean you didn't know how to
8  deal with it?
9       A.  We didn't know what course we can take,
10  whether what he did was wrong.  We didn't know.  We
11  didn't know anything.  We didn't know what to do, but
12  we were both uncomfortable.  I was uncomfortable and
13  it affected me.
14       So when he heard the ad about Dr. Akoda, he was
15  like, oh, my God, this is probably what we were
16  feeling the whole time, you know, like, so reach out
17  to them because you're not the only person that he's
18  done this to.
19       So I wasn't even aware at the time that it was
20  about him possibly not being a doctor.  I thought it
21  was about him touching women inappropriately, because
22  that's how I felt, and that was my main -- my main
23  issue at the beginning.
24       Q.  How did you feel when you got the
25  impression that it was possibly about him not being a

Page 173

1  doctor?
2       A.  I felt even worse about it.
3       Q.  And if it had turned out that he actually
4  was really a doctor, would that being told that maybe
5  he wasn't really a doctor be part of what has made
6  your experience worse since that time?
7       MR. CERYES:  Objection, form, foundation.
8       A.  So can you say it again?
9       Q.  So if it turns out that it was wrong that
10  he was not a doctor, so he actually was a doctor, was
11  having been told that he was not a doctor part of what
12  caused you anguish since that time?
13       MR. CERYES:  Objection, form, foundation.
14       A.  I was already feeling anguish, but, yes, it
15  made it worse.
16       Q.  How did you come to have the impression
17  that Dr. Akoda may not have been a doctor?
18       MR. CERYES:  Objection, form, foundation.
19       A.  Through speaking to counsel.
20       Q.  Did you do any independent investigation
21  about whether that was true?
22       A.  What, if Dr. Akoda wasn't actually a
23  doctor?
24       Q.  Correct.
25       A.  I mean, I Googled it.  I Googled him.  And

Page 174

1  as I mentioned, I saw the news ad where he was
2  actually in jail, so...
3      Q. But you mentioned earlier you didn't see
4  why he was in jail.
5      A. No, but I saw that he was in jail.
6      Q. So you didn't investigate about whether
7  that was for unlawful practice of medicine?
8      A. No.
9      Q. So did you do anything other than consult
10  with counsel to find out whether Dr. Akoda was a
11  doctor or not?
12      A. No.
13      Q. You just mentioned a moment ago that your
14  husband and yourself had discussed your experience
15  with Dr. Akoda following Peyton's birth; is that
16  correct?
17      A. Yes.
18      Q. Approximately how many times?
19      A. It was quite -- it was quite often.  It
20  was --
21      Q. More frequently at one point than another
22  or consistently throughout?
23      A. Consistently throughout.
24      Q. Was this a daily conversation?
25      A. I mean, not daily, but it was something

Page 175

1  that -- that affected -- that affected us.
2      Q. Did you discuss your experience with
3  Dr. Akoda from your birth with Peyton with your mother
4  following the birth of Peyton?
5      A. Yes.
6      Q. How frequently?
7      A. Maybe three, four times.
8      Q. When most recently?
9      A. Most recently?  Letting her know that I was
10  coming to a deposition.
11      Q. Before that time, when most recently to
12  that?
13      A. Oh.  Maybe a few months ago.
14      Q. And before that?
15      A. Probably a few months before that.  I can't
16  really say.
17      Q. And do you remember after Peyton's birth
18  when the first time you spoke again with your mother
19  about Dr. Akoda's conduct was?  Maybe how old Peyton
20  was, if that's helpful.
21      A. I told -- we discussed it, like, as soon as
22  I got home.
23      Q. Do you remember what you discussed?
24      A. How -- what he did and how it made me feel
25  uncomfortable.  And then she said I didn't even notice

Page 176

1  that.  And then my husband -- me and my husband
2  explained to her what happened.
3      Q. Did you discuss anything else?
4      A. No.
5      Q. Through your discussions with your husband
6  or with your mother, did you consider going to consult
7  legal counsel?
8      A. We were thinking about it.
9      Q. Did you ever consult with legal counsel
10  prior to hearing the radio ad?
11      A. No.
12      Q. Did you ever consult with another physician
13  other than Dr. Newton?
14      A. No.
15      Q. Did you consider going to consult with
16  another physician?  I don't mean for medical
17  treatment.  I mean regarding your experiences with
18  Dr. Akoda after your delivery with Peyton.
19      A. No.
20      Q. And Dr. Newton is your cousin, we discussed
21  earlier, correct?
22      A. Yes.
23      Q. And have you discussed your experiences
24  with Dr. Akoda with Dr. Newton?
25      A. At the very beginning, yes.

Page 177

1      Q. When was that approximately?
2      A. Maybe April 2016.
3      Q. Do you remember what you talked about with
4  Dr. Newton?
5      A. I was just explaining to him -- well, I was
6  asking him about how -- I was telling him that I felt
7  uncomfortable and I didn't really know if there was
8  anything that I could do about it or, like, should he
9  have done that, like, am I right for feeling this way.
10  I just wasn't -- I wasn't 100 percent sure if he would
11  even -- like, if that's really something that you do,
12  is that really how you stimulate for a baby to come
13  out.
14      Like I had no idea, so I was just trying to get
15  a little bit more information about if I -- what I was
16  feeling was -- what's the word I'm looking for -- not
17  accurate, but if what I was feeling was right.  Was I
18  right in feeling that he wasn't supposed to treat me
19  like that, or he was violating his place, and he said
20  that he thought so.
21      Q. What did Dr. Newton tell you?
22      A. He said he thought -- he said he thought
23  so.  He said he wouldn't touch anyone that way.
24      Q. He's an anesthesiologist, correct?
25      A. Mm-hmm.

Desire Evans

Page 178

1    Q.  Is that yes?
2    A.  Yes.
3    Q.  So for his profession do you know if he's
4  touching anybody's private parts?
5    A.  No.
6    Q.  Do you know when the last time Dr. Newton
7  delivered a baby was?
8    A.  No, I don't.
9    Q.  Do you know if Dr. Newton has ever
10  delivered a baby?
11    A.  I don't know if he's ever delivered a baby.
12  Valid, if my feelings were valid, that's the
13  word I was looking for.
14    Q.  Oh, from your earlier answer.
15    A.  Yes.  Yes.
16    Q.  Do you use any social media, Ms. Evans?
17    A.  Yes.
18    Q.  What social media do you use?
19    A.  I have Facebook.
20    Q.  Are you on Facebook as Desire Evans?
21    A.  Yes.
22    Q.  Are you an active user of Facebook?
23    A.  Yeah, you can say that.
24    Q.  Do you keep a diary, Ms. Evans?
25    A.  No.

Page 179

1    Q.  Do you have a blog?
2    A.  No.
3    Q.  Do you keep a calendar or a daily diary of
4  your activities?
5    A.  No.
6    Q.  Do you have in your possession any medical
7  records that were not provided to counsel in this
8  litigation?
9    A.  No.
10    Q.  You mentioned that you are currently being
11  treated by a Paul Donato, correct?
12    A.  Yes.
13    Q.  Do you know if you signed a consent form
14  for Dr. Donato's office to release records about your
15  treatment?
16    A.  I'm pretty sure I did.
17    Q.  Do you know if you signed a release or a
18  consent form for Dr. Nnamani's office to release
19  records?
20    A.  I'm pretty sure I did.
21    Q.  Have you ever seen those doctors' records
22  from either Drs. Donato or Nnamani?
23    A.  No.

Page 180

2    A.  No.
3    Q.  Do you have any documentation about that
4  experience at all?
5    A.  No.
6    MS. MCENROE:  I'd like to take a quick
7  break.
8    MR. CERYES:  Okay.
9    VIDEO SPECIALIST:  We're going off the
10  record at 2:29.
11    (Proceedings recessed)
12    VIDEO SPECIALIST:  We're back on the record
13  at 2:41.
14  BY MS. MCENROE:
18    A.  Yes.
21    A.  Yes.
22    Q.  What hospital was that at?
23    A.  Laurel?
24    Q.  Where?
25    A.  Wait.  Hold on.  I was living in -- Laurel

Page 181

1  Regional Medical Center, I'm assuming.
2    Q.  In Maryland?
3    A.  Yes.
4    MS. MCENROE:  From our perspective,
5  counsel, there's still some significant open medical
6  records that have not been produced, most notably from
7  Dr. Donato and Dr. Nnamani,
9    So pending those productions and our ability to
10  review them, we're going to suspend the deposition and
11  leave it open.
12    We appreciate your attending here today and
13  answering my questions.
14    MR. CERYES:  Okay.  And we'll evaluate from
15  our perspective -- we have requested those records, so
16  once they come in, we'll discuss the propriety of
17  reopening the deposition at that time.
18    MS. MCENROE:  We look forward to reviewing.
19  Thank you.
20    THE WITNESS:  I'm going to have to come
21  back?
22    MR. CERYES:  We'll see about that.
23    Ms. Evans, I do have just a couple follow-up
24  questions for you.
25    EXAMINATION

JA1282

Desire Evans

Page 182

```
1   BY MR. CERYES:
2       Q.  First of all, you were asked by counsel
3   some questions about your knowledge of the process
4   that physicians have to go through in order to
5   become -- in order to see and treat patients.  Do you
6   recall those questions?
7       A.  Yes.
8       Q.  Okay.  Prior to undergoing care and
9   treatment from Akoda, was it your belief that
10  physicians did have to go through a process in order
11  to be entrusted with the responsibility of seeing and
12  treating patients as a physician?
13      MS. MCENROE:  Objection to form, leading.
14      A.  Yes.
15      Q.  Okay.  And was it your assumption in
16  agreeing to undergo treatment by the person you
17  knew -- you knew as Dr. Akoda, that he had gone
18  through that process in a lawful way without having
19  misrepresented his identity?
20      MS. MCENROE:  Objection to form, leading.
21      A.  Yes.
22      Q.  Okay.  And had you understood that Akoda
23  had misrepresented his identity in order to go through
24  that process, would you have agreed to undergo
25  treatment from him?
```

Page 183

```
1       MS. MCENROE:  Objection to form, leading.
2       A.  No.
3       Q.  Okay.  You were also asked some questions
4   about your role as a Class representative in this
5   case.  Do you recall those questions?
6       A.  Yes.
7       Q.  Is it your intention in this case to seek
8   on behalf of yourself and others who are patients of
9   Dr. Akoda compensatory damages, meaning monetary
10  damages, for the emotional distress caused by having
11  undergone treatment by Akoda in an amount that a jury
12  deems appropriate?
13      MS. MCENROE:  Objection to form --
14      A.  Yes.
15      MS. MCENROE:  -- leading.  Counsel is
16  testifying.
17      MR. CERYES:  That's all I have.
18      MS. MCENROE:  No questions from us.  Again,
19  we suspend the deposition.  Thank you.
20      VIDEO SPECIALIST:  We're going off the
21  record at 2:44.
22
23  //
24  //
25  (The deposition of DESIRE EVANS adjourned
```

Page 184

```
1   at 2:44 p.m.)
2   //
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 185

```
1       ACKNOWLEDGMENT OF DEPONENT
2
3       I, DESIRE EVANS, do hereby acknowledge that
4   I have read and examined the foregoing testimony and
5   that the same is a true, correct and complete
6   transcription of the testimony given by me, with the
7   exception of the noted corrections, if any, appearing
8   on the attached errata page(s).
9   _____   _____
10  DATE          DESIRE EVANS
11
12
13  Subscribed and sworn to before me this _____ day of
14  _____, 20_____ .
15  _____ (Notary Public)
16  My Commission expires: _____
17
18
19
20  [SEAL]
21
22
23
24
25
```

Desire Evans

Page 186

```
 1        C E R T I F I C A T E

 2

 3     I, LINDA S. KINKADE, Registered Diplomate

 4  Reporter, Certified Realtime Reporter, Registered

 5  Merit Reporter, Certified Shorthand Reporter, and

 6  Notary Public, do hereby certify that prior to the

 7  commencement of examination the deponent herein was

 8  duly sworn by me to testify truthfully under penalty

 9  of perjury.

10     I FURTHER CERTIFY that the foregoing is a true

11  and accurate transcript of the proceedings as reported

12  by me stenographically to the best of my ability.

13     I FURTHER CERTIFY that I am neither counsel for

14  nor related to nor employed by any of the parties to

15  this case and have no interest, financial or

16  otherwise, in its outcome.

17      IN WITNESS WHEREOF, I have hereunto set my hand

18  and affixed my notarial seal this 9th day of

19  September, 2019.

20      My commission expires:  July 31, 2022

21

22  _____

23  NOTARY PUBLIC IN AND FOR

24  THE DISTRICT OF COLUMBIA

25
```

Page 187

```
 1       WITNESS ERRATA SHEET

 2  REF. NO. 225851          Page 1 of _____

 3  NAME OF CASE: RUSSELL, et al. v. ECFMG

 4  DEPONENT:  DESIRE EVANS

 5  DATE OF DEPOSITION: September 5, 2019

 6  PLEASE INSERT REASON FOR CHANGE:

 7        1. To clarify the record.

           2. To conform to the facts.

 8        3. To correct a transcription error.

 9  Page      Line      Reason No.

10  From _____ to _____

11  Page      Line      Reason No. _____

12  From _____ to _____

13  Page      Line      Reason No.

14  From _____ to _____

15  Page      Line      Reason No.

16  From _____ to _____

17  Page      Line      Reason No.

18  From _____ to _____

19  Page      Line      Reason No.

20  From _____ to _____

21

22

23  SIGNED: _____ DATE: _____

24  (Signature of DESIRE EVANS)

25
```

JA1284

# **EXHIBIT 37**

Elsa Powell

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5    --------------------------------x

 6    MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 7    ELSA M. POWELL, and DESIRE EVANS,    18-5629

 8         Plaintiffs,                     Honorable

                                           Joshua D. Wolson

 9    v.

10    EDUCATIONAL COMMISSION FOR FOREIGN

11    MEDICAL GRADUATES,

12         Defendants.

13    --------------------------------x

14

15

16          VIDEOTAPED DEPOSITION OF ELSA POWELL

17                 Washington, D.C.

18             Friday, September 6, 2019

19

20

21

22

23             GOLKOW LITIGATION SERVICES

24         T 877.370.3377 | F 917.591.5672

25                 deps@golkow.com
```

JA1286

Elsa Powell

|  | Page 2 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 | Friday, September 6, 2019 |
| 6 | 9:32 a.m. |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 | The following is the transcript of the |
| 12 | videotaped deposition of ELSA POWELL held at the |
| 13 | offices of Morgan, Lewis & Bockius, LLP, 1111 |
| 14 | Pennsylvania Avenue, NW, Washington, DC 20004. |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 | Reported by:  Linda S. Kinkade, RDR CRR RMR RPR CSR |
| 20 | Registered Diplomate Reporter, Nationally Certified |
| 21 | Realtime Reporter, Registered Professional Reporter |
| 22 | with Merit Distinction, Certified Shorthand Reporter |
| 23 | (CA), Notary Public, within and for the District of |
| 24 | Columbia, and official duly authorized to administer |
| 25 | oaths and/or affirmations. |

**Page 4**

1

2

3  INDEX OF EXAMINATION

4

5

6  EXAMINATION OF ELSA POWELL              PAGE

7      BY MS. MCENROE              7

8      BY MR. CERYES              109

|  | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 |  |
| 3 | On Behalf of Plaintiffs MONIQUE RUSSELL, JASMINE |
| 4 | RIGGINS, ELSA M. POWELL, and DESIRE EVANS: |
| 5 | Schochor, Federico and Staton, P.A. |
| 6 | 1211 St. Paul Street |
| 7 | Baltimore, Maryland 21202 |
| 8 | (410) 234-1000 |
| 9 | By:  Brent Ceryes, Esq. |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 | On Behalf of Defendant EDUCATIONAL COMMISSION FOR |
| 14 | FOREIGN MEDICAL GRADUATES: |
| 15 | Morgan, Lewis & Bockius, LLP |
| 16 | 1701 Market Street |
| 17 | Philadelphia, Pennsylvania 19103 |
| 18 | (215) 963-5609 |
| 19 | By:  Elisa P. McEnroe, Esq. |
| 20 | By:  Matthew D. Klayman, Esq. |
| 21 |  |
| 22 |  |
| 23 | Also present: |
| 24 | Crystal Strawbridge, Videographer |
| 25 |  |

**Page 5**

1          E X H I B I T S

2

3  NO.        DESCRIPTION                PAGE

4  Exhibit 1    Amended Notice of Deposition of ...  55

5      Plaintiff Elsa Powell

6  Exhibit 2    Civil Action re Russell, et al. ...  91

7      v. Educational Commission for

8      Foreign Medical Graduates

9  Exhibit 3    Plaintiff Elsa Powell's Answers ...  100

10      to First Set of Interrogatories

11      and Responses to First Set of

12      Requests for Production of

13      Documents

14  Exhibit 4    Plaintiff Elsa Powell's ........... 100

15      Supplemental Answers to First Set

16      of Interrogatories and

17      Supplemental Responses to First

18      Set of Requests for Production of

19      Documents

20

21

22

23

24

25

JA1287

Elsa Powell

Page 6

P R O C E E D I N G S
1
2    VIDEO SPECIALIST:  We are now on the
3  record.  My name is Crystal Strawbridge.  I'm a
4  videographer for Golkow Litigation Services.  Today's
5  date is September 6th, 2019.  The time is 9:32 a.m.
6    This deposition is being held at 1111
7  Pennsylvania Avenue, Northwest, Washington, D.C., in
8  the matter of Monique Russell, et al. v. Educational
9  Commission for Foreign Medical Graduates, Civil
10  Action No. 18-5629, for the United States District
11  Court for the Eastern District of Pennsylvania.  The
12  deponent is Elsa Powell.
13    Will counsel please identify themselves?
14    MR. CERYES:  Brent Ceryes on behalf of the
15  plaintiffs.
16    MS. MCENROE:  Good morning.  Elisa McEnroe
17  for Morgan, Lewis & Bockius on behalf of the
18  Educational Commission for Foreign Medical Graduates,
19  and together with me today I have my colleague, Matt
20  Klayman.
21    VIDEO SPECIALIST:  The court reporter
22  today is Linda Kinkade and will now swear in the
23  witness.
24  //
25  //

Page 7

1    ELSA POWELL,
2    having been first duly sworn and/or
3  affirmed on her oath, was thereafter examined and
4  testified as follows:
5    EXAMINATION
6  BY MS. MCENROE:
7    Q.  Good morning, Ms. Powell.
8    A.  Good morning, ma'am.
9    Q.  For the record, could you just state your
10  complete name for me?
11    A.  Elsa Miguelina Powell.
12    Q.  And is it correct that your birthday is
13  ███████████
14    A.  That's correct.
15    Q.  And that makes you ██ years old today?
16    A.  That's correct.
17    Q.  You understand that I'm here because you
18  have filed a lawsuit against the Educational
19  Commission for Foreign Medical Graduates; is that
20  correct?
21    A.  Yes, ma'am.
22    Q.  And we'll be taking your deposition today.
23  Do you understand that?
24    A.  Yes, ma'am.
25    Q.  And you've been deposed once before; is

Page 8

1  that correct?
2    A.  Yes, ma'am.
3    Q.  Was that in the Dimensions lawsuit in
4  Maryland?
5    A.  Yes, ma'am.
6    Q.  Have you ever been deposed otherwise?
7    A.  No, ma'am.
8    Q.  So you may remember from that deposition
9  that the way it works is that I'll ask you some
10  questions, and I'll ask that you answer them.  Do you
11  understand that?
12    A.  Yes, ma'am.
13    Q.  And it works best if I get to get my full
14  questions out and you get to get your full answers
15  out so we're not talking on top of each other.  Does
16  that make sense?
17    A.  Yes, ma'am.
18    Q.  If at any time today you don't understand
19  my question or you find it confusing, please let me
20  know.  I'd be happy to restate it.  If you do answer
21  the question, I'm going to assume that you understood
22  it.  Does that make sense?
23    A.  Yes, ma'am.
24    Q.  Because of the allegations in the lawsuit,
25  some of the questions today may be a bit personal or

Page 9

1  sensitive.  If you need to take a break or a moment,
2  just let me know, and I'm happy to do that as needed.
3  I just ask that, if there's a question that's
4  pending, that you answer the question before we take
5  a break.  Does that make sense?
6    A.  Yes, ma'am.
7    Q.  We just discussed a moment ago that you
8  were deposed in the Dimensions lawsuit in Maryland;
9  right?
10    A.  Yes, ma'am.
11    Q.  Do you remember when that took place?
12    A.  2017, '18, around there.
13    Q.  If -- if I told you the deposition was on
14  March 27th, 2019, would that refresh your
15  recollection?
16    A.  No, ma'am.
17    Q.  Okay.  And why is that?
18    MR. CERYES:  Objection, form, foundation.
19    MS. MCENROE:  I can restate it.
20    Q.  Do you believe that it happened earlier
21  than that, your deposition?
22    A.  Yes, ma'am, 2019.
23    Q.  In 2019?  Okay.
24    A.  Yes.
25    Q.  And sitting here today, do you believe

Elsa Powell

Page 10

1  that the answers you gave during that deposition were
2  true and correct?
3      A.  Yes, ma'am.
4      Q.  And you stand by the answers you gave at
5  that deposition?
6      A.  Yes, ma'am.
7      Q.  So that will help us speed things along a
8  little bit today.
9      So I'm not going to necessarily ask you
10 everything they asked you in that deposition, so, for
11 example, about your employment or education
12 background, but if there's anything today that, as
13 I'm asking you questions, you remember that you
14 testified previously inaccurately for any reason,
15 please let us know, because, otherwise, we're going
16 to take those past answers as having been correct.
17     Do you understand?
18     A.  Yes, ma'am.
19     Q.  Is there any reason you can't tell the
20 truth today?
21     A.  No reason at all.
22     Q.  Any medication that would impair your
23 ability to understand or answer my questions?
24     A.  No, ma'am.
25     Q.  Has your name always been Elsa Powell, or

Page 11

1  did you have another name before you got married?
2      A.  I had another name.
3      Q.  What was that name?
4      A.  Delvillar-Mejia.
5      Q.  That was the last name?
6      A.  Yes.
7      Q.  And was that hyphenated?
8      A.  Yes.
9      Q.  And have you used any other names besides
10 those we just discussed?
11     A.  No, ma'am.
12     Q.  And am I correct to assume that you
13 changed your name because you got married?
14     A.  Correct.
15     Q.  Do I have it right that you were married
16 in January 2015?
17     A.  That's correct.
18     Q.  To Gregory Lamont Powell?
19     A.  That's correct.
20     Q.  Is he still your husband today?
21     A.  Yes, ma'am.
22     Q.  How many children do you have?
23     A.  I have five children.
24     Q.  Would you please tell me their names and
25 ages?

Page 12

1      A.  Lucy Mercedes, she is 14; Nestor Mercedes,
2  he's 13; Josiah Rodriguez, he's 9; Jaiden Powell, he
3  is 4, soon to be 5; and Tatiana Powell, she is 3.
4      Q.  Does Mr. Powell have any other children?
5      A.  No, ma'am.
6      Q.  Do all five of your children live with
7  you?
8      A.  Yes, ma'am.
9      Q.  Is Jaiden in school?
10     A.  Yes, he is.
11     Q.  In pre-K or kindergarten?
12     A.  Pre-K.
13     Q.  And does Tatiana go to daycare?
14     A.  No.
15     Q.  Okay.  How does she get cared for during
16 the day?
17     A.  I take care of her.
18     Q.  Do you work from home?
19     A.  I work overnights.
20     Q.  Who is home with the children overnight
21 while you're working?
22     A.  Sometimes my husband; sometimes my oldest
23 child.
24     Q.  That would be Lucy?
25     A.  Yes.

Page 13

1      Q.  Are your kids good sleepers?
2      A.  Yes.
3      Q.  That makes it easier.
4      A.  It does.
5      Q.  You said you work overnights.  What are
6  your typical hours of your shifts?
7      A.  I work 2100 hours to 05.
8      Q.  So if my math is correct --
9      A.  Nine to 5 -- 9 p.m. to 5 a.m.
10     Q.  Thank you.  9 p.m. to 5 a.m.?
11     A.  Yes.
12     Q.  Where do you work?
13     A.  NIH Bethesda.
14     Q.  How long have you worked at NIH Bethesda?
15     A.  One year and three months.
16     Q.  What do you do there?
17     A.  I'm in admin.  I do admin for the security
18 company, Paragon Systems.
19     Q.  Is that the security company for the
20 building that you're working in?
21     A.  It's for the whole entire campus.
22     Q.  For the whole camp-- --
23     A.  Yes.
24     Q.  It's an NIH campus?
25     A.  Yes.

JA1289

Elsa Powell

Page 14

1    Q. You say you do admin. Just very briefly
2  what does that entail?
3    A. Contact officers, when we have call-outs,
4  I cover those shifts, answer phones, do daily
5  reports, sometimes give officer breaks,
6  administrative work.
7    Q. And when you say you step in for shifts
8  sometimes, that's acting as a security guard?
9    A. Yes, acting lieutenant.
10    Q. Are the shifts you do from 9 p.m. to 5
11  a.m. Monday through Friday?
12    A. Yes.
13    Q. Do you do shifts on the weekend ever?
14    A. No.
15    Q. Is it a regular set schedule so you expect
16  that you will be working Monday through Friday for
17  those times?
18    A. Yes.
19    Q. How far do you live from where you work?
20    A. Forty-five minutes without traffic.
21    Q. Is there usually traffic?
22    A. Not around that time, unless there's an
23  accident or a game, FedExField.
24    Q. So you usually expect it will take you
25  about 45 minutes to get to and from work?

Page 15

1    A. Uh-huh.
2    Q. Each way?
3    A. Yes.
4    Q. So usually you'll leave around 8 p.m. and
5  get home around 6 a.m.?
6    A. Yes.
7    Q. Is that fair?
8    A. Mm-hmm.
9    Q. What time does Tatiana wake up?
10    A. She wakes up around 9 to 10 in the
11  morning.
12    Q. And what time is bedtime at your house for
13  the kids?
14    A. Nine, 9 to 9:30.
15    Q. Nine to 9:30 p.m.?
16    A. Yes.
17    Q. Does Tatiana nap?
18    A. No.
19    Q. When do you sleep during your usual
20  schedule?
21    A. On the weekends. Honestly, on the
22  weekends.
23    Q. What -- how much sleep do you -- do you
24  estimate you get during the workweek?
25    A. Sometimes 30 minutes, 45 minutes.

Page 16

1    Q. A day or at a time are you saying?
2    A. A day.
3    Q. And how -- how long have you been holding
4  that kind of schedule?
5    A. For a year and three months.
6    Q. When did Jaiden start in pre-K?
7    A. Pre-K? He started last year, early pre-K,
8  put him in early entry pre-K so he could get the
9  experience.
10    Q. Prior to that who was caring for him?
11    A. I was.
12    Q. Were you working night shifts at that same
13  time?
14    A. No.
15    Q. So were you working at all or were you
16  home with him? I mean, being home with him is work,
17  so I don't mean to say that, but were you working
18  outside the home in addition?
19    A. No. I was a stay-at-home mom because
20  Tatiana was born with a kidney issue, so I was taking
21  care of her.
22    Q. So you were home with both of them?
23    A. Yes.
24    Q. What kind of kidney issue was Tatiana born
25  with?

Page 17

1    A. She was born with a dilated kidney.
2    Q. And I'm not a medical person, so what does
3  that mean, just in basic terms?
4    A. One kidney was bigger than the other one
5  because it was filled with, like, fluids and stuff.
6    Q. That's something you said she was born
7  with?
8    A. Yes.
9    Q. Has she been able to be treated for that?
10    A. Yes. She received surgery and everything.
11    Q. How is she doing now?
12    A. She's doing good. Thank you.
13    Q. When did she have her surgery?
14    A. April of 2017.
15    Q. Will she require more surgeries or
16  treatments for this kidney problem?
17    A. Just exams, MRIs and MAG3 scans,
18  ultrasounds.
19    Q. How frequently would you say she goes in
20  for medical care?
21    A. Due to the kidney, at first it was
22  every -- every two weeks, but then after the surgery
23  it was every six months.
24    Q. Is she going to a specialist or her
25  regular pediatrician for the follow-up care?

JA1290

Elsa Powell

Page 18

1      A.  A specialist.
2      Q.  Does she also go to a regular
3  pediatrician?
4      A.  Yes, she does.
5      Q.  Is that a general practitioner, family
6  medicine kind of person?
7      A.  Kaiser.
8      Q.  Do your other children get medical care?
9      A.  Yes.
10      Q.  Do they see a pediatrician as well?
11      A.  Yes.
12      Q.  Is Lucy still seeing a pediatrician?
13      A.  Yes, she is.
14      Q.  Is she seeing an obstetrician/gynecologist
15  as well?
16      A.  I haven't taken her yet, but -- I just
17  don't feel comfortable taking her yet.  It's
18  something that we have talked about.
19      Q.  And, again, she's 14, right?
20      A.  Yes.
21      Q.  What grade is she in?
22      A.  She's in high school.  She's in ninth
23  grade.
24      Q.  She just started high school?
25      A.  (Nodding head up and down.)

Page 19

1      Q.  This week?
2      A.  Yes.
3      Q.  Do Tatiana, Jaiden, Josiah, Nestor and
4  Lucy all go to the same pediatrician?
5      A.  No.  Josiah goes to Children's in Clinton,
6  because he has a different insurance than what they
7  have.  And then Jaiden and Angel, they have the same
8  pediatrician.  And then Lucy and Tatiana have the
9  same pediatrician.
10      Q.  And you referred to one of your children
11  as "Angel."  Which one of your children do you call
12  Angel?
13      A.  Oh, I'm sorry.  Nestor.  I'm so sorry.
14      Q.  No, no reason to apologize, but Nestor
15  also goes by Angel sometimes?
16      A.  Yes.  That's his middle name.
17      Q.  And I'm sorry to be a little forward about
18  this, but these five children are yours.  Did you
19  birth each of them?
20      A.  Yes, I did.
21      Q.  Okay.  I just wanted to make sure I
22  understood whether I needed to come to you in a
23  different way.
24      Do I have your address correct, 12 -- sorry.
25  I'm going to start over with the number.

Page 20

1      Do I have your address correct, 12705 Live Oak
2  Place, Upper Marlboro, Maryland?
3      A.  Yes.
4      Q.  I may have said that a little bit off, but
5  that's the right address?
6      A.  Yes, it is.
7      Q.  Okay.  Did you graduate from high school?
8      A.  Yes, I did.
9      Q.  Have you gone to any school after that?
10      A.  I went to college, Everest and Kaplan
11  University.
12      Q.  Did you get a degree?
13      A.  Unfortunately, I was unable to finish.
14  Mommy duties first.
15      Q.  How much do you have left?
16      A.  I only had six months left.
17      Q.  When did you stop attending school?
18      A.  2013, '14.
19      Q.  And you referred to it as "mommy duties"
20  taking you out of school, so tell me about which
21  child joined you that you -- or how that worked that
22  you ended up leaving school?
23      A.  I was working.  I was working two jobs to
24  take care of, at the time, three children, so I
25  had --

Page 21

1      Q.  That was when you had Lucy, Angel and
2  Josiah?
3      A.  Correct.
4      Q.  You said you were working two jobs.  What
5  jobs were you working then when you were also taking
6  care of your three children?
7      A.  I was a concierge in D.C., and I was also
8  doing hair on the side, hairdresser.
9      Q.  At a salon or in people's homes?
10      A.  In a salon, which is owned by Nestor and
11  Lucy's grandmother.
12      Q.  When, compared to that timing, did you get
13  a certificate for being a security guard?
14      A.  I got that around 2010.  I was working at
15  Howard University as a security guard on the campus,
16  and then I got my SPO and started working at George
17  Washington Hospital.
18      Q.  You used the acronym "SPO."  What does
19  that stand for?
20      A.  Special police officer.
21      Q.  So am I correct that -- you said that was
22  in 2010, so that was before the time that you left
23  Everest and Kaplan from going to school, so that was
24  before you were working, like you said, the two jobs,
25  working doing hair and as a concierge in D.C.?

Elsa Powell

Page 22

1      A.  Yes.
2      Q.  When did you switch to being a
3  stay-at-home mom?
4      A.  After I had Jaiden in 2014.
5      Q.  Was it immediately after having Jaiden?
6      A.  Yes.
7      Q.  Had you been working while you were
8  pregnant with Jaiden?
9      A.  Yes, I did.
10     Q.  In -- in what job?
11     A.  Concierge in D.C.
12     Q.  Were you still working at the salon?
13     A.  No.
14     Q.  So it was just the one job as a concierge
15  in D.C. --
16     A.  Yes.
17     Q.  -- while you were pregnant with Jaiden?
18     A.  Yes.
19     Q.  When did you make the decision you wanted
20  to switch to be a stay-at-home mom?
21     A.  After I had Jaiden, I didn't have any
22  help, so with a newborn and then three other
23  children, I had no choice but to stop working.
24     Q.  Does Mr. Powell work?
25     A.  Yes.

Page 23

1      Q.  What is his job?
2      A.  He's a Prince George's County police
3  officer.
4      Q.  What kind of schedule does he work?
5      A.  Crazy schedule.  Sometimes he -- he works
6  evenings for four days, and sometimes he works day
7  work for four days or five days.  Then every three to
8  four months he works midnights for a whole month.
9      Q.  Is his job shift work as well, so he'll
10  know he's on a certain time and he's off a certain
11  time --
12     A.  Yes.
13     Q.  -- when he gets his schedule?
14     A.  Yes.  He gets his schedule for the whole
15  entire year.
16     Q.  Oh, all at once?
17     A.  All at once, yeah.
18     Q.  How long has he been a police officer?
19     A.  Six years.
20     Q.  Is that the entire -- that's through the
21  whole time you've been married he's been a police
22  officer?
23     A.  Yes.
24     Q.  Do you have full custody of Lucy, Angel
25  and Josiah?

Page 24

1      A.  Yes.
2      Q.  And you have full-time care, then,
3  responsibility for them as well?
4      A.  Yes.
5      Q.  And I think I had asked but just to
6  confirm, Lucy, Angel and Josiah are all in school as
7  well?
8      A.  Correct.
9      Q.  How do they get to and from school?  Do
10  they take a school bus?
11     A.  Lucy takes a school bus.  I drop and pick
12  up Nestor, Josiah and Jaiden.
13     Q.  And does that involve taking Tatiana with
14  you to go drop-offs?
15     A.  Sometimes it does when her father is not
16  home.
17     Q.  For pick-ups as well?
18     A.  Yes.
19     Q.  And how far is Angel and Josiah's school
20  from where you live?
21     A.  Angel and Josiah's school, from where I
22  live, is about 20 to 25 minutes --
23     Q.  And how --
24     A.  -- without traffic.
25     Q.  And how far is Jaiden's pre-K from their

Page 25

1  school?
2      A.  Five minutes.
3      Q.  So do you do that in sort of one trip; you
4  go drop all the kiddoes off at school?
5      A.  Yes.
6      Q.  I think in the Dimensions litigation you
7  testified about working for a company called MVM; is
8  that correct?
9      A.  (Nodding head up and down.)
10     Q.  How is that related, if at all, to the job
11  you have at NIH?
12     A.  MVM -- I started with MVM at NIH.  So the
13  contract was almost over, so Paragon took over.
14     Q.  Did your job responsibilities change
15  between when it shifted from MVM to Paragon?
16     A.  Nope.  Same duties, same shift, same
17  schedule.
18     Q.  So the answers you gave in the Dimensions
19  litigation about your job would still hold true
20  today?
21     A.  Correct.
22     Q.  When were you most recently seen by a
23  doctor for anything?
24     A.  About two or three months ago.
25     Q.  For what?

Elsa Powell



Page 26

1    A. I was having ████████████.
2    Q. In like your ████████?
3    A. On my -- ████ a little bit up from my
4    ████████.
5    Q. Yeah.
6    A. So they said I had an ████████.
7    Q. Did you have to have any treatment for
8    that?
9    A. Ibuprofen. They mostly recommended
10   ibuprofen and, of course, take it easy. Iron
11   tablets, because I also suffer from low iron, and
12   it's called -- something called thalassemia alpha
13   trait.
14   Q. Do you know what that was for?
15   A. It's something that I've always had. You
16   have -- your blood cells, low blood cells, yeah.
17   Q. You say that's something you've always
18   had, since you were a child?
19   A. Yes.
20   Q. And is that a medication you've taken
21   since you were a child?
22   A. Well, they mainly recommend to take iron
23   tablets.
24   Q. Besides the medications you just
25   described, do you take any other medications?

Page 27

1    A. No.
2    Q. Besides going in two to three months ago
3    when you were ████████████████████
4    ████ checkups?
5    A. No.
6    Q. Do you have a primary care physician?
7    A. Yes.
8    Q. Who is that?
9    A. It was Emily Lo, but they've changed her,
10   and, honestly, I do not remember her name, the new
11   one that I have. I haven't seen her yet.
12   Q. Do you plan to go see her?
13   A. No.
14   Q. When you went in two to three months ago
15   because ████████████████████████ he
16   emergency room?
17   A. I went to Kaiser Urgent Care.
18   Q. Were you admitted to the hospital?
19   A. No.
20   Q. Were you released the same day?
21   A. Yes.
22   Q. Prior to that visit to the Kaiser Urgent
23   Care, do you remember the time before that you were

Page 28

1    most recently treated by a doctor?
2    A. After that I saw Emily Lo, which is my --
3    was my primary. I had a
4    ████████████████.
5    Q. Is that the treatment that you discussed
6    at your last deposition you got cough medicine for?
7    A. Yes.
8    Q. Prior to that, do you remember when you
9    last went to a primary care physician or any doctor?
10   A. Prior to that I was at the emergency room
11   at Southern Maryland because I was having ████████.
12   ████ They said I had an ████████.
13   Q. Do you know ████████ they were
14   saying it was?
15   A. No. I never followed up.
16   Q. Did that pain stop?
17   A. Yes.
18   Q. Do you still have that pain today?
19   A. No.
20   Q. Do you recall any other visits to the
21   emergency room you've ever made for yourself?
22   A. No. Besides that one, no.
23   Q. Aside from any times you may have been in
24   the hospital when you were delivering your children,
25   do you remember ever being hospitalized?

Page 29

1    A. No, just when I delivered the children.
2    Q. Did you deliver each of your children in a
3    hospital?
4    A. Yes.
5    Q. Was each of your children delivered by an
6    OB/GYN?
7    A. Yes.
8    Q. And when I say OB/GYN, you know what I'm
9    talking about, an obstetrician/gynecologist?
10   A. Yes, I do.
11   Q. It would be easier if I could say the
12   shorter one. Thank you.
13   Have you ever been treated by or seen a
14   midwife or a doula?
15   A. No.
16   Q. Do you know what a midwife or a doula --
17   do you know what they are?
18   A. Yes.
19   Q. Do you currently have an OB/GYN?
20   A. Yes, I do.
21   Q. Who is that?
22   A. Honestly, I do not know her name.
23   Q. Is that -- is that through Kaiser?
24   A. Yes. I haven't seen her yet.
25   Q. It's a woman?

JA1293

Elsa Powell

Page 30

1    A. From what my primary care physician said,
2  yes, it's a woman.
3    Q. When you said your primary care physician
4  said, is that Emily Lo?
5    A. No, it's the new lady I have.  I haven't
6  seen her yet either.
7    Q. You haven't seen her, but have you spoken
8  to her?
9    A. I have messaged her --
10   Q. Tell --
11   A. -- through the Kaiser app.
12   Q. Tell me a little bit about your messages
13  with the primary care physician.
14   A. When I got discharged from Urgent Care,
15  they did some scans, and they said they were going to
16  send it to her.  A couple days passed by, I didn't
17  hear anything, so I sent her a couple messages.
18   That's when she finally wrote back and said
19  that, you know ▓▓▓▓▓▓▓▓▓▓ and I had
20  to take it easy.  If the pain came back, take
21  ibuprofen, and if the symptoms get worse, to contact
22  her and go see her.  And that's when she said that I
23  have to go see an OB/GYN, because also I have
24  ▓▓▓▓▓▓▓▓  which she was concerned about.
25

14   Q. Was that between certain of your children,
15  do you remember?
16   A. Yes.  Yes, Josiah.
17   Q. After Josiah?
18   A. After Josiah.  Actually was it after
19  Josiah?  Yeah.  Jaiden.
20   Q. After Jaiden?
21   A. It was after Jaiden.
22   Q. And after you delivered Jaiden, at any
23  point did you go on to birth control of any sort?
24   A. I was on birth control when I had
25  Jaiden --

Page 32

1    Q. What kind of birth control was that?
2    A. -- when I got pregnant with Jaiden.  I was
3  on the depo shot.
4    Q. Did you continue on that treatment after
5  you had Jaiden?
6    A. No.
7    Q. Did you switch to a different kind of
8  birth control, or did you come off of birth control?
9    A. I came off birth control.
10   Q. Have you ever received treatment from a
11  psychologist or a psychiatrist?
12   A. No.
13   Q. Have you ever --
14   A. I never went to see one, no.
15   Q. Have you ever gotten treatment from any
16  sort of counselor?
17   A. No.
18   Q. Generally speaking, how do you choose your
19  doctors?
20   A. Kaiser chooses them, and sometimes I could
21  switch, but I don't because, like I said, I don't go
22  see them unless I'm seriously injured or seriously in
23  pain.
24   Q. You said Kaiser chooses them.  Is Kaiser
25  your insurance company?

Page 33

1    A. Yes.
2    Q. Is that insurance that you have through
3  your or your husband's employment?
4    A. My husband's employment.
5    Q. When did you get on to your husband's
6  Kaiser insurance?
7    A. In 2015.
8    Q. Upon getting married?
9    A. Yes.
10   Q. Did you have insurance before that?
11   A. Yes, I did.
12   Q. What insurance did you have then?
13   A. It was through the state, Medicaid.
14   Q. So just trying to understand the timing of
15  getting on to Kaiser insurance as compared to your --
16  the birth of your children, did you switch to Kaiser
17  insurance while you were pregnant with Jaiden?
18   A. No.
19   Q. Can you explain that to me, how that
20  timing worked?
21   A. I had Medicaid when I was pregnant with
22  Jaiden.  Then once I got married, my husband put the
23  children and I on Kaiser.
24   Q. That was after you had Jaiden?
25   A. After I had Jaiden, correct.

JA1294

Elsa Powell

Page 34

1    Q.  Thank you for straightening out my
2    timeline.
3         Where did you deliver Tatiana?
4         A.  Holy Cross, Montgomery -- Montgomery
5    County.
6         Q.  Who was your OB/GYN who delivered Tatiana?
7         A.  Mr. Kingsley.  It was through Kaiser.
8         Q.  Is he the doctor you saw for any prenatal
9    care for her?
10        A.  Yes.
11        Q.  And you sought prenatal care while you
12   were pregnant with Tatiana?
13        A.  Yes.
14        Q.  How regularly?
15        A.  First it was every -- every two to three
16   weeks, and then every -- once I got to, like, six
17   months or so, it was every -- every often.
18        Q.  When they told you to come?
19        A.  Yes.
20        Q.  And you saw Dr. Kingsley for ultrasounds,
21   physical exams, that sort of thing?
22        A.  Yes.  Correct.
23        Q.  How did you select Dr. Kingsley as your
24   OB/GYN?
25        A.  I went to Kaiser when I first found out I

Page 35

1    was pregnant, and he was the one that, you know, did
2    all the exam and stuff, and then I just kept him from
3    there.
4         Q.  And you stuck with him from there?
5         A.  Mm-hmm.
6         Q.  And did he do post-delivery treatment for
7    you after you had Tatiana?
8         A.  Yes.
9         Q.  When did you last see Dr. Kingsley?
10        A.  For my six-weeks checkup, and then that
11   was it.
12        Q.  So you went to your six-week checkup?
13        A.  Mm-hmm.
14        Q.  That's a yes?
15        A.  Yes.  I'm sorry.  Yes.
16        Q.  How old was Tatiana when her kidney issue
17   sort of presented itself, when you found out she had
18   a kidney problem?
19        A.  I was pregnant when they detected it.
20        Q.  Oh, you knew when you were pregnant?
21        A.  Mm-hmm.  Yes.  I was eight months pregnant
22   when they detected it.
23        Q.  Aside from Tatiana's kidney issue, have
24   any of your other children had any health issues
25   other than broken bones or normal kid stuff?

Page 36

1         A.  No.
2         Q.  When you first started going to see
3    Dr. Kingsley, did you check out his résumé or his
4    credentials, anything like that?
5         A.  Yes, I did my research.
6         Q.  What --
7         A.  Kaiser has a website which tells you his
8    experience and stuff like that, every hospital that
9    he has worked on.
10        Q.  And did you do research into his
11   certifications or education?
12        A.  No, because Kaiser had all that laid out
13   on their website.
14        Q.  So fair to say you checked out what Kaiser
15   had?
16        A.  What Kaiser had.
17        Q.  You mentioned that Kaiser -- with Kaiser,
18   you're able to ask to switch doctors --
19        A.  Yes.
20        Q.  -- in some -- have you ever done that?
21        A.  No.
22        Q.  When you had Medicaid, did you ever ask to
23   switch doctors?
24        A.  No.
25        Q.  When you had Medicaid, how was it that you

Page 37

1    went about finding a doctor?
2         A.  They have a list of doctors nearby, so I
3    chose the one that was closer to where I lived.
4         Q.  Would it be fair to say they have certain
5    doctors that are considered like in network or that
6    you can -- you're sort of covered if you go see them?
7         A.  Yes.
8         Q.  And you said you -- you selected those
9    doctors by proximity, how close they were to you?
10        A.  Yes.
11        Q.  Did you do any other research other than
12   figuring out how close they were to you?
13        A.  No.
14        Q.  How did you know where they were located
15   about whether they were close to you or not?
16        A.  The address.
17        Q.  So did the list that was provided to you
18   include their addresses?
19        A.  Yes.
20        Q.  Fair to say that, when you had Medicaid,
21   you did nothing other than look at the list that
22   Medicaid provided to you with the names and addresses
23   of the doctors available to you?
24        A.  Correct.
25        Q.  Do you remember who your OB/GYN was who

JA1295

Elsa Powell

Page 38

1  delivered Lucy?  It was a long time ago.
2      A.  It was in Manassas, Virginia, but I do not
3  remember.
4      Q.  Was it a man OB/GYN or a woman OB/GYN?
5      A.  I -- Jesus Christ.  I do not remember,
6  honestly.
7      Q.  Okay.  But it was -- it was an OB/GYN,
8  though, who delivered you then?
9      A.  Yes, yes.
10     Q.  Did you have a different doctor to deliver
11  Angel?
12     A.  Yes.  That was in Fairfax County, and I do
13  not remember.  I do not remember.  Josiah, he was a
14  male.
15     Q.  The OB/GYN was a male?
16     A.  Yes.
17     Q.  And where was he located, generally
18  speaking?
19     A.  In Arlington, Virginia hospital.
20     Q.  How did you come to select your OB/GYN to
21  deliver Jaiden?
22     A.  So I was seeing the lady -- it was a lady
23  at first on Saint Barnabas Road, which was close to
24  where I lived at the time.  So after I became six
25  months, she said that she had to refer me to another

Page 39

1  doctor's office, because that's when she stopped
2  seeing patients.
3      Q.  You said it was a lady, so it was a female
4  OB/GYN?
5      A.  Yes.
6      Q.  Did she refer you to another doctor?
7      A.  Yes.
8      Q.  To whom did she refer you?
9      A.  Dr. Chaudhry.
10     Q.  Is Dr. Chaudhry an OB/GYN?
11     A.  Yes.
12     Q.  Where is he located?
13     A.  In District Heights.
14     Q.  How close to you is that?
15     A.  At the time where I lived, it was about 15
16  minutes.
17     Q.  Did you move at some point since then?
18     A.  Yes, I did.
19     Q.  Have you moved more than once since then?
20     A.  Since then, yes.
21     Q.  And so did you actually ever go see
22  Dr. Chaudhry?
23     A.  I did not see Dr. Chaudhry.  He was never
24  in there.  I saw Dr. Akoda.
25     Q.  Did you go to Dr. Chaudhry's practice?

Page 40

1      A.  Yes, his office.
2      Q.  So just tell me a little bit about how
3  that works.  Did you call up to make an appointment
4  at Dr. Chaudhry's practice?  Did the lady OB/GYN call
5  for you and make appointments, or how did that
6  transition happen, if you remember?
7      A.  She gave me the referral.  I called up
8  there and made an appointment.  So when I got to my
9  appointment, they said that Dr. Chaudhry had to step
10  out, but Dr. Akoda was there.  So I said, that's
11  fine, I just need to get care, I don't care who I
12  see.  I was at my last stage of pregnancy.
13     Q.  You were about six months, you said?
14     A.  About six months, yes.  So then that's
15  when I saw Dr. Akoda, and then all my regular
16  visits -- two weeks after that, every two weeks.
17     Q.  Starting every two weeks?
18     A.  Yes.
19     Q.  Where did those visits take place?
20     A.  At Dr. Chaudhry's office in District
21  Heights.
22     Q.  Prior to going to Dr. Chaudhry's practice,
23  did you do any research into him, Dr. Chaudhry?
24     A.  No.
25     Q.  Can you tell me just a little bit about

Page 41

1  what Dr. Chaudhry's practice looked like?  Is there a
2  reception area, a waiting room, that kind of thing?
3      A.  There was a waiting -- a waiting room, and
4  then on the left-hand side, it's the entrance, and
5  then there's the receptionist, and then on the
6  right-hand side is the rooms, the examination rooms.
7      Q.  Were there nurses or other medical
8  professionals who worked there as well as the
9  doctors?
10     A.  Nurses.  There was nurses.
11     Q.  Did you see other patients there while you
12  were there?
13     A.  Yes.
14     Q.  In the waiting room?
15     A.  Yes.
16     Q.  Okay.  Aside from Dr. Akoda, were you ever
17  treated by any other physician at Dr. Chaudhry's
18  practice?
19     A.  No.
20     Q.  So you said it started out with Dr. Akoda
21  that your appointments were about every two weeks?
22     A.  Yes.
23     Q.  At some point did that become more
24  frequent?
25     A.  When I got closer to my due date.

JA1296

Elsa Powell

Page 42

1    Q.  They began weekly?
2    A.  Yes.
3    Q.  Did your labor with Jaiden begin
4  naturally?
5    A.  Yes.  I was induced.
6    Q.  Who induced you?
7    A.  Dr. Akoda.
8    Q.  Where?
9    A.  PGH hospital.
10   Q.  Did you have an appointment for that?
11   A.  Yes.
12   Q.  Why?
13   A.  Because from my understanding that was the
14  policy.  You had to make an appointment to get
15  induced.
16   Q.  How far along were you when you were
17  induced, do you recall?
18   A.  I was almost nine months, eight and a half
19  to nine.
20   Q.  Do you remember if there was a medical
21  reason that you needed to get induced?
22   A.  No.
23   Q.  So is it fair to say that you had an
24  appointment to get induced and then you showed up at
25  PGH hospital then to actually be induced --

Page 43

1    A.  Yes.
2    Q.  -- at the time of your appointment?
3    A.  Yes.
4    Q.  And at the time of your appointment, did
5  you expect it would be Dr. Akoda who would be doing
6  the induction?
7    A.  I honestly didn't know who was coming, if
8  it was Chaudhry or Akoda.
9    Q.  Sure.
10   A.  Yeah, just...
11   Q.  But either of those two from that
12  practice?
13   A.  Yes.
14   Q.  Have you ever been treated by
15  Dr. Chaudhry?
16   A.  No.
17   Q.  Have you ever seen Dr. Chaudhry in person?
18   A.  I saw him going out the door, but that --
19  that was it.
20   Q.  Did you ever meet him?
21   A.  Just saw him going out the door.  I never
22  actually, you know, met, hey, doctor, no.
23   Q.  How long was your labor with Jaiden?
24   A.  Ooh.
25   Q.  Sorry for needing to ask, but...

Page 44

1    A.  It was hours.
2    Q.  Hours?
3    A.  It was hours, and induced me on the 16th
4  and he wasn't born until the 17th, so about -- tell
5  you, it was more than nine, ten hours.
6    Q.  Nine to ten hours of labor?  Did you have
7  an epidural?
8    A.  Yes, I did.
9    Q.  Did it work?
10   A.  Yes.
11   Q.  Who was your treating physician while you
12  were in labor?
13   A.  It was -- I know Dr. Akoda was there, and
14  there was another lady in there.  I do not remember.
15   Q.  Another physician?
16   A.  Yeah -- no, it's the nurse.
17   Q.  Oh, the nurse.
18   A.  The nurses.  It was two nurses and
19  Dr. Akoda.
20   Q.  Did you have an anesthesiologist come and
21  place the epidural?
22   A.  Yes.
23   Q.  And that was a different doctor?
24   A.  Yes.
25   Q.  Do you remember if that was a lady or a

Page 45

1  man doctor?
2    A.  That was a man doctor.
3    Q.  Were you able to deliver Jaiden vaginally?
4    A.  Yes.
5    Q.  Have you ever had to have a C-section for
6  any of your deliveries?
7    A.  No.
8    Q.  Have you ever had complications from any
9  of your deliveries?
10   A.  Yes.
11   Q.  Tell me about that.
12   A.  So after I had Jaiden, my bleeding was
13  really heavy.  I had to change my -- the padding
14  every three to five seconds, and it was going through
15  the sheets and everything.  So I had texted a friend
16  who was also being seen at Dr. Chaudhry's office, and
17  I had sent her a picture.
18   I said, I don't think this is normal, because
19  it was blood clots as well.  It was bigger than
20  normal blood clots.  So that's when she said, it's
21  not, you need to tell the nurse that she needs to get
22  the doctor in there as soon as possible.
23   So that's when I told the nurse, and she
24  called the doctor, Dr. Akoda.  He came in, and he
25  kept saying, I'm sorry, I should have detected it

JA1297

Elsa Powell

Page 46

1  sooner, I'm so sorry, we're getting the O.R. ready
2  for you.  So they rushed me to the O.R.
3      Next thing you know, I woke up with tubes
4  everywhere, and I was just crying.  I didn't know --
5  I was concerned about my baby.  I didn't know what
6  was going on, why was I bleeding, why these blood
7  clots were so huge.  I just -- I didn't know.
8      Q.  Did this take place while you were at PGH
9  hospital?
10     A.  Yes.
11     Q.  Was -- how long in time was it after you
12 had delivered Jaiden?
13     A.  It was about two or three after I had him.
14     Q.  Two to three hours, so it was that same
15 day?
16     A.  Uh-huh, it was the same day.
17     Q.  Do you remember what time of day you
18 delivered Jaiden?
19     A.  Actually I do not remember what time.
20     Q.  Sure.  Who was the friend that you texted?
21     A.  Her name is Tisa.  I call her Tisa,
22 Latisa.
23     Q.  Latisa?
24     A.  Latisa.
25     Q.  What's her last name?

Page 47

1      A.  Gaymon.
2      Q.  Does it start with a G?
3      A.  G, yes.
4      Q.  So you -- you had the bleeding and the
5  blood clots that you found to be troubling, and you
6  told a nurse then?
7      A.  Yes.
8      Q.  Okay.  And the nurse went and got
9  Dr. Akoda; is that right?
10     A.  Yes.
11     Q.  And Dr. Akoda came and he took you to
12 surgery?
13     A.  Yes.
14     Q.  Do you know who conducted the surgery for
15 you?
16     A.  It was Dr. Akoda.
17     Q.  How long were you in the hospital after
18 you delivered Jaiden?
19     A.  Three days.  Two to three days.
20     Q.  After the surgery that you had from
21 Dr. Akoda after delivering Jaiden, how was your
22 recovery?
23     A.  You know what?  The recovery was fine.  I
24 did meet Dr. Chaudhry.
25     Q.  Tell me about that.

Page 48

1      A.  He was the one who removed the bandages at
2  the hospital.
3      Q.  After the surgery?
4      A.  After the surgery.
5      Q.  Okay.  Where were the bandages?
6      A.  In -- inside me.
7      Q.  Inside your vaginal canal?
8      A.  Yes.
9      Q.  Okay.  But they didn't have to cut open
10 your abdomen at all?
11     A.  No.
12     Q.  Okay.  And, I'm sorry, you -- you had said
13 that after you were released from the hospital, then
14 your post-delivery recovery from Jaiden was normal?
15     A.  Mm-hmm.
16     Q.  Is that a yes?
17     A.  Yes.
18     Q.  Did Jaiden have any complications from his
19 delivery?
20     A.  No.
21     Q.  Was Jaiden a good eater?
22     A.  Picky eater.
23     Q.  Well, as an infant, was he breastfed?
24     A.  Yes.
25     Q.  Okay.  And how did he do with feeding?

Page 49

1      A.  Lasted about two weeks, and then he would
2  just take Similac.
3      Q.  He wanted to switch to formula?
4      A.  Yes.
5      Q.  And bottles?
6      A.  Yes.
7      Q.  And how was he as a sleeper after
8  delivery?
9      A.  A good sleeper.
10     Q.  Did you breastfeed all your children?
11     A.  Yes.
12     Q.  How long did you breastfeed Tatiana for?
13     A.  Seven months.
14     Q.  Aside from the bleeding and the clots that
15 you had after delivering Jaiden, did you have any
16 other concerns about your delivery of Jaiden?
17     A.  I did.  Because, like I said, I'm ██████
   ████████████████████████████████████████
   ██████████████████████████
21     Q.  Did you ask?
22     A.  I did, but I never got the answer.
23     Q.  When you say you asked, who did you ask?
24     A.  I asked Dr. Akoda.
25     Q.  While you were in the hospital?

JA1298

Elsa Powell

Page 50

1     A. Yes.
2     Q. Do you know if you signed a consent form
3  to get a blood transfusion?
4     A. I don't remember, honestly.
5     Q. Do you know if they talked to you about
6  getting a blood transfusion before you went into
7  labor?
8     A. I don't remember.
9     Q. Any other concerns unrelated to the
10 bleeding and the clotting issue from your delivery
11 with Jaiden?
12    A. Not after the delivery.
13    Q. Okay. What about during the delivery?
14    A. During, no.
15    Q. Or before delivery?
16    A. Before, no.
17    Q. Let's get back to your prenatal care for
18 Jaiden. You were going about once every two weeks
19 once you were six months pregnant to see Dr. Akoda;
20 is that correct?
21    A. Correct.
22    Q. And that was always at Dr. Chaudhry's
23 medical practice?
24    A. Correct.
25    Q. Was that in a private exam room?

Page 51

1     A. Yes.
2     Q. Would you first get seen by a nurse for
3  like blood pressure and weight and that kind of
4  stuff?
5     A. Yes.
6     Q. And then when -- you would be taken back,
7  and you would see Dr. Akoda?
8     A. Correct.
9     Q. Was a nurse with you for those
10 examinations by Dr. Akoda?
11    A. No.
12    Q. Okay. Sometimes yes, sometimes no, or
13 always no?
14    A. At first no. Then after I requested one
15 to be there.
16    Q. And when did you request to have a nurse
17 present with your examinations of Dr. Akoda?
18    A. When Dr. Akoda was starting being very
19 flirtatious.
20    Q. When was that?
21    A. He would do -- examine my breasts and
22 stuff and make comments about I have nice breasts and
23 stuff like that. So then I felt uncomfortable. That
24 was -- I was eight months pregnant at that time,
25 seven and a half to eight.

Page 52

1     Q. So it wasn't the first time you went to
2  see Dr. Akoda that this happened?
3     A. It wasn't the first time, no.
4     Q. And you went a couple times before that
5  had happened?
6     A. Correct.
7     Q. Okay. You said he would examine your
8  breasts. Do you mean like a breast exam?
9     A. Yes.
10    Q. Palpitating your breasts, feeling for
11 lumps, that kind of thing?
12    A. Correct.
13    Q. The first time that you said Dr. Akoda
14 began being flirtatious, following that, is that when
15 you asked to have a nurse present for your next
16 examination?
17    A. Yes.
18    Q. So was it one time that this happened with
19 Dr. Akoda when you were alone with him?
20    A. No, it was a few times.
21    Q. So were you seen by Dr. Akoda alone after
22 you had requested to have a nurse present?
23    A. At first, yes. She would step out of the
24 room, and then I wouldn't seen her. But then I said
25 something again to the front desk requesting a nurse,

Page 53

1  and from that point on, every time I saw him, there
2  was a nurse present.
3     Q. Do you remember, did they have female
4  nurses, male nurses accommodation?
5     A. Female.
6     Q. All female nurses?
7     A. It was all female nurses.
8     Q. Was that true both for your prenatal care
9  and for your delivery, they were all female nurses?
10    A. Yes.
11    Q. At any point after you said Dr. Akoda
12 became flirtatious, did you ask to be seen instead by
13 a different OB/GYN?
14    A. No.
15    Q. Other than the comments to you in
16 connection with the breast exams, did Dr. Akoda do or
17 say anything else that you felt was flirtatious?
18    A. No, that was it.
19    Q. And by "flirtatious" I also mean or sexual
20 in any way. Do you understand that?
21    A. Yes.
22    Q. Okay. So the answer is still no?
23    A. Still no.
24    MS. MCENROE: We've been going just about
25 an hour. It might be a good time for a little break,

Elsa Powell

|  | Page 54 |
|---|---|
| 1 | if that's okay. |
| 2 | THE WITNESS:  If that's what you guys want |
| 3 | to do.  I mean, I'm fine. |
| 4 | MS. MCENROE:  That sounds good.  Let's |
| 5 | take a quick break. |
| 6 | MR. CERYES:  Okay. |
| 7 | VIDEO SPECIALIST:  We're going off the |
| 8 | record at 10:26. |
| 9 | (Proceedings recessed.) |
| 10 | VIDEO SPECIALIST:  We're back on the |
| 11 | record at 10:36. |
| 12 | BY MS. MCENROE: |
| 13 | Q.  Ms. Powell, what, if anything, did you do |
| 14 | to prepare for today's deposition? |
| 15 | A.  Just be here. |
| 16 | Q.  Did you review any documents in advance of |
| 17 | today for your deposition? |
| 18 | A.  Yes, I did. |
| 19 | Q.  What did you review? |
| 20 | A.  For starters, the address. |
| 21 | Q.  That's good.  Anything else? |
| 22 | A.  I had to remember again what ECFG [sic] |
| 23 | was. |
| 24 | Q.  Anything else? |
| 25 | A.  That's -- that's mainly -- mainly what I |

|  | Page 55 |
|---|---|
| 1 | was -- |
| 2 | Q.  And what do you mean you had to remind |
| 3 | yourself what ECFMG is? |
| 4 | A.  Because I didn't know at first who you |
| 5 | guys were. |
| 6 | Q.  And how did you remind yourself what ECFMG |
| 7 | is? |
| 8 | A.  I looked -- I looked it up, how the |
| 9 | documentation had said that I had from my lawyer. |
| 10 | Q.  What documentation? |
| 11 | A.  The deposition. |
| 12 | Q.  Was that your deposition from the |
| 13 | Dimensions litigation? |
| 14 | A.  No.  It was the one that my lawyer had |
| 15 | sent me of where to come and who I was going to meet. |
| 16 | Q.  Okay. |
| 17 | (Exhibit 1 marked for |
| 18 | identification:  Amended Notice of |
| 19 | Deposition of Plaintiff Elsa Powell) |
| 20 | BY MS. MCENROE: |
| 21 | Q.  I'd like to hand you what I'm marking as |
| 22 | Exhibit 1 -- that was a good toss -- which you'll see |
| 23 | at the top says Amended Notice of Deposition of Elsa |
| 24 | Powell.  Do you see that? |
| 25 | A.  Yes. |

|  | Page 56 |
|---|---|
| 1 | Q.  Have you seen this deposition notice |
| 2 | before? |
| 3 | A.  Yes. |
| 4 | Q.  Is that what you reviewed? |
| 5 | A.  Yes. |
| 6 | Q.  Okay.  Aside from this amended notice of |
| 7 | deposition, did you review anything else in |
| 8 | preparation for your deposition today? |
| 9 | A.  No. |
| 10 | Q.  Did you look up any information on the |
| 11 | Internet in preparation for today's deposition? |
| 12 | A.  No. |
| 13 | Q.  Did you speak with anyone to prepare for |
| 14 | today's deposition? |
| 15 | A.  No. |
| 16 | MR. CERYES:  You can share the fact -- if |
| 17 | we discussed, you can share the fact that we had |
| 18 | communications, just not -- |
| 19 | A.  That's including my lawyer? |
| 20 | Q.  Correct. |
| 21 | A.  Oh, okay. |
| 22 | Q.  So not what you said to one another, but |
| 23 | just the fact of having spoken with counsel. |
| 24 | A.  Oh, yes, my attorney. |
| 25 | Q.  And who did you speak with? |

|  | Page 57 |
|---|---|
| 1 | A.  My attorney. |
| 2 | Q.  And is that Brent sitting next to you? |
| 3 | A.  Mr. Brent, yes, that's correct. |
| 4 | Q.  And did you speak to him in person or on |
| 5 | the telephone? |
| 6 | A.  In person and the telephone. |
| 7 | Q.  How long was that for? |
| 8 | A.  In person?  A good 25, 30 minutes. |
| 9 | Q.  And on the telephone? |
| 10 | A.  Forty minutes. |
| 11 | Q.  When did those conversations take place? |
| 12 | A.  Yesterday. |
| 13 | Q.  Both the in person and the telephone? |
| 14 | A.  No, the one in person was today. |
| 15 | Q.  This morning? |
| 16 | A.  Yes, this morning. |
| 17 | Q.  Okay.  Great.  Thank you.  Here? |
| 18 | A.  Yes. |
| 19 | Q.  How did you first meet your counsel? |
| 20 | A.  It was a meeting that we had about the |
| 21 | Akoda case once I've learned what was going on. |
| 22 | Q.  When you say it was a meeting that you |
| 23 | had, was that an in-person meeting? |
| 24 | A.  It was an in-person meeting, yes, with a |
| 25 | group of young ladies. |

Elsa Powell

Page 58

1    Q. So there were other clients there in
2  addition to yourself?
3    A. Yes.
4    Q. And some lawyers as well?
5    A. Correct.
6    Q. Do you know any of the other ladies who
7  were there with you?
8    A. Just one.
9    Q. Who was that?
10   A. My friend, Latisa.
11   Q. Would Gaymon sound correct for her name?
12   A. Yes.
13   Q. G-A-Y-M-O-N?
14   A. Yes.
15   Q. Is that who you also texted when you were
16  bleeding after delivering Jaiden?
17   A. Correct.
18   Q. Aside from Ms. Gaymon, did you know any of
19  the other ladies who were also meeting with counsel?
20   A. No.
21   Q. Approximately how long did that meeting
22  last?
23   A. About two hours or so.
24   Q. Do you remember when that was?
25   A. No, it's -- it's -- it's been like around

Page 59

1  2017 or so.
2    Q. Was that before you filed any lawsuits?
3    A. Yes.
4    Q. Had you hired counsel by then?
5    A. No.  I wasn't aware of what was going on
6  by then.
7    Q. Can you estimate how many ladies were in
8  the group who were at that meeting with counsel?
9    A. I wouldn't know to tell you.  It was --
10   Q. Was it closer to four or 20 or --
11   A. No, it was -- it was about -- more than 20
12  or so.
13   Q. Did you have any other more group meetings
14  with counsel like that?
15   A. No.
16   Q. Where did that meeting take place?
17   A. It was a hotel lobby, but I -- not lobby
18  but conference area, but I don't remember the exact
19  name.
20   Q. Aside from the group of ladies who were
21  there, you mentioned counsel was there as well?
22   A. Correct.
23   Q. How many lawyers were there?
24   A. A good four or five.
25   Q. Was anyone else there besides the lawyers

Page 60

1  and the -- as you described them, the group of
2  ladies?
3    A. No, it's just us.
4    Q. How did you know to be at that meeting?
5    A. My friend told me about it.
6    Q. Had you spoken to any lawyers before you
7  went to that meeting?
8    A. No.
9    Q. Did you speak to any lawyers at that
10  meeting?
11   A. Yes.
12   Q. Who did you speak to?
13   A. I do not remember.
14   Q. Did you hire counsel at that meeting?
15   A. Yes.
16   Q. Did you sign anything at that meeting?
17   A. Yes.
18   Q. Do you have a copy of what you signed in
19  that meeting?
20   A. Not with -- no, not on me, no.
21   Q. Not necessarily with you, but do you have
22  a copy of it?
23   A. No.
24   Q. When you were going to that meeting, do
25  you know what you thought the purpose of the meeting

Page 61

1  was?
2    A. Yes.
3    Q. What did you think the purpose of the
4  meeting was going to be?
5    A. Learn more information about how the
6  doctor that I thought was a real doctor unfortunately
7  wasn't who he said he was or what his name was.
8    Q. Is that Dr. Akoda you're talking about?
9    A. That's correct.
10   Q. Is that in fact what you learned at the
11  meeting?
12   A. That's --
13      MR. CERYES:  Object.  I think we're
14  starting to get into the substance of what was
15  discussed at that meeting.  So I'm going to advise
16  you not to answer that question.
17  BY MS. MCENROE:
18   Q. Let me restate it a different way, or I'll
19  just ask a different question actually.
20      So how did you come to have the expectation
21  that that was what you were going to hear about at
22  the meeting?
23   A. Because my friend had actually told me,
24  and she had learned it through a TV ad.  So I said, I
25  don't believe it, I don't -- this has got to be some

JA1301

Page 62

1  kind of joke.  That's when she said was like, well,
2  they're having a meeting.  If you don't believe me,
3  we can attend the meeting.  I'm sure you can get the
4  information that you're so confused about.
5      Q.  Did you ever see the TV ad Ms. Gaymon was
6  referring to?
7      A.  No.
8      Q.  Was it Ms. Gaymon you were just talking
9  about?
10     A.  Correct.
11     Q.  Did you ever hear any radio ads?
12     A.  After the fact, yes.
13     Q.  When you say "after the fact," you mean
14  after this meeting?
15     A.  After the meeting.
16     Q.  What did the radio ad say?
17     A.  It was -- whatchamacallit -- the radio --
18  not the radio -- the radio station, not a -- not like
19  an ad, the radio station.  They were talking about
20  how there was a doctor who was delivering children,
21  and come to find out that he lied about his identity,
22  and they were talking about that.
23     So that's when I had called my friend Tisa.  I
24  was like, wow, it's everywhere.  I -- I still can't
25  believe it.

Page 63

1      Q.  Had you seen or heard any other news media
2  coverage about Dr. Akoda?
3      A.  Online I did.
4      Q.  What did you see?
5      A.  I saw how they were talking about his real
6  name wasn't Akoda, and that he had lied and was being
7  charged with security fraud.
8      Q.  Social Security fraud?
9      A.  Social Security fraud, yes.
10     Q.  Any other news coverage that you saw or
11  heard?
12     A.  That was it.  After that, I didn't want to
13  see anything else.
14     Q.  When did Ms. Gaymon first contact you
15  regarding these allegations about Dr. Akoda?
16     A.  I don't know the specific day or month,
17  but I know it was in 2017.
18     Q.  What year was Jaiden born again?
19     A.  2014.
20     Q.  Okay.  Following Jaiden's delivery, did
21  you do post-delivery care with Dr. Akoda?
22     A.  I sure did.
23     Q.  Okay.  For how long?  Until when?
24     A.  My -- I did my six-weeks checkup.  He had
25  said that I had an ovarian cyst and that it needed to

Page 64

1  be burned.  And he did the procedure right there at
2  Dr. Chaudhry's office.
3      Q.  In the office?
4      A.  Yes.
5      Q.  Did you have any complications from having
6  the ovarian cyst treated?
7      A.  Just -- it was irritation and pain, but
8  that was it.
9      Q.  And how long did that irritation and pain
10  last after the procedure?
11     A.  Three to four -- three to four days.
12     Q.  Three to four days?  Okay.  Following the
13  treatment of that ovarian cyst, did you get treatment
14  or have an examination by Dr. Akoda after that?
15     A.  After that, no.
16     Q.  Did you see any obstetricians or
17  gynecologists between then and then when you were
18  again pregnant with Tatiana?
19     A.  No.
20     Q.  Did you see any obstetricians or
21  gynecologists between when you delivered Lucy and
22  finished that postnatal care and when you became
23  pregnant with Angel?
24     A.  No.
25     Q.  Did you see any obstetricians or

Page 65

1  gynecologists between when you were done with your
2  postnatal care from Angel and when you became
3  pregnant with Josiah?
4      A.  No, I --
5      Q.  Did you see any OB/GYNs between when you
6  finished your post -- postnatal care of Josiah and
7  when you became pregnant with Jaiden?
8      A.  No.
9      Q.  How did you become friends with
10  Ms. Gaymon?
11     A.  I met her at the doctor's office, my
12  OB/GYN, when I found out I was pregnant with Jaiden.
13  I do not remember her name, but it was at the office
14  on Saint Barnabas Road.
15     Q.  With the woman OB/GYN, correct?
16     A.  Yes.
17     Q.  Okay.  And she was pregnant at the same
18  time you were pregnant?
19     A.  Correct.
20     Q.  Did she then go on, do you know, to switch
21  to Dr. Chaudhry's practice around the time you did as
22  well?
23     A.  Yes.
24     Q.  Did you guys talk about that?
25     A.  Yes, we did.

Elsa Powell

Page 66

1    Q.  What did you talk about?
2    A.  I told her that they had changed me over
3  to Dr. Chaudhry's office, but I wasn't too happy
4  because I didn't want to deliver Jaiden at PGH with
5  all the negative reviews that I had heard from PGH.
6  So that's when she said, well, I'm delivering there
7  too, so you're not alone.
8        And our dates were different, doctor's
9  appointments were different, so I would call her and
10  say, hey, I saw Dr. Akoda.  And she was like, oh, I'm
11  going next week, okay, we'll follow up next week.
12       But eventually we went weeks without speaking
13  until I had called her and told her I was in labor.
14  And then she went to see me afterwards.
15    Q.  Did she come to see you in the hospital?
16    A.  Yes.
17    Q.  Was she still pregnant or had she had her
18  baby?
19    A.  She was still pregnant.
20    Q.  Did she deliver a healthy baby?
21    A.  Yes.
22    Q.  And did Dr. Akoda deliver her baby, do you
23  know?
24    A.  Yes.
25    Q.  Did she have a boy or a girl?

Page 67

1    A.  A girl.
2    Q.  How long after you had Jaiden?
3    A.  A week after I had Jaiden.
4    Q.  So pretty close in time?
5    A.  Uh-huh.
6    Q.  Did you guys overlap in the hospital at
7  all?
8    A.  No.
9    Q.  And did she actually deliver at PGH?
10    A.  Yes.
11    Q.  When did she come visit you in the
12  hospital?
13    A.  The -- right after I had my surgery, a
14  couple hours after I had my surgery.
15    Q.  When you were in recovery?
16    A.  Yes.
17    Q.  By the way, how was Jaiden when you saw
18  him after your surgery?
19    A.  It was good seeing him.  He was sleeping.
20  It was really nice.
21    Q.  Good.  Yeah.  And was your husband in the
22  hospital with you as well?
23    A.  No.
24    Q.  Was he working?
25    A.  No.  We weren't together at that time.

Page 68

1    Q.  So did you have anyone else with you
2  supporting you in the hospital when you had Jaiden?
3    A.  No.
4    Q.  Okay.  Was he with nurses when you had
5  your surgery?
6    A.  Yes.
7    Q.  Okay.  And then when did Latisha come to
8  you -- or did I say that wrong?  I'm sorry,
9  Ms. Gaymon.  Stick with Ms. Gaymon.
10    A.  It was a couple hours.  It was -- it was
11  later, later that day.
12    Q.  How long did she stay with you in the
13  hospital?
14    A.  About 45 minutes to an hour.
15    Q.  Did you have any other visitors when you
16  were in the hospital having delivered Jaiden?
17    A.  No.
18    Q.  Do you have any family members living
19  nearby, your mom, your dad, siblings?
20    A.  No.  They're all in Massachusetts.
21    Q.  Oh, they all live in Massachusetts?
22    A.  Yes.
23    Q.  Do you have siblings?
24    A.  No -- in Massachusetts.  They are all in
25  Massachusetts.

Page 69

1    Q.  Do you have brothers and sisters, though?
2    A.  Six brothers.
3    Q.  Six brothers?
4    A.  Yes.
5    Q.  They all live in Massachusetts?
6    A.  Yes.
7    Q.  Do they have any children?
8    A.  Yes, they do.
9    Q.  Do you get up there to see them?
10    A.  Sometimes, when I can.
11    Q.  Are your parents still living?
12    A.  Yes.
13    Q.  And -- and they live in Massachusetts?
14    A.  My father lives in Massachusetts.  My
15  mother lives in Florida.
16    Q.  Did either of them come to visit you after
17  you had Jaiden?
18    A.  No.
19    Q.  When you went home after having delivered
20  Jaiden, was there anyone there to help you?
21    A.  My children and my neighbor.
22    Q.  And who is your neighbor?
23    A.  Lord, what's her name?  I do not remember
24  her name.  I just -- Peterson is her last name, but I
25  do not remember her name.

Elsa Powell

Page 70

1    Q.  Ms. Peterson came to help you some?
2    A.  Yes.
3    Q.  And what kind of help did she provide?
4    A.  She was the one who took care of the
5  children while I was in the hospital.
6    Q.  Did she stay to help after you came home
7  with Jaiden?
8    A.  Yes, because she was literally my
9  next-door neighbor.
10    Q.  Did she stay over to help so that you
11  could sleep --
12    A.  Yes.
13    Q.  -- and take a shower?
14    A.  Yes.
15    Q.  How much time do you think Ms. Peterson
16  spent at your home after you had Jaiden?
17    A.  Probably about -- I'd say about an hour or
18  two a day.
19    Q.  For -- for how long did that go on, do you
20  think?
21    A.  For the first -- first two weeks.  Or, if
22  I needed her, I went over to her house.
23    Q.  At some point after you had Jaiden did you
24  and Mr. Powell get together or move into the same
25  home?

Page 71

1    A.  Not aft- -- until we got married.
2    Q.  So how long was it that you got married
3  after you had Jaiden?
4    A.  Let's see.  I had Jaiden in September '14.
5  We got married in January 2015.  It was a couple
6  months.
7    Q.  Did he help with any of the child care
8  responsibilities before you got married?
9    A.  No.
10    Q.  Does he help with any child care
11  responsibilities now?
12    A.  Yes.
13    Q.  We were talking about Ms. Gaymon had a
14  baby girl, healthy baby girl, about a week after you
15  had Jaiden; is that right?
16    A.  Yes.
17    Q.  Does she live nearby where you live, or at
18  least at the time did she?
19    A.  No.  At the time she lived, let's see -- I
20  lived in Temple Hills.  She lived in Fort Washington.
21  So it was probably 30, 40 minutes away from me.
22    Q.  Did you visit with one another after you
23  both had your babies?
24    A.  Like six -- six or seven months after.
25    Q.  And did you talk at all about your birth

Page 72

1  experiences with Dr. Akoda?
2    A.  She spoke about her cesarean because she
3  had a cesarean, and that's when I said I've never had
4  a cesarean, and that was the conversation.
5    Q.  Do you know how her recovery went after
6  her C-section?
7    A.  Not really.  Honestly, not really.
8    Q.  Do you know if she talked to you about any
9  infection or scarring, anything like that?
10    A.  No.
11    Q.  Does she have other children, do you know,
12  other than that daughter?
13    A.  Yes, she has two older children.
14    Q.  Before she had that daughter?
15    A.  Yes.
16    Q.  Do you know if she's had any children
17  since?
18    A.  No, she has not.
19    Q.  You said that you guys got together about
20  six or seven months after your -- Jaiden and her
21  daughter had been born.  Do you know if you saw each
22  other then thereafter, before you had the meeting
23  with counsel we talked about earlier?
24    A.  Yes, we did.
25    Q.  About how frequently?

Page 73

1    A.  Not frequently.
2    Q.  For about how many times?
3    A.  How many times after that?  I would say
4  about four to five.
5    Q.  Were those of a social nature, those
6  meetings?
7    A.  Yes, gatherings at my house from kids'
8  birthday parties, stuff like that.
9    Q.  Aside from seeing each other, would you
10  stay in touch over social media or texting, anything
11  of the like?
12    A.  Yes.
13    Q.  Okay.  How?
14    A.  Facebook.  And she would text me time to
15  time and see how I'm doing, see how the kids are
16  doing, and to tell me she's -- Maddie, which is her
17  daughter that she had -- Maddie is asking when she's
18  going to see Jaiden and when she's going to come
19  over.
20    Q.  Is Maddie a healthy kid, from what you
21  know?
22    A.  Yes.
23    Q.  What name do you use on Facebook?
24    A.  Miguella Powell.
25    Q.  Miguella Powell?  So your -- your current

Elsa Powell

Page 74

1    middle name and last name?
2        A. My nickname.
3        Q. Oh, you go by -- is that your nickname?
4        A. Yes. Because my father's name is Miguel,
5    so everybody calls me Miguella.
6        Q. Do you use any other social media?
7    ████████████████████████████████
8    ████████████████████████████████
   ██
   ██
   ██
14                                 number.
14       Q. Okay. And is that your cell phone number?
15       A. Yes.
16       Q. And what is that number?
1    ████████████████████████████████
   ████████████████████
19       A. No.
20       Q. Do you have any blogs?
21       A. No.
22       Q. Do you do any other sort of journaling?
23   Do you have any hard-copy journals you keep?
24       A. No. I barely have time to sleep.
25       Q. You mentioned that Ms. Gaymon was the

Page 75

1    first one to be in touch with you to talk about the
2    allegations about Dr. Akoda and his identity; is that
3    correct?
4        A. That's correct.
5        Q. How was she first in touch with you about
6    that?
7        A. She called me.
8        Q. On the telephone?
9        A. Yes.
10       Q. What did she say?
11       A. She said, girl, you will not believe this.
12   I said, what. She was like, Dr. Akoda is not who he
13   said he is. I said, you're lying. She's like, no,
14   I'm not lying. I said, girl, I don't believe you,
15   whatever. So she said, if you don't believe me,
16   there's going to be a meeting that you can go and see
17   it for yourself, so...
18       Q. Was that just one conversation before you
19   then went to the meeting with counsel?
20       A. Yes.
21       Q. Do you know how she found out?
22       A. She said she -- through an ad.
23       Q. On the television?
24       A. On the television.
25       Q. Did she describe that ad to you?

Page 76

1        A. No.
2        Q. Did she tell you what station it was on?
3        A. No.
4        Q. What was her mood like when she called
5    you?
6        A. Shocked.
7        Q. Do you know anyone else other than
8    Ms. Gaymon who was treated or examined by Dr. Akoda?
9        A. No.
10       Q. Did you become friends with anyone else in
11   the waiting room of any of your OB/GYNs?
12       A. No.
13       Q. And we covered this, I think, but you
14   delivered Jaiden vaginally, correct?
15       A. Correct.
16       Q. And Ms. Gaymon had a C-section?
17       A. Correct.
18       Q. Do you know if your birthing experiences
19   were similar?
20           MR. CERYES: Objection, form, foundation.
21       You can answer to the extent you know and
22   understand the question.
23       A. I don't know.
24       Q. Okay. So you had a vaginal delivery and
25   she had a C-section?

Page 77

1        A. Yes.
2        Q. So I'm just asking if you think that your
3    delivery experiences with Dr. Akoda were similar.
4           MR. CERYES: Same objection.
5        A. I don't -- I don't -- I don't know,
6    honestly. I thought mine was harsh. I don't know
7    what she went through.
8        Q. You mean your labor and delivery was --
9    was a tough one?
10       A. Yes.
11       Q. Do you know about the experiences of any
12   of the other patients of Dr. Akoda's?
13       A. No.
14       Q. Do you know if Ms. Gaymon had the same
15   experiences with breast exams that you had with
16   Dr. Akoda?
17       A. I don't know.
18       Q. Did you talk to her about that experience?
19       A. No.
20       Q. Have you ever spoken to her about that
21   experience?
22       A. No.
23       Q. Has Ms. Gaymon ever told you that there
24   was anything flirtatious or sexual about any of her
25   interactions with Dr. Akoda?

Elsa Powell

Page 78

1    A. No.
2    Q. She has not told you that?
3    A. No, she has not.
4    Q. Other than the issue of Dr. Akoda's
5 identity, has Ms. Gaymon raised any concerns about
6 Dr. Akoda's treatment of her with you?
7    A. She hasn't told me anything, no.
8    Q. Sitting here today, do you believe that
9 Dr. Akoda is a doctor?
10    MR. CERYES: Objection, form, foundation.
11 You can answer.
12 BY MS. MCENROE:
13    Q. Just asking for what you -- what your
14 belief is.
15    A. My honest opinion? I don't know what to
16 believe.
17    Q. So you don't know one way or the other?
18    A. I don't know what -- he said his name was
19 Akoda, and come to find out it wasn't. I mean, I
20 don't know what to believe.
21    Q. Okay. And does him using a different name
22 have some sort of special significance to you? What
23 is it that -- that is the problem with that?
24    A. It's the problem --
25    MR. CERYES: Objection, form, foundation.

Page 79

1    You can answer.
2    A. Yeah, it's a problem. You told me your
3 name was Akoda and come to find out it's not. I
4 mean, what other secrets are you hiding? I -- I
5 trusted you. You know, you touched my body. I mean,
6 that's -- I thought Akoda, you know, was my doctor,
7 who I trusted to do my exams and -- and touch my body
8 and deliver my baby.
9    I don't -- I don't know whatever his name is.
10 I don't -- it's beyond disturbing, it is. So, yeah,
11 it has -- it has a lot to do with his name, because
12 it's shocking. It's disturbing. I felt violated by
13 somebody who I don't know.
14    Q. When did you feel violated by Dr. Akoda?
15 When is it that you came to feel violated, if that
16 makes sense?
17    A. When I found out that Akoda was not Akoda.
18    Q. When he used a different name -- that he
19 had used a different name?
20    A. Yeah. So I was like, who -- who -- who
21 was it that was touching me, who was it that I had
22 trusted to say -- to put my -- my life on the line.
23 If my -- if my kids, my older kids -- if I would --
24 did die in that O.R. room, you know, and my kids have
25 questions, and come to find out, oh, you know, it

Page 80

1 wasn't Dr. Akoda who did the surgery. Come to find
2 out it's -- it's some other man. I mean, how are
3 they going to feel? Like, it's -- it's disturbing.
4 It's beyond disturbing.
5    Q. Sitting here today, do you have any reason
6 to doubt that Dr. Akoda had medical training?
7    A. Yeah. Yes, I do.
8    Q. You've -- you've had a number of OB/GYNs
9 over the span of your experience in birthing
10 children. Was there anything out of the ordinary
11 about Dr. Akoda's care of you compared to the other
12 OB/GYNs you've had?
13    MR. CERYES: Objection to the extent it's
14 already been answered.
15    But you can answer.
16    A. I mean, besides that he was flirtatious,
17 and, certain extent, disrespectful because,
18 you know --
19    Q. But I'm talking about the medical care
20 itself.
21    A. No. I mean, when you go to get checked
22 out, you don't -- you don't actually focus on, you
23 know, what is he doing. I mean, I didn't go to
24 medical school, so I don't know what -- what a doctor
25 is supposed to do.

Page 81

1    Q. You've delivered other children before, so
2 I'm just trying to understand if in your experience,
3 your treatment with Dr. Akoda -- and we've talked
4 about the flirtatious issues -- setting that aside,
5 the medical treatment he provided to you was
6 different or notable in some way compared to the
7 other treatment you've had from other OB/GYNs that
8 you've seen.
9    A. Well, this one, yes, it was different. I
10 almost -- I almost bled to death, so, yeah, it was
11 definitely different --
12    Q. From your --
13    A. -- from other experience.
14    Q. From your post-delivery birth bleeding
15 issue?
16    A. Yeah, so definitely it was different.
17    Q. And leading into your delivery, was any of
18 your prenatal care different, aside from the
19 flirtatious issue?
20    A. No, those were not.
21    Q. And the actual delivery experience of
22 Jaiden, was that different from your other delivery
23 experiences, aside from the bleeding issue?
24    A. No.
25    Q. So it was the same --

JA1306

Elsa Powell

Page 82

1    A.  Mm-hmm.
2    Q.  -- as your others?  Is that a yes?
3    A.  Yes.
4    Q.  And Dr. Akoda did a procedure on you to
5  help stop the bleeding and the clotting; is that
6  correct?
7    A.  From my understanding, he removed the
8  blood clots.  How, I don't know.
9    Q.  Okay.
10   A.  But, yeah, and then after that he put some
11  bandages to stop the bleeding.
12   Q.  And it did stop the bleeding, correct?
13   A.  Yes.
14   Q.  Okay.  Do you know one way or another
15  about whether Dr. Akoda was ever board certified in
16  obstetrics and gynecology?
17   A.  No, I do not know.
18   Q.  Do you know what board certification means
19  in that kind of setting?
20   A.  In that kind of setting, yes.
21   Q.  That they have taken extra exams and
22  passed oral and written exams?
23   A.  Correct.
24   Q.  Would it surprise you to learn that he was
25  board certified in obstetrics and gynecology?

Page 83

1    MR. CERYES:  Objection, form, foundation.
2  You can answer.
3    A.  I mean, I know you have to -- to be a
4  physician, a doctor, you have to take some type of,
5  you know, classes and -- and exams and stuff, but I
6  really don't know what he had.
7    Q.  Okay.  Did you do any investigation into
8  his training or certification?  I think we maybe
9  talked earlier that you had not; is that right?
10   A.  No, I did not.
11   Q.  You are a plaintiff in this lawsuit; is
12  that correct?
13   A.  That's correct.
14   Q.  And you are a plaintiff in the lawsuit in
15  Maryland; is that correct?
16   A.  That's correct.
17   Q.  Against Dimensions?
18   A.  That's correct.
19   Q.  Have you ever been a plaintiff in any
20  other lawsuit before?
21   A.  No.
25   Q.  Tell me about that.



Page 84

17   Q.  And everything was okay with Jaiden
18  following that?
19   A.  Yes.
20   Q.  Okay.  That was prior to you seeing
21  Dr. Akoda; is that correct?
22   A.  Correct.
23   Q.  Have you otherwise -- strike that.
24   Have you otherwise ever been a defendant in a
25  lawsuit?

Page 85

1    A.  No.
2    Q.  Have you ever, to your knowledge, had a
3  lawsuit threatened against you; someone told you they
4  were going to file one?
5    A.  No.
6    Q.  Have you ever threatened a lawsuit that
7  you did not file?
8    A.  No.
9    Q.  Have you ever filed a workers'
10  compensation claim?
11   A.  No.
12   Q.  Have you ever sought accommodations under
13  the ADA?
14   A.  No.
15   Q.  Americans with Disabilities Act?
16   A.  No.
17   Q.  Have you ever taken FMLA, Family Medical
18  Leave Act?
19   A.  No.
20   Q.  Did you get maternity leave or time out of
21  work for any of your other -- strike that.
22   Have you gotten maternity leave or parental
23  leave from any of your deliveries?
24   A.  No.
25   Q.  Have you ever been convicted of a crime?

JA1307

Elsa Powell

Page 86

1    A. No.
2    Q. Have you ever been the victim of a crime?
3    A. No.
4    Q. You mentioned your husband is a police
5  officer. Does he go out into the field?
6    A. Yes.
7    Q. Can you describe to me what he does? Is
8  he like a beat officer, or what does he do?
9    A. Yes, he's a patrol officer for station 5
10  in Clinton.
11    Q. Does he patrol in a car, on a bike?
12    A. A car, a cruiser.
13    Q. Or a horse, I guess, is also an option.
14  In a -- in a car?
15    A. Yes, in a cruiser.
16    Q. Has he ever been injured in the line of
17  duty?
18    A. Yes.
19    Q. Can you tell me a little bit about that?
20    A. Car -- cruiser crashed. He had some
21  fractured ribs.
22    Q. When was that?
23    A. 2016? '15, '16?
24    Q. Is he doing okay now?
25    A. Yes. And then -- that's -- that's --

Page 87

1  that's the biggest one. Other ones are just little
2  minor, you know, chasing a suspect and
3  trip-and-falls, stuff like that.
4    Q. So we'll knock on wood that we keep him
5  that way.
6    A. Yeah. Yes.
7    Q. We keep him nice and safe.
8    And has he ever gotten into any violent
9  altercations while in the line of duty involving his
10  firearm?
11    A. Yes. He has been through a shooting.
12    Q. Has he been shot?
13    A. No. Thank God, no.
14    Q. I'll knock on wood again.
15    Has he been shot at in the line of duty?
16    A. Yes.
17    Q. Has he sought medical care?
18    A. No.
19    Q. Do you know if he gets any mental health
20  treatment?
21    A. No, he does not.
22    Q. Did your husband, Mr. Powell, ever meet
23  Dr. Akoda?
24    A. Yes, he did.
25    Q. When was that?

Page 88

1    A. When I went for my six-weeks checkup.
2    Q. Was that the first time you met Dr. Akoda?
3    A. Who, me?
4    Q. Oh, I'm sorry. Strike that. I was --
5  six-month checkup is what I was thinking when you
6  said --
7    A. Six weeks.
8    Q. So it was post-delivery.
9    A. Yes.
10    Q. Okay. So -- so let me start that over
11  again.
12    So Mr. Powell, your husband, came with you to
13  your six-week post-delivery appointment; is that
14  correct?
15    A. Yes.
16    Q. And your husband met Dr. Akoda at that
17  time?
18    A. Yes.
19    Q. Did anything happen at that appointment
20  other than you getting checked out?
21    A. He stayed in the lobby and I went in, and
22  that's when he burned an ovarian cyst that he said
23  that I had.
24    Q. So your husband waited in the waiting
25  room?

Page 89

1    A. Correct.
2    Q. And did he get to meet Dr. Akoda?
3    A. Yes, when Dr. Akoda came -- came out.
4    Q. At the beginning of the appointment or
5  after the appointment?
6    A. After the appointment.
7    Q. Did your husband and Dr. Akoda ever speak?
8    A. How you doing, sir, that's it.
9    Q. Just an introduction?
10    A. Yeah. Yes.
11    Q. Do you have any medical doctors in your
12  family?
13    A. No.
14    Q. Any of your six brothers a doctor?
15    A. No.
16    Q. Okay. Do you have any friends, close
17  friends or other acquaintances who are medical
18  doctors?
19    A. No.
20    Q. Do you know anyone close or sort of in
21  passing, neighbors, friends, family, who have gone to
22  medical school outside of the United States?
23    A. No.
24    Q. When did you first hear of the Educational
25  Commission for Foreign Medical Graduates?

JA1308

Elsa Powell

Page 90

1    A. Back in 2018.
2    Q. How?
3    A. Through my lawyer.
4    Q. And if I call them ECFMG today, is that
5  okay? You'll know what I'm talking about?
6    A. Yes.
7    Q. It will be a little shorter for everybody.
8    A. Yes.
9    Q. So it's fair to say that, before you met
10 counsel in connection with the lawsuits about
11 Dr. Akoda, you had not heard of ECFMG before?
12   A. No.
13   Q. Other than counsel, have you ever gotten
14 any information about who ECFMG is or what they have
15 done?
16   A. No.
17   Q. Have you ever looked them up on the
18 Internet?
19   A. No.
20   Q. Met anyone who works there?
21   A. No.
22   Q. Do you have an understanding of what ECFMG
23 does?
24   A. Yes.
25   Q. What's your understanding of what ECFMG

Page 91

1  does?
2    A. It's for foreigners. It's pretty much a
3  -- they give the license for foreigners from -- yeah.
4    Q. In what kind of context?
5    A. Medical license and stuff like that.
6    Q. So it's your understanding that ECFMG
7  licenses foreign medical doctors --
8    A. Yes.
9    Q. -- to practice medicine in the
10 United States?
11   A. Correct.
12   Q. Have you ever heard of the United States
13 Medical Licensing Examination?
14   A. No.
15   Q. Sometimes called USMLE?
16   A. No.
17   Q. We talked about just a minute ago that you
18 are a plaintiff in this litigation against ECFMG,
19 correct?
20   A. Correct.
21   Q. And you're a named plaintiff. Do you
22 understand that?
23   A. Yes.
24         (Exhibit 2 marked for
25         identification: Civil Action re

Page 92

1         Russell, et al. v. Educational
2         Commission for Foreign Medical
3         Graduates)
4  BY MS. MCENROE:
5    Q. I just handed you what I marked as Exhibit
6  2. That is a copy of the complaint that was filed in
7  this lawsuit against ECFMG. Have you ever seen this
8  before?
9    A. Yes.
10   Q. Have you ever read it before?
11   A. Yes.
12   Q. Did you read it before it was filed?
13   A. Yes.
14   Q. Did you suggest any edits or changes to
15 it?
16   A. No.
17   Q. Did you sign anything relating to a
18 verification or anything like that?
19   A. Yes.
20   Q. Did you swear that it was true and
21 accurate --
22   A. Yes.
23   Q. -- under penalty of perjury?
24   A. Yes.
25        MR. CERYES: Objection, form, foundation.

Page 93

1  BY MS. MCENROE:
2    Q. Do you believe the allegations in the
3  complaint to be true?
4    A. Yes.
5    Q. Sitting here today, anything you would
6  change in the complaint now that you know what you
7  know?
8    A. No.
9    Q. In your own words, can you tell me what
10 you think ECFMG did wrong?
11        MR. CERYES: Objection to form,
12 foundation, calls for an expert opinion.
13        You can answer with respect to your
14 understanding.
15   A. Yes, I understand that they did wrong --
16 they did wrong, allowed him to practice with a fake
17 name.
18   Q. Any more specifics about what you think
19 that ECFMG did wrong? And I don't mean this as a pop
20 quiz; I'm just trying to get your best understanding.
21   A. They -- they failed to -- look over his
22 documentations and actually provide him with a
23 license to practice.
24   Q. I'd like to direct your attention to
25 paragraph 42. You'll see each of the -- once you get

JA1309

Page 94

1  into the meat of the complaint, each paragraph has a
2  number.  Do you see that?  So it's on page 9,
3  paragraph 42.  Let me know when you're there.
4      A.  I'm here.
5      Q.  Great.  That paragraph says, "the
6  plaintiff, Elsa Powell" -- that's you?
7      A.  Correct.
8      Q.  "-- was a patient of Igberase on or about
9  September 17th, 2014, and on several occasions
10  thereafter Igberase delivered Elsa Powell's son on
11  that date at Prince George's Hospital Center."
12  Did I read that correctly?
13      A.  That's correct.
14      Q.  And do you understand in the complaint
15  that the reference to Igberase is also Dr. Akoda?
16      A.  Unfortunately, yes.
17      Q.  Okay.  But you understand that those mean
18  the same for the purposes of this complaint; is that
19  correct?
20      A.  Correct.
21      Q.  Are the -- is the information in paragraph
22  42 correct?
23      A.  That's correct.
24      Q.  I'd like to direct your attention to
25  paragraph 44, which is on the next page on the top.

Page 95

1  It says:
2      "The plaintiffs and others similarly
3      situated chose Igberase who they
4      knew as Akoda as their
5      obstetrician/gynecologist on the
6      basis of their belief that Akoda had
7      obtained all necessary credentials
8      and certifications required of
9      physicians practicing in the
10      United States, including
11      certification from ECFMG."
12  Did I read that correctly?
13      A.  Yes, you read it correctly.
14      Q.  Do you know on what basis others -- so not
15  yourself, but other patients of Dr. Akoda's chose him
16  as their physician?
17      A.  I can't speak on others, but I can speak
18  on myself.  I didn't choose Igberase, whatever his
19  name is -- Akoda.  I -- I went with the intentions of
20  seeing Dr. Chaudhry.  Dr. Chaudhry was never there,
21  so pretty much I was stuck with Dr. Akoda.
22      Q.  When you started seeing Dr. Akoda as a
23  physician, did you specifically rely on the concept
24  that he had an ECFMG certification?  Was that
25  something that was in your head?

Page 96

1      A.  No.
2      MR. CERYES:  Objection, form, foundation.
3  BY MS. MCENROE:
4      Q.  Because you didn't even know ECFMG existed
5  at the time, correct?
6      A.  No.  All's in my head was getting prenatal
7  care and delivering my baby.
8      Q.  A healthy -- healthy baby, healthy mommy?
9      A.  Healthy baby.
10      Q.  So is it fair to say -- it might save us
11  some time to not go through each of the paragraphs --
12  but you -- you don't know what any of Dr. Akoda's
13  patients, other than yourself, knew or thought or
14  expected about Dr. Akoda, correct?
15      A.  That's correct.
16      Q.  Do you think you can speak on their
17  behalf?
18      A.  I mean --
19      MR. CERYES:  Objection, form, foundation.
20  You can answer.
21      A.  We all went through similar shockness.  I
22  mean, we're all going through this together.  I mean,
23  I -- I can speak on behalf of them when I can tell
24  you that we all feel violated, we -- lied to,
25  disrespected.

Page 97

1      Q.  How do you know that?
2      A.  How do I know that?
3      Q.  You said we all feel this way.
4      A.  Yes.
5      Q.  How do you know that?  Are you surmising
6  that you think they all should feel that way, or do
7  you actually know that that's how they feel?
8      MR. CERYES:  Objection, form.
9      A.  Anybody who get lied to feel that way, and
10  that's what in -- this case is, we've been lied to.
11      Q.  Do you have any special reason to know
12  that, or did you talk to other patients of
13  Dr. Akoda's, other than Ms. Gaymon --
14      A.  No.
15      Q.  -- to know how anyone feels?
16      A.  No, I have not.
17      MR. CERYES:  Objection, form, foundation.
18  You can answer.
19  BY MS. MCENROE:
20      Q.  Do you know about any consents that any of
21  Dr. Akoda's other patients may have provided for his
22  treatment of them?
23      A.  No.
24      Q.  What are you hoping to get out of this
25  lawsuit?

Elsa Powell

Page 98

1    A.  Some sort of -- somebody needs to be
2  accountable for what happened.
3    Q.  Have you sued Dr. Akoda or Dr. Igberase?
4    A.  No.
5    Q.  Have you brought a medical malpractice
6  claim against him?
7    A.  No.
8    Q.  You did sue Dimensions, though, right?
9    A.  I sure did.
10   Q.  Did you review a complaint in connection
11  with the lawsuit against Dimensions?
12   A.  Yes, I did.
13   Q.  Do you believe that the allegations in
14  that complaint are true and correct as written?
15   A.  That's correct.
16     MR. CERYES:  Objection, form, foundation.
17  BY MS. MCENROE:
18   Q.  What injury, if any, are you claiming in
19  this lawsuit?
20   A.  What injury am I claiming in this lawsuit?
21  Well, besides the fact that I almost lost my life
22  because of a fake doctor who I thought was a doctor.
23  I don't have a peace of mind since I found out that
24  he wasn't who he said he was.
25   Q.  So breaking that down, I just -- it

Page 99

1  sounded like there are two separate things that you
2  just articulated there.  There was a physical concern
3  about the bleeding and clotting issue after delivery
4  of Jaiden; is that correct?
5    A.  Of course.
6    Q.  And then there's more of an emotional and
7  mental issue separately, then, that we talked about
8  just a second ago?
9    A.  I won't say mental, but emotionally, yes.
10   Q.  Okay.  Have you sought any treatment or
11  help for that emotional concern?
12   A.  No.
13   Q.  Okay.  So just so the record's clear, the
14  -- the concern for your life that you were referring
15  to, that was the post-delivery bleeding and clotting,
16  correct?
17   A.  Correct.
18   Q.  Have you ever heard the term
19  "interrogatory" before?
20   A.  Yes, I have.
21   Q.  You -- you understand that interrogatories
22  are questions that get asked in the course of
23  litigation; is that correct?
24   A.  Correct.
25   Q.  Did you play any role in drafting the

Page 100

1  responses of any interrogatories in this litigation?
2    A.  No.
3    Q.  Did you provide any information to your
4  counsel in connection with the responses to
5  interrogatories?
6    A.  No.
7      MS. MCENROE:  This will be 3, and this
8  will be 4.  They go together.
9        (Exhibit 3 marked for
10     identification:  Plaintiff Elsa
11     Powell's Answers to First Set of
12     Interrogatories and Responses to
13     First Set of Requests for Production
14     of Documents)
15        (Exhibit 4 marked for
16     identification:  Plaintiff Elsa
17     Powell's Supplemental Answers to
18     First Set of Interrogatories and
19     Supplemental Responses to First Set
20     of Requests for Production of
21     Documents)
22  BY MS. MCENROE:
23   Q.  Ms. Powell, I'm handing you what I've
24  marked as Exhibits 3 and 4.  Take a quick second.
25  I'm not going to quiz you on everything in there, but

Page 101

1  I just want to give you a minute to familiarize
2  yourself before I start asking questions.
3    So in Exhibit 3, I'd like to point you to the
4  second-to-last page in the document, the next page
5  after that.
6      MR. CERYES:  In the back of that page.
7    A.  Mm-hmm.
8    Q.  It's double-sided.
9    A.  I'm here.
10   Q.  And it says "Verification" at the top.  Do
11  you see that?
12   A.  Mm-hmm.
13   Q.  And it reads:
14     "I, Elsa Powell, hereby aver that
15     the factual statements in the
16     foregoing answers to interrogatories
17     are true and correct to the best of
18     my knowledge, information and
19     belief, and that these answers are
20     made subject to the penalties
21     relating to unsworn falsification to
22     authorities."
23  Do you see that?
24   A.  Mm-hmm.
25   Q.  Is that a yes?

JA1311

Elsa Powell

Page 102

1    A.  Yes.
2    Q.  Is that your signature?
3    A.  Yes.
4    Q.  Did you actually review the answers to the
5    interrogatories before you signed this?
6    A.  Yes.
7    Q.  Okay.  And you believed them to be true
8    and correct?
9    A.  Yes.
10   Q.  Great.  So you can set Exhibit 3 aside.
11       And let's look at Exhibit 4, which is a
12   supplemental set of interrogatory responses.  It's
13   something that happens sometimes in -- in discovery.
14       Toward the back of the document, there's a
15   long list of names, but a couple pages before that is
16   another verification page.  I'm hoping you can look
17   at that with me.
18   A.  Mm-hmm.
19   Q.  And it's a verification, and it says:
20       "I, Elsa Powell, hereby aver that
21       the factual statements in the
22       foregoing supplemental answers to
23       interrogatories are true and correct
24       to the best of my knowledge,
25       information and belief, and that

Page 103

1        these supplemental answers are made
2        subject to the penalties relating to
3        unsworn falsification to
4        authorities."
5    Did I read that correctly?
6    A.  Yes.
7    Q.  Then there's a -- it looks like maybe more
8    of an electronic signature or something there.  Is
9    that your signature?
10   A.  Yes.
11   Q.  Okay.  And so did you review the responses
12   to the supplemental answers to interrogatories as
13   well?
14   A.  Yes.
15   Q.  And you believed them to be true and
16   accurate as written?
17   A.  Yes.
18   Q.  It might save us a little bit of time.
19       Are there any changes or issues or concerns
20   you have about any of the interrogatory responses as
21   written or supplemented?
22   A.  No.
23   Q.  Okay.  So there's nothing today you'd like
24   to change or amend about your discovery responses?
25   A.  No.

Page 104

1    Q.  In the Exhibit 4, that list at the back,
2    Ms. Gaymon is listed, right, on the second page
3    there?  It's alphabetical by last name.
4    A.  Correct.
5    Q.  Latisa Gaymon, that's the friend you've
6    been talking about today?
7    A.  Correct.
8    Q.  Correct?  Okay.  So you can set those
9    aside.
10       We talked a little earlier today about the way
11   that you go about choosing a medical doctor, and it's
12   been different depending on the insurance you have;
13   is that fair to say?
14   A.  Yes.
15   Q.  When you've gotten a new medical doctor,
16   have you ever done any sort of background or criminal
17   check on them?
18   A.  Yes, if I go see them.
19   Q.  Which doctor?
20   A.  My children's doctor.
21   Q.  Your children's doctor?
22   A.  Yes.  I haven't seen my doctors yet,
23   unless I need to, which was Ms. Em- -- Emily Lo, and
24   I did my research on her.
25   Q.  Right.  And you did a criminal background

Page 105

1    check on her?
2    A.  Yes.
3    Q.  Okay.  How did you do that?
4    A.  Online.
5    Q.  Okay.  So you Googled her?
6    A.  Mm-hmm.
7    Q.  Did you --
8    A.  Yes.
9    Q.  Is that a yes?
10       Did you pay to have anyone perform an actual
11   criminal background check on her?
12   A.  No.
13   Q.  Okay.  Did you ask your husband to do any
14   sort of special police check on her or anything?
15   A.  No.
16   Q.  Do you know if any of the doctors you've
17   seen in the past have ever been convicted of tax
18   fraud?
19   A.  No.
20   Q.  Okay.  Do you know if any of them have
21   ever been found to have failed to have paid their
22   nannies or their housekeepers?
23   A.  No.
24   Q.  Do you know if any of them have ever
25   smoked pot in a place where that's not legal?

Elsa Powell

Page 106

1      A.  No.

2      Q.  Do you know if any of them have ever been

3  committed [sic] of Social Security fraud other than

4  Dr. Akoda?

5      A.  No.

6      Q.  Do you know if any of those doctors have

7  ever perjured themselves or lied in a court of law?

8      A.  No.

9      Q.  Do you know if any of them have ever been

10  sued for malpractice, any doctor you've ever gone to?

11      A.  No.

12      Q.  You don't know one way or the other?

13      A.  No.

14      MS. MCENROE:  Let's take a quick break.

15      VIDEO SPECIALIST:  We're going off the

16  record at 11:32.

17      (Proceedings recessed)

18      VIDEO SPECIALIST:  We're back on the

19  record at 11:42.

20  BY MS. MCENROE:

21  ████████████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████

24  ██████

25      A.  Yes.

Page 107

1  ██████████████████████████████████

2  ██████████████████████████████████

3  ████████████████

4      A.  Yes.

5  ████████████████████████████████

6  pregnant or you had had Jaiden already?

7      A.  I had Jaiden.

8      Q.  Okay.  How old was Jaiden, do you know,

9  when you got sued?

10      A.  He was a couple months old.

11  ████████████████████████████████████

12  ████████████████████████████████████

13  ██████████████████████████████████gs

14  ██████████████████████████████████████

15  ██████████████████████████████████████

16  ██████████████████████████████████████

17  ██████████████████████████████████████

18  ██████████████████████████████████████

19  ██████████████████████████████████

20  ████████████████████████████████

21  ████████████████████████████████

22      Q.  Okay.  Again, that was when Jaiden was

23  just a couple months old?

24      A.  Correct.

25      Q.  Jumping back to your treatment by

Page 108

1  Dr. Akoda real quick, was the person who treated you

2  as Dr. Akoda the same man throughout the treatment?

3  Did you recognize him to be the same person?

4      A.  Yes.

5      Q.  Okay.  And can you describe to me very

6  briefly what he looked like?

7      A.  Tall, dark-skinned.  He was bald-headed,

8  slim.

9      Q.  Did he speak with an accent?

10      A.  Yes.

11      Q.  And the person who delivered Jaiden is the

12  same person who did your prenatal care, Dr. Akoda?

13      A.  Correct.

14      Q.  I did have one other question for your

15  counsel, just as a housekeeping matter.

16      MS. MCENROE:  We've gotten some of the

17  medical records like we had talked about yesterday

18  that have some redactions on them, so I think we may

19  need to discuss or revisit -- we can do that off the

20  record afterwards.

21      MR. CERYES:  Sure.

22      MS. MCENROE:  But pending any resolution

23  of figuring out some of that medical record cleanup,

24  I have no further questions for today.

25      MR. CERYES:  Okay.

Page 109

1      EXAMINATION

2  BY MR. CERYES:

3      Q.  And I do, just very briefly, have one or

4  two for you.

5      A.  Yes.

6      Q.  You were -- you were asked by counsel some

7  questions about how you came to be a patient of

8  Akoda.  Do you remember that?

9      A.  Yes.

10      Q.  Okay.  And you explained that he -- it's

11  not -- he's not someone you picked from a list, but

12  rather you had been referred to him -- initially to

13  Chaudhry and then to Akoda, do you recall that?

14      MS. MCENROE:  Objection to form, leading.

15      A.  Yes.

16      Q.  When you agreed to receive treatment from

17  Akoda, was it your assumption and belief that he had

18  gone through the appropriate and lawful process in

19  order to become a physician?

20      MS. MCENROE:  Objection to form, leading.

21      A.  Yes.

22      Q.  Okay.  And had you understood that he had

23  not gone through that lawful process to become a

24  licensed physician, would you have agreed to receive

25  treatment from him?

Elsa Powell

**Page 110**

1  MS. MCENROE: Objection to form, leading.
2  A. Never.
3  MR. CERYES: That's all I have.
4  MS. MCENROE: Thank you.
5  VIDEO SPECIALIST: That completes the
6  deposition. We're going off the record at 11:45.
7
8  //
9  (The deposition of ELSA POWELL adjourned
10  at 11:45 a.m.)
11  //
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 111**

1  ACKNOWLEDGMENT OF DEPONENT
2
3  I, ELSA POWELL, do hereby acknowledge that
4  I have read and examined the foregoing testimony and
5  that the same is a true, correct and complete
6  transcription of the testimony given by me, with the
7  exception of the noted corrections, if any, appearing
8  on the attached errata page(s).
9  _____  _____
10  DATE         ELSA POWELL
11
12
13  Subscribed and sworn to before me this _____ day of
14  _____, 20_____ .
15  _____ (Notary Public)
16  My Commission expires: _____
17
18
19
20  [SEAL]
21
22
23
24
25

**Page 112**

1  C E R T I F I C A T E
2
3  I, LINDA S. KINKADE, Registered Diplomate
4  Reporter, Certified Realtime Reporter, Registered
5  Merit Reporter, Certified Shorthand Reporter, and
6  Notary Public, do hereby certify that prior to the
7  commencement of examination the deponent herein was
8  duly sworn by me to testify truthfully under penalty
9  of perjury.
10  I FURTHER CERTIFY that the foregoing is a true
11  and accurate transcript of the proceedings as
12  reported by me stenographically to the best of my
13  ability.
14  I FURTHER CERTIFY that I am neither counsel
15  for nor related to nor employed by any of the parties
16  to this case and have no interest, financial or
17  otherwise, in its outcome.
18  IN WITNESS WHEREOF, I have hereunto set my
19  hand and affixed my notarial seal this 10th day of
20  September, 2019.
21  My commission expires: July 31, 2022
22
23  _____
24  NOTARY PUBLIC IN AND FOR
25  THE DISTRICT OF COLUMBIA

**Page 113**

1  WITNESS ERRATA SHEET
2  REF. NO. 225850         Page 1 of _____
3  NAME OF CASE: Russell, et al. v. ECFMG
4  DEPONENT: ELSA POWELL
5  DATE OF DEPOSITION: September 6, 2019
6  PLEASE INSERT REASON FOR CHANGE:
7    1. To clarify the record.
8    2. To conform to the facts.
8    3. To correct a transcription error.
9  Page     Line     Reason No.
10  From _____ to _____
11  Page     Line     Reason No. _____
12  From _____ to _____
13  Page     Line     Reason No.
14  From _____ to _____
15  Page     Line     Reason No.
16  From _____ to _____
17  Page     Line     Reason No.
18  From _____ to _____
19  Page     Line     Reason No.
20  From _____ to _____
21
22
23  SIGNED: _____ DATE: _____
24  (Signature of ELSA POWELL)
25

JA1314

# <u>EXHIBIT 38</u>

JA1315

## IN THE CIRCUIT COURT
## FOR PRINCE GEORGE'S COUNTY, MARYLAND

MONIQUE RUSSELL
(Prince George's County, Maryland)

JASMINE RIGGINS

*on their own behalf and on behalf of*
*all others similarly situated,*

    Plaintiffs,

    v.

DIMENSIONS HEALTH CORPORATION

    Defendant.

JURY TRIAL REQUESTED

Case No. CAL 17-22761

2017 DEC 18 AM 8 54
PR GEO CO MD # 94
Clerk of the Circuit Court

---

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Monique Russell and Jasmine Riggins (collectively "Named Plaintiffs" or individually "Russell" or "Riggins"), on their own behalf and on behalf of all others similarly situated, through their attorney Cory L. Zajdel, Esq. and Z LAW, LLC , Jay D. Miller, Esq. and the Law Offices of Peter G. Angelos, P.C., hereby submits this First Amended Class Action Complaint against Defendant Dimensions Health Corporation ("Dimensions") and for support state as follows:

### I.    PARTIES AND JURISDICTION

1.    Plaintiff Monique Russell is a natural person currently residing at 2811 63rd Place, Cheverly, MD 20785 (Prince George's County, Maryland).

2.    Plaintiff Jasmine Riggins is a natural persons currently residing at 312 37th Street, Apt. #304, Washington, DC 20019.



3.     Defendant Dimensions Health Corporation ("Dimensions") is a corporation organized under the laws of the State of Maryland and located in Prince George's County, Maryland, to provide medical services to the members of the public, operating as a health care facility, specializing in various areas of medicine, and specifically, in this case, in the field of obstetrics and gynecology, including by way of example and not by way of limitation: administration, staffing, credentialing, and/or supervision of personnel and employees, which held itself out to the public and to the Plaintiffs that it, and its agents, servants, credentialed doctors, and/or employees, possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent, licensed, credentialed, and competent medical providers practicing under the same or similar circumstances as those involving Plaintiffs.

4.     Defendant Dimensions Health Corporation is also known as Dimensions Healthcare System, Prince George's Hospital Center, Laurel Regional Hospital, Bowie Health Center and Family Health and Wellness Center.

5.     At all times relevant, Oluwafemi Charles Igberase also known as Charles J. Akoda, M.D. ("Akoda") was the actual and/or apparent, duly authorized agent, servant and/or employee of Dimensions and carried on a regular medical practice in Prince George's County, Maryland.

6.     At all times relevant, Akoda was purportedly licensed as a physician in the State of Maryland, in the practice of Obstetrics and Gynecology, who represented to the public and to the Plaintiffs that he possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent OB/GYN practicing under the same or similar circumstances as those involving the Plaintiffs.

- 2 -

7.      At all times relevant, Akoda acquired, serviced and performed invasive obstetrical procedures on patients in his medical office and through Dimensions facilities including but not limited to Prince George's Hospital Center and Family Health and Wellness Center as Akoda.

8.      The matter in controversy exceeds the sum of thirty thousand dollars ($30,000.00), exclusive of interest and costs.

9.      This Court has jurisdiction over this case under MD. CODE ANN., CTS. & JUD. PROC. § 1-501.

10.     This Court has personal jurisdiction over Dimensions pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-103(1)-(3), as Dimensions systematically and continually transacts business in Maryland, the case arises out of conduct that took place within Maryland and Dimensions is a Maryland corporation with its headquarters in Maryland.

11.     The Circuit Court of Maryland for Prince George's County is the appropriate venue under MD. CODE ANN., CTS. & JUD. PROC. § 6-201 and 6-202 because the acts giving rise to the claims occurred in Prince George's County, Maryland and Dimensions maintains its principal offices and carries on regular business in Prince George's County, Maryland.

## II.     FACTS COMMON TO ALL COUNTS

12.     Monique Russell was a patient of Oluwafemi Charles Igberase on or about May 25, 2016 at Dimensions.  Monique Russell knew Oluwafemi Charles Igberase as Akoda.

13.     Akoda delivered Monique Russell's child through unplanned emergency cesarean section surgery.

14.     Jasmine Riggins was a patient of Oluwafemi Charles Igberase between August 2012 and March 2013 at Dimensions.  Jasmine Riggins knew Oluwafemi Charles Igberase as Akoda.

- 3 -

JA1318

15.    Akoda delivered Jasmine Riggins' child through unplanned emergency cesarean section surgery.

16.    Prior to using the name Akoda, Oluwafemi Charles Igberase was raised and lived outside of the United States of America.

17.    Akoda never attended or graduated from a medical school.

18.    At some time in 1991 Akoda entered the United States of America on a Nonimmigrant Visa.

19.    In April 1992, Akoda submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States.

20.    In October 1993, ECFMG issued a certification to Akoda but only after multiple attempts to pass the three-part United States Medical Licensing Examination ("USMLE"). Because Akoda did not pass the USMLE in a competent manner, he was denied acceptance into an accredited residency program.

21.    In order to resolve this problem, Akoda created a false identity by obtaining a fraudulent social security number. In March of 1994, Akoda applied for and received a second ECFMG certification under the name of "Igbarese Oluwafemi Charles."

22.    The ECFMG Committee on Medical Education Credentials determined that Oluwafemi Charles Igberase fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth and revoked both ECFMG certifications in December 1995.

- 4 -

JA1319

23.    Oluwafemi Charles Igberase again passed the ECFMG in 1998 this time using the name "John Nosa Akoda."

24.    Oluwafemi Charles Igberase, using the name Akoda, applied for and was accepted into a residency program at Jersey Shore Medical Center in 2000.

25.    Jersey Shore Medical Center quickly learned that Oluwafemi Charles Igberase's social security number and identity as Akoda did not match up and later suspended Oluwafemi Charles Igberase from the residency program in August 2000 and dismissed Oluwafemi Charles Igberase in November 2000.

26.    In 2006, Akoda was accepted into a residency program at Howard University using the name "John Charles Akoda," a fake SSN and fake permanent resident card. He completed this program in 2011. He thereafter applied for and received a Maryland medical license using "Charles John Nosa Akoda", a fake SSN, fake permanent residence card and fake Nigerian passport.

27.    In early 2012, Akoda applied for and obtained privileges and became a member of the medical staff at Dimensions under the name "Charles John Nosa Akoda"-which was different than the name on his ECFMG certification and also using a fake permanent resident card, fake Maryland driver's license, fake Nigerian passport and fake letters of recommendation.

28.    In 2012, Dimensions knew or should have known that the ECFMG certification was under a different name and the social security number, permanent resident card, driver's license, passport and letters of recommendation provided to Dimensions by  Akoda were fraudulent.

29.    In March 2012, the Center of Medicare and Medicaid Services denied Akoda's application to enroll for Medicare reimbursement using the Akoda identity and the same

- 5 -

documentation used for privileges at Dimensions due to the Center of Medicare and Medicaid Services' determination that Akoda did not provide an accurate social security number.

30.    Akoda acted an as obstetrician-gynecologist in the State of Maryland between the years of 2008 and 2016 at all times practicing under the name Charles John Nosa Akoda.

31.    From 2008 through 2016, Akoda acted as a doctor practicing obstetrics and gynecology as an actual and/or apparent agent, servant and/or employee of Dimensions under the name Akoda.

32.    On June 9, 2016, law enforcement executed search warrants at Akoda's residence, medical office and vehicle where they found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

33.    In February 2017, Akoda plead guilty to social security fraud in the United States District Court for the District of Maryland and was sentenced to six (6) months incarceration, three (3) years supervised release, home detention for six (6) months and an assessment of one hundred dollars ($100.00).

34.    Shortly thereafter in early 2017, Dimensions terminated Akoda's employment and medical privileges at Dimensions.

35.    On or about July 10, 2017, the Maryland Board of Physicians revoked Akoda's medical license on the basis of a fraud and felony conviction.

36.    None of Akoda's patients knew his true identity as Oluwafemi Charles Igberase, but rather, knew Oluwafemi Charles Igberase as Akoda.

- 6 -

37.     The Plaintiffs herein did not learn of Akoda's impersonation of a medical doctor until March 16, 2017.  Additionally, the Plaintiffs were in no position to suspect or question Akoda was impersonating a physician and therefore had no reason to inquire.

38.     None of Akoda's patients gave consent to this physician impersonator to perform examinations, invasive procedures and surgeries on their persons.

39.     Class members chose Akoda as their obstetrician relying on his representations that he would deliver Plaintiffs' babies at Dimensions, where he was credentialed to deliver babies.

40.     Akoda informed the Plaintiffs that they would have to seek obstetrical care elsewhere if they did not wish to deliver at Dimensions.  Similarly, Plaintiffs would not have allowed Akoda to manage their pregnancies if he did not have privileges at Dimensions.  Additionally, Plaintiffs were informed and aware that their pregnancies would be co-managed in some respects with the medical providers at Dimensions.

41.     On many occasions, Akoda penetrated his patients with parts of his body through the vaginal canal and through the stomach in performing medical services.  Additionally, Akoda performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language.

42.     Akoda's penetrations of his patients were clear boundary violations.

III.    **CLASS ACTION ALLEGATIONS**

43.     Named Plaintiffs bring this action on behalf of a Class which consists of:

    All patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.).

    **Subclass**

    All  patients  examined  and/or  treated  in  any  manner  at  a

- 7 -

Dimensions Health Corporation facility by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.).

44.     Excluded from the Class Definition are patients of Akoda whose examination or treatment took place in a location outside the state of Maryland.  Also excluded from the Class Definition are those who were examined and/or treated after Akoda's medical privileges were terminated by Dimensions Health Corporation.

45.     The Class and Subclass, as defined above, are identifiable.  The Named Plaintiffs are members of the Class and Subclass.

46.     The Class consists of more than five hundred (500) patients and is thus so numerous that joinder of all members is clearly impracticable.

47.     The Subclass consists of more than five hundred (500) patients and is thus so numerous that joinder of all members is clearly impracticable.

48.     There are questions of law and fact which are not only common to the Class and Subclass but which predominate over any questions affecting only individual Class Members.

49.     The common and predominating questions include, but are not limited to:

(a)     Whether Akoda was an actual and/or apparent agent, servant and/or employee of Dimensions at all relevant times herein.

(b)     Whether Akoda committed boundary violations on class members.

(c)     Whether Dimensions' actions and/or alleged failures to act, including their alleged negligent failure to properly investigate, credential, qualify, select, monitor and supervise Akoda, directly and proximately resulted in foreseeable injuries or damages to Class Members.

- 8 -

50.    Claims of Named Plaintiffs are typical of the claims of the respective members of the Class and are based on and arise out of similar facts constituting the wrongful conduct of Dimensions.

51.    Named Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Named Plaintiffs and of all other members of the class are identical.

52.    Named Plaintiffs are cognizant of their duties and responsibilities to the Class.

53.    Named Plaintiffs are committed to vigorously litigating this matter.

54.    Further, Named Plaintiffs have secured counsel experienced in handling class actions and complex litigation.

55.    Undersigned Counsel are uniquely qualified to represent the Class given each firm's resources and vast experience representing Maryland residents in significant and complex litigation at the trial and appellate level, up to and including the United States Supreme Court. Representative cases include, but are not limited to: the 1998 tobacco litigation that resulted in a four billion two hundred million dollar ($4,200,000,000.00) settlement on behalf of the State of Maryland; the Tower Securities litigation that resulted in a one hundred seventeen million five hundred thousand dollar ($117,500,000.00) recovery for the Steamship Trade Association pension fund; a one billion dollar ($1,000,000,000.00) verdict against ExxonMobil Corp. on behalf of four hundred sixty six (466) Baltimore County residents whose water aquifer was polluted with 26,000 gallons of gasoline; a class action suit against Dr. Mark Midei and Catholic Health Initiatives based upon allegations he was implanting unnecessary coronary stents in his patients. Moreover, the Law Offices of Peter G. Angelos has been litigating a separate medical malpractice and credentialing case against Akoda since 2015 and, therefore, has already done a significant amount of investigation and discovery about his conduct that no other Firm can claim.

- 9 -

56.    Neither Named Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this claim.

57.    This action is properly maintained as a class action under Md. Rule 2-231(b)(l)(A) in that separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the Class that could establish incompatible standards of conduct for Class Members as well as Dimensions.

58.    This action is properly maintainable as a class action pursuant to Md. Rule 2-231(b)(l)(B) in that separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not party to the adjudications, or would substantially impair or impede their ability to protect themselves.  The Class also fits within the ambit of a limited fund class as Dimensions may contend that it is an eleemosynary institution with limited funds with which to satisfy the thousands of claims which will be made.

59.    This action is also properly maintainable as a Class in that questions of law or fact common to members of the Class predominate over any questions affecting only individual members under MD. RULE 2-231(b)(3).

60.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy between the class and Dimensions.

61.    The commonality of issues of law and fact in this case are clear. Many of the members of the Class are unaware of their rights to prosecute a claim against Dimensions. This class action can be managed without undue difficulty because Named Plaintiffs will

JA1325

vigorously pursue the interests of the Class by virtue of the fact that Named Plaintiffs have suffered the same injuries as other Class Members.

62.     The difficulties likely to be encountered in the management of a class action in this litigation are insignificant, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Class through thousands of separate actions.

63.     The likelihood that individual members of the Class will prosecute separate actions is remote also because most class members do not know that a claim against Dimensions exists.

64.     Counsel for Named Plaintiffs and the Class is experienced in class actions and foresees little difficulty in the management of this case as a class action.

## IV.    <u>CAUSE OF ACTION</u>

### <u>COUNT ONE</u>
#### (Negligent and Grossly Negligent Hiring, Retention, Supervision, Selection, Qualification and Credentialing)

65.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

66.     Between 2008 and 2016, Akoda was an actual and/or apparent, duly authorized agent, servant and/or employee of Dimensions, holding a medical staff position and/or enjoying hospital privileges.

67.     Between 2008 and 2016, Dimensions was responsible to assure and maintain patient safety and privacy for members of the public who received treatment from its agents, servants, and/or employees, such as physicians who were medical staff members and/or enjoyed hospital privileges, including specifically but not limited to Akoda.

68.     Between 2008 and 2016, Dimensions had a duty under applicable standards of

administrative practice and common law to properly investigate, credential, qualify, select, monitor, supervise, and retain only competent physicians and surgeons who practice medicine and/or surgery in accordance with the standards of care and who are not guilty of boundary violations and/or other improper, unlawful or inappropriate behavior including but not limited to violations of internal protocols established by Dimensions.

69.     Dimensions also failed to discover, stop, and report any professional misconduct of which they knew or should have known. This common law duty is non-delegable and was known or by the exercise of due care should have been known to all health care providers including Dimensions herein.

70.     Between 2008 and 2016, Dimensions had a duty under the applicable standards of care and common law to promulgate proper and effective standards, procedures, protocols, systems and rules to ensure quality care, safety and privacy of its patients.

71.     Dimensions knew or should have known, that Oluwafemi Charles Igberase had assumed a fake identity using the name Charles J. Akoda, M.D.

72.     Dimensions knew or should have known that Akoda had not graduated medical school and therefore did not have the requisite education, training and competence to provide medical care to its patients and the community.

73.     Dimensions knew or should have known, that Akoda engaged in improper, unlawful and unprofessional conduct by undertaking medical services on his patients without consent or authorization.

74.     Dimensions knew or should have known, that Akoda engaged in boundary violations during his care and treatment of Named Plaintiffs and the Class.

75.     Dimensions breached its common law duties and the applicable standards of

- 12 -

administrative practice on an ongoing basis by negligently failing to investigate, credential, qualify, select, monitor and supervise its medical personnel and to discover, stop and report Akoda.

76.    Dimensions' continuing breaches of common law and the applicable standards of administrative care constituted negligence, gross negligence, carelessness, recklessness and wanton misconduct.

77.    Dimensions as an institution and/or its officers, directors, management and/or staff committed breaches of the duties owed to Named Plaintiffs and members of the Class including but not limited to the following:

(a)    negligently failed to properly supervise and oversee Oluwafemi Charles Igberase;

(b)    negligently credentialed Oluwafemi Charles Igberase;

(c)    knew or should have known about Oluwafemi Charles Igberase's identity and activity but negligently failed to report, stop and/or prevent its continuation;

(d)    negligently failed to observe Oluwafemi Charles Igberase's activity;

(e)    negligently failed to train staff to recognize and report conduct of this type and/or;

(f)    negligently failed to have or enforce policies and procedures that would prevent this type of activity.

78.    Dimensions further breached the applicable standards of administrative care and common law duties on a continuing basis by:

JA1328

(a)    failing to properly investigate Akoda during his employment and/or association with the Dimensions;

(b)    failing to properly investigate Akoda's identity;

(c)    failing to take appropriate actions to ensure the safety and privacy of patients who came under Akoda's care;

(d)    failing to appropriately credential, qualify, select, investigate, monitor and supervise Akoda;

(e) continuing Akoda's privileges and employment when Dimensions knew or should have known that he engaged in wrongful, unlawful and outrageous conduct including, but not limited to, assuming the identity of another person, performing medical services on patients without authorization or consent, in addition to engaging in boundary violations, and/or violating other standards of care and/or internal protocols, rules, systems, and procedures;

(f)    granting privileges to an applicant who was not properly educated, trained and competent to provide obstetrical and gynecologic care;

(g)    granting privileges to an applicant who used a false ECFMG certification, false passport, driver's license and resident card and using forged letters of recommendation.

79.    Dimensions' continuing breaches of the applicable standards of administrative care and Dimensions' common law duties constituted negligence, gross negligence, carelessness and recklessness.

80.    Dimensions' ongoing breaches of the common law and violations of the standards of care proximately caused the Named Plaintiffs and all class members physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and

- 14 -

other physical and emotional injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future.

81.     Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and class members with Named Plaintiffs and Class Members being in no way contributorily negligent.

82.     As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

      (a)     Great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

      (b)     Severe mental anguish and psychological distress;

      (c)     The cost past, present and future cost of medical care, including but not limited to therapy and psychological counseling; and

      (d)     Lost earnings and diminished earnings capacity

## COUNT TWO
### (Invasion of Privacy - Intrusion Upon Seclusion)

83.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

84.     Akoda intruded upon the solitude, seclusion or private affairs and concerns of Named Plaintiffs and class members by viewing private areas of each patient's body, performing medical procedures on each patient, inserting his extremities inside each patient, performing surgical procedures on patients and other boundary violations all without authorization or consent.

85.     These intrusions are highly offensive to a reasonable individual, such as

- 15 -

JA1330

N a m e d  Plaintiffs and the Class, and  was totally unwarranted and unjustified, constituting invasion of privacy, and a violation of The Health Insurance Portability and Accountability Act (HIPAA).

86.     Dimensions is liable and vicariously liable for A k o d a 's conduct.

87.     As  a  direct  and  proximate  result  of  A k o d a 's acts, Named Plaintiffs suffered physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other emotional, physical and injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future.

88.     Dimensions' negligence w a s the sole and proximate cause o f the injuries, damages and permanent disability of Named Plaintiffs and the class, with N a m e d  Plaintiffs and the class being in no way contributorily negligent.

89.     As  a  direct,  proximate,  immediate  and  foreseeable  result  of Dimensions' conduct, N a m e d  P laintiffs and  c l a s s  m e m b e r s  have and/or will suffer permanent economic and non-economic damages including but not limited to:

        (a)     Great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

        (b)     Severe mental anguish and psychological distress;

        (c)     The past, present and future cost of medical care, including but not limited to therapy and psychological counseling; and

        (d)     Lost earnings and diminished earnings capacity.

**COUNT THREE**
**(Intentional Infliction of Emotional Distress)**

90.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

- 16 -

JA1331

91.    Akoda's ongoing conduct was intentional and/or reckless  when he viewed private areas of each patient's body, performed medical procedures on each patient, inserted his extremities inside each patient, performed surgical procedures on patients and other boundary violations all without authorization or consent.

92.    Akoda's conduct involved extreme, outrageous and unreasonable conduct and occurred when he acted as a duly authorized agent and/or employee of Dimensions. As a result, Named Plaintiffs and class members sustained severe emotional distress resulting in physical manifestations, physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and  emotional injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future, for which this claim is made. The injuries suffered by the Named Plaintiffs and class members are substantial, continuing, and permanent.

93.    Dimensions is liable and vicariously liable for Akoda's conduct.

94.    The emotional distress that has been sustained by Named Plaintiffs and Class Members was the natural and proximate result of the ongoing wrongful, unlawful and outrageous conduct on the part of the Dimensions as alleged herein.

95.    Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and class members, with Named Plaintiffs and Class Members being in no way contributorily negligent.

96.    As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

- 17 -

(a)    great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

(b)    severe mental anguish and psychological distress;

(c)    the past, present and future cost of medical care including but not limited to therapy and psychological counseling; and

(d)    lost earnings and diminished earnings capacity.

### COUNT FOUR
**(Battery)**

97.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

98.    Akoda intentionally and without Named Plaintiffs or class members' consent made unpermitted, harmful and offensive sexual and/or other contact with Named Plaintiffs and Class Members.

99.    At all relevant times, Akoda acted as a duly authorized agent and/or employee of Dimensions.

100.    These contacts would offend an ordinary person's reasonable sense of personal dignity, and constituted an intentional, unpermitted touching of Named Plaintiffs and Class Members.

101.    Dimensions is liable and vicariously liable for Akoda's conduct.

102.    As a result of Dimensions' conduct, Named Plaintiffs and Class Members sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future, for which this claim is made.

- 18 -

103.    The injuries suffered by Named Plaintiffs and Class Members are substantial, continuing and permanent.  Dimensions is responsible for Akoda's conduct due to its ongoing failure to investigate, credential, qualify, select, monitor and supervise its medical personnel and to discover, stop and report Akoda.

104.    Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and Class Members, with Named Plaintiffs and Class Members being in no way contributorily negligent.

105.    As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

(a)    great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

(b)    severe mental anguish and psychological distress;

(c)    the past, present and future cost of medical care including but not limited to therapy and psychological counseling; and

(d)    lost earnings and diminished earnings capacity.

## COUNT FIVE
### (Negligent Entrustment)

106.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

107.    At all times relevant hereto Dimensions appointed, engaged, employed and/or contracted with Akoda to act as its actual and/or apparent, duly authorized agent, servant and/or employee and permitted him to remain as such from 2012 to 2016.

108.    At all times relevant hereto, Dimensions granted privileges to Akoda to

JA1334

practice as an obstetrician/gynecologist in its medical facilities and on its patients including Named Plaintiffs and Class Members.

109.    In connection with granting Akoda these privileges Dimensions entrusted Akoda with the use of its medical facilities, devices, equipment, machines and/or supplies to provide care and treatment to his and the Dimensions' patients, including Named Plaintiffs and Class Members.

110.    At all times relevant hereto, D imensions owed a continuing duty to Named Plaintiffs and Class Members to use reasonable care to ensure that Akoda was trustworthy, competent, and fit to safely and appropriately utilize the medical facilities, devices, equipment, machines, and/or supplies it entrusted to him to treat its patients such as Named Plaintiffs and Class Members.

111.    At all times relevant hereto, Dimensions knew or should have known, and/or had actual or constructive knowledge and/or reasonable suspicion that Akoda was using the Dimensions' medical facilities, devices, equipment, machines, and/or supplies to engage in unprofessional, unlawful and outrageous conduct by viewing private areas of each patient's body, performing medical procedures on each patient, inserting his extremities inside each patient, performing surgical procedures on patients and other boundary violations all without authorization or consent.

112.    Dimensions breached these duties owed to Named Plaintiffs and Class Members by entrusting Akoda with the medical facilities, devices, equipment, machines, and/or supplies which he used to perform the acts which are the subject of this Amended Complaint.

113.    Dimensions negligently breached these duties owed to Named Plaintiffs and

- 20 -

JA1335

class members and failed to carry out their responsibilities in accordance with the level of care and skill expected of a reasonably prudent medical corporation under the same or similar circumstances, by entrusting Akoda with their patients, including Named Plaintiffs and Class Members, and with the use of medical facilities, devices, equipment, machines, and/or supplies.

114.    As a result of this negligence by Dimensions, Named Plaintiffs and Class Members sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries, damages (both economic and non- economic) and permanent disability, in the past, present and future, for which this claim is made. The injuries suffered by Named Plaintiffs and class members are substantial, continuing and permanent.

115.    Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and class members, with Named Plaintiffs and class members being in no way contributorily negligent.

116.    As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

(a)    great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

(b)    severe mental anguish and psychological distress;

(c)    the past, present and future cost of medical care including but not limited to therapy and psychological counseling; and

(d)    lost earnings and diminished earnings capacity.

- 21 -

JA1336

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs respectfully pray that this Court:

A.    assume jurisdiction of this case;

B.    enter an order certifying the Class under MD. RULE 2-231(b)(1)(A-B) and 2-231(b)(3);

C.    appoint Named Plaintiffs as Class Representatives;

D.    appoint Named Plaintiffs' Counsel as Class Counsel;

E.    enter a judgment against Dimensions finding it liable to Named Plaintiffs and each Class Member;

F.    award compensatory damages to each class member in an amount which exceeds seventy five thousand dollars;[1]

G.    award punitive damages to each Class Member;

H.    award the costs and expenses of this case, including attorneys' fees;

I.    award pre-judgment and post-judgment interest; and

J.    award such other relief as the court deems appropriate.

Respectfully submitted,

Z LAW, LLC

Dated: December 15, 2017          By:

Cory L. Zajdel, Esq.
2345 York Road, Suite #B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com

---

[1] Pursuant to MD. RULE 2-305, Named Plaintiffs state that each of their claims exceed seventy five thousand dollars ($75,000.00).

- 22 -

Jay D. Miller, Esq.
LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
JMiller@lawpga.com

**Attorneys for Plaintiffs**

**JURY TRIAL**

Named Plaintiffs on behalf of themselves and all others similarly situated demands trial by jury on all issues so triable.

_____
Cory L. Zajdel

**CERTIFICATE OF SERVICE**

I certify that on this 15th day of December, 2017, I caused a copy of the foregoing First Amended Class Action Complaint to be placed in the mail for delivery using first class postage prepaid to:

Joseph B. Chazen, Esq.
Gina M. Smith, Esq.
Samuel T. Wolf, Esq.
Meyers, Rodbell & Rosenbaum, P.A.
6801 Kenilworth Avenue, Suite 400
Riverdale, Maryland 20737

**Counsel for Defendant Dimensions Health Corporation**

_____
Cory L. Zajdel

- 23 -

JA1338

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

                Plaintiffs,

     v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

              Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

**[PROPOSED] ORDER**

      **AND NOW**, this ___ day of _____ 2019, upon consideration of Plaintiffs' Motion for

Class Certification (ECF 32), Defendant's Opposition to Plaintiffs' Motion for Class

Certification, and any responses thereto, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for

Class Certification (ECF 32) is **DENIED**.:

                      BY THE COURT:

                      _____
                                 J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS,** | **CIVIL ACTION NO. 18-5629** |
| **Plaintiffs,** | |
| **v.** | |
| **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** | |
| **Defendant.** | |

## <u>REPLY MEMORANDUM OF LAW IN SUPPORT OF</u>

## <u>MOTION FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

Table of Contents ................................................................................................ ii

Table of Authorities ........................................................................................... iv

Introduction ..........................................................................................................1

I.    ECFMG's arguments do not overcome the fact that Plaintiffs satisfy the requisite
      criteria under Rule 23(a) for certification by a preponderance of the evidence. ..........2

      A.    ECFMG's effort to impose a per se bar on class certification of emotional
            distress claims should fail as contrary to applicable law....................................2

      B.    Typicality is satisfied, as the named plaintiffs have suffered a similar
            injury from the same course of conduct by ECFMG as the class members.....6

      C.    Plaintiffs are fully adequate to represent the interests of the class, as their
            claims are typical of the class, and they do not have interests that diverge
            from those of other class members. ......................................................................6

      D.    ECFMG's contentions regarding ascertainability lack merit, as well over
            600 patients have retained one or more of the undersigned counsel, and
            additional class members can be identified via subpoena. ................................8

      E.    Additional Class Counsel .................................................................................8

II.   ECFMG misunderstands and fails to overcome Plaintiffs' arguments in favor of
      satisfying Rules 23(b)(3) and 23(c)(4). ...............................................................9

      A.    Plaintiffs' satisfaction of the *Gates* factors means that Plaintiffs satisfy
            Rule 23(b)(3) in the context of a Rule 23(c)(4) issue class certification............9

      B.    Key questions of liability, including key elements of duty and causation,
            can be determined on a classwide basis. ...........................................................10

III.  The statute of limitations and the issue of superseding cause pose no bar to class
      certification, because their applicability is properly addressed in individual
      damages proceedings. ...................................................................................11

ii

JA1341

**IV.    ECFMG's choice of law analysis is flawed, because it fails to take into account that conflicts between the tort law of Pennsylvania and those of Plaintiffs' domiciles are false conflicts.** ............................................................................................13

**V.    The recitation of facts in ECFMG's brief is flawed.** ......................................................14

**CONCLUSION** ......................................................................................................................15

JA1342

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................... 6

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................... 6

*Bouriez v. Carnegie Mellon Univ.,*
  585 F.3d 765 (3d Cir. 2009)................................................................. 13

*Butler v. Sears, Roebuck & Co.,*
  727 F.3d 796 (7th Cir. 2013) .............................................................. 10

CV-0291,
  2013 WL 2042369 (M.D. Pa. May 14, 2013) ...................................... 4

*Erisoty v. Rizik,*
  No. 93-, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) ........................... 15

*Gates v. Roem and Haas Co.,*
  655 F.3d 255 (3d Cir. 2011).............................................................. 5, 9

*Gunnells v. Healthplan Serv., Inc.,*
  348 F.3d 417 (4th Cir. 2003)....................................................... 4, 5, 10

*In re Linerboard Antitrust Litig.,*
  305 F.3d 145 (3d Cir. 2002) In *Linerboard* ............................ 11, 12, 13

*In re Nassau County Strip Search Cases,*
  461 F.3d 219 (2d Cir. 2006) ............................................................... 10

*In re Suboxone Antitrust Litig.,*
  No. 13-MD-2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019)............ 8

*In re Three Mile Island Litig.,*
  87 F.R.D. 433 (M.D. Pa. 1980)............................................................. 5

*Lacey v. Cessna Aircraft Co.,*
  932 F.2d 170 (3d Cir. 1991)................................................................. 13

*Martin v. Behr,*
  896 F.3d 405 (6th Cir. 2018).......................................................... 9, 10

*McRobie v. Credit Protection Association,*
  No. 5:18-cv-00566, 2019 WL 1469097 (E.D. Pa.April 3, 2019)........... 2, 3

*Shady Grove Orthopedic Assoc, v. Allstate Ins. Co.,*
  559 U.S. 393 (2010)............................................................................... 6

*Spence v. Bd. Of Ed. Of Christina Sch. Dist.,*
  806 F.2d 1198 (3d Cir. 1986)............................................................ 2, 5

*Thierfelder v. Wolfort,*
  52 A.3d 1251 (Pa. 2012) ..................................................................... 10

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996)............................................................... 10

*Wallace v. Powell,*
  No. 3:09-CV-0291, 2013 WL 2042369 (M.D. Pa. May 14, 2013)........... 4

iv

JA1343

**<u>Rules</u>**

Fed. R. Civ. P. 1 ...................................................................................................................... 11
Fed. R. Civ. P. 23 ............................................................................................................. *passim*

**<u>Other Authorities</u>**

2 Newberg on Class Actions § 4.57 (3d. ed.) ............................................................................ 12
Charles E. Clark & James William Moore, *A New Federal Civil Procedure I, The Background*,
    44 Yale L.J. 387 (1935)............................................................................................................ 6
Stephen B. Burbank, *The Rules Enabling Act of 1934*, 130 U. Pa. L. Rev. 1015 (1982).............. 6

JA1344

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Reply Memorandum of Law in Support of Motion for Class Certification.

**<u>INTRODUCTION</u>**

As Plaintiffs allege, ECFMG's negligence facilitated, aided, and abetted Oluwafemi Igberase a/k/a John Nosa Akoda to repeatedly commit sexual assault for more than a decade. As a result of ECFMG's negligence, Igberase had the opportunity to examine and touch hundreds of obstetrics and gynecology patients, who would never have consented to such an examination had they known—as ECFMG did—that Igberase had obtained his credentials through repeated acts of fraud, later found to constitute a "crime of moral turpitude." See Ex. 1 at 1; ECF No. 32-34 (Ex. 32) at 5. As ECFMG itself admitted, patients have the right to be treated by an appropriately certified physician. Although the severity of damages may vary, plaintiffs claim a common injury: the wrongful touching of patients' bodies based on Igberase's false pretense that he was a lawfully licensed and certified physician, which was aided and abetted by ECFMG's negligence in certifying Igberase/Akoda and in failing to notify hospitals and medical boards when it knew Igberase had obtained his certification through fraud. A single course of conduct led to a single type of injury suffered by all members of the proposed class. Plaintiffs thus appropriately seek certification on issues central to ECFMG's liability for negligently certifying Igberase.

ECFMG's opposition to certification fails to sidestep this core commonality of Plaintiffs' claims. Instead, it objects that Plaintiffs' claims may vary in the amount of damages and the circumstances under which they were inflicted. Thus it has always been so: the individualized nature of Plaintiffs' damages cannot defeat class certification, any more than can differences in

antitrust impact defeat certification of an antitrust action. ECFMG cannot avoid the reality that the proposed class members' claims arise from one, and only one, course of conduct by ECFMG. Class certification of liability or key issues central to the class member's claims will materially advance the termination of the litigation, to the benefit of the Court and all parties.

I.    **ECFMG's arguments do not overcome the fact that Plaintiffs satisfy the requisite criteria under Rule 23(a) for certification by a preponderance of the evidence.**

A.    **ECFMG's effort to impose a *per se* bar on class certification of emotional distress claims should fail as contrary to applicable law.**

Defendant erroneously contends that no court can possibly try limited issue class action where emotional distress damages are claimed, because "with respect to the claims of even a single plaintiff, emotional distress liability and damages are 'too interwoven to allow a fair determination of damages apart from liability.'" ECF No. 39 at 12 (quoting *Spence v. Bd. Of Ed. Of Christina Sch. Dist.*, 806 F.2d 1198 (3d Cir. 1986)).

Earlier this year, however, this District, in *McRobie v. Credit Protection Association*, No. 5:18-cv-00566, 2019 WL 1469097 (E.D. Pa. April 3, 2019), certified a limited issue class per Rule 23(c)(4) of a claim brought under the Fair Debt Collection Practices Act (FDCPA) even though the sole representative plaintiff sought emotional distress damages. The representative plaintiff filed a putative class action seeking relief under several provisions of the FDCPA after receiving a notice from the defendant, a debt collector, which allegedly did not comply with the requirements of the FCDPA. Plaintiff sought certification of claims corresponding to two putative violations under the FDCPA. The court, exercising its discretion under Rule 23(c)(4), certified only one of the claims, citing authority from this circuit that "a court may grant a motion to certify in part and certify a class with respect to one of several causes of action in a suit, even where the others do not satisfy Rule 23." *Id.* at *2.

As here, the defendant argued that the plaintiff "cannot establish commonality because she suggested in her deposition that she seeks emotional distress damages for her 'hyperbolic' reaction [to the notice], and that as a result, she cannot establish damages on a class-wide basis." *Id.* at *4. The court disagreed. It noted that the commonality element "is easily met" because it "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Id.* It further found as follows

> [Plaintiff's] claim under Section 1692f(8) [of the FDCPA] requires resolving a question common to her and the members of the proposed class who received the mailer, specifically, whether the use of the numerical creditor code on the outside of the mailer violated Section 1692f(8) of the FDCPA. Because all members of the class received identical mailers in this respect, the answer to this question—and the evidence required to prove it—will be common to the class. Even if [Defendant] is correct and McRobie claims a measure of damages different than the other members of the proposed class, she has shown at least one issue of law and fact common to her and the proposed class; therefore, the proposed class satisfies the commonality requirement.

*Id.* (emphasis added). The court further found that a class action was a superior device for resolving the litigation because "[t]he alternative to this class action is myriad individual lawsuits for relatively small amounts of damages resulting from the same conduct." *Id.* at *7.

Here, Plaintiffs and the members of the prospective class were assaulted—intimately examined by Igberase without obtaining informed consent—as a result of a single, common course of conduct by the defendant, provable by common evidence. ECFMG does not rebut this central proposition. The fact that the nature of damages may differ among the various class members does not, and cannot, defeat commonality. *See, e.g.*, *McRobie*, 2019 WL 1469097, at *4; *Wallace v. Powell*, No. 3:09-CV-0291, 2013 WL 2042369, at *20–21 (M.D. Pa. May 14, 2013); *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 427-28 (4th Cir. 2003).

3

*McRobie* is hardly an outlier. In *Gunnells*, a major decision on certification under Rule

23(c)(4), the Fourth Circuit found that a district court appropriately certified a single issue for

class-wide treatment: whether a third-party health benefits administrator breached its duty to the

class members and caused the collapse of a health plan, thus injuring members and purchasers of

the plan. Notably, the Fourth Circuit deemed appropriate the fact that the district court certified

the issue for class treatment while expressly reserving "all issues regarding the fact and nature of

injury specifically as to plaintiffs' claims of mental anguish and emotional distress" for

individualized proceedings, *id.* at 458 (Niemeyer, J., concurring in part), and "acknowledged the

potential need for individualized mini-trials on proximate causation specifically relating to the

reason for nonpayment of a given claim," *id*. The Fourth Circuit squarely rejected the argument

ECFMG relies on here:

> TPCM contends that individualized damages determinations destroy
> commonality, typicality, and predominance. But Rule 23 contains no suggestion
> that the necessity for individual damage determinations destroys commonality,
> typicality, or predominance, or otherwise forecloses class certification. **In fact,
> Rule 23 explicitly envisions class actions with such individualized damage
> determinations.** See Fed. R. Civ. P. 23 advisory committee's note (1966
> Amendment, subdivision (c)(4)) (noting that Rule 23(c)(4) permits courts to
> certify a class with respect to particular issues and contemplates possible class
> adjudication of liability issues with "the members of the class ... thereafter ...
> required to come in individually and prove the amounts of their respective
> claims."); see also 5 Moore's Federal Practice § 23.23[2] (1997) ("[T]he necessity
> of making an individualized determination of damages for each class member
> generally does not defeat commonality."). Indeed, "[i]n actions for money
> damages under Rule 23(b)(3), courts usually require individual proof of the
> amount of damages each member incurred." *Id.* at § 23.46[2][a] (1997) (emphasis
> added). When such individualized inquiries are necessary, if "common questions
> predominate over individual questions as to liability, courts generally find the
> predominance standard of Rule 23(b)(3) to be satisfied." *Id.* This is precisely the
> situation here—"common questions [do] predominate over individual questions as
> to liability." *Id.*

4

*Id.* at 428 (emphasis added). In other words, certification of the proposed issues for class-wide treatment in this action would follow a well-worn path.

ECFMG relies on inapposite authority in seeking to erect a *per se* barrier against certification of emotional distress claims. The court in *In re Three Mile Island Litig.*, 87 F.R.D. 433 (M.D. Pa. 1980), did not consider whether issues of liability pertaining to the emotional distress claim could be certified under Rule 23(c)(4). *Spence v. Board of Education of Christina School District*, 806 F.2d 1198 (3d Cir. 1986), was not a class action. The issue on appeal in *Spence* concerned whether damages could be tried separately from liability without presenting evidence as to liability. The court reasonably concluded that a jury would have to understand the circumstances out of which the emotional distress arose. Here, if Plaintiffs prevail at the class certification stage, a jury or special master will be presented with the details of each class member's treatment by Igberase and the effect of learning that Igberase was not a lawfully licensed physician and realizing they had been assaulted. There is no evidence that any of the class members had any direct contact with ECFMG (and they would have no reason to); thus, the relevant circumstances to be presented to a jury regarding their emotional distress are Igberase's conduct and testimony about their own circumstances. An issues trial centered on the negligent conduct of ECFMG that enabled Igberase to practice as an OB/GYN at a discrete number of institutions, followed by individual proceedings focused on the individual injury and damages incurred once Igberase was able to practice as an OB/GYN at those institutions, appropriately "carve[s] at the joint" in this action. *Gates*, 655 F.3d at 273.[1]

---

[1] To the extent that the Court might deem Plaintiffs' prayer for punitive damages an obstacle to issue class certification, as it might involve duplicative presentation of evidence regarding ECFMG's conduct, Plaintiffs would seek leave to amend the complaint to drop the punitive damages claim.

5

Finally, Defendant's effort to categorically exclude actions that involve emotional distress damages proves too much, and is at odds with first principles. The Federal Rules of Civil Procedure are trans-substantive. See Stephen B. Burbank, *The Rules Enabling Act of 1934*, 130 U. Pa. L. Rev. 1015, 1108 (1982); Charles E. Clark & James William Moore, *A New Federal Civil Procedure I, The Background*, 44 Yale L.J. 387, 388–89 (1935). Courts do not vary their interpretation and application of Rule 23 based on the nature of the action or amount of damages claimed. *Id.* Instead, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assoc, v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).

**B.    Typicality is satisfied, as the named plaintiffs have suffered a similar injury from the same course of conduct by ECFMG as the class members.**

ECFMG argues that Plaintiffs' claims are not typical of other claims because Plaintiffs and putative class members may have been treated at different times along a certain chain of events. This is a smokescreen. Plaintiffs, and all class members, are those treated by Igberase at any time who suffered emotional damage because of learning Igberase was not who he held himself out to be. ECFMG also argues that Plaintiffs' claims are not typical of putative class members who may have suffered other damages, but points to no evidence that any putative class member has suffered damages different in nature from Plaintiffs' damages.

**C.    Plaintiffs are fully adequate to represent the interests of the class, as their claims are typical of the class, and they do not have interests that diverge from those of other class members.**

ECFG argues that Plaintiffs are not adequate class representatives because 1) they filed and then dismissed a similar class action complaint against the hospital that granted privileges to Igberase, 2) they do not understand what ECFMG does and 3) some putative class members may

6

not yet have suffered emotional distress. None of these arguments have merit. The four named class representatives have diligently performed their duties on behalf of the class. All of them have traveled to Pennsylvania for defense medical examinations by a defense psychiatrist. Indeed, at great inconvenience, one of them traveled from Costa Rica. All four have sat for hours for depositions by the defense. And all four have responded to interrogatories and requests for production of documents propounded by the defense.

The fact that Plaintiffs dismissed the class action complaint against Dimensions Health Corporation in Maryland state court does not result in the conclusion that Plaintiffs will not pursue to conclusion the more direct claims against ECFMG. It seems paradoxical that ECFMG would challenge the adequacy of representation due to this possibility, since such a dismissal would be in the best interests of ECFMG. Nothing that has taken place in this case even hints at the possibility that Plaintiffs will not pursue this case to a conclusion. In fact, if it becomes necessary, the 600+ clients represented by Plaintiffs' counsel will file individual cases.

The fact that Plaintiffs, as lay people, do not know the role ECFMG plays in the careers of international medical graduates has no bearing on their adequacy as class representatives. Plaintiffs are not required to know this. It is enough that Plaintiffs suffered emotional distress upon learning that Igberase was not who he held himself out to be. It is for lawyers to determine who may be responsible for allowing Igberase to commit his fraud. How and when putative class members learned about Igberase and the circumstances of injury has no bearing on the adequacy of class representation. Finally, there is no evidence to suggest that Plaintiffs or putative class members have an interest in controlling the litigation that would make class certification inappropriate. Any class member would have the right to opt out and pursue her own action.

7

**D.    ECFMG's contentions regarding ascertainability lack merit, as well over 600 patients have retained one or more of the undersigned counsel, and additional class members can be identified via subpoena.**

ECFMG improperly characterizes the class definition as "hopelessly vague" and incapable of identifying members of the class. The proposed class consists of patients who were examined or treated by Igberase. This cannot be clearer. Health care institutions will be able to identify these individuals—indeed, the institution at which Igberase provided the majority of patient care, Prince George's Hospital Center, has already done so. (ECFMG knows this: all records for these patients in Plaintiffs' counsel's possession have already been provided to ECFMG's counsel. *See* Ex. 2.) If the class is certified, subpoenas can issue to the other institutions at which Igberase provided care, to identify other class members. As this District has expressly held, such a procedure satisfies the ascertainability requirement. *In re Suboxone Antitrust Litig.*, No. 13-MD-2445, 2019 WL 4735520, at *42 (E.D. Pa. Sept. 27, 2019). Finally, ECFMG's repeated reference to Nigerian patients is a distraction: there is no evidence Igberase treated anyone there after seeking certification from ECFMG, and evidence is lacking that he treated anyone there before that time. At deposition, ECFMG refused to state that a purported confirmation of his registration and licensure as a physician practicing in Nigeria was authentic. *See* Ex. 32-46 (Ex. 45) at 105:13–22, 109:21–110:5. If the Court deems it necessary, however, it can reform the class definition to encompass only patients in the United States.

**E.    Additional Class Counsel**

Regarding the adequacy of class counsel, which ECFMG does not challenge, Plaintiffs neglected in their opening brief to discuss co-counsel Conrad O'Brien, PC and Z Law, LLC. Conrad O'Brien has extensive experience in representing clients in class and mass actions and other complex litigation. Nicholas Centrella, co-counsel in this case, is the managing shareholder

8

of Conrad O'Brien. Cory Zajdel of Z Law has been appointed class counsel in both state and federal courts on more than ten occasions and has represented more than 2.5 million consumers in class actions. These class actions recovered more than one hundred million dollars ($100,000,000.00) in settlements in certified class actions over the last ten years.

II.    **ECFMG misunderstands and fails to overcome Plaintiffs' arguments in favor of satisfying Rules 23(b)(3) and 23(c)(4).**

A.    **Plaintiffs' satisfaction of the *Gates* factors means that Plaintiffs satisfy Rule 23(b)(3) in the context of a Rule 23(c)(4) issue class certification.**

ECFMG misunderstands the interplay between Rule 23(b)(3) and Rule 23(c)(4) when it argues that Plaintiffs' pursuit of Rule 23(c)(4) certification entails an "[i]mplicit[] recogni[tion]" that Plaintiffs do not meet Rule 23(c)(4). ECF No. 39 at 10. In fact, the *Gates* factors, which Plaintiffs discuss at length, are precisely the factors courts in the Third Circuit analyze when determining whether an issue class proposed under Rule 23(c)(4) meets the predominance requirement of Rule 23(b)(3). As the *Gates* court observed, the adoption in *Gates* of the multifactor test for issue class certification originally propounded by ALI was the Third Circuit's answer to the "complicated area of class action procedure" pertaining to "the extent to which the ability to certify issue classes alters the predominance requirement." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272–73 (3d Cir. 2011). The *Gates* factors apply not only to the predominance requirement in Rule 23(b)(3) but also to the superiority requirement, as they involve a "functional, superiority-like analysis," *Martin v. Behr,* 896 F.3d 405 (6th Cir. 2018). In other words, satisfying the *Gates* factors satisfies Rule 23(c)(4) and 23(b)(3) for purposes of a damages class action in the Third Circuit. Plaintiffs have explained in detail how either proposed option for certification meets those factors. *See* ECF No. 32-1 at 20–25.

9

The consensus among the Circuits that whether common questions predominate over individual ones should be evaluated *within the issues to be certified*, rather than in the context of the entire action, provides persuasive authority that weighs in favor of class certification.[2] The "circuit split" referenced by ECFMG is illusory, as the Rule 23 Subcommittee of the Advisory Committee on Civil Rules found when considering whether to amend Rule 23(c)(4) to address this supposed split.[3]

### B.    Key questions of liability, including key elements of duty and causation, can be determined on a classwide basis.

This action raises the question whether ECFMG owed a duty to an individual plaintiff as a result of a general duty to the public or as a result of its undertaking of a duty to another health care provider. The existence of a duty is an issue of law to be determined by the Court, not a class jury. *Thierfelder v. Wolfort*, 52 A.3d 1251, 1264 (Pa. 2012). There are a relatively small number of health care institutions at which Igberase provided care: Harlem Hospital, Jersey Shore Medical Center, Howard University Hospital, Prince George's Hospital Center, and the office practice of Drs. Chaudry and Moore. The Court can determine whether a duty to class members arises out of a relationship with one or more of these entities, based on the evidence and a determination of whether it was foreseeable that ECFMG's conduct resulted in Igberase being in a position to assault class members at those institutions by performing intimate

---

[2] *See, e.g.*, *Martin v. Behr,* 896 F.3d 405 (6th Cir. 2018); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003)*; In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

[3] Rule 23 Subcommittee Report 5, in Advisory Comm. on Civil Rules, Agenda Book, Nov. 5–6, 2015, at 91, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf (noting that "there is no significant need" to amend Rule 23(c)(4) because the "circuits seem to be in accord" about the propriety of certifying classes limited to particular issues even when certifying the entire action might not satisfy Rule 23(b)(3)").

OB/GYN procedures and examinations on false pretenses. It would be reasonable to create subclasses for this determination, if necessary. *See* Fed. R. Civ. P. 23(c)(5). Subclasses would be unnecessary, however, to address the other issues proposed for classwide determination (e.g., whether ECFMG owed a duty to the public by virtue of its undertaking, whether it owed a duty as a result of aiding and abetting the tortious conduct of Igberase), as the relationship with individual healthcare entities would not need to be analyzed.

After resolving these questions on a classwide basis, fact-of-injury and the foreseeability and extent of the damages sought can be resolved in mini trials or, if the parties consent, through a special master process. Trying a limited number of these claims would help the parties to more accurately value the case, and thus facilitate settlement. The alternative to this procedure— determining the existence of a duty and the foreseeability of damages in each of hundreds of individual cases, on a common set of facts—is hardly in the interest of judicial economy. ECFMG offers no reason—and there is none—why such an arrangement would be preferable to a class-wide determination of common issues, followed by individual mini-trials or, with the parties' consent, an administrative determination of damages. The choice facing the court is between a class trial on common issues followed by resolution of the individual plaintiffs claims, or hundreds of full-blown trials on all issues, with repetitive presentations of extensive factual and expert evidence on ECFMG's conduct. The latter does not serve judicial economy or "secure the just, speedy, and inexpensive determination" of this matter. Fed. R. Civ. P. 1.

**III.**    **The statute of limitations and the issue of superseding cause pose no bar to class certification, because their applicability is properly addressed in individual damages proceedings.**

The Third Circuit has long held that the statute of limitations questions generally do not bar class certification. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002). In

JA1355

*Linerboard*, the defendants argued that the district court erred in granting class certification on antitrust liability, because of the necessity of individualized inquires on whether a class member could avail itself of tolling of limitations under the fraudulent concealment doctrine. The Third Circuit acknowledged that an analysis of the applicability of the fraudulent concealment exception to the statute of limitations would require individualized proof, because some class members would be barred from asserting a fraudulent concealment defense due to prior knowledge of defendants' conduct or failure to act with the requisite due diligence in bringing a claim. *Id.* at 161. But this was insufficient to defeat class certification. As the Third Circuit observed, "[c]hallenges based on the *statute of limitations*, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.'" *Id.* at 163 (quoting Newberg on Class Actions § 4.26 (3d ed.)) (emphasis added). Common issues predominated, as the common evidence to be presented in the class-wide proceeding concerned the defendants' conduct in concealing unlawful antitrust activity. The Third Circuit determined that the applicability of the statute of limitations should be determined in individual damages proceedings. *Id.* at 161; *see also* 2 Newberg on Class Actions § 4.57 (5th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.")

Here, as in *Linerboard*, any question of when individual claimants became aware of Igberase's or ECFMG's conduct goes to the right of the class member to recover, not the defendant's liability. The statute of limitations is appropriately raised in individualized damages proceedings, and cannot defeat class certification.

ECFMG also claims the "superseding cause" of other healthcare institutions' privileging of Igberase bars class certification. Again, "[c]hallenges based on . . . causation . . . will not bar predominance satisfaction." *Id.* at 163. The dubious nature of this argument also undermines its persuasiveness in the class certification context. A superseding cause "is an intervening force that is 'so extraordinary as not to have been reasonably foreseeable.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009). An event is a superseding cause if it "operat[es] independently of any situation created by the first actor's negligence" and "is not . . . a normal result of that situation." *Id.* Here, neither of these conditions is met: ECFMG certification was a prerequisite to him attending a residency program and becoming able to practice obstetrics and gynecology. For a health care institution to grant him privileges is hardly extraordinary so as to not have been reasonably foreseeable.

IV.   **ECFMG's choice of law analysis is flawed, because it fails to take into account that conflicts between the tort law of Pennsylvania and those of Plaintiffs' domiciles are false conflicts.**

ECFMG's conflicts of law analysis fails to acknowledge that any purported conflict it identifies between the substantive tort law of Pennsylvania and that of the Plaintiffs' domiciles, where the law of the domicile would tend to limit recovery of damages (e.g., the fact that Pennsylvania recognizes negligent infliction of emotional distress while Maryland does not), is a *false* conflict. This is because Pennsylvania has a strong interest in regulating the conduct of its domiciliary corporations by applying its substantive tort law, and other jurisdictions have no interest in applying their own law when doing so would limit their citizen's right to recover, to the benefit of a foreign corporation. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187–88 (3d Cir. 1991). Applying Maryland law on negligent infliction of emotional distress, or another jurisdiction's law in a manner that would limit Plaintiffs' recovery, would impair Pennsylvania's

13

JA1357

interest in regulating the conduct of its domestic corporations by deterring tortious conduct through the civil justice system. Conversely, applying Pennsylvania's law does not harm Maryland's interest, since Maryland has no interest in restricting compensation of its residents for harm done to them. To the extent that any true conflicts arise, they can be dealt with through appropriate subclasses under Rule 23(c)(5). The relatively small number of relevant domiciles (Pennsylvania, Maryland, New York, New Jersey, Washington, D.C.) would render such a procedure manageable.

**V.**    **The recitation of facts in ECFMG's brief is flawed.**

ECFMG fails to respond to Plaintiffs' overwhelming evidence of ECFMG's failure to revoke Igberase's certification obtained under the Akoda identity. Instead, ECFMG attempts to discredit Jersey Shore Medical Center (JSMC), which took this evidence seriously, by arguing that some of JSMC's information was inaccurate: namely, that Igberase had served in other residency programs, because "ECFMG has no record of sending ECFMG Certification status reports to the residency programs about which JSMC had inquired." ECF No. 39 at 6. But Plaintiffs have obtained documents (copies of which have been produced to ECFMG in this case) which cast doubt on ECFMG's representation. *See* Ex. 3 at 000041–43 According to the American Board of Internal Medicine, Igberase served in a residency program at Harlem Hospital Center from August 16, 1995 to June 30, 1996. *Id.* at 000043. ECFMG must have provided certification information to Harlem Hospital Center as a necessary precondition for Igberase to practice medicine as a resident there.

ECFMG incorrectly states that Plaintiffs' causes of action accrued no later than November 16, 2016, the date when Igberase's guilty plea became public, because, it says, class member knew or should have known of Igberase's conduct and any emotional distress they

14

JA1358

might have experienced from that knowledge. Plaintiffs disagree. Simply because Igberase's guilty plea became public does not mean that class members knew or should have known of this fact. Under Pennsylvania's discovery rule, a cause of action does not accrue "until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." The applicability of the discovery rule is fact-dependent. *See Erisoty v. Rizik,* No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995). The applicability of statute of limitations defenses can be determined at the damages phase.

ECFMG next argues that there are class members whose claims may be time-barred because they allegedly suffered emotional distress caused by Igberase before November 2016. In support of this statement, ECFMG refers to its Exhibit 25, which consists of a few of the 200+ surveys sent to Plaintiffs by Annie Steinberg, M.D., a psychiatrist retained by Plaintiffs who has provided a report as to damages suffered by the class members. None of these surveys support this argument because they do not state when any of the persons responding to the survey learned of the charges against Igberase. To compound its error, ECFMG exults that "indeed, one class member actually filed a lawsuit seeking emotional damages resulting from treatment by Dr. Igberase in early 2016—months **before** Dr. Igberase was even arrested." Br. at 17. Attached in support of this statement is a copy of a complaint seeking damages for medical negligence based on a theory of wrongful birth. But that complaint had nothing to do with Igberase's identity and Social Security fraud. It does not contain any allegations of negligent privileging or certification.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification, appoint them as representative plaintiffs, and appoint their counsel as class counsel. Plaintiffs respectfully request oral argument on this motion.

<div align="center">15</div>

Dated: <u>November 11, 2019</u>

CONRAD O'BRIEN PC

<u>/s/ Nicholas M. Centrella</u>
Nicholas M. Centrella, Esquire (Pa. I.D. No.
67666)
Howard M. Klein, Esquire (Pa. I.D. No. 33632)
Benjamin O. Present, Esquire (Pa. I.D. No.
322682)
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600

SCHOCHOR, FEDERICO AND STATON

<u>/s/ Brent Ceryes</u>
Jonathan Schochor jschoehor@sfspa.com (*pro
hac vice*
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (*pro hac vice*)
 bceryes@sfspa.com
Phil Federico (*pro hac vice*)
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

LAW OFFICES OF PETER G. ANGELOS,
P.C.

<u>/s/ Paul M. Vettori</u>
Danielle S. Dinsmore (*pro hac vice*)
ddinsmore@lawpga.com
Paul M. Vettori (*pro hac vice*)
pvettori@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150

Respectfully submitted,

JANET, JANET & SUGGS, LLC

<u>/s/ Patrick Thronson</u>
Patrick A. Thronson (*pro hac vice*)
pthronson@JJSjustice.com
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030

THE COCHRAN FIRM

<u>/s/ Karen Evans</u>
Karen E. Evans, R.N., J.D. (*pro hac vice*)
David Haynes
kevans@cochranfirm.com
1100 New York Ave, N.W.
Washington, D.C. 20005
Telephone: (202) 682-5800

Z LAW, LLC

<u>/s/ Cory Zajdel</u>
Cory L. Zajdel (*pro hac vice*)
clz@zlawmaryland.com
2345 York Rd. Suite B-13
Timonium, MD 21093
Telephone: (443) 213-1977

*Attorneys for Plaintiffs*

16

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 11th day of November, 2019, the undersigned caused to be filed the foregoing Reply Memorandum of Law in Support of Motion for Class Certification, using the CM/ECF system of the United States District Court for the Eastern District of Pennsylvania, which will send notification of the filing to all counsel of record.

/s/ Patrick Thronson
Patrick A. Thronson

17

JA1361

# EXHIBIT 1



August 30, 2017

<u>CERTIFIED RETURN RECEIPT REQUESTED</u>

John-Charles Akoda, MD



Dear Dr. Akoda:

The American Board of Obstetrics and Gynecology (ABOG) was recently made aware through a Disciplinary Action Notification System (DANS) report that the Maryland State Board of Physicians took adverse action on your license on July 10, 2017. Your Maryland medical license was revoked in a Final Decision and Order for the following:

1. You pled guilty to a crime involving moral turpitude on November 15, 2016.

2. You were convicted of social security number fraud, a felony, in violation of 42 U.S.C. 408(a)(7)(B) In the United States District Court for the District of Maryland.

3. You were sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

The ad hoc committee of the Credentials Committee has reviewed the above information and determined that you do not meet the terms of the requirements to maintain certification by the ABOG. The committee voted unanimously that you have violated the moral and ethical standards of the practice of medicine accepted by organized medicine because your license was revoked and you were convicted of a felony. Your ABOG certificate expired December 31, 2016. The committee has determined that you currently are ineligible to participate in the ABOG Re-entry exam/ MOC Process.

Disqualification or Diplomate revocation may occur whenever the physician's license has had his/her license revoked. Disqualification or Diplomate revocation may also occur whenever the physician has been convicted of a felony or has pled guilty to a felony. The ABOG policies require Diplomates to have an unrestricted license to practice in all states in which they are licensed.  This information is under the Policies section at
https://www.abog.org/new/n_policies.aspx?title=revocation

2915 Vine Street, Dallas, Texas 75204 | P: 214.871.1619 | F: 214.871.1943 | E: info@abog.org | W: ABOG.org

CONFIDENTIAL           ABOG_nonparty_000001

JA1363

The ad hoc committee also voted to refer your case to the Credentials Committee for consideration of revocation of certification. The Credentials Committee will review your case for possible revocation of your certification at the next Board of Directors meeting in January 2018. You may submit any additional information that you think may aid the Credentials Committee in consideration of the revocation of your certification. Please submit any information to me in writing or by email, and we will see that the committee has the information to consider at the meeting.

Please feel free to contact us if you have any further questions.

Sincerely,

Susan M. Ramin, M.D.
Associate Executive Director
Maintenance of Certification
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX  75204
Phone: (214) 721-7510
Fax: (214) 871-1943

ABOG Diplomate # 9025829
SMR/kw

CONFIDENTIAL          ABOG_nonparty_000002

JA1364

# EXHIBIT 2



Compose Delivery

Inbox

**Sent Items**

Packages

Workspaces

Contacts

Reports

Help

Uploads
Drag and drop files anywhere on the page to upload

# Delivery Details

Act

**Delivery Information**

| | |
|---|---|
| **To** | Class Action All Counsel |
| **Subject** | Russell et al. v. ECFMG - Plaintiffs Supplemental ... |
| **Date available** | 09/16/2019 03:47 PM |
| **Date expires** | 10/16/2019 11:59 PM (Expired) |
| **Password assigned** | No |
| **Require recipients to sign in** | No |
| **Notify when recipients access this delivery** | First time |
| **Notify when recipients download files** | Do not notify |
| **Notify when recipient deletes** | No |
| **Access status** | 7 recipient(s) have not accessed the delivery |
| **Secure message** | Counsel,<br><br>Attached, please find a supplemental document production from Plaintif the above-referenced matter with respect to various putative class meml<br><br>Best,<br><br>Ben |
| **Notification message** | You are receiving a secure email from Conrad O'Brien. Please click or link to retrieve your message and attachments. |
| **Package name** | Russell et al. v. ECFMG - Pla... |
| **Tags** | |
| **Description** | |

**Files**

| ☐ | | File name | Date created | Size |
|---|---|---|---|---|
| ☐ | | Plaintiffs0000118760 - 0000140233.PDF | 09/16/2019 03:47 PM | 1,864.7 |

**Total: 1,864.7**

Download As Zip | Forward

**Secure Replies**

No replies

# EXHIBIT 3

MERIDIAN HEALTH SYSTEM

*JERSEY SHORE MEDICAL CENTER*
*DEPARTMENT OF MEDICINE*
*OFFICE:  732-776-4420*
*FAX:      732-776-3795*

***CONFIDENTIAL***

### INTEROFFICE MEMORANDUM

**TO:**        Distribution

**FROM:**   Elliot Frank, MD, Chair/Program Director, Department of Medicine

**DATE:**    October 26, 2001

**RE:**        Former Medical Resident:  Dr. Akoda

I am passing on the enclosed letter since you expended so much time in this matter.  This appears to resolve the question of whether Dr. Akoda had been in another training program, something he continued to deny.

By the way, I have not heard from, or of, Dr. Akoda since his departure.

k
Enclosure

Distribution:   Carl Marchetti, MD
                      Steve Littleson
                      Katie Luciani
                      David DeSimone, Esq.

Jersey Shore Medical Center000041



**AMERICAN
BOARD OF
INTERNAL
MEDICINE**

October 19, 2001

PROMOTING
EXCELLENCE IN
HEALTH CARE
◆
510 Walnut Street
Suite 1700
Philadelphia, PA
19106-3699

Tel: 215-446-3500
Tel: 800-441-2246
Fax: 215-446-3470
E-mail: request@abim.org
www.abim.org
◆
Paul G. Ramsey, MD
Chair

Douglas P. Zipes, MD
Chair-Elect

James L. Naughton, MD
Secretary-Treasurer
◆
Harry R. Kimball, MD
President

F. Daniel Duffy, MD
Executive Vice President

John J. Norcini, PhD
Senior Vice President
Psychometrics and Research

Lynn O. Langdon, MS
Senior Vice President
Subspecialty Medicine and
Test Development

Linda L. Blank
Vice President
Clinical Competence and
Communications

Henry F. Stroszaki, MBA
Vice President
Administration and
Operations
Chief Financial Officer

Leslie D. Goode, MHS
Vice President
Assistant to the President

Elizabeth A. Hopkins
Associate Vice President
Registration and Credentials

Muriel Horne
Associate Vice President
Registration and Credentials

Dr. John C. Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

Dear Dr. Akoda:

At the end of each year of residency training, the American Board of Internal Medicine asks program directors to evaluate the performance of residents in their program to document satisfactory humanistic qualities, moral and ethical behavior, and overall clinical competence.

The attached report summarizes the information received to date regarding the level of training, program(s) performance rating(s), and number of *months* credit you have received toward the requirements for admission to a future Certifying Examination in Internal Medicine. No credit is granted for training rated as unsatisfactory.

The requirements for admission to the Certifying Examination may be found in the enclosed *Policies and Procedures.* If you have any questions regarding the report, we suggest that you contact your program director directly.

Respectfully,

*Muriel Horne*

Muriel Horne

Enclosures:        Summary of Training and Evaluation Report
                   *ABIM Policies and Procedures for Certification,*
                   *July, 2001*

PC: Dr. Elliot Frank

Jersey Shore Medical Center000042

JA1369

10/19/01

**AMERICAN BOARD OF INTERNAL MEDICINE**

Summary of Training and Evaluation Report

Name: Akoda, John C.

Social Security number: 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

| Prog No | Program Name | Dates of Training | Level | Rating | Credit |
|---------|--------------|-------------------|-------|--------|--------|
| 0477 | HARLEM HOSPITAL CENTER | | | | |
| | Internal Med. | 08/16/95 - 06/30/96 | 1 | | 0 |

*AES form has not been returned for this resident.*

| 0420 | JERSEY SHORE MEDICAL CENTER | | | | |
|------|----------------------------|---|---|---|---|
| | Internal Med. | 07/01/98 - 06/30/99 | 1 | Superior | 12 |
| | Internal Med. | 07/01/99 - 06/30/00 | 2 | Superior | 12 |
| | Internal Med. | 07/01/00 - 11/21/00 | 3 | Unsatisfactory | 0 |

*No credit toward the Board's training requirements for admission to the Certification Examination is granted for training rated unsatisfactory.*

Total    24

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>    Plaintiffs,<br><br>  v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>    Defendant. | Civil Action No. 18-5629<br><br>Honorable Joshua D. Wolson |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

Dated: November 18, 2019

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates*

Pursuant to Section II.B.2 of the Court's Policies and Procedures, Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") submits this Sur-Reply in Opposition Plaintiffs' Motion for Class Certification to address certain arguments raised by Plaintiffs in their Reply (ECF 47).

*First*, Plaintiffs concede that there are individualized damages issue that are incapable of resolution on a class-wide basis (*see* ECF 47 at 5), but Plaintiffs wrongly suggest that those are the **only** individualized issues that ECFMG identified in its Opposition (*see id.* at 1-4). To the contrary, ECFMG's Opposition clearly identified numerous individualized issues going to questions of liability—including questions of duty (ECF 39 at 13-14), breach (*id.* at 13-14), and causation (*id.* at 14-17)—that are distinct from individualized damages issues and present insurmountable obstacles to class certification. Plaintiffs' failure to acknowledge and confront these other individual issues is on full display in Plaintiffs' proposal (ECF 47 at 11) that questions of "foreseeability" be relegated to hundreds or thousands of separate mini-trials when, as ECFMG explained in its Opposition (ECF 39 at 13-17), foreseeability is a critical issue in determining questions of duty, breach, and causation, which are purportedly common questions that Plaintiffs have proposed for treatment on a class-wide basis. In other words, Plaintiffs concede that foreseeability is an individualized issue, but they ignore that fact in seeking to certify classes on questions of duty and causation implicating that very same individualized issue.

*Second*, Plaintiffs argue that challenges based on causation "will not bar predominance satisfaction." ECF 47 at 13. They ignore the host of cases cited in ECFMG's Opposition in which individualized causation problems precluded class certification. ECF 39 at 14-17. Moreover, Plaintiffs offer no workable trial proposal for when and how to resolve the question of causation. Aside from stating in a heading (without explanation) that "key questions of . . . causation can be determined on a classwide basis" (ECF 47 at 10), Plaintiffs do not explain whether causation will

be part of a class-wide trial or the individualized mini-hearings.  They do not explain whether they are continuing to press for certification of "general causation," which ECFMG explained was unworkable.  *See* ECF 39 at 14-17.  To the extent they contend (ECF 47 at 13) that the actions of multiple healthcare institutions that allowed Dr. Akoda to treat patients after evaluating him separately (based on different sets of information and criteria) could not possibly be superseding causes, Plaintiffs are wrong.  Whether it was foreseeable to ECFMG that those institutions would allow him to treat patients as he did after conducting an independent assessment of Dr. Akoda's abilities and performance is both a legitimate and individualized question that is a serious obstacle to class certification.

*Third*, Plaintiffs repeatedly mischaracterize ECFMG's Opposition as arguing that there is a "*per se* bar on class certification of emotional distress claims."  ECF 47 at 2.  Plaintiffs misconstrue ECFMG's argument.  What ECFMG demonstrated is that individualized personal injury claims for emotional distress arising from alleged negligence are extremely ill-suited to class certification.  *See* ECF 39 at 11-20, 24-25.  Plaintiffs' assertion that "[c]ourts do not vary their interpretation and application of Rule 23 based on the nature of the action" (ECF 47 at 6), does not confront ECFMG's fundamental point that before certifying any class under Rule 23, courts must engage in a "rigorous analysis" that "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013); *see* Fed. R. Civ. P. 23 advisory committee's note ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.").

2

Plaintiffs still have not identified any case in which personal injury claims for emotional distress were tried on a class-wide basis. Plaintiffs' reliance (ECF 47 at 2-3) on *McRobie v. Credit Protection Association*, Civ. A. No. 18-0566, 2019 WL 1469097 (E.D. Pa. Apr. 3, 2019), is misplaced. *McRobie* involved claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, which is a single federal statute allowing for (among other things) strict liability and statutory damages. *See* 15 U.S.C. § 1692k(a)(2). The *McRobie* Court determined that the commonality requirement of Rule 23(a) was satisfied because that case involved "identical mailers" sent to identically situated class members in violation of a single federal statute. *Id.* at *4. That is a far cry from this case, which involves thousands of class members who allegedly encountered Dr. Akoda in a variety of materially different situations, had widely varying experiences with Dr. Akoda, and will pursue claims under a variety of state laws that require proof of actual damages.[1] Moreover, the *McRobie* Court only discussed emotional distress in connection with Rule 23(a)'s commonality requirement, not the predominance requirement of Rule 23(b)(3) or any other requirements bearing on the superiority or manageability of class certification.

Plaintiffs' reliance on *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417 (4th Cir. 2003)—an out-of-circuit case predating *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)—is similarly inappropriate. In *Gunnells*, a split panel of the Fourth Circuit deepened a circuit split by affirming

---

[1] Plaintiffs are also right to recognize (ECF 47 at 5 n.1) that any request for punitive damages would be entirely inconsistent with their proposed issue classes because in order to prove that ECFMG's conduct warrants punitive damages, Plaintiffs "would have to present to the jury all the facts" about ECFMG's conduct, and such liability and damages issues are very much "intertwined." *Spence v. Bd. of Ed. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986). But Plaintiffs' discussion of punitive damages is inapposite because they have represented repeatedly in discovery that despite the generic *ad damnum* clause in their Complaint, they are not seeking punitive damages in this case. Plaintiffs' discovery responses made no reference to punitive damages despite specific requests regarding the types of relief Plaintiffs are seeking. *See* ECF 46-1 to 46-8 at Rogs 2 & 9. Accordingly, punitive damages are not a part of this case.

class certification in a sprawling case involving dozens of subclasses and extensive individualized mini-trials.  But in *Gates v. Rohm & Haas Co.*, the Third Circuit declined to follow *Gunnells* and instead affirmed a district court's denial of class certification on the grounds that "common issues [were] not divisible from individual issues" and "resolution of [common] questions [left] significant and complex questions unanswered."  655 F.3d 255, 273 (3d Cir. 2011).

*Fourth*, Plaintiffs mischaracterize the Third Circuit's jurisprudence about the relationship between Rule 23(b)(3) and Rule 23(c)(4).  The fact is that "Plaintiffs cannot read the predominance requirement out of (b)(3) by using (c)(4) to sever issues until the common issues predominate over the individual issues."  *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 496 (E.D. Pa. 1997).

Tellingly, despite multiple opportunities, Plaintiffs still have not offered a trial plan that "describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof."  Fed. R. Civ. P. 23(c)(1)(A) advisory committee's note.  That Plaintiffs have failed to offer "any proposal for managing a class action in this case" suggests "they have none."  *Powers v. Lycoming Engines*, 272 F.R.D. 414, 430 (E.D. Pa. 2011).   Given the fundamental problems identified by ECFMG, Plaintiffs' shortcomings weigh strongly against class certification.  *See, e.g.*, *Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548, 563 (E.D. Pa. 2010) (noting the absence of a trial plan in denying class certification); *Arch*, 175 F.R.D. at 493 (noting the inadequacy of trial plan in denying class certification); *see also Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 186 & n.7 (3d Cir. 2006) ("We believe that the pre-certification presentation of the aforementioned trial plans represents an advisable practice within the class action arena"); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 315 (3d Cir. 2011) (trial plans serve a "critical" role).

The conspicuous absence of a credible trial plan is a red flag signaling that Plaintiffs' proposals for managing a class action are entirely unworkable.  This is further confirmed by the inadequate "solutions" Plaintiffs proffer in response to the legitimate problems discussed in

ECFMG's Opposition. For example, Plaintiffs suggest on one page of their Reply that that the Court can divide the case into 5 subclasses based on the "relevant domiciles" of class members (ECF 47 at 14), and they suggest on another page that the Court can create 6 **other** subclasses based on the "health care institutions at which Igberase [allegedly] provided care,"[2] *id.* at 10, and that other issues should be resolved without the use of subclasses, *id.* Nowhere have Plaintiffs described how this convoluted web of subclasses would work or the common proof Plaintiffs would present in separate subclass proceedings. Even then, Plaintiffs concede that resolution of individualized issues must be relegated to hundreds (if not thousands) of mini-trials. *Id.* at 15.

*Fifth*, Plaintiffs represent that "if it becomes necessary, the 600+ clients represented by Plaintiffs' counsel will file individual cases." *Id.* at 7. This unverified, unsubstantiated representation, even if true, undermines Plaintiffs' assertions that "the cost of litigating each individual case likely outweighs an individual award" and that a class action is the only way of adjudicating these claims. *See* ECF 32-1 at 22. Moreover, it confirms that each individual class member has a strong interest in controlling her own litigation, as ECFMG explained in its Opposition (ECF 39 at 19), which weighs heavily against class certification. *See, e.g.*, *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996).

---

[2] Plaintiffs claim that Harlem Hospital Center is one such institution and that "ECFMG must have provided certification information to Harlem Hospital Center as a necessary precondition for Igberase to practice medicine as a resident there." ECF 47 at 14. But the documents they attach are the same incomplete records that led JSMC to ask ECFMG whether it had any record of Dr. Akoda working at Harlem Hospital Center; and Plaintiffs have no evidence that ECFMG actually communicated anything to Harlem Hospital Center about Dr. Akoda. Indeed, Dr. Akoda was not even ECFMG certified until **after** the time period when he allegedly worked at Harlem Hospital Center. *See* ECF 32-21. That, in and of itself, helps to explain why ECFMG would not have had records of communicating Dr. Akoda's ECFMG certification status to Harlem Hospital Center, since he would have had no such status to communicate at that time. If Dr. Akoda treated or examined patients at institutions that never received any communications from ECFMG about Dr. Akoda (as Plaintiffs apparently contend), then the individualized questions are compounded even further and class certification is even less appropriate.

**Sixth**, Plaintiffs mischaracterize ECFMG's arguments about the plaintiff-specific issues associated with its statute of limitations defense in three respects.  First, there are cases in which individualized issues relating to the statute of limitations preclude class certification.  *See, e.g.*, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998).  Second, class members' survey responses indicate that some class members suffered emotional distress **only** after being treated by Dr. Akoda and **not** as a result of learning about the charges against him.  *See* ECF 39-25.  Whether the surveys indicate when class members learned of the charges is therefore irrelevant because the only emotional distress for some class members happened **before** learning of the charges.  Third, Plaintiffs purport to distinguish the medical negligence case brought against Dr. Akoda as irrelevant to the statute of limitations defense (ECF 47 at 15), but that litigation was pending when Dr. Akoda was arrested—but before his guilty plea was made public.  It is entirely reasonable to suspect that the plaintiff in that case knew of the charges against Dr. Akoda before the guilty plea was made public, so her claims are almost certainly barred by the statute of limitations.

**Seventh**, Plaintiffs' choice-of-law analysis ignores the overwhelming interest that Maryland has in regulating claims brought by a Maryland resident based on treatment rendered in Maryland by a physician licensed to practice medicine in Maryland and, in many instances, at hospitals authorized to do business in Maryland.[3]  Plaintiffs have not identified any case in which Pennsylvania's choice-of-law principles resulted in the application of Pennsylvania law under similar circumstances.  Plaintiffs contend that there is not a "true conflict," but in doing so they ignore a litany of cases applying non-Pennsylvania law to injuries occurring outside Pennsylvania, even when the defendant had contacts with Pennsylvania.  *See Slear v. Federal Mogul*, 1996 WL

---

[3] A separate analysis is necessary for class members who are not resident in Maryland or who were treated outside of Maryland.

221769, at *1 (E.D. Pa. Apr. 26, 1996) (applying Maryland law in tort case where injury occurred in Maryland, but defendant also operated in Pennsylvania).  The single case Plaintiffs cite—*Lacey v. Cessna Aircraft Co.*—is distinguishable because it involved Pennsylvania's **strict liability** standard and Pennsylvania's interest in "deterring the manufacture of defective products and in shifting the costs of injuries onto producers."  932 F.2d 170, 188 (3d Cir. 1991).  Here, by contrast, Maryland has an interest in encouraging physicians—including international medical graduates— to practice medicine in Maryland without fear that claims for negligent infliction of emotional distress will arise from such practice.  Moreover, Maryland has strong reasons for limiting the ability to recover for such claims.  *See Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (MD Ct. Special App. 1986) ("We cannot imagine any act opprobrious enough to justify an award of damages solely for the infliction of emotional distress that would not satisfy the definition of reckless conduct encompassed by the concept of intentional infliction of emotional distress.").  Accordingly, there is a true conflict and Maryland law should apply to Plaintiffs who are residents there and who were treated there.

***Eighth, and finally,*** Plaintiffs contend that the class definition "cannot be clearer" because it includes any patient who was "examined or treated" by Dr. Akoda.  ECF 47 at 8.  Plaintiffs did not respond to the legitimate problems with those vague terms identified in ECFMG's Opposition. *See* ECF 39 at 23-24.  Plaintiffs also contend (ECF 47 at 8) that additional class members can be identified via subpoena, but they ignore the fact that some of the medical institutions whom they would subpoena are under no legal obligation to continue to retain records from the timeframe when Dr. Akoda practiced medicine.  *See* ECF 39 at 23-24.  That is yet another obstacle (among many) Plaintiffs did not address.

Accordingly, the Court should not certify either proposed class.

Respectfully submitted,

Dated: November 18, 2019

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

8

JA1379

## **CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED:  November 18, 2019                    */s/ Brian W. Shaffer*
                                             Brian W. Shaffer

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                       -  -  -

 3   MONIQUE RUSSELL, et al.      :  CIVIL ACTION NO.
                                  :  2:18-cv-05629
 4     v.                         :
                                  :
 5   EDUCATION COMMISSION FOR     :
     FOREIGN MEDICAL GRADUATES    :  ORAL ARGUMENT
 6   _____

 7
                                James A. Byrne U.S. Courthouse
 8                              601 Market Street
                                Philadelphia, PA 19106
 9                              January 30, 2020
                                Commencing at 2:06 p.m.
10   _____

11          BEFORE THE HONORABLE JOSHUA D. WOLSON

12   _____

13
     APPEARANCES:                         ORIGINAL
14
            JANET JANET & SUGGS LLC
15          BY:  PATRICK A. THRONSON, ESQUIRE
            4 Reservoir Circle
16          Suite 200
            Baltimore, Maryland 21208
17          (410) 653-3200
            pthronson@jjsjustice.com
18          Representing the Plaintiffs

19
                            -  -  -
20
                 Ann Marie Mitchell, CRR, RDR, RMR
21                     Official Court Reporter
                         (267) 299-7250
22

23   Proceedings taken stenographically and prepared utilizing
     computer-aided transcription
24

25
```

```
 1   APPEARANCES CONTINUED:

 2
          CONRAD O'BRIEN, PC
 3        BY:  NICHOLAS M. CENTRELLA, ESQUIRE
          1500 Market Street
 4        West Tower, Suite 3900
          Philadelphia, Pennsylvania 19102
 5        (215) 864-9600
          ncentrella@conradobrien.com
 6        Representing the Plaintiffs

 7

 8        LAW OFFICES PETER G. ANGELOS PC
          BY:  PAUL M. VETTORI, ESQUIRE
 9        One Charles Center
          100 N Charles Street, 20th FLoor
10        Baltimore, Maryland 21201
          (410) 649-2027
11        pvettori@lawpga.com
          Representing the Plaintiffs
12

13
          SCHOCHOR FEDERICO & STATION PA
14        BY:  BRENT P. CERYES, ESQUIRE
          1211 St. Paul Street
15        Baltimore, Maryland 21202
          (410) 598-1667
16        bceryes@sfspa.com
          Representing the Plaintiffs
17

18
          MORGAN, LEWIS & BOCKIUS LLP
19        BY:  BRIAN W. SHAFFER, ESQUIRE
          BY:  ELISA P. McENROE, ESQUIRE
20        BY:  MATTHEW DANIEL KLAYMAN, ESQUIRE
          1701 Market Street
21        Philadelphia, Pennsylvania 19103
          (215) 963-5000
22        bshaffer@morganlewis.com
          elisa.mcenroe@morganlewis.com
23        matthew.klayman@morganlewis.com
          Representing the Defendant
24

25                              -  -  -
```

```
 1                (Court called to order at 2:06 p.m.)

 2                THE COURT:  Good afternoon.  Please be seated.

 3                RESPONSE:  Good afternoon, Your Honor.

 4                THE COURT:  So we're here for Russell v. Educational

 5   Commission for Foreign Medical Graduates, which is 18-5629.

 6                Let me get appearances of counsel if I could so I can

 7   put some faces with names.  Start with the plaintiff's side.

 8                MR. THRONSON:  Good morning, Your Honor.  Patrick

 9   Thronson on behalf of the plaintiffs.

10                THE COURT:  Good afternoon, Mr. Thronson.

11                MR. VETTORI:  Good morning, Your Honor.  Paul Vettori

12   on behalf of plaintiffs.

13                THE COURT:  Mr. Vettori.

14                MR. CENTRELLA:  Good morning, Your Honor.  Nick

15   Centrella on behalf of plaintiffs.

16                THE COURT:  Okay.

17                MR. CERYES:  Good afternoon, Your Honor.  Brent Ceryes

18   on behalf of the plaintiffs.

19                THE COURT:  Good afternoon, everybody.

20                And defense?

21                MR. SHAFFER:  Good afternoon, Your Honor.  Brian

22   Shaffer on behalf of ECFMG.

23                THE COURT:  Good afternoon.

24                MS. McENROE:  Good afternoon.  Elisa McEnroe, also for

25   ECFMG.
```

1          MR. KLAYMAN:  Good afternoon.  Matthew Klayman, also

2     on behalf of ECFMG.

3          THE COURT:  Great.  Welcome everybody.

4          So let me tell you what I want to do here.  We've been

5     through all of the pleadings and exhibits a couple times in

6     chambers.  And certainly I have I think a pretty good handle on

7     the issues, although maybe your arguments will tell me

8     otherwise.  And I've got some sort of questions and issues that

9     I want to hone in on.

10          And so what I sort of want to cover with you all

11     are -- I want to clarify the claims themselves that are

12     asserted in the case, just to make sure I understand them.  I

13     want to talk about some of class definition and

14     ascertainability issues that I know are floating around.  And

15     then I want to -- once we kind of get through those couple

16     things, I want to turn to the -- sort of the class

17     certification issues themselves and talk about some of the

18     issues that come up with the interplay between Rule 23(b) and

19     23(c) and then sort of talk about the two alternative

20     approaches that the plaintiffs have outlined in terms of class

21     certification.  And then we can sort of circle back from there

22     to cover some of the 23(a) factors after that that I know are

23     some of the arguments that the defense has made as well.

24          And then once I've kind of covered all that, to the

25     extent there are things we haven't covered that you all think

1    are important to say to me, I'll give you an opportunity to do

2    that.  I'll tell you now -- and I'll remind you then -- that

3    I've read everything pretty carefully, and so I don't need

4    repetitions of what's in the briefs, but if there are things

5    that either I say today that trigger something in your mind or

6    just you feel you want to say in addition to what's been

7    briefed, I'm certainly happy to hear that.

8         So with that in mind -- and in terms of process, I

9    mean, I'm going to go back and forth, so certainly you don't

10   have to step up.  I'm not going to be insulted if you stay

11   seated while you talk to me.  If you have an old habit that you

12   feel like you need to stand when I talk to you, that's fine,

13   but I won't be insulted if you don't.

14        So let me just start with the claims themselves that

15   have been asserted in the Complaint, and there's two.  There's

16   a negligence and a negligent infliction of emotional distress

17   claim.

18        And so I just want to make sure in the first instance

19   on negligence, is all of the harm that the plaintiffs are

20   asserting sort of under the rubric of emotional distress in

21   this case, or are there other harms that are at issue?

22        MR. THRONSON:  Yes, Your Honor.  The harm that we're

23   proposing for classwide -- essentially for individual

24   resolution after class treatment of the common issue is

25   emotional distress.

1           THE COURT:  Okay.  So there's a reference in your

2   brief to -- I think when you talk about the questions that you

3   wanted me to certify, there was a reference to emotional

4   distress and other damages, but that's sort of just -- I'm

5   taking that more as stray language than it is some

6   suggestion --

7           MR. THRONSON:  Right.

8           THE COURT:  -- that there are other damages out there

9   that are not emotional distress damages?

10          MR. THRONSON:  That's correct, Your Honor.  There may

11  be individual, you know, plaintiffs who, you know, sustained

12  other damages who we don't know about, but, you know, for

13  purposes of this case, this class, the damages are emotional

14  distress damages.

15          THE COURT:  Right.  They may have asserted --

16  sustained other damages, but they're not asserting them or at

17  least you guys are not proposing to represent them to assert

18  them in this case, which is I think a key element to me being

19  able to get to any kind of a class here.  Right?

20          MR. THRONSON:  That's correct.

21          THE COURT:  And then the negligent infliction of

22  emotional distress claim, you know, it's not spelled out in the

23  Complaint, wouldn't normally be, but I assume what you have in

24  mind is that it's asserted under Pennsylvania law based on the

25  choice of law arguments in the briefing; is that right?

```
 1          MR. THRONSON:  That is correct, Your Honor.  Under
 2   Maryland law you can assert a claim for negligence where
 3   emotional distress is the only damages.  And so that can be
 4   proved either through physical injuries, some physical
 5   manifestation of the emotional distress, or in certain cases
 6   involving fraud or egregious conduct, it can be proved just by
 7   the testimony of the plaintiff him or herself without reference
 8   to objective criteria.  But we do believe that, you know,
 9   Pennsylvania law applies, and that claim, to the extent that we
10   assert it in the Complaint, is based on Pennsylvania law.
11          THE COURT:  And so Pennsylvania law, at least from
12   what I've seen, when you look at the elements of negligent
13   infliction of emotional distress, there's these four -- there's
14   sort of the basic four elements of negligence, right, and then
15   the sort of additional -- there's like these four alternatives.
16   Right?  And it's contractual fiduciary duty, which I assume is
17   not applicable here in your view.  Or is that one of bases that
18   you're proceeding under?
19          MR. THRONSON:  There's no fiduciary duty that we're
20   alleging between ECFMG and the plaintiffs.
21          THE COURT:  And certainly there's no contractual duty
22   because they didn't have a direct relationship?
23          MR. THRONSON:  Right.  There is a physician-patient
24   relationship between Akoda and the patient.
25          THE COURT:  Yes.  But that doesn't get you to
```

1    liability against them.

2            MR. THRONSON:  Sure.

3            THE COURT:  And then physical -- plaintiff suffered a

4    physical impact?

5            MR. THRONSON:  Right.

6            THE COURT:  Are you proceeding under that prong?

7            MR. THRONSON:  Yes.  A battery.

8            THE COURT:  As opposed to zone of danger or

9    contemporaneous perception of a tortious injury --

10           MR. THRONSON:  Right.

11           THE COURT:  -- to the other two.  Right?

12           And does there need to be a physical manifestation

13   under Pennsylvania law?

14           MR. THRONSON:  You do need to prove it by some kind of

15   evidence, so we'd offer medical records, testimony of the

16   plaintiff, testimony of relatives, in these individualized

17   proceedings that we're proposing.

18           THE COURT:  Okay.  Right.  And so that's all going to

19   be -- in your mind, that would all be left to the

20   individualized proceedings?

21           MR. THRONSON:  That's right.

22           THE COURT:  So you don't have a fraud claim in the

23   case, though.  Right?

24           MR. THRONSON:  Right.

25           THE COURT:  So there's some reference in the class

 1   cert briefing to -- I think one of the issues you referenced

 2   that I could certify is whether or not -- we're going with Dr.

 3   Akoda?  Is that the name, Akoda?  I don't actually know if I

 4   should put the "Dr."  In front of it or not under the

 5   circumstances, but that's the name we're using; is that right?

 6           MR. THRONSON:  That's fine.

 7           MR. SHAFFER:  Right.

 8           THE COURT:  So we're all on the same page.  Okay.

 9           So there's some reference to certifying a class

10   about -- I think ECFMG assisting the commission of fraud under

11   Section 876 of the Restatement?

12           MR. THRONSON:  That's right, Your Honor.

13           Obviously, the evidence shows, the record shows, and I

14   don't think there's any dispute about this, that Dr. Akoda,

15   Akoda -- we're not saying he's a doctor, but -- committed fraud

16   against multiple entities.  And ECFMG provided evidence of

17   certification to a residency program at Howard, a residency

18   program at Jersey Shore, and each healthcare institution at

19   which Akoda purported to practice medicine.  And that

20   documentation verified that Akoda allegedly was properly

21   certified by ECFMG and that his certification was valid.  In

22   fact, the precise piece of paper that was provided, which is in

23   our exhibits, is that it was valid indefinitely.

24           So our claim is that ECFMG knew or should have known

25   that Akoda was committing fraud and was using, you know,

1    through, among other means, this ECFMG certification, which was

2    a prerequisite to practicing at each of these healthcare

3    institutions and being licensed to practice in Maryland.  And

4    so to that extent we think there is an issue that ECFMG aided

5    in the commission of fraud.

6            THE COURT:  But why does that matter for the claims of

7    the case?  I mean, you know, it may be true in the abstract.

8    It may be something that is interesting legally, but you don't

9    have a claim based on it.  Right?

10           MR. THRONSON:  Right.  But that -- I mean, to the

11   extent that any negligence arises from that.

12           THE COURT:  So it might go to the breach question.

13           MR. THRONSON:  Right.

14           THE COURT:  Right.  But -- okay.

15           It seems to strange to me that I would sort of certify

16   something specific to the issue of fraud in a case where

17   there's no fraud.  Right?  I mean, unless you're telling me

18   that's the only theory you have that constitutes a breach.  And

19   I don't think it is.

20           MR. THRONSON:  Right.

21           THE COURT:  So I don't think -- okay.

22           All right.  So -- all right.  That gives me some

23   clarity then, I think, on what's in the case and sort of

24   what's -- how that -- some of that does bear certainly on the

25   motion that's in front of me.

1          So let me talk about class definition stuff, and then

2     related to that, I mean, sort of flowing naturally from that

3     are the ascertainability questions, I think.

4          Again, I'm going to start with plaintiffs.  So who do

5     you want to include in the class?  Because there's -- and I ask

6     that because there's, you know, a bunch of stuff in the

7     defense's responses about, for instance, patients in Nigeria.

8     And my take on that in reading it was your class definition is

9     inartfully drafted, because on its face the way it's drafted

10    potentially includes -- I don't know what kind of training

11    Akoda had in Nigeria, I don't know whether he was exposed to

12    patients, but it potentially includes that.  I don't think

13    that's what you meant to include.  I think that predates his

14    submissions to ECFMG and to his coming here.  Right?

15         MR. THRONSON:  You're right.  Yeah.

16         THE COURT:  So it struck me as a little bit of a

17    sideshow in the briefing.  It doesn't -- it's not a reason for

18    me not to certify a class.  It's certainly a reason for me to

19    red pencil your class definition.

20         So tell me who you want to include in the class, you

21    know, with bearing some of those issues in mind.

22         MR. THRONSON:  Sure.  Your Honor, you're completely

23    correct as to the Nigeria issue.  It had not even occurred to

24    us that there would be patients in Nigeria because we had no

25    evidence there were.  And we don't believe that, again, he was

JA1391

1    properly trained or he saw patients in Nigeria.

2           In terms of the class definition, it is, you know,

3    everyone who was treated by Akoda.  And what we take that to

4    mean is everyone who had a physician-patient relationship with

5    Akoda.  You know, if we -- and our method for ascertaining that

6    is, as was proposed and approved in the In Re:  Suboxone case,

7    is to send subpoenas to every known institution or entity at

8    which Akoda purported to practice medicine, everywhere where he

9    worked, and to say, identify all the individuals at your

10   institution who were treated by Akoda.

11          And we did this with Prince George's Hospital Center

12   in Maryland.  They said, here's a list of 712 individuals who

13   were treated by Akoda.

14          So this is something that is objective -- it's an

15   objective criteria in both a theoretical and a practical sense,

16   because healthcare institutions understand that phrase.

17          Now, it may be, just like with any class, that there

18   are individuals who were treated by Akoda who suffered no --

19   suffered no harm as a result of it, the involvement in the care

20   was minimal.  The individuals upon finding out of Akoda's fraud

21   didn't suffer any provable emotional distress.  But it really

22   is all individuals who had a physician-patient relationship

23   with Akoda.  And the way we would determine that is, again, the

24   subpoenas to healthcare institutions that the record shows he

25   worked at.

```
 1           THE COURT:  So geographically, are we including Jersey
 2    Shore Medical Center?
 3           MR. THRONSON:  We would.
 4           THE COURT:  Okay.  And then Howard University.  Right?
 5           MR. THRONSON:  Right.
 6           THE COURT:  And then you mentioned Prince George's
 7    Medical Center.  And his private practice with Dr. Chaudry?
 8           MR. THRONSON:  That's right.
 9           THE COURT:  Anywhere else that I missed?
10           MR. THRONSON:  No.
11           THE COURT:  Okay.  And so when you talk about -- I
12    mean, I assume you probably know better than I do based on your
13    discussions with them that if you go somewhere like Prince
14    George and say, give us everyone who he treated, they basically
15    go find everyone for whom they obtained any professional
16    revenue from him.  Right?  And -- or sent out a bill, even if
17    they didn't actually get the revenue, and look to that.
18           Is that basically correct, or is there some other way?
19           You know, I assume billing codes is the only way
20    you're going to find that, but you tell me.
21           MR. THRONSON:  You would -- this is based on just our
22    best understanding.
23           THE COURT:  Yeah.
24           MR. THRONSON:  We didn't do the search ourselves,
25    obviously, but there was a chart search.  Individuals who -- or
```

 1  hospitals keep track of what procedures individuals are

 2  involved with.

 3          The physician billing itself, I'm not sure that the

 4  hospital would have taken care of that.  That may have been

 5  submitted through his practice.

 6          THE COURT:  Okay.

 7          MR. THRONSON:  But it would correspond to the patient,

 8  and it would reflect the services that were rendered.

 9          So in terms of reflecting -- in requesting billing

10  records and also in asking the facilities to do a chart review

11  and identify the individuals who Akoda treated and to supply

12  their -- you know, their medical records under proper HIPAA

13  procedures, that's how we would identify the class members.

14          THE COURT:  Was he an employee at Prince George's or

15  did he just have privileges there?

16          MR. THRONSON:  He had privileges there.

17          THE COURT:  So he was coming in through the private

18  practice and just treating patients there?

19          MR. THRONSON:  That's right.

20          THE COURT:  So all the professional revenue would have

21  been deprived by the practice, and it was just technical

22  revenue to the hospital for stuff he did there.  Right?

23          MR. THRONSON:  That's right.

24          THE COURT:  And so I'm going to -- Mr. Shaffer, I'm

25  going to give you a chance in a second.  I do have a couple

1    more questions.

2         So one of the issues that does come up in the defense

3    briefing is this question of, you know, patients -- so I don't

4    know what kind of records are kept for -- let me start with

5    this -- records are kept for residents.

6         Is it only if he has -- because that's essentially the

7    Howard example.  Right?  Was it just a residency at Howard?

8    Was there a fellowship also, or was it just a residency?

9         MR. THRONSON:  Just a residency.

10        THE COURT:  So do they chart every time he has, what,

11   a physical encounter with a patient?  I presume they don't

12   chart every time he's, for example, in the room observing, but

13   how do you deal with some of those issues as to people for whom

14   he may have had contact but may not show up on a chart?

15        MR. THRONSON:  To the extent that he had any

16   meaningful involvement in a procedure and treatment of a

17   patient, we think that would have been charted, both for -- if

18   he is in the capacity of, you know, rendering some -- making

19   some clinical judgment, assisting in the care, providing care

20   to these patients, that should be reflected in the chart.

21        THE COURT:  So if he's just there on rounds, right,

22   some attending or some senior resident takes them around on

23   rounds in his first year and he stands there, that's not being

24   recorded anywhere.  Right?

25        MR. THRONSON:  I mean, to the extent -- I do medical

 1   malpractice as another part of my practice.  And to the extent

 2   that residents are -- residents are rounding with physicians,

 3   you typically see that, in my experience, reflected in the

 4   medical records.

 5           THE COURT:  All right.  So Mr. Shaffer -- well, before

 6   I get to Mr. Shaffer, because I think the one last issue that's

 7   out there, you know, is this issue of document retention.

 8           As you go back to, for example, Jersey Shore in

 9   particular, but maybe Howard as well, you know, you may be

10   beyond the point where they've kept records for these patients.

11   Some of the patients may have come back, in which case their

12   charts may still exist.  But how do you deal with the issue of

13   records that are no longer in existence?

14           MR. THRONSON:  You would again look at -- essentially

15   through a -- let me back up.

16           First of all, there is a federal requirement as to

17   record retention.

18           THE COURT:  Right.

19           MR. THRONSON:  But institutions aren't bound by that.

20   So many institutions like Prince George's County Hospital

21   maintain records that went beyond that point.  So, you know,

22   places will still have -- based on our experience in this

23   litigation, will have documentation of a patient being seen

24   there.  So I mean, it's -- this is essentially an objective

25   means of identifying these individuals.  And it may not be 100

1    percent perfect.  It may not capture every single individual.

2    That's theoretically possible.  I have to acknowledge that.

3    But that's always the case.  I mean, you know, in an antitrust

4    case involving price fixing, you know, a pharmacy may not have

5    all of the records of an individual who purchased a certain

6    medication at that place or a group benefit administrator or a

7    hospital that purchased that medication.  But still, the

8    inquiry is whether it's feasible and it's capable of objective

9    ascertainment.  And we think this method is -- that's through

10   this method, yeah.

11        THE COURT:  So Mr. Shaffer, let's talk about that,

12   because what's -- I mean, I understand there is a possibility

13   of some false negatives.  Right?  Because I forgot to note Dr.

14   Akoda on a chart, particularly if he's rounding or documents

15   don't exist anymore, but -- so let's start with the sort of

16   objectivity piece of this.

17        Is there a problem in terms of those criteria from

18   your perspective in terms of identifying these people?

19        MR. SHAFFER:  Your Honor, I think there could be a

20   couple of different problems.  And part of it relates to some

21   of the ways in which even during this hearing they're modifying

22   the entities or the organizations which may or may not be part

23   of any class that they would seek to involve.

24        Certainly with respect to Nigeria, we believe there

25   would have been serious issues there.  They say fine, we didn't

1   mean that.

2          They have a reference to a Harlem Hospital in their

3   briefing where apparently they believe Dr. Akoda practiced at a

4   time.  They didn't mention that today as to whether that's an

5   organization that predated his involvement, his application to

6   ECFMG, but it's in their briefing.

7          The JSMC from 1998 to 2000, that predates the

8   information that they claim our client had that should have put

9   them on notice to do something with respect to Dr. Akoda's

10  certification, which was a report in 2000.  So they've got

11  folks who are in the 1998 to 2000 time period that they are

12  claiming are going to be part of the class that they're going

13  to purport to treat.

14         And then we've got folks from -- assuming 1998 to

15  2000, 2007 to 2011 where they have not gone and identified

16  whether there are records that exist as to folks who would have

17  been treated by Dr. Akoda.  It is more than ten years ago.  The

18  suggestion that billing records will reflect exactly who was

19  there, I think I heard that maybe it would, maybe it wouldn't.

20  You would have to then take billing records and go to medical

21  records.  We don't know what medical records would exist.  We

22  don't know that they would accurately reflect, certainly in a

23  residency program at Howard, whether or not he was there.  I

24  think that's a question.

25         And from our perspective, even the question of going

1    to a hospital and saying, who treated -- who did Dr. Akoda

2    treat, the description that I heard during Mr. Thronson's

3    recitation was sort of three or four different iterations of

4    what constitutes treatment.  And so there is an

5    ascertainability problem to decide whether someone would be

6    sufficiently identified as in the class or out, which is

7    important both for the class members as well as for ECFMG.

8          THE COURT:  Well, it is.  Some of those issues, it

9    seems to me, are issues that are not so much class

10   certification issues as they may be merits issues.

11         So for example, I hear you say, well, Jersey Shore,

12   there's an issue with, you know, this temporal issue, when was

13   your client on notice.  I can anticipate responses from the

14   other side as to what their liability theory is.  But even if I

15   certify the class and say the class is anyone who was treated

16   including at Jersey Shore and then I get to summary judgment

17   and say for whatever reason there's a temporal distinction and,

18   you know, maybe there's a duty that lies post this event and

19   not pre, I can deal with that.  Right?  I mean, it's not

20   really -- that's not really a class issue.  Right?

21         MR. SHAFFER:  I disagree, Your Honor, respectfully.

22   That is a class issue.

23         If you have to decide the question of duty and breach

24   in the context of different factual evidence with respect to

25   the class that they're offering -- and that's what we think

1   happens here with what they're proposing with their liability

2   and damages separation.  They're essentially going to be asking

3   the Court to make different decisions about whether a duty

4   existed, whether that duty was breached, involving individual

5   questions which will change depending on who the plaintiff or

6   the class member is.  And so it may also be a question that

7   summary judgment would decide for a particular plaintiff.  But

8   to decide that issue on a class basis is in our view

9   inconsistent with Rule 23.

10          THE COURT:  As far as the other issues go, you know, I

11   recognize there may be informational gaps.  But I view the

12   requirements on ascertainability as sort of twofold.  Right?

13   There's the question of is it objective or subjective.  I do

14   think it's objective.  Right?  Are they on -- you know, does

15   Akoda appear on the chart or doesn't he.  Right?  It's an

16   objective measure.  It's something that we can figure out.  We

17   can go to the hospitals and say this.

18          I will say, I mean, towards the end of my run in

19   private practice, this was an issue we confronted in a case

20   involving a physician group.  And we had to go to a hospital

21   and say, tell us everyone who these guys treated.  I mean, the

22   hospital griped, but they did it.  And so it strikes me that

23   that piece is okay.

24          Now, then there's the question of are there going to

25   be a whole bunch of false negatives.  Right?  That's

1  essentially what you're telling me is there will be a whole

2  bunch of false negatives because we don't identify them this

3  way because the records aren't there and that renders the class

4  sort of nonascertainable.  Is that's essentially right?

5           MR. SHAFFER:  I think that's one of piece of it, Your

6  Honor.  I guess you could even also have the person who comes

7  forward who says, I'm not in the records, but guess what, I was

8  treated by Dr. Akoda.  I remember the name.  I had a

9  conversation with someone.  I sat in a room, and I'm pretty

10 sure that was the guy who delivered my baby.

11          What do we do with someone like that, who -- again, is

12 that a subjective question and they are excluded?  Do we allow

13 all of those individuals without verification to become class

14 members?

15          THE COURT:  Isn't that true in every class?  I mean,

16 so, you know, hypothesize some antitrust class where it's

17 direct purchasers, so the records are there.  They're in the

18 possession of the defendant.  And then, you know, some third

19 party walks up and says, I bought from them too and they just

20 don't have the record of it.  They lost it.  Right?  I mean,

21 and yet everyone says, well, antitrust cases are particularly

22 well suited to class certification.  Right?

23          And so, you know, I mean, that issue exists and I

24 understand it exists, but it strikes me as sort of marginal.

25 Isn't it?

1          MR. SHAFFER:  I guess, Your Honor, we would view it as

2    not marginal, that it is a problem for the plaintiffs the way

3    they've defined the class.  I think there are much greater,

4    more fundamental problems with what they have proposed to you

5    with their issue class certification.  If you did find that the

6    class was sufficiently ascertainable with modifications from

7    what they drafted in their motion, there are still numerous

8    other problems that we can -- are happy to talk about.

9          THE COURT:  We're going to get to them.  Absolutely.

10          Okay.  All right.  So let's --

11          MR. THRONSON:  Your Honor, could I respond briefly

12    just on one point?

13          THE COURT:  Yeah, go ahead.

14          MR. THRONSON:  So we did include Harlem Hospital in

15    the briefing.  It appears that his involvement at Harlem

16    Hospital predated his application to ECFMG.  And that's, you

17    know, evidence that we've been processing, you know, over the

18    course of this briefing period.

19          So for the purpose of notice, if this were certified,

20    it could be appropriate to include that individual -- you know,

21    to include that institution, but that's probably an issue

22    that's best resolved on summary judgment.

23          And again, with respect to these false negatives, that

24    goes -- you know, in some ways that's more a merits issue and a

25    proof problem rather than a certification issue.

```
 1          THE COURT:  I'm not sure it's easy enough to sort of
 2   sweep it aside and say, well, it can be dealt with at summary
 3   judgment.  You know, Mr. Shaffer's point is not an unfair one
 4   when he says, well, if there are issues that mean that I have
 5   to look at who the plaintiff is and where they were treated --
 6   I guess where she was treated in almost every case here --
 7   individually, then it's not so easy to -- you know, and that
 8   may define liability, then doesn't that seem to undermine some
 9   of the commonality issues that we would have for certification
10   even with an issue class?
11          And so I do think one of the things we need to do now,
12   not even at notice but now, is define whether it's temporally
13   or whether it's by institution.  And those two things may
14   effectively be the same thing here.  I think I need to define
15   who you think is in the class.  And I mean, we can do it by
16   year if you want to talk about it by year.  And I can hear from
17   Mr. Shaffer what problems he sees that posing.  Or we can do it
18   by institution.  But one way or another, I do think I need some
19   objective measure of who's in the class.  And I don't think I
20   can punt that issue to later to decide it if I'm going to
21   certify it.
22          I think -- and I'm jumping ahead on my outline, but
23   that's okay -- if I were to certify a class here -- and don't
24   read this as tea leaves saying that I'm going to.  But one of
25   the issues that I spotted is if I certify a class here, it is
```

1  ultimately a (b)(3) class.  Right?  Does everybody agree with

2  that?

3          MR. THRONSON:  In -- I think in part, Your Honor,

4  because --

5          THE COURT:  I mean, I understand there may be sort

6  of -- I understand I can tackle (c)(4) and define the issues

7  that I'm certifying, but in the end -- the reason I'm saying

8  that, isn't there going to be a notice of an opt-out period if

9  I certify some sort of class?

10         MR. THRONSON:  I think if the class is -- the case law

11  is a little unclear on (c)(4) notice.  But I would agree, we

12  would agree that in essence, it's a (b)(3) class.

13         I mean, in the sense that (b)(3) classes in most

14  instances are in some respects (c)(4) classes, because it's --

15  they're certifying on the issue of liability and they're not

16  determining damages on a classwide basis.

17         THE COURT:  That's not always true.

18         MR. THRONSON:  What's that?

19         THE COURT:  That's not always true.

20         MR. THRONSON:  Not always true.  Not always true.  But

21  in this context, it's essentially a (b)(3) class in terms of if

22  we're certifying on the issue of liability.

23         Now, if we're certifying on a threshold issue like did

24  ECFMG owe a duty to the class members, did it owe a duty to

25  hospitals and healthcare institutions or medical boards that --

 1   to which it gave rise to obligations to the class members,

 2   those threshold issues that we proposed a number of them in the

 3   brief, then that -- that's more of a true (c)(4) class.  But I

 4   think Your Honor is correct.

 5          THE COURT:  But even if it's a true (c)(4) class, I

 6   mean, don't I still -- so --

 7          MR. THRONSON:  Yeah.  We still do notice and an

 8   opt-out period.

 9          THE COURT:  We still do notice and an opt-out period.

10   Right?

11          MR. THRONSON:  Yep.

12          THE COURT:  So given that and given the need to

13   identify the universe of people who are going to get notice, I

14   think we need to identify the institutions who are going to be

15   subject to presumably some sort of subpoena and, you know,

16   information retrieval process even to tackle the question of

17   defining a class.

18          MR. THRONSON:  I agree, Your Honor.  And I think that

19   the class definition, you know, to be crystal clear, could

20   clarify that we're only talking about patients within the

21   United States and we're only talking about patients who were --

22   you know, who encountered Akoda after ECFMG certified him, you

23   know, so from that point forward.  And that involves the

24   various institutions that we've talked about.

25          THE COURT:  Okay.  So it does not include Harlem?

1            MR. THRONSON:  No, it would not include Harlem.

2            THE COURT:  So we started to touch on this a little

3    bit.  And I guess one of my questions for you all is sort of

4    the interplay between Rule 23(a) and (b) on the one hand and

5    23(c)(4) on the other hand and in particular how you sort of

6    conceive of -- when do I tackle the 23(a) and -- really the

7    23(a) factors in the first instance?  I mean, and maybe the

8    (b)(3) factors and sort of do I have to decide the case as a

9    whole can be certified as a class and then define the issues,

10   or do I define the issues that I want to certify if I'm going

11   to do that and then apply the 23(a) factors to that sort of

12   universe as defined by those issues?

13           And so let me hear -- I'll start with the plaintiffs

14   and then I'll hear from the defense as to -- because I think

15   you have different views on how that works.

16           MR. THRONSON:  Your Honor, it's the latter in our

17   view, meaning defining the issues and then determining whether,

18   you know, predominance and superiority are satisfied with

19   respect to those issues.  23(a), that applies regardless.

20           THE COURT:  But 23(a) might be -- can 23(a) be

21   different?  Can the analysis be different if I'm defining the

22   issue first?  I mean, I know I'm going to find, you know,

23   that -- the 23(a) factors somewhere along the way if I do the

24   analysis.  I'm going to analyze them.

25           But so, for example, the defense has a bunch of

1    arguments about typicality and says, well, you know, the type

2    of encounter he had is significant here.  And so if I'm doing

3    the 23(a) analysis first, then that may be different and have a

4    different outcome, right, than if I'm doing it after defining

5    an issue now.  I mean, if I just say liability, it may not.

6    But if I do something narrower, then it may.  Right?

7         MR. THRONSON:  The -- I think in this case, in this

8    case not, because the issue here is -- you know, typicality

9    analysis is do the claims of the plaintiffs conflict with that

10   of the -- you know, the class members.  And, you know, can this

11   action be efficiently maintained as a class action given these

12   representative plaintiffs.  And do these plaintiffs have -- you

13   know, are they asserting claims that are typical of those of

14   the class.  Do they arise from, you know, common course of

15   conduct.

16        So I think in either event, whether you -- I guess you

17   would first look at the class definition that we're proposing

18   and the -- or that we develop and the issues that we are

19   proposing for certification, and then, you know, would go

20   through those (a)(3) factors.  But I think in either event with

21   respect to (a), the analysis is the same.

22        With respect to the interplay between (b)(3) and

23   (c)(4), I think the advisory committee on civil rules and the

24   most recent decisions -- circuit decision to analyze this

25   issue, which was Martin v. Behr.  In the Sixth Circuit, they've

1    essentially concluded that this circuit split is illusory.  And

2    the advisory committee at one point was considering, well, do

3    we need to clarify (c)(4) to address this issue, you know,

4    whether -- whether predominance and superiority have to apply

5    to the case as a whole or just to the issues within -- that are

6    defined for classwide treatment.

7         And their conclusion was that it didn't need any

8    modification, because the circuits had come into alignment with

9    respect to the predominance and superiority applying only to

10   those issues that are certified for classwide treatment as

11   opposed to needing to apply to the case as a whole.

12        In other words, Castano has been -- Castano is in the

13   past.

14        THE COURT:  Really, for me, it seems like on that last

15   point, the thing that -- I mean, I don't know that I know the

16   temporal answer, but, I mean, the Third Circuit identified that

17   split and then said we're not going either way.  Right?  That's

18   Gates.  Gates is still binding on me.  Regardless of what the

19   Sixth Circuit thinks or the advisory committee thinks, I live

20   under Gates and have to do that.  Right?  So that's sort of the

21   structure of the analysis here.

22        MR. THRONSON:  That's correct, Your Honor.

23        So if -- in terms of a (b)(3) type certification on

24   liability, you know, you would -- you know, either with that --

25   with that kind of certification or with issue certification,

1  you're looking at those factors, the Gates factors, with

2  respect to the issues in question.

3       And it doesn't really -- you know, I guess in Gates,

4  this issue doesn't really arise, because the Third Circuit has

5  taken the position of we're going to apply what's been termed a

6  functional superiority like analysis to this question rather

7  than getting way into the weeds of the interplay of how these

8  two provisions apply.

9       THE COURT:  I mean, I view Gates as essentially

10 imposing a bunch of factors that kind of capture the 23(b)(3)

11 analysis.  Right?  There's a lot of 23(b)(3) in there and then

12 maybe some more issues as well.  Right?

13      So I'm kind of doing a predominance, superiority,

14 almost like a superiority plus analysis is kind of how I

15 conceive of it.  Right?  I have to make sure it's a superior

16 way to go, but I also have to make sure that there aren't

17 issues floating around like constitutional problems and, you

18 know, choice of law problems and things like that that may

19 also -- and I understand choice of law can also come in in a,

20 you know, predominance choice -- or analysis.

21      But that's how I conceive of Gates.  So it's something

22 different.  I don't want to say it's more rigorous than (b)(3).

23 It may or may not be, but it's a little different is how I see

24 it.

25      So okay.  Let me --

1          MR. SHAFFER:  May I address --

2          THE COURT:  That's what I was going to ask, Mr.

3   Shaffer.  I want to give you a chance to talk about this before

4   I move to the sort of next thing on my list.

5          MR. SHAFFER:  Thank you, Your Honor.

6          Our view, and I think it is guided by the Third

7   Circuit's analysis in Gates and by the cases from this circuit,

8   Arch and Suboxone that are cited in our briefing, as well as a

9   decision from Judge Jordan back in December of this year,

10  Ferreras v. American Airlines, which came out after our

11  briefing.  That is 946 F.3d 178.  And the Third Circuit in that

12  case in reversing a district court's certification noted that

13  prior to certifying a class, a court must resolve every dispute

14  that is relevant to class certification before doing so.  And

15  I'm sure Your Honor is aware of that standard.  And Gates

16  similarly notes that you can't certify an issue class without

17  clearly enumerating the issues to be tried on the class basis

18  and explaining how remaining issues will be resolved.

19         And so it's not only that you can leave for another

20  day things that might not be tried in the issue class, but that

21  as part of any certification decision, the Court needs to

22  analyze whether, for example, problems of 23(a) or the

23  subsections of 23(b), including (b)(3), is analyzed through the

24  Gates factors whether or not they present a problem.  And in

25  our view, the way it's articulated here, there are problems

1    presented under 23(a), under the two alternatives, which in our

2    view are really just the same liability division that the

3    plaintiffs are arguing for.

4              23(c)(4) is a cleanup authority for the Court.  It

5    allows the Court to deal with permutations.  But as I think

6    Your Honor correctly noted, the way Gates analyzed the issue,

7    it certainly rejected Gunnells and the Fourth Circuit case

8    cited by the plaintiffs that there is not a superiority and a

9    predominance analysis as part of a (c)(4) class.  And we think

10   those are requirements that the Court needs to address.

11             THE COURT:  So do I look at the 23(a) factors sort of

12   colored by what I might do with the issues class?  Or do I have

13   to look at them for a case as a whole?  I mean, to the extent

14   there are distinctions, and there may be, what's your view on

15   that?

16             Because I don't -- well, let me say this:  I don't

17   think that Gates tackles that.  I do think that -- my

18   recollection is -- and maybe I'm going to get this name a

19   little off.  Hohider, was that the one that predated Gates in

20   the Third Circuit?

21             MR. SHAFFER:  Hohider.

22             THE COURT:  Yeah.  I think Hohider does seem to say

23   (a) and (b) kind of factor into this analysis.  And you would

24   look at both the (a) factors and the (b) factors with regard to

25   what you're considering, sort of what the issue you're

1    considering certifying.

2         MR. SHAFFER:  We think that's generally correct.  And

3    it probably can be done through several different lenses.  And

4    maybe even the Gates factors themselves allow you to think

5    about questions of commonality or typicality as you're

6    analyzing the questions that are presented.  They're

7    non-exhaustive factors.  And they specifically offer guidance

8    in an issues class like we have proposed here.

9         And I think the reason sort of logically why that

10   makes sense is otherwise plaintiffs could simply offer the

11   narrowest question for class treatment and say, well,

12   they're -- you know, typicality, commonality, numerosity are

13   satisfied as to this very, very narrow question, and Judge, you

14   don't -- you shouldn't look at anything else.  You shouldn't

15   look at the rest of the case and whether there are 23(a)

16   problems associated with that.  The Third Circuit I think would

17   reject that type of approach.

18        THE COURT:  I think as a practical matter -- and I

19   understand.  I think as a practical matter the Gates factors

20   kind of negate that possibility, personally.  I think that -- I

21   understand why it's a concern as I came into this and sort of

22   focus on the interplay of these sections.  And I understood the

23   argument about, well, you don't want to just sort of use the

24   issue class to define away the potential predominance problems

25   that are out there.  And I see that, and I think the Gates

1   factors kind of guide me in a way to say, no, look, I have to

2   look at the rest of this.  I have to look at the overlap

3   between what I'm putting in and out.  And, you know, is it kind

4   of proof, kind of witnesses, things like that, because that all

5   goes to manageability and efficiency as well.  I mean,

6   ultimately, if I'm doing this, it's because it's efficient.  I

7   mean, at some level that's -- I mean, I don't know if that word

8   is specifically in Gates, but it's sort of the guide star here

9   for why we would even consider doing this in the first place.

10          MR. SHAFFER:  And just to conclude on that, Your

11  Honor, I guess to the extent that Your Honor views the Gates

12  factors as providing a framework to look at the 23(a) factors

13  or the other 23(b) factors and is addressing those, as you say,

14  I don't think the Third Circuit has been crystal clear as to,

15  you know, you can only do it through marching through 23(a)

16  numerosity, typicality, commonality, adequacy of

17  representation, but certainly the substance of the analysis

18  must occur.

19          THE COURT:  Right.  I agree with that.

20          Okay.  I actually don't think -- listening to the two

21  of you, I understand you're different in where you want me to

22  go, but your sort of conceptual approach to how this gets

23  applied is actually not that far apart, so I'll chalk that up

24  as a win for me.

25          Okay.  So let me talk about the sort of two different

1  alternatives that you proposed here.  And let me start with

2  the -- sort of the broader version, which is option A I guess

3  you describe it as, this sort of full-fledged liability class.

4       And so cards on the table, I see problems with that.

5  Okay.  And let me tell you what they are and let you address

6  them.

7       You know, both of your claims include elements of

8  causation and harm.  And I see a problem potentially with the

9  overlap between that and the damages issue.  Right?  Isn't the

10  evidence of harm, which is an element of liability, basically

11  the same evidence of damages?

12       MR. THRONSON:  What we're proposing, Your Honor, is

13  that -- that obviously the questions of duty and breach be

14  addressed in a classwide basis.

15       And then with respect to harm, I think that there

16  is -- the relevant inquiry is whether there's an injury.  And

17  an injury is an invasion of a legally protected interest.  And

18  so here what we're proposing to determine on a classwide basis

19  is did ECFMG have a duty, you know, on all theories of

20  liability, did breach that duty on all theories of liability,

21  and was its conduct a cause of Akoda coming into contact with

22  patients, did it put him in the room with a patient, because

23  the injury here is unconsented to touching and medical

24  treatment.  That's the injury.  It's a battery.  It's, you

25  know, unconsented to treatment by a physician.

1            Now, the harm from that, the harm and the damages,

2    that's going to be determined in individualized proceedings.

3    So did that actually, you know, harm an individual class

4    member, meaning did the individual class member suffer damages

5    in some respect, and are those compensable.

6            So essentially that -- the causation inquiry doesn't

7    overlap in that sense, because the evidence that will be

8    presented in the individualized proceedings is what happened

9    with Akoda in that room.  It's already been concluded by the

10   first jury, assuming that we would succeed at the classwide

11   basis on the first class trial, that ECFMG was negligent and

12   that that caused Akoda to be in a position to cause harm to

13   these patients.  And it caused Akoda to cause an injury in

14   terms of an invasion of this legally protected interest that

15   we're talking about.

16           Now, this individualized proceeding, it's -- that's

17   the opportunity for the plaintiffs to come forward and say,

18   well, you know, did you actually see Akoda?  What happened?

19   Did you suffer emotional distress?  Is that emotional distress

20   traceable to this?  So in that sense the proof doesn't overlap.

21           THE COURT:  So I'm sorry, you said something now

22   that's going to make me go back.  But you talked about, you

23   know, the need to have come in contact with Akoda, right, that

24   it's essentially some sort of unauthorized touching.

25           And I guess that gives me some pause, because I see at

1   least two patterns where there's no touching within the

2   universe of people who you're defining as being within the

3   class.

4          So the first are, you know, you go back to the

5   rounding.  Right?  And there's, you know, some number of people

6   for whom he's just standing there.  Right?  He doesn't come in

7   contact with any of them.  So there's no battery, I don't

8   think.

9          MR. THRONSON:  That could be true in some instances,

10   that there's no battery.  But there are other -- there are

11   other interests at stake.  So, you know, was this patient --

12   was this patient naked?  Did ECFMG's negligence put Akoda in a

13   position where there's an invasion of privacy?

14          THE COURT:  But now you have a different harm.

15          MR. THRONSON:  Well, you've got -- you still have

16   injury.  So the question in the class proceeding is, is there

17   injury to patients in the form of invasion -- you know, this

18   battery that we're talking about, or, you know, an invasion of

19   privacy in terms of --

20          THE COURT:  But if those are different -- so if the

21   outcome is, you know, duty, breach, causes a battery, duty,

22   breach, causes an invasion of privacy, if those are different,

23   then doesn't that mean that potentially that last element is

24   not -- or maybe the last two elements are not susceptible to

25   classwide treatment, that we have to decide how they were

1    harmed, and isn't that an individual question?

2          MR. THRONSON:  I think, Your Honor, that it's -- the

3    classwide question is, was Akoda put in the room with patients,

4    was he put in the position to examine patients, to treat

5    patients, to touch them.

6          If -- to the extent that there are differing injuries

7    in this respect, you know, in terms of observation, then that

8    can be an issue that's addressed by subclasses.

9          THE COURT:  So let me ask a question.  If he's put in

10   the room, so he's just standing there before anything happens,

11   is the tort complete?

12         MR. THRONSON:  I think in some cases it would be.

13         THE COURT:  But not all cases?

14         MR. THRONSON:  Right.  Because just like with any --

15   with any class action, you know, you've got people who aren't

16   injured, who don't suffer any kind of injury as a result -- who

17   don't suffer any kind of harm as a result of it.

18         THE COURT:  But if they don't suffer a harm, I mean,

19   then how can I determine liability on a classwide basis for a

20   claim where one of the elements is harm?

21         MR. THRONSON:  So our allegation is that the tort --

22   the tort is complete when he's in the room, because there is

23   some invasion of a legally protected interest there.  There's a

24   touching, there's an observation of the person.  The person

25   didn't consent to an individual who is not a physician, who is

1  not a resident, who's obtained those qualifications through

2  fraud, the individual didn't consent to that person being

3  there.

4       THE COURT:  So let me just go back because I'm a

5  little concerned now on one of the other aspects of class

6  definition, which is the scenario where, you know, in the

7  private practice he meets with a patient but does not touch,

8  observe, et cetera.

9       So, you know, I'm hypothesizing, for example, you

10  know, someone who is pregnant and has a concern, comes in and

11  just sits in the room with him, maybe he's the guy there that

12  day.  Right?  And she comes in and they squeeze her in in an

13  emergency appointment.  And he sits in the room, in the office

14  with her across a desk and says, everything is normal, someone

15  did a sonogram, whatever it is, everything is normal, you're

16  fine, I understand it's nerve wracking, go home.

17       Is there a tort there in your world?

18       MR. THRONSON:  Yes.

19       THE COURT:  What's the harm then?

20       MR. THRONSON:  It's an invasion of privacy.  This

21  person disclosed confidential protected health information on

22  the basis of a fraud committed by this other person.  And Akoda

23  shouldn't have been there.  That's the whole crux of our case.

24  If ECFMG had done its job, Akoda shouldn't be there.

25       So the nature of the harm and damages is going to

 1  differ, but there is a common injury in the sense that

 2  regardless of the purpose of whether he's, you know --

 3  regardless of the nature of his examination and treatment,

 4  being in the room gives him access to confidential health

 5  information of the patients.

 6          THE COURT:  Okay.  I'm going to give you a chance to

 7  respond, Mr. Shaffer, and then I have a different sort of

 8  liability class issue for you -- question for you as well.

 9          MR. SHAFFER:  Thank you, Your Honor.

10          I think your questions illustrate that what they are

11  trying to do, even with their issue class, presents the very

12  unworkable problem that the questions that they are trying to

13  carve out and say, well, these are common and can be addressed

14  without getting into individualized questions, we'll save those

15  for a later day, are involving the exact same evidence that are

16  going to go into whether there was an issue for an individual

17  person.

18          I mean, we didn't even talk about the fact that the

19  emotional distress that I understood that the plaintiffs were

20  trying to recover wasn't suffered the day they went in and met

21  with Dr. Akoda in this hypothetical meeting.  It was sometime

22  after 2016 when he pled guilty to Social Security fraud and

23  that was an event later on that may or may not have triggered

24  damage or a reaction, if they even heard about it, that is

25  necessary for their claim to begin with.

 1          And so I think there are problems from a liability

 2   perspective whether they want to try to identify it as a

 3   liability-only question or whether they want to try to carve it

 4   up into duty and breach.  And I'm happy to talk about that as

 5   well.

 6          THE COURT:  We're going to talk about that in a

 7   second.

 8          So let me ask, I think this is a sort of a logical

 9   place to touch on some of the choice of law issues that you

10   raised as well.

11          Do I have to resolve the choice of law issues before I

12   certify the class, or can I sort of do it later?

13          And let me rephrase that.  Do I have to resolve them?

14   I mean, given sort of what you read to me and I think I saw in

15   the case that Judge Jordan handed down, where he says I've got

16   to resolve threshold issues if I'm going to certify a class, do

17   I just resolve it at this stage of the proceedings, or do I

18   have to say, well, because it's out there, it's a problem?

19          And just -- I know you want to answer.  I'm just going

20   to put one more little piece on this, which is, is the choice

21   really that significant from a class standpoint, because isn't

22   it really either Pennsylvania or Maryland law applies?  Or I

23   mean, I guess maybe there's a New Jersey possibility with

24   Jersey Shore, but otherwise, isn't it those two states?

25          MR. SHAFFER:  Let me take a couple of the questions

1    that you asked in order.

2            THE COURT:  Yeah.

3            MR. SHAFFER:  First of all, what is crystal clear is

4    that you cannot punt the choice of law issues and say, I don't

5    need to confront differences in choice of law; I don't need to

6    decide whether there are conflicts in choices of law and

7    certify a class at this stage.  That's not --

8            THE COURT:  Can't I say, look, I don't know which law

9    applies but it's going to be a state's law, and so therefore,

10   the claims will be common, without actually saying for certain

11   which state's law it is because maybe I want more factual

12   development on that?

13           MR. SHAFFER:  I don't think so in a class context,

14   Your Honor.  If you're going to certify a class -- I know Your

15   Honor had the Sheridan case recently where you were able to

16   defer the choice of law analysis for a more complete record.

17           I don't believe Rule 23, especially in the context of

18   looking at manageability, conflicts, triability of the case,

19   that you can -- that you have the luxury of that type of

20   approach in this case.  And I don't think it is clear that

21   there could only be two or three choices of law.

22           Pennsylvania's choice of law analysis is flexible.  We

23   have plaintiffs who are residents of Virginia, the District,

24   Maryland.  We have New Jersey.  We have Pennsylvania.

25           THE COURT:  So the way you characterize it in the

1  brief, and I think correctly, is to say, look, Pennsylvania

2  says you look at the state that has the most significant

3  interest in regulating this.  And the argument you make is,

4  well, Maryland has an interest in regulating the contact that

5  people who are seeing a doctor in Maryland have, you know, with

6  that doctor.

7          So even if -- I mean, let's assume I accept that

8  analysis.  It brings me, I guess, to the people in New Jersey

9  at Jersey Shore are subject to New Jersey law.  The people at

10 Prince George's and the private practice who are all seen in

11 Maryland are subject to Maryland law.  The people who are seen

12 at Howard are all subject to DC law.  Right?  But that should

13 be it, if that's the most significant interest test.  Right?

14 The fact that someone lives in Virginia doesn't bring Virginia

15 law into play.  Right?  Otherwise, I don't know how the most

16 significant interest test that you articulated works.

17         MR. SHAFFER:  I think that's probably right, Your

18 Honor.  You could, I suppose, have an individual plaintiff who

19 would argue that their choice of law analysis is different than

20 that.  But at a minimum, I agree with you that you're looking

21 at at least four subclasses for different choices of law if

22 you're going to adopt the proposition that there are -- that

23 the choice of law analysis is not a problem, because you're

24 going to have to analyze the question of whether, for example,

25 a negligent infliction of emotional distress claim even exists

1    under Maryland law.

2         THE COURT:  Or I could just look at those four states

3    and conclude their laws aren't meaningfully different and then

4    certify the class.  Right?  I'm not saying I've done that, but

5    if that's where that comes out, then I could do that.  Right?

6    Or potentially two subclasses if two states go one way and two

7    states go a different way or something like that.

8         MR. SHAFFER:  Obviously the choice of law analysis

9    will drive how many different laws are applied.  We certainly

10   think that there are conflicts here.  The false conflict

11   suggestion that the plaintiffs made certainly isn't true with

12   respect to Pennsylvania and Maryland.  And so I guess from our

13   perspective, we don't think the outcome of that choice of law

14   analysis would remove the problems that are presented by it,

15   but it would certainly have to be done.

16        THE COURT:  So, I mean, that answers one of my

17   questions, because I was concerned about, you know, the

18   hypothetical where, for example, someone has moved to Colorado

19   and would say Colorado law applies even though they were

20   treated in Maryland, but I don't think that's where we are.

21        So I think what I have to do to figure out -- I mean,

22   the words of the test sort of speak to it.  Right?  Which state

23   has the most significant interest.  And you say to me, well,

24   Maryland has got an interest, and maybe that's right, but you

25   haven't really weighed it against Pennsylvania's interest.

1    Right?  So Pennsylvania's interest is an entity.  It's

2    Pennsylvania.  It's Pennsylvania law.  Its actions occur in

3    Pennsylvania.  That's all of the actions that the plaintiffs

4    posit that give rise to the claim that are performed by that

5    entity take place in Pennsylvania.  Why doesn't Pennsylvania

6    have an interest that's at least as great as Maryland?  And if

7    Pennsylvania's interest is, you know, sort of the proverbial

8    balancing scales, that they're equal, why don't I apply

9    Pennsylvania?

10            MR. SHAFFER:  I guess, Your Honor, which plaintiff?

11   Right?  If we're talking about a named plaintiff who lives in

12   the District of Columbia who was seen at Howard County in

13   Maryland by -- with respect to a birth given in Maryland who

14   filed suit in Pennsylvania against a Pennsylvania company,

15   that's one choice of law analysis.  If you have a Maryland

16   resident with a Maryland injury, a Maryland birth at Howard

17   County and the only connection to Pennsylvania is that in this

18   case they've sued a Pennsylvania defendant, I think the choice

19   of law analysis that we cited would say Maryland has a greater

20   interest in regulating whether physicians, including those like

21   Dr. Akoda, can practice medicine in Maryland, what the standard

22   is going to be for a negligent infliction of emotional distress

23   claim in the context of the scenarios that the plaintiffs are

24   positing, there absolutely could be a greater interest on the

25   part of Maryland in defining the contours of what claim exists.

 1          THE COURT:  So one of the things I find a little

 2     strange about this is if there's a woman who was seen either in

 3     the District of Columbia at Howard or in Maryland at Prince

 4     George's County, I mean, that's a small area with a lot of

 5     state boundaries nearby.  And so, you know, if you have, for

 6     example, a woman who -- I'm going to sort of lay out one

 7     variation of the hypothetical.  But who lives in Virginia and

 8     gave birth at Howard and was treated by -- you know, seen Dr.

 9     Akoda potentially as a resident or whatever, under the -- and

10     then she doesn't know anything about it until 2016 when she

11     was sort of -- until which she was sort of blissfully ignorant

12     and was living in Virginia with her kids and now she finds out

13     about it, says, this is horrible, right, I'm distressed.

14          So in that world, the ECFMG conduct takes place in

15     Pennsylvania.  Right?  And the -- I guess the plaintiff's

16     theory is that the harm arises in DC but the damages arise in

17     Virginia.  And it seems strange to me that for the most part,

18     none of the -- I mean, I don't know if I agree with your

19     conception.  And if I don't, then none of the elements of the

20     tort took place in DC, but you're still saying DC law would

21     apply.  And in their conception I guess one of the elements of

22     the tort took place in DC.  But it seems an odd outcome in some

23     respects to me that you could have this possibility where none

24     of the elements take place in the jurisdiction whose law you

25     think should apply.

1         MR. SHAFFER:  I guess the problem is you have to

2    choose a choice of law.

3         THE COURT:  But I could choose Pennsylvania, and in

4    Pennsylvania there's no doubt that some of the actions took

5    place for everybody.  Right?  I mean some of what happened at

6    issue in the case is ECFMG's conduct.

7         MR. SHAFFER:  So if this were a single plaintiff case

8    and that -- we had the scenario you articulated, which creates

9    problems, DC, Virginia, Pennsylvania, maybe they now move to

10   Colorado --

11        THE COURT:  Right.

12        MR. SHAFFER:  -- you could make an individualized

13   choice of law determination for that plaintiff and their

14   situation and their harm, and you could decide, there's nothing

15   really good here.  Pennsylvania seems to me to be the best and

16   it has the most interest.

17        We have a punitive class with individuals who will

18   have varying different analyses that have to be applied.  And

19   so from our perspective on a class basis to simply say, well,

20   because some class members might have no really good connection

21   to Maryland, so I'll just pick Pennsylvania, we would think

22   that would not be consistent with your obligations.

23        MR. THRONSON:  Just a brief response, Your Honor.

24        Courts, as you know, certify nationwide classes.  And

25   they certify, for instance, in the Warfarin case, the Court

1   noted, the Third Circuit:  When a defendant's singular conduct

2   gives rise to one cause of action in one state while providing

3   for a different cause of action in another state, the courts

4   may group both claims in a single class action.

5           And what courts do is they group relevant laws, you

6   know, similar laws together and apply them to the claims at

7   issue.

8           So here, as we talked about in our brief, we think

9   it's pretty clear that Pennsylvania law applies.  Defendants

10  haven't identified any relevant distinction on the negligence

11  claim.  Right?  Their only distinctions that they're raising

12  are on the negligent infliction of emotional distress claim.

13  So there's been no conflict that's been identified as to

14  negligence itself.

15          Moreover, you know, under Maryland law, you can't have

16  negligence that gives rise to emotional distress, as I

17  mentioned, in the absence of physical injury.  So we don't

18  think this is an issue under the case law or the facts of this

19  case that precludes class certification.

20          THE COURT:  Let me shift gears and focus on sort of

21  the option B prospects here for some narrower issues.  And I

22  mean, I'm -- I remain sort of dubious on the notion of any kind

23  of causation or harm issues being certified.  But let me talk

24  about the sort of duty and breach issues.  And let me start

25  with this.

```
 1          I didn't see a lot, I don't think, in the briefs about

 2   this, but I have seen some -- in some of what I've read about

 3   it.  And maybe this has been resolved and I just missed it,

 4   it's been resolved already.

 5          But is there a constitutional problem under the 7th

 6   Amendment if I allow some elements of the negligence claim to

 7   be tried on a classwide basis and then have other elements

 8   tried individually?

 9          MR. THRONSON:  No, Your Honor.

10          THE COURT:  No?

11          You think yes?

12          MR. SHAFFER:  Absolutely could be, Your Honor.

13          THE COURT:  If there's overlap in the proofs; is that

14   right?

15          MR. SHAFFER:  Correct.  And there most certainly will

16   be.

17          THE COURT:  Well, let's get to that.

18          So let me sort of focus on sort of the duty and breach

19   elements, okay, because that's where I see the stronger

20   arguments here for certification.

21          It seems like from my perspective -- and, you know,

22   so, Mr. Shaffer, you can tell me why you think I'm wrong.  It

23   seems like the duty and breach analyses are sort of based on

24   the law, whichever law I determine is applicable.  And then as

25   a matter of law I decide if there's a duty.  And there's a
```

1    question about breach, but the breach is really about what
2    ECFMG did.  It's not about what any plaintiff did.  So why
3    aren't those issues subject to common proof?
4         MR. SHAFFER:  I think the simplest answer is that in
5    order to determine duty, whether it's a question of law for the
6    Court or it's an application of factual information to the law
7    to determine the existence of the duty, it's not a simple, does
8    ECFMG owe a duty to members of the public.  Duty is a
9    multifactorial analysis that the Court applies.  And the number
10   one factor that is part of that duty question is
11   foreseeability, and it's foreseeability of harm to the
12   plaintiff in a particular situation.  And your questions
13   earlier about harm highlight the very different nature of the
14   analysis that could occur with this particular case.
15        The other factors that go into duty, the degree of
16   certainty the plaintiff suffered the injury.  So the fact of
17   injury is relevant not only to causation but also to duty.  And
18   then another is the closeness of the connection between the
19   defendant's conduct and the injury suffered.
20        You know, we think of this as a Palsgraf or a
21   causation and remoteness context, which I think Your Honor has
22   pointed out, but the connection and the analysis of whether a
23   duty exists is highly individualized to look at a particular
24   plaintiff.  And --
25        THE COURT:  Why?

1          MR. SHAFFER:  We could look at two particular examples

2     here to perhaps think of a scenario.

3          Under the timeline that we have here, we could have a

4     question of whether someone who was seen at JMSC (sic) in 1998,

5     so a year after ECFMG had let the person through, no one else

6     had done anything, there is a person who's treated there, did

7     they owe that person a duty on the first day at JMSC not to

8     have certified Dr. Akoda, a legal duty that could result in

9     harm.

10          Then let's take a plaintiff like one of the named

11     plaintiffs here who wasn't seen until 2016 or 2017, after Dr.

12     Akoda had been hired by six, seven different entities, had been

13     subjected to licensing, to board certification, had been

14     through multiple employers, had been hired, had been fired, had

15     been hired by new individuals, whether they might have looked

16     at him.

17          And the question of whether ECFMG owes a duty to that

18     person in 2016 may be a different question.  We think there's

19     no duty in either respect, but there could be and there is a

20     different factual analysis that Your Honor has to address to

21     decide whether the duty that exists on January 1, 1998 is the

22     same as the duty in 2016.

23          THE COURT:  Why isn't that a causation argument?

24          MR. SHAFFER:  It's both.

25          THE COURT:  But it feels like you're blurring the two

1    elements then of the claim.

2        MR. SHAFFER:  The reason it's distinct is that

3    foreseeability is a requirement of duty.  It's a crux of duty.

4        THE COURT:  So foreseeability, as I understand it, is

5    a requirement both of duty and of causation.  But I think they

6    are different -- although the word is the same, I think they

7    are different foreseeability analyses.

8        As I -- and again, I'm going to have to go back and

9    read more on this, but as I at least understand it as I come in

10   here today, the foreseeability for the duty is, you know, sort

11   of analyzing whether the risk is there, whether you have

12   created a risk, versus the foreseeability for causation, which

13   is more -- you know, was the harm something you expected to

14   have happen.  And I think there's a distinction there.  And

15   maybe it's subtle, but I think at least in this context it's

16   important.

17       MR. SHAFFER:  I'll agree with you that there is a

18   distinction.  And I guess the way we have thought about it

19   here, it is a different foreseeability question.

20       So the question on the causation side really is, like

21   a Palsgraf, is it foreseeable that someone would read a report

22   from a US attorney's guilty plea about a Social Security fraud

23   and suffer injury related to some alleged conduct in 1996.

24   That's a causation/remoteness problem.

25       Here, even on duty, I guess the foreseeability

1   question is whether it was foreseeable that ECFMG's alleged

2   actions in 1996 after -- would have nonetheless placed the

3   plaintiff in 2016 after having been hired, fired, subject to

4   what everyone would expect an employer would do, what everyone

5   would expect a licensing board to do, what everyone would

6   expect a state to do before allowing that person to practice

7   medicine, whether those intervening steps, whether the

8   foreseeability of the harm to the plaintiff in 2016 because of

9   the degree of certainty, all of those separate acts, reviews,

10  obligations, many of which they have alleged in other cases,

11  are negligence on the part of those folks, whether those things

12  change the analysis on an individual basis for class members.

13  And if the answer is yes, then duty isn't a common question.

14  It still has individualized questions about who that plaintiff

15  is.

16          THE COURT:  Let me just break down two things.

17          I understand the argument about the individualized

18  issues.  I don't know whether I agree or disagree at this

19  point.  I'm still trying to figure it out.  But I understand

20  the argument.

21          I don't think from what you're telling me, and given

22  that the foreseeability analysis is different than it is for

23  the causation element, I don't think there's a common proof

24  problem as to that issue in terms of the sort of 7th Amendment

25  concern that I was articulating a couple minutes ago.  I think

1    the proofs are going to be different.  Right?  I'm going to ask

2    the jury at the duty and breach stage to evaluate one thing.

3    I'm going to ask the jury at the causation and damages phase to

4    answer something different.

5         MR. SHAFFER:  I guess I would -- A, we don't have a

6    trial plan to know whether or not what evidence would be

7    presented would be the same or different.  Given one of the

8    factors is the degree of certainty the plaintiff suffered the

9    injury, there absolutely would be a likelihood that the same

10   type of testimony that they're going to offer about a

11   particular plaintiff's interactions in the first phase is going

12   to be the exact same testimony they're going to offer in the

13   second phase.  And that's especially true I think in the

14   emotional distress context, where Spence kind of identified

15   this problem with, you know, an attempt to address certain

16   issues of duty and breach in the first phase and then damages

17   in the second phase and said they're interwoven.

18        And so we think given the nature of the claim here,

19   could I conceive of a case, for example, where it's, you know,

20   a mailing of some kind and there's no third parties and no

21   difference and everybody got it on the exact same day.  Maybe

22   Your Honor is correct in that scenario you don't have the

23   problem, but it is present here.

24        THE COURT:  So tell me what differences the plaintiff

25   sees in terms of sort of the foreseeability piece here.  I

1  mean, first off, tell me about it from -- the distinctions you

2  see in terms of the proof that would be presented as to duty

3  and breach versus harm and causation and then more generally

4  whether -- how you see the duty issues playing out classwide if

5  you think they can be done that way.

6        MR. THRONSON:  Your Honor, we see the evidence being

7  presented in the two stages as distinct.

8        The first stage would focus on ECFMG's conduct, what

9  ECFMG did or didn't do and whether that conduct was a cause of

10  Akoda coming into contact with patients.

11        Then the second phase, the evidence is what happened

12  in the interaction between Akoda and an individual patient.

13  Was it foreseeable that that interaction could give rise to

14  emotional distress on behalf of the plaintiffs, and learning of

15  his fraudulent certification years later, could that give rise

16  to emotional distress.

17        THE COURT:  So assume for a second that the causation

18  piece is something that I think needs to be done individually.

19  Okay?  So let's focus on sort of duty and breach.

20        You know, Mr. Shaffer identified a bunch of issues

21  that he thinks the -- sort of nature of the plaintiff, the

22  plaintiff's history, status, temporal -- you know, when they

23  encountered Mr. Akoda, all of that bears on the duty analysis.

24        You know, if that's right, then it does seem like

25  there's a bunch of individualized issues that preclude class

1    certification on -- even as to duty and breach.  Right?

2           MR. THRONSON:  I think that's an incorrect analysis of

3    duty.

4           THE COURT:  And why?

5           MR. THRONSON:  Because the issue of duty -- a duty is

6    determined primarily with reference to the defendant, you know.

7    They cite the Tulp case in which Judge Beetlestone identified a

8    common law duty on the part of ECFMG to give due process to

9    applicants.  And that was done without reference to this

10   individual's characteristics who was the plaintiff who was

11   aggrieved about a decision of ECFMG.  But the role of ECFMG

12   this is quasi public and private entity, its importance within

13   the healthcare system.

14          And you're right, there are those five factors.  One

15   of them is foreseeability of the injury, but it's not

16   foreseeability of the particular harm that's in question.  I

17   mean, when we -- in a medical malpractice case, you don't

18   reanalyze in every single case, well, does this doctor have a

19   duty to this patient who had a negligently performed C-section

20   and suffered these damages.  The duty analysis doesn't depend

21   on the individual characteristics of the plaintiff.  The duty

22   analysis depends, among other factors, on whether it's

23   foreseeable that a breach of this defendant's duty could cause

24   harm.  And it doesn't have to be the particular type of harm

25   that's suffered by the plaintiff.  It's just not how that

 1    analysis occurs.

 2          THE COURT:  Well, no, but it does -- I mean, doesn't

 3    the nature of the plaintiff and her -- even in the medical

 4    malpractice context, the nature of the plaintiff and, you know,

 5    her injuries and the context in which she comes in contact with

 6    the doctor, doesn't that impact what the scope of the doctor's

 7    duty is?

 8          MR. THRONSON:  So there has to be a doctor-patient

 9    relationship, so that has to be shown.

10          THE COURT:  Right.  But even then, within the confines

11    of a doctor-patient relationship, for example, you know, I

12    mean, in the world of the absurd, if a patient who is pregnant

13    and is having pregnancy problems goes to see her dermatologist,

14    the dermatologist's duties are presumably different by virtue

15    of the nature of that interaction than they are if she goes to

16    see her OB.

17          MR. THRONSON:  The breach of the duty is different.  I

18    mean --

19          THE COURT:  The duty is different.  Right?

20          MR. THRONSON:  The duty is the same of reasonable care

21    under the circumstances with respect to the patient.

22          THE COURT:  Under the circumstances.

23          MR. THRONSON:  Yeah.  Acting as an ordinary physician.

24    And so the breach of the duty may be different with respect to

25    the dermatologist, the nature of the breach of it.

1          THE COURT:  But isn't it that -- I mean, if the

2     duty -- well, two things.  One is if the duty is different

3     under the circumstances, then doesn't that mean -- I mean, if I

4     port that logic here, then the circumstances -- if the

5     circumstances define or help define the duty, then I can't

6     certify a class, because the circumstances are going to be

7     different.

8          MR. THRONSON:  I'm not saying the duty differs.

9     That's not what I meant to say at all.

10          THE COURT:  Okay.

11          MR. THRONSON:  What I'm saying is that the duty -- the

12     duty doesn't depend on the individual nature of the harm and

13     damages suffered by these patients.  You know, these patients

14     all share a common characteristic, the proposed class.  They're

15     all patients of this one individual who was certified by ECFMG.

16     That's the relevant inquiry for class cert purposes, and that's

17     what can be determined on a classwide basis.

18          THE COURT:  Okay.  Let me just ask from both of your

19     perspectives -- let me ask the plaintiff in particular, because

20     you're the one who's positing a class here as a way to resolve

21     this.

22          If I resolve any of the duty or breach issues, let's

23     say I took one of your named plaintiffs as an initial test case

24     and resolved the duty issue in particular.  Let's start there,

25     because I resolve duty as a question of law.  Does that have

1    collateral estoppel effects in other cases, and is that an

2    alternative way to proceed that buys me some of the efficiency

3    without having to certify a class?

4        MR. THRONSON:  It does not, and it hasn't been the

5    experience I think of the judiciary that that is a workable

6    alternative.  Because under Park Lane, the inquiry is, is it

7    fair to apply this offensively to another case.  And so there's

8    going to be an argument from both sides that, well, it's not

9    fair to apply that result to this patient, this client, in this

10   case because there's some differences or because of mutuality.

11       This came up in the asbestos cases.  And there's

12   actually a reference in -- I think it's in the School Asbestos

13   Litigation case, In Re:  School Asbestos Litigation, where the

14   Court says, look, this has not proved to be a workable

15   alternative and certified the class as a (b)(3) class.

16       THE COURT:  So that seems a little strange to me from

17   an analytical standpoint, only because the reason collateral

18   estoppel doesn't apply is the differences, and the differences

19   are a reason to certify a class?  That seems like a strange

20   outcome.

21       MR. THRONSON:  I'm sorry, Your Honor.

22       THE COURT:  So I think what you said was, well,

23   collateral estoppel is not going to apply because the parties

24   are going to say, well, this plaintiff is different and this

25   plaintiff is different and this plaintiff is different, and

1    therefore, it's unfair to apply collateral estoppel; but if the

2    differences are what prevent the application of collateral

3    estoppel, and I'm looking at commonality in trying to find a

4    common solution, then doesn't that seem to suggest that I can't

5    certify a class because there are individual differences that

6    prevent the application of collateral estoppel as well?

7            MR. THRONSON:  I'm saying something slightly

8    different, which is that not that collateral estoppel wouldn't

9    apply, but you would get that argument with respect to each

10   plaintiff.

11           THE COURT:  So you're saying I wouldn't have to

12   relitigate the collateral estoppel?

13           MR. THRONSON:  Exactly.  It's a manageability issue.

14   You'd have to --

15           THE COURT:  Okay.  All right.  I understand.  Let me

16   see.

17           Okay.  We've covered -- from my perspective, we have

18   sort of already -- the discussion subsumed what I wanted to

19   cover on typicality.

20           I do want to hear from the defendant initially and

21   then hear your response on adequacy, because I'm not sure I

22   fully understood the issues.  You know, and I'm mostly

23   concerned again -- I understand the issues on adequacy as to

24   different types of injuries and encounters with Dr. Akoda, that

25   that sort of all -- I don't know whether it's right, but it all

1    makes sense to me, and I understand the arguments.

2          But the issue with respect to the Maryland litigation,

3    which I think was the first one you identified in your

4    opposition, I'm not sure I fully followed.  Both -- I mean, I

5    sort of know what happened.  I don't really want to retry the

6    litigation strategy decisions that were made in Maryland, but I

7    want to understand why you think that renders them inadequate.

8          MR. SHAFFER:  I guess what I will say about adequacy,

9    Your Honor, and it falls within the context of the types of

10   claims that are being asserted, which are emotional distress

11   claims, which we articulate in other parts of our brief,

12   individuals would have a strong interest in controlling, A,

13   whether they want to bring them; B, whether they want to be

14   involved in this particular case as to how they're going to

15   pursue it; and C, whether those class members believe that the

16   named plaintiffs who are here are aligned in terms of what any

17   individual class member might feel about their own situation.

18         And again, we're not in a position where we have, you

19   know, perspective on that, other than to know that you could

20   certainly understand that individuals, for example, might not

21   agree with having dismissed claims against the hospital in

22   Maryland that hired and allowed Akoda to treat 700 women for

23   nothing.

24         THE COURT:  But those were dismissed without a class

25   certification.  Right?

1          MR. SHAFFER:  Correct.

2          THE COURT:  So there's no preclusive effect of that.

3    And to the extent that someone here has a problem with the

4    litigation decision to pursue this as, say, an emotional

5    distress claim as opposed to a specific battery, intentional

6    tort type claim or something like that, they'll have the chance

7    to opt out and to do that if they want to.  Right?

8          MR. SHAFFER:  As we discussed earlier, there would

9    have to be an opt-out period.  The suggestion that there would

10   be some sort of limited issue class, there would be an opt out

11   of many individuals who might decide to bring their own claims,

12   and a second set of many mini-trials suggests that those

13   factors that talk about manageability and efficiency are not

14   served in a case like this.  Whether those are truly adequacy

15   of the representatives, maybe that's not the best prong to

16   identify those issues.

17         THE COURT:  I mean, the rubrics blur sometimes.  And I

18   understand that.  And, you know, the many mini-trials thing,

19   frankly, it doesn't -- it doesn't motivate me a lot, because it

20   does seem that they've signed a lot of plaintiffs up.  And one

21   way or another, there's probably going to be a lot of trials,

22   or, you know, a lot of -- at least a lot of time in court,

23   whether that's motions practice or what.

24         And so, you know, I think the thing I have to figure

25   out is whether there's a way to short-circuit some of that by

1  doing, you know, one trial on some issue and then a bunch of

2  what amount to like half-day trials or day-long trials on some

3  of the other issues.  If it's not that, if it's going to be,

4  well, I'm going to do the big trial and then we're still going

5  to have a bunch of three- and four-day trials, then I'm not

6  sure I get much.

7      And I understand you're -- I know you're about to say,

8  well, you don't have a trial plan, Judge.  And I heard that

9  argument, and I have to think about how significant that is

10  here.  I mean, obviously, I think to some extent the courts

11  have the discretion to call upon their experience to sort of

12  see how this case would play out.  If there's only one logical

13  way it would play out versus if there's a lot of ways it might

14  play out and there's a lot of uncertainty, then maybe it's

15  important for me to get a trial plan.

16      MR. SHAFFER:  And I think, again, we're speculating as

17  to what will come and what will ultimately be the posture of

18  plaintiffs who they have averred they have signed up.  We have

19  all been involved with cases with consolidated Complaints with

20  plaintiffs who all of a sudden it happens that there's far, far

21  fewer than there were represented to be.  And there are ways to

22  structure cases of consolidated actions in a way that don't run

23  afoul of Rule 23.

24      And so you know, I guess we would simply note for the

25  Court's consideration that the manageability and whether there

1   would be additional actions here or elsewhere, that if any

2   class action were trying to shoehorn a case into Rule 23 that

3   doesn't really belong there and that the Third Circuit has said

4   is not the kind of case that fits within that rubric doesn't

5   leave the Court without options on how to manage, administer

6   and effectively handle the docket.

7           THE COURT:  So I have two last issues on my outline to

8   cover, one sort of for each of you.  So I'll start with you,

9   Mr. Shaffer.

10          Statute of limitations, which I know you raise.  I

11  struggled a little bit with what your statute of limitations

12  argument is.  So tell me what your statute of limitations

13  argument is, and then I have some questions about how it

14  applies.

15          MR. SHAFFER:  Sure, Your Honor.

16          So the way in which a statute of limitations defense

17  would be presented here would be that the triggering event,

18  which we've heard from the named plaintiffs and I think was

19  averred in the Complaint, was the US Attorney's press release

20  announcing the guilty plea of Akoda for Social Security fraud

21  and that individual plaintiffs upon having read that suffered

22  harm or injury or damage as a result of having tied that to

23  some experience they had.

24          The Complaint in this case was filed two years minus

25  one day to the day of that press release.  And so there could

1  be a possibility that there would be individuals who would have

2  knowledge prior to the press release on an individual basis of

3  Akoda, of either his charge, of his arrest.  We have references

4  in some of the survey-like responses that we got from the

5  plaintiffs that certain individuals had suffered emotional

6  distress prior to that announcement by the US Attorney's

7  office.  And so if you have your emotional distress prior to

8  that date, it would be more than two years from the date of

9  filing, and that individual would have a potential statute of

10  limitations problem.

11        We pointed out as -- primarily to note that this is

12  not, as the plaintiffs tried to suggest, the only issue left

13  for another day is damages.  No.  There will be statute of

14  limitations issues that have to be resolved if there were

15  subsequent proceedings, not just amount of damages.

16        THE COURT:  So -- and, you know, I can go back and

17  find out, but with respect to the Akoda prosecution, there's an

18  announcement of a guilty plea.

19        Was there either an arrest or an indictment that

20  preceded that, or is this the kind of thing where there were

21  discussions with Akoda and his counsel, there's, you know, a

22  plea that's contemporaneous with the announcement?

23        MR. SHAFFER:  We don't know the answer for sure.  We

24  do know there was a pending medical malpractice claim against

25  Akoda at the time that he was arrested.

1          THE COURT:  That alleged that he wasn't a doctor?

2          MR. SHAFFER:  No.  But that would have perhaps --

3     that's a class member who would have perhaps been in discovery,

4     perhaps would have gained information about the arrest during

5     that process that would potentially trigger again a question

6     that would have to be resolved in that person's individual

7     proceeding.

8          To your question, I don't believe they issued a press

9     release when the arrest occurred.

10          THE COURT:  So -- well, I mean, but if an arrest

11     occurred beforehand, you know, there's certainly -- I mean, you

12     know, there's a gossip mill and people may have known.

13          If there was no arrest, if there's just discussion,

14     he's a target, there's discussions with his counsel, he works

15     something out and then there's a press release at which time

16     either he turns himself in or, you know, has his first day

17     hearing or something like that, that's a little different in

18     terms of how much -- what the odds are that there's public

19     disclosure of it in advance.

20          And I guess that gets me to sort of my question here,

21     which is, you know -- I understand you're hypothesizing the

22     possibility that there are people who are going to be barred by

23     the statute of limitations, but is that enough to trigger a

24     statute of limitations defense that precludes class

25     certification?  Or -- you know, I mean, I haven't had you yet,

1    I've had some of your partners in Rule 16s with me.  One of my

2    bugaboos is that people plead affirmative defenses

3    prophylactically instead of affirmative defenses for which they

4    have a good faith basis under Rule 11.

5         Do you need a good faith basis under Rule 11 to say

6    that there are class members who are barred by the statute of

7    limitations, or is it just enough to say there might be?

8         MR. SHAFFER:  So I think what we have here at least,

9    Your Honor, evidence from the one malpractice case of an

10   individual who if they brought a -- if there was an issue class

11   certified and there was a secondary proceeding, there would be

12   a fight about whether that claim was barred by the statute of

13   limitations.  And our point in --

14        THE COURT:  But why?  I mean, doctors get sued for

15   malpractice all the time.  And sometimes it's meritorious and

16   sometimes it's not, but that doesn't mean that you have any

17   suspicion the person is not a doctor.

18        MR. SHAFFER:  If it -- I mean, the way the defense

19   would come up is in discovery and taking the deposition of that

20   plaintiff, did you hear about Dr. Akoda being arrested?  Yes.

21   How did you hear about that?  It was in the newspaper.  I don't

22   know.  I don't have specific information that says I know of

23   Person A who had knowledge that Dr. Akoda was arrested.  But if

24   discovery revealed that, we would be entitled to assert a

25   statute of limitations defense in a subsequent proceeding.

1          Maybe Ms. McEnroe can address you.

2          THE COURT:  You're welcome to address it.  That's

3    fine.

4          MS. McENROE:  Thank you.  One related point on that

5    also is there was a law enforcement search warrant executed at

6    the individual's residence, medical practice and vehicle in

7    June of 2016, which especially for the medical practice could

8    potentially more credibly implicate potential class members

9    who --

10          THE COURT:  I think I need a lot more detail before I

11   would be willing to conclude that that provided any kind of

12   constructive notice.  I mean, whether you have actual notice

13   because some patient is sitting in the waiting room when the

14   agents show up, I don't know.

15          Okay.  My last question, saved for the plaintiffs

16   before I kind of give you each a chance to cover anything you

17   think I haven't that you think I need to hear.  You know,

18   there's any number of cases out there that are resolved as mass

19   torts rather than as classes.  And there's a playbook for how

20   you do that.  And why isn't that what I should be doing here?

21   I mean, you've got a defendant that's in Pennsylvania.  Maybe

22   you get them with specific jurisdiction elsewhere, I don't even

23   know, for individual cases, but otherwise, you're going to file

24   it here.  The cases are all going to come here.  They're all

25   going to be related here.  Maybe or maybe not.  Maybe there

1  will be an MDL.  I don't know.

2         But, you know, it seems to me it's fairly likely one

3  way or another that even if I don't certify the class and even

4  if there is a bunch of individualized claims, you know, even if

5  you sue in Maryland, you know, I don't want to assume I know

6  Mr. Shaffer's playbook, but I'm willing to guess that he's

7  going to remove all of them if you file in Maryland Circuit

8  Court and -- or in, you know, Virginia or DC Superior Court.  I

9  think they're going to get removed.  And, you know, I see them

10  winding up here either via transfer motions or via an MDL.  I

11  don't presume to tell them how to consolidate things, but this

12  case is obviously a lot further along than anything else would

13  be.

14         And so why isn't that the way to resolve this?  And

15  just to do that and then either to have some test cases where I

16  could bracket value, you know, or you guys could just file your

17  cases here and we could consolidate them locally and, you know,

18  we could run some test cases and bracket value and then put a

19  master in place and try to get it resolved, why isn't that a

20  more efficient way to do this?

21         MR. THRONSON:  I think, Your Honor, you lose

22  efficiency in a couple of respects.

23         There's a lot of evidence that's going to need to

24  be -- to be put on as to this case.  And that's true of

25  other -- you know, other MDLs as well, but, you know -- cases

1   that are filed as mass torts.  But the conduct of ECFMG, the

2   conduct of Akoda, each side has identified eight to nine

3   experts.  It's a lot of trial time.

4          And so, you know, the pretrial proceedings for that

5   are going to be hotly contested I think in terms of who's an

6   appropriate bellwether plaintiff, you know, case information

7   sheets, things of that nature.

8          And at the end of the day, you don't have -- you've

9   got to put on the same evidence a number of times in any event

10  with the hope of eventually getting settlement.  And you don't

11  have a common resolution of these questions that we believe are

12  really common to each plaintiff and the resolution of which

13  will have a preclusive effect.

14         THE COURT:  So how does that distinguish this case

15  from any of the universe of mass tort cases that are out there

16  that the MDL panel consolidates somewhere, you know, whether

17  it's Opioids right now or -- you know, I mean, this Court has

18  had Fen-Phen over the years, and we had the Asbestos and, you

19  know, any of the other ones.  I mean, Tobacco was certainly a

20  case where -- you know, any number of Tobacco cases where there

21  was all kinds of common proof about the industry.  Years ago I

22  was in the Welding Fumes MDL where the allegation was that

23  there was this industrywide conspiracy to conceal the harmful

24  health effects of welding fumes.  And there was a lot of common

25  proof that had to be put on again and again and again.  And

1   some of it got done -- frankly, I thought -- maybe it was

2   inefficient that it got done again and again in the state

3   courts, but it also got done in federal court six or eight

4   times in the Northern District of Ohio, and then we were able

5   to sort of start sorting out where we stood.  And yeah, it's

6   common proof, and yeah, it's a little slower, but maybe it's

7   not a lot slower if there's a whole bunch of individual issues

8   that have to get tried anyway.

9          MR. THRONSON:  I think the distinction is in all of

10  those cases you have typically multiple producers, multiple

11  methods of distribution, multiple, you know, points of

12  consumption.  And so the -- there's common proof, but it

13  doesn't end up being very meaningful in terms of driving the

14  ultimate resolution of the litigation.

15         Here we have the actions of one corporation as to one

16  individual which caused damage to a group of plaintiffs.

17  That's the difference.  And it's just a lot easier and simpler

18  and cleaner to resolve these numerous common issues on a

19  classwide basis.

20         THE COURT:  What's your view on that?  I mean, in some

21  respects, I mean, I always felt weird saying it in practice,

22  but there's the arguable advantage to the defendant of having a

23  class certified as opposed to having to try the case, you know,

24  35 times just in bellwether trials, because if you win, it's a

25  grand slam.  You're done.

1          MR. SHAFFER:  And Your Honor, it's a question, but the

2    reality is the types of cases that we're talking about here,

3    the types of claims that are being asserted here, and the wide

4    range of experiences that we have and we already know about

5    from the individuals who are involved here, makes this much

6    more like your Welding Fume or your MDL or your consolidated

7    plaintiff at a -- you know, in a -- some sort of toxic case

8    than a class action with a single mailing, with a single

9    defendant and a single outcome four days after the letter is

10   mailed.  That's a class action -- you know, that has

11   feasibility and value in a class setting.

12          These cases may.  You're correct.  There are things

13   that can be done in a situation if there are consolidated

14   cases, if there are additional cases filed, that can be done to

15   advance multiple cases at once.  But Rule 23 doesn't allow you

16   to sort of, again, shoehorn cases that don't belong as a class

17   action in a class action purely for efficiency and especially

18   where there are other alternatives.  And you are correct, there

19   are -- there are risks to the defendant of that scenario as

20   well as, you know, to the class scenario.

21          But, you know, our view on that is it is not

22   appropriate.  The example we were talking about on a duty

23   question or a res judicata to say, you know, you can decide

24   that on a classwide basis and then individuals will come in and

25   fight about their facts were different and they weren't bound

1    anyway.

2         So we respectfully submit that Rule 23 isn't the way

3    you can go here.

4         THE COURT:  So I've covered what I wanted to cover

5    with you guys today.  I'll give you each a few minutes to wrap

6    up if there's things you want to cover with me, arguments you

7    want to make that I haven't covered, bearing in mind I hope you

8    can tell I read your briefs, and so I don't need you to repeat

9    that.  And also bear in mind that if you say to me, nope, I'm

10   good, I'm not going to look down on you and think that means

11   there's some weakness in your case.  I will be perfectly

12   happily to hear that.

13        MR. VETTORI:  Nope, we're good.

14        THE COURT:  From plaintiff's side?

15        MR. THRONSON:  I think one case that I think could be

16   instructive for Your Honor to take a look at is Wallace v.

17   Powell, which we cited in our brief.  That's the Kids for Cash

18   case.  And there was a -- it was a case that was certified on

19   all issues of liability out of the Middle District of

20   Pennsylvania.  And there were a variety of claims brought

21   there, you know, RICO claims, constitutional violation, various

22   constitutional violations, also state law false imprisonment.

23   And the Court found that certification on a classwide basis as

24   to liability was appropriate, notwithstanding obviously you

25   have all these plaintiffs, probably about 5,000 plaintiffs,

1  different kinds of interaction with the judicial system,

2  different injuries.  Emotional distress was claimed in that

3  case.  But at the core of it all is a common course of conduct

4  by Judge Shivarelo and these corporations to deprive these

5  individuals of their constitutional rights.  And so that case I

6  think is a good demonstration of the facts that the fact that

7  emotional distress damages are claimed is no barrier to class

8  certification.

9           THE COURT:  Okay.  All right.  Mr. Shaffer, anything?

10          MR. SHAFFER:  Only one point to bring us back to.  I

11  think the very first question that Your Honor asked the

12  plaintiffs that I made a note of, and that related to the

13  damages that they're talking about asserting, only emotional

14  distress damages.  And we've discussed that yes, if there were

15  notice and an opt-out, that there would be maybe individuals

16  who believe that they had a personal injury claim of some kind

17  that they could decide to opt out.

18          I believe there would be a claim-splitting problem if

19  they don't opt out and go to judgment in this case, that they

20  couldn't say at the judgment, let's say our client prevails and

21  they say, well, I only asserted a claim for emotional distress.

22  Now I want to file a lawsuit for my personal injury arising

23  from the exact same conduct.  I believe that judgment is going

24  to bar them from all damages that would arise from the same

25  conduct.

1          And so again, it's just another point that certifying

2    this as a class both from the defendant's perspective but also

3    for class members could mean if they don't opt out, it's not

4    that the plaintiffs in this case have asserted the full panoply

5    of possible claims and damages that someone could envision

6    could arise from Dr. Akoda, and a judgment would potentially

7    raise the possibility that those claims are extinguished.

8          THE COURT:  Yeah.  I mean, I don't have to decide

9    that.  Right?  Because presumably they file somewhere else.

10   But it seems to me that's what the opt-out is for.  Right?  If

11   we think notice is meaningful, you know, if we operate under

12   the view that the notice that they get is meaningful, it

13   actually tells them what their rights are and then they get to

14   make an informed judgment.

15         And some plaintiffs choose -- I mean, a plaintiff

16   might say, no, I was damaged by more than this.  Some other

17   plaintiff might say, hey, great, there's less for me to do and

18   someone else is carrying the water.  So I'm less troubled by

19   that possibility in this circumstance as long as there's an

20   opt-out.

21         MR. SHAFFER:  I guess I would just simply compare it

22   to the typical (b)(3) opt-out case where you're not just simply

23   seeking one type of damages and you're excluding all the other

24   possible damages arising from an act.  You would -- presumably

25   most (b)(3) cases, the plaintiffs seek all the damages arising

1   from a particular conduct at one time.  And so --

2         THE COURT:  I don't know.  I mean, you know, I sat on

3   the plaintiff's side of cases sometimes where we'd say issue X,

4   Y or Z creates a problem for us from a class certification

5   standpoint and we don't think that makes sense and, you know,

6   we're not going to pursue, for instance, unjust enrichment.

7   Unjust enrichment is really, really hard to certify because of

8   the variations among state law.  And some plaintiffs will say,

9   let's drop it.  I don't want to do that.  Or I don't want to

10  pursue a state unfair competition claim instead of an antitrust

11  claim.

12        MR. SHAFFER:  And with respect to theories, I

13  understand and agree with Your Honor that that doesn't create

14  the issue I'm talking about here.  This is -- they're talking

15  about some of the interactions and saying that person gets up

16  and testifies about the interaction and the physical injury

17  that they suffered, then that person hasn't opted out, that

18  claim is going to be barred.  And again, maybe that's not for

19  today's problem, but when considering the practical

20  implications, the manageability and the issue certification

21  concept that they've offered, I just wanted to raise it since

22  it was the first Post-it note I kept.

23        THE COURT:  I will keep it in mind.

24        All right.  So no surprise, I'm not ruling today.  I'm

25  going to take it under advisement.  This was extraordinarily

```
 1    helpful to me, so thank you.  And we'll try and get you

 2    something expeditiously.  The motion I know has been pending

 3    for a while, although it took a while to get the argument

 4    scheduled too.  But I'll try to get you something, you know, in

 5    the not too, too distant future so we've got some clarity about

 6    what's going to happen with this case going forward.  Okay.

 7             We're going to be adjourned.  I'm going to clean up

 8    here for a minute, so you can sit or go about your business,

 9    that's fine.  Have a good day, everybody.

10             (Proceedings concluded at 3:56 p.m.)

11

12

13             I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    _____

17    Ann Marie Mitchell, CRR, RDR, RMR
      Official Court Reporter
18

19

20

21

22

23

24

25
```

**1** [1] - 50:20
**100** [2] - 2:9, 16:25
**11** [2] - 66:3, 66:4
**1211** [1] - 2:14
**1500** [1] - 2:3
**16s** [1] - 65:25
**1701** [1] - 2:20
**178** [1] - 30:11
**18-5629** [1] - 3:5
**19102** [1] - 2:4
**19103** [1] - 2:21
**19106** [1] - 1:8
**1996** [2] - 51:22, 52:1
**1998** [5] - 18:7, 18:11, 18:14, 50:4, 50:20
**200** [1] - 1:16
**2000** [4] - 18:7, 18:10, 18:11, 18:15
**2007** [1] - 18:15
**2011** [1] - 18:15
**2016** [8] - 39:22, 45:10, 50:10, 50:17, 50:21, 52:2, 52:7, 67:6
**2017** [1] - 50:10
**2020** [1] - 1:9
**20th** [1] - 2:9
**21201** [1] - 2:10
**21202** [1] - 2:15
**21208** [1] - 1:16
**215** [2] - 2:5, 2:21
**23** [6] - 20:9, 41:17, 62:22, 63:1, 71:14, 72:1
**23(a** [16] - 4:22, 26:4, 26:6, 26:7, 26:11, 26:19, 26:20, 26:23, 27:3, 30:22, 31:1, 31:11, 32:15, 33:12, 33:15
**23(b** [3] - 4:18, 30:23, 33:13
**23(b)(3** [2] - 29:10, 29:11
**23(c** [1] - 4:19
**23(c)(4** [2] - 26:5, 31:4
**267** [1] - 1:21
**299-7250** [1] - 1:21
**2:06** [2] - 1:9, 3:1
**2:18-cv-05629** [1] - 1:3
**30** [1] - 1:9
**35** [1] - 70:23
**3900** [1] - 2:4
**3:56** [1] - 76:9
**4** [1] - 1:15
**410** [3] - 1:17, 2:10, 2:15
**5,000** [1] - 72:24
**598-1667** [1] - 2:15
**601** [1] - 1:8
**649-2027** [1] - 2:10
**653-3200** [1] - 1:17
**700** [1] - 60:21
**712** [1] - 12:12
**7th** [2] - 48:5, 52:23
**864-9600** [1] - 2:5

**876** [1] - 9:11
**946** [1] - 30:11
**963-5000** [1] - 2:21
**a).(3** [1] - 27:20
**able** [3] - 6:19, 41:15, 70:3
**above-entitled** [1] - 76:13
**absence** [1] - 47:17
**absolutely** [4] - 22:9, 44:24, 48:12, 53:8
**abstract** [1] - 10:7
**absurd** [1] - 56:11
**accept** [1] - 42:7
**access** [1] - 39:4
**accurately** [1] - 18:22
**acknowledge** [1] - 17:2
**act** [1] - 74:23
**acting** [1] - 56:22
**ACTION** [1] - 1:3
**action** [11] - 27:11, 37:15, 47:2, 47:3, 47:4, 63:1, 71:7, 71:9, 71:16
**actions** [7] - 44:2, 44:3, 46:4, 52:1, 62:21, 62:25, 70:14
**acts** [1] - 52:8
**actual** [1] - 67:11
**addition** [1] - 5:6
**additional** [3] - 7:15, 62:25, 71:13
**address** [8] - 28:3, 30:1, 31:10, 34:5, 50:19, 53:14, 66:25, 67:1
**addressed** [3] - 34:14, 37:8, 39:13
**addressing** [1] - 33:13
**adequacy** [5] - 33:16, 59:20, 59:22, 60:7, 61:13
**adjourned** [1] - 76:6
**administer** [1] - 63:4
**administrator** [1] - 17:6
**adopt** [1] - 42:22
**advance** [2] - 65:18, 71:14
**advantage** [1] - 70:21
**advisement** [1] - 75:24
**advisory** [3] - 27:23, 28:2, 28:19
**afoul** [1] - 62:22
**afternoon** [9] - 3:2, 3:3, 3:10, 3:17, 3:19, 3:21, 3:23, 3:24, 4:1
**agents** [1] - 67:13
**aggrieved** [1] - 55:10
**ago** [3] - 18:17, 52:24, 69:20
**agree** [11] - 24:1, 24:11, 24:12, 25:18, 33:19, 42:20, 45:18, 51:16, 52:17, 60:20, 75:12
**ahead** [2] - 22:13, 23:22
**aided** [2] - 1:23, 10:4
**Airlines** [1] - 30:10

**Akoda** [53] - 7:24, 9:3, 9:14, 9:15, 9:19, 9:20, 9:25, 11:11, 12:3, 12:5, 12:8, 12:10, 12:13, 12:18, 12:23, 14:11, 17:14, 18:3, 18:17, 19:1, 20:15, 21:8, 25:22, 34:21, 35:9, 35:12, 35:13, 35:18, 35:23, 36:12, 37:3, 38:22, 38:24, 39:21, 44:21, 45:9, 50:8, 50:11, 54:9, 54:11, 54:22, 59:23, 60:21, 63:19, 64:2, 64:16, 64:20, 64:24, 66:19, 66:22, 69:1, 74:5
**Akoda's** [2] - 12:20, 18:9
**al** [1] - 1:3
**aligned** [1] - 60:15
**alignment** [1] - 28:8
**allegation** [2] - 37:21, 69:21
**alleged** [4] - 51:22, 51:25, 52:9, 64:25
**allegedly** [1] - 9:20
**alleging** [1] - 7:20
**allow** [4] - 21:12, 32:4, 48:6, 71:14
**allowed** [1] - 60:21
**allowing** [1] - 52:5
**allows** [1] - 31:5
**almost** [2] - 23:6, 29:14
**alternative** [4] - 4:19, 58:1, 58:5, 58:14
**alternatives** [4] - 7:15, 31:1, 34:1, 71:17
**Amendment** [2] - 48:6, 52:23
**American** [1] - 30:10
**amount** [2] - 62:1, 64:14
**analyses** [3] - 46:18, 48:23, 51:6
**analysis** [34] - 26:21, 26:24, 27:3, 27:9, 27:21, 28:21, 29:6, 29:11, 29:14, 29:20, 30:7, 31:9, 31:23, 33:17, 41:16, 41:22, 42:8, 42:19, 42:23, 43:8, 43:14, 44:15, 44:19, 49:9, 49:14, 49:22, 50:19, 52:11, 52:21, 54:22, 55:1, 55:19, 55:21, 55:25
**analytical** [1] - 58:16
**analyze** [4] - 26:24, 27:24, 30:22, 42:24
**analyzed** [2] - 30:23, 31:6
**analyzing** [2] - 32:6, 51:10
**ANGELOS** [1] - 2:8
**Ann** [2] - 1:20, 76:16
**announcement** [2] - 64:5, 64:17, 64:21
**announcing** [1] - 63:19
**answer** [6] - 28:16, 40:19, 49:4, 52:12, 53:3, 64:22
**answers** [1] - 43:16
**anticipate** [1] - 19:13

**antitrust** [4] - 17:3, 21:16, 21:21, 75:9
**anyway** [2] - 70:7, 71:25
**apart** [1] - 33:23
**appear** [1] - 20:15
**APPEARANCES** [2] - 1:13, 2:1
**appearances** [1] - 3:6
**applicable** [2] - 7:17, 48:24
**applicants** [1] - 55:8
**application** [5] - 18:5, 22:16, 49:6, 59:1, 59:5
**applied** [3] - 33:23, 43:9, 46:18
**applies** [8] - 7:9, 26:19, 40:22, 41:9, 43:19, 47:9, 49:9, 63:13
**apply** [15] - 26:11, 28:4, 28:11, 29:5, 29:8, 44:8, 45:21, 45:25, 47:6, 58:6, 58:8, 58:17, 58:22, 58:25, 59:8
**applying** [1] - 28:9
**appointment** [1] - 38:13
**approach** [3] - 32:17, 33:22, 41:20
**approaches** [1] - 4:20
**appropriate** [4] - 22:20, 69:5, 71:21, 72:23
**approved** [1] - 12:6
**Arch** [1] - 30:8
**area** [1] - 45:4
**arguable** [1] - 70:21
**argue** [1] - 42:19
**arguing** [1] - 31:3
**ARGUMENT** [1] - 1:5
**argument** [11] - 32:23, 42:3, 50:22, 52:16, 52:19, 58:7, 59:8, 62:8, 63:11, 63:12, 76:2
**arguments** [7] - 4:7, 4:23, 6:25, 27:1, 48:20, 59:25, 72:5
**arise** [5] - 27:14, 29:4, 45:16, 73:23, 74:5
**arises** [2] - 10:11, 45:16
**arising** [3] - 73:21, 74:23, 74:24
**arrest** [6] - 64:2, 64:18, 65:3, 65:8, 65:9, 65:12
**arrested** [3] - 64:24, 66:19, 66:22
**articulate** [1] - 60:10
**articulated** [3] - 30:25, 42:16, 46:8
**articulating** [1] - 52:24
**asbestos** [1] - 58:10
**Asbestos** [3] - 58:11, 58:12, 69:17
**ascertainability** [4] - 4:14,

11:3, 19:5, 20:12
**ascertainable** [1] - 22:6
**ascertaining** [1] - 12:5
**ascertainment** [1] - 17:9
**aside** [1] - 23:2
**aspects** [1] - 38:5
**assert** [4] - 6:17, 7:2, 7:10, 66:23
**asserted** [8] - 4:12, 5:15, 6:15, 6:24, 60:9, 71:2, 73:20, 74:3
**asserting** [4] - 5:20, 6:16, 27:13, 73:12
**assisting** [2] - 9:10, 15:19
**associated** [1] - 32:16
**assume** [7] - 6:23, 7:16, 13:12, 13:19, 42:7, 54:16, 68:4
**assuming** [2] - 18:14, 35:10
**attempt** [1] - 53:14
**attending** [1] - 15:22
**Attorney's** [2] - 63:18, 64:5
**attorney's** [1] - 51:21
**authority** [1] - 31:4
**averred** [2] - 62:17, 63:18
**aware** [1] - 30:15

**b)(3** [11] - 24:1, 24:12, 24:13, 24:21, 26:8, 27:22, 28:23, 30:23, 58:14, 74:21, 74:24
**b)(3)** [1] - 29:22
**baby** [1] - 21:10
**balancing** [1] - 44:8
**Baltimore** [3] - 1:16, 2:10, 2:15
**bar** [1] - 73:23
**barred** [4] - 65:21, 66:5, 66:11, 75:17
**barrier** [1] - 73:6
**based** [7] - 6:24, 7:10, 10:9, 13:12, 13:21, 16:22, 48:23
**bases** [1] - 7:17
**basic** [1] - 7:14
**basis** [18] - 20:8, 24:16, 30:17, 34:14, 34:18, 35:11, 37:19, 38:22, 46:19, 48:7, 52:11, 57:16, 64:1, 66:3, 66:4, 70:18, 71:23, 72:22
**battery** [7] - 8:7, 34:24, 36:7, 36:10, 36:18, 36:21, 61:4
**bceryes@sfspa.com** [1] - 2:16
**bear** [2] - 10:24, 72:8
**bearing** [2] - 11:21, 72:6
**bears** [1] - 54:22
**become** [1] - 21:13
**Beetlestone** [1] - 55:6
**BEFORE** [1] - 1:11
**beforehand** [1] - 65:10
**begin** [1] - 39:25

**behalf** [7] - 3:9, 3:12, 3:15, 3:18, 3:22, 4:2, 54:13
**Behr** [1] - 27:25
**bellwether** [2] - 69:5, 70:23
**belong** [2] - 63:2, 71:15
**benefit** [1] - 17:6
**best** [4] - 13:22, 22:22, 46:15, 61:14
**better** [1] - 13:12
**between** [9] - 4:18, 7:20, 7:24, 26:4, 27:22, 33:3, 34:9, 49:18, 54:11
**beyond** [2] - 16:10, 16:21
**big** [1] - 62:3
**bill** [1] - 13:16
**billing** [5] - 13:19, 14:3, 14:9, 18:18, 18:20
**binding** [1] - 28:18
**birth** [3] - 44:13, 44:16, 45:8
**bit** [3] - 11:16, 26:3, 63:10
**blissfully** [1] - 45:11
**blur** [1] - 61:16
**blurring** [1] - 50:24
**board** [2] - 50:12, 52:4
**boards** [1] - 24:25
**BOCKIUS** [1] - 2:18
**bought** [1] - 21:19
**bound** [2] - 16:19, 71:24
**boundaries** [1] - 45:5
**bracket** [2] - 68:15, 68:17
**breach** [23] - 10:12, 10:18, 19:23, 34:13, 34:20, 36:21, 36:22, 40:4, 47:24, 48:18, 48:23, 49:1, 53:1, 53:15, 54:2, 54:18, 54:25, 55:22, 56:16, 56:23, 56:24, 57:21
**breached** [1] - 20:4
**break** [1] - 52:15
**BRENT** [1] - 2:14
**Brent** [1] - 3:17
**BRIAN** [1] - 2:19
**Brian** [1] - 3:21
**brief** [7] - 6:2, 25:3, 42:1, 46:23, 47:8, 60:10, 72:16
**briefed** [1] - 5:7
**briefing** [10] - 6:25, 9:1, 11:17, 15:3, 18:3, 18:6, 22:15, 22:18, 30:8, 30:11
**briefly** [1] - 22:11
**briefs** [3] - 5:4, 48:1, 72:7
**bring** [4] - 42:14, 60:12, 61:10, 73:9
**brings** [1] - 42:8
**broader** [1] - 34:2
**brought** [2] - 66:9, 72:19
**bshaffer@morganlewis. com** [1] - 2:22
**bugaboos** [1] - 66:1
**bunch** [11] - 11:6, 20:25,

21:2, 26:25, 29:10, 54:19, 54:24, 61:25, 62:4, 68:3, 70:6
**business** [1] - 76:7
**buys** [1] - 58:1
**Byrne** [1] - 1:7

**c)(4** [8] - 24:6, 24:11, 24:14, 25:3, 25:5, 27:23, 28:3, 31:9
**C-section** [1] - 55:18
**cannot** [1] - 41:4
**capable** [1] - 17:8
**capacity** [1] - 15:18
**capture** [2] - 17:1, 29:10
**cards** [1] - 34:4
**care** [5] - 12:19, 14:4, 15:19, 56:19
**carefully** [1] - 5:3
**carrying** [1] - 74:17
**carve** [2] - 39:13, 40:3
**case** [68] - 4:12, 5:21, 6:13, 6:18, 8:23, 10:7, 10:16, 10:23, 12:6, 16:11, 17:3, 17:4, 20:19, 23:6, 24:10, 26:8, 27:7, 27:8, 28:5, 28:11, 30:12, 31:7, 31:13, 32:15, 38:23, 40:15, 41:15, 41:18, 41:20, 44:18, 46:6, 46:7, 46:25, 47:18, 47:19, 49:14, 53:18, 55:6, 55:16, 55:17, 57:22, 58:6, 58:9, 58:12, 60:13, 61:13, 62:11, 63:1, 63:3, 63:23, 66:8, 68:11, 68:23, 69:5, 69:13, 69:19, 70:22, 71:6, 72:10, 72:14, 72:17, 73:2, 73:4, 73:18, 74:3, 74:21, 76:5
**cases** [28] - 7:5, 21:21, 30:7, 37:12, 37:13, 52:9, 57:25, 58:10, 62:18, 62:21, 67:17, 67:22, 67:23, 68:14, 68:16, 68:17, 68:24, 69:14, 69:19, 70:9, 71:1, 71:11, 71:13, 71:14, 71:15, 74:24, 75:2
**Cash** [1] - 72:16
**Castano** [2] - 28:12
**causation** [13] - 34:8, 35:6, 47:23, 49:17, 49:21, 50:22, 51:4, 51:11, 51:19, 52:22, 53:2, 54:2, 54:16
**causation/remoteness** [1] - 51:23
**caused** [3] - 35:12, 35:13, 70:15
**causes** [2] - 36:21, 36:22
**Center** [4] - 2:9, 12:11, 13:2, 13:7
**Centrella** [1] - 3:15
**CENTRELLA** [2] - 2:3, 3:14
**cert** [2] - 9:1, 57:15
**certain** [5] - 7:5, 17:5, 41:10,

53:14, 64:4
**certainly** [17] - 4:6, 5:7, 5:9, 7:21, 10:24, 11:18, 17:24, 18:22, 31:7, 33:17, 43:9, 43:11, 43:15, 48:15, 60:19, 65:10, 69:18
**certainty** [3] - 49:16, 52:8, 53:7
**certification** [29] - 4:17, 4:21, 9:17, 9:21, 10:1, 18:10, 19:10, 21:22, 22:5, 22:25, 23:9, 27:19, 28:23, 28:25, 30:12, 30:14, 30:21, 47:19, 48:20, 50:12, 54:14, 54:25, 60:24, 65:24, 72:22, 73:7, 75:3, 75:19
**certified** [12] - 9:21, 22:19, 25:22, 26:9, 28:10, 47:23, 50:8, 57:14, 58:14, 66:10, 70:22, 72:17
**certify** [25] - 6:3, 9:2, 10:15, 11:18, 19:15, 23:21, 23:23, 23:25, 24:9, 26:10, 30:16, 40:12, 40:16, 41:7, 41:14, 43:4, 46:24, 46:25, 57:5, 58:2, 58:18, 59:4, 68:2, 75:6, 76:12
**certifying** [8] - 9:9, 24:7, 24:15, 24:22, 24:23, 30:13, 32:1, 73:25
**Ceryes** [1] - 3:17
**CERYES** [2] - 2:14, 3:17
**cetera** [1] - 38:8
**chalk** [1] - 33:23
**chambers** [1] - 4:6
**chance** [5] - 14:25, 30:3, 39:6, 61:5, 67:15
**change** [2] - 20:5, 52:11
**characteristic** [1] - 57:13
**characteristics** [2] - 55:9, 55:20
**characterize** [1] - 41:25
**charge** [1] - 64:2
**Charles** [2] - 2:9, 2:9
**chart** [8] - 13:25, 14:10, 15:10, 15:12, 15:14, 15:20, 17:14, 20:15
**charted** [1] - 15:17
**charts** [1] - 16:12
**Chaudry** [1] - 13:7
**choice** [19] - 6:25, 29:18, 29:19, 29:20, 40:9, 40:11, 40:20, 41:4, 41:5, 41:16, 41:22, 42:19, 42:23, 43:8, 43:13, 44:15, 44:18, 46:2, 46:13
**choices** [3] - 41:6, 41:21, 42:21
**choose** [3] - 46:2, 46:3, 74:14

Circle [1] - 1:15
circle [1] - 4:21
circuit [4] - 27:24, 28:1, 30:7, 61:24
Circuit [12] - 27:25, 28:16, 28:19, 29:4, 30:11, 31:7, 31:20, 32:16, 33:14, 47:1, 63:2, 68:6
Circuit's [1] - 30:7
circuits [1] - 28:8
circumstance [1] - 74:18
circumstances [7] - 9:5, 56:20, 56:21, 57:2, 57:3, 57:4, 57:5
cite [1] - 55:6
cited [4] - 30:8, 31:8, 44:19, 72:16
CIVIL [1] - 1:3
civil [1] - 27:23
claim [29] - 5:17, 6:22, 7:2, 7:9, 8:22, 9:24, 10:9, 18:8, 37:20, 39:25, 42:25, 44:4, 44:23, 44:25, 47:11, 47:12, 48:6, 50:25, 53:17, 61:4, 61:5, 64:23, 66:11, 73:15, 73:17, 73:20, 75:9, 75:10, 75:17
claim-splitting [1] - 73:17
claimed [2] - 73:1, 73:6
claiming [1] - 18:12
claims [19] - 4:11, 5:14, 10:6, 27:9, 27:13, 34:7, 41:10, 47:4, 47:6, 60:9, 60:10, 60:20, 61:10, 68:3, 71:2, 72:19, 72:20, 74:4, 74:6
clarify [3] - 4:11, 25:20, 28:3
clarity [2] - 10:23, 76:4
class [123] - 4:13, 4:16, 4:20, 5:24, 6:13, 6:19, 8:25, 9:9, 11:1, 11:5, 11:8, 11:18, 11:19, 11:20, 12:2, 12:17, 14:13, 17:23, 18:12, 19:6, 19:7, 19:9, 19:15, 19:20, 19:22, 19:25, 20:6, 20:8, 21:3, 21:13, 21:15, 21:16, 21:22, 22:3, 22:5, 22:6, 23:10, 23:15, 23:19, 23:23, 23:25, 24:1, 24:9, 24:10, 24:12, 24:21, 24:24, 25:1, 25:3, 25:5, 25:17, 25:19, 26:9, 27:10, 27:11, 27:14, 27:17, 30:13, 30:14, 30:16, 30:17, 30:20, 31:9, 31:12, 32:8, 32:11, 32:24, 34:3, 35:3, 35:4, 35:11, 36:3, 36:16, 37:15, 38:5, 39:8, 39:11, 40:12, 40:16, 40:21, 41:7, 41:13, 41:14, 43:4, 46:17, 46:19, 46:20, 47:4, 47:19, 52:11, 54:24, 57:5,
57:13, 57:15, 57:19, 58:2, 58:14, 58:18, 59:4, 60:14, 60:16, 60:23, 61:9, 63:1, 65:2, 65:23, 66:5, 66:9, 67:7, 68:2, 70:22, 71:7, 71:9, 71:10, 71:15, 71:16, 71:19, 73:6, 74:1, 74:2, 75:3
classes [4] - 24:13, 24:14, 46:24, 67:18
classwide [16] - 5:23, 24:16, 28:6, 28:10, 34:14, 34:18, 35:10, 36:25, 37:3, 37:19, 48:7, 54:3, 57:16, 70:18, 71:23, 72:22
clean [1] - 76:6
cleaner [1] - 70:17
cleanup [1] - 31:4
clear [5] - 25:19, 33:14, 41:3, 41:20, 47:9
clearly [1] - 30:17
client [4] - 18:8, 19:13, 58:8, 73:19
clinical [1] - 15:19
closeness [1] - 49:18
codes [1] - 13:19
collateral [6] - 57:25, 58:16, 58:22, 58:25, 59:1, 59:5, 59:7, 59:11
Colorado [3] - 43:18, 43:19, 46:10
colored [1] - 31:12
Columbia [2] - 44:12, 45:3
coming [4] - 11:14, 14:17, 34:21, 54:9
Commencing [1] - 1:9
commission [2] - 9:10, 10:5
COMMISSION [1] - 1:5
Commission [1] - 3:5
committed [2] - 9:15, 38:22
committee [3] - 27:23, 28:2, 28:19
committing [1] - 9:25
common [19] - 5:24, 27:14, 39:1, 39:13, 41:10, 49:3, 52:12, 52:22, 55:7, 57:13, 59:3, 69:10, 69:11, 69:20, 69:23, 70:5, 70:11, 70:17, 73:2
commonality [5] - 23:9, 32:5, 32:12, 33:16, 59:2
company [1] - 44:14
compare [1] - 74:20
compensable [1] - 35:5
competition [1] - 75:9
Complaint [5] - 5:15, 6:23, 7:10, 63:18, 63:23
Complaints [1] - 62:18
complete [3] - 37:11, 37:22, 41:16
completely [1] - 11:22

computer [1] - 1:23
computer-aided [1] - 1:23
conceal [1] - 69:22
conceive [4] - 26:6, 29:15, 29:21, 53:18
concept [1] - 75:20
conception [2] - 45:19, 45:21
conceptual [1] - 33:22
concern [3] - 32:21, 38:10, 52:24
concerned [3] - 38:5, 43:17, 59:22
conclude [3] - 33:10, 43:3, 67:10
concluded [3] - 28:1, 35:9, 76:9
conclusion [1] - 28:7
conduct [16] - 7:6, 27:15, 34:21, 45:14, 46:6, 47:1, 49:19, 51:22, 54:7, 54:8, 68:25, 69:1, 73:2, 73:22, 73:24, 74:25
confidential [2] - 38:21, 39:4
confines [1] - 56:9
conflict [3] - 27:9, 43:10, 47:13
conflicts [3] - 41:6, 41:18, 43:10
confront [1] - 41:5
confronted [1] - 20:19
connection [4] - 44:17, 46:20, 49:18, 49:22
CONRAD [1] - 2:2
consent [2] - 37:25, 38:2
consider [1] - 33:9
consideration [1] - 62:24
considering [4] - 28:2, 31:25, 32:1, 75:18
consistent [1] - 46:22
consolidate [2] - 68:10, 68:16
consolidated [4] - 62:18, 62:21, 71:5, 71:12
consolidates [1] - 69:15
conspiracy [1] - 69:22
constitutes [2] - 10:18, 19:4
constitutional [5] - 29:17, 48:5, 72:20, 72:21, 73:4
constructive [1] - 67:11
consumption [1] - 70:11
contact [7] - 15:14, 34:21, 35:23, 36:7, 42:4, 54:9, 56:4
contemporaneous [2] - 8:9, 64:21
contested [1] - 69:4
context [1] - 19:24, 24:21, 41:13, 41:17, 44:23, 49:21, 51:14, 53:13, 56:3, 56:4, 60:8

CONTINUED [1] - 2:1
contours [1] - 44:25
contractual [2] - 7:16, 7:21
controlling [1] - 60:11
conversation [1] - 21:9
core [1] - 73:2
corporation [1] - 70:14
corporations [1] - 73:3
correct [14] - 6:10, 6:20, 7:1, 11:23, 13:18, 25:4, 28:22, 32:2, 48:15, 53:21, 60:25, 71:11, 71:17, 76:12
correctly [2] - 31:6, 42:1
correspond [1] - 14:7
counsel [3] - 3:6, 64:20, 65:13
County [4] - 16:20, 44:12, 44:17, 45:4
couple [7] - 4:5, 4:15, 14:25, 17:20, 40:25, 52:24, 68:21
course [3] - 22:18, 27:14, 73:2
COURT [1] - 1:1
Court [6] - 1:21, 3:1, 68:7, 69:16, 76:16
court [3] - 30:13, 61:21, 70:2
Court's [1] - 62:24
court's [1] - 30:12
Courthouse [1] - 1:7
courts [5] - 46:24, 47:3, 47:5, 62:9, 70:2
cover [7] - 4:10, 4:22, 59:18, 63:7, 67:15, 72:3, 72:5
covered [5] - 4:24, 4:25, 59:16, 72:3, 72:6
create [1] - 75:12
created [1] - 51:11
creates [2] - 46:8, 75:3
credibly [1] - 67:7
criteria [3] - 7:8, 12:15, 17:17
CRR [2] - 1:20, 76:16
crux [2] - 38:23, 51:2
crystal [3] - 25:19, 33:14, 41:3
damage [3] - 39:24, 63:21, 70:15
damaged [1] - 74:15
damages [30] - 6:4, 6:8, 6:9, 6:12, 6:13, 6:14, 6:16, 7:3, 20:2, 24:16, 34:9, 34:11, 35:1, 35:4, 38:25, 45:16, 53:2, 53:15, 55:19, 57:12, 64:12, 64:14, 73:6, 73:12, 73:13, 73:23, 74:4, 74:22, 74:23, 74:24
danger [1] - 8:8
DANIEL [1] - 2:20
date [2] - 64:7
day-long [1] - 62:1
days [1] - 71:8

**DC** [7] - 42:12, 45:16, 45:20, 45:22, 46:9, 68:7
**deal** [4] - 15:13, 16:12, 19:19, 31:5
**dealt** [1] - 23:2
**December** [1] - 30:9
**decide** [19] - 19:5, 19:23, 20:7, 20:8, 23:20, 26:8, 36:25, 41:6, 46:14, 48:25, 50:20, 61:10, 71:22, 73:16, 74:7
**decision** [5] - 27:24, 30:9, 30:21, 55:10, 61:3
**decisions** [3] - 20:3, 27:24, 60:5
**Defendant** [1] - 2:23
**defendant** [8] - 21:18, 44:18, 55:5, 59:19, 67:20, 70:21, 71:8, 71:18
**defendant's** [4] - 47:1, 49:19, 55:22, 74:1
**defendants** [1] - 47:9
**defense** [9] - 3:20, 4:23, 15:2, 26:14, 26:25, 63:15, 65:23, 66:17, 66:24
**defense's** [1] - 11:7
**defenses** [2] - 66:1, 66:2
**defer** [1] - 41:16
**define** [9] - 23:8, 23:12, 23:14, 24:6, 26:9, 26:10, 32:24, 57:4
**defined** [3] - 22:3, 26:12, 28:6
**defining** [6] - 25:17, 26:17, 26:21, 27:4, 36:2, 44:25
**definition** [8] - 4:13, 11:1, 11:8, 11:19, 12:2, 25:19, 27:17, 38:6
**degree** [3] - 49:15, 52:8, 53:7
**delivered** [1] - 21:10
**demonstration** [1] - 73:5
**deposition** [1] - 66:18
**deprive** [1] - 73:3
**deprived** [1] - 12:24
**dermatologist** [2] - 56:12, 56:24
**dermatologist's** [1] - 56:13
**describe** [1] - 34:3
**description** [1] - 19:2
**desk** [1] - 38:14
**detail** [1] - 67:9
**determination** [1] - 46:13
**determine** [6] - 12:23, 34:18, 37:19, 48:24, 49:5, 49:7
**determined** [3] - 35:2, 55:5, 57:16
**determining** [2] - 24:16, 26:17
**develop** [1] - 27:18
**development** [1] - 41:12

**differ** [1] - 39:1
**difference** [2] - 53:20, 70:16
**differences** [7] - 41:5, 53:23, 58:9, 58:17, 59:1, 59:4
**different** [51] - 17:20, 19:3, 19:24, 20:3, 26:15, 26:21, 27:3, 27:4, 29:22, 29:23, 32:3, 33:21, 33:25, 36:14, 36:20, 36:22, 39:7, 42:19, 42:21, 43:3, 43:7, 43:9, 46:18, 47:3, 49:13, 50:11, 50:17, 50:19, 51:5, 51:6, 51:18, 52:21, 52:25, 53:3, 53:6, 56:13, 56:16, 56:18, 56:23, 57:1, 57:6, 58:23, 58:24, 59:7, 59:23, 65:16, 71:24, 72:25, 73:1
**differing** [1] - 37:6
**differs** [1] - 57:7
**direct** [2] - 7:22, 21:17
**disagree** [2] - 19:21, 52:17
**disclosed** [1] - 38:21
**disclosure** [1] - 65:18
**discovery** [3] - 65:2, 66:18, 66:23
**discretion** [1] - 62:10
**discussed** [2] - 61:7, 73:13
**discussion** [2] - 59:17, 65:12
**discussions** [3] - 13:13, 64:20, 65:13
**dismissed** [2] - 60:20, 60:23
**dispute** [2] - 9:14, 30:13
**distant** [1] - 76:4
**distinct** [2] - 51:1, 54:6
**distinction** [5] - 19:17, 47:10, 51:13, 51:17, 70:8
**distinctions** [3] - 31:14, 47:11, 53:25
**distinguish** [1] - 69:13
**distress** [29] - 5:16, 5:20, 5:25, 6:4, 6:9, 6:14, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:4, 64:5, 64:6, 73:1, 73:6, 73:13, 73:20
**distressed** [1] - 45:13
**distribution** [1] - 70:10
**district** [1] - 30:12
**DISTRICT** [2] - 1:1, 1:1
**District** [5] - 41:23, 44:12, 45:3, 70:3, 72:18
**division** [1] - 31:2
**docket** [1] - 63:5
**doctor** [9] - 9:15, 42:5, 42:6, 55:17, 56:5, 56:7, 56:10, 64:25, 66:16
**doctor's** [1] - 56:5
**doctor-patient** [2] - 56:7, 56:10

**doctors** [1] - 66:13
**document** [1] - 16:7
**documentation** [2] - 9:20, 16:23
**documents** [1] - 17:14
**done** [14] - 32:3, 38:24, 43:4, 43:15, 50:6, 54:4, 54:17, 55:8, 69:25, 70:1, 70:2, 70:24, 71:12, 71:13
**doubt** [1] - 46:4
**down** [3] - 40:15, 52:15, 72:9
**Dr** [19] - 9:2, 9:4, 9:14, 13:7, 17:13, 18:3, 18:9, 18:17, 19:1, 21:8, 39:21, 44:21, 45:8, 50:8, 50:10, 59:23, 66:19, 66:22, 74:5
**drafted** [3] - 11:9, 22:7
**drive** [1] - 43:9
**driving** [1] - 70:12
**drop** [1] - 75:8
**dubious** [1] - 47:22
**due** [1] - 55:7
**during** [3] - 17:21, 19:2, 65:3
**duties** [1] - 56:13
**duty** [69] - 7:16, 7:19, 7:21, 19:18, 19:23, 20:3, 20:4, 24:24, 34:13, 34:19, 34:20, 36:21, 40:4, 47:24, 48:18, 48:23, 48:25, 49:5, 49:7, 49:8, 49:10, 49:15, 49:17, 49:23, 50:7, 50:8, 50:16, 50:18, 50:20, 50:21, 51:2, 51:4, 51:9, 51:24, 52:12, 53:1, 53:15, 54:1, 54:3, 54:18, 54:22, 54:25, 55:2, 55:4, 55:7, 55:18, 55:19, 55:20, 55:22, 56:6, 56:16, 56:18, 56:19, 56:23, 57:1, 57:4, 57:7, 57:10, 57:11, 57:21, 57:23, 57:24, 71:21

**easier** [1] - 70:16
**EASTERN** [1] - 1:1
**easy** [2] - 23:1, 23:7
**ECFMG** [30] - 3:22, 3:25, 4:2, 7:20, 9:10, 9:16, 9:21, 9:24, 10:1, 10:4, 11:14, 18:6, 19:7, 22:16, 24:24, 25:22, 34:19, 35:11, 38:24, 45:14, 49:2, 49:8, 50:5, 50:16, 54:8, 55:7, 55:10, 57:14, 68:25
**ECFMG's** [3] - 36:12, 46:6, 51:25, 54:7
**EDUCATION** [1] - 1:5
**Educational** [1] - 3:4
**effect** [2] - 61:1, 69:12
**effectively** [2] - 23:14, 63:5
**effects** [2] - 57:25, 69:23
**efficiency** [5] - 33:5, 58:1, 61:12, 68:21, 71:16
**efficient** [2] - 33:6, 68:19

**efficiently** [1] - 27:11
**egregious** [1] - 7:6
**eight** [2] - 69:1, 70:2
**either** [14] - 5:5, 7:4, 27:16, 27:20, 28:17, 28:24, 40:22, 45:2, 50:18, 64:2, 64:18, 65:15, 68:9, 68:14
**element** [4] - 6:18, 34:10, 36:23, 52:22
**elements** [12] - 7:12, 7:14, 34:7, 36:24, 37:20, 45:19, 45:21, 45:24, 48:6, 48:7, 48:19, 50:25
**Elisa** [1] - 3:24
**ELISA** [1] - 2:19
**elisa.mcenroe@ morganlewis.com** [1] - 2:22
**elsewhere** [2] - 62:25, 67:21
**emergency** [1] - 38:13
**emotional** [29] - 5:16, 5:20, 5:25, 6:3, 6:9, 6:13, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:3, 64:4, 64:6, 73:1, 73:6, 73:12, 73:20
**employee** [1] - 14:14
**employer** [1] - 52:3
**employers** [1] - 50:13
**encounter** [2] - 15:11, 27:2
**encountered** [2] - 25:22, 54:22
**encounters** [1] - 59:23
**end** [4] - 20:18, 24:7, 69:7, 70:12
**enforcement** [1] - 67:4
**enrichment** [2] - 75:5, 75:6
**entities** [3] - 9:16, 17:22, 50:11
**entitled** [2] - 66:23, 76:13
**entity** [4] - 12:7, 44:1, 44:5, 55:11
**enumerating** [1] - 30:17
**envision** [1] - 74:4
**equal** [1] - 44:8
**especially** [4] - 41:17, 53:12, 67:6, 71:16
**ESQUIRE** [7] - 1:15, 2:3, 2:8, 2:14, 2:19, 2:19, 2:20
**essence** [1] - 24:12
**essentially** [12] - 5:23, 15:6, 16:14, 16:24, 20:2, 21:1, 21:4, 24:21, 28:1, 29:9, 35:6, 35:24
**estoppel** [8] - 57:25, 58:17, 58:22, 58:25, 59:2, 59:5, 59:7, 59:11
**et** [2] - 1:3, 38:8
**evaluate** [1] - 53:1
**event** [6] - 19:18, 27:16,

27:20, 39:23, 63:16, 69:8
**eventually** [1] - 69:9
**everywhere** [1] - 12:8
**evidence** [16] - 8:15, 9:13, 9:16, 11:25, 19:24, 22:17, 34:10, 34:11, 35:7, 39:15, 53:5, 54:5, 54:10, 66:8, 68:22, 69:8
**exact** [4] - 39:15, 53:11, 53:20, 73:22
**exactly** [2] - 18:18, 59:12
**examination** [1] - 39:3
**examine** [1] - 37:4
**example** [14] - 15:7, 15:12, 16:8, 19:11, 26:25, 30:22, 38:9, 42:24, 43:18, 45:6, 53:18, 56:10, 60:19, 71:21
**examples** [1] - 50:1
**excluded** [1] - 21:12
**excluding** [1] - 74:22
**executed** [1] - 67:4
**exhaustive** [1] - 32:7
**exhibits** [2] - 4:5, 9:23
**exist** [4] - 16:12, 17:15, 18:16, 18:21
**existed** [1] - 20:4
**existence** [2] - 16:13, 49:7
**exists** [6] - 21:23, 21:24, 42:25, 44:25, 49:23, 50:20
**expect** [3] - 52:3, 52:4, 52:5
**expected** [1] - 51:12
**expeditiously** [1] - 76:1
**experience** [5] - 16:3, 16:22, 58:4, 62:10, 63:22
**experiences** [1] - 71:3
**experts** [1] - 69:2
**explaining** [1] - 30:18
**exposed** [1] - 11:11
**extent** [12] - 4:25, 7:9, 10:4, 10:11, 15:15, 15:25, 16:1, 31:13, 33:11, 37:6, 61:2, 62:9
**extinguished** [1] - 74:6
**extraordinarily** [1] - 75:24
**F.3d** [1] - 30:11
**face** [1] - 11:9
**faces** [1] - 3:7
**facilities** [1] - 14:10
**fact** [5] - 9:22, 39:18, 42:14, 49:16, 73:5
**factor** [2] - 31:23, 49:10
**factors** [25] - 4:22, 26:7, 26:8, 26:11, 26:23, 27:20, 29:1, 29:10, 30:24, 31:11, 31:24, 32:4, 32:7, 32:19, 33:1, 33:12, 33:13, 49:15, 53:7, 55:13, 55:21, 61:12
**facts** [3] - 47:18, 71:24, 73:5
**factual** [4] - 19:24, 41:11, 49:6, 50:19

**fair** [2] - 58:6, 58:8
**fairly** [1] - 68:1
**faith** [2] - 66:3, 66:4
**falls** [1] - 60:8
**false** [6] - 17:13, 20:25, 21:2, 22:23, 43:10, 72:21
**far** [4] - 20:10, 33:23, 62:19
**feasibility** [1] - 71:10
**feasible** [1] - 17:8
**federal** [2] - 16:16, 70:2
**FEDERICO** [1] - 2:13
**fellowship** [1] - 15:8
**felt** [1] - 70:20
**Fen** [1] - 69:17
**Fen-Phen** [1] - 69:17
**Ferreras** [1] - 30:10
**few** [1] - 72:4
**fewer** [1] - 62:20
**fiduciary** [2] - 7:16, 7:19
**fight** [2] - 66:11, 71:24
**figure** [4] - 20:16, 43:21, 52:18, 61:23
**file** [5] - 67:22, 68:6, 68:15, 73:21, 74:8
**filed** [4] - 44:14, 63:23, 68:25, 71:13
**filing** [1] - 64:8
**fine** [6] - 5:12, 9:6, 17:25, 38:16, 67:2, 76:8
**fired** [2] - 50:13, 52:2
**first** [21] - 5:18, 15:23, 16:16, 26:7, 26:22, 27:3, 27:17, 33:9, 35:10, 35:11, 36:4, 41:3, 50:7, 53:10, 53:15, 53:25, 54:7, 60:2, 65:15, 73:10, 75:21
**fits** [1] - 63:3
**five** [1] - 55:13
**fixing** [1] - 17:4
**fledged** [1] - 34:3
**flexible** [1] - 41:22
**floating** [2] - 4:14, 29:17
**FLoor** [1] - 2:9
**flowing** [1] - 11:2
**focus** [5] - 32:22, 47:20, 48:18, 54:7, 54:18
**folks** [4] - 18:11, 18:14, 18:16, 52:10
**followed** [1] - 60:3
**foregoing** [1] - 76:12
**FOREIGN** [1] - 1:5
**Foreign** [1] - 3:5
**foreseeability** [14] - 49:11, 51:2, 51:3, 51:6, 51:9, 51:11, 51:18, 51:24, 52:7, 52:21, 53:24, 55:14, 55:15
**foreseeable** [4] - 51:20, 51:25, 54:12, 55:22
**forgot** [1] - 17:13

**form** [1] - 36:17
**forth** [1] - 5:9
**forward** [4] - 21:7, 25:23, 35:17, 76:5
**four** [8] - 7:13, 7:14, 7:15, 19:3, 42:21, 43:2, 62:4, 71:8
**four-day** [1] - 62:4
**Fourth** [1] - 31:7
**framework** [1] - 33:12
**frankly** [2] - 61:18, 69:25
**fraud** [14] - 7:6, 8:22, 9:10, 9:15, 9:25, 10:5, 10:16, 10:17, 12:20, 38:2, 38:22, 39:22, 51:21, 63:19
**fraudulent** [1] - 54:14
**front** [2] - 9:4, 10:25
**full** [2] - 34:3, 74:3
**full-fledged** [1] - 34:3
**fully** [2] - 59:21, 60:3
**Fume** [1] - 71:5
**Fumes** [1] - 69:21
**fumes** [1] - 69:23
**functional** [1] - 29:6
**fundamental** [1] - 22:4
**future** [1] - 76:4
**gained** [1] - 65:3
**gaps** [1] - 20:11
**Gates** [18] - 28:18, 28:20, 29:1, 29:3, 29:9, 29:21, 30:7, 30:15, 30:24, 31:6, 31:17, 31:19, 32:4, 32:19, 32:25, 33:8, 33:11
**gears** [1] - 47:20
**generally** [2] - 32:2, 54:2
**geographically** [1] - 13:1
**George** [1] - 13:14
**George's** [6] - 12:11, 13:6, 14:14, 16:20, 42:10, 45:4
**given** [8] - 25:12, 27:11, 40:14, 44:13, 52:20, 53:6, 53:17
**gossip** [1] - 65:11
**GRADUATES** [1] - 1:5
**Graduates** [1] - 3:5
**grand** [1] - 70:24
**great** [3] - 4:3, 44:6, 74:16
**greater** [2] - 22:3, 44:19, 44:24
**griped** [1] - 20:22
**group** [5] - 17:6, 20:20, 47:4, 47:5, 70:15
**guess** [25] - 21:6, 21:7, 22:1, 23:6, 26:3, 27:16, 29:3, 33:11, 34:2, 35:25, 40:23, 42:8, 43:12, 44:10, 45:15, 45:21, 46:1, 51:17, 51:24, 53:4, 60:7, 62:23, 65:19, 68:5, 74:20
**guidance** [1] - 32:7
**guide** [2] - 33:1, 33:8

**guided** [1] - 30:6
**guilty** [4] - 39:22, 51:21, 63:19, 64:17
**Gunnells** [1] - 31:7
**guy** [2] - 21:10, 38:11
**guys** [6] - 6:17, 20:21, 68:15, 72:4
**habit** [1] - 5:11
**half** [1] - 62:1
**half-day** [1] - 62:1
**hand** [2] - 26:4, 26:5
**handed** [1] - 40:15
**handle** [2] - 4:6, 63:5
**happily** [1] - 72:11
**happy** [3] - 5:7, 22:8, 40:4
**hard** [1] - 75:6
**Harlem** [5] - 18:2, 22:14, 22:15, 25:25, 26:1
**harm** [30] - 5:19, 5:22, 12:19, 34:8, 34:10, 34:15, 35:1, 35:3, 35:12, 36:14, 37:17, 37:18, 37:20, 38:19, 38:25, 45:16, 46:14, 47:23, 49:11, 49:13, 50:8, 51:12, 52:7, 54:2, 55:15, 55:23, 57:11, 63:21
**harmed** [1] - 37:1
**harmful** [1] - 69:22
**harms** [1] - 5:21
**health** [3] - 38:21, 39:4, 69:23
**healthcare** [6] - 9:18, 10:2, 12:16, 12:24, 24:25, 55:12
**hear** [11] - 5:7, 19:11, 23:16, 26:13, 26:14, 59:19, 59:20, 66:19, 66:20, 67:16, 72:11
**heard** [5] - 18:19, 19:2, 39:24, 62:7, 63:17
**hearing** [2] - 17:21, 65:16
**help** [1] - 57:4
**helpful** [1] - 75:25
**herself** [1] - 7:7
**highlight** [1] - 49:13
**highly** [1] - 49:23
**himself** [1] - 65:15
**HIPAA** [1] - 14:12
**hired** [5] - 50:11, 50:13, 50:14, 52:2, 60:21
**history** [1] - 54:21
**Hohider** [3] - 31:19, 31:21, 31:22
**home** [1] - 38:16
**hone** [1] - 4:9
**Honor** [49] - 3:3, 3:8, 3:11, 3:14, 3:17, 3:21, 5:22, 6:10, 7:1, 9:12, 11:22, 17:19, 19:21, 21:6, 22:1, 22:11, 24:3, 25:4, 25:18, 26:16, 28:22, 30:5, 30:15, 31:6, 33:11, 34:12, 37:2, 39:9,

41:14, 41:15, 42:18, 44:10, 46:23, 48:9, 48:12, 49:21, 50:19, 53:21, 54:5, 58:20, 60:8, 63:14, 66:8, 68:20, 70:25, 72:15, 73:10, 75:12
**HONORABLE** [1] - 1:11
**hope** [2] - 69:9, 72:6
**horrible** [1] - 45:13
**Hospital** [5] - 12:11, 16:20, 18:2, 22:14, 22:16
**hospital** [7] - 14:4, 14:22, 17:7, 19:1, 20:20, 20:22, 60:20
**hospitals** [3] - 14:1, 20:17, 24:25
**hotly** [1] - 69:4
**Howard** [11] - 9:17, 13:4, 15:7, 16:9, 18:23, 42:12, 44:12, 44:16, 45:3, 45:8
**hypothesize** [1] - 21:16
**hypothesizing** [1] - 38:9, 65:20
**hypothetical** [3] - 39:21, 43:18, 45:7
**identified** [10] - 18:15, 19:6, 28:16, 47:10, 47:13, 53:13, 54:19, 55:6, 60:2, 69:1
**identify** [8] - 12:9, 14:11, 14:13, 21:2, 25:13, 25:14, 40:2, 61:15
**identifying** [2] - 16:25, 17:18
**ignorant** [1] - 45:11
**illusory** [1] - 28:1
**illustrate** [1] - 39:10
**impact** [2] - 8:4, 56:5
**implicate** [1] - 67:7
**implications** [1] - 75:19
**importance** [1] - 55:11
**important** [4] - 5:1, 19:7, 51:15, 62:14
**imposing** [1] - 29:10
**imprisonment** [1] - 72:21
**inadequate** [1] - 60:6
**inartfully** [1] - 11:9
**include** [9] - 11:5, 11:13, 11:20, 22:14, 22:20, 22:21, 25:25, 26:1, 34:7
**includes** [2] - 11:10, 11:12
**including** [4] - 13:1, 19:16, 30:23, 44:20
**inconsistent** [1] - 20:9
**incorrect** [1] - 55:1
**indefinitely** [1] - 9:23
**indictment** [1] - 64:18
**individual** [28] - 5:23, 6:11, 17:1, 17:5, 20:4, 22:20, 35:3, 35:4, 37:1, 37:25, 38:2, 39:16, 42:18, 52:11, 54:11, 55:20, 57:11, 57:14, 59:4, 60:16, 63:20, 64:1, 64:8,

65:5, 66:9, 67:22, 70:6, 70:15
**individual's** [2] - 55:9, 67:5
**individualized** [12] - 8:16, 8:20, 35:2, 35:8, 35:16, 39:14, 46:12, 49:23, 52:13, 52:16, 54:24, 68:3
**individually** [3] - 23:7, 48:8, 54:17
**individuals** [21] - 12:9, 12:12, 12:18, 12:20, 12:22, 13:25, 14:1, 14:11, 16:25, 21:13, 46:17, 50:14, 60:11, 60:19, 61:10, 63:25, 64:4, 71:4, 71:23, 73:4, 73:14
**industry** [1] - 69:20
**industrywide** [1] - 69:22
**inefficient** [1] - 70:1
**infliction** [6] - 5:16, 6:21, 7:13, 42:25, 44:22, 47:12
**information** [8] - 18:8, 25:16, 38:21, 39:5, 49:6, 65:3, 66:21, 69:5
**informational** [1] - 20:11
**informed** [1] - 74:13
**initial** [1] - 57:22
**injured** [1] - 37:16
**injuries** [5] - 7:4, 37:6, 56:4, 59:23, 73:1
**injury** [22] - 8:9, 34:16, 34:17, 34:23, 34:24, 35:13, 36:16, 36:17, 37:16, 39:1, 44:16, 47:17, 49:16, 49:17, 49:19, 51:22, 53:8, 55:14, 63:21, 73:15, 73:21, 75:15
**inquiry** [5] - 17:8, 34:16, 35:6, 57:15, 58:5
**instance** [5] - 5:18, 11:7, 26:7, 46:25, 75:5
**instances** [2] - 24:14, 36:9
**instead** [2] - 66:2, 75:9
**institution** [6] - 9:18, 12:7, 12:10, 22:21, 23:13, 23:18
**institutions** [8] - 10:3, 12:16, 12:24, 16:19, 16:20, 24:25, 25:14, 25:24
**instructive** [1] - 72:15
**insulted** [2] - 5:10, 5:13
**intentional** [1] - 61:4
**interaction** [5] - 54:11, 54:12, 56:14, 72:25, 75:15
**interactions** [2] - 53:10, 75:14
**interest** [17] - 34:17, 35:14, 37:23, 42:3, 42:4, 42:13, 42:16, 43:23, 43:24, 43:25, 44:1, 44:6, 44:7, 44:20, 44:24, 46:16, 60:11
**interesting** [1] - 10:8
**interests** [1] - 36:11

**interplay** [5] - 4:18, 26:4, 27:22, 29:7, 32:22
**intervening** [1] - 52:6
**interwoven** [1] - 53:16
**invasion** [8] - 34:17, 35:14, 36:13, 36:17, 36:18, 36:22, 37:23, 38:20
**involve** [1] - 17:23
**involved** [4] - 14:2, 60:13, 62:18, 71:4
**involvement** [4] - 12:19, 15:16, 18:5, 22:15
**involves** [1] - 25:23
**involving** [5] - 7:6, 17:4, 20:4, 20:20, 39:15
**issue** [56] - 5:21, 5:24, 10:4, 10:16, 11:23, 16:6, 16:7, 16:12, 19:12, 19:20, 19:22, 20:8, 20:19, 21:23, 22:5, 22:21, 22:24, 22:25, 23:10, 23:20, 24:15, 24:22, 24:23, 26:22, 27:5, 27:8, 27:25, 28:3, 28:25, 29:4, 30:16, 30:20, 31:6, 31:25, 32:24, 34:9, 37:8, 39:8, 39:11, 39:16, 46:6, 47:7, 47:18, 52:23, 55:4, 57:23, 59:12, 60:1, 61:9, 61:25, 64:11, 66:9, 75:2, 75:13, 75:19
**issued** [1] - 65:7
**issues** [58] - 4:7, 4:8, 4:14, 4:17, 4:18, 9:1, 11:21, 15:2, 15:13, 17:25, 19:8, 19:9, 19:10, 20:10, 23:4, 23:9, 23:25, 24:6, 25:2, 26:9, 26:10, 26:12, 26:17, 26:19, 27:18, 28:5, 28:10, 29:2, 29:12, 29:17, 30:17, 30:18, 31:12, 32:8, 40:9, 40:11, 40:16, 41:4, 47:21, 47:23, 47:24, 49:3, 52:17, 53:15, 54:3, 54:19, 54:24, 57:21, 59:21, 59:22, 61:15, 62:2, 63:6, 64:13, 70:6, 70:17, 72:18
**iterations** [1] - 19:3
**itself** [2] - 14:3, 47:14
**James** [1] - 1:7
**JANET** [2] - 1:14
**January** [2] - 1:9, 50:20
**Jersey** [11] - 9:18, 13:1, 16:8, 19:11, 19:16, 40:23, 40:24, 41:24, 42:8, 42:9
**JMSC** [2] - 50:4, 50:7
**job** [1] - 38:24
**Jordan** [2] - 30:9, 40:15
**JOSHUA** [1] - 1:11
**JSMC** [1] - 18:7
**Judge** [6] - 30:9, 32:13, 40:15, 55:6, 62:7, 73:3

**judgment** [10] - 15:19, 19:16, 20:7, 22:22, 23:3, 73:18, 73:19, 73:22, 74:5, 74:13
**judicata** [1] - 71:22
**judicial** [1] - 72:25
**judiciary** [1] - 58:4
**jumping** [1] - 23:22
**June** [1] - 67:6
**jurisdiction** [2] - 45:24, 67:21
**jury** [3] - 35:10, 53:1, 53:2
**keep** [2] - 14:1, 75:22
**kept** [4] - 15:4, 15:5, 16:10, 75:21
**key** [1] - 6:18
**Kids** [1] - 72:16
**kids** [1] - 45:12
**kind** [25] - 4:15, 4:24, 6:19, 8:14, 11:10, 15:4, 28:25, 29:10, 29:13, 29:14, 31:23, 32:20, 33:1, 33:3, 33:4, 37:16, 37:17, 47:22, 53:13, 53:19, 63:3, 64:19, 67:10, 67:15, 73:15
**kinds** [2] - 69:20, 72:25
**KLAYMAN** [2] - 2:20, 4:1
**Klayman** [1] - 4:1
**knowledge** [2] - 64:1, 66:22
**known** [3] - 9:24, 12:7, 65:11
**Lane** [1] - 58:5
**language** [1] - 6:5
**last** [6] - 16:6, 28:14, 36:23, 36:24, 63:6, 67:14
**latter** [1] - 26:16
**law** [53] - 6:24, 6:25, 7:2, 7:9, 7:10, 7:11, 8:13, 24:10, 29:18, 29:19, 40:9, 40:11, 40:22, 41:4, 41:5, 41:6, 41:8, 41:9, 41:11, 41:16, 41:21, 41:22, 42:9, 42:11, 42:12, 42:15, 42:19, 42:21, 42:23, 43:1, 43:8, 43:13, 43:19, 44:2, 44:15, 44:19, 45:20, 45:24, 46:2, 46:13, 47:9, 47:15, 47:18, 48:24, 48:25, 49:5, 49:6, 55:7, 57:24, 67:4, 72:21, 75:7
**LAW** [1] - 2:8
**laws** [4] - 43:3, 43:9, 47:5, 47:6
**lawsuit** [1] - 73:21
**lay** [1] - 45:6
**learning** [1] - 54:13
**least** [9] - 6:17, 7:11, 36:1, 42:21, 44:6, 51:8, 51:14, 61:21, 66:7
**leave** [2] - 30:19, 63:4
**leaves** [1] - 23:24
**left** [2] - 8:19, 64:11
**legal** [1] - 50:8

**legally** [4] - 10:8, 34:17, 35:14, 35:17, 37:23
**lenses** [1] - 32:3
**less** [2] - 74:16, 74:17
**letter** [1] - 71:8
**level** [1] - 33:7
**LEWIS** [1] - 2:18
**liability** [19] - 8:1, 19:14, 20:1, 23:8, 24:15, 24:22, 27:5, 28:24, 31:2, 34:3, 34:10, 34:20, 37:19, 39:8, 40:1, 40:3, 72:18, 72:23
**liability-only** [1] - 40:3
**licensed** [1] - 10:3
**licensing** [2] - 50:12, 52:4
**lies** [1] - 19:18
**likelihood** [1] - 53:8
**likely** [1] - 68:1
**limitations** [11] - 63:9, 63:10, 63:11, 63:15, 64:9, 64:13, 65:22, 65:23, 66:6, 66:12, 66:24
**limited** [1] - 61:9
**list** [2] - 12:12, 30:4
**listening** [1] - 33:20
**Litigation** [1] - 58:12
**litigation** [5] - 16:23, 60:1, 60:5, 61:3, 70:13
**live** [1] - 28:19
**lives** [3] - 42:14, 44:11, 45:7
**living** [1] - 45:12
**LLC** [1] - 1:14
**LLP** [1] - 2:18
**locally** [1] - 68:16
**logic** [1] - 57:3
**logical** [2] - 40:8, 62:11
**logically** [1] - 32:9
**look** [23] - 7:12, 13:17, 16:14, 23:5, 27:17, 31:11, 31:13, 31:24, 32:14, 32:15, 33:1, 33:2, 33:12, 41:8, 42:1, 42:2, 43:2, 49:23, 50:1, 58:13, 72:9, 72:15
**looked** [1] - 50:14
**looking** [4] - 29:1, 41:18, 42:20, 59:2
**lose** [1] - 68:20
**lost** [1] - 21:20
**luxury** [1] - 41:19
**mailed** [1] - 71:9
**mailing** [2] - 53:19, 71:7
**maintain** [1] - 16:21
**maintained** [1] - 27:11
**malpractice** [6] - 16:1, 55:16, 56:3, 64:23, 66:8, 66:14
**manage** [1] - 63:4
**manageability** [6] - 33:5, 41:18, 59:12, 61:12, 62:24, 75:19

**manifestation** [2] - 7:5, 8:12
**marching** [1] - 33:15
**marginal** [2] - 21:24, 22:2
**Marie** [2] - 1:20, 76:16
**Market** [3] - 1:8, 2:3, 2:20
**Martin** [1] - 27:25
**Maryland** [33] - 1:16, 2:10, 2:15, 7:2, 10:3, 12:12, 40:22, 41:24, 42:4, 42:5, 42:11, 43:1, 43:12, 43:20, 43:24, 44:6, 44:13, 44:15, 44:16, 44:19, 44:21, 44:25, 45:3, 46:21, 47:15, 60:1, 60:5, 60:21, 68:4, 68:6
**mass** [3] - 67:17, 68:25, 69:14
**master** [1] - 68:18
**matter** [5] - 10:6, 32:18, 32:19, 48:25, 76:13
**MATTHEW** [1] - 2:20
**Matthew** [1] - 4:1
**matthew.klayman@morganlewis.com** [1] - 2:23
**McEnroe** [5] - 2:19, 3:24, 66:25, 67:3
**MDL** [5] - 67:25, 68:9, 69:15, 69:21, 71:5
**MDLs** [1] - 68:24
**mean** [72] - 5:9, 10:7, 10:10, 10:17, 11:2, 12:4, 13:12, 15:25, 16:24, 17:3, 17:12, 18:1, 19:19, 20:18, 20:21, 21:15, 21:20, 21:23, 23:4, 23:15, 24:5, 24:13, 25:6, 26:7, 26:22, 27:5, 28:15, 28:16, 29:9, 31:13, 33:5, 33:7, 36:23, 37:18, 39:18, 40:14, 40:23, 42:7, 43:16, 43:21, 45:4, 45:18, 46:5, 47:22, 53:25, 55:16, 56:1, 56:11, 56:17, 56:25, 57:2, 60:3, 61:16, 62:9, 65:9, 65:10, 65:24, 66:13, 66:15, 66:17, 67:11, 67:20, 69:16, 69:18, 70:19, 70:20, 74:2, 74:7, 74:14, 75:1
**meaning** [2] - 26:17, 35:4
**meaningful** [4] - 15:16, 70:12, 74:10, 74:11
**meaningfully** [1] - 43:3
**means** [3] - 10:1, 16:25, 72:9
**meant** [2] - 11:13, 57:8
**measure** [2] - 20:16, 23:19
**MEDICAL** [1] - 1:5
**Medical** [3] - 3:5, 13:2, 13:7
**medical** [13] - 8:15, 14:12, 15:25, 16:4, 18:20, 18:21, 24:25, 34:23, 55:16, 56:2, 64:23, 67:5, 67:6
**medication** [2] - 17:6, 17:7

**medicine** [4] - 9:19, 12:8, 44:21, 52:6
**meeting** [1] - 39:21
**meets** [1] - 38:7
**member** [5] - 20:6, 35:4, 60:16, 65:2
**members** [13] - 14:13, 19:7, 21:14, 24:24, 25:1, 27:10, 46:20, 49:8, 52:11, 60:14, 66:5, 67:7, 74:2
**mention** [1] - 18:4
**mentioned** [2] - 13:6, 47:17
**meritorious** [1] - 66:14
**merits** [2] - 19:10, 22:24
**met** [1] - 39:20
**method** [3] - 12:5, 17:9, 17:10
**methods** [1] - 70:10
**Middle** [1] - 72:18
**might** [13] - 10:12, 26:20, 30:20, 31:12, 46:20, 50:14, 60:16, 60:19, 61:10, 62:12, 66:6, 74:15, 74:16
**mill** [1] - 65:11
**mind** [8] - 5:5, 5:8, 6:24, 8:19, 11:21, 72:6, 72:8, 75:22
**mini** [2] - 61:11, 61:17
**mini-trials** [2] - 61:11, 61:17
**minimal** [1] - 12:20
**minimum** [1] - 42:20
**minus** [1] - 63:23
**minute** [1] - 76:7
**minutes** [2] - 52:24, 72:4
**missed** [2] - 13:9, 48:3
**Mitchell** [2] - 1:20, 76:16
**modification** [1] - 28:8
**modifications** [1] - 22:6
**modifying** [1] - 17:21
**MONIQUE** [1] - 1:3
**moreover** [1] - 47:15
**MORGAN** [1] - 2:18
**morning** [3] - 3:8, 3:11, 3:14
**most** [10] - 24:13, 27:24, 42:2, 42:13, 42:15, 43:23, 45:17, 46:16, 48:15, 74:24
**mostly** [1] - 59:21
**motion** [3] - 10:25, 22:7, 76:1
**motions** [2] - 61:22, 68:9
**motivate** [1] - 61:18
**move** [2] - 30:4, 46:9
**moved** [1] - 43:18
**MR** [124] - 3:8, 3:11, 3:14, 3:17, 3:21, 4:1, 5:22, 6:7, 6:10, 6:20, 7:1, 7:19, 7:23, 8:2, 8:5, 8:7, 8:10, 8:14, 8:21, 8:24, 9:6, 9:7, 9:12, 10:10, 10:13, 10:20, 11:15, 11:22, 13:3, 13:5, 13:8, 13:10, 13:21, 13:24, 14:7,

14:16, 14:19, 14:23, 15:9, 15:15, 15:25, 16:14, 16:19, 17:19, 19:21, 21:5, 22:1, 22:11, 22:14, 24:3, 24:10, 24:18, 24:20, 25:7, 25:11, 25:18, 26:1, 26:16, 27:7, 28:22, 30:1, 30:5, 31:21, 32:2, 33:10, 34:12, 36:9, 36:15, 37:2, 37:12, 37:14, 37:21, 38:18, 38:20, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 46:23, 48:9, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 54:5, 55:1, 55:4, 56:7, 56:16, 56:19, 56:22, 57:7, 57:10, 58:3, 58:20, 59:6, 59:12, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 68:20, 70:8, 70:25, 72:12, 72:14, 73:9, 74:20, 75:11
**MS** [2] - 3:24, 67:3
**multifactorial** [1] - 49:9
**multiple** [6] - 9:16, 50:13, 70:9, 70:10, 71:14
**must** [2] - 30:13, 33:18
**mutuality** [1] - 58:9
**naked** [1] - 36:12
**name** [4] - 9:3, 9:5, 21:8, 31:18
**named** [5] - 44:11, 50:9, 57:22, 60:15, 63:17
**names** [1] - 3:7
**narrow** [1] - 32:13
**narrower** [2] - 27:6, 47:21
**narrowest** [1] - 32:11
**nationwide** [1] - 46:24
**naturally** [1] - 11:2
**nature** [11] - 38:25, 39:3, 49:13, 53:17, 54:20, 56:2, 56:3, 56:14, 56:24, 57:11, 69:6
**ncentrella@conradobrien.com** [1] - 2:5
**nearby** [1] - 45:5
**necessary** [1] - 39:25
**need** [19] - 5:3, 5:12, 8:12, 8:14, 23:11, 23:14, 23:18, 25:12, 25:14, 28:3, 28:7, 35:23, 41:5, 66:4, 67:9, 67:16, 68:22, 72:7
**needing** [1] - 28:11
**needs** [3] - 30:21, 31:10, 54:17
**negate** [1] - 32:20
**negatives** [4] - 17:13, 20:25, 21:2, 22:23
**negligence** [11] - 5:16, 5:19, 7:2, 7:14, 10:11, 36:12,

47:10, 47:14, 47:16, 48:6, 52:10
**negligent** [7] - 5:16, 6:21, 7:12, 35:11, 42:25, 44:22, 47:12
**negligently** [1] - 55:18
**nerve** [1] - 38:16
**new** [1] - 50:14
**New** [4] - 40:23, 41:24, 42:8, 42:9
**newspaper** [1] - 66:20
**next** [1] - 30:4
**NICHOLAS** [1] - 2:3
**Nick** [1] - 3:14
**Nigeria** [6] - 11:7, 11:11, 11:23, 11:24, 12:1, 17:24
**nine** [1] - 69:1
**NO** [1] - 1:3
**non** [1] - 32:7
**non-exhaustive** [1] - 32:7
**nonascertainable** [1] - 21:4
**none** [3] - 45:18, 45:19, 45:23
**nonetheless** [1] - 52:1
**normal** [2] - 38:14, 38:15
**normally** [1] - 6:23
**Northern** [1] - 70:3
**note** [5] - 17:13, 62:23, 64:10, 73:11, 75:21
**noted** [3] - 30:12, 31:6, 47:1
**notes** [1] - 30:16
**nothing** [2] - 46:14, 60:22
**notice** [14] - 18:9, 19:13, 22:19, 23:12, 24:8, 24:11, 25:7, 25:9, 25:13, 67:11, 73:14, 74:10, 74:11
**notion** [1] - 47:22
**notwithstanding** [1] - 72:23
**number** [6] - 25:2, 36:5, 49:9, 67:17, 69:8, 69:19
**numerosity** [2] - 32:12, 33:16
**numerous** [2] - 22:7, 70:17
**O'BRIEN** [1] - 2:2
**OB** [1] - 56:15
**objective** [9] - 7:8, 12:14, 12:15, 16:24, 17:8, 20:13, 20:14, 20:16, 23:19
**objectivity** [1] - 17:16
**obligations** [3] - 25:1, 46:22, 52:9
**observation** [2] - 37:7, 37:24
**observe** [1] - 38:8
**observing** [1] - 15:12
**obtained** [2] - 13:15, 38:1
**obviously** [7] - 9:13, 13:25, 34:13, 43:8, 62:9, 68:11, 72:23
**occur** [3] - 33:18, 44:2, 49:14

**occurred** [3] - 11:23, 65:8, 65:10
**occurs** [1] - 55:25
**odd** [1] - 45:22
**odds** [1] - 65:17
**offensively** [1] - 58:6
**offer** [5] - 8:15, 32:7, 32:10, 53:9, 53:11
**offered** [1] - 75:20
**offering** [1] - 19:25
**office** [2] - 38:13, 64:6
**OFFICES** [1] - 2:8
**Official** [1] - 1:21, 76:16
**Ohio** [1] - 70:3
**old** [1] - 5:11
**once** [3] - 4:15, 4:24, 71:14
**one** [51] - 7:17, 9:1, 15:2, 16:6, 21:5, 22:12, 23:3, 23:11, 23:18, 23:24, 26:3, 26:4, 28:2, 31:19, 37:20, 38:5, 40:20, 43:6, 43:16, 44:15, 45:1, 45:6, 45:21, 47:2, 49:10, 50:5, 50:9, 53:1, 53:6, 55:13, 57:1, 57:14, 57:19, 57:22, 60:2, 61:19, 61:25, 62:11, 63:7, 63:24, 65:25, 66:8, 67:3, 68:1, 70:14, 72:14, 73:9, 74:22, 74:25
**One** [1] - 2:9
**ones** [1] - 69:18
**operate** [1] - 74:10
**Opioids** [1] - 69:16
**opportunity** [2] - 5:1, 35:17
**opposed** [4] - 8:8, 28:11, 61:4, 70:22
**opposition** [1] - 60:3
**opt** [13] - 24:8, 25:8, 25:9, 61:6, 61:8, 61:9, 73:14, 73:16, 73:18, 74:2, 74:9, 74:19, 74:21
**opt-out** [8] - 24:8, 25:8, 25:9, 61:8, 73:14, 74:9, 74:19, 74:21
**opted** [1] - 75:16
**option** [2] - 34:2, 47:21
**options** [1] - 63:4
**ORAL** [1] - 1:5
**order** [3] - 3:1, 41:1, 49:5
**ordinary** [1] - 56:22
**organization** [1] - 18:5
**organizations** [1] - 17:22
**otherwise** [5] - 4:8, 32:10, 40:24, 42:15, 67:22
**ourselves** [1] - 13:24
**outcome** [6] - 27:4, 36:21, 43:13, 45:22, 58:19, 71:8
**outline** [2] - 23:22, 63:6
**outlined** [1] - 4:20
**overlap** [5] - 33:2, 34:9, 35:7,

35:20, 48:13
**owe** [4] - 24:24, 49:8, 50:7
**owes** [1] - 50:16
**own** [2] - 60:16, 61:10
**p.m** [3] - 1:9, 3:1, 76:9
**PA** [2] - 1:8, 2:13
**page** [1] - 9:8
**Palsgraf** [2] - 49:20, 51:20
**panel** [1] - 69:15
**panoply** [1] - 74:3
**paper** [1] - 9:22
**Park** [1] - 58:5
**part** [12] - 16:1, 17:20, 17:22, 18:12, 24:3, 30:21, 31:9, 44:25, 45:17, 49:10, 52:10, 55:7
**particular** [14] - 16:9, 20:7, 26:5, 49:12, 49:14, 49:23, 50:1, 53:10, 55:15, 55:23, 57:18, 57:23, 60:13, 74:25
**particularly** [2] - 17:14, 21:21
**parties** [2] - 53:19, 58:22
**partners** [1] - 65:25
**parts** [1] - 60:10
**party** [1] - 21:19
**past** [1] - 28:13
**patient** [20] - 7:23, 7:24, 12:4, 12:22, 14:7, 15:11, 15:17, 16:23, 34:22, 36:11, 36:12, 38:7, 54:11, 55:18, 56:7, 56:10, 56:11, 56:20, 58:8, 67:12
**patients** [22] - 11:7, 11:12, 11:24, 12:1, 14:18, 15:13, 15:20, 16:10, 16:11, 25:20, 25:21, 34:22, 35:13, 36:17, 37:3, 37:4, 37:5, 39:5, 54:9, 57:12, 57:14
**Patrick** [1] - 3:8
**PATRICK** [1] - 1:15
**patterns** [1] - 36:1
**PAUL** [1] - 2:8
**Paul** [2] - 2:14, 3:11
**pause** [1] - 35:25
**PC** [2] - 2:2, 2:8
**pencil** [1] - 11:19
**pending** [2] - 64:23, 76:1
**Pennsylvania** [30] - 2:4, 2:21, 6:24, 7:9, 7:10, 7:11, 8:13, 40:22, 41:24, 42:1, 43:12, 44:2, 44:3, 44:5, 44:9, 44:14, 44:17, 44:18, 45:15, 46:3, 46:4, 46:9, 46:15, 46:21, 47:9, 67:20, 72:19
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania's** [4] - 41:22, 43:25, 44:1, 44:7
**people** [13] - 15:13, 17:18, 25:13, 36:2, 36:5, 37:15,

42:5, 42:8, 42:9, 42:11, 65:11, 65:21, 66:1
**percent** [1] - 17:1
**perception** [1] - 8:9
**perfect** [1] - 17:1
**perfectly** [1] - 72:10
**performed** [2] - 44:4, 55:18
**perhaps** [4] - 50:2, 65:1, 65:2, 65:3
**period** [6] - 18:11, 22:18, 24:8, 25:8, 25:9, 61:8
**permutations** [1] - 31:5
**person** [15] - 21:6, 37:24, 38:2, 38:21, 38:22, 39:17, 50:5, 50:6, 50:7, 50:17, 52:5, 66:16, 75:14, 75:16
**Person** [1] - 66:22
**person's** [1] - 65:5
**personal** [2] - 73:15, 73:21
**personally** [1] - 32:20
**perspective** [9] - 17:18, 18:25, 40:2, 43:13, 46:19, 48:21, 59:16, 60:18, 74:1
**perspectives** [1] - 57:18
**PETER** [1] - 2:8
**pharmacy** [1] - 17:4
**phase** [6] - 53:2, 53:10, 53:12, 53:15, 53:16, 54:10
**Phen** [1] - 69:17
**Philadelphia** [3] - 1:8, 2:4, 2:21
**phrase** [1] - 12:16
**physical** [8] - 7:4, 8:3, 8:4, 8:12, 15:11, 47:17, 75:15
**physician** [8] - 7:23, 12:4, 12:22, 14:3, 20:20, 34:25, 37:25, 56:22
**physician-patient** [3] - 7:23, 12:4, 12:22
**physicians** [2] - 16:2, 44:20
**pick** [1] - 46:21
**piece** [7] - 9:22, 17:16, 20:23, 21:5, 40:20, 53:24, 54:17
**place** [10] - 17:6, 33:9, 40:9, 44:5, 45:14, 45:20, 45:22, 45:24, 46:5, 68:18
**placed** [1] - 52:1
**places** [1] - 16:22
**plaintiff** [38] - 7:7, 8:3, 8:16, 20:5, 20:7, 23:5, 42:18, 44:10, 44:11, 46:7, 46:13, 49:2, 49:12, 49:16, 49:24, 50:9, 52:2, 52:7, 52:13, 53:7, 53:23, 54:20, 55:9, 55:20, 55:24, 56:2, 56:3, 57:18, 58:23, 58:24, 59:9, 66:19, 69:5, 69:11, 71:6, 74:14, 74:16
**plaintiff's** [6] - 3:7, 45:15,

**practiced** [1] - 18:3
**practicing** [1] - 10:2
**pre** [1] - 19:19
**preceded** [1] - 64:19
**precise** [1] - 9:22
**preclude** [1] - 54:24
**precludes** [2] - 47:19, 65:23
**preclusive** [2] - 61:1, 69:12
**predated** [3] - 18:5, 22:16, 31:19
**predates** [2] - 11:13, 18:7
**predominance** [7] - 26:18, 28:4, 28:9, 29:13, 29:20, 31:9, 32:24
**pregnancy** [1] - 56:12
**pregnant** [2] - 38:10, 56:11
**prepared** [1] - 1:23
**prerequisite** [1] - 10:2
**present** [2] - 30:24, 53:22
**presented** [8] - 31:1, 32:6, 35:8, 43:14, 53:6, 54:1, 54:6, 63:16
**presents** [1] - 39:11
**press** [5] - 63:18, 63:24, 64:1, 65:7, 65:14
**presumably** [4] - 25:15, 56:13, 74:8, 74:23
**presume** [2] - 15:11, 68:10
**pretrial** [1] - 69:3
**pretty** [4] - 4:6, 5:3, 21:9, 47:9
**prevails** [1] - 73:19
**prevent** [2] - 59:1, 59:5
**price** [1] - 17:4
**primarily** [2] - 55:5, 64:10
**Prince** [7] - 12:11, 13:6, 13:13, 14:14, 16:20, 42:10, 45:3
**privacy** [4] - 36:13, 36:19, 36:22, 38:20
**private** [6] - 13:7, 14:17, 20:19, 38:7, 42:10, 55:11
**privileges** [2] - 14:15, 14:16
**problem** [20] - 17:17, 19:5, 22:2, 22:25, 30:24, 34:8, 39:12, 40:18, 42:23, 46:1, 48:5, 51:23, 52:23, 53:14, 53:22, 61:2, 64:9, 73:17, 75:3, 75:18
**problems** [15] - 17:20, 22:4, 22:8, 23:17, 29:17, 29:18, 30:22, 30:25, 32:16, 32:24, 34:4, 40:1, 43:14, 46:9, 56:12
**procedure** [1] - 15:16
**procedures** [2] - 14:1, 14:13
**proceed** [1] - 58:1
**proceeding** [7] - 7:18, 8:6, 35:16, 36:16, 65:6, 66:10, 66:24

**Proceedings** [2] - 1:23, 76:9
**proceedings** [8] - 8:17, 8:20, 35:2, 35:8, 40:17, 64:14, 69:3, 76:13
**process** [4] - 5:8, 25:16, 55:7, 65:4
**processing** [1] - 22:17
**producers** [1] - 70:9
**professional** [2] - 13:15, 14:20
**program** [3] - 9:17, 9:18, 18:23
**prong** [2] - 8:6, 61:14
**proof** [10] - 22:25, 33:4, 35:20, 49:3, 52:22, 54:1, 69:20, 69:24, 70:5, 70:11
**proofs** [2] - 48:13, 52:25
**proper** [1] - 14:12
**properly** [2] - 9:20, 12:1
**prophylactically** [1] - 66:2
**proposed** [6] - 12:6, 22:4, 25:2, 32:8, 34:1, 57:13
**proposing** [8] - 5:23, 6:17, 8:17, 20:1, 27:17, 27:19, 34:12, 34:18
**proposition** [1] - 42:22
**prosecution** [1] - 64:16
**prospects** [1] - 47:21
**protected** [4] - 34:17, 35:14, 37:23, 38:21
**provable** [1] - 12:21
**prove** [1] - 8:14
**proved** [3] - 7:4, 7:6, 58:13
**proverbial** [1] - 44:7
**provided** [3] - 9:16, 9:22, 67:10
**providing** [3] - 15:19, 33:12, 47:2
**provisions** [1] - 29:8
**pthronson@jjsjustice.com** [1] - 1:17
**public** [3] - 49:8, 55:11, 65:17
**punitive** [1] - 46:17
**punt** [2] - 23:20, 41:4
**purchased** [2] - 17:5, 17:7
**purchasers** [1] - 21:17
**purely** [1] - 71:16
**purport** [1] - 18:13
**purported** [2] - 9:19, 12:8
**purpose** [2] - 22:19, 39:2
**purposes** [2] - 6:13, 57:15
**pursue** [4] - 60:14, 61:3, 75:5, 75:9
**put** [13] - 3:7, 9:4, 18:8, 34:22, 36:12, 37:3, 37:4, 37:9, 40:20, 68:17, 68:23, 69:8, 69:24
**putting** [1] - 33:3

**pvettori@lawpga.com** [1] - 2:11
**qualifications** [1] - 38:1
**quasi** [1] - 55:11
**questions** [18] - 4:8, 6:2, 11:3, 15:1, 20:5, 26:3, 32:5, 32:6, 34:13, 39:10, 39:12, 39:14, 40:25, 43:17, 49:12, 52:13, 63:12, 69:10
**raise** [3] - 63:9, 74:6, 75:20
**raised** [1] - 40:10
**raising** [1] - 47:11
**range** [1] - 71:3
**rather** [3] - 22:25, 29:6, 67:18
**RDR** [2] - 1:20, 76:16
**Re** [2] - 12:6, 58:12
**reaction** [1] - 39:24
**read** [8] - 5:3, 23:24, 40:14, 48:2, 51:8, 51:20, 63:20, 72:7
**reading** [1] - 11:8
**reality** [1] - 71:1
**really** [20] - 12:21, 19:20, 26:6, 28:14, 29:3, 29:4, 31:2, 40:21, 40:22, 43:25, 46:15, 46:20, 49:1, 51:19, 60:4, 63:2, 69:11, 75:6
**reanalyze** [1] - 55:17
**reason** [8] - 11:17, 11:18, 19:17, 24:7, 32:9, 51:1, 58:16, 58:18
**reasonable** [1] - 56:19
**recent** [1] - 27:24
**recently** [1] - 41:15
**recitation** [1] - 19:3
**recognize** [1] - 20:11
**recollection** [1] - 31:18
**record** [6] - 9:13, 12:24, 16:17, 21:20, 41:16, 76:13
**recorded** [1] - 15:24
**records** [18] - 8:15, 14:10, 14:12, 15:4, 15:5, 16:4, 16:10, 16:13, 16:21, 17:5, 18:16, 18:18, 18:20, 18:21, 21:3, 21:7, 21:17
**recover** [1] - 39:20
**red** [1] - 11:19
**reference** [9] - 6:1, 6:3, 7:7, 8:25, 9:9, 18:2, 55:5, 55:8, 58:11
**referenced** [1] - 9:1
**references** [1] - 64:2
**reflect** [3] - 14:8, 18:18, 18:22
**reflected** [2] - 15:20, 16:3
**reflecting** [1] - 14:9
**regard** [1] - 31:24
**regardless** [4] - 26:19, 28:18, 39:2, 39:3

53:10, 54:21, 72:13, 75:2
**Plaintiffs** [4] - 1:18, 2:6, 2:11, 2:16
**plaintiffs** [43] - 3:9, 3:12, 3:15, 3:18, 4:20, 5:19, 6:11, 7:20, 11:4, 22:2, 26:13, 27:9, 27:12, 31:3, 31:8, 32:10, 35:17, 39:19, 41:23, 43:11, 44:3, 44:23, 50:10, 54:13, 57:22, 60:15, 61:19, 62:17, 62:19, 63:17, 63:20, 64:4, 64:11, 67:14, 70:15, 72:24, 73:11, 74:3, 74:14, 74:24, 75:7
**plan** [3] - 53:5, 62:7, 62:14
**play** [4] - 42:15, 62:11, 62:12, 62:13
**playbook** [2] - 67:18, 68:5
**playing** [1] - 54:3
**plea** [4] - 51:21, 63:19, 64:17, 64:21
**plead** [1] - 66:1
**pleadings** [1] - 4:5
**pled** [1] - 39:22
**plus** [1] - 29:14
**point** [12] - 16:10, 16:21, 22:12, 23:3, 25:23, 28:2, 28:15, 52:18, 66:12, 67:3, 73:9, 73:25
**pointed** [2] - 49:22, 64:10
**points** [1] - 70:10
**port** [1] - 57:3
**posing** [1] - 23:17
**posit** [1] - 44:4
**positing** [2] - 44:24, 57:19
**position** [5] - 29:5, 35:12, 36:13, 37:4, 60:17
**possession** [1] - 21:18
**possibility** [8] - 17:12, 32:20, 40:23, 45:23, 63:25, 65:21, 74:6, 74:18
**possible** [3] - 17:2, 74:4, 74:23
**Post** [1] - 75:21
**post** [1] - 19:18
**Post-it** [1] - 75:21
**posture** [1] - 62:16
**potential** [3] - 32:24, 64:8, 67:7
**potentially** [9] - 11:10, 11:12, 34:8, 36:23, 43:6, 45:9, 65:4, 67:7, 74:5
**Powell** [1] - 72:16
**practical** [4] - 12:15, 32:18, 32:19, 75:18
**practice** [17] - 9:19, 10:3, 12:8, 13:7, 14:5, 14:18, 14:21, 16:1, 20:19, 38:7, 42:10, 44:21, 52:5, 61:22, 67:5, 67:6, 70:20

**regulating** [3] - 42:3, 42:4, 44:20
**reject** [1] - 32:17
**rejected** [1] - 31:7
**related** [5] - 11:2, 51:22, 67:3, 67:24, 73:11
**relates** [1] - 17:20
**relationship** [6] - 7:22, 7:24, 12:4, 12:22, 56:8, 56:10
**relatives** [1] - 8:16
**release** [5] - 63:18, 63:24, 64:1, 65:8, 65:14
**relevant** [6] - 30:14, 34:16, 47:5, 47:10, 49:17, 57:15
**relitigate** [1] - 59:11
**remain** [1] - 47:22
**remaining** [1] - 30:18
**remember** [1] - 21:8
**remind** [1] - 5:2
**remoteness** [1] - 49:21
**remove** [2] - 43:14, 68:6
**removed** [1] - 68:8
**rendered** [1] - 14:8
**rendering** [1] - 15:18
**renders** [2] - 21:3, 60:6
**repeat** [1] - 72:7
**repetitions** [1] - 5:4
**rephrase** [1] - 40:13
**report** [2] - 18:10, 51:20
**Reporter** [2] - 1:21, 76:16
**represent** [1] - 6:17
**representation** [1] - 33:17
**representative** [1] - 27:12
**representatives** [1] - 61:14
**represented** [1] - 62:20
**Representing** [5] - 1:18, 2:6, 2:11, 2:16, 2:23
**requesting** [1] - 14:9
**requirement** [3] - 16:16, 51:2, 51:4
**requirements** [2] - 20:12, 31:10
**res** [1] - 71:22
**Reservoir** [1] - 1:15
**residence** [1] - 67:5
**residency** [6] - 9:17, 15:7, 15:8, 15:9, 18:23
**resident** [4] - 15:22, 38:1, 44:16, 45:9
**residents** [1] - 15:5, 16:2, 41:23
**resolution** [4] - 5:24, 69:10, 69:11, 70:13
**resolve** [10] - 30:13, 40:11, 40:13, 40:16, 40:17, 57:19, 57:21, 57:24, 68:13, 70:17
**resolved** [9] - 22:22, 30:18, 48:3, 48:4, 57:23, 64:13, 65:5, 67:17, 68:18

**respect** [21] - 17:24, 18:9, 19:24, 22:23, 26:19, 27:21, 27:22, 28:9, 29:2, 34:15, 35:5, 37:7, 43:12, 44:13, 50:18, 56:20, 56:23, 59:8, 60:1, 64:16, 75:11
**respectfully** [2] - 19:21, 72:1
**respects** [4] - 24:14, 45:23, 68:21, 70:20
**respond** [2] - 22:11, 39:7
**response** [2] - 46:23, 59:20
**RESPONSE** [1] - 3:3
**responses** [3] - 11:7, 19:13, 64:3
**rest** [2] - 32:15, 33:2
**Restatement** [1] - 9:11
**result** [6] - 12:19, 37:16, 37:17, 50:8, 58:8, 63:21
**retention** [2] - 16:7, 16:17
**retrieval** [1] - 25:16
**retry** [1] - 60:4
**revealed** [1] - 66:23
**revenue** [4] - 13:16, 13:17, 14:20, 14:22
**reversing** [1] - 30:12
**review** [1] - 14:10
**reviews** [1] - 52:8
**RICO** [1] - 72:20
**rights** [2] - 73:4, 74:12
**rigorous** [1] - 29:22
**rise** [6] - 25:1, 44:4, 47:2, 47:16, 54:12, 54:14
**risk** [2] - 51:10, 51:11
**risks** [1] - 71:18
**RMR** [2] - 1:20, 76:16
**role** [1] - 55:10
**room** [11] - 15:12, 21:9, 34:22, 35:9, 37:3, 37:10, 37:22, 38:11, 38:13, 39:4, 67:12
**rounding** [3] - 16:2, 17:14, 36:5
**rounds** [2] - 15:21, 15:23
**rubric** [2] - 5:20, 63:3
**rubrics** [1] - 61:16
**Rule** [11] - 4:18, 20:9, 26:4, 41:17, 62:22, 63:1, 65:25, 66:3, 66:4, 71:14, 72:1
**rules** [1] - 27:23
**ruling** [1] - 75:23
**run** [3] - 20:18, 62:21, 68:17
**RUSSELL** [1] - 1:3
**Russell** [1] - 3:4
**sat** [2] - 21:9, 75:1
**satisfied** [2] - 26:18, 32:13
**save** [1] - 39:14
**saved** [1] - 67:14
**saw** [2] - 12:1, 40:14
**scales** [1] - 44:8

**scenario** [6] - 38:6, 46:8, 50:2, 53:21, 71:18, 71:19
**scenarios** [1] - 44:23
**scheduled** [1] - 76:3
**SCHOCHOR** [1] - 2:13
**School** [2] - 58:11, 58:12
**scope** [1] - 56:5
**search** [3] - 13:24, 13:25, 67:4
**seated** [2] - 3:2, 5:11
**second** [7] - 14:25, 40:7, 53:12, 53:16, 54:10, 54:16, 61:11
**secondary** [1] - 66:10
**Section** [1] - 9:11
**section** [1] - 55:18
**sections** [1] - 32:22
**Security** [3] - 39:22, 51:21, 63:19
**see** [17] - 16:3, 29:23, 32:25, 34:4, 34:8, 35:18, 35:25, 48:1, 48:19, 54:1, 54:3, 54:5, 56:12, 56:15, 59:15, 62:11, 68:8
**seeing** [1] - 42:5
**seek** [2] - 17:23, 74:24
**seeking** [1] - 74:22
**seem** [5] - 23:8, 31:22, 54:23, 59:3, 61:19
**sees** [2] - 23:17, 53:24
**send** [1] - 12:7
**senior** [1] - 15:22
**sense** [8] - 12:15, 24:13, 32:10, 35:7, 35:20, 39:1, 59:25, 75:4
**sent** [1] - 13:16
**separate** [1] - 52:8
**separation** [1] - 20:2
**serious** [1] - 17:25
**served** [1] - 61:13
**services** [1] - 14:8
**set** [1] - 61:11
**setting** [1] - 71:10
**settlement** [1] - 69:9
**seven** [1] - 50:11
**several** [1] - 32:3
**SHAFFER** [43] - 2:19, 3:21, 9:7, 17:19, 19:21, 21:5, 22:1, 30:1, 30:5, 31:21, 32:2, 33:10, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 70:25, 73:9, 74:20, 75:11
**Shaffer** [12] - 3:22, 14:24, 16:5, 16:6, 17:11, 23:17, 30:3, 39:7, 48:22, 54:19,

63:8, 73:8
**Shaffer's** [2] - 23:3, 68:5
**share** [1] - 57:13
**sheets** [1] - 69:6
**Sheridan** [1] - 41:15
**shift** [1] - 47:20
**Shivarelo** [1] - 73:3
**shoehorn** [2] - 63:1, 71:15
**Shore** [7] - 9:18, 13:2, 16:8, 19:11, 19:16, 40:24, 42:9
**short** [1] - 61:24
**short-circuit** [1] - 61:24
**show** [2] - 15:14, 67:13
**shown** [1] - 56:8
**shows** [3] - 9:13, 12:24
**side** [6] - 3:7, 19:14, 51:19, 69:1, 72:13, 75:2
**sides** [1] - 58:7
**sideshow** [1] - 11:17
**signed** [2] - 61:19, 62:17
**significant** [7] - 27:2, 40:21, 42:2, 42:13, 42:16, 43:23, 62:8
**similar** [1] - 47:6
**similarly** [1] - 30:16
**simple** [1] - 49:7
**simpler** [1] - 70:16
**simplest** [1] - 49:4
**simply** [5] - 32:10, 46:19, 62:23, 74:20, 74:21
**single** [7] - 17:1, 46:7, 47:4, 55:17, 71:7, 71:8
**singular** [1] - 47:1
**sit** [1] - 76:7
**sits** [2] - 38:11, 38:13
**sitting** [1] - 67:12
**situation** [4] - 46:14, 49:12, 60:16, 71:12
**six** [2] - 50:11, 70:2
**Sixth** [2] - 27:25, 28:19
**slam** [1] - 70:24
**slightly** [1] - 59:6
**slower** [2] - 70:5, 70:6
**small** [1] - 45:4
**Social** [3] - 39:22, 51:21, 63:19
**solution** [1] - 59:3
**someone** [12] - 19:5, 21:9, 21:11, 38:10, 38:14, 42:14, 43:18, 50:4, 51:20, 61:2, 74:4, 74:17
**sometime** [1] - 39:21
**sometimes** [4] - 61:16, 66:14, 66:15, 75:2
**somewhere** [4] - 13:13, 26:23, 69:15, 74:8
**sonogram** [1] - 38:15
**sorry** [2] - 35:21, 58:20
**sort** [68] - 4:8, 4:10, 4:16,

4:19, 4:21, 5:20, 6:4, 7:14, 7:15, 10:15, 10:23, 11:2, 17:15, 19:3, 20:12, 21:4, 21:24, 23:1, 24:5, 24:9, 25:15, 26:3, 26:5, 26:8, 26:11, 28:20, 30:4, 31:11, 31:25, 32:9, 32:21, 32:23, 33:8, 33:22, 33:25, 34:2, 34:3, 35:24, 39:7, 40:8, 40:12, 40:14, 43:22, 44:7, 45:6, 45:11, 47:20, 47:22, 47:24, 48:18, 48:23, 51:9, 52:23, 53:24, 54:18, 54:20, 59:17, 59:24, 60:4, 61:9, 62:10, 63:7, 65:19, 70:4, 71:6, 71:15

**sorting** [1] - 70:4
**specific** [4] - 10:16, 61:4, 66:21, 67:21
**specifically** [2] - 32:7, 33:8
**speculating** [1] - 62:15
**spelled** [1] - 6:22
**Spence** [1] - 53:13
**split** [2] - 28:1, 28:17
**splitting** [1] - 73:17
**spotted** [1] - 23:25
**squeeze** [1] - 38:12
**St** [1] - 2:14
**stage** [4] - 40:17, 41:7, 53:1, 54:7
**stages** [1] - 54:6
**stake** [1] - 36:11
**stand** [1] - 5:12
**standard** [2] - 30:15, 44:21
**standing** [2] - 36:6, 37:10
**standpoint** [3] - 40:21, 58:16, 75:4
**stands** [1] - 15:23
**star** [1] - 33:8
**start** [11] - 3:7, 5:14, 11:4, 15:4, 17:15, 26:13, 34:1, 47:24, 57:23, 63:7, 70:4
**started** [1] - 26:2
**state** [10] - 42:2, 43:22, 45:5, 47:2, 47:3, 52:5, 70:1, 72:21, 75:7, 75:9
**state's** [2] - 41:9, 41:11
**STATES** [1] - 1:1
**States** [1] - 25:21
**states** [4] - 40:24, 43:2, 43:6, 43:7
**STATION** [1] - 2:13
**status** [1] - 54:21
**statute** [11] - 63:9, 63:10, 63:11, 63:15, 64:8, 64:12, 65:22, 65:23, 66:5, 66:11, 66:24
**stay** [1] - 5:10
**stenographically** [1] - 1:23
**step** [1] - 5:10

**steps** [1] - 52:6
**still** [13] - 16:12, 16:22, 17:7, 22:7, 25:6, 25:7, 25:9, 28:18, 36:15, 45:20, 52:13, 52:18, 62:3
**stood** [1] - 70:4
**strange** [5] - 10:15, 45:2, 45:17, 58:15, 58:18
**strategy** [1] - 60:5
**stray** [1] - 6:5
**Street** [5] - 1:8, 2:3, 2:9, 2:14, 2:20
**strikes** [2] - 20:22, 21:24
**strong** [1] - 60:11
**stronger** [1] - 48:19
**struck** [1] - 11:16
**structure** [2] - 28:21, 62:21
**struggled** [1] - 63:10
**stuff** [3] - 11:1, 11:6, 14:22
**subclasses** [3] - 37:8, 42:21, 43:6
**subject** [6] - 25:15, 42:9, 42:11, 42:12, 49:3, 52:2
**subjected** [1] - 50:12
**subjective** [2] - 20:13, 21:12
**submissions** [1] - 11:14
**submit** [1] - 72:1
**submitted** [1] - 14:5
**Suboxone** [2] - 12:6, 30:8
**subpoena** [1] - 25:15
**subpoenas** [2] - 12:7, 12:24
**subsections** [1] - 30:23
**subsequent** [2] - 64:14, 66:24
**substance** [1] - 33:17
**subsumed** [1] - 59:17
**subtle** [1] - 51:14
**succeed** [1] - 35:10
**sudden** [1] - 62:19
**sue** [1] - 68:4
**sued** [2] - 44:18, 66:13
**suffer** [7] - 12:21, 35:4, 35:19, 37:16, 37:17, 37:18, 51:22
**suffered** [13] - 8:3, 12:18, 12:19, 39:20, 49:16, 49:19, 53:7, 55:19, 55:24, 57:12, 63:20, 64:4, 75:16
**sufficiently** [2] - 19:6, 22:6
**suggest** [2] - 59:3, 64:11
**suggestion** [4] - 6:6, 18:18, 43:11, 61:8
**suggests** [1] - 61:11
**SUGGS** [1] - 1:14
**suit** [1] - 44:14
**Suite** [2] - 1:16, 2:4
**suited** [1] - 21:22
**summary** [4] - 19:16, 20:7, 22:22, 23:2

**superior** [1] - 29:15
**Superior** [1] - 68:7
**superiority** [7] - 26:18, 28:4, 28:9, 29:6, 29:13, 29:14, 31:8
**supply** [1] - 14:11
**suppose** [1] - 42:18
**surprise** [1] - 75:23
**survey** [1] - 64:3
**survey-like** [1] - 64:3
**susceptible** [1] - 36:24
**suspicion** [1] - 66:16
**sustained** [2] - 6:11, 6:16
**sweep** [1] - 23:2
**system** [2] - 55:12, 72:25
**table** [1] - 34:4
**tackle** [3] - 24:6, 25:16, 26:6
**tackles** [1] - 31:17
**target** [1] - 65:13
**tea** [1] - 23:24
**technical** [1] - 14:21
**temporal** [4] - 19:12, 19:17, 28:16, 54:21
**temporally** [1] - 23:12
**ten** [1] - 18:17
**termed** [1] - 29:5
**terms** [18] - 4:20, 5:8, 12:2, 14:9, 17:17, 17:18, 24:21, 28:23, 35:14, 36:19, 37:7, 52:23, 53:24, 54:1, 60:15, 65:17, 69:4, 70:12
**test** [6] - 42:13, 42:16, 43:22, 57:22, 68:14, 68:17
**testifies** [1] - 75:15
**testimony** [5] - 7:7, 8:15, 8:16, 53:9, 53:11
**The Court** [136] - 3:2, 3:4, 3:10, 3:13, 3:16, 3:19, 3:23, 4:3, 6:1, 6:8, 6:15, 6:21, 7:11, 7:21, 7:25, 8:3, 8:6, 8:8, 8:11, 8:18, 8:22, 8:25, 9:8, 10:6, 10:12, 10:14, 10:21, 11:16, 13:1, 13:4, 13:6, 13:9, 13:11, 13:23, 14:6, 14:14, 14:17, 14:20, 14:24, 15:10, 15:21, 16:5, 16:18, 17:11, 19:8, 20:3, 20:10, 21:15, 22:9, 22:13, 23:1, 24:5, 24:17, 24:19, 25:5, 25:9, 25:12, 25:25, 26:2, 26:20, 28:14, 29:9, 30:2, 30:21, 31:4, 31:5, 31:10, 31:11, 31:22, 32:18, 33:19, 35:21, 36:14, 36:20, 37:9, 37:13, 37:18, 38:4, 38:19, 39:6, 40:6, 41:2, 41:8, 41:25, 43:2, 43:16, 45:1, 46:3, 46:11, 46:25, 47:20, 48:10, 48:13, 48:17, 49:5, 49:9, 49:25, 50:22, 50:24,

51:3, 52:15, 53:23, 54:16, 55:3, 56:1, 56:9, 56:18, 56:21, 56:25, 57:9, 57:17, 58:12, 58:15, 58:21, 59:10, 59:14, 60:23, 61:1, 61:16, 63:4, 63:6, 64:15, 64:25, 65:9, 66:13, 67:1, 67:9, 69:13, 70:19, 72:3, 72:13, 72:22, 73:8, 74:7, 75:1, 75:22
**themselves** [4] - 4:11, 4:17, 5:14, 32:4
**theoretical** [1] - 12:15
**theoretically** [1] - 17:2
**theories** [3] - 34:19, 34:20, 75:11
**theory** [3] - 10:18, 19:14, 45:16
**therefore** [2] - 41:9, 58:25
**they've** [7] - 16:10, 18:10, 22:3, 27:25, 44:18, 61:19, 75:20
**thinks** [3] - 28:19, 54:20
**third** [2] - 21:18, 53:19
**Third** [9] - 28:16, 29:4, 30:6, 30:11, 31:20, 32:16, 33:14, 47:1, 63:2
**three** [3] - 19:3, 41:21, 62:4
**threshold** [3] - 24:23, 25:2, 40:16
**Thronson** [2] - 3:9, 3:10
**THRONSON** [78] - 1:15, 3:8, 5:22, 6:7, 6:10, 6:20, 7:1, 7:19, 7:23, 8:2, 8:5, 8:7, 8:10, 8:14, 8:21, 8:24, 9:6, 9:12, 10:10, 10:13, 10:20, 11:15, 11:22, 13:3, 13:5, 13:8, 13:10, 13:21, 13:24, 14:7, 14:16, 14:19, 14:23, 15:9, 15:15, 15:25, 16:14, 16:19, 22:11, 22:14, 24:3, 24:10, 24:18, 24:20, 25:7, 25:11, 25:18, 26:1, 26:16, 27:7, 28:22, 34:12, 36:9, 36:15, 37:2, 37:12, 37:14, 37:21, 38:18, 38:20, 46:23, 48:9, 54:5, 55:1, 55:4, 56:7, 56:16, 56:19, 56:22, 57:7, 57:10, 58:3, 58:20, 59:6, 59:12, 68:20, 70:8, 72:14
**Thronson's** [1] - 19:2
**tied** [1] - 63:21
**timeline** [1] - 50:3
**Tobacco** [2] - 69:18, 69:19
**today** [5] - 5:5, 18:4, 51:9, 72:4, 75:23
**today's** [1] - 75:18
**together** [1] - 47:6
**took** [5] - 45:20, 45:22, 46:4, 57:22, 76:2

**tort** [8] - 37:11, 37:21, 37:22, 38:17, 45:20, 45:22, 61:5, 69:14
**tortious** [1] - 8:9
**torts** [2] - 67:18, 68:25
**touch** [4] - 26:2, 37:5, 38:7, 40:9
**touching** [4] - 34:23, 35:24, 36:1, 37:24
**towards** [1] - 20:18
**Tower** [1] - 2:4
**toxic** [1] - 71:6
**traceable** [1] - 35:20
**track** [1] - 14:1
**trained** [1] - 12:1
**training** [1] - 11:10
**transcript** [1] - 76:12
**transcription** [1] - 1:23
**transfer** [1] - 68:9
**treat** [4] - 18:13, 19:2, 37:4, 60:21
**treated** [16] - 12:3, 12:10, 12:13, 12:18, 13:14, 14:11, 18:17, 19:1, 19:15, 20:21, 21:8, 23:5, 23:6, 43:20, 45:8, 50:6
**treating** [1] - 14:18
**treatment** [10] - 5:24, 15:16, 19:4, 28:6, 28:10, 32:11, 34:24, 34:25, 36:25, 39:3
**triability** [1] - 41:18
**trial** [7] - 35:11, 53:5, 61:25, 62:3, 62:7, 62:14, 69:2
**trials** [7] - 61:11, 61:17, 61:20, 62:1, 62:4, 70:23
**tried** [6] - 30:17, 30:20, 48:7, 48:8, 64:11, 70:7
**trigger** [3] - 5:5, 65:4, 65:22
**triggered** [1] - 39:23
**triggering** [1] - 63:16
**troubled** [1] - 74:17
**true** [12] - 10:7, 21:15, 24:17, 24:19, 24:20, 25:3, 25:5, 36:9, 43:11, 53:12, 68:23
**truly** [1] - 61:13
**try** [6] - 40:2, 40:3, 68:18, 70:22, 75:25, 76:3
**trying** [6] - 39:11, 39:12, 39:20, 52:18, 59:2, 63:1
**Tulp** [1] - 55:6
**turn** [1] - 4:16
**turns** [1] - 65:15
**two** [23] - 4:19, 5:15, 8:11, 23:13, 29:8, 31:1, 33:20, 33:25, 36:1, 36:24, 40:24, 41:21, 43:6, 50:1, 50:24, 52:15, 54:6, 57:1, 63:6, 63:23, 64:7
**twofold** [1] - 20:12
**type** [8] - 27:1, 28:23, 32:17,

41:19, 53:9, 55:23, 61:5, 74:22
**types** [4] - 59:23, 60:8, 71:1, 71:2
**typical** [2] - 27:13, 74:21
**typicality** [6] - 27:1, 27:8, 32:5, 32:12, 33:16, 59:18
**typically** [2] - 16:3, 70:9
**U.S** [1] - 1:7
**ultimate** [1] - 70:13
**ultimately** [3] - 24:1, 33:6, 62:16
**unauthorized** [1] - 35:24
**uncertainty** [1] - 62:13
**unclear** [1] - 24:11
**unconsented** [2] - 34:23, 34:25
**under** [26] - 5:20, 6:24, 7:1, 7:18, 8:6, 8:13, 9:4, 9:10, 14:12, 28:20, 31:1, 43:1, 45:9, 47:15, 47:18, 48:5, 50:3, 56:20, 56:21, 57:2, 58:5, 66:3, 66:4, 74:10, 75:24
**undermine** [1] - 23:8
**understood** [3] - 32:22, 39:19, 59:21
**unfair** [3] - 23:3, 58:25, 75:9
**United** [1] - 25:21
**UNITED** [1] - 1:1
**universe** [4] - 25:13, 26:12, 36:2, 69:14
**University** [1] - 13:4
**unjust** [2] - 75:5, 75:6
**unless** [1] - 10:17
**unworkable** [1] - 39:12
**up** [18] - 4:18, 5:10, 15:2, 15:14, 16:15, 21:19, 33:23, 40:4, 58:10, 61:19, 62:17, 66:18, 67:13, 68:9, 70:12, 72:5, 75:14, 76:6
**US** [3] - 51:21, 63:18, 64:5
**utilizing** [1] - 1:23
**valid** [2] - 9:21, 9:23
**value** [3] - 68:15, 68:17, 71:10
**variation** [1] - 45:7
**variations** [1] - 75:7
**variety** [1] - 72:19
**various** [2] - 25:24, 72:20
**varying** [1] - 46:18
**vehicle** [1] - 67:5
**verification** [1] - 21:13
**verified** [1] - 9:20
**version** [1] - 34:2
**versus** [3] - 51:11, 54:2, 62:12
**Vettori** [2] - 3:11, 3:13
**VETTORI** [3] - 2:8, 3:11, 72:12

**via** [2] - 68:9
**view** [13] - 7:17, 20:8, 20:11, 22:1, 26:17, 29:9, 30:6, 30:25, 31:2, 31:14, 70:19, 71:20, 74:11
**views** [2] - 26:15, 33:11
**violation** [1] - 72:20
**violations** [1] - 72:21
**Virginia** [8] - 41:23, 42:14, 45:7, 45:12, 45:17, 46:9, 68:7
**virtue** [1] - 56:13
**waiting** [1] - 67:12
**walks** [1] - 21:19
**Wallace** [1] - 72:15
**Warfarin** [1] - 46:25
**warrant** [1] - 67:4
**water** [1] - 74:17
**ways** [4] - 17:21, 22:24, 62:12, 62:20
**weakness** [1] - 72:10
**weeds** [1] - 29:7
**weighed** [1] - 43:25
**weird** [1] - 70:20
**welcome** [2] - 4:3, 67:1
**Welding** [2] - 69:21, 71:5
**welding** [1] - 69:23
**West** [1] - 2:4
**whichever** [1] - 48:24
**whole** [8] - 20:25, 21:1, 26:9, 28:5, 28:11, 31:13, 38:23, 70:6
**wide** [1] - 71:2
**willing** [2] - 67:10, 68:5
**win** [2] - 33:24, 70:23
**winding** [1] - 68:9
**witnesses** [1] - 33:4
**WOLSON** [1] - 1:11
**woman** [2] - 45:2, 45:6
**women** [1] - 60:21
**word** [2] - 33:7, 51:5
**words** [2] - 28:12, 43:22
**workable** [2] - 58:4, 58:13
**works** [3] - 26:15, 42:16, 65:13
**world** [3] - 38:17, 45:14, 56:11
**wracking** [1] - 38:16
**wrap** [1] - 72:4
**year** [5] - 15:23, 23:16, 30:9, 50:5
**years** [6] - 18:17, 54:14, 63:23, 64:7, 69:17, 69:20
**zone** [1] - 8:8

JA1468

No. 20-8024

In the United States Court of Appeals for the
Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL,
and DESIRE EVANS, on behalf of themselves and all others similarly situated,
*Plaintiffs-Respondents*,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
*Defendant-Petitioner*.

On Petition for Permission to Appeal from the United States District Court for
the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

**RESPONSE IN OPPOSITION TO PETITION FOR PERMISSION TO
APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE
23(f)**

LAW OFFICES OF PETER G.
ANGELOS, P.C.
Paul M. Vettori
pvettori@lawpga.com
Danielle S. Dinsmore
ddinsmore@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150

JANET, JANET & SUGGS, LLC
Patrick A. Thronson
pthronson@JJSjustice.com
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030

SCHOCHOR, FEDERICO AND
STATON
Jonathan Schochor
Phil Federico
Brent Ceryes
Lauren Schochor
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

CONRAD O'BRIEN PC
Nicholas M. Centrella
Howard M. Klein
Robin S. Weiss
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600

THE COCHRAN FIRM
Karen E. Evans, R.N., J.D.
David Haynes
kevans@cochranfirm.com
1100 New York Ave, N.W.
Washington, D.C. 20005
Telephone: (202) 682-5800

Z LAW, LLC
Cory L. Zajdel
clz@zlawmaryland.com
2345 York Rd. Suite B-13
Timonium, MD 21093
Telephone: (443) 213-1977

*Counsel for Plaintiffs-Respondents*

ii

## CORPORATE DISCLOSURE STATEMENT

Not applicable. Plaintiffs-Respondents Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans, on behalf of themselves and all others similarly situated, are all natural persons.

iii

# TABLE OF CONTENTS

Table of Contents ..................................................................................iv

Table of Authorities ..............................................................................v

Questions Presented .............................................................................1

Introduction ..........................................................................................2

Factual Background ..............................................................................4

Standard of Review ..............................................................................8

I.     Granting ECFMG's Petition risks introducing confusion and disruption into settled Circuit precedent on issue-class certification, causing regression, not advancement, in the law.........................9

II.    ECFMG's choice of law arguments mischaracterize the district court's order.....................................................................................17

III.   ECFMG misstates and misapplies the typicality and adequacy requirements—the only Rule 23(a) findings it challenges ......................19

IV.   The district court's class certification order creates no inordinate settlement pressure .........................................................................22

Conclusion.............................................................................................23

Certificate of Service............................................................................25

Certificate of Compliance with Rule 32(a) .........................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Behr Dayton Thermal Prods. v. Martin*,
    139 S. Ct. 1319 (2019) ................................................................12

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) .........................................................12

*Chiang v. Venemen*,
    385 F.3d 256 (3d. Cir. 2004) .......................................................11

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .......................................................................10

*Gates v. Rohm and Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) ................................................ passim

*Gonzalez v. Corning*,
    885 F.3d 186 (3d Cir. 2018) ........................................................15

*Hammersmith v. TIG Ins. Co.*,
    480 F.3d 220 (3d Cir. 2007) ........................................................18

*Harris v. City of Philadelphia*,
    35 F.3d 840 (3d Cir. 1994) ....................................................15, 19

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) ..........................................................8

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    289 F.3d 98 (D.C. Cir. 2002) .........................................................9

*In re Suboxone Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019) .......................................16, 22

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (2004) ......................................................................20

*Johnson v. SmithKline Beecham Corp.*,
    724 F.3d 337 (3d Cir. 2013) ..........................................................9

*Lacey v. Cessna Aircraft Co.*,
    932 F.2d 170 (3d Cir. 1991) ........................................................19

*Luppino v. Mercedes Benz USA*,
    718 F. App'x 143 (3d Cir. 2017) ..........................................4, 7, 15

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ........................................................20

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015) ........................................................10

*Newton v. Merrill Lynch, Pierce, Fenner & Smith. Inc.*,
  259 F.3d 154 (3d Cir. 2001) ....................................................................8
*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..............................................................................18
*Rodriguez v. Nat'l City Bank*,
  726 F.3d 372 (3d Cir. 2013) .......................................................... 9, 23
*Romero v. Allstate Ins. Co.*,
  52 F. Supp. 3d 715 (E.D. Pa. 2014)....................................................16
*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..............................................................................10

## **<u>Rules</u>**

Federal Rule of Civil Procedure 23 ................................................ *passim*
Federal Rule of Appellate Procedure 5(c)(1)........................................26
Federal Rule of Appellate Procedure 32(a)(5).....................................26
Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) ...........................26

## **<u>Other Authorities</u>**

Alon Klement & Robert Klonoff Class Actions in the United States and Israel,
  19 *Theoretical Inquiries L.* 151 (2018)..................................................13
Principles of the Law of Aggregate Litigation ................................ 11, 13

# QUESTIONS PRESENTED

1.     Whether the Court should consider overruling *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011) by holding, contrary to the present inter-Circuit consensus, that a class action for money damages must satisfy Rule 23(b)(3) in its entirety for an issue therein to be certified under Rule 23(c)(4)?

2.     Whether the Court should review the district court's class certification decision for abuse of discretion, based on:

    a.     alleged conflict with an unreported panel decision that never examines *Gates* and that ECFMG never cited below;

    b.     a choice-of-law determination that is fully reviewable at later stages of the case and not alleged to pose an insuperable obstacle to class certification;

    c.     findings on typicality and adequacy not alleged to be an abuse of discretion, where commonality is not disputed; or

    d.     emotional distress that allegedly will be caused by the dissemination of class notice, an argument not supported by authority and that was never presented below?

1

JA1475

## INTRODUCTION

At the heart of this case is a single course of conduct, by a single defendant, central to the claims of all class members, which gives rise to the same issues of duty and breach as to each. The Educational Commission on Foreign Medical Graduates (ECFMG), Plaintiffs allege, negligently certified "John Nosa Akoda" (whose true name was Oluwafemi Charles Igberase) as eligible to apply to medical residency programs in the United States. ECFMG certified "Akoda" even though it knew he had repeatedly attempted to secure ECFMG certification by falsifying his identity, educational history, and professional credentials. Thereafter, it negligently assisted his applications to residency programs, state medical licensing boards, and hospital medical staffs under the Akoda identity, by representing "Akoda" was validly certified and by failing to disclose clear indications that "Akoda" was not who he said he was. Ultimately, Igberase, using the "Akoda" identity, committed sexual assault, battery, and boundary violations with female patients, who agreed to be intimately examined and treated by him based on the false premise he was a properly certified, credentialed, and licensed physician.

The district court appropriately recognized the centrality of ECFMG's conduct to all of Plaintiffs' claims, while appreciating the differences between plaintiffs with regard to the nature and extent of their damages. It granted Plaintiffs' motion to certify a class limited to issues of duty and breach, in a

2

thoroughly reasoned 28-page memorandum rendered after extensive briefing and a hearing. In doing so, it considered the necessary criteria under Federal Rule of Civil Procedure 23(a) and the criteria developed by this Court in *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011).

ECFMG cannot change the inescapable fact that the same questions of duty and breach certified by the district court are common to the claims of all class members, and are efficiently resolved on a classwide basis. Indeed, ECFMG does not challenge the district court's finding of commonality as to the certified issues. As the district court noted, "this case is not about Igberase's conduct; it is about ECFMG's conduct." Pet., Attach. (hereinafter "Ord.") at 11 (emphasis added). Resolution of the certified issues does not turn on any differences among the class members as to causation and damages.

The Petition also ignores that these questions can be resolved in one stroke through class treatment, and provides no alternative for efficiently and materially advancing the termination of this litigation. Instead, it presents ephemeral arguments concerning damages and choice of law, without explaining how these arguments undermine the appropriateness of certifying the issues of duty and breach, and without ever arguing that the district court abused its discretion in making its findings of fact as to the necessary elements of class certification.

3

And the Petition invites this Court—based on a strained reading of an inapposite, unreported panel decision never presented to the district court[1]—to embrace a rule rejected in *Gates*: that a proposed issue class action must satisfy Rule 23(b)(3) as to all issues in the action before Rule 23(c)(4) is applied. ECMFG gives no compelling reason for this Court to do so. And the "clarification" ECFMG seeks will regress, not advance, the law of class action certification, and create needless confusion in an already complicated area of class action procedure. Plaintiffs respectfully request that the Petition be denied.

## FACTUAL BACKGROUND

ECFMG's factual background section contains a concerning amount of inaccurate information. In the limited space provided, Plaintiffs will focus on correcting this information. For an extensive recitation of the factual background supporting their Motion for Class Certification, Plaintiffs respectfully refer the Court to the statement of facts contained within their Memorandum in Support of Plaintiffs' Motion for Class Certification. *See* Pet., Ex. 1 at 1–7.

> *"This case involves obstetrician/gynecologist John Nosa Akoda. . . . The district court's statement that John Akoda 'was not a doctor' is incorrect."* Pet. 4 & fn. 1.

---

[1] *Luppino v. Mercedes Benz USA*, 718 F. App'x 143 (3d Cir. 2017).

4

There is no "Dr. Akoda." There is no licensed OB/GYN named John Nosa Akoda. There is no evidence that a person properly bearing that name ever existed. As he admitted under oath in federal court, his real name is Oluwafemi Charles Igberase, not "Akoda." Pet., Ex. 9 at 8–9. Evidence of his medical education submitted to ECFMG was forced: Igberase's putative 1987 University of Ibadan (Nigeria) medical school diploma and "Akoda's" putative 1988 University of Benin medical school diploma involve almost the same underlying years of alleged medical training. Pet., Ex. 104:18–105:11, 106:24–107:8. Clearly, Igberase could not have simultaneously attended two different medical schools located over 180 miles apart.[2] In fact, ECFMG's corporate designee refused to take a position on whether "Akoda" ever graduated from medical school. Pet., Ex. 12 at 86:22–87:5; 107:14–108:15.

> *"In November 2016, following a two-year investigation by the U.S. Attorney's office, Dr. Akoda pleaded guilty to misuse of a Social Security number."*

The Petition grossly minimizes "Akoda's" misconduct. In June 2016, law enforcement officials executed search warrants at "Akoda's" residence, medical office and vehicle. Pet. Ex 9 at 9. As "Akoda" later admitted in his plea agreement, they found a false driver's license, "a false Social security card . . . a false Nigerian

---

[2] *See* https://tinyurl.com/ycvrpo6w.

5

passport . . . a false United States visa" and "fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates." *Id*. at 9. He was charged with six felony counts,[3] but, as stated, ultimately agreed to plead guilty to one count of Social Security fraud.

> *"Following an investigation—in which Dr. Akoda addressed those concerns [that ECFMG had expressed about his truthfulness] and provided supporting hard-copy documents . . . ECFMG concluded that there was insufficient evidence of any discrepancy."*

ECFMG omits important facts showing ECFMG directly enabled Igberase, using the "Akoda" identity, to intimately examine hundreds of female patients at Howard University and in Prince George's County, Maryland without informed consent—all of which could have been avoided had ECFMG acted reasonably in detecting, preventing, and correcting "Akoda's" numerous, obvious acts of fraud.

The ECFMG executive most familiar with the Akoda matter—William Kelly—wrote in a not-for-file memorandum that he "believed" that "Akoda" and Igberase were the same person. Pet., Ex. 8. (ECFMG had previously revoked Igberase's ECFMG certification for misrepresenting his identity.) Pet., Ex. 9 at 8. He wrote that Jersey Shore Medical Center's (JSMC's) residency program, in

---

[3] *See* Superseding Indictment, ECF. No. 37, United States v. Oluwafemi Charles Igberase, No. 8:16-cv-00277-PWG (D. Md. Oct. 19, 2016).

6

which Akoda was then enrolled, shared Kelly's belief. *Id.* Kelly noted "Akoda's" written admission to using Igberase's Social Security number in connection with his ECFMG application. *Id.* Kelly noted he "sent Igberase an email . . . and who should respond, but Akoda!" *Id.* Yet Kelly and other ECFMG executives and staff chose not to apprise the ECFMG Medical Education Credentials Committee or Board of Directors of the matter until 2016. Pet., Ex. 12 at 171:11–21. ECFMG took no additional action to determine whether Igberase and "Akoda" were the same person. *Id.* at 174:5–11.

In 2006, Igberase, using the "Akoda" identity, attempted to use ECFMG's electronic residency application system (ERAS) to assist with his application for a graduate resident program at Howard University Hospital. Kelly sought to contact the purported authors of three letters of reference submitted by "Akoda" and verify their authenticity, because he had concerns about Akoda's credibility, *id.* at 95:20–96:11. He received no response. *Id.* at 96:17–18.

ECFMG failed to inform any hospital or the public of Akoda's misconduct and false representations, until contacted by law enforcement in approximately 2015. Pet., Ex. 12 at 181:9–16. In short, ECFMG negligently enabled "Akoda" to fraudulently hold himself out as a legitimately credentialed medical doctor, to hospitals, medical boards, his patients, and the public, for nearly a decade.

7

## STANDARD OF REVIEW

Although an appellate court has the discretion "to grant or deny [Rule 23(f)]

petitions 'on the basis of any consideration that the court of appeals finds

persuasive," this Court and the Advisory Committee on Civil Rules have identified

three primary circumstances warranting review: "(1) the possible case-ending

effect of an imprudent class certification decision (the decision is likely dispositive

of the litigation); (2) an erroneous ruling; or (3) facilitat[ing] development of the

law on class certification." *Newton v. Merrill Lynch, Pierce, Fenner & Smith. Inc.*,

259 F.3d 154, 165 (3d Cir. 2001), *as amended* (October 16, 2001).

This Court situates its consideration of these principles within the general

framework of appellate deference to the district court's discretion in resolving class

certification motions. *Id.* The Petition nowhere recognizes that this Court

"review[s] a district court's grant of class certification under an abuse of discretion

standard." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 149 (3d Cir. 2002)

(citation omitted). A district court abuses its discretion when "'its decision rests

upon a clearly erroneous finding of fact, an errant conclusion of law or an improper

application of law to fact.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552. F.3d

305, 313 (3d Cir. 2008) (citation omitted). "Clearly erroneous" signifies a

reviewing court can reverse a factual finding only if the court is "'left with the

definite and firm conviction that a mistake has been committed.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013) (citation omitted).

Granting a Rule 23(f) petition "is discouraged when the natural course of litigation will provide the moving party with an adequate remedy, or when the certification decision was routine and easily resolved." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 376–77 (3d Cir. 2013). Appellate courts rarely grant review under Rule 23(f) when a case neither involves a "death-knell" for the litigation nor a novel area of law. *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002). This is due to the "sheer number of class actions, [and] the district court's authority to modify its class certification decision [under Rule 23(c)(1)]." *Id.*

## I.    Granting ECFMG's Petition risks introducing confusion and disruption into settled Circuit precedent on issue-class certification, causing regression, not advancement, in the law.

ECFMG contends the district court failed to consider the predominance and superiority requirements of Rule 23(b)(3) in the context of a Rule 23(c)(4) issue class certification, and that the interplay between the two rules poses a novel question of law. In fact, the district court scrupulously applied established Circuit precedent on issue class certification, principally *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011) It appropriately refused to consider whether the claim as a whole satisfies Rule 23(b)(3). Instead, it analyzed the proposed issue classes using

9

the *Gates* factors, which it understood correctly to incorporate considerations of predominance and superiority. ECFMG's recommended "clarification," in which a district court should apply Rule 23(b)(3)'s predominance and superiority requirements to an entire claim (a path rejected in *Gates*), then apply them again in the context of the *Gates* factors, will cause needless doctrinal confusion and duplication.

According to the familiar standard, class certification "is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (citation omitted). "The same analytical principles govern Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). A class certification order that leaves damages to be calculated on an individual basis complies with Rule 23. As this Court held in considering *Comcast*, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015) (citation omitted).

In *Gates*, this Court adopted the non-exclusive list of factors from the American Law Institute's *Principles of the Law of Aggregate Litigation* as a guide to determining whether to certify a motion for class certification brought under Rule 23(c)(4). The factors are:

10

the type of claim(s) and issue(s) in question; the overall complexity of
the case; the efficiencies to be gained by granting partial certification
in light of realistic procedural alternatives; the substantive law
underlying the claim(s), including any choice-of-law questions it may
present and whether the substantive law separates the issue(s) from
other issues concerning liability or remedy; the impact partial
certification will have on the constitutional and statutory rights of both
the class members and the defendant(s); the potential preclusive effect
or lack thereof that resolution of the proposed issue class will have; the
repercussions certification of an issue(s) class will have on the
effectiveness and fairness of resolution of remaining issues; the impact
individual proceedings may have upon one another, including whether
remedies are indivisible such that granting or not granting relief to any
claimant as a practical matter determines the claims of others; and the
kind of evidence presented on the issue(s) certified and potentially
presented on the remaining issues, including the risk subsequent triers
of fact will need to reexamine evidence and findings from resolution of
the common issue(s).

*See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 274 (3d Cir. 2011) (citing

*Principles of the Law of Aggregate Litigation* §§ 2.02–05 (2010)). These factors

"should guide courts as they apply Fed. R. Civ. P. 23(c)(4) 'to treat common things

in common and to distinguish the distinguishable.'" *Id.* (quoting *Chiang v.

Veneman,* 385 F.3d 256 (3d Cir. 2004)).

In formulating the *Gates* criteria, this court declined to take either side in

what it perceived as a circuit split on the relationship between Rules 23(b)(3) and

(c)(4). One side of the split—ECFMG's "narrow view" of the relationship between

Rules 23(b)(3) and (c)(4)—holds that predominance and superiority must be

11

satisfied for the entire case before certification pursuant to Rule 23(c)(4) can even

occur. This Court unmistakably rejected that view:

> Some appellate courts have viewed Rule 23(c)(4) as a "housekeeping
> rule" allowing common issues to be certified only when the cause of
> action, taken as a whole, meets the predominance requirement. *See
> Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir. 1996).
> Others have allowed certification of issue classes even if common
> questions do not predominate for the cause of action as a whole.
> [Citations omitted].
>
> <u>Rather than joining either camp in the circuit disagreement</u>, we believe
> the considerations set forth in *Hohider* and more recently in the Final
> Draft of the ALI's Principles of Aggregate Litigation provide the most
> sound guidance in resolving this complicated area of class action
> procedure.

*Gates*, 655 F.3d at 272–73 (emphasis added).

The so-called circuit split identified by *Gates* no longer exists. The United

States Supreme Court has denied certiorari on the four occasions it has considered

a petition from class action defendants that advances the view of Rule 23(c)(4)

class certification espoused by ECFMG.[4] And *Castano* has been unmistakably

eclipsed by subsequent developments. There is now "universal agreement that the

predominance requirement of Rule 23(b)(3) does not apply when certification is

---

[4] See Healthplan Servs., Inc. v. Gunnells, No. 03-1282 (filed March 11, 2004);
Pella Corp. v. Saltzmann, No. 10-355 (filed Sept. 13, 2010); Merrill Lynch, Pierce,
Fenner & Smith Inc. v. McReynolds, No. 12-113 (filed July 25, 2012); *Behr
Dayton Thermal Prods. v. Martin*, 139 S. Ct. 1319 (2019).

only for an issues class." Alon Klement & Robert Klonoff, Class Actions in the United States and Israel, 19 *Theoretical Inquiries L.* 151, 161 (2018).[5]

Regardless, the *Gates* criteria already incorporate the elements of predominance and superiority, contextualized within the framework of an issue class. The *Gates* criteria are based on "the premise that both the <u>predominance</u> requirement of Rule 23(b)(3) and the authorization for issue classes in Rule 23(c)(4) are worthwhile components of the law of aggregate litigation." *Principles of the Law of Aggregate Litigation* § 2.02 (2010) cmt. a (emphasis added). The criteria require a district court to consider whether a proposed issue class will "materially advance the resolution of multiple civil claims by addressing the core of the dispute in a manner <u>superior to other realistic procedural alternatives</u>, so as to generate significant judicial efficiencies." *Id.* § 2.02 & cmt. a (emphasis added).

The district court clearly understood that the *Gates* factors encompass predominance and superiority considerations. Pet., Ex. 23 at 29:9–24. The district court also recognized, at the hearing and in its memorandum opinion, the superiority concerns of material advancement and efficiency that are reflected in

---

[5] *See also* Advisory Comm. on Civil Rules, Agenda Book at 91, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf (noting the "circuits seem to be in accord" about the propriety certifying issue classes even when the entire action might not satisfy Rule 23(b)(3)).

13

the *Gates* factors, and appropriately considered (and ultimately rejected) the possibility it was certifying overly narrow issues. *See* Pet., Ex. 23 at 32:9–33:9.

The district court identified, discussed, and applied the factors set forth in this Court's opinion in *Gates*. Ord. at 7–8, 25–28. As mentioned, these factors include Rule 23(c)(4)-specific predominance and superiority considerations. After a persuasive analysis, the district court concluded there were great efficiencies to be gained through classwide treatment of duty and breach, which would have preclusive effect. As below, ECFMG identifies no reasonable alternative to efficiently resolving Plaintiffs' claims.

ECFMG criticizes the length of the district court's discussion of the *Gates* factors, yet ECFMG's own analysis of the factors in its briefing was less than two pages. *See* Pet., Ex. 13 at 24–25. Contrary to ECFMG's contentions, the district court appropriately considered the risk of reexamination and the type of claims at issue pursuant to *Gates*. In fact, it sided with ECFMG on these criteria in declining to certify liability for class treatment. Ord. at 22–25. The district court then concluded after additional analysis that these criteria did not pose an obstacle to certifying issues of duty and breach, and that the other *Gates* factors indicated the wisdom of doing so. Ord. at 25–28.

The district court declined ECFMG's invitation to commit error by applying Rule 23(b)(3) to the entire claim before applying Rule 23(c)(4). Ord. at 7–9. As

14

discussed, the Third Circuit in *Gates*, along with the other circuits that have considered the issue, now eschew ECFMG's preferred approach. Since *Gates*, this Court has reaffirmed that "that the appropriateness of certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3)." *Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018), *as amended* (Apr. 4, 2018).

In seeking to secure review of the district court's decision, ECFMG contends the district court's decision is inconsistent with an unreported opinion ECFMG never cited to the district court, *Luppino v. Mercedes Benz USA*, 718 F. App'x 143 (3d Cir. 2017).

First, ECFMG does not attempt to explain its failure to cite *Luppino* to the district court. The argument ECFMG advances in connection with this case is therefore waived. *See, e.g.*, *Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994).

Second, *Luppino*, an unreported panel decision, cannot overrule *Gates*, and would generally not even be cited by this Court. *See* Third Circuit Internal Operating Procedures 5.7, 9.1. *Gates* indisputably rejected ECFMG's obsolete conception of the relationship between Rules 23(b)(3) and (c)(4). And in contrast to *Luppino*, the *Gates* court considered whether class certification was appropriate under Rule 23(c)(4) even after affirming the denial of class certification under Rule

15

23(b)(3). A failure to satisfy claim-wide predominance thus does not bar issue certification.

Third, *Luppino*'s analysis does not help resolve the issues at stake in this case. The opinion does not discuss *Gates*. Its affirmance of an order denying class certification hinged on a failure to satisfy commonality, a Rule 23(a) element. Here, ECFMG does not challenge the Court's finding of commonality.

ECFMG fails to explain how the district court is an outlier in its approach to Rules 23(b)(3) and (c)(4). Its reliance on two district court decisions—*Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715 (E.D. Pa. 2014), and *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12 (E.D. Pa. 2019), *appeal filed*, No. 19-3640—is wholly misplaced. *Romero* never mentions Rule 23(b)(3), and the *Romero* court examined the *Gates* factors without first determining whether the action as a whole satisfied Rule 23(b). *Id.* at 725–38. The *Suboxone* court did not have occasion to examine the interplay between Rules 23(b)(3) and (c)(4). It certified a class of purchasers as to issues of anticompetitive conduct under *Gates*, after it declined to certify the claims of the class as a whole under Rule 23(b)(2). *Id.* at 68–78. This belies ECFMG's argument that the entire claim must satisfy Rule 23(b) in order for an issue to be certified under Rule 23(c)(4).

Finally, ECFMG suggests this Court should clarify whether class notice is required for an action certified under Rule 23(c)(4). Here, the parties do not dispute

16

that notice should occur. *See* Ex. 3 at 1–2. The Court should not grant review to render an advisory opinion.

## II.    ECFMG's choice of law arguments mischaracterize the district court's order.

ECFMG contends the district court "overlooked" potential conflicts of law in this case, but fails to identify any potential conflict of law that the court did not specifically consider and reject. Pet. at 19. The district court examined the elements of Plaintiffs' negligence and negligent infliction of emotional distress claims, and assessed whether or not there was a conflict of law among the implicated states. After an examination of law in Virginia, the District of Columbia, Maryland and Pennsylvania, the Court concluded that no conflict exists. Ord. at 10–12.

ECFMG incorrectly claims that in rejecting its choice of law arguments, the Court "relied" on the fact that "'the parties have not identified any [variations]'" in state law, and thereby misallocated the burden of proof. Pet. at 18 (quoting Ord. at 11). The truth is otherwise. Plaintiffs' briefing argued that Pennsylvania law applied to the certified issues. *See* Ex. 2 at 13–14; Pet., Ex. 1 at 22–23. The court discussed potential conflicts of law with the parties at length at the hearing. Pet., Ex. 23 at 40–47. In its memorandum opinion, the district court considered each of the legal and factual issues to be certified, analyzed any potential conflict of law

17

between each of the potential states, and found that no conflict existed. Ord. at 9–12.

Even in the event a conflict of law existed with respect to Plaintiffs' claims, the relative interests of the other implicated states "would be far weaker than Pennsylvania's interest," and Pennsylvania law would apply. *Id*. at 10 (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229–30 (3d Cir. 2007). As the district court observed, "this case is not about Igberase's conduct; it is about ECFMG's conduct." Ord. at 11 (emphasis added). The relevant acts and omissions of ECFMG all took place in Pennsylvania; where "Akoda" encountered class members is irrelevant.

ECFMG's reliance on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 802 (1985) is misplaced. There, the United States Supreme Court considered whether conflicts of law prevented a Kansas trial court from certifying a nationwide class of 28,000 members. *Id*. Kansas had no relation to the controversy apart from the fact that a small number of the leases were in Kansas. *Id.* at 814–15. The Court ultimately found that there were substantive conflicts of law and Kansas law could not be held applicable to all claims. *Id*. at 822.

Here, claims are asserted against a Pennsylvania corporation, for acts and omissions that took place exclusively in Pennsylvania. Pennsylvania has a strong interest in regulating the conduct of its domiciliary corporations by applying its

substantive tort law, and other jurisdictions have no interest in applying their own law when doing so would limit their citizen's right to recover, for the benefit of a foreign corporation. *See Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187–88 (3d Cir. 1991). Pennsylvania law applies.

Even if the district court later determined that other state's law should be applied to resolve the certified issues, the district court can create subclasses under Rule 23(c)(5) to do so, as Plaintiffs argued below. *See* Ex. 2 at 14.

Finally, ECFMG references "problems under the Commerce Clause," without any further explanation or argument. ECFMG never briefed or argued this issue below; thus, it is waived. *See, e.g.*, *Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). The claims asserted in this case do not concern the physician-patient relationship. They simply seek to hold ECFMG accountable for negligence committed in Pennsylvania.

## III.    ECFMG misstates and misapplies the typicality and adequacy requirements—the only Rule 23(a) findings it challenges.

ECFMG next contends that this case should not have been certified on the narrow issues set forth by the district court, because there may be differences in damages between class members. It claims these differences defeat the requirements of typicality, adequacy or superiority, despite the fact that issues of damages are not among those certified under the district court's order.

19

The representative Plaintiffs are four patients of "Akoda" who, as with every other class member, entrusted "Akoda" with their medical care and treatment. Their claims are typical of the class certified by the district court. The typicality prong is normally met where "claims of representative Plaintiffs arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (2004); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012) ("If a Plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class.")

Here, the named Plaintiffs, like the members of the class, were obstetrical and gynecological patients who consented to receive care and treatment from "Akoda" on the false premise that he was a properly certified and qualified OB/GYN who had obtained all necessary credentials and certifications required of physicians practicing in the United States. Although the individual class members suffered injury under different circumstances, the named Plaintiffs' and class's claims "arise from the same alleged wrongful conduct"[6] of ECFMG and are "based on the same legal theory."[7]  Typicality is satisfied here.

---

[6] *In re Warfarin*, 391 F.3d at 532.
[7] *Marcus*, 687 F.3d at 598.

JA1494

Additionally, the determination of damages is not among those claims certified by the district court. The certified issues of duty and breach are common to all claims of class members, and there are no conflicts of interests between the representative Plaintiffs and the class. Thus, there is no harm or prejudice to any class member should this matter proceed as a class action.

ECFMG suggests that certification may be inappropriate because class members could suffer emotional distress upon receipt of class notice. This argument was never raised before the district court, and is therefore waived. ECFMG cites no authority indicating how this argument can defeat class certification.

ECFMG then suggests that to the extent class members were the victims of medical malpractice, a class action might somehow preclude them from asserting their claims. Pet. 22. ECFMG never raised this argument below. It is waived. ECFMG also does not explain why this class action, which asserts only emotional distress damages against ECFMG, in any way forecloses Plaintiffs from recovering in a separate medical negligence claim for emotional distress arising out of bodily injury. The merely theoretical possibility that some class member may desire to file a medical negligence claim against ECFMG relating to "Akoda's" conduct creates no conflict of interest and does not impair typicality or adequacy of the class representatives.

21

## IV.    The district court's class certification order creates no inordinate settlement pressure.

For this Court to grant review on the basis that class certification places inordinate pressure on a defendant to settle, there should be some showing that the pressure is illegitimate and premised on nonmeritorious claims. ECFMG has not made this showing. Its arguments that Plaintiff's claims are "nonmeritorious," "weak," or "extortion[ate]" are unsupported invective. ECFMG belittles Plaintiffs' emotional distress claims as based on a "highly questionable premise." Pet. 21. Yet it also argues class certification risks "ruinous liability." *Id.* at 23. ECFMG cannot have it both ways.

ECFMG also fails to show the district court's certification order risks financial Armageddon. Such a conclusion is not remotely plausible. The district court certified only duty and breach, leaving damages for resolution on an individualized basis (e.g., through bellwether proceedings). This differs from *Newton*, relied on by ECFMG, where the proposed class involved thousands of investors who were parties to hundreds of millions of trades. Here, the class size is nowhere near that number. Pet., Ex. 1 at 11–12.

ECFMG has offered no evidence it is financially incapable of paying a judgment. In fact, its Corporate Disclosure Statement represents that its insurer "AIG may be liable to satisfy all or part of a possible judgment." Pet. at i.

22

ECFMG's most recent tax return (Form 990), from fiscal year 2018, is available at

https://tinyurl.com/y7m6pcf6. It shows total revenue of $89.9 million and net

assets of $151.8 million. *Id.* at 1. In short, this Court should not conclude that the

certification order creates "inordinate . . . pressure . . . to settle." *Rodriguez v. Nat'l

City Bank*, 726 F.3d 372, 376-77 (3d Cir. 2013) (citation omitted) (emphasis

added). The ordinary pressure to settle that a ruling on class certification creates,

without more, is insufficient for review.

Finally, ECFMG suggests the Order could open the door to class actions in

connection with treatment rendered by an international medical graduate (IMG).

ECFMG's liability arises solely from its own direct negligence. Plaintiffs have

never claimed that ECFMG could be held liable on a purely vicarious basis for

poor medical care provided by an IMG. There is no reason to conclude that

ECFMG could be held vicariously liable for the negligence of IMGs, where

ECFMG does not employ IMGs and is not even a healthcare provider.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that ECFMG's Rule

23(f) Petition be denied.

Dated: April 20, 2020                                    Respectfully submitted,

*[signatures on following page]*

23

JA1497

CONRAD O'BRIEN PC

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella, Esquire
Howard M. Klein, Esquire
Robin S. Weiss, Esquire
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
ncentrella@conradobrien.com

JANET, JANET & SUGGS, LLC

Patrick A. Thronson
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030
pthronson@JJSjustice.com

SCHOCHOR, FEDERICO AND
STATON

Jonathan Schochor
Lauren Schochor
Brent Ceryes
Phil Federico
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

LAW OFFICES OF PETER G.
ANGELOS, P.C.

Danielle S. Dinsmore
Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150

THE COCHRAN FIRM

Karen E. Evans, R.N., J.D.
David Haynes
1100 New York Ave, N.W.
Washington, D.C. 20005
Telephone: (202) 682-5800

Z LAW, LLC

Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
Telephone: (443) 213-1977

*Attorneys for Plaintiffs-Respondents*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2020, the foregoing Response in Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) was filed with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit through the Court's CM/ECF system. I also certify that copies of the foregoing Response in Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) were served by email upon the following counsel for Defendant-Petitioner Educational Commission for Foreign Medical Graduates:

William R. Peterson                  Brian W. Shaffer
Morgan, Lewis & Bockius, LLP         Matthew D. Klayman
1000 Louisiana St., Suite 400        Morgan, Lewis & Bockius, LLP
Houston, TX 77002                    1701 Market Street
                                     Philadelphia, PA 19103


/s/ Nicholas Centrella
Nicholas M. Centrella

25

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This filing complies with the type-volume limitations of Federal Rule of Appellate Procedure 5(c)(1), because it contains 5,197 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this filing has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times 14-point font.

/s/ Nicholas Centrella
Nicholas M. Centrella

26

## No. 20-8024

### In the United States Court of Appeals
### For the Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents*,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

*Defendant-Petitioner.*

On Petition for Permission to Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

### REPLY IN SUPPORT OF
### PETITION FOR PERMISSION TO APPEAL

MORGAN, LEWIS & BOCKIUS LLP
  Brian W. Shaffer
  Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
  William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

*Counsel for Defendant-Petitioner*

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................i

Table of Authorities ........................................................................... ii

Argument in Reply in Support of Petition ..............................................1

I.    This Court Should Grant Review to Develop the Law on Class
      Certification Under Rule 23(c)(4). .................................................2

      A.    Plaintiffs' response confirms the need for clarification of the
            relationship between Rule 23(b)(3) and Rule 23(c)(4). ........................3

      B.    This Court should correct the district court's misapplication
            of *Gates*. ....................................................................5

II.   Review Is Warranted Because the District Court's Class
      Certification Determination Was Erroneous. ....................................6

      A.    The district court erred in analyzing variations in state law. ...............7

      B.    The district court erred in analyzing Rule 23(a). .................................8

III.  The District Court's Ruling Places Inordinate Settlement Pressure
      on ECFMG...............................................................................10

Conclusion & Prayer for Relief ..............................................................12

Certificate of Service ...........................................................................13

Certificate of Compliance with Rule 32(a).................................................14

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.*,
  399 F.3d 89 (1st Cir. 2005) .......................................................................4

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ...................................................................1, 3, 4

*Gates v. Rohm and Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ..................................................3, 4, 5, 6

*Luppino v. Mercedes Benz USA*,
  718 F. App'x 143 (3d Cir. 2017) .........................................................4

*Nafar v. Hollywood Tanning Sys., Inc.*,
  339 F. App'x 216 (3d Cir. 2009) .......................................................10

*In re Sch. Asbestos Litig.*,
  789 F.2d 996 (3d Cir. 1986) ...............................................................7

*Spence v. Bd. of Ed. of Christina Sch. Dist.*,
  806 F.2d 1198 (3d Cir. 1986) .............................................................5

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta*,
  552 U.S. 148 (2008).........................................................................11

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ...........................................................................*passim*

ii

### ARGUMENT IN REPLY IN SUPPORT OF PETITION

Plaintiffs' response confirms that review is warranted under Rule 23(f). Plaintiffs do not deny the importance of the primary issue raised by the petition: the interaction of Rule 23(b) and Rule 23(c)(4). And they have no answer to the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), that class certification requires a plaintiff to "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)," *id.* at 1432, a holding that goes unaddressed in Plaintiffs' response.

Plaintiffs incorrectly describe the certification order, suggesting that it merely "leaves damages to be calculated on an individual basis." Resp. at 10. To the contrary, as ECFMG detailed in its petition, the district court certified only narrow, abstract questions of duty and breach, leaving issues such as causation, injury, damages, as well as individual affirmative defenses, to be determined in individual proceedings that will require re-presenting virtually all of the common evidence.

Moreover, there is no reason to believe that many class members suffered the emotional distress alleged by the named plaintiffs as a proximate result of any alleged act or omission by ECFMG. Plaintiffs accuse a third-party, Dr. John Akoda[1],

---

[1] Plaintiffs are wrong to state, "There is no 'Dr. Akoda.'" Resp. at 5. John Akoda completed a residency program, Dkt. 39-5, Dkt. 39-6; was licensed to practice medicine in two states, Dkt. 32-34 at 4; and achieved Board certification as a specialist, Dkt. 39-7. Plaintiffs' theory—that he should not have been licensed to

1

of committing "sexual assault, battery, and boundary violations." Resp. at 2. But Plaintiffs' class action does not seek to recover for such serious allegations, which would require proof on an individual basis and would likely be time-barred. Plaintiffs instead seek to recover only for the emotional distress they allegedly suffered upon learning that they received treatment (in many cases, completely satisfactory treatment) from an allegedly unqualified doctor. If Plaintiffs are correct, then notice of those allegations will be the cause of injuries to many class members.

Rather than defend the substance of the district court's order, Plaintiffs' response (i) retreats to meritless waiver arguments, accusing ECFMG of "waiving" particular cases; and (ii) in at least two instances, misstates the record in arguing that ECFMG did not raise arguments that it plainly did. Plaintiffs' reliance on waiver arguments, rather than a defense of the decision's merits, reveals their lack of confidence in its correctness.

This Court should review certification of this unusual and unprecedented class.

## I.    This Court Should Grant Review to Develop the Law on Class Certification Under Rule 23(c)(4).

This Court should allow this interlocutory appeal to clarify the law of class certification under Rule 23(c)(4). Pet. at 10–17.

_____

practice medicine—does not overcome the fact that "John Akoda" was, in fact, licensed to practice medicine.

### A.   Plaintiffs' response confirms the need for clarification of the relationship between Rule 23(b)(3) and Rule 23(c)(4).

This interlocutory appeal should be granted for this Court to address the relationship between Rule 23(b)(3) and Rule 23(c)(4), including whether this Court's decision in *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011), was affected by the Supreme Court's decision in *Comcast v. Behrend*, 133 S. Ct. 1426 (2013).

Plaintiffs do not deny the importance of this issue.  Nor do they dispute ECFMG's explanation of the district court's analysis.  Resp. at 9–10 (agreeing that the district court refused to consider Rule 23(b) and looked only at the *Gates* factors). Instead, Plaintiffs present it as settled law that a court should ignore Rule 23(b) when certifying issues for class treatment under Rule 23(c)(4).

As an initial matter, Plaintiffs' arguments largely attack a strawman, describing ECFMG's position as that "predominance and superiority must be satisfied for the entire case before certification pursuant to Rule 23(c)(4) can even occur." Resp. at 11–12.  But Plaintiffs' misstate ECFMG's position: although it may be that Rule 23(b) must be satisfied for the entire case, the district court's error here was failing to consider Rule 23(b) at all, either for the case or for the issues certified and not certified.

Plaintiffs' position that Rule 23(b) is irrelevant cannot be reconciled with the Supreme Court's statement in *Comcast v. Behrend* that class certification requires a

plaintiff to "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." 133 S. Ct. at 1432. Their position is also inconsistent with *Luppino v. Mercedes Benz USA*,[2] which relied on *Comcast* to hold that a plaintiff "may seek certification under Rule 23(c)(4)" only after "having satisfied Rule 23(a) and (b)'s requirements." 718 F. App'x 143, 146 (3d Cir. 2017).

Nor do Plaintiffs' counsel address why their description of *Gates* and this Court's Rule 23(c)(4) jurisprudence to the Supreme Court is inconsistent with the district court's analysis. Pet. at 13 (quoting *Behr Dayton* Brief in Opposition). The fact that Plaintiffs' lawyers cannot consistently describe *Gates* from case to case establishes the need for clarification.

Plaintiffs attempt to distinguish two district court decisions cited by ECFMG, Pet. at 16, but notably, they cite no case that is consistent with the district court's "Rule 23(b) is irrelevant" approach to Rule 23(c)(4). The decision below is an outlier, and Plaintiffs do not dispute what ECFMG explained in its petition: under the district court's approach—no matter how predominant individual issues or

---

[2] *Luppino* confirms the need for clarification of this area of the law. Plaintiffs' contention (at 15) that ECFMG somehow forfeited reliance on *Luppino* is frivolous. They "confus[e] the making of an argument with the citation of a case." *Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc.*, 399 F.3d 89, 100 n. 7 (1st Cir. 2005). ECFMG has fully preserved the argument that the district court was required to consider Rule 23(b) in certifying a class under Rule 23(c)(4). Dkt. 39 at 10.

superior individual suits—a district court could always slice off a narrow, abstract issue for class treatment.  Pet. at 14.

This Court has not discussed Rule 23(c)(4) at any length in nearly a decade. Plaintiffs cannot deny the importance of the issue, which warrants clarification.

### B.    This Court should correct the district court's misapplication of *Gates*.

Independent of Rule 23(b), this interlocutory appeal will allow this Court to develop the law of class certification by clarifying whether the district court correctly analyzed *Gates* and, if not, how district courts in this Circuit should do so in the future.

Plaintiffs do not mount a meaningful defense of the district court's cursory analysis of *Gates*.  Much of their argument is in a single, conclusory sentence: "The district court identified, discussed, and applied the factors set forth in this Court's opinion in *Gates*."  Resp. at 14.  This is no answer to the district court's failure to engage in the rigorous analysis required by this Court.  Pet. at 15.

Plaintiffs have no explanation for the district court's failure to consider "the type of claims at issue" in light of this Court's holding that emotional distress is "unsuitable for class treatment," given that emotional distress liability and damages are "too interwoven to allow a fair determination of damages apart from liability." *Spence v. Bd. of Ed. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986).

5

The problems with doing so are spotlighted in this case where emotional distress is the *only* form of damages and relief sought by the class members.

Nor do Plaintiffs address how the analysis of "efficiencies" can be harmonized with *Gates* itself, which rejected an indistinguishable class under Rule 23(c)(4). *See* Pet. at 16 ("As in *Gates*, in this case, determination of the classwide issues would still leave causation, the fact of damages, and the amount of damages to be determined in follow-up proceedings.").

In its petition, ECFMG explained in detail why individual proceedings to determine the existence, cause, and amount of any individual's emotional distress would require a jury to rehear virtually all of the classwide evidence. Pet. at 16–17. Plaintiffs are silent in response.

Particularly if Plaintiffs are correct that Rule 23(b) is irrelevant, then rigorous application of *Gates* is critical. This Court should grant this petition to develop the law of class certification, provide guidance regarding *Gates*, and correct the district court's application thereof.

## II.    Review Is Warranted Because the District Court's Class Certification Determination Was Erroneous.

A number of errors in the district court's analysis also warrant granting this petition for interlocutory appeal. Pet. at 17–23.

6

### A.    The district court erred in analyzing variations in state law.

Plaintiffs do not dispute that it was their burden under Rule 23 to conduct an "extensive analysis" of state law variations.  *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986).  But Plaintiffs cannot show that the district court properly applied this burden or that they conducted this "extensive analysis."

As ECFMG explained, the full analysis of state law variations in Plaintiffs' class certification briefing consisted of counsel's representation that they were "unaware" of any relevant conflicts.  Plaintiffs never cited (let alone discussed) any case from any state other than Pennsylvania.  That is not the "extensive analysis" required by this Court.  *Id.* at 1010.

Rather than attempting to prove the absence of state law variations, Plaintiffs invited the district court to misapply the burden of proof, arguing that "Defendants haven't identified any relevant distinction[.]"  Jan. 30, 2020 Hearing Tr. at 47:9-11.  Similarly, the district court then noted—without any substantive analysis—that "the parties have not identified any" real difference between the relevant state laws.  Dkt. 57, Class Certification Memorandum ("Mem.") at 11.  The district court never concluded that Plaintiffs demonstrated uniformity.

Far from "specifically consider[ing] and reject[ing]" specific differences in state law (Resp. at 17), the district court did not discuss a single case from Virginia or the District of Columbia, and the cited case from Maryland confirms there is a

7

conflict between the law of Maryland (which does not recognize a claim for negligent infliction of emotional distress) and the laws of Pennsylvania and of the District of Columbia (which do recognize such a claim, though the elements may vary). The district court's conclusion (at Mem. at 11) that the "same result would ensue" under Pennsylvania and Maryland law cannot be correct. ECFMG made that argument to the district court, to no avail. Dkt. 39 at 19–20.

Plaintiffs also attempt to defend the suggestion that Pennsylvania law could apply to emotional distress arising out of an out-of-state doctor treating an out-of-state plaintiff in an out-of-state hospital, suggesting that "where 'Akoda' encountered class members is irrelevant." Resp. at 18. That argument is facially incorrect: Plaintiffs allege that what they subsequently learned about their interactions with Dr. Akoda—not with ECFMG—caused emotional distress.

Again, Plaintiffs retreat to a meritless waiver argument. Resp. at 19. ECFMG has consistently maintained that Pennsylvania law cannot apply, Dkt. 39 at 20, and the problems under the Commerce Clause that would occur if Pennsylvania attempted to apply its law to regulate an out-of-state doctor-patient relationship merely provide further support for ECFMG's fully-preserved position.

**B.    The district court erred in analyzing Rule 23(a).**

This Court should also grant review to correct the erroneous analysis of Rule 23(a). Plaintiffs failed to carry their burden as to typicality. Their theory—that other

class members have suffered or would suffer emotional distress after learning that Dr. Akoda was not allegedly "properly certified and qualified"[3]—is speculation: Plaintiffs admit that the class includes individuals who "didn't suffer any provable emotional distress." Jan. 30, 2020 Hearing Tr. at 12:20–21. The problem is not only that "individual class members suffered injury under different circumstances," Resp. at 20, but also that other class members have suffered no injury at all.

With respect to the fact that (under Plaintiffs' theory) certification of this class action would cause harm to unnamed class members, Plaintiffs misstate the record in asserting that the argument "was never raised." Resp. at 21. ECFMG expressly argued that Rule 23(a) is not satisfied and adequacy is lacking because "class members might suffer emotional distress only upon receiving notice of this class action, if it is certified." Dkt. 39 at 21–22. Plaintiffs have not identified a single case in which a class was certified in the face of such a fundamental conflict. *See* Pet. at 22 (noting that the desire to inflict injury on class members should preclude certification on numerous grounds).

Plaintiffs make a similarly incorrect waiver argument with respect to the class claims precluding claims by class members for physical injuries allegedly caused by

---

[3] Plaintiffs' liability theory is that class members typically suffer emotional distress upon learning that Dr. Akoda pleaded guilty to misuse of a social security number, even if years had passed since their interactions with Dr. Akoda and even if their interactions with Dr. Akoda were fully satisfactory.

Dr. Akoda. *See* Resp. at 21 ("ECFMG never raised this argument below."). ECFMG expressly argued: "[I]f a class is certified here, class members would be precluded from later pursuing claims that could have been asserted in this class action." Dkt. 39-1 at 21. Plaintiffs express apparent puzzlement at how this could occur, but principles of claim preclusion prevent plaintiffs from splitting claims in separate proceedings. *See Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224–25 (3d Cir. 2009) (vacating class certification order and noting that "claim splitting, which is generally prohibited by the doctrine of *res judicata*" is a "very important issue in assessing the adequacy of representation requirement"). Plaintiffs' desire to manufacture a class action by pursuing claims only for emotional distress creates a conflict between Plaintiffs and any class members who have allegedly suffered physical injuries. This conflict renders Plaintiffs inadequate representatives.

## III.  The District Court's Ruling Places Inordinate Settlement Pressure on ECFMG.

Finally, the settlement pressure of the ruling justifies review by this Court. Plaintiffs argue, in essence, that the extreme settlement pressure on ECFMG is desirable because Plaintiffs believe their claims are meritorious. Resp. at 22. That is not the law. Regardless of a claim's ultimate merits, an order granting certification warrants immediate appellate review if it "may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." Fed. R. Civ. P. 23(f), Advisory Committee Note. The "potential for

10

uncertainty and disruption" in a class action lawsuit, *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148, 149 (2008), is particularly acute with respect to emotional distress damages, which are extremely difficult to predict.

Plaintiffs do not dispute that international medical graduates compose a substantial percentage of doctors in the United States or that an unfavorable ruling creates the possibility that ECFMG, a non-profit Philadelphia-based organization, may be sued in a class action whenever there is possible malfeasance by an international medical graduate. Pet. at 23–24 . Plaintiffs' focus on whether "ECFMG could be held vicariously liable" misses the point. Resp. at 23. The issue is that if class treatment is appropriate (or if the district court rendered an unfavorable decision on a classwide basis), virtually any dissatisfaction by patients of an international medical graduate could lead to a class action against ECFMG. From such a perspective, the stakes—and the settlement pressure—are high.

11

## CONCLUSION & PRAYER FOR RELIEF

ECFMG respectfully renews its request that this Court grant this petition for permission to appeal under Rule 23(f) and permit interlocutory review of the class certification order.

Dated:  April 27, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: _William Peterson_
William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

Brian W. Shaffer
Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

*Counsel for Defendant-Petitioner*
*Educational Commission for Foreign Medical Graduates*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020, the foregoing Reply in Support of Petition for Permission to Appeal was served via this Court's CM/ECF system and/or email upon the following counsel:

Nicholas M. Centrella
Robin Weiss
CONRAD O'BRIEN
1500 Market Street
Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102

Jonathan Schochor
Philip C. Federico
Brent P. Ceryes
SCHOCHOR FEDERICO & STATON, PA
1211 St. Paul Street
Baltimore, MD 21202

Cory L. Zajdel
Z LAW LLC
2345 York Road, Suite #B-13
Timonium, MD 21093

Patrick A. Thronson
JANET JANET & SUGGS LLC
4 Reservoir Circle, Suite 200
Baltimore, MD 21208

David E. Haynes
Karen E. Evans
THE COCHRAN FIRM
1100 New York Ave NW
Suite 340
Washington, DC 20005

Paul M. Vettori
Danielle S. Dinsmore
LAW OFFICES OF PETER ANGELOS
One Charles Center
100 N. Charles Street
Baltimore, MD 21201

***Counsel for Plaintiffs-Respondents***

_William Peterson_
—————————————————
William R. Peterson

13

JA1516

### CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.    This petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(C) because this petition contains 2,577 words, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f).

2.    This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

*William Peterson*

_____
William R. Peterson
*Counsel for Defendant-Petitioner,*
*Educational Commission for Foreign*
*Medical Graduates*

Dated: April 27, 2020

JA1517