# No. 22-1998

## In the United States Court of Appeals for the Third Circuit

MONIQUE RUSSELL; JASMINE RIGGINS; ELSA M. POWELL; DESIRE EVANS

*Appellants*

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Appellee*

On Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## JOINT APPENDIX VOLUME VI, PAGES JA1909 TO JA4931

JANET, JANET & SUGGS
    Patrick A. Thronson
    Brenda A. Harkavy
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

CONRAD O'BRIEN PC
    Nicholas M. Centrella
    Robin S. Weiss
1500 Market Street, Suite 3900
Philadelphia, PA 19102
(215) 864-9600

***Counsel for Appellants***

MORGAN, LEWIS & BOCKIUS LLP
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

***Counsel for Appellee***

***Additional Counsel on Inside Cover***

THE LAW OFFICES OF PETER G. ANGELOS, P.C.
     Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, MD 21201
(410) 649-2027

THE COCHRAN FIRM
     Karen Evans
     David Haynes
1666 K Street NW
Suite 1150
Washington, DC 20006
(202) 682-5800

SCHOCHOR AND STATON, P.A.
     Scott Kurlander
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Z LAW, LLC
     Cory L. Zajdel
2345 York Road, Suite #B-13
Timonium, MD 21093
(443) 213-1977

***Counsel for Appellants***

# TABLE OF CONTENTS

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| *Volume I* | | | |
| 1-1 | Petitioner's Notice of Appeal (3d Cir. No. 22-1998) | 5/24/2022 | JA1 |
| 102 | ORDER Cancelling Oral Arguments on Motion for Summary Judgment and Class Certification Motions | 3/22/2022 | JA4 |
| 103 | Memorandum Opinion | 5/19/2022 | JA5 |
| 104 | ORDER Granting Defendants' Motion for Summary Judgment (ECF No. 81) | 5/19/2022 | JA24 |
| 57 | Memorandum Opinion | 3/23/2020 | JA25 |
| 58 | Order | 3/23/2020 | JA53 |
| 10-1 | Order, No. 20-8024 (3d Cir. May 11, 2020) | 5/11/2020 | JA54 |
| 5-1 | Petitioners' Concise Summary of the Case | 6/2/2022 | JA56 |
| — | District Court Docket | Printed 9/8/2022 | JA59 |
| *Volume II, Pages JA79 to JA562* | | | |
| 1 | Civil Cover Sheet | 12/31/2018 | JA79 |
| | Designation Forms | | JA80 |
| | Defendant's Notice of Removal | | JA83 |
| | Exhibit A: Plaintiffs' Class Action Civil Complaint (Phila. Ct. Com. Pl. No. 181101690) | | JA90 |
| | Exhibit A | | JA113 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit B | | JA119 |
| | Exhibit C | | JA122 |
| 7 | Answer to Class Action Civil Complaint and Affirmative Defenses | 2/6/2019 | JA126 |
| 32 | Motion for Class Certification | 10/7/2019 | JA167 |
| 32-1 | Memorandum of Law in Support of Motion for Class Certification | | JA169 |
| 32-2 | Certificate of Service | | JA199 |
| 32-3 | Exhibit 1 | | JA200 |
| 32-4 | Exhibit 2 | | JA202 |
| 32-5 | Exhibit 3 | | JA204 |
| 32-6 | Exhibit 4 | | JA207 |
| 32-7 | Exhibit 5 | | JA210 |
| 32-8 | Exhibit 6 | | JA215 |
| 32-9 | Exhibit 7 | | JA217 |
| 32-10 | Exhibit 8 | | JA238 |
| 32-11 | Exhibit 9 | | JA241 |
| 32-12 | Exhibit 10 | | JA245 |
| 32-13 | Exhibit 11 | | JA251 |
| 32-14 | Exhibit 12 | | JA253 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-15 | Exhibit 13 | | JA255 |
| 32-16 | Exhibit 14 | | JA257 |
| 32-17 | Exhibit 15 | | JA259 |
| 32-18 | Exhibit 16 | | JA262 |
| 32-19 | Exhibit 17 | | JA267 |
| 32-20 | Exhibit 18 | | JA272 |
| 32-21 | Exhibit 19 | | JA274 |
| 32-22 | Exhibit 20 | | JA276 |
| 32-23 | Exhibit 21 | | JA278 |
| 32-24 | Exhibit 22 | | JA280 |
| 32-25 | Exhibit 23 | | JA283 |
| 32-26 | Exhibit 24 | | JA286 |
| 32-27 | Exhibit 25 | | JA288 |
| 32-28 | Exhibit 26 | | JA290 |
| 32-29 | Exhibit 27 | | JA292 |
| 32-30 | Exhibit 28 | | JA294 |
| 32-31 | Exhibit 29 | | JA296 |
| 32-32 | Exhibit 30 | | JA303 |
| 32-33 | Exhibit 31 | | JA314 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 32-34 | Exhibit 32 | | JA317 |
| 32-35 | Exhibit 33 | | JA325 |
| 32-36 | Exhibit 34 | | JA383 |
| 32-37 | Exhibit 35 | | JA419 |
| 32-38 | Exhibit 36 | | JA459 |
| 32-39 | Exhibit 37 | | JA490 |
| 32-40 | Exhibit 38 | | JA525 |
| 32-41 | Exhibit 40 | | JA532 |
| *Volume III, Pages JA563 to JA1037* | | | |
| 32-42 | Exhibit 41 | | JA563 |
| 32-43 | Exhibit 42 | | JA571 |
| 32-44 | Exhibit 43 | | JA579 |
| 32-45 | Exhibit 44 | | JA604 |
| 32-46 | Exhibit 45 | | JA628 |
| 33 | Exhibit 39 to Motion to Certify Class | 10/8/2019 | JA698 |
| 39 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification | 10/28/2019 | JA707 |
| 39-1 | Exhibit 1: Verification Papers - University of Ibadan | | JA743 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 39-2 | Exhibit 2: Verification Papers – University of Benin | | JA749 |
| 39-3 | Exhibit 3: October 14, 2019 Expert Report from Dr. Mark A. Smith | | JA755 |
| 39-4 | Exhibit 4: October 14, 2019 Expert Report from dr. Laurence H. Beck | | JA772 |
| 39-5 | Exhibit 5: March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital | | JA796 |
| 39-6 | Exhibit 6: Howard University Hospital Certificate of Completion of Residency for John-Charles Nosa Akoda MD | | JA798 |
| 39-7 | Exhibit 7: January 31, 2014 Letter to John-Charles Akoda from American Board of Obstetrics and Gynecology | | JA800 |
| 39-8 | Exhibit 8: May 22, 2002 Letter to Dr. Oluwafemi Charles Igberase from William C. Kelly | | JA802 |
| 39-9 | Exhibit 9: November 7, 2000 Letter to State of Maryland Board of Physician Assurance from Meridian Health System | | JA805 |
| 39-10 | Exhibit 10: May 5, 2017 Virginia Department of Health Professions Report | | JA807 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 50-1 | Exhibit 11 (Redacted): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA811 |
| 50-2 | Exhibit 12 (Redacted): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA836 |
| 50-3 | Exhibit 13 (Redacted): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA863 |
| 50-4 | Exhibit 14 (Redacted): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA887 |
| 39-15 | Exhibit 15: Email from Kara Corrado to Lisa Cover, Suzann Paolini, and Roman Mizak (March 18, 2016) | | JA911 |
| 39-16 | Exhibit 16: Email from Kara Corrado to Lisa Cover (Nov. 29, 2016) | | JA915 |
| 39-17 | Exhibit 17: Notice #101 from Lisa Cover (March 1, 2017) | | JA920 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 50-5 | Exhibit 18 (Redacted): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA924 |
| 46-6 | Exhibit 19 (Unredacted): Plaintiff Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA954 |
| 46-7 | Exhibit 20 (Unredacted): Plaintiff Jasmine Riggins' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA984 |
| 46-8 | Exhibit 21 (Redacted): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1008 |
| 39-22 | Exhibit 22: February 26, 2018 Expert Report from Dr. Thomas Bojko | | JA1033 |
| *Volume IV, Pages JA1038 to JA1517* | | | |
| 39-23 | Exhibit 23: Docket from Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) | | JA1038 |
| 39-24 | Exhibit 24: Stipulation of Dismissal, CAL 17-2271 | | JA1053 |
| 50-6 | Exhibit 25 (Redacted): Questionnaire Responses | | JA1058 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 46-10 | Exhibit 26 (Redacted): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1124 |
| 50-7 | Exhibit 27 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1132 |
| 46-12 | Exhibit 28 (Redacted): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins conducted by Dr. Gladys Fenichel | | JA1141 |
| 46-13 | Exhibit 29 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel | | JA1147 |
| 50-8 | Exhibit 30 (Redacted): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel | | JA1154 |
| 46-15 | Exhibit 31 (Redacted): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel | | JA1164 |
| 46-16 | Exhibit 32 (Redacted): September 23, 2019 Expert Report from Dr, Jay Goldberg | | JA1168 |
| 39-33 | Exhibit 33: Facebook Comments Produced by Plaintiff Monique Russell | | JA1179 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 39-34 | Exhibit 34: October 14, 2019 Rebuttal Expert Report from Dr. Susan McDonald | | JA1183 |
| 39-35 | Exhibit 35: Jalloh et al v. Chaudry et al, CAL 16-22162 (Cir. Ct. Prince George's Cty, MD) – Complaint | | JA1214 |
| 50-9 | Exhibit 36 (Redacted): September 5, 2019 Transcript of Deposition of Desire Evans | | JA1236 |
| 50-10 | Exhibit 37 (Redacted): September 6, 2019 Transcript of Deposition of Elsa Powell | | JA1285 |
| 39-38 | Exhibit 38: Russell et al v. Dimensions Health Corporation, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) – First Amended Class Action Complaint | | JA1315 |
| 39-39 | Text of Proposed Order | | JA1339 |
| 47 | Reply Memorandum of Law in Support of Motion for Class Certification | 11/11/2019 | JA1340 |
| 47-1 | Exhibit 1 | | JA1362 |
| | Exhibit 2 | | JA1365 |
| | Exhibit 3 | | JA1367 |
| 48 | Defendant Educational Commission for Foreign Medical Graduates' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification | 11/18/2019 | JA1371 |
| 63 | Transcript of Proceedings Held on January 30, 2020 | 4/6/2020 | JA1381 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 5-1 | Response in Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), No. 20-8024 (3d Cir. No. 20-8024) | 4/20/2020 | JA1469 |
| 9 | Reply in Support of Petition for Permission to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 4/27/2020 | JA1501 |
| *Volume V (Under Seal), Pages JA1518 to JA1908* | | | |
| 40 | Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification (Under Seal) | 10/28/2019 | JA1518 |
| | Exhibit 11 (Under Seal): Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1554 |
| | Exhibit 12 (Under Seal): Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1579 |
| | Exhibit 13 (Under Seal): Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1606 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| | Exhibit 14 (Under Seal): Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents | | JA1630 |
| | Exhibit 18 (Under Seal): Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1654 |
| | Exhibit 21 (Under Seal): Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents | | JA1684 |
| | Exhibit 25 (Under Seal): Questionnaire Responses | | JA1709 |
| | Exhibit 26 (Under Seal): September 25, 2019 Expert Report from Dr. Gladys Fenichel | | JA1775 |
| | Exhibit 27 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel | | JA1783 |
| | Exhibit 28 (Under Seal): September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins, conducted by Dr. Gladys Fenichel | | JA1792 |

## TABLE OF CONTENTS
### (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
|  | Exhibit 29 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel |  | JA1798 |
|  | Exhibit 30 (Under Seal): September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel |  | JA1805 |
|  | Exhibit 31 (Under Seal): October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel |  | JA1815 |
|  | Exhibit 32 (Under Seal): September 23, 2019 Expert Report from Dr, Jay Goldberg |  | JA1819 |
|  | Exhibit 36 (Under Seal): September 5, 2019 Transcript of Deposition of Desire Evans |  | JA1830 |
|  | Exhibit 37 (Under Seal): September 6, 2019 Transcript of Deposition of Elsa Powell |  | JA1879 |
| *Volume VI – Pages JA1909 to JA4931* | | | |
| 1-1 | Petition by Educational Commission for Foreign Medical Graduates for Leave to Appeal Pursuant to Fed. R. Civ. P. 23(f) (3d Cir. No. 20-8024) | 4/6/2020 | JA1909 |
| 10-1 | Order Granting Petition for Leave to Appeal, No. 20-8024 (3d Cir. No. 20-8024) | 05/11/2020 | JA1943 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 10-2 | Notice Grant of Permission for Leave to Appeal | 05/11/2020 | JA1944 |
| 20 | Brief of Appellant and Joint Appendix | 09/02/2020 | JA1945 |
| 26 | Addendum to Brief of Appellant | 09/04/2020 | JA2012 |
| 34 | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Appellant | 09/09/2020 | JA2016 |
| 47 | Brief of Appellees | 11/02/2020 | JA2044 |
| 49 | Reply Brief of Appellants | 11/23/2020 | JA2125 |
| 64 | Transcript of Oral Argument Before the Honorable Luis Felipe Restrepo, the Honorable Stephanos Bibas, the Honorable David James Porter United States Circuit Court Judges | 02/25/2021 | JA2161 |
| 65 | Opinion Order Remanding Case to the United States District Court for the Eastern District of Pennsylvania | 09/24/2021 | JA2202 |
| 79 | Plaintiffs' Supplemental Memorandum in Support of Class Certification | 12/10/2021 | JA2234 |
| 80 | Defendant's Supplemental Brief in Opposition to Class Certification | 12/10/2021 | JA2254 |
| 81 | Defendant's Motion for Summary Judgment | 12/10/2021 | JA2280 |
| 82 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs Expert Dr. Annie Steinberg | 12/10/2021 | JA2334 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
| 83 | Defendants' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 12/10/2021 | JA2542 |
| 84 | Defendants' Unopposed Motion to Seal | 12/10/2021 | JA2810 |
| 85 | Statement of Undisputed Material Facts in Support of Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 12/10/2021 | JA2818 |
| 86 | Defendant Educational Commission for Foreign Medical Graduates' Notice of Exhibits | 12/11/2021 | JA3079 |
| 92 | Joint Stipulation re ECF 82 | 01/14/2022 | JA3914 |
| 93 | Plaintiffs' Response in Opposition to Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment | 01/14/2022 | JA3916 |
| 94 | Plaintiffs' Response in Opposition to Defendant's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/14/2022 | JA4271 |
| 95 | Plaintiffs' Response to Defendant's Supplemental Brief in Opposition to Class Certification | 01/14/2022 | JA4514 |
| 96 | Defendant's Opposition Brief in Response to Plaintiffs' Supplemental Brief Regarding Class Certification | 01/14/2022 | JA4530 |

**TABLE OF CONTENTS**
**(continued)**

| ECF No. | Document Description | Date Filed | Page |
|---------|---------------------|------------|------|
| 98 | Defendant's Reply in Support of Motion for Summary Judgment | 01/28/2022 | JA4550 |
| 99 | Defendant's Reply in Support of its Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson Dr. John Charles Hyde, and Dr. Jerry Williamson | 01/28/2022 | JA4687 |
| 100 | Order rescheduling Oral Argument on summary judgment and class certification is Rescheduled for March 29, 2022 | 01/31/2022 | JA4702 |
| 101 | Plaintiffs' Sur-Reply In Support of its Opposition to Defendant Educational Commission for Foreign Medical Graduates Motion for Summary Judgment | 02/11/2022 | JA4703 |
| 102 | Order Cancelling Oral Argument on summary judgment and class certification motions, currently scheduled for March 29, 2022, is Cancelled | 03/22/22 | JA4715 |
| | Petitioner's Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit, No. 21-948 (Supreme Court of the United States, No. 21-948) | 12/23/2021 | JA4716 |
| | Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 01/28/2022 | JA4824 |

# TABLE OF CONTENTS
## (continued)

| ECF No. | Document Description | Date Filed | Page |
|---|---|---|---|
|  | Respondents' Brief in Opposition, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/08/2022 | JA4853 |
|  | Reply for Petitioner, No. 21-948 (Supreme Court of the United States, No. 21-948) | 04/26/2022 | JA4899 |
|  | Order Denying Petitioner's Petition for Writ of Certiorari, No. 21-948 (Supreme Court of the United States, No. 21-948) | 05/16/2022 | JA4923 |

# No. 20-_____

## In the United States Court of Appeals
## For the Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents*,

v.

## EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Defendant-Petitioner.*

On Petition for Permission to Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(F)

MORGAN, LEWIS & BOCKIUS LLP
  Brian W. Shaffer
  Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
  William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

***Counsel for Defendant-Petitioner***

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, Defendant–Petitioner Educational Commission for Foreign Medical Graduates makes the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*Educational Commission for Foreign Medical Graduates has no parent corporation.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*No publicly held corporation owns more than 10% of Educational Commission for Foreign Medical Graduates' stock.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*At this time, Educational Commission for Foreign Medical Graduates believes that AIG may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy a possible judgment in the action.*

i

4)     In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated:  April 6, 2020                    Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  _William Peterson_
     _____
       William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

       Brian W. Shaffer
       Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

ii

TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ..............................................................i

Table of Contents ................................................................................. iii

Table of Authorities ............................................................................... v

Introduction ..........................................................................................1

Factual Background ...............................................................................3

Questions Presented ..............................................................................8

Relief Sought.........................................................................................9

Reasons for Granting the Petition .........................................................10

I.    Review Would Facilitate Development of the Law on Class
      Certification Under Rule 23(c)(4). ..............................................10

      A.    This Court should clarify the relationship between the *Gates*
            factors and Rule 23(b). ......................................................12

      B.    This Court should correct the district court's misapplication
            of *Gates*. ......................................................................14

II.   This Court Should Grant Interlocutory Review Because The District
      Court's Class Certification Determination Was Erroneous. .........................17

      A.    The district court erred in analyzing variations in state law. ..............18

      B.    The district court erred in analyzing Rule 23(a). ...............................21

III.  Class Certification Places Inordinate Pressure on ECFMG to Settle............23

JA1912

Conclusion & Prayer for Relief ................................................................25

Certificate of Service .............................................................................26

Certificate of Compliance with Rule 32(a)............................................27

Attachment

iv

JA1913

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alban v. Fiels*,
    61 A.3d 867 (Md. 2013) .......................................................................19

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)..........................................................................23

*Bordentown v. FERC*,
    903 F.3d 234 (3d Cir. 2018) .............................................................17

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)......................................................................12

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) .......................................................passim

*Grandalski v. Quest Diagnostics Inc.*,
    767 F.3d 175 (3d Cir. 2014) .............................................................18

*Hammersmith v. TIG Ins. Co.*,
    480 F.3d 220 (3d Cir. 2007) .............................................................20

*Hedgepeth v. Whitman Walker Clinic*,
    22 A.3d 789 (D.C. 2011) ..................................................................20

*Hershman v. Muhlenberg College*,
    17 F. Supp. 3d 454 (E.D. Pa. 2014)..................................................20

*In re Sch. Asbestos Litig.*,
    789 F.2d 996 (3d Cir. 1986) ........................................................18, 20

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust
Litig.*,
    No. 13-md-2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019) ........13

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ........................................................18

*Luppino v. Mercedes Benz USA*,
    718 F. App'x 143 (3d Cir. 2017) ...................................................1, 12

v

*Microsoft Corp. v. Baker*,
    137 S. Ct. 1702 (2017) .......................................................................10

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001), *as amended* (Oct. 16, 2001) ...........................23, 24

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ..........................................................................20

*Rodriguez v. Nat'l City Bank*,
    726 F.3d 372 (3d Cir. 2013) .......................................................10, 17

*Romero v. Allstate Ins. Co.*,
    52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) ...........................................13

*Slade v. Progressive Sec. Ins. Co.*,
    856 F. 3d 408 (5th Cir. 2017) ............................................................22

*Spence v. Bd. of Ed. of Christina Sch. Dist.*,
    806 F.2d 1198 (3d Cir. 1986) ......................................................1, 15

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ..........................................................................24

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) (en banc) ..............................................18

*Walsh v. Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) .........................................................18

**OTHER AUTHORITIES**

Aaron Young, PhD, et al., *A Census of Actively Licensed Physicians
    in the United States, 2016*, Journal of Medical Regulation (Vol. 10,
    No. 2) ..............................................................................................24

Fed. R. Civ. P. 23 ...........................................................................passim

JA1915

# INTRODUCTION

The district court certified a multistate class of hundreds of plaintiffs seeking to recover for emotional distress. Despite the fact that the claims as a whole are unquestionably unsuitable for class adjudication, the district court relied on Rule 23(c)(4) to certify narrow and abstract issues, limited to duty and breach.

This interlocutory appeal will permit this Court to clarify the relationship between Rule 23(c)(4) and Rule 23(b), an important and unsettled issue in the law of class certification. The district court held that under this Court's decision in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), Rule 23(b) has no relevance to certification under Rule 23(c)(4). *See* Dkt. 57, Class Certification Memorandum (cited hereinafter as "Mem.") at 9. But this Court, after *Gates*, has held that a plaintiff "may seek certification under Rule 23(c)(4)" only after "having satisfied Rule 23(a) and (b)'s requirements." *Luppino v. Mercedes Benz USA*, 718 F. App'x 143, 146 (3d Cir. 2017).

This Court should also permit interlocutory review because of the errors committed by the district court. For example, the district court's cursory consideration of the *Gates* factors led to certification of an issue class that is "unlikely to substantially aid resolution of the substantial issues on liability and causation." *Gates*, 655 F.3d at 274; *see also Spence v. Bd. of Ed. of Christina Sch.*

1

*Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (explaining that emotional distress is "too interwoven to allow a fair determination of damages apart from liability").

And the district court misplaced the burden of proof regarding variations in state law, noting that the "parties have not identified any variations" in the law of the relevant case, Mem. at 11, rather than asking whether Plaintiffs carried their burden of proof to demonstrate the absence of variations. The district court's alternative holding—that Pennsylvania law could apply to claims arising from out-of-state treatment rendered by an out-of-state doctor to an out-of-state patient—is facially incorrect. Mem. at 11.

Nor did the district court ever seriously grapple with the other problems inherent in attempting to certify a class seeking to recover for emotional distress. Even if Plaintiffs suffered compensable emotional distress merely because they learned that they were examined by an allegedly unqualified doctor, Plaintiffs have not demonstrated that such a reaction is typical. And if learning that the doctor was unqualified is what causes emotional distress, then certifying and providing notice of this class action will actually **cause** injuries to class members.

For these reasons—and because of the settlement pressure that class certification creates—this Court should grant this petition for permission to appeal.

2

## FACTUAL BACKGROUND

Petitioner Educational Commission for Foreign Medical Graduates ("ECFMG") is a Philadelphia-based private non-profit organization that promotes quality health care for the public. *See* Dkt. 32-3. Among other tasks, ECFMG certifies graduates of international medical schools as ready to enter U.S. graduate medical education (usually residency programs). *See id.*

The certification provided by ECFMG is limited. ECFMG would only (1) certify that the applicant received passing grades on an English exam and two substantive exams (the first two steps of the United States Medical Licensing Examination ("USMLE")), Dkt. 32-5; Dkt. 32-46 at 88:21–89:2; and (2) verify the diploma provided by the applicant by asking the issuing medical school to confirm its legitimacy, Dkt. 32-46 at 88:3–14.

Other than certifying the test results and the diploma, ECFMG did not make any additional representations regarding the applicant. In particular, ECFMG's reports did not (and were not expected to) verify an applicant's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character. *Id.* at 198:16–22, 200:13–15, 240:18–241:6, 242:6–243:3, 244:22–245:13.

3

***Dr. Akoda***

This case involves obstetrician/gynecologist John Nosa Akoda, who ECFMG certified in 1997.[1]  Dkt. 32-21.  It is undisputed that Dr. Akoda passed the two substantive examinations and presented to ECFMG a medical school diploma in his name that was verified as authentic by the University of Benin, a Nigerian medical school.  Dkt. 32-1 at 4; Dkt. 39-2.  After obtaining ECFMG certification, Dr. Akoda successfully:

- passed Step 3 of the USMLE, Dkt. 32-34 at 4;

- was admitted to and completed a residency program at Howard University Hospital, Dkt. 39-5; Dkt. 39-6;

- became licensed to practice medicine in Maryland and Virginia, Dkt. 32-34 at 4;

- was awarded hospital privileges at Prince George's Hospital Center and hired by several medical offices, *id.*; and

- achieved Board certification in his specialty, Dkt. 39-7.

In 1996, Jersey Shore Medical Center, a residency program that Dr. Akoda had entered, raised concerns with ECFMG regarding Dr. Akoda's identity.  Dkt. 32-23.  Following an investigation—in which Dr. Akoda addressed those concerns and provided supporting hard-copy documentation, Dkt. 32-26; Dkt. 32-27—ECFMG

---

[1] The district court's statement that John Akoda "was not a doctor," Mem. at 1, is incorrect.  John Akoda completed a residency program, was licensed to practice medicine, and achieved Board certification as a specialist.  By any meaning of the term, John Akoda was a "doctor."

JA1919

concluded that there was insufficient evidence of any discrepancy.  Dkt. 32-29; Dkt. 32-46 at 150:24–151:6  Jersey Shore Medical Center also reported its suspicions to the Maryland Board of Physicians, which took no action against Dr. Akoda.  Dkt. 39-9.

In November 2016, following a two-year investigation by the U.S. Attorney's office, Dr. Akoda pleaded guilty to misuse of a Social Security number.  Dkt. 32-32. It was discovered that Dr. Akoda had previously applied to ECFMG under two different names: Oluwafemi Charles Igberase in 1992 and Igberase Oluwafemi Charles in 1994.  *Id.*  ECFMG immediately revoked his certificate.  Dkt. 32-33.

### *Plaintiffs Sue ECFMG for Emotional Distress*

The four named plaintiffs—Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans—are former patients of Dr. Akoda, either because Dr. Akoda was their regular doctor or was the doctor who happened to be "on-call" at the hospital when they gave birth.  Even among Plaintiffs, there is significant variation in their treatment by and allegations against Dr. Akoda:

- For Ms. Russell, Dr. Akoda performed a successful emergency c-section. Dkt. 46-16 at 9.  She not only does not complain about her treatment but agrees that it "really was best/necessary."  Dkt. 39-33.  She never sought any mental health treatment after hearing about Dr. Akoda's guilty plea. Dkt. 50-7.

- For Ms. Riggins, Dr. Akoda performed a successful elective c-section and provided prenatal care.  Dkt. 46-16 at 8.  She had no concerns about her treatment and no history of mental health or psychiatric treatment.  Dkt. 46-12 at 4.

5

- For Ms. Powell, Dr. Akoda successfully delivered her baby, performed emergency surgery, and assisted with post-natal care. Dkt. 46-16 at 6. She alleges that Dr. Akoda was flirtatious and made inappropriate comments. *Id.* at 6. She has no history of mental health or psychiatric treatment. Dkt. 46-13 at 4.

- For Ms. Evans, Dr. Akoda performed a successful emergency c-section. Dkt. 46-16 at 4. She alleges that he improperly manipulated her clitoris. *Id.* at 4. Ms. Evans has extensive history of mental health treatment, both before and after encountering Dr. Akoda. Dkt. 50-8 at 6–8. None of her mental health records refers to Dr. Akoda. *Id.* at 7.

Despite the large number of persons and entities potentially responsible for Plaintiffs' alleged emotional distress[2]—most obviously, Dr. Akoda himself but also including the residency program from which he graduated, states that licensed him, and hospitals and medical practices that employed him—Plaintiffs chose to sue ECFMG on behalf of a putative class.[3]

Following extensive briefing and a hearing, Judge Wolson certified an issue class under Federal Rule of Civil Procedure 23(c)(4), comprising "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/ka Charles J.

---

[2] At the hearing, Plaintiffs' counsel confirmed that the only harm for which they seek for the class to recover is "emotional distress." Jan. 30, 2020 Hearing Tr. at 5:22–25.

[3] This litigation follows an unsuccessful putative class action against Dimensions Health Corporation and others who operated Prince George's Hospital Center, where Dr. Akoda practiced. *See Russell v. Dimensions Corp., et al.*, CAL 17-22761 (Prince George's Cty. Cir. Ct., Md.); *Dews v. Dimensions Healthcare Sys.*, CAL 17-37091 (Prince George's Cty. Cir. Ct., Md.). The plaintiffs in those cases abandoned their claims after receiving the defendants' motions for summary judgment.

Akoda) beginning with his enrollment in a postgraduate medical education program

at Howard University in 2007." Dkt. 58 at 1–2.

The following issues were certified:

(1) whether Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") undertook or otherwise owed a duty to class members;
(2) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable to class members pursuant to Restatement (Second) of Torts § 324A;
(3) whether ECFMG breached any duty that it owed to class members; and
(4) whether ECFMG breached any duty that it owed to hospitals and state medical boards.

*Id.* at 2.

## QUESTIONS PRESENTED

1.      Whether Rule 23(c)(4) permits certification of a class limited to questions of duty and breach with respect to a multistate class seeking only highly individualized emotional distress damages, without any finding that questions of law or fact common to class members predominate over questions affecting only individual class members and without any finding that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy?

2.      Whether the district court erred in certifying the class, including:

        a.      whether the district court correctly applied this Court's decision in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011);

        b.      whether the district court erred in analyzing choice-of-law and misallocated the burden regarding variations in state law;

        c.      whether the district court erred in analyzing typicality, without considering whether any other class members suffered the same alleged emotional damages as Plaintiffs; and

        d.      whether the district court erred by failing to consider that certification will cause emotional distress to class members.

## RELIEF SOUGHT

Petitioner seeks leave to appeal the March 23, 2020 Order granting Plaintiffs' motion for class certification.

## REASONS FOR GRANTING THE PETITION

Interlocutory review of a district court's class certification order may be granted "on the basis of any consideration." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1710 (2017). This Court has identified several circumstances in which review is appropriate, including (1) "when the appeal might 'facilitate development of the law on class certification,'" (2) "when the district court's class certification determination was erroneous;" and   (3) "when class certification risks placing 'inordinate . . . pressure on defendants to settle.'" *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 376–77 (3d Cir. 2013) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164–65 (3d Cir. 2001), *as amended* (Oct. 16, 2001)). Review is warranted under all three criteria.

## I.    Review Would Facilitate Development of the Law on Class Certification Under Rule 23(c)(4).

This Court should provide guidance on certification of issue classes under Rule 23(c)(4), which provides, "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

This Court has not addressed Rule 23(c)(4) at length in nearly a decade. In *Gates v. Rohm and Haas Co.*, this Court recognized "[t]he interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issue classes under Rule 23(c)(4)" as "a difficult matter" that has "generated

10

divergent interpretations among the courts."  655 F.3d at 272.  And this Court set

forth a list of factors that district courts should consider as part of the "rigorous

analysis" in deciding whether to certify an issue class:

- the type of claim(s) and issue(s) in question;

- the overall complexity of the case;

- the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;

- the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;

- the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);

- the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;

- the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;

- the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and

- the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Id.* at 273.

Two issues related to Rule 23(c)(4) and the *Gates* factors warrant clarification

by this Court.  First, did the district court correctly hold—contrary to a decision by

11

this Court post-dating *Gates*—that the *Gates* factors render Rule 23(b) irrelevant to class certification?  Second, did the district court's cursory discussion of *Gates* satisfy the "rigorous analysis" required by this Court?

> **A.     This Court should clarify the relationship between the *Gates* factors and Rule 23(b).**

The district court interpreted *Gates* as holding that Rule 23(b) is irrelevant to certification of an issue class under Rule 23(c)(4), holding that it only had to "consider Rule 23(a) and then turn to the *Gates* factors in conducting its analysis." Order at 9.  This decision appears to be the first case ever interpreting *Gates* in this manner.

Numerous decisions—including one from this Court—cast serious doubt on this understanding of *Gates*.   Two years after *Gates*, the Supreme Court unequivocally reaffirmed that "a party seeking to maintain a class action" must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Relying on *Comcast*, an unpublished decision from this Court held that a plaintiff "may seek certification under Rule 23(c)(4)" only after "having satisfied Rule 23(a) and (b)'s requirements." *Luppino*, 718 F. App'x at 146; *see also id.* (holding that the "conclusion that a (c)(4) class was not certifiable" need not be addressed because of "the class certification's (b)(3) defects").

12

Nor have other district courts shared the understanding of the district judge in this case.  *See Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) (quoting *Gates* while noting that "[c]ertification of particular issues under Rule 23(c)(4) is only proper if the other requirements of Rule 23(a) and (b) are first met"); *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, No. 13-md-2445, 2019 WL 4735520, at *18 (E.D. Pa. Sept. 27, 2019) (relying on *Romero* for this proposition).

Indeed, Plaintiffs' counsel—in a brief filed with the Supreme Court—disavowed the district court's interpretation of *Gates*.  Janet, Janet & Suggs, LLC, who the district court appointed class counsel, represented to the Supreme Court that this Court "rest[s] the determination whether to certify an issue class on whether the issue class itself satisfies the Rule 23(b)(3) requirements of predominance and superiority, and appl[ies] a 'functional' analysis to consider whether an issue class is a superior method of adjudicating a case."  Brief in Opposition, *Behr Dayton Thermal Prods., LLC v. Martin*, No. 18-472 (U.S. 2019), *available at* https://tinyurl.com/w4ep2ju.

The district court's treatment of Rule 23(b)(3) as irrelevant is particularly puzzling, given the acknowledgment by Plaintiffs' counsel at the class certification hearing that "in essence, it's a (b)(3) class" that Plaintiffs seek to certify.  Jan. 30, 2020 Hearing Tr. 24:10-12; *see also id.* at 23:2–24:1 (The Court: "[I]f I certify a

13

class here, it is ultimately a (b)(3) class.  Right?").  It is incongruous to suggest that the certified class is "in essence" a Rule 23(b)(3) class but that Rule 23(b)(3) need not be satisfied.  And the district court noted the difficulty in understanding the interaction of the provisions of Rule 23.  *See id.* at 26:3–5 ("[O]ne of my questions for you all is sort of the interplay between Rule 23(a) and (b) on the one hand and 23(c)(4) on the other hand[.]").

The correct standard for certification of an issue class is an important one, which warrants clarification by this Court.  If the certification order in this case is correct, then certification would be proper in any case in which a plaintiff can identify a common issue of law or fact potentially affecting numerous plaintiffs.  No matter how predominant the individualized issues and evidence (or superior individual suits or other judicial tools might be), a district court would always be free to slice off a narrow, abstract issue and certify it for class treatment.  This is a far cry from the "rigorous analysis" of Rule 23(b) demanded by this Court and the Supreme Court.

> **B.**     **This Court should correct the district court's misapplication of** ***Gates***.

Even apart from the district court's failure to consider Rule 23(b) (much less find that the requirements of the Rule had been met), the district court failed to engage in the rigorous analysis under Rule 23(c)(4) required this this Court's precedent: "[A] court's decision to exercise its discretion under Rule 23(c)(4), like

14

any other certification determination under Rule 23, must be supported by rigorous analysis." *Gates*, 655 F.3d at 272 (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200–01 (3d Cir. 2009) (alteration in original)).

The district court's discussion of the *Gates* factors begins on page 22 of the 28-page opinion. But the first four pages of that truncated discussion concern Plaintiffs' request for certification of all liability issues, which the district court rejected. *See* Mem. at 22–25. Only four paragraphs of the opinion discuss whether Rule 23(c)(4) and *Gates* permit the certification ordered by the district court. *See* Order at 25-28.

This brief discussion does not engage in a rigorous analysis of the *Gates* factors sufficient to justify certification. For example, the district court failed to consider "the type of claims at issue." This failure is significant in light of this Court's holding that claims based on emotional distress are particularly "unsuitable for class treatment," given that emotional distress liability and damages are "too interwoven to allow a fair determination of damages apart from liability." *Spence*, 806 F.2d at 1202.

And the district court's analysis of "efficiencies to be gained" conflicts with this Court's analysis in *Gates*. In *Gates*, the plaintiffs brought claims based on alleged exposure to environmental contamination. Like Plaintiffs, the *Gates* plaintiffs sought certification of generalized, abstract questions of liability, while

15

leaving the bulk of the claims for later, individual proceedings. *See Gates*, 655 F.3d at 272 (explaining that "causation and extent of contamination," "the fact of damages," and "the amount of damages" would need to be determined in follow-up proceedings). In light of the "numerous individual issues that would remain," resolution of the common issues was "unlikely to substantially aid resolution of the substantial issues on liability and causation," so certification under Rule 23(c)(4) would be improper. *Id.* at 272, 274.

As in *Gates*, in this case, determination of the classwide issues would still leave causation, the fact of damages, and the amount of damages to be determined in follow-up proceedings. The district court failed to follow this Court's direction to "explain how class resolution of the issue(s) will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues," *id.* at 273, and as a result, certified an issue class indistinguishable from the issue class rejected in *Gates*.

And although the district court suggested that a jury in individual proceedings "will not have to reexamine any of the evidence about ECFMG's conduct," that suggestion is incorrect. Mem. at 27. To determine causation (particularly proximate causation), understand who Dr. Akoda was, and even have a basic understanding of the theory of liability against ECFMG, every jury in every individual proceeding would need to hear essentially all of the evidence that Plaintiffs propose to present

16

on the class issues.  And in every case, determining causation would require a jury to consider the entire chain of events—including any alleged wrongdoing by ECFMG, residency programs that admitted Dr. Akoda, medical boards that licensed him, hospitals that gave him privileges, the specialty board that certified him, and law enforcement officers who investigated him—to decide which actor, if any, was the proximate cause of any alleged emotional distress suffered by any individual plaintiff.  *Cf. Bordentown v. FERC*, 903 F.3d 234, 247 (3d Cir. 2018) (noting that "intervening act[s]" can sever a causal chain).  No efficiencies would be gained by such a proceeding.

Every justification offered by the district court for certification of the issue class in this proceeding would apply equally to the issue class denied certification in *Gates*.  Granting interlocutory review would allow this Court to develop the law on class certification under Rule 23(c)(4) and provide guidance on application of the *Gates* factors in cases where parties seek to certify narrow issues for class treatment while leaving the majority of the claims for individual determinations.

## II.    This Court Should Grant Interlocutory Review Because The District Court's Class Certification Determination Was Erroneous.

Review of a district court's class certification determination is also appropriate when that determination is erroneous.  *Rodriguez*, 726 F.3d at 377.  Even apart from the errors in failing to consider Rule 23(b)(3) and applying the *Gates* factors, the district court committed other errors that warrant review.

17

### A.    The district court erred in analyzing variations in state law.

"[I]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304 n.28 (3d Cir. 2011) (en banc) (internal quotation marks and citations omitted); *see Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183–84 (3d Cir. 2014) (affirming denial of class certification due to variations in state law). The district court incorrectly analyzed variations in state law and misplaced the burden of proof.

The party seeking certification of a class action has the burden to conduct an "extensive analysis" of state law variations. *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986); *see also Grandalski*, 767 F.3d at 183-84; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) (noting that the burden "rests squarely with the plaintiffs"); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) ("[M]ovants must credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" (quoting *In re Sch.l Asbestos Litig.*, 789 F.2d at 1010)).

Plaintiffs failed to carry their burden in this case. Although ECFMG is headquartered in Pennsylvania, Dr. Akoda was not licensed to practice medicine in Pennsylvania and did not treat patients in Pennsylvania. He was licensed to practice medicine in Maryland and Virginia, worked in two private medical practices in

18

Maryland, and secured privileges at hospitals in Maryland and the District of Columbia.  The certified class comprises patients examined or treated in at least three jurisdictions (Maryland, Virginia, and the District of Columbia).   Rather than provide the necessary "extensive analysis" of these states' laws, Plaintiffs' counsel merely represented that they were "unaware" of any relevant conflicts between the laws of Pennsylvania and other states.  Dkt. 32-1 at 22–23.

The district court followed suit and misallocated the burden of proof.  Rather than asking whether Plaintiffs proved that there was no variation, the district court relied on the fact that "the parties have not identified any [variations]," Mem. at 11, placing the burden on ECFMG to identify differences in state law rather than on Plaintiffs to prove uniformity.

The district court overlooked conflicts between the laws of the relevant jurisdictions.  Maryland, for example, "does not recognize the tort of negligent infliction of emotional distress." *Alban v. Fiels*, 61 A.3d 867, 876 (Md. 2013). Pennsylvania and the District of Columbia recognize causes of action for negligent infliction of emotional distress but with significant variations: In the District of Columbia, a plaintiff must prove, *inter alia*, that "the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being" and that there is "an especially likely risk that the defendant's negligence would cause serious emotional

19

distress to the plaintiff." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810-11 (D.C. 2011). Pennsylvania courts are split as to whether the Pennsylvania Supreme Court would approve of negligent infliction of emotional distress claims based on similar considerations. *Hershman v. Muhlenberg College*, 17 F. Supp. 3d 454, 460 n.6 (E.D. Pa. 2014).

The district court did not grapple with these variations in state law or engage in any meaningful analysis of the availability of emotional distress damages in regular negligence claims. Its reasoning falls well short of the "extensive analysis" of state law variations required to show "that class certification does not present insuperable obstacles." *In re Sch. Asbestos Litig.*, 789 F.2d at 1010.

The district court's alternative holding—that Pennsylvania law would apply to the claims of class members treated in hospitals across the country—is erroneous. Mem. at 11. The Supreme Court has rejected this approach: Courts cannot avoid variations in state law by taking "a transaction with little or no relationship to the forum and apply[ing] the law of the forum." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).

Pennsylvania applies a "flexible" choice-of-law analysis that "permits analysis of the policies and interests underlying the particular issue before the court" and applies the law of the state with the "most interest in the problem." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v.*

20

*United Air Lines, Inc.*, 203 A.2d 796, 805–06 (Pa. 1964)).  Pennsylvania has little (if any) interest in the emotional distress resulting from out-of-state treatment rendered by an out-of-state doctor to an out-of-state plaintiff.  Indeed, serious problems under the Commerce Clause would arise if Pennsylvania purported to apply its law to claims arising out of the relationship between doctors and patients in other states.

The alternative holding fails, and Plaintiffs' failure to present an analysis of variations in state law, standing alone, should have precluded certification.

### B.    The district court erred in analyzing Rule 23(a).

Nor did the district court correctly analyze Rule 23(a).  Even assuming (the highly questionable premise) that Plaintiffs suffered compensable emotional distress when they learned, years after the fact, that their Board-certified doctor (who delivered hundreds of healthy babies to healthy mothers) had misused a Social Security number, Plaintiffs did not demonstrate that their reactions were typical of the reactions of other members of the putative class.  For class members who were perfectly satisfied with the medical care and treatment that they received from Dr. Akoda, there is no reason to believe that members of the class would share Plaintiffs' atypical emotional distress.  *See* Jan. 30, 2020 Hearing Tr. at 12:20–21 (Plaintiffs' counsel conceding  that the class includes individuals who "didn't suffer any provable emotional distress").

21

Indeed, if Plaintiffs' liability theory were correct—and learning that Dr. Akoda misused a Social Security number would predictably cause emotional distress to his former patients—then certification of this class action would **cause harm** to unnamed class members.  Under Plaintiffs' theory, learning of Dr. Akoda's guilty plea causes emotional distress.  Class members who are unaware of the guilty plea have (at present) suffered no harm at all.  But certifying the class and providing notice would inflict emotional distress on class members solely for the purpose of allowing them to recover for this distress against ECFMG.  Whether this issue is viewed as typicality (because Plaintiffs, unlike unnamed class members, have allegedly already suffered emotional distress), adequacy (because of the inherent conflict of interest in Plaintiffs' plans to inflict emotional distress on their fellow class members), or superiority (because of the harms to class members), the fact should preclude certification.

And to the extent that class members were dissatisfied with their treatment by Dr. Akoda—and suffered actual, physical injuries as a result of malpractice—a class action seeking only emotional distress could preclude them from asserting their claims.  The district court relied on the opportunity to opt out to cure any conflicts between named and unnamed class members, Mem. at 19, but if opting out could always cure a conflict between named and unnamed class members, adequacy would be a dead letter.  *But see Slade v. Progressive Sec. Ins. Co.*, 856 F. 3d 408, 412 (5th

22

Cir. 2017) ("When the class representative proposes waiving some of the class's claims, the decision risks creating an irreconcilable conflict of interest with the class.").

Moreover, the issue class has not been certified under any provision of Rule 23(b), and nothing in Rule 23(c)(4) creates a right for class members to opt out.[4] This procedural issue further demonstrates the need for this Court's clarification of the proper standard under Rule 23(c)(4) for issue certification.

## III.    Class Certification Places Inordinate Pressure on ECFMG to Settle.

Finally, this Court should grant review because of the settlement pressure created by class certification. Rule 23(f) recognizes that "granting class certification is often the defining moment in class actions" because it may "create unwarranted pressure to settle nonmeritorious claims on the part of defendants." *Newton*, 259 F.3d at 162. Rather than "run the risk of potentially ruinous liability," *id.* at 164 (quoting Fed. R. Civ. P. 23(f) advisory committee's note), a class action defendant "[f]aced with even the small chance of a devastating loss" may be pressured into settling questionable claims, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). The mere "potential for uncertainty and disruption in a lawsuit" alone might "allow plaintiffs with weak claims to extort settlements from [an] innocent

---

[4] At the hearing, the district court stated that "[w]e still do notice and an opt-out period" for a "true (c)(4) class" but offered no support for this proposition.

compan[y]." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 149 (2008).

Class certification places inordinate pressure on ECFMG to settle. There are hundreds of class members alleging emotional distress damages that are difficult to quantify and which, if they proceeded trial, could result in outsized judgments. The threat of class-wide determinations regarding ECFMG's duties gives rise to particular concern for ECFMG because, in the event of unfavorable holdings, ECFMG could theoretically face class actions in connection with treatment rendered by any international medical graduate (who compose approximately 22% of all doctors in the United States). Aaron Young, PhD, et al., *A Census of Actively Licensed Physicians in the United States, 2016*, Journal of Medical Regulation (Vol. 10, No. 2), at 10, *available at* https://tinyurl.com/tlnkqat. Class certification thus places "inordinate or hydraulic pressure" on ECFMG to settle and weighs in favor of granting review. *Newton*, 259 F.3d at 164.

24

## CONCLUSION & PRAYER FOR RELIEF

For the foregoing reasons, this Court should grant this petition for permission to appeal under Rule 23(f) and permit interlocutory review of the class certification order.

Dated:  April 6, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: _William Peterson_
_____
William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

Brian W. Shaffer
Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

*Counsel for Defendant-Petitioner*
*Educational Commission for Foreign Medical Graduates*

25

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, the foregoing Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) was filed with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit by email to emergency_motions@ca3.uscourts.gov, in accordance with the April 1, 2020 Filing Notice on acceptance of original proceedings filings by email. I also certify that copies of the foregoing Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) were served by email upon the following counsel:

Nicholas M. Centrella
CONRAD O'BRIEN
1500 Market Street
Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102

Cory L. Zajdel
Z LAW LLC
2345 York Road, Suite #B-13
Timonium, MD 21093

David E. Haynes
Karen E. Evans
THE COCHRAN FIRM
1100 New York Ave NW
Suite 340
Washington, DC 20005

Robin Schleifer Weiss
HAGGERTY GOLDBERG
SCHLEIFER & KUPERSMITH
92 Buck Road
Holland, PA 18966

Jonathan Schochor
Philip C. Federico
Brent P. Ceryes
SCHOCHOR FEDERICO & STATON, PA
1211 St. Paul Street
Baltimore, MD 21202

Patrick A. Thronson
JANET JANET & SUGGS LLC
4 Reservoir Circle, Suite 200
Baltimore, MD 21208

Paul M. Vettori
Danielle S. Dinsmore
LAW OFFICES OF PETER ANGELOS
One Charles Center
100 N. Charles Street
Baltimore, MD 21201

*Counsel for Plaintiffs-Respondents*

_William Peterson_
William R. Peterson

JA1941

### CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 5(c)(1) because this petition contains 5,171 words, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

_William Peterson_
_____
William R. Peterson
*Counsel for Defendant-Petitioner,*
*Educational Commission for Foreign*
*Medical Graduates*

Dated: April 6, 2020

27

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CCO-065

No. 20-8024

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; DESIRE EVANS

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
Petitioner

(E.D. Pa. No. 2-18-cv-05629)

Present: JORDAN, KRAUSE, and MATEY, Circuit Judges

1. Petition by Educational Commission for Foreign Medical Graduates for Leave
   to Appeal Pursuant to Fed. R. Civ. P. 23(f)

2. Respondents' Response in Opposition

3. Petitioner's Unopposed Motion for Leave to File Reply in Support of Petition,
   with Reply Attached

Respectfully,
Clerk/CJG

_____ORDER_____
        The foregoing petition for leave to appeal is granted, and the foregoing unopposed
motion for leave to file reply is granted.

By the Court,

s/ Cheryl Ann Krause
Circuit Judge

Dated: May 11, 2020
Lmr/cc: All Counsel of Record

A True Copy:

Patricia A. Dodszuweit
Patricia S. Dodszuweit, Clerk

JA1943

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## NOTICE

## GRANT OF PERMISSION FOR LEAVE TO APPEAL

The Court of Appeals has granted a petition for leave to appeal in this matter.

The $505.00 docketing and filing fee must be paid in the district court within 14 days after the entry of the order granting permission for leave to appeal, unless the petitioner is the United States government. Fed. R. App. P. 5. In addition, a cost bond must be filed if one is required under Fed. R. App. P. 7.

A notice of appeal does not need to be filed as a copy of the Court's order granting permission for leave to appeal which has been forwarded to the district court will serve as the notice of appeal.

The entry date of the order granting permission to appeal serves as the date of the filing of the notice of appeal for calculating time under the Federal Rules of Appellate Procedure. **Petitioner should notify the Court of Appeals in writing that the filing fee has been paid.**

Upon receipt of the notice from petitioner, the appeal will be opened on the general docket. All future filings regarding the appeal will be entered under the new docket number.

Very truly yours,
Patricia S. Dodszuweit, Clerk


By: s/Laurie
Case Manager
267-299-4936

cc: Nicholas M. CentrellaEsq.
Brent P. CeryesEsq.
Danielle S. DinsmoreEsq.
Philip C. FedericoEsq.
Matthew D. KlaymanEsq.
William R. PetersonEsq.
Benjamin O. PresentEsq.
Jonathan SchochorEsq.
Brian W. ShafferEsq.
Patrick A. ThronsonEsq.
Paul M. VettoriEsq.
Cory L. ZajdelEsq.

JA1944

# No. 20-2128

## In the United States Court of Appeals
## For the Third Circuit

MONIQUE RUSSELL; JASMINE RIGGINS; ELSA M. POWELL;
DESIRE EVANS

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

*Appellant*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## BRIEF OF APPELLANT AND JOINT APPENDIX
## (VOLUME I, PAGES JA1 TO JA78)

MORGAN, LEWIS & BOCKIUS LLP
   Brian W. Shaffer
   Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
   William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, Defendant-Petitioner Educational Commission for Foreign Medical Graduates makes the following disclosure:

(1)   For nongovernmental corporate parties, please list all parent corporations:

*Educational Commission for Foreign Medical Graduates has no parent corporation.*

(2)   For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*No publicly held corporation owns more than 10% of Educational Commission for Foreign Medical Graduates' stock.*

(3)   If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*At this time, Educational Commission for Foreign Medical Graduates believes that AIG may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy a possible judgment in the action.*

JA1946

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated:  September 2, 2020

Respectfully submitted,

Morgan, Lewis & Bockius LLP

By:    */s/ William R. Peterson*
      William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

      Brian W. Shaffer
      Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ...................................................................i

Table of Citations....................................................................................v

Statement of Jurisdiction...........................................................................1

Statement of the Issues.............................................................................2

Statement of the Case...............................................................................3

Summary of the Argument...........................................................................14

Standard of Review.................................................................................17

Argument.............................................................................................18

I. The District Court Erred in Analyzing Rule 23(a). ........................................18

    A. The district court did not find—and Named Plaintiffs did not show—that their alleged emotional distress is typical of the class. ...............................................................................19

    B. Named Plaintiffs fail typicality and adequacy because they propose to inflict emotional distress on class members......................22

    C. Named Plaintiffs' proposal to certify only claims for emotional distress defeats Rule 23(a)'s typicality and adequacy requirements. .......................................................24

II. The District Court Erred by Certifying a Class Without Finding that Named Plaintiffs Satisfied Rule 23(b)...........................................28

    A. Class certification requires the party seeking certification to satisfy one of the three subsections of Rule 23(b). ........................30

JA1948

TABLE OF CONTENTS
(continued)

**Page**

B.   This Court should, consistent with *Gates*, require Rule 23(b)(3) to be satisfied for the claim as a whole, even when a party seeking certification invokes Rule 23(c)(4)..............................32

III.   The District Court Abused Its Discretion in Analyzing the *Gates* Factors..................................................................................................39

A.   The district court erred in analyzing choice-of-law and inconsistencies among state law.........................................................40

1.   Plaintiffs failed to present the required "extensive analysis" of state law. ..............................................................41

2.   The district court erred in holding, in the alternative, that Pennsylvania law governs the claims of out-of-state plaintiffs based on out-of-state medical treatment. ..................................................................................43

B.   The district court failed to consider the type of claim at issue, including that claims of emotional distress are particularly unsuitable for class treatment.............................................................46

C.   The district court abused its discretion in analyzing the efficiencies to be gained...................................................................49

D.   The district court's analysis would permit certification of an issue class in virtually any case..........................................................53

Conclusion & Prayer for Relief ................................................................55

Certificate of Bar Membership, Compliance with Type-Volume Limitation and Typeface Requirements, and Virus Check.........................................56

Certificate of Service ................................................................................57

Joint Appendix (Volume I, Pages JA1 to JA78)

iv

# TABLE OF CITATIONS

**Page(s)**

## CASES

*A.H. by next friends C.H. v. Church of God in Christ, Inc.*,
   831 S.E.2d 460 (Va. 2019) ....................................................43

*Aiello v. Providian Fin. Corp.*,
   239 F.3d 876 (7th Cir. 2001) ...............................................49

*Alban v. Fiels*,
   61 A.3d 867 (Md. 2013) ..................................................11, 42

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997).............................................................19

*Arch v. Am. Tobacco Co., Inc.*,
   175 F.R.D. 469 (E.D. Pa. 1997)...........................................26

*Baby Neal v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ...............................................18, 20

*Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*,
   637 F.3d 827 (7th Cir. 2011) ...............................................26

*Beck v. Maximus, Inc.*,
   457 F.3d 291 (3d Cir. 2006) ................................................18

*Bruni v. City of Pittsburgh*,
   941 F.3d 73 (3d Cir. 2019) ..................................................46

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .....................................29, 33, 42

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...................................14, 17, 31, 38

*D.C. by & through Garter v. County of San Diego*,
   783 F. App'x 766 (9th Cir. 2019) ........................................52

v

TABLE OF CITATIONS
(continued)

**Page(s)**

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ...............................................................20

*Ferreras v. Am. Airlines, Inc.*,
   946 F.3d 178 (3d Cir. 2019) .........................................................31, 33

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) ....................................................*passim*

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982).................................................17, 18, 20, 54

*Gonzalez v. Corning*,
   885 F.3d 186 (3d Cir. 2018) ...........................................36, 37, 38, 52

*Grandalski v. Quest Diagnostics Inc.*,
   767 F.3d 175 (3d Cir. 2014) ...................................................40, 41, 45

*Griffith v. United Air Lines, Inc.*,
   203 A.2d 796 (Pa. 1964) .....................................................................44

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989)............................................................................45

*Hedgepeth v. Whitman Walker Clinic*,
   22 A.3d 789 (D.C. 2011) ....................................................................43

*Hohider v. United Parcel Serv., Inc.*,
   574 F.3d 169 (3d Cir. 2009) ........................................................35, 36

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ..............................................................17

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ................................................................17

*In re Krebs*,
   527 F.3d 82 (3d Cir. 2008) ................................................................38

JA1951

**Page(s)**

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016) .................................................17, 22, 31

*In re Nassau Cty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) ..............................................................30

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ..............................................................20

*In re Sch. Asbestos Litig.*,
  789 F.2d 996 (3d Cir. 1986) ..............................................................41

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ........................................................18, 21

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F.Supp. 3d 12, 45 (E.D. Pa. 2019) ..............................................39

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ..............................................................34

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) .........................................................41

*Luppino v. Mercedes Benz USA*,
  718 F. App'x 143 (3d Cir. 2017) ..................................................38, 39

*Maniscalco v. Brother Int'l (USA) Corp.*,
  709 F.3d 202 (3d Cir. 2013) ..............................................................45

*Marcus v. BMW of N.A., LLC*,
  687 F.3d 583 (3d Cir. 2012) ........................................................17, 38

*Martin v. Behr Dayton Thermal Prods. LLC*,
  896 F.3d 405 (6th Cir. 2018) .............................................................34

*McKenna v. City of Philadelphia*,
  649 F.3d 171 (3d Cir. 2011) ..............................................................50

JA1952

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Nafar v. Hollywood Tanning Sys., Inc.*,
339 F. App'x 216 (3d Cir. 2009) ........................................................25

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ..............................................................20

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ..............................................................23

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006) .............................................................21

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .............................................................21

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985).............................................................................43

*Robertson v. Monsanto Co.*,
287 F. App'x 354 (5th Cir. 2008) ......................................................46

*Romero v. Allstate Ins. Co.*,
52 F. Supp. 3d 715, 724 (E.D. Pa. 2014)....................................38, 39

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
211 F.3d 1228 (11th Cir. 2000) .................................................47, 48

*Slade v. Progressive Sec. Ins. Co.*,
856 F. 3d 408 (5th Cir. 2017) ....................................................26, 27

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
806 F.2d 1198 (3d Cir. 1986) ...................................10, 15, 47, 51

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ..............................................................40

*Taylor v. Johnston*,
985 P.2d 460 (Alaska 1999) ..............................................................28

JA1953

# TABLE OF CITATIONS
### (continued)

**Page(s)**

*Township of Bordentown, N.J. v. FERC*,
903 F.3d 234 (3d Cir. 2018) ...............................................................51

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)................................................................20, 34

*Walmart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).........................................................................18

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986).........................................................41

## STATUTES & CONSTITUTIONAL PROVISIONS

28 U.S.C. § 1292 ..................................................................................1

28 U.S.C. § 1332 ..................................................................................1

U.S. Const. art. I, § 8, cl. 3....................................................................45

U.S. Const. art. III ...............................................................................20

## RULES

Fed. R. Civ. P. 23 ...........................................................................*passim*

## OTHER AUTHORITIES

Principles of the Law of Aggregate Litigation (2010)......................................48, 49

Restatement (Second) of Conflict of Laws § 148 (1971) .................................44, 45

Restatement (Second) of Torts § 324A (1965).........................................13

Restatement (Second) of Torts § 892B (1979).........................................28

Restatement (Third) of Torts: Inten. Torts to Persons (2019) ................................29

JA1954

## STATEMENT OF JURISDICTION

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), over this class action in which the alleged amount in controversy exceeds the sum of $5,000,000 exclusive of costs and interest, there are more than 100 members in the proposed putative class, and there is diversity between the defendant (a citizen of Pennsylvania) and at least one of the putative plaintiffs. *See* JA83–JA88 (Notice of Removal, detailing the basis for the district court's jurisdiction).

This Court has jurisdiction over this interlocutory appeal of a class certification decision pursuant to 28 U.S.C. § 1292(e) and Fed. R. Civ. P. 23(f). The district court certified the class on March 23, 2020. JA63–JA65. Appellant Educational Commission for Foreign Medical Graduates filed a timely petition for permission to appeal on April 6, 2020 (JA1–JA34), which a motions panel of this Court granted on May 11 (JA66).

1

## STATEMENT OF THE ISSUES

1.     Whether Named Plaintiffs satisfied their burden to prove adequacy and typicality under Rule 23(a) when:

> a.     Named Plaintiffs failed to demonstrate that the emotional distress they allegedly suffered was typical of other class members;

> b.     under Named Plaintiffs' theory, certifying the class and providing notice would inflict emotional distress on class members; and

> c.     Named Plaintiffs are acting adversely to the interests of class members by asserting claims only for emotional distress (and no other injuries).

2.     Whether Rule 23 permits certification of the class action in the absence of a finding that plaintiffs satisfied one of the subsections of Rule 23(b).

3.     Whether the district court correctly analyzed the factors set forth in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), including:

> a.     whether the district court erred in analyzing variations in state law;

> b.     whether the district court erred by failing to consider the type of claim at issue, including this Court's holding that emotional distress liability and damages are too interwoven to be tried separately; and

> c.     whether the district court erred in analyzing efficiencies created by certifying only duty and breach, while deferring all other issues—including affirmative defenses, causation, injury, and damages—for later  proceedings.

JA1956

## STATEMENT OF THE CASE

This appeal concerns the certification of a class action against the Educational Commission for Foreign Medical Graduates ("ECFMG"), a Philadelphia-based private non-profit organization that promotes quality health care for the public. JA201. Among other services, ECFMG certifies graduates of international medical schools as having met certain criteria to enter U.S. graduate medical education (usually residency programs). *Id.*

The certification provided by ECFMG is circumscribed. At the relevant time, ECFMG (1) certified that an applicant received passing grades on an English exam and two substantive exams (the first two steps of the United States Medical Licensing Examination ("USMLE")), JA205–JA206; JA653 at 88:21–89:2; and (2) primary source verified the diploma provided by an applicant by asking the issuing medical school to confirm its legitimacy, JA653 at 88:3–14.

ECFMG does not make any additional representations regarding the applicant. In particular, ECFMG does not (and is not expected to) verify an applicant's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character. JA681 at 198:16–22, 200:13–15; JA691–JA692 at 240:18–241:6, 242:6–243:3, 244:22–245:13.

3

ECFMG does not provide its certifications to the general public. Instead, it discloses certification information only to residency programs, licensing boards, and organizations that employ physicians. JA692 at 243:4–244:8. There is no suggestion in this case that any recipient of ECFMG certification information misunderstood its limited scope or relied on it for purposes for which it was not intended.

### Dr. Akoda

Plaintiffs are a class of individuals who received medical treatment from obstetrician/gynecologist John Nosa Akoda, who was issued a certificate from ECFMG in 1997. JA275.

The district court (and Named Plaintiffs) erroneously stated that John Akoda "was not a doctor." JA35. This is incorrect: public records reflect that "John Akoda" was licensed to practice medicine in Maryland and Virginia,[1] and it is undisputed that he was fully licensed to practice medicine when he treated class members.

Plaintiffs' true complaint is not that John Akoda was not licensed to practice medicine (he was), it is that Plaintiffs believe that John Akoda should not have been

---

[1]  *See* Maryland Board of Physicians, https://www.mbp.state.md.us/bpqapp/ Profile.aspx (Maryland license for Dr. Charles John Nosa Akoda issued on September 14, 2011 and revoked on July 10, 2017); https://dhp.virginia interactive.org/Lookup/Detail/0101250081 (Virginia license for "Charles J. Akoda" issued on June 21, 2011 and suspended on April 25, 2017).

4

licensed to practice medicine.  But rather than suing Akoda himself, state Boards that licensed him, or hospitals that employed him, Named Plaintiffs sued ECFMG.

It is undisputed that Dr. Akoda passed the two substantive examinations and presented to ECFMG a medical school diploma in his name that was verified as authentic by the issuing school, the University of Benin, a Nigerian medical school. JA176; JA753.

After obtaining ECFMG certification, Dr. Akoda successfully:

- passed Step 3 of the United States Medical Licensing Examination (USMLE), which provides a final assessment of physicians assuming independent responsibility for delivering general medical care, JA321;

- was admitted to and completed a residency program at Howard University Hospital, JA797; JA799;

- became licensed to practice medicine in Maryland and Virginia, JA321;

- was awarded hospital privileges at Prince George's Hospital Center and hired by several medical offices, *id.*; and

- achieved Board certification in his specialty, JA801.

In 1996, Jersey Shore Medical Center, a residency program that Dr. Akoda had entered, noted for ECFMG certain discrepancies relating to Dr. Akoda's identity. JA279.  Following an investigation—in which Dr. Akoda addressed those discrepancies and provided supporting hard-copy documentation, JA287; JA289—ECFMG found that there was insufficient evidence of misconduct for it to sanction Dr. Akoda.  JA293; JA669 at 150:24–151:6.  Jersey Shore Medical Center also

5

reported to the Maryland Board of Physicians its suspicion that Dr. Akoda's application for medical licensure in the State of Maryland included an incorrect Social Security number. JA806. The Board took no action against Dr. Akoda.

In November 2016, following a two-year investigation by the U.S. Attorney's office, Dr. Akoda pleaded guilty to misuse of a Social Security number. JA304–JA313. During the course of this investigation, law enforcement did not prevent Dr. Akoda from practicing medicine. Indeed, in 2014, ECFMG was instructed by federal authorities not to take adverse action against Dr. Akoda for fear of impeding the government's ongoing investigation. JA917; JA318–JA324.

The guilty plea was evidence that Dr. Akoda had previously applied to ECFMG under two different names: Oluwafemi Charles Igberase in 1992 and Igberase Oluwafemi Charles in 1994. JA304–JA313. ECFMG immediately revoked his certificate following the guilty plea based on Dr. Akoda's admission that he provided a falsified passport to ECFMG. JA921–JA923.[2]

### *Plaintiffs Sue ECFMG for Emotional Distress*

In December 2018, Named Plaintiffs Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans sued ECFMG in the Court of Common Pleas of

---

[2] Although Dr. Akoda's motive in using a false name is unknown, one possibility is that he believed that his exam history kept him from securing a residency position and reapplying to ECFMG using a different name would allow him to present a "cleaner" profile for new residency applications. JA717.

JA1960

Philadelphia County on behalf of a putative class of "[a]ll patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." JA102; JA91–JA125.  ECFMG removed the matter to federal court.  JA83–JA88.

ECFMG was not Named Plaintiffs' first choice of defendant.  In September 2017, Monique Russell and Jasmine Evans filed a putative class action against Dimensions Health Corporation (and other defendants) who operated Prince George's Hospital Center, where Dr. Akoda practiced.  *See Russell v. Dimensions Corp.*, CAL 17-22761 (Prince George's Cty. Cir. Ct., Md.).  They were represented in that matter by the same counsel that represents them before this Court.  Russell and Evans voluntarily dismissed the Maryland suit after the defendants filed a motion for summary judgment.  *Id.*

Named Plaintiffs are former patients of Dr. Akoda, either because Dr. Akoda was their regular obstetrician/gynecologist or was the doctor who happened to be "on-call" at the hospital when they gave birth.

Significantly, Named Plaintiffs do not seek any recovery based on any alleged malpractice by Dr. Akoda, any misdiagnosis or improperly performed medical procedure, or any physical injuries.  Instead, the only harm for which they seek recovery is "emotional distress" allegedly suffered when they learned that Dr. Akoda

pleaded guilty to misuse of a social security number.  JA1385 at 5:22–25.[3]  Perhaps

inspired by the statute of limitations, Named Plaintiffs do not allege that they (or

class members) suffered any emotional distress at the time of their treatment by Dr.

Akoda.  Instead, they allege that they suffered emotional distress (and thus that their

claim against ECFMG accrued) when they learned of Dr. Akoda's guilty plea.[4]

The four Named Plaintiffs vary significantly in their treatment by and

allegations against Dr. Akoda, although none has received any mental health

treatment for any "emotional distress" related to Dr. Akoda:

- For Ms. Russell, Dr. Akoda performed a successful emergency c-section. JA1177.  She not only does not complain about her treatment but agrees that it "really was best/necessary."  JA1182.  She never sought any mental health treatment after hearing about Dr. Akoda's guilty plea.  JA1139.

- For Ms. Riggins, Dr. Akoda performed a successful elective c-section and provided prenatal care.  JA1176.  She had no concerns about her treatment and no history of mental health or psychiatric treatment.  JA1145.

- For Ms. Powell, Dr. Akoda successfully delivered her baby, performed emergency surgery, and assisted with post-natal care.  JA1174.  She alleges that Dr. Akoda was flirtatious and made inappropriate comments.  *Id.*  She has no history of mental health or psychiatric treatment.  JA1151.

- For Ms. Evans, Dr. Akoda performed a successful emergency c-section. JA1172.  She alleges that he improperly manipulated her clitoris.  *Id.*  Ms.

---

[3] Although some of the Named Plaintiffs also allege that they suffered offensive touching (i.e., inappropriate treatment) by Dr. Akoda, during the class certification process, Named Plaintiffs confirmed that they were pursuing a theory that the alleged emotional distress was caused by learning information about Dr. Akoda's guilty plea.  JA1385 at 5:22–25.

[4] As detailed below, if Named Plaintiffs' theory is correct, then certifying the class and providing notice would inflict emotional distress on unnamed class members.

Evans has extensive history of mental health treatment, both before and after encountering Dr. Akoda. JA1160–JA1162. None of her mental health records refers to Dr. Akoda. JA1161.

### Named Plaintiffs Move for Class Certification

Despite these extensive variations, in October 2019, Named Plaintiffs moved for class certification, asking the district court to certify a class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)". JA182. Apparently conceding that emotional distress damages would require individual inquiries, Named Plaintiffs suggested two class certification "options" for the district court under Rule 23(c)(4): one option was "certification on liability only" for negligence and negligent infliction of emotional distress; and the other option was certification of nine different discrete issues. JA182–JA183.

Notably, Named Plaintiffs did not argue that the putative class action satisfied any of the prongs of Rule 23(b). Instead, they argued only that they satisfied Rule 23(a) and "the [r]equirements of Rule 23(c)(4)." JA190. They argued that certification under Rule 23(c)(4) is, in effect, independent of Rule 23(b). JA191–JA193.

Named Plaintiffs made no attempt to analyze variations of the laws of the different states where class members were treated. Instead, counsel merely represented that they were "unaware of meaningful conflicts." *See* JA194

9

("Pennsylvania law will likely apply to all issues in this action—and, at any rate, Plaintiffs are unaware of meaningful conflicts between the tort law of Pennsylvania applicable to resolution of liability or the common issues and the tort law of the states in which Igberase interacted with class members.").

### ECFMG Explains Why Class Certification Is Unwarranted

In response, ECFMG noted that the numerous individual questions of law and fact preclude certification.  At a high level, ECFMG explained that Rule 23(c)(4) could not be used to evade the requirements of Rule 23(b)(3): "Plaintiffs' reliance on Rule 23(c)(4) does not obviate their need to satisfy Rule 23(b)(3)."  JA722.

The proposed class action could not satisfy these standards.  This Court has held that claims for emotional distress cannot be bifurcated in the way that Named Plaintiffs suggest because emotional distress liability and damages are "too interwoven to allow a fair determination of damages apart from liability."  JA724 (quoting, *inter alia*, *Spence v. Bd. of Educ. of Christina Sch. Dist.,* 806 F.2d 1198, 1202 (3d Cir. 1986)).

Similarly, liability could not be determined on a classwide basis because causation presents extremely difficult, individualized inquiries.  JA726–JA729. ECFMG explained that the Named Plaintiffs "offered no trial plan or other explanation about how they expect to try either proposed issue class in a manageable

10

way, and concede (as they must) that there will still be thousands of mini-trials even if an issue class is certified."  JA730–JA731.

In addition, choice-of-law issues rendered the proposed class unmanageable. The applicable law would be the state where each class member interacted with Dr. Akoda—including Maryland, Virginia, and Washington, D.C.   And there are material differences between the laws of these states: Maryland, for example, "does not recognize the tort of negligent infliction of emotional distress."  JA732 (quoting *Alban v. Fiels*, 61 A.3d 867, 876 (Md. 2013)).

ECFMG also explained the significant issues under Rule 23(a) caused by Named Plaintiffs' decision to pursue only claims for putative emotional distress. Class members who suffered actual, physical injuries could be precluded from asserting those claims.  JA733.  And the purported class includes members "who may not yet (or ever) suffer emotional distress."   JA734.  Not only do Named Plaintiffs not demonstrate that their injuries are typical but if Named Plaintiffs are correct, "some class members might suffer emotional distress only upon receiving notice of this class action, if it is certified."  *Id.*

### The District Court Holds a Hearing Regarding Class Certification

After a reply (JA1340–JA1361) and a sur-reply (JA1371–JA1380) were filed, the district court held a hearing regarding class certification on January 30, 2020. Named Plaintiffs acknowledged two important facts at the hearing.  First, they

11

confirmed that the only damages sought by the proposed class would be "emotional distress damages."  JA1386 at 6:13–14.

Second, Plaintiffs' counsel acknowledged that the class included individuals who suffered no emotional distress: "Now, it may be, just like with any class, that there are individuals who were treated by Akoda who suffered no—suffered no harm as a result of it, the involvement in the care was minimal. The individuals upon finding out of Akoda's fraud didn't suffer any provable emotional distress." JA1392 at 12:17–21.

The district court also discussed with Plaintiffs' counsel the relationship between Rule 23(b)(3) and Rule 23(c)(4), seeking to confirm that "if I certify a class here, it is ultimately a (b)(3) class."  JA1403–JA1404 at 23:25–24:1.  Counsel "agree[d] that in essence, it's a (b)(3) class."  JA1404 at 24:12; *see also id.* at 24:21–22 ("[I]n this context, it's essentially a (b)(3) class in terms of if we're certifying on the issue of liability.").

### *The District Court Certifies a Class*

Two months later, Judge Wolson certified an issue class under Federal Rule of Civil Procedure 23(c)(4), comprising "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda) beginning with his

12

enrollment in a postgraduate medical education program at Howard University in 2007." JA63–JA65.[5]

The district court did not certify the issue of "liability" as Named Plaintiffs requested. Instead, the court certified only four discrete issues that make up a part of the liability inquiry:

> (1) whether Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") undertook or otherwise owed a duty to class members;
>
> (2) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable to class members pursuant to Restatement (Second) of Torts § 324A;
>
> (3) whether ECFMG breached any duty that it owed to class members; and
>
> (4) whether ECFMG breached any duty that it owed to hospitals and state medical boards.

JA64.

The district court expressly declined to consider Rule 23(b), holding instead that it "will consider Rule 23(a) and then turn to the *Gates* factors in conducting its analysis." JA43.

ECFMG petitioned this Court for permission to appeal under Rule 23(f), JA1–JA34, which this Court granted. JA66.

---

[5] The restriction that the class be limited to patients treated after Dr. Akoda enrolled at Howard University was intended to exclude patients treated at Jersey Shore Medical Center and in Nigeria.

## SUMMARY OF THE ARGUMENT

This Court should reverse the order certifying the narrow issues for class treatment.  First, Named Plaintiffs failed to satisfy Rule 23(a).  The district court failed to find that the injury that Named Plaintiffs allegedly suffered—emotional distress upon learning of Dr. Akoda's guilty plea—is typical of class members.  And if Named Plaintiffs' theory were correct, then certifying the class and sending notice to class members would, in fact, inflict emotional distress on class members who are currently uninjured.  The district court failed to address this adversity between Named Plaintiffs and the class.  Nor did the district court correctly analyze the potential effects of the emotional-distress-only class action on members who suffered actual, physical injuries arising out of treatment by Dr. Akoda.

Second, the district court erred by certifying a class without finding that Named Plaintiffs had satisfied any subsection of Rule 23(b).  The plain text of the Rule and black-letter law require that a party seeking certification must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  There are different ways in which this Court's precedent could be harmonized with Rule 23(b), but one proposition is indisputable: a class action cannot be certified without finding that one portion of Rule 23(b) has been satisfied.

Third, the district court erred in analyzing the factors set forth in *Gates*, 655 F.3d 255. With respect to variations in state law, the district court misplaced the burden. Rather than requiring Named Plaintiffs to affirmatively prove that there was no conflict, the district court relied on the fact that the parties did not identify a conflict. And the court was wrong: there are meaningful differences in the availability of recovery for negligent infliction emotional distress among the states. The district court's alternative suggestion—that Pennsylvania law could govern claims by out-of-state plaintiffs arising from out-of-state medical treatment provided by an out-of-state doctor—is erroneous under Pennsylvania choice-of-law rules.

And the district court did not consider "the type of claim(s) and issue(s) in question." Plaintiffs' request for damages for emotional distress should have foreclosed class certification. This Court has already held that emotional distress liability and damages cannot be bifurcated in the way that Named Plaintiffs suggest. *Spence*, 806 F.2d at 1202.

The district court also erred in evaluating whether efficiencies would result from the class action. Given the numerous issues left for individual treatment—including causation, injury, damages, apportionment of fault, as well as all of ECFMG's affirmative defenses—all of the common issues would need to presented again at any individual proceeding. Indeed, the class action certified here is essentially indistinguishable from the class rejected in *Gates*, in which certification

15

under Rule 23(c)(4) was improper because resolution of the narrow and abstract common issues was "unlikely to substantially aid resolution of the substantial issues on liability and causation." *Gates*, 655 F.3d at 272, 274.

Class certification should be reversed.

16

## STANDARD OF REVIEW

Class certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008).

A party seeking class certification must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33; *accord Marcus v. BMW of N.A., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) ("[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016).

This Court "review[s] a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 312 (internal quotation marks omitted). "[W]hether an incorrect legal standard has been used is an issue of law to be reviewed de novo." *Id.* (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)).

17

<center>**ARGUMENT**</center>

## I.    The District Court Erred in Analyzing Rule 23(a).

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).    Two of Rule 23(a)'s requirements—typicality and adequacy—"often 'tend[] to merge' because both look to potential conflicts and to 'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (quoting *Falcon*, 457 U.S. at 157–58 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge.")); *see also Dukes*, 564 U.S. at 349 n.5 (same).

To evaluate typicality, a court must "ask 'whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentive of the plaintiffs are aligned with those of the class."  *Beck*, 457 F.3d at 295–96 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)); *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009) (holding that typicality requires, *inter alia*, that "the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory").  Similarly, Rule 23(a)(4)'s adequacy requirement is designed "to uncover conflicts of interest between named parties and

<center>18</center>

the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). Here, Named Plaintiffs fail to carry their burden to demonstrate either typicality or adequacy.

### A. The district court did not find—and Named Plaintiffs did not show—that their alleged emotional distress is typical of the class.

Named Plaintiffs failed to show that their claims are "typical, in common-sense terms, of the class." Named Plaintiffs allege that they experienced emotional distress as a result of learning that Dr. Akoda pleaded guilty to social security fraud. *See* JA839, JA926, JA957 (claiming to "suffer excruciating emotional anguish as well as fear and anxiety, as a result of learning that Akoda was a fraud"). But in seeking class certification, Named Plaintiffs failed to demonstrate that such an injury is typical of class members, as opposed to their own idiosyncratic reactions.

Indeed, at the hearing, Plaintiffs' counsel acknowledged that the proposed class includes members who did not experience similar emotional distress. *See* JA1392 at 12:21 (acknowledging that the class includes individuals who "didn't suffer any provable emotional distress").

But Plaintiffs made no attempt to prove—and the district court did not make any findings regarding—which of these two reactions was "typical." If Named Plaintiffs' purported emotional distress is atypical and unusual, then Rule 23(a) cannot be satisfied and no class should be certified.

ECFMG does not argue that a class must be defined so that every member has suffered injury and would have Article III standing. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015) ("We now squarely hold that unnamed, putative class members need not establish Article III standing."); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) (involving a class action with some uninjured class members). *But see, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must therefore be defined in such a way that anyone within it would have standing."). But injury must be typical. If Named Plaintiffs had shown (and the district court found) that emotional distress was a typical reaction of class members, then the possibility of uninjured (atypical) class members would be no bar to certification.

But without a finding that Named Plaintiffs' alleged injuries are typical, Rule 23(a) has not been satisfied. Typicality may be satisfied where class members suffer the "same injury" as the proposed class representatives. *Falcon*, 457 U.S. at 157–58. Typicality may also be satisfied where class members suffered a different injury than the proposed class representatives, so long as all the injuries are shown to result from a single challenged practice. *Baby Neal*, 43 F.3d at 58. But injury must be typical for the proposed class representatives to satisfy the typicality requirement. *See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (typicality satisfied where class members "all have claims"

20

arising from defendant's course of conduct).  The "test of typicality" includes "whether other members have the same or similar injury."  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (internal quotation marks omitted).  If most class members were uninjured, then Named Plaintiffs would not be "sufficiently *similar* to the rest of the class" in their "factual circumstances" to satisfy typicality.  *Schering Plough*,  589 F.3d at 597 (emphasis in original).

The Seventh Circuit rejected a proposed class action for similar reasons in *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006), which involved allegations regarding deception about the ingredients in fountain Diet Coke.  The Seventh Circuit noted that the proposed class "could include millions who were not deceived and thus have no grievance."  *Id.*  Because "[c]ountless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception," the named plaintiff's claims did not "have the same essential characteristics as the claims of the class at large" and were atypical. *Id.* (internal quotation marks omitted).

The district court erred by failing to consider (or make any findings regarding) the typicality of the Named Plaintiffs' alleged injuries.  According to the district court, typicality was satisfied because "the Plaintiffs' claims arise from the same facts and legal theories as members of the class."  JA53.  In effect, the district court found typicality satisfied because Named Plaintiffs alleged that class members

21

suffered similar emotional distress.  But allegations are insufficient—typicality must be proven "by a preponderance of the evidence."  *In re Modafinil*, 837 F.3d at 248.

Because the district court failed to perform the requisite rigorous analysis and find that Named Plaintiffs' alleged emotional distress is typical of the class, certification should be reversed.

### B.     Named Plaintiffs fail typicality and adequacy because they propose to inflict emotional distress on class members.

Even more significantly, if Named Plaintiffs were correct that emotional distress is a class members' typical reaction to learning of Dr. Akoda's guilty plea, then certification of the class would inflict injury on class members and cause them to suffer emotional distress.  Under Named Plaintiffs' theory, class members who are unaware of Dr. Akoda's guilty plea have, at present, suffered no compensable injury.  By sending notice of the class action (and guilty plea) to class members, Named Plaintiffs plan to cause them to suffer emotional distress that they would not suffer but for Named Plaintiffs use of the class action vehicle.

It is difficult to imagine a greater conflict of interest between Named Plaintiffs and class members.  Undersigned counsel have identified no other case in which plaintiffs propose to inflict potential injury (emotional distress or otherwise) on class members in order to allow the injured to recover on a classwide basis.  Whether viewed as adequacy or typicality, that conflict of interest precludes class certification.

JA1976

Typicality requires that "the interests of the class and the class representatives are aligned." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001).  Far from being "aligned," Named Plaintiffs affirmatively seek to injure their fellow class members.

Nor can Named Plaintiffs be adequate representatives of class members who would suffer injury only because of Named Plaintiffs' actions.  Indeed, during trial of the claim of any class member who became injured after learning of the certification, ECFMG would argue that: (1) the intentional infliction of emotional distress by Named Plaintiffs and class counsel breaks any causal link between ECFMG's actions and a class members' emotional distress; and (2) at a minimum, the jury must apportion some liability for emotional distress to Named Plaintiffs' and their counsel.[6]

---

[6] Indeed, it appears that some Named Plaintiffs suffered emotional distress after being exposed to advertisements by plaintiffs' counsel or from other Named Plaintiffs. *See, e.g.*, JA866–JA867 (Riggins: "Plaintiff began experiencing these injuries when she learned in July 2017 that Akoda was not really a doctor.  Plaintiff learned this from Monique Russell."); JA927 (Evans: "The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct. She first learned this information from the radio."); JA1274 at 148:10–17 (Evans explaining that she learned about Dr. Akoda from "a radio ad" by her current lawyers); JA1306 at 14:17 & JA1301–JA1302 at 59:16–62:25 (Powell explaining that she "came to feel violated" when she "found out that Akoda was not Akoda," which occurred at a meeting at a hotel with her current lawyers).

23

This class action appears to be unprecedented. Under Named Plaintiffs' theory, many class members are presently uninjured and will continue to be uninjured. There is no reason to disturb this status quo by providing notice of a class action and inflicting emotional distress on uninjured class members. Named Plaintiffs' proposal to injure their fellow class members creates an insoluble conflict of interest, defeating typicality and rendering them inadequate class representatives.

The district court's class certification ruling failed to address the incongruity of Named Plaintiffs inflicting injuries on their fellow class members through certification. It should be reversed.

### C. Named Plaintiffs' proposal to certify only claims for emotional distress defeats Rule 23(a)'s typicality and adequacy requirements.

Named Plaintiffs decision to seek recovery only for emotional distress renders them inadequate representatives of class members who suffered actual, physical injuries. If Named Plaintiffs' theory were correct—and Dr. Akoda never attended medical school and should not have been licensed to practice medicine (much less been certified as a specialist)—then one would expect his patients to have suffered from improper treatment. Patients who suffered from malpractice, particularly medical malpractice involving the birth of a child, might seek very significant damages. Indeed, Named Plaintiffs include some allegations that Dr. Akoda treated patients improperly or incorrectly.

24

But Named Plaintiffs—who do not allege that they suffered from malpractice or any physical effects as a result of negligent medical care—do not seek to recover for malpractice. They seek to recover only for emotional distress. This plan gives rise to typicality and adequacy issues, each of which defeats class certification.

Named Plaintiffs' interests are not aligned with those of the class. Named Plaintiffs seek to recover solely for alleged emotional distress, without regard for the extent of physical injuries that may have been experienced by class members. Class members who allegedly suffered physical injuries, by contrast, are interested in pursuing a remedy for any injury they experienced, including claims for physical injuries. The disconnection between the interests of Named Plaintiffs and class members defeats typicality and precludes class certification.

By pursuing recovery only for emotional distress, Named Plaintiffs may waive unnamed class members' ability to assert claims relating to any alleged physical injuries. The doctrine of *res judicata* prohibits claim-splitting. *Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224–25 (3d Cir. 2009). Unnamed class members who pursue claims for emotional distress as part of this class action could not subsequently pursue their related claims for malpractice (or other theories of liability) in a subsequent case. That is why this Court has recognized claim splitting as a "very important issue in assessing the adequacy of representation requirement." *Id.* at 225 (reversing a grant of class certification seeking to recover

only for limited injuries where, as here, the district court failed to consider "whether any potential future claims by class members with personal injury would be at risk of being barred by *res judicata*").

Courts regularly hold that named plaintiffs cannot manufacture a class action by waiving (or choosing not to pursue) the potential claims of unnamed class members: "[N]amed plaintiffs who would intentionally waive or abandon potential claims of absentee plaintiffs have interests antagonistic to those of the class." *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 480 (E.D. Pa. 1997); *see also Slade v. Progressive Sec. Ins. Co.*, 856 F. 3d 408, 412 (5th Cir. 2017) ("When the class representative proposes waiving some of the class's claims, the decision risks creating an irreconcilable conflict of interest with the class."); *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830–31 (7th Cir. 2011) ("A representative can't throw away what could be a major component of the class's recovery.").

These principles should govern this class certification: Named Plaintiffs, who seek to intentionally abandon class members' claims for actual, physical injuries from improper medical treatment, have interests antagonistic to those of the class, and their plan creates an irreconcilable conflict of interest.

The district court also suggested that the opportunity to opt out would cure any conflicts between named and unnamed class members, JA53,[7] but the opt-out procedure is "not a panacea," *Slade*, 856 F.3d at 415 n.3, and the district court abused its discretion by holding that it solved any adequacy issues.  If the potential to opt out could always cure a conflict between named and unnamed class members, adequacy would be a dead letter.  Here, the relative seriousness of potential physical injuries during childbirth compared to allegations of emotional distress at learning of a doctor's pleading guilty to misuse of a Social Security number means that the risk posed by potential preclusion is disproportionately high, and Plaintiffs' willingness to expose those claims to possible preclusion (or limitations) reveals a fundamental adequacy problem that defeats class certification.

Because the district court failed to make findings regarding the typicality of Named Plaintiffs' injuries, failed to consider the typicality or adequacy implications of Named Plaintiffs' plan to inflict injuries on unnamed class members, and abused its discretion in analyzing the effects of Named Plaintiffs' decision to abandon claims for physical injuries, class certification was improper under Rule 23(a) and should be reversed.

---

[7] Nor did the district court explain why there would be an opportunity for class members to opt out or what the scope of any opt out would be.  As detailed below, the district court did not find that Named Plaintiffs had satisfied Rule 23(b)(3), and nothing in Rule 23(c)(4) creates a right for class members to opt out of the issue class.

27

## II.    The District Court Erred by Certifying a Class Without Finding that Named Plaintiffs Satisfied Rule 23(b).

Even if Named Plaintiffs had satisfied Rule 23(a), the district court erred by certifying a class without finding that Named Plaintiffs satisfied any of the subsections of Rule 23(b).   The district court certified only narrow, abstract questions of duty and breach.  Not only are all issues of damages left to individual proceedings, but so are key liability questions, including the existence of injury (whether a particular class member has suffered emotional distress), but-for and proximate causation (whether that emotional distress was caused by ECFMG or intervening causes and whether ECFMG's alleged conduct is too remote to support liability), apportionment of liability (among various entities responsible or potentially responsible for the class member's emotional distress), and all of ECFMG's affirmative defenses (including, for example, a class member's consent to treatment by Dr. Akoda[8]).  Given the overwhelming number of individual issues

---

[8] Class members' consent to treatment by Dr. Akoda is fatal to their claims.  Under the Restatement and general principles of tort law, the type of misrepresentation alleged in this case (regarding a doctor's identity or medical education) does not vitiate a patient's consent to treatment. *See Taylor v. Johnston*, 985 P.2d 460, 466 (Alaska 1999) (involving essentially indistinguishable facts, where a plaintiff asserted claims based on a theory that physician should not have been licensed, and holding that "[t]he fact that [the doctor] was licensed in Alaska at the time of the procedure defeats [any] claim for medical battery based on fraud"); *see also* Restatement (Second) of Torts § 892B.1 (consent is "effective for all consequences of the conduct and for the invasion of any interests resulting from it" and is ineffective only if induced "by a substantial mistake concerning the nature of the

28

and the absence of any efficiency gained by class proceedings, Rule 23(b)(3) does not permit certification of this class action.

The district court erroneously held that Rule 23(b) is irrelevant to certifying an issue class under Rule 23(c)(4).  *See* JA43 (rejecting ECFMG's argument regarding Rule 23(b) and holding that it only had to "consider Rule 23(a) and then turn to the *Gates* factors in conducting its analysis").

This Court has recognized that courts have struggled with the relationship between Rule 23(b) and Rule 23(c)(4), noting that "[c]ourts have disagreed over the extent to which the ability to certify issue classes alters the predominance requirement," a "complicated area of class action procedure."  *Gates*, 655 F.3d at 272–73.

Some circuits have held that "a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745–46 n.21 (5th Cir. 1996).  Others have held that "a court may

---

invasion of his interests or the extent of the harm to be expected from it"); Restatement (Third) of Torts: Inten. Torts to Persons § 15 TD No 4, cmt. f (2019) ("[A] patient's consent to medical treatment is not vitiated by the doctor's false representation that he has not been convicted of a crime (Illustration 10) or by his exaggeration of the amount of experience he has conducting the medical treatment in question.").  Here, a patient's consent to medical treatment by Dr. Akoda would not be vitiated by any misrepresentation regarding his name or Social Security number.

employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).

No circuit agrees with the approach of the district court in this case, which read *Gates* to hold that Rule 23(b) need not be considered when a party invokes Rule 23(c)(4), creating (in effect) a fourth type of class action. Under the plain text of Rule 23 and the cases interpreting it, the party seeking certification must satisfy one of the subsections of Rule 23(b). This, alone, requires reversal.

### A.    Class certification requires the party seeking certification to satisfy one of the three subsections of Rule 23(b).

Under the plain text of Rule 23, class certification requires satisfaction of Rule 23(a) and one subpart of Rule 23(b):

> TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:
>
>> (1) prosecuting separate actions by or against individual class members would create a risk of: [conflicting adjudications];
>>
>> . . .
>>
>> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>>
>> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

30

Fed. R. Civ. P. 23(b).  The Rules do not include any provision for a fourth type of class action.  A party seeking certification must always satisfy one of the subsections of Rule 23(b).

The Supreme Court and this Court have acknowledged that class certification requires satisfaction of Rule 23(b).  *See, e.g.*, *Comcast*, 569 U.S. at 33 (class certification requires a plaintiff to "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)"); *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 182 (3d Cir. 2019) ("A party seeking class certification must satisfy the four requirements of Rule 23(a), as well as the requirements of either Rule 23(b)(1), (b)(2), or (b)(3)."); *In re Modafinil*, 837 F.3d 238, 248 (3d Cir. 2016) ("[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." (internal quotation marks omitted)).

Rule 23(c)(4), which provides only that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," does not create an exception to these rules.  The plain text of Rule 23 and the cases cited above require, unequivocally, that a party seeking class certification must satisfy one of the provisions of Rule 23(b).

Indeed, in a brief filed with the Supreme Court of the United States, Plaintiffs' counsel acknowledged that Rule 23(b) must still be satisfied even when Rule 23(c)(4) is invoked.  *See* Brief in Opposition, *Behr Dayton Thermal Prods., LLC v.*

31

*Martin*, No. 18-472 (U.S. 2019), *available at* https://tinyurl.com/w4ep2ju (arguing that this Court "rest[s] the determination whether to certify an issue class on whether the issue class itself satisfies the Rule 23(b)(3) requirements of predominance and superiority, and appl[ies] a 'functional' analysis to consider whether an issue class is a superior method of adjudicating a case").

Here, the district court did not make any finding that Named Plaintiffs satisfied any of the three subparts of Rule 23(b). To the contrary, the district court expressly declined to consider Rule 23(b). JA43. Standing alone, the failure to find any provision of Rule 23(b) satisfied requires reversal of class certification.

**B.    This Court should, consistent with *Gates*, require Rule 23(b)(3) to be satisfied for the claim as a whole, even when a party seeking certification invokes Rule 23(c)(4).**

This Court should provide further guidance regarding how Rule 23(c)(4) (and the decision in *Gates*) interact with Rule 23(b) and explain how Rule 23(b) must be satisfied when a party seeks certification under Rule 23(c)(4). Critically, *Gates* does not hold that Rule 23(b) is irrelevant to certification of a class under Rule 23(c)(4).

ECFMG contends that Rule 23(b)(3)'s predominance requirement must be satisfied with respect to the claim as a whole. Rule 23(b)(3) expressly requires that a court compare the issues that can be resolved through class treatment (i.e., "questions of law or fact common to class members") against the issues that must be tried individually (i.e., "questions affecting only individual members") to determine

32

which predominates. Fed. R. Civ. P. 23(b)(3); *see Ferreras*, 946 F.3d at 185 ("An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member." (internal quotation marks omitted)). As the Fifth Circuit explained, considering predominance only with respect to the certified issues would mean that predominance would always be satisfied, "eviscerat[ing] the predominance requirement of rule 23(b)(3)" and permitting "certification in any case where there is a common issue." *Castano*, 84 F.3d at 745 n.21. This Court, in *Gates*, correctly rejected the suggestion that predominance could be determined without considering the claim as a whole, correctly holding instead that courts considering certification (even under Rule 23(c)(4)) must examine both the issues certified for class treatment and the remaining issues.

Holding that predominance and superiority must be satisfied for the claims as a whole would not require departing from the factors listed as considerations in the *Gates* decision. Several of these factors—such as "the efficiencies to be gained by granting partial certification," "whether the substantive law separates the issue(s) from other issues concerning liability or remedy," and "the repercussions certification . . . will have on the effectiveness and fairness of resolution of remaining issues," *Gates*, 655 F.3d at 273—track, in effect, the requirement of Rule

33

23(b) that a court compare the common issues against the individual issues to determine which predominate. As this Court recently recognized, the mere existence of individual issues does not mean that common issues do not predominate for the claim as a whole: "[An] action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately[.]" *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (quoting *Tyson Foods*, 136 S. Ct. at 1045).

Where, as here and as in *Gates* itself, a party seeks certification of common issues that are "inseverable from other issues that would be left for follow-up proceedings," are "not easily separate[d] from individual issues," and would not "substantially aid resolution of the substantial issues on liability and causation," then individual issues would predominate over common issues under a traditional analysis of predominance under Rule 23(b)(3). The remaining factors listed in *Gates*—such as "the type of claim(s) and issue(s) in question," "the overall complexity of the case," "choice-of-law questions," "the potential preclusive effect," and "the impact individual proceedings may have upon one another," *Gates*, 655 F.3d at 273—fit comfortably within the traditional superiority analysis of Rule 23(b)(3).[9]

---

[9] The Sixth Circuit correctly described *Gates* as a "superiority-like analysis." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 412 (6th Cir. 2018), cert. denied, 139 S. Ct. 1319 (2019).

JA1988

Although *Gates* did not describe this Circuit as adopting the requirement that Rule 23(b)(3) be satisfied for the claim as a whole, the factors that it adopts effectively track the requirements that common issues predominate for the claim as a whole and that class treatment be the superior method of adjudication. But a court cannot, as the district court did here, consider these factors in isolation, rather than as a guide to making the required findings of predominance and superiority under Rule 23(b)(3).[10]

Alternatively, *Gates* can be read to hold that its factors should be used to determine predominance under Rule 23(b)(3), leaving traditional superiority unaffected. The issue addressed in *Gates* was "the extent to which the ability to certify issue classes alters the predominance requirement." *Gates*, 655 F.3d at 272. This Court held that "the considerations set forth in *Hohider* and more recently in the Final Draft of the ALI's Principles of Aggregate Litigation provide the most sound guidance in resolving this complicated area of class action procedure," i.e., how the predominance requirement of Rule 23(b)(3) applies in a Rule 23(c)(4) class.[11] In this reading, the factors listed in *Gates* would guide a court in making the

---

[10] Consider, for example, Rule 23(b)(3) itself, which lists four "matters pertinent to [the] findings." Fed. R. Civ. P. 23(b)(3). A court would err by considering these findings on their own, rather than considering them in order to make the superiority and predominance findings under Rule 23(b)(3).

[11] Oddly, although *Gates* looked to *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 201 (3d Cir. 2009), for factors relevant to predominance under Rule 23(b)(3),

finding whether common issues predominate over individual ones in a class involving Rule 23(c)(4), *id.* at 272–73, but superiority would be left unchanged.[12] .

Here, the district court erred by considering the *Gates* factors in isolation, independent of Rule 23(b). To certify the class under Rule 23(b)(3), the district court was required to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," potentially based on consideration of the *Gates* factors.

There is an alternative way of harmonizing *Gates* with the plain text of Rule 23. This Court could read *Gates* as not addressing the requirements of Rule 23(b) at all and instead enumerating factors to be considered only in determining whether issue certification would be "appropriate" under Rule 23(c)(4). There is some support for this reading: "In *Gates v. Rohm & Haas Co.*, we enumerated several non-exhaustive factors relevant to assessing whether certification of an issue class under Rule 23(c)(4) is appropriate." *Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir.

---

*Hohider* involved a class certification decision under Rule 23(b)(2), not Rule 23(b)(3). *See id.* at 198 ("In addition to the individualized inquiries necessary to adjudicate plaintiffs' claims, UPS contends the nature of the relief sought by plaintiffs renders the class ineligible for certification under Rule 23(b)(2).").

[12] As noted above, many *Gates* factors fit more naturally as part of a superiority analysis than predominance, but the opinion can be read to adopt the factors in taking a position on the circuit split "over the extent to which the ability to certify issue classes alters the predominance requirement."

2018), as amended (Apr. 4, 2018) (internal citation omitted). In *Gonzalez*, this Court described "the appropriateness of certifying a Rule 23(c)(4) class" as "analytically independent from the predominance inquiry under Rule 23(b)(3)." *Id.* Under this understanding of *Gates*, a court considering certification of an issue class under Rule 23(c)(4) must conclude that certification is "appropriate" under the *Gates* factors **in addition** to concluding that the movant satisfied one of the subsections of Rule 23(b) under a traditional analysis.

Under this reading of *Gates*, this Court has yet to adopt a holding about "[t]he interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issue classes under Rule 23(c)(4)." *Gates*, 655 F.3d at 272. If *Gates* held only that it was not "appropriate" to maintain an issue class under Rule 23(c)(4), then there was no need for *Gates* (or *Gonzalez*) to address whether Rule 23(b)(3) had been satisfied or how Rule 23(b)(3) would be satisfied when a party invokes Rule 23(c)(4).[13]

Moreover, to the extent that *Gates* is interpreted as adopting an incorrect standard (and holding that a class can be certified without considering Rule 23(b)), this panel can reevaluate its precedent in light of intervening Supreme Court

---

[13] If this Court agrees with this reading of *Gates*, then it could follow the same approach. Because, as detailed below, the district court erred in analyzing the *Gates* factors, this Court could reverse the class certification order by holding that certification is not "appropriate" under Rule 23(c)(4) without addressing Rule 23(b)(3).

decisions. *E.g.*, *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008) ("A panel of this Court may reevaluate the holding of a prior panel which conflicts with intervening Supreme Court precedent."). In the decade since *Gates*, the Supreme Court has confirmed that class certification requires satisfaction of Rule 23(b). *See Comcast*, 569 U.S. at 33 (requiring satisfaction "through evidentiary proof at least one of the provisions of Rule 23(b)").

Indeed, this Court has already held, albeit in an unpublished decision, that a plaintiff "may seek certification under Rule 23(c)(4) as to particular issues" only after "having satisfied Rule 23(a) and (b)'s requirements." *Luppino v. Mercedes Benz USA*, 718 F. App'x 143, 146 (3d Cir. 2017) (citing *Comcast*, 569 U.S. at 33); *see id.* ("Given the class certification's (b)(3) defects, described below, we need not address the District Court's conclusion that a (c)(4) class was not certifiable."); *see also Marcus*, 687 F.3d at 590 ("[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."); *Gonzalez*, 885 F.3d at 192 (same).

District courts have also concluded, even following *Gates*, that Rule 23(a) and Rule 23(b) must be satisfied before an issue class may be certified under Rule 23(c)(4). *See Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) (quoting *Gates* while noting that "[c]ertification of particular issues under Rule 23(c)(4) is only proper if the other requirements of Rule 23(a) and (b) are first met");

38

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F.Supp. 3d 12, 45 (E.D. Pa. 2019) (relying on *Romero* for this proposition).

Particularly in light of the intervening Supreme Court authority, this Court should follow *Luppino* and the plain text of Rule 23 and hold that a plaintiff seeking certification under Rule 23(c)(4) must satisfy Rule 23(a) and (b).

Here, given the overwhelming number of individual issues—including the existence of emotional distress, apportionment, causation, and ECFMG's affirmative defenses—there is no serious argument that common issues would predominate over individual ones. Named Plaintiffs should not be able to evade the predominance requirement of Rule 23(b)(3) by invoking Rule 23(c)(4).

Under the plain text of Rule 23 and the cases interpreting it, the party seeking to certify a class must satisfy one of the prongs of Rule 23(b). Because the district court failed to find that Named Plaintiffs satisfied Rule 23(b)(3) or any other prong of Rule 23(b), the class certification must be reversed.

## III.    The District Court Abused Its Discretion in Analyzing the *Gates* Factors.

Even if the district court were correct that a class can be certified under Rule 23(c)(4) without finding that the party seeking certification satisfied any provision of Rule 23(b), class certification should be reversed because the district court abused its discretion in analyzing the *Gates* factors. Like other aspects of class certification, "a court's decision to exercise its discretion under Rule 23(c)(4) . . . must be

39

supported by rigorous analysis." *Gates*, 655 F.3d at 272 (internal quotation marks omitted).

The district court failed to perform a rigorous analysis. Its discussion of the *Gates* factors begins on page 22 of the 28-page opinion. But the first four pages of that discussion concern Plaintiffs' request for certification of all liability issues, which the district court rejected. *See* JA56–JA59. Only four paragraphs of the opinion discuss whether Rule 23(c)(4) and *Gates* permit the certification ordered by the district court. *See* JA59–JA62.

### A. The district court erred in analyzing choice-of-law and inconsistencies among state law.

As part of considering class certification, a district court must ordinarily resolve any choice-of-law disputes: "[I]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 304 n.28 (3d Cir. 2011) (en banc) (internal quotation marks and citations omitted); *see Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183–84 (3d Cir. 2014) (affirming denial of class certification due to variations in state law). *Gates* confirms that a court must consider "the substantive law underlying the claim(s), including any choice-of-law questions." 655 F.3d at 273.

The district court erred in two ways. First, Named Plaintiffs failed to carry their burden to prove that there was no variation in state law. Second, the district

40

court's alternative holding that Pennsylvania law could apply to claims of out-of-state patients is incorrect.

### 1. Plaintiffs failed to present the required "extensive analysis" of state law.

The party seeking certification of a class action has the burden to conduct an "extensive analysis" of state law variations. *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986); *see also Grandalski*, 767 F.3d at 183–84; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) (noting that the burden "rests squarely with the plaintiffs"); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) ("[M]ovants must credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" (quoting *In re Sch. Asbestos Litig.*, 789 F.2d at 1010)).

Named Plaintiffs failed to carry their burden in this case. Although they filed this case in Pennsylvania (where ECFMG is headquartered), Dr. Akoda was not licensed to practice medicine in Pennsylvania and did not treat patients in Pennsylvania. He was licensed to practice medicine in Maryland and Virginia and worked at private medical practices in Maryland and hospitals in Maryland and the District of Columbia.

The certified class comprises patients examined or treated in at least three jurisdictions: Maryland, Virginia, and the District of Columbia. As detailed below, the law applicable to claims arising out of Dr. Akoda's treatment of a patient would

41

be the law of the state in which the treatment was provided.  Here, Named Plaintiffs were required to provide an "extensive analysis" of the law of all three jurisdictions to prove that dissimilarities did not defeat predominance.

Plaintiffs failed to carry their burden.  Rather than provide the necessary "extensive analysis" of these states' laws, Plaintiffs' counsel merely represented that they were "unaware" of any relevant conflicts between the laws of Pennsylvania and other states.  JA194.

The district court erred by relying on this representation rather than holding Named Plaintiffs to their burden.  Instead of finding that Named Plaintiffs had proved that there were no variations in state law, the district court erroneously placed the burden on the parties (effectively, on ECFMG) to prove variations.  *See* JA45 (relied on the fact that "the parties have not identified any [variations]").

Not only did the district court misplace the burden, but its cursory analysis is incorrect.  As ECFMG argued, there appear to be extensive variation regarding the claim of negligent infliction of emotional distress.  The Fifth Circuit surveyed the law and correctly concluded that "[n]egligent infliction of emotional distress . . . involves wide variations" among the states.  *Castano*, 84 F.3d at 742–43, n.15.

Maryland, for example, "does not recognize the tort of negligent infliction of emotional distress."  *Alban*, 61 A.3d at 876.  The District of Columbia recognizes the tort, but a plaintiff must prove, *inter alia*, that "the defendant has a relationship

42

with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being" and that there is "an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011). Virginia requires "a showing of an underlying tort duty as the predicate for making a claim for the negligent infliction of emotional distress." *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 476 (Va. 2019).

Named Plaintiffs failed to provide the district court with the extensive analysis of state law necessary to determine whether the class should have been certified.

> **2.    The district court erred in holding, in the alternative, that Pennsylvania law governs the claims of out-of-state plaintiffs based on out-of-state medical treatment.**

The district court held, in the alternative, that any variations in state law were irrelevant because it could apply the law of Pennsylvania to claims arising out of out-of-state treatment of out-of-state patients by Dr. Akoda.

The Supreme Court has affirmatively rejected this approach to class certification: A court may not "take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).

43

Pennsylvania follows the choice-of-law approach from the Restatement (Second) of Conflict of Laws. *Griffith v. United Air Lines, Inc.*, 203 A.2d 796 (Pa. 1964). Section 148(2) of the Restatement (Second) of the Conflicts of Laws governs fraud and misrepresentations. Named Plaintiffs' claims, which allege negligent infliction of emotional distress based on ECFMG's alleged misstatements to state regulatory authorities, residency programs, or employers, would appear to be governed by these rules.

Under the Restatement (and Pennsylvania choice-of-law rules), because the alleged false representations were made and relied upon in different states, a court must consider:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Applying this test, factors (e) and (f) are irrelevant; factors (a) and (b) favor the law of the state of treatment by Dr. Akoda; and only factor (c) suggests applying Pennsylvania law. Factor (d), residence, likely favors the state of treatment because

"the domicil of the plaintiff is regarded by the Restatement as more important than that of the defendant." *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 182 (3d Cir. 2014) (quoting Restatement (Second) of Conflict of Laws § 148, cmt. i).

Because of factors (a) and (b), the law of Maryland, Virginia, and the District of Columbia will apply: "If any two of the [Section 148(2)] contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 209 (3d Cir. 2013) (quoting Restatement (Second) of Conflicts of Law § 148, cmt j)).

Indeed, if Pennsylvania's choice-of-law rules purported to apply Pennsylvania substantive law to an out-of-state plaintiff's claims arising from out-of-state medical treatment, difficult constitutional questions would arise under the Commerce Clause. As the Supreme Court has explained, a State has no authority to enact a regulation that has "the practical effect" of "control[ling] conduct beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Here, Pennsylvania could not regulate which doctors should be licensed in Maryland, could not require disclosures by Maryland doctors treating Maryland patients, could not set the rules for effective consent under Maryland law, and could not create a right to recovery in tort when a Maryland patient's treatment by a Maryland doctor purportedly leads to emotional distress. At a minimum, correctly holding that Pennsylvania's choice-

45

of-law rules would apply the law of the state of treatment would avoid these difficult constitutional issues. *E.g.*, *Bruni v. City of Pittsburgh*, 941 F.3d 73, 85 (3d Cir. 2019) (applying principles of constitutional avoidance).

The district court failed to conduct a rigorous choice of law analysis and erred in suggesting that the law of Pennsylvania could apply to claims by out-of-state plaintiffs based on out-of-state medical treatment.

**B.    The district court failed to consider the type of claim at issue, including that claims of emotional distress are particularly unsuitable for class treatment.**

*Gates* directs that in determining whether certification of an issue is appropriate under Rule 23(c)(4), a court must consider "the type of claim(s) and issue(s) in question" and "whether the substantive law separates the issue(s) from other issues concerning liability or remedy." 655 F.3d at 273. These factors were not addressed by the district court in its analysis.

Here, the nature of the claims should foreclose class certification, particularly class certification of narrow issues under Rule 23(c)(4). Emotional distress is a particularly individualized injury. It is undisputed, as the Fifth Circuit has recognized, that "emotional distress claims . . . will require some form of individualized proceedings." *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362 (5th Cir. 2008).

JA2000

But at individual proceedings to determine the existence and cause of an individual class members' emotional distress, all of the evidence presented at any class proceeding would need to be revisited.[14] Emotional distress damages cannot be separated from the evidence of liability purportedly giving rise to the emotional distress. This Court has held, unequivocally, that a court cannot hold a trial limited to damages for emotional distress: such a proceeding would be "contrary to the rule that emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Spence*, 806 F.2d at 1202. Emotional distress liability and emotional distress damages are "too interwoven to allow a fair determination of damages apart from liability." *Id.* In other words, the substantive law does not permit the issues to be separated from other issues concerning liability or remedy—they must be decided together. Despite being argued by ECFMG, the *Spence* decision (and the principle that emotional distress damages may not be bifurcated from liability) went unmentioned by the district court.

The Eleventh Circuit reached a consistent result in *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000), which involved an attempt to certify a class under Rule 23(b)(3) based on an alleged policy of racial discrimination. The plaintiffs suggested (as Named Plaintiffs do here), that class treatment was justified

---

[14] Named Plaintiffs never presented any type of "trial plan" to the district court or otherwise attempted to detail how they intend that the cases be tried.

47

because of a common policy or conduct by the defendant. *Id.* at 1236. In reversing the certification, the Eleventh Circuit explained that proof of liability would require individual proceedings to determine whether a particular plaintiff was (or was not) subject to discrimination: "The idea that proof of a policy or practice of discrimination could establish that every member of the class is entitled to such damages is, given the substantive elements of the underlying cause of action, untenable." *Id.* at 1241. And because "every member of the class will have to prove actual damage in order to receive compensation for their loss, the policy or practice issue cannot possibly predominate over all the other issues in the case that are necessarily capable of only individualized resolution." *Id.* The same analysis applies here: the personal injury claims asserted by Named Plaintiffs require individual proof of whether each class member suffered emotional distress and whether that emotional distress was caused by ECFMG. Given the need for these individual proceedings, common issues cannot possibly predominate and class treatment is inappropriate.

This result accords with comments to the Principles of the Law of Aggregate Litigation adopted by *Gates*. Those comments recognize that aggregate treatment of narrow issues in personal injury claims is rarely appropriate: "[C]ommon issues will tend to arise more frequently with respect to economic injuries from a generally applicable course of conduct than with regard to personal injuries[.]" Principles of

48

the Law of Aggregate Litigation § 2.01, cmt. c (2010).  For personal injuries, "the 'upstream' inquiry [i.e., the high-level duty and breach issues certified here] likely would not materially advance the disposition of claims."  *Id.*; *see also id.* § 2.03, cmt. b ("[W]hen [a] common issue remains intertwined under applicable substantive law with other issues that are not common, including individualized defenses," then class treatment "would not materially advance the resolution of related claims" and creates a "prospect for substantial duplication of effort for both the parties and the courts [that] amounts to a danger signal that counsels strongly against aggregate treatment of the common issue in the first place"); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (holding that a case seeking recovery for emotional distress "is not suitable for class action treatment because of the variance in injury among the members of the class and the cost of the individualized hearings that would in consequence be required for assessing damages" and noting that injuries "must vary very considerably across the members of the class").  These factors from *Gates*, which went unaddressed by the district court, should be fatal to certification under Rule 23(c)(4).

### C.   The district court abused its discretion in analyzing the efficiencies to be gained.

Nor did the district court correctly analyze whether any efficiencies would be gained from the class proceeding.

The district court certified only narrow, abstract questions of duty and breach, leaving issues such as causation, injury, damages, apportionment of fault, as well as all of ECFMG's affirmative defenses, to be tried in subsequent individual proceedings.

The district court stated, without elaboration, that juries in these individual proceedings "will not have to reexamine any of the evidence about ECFMG's conduct," but its prediction is incorrect.   JA61. Virtually all of the "common" evidence and arguments would need to be reheard in every individual case.

To determine causation (particularly proximate causation), understand who Dr. Akoda was, and even have a basic understanding of the theory of liability against ECFMG, every jury in every individual proceeding would need to hear essentially all of the evidence that Named Plaintiffs propose to present at the class proceeding. Evaluating causation would require a jury to consider the entire chain of events— including any alleged wrongdoing by ECFMG, residency programs that admitted Dr. Akoda, medical boards that licensed him, hospitals that gave him privileges, the specialty board that certified him, and law enforcement officers who investigated him—to decide which actor, if any, was the proximate cause of any alleged emotional distress suffered by any individual plaintiff.   *Cf. McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011) (explaining that "proximate cause" excludes "link[s] that are too remote, purely contingent, or indirect" (internal

50

quotation marks omitted)); *Township of Bordentown, N.J. v. FERC*, 903 F.3d 234, 247 n.6 (3d Cir. 2018) (noting that "intervening act[s]" can sever a causal chain).

Similarly, as noted above, to determine the amount of damages for emotional distress that an individual plaintiff could receive, a jury would need to rehear all of the evidence regarding ECFMG's liability. *Spence*, 806 F.2d at 1202. No efficiencies would be gained by such a proceeding.

The class action certified by the district court is indistinguishable from the issue class rejected by this Court in *Gates*. Like Named Plaintiffs, the *Gates* plaintiffs sought class certification of generalized, abstract questions of liability, while leaving the bulk of the claims for later, individual proceedings. *See Gates*, 655 F.3d at 272 (explaining that "causation and extent of contamination," "the fact of damages," and "the amount of damages" would need to be determined in follow-up proceedings). This Court recognized that in light of the "numerous individual issues that would remain," resolution of the common issues was "unlikely to substantially aid resolution of the substantial issues on liability and causation," so certification under Rule 23(c)(4) would be improper. *Id.* at 272, 274.

As in *Gates*, in this case, resolution of the proposed classwide issues would still leave causation, the fact of damages, and the amount of damages (and numerous other issues) to be determined in follow-up proceedings. The district court failed to follow this Court's direction to "explain how class resolution of the issue(s) will

51

fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues," *id.* at 273, and as a result, certified an issue class indistinguishable from the issue class rejected in *Gates*. *See also id.* (noting, as here, that there was "no marked division between damages and liability").

The mere identification of a purportedly common issue does not mean that resolution of the common issue through a class action will "fairly and efficiently" advance resolution of the case as a whole. *See D.C. by & through Garter v. County of San Diego*, 783 F. App'x 766, 768 (9th Cir. 2019) ("Based on its finding that certification of a liability-only class would not significantly advance the resolution of the class claims, the district court did not abuse its discretion by denying D.C.'s motion for certification of a liability-only class.").

The district court correctly recognized that this is not a case in which liability is appropriate for classwide treatment, but it should have followed by concluding that certification of narrow liability issues would not materially advance resolution of the underlying claims. *See Gonzalez*, 885 F.3d at 202–03 ("Unlike a situation in which a Rule 23(c)(4) class might be appropriate because liability is capable of classwide treatment but damages are not, Plaintiffs offer no theories of liability for which classwide treatment is apt. The District Court therefore correctly determined that a Rule 23(c)(4) class would not materially advance resolution of the underlying claims[.]"). Here, as in *Gonzalez*, Named Plaintiffs "offer no theories of liability for

<div align="center">52</div>

which classwide treatment is apt," and therefore "a Rule 23(c)(4) class would not materially advance resolution of the underlying claims."

The district court erred by failing to conduct the rigorous analysis required under *Gates* and abused its discretion in concluding that certification of narrow issues would lead to efficiencies in resolution of the case as a whole.

### D. The district court's analysis would permit certification of an issue class in virtually any case.

The class certification decision below suggests dramatic expansion of the class action device. If the district court's analysis were correct, then class certification under Rule 23(c)(4) would be permissible (and proper) in virtually any case.

Under the text of Rule 23, "commonality" is just a single factor under Rule 23(a). Identification of a common issue is necessary—but by no means sufficient—for class certification. But under the district court's approach to Rule 23(c)(4), the entire certification inquiry effectively reduces to commonality.

The district court's error is confirmed by the fact that the justifications offered by the district court for class certification in this case would apply equally to virtually any case involving a common issue. The court's statement—"the questions of duty and breach favor issue certification because they are questions of law and/or fact common to all class members and subject to common proof," JA59–JA60—merely restates that a common issue has been identified. The statement that certification

53

would allow "a single trial with a single, preclusive determination" about the common issue is also a truism.  JA60.  The same would be true of any case in which a common issue has been identified.  And the district court's final justification—that "[p]artial certification will not damage any class member's statutory or constitutional rights," JA61—is not a justification for certifying the class but only identifies the absence of a barrier to certification.[15]

If the district court's approach to Rule 23(c)(4) were correct, then certification of an issue class would be appropriate in any case in which Rule 23(a) (including its commonality requirement) has been satisfied.  Such a result conflicts with the plain text of Rule 23, would be a dramatic expansion of the class action device, and cannot be squared with the rule that the class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Falcon*, 457 U.S. at 155 (internal quotation mark omitted).

---

[15] Nor, as discussed above, is the district court's analysis correct.  Splitting claims for emotional distress from other injuries threatens class members' rights.

## CONCLUSION & PRAYER FOR RELIEF

For the foregoing reasons, the order certifying the class should be reversed.

Dated:  September 2, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:    */s/ William R. Peterson*
William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

Brian W. Shaffer
Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

***Counsel for Appellant, Educational Commission for Foreign Medical Graduates***

55

JA2009

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I, William R. Peterson, counsel for Appellant Educational Commission for Foreign Medical Graduates, certify, pursuant to Local Appellate Rule 28.3(d), that I am a member in good standing of the Bar of this Court. I further certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5)–(7), and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Brief of Appellant Educational Commission for Foreign Medical Graduates is proportionately spaced and has a typeface of 14-point Times New Roman, contains 12,561 words, and that the text of the electronic brief is identical to the text of the paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that McAfee Endpoint Security did not detect a virus.

*/s/ William R. Peterson*
William R. Peterson

JA2010

## CERTIFICATE OF SERVICE

I, William R. Peterson, counsel for Appellant Educational Commission for Foreign Medical Graduates, certify that, on September 2, 2020, a copy of the foregoing Brief of Appellant and Joint Appendix (Volume I, Pages JA1 to JA78) was filed electronically through the appellate CM/ECF system with the Clerk of the Court.  All counsel of record in this case are registered CM/ECF users.  Pursuant to Local Appellate Rule 31.1, as amended by the April 29, 2013 order, seven copies of this brief were sent to the Clerk of the Court for delivery.

*/s/ William R. Peterson*
William R. Peterson
*Counsel for Appellant,*
*Educational Commission for*
*Foreign Medical Graduates*

Dated: September 2, 2020

57

# No. 20-2128

In the United States Court of Appeals
For the Third Circuit

---

MONIQUE RUSSELL; JASMINE RIGGINS; ELSA M. POWELL;
DESIRE EVANS

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

*Appellant*

---

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

---

## ADDENDUM TO BRIEF OF APPELLANT

---

MORGAN, LEWIS & BOCKIUS LLP
  Brian W. Shaffer
  Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
  William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

*Counsel for Appellant*

## STATEMENT OF RELATED CASES

In May 2016, a malpractice action related to this case was filed against Dr. Charles J. Akoda and his employer Dr. Abdul G. Chaudry. *See Jalloh et al. v. Chaudry et al*., CAL 16-22162 (Prince George's Cty. Cir. Ct., Md.). That action was voluntarily dismissed.

In November 2016, a guilty plea for misuse of a Social Security number related to this case was entered in *United States v. Oluwafemi Charles Igberase, a/k/a "Charles John Nosa Akoda,"* No. 8:16-cr-00277-PWG (D. Md.).

Monique Russell and Jasmine Riggins—two of the Named Plaintiffs in this case—filed two putative class actions against Dimensions Health Corporation (and other defendants) that are related to this case. *See Russell v. Dimensions Corp.*, CAL 17-22761 (Prince George's Cty. Cir. Ct., Md.); *Russell v. Dimensions Health Corp.*, CAL 18-07863 (Prince George's Cty. Cir. Ct., Md.). That case was consolidated with another putative class action also against Dimensions Health Corporation brought by Desire Evans and Elsa Powell, the other two Named Plaintiffs in this case. *See Dews v. Dimensions Health Corp.*, CAL 17-37091 (Prince George's Cty. Cir. Ct., Md.). The consolidated case was voluntarily dismissed after the defendants filed a motion for summary judgment.

1

Dated:  September 4, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:   */s/ William R. Peterson*
      William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

      Brian W. Shaffer
      Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

**Counsel for Appellant, Educational Commission for Foreign Medical Graduates**

2

## CERTIFICATE OF SERVICE

I, William R. Peterson, counsel for Appellant Educational Commission for Foreign Medical Graduates, certify that, on September 4, 2020, a copy of the foregoing Addendum to Brief of Appellant was filed electronically through the appellate CM/ECF system with the Clerk of the Court. All counsel of record in this case are registered CM/ECF users. Pursuant to Local Appellate Rule 31.1, as amended by the April 29, 2013 order, seven copies of this Addendum to Brief of Appellant were sent to the Clerk of the Court for delivery.

/s/ William R. Peterson
William R. Peterson
*Counsel for Appellant,*
*Educational Commission for*
*Foreign Medical Graduates*

Dated: September 4, 2020

JA2015

No. 20-2128

In the

# United States Court of Appeals
## For the Third Circuit

———————

MONIQUE RUSSELL, JASMINE RIGGINS, ELSE M. POWELL, and DESIRE EVANS,

*Appellees,*

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Appellant.*

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
The Honorable Joshua D. Wolson, District Judge

———————

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT

———————

Steven P. Lehotsky
Jonathan D. Urick
U.S. CHAMBER
  LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
T: (202) 463-5337

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

Gilbert C. Dickey
MCGUIREWOODS LLP
2001 K. Street, N.W.
Suite 400
Washington, D.C. 20006
T: (202) 828-2829

*Counsel for* Amicus Curiae *Chamber of Commerce of the United States of America*

———————

September 9, 2020

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1., *amici curiae* the Chamber of Commerce of the United States of America makes the following disclosure:

(1) For nongovernmental corporate parties please list all parent corporations: *The Chamber is a nonprofit corporation and has no parent corporation*.

(2) For nongovernmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: *No publicly held company owns 10% or more of the Chamber's stock*.

(3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interests or interest: *Defendant-Appellant has identified AIG as potentially having an interest in this proceeding.  The Chamber is not aware of any other party with a financial interest in this proceeding*.

(4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is an active participant in the bankruptcy

i

proceeding.  If the debtor or trustee is not participating in the appeal, this information

must be provided by the appellant: *Not applicable.*

> */s/ Gilbert C. Dickey*
> Gilbert C. Dickey
>
> *Counsel for* Amicus Curiae
> *Chamber of Commerce*
> *of the United States of America*
>
> Dated: September 9, 2020

JA2018

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES .................................................................iv

INTEREST OF AMICUS CURIAE .......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................2

ARGUMENT ........................................................................................5

    I.     Rule 23(c)(4) Merely Provides a Case-Management Tool, Not a New Type of Class Action Exempt from the General Certification Requirements ......................................5

          A.     All Damages Class Actions Must Satisfy the Same Requirements Established in Rules 23(a) and (b)(3) ................5

          B.     Rule 23(c) Provides Procedures and Case-Management Tools to Aid Class Adjudication, Not an Alternative Path to Certification .........................7

          C.     Recognizing a Freestanding "Issues" Class Action Would Completely Undermine Rule 23(b)(3)'s Critical Safeguards ................................................10

          D.     This Court's Precedents Do Not Authorize a Rule 23(c)(4) "Issues" Class Action ................................12

    II.    The District Court's Decision Invites a Wave of Class Action Abuse .................................................................16

CONCLUSION ...................................................................................19

CERTIFICATE OF COMPLIANCE ...................................................20

CERTIFICATE OF SERVICE ............................................................21

JA2019

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)..................................................................5, 6, 11

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011)......................................................................16, 17

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975)..............................................................................17

*Castano v. American Tobacco Co.,*
  84 F.3d 734 (5th Cir. 1996) ...........................................................9, 11

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013)......................................................................*passim*

*Coopers & Lybrand v. Livesay,*
  437 U.S. 463 (1978)..............................................................................16

*Gates v. Rohm & Haas Co.,*
  655 F.3d 255 (3d Cir. 2011) ........................................................*passim*

*Gonzalez v. Corning,*
  885 F.3d 186 (3d Cir. 2018) ...........................................................7, 14

*Hohider v. United Parcel Service, Inc.,*
  574 F.3d 169 (3d Cir. 2009) .......................................................12, 14

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.,*
  502 U.S. 183 (1991)................................................................................9

*Luppino v. Mercedes Benz USA,*
  718 F. App'x 143 (3d Cir. 2017) ......................................................15

*McFadden v. United States,*
  576 U.S. 186 (2015)................................................................................6

*Murphy v. United States,*
  138 S. Ct. 784 (2018)............................................................................8

iv

*POM Wonderful LLC v. Coca-Cola Co.,*
573 U.S. 102 (2014)................................................................................9

*Shady Grove Orthopedic Assocs v. Allstate Ins. Co.,*
559 U.S. 393 (2010) (Ginsburg, J., dissenting) .................................16

*United States v. Tohono O'Odham Nation,*
563 U.S. 307 (2011)..............................................................................11

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)..............................................................10, 11, 18

**Court Rules**

Fed. R. Civ. P. 23 ...................................................................*passim*

Fed. R. Civ. P. 23(a)..............................................................*passim*

Fed. R. Civ. P. 23(b)..............................................................*passim*

Fed. R. Civ. P. 23(b)(1)..............................................................5, 10

Fed. R. Civ. P. 23(b)(2)......................................................................14

Fed. R. Civ. P. 23(b)(3)..........................................................*passim*

Fed. R. Civ. P. 23(c)..........................................................3, 7, 8, 10

Fed. R. Civ. P. 23(c)(1)........................................................................7

Fed. R. Civ. P. 23(c)(2)..................................................................7, 10

Fed. R. Civ. P. 23(c)(3)..................................................................7, 10

Fed. R. Civ. P. 23(c)(4)..........................................................*passim*

Fed. R. Civ. P. 23(c)(5)........................................................................7

**Other Authorities**

Black's Law Dictionary (4th ed. 1968) ...................................................6

Black's Law Dictionary (5th ed. 1979) ...................................................6

JA2021

Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 Emory L.J. 399 (2014) ...................17

Webster's Third New Int'l Dictionary (2002) ..........................................................6

vi

# INTEREST OF *AMICUS CURIAE*[*]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interest of its members and the business community before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases of concern to the nation's business communities, including cases involving the application of Federal Rule of Civil Procedure 23.

Many of the Chamber's members are defendants in class actions. They therefore have a keen interest in ensuring that courts rigorously analyze, consistent with the text of Rule 23 and the requirements of due process, whether a plaintiff has satisfied the prerequisites for class certification before certifying a class.

This case presents the question whether Rule 23(c)(4) may serve as an end-run around Rule 23(b)(3)'s critical due-process safeguards for defendants and absent class members. The answer is "no." By reaching the opposite conclusion, the decision below invites a flood of time-consuming, expensive, and abusive class

---

[*] No party's counsel authored this brief. No party, party's counsel, or person other than *amicus curiae*, its members, or its counsel provided money for this briefs preparation or submission. All parties consent to the filing of this brief.

JA2023

actions that would benefit only the lawyers in the litigation. The Chamber therefore has a strong interest in this Court's resolution of the question.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a critical question of class-action procedure: whether a district court can certify an issues class under Federal Rule of Civil Procedure 23(c)(4) even though the lawsuit as a whole does not satisfy Rule 23(b)(3)'s predominance and superiority requirements. The district court wrongly held that it could because, in its view, Rule 23(b)(3)'s requirements simply do not apply to so-called "issues" classes certified under Rule 23(c)(4).

This misinterpretation not only conflicts with Rule 23's text, it will also generate massive pressure on class-action defendants to settle meritless claims. To begin, the district court's decision will make it trivially easy to obtain class certification. Under that approach, a court can certify a class for the purpose of adjudicating common issues even if such issues do not predominate over individualized questions for the case as a whole. That reading of Rule 23(c)(4) would greatly expand class-action litigation. A clever lawyer would almost always be able to identify some common factual or legal issue. And once a class has been certified, defendants confronting the prospect of a large loss in class proceedings would face overwhelming pressure to settle even meritless claims.

JA2024

Rule 23's text and structure contradict the district court's reading.  Like the other provisions of Rule 23(c), Rule 23(c)(4) creates a case-management tool for the adjudication of a class action that otherwise satisfies the requirements for certification.  Rule 23(a) and Rule 23(b) set out those detailed requirements.  To obtain certification, the named plaintiffs must show that their case both satisfies the general requirements of Rule 23(a) and falls within one of the three categories of class action identified in Rule 23(b).  Rule 23(c) then lists a number of tools courts may use to manage class actions.   Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  On its face and read in context, this provision merely creates a discretionary tool that allows a district court to adjudicate only some common issues on a class basis if a case otherwise meets the requirements for class certification.   In other words, it makes explicit that, for properly certified class actions, the court may try individualized issues separately.  If Rule 23(c)(4) instead creates a fourth kind of class action, the rule's drafters would not have included it in a list of procedural rules for the litigation of cases that have already been certified.  And it would have listed the detailed requirements for bringing an "issues" class action instead of simply announcing that one may proceed "[w]hen appropriate."  Fed. R. Civ. P. 23(c)(4).  Instead, this provision should be read as exactly what its text and context suggest.

JA2025

The district court, however, permitted the certification of issues under Rule 23(c)(4) without assessing whether the case satisfies the requirements of Rule 23(b)(3).  The district court found that analysis unnecessary, but it did not reach that conclusion based on Rule 23's text.  On the contrary, the court concluded that this Court's decision in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), precluded it from "requir[ing] Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement," and mandated that the court look only to a multi-factor test.  JA43.

*Gates* does not compel the district court's misreading of Rule 23.  In *Gates*, this Court declined to address whether a plaintiff who invokes Rule 23(c)(4) must also show that the case as a whole satisfies the predominance requirement of Rule 23(b)(3).  *See* 655 F.3d at 273 (declining to join "either camp" in a circuit split on the question).  The Court instead rejected certification because the proposed liability issues class failed to satisfy a multi-factor test that it applied based on Rule 23(c)(4)'s appropriateness requirement.  As a result, the Court had no need to decide whether the class could have been certified without an additional Rule 23(b)(3) finding.  *Gates* thus does not prevent the application of Rule 23(b)(3) in this case, and the text of Rule 23 confirms that Rule 23(b)(3)'s predominance requirement applies.

4

# ARGUMENT

## I. Rule 23(c)(4) Merely Provides a Case-Management Tool, Not a New Type of Class Action Exempt from the General Certification Requirements.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). This provision merely creates a discretionary case-management tool that a district court can employ when a case otherwise satisfies the requirements for class certification but some issues cannot be resolved through class litigation. Rule 23(c)(4) does not authorize a court to certify a new type of class action—a so-called "issues class"—that does not satisfy the requirements of Rule 23(b).

### A. All Damages Class Actions Must Satisfy the Same Requirements Established in Rules 23(a) and (b)(3).

Rule 23 establishes two sets of requirements that a case must satisfy to proceed as a class action. Rule 23(a) first establishes four "prerequisites"—numerosity, commonality, typicality, and adequacy. These prerequisites are "threshold requirements applicable to all class actions." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

A party who has satisfied the Rule 23(a) prerequisites "must" then "show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id*. at 614; *accord Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). These provisions identify three "types of class actions" that a party can bring. Fed. R. Civ. P. 23(b). A case must

5

satisfy the requirements for one of these categories "[i]n addition" to the Rule 23(a) prerequisites. *Amchem*, 521 U.S. at 514. "A class action may be maintained if Rule 23(a) is satisfied and if" the plaintiff satisfies the requirements for one of these three types of class action. Fed. R. Civ. P. 23(a). These requirements apply to *all* class actions because the indefinite article "a" in this context means "any." *See McFadden v. United States*, 576 U.S. 186, 191–92 (2015) (concluding that the indefinite article "a" refers to any item included in the described category); Webster's Third New Int'l Dictionary 1 (2002) (explaining that the indefinite article means "any" or "each" when used with a restrictive modifier); Black's Law Dictionary 3 (4th ed. 1968) (explaining that "[t]he article 'a' . . . is often used in the sense of 'any'"); Black's Law Dictionary (5th ed. 1979) ("'A' means 'one' or 'any' . . . [and] is not necessarily a singular term; it is more often used in the sense of 'any' and is then applied to more than one individual object.").

For damages claims, Rule 23(b)(3) only permits a class action to proceed if "the court finds" that the case presents common questions that "predominate over" individualized ones and that "a class action is superior to other available methods" of "adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These additional predominance and superiority requirements help ensure that class litigation is the best route for resolving the case.

**B.     Rule 23(c) Provides Procedures and Case-Management Tools to Aid Class Adjudication, Not an Alternative Path to Certification.**

After Rules 23(a) and (b) establish the requirements for all class actions, Rule 23(c) then provides district courts procedures and tools for their management.  Rule 23(c)(1) requires a court to decide whether to certify a class by order "[a]t an early practicable time," and announces that a certification order must "define the class and the class claims, issues or defenses, and must appoint class counsel."  Rule 23(c)(2) establishes notice requirements for class actions, including individual notice to members of a Rule 23(b)(3) class.   Rule 23(c)(3) requires findings about class membership in the judgments in each of the three types of class action permitted by Rule 23(b).  And Rule 23(c)(5) permits the division of a class into subclasses.

Similar in kind to its surrounding provisions, Rule 23(c)(4) provides that, "[w]hen appropriate," a class action may proceed "with respect to particular issues." This language does not create a new category of class action exempt from Rule 23(b).  Instead, it creates a discretionary case-management tool that allows a court to adjudicate a class action that satisfies Rule 23(b)(3)'s predominance and superiority requirements but nevertheless includes some individualized issues that cannot be resolved on a class-wide basis.  As this Court has explained, this approach "might be appropriate because liability is capable of classwide treatment but damages are not."  *Gonzalez v. Corning*, 885 F.3d 186, 202–03 (3d Cir. 2018); *but cf. Comcast*, 569 U.S. at 34 (noting that predominance cannot be satisfied where

7

individual damages questions "will inevitably overwhelm questions common to the class").

The advisory committee notes to the 1966 Amendments to Rule 23 confirm the case-management reading. The notes explain that Rule 23(c)(4) would allow a district court to issue an order that allows "adjudication of liability to the class" but then requires individual class members to "prove the amounts of their respective claims." In that situation, Rule 23(c)(4) would operate like the other provisions of Rule 23(c) by providing tools to manage an action that has already been certified.

Rule 23(c)(4)'s placement among a series of case-management procedures and tools strongly suggests that it does not establish a freestanding "issues" class action. The rest of Rule 23(c) lists rules that only apply to certified class actions that meet the requirements of Rule 23(a) and one of the categories of Rule 23(b). *See Murphy v. United States*, 138 S. Ct. 784, 789 (2018) (looking to the "surrounding statutory structure" and "other provisions" to interpret statutory text). The Rules Committee would not have included Rule 23(c)(4) in this list of management tools if it had meant to create a whole new type of class action. This placement confirms that "[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to

8

sever common issues for a class trial." *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Notably, Rule 23(c)(4) does not include the kind of language that Rule 23 uses for the creation of a type of class action. It does not announce the creation of any new types of class action. Nor does it establish any requirements to bring a class action under Rule 23(c)(4). Instead, it merely announces that "when appropriate" a court may permit class proceedings "with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

By contrast, Rule 23(b) is explicit about creating three different types of class action and establishing the requirements for each of them. Rule 23(b) is titled "types of class actions." *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (explaining that the title of a statute or section can help clarify meaning). And it begins by explaining that a class action can be brought "if Rule 23(a) is satisfied and if" the conditions for one of the three types of class action have been met. Fed. R. Civ. P. 23(b). It then lists detailed requirements for each of the three types of class action. *See id.* This language and structure strongly convey exclusivity—that they establish the *only* paths to class certification. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (explaining that the provision of rules for some cases implies the exclusion of other cases). The Rules

9

Committee would have used similar language in Rule 23(c)(4) if it meant for that provision to create a new category of "issues" class action.

What's more, the other provisions of Rule 23(c) presume that Rule 23(b) recognizes the only three types of class action, establishing specific rules for each of them. Rule 23(c)(2), for example, provides notice requirements "[f]or any class certified under Rule 23(b)(1) or (b)(2)" and a separate set of notice requirements "[f]or any class certified under Rule 23(b)(3)." Fed R. Civ. P. 23(c)(2). Rule 23(c)(3) similarly imposes rules for the judgments in "any class action certified under Rule 23(b)(1) or (b)(2)" and different requirements for "any class action certified under Rule 23(b)(3)." Fed. R. Civ. P. 23(c)(3). But there are no similar rules for a Rule 23(c)(4) "issues" class, quite an anomaly if it actually exists as an additional certifiable type. The absence of any corresponding rules for managing such a class action confirms that Rule 23(c)(4) does not establish a separate type.

### C. Recognizing a Freestanding "Issues" Class Action Would Completely Undermine Rule 23(b)(3)'s Critical Safeguards.

Rule 23 establishes exacting procedures for the certification of a damages class action. Among other requirements, such an action must comply with Rule 23(b)(3)'s predominance requirement. The Supreme Court has acknowledged that Rule 23(b)(3) permits class proceedings in "situations in which class-action treatment is not as clearly called for." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). But by requiring that common questions predominate, Rule 23(b)(3)

10

aims "to assure the class cohesion that legitimizes representative action in the first place." *Amchem*, 521 U.S. at 623.

The district court's reading of Rule 23(c)(4) would completely undermine Rule 23(b)(3)'s critical safeguards and limits for damages class actions. Rule 23(b)(3) is already the "most adventuresome innovation" in Rule 23. *Comcast*, 569 U.S. at 34. The district court's approach goes even further, permitting class adjudication of common issues even when they do not predominate over individualized questions. There will almost always be some common legal or factual issue that could be invoked to obtain class treatment. "[A]ny competently crafted class complaint literally raises common questions." *Wal-Mart*, 564 U.S. at 349 (quotation marks and citation omitted).

The Fifth Circuit has explained that this approach "would eviscerate the predominance requirement of Rule 23(b)(3)." *Castano*, 84 F.3d at 745 n.21. A court would be able to "sever issues until the remaining common issue predominates." *Id*. This "nimble use of subdivision (c)(4)" would allow a class to be certified even though the common issues constitute only a small part of the issues in a case. *Id*.

"[T]he result would be automatic certification in every case where there is a common issue, a result that could not have been intended." *Id*. Rule 23 should not be read to render any provision "nugatory through construction." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011). But permitting certification

11

any time that an issue can be resolved on a class basis would effectively eliminate Rule 23(b)(3)'s requirement that common questions must predominate.

### D. This Court's Precedents Do Not Authorize a Rule 23(c)(4) "Issues" Class Action.

*Gates* did not hold that Rule 23(c)(4) establishes a new category of "issues" class action. There, this Court noted that its sister circuits have disagreed about whether an issues class must satisfy the predominance requirement of Rule 23(b)(3). *Gates*, 655 F.3d at 272. Some appellate courts treat Rule 23(c)(4) "as a 'housekeeping rule.'" *Id*. These courts permit an issues class to proceed "only when the cause of action, taken as a whole, meets the predominance requirement." *Id*. But other courts allow an issues class to proceed "even if common questions do not predominate for the cause of action as a whole." *Id*.

This Court elected not to "join[] either camp in the circuit disagreement" about whether an issues class must meet the predominance requirement of Rule 23(b)(3). *Id*. at 273. Instead, the Court relied on the factors "set forth in *Hohider* [*v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009)] and more recently in the Final Draft of the ALI's Principles of Aggregate Litigation." *Id*. Applying those factors, this Court affirmed the district court's refusal to certify a common issues class, citing the "inability to separate common issues from issues where individual characteristics may be determinative." *Id*. at 274. In other words, the Court held that class

12

adjudication of particular issues would not be "appropriate," as Rule 23(c)(4) requires.

As a result, nothing in *Gates* forecloses this Court from holding that a party invoking Rule 23(c)(4) must also satisfy Rule 23(b)'s requirements. As explained, *Gates* acknowledged a disagreement about that question, but refused to "join either camp." *Id*. at 273. Instead, the Court looked to a "non-exclusive list of factors" that if found provided "the most sound guidance in resolving this complicated area of class action procedure." *Id*. Since those appropriateness factors supported the denial of class certification, the Court had no need to address whether a party who can satisfy the *Gates* factors must separately show that a cause of action satisfies Rule 23(b)(3). Any statement on that question would thus have been dicta.

By refusing to require Plaintiffs to satisfy Rule 23(b)(3), the district court adopted one of the approaches rejected in *Gates*. The district court rejected an argument that it should "require Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement," explaining that the argument "parrots one of the camps that the Third Circuit acknowledged but refused to join in *Gates*." JA43. But the district court's approach reads *Gates* to join the other camp that it declined to join by holding that a party invoking 23(c)(4) does not need to satisfy Rule 23(b)(3). *Gates* held no such thing.

13

In fact, this Court has never held that satisfying the *Gates* factors alone is enough to certify an issues class under Rule 23.  *Hohider* decertified a class claim for injunctive relief under Rule 23(b)(2) while severing claims for other kinds of relief.  *See* 574 F.3d at 200.  After rejecting certification of a class under Rule 23(b)(2), this Court held that it need not address a potential issues class under Rule 23(c)(4) "given the class certification's other defects."  *Id*.  The Court specifically declined to address "[t]he interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issues classes under Rule 23(c)(4)."  *Id*. at 200 n.25.

What's more, since *Gates*, this Court affirmed a district court's *refusal* to certify an issues class under Rule 23(c)(4) in *Gonzalez*.  Citing *Gates*, the Court said that the Rule 23(c)(4) inquiry is "analytically independent from the predominance inquiry under Rule 23(b)(3)."  *Gonzalez*, 885 F.3d at 202.  Read in context, that statement is technically correct, since Rule 23(c)(4) adds the independent (though surely overlapping) requirement that class adjudication of particular issues must be "appropriate."  *Gonzalez* hardly implies that issues classes are an entirely distinct type of class action exempt from Rule 23(b).  Regardless, the case found that the certification of an issues class was inappropriate when plaintiffs "offer no theories of liability for which classwide treatment is apt."  *Id*. at 203.

14

Both the Supreme Court and this Court have issued decisions since *Gates* confirming that Rule 23(c)(4) does not provide an end run around Rule 23(b). In *Comcast*, the Supreme Court explained that a party seeking class certification "*must . . .* satisfy through evidentiary proof *at least one* of the provisions of Rule 23(b)." 569 U.S. at 33 (emphasis added). Relying on *Comcast*, this Court has since clarified, in an unpublished decision, that a plaintiff must "satisf[y] Rule 23(a) and 23(b)'s requirements" before "seek[ing] certification under Rule 23(c)(4) as to particular issues." *Luppino v. Mercedes Benz USA*, 718 F. App'x 143, 146 (3d Cir. 2017).

Moreover, even if this Court reads *Gates* to hold that district courts need not consider predominance and superiority *in addition* to the *Gates* factors, such a holding would still not establish that factors relevant to Rule 23(b)(3)'s criteria do not apply to an "issues" class. Properly applied, several of the *Gates* factors overlap with Rule 23(b)(3)'s predominance and superiority requirements. For example, *Gates* instructs district courts to consider "the type of claims . . . in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; [and] the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues." *Gates*, 655 F.3d at 273. Each of these appropriateness factors reflects a concern with ensuring the role that common issues play in the larger litigation and ensuring that class litigation is the best method for

15

resolution of the cause of action—the very same concerns relevant to Rule 23(b)(3). So whether or not Rule 23(b)(3) formally governs class adjudication under Rule 23(c)(4), such adjudication would not be "appropriate," as the latter provision requires, unless the case as a whole satisfies the normal predominance and superiority analysis.

## II. The District Court's Decision Invites a Wave of Class Action Abuse.

The district court's misreading of Rule 23(c)(4) will permit a flood of abusive class actions, with troubling and far-reaching consequences for businesses, shareholders, employees, customers, and the judicial system.

Certification of a class action massively raises the litigation stakes, creating enormous pressure on defendants to settle. The Supreme Court has cautioned that a defendant may be "pressured into settling questionable claims" by "even a small chance of a devastating loss." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011); *see also, e.g.*, *Shady Grove Orthopedic Assocs v. Allstate Ins. Co.*, 559 U.S. 393, 445 n.3 (2010) (Ginsburg, J., dissenting) ("A Court's decision to certify a class . . . places pressure on the defendant to settle even unmeritorious claims."); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense."). As a result, "[e]ven a complaint which by objective standards may have

16

very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975).

Unsurprisingly then, defendants often cannot withstand this pressure and enter "in terrorem settlements" of meritless class actions. *Concepcion*, 563 U.S. at 350. "In reality, virtually all certified class actions subsequently settle; very few certified class actions proceed to trial." Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 Emory L.J. 399, 419 (2014).

The unfair settlement pressure will multiply even further if courts misread Rule 23(c)(4) to fall outside the Rule 23(b) requirements. By limiting the types of actions eligible for class treatment, Rule 23(b) attempts to confine the settlement pressure to cases where the benefits of class treatment likely outweigh the costs.

But even Rule 23(b)(3)'s requirements are not a perfect safeguard. Indeed, those criteria already err on the overinclusive side, allowing certification in questionable cases. The Supreme Court has acknowledged that Rule 23(b)(3), which permits damages suits on behalf of a class when common questions predominate, is an "adventuresome innovation" that "is designed for situations in which class-action treatment is not as clearly called for." *Comcast*, 569 U.S. at 34 (quotation marks and citation omitted). As a result, Rule 23 limits the potential for abuse of Rule 23(b)(3) classes by imposing additional "procedural safeguards" not required for other class

17

actions, and by imposing on courts a "duty to take a close look at whether common questions predominate over individual ones." *Id*.

The categories and numbers of cases eligible for class certification is unlimited, however, if courts misread Rule 23(c)(4) to authorize issues classes even though the case as a whole does not satisfy Rule 23(b)'s requirements. As noted, *see supra* at 11, when a group of individuals suffers an injury, it will almost always be possible to identify *some* common legal or factual question. *See Wal-Mart*, 564 U.S. at 349. The pressure on defendants to settle will accordingly expand in direct proportion to the vast expansion of class actions certified.

The cost of the resulting class-action abuse will reverberate through the economy. Businesses will expend substantial resources defending against this new category of class action. And they will ultimately pass along these increased litigation costs to consumers through higher prices. The courts will also bear the burden of resolving disputes about a new type of class action proceeding with no text governing its contours.

18

# CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed.

Dated: September 9, 2020               Respectfully submitted,

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey
MCGUIREWOODS LLP
2001 K. Street, N.W.
Suite 400
Washington, D.C. 20006
T: (202) 828-2829
F: (202) 828-3329
gdickey@mcguirewoods.com

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
F: (804) 698-2251
mfitzgerald@mcguirewoods.com

Steven P. Lehotsky
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
T: (202) 463-5337

*Counsel for* Amicus Curiae
*Chamber of Commerce*
*of the United States of America*

JA2041

## CERTIFICATE OF COMPLIANCE AND BAR MEMBERSHIP

1.     Pursuant to Local Rule 28.3(d), I, Gilbert C. Dickey, certify that I am a member in good standing of the bar of this Court.

2.     This brief complies with the type-volume requirements of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,264 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) and 3d Cir. L.A.R. 32.1(c) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

4.     Pursuant to Local Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text of the paper copies, and that the brief has been scanned for viruses using FireEye Endpoint Protection, Version 38.28.8, and no virus was detected.

Dated: September 9, 2020                    */s/ Gilbert C. Dickey*
                                            Gilbert C. Dickey

                                            *Counsel for* Amicus Curiae
                                            *Chamber of Commerce*
                                            *of the United States of America*

20

JA2042

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2020, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Third Circuit using the appellate

CM/ECF system, which will also serve counsel of record.


*/s/ Gilbert C. Dickey*
Gilbert C. Dickey

*Counsel for* Amicus Curiae
*Chamber of Commerce*
*of the United States of America*

No. 20-2128

In the United States Court of Appeals for
the Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL,
and DESIRE EVANS, on behalf of themselves and all others
similarly situated,
*Appellees*,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
*Appellant.*

On Petition for Permission to Appeal from the United States
District Court for the Eastern District of Pennsylvania,
No. 2:18-cv-05629-JDW (Wolson, J.)

## BRIEF OF APPELLEES

JANET, JANET & SUGGS, LLC
  Patrick A. Thronson
  Brenda A. Harkavy
  4 Reservoir Circle, Suite 200
  Baltimore, MD 21208
  (410) 653-3200

PUBLIC CITIZEN LITIGATION
GROUP
  Scott L. Nelson
  1600 20th St. NW
  Washington, D.C. 20009
  (202) 588-1000

LAW OFFICES OF PETER G. ANGELOS, P.C.
  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th Floor
  Baltimore, Maryland 21201
  (410) 649-2000

SCHOCHOR, FEDERICO AND STATON
  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

CONRAD O'BRIEN P.C.
  Nicholas M. Centrella
  Robin S. Weiss
  1500 Market Street, Suite 3900
  Philadelphia, PA 19102-2100
  (215) 864-9600

Z LAW, LLC
  Cory L. Zajdel
  2345 York Rd. Suite B-13
  Timonium, MD 21093
  (443) 213-1977

*Counsel for Appellees*

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF RELATED PROCEEDINGS ...................................... 1

STATEMENT OF THE CASE .................................................................. 1

SUMMARY OF ARGUMENT ................................................................ 16

STANDARD OF REVIEW ...................................................................... 20

ARGUMENT ........................................................................................... 22

   I.   The district court did not abuse its discretion in finding that
Plaintiffs satisfy the elements of typicality and adequacy. ................. 22

     A.  The Plaintiffs' claims are typical. ................................................. 22

     B.  ECFMG's claim that Plaintiffs will "inflict emotional distress"
on the class is false and speculative. ................................................. 27

     C.  The district court correctly concluded that certification will
not create claim-splitting problems for class members ..................... 30

iii

II.  Certification of a Rule 23(c)(4) issue class does not require a finding that a claim as a whole satisfies Rule 23(b). ...........................33

  A.  The district court's application of *Gates* satisfied Rule 23(b)(3). 33

  B.  Rule 23(c)(4) certification does not require that a class's cause of action as a whole satisfy Rule 23(b)(3)...........................................39

III.  The district court did not abuse its discretion under Gates........51

  A.  The district court thoroughly considered the *Gates* factors. .......51

  B.  Plaintiffs addressed choice of law....................................................52

  C.  The district court did not abuse its discretion in determining that Pennsylvania law applies. ........................................................55

  D.  There is no per se bar on issue certification of claims involving emotional harm. ................................................................................57

  E.  Considerations of efficiency favor issue certification. .................63

  F.  ECFMG's alarmism concerning issue-class certification is unfounded.........................................................................................66

CONCLUSION ...................................................................................67

JA2047

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aiello v. Providian Financial Corp.,*
239 F.3d 876 (7th Cir. 2001)............................................................60, 61

*Bohus v. Beloff,*
950 F.2d 919 (3d Cir. 1991) .............................................................32, 33

*Bolin v. Sears, Roebuck & Co.,*
231 F.3d 970 (5th Cir. 2000).................................................................46

*Butler v. Sears, Roebuck & Co.,*
702 F.3d 359 (7th Cir. 2012).................................................................38

*Butler v. Sears, Roebuck & Co.,*
727 F.3d 796 (7th Cir. 2013).............................................................38, 47

*Castano v. Am. Tobacco Co.,*
84 F.3d 734 (5th Cir. 1996)........................................................20, 39, 45

*Charron v. Pinnacle Grp. N.Y. LLC,*
269 F.R.D. 221 (S.D.N.Y. 2010).............................................................33

*Chiang v. Veneman,*
385 F.3d 256 (3d Cir. 2004) ..................................................................34

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013).................................................................................38

v

*Corley v. United States,*
   556 U.S. 303 (2009) ............................................................... 44

*Dewey v. Volkswagen Aktiengesellschaft,*
   681 F.3d 170 (3d Cir. 2012) .................................................... 28

*Gasoline Products Co. v. Champlin Refining Co.,*
   283 U.S. 494 (1931)............................................................... 58

*Gates v. Rohm & Haas Co.,*
   655 F.3d 255 (3d Cir. 2011) ........................................... passim

*General Telephone Company of Southwest v. Falcon,*
   457 U.S. 147 (1982).............................................................. 25

*Gorman v. Costello,*
   929 A.2d 1208 (Pa. 2007) ..................................................... 65

*Grainy v. Campbell,*
   425 A.2d 379 (Pa. 1981)........................................................ 65

*Griffith v. United Air Lines, Inc.,*
   203 A.2d 796 (Pa. 1964) ....................................................... 53

*Gunnells v. Healthplan Servs., Inc.,*
   348 F.3d 417 (4th Cir. 2003)......................................... passim

*Hamilton v. Ford Motor Credit Co.,*
   502 A.2d 1057 (Md. Ct. Spec. App. 1986) ...................... 53, 55

*Healy v. Beer Inst., Inc.,*
   491 U.S. 324 (1989).............................................................. 56

vi

*Hohider v. United Parcel Serv., Inc.*,
  574 F.3d 169 (3d Cir. 2009) ................................................... 34

*In re A.H. Robins*,
  880 F.2d 709 (4th Cir. 1989) ................................................ 43

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) .................................................. 21

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ........................................... 46, 47

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ................................................... 22

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008), *as amended* ............................. 34

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ................................................. 66

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) ................................. 42, 43, 44, 45

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ..................................... 22, 23, 24

*In re Paoli R.R. Yard PCB Litig.*,
  113 F.3d 444 (3d Cir. 1997) ................................................. 64

*In re Prudential*,
  148 F.3d 283 (3d Cir. 1998) ................................................. 25

*In re Rodriguez,*
    695 F.3d 360 (5th Cir. 2012) ................................................................ 46

*In re St. Jude Med., Inc.,*
    522 F.3d 836 (8th Cir. 2008) ................................................................ 45

*In re Suboxone Antitrust Litig.,*
    967 F.3d 264 (3d Cir. 2020) ................................................ 21, 30, 31, 62

*In re Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004) ................................................................ 23

*Johnson v. SmithKline Beecham Corp.,*
    724 F.3d 337 (3d Cir. 2013) ................................................................ 21

*Kleinknecht v. Gettysburg Coll.,*
    989 F.2d 1360 (3d Cir. 1993) .............................................................. 63

*Lacey v. Cessna Aircraft Co.,*
    932 F.2d 170 (3d Cir. 1991) ...................................................... 54, 55, 56

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012) ................................................................ 23

*Martell v. Boardwalk Enters., Inc.,*
    748 F.2d 740 (2d Cir. 1984) ................................................................ 60

*Martin v. Behr Dayton Thermal Prods. LLC,*
    896 F.3d 405 (6th Cir. 2018) ........................................................ passim

*McQuilken v. A & R Dev. Corp.,*
    576 F. Supp. 1023 (E.D. Pa. 1983) ...................................................... 33

viii

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  672 F.3d 482 (7th Cir. 2012) .................................................. 45

*Murray v. Bledsoe*,
  650 F.3d 246 (3d Cir. 2011) ................................................... 27

*New Directions Treatment Svcs. v. City of Reading*,
  390 F.3d  (3d Cir. 2007) ........................................................ 28

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) ........................................... 25, 26

*Parsky v. First Union Corp.*,
  51 Pa. D. & C.4th 468 & n.28 (Com. Pl. 2001) .............. 52, 53

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .................................................. 25

*Pryer v. C.O. 3 Slavic*,
  251 F.3d 448 (3d Cir. 2001) ................................................... 59

*R.W. v. Manzek*,
  888 A.2d 740 (Pa. 2005) ........................................................ 63

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3d Cir. 2018) ................................................... 22

*Rosa v. City of Chester*,
  278 F.2d 876 (3d Cir. 1960) ................................................... 60

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
  211 F.3d 1228 (11th Cir. 2000) .............................................. 60

ix

*Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ................................................................. 58

*Slade v. Progressive Security Insurance Co.*,
   856 F.3d 408 (5th Cir. 2017) ........................................... 31, 32

*Spence v. Board of Education of Christina School District*,
   806 F.2d 1198 (3d Cir. 1986) ........................................... 58, 59

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ................................................. 45

*Walters v. Mintec/Int'l*,
   783 F.2d 73 (3d Cir. 1985) ..................................................... 60

## Statutes

40 Pa. Stat. Ann. § 1303.503 (West 2020) ................................................ 32

## Rules

Fed. R. Civ. P. 23 ............................................................. passim

Fed R. Civ. P. 42(b) ................................................................. 59

Fed R. Civ. P. 49 ...................................................................... 64

## Regulations

231 Pa. Code Rule 1042.1 (West 2020) ...................................... 32

x

# Other Authorities

## Treatises:

Newberg on Class Actions (5th ed., June 2020 update) ............. 24, 30, 48

Pennsylvania Suggested Standard Civil Jury Instructions
(5th ed. 2020) ......................................................... 65

Principles of the Law of Aggregate Litigation
(Oct. 2020 update) .................................................. 34, 37, 52

Restatement (Second) of Conflicts of Law § 148 .............................. 54, 56

Restatement (Second) of Judgments § 24 (1982) ................................... 30

Restatement (Second) of Torts § 324A ...................................... 17

## Law Review Articles:

Stephen B. Burbank, The *Rules Enabling Act of 1934*, 130 U.
Pa. L. Rev. 1015 (1982) ................................................. 57, 58

Elizabeth Chamblee Burch, *Constructing Issue Classes*, 101
Va. L. Rev. 1855 (2015) ..................................................... 47

Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class
Action*, 92 N.Y.U. L. Rev. 846 (2017) ................................... 48

Patrick Wooley, *Choice of Law and the Protection of Class Members in
Class Suits Certified Under Federal Rule of Civil Procedure 23(b)(3)*,
2004 Mich. St. L. Rev. 799 (2004) ....................................... 52

JA2054

# STATEMENT OF THE ISSUES

Did the district court abuse its discretion in certifying the issues of duty and breach under Federal Rule of Civil Procedure 23(c)(4), where one negligent course of conduct by one defendant caused one type of injury to Plaintiffs and the class, who share the same legal relationship with the defendant?

# STATEMENT OF RELATED PROCEEDINGS

This case has not previously been before this Court. The matters listed in Appellant's Addendum containing its Statement of Related Cases are not pertinent to this appeal or the underlying litigation.

# STATEMENT OF THE CASE

This action arises from allegations that Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") negligently investigated and certified Oluwafemi Charles Igberase, a/k/a John Nosa Akoda (among other aliases), as eligible to enter a residency program, notwithstanding compelling evidence that Igberase/"Akoda" had committed extensive fraud as to his identity and credentials. As Plaintiffs allege, ECFMG knew of Igberase's fraud, but failed to appropriately investigate and respond to it. ECFMG failed to inform state medical

1

boards, residency programs, and hospitals of Igberase's fraud, even as it attested that Igberase held a valid ECFMG certification.

ECFMG acknowledged that "patients have the right not to be treated by physicians who have obtained ECFMG certification based on false pretenses." JA644. Yet ECFMG failed to respect this right and protect the public. As a result, Igberase had the opportunity to examine, touch, harass, and sexually abuse hundreds of women under the guise of providing OB/GYN care. These patients would never have consented to examination and treatment by Igberase had they known—as ECFMG did—that Igberase had obtained his credentials through repeated acts of fraud, later found to constitute a "crime of moral turpitude." JA322, 1363.

### *ECFMG's Role in the American Healthcare System*

According to Appellant, "[p]art of ECFMG's mission is to promote public health and to protect the public." JA643. ECFMG certifies international medical graduates ("IMGs," defined as those who attend medical school outside the U.S. and Canada) as eligible to enter US graduate medical education programs, and verifies an IMGs credentials for hospitals and state medical licensing boards. JA201, 642–44, 689.

2

To practice medicine in the U.S., an IMG must first apply to ECFMG, which verifies from primary sources that the IMG has obtained a valid diploma from a medical school recognized by the school's home country. *See* JA205–06. An IMG must also pass portions of the United States Medical Licensing Examination (USMLE) and a clinical skills assessment. *Id.* When these steps are satisfactorily completed, ECFMG issues a certificate to the IMG. *Id.* ECFMG also acts as a dean's office for IMG's applying to residency programs. JA367.

### *Igberase obtains initial ECFMG certification after failing medical examination twice.*

In 1992, Igberase applied to ECFMG to take the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS")—the initial phase of the USMLE examination—and the ECFMG English Test. JA211. Igberase provided ECFMG with a purported 1987 diploma from the University of Ibadan in Nigeria. *See* JA216.

Igberase twice failed both the basic medical science and clinical science components of the FMGEMS. JA219. He passed the exam on the third try. *Id.* ECFMG issued him a certificate in 1993 after he passed steps 1 and 2 of the USMLE. JA239–40.

3

***Igberase obtains second certification under the "Charles" identity. ECFMG investigates and revokes Igberase's certification.***

In 1994, ECFMG received a second application from Igberase, using the name "Igberase Oluwafemi Charles," to take steps 1 and 2 of the USMLE examination (again). JA242–44. His application falsely represented he had never taken the USMLE examination before. *Id.* After "Charles" successfully completed the USMLE examinations, ECFMG issued him a certificate under the Charles identity. JA239.

Shortly thereafter, ECFMG investigated whether Igberase and Charles were the same person. JA239–40. Igberase admitted he had lied about his identity and examination history because residency programs had rejected him for repeatedly failing the USMLE examinations. JA246–50.

ECFMG referred the matter to its Committee on Medical Education Credentials. The Committee found Igberase had engaged in "irregular behavior," invalidated the certificate issued to "Charles" and revoked Igberase's original certificate. JA252. In 1996, after Igberase appealed,

4

ECFMG's Review Committee for Appeals limited the period of revocation to five years. JA260–61.

### *Igberase applies and is certified under the "Akoda" identity.*

While appealing this revocation, Igberase submitted a third application to ECFMG to take Steps 1 and 2 of the USMLE examination under the name "John Nosa Akoda." JA263, JA268. This time, he provided ECFMG a purported 1988 diploma issued to "Johnbull Enosakhare Akoda" from the University of Benin. JA753. ECFMG takes no position on where or whether Igberase/"Akoda" actually went to medical school. JA653. It merely claims that it verified both diplomas from primary sources. *Id.* It did not, however, verify Akoda's purported certificate of registration as a physician in Nigeria. *Id.*

After he passed the required examinations, ECFMG issued "Akoda" a certificate in 1998. *See* JA275. Akoda then entered a residency program at Jersey Shore Medical Center (JSMC). JA276. ECFMG sent a permanently validated ECFMG certificate for Akoda to JSMC. *See id.*

### *ECFMG learns Akoda and Igberase are the same person.*

In August 2000, JSMC notified ECFMG it was investigating whether Akoda had used a Social Security number issued to Igberase. *See*

5

JA279. ECFMG sent Akoda a "charge letter" advising it had received information alleging he may have engaged in irregular behavior and demanded a written explanation within fifteen days. *See* JA284–85. Akoda admitted he used the Social Security number of his "cousin" Igberase Oluwafemi Charles. *See* JA287.

Akoda met with William Kelly, Manager of ECFMG's Medical Education Credentials Department. This was not the first time Kelly had met Igberase/Akoda: Kelly attended a hearing on the revocation of Igberase's certificate, where Igberase testified. JA365. Igberase again admitted he had used his cousin's Social Security number, and presented a purported Nigerian passport and "international driving permit." JA289, 358. ECFMG did not verify the documents. JA671.

In December 2000, ECFMG learned that JSMC dismissed Akoda from its residency program, because he had used a false Social Security number and provided JSMC with two inconsistent green cards. JA291.

In a December 22, 2000 memorandum that Kelly intentionally left out of "Akoda's" official file, Kelly stated he and the director of JSMC's residency program believed that Igberase and Akoda were the same person. JA293. Somehow, Kelly did not think there was enough

6

information to refer the matter to the ECFMG's Credentials Committee for investigation. *Id.* Had the Committee known, Kelly acknowledges, it would have investigated and charged Akoda with "providing false information to ECFMG on an application, among other things," JA366, as it did after Igberase's initial fraudulent application in his own name.

### *ECFMG nonetheless represents to Howard University's residency program, the State of Maryland, and Prince George's Hospital Center that "Akoda" has a valid ECFMG certificate.*

In October 2006, Akoda used ECFMG's Electronic Residency Application System (ERAS) to apply for residency at Howard University Medical Center. The application included three purported letters of reference. JA295. Although not part of the ERAS process (JA367), Kelly undertook to verify the letters' authenticity (JA297), because he doubted Akoda's credibility (JA367). He never received responses from the supposed authors. JA675. Kelly never notified anyone outside the organization of his concerns (JA676–77), and ECFMG did not investigate the matter further (JA675).

Later, ECFMG verified Akoda had a valid ECFMG certificate to the Maryland Board of Physicians and Prince George's Hospital Center (PGHC). In 2011, Akoda obtained privileges and became a member of the

7

medical staff at PGHC. JA312. He began seeing patients there in 2011. JA100 at ¶ 30.

ECFMG never notified any residency program, hospital, or other entity of the concerning information it had obtained regarding Igberase/Akoda's character and fitness—and the conclusions it drew from that information—until law enforcement became involved. JA676–77.

### *Igberase faces six felony charges and pleads guilty to one.*

Law enforcement contacted ECFMG regarding Akoda in approximately 2015. JA676 at 18. ECFMG had not investigated the matter further since his residency application. JA675. In 2016, officers executed search warrants at Igberase's residence, medical office and vehicle. JA100. They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation and birth certificates. *Id.*

Igberase was charged with six felony counts. JA319. On November 15, 2016, Igberase signed a plea agreement admitting to felony misuse of a Social Security number to obtain a medical license. JA313.

In 2017, the United States District Court for the District of Maryland sentenced Igberase to six months incarceration, followed by

8

probation. JA101 at ¶ 37. PGHC terminated his privileges and the
Maryland Board of Physicians revoked "Akoda's" medical license. *Id.* at
¶¶ 38–39.

ECFMG's brief misleadingly implies that ECFMG was not aware
until the guilty plea that "Akoda"—who is not a licensed physician—had
twice before applied to ECFMG under two different names. Br. 6. The
evidence indicates ECFMG knew of Igberase's fraudulent behavior for
many years before Igberase was charged.

### *Plaintiffs suffer emotional harm.*

Plaintiffs claim a common injury: wrongful touching of their bodies
based on the false pretense that Igberase was a properly credentialed
physician. This injury occurred as a result of ECFMG's negligence in
certifying Igberase/Akoda and in failing to notify hospitals and medical
boards when it knew Igberase had obtained the Akoda certification
through fraud.

The named Plaintiffs suffered injuries representative of those
suffered by numerous class members:

- Desire Evans: Igberase touched Ms. Evans's clitoris during her
  labor, claiming he needed to do so to help her push. JA1270.
  She is afraid to seek medical care for her and her child, and
  has lost trust in the medical system. JA1278.

9

- Elsa M. Powell: Igberase provided prenatal care to Ms. Powell. Igberase repeatedly made inappropriate advances and comments, including stating her breasts were "nice." JA1174. Igberase delivered Ms. Powell's baby. JA1174. The delivery was complicated by significant bleeding requiring additional medical care. JA1306. She trusted that Igberase was a duly licensed and credentialed physician and suffered emotional harm upon learning that the individual she trusted to touch the most intimate parts of her body and deliver her baby had lied about his identity and background. *Id.*

- Jasmine Riggins: Igberase provided Ms. Riggins prenatal care and delivered her baby. JA1143. She suffered severe abdominal pain and could not have her tubes tied because of scarring. JA429. After learning the truth about Igberase from a Facebook group, "Embracing Mommies," Ms. Riggins felt angry, sad, embarrassed, and ashamed about receiving treatment from Igberase. JA436, JA443. She was deeply affected by what Igberase did, and felt outraged because his dishonesty enabled him to perform C-sections, examine women's genitals, touch and violate them. JA456.

- Monique Russell: Igberase delivered Ms. Russell's baby by emergency C-section. JA394. She learned of Igberase's guilty plea from a Department of Justice press release. Ms. Russell read the federal sentencing transcript. JA359–96. She feels Igberase violated her and has difficulty going to the gynecologist, distrusts the medical community, and distrusts institutions that credential doctors. JA403. Ms. Russell also suffers from intimacy issues and anxiety, and feels like a victim of sexual assault because Igberase examined her vagina under false pretenses. JA415, JA417.

A report provided by psychiatrist Annie Steinberg, M.D., Clinical

Professor at the Perelman School of Medicine, incorporating information

10

from responses to a questionnaire completed by 306 of approximately 500 former patients of Igberase whom Class Counsel represent, revealed that nearly half of participants felt uncomfortable during Akoda's exams and over 89 percent suffered emotional distress from Akoda's conduct and/or from learning that he practiced medicine under false pretenses. JA182, 580, 585, 587.

Because none of Igberase's patients knew his true identity or of his fraudulent background and conduct (JA102 at ¶¶ 44–45), they could not give informed consent to be touched by him (*id.* at ¶ 46). On many occasions, Igberase committed battery by touching and digitally penetrating patients without consent and on false pretenses, and by examinations of a sexual nature. *Id.* at ¶ 47. He also used inappropriate language. *Id.*

### *Procedural History*

In December 2018, named Plaintiffs Russell, Riggins, Powell, and Evans sued ECFMG in the Court of Common Pleas of Philadelphia, asserting claims of negligence and negligent infliction of emotional distress on behalf of a putative class. JA102; JA91–125. ECFMG removed

11

the case to the United States District Court for the Eastern District of Pennsylvania. JA83–88.

After substantial discovery, Plaintiffs filed a Motion for Class Certification in the district court. JA167–198. The Motion sought certification under Federal Rule of Civil Procedure 23(c)(4) of a class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." JA182–83. Specifically, the motion sought certification of "liability for the causes of action of the class members: negligence ... and negligent infliction of emotional distress," or, in the alternative, certification of nine class issues, including the four ultimately certified by the district court. JA182–83.

Following extensive briefing and oral arguments, the district court analyzed each of Rule 23's relevant requirements in depth. The court found Plaintiffs had properly defined an ascertainable class. JA46–48. It found the class sufficiently numerous to satisfy Rule 23(a)(1) because, as ECFMG did not dispute, the number of potential class members—"at least 712 people"—precluded joinder. JA48–49. And it found Rule 23(a)(2)'s commonality requirement satisfied—a finding ECFMG does not challenge on appeal. *Id.*

12

The court likewise found Rule 23(a)(3)'s typicality requirement satisfied. JA51–53. As it explained, "Plaintiffs' claims are typical of class members to the extent that the class members consist of Igbarese's patients during and after his residency" because all the claims "arise from the same legal theory: negligence" and from "a single course of conduct by ECFMG: the certification and subsequent (allegedly inadequate) investigation of his identity." JA52. The court, however, excluded JSMC patients from the class because their claims differ from those of the named Plaintiffs. JA53.

The court rejected ECFMG's argument that the Plaintiffs are not typical because their claims involve emotional damages and Igberase might have physically harmed other class members. *Id.* The court ruled that such distinctions did not "overcome the fact that Plaintiffs' claims arise from the same facts and legal theories as members of the class," and that any member of the class who wanted to assert claims against ECFMG for additional injuries "will have the opportunity to opt out of the class and assert those claims individually." *Id.* Further, certification would not prevent class members from asserting claims for other injuries against Igberase. *Id.*

13

The district court also found the class representatives satisfy Rule 23(a)(4)'s adequacy requirement. JA54. As the court noted, adequacy is only impaired by a "fundamental" conflict, which occurs when "some class members benefitted from conduct that harmed other class members." *Id.* (citation omitted). No class member benefited here. *Id.*

The court then considered whether to certify an issue class under Rule 23(c)(4), applying the factors set forth in this Court's opinion in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011). The court rejected Plaintiffs' request for certification on liability for the class members' causes of action, because such certification would encompass elements of causation and harm that the court considered too individualized. JA56–57.

Addressing Plaintiffs' alternate request for certification of nine specific issues, the court first stated that it would not certify damages issues or whether ECFMG was liable for assisting Igberase in committing fraud. JA59. But the court did find that issues concerning "whether ECFMG had a relevant legal duty and whether it breached that duty" were appropriate for certification. *Id.*

14

Applying *Gates*, the court concluded that the four "questions of duty

and breach favor issue certification because they are questions of law

and/or fact common to all class members and subject to common proof."

JA59–60. The court found that all class members are "identical in terms

of their legal relationship to ECFMG," such that "ECFMG owes the same

duty (if any)" to all. JA60. Likewise, whether ECFMG breached its duty

"is a common question of fact for each prospective class member," because

it turns on ECFMG's conduct, not that of individual class members. JA60.

The court found that certifying a class on duty and breach would

permit "a single, preclusive determination about ECFMG's conduct" and

avoid repetitive presentation of the same extensive evidence to one jury

after another. *Id.* Moreover, no other similarly efficient "procedural

alternatives" were available. *Id.* For example, the court observed that

there is no guarantee that collateral estopped would enable a single,

controlling resolution, because ECFMG would not be able to use a

possible favorable decision against a different plaintiff in a later case. *Id.*

Finally, the court concluded that certifying an issue class would not

"trigger any of the problems about which courts must be mindful under

*Gates*." JA61. Partial certification will not impair a class member's

15

statutory or constitutional rights or affect any indivisible remedies, and the individual proceedings on causation and damages will not impact one another. And issue certification will not implicate Seventh Amendment problems, because juries in subsequent individual proceedings will not reconsider the class jury's factual determinations. *Id.*

The district court accordingly certified an issue class under Rule 23(c)(4), comprising all patients treated by Igberase since he entered Howard in 2007. JA63–64. The certification identified four issues for classwide resolution: (1) whether ECFMG undertook or otherwise owed a duty to class members; (2) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable to class members pursuant to Restatement (Second) of Torts § 324A; (3) whether ECFMG breached any duty that it owed to class members; and (4) whether ECFMG breached any duty that it owed to hospitals and state medical boards. *Id.* at 2.

## SUMMARY OF ARGUMENT

The elements of duty and breach central to Plaintiffs' negligence claims are tailor-made for issue class certification. These claims concern a single course of conduct (negligent certification and investigation of

16

Igberase), in one state (Pennsylvania), by a single defendant (ECFMG), that gave rise to claims based on a single legal theory (negligence) common to all class members, and that resulted in the same type of injury (emotional harm). ECFMG's duties, or breaches of those duties, do not differ as to any class members. No class members are subject to unique defenses or have fundamental conflicts of interest with the class. Far from constituting an abuse of discretion, certifying the elements of duty and breach for classwide treatment carries out the text and spirit of Rule 23.

ECFMG's brief never confronts the core realities of the litigation or the district court's appropriate use of Rule 23(c)(4) as a case management tool. It proceeds largely through misdirection, seeking to shift the focus from evidence to speculation, from the record that exists to the record-as-wished-for, from settled precedent to novel or discredited theories.

ECFMG begins its attack with the Rule 23(a) elements of typicality and adequacy, which it treats synonymously. ECFMG does not address the well-grounded reasoning and precedent supporting the district court's finding that the named Plaintiffs' claims are typical because they arise from exactly the same circumstances as those of the class. ECFMG would have plaintiffs "prove," and district courts "find," what constitutes a

17

typical harm among hundreds of class members before a class is even
certified. No case ECFMG cites even recommends such unworkable
certification procedures, let alone requires them.

ECFMG's attack on the district court's finding of adequacy is
equally flawed. ECFMG challenges Plaintiffs' adequacy because they
supposedly seek to "inflict emotional distress" on class members (Br. 22)
by informing them they were treated by Igberase. ECFMG's judgment
that it is better for class members to be kept in ignorance is not grounded
in precedent. Moreover, class counsel already represent several hundred
likely class members, and the record shows the vast majority learned of
Igberase's conduct through news coverage, which was extensive.
ECFMG's claim that notice of the class action will harm class members,
or even surprise them, is speculative.

ECFMG's alternative argument that Plaintiffs are inadequate
because they "abandoned" class members' hypothetical claims for physical
injury is also unsupported by the record. ECFMG identifies no class
members with such claims. As the district court correctly observed,
certification will not bar class members from suing Igberase and entities
that provided medical care to them, and members who wish to pursue

18

non-emotional harm claims against ECFMG can opt out. Suing ECFMG, a non-healthcare provider, for medical malpractice does not appear possible under Pennsylvania law, and is likely also barred by the statute of limitations.

ECFMG's contention that the district court erred by certifying an issue class without separately analyzing Rule 23(b)(3) is misguided. The district court applied the *Gates* factors, which incorporate the necessary analysis under Rule 23(b)(3) and (c)(4). The American Law Institute developed those factors to address the interplay between those two sections of Rule 23. The Court should not accept ECFMG's invitation to rewrite *Gates* by adopting a footnote from *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), which *Gates* expressly declined to adopt, and which conflicts with the consensus of courts and the Advisory Committee on Civil Rules. The *Gates* factors provide a roadmap to determine whether aggregate treatment of common issues is warranted, and ensure that issue classes are certified only when classwide resolution of common issues meaningfully advances fair and efficient disposition of cases.

Finally, the district court's findings as to the *Gates* factors were well within its discretion. The district court correctly ruled Pennsylvania law

19

applies to claims based on a Pennsylvania corporation's conduct in Pennsylvania. ECFMG attempts to circumvent that ruling by invoking a section of the Restatement (Second) of Conflicts of Law different from the one both ECFMG and the district court relied on below. The cited provision, however, applies to claims for pecuniary loss resulting from fraud, not negligence claims for emotional harm damages.

ECFMG also seeks to erect a per se bar against class treatment of any issue in a claim seeking damages for emotional harm. No precedent suggests this result, which violates the fundamental principle that the Federal Rules of Civil Procedure apply trans-substantively, i.e., in the same manner to all claims. District courts managing cases including claims for emotional-harm damages should not be deprived of the efficiencies Rule 23(c)(4) can achieve when, as here, the alternative is to litigate identical questions hundreds of times, with potentially varying results.

## STANDARD OF REVIEW

District courts have "broad discretion" to certify classes, *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009). This court reviews certification for abuse of discretion, "which occurs if the district

20

JA2074

court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 269 (3d Cir. 2020) (citation and quotes omitted). A factual finding is clearly erroneous only if the appellate court is "'left with the definite and firm conviction that a mistake has been committed.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013) (citation omitted).

The abuse of discretion standard applies both to the ultimate certification decision and to rulings on individual prerequisites to certification. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34 (2d Cir. 2009). Review is "particularly deferential" on interlocutory appeal of class certification. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). If this Court finds a district court's certification analysis insufficiently rigorous, the appropriate remedy is remand, not reversal. *Reinig v. RBS Citizens, N.A.,* 912 F.3d 115, 130 (3d Cir. 2018).

21

# ARGUMENT

**I.   The district court did not abuse its discretion in finding that Plaintiffs satisfy the elements of typicality and adequacy.**

**A.   The Plaintiffs' claims are typical.**

**1.   Precedent contradicts ECFMG's assertion that harm must be typical.**

Federal Rule of Civil Procedure 23(a)(3) requires that class representatives' claims be "typical of the claims ... of the class." This Circuit has "set a 'low threshold' for typicality." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016), *as amended* (May 2, 2016) (citation omitted). The typicality prong is normally met where "claims of representative Plaintiffs arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

Courts consider three factors in evaluating typicality: (1) the class representatives' claims should mirror the class's claims relative to "(a) the legal theory advanced and (b) the factual circumstances underlying that theory"; (2) the class representatives' claims should not be subject to defenses that are "inapplicable to many members of the class and likely to become a major focus of the litigation"; and (3) the class representatives'

22

interests and incentives should align with those of the class. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). Even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re NFL Players*, 821 F.3d at 428 (quotes omitted).

The district court appropriately applied these criteria. JA51–52. It found Plaintiffs' claims were typical of those of class members Igberase treated at Howard and in Maryland because "[a]ll of the claims arise from the same legal theory: negligence" and "a single course of conduct by ECFMG: the certification and subsequent (allegedly inadequate) investigation of his identity." JA52. There was no evidence Plaintiffs were subject to unique defenses or had interests opposed to the class. *Id.*

ECFMG does not contest these findings. Instead, it attempts to shift the conversation by urging the Court to adopt an extra-textual requirement that the representatives' "injury" be typical. It concedes, however, that "[t]ypicality may also be satisfied where class members suffered a different injury than the proposed class representatives, so long as all the injuries are shown to result from a single challenged practice,"

23

and that not all members of the class need to have suffered an injury. Br. 20. Paradoxically, ECFMG insists the district court was required to find that "emotional distress was a typical reaction of class members"; if so, "then the possibility of uninjured (atypical) class members would be no bar to certification." *Id.*

ECFMG adduces no precedent showing that Rule 23(a)(3) requires that the injury or harm class representatives have suffered be typical of those of the class. This Court has expressly disagreed with any such requirement (*see In re NFL Players*, 821 F.3d at 428), consistent with the consensus view (*see* 1 Newberg on Class Actions § 3:43 (5th ed., June 2020 update)).

ECFMG misreads *In re Prudential*, 148 F.3d 283 (3d Cir. 1998) as indicating that "typicality is satisfied where class members 'all have claims.'" Br. 20. There, this Court observed that class members all had claims—but never held that was required for typicality or certification.

ECFMG also misreads *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147 (1982) as stating harm must be typical. But *Falcon* instructs that a district court may find typicality without concluding class

members suffered harm, as long as the conduct complained of is common. *Id.* at 159.

ECFMG cites *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014)—a civil rights action for negligent prison medical care—but it, too, supports Plaintiffs. *Parsons* held differences in past injuries or current healthcare needs of the named plaintiffs and class members did not preclude a finding of typicality. *Id.* at 686. *Parsons* held the class representatives typical for the same reason the district court did here. *Id.*

ECFMG also wrongly invokes *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). There, typicality was not satisfied because the class included people who knew fountain Diet Coke contained saccharine but bought it anyway, whereas the named Plaintiff complained she was deceived. *Id.* The court also held Oshana's claim was subject to a range of unique defenses. Here, by contrast, no patient knew about Igberase's fraud, much less ECFMG's role in enabling it, before his 2016 conviction. ECFMG has asserted no unique defenses against Plaintiffs.

Finally, ECFMG misreads the record. It claims Plaintiffs "acknowledged that the proposed class includes members who did not experience similar emotional distress." Br. 19. In fact, Plaintiffs' counsel

25

said it is *possible* the class would include individuals who did not suffer harm, but that does not defeat *ascertainability*—the subject under discussion at that point. *See* JA1392 at 12:17–25. And ECFMG acknowledges that the presence of uninjured class members does not defeat certification. Br. 20.

> **2. The Court should reject ECFMG's novel typicality criterion.**

ECFMG's proposed alteration of this Court's typicality jurisprudence would eviscerate the class device. It is unclear how Plaintiffs would "show" and a district court "find" before certification, that emotional distress was a typical reaction among class members without conducting hundreds of depositions of class members—an entirely unworkable process.

Requiring typicality of harm is particularly inappropriate in the context of the district court's issue-class certification, which includes no questions regarding injury. Possible variations in the emotional harm suffered by class members have no bearing on the alignment of interests between the named Plaintiffs and the class on the certified issues of duty and breach.

JA2080

### 3. The record indicates that the vast majority of known class members suffered emotional harm.

This Court "may affirm the District Court's judgment on any basis supported by the record." *Murray v. Bledsoe*, 650 F.3d 246, 247 (3d Cir. 2011) (citation omitted). Plaintiff's certification motion cited Dr. Steinberg's expert report, *see* JA182, which found that an overwhelming majority (89%) of hundreds of class members surveyed experienced emotional harm as a result of Igberase's conduct, and 84% still do. JA587. Record evidence thus confirms emotional harm was a typical result of ECFMG's negligence.

### B. ECFMG's claim that Plaintiffs will "inflict emotional distress" on the class is false and speculative.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Although adequacy can overlap with typicality, it addresses a distinct concern: whether the class representatives have conflicts of interest with the class. *See New Directions Treatment Svcs. v. City of Reading*, 390 F.3d 313 (3d Cir. 2007). Only a "fundamental" conflict of interest can defeat adequacy. *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

27

ECFMG identifies no such conflict, but instead contends that certification will necessarily "inflict emotional distress" on class members—even while it faults the district court for not finding this reaction typical. According to ECFMG, class members are better off not receiving court-approved notice of the allegations against ECFMG or their potential right of redress.

The district court performed a focused analysis of possible conflicts between named Plaintiffs and the class. JA54–55. It correctly found that there is no "'fundamental' conflict of interest," because no class members benefited from conduct that harmed other class members—Igberase's deception and ECFMG's negligence. JA55. The district court further found that "[n]othing before the Court demonstrates that the Plaintiffs have incentives that are at odds with the class they seek to represent." JA52.

ECFMG's only response is that class members will be upset upon receiving class notice and learning of the allegations against ECFMG. It cites no authority suggesting that this possibility affects Plaintiffs' adequacy, let alone amounts to a fundamental conflict. And it cites no record evidence supporting the argument. The majority of the 712 class

28

members known to exist (*see* JA616) are already aware of Igberase's misconduct and ECFMG's role in facilitating it. ECFMG's own opposition to certification included names of over 500 clients Class Counsel represent individually for claims arising from ECFMG's and Igberase's misconduct. *See* JA858–62, 880–86.[1] Igberase's fraud and ECFMG's role also received widespread media coverage, long before class certification.[2] Class notice will not add to the emotional impact ECFMG's conduct has already had on the class.

This Court rejects speculative arguments against certification. *In re Suboxone*, 967 F.3d at 273. The Court should be still more reluctant to give credence to a defendant's speculation that prospective plaintiffs are better off not knowing about its conduct. The Court could just as easily conclude that notice will make class members feel empowered, because their entitlement to justice is being taken seriously.

---

[1] Even if the Court otherwise credited ECFMG's argument, it would still not justify decertification with respect to these class members.

[2] *See, e.g.*, Kelsey McKinney, "A Shattering Breach of Trust: What Happens to Patients When Their Doctor Is Not Who He Claimed to Be?" *StatNews* (Jan. 3, 2019), https://tinyurl.com/y4vpqfpa; Whitney Wild, "Md. Doctor Who Obtained Medical License Illegally Prompts Lawsuits," WUSA9 (Dec. 1, 2017), https://tinyurl.com/yykc43o8.

### C. The district court correctly concluded that certification will not create claim-splitting problems for class members.

Claim-splitting concerns arise when "a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar," such that "the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24 (1982). A class judgment "does not bar class members from pursuing individual lawsuits that are not transactionally related to the class's claims," such as individual medical malpractice claims. 6 Newberg on Class Actions § 18:16. "Class members in class actions are not expected to join such individualized claims to the class suit because to do so would undermine the efficiency of the aggregate resolution of the common claims." *Id.* at § 18:17.

ECFMG falsely asserts that "the district court failed to consider 'whether any potential future claims by class members with personal injury would be at risk of being barred by *res judicata.*'" Br. 26. The district court expressly addressed this precise concern. JA53. It found

30

that class members who wished to assert additional claims against

ECFMG could opt out and assert them individually, and certification

would not prevent class members from asserting claims against Igberase.

*Id.*

ECFMG selectively quotes *Slade v. Progressive Security Insurance*

*Co.*, 856 F.3d 408 (5th Cir. 2017) to argue that opting out is "not a

panacea" and cannot cure the alleged inadequacy of class representatives

who "abandoned" the class's potential medical malpractice claims. *Slade*,

however, also recognizes that "[r]efusing to certify a class because the

plaintiff decides not to make the sort of person-specific arguments that

render class treatment infeasible would throw away the benefits of

consolidated treatment." *Slade*, 856 F.3d at 415. "Only when all or almost

all of the claims are likely to be large enough to justify individual

litigation is it wise to reject class treatment altogether." *Id.* Here, there is

no indication that "all or almost all" of the individual claims are likely to

be large enough to be litigated entirely individually.

Moreover, ECFMG's claim-splitting argument founders on the

unavoidable reality that it is not a health-care provider under

Pennsylvania law. *See* 40 Pa. Stat. Ann. § 1303.503 (West 2020). And

31

ECFMG never employed Igberase. Thus, it cannot be sued for medical malpractice based on his conduct. *See* 231 Pa. Code Rule 1042.1 (West 2020). The proper defendants for a medical malpractice claim are Igberase and his employers.

In addition, Pennsylvania provides for a two-year statute of limitations for medical malpractice claims that begins to run when the plaintiff, exercising reasonable diligence, learns of her or his injury and the defendant's role in causing it. *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991). Here, that time has likely elapsed. The Department of Justice announced Igberase's guilty plea on November 15, 2016.[3] The announcement described ECFMG's role in credentialing "Akoda." *Id.* The district court's order cannot deprive the class members of a right they do not have.

Finally, ECFMG's suggestion that providing notice and opt-out rights in an issue class may be improper (Br. 23 n.4, 27) contradicts its own concession below (JA1441 at 61:8–9). And several courts have

---

[3] Bowie Man Pleads Guilty to Misusing a Social Security Number to Fraudulently Obtain a Medical License" (Nov. 16, 2016), U.S. Dep't of Justice, https://www.justice.gov/usao-md/pr/bowie-man-pleads-guilty-misusing-social-security-number-fraudulently-obtain-medical.

directed notice to the class after certifying issue classes under Rule 23(c)(4). *See, e.g.*, *McQuilken v. A & R Dev. Corp.*, 576 F. Supp. 1023, 1032 (E.D. Pa. 1983)*; Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239, 244 (S.D.N.Y. 2010). The district court was well within its discretion in rejecting challenges to Plaintiffs' adequacy based on claim-splitting concerns.

## II. Certification of a Rule 23(c)(4) issue class does not require a finding that a claim as a whole satisfies Rule 23(b).

### A. The district court's application of *Gates* satisfied Rule 23(b)(3).

Federal Rule of Civil Procedure 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Rule 23(c)(4) "both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to 'treat common things in common and to distinguish the distinguishable.'" *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) (citation omitted), *abrog. on other grounds*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008), *as amended* (Jan. 16, 2009).

33

In certifying the issue class here, the district court applied the standards articulated in *Gates*, 655 F.3d at 272–74. Building on *Chiang* and *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200–01 (3d Cir. 2009), *Gates* held that certification of an issue class requires identifying a common issue that is "divisible from the individual issues" and "a rigorous analysis on the effect 'partial certification would have on the class action going forward.'" 655 F.3d at 273 (quoting *Hohider*, 574 F.3d at 202).

To structure consideration of whether issue certification will advance a case's resolution, *Gates* looked to the ALI's Proposed Final Draft of the Principles of the Law of Aggregate Litigation, §§ 2.02–05, 2.07–08 (2010) ("ALI Principles"), which the Court concluded "provide[s] the most sound guidance in resolving this complicated area of class action procedure." 655 F.3d at 273. Based on the ALI Principles, *Gates* set forth a "non-exclusive list of factors," *id.*, to guide courts in applying Rule 23(c)(4):

> [W]hen deciding whether or not to certify an issue class, the trial court should consider: the type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability

34

or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Id.*

*Gates* further instructed that, when certifying an issue class, a district court should "explain how class resolution of the issue(s) will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues." *Id. Gates* thus sets forth a "functional" approach to determining whether an issue class will be superior to individual adjudication of common issues. *See, e.g., Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 412–13 (6th Cir. 2018).

*Gates*'s functional approach comports with Rule 23(b). The *Gates* considerations ensure a finding that an issue class is "appropriate" under Rule 23(c)(4) also encompasses a determination that a class action limited

35

to the specified issues meets Rule 23(b)(3)'s demands that common issues "predominate" and that class resolution be "superior to other available methods for fairly and efficiently adjudicating" the certified issues. Indeed, the U.S. Chamber of Commerce's amicus brief recognizes *Gates's* overlap with Rule 23(b)(3). *See* Chamber Commerce Br. 15 ("Properly applied, several of the *Gates* factors overlap with Rule 23(b)(3)'s predominance and superiority requirements.").

As to predominance, *Gates* requires that the district court examine the types of claims and issues in question, including the law applicable to each, *see Gates*, 655 F.3d at 273, so that certification is limited to issues turning on questions of law and fact that are common to the class as a whole, are "separate[ ]" and "divisible" from other issues in the case, and will advance fair and efficient resolution of the remaining issues. *Id.* These requirements ensure common issues predominate the class action as certified. *See Martin*, 896 F.3d at 413. Indeed, the approach of the ALI Principles adopted in *Gates* was specifically designed to "identify[] with greater precision the considerations reflected in the interplay between Subsections (b)(3) and (c)(4) of Rule 23, as set forth in existing case law"

36

and "delineate[ ] the multifaceted inquiries presently encapsulated under the predominance concept." ALI, Principles, § 2.02 cmt. a.

In this case, the district court found that the issues of duty and breach presented questions "common to all members of the class." JA49. The court further found that neither applicable law nor factual circumstances that determine the answer to those questions vary among class members. JA50–51. Accordingly, "the questions of duty and breach favor issue certification because they are questions of law and/or fact common to all class members and subject to common proof." JA56–59. By limiting certification to those issues, the court necessarily ensured that common questions predominated the class action. As Judge Posner has explained, "[i]f there are … only common questions, the issue of predominance is automatically resolved." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012).[4]

With respect to superiority, *Gates* provides a focused framework for considering whether issue certification is the best means of "fairly and

---

[4] The Supreme Court vacated and remanded *Butler* in light of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). *See* 569 U.S. 1015 (2013). On remand, the Seventh Circuit reaffirmed its predominance analysis and reinstated its judgment. *See* 727 F.3d 796 (2013).

37

efficiently advanc[ing] the resolution of class members' claims." *Gates*, 655 F.3d at 273. The *Gates* considerations elaborate on Rule 23(b)(3)'s non-exclusive list of "matters pertinent" to whether a class action is the superior means of adjudication. *Compare* Fed. R. Civ. P. 23(b)(3)(A)–(D) with *Gates*, 655 F.3d at 273. *Gates*'s functional approach does the same work as Rule 23(b)(3)'s superiority requirement: It "ensures that courts will not rely on issue certification where there exist only minor or insignificant common questions, but instead where the common questions render issue certification the superior method of resolution." *Martin*, 896 F.3d at 413.

In this case, the district court determined that issue certification would result in "efficiencies" in resolving critical issues that could not be achieved through "any realistic procedural alternatives." JA60. The court further found no offsetting drawbacks to issue certification. JA60–61. These findings provide a textbook illustration of how applying *Gates* results in issue class certification only when a district court concludes, based on considerations tailored to the issue-class context, that class resolution is superior to individual adjudication of the certified issues.

38

## B.    Rule 23(c)(4) certification does not require that a class's cause of action as a whole satisfy Rule 23(b)(3).

Because the district court necessarily determined that the issue class meets the requirements of predominance and superiority as to the certified issues, ECFMG's claim that the certification violates Rule 23(b) depends on its argument that a court may not certify an issue class without first determining whether the class's cause of action, *as a whole*, satisfies Rule 23(b)(3). ECFMG relies on a footnote in the Fifth Circuit's 1996 *Castano* decision stating that an entire "cause of action must satisfy the requirements of Rule 23(b)(3) before individual issues can be certified under Rule 23(c)(4)." 84 F.3d at 745, n.21. ECFMG asks this Court to "read" *Gates* as if it adopted *Castano*'s footnote. ECFMG Br. 35–36. But *Gates*, the text of Rule 23, precedents from other circuits, and the rulemakers' deliberations all contradict ECFMG's argument. A court need not determine that a class's cause of action as a *whole* satisfies Rule 23(b)(3) before certifying only *part* of it.

### 1.    *Gates* rejected ECFMG's argument.

In *Gates*, this Court declined to adopt the *Castano* footnote's statement that an issue class may "be certified only when the cause of

39

action, taken as a whole, meets the predominance requirement." 655 F.3d at 273. The court also declined to endorse specific opinions of other circuits that had rejected *Castano* and instead adopted a multifactor approach drawn from the ALI Principles. *See id.* The considerations *Gates* derived from the Principles require attention to the relationship between the certified issues and other issues in the case to determine whether they can be "separate[d]" and to assess issue certification's impact on the ultimate resolution of the remaining issues. *Id.* Notably, those considerations do *not* include whether the certified issues would predominate if the class's claims were viewed as a whole.

*Gates*'s discussion of issue certification takes as its starting point that the class's claims, viewed as a whole, do *not* satisfy Rule 23(b)(3)'s predominance requirement. *Gates* considered issue certification only after determining the district court had correctly found that the plaintiffs' claims in their entirety did not satisfy predominance. *See id.* at 270–72. *Gates* then addressed whether an issue class may be certified "even if common issues do not predominate" when claims are viewed as a whole. *Id.* at 272. Had the Court intended to adopt a standard precluding certification in those circumstances, that discussion would have been a

40

very short one. Instead, *Gates* addressed at length the considerations that would *permit* issue class certification if it would "fairly and efficiently advance the resolution of class members' claims." *Id.* at 273. *Gates cannot* be "read" to impose a requirement that would have made it unnecessary to elaborate on those considerations.

### 2.   ECFMG's position contradicts Rule 23's text.

ECFMG's argument that Rule 23(b)(3)'s requirements must be satisfied by a class's cause of action as a whole even when only specific issues are certified contradicts the plain terms of the Rule. Rule 23(b) sets forth requirements for a "class action" to be "maintained." Rule 23(c)(4), in turn, allows "an *action*" to be "maintained as a *class action* with respect to particular issues" (emphasis added). In other words, the action is a "class action" *only* as to those issues. A court cannot meaningfully consider whether maintenance of that "class action" satisfies Rule 23(b)(3)'s requirements without taking into account the bounds Rule 23(c)(4) places on the "class action." That is, the court must determine whether a "class action" limited to the certified issues satisfies Rule 23(b), not whether the rest of the action—which is *not* a class action—does so. Accordingly, in applying Rule 23(b)(3) in the context of a Rule 23(c)(4) issues class, a

41

court must consider whether common questions of law or fact predominate with respect to the issues that fall within the class action, and whether a class action limited to those issues is the superior means of adjudicating them.

As originally adopted, Rule 23(c)(4) made this point explicitly. It stated: "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Fed. R. Civ. P. 23(c)(4) (1966). As the Second and Fourth Circuits explained, that language means that other provisions of Rule 23 must be applied after taking into account the class action's limitation to particular issues. *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *Gunnells*, 348 F.3d at 439. This "sequencing directive" was eliminated in 2007 revisions of the Rules, but "the Advisory Committee made clear that the changes to the Rule's language were 'stylistic only.' Fed. R. Civ. P. 23(c)(4) adv. comm. n. to 2007 amend." *Martin*, 896 F.3d at 413.

42

The Rule's structure and context, and the purposes evident from its text, confirm that it cannot be read to allow certification of an issue class only when Rule 23(b)(3) would permit certification of a class's entire cause of action. Rule 23(c)(4)'s broad grant of authority to certify issues "when appropriate" incorporates the "flexibility in application" generally appropriate under Rule 23. *Gunnells*, 348 F.3d at 424 (quoting *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989)). The Rule permits courts to give common treatment to common issues to advance fair and efficient resolution of a case even when a broader certification would be impermissible. *Gates*, 655 F.3d at 273.

Permitting issue certification only when the class's entire cause of action could be certified under Rule 23(b)(3) would undermine that objective and "render[ ] subsection (c)(4) virtually null." *Nassau*, 461 F.3d at 226; *accord Martin*, 896 F.3d at 413. If an entire cause of action satisfied Rule 23(b)(3)'s requirements of predominance and superiority, a district court would not need to certify a narrower issue class. Moreover, under the *Castano* footnote's approach, "a court considering the manageability of a class action—a requirement for predominance under Rule 23(b)(3)(D)—[would have] to pretend that subsection (c)(4)—a

43

provision specifically included to make a class action more manageable—does not exist until after the manageability determination [has been] made." *Nassau*, 461 F.3d at 227 (quoting *Gunnells*, 348 F.3d at 439). Thus, "a court could only use subsection (c)(4) to manage cases that the court had already determined would be manageable *without* consideration of subsection (c)(4)." *Id.* (emphasis added by *Nassau*). Such a reading would leave Rule 23(c)(4) "without any practical application, thereby rendering it superfluous." *Gunnells*, 348 F.3d at 439. Accepting ECFMG's reading would thus violate one of the most basic interpretive canons: that a rule or statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citations and quotation marks omitted).

### 3.    The circuits have rejected ECFMG's rule.

The disconnect between the *Castano* footnote and Rule 23's text and purposes has led all circuits that have addressed the question to reject the view that Rule 23(c)(4) certification is available only when a cause of action, viewed as a whole, satisfies Rule 23(b)(3)'s requirements. *See Martin*, 896 F.3d at 413; *Nassau*, 461 F.3d at 227; *Valentino v. Carter-*

44

*Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also Gunnells*, 348 F.3d at 443 (rejecting view that an issue class can be certified only if the entire action meets Rule 23(b)(3)'s requirements).

The Seventh and Eighth Circuits, while not specifically discussing the *Castano* footnote, have—like this Court in *Gates*—adopted a functional approach to issue certification that is irreconcilable with a rigid requirement that Rule 23(b)(3)'s criteria must be assessed with respect to a cause of action as a whole. See *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012); *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008).

Not even the Fifth Circuit adheres to the *Castano* footnote. In *Castano* itself, the footnote was dicta: the holding was the district court had not properly found predominance or superiority even as to the matters it certified. *See* 84 F.3d at 740–51. More recent Fifth Circuit decisions—especially *In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012), and *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)—reflect a practical approach to Rule 23(c)(4) in line with that of other circuits.

In *Rodriguez*, the Fifth Circuit affirmed the "narrow class certification" of a Rule 23(b)(2) class on the issue of injunctive relief even

45

though damages claims arising from the same causes of action did not satisfy Rule 23(b)(3)'s predominance requirement. 695 F.3d at 363. The court stated that "Rule 23(c)(4) explicitly recognizes the flexibility that courts need in class certification by allowing certification 'with respect to particular issues' and division of the class into subclasses." *Id.* at 369 n.13 (quoting *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000)). The court's focus on whether the certified *issue* satisfied Rule 23(b), as opposed to the cause of action as a whole, is incompatible with the *Castano* footnote's dicta.

*Deepwater Horizon* also shows that the Fifth Circuit does not adhere to the *Castano* footnote. Over objections that certification of a class did not comport with Rule 23(b)(3) because common issues did not predominate, *Deepwater Horizon* held that certification was "in accordance with … Rule 23(c)(4)." 739 F.3d at 806; *see also id.* at 815–16. The Fifth Circuit stated that "'determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.'" *Id.* at 806 n.66 (quoting *Butler v. Sears, Roebuck & Co.*, 727

46

F.3d 796, 800 (7th Cir. 2013) (Posner, J.), *cert. denied*, 571 U.S. 1196 (2014)). *Deepwater Horizon* approvingly cited decisions of "many circuits" that had "divided and tried" "common and individual issues" "by means of … Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination." *Id.* at 816. The decision never once cited *Castano*.

Academic authorities have noted the circuits' "emerging consensus" on a practical approach to Rule 23(c)(4) issue certification that does not depend on whether a cause of action as a whole meets the Rule 23(b)(3) criteria.[5] As Professor Samuel Issacharoff (Reporter of the ALI Principles of the Law of Aggregate Litigation relied on by this Court in *Gates*) and Elizabeth Cabraser have put it, "The world has moved since *Castano*."[6] The view of the circuits aligns with that of major treatises on civil procedure and class actions, which agree that Rule 23(c)(4) certification

---

[5] *See, e.g.*, Elizabeth Chamblee Burch, *Constructing Issue Classes*, 101 Va. L. Rev. 1855, 1892 (2015).

[6] Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. Rev. 846, 871 (2017).

should depend on the practical benefits of class resolution of a common issue.[7]

### 4. The rulemakers rejected ECFMG's proposed approach.

The recent rejection of possible amendments to Rule 23(c)(4) by the Advisory Committee on Civil Rules reflects the rulemakers' satisfaction with the circuits' agreement on a flexible approach to issue certification. The Advisory Committee's Rule 23 Subcommittee began considering whether to amend Rule 23(c)(4) in August 2014, when a group of corporate counsel and defense bar practitioners proposed amending the Rule to incorporate the *Castano* footnote's approach.[8] After considering the issue, the Subcommittee reported in 2015 that "recent reports suggest that all the circuits are coming into relative agreement that in appropriate cases Rule 23(c)(4) can be used even though full Rule 23(b)(3)

---

[7] *See, e.g.* 2 Newberg on Class Actions § 4:91; 5 James Wm. Moore, Moore's Federal Practice § 23.86 (3d ed. 2011); Jay Tidmarsh & Roger H. Trangsrud, *Modern Complex Litigation* 490 (2d ed. 2010).

[8] Lawyers for Civil Justice, Repairing the Disconnect Between Class Actions and Class Members: Why Rules Governing "No-Injury" Cases, Certification Standards for Issue Classes, and Notice Need Reform (Aug. 13, 2014), http://www.uscourts.gov/file/17648/download.

48

certification is not possible due to the predominance requirement."[9] The

Advisory Committee concurred that the courts are "converging on the

view that predominance is required only as to the issues."[10]

Thereafter, the Subcommittee took amending Rule 23 to embody the

*Castano* footnote off the table but continued to consider amending Rule 23

to confirm that predominance as to an entire claim is *not* a prerequisite to

Rule 23(c)(4) certification.[11] It concluded such an amendment was

unnecessary, because "[t]he various circuits seem to be in accord about

the propriety of [issue class] treatment '[w]hen appropriate,' as Rule

23(c)(4) now says."[12] The Advisory Committee accordingly advised the

Standing Committee on Rules of Practice and Procedure that there was

---

[9] Rule 23 Subcomm. Report 39, in Advisory Comm. on Civ. Rules, Agenda Book, April 9–10, 2015, at 281 (emphasis added), https://www.uscourts.gov/sites/default/files/fr_import/CV2015-04.pdf.

[10] *Id.* at 41.

[11] Rule 23 Subcomm., Introductory Memorandum for Mini-Conference on Rule 23 Issues, Sept. 11, 2015, at 40, in Advisory Comm. on Civ. Rules, Agenda Book, Nov. 5–6, 2015, at 226, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf.

[12] Rule 23 Subcomm. Report 4, in Advisory Comm. on Civ. Rules, Agenda Book, Nov. 5–6, 2015, at 5, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf.

JA2103

no need to amend Rule 23(c)(4).[13] The Rule 23 amendments the Standing Committee sent the Supreme Court in 2017 therefore did not change Rule 23(c)(4).[14] ECFMG's request that this Court adopt the *Castano* footnote would undo the results of the Advisory Committee's careful deliberations.

**5. ECFMG's argument would entitle it at most to remand.**

ECFMG concedes that common liability issues may predominate over individual issues of causation and damages when a cause of action is viewed as a whole. Br. 34. Thus, even under ECFMG's approach, the Rule 23(c)(4) certification here would be permissible on such a finding. The district court's enumeration of the benefits of issue certification leaves little doubt that it would make such a finding, but if there were any doubt, the district court should have the opportunity to consider the issue if this Court reversed the course set in *Gates* and adopted the *Castano* footnote.

---

[13] *See* Comm. on Rules of Practice and Procedure, Minutes, Jan 7, 2016, at 11–12, https://www.uscourts.gov/file/20044/download; Advisory Comm. on Civ. Rules, Report to the Standing Committee, Dec. 11, 2015, at 27 (emphasis added), https://www.uscourts.gov/sites/default/files/2015-12-11-cv_rules_committee_report_0.pdf.;

[14] *See* Comm. on Rules of Practice and Procedure, Minutes, June 12–13, 2017, at 27–28, https://www.uscourts.gov/file/24103/download.

50

## III.   The district court did not abuse its discretion under Gates.

### A.   The district court thoroughly considered the *Gates* factors.

ECFMG contends the district court's analysis was insufficiently rigorous, because "only four paragraphs of the opinion discuss whether Rule 23(c)(4) and *Gates* permit the certification ordered by the district court." Br. 40. ECFMG paints the district court's detailed certification decision in a false light. The court cited or discussed *Gates* throughout its opinion. *See* JA41–43, JA56, JA57, JA59–62. It addressed several *Gates* factors before the lengthy paragraphs (spanning four full pages) that ECFMG identifies. For example, the substantive law underlying the claim (including choice of law) is thoroughly addressed earlier in the opinion, at JA43–46.

No precedent sets a threshold on the number of pages a rigorous analysis requires. *Gates* itself spent four paragraphs applying the factors it adopted. *Gates*, 655 F.3d at 273–74. The district court's comprehensive discussion of the *Gates* factors reflects no abuse of discretion.

51

## B.   Plaintiffs addressed choice of law.

ECFMG confuses the burden of showing certification is warranted with the burden of addressing conflicts of law. Plaintiffs bear the latter burden *only when* the defendant first demonstrates that multiple bodies of law apply. *See, e.g.*, Principles of the Law of Aggregate Litigation § 2.05 cmt. f (2020); Patrick Woolley, *Choice of Law and the Protection of Class Members in Class Suits Certified Under Federal Rule of Civil Procedure 23(b)(3)*, 2004 Mich. St. L. Rev. 799, 811 (2004). Under Pennsylvania law, a class-action defendant has the burden of showing that the law of another state applies or, if it does, that a true conflict exists. *See, e.g.*, *Parsky v. First Union Corp.*, 51 Pa. D. & C.4th 468, at 12 & n.28 (Com. Pl. 2001).

Though it was not their burden to do so, Plaintiffs demonstrated that choice-of-law considerations support certification. ECFMG claims Plaintiffs did nothing more than state they were unaware of meaningful conflicts. Br. 42. That is false. In their certification motion, Plaintiffs showed that Pennsylvania choice-of-law rules would resolve any conflict in favor of Pennsylvania law. JA194–95. As Plaintiffs explained, Pennsylvania abandoned the *lex loci delicti* rule in favor of a more flexible

52

interest- and policy-based analysis, under which "'the state in which injury occurred, as such, has relatively little interest in the measure of damages to be recovered unless it can be said with reasonable certainty that defendant acted in reliance on that state's rule.'" JA195 (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964)). Plaintiffs argued that there is no evidence ECFMG relied on the law of any other state in certifying Igberase, and that "'the reliance argument is almost totally untenable'" in negligence cases. *Id.* (quoting *Griffith*).

ECFMG's response ignored this language in *Griffith*. ECFMG pointed to one alleged difference between Pennsylvania and Maryland law—that Maryland doesn't recognize the tort of negligent infliction of emotional distress. ECFMG ignored that Maryland allows emotional distress damages in negligence actions without bodily injury. *See Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986). ECFMG did not establish that this difference was a true conflict requiring application of interest analysis; rather, as the district court recognized (Tran. 43:24–25), it simply asserted that Maryland's interest was greater, without enumerating and weighing Pennsylvania's.

53

JA732. ECFMG never argued that section 148 of Restatement (Second) of Conflicts of Law was implicated, as it does here.

Plaintiffs replied that ECFMG's claimed conflict was a *false* one "because Pennsylvania has a strong interest in regulating the conduct of its domiciliary corporations by applying its substantive tort law, and other jurisdictions have no interest in applying their own law when doing so would limit their citizen's right to recover, to the benefit of a foreign corporation. JA1357–1358 (citing *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187–88 (3d Cir. 1991)). Subclassing under Rule 23(c)(5) can resolve true conflicts that might arise. JA1358. ECFMG's sur-reply did not respond to the latter point or weigh Pennsylvania's interest, but instead speculated about Maryland's interest in protecting its physicians from claims for negligent infliction of emotional distress, which is irrelevant here. JA1378.

At the certification hearing, Plaintiffs again explained the absence of a true conflict. JA1386 at 6:21–7:10. ECFMG acknowledged that even under its theory, only a few states' laws could be applied, because class members were treated by Igberase only in Maryland and the District of Columbia. JA1422 at 42:9–18. The district court thus had the benefit of

54

considerable argument on choice of law in Plaintiff's brief and the hearing.

### C. The district court did not abuse its discretion in determining that Pennsylvania law applies.

The district court's analysis was not "cursory" (Br. 42), nor did it merely "rely[] on the representation" (*id.*) that Plaintiffs were unaware of relevant conflicts. The court did not require ECFMG to demonstrate how meaningful variations in state law precluded certification (although it could properly have done so). Rather, it inquired into choice of law extensively at the hearing. JA1386 at 6:21–7:18, JA1420 at 40:8–47:19. It then independently and carefully analyzed the applicable law. JA43–46. The court found no real differences in the elements of negligence/negligent inflection of emotional distress in the laws of Pennsylvania and DC. It added, for the sake of completeness—not as an allocation of burden—that the parties had identified no such differences. JA45. Although Maryland does not recognize negligent infliction of emotional distress as a distinct claim, the court correctly recognized Maryland permits recovery for emotional distress arising out of negligence. JA45 (citing *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986)). Thus, the court concluded, there

55

were no true conflicts of law. *Id.* Even if there were, the court explained,

Pennsylvania has a more significant relationship to the case, which

concerns ECFMG's conduct, not Igberase's. JA45–46.

ECFMG never addresses these findings directly. Instead, it argues

for the first time that Section 148 of the Restatement (Second) of Conflict

of Laws applies here. Section 148 only applies where "the plaintiff has

suffered pecuniary harm on account of his reliance on the defendant's

false representations." Restatement (Second) Conflicts of Law § 148(a) &

cmt.a, c. Plaintiffs do not assert claims of fraud or misrepresentation

against ECFMG, nor do they seek recovery for pecuniary harm. *See, e.g.*,

JA391 at 26:13–25. It was hardly an abuse of discretion for the district

court not to consider a plainly inapplicable section of the Restatement

that was never presented to it.

Finally, ECFMG suggests that applying Pennsylvania law will give

rise to "difficult constitutional questions under the Commerce Clause." Br.

45. The sole case it cites concerns whether a Connecticut beer-pricing

statute unconstitutionally discriminated against interstate commerce.

*Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335 (1989). *Healy* nowhere

discusses choice of law. ECFMG never shows how applying Pennsylvania

56

law to a Pennsylvania corporation's conduct in Pennsylvania would
discriminate against interstate commerce.

### D.     There is no per se bar on issue certification of claims involving emotional harm.

ECFMG falsely claims the district court did not consider "the type of
claim(s) and issues in question." The district court recognized this factor
as part of the *Gates* analysis. JA42. It considered the elements of
negligence and negligent infliction of emotional distress, JA45, addressed
commonality, adequacy and typicality in light of those elements, JA50–55,
and considered the nature of the claims in refusing to certify the issue of
liability for classwide treatment. JA58. The court likewise considered the
nature of the claims in certifying issues of duty and breach, which, it
explained, were common to all class members. JA60.

ECFMG, however, asserts that Rule 23(c)(4) categorically excludes
certification of any issue arising from a claim for emotional distress
damages. Br. 15 ("Plaintiffs' request for damages for emotional distress
should have foreclosed class certification.") This assertion is contrary to
first principles. The Federal Rules of Civil Procedure are trans-
substantive. *See, e.g.*, Stephen B. Burbank, *The Rules Enabling Act of
1934*, 130 U. Pa. L. Rev. 1015, 1108 (1982). Rule 23 does not apply to

57

some kinds of actions but not others. *Id.* Instead, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

The authorities ECFMG cites do not support its argument. *Spence v. Board of Education of Christina School District*, 806 F.2d 1198 (3d Cir. 1986), was not a class action, but an individual claim for retaliatory transfer. The issue on appeal concerned the application of *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494 (1931), to determine whether damages could be *re-tried* on a limited factual presentation, in the context of "a tangled and complex fact situation." *Id.* at 1202. Unlike this case, the plaintiff sought punitive damages, which would require presenting evidence of the entirety of defendant's conduct in a damages retrial. *Id.*

*Spence* did not hold that emotional distress liability and damages are *always* "'too interwoven to allow a fair determination of damages apart from liability.'" Br. 47 (quoting *id.* at 1202). *Spence* held only that the district court had not abused its discretion in not allowing a damages-only retrial on that record, 806 F.2d at 1202—not that a district court

58

cannot try issues of liability and emotional distress damages separately in a class action. And it did not hold that issues of duty and breach within liability could not be tried separately from causation and damages where, as here, the facts bearing on the defendant's breach of duty have little bearing on whether particular individuals suffered compensable harm.

No reported decision has applied *Spence* to bar certification and trial of liability (much less issues within liability) separately from damages. Although "[t]he universal requirement of a causal link between liability and damages means that the issues can never be completely unlinked … it is clear that in many cases damages may justly be tried apart from liability." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 461 (3d Cir. 2001). The Federal Rules of Civil Procedure "expressly authorize such separate trials." *Id.* at 461 n.9 (citing Fed R. Civ. P. 42(b)).

Courts in this and other circuits often try or re-try liability and emotional harm damages separately. In *Gunnells*, the Fourth Circuit affirmed an order granting issue-class certification, where mini-trials on proximate cause and damages, including emotional distress damages, would have followed the class trial on the certified issues. *See Gunnells*, 348 F.3d at 426–30, 454–56; *see also Walters v. Mintec/Int'l*, 783 F.2d 73,

59

82 (3d Cir. 1985) (ordering new trial on emotional and pecuniary damages only in wrongful death claim); *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 755 (2d Cir. 1984) (permitting retrial on damages including psychological injury where first jury answered special interrogatories on liability); *see also Rosa v. City of Chester*, 278 F.2d 876, 882 (3d Cir. 1960) ("Federal appellate and district courts have time and again ordered new trials as to damages only.").

*Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000) is wholly distinguishable. It concerned a putative class action under 42 U.S.C. § 1981 that the district court certified under Rule 23(b)(3), not (c)(4). Classwide determination of whether a hypothesized policy of racial discrimination existed would not have resolved *any* elements of the § 1981 action, because individual proof of intentional racial discrimination would still have been required. By contrast, all class members stand on the same legal footing vis-à-vis ECFMG, allowing classwide resolution of issues of duty and breach that will materially advance the litigation.

Similarly, the Seventh Circuit's decision in *Aiello v. Providian Financial Corp.*, 239 F.3d 876 (7th Cir. 2001) does not hold categorically "that a case seeking recovery for emotional distress 'is not suitable for

60

class action treatment.'" Br. 49. There, a debtor sought emotional harm damages under 11 U.S.C. § 362(h) after a creditor sent her a letter requesting reaffirmation of a debt after a bankruptcy stay. *Aiello* affirmed dismissal of her individual claim because, it held, financial loss is a prerequisite to any recovery under that statute. *Aiello*, 239 F.3d at 881. The court then briefly affirmed denial of class certification on the grounds that class counsel were inadequate and that, in light of the insubstantiality of the claimed injuries and the variances among class members, certification would be inefficient and excessively costly. *Id.* Those circumstances are not present here, and *Aiello* says nothing about issue certification.

ECFMG wrongly claims the ALI Principles "recognize that aggregate treatment of narrow issues in personal injury claims is rarely appropriate." Br. 48. On the contrary, section 2.01 of the Principles, on which ECFMG relies, says "[c]ommon issues are those legal or factual issues that are the same in functional content across multiple civil claims, regardless of whether their disposition would resolve all contested issues in the litigation." Here, duty and breach are the same in functional content across all claims. Indeed, ECFMG has not challenged the district

61

court's findings that these are common issues. Moreover, the district court expressly found that these issues are not intertwined with issues that are not common, such as individualized defenses.

This Court has consistently held that individualized damages determinations "do not ordinarily preclude the use of the class action device." *See, e.g.*, *In re Suboxone*, 967 F.3d at 272. Such determinations presuppose classwide resolution of issues of duty and breach favorable to the plaintiffs. In this case, if the class prevails on these issues, factfinders in subsequent damages proceedings will consider evidence concerning Igberase's treatment of individual class members and the emotional harm his conduct and revelations that he was an impostor caused, while giving findings as to ECFMG's breach of duty preclusive effect. Because ECFMG's conduct determines its responsibility but not whether Plaintiffs' interactions with Igberase resulted in compensable emotional harm, juries will not need to reexamine ECFMG's conduct in damages proceedings. Thus, an issues trial centered on ECFMG's negligent conduct, followed by proceedings focused on individual injury and damages, appropriately "carve[s] at the joint" in this action. *Gates*, 655 F.3d at 273.

<div align="center">62</div>

### E. Considerations of efficiency favor issue certification.

The district court correctly found that issue certification of duty and breach would be efficient. In Pennsylvania, "[t]he existence of a duty is a question of law for the court to decide." *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005). And the answer to that question is common to all class members because they stand in the same legal relationship to ECFMG. A single determination of that legal question is obviously more efficient than repeated proceedings.

The amicus brief of the medical societies erroneously argues that duty must be determined on a plaintiff-by-plaintiff basis. AMA, et al. Br. 9–13. Relying on Circuit case law, the district court correctly found that the existence of a duty does not turn on the foreseeability of a particular plaintiff's damages. *See* JA49–50. Rather, duty is predicated on the parties' relationship, which does not vary among class members. *Id.*[15]

A class jury's determination on all issues of breach will likewise spare the court and the parties from the need for repetitive presentation

---

[15] The medical societies then essentially argue there should be no negligence cause of action against ECFMG. (AMA Br. 14–18.) This question is not before the Court. Again, Rule 23 must be applied trans-substantively.

63

of voluminous documentary evidence and witness testimony. Class resolution also avoids potentially inconsistent determinations on breach of duty.

ECFMG incorrectly argues that "every jury in every individual proceeding would need to hear essentially all of the evidence that Named Plaintiffs propose to present at the class proceeding" to "understand who Dr. Akoda [*sic*] was," comprehend "the theory of liability," and "determine causation." Br. 50. The limited role of juries in individual damages proceedings does not require they understand the full story of Igberase's deception and ECFMG's liability. Basic facts concerning what ECFMG is and its connection to Igberase can be provided to the jury by stipulation or a class jury's answers to special interrogatories. *See* Fed R. Civ. P. 49. Providing such summary information will unquestionably be more efficient than repeated full-blown trials.

Such proceedings will not implicate the Seventh Amendment's Reexamination Clause: "the Seventh Amendment prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." *In re Paoli R.R. Yard*

64

*PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997) (citation and quotes omitted).

ECFMG also misunderstands the causation inquiry. The question for juries in individual causation/damages proceedings will be whether ECFMG's negligence was *a* factual cause of Plaintiffs' injuries, not whether it was *the* proximate cause among other supposed causes (e.g., decisions of medical boards or hospital credentialing committees that relied in part on information supplied by ECFMG). *See Grainy v. Campbell*, 425 A.2d 379, 383 (Pa. 1981) (Nix, J., concurring).[16] ECFMG presented no evidence below that another person's *negligence* allowed Igberase to treat patients.

ECFMG incorrectly analogizes the issue certification in this case to that proposed in *Gates*. There the class alternatively proposed issue certification on liability with respect to medical monitoring and property

---

[16] Pennsylvania courts use the term "factual cause," not proximate cause. Negligence "is a factual cause of harm when the harm would not have occurred absent the conduct. … To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. … *The fact that some other causes concur with [name of defendant]'s negligence in producing an injury does not relieve [name of defendant] from liability as long as [his] [her] own negligence is a factual cause of the injury.*" Pa. SSJI (CIV), 13.20 (emphasis added); *see also Gorman v. Costello*, 929 A.2d 1208, 1212 (Pa. 2007).

65

damage claims, solely with regard to vinyl chloride exposure through a single pathway. This Court concluded that "a trial on whether the defendants discharged vinylidene chloride into the lagoon that seeped in the shallow aquifer and whether the vinyl chloride evaporated from the air from the shallow aquifer is unlikely to substantially aid resolution of the substantial issues on liability and causation." 655 F.3d at 274. The issue class certification here, by contrast, will meaningfully advance ultimate termination of the litigation by resolving the central issues of duty and breach of duty for all class members on all theories. The benefits of class resolution of these key issues are not negated by ECFMG's speculative references to possible "affirmative defenses" (Br. 50) to individual claims. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002).

### F.   ECFMG's alarmism concerning issue-class certification is unfounded.

ECFMG concludes its brief by asserting that "under the district court's approach to Rule 23(c)(4), the entire certification inquiry effectively reduces to commonality." Br. 53. This "error" is allegedly "confirmed" by the court's statement that *one reason* for certifying duty and breach is that they are common to all class members and subject to

66

common proof. But the district court did not merely analyze commonality. It also analyzed all of the Rule 23(a) requirements, JA48–56, and it reviewed all of the *Gates* factors in determining that class resolution of the common issues was the most efficient means of resolving the case. *See* JA41–43, JA56, JA57, JA59–62. Moreover, the district court rejected certification of the issue of liability under Rule 23(c)(4), despite strong commonality of issues. The district court's scrupulous application of *Gates* clearly does not prefigure class certification in any case presenting a common issue.

## CONCLUSION

This Court should affirm the district court's order.

Respectfully submitted,

Dated: November 2, 2020

JANET, JANET & SUGGS, LLC

/s/ Patrick Thronson
  Patrick A. Thronson
  Brenda A. Harkavy
  4 Reservoir Circle, Suite 200
  Baltimore, MD 21208
  (410) 653-3200

PUBLIC CITIZEN LITIGATION GROUP
  Scott L. Nelson
  1600 20th St. NW
  Washington, D.C. 20009
  (202) 588-1000

JA2121

LAW OFFICES OF PETER G.
ANGELOS, P.C.
  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th
  Floor Baltimore, Maryland
  21201
  (410) 649-2000

SCHOCHOR, FEDERICO
AND STATON
  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

CONRAD O'BRIEN PC
  Nicholas M. Centrella
  Robin S. Weiss
  1500 Market Street, Suite 3900
  Philadelphia, PA 19102-2100
  (215) 864-9600

Z LAW, LLC
  Cory L. Zajdel
  2345 York Rd. Suite B-13
  Timonium, MD 21093
  (443) 213-1977

*Attorneys for Appellees*

**CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH
TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS,
AND VIRUS CHECK**

I, Patrick A. Thronson, counsel for Appellees, certify, pursuant to
Local Appellate Rule 28.3(d), that I am a member in good standing of the
Bar of this Court.

I further certify, pursuant to Federal Rules of Appellate Procedure
32(a)(5)–(7), and Local Appellate Rule 31.1(c) and 32.1(c), that the
foregoing Brief of Appellees Monique Russell, Jasmine Riggins, Elsa M.
Powell, and Desire Evans, on behalf of themselves and all others similarly
situated, is proportionately spaced and has a typeface of 14-point Century
Schoolbook, contains 12,998 words, and that the text of the electronic
brief is identical to the text of the paper copies.

I further certify, pursuant to Local Appellate Rule 31.1(c), that
Bitdefender Endpoint Security did not detect a virus in this filing.


Dated: <u>November 2, 2020</u>         <u>/s/ Patrick Thronson</u>
                                     Patrick A. Thronson

JA2123

# CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2020, the foregoing Brief of Appellees Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans, on behalf of themselves and all others similarly situated, was filed with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit through the Court's CM/ECF system. All counsel of record are registered CM/ECF users

William R. Peterson
Morgan, Lewis & Bockius, LLP
1000 Louisiana St., Suite 400
Houston, TX 77002

Brian W. Shaffer
Matthew D. Klayman
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103

Dated: <u>November 2, 2020</u>

<u>/s/ Patrick Thronson</u>
Patrick A. Thronson

# No. 20-2128

## In the United States Court of Appeals
## For the Third Circuit

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; DESIRE EVANS

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

*Appellant*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## REPLY BRIEF

MORGAN, LEWIS & BOCKIUS LLP
    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

***Counsel for Appellant***

# TABLE OF CONTENTS

**Page**

Table of Citations ................................................................. iii

Argument in Reply ...................................................................1

I.   The District Court Erred in Analyzing Rule 23(a). ........................................2

    A.   The district court did not find—and Named Plaintiffs did not show—that their alleged emotional distress is typical of the class. ....................................................................2

    B.   Named Plaintiffs propose to inflict emotional distress on class members.................................................6

    C.   Named Plaintiffs seek to certify only claims for emotional distress. ....................................................8

II.  The District Court Erred by Certifying a Class Without Finding Rule 23(b) Satisfied.........................................................9

    A.   Named Plaintiffs do not dispute that class certification requires satisfaction of at least one prong of Rule 23(b). ...................10

    B.   Named Plaintiffs' theory—that the district court made implicit findings under Rule 23(b)(3)—is meritless. ...........................11

    C.   In determining whether Rule 23(b)(3) has been satisfied, a court cannot look only at the issue(s) to be certified. ........................13

III. The District Court Erred in Analyzing the *Gates* Factors. ...........................16

    A.   The district court erred in analyzing choice of law and conflict of laws. .................................................16

    B.   The district court failed to consider the type of claim at issue and the fact that emotional distress claims introduce numerous individualized questions that make the claims here particularly ill-suited for class treatment.....................................19

i

# TABLE OF CONTENTS
(continued)

C.    Named Plaintiffs' analysis of efficiencies is incorrect .......................23

D.    The district court reduced issue certification to commonality. ........................................................................27

Conclusion & Prayer for Relief .............................................................28

Certificate of Bar Membership, Compliance with Type-Volume Limitation and Typeface Requirements, and Virus Check.......................................29

Certificate of Service .................................................................30

JA2127

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Aiello v. Providian Fin. Corp.,*
    239 F.3d 876 (7th Cir. 2001) .............................................................22

*Betz v. Pneumo Abex, LLC,*
    44 A.3d 27 (Pa. 2012).....................................................................25

*Carey v. Piphus,*
    435 U.S. 247 (1978).......................................................................20

*Cole v. Gen. Motors Corp.,*
    484 F.3d 717 (5th Cir. 2007) .............................................................17

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013).................................................................10, 15

*Ferreras v. Am. Airlines, Inc.,*
    946 F.3d 178 (3d Cir. 2019) .............................................................10

*Gasoline Prods. Co. v. Champlin Ref. Co.,*
    283 U.S. 494 (1931).......................................................................21

*Gates v. Rohm & Haas Co.,*
    655 F.3d 255 (3d Cir. 2011) .....................................................*passim*

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982).........................................................................3

*Gonzalez v. Corning,*
    885 F.3d 186 (3d Cir. 2018) ..........................................................2, 12

*Grandalski v. Quest Diagnostics Inc.,*
    767 F.3d 175 (3d Cir. 2014) .............................................................18

*Gunnells v. Healthplan Servs., Inc.,*
    348 F.3d 417 (4th Cir. 2003) .......................................................22, 23

JA2128

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989) ........................................................................ 17

*Hohider v. United Parcel Serv., Inc.*,
574 F.3d 169 (3d Cir. 2009) ........................................................... 12

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ...................................................... 18

*Kornfeind v. New Werner Holding Co.*,
2020 PA Super 266, 2020 WL 6555158 (Nov. 9, 2020) .................. 16

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ........................................................... 24

*Luppino v. Mercedes Benz USA*,
718 F. App'x 143 (3d Cir. 2017) ..................................................... 15

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ........................................................... 15

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016) ............................................................. 2

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ............................................................. 4

*Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006) ........................................................... 3

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ........................................................... 3

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) ........................................................... 3

*Pryer v. C.O. 3 Slavic*,
251 F.3d 448 (3d Cir. 2001) ........................................................... 21

iv

TABLE OF CITATIONS
(continued)

Page(s)

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982)............................................................5, 19

*In re Sch. Asbestos Litig.*,
    789 F.2d 996 (3d Cir. 1986) ...........................................17

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
    806 F.2d 1198 (3d Cir. 1986) .........................................20

*Sprint/United Mgmt. Co. v. Mendelsohn*,
    552 U.S. 379 (2008).........................................................19

*Taylor v. Johnston*,
    985 P.2d 460 (Alaska 1999) .............................................1

*Vattimo v. Lower Bucks Hosp., Inc.*,
    465 A.2d 1231 (Pa. 1983).................................................25

RULES

Fed. R. Civ. P. 23 .............................................................*passim*

OTHER AUTHORITIES

1 Newberg on Class Action § 3:43 (5th ed., June 2020 Update) ............................5

Restatement (Second) of Conflict of Laws (1971)
    § 146..................................................................................16
    § 148..................................................................................16

Restatement (Second) of Torts § 433 (1965)............................................25

## ARGUMENT IN REPLY

To decide this appeal, it is critical that this Court understand the precise claims at issue. To proceed as a class, Named Plaintiff have limited themselves to a single theory: After consenting to[1] and receiving (for some, life-saving) medical treatment from a fully licensed, board-certified physician, Named Plaintiffs allege class members suffered emotional distress when they learned (primarily from plaintiffs' counsel and years after their treatments) that their doctor pleaded guilty to misuse of a Social Security number.

Named Plaintiffs limited themselves to this theory because any claim for an injury sustained at the time of treatment by Dr. Akoda would, undeniably, be barred by limitations. The disturbing allegations recited in Named Plaintiffs' brief— "touch, harass, and sexually abuse," "examinations of a sexual nature," "wrongful touching," "violate [women]," Appellees' Br. 2, 9, 10, 11—are not the basis for their claims against ECFMG.

The class's claims must stand or fall with their emotional-distress-from-information theory of liability, and the district court's decision to certify the class under Rule 23(c)(4) must similarly be reviewed in light of this theory.

---

[1] Named Plaintiffs' theory that there has been no consent is meritless. Appellees' Br. 11. It is well established that an argument that a licensed physician should not have been licensed does not vitiate consent to treatment. *See* ECFMG Br. 28 n.8 (citing *Taylor v. Johnston*, 985 P.2d 460, 465–66 (Alaska 1999), which involves indistinguishable facts).

1

When read closely, Named Plaintiffs' brief has no answer to ECFMG's arguments. Key cases cited by ECFMG in its opening brief—such as *Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018)—are undiscussed and uncited by Named Plaintiffs. ECFMG's arguments go unanswered because they are unanswerable. Certification should be reversed.

## I. The District Court Erred in Analyzing Rule 23(a).

### A. The district court did not find—and Named Plaintiffs did not show—that their alleged emotional distress is typical of the class.

The district court did not find (and Named Plaintiffs failed to establish) that their alleged injury—emotional distress upon learning of Dr. Akoda's guilty plea—is typical of class members. ECFMG Br. 18–22. If Named Plaintiffs' purported emotional distress is atypical and unusual, then Rule 23(a) was not satisfied.

Named Plaintiffs' first argue that it is irrelevant whether their injuries are typical. Appellees' Br. 22–26. Under their theory, even if Named Plaintiffs had unusual reactions and were the only class members who suffered emotional distress upon learning of the guilty plea, a class of (almost entirely) uninjured plaintiffs could still have been certified. Such a result is facially absurd.

Rule 23(a)(3) makes clear that plaintiffs must show their claims "are typical of the claims . . . of the class." Fed R. Civ. P. 23(a)(3); *In re Modafinil Antitrust*

JA2132

*Litig.*, 837 F.3d 238, 248 (3d Cir. 2016) (requiring proof by a preponderance).[2] There is no basis to exempt the fact of injury from this requirement.

Named Plaintiffs complain that satisfying typicality would require "an entirely unworkable process," including "hundreds of depositions of class members." Appellees' Br. 26. But such a burden presumably could be addressed via appropriate expert testimony or other statistical evidence. And the rule has not proven unworkable in the numerous cases applying it.[3]

If it is "unworkable" for Named Plaintiffs to satisfy typicality here, then the answer is to deny certification, not abandon the requirement of typicality.

---

[2] The requirement of proof by a preponderance refutes Named Plaintiffs' argument that it is sufficient that "the Plaintiffs' claims arise from the same facts and legal theories as members of the class." JA53. Rule 23 is not about a plaintiff's legal theory—it is not a pleading standard; it requires proof by evidence.

[3] *See, e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982) (finding typicality lacking for failure to prove, *inter alia*, "the existence of a class of persons who have suffered the same injury" as the named plaintiff); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (finding typicality satisfied because class members "suffered the same injury" and "suffered the same generic type of harm" as the class representatives); *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) (finding typicality satisfied because each class member faced substantial risk of serious harm from the challenged policies); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (finding typicality lacking where many class members suffered no injury from alleged deception). Each decision considered the existence of the alleged harm as part of analyzing typicality. Named Plaintiffs' efforts to distinguish them fail.

Named Plaintiffs also argue that Rule 23(c)(4) exempts them from satisfying typicality because injury was not a certified issue.  Appellees' Br. 26.  But Rule 23(a) is not limited to the certified issues—it requires typicality in the "claims."

Named Plaintiffs contend it is "paradoxical[]" to suggest that there may be "uninjured (atypical) class members" if emotional distress must be "a typical reaction."  Appellees' Br. 24.  This is a non-sequitur.  "Typical" does not mean "uniform."  Just as it may be that Named Plaintiffs' alleged emotional distress is an atypical reaction and the class is largely uninjured, it also may be that emotional distress is a typical reaction but some class members were (atypically) uninjured.

Named Plaintiffs misread *In re National Football League Players Concussion Injury Litigation*, 821 F.3d 410 (3d Cir. 2016).  Appellees' Br. 24.  That case involved a class action settlement in which the typicality of injury—head injuries and related cognitive disorders associated with playing football—was supported by ample scientific evidence.  821 F.3d at 421–22.  Indeed, plaintiffs' whole case was premised on their showing that playing football predictably leads to head injuries and related cognitive disorders.  *Id.* at 420–21.  The decision offers no support for Named Plaintiffs.

Their reliance on *Newberg on Class Actions* is similarly misplaced.  The cited section explains that "the amount of damages" may vary between class members without defeating typicality, but it emphasizes that the "critical inquiry" on typicality

4

is "whether the proposed representative's claims are qualitatively similar to those of the class."  1 Newberg on Class Action § 3:43 (5th ed., June 2020 Update).  If injury is atypical, then Named Plaintiffs' claims are not "qualitatively similar" to those of the class.

In the alternative, Named Plaintiffs contend that even if the district court failed to find typicality, this Court can affirm because they presented evidence from which the district court **could have** made this finding.  *See* Appellees' Br. 27 (discussing a purported expert report by Dr. Annie Steinberg).[4]

The argument fails legally and factually.  Plaintiffs never argued (and the district court did not find) that this report had any bearing on the class certification analysis generally or the typicality inquiry specifically.  Legally, it is "elementary" that this Court cannot affirm based on a finding that the district court did not make— when findings are infirm, "a remand is the proper course unless the record permits only one resolution of the factual issue."  *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982).

Factually, Dr. Steinberg's report is worthless.  ECFMG's rebuttal expert, Dr. Susan McDonald, explained that Dr. Steinberg's survey "is not simply amateurish"

---

[4] Note the incongruity of Named Plaintiffs simultaneously arguing (1) that the typicality standard as argued by ECFMG is unworkable and impossible to satisfy; and (2) that they satisfied it.

5

but "so methodologically deficient and so biasing as to lack validity as a survey measurement tool." JA1186. And to the extent the survey is credited, it hardly supports Named Plaintiffs—most respondents indicated that they either experienced no emotional distress or experienced emotional distress **before** learning of Dr. Akoda's guilty plea, JA587, which does not support Named Plaintiffs' claims for emotional distress from learning of the guilty plea. Named Plaintiffs' failure to prove that their alleged injury is typical requires reversal of class certification.

## B.  Named Plaintiffs propose to inflict emotional distress on class members.

As ECFMG explained in its opening brief, if Named Plaintiffs' theory were correct—and learning of Dr. Akoda's guilty plea causes emotional distress—then sending notice of the class would inflict injury on class members. ECFMG Br. 22–24. Because Named Plaintiffs seek to inflict emotional distress on unnamed class members, this conflict of interest bars class certification.

Named Plaintiffs acknowledge the possibility that "class members will be upset" upon receiving the class notice. Appellees' Br. 28. But emotional distress from "be[ing] upset" at learning this information is the very injury for which Named Plaintiffs seek class recovery. If "being upset" at learning of Dr. Akoda's guilty plea is as trivial as Named Plaintiffs suggest, then Named Plaintiffs should dismiss their claims.

6

It is true, as Named Plaintiffs point out, that many class members have already been informed of the guilty plea (largely due to the efforts of Named Plaintiffs and their counsel). Appellees' Br. 29.[5]  This does not eliminate the conflict—it illustrates it.

This conflict is heightened by the nature of the claims, which are based on emotional distress at learning information.  If class members were informed of the simple truth—"You once received medical treatment from a fully licensed and board-certified physician who had misused a Social Security number."—it seems inconceivable that anyone would suffer emotional distress.  To the extent that any emotional distress has occurred, it is likely due to plaintiffs' counsel communicating the allegations in their brief, that class members were "sexually abuse[d] . . . under the guise of providing OB/GYN care."  Appellees' Br. 2.  Class counsel stand to benefit by increasing the injury to their clients (and the putative class) by dramatizing the allegations about Dr. Akoda to be as inflammatory as possible.[6]

---

[5] Indeed, the "widespread media coverage" cited by Named Plaintiffs as evidence that class members probably know of Dr. Akoda's guilty plea feature quotations from Named Plaintiffs or their counsel.  Appellees' Br. 29 & n.2.

[6] The cause of an individual class members' emotional distress—what information the person was told that caused distress, when, by whom, and why—is highly relevant to whether ECFMG had a duty to protect against it.  AMA Br. 9–13.

7

There are class members who, at present, have suffered no injury.  If Named Plaintiffs' theory is correct, then certifying a class would cause these uninjured class members to suffer emotional distress.

The district court never grappled with this fundamental conflict of interest. Named Plaintiffs fault ECFMG for not citing cases presenting similar conflicts of interest, but ECFMG cites no case because, to our knowledge, no case has ever previously involved class counsel proposing to injure class members and then seeking recovery for that injury.  It is self-evident (and flows from the adequacy and typicality standards) that this conflict bars class certification.  ECFMG Br. 22–24.

C.    **Named Plaintiffs seek to certify only claims for emotional distress.**

Named Plaintiffs accuse ECFMG of "falsely assert[ing]" that the district court failed to consider *res judicata*, Appellees' Br. 30 (citing JA53), but the phrase *res judicata* appears nowhere in the district court's opinion.  The page of the district court's opinion cited by Named Plaintiffs addresses typicality, JA53, but as ECFMG explained in its brief, claim-splitting (and the risk of *res judicata*) primarily concerns adequacy.  *See* ECFMG Br. 25 (describing claim-splitting as important "in assessing the adequacy of representation requirement").  The district court did not consider claim-splitting as part of adequacy.

Named Plaintiffs incorrectly state that ECFMG has identified no class members with alleged physical injuries.  Appellees' Br. 18.  But the report of Named

8

Plaintiffs' expert, Dr. Steinberg, noted testimonials from absent class members describing supposed "Adverse Clinical Outcomes." JA589; JA592. Any damages from an "adverse clinical outcome" would likely far exceed any damages from emotional distress.[7] But Named Plaintiffs seek recovery only for the latter.

With respect to the right of unnamed class members to opt out, Named Plaintiffs cite several cases that were certified under Rule 23(b)(3) for the proposition that class members will have an opportunity to opt out. *See* Appellees' Br. 32–33 (citing cases). But this class was not certified under Rule 23(b)(3)—it was certified under Rule 23(c)(4), without any finding that any prong of Rule 23(b) was satisfied. Nothing in the text of Rule 23 suggests that a "Rule 23(c)(4) class"— to the extent that such a thing exists—can be opted out of.

Because the district court erred in analyzing Rule 23(a), the class certification must be reversed.

## II.     The District Court Erred by Certifying a Class Without Finding Rule 23(b) Satisfied.

Named Plaintiffs' brief confirms that class certification must be reversed because the district court did not find any provision of Rule 23(b) to be satisfied.

---

[7] Named Plaintiffs argue that "there is no indication that 'all or almost all' of the individual claims are likely to be large enough to be litigated entirely individually." Appellees' Br. 31. But the burden rests with Named Plaintiffs, not with ECFMG.

The parties appear to largely agree about the governing law.  Named Plaintiffs do not dispute that (1) a class cannot be certified unless one prong of Rule 23(b) is satisfied, ECFMG Br. 30–32; and (2) in determining whether Rule 23(b) has been satisfied in a case involving Rule 23(c)(4), a court cannot consider only the issues to be certified but must consider other issues as well, ECFMG Br. 32–33; Appellees' Br. 35–36 (suggesting that the *Gates* factors—which involve non-certified issues— reflect the requirements of Rule 23(b)(3)).  Because the district court did not apply these principles, certification must be reversed.

### A.    Named Plaintiffs do not dispute that class certification requires satisfaction of at least one prong of Rule 23(b).

The key premise of ECFMG's argument goes undisputed by Named Plaintiffs: "Class certification requires the party seeking certification to satisfy one of the three subsections of Rule 23(b)."  ECFMG Br. 30–32.  This requirement follows from the plain text of Rule 23 and is acknowledged by cases discussing it. *See* ECFMG Br. 31 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013*)*; *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 182 (3d Cir. 2019)).

Named Plaintiffs do not dispute this proposition.  Their brief does not defend the idea that Rule 23 (or precedent) permits a class to be satisfied without a finding that at least one prong of Rule 23(b) has been satisfied.

Here, the district court did not find that Named Plaintiffs satisfied any prong of Rule 23(b).  The district court expressly declined to consider any portion of Rule

23(b), holding instead that it would "consider Rule 23(a) and then turn to the *Gates* factors in conducting its analysis." JA43. As a result, there is no finding by the district court regarding either predominance or superiority. Under the plain language of Rule 23, certification cannot stand.

**B.      Named Plaintiffs' theory—that the district court made implicit findings under Rule 23(b)(3)—is meritless.**

Named Plaintiffs argue (in effect) that the district court implicitly found that Rule 23(b)(3) was satisfied because the district court considered the *Gates* factors. Appellees' Br. 35–36 ("The *Gates* considerations ensure a finding that an issue class is 'appropriate' under Rule 23(c)(4) also encompasses a determination that a class action limited to the specified issues meets Rule 23(b)(3)'s demands [of predominance and superiority].").

There are at least three problems with Named Plaintiffs' suggestion. First, as ECFMG addressed in its opening brief, although the *Gates* factors might be relevant in making findings regarding predominance and superiority in a proposed class involving Rule 23(b)(3) and Rule 23(c)(4), there is a material difference between considering these factors in isolation (as the district court did here) and considering them as part of determining whether the requirements of Rule 23(b)(3) have been satisfied. ECFMG Br. 35 & n.10. A court would similarly err by considering only the four "matters pertinent to [the Rule 23(b)(3)] findings" in Rule 23(b)(3)(A)–(D),

without relying on those "matters" to make predominance and superiority findings. ECFMG Br. 35 n.10.

Indeed, Named Plaintiffs' suggestion that considering the *Gates* factors is inherently synonymous with the Rule 23(b)(3) inquiry is inconsistent with *Gates* itself, which drew the factors from *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009), a case involving a proposed class under Rule 23(b)(2). Because the *Gates* factors apply in both Rule 23(b)(2) and Rule 23(b)(3) class actions, they plainly are not simply the equivalent of the requirements of Rule 23(b)(3).

Similarly, as ECFMG noted and the Chamber highlights in its amicus brief, this Court distinguished between the *Gates* factors and the Rule 23(b)(3) inquiry in *Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018). This Court held that "the appropriateness of certifying a Rule 23(c)(4) class," which must be evaluated under *Gates*, is "analytically independent from the predominance inquiry under Rule 23(b)(3)." *Id.* at 202.

Named Plaintiffs have no answer to *Gonzalez v. Corning*, which refutes their position that the *Gates* factors and Rule 23(b)(3) are analytically identical. Although the case is this Court's only published post-*Gates* discussion of Rule 23(c)(4) and was relied on heavily by ECFMG and amici, it goes undiscussed—indeed, uncited— in Named Plaintiffs' brief.

12

Reviewing the *Gates* factors was not a substitute for the predominance and superiority findings required by Rule 23(b)(3).  The district court erred by certifying a class without these findings.

### C.   In determining whether Rule 23(b)(3) has been satisfied, a court cannot look only at the issue(s) to be certified.

Named Plaintiffs' arguments regarding how Rule 23(b)(3) must be considered are equally meritless.  At a high level, there are only two possible ways in which Rule 23(b)(3) and Rule 23(c)(4) could interact.  Predominance and superiority must be satisfied either: (1) considering only the issues certified for class treatment; or (2) considering both the issues certified for class treatment and the issues left for individual adjudication, *i.e.*, considering the claim as a whole.

Named Plaintiffs' arguments on this point are inconsistent.  Although a portion of their brief argues strenuously that after Rule 23(c)(4) is invoked, Rule 23(b)(3) considers only the certified issues, Appellees Br. 39–50, they argue several pages earlier that Rule 23(b)(3) is satisfied by considering the *Gates* factors, many of which expressly require considering the non-certified issues, *e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011) (requiring consideration whether "class resolution of the issue(s) will fairly and efficiently advance the resolution of class members' claims, **including resolution of remaining issues**" (emphasis added)).  If the *Gates* factors require considering the non-certified issues and (according to Named Plaintiffs) the *Gates* factors are synonymous with "Rule

13

23(b)(3)'s demands," Appellees Br. 36, then Rule 23(b)(3) necessarily requires considering the non-certified issues.

The alternative—considering only the certified issues—renders Rule 23(b)(3) a nullity. As Named Plaintiffs acknowledge, if only the issues certified for class treatment matter, then Rule 23(b)(3) will always be satisfied. Appellees' Br. 37. Under Named Plaintiffs' own arguments, their position cannot be correct because it renders Rule 23(b)(3) "inoperative or superfluous." Appellees' Br. 44.[8]

Named Plaintiffs attack a straw man when they accuse ECFMG of arguing that Rule 23(c)(4) should be ignored when analyzing Rule 23(b)(3). Appellees' Br. 43–44. That is incorrect—the ability of a court to certify only individual issues under Rule 23(c)(4) is surely relevant when analyzing superiority, which concerns how a case will actually be adjudicated. ECFMG does not suggest that Rule 23(c)(4) is meaningless, only (1) that a class cannot be certified without satisfying Rule 23(b); and (2) that Rule 23(c)(4) cannot be used to evade or substitute for the requirements of Rule 23(b).

---

[8] As ECFMG detailed in its opening brief (at 37 & n.13), *Gates* can be read as addressing whether issue certification is "appropriate" under Rule 23(c)(4) without adopting a holding about the interaction of Rule 23(b) and Rule 23(c)(4). Under this reading, there is nothing incongruous about *Gates* discussing certification involving Rule 23(c)(4) after rejecting certification under Rule 23(b)(3). Appellees' Br. 40. And if *Gates* is read as adopting a holding on this point, it rejected the only-certified-issues approach urged by Named Plaintiffs. 655 F.3d at 272–73.

To the extent that Named Plaintiffs contend that Rule 23(b)(3) cannot be considered until after determining whether Rule 23(c)(4) is "appropriate," their dispute is with this Court, not ECFMG. In *Luppino v. Mercedes Benz USA*—another case cited by ECFMG that is notably missing from Named Plaintiffs' brief—this Court held that a plaintiff "may seek certification under Rule 23(c)(4) as to particular issues" only after "having satisfied Rule 23(a) and (b)'s requirements" and that it would not consider (c)(4) in light of "class certification's (b)(3) defects." 718 F. App'x 143, 146 (3d Cir. 2017) (citing *Comcast*, 569 U.S. at 33).

Named Plaintiffs suggest that the remedy for this error is a remand, Appellees' Br. 50, but their brief fails to develop any argument that certification could be proper.[9] As ECFMG explained in its opening brief, in light of the overwhelming number of individual issues and the limited issues that could be resolved through class treatment, there is no argument that certification could be proper if Rule 23(b)(3) were considered. Named Plaintiffs' prediction (at 50) regarding how the

---

[9] Named Plaintiffs incorrectly state that "ECFMG concedes that common liability issues may predominate over individual issues of causation and damages." Appellees' Br. 50 (citing ECFMG Br. 34). This is false—ECFMG merely stated the general proposition that "the mere existence of individual issues does not mean that common issues do not predominate." ECFMG Br. 34. But as this Court has recognized, "individual issues of causation create irremediable predominance problems." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 604 (3d Cir. 2012).

15

district court would rule on remand is no substitute for a reasoned argument in their brief. This Court should render judgment that no class be certified.

## III.    The District Court Erred in Analyzing the *Gates* Factors.

Finally, as ECFMG detailed in its opening brief, the district court failed to engage in the requisite "rigorous analysis" of the *Gates* factors and abused its discretion in the four paragraphs of analysis that led it to conclude that certification was "appropriate" under Rule 23(c)(4).

### A.    The district court erred in analyzing choice of law and conflict of laws.

Named Plaintiffs' brief essentially repeats their entire choice-of-law argument to the district court, which consists of pointing out that Pennsylvania abandoned the *lex loci delicti* rule. *Compare* Appellees' Br. 52–53, *with* JA194–95. This is true, but Named Plaintiffs misstate Pennsylvania's actual choice-of-law test, which relies on the Restatement (Second) of the Conflict of Laws, particularly including the "presumption in personal injury cases that favors the application of the law of the state where the injury occurred." *Kornfeind v. New Werner Holding Co.,* 2020 PA Super 266, 2020 WL 6555158, at *10–11 (Nov. 9, 2020) (discussing Restatement (Second) of Conflict of Laws § 146).[10] Pennsylvania has no interest in applying its

---

[10] Because Plaintiffs' claims are based on alleged misrepresentations made by ECFMG to its clients, ECFMG believes that Section 148(2) supplies the appropriate standard. In any event, both lead to the same conclusion: application of the law of the state where a class member was treated by Dr. Akoda.

laws to claims arising from out-of-state treatment by an out-of-state doctor of an out-of-state patient or arising from communications received by out-of-state entities deciding which individuals will be licensed to practice medicine in other states.

Indeed, as ECFMG noted in its opening brief, difficult constitutional issues would arise if Pennsylvania attempted to apply its law to these claims. Fundamentally, Named Plaintiffs' theory is that Dr. Akoda should not have been licensed to practice medicine.  But Pennsylvania cannot say which doctors should be licensed to treat patients in Virginia or Maryland, whether it attempts to do so directly or indirectly through the imposition of liability in tort.  Under our federal structure, a State cannot "control conduct beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).  It is no answer for Named Plaintiffs to distinguish the facts of *Healy* (at 56–57)—the legal principle would squarely apply if Pennsylvania attempted to apply its tort laws to the conduct of out-of-state physicians treating out-of-state patients.  Constitutional avoidance suggests applying the law of the state of treatment.

A party seeking certification must "provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles[,] [a]nd the district court must then consider how variations in state law affect predominance." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (internal quotation marks and citation omitted); *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.

17

1986) (plaintiff presented an "extensive analysis"); *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 184 (3d Cir. 2014) (involving plaintiffs' failure to provide sufficient analysis of state law); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) (noting that the burden "rests squarely with the plaintiffs").

Named Plaintiffs do not contend that they satisfied this burden. Instead, they argue that it never arose, citing a comment to the Principles of the Law of Aggregate Litigation and a law review article. Appellees' Br. 52. Such authority cannot overcome the black-letter law of the federal courts. Named Plaintiffs failed to carry their burden to provide an analysis of the law of the different states, proving that it was no barrier to certification.

Named Plaintiffs also cannot shift the burden to ECFMG, *see* Appellee's Br. 53 (arguing that ECFMG was required to prove the existence of a "true conflict"), and the district court abused its discretion in relying on Plaintiffs' representation that they were "unaware" of any relevant conflicts, JA194, particularly when ECFMG pointed out that such conflicts existed.

Here again, Named Plaintiffs simply ignore the cases cited on page 43 of ECFMG's opening brief that illustrate the conflict between the laws of Maryland, Virginia, and the District of Columbia. As with other authority that is unfavorable to them, Named Plaintiffs neither discuss the cases nor cite them in their brief.

18

**B.    The district court failed to consider the type of claim at issue and the fact that emotional distress claims introduce numerous individualized questions that make the claims here particularly ill-suited for class treatment.**

As ECFMG explained in its opening brief, the district court did not address two of the *Gates* factors: "the type of claim(s) and issue(s) in question" and "whether the substantive law separates the issue(s) from other issues concerning liability or remedy." 655 F.3d at 273.

This should not be open to dispute. The district court's analysis of the *Gates* factors is found on JA59 through JA62. These factors are not discussed.

Named Plaintiffs misstate the record when they assert the contrary. Appellees' Br. 57. Although the district court discussed various aspects of Named Plaintiffs' claims, the district court never addressed these *Gates* factors.

Standing alone, this requires a reversal. It is not enough for Named Plaintiffs to argue that if the district court had considered the factors, it might still have certified the class action. *Cf. Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("When a district court 'fail[s] to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings.'" (quoting *Pullman-Standard*, 456 U.S. at 291)).

Indeed, Plaintiffs' lead argument appears to be that this Court should overrule this portion of *Gates* and hold that the type of claim and the substantive law is

19

irrelevant to class certification. *See* Appellees' Br. 57–58 (arguing that these factors should be ignored because the Federal Rules "are trans-substantive"). There is no reason to depart from *Gates* for these two factors, and considering the nature of the claim in the context of Rule 23(c)(4) is both rational and appropriate.

This Court should hold that in this case, the type of claim at issue—and the failure of the substantive law to separate the existence and amount of emotional distress from other issues—renders certification inappropriate under Rule 23(c)(4).

In *Spence v. Board of Education of Christina School District*, 806 F.2d 1198 (3d Cir. 1986), this Court applied "the rule that emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Id.* at 1202 (citing *Carey v. Piphus*, 435 U.S. 247, 263 (1978)). Here, to recover against ECFMG for any alleged emotional distress, any trier of fact must evaluate "all of the circumstances surrounding the alleged misconduct," *i.e.*, all of ECFMG's alleged wrongdoing. As a result, the nature of the claim strongly weighs against bifurcating it into separate proceedings. Named Plaintiffs cannot deny *Spence*'s holding or the rule it applied.

Named Plaintiffs' response is puzzling. They apparently attempt to recast their claims as some type of vicarious liability, implying that they intend to hold ECFMG vicariously liable for Dr. Akoda's torts. *See* Appellees' Br. 62 ("ECFMG's conduct determines its responsibility but not whether Plaintiffs' interactions with

20

[Dr. Akoda] resulted in compensable emotional harm[.]").[11]  But—as ECFMG noted above—this is not the claim they have asserted, and there is no basis to impose vicarious liability on ECFMG for any of Dr. Akoda's alleged wrongs.  To the extent that Named Plaintiffs can recover from ECFMG, it must be because of emotional distress allegedly caused by ECFMG's alleged negligence, which necessarily requires any jury considering the existence and amount of emotional distress to rehear all of the evidence regarding ECFMG's conduct.

In some cases, of course, a new trial can be held only on damages, but the individual issues here go far beyond damages and include causation and injury.  A partial new trial is allowed only when "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."  *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454–55 (3d Cir. 2001) (quoting *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931)).  Damages cannot be tried separately where, as here, they are "so interwoven with . . . liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial."  *Id.* at 455 (quoting *Gasoline Prods.*, 283 U.S. at 500).

---

[11] And, of course, it is not the "interactions with Dr. Akoda" that allegedly caused emotional distress—it is learning of his guilty plea.

Indeed, *Aiello v. Providian Financial Corp.*, 239 F.3d 876 (7th Cir. 2001), speaks directly to this situation, noting that "claims of emotional distress . . . are so easy to manufacture" and the "potential for abuse" in awarding "damages for a purely emotional injury." *Id.* at 880–81. Allowing class plaintiffs to aggregate claims for emotional damages and trying them individually has the plain purpose of "forc[ing] settlement by confronting the defendant with an avalanche of litigation and an unquantifiable potential liability." *Id.* at 881. Named Plaintiffs' conclusory response—"Those circumstances are not present here," Appellees' Br. 61—is no answer.

Named Plaintiffs identify only a single case involving certification of a class seeking damages for emotional distress: *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417 (4th Cir. 2003). But damages for emotional distress were only a small component of the claims, which largely involved economic injury:

> [T]he damage calculations in this case do not appear to be particularly complex, unlike the calculations in those cases in which courts have found that numerous complicated individual damage inquiries predominated over common issues. . . . [I]t appears that a court-appointed fiduciary has already calculated most of the Plaintiffs' claims for medical bills using [a] computer program[.] Thus, in many cases there is likely to be little or no dispute over the amount to which an individual class member is entitled for unpaid medical claims. Similarly, if the court determines that Plaintiffs are entitled to a refund of premiums paid, these amounts could be quickly and easily determined.

*Id.* at 429.[12]  The case provides no support for class certification here, where Named Plaintiffs pursue certification of a class seeking only unverifiable emotional distress at learning information, as opposed to a small component of damages for a class primarily seeking economic recovery.  Certification here is unprecedented and erroneous.

### C.    Named Plaintiffs' analysis of efficiencies is incorrect.

The parties' dispute concerning efficiencies confirms the error in the district court's analysis.  On appeal, the parties disagree regarding what will be decided in class proceedings and what issues remain to be tried in individual proceedings.  This uncertainty exists because neither Named Plaintiffs nor the district court seriously grappled with how the case would actually be tried if these issues were certified.  One is left with the impression that class certification was valued more for the purposes of pressuring settlement than as a realistic means of trying claims.

As an initial matter, Named Plaintiffs discuss only Pennsylvania law in this portion of their brief.  Appellees' Br. 63–66.  They make no attempt to show that the law of the other states is identical on these complex issues of state law.  *See, e.g.,*

---

[12] Indeed, certification was only conditional, and the district court "was fully aware of the possibility that individual issues, although currently subordinate to the common liability and damage issues, might in time predominate and the case prove unmanageable." *Gunnells*, 348 F.3d at 430.

Appellees' Br. 65 n.16 (arguing that "factual cause" is different from "proximate cause" under Pennsylvania law).

There is no question that lengthy individual proceedings would be required. Each plaintiff would need to prove individually, the existence of emotional distress and the amount of any recovery. That is, neither injury nor damages can be proven on a classwide basis. This Court has "consistently distinguished injury from damages." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020). The difference "is significant" because this Court applies a stricter predominance standard for injury than for damages. *Id.* at 195.

And Named Plaintiffs do not deny that all of ECFMG's affirmative defenses—including each plaintiff's consent to treatment by Dr. Akoda—will be tried individually.

Causation, as well, is left for individual proceedings. Named Plaintiffs suggest that the other causes of an individual plaintiffs' alleged injury—such as residency programs that admitted Dr. Akoda, medical boards that licensed him, hospitals that gave him privileges, the specialty board that certified him, law enforcement officers who investigated him, and the role of plaintiffs' counsel and Named Plaintiffs in informing class members of Dr. Akoda's alleged wrongdoing— are wholly irrelevant to their claims against ECFMG.

24

This is incorrect. Not only does proximate causation involve questions of remoteness,[13] but the Supreme Court of Pennsylvania has held that when multiple causes are involved, evaluating substantial-factor causation may require "a proportionate evaluation" of the contributions of different causes. *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 56 n.36 (Pa. 2012) (citing Restatement (Second) of Torts § 433, cmt. d); *see also id.* ("This Court has cited Section 433 [of the Restatement (Second) of Torts] as consistent with Pennsylvania law."). Indeed, as the Restatement emphasizes, the first consideration in evaluating whether an act is a substantial factor is "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it." Restatement (Second) of Torts § 433(a).

In this case, to evaluate causation with respect to any individual plaintiff, every jury would need to rehear all of the evidence of all of the numerous causes that led to an individual being treated by Dr. Akoda in order to determine whether

---

[13] Legal liability does not extend all the way down the causal chain. *See Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1233 (Pa. 1983) (explaining that "the concept of legal cause (the traditional 'proximate cause') is an articulation of policy related to social and economic considerations," whether "the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred"). As Amici American Medical Association, Pennsylvania Medical Society, and Association of American Medical Colleges discuss, ECFMG's role in the certification process is far too remote and limited for any duty or proximate causation to exist. AMA Amicus Br. 14–18.

ECFMG's relatively minimal role in Dr. Akoda's credentialing was a substantial factor in causing a particular plaintiff's injury.

And even apart from substantial-factor causation, evaluating but-for causation would require a lengthy presentation of evidence regarding other actors. As best ECFMG understands Named Plaintiffs' theory, it is that ECFMG was negligent because it should have (1) performed more investigation than it did; and (2) based on the result of that investigation, sent a letter to third parties. *See* Appellees' Br. 1–2 (asserting that ECFMG "failed to inform state medical boards, residency programs, and hospitals"); Appellees' Br. 8 ("never notified" and "had not investigated the matter further"). To prove but-for causation, Named Plaintiffs must prove both (1) what the results of that additional investigation might have been; and (2) that if ECFMG had sent the letter that Named Plaintiffs contend should have been sent, third parties would have acted to prevent Dr. Akoda from treating patients.

As ECFMG explained, this class certification is indistinguishable from the certification rejected in *Gates*: "[I]n light of the 'numerous individual issues that would remain,' resolution of the common issues was 'unlikely to substantially aid resolution of the substantial issues on liability and causation.'" ECFMG Br. 51 (quoting *Gates*, 655 F.3d at 272, 274).

Named Plaintiffs' only response is that in this case, issue certification "will meaningfully advance ultimate termination of the litigation by resolving the central

26

issues of duty and breach of duty." Appellees' Br. 66. This is no answer. In *Gates*, the plaintiffs sought certification of whether defendants breached their duty by "discharg[ing] vinylidene chloride into the lagoon that seeped in the shallow aquifer." 655 F.3d at 274. But in *Gates*, like here, these narrow, abstract questions are "inseverable from other issues that would be left for follow-up proceedings" and "unlikely to substantially aid resolution of the substantial issues on liability and causation." *Id.* at 273–74.

*Gates* is indistinguishable and confirms that the issue certification ordered in this case is not appropriate under Rule 23(c)(4).

### D. The district court reduced issue certification to commonality.

Finally, as ECFMG and the Chamber established, under the district court's analysis, virtually any common issue would be appropriate for certification under Rule 23(c)(4). ECFMG Br. 53–54 (discussing JA59–61). Named Plaintiffs have no response. They cannot deny what ECFMG demonstrated: the district court's justifications for issue certification would apply equally to any common issue. Such a result cannot be correct and confirms the error in certification.

JA2157

## CONCLUSION & PRAYER FOR RELIEF

ECFMG respectfully renews its prayer that this Court reverse the order granting certification and render judgment that no class be certified.

Dated: November 23, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ William R. Peterson*
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103

*Counsel for Appellant, Educational Commission for Foreign Medical Graduates*

28

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I, William R. Peterson, counsel for Appellant Educational Commission for Foreign Medical Graduates, certify, pursuant to Local Appellate Rule 28.3(d), that I am a member in good standing of the Bar of this Court.  I further certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5)–(7), and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Reply Brief is proportionately spaced and has a typeface of 14-point Times New Roman, contains 6,482 words, and that the text of the electronic brief is identical to the text of the paper copies.  I further certify, pursuant to Local Appellate Rule 31.1(c), that McAfee Endpoint Security did not detect a virus.

*/s/ William R. Peterson*
William R. Peterson

## CERTIFICATE OF SERVICE

I, William R. Peterson, counsel for Appellant Educational Commission for Foreign Medical Graduates, certify that, on November 23, 2020, a copy of the foregoing Reply Brief was filed electronically through the appellate CM/ECF system with the Clerk of the Court.  All counsel of record in this case are registered CM/ECF users.  Pursuant to Local Appellate Rule 31.1, as amended by the April 29, 2013 order, seven copies of this brief were sent to the Clerk of the Court for delivery.

*/s/ William R. Peterson*
William R. Peterson
*Counsel for Appellant,*
*Educational Commission for*
*Foreign Medical Graduates*

Dated: November 23, 2020

JA2160

UNITED STATES COURT OF APPEALS
THIRD CIRCUIT

MONIQUE RUSSELL, JASMINE       . Case No. 20-2128
RIGGINS, ELSA POWELL, DESIRE   .
EVANS,                         .
                               .
           Appellees,          .
      vs.                      .
                               .
EDUCATIONAL COMMISSION FOR     . U.S. Courthouse
FOREIGN MEDICAL GRADUATES,     . 601 Market Street
                               . Philadelphia, Pennsylvania
           Appellant.          .
. . . . . . . . . . . . . . . . . Thursday, February 11, 2021

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE LUIS FELIPE RESTREPO
THE HONORABLE STEPHANOS BIBAS
THE HONORABLE DAVID JAMES PORTER
UNITED STATES CIRCUIT COURT JUDGES


APPEARANCES VIA VIDEO CONFERENCE:

For the Appellant:        William R. Peterson, Esq.
                          MORGAN, LEWIS & BOCKIUS
                          1000 Louisiana Street
                          Houston, Texas 77002

For the Appellees:        Patrick A. Thronson, Esq.
                          JANET, JANET & SUGGS
                          4 Reservoir Circle
                          Suite 200
                          Baltimore, Maryland 21208


Audio Operator:           Electronically Recorded

Transcription Company:    AdvancedONE Legal
                          1600 Market Street, Suite 1700
                          Philadelphia, Pennsylvania 19103
                          (855)204-8184


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.



(866) 715-7770
advancedONE.com

JA2161

```
 1                              INDEX

 2                                                    Page

 3   ARGUMENT BY MR. PETERSON                            3

 4   ARGUMENT BY MR. THRONSON                           16

 5   FURTHER ARGUMENT BY MR. PETERSON                   34

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



(866) 715-7770
advancedONE.com

 1              (Proceedings commence)

 2         THE COURT:  So I'll call the case of Monique

 3   Russell, et al v. The Educational Commission for Foreign

 4   Medical Graduates, Docket Number 20-2128.

 5         Mr. Peterson.

 6         MR. PETERSON:  Thank you, Your Honor.  Good

 7   morning.  William Peterson on behalf of The Educational

 8   Commission for Foreign Medical Graduates.

 9         I'd like to request three minutes for rebuttal.

10         THE COURT:  Sure.

11         MR. PETERSON:  Thank you.

12         There are three independent grounds to reverse the

13   class certification order, each corresponding to a different

14   section of Rule 23:

15         First, under Rule 23(a), there are the errors with

16   respect to typicality and adequacy.

17         Second, there is the failure to make any finding

18   with respect to Rule 23(b).

19         And third is the abuse of discretion in applying

20   the Gates factors to conclude that class certification is

21   appropriate under Rule 23(c)(4).

22         We start first with typicality and adequacy.  There

23   is no finding by the district court that the alleged injuries

24   suffered by the named plaintiffs -- that is, emotional

25   distress upon learning that the licensed and board-certified

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  doctor who treated them pleaded guilty to misuse of a Social

2  Security number -- are typical injuries of the class.  And

3  recall that this class includes all patients who were treated

4  or even examined by Dr. Akoda in any way.

5          THE COURT:  No, but if we're talking though about a

6  class that's just for duty and breach, why does the injury

7  have to be typical?  Wouldn't it just be the duty that was

8  breached that would have to be typical?  Because we're not

9  talking about causation and damages here.

10          MR. PETERSON:  Well, Your Honor, Rule 23(a) doesn't

11  refer to the issues that are certified for class treatment.

12  Rule 23(a) requires that the claims or defenses of the

13  representative parties are typical of the claims and defenses

14  of the class.  So, if there's no typicality of the injury,

15  there is no typical claim whatsoever among the unnamed class

16  members.

17          THE COURT:  So was the district court wrong when it

18  concluded that the claims arise from the same legal theory,

19  that's insufficient?

20          MR. PETERSON:  He was correct to say that the

21  claims arise from the same legal theory, wrong to conclude --

22          THE COURT:  And from the --

23          MR. PETERSON:  -- that is --

24          THE COURT:  -- same course of conduct.  He also

25  concluded that it came from the same course of conduct,



AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

1   right?

2           MR. PETERSON:  Yes, Your Honor.

3           THE COURT:  So that was --

4           MR. PETERSON:  That's correct.

5           THE COURT:  That was correct.

6           MR. PETERSON:  Yes.  But injury, as well, is a

7   requirement for typicality.

8           THE COURT:  Why?

9           MR. PETERSON:  And even (indiscernible)

10          THE COURT:  Why, though?  Why, at least when -- it

11  says claims or defenses.  And ordinarily, injury would be in

12  there, when we're talking about a class as to the entire

13  claim.  But when we're talking about issue classes, why

14  shouldn't it just be the portion of the claim, the relevant

15  portion of the claim that has to be typical?

16          MR. PETERSON:  Well, Rule 23(a) goes to whether a

17  class, at a high level, is appropriate at all, whether the

18  class certification device should be used.  And the problem

19  is, if the other unnamed class members don't have any

20  interest in these proceedings -- I mean, assume the extreme

21  hypothetical in which the four named plaintiffs were the only

22  individuals who suffered any emotional distress, and none of

23  the other class members suffered any emotional distress on

24  learning this information at all -- there would be absolutely

25  no need to use the class action device --

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1      THE COURT:  Okay.  But that's not --

2      MR. PETERSON:  -- (indiscernible)

3      THE COURT:  -- what we're talking about here.

4      MR. PETERSON:  Well, there's no proof.  I mean, at

5  the end of the day, Rule 23(a) has to be satisfied by a

6  preponderance of the evidence.  And if you look at where the

7  plaintiffs attempted to show typicality, you'll see -- Joint

8  Appendix 188, Joint Appendix 1315 -- they do not cite to any

9  evidence in the record in their typicality analysis and there

10  are no findings by the district court related to typicality.

11      But let me turn to adequacy because, even if you

12  accept the theory that emotional distress is a typical

13  reaction to learning this information, it creates the issue

14  that we highlighted, which is that, if, under their theory,

15  certifying the class and providing this information to class

16  members would, in fact, cause currently uninjured class

17  members to suffer an injury as a result of the class

18  certification, individuals who do not currently suffer from

19  emotional distress would, at that point in time, be suffering

20  from emotional distress going forward.  We see that as a

21  fundamental conflict between the named plaintiffs and the

22  unnamed class members.

23      THE COURT:  How is that a --

24      MR. PETERSON:  It's (indiscernible)

25      THE COURT:  How is that a conflict?  How are the --



1  | how are the interests of the four named plaintiffs different
2  | or in conflict with any potential claim members?
3  |         MR. PETERSON:  Because what the named plaintiffs
4  | are asking the Court to do is inflict an injury.
5  |         THE COURT:  No.
6  |         MR. PETERSON:  They --
7  |         THE COURT:  No.  The injury comes -- the injury
8  | could well come from the actual misconduct.  You can't then
9  | blame it on the revelation of the misconduct.  You're
10 | shooting the messenger.
11 |         MR. PETERSON:  Well, you could be.  But the
12 | question is -- you have someone who, right now, is happily
13 | living their life, they are suffering from no --
14 |         THE COURT:  Okay.
15 |         MR. PETERSON:  -- emotional distress or --
16 |         THE COURT:  So the argument is we should let you
17 | run out the statute of limitations and then say it's too
18 | late, by the time they discovery it.
19 |         MR. PETERSON:  Well, actually, the statute of
20 | limitations is a fascinating point here because, under
21 | plaintiffs' theory, the way they are getting around the
22 | statute of limitations is to say that limitations begins when
23 | you learn the information.  So, under their theory of the
24 | case, you don't look at the limitations from the time of
25 | treatment.  They say there is no injury, they say there is no



1  limitations accrual until you actually learn this information

2  and begin to suffer the emotion distress.

3           THE COURT:  You have --

4           THE COURT:  Would you stipulate to that?

5           MR. PETERSON:  I would not stipulate to that --

6           THE COURT:  Ah.  Then they --

7           MR. PETERSON:  -- because that is --

8           THE COURT:  -- can't rely --

9           MR. PETERSON:  -- that is --

10          THE COURT:  -- on that.

11          MR. PETERSON:  But that is my friend's theory,

12  that's the theory that the plaintiffs are proceeding on, and

13  that's the theory that it's appropriate to hold them to, to

14  the adequacy determinations.

15          And right or wrong, this is an argument that we

16  made to the district court below and it's an analysis that

17  wasn't performed in the class certification order.

18          THE COURT:  Come back to this -- to the conflict

19  issue.  How are they adverse to one another?  How are the

20  interests of the named plaintiffs adverse or in conflict with

21  the interests of yet-to-be-named plaintiffs?

22          MR. PETERSON:  The conflict, as we see it, is that

23  the named plaintiffs have said, "In our view, sharing this

24  information with the class will cause the class members

25  emotional distress."  That is their theory.  Learn the

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

```
 1  information, you go from not being injured to being injured.
 2  You move from not suffering any emotional distress to
 3  suffering emotional distress.  And the named plaintiffs are
 4  saying we would like the district court to send notification
 5  to the class to provide this -- them this information and for
 6  them to have -- suffer an injury.
 7           Now, look, to be clear, it's not perfectly clear to
 8  me whether this fits into the adequacy or typicality bar.
 9  It appears to be a novel circumstance.  We have not
10  identified any case previously in which class counsel was
11  saying, "We would like to represent a group of uninjured
12  plaintiffs, and we think you should then inflict emotional
13  distress on them, so that we can then recover" --
14           THE COURT:  Well, you don't have --
15           MR. PETERSON:  -- allow (indiscernible)
16           THE COURT:  -- any authority for your proposition.
17  You don't have any authority that says that keeping people in
18  the dark prevents them from being injured.
19           MR. PETERSON:  No, Your Honor, I don't.  And I'll
20  admit, though, that I think it's a difficult question, but I
21  think it's a question that needed to be wrestled with and
22  addressed as part of the class certification analysis.
23           THE COURT:  Okay.  Well, then --
24           THE COURT:  But --
25           THE COURT:  -- shouldn't the scales be tipped by
```



AdvancedONE LEGAL
(866) 715-7770
advancedONE.com

 1  the fact that you won't stipulate that this -- that there's

 2  no statute of limitations problem here, and so we should err

 3  on the side of at least giving them the choice and empowering

 4  them because Rule 23 favors letting the party decide to opt

 5  in or opt out?

 6          MR. PETERSON:  And the problem, as I see it, is

 7  that the uninjured party, it's not a question of opting in or

 8  opting out; it's a question of suffering the injury or not

 9  suffering the injury.

10          THE COURT:  So you want to say --

11          MR. PETERSON:  Again --

12          THE COURT:  -- that the injury is really being

13  caused by the attorneys and distract from the fact that your

14  own client had a role in playing these injuries, and a lot of

15  people, they may be injured out there and just not know how

16  to sue about it.

17          MR. PETERSON:  Well, that's the -- if -- under

18  plaintiffs' theory, they have not been injured until they

19  learn the information.

20          THE COURT:  Okay.  They could amend that.  I mean,

21  fine, we can agree to disagree on that.

22          Before we leave Rule 23, I forgot to ask on

23  typicality.  Didn't you forfeit the typicality issue below?

24  You didn't preserve this.

25          MR. PETERSON:  No, Your Honor.  We certainly --



```
 1          THE COURT:  Okay.  Give me a citation as to where
 2   you preserve this issue.  Where did you raise it below?
 3          MR. PETERSON:  Joint Appendix Page 734.
 4          THE COURT:  Okay.  I looked.  Joint Appendix 732 to
 5   33 don't really seem to discuss this.  I ought to look at 734.
 6          THE COURT:  Does the record show -- does the record
 7   show how many putative class members have not yet learned
 8   about this conduct, so we can better --
 9          MR. PETERSON:  It's not --
10          THE COURT:  -- assess --
11          MR. PETERSON:  It's not --
12          THE COURT:  -- we can better assess your argument?
13          MR. PETERSON:  It's not perfectly clear, Your
14   Honor.  It's not perfectly clear how many putative class
15   members there are.  You know, recall, of course, it's not
16   examined in any way and it's difficult to know exactly how
17   many class members there will be.  There appears to be some
18   indication that hundreds of class members have been informed
19   of this.
20          But with the Court's permission, let me turn to
21   Rule 23(b).
22          THE COURT:  Please.
23          MR. PETERSON:  Thank you.
24          As Rule 23's text requires and as the cases
25   interpreting it make plain, class certification requires
```

1  satisfication [sic] -- satisfaction of one of the prongs of
2  Rule 23(b), in addition to satisfaction of Rule 23(a).  Here,
3  the district court did not make any findings on any of the
4  prongs of Rule 23(b).  Instead, it looked at 23(a) and then
5  to the Gates factors.
6          THE COURT:  Is that required?  Is twenty -- is
7  analysis of 23(b) required under Gates and under the majority
8  view these days?
9          MR. PETERSON:  Yes, Your Honor.  And to be clear --
10         THE COURT:  And what case supports that?  Other
11 than the Fifth Circuit footnote from '96, what do you have?
12         MR. PETERSON:  Well, I would point you, for
13 example, to Martin v. Behr Dayton Thermal Products --
14         THE COURT:  And that's --
15         MR. PETERSON:  -- a Sixth Circuit case --
16         THE COURT:  -- a case where the Supreme Court
17 denied cert on this issue, right?
18         MR. PETERSON:  It is a case -- and I think it's a
19 case that my friend champions.  And that's a case where it
20 does accept the idea that you can certify under 23(c)(4)
21 without proceeding to look at predominance and superiority --
22 or I'm sorry -- without looking at predominance with respect
23 to the non-certified issues.  However, it nonetheless applies
24 a robust test for predominance, looking at whether these are
25 truly separate issues or not.  And it actually says you do

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

 1  need to look at superiority with respect to the claims as a
 2  whole, explaining that superiority functions as a backdrop
 3  against inefficient certification.  There is no court that I
 4  am aware of that says you can disregard Rule 23(b) as a part
 5  of certification.
 6          Now Gates is a difficult case and it's difficult to
 7  understand.  I'll certainly admit that.  I think there are
 8  several ways of reading it and we've tried to set out a
 9  couple of them in the brief.  I think the most that you can
10  read Gates for is the proposition that those factors are a
11  way of determining the predominance requirements of Rule
12  23(b).  But I don't think you can read the text of Gates and
13  say those factors are also as substitute for the superiority
14  requirements of Rule 23(b).
15          Now, in our view, we think that's wrong.  We do
16  think you need to take those Gates factors and not simply
17  look at them in isolation.  But even if you're going to
18  consider them, proceed to use them to make the required
19  superiority finding of Rule 23(b) -- I'm sorry -- the
20  required predominance finding of Rule 23(b)(3) and to make
21  the separate superiority finding of Rule 23(b) with respect
22  to the claims as a whole.
23          Let me turn briefly, though -- I'd like to turn
24  back to the interaction of 23(b) and (c)(4) -- I know I'm
25  pressed for time -- and just briefly touch upon the



(866) 715-7770
advancedONE.com

1   application of the Gates factors in this case, which may be

2   the easiest way of resolving it.

3           We detailed the variations in state law in the

4   briefing.  We think the district court erred in concluding

5   Pennsylvania law could apply.  And with respect to the

6   variations in state law, it's not enough to say each of these

7   states has duties as an element of negligent inflection of

8   emotional distress.  This is a novel claim, attempting to

9   create broad new duties.  If you're going to say the state

10  law is the same, you have to do more than simply say they all

11  have duty as an element.  You would have to show that every

12  state would impose the same sweeping duty on credentialing

13  organizations.

14          With respect to the type of claim at issue, as we

15  pointed out, emotional distress is not a claim where you can

16  bifurcate damages and liability.  What my friend is going to

17  say is that the emotional distress is solely due to treatment

18  by Dr. Akoda.  That's not the case, though.

19          And I point you to Ms. Russell's deposition

20  testimony on Joint Appendix Page 403 because what she says

21  there is, "it's not just feeling violated by treatment by Dr.

22  Akoda, but it's feeling violated by the institutions that

23  allowed her to be treated by Dr. Akoda."  She's feeling

24  violated that -- in her view, she thinks ECFMG is a government

25  organization that performs background checks -- but in her

1  view, it's the institutions that were supposed to protect her

2  from Dr. Akoda that failed.  So her alleged emotional

3  distress really is traced to her view of ECFMG's actions, not

4  just the fact that she was treated by Dr. Akoda.  And in

5  analyzing that emotional distress, you would need to look at

6  all of the circumstances leading up to it.

7        Again, we argued this, we argued Spence to the

8  district court, it wasn't considered.  With the efficiencies,

9  as we pointed out, virtually all of the information presented

10 in any common proceedings would need to re-presented in any

11 individual proceedings.  Causation, all of our affirmative

12 defenses, the vast meat of the case is left for subsequent,

13 individual proceedings.  This case really is Gates, where the

14 plaintiffs were seeking to certify narrow, abstract questions

15 of duty and breach, while leaving the vast bulk of the case

16 for subsequent treatment in individual proceedings.

17        THE COURT:  Thank you, Counsel.  I mean, if you

18 have -- if -- I didn't mean to cut you off.  Did you want to

19 finish up here?

20        MR. PETERSON:  No.  Thank you.

21        With respect to Rules 23(b) and (c)(4) -- and I'm

22 sorry, Your Honor, I believe I'm into my rebuttal time.

23        THE COURT:  It's -- no, no, go ahead, go ahead.  Go

24 on, Counsel.

25        MR. PETERSON:  Thank you.



1          I just encourage the Court to look at the advisory

2   committee notes in 1990 -- 1966 to Rule 23, with respect to

3   Rule 23(b)(3) and 23(c)(4).  Both of them use the same

4   example, a fraud claim in which liability issues are suitable

5   for common treatment and damages are individualized.  And

6   what Rule 23(b)'s comments say is that is an example in which

7   the common liability issues predominate over the

8   individualized damage question.  That's the same example

9   called back to in Rule 23(c)(4), not as a way of evading the

10  predominance test, but pointing out the predominance test was

11  satisfied.

12          The circuits that have gone astray -- the Second

13  Circuit in the Nassau decision, the Sixth Circuit in its Behr

14  decision -- have both misread the advisory committee notes to

15  23(c)(4), suggesting that fraud example is an example of

16  evading the predominance requirements of 23(b)(3), not

17  correctly recognizing it as an example in which the

18  predominance requirements are satisfied.

19          THE COURT:  Thank you, Counsel.  We'll get you back

20  up on rebuttal shortly.

21          Mr. Thronson.

22          MR. THRONSON:  Thank you, Judge Restrepo.  May it

23  please the Court, Patrick Johnson on behalf of

24  (indiscernible) class.

25          The district court acted within its broad



 1 | discretion in certifying the negligence elements of duty and
 2 | breach which are indisputably common to all class members  A
 3 | single course of conduct in one state by the sole defendant
 4 | gave rise to claims of one type of class-wide harm under one
 5 | legal theory.
 6 |            THE COURT:  Let me start --
 7 |            MR. THRONSON:  All plaintiffs --
 8 |            THE COURT:  Let me back you up to the Gates
 9 | factors.  All right?
10 |            MR. THRONSON:  Sure.
11 |            THE COURT:  Did the district court do a robust
12 | enough analysis, so to speak, of the Gates factors?
13 |            MR. THRONSON:  Yes, Your Honor.  There are two
14 | factors that my colleague indicated -- claimed were not
15 | addressed in the district court's opinion in the reply brief.
16 | The type of claims and issues in question -- that's addressed
17 | throughout the district court's opinion.  And the district
18 | court performed a very careful and discriminating analysis in
19 | determining whether, for example, the entire issue of
20 | liability could be certified, versus certain elements of
21 | negligence in this case.  And that's on Pages Joint Appendix
22 | 45 and 56 and onward.
23 |            The second is the -- whether the substantive law
24 | separates the issues from other issues concerning liability
25 | or remedy.  If you look at the ALI Principles on which the

```
 1   Gates factors were modeled, the question there is whether,

 2   essentially, the district court can appropriately carve at

 3   the joint and find issues that can be efficiently and

 4   appropriately isolated for common treatment -- for common

 5   resolution, while leaving the remaining issues for

 6   individual resolution.  So you see consideration of those --

 7   that issue at 56 and 59 through 62.

 8            THE COURT:  The efficiency --

 9            THE COURT:  Mr. Thronson --

10            THE COURT:  Sorry.  Mr. Bibas, go ahead.  Judge

11   Bibas, go ahead.

12            THE COURT:  Sorry.  We should get back to

13   efficiencies.  But I did want to ask you about a couple of

14   factors that your friend doesn't focus on.  I didn't see

15   express discussion of Number 2, overall complexity; Number 6,

16   potential preclusive effect, or Number 7, repercussions of

17   certification on resolution of remaining issues.  Do you see

18   that in the record?

19            MR. THRONSON:  I -- in terms of the overall

20   complexity of the case, I think that -- I mean, the district

21   court accurately describes what the case is about, what the

22   claims are, talks about that individual -- these individual

23   elements of negligence can be isolated for class-wide

24   resolution, contemplates what the follow-on proceedings will

25   involve, in terms of the resolution of individual claims.  I
```

```
 1   think that's inherent in the entire discussion, Judge Bibas.
 2              In terms of the potential preclusive effect, on
 3   Joint Appendix 60 through 61, the Court, for example,
 4   discusses whether non-mutual collateral estoppel could be
 5   sufficient and determines that class treatment -- determines
 6   that it can't be, that it won't be because it will generate
 7   inconsistent outcomes.  And if ECFMG prevails in one trial,
 8   they can't use that result against another plaintiff, and
 9   that the preclusive effect of a class determination of these
10   issues is a superior way --
11              THE COURT:  And how about the repercussions on
12   other remaining issues?
13              MR. THRONSON:  I see that discussed on 60 through
14   61, which is, again, a discussion of preclusion; and also on
15   61, the individual proceedings will remain which will focus
16   on causation and damages need not impact each other.  So I
17   see the district court considering that there.
18              THE COURT:  And maybe it considered it, but let's
19   talk about that in the light of efficiency.  So let's assume
20   you prevail down the line on duty and breach, and now you're
21   at a damages phase of this proceeding.  What's that going to
22   look like?
23              MR. THRONSON:  What it will look like, Your Honor,
24   is a series of mini-trials and --
25              THE COURT:  Like 700, maybe, mini-trials?
```



(866) 715-7770
advancedONE.com

1          MR. THRONSON:  Well, likely not.  I think how the

2    district court -- obviously, it would be up to the district

3    court's discretion and judgment, in terms of how the class

4    proceeding pans out and what the case looks like at that

5    stage.

6          THE COURT:  Even if you --

7          MR. THRONSON:  We might be --

8          THE COURT:  -- had maybe --

9          MR. THRONSON:  -- structured as -- like a mass tort

10   case, where --

11         THE COURT:  But even if you had just --

12         MR. THRONSON:  -- you have a bellwether --

13         THE COURT:  Even you had just a handful of mini-

14   trials, you would still have to present evidence.  Damages is

15   tethered to duties and breach, right?  And causation.

16         MR. THRONSON:  Well, here, what you would avoid by

17   using the class device is repetitive, expensive presentation

18   of expert testimony on the standard of care.  So the parties

19   have identified approximately 15 experts, and the majority of

20   them pertain to standard of care.  And in resolving issues of

21   duties of breach, you don't have to present that evidence

22   repeatedly, fly experts in from all over the country and

23   present them at 700 individual trials.  You know, we

24   represent 550 claimants.  I think there's evidence in the

25   record that there are about 720 who were treated at Prince



1   George's Hospital Center, at the very least.

2           So you have some kind of limited presentation of

3   the evidence that will -- of the factual record -- that could

4   be through answers to special interrogatories that are

5   submitted at the class proceeding, it could be through a

6   stipulation entered into by the parties, it could be through

7   presentation of witness testimony -- that would allow the

8   jury to develop an understanding of what occurred, and -- but

9   again, no expert testimony on liability.

10          And then you have testimony of the plaintiff, we

11  have testimony of perhaps one or two fact witnesses

12  (indiscernible) physician or someone who's evaluated the

13  plaintiff, to testify as to the nature of the impact.  So

14  causation and damages would be resolved in those individual

15  proceedings.  And most likely, Your Honor, like most

16  individual -- like most MDLs resolve, they don't resolve 700

17  individual cases.  After litigating a number of these,

18  eventually, the parties are able to -- it facilitates

19  settlements and it facilitates an appropriate valuation of

20  the case.

21          To turn briefly to the Gates factors because we

22  were on that immediately beforehand.  The Gates factors are

23  the means by which predominance and superiority are resolved

24  in the context of an issue class certification.  What the

25  ALI Principles did and what the district -- what this Court



 1  adopted is a means of determining, with precision, the

 2  considerations that are involved in the interplay between

 3  (b)(3) and (c)(4).

 4           So, for example, Section 2.02, Comment A, indicates

 5  "this section as a whole, not just the phrase 'materially

 6  advance,' delineates the multi-faceted inquiries presently

 7  encapsulated under the predominance concept."

 8           The reporter's notes indicates the objective of

 9  these factors is to assist both courts and lawyers by

10  identifying with greater precision the considerations

11  reflected in the interplay between Subsections (b)(3) and

12  (c)(4), as set forth in existing case law.

13           What the Gates factors don't contemplate is that

14  the Court go through a detailed analysis of the Gates factors

15  as pertaining to the issue class, and then back up and do an

16  evaluation of (b)(3) as it pertains to the entire claim.

17  That's not in the text of Gates, and it doesn't make sense

18  for -- in terms of the text and structure of Rule 23 as we

19  described in the brief.

20           THE COURT:  What about doing it -- what about doing

21  it in the other order?  Start with (a) and then do (b),

22  especially (b)(3).  And then, if you can't satisfy

23  predominance and superiority, you don't get to (c)(4).

24  Instead of doing (c)(4) and then backing up to (b), why not

25  do (b)(3); and then, if it's satisfied, go to (c)(4)?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1          MR. THRONSON:  That was a -- Judge Porter, that was

2     a path that the district court -- that the Circuit Court

3     considered, but then rejected in Gates.  The Court considered

4     (b)(3) and then went on to the consideration of whether the

5     class satisfied (c)(4).  If (b)(3) certification were

6     required for the entire claim before considering (c)(4), the

7     -- this Court would not have had to go on to (c)(4).

8          And the reason is that that avoids -- I think that

9     mode of operating would avoid the efficiencies that are

10    presented by the class device.  I mean, here, you have issues

11    of duty and breach that involve the conduct of one defendant

12    in one state, it's a single course of conduct that are

13    indisputably common to all class members.  And it's

14    appropriate to give the district -- under Rule 23 and under

15    general principles of case management, to give district

16    courts the tool to isolate those issues for common treatment

17    and for common resolution.  And that's exactly what the ALI

18    Principles contemplate.

19          THE COURT:  All right.  So Gates really left this

20    issue open.  It didn't really decide either way, you know.

21    And the Fifth Circuit viewed (c)(4) as just, okay, if you've

22    satisfied (a) and (b), it might be a little cleaner to let

23    the Court do it this way.  Why shouldn't we follow the Fifth

24    Circuit's approach and not allow (c)(4) to -- you know, if a

25    class doesn't satisfy (b)(3), then (c)(4) is not going to

 1  broaden it or allow it in -- you know, if (b)(3) is only
 2  partially asserted satisfied.
 3           MR. THRONSON:  Judge Bibas, I think I disagree with
 4  the idea that Gates didn't resolve that question.  I mean,
 5  this Court expressly considered Castano --
 6           THE COURT:  Right.
 7           MR. THRONSON:  -- and decided not to follow it.
 8           THE COURT:  I understand that argument.
 9           MR. THRONSON:  And so --
10           THE COURT:  But let's assume that Gates leaves the
11  issue open.  Why should we favor the majority side of the
12  circuit split, as opposed to the Fifth Circuit's approach?
13           MR. THRONSON:  First of all, all of the rest of the
14  circuits who have considered the issue have come into
15  alignment on the question and have rejected Castano.  Even
16  the Fifth Circuit has moved away from Castano.
17           Moreover, if the entire case can be satisfied as to
18  (b)(3), there's no reason to then consider whether the
19  discrete issue within that case needs to be satisfied.
20           THE COURT:  So (c)(4) would be superfluous.
21           MR. THRONSON:  Exactly, exactly.  That's precisely
22  the consider -- the concern that the Fourth Circuit
23  identified in Gunnells.
24           THE COURT:  Okay.
25           MR. THRONSON:  I would disagree, too, with my

1   colleague's characterization of the Gates factors as not

2   addressing superiority.  The Gates factors expressly

3   considered the -- whether the proceeding can be efficiently

4   resolved.  And if you look at Section 2.02 of the ALI

5   Principles, it discusses -- I can quote from it for you

6   directly.

7           It asked district courts to consider whether issue

8   certification will materially advance the resolution of

9   multiple civil claims by addressing the core of the dispute

10   in a manner superior to other realistic procedural

11   alternatives.  That tracks the superiority requirement of

12   Rule 23(b)(3).

13           THE COURT:  I'm going to ask you to talk about

14   choice of law a little.  Your friend spent some time on this.

15   And I want you both to talk about the substance of why choice

16   of law is appropriate, and also the record the district court

17   made on choice of law.  You know, is it so clear that

18   Pennsylvania law applies?  And did the district court say

19   enough about Maryland and D.C. law, such that it has a record

20   to justify why it thought Pennsylvania law is the one that

21   governs here.

22           MR. THRONSON:  We believe so, Judge Bibas.  We

23   believe the district court did sufficiently consider the

24   issue, did thoughtfully consider whether the laws of these

25   different states materially differ in a way that would impact

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

```
1   manageability in certifying these issues for class-wide

2   treatment.

3            I mean, the real options are that Pennsylvania law

4   applies --

5            THE COURT:  Uh-huh.

6            MR. THRONSON:  -- to all claims, or that D.C. and

7   Maryland law apply to all claims.

8            THE COURT:  Right.

9            MR. THRONSON:  And in neither instance is class

10  certification impaired.  I mean, it -- at the worst, worst-

11  case scenario, you have different classes certified,

12  depending on where the plaintiff resides.

13           THE COURT:  Well, but make the arguments because

14  your friend says, okay, Maryland law, in particular, doesn't

15  have this separate tort, and the person was injured in

16  Maryland, and so you're going to be in a morass about which

17  tort we're talking about here.  So, you know, what's the case

18  that it really is Pennsylvania law that governs?  And what's

19  the case that, even if it isn't Pennsylvania law that

20  governs, that it just -- it really doesn't matter which law

21  governs?

22           MR. THRONSON:  Sure.  So the -- taking the second

23  point first, there's no dispute as to the negligence cause of

24  action.  So my colleague doesn't make any contention that,

25  somehow, the laws of these different states and districts are
```



(866) 715-7770
advancedONE.com

1  materially different on negligence.

2          The question as to negligent infliction of

3  emotional distress, the district court appropriately

4  concluded that there was no functional difference between --

5  certainly, there's no difference between D.C. and

6  Pennsylvania, there's no issue raised by my colleague there.

7  And there's no real functional difference between those two

8  jurisdictions and Pennsylvania and Maryland because Maryland

9  permits the recovery of emotional distress damages in a

10  negligence cause of action without physical impact.

11          THE COURT:  Have you done a fifty-state survey?

12  I'm just kind of curious, when this issue and case goes on to

13  other people who have moved elsewhere, like how widespread

14  these approaches are?

15          MR. THRONSON:  The approach of negligent

16  infliction --

17          THE COURT:  Of having --

18          MR. THRONSON:  -- (indiscernible)

19          THE COURT:  -- separate negligent infliction tort

20  or having the functional equivalent folded inside negligence.

21          MR. THRONSON:  I have not done a fifty-state survey

22  of that, Your Honor.  I'm happy to (indiscernible)

23          THE COURT:  That's all right.  So then let's assume

24  that he has something to the point that Maryland's difference

25  matters.  How clear is it that Pennsylvania law really ought



(866) 715-7770
advancedONE.com

JA2187

 1  to govern all of these?  I think he's pushed that point.

 2          MR. THRONSON:  Because what's -- my colleague

 3  focuses the choice of law question on conduct that is really

 4  not part of this aspect of the case and not relevant to the

 5  parties who are actually in the case.  I mean, this case is

 6  about ECFMG's conduct in Pennsylvania.  ECFMG is a

 7  Pennsylvania corporation.  It's not about what Akoda did,

 8  it's not about what other state medical boards did for the

 9  purpose of determining choice of law.  It's really about what

10  a Pennsylvania corporate citizen did.

11          And it would be a strange outcome to have the

12  application of Pennsylvania tort law to regulate the conduct

13  of a Pennsylvania corporation depend on the fortuitous

14  location of a plaintiff at that time the particular plaintiff

15  happened to be injured.  And so I think the district court

16  appropriately determined that, really, Pennsylvania had the

17  most substantial relationship to the dispute; and, therefore,

18  Pennsylvania law should govern.  And the analysis is sound

19  there.

20          THE COURT:  Could you touch on counsel's argument

21  with respect to this conflict of interest?

22          MR. THRONSON:  Certainly.  First of all, as, Judge

23  Restrepo, you made a reference to, only a fundamental

24  conflict of interest can defeat adequacy.  The district court

25  made this finding at Page 20 of its opinion, citing Dewey v.

1   Volkswagen.  My colleague doesn't contest this.

2            And what a "fundamental conflict of interest" means

3   is that some members of the class benefitted, while other

4   members were harmed by the relevant conduct.  Here, the

5   district court appropriately found that no one benefitted

6   from the conduct.

7            And so it would be -- there's no real basis that my

8   colleague identifies to deem the district courts to have

9   clearly erred in this finding.  I mean, there's no argument

10  that the district court misapplied circuit precedent or

11  Supreme Court precedent.  There's no argument that, somehow

12  -- that my colleague's speculative argument about the

13  potential impact of this notice upon individuals, that that

14  is contained in a precedent that was misapplied.

15           The important thing, too, for the Court to

16  recognize is that this argument does not apply to the over

17  500 individuals who are already represented.  So these are

18  individuals who already aware of the claim and are already

19  signed up and they're in the record.  And so this -- the

20  adequacy argument does not apply to them.

21           Moreover, it's important to recognize that

22  plaintiffs don't seek to inflict emotional injury on anyone.

23  They seek to vindicate their rights and the rights of the

24  class members.  And in any event, if there is such a person

25  out there who, despite the widespread media coverage of this

1   case, were to determine that -- were to be, you know,

2   emotionally distressed by receiving notice of this and didn't

3   know about it beforehand, ECFMG, under our theory, is the

4   cause of that emotional distress.  The Court or the mailman

5   or counsel, plaintiffs' counsel, are just the messenger for

6   that.  I mean, the -- we don't cut off ECFMG as a proximate

7   cause of that emotional distress.  So it's important to

8   distinguish between the cause of injury and the means by

9   which that injury comes to light for an individual plaintiff.

10          Actually, briefly, on typicality, Your Honor.

11  There are a number of hurdles to overcome, I believe, for

12  this Court to find in favor of my colleague on typicality.

13  First is the discussion in Newton v. Merrill Lynch.  It's a

14  case that's cited on Page 23 of ECFMG's brief.  And as to

15  typicality, Judge Scirica articulated:

16          "The criterion acts as a bar to class certification

17  only when the legal theories of the named representatives

18  potentially conflict with those of the absentees.  If the

19  claims of the named plaintiffs and putative class members

20  involve the same conduct by the defendant, typicality is

21  established, regardless of factual differences."

22          We believe that language is dispositive here.

23          Also, the Court's language in the NFL concussion

24  cases that typicality is a low threshold.  And in that case,

25  only 28 percent of the class members were expected to suffer

1  any injury, and that was no barrier to the class

2  certification for (indiscernible)

3          THE COURT:  That's typicality.  Now talk about this

4  adequacy argument that the notice itself was going to

5  traumatize your clients.

6          MR. THRONSON:  Certainly.  There, we find that,

7  first of all, as I was mentioning to Judge Restrepo, that a

8  fundamental conflict of interest is required in order for

9  adequacy to be impaired, which is some individuals benefitted

10 and other individuals were harmed.  And we don't -- there's

11 no contention that that's the case here by appellant, and

12 there's no challenge to that particular test or any kind of

13 argument that that test doesn't apply.  The district court

14 made that finding explicitly, so we believe that the district

15 court's finding on adequacy is sound.  Again, it doesn't

16 apply to the individuals who are already represented, who are

17 over 500 in number.

18         And ECFMG is the cause of the class members'

19 injuries; I mean, the cause in two respects:  First, that it

20 was the -- sorry.  Let me back up for a second.

21         In that scenario, let's assume there is someone out

22 there who did not know about this issue, and finds out

23 through some kind of court-approved notice that would reflect

24 the district court's careful consideration of this matter and

25 the potential impact upon plaintiffs of receiving it.  ECFMG

 1 | is the cause of whatever distress occurs.  I mean, it's just
 2 | -- it would be as strange to argue that somehow the mail
 3 | carrier or the Court were the cause of emotional distress in
 4 | that scenario, as it would be to argue that somehow the news
 5 | media is the cause of an individual's distress and for the
 6 | rest of the plaintiffs, and that somehow there's an action
 7 | against them.  So, again, it's important to distinguish
 8 | between the cause of the injury and the means by which the
 9 | injury comes to light.  The Court and class counsel would be
10 | merely the messenger under that scenario.
11 |            And I think, in pointing out that if this -- just
12 | one final point.  We think that Gates is sound, we don't
13 | seek any modification to Gates, contrary to my colleague's
14 | contention in its brief.  We don't believe that Gates
15 | overruled and modified in any way.
16 |            We do believe that Rule 23 is trans-substantive,
17 | and that -- meaning that the mere facts that a party is
18 | claiming emotional distress doesn't mean that the class
19 | certification is precluded.  You can see that in the Gunnells
20 | case, where emotional distress was one of the claims and the
21 | Fourth Circuit, nonetheless, certified issues classes there.
22 | So we're just merely saying that Gates and Rule 23 don't
23 | contemplate that emotional harm can be rejected vel non.
24 |            THE COURT:  Does it matter that --
25 |            MR. THRONSON:  And your Honor --



1      THE COURT:  Does it matter -- does it matter that,

2  in a negligence action for emotional distress, damages cannot

3  be bifurcated from liability?

4      MR. THRONSON:  I don't think that's universally the

5  rule, Your Honor.  I think that -- and in this particular

6  case, we're facing a different scenario, where -- in an

7  ordinary negligence case, you're talking about the personal

8  interaction between the plaintiff and the defendant and you

9  need to develop a factual record to determine the effect of

10  defendant's actions on the plaintiff.

11      Here, there's no direct interaction between the

12  plaintiff and the defendant.  The defendant's conduct can be,

13  you know, isolated.  It's a common course of conduct and can

14  be addressed on a common basis and without any issue of

15  having emotional distress be addressed separately because the

16  emotional distress arises out of the interactions with Akoda,

17  either -- again, there's no Dr. Akoda.

18      Let's be clear.  There is a Mr. Igberase.  There's

19  no medically licensed individual named "Akoda."  He doesn't

20  have a board certification, he doesn't have a medical

21  license.  The license was stripped for committing a crime of

22  moral turpitude.

23      But the emotional distress arises out of that

24  interaction and, separately, for some, for plaintiffs finding

25  out about ECFMG's conduct and Akoda/Igberase's true identity.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

 1   So we believe that there is a separation there that permits

 2   these issues to be resolved separately.

 3          THE COURT:  Thank you very much.  I'm sorry, I

 4   didn't mean to cut you off.  Anything else you want to add

 5   for us?

 6          MR. THRONSON:  Nothing else.  Thank you, Judge

 7   Restrepo.

 8          THE COURT:  All right.  Take care.

 9          Mr. Peterson.

10          MR. PETERSON:  Thank you, Your Honor.  A few points

11   in rebuttal.

12          First, what you heard from my friend during his

13   argument is the first time that the plaintiffs have put

14   together any kind of concrete trial plan as to how this case

15   will actually be tried.  Now we think that's wrong.  But more

16   significantly, that's the sort of thing that should have been

17   analyzed in the district court and not for the first time

18   during oral argument on appeal.  The fact that we are

19   disputing, right now, what evidence would need to be

20   presented at each proceeding, what issues would need to be

21   pre -- decided at each proceeding is, essentially,

22   confirmation that the district court didn't rigorously

23   analyze how this case would actually be tried below.

24          And I'll note I can understand why my friend would

25   want to try the case that way, but there's no answer to

1  causation in his trial plan.  There's no answer to when and

2  which jury would actually look at ECFMG's conduct, compared

3  to all of the other numerous causes of the alleged emotional

4  injury suffered by plaintiffs and decide whether ECFMG was

5  actually the proximate cause of anyone's injuries.

6          Second, there were references to the majority of

7  the circuit split.  Judge Bibas, I do want to suggest I think

8  the circuit split may have been unsettled somewhat by the

9  Supreme Court's Comcast decision in 2013.  If you look at the

10 wake of Comcast and what some of the circuits did; in

11 particular, the Seventh Circuit on remand in Butler v. Sears,

12 Roebuck & Company --  that was a remand from the Supreme

13 Court, a common liability class and individual damage issues

14 under Rule 23(c)(4).  It went back down to the Seventh

15 Circuit.

16         The Seventh Circuit didn't say, because this is a

17 23(c)(4) class, we can look at predominance, just focused on

18 the common liability issues.  The Seventh Circuit looked at

19 it and said, well, we need to look at predominance, comparing

20 the common liability issues against the individual damages

21 issues, and correctly determined, even in a 23(c)(4) class,

22 that those issues predominated.  But it still made that

23 comparison.

24         THE COURT:  Well, what do you say to your friend's

25 argument that, if you do it in that order, you render (c)(4)

 1  superfluous?

 2         MR. PETERSON:  Well, I say his argument renders

 3  23(b)(3) superfluous --

 4         THE COURT:  I --

 5         MR. PETERSON:  -- (indiscernible)

 6         THE COURT:  I know.

 7         MR. PETERSON:  So I think the -- I actually

 8  disagree.  And I think the Fourth Circuit went astray in

 9  Gunnells when it suggested that you should just -- the

10  alternative is to ignore (c)(4) as you proceed through the

11  (b)(3) analysis -- and Judge Porter, respectfully, I do

12  think (c)(4) and the availability of the power under (c)(4)

13  is important in a 23(b)(3) class action.  You need to know

14  which issues the Court is being asked to give class

15  treatment to and what will actually be tried on a class-wide

16  basis, as opposed to individually, any time you're

17  proceeding through the superiority and predominance analysis

18  of (b)(3).

19         So, far from rendering 23(c)(4) a dead letter, in

20  our view, Rule 23(c)(4) is used and is important every time

21  you have a class action in which not all of the issues are

22  being given class-wide treatment, which is a relatively

23  common occurrence, albeit often implicitly, rather than

24  explicitly under 23(c)(4).

25         Third, with respect to choice of law, as I think my

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1  friend indicated, the only real relationship that

2  Pennsylvania has to this lawsuit is the fact that ECFMG is

3  located there, that ECFMG's communications were with out-of-

4  state entities.  Now ECFMG's communications are to hospitals

5  located out of state, ECFMG's communications located to

6  medical boards out of state.  The location of the defendant

7  tends to be the least significant factor in the choice of law

8  analysis.

9          And again, what's critical here is not just that,

10 at a high level, the tort is recognized; not just, at a high

11 level, that these states recognize a cause of action for

12 negligence.  What matters is whether these states would

13 actually recognize the duty that plaintiffs are seeking to

14 impose.  These are novel claims.  This is an extraordinarily

15 broad duty.  A suggestion that ECFMG owes any kind of duty at

16 all to any kind of patient treated by any foreign medical

17 graduate is a broad, expansive proposition, and it's one that

18 would need to be tested and questioned under the law of each

19 of these states.

20          Fourth, with respect to the adequacy discussion and

21 the conflict, my friend talked about it as the injury coming

22 to light, and I think that's not a framing that we agree

23 with.  It's not about an injury coming to light, it's about

24 not suffering an injury.

25          This is not the usual case in which there is a



 1  plaintiff who has suffered a physical or pecuniary injury or

 2  even an emotional injury, walks into a lawyer's office,

 3  finds out about it, and then walks out being represented.

 4  This is a case in which there are class members who have

 5  suffered no injury at all, who don't even know that they were

 6  ever examined by Dr. Akoda, who are happily living their

 7  lives and who will continue happily living their lives, not

 8  with no injury that has come to light, but with no injury

 9  whatsoever.

10          And under my friend's theory, they suffer that

11  injury and they suffer compensable emotional distress --

12  which is not a small thing -- upon being notified of the

13  class.  Again, this is novel.  I don't think either party has

14  found a case which involves this.  But I do think it's a

15  serious consideration when the plaintiffs' theory is that the

16  class certification itself will, in fact, cause the injury

17  that will then allow the class members to recover.  Not an

18  injury coming to light, but an injury actually occurring.

19  It's not about causation and it's no about whether ECF [sic]

20  is legally responsible for it -- although we certainly think

21  it's not -- but it's about the fact that there is no injury

22  pre-close -- pre-certification, and then there is an injury

23  post-certification.

24          And Your Honor, if I can close just on one point.

25          THE COURT:  Sure.



```
 1        MR. PETERSON:  It is a question of causation and

 2   it's a question of whether these claims can be severed in the

 3   manner suggested by the district court.  The -- ECFMG needs

 4   to be able to present its defenses.  Class certification

 5   cannot be used can deprive a defendant of the right to

 6   present its case and present its arguments, including, here,

 7   the fact that any emotional distress traceable to ECFMG needs

 8   to be considered in light of all of the evidence of ECFMG's

 9   conduct, and that causation needs to be weighed in light of

10   all of the different actors, including ECFMG's conduct.

11   These claims are not divisible, and class certification

12   was error.

13        THE COURT:  Counsel, thank you very much.

14        I'm going to ask that you folks reach out to the

15   Clerk's Office and make arrangements to docket the transcript

16   -- and you'll split the costs -- of this argument.

17        MR. THRONSON:  Certainly, Your Honor.

18        MR. PETERSON:  Thank you, Your Honor.

19        THE COURT:  And thanks again for working with us to

20   reschedule this.  Have a great rest of your day.

21        MR. PETERSON:  Thank you.

22        THE COURT:  We're in recess.

23        MR. THRONSON:  Thank you, Your Honor.

24        (Proceedings concluded)

25                     ******
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

```
 1                        CERTIFICATION

 2

 3           I certify that the foregoing is a correct

 4   transcript from the electronic sound recording of the

 5   proceedings in the above-entitled matter to the best of my

 6   knowledge and ability.

 7

 8

 9

10

11   _____     February 18, 2021
     Coleen Rand, AAERT Cert. No. 341
12   Certified Court Transcriptionist
     For AdvancedONE Legal
13

14

15

16

17

18

19

20

21

22

23

24

25
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

## CERTIFICATE OF ACCURACY

On behalf of all counsel I hereby certify that I have reviewed the foregoing transcript, and

that it is an accurate transcription of the oral arguments held on Thursday, February 11, 2021.

February 24, 2021
Dated                                      Patrick A. Thronson

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2128
_____

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:18-cv-05629)
District Judge: Honorable Joshua D. Wolson
_____

Argued February 11, 2021

Before: RESTREPO, BIBAS, and PORTER, *Circuit Judges*

(Filed: September 24, 2021)
_____

William R. Peterson [ARGUED]
Morgan, Lewis & Bockius
1000 Louisiana Street, Suite 4000
Houston, TX 77002

Matthew D. Klayman
Brian W. Shaffer
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
          *Counsel for Appellant*

Nicholas M. Centrella
Robin S. Weiss
Conrad O'Brien
1500 Market Street
West Tower, Suite 3900
Philadelphia, PA 19102

Brent P. Ceryes
Schochor Federico & Staton
1211 Saint Paul Street
Baltimore, MD 21202

Brenda Harkavy
Patrick A. Thronson [ARGUED]
Janet Janet & Suggs
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009

Paul M. Vettori
Law Offices of Peter G. Angelos
100 North Charles Street
One Charles Center, 22nd Floor
Baltimore, MD 21201

Cory L. Zajdel
Z Law
2345 York Road, Suite B-13
Timonium, MD 21093
    *Counsel for Appellee*

Diana Huang
American Medical Association
25 Massachusetts Avenue, N.W., Suite 600
Washington, DC 20001

Leonard A. Nelson
American Medical Association
330 North Wabash Avenue, Suite 39300
Chicago, IL 60611
    *Counsel for Amicus American Medical Association, As-
    sociation of American Medical Colleges, and Pennsyl-
    vania Medical Society in support of Appellant*

Gilbert Dickey
McGuireWoods
201 North Tryon Street, Suite 3000
Charlotte, NC 28202

Matthew A. Fitzgerald
McGuireWoods
800 East Canal Street

Gateway Plaza
Richmond, VA 23219
    *Counsel for Amicus Chamber of Commerce in support
    of Appellant*

_____

OPINION OF THE COURT

_____

RESTREPO, *Circuit Judge*.

This case presents the question whether the District Court abused its discretion when it certified an "issue class" pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure. We hold that it did. According to Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." For "an action" to be "brought or maintained as a class action," the party seeking class status must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Further, in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), we enumerated a "non-exclusive list of factors" relevant to assessing whether the certification of an issue class under Rule 23(c)(4) is "appropriate." *Id.* at 272 (quoting *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004)). So when a party seeks to certify "particular issues" for class treatment, the district court must ask three questions. *First*, does the proposed issue class satisfy Rule 23(a)'s requirements? *Second*, does the proposed issue class fit within one of Rule 23(b)'s categories? *Third*, if it does, is it "appropriate" to certify this as an issue class? Fed. R. Civ. P. 23(c)(4). Here, lacking clear guidance, the District Court failed to determine whether the issues identified for class treatment fit within one of Rule 23(b)'s categories and then failed to explicitly consider a few of the *Gates*

4

factors. Accordingly, for the reasons that follow, we will va-
cate the District Court's issue-class certification and remand
for further proceedings.

## I. FACTUAL BACKGROUND

### A. The Educational Commission for Foreign Medi-
cal Graduates

Graduates of foreign medical schools who wish to be
accepted to a United States medical-residency program must
have graduated from a recognized foreign institution, demon-
strated English-language proficiency, and passed the first two
steps of the United States Medical Licensing Examination.
Defendant-Appellant Educational Commission for Foreign
Medical Graduates ("the Commission") is a Philadelphia-
based nonprofit that certifies that such graduates have satisfied
those requirements. The Commission carries out this function
in two ways. First, it administers the English-language and
medical examinations the foreign medical school graduates
must pass. Second, the Commission verifies, using primary
sources, that the applicant received a medical degree from a
qualifying institution.

As the central certification agency for graduates of for-
eign medical schools, the Commission also investigates what
it calls "irregular behavior." According to internal policies, the
Commission may investigate "all actions or attempted actions
on the part of applicants . . . that would or could subvert the
examination, certification or other processes, programs, or ser-
vices of [the Commission]." J.A. 254. The Commission's in-
vestigation of such behavior proceeds as follows. When the
Commission receives an allegation that an applicant commit-
ted irregular behavior, it reviews the allegation and determines
whether sufficient evidence supports the charge. If sufficient

evidence supports the charge, the Commission notifies the applicant of the allegation and invites him to submit a written explanation or present any other relevant information. The applicant may also request a hearing and hire legal counsel. After the applicant is heard, the Commission then determines whether, by a preponderance of the evidence, the applicant engaged in the irregular behavior that was charged. The Commission may take various disciplinary actions, up to and including permanent revocation of a certification. The charged individual has a right of appeal, but petitions to reconsider decisions are granted "only in extraordinary cases." *Id.* And whatever the case, if the Commission "determines that an individual engaged in irregular behavior, a permanent annotation to that effect will be included in the individual's [Commission] record." *Id.*

## B.  A Foreign Doctor Named Charles Igberase

In early 1992, a man named Oluwafemi Charles Igberase applied to the Commission for certification. He eventually passed the medical-licensing and English-language examinations and was issued the Commission's certification. But no residency program accepted him. So, in March 1994, Igberase submitted a second application for certification to the Commission. In that application, however, Igberase rearranged his name ("Igberase Oluwafemi Charles" instead of "Oluwafemi Charles Igberase"); used a different date of birth (April 17, 1961 instead of April 17, 1962); and responded "No" to the question of whether he had ever previously submitted an application to the Commission. Igberase passed each required examination and was certified by the Commission for a second time. But in June 1995, the Commission learned that Igberase had obtained two of its certifications under different names and

6

dates of birth, and had lied on his second application about not seeking certification previously. So it invalidated Igberase's second certification and revoked the first, and informed the United States Medical Licensing Examination Committee of his deception. J.A. 237.

In 1996, Igberase applied to the Commission for certification for yet a third time. In this application, Igberase ditched his first two names and invented another one: "John Nosa Akoda." J.A. 263. As he had twice before, Igberase (as Akoda) eventually passed the medical-licensing and English-language examinations and received the Commission's certification. After receiving the certification as "Akoda," Igberase applied for and was admitted to a residency program in New Jersey. But in August 2000, the residency program learned that the social security number Akoda used in his application belonged to Igberase. The residency program informed the Commission of the inconsistency, provisionally suspended the doctor it knew as Akoda, and, after an internal investigation, in November 2000, dismissed him.

Once it learned of Akoda's possible misuse of Igberase's social security number, the Commission launched its own investigation. Based on the information it had received from the residency program, the Commission sent Akoda a "charge letter." In it, the Commission told Akoda that it had "received information alleging that you may have engaged in irregular behavior," specifically that he had twice before applied for certification using the name "Igberase." J.A. 284. The Commission told Akoda that the allegations "require[] an explanation," and granted him fifteen days to submit a written response. J.A. 285.

A week later, as Akoda, Igberase responded. He denied the allegations, telling the Commission that "[t]he identification numbers listed in your letter apparently belong to my

7

cousin Dr. Igberase Oluwafemi Charles, who left the country to practice, I believe, in South Africa." J.A. 287. Akoda admitted using Igberase's social security number but insisted that they were "two different persons who attended two different Colleges of Medicine." *Id.* He reiterated that he had "only taken the examination once in my name, John NOSA Akoda," and offered to provide the Commission with his passport if it requested it. J.A. 287.

The Commission official overseeing Akoda's case apparently did not buy the explanation. In a December 2000 memorandum intentionally not made part of Akoda's official file, the official wrote that he and others believed Igberase and Akoda were one in the same. J.A. 293. But the official concluded that he did not have enough evidence to recommend Akoda's case to the Commission's credentialling committee. So Akoda's credential remained active.

In October 2006, Igberase, again as "Akoda," applied to a residency program at Howard University Medical Center. As part of his application, he submitted to the Commission three letters of recommendation. But the Commission was suspicious of Akoda, so one of its officials attempted to verify the authenticity of these three letters of reference. The official sent each reference the recommendation letter submitted by Akoda and asked each whether the letter was authentic. The record does not reflect whether the official received a response from any of the references.

Despite the official's reservations, Igberase (as Akoda) was admitted to Howard's residency program. He successfully completed the program in 2011. After completing the program, he applied for and received a Maryland medical license using fake identification documents. That same year, he became a member of the medical staff at Prince George's Hospital Center and began seeing patients there.

In June 2016, law enforcement officials executed search warrants at Igberase's residence, medical office, and vehicle. They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation, and birth certificates. On November 15, 2016, Igberase signed a plea agreement. In it, he pleaded guilty to misuse of a social security account number to fraudulently obtain a Maryland medical license and admitted that "Akoda" was a pseudonym. *Id.*

The Commission subsequently invalidated Akoda's foreign-doctor certification, and the Maryland Board of Physicians revoked his medical license.

## C. Patients of Igberase sue the Commission

The named Plaintiffs are Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans. Each received medical treatment from the doctor known as "Akoda," who was certified by the Commission in 1997. Igberase performed unplanned emergency cesarean-section surgery on Russell and Riggins and delivered Evans's and Powell's children. These Plaintiffs also seek to represent a class of similarly situated individuals who likewise received medical treatment from "Akoda." But the Plaintiffs (appellees here) did not sue Igberase. Instead, they sued the Commission, and asserted claims of negligent infliction of emotional distress arising out of the Commission's certification of Igberase as "Akoda."

Eventually, the district court certified a class of "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/ka [sic] Charles J. Akoda) beginning with his enrollment in a postgraduate medical education program at Howard University in 2007." J.A. 63-64. But the district court did not certify the class under any subsection of Rule 23(b).

9

Instead, the court certified the class as an "issue class" pursuant to Rule 23(c)(4). The court certified the class with respect to these issues:

> (1) whether the Commission undertook or otherwise owed a duty to class members.

> (2) whether the Commission breached any duty that it owed to class members.

> (3) whether the Commission undertook or otherwise owed a duty to hospitals and state medical boards, such that it may be held liable to class members pursuant to the Restatement (Second) of Torts § 324A.

> (4) whether the defendant breached any duty that it owed to hospitals and state medical boards.

In short, the particular issues the district court certified for class treatment concern only the duty and breach elements of Plaintiffs' claim. The district court therefore left for individualized proceedings whether each Plaintiff was injured; whether the Commission's breach of the relevant duty (if it had a duty that was breached) actually and proximately caused those injuries; whether those injuries are due a particular amount of damages; and whether the Commission could raise any affirmative defense, including, presumably, whether each Plaintiff's consent to medical treatment by Igberase breaks the causal chain. In the wake of the Rule 23(c)(4) certification, the Commission successfully petitioned for leave to appeal under Rule 23(f). We must decide whether that certification was proper.

10

## II. THE LEGAL FRAMEWORK OF ISSUE-CLASS CERTIFICATION

### A. Rule 23 outlines one procedure for pursuing aggregate litigation

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2009) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). One reason the class action is an exceptional form of litigation is because final judgments in such actions may implicate the procedural and substantive rights of absent persons.

The Supreme Court recently reiterated the principle that absent persons may not be bound by federal-court judgments unless one of a limited number of historically recognized exceptions is satisfied. *See Taylor v. Sturgell*, 553 U.S. 880, 893 (2008). A "properly conducted" class action is one such exception. *Id.* at 894-95. A properly conducted class action requires that (1) "[t]he interests of the nonparty and her representative are aligned"; (2) "either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty"; and (3) there was "notice of the original suit to the persons alleged to have been represented." *Id.* at 900.

In the class context, "these limitations are implemented by the procedural safeguards in Federal Rule of Civil Procedure 23." *Id.* at 900-01. The procedural safeguards of Rule 23, in turn, are constitutionally mandated and "grounded in due process." *Id.* at 901. Rule 23 thus provides a constitutional safe harbor for litigants to pursue class treatment on behalf of absent persons. But the party seeking to certify a class "bears the burden of affirmatively demonstrating by a preponderance of

JA2212

the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015) (discussing and clarifying preponderance of evidence standard in class certification determinations).

The requirements of Rule 23 are these. The party seeking class certification must demonstrate, first, that the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To satisfy Rule 23(a), a plaintiff must "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).

Once beyond Rule 23(a)'s four prerequisites, plaintiffs then must seek to certify a class of one of three "types," each with additional requirements. *See* Fed. R. Civ. P. 23(b). For instance, Rule 23(b)(3), a provision at issue here, states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."[1]

---

[1] There are two additional "types" of class actions maintainable under Rule 23(b). Rule 23(b)(1) allows a class to be maintained where "prosecuting separate actions by or against individual class members would create a risk of" either "(A) inconsistent or varying adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Rule 23(b)(2), by contrast, applies when "the

12

Rule 23(c) provides two additional pathways to a form of class certification. Rule 23(c)(5) permits a district court, "[w]hen appropriate," to "divide[]" a class "into subclasses that are each treated as a class under [Rule 23]." So if a district court detects dissimilarities of interests between the putative class representative and absent class members, it may divide the full class into subclasses to isolate atypical issues or claims, or resolve conflicts of interest that otherwise would preclude full class certification. *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 432 (3d Cir. 2016); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[A] class divided between holders of present and future claims . . . requires division into homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel."). And Rule 23(c)(4), the provision center stage here, states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Pursuant to that provision, we have previously held that a district court may certify for class treatment issues that would, upon their resolution, determine a defendant's course of conduct. *See Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004). In what follows, we examine the scope of issue-class certification under Rule 23(c)(4).

---

party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

## B. Issue-class certification under Rule 23(c)(4) grants district courts broad but well-defined discretion to certify particular issues for class treatment

Let us restate the text of Rule 23(c)(4). It says that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Rule, therefore, permits an issue class to be brought or maintained "as a class action." But with that permission comes restrictions. To be a "class action," a party must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305, 310 (3d Cir. 2008) ("[A] class may not be certified without a finding that each Rule 23 requirement is met."). In other words, "[i]n addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). A party seeking to certify "particular issues" for class treatment must show the same. That party must show that those issues "satisfy[] Rule 23(a)'s prerequisites" and that those issues are "maintainable under Rule 23(b)(1), (2), or (3)." *See id.*

But neither Rule 23(c)(4) nor its commentary outlines the "appropriate[ness]" inquiry, or discusses which types of "issues" might be suitable for class treatment and which may not be. At the provision's adoption, the Rules Committee, in its commentary, suggested that the issue-class device may be used to bifurcate the "adjudication of liability to the class" from follow-on proceedings needed to "prove the amounts of [class members'] respective claims." Fed. R. Civ. P. 23(c)(4) advisory committee's note to 1966 amendment. That commentary

does not illuminate much. In a typical Rule 23(b)(3) class action, for example, individualized damages determinations often remain after common questions have been decided. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-60 (2016); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-70 (2013). Further, Rule 23(c)(4) talks about "issues," not "liability" (or "claims" or "causes of action"), so there is no obvious textual basis to limit issue-class certification to issues that, upon *their* resolution, necessarily establish a defendant's liability as to all claimants.

We explained Rule 23(c)(4)'s "appropriate[ness]" inquiry in *Gates v. Rohm & Haas*, 655 F.3d 255 (3d Cir. 2011). In *Gates*, we considered the appropriateness of issue-class certification for property owners who alleged that a chemical company's pollution decreased their property values. In 2005, Rohm & Haas acquired a chemical-processing plant in Ringwood, Illinois. *Id.* at 258. For the half-century or so prior to Rohm & Haas's acquisition, the Ringwood facility was owned and operated by a company called Morton International. *Id.* During at least some of that time, Morton dumped wastewater produced by its chemical processing into an on-site lagoon. *Id.* The wastewater contained vinylidene chloride, a molecule used in the production of vinyl chloride, which is important in the production of plastics and a known carcinogen. "In 1978, Morton ceased using the on-site lagoon and covered it." *Id.* But environmental testing in the 1970s and 1980s suggested that Morton's dumping of vinylidene chloride was polluting the surrounding environment. In 1973, for example, "tests of a shallow aquifer under the Ringwood facility showed elevated levels of ammonia and chloride." *Id.* And in 1984, water samples from wells that Morton had installed at Ringwood showed elevated levels of vinylidene chloride and vinyl chloride. *Id.*

15

In 2006, residents of a nearby residential village filed a class-action complaint alleging, among other things, that Morton's dumping of the vinylidene chloride caused their residential community to become less attractive and their property values to decrease.[2] *Id.* at 259, 271. Before the district court, with respect to their property damage claim, the plaintiffs moved to certify two classes—a Rule 23(b)(3) class of property owners who allegedly suffered loss in property values due to the defendants' contamination and an "issue only" class that would decide defendants' liability but leave damages for individual trials. *Id.* at 272.

The district court declined to certify either class. As to the plaintiffs' proposed Rule 23(b)(3) class, the district court found that common questions did not predominate over individual ones. The court observed "that resolution of [common] questions leaves significant and complex questions unanswered, including questions relating to causation of contamination, extent of contamination, fact of damages, and amount of damages." *Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 233-34 (E.D. Pa. 2010). The district court likewise rejected plaintiffs' attempt to certify a Rule 23(c)(4) issue class. The

---

[2] The plaintiffs' complaint asserted several claims for relief, including medical monitoring, property damage claims, relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, the Illinois Environmental Protection Act, 415 Ill. Comp. Stat. § 5/1 *et seq.*, and state-law fraudulent misrepresentation and willful and wanton misconduct claims. But they chose to proceed on a class basis only on the medical monitoring and property damage claims and, as noted, solely with regard to vinyl chloride exposure. *Gates*, 655 F.3d at 259.

16

court found that an issue class "would not advance the resolution of class members' claims" because, like in the Rule 23(b)(3) context, "the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quotation marks omitted). We affirmed.

In affirming the district court's decision not to certify a Rule 23(c)(4) issue class, we adopted a "non-exclusive list of factors [to] guide courts" faced with motions to certify particular issues. *Gates*, 655 F.3d at 273. *Id.* The factors, which number nine, are these:

1.  the type of claim(s) and issue(s) in question;

2.  the overall complexity of the case;

3.  the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;

4.  the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;

5.  the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);

6.  the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;

7. the repercussions certification of an issue(s) class
   will have on the effectiveness and fairness of reso-
   lution of remaining issues;

8. the impact individual proceedings may have upon
   one another, including whether remedies are indi-
   visible such that granting or not granting relief to
   any claimant as a practical matter determines the
   claims of others;

9. and the kind of evidence presented on the issue(s)
   certified and potentially presented on the remaining
   issues, including the risk subsequent triers of fact
   will need to reexamine evidence and findings from
   resolution of the common issue(s).

When assembled, the *Gates* factors construct a func-
tional framework to aid the district courts tasked with resolving
issue-class certification questions.[3] But *Gates* did not define
which "issues" would be appropriate for class treatment or,

---

[3] The *Gates* factors grew out of our opinion in *Hohider v.
United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009). In
*Hohider*, we provided relevant considerations on when a dis-
trict court may wish "to carve at the joints to form issue clas-
ses." *Gates*, 655 F.3d at 273. As source for the factors, the
*Hohider* court cited the American Law Institute's "Proposed
Final Draft of the Principles of the Law of Aggregate Litiga-
tion." *Hohider*, 574 F.3d at 200-02. By the time *Gates* issued,
the ALI had finalized the Principles, and we incorporated many
of them as the factors district courts should consider in as-
sessing whether to certify an issue class. *Gates*, 655 F.3d at
273.

more importantly, which would not. Specifically, *Gates* did not answer whether the term "particular issues" in Rule 23(c)(4) could encompass claim elements (like duty or breach, or causation or reliance) and defenses (like consent or intervening cause), or if the "particular issues" that the district court could certify "when appropriate" must be limited to questions that would resolve a defendant's liability.

At several points, *Gates* appears to suggest that the certified "issues" should (perhaps except in exceptional circumstances) be able to resolve a defendant's liability. *See, e.g.*, *id.* at 272 ("[T]he [district] court declined to certify a liability-only class."); *id.* at 273 ("The trial court here did not abuse its discretion by declining to certify a liability-only issue class when it found liability inseverable from other issues that would be left for follow-up proceedings."); *id.* ("Nor did the court err in finding no marked division between damages and liability."); *id.* at 274 ("Plaintiffs have neither defined the scope of the liability-only trial nor proposed what common proof would be presented."); *id.* ("A trial on whether the [issues proposed] is unlikely to substantially aid resolution of the substantial issues on liability and causation.").

Reading "issues" in Rule 23(c)(4) to exclude claim elements is supported by later cases from our Court. In *Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018), for example, the only published opinion from this Court to apply *Gates*, we reiterated that issue-class certification "*might* be appropriate" if "liability is capable of classwide treatment but damages are not[.]" *Id.* at 202-03 (emphasis added). Said another way, issue-class certification *is not* appropriate if class-wide resolution of the "issues" does not resolve liability. *See id.* (noting that declining issue-class certification was appropriate because plaintiffs offered "no theories of *liability* for which classwide treatment is apt") (emphasis added).

But at various other points, *Gates* suggests that claim elements *may* be appropriate for issue-class treatment in certain circumstances. For example, the *Gates* Court "agreed" with the district court's finding that an issue class was not feasible and would not advance the resolution of class members' claims because "both the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quoting district court). In other words, for the district court, the fact that claim elements (like causation) would remain after resolution of the class issues was a *reason* for the inappropriateness of certifying an issue class. But neither the district court nor the court of appeals concluded that claim elements remaining after resolution of class issues *barred* issue-class certification.

Viewing *Gates* to permit the certification of issues that do not resolve liability comports with our pre-*Gates* caselaw. In *Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004), we noted "that courts commonly use Rule 23(c)(4) to certify some *elements* of liability for class determination, while leaving other elements to individual adjudication—or, perhaps more realistically, settlement." *Id.* at 267 (emphasis added). So there, we affirmed the district court's certification of an issue class limited to determining the defendant's course of conduct (whether a federal agency placed "thousands of Virgin Islanders, almost all of whom were Black, Hispanic, or female," on a "phony, illegal waiting list" when those individuals sought to apply to a "loan program[] intended to help low income rural families obtain homes and make repairs to existing homes," *id.* at 259-60, 263), but left for subsequent individual adjudication the issue of whether those individuals were eligible for the loans in the first place. *Id.* at 267.

JA2221

Other courts of appeals have permitted the certification of non-liability issue classes in analogous circumstances. The Seventh Circuit, for example, has affirmed the certification of an issue class where the issues, once resolved, stopped short of establishing a defendant's liability to any claimant. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (in employment case, endorsing the use of a Rule 23(c)(4) issue class to determine the disparate impact of a challenged corporate policy, with "separate trials . . . to determine which class members were actually adversely affected . . . and if so what loss each class member sustained"); *cf. Pella Corp. v. Saltzman*, 606 F.3d 391, 393-94 (7th Cir. 2010) (in consumer fraud case, upholding certification of Rule 23(b)(3) class when common issues left components of causation for individualized determination).

Moreover, the text of Rule 23(c)(4) supports the reading that the "issues" a district court may certify for class treatment need not be limited to those that decide a party's liability. The Rule permits an action to be brought or maintained as a class action "with respect to particular issues," not just those that decide liability. We therefore hold that district courts may certify "particular issues" for class treatment even if those issues, once resolved, do not resolve a defendant's liability, provided that such certification substantially facilitates the resolution of the civil dispute, preserves the parties' procedural and substantive rights and responsibilities, and respects the constitutional and statutory rights of all class member and defendants.

\* \* \* \* \*

In sum, district courts tasked with resolving motions to certify issue classes must make three determinations. First,

does the proposed issue class satisfy Rule 23(a)'s requirements? Second, does the proposed issue class fit within one of Rule 23(b)'s categories? Third, if the proposed issue class does both those things, is it "appropriate" to certify these issues as a class? Fed. R. Civ. P. 23(c)(4). The first two steps will be informed by general class-action doctrine. The third step will be informed by *Gates*. *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 201 (3d Cir. 2009). In other words, Rule 23(a) and Rule 23(b) decide if the proposed issues *can* be brought or maintained as class action, while the *Gates* factors determine whether they *should*.

## III. Discussion

Guided by Rule 23(c)(4) and *Gates*, in this case, we must determine whether the District Court appropriately certified for class treatment whether the Commission owed a relevant legal duty to the Plaintiffs that it subsequently breached, but left for individual proceedings whether Plaintiffs were injured; whether the Commission's breach of the relevant duty actually and proximately caused those injuries; whether those injuries are due a particular amount of damages; and whether the Commission's affirmative defenses (including, presumably, that each Plaintiff consented to medical treatment by Igberase) can refute Plaintiffs' claim.

We review the District Court's decision to certify the duty and breach issues of Plaintiffs' negligent infliction of emotion distress claim for abuse of discretion. *Gates*, 655 F.3d at 262. A district court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (quoting *In re Hydrogen Peroxide*, 552 F.3d 305, 320 (3d Cir. 2009)). Whether the district court employed the correct legal standard

JA2223

is reviewed *de novo*. *In re Hydrogen Peroxide*, 471 F.3d at 312 (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)). Conducting that review, we conclude that the District Court abused its discretion.

## A. The District Court erred in certifying this issue class

Two reasons, each independently sufficient, support the conclusion that the District Court misapplied *Gates* when it certified for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim.

*First*, the District Court did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3). The Court correctly observed that *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies Rule 23(b)(3). J.A. 42-43 ("[The Commission]'s argument that the Court should require Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement before turning to these factors parrots one of the camps that the Third Circuit acknowledged but refused to join in *Gates*. Because the Third Circuit rejected that view, this Court must do the same."); *see also* J.A. 56 ("Having determined that Plaintiffs can satisfy the Rule 23(a) factors, the Court turns to the question of whether to certify an issues class under Rule 23(c)(4)."). But while *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies a subsection of Rule 23(b), for reasons we have explained, Rule 23(c)(4) does require that the Plaintiffs demonstrate that the issues they seek to certify satisfy one of Rule 23(b)'s subsections. On remand, the Plaintiffs may

JA2224

be able to make such a showing, but we will leave that inquiry to the District Court to consider in the first instance.[4]

   *Second*, separate and apart from the District Court's failure to determine whether the duty and breach elements of Plaintiffs' claim satisfied any subsection of Rule 23(b), the Court also failed to rigorously consider several *Gates* factors.

---

[4] The Commission also insists that the District Court erred in finding that Plaintiffs' satisfied Rule 23(a)'s typicality and adequacy requirements. Appellant Br. 18-19. It argues the Plaintiffs are atypical and inadequate class representatives because they propose to inflict emotional distress on absent class members currently ignorant of the underlying allegations, and that Plaintiffs' decision to seek relief only for their emotional distress makes them inadequate representatives of absent class members who have suffered physical injuries. Neither argument is persuasive. For one, we find no support for the proposition that absent class members ignorant of their potential legal injury might cause named plaintiffs (who are aware of their injury) to be inadequate or atypical class representatives. For another, if the District Court determines that some cognizable subset of absent class members may also have live legal claims for physical injuries, then it has ample tools at its disposal to manage those divergences, including by creating subclasses pursuant to Rule 23(c)(5) or the notice requirements of Rule 23(c)(4).We have "set a low threshold for typicality." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (internal quotations omitted). And "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.*

For example, the Court does not explicitly discuss whether the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues. Many other actors played a role in Igberase's fraud, including the residency programs that admitted and trained him, the state medical boards that licensed him, the hospitals that gave him privileges, the specialty board that certified him, and the law enforcement officers (state and federal) who investigated him. If an issue-class jury finds that the Commission owed Plaintiffs a legal duty that it subsequently breached, the Commission may face undue pressure to settle, even if their breach did not cause Plaintiffs' harm.

Relatedly, the District Court did not rigorously consider what efficiencies would be gained by resolution of the certified issues. To be sure, the District Court briefly discussed the efficiencies of a single trial and broached other options with the parties. J.A. 60-61. But more was needed. To prove their claim that the Commission negligently inflicted emotional distress, Plaintiffs will need to show (as with all causes of action arising under state tort law) duty, breach, cause, and harm. But the District Court certified an issue class with respect to the duty and breach elements only. So even if the District Court finds that the Commission owed a relevant legal duty to the Plaintiffs that it subsequently breached, each Plaintiff, in individual proceedings, will have to prove that they were injured; that the Commission's breach of the relevant duty actually and proximately caused those injuries; that those injuries are due a particular amount of damages; and that the Commission's affirmative defenses (including, presumably, each Plaintiff's consent to medical treatment by Igberase) are not decisive.

The District Court may also wish to consider whether the duty and breach elements of Plaintiffs' negligent infliction

25

of emotional distress claim are suitable for issue-class treatment. Under Pennsylvania law, for example, to determine whether the Commission owed the Plaintiffs a relevant legal duty, the class jury will have to weigh several factors, including the "foreseeability of the harm incurred." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (citations omitted). And once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of the Commission's negligence as to each Plaintiff. *See Spence v. Bd. of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (finding no abuse of discretion where the District Court joined for trial the issues of liability and damages for emotional distress, explaining that "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct"). So the issue-class jury, like each individual jury, may need to consider evidence regarding the harm the Commission allegedly caused. And each individual jury, like the issue-class jury, may need to consider evidence regarding the Commission's overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty. *Gates* disfavors this. *See* 655 F.3d at 273 (holding that "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" counsels against certification of those common issues).

Of course, the District Court may very well be correct that "there are efficiencies to be gained by certifying a class on these issues because it will allow for a single trial with a single, preclusive determination about [the Commission]'s conduct, rather than the presentation of the same evidence about [the Commission] again, and again, and again to separate juries." J.A. 60. Duty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages. *See Sharpe v.*

26

*St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003). It is true that deciding if the Commission had a duty to investigate requires balancing several factors. *Id.* But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence: How much investigating did the Commission do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including the New Jersey residency program? Should it have followed up in later years once Igberase was admitted to another residency program? No absent class member would have anything special to add in her individual trial. There will be plenty left for individual proceedings, but these major issues could be resolved on a class-wide basis.[5]

---

[5] These two reasons are sufficient to support our decision to vacate the District Court's certification for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim. But there may yet be other problems with the issue class, including the possibility that Plaintiffs' legal claim implicates multiple states' laws. Under *Gates*, a district court, tasked with resolving a motion to certify an issue class, must assess the "substantive law underlying the claim(s), including any choice-of-law questions [that law] may present." 655 F.3d at 273. Here, the District Court concluded that the various state laws that may be implicated do not meaningfully differ and that Pennsylvania law would govern anyway. *Russell v. Educational Comm'n for Foreign Med. Graduates*, 2020 WL 1330699, at *4-5 (E.D. Pa. Mar. 23, 2020). That seems like a close question. It may well be true that Pennsylvania has the greatest interest in this case (the Commission's alleged tortious conduct occurred here, after all), but various other states

JA2228

## B. The Commission's remaining arguments for reversal are unavailing or inapposite

The Commission and its amicus offer two additional bases on which to reverse the District Court. The Commission first argues that "the plain text of Rule 23 and the cases interpreting it" demand that "the party seeking to certify a class must satisfy one of the prongs of Rule 23(b)" and, "[b]ecause the district court failed to find that Named Plaintiffs satisfied Rule 23(b)(3) or any other prong of Rule 23(b), the class certification must be reversed." Appellant's Br. 39; *see also* Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 5-16.

That is not accurate. A majority of the courts of appeals have concluded that in appropriate cases Rule 23(c)(4) can be used even though full Rule 23(b)(3) certification is not possible due to the predominance infirmities. That view, the so-called "broad view," has been adopted or supported by the Second, Fourth, Sixth, Seventh, and Ninth Circuits.[6] Under the broad

---

have a substantial interest in the resolution of the claims, too. But because the conflict-of-law question was briefed before the District Court in the context of a motion for class certification, we will leave it to the District Court to determine which state's law applies to each Plaintiff's claim, if the question of which state's law applies becomes relevant in future proceedings.

[6] For discussions of the broad view from these courts of appeals, see, *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (permitting issue certification "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement''); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439-45 (4th Cir. 2003) (holding that courts may employ Rule 23(c)(4) to certify a class as to one claim even

JA2229

view, courts apply the Rule 23(b)(3) predominance and supe-
riority prongs after common issues have been identified for
class treatment under Rule 23(c)(4). The broad view permits

---

though all of the plaintiffs' claims, taken together, do not sat-
isfy the predominance requirement); *Martin v. Behr Dayton
Thermal Prods.*, 896 F.3d 405 (6th Cir. 2018) (noting that
"Rule 23(c)(4) contemplates using issue certification . . . where
common questions predominate within certain issues and
where class treatment of those issues is the superior method of
resolution"); *McReynolds v. Merrill Lynch, Pierce, Fenner &
Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) ("Rule 23(c)(4)
provides that 'when appropriate, an action may be brought or
maintained as a class action with respect to particular issues.'
The practices challenged in this case present a pair of issues
that can most efficiently be determined on a class-wide basis,
consistent with the rule just quoted."), *abrogated on other
grounds by Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 559
(7th Cir.), *reh'g and suggestion for reh'g en banc denied*, (7th
Cir. Aug. 3, 2016); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394
(7th Cir. 2010) ("A district court has the discretion to split a
case by certifying a class for some issues, but not others, or by
certifying a class for liability alone where damages or causa-
tion may require individualized assessments."); *Valentino v.
Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)
("Even if the common questions do not predominate over the
individual questions so that class certification of the entire ac-
tion is warranted, Rule 23 authorizes the district court in ap-
propriate cases to isolate the common issues under Rule
23(c)(4)[] and proceed with class treatment of these particular
issues.").

JA2230

utilizing Rule 23(c)(4) even where predominance has not been (or cannot be) satisfied for the cause of action as a whole.

The Fifth Circuit, however, in a footnote adopted what is known as "the narrow view," which prohibits issue-class certification if Rule 23(b)(3) predominance has not been satisfied for the cause of action as a whole. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). But *Castano*'s approach has not been adopted by any other circuit, and subsequent caselaw from the Fifth Circuit suggests that any potency the narrow view once held has dwindled. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that bifurcation might serve "as a remedy for the obstacles preventing a finding of predominance" but that the plaintiffs had not made such a proposal to the district court).[7]

---

[7] Further, the Advisory Committee on Civil Rules appears to agree that issues can be certified for class treatment even if predominance cannot be satisfied for the action as a whole. At their April 2015 meeting, the Committee noted that "[a] major reason for considering possible rule amendments to deal with issue classes is that there has seemed to be a split in the circuits about whether they can only be allowed if (b)(3) predominance is established." *See* Rule 23 Subcommittee Report, in Advisory Committee on Civil Rules 243-99 (Apr. 9-10, 2015). But the Committee went on to note that "recent reports suggest that all the circuits are coming into relative agreement that in appropriate cases Rule 23(c)(4) can be used *even though full Rule*

JA2231

The Commission's attempts to avoid the majority view by arguing not so much that full-class Rule 23(b)(3) certification must *precede* Rule 23(c)(4) certification, but that the District Court here failed to consider Rule 23(b)(3) at all. But "certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3)," though predominance concerns may be relevant to both. *See Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018) ("While Plaintiffs are correct to point out that the appropriateness of certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3), a case may present concerns relevant to both.").

Amicus Chamber of Commerce offers yet another reason to reverse the District Court: that the District Court's Rule 23(c)(4) ruling, if adopted, "will permit a flood of abusive class actions, with troubling and far-reaching consequences for businesses, shareholders, employees, customers, and the judicial system." Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 16-18. The Chamber's concerns seem overblown. Even capacious rules for issue-class certification (which we do not purport to advance in this holding) likely will not encourage "a flood of abusive class actions" because few lawyers will have an incentive to file them. Any lucrative potential payday for class action lawyers arises from securing a damages award, not from obtaining an order on a particular issue. That order, which can be thought of as a type of declaratory judgment, may eventually transform into a judgment awarding damages, but even then it is not clear that the future individualized proceedings would be controlled by the

---

23(b)(3) certification is not possible *due to the predominance requirement." *Id.* at 280 (emphasis added)*.

31

lawyers that won the issue-class order. In any case, even if a lawyer could obtain a quasi-declaratory ruling on a subset of common issues, the transformation of the case from a proposed class action to a set of individualized proceedings would spoil any settlement leverage that the lawyer had. Of course, the lawyer representing the class would prefer a favorable issue-class order to no order at all, but the defendant, once facing just individualized proceedings, could return to the very tactics that may have given it an advantage in the first place. From the defense perspective, such tactics could have the added benefit of deterring other class-action lawyers from attempting similar bifurcated class actions in the future.

* * * * *

Because the District Court failed to determine whether the proposed issues satisfied a subsection of Rule 23(b), and because it failed to rigorously analyze several *Gates* factors, we will vacate the District Court's issue-class certification and remand for further proceedings consistent with this opinion.

## IV. CONCLUSION

For these reasons, we vacate the District Court's Order certifying for aggregate treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim, and remand for further proceedings consistent with this opinion.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629 |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

JA2234

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 3

I.    The Court's findings on ascertainability and the Rule 23(a) elements should stand, because those findings were either not raised on appeal or were affirmed. .................................................. 4

II.    The proposed class satisfies Rule 23(b)(3), because the proposed issues require no individualized considerations. ........................................................................................ 5

   A.    The Third Circuit endorsed the broad view of the predominance and superiority requirements, which Plaintiffs' issue class satisfies. ....................................................... 5

III.    The proposed issue class satisfies the seventh *Gates* factor, concerning the impact of certification on the effectiveness and fairness of the resolution of remaining issues, because it maintains fairness to all parties. ........................................................................ 8

IV.    The proposed issue class also satisfies the third *Gates* factor, concerning the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives, because no efficient alternative exists. .................................................................... 11

V.    The Third Circuit's dicta regarding the ninth *Gates* factor should not alter the Court's class certification decision, as no Reexamination Clause issues inhere in the proposed issue class. ................. 12

   A.    The Reexamination Clause concerns the redetermination of issues, *not* the rehearing of evidence. ............................................................................................ 13

   B.    The issue of duty does not implicate the Reexamination Clause, because it is an issue to be determined by the Court separately from other elements. .................................................. 16

   C.    Trying the issue of breach separately from causation and damages will not run afoul of the Reexamination Clause. ........................................................................... 16

VI.    The choice of law question should not impair certification of the proposed issue class, as the Third Circuit did not indicate the Court should revisit its earlier findings on this issue. .............. 18

CONCLUSION ............................................................................................................... 19

2

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Supplemental Memorandum in Support of Class Certification, pursuant to the Court's Order of November 9, 2021 (ECF No. 77).

## INTRODUCTION

As the Third Circuit held, "[t]wo reasons, each independently sufficient, support the conclusion that the District Court misapplied *Gates* when it certified for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim." *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 271 (3d. Cir. 2021) (emphasis added). The two errors in certifying Plaintiffs' negligent infliction of emotional distress claim identified by the Third Circuit are:

1.    "[T]he District Court did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3)." *Id.*

2.    "[T]he Court also failed to rigorously consider several *Gates* factors," namely:

   a.   "the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues" and

   b.   "what efficiencies would be gained by resolution of the certified issues." *Id.* at 272.

The Court's analysis on remand should focus on this small number of errors the Third Circuit found were present in the Court's certification of the negligent infliction of emotional distress claim. The alleged errors do not extend to the substance of the Court's analysis, but rather reflect the Third Circuit's assessment of whether the Court adequately showed its work.

Strictly speaking, the Third Circuit vacated only this Court's certification of issues in Plaintiffs' negligent infliction of emotional distress claim—not its accompanying certification of issues in Plaintiffs' negligence claim. *See Russell*, 15 F.4th at 275 ("For these reasons, we vacate the District Court's Order certifying for aggregate treatment the duty and breach elements of Plaintiffs' negligent

3

infliction of emotional distress claim, and remand for further proceedings consistent with this opinion.") To be sure, the Court may wish as a matter of prudence to also analyze these factors in the context of Plaintiffs' negligence claim. But the Third Circuit's decision leaves undisturbed the vast majority of this Court's original, closely reasoned decision on Plaintiffs' class certification request.

As argued herein, the Third Circuit affirmed this Court's findings on the Rule 23(a) elements. It embraced the "broad," or majority, view of the relationship between Rules 23(b)(3) and (c)(4), and all but held that Plaintiffs' issue class satisfied Rule 23(b)(3) on both claims. And its analysis of the two *Gates* factors it found the Court's class certification decision had inadequately discussed leaves the Court ample room to exercise its discretion in reaffirming its original findings.

## I.     The Court's findings on ascertainability and the Rule 23(a) elements should stand, because those findings were either not raised on appeal or were affirmed.

In its class certification order, the Court found that the issue class proposed by Plaintiffs was ascertainable. (ECF No. 57 at 12–14.) ECFMG did not raise this determination as a ground for appeal, and the Third Circuit's opinion does not call this finding into question. It should stand.

The Court also found that Plaintiffs' proposed issue class satisfied the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). (ECF No. 57 at 14–21.) ECFMG appealed only the Court's findings on typicality and adequacy. Appellant's Br., 2020 WL 5352387, at 18–27 (3d Cir. Sept. 20, 2020). The Third Circuit rejected ECFMG's argument on these two elements, *see Russell,* 15 F.4th at 271 & n.4, and did not otherwise suggest the Court should reevaluate its Rule 23(a) findings. There is no reason for the Court to do so.

4

II.     **The proposed class satisfies Rule 23(b)(3), because the proposed issues require no individualized considerations.**

    A.     The Third Circuit endorsed the broad view of the predominance and superiority requirements, which Plaintiffs' issue class satisfies.

As the Third Circuit found, a party must show that issues proposed for certification satisfy Rule 23(a) and are " 'maintainable under Rule 23(b)(1), (2), or (3).' " *Russell*, 15 F.4th at 267 (citation omitted). Rule 23(b)(3) permits a class action to be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Per the Third Circuit, "Rule 23(a) and Rule 23(b) decide if the proposed issues *can* be brought or maintained as class action, while the *Gates* factors determine whether they *should*." *Russell*, 15 F.4th at 270.

Rule 23 continues with four (non-exclusive) factors "pertinent to these findings," including "the class members' interests in individually controlling . . . separate actions" (*id.* at (b)(3)(A)), the "extent and nature of any litigation concerning the controversy already begun," (*id.* at (b)(3)(B)), the "desirability . . . of concentrating the litigation of the claims in the particular forum" (*id.* at (b)(3)(C)), and "the likely difficulties in managing a class action." *Id.* at (b)(3)(D).

As the Third Circuit held, "[t]he Court correctly observed that *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies Rule 23(b)(3)." *Id.* at 271. It unequivocally adopted the majority, or "broad," view of the relationship between Rules 23(b)(3) and Rule 23(c)(4), according to which predominance and superiority must be satisfied as to the issues proposed for certification. *See id*; *see also id.* at 273–74.

Here, all of the factors favor certification of the issue class.

First, Plaintiffs have little interest in holding hundreds of separate trials to obtain hundreds of separate answers to the questions surrounding Defendant's legal duties and conduct in breach of those duties. *Id.* at (b)(3)(A). Even if Plaintiffs' interests diverged on the questions of damages and individualized defenses, the proposed issue class treatment allows Plaintiffs (and Defendant) to make individualized showings on these issues, if needed, *after* the class-wide issues are resolved. And there is no existing litigation by or against the class members relating to the subject matter of this suit; thus Rule 23(b)(3)(B) poses no obstacle to certification.

Further, Defendant, a Pennsylvania entity, should be judged for its Pennsylvania actions in Pennsylvania. It is particularly desirable to hear all questions concerning Defendant's conduct in the state where it took place. Rule 23(b)(3)(C) supports the proposed issue class treatment.

The "likely difficulties in managing a class action" pale in comparison to the likely difficulties, and drain on judicial resources, of handling these claims individually. Fed. R. Civ. P. 23(b)(3)(D). In short, none of the enumerated factors support denying class treatment.

The Third Circuit's opinion also supports the conclusion that predominance and superiority are satisfied:

> It is true that deciding if the Commission had a duty to investigate requires balancing several factors. *Id.* But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence: How much investigating did the Commission do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including the New Jersey residency program? Should it have followed up in later years once Igberase was admitted to another residency program? No absent class member would have anything special to add in her individual trial. There will be plenty left for individual proceedings, but these major issues could be resolved on a class-wide basis.

*Id.* at 273 (emphasis added).

Numerous other courts support that predominance and superiority are satisfied in this setting. For example, writing for the Seventh Circuit in *Butler v. Sears, Roebuck & Co.*, 727 F.3d 359 (7th Cir. 2012), Judge Posner asserted that "[i]f there are no common questions or only common questions, the issue of predominance is automatically resolved." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012), *cert. granted, judgment vacated*, 569 U.S. 1015 (2013), and *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013). As Judge Weinstein noted in an oft-cited 2001 opinion, "[t]he framers of Rule 23(c)(4)(A) considered class actions brought under Rule 23(b)(3) . . . particularly well suited for certification of fewer than all issues. Their conclusion follows from the fact that Rule 23(c)(4)(A) assists in satisfying Rule 23(b)(3)'s additional class certification requirements of predominance and superiority." *Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 28–30 (E.D.N.Y. 2001) (citations omitted); *see also Martin v. Behr*, 896 F.3d 405 (6th Cir. 2018); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826 (E.D. Tenn. 2019).

Prominent treatises are in accord. According to Professors Tidmarsh and Trangsrud, in this context "[b]y definition, these common issues would predominate, because only the common issues are litigated on a class-wide basis." Jay Tidmarsh and Roger H. Transgrud, Modern Complex Litig. 490 (2d ed. 2010) (emphasis added). And as Joseph McLaughlin writes, "when common issues predominate, the manageability factor usually favors certification. The more common issues predominate, the more manageable the litigation becomes, and a class action becomes the superior device for resolving the case through elimination of duplicative litigation." 1 McLaughlin on Class Actions § 5:68 (14th ed., Oct. 2017 update) (emphasis added) (footnotes omitted).

Here, because the issues to be certified involve only common issues, with no individualized inquiries necessary for the class determination, predominance and superiority are satisfied.

**III.    The proposed issue class satisfies the seventh _Gates_ factor, concerning the impact of certification on the effectiveness and fairness of the resolution of remaining issues, because it maintains fairness to all parties.**

The Third Circuit asked this Court to "explicitly discuss whether _[sic]_ the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues." The sole concern the Third Circuit identified in this regard is whether ECFMG will face "undue pressure to settle even if their breach did not cause Plaintiffs' harm." _Russell_, 15 F.4th at 272.

Later, however, the opinion rejects the notion that issue classes will unfairly pressure ECFMG into settling with Plaintiff. The court rejected as "overblown" amicus Chamber of Commerce's contention that the district court's ruling would encourage "a flood of abusive class actions." _Id._ at 275. As it explained, "even if a lawyer could obtain a quasi-declaratory ruling on a subset of common issues, the transformation of the case from a proposed class action to a set of individualized proceedings would spoil any settlement leverage that the lawyer had." _Id._ Whatever the merits of the Third Circuit's analysis, it certainly did not hold that certifying the proposed issue class will extort a settlement from ECFMG.

Even if Defendant experiences settlement pressure after an adverse determination on the certified issues, this does not mean that such settlement pressure was "undue," i.e., "excessive or unwarranted." Black's Law Dictionary (11th ed. 2019). There are built-in safeguards against undue settlement pressure, including the requirement of rigorous analysis itself and the Rule 23(f) appeal. Settlement pressure resulting from a fair resolution of the certified issues is not grounds to reject certification. _Jackson v. Se. Pennsylvania Transp. Auth._, 260 F.R.D. 168, 185 (E.D. Pa. 2009) ("[T]he Court cannot simply deny certification on this ground."); Fed. R. Civ. P. 23, 1998 advisory committee cmt. To hold otherwise would preclude most any issue certification, eviscerating the issue class device.

8

Merely because other persons, absent from this litigation and not alleged to be negligent, were involved in the causal chain does not make it "unfair" to impose liability on ECFMG. The relevant inquiry is whether ECFMG's negligence was a factual cause of Plaintiffs' injuries, not, as the opinion's dicta implied, whether ECFMG was *the* cause. The standard instruction on causation (referred to as "proximate cause" rather than "factual cause") reads as follows:

> In order for *[name of plaintiff]* to recover in this case, *[name of defendant]*'s [negligent] [grossly negligent] [reckless] <u>conduct must have been a factual cause in bringing about harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct.</u> To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.
>
> To be a factual cause, *[name of defendant]*'s conduct need not be the only factual cause. <u>The fact that some other causes concur with *[name of defendant]*'s negligence in producing an injury does not relieve *[name of defendant]* from liability as long as [his] [her] own negligence is a factual cause of the injury.</u>

Pa. SSJI (CIV), 13.20 (emphasis added).[1]

Pennsylvania does retain the concept of concurring causes, but that only comes into play "when the joint negligence of more than one person is involved." Pa. SSJI (CIV), 13.150. That is not the case here: ECFMG has not asserted that another person's *negligence* was a factual cause of the injuries. Even if it did, a defendant cannot avoid liability on the basis that "another concurring cause is also responsible for producing injury." *Id.* "The basic question is whether the first tortfeasor's action was in fact a legal cause of the resultant injury. If in fact it was . . . the fact that a second actor may also have contributed to the injury does not relieve the initial tortfeasor of responsibility." *Grainy v. Campbell,*

---

[1] This instruction accurately reflects Pennsylvania law. *Gorman v. Costello*, 2007 PA Super 224, ¶ 13, 929 A.2d 1208, 1212 (2007).

493 Pa. 88, 95, 425 A.2d 379, 383 (1981) (Nix, J., concurring).[2] Juries in individual proceedings may fairly consider this question if ECFMG receives unfavorable determinations on duty and breach.

The result is the same if one frames this inquiry as "superseding cause." The mere fact that other institutions relied on ECFMG's certification of Igberase, and thus played a role in his ability to practice medicine, does not transform them into superseding causes that warrant inclusion on a verdict form. A superseding cause "is an intervening force that is 'so extraordinary as not to have been reasonably foreseeable.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009). An event is a superseding cause if it "operat[es] independently of any situation created by the first actor's negligence" and "is not . . . a normal result of that situation." *Id.* Here, neither of these conditions is met: ECFMG certification was a prerequisite to him attending a residency program and becoming able to practice obstetrics and gynecology. ECFMG initiated the causal chain that enabled Igberase to practice medicine in the United States. For a health care institution to grant him privileges is hardly so extraordinary as to not have been reasonably foreseeable.

---

[2] *See also* the damages instruction on "Other Contributing Causes":

> *[Name of plaintiff]* is entitled to recover damages for all [injuries] [harm] factually caused by the defendant['s] [s'] negligence.

> The defendant['s] [s'] negligence need not be the sole cause of the [injuries] [[harm]; other causes may have contributed to producing the final result.

> The fact that some other factor may have contributed to [an injury] [a harm] does not relieve [a defendant] [defendants] of liability, unless you find that such other causes would have produced the [injury] [harm] complained of independently of their negligence.

> [Even though prior conditions or concurrent causes may have contributed to [an injury] [a harm], if the defendant['s] [s'] negligence factually caused the [injury] [harm], the defendant[s] [is] [are] liable for the full amount of damages sustained, without any apportionment or diminution for the other conditions or causes.]

Pa. SSJI (Civ), §7.90 (2020).

10

Moreover, issues of causation should not bar class certification here. As the Third Circuit has observed, "[c]hallenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (quoting Newberg on Class Actions § 4.26 (3d ed.)).

Finally, the language of this *Gates* factor resembles the element of superiority, which asks courts to determine "whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because the superiority element is met, as described above, this *Gates* factor is satisfied as well.

## IV.    The proposed issue class also satisfies the third *Gates* factor, concerning the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives, because no efficient alternative exists.

According to the Third Circuit, this Court "did not rigorously consider what efficiencies would be gained by resolution of the certified issues" with respect to Plaintiffs' negligent infliction of emotional distress claim—although, as the Third Circuit acknowledged, the Court "briefly discussed the efficiencies of a single trial and broached other options with the parties." *Russell*, 15 F.4th at 272. The appellate court stressed that following a class phase trial, if Plaintiffs were successful, individual proceedings would be necessary to determine fact of injury, proximate (factual) cause, and affirmative defenses.

The Third Circuit's decision should not alter this Court's conclusion. The key question, as Judge Posner put it, is: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" *Butler*, 702 F.3d at 362. The mere fact that individualized determinations are needed to resolve damages

11

claims cannot defeat certification. As this Court found, "there are efficiencies to be gained by certifying a class on these issues because it will allow for a single trial with a single, preclusive determination about ECFMG's conduct, rather than the presentation of the same evidence about ECFMG again, and again, and again to separate juries." (ECF No. 57 at 26). And the Third Circuit supported this conclusion: it not only indicated that "the District Court may very well be correct" in this assessment, *Russell*, 15 F.4th at 272, but also noted that "[t]here will be plenty left for individual proceedings, but these major issues [of duty and breach] could be resolved on a class-wide basis." *Russell*, 15 F.4th at 273.

In fulfilling the Third Circuit's mandate to analyze fulsomely this *Gates* factor, this Court should not alter its central conclusion. The only alternative to issue class certification followed by individualized determinations on causation and damages is full-blown trials for each of at least 550 plaintiffs whom counsel presently represent. This is necessarily far less efficient, because it would require repetitive presentations of evidence on duty and breach. Collateral estoppel, as the Court observed, is not an alternative because it cannot be used offensively here to resolve multiple claims. ECF No. 57 at 26–27. The Third Circuit did not disturb the merits of these findings, and this Court has no reason to revisit them.

**V.** **The Third Circuit's dicta regarding the ninth *Gates* factor should not alter the Court's class certification decision, as no Reexamination Clause issues inhere in the proposed issue class.**

In dicta, the appellate opinion suggested "[t]he District Court may also wish to consider whether the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim are suitable for issue-class treatment." *Russell*, 15 F.4th at 272. It observed that "under Pennsylvania law, for example, to determine whether the Commission owed the Plaintiffs a relevant legal duty, the class jury will have to weigh several factors, including the 'foreseeability of the harm incurred.' " *Id.* The

12

Third Circuit anticipated that "once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of the Commission's negligence as to each Plaintiff." *Id.* According to the Third Circuit, then, "each individual jury, like the issue-class jury, may need to consider evidence regarding the Commission's overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty." *Id.* Based on "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)," the appellate court concluded that "*Gates* disfavors this," referencing the ninth factor of the *Gates* test.[3] As described below, these hypothetical concerns the Third Circuit chose to express in dicta should not disturb the merits of this Court's conclusions.

A.     The Reexamination Clause concerns the redetermination of issues, *not* the rehearing of evidence.

At the outset, a persistent Reexamination Clause myth must be dispelled. The Reexamination Clause of the Seventh Amendment—the focus of the concern the appellate court raised concerning Gates factor 9—does not preclude the repeated presentation of evidence at different phases of the same trial.[4] Rather, "the Seventh Amendment prohibition is not against having two juries review the

---

[3] This factor requires a district court to consider "the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011) (citing Principles of the Law of Aggregate Litigation §§ 2.02–05 (2010), *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 201 (3d Cir. 2009)). The Court concluded that there were no indivisible remedies in its class certification decision (ECF No. 57 at 27), and neither ECFMG nor the appellate court has opined otherwise.

[4] The Seventh Amendment, ratified in 1791, provides that "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII

13

same evidence, but rather against having two juries decide the same essential issues." *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997) (citation and quotes omitted). Separate juries are permissible even where "certain evidentiary items might have been relevant to both phases of trial," even if evidence is reheard. *Id.* As a defense-side journal has observed,

> First, the Clause refers to a "fact tried by a jury," which appears to be considerably narrower than an Article III "case or controversy." There are several possible interpretations of "fact tried by a jury." One is construing the phrase as synonymous with "fact examined by a jury" which would prevent subsequent juries from hearing the same evidence as the initial jury. This position could be implied in the Fifth Circuit's criticism of a bifurcation plan because "a second jury will rehear evidence of the defendant's conduct." [quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 751 (5th Cir. 1996).] However, <u>such an interpretation has been soundly rejected</u>, even by the Fifth Circuit, <u>and, for good reason, because, for decades before and after the ratification of the Seventh Amendment, subsequent juries were essentially *required* to rehear evidence pertaining to a plaintiff's claims where the common law's rigid joinder rules prohibited the joinder of all the plaintiff's claims.</u> Moreover, <u>such a broad reading of "fact tried by a jury" would cripple the ability of trial courts not only to bifurcate in many instances but also to employ other management devices</u> such as directing a retrial on only the issue of damages where the first trial was otherwise error-free.

W. Russell Taber, *The Reexamination Clause: Exploring Bifurcation in Mass Tort Litigation Analyzing the Constitutional Hurdle to Bifurcated Trials*, 73 Def. Couns. J. 63, 71 (2006).

The concerns that motivated the Framers in drafting the Seventh Amendment are also not at play in the proposed issue certification. As Judge Weinstein concluded after an extensive, oft-cited analysis:

> The historical record demonstrates that the Framers' main objective in drafting the Seventh Amendment was to limit the ability of an appellate court, specifically the Supreme Court, to review de novo and overturn a civil jury's findings of fact. Nowhere is there an indication that the Framers intended to constrain the trial judge's substantial discretion to employ appropriate mechanisms of jury control.

*Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 33 (E.D.N.Y. 2001).

14

The remedy for any potential Reexamination Clause concerns is prudent case management combined with the use of well-drawn special interrogatories: "[u]se of special verdict forms can provide the specificity necessary for instructing a second jury as to the aspects of the litigation previously resolved." Ann. Manual Complex Lit. § 22.755 (4th ed.); *see also* 2 Newberg on Class Actions § 4:92 (5th ed.) ("In sum, the Seventh Amendment does not seem to pose a significant obstacle to the use of issue classes, even in the mass tort context, so long as courts are careful to certify only those issues for class treatment that are sufficiently separable from individual issues."). As the same defense-side journal cited above also observed,

> [t]he fundamental means to avoid a prohibited reexamination in most bifurcation plans is the use of carefully crafted special verdicts. In bifurcated trials, as discussed earlier, a special verdict captures the very "fact[s] tried by a jury" by catechizing a jury's factual considerations that led to its affixation of a particular legal label. Prohibited reexaminations can, therefore, be avoided altogether by documenting the "fact[s] tried by a jury" in a special verdict, providing the special verdict to subsequent juries, and instructing subsequent juries that they are bound to the conclusions recorded in the special verdict. In this sense, the Reexamination Clause "requires only that later juries respect the formal findings of the first jury."

Taber, 73 Def. Couns. J. at 75.

Moreover, the potential constitutional infirmity is not ripe for resolution at this stage. Special interrogatories have not been crafted. " 'We do not normally require that a party be protected against an amorphous risk that a state actor—in this case the jury—will violate its legal obligations.' " *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 47 (E.D.N.Y. 2001) (quoting Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause*, 83 Iowa L. Rev. 499, 525 (1998)). If Defendant believes there is a concrete danger of reexamination issues, Defendant should identify them and propose special verdict interrogatories to protect its interests.

The courts and the treatises agree. Appropriate case management undertaken by the parties and the Court can address any concerns that might arise under the Reexamination Clause. This Court and

the parties should embrace the efficiencies of the proposed issues classes and deal with any potential Reexamination Clause issues if and when they arise.

      B.    <u>The issue of duty does not implicate the Reexamination Clause, because it is an issue to be determined by the Court separately from other elements.</u>

The Court need not be concerned a jury in an individual proceeding might reexamine a class jury's finding on the issue of duty, as the aforementioned dicta in the Third Circuit's decision might be read to imply. The Court, not the class jury, will determine whether ECFMG owed a duty to Plaintiffs and members of the class, as the Third Circuit itself acknowledges on the following page of its opinion. *Id.* at 273 ("Duty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages."). Juries in individual proceedings will not be asked to determine whether ECFMG owed a duty to the class. Issues of duty here proposed for classwide treatment do not run afoul of the ninth *Gates* factor.

      C.    <u>Trying the issue of breach separately from causation and damages will not run afoul of the Reexamination Clause.</u>

Courts in this and other circuits routinely try or re-try liability and emotional harm damages separately. *See Rosa v. City of Chester*, 278 F.2d 876, 882 (3d Cir. 1960) ("Federal appellate and district courts have time and again ordered new trials as to damages only."); *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 426–30 (4th Cir. 2003); *Walters v. Mintec/Int'l*, 783 F.2d 73, 82 (3d Cir. 1985) (ordering new trial on emotional and pecuniary damages only in wrongful death claim); *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 755 (2d Cir. 1984) (permitting retrial on damages including psychological injury where first jury answered special interrogatories on liability). In *Gunnells*, the Fourth Circuit affirmed an order granting issue-class certification, where mini-trials on proximate cause and damages, including emotional distress damages, would have followed the class trial on the certified issues. *Gunnells,* 348 F.3d at 426–30.

16

It is well within this Court's discretion to permit " 'a single trial with a single, preclusive determination about [the Commission]'s conduct, rather than the presentation of the same evidence about [the Commission] again, and again, and again to separate juries.' " *Russell*, 15 F.4th at 273.  Here, the circumstances a jury will need to consider when evaluating damages in the claims for emotional distress are primarily *Igberase's* conduct, as Igberase, unlike ECFMG, was in direct contact with the class members.  As the Court of Appeals noted, "each patient shared the same distanced relationship of trust with the Commission." *Russell*, 15 F.4th at 273.  ECFMG's negligence allowed Igberase to be in a position to treat patients, but there is no evidence that plaintiffs had any direct contact with ECFMG. Thus, ECFMG's actions are not necessary to evaluate the plaintiffs' emotional distress, caused by Igberase's examinations. Rather, individual juries will already be instructed that ECFMG is responsible for putting Igberase in a position to damage Plaintiffs in the first place. Even if there will be limited reintroduction of evidence, the efficiencies to be gained far exceed scores of separate trials.

*Spence v. Board of Education of Christina School District*, 806 F.2d 1198 (3d Cir. 1986), referenced by the Third Circuit, is of no moment here. The issue on appeal concerned the application of *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494 (1931), in an individual claim for retaliatory transfer, to determine whether damages could be *re-tried* on a limited factual presentation. *Id.* at 1202.  Unlike here, the case involved "a tangled and complex fact situation." *Id.*

*Spence* certainly did not hold that emotional distress liability and damages are *always* too interwoven to allow a fair determination of damages apart from liability. *Spence* held only that the district court had not abused its discretion in not allowing a damages-only retrial on that record, 806 F.2d at 1202—not that a district court cannot try issues of liability and emotional distress damages separately in a class action. And it did not hold that issues of duty and breach within liability could not be tried separately from causation and damages where, as here, the facts bearing on the defendant's breach of duty have little bearing on whether particular individuals suffered compensable harm.

17

No reported decision has applied *Spence* to bar certification and trial of liability (much less issues within liability) separately from damages. Although "[t]he universal requirement of a causal link between liability and damages means that the issues can never be completely unlinked . . . it is clear that in many cases damages may justly be tried apart from liability." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 461 (3d Cir. 2001). The Federal Rules of Civil Procedure "expressly authorize such separate trials." *Id.* at 461 n.9 (citing Fed R. Civ. P. 42(b)).

Finally, Defendant's interests are not in jeopardy here. Even if there were an overlap in the issues to be tried at the two proposed stages, the defendant could only benefit from the proposed staging of the trials. First, Plaintiffs must prevail on the issues of duty and breach. If Plaintiffs do not succeed at this stage, their class claims are extinguished, and there need be no second stage.

## VI. The choice of law question should not impair certification of the proposed issue class, as the Third Circuit did not indicate the Court should revisit its earlier findings on this issue.

The only other note of error correction in the Third Circuit's opinion lies in its footnote 5. There, the appellate court noted that what it termed a lack of rigorous analysis of the two *Gates* factors contended with above was sufficient to vacate the class certification decision, but also hypothesized that "there may yet be other problems with the issue class." *Russell*, 15 F.4th at 275 n.5. The only hypothetical "problem" the Third Circuit identified was "the possibility that Plaintiffs' legal claim implicates multiple states' laws." *Id.* The opinion mused that it is a "close question," because "[i]t may well be true that Pennsylvania has the greatest interest in this case," as this Court concluded, but "various other states have a substantial interest in the resolution of the claims, too." *Russell*, 15 F.4th at 273 n.5. Yet, because the issue was briefed in the context of class certification, the Third Circuit empowered this Court "to determine which state's law applies to each Plaintiff's claim, if the question of which state's law applies becomes relevant in future proceedings." *Id.* The appellate court did not

18

discuss whether application of another state's law would give rise to a true conflict (it would not, as this Court concluded). In short, the Court did not disturb this Court's findings on choice of law and did not encourage it to revisit them at this stage. As Plaintiffs have argued, the Court can address any potential choice of law issues through the use of subclasses under Rule 23(c)(5), particularly given the small number of states at issue.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court re-certify the proposed Issue Classes.

Dated: <u>December 10, 2021</u>                              Respectfully submitted,

JANET, JANET & SUGGS, LLC                        SCHOCHOR, FEDERICO AND STATON
                                                                        Brent Ceryes
<u>/s/ Patrick Thronson</u>                                          Jon Schochor
  Patrick A. Thronson                                            Phil Federico
  4 Reservoir Circle, Suite 200                             Lauren Schochor
  Baltimore, MD 21208                                       1211 St. Paul Street
  (410) 653-3200                                                 Baltimore, Maryland 21202
                                                                        (410) 234-1000
CONRAD O'BRIEN PC
<u>/s/ Robin Weiss</u>                                             Z LAW, LLC
  Nicholas M. Centrella (PA ID No. 312071)          Cory L. Zajdel
  Robin S. Weiss (PA ID No. 67666)                     2345 York Rd. Suite B-13
  1500 Market Street, Suite 3900                          Timonium, MD 21093
  Philadelphia, PA 19102-2100                           (443) 213-1977
  (215) 864-9600
                                                                     THE COCHRAN FIRM
LAW OFFICES OF PETER G. ANGELOS,                   Karen E. Evans, R.N., J.D.
P.C.                                                                      David Haynes
  Paul M. Vettori                                                  1100 New York Ave, N.W.
  100 N. Charles Street, 20th Floor                        Washington, D.C. 20005
  Baltimore, Maryland 21201                              (202) 682-5800
  (410) 649-2000

                                                                     *Attorneys for Plaintiffs, on behalf of themselves and*
                                                                     *all others similarly situated*

19

JA2252

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be electronically filed and served upon all counsel of record by electronic filing. This document is available for viewing and downloading from the Court's ECF system.

Dated: 12/10/2021

*/s/ Robin S. Weiss*
Robin S. Weiss

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

       Plaintiffs,

  v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

       Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S SUPPLEMENTAL BRIEF
## IN OPPOSITION TO CLASS CERTIFICATION

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 2

    I.     Plaintiffs Have Not Demonstrated That an Issue Class Satisfies
          Rule 23(c)(4). ......................................................................................... 2

          A.     Issue certification will not substantially facilitate the resolution of
                the dispute. .................................................................................. 3

          B.     Issue certification will neither preserve the parties' procedural and
                substantive rights and responsibilities, nor respect the
                constitutional and statutory rights of the parties. ...................................... 7

          C.     This case is indistinguishable from *Gates* and merits the same
                result. ........................................................................................... 9

    II.     Plaintiffs Have Not Demonstrate That an Issue Class Satisfies
          Rule 23(b)(3). ......................................................................................... 9

          A.     The duty and breach elements of Plaintiffs' claims do not satisfy
                predominance. ................................................................................ 10

          B.     The duty and breach elements of Plaintiffs' claims do not satisfy
                superiority. .................................................................................... 13

CONCLUSION .................................................................................................. 19

JA2255

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Amchem Prods., Inc. v. Windsor,
  521 U.S. 591 (1997)..................................................................................10

AT&T Mobility LLC v. Concepcion,
  563 U.S. 333 (2011)..................................................................................18

Bowman v. Williams,
  165 A. 182 (Md. 1933) ...............................................................................8

Gates v. Rohm & Haas Co.,
  655 F.3d 255 (3d Cir. 2011) ............................................................... passim

Healy v. Beer Inst., Inc.,
  491 U.S. 324 (1989)....................................................................................9

In re Hydrogen Peroxide Antitrust Litig.,
  552 F.3d 305 (3d Cir. 2008).................................................................10, 13

In re Sch. Asbestos Litig.,
  789 F.2d 996 (3d Cir. 1986)...................................................................8, 16

Johnston v. HBO Film Mgmt., Inc.,
  265 F.3d 178 (3d Cir. 2001)......................................................................13

Matter of Rhone-Poulenc Rorer, Inc.,
  51 F.3d 1293 (7th Cir. 1995) ......................................................................5

McKenna v. City of Philadelphia,
  649 F.3d 171 (3d Cir. 2011).......................................................................4

Mejdrech v. Met-Coil Sys. Corp.,
  319 F.3d 910 (7th Cir. 2003) ....................................................................17

Russell v. Educ. Comm'n for Foreign Med. Graduates,
  15 F.4th 259 (3d Cir. 2021) ............................................................... passim

Sala v. Nat'l R.R. Passenger Corp.,
  120 F.R.D. 494 (E.D. Pa. 1988).................................................................15

Spence v. Bd. of Educ. of the Christina Sch. Dist.,
  806 F.2d 1198 (3d Cir. 1986)....................................................................17

JA2256

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) (en banc)..................................................16

*Toney v. Chester Cty. Hosp.*,
  36 A.3d 83 (Pa. 2011) ...................................................................8

*Township of Bordentown, N.J. v. FERC*,
  903 F.3d 234 (3d Cir. 2018).............................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................12, 13

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a) ..................................................................2,10, 15

Fed. R. Civ. P. 23(b) ............................................................... *passim*

Fed. R. Civ. P. 23(c) ............................................................... *passim*

Am. Med. Ass'n, *How IMGs have changed the face of American medicine* (Oct. 19, 2021),
  https://www.ama-assn.org/education/international-medical-education/how-imgs-have-
  changed-face-american-medicine ........................................................17

JA2257

## INTRODUCTION

Pursuant to this Court's November 9, 2021 Order (ECF 77), Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") submits this supplemental brief to address class certification in light of the Third Circuit's decision in *Russell v. Educational Commission for Foreign Medical Graduates*, 15 F.4th 259 (3d Cir. 2021).

This Court previously and correctly determined that most of this case is not suitable for class treatment. It rejected Plaintiffs' request to certify liability for class-wide determination, ECF 57 at 22–25, and rejected class treatment of five of the nine issues that Plaintiffs proposed, *id.* at 25. Nothing in the Third Circuit's decision disturbs these aspects of this Court's earlier decision.

In vacating this Court's order certifying the duty and breach elements for class treatment, the Third Circuit held that to certify the requested issue class, this Court must, *inter alia*, (1) find that the issue class is "appropriate" under Rule 23(c)(4) based on a rigorous analysis of the *Gates* factors, as guided by the Third Circuit's opinion; and (2) find that the issue class satisfies Rule 23(b)(3)'s predominance and superiority requirements. Plaintiffs can make neither showing.

The Third Circuit identified a host of major obstacles to issue certification under Rule 23(c)(4) and *Gates*. Issue certification cannot substantially facilitate the resolution of the dispute because each class member would still have to prove a plethora of complex issues through individualized proceedings that require the same evidence as the issue class trial. It would also undermine the parties' procedural and substantive rights because it risks unduly pressuring ECFMG to settle (rather than having its strong arguments decided on the merits) and creates difficult constitutional issues (including under the Seventh Amendment and the Commerce Clause). Plaintiffs have proposed no viable solutions to any of these impediments.

With respect to Rule 23(b)(3), Plaintiffs have failed to demonstrate that any common issues presented by the duty and breach inquiries predominate over the individual issues that must be

1

resolved to determine whether ECFMG owed and/or breached a duty to a particular class member. Nor have Plaintiffs shown that issue class certification is a superior method for resolving the controversy. Plaintiffs have offered no plan for how the Court can effectively manage an issue class trial or apply the results of an issue class trial to each class member's claim, without almost complete duplication of evidence. Individual proceedings are also superior because they do not threaten undue settlement pressure or risk inflicting emotional distress on putative class members who are presently (and may forever remain) uninjured.

For the reasons set forth below and in ECFMG's prior briefing, class certification should be denied in its entirety.

## ARGUMENT

### I.    Plaintiffs Have Not Demonstrated That an Issue Class Satisfies Rule 23(c)(4).

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." In contrast to Rule 23(a) and Rule 23(b), which determine "if the proposed issues **can** be brought or maintained as [a] class action," Rule 23(c)(4) "determine[s] whether they **should**." *Russell*, 15 F.4th at 270 (emphasis in original). The Court cannot certify an issue class without finding Rule 23(c)(4) satisfied. *Id.*

The Third Circuit clarified that its decision in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011)—including the list of nine factors relevant to issue class certification—explained Rule 23(c)(4)'s "appropriate[ness]" inquiry. *Id.* at 267. "When assembled, the *Gates* factors construct a functional framework to aid the district courts tasked with resolving issue-class certification questions." *Id.* at 268. "[D]istrict courts may certify 'particular issues' for class treatment even if those issues, once resolved, do not resolve a defendant's liability" only if "such certification substantially facilitates the resolution of the civil dispute, preserves the parties' procedural and substantive rights and responsibilities, and respects the constitutional and statutory

2

rights of all class member and defendants." *Id.* at 270.

As explained in ECFMG's prior briefing and herein, Plaintiffs have not demonstrated that Rule 23(c)(4) and the *Gates* factors favor issue class certification.

### A. Issue certification will not substantially facilitate the resolution of the dispute.

The Third Circuit explained that the overall complexity of the case (*Gates* factor 2) and the lack of efficiencies to be gained from an issue class proceeding in light of realistic procedural alternatives (*Gates* factor 3) weigh strongly against issue class certification. "[E]ven if the District Court finds that [ECFMG] owed a relevant legal duty to the Plaintiffs that it subsequently breached, each Plaintiff, in individual proceedings, will have to prove that they were injured; that [ECFMG's] breach of the relevant duty actually and proximately caused those injuries; that those injuries are due a particular amount of damages; and that [ECFMG's] affirmative defenses (including, presumably, each Plaintiff's consent to medical treatment by Igberase) are not decisive." *Russell*, 15 F.4th at 272.

Virtually all of the "common" evidence and arguments that would presumably be presented in an issue class trial on questions of duty and breach would need to be reheard in every individual case. To determine causation, understand who Dr. Akoda was, and even have a basic understanding of the theory of liability against ECFMG, every jury in every individual proceeding would need to hear the evidence that Plaintiffs presumably propose to present in the issue class proceeding.

Evaluating but-for and proximate causation would require an individual jury to consider the entire chain of events relevant to the class member at issue—including any alleged wrongdoing by ECFMG, JSMC, Howard, the Maryland Board of Physicians, the Virginia Board of Medicine, Dr. Chaudry, Dr. Moore, ABOG, and/or law enforcement—that will already have been presented to the issue class jury. *See id.* ("Many other actors played a role in Igberase's fraud, including the

JA2260

residency programs that admitted and trained him, the state medical boards, that licensed him, the hospitals that gave him privileges, the specialty board that certified him, and the law enforcement officers (state and federal) who investigated him."). *Cf. McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011) (explaining that "proximate cause" excludes "link[s] that are too remote, purely contingent, or indirect" (internal citation omitted)); *Township of Bordentown, N.J. v. FERC*, 903 F.3d 234, 247 n.6 (3d Cir. 2018) (noting that "intervening act[s]" can sever a causal chain).

Moreover, as the Third Circuit noted, "once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of [ECFMG's] negligence as to each Plaintiff." *Russell*, 15 F.4th at 272 (citing *Spence v. Bd. of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986)). The Third Circuit affirmatively rejected Plaintiffs' argument that emotional distress could be evaluated solely based on a class member's interactions with Dr. Akoda, *See* Appellees' Br., Dkt. 47, at 57–59. Rather, it agreed with ECFMG (and Third Circuit precedent) that any "emotional distress damages must be evaluated in light of all the circumstances surrounding [ECFMG's] alleged misconduct." *Id.* (quoting *Spence*, 806 F.2d at 1202). As a result, "each individual jury, like the issue-class jury, may need to consider evidence regarding [ECFMG's] overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty." *Id.* at 272. As the Third Circuit noted, "*Gates* disfavors this." *Id.*; *see Gates*, 655 F.3d at 273 (holding that "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" counsels against certification of those issues).

Thus, the Third Circuit held, individual proceedings considering each class member's emotional distress damages will require reconsidering all of the circumstances surrounding ECFMG's duty and breach, essentially a complete reduplication of any evidence presented at a

class-wide issue trial. No efficiencies can be gained by an issue class proceeding when the same evidence will need to be represented to juries in individual proceedings.

The need to present the same evidence at both an issue class trial and individual proceedings creates serious Seventh Amendment concerns. Courts have disapproved of the kind of issue class Plaintiffs propose because attempting to separate questions of duty and breach from the question of proximate causation would violate the Seventh Amendment. "Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant. It overlaps the issue of defendants' negligence," particularly when (as here) applicable state law "make[s] the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence." *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995); *see Russell*, 15 F.4th at 272 (noting that whether ECFMG owed Plaintiffs a "relevant legal duty" requires considering "the foreseeability of the harm incurred," among other factors). As a result, Plaintiffs' proposed issue class presents a "looming infringement of Seventh Amendment rights": "[u]nless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs" issues of proximate causation that overlap issues of duty and breach already tried to another jury. *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d at 1303. The impact issue certification will have on the constitutional rights of the parties (*Gates* factor 5) and the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issues (*Gates* factor 9) thus weigh strongly against issue certification.

The type of claims and issues in question (*Gates* factor 1) also weighs against certification. "[T]o determine whether [ECFMG] owed the Plaintiffs a relevant legal duty, the class jury will have to weigh several factors, including 'the foreseeability of the harm incurred.'" *Russell*, 15

5

F.4th at 272 (quoting *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000)).[1] By definition, that requires the issue class jury to look beyond "[ECFMG]'s conduct," *id.* at 273, to the nature of the harm allegedly suffered by class members, which Plaintiffs have proposed to excise from the issue class trial. Plaintiffs have failed to detail how the duty and breach elements of each class member's claim can be resolved on a class-wide basis without consideration of other elements of their claim, which they propose to sever for subsequent individual trials. They have no explanation for how a proposed issue class trial would not broach the emotional distress that will be the focus of subsequent individual trials.

The Third Circuit discussed the possibility that there may be efficiencies to be gained from "a single trial with a single, preclusive determination about [ECFMG]'s conduct." *Id.* at 272–73. But an issue class on the abstract questions of duty and breach that Plaintiffs propose to certify (and whose certification the Third Circuit vacated) would not actually generate a determination that would have preclusive effect in each class member's individual proceeding. As explained below, because of the relevant legal standard, the complexity of the facts, and the wide-ranging time period that Plaintiffs seek to put at issue, determining whether ECFMG breached a duty that it owed to Plaintiffs would not necessarily answer whether ECFMG breached a duty that it owed to other class members who were treated at different times or under different circumstances. *See infra* Part II.A. And there is no manageable way to further limit or divide the proposed issue class so that it might generate a preclusive determination as to the entire class. *See infra* Part II.B.2. The inability of an issue class trial to have preclusive effect (*Gates* factor 6) in each class member's subsequent individual proceeding weighs heavily against issue certification.

---

[1] The Third Circuit assumed without deciding that Pennsylvania law governed Plaintiffs' claims for purposes of class certification. *Russell*, 15 F.4th at 273 n.5. As explained below, choice-of-law issues are individualized questions weighing against issue certification.

**B.   Issue certification will neither preserve the parties' procedural and substantive rights and responsibilities, nor respect the constitutional and statutory rights of the parties.**

The risk of undue settlement pressure arising from the prospect of an issue class undermines the effectiveness and fairness of resolution of remaining issues (*Gates* factor 7) and weighs heavily against issue certification. As the Third Circuit recognized, ECFMG has strong defenses, including the absence of any duty, the limitations on claims of negligent infliction of emotional distress, class members' consent to treatment by Dr. Akoda, and a very strong causation defense in light of the fact that "[m]any other actors played a role in Igberase's fraud, including the residency programs that admitted and trained him, the state medical boards that licensed him, the hospitals that gave him privileges, the specialty board that certified him, and the law enforcement officers (state and federal) who investigated him." *Russell*, 15 F.4th at 272.

Issue class certification risks unfairly pressuring ECFMG to settle rather than having its arguments heard on the merits in court: "If an issue-class jury finds that [ECFMG] owed Plaintiffs a legal duty that it subsequently breached, [ECFMG] may face undue pressure to settle, even if [its] breach did not cause Plaintiffs' harm." *Id.* That risk of undue settlement pressure could be avoided if class members' claims were to proceed as individual cases. Individual proceedings would allow the parties to be heard in court and on appeal, without ECFMG facing the coercive threat that a certified class presents.

The impact individual proceedings may have on one another (*Gates* factor 8) similarly weighs against issue certification. Even if Plaintiffs prevail in an issue class proceeding, there would be some resort to multiple trials on the individual questions remaining for resolution. From those trials, Plaintiffs contend that a consensus would emerge that would allow the parties to evaluate the merits *vel non* of each class member's claims. *See* ECF 47 at 11 ("Trying a limited number of these claims would help the parties to more accurately value the case."). There is no

reason why the elements of duty and breach could not similarly be included in a limited number of bellwether cases "to help the parties more accurately value the case." In light of the complexities and uncertainties of attempting to try abstract elements of Plaintiffs' claims on a class-wide basis separate from other elements, the most effective and fair way to resolve the case would be through individual proceedings resolving all the elements of each class member's claims.

There are also methods short of issue class certification that would allow individual proceedings to facilitate the efficient resolution of these controversies. The parties could, for example, coordinate discovery across individual proceedings to minimize the burden on parties.

Finally, a careful choice-of-law analysis (*Gates* factor 4) should be conducted for each class member, and that weighs against issue class certification. The Third Circuit recognized choice of law as a "close question" in this case that should be reassessed "if the question of which state's law applies becomes relevant in future proceedings." *Russell*, 15 F.4th at 273 n.5. Plaintiffs seek to certify a class comprising patients examined or treated in at least Maryland, Virginia, and the District of Columbia, but they still have not carried their burden to conduct an "extensive analysis" of variations in those state's laws. *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986). Even seemingly minor variations in each state's law have the potential to create a true conflict because each jurisdiction has adopted carefully crafted standards to guard against fictitious or fraudulent claims for emotional distress. *See Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 91 (Pa. 2011) (stating the need for "standards to determine the veracity of the emotional distress and to limit the potential number of plaintiffs"); *Bowman v. Williams*, 165 A. 182, 184 (Md. 1933) (noting that because fright is "easily simulated and feigned" and "difficult to ascertain," it "tend[s] to multiply fictitious or speculative claims, and to open to unscrupulous litigants a wide field for exploitation").

8

If Pennsylvania substantive law applied to an out-of-state plaintiff's claims arising from out-of-state medical treatment, difficult constitutional questions would arise under the Commerce Clause because Pennsylvania has no authority to impose liability that has "the practical effect" of "control[ling] conduct beyond the boundaries of the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Whether Pennsylvania law ultimately applies to Plaintiffs' claims or not, the need for individualized determinations on choice-of-law issues with important constitutional implications weighs against issue class certification.

### C. This case is indistinguishable from *Gates* and merits the same result.

This case is indistinguishable from *Gates*. The *Gates* plaintiffs sought certification of generalized, abstract questions, while leaving the bulk of the claims for later, individual proceedings. *See Gates*, 655 F.3d at 272 (explaining that "causation and extent of contamination," "the fact of damages," and "the amount of damages" would need to be determined in follow-up proceedings). In light of the "numerous individual issues that would remain," resolution of the common issues was "unlikely to substantially aid resolution of the substantial issues on liability and causation," so certification under Rule 23(c)(4) was improper. *Id.* at 272, 274.

Here, as in *Gates*, resolution of the proposed class-wide issues would still leave causation, the fact of damages, and the amount of damages (and numerous other issues) to be determined in follow-up proceedings. Accordingly, the same result is warranted.

## II. Plaintiffs Have Not Demonstrate That an Issue Class Satisfies Rule 23(b)(3).

"A party seeking to certify 'particular issues' for class treatment" must show "that those issues are 'maintainable under Rule 23(b)(1), (2), or (3).'" *Russell*, 15 F.4th at 266–67. Rule 23(b)(3) provides that class certification is appropriate only if "the court finds [(1)] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [(2)] that a class action is superior to other available methods for fairly

9

and efficiently adjudicating the controversy." The application of Rule 23(b)(3) in the context of a request to certify an issue class is "informed by general class-action doctrine." *Russell*, 15 F.4th at 270.

As explained below and in ECFMG's prior briefing, Plaintiffs have not carried their burden on Rule 23(b)(3) as to the duty or breach elements of their claims.

### A. The duty and breach elements of Plaintiffs' claims do not satisfy predominance.

Rule 23(b)(3)'s "predominance criterion is far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (internal quotation marks and citations omitted).

As detailed in its accompanying motion for summary judgment, the correct understanding of the law is that no duty was owed by ECFMG to any patient of Dr. Akoda's, and the claims for negligent infliction of emotional distress are infirm as a matter of law. But to the extent that the claim is even theoretically viable, in light of the Third Circuit's guidance, it is possible that a duty could be owed or breached as to some class members but not as to others, depending on each class members' individual circumstances and harm suffered. As a result, the issues of duty and breach do not satisfy predominance and class certification should be denied.

Whether ECFMG owed any putative class member a relevant legal duty requires "weigh[ing] several factors, including 'the foreseeability of the harm incurred.'" *Russell*, 15 F.4th

10

JA2267

at 272 (quoting *Althaus*, 756 A.2d at 1169). That is not a uniform inquiry that would necessarily produce the same outcome for every patient treated by Dr. Akoda over the proposed class period.

Over the course of Dr. Akoda's career, a host of independent third parties—including JSMC, Howard, the Maryland Board of Physicians, the Virginia Board of Medicine, PGHC, Dr. Chaudry, and Dr. Moore—facilitated his practice of medicine. They did so after evaluating Dr. Akoda under a wide variety of criteria and considering an array of information far broader than ECFMG Certification. As Dr. Akoda's career progressed, more and more third parties evaluated him and concluded that it was appropriate for him to continue treating patients. Unlike ECFMG, many of those third parties were positioned (if not obligated) to monitor Dr. Akoda's medical decisions and day-to-day interactions with patients. With each additional third party's evaluation of Dr. Akoda, it became less and less foreseeable that a patient would come to believe that he should not have been permitted to practice medicine or that treatment by Dr. Akoda would result in emotional distress. The relevant duty inquiry thus varies among class members depending on when they were treated. Answering the general question "whether ECFMG undertook or otherwise owed a duty" to Plaintiffs—an inquiry necessarily rooted in the circumstances that existed at the time Plaintiffs were treated—will not necessarily answer the question as to class members treated under other circumstances or at other times.

Similarly, the issue of breach does not satisfy predominance. The Third Circuit identified various questions relevant to the breach inquiry, including "How much investigating did [ECFMG] do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including [JSMC]? Should it have followed up in later years once Igberase was admitted to another residency program?" *Russell*, 15 F.4th at 273. The answer to the breach question is not common across the class period.

11

It may vary from class member to class member depending on when the class member was treated and the nature of the alleged breach.

A jury may find, for example, that ECFMG did not breach a duty to patients like Ms. Russell and Ms. Evans who were treated after 2014 because it was reasonable for ECFMG to heed requests from law enforcement officials in 2014 not to take action that might jeopardize their investigation of Dr. Akoda. But that finding would not answer the question whether ECFMG took "enough steps to investigate" Dr. Akoda before he treated Ms. Riggins in 2012 or an absent class member in 2007. An issue-class proceeding on the question of duty would not "generate common **answers** apt to drive the resolution of the litigation," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original), so common questions do not predominate, and class certification should be denied.

This Court has already recognized that factual variations that would lead class members to make different arguments on the merits may preclude class certification. It denied certification as to patients treated by Dr. Akoda **before** he enrolled in the Howard residency program for lack of typicality because "[t]hose patients can assert negligence claims based on ECFMG's initial certification of Akoda, but they cannot assert claims based on ECFMG's subsequent investigation **because ECFMG did not conduct the investigation until after Igberase had treated those patients.**" ECF 57 at 19 (emphasis added). Even with a narrowed issue class, the same problem persists. Factual variations require class members to make different arguments on the issues of duty and breach. That means uncommon issues outnumber common issues and predominance is lacking.

Plaintiffs' sole argument in favor of predominance is that ECFMG engaged in a single course of conduct that is capable of proof through common evidence. ECF 32-1 at 21. But this framing ignores that the issues of duty and breach are only "common" if they are "capable of

classwide resolution" and can be resolved "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. That is not the case here because there are a litany of factual variations among class members that may bear materially on whether ECFMG owed a duty to any given class member. Because the issues proposed for certification "require[] individual treatment," predominance is not satisfied and "class certification is unsuitable." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

> **B.     The duty and breach elements of Plaintiffs' claims do not satisfy superiority.**

"Superiority" requires the Court to address "the difficulties likely to be encountered in the management of a class action." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185 (3d Cir. 2001); *see* Fed. R. Civ. P. 23(b)(3)(D) ("The matters pertinent to these findings include … the likely difficulties in managing a class action."). It is not enough that a class action be one of many available methods for resolving the case. It "must represent the best 'available method[] for the fair and efficient adjudication of the controversy.'" *Id.* As explained below and in ECFMG's prior briefing, issue class certification in this case would not be efficient, manageable, or fair.

> **1.     Certifying the duty and breach elements of Plaintiffs' claims is not the best available method for efficient adjudication of the controversy.**

An issue class is not an efficient method for adjudicating the controversy. As discussed, the Third Circuit recognized that an issue class proceeding would not eliminate the need for hundreds of individualized proceedings that would deal with a variety of complicated issues, including "whether each Plaintiff was injured; whether [ECFMG]'s breach of the relevant duty (if it had a duty that was breached) actually and proximately caused those injuries; whether those injuries are due a particular amount of damages; and whether [ECFMG] could raise any affirmative defense, including, presumably, whether each Plaintiff's consent to medical treatment by Igberase breaks the causal chain." *Russell*, 15 F.4th at 265.

Moreover, the same evidence would be presented in both an issue class proceeding and individual proceedings. "[T]he issue-class jury, like each individual jury, may need to consider evidence regarding the harm [ECFMG] allegedly caused. And each individual jury, like the issue-class jury, may need to consider evidence regarding [ECFMG]'s overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty." *Id.* at 272. The overlap in issues to be decided by an issue class jury and an individual jury gives rise to Seventh Amendment problems, *see supra*, that could be avoided entirely through the use of individual proceedings. Individual proceedings offer a far more efficient approach.

### 2. Certifying the duty and breach elements of Plaintiffs' claims would present insurmountable manageability problems.

Plaintiffs contend that Rule 23(b)(3)'s superiority requirement is satisfied because an issue class trial would result in "a quasi-declaratory ruling on a subset of common issues," 15 F.4th at 275, and that any such ruling can be applied to the claims of each class member during subsequent individualized proceedings, thereby obviating the need to retry those issues to subsequent juries. *See* ECF 32-1 at 21–22. But Plaintiffs have not shown how a general determination that ECFMG breached some duty to Plaintiffs at some point over the lengthy proposed class period, without more, would actually resolve the questions of duty and breach for each absent class member. *See supra*. Answering "whether [ECFMG] owed a relevant legal duty **to the Plaintiffs** that it subsequently breached" would not actually answer whether ECFMG owed a relevant legal duty **to each class member** that it subsequently breached. *Russell*, 15 F.4th at 273. In reality, what matters is whether ECFMG breached a duty owed to a specific class member such that the breach may be the legal and proximate cause of that class member's alleged emotional distress. It is clearly superior to have individual juries decide individually whether ECFMG's conduct breached a duty to each class member such that ECFMG may be liable to that class member.

14

This is not a case where a single course of conduct gives rise to a single inquiry regarding duty and breach as to all class members. In cases like that, all class members may be similarly situated with respect to not only to breach and duty but also to causation. *See, e.g.*, *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D. Pa. 1988) (certifying a class of injured victims of a particular train crash). The legal theories at issue would assert violations of law occurring at materially indistinguishable times. Here, by contrast, Plaintiffs have not shown that each Plaintiff and class member asserts claims under legal theories for which duty and breach could be determined on a class-wide basis. *See* Fed. R. Civ. P. 23(b)(3), advisory committee's notes ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways."). As a result, common issues do not predominate, *see supra*, and issue certification is not a superior method for resolving the controversy.

Plaintiffs have suggested that the Court can solve for superiority (and predominance) by dividing the issue class into subclasses based on when or where each class member was treated or the possible relationships from which a duty might arise. That would be unworkable. It would leave certain subclasses, like the subclass of individuals treated at Howard, without a class representative, because none of the Plaintiffs were treated at Howard. The Court could not certify a subclass without a subclass representative. *See* Fed. R. Civ. P. 23(c)(5) (requiring that Rule 23(a)'s requirements—including the requirement of an adequate class representative—be satisfied as to any subclass). Moreover, each class member is differently situated based on the time and context in which she was treated by Dr. Akoda. That makes it impossible to carve out meaningful or principled subclasses, leading to myriad tiny subclasses or unworkable overbroad ones.

Plaintiffs may propose to present the issue class jury with a series of special interrogatories so it can address each and every act or omission about which there is evidence to identify the precise moment when (if ever) ECFMG breached a duty. But with Plaintiffs arguing multiple sources of duties and multiple ways in which ECFMG supposedly breached those duties, individual questions would overwhelm even the most well-intentioned jury trying to apply the law to decades of conduct involving numerous parties. And even if a special verdict sheet might theoretically be possible, it is Plaintiffs' burden to articulate how that can be accomplished. This Court cannot find that an issue class trial involving facts this complicated and legal theories this hazy would be manageable unless Plaintiffs come forward with a workable and detailed trial plan. Despite numerous opportunities, they have not.

Further, choice-of-law issues render class treatment unmanageable. "[I]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 304 n.28 (3d Cir. 2011) (en banc) (internal quotation marks and citations omitted). Plaintiffs bear the burden of conducting an "extensive analysis" of state law variations. *In re Sch. Asbestos Litig.*, 789 F.2d at 1010. For the reasons described in ECFMG's motion for summary judgment, the choice-of-law analysis may result in the application of varying states' laws to various elements of Plaintiffs' claims, and Plaintiffs have not carried their burden on the manageability of determining which state's law applies or applying the law of multiple jurisdictions.

The manageability problems are underscored by the Third Circuit's confusion regarding which issues would be resolved by the Court and which by a jury. At some points in its opinion, the Third Circuit explained that an issue class jury may "find[] that [ECFMG] owed Plaintiffs a legal duty that it subsequently breached[.]" *Russell*, 15 F.4th at 272; *see also id.* ("[T]o determine whether [ECFMG] owed the Plaintiffs a relevant legal duty, **the class jury** will have to weigh

16

JA2273

several factors[.]" (emphasis added)). At other points, the Third Circuit described duty as "an issue of law" and that this Court may "find[] that [ECFMG] owed a relevant legal duty to the Plaintiffs that it subsequently breached[.]" *Id.* The absence of a trial plan regarding which issues would be decided how—and by whom—means that Plaintiffs have not carried their burden to prove that the issue class they propose is manageable.

### 3. Certifying the duty and breach elements of Plaintiffs' claims would present insurmountable fairness problems.

An issue class on the elements of duty and breach is not superior because it would be unfair to ECFMG and to class members.

Emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *See Spence*, 806 F.2d at 1202; *see* ECF 39 at 18–20. The Third Circuit reaffirmed this principle on appeal. *Russell*, 15 F.4th at 272 ("[T]o determine and measure emotional damages, each individual jury will have to assess the degree of [ECFMG's] negligence as to each Plaintiff." (citing *Spence*, 806 F.2d at 1202)). Individual proceedings would not implicate this fairness problem.

Issue certification is unfair to ECFMG also because it creates substantial undue settlement pressure. "When enormous consequences turn on the correct resolution of a complex factual question, the risk of error in having it decided once and for all by one trier of fact rather than letting a consensus emerge from several trials may be undue." *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 912 (7th Cir. 2003). This case presents complex factual questions. *See Russell*, 15 F.4th at 272 ("Many other actors played a role in Igberase's fraud[.]"). And the risk of error in having the questions of duty and breach decided by a single trier of fact presents incredibly high stakes. IMGs represent 25% of all licensed doctors in the United States. American Medical Association, *How*

17

*IMGs have changed the face of American medicine* (Oct. 19, 2021), https://www.ama-assn.org/education/international-medical-education/how-imgs-have-changed-face-american-medicine. ECFMG is confident that it owes no duty to members of the general public who may one day be treated by an IMG, but when "[f]aced with even the small threat of a devastating loss," any defendant may be pressured to settle questionable claims rather than litigate them. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). A better approach would be to have the issues resolved individually—reflecting each permutation of possible factual scenarios—so that a consensus might emerge, without ECFMG facing "undue pressure to settle, even if [its] breach did not cause Plaintiffs' harm." *Russell*, 15 F.4th at 272.

An issue class trial as to whether ECFMG breached a duty to Plaintiffs would also risk prejudicing ECFMG by allowing irrelevant evidence to be submitted to the jury. Under Plaintiffs' theory, what matters is what ECFMG did before a class member was treated by Dr. Akoda. In an individual proceeding, a class member who was treated by Dr. Akoda in 2007 would not present evidence about what ECFMG did or did not do in 2008 or later. But in the proposed issue class trial, Plaintiffs would presumably present evidence irrelevant to that class member about what ECFMG did or did not do at least through 2016. That problem would not arise in an individual proceeding.

Issue class certification would be unfair also to class members because it would undermine each class member's significant interest in controlling her own litigation. *See* Fed. R. Civ. P. 23(b)(3)(A). Personal injury claims—especially ones seeking relief for alleged emotional distress—give each class member a sufficient stake in pursuing their claims, and it would be unfair to have them tried on a class-wide basis. *See* ECF 39 at 18–20.

Finally, individual proceedings are superior to issue class proceedings because they would avoid the possibility of class notice inflicting injuries on class members. If Plaintiffs were correct

that emotional distress is a class member's typical reaction to learning of Dr. Akoda's guilty plea, then certification of the class could cause class members who are presently unaware of Dr. Akoda's guilty plea to suffer emotional distress that they have not yet suffered. By sending notice of the class action (and guilty plea) to class members, under Plaintiffs' own theory, Plaintiffs could cause them to suffer emotional distress that they would not suffer but for Plaintiffs' use of the class action device. Even the mere possibility that the class action vehicle could injure class members weighs against a finding of superiority. The concern would be avoided if the case proceeded as individual proceedings brought by any class members who believe they have suffered emotional distress attributable to an alleged breach of duty by ECFMG.

## CONCLUSION

The Third Circuit's decision articulates an array of reasons why an issue class should not be certified. Even if an issue class is certified and Plaintiffs prevail on a class-wide basis, there remains the need for hundreds of individualized hearings on complicated issues. Those individualized hearings would also require the same evidence that would be presented to the issue class jury, further undermining any purported claims of efficiency and actually giving rise to serious Seventh Amendment concerns. Even if Plaintiffs prevail in an issue class proceeding, Plaintiffs do not intend to try hundreds of individualized proceedings; they envision bellwether trials on the non-certified issues. They offer no explanation for why similar bellwether trials could not be held on the questions of duty and breach for purposes of resolving this case without resort to a complicated—and unprecedented—use of the class action device.

These considerations preclude class certification under Rule 23(c)(4) and Rule 23(b)(3). For the reasons set forth above and in ECFMG's prior briefing, the Court should deny class certification.

Dated: December 10, 2021

/s/ Brian W. Shaffer

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:   +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates*

20

JA2277

## **CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED:  December 10, 2021                    */s/ Brian W. Shaffer*
                                             Brian W. Shaffer

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

           Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

           Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2022, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Supplemental Brief in Opposition to Class Certification and any response thereto, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification is **DENIED**.

BY THE COURT:

_____
Wolson, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in the attached memorandum of law, Defendant Educational Commission for Foreign Medical Graduates, by and through its undersigned counsel, moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Dated: December 10, 2021

Respectfully submitted,

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:   +1.215.963.5000
Facsimile:   +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA2280

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.


DATED: December 10, 2021       */s/ Brian W. Shaffer*
                                      Brian W. Shaffer

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>Defendant. | Civil Action No. 18-5629<br><br>Honorable Joshua D. Wolson |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES' MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# REDACTED FOR PUBLIC FILING

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates*

JA2282

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

I.      ECFMG's Certification and Irregular Behavior Processes..................... 2

II.     The Medical Field Uses ECFMG Certification For Limited Purposes.................. 4

III.    John Nosa Akoda and His Aliases ...................................................... 4

        A.      Residency Programs, Including Jersey Shore Medical Center and
                Howard University Hospital ...................................................... 5

        B.      Maryland Board of Physicians and Virginia Board of Medicine ............. 6

        C.      Prince George's Hospital Center, Dr. Abdul Chaudry, and Dr.
                Javaka Moore ...................................................................... 8

        D.      Other Evaluations of Dr. Akoda ................................................ 8

        E.      Law Enforcement .................................................................. 9

IV.     This Lawsuit............................................................................ 10

        A.      Monique Russell .................................................................. 10

        B.      Jasmine Riggins .................................................................. 11

        C.      Elsa Powell........................................................................ 12

        D.      Desire Evans ...................................................................... 13

LEGAL STANDARD.................................................................................... 14

ARGUMENT ............................................................................................. 15

I.      Recovery for Emotional Distress Is Not Permitted Under These
        Circumstances. ...................................................................... 15

II.     ECFMG Did Not Owe Plaintiffs A Legally Cognizable Duty of Care. ............. 17

        A.      ECFMG owed no general tort duty to Plaintiffs.................................. 17

        B.      ECFMG is not liable to Plaintiffs under Restatement (Second) of
                Torts § 324A. ...................................................................... 23

        C.      ECFMG is not liable to Plaintiffs under Maryland law.......................... 26

III.    ECFMG Was Not A Proximate Cause of Plaintiffs' Emotional Distress........... 29

IV.     There Is No Evidence That Any Alleged Breach of Duty by ECFMG Was
        a But-For Cause of Plaintiffs' Emotional Distress. ............................... 32

V.      Plaintiffs Consented to Treatment by Dr. Akoda, and the Alleged
        Misrepresentations Did Not Vitiate That Consent.............................. 34

i

VI.    There Is No Evidence That Plaintiffs Experienced Compensable Emotional Distress. ................................................................................ 37

VII.   The Claims of Plaintiffs Evans and Powell Are Barred By Limitations. ............ 38

CONCLUSION ...................................................................................................... 40

JA2284

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamski v. Allstate Ins. Co.*,
   738 A.2d 1033 (Pa. Super. 1999) ................................................................. 38

*Alban v. Fiels*,
   61 A.3d 867 (Md. Ct. Spec. App. 2013) ....................................................... 27

*Albany Urology Clinic, P.C. v. Cleveland*,
   528 S.E.2d 777 (Ga. 2000) ............................................................................ 36

*Althaus ex rel. Althaus v. Cohen*,
   756 A.2d 1166 (Pa. 2000) ........................................................... 17, 18, 19, 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................. 14, 15

*Armstrong v. Paoli Mem'l Hosp.*,
   633 A.2d 605 (Pa. Super. 1993) .................................................................... 37

*Ashburn v. Anne Arundel Cty.*,
   510 A.2d 1078 (Md. 1986) ...................................................................... 28, 29

*Barclay v. Briscoe*,
   47 A.3d 560 (Md. 2012) ................................................................................ 29

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006) .......................................................................... 14

*Bickell v. Stein*,
   435 A.2d 610 (Pa. Super. 1981) .................................................................... 40

*Black v. Cmty. Educ. Centers, Inc.*,
   No. 13–CV–6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) ..................... 16

*Bowman v. Williams*,
   165 A. 182 (Md. 1933) .................................................................................. 27

*Cantwell v. Allegheny Cty.*,
   483 A.2d 1350 (Pa. 1984) ................................................................. 24, 25, 26

*Citizens Bank of Pennsylvania v. Reimbursement Tech., Inc.*,
   609 F. App'x 88 (3d Cir. 2015) ..................................................................... 18

i

*Commerce Bank/Penn. v. First Union Nat'l Bank,*
    911 A.2d 133 (Pa. Super. 2006).................................................................................. *passim*

*Credico v. Unknown Employee of the Houston FBI Forfeiture Unit,*
    567 F. App'x 83 (3d Cir. 2014) ...............................................................15

*Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force,*
    745 A.2d 25 (Pa. Super. 2000), *aff'd,* 767 A.2d 548 (Pa. 2001) .............................15

*Dudley v. USX Corp.,*
    606 A.2d 916 (Pa. Super. 1992)...............................................................30

*Duttry v. Patterson,*
    771 A.2d 1255 (Pa. 2001) ......................................................................36

*El v. Southeastern Pa. Transp'n Auth. (SEPTA),*
    479 F.3d 232 (3d Cir. 2007)....................................................................14

*Emekekwue v. Offor,*
    No. 1:11–CV–01747, 2012 WL 1715066 (M.D. Pa. May 15, 2012) .....................17

*Erisoty v. Rizik,*
    No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) ........................................38

*Evans v. Otis Elevator Company,*
    168 A.2d 573 (Pa. 1961) ...............................................................24, 26

*Farabaugh v. Pennsylvania Turnpike Com'n,*
    911 A.2d 1264 (Pa. 2006)...............................................................24, 26

*First v. Zem Zem Temple,*
    686 A.2d 18 (Pa. Super. 1996)..................................................................33

*Fragale v. Wells Fargo Bank, N.A.,*
    480 F. Supp. 3d 653 (E.D. Pa. 2020) .............................................................20, 21

*Gen. Refractories Co. v. First State Ins. Co.,*
    855 F.3d 152 (3d Cir. 2017)....................................................................32

*Gibbs v. Ernst,*
    647 A.2d 882 (Pa. 1994) ......................................................................17

*Griffith v. United Air Lines, Inc.,*
    203 A.2d 796 (Pa. 1964) ......................................................................26

*Grimaldi v. Bank of Am.,*
    No. 12–CV–2345, 2013 WL 1050549 (M.D. Pa. Mar. 14, 2013) ..........................16

*Hall v. United States*,
  No. 2:19-cv-05256-KSM, 2020 WL 3265146 (E.D. Pa. June 17, 2020) ................................ 18

*Hammersmith v. TIG Ins. Co.*,
  480 F.3d 220 (3d Cir. 2007) ................................................................................................ 26

*Hawkins v. Fed. Nat. Mortgage Ass'n*,
  No. 13–CV–6068, 2014 WL 272082 (E.D. Pa. Jan. 23, 2014) ............................................. 16

*Hershman v. Muhlenberg Coll.*,
  17 F. Supp. 3d 454 (E.D. Pa. 2014) ..................................................................................... 15

*Humphries v. Pa. State Univ.*,
  No. 4:20-CV-0064, 2021 WL 4355352 (M.D. Pa. Sept. 24, 2021) ....................................... 15

*Humphries v. Pennsylvania State Univ.*,
  492 F. Supp. 3d 393 (E.D. Pa. 2020) ................................................................................... 17

*Kazatsky v. King David Mem'l Park, Inc.*,
  527 A.2d 988 (Pa. 1987) ...................................................................................................... 16

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) ............................................................................................................. 26

*Lacey v. Cessna Aircraft Co.*,
  932 F.2d 170 (3d Cir. 1991) ................................................................................................. 27

*Lamb v. Hopkins*,
  492 A.2d 1297 (Md. 1985) ................................................................................................... 29

*LeJeune v. Bliss-Salem*,
  85 F.3d 1069 (3d Cir. 1996) ................................................................................................. 27

*Love v. Cramer*,
  606 A.2d 1175 (Pa. Super. 1992) ......................................................................................... 37

*Lux v. Gerald E. Ort Trucking, Inc.*,
  887 A.2d 1281 (Pa. Super. 2005) .................................................................................... 30, 31

*Madison v. Bethanna, Inc.*,
  No. 12-01330, 2012 WL 1867459 (E.D. Pa. May 23, 2012) ................................................ 16

*Mazzagatti v. Everingham by Everingham*,
  516 A.2d 672 (Pa. 1986) .................................................................................................. 16, 21

*Melmark, Inc. v. Schutt by and through Schutt*,
  206 A.3d 1096 (Pa. 2019) .................................................................................................... 27

JA2287

*Moore v. McComsey*,
    459 A.2d 841 (Pa. Super. 1983)............................................................38

*Mulawka v. Pennsylvania*,
    No. 2:11cv1651, 2013 WL 171911 (W.D. Pa. Jan. 16, 2013)................................16

*Novak v. Jeannette Dist. Memorial Hosp.*,
    600 A.2d 616 (Pa. Super. 1991)............................................................30

*Okane v. Tropicana Entm't, Inc.*,
    No. 12–CV–6707, 2013 WL 56088 (E.D. Pa. Jan. 3, 2013)................................17

*P.J.A. v. H.C.N.*,
    156 A.3d 284 (Pa. Super. 2017)............................................................38

*Palsgraf v. Long Island R.R. Co.*,
    162 N.E. 99 (N.Y. 1928)............................................................1, 19, 30

*Pearce v. Salvation Army*,
    674 A.2d 1123 (Pa. Super. 1996)............................................................38

*Pendleton v. State*,
    921 A.2d 196 (Md. 2007) ............................................................28

*Prince v. Esposito*,
    628 S.E.2d 601 (Ga. App. 2006)............................................................36

*R.W. v. Manzek*,
    888 A.2d 740 (Pa. 2005)............................................................18, 19

*Reilly v. Tiergarten Inc.*,
    633 A.2d 208 (Pa. Super. 1993)............................................................30

*Remsburg v. Montgomery*,
    831 A.2d 18 (Md. 2003) ............................................................29

*Rice v. Brakel*,
    310 P.3d 16 (Ariz. App. 2013)............................................................36

*Rice v. Diocese of Altoona-Johnstown*,
    255 A.3d 237 (Pa. 2021) ............................................................40

*Russell v. Educ. Comm'n. for Foreign Med. Graduates*,
    15 F.4th 259 (3d Cir. 2021) ............................................................17, 19

*Santini v. Fuentes*,
    795 F.3d 410 (3d Cir. 2015)............................................................14

JA2288

*Shulick v. United Airlines*,
    No. 11–CV–1350, 2012 WL 315483 (E.D. Pa. Feb. 2, 2012)................................17

*Smith-McConnell v. Todd T. Thompson Funeral Home, Inc.*,
    No. 1035 WDA 2020, 2021 WL 3771822 (Pa. Super. Aug. 25, 2021) ...................27

*Sutcliffe v. Bernese*,
    No. 4:19-CV-00317, 2019 WL 3776560 (M.D. Pa. Aug. 12, 2019) ......................32

*Taylor v. Johnston*,
    985 P.2d 460 (Alaska 1999)..........................................................................35, 36

*Toney v. Chester County Hospital*,
    36 A.3d 83 (Pa. 2011) .......................................................................16, 22, 27

*Toney v. Chester Cty. Hosp.*,
    961 A.2d 192 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) ...............................37

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*,
    824 F. App'x 134 (3d Cir. 2020) ..............................................................................3

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*,
    Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) ........................21

*Valentine v. On Target, Inc.*,
    727 A.2d 947 (Md. 1999) .......................................................................................29

*Walden v. Saint Gobain Corp.*,
    323 F. Supp. 2d 637 (E.D. Pa. 2004) ....................................................................15

*Warr v. JMGM Group, LLC*,
    70 A.3d 347 (Md. 2013) .........................................................................................29

*Weiley v. Albert Einstein Med. Ctr.*,
    51 A.3d 202 (Pa. Super. 2012)...............................................................................17

*Wiest v. Tyco Electronics Corp.*,
    812 F.3d 319 (3d Cir. 2016)....................................................................................14

*Willard v. Interpool, Ltd.*,
    758 A.2d 684 (Pa. Super. Ct. 2000).......................................................................30

*Willow Tree Learning Ctr., Inc. v. Prince George's Cty., Md.*,
    584 A.2d 157 (Md. Ct. Spec. App. 1991) ..............................................................29

*Estate of Witthoeft v. Kiskaddon*,
    733 A.2d 623 (Pa. 1999) ........................................................................................20

v

*Yarnall v. Philadelphia Sch. Dist.*,
No. 11–CV–3130, 2013 WL 5525297 (E.D. Pa. Oct. 7, 2013) ...............................................16

**Other Authorities**

42 Pa. C. S. § 5521(b) ...............................................................................................................38

Fed. R. Civ. P. 56(a) ..................................................................................................................14

Restatement (Second) of Torts § 7(3) ........................................................................................24

Restatement (Second) of Torts § 55...........................................................................................35

Restatement (Second) of Torts § 324A.................................................................................23, 24

Restatement (Second) of Torts § 892B.......................................................................................35

Am. Med. Ass'n, *How IMGs have changed the face of American medicine* (Oct.
19, 2021), https://www.ama-assn.org/education/international-medical-
education/how-imgs-have-changed-face-american-medicine ................................................22

Victor E. Schwartz, *Remoteness Doctrine: A Rational Limit on Tort Law*, 8
Cornell J. of Law & Pub. Pol. 421, 425 (1999) ....................................................20, 22, 30, 32

JA2290

# INTRODUCTION

This case is an unprecedented attempt to hold liable Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") in negligence for emotional distress allegedly suffered by Plaintiffs from learning information, years after they were treated, about their former doctor's misuse of his name and Social Security number. Having previously (and unsuccessfully) pursued claims against the hospital where they were treated, Plaintiffs changed course and sued ECFMG, a private non-profit organization that serves an important, but strictly circumscribed, role in credentialing graduates of foreign medical schools.

Plaintiffs' claims against ECFMG run afoul of bedrock legal principles, including the limits of duty and foreseeability made famous in *Palsgraf v. Long Island Railroad* nearly a century ago, the limits of but-for and proximate causation, the remoteness doctrine, and the rational limits of tort law. Discovery is complete, and the undisputed facts entitle ECFMG to judgement as a matter of law on a number of grounds.

Plaintiffs have not proven that this case presents any of the limited circumstances under which recovery for emotional distress may be had. There is no evidence of emotional distress triggered by actual or impending physical impact or from witnessing injuries to a close relative, and ECFMG had absolutely no relationship with Plaintiffs, let alone the kind of legally cognizable "special relationship" that could possibly render it liable to them.

Nor did ECFMG owe even a general legal duty to Plaintiffs. At all relevant times, ECFMG played a limited role in the medical field; ECFMG Certification verified only that individuals seeking to enter post-graduate medical education in the United States completed certain exams and presented a medical school diploma primary-source verified as authentic by the issuing medical school. That's it. ECFMG Certification status information was available only to entities within the medical community—potential employers and licensors, not members of the general public—to use

1

as part of their robust independent processes for vetting and overseeing applicants. The remote possibility that an individual's receipt of ECFMG Certification would actually result in any particular patient, such as any of the four Plaintiffs, being treated—let alone suffering emotional distress years after treatment upon learning information about the individual's name or Social Security number—is not foreseeable as a matter of law. Under the laws of either Pennsylvania or Maryland, this does not warrant imposing a duty on ECFMG for the benefit of Plaintiffs.

Plaintiffs' claims also run head-on into a number of other insurmountable legal obstacles barring recovery. Their claims fail because they received precisely what they consented to: medical treatment by a licensed and Board-certified physician. Dr. Akoda's alleged misrepresentations did not vitiate that consent. There is no evidence that any breach by ECFMG of a legally cognizable duty caused the alleged emotional distress. The lengthy causal chain separating ECFMG from Dr. Akoda's treatment of Plaintiffs—including negligence of intervening third parties (undisputed by Plaintiffs)—defeats proximate causation. And Plaintiffs can only speculate that any specific act that ECFMG was allegedly required by law to take would have avoided harm to Plaintiffs, particularly since Plaintiffs' harm is largely premised on their mistaken beliefs about Dr. Akoda's licensure and training, and ECFMG's role in the medical field.

Plaintiffs aver emotional distress unaccompanied by physical harm. As a result, they do not satisfy an essential prerequisite for recovery. And the claims of Plaintiffs Evans and Powell are time-barred. They claim Dr. Akoda's treatment was injurious, so the limitations period began to run at the time of treatment. But they did not file suit until after the limitations period expired.

ECFMG's motion for summary judgment should be granted.

## STATEMENT OF FACTS

### I.    ECFMG's Certification and Irregular Behavior Processes

ECFMG is a private non-profit organization that promotes quality health care for the public

2

by, among other things, certifying eligible international medical graduates ("IMGs") of foreign medical schools who have met certain minimum requirements as ready to enter U.S. graduate medical education (usually residency programs). Def.'s Stmt. of Undisputed Material Facts ¶ 1 (hereinafter "¶ _"). At all relevant times, those requirements included (i) passing grades on an English exam and two substantive exams, and (ii) a primary-source verified medical school diploma. ¶ 3. To primary-source verify a diploma, ECFMG would send a copy directly to the issuing medical school, which would confirm for ECFMG whether the diploma was authentic. ¶ 3.

For various reasons, IMGs and others sometimes try to subvert ECFMG's requirements. ECFMG calls that "irregular behavior" and has a process for evaluating suspected irregular behavior. ¶ 20. That process is intended to ensure the integrity of ECFMG's programs and services while affording due process to the accused.[1] When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused. ¶ 21. ECFMG is not a government, law enforcement, or investigative agency, but it uses the tools at its disposal to determine whether a suspicion of irregular behavior is well founded. ¶ 25. If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee ("MECC"), a sub-committee of ECFMG's Board of Trustees, for a formal determination on the merits. ¶ 24. Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. ¶ 23. If the MECC finds that an IMG engaged in irregular behavior, ECFMG annotates the individual's record and can, *inter alia*, limit the

---

[1] ECFMG has been sued (unsuccessfully) by those alleging that it deprived them of due process. *See Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 824 F. App'x 134, 135 (3d Cir. 2020).

3

individual's participation in ECFMG programs or withhold or revoke ECFMG Certification. ¶ 24.

## II.    The Medical Field Uses ECFMG Certification For Limited Purposes.

ECFMG Certification status information is made available only to certain third parties in the medical field, such as residency programs, hospitals, licensing boards, and employers. ¶ 5. It is not made available to patients. ¶ 6. At all relevant times, ECFMG Certification status reports communicated the IMG's name, date of birth, medical school name and country, graduation year, certification status, and certain examination scores (depending on the recipient). ¶ 7.

Recipients of ECFMG Certification status reports used them for limited purposes in their own processes. The reports are by no means the only information the recipients use when evaluating IMGs. ¶ 10. The reports do (and are not expected to) verify, among other things, an IMG's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character. ¶ 8.

## III.    John Nosa Akoda and His Aliases

Plaintiffs are former patients of an obstetrician/gynecologist ("OB/GYN") who got his ECFMG Certificate (No. 0-553-258-5) in 1996 under the name John Nosa Akoda based on his passing of an English exam and Steps 1 and 2 of the USMLE, and the primary source verification of a medical school diploma by the University of Benin. ¶¶ 44–52. ECFMG and Plaintiffs came to later learn that doctor committed Social Security fraud and went by several different names. ¶ 100.

In 1992, the doctor applied to ECFMG using the name Oluwafemi Charles Igberase and presenting ECFMG with a medical school diploma that was primary source verified by the University of Ibadan. ¶¶ 26–28. He ultimately got an ECFMG Certificate (No. 482-700-2) but did not gain admission to a residency program. ¶¶ 33–34. In 1994, he applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles and misrepresenting that he had never applied to ECFMG before. ¶¶ 35–36. Using that name, he got a new ECFMG Certificate

4

(No. 0-519-573-0). ¶ 37. Soon thereafter, ECFMG staff determined that there was sufficient evidence the doctor had engaged in irregular behavior by misrepresenting his application history with ECFMG and promptly referred the matter to the MECC. ¶¶ 39–42. Following irregular behavior proceedings, the MECC found that he had engaged in irregular behavior and (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. ¶ 42. ECFMG later barred the doctor from applying after he submitted additional applications using variations of the names Oluwafemi, Charles, and Igberase, each of which ECFMG identified and refused to process. ¶ 43.

When the doctor applied in 1996, he misrepresented his ECFMG application history and made no reference to the Igberase or Charles applications. ¶¶ 44, 48. After getting his ECFMG Certificate as Dr. Akoda—but before treating Plaintiffs—a number of other third parties evaluated, hired, credentialed and/or licensed Dr. Akoda and allowed him to practice medicine.

### A. Residency Programs, Including Jersey Shore Medical Center and Howard University Hospital

Plaintiffs were not treated by Dr. Akoda while he was enrolled in a residency program. ¶¶ 74, 103, 134, 164, 188. But his admission to and successful completion of a residency program enabled him to continue practicing medicine and eventually treat Plaintiffs.

When considering a residency applicant, residency programs consider things beyond ECFMG Certification status, including (1) in-person interviews; (2) information provided directly by the IMG; (3) letters of recommendation; (4) skills assessments or additional examinations; (5) reports from prior educational or training programs; (6) medical school transcripts; (7) information obtained as part of a background check; and (8) ongoing performance monitoring. ¶ 10. There is no evidence that any residency programs evaluated, admitted, or approved of Dr. Akoda based solely (or even primarily) on his ECFMG Certification status.

JA2295

Dr. Akoda initially gained admission to the residency program at Jersey Shore Medical Center ("JSMC") in 1998. ¶ 56. In 1999, JSMC came to suspect that Dr. Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. ¶ 57. When JSMC tried to verify the Social Security number that Dr. Akoda provided directly to JSMC in his residency paperwork, JSMC concluded that it belonged to Charles Igberase. ¶ 58. JSMC ultimately discharged Dr. Akoda in 2000 because of perceived discrepancies involving his Social Security number and green card (the latter of which was not part of his ECFMG application). ¶ 67. JSMC stated that it would notify the Maryland Board of Physicians about those discrepancies. ¶ 68.

JSMC shared only limited information about and from its investigation with ECFMG, and ECFMG conducted its own investigation to determine if Dr. Akoda and Dr. Igberase were the same person. ¶¶ 59–60. Through its investigation, ECFMG discovered that some of the information JSMC gave ECFMG was inaccurate, ¶ 61, and Dr. Akoda provided ECFMG further explanations and supporting hard-copy documentation in person to show that he and Dr. Igberase were not the same person. ¶¶ 64–65. Despite some suspicions at the time—which were put in a memo separate from Dr. Akoda's file—ECFMG staff thought there was insufficient evidence to bring Dr. Akoda before the MECC on charges of irregular behavior. ¶¶ 66, 70. While ECFMG continued to investigate Dr. Akoda, it took no adverse action against him at that point because ECFMG staff concluded there was insufficient evidence of irregular behavior. ¶ 69.

Years later, in 2007, Dr. Akoda participated in the residency program at Howard University Hospital ("Howard"). ¶ 74. In connection with that program, Dr. Akoda provided Howard a false permanent resident card in the name "N. Akoda, John Charles." ¶ 73. Dr. Akoda successfully completed his residency at Howard in 2011. ¶ 74.

B.     **Maryland Board of Physicians and Virginia Board of Medicine**

In 2011, Dr. Akoda was licensed by the Maryland Board of Physicians and the Virginia

6

Board of Medicine. ¶¶ 75–76. Those authorities usually evaluate applicants on a range of information, including, *inter alia*, evidence of good moral character and completion of at least two years of an accredited residency program. ¶¶ 10, 12–13. There is no evidence that either authority evaluated or approved of Dr. Akoda based solely (or even primarily) on his ECFMG Certification status. Rather, the ECFMG Status Report regarding Dr. Akoda received by the Maryland Board of Physicians in 2011 was intended only to indicate that Dr. Akoda was "certified by ECFMG" and that ECFMG "verified medical school credentials directly with the medical schools[.]" ¶ 79.

Dr. Akoda's application for licensure in Maryland required that if his name was "not written the same way on all documents," he had to "submit documentation to explain how and why [his] name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree." ¶ 78. Dr. Akoda's name appeared differently on his licensure application ("John Charles Nosa Akoda" and "Charles John Nosa Akoda"), ECFMG Certificate ("John Nosa Akoda"), medical school diploma ("Johnbull Enosakhare Akoda"), and residency program certificate of completion ("John-Charles Nosa Akoda"). ¶ 80. There is no evidence that Dr. Akoda provided documentation to explain the discrepancies to the Maryland Board of Physicians as required, and he later admitted to providing a false permanent resident card and a false Maryland driver's license in connection with his application for licensure in Maryland. ¶ 81. His application for medical licensure in Maryland also omitted his residency at JSMC. ¶ 77.

As early as 2014, the Maryland Board of Physicians was aware of the allegations that Dr. Akoda had used other names and may have misrepresented his identity. ¶ 82. It nonetheless did not revoke Dr. Akoda's medical license until 2017, after Dr. Akoda pleaded guilty to Social Security fraud in 2016. ¶¶ 83–84. Even then, it did so on the basis that Dr. Akoda's Social Security fraud conviction was for a so-called "crime of moral turpitude," not that he had used other names

7

or was not properly trained or credentialed. ¶ 84.

### C.    Prince George's Hospital Center, Dr. Abdul Chaudry, and Dr. Javaka Moore

After successful completion of his Howard residency, Dr. Akoda obtained privileges at Prince George's Hospital Center ("PGHC") and worked with medical practices run by Drs. Abdul Chaudry and Javaka Moore. ¶¶ 87, 90. Each, although aware of Dr. Akoda's ECFMG Certificate, would have used its own processes to evaluate Dr. Akoda's training and credentials. ¶¶ 10, 15. Hospitals have their own procedures for credentialing physicians, generally including an interview, personal references with contact information, a current photograph, certificates of completion from all residencies and fellowships, letter of recommendation from program directors, Social Security number, valid passport or birth certificate, malpractice insurance history, licenses, a two-year case log, fingerprinting for a federal background check, and a urine drug screen. ¶ 10. IMGs are subject to normal employment processes and ongoing evaluation. ¶ 16.

Dr. Akoda treated each Plaintiff at PGHC. ¶¶ 103, 136, 164, 188. Dr. Akoda got privileges at PGHC by, among other things, submitting a false permanent residence card and a false Maryland driver's license. ¶ 81. Plaintiffs contend that PGHC failed to perform an appropriate and proper investigation and background check of Dr. Akoda before granting him privileges. ¶ 88. Had PGHC "use[d] require and reasonable care to investigate, credential, grant privileges, monitor and supervise" Dr. Akoda, his fraudulent conduct would have been discovered, he would not have seen patients at PGHC, and Plaintiffs "would not have suffered their injuries[.]" ¶ 89.

Ms. Russell and Ms. Evans were patients of Dr. Akoda by virtue of his affiliation with Dr. Moore's practice, and Ms. Powell and Ms. Riggins were patients of Dr. Akoda by virtue of his affiliation with Dr. Chaudry's practice. ¶¶ 106, 135, 165, 189.

### D.    Other Evaluations of Dr. Akoda

In 2012, Dr. Akoda submitted a Medicare Enrollment Application to the Centers for

8

Medicare and Medicaid Services ("CMS"). ¶ 91. CMS denied the application based, in part, on its determination that Dr. Akoda did not provide an accurate Social Security number. ¶ 92. There is no evidence that CMS took any action to advise licensing boards, hospitals, or employers about inconsistencies with Dr. Akoda's Social Security number.

In 2014, Dr. Akoda achieved certification by the American Board of Obstetrics and Gynecology ("ABOG"). ¶ 93. Medical specialty board certification typically requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of prior case logs, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. ¶ 18. Following Board certification, a candidate must comply with requirements for ongoing educational modules to maintain certification. ¶ 19. ABOG waited until January 2018—more than a year after Dr. Akoda's guilty plea—to revoke his diplomate status. ¶ 94.

### E.    Law Enforcement

In 2014—before Ms. Evans and Ms. Russell encountered Dr. Akoda—ECFMG received a subpoena from the U.S. Attorney's office regarding Dr. Akoda. ¶ 95. ECFMG cooperated with the investigation and followed instructions from federal authorities not to impede the investigation and not to take adverse action against Dr. Akoda while the investigation was ongoing. ¶ 96. ECFMG worked together with the Maryland Board of Physicians to assist the investigation. ¶ 97. Then, in March 2016, the Prince George's County Police Department contacted ECFMG about Dr. Akoda. ¶ 98. ECFMG cooperated with that investigation and continued to follow instructions not to impede the investigation or take adverse action against Dr. Akoda while the investigation was ongoing. ¶ 99. Law enforcement did not stop Dr. Akoda from practicing medicine during their investigations. ¶¶ 83, 108, 137, 193.

In November 2016, Dr. Akoda pleaded guilty to misuse of a Social Security number and

9

stipulated that he and Oluwafemi Charles Igberase were the same person. ¶ 100. With that admission, ECFMG promptly consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. ¶ 101.

## IV. This Lawsuit

Plaintiffs are Dr. Akoda's former patients who generally contend that ECFMG was negligent in its certification and/or investigation of Dr. Akoda and that ECFMG's actions or inactions caused Plaintiffs to suffer emotional distress upon learning that Dr. Akoda went by other names and pleaded guilty to Social Security fraud. At the relevant time, each Plaintiff had consented to treatment by a licensed physician. ¶¶ 105, 136, 166, 191.

### A. Monique Russell

Dr. Akoda performed a successful emergency c-section for Ms. Russell in May 2016 at PGHC when Ms. Russell was a Maryland resident and a patient at Dr. Moore's practice. ¶¶ 187–194. Ms. Russell had never previously been treated by Dr. Akoda, but she knew that he might assist her at the hospital. ¶¶ 189–190. Ms. Russell acknowledges that the consequences of Dr. Akoda's treatment were "minor," ¶ 195, and that Dr. Akoda rendered treatment that "really was best/necessary." ¶ 196.

Ms. Russell now claims to question whether her c-section was necessary because she mistakenly believes Dr. Akoda was a "fake doctor" who was "not properly trained as a doctor or credentialed as a doctor." ¶ 216. She also mistakenly believes that ECFMG is a "government agency" and that ECFMG Certification is a valid substitute for a background check. ¶ 214.

Ms. Russell claims to feel violated and have a sense of distrust in the medical community, but she continues to see physicians and take her family members to be treated by physicians. ¶¶ 208–209. Ms. Russell also claims to suffer from anxiety but has never been formally diagnosed with anxiety. ¶¶ 198, 203. There is no evidence of any physical symptoms attributable to the

10

emotional distress allegedly experienced by Ms. Russell. ¶ 205.

Ms. Russell believes that PGHC was negligent in credentialing Dr. Akoda. ¶ 208. She claims her emotional distress and distrust of doctors were amplified upon discovering that PGHC never performed a background check on Dr. Akoda. ¶ 208. She was also told by Dr. Moore that Dr. Akoda did not undergo a background check before joining his practice. ¶ 211.

### B. Jasmine Riggins

Ms. Riggins was a patient with the practice of Dr. Chaudry in 2012 and 2013, through which she received prenatal care from Dr. Akoda. ¶ 165. Dr. Akoda subsequently performed a successful c-section for Ms. Riggins in 2013. ¶ 167. Ms. Riggins has reported that she did not have any concerns about her treatment with Dr. Akoda during prenatal visits, during the c-section, or after her healthy child's birth. ¶ 169.

Ms. Riggins never heard of ECFMG prior to speaking with her attorneys. ¶ 183. She mistakenly believes that ECFMG gives foreigners "permission to practice medicine in the United States" ¶ 184. She believes ECFMG should have been "more careful about who they certify," but she acknowledges that if she learned that ECFMG had cooperated with law enforcement to help build a case against Dr. Akoda, it may make a difference to her. ¶¶ 186–186.

Ms. Riggins also believes that PGHC knew or should have known that Dr. Akoda went by other names. ¶ 178. She contends that PGHC was negligent and that PGHC's negligence was the "sole and proximate cause" of her injuries. ¶ 177.

Ms. Riggins claims to have begun experiencing emotional distress upon coming to believe that Dr. Akoda was a "fake doctor." ¶ 169. Medical records throughout 2017 confirm that Ms. Riggins did not experience anxiety/worry, depressed mood, or suicidal thoughts after learning about Dr. Akoda's fraud. ¶¶ 173, 176. She claims to have experienced no physical manifestation of her emotional distress. ¶ 175. She has never been diagnosed with depression or any psychiatric

11

disorder, nor has she seen a medical professional to discuss her alleged emotional distress. ¶¶ 172, 179.

### C.     Elsa Powell

Ms. Powell began seeing Dr. Akoda at Dr. Chaudry's practice in 2014 when she was about 6 months pregnant. ¶¶ 134, 137. Ms. Powell alleges that Dr. Akoda was flirtatious during pre-natal visits and made comments about her breasts that she never reported. ¶ 138. She claims that she asked to have a nurse present during examinations because of Dr. Akoda's inappropriate conduct. ¶ 139.

Dr. Akoda successfully delivered her baby vaginally and helped with her post-natal care through January 2015. ¶ 142. Ms. Powell experienced post-partum bleeding that required Dr. Akoda to perform emergency surgery, at which time Dr. Akoda allegedly told her, "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." ¶ 144–145.

Ms. Powell claims that she does not "have a peace of mind" since she found out Dr. Akoda "wasn't who he said he was." ¶ 148. Ms. Powell has no history of psychiatric or mental health disorder, never sought treatment for any such disorder, and does not present with symptoms compatible with any such disorder. ¶¶ 149, 151. There is no evidence that she suffered physical manifestations from her alleged emotional distress.

Ms. Powell had never heard of ECFMG until 2018 when she learned of ECFMG through her lawyer. ¶ 155. Even now, she mistakenly believes ECFMG "give[s] the license for foreigners" to "practice medicine in the United States." ¶ 156. Ms. Powell claims to doubt that Dr. Akoda had medical training, even though it is undisputed that he completed a residency program at Howard. ¶¶ 74, 158. She faults ECFMG for "actually provid[ing] him with a license to practice" but it is undisputed that ECFMG does not license physicians. ¶¶ 9, 157. She also contends that PGHC was negligent and should have discovered Dr. Akoda's alias sooner. ¶ 152.

12

### D. Desire Evans

Desire Evans, a Maryland resident, was a patient with the practice of Dr. Moore. ¶¶ 102, 106. Dr. Akoda performed a successful emergency c-section for Ms. Evans at PGHC in March 2016. ¶ 108. Ms. Evans claims that Dr. Akoda inappropriately manipulated her clitoris in an effort to progress her labor. ¶ 112. She claims that her husband and mother witnessed Dr. Akoda's actions and asked about them. ¶¶ 113–114.

Ms. Evans did not do any research into the background, education, credentials, or certifications of any physicians at Dr. Moore's practice, including Dr. Akoda. ¶¶ 103–04. She had never heard of ECFMG Certification. ¶ 123. Ms. Evans mistakenly believes that ECFMG's purpose is "to verify identification documentation," not foreign medical diplomas, and that ECFMG is responsible for verifying IMGs' Social Security numbers, birth certificates, green cards, state medical licenses, board certifications, and any other "piece of identifying information about a foreign medical graduate." ¶ 125. She only learned of ECFMG's existence from her lawyers. ¶ 124.

Ms. Evans claims that she began experiencing increased anxiety and depression after giving birth to her son but before Dr. Akoda's guilty plea. ¶ 119. She claims that she is afraid to see a doctor, does not know who to trust, and her trust in the medical profession has diminished. ¶ 121. There is no evidence in the record of physical manifestations of alleged emotional distress.

Ms. Evans is the only Plaintiff who has sought mental health treatment since she encountered Dr. Akoda, but her psychiatric history extends well before she even met Dr. Akoda. She was hospitalized in 2009 (before Dr. Akoda even had his medical license) ██████████ ███ and has reported histories of psychiatric symptoms on and off throughout her adult life. ¶ 116. Despite extensive mental health records from both before and after Ms. Evans learned of the charges against Dr. Akoda, not a single health record makes any reference to Dr. Akoda. ¶ 122.

13

Although Ms. Evans has psychiatric conditions, there is no causal connection between those conditions and the allegations in the Complaint. ¶ 128.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the initial burden to identify 'specific portions of the record that establish the absence of a genuine issue of material fact.'" *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (quoting *Santini*, 795 F.3d at 416). "If the moving party satisfies its burden, the burden then 'shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (internal quotation marks and citations omitted). To defeat summary judgment, the nonmoving party "cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." *El v. Southeastern Pa. Transp'n Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (internal citation omitted). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (internal citation omitted).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. "If the evidence is merely colorable, or is not

14

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004).

## ARGUMENT

### I. Recovery for Emotional Distress Is Not Permitted Under These Circumstances.

Plaintiffs claim emotional distress resulting from ECFMG's alleged negligence. Pennsylvania law limits recovery on such claims to three circumstances. *Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014). They are "(1) when 'the plaintiff suffers a physical injury which causes the emotional distress'; (2) when the plaintiff was in the 'zone of danger'— or, in other words, experienced a 'near-miss' and suffered emotional distress from having been endangered, despite not having suffered physical harm; and (3) when the 'plaintiff witnesses an accident causing serious injury to a close family member.'" *Humphries v. Pa. State Univ.*, No. 4:20-CV-0064, 2021 WL 4355352, at *20 (M.D. Pa. Sept. 24, 2021).

None of these circumstances is present here. Each Plaintiff claims to have suffered emotional distress upon learning that Dr. Akoda used an alias and/or pleaded guilty to misuse of a Social Security number. They do not claim emotional distress as a result of a physical injury or a fear of "impending physical injury." *Credico v. Unknown Employee of the Houston FBI Forfeiture Unit*, 567 F. App'x 83, 83 (3d Cir. 2014).[2] They do not allege emotional distress resulting from actually witnessing an accident causing serious injury to a close family member. Nor could they. *See, e.g.*, *Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 29 (Pa. Super. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001) ("[W]e cannot conclude that two influenza vaccines,

---

[2] To the extent Plaintiffs claim that their emotional distress arose from physical injury at the time of treatment, their claims are time-barred. *See infra* Part VII.

JA2305

which were not the cause of any lasting physical or emotional effects, are sufficient to bootstrap Appellant's claim that he suffered the 'physical impact' necessary to support a claim of negligent infliction of emotional distress."); *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 993 (Pa. 1987) (noting that "learning of the accident from others after its occurrence" weighs against the possibility of liability); *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 679 (Pa. 1986) ("Where, as here, the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions."). Accordingly, ECFMG cannot be liable for Plaintiffs' emotional distress.

Nor can Plaintiffs invoke *Toney v. Chester County Hospital*, 36 A.3d 83 (Pa. 2011), a non-precedential decision by less than a majority of the Pennsylvania Supreme Court, to suggest that recovery for emotional distress may be permitted based on a defendant's "special relationship" with a plaintiff. There was no "special relationship" between ECFMG and Plaintiffs. "[S]pecial relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *Id.* at 90–95. They are limited "to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach." *Id.* Courts have recognized such "special relationships" only between medical professionals and patients and adoption agencies and adoptee parents. *See Mulawka v. Pennsylvania*, No. 2:11cv1651, 2013 WL 171911 (W.D. Pa. Jan. 16, 2013) (EMS technician / patient); *Madison v. Bethanna, Inc.*, No. 12-01330, 2012 WL 1867459, at *12 (E.D. Pa. May 23, 2012) (adoption agency and adoptee parents). Otherwise, courts have refused to extend liability farther.[3]

---

[3] *See, e.g.*, *Black v. Cmty. Educ. Centers, Inc.*, No. 13–CV–6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) (employer / employee); *Hawkins v. Fed. Nat. Mortgage Ass'n*, No. 13–CV–6068, 2014 WL 272082 (E.D. Pa. Jan. 23, 2014) (lender / borrower); *Yarnall v. Philadelphia Sch. Dist.*, No. 11–CV–3130, 2013 WL 5525297 (E.D. Pa. Oct. 7, 2013) (union and members); *Grimaldi v. Bank*

ECFMG does not have a special relationship with Plaintiffs. No court has ever recognized a special relationship between ECFMG and members of the general public who might one day be treated by an IMG, and the indirect chain of links between ECFMG certifying an IMG and a doctor treating a patient is far removed from the narrow circumstances in which courts have found such a relationship to exist. In truth, Plaintiffs had **no** relationship with ECFMG at all, much less a "special relationship." None had heard of or interacted with ECFMG when they were treated by Dr. Akoda or learned of his aliases or Social Security fraud. Because recovery for emotional distress is unavailable as a matter of law, ECFMG is entitled to summary judgment.

## II. ECFMG Did Not Owe Plaintiffs A Legally Cognizable Duty of Care.

### A. ECFMG owed no general tort duty to Plaintiffs.

ECFMG is entitled to summary judgment on Plaintiffs' claims for negligence and negligent infliction of emotional distress ("NIED") because ECFMG did not owe a general tort duty to Plaintiffs. To prevail on either, Plaintiffs "must establish a prima facie case of negligence," *Humphries v. Pennsylvania State Univ.*, 492 F. Supp. 3d 393, 409 (E.D. Pa. 2020), including "the existence of a duty owed by one party to another," *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994).

"The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequence of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000); *see Russell*

---

*of Am.*, No. 12–CV–2345, 2013 WL 1050549 (M.D. Pa. Mar. 14, 2013) (lender / borrower); *Okane v. Tropicana Entm't, Inc.*, No. 12–CV–6707, 2013 WL 56088 (E.D. Pa. Jan. 3, 2013) (casino / patron); *Emekekwue v. Offor*, No. 1:11–CV–01747, 2012 WL 1715066 (M.D. Pa. May 15, 2012) (ethnic group organization and member); *Shulick v. United Airlines*, No. 11–CV–1350, 2012 WL 315483 (E.D. Pa. Feb. 2, 2012) (airline and passengers); *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218 (Pa. Super. 2012) (decedent's son and father's hospital).

JA2307

*v. Educ. Comm'n. for Foreign Med. Graduates*, 15 F.4th 259, 272 (3d Cir. 2021) (citing *Althaus*, 756 A.2d at 1169). Here, each of the *Althaus* factors weighs against imposing on ECFMG a duty of care owed to Plaintiffs.

   ***First***, it there was no relationship whatsoever between ECFMG and Plaintiffs. "[D]uty is predicated on the relationship that exists between the parties at the relevant time." *R.W. v. Manzek*, 888 A.2d 740, 747 (Pa. 2005). When Plaintiffs were treated by Dr. Akoda and when they learned of Dr. Akoda's aliases/Social Security fraud, Plaintiffs did not even know that ECFMG existed, let alone rely on or interact with ECFMG. "Because the parties were essentially strangers to each other at the relevant time, this factor does not support a finding of a duty." *Commerce Bank/Penn. v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. 2006); *see Hall v. United States*, No. 2:19-cv-05256-KSM, 2020 WL 3265146, at *5 (E.D. Pa. June 17, 2020) ("[B]ecause Hall does not plead any facts indicating that he was known to the Government at the time of his accident with Mullins, dismissal is further warranted."). The absence of a relationship between the parties amounts to "a **significant** factor that weights against the existence of a duty." *Citizens Bank of Pennsylvania v. Reimbursement Tech., Inc.*, 609 F. App'x 88, 92 (3d Cir. 2015) (emphasis added).

   ***Second***, there is not high social utility in imposing a duty here. ECFMG played a limited role in the process whereby an IMG might eventually treat any particular patient in the United States. ECFMG was not, and is not, contrary to the uninformed or mistaken views of Plaintiffs, a government entity of any kind. ECFMG Certification status communicated to sophisticated parties within the medical community only that an IMG was ready to apply for post-graduate medical education because he or she had passing grades on an English exam and two substantive exams and presented a primary-source verified medical school diploma. Nothing more. It did not cause an IMG to (1) be accepted to a residency, (2) successfully complete a residency, (3) be licensed by a licensing authority, (4) be hired for employment as a medical doctor, (5) be permitted to treat

18

patients on an ongoing basis, or (6) be certified by any specialty boards. An IMG's direct educators and employers are much more directly responsible for ensuring his or her preparedness to practice medicine and treat patients, like Plaintiffs.

There are many others who stand in line before ECFMG in any rational consideration of responsibility for Plaintiffs' alleged injuries, among them Dr. Akoda himself, Howard, the Maryland Board of Physicians, and PGHC. As described below in connection with the fourth and fifth *Althaus* factors, imposing a duty on ECFMG to try to take action to ensure that IMGs deal honestly with patients would fundamentally disrupt the complex alignment of roles and responsibilities regarding IMGs practicing in the United States. *See* Br. of Amici Curiae Am. Med. Ass'n et al. ("AMA Br.") at 3, *Russell v. Educ. Comm'n for Foreign Medical Graduates*, 15 F.4th 259 (3d Cir. 2021) (No. 20-2128) ("The pathway to physician licensure in the United States is a rigorous, complex process that involves education, testing, and training with an interconnected web of organizations supporting the process along the way."). The risk of such disruption greatly outweighs whatever minuscule utility might theoretically arise from imposing on ECFMG a duty to Plaintiffs in this unique and unusual context. Moreover, Ms. Russell and Ms. Evans were treated by Dr. Akoda after law enforcement requested that ECFMG help with its investigation and not take action that might jeopardize it. There can be no social utility in imposing a duty on ECFMG to disregard such requests by law enforcement.

***Third***, the nature of the risk imposed and the foreseeability of the harm incurred weigh strongly against imposing a duty. "[D]uty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *Manzek*, 888 A.2d at 747; *see also Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928). "Courts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances." *Commerce Bank/Penn.*, 911 A.2d at 139. To do so would

19

"stretch foreseeability beyond the point of recognition [and] make liability endless." *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 630 (Pa. 1999); *see* Victor E. Schwartz, *Remoteness Doctrine: A Rational Limit on Tort Law*, 8 Cornell J. of Law & Pub. Pol. 421, 425 (1999) ("Whatever conceptual vehicle is utilized – proximate cause or duty – the remoteness limitation on liability has endured as a basic doctrine of tort law.").

The nature of the risk at issue is minimal both in terms of likelihood and degree. Dr. Akoda's fraud on ECFMG and a host of third parties in the medical field is unprecedented. This is not a common occurrence that would necessitate the overreaction of imposing a tort duty on ECFMG as to members of the general public who might one day be treated by an IMG. Moreover, Plaintiffs were not truly harmed in any cognizable way. It cannot be disputed that Dr. Akoda was licensed to practice medicine. It cannot be disputed that he successfully completed post-graduate medical education in the United States. It cannot be disputed that he successfully performed serious medical procedures and that each Plaintiff emerged from her pregnancy healthy and with a healthy child. Beyond being licensed, Dr. Akoda was at all times affiliated with one more entity in the medical field that monitored his daily interactions with patients.

The foreseeability inquiry requires that "the nature of the risk and the foreseeability of harm **in this specific case**" be clear, not "vague and attenuated." *Commerce Bank/Pa.*, 911 A.2d at 139 (emphasis added). In *Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020), for example, the court refused to impose a duty on banks to prevent the opening of fraudulent accounts. The court recognized that "[w]ith the benefit of hindsight," it may seem that "it was foreseeable that a noncustomer who was deceived into transferring money to an account at Wells Fargo might be the victim of a fraudulent scheme perpetrated by someone who opened the account for fraudulent purposes." *Id.* at 666. But it held that was insufficient to impose a duty.

20

JA2310

Here, the foreseeability of harm is even more attenuated than in *Fragale*. For the harm at issue to result, Dr. Akoda had to defraud not just ECFMG and Plaintiffs, but also **the medical field**—including residency programs, hospitals, licensing boards, specialty boards, and private practitioners, not to mention all of the professionals he interacted with on a daily basis. With each additional actor that independently evaluated Dr. Akoda and concluded that he was qualified and permitted him to treat patients, the foreseeability of any harm resulting to Plaintiffs from ECFMG's allege negligence becomes less and less foreseeable. Moreover, the harm at issue here—Plaintiffs' emotional distress—is extremely unforeseeable given that it is based on Plaintiffs' later learning about Dr. Akoda's aliases/Social Security fraud. The harm reflects "the particular emotional makeup of [each] plaintiff rather than … the nature of defendant's actions." *Mazzagatti*, 516 A.2d at 679. It was not foreseeable to ECFMG that Dr. Akoda would not only perpetrate a fraud on the medical field, but also that Plaintiffs would suffer emotional distress based on their mistaken beliefs that he was a "fake doctor" when it is undisputed that he successfully completed his residency and was licensed to practice medicine. ECFMG can have no duty to prevent emotional distress resulting from Plaintiffs' miscomprehensions of the facts.

**Fourth**, the consequences of imposing a duty on ECFMG would be inconsistent with Pennsylvania law and unworkable. A duty for ECFMG to disclose suspicions about Dr. Akoda to third parties without first proceeding through ECFMG's irregular behavior process and making a determination on the merits could have violated Dr. Akoda's common law due process rights. *See Tulp v. Educ. Comm'n for Foreign Med. Graduates*, Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) (granting summary judgment for ECFMG because ECFMG's irregular behavior procedures afford sufficient process to the accused). The law cannot simultaneously

JA2311

impose both a duty on ECFMG to report suspicions of irregular behavior and a crosswise duty on ECFMG to refrain from disclosing suspicions pending due process.[4]

At the same time, ECFMG is not and cannot become a guarantor of each IMG's trustworthiness. Dr. Akoda got his ECFMG Certificate more than a decade before he treated any Plaintiff. Before treating Plaintiffs, Dr. Akoda was scrutinized—on much more wide-ranging criteria than ECFMG purported to evaluate—by a host of institutions who had much closer and repeated interactions with him. To impose a duty on ECFMG after Dr. Akoda had practiced medicine successfully for more than a decade would be absurd; arguably tantamount to imposing a duty on ECFMG to any member of the general public who may one day be treated by an IMG. With IMGs representing 25% of all licensed doctors in the United States, Am. Med. Ass'n, *How IMGs have changed the face of American medicine* (Oct. 19, 2021), https://www.ama-assn.org/education/international-medical-education/how-imgs-have-changed-face-american-medicine, such a duty could be impossibly onerous. The Court "must draw lines to prevent unlimited liability to an unlimited number of plaintiffs, notwithstanding the commission of negligent acts." *Toney*, 36 A.3d at 91; *see* Schwartz, *Remoteness Doctrine*, at 443 ("If one can stand back from the controversial cases and make objective judgments – judgments about the shape of the law and its rationale – the remoteness doctrine has clear, strong public policy bases that would continue to apply in a myriad of contexts."). And to impose a duty on ECFMG owed to Ms. Russell and Ms. Evans after ECFMG was asked by law enforcement not to act against Dr. Akoda in 2014 would put ECFMG to the impossible choice of complying with competing directives.

---

[4] If ECFMG owed a duty to refer Dr. Akoda to irregular behavior proceedings at some point, Plaintiffs' claims would still fail for lack of causation. *See infra*. There is no evidence that prior to Dr. Akoda's guilty plea, the MECC would have found that he engaged in irregular behavior, especially since ECFMG staff did not think there was sufficient evidence warranting a referral to the MECC, even if they had suspicions they could not substantiate.

*Fifth*, the public interest weighs strongly against imposing a wide-reaching duty on ECFMG to any member of the general public who may one day be treated by an IMG. The medical field is already thoroughly regulated. Licensing boards, hospitals, specialty boards and private employers routinely can and do conduct background checks on candidates. ECFMG is a non-profit responsible for working with foreign medical schools to confirm the authenticity of documents presented by IMGs and passage of certain exams (among other things, not relevant here). The public interest lies with imposing a duty on the entities actually responsible for deciding whether an IMG treats patients, not on a party removed from that decision by multiple degrees who supplies specific narrow information to be used by sophisticated actors in a broader exercise of discretion. Moreover, imposing a duty on any entity that has a role in allowing IMGs—of which there are currently almost 223,000 in this country—to practice medicine would "chill[] the medical community's efforts to provide access to care across America and, in particular, in patient communities of need." AMA Br. at 4.

*The Althaus* factors weigh conclusively against imposing a duty on ECFMG to Plaintiffs.

### B. ECFMG is not liable to Plaintiffs under Restatement (Second) of Torts § 324A.

Plaintiffs have also suggested that ECFMG may be liable to Plaintiffs because ECFMG Certification status reports are provided to hospitals and licensing boards. Restatement (Second) of Torts § 324A provides that "[o]ne who undertakes … to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking" under three circumstances: "(a) his failure to exercise reasonable care increases the risk of such harm"; "(b) he has undertaken to perform a duty owed by the other to the third person"; or "(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Under those limited circumstances, the law imposes a duty to perform an

23

undertaking "in such manner that third persons—strangers to the [undertaking]—will not be injured thereby." *Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa. 1984) (quoting *Evans v. Otis Elevator Company*, 168 A.2d 573, 575–76 (Pa. 1961)). "[T]he orbit of the duty is measured by the nature and scope of the … undertaking." *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1283 (Pa. 2006) (quoting *Otis Elevator*, 168 A.2d at 576).

As a threshold matter, Section 324A allows liability only for "physical harm." *See* Restatement (Second) of Torts § 7(3) ("the physical impairment of the human body"). Plaintiffs do not allege—let alone present any evidence—that ECFMG's conduct resulted in "physical harm." ¶¶ 174, 205; *see also infra* Part VI. Section 324A is therefore inapplicable.

Even then, the record confirms that there was no basis for ECFMG to believe that its services were "necessary for the protection" of Plaintiffs. Hospitals and licensing boards have their own robust requirements for choosing who can practice medicine. Whether Dr. Akoda was qualified to practice medicine was a question left to the discretion of hospitals and licensing boards, not ECFMG. There is no evidence that anyone at hospitals or licensing boards views ECFMG Certification status as a substitute for the vigorous vetting processes they undertake (and indeed, may be obligated to undertake for the protection the general public). ECFMG does not assess IMGs' suitability to practice medicine. Recipients of ECFMG Certification status reports independently evaluate IMGs through multiple methods that go far beyond ECFMG. No reasonable jury could conclude that ECFMG should have understood that any communication regarding Dr. Akoda's ECFMG Certification status was necessary to protect Plaintiffs treated by Dr. Akoda after he had been independently evaluated and approved by a residency program, medical licensing boards, a hospital, and a specialty board.

This is especially true as of 2014, after ECFMG received notice of the investigations by law enforcement into Dr. Akoda and was told not to take action. As a matter of law, ECFMG

24

should not have viewed any action that it could have taken as "necessary" for the protection of Plaintiffs yet to be treated (such as Ms. Russell and Ms. Evans) when law enforcement was investigating and itself waited years to take action to prevent Dr. Akoda from treating patients. It bears repeating: The FBI was investigating Dr. Akoda, and the U.S. Department of Justice allowed him to continue treating patients **for years**. The same is true of the Maryland Board of Physicians, which knew of the allegations about Dr. Akoda by 2014 (and perhaps even as early as 2011 from JSMC) but nonetheless allowed him to maintain his medical license until after he pleaded guilty.

*Cantwell* is instructive. In that case, the Pennsylvania Supreme Court ruled that a crime lab performing tests for the police cannot be liable to a criminal suspect for harm allegedly suffered as a result of negligent testing. 483 A.2d at 1354. The court noted that the crime lab "does not exist or renders its services for the protection of suspects or potential suspects; rather, its purpose is to assist the police and the Commonwealth in collecting and analyzing evidence which may be relevant in presenting a case to a jury." *Id.* It also noted the importance of "the discretion of the Commonwealth," which stood between the crime lab's conduct and its effect on third parties. "No matter how well or how poorly a crime lab performs, it has no control, or ability to foresee, the disposition of criminal suspects, since the prosecution of suspects in criminal cases depends to a large extent upon the discretion of the police and the district attorney's office." *Id.*

The same reasoning applies with even greater force here. ECFMG provided limited factual information to entities in the medical field for their consideration—along with a host of other information—in deciding whom to license or privilege or credential. Each of those entities in the medical field exercised discretion—one after another, based on wide-ranging information—and ECFMG had no control or ability to foresee whether an IMG may come to treat any patients, let alone Plaintiffs. Even then, Dr. Akoda had to independently decide to continue his fraud and misrepresent his identity to each additional third party (and to Plaintiffs) before he might one day

25

suffer emotional distress from learning about an IMG's aliases. If the single layer of discretion separating the crime lab in *Cantwell* from any alleged harm to a criminal suspect meant there was no duty as a matter of law in that case, the multiple layers separating ECFMG from any alleged harm to Plaintiffs means there cannot be any duty owed in this case.

Plaintiffs seek to impose upon ECFMG a duty that goes far beyond "the nature and scope" of the "undertaking" at issue. *Farabaugh*, 911 A.2d at 1283 (quoting *Otis Elevator*, 168 A.2d at 576). ECFMG's "undertaking" was to certify that Dr. Akoda had passed certain exams (he had) and that the issuing medical school primary source verified his diploma (it did). Nothing in any "undertaking" by ECFMG obligated it to communicate with anyone that Dr. Akoda may have used an alias or may be committing Social Security fraud.

ECFMG also cannot be liable to Plaintiffs based on any undertaking on behalf of JSMC, Howard, or the Virginia Board of Medicine. Plaintiffs were not treated by Dr. Akoda while he was a resident at JSMC or Howard. Nor were Plaintiffs treated by Dr. Akoda in Virginia pursuant to the license issued to him by the Virginia Board of Medicine. There is no basis to hold that any undertaking by ECFMG on behalf of those institutions could possibly have been "necessary for the protection" of Plaintiffs, who were treated elsewhere and years later by Dr. Akoda.

### C.     ECFMG is not liable to Plaintiffs under Maryland law.

ECFMG is also entitled to summary judgment because Plaintiffs' claims fail under Maryland law. In diversity cases like this, federal courts apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, the forum state (Pennsylvania) applies a "flexible" choice-of-law analysis that "permits analysis of the policies and interests underlying the particular issue before the court" and applies the law of the state with the "most interest in the problem." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964)). The analysis differs

26

depending on whether the purported conflict is "true" or "false." A true conflict exists "when the governmental interests of **both** jurisdictions would be impaired if their law were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n. 15 (3d Cir. 1991). If a true conflict exists, the Court examines "which state has the most significant relationship to the occurrence and the parties." *Melmark, Inc. v. Schutt by and through Schutt*, 206 A.3d 1096 (Pa. 2019). "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction." *Lacey*, 932 F.2d at 187. If a false conflict exists, the Court must apply the law of the jurisdiction whose interests risk being impaired. *Id.*

Here, there are at least two true conflicts between the laws of Pennsylvania and Maryland warranting the application of Maryland law under which ECFMG is entitled to summary judgment.

***First***, Pennsylvania recognizes a claim for NIED, but Maryland does not. *Compare Smith-McConnell v. Todd T. Thompson Funeral Home, Inc.*, No. 1035 WDA 2020, 2021 WL 3771822, at *5 (Pa. Super. Aug. 25, 2021) (discussing claims for NIED under Pennsylvania law), *with Alban v. Fiels*, 61 A.3d 867, 876 (Md. Ct. Spec. App. 2013) (noting that Maryland "does not recognize the tort of negligent infliction of emotional distress"). Each state recognizes that emotional distress is "easily simulated and feigned" and thus presents a risk of "fictitious or speculative claims" and a "wide field for exploitation" by "unscrupulous litigants." *Bowman v. Williams*, 165 A. 182, 184 (Md. 1933); *see Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 91 (Pa. 2011) (noting the importance of "setting standards to determine the veracity of the emotional distress and to limit the potential number of plaintiffs"). Each state thus has a compelling interest in applying its own carefully crafted standards to guard against fictitious or fraudulent claims for emotional distress. *See LeJeune v. Bliss-Salem*, 85 F.3d 1069, 1072 (3d Cir. 1996) ("a state could have a host of reasons for limiting liability, including encouraging economic activity in the state … and lowering costs to consumers"). Maryland has an overwhelming interest in regulating claims brought by Maryland

27

residents based on treatment rendered in Maryland by a physician licensed to practice in Maryland. Accordingly, Maryland law should apply, and Plaintiffs' NIED claim fails as a matter of law.

*Second*, Pennsylvania and Maryland apply different tests to determine whether a duty exists. Pennsylvania applies the *Althaus* factors discussed above. But under Maryland law, the "balancing of policy considerations to determine whether a duty exists" involves consideration of "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." *Pendleton v. State*, 921 A.2d 196, 205 (Md. 2007) (quoting *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1083 (Md. 1986)) (internal quotation marks omitted). Each state has an interest in using its own standard to decide whether a duty is imposed in a negligence case seeking recovery for emotional distress, and applying the other's standard would impair each state's effort guard against "fictitious or speculative" negligence claims. Because Maryland's interest in this case dwarfs Pennsylvania's interest, Maryland law applies.

ECFMG owes no duty to Plaintiffs under Maryland law. As explained above in connection with the *Althaus* factors, because harm to Plaintiffs was not foreseeable and ECFMG's conduct was far removed from Plaintiffs' alleged injuries, those factors similarly weigh against imposing a duty on ECFMG under Maryland law. *See supra*. Each factor considered by Maryland, but not by Pennsylvania, similarly weighs against imposing a duty on ECFMG. Plaintiffs have not presented evidence of any cognizable emotional distress, so the "degree of certainty that [Plaintiffs] suffered the injury" weighs against recognizing a duty. The lack of "moral blame" similarly weighs against imposing a duty because Plaintiffs suffered their injuries more than a

28

decade after Dr. Akoda secured ECFMG Certification, and ECFMG's role in the medical field is separated from Plaintiffs by numerous intervening third parties with independent responsibility to scrutinize Dr. Akoda. Nor is there any evidence regarding the availability of insurance.

Maryland law routinely declines to impose a duty on one party to protect the general public from the conduct of a third party. *See, e.g.*, *Warr v. JMGM Group, LLC*, 70 A.3d 347, 364 (Md. 2013) (declining to impose a duty on dram shop owners for injuries caused by their patrons who drove drunk after drinking alcohol at their establishment); *Barclay v. Briscoe*, 47 A.3d 560, 582 (Md. 2012) (declining to impose a duty on an employer for an employee's negligent driving after the employee worked a 22-hour shift); *Remsburg v. Montgomery*, 831 A.2d 18, 38 (Md. 2003) (declining to impose duty on the leader of a hunting party for injury to property owner by member of hunting party while hunting on the property owner's land); *Valentine v. On Target, Inc.*, 727 A.2d 947, 952–53 (Md. 1999) (declining to impose a duty on gun retailer to third parties for death of victim killed by a gun stolen from the gun retailer); *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1087 (Md. 1986) (declining to impose a duty on police officer, police department, and county for injuries to a pedestrian by a drunk driver after police had pulled the drunk driver over and let him go); *Lamb v. Hopkins*, 492 A.2d 1297, 1306 (Md. 1985) (declining to impose a duty on probation officers for injuries caused by alleged driving under the influence of a probationer under the officers' supervision); *Willow Tree Learning Ctr., Inc. v. Prince George's Cty., Md.*, 584 A.2d 157 (Md. Ct. Spec. App. 1991) (declining to impose a duty on the county and county inspector to parents for fatal injury to a child at a daycare center when daycare center safety was regulated by state and county law). The same result is warranted here.

III.     **ECFMG Was Not A Proximate Cause of Plaintiffs' Emotional Distress.**

Summary judgment is warranted because there is no evidence that ECFMG was the proximate cause of Plaintiffs' alleged emotional distress. "[T]he mere existence of negligence and

29

the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation." *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super. 2005); *see Palsgraf*, 162 N.E. at 99 ("Proof of negligence in the air, so to speak, will not do."). To establish causation, plaintiff must "demonstrate that the breach was both the proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993). Proximate cause "is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." *Dudley v. USX Corp.,* 606 A.2d 916, 923 (Pa. Super. 1992) (citations omitted). It is a question of law to be determined by the court before the issue of actual cause is put to the jury. *Reilly*, 633 A.2d 210 (citing *Novak v. Jeannette Dist. Memorial Hosp.*, 600 A.2d 616, 618 (Pa. Super. 1991)).

"A determination of legal causation, essentially regards whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently, occurred." *Id.* (internal quotations and citations removed). It is guided by:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
>
> (c) lapse of time

*Lux*, 887 A.2d at 1287 (quoting *Willard v. Interpool, Ltd.*, 758 A.2d 684, 688 (Pa. Super. Ct. 2000)).

The undisputed facts confirm that ECFMG was not a proximate cause of Plaintiffs' alleged injuries. The lengthy causal chain between ECFMG's conduct and Dr. Akoda's treatment of Plaintiffs—including the undisputed negligence of intervening third parties—precludes ECFMG from being a legal cause of Plaintiffs' alleged injuries. *See* Schwartz*, Remoteness Doctrine*, at 429

JA2320

(explaining how proximate causation gives effect to the policies of the remoteness doctrine). Regarding the lapse of time consideration, nearly two decades passed between when Dr. Akoda got his ECFMG Certificate in 1996, ¶ 44, and treated Plaintiffs. *See* ¶ 164 (17 years for Ms. Riggins); ¶ 103 (20 years for Ms. Evans); ¶ 134 (18 years for Ms. Powell); ¶ 188 (20 years for Ms. Russell). At least twenty years passed before Plaintiffs suffered their alleged emotional distress upon learning of Dr. Akoda's aliases/Social Security fraud. ¶¶ 117, 153, 168, 210. Over the course of these two decades, Dr. Akoda: participated in two residency programs, graduating from the program at Howard in 2011; applied for and obtained a medical license to practice in Maryland and Virginia; obtained privileges at PGHC and employment in two medical practices; achieved board certification from the ABOG. ¶¶ 56, 74, 75, 76, 87, 90, 93. This substantial passage of time and the number of intervening actors who independently reviewed Dr. Akoda precludes ECFMG's alleged negligence from being a proximate cause. *See Lux*, 887 A.2d at 1287.

Pennsylvania courts have refused to hold that proximate causation exists when the alleged tortfeasor is separated from the alleged tort victim by a lengthy chain of parties defrauded by another. In *Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d 133 (Pa Super. 2006), Commerce Bank alleged that First Union had allowed a third party to operate a check-kiting scheme and negligently failed to report the scheme or close the account. *Id.* at 135. Based on the existence of the First Union account, Commerce Bank allowed the third party to open a new account, through which the third party harmed Commerce Bank by engaging in a similar check-kiting scheme. *Id.* The Pennsylvania Superior Court rejected Commerce Bank's argument that First Union's negligence was the proximate cause of its harm, finding it "unduly speculative" and noting that such a theory "stretches the concepts of proximate cause and individual responsibility beyond the breaking point." *Id.* at 142. The Court found that First Union's actions were merely one minor factor in a long, attenuated chain of events leading to Commerce Bank's harm, citing

31

other significant factors that contributed to the harm such as (1) the perpetrator's decision to open an account; (2) Commerce Bank's decision to approve the new account without sufficient investigation; (3) the perpetrator's fraudulent activity; and (4) Commerce Bank's own failure to detect the fraud any earlier.

The reasoning from *Commerce Bank/Pennsylvania* applies with even greater force here because ECFMG's alleged negligence was just one minor factor separated from Plaintiffs' alleged injuries by a lengthy and attenuated causal chain, which included: (1) Dr. Akoda's decisions to apply for residency programs, state licenses, board certifications, and medical privileges; (2) the negligence of these independent third parties in providing him with these licenses and privileges; (3) Dr. Akoda's fraudulent and criminal activity that allegedly harmed Plaintiffs and triggered the involvement of law enforcement (who instructed ECFMG to not take adverse action against Dr. Akoda while their criminal investigation proceeded); and (4) Plaintiffs' consent to treatment. Accordingly, as a matter of law ECFMG's alleged breach cannot be a proximate cause of any harm Plaintiffs allege—its conduct is far too remote and Plaintiffs' theory of causation is far too speculative. *See Commerce Bank/Pennsylvania*, 911 A.2d at 142; *see* Schwartz, *Remoteness Doctrine*, at 426 (noting that the remoteness doctrine bars liability as a matter of law "most frequently in cases involving **attenuated harms**").

## IV.   There Is No Evidence That Any Alleged Breach of Duty by ECFMG Was a But-For Cause of Plaintiffs' Emotional Distress.

But-for causation represents a critical connection between the breach of the alleged tortfeasor and the injury of the alleged tort victim. It requires "proof that the alleged injury would not have occurred but for the negligent conduct of the defendant." *Sutcliffe v. Bernese*, No. 4:19-CV-00317, 2019 WL 3776560, at *3 (M.D. Pa. Aug. 12, 2019); *see Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 161 (3d Cir. 2017) ("Cause in fact or 'but for' causation provides that

32

if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury." (quoting *First v. Zem Zem Temple*, 686 A.2d 18, 21 n.2 (Pa. Super. 1996))). Here, Plaintiffs have failed to present evidence from which a jury could reasonably conclude that any Plaintiff would not have suffered emotional distress absent some specific act or omission by ECFMG that breached a duty to Plaintiffs.

There is no evidence, for example, that ECFMG's alleged breach—as opposed to sensationalized and factually incorrect reports from media outlets or Plaintiffs' counsel—caused Plaintiffs to hold the mistaken beliefs underlying their emotional distress. Plaintiffs' alleged injuries arise from their mistaken beliefs regarding whether Dr. Akoda was a "real doctor," whether Dr. Akoda was validly licensed to practice medicine, and whether Dr. Akoda had medical training. *See, e.g.*, ¶ 169 ("fake doctor"); ¶ 216. In truth, it is undisputed that Dr. Akoda completed a residency program at Howard, was licensed to practice medicine, was board certified, and maintained hospital privileges. ¶ 74, 76, 87, 90, 93. Plaintiffs' alleged injuries also arise from their mistaken belief that ECFMG was a government agency that licensed Dr. Akoda to practice medicine without conducting a full background check. ¶¶ 214–15 In reality, ECFMG is **not** a government agency, did **not** license him to practice medicine, and was **not** responsible for background checking him. ¶¶ 8, 9, 25. To the extent that any Plaintiff suffered compensable emotional distress, it arose from misunderstandings for which ECFMG bears no responsibility, and not from ECFMG's conduct.

There is similarly no evidence that if ECFMG had referred Dr. Akoda to the MECC on allegations of irregular behavior, then Plaintiffs would not have been injured. ECFMG's witnesses testified consistently that despite documented suspicions about Dr. Akoda, they did not have enough information to warrant an irregular behavior referral. ¶ 69. The contemporaneous documentary evidence confirms that they lacked the kind of evidence needed to initiate irregular

33

behavior proceedings. ¶ 69. Plaintiffs can only speculate that a referral to the MECC would have ultimately led the MECC to conclude that Dr. Akoda engaged in irregular behavior and that the appropriate sanction for that irregular behavior would have been revocation of his ECFMG Certificate such that he would not have practiced medicine. On this record, no reasonable jury could find as much.

Nor is there evidence that any legally required additional investigation or disclosures by ECFMG would have prevented Plaintiffs' injuries. ECFMG's investigation of Dr. Akoda was reasonable. It included contacting Dr. Akoda and third parties, as well as analyzing its own documents. ECFMG had received only limited information about Dr. Akoda from JSMC, some of which proved to be false and undermined the credibility of JSMC's allegations against Dr. Akoda. ECFMG is not a law enforcement agency and does not have subpoena power. It took at least 20 months of investigation by professional law enforcement to indict Dr. Akoda. Moreover, ECFMG has no legal basis to communicate unfounded suspicions about applicants to third parties because it has been found that individuals subject to irregular behavior proceedings must be afforded due process. *See supra*. And even if ECFMG had communicated its suspicions to third parties, there is no evidence that other institution would have acted differently or prevented Dr. Akoda from treating Plaintiffs. Both law enforcement and the Maryland Board of Physicians unquestionably knew of allegations concerning Dr. Akoda in 2014—before he treated Ms. Russell and Ms. Evans—and they took no action to stop him from practicing medicine.

## V.    Plaintiffs Consented to Treatment by Dr. Akoda, and the Alleged Misrepresentations Did Not Vitiate That Consent.

Summary judgment should also be granted because Plaintiffs consented to have their babies delivered by Dr. Akoda, and any misrepresentation about Dr. Akoda's name or use of Social Security numbers did not vitiate that consent. It is undisputed that Dr. Akoda had a medical license

when he provided Plaintiffs with medical treatment. ¶¶ 76, 83. It is further undisputed that Plaintiffs actually consented to having their babies delivered by Dr. Akoda. ¶¶ 105, 136, 166, 191. Plaintiffs do not contend that Dr. Akoda exceeded the scope of consent by, for example, performing the wrong medical procedure. As a general matter, "consent is effective for all consequences of [an actor's] conduct." Restatement (Second) of Torts § 892B(1); *see also id.* § 55 (including the "harmful or offensive character" of the conduct). Plaintiffs cannot recover for any alleged injuries arising from their receipt of medical treatment to which they consented.

Recognizing that their claims are viable only if they can avoid the consequences of their consent, Plaintiffs may argue that Dr. Akoda's misrepresentations rendered their consent ineffective. But it is black-letter law that not all misrepresentations vitiate consent. Consent is ineffective only if it is induced "by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it," Restatement (Second) of Torts § 892B, or by "the harmful or offensive character of a contact," Restatement (Second) of Torts § 55. These situations are not present here. Dr. Akoda had a medical license, was Board certified, and was employed by a hospital that provided care to Plaintiffs. That care—which resulted in positive outcomes for Plaintiffs and their babies—is the care to which Plaintiffs consented.

That Plaintiffs believe Dr. Akoda should not have been licensed to practice medicine because of misrepresentations made to licensing authorities (and ECFMG) about his name and Social Security number does not vitiate their consent. Courts have uniformly held that misrepresentations like Dr. Akoda's—including those concerning the experience or credentials of a licensed physician—do not vitiate consent. *Taylor v. Johnston* is directly on point. 985 P.2d 460 (Alaska 1999). There, as here, a patient alleged that consent to treatment was ineffective because of the physician's fraudulent actions in obtaining a medical license. *Id.* at 464. The Alaska Supreme Court held that these actions did not vitiate consent: "[I]f a plaintiff could bring a fraud claim by

35

simply alleging a licensed physician was not properly licensed, nearly every medical negligence action would include a fraud claim." *Id.* at 465. Like *Taylor*, Plaintiffs have no claim because they were "not treated by someone who was falsely represented himself as licensed." *Id.* This reasoning is sound and should be followed by this Court.

Any number of cases, both in Pennsylvania and elsewhere, have reached consistent results. *See Duttry v. Patterson*, 771 A.2d 1255, 1259 (Pa. 2001) ("[I]nformation personal to the physician, whether solicited by the patient or not, is irrelevant to the doctrine of informed consent."); *Prince v. Esposito*, 628 S.E.2d 601, 604 (Ga. App. 2006) (holding that "a medical professional has no duty to disclose negative information about his personal life to patients," even if "the patient testifies that he or she would have sought treatment elsewhere upon discovering the information"); *Rice v. Brakel*, 310 P.3d 16, 20 (Ariz. App. 2013) (declining to "expand medical battery to a situation in which the surgeon fully explains the procedure and obtains consent, but fails to disclose some other potential issue"); *Albany Urology Clinic, P.C. v. Cleveland*, 528 S.E.2d 777, 778 (Ga. 2000) ("[A]bsent inquiry by a patient or client, there is neither a common law nor a statutory duty on the part of either physicians or other professionals to disclose to their patients or clients unspecified life factors which might be subjectively considered to adversely affect the professional's performance.").

Plaintiffs consented to medical treatment by someone licensed to practice medicine and with medical training. They received just that. Each Plaintiff emerged from their pregnancy healthy and with a healthy child. Any misrepresentation by Dr. Akoda in connection with his credentialing process did not concern the character of his contact with Plaintiffs, and Plaintiffs' contention that Dr. Akoda should not have been licensed to practice medicine—at best, an issue for licensing boards, not ECFMG—does not vitiate their consent or give rise to a claim.

36

**VI.    There Is No Evidence That Plaintiffs Experienced Compensable Emotional Distress.**

"Physical injury must be averred to sustain a cause of action for negligent infliction of emotional distress." *Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. 1993); *see Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) ("the plaintiff must have experienced physical injury as a result of having been exposed to the traumatic event"). "Temporary fright, nervous shock, nausea, grief, rage, and humiliation if transitory are not compensable harm; but, long continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries." *Armstrong*, 633 A.2d at 609. Summary judgment is warranted unless Plaintiffs present record evidence that they experienced physical injury such as "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and ... ongoing mental, physical and emotional harm." *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. 1992); *see Armstrong*, 633 A.2d at 609 ("depression, nightmares, nervousness, insomnia and hysteria").

Here, Plaintiffs have presented no evidence of cognizable physical injury. Plaintiffs offer only generalized averments that they have experienced emotions. *See, e.g.*, ¶ 170 ("angry"); ¶ 170 ("sad"); ¶ 170 ("embarrassed"); ¶ 170 ("ashamed"); ¶ 208 ("distrust"); ¶ 148 (lacking "peace of mind"). But "[t]he law is not the guarantor of an emotionally peaceful life. Tort law cannot protect any of us from the emotional slings and arrows of daily living. Not every mistake that happens will be legally cognizable." *Armstrong*, 633 A.2d at 615. Plaintiffs even expressly disclaim both physical injuries and a variety of psychological issues. *See, e.g.*, ¶ 174 (physical injury); ¶ 202 (PTSD); ¶ 201 (anxiety). On this record, no reasonable jury could find that Plaintiffs experienced physical manifestations as a result of their alleged emotional distress that could support a recovery.

Ms. Evans is the only Plaintiff who sought mental health treatment after suffering her alleged emotional distress. But her emotional distress preceded any knowledge of Dr. Akoda's

guilty plea. She suffered from emotional disturbances long before she learned the information that supposedly precipitated the emotional distress for which she seeks to recover. ¶ 116. Indeed, the record shows that her emotional distress preceded even her treatment by Dr. Akoda. ¶ 116. It is common sense that Ms. Evans' emotional distress could not have been avoided by an alternative course of conduct by ECFMG when it predated any causal chain that traces back to ECFMG.

Ms. Russell claimed to experience back pain around the time that she learned of Dr. Akoda's alias. ¶ 217. But she admitted that she does not know if the back pain was attributable to her alleged emotional distress. ¶ 217. Other than her equivocal testimony, there is no evidence of physical harm. On this record, no reasonable jury could conclude that her back pain was attributable to ECFMG's conduct or at all related to her emotional distress.

## VII.    The Claims of Plaintiffs Evans and Powell Are Barred By Limitations.

Summary judgment should also be granted because the claims of Ms. Evans and Ms. Powell are time-barred. Plaintiffs' claims are subject to Pennsylvania's two-year statute of limitations. *See Erisoty v. Rizik*, No. 93-6215, 1995 WL 91406, at *10 n.4 (E.D. Pa. Feb. 23, 1995) (applying 42 Pa. C. S. § 5521(b) to hold that Pennsylvania's two-year statute of limitations—rather than Maryland's three-year statute of limitations—applies in a diversity action). "For tort actions, the general rule in Pennsylvania is that the statute begins to run when the cause of action arises, as determined by the occurrence of the final significant event necessary to make the claim suable." *P.J.A. v. H.C.N.*, 156 A.3d 284, 291 (Pa. Super. 2017); *see also Moore v. McComsey*, 459 A.2d 841, 844 (Pa. Super. 1983). What matters is "when a plaintiff is harmed and not when the precise amount or extent of the damages is determined." *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1042 (Pa. Super. 1999); *see also Pearce v. Salvation Army*, 674 A.2d 1123 (Pa. Super. 1996) (holding that the statute of limitations begins to run "when the injured party possesses sufficient crucial

JA2328

facts to put [her] on notice that a wrong has been committed and that [s]he need investigate to determine whether [s]he is entitled to redress.").

Ms. Evans and Ms. Powell believed that they suffered an injury at the time of their treatment by Dr. Akoda. As a result, even if they did not know the full extent of their alleged harm, the statute of limitations began running at the time of treatment.

Ms. Evans testified that even before Dr. Akoda assisted with her delivery in March 2016, she believed he was unprofessional because he performed intrusive pelvic examinations and used inappropriate language. ¶ 11. Ms. Evans also testified that she (and her husband and mother) were suspicious of Dr. Akoda during the delivery in March 2016 after Dr. Akoda allegedly manipulated her clitoris and claimed it would help with labor. ¶ 115. In other words, Ms. Evans testified that she was aware that a wrong had been committed against her at the time of treatment in March 2016. Her statute of limitations for any claims based on treatment by Dr. Akoda thus began running at that point in time. Ms. Evans did not file suit until November 2018, more than eight months after the statute of limitations had run.

Ms. Powell was treated by Dr. Akoda from April 2014 to January 2015. ¶ 137. She testified that during that time, Dr. Akoda was flirtatious, made lewd comments, and performed intrusive pelvic examinations. ¶ 138. At one point, she claimed to be so uncomfortable with Dr. Akoda's behavior that she asked for a nurse to be present in the room during examinations. ¶ 139. Then, she experienced post-partum bleeding that required Dr. Akoda to perform emergency surgery, at which time Dr. Akoda allegedly told her, "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." ¶ 145. According to her testimony Ms. Powell was aware that she had suffered a wrong at the time of treatment. Her statute of limitations thus began running in January 2015. She had to file suit by January 2017, but she did not file suit until November 2018. Her claims are therefore time-barred.

JA2329

Recognizing this issue, Plaintiffs frame their claims as arising from emotional distress they suffered upon learning of Dr. Akoda's guilty plea (which seems to bring the claims just within the statute of limitations). But this formulation does not save Plaintiffs' time-barred claims because Ms. Evans and Ms. Powell were already aware of harm they felt as a result of their treatment.

Nor does the discovery rule save Plaintiffs' claims. To benefit from the discovery rule, plaintiffs must show they made reasonable efforts to protect their interests and explain why they were unable to discover the operative facts necessary to plead their claims before the limitations period expired. *See Bickell v. Stein*, 435 A.2d 610, 612 (Pa. Super. 1981). There is no evidence in the record indicating that Ms. Evans or Ms. Powell made reasonable efforts to protect their interests so as to trigger the discovery rule. And the Pennsylvania Supreme Court has repeatedly stressed that Pennsylvania follows an inquiry notice approach tying "commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247 (Pa. 2021) (internal citations and quotes omitted). Where a plaintiff has knowledge of a cause of significant harm, she is on inquiry notice regarding other potentially liable actors as well. *Id.* at 251. Here, Ms. Riggins and Ms. Powell were aware that Dr. Akoda's treatment had allegedly harmed them. The statute of limitations began to run at that time, and their claims are time-barred as a result.

## CONCLUSION

For these reasons, this Court should grant summary judgment for ECFMG.

40

Dated: December 10, 2021

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021              */s/ Brian W. Shaffer*
                                      Brian W. Shaffer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>        Plaintiffs,<br><br>    v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>        Defendant. | Civil Action No. 18-5629<br><br>Honorable Joshua D. Wolson |

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2022, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment and any response thereto, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Defendant Educational Commission for Foreign Medical Graduates and against Plaintiffs.

BY THE COURT:

_____

Wolson, J.

JA2333

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS' EXPERT DR. ANNIE STEINBERG

For the reasons set forth in the attached memorandum of law, Defendant Educational Commission for Foreign Medical Graduates, by and through its undersigned counsel, moves to exclude the opinions and anticipated testimony of Plaintiffs' expert Dr. Annie Steinberg pursuant to Federal Rules of Evidence 702, 703, and 403, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Dated: December 10, 2021

Respectfully submitted,

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021        */s/ Brian W. Shaffer*
                                   Brian W. Shaffer

JA2335

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>        Plaintiffs,<br><br>    v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>        Defendant. | Civil Action No. 2:18-cv-5629<br><br>Honorable Joshua D. Wolson |

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS' EXPERT DR. ANNIE STEINBERG

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 2

    A. Factual and Procedural History ........................................................... 2

    B. Dr. Steinberg's Questionnaire ............................................................. 3

    C. Dr. Steinberg's Report and Opinions .................................................. 5

    D. Reliable Survey Science Principles and ECFMG's Rebuttal Expert Dr. Susan McDonald .............................................................................. 6

    E. Plaintiffs' Belated Production of Supporting Materials for Dr. Steinberg's Report .............................................................................. 7

III. LEGAL STANDARD ........................................................................................ 8

IV. ARGUMENT ..................................................................................................... 9

    A. Dr. Steinberg Is Not Qualified to Perform a True, Reliable Survey ................... 10

    B. Dr. Steinberg's Questionnaire Methodology Is Unreliable Making the Responses She Received Inadmissible. ............................................... 12

        i. Dr. Steinberg's Questionnaire Has Sampling Errors. ............................ 14

        ii. The Design of Dr. Steinberg's Questionnaire Is Flawed. ...................... 15

        iii. Dr. Steinberg's Interpretation of the Questionnaire Results Is Flawed. ........................................................................................ 20

    C. The Questionnaire Responses and Dr. Steinberg's Conclusions Are Unhelpful to the Factfinder and Lack Sufficient Connection or Fit to Issues in This Case. ............................................................................ 21

    D. Rule 403 Also Supports Excluding Dr. Steinberg's Opinions ............................. 23

V. CONCLUSION ................................................................................................. 24

JA2337

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*,
  1 F.3d 611 (7th Cir. 1993) ....................................................................13

*Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*,
  873 F. Supp. 893 (D.N.J. 1994) ...........................................................19

*Citizens Fin. Grp. v. Citizens Nat. Bank of Evans City*,
  383 F.3d 110 (3d Cir. 2004) ........................................................9, 13, 23

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ...............................................10, 16

*Daubert v. Merrell Dow Pharm.*,
  509 U.S. 579 (1993) ...................................................................... *passim*

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003) ....................................................................8

*Evans v. Philadelphia Hous. Auth.*,
  No. 93-5547, 1995 WL 154872 (E.D. Pa. Mar. 31, 1995) .....................12

*Goodman v. Burlington Coat Factory*,
  No. 11-4395 (JHR), 2019 WL 4567366 (D.N.J. Sept. 20, 2019) ...........20

*Hartle v. FirstEnergy Generation Corp.*,
  Nos. 08-1019, 08-1025, 08-1030, 2014 WL 1317702 (W.D. Pa. Mar. 31,
  2014) ......................................................................................................16

*Hurt v. Commerce Energy, Inc.*,
  No. 1:12-CV-00758, 2015 WL 410703 (N.D. Oh. Jan. 29, 2015) ...........14, 15, 21

*J&J Snack Foods Corp. v. Earthgrains Co.*,
  220 F. Supp. 2d 358 (D.N.J. 2002) ....................................................22, 23

*Johnson & Johnson-Merck v. Rhone-Poulenc Rorer Pharm., Inc.*,
  19 F.3d 125 (3d Cir. 1994) .....................................................................16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................9

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) .....................................................................8

*In re Paoli R.R. Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994) ...........................................................................9, 12

*Pittsburgh Press Club v. United States,*
  579 F.2d 751 (3d Cir. 1978) ................................................................... *passim*

*Senne v. Kansas City Royals Baseball Corp.,*
  315 F.R.D. 523 (N.D. Cal. 2016) ...........................................................................14

*Sterling v. Redevelopment Auth. of City of Phila.,*
  836 F. Supp. 2d 251 (E.D. Pa. 2011) ....................................................................24

*Therasense, Inc. v Becton Dickinson & Co.,*
  No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008)...................24

## Other Authorities

Fed. R. Civ. P. 23 .................................................................................................1

Fed. R. Evid. 403 ........................................................................................2, 23, 24

Fed. R. Evid. 702 ..........................................................................................1, 8, 9

Fed. R. Evid. 703 ................................................................................... *passim*

JA2339

## I.    INTRODUCTION

In an attempt to bolster their claims, Plaintiffs have put forth a psychiatrist, Dr. Annie Steinberg, who aggregated responses to a questionnaire that she put together, which Plaintiffs' Counsel sent to the named Plaintiffs and certain absent class members. Based on the responses received, Dr. Steinberg takes an extraordinary leap and tries to purportedly "outline the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery" and "opine on current psychological issues that relate to the subject incidents and their consequences." Exhibit 1, Steinberg Expert Report ("Steinberg Rep.") at 1.

Dr. Steinberg's questionnaire, and the opinions and testimony she purports to offer based on the responses, are inadmissible under Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579 (1993). First, Dr. Steinberg is not qualified to develop or administer a scientifically valid survey that would be necessary to support the conclusions she offers. Second, and more fundamentally, she did not generate or conduct such a valid survey in this matter: the questionnaire she created and the responses she collected are unreliable based on principles of survey methodology. Third, given the flawed methodology associated with the questionnaire, the sweeping opinions Dr. Steinberg offers and the cherry-picked statistics she calculates from the responses are wholly unreliable and not useful in evaluating the claims in this case.

In addition, Dr. Steinberg's testimony would be highly prejudicial and inappropriate under Federal Rule of Evidence 403. Despite claiming that she was asked by Plaintiffs' counsel for a "forensic psychiatric consultation . . . to assess the potential damages, if any, that class members may have experienced concerning the actions of 'Dr. Akoda'" (Steinberg Rep. at 3), Dr. Steinberg admits that she did not conduct individual evaluations of any of the putative class members, nor

would it be possible to do a "group" diagnosis of them. Accordingly, any psychiatric opinions Dr. Steinberg offers about the anonymous respondents do not stem from a recognized diagnostic methodology. Moreover, while Federal Rule of Evidence 703 allows experts to rely on hearsay if trustworthy and normally employed by experts in the field, the hearsay narratives Dr. Steinberg pulls from the unreliable questionnaire responses plainly do not meet this standard, and experts cannot simply serve as conduits for hearsay, as Dr. Steinberg proposes to do by parroting survey responses.

## II.  BACKGROUND

### A.  Factual and Procedural History

ECFMG knows the Court is familiar with the background and status of this matter. In November 2016, Dr. John Nosa Akoda pleaded guilty to misuse of a Social Security number and stipulated that another name that he used was Oluwafemi Charles Igberase. Both John Nosa Akoda and Oluwafemi Charles Igberase were the names of applicants to ECFMG, a Philadelphia-based private non-profit organization that promotes quality health care for the public, by, among other things, certifying that eligible graduates of international medical schools have met certain minimum requirements for entry into U.S. graduate medical education (usually residency programs).

ECFMG revoked its certification of Oluwafemi Charles Igberase when ECFMG learned that he had misrepresented his application history in an effort to wipe clean his record of failed examinations. After losing his certification under the name Dr. Igberase, the doctor applied for and received ECFMG certification under the name John Nosa Akoda. Dr. Akoda then completed a residency program at Howard University and obtained medical licenses from Maryland and Virginia.

JA2341

The named Plaintiffs are former patients seen by Dr. Akoda, either as their regular obstetrician/gynecologist or as the doctor "on-call" at the hospital when they gave birth. Compl., ECF 1. After learning of Dr. Akoda's criminal conviction, Plaintiffs filed suit in Maryland against the Prince George's Hospital System and Dr. Akoda's practice. Later, Plaintiffs pivoted, dismissed that case and filed this one as a putative class action, changing theories of liability and asserting that ECFMG was negligent in its certification and investigation of Dr. Akoda, and that ECFMG's actions directly caused them to suffer emotional distress upon learning of Dr. Akoda's conduct.

ECFMG files this *Daubert* motion contemporaneously with its Supplemental Brief in Opposition to Class Certification, Motion for Summary Judgment as to the named Plaintiffs, and *Daubert* motion directed at Plaintiffs' "credentialing experts," Drs. David Markenson, John Charles Hyde, and Jerry Williamson.

### B. Dr. Steinberg's Questionnaire

In order for the Court to perform its gatekeeping function and assess the admissibility of Dr. Steinberg's opinions, some background on the questionnaire that she generated is necessary. According to Dr. Steinberg, Plaintiffs engaged her for "forensic psychiatric consultation . . . to assess the potential damages, if any, that class members may have experienced concerning the actions of 'Dr. Akoda.'" Steinberg Rep. at 3. As part of this engagement, she designed a sixty-item questionnaire that was then distributed to putative class members by Plaintiffs' counsel. *Id.* The questionnaire was in large part adapted from a prior questionnaire she designed with anthropologist Girija Kaimal, clinical psychologist Elizabeth Hembree, and an unnamed Drexel professor for a case involving a rabbi alleged to have videotaped women participating in a ceremonial cleansing ritual without their knowledge. Exhibit 2, Steinberg Deposition Transcript ("Steinberg Tr."), Steinberg Tr. 29:15–30:5; 52:23–53:7. The purpose of that prior questionnaire was to assist with a mediation and the apportionment of a potential lump sum financial settlement among the

JA2342

different women involved. Exhibit 3, October 11, 2019 Email from B. Ceryes to E. McEnroe. Dr. Steinberg did not reach out to her collaborators from the earlier case—whose questionnaire she based this one on—to assess (or assist with) her adaption of the questionnaire because "[she] used the same methodology and versions of the same questionnaire and [she] felt very comfortable with what [they] had developed before and this was an adaptation of that." Steinberg Tr. 52:20–53:20.

Dr. Steinberg performed very little independent background investigation into the allegations in this case, obtaining information for the factual background portion of her report from (1) a letter Plaintiffs' counsel drafted containing their description of the case, on which she "relied heavily;" (2) the Complaint; (3) two of the four named Plaintiffs' deposition transcripts; and (4) the deposition transcript of one ECFMG representative (that she "perused"). Steinberg Tr. 75:22–76:10, 80:24–81:12. During the development and administration of the questionnaire, Dr. Steinberg worked with Lisa Bain, a "science writer" who does not appear to have any degrees in marketing or survey methodology. Steinberg Tr. 50:7–54:16. Dr. Steinberg also worked with Stephen Ehrlich, an information technology consultant who set up a website that hosted the questionnaire and formatted the questionnaire so that participants "would not be intimidated by it." Steinberg Tr. 58:18–60:7.

About her work, Dr. Steinberg noted that "there was so much information in a very short time. It was a very crazy time." Steinberg Tr. 80:24 – 81:12. Given the extremely short turnaround time (*id*. at 93:18-24) Dr. Steinberg relied on Ms. Bain as an "extender" of herself, helping to draft and edit both the questionnaire and report. Steinberg Tr. 50:7–53:14. While Ehrlich helped Bain and Dr. Steinberg extract spreadsheets and pie charts from some of the questionnaire responses to support Dr. Steinberg's statistical analyses, there was not enough time for him to do so for every question. Steinberg Tr. 54:19-55:6. Also, although her team left the questionnaire open for

4

additional responses, she did not review any responses that may have come in after her pre-determined cutoff date. Steinberg Tr. 94:21–95:5; Exhibit 4, Emails0003 (indicating that respondents had less than a week from when they were notified of the questionnaire to complete it). Dr. Steinberg had only ten days from the cutoff date to analyze the results and draft her report.

The questionnaire was sent to 575 individuals who were "presumed" to be Dr. Akoda's patients because they are purportedly represented by Plaintiffs' counsel in this matter. Steinberg Rep. at 4. Dr. Steinberg then analyzed 305 questionnaires that were completed, including 131 summary statements that accompanied these questionnaires. *Id.* The respondent population included a significant portion of under-privileged patients; 73% responded that they were on Medicaid when they were treated by Dr. Akoda. Steinberg Rep. at 5.

### C. Dr. Steinberg's Report and Opinions

Dr. Steinberg contends that this questionnaire and her assessment of the responses "outline the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery" and allow her to opine on "current psychological issues that relate to the subject incidents and their consequences." Steinberg Rep. at 1. From the responses she received on her questionnaire, Steinberg draws the following conclusions:

- "The misconduct of Oluwafemi Charles Igberase (fraudulently known as Dr. Akoda) has resulted in varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions; for some even more broadly applied." Steinberg Rep. at 21.

- "The consistency and intensity of the narrative content across three hundred women both affirms the veracity of the histories and reported symptoms experienced as a result of learning of their doctor's fraudulent activities." Steinberg Rep. at 21.

Dr. Steinberg provides rudimentary statistical analyses of responses for a limited number of the questions. Steinberg Rep. at 5–10; Steinberg Tr. 54:21–55:16. Dr. Steinberg also directly copies

some language verbatim from the questionnaire responses into her report, despite the fact that she did not directly interview these individuals, does not know who they are, and did not have the opportunity to pose follow-up questions to assess the meaning or significance of the responses. Steinberg Rep. at 10–20. She concludes that verbatim snippets from the responses are consistent with alleged boundary violations by Dr. Akoda, and disrespect for patients, betrayal of trust, and patients' emotional distress—all despite admitting that she did not diagnosis any of these individuals nor would a group diagnosis even be possible. Steinberg Rep. 10–20; Steinberg Tr. 44: 20–24 ("I would never diagnose somebody on the basis of a response to a questionnaire"), 45:1–7 ("It was never my intention to present psychiatric diagnoses of any individual women in this matter"), 45:8–24 (finding it "laughable" or "unfathomable" that there could be a group diagnosis). Despite Dr. Steinberg's multiple acknowledgements of the limited scope of her report, *see* Steinberg Rep. 4, 21, 22, she baldly concludes that: "the response rate and sample size would be more than adequate to provide reasonable confidence intervals for the percentages of Plaintiffs in each of several categories of damage severity." Steinberg Rep. 4.

D. **Reliable Survey Science Principles and ECFMG's Rebuttal Expert Dr. Susan McDonald**

Dr. Steinberg's approach—drawing conclusions about a broader universe of Dr. Akoda's patients from a small subset of responses—is an attempt, albeit a fundamentally flawed one, at a recognized survey methodology. ECFMG engaged Dr. Susan McDonald, who has a doctoral degree in social psychology and communications theory, to assess the merits and validity of Dr. Steinberg's questionnaire. Dr. McDonald has significant educational and professional experience in survey science, a discipline focused on using survey measurement to learn details about a large number of people based on a representative sample. Exhibit 5, Rebuttal Report of Dr. Susan McDonald ("McDonald Rep.") 3–4, 6. "A survey collects data from a representative subset based

JA2345

on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about the broader universe." McDonald Rep. at 6. Dr. McDonald draws a distinction between surveys and qualitative studies, noting that qualitative studies with a majority of open-ended questions require "improvisation and proving based on the particular answers," as opposed to surveys which require no improvisation in order to be able to derive sample statistics to apply to a broader population. *Id.* She notes that to assess a survey's validity, one should look to: (1) the reliability of the sampling; (2) the validity of the design; and (3) the interpretation and analysis of the survey responses. McDonald Rep. at 7.

Dr. McDonald has expertise in survey design, implementation, analysis, and interpretation based on her graduate training in social sciences, as well as professional experience using survey research to consult on product development, brand strategy, and other strategic marketing activities. McDonald Rep. 2–3, App. A. In sharp contrast to Dr. McDonald's credentials and experience, Dr. Steinberg recounted no specific experience with traditional surveys; had difficulty remembering whether her past work was survey or interview-based; had difficulty explaining the difference between an interview and survey; does not have any degrees related to survey design; and admitted that she did not consult with any literature on surveys and survey design for her work on this matter. Steinberg Tr. 18:23–19:22; 43:7–44:15; 46:11–47:8; 49:14–19.

E.  **Plaintiffs' Belated Production of Supporting Materials for Dr. Steinberg's Report**

Plaintiffs' disclosure of Dr. Steinberg's supporting materials of her report to ECFMG was delayed and deficient. For example, Plaintiffs did not even produce the final questionnaire that was completed by the respondents until after Dr. Steinberg's deposition. *See* Ex. 3 Oct. 11, 2019 Email from B. Ceryes to E. McEnroe. Furthermore, raw malleable data associated with the responses was not produced until six weeks after the rebuttal expert's deadline had passed (and,

7

JA2346

more importantly more than nine weeks after Dr. Steinberg completed her analysis and report). *See* Exhibit 6 Dec. 1, 2019 Email from B. Ceryes to E. McEnroe. As ECFMG's rebuttal expert, Dr. McDonald, explained, Dr. Steinberg's "claim not to have such a database at her disposal is highly unusual insofar as survey programs produce readily manipulated databases as a matter of course." McDonald Rep. 5.

## III.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows for the testimony of expert witnesses only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Third Circuit has explained that Rule 702 imposes various requirements on proponents of expert testimony centered around "qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The proponent of expert testimony has the burden of establishing that it meets these requirements by a preponderance of proof. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals*, the United States Supreme Court held that Rule 702 requires a court to examine any proffered expert testimony for reliability, methodology, and connection between the data and the expert's conclusion. 509 U.S. 579 (1993). More specifically, *Daubert* provided five factors to guide a district court in its assessment of these requirements: (1) whether the methodology can and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error of the methodology; (4) the existence and maintenance of standards controlling the technique's

JA2347

operation; and (5) whether the technique has been generally accepted in the proper scientific community. *See id.* at 593-94.

The Third Circuit has enumerated three additional factors that courts may consider in assessing the admissibility of expert reports and testimony, including: (1) the relationship of the technique to methods that have been established to be reliable, (2) the expert witness's qualifications, and (3) the non-judicial uses to which the method has been put. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994). District courts must act as "gatekeeper[s]" for all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999).

Rule 703 of the Federal Rules of Evidence governs the admissibility of the facts or data that an expert bases his or her opinion on and applies the same reliability standard as *Daubert*. *See In re Paoli,* 35 F.3d at 748–49, n. 18. In addition, an expert can only rely on facts and data that is otherwise inadmissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. P. 703.

## IV.  ARGUMENT

Dr. Steinberg's questionnaire, responses, and opinions should be excluded because they do not meet the requirements of Federal Rules of Evidence 702 and 703. *See also Citizens Fin. Grp. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121-22 (3d Cir. 2004) (affirming exclusion of not only an expert's opinion but also the survey and responses underlying the expert's opinion for failure to meet requirements of Federal Rule of Evidence 702 and Rule 403 concerns).

In particular: (1) Dr. Steinberg does not have the qualifications to develop, administer, and interpret a reliable survey methodology; (2) her questionnaire is unreliable; and (3) her opinions developed from the questionnaire and responses lack the necessary fit to be useful to a fact finder.

JA2348

A.     <u>Dr. Steinberg Is Not Qualified to Perform a True, Reliable Survey.</u>

Because Dr. Steinberg lacks the qualifications to develop, administer, and interpret a reliable questionnaire or scientific survey, her opinions and questionnaire in this case should be excluded. Her experience is in qualitative interviews, not surveys or questionnaires. When asked whether any of her experience was with traditional surveys Dr. Steinberg did not identify any and instead responded: "Well, let's see. I believe – I honestly don't remember. Isn't that terrible?" Steinberg Tr. 20:7–9. She was transparent about the fact that she did not have any degrees related to survey design and she would not be able to lecture and teach other individuals on survey design:

> I don't know that that – you know, that I can profess to give you a lecture on sound survey design. I just can tell you that I studied it like – like if you asked me, you know, the basis for a psychiatric interview, I suppose because I'm a forensic psychiatrist I would have to be able to provide that for you, but I don't have any degrees in survey design and I don't know that I would want to make a feeble effort at articulating that for you. I – I only know that I've studied it and that I've learned from smart people and someplace it's in the soup. You know, it's mixed in the – it's in the blend of what I have come to understand and to have learned from very good teachers.

Steinberg Tr. 46:11-47:8.

Dr. Steinberg's past experience with qualitative interviews does not make her qualified to conduct a survey supporting the opinions she tries to offer. When an expert is "not sufficiently familiar with the methodology used to design and administer the survey to [be able to] opine that it was 'conducted according to accepted principles' and reliable," it is appropriate to exclude that expert's opinion. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951-52 (C.D. Cal. 2015) (citing *In re TMI Litigation Cases Consolidated II*, 922 F. Supp. 1038, 1046-48 (M.D. Pa. 1996)). Here, Dr. Steinberg's methodology was based off another team's questionnaire used in a different case for a very different purpose (settlement and apportionment of damages)—yet she did not consult with that team (or similar survey experts) on this case to see if the same methodology was

appropriate for the opinions she purports to offer here. Steinberg Tr. 52:23–53:20. This lack of familiarity with the underlying methodology disqualifies Dr. Steinberg from opining on it.

In fact, Dr. Steinberg concedes her lack of relevant expertise and that a polling expert might be better at interpreting the results of a questionnaire. Steinberg Tr. 156:5–157:1; 159:2–3; 210:7 – 211:19 (admitting that the domain of her training is not in survey science and marketing and that she did not consult experts on how surveys induce respondents to pick a certain response). While Dr. Steinberg may be qualified to comment on certain areas of psychiatry, she admits she did no independent medical evaluations ("IMEs")[1] here, Steinberg Tr. 156:5–157:1, and she admits that she issued the questionnaire without meeting any of the women, examining their medical records, or observing Dr. Akoda's practices. Steinberg Tr. 99:19-100:6. As a result, she firmly states that she was not diagnosing these questionnaire respondents and that a group diagnosis is not possible. Steinberg Tr. 44: 20–24; 45:1–7; 45:8–24. Accordingly, even though she is a psychiatrist, she cannot rely on the statements from the questionnaire responses, *see* Steinberg Rep. at 10–20, to make an expert opinion on "the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of . . . agents that enabled him to practice medicine" and psychological issues that stem from Dr. Akoda's treatment. Steinberg Rep. at 1. These questionnaire responses would be inadmissible hearsay, and they are not derived from a diagnostic method reasonably relied on in forensic psychiatry. *Pittsburgh Press Club v. United States*, 579 F.2d 751, 755, 757 (3d Cir. 1978) (excluding flawed survey as "nothing more than compilation of hearsay," opining that "[t]he survey was no more than a summary and distillation of 281 extrajudicial declarations offered to prove the truth of the matters asserted in those declarations"); *see also* Fed. R. Evid. 703

---

[1] Notably, both parties engaged experts to conduct IMEs of the four named Plaintiffs in this matter. *See* ECF 32-1 at 10; ECF 39-26, 46-10. At this time, ECFMG is not moving to exclude Plaintiffs' expert Dr. Tellefsen, who conducted one set of IMEs.

(restricting experts from relying on inadmissible facts or data when the contested facts or data are not reasonably relied on in that particular field).

Accordingly, Dr. Steinberg was not qualified to conduct this questionnaire, as is required by both *Daubert* and Third Circuit case law on the admissibility of surveys. *See Pittsburgh Press Club*, 579 F.2d. at 758 ("[T]he persons conducting the survey must be experts."). Nor does her expertise in forensic psychiatry save her flawed methodology because she admits that her questionnaire methodology is not a valid diagnostic tool.

**B.      Dr. Steinberg's Questionnaire Methodology Is Unreliable Making the Responses She Received Inadmissible.**

Even if Dr. Steinberg were qualified in survey design and administration, her methodology is deeply flawed and unreliable and thus inadmissible. One factor the Third Circuit has added to the original five *Daubert* factors is the relationship of the challenged technique or methodology to those methodologies and techniques that have been established as reliable. *See In re Paoli.*, 35 F.3d at 742 n.8. Surveying, provided that the developed survey is consistent with generally accepted principles, is one such reliable methodology to which Dr. Steinberg's methods can be compared. A review of valid survey methodology principles demonstrates that Dr. Steinberg has not employed established and standard methods found to be reliable (as the fourth *Daubert* factor requires); has not used a generally accepted technique to design and interpret her questionnaire (inconsistent with the fifth *Daubert* factor); and has not used a method that would enable others to test her hypotheses (inconsistent with the first *Daubert* factor).

"The failure of a survey to comport with generally accepted survey principles, with the results used in a statistically correct way, renders that survey inadmissible." *Evans v. Philadelphia Hous. Auth.*, No. 93-5547, 1995 WL 154872, *5 (E.D. Pa. Mar. 31, 1995). This is important

JA2351

because these survey principles serve as "circumstantial guarantees of trustworthiness" and are "intended to assure a poll's reliability." *Pittsburgh Press Club*, 579 F.2d at 758.

The Third Circuit has identified various survey principles that are generally accepted:

- A proper universe must be examined and a representative sample must be chosen;
- the persons conducting the survey must be experts;
- the data must be properly gathered and accurately reported;
- the sample design, the questionnaires and the manner of interviewing [must] meet the standards of objective surveying and statistical techniques;
- the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

*Id.* A proffered survey should be excluded where, as here, it is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993). Although minor shortcomings may affect a survey's weight for the trier of fact, some suveys are so flawed that they must be excluded. *Id.*; *see also Citizens Fin. Grp., Inc.*, 383 F.3d at 121–22 (excluding survey that suffered from fatal flaws, rather than mere technical flaws, because danger of undue prejudice far outweighed the limited probative value of the survey).

Dr. Steinberg's questionnaire is not a scientific survey. Her own description of the development, management, and analysis of the questionnaire responses demonstrates her lack of preparation and rigor. Stated simply, rather than being an "expert," Dr. Steinberg's work is "amateurish." *See* Exhibit 7 McDonald Deposition Transcript ("McDonald Tr."), McDonald Tr. 69:7–71:19; McDonald Rep. at 3 ("Based on my expertise in survey design, implementation, analysis, and interpretation, I have concluded that Dr. Steinberg's survey is not simply amateurish; **it is so methodologically deficient and so biasing as to lack validity as a survey measurement tool**. Due to numerous disabling methodological flaws, none of the statistics generated by this survey can be taken at face value or serve as the basis for conclusions, even with a confidence

13

interval applied.") (emphasis added). It comes as no surprise that Dr. Steinberg's method was not subject to peer review (implicating the second *Daubert* factor). Steinberg Tr. 115:19-118:4.

In addition, Dr. Steinberg's work suffers from errors in sampling, design, and interpretation, as described in Sections IV(B)(i)-(iii) below.

### i. Dr. Steinberg's Questionnaire Has Sampling Errors.

Survey methodology principles demand that the respondent sample be representative. McDonald Rep. 6 ("A survey collects data from a representative subset based on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about a broader universe."). The Third Circuit has found unreliable surveys where the respondents are limited to interested parties in a litigation who were told of the precise nature of the litigation and the purpose of the survey. *See Pittsburgh Press Club*, 579 F.2d at 759 (noting that survey respondents who were parties to a litigation consequently knew "which responses would be helpful [ ] and [,] conversely, which would be harmful. Moreover, it was possible that a recipient of the questionnaire would fail to respond because he knew an honest answer would be harmful"). Other courts have similarly rejected surveys where the chosen respondents are based on the convenience or bias of the parties' counsel. *See, e.g.*, *Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2015 WL 410703, *5 (N.D. Oh. Jan. 29, 2015) (noting that there was systematic bias evident in the survey when the respondents only covered members of the class with higher damages); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016) (noting that a survey invitation that mentioned that a recipient had a vested interested in the results was sufficient to raise questions about the reliability of the results).

Dr. Steinberg's questionnaire was only sent to putative class members identified by Plaintiffs' counsel. Steinberg Report 1, 4 ("Confirmed patients/class members were contacted by

e-mail and given instructions for logging on and completing the questionnaire"); McDonald Rep. 2, 9-10; McDonald Tr. 41:24-42:17. While this alone suggests that the sample of respondents was not representative of all of Dr. Akoda's patients, the lack of representativeness was exacerbated by the invitation that accompanied the questionnaire link: Plaintiffs' counsel said that the individual's participation was necessary "so that we can proceed with your case." *See* Emails0003; Dr. McDonald Report 9-10. The selection bias was further exacerbated by the fact that only some individuals responded to the survey. Dr. Steinberg has no reliable basis—there is none—for assuming that the individuals who chose to respond to the survey are representative of the full set of individuals to whom the survey is sent, much less the full set of all of Dr. Akoda's patients.

Counsel's participation in the administration of this questionnaire, alongside biased instructions that tied questionnaire participation to litigation participation and success, exacerbated these sampling problems. *See Hurt*, 2015 WL 410703 at *4 (noting that a survey was unreliable in part because the cover email to the survey explained that it would be used to properly seek recovery for unpaid wages, enhancing the likelihood that respondents would inflate their hours to increase damages they could recover).

## ii. The Design of Dr. Steinberg's Questionnaire Is Flawed.

A flawed survey design will result in skewed or distorted data. McDonald Rep. 7. The questionnaire must be clearly written, consistent, and non-biasing to be valid. *Id.; see also Pittsburgh Press*, 579 F.2d at 758 ("It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques."). Dr. Steinberg's questionnaire design suffers from: (1) lack of pre-testing, (2) unclear, ambiguous, or leading questions, and (3) lack of filtering mechanisms or skip patterns to weed out irrelevant answers. Each is described below.

JA2354

1.      *Lack of Pre-testing*

Pre-testing enables a surveyor to "identify and help eliminate response bias," such as determining "whether the phrasing or ordering of questions may have suggested certain answers or caused respondents to systematically overestimate or underestimate" their responses. *Hurt*, 2015 WL 410703 at*5. Pre-testing involves having a small group of respondents take the survey and debrief with the administrators on what questions or instructions puzzled or confused them. McDonald Rep. at 10.

Dr. Steinberg did not pre-test her questionnaire; she and Bain only ran through the questionnaire to see how long it would take. Steinberg Tr. 118: 5-19. Without a pre-test, Dr. Steinberg was unable to determine which questions were puzzling or could have caused difficulty for the disproportionate number of under-privileged women taking the questionnaire, answering sensitive questions about their reproductive care. McDonald Rep. 10.

Pre-testing also may have caught errors in her methodology (implicating the third *Daubert* factor) that Dr. Steinberg was unable to explain later. *See, e.g.*, Steinberg Tr. 221:8–222:24 (acknowledging that it was "just probably an error" that there was no 'I don't know' or 'I don't remember' option for question 4c); Tr. 232:23 – 236:5 (attempting to side step error in inserting skip patterns); Tr. 239:3–18 (admitting that her team had overlooked putting in a skip pattern in place for Question 6). The presence of errors is a reason for finding a survey methodology too unreliable to be useful in a case. *See also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 950-951 (a high percentage of clearly incorrect answers on the survey demonstrates that the survey methodology was unreliable).

2.      *Unclear, Ambiguous, and Leading Questions*

"Proper questions are critical to the reliability of the survey. 'When unclear questions are included in a survey .... If the crucial question is sufficiently ambiguous or unclear, it may be the

16

basis for rejection the survey.'" *Hartle v. FirstEnergy Generation Corp.*, Nos. 08-1019, 08-1025, 08-1030, 2014 WL 1317702, at *6 (W.D. Pa. Mar. 31, 2014) (citation omitted). Furthermore, "[a] survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Johnson & Johnson-Merck v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) (citation omitted).

Dr. Steinberg's questionnaire was littered with unclear, ambiguous or leading questions and undefined terms. For example, she asked whether the respondents experienced "emotional distress" or "intense physical reactions" as a result of Dr. Akoda's treatment without defining either term or giving further guidance. Exhibit 8, Akoda Questionnaire 6a-6d. She asked respondents to identify physical symptoms such as high blood pressure, chest pain, and fatigue, that they believe are the result of Dr. Akoda's conduct; a question that rests on the bold assumption that this questionnaire population has both the clinical judgment and ability to make such a determination on causation. Akoda Questionnaire 6t; Dr. McDonald Rep. 17.

The unclear, ambiguous, and leading nature of Dr. Steinberg's questions were exacerbated by the proposed answers. One example of problematic answer sets involved yes/no questions where the respondent was given three different variations on "yes," with different qualifications, and one variation of no. *See* Akoda Questionnaire 6e, 6g, 6i–6s ("Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? Yes, before I learned of the charges against him.; Yes, only after I learned of the charges against him; Yes, both before and after I learned of the charges against him.; No"). Such stacked yes answers bias the respondent and prompt an expected answer. McDonald Rep. at 11.

Dr. Steinberg also failed to provide "don't know" or "can't recall" options for many questions where a questionnaire respondent may be on the fence or that would have required a

JA2356

respondent to recall events and emotions that happened years ago. The absence of these options sends a signal to the respondent that uncertainty or hesitation is illegitimate, and they are more likely to choose a response that they believe is socially acceptable or likely to please an interviewer, making the data gleaned from the questionnaire questionable. McDonald Rep. at 12–13.

Dr. Steinberg further biased the questionnaire respondents by using loaded language in the proposed answers. For example, questions better-suited for open-ended responses—such as respondents' emotions when they heard about the charges against Dr. Akoda—instead had supplied answers overwhelmingly capturing negative emotions (shocked, angry, betrayed, sad). Akoda Questionnaire 5b. Thus, a woman "who was mildly disconcerted or incredulous or had some other reaction not captured by Dr. Steinberg's options had to work harder than others to express her point of view." McDonald Rep. 13. Any conclusions that Dr. Steinberg draws from these questions and supplied answers are flawed given their leading nature.

### 3. Lack of Skip Patterns

Dr. Steinberg's failure to use skip patterns on the questionnaire also calls into question the questionnaire's validity. As a result, many respondents answered questions that they were ineligible to answer based on their prior answers, potentially prompting them to change their answers.

By way of illustration, respondents were asked whether they trusted Dr. Akoda. Akoda Questionnaire 2a. Even though 79% responded yes, they did trust Dr. Akoda, Dr. Steinberg's questionnaire then gave respondents an opportunity to change their mind in 2b, in a highly suggestive manner: "If you answered yes to question 2a but at some point began not to trust him, what happened that changed?" Akoda Questionnaire 2b; McDonald Rep. 14-15 ("Thanks to that second bite, almost no one could get through this series without ultimately affirming lack of trust

18

in Dr. Akoda . . . By the time respondents reached Q. 2 (ever feel scared or threatened during care, yes/no), they were primed to respond in hyperbolic ways about Dr. Akoda."). The lack of skip patterns continued in Question 5, where all respondents were required to answer 5c ("If you are upset about what Dr. Akoda did, why"), even if their answer to preceding questions indicated that they were not upset.

Courts in this Circuit have noted the importance of using filter mechanisms (such as skip patterns) to screen out survey participants whose answers are not relevant to the inquiry. *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 908 (D.N.J. 1994) (citing proposition that "[a] survey should be properly 'filtered' to screen out those" whose responses would be irrelevant, and acknowledging that skipped questions in reaction to the response of a prior question is one such filtering mechanism) (citation omitted). Dr. Steinberg's failure to use such a mechanism made the follow-up questions leading and put ideas in the head of questionnaire participants who were ineligible to respond to those follow-up questions based on their initial responses.

Dr. Steinberg's explanation and defense of the lack of skip patterns demonstrates how weak her questionnaire design is. When asked about Question 6 (respondent's emotional distress) and a particular respondent's contradictory responses in 6a and 6b, Dr. Steinberg explained: "[M]y thought is, and as I'm looking at this right now, is that this exemplifies the complex nature of emotions and how a person can have multiple and contradictory experiences of the same thing. . . . So in two questions, one right next to the other, you see the contradictory nature of her emotions about this." Steinberg Tr. 233:3–236:5. Dr. Steinberg's attempt to side-step this error and to explain away the impact of missing skip patterns demonstrates her flawed approach: her questionnaire was rife with bias designed to prompt specific answers on how a patient should react

19

to Dr. Akoda's conduct, consistent with Dr. Steinberg's predetermined view. *See* McDonald Rep. 8 ("A good survey researcher, no matter how deeply committed to her viewpoints and hypotheses, must do everything possible to guard against response bias in designing her instrument, lest research become an instrument of prophecy fulfillment, not scientific inquiry. Dr. Steinberg's avowed commitment to proving preconceptions, combined with her evident lack of expertise in survey methodology, produced a study afflicted with nearly as many problems as there were survey questions."). Courts have criticized such outcome-determinative studies and surveys, where the design encourages biases. *See, e.g.*, *Goodman v. Burlington Coat Factory*, No. 11-4395 (JHR), 2019 WL 4567366, *9 (D.N.J. Sept. 20, 2019) (finding that an observational survey's design improperly "pigeon-holed" survey administrators into recording a particular result and, as a result, the expert's "ultimate conclusions [were] predicated upon impermissible speculation and assumption in part.").

*        *        *

The flaws in Dr. Steinberg's questionnaire—lack of pre-testing, flaws in biased questions and available answers, and lack of skip patterns—show that the questionnaire's design does not "meet the standards of objective surveying and statistical techniques" as required in this Circuit to make the questionnaire reliable. *Pittsburgh Press Club*, 579 F.2d at 758.

### iii.    Dr. Steinberg's Interpretation of the Questionnaire Results Is Flawed.

Dr. Steinberg's attempt to extrapolate broader conclusions from the responses is also flawed. Dr. Steinberg provided only "a superficial analysis" of the questionnaire responses, failing to analyze diverse responses or to meaningfully engage with open-ended responses. McDonald Rep. 18 – 19. In such instances where an expert's opinions are "devoid of critical interaction" with those being observed or interviewed, any conclusions stemming from the opinions lack sufficient foundational evidence and information to support findings. *Goodman*, 2019 WL 4567366 at *9.

JA2359

For example, Dr. Steinberg did not analyze or dig deeper into questions where a substantial portion of the questionnaire respondents responded "other." *See* Akoda Questionnaire 2b; Steinberg Report 6 (127 out of 383 respondents chose "other" as the reason why at some point they began to not trust Dr. Akoda); *see also* Akoda Questionnaire 4f; Steinberg Report 7 (62 out of 291 respondents chose "other" as the reason for not telling anyone about Dr. Akoda's inappropriate behavior). Despite these instances where the "other" responses dominate over the answers Dr. Steinberg chose to suggest, she did not attempt to code or tabulate the "other" responses at all, even though "[a]s a general rule, the appearance of large numbers of 'other' responses is a signal that the pre-specified response categories have not been adequate to the job." McDonald Report 16.

As a result, Dr. Steinberg's conclusions, including that the majority of respondents experience "varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions" as a result of Dr. Akoda's conduct, must be rejected. Steinberg Rep. 21. Her superficial and limited analysis of the questionnaire responses, and failure to address "other" responses, cannot support her opinions.

As detailed above, her methodology ignores generally accepted principles of survey design, and she fails many of the *Daubert* reliability factors. As a result, Dr. Steinberg's questionnaire, her responses, and opinions should be excluded.

**C.**     **The Questionnaire Responses and Dr. Steinberg's Conclusions Are Unhelpful to the Factfinder and Lack Sufficient Connection or Fit to Issues in This Case.**

Due to Dr. Steinberg's lack of qualifications and flawed questionnaire methodology, any opinions or conclusions she derives from the questionnaire are inherently unreliable and should be excluded. When a survey is inadmissible, evidence based on the survey should be excluded as

21

well, as it is not helpful to the factfinder. *Pittsburgh Press Club*, 579 F.2d at 760; *see also Hurt*, 2015 WL 410703, at *7 (excluding expert report when survey was unreliable).

Even if Dr. Steinberg's questionnaire was reliable and otherwise admissible—which it is not—both the questionnaire responses and her conclusions stemming from the questionnaire lack sufficient connection or fit to the issues in the case. "Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury." *J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 (D.N.J. 2002). Plaintiffs have not articulated how Dr. Steinberg's conclusions would help the factfinder at either an issue class trial or individual trial.

The proposed issue class trial would only concern the duty and breach elements of Plaintiffs' claim. ECF 32-1 at 11; ECF 58 at 2. Dr. Steinberg solely gathered information about the respondent's demographics, their interaction with Dr. Akoda, and their perceptions of emotional distress and physical symptoms they have faced as a result of Dr. Akoda's conduct. *See* Akoda Questionnaire; Steinberg Rep. Such information would not inform what an issue class jury would determine: whether ECFMG owed a duty to members of the class that it breached. With the exception of Dr. Steinberg's background section in her report, which she admitted was based largely on Plaintiffs counsel's letter reciting the alleged facts of the case and the Complaint, Steinberg Tr. 80:24-81:9, Dr. Steinberg does not mention or opine on ECFMG in her report at all. *See* Section IV. D. Because she does not opine on issues even arguably suited for class treatment, her testimony would be irrelevant at an issue class trial and serve no valid purpose.

Dr. Steinberg's opinions and conclusions also would have no valid purpose at individualized class members proceedings on causation and damages. Evaluating causation would

22

JA2361

still require the individual trial jury to reflect on any alleged wrongdoing by ECFMG, (see Supplemental Brief in Opposition to Class Certification at Argument §I.A), on which, as covered above, Dr. Steinberg does not gather material or reach conclusions. She, likewise, does not gather information on the multiple actors in the causal chain, whose actions a jury would need to assess in determining but-for causation. *See* Motion for Summary Judgment at Argument § V. Regarding damages, while her questionnaire is adapted from a prior engagement where she was asked to assist with a mediation and the apportionment of damages, (Steinberg Tr. 29:15–30:5; 52:23–53:7; October 11, 2019 Email from B. Ceryes to E. McEnroe), the damages inquiry here at an individualized level would be significantly different. Dr. Steinberg's conclusions are not psychiatric diagnoses that can help a jury identify injury, (see Section IV.A), and her report does not even bother to identify and opine on individual plaintiffs (such as the named Plaintiffs, whose claims ECFMG is simultaneously moving for summary disposition). Her cherry-picked statistics and response verbatims would be of no use to juries assessing an individual's injury and extent of damages.

Thus, the questionnaire responses and conclusions do not directly implicate the issues at hand in any potential issue class trial or individualized proceeding and will not assist the factfinder with any of the disputed issues. Excluding her conclusions, report, and testimony is proper to avoid "confounding rather than assisting the jury." *J&J Snack Foods Corp.,* 220 F. Supp. 2d at 370.

### D.     Rule 403 Also Supports Excluding Dr. Steinberg's Opinions.

Given how unreliable Dr. Steinberg's questionnaire results are, and her use of inadmissible hearsay without using a methodology to actually make a psychiatry diagnosis (see Section IV.A), Federal Rule of Evidence 403 also counsels excluding her expert opinion. *J&J Snack Foods Corp.*, 220 F. Supp. 2d at 369 ("Significant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice, waste of time, and

JA2362

confusion that it would cause at trial.") (citing Fed. R. Evid. 403). Rule 403 is especially applicable

here, where there is a concern that "if an expert, a person with special knowledge and expertise,

testifies as to the skewed [questionnaire] results, a jury is likely to give special weight to the

skewed conclusion." *Citizens Fin. Grp., Inc.*, 383 F.3d 110 at 120.

Given Dr. Steinberg's admission that she did not independently investigate and assess

ECFMG's actions, see Section II.B, it is important for the Court to block Plaintiffs' counsel's

efforts here to use Dr. Steinberg's report as a mechanism to promote their litigation theory. *Sterling*

*v. Redevelopment Auth. of City of Phila.*, 836 F. Supp. 2d 251, 272 (E.D. Pa. 2011) (excluding

expert opinion that relied solely on plaintiffs' assumptions and that was not buttressed by expert's

own independent investigation). Federal Rule of Evidence 703 may not be used to avoid the

admissibility rules by creating improper expert opinions solely as a vehicle for getting in client

statements normally blocked by the rules of hearsay. "One of the worst abuses in civil litigation is

the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert

who then 'relies' on the information to express an opinion." *Therasense, Inc. v Becton Dickinson*

*& Co.*, No. C 04-02123 WHA, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008) (excluding an

expert opinion under both Rules 403 and 703). Rule 403 provides an additional basis for excluding

this expert report and testimony and correcting this abuse.

## V.    CONCLUSION

Because Dr. Steinberg's report and anticipated testimony does not meet the requirements

of expert testimony—qualification, reliability, and fit—ECFMG respectfully requests that this

Court exclude Dr. Steinberg's report, questionnaire responses, and anticipated testimony from this

case. Plaintiffs cannot meet the burden of establishing that Dr. Steinberg's methodology meets the

requirements of Rule 703, and admission of the report, questionnaire responses, and anticipated

testimony would prejudice ECFMG under Rule 403, substantially outweighing the probative value of her report and expert opinion (if any).

Dated: December 10, 2021

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA2364

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.


DATED:  December 10, 2021                    _/s/ Brian W. Shaffer_
                                             Brian W. Shaffer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2022, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Motion to Exclude the Opinion and Anticipated Testimony of Plaintiffs' Expert Dr. Annie Steinberg and any response thereto, **IT IS HEREBY ORDERED** that ECFMG's Motion to Exclude the Opinion and Anticipated Testimony of Plaintiffs' Expert Dr. Annie Steinberg is **GRANTED**. The opinion and anticipated testimony of Plaintiffs' expert Dr. Annie Steinberg are **EXCLUDED**.

BY THE COURT:

_____
Wolson, J.

JA2366

# Exhibit 1

Annie Steinberg, M.D.
The Bridge
31 N. Narberth Avenue
Narberth, PA 19072

September 23, 2019.

Brent Ceryes, Esq.
Jonathan Schochor, Esq.
Schochor, Federico & Staton, P.A.
1211 Saint Paul Street
Baltimore, Maryland  21202

Re: 'Akoda' Matter

Dear Mr. Ceryes, Mr. Schochor and colleagues:

Pursuant to your request, I have reviewed the information provided and gathered additional information from the claimants involved in this matter.  In this correspondence, I offer my synthesis of the findings in this matter to date.  My findings will include the process by which this matter was assessed (in the aggregate) with respect to the individual plaintiffs and will outline the degree to which women treated by "Dr. Akoda" report have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery.  I will also opine on current psychological issues that relate to the subject incidents and their consequences.

While the contents of this correspondence are subject to amendment or supplementation with the availability of new or additional information, this report incorporates information from the individual responses to a self-administered questionnaire completed by over 300 women who have come forth as former patients of "Dr. Akoda", now plaintiffs in this matter, and will also address issues from the larger collective or summative perspective.  Individual narratives will be included in this report without grammatical correction and precisely as written by the class member.

1. **Background**

Oluwafemi Charles Igberase practiced medicine in Maryland as an obstetrician and gynecologist between 2008 and 2016, treating more than 1,000 patients after fraudulently obtaining a medical license under the name John Charles Akoda.

Igberase had immigrated to the United States from Nigeria in 1991.  Little is known about his life, medical education, and training in Nigeria.  Between 1991 and 1999, Igberase applied for and obtained at least three different Social Security numbers using different names and birth dates. Between 1992 and 1997, he also applied for and received three separate certifications from the Educational Commission for Foreign Medical Graduates (ECFMG), again using different names, birthdates, Social Security numbers, and falsified passports.  His first certification was

JA2368

subsequently revoked and the second certification invalidated based on ECFMG's conclusion that he had provided false information.   In 1997, using the name John Charles Akoda, Igberase applied for and received a third certification.

'Akoda' a/k/a "Oluwafemi Igeberase," has since admitted to using various fictious identities, including the 'Akoda' identity, as well as a variety of fake identification documents, including a fake passport, a fraudulent social security number, fraudulent or altered medical transcripts, fraudulent or altered diplomas, and fraudulent letters of recommendation, in order to obtain ECFMG certification, obtain admission to residency programs and ultimately act as an obstetrician/gynecologist, performing medical and surgical procedures and gynecologic examinations on patients.  Through his conduct, he circumvented the lawful process designed to ensure the competency and character of foreign medical graduates, placing patients at risk.

A lawsuit has been filed against the Educational Commission for Foreign Medical Graduates, which was made aware in 2000 that 'Akoda' had used a fraudulent social security number in documentation submitted to ECFMG and the Jersey Shore residency program.  ECFMG was also made aware at that time that 'Akoda' had admitted to previously using other aliases, including the "Igberase" identity.  ECFMG had previously revoked the ECFMG certification of "Igberase" as a result of false statements he made on ECFMG applications.

It has been alleged that ECFMG was negligent in failing to investigate and take appropriate action to revoke the ECFMG certification issued to 'Akoda' after having been made aware of these and other concerns, and that as a result of this negligence, the women who encountered him as patients seeking obstetrical and gynecologic care have suffered significant emotional distress, including the distress they experienced upon learning that the individual they trusted to render medical care was not a lawfully-licensed physician, and had engaged in substantial fraud in order to become their obstetrician/gynecologist.   Additionally, clients have identified concerns regarding potential inappropriate behavior and conduct.

ECFMG was established to ensure that international medical graduates have the education, credentials, and knowledge necessary to enter medical residency and fellowship programs in the United States.  To receive certification, applicants are required to pass examinations administered by USMLE as well as an English examination, and to submit their medical diplomas for review.  'Akoda' has claimed that he attended medical school in Nigeria, although STAT news was unable to verify this claim.

With his ECFMG certification in hand, in 1998, Igbarase (using the name Akoda) applied for and was accepted into a residency program at Jersey Shore Medical Center (JSMC) but was dismissed in 2000.  He then used a different Social Security number to apply for a residency at Howard University in 2006.  He was admitted to this program and completed the residency in 2011.  Later that year, using the name Charles John Nosa Akoda, a falsified Social Security number, a fake permanent residence card, and a fake Nigerian passport, he applied for and received a Maryland medical license.

Using these same fake documents as well as a fake Maryland driver's license and fake letters of recommendation, he obtained privileges and became a member of the medical staff at Prince

2

George's Hospital Center (PGHC). Between February and June of 2012, he was also employed by Dimensions Healthcare Associates, Inc.

In 2016, law enforcement searched the residence, medical office, and vehicle of the man posing as "Dr. Akoda," where they found fraudulent documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates. Igberase signed a plea agreement admitting to the misuse of a Social Security number. Igberase's 'Akoda' ECFMG certification was then revoked, and he was sentenced to 6 months incarceration, 3 years of supervised release, home detention for 6 months, and a file of $100. In 2017, Prince George's Hospital Center terminated his medical privileges and the Maryland Board of Physicians revoked his medical license on the basis of fraud and a felony conviction.

As a result of Igbarase's ability to fraudulently gain admission to residency programs and become employed as a physician, he was able to practice obstetrics and gynecology between 2008 and 2016, delivering care to approximately 1000 women at Howard University, Prince George's Hospital Center, and the practices of A. G. Chaudry, M.D. and Javaka Moore, M.D.

Legal action was filed on December 10, 2018 in the Court of Common Pleas of Philadelphia County and thereafter removed to Federal District Court for the Eastern District of Pennsylvania, claiming that ECFMG's negligent certification of the man known as Dr. Akoda enabled him to violate the boundaries of trust with his patients, causing physical pain, emotional anguish, fear, anxiety, humiiation, embarrassment, and other physical and emotional injuries; and that these damages have resulted in both economic and non-economic damages.


## 2. Description of Evaluation Process

Forensic psychiatric consultation was requested to assess the potential damages, if any, that class members may have experienced concerning the actions of "Dr. Akoda." A 60-item survey questionnaire was designed by this psychiatrist/writer which you distributed securely to your clients (with names removed and an identification number provided). The results of this survey questionnaire and a provisional analysis of the results are offered in this correspondence.

"Dr. Akoda" had at least 1000 patients between 2008 and 2016. Approximately 575 patients who were treated by the man they knew as Dr. Akoda had come forward for legal representation by your firm and other law firms working cooperatively, and these 575 individuals had been vetted and identified as class members. In an effort to evaluate the presence and severity of injuries sustained by the Plaintiffs' class, this psychiatrist developed a 60 item standardized questionnaire suitable for on-line administration to gather consistent and reliable data across class members.

Following the digitization of the electronic questionnaire, link and report portal setup, the secure hosting of the form and form data, the 60 item questionnaire was sent electronically to identified class members. Collected demographic information included age, partner status, primary language, ethnicity, and type of health insurance; as well as information about patients' experiences with the person they knew as Dr. Akoda. Questions were written in plain language

JA2370

to ensure clarity and understanding among all claimants regardless of their educational background.

Sections of the questionnaire addressed demographic information and 8 topical domains:
  1) Meeting "Dr. Akoda" and the experience of being his patient
  2) Trust in "Dr. Akoda"
  3) Experiences of "Dr. Akoda" during his gynecological exam and related care
  4) Unusual behaviors by "Dr. Akoda"
  5) Learning about the charges against "Dr. Akoda"
  6) Impact of experience with "Dr. Akoda" on respondents' mental and physical health
  7) Impact of experience with "Dr. Akoda" on other aspects of respondents' lives
  8) Other factors that may have influenced the degree of harm, such as previous experience with abuse.

Respondents were provided with checkboxes to ensure that the questionnaire could be completed in approximately 15 minutes. Multiple choice responses were utilized throughout the questionnaire so as to facilitate quantitative analysis. Text boxes were also available for many questions to enable respondents to provide additional details, and respondents were offered the option of including a statement. A secure custom application had been developed to capture electronically the answers to the questionnaire and could be viewed real time to facilitate accurate data collection, documentation, and quantitative analysis, as well as to collate the summary statements for a more qualitative examination.

Confirmed patients/class members were contacted by e-mail and given instructions for logging on and completing the questionnaire. A total of 575 presumed patients were sent the email and 306 returned the questionnaire, with 292 completed fully; 14 of the questionnaires were missing one or more responses. This synthesis analyzed the data when 305 questionnaires were returned. Summary statements were offered by 131 women. In order to assess the aggregate severity and distribution of potential damages among the entire Plaintiffs' class, the response rate and sample size would be more than adequate to provide reasonable confidence intervals for the percentages of Plaintiffs in each of several categories of damage severity but this exceeded the scope of this report. Statistically reliable information was also gathered in a mode that ensured an equal opportunity for each class member to communicate her experience related to "Dr. Akoda."

This analysis incorporates only some of the data collected, represented here with both numerical/ quantitative information as well as qualitative data in the form of narrative or selected quotes. Some topical sections have a sample of quotes by individual women; the quotes are presented in large quantities so as to demonstrate the consistency of experiences among the Plaintiffs.

## 3. Results

> *"I really don't Trust no male doctors he mess up that I trusted him with my body and he wasn't even who say he was…"*

JA2371

This section summarizes statistically the results of the questionnaire. Although 306 class members started the questionnaire, some did not answer every question; thus, the percentages calculated reflect responses only from those who answered a particular question. For questions where multiple answers were allowed, the percentages are calculated based on the total number of results rather than the total number of responses.

### a. Patient demographics

The women seen by "Dr. Akoda" vary in age from 22 to 59, with a median age of 35. The vast majority of patients (89%) identified themselves as African American and used English as their primary language (96%). An additional 10 patients were mixed or biracial, six were Hispanic, two were Caucasian, and one was Asian. Most patients (57%) were single; 43% were married or in a long-term relationship. During the time in when they were treated by "Dr. Akoda", 73% were on Medicaid, 21% had private insurance, and 5% had no insurance.

### b. Patients' experiences with Akoda

Respondents were asked how they became a patient of "Dr. Akoda." Most (55%) said they had gone to see another doctor but were re-assigned to see "Dr. Akoda" instead. About 6% were referred by another doctor, and another 6% found his name on a list of doctors; 5% walked into the clinic; and 4% were referred by a family member. The remaining 24% became his patient through other means.

More than half (59%) of claimants reported that they saw "Dr. Akoda" at the medical practice of Dr. A.G. Chaudry, 31% reported that they encountered him at PGHC, and 11% reported that they saw him somewhere else, although none reported seeing him at JSMC, Howard University Hospital, or the medical practice of Dr. Moore.

A few respondents saw "Dr. Akoda" before 2012, but most saw him between 2012 and 2016. Forty-three percent (43%) saw him more than 5 times, and another 37% saw him between two and five times. About 20% saw him only one time. Approximately half (50%) of these appointments were for prenatal, delivery, and postnatal obstetric visits. Other reasons for seeing "Dr. Akoda" included routine annual gynecological care (26%), surgery (13%), and other medical care (11%).

### c. Perceived trustworthiness

Initially, patients expressed a high level of trust in "Dr. Akoda," with 79% saying they initially trusted him. However, about 75% of those who indicated initial trust in him reported that their trust changed at some point, very often for a change in his demeanor that left them uncomfortable, a rude or sexualized comment that they did not fully understand but was out of the range of what they had previously experienced. Reasons given for this loss of trust are illustrated in Figure 1. About 29% of patients indicated they felt scared or threatened by "Dr. Akoda" during their time in his care. Vignettes offered later in this report elaborate on the prevalence of "Dr. Akoda's" disrespectful posture with his patients during routine health care maintenance as well as during tumultuous deliveries.

5

JA2372

**Figure 1. Changes in perceived trustworthiness of "Dr. Akoda"**



383 responses in 291 results

### d. Pelvic and breast exams

Class members were asked how "Dr. Akoda's" pelvic and breast exams compared with other doctors' exams before or since they saw him. For pelvic exams, responses were evenly split between those who responded that there was no difference in the exams and the exams being perceived as worse than other doctors. About 2% said they liked "Dr. Akoda's" pelvic exams better than previous pelvic exams they had experienced. 43% of women said "Dr. Akoda's" pelvic exams were more painful, while 10% said they were less painful. Most (74%) patients reported that Akoda's breast exams were similar to those of other doctors, but 23% indicated that they were worse, e.g., rougher, longer, or sexualized).

Also explored is whether or not a nurse or chaperone was present during pelvic exams and whether "Dr. Akoda" always wore gloves, since both are considered standard practice. Many patients (58%) said there was always or sometimes a nurse or chaperone in the room during pelvic examinations, although about 23% reported that a nurse or chaperone was never present and about 19% of the respondents did not remember. About 25% said the nurse or chaperone never stayed throughout the examination and about 30% said she never stood in a place where she could see the examination. 10% of patients said he sometimes or always performed a pelvic exam without using gloves.

### e. "Dr. Akoda's" inappropriate behavior

Nearly half (46%) of patients said they were uncomfortable during or after the exam and about 62% said they considered changing doctors. About 30% said "Dr. Akoda" touched them in a way that felt uncomfortable or wrong and 24% said he "talked dirty" or made sexual or otherwise inappropriate comments. Eight patients said they felt sexually aroused or had an orgasmic response during the examination. Asked if patients who felt that "Dr. Akoda's" behavior had been

6

JA2373

inappropriate ever told anyone, who they told, and why they may not have told anyone.   Of the 46% of patients who said they told someone, most told a family member,

128(46%) patients said they told someone about Akoda's inappropriate comments or behavior. They most often told a family member (48%) or friend (27%). Several told a nurse or other healthcare provider (8%), another doctor (6%), an administrator (<1%), or someone else (11%). 53% of patients did not tell anyone for reasons illustrated in Figure 2.

**Figure 2.  Reasons for not telling anyone about "Dr. Akoda's" inappropriate behavior**



150 responses in 291 results

      **f.   Learning about the charges against "Dr. Akoda"**

Most patients first learned that charges had been made against Dr. Akoda through the news media, either from something viewed on the television (59%), heard on the radio (16%), or read in the newspaper (2%).  About 12% heard about it from a friend, and a few (2%) received a call from a healthcare provider. Figure 3 illustrates the feelings of patients when they heard about these charges:

**Figure 3. Patients' feelings upon learning about the charges against "Dr. Akoda"**



819 responses in 291 results

Only 8 patients said they were not upset about what they heard. The reasons other patients gave for being upset are shown in Figure 4.

JA2374

**Figure 4. Reasons patients were upset about what "Dr. Akoda" did**



5c. If you are upset about what Dr. Akoda did, why? (Check all that apply)

I feel that he betrayed my ...., 246

I am not upset about what h

I worry that he may have hu...., 9

I think he performed unnece...., 104

k he may have hurt me...., 94

**546 responses in 291 results**

### g. Emotional and physical distress experienced as a result of "Dr. Akoda's" conduct

Survey questions explored the emotional distress experienced by class members. In response to the global question of whether, when, and for how long class members experienced emotional distress as a result of Akoda's conduct or from learning that he may not have been a licensed doctor and had falsified documents to obtain certification, 89% said they did experience emotional distress. Of these, nearly half (47%) indicated that their emotional distress occurred only after learning about the charges against him. 84% of respondents indicated that they still experience emotional distress.

Emotional distress was also experienced physically by class members. 65% of respondents reported intense physical reactions such as rapid heartbeat, shortness of breath, or excessive sweating when reminded of being treated by Akoda. More than half (55%) said these physical manifestations occurred only after learning about the charges against him and 70% said they have persisted.

Most class members (79%) reported having upsetting thoughts, memories, or dreams of being treated by Akoda, with 54% indicating this only occurred after learning about the charges against him and 84% saying these upsetting thoughts still occur. 75% said they try to avoid thoughts or feelings about what happened with Akoda, and 39% said they find it hard to recall some aspects of what transpired.

Class members were asked whether and when they experienced specific signs or symptoms of post-traumatic stress. These results (rounded to the nearest percent) are presented in Table 1,

**Table 1. Signs and Symptoms of Post-traumatic Stress experienced by patients of Dr. Akoda**

| Symptom | Yes, only in the past month | Yes, only prior to the past month | Yes, both in the past month and prior | No |
|---|---|---|---|---|
| Mood changes or depression | 4% | 6% | 49% | 41% |

JA2375

| | | | | |
|---|---|---|---|---|
| Reduced interest or pleasure with important activities | 3% | 6% | 38% | 53% |
| Irritability or anger | 7% | 9% | 53% | 31% |
| Difficulty concentrating | 5% | 5% | 42% | 49% |
| Feeling jumpy, overly alert, or easily startled | 4% | 5% | 37% | 55% |
| Trouble sleeping, bad dreams, or nightmares | 4% | 8% | 42% | 46% |
| Embarrassment, shame, or humiliation | 6% | 5% | 56% | 33% |
| Trouble making decisions | 4% | 3% | 27% | 66% |
| Overuse of drugs or alcohol | <1% | 1% | 5% | 94% |
| Discomfort with body or reduced self-care | 4% | 6% | 36% | 53% |

Class members also reported a variety of physical symptoms that they attributed to Dr. Akoda's conduct. These are summarized in Figure 5. These symptoms were described as mild by 26% of respondents, moderate by 53%, and severe by 21%.

**Figure 5. Physical symptoms experienced as a result of Dr. Akoda's conduct**



Most class members (82%) have not received any psychological, psychiatric, or medical treatment for symptoms arising from their experience with Akoda. Among those who have received treatment, these treatments included non-psychiatric medication (46%), psychiatric medication

9

JA2376

(17%), and therapy or counseling (37%). Only slightly more than half of class members (158 individuals) described receiving psychiatric or medical diagnoses that they believed were related to their experience with Akoda. These included Major Depressive Disorder in 64 patients, Anxiety Disorder in 52 patients, Post-Traumatic Stress Disorder in 30 patients, and Substance Abuse in 12 patients.

### h. Loss of trust and aversion to medical care

The vast majority of class members (94%) said that their experience with Dr. Akoda affected their trust in doctors. They were also asked how this experience affected their use of medical care. More than half said it has changed how often they visit and obstetrician/gynecologist (53%) and/or has affected the medical choices or decisions they make (53%). Slightly fewer said it has changed how often they visit any doctor (45%) and/or has affected the types of specialists they see (49%). Only 8% said it has not affected their use of medical care.

### i. Effects on non-medical aspects of life

Many class members reported that their experience with Dr. Akoda affected other non-medical aspects of their lives as well. 46% said they were concerned about their daughters going to see an obstetrician/gynecologist; 27% said it has affected their relationship with a spouse or partner; and 6% said it had affected their relationship with their children. Only 23% said it had not affected non-medical aspects of their lives.

Some class members (21%) reported that their experience with Dr. Akoda had negatively affected their work lives. For example, 13% of respondents said they were not able to go to work for some period of time. Others said they missed work deadlines (6%), quit their jobs (3%), or were fired (2%).

About 32% of class members reported effects on their social life, for example, avoiding friends, neighbors, and relatives (21%); avoiding certain types of social events (24%); avoiding certain neighborhoods (10%), not reading mail or email (5%), and not retuning messages and phone calls (11%). Thirty class members (10%) said they were afraid of or avoided leaving home.

### j. Prior vulnerabilities

Since previous experiences with violence or abuse may make individuals especially vulnerable to subsequent abuse, class members were asked about prior experiences. 26% reported that they had been threatened by somebody (6% declined to answer), 19% said they had experienced or witnessed violence in their own homes (4% declined to answer), 17% said they had been forced to have sex or been threatened with violence if they didn't (9% declined to answer), and 22% said they had been sexually abused in other ways. (9% declined to answer)

### 4. Analysis of Damages

*Boundary Violations in Gynecological Care*

It is well established in the literature that sexual contact between physicians and their patients can have devastating consequences for the patients (Dehlendorf and Wolfe, 1998, Feldman-

JA2377

Summers and Jones, 1984). Patients' responses to physician sexual misconduct has been examined specifically in the context of gynecological care and sexually abusive internal examinations and found to impact on patients in specific ways (Burgess, A.W.,1981). Sexual exploitation, defined as situations in which a person is used primarily for another person's gratification, profit or selfish purpose, was explored with interviews of women who had been exploited with intentional genital manipulation during internal gynecological examinations over an eight year span of time.

In this matter, 'Dr. Akoda' was perceived to have lengthy exams by some, with misuse of his hands, and occasional absence of a nurse during the examination. The claimants consistently describe physical discomfort, feeling disrespected, a sense of powerlessness, annoyance, anger, and shame. Some women described a feeling of being degraded and exploited, and felt that their credibility was at risk, emphasizing the unequal power status.

In this matter, women reported negative experiences during their time in care with 'Dr. Akoda, including physical and emotional discomfort with the genital examination (prolonged duration, painful exam, absence of gloves, the departure of the chaperone, sexualized touching of the vagina and clitoris, rude, inappropriate, and crude sexual comments, and overly personal interactions:

*"I just wanna say that this whole situation has changed my life. It puts me in a place to where I'm uncomfortable about going to the doctors. Only because Dr. Akoda did what he did to me. This man did exams on me he barely used gloves I feel so violated. I only remember him using gloves 4 times out of my whole pregnancy that was only in the beginning. But when I started getting into my second trimester and at the end of it he didn't use gloves and in my 3rd trimester he never used them."*

*"I went to his office when i was over 1 5weeks pregnant after the pap smear the female lady stepped out and i was putting on my clothes and he slapped my ass telling me i have big buttocks. I felt so sad and i cried on leaving which was my second visit to him."*

*"My doctor (s) were not available to come to the hospital and so he was the doctor they told me would delivery my daughter. After delivering my daughter, my husband kept talking about how uncomfortable he was with him as the doctor. He felt that he was touching my inappropriately and not doing some things correctly. After a while, we forgot all about it and moved on thinking that maybe that was what was suppose to happen. Like a year later, we received word about a fake doctor at PG Hospital and when the person showed us that picture, my husband immediately knew that was the doctor that deliver my daughter. Once getting the paperwork from the hospital, it was confirmed!"*

*"I'd also like to elaborate on #6t. After my pelvic exam in which he smelled his fingers. I grew very self conscience of my body and vaginal health. I couldn't understand why he would do that and never explained why. I was too ashamed to ask but I noticed that major decrease in my libido after that experience."*

*"I am small breasted and during the breast exam he stated that they were so small I shouldn't have a problem finding anything! I was very embarrassed and couldn't wait to leave. I didn't get another yearly exam for two years."*

11

JA2378

*"During my appointment with Akoda, my fiancé was in the room with us, once he saw that Akoda had no gloves on during my removal of the Mirana and breast exam, he asked him "aren't you suppose to have gloves on?" and Akoda stated no, My fiancé got uncomfortable and frustrated and left the room. After the door closed Akoda stated "he is a very jealous man". I will never forget how he look, and how his hands were extremely ashy."*

*"Then one day I went for office visit and he told me to stop having more babies that I could kill myself if I keep having more babies. Then I was really upset and reported the case to Dr. Chaudry and when I got home I also reported to my husband who accompanied me to the clinic on my next visit. Dr. Chaudry asked him to apologized to me which he did that very day in the presence of my husband."*

*"My oldest daughter would accompany me to my appointments and would always tell me there was something about him that didn't sit well with her. He made a comment about the size of my vagina and uterus that made me feel disgusting and dirty. The day he scheduled my induction he also told me he had 11 other inducements that day and that he would be leaving for Africa the next day which according to him was his birthday. He rushed me and even suggested I have a C-Section, I told him he was going to be patient and wait for my child and I would not allow him to cut me. My daughter is now a thriving 7 year old second grader, but as a parent I always fear what her future holds as a result of him having ever touched her with his sick, in-educated, moral less hands."*

*"He is a demon doctor he let me go in shock while on the eximanation table while i went unconcious he had his han in me and then went up on me lying still unconcious he ripped the point of my cloterist wide open saying how that you have three children and still so neat. I told him that l was seperated from my husband for seveteen years and hoping for him to come back. He dr okada is a real Deamon."*

Sexual contact between physicians and patients violates the fiduciary nature of the relationship that requires physicians to act in the best interest of their patients; fiduciary actually being a legal term that is applied to a professional in whom the patient places her trust. Most physicians adhere to one or more sets of ethics codes, depending on the professional organizations to which they belong. An example of such a code would be the American Medical Association's "Principles of Medical Ethics," which notes, "The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obligations to other groups, and to advocate for their patients' welfare." It is not clear if Igberase received the necessary training and supervision in medical school to be knowledgeable about the physician's Code of Ethics.

The AMA Code specifically addresses sexual misconduct in the practice of medicine and states that, "sexual contact that occurs concurrent with the physician-patient relationship constitutes sexual misconduct. Sexual interactions between physician and patients detract from the goals of the physician/patient relationship and may exploit the vulnerability of the patient, may obscure the physician's objective judgement concerning the patient's health care and ultimately, may be detrimental to the patient's well being."

12

The Code of Professional Ethics of the American College of Obstetrics and Gynecology is another example of the provision of rules for ethical conduct to the members of a professional organization. The code of this organization, one to which 'Dr. Akoda' may or may not have belonged, also addresses the fiduciary nature of the relationship, and states clearly that, "sexual misconduct on the part of the obstetrician–gynecologist is an abuse of professional power and a violation of patient trust.'"Akoda's' reported irregular pelvic examinations, protracted and painful examinations (some without gloves), inappropriate comments, and intentional vaginal, clitoral, and breast stimulation together suggest the abuse of power with a vulnerable population.

### Disrespect and Adverse Clinical Outcomes

The power imbalance and vulnerability of his patients did not yield a confrontation by his work colleagues of the very significant misconduct and abuse of power; many of the vignettes offered by claimants suggest blatant disrespect for and neglect of claimants so great that it was described as a factor adversely affecting the clinical outcome:

*"I was scheduled to have an induction from Dr. Javaka Moore's office and Dr Akoda was the delivering doctor at that time. He was very rude and pushy. He kept telling me to shut up and hurry up and push the baby out because he had somewhere to be and didn't have time for me all night. He kept saying if I didn't hurry up he was going to perform a C Section . He just kept saying that over and over. So halfway during my delivery the baby was coming out and he just left me there for a few with the baby half way in and half way out and i was telling him that that was so painful and he told me to shut up and stop crying like a baby."*

*"My overall experience with Dr. Akoda was completely terrifying! I feared for my child's life and safety as he failed to perform the necessary c-section procedure after he discovered that my child was in complete distress during my labor in March of 2016. Dr. Akoda did not show any concern. As a result of Dr. Akodas negligence, my child was born with his umbilical cord wrapped around his neck, strangling him and blocking his airways preventing him from breathing. I thought my child was DEAD! He was completely blue in the face! He had swallowed his own urine and feces!"*

*"Akoda was the doctor that delivered my son 2015. He took over because my actual doctor was out of town...I believe. He left me (in active labor) went home and returned late evening the next day to attend to me (so uncalled for). I almost lost my son and my life during the process. I felt sick and was admitted at PG hospital after emergency C-section was done of me for about 5 days with tons of blood transfusion."*

*"Dr. Akoda made decisions in the delivery room that affected both me and my son. He tried to break my water after it already broke. I felt a sharp paid and started to bleed profusely. He then attempted to deliver my son without any antibiotic even though my chart stated I was gbs positive. My son suffered an infection and had to be hospitalized at 2 weeks old due to this."*

*"My delivery process was rushed I was not giving the time to go through the different phases of labor as I have intended. Instead Dr Akoda, came into my room and brook my water after one hour of being admitted and he stated, "I want to help you speed up this process." After breaking*

JA2380

*my water, Dr. Akoda told me not to tell the nurse. the nurse came into my room and asked me what he just did and I told her that he broke my water. The nurse stated "why would he do that." My trust for Dr. Akoda was broken after he rushed my delivery because he wanted to live [leave] and did not want another doctor to take over. I was hurt and broken but I was thankful that I came out of the delivery room alive after everything I went through while laying in that delivery table. First my epidural was no longer effective at the time of the surgery and I could feel Dr. Akoda cutting my stomach. I screamed in pain and he said that I should not be feeling anything but pressure. Second I was finally put to sleep with general anesthesia because I was in so much pain. The day after my surgery, Dr. Akoda, came to my room and stated "You are lucky to be alive" "I have been a medical doctor for many years and I have never had a difficult surgery as yours." Dr. Akoda also stated that if it was not for his years of experience he would have performed a hysterectomy on me and advised that I should plan on not having kids again in the future. This statement has tormented my husband and I for the past three years. My experience at Prince George's Hospital and with Dr. Akoda was rough and I was afraid to ever become pregnant and to have to ever go through the same thing I went through during delivery."*

*"Dr Akota told me I was pregnant in my tubes and performed surgery on me and couldn't find the baby and I was drugged up and put to sleep and I don't know what happens after that I woke up in my room in a lot of pain then hours or next day dr akota came into my room and gave me a shot in my arm and said he couldn't find the baby so I started going off on him saying he cut me open for nothing then dr akota gave me a shot in my arm saying that shot is to kill the baby and so I can bleed it out I bleed for days weeks and in a hole lot of pain and all I can think of was what really happened to me while I was drugged up under the Anastasia and if dr akota didn't know what he was doing and if I was really pregnant in my tubes I think bout all this since the day it all happened."*

*"Dr. Akoda did some things to me that I know now were completely wrong. He did NOT properly medicate me because I rememner the whole C-Section. I felt the whole thing I screamed and cried through the whole thing. Also, he cut my son while he was coming out of me and he still has the scar to this day. I don't remember much from my sons first 3 month of life. And I Learned when I had my daughter, there is pain med that will make you forgot things. He scared me and I will never forgive him!"*

*"As I'm typing this I'm experiencing so many emotions at this time.It's so hard and very painful just thinking about Akoda I'm feeling sick. He was rude and unprofessional,I was told that I should have my tubes tied because I have a Nigerian husband with to many kids.He said if I don't tie my tubes I would be pregnant again because Nigerians love making babies, that was on my first visit in 2013.I pray this comes to a end soon because just thinking about him makes me angry,sad sick and betrayal."*

*"A life time mental exhaustion remains in my family due to an unwanted outcome .. My family and I have to cared for my son forever and it makes me depressed on a daily basis. And sometimes I get worried about the c-section if it was done right. I also suffered placenta previa during my pregnancy and was never diagnosed by Dr Akoda until it happened and was diagnosed at the hospital! And moreover Dr Akoda lied to me and he failed to answer my*

JA2381

*questions after the birth of my so . I am still angry and grieving about what happened to my son."*

While all misconduct is a fiduciary failure, 'Dr. Akoda' recognized the extreme power imbalance and his capacity to control his patients in their most exposed and defenseless moments. A physician associated with a powerful institution, he likely found his female patients looking up to him because of his social status; this also resulted in an imbalance of credibility; when questioning themselves about what had transpired, they would presume that they had only imagined misconduct. Furthermore, his patient population was a very vulnerable group of women; 89% African American and 73% Medicaid recipients, 19% reported having experienced domestic violence; 17% had been forced at some point to engage in sexual relations; and 22% reported having been sexually abused in other ways in the past. While it is possible (likely even) that the above percentages are not independent – women may have said yes to multiple types of abuse and may have been thinking of the same events, these figures are not surprising and do lend support to the premise that his patients were a particularly vulnerable population and that his physical and sexual misconduct and betrayal of trust would be high impact event.

*Emotional Distress Upon Learning of Fraud Allegations Against 'Akoda'*

While some wondered if his behavior (e.g. protracted pelvic examinations) were the source of some damage or the etiology of precipitated labor or miscarriage, most women experienced an array of powerful sentiments after learning that 'Dr. Akoda's name and medical credentials were falsified. The majority experienced shock, anger, sadness embarrassment and a sense of betrayal, acute emotional distress upon learning of the allegations against 'Akoda.' Only eight patients (of 306 respondents) reported not feeling upset. 65% reported intense physical reactions when reminded of being treated by 'Akoda.' 79% reported re-experiencing with upsetting thoughts, memories and dreams of being treated by 'Akoda' and 75% reported attempts to avoid thinking about what had transpired and the implications of his fraudulent credentials.

*"Every time i think or talk about this situation, i cry, i cant concentrate, i cant sleep and my body tingles and go numb. I trusted him and he betrayed my trust of care, i was comfortable thinking i can depend on my doctor, who i thought had my best interest for me and the delivery of my child. The fact that i have to live knowing his credentials and education is false and someone did not do their job thoroughly, to be one of so many women who are victimized is very stressful. to know he delivered my daughter and now i have to live with this thought and knowing he is a fake doctor with false credentials and my daughter was delivered by a fake doctor. No matter how old she gets this will taunt me and i will have this uncomfortable feeling i would get from him and the thought of it all for the rest of my life. I am crying typing this this is so upsetting, i want this to be over it seems like a bad nightmare that just will not end. when will this be over!!"*

*"He would hint and say, my private area is loose. I can do some exercises to tighten. While fully undressed, he'd take the full blue blanket off my complete body. Thought was weird, the first time, walking away thinking I was over thinking the situation. Second time, he became extra talkative and friendly, even coming to the front desk as I checked out to joke. What finally did it, when my daughter came out the examine room, to say, I think that doctor was flirting with me. After her pregnancy, we both moved to another location/doctor. Eventually after knowing Dr,*

15

JA2382

*Akoda would be doing my paps instead of the other doctor I left seeing him. He made me feel weird and even today, I hate and am right now contemplating if I can trust this male foreign doctor I have, if he is a fraud, or do I just not have pap smears done. Which I know I'm only hurting myself by not doing so. Have to make a decision soon. I'm thinking, I'd rather take the chance with a woman at least she has the same private parts as I. But I am left feeling embarrassed about my body. Wondering which of my insurance choices are truly licensed before exposing myself to them again. The nurses would leave the room when I was examined after taking my vitals. Yes, his exams were more painful than what i was used to. Before finding out who he is, I just thought maybe the pain was coming from my body changing as he said my pelvic is dropping. As well as my vagina is tilted. (TMI). I still remember him examining my breast. Just the thought. I hate to think about it. I talk with my daughter to help us get through this. The worst, he also prescribed us prescription drugs. Were they right or wrong? The thoughts are endless."*

*"The visits with Dr. Akoda were so painful it often left me sore and wondering if my baby was ok. It felt like pure hell and I dread going back to the office because of how rough the dilated checkups were. I would always cry after I left his office it was a horrible feeling. And now I feel like I have PTSD when I step inside a doctors office for a OBGYN visit because of the pain he puts me through, I'm always gripping the seat during the checkup and feels like my heart is beating a million miles a minute."*

*"My experience with Akoda has made it very difficult to trust doctors or to be examined by a medical doctor. I have avoided women's health care, such as gynecological exams, and have only gone to see a gynecologist in an emergency situation since discovering that Akoda was a fake doctor and that multiple gatekeepers accepted his fake documents and credentials. Since discovering this information, I have experienced a lot of anxiety, resulting in insomnia, lack of concentration at times, and even back pain."*

Altered mood and post-traumatic responses to learning of allegations against Akoda also included a state of arousal with nightmares, irritability, hyperalertness, to name but a few. Most (82%) have not accessed mental health services, however, more than half of the class members described receiving psychiatric or medical diagnoses that they believed to be related to their experiences with Akoda, as noted below Figure 5 earlier in this report.

*"My experience with Charles Akoda has truly been very traumatizing. It has effected the way I approach my medical care, my social life, and I've had plenty of nightmares about him. I don't know who I can trust. It has improved slightly but when I think about him I get chills down spine. How could this have happened? I look at my sons birth certificate and I see his name and it puts me in bad state of mind."*

*"Dr. Akoda took away the full enjoyments of my son birth, by his actions. The nightmares interrupted my time with my spouse and caused emotional stress on my family. How can you not lose sleep with such roaming around in her head??? When I saw his face on the news, it was something you can't prepare for... I would then go online to check hospital website for my health information to confirm, it was him. Once that confirmation was done, I started screaming and*

JA2383

*bursting into tears and when my son came in my view , it really hit me, because, his birth will forever be scarred and he will know later in life, he was a victim of fraud in his birth."*

*"I think it's a shame that he got away with this so long I haven't been able to go to a GYN doctor sense I have a therapist and a psychiatrist now and trust issues with any male doctors."*

*"He used to wear Creed cologne and another strong scent like Tom Ford. I asked him the scent and whenever i smell it on a male I instantly get a sick feeling to my stomach because i think of Dr.Akota. This scent that Would make a female attracted to a man, something i would want to buy a boyfriend, something arousing now makes me so nauseas and nervous. The smell of betrayal. He would always smell like he just put it on and would always be eating a breath mint."*

### Betrayal of Trust

Trust has been defined as "a psychological state comprising the intention to accept vulnerability based upon positive expectations of the intentions or behaviors of another" (Rousseau, Sitkin, Burt, & Camerer 1998). This definition includes three key components: a relationship of dependency, vulnerability of at least one party, and confident expectations or beliefs by at least one party that the other will behave towards him or her in a positive manner (Koehler & Gershoff, 2003). However, sometimes those whom one trusts instead actively cause the very harm they were entrusted to prevent; the response to such a betrayal varies, although fight or flight behaviors are common.

The impact of "Dr. Akoda's" betrayal of the trust his patients had placed in him was multidimensional, with profound feelings of hurt and disappointment that his name and his credentials were not real, and that he was not the doctor they thought him to be.

*"I am angry to hear that we lost this man as lied to many of us we trusted with our body's ,babies we as mother are expect to be safe when we go to the doctors to trust them feel comfort while we are going through this Journey to bring life in to the world , my self being a previous rape/molested victim it's hard for me to trust how am i suppose to be comfortable knowing that this person as completely lied."*

*"I feel lied to and i feel angry that i put my trust in a doctor who was suppose to help me but instead lied and could have killed my self and my child."*

a.    <u>Loss of Trust in medical providers, aversion to medical care, system's failure to protect</u>

The fraud perpetrated by 'Akoda' resulted in 94% of claimants affirming that their trust in physicians has been impacted, and more than half acknowledged that it had changed their use of medical care. were the obvious feelings that doctors can't be trusted, the resultant avoidance of medical care and of male providers. This negative impact directly creates a barrier to accessible medical care, of particular significance given that cancer and other diseases are already detected late and more often associated with poor outcome in this demographic.

JA2384

*"This was a horrible expereince in my life. To be diagnised and hav a doctor with his hand in my private area holding my uterus and not being certified to make any decisions or do any procedures was allows to practice medicine and be involved in such a personal aspect in a womens and babies life. The instutuions and the Mr. Akoda or whatever his name is should be held accountable fully. How we trust any physician or hospital again after the did not properly veet and investiagate the people they hire to make life-altering changes."*

*"At the moment, i still feel sad and betrayed with the medical profession board for allowing me to go through this betrayal and risk twice. I have put my life and that of my two daughters at the highest risk and perhaps the surgical procedures i went through were not in the first place necessary."*

*"Learning that he is not a real doctor has really made me scared for my children when seeing other doctors. Also i think about what if something went wrong when he was delivering my son. I feel violated that he was able to get so close to my personal area and even touch me and then to find out that he is not licensed is really scary."*

*"I saw Akoda on days that Dr. Chaudry wasn't available. I sat straight up in the bed on that morning and screamed when I saw his picture and heard his name about 5 am on FOX 5 news!!. As I think back about me allowing some man to touch me... I feel like this a case of rape! I am extremely disgusted, humiliated and disappointed amongst other things. I initially allowed my daughter, now 23, to go to this practice. I am so glad that she never experienced Akoda but even she is upset and traumatized and scared. its bad enough for me at 49! It has definitely made me rethink my position with drs. He should be in jail for life. He raped hundreds of women!"*

A common belief expressed by the claimants is that 'Dr. Akoda's' clinical practice was the cause of perinatal trauma and stress, and ultimately, problems for the newborn infant later in life.

*"...This ordeal has impacted my life greatly. After waiting hours to push, we were told that our baby was in distress with the umbilical chord wrapped around her neck. Instead of expediting the delivery, we waited all day into the evening. Finally, I was rushed in for an emergency C-section. In the process of the C-section, Dr. Akoda was arguing with the medical staff. He even dropped a tool on the floor so they had to count every tool to ensure that one wasn't left inside of me. Our daughter was silent, limp and blue when she was delivered. This was very scary because she didn't make a sound or move. She was sent to the NICU immediately, where she resided for a week. The whole enjoyable experience of her being placed in our arms, rooming and being discharged with me was stripped from us. We were looking forward to a safe delivery. Upon my initial engagement with Dr. Akoda, I felt uneasy. This was my second live birth and I knew something wasn't right with him or the experience. He was abrasive, rude and unprofessional. I experienced a miscarriage less than a year after delivering my daughter that Akoda delivered. I never had a miscarriage before this ordeal. We have been trying to conceive and haven't been able to ever since. I truly believe it has something to do with the treatment from Akoda. My lower abdomen is still numb. I should have never been under the care of Akoda. A man that practiced under false pretenses. We can't reverse time, but justice can be served for the negative impact that this ordeal has caused me and my family."*

18

*"Not once were any of those [previous] doctors rough with the way they inserted the speculums. Nor how they put their fingers in your vagina, and never has a doctor ever pressed downward in my vagina, there is nothing truly there. It was like he was scratching my insides. So I am not sure if he used a glove or not. There was no conversation, so I can't tell you what was on this mans mind. I bleed for an hour that day, and was wondering why he had to be so rough. Why he would never talk the whole time. It was like an awkward silence. Regardless, of what kind of doctor he was somewhere else, medicine is practiced differently all over the world. Everyone has to go through a process for a reason and this man thought his way was the best way and skipped the formalities of American ways. He violated and performed aggressive exams that only reminded me of times I was sexually asasulted. That's how rough and cold the exam was."*

b.    Loss of Trust in Obstetrician-Gynecologists

Obstetrics-gynecology specialists were identified as particularly untrustworthy, with a reduction in visits for care reported by 53% of respondents.  The lingering mistrust of practitioners appeared to pose a continuing barrier to appropriate health care, particularly with avoidance of gynecological care; some reported a particular concern about daughters' consultation with this subspecialist.

*"I am contemplating having another child with my husband, but my experience with Dr. Akoda has made me an emotional wreck every time I think about it. It is now affecting my marriage because my husband wants more children but I am terrified. I am terrified because I had a C-section, something that now in hindsight, I believe I did not need. Dr. Akoda talked about a c-section very early in my pregnancy without a medical need. There was no medical reason earlier on that suggested I may need it, yet he continuously talked about it and suggested it.In the end he came into the hospital the day after my induction instead of Dr. Chaudry who was scheduled to deliver my baby. He told my husband and I a story of Dr. Chaudry forcing a vaginal delivery the day before causing a birth defect and that why he was not present. He suggested we have a C-section to prevent the same because if he forces a vaginal delivery for a baby as big as ours he will bare no responsibility. In the end our daughter was delivered via c-section by him because of the fear he instilled in us regarding natural birth. He told us she was too big to be delivered vaginally and turned out to weigh 7lbs 12 ounces and not the 9lbs he mentioned. "*

*"Because of Akoda every time I go to a physician I want to know what school and see their certification for them to be doctors I don't trust any doctor anymore I never felt so violated in my life I trusted somebody they saw my intimate areas and wasn't even a doctor never been so betrayed in my life because of this doctor I don't go to OBGYN I avoid any type of check up if is not necessary because of my trust issue."*

*"I had prior shared with Dr. Akoda that my husband had a vasectomy but because of our desire of wanting more, we would begin the process of having a reversal. He at that time offed to give me some medication to help my husband's sperm count rise that would help. I then thought something was off but never 2nd guessed it. But my 2nd experience with him, he was telling me I was pregnant. As soon as I showed my excitement he stated that I was having a miscarriage. But*

JA2386

*when he walked out only to return with this lack of compassion of me taking what just happen to me just to pass me a prescription following the words of " take this to complete the flushing process". I was so offended I stormed out crying. I called my husband not knowing how to explain what just happened. Mind you, My husband thinking we can't have any kids almost had him questioning my faithfulness to our marriage. Well, I had no choice but to explain what was just told to me. I just remember crying for a while. As a mother of two already I couldn't even be a mother to them. I was not myself because I was having this fight in my mind of was I or was I not. I ended up at the hospital the next day looking crazy to the doctors and nurses. I was told there were no signs of me ever being pregnant. My whole experience has been one that I can't forget about. I still don't know if I was or not but If I was did he do something to hurt our chances?!"*

## Betrayal Trauma

*"Question I have is why??? If you can legitimately be a doctor, why you didn't do it the right way, why do it by fraudulent means??? That alone shows, he shouldn't have been able to use fraudulent documents, if the ones that license had truly vetted his credentials for something so important."*

Betrayal is the violation of implicit or explicit trust.  The closer and/ or more necessary the relationship, the greater the degree of betrayal.  Much of what is traumatic to human beings involves some degree of betrayal.  The phrase 'betrayal trauma' can be used to refer to a kind of trauma independent of the reaction to the trauma.  It occurs when the people or institutions on which a person depends for survival significantly violate that person's trust or well being.  Physical, sexual, and emotional abuse perpetrated by an individual who is in a caregiving position are examples of betrayal trauma.

Betrayal trauma theory is a theory that predicts that the degree to which a negative event represents a betrayal by a trusted and needed other will influence the way in which that event is processed (Freyd, 1996).  It posits that there is a social utility in remaining unaware of abuse when the perpetrator is a caregiver; that under certain conditions, betrayal necessitates a 'blindness' in which the person does not have a conscious awareness of the betrayal, and that the response to the trauma of the betrayal significantly influences the encoding of the experience and the accessibility of the experience to awareness, as well as the psychological response.  Some people come to allow themselves to fully realize that they have been betrayed a long time after the event, and this recovery from the betrayal only begins when the individual forms a new understanding of a remembered event.

Self-interest would seem to demand that individuals would be highly sensitive to betrayal.  As a general rule, to the extent that you are able to choose with whom to engage, you would want to avoid those who had previously betrayed you.  However, in certain kinds of abusive betrayals, removal is not perceived to be a viable option, the person doing the betraying is someone who is believed to be vital and the individual feels that he or she cannot afford *not* to trust.  The ability to detect and acknowledge betrayal may need to be stifled for the greater goal, and it is perceived that it may be more advantageous to be blind to the betrayal.

Being sensitive to betrayal brings pain, and the pain can be great. When the betrayer is someone on whom we are dependent, one either must block the awareness or experience the distress. Perpetrators can take advantage and even enhance the likelihood of the natural inclination of victims to block awareness and to forget. Forced silence, prohibition of contact and communication with others, is a common component of abusive behaviors.

The effects of betrayal are widespread and lasting, varying depending on the nature of the betrayal (Rachman, 2010). A harmful disclosure of information, for example, can cause distress, punitive thoughts, and anger. Infidelity may cause shock, loss, distress, ruminative pre-occupation, self-doubting, lowered self-esteem, and anger. A failure to provide expected assistance causes distress, disbelief, ruminations, and anger. Dishonesty causes anger, distress, and punitive thoughts. In some extreme cases, betrayal can cause PTSD-like symptoms such as emotional numbing, distress, avoidance of reminders, intrusive images, rumination, foreshortened future, a morbid pre-occupation with the breach of trust, self-doubt, and anger. Betrayal can also leave the violated person feeling polluted and can be triggered by images or memories of the violation or the violator. This feeling of contamination occurs because victims feel degraded and humiliated, and the feelings of degradation leave them feeling sullied and polluted.


**Summary of Findings and Opinion**

For all of the reasons outlined above, it is this examiner's professional opinion, within a reasonable degree of certainty, based on the aggregate data gathered with over three hundred class members, that the fraudulent behavior of Oluwafemi Charles Igberase constituted the intent to harm unknowing women who entrusted him with the most intimate parts of their body selves and the most important moments of their lives. His objectification of their bodies for his own stimulation and/or sadistic control is an additional aspect of wrongdoing that resulted in the infliction of emotional distress. The misconduct of Oluwafemi Charles Igberase (fraudulently known as Dr. Akoda) has resulted in varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions; for some, even more broadly applied.

Some of Igberase's patients were particularly vulnerable due to the prevalence of prior trauma and peri-traumatic psychological processes due to the imbalance of power and betrayal trauma. A history of childhood abuse, female gender, low socioeconomic status and social disadvantage, psychiatric history, and various types of previous adversity are all factors that may have enhanced the risk of symptoms for individual class members. Using the dataset to address these risk factors for severity of damages was beyond the scope of this endeavor,

The consistency and intensity of the narrative content across three hundred women both affirms the veracity of the histories and reported symptoms experienced as a result of learning of their doctor's fraudulent activities. The presence of a substantial percentage of neutral responses further enhances the credibility of the findings and renders less likely the prospect that the

JA2388

litigation itself has led to exaggerative patient reports. Some of the narratives suggest frank medical malpractice, though this, too, was beyond the scope of this consultation and report. At a minimum, the fraudulent misconduct and exploitation of patients committed by Igbersce has been a significant contributing factor to the well- being and current clinical status of many of the women he exploited.

I am a Pediatrician and Child and Adolescent Psychiatrist with a Clinical Professor faculty appointment in the Department of Psychiatry at The Perelman School of Medicine at the University of Pennsylvania. For 19 years, I worked at The School of Medicine and the Children's Hospital of Philadelphia (CHOP) where I served in both the Department of Child and Adolescent Psychiatry and the Division of Child Development and Rehabilitation in the Department of Pediatrics. Since September of 2006, I have been in the private practice of adult and child psychiatry and consult to community based mental health agencies.

While my curriculum vitae largely reflects my academic research pursuits, my clinical work bears relevance to this matter:
- In mass tort claims involving the transgressions of physicians, I have served as forensic psychiatry consultant and expert for the plaintiff, the defense, the claims administrator, and the judge assigned to disburse funds.
- In my clinical practice have treated hundreds of adults and children who have experienced trauma, abuse, and neglect; including sexual abuse.
- I have been granted support from the Pew Charitable Trusts in the past to conduct best interest evaluations in the City of Philadelphia, and continue to be funded by the Van Pelt Foundation to conduct trainings for family court judges, as well as child protection agencies on the issues of trauma, abuse, and neglect, and the resulting sequela and treatment of trauma.
- I have presented nationally on the complexity of these evaluations and best practices.
- I have lectured about and recently authored a chapter on abuse and neglect in a 2012 textbook of Forensic Psychiatry.
- I currently direct the Child Forensic Psychiatry track in the Forensic Psychiatry fellowship at the Perelman School of Medicine at the University of Pennsylvania.

I have completed additional training in adolescent medicine, forensic psychiatry, pediatric forensic psychiatry, and am board certified in four areas: Pediatrics, Adult Psychiatry, Child and Adolescent Psychiatry and (specialization in Forensic Psychiatry. I am a former Robert Wood Johnson Clinical Scholar and Picker/Commonwealth Scholar, having focused on issues related to vulnerability, resilience and childhood disabilities.

Consistent with Federal Rule 26, I have included a complete statement of my opinions and the basis and reasons for them; the data considered in forming them; the records reviewed that support my opinion. I have appended the questionnaire used to collect the data that informed this consultation as well as the statements over 100 class members offered when completing the questionnaires; the complete dataset is available upon request.

I have attached my curriculum vitae as well as a list of cases in which I have testified as an expert at trial or by deposition. I have billed for 27 hours as compensation for this forensic psychiatric consultation and my hourly rate is $600/hour. I was assisted in this assessment by

22

JA2389

two colleagues, Lisa Bain and Stephen Ehrlich.  Lisa Bain is a science writer and her hourly rate is $125/hour; she worked 25 hours on the development of this assessment tool and data analysis.  Stephen Ehrlich is an information technology consultant whose charge was $2300 for his role in the development and digitalization of the on-line self-administered questionnaire, link and report portal setup, secure hosting of the data management form for archiving, organizing and quantitatively analyzing the dataset, and assistance with data analysis.

The above opinions have been rendered within a reasonable degree of medical certainty, based on the review of materials provided to me.  If provided with additional information, this report would be revised to incorporate new data.

Thank you for the opportunity to review this matter and render an opinion.  Should questions arise regarding this correspondence, or if I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Annie Steinberg, M.D. (signed electronically)
_____
Annie Steinberg, M.D.
Clinical Professor, Department of Psychiatry
Perelman School of Medicine at the University of Pennsylvania

**Attachments**
Attachment 1- Questionnaire
Attachment 2- Summary Statements

JA2390

# References

American College of Obstetrics and Gynecology (2011).   Washington, D.C.

American Medical Association (2001). Council on Ethics and Judicial Affairs: Code of Medical Ethics: Current Opinions with Annotations. Chicago, IL.

Bloom, J.D., Nadelson, C. Notman, M.T. (1999) <u>Physician Sexual Misconduct</u>. American Psychiatric Press, Washington, D.C.

Burgess, A.W. (1981). Physician Sexual Misconduct and Patients' Responses. *American Journal of Psychiatry* 138: 10, 1335- 1342.

Dehlendorf, C.E. & Wolfe, S.M.(1996). Physicians Disciplined for Sex-Related Offenses. *Journal of the American Medical Association* 279: 23, 1883-1888.

Feldman-Summers S. & Jones, G. (1984). Psychological impact of sexual contact between therapists or other health care practitioners and their clients. Journal of Consulting and Clinical Psychology 52: 1054-1061.

Freyd, J. (1996). <u>Betrayal Trauma</u>.  Harvard University Press, Cambridge, MA.

Koehler, J.J., & Gershoff, A.D. (2003). Betrayal aversion: When agents of protection become agents of harm. *Organizational Behavior and Human Decision Process*, *90*, 244-261. doi:10.1016/S0749-5978(02)00518-6

Rachman, S. (2010). Betrayal: A psychology analysis.*Behavior and Research Therapy*, *48*, 304 311. doi: doi:10.1016/j.brat.2009.12.002

Redleaf, A. (2008).  <u>Boundaries in Healthcare</u>. International Health Publishing, U.S.A.

Rousseau, D. M., Sitkin, S. B., Burt, R. S., & Camerer, C. (1998). Not so different after all: A cross-discipline view of trust. *Academy of Management Review*, *23*(3), 393-404. Retrieved from http://portal.psychology.uoguelph.ca/faculty/gill/7140/ WEEK_3_Jan.25/ Rousseau,Sitkin, Burt, & Camerer_AMR1998.pdf

JA2391

JA2392

# Exhibit 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                  -  -  -
     MONIQUE RUSSELL,     :
 4   JASMINE RIGGINS,     :
     ELSA M. POWELL, and :
 5   DESIRE EVANS,        :
            Plaintiffs,  : Civil Action No.
 6                       : 18-5629
            v.           :
 7                       : Honorable
     EDUCATIONAL         : Joshua D. Wolson
 8   COMMISSION FOR      :
     FOREIGN MEDICAL     :
 9   GRADUATES,          :
            Defendant.   :
10

                   -  -  -
11
                October 10, 2019
12
                   -  -  -
13
14            Videotaped deposition of
15   ANNIE G. STEINBERG, M.D., taken pursuant
16   to notice, was held at The Bridge, 31
17   North Narberth Avenue, Narberth,
18   Pennsylvania 19072, beginning at 9:42
19   a.m., on the above date, before Kristy L.
20   Liedtka, a Professional Court Reporter
21   and Notary Public in and for the
22   Commonwealth of Pennsylvania.
23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

1    pull them and take a look at them --

2         A.    Sure.

3         Q.    -- would I be able to see

4    that you did a questionnaire or a survey

5    like you did in this case?

6         A.    Sure.  Let me see.  So

7    qualitative health research was --

8         Q.    Which one?  Let's make sure

9    I can find the one you're talking about.

10        A.    The fifth down was one of my

11   earlier pieces.

12        Q.    From 1997?

13        A.    Yeah, that was an early

14   qualitative.

15        Q.    So was that a population

16   identified like this that was

17   predetermined and then you drafted a

18   survey to survey them?

19        A.    Uh-huh.

20        Q.    That's a yes?

21        A.    That was not a survey.  That

22   was an interview study.

23        Q.    So that was in-person

24   interviews?

1       A.      Yes.

2       Q.      So I'm talking about --

3       A.      I might have had --

4       Q.      -- surveys?

5       A.      -- a questionnaire.  I don't

6  remember.  The next one --

7       Q.      And, Dr. Steinberg, I

8  appreciate your help today, but can you

9  let me finish my questions --

10      A.      Sure.

11      Q.      -- and I'll let you finish

12  your answers?

13      A.      Uh-huh.

14      Q.      Great.  So that one was

15  interview studies in-person.  So I'm not

16  talking about the in-person interviews --

17      A.      Uh-huh.

18      Q.      -- because I'm sure in your

19  line of work you've interviewed a lot of

20  people in person.  I'm talking

21  specifically about the surveys or the

22  questionnaires.

23      A.      The DIS study was

24  essentially a survey, not in-person,

JA2396

Annie G. Steinberg, M.D.

1    because we used interactive video.

2         Q.    And which one is that?

3         A.    That's the American Journal

4    of Psychiatry, I believe.  I can't

5    remember these very well.  It was 1998.

6    But --

7         Q.    Okay.  So you think that one

8    was a survey like you -- or a

9    questionnaire like you sent out in this

10   case to a defined population of patients?

11             MR. CERYES:  Objection to

12        form and foundation.

13             You can answer.

14             THE WITNESS:  I think it was

15        a video survey, if I recall.

16   BY MS. McENROE:

17        Q.    So those would be video

18   interviews you're saying?

19        A.    I -- I don't remember,

20   honestly.

21        Q.    Okay.

22        A.    So I better not say.

23             The next one down is also an

24   interview survey.

JA2397

1    Q.    Right.  So I'm sure you did

2    a lot of interview surveys, but taking a

3    look through these, if there are any that

4    were not interview surveys, that were

5    more traditional surveys in the way that

6    you provided today for this case?

7         A.    Well, let's see.  I

8    believe -- I honestly don't remember.

9    Isn't that terrible?  Let's see.  All

10   of -- all of these things involved

11   interviews and questionnaire development,

12   whether the questionnaire was

13   administered in an interview format or

14   not.  It's just pretty much everything,

15   deaf woman, ah, here's one that was a

16   survey.  This one made JAMA.  That's my

17   best journal.  That is page 15, second

18   down.

19        Q.    Yep.  2003?

20        A.    That was a survey

21   administered to medical faculty that

22   related to their experiences in the

23   academic environment, and JAMA thought it

24   was good enough, I guess, so that's good.

1          Q.     Yep.   And were there

2     interviews in conjunction with those

3     surveys?

4          A.     No, I don't believe there

5     were.   Uh-uh.

6          Q.     Okay.   Any others?

7          A.     I believe some of the

8     parental decision-making that followed it

9     on the next page.

10          Q.     The next page, so page 16?

11          A.     No, following immediately

12     that JAMA article.   The Archives of

13     Pediatric and Adolescent Medicine --

14          Q.     Yeah.

15          A.     -- I believe that was a

16     survey.

17          Q.     With interviews?

18          A.     But I -- it may have had

19     interviews.   I'm -- I'm really not

20     remembering.

21          Q.     Okay.   Any others?

22          A.     Honestly, I cannot recall.

23     There are many studies that look the same

24     to me now.   Some on genetic testing,

Annie G. Steinberg, M.D.

1   claims had to be excluded.  And so we

2   trained, oh, maybe 30 interviewers,

3   something like that, and then I sort of

4   managed oversight of those interviewers.

5   Did -- listened in on their tapes, gave

6   them feedback for future interviews and

7   basically did sort of quality control on

8   the interview process, what they were --

9   how they were facilitating the interview,

10   tried to keep it to the integrity of the

11   actual questionnaire or interview, if you

12   will.  So basically administered --

13   administered questionnaire.

14        Q.   So the questionnaire that we

15   were just discussing in the second case

16   wasn't sort of like it was disseminated

17   here by email, it was administered

18   through an interview process?

19        A.   Yes.  Uh-huh.

20        Q.   Okay.  And you mentioned

21   that in this case with the OB/GYN, that

22   it went from approximately 13,000

23   patients to about 9,000 patients because

24   there were some fraudulent claims; is

1   that correct?

2          A.    Or people didn't follow

3   through with it.  One or the other.

4          Q.    What do you mean by

5   "fraudulent claims"?

6          A.    Oh, well, when you have

7   these sorts of class actions, mass torts,

8   mass tort claims, a number of people find

9   their way to this information, might live

10  in Alabama, Texas and claim that they

11  were patients of this physician.

12         Q.    And what was the third of

13  the case settlements you were mentioning

14  before?

15         A.    The third one involved a

16  rabbi and the rabbi was in charge of --

17  it's called a mikvah.  It's sort of a

18  ceremonial religious immersion.  That

19  women go into this cleansing ritual once

20  a month after their period is finished or

21  before they get married or at other vital

22  times where they want to be purified.

23  And the rabbi had set up video equipment.

24  So that was a -- like the second case I

Case 2:18-1908562mDoDuWenD22m5entPage: 512 1DateFiledPa0e/0308/20223

1    mentioned where the women were unaware

2    that they were videotaped until later; in

3    this case the women were also unaware at

4    the time and the damages occurred when

5    they found out.

6         Q.    And was that a

7    self-administered questionnaire?  Was

8    that an interview?

9         A.    That was a self-administered

10   questionnaire, yes.

11        Q.    Were there interviews in

12   conjunction with those questionnaires?

13        A.    There were not.  Uh-uh.

14        Q.    And approximately how large

15   was that patient pop -- I'm sorry,

16   that --

17        A.    It was hundreds.

18        Q.    -- victim population?

19        A.    Hundreds.  Not thousands.  I

20   forget the exact number.

21        Q.    Did you design that

22   questionnaire?

23        A.    I did.

24        Q.    And did you administer that

Case 2:21-19985620 Document D22-5 Document 513-18 1 Date Filed 09/08/2022
Case 2:21-19985620 Document D22-5 Page 513 1 Date Filed 09/08/2022

¹ questionnaire?

² A. That was a comp --

³ Q. Did you -- were you involved

⁴ in sending it out?

⁵ A. It was a computer.

⁶ Q. Okay. Were you seeking

⁷ information on emotional damages through

⁸ that questionnaire?

⁹ A. I was. Uh-huh.

¹⁰ Q. When was that?

¹¹ A. That was over the past year,

¹² maybe 15, 18 months at the most. It was

¹³ about a year process. Finished up a few

¹⁴ little straggler cases in the last couple

¹⁵ of months.

¹⁶ Q. So for any of these cases

¹⁷ you mentioned or any of the other cases

¹⁸ you recall working on, had you ever

¹⁹ worked with plaintiffs' counsel involved

²⁰ in this case before?

²¹ A. They were involved in -- and

²² I -- they were involved in the second

²³ case. They retained me in the second

²⁴ case. That's the only case in which they

Case 2:18-cv-09562-WB Document 22-5 Filed 12/10/18 Page 514 of 3041

1          can get a tremendous amount of

2          information from each one.

3    BY MS. McENROE:

4          Q.     What are the differences?

5                 MR. CERYES:  Same objection.

6                 THE WITNESS:  It probably

7          varies person to person more than

8          anything.  With studies in which

9          aren't really clinical work, in

10         which I do both, the surveys are

11         nicer because you can make sure

12         you don't miss any areas.  If

13         you're just doing an interview,

14         you can't remember everything to

15         ask, but if you use inventories,

16         anxiety, depression,

17         post-traumatic stress, you can

18         cover a lot of ground in a short

19         amount of time and uncover areas

20         that you might not otherwise have

21         remembered to ask about or that

22         somebody face-to-face will not

23         say.

24    BY MS. McENROE:

JA2404

Case 2:23-19985620 Document 22-5 Filed 11/10/10 Page 515 of 3041 Page: 515 Date Filed: 09/08/2023

1    Q.    You mean using a diagnostic

2    tool?

3    A.    Using an -- using a

4    questionnaire or a survey --

5    Q.    Okay.

6    A.    -- as you call it.

7    Q.    Okay.  But is -- but I'm

8    trying to figure out if there's a

9    distinction in your mind between the more

10   canned, if you will, or standardized

11   diagnostic tools or questionnaires as

12   opposed to a survey --

13   A.    Surveys.

14   Q.    -- like the one designed in

15   this case?

16   A.    You know --

17        MR. CERYES:  Objection.

18   Form and foundation.

19        THE WITNESS:  You know, I --

20   I no longer am certain.  I would

21   have always wanted to do an

22   interview in -- in the past, but

23   in the recent case I did involving

24   the rabbi, for example, the

JA2405

Case 2:18-cv-05623-MMB   Document 225   Filed 09/08/23   Page 516 of 3041

1          lawyers were quite vehemently

2          opposed to an interview and only

3          wanted me to do -- develop a

4          questionnaire and administer it

5          through the computer.

6                    I thought it would be a

7          shortcoming, but in fact, there

8          was a tremendous amount of

9          information that women poured into

10         their responses.  So I really have

11         come to understand that when

12         people are motivated to express

13         themselves, they will use whatever

14         modality is available to them to

15         communicate their experiences.

16    BY MS. McENROE:

17         Q.    In that rabbi case, did you

18    view yourself as diagnosing anyone

19    through those questionnaires?

20         A.    We did ask about symptoms of

21    depression, anxiety and post-traumatic

22    stress, but of course I would never

23    diagnose somebody on the basis of a

24    response to a questionnaire.

JA2406

1      Q.    Is that true in this case as

2  well, that you would not consider

3  yourself as diagnosing any of these

4  individuals?

5      A.    It was never my intention to

6  present psychiatric diagnoses of any

7  individual woman in this matter.

8      Q.    Okay.  Individually or as a

9  group?  You haven't diagnosed them as a

10  whole?

11     A.    Correct.

12     Q.    Okay.

13     A.    I would not --

14     Q.    And you're --

15     A.    I would not --

16     Q.    You're laughing a little,

17  but can you explain what you mean by

18  that?  Would you be able to diagnose a

19  group as a whole?

20     A.    No, a psychiatric diagnosis

21  is administered individually, but I would

22  not fathom a group diagnosis, no.

23     Q.    Okay.

24     A.    Group psychiatric diagnosis.

Case 2:18-cv-05629-JDW   Document 22   Filed 09/08/22   Page 518 of 3041

1    Q.   We discussed a little bit

2  earlier some of your experience of

3  designing and administering surveys and

4  some of your prior professional

5  experiences.  Can you articulate for us

6  the principles that govern the sound

7  survey design?

8              MR. CERYES:  Objection to

9         the breadth of the question.

10             You can answer.

11             THE WITNESS:  I don't know

12        that that -- you know, that I can

13        profess to give you a lecture on

14        sound survey design.  I just can

15        tell you that I studied it like --

16        like if you asked me, you know,

17        the basis for a psychiatric

18        interview, I suppose because I'm a

19        forensic psychiatrist I would have

20        to be able to provide that for

21        you, but I don't have any degrees

22        in survey design and I don't know

23        that I would want to make a feeble

24        effort at articulating that for

JA2408

1  you.  I -- I only know that I've
2  studied it and that I've learned
3  from smart people and someplace
4  it's in the soup.  You know, it's
5  mixed in the -- it's in the blend
6  of what I have come to understand
7  and to have learned from very good
8  teachers.
9  BY MS. McENROE:
10  Q.   So what is it that you
11  learned from the smart people about
12  governing surveys?
13  A.   That question --
14  MR. CERYES:  Same objection.
15  You can answer.
16  THE WITNESS:  That questions
17  need to be written as open-ended
18  as possible and not directing
19  people, but that choices do need
20  to be given for those people who
21  may not be able to retrieve words
22  or descriptors.
23  BY MS. McENROE:
24  Q.   Anything else?

1          MR. CERYES:  Same objection.

2          THE WITNESS:  That you open

3     gently and you proceed with

4     respect and caution and

5     thoughtfulness.

6  BY MS. McENROE:

7     Q.     Anything else?

8     A.     And in this case --

9          MR. CERYES:  Same objection.

10         THE WITNESS:  Sorry.

11         And in this case, that I

12    don't extend beyond my domain.

13  BY MS. McENROE:

14    Q.     What do you mean by that?

15    A.     If my domain is psychiatry,

16 then the questions I ask should not be

17 about obstetrics or gynecology beyond --

18 beyond common sense.

19    Q.     You don't think that your

20 questions in the questionnaire in this

21 case had anything to do with obstetrics

22 or gynecology?

23    A.     I said beyond the common

24 understanding of general practice and

```
 1    demeanor --
 2         Q.    Okay.
 3         A.    -- of a physician.
 4         Q.    Anything else?
 5         A.    No, I think that's probably
 6    all I would say for now.
 7         Q.    Did you sort -- I'm sorry,
 8    strike that.
 9              Did you cite any sources in
10    ensuring that you were preparing a sound
11    survey in this case?
12         A.    I'm sorry, I don't
13    understand your question.  Did I cite?
14         Q.    Did you consult with
15    literature on surveys or those types of
16    issues and how to design a survey in
17    preparing the one that you did for this
18    case?
19         A.    No, I don't think I did.
20    Uh-uh.
21         Q.    You worked with others in
22    doing the project for this case --
23         A.    Uh-huh.
24         Q.    -- is that correct?
```

Case 2:23-1998520 Document 22-5 Page: 522 1 Date Filed: 09/08/2023

1      A.     Correct.  Uh-huh.

2      Q.     So I have Lisa Bain and

3   Stephen Ehrlich; is that correct?

4      A.     Yes.

5      Q.     Anybody else?

6      A.     That's it.

7      Q.     Okay.  So Lisa Bain --

8      A.     Uh-huh.

9      Q.     -- in your report you wrote

10  that she's a science writer and her

11  hourly rate is $125 per hour.  She worked

12  25 hours on the development of this

13  assessment tool and her data analysis.

14             Does that sound right?

15     A.     Yes.  Uh-huh.

16     Q.     What do you mean by her

17  development -- or I should -- strike

18  that.

19             What do you mean by "the

20  development of this assessment tool"?

21     A.     I considered Lisa Bain to be

22  a fantastic extender for me.  She worked

23  with me over many years as the program

24  manager for those other grants involving

1    questionnaires and interviews.  So we

2    work fairly seamlessly together and she's

3    an excellent writer, so she can edit me,

4    I can edit her and we can go back and

5    forth and discuss ways to phrase

6    questions about dates of birth versus age

7    versus -- you know, and what -- how we

8    can capture the information in the best

9    way.

10        Q.    What is her educational

11   background?

12        A.    She has I believe a master's

13   degree in science writing.

14        Q.    Do you know if she has any

15   degrees in marketing or surveys?

16        A.    No, I don't believe she

17   does.

18        Q.    Was she involved in any of

19   those other cases you mentioned, the

20   pediatrician, the OB/GYN with the

21   videotape and -- or the rabbi with the

22   videotape?

23        A.    She was definitely involved

24   in the OB/GYN.  And let me just think.

Case 2:23-1998562DocDocument D2:25ment Page: 524led 1/Date Filed: 09/08/2023

1    She was definitely involved in the rabbi

2    case too.  I don't think she was involved

3    in the pediatrician case.

4         Q.    And when you say she was

5    involved, in a similar way to her

6    involvement in this case?

7         A.    Yes.  She did more -- she

8    spent a tremendous amount of time

9    listening to the interviews that the

10   trainees, most of them were like

11   psychologists or psych -- psychology

12   interns, people who have already finished

13   some of their psychology training, that

14   they -- that they were doing -- not live,

15   she would listen to them after and then

16   give them feedback or give me feedback

17   and we'd give feedback together to the

18   interviewer about how the -- those

19   interviews were going.

20        Q.    Did she help to design any

21   questions or questionnaires involved in

22   the OB/GYN or the rabbi case?

23        A.    No, I believe for -- I

24   worked with -- in those I worked with

Case 2:23-19085620 Document 22-5 entPage: 525 ed 1/Date Filed 09/08/2023

1   Girija Kaimal, who is -- she might be an

2   anthropologist.  I forget what her --

3   she's a professor at Drexel and -- so she

4   helped with the methodology.  And I also

5   worked with Elizabeth Hembree, who's a

6   researcher at Penn on those

7   questionnaires.

8          Q.    Why didn't you work with

9   them in this case?

10         A.    Because I used the same

11  methodology and versions of the same

12  questionnaire and I felt very comfortable

13  with what we had developed before and

14  this was an adaptation of that.

15         Q.    Did they review the

16  questionnaire in this case?

17         A.    No.  Uh-uh.

18         Q.    Did you discuss this case

19  with either of them?

20         A.    No.

21         Q.    For Lisa Bain, when you say

22  that she did data analysis, what do you

23  mean about that?

24         A.    I mean she and I both

JA2415

1  reviewed all the computerized data that

2  you have on the 300 and some -- 305

3  women, and that was a lot of work, as you

4  may know.  So we both did it and then we

5  talked about it a number of times and

6  discussed what trends we were seeing and

7  what could be said.  Really just a -- I

8  always need somebody to -- to work with

9  to bounce off the ideas, make sure that I

10  am perceiving things correctly.  And then

11  we discussed how we would write up the

12  synthesis or summary of what was

13  discussed and we shared back and forth in

14  that process.

15       Q.    When you say that you were

16  reviewing the computerized data, in what

17  format were you doing that?

18       A.    On the laptop.

19       Q.    And was that provided to you

20  in Excel form or how did you get it?

21       A.    Same as you.  It was in

22  individual -- you know, you would have to

23  open individual files to review.  And

24  ultimately we did create spreadsheets and

1   so on and so forth and then fancy pie

2   charts and so on were derived from the

3   data.

4           Q.    Did you create spreadsheets

5   on each of the questions?

6           A.    No, I don't think we did.  I

7   think we had -- we had spreadsheets on

8   the summary statements.  We developed in

9   the end some spreadsheets on those and

10  then I think we asked Stephen particular

11  questions and to -- we had different

12  versions and formats of looking at that

13  to -- in a way that would be visually

14  understandable to other people and

15  decided on sort of pie chart

16  configurations this time.

17          Q.    And do you have --

18                MR. CERYES:  Just jump in

19          here for a second.  I think we're

20          getting close to what would

21          constitute attorney work product

22          in terms of communications that

23          Dr. Steinberg had with other

24          consultants of ours in this case.

```
 1              And so -- and I agree you're
 2              entitled to any facts and data
 3              that Dr. Steinberg considered,
 4              but, you know, I would object and
 5              instruct Dr. Steinberg not to go
 6              beyond that in terms of
 7              discussions and communications
 8              that she has had with Stephen
 9              Ehrlich and Lisa Bain.  And move
10              to strike to the extent that we've
11              gotten into that already, but with
12              that objection we can proceed.
13                   MS. McENROE:  So I disagree.
14    BY MS. McENROE:
15         Q.    I mean, Lisa is not an
16    attorney, I presume?
17         A.    Uh-uh.
18         Q.    She's not a --
19         A.    No.
20         Q.    Okay.  And Stephen Ehrlich
21    is not an attorney?
22         A.    No.
23         Q.    And they were both hired to
24    help assist you in your work in this
```

Case 2:23-1998 56 Document 22-5 Page: 529 Date Filed 1/09/08/2023

```
 1    case?
 2          A.    Well, I identified them, but
 3    I believe they were hired by the
 4    attorney.
 5          Q.    Right.  But they did assist
 6    you with your work in this case?
 7          A.    They did.  Uh-huh.
 8          Q.    Okay.
 9          MS. McENROE:  And I'm glad
10          that you, counsel, agree that
11          we're entitled to the data.  So I
12          would ask that we work out that we
13          can get all of that data after
14          this -- after the deposition is
15          done.  We've only gotten the raw
16          versions of the survey responses
17          and the empty survey Word
18          document, but other than that, to
19          the extent that there's other data
20          that exists, we would request that
21          we get that.
22          MR. CERYES:  Right.  And you
23          have all of the data that was
24          compiled on these individuals.  To
```

1    the extent that there were other

2    drafts in terms of their

3    presentation of collections of

4    those data or statistics regarding

5    those data, our position would be

6    that that would constitute

7    attorney work product and draft

8    versions of the reports, which

9    would similarly not be

10   discoverable.

11          MS. McENROE:  Well, let's

12   talk about it after --

13          MR. CERYES:  Sure.

14          MS. McENROE:  -- the

15   deposition or we can I'm sure

16   write each other letters about it,

17   but we disagree.

18   BY MS. McENROE:

19          Q.    So Stephen Ehrlich, have you

20   worked with him before?

21          A.    Uh-huh.  Yes.

22          Q.    Okay.  And in your report

23   you wrote that he's an information

24   technology consultant, correct?

Case 2:18-19085 2 Document 22 Page: 531 Date Filed 02/08/2023

1      A.    Yes.  Uh-huh.

2      Q.    So just in plain words

3  basically what did he do to help in this

4  case?

5      A.    So Stephen set up a website,

6  a confidential website that would be

7  secure and created the technology for

8  allowing women to enter that secure site

9  with an ID and -- so that we would not

10  have their names, that they would be

11  anonymized for us.  That they would be an

12  ID number as opposed to a name.  And he

13  also created the technology so that the

14  written questionnaire that we had could

15  be put into a computer form and to design

16  it so that it would be visually

17  accessible to women, that they would not

18  be intimidated by it, that it would flow

19  and they continue -- complete the

20  questionnaire, which is not a small feat.

21  And then Stephen also created a mode for

22  us to gain access with our own specific

23  passwords so that we could follow daily,

24  hourly sometimes, how many women had

JA2421

Case 2:23-1998562 Document 22-5 ent Page: 532 d 1 Date Filed Page 09/08/2023

1  completed, what they had written, and

2  then later he helped us to compile the

3  data in a way that was easier for us to

4  see the different responses.  Their ages,

5  their -- how long they had known Dr.

6  Akoda, under what circumstance they had

7  come to him and so on.

8       Q.    Have you seen what the

9  survey looked like when it was on the

10 website?

11      A.    Yes.

12      Q.    Okay.  So you've seen what

13 the user experience was like?

14      A.    Yes, uh-huh.

15      Q.    Did you have any say or

16 input into figuring out or deciding how

17 that would appear?

18      A.    Totally.

19      Q.    Okay.  And so describe to me

20 when someone would log in using their

21 user ID what they would see next.

22      A.    Let me see if I have it.

23 They would see an introduction and then

24 they would see the first question and --

1   and so on.  I don't remember how many

2   questions per screen they had.

3          Q.    Well, that's what I was

4   going to ask.  Was it a choose your own

5   adventure?  Right?  If you said yes to

6   one and then it said to skip to the next

7   question, would it automatically do that

8   for you?

9          A.    There were a couple of --

10  two or maybe three questions at the most

11  where we decided if they said no to

12  something, that it would automatically

13  move them to the next, but typically

14  we -- most of the questionnaire was

15  complete everything.

16         Q.    But were they automatically

17  moved to the next if that was what their

18  response had prescribed for in those

19  circumstances or was it a circumstance

20  that they could have responded even for

21  the other questions that they were sort

22  of then not eligible for or that didn't

23  make sense for them to answer?

24         A.    I'm trying to remember the

Case 2:23-1998 Document 22-5 Page: 534 Date Filed 09/08/2023

```
 1          A.      Correct.

 2          Q.      -- say back?

 3          A.      I think he smirked.

 4          Q.      Okay.  So that was a

 5   nonresponse response?

 6          A.      Yes.

 7          Q.      Is he being compensated for

 8   his time in --

 9          A.      No --

10          Q.      -- connection with this

11   case?

12          A.      -- he's not.

13          Q.      Who first contacted you in

14   connection with this litigation?

15          A.      I believe it was Mr. Ceryes.

16          Q.      Okay.  And when was that?

17          A.      In September.

18          Q.      Of 2019?

19          A.      Yes.

20          Q.      Would September 4th sound

21   about right?

22          A.      3rd, 4th, something around

23   there.

24          Q.      In or around that time.  And
```

1    then the report you produced was dated

2    September 23rd, correct?

3           A.     Yes.

4           Q.     So in between September 3rd

5    or 4th and September 23rd, is it correct

6    that you designed, administered and then

7    digested the outcome from the

8    questionnaire in this case?

9           A.     Are you going to ask me if

10   I've slept during that time?

11          Q.     But that's true, correct?

12          A.     That is true.

13          Q.     Okay.  And that's also the

14   time in which you reviewed, if at all,

15   the materials involved in this case --

16          A.     Uh-huh.

17          Q.     -- separate from the survey

18   responses?

19          A.     Uh-huh.

20          Q.     Is that correct?

21          A.     Correct.  Uh-huh.

22          Q.     Where did you get the

23   information for the background section in

24   your report?

Case 2:18-cv-05629-JDW   Document 122-5   Filed 12/08/23   Page 536 of 3041

1          A.    I had asked Mr. Ceryes to

2     send me a letter with the facts of the

3     case.  I had the Complaint and I had --

4     at the time I had two depositions.  I

5     don't even think I had time to review the

6     second set of those depositions.  So I

7     think it was the first set of depositions

8     for the two plaintiffs and I had also one

9     deposition from somebody associated with

10    ECFMG that I perused.

11         Q.    So it looks to me like your

12    counsel has indicated to us that you got

13    deposition transcripts for plaintiffs

14    Evans, Powell -- Evans and Powell.  Were

15    those the two plaintiffs whose

16    depositions you reviewed?

17         A.    I brought everything with

18    me, so I can check.  I don't remember --

19         Q.    Great.

20         A.    -- their names.

21         Q.    Yeah, let's take a look.

22         A.    Evans, Powell and Mr. Kelly.

23         Q.    Great.  Okay.  And what else

24    do you have in that pile, just so I don't

JA2426

1   lose track of it?

2          A.    I have your Exhibit 3.

3          Q.    Yeah.  So you can put that

4   aside.  But then you have a copy of your

5   report, it looks like.

6          A.    I have your Exhibit 2.

7          Q.    Yep.

8          A.    I have now a collated

9   version of the Complaint -- the -- the

10  statements.

11         Q.    So just to make sure I

12  understand what that is.  So those are

13  the statements that -- there was a

14  statement and then colon section on the

15  questionnaire that people could chose to

16  write in a statement.  So is this just a

17  document pulling together each of the

18  sections from each of those?

19         A.    All of the --

20         Q.    If there was one?

21         A.    Yes.  All of the decided 300

22  individual comments would not be suitable

23  to bring today.  And I have the notice of

24  deposition.

JA2427

1    Q.    Great.

2    A.    I should have printed it

3 out, but I don't have it here.

4    Q.    That's okay.  What is STAT

5 News, S-T-A-T News?

6    A.    Did I cite that as a source?

7    Q.    Yeah, you said Akoda has

8 claimed he attended medical school in

9 Nigeria, although STAT News was unable to

10 verify this claim.

11    A.    I don't recall, but when Mr.

12 Ceryes called me, I probably ran a search

13 on Google of the name "Akoda" and

14 probably was something on a website

15 someplace.

16    Q.    So in addition to the

17 materials considered here, the facts

18 provided to you from counsel, you also

19 googled Dr. Akoda?

20    A.    Yes.

21    Q.    What else did you find about

22 Dr. Akoda other than the STAT News --

23    A.    I don't believe I had much

24 time to search very much.  I just wanted

Case 2:18-1998562 Document 22-5 entfile 539 d 1/10/Filed Page 09/08/2023

1    to see kind of what was out there.

2            Q.    And what was out there?

3    What did you see?

4            A.    I don't even remember.  If I

5    cited it, that's because I saw it and

6    scribbled something down and included it

7    in here, but that...

8            Q.    Is STAT News a news source

9    that you refer to in checking out other

10   physicians in your usual practice?

11           A.    I don't usually check out

12   other physicians, but if I get a case, I

13   sometimes will do a quick search.

14   Usually I spend more time with it.  In

15   this case, I had to get on to the task at

16   hand.  So I'm surprised I even included

17   it in here.  So -- I don't even remember

18   doing that, but...

19           Q.    Okay.  It's possible you

20   weren't the one who wrote that?

21           A.    No, it's possible I did, but

22   I just don't remember.

23           Q.    Okay.

24           A.    There was so much

JA2429

1    information in a very short time.  It was

2    a very crazy time.

3           Q.    Well, that's what I'm trying

4    to understand, how you got this

5    background section together in that short

6    of time and on the limited sources that

7    you had?

8           A.    I relied heavily on Mr.

9    Ceryes's letter and the Complaint.

10          Q.    Okay.

11          A.    I would say the Complaint

12   probably the most -- most of all.

13                MR. CERYES:  Just for the

14          record, it's Ceryes, like World

15          Series.

16                THE WITNESS:  I'm sorry.

17                MR. CERYES:  That's okay.

18          Just in case we're going to use my

19          name a lot more, I want to get it

20          right.

21   BY MS. McENROE:

22          Q.    Okay.  So looking in the

23   background section on page 2.  Towards

24   the bottom there's a paragraph that

Case 2:13-1998-1998 Document 22-5 Page 541 Date Filed 09/08/2023

1    starts "with his ECFMG certification in

2    hand."

3              Do you see that?

4        A.    Uh-huh.

5        Q.    Towards the end there's a

6    sentence that starts "later that year."

7    It's about three lines up from the bottom

8    of that paragraph.

9              Do you see where I am?

10       A.    Yes.

11       Q.    It says, "Later that year,

12   using the name Charles John Nosa Akoda, a

13   falsified Social Security number, a fake

14   permanent residence card, and a fake

15   Nigerian passport, he applied for and

16   received a Maryland medical license."

17             Do you see that?

18       A.    Yes.

19       Q.    Do you know what name was on

20   Dr. Akoda's ECFMG certificate?

21       A.    No.

22       Q.    Are you aware of whether the

23   plaintiffs in this case have filed any

24   other lawsuits stemming out of

1  certain way when they learned about

2  Dr. Akoda's history?

3      A.    Yes, each response was

4  different.  Each and every response was

5  different.

6      Q.    What do you understand the

7  purpose of your report to be in this

8  lawsuit?

9      A.    My report was simply to give

10  information to the plaintiffs' attorneys

11  about what the women reported.

12      Q.    Okay.  Were you trying to

13  give a set of data from which any other

14  conclusions could be drawn, to

15  extrapolate to another population of

16  patients, for example?

17      A.    I don't think I understand

18  the question.

19      Q.    So what I mean by that is,

20  so of the population that was given the

21  survey, about half responded, correct?

22      A.    Uh-huh.  Yes.  Uh-huh.

23      Q.    Was it your intention to use

24  the outcome of the results from the half

1    that responded to be statistically

2    significant for the half that did not

3    respond or for those who may have been

4    treated or examined by Dr. Akoda, but did

5    not receive the survey?

6                    MR. CERYES:  Objection.

7          Form and foundation.

8                    You can answer.

9                    THE WITNESS:  Yes, I think

10          that that response rate would

11          suggest that there is

12          reasonable -- it is reasonable to

13          assume that of the women that did

14          not respond, some of those women

15          would have also had an experience

16          similar to these women.

17    BY MS. McENROE:

18          Q.    Do you think that there's

19    anything at all meaningful to the fact

20    that half of the women didn't choose to

21    respond?

22          A.    No, we had a very short

23    turnaround time.  Extremely short

24    turnaround time.

JA2433

1          Q.    And so you think it's just a
2    matter of convenience.  It's not a matter
3    of that they may have just chosen not to
4    respond?
5          A.    Oh, well, that was certainly
6    a good part of it.  We had a remarkable
7    response rate given the women were not
8    even given a week to respond.
9          Q.    On what basis do you say
10   that you got a remarkable response rate?
11         A.    Because people are busy and
12   this was an unexpected intrusion into
13   their lives and their daily schedules.
14         Q.    Do you have a sense for how
15   quickly or frequently plaintiffs in
16   lawsuits tend to respond to requests from
17   their counsel?
18         A.    I know in other cases that
19   I've done that a week would not have been
20   adequate time.
21         Q.    Have you gotten responses
22   since September 23rd?
23         A.    I don't know.
24         Q.    Have you asked?

1        A.    No, we decided to keep it

2   open, but I did not check.

3        Q.    Do you know if anyone else

4   checked?

5        A.    I don't know.

6        Q.    So was it your intention to

7   use the outcome of this questionnaire or

8   this survey to help diagnose any

9   individual plaintiff?

10        A.    No.

11        Q.    Is it your intention for the

12   outcome of this questionnaire or survey

13   to help diagnose the plaintiff class as a

14   whole?

15        A.    Not to present psychiatric

16   diagnoses, no.

17        Q.    Okay.  At one point in your

18   report you say, "forensic psychiatric

19   consultation was requested."  What do you

20   mean by "forensic psychiatric

21   consultation" in that -- in that --

22        A.    Sure.

23        Q.    -- usage?

24        A.    Well, it's a consultation

1   because they have asked my -- for my

2   input in the matter.  It's psychiatric

3   because it's addressing emotional

4   damages, and as a psychiatrist I have

5   some experience with listening to people

6   and understanding what their internal

7   experience of an action might have been,

8   and it's forensic because it pertains to

9   the court and matters related to

10  questions that can appear in court.

11          Q.    I see.  Okay.  At one point,

12  you call your responses -- strike that.

13          At one point you call your

14  analysis provisional.  Have you done any

15  non-provisional analysis since then?

16          A.    No.

17          Q.    Do you intend to?

18          A.    Only if asked.

19          Q.    Have you written any other

20  expert report in this case other than --

21  and I'm not talking about drafts of, but

22  any other reports other than what's been

23  marked as Exhibit 3?

24          A.    No.

Case 2:23-1998562900Dument 22-5ent Page: 547 11/Date/Filed Page: 09/08/2023

1   Aggrieved is a funny word.  It's more

2   like a complaint as opposed to damage.

3          Q.    So you think that through

4   your questionnaire you've proven to

5   yourself at least that there were

6   specific damages to particular patients

7   in this case?

8          A.    I do believe that, yes.

9          Q.    Having not spoken to any of

10  them?

11         A.    I do believe that, yes.

12         Q.    What do you believe your

13  opinions to be through this expert

14  report?

15              MR. CERYES:  Objection.

16         Breadth of the question.

17              You can answer.

18              THE WITNESS:  My opinion is

19         that it's not good for women to

20         find out that their doctor may not

21         have gone to medical school or

22         have, in fact, been a doctor as

23         they perceive credentialing to

24         imply.

JA2437

1          And in this particular case,

2     it was additional affirmation for

3     the women that the behaviors he

4     exhibited in the office with them,

5     in the hospital with them were

6     abusive, not just atypical.

7  BY MS. McENROE:

8     Q.    What do you mean by that

9  second statement?

10    A.    That some of the comments he

11 made, some of the ways he put his hands

12 on them and in them were wrong and not

13 just -- not just a cultural difference or

14 a moment in time, but that they were --

15 they were related to something bigger.

16    Q.    So that's an opinion you're

17 offering in this case?

18    A.    Yes.  Uh-huh.

19    Q.    Having not actually spoken

20 to any of the individual plaintiffs?

21    A.    Correct.

22    Q.    Having not examined their

23 medical records?

24    A.    Correct.

1      Q.      Having not spoken to

2  Dr. Akoda?

3      A.      Correct.

4      Q.      Having not observed

5  Dr. Akoda in practice?

6      A.      Yes, that's correct.

7      Q.      Okay.  And so you said the

8  opinion you're offering in this case --

9  one of the opinions you're offering in

10 this case is that it's not good for women

11 to find out that their doctor did not go

12 to medical school or that he was not

13 really a doctor.  If it turns out that

14 Dr. Akoda really was a doctor --

15     A.      Uh-huh.

16     Q.      -- but that he had committed

17 Social Security fraud --

18     A.      Uh-huh.

19     Q.      -- but that the plaintiffs

20 were led to believe that he was not

21 really a doctor --

22     A.      Uh-huh.

23     Q.      -- wouldn't that lie to them

24 about him not really having been a doctor

1    be what actually caused them the harm?

2              MR. CERYES:  Objection.

3         Form and foundation.

4              THE WITNESS:  Well, I would

5         have to say the question was a

6         little bit convoluted for me, so

7         if you ask it in a simpler way for

8         my brain, that I would probably be

9         happy to answer.

10   BY MS. McENROE:

11        Q.    Sure.  So you had said that

12   one of your opinions is that it's not

13   good for women to find out that their

14   doctor basically was not a doctor.

15        A.    Uh-huh.  Uh-huh.

16        Q.    Is that correct?

17        A.    Yes, that's correct.

18        Q.    If Dr. Akoda really was a

19   doctor --

20        A.    Uh-huh.

21        Q.    Correct?  I'm making sure

22   you understand what I'm saying.

23        A.    I'm following you.

24        Q.    Okay.  If it turns out that

1    substance abuse or Internet
2    addiction or other things.  I will
3    pull a questionnaire relating to
4    that.  Sometimes I'll use a
5    questionnaire about autism
6    spectrum symptoms.  So -- same for
7    OCD.  So I have a wide variety of
8    questionnaires in my office that
9    after I am finished interviewing
10   or sometimes in the midst of it, I
11   will give them a questionnaire.  I
12   do not administer psychological
13   testing.  That is not my domain.
14   I'm not a psychologist.  I haven't
15   been trained to do that.  So I use
16   forms that have been developed,
17   validated, widely accepted for the
18   most part, and I find them to be
19   helpful and even -- even the ones
20   that -- I have also written out
21   some -- some questions that I use
22   routinely.  I guess you would call
23   them a questionnaire.  They're
24   projective questions that I do

Annie G. Steinberg, M.D.

1       administer routinely that is not

2       self-administered.  I will usually

3       ask the questions.

4   BY MS. McENROE:

5       Q.     In an interview format?

6       A.     Uh-huh.

7       Q.     That's a yes?

8       A.     That's -- sorry.  That's a

9   yes.

10      Q.     You mentioned that you use

11  some questionnaires or surveys that have

12  been validated or widely accepted.  What

13  do you mean by that?

14      A.     They are typically

15  questionnaires that are not new.  They

16  are published in peer reviewed journals

17  and sort of the standard forms that can

18  augment my clinical interview.

19      Q.     Have you ever published a

20  questionnaire or a survey in a peer

21  reviewed publication?

22      A.     You know, I -- I might have

23  thought no, but I recently received some

24  requests for questionnaires I had

1 developed and I had to notify the
2 individual that I no longer have access
3 to them myself.  They related to
4 decision-making and somebody from South
5 America wrote to me about an
6 autism-related questionnaire with blind
7 individuals.
8       Q.    Right.  But -- so my --
9       A.    So I guess I did develop
10 some questionnaires and they were
11 published in peer reviewed journals, yes.
12       Q.    But the questionnaires
13 themselves were published?
14       A.    Yes.
15       Q.    Not just the --
16       A.    Well, you know, it's funny.
17 The questionnaires were not included,
18 they never are in -- well, they rarely
19 are because very often people want to
20 sell their questionnaires.
21       Q.    So what I'm trying to
22 understand is when you said that you used
23 validated and widely accepted
24 questionnaires, what that means.  And you

1    said that they're in published --

2            A.    Uh-huh.

3            Q.    -- they're often older,

4    they've been used a lot --

5            A.    Uh-huh, uh-huh.

6            Q.    And they're in publications?

7            A.    Right.

8            Q.    So presumably you would have

9    access to those questionnaires if you're

10   using them?

11           A.    Yes, you buy them.

12           Q.    You buy them.  I see.

13           A.    You buy them.

14           Q.    So you buy them from the

15   authors or you buy them from the

16   publication?

17           A.    You buy them from a company

18   that publishes them.

19           Q.    Okay.  Are any of your

20   questionnaires or surveys that you've

21   prepared for sale?

22           A.    No.  Uh-uh.

23           Q.    Is the questionnaire or

24   survey you used in this case validated?

Annie G. Steinberg, M.D.

1    A.    No.

2    Q.    Is it widely accepted?

3    A.    It's individually designed

4  for this project.

5    Q.    Did you do any pretesting?

6    A.    No.  Pretesting in this

7  brief sense, that both Lisa and I ran

8  through the questionnaire as a pretest to

9  see how long it would take to complete.

10    Q.    So you -- you and Lisa ran

11  through the questionnaire for time?

12    A.    Uh-huh.  Yes.

13    Q.    Length?

14    A.    Uh-huh.

15    Q.    Okay.  Did you do any other

16  pretesting on the content or the tone of

17  the questions or the order of the

18  questions, anything like that?

19    A.    No.

20    Q.    I think we established

21  earlier, but you've never met Dr. Akoda,

22  correct?

23    A.    Correct.

24    Q.    And you've never spoken with

1   him?

2           A.      Correct.

3           Q.      You've never treated him?

4           A.      Correct.

5           Q.      And you've never diagnosed

6   him with anything?

7           A.      Correct.

8           Q.      And you've never been

9   treated by him?

10          A.      Correct.

11          Q.      And did you consult with an

12  OB/GYN in any way in preparing this

13  questionnaire and this survey?

14          A.      No.

15          Q.      Do you routinely in your

16  professional experiences work with

17  OB/GYNs --

18          A.      No.

19          Q.      -- for any purpose?

20                  Okay.  Aside from whether or

21  not you are a patient, which I'm not

22  asking, do you interact with OB/GYNs

23  otherwise?

24          A.      I think you addressed the --

Annie G. Steinberg, M.D.

1        A.      Yes.

2        Q.      And 271 recipients did not

3   return the questionnaire at all, correct?

4        A.      Correct.

5        Q.      Okay.  At least before

6   September 23rd?

7        A.      Correct.

8        Q.      Okay.  And so I think you

9   had mentioned earlier that you think you

10  could use the responses from the 306 to

11  extrapolate to the 271; is that correct?

12       A.      Extrapolate is a funny word.

13  What did you mean by "extrapolate."

14       Q.      So to tell us anything

15  meaningful about the population that did

16  not respond.

17       A.      I do think it would tell us

18  something meaningful, yes.

19       Q.      What do you think it would

20  tell us?

21       A.      That there are some women in

22  that group that also may have experienced

23  some distress around Dr. -- around

24  Akoda's fraudulent claims of his

Case 2:23-1998562 Document 22-5 Page: 558 1/16/Filed 09/08/2023

1    identity.

2         Q.    But not necessarily all of

3    them, correct?

4         A.    Absolutely not, yeah.

5         Q.    And so if I invited, as a

6    hypothetical, 100 relatives to a family

7    reunion and only 75 showed up, do you

8    think I could use the feelings or

9    experiences of those 75 about whether

10   they wanted to show up to tell me

11   anything about the 25 that chose not to

12   come?

13              MR. CERYES:  Objection.

14        Form and foundation.

15              THE WITNESS:  I think you'd

16        probably do better asking a

17        polling researcher that question.

18   BY MS. McENROE:

19        Q.    And you're not a polling

20   researcher, correct?

21        A.    That's correct.  I'm a

22   psychiatrist.

23        Q.    And you didn't conduct IMEs

24   in this case, correct?

Annie G. Steinberg, M.D.

1    A.    Correct.

2    Q.    So I want to make sure I

3    understand the summary statements we've

4    talked about a couple times, because in

5    your report you mention that summary

6    statements were offered by 131 women,

7    right?

8    A.    I thought it was a little

9    bit more, but maybe not.

10    Q.    So it's at page 4, if my

11    notes are right.  So there's a big

12    paragraph two paragraphs above where it

13    says "results" on page 4 and about in the

14    middle it says, summary statements were

15    offered by 131 women.

16    A.    Ah, okay.  I see it, yes.

17    Q.    Is that correct?

18    A.    Yes.

19    Q.    And are those the narratives

20    you were talking about earlier?

21    A.    Yes.

22    Q.    And so that's where in the

23    report there was an option to write in a

24    free text box after a statement colon?

1       A.    Correct.

2       Q.    And there were not separate

3   summary statements, right?  There weren't

4   other documents submitted?  Those were

5   the summary statements, the ones that

6   came in --

7       A.    Yes.

8       Q.    -- the responses?

9            Okay.  The only difference

10  from what you had had in your pile was

11  that you compiled those from each of the

12  individual reports or somebody compiled

13  those from each of the individual --

14      A.    Uh-huh.

15      Q.    -- reports?

16      A.    Yes.

17      Q.    And who did that?

18      A.    It was a combination of all

19  of us.

20      Q.    Okay.  When you say "all of

21  us," was it you, Lisa and Stephen?

22      A.    Lisa and Stephen.  We all

23  had our versions until we settled on that

24  one.  And then the major feat was getting

Annie G. Steinberg, M.D.

1    it to print out.

2         Q.    Are you a statistician?

3         A.    No.

4         Q.    On page 4 it also goes on to

5    say -- make sure I'm looking at the right

6    sentence -- right after where it said the

7    summary statements were offered by 131

8    women, in order to assess the aggregate

9    severity and distribution of potential

10   damages among the entire plaintiffs'

11   class, the response rate and sample size

12   would be more than adequate to provide

13   reasonable confidence intervals for the

14   percentages of plaintiffs in each of

15   several categories of damage severity,

16   but this exceeded the scope of this

17   report.

18         Did I read that correctly?

19         A.    You did.

20         Q.    What does that mean?

21         A.    That means that had one

22   wanted to look at statistical

23   significance of the response rate --

24         Q.    Yeah.

1         A.    -- that it would have been

2    statistically significant; however, this

3    was not being conducted as a research

4    study.  So it was beyond the scope of

5    this because we were not yet going to be

6    looking at the statistical significance.

7    I was mentioning that the response rate

8    was excellent, that we're pleased to have

9    that many women respond because it gave

10   us a good sense of what the general

11   experience might have been of all the

12   women, but that we were not going to be

13   conducting research yet about this

14   matter.

15         Q.    So in your professional

16   experience, is it fair to say that you're

17   saying that a population made up of

18   individuals who both approached counsel

19   and then chose to fill out a survey would

20   be statistically relevant in some way to

21   a population also treated by Akoda who

22   neither approached counsel or decided to

23   complete the survey?

24         A.    Possibly yes and possibly

1            better than previous pelvic exams

2            they had experienced.  Right?  And

3            10 percent said they were less

4            painful than other exams.

5    BY MS. McENROE:

6            Q.    But again, is this a way of

7    suggesting to the respondents as they go

8    through that Dr. Akoda might have been

9    more rough, insensitive, had longer

10   exams, sexual talk and/or touch?

11           A.    You know, if asking a

12   question is always perceived as

13   suggestive, then I would never ask

14   somebody if they have any suicidal or

15   homicidal ideation because they may never

16   give that answer unless I ask that

17   question.  But if asking the question is

18   sort of the same as the whole debate

19   about should you talk to kids about --

20   about their sexuality.  Well, when you

21   speak with a middle school child about

22   whether they've ever had sex or thought

23   about sex, is that suggestive to them

24   that, gee, maybe I should have sex?  So,

Annie G. Steinberg, M.D.

1  you know, I guess I could be mute and not

2  ask any questions, but if I want to be

3  effective as a person trying to gather

4  information then I'm going to ask the

5  questions in a way that gives people

6  permission to explain and to say more.

7          Q.    What about the difference in

8  length in the response options, do you

9  have any sense about -- in survey science

10  about how it influences respondents to

11  pick a certain response when that's the

12  longest one?

13          A.    I'm sure you can find

14  experts to that -- that can speak more to

15  that.

16          Q.    But you don't?

17          A.    I don't --

18          Q.    That's not something --

19          A.    -- have experts in my

20  pocket, no.

21          Q.    That's not something you

22  took into consideration when drafting

23  these responses?

24          A.    I took into consideration

Case 2:23-1998 2:19-05620 Document 22-5 Page 565 Date Filed 09/08/2023

1  doing the job that I was asked to do, to

2  understand what these women's experiences

3  were in the presence of Dr. Akoda, who

4  may or may not, have been a doctor as

5  certified by your client.

6          Q.    But without using survey

7  sciences?

8                MR. CERYES:  Objection.

9          Form and foundation.

10               THE WITNESS:  I'm sorry, I

11         think that the morning part of the

12         session I explained the background

13         that I had.  I'm sure there are

14         many aspects to survey science and

15         marketing.  That's not really the

16         domain of my training.  My

17         training was in ethnography,

18         microethnography, qualitative and

19         quantitative methodologies.

20  BY MS. McENROE:

21         Q.    Okay.  And for 3c, you ask

22  about having a nurse or a chaperone in

23  the room during pelvic examinations, and

24  I think this morning you referenced that

1    in the practice typically you would

2    expect that there would be a chaperone in

3    the room for all gynecological care on

4    what basis?

5          A.    In recent years that has

6    been the practice.

7          Q.    Okay.

8          A.    Now, you may have a

9    different experience if you have a very

10   deep and abiding relationship with your

11   practitioner, but most physicians

12   providing gynecologic care now will do

13   that for their own liability and

14   protection.

15         Q.    And on what basis do you say

16   that?

17         A.    On the basis of being a

18   physician and being at the University of

19   Pennsylvania communicating with my

20   colleagues about practice.

21         Q.    Who have you talked to about

22   specifically having chaperones in the

23   room during pelvic examinations?

24         A.    Oh, I have a number of

1    answered.

2        THE WITNESS:  From reading

3    the newspaper and from common

4    knowledge that that is a standard

5    of care among American

6    obstetrics-gynecologists.

7  BY MS. McENROE:

8    Q.   For question 4, 4a, you had

9  asked, did you think that Dr. Akoda asked

10  you to come in for checkups more often

11  than needed.

12        Why did you ask that

13  question?

14    A.   That would suggest that he

15  was seeking contact with particular

16  patients for his own gratification rather

17  than for their medical need.

18    Q.   And you think that -- or

19  strike that.

20        You drafted this for a

21  second or third grade reading level, you

22  said?

23    A.   Uh-huh.

24    Q.   That's a yes?

1    A.    Yes.  Sorry.

2    Q.    And you're now asking them,

3  the respondents to make a determination

4  of whether they think that the requested

5  checkups were more frequent than would be

6  medically necessary?

7    A.    Yes.  Uh-huh.

8    Q.    Okay.  For 4c, that's the

9  question, pelvic exams are never fun, but

10 looking back do you think his exams were

11 more or less painful than other pelvic

12 exams you've had with other doctors.

13         There's no I don't know or

14 remember option there.  Why not?

15    A.    Probably were trying to keep

16 this to be a short survey and all the I

17 don't knows or remembers or -- add space

18 and time to read.  But there was a more,

19 there was a less and there was a -- I

20 don't know what the no is actually.  Do

21 you think he was more or less painful --

22 I don't even know what the no is.  That's

23 just probably an error.

24    Q.    So maybe that was intended

1   to be I don't know or remember?

2        A.    I don't remember actually

3   and I -- and I don't know.  It may have

4   been at 2:00 in the morning.

5        Q.    So you think you prepared

6   this at 2 o'clock in the morning?

7        A.    Very likely.

8        Q.    Okay.  And what review or

9   process was there before this went live

10  in terms of the content?

11       A.    I'm sorry, you want to

12  clarify that question, please.

13       Q.    Yeah, the questionnaire --

14       A.    Yeah.

15       Q.    -- what review or process

16  was there to verify that the questions

17  were what you meant to be asking before

18  it went live?

19       A.    I read them through a few

20  times and Lisa Bain read them through a

21  few times.

22       Q.    Anybody else?

23       A.    Probably Mr. Ceryes also or

24  his associate.

Annie G. Steinberg, M.D.

1    Q.   For 4e, did you ever

2  consider changing doctors, yes, no, I

3  don't know or remember.

4         I didn't see the data

5  reported on that in your report.  Do you

6  remember how that came out?

7    A.   No, there were lots of

8  things we did not report on.  Just not

9  enough time.  But you have the -- the raw

10  data, so you can calculate that.

11    Q.   Well, I have the raw

12  reports.  I think you said you had it

13  more in a tabulated data form that

14  Stephen could get for you as you needed

15  it.

16    A.   What we asked of him.  We

17  did not ask that of him.

18    Q.   Okay.  Why not?

19    A.   Probably a limitation of

20  time.

21    Q.   So in question 5b the

22  question is, how did you feel when you

23  heard about the charges against

24  Dr. Akoda?  Check all that apply.  And

1          A.    I meant emotional

2    distress --

3                MR. CERYES:  Objection.

4          Form and foundation.

5                THE WITNESS -- as a

6          layperson correlate of not -- not

7          settling well, not being

8          comfortable, not being happy, not

9          being satisfied, not feeling good.

10   BY MS. McENROE:

11         Q.    Do you have any

12   understanding of whether there's a legal

13   meaning to the term "emotional distress"?

14         A.    There probably is.

15         Q.    Were you intending to use

16   this in that way?

17         A.    No, I was not.  I'm not

18   sure.  I'm not a lawyer.

19                MR. CERYES:  Objection.

20          Form and foundation.

21                THE WITNESS:  And that's not

22          my intention.

23   BY MS. McENROE:

24         Q.    So you're meaning emotional

1    distress here to mean that in not sort of

2    a formal term, but in more of a

3    layperson's type of language --

4            A.    Correct.

5            Q.    -- is that what you mean?

6                  So let's turn real quick --

7    you still have that on your lap.

8            A.    I do.  Uh-huh.

9            Q.    Let's -- we're going to take

10   a look at -- I think it was Exhibit 6,

11   which is the collection of survey

12   responses.

13           A.    Yes.

14           Q.    And we put Bates numbers,

15   like I mentioned, at the bottom.

16           A.    Okay.

17           Q.    So it might be easiest if I

18   use those.

19           A.    Sure.

20           Q.    We're going to flip ahead to

21   page 185.

22           A.    Okay.

23           Q.    Let me get there.  One

24   second.  Okay.  So let's take a look --

1   this is the first of the questionnaires

2   that we're really going to look at for a

3   minute.  I'm only going to point to a

4   couple of particular responses because

5   I'm going to get back the questionnaire

6   before we come back to some more specific

7   responses.  But I wanted to look -- we

8   were just talking about 6a and it relates

9   to 6b.  So I want to take a look at this

10  respondent's responses to 6a and 6b.  So

11  6a is, did you experience emotional

12  distress as a result of Dr. Akoda's

13  conduct or as a result of learning that

14  he might not be a licensed doctor or that

15  his name and papers were not real.  And

16  this respondent said no.  So they didn't

17  experience emotional distress from that.

18  And then 6b, do you still experience

19  emotional distress as a result of

20  Dr. Akoda's conduct or as a result of

21  learning that he might not be a licensed

22  doctor or that his name and papers were

23  not real, and the respondent said yes.

24          How do you reconcile those

Case 2:23-1998526 Document D 22-5ent Page 574d 1 Date Filed Page 09/08/2022

1   two answers?

2           A.    Yeah.  It's -- it's

3   interesting.  This is a fairly benign

4   response.  This person was pretty pleased

5   with the care that she received with

6   Dr. Akoda.  She thought the pelvic exams

7   were fine, less painful.  Her daughter

8   saw him.  But she noted that she feels he

9   betrayed her trust and has led her to

10  change her practice about how often she

11  visits an OB/GYN and it has led her not

12  to trust doctors.  She is very clear it

13  hasn't affected other parts of her life,

14  although she says it's a -- still has a

15  pain in her stomach, which may or may not

16  be related, and that is the sum totality

17  of what she reports, not particularly --

18          Q.    Right.

19          A.    -- excessive.

20          Q.    So that --

21          A.    This is a woman --

22          Q.    -- wasn't my question, Dr.

23  Steinberg.

24                So 6a is no and it instructs

1    if you say no to move on to 6c, yet she

2    answered yes for 6b.  So I'm just trying

3    to understand as a survey design

4    standpoint, she was able to answer a

5    question she was supposed to have skipped

6    and then they give contradictory

7    responses, and I just wanted to

8    understand your --

9         A.    Right.

10        Q.    -- perspective on that from

11   a survey design perspective?

12        A.    My -- my thought is, and as

13   I'm looking at this right now, is that

14   this exemplifies the complex nature of

15   emotions and how a person can have

16   multiple and contradictory experiences of

17   the same thing.  Here's somebody who was

18   really okay with Dr. Akoda and yet she

19   was shocked to find out about this.  It

20   betrayed her trust and it altered her

21   practice.  So overall her distress is

22   limited to the sort of cognitive

23   dissonance of this person that she liked,

24   that she valued, that she trusted and

JA2465

Annie G. Steinberg, M.D.

1    then this information that she couldn't

2    quite grapple with.  So in two questions,

3    one right next to the other, you see the

4    contradictory nature of her emotions

5    about this.

6            Q.    But that's a lot to take

7    from this, knowing this yes.  Right?  I

8    mean, she could have either made a

9    mistake, she could have not understood

10   the questions or could have just been

11   that when she hit no and it meant to skip

12   her along to the next question, the

13   design of the survey was just not robust

14   enough to direct her in that way.  Right?

15   She clearly saw 6b after answering 6a.

16           A.    Do you have a question for

17   me?

18           Q.    I'm asking you.  So isn't

19   that true?  I mean, she saw 6b then

20   clearly after she saw 6a, correct?

21           A.    You asked me what I took

22   from this.

23           Q.    Yeah.

24           A.    I'm explaining to you what I

1  took from the contradictory nature of her

2  responses on those two because I'm not

3  looking at exclusively at those two

4  questions.  I'm looking at the rest of

5  the responses that she had and I'm seeing

6  other information that fills it out a

7  little built more.  Kind of like if

8  you're coloring a page, there's an

9  outline and then there's a color.  So I

10  get the color from her responses.  She

11  really did not have terrible experiences

12  with him.  She liked him.  She trusted

13  him.  And she sent her daughter to him.

14  And she thought his pelvics were fine.

15  There is no sexually inappropriate

16  conduct that he had that she experienced.

17  And yet she felt that he betrayed her

18  trust.  Those are her words.  That was

19  not a choice.  She didn't check "other"

20  and leave it blank.  She explained what

21  she felt.  She colored in the lines as

22  she did in 7.  So while that may -- in

23  and of itself, those two questions might

24  be confusing to you as you look at them.

Case 2:23-19085-GWend D22-Supplemental Page 578 Filed 12/08/2022 Page 09/06/2023

1    I have a little more information from

2    looking at her response to 7a and 7b and

3    5c.  That explains, yeah, she -- she was

4    really not -- she didn't really

5    experience emotional distress, but

6    then -- then she learned that that this

7    stuff was in the news and she heard about

8    it.  And so still, it has -- there's that

9    "still" word.  Do you still experience.

10   And when she saw the "still," is like

11   yes, I don't go to doctors as often, I

12   don't go to OB/GYNs as often.  The

13   difference between those two questions is

14   one of immediate.  When you heard about

15   it, did you have emotional distress?

16   Were you -- were you -- she might have

17   read emotional distress as like trauma.

18   Did you experience trauma.  This woman is

19   not really decrying trauma.  What she's

20   explaining is that it's affected me

21   still.  I -- I don't use practice --

22   practitioners in the same way that I did

23   before.  Those are her words.  I'm not

24   putting words into her mouth in this.

JA2468

Annie G. Steinberg, M.D.

1   And you asked me what I take from those

2   two questions and that is my answer.

3           Q.    So with 6a, when you said no

4   and then in itals, if you answered no to

5   question 6a, skip to question 6c, you

6   didn't really mean it.  You thought they

7   might have cognitive dissonance and

8   answer 6b.

9           A.    No, I thought that she would

10  skip it, but she didn't.

11          Q.    Okay.  So it wasn't set up

12  to skip it for her?

13          A.    Apparently not.

14          Q.    Okay.

15          A.    That particular one was not.

16  Sometimes we did, sometimes we just

17  overlooked it.  But it is interesting how

18  she responded.

19          Q.    So question 6h.

20          A.    Yes.

21          Q.    And after that then 6i

22  through 6s.

23          A.    Yes.

24          Q.    We don't need to go through

1   each of them in detail, but starting with

2   6i, these are not questions tied to

3   experiences with Dr. Akoda in particular,

4   as written on their face.  Right?  So,

5   for example, 6i, have you experienced

6   mood changes or depression?  Then, yes,

7   only in the past month; yes, only prior

8   to the past month; yes, both in the past

9   month and prior to the past month; and

10  no.

11          Do you see that?

12      A.    Yes.  Uh-huh.

13      Q.    And then the rest of those

14  until 6s are the same, right?  They're

15  asking all sorts of questions.

16      A.    Uh-huh.

17      Q.    But they're not tied

18  specifically to experiences with

19  Dr. Akoda?

20      A.    They're asking if they've

21  had these experiences, correct.

22      Q.    Right.  So it's true that

23  the responses there on those, this could

24  have all different other sorts of causes.

# Exhibit 3

| | |
|---|---|
| From: | Brent Ceryes <bceryes@sfspa.com> |
| Sent: | Friday, October 11, 2019 6:40 PM |
| To: | McEnroe, Elisa P. |
| Cc: | Paul Vettori |
| Subject: | RE: Russell, et al. v. ECFMG - Outstanding Documents re: Dr. Steinberg |
| Attachments: | AkodaQuestionnaireBlank.pdf; Akoda Summary Statements.pdf |

[EXTERNAL EMAIL]

Elisa:

I have enclosed the list of summary statements and the final questionnaire that was completed by the survey respondents. I have also requested that Dr. Steinberg produce a copy of the questionnaire from the Levy/Hopkins matter that she discussed at her deposition, and have reached out to determine whether we can obtain the data from these surveys in a database or spreadsheet format.

The report she wrote in the Levy matter is beyond the scope of discovery. You had an opportunity to question Dr. Steinberg regarding her experience in the Levy matter and the extent to which that experience, and her other experience in similar cases, informed her approach in this case, and you did so. The report she drafted in that separate case does not represent facts or data upon which she is relying or considering in this matter. It is also a report that was submitted confidentially for mediation purposes, and includes personal information and narratives concerning sexual assaults and damages of individuals who are not parties to this matter. That report is not relevant, discovery of that report is not proportionate to the needs of the case, and it represents attorney work product, particularly considering that is was material prepared for counsel in a separate matter.

I will provide the other materials when I receive them.

Thanks, and have a good weekend.

Brent

---

**From:** McEnroe, Elisa P.
**Sent:** Friday, October 11, 2019 4:27 PM
**To:** Brent Ceryes
**Cc:** Shaffer, Brian W. ; Klayman, Matthew D. ; Paul Vettori
**Subject:** Russell, et al. v. ECFMG - Outstanding Documents re: Dr. Steinberg

Brent,

It was apparent at Dr. Steinberg's deposition yesterday that documentation that should be produced has not yet been produced.

First, and most glaringly, it is not clear what survey was actually disseminated to the survey respondents. Please provide an authoritative version of the survey ASAP.

Second, as you agreed, Dr. Steinberg referred repeatedly to a past other survey she had used in another case as the key material considered in crafting her survey here. Please provide that survey and please also provide the resulting report. I believe that Dr. Steinberg testified she has those in her possession if you do not.

Third, please provide the documentation with the "Statements" collected through the survey, in the form that Dr. Steinberg had it.

Fourth, please provide the electronic data coming out of the survey, as we discussed.

It is imperative that we get this information as soon as possible. Rebuttal reports are due on Monday and we are concerned about prejudice, potentially requiring later supplementation.

Thank you.

**Elisa P. McEnroe**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5917 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
elisa.mcenroe@morganlewis.com | www.morganlewis.com
Assistant: Angela P. Garden | +1.215.963.5463 | angela.garden@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

JA2473

# Exhibit 4

**From:** Mickey McCoy
**Sent:** Wednesday, September 4, 2019 2:03 PM
**To:** drannie@pennmedicine.upenn.edu
**Cc:** Brent Ceryes <bceryes@sfspa.com>
**Subject:** ECFMG - Akoda Matter

Good day Dr. Steinberg:

Attached to this email are the following documents for your review, I will also be sending Fed-Ex to the address you provided:

1. ECFMG Complaint
2. Dep Transcript of Desire Evans
3. Dep Transcript of Elsa Powell
4. Dep Transcript of William Kelly

Thank you for your assistance and should you have any questions, please do not hesitate to contact our office.

---

Citrix Attachments                                    Expires March 2, 2020

Dep Transcript of Desire Evans.pdf                    4.5 MB

Dep Transcript of Elsa Powell.pdf                     4.7 MB

Dep Transcript of William Kelly.pdf                   7.4 MB

ECFMG Complaint.PDF                                   1.6 MB

Download Attachments

Mickey McCoy uses Citrix Files to share documents securely.

Mickey Y. McCoy, Mass Tort Paralegal
SCHOCHOR, FEDERICO AND STATON, P.A.
1211 Saint Paul Street
Baltimore, MD 21202
mmccoy@sfspa.com
410-234-1000 – Office
410-234-2846 – Facsimile
*The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, please be advised that any dissemination, distribution or copying is strictly prohibited. If you have received this e-mail in error, please immediately e-mail the sender.*



Emails0001
JA2475

| From: | Brent Cerves |
|---|---|
| To: | Steinberg, Annie; jon.schochor@gmail.com; Phil Federico |
| Cc: | Lisa Bain; stephen.ehrlich@themcsgroup.com |
| Subject: | Re: Akoda questionnnaire for your review |
| Date: | Sunday, September 08, 2019 7:27:53 AM |

Dr. Steinberg,

I have reviewed the questionnaire, and have the following comments.

1b. While this list should cover most of our clients, we may want to include an option for "Other."

5a. None of these women would have recieved an unsolicited call from an attorney. I would suggest removing that option.

I will discuss with Jon and Phil and let you know their thoughts.

If you would like to discuss these changes, please feel free to call today on my cell phone at (410) 598 1667.

Thank you.
Brent

# Brent Ceryes

| | |
|---|---|
| **From:** | Brent Ceryes |
| **Sent:** | Wednesday, September 11, 2019 11:20 AM |
| **To:** | 'Steinberg, Annie' |
| **Subject:** | FW: Urgent: Akoda Matter |

Dr. Steinberg:

The emails have been sent for our clients. The text is below.

Thanks.


Dear Ms. Day,

As you know, we have filed a lawsuit against the Educational Commission for Foreign Medical Graduates ("ECFMG"). We allege that ECFMG, which checks the credentials of foreign medical graduates, knew or should have known of wrongful conduct by "Charles Akoda," but failed to take action to stop him from practicing medicine. As a result, "Akoda" was allowed to see and treat patients with an unlawfully obtained medical license. You are a potential Class Member in this lawsuit.

In order to understand the experiences of our clients, we have hired an expert in forensic psychiatry, Dr. Annie Steinberg. To allow Dr. Steinberg to help us go forward with this lawsuit and collect the information necessary for her opinions, you will need to complete a questionnaire to share your experiences and feelings as a patient of Akoda.

This questionnaire must be completed by clicking the following link:

https://fs4.formsite.com/Nx0yfi/lbpxinjxt4/index.html

You will be asked to login using your email address. In the Password field, please enter "AKSurvey@2019" without quotes. This email address will only be used to identify your submission.

**It is very important that you complete this questionnaire so that we can proceed with your case.**

**Please respond to this questionnaire no later than this Friday, September 13, 2019.**

We estimate that this questionnaire should take approximately 10 minutes to complete.

If you have any questions about this process, or if you need help with the questionnaire, please contact us at 410 234 1000.


Sincerely,

Brent Ceryes

Attorney

Schochor, Federico & Staton, P.A.

1211 St. Paul Street

Baltimore, Maryland 21202

Emails0003
JA2477

(410) 234 - 1000

2

## Brent Ceryes

| From: | Brent Ceryes |
|---|---|
| Sent: | Wednesday, September 11, 2019 3:02 PM |
| To: | Steinberg, Annie |
| Subject: | FW: Desire Evans - 09.05.19 - Monique Russell, et al. v. Educational Commission for Foreign Medical Graduates - FINAL |
| Attachments: | de090519.pdf; de090519.ptx; de090519.txt; Evans Exhibits 09.05.19.zip |

**From:** Production <Production@golkow.com>
**Sent:** Wednesday, September 11, 2019 9:08 AM
**To:** Brent Ceryes <bceryes@sfspa.com>
**Cc:** Finals <Finals@golkow.com>
**Subject:** Desire Evans - 09.05.19 - Monique Russell, et al. v. Educational Commission for Foreign Medical Graduates - FINAL

Please find attached the FINAL Ascii and e-transcript of Desire Evans.

This attachment is in e-transcript PTX format, which requires a downloadable viewer in order to open it. You can obtain the PTX viewer free of charge at the following link: http://store.westlaw.com/software/ebundle/viewer/default.aspx. You need only download the viewer once. If you've previously installed the viewer, simply double-click the attached PTX file. For your convenience, a plain text ASCII is also attached for importation into LiveNote, Summation and/or most word-processing programs.

If we can be of any further assistance in this matter, please do not hesitate to contact us.

Thank you,
**Chrissy Tafel**
*Case Manager*
One Liberty Place
1650 Market Street, Suite 5150
Philadelphia, Pennsylvania 19103
www.Golkow.com | **215.586.4223 | 877.370.DEPS** | CTafel@golkow.com



Discovery  Depositions · Trial

Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosures by federal privacy laws. Any medically related patient information contained herein is protected under federal privacy laws, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This information is not to be relayed to unauthorized third parties. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and delete this email from your system.

1

Emails0005
JA2479

# Brent Ceryes

| From: | Brent Ceryes |
|---|---|
| Sent: | Wednesday, September 11, 2019 3:02 PM |
| To: | Steinberg, Annie |
| Subject: | FW: Elsa Powell - 09.06.19 - Monique Russell, et al. v. Educational Commission for Foreign Medical Graduates - FINAL |
| Attachments: | Powell Exhibits 09.06.19.zip; ep090619.pdf; ep090619.ptx; ep090619.txt |

From: Production <Production@golkow.com>
Sent: Wednesday, September 11, 2019 9:21 AM
To: Brent Ceryes <bceryes@sfspa.com>
Cc: Finals <Finals@golkow.com>
Subject: Elsa Powell - 09.06.19 - Monique Russell, et al. v. Educational Commission for Foreign Medical Graduates - FINAL

Please find attached the FINAL Ascii and e-transcript of Elsa Powell.

This attachment is in e-transcript PTX format, which requires a downloadable viewer in order to open it. You can obtain the PTX viewer free of charge at the following link: http://store.westlaw.com/software/ebundle/viewer/default.aspx.
You need only download the viewer once. If you've previously installed the viewer, simply double-click the attached PTX file. For your convenience, a plain text ASCII is also attached for importation into LiveNote, Summation and/or most word-processing programs.

If we can be of any further assistance in this matter, please do not hesitate to contact us.

Thank you,
**Chrissy Tafel**
*Case Manager*
One Liberty Place
1650 Market Street, Suite 5150
Philadelphia, Pennsylvania 19103
www.Golkow.com | **215.586.4223 | 877.370.DEPS** | CTafel@golkow.com



Discovery  Depositions  Trial

Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosures by federal privacy laws. Any medically related patient information contained herein is protected under federal privacy laws, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This information is not to be relayed to unauthorized third parties. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and delete this email from your system.

Emails0006
JA2480

**Brent Ceryes**

| | |
|---|---|
| **From:** | Brent Ceryes |
| **Sent:** | Thursday, September 19, 2019 5:25 PM |
| **To:** | Steinberg, Annie |
| **Subject:** | ECFMG; Expert Report |

Dear Dr. Steinberg,

As we have discussed, and as you have seen in our Complaint, this case involves an individual known to our clients as "Dr. Charles Akoda," who undertook to act as a gynecologist/obstetrician to potentially over 1,000 patients.

"Akoda" a/k/a "Oluwafemi Igeberase," has admitted to using various fictious identities, including the "Akoda" identity, as well as a variety of fake identification, including a fake passport, a fraudulent social security number, fraudulent or altered medical transcripts, fraudulent or altered diplomas, and fraudulent letters of recommendation, in order to obtain ECFMG certification, obtain admission to residency programs and ultimately act as an obstetrician/gynecologist, performing medical procedures and gynecologic examinations on patients. Through this conduct, this individual intentionally sought to circumvent the lawful process designed to ensure the competency and character of foreign medical graduates, placing patients at risk.

This lawsuit has been filed against the Educational Commission for Foreign Medical Graduates, which was made aware in 2000 that "Akoda" had used a fraudulent social security number in documentation submitted to ECFMG and the Jersey Shore residency program. ECFMG was also made aware at that time that "Akoda" had admitted to previously using other allases, including the "Igberase" identity. Notably, ECFMG had previously revoked the ECFMG certification of "Igberase" as a result of false statements he made on ECFMG applications.

We allege, among other allegations, that ECFMG was negligent in failing to investigate and take appropriate action to revoke the ECFMG certification issued to "Akoda" after having been made aware of these and other concerns. We allege that as a result of this negligence, our clients have suffered significant emotional distress, including the distress and fear they experienced upon learning that the individual they trusted to render medical care was not a lawfully-licensed physician, and had engaged in substantial fraud in order to become their obstetrician/gynecologist. Additionally, clients have identified concerns regarding potential inappropriate behavior and conduct.

Consistent with our prior discussions, we have asked you to oversee a survey of the potential damages our clients may have experienced concerning this incident. We have distributed the survey you designed to our clients, and ask that you review the results of those surveys and provide us your analysis of the results in a report.

As this matter is pending in federal court, please include the following with your report, consistent with Federal Rule 26:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

Emails0007
JA2481

(vi) a statement of the compensation to be paid for the study and testimony in the case.

We look forward to the receipt of your report.

Thank you.

Brent Ceryes
Attorney
Schochor, Federico & Staton, P.A.
The Paulton
1211 St. Paul Street
Baltimore, MD 21202
(410) 234 -1000

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, please be advised that any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail in error, please immediately e-mail the sender at bceryes@sfspa.com. Thank you.

Emails0008
JA2482

## Brent Ceryes

| From: | Brent Ceryes |
|---|---|
| Sent: | Saturday, September 21, 2019 5:31 PM |
| To: | Steinberg, Annie |
| Subject: | Re: quick question |

Filed on December 10, 2018 in court of common pleas of Philadelphia County, but it was thereafter removed to Federal District Court for the Eastern District of PA.

In response to Lisa's other questions, my understanding is that the questionnaire was emailed to all individuals on Stephen's list. I do not believe that any questionnaires were completed over the phone.

Get Outlook for Android

1

Emails0009
JA2483

| | |
|---|---|
| **From:** | Brent Ceryes |
| **To:** | Steinberg, Annie |
| **Cc:** | stephen.ehrlich@themcsgroup.com; Lisa Bain |
| **Subject:** | Re: need to know how many questionnaires were sent out. |
| **Date:** | Sunday, September 22, 2019 7:27:20 AM |

It looks like 575 emails, per Stephen's list. Stephen creates two accounts for me (first had a typo), but I only accessed the form. I did not answer any of the questions. If 305 is completed forms, I am not in that number.

Get Outlook for Android

**From:** Steinberg, Annie <drannie@pennmedicine.upenn.edu>
**Sent:** Sunday, September 22, 2019 12:40:47 AM
**To:** Brent Ceryes <bceryes@sfspa.com>
**Cc:** stephen.ehrlich@themcsgroup.com <stephen.ehrlich@themcsgroup.com>; Lisa Bain <lisa.bain@gmail.com>
**Subject:** need to know how many questionnaires were sent out.

Redacted - Trial Preparation Material

# Exhibit 5



# Expert Rebuttal by
# Susan Schwartz McDonald, Ph.D.
# on a Survey Conducted for Plaintiffs by
# Annie Steinberg, MD

October, 2019



EXHIBIT

McDonald-1

12/19/19



NAXION

RESEARCH › CONSULTING

JA2486

# TABLE OF CONTENTS

**Page**

I.  **INTRODUCTION** .................................................................. 3

    A.  Scope of Testimony and Summary of Opinions ............................... 3

    B.  Professional Credentials and Compensation .................................. 3

    C.  Basis for my Opinions ........................................................ 5

II.  **Survey Definitions and Methodological Requirements** ..................... 6

    A.  What is a 'Survey'? .......................................................... 6

    B.  Overview of Deficiencies in the Steinberg Survey ........................... 7

III.  **Specific Deficiencies of the Steinberg Survey** ........................... 9

IV.  **Conclusions** ................................................................ 21

    **Appendix A:** CV of Susan Schwartz McDonald, Ph.D.

JA2487

## I.  Introduction

### A.  Scope of Testimony and Summary of Opinions

I was retained by Morgan Lewis as an expert witness on behalf of Defendant in *Monique Russell et al. v Educational Commission for Foreign Medical Graduates*, class action litigation which has been brought in the Eastern District of Pennsylvania.  Specifically, my charge is to offer rebuttal testimony to a survey conducted on behalf of Plaintiffs by Dr. Annie Steinberg, a psychiatrist whose survey of putative class members purports to assess harm suffered by Plaintiffs as a result of their experiences under the care of "Dr. Akoda".  I note that my testimony is not offered in rebuttal to any allegations regarding Dr. Akoda's credentials or the circumstances under which he practiced medicine. My testimony as a survey methodology expert is focused exclusively on the *validity of the survey assessment* made by Dr. Steinberg, and its meaningfulness as a vehicle for measuring psychological harm and other life consequences experienced by Plaintiffs, either as individuals or as a class.  My testimony also makes no assumptions about the legal purpose or relevance of Dr. Steinberg's data and conclusions.

I base my opinions on my graduate training in the social sciences, my professional expertise in the field of survey science, and my applied experience as a research professional who has been chief executive of a highly respected, century-old marketing and opinion research firm, and has authored and supervised thousands of complex surveys relied on by corporations, government agencies, and courts over a span of nearly four decades.  Also relevant to this rebuttal analysis is my expertise in *qualitative* research, having conducted many thousands of qualitative interviews in my career and co-authored the field's first standard text on qualitative interview techniques.

Based on my expertise in survey design, implementation, analysis, and interpretation, I have concluded that Dr. Steinberg's survey is not simply amateurish; it is so methodologically deficient and so biasing as to lack validity as a survey measurement tool.  Due to numerous disabling methodological flaws, none of the statistics generated by this survey can be taken at face value or serve as the basis for conclusions, even with a confidence interval applied.

### B.  Professional Credentials and Compensation

I am President and CEO of NAXION, a century-old marketing research and consulting organization that advises companies on product development, brand strategy, and other strategic marketing activities.  As an expert in marketing and opinion research, I consult to companies on a variety of strategic issues including brand health, opportunity assessment, innovation, commercialization strategy, and lifecycle management.  My marketing and research experience encompass assignments designed to improve customer experience and strengthen brand reputation, as well as develop and commercialize new market offerings in a number of industries – particularly Healthcare, Consumer products, and Financial services.

Survey research is a principal tool in a large number of these engagements, and I am relied on by clients and colleagues for my expertise in designing and developing surveys with complex

3

JA2488

objectives, many of which are used to measure opinions and behaviors within challenging or sensitive populations.  Throughout my career, I have personally designed and conducted thousands of surveys, many of them in the service of developing new products, optimizing product configuration, projecting demand or measuring public health consequences of product usage. I have also consulted and testified frequently on the application and interpretation of survey research to adjudicate claims under the Lanham Act (as well as decide patent claims) and my survey work has been utilized by government agencies like FDA and FTC, as well as USPTO. I am quite familiar with the specialized issues associated with collecting data on patient experience with diagnosis and disease progression, interactions with healthcare professionals, and recollections of their healthcare "journey." Throughout my career, I have conducted hundreds of surveys with healthcare consumers and patients of all kinds (including some who have received psychiatric diagnoses).  I have also worked on the development and application of survey tools designed to measure patient-reported outcomes (PROs).

Although my professional focus is on commercial application, not academics, I make regular podium appearances and have lectured extensively on research methodology and marketing at major universities (e.g., University of Pennsylvania and Princeton University), commercial organizations, and industry-training programs sponsored by major professional organizations—for instance, the Council of American Survey Research Organizations (CASRO), the Pharmaceutical Marketing Research Group (PMRG), Healthcare Marketing and Communications Council (HMC), and the Advertising Research Foundation (ARF).  I have also served as Chair of the Board of Directors of CASRO, the trade association of the US marketing and survey-research industry, recently renamed The Insights Association. In my decade of CASRO board service, I was actively involved in the development of standards for survey research, both ethical and technical. Currently, I am a trustee of The Wistar Institute, the world's second oldest incubator of biomedical research discoveries, as well as President of the Board of The Chamber Orchestra of Philadelphia.

My professional marketing career has been spent at NAXION, known until 2014 as National Analysts Worldwide, and previously a division of the global commercial and technology consulting firm Booz•Allen & Hamilton, where I was a partner and vice president.  My tenure at Booz•Allen included a period during which I served as the leader of that firm's worldwide pharmaceutical-industry practice.  NAXION traces its roots directly to the world's first business intelligence unit and progenitor of the survey research discipline (1911).  Some of the nation's first commercial and government sponsored surveys were conducted by National Analysts (and its predecessor company, Curtis Publishing) and the firm is known to have shaped the opinion research and marketing research fields through the development of probability sampling and other landmark survey techniques, as well as the genesis of the focus group. In 1992, National Analysts became an independent entity, under my co-ownership, and is now an Employee-Owned Stock Ownership Corporation (ESOP) of which I am majority shareholder.  Renamed NAXION, the firm retains the same ownership and management structure, and the same corporate mission.  It has consistently been listed as one of the AMA "Top 40" market research firms in the US.

4

I received my BA degree magna cum laude, Phi Beta Kappa, from Smith College, and my MA and doctoral degrees from the University of Pennsylvania's Annenberg School for Communication, where my studies were concentrated in the field of social psychology and communications theory. I am the author of a text on market research and of numerous publications and speeches on marketing and market research methodology.  A complete copy of my vitae along with a list of publications authored in the past ten years, and testimony and depositions taken in the past five years is included in Exhibit 1.

I am being compensated for my work in this case at my customary fee of $675 per hour.  My compensation is in no way contingent on the outcome of the case.

### C.  Basis for my Opinions

In order to form my opinions, I have reviewed the following documents and materials:

- Complaint in *Russell et al. v. ECFMG*
- Answer in *Russell et al. v. ECFMG*
- Report of Annie Steinberg, MD, with Attached Questionnaire
- CV of Annie Steinberg, MD
- List of Testimony by Annie Steinberg, MD
- Rough Transcript of Deposition of Annie Steinberg, MD (10/10/2019)
- Emails0003-0004 from Exhibit 4 to the Deposition of Annie Steinberg, MD (10/10/2019)
- "Akoda Questionnaire Blank" (provided by Plaintiffs' counsel)
- "Akoda Summary Statements" (provided by Plaintiffs' counsel)

I note that, as of this writing, I have not been provided with an electronic database for the survey and have therefore not been able to manipulate or query the data to confirm Dr. Steinberg's limited statistical analyses, or to perform any of my own.  Her claim not to have such a database at her disposal is highly unusual insofar as survey programs produce readily manipulated databases as a matter of course.  (Manual inspection of individual data files does not lend itself to statistical tabulations or efficient review.)  I have also not seen actual screen shots of the survey or had an opportunity to gain direct experience with the survey programming.  Especially in light of my inability to access an electronic database at this moment of submission, I reserve the right to add or amend my rebuttal report, as relevant, if additional data, or other survey documents of any kind, are made available to me.

JA2490

## II. Survey Definition and Methodological Requirements

### A. What is a 'Survey'?

As a measurement tool of the social or behavioral sciences, survey research is guided by a set of principles and long-established best practices that aspire to justify the term "survey science". If you want to learn something about a large number of people and to feel confident that you've accurately measured what you set out to measure, it's not enough to ask them the same set of questions and then count the answers. Experience in other forms of research (e.g., experimental or clinical trial design, or proficient use of existing diagnostic tools to conduct clinical research) does not generalize to expertise in survey measurement without specific survey training.

A survey collects data from a representative subset based on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about the broader universe. Whether conducted on-line (the majority), by phone, or in person, survey questionnaires are highly structured, carefully constructed measurement instruments that ask respondents the same questions in a uniform way --with allowance made for necessary skip patterns to avoid posing nonsensical or irrelevant questions based on prior responses.

In light of Dr. Steinberg's propensity to use the term "survey" loosely to characterize large *qualitative* inquiries as well as quantitative inquiries, it may be just as important to describe what surveys are *not*. While surveys may incorporate some open-ended questions to allow respondents to express certain ideas in their own words, surveys do not accommodate customized and nuanced probing, even with the best artificial intelligence built in. Even when conducted in person (and these days, surveys rarely are), surveys afford no latitude for an interviewer to improvise. This disciplined, consistent approach to question structure justifies statistical analysis – and makes it legitimate to generalize from the survey sample statistics to a broader population.

By contrast, qualitative research is a process that seeks depth and nuance at the expense of statistical generalization. Qualitative interviews are shaped by a *semi-structured* interview protocol which, by definition, must allow for improvisation and probing based on the particular answers given by respondents in their own words. Qualitative interviews will also reflect stylistic differences among the interviewers who guide the conversation. The implications are that qualitative questioning is not necessarily or consistently uniform and the conversation between interviewer and subject unfolds in varied ways. There is room for techniques that cannot be employed in a "survey" and the standards of data validity can be more permissive in deference to the nature of the process. It does not qualify as survey *measurement*.

Indeed, qualitative research may be done in many settings for many objectives – but no matter how many interviews are conducted in a qualitative study – we do not call it a "survey" as that term is commonly used. Social scientists reserve that word for a type of research whose mission is to count answers for purposes of statistical generalization, and which therefore require a precisely

JA2491

and tightly constructed measurement instrument.  It appears that Dr. Steinberg has had very limited experience with that kind of research.

Most of the principles that qualify a survey as valid for any purpose fall under several broad headings:  (1) sampling reliability, which enables us to project from a subset to an entire population; (2) survey validity, which allows us to feel confident we have correctly measured what we set out to measure without introducing bias; and (3) proper statistical analysis, which enables us to characterize the sample in aggregate and draw correct interpretations and conclusions from the data.

It is not clear to me what "rules of the road" were guiding Dr. Steinberg in the design of her "survey" (she failed to articulate any) but survey scientists agree that for a survey to provide an accurate, statistically projectable picture of a population, the following criteria must be met:

- The universe must be properly defined in a way that is relevant to the inquiry, and survey participants must be sampled in a way that is appropriately inclusive and unbiased to ensure statistical *reliability* – i.e., allowing us to put a confidence interval around the findings.

- All questions (and survey materials) must be clearly written; consistently asked; and non-biasing in order for the findings to be deemed *valid* – i.e., allowing us to conclude that we have accurately measured what we mean to measure without skewing or distorting the data.

- Appropriate statistics need to be employed, calculations correctly made, and findings properly and contextually interpreted in order to ensure accuracy of the conclusions – i.e., allowing us to use survey numbers to paint a meaningful picture of the population, not just a numerical picture.

## B. Overview of Deficiencies in the Steinberg Survey

*Surveys can run afoul of these guidelines in a number of ways but most of my objections to Dr. Steinberg's survey fall under the heading of measurement validity and interpretation.*  The survey is poorly constructed, improperly executed, and riddled with errors known to distort the data.  The data have been under-analyzed and misinterpreted through a lens of overt and unapologetic bias.

Any study with these deficiencies cannot help but lead to unreliable and largely self-fulfilling conclusions – even if the data are correctly tabulated – but a study that aims to survey potential plaintiffs in a class action case has special vulnerabilities based on sensitizing context and self-interested participation.  In short, Dr. Steinberg's survey has produced very little worth knowing, and nothing that can be relied on for important insight into the population studied.

JA2492

Research is often hypothesis-driven, and Dr. Steinberg's survey explicitly was. She was specifically hired to put numbers to her hypotheses concerning the traumatic effects and life changes experienced by women receiving care from Dr. Akoda. Being guided by hypotheses is certainly not *per se* a bad thing, but only so long as care is taken to avoid *creating* the results one aims to measure. Survey measurement, like any tool that relies on the answers to questions, is highly prone to response bias because the act of formulating answers is an interpretive process. Participants are sensitive to signals and assumptions about what researchers might want of them, and these influences can shape their responses in ways both tacit and explicit.

A good survey researcher, no matter how deeply committed to her viewpoints and hypotheses, must do everything possible to guard against response bias in designing her instrument, lest research become an instrument of prophecy fulfillment, not scientific inquiry. Dr. Steinberg's avowed commitment to proving preconceptions, combined with her evident lack of expertise in survey methodology, produced a study afflicted with nearly as many problems as there were survey questions. Chapter III enumerates and illustrates them in detail.

8

JA2493

## III. Specific Deficiencies of the Steinberg Survey

There are numerous ways in which survey questions can specifically fail to meet threshold standards of validity – so many ways, in fact, that it may be easier to write a bad survey than a good one. Survey questions can be unclear or confusing. They can be lacking in precision. They can be priming or biasing (whether intentional or not) in ways that increase acquiescence or plant ideas. They can fail to provide appropriate response options, or those options can themselves be biasing. They can be sequenced in ways that allow early responses or questions to influence responses to questions downstream. In all these ways, and some more besides, Dr. Steinberg (and her associate, Lisa Bain) wrote a bad survey. And because a bad survey still produces *numbers* -- however off the mark or meaningless they may be – it is an inherently dangerous thing to rely on. It has the look of something authentic, but the data can be a mirage.

- ***The Steinberg Survey context was inherently prone to produce certain types of response bias, and there was nothing to mitigate that bias – or even encourage candor and reflection – in the scanty instructions provided to respondents.***

  The creation of a "survey environment" begins with the invitation to participate and instructions regarding how to take it. The general goal is to encourage participation by creating confidence that data will be treated respectfully and confidentially; to anticipate and minimize technical difficulties in advance; to secure data of good quality by encouraging candor and thoughtfulness; and to discourage respondents from attempting to "please" the researcher with specific kinds of responses.

  For instance, in surveys used for forensic purposes, it is routine to advise respondents to pay close attention, feel free to withhold an answer if they are not sure, and avoid relying on the opinions of others. In drafting surveys that require significant recall, care is taken to help respondents find their own way back to past events by establishing clear timeframes and by using techniques to help retrieve accurate memories, not promote false ones.

  Most surveys, however, are directed at respondents *without* serious personal "skin in the game" – i.e., the participants are consumers or voters, not alleged victims or financial stakeholders – and as a rule, most surveys are not dedicated, as this one was, to gathering recollections and emotions experienced before and after a specific event (learning of Dr. Akoda's fraud. This survey invitation was sent by lawyers and represented to participants as necessary "*so that we can proceed with your case.*" Notably, those same attorneys were individuals who had a hand in relaying to them the circumstances surrounding Dr. Akoda's imprisonment and claims regarding his credentials.

  Dr. Steinberg is not a survey researcher, but as a psychiatrist, she must have been aware of these potential biasing effects. Rather than making efforts to minimize them, she seems, based on her deposition testimony, to have welcomed them, bringing her own confirmation biases to bear in construction of the survey and analysis of the data. The introductory comments did not encourage respondents to take their time (indeed, respondents were

9

informed that the survey was unlikely to take more than 10 minutes even though, perhaps, it should have taken more); nor were they given orientation instructions regarding the time frames at issue and the importance of differentiating feelings and experiences *before* versus *after* they learned of the charges against Dr. Akoda. Indeed, a commonly used approach in such surveys is to address time frames separately without segueing back and forth between them to avoid conflation. This survey "time-traveled" at will.

In short, no precautions were taken to foster accurate retrospection or accommodate the possibility of a respondent having had positive experiences with Dr. Akoda. On the contrary, this "survey" was really an instrument for eliciting evidentiary testimony from putative class members in litigation, and in that sense, was a prophecy meant to be self-fulfilling.

- **The survey was <u>not pretested</u> with respondents for clarity of content nor for accuracy of programming, despite the sensitivity of the material and the avowed need to accommodate low literacy levels.**

A cardinal rule of survey science is the importance of a pretest to ensure not just that survey program mechanics are in working order, but equally important, to confirm that respondents understand the questions and the instructions. A pretest requires that at least five eligible survey respondents be asked to take the survey as they would in their own environment, and then be the subject of what, in survey science, is referred to as a "cognitive debrief". In a cognitive debrief, pretest respondents are encouraged to identify questions or instructions that puzzled or confused them and are also proactively probed for comprehension of key concepts and phrases – either in person or by phone or "Skype". Respondents' screens are typically tracked real-time during the pretest so that the interviewer can observe the answers as they are recorded and then follow up with appropriate debrief questions.

A cognitive debrief is, itself, a qualitative interview, guided by a protocol *developed specifically for the survey at issue* based on potential concerns a research team might have about certain difficult questions and concepts. Surveys often undergo some revisions based on pretest feedback because it is not uncommon for researchers to discover that there are comprehension problems – even with questions they anticipate will be entirely clear. Sometimes a second pretest is needed to confirm the efficacy of revisions. It is considered professionally irresponsible to omit the pretest step – even in the fast-paced world of commercial research, where critical business deadlines and decisions place a premium on rapid turnaround.

Lack of time is no excuse for omitting a pretest, especially when (a) the survey population is understood to include disproportionate numbers of women who are under-privileged, (b) the survey population does not comprise proficient and experienced survey-takers (e.g., a survey panel); and (c) respondents and are being asked highly sensitive questions for purposes of legal adjudication, where validity standards must be all the higher. Dr. Steinberg acknowledges that her aim was to write a survey geared to "third-grade" reading level – and potentially, to low levels of computer literacy as well. It is a rather extraordinary act of hubris for a

JA2495

researcher to assume she can accomplish that without a pretest, even if she has prior experience interviewing people with that level of reading proficiency. Each survey is different, with different question structures and language, and different instructions for question completion. Researchers need to exercise due diligence by pretesting before they go live, since there is no opportunity for course-correction once the survey is underway.

Had Dr. Steinberg conducted a pretest, she might well have discovered that phrases like "emotional well-being" were not consistently interpreted by respondents, or that respondents did not understand the importance of honoring skip patterns, or that they did not grasp some of her time frame references. She might also have discovered that some of the answer categories she supplied were inadequate to accommodate the range of likely and relevant responses. A researcher who neglects to conduct a pretest runs the risk of making survey errors that would compromise or invalidate the survey altogether.

- ***Dr. Steinberg avoided questions that would have allowed for measurement of intensity via rating scales, and instead, collected largely binary responses to questions that were often "stacked" with more than one "yes" option to prompt the expected or desired answer.***

The vast majority of questions in this survey require women to indicate whether they do (did) or do not (did not) have specific reactions or feelings about Dr. Akoda and what symptoms or consequences they have experienced. A prime example is the survey question concerning whether women trusted Dr. Akoda, asked as a simple yes/no question even though trust could be said to reside in a situational context or along an intensity continuum, and is clearly situated at points in time. The word, "trust", is itself a complex idea, with multiple connotations, even in the context of a physician-patient relationship where trust in motivation/care, trust in medical competence, and trust in personal integrity are not necessarily the same things.

Another noteworthy example is the question that asks whether survey participants' experience with Dr. Akoda has affected trust in *doctors generally* (7a). Here, again, just two answer options are offered: "yes, it has led me not to trust doctors" and "no". This is a "textbook" illustration of how _not_ to ask a question. It consistently leads with an affirmative response option and amplifies the "yes" with a single extreme statement that now obliges us to assume that every respondent who gave that response now trusts no physicians at all. The possibility of exercising greater caution, greater attention to credentials or recommendations, or any other nuanced version of "yes" has been effectively excluded by the heavy-handed wording of that answer.

Other survey questions that pursued *impact* (6a-t) are also all yes/no questions but often with a twist: here response options were typically proliferated to accommodate multiple time frames in a way that allowed Dr. Steinberg to offer three "yes" answer options (only before, only after, both) stacked up against a single "no" (Q's 6a-t). The idea of balancing response options so as not to create a positive or negative bias is also survey research canon, since we

11

know that respondents are statistically more like to select a type of answer option that is offered more frequently than another.

The 6g-s questions on impact also illustrate Dr. Steinberg's focus on an arbitrary time frame to proliferate three "yes" options (past month, prior, both) accompanied (always at the bottom) by a single "no". While bearing no clear relationship to the point at which any of these women learned of problems with Dr. Akoda's credentials, this time frame was nonetheless targeted for measurement over the frequency or intensity of *symptoms*. We don't know from the responses whether those symptoms have been experienced daily or just once, and how intense they may have been – and, of course, we do not know how many women were unsure if they had those symptoms or when since it was not measured (see commentary below). It is also worth noting that this arbitrary last month vs prior timeframe was inserted without warning after a series of time frame questions that focused on before and after learning of the charges against Dr. Akoda. It is poor practice to change question or answer structures in that way without fair warning since people readily develop response habits and often fail to notice changes.

Dr. Steinberg may have stacked the deck even higher by failing to rotate the position of "yes" and "no" responses anywhere. (There is a known bias toward "yes" in many circumstances, especially if it is consistently positioned first.) Indeed, I find no evidence of question or response rotation in any place where it might be considered appropriate, despite the fact that survey software platforms make this a fairly easy operation to perform and the principle of response rotation is routinely honored in all forensic surveys.

- **Dr. Steinberg's failure to consistently offer "don't know" or "can't recall" options wherever in the survey they were appropriate violates another cardinal rule of survey design**.

If there is a possibility that respondents may not recall or know the answer to a question, or they might conceivably be on the fence about something, the survey researcher needs to provide a response option to accommodate that, since the absence of a "don't know/not sure/can't recall" ("DK/NS") response option has been shown to have demonstrable effects on the results. Binary (yes/no) questions, in particular, need to provide hesitant or fence-sitting respondents with some refuge.

Not *every* survey question requires a DK/NS option (e.g., age and residency, occupation, or routine product purchase) but any question that requires significant recall or complex assessment should allow respondents to take refuge in uncertainty. Otherwise, respondents are forced to provide an answer that does not accurately reflect how they feel or what they recall. The omission sends a signal that respondents *ought* to remember, *ought* to have definite feelings, even if they don't. Uncertainty or hesitation can be made to seem illegitimate.

12

JA2497

Dr. Steinberg's survey was comprised extensively of questions requiring recall of events that may have happened years ago, questions involving medical practice, and many other questions about past or current emotions for which respondents did not necessarily have clear answers. Examples include whether they trusted Dr. Akoda, whether they ever felt scared or threatened by him, or whether they were ever made to feel uncomfortable in his presence. Dr. Steinberg *did* include a don't know or remember option for a number of other similar questions – for example, regarding use of gloves or sexual arousal during an exam, or physical and emotional symptoms diagnosed since their experiences with Dr. Akoda. It is not clear whether she failed to appreciate the basic principle or was merely disinclined to honor it in some places. The absence of a "don't know" or "not sure" option for important questions has, in my experience, been grounds for disqualifying surveys altogether.

That is because survey data that make no provision for "don't know" or "not sure" will overstate the percentage of definitive responses in directions that favor social acquiescence. Respondents who would otherwise have picked a "don't know" or "not sure" response are more likely, when they can't, to choose a response they perceive is socially acceptable or likely to please an interviewer. The implicit bias can be quite powerful – especially for people asked to take a survey that will help attorneys proceed with their case.

There is no clear rationale for when and why Dr. Steinberg offered "know/can't recall/not sure" response options but her suggestion at her deposition that they add time to the survey are, at best, pretextual. The absence of a relevant response option can actually *increase* response time as respondents struggle to decide in which direction they might want to err.

- ***Where Dr. Steinberg supplied substantive answers, the deck was frequently stacked with loaded language and biasing response sets.***

A striking example is 5b, which asks respondents how they felt when they heard about the charges against Dr. Akoda. This question would have been better handled as an open-ended one since the number of emotions one might envision would comprise a long list. Instead, Dr. Steinberg chose to offer four negative words ("shocked", "angry", "betrayed", "sad") along with "neutral" – a peculiar term that might better have been expressed as "indifferent"). In that way, she deprived respondents of the chance to express themselves fully from the outset before she had primed them, and she made it more challenging for them to select other words that might have offered us more insight on their own feelings. It is not clear how many respondents actually checked "other" or took the opportunity to specify, but the easy thing for anyone to do was select one of the four negative words already provided. A woman who was mildly disconcerted or incredulous or had some other reaction not captured by Dr. Steinberg's options had to work harder than others to express her point of view.

In much the same way, a question asking why women did not tell anyone about inappropriate things said by Dr. Akoda (4f) provides words like "ashamed" or "embarrassed" but does not offer respondents the option of saying that they were not much bothered by the interactions or they weren't sure they interpreted them correctly, etc.

13

Another different form of bias can be seen in questions that asked respondents to compare Dr. Akoda's pelvic and breast exams with exams given by other physicians (3a-b).  Both questions provided three categories – "positive", "neutral", "negative" – but gratuitously offered examples of the negative (more rough, insensitive, longer, sexual talk and/or touch) to help define it in a suggestive way.  There are several things wrong with this pair of questions. First, there should have been no prompts at all in the answer categories about what negative might mean.  Second, respondents should have been allowed to explain in their own words what about their personal experience was negative. Trained survey researchers understand the need to be judicious about when and how open-ended questions are utilized, but if ever there were a case for soliciting open-ended responses, this was it. Without benefit of respondent commentary here, we have only the words Dr. Steinberg herself supplied. All other possible interpretations or objections have been ruled out of hand.

In addition, it is well-established that survey respondents take tacit clues from certain aspects of question construction to detect a preferred response to which they should acquiesce. Longer, more fully elaborated responses tend to be favored, just as proliferation of negative responses increases the odds that a negative response will be chosen.

Notably, so too does gratuitous repetition of questions.  Regardless of how women responded to Q. 3a, they had another opportunity to indicate whether they found Dr. Akoda's exams more or less *painful* than others in Q. 4c, accompanied this time by a priming statement: "Pelvic exams are never fun, but…".  It's not clear what effect this language actually had, if any, but if Dr. Steinberg felt conviction about its value in orienting respondents, Q. 3a would have been the spot in which to introduce it.

- ***Dr. Steinberg neglected to program skip patterns and did not necessarily use them appropriately, allowing (or sometimes compelling) respondents to answer questions for which they were arguably ineligible.***

One of the many boons of on-line surveys is that even the most basic survey software platforms can be programmed to guide respondents through the survey with automated skip patterns.  Dr. Steinberg's technical assistant evidently did not avail himself of this option, or at least did not do so consistently, and the hazards are illustrated in the Q. 2 (trust) series.

After a few introductory questions about where they had seen Dr. Akoda and for what purposes, the survey asks respondents in Q. 2a if they trusted Dr. Akoda. This is a fairly stark way of broaching the topic of the "relationship" (as this section is labeled) because it goes straight to the heart of the claims, without allowing respondents to offer a general evaluation of the quality of care they received from Dr. Akoda.  As a simple yes/no question, without any clarifying time frame or "don't know" option, it is also a highly *biasing* way of broaching the topic.

It turns out that 79% of respondents said yes to Q. 2a, a finding which Dr. Steinberg couches as *initial* trust – even though nowhere in the question is the word "initial" or a synonym used; the

14

JA2499

question is completely non-specific as to timeframe.  Respondents who said *yes* were then given a second bite of the apple with a follow-up "If you answered yes to question 2a but at some point began not to trust him, what happened that changed?"  The question is highly suggestive.

Things look even worse when we consider the potential reasons offered for ceasing to trust Dr. Akoda: four specific options (rudeness, pain, sexual comments long pelvic exams) topped by the blandly uninformative, "just something about him" (an option chosen by roughly a third of the sample).  That curious list is notable for the omission of many plausible reasons for ceasing to trust a physician, which might have included specific advice offered, a failure to respond to calls, medical outcomes, etc.  Since the focus was apparently on establishing sexually inappropriate or abusive physical contact as precipitating factors, Dr. Steinberg's response categories were limited to those ideas.

Thanks to that second bite, almost no one could get through this series without ultimately affirming lack of trust in Dr. Akoda.  The 79% who trusted him "initially" was reduced to roughly 20% of the sample once respondents had been asked the follow-up (my calculation based on Dr. Steinberg's own reported statistics).  By the time respondents reached Q, 2d (ever feel scared or threatened during care, yes/no), they were primed to respond in hyperbolic ways about Dr. Akoda.

Another instance in which the survey conspicuously failed to take advantage of the software to skip responses is 5c, where respondents are asked *if* you are upset about what Dr. Akoda did, why?  No attempt was made to exclude people who had given a neutral response in 5b, which meant that virtually everyone was vectored into this question -- even if they were not, in fact, upset.  The question offers four reasons (no opportunity to elaborate or say "other") before nodding to the people who should not have been asked this question by providing them with a "not upset" response at the bottom.  Dr. Steinberg presumed everyone in the sample was upset, or should have been upset, and here, as elsewhere, the survey means to preordain or prove it.

- ***While Dr. Steinberg's answer categories were frequently inadequate to the question and/or biasing, she did not provide any analysis of the other-specific responses, depriving us of insight about respondents who were "disenfranchised" by the answer options supplied.***

Dr. Steinberg's agenda for the survey was evidenced in close-ended response categories that featured certain themes prominently and excluded others of equal relevance. In most cases, however, respondents appear to have had the option to choose "other" and to specify an answer if they chose to.  Unfortunately, the data have not been coded and tabulated.

Surveys tend to ration their reliance on open-end response options, including "other-specify", for various reasons.  The need to code verbal responses introduces another step with its own challenges and complications, but we frequently offer an "other-specify" option to spare

15

respondents the effort of force-fitting themselves into places they don't comfortably belong. Here, especially, the "other-specify" respondents hold special interest, given the answer categories Dr. Steinberg chose to provide.

And, indeed, we have reason to suppose a fair number of respondents did make use of "other", if responses to 1a are any indication. Even when devising a question as apparently benign as the one that asked how patients originally came to Akoda, Dr. Steinberg managed both to proliferate redundant options and miss enough possibilities to produce 24% "other". As a general rule, the appearance of large numbers of "other" responses is a signal that the pre-specified response categories have not been adequate to the job. Thus, even if we begin with no intention of coding those miscellaneous "other" answers, percentages above 20% encourage a review in order to further elucidate the data patterns. There is, however, no evidence that Dr. Steinberg looked at any of the open-ends she collected.

Respondents answering Q. 1c regarding types of visits did *not* have that "other-specify" option, even though her scant three answer categories exclude meaningful possibilities, such as visits for symptoms, fertility, or contraception, among other possibilities. Here, as in many other places, a pretest would have been helpful – to the extent there was actual interest in knowing the answers to this question. It is not clear what use Dr. Steinberg meant to make of it.

Another noteworthy example of a question that might have profited from an "other-specify" option is 5a, concerning how respondents initially learned of the charges against Dr. Akoda. One option conspicuous for its absence is an attorney or someone representing Plaintiffs in the case. This would have been useful information to have in assessing the data.

- *While ostensibly geared to a 'third-grade reading level', this survey posed questions which many women of <u>any</u> education or reading proficiency level, much less more challenged respondents, would be hard-pressed to answer.*

There is reason to doubt that many women have a clear view of how long a pelvic exam should take – especially since duration of that exam can depend on age, symptomatology, and other reasons for the visit, creating significant variance and equally significant recall challenges. There is also reason to question whether a patient of any education level could necessarily have discerned whether a chaperone was positioned in a place from which she could see the exam, especially when lying prone. People are notoriously poor judges of time and vantage point – and, as Dr. Steinberg so accurately puts it, pelvics are "never fun". They prompt thoughts and emotions of many sorts, including anxiety about the outcome. It is a large leap of research faith to imagine that the answers given by respondents to such questions can be relied on, especially in a general survey context that primed negative responses.

One of the more egregious examples of questions to which no woman could have a reliable answer is the series of questions designed to elicit physical symptoms experienced "as a result of Dr. Akoda's conduct" (6t-6x). Women are not being asked merely whether they have been

16

JA2501

diagnosed with high blood pressure but whether they have been diagnosed as a result of those experiences. For starters, anyone who believes she has been diagnosed with one or more symptoms on the list for other reasons has no place to signal that, so every answer here counts against Dr. Akoda as the cause, regardless of whether he was. More important, however, the question boldly presumes that *anyone* (physician or patient) could know whether a diagnosis of high blood pressure or PTSD or "major depressive disorder" was "as a result" of experiences with Dr. Akoda (or revelations about him). This is not a survey population equipped to make that determination or likely to have speculated about it unless prompted to do so. If a respondent perceived a connection, the perception might not be accurate; and whether or not founded, it is quite likely to have been fostered by the experience of taking this survey rather than a product of respondent's own ingoing thought process about experiences of being treated by Dr. Akoda.

Compounding error with bias, Dr. Steinberg asked a single follow-up question about severity for all "your physical symptoms" (of which over a dozen were listed), leaving the respondent to, first, assess whether any symptom might actually qualify as mild/moderate/severe, and then, second, to ponder over how to respond if different symptoms had varying degrees of severity. Failure to provide opportunity for specific reporting creates bias toward "severity" insofar as it invites people to aggregate. Bias aside, it is more vivid evidence of poor survey technique. Data from all these symptom questions should be disregarded.

- *While intrepid in asking questions that respondents truly could not answer, Dr. Steinberg omitted asking some meaningful ones that they could reasonably have been expected to answer, and which would have elucidated their experiences.*

It is noteworthy that Dr. Steinberg asked numerous questions about symptoms and life consequences she sought to attribute to experiences with Dr. Akoda but asked nothing about any medical harm they attribute to his care except a question that first built a negative frame ("if you are upset about what Dr. Akoda did, why?") and also failed to ask why they chose to remain in his care.

In an impartial survey of this population, respondents would have been asked at the outset for their assessment of the quality of care they received, any medical consequences they perceived as a result of his care, and even emotional distress linked to those consequences. Some of these lines of questioning would properly have begun as open-ended to enable respondents to express their own opinions and experiences without the biasing effects of Dr. Steinberg's questions. We would have learned whether they switched doctors at any point and why; and if they did not switch, why not. We also would have learned more about the circumstances under which they first heard about Dr. Akoda.

Finally, we could have gained more insight into the demographic backgrounds of these women, including their income status, education, employment, whether they have children (and how many had been delivered by Dr. Akoda). Insurance can be a proxy of sorts for some

17

demographic measures, but it is far from definitive.  There were nearly as many relevant things Dr. Steinberg omitted to ask as *irrelevant* things she chose to include.

The argument that this survey needed to be 10 minutes long lacks credibility.  It was not engineered to be especially efficient (for lack of survey design expertise) and while response rate is, in general, influenced by survey length, there is no evidence that response rate among a putative class with a stake in the outcome is so sensitive to length, nor that 10 minutes would be a critical number.  Dr. Steinberg could have written a meaningful 15-minute survey that extracted more information.  And if she were so concerned about maximizing response rate, she could have checked how many other questionnaires had been completed at any point in her analysis. There is no single number in her report that proves a point, no threshold statistic she has identified as meaningful.  Competent data processing could have reached back and integrated "stragglers" into the survey database with ease.

- **Dr. Steinberg's analysis is striking both for its superficiality and its wanton misattribution of causality.**

Having had no access to a computerized database, I am going to assume for the moment that the statistics in Dr. Steinberg's report have been correctly calculated.  It hardly matters, in any event, because statistical calculations applied to distorted or nonsensical data are not meaningful, even when the math is correct.

It is noteworthy that Dr. Steinberg presented (and quite possibly performed) only a very superficial analysis of the database – and perhaps only some portions of it.  There is no evidence that she used cross-tabulation to look at subgroups and establish whether responses were plausibly linked to circumstances and how (ob vs gyn care, length of experience with Dr. Akoda, etc.).  These are the sorts of ad hoc analyses that are routinely employed both to develop keen insights and also to establish face validity of the data.  (Here, lacking automated skip patterns, we have no way of establishing whether people who answered certain questions had met the relevant conditions of eligibility.  We also have no way of linking the kind of behaviors they experienced with the kinds of outcomes or symptoms they report – all relevant to provide a meaningful picture of the sample.)

To the extent that she is made aware of contradictions in the data, Dr. Steinberg's approach is to rationalize, rather than analyze, by invoking the argument that feelings are potentially so complex, one cannot expect consistency.  If that theory holds any water, then even a well-done survey may be inappropriate to the task of fully understanding people's experiences and feelings.  Surveys are instruments whose measurement validity and quantitative interpretation demands that we make practical assumptions about our ability to tabulate and interpret responses to each question.  Response inconsistency may be deemed "data" leading to elucidation in qualitative or clinical evaluations, but it cannot be taken as an indication of measurement "success" or insight in quantitative surveys. It is taken as a sign of measurement error.

18

Dr. Steinberg's lack of thorough statistical analysis is primarily an error of omission, serious though it may be. Dr. Steinberg's critical error of *commission* is her unjustified (and unscientific) presumption of causality where none can legitimately be assumed. A key example is her insistence on linking physical symptoms and life outcomes to Dr. Akoda based on respondents' own reporting of a link (itself, shaped by lack of knowledge and survey bias) or – worse yet – her assumption that anything negative event reported by this survey population post-Akoda *must* be laid at his doorstep. In any given timeframe, some proportion of people in a population will experience depression, job loss, or a diagnosis of hypertension. Dr. Steinberg makes no attempt to control for that in her analysis, taking on face value both the accuracy of the event reporting and the meaningfulness of respondents' own primed attributions.

In considering how spurious these relationships are likely to be, it is also important to take note of something Dr. Steinberg herself likes to feature: the special psychological vulnerability of this population based on reporting of prior abuse or threat. Unaccountably, the questions that address the topic (series 8) are flagged as highly personal – no more so, I would argue, than many others that preceded them – and respondents are invited to decline to answer. That, though, is a small point relative to the interpretation she makes of their significance. Dr. Steinberg features prior abuse and threat as a *source of elevated risk* from experiences with Dr. Akoda when, in fact, a history of abuse could quite easily be interpreted as the *source* of whatever sequelae -- including depression or job loss – Dr. Steinberg attributes directly to Dr. Akoda. As survey researchers should know, association is not causality – and, in this case, we cannot be sure what is real association and what is distortion.

In deflecting criticism of bias, Dr. Steinberg points to the fact not everyone in the sample agrees with everything or reports every adverse outcome – in other words, not all respondents have been influenced by the circumstances of the survey (evident self-interest) or the design of the questions to acquiesce. There is a substantial degree of diversity in responses, suggesting considerable heterogeneity of experience, emotions, and ostensible outcomes, but for Dr. Steinberg, there should be cold comfort in that. The idea that not everyone was led by survey bias to the same responses neither validates the data nor precludes the likelihood that some or many were. It is hard to imagine a survey so successful in engineering false acquiescence that every single respondent, or even necessarily half, can be led to "yea-say." There is too large a corpus of study confirming the effects of survey bias to dismiss the issue. And indeed, the challenge of measuring its effects is what makes survey bias so insidious. You cannot easily measure them without deliberate experimentation or cross-study comparison, but you can legitimately assume they are present.

Under the heading of unanalyzed data, I point finally to the many open-ended commentaries provided by survey participants that describe their experiences with Dr. Akoda and their emotional responses to those experiences. I understand that Dr. Steinberg has not chosen to code and tabulate them but, rather, to offer them as a form of narrative. The difficulty is that the reporting in some of them appear to have face validity or interpretability (allowing a

JA2504

patient to go into "shock" on the examining table and "ripping open" her clitoris) while others are confused or confusing accounts of obstetrical care that seem, in instances, unrelated to Dr. Akoda. There is anger and complaint, to be sure, but not all of it necessarily rings true or fair. Dr. Steinberg seems to regard herself as primarily a conduit for this outpouring without offering any strategy for interpretation and validation.

- ***Finally, we need to be cautious in discounting concerns about non-response bias in a survey of putative class members – and to challenge the premise that these results would be statistically generalizable, even if the survey were properly conducted***.

The sample size studied appears large enough to represent the universe of potential class members. The question we need to ask is whether it is representative enough. Survey research as a discipline and the applied fields in which it is used (from polling to market research) are forced routinely to consider non-response bias and sampling reliability. The general public is sometimes made aware of these issues when the accuracy of political polling numbers comes into focus but while non-response bias almost looms over us, survey researchers are largely forced to behave (apply statistics and make interpretations) "as if" non-response bias were not an issue – however optimistic or unjustified that may be.

In this case, however, we are looking at a very particular kind of survey universe and a very particular source of potential non-response bias, insofar as women who chose not to respond may include disproportionately large numbers of patients who do not feel aggrieved. I call out this concern less to add yet another criticism of Dr. Steinberg's methodology than to flag a legitimate intellectual challenge. I don't know enough about how the sampling frame was developed by the attorneys to offer commentary on what systematic bias may have been introduced or not but even if there had been no systematic sampling bias, we cannot rule out significant non-response bias based on self-selection.

All that said, it almost doesn't matter. Regardless of whether self-selection is an actual problem here (i.e., in the event that non-responders over-represented women may have expressed no interest in joining the class or expressed interest but ultimately opted out of the survey), the data from those who *were* surveyed cannot be put to obvious use because the survey measurement instrument employed was, itself, so seriously flawed. Repeated mismeasurement generates untrustworthy statistics.

JA2505

## IV. Conclusions

Dr. Annie Steinberg is undoubtedly an accomplished professional in her own field, but she is not an accomplished practitioner of survey research. It may have seemed to her that her skill in conducting qualitative interviews and general experience in clinical research would have conferred some survey research credentials by casual exposure, but it did not. Survey research is a distinct discipline and skillset, and anyone who develops survey data for forensic purposes needs to have mastered it. Even when hypothesis-driven, it needs to honor principles of measurement integrity and proficiency. Dr. Steinberg's methodologically flawed and overtly biasing survey did not.

As a clinician, Dr. Steinberg has approached the very idea of survey research in a way that reflects her own distinct background. She approached it as a vehicle for eliciting data and testimony from women whom she believes to have suffered serious harm at the hands of Dr. Akoda – including PTSD – although she disclaims any intent to diagnose women individually or the class as a whole. With that mission in mind, she regarded any signal of grievance or harm – no matter how extracted from survey respondents – as "data" merely because she asked many people the same questions in the same ways using a computer program designed to conduct "surveys".

This was *not*, however, an impartial survey meant to fully understand a particular population of women. It was a survey meant to prove a point in any way possible. There are many sources of data and ways for an advocate to prove a case in litigation, but the survey research science should not be pressed into service – and misappropriated – for those purposes. What Dr. Steinberg has proffered as survey research is neither high-quality survey research (as survey scientists understand it), nor testimony that has been subjected to cross-examination or critical interpretation.

The problem with poorly constructed, biased survey is that every single number comes into question. We cannot know how far from reality, or validity, each number is. We know only that there are grounds to doubt them all and no available mechanism for measuring how far off they really are. The sample size might imply that the confidence intervals around these numbers is small but, in reality, problems with the survey methodology would suggest that the confidence interval is ultimately irrelevant.

While we can't necessarily attach reliable numbers or percentages to key issues pursued in Dr. Steinberg's research, what we *take* from her survey is that this sample of putative plaintiffs is diverse in many ways – with respect to their experiences, their impressions, and their reactions. Not all have been harmed and not all have been affected -- or affected in the same ways. Beyond that, conclusions are difficult to draw.

JA2506

\* \* \* \* \*

Susan Schwartz McDonald

October 14, 2019

# Appendix A



**Susan Schwartz McDonald, Ph.D.**
*President & CEO*



As CEO of **NA**XION, and leader of the firm's Healthcare practice, Susan is a marketing strategist whose areas of expertise include demand forecasting and product optimization, pricing, market segmentation, brand positioning and portfolio strategy. She is known for her marketing ingenuity and her track record in guiding commercialization of paradigm-changing technologies that require new market models, including some of the industry's most important global brands. Other sectors in which she has extensive experience include OTC pharmaceuticals and consumer products – both packaged goods and technology-driven categories.

As a respected expert on brand marketing, Susan also directs the Litigation Support practice of **NA**XION. In that context, she is frequently called upon to conduct surveys and testify as a marketing methodology expert in cases pertaining to trademark confusion, secondary meaning, patent infringement, brand dilution, and deceptive advertising. The focus of her work in that area is often the process of brand development and the factors promoting strong, distinctive brand identity.

Much of Susan's 35-year marketing career was spent at Booz•Allen & Hamilton, a worldwide management and technology consulting firm, of which she was a Vice President for over five years. She lectures and writes frequently on marketing issues and market research techniques, and has contributed to medical journals as well as marketing texts. Susan is also coauthor of a standard text on qualitative research methods, *The Group Depth Interview: Principles and Practice* (Simon & Schuster/Prentice Hall). Her early professional years were spent as a journalist and a poet, contributing regularly to a number of major magazines and newspapers, including *National Review* and *Harper's*.

Susan is the 2011-2012 Past Chair of the CASRO Board of Directors, the trade association of the US marketing and survey research industry, recently renamed The Insights Association. Currently, she is a trustee of The Wistar Institute, the world's oldest incubator of biomedical discoveries in cancer and immunology, and a member of the Advisory Board to the marketing research program of the Rutgers University Graduate School of Business. She is also President of the Board of the Chamber Orchestra of Philadelphia.

Susan holds M.A. and Ph.D. degrees from the Annenberg School for Communication, University of Pennsylvania, where she was trained in communications theory and social psychology. Her B.A. was awarded magna cum laude, Phi Beta Kappa, from Smith College.

JA2509

SUSAN SCHWARTZ McDONALD

**MARKETING PUBLICATIONS**

BOOKS AND BOOK CHAPTERS

The Group Depth Interview:  Principles and Practice, Goldman, A. E., & McDonald, S. S., Prentice-Hall, Inc., Englewood Cliffs, New Jersey, 1987.

"Evaluation of Federally Funded Family-Planning Programs," Program Evaluation at HEW: Research Versus Reality (265-310) Henry, Nicholas, Marcel Dekker, Inc., New York, Basel, 1979.

*Market Segmentation*, Handbook of Business Strategy (second edition), Glass, Harold E., Editor, Warren Gorham & Lamont, Boston, Massachusetts, January 1991.

ARTICLES, PAPERS AND SPEECHES

*Strategies of Segmentation Research*, Proceedings of the Tenth Attitude Research Conference, Goldman, A. E., & McDonald, S. S., American Marketing Association, 30-42, 1979.

*The Psychology of Consumer Promotions*, presented at the meeting of the Promotion Marketing Association of America, Inc., New York, NY, March 1982.

*Targeting and Research Development:  Matching New Products and New Solutions*, Product Development and Management Association, Minneapolis, MN, March 1982.

*Practices, Strategies, and Motivations in Treatment of Rheumatoid Arthritis*, Goldman, A. E., & McDonald, S. S., The American Journal of Medicine, December 1983.

*Position and Forecasting for New Medical Products:  The Application of Segmentation and Conjoint Analyses*, The Joint Meeting of the Pharmaceutical and the Medical Surgical Marketing Research Groups, Chicago, IL, October 1985.

*The Case Against Peer Influence Groups*, Medical Marketing and Media, 23, 13, 4-8, October 1988.

*An Introduction to Market Segmentation*, International Association of Business Communications, Harrisburg Chapter, November 1988.

*Successful Needs/Benefits Segmentation:  A User's Guide*, The Journal of Consumer Marketing, Greenberg, M. G., and McDonald, S. S., 6, 29-36, Summer 1989.

*Brand Equity:  Working Toward a Disciplined Methodology for Measurement*, Advertising Research Foundation, New York, NY, January 1990.

*Continued …*

JA2510

*Getting Your Client to 'Buy Into' Marketing Research*, Pharmaceutical Market Research Group Meeting, Spring 1990, Philadelphia, PA.

*The Morning After: Market Research Problems and How to Avoid Them*, Pharmaceutical Market Research Group Developmental Seminar, Fairfield, New Jersey, June 1990.

*Contamination in Qualitative Research*, presented at the 47th Annual Conference of the American Association for Public Opinion Research, St. Petersburg, Florida, May 1992.

*Multivariate Techniques*, Pharmaceutical Market Research Group, Developmental Seminar: Quantitative Research - Design and Analysis, Philadelphia, PA, June 1992.

*Making Optimal Use of Your Sales and Marketing Levers,* presented at the Institute for International Research conference on "Marketing and Sales Force Reengineering," Philadelphia, PA, September 1994.

*Another Look at Managed Care: Reassessing Their Priorities ... and Ours,* presented at the Pharmaceutical Marketing Research Group Meeting on "Redesigning Marketing Research in a Restructured Environment," Philadelphia, PA, April 30 - May 3, 1995.

*How to Design and Implement Successful Pricing Research: Counsel and Caveats from the Trenches,* presented at the Professional Pricing Society, 6th Annual Pricing Conference, Chicago, IL, October 1995; reprinted in The Journal of Professional Pricing, 13, 3, 2004.

*Charting the New Product Development Course: A Market Research Case Study Workshop*, conducted at the Institute for International Research's 2nd Annual Pharmaceutical Marketing Research Roundtable, Philadelphia, PA, November 1996.

*The Positioning Research Ritual: When Not to Bother At All,* presented at the Pharmaceutical Marketing Research Group Fall '98 Meeting, Baltimore, MD, September 1998.

*Project Conception: Questioning Your Client/Designing the Study*, presented at the CASRO Advanced Project Directors Training Conference, Philadelphia, PA, September 14, 2000.

*Transforming Market Strategy into Marketing Action: An Overview of Primary Research Techniques*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, November 2001.

*The Positioning Paradox: When Words Hold Ideas Captive,* presented at the Pharmaceutical Marketing Research Group Fall '02 Meeting, Tysons Corner, VA, October 2002.

*The Long and Winding Road: Market Research in Support of Creative Concept Development*, presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, October 2004 and May 2007.

*Continued…*

JA2511

*Taking Care of Business: Defending Pharmaceutical Market Research against the Perils of Industry Regulation,* presented at the Pharmaceutical Marketing Research Group 2006 Spring Conference, Las Vegas, NV, March 5-7, 2006.

*AE Reporting in the Market Research Industry: An Update on the Still-Gathering Storm,* presented at the Pharmaceutical Marketing Research Group Fall 2006 Conference, Baltimore, MD, September 10-12, 2006.

*A "Brief History of Time" in the Pharmaceutical Industry … And a Quick Peek into the Future,* presented at the Market Research Association Philadelphia Chapter Meeting, Philadelphia, PA, May 2007.

*Improving Survey Efficiency: Understanding the Relationships Among Standard Measures of Concept Evaluations,* Polster, M., McDonald, S. & Boldry, J., poster presented at 2009 PBIRG Annual General Meeting, Phoenix, AZ, May 17-20, 2009.

*Evaluation of GLP-1 Product Attributes in Treating People with Type 2 Diabetes in US: Comparing Time Trade-off and Willingness to Pay Methodologies,* Zanutto, E., Conner, C., Polster, M., McDonald, S. & Hammer, M, poster presented at ISPOR 14th Annual Meeting, Orlando, FL, May 18, 2009.

*Reinventing the Market Research Function: In a Disruptive Era of Change, Old-fashioned Intuition Still Counts,* McDonald, S. and Sharma, S., Pharmaceutical Executive, January 2010.

*Assessing Drug Treatment Preferences of Patients with Crohn's Disease: A Conjoint Analysis,* Lichtenstein, G.R., Waters, H., Kelly, J., McDonald, S., Zanutto, E, Hendricks, D. and Rahman, M. The Patient: Patient-Centered Outcomes Research, 2010.

*Much not Understood about Physicians, and Even Less about Patients and MCOs,* Pharma Market Research Report, February 2010.

*The True Importance of Derived Importance for In-line Pharmaceutical Products: Putting a Valuable Tool into Context,* Polster, M., and McDonald, S., in PBIRG's Perspective, Vol. 12 No. 1.

*When a Single Measure Is Sufficient: Optimizing Survey Efficiency in Concept Evaluation Research,* Boldry, J., Polster, M. & McDonald, S., poster presented at 2010 AAPOR Conference, Chicago, IL, May 13-16, 2010.

*Understanding and Surviving the Regulatory Environment: A 'State of the Union' Perspective,* Pharmaceutical Marketing Research Group Webinar, May 20, 2010.

*A Comparison of Preferences for Two GLP-1 Products – Liraglutide and Exenatide – for the Treatment of Type 2 Diabetes,* Polster, M., Zanutto, E., McDonald, S., Conner, C. & Hammer, M., Journal of Medical Economics, 2010 13(4):655-661.

*Continued…*

JA2512

*MD Attitude Segmentation: Can You Ever Get There from Here?* Presented at the PharMArket Research Conference, Parsippany, NJ, February 2011.

*The Quantum Mechanics of Brand: What You See – and Don't See – with Derived Importance Analysis.* Polster, M. and McDonald, S. April 2011.

*The Art of the Ask in Forecast Modeling: Implications of 'Allocation' vs. 'Discrete Choice' Projections.* Polster, M. and McDonald, S. January, 2012.

*DTC ROI: When We Advertise to Consumers, What Do They Hear?* Presented at the PharMArket Research Conference, Parsippany, NJ, February 2012.

*The Impact of Nausea and Vomiting of Pregnancy on Quality of Life: Report of a National Consumer Survey and Recommendations for Improving Care,* Clark, S., Hughes, B., and McDonald, S., <u>Obstetrical and Gynecological Survey</u>, September 2013, Vol. 68, No. 9, Supplement 1:S1-S10.

*The End of Pharma Marketing – or a New Beginning?* Sharma, S., and McDonald, S., <u>Pharmaceutical Executive,</u> February 2015.

*Using Data to Make Decisions: Ten Things I've Learned in 35 Years.* Presented at the MSMR Alumni Market Research Conference, Arlington, TX, April 2015.

*When Size Matters … And What You Can Do About It: Mapping the Dark Frontiers of 'Small Data' Modeling.* Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*The 'Art of the Ask' in Choice Modeling: Discrete Choice vs Allocation.* Presented at the EphMRA Annual Conference, Frankfurt, Germany, June 2016.

*New PhRMA Campaign 'Goes Boldly' But Treads Unevenly.* May 2017.

*Ten New Year's Resolutions for Using Data to Make Marketing Decisions.* January 2018.

*Is Market Research Really Getting Emotional? Discovering What Implicit Metrics Actually Measure.* July 2018.

*The Elusive System 1. Can We Truly Measure Its Role in Consumer Behavior?* March 2019

*A New Manifesto for the Insights Industry. Let's Stop Hawking Vocabulary and Commit to Selling Truly Good ideas.* April 2019

*Continued…*

**SUSAN SCHWARTZ McDONALD**
**TESTIMONY/DEPOSITION ACTIVITY SUMMARY**

**(2013 - Present)**

Serenity Pharmaceuticals, LLC, et al., Counterclaim-Plaintiffs v. Ferring B.V., et al.,
Counterclaim Defendants
U.S. District Court for the Southern District of New York
C.A. No. 1:17-cv-09922 (RWS), ECF Case
*Deposition on behalf of Counterclaim-Plaintiffs* (November 27, 2018)

J-B Weld Company, LLC, Plaintiff v. The Gorilla Glue Company, Defendant
U.S. District Court for the Northern District of Georgia
Atlanta Division
Case No. 17-CV-03946-LMM
*Deposition on behalf of Plaintiff (July 10, 2018)*

Forever 21, Inc., Plaintiff v. Gucci America, Inc., et al., Defendants
U.S. District Court of California, Western Division
Case No. 2:17-cv-04706-FMO-E
*Deposition on behalf of Defendants (June 28, 2018, New York)*

MARS, Incorporated, et al., Plaintiffs v. The J.M. Smucker Company, et al., Defendants
U.S. District Court for the Eastern District of Virginia Alexandria Division
No. 1:16-cv-1451 (CMH/MSN)
*Deposition on behalf of Defendants (July 12, 2017, Philadelphia)*

Adidas America, Inc., et al., Plaintiffs v. TRB Acquisitions, LLC, et al., Defendants
U.S. District Court, District of Oregon Portland Division
No. 3:15-cv-02113-SI
*Deposition on behalf of Defendants (May 31, 2017, Philadelphia)*

Pinterest, Inc., Plaintiff v. Pintrips, Inc., Defendant
U.S. District Court for the Northern District of California
No. CV 113-04608-PS-KAW
*Deposition on behalf of Defendant (January 14, 2015, Philadelphia)*
*Testimony on behalf of Defendant (May 26, 2015, San Francisco)*

In the Matter of Investigation: Certain Footwear Products
U.S. International Trade Commission
No. 337-TA-936
*Deposition (May 21, 2015, Washington, DC)*

JA2514

HM Electronics, Inc., Plaintiff v. R.F. Technologies, Inc., Defendant
U.S. District Court, Southern District of California
No. CV12-2884-BAS (MDD)
*Deposition on behalf of Defendant (November 24, 2014, Philadelphia)*

OraLabs, Inc., Plaintiff v. The Kind Group LLC, Defendant
U.S. District Court for the District of Colorado
Civil Action No. 1:13-cv-00170-PAB-KLM
*Deposition on behalf of Defendant (July 24, 2014, Philadelphia)*

Healthcare Royalty Partners, L.P. (f/k/a Cowen Healthcare Royalty Partners, L.P.),
Plaintiff v. Shionogi Inc., LLC, Defendant
Supreme Court of the State of New York, New York County
Index No. 650424/2012
*Deposition on behalf of Plaintiff (June 18, 2014, New York)*

Zest IP Holdings; Zest Anchors, LLC, Plaintiffs v. Implant Direct Mfg., LLC;
Implant Direct LLC; Implant Direct International, Defendants
U.S. District Court, Southern District of California
No. 10-0541 LAB (WVG)
*Deposition on behalf of Plaintiffs (June 3, 2014, Chicago)*

T-Mobile US, Inc., T-Mobile USA, Inc. and Deutsche Telekom AG, Plaintiffs v.
Aio Wireless LLC, Defendant
U.S. District Court for the Southern District of Texas, Houston Division
Civil Action No. 4:13-cv-2478
*Deposition on behalf of Plaintiffs (October 21, 2013, Philadelphia)*

JA2515

# Exhibit 6

JA2516

| From: | Brent Ceryes <bceryes@sfspa.com> |
| --- | --- |
| Sent: | Sunday, December 1, 2019 11:36 AM |
| To: | McEnroe, Elisa P. |
| Subject: | Steinberg Data |
| Attachments: | AkodaQuestionnaire.xlsx |

[EXTERNAL EMAIL]

Elisa:

I have attached an excel spreadsheet containing the data from Dr. Steinberg's study.

Thanks.

Brent

JA2517

# Exhibit 7



# Transcript of Susan McDonald, Ph.D.

**Date:** December 19, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTER DISTRICT OF PENNSYLVANIA

3

   MONIQUE RUSSELL, JASMINE RIGGINS, : NO.
4  ELSA M. POWELL, and DESIRE EVANS, : 18-5629
        Plaintiffs,                  :
5                                     :
                                      :
6  v.                                 :
                                      :
7  EDUCATIONAL COMMISSION FOR         :
   FOREIGN MEDICAL GRADUATES,         :
8       Defendants.                   :

9                       - - -

10             Thursday, December 19, 2019

11                      - - -

12               TRANSCRIPT OF DEPOSITION OF

13  SUSAN MCDONALD, Ph.D., taken by and before

14  Michelle Tormey, Professional Reporter and

15  Notary Public, at MORGAN, LEWIS & BOCKIUS

16  LLP, 1701 Market Street, Philadelphia,

17  Pennsylvania 19103, commencing at 9:10 a.m.

18

19

20

21

22

23

24

25

```
 1   BY MR. CERYES:
 2        Q    And that they may serve in that
 3   role despite not having a subspecialty or
 4   specialty in survey methodology or design?
 5        A    Oh, absolutely.
 6        Q    You write in your reports -- let's
 7   turn to Page 8 -- in the first -- well, the
 8   second sentence, she was specifically hired
 9   to put numbers to her hypotheses concerning
10   the traumatic effects and life changes
11   experienced by women receiving care from
12   Dr. Akoda.
13             What do you mean by hired to
14   put numbers on her hypotheses?
15        A    Well, Dr. Steinberg entered this
16   process with the very strong hypothesis that
17   the women who were treated by Dr. Akoda had
18   experienced harm of various kinds.  And it's
19   my understanding based on her own sort of
20   vague description of what her mission was,
21   and what I intuit about the way she seems to
22   use her data, that her goal was to assign
23   numbers to those so that generalizations
24   could be made to the broader universe of
25   other women, the women that were solicited
```

1    for the survey, 575, or something like that.

2    So the assumption is when you're talking to

3    hundreds of women that the expectation is

4    that numbers will be generated.  And, in

5    fact, she did generate some numbers.

6         Q    Now, I want to briefly review some

7    of the various criticisms that you offer in

8    your report.

9                   Among the criticisms

10   regarding -- I guess -- the generalizability

11   of the responses is the concept that these

12   women are -- I guess as you characterize here

13   on Page 9 -- alleged victims or financial

14   stakeholders, is that fair?

15        A    Let me find the line.  I'm not sure

16   that I heard your question correctly.  I

17   think you were referring to not alleged --

18   i.e., the participants are consumers or

19   voters -- the not alleged victims or

20   financial stakeholders.  And if you're asking

21   me whether I believe that statement is true,

22   the answer is, yes, but I'm not sure what

23   your question really was.

24        Q    Given that this population are

25   people who are potential plaintiffs in

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    42

```
 1   litigation -- or, claimants in litigation,
 2   would there be any way to assess or survey
 3   their potential emotional harm given the
 4   potential financial stake that they may have
 5   in the outcome of this litigation?
 6       A    I certainly can't say no, there is
 7   no way to do it.  There are better ways to do
 8   it and there are limitations on the way you
 9   interpret the responses of people who have
10   responded versus those who have chosen not
11   to.  So it's less about you can never do that
12   and more about understanding the implications
13   of the relationship between these survey
14   participants and the outcome of the case, so
15   that you can put the data in context and you
16   can evaluate its validity as well as its
17   statistical reliability.
18       Q    Dr. Steinberg did reference in her
19   report the -- or, at least included a
20   consideration that that's something that she
21   thought about, potential financial interest
22   in the outcome?
23       A    She may have.  I don't recall that
24   sentence particularly.
25       Q    You reference the survey
```

```
 1    invitation -- which was sent by lawyers -- in
 2    terms of the potential impacts that that
 3    invitation might have on the individuals
 4    filling out the survey, you've set forth
 5    those concerns in your report in their
 6    entirety?
 7         A    I'm sorry.  I missed the question.
 8    I did mention that, yes, but the entirety
 9    part I don't recall.
10         Q    Within your report you've explained
11    why you think the invitation itself may have
12    had an impact on the individuals filling out
13    the survey?
14         A    Yes, both who chose to and what
15    they might have written.
16         Q    At the bottom of Page 9, you refer
17    to Dr. Steinberg making efforts to minimize
18    the potential biasing effects and welcoming
19    them bringing her own confirmation biases to
20    bear in construction of the survey and
21    analysis of the data.
22              What do you mean by
23    "minimizing and welcoming those biasing
24    effects?"
25              MR. SHAFFER:  Let me object to the
```

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    68

```
 1            MR. SHAFFER:  Objection to form.
 2            THE WITNESS:  Well, if someone were
 3       to ask me to give examples, I would
 4       certainly read them carefully with that
 5       eye.  But there are a couple that I
 6       recall; one, the ripping of the
 7       clitoris, I found to be lacking in
 8       credibility to me.  Not that I dispute
 9       the conviction with which that statement
10       was offered, it just didn't necessarily
11       make sense to me.  You know, again, I am
12       not here to assert the truthfulness of
13       any given individual.  I am only here to
14       talk about the survey and what value it
15       has.  And individuals of course may
16       testify in courts or any other place and
17       be cross-examined on that.  But I can
18       say from a survey research perspective
19       that I don't know what to do with
20       anything that came out of this survey.
21  BY MR. CERYES:
22       Q    Okay.  Do these summary statements
23  provide you any information about the
24  individual experiences of the women who
25  completed this survey?
```

1          MR. SHAFFER:  Objection to form.

2          THE WITNESS:  I'm not sure what you

3      mean, exactly; what you're asking me if

4      I now know or feel as a result of

5      reading them.

6  BY MR. CERYES:

7      Q    Is there anything included within

8  Exhibit 5 -- the summary statements -- that

9  would allow you to learn anything about the

10 experiences that these women had through

11 their treatment with this individual?

12     A    I think that if I were responsible

13 for -- once we start talking about individual

14 women, I think if I were responsible for

15 drawing interpretations about individuals, I

16 would be thinking about qualitative research

17 in which these women were questioned and

18 probed on specific information to fully

19 understand their responses.  And what I said

20 earlier still holds.  This is not qualitative

21 information.  These are verbatims and their

22 interpretation and their meaningfulness

23 without further probing to contextualize and

24 confirm and explain some cases what they

25 meant -- because it's not always clear what

JA2526

Case 2:18-cv-00562-BHS Document 22-5 Filed 12/16/21 Page 637 of 3041
Case 2:23-1998 Document 22-5 Filed 12/16/21 Date Filed 09/08/2022

```
 1   they mean -- would be necessary to make a
 2   determination by someone -- not me; it's not
 3   my role here -- about the veracity or
 4   meaningfulness of any of them.
 5        Q    Okay.  So without going through
 6   that process that you described, Exhibit 5
 7   provides no meaningful or helpful information
 8   about the experiences of these women in your
 9   view?
10            MR. SHAFFER:  Objection as asked
11        and answered.
12            THE WITNESS:  It depends on what
13        you mean by meaningful.  I don't know
14        what a judge would do with it.  I have
15        no idea.  If you present this
16        information this way, I don't know what
17        it's legal bearing has.  I can tell you
18        that it is neither qualitative research
19        nor is it quantitative research.
20   BY MR. CERYES:
21        Q    Would you defer to a psychiatrist
22   as to whether the verbatims included within
23   Exhibit 5 could be used to reach any opinions
24   about the nature and extent of damages
25   suffered by patients of Igberase/Akoda?
```

Case 2:23-19085629 Document 22-5 Filed: 6/38 1/10/11 Page 190/08/2022

```
1              MR. SHAFFER:  Objection to form.
2              THE WITNESS:  No, I would not
3         because the method by which these data
4         were extracted is not the realm of
5         psychiatric examination.  The
6         methodology resides with survey
7         research.  This was a process that
8         occurred as a result of survey
9         invitations to women who chose to
10        respond to a survey among -- in a
11        population who chose to respond to
12        invitation to be part of litigation.
13        This is not notes from a psychiatric
14        interview.  So Dr. Steinberg can testify
15        with regard to how she would interpret
16        it.  She's entitled to do that.  But I
17        would not credit this as psychiatric
18        information myself because its source is
19        survey research.
20   BY MR. CERYES:
21        Q    Okay.  Is it fair to say that in
22   all of the responses and summary statements
23   provided, you would not feel comfortable
24   saying that any of that documentation
25   reflects that any women have experienced harm
```

Case 2:23-1998-DocumenDocumen 22-5enPage: 639ed 12/16/1ile Page09/08/2022

```
 1    by virtue of being treated by Igberase/Akoda?
 2              MR. SHAFFER:  Objection to form.
 3              THE WITNESS:  I don't know what to
 4         do with this information.  And, in
 5         part -- again, this is parsing.  I don't
 6         know what any of these statements
 7         themselves mean.  I don't know -- in
 8         some cases, they're hard to even
 9         interpret, just to understand what's
10         being said and what connections are
11         being made.  That's one thing.
12              What needs to be parsed is the "as
13         a result of being seen or treated by
14         Dr. Akoda," and it's not clear to me
15         what somebody would have said depending
16         on how they learned about or what
17         information was imparted to them about
18         Dr. Akoda, and that's part of this as
19         well.  I mean, that's the 600-pound
20         gorilla in the room.  What were these
21         women told about him.  What was their
22         experience or their thought process
23         before they were told about him.  So is
24         a result of being treated is not exactly
25         the same as a result of being treated
```

# Exhibit 8

Reference #

Status

Login Username

Login Email

Introduction

You are being mailed this questionnaire because you were a patient of Dr. Akoda. The purpose of this questionnaire is to help us understand how you may have been affected by your experience as his patient.  There are no right or wrong answers. Some of these questions may feel uncomfortable, but please answer as best you can.

Although the questionnaire may seem long, it should not take you more than about 10 minutes to complete.

## 1. Questions about meeting Dr. Akoda and the experience of being his patient.

1a. How did you become Dr. Akoda's patient?

- ○ Walked into clinic
- ○ Found name on list of doctors
- ○ Went to see other doctor in practice but saw Dr. Akoda instead.
- ○ I was referred by another doctor
- ○ I was referred by a family member or friend
- ○ Other:

1b. Where did you see Dr. Akoda?

- ○ Jersey Shore Medical Center (JSMC)
- ○ Howard University Hospital
- ○ Prince George's Hospital Center
- ○ At the medical practice of Dr. A.G. Chaudry
- ○ At the medical practice of Dr. Javaka Moore
- ○ Other

1c. During which of the following years did you see Dr. Akoda? (Check all that apply)

- ☐ Before 2008
- ☐ 2008
- ☐ 2009
- ☐ 2010
- ☐ 2011
- ☐ 2012

JA2531

- ☐ 2013
- ☐ 2014
- ☐ 2015
- ☐ 2016
- ☐ I don't remember

**1d. About how many times did you see him?**

- ○ One time
- ○ 2-5 times
- ○ More than 5 times

**1e. What types of visits did you have with him? (Check all that apply)**

- ☐ Routine annual gynecological checkups
- ☐ Prenatal, delivery, and postnatal obstetric visits
- ☐ Surgery
- ☐ Visits for other medical care

## 2. Questions about your relationship with Dr. Akoda

**2a. Did you trust Dr. Akoda?**

- ○ Yes
- ○ No

**2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply)**

- ☐ It was just something about him
- ☐ He was rude
- ☐ He made sexual comments
- ☐ He hurt me
- ☐ Pelvic exams were too long
- ☐ Other

```

```

**2c. If you answered no to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply)**

- ☐ It was just something about him
- ☐ He was rude
- ☐ He made sexual comments
- ☐ He hurt me
- ☐ Pelvic exams were too long
- ☐ Other

```

```

**2d. Did you ever feel scared of or threatened by Dr. Akoda during your time in his 'care'?**

- ○ Yes
- ○ No

## 3. Questions about Dr. Akoda's gynecological examination.

**3a. How did Dr. Akoda's pelvic examination compare with other doctor's exams before or since you saw him?**

JA2532

○ Positive (e.g., Liked Dr. Akoda's practice)
○ Neutral (e.g., No difference)
○ Negative (e.g., he was more rough, longer exams, sexual talk and/or touch)

3b. How did his breast examination compare with other doctors' exams before/after you saw him?

○ Positive (Liked Dr. Akoda's practice)
○ Neutral (No difference)
○ Negative (Dr. Akoda more rough, insensitive, longer exams, sexual talk and/or touch)

3c. Was there always a nurse or chaperone in the room during pelvic examinations?

○ Always
○ Sometimes
○ Never
○ I don't know or remember

3d. Did she stay throughout the examination?

○ Always
○ Sometimes
○ Never
○ I don't know or remember

3e. Was she standing in a place where she could see the pelvic examination?

○ Always
○ Sometimes
○ Never
○ I don't know or remember

3f. Did Dr. Akoda ever perform a pelvic exam without using gloves?

○ Always
○ Sometimes
○ Never
○ I don't know or remember

3g. Did Dr. Akoda ever touch you in a way that felt uncomfortable or wrong, beyond the usual discomfort of this kind of medical care?

○ Yes
○ No
○ I don't know or remember

3h. Did you ever feel sexually aroused or have an orgasmic response to the examination?

○ Yes
○ No
○ I don't know or remember

## 4. Questions about other unusual behaviors

4a. Did you think that Dr. Akoda asked you to come in for check-ups more often than needed?

○ Yes
○ No
○ I don't know or remember

4b. Did anything ever make you feel uncomfortable in the office during or after the exam?

○ Yes
○ No

4c. Pelvic exams are never fun, but looking back, do you think his exams were more or less painful than other pelvic exams you've had with other doctors?

○ Yes, more painful
○ Yes, less painful
○ No

4d. Did Dr. Akoda ever talk dirty or say anything at any time that you thought was in some way sexual or inappropriate?

○ Yes
○ No
○ I don't know or remember

4e. Did you ever consider changing doctors?

○ Yes
○ No
○ I don't know or remember

4f. Did you tell anyone about things he said or did that were inappropriate?

○ Yes
○ No

Yes (please indicate who you told. Check all that apply)

☐ I told a nurse or other healthcare provider
☐ I told an administrator
☐ I told another doctor
☐ I told a family member
☐ I told a friend
☐ I told someone else

No. (below, please indicate why you didn't tell anyone. Check all that apply)

☐ I was embarrassed
☐ I felt ashamed
☐ I didn't think anyone would believe me
☐ I didn't know what to do
☐ Other

## 5. Questions about how you learned about the charges against Dr. Akoda

5a. How did you first learn that charges were made against Dr. Akoda?

○ I heard about it on the radio
○ I read about it in the newspaper
○ I saw something about it on TV or the internet
○ A friend told me she had heard or seen one of these announcements
○ I received a call from a health care professional
○ Other:

JA2534

5b. How did you feel when you heard about the charges against Dr. Akoda? (Check all that apply)

☐ Neutral
☐ Shocked
☐ Angry
☐ Betrayed
☐ Sad
☐ Other:

[   ]

5c. If you are upset about what Dr. Akoda did, why? (Check all that apply)

☐ I feel that he betrayed my trust.
☐ I think he may have hurt me physically
☐ I think he performed unnecessary procedures on me
☐ I worry that he may have hurt my baby
☐ I am not upset about what he did

## 6. Impact of your experience with Dr. Akoda on your mental and physical health.

6a. Did you experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real?

○ Yes, before I learned of the charges against him.
○ Yes, only after I learned of the charges against him.
○ Yes, both before and after I learned of the charges against him.
○ No

(If you answered no to question 6a, skip to question 6c)

6b. Do you still experience emotional distress as a result of Dr. Akoda's conduct or as a result of learning that he might not be a licensed doctor or that his name and papers were not real?

○ Yes
○ No

6c. Have you had any intense physical reactions when reminded of being treated by Dr. Akoda such as your heart beating faster, being short of breath, or being sweaty?

○ Yes, before I learned of the charges against him.
○ Yes, only after I learned of the charges against him
○ Yes, both before and after I learned of the charges against him.
○ No

(If you answered no to question 6c, skip to question 6e)

6d. Do you still have intense physical reactions when reminded of being treated by Dr. Akoda?

○ Yes
○ No

6e. Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda?

JA2535

○ Yes, before I learned of the charges against him.
○ Yes, only after I learned of the charges against him
○ Yes, both before and after I learned of the charges against him.
○ No

(If you answered no to question 6e, skip to question 6g)

6f. Do you still have upsetting thoughts, memories, or dreams of being treated by Dr. Akoda?

○ Yes
○ No

6g. Have you tried to avoid thoughts or feelings about what happened to you with Dr. Akoda?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6h. Is it hard for you to recall some aspects of what transpired?

○ Yes
○ No

6i. Have you experienced mood changes or depression?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6j. Have you experienced less interest or pleasure with important activities?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6k. Have you experienced less interest or pleasure with important activities?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6l. Have you felt irritable or angry?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6m. Have you had difficulty concentrating?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6n. Have you felt jumpy, overly alert, or easily startled?

JA2536

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6o. Do you have trouble sleeping or bad dreams or nightmares?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6p. Do you feel embarrassed, shame, or humiliated?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6q. Do you have trouble making decisions?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6r. Do you overuse drugs or alcohol?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6s. Have you felt uncomfortable with your body or not cared for yourself as you should?

○ Yes, only in the past month
○ Yes, only prior to the past month
○ Yes, both in the past month and prior to the past month
○ No

6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)?

☐ Headache/dizziness
☐ High blood pressure
☐ Chest pain or shortness of breath
☐ Abdominal pain, nausea, reflux, ulcers, constipation
☐ Fatigue or insomnia
☐ Weight gain or weight loss
☐ Numbness, loss of enjoyment in life, or loss of libido
☐ Pain, trembling and/or nervous tics
☐ I have not experienced any of these symptoms
☐ Other:

[ ]

(if you have not experienced physical symptoms, skip to question 6v)

6u. How severe were your physical symptoms?

○ mild

JA2537

○ moderate
○ severe

6v. Have you received any psychological, psychiatric, and/or other medical treatment for symptoms arising from your experience with Dr. Akoda?

○ Yes
○ No

(if you answered no to question 6v, skip to question 6x)

6w. Please describe any treatment you received for symptoms arising from your experience with Dr. Akoda?

☐ Therapy or counseling
☐ Psychiatric medication
☐ Non-psychiatric medication

6x. Please describe any psychiatric or medical diagnoses you have received that you believe are related to your experience with Dr. Akoda.

☐ Depression (Major Depressive Disorder)
☐ Anxiety (Anxiety Disorder)
☐ PTSD (Post Traumatic Stress Disorder)
☐ Alcohol or Drug Use (Substance Abuse Disorder)

## 7. Impact of your experience with Dr. Akoda on other aspects of your life.

7a. Has your experience with Dr. Akoda affected your trust in doctors?

○ Yes, it has led me to not trust doctors
○ No

7b. In what ways has your experience with Dr. Akoda affected your use of medical care? (Check all that apply)

☐ It has not affected my use of medical care.
☐ It has changed how often I visit any doctor
☐ It has changed how often I visit an ob/gyn
☐ It has affected the types of medical specialists I will go to see
☐ It has affected the medical choices or decisions I make
☐ Other:

7c. In what ways has your experience with Dr. Akoda affected other non-medical aspects of your life? (Check all that apply)

☐ It has not affected other parts of my life.
☐ It has affected my relationship with my spouse or partner.
☐ It has affected my relationships with my children
☐ I am concerned about my daughter going to an ob/gyn
☐ Other:

7d. Has your experience with Dr. Akoda affected your work life?

○ Yes
○ No

JA2538

(If you answered no to Question 7d, skip to question 7f).

7e. In what way has your experience with Dr. Akoda affected your work life (Check all that apply)?

☐ I was not able to go to work for awhile
☐ I missed work deadlines
☐ I was fired from my job
☐ I quit my job
☐ Other:

[   ]

7f. Did your experience with Dr. Akoda affect your social life?

○ Yes
○ No

(If you answered no to Question 7f, skip question #7g)

7g. In what way did your experience with Dr. Akoda affected your social life? (Check all that apply)

☐ I avoided friends, neighbors, and relatives.
☐ I avoided certain types of social events.
☐ I avoided certain neighborhoods and locations.
☐ I didn't read my mail or email
☐ I didn't return messages and phone calls.
☐ I was afraid of or avoided leaving home.

[   ]

## 8. Other factors that may influence how your experience with Dr. Akoda affected you.

These questions are very personal and may be difficult to answer, but they are important, so please try to answer as completely as possible.

8a. Have you ever been threatened by somebody?

○ No
○ Yes
○ Decline to answer

8b. Have you ever experienced or witnessed violence in your own home in years past?

○ No
○ Yes
○ Decline to answer

8c. Have you ever been forced to have sex or been threatened with violence if you didn't?

○ No
○ Yes
○ Decline to answer

8d. Have you ever been sexually abused in other ways?

JA2539

○ No
○ Yes
○ Decline to answer
○ Other Type of Abuse Experienced:

Item # 82

[blank box]

## 9. Demographics

9a. Date of Birth

MM

[blank box]

YY

[blank box]

9b. Your marital status
○ single
○ married or in long-term relationship

9c. Is English your main language?
○ Yes
○ No

9d. Your ethnicity
○ African-American
○ Caucasian
○ Asian
○ Hispanic
○ Biracial
○ Mixed
○ Other

9e. When you were treated by Dr. Akoda, what type of health insurance did you have?
○ Medicaid
○ Private insurance
○ No insurance

## Thank you for answering these questions. If you wish to say more about your experience with Dr. Akoda, you can write your statement here:

Statement:

[blank box]

JA2540

Last Update

Start Time

Finish Time

IP

Browser

OS

Referrer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

      Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

      Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

---

## DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS' EXPERTS DR. DAVID MARKENSON, DR. JOHN CHARLES HYDE, AND DR. JERRY WILLIAMSON

For the reasons set forth in the attached memorandum of law, Defendant Educational Commission for Foreign Medical Graduates, by and through its undersigned counsel, moves to exclude the opinions and anticipated testimony of Plaintiffs' experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson pursuant to Federal Rules of Evidence 702, 703, and 403, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Dated: December 10, 2021

Respectfully submitted,

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:  +1.215.963.5000
Facsimile:  +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021            */s/ Brian W. Shaffer*    
                                    Brian W. Shaffer

JA2543

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 2:18-cv-5629

Honorable Joshua D. Wolson

---

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS'
EXPERTS DR. DAVID MARKENSON, DR. JOHN CHARLES HYDE,
<u>AND DR. JERRY WILLIAMSON</u>**

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:      +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission
for Foreign Medical Graduates*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND .................................................................................. 2

    A.    Factual History Regarding the Limited Role of ECFMG Certification. ................ 2

    B.    Plaintiffs' Credentialing Experts. ........................................................ 3

    C.    ECFMG's Rebuttal Experts. ............................................................ 5

III.   LEGAL STANDARD ........................................................................... 6

IV.   ARGUMENT ..................................................................................... 8

    A.    Plaintiffs' Experts Are Not Qualified to Offer Opinions on ECFMG. ................ 8

    B.    Drs. Markenson, Hyde, and Williamson Offer Impermissible Legal Conclusions in the Form of Expert Opinions. .................................... 11

    C.    Drs. Markenson's, Hyde's, and Williamson's Methodologies Are Flawed Because Each Relied on an Incomplete Record. ................................ 13

    D.    Drs. Markenson's, Hyde's, and Williamson's Opinions Are Impermissibly Speculative. ................................................................................ 18

    E.    Rules 403 & 703 Also Support Excluding the Opinions of Drs. Markenson, Dr. Hyde, and Dr. Williamson. ...................................... 20

V.    CONCLUSION ................................................................................. 21

JA2545

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berckeley Inv. Grp. Ltd. v. Colkitt¸*
  455 F.3d 195 (3d Cir. 2006)............................................................................8, 11

*Calhoun v. Yamaha Motor Corp. U.S.A.*,
  350 F.3d 316 (3d Cir. 2003)..........................................................................10, 11

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank*,
  383 F.3d 110 (3d Cir. 2004)..................................................................................20

*Commerce Bank/Penn. v. First Union Nat'l Bank*,
  911 A.2d 133 (Pa. Super. 2006)...........................................................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)..............................................................................1, 7, 18

*Dorshimer v. Zonar Sys.*,
  No. 3:13-0553, 2016 WL 4179480 (M.D. Pa. Aug. 8, 2016)................................11

*Elswick v. Nichols*,
  144 F. Supp. 2d 758 (E.D. Ky. 2001) ...................................................................10

*Schneider ex rel. Est. of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003)....................................................................................7

*Flickinger v. Toys R Us-Delaware, Inc.*,
  492 F. App'x 217 (3d Cir. 2012) ....................................................................11, 13

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................................18

*Goodman v. Burlington Coat Factory*,
  No. 11-4395, 2019 WL 4567366 (D.N.J. Sept. 20, 2019).....................................18

*Hartle v. FirstEnergy Generation Corp.*,
  2014 WL 1317702 (W.D. Pa. Mar. 31, 2014) ......................................................13

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999)...................................................................................13

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..................................................................................................7

JA2546

*Lux v. Gerald E. Ort Trucking, Inc.*,
    887 A.2d 1281 (Pa. Super. 2005) ...........................................................................14

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) .........................................................7, 8, 11, 18

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ...........................................................................7, 8

*Reilly v. Tiergarten Inc.*,
    633 A.2d 208 (Pa. Super. 1993) ............................................................12, 13, 14

*Svindland v. A.I. Dupont Hosp. for Children*,
    No. 05-0417, 2006 WL 3209953 (E.D. Pa. 2006) ............................................10

*Therasense, Inc. v. Becton Dickinson Co.*,
    No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008) .................20

**Other Authorities**

Fed. R. Evid. 403 ..........................................................................................8, 20

Fed. R. Evid. 702 ..........................................................................................1, 6, 7, 8

Fed. R. Evid. 703 .......................................................................................... *passim*

JA2547

## I.    INTRODUCTION

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans ("Plaintiffs") have brought negligence-based claims against Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") in this proposed class action, alleging that class members treated by Dr. Akoda experienced emotional distress when they found out that Dr. Akoda—to whom ECFMG had issued an ECFMG Certificate—used a different name and/or pleaded guilty to Social Security fraud. In an attempt to generate evidence to support their legally and factually deficient claims, Plaintiffs have offered three experts on medical credentialing: Drs. David Markenson, John Charles Hyde, and Jerry Williamson.

There are three fundamental reasons why the Court should employ its gatekeeping function under Federal Rules of Evidence 702 and 703 and the standard from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and exclude the opinions and conclusions of Drs. Markenson, Hyde, and Williamson, from the individual cases of Plaintiffs and any class proceedings (which, as the Court is aware, ECFMG believes would be improper). First, all three witnesses lack adequate and particularized knowledge about ECFMG, its processes, and ECFMG Certification's limited role in the medical community. Second, through their opinions, each of these witnesses advances impermissible legal conclusions. Third, even if they had the qualifications to opine on these issues (which they do not), the methodologies they use to reach their conclusions are unreliable because they rely on (1) an incomplete record on the causal chain that fails to address relevant information about other entities who paved the way for Dr. Akoda to treat patients; and (2) improper speculations and assumptions that result in an unreliable analysis.

JA2548

## II.     BACKGROUND

### A.     <u>Factual History Regarding the Limited Role of ECFMG Certification</u>.

ECFMG knows the Court is familiar with the background and status of this matter. While the factual and procedural history detailed in Section II.A of ECFMG's Motion to Exclude Dr. Annie Steinberg remains the same, some background on the function of ECFMG Certification in the medical field is necessary.

ECFMG Certification plays a specific and limited role in an IMG's path to practicing medicine in the United States. ECFMG issues ECFMG Certificates to IMGs who have met specific minimum requirements to be deemed ready to apply for graduate medical education (usually a residency program) in the United States. Statement of Undisputed Material Facts ("SUMF") ¶ 2. During the relevant time period, those minimum requirements were: (1) passing an English exam and two substantive exams; and (2) having their medical school diploma successfully primary-source verified as authentic by the issuing medical school. SUMF ¶ 3. That is it. At the relevant time, ECFMG Certification status reports contained the IMG's name, USMLE number, medical school name and country, graduation year, certification status, validity of ECFMG Certification, and date of issuance of ECFMG Certification. SUMF ¶ 7. These reports did not (and did not purport to) verify an IMG's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character. SUMF ¶ 8.

ECFMG Certification status information is made available only to certain third parties in the medical field, like residency programs, hospitals, licensing boards, and employers. SUMF ¶ 5. Recipients of ECFMG Certification status reports use them for a limited purpose as part of their own processes; the information provided by ECFMG is by no means the only information used by

JA2549

hospitals, programs, and employers when evaluating IMGs. Ex. 1, Beck Rebuttal Rep. at 3–7; Ex. 2, Smith Rebuttal Rep. at 2–5; SUMF ¶¶ 10–19. ECFMG Certification status information is not available to members of the general public (including patients of doctors who have received ECFMG certification). SUMF ¶ 6.

**B.  Plaintiffs' Credentialing Experts.**

***Dr. Markenson.*** Dr. Markenson is a pediatrician specializing in emergency and critical care. Ex. 3, Deposition of Dr. Markenson ("Markenson Tr.") 17:7–13, 18:8–13. Plaintiffs engaged Dr. Markenson to provide an opinion on "this matter," and Dr. Markenson believed he was engaged to opine on "ECFMG's certification of a physician as it related to its use, you know within hospitals of privileging, credentialing, residency application." Ex. 4, Dr. Markenson Report ("Markenson Rep.") 1, 3–4; Markenson Tr. 110:24-6. In his report, Dr. Markenson summarizes Plaintiffs' allegations and then purports to offer opinions on what duties ECFMG allegedly breached during its certification and investigation of Dr. Akoda, without explaining any basis for identifying these duties or breaches. Markenson Rep. 4–5. Dr. Markenson critiques ECFMG's: review of Dr. Akoda's application; investigation into unsubstantiated allegations about Dr. Akoda; and alleged delay in involving the Medical Education Credentials Committee. *Id.* Based on these critiques, Dr. Markenson concluded that ECFMG "failed to adopt appropriate policies for certification of IMG's, failed to exercise reasonable care in its certification of Akoda and failed to exercise reasonable care in its investigation of allegations made about Akoda and that these failures caused harm to the named plaintiffs and members of the class." Markenson Rep. 2.

***Dr. Hyde.*** Dr. Hyde is a retired professor of health services administration and clinical outcomes research, although he maintains an adjunct position teaching healthcare management at George Washington University. Ex. 5, Dr. Hyde Report ("Hyde Rep.") 1. He has degrees in

JA2550

healthcare administration and is a Certified Healthcare Executive through the American College of Healthcare Executives, but he is not a clinician and does not have any expertise in clinical medical care. *Id.;* Ex. 6, Deposition of Dr. Hyde ("Hyde Tr.") 55:3–13.

Dr. Hyde opined that ECFMG was required to follow administrative standards for credentialing IMGs in order to fulfill a duty to patients and "assure all foreign educated physicians are properly and thoroughly investigated and deemed eligible for ECFMG certification." Hyde Rep. 6. Dr. Hyde provided a list of ECFMG's alleged breaches, with no explanation on how these breaches relate to any duty or responsibility on the part of ECFMG. He concluded that such "breaches of duties, by ECFMG caused Akoda to . . . gain access to and directly cause harm [to] the plaintiffs and the members of the class," even though Dr. Hyde has never met with Dr. Akoda's patients or otherwise reviewed their medical records to make an assessment on their harm. *Id.* at 7; Hyde Tr. 57:1-57:21.

***Dr. Williamson.*** Dr. Williamson has a background as a physician and hospital administrator. Ex. 7, Dr. Williamson Report ("Williamson Rep.") 1. He is not currently credentialed or on staff at any medical facility, and he has not formally worked in hospital administration since 1993. Ex. 8, Deposition of Dr. Williamson ("Williamson Tr.") 22:13–23:1. Dr. Williamson has a master's degree in health jurisprudence from Loyola University Chicago School of Law, but he is not a lawyer. *Id.* at 19:14-25. All of his prior testimonial experience has centered on his clinical expertise, and he has never testified in a matter regarding the credentialing of a physician or a residency program's decision to hire or not hire a candidate. *Id.* at 7-8, 15:10–22. While he has been engaged in two matters involving negligent "credentialing", these were focused on the negligent decisions ***of a hospital*** in employing or providing a doctor with access to patients, not the decision of an entity like ECFMG. *Id.* at 10:10–12:1, 13:9–12. In his report, after

4

JA2551

summarizing his understanding of ECFMG's role in the credentialing processes that led to Dr. Akoda treating patients, Dr. Williamson states that the key question he is resolving is "whether ECFMG's actions or failure to act resulted in foreseeable injuries to Class Members." Williamson Rep. 2–4. Dr. Williamson provides a list of ECFMG's alleged "breaches" tied to duties he claims belong to a "prudent credentialing organization" like ECFMG. *Id.* at 5–6. Citing "missed opportunities to address the many irregularities in the Igberase/Acoda [sic] applications," he concludes that "ECFMG had a duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. However, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety." *Id.* at 6.

### C.  **ECFMG's Rebuttal Experts**.

In light of the numerous flaws in Plaintiffs' credentialing expert's opinions, detailed below, ECFMG engaged two experts in the field.

*Dr. Mark Smith.* Dr. Smith practiced medicine for 25 years as a general and vascular surgeon and has extensive healthcare consulting experience, including on issues such as credentialing and privileging. Ex. 2, Smith Rebuttal Rep. 1.  He is now a clinical assistant professor working with residents and medical students. He has authored a book on credentials committees and served in a professional role dedicated to credentialing. *Id.* at 9, 12. In his report, Dr. Smith explained the processes an IMG must go through to treat patients, including but certainly not limited to ECFMG Certification. *Id.* at 2. He opines on the extensive evaluation and review processes an IMG faces as a resident, applicant to state medical board, and on staff at a hospital. *Id.* at 4. Based on his credentialing expertise, he concluded that "ECFMG is by no means the only or even the most significant information point regarding [a foreign medical graduate's] ability to

5

JA2552

practice medicine in the US" and that residencies and hospitals gather a wide variety of information about an IMG from sources other than ECFMG. *Id.* at 5.

**Dr. Laurence Beck.** Throughout Dr. Beck's 50-year medical career in internal medicine, he held numerous leadership positions that required his direct participation in the credentialing of IMGs, including Chairman of residency committees and programs and Chairman of multiple departments of medicines. Ex. 1, Beck Rebuttal Rep. 2. In his report, Dr. Beck explained the numerous steps IMGs must go through to practice medicine in the United States, including what criteria residency programs, state licensing boards, medical specialty boards, and hospitals consider (besides ECFMG Certification status) when evaluating IMGs. *Id.* at 1–7. He then analyzed the steps that Dr. Akoda took leading to his treatment of patients and concluded that while there were "numerous opportunities for [these entities] to suspect and investigate Dr. Akoda's behavior, . . . these opportunities appear to have been repeatedly hidden, or covered up, by Dr. Akoda, though his apparent lies, false documents, and evasiveness." *Id.* at 8. Finally, he explains that, at bottom, the way "Dr. Akoda was able to move "through the system, licensure and ability to practice medicine . . . was Dr. Akoda himself and his fraudulent and criminal activities." *Id.* at 9.

### III. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows for the testimony of expert witnesses only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Third Circuit has explained that Rule 702 imposes various requirements on proponents

JA2553

of expert testimony centered around: "qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The proponent of expert testimony has the burden of establishing that it meets these requirements by a preponderance of proof. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 144 (3d Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals*, the U.S. Supreme Court held that Rule 702 requires a court to examine any proffered expert testimony for reliability, methodology, and connection between the data and the expert's conclusion. 509 U.S. 579 (1993). More specifically, *Daubert* provided five factors to guide a district court in its assessment of these requirements: (1) whether the methodology can and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error of the methodology; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the proper scientific community. *See id.* at 593–94; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (recognizing the importance of these factors in determining the admissibility of an expert's opinions, along with other reliability considerations). Rule 703 of the Federal Rules of Evidence governs the admissibility of the facts or data that an expert bases its opinion on and applies the same reliability standard as *Daubert*. *See id.* at 748–49 n. 18. Rule 703 excludes "facts or data [that] would otherwise be inadmissible" unless the probative value to the jury substantially outweighs their prejudicial effect. Fed. R. Civ. P. 703.

District Courts must act as "gatekeepers" for all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This includes, determining whether an expert impermissibly opines on legal conclusions: "[A]n expert witness is prohibited from rendering a legal opinion. . . . Such testimony is prohibited because it would usurp the District Court's pivotal

7

JA2554

role in explaining the law to the jury." *Berckeley Inv. Grp. Ltd. v. Colkitt*¸ 455 F.3d 195, 217 (3d Cir. 2006).

## IV.    ARGUMENT

Drs. Markenson's, Hyde's, and Williamson's opinions should be excluded because: (1) the witnesses' lack of adequate and specialized knowledge about ECFMG make them unqualified to reach their conclusions; (2) the witnesses offer legal opinions, including on ultimate issues that are for the Court or factfinder, far beyond the scope of admissible expert testimony; and (3) their opinions are based on unreliable methodologies. *See Oddi*, 234 F.3d at 145 ("we concluded that Rule 702 has two major requirements; qualifications and reliability"). Federal Rules of Evidence 403 & 703 also support excluding their opinions because the probative value of presenting their opinions is substantially outweighed by the prejudicial effect their inappropriate legal conclusions will have on a jury.

### A.    <u>Plaintiffs' Experts Are Not Qualified to Offer Opinions on ECFMG.</u>

Rule 702 demands that an expert possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Drs. Markenson, Hyde, and Williamson do not possess specialized knowledge that will help a factfinder evaluate whether ECFMG breached a duty to Plaintiffs and thereby caused them harm. Their lack of expertise in ECFMG's role in the credentialing of physicians detracts from the reliability of their opinions and makes them unqualified to reach conclusions about ECFMG's responsibilities and conduct. *See Paoli*, 35 F.3d at 741 ("the level of expertise may affect the reliability of the expert's opinion").

None has ever been an ECFMG applicant, employee, board member, or a Medical Education Credentials Committee member. None has known anyone on the Committee or been

JA2555

involved with an investigation of irregular behavior. Markenson Tr. 77:8–14; 78:1–17, 112:3–5, 143:11–24 (conceding he is not an expert on how ECFMG verifies credentials, and is only "aware of the information they provide to those who use it and how they hold themselves out to people who use it"); Hyde Tr. 60:20–61:20, 131, 138 (confirming he has never been an ECFMG applicant, served on the Board of Trustees, or been a member of the Medical Education Credentials Committee, and his interactions with ECFMG have been "very few and far between"); Williamson Tr. 64:19–65:23. Unsurprisingly then, none has testified about ECFMG before. Markenson Tr. 16:4–22 18:21–24; Hyde Tr. 69:20–70:4 (confirming has never provided an expert opinion on ECFMG's policies or procedures); Williamson Tr. 7-8, 13:9-12, 15:10–22.

Drs. Markenson and Williamson both demonstrate a fundamental misunderstanding of ECFMG's role in the credentialing of physicians. Dr. Markenson did not understand ECFMG's document verification services and its relation to other institutions. Markenson Tr. 59:5–62:13 (erroneously guessing that ECFMG verifies all aspects of an applicant's identify, including social security number and photographic identification). Despite claiming in his report that his hospital administrative work made him knowledgeable about the ECFMG credentialing process, during his deposition, Dr. Williamson was unable to recite what information ECFMG communicated to hospitals about IMGs through an ECFMG certification status report. Williamson Rep. 1; Williamson Tr. 32:13–18. In addition, he could not testify as to whether the USMLE Step 3 Exam had any role in ECFMG's certification processes. Williamson Tr. 126:22–127:10. It does not.

While all three of the experts had some interaction with ECFMG over the course of their careers, that is not enough to offer the type of "Monday-morning quarterbacking" these experts seek to provide regarding ECFMG's internal policies and procedures. An expert needs more than passing familiarity with the subject matter to qualify as an expert: "While the background,

9

education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003). Even so, Drs. Hyde and Williamson claim to have last interacted with ECFMG more than a decade ago, and both struggled to recall the specifics of that interaction and what they actually learned about ECFMG's processes and certification during that time. *See, e.g.*, Hyde Tr. 61–62 (trying to recall an interaction with ECFMG back in the 1970s or 1980s). The experts' perusal of ECFMG's public website is not enough to gain the specialized knowledge that could form the basis for an expert opinion about ECFMG. Markenson Tr. 78:1–17, 143:11–24; Hyde Tr. 117–118. Nor they suggest that they have some "specialized knowledge" that allowed them to draw conclusions from reviewing ECFMG's website that a lay juror would not.

Dr. Hyde, in particular, has a history of overreaching in expert opinions. He has been excluded as unqualified to opine on the "probability" of causation in a personal injury case, in which the court criticized Dr. Hyde's "broad conclusions" that were unsupported by data. *See Elswick v. Nichols*, 144 F. Supp. 2d 758, 764, 768 (E.D. Ky. 2001). He has also been excluded from a case in which he purported to opine that a doctor was unqualified, with the court criticizing his testimony for including "a conclusory statement without factual support." *Svindland v. A.I. Dupont Hosp. for Children*, No. 05-0417, 2006 WL 3209953, at *6 (E.D. Pa. 2006). His conclusions here are similarly unsupported. Although he cites ten years of experience as a healthcare administrator as his basis for an expertise in physician credentialing and privileging, he conceded he has not had direct experience with the field in 30 years: "[a]nd again, this has happened 30-something years ago. So I'm talking a little bit of what I remember with not that much specificity but just generalities." Hyde Rep. 1; Hyde Tr. 47:14–17. He also is not a clinician

JA2557

and has not had any experience in clinical medical care, so he is unfamiliar with the subject and cannot assess plaintiffs' harms. Hyde Tr. 55:3–13. By his own admissions, Dr. Hyde lacks the specific expertise required to qualify as an expert, and his testimony should be excluded. *See Calhoun*, 350 F.3d at 322.

Drs. Markenson's, Hyde's, and Williamson's overall lack of knowledge of ECFMG, its certification processes, and its irregular behavior investigations mean they lack the qualifications to offer their opinions about ECFMG, and their reports and testimony should be excluded. *See Oddi*, 234 F.3d at 145.

**B.    Drs. Markenson, Hyde, and Williamson Offer Impermissible Legal Conclusions in the Form of Expert Opinions.**

As is evident from the summary presented in section II *supra*, Plaintiffs' credentialing experts' opinions that are legal opinions are improper and should be excluded. "[A]n expert witness is prohibited from rendering a legal opinion. . . . Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp. Ltd.*, 455 F.3d at 217; *see also Flickinger v. Toys R Us-Delaware, Inc.*, 492 F. App'x 217, 224 (3d Cir. 2012) (affirming exclusion of portions of experts' report offering opinions on "substantial cause" and "negligence," as such terms are legal terms of art that cannot be the subject of expert testimony); *Dorshimer v. Zonar Systems*, No. 3:13-0553, 2016 WL 4179480 (M.D. Pa. Aug. 8, 2016) ("Additionally, experts can provide an opinion about the ultimate issue in a case, but may not give an opinion tied to any legal conclusion, such as whether a defendant was negligent") (internal citations omitted).

All three experts opined on ECFMG's breach of alleged duties and whether an alleged breach caused harm to Plaintiffs and putative class members. *See* Markenson Rep. 3 ("The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable

policies and procedures and to follow those procedures to ensure that IMG's [sic] comply with all requirements for certification . . . Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs."); Hyde Rep. 6–7 ("With a high degree of professional certainty, it is my opinion that the above breaches of duties, by ECFMG caused Akoda to be certified by ECFMG, which allowed him to be accepted into a residency, secure a medical license in MD and gain access to and directly cause harm the plaintiffs and the members of the class."); Williamson Rep. 5–6 ("There were several opportunities for ECFMG to intercede, still they breached the standard of care in the following ways"). The deposition testimony of Drs. Markenson and Williamson confirmed that they will continue to offer legal conclusions that are not within the scope of their expertise. *See, e.g.*, Markenson Tr. 218:5–9 ("I don't hold them accountable to law enforcement; but anything that an individual was allowed to do based on their certification, they do have culpability in that case."), 220:17-221:4 (purporting to assign liability to ECFMG); Williamson Tr. 116-117 (admitting he is putting forth a legal opinion on duty), 118:10–11 ("I guess perhaps I can present a legal opinion without being a lawyer"), 119:17–120:12 (opining on the question of foreseeability).

Whether or not ECFMG owed a duty to Plaintiffs under particular circumstances is a legal determination ultimately left to the Court. That is especially important here because "[c]ourts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances." *Commerce Bank/Penn. v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. 2006); *see also* Motion for Summary Judgment at Argument, Part II.A. Similarly, to establish causation, plaintiffs must "demonstrate that the breach was both the proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993). Allowing paid experts to opine on the legal question of whether a duty is

JA2559

owed (and to whom) at a particular time, in the context of a particular Plaintiff, is problematic whether presented in the context of the individual Plaintiffs' cases or, for the reasons stated in ECFMG's Supplemental Brief in Opposition to Class Certification, as part of any issue class proceedings. Proximate cause is a question of law to be determined by the court before the issue of actual cause is put to the jury. *Reilly*, 633 A.2d at 210 (citing *Novak v. Jeannette Dist. Mem. Hosp.*, 600 A.2d 616, 618 (Pa. 1991)); *see* Motion for Summary Judgment at Argument, Part IV.

Because experts are prohibited from providing legal opinions, especially on whether a defendant owed a legal duty, was negligent, or was the cause of an alleged harm, the opinions and testimony of Drs. Markenson, Hyde and Williamson should be excluded. *See, e.g., Flickinger*, 492 F. App'x at 224.

### C.   Drs. Markenson's, Hyde's, and Williamson's Methodologies Are Flawed Because Each Relied on an Incomplete Record.

Each of Plaintiffs' three credentialing experts relied on a flawed methodology to reach his conclusions. "[E]xperts are not permitted to engage in a 'haphazard, intuitive inquiry,' but must explain the research and methodology they employed." *Hartle v. FirstEnergy Generation Corp.*, 2014 WL 1317702, at *2 (W.D. Pa. Mar. 31, 2014). District courts may exclude expert testimony when the expert's conclusions "did not reliably flow from [the] data and methodology." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 159 (3d Cir. 1999).

Even if Drs. Markenson, Hyde, and Williamson were qualified to offer their opinions (they are not) and even if their opinions were not impermissible legal conclusions (they are), their opinions should still be excluded because the witnesses did not have an adequate basis on which to reach and support their opinions, and each of witnesses ignored avenues of analysis and information that are not only relevant, but necessary, for a sound consideration of the chain of events that they seek to offer expert testimony about.

13

As covered in greater detail in ECFMG's Motion for Summary Judgment, determining that Plaintiffs' injuries were proximately caused by ECFMG's conduct requires consideration of Plaintiffs' alleged injuries and how remote they were from the alleged negligence. *Reilly*, 633 A.2d 210 (internal citations omitted); *see* Motion for Summary Judgment at Argument Part III. None of these experts ever met Dr. Akoda's patients, performed examinations, reviewed medical records, or evaluated any harm that has allegedly come to them. Markenson Tr. 25:11–26:4, 31:9–16 (Dr. Markenson admits to having no knowledge of Dr. Akoda's medical procedures, examinations, or quality of care), 33:12–13 ("I did not read—as I've said, I have not reviewed their medical records."); Hyde Tr. 57:1–57:21; Williamson Tr. 115. As a result, they do not have sufficient information and factual ground on which to then offer expert opinions about plaintiffs' alleged emotion distress.

Similarly, despite offering opinions about proximate causation and whether they believe ECFMG's conduct caused Plaintiffs' alleged harm, each of Plaintiffs' credentialing experts chose to ignore and not evaluate highly relevant aspects of the chain of circumstances that led to Dr. Akoda's employment and his treatment of patients. In terms of evaluating the level of remoteness, courts review the causal chain between the conduct and the injury by looking at considerations including the number of factors that contributed to the harm, the effect of those factors on the harm, and the lapse of time. *See Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1287 (Pa. Super. 2005) (internal quotation and citation omitted); *see also* Motion for Summary Judgment Argument Part III. Drs. Markenson, Hyde, and Williamson did not perform any type of review of the causal chain.

In fact, their conclusions on the question of whether ECFMG was the direct cause of Plaintiffs' injuries did not consider—and are directly contradicted by—an expert Plaintiffs

JA2561

previously offered in a prior lawsuit against Dimensions Healthcare, the entity that provided Dr. Akoda with his privileges. That expert opined that "[Dimensions] breached the applicable standards of administrative care . . . [and] [a]s a direct and proximate result of [Dimensions'] continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability." SUMF ¶ 89.

In analyzing ECFMG's conduct, each of the experts drew conclusions from an incomplete record (as detailed expert-by-expert below).

**Dr. Markenson.** Dr. Markenson's report is solely based on his review of a limited set of documents curated by Plaintiffs' counsel, which he did not completely list in his report or maintain a master list of. Markenson Rep. 1; Markenson Tr. 110:21–23, 114–18, 140, 141–43. In fact, there were many relevant and necessary documents that Dr. Markenson did not review, such as: ECFMG's policies and procedures, records from Dr. Akoda's residency programs, the American Board of Obstetrics and Gynecology certification records for Dr. Akoda, and information on Virginia's and Maryland's licensing and credentialing processes. Markenson Tr. 84:22–85:24, 124, 128, 129, 139, 165. Dr. Markenson also never met Dr. Akoda's patients, performed examinations on them, or reviewed their medical records, so he has never evaluated the extent to which these patients were harmed. *Id*. at 25:11–26:4.

While Dr. Markenson has professional experience in the residency application process, he chose not to draw from that experience when evaluating the causal chain and failed to consider the multiple steps involved in a prospective resident's application. *Id.* at 40:8–41:3 (detailing the multiple steps involved in a residency application process, despite failure to include such details in his report), *Id.* at 42:14–18. Dr. Markenson did not analyze or research the processes for verifying documents, reviewing credentialing files, and admitting applicants that a residency

15

program would normally undertake. *Id.* at 37:21–38:2 (admitting he did not analyze, nor did he have access to, the materials Dr. Akoda submitted to Howard); 160:16–161:2 ("I do not know their processes").

Similarly, Dr. Markenson acknowledged that medical licensing boards independently licensed Dr. Akoda, thus permitting him to treat patients. *Id.* at 35:4–19. Despite this significant step, he also did not review medical licensing authorities' procedures and could not determine whether the medical licensing authorities who issued Dr. Akoda his medical license had acted properly. *Id.* at 35:24–36:9; 106:6–8 (admitting he is not familiar with Dr. Akoda's application to the Maryland licensing authority); 168:1–8 (admitting he does not know what steps Maryland took to verify Dr. Akoda's permanent residence card and Nigeran passport).

Further, Dr. Markenson failed to consider what role the hospital system Dr. Akoda worked for played in enabling him to treat patients. *Id.* at 106:12–16 (admitting he "was not privy to [the hospital system's] credentialing files or processes"). Dr. Markenson's conclusion that "failures on the part of ECFMG to comply with the standard of care . . . ***are the direct cause*** of the harms caused to the plaintiffs and the members of the class" shows just how flawed and unreliable his causation analysis is. Markenson Rep. 5 (emphasis added).

***Dr. Hyde.*** Dr. Hyde's report is based on his review of a limited set of documents curated by Plaintiffs' counsel, in addition to a review of a portion of ECFMG's website. *See* Hyde Rep. 2; Hyde Tr. 117–18. He also reviewed a couple of documents related to other health organizations, whose significance is of little relevance or never explained. Hyde Rep. 2, 5; Hyde Tr. 108–09; 116–17.

Despite conceding that credentialing physicians involved more than ECFMG's verification, (Hyde Tr. 72:24–76:12), Dr. Hyde did not analyze or research what the credentialing

JA2563

or licensing process may be for: (1) the residency programs Dr. Akoda was admitted into and evaluated by, (*id.* at 77:6–16); (2) the state of Maryland, which licensed Dr. Akoda, (*id.* at 162:3–165:25 (basing his knowledge of what Maryland does to credential applicants purely on the application, rather than investigating the state's verification process)); or (3) Prince George's Hospital Center, the hospital where Dr. Akoda had privileges, and had no insight into what those further requirements might be at Prince George's Hospital Center. *Id.* at 59:18–25.

**Dr. Williamson.** Dr. Williamson's report is based on his past administrative experience, as well as his review of a limited set of materials curated by Plaintiffs' counsel. Williamson Rep. 1–2. Notably, this included a timeline of events drafted by Plaintiffs' counsel, which he relied on in part for his statement of facts. Williamson Rep. 2; Williamson Tr. 60–61, 103. Dr. Williamson did not include in his analysis a review or investigation of the policies and procedures of Dr. Akoda's residency programs or Prince George's Hospital Center. Williamson Tr. 84–85. Furthermore, he did not analyze or research the Maryland Board of Physicians' credentialing and licensing process. *Id.* at 94:4-11.

Dr. Williamson ignored crucial steps in the chain of causation when evaluating ECFMG's responsibility. In his deposition, he contradicted his own expert report and admitted that there were many steps involved in hospital credentialing. *Compare* Williamson Rep. 6 ("ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety.") *with* Williamson Tr. 27:4–6 ("I would say [the credentialing processes at hospitals, health centers, or health maintenance organizations] is a very cumbersome and very thorough process that requires significant attention to detail."). At deposition, Dr. Williamson conceded that hospitals verify a physician before making a hiring decision, including independent verification of education, residency program, national practitioner data bank issues, background check, driver's license

JA2564

verification, and drug testing. Williamson Tr. 27:17–28:11. Yet none of that appeared in his report, wherein he concluded that ECFMG was responsible for Dr. Akoda obtaining a medical license and being accepted into his residency program. *See* Williamson Rep. 6.

### D. Drs. Markenson's, Hyde's, and Williamson's Opinions Are Impermissibly Speculative.

For many of the same reasons as the previous section, Plaintiffs' credentialing experts' opinions are littered with impermissible speculation. *Daubert* requires that an expert has a methodology that can and has been tested (first *Daubert* factor) and has standards controlling its operation (fourth *Daubert* factor). Speculation by an expert is grounds for exclusion of the expert's opinion. *See Goodman v. Burlington Coat Factory*, No. 11-4395, 2019 WL 4567366, at *9 (D.N.J. Sept. 20, 2019) (excluding conclusions of expert when "predicated upon impermissible speculation and assumption in part"); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Oddi*, 234 F.3d at 146.

*Dr. Markenson*. Dr. Markenson opined in his report on what he guesses the Medical Education Credentials Committee would have done if ECFMG had referred the matter to it (Markenson Rep. 5), despite having no prior experience with the Committee. Markenson Tr. 74:10–19 (acknowledging lack of familiarity with ECFMG, credentials committee, and allegations of irregular behavior.), 77:8–14 (no familiarity with the work of the Medical Education Credentials Committee outside this matter), 82:19-83:17 (same). Further, he proffered an opinion on what written ECFMG policies **might** say without having consulted what they actually **do** say. *Id.* at 84:22–85:24 ("I, as a physician, rely upon ECFMG[,] would have presume[d] that they would have had adequate policies and procedures to follow, to process, verify, and adjudicate issues; but I

JA2565

don't know these specific policies."), 124:10–13 (indicating he did not read policies and procedures from the applicable time period); 125:19–127.

Several errors in his testimony demonstrate the extent of his impermissible speculation. *Id.* at 225:7–226:9 (acknowledging that he confused the diplomas and referenced the wrong medical school), 227:21–235:22 (acknowledging that he does not know whether Dr. Akoda's application was considered complete by ECFMG's standards, even though he listed acceptance of an incomplete application as an alleged breach), 238:6–239:16 (erroneously claiming Dr. Akoda provided a green card to ECFMG when he did not).

**Dr. Hyde.** Dr. Hyde offered an opinion of how he believed ECFMG should have acted in light of allegations against Dr. Akoda, though that opinion was not based on any actual expertise or experience. Hyde Tr. 137:9–138:16 ("So I think there's a lot of contemporaneous information that I would have not allowed him to go any further, to be honest. He would have been permanently revoked, and I wouldn't give him a five-year revocation, then let this start over again because that in and of itself sets us where we are today."). None of this pontification by Dr. Hyde was anything beyond pure speculation since he had never been in a position to evaluate irregular behavior on behalf of ECFMG. *Id.* at 138:17–25. *See also* Hyde Rep. 7.

**Dr. Williamson.** Without developing any basis for opinions in this area or referencing a supporting methodology, Dr. Williamson nonetheless opined about how ECFMG's credentialing works and what duties ECFMG has. Williamson Tr. 64:19–65:23. Despite admitting that credentialing processes are not "one size fits all" at different health organizations, *id.* at 26:22, and because he lacks specific knowledge of ECFMG, Dr. Williamson wrongly assumes that ECFMG had verification responsibilities that it did not have, such as verifying the authenticity of letters of recommendation or Social Security numbers. *Id.* at 82:11–83:9; 112–113. Dr. Williamson

19

effectively conflates the responsibility of ECFMG with that of the Maryland Board of Physicians, because he does not have any familiarity with ECFMG or the Maryland Board of Physicians' evaluation and licensing processes. *See id.* at 96:23–99:11. He also expresses an opinion about whether the absence of a memo in Dr. Akoda's file was a breach of ECFMG's irregular behavior policies before admitting he does not have knowledge about ECFMG's file management system or even the term "irregular behavior." *Id.* at 108–109.

These experts' rank speculation should be excluded.

### E. Rules 403 & 703 Also Support Excluding the Opinions of Drs. Markenson, Dr. Hyde, and Dr. Williamson.

Drs. Markenson, Hyde, and Williamson rely on methodologies so unreliable that Federal Rules of Evidence 403 and 703 counsel excluding their expert opinions. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury." Similarly, Rule 703 covers what bases an expert may rely on and excludes "facts or data [that] would otherwise be inadmissible" unless the probative value to the jury substantially outweighs their prejudicial effect. Lawyers may not use expert opinions to supply client statements normally blocked by the rule of hearsay. *Therasense, Inc. v. Becton Dickinson Co.*, No. C 04-02123 WHA, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008). When experts "pass off client-prepared litigation-driven tests as fact . . . the jury can be easily misled into believing that the tests in question were tested and subjected to cross-examination" and "the probative value of such testimony is far outweighed by risk of misleading the jury." *Id.* at *2 (internal quotation marks omitted). "If an expert, a person with special knowledge and expertise, testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion." *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 120 (3d Cir. 2004).

JA2567

Here, Drs. Markenson, Dr. Hyde, and Dr. Williamson all provided legal opinions on elements of negligence that were not only outside their expertise, but also the scope of permissible expert testimony. Their reports demonstrate that rather than providing the jury with facts to consider, they will be spouting the same flawed legal theories that Plaintiffs' counsel have put forward. Such testimony will mislead the jury and must be excluded.

## V. CONCLUSION

The opinions of Drs. Markenson, Hyde, and Williamson do not meet the requirements of proper expert testimony and should be excluded in their entirety.

Dated: December 10, 2021      Respectfully submitted,

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:      +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission*
*for Foreign Medical Graduates*

JA2568

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED:  December 10, 2021                    */s/ Brian W. Shaffer*

Brian W. Shaffer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2022, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson and any response thereto, **IT IS HEREBY ORDERED** that ECFMG's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson is **GRANTED**. The opinion and anticipated testimony of Plaintiffs' experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson are **EXCLUDED**.

BY THE COURT:

_____

Wolson, J.

JA2570

# Exhibit 1

# Laurence H. Beck, MD, FACP

## 529 Broad Acres Road; Narberth PA 19072

October 14, 2019

Dear Elisa McEnroe:

In re: Russell et al v. ECFMG

I have been asked by Elisa McEnroe of Morgan, Lewis & Bockius LLP to review documents and other materials related to the above litigation, and to provide my expert opinion in such matters. In particular, I have been asked to provide expert opinion on the processes involved, after an International Medical Graduate (IMG) receives certification from the ECFMG, in applying for, and receiving, (1) acceptance into a residency training program; (2) hospital staff privileges; (3) state licensure to practice medicine independently; and (4) Board certification in a medical specialty.

I have separately submitted my curriculum vitae, including publications. I have had no publications in the previous 10 years.

I have not participated as an expert witness at trial or by deposition in the previous 4 years.

JA2572

I have been contracted for this work at the rate of $500 per hour.

In preparing this report, I have reviewed the expert reports of Dr. John Charles Hyde, Dr. Jonathan Burroughs, Dr. David Markenson, and Dr. Jerry Williamson. In addition, I have reviewed current published material from the Virginia Board of Medicine and the Maryland Board of Physicians concerning the process and requirements for an IMG to apply for a state license to practice medicine. I have reviewed published criteria from the American Board of Obstetrics and Gynecology, as well as from the American Board of Medical Specialties. I have also reviewed correspondence and records concerning Dr. Akoda from Jersey Shore Medical Center (Jersey Shore Medical Center 000006-000010). I have also reviewed correspondence and records concerning Dr. Akoda from the American Board of Obstetrics and Gynecology (ABOG nonparty 000001-000082).

Most importantly, I have drawn on my expertise in the matters related to the above issues. This expertise includes 50 years of leadership and practice of medicine in Pennsylvania, the District of Columbia, and Florida. During that time, I have held numerous leadership positions requiring participation in, and knowledge of, credentialing of IMG's, including: (1) Chairman of the Residency Selection Committee at the University of Pennsylvania School of Medicine; (2)

Program Director of Internal Medicine Residency at the Hospital of the University of Pennsylvania; (3) Chairman of the Departments of Medicine [at the University of Pennsylvania, Philadelphia Veterans Administration Hospital, Geisinger Medical Center, Georgetown University Medical Center, and Cleveland Clinic Florida] and (4) Associate Chief of Staff of a Hospital [Georgetown University Hospital]. I am Board Certified by the American Board of Internal Medicine (ABIM).

For an IMG to practice medicine in any State in the United States, he/she must pass through numerous steps of application and acceptance.

1. He/she must apply to and be accepted into a residency accredited by the ACGME (Accreditation Council for Graduate Medical Education). In order to be considered as a candidate, the IMG must have, in addition to certification by the ECFMG, numerous other documents and undergo scrutiny in several areas, as iterated below.

2. To receive a license to practice medicine in the State of Maryland and/or the Commonwealth of Virginia, the IMG must (in addition to ECFMG certification) have graduated from an approved medical school, must be of "good moral character", must have completed at least 2 years of an

accredited residency, and satisfy numerous other criteria, as spelled out below.

3. To be accepted as Staff at a Hospital in either of those jurisdictions, the IMG must have an unrestricted state license to practice medicine, and must meet numerous other criteria, as iterated below.

4. To achieve Board certification in a medical specialty (which is a voluntary decision, and not required for state licensure), the candidate must pass a certifying examination and be evaluated in numerous other categories, as iterated below.

At each of these steps, the program or institution has a specific set of requirements, which include verification of credentials and usually a personal interview. For application to a residency program, it is the responsibility of the residency program administration to ensure verification of primary-source credentials.  Typical additional requirements include: an in-person interview, letters of reference (with contact information for each writer), a current photograph, an up-to-date CV [curriculum vitae], evidence of proficiency in spoken and written English, review of visa status (usually J-1 or green card), and review of any prior residency, with a letter of recommendation from its program director.  Following review of an application, the candidate and the residency

JA2575

program must participate in the National Residency Matching Program (NRMP), wherein each party submits a rank order list of their preference (the list of residency programs for the applicant; the list of candidates for the residency program).

Although it is sufficient for the residency program to accept primary source credential verification via ECFMG certification (or their ERAS program) for the medical credentials, the residency program must pursue the other requirements via their own resources. Based on my extensive knowledge and experience, the above requirements are typical of residency programs in the United States, and represent, in my opinion, a medical profession and industry standard.

An IMG's application to the Virginia and/or Maryland Board of Physicians for a license to practice requires ECFMG certification, as well as numerous other requirements. For either state, there is a personal interview, with verification of identity, reporting of all post-graduation residency or fellowship training, with letter(s) of recommendation from the program director(s), medical school transcripts (usually directly from the medical school), scores of FLEX or Step 3 of the USMLE, employment record from the date of medical school graduation, report of any disciplinary action, and competency in written and spoken English.

Each state also has a separate written licensure exam. The Maryland Board of Physicians states also "The Board requires primary source verification from medical schools, postgraduate training programs, national licensing entities (USMLE, FSMB, NBME, etc) and other state boards". Again, based on my extensive knowledge and experience, the above requirements are typical of state medical licensure boards in the United States, and represent, in my opinion, a medical profession and industry standard.

Similarly, Hospital staff privileges require a separate application process which, for the IMG, requires ECFMG certification, but also (usually) an interview, as well as a number of other areas of review, including one or more personal references with contact information for each, a current photograph, certificates of completion from all residencies and fellowships, letter of recommendation from program director(s), Social Security number, valid passport and/or birth certificate, malpractice insurance history, all licenses, including DEA certificate, a 2-year case log, fingerprinting for federal background check, and a urine drug screen. Furthermore, after achieving hospital staff privileges, all physicians are evaluated on an ongoing basis, usually by the Medical Director's office, on their clinical performance, demeanor, and interactions with patients and staff. Based on my extensive knowledge and experience, the above requirements are typical

JA2577

of hospitals in the United States, and represent, in my opinion, a medical profession and industry standard.

Certification by an American Board of a medical specialty requires a process involving examination, review of credentials, and evidence of satisfactory performance in that specialty. Typically, for the American Board of Obstetrics and Gynecology, that requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of case logs over the previous years, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. Following successful Board certification, a candidate must comply with annual requirements for ongoing educational modules as part of the MOC (maintenance of certification) process.

 Dr. Akoda passed both the written and oral examinations of the ABOG, and his credentials were initially approved, so that he was given a one-year Board certification. He successfully complied with the MOC requirements for the first year after his certification, but then failed to continue that activity. As a result, the ABOG did not renew his certification. Subsequently, upon learning of his

criminal behavior, it revoked entirely his Board certification.  All these activities

were instigated by the ABOG and were not dependent upon input from ECFMG.

CONCLUSIONS

In reviewing the chronology of Dr. Akoda's progression through the above steps

leading to medical residency acceptance at Jersey Shore Medical Center and at

Howard University, licensure in Virginia and Maryland, staff privileges at Prince

George's Hospital Center, and certification by the American Board of Obstetrics

and Gynecology, there were numerous opportunities for the above institutions to

suspect and investigate Dr. Akoda's fraudulent behavior, except that these

opportunities appear to have been repeatedly hidden, or covered up, by Dr.

Akoda, through his apparent lies, false documents, and evasiveness.  As an

example, the residency program director at Howard University certainly should,

and I believe, would have pursued the question of why Dr. Akoda had left his third

year of residency at Jersey Shore Medical Center.  He/she should, and I believe,

would have called the program director at Jersey Shore Medical Center and

learned that Dr. Akoda was dismissed from that program.   It is likely that the

Howard University program did not pursue this discrepancy because they were

unaware of this history (because Dr. Akoda apparently either lied or failed to report it, on his application or in a personal interview).

Although residency programs, hospital staff boards, and state medical boards may rely on the ECFMG certification for verification of certain medical credentials, they must use their own resources to ascertain the validity of the numerous other requirements of acceptance (letters of recommendation, visas, social security information, etc.). There is no expectation of these institutions to receive additional information from the ECFMG after they have documented that the certificate is valid.

The primary or root cause of Dr. Akoda's movement through the system, licensure and ability to practice medicine at Prince George's Hospital Center was Dr. Akoda himself and his fraudulent and criminal activities. These activities effectively hid the inaccuracies and lies from all concerned, from the ECFMG, through to the residencies, hospital staff, and state Boards of Medicine. Any alleged harm to patients resulting from his repeatedly dishonest behavior are directly due to his dishonest behavior.

Sincerely yours,

*Laurence H. Beck, MD*

Laurence H. Beck, MD

# Exhibit 2

October 14, 2019

Elisa P. McEnroe, Esq.
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103-2921

Re: *Russell et al. v. Educational Commission for Foreign Medical Graduates*,
No. 2:18-cv-05629

Dear Ms. McEnroe,

I was asked to review the case of *Russell et al. v. Educational Commission for Foreign Medical Graduates* (ECFMG) as an expert witness in hospital administration, graduate medical education, organized medical staffs, and credentialing. I was asked to opine on the processes that a foreign medical graduate must go through after ECFMG certification when applying for graduate education (residency and fellowship training) and, subsequent application for membership and privileges at a U.S. hospital.

I am qualified to offer an evaluation of this case due to my extensive experience and training in the subject areas. I have been a practicing surgeon in Southern California since July 1982. From 1982 through 2007, I practiced General and Vascular Surgery in private practice in Palm Springs, California with privileges at Desert Regional Medical Center and Eisenhower Medical Center. During that time, I was also the Medical Director and Managing General Partner of Desert Surgery Center, a multispecialty ambulatory surgery center, from 1988 to 2004. I began consulting in healthcare in 2002. From 2002 to 2007, I worked as a consultant for The Greeley Company. In 2007, I decided to close my private practice and became a Clinical Assistant Professor of Surgery at the University of California, Irvine where I practice and teach residents and medical students one week a month. My remaining time is spent in healthcare consulting. My major areas of interest in consulting are organized medical staffs, quality, peer review, credentialing and

JA2583

privileging and automated data processing. I have attached my full CV as Appendix A for further details in these areas.

My compensation for these endeavors is outlined on my fee schedule attached as Appendix B.

The documents that I reviewed for these opinions are listed in Appendix C.

A list of all cases in which I testified as an expert at trial or by deposition over the last 4 years is attached as Appendix D.

ECFMG provides a number of services relevant to a foreign medical graduate's (FMG's) pathway into clinical practice in the United States, including primary-source verification of foreign medical school diplomas. ECFMG certification is a screening mechanism for ensuring that an FMG has met certain minimum criteria.

Once the FMG obtains his or her ECFMG certification, he or she will usually be applying for a graduate medical position through the National Residency Match Program (NRMP)/Accreditation Council for Graduate Medical Education (ACGME) process if he/she wants to practice in the U.S. It is a requirement of those programs that an FMG hold an EFCMG certificate to be able to enter the residency process. However, the FMG applicant will also need to complete the NRMP application, obtain interviews at an ACGME-approved institution with a desired residency, and be rated by those institutions for a position match. The NRMP application includes supporting documentation such as Medical Student Performance Evaluation (MSPE), medical school transcript, Letters of Reference, Photograph, USMLE (United States Medical Licensing Examination in 3 parts) transcript and the ECFMG certificate.

During the interview process, the FMG goes through a series of interviews with review of all information in the application (of which the ECFMG certificate is only one item as noted above). These interviews are with multiple faculty typically and are designed to elicit information about the applicant's aspirations, program desires such as research, and ultimate goals. At the same time, the applicant gets to learn about the institution's programs, objectives and residency culture. This enables both sides to make rational rating decisions as most institutions will then rate their applicants while the applicants rate the institutions. These are all

JA2584

submitted to NRMP, which applies its match algorithms to fill the residency position.

If an FMG is accepted for a residency, he or she is subjected to the ongoing review requirements set up by the ACGME. Each residency institution has to file an annual progression report on each resident with milestone achievements identified. Milestones are developed for each specialty but are based on the Six Core General Competencies and then applied to each level of residency from beginner to most advanced and ready to graduate out of residency. Thus, an annual report for any given resident is a complex report on multiple performance measurements that require judgment and explanation. In addition to these reports by the faculty, most specialties have an annual examination (e.g. ABSITE for surgery, IM-ITE for internal medicine) that is another check on the resident's progress.

All patient care delivered by residents is conducted under ongoing oversight by the faculty which puts the faculty in a position to know the strengths and weaknesses of the resident. Additionally, as an employee of the residency program, each resident is subject to normal employee processes such as payroll, taxes, visas if appropriate, healthcare programs and other conditions and requirements of employment.

If the FMG successfully completes all years of the residency fulfilling all requirements as determined both by ACGME and the institution's faculty, he or she may graduate the residency.[1]

Typically, at some point early in the residency, states like Maryland and Virginia require that the resident obtain a state medical license of some variety. This is another application process for which an FMG will need to supply a variety of information, including but certainly not limited to his or her ECFMG certificate. In addition, the state board typically requires information about education, clinical training, disciplinary actions, criminal record, practice impairments and a photograph among other data points. The state medical board or licensing agency

---

[1] At this point, the FMG may be ready to go out into practice or they may desire additional training through a fellowship. The process for entering a fellowship program is similar to the residency process with an application, interviews and match process. Once fellowship is completed in like manner, the FMG is ready to go out for practice of medicine. Fellowship is not required for all FMGs.

will consider the information, may or may not require interviews, and may or may not require a separate examination before issuing a medical license. Since medical licenses are state based, often times, applicants may need to obtain multiple licenses as their training hospitals may cross state lines.

When specialty training is complete, an FMG clinical graduate will be eligible for specialty board certification. The most recognized and accepted is the boards under the umbrella of the American Board of Medical Specialties (ABMS). Each specialty has its own application process but it tends to mirror similar types of information collected by state medical boards. ECFMG certification status is just one data point among many in such applications. This is evidenced in particular by looking at the American Board of Obstetrics and Gynecology's process in utilizing many sources of data in reaching its decision to grant Board Certification status.

When the graduate resident or fellow is applying for hospital medical staff membership and privileges, they will need to undergo an even more rigorous credentialing process. One part of this credential program will be the checking of the ECFMG certificate status. However, this is but one piece of information checked. Licensure, training, board status, personal references, and any clinical performance data available will also be evaluated. There may be in person interviews as well. The applicant typically will need to provide evidence of malpractice coverage and clinical coverage by other practitioners on staff. The credentials are usually reviewed at multiple levels, starting with the specialty service or department. They then may be reviewed by a Credentials committee as well as a Medical Executive Committee (MEC) for final recommendations. These recommendations are then transmitted by the MEC to the Board or Governing Authority which makes the final decision.

Once the FMG is on staff at a hospital, his or her clinical competence is immediately evaluated through a focused review process commonly known as FPPE (Focused Professional Practice Evaluation). If the FMG practitioner is successful here, they are then evaluated for clinical competence in an Ongoing Profession Practice Evaluation (OPPE) that is carried out more than once a year, typically every 6-8 months in most hospitals.

The FMG will need to renew his or her membership and privileges on regular intervals. The FMG's performance data, malpractice information and any other

JA2586

relevant data will be reviewed in a fashion similar to the initial application with the final decision coming from the Governing Board.

Opinions

1. While ACGME residency programs require ECFMG certification for an FMG to be eligible, ECFMG certification is by no means the only or even the significant information point regarding an FMG's ability to practice medicine in the US.
2. Residencies and Fellowships should, and typically do, look for information regarding an FMG's background, character and aspirations, which requires gathering a large amount of data to see if he or she will be a fit for an institution's particular specialty training program. Residencies and Fellowships gather this data from a variety of sources. The ECFMG certificate is just one data point for them to check.
3. Hospitals should, and typically do, check the validity of training, quality of clinical care and goodness of character to see if the applicant matches the hospital's goals and requirements of their physicians when the Hospital is granting initial membership and privileges. Hospitals get this information from a variety of sources. A current ECFMG certificate is but one piece of information available to them.
4. Current clinical competence is a responsibility of the ACGME and institutional faculty during training and of the organized medical staff for hospital practice. Current clinical competence is determined based on an assessment of a wide array of information from a variety of sources. A current ECFMG certificate is only a single point of information in a large sea of performance data.
5. An FMG working as a resident or with privileges at a hospital is subject to normal employee processes such as payroll, taxes, healthcare programs and other conditions and requirements of employment. In connection with those processes, residency programs and hospitals should, and typically do, gather a wide variety of information about the FMG from a variety of sources other than ECFMG.

I reserve the right to add to or modify these opinions if I am given further information to review.

Respectfully submitted,

Mark A. Smith, MD, MBA, FACS

Appendix A

CURRICULUM VITAE

Mark A. Smith, M.D., M.B.A., F.A.C.S., FACHE                    Licenses

                                                          PA MD- 025431-E (Inactive)
                                                          CA00G47011 (Active)
747 Camino Norte                                          Board Certification-  Gen'l Surg,
                                                          Vascular Surgery
Palm Springs, CA 92262                                    American Board of Surgery- 1983
Home Telephone- (760) 320-3851                            Recertified- 1990, 2004

Cell Phone- (760) 275-8204
Email- Vascu@aol.com

                                                          Certification Vascular Surgery-
                                                          November 1984
                                                                 Recertified- 2013

                                                                 Fellow of the American College of
                                                          Surgeons- October, 1985- Present

Married- Bonnie Heinen Smith                               Special Certification in Laser Asst
Children- 2 Daughters (Lisa, Lindsay)                     Angioplasty – January 1988

                                                          Certified- American Board of
                                                          Quality Assurance and Utili-
                                                          Zation  Review
                                                          Physicians- July 2005-  Dec.2015

                                                                 Certified- Fellow of the American
                                                                 College of Healthcare Executive, Januar
                                                                 2011

                                                                 Certified- Graduate Gemologist (GG),
                                                                 May, 2015

                                                                 Certified Specialist in Wine (CSW),
                                                                 August, 2017

                                                                 Certified Professional Healthcare Qualit
                                                                 Dec. 2017

JA2589

Education

|  |  |
|---|---|
| Haverford Senior High School<br>Havertown, PA | 9/66- 6/69  Diploma |
| University of Michigan<br>Ann Arbor, Michigan | 9/69- 8/72  B.S. Zoology |
| Jefferson Medical College<br>Philadelphia, PA | 9/72- 6/76  M.D. |
| University of Phoenix<br>Phoenix, AR | 1/92- 3/94  M.B.A. |

Training

Internship

University California San Diego Medical Center        7/76- 6/77  Surgery
225 W. Dickinson Street
San Diego, CA
Marshall Orloff, M.D.

Residency

University of Kansas Medical Center        7/77- 6/81  General Surgery
39th and Rainbow Blvd.
Kansas City, KS
William Jewell, M.D.

Fellowship

Hospital of the University of Pennsylvania        7/81- 12/81  Cardiothoracic
34th and Spruce Streets        Surgery
Philadelphia, PA
L. Henry Edmunds, M.D.

Hospital of the University of Pennsylvania        1/82- 6/82  Vascular Surgery
34th and Spruce Streets
Philadelphia, PA
Brooke Roberts, M.D.

JA2590

Employment

     Private Practice- Vascular and General Surgery          7/82- 3/2007
     Coachella Valley Surgical Associates
     1100 N. Palm Canyon Drive
     #208
     Palm Springs, CA 92262

     Medical Director and Managing General Partner     12/88- 8/2004
     Desert Surgery Center
     1190 N. Palm Canyon Drive
     Palm Springs, CA 92262

     Senior Consultant           3/2002- 12/2007
     Practice Director, Credentialing        1/2008- 6/30/2009
     The Greeley Company
     200 Hoods Lane
     Marblehead, MA  01945

     Independent Healthcare Consultant        7/1/2009- Present
     HG HealthCare Consultants, LLC.

     Assistant Professor of Surgery,         9/2007- Present
     Division of Vascular Surgery
     UCI Medical Center
     333 City Blvd., Suite 1600
     Orange, CA 92868

     Chief Medical Officer           9/2011- 3/2014
     Verisys Corporation
     1001 N. Fairfax Street
     Suite 640
     Alexandria, VA 22314

     Chief Medical Consultant         3/2012- 3/2015
     Morrisey Associates, Inc.
     222 South Riverside Plaza
     Suite 1850
     Chicago, IL 60606

VP & Chief Medical Officer                              3/2015- 12/2015
Morrisey Associates, Inc./Morcare
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

VP & Chief Medical Officer                              1/2016- 1/31/2017
Morcare LLC.
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

Senior Medical Consultant                              2/1/2017- 12/31/2017
Morrisey Associates Inc., A Healthstream Company

Chief Medical Officer                                  1/1/2018- 2/1/2019
Humanus Inc.

## Hospital Appointments

Desert Regional Medical Center          Active Staff  7/82- 12/2007
1150 N. Indian Canyon Drive             Emeritus Staff  1/2008- Present
Palm Springs, CA 92262

Eisenhower Medical Center               Active Staff   9/82- 12/2007
39000 Bob Hope Drive
Rancho Mirage, CA 92270

UCI Medical Center                      Provisional Staff  5/08- 8/09
100 City Drive                          Active Staff  8/09- Present
Orange, CA 92868

## Hospital Positions

President Elect- DRMC                          July 1988- June 1990

President- DRMC                               July 1990- June 1992

Past President- DRMC                          July 1992- June 1994

JA2592

| | |
|---|---|
| Chief of Surgery- DRMC | July 1993- June 1995 |
| Chairman, Peer Review Committee | July 2004- Jan, 2007 |
| Medical Director, Cardiac Surgery DRMC | August 2004- September, 2006 |
| Co-Surgeon Champion, NSQIP for University of California Irvine Medical Center, Department of Surgery | August 2010- 2012 |

Professional Memberships

    American College of Surgeons, Fellow

    American College of Physician Executives, Member

    American College of Healthcare Executives, Fellow

    Southern California Vascular Surgical Society, Member

    National Association of Healthcare Quality, Member

    Society of Vascular Surgery, Active Member

Other Memberships

    Airplane Owner and Pilot's Association

    Experimental Aircraft Association

    American Philatelic Association, Life Member

    Palm Springs Air Museum

    Association Naval Aviators

    United States Tennis Association

    Defense Orientation Conference Association, Member since 1995

JA2593

Interests

     Art Collecting, Reading, Flying, Tennis, Stamp Collecting

     Gemology, Sailing, Vintage Cars

Past Associations, Positions

     Palm Springs Desert Museum, Member of Board of Directors 1993-95

     Desert Surgery Center, General Partner and Medical Director 1987- 2004

     Palm Springs Professional Building, General Partner 1988- 1998

Publications

<u>Assessing the Competency of Low Volume Providers</u>, Smith, MA and Pelletier, S, HCPro, 2009

<u>Effective Peer Review</u>, Marder, R and Smith, MA, HCPro, 2005

<u>Effective Peer Review 2nd Edition</u>, Marder, R, Smith, M. and Sheff, R., HCPro, 2007

<u>Proctoring and Focused Professional Practice Evaluation</u>. Marder, R., Smith, MA, and Sagin, T., HCPro, 2006

<u>Proctoring and FPPE</u>, Marder, R and Smith, MA, HCPro, 2009

<u>Measuring Physician Competency</u>, Marder, R, Smith M.A., Smith, M. and Searcy, V., HCPro, 2007

<u>Core Privileges for Physicians</u>, Crimp, W, Pelletier, S., Searcy, V. and Smith, M, HCPro, 2007

<u>The Credentials Committee Manual</u>, Smith, M.A., HCPro, 2016

<u>Effective Peer Review 4th Edition</u>, Marder, R, HCPro, 2017. Contributed chapter on approach to team performance measurement

<u>Optimal Resources for Surgical Quality and Safety</u>, Editors Hoyt, D. and Ko, C., American College of Surgeons, 2017. Contributing Author.

Seminars

Multiple seminars delivered on various topics related to Medical Staff including effective Medical Staff leadership, credentialing and privileging, peer review, surgical team summit, proctoring, physician performance profiles

Redesign of peer review system at approximately 75 hospitals in last fifteen years.

Keynote Speaker for Morrisey Users Conference, August 2010, "Moving from Competence to Excellence … Improving Patient Safety through Automation"

Faculty, American Association of Physician Leadership (previously American College of Physician Executives) 2011- Present

Member of Faculty Advisory Council, AAPL, August 2015- July, 2019

Faculty, Credentialing Resource Center, April 2017- present

Worked with ECRI on a number of evaluations and presentations  under their Patient Safety Organization

Appendix B  Compensation

Legal Fee Schedule for Mark A. Smith, MD


Document Review and Letters: $500/hr
Deposition in my town- $600/hr
Traveling deposition or Trial Testimony- $6000/dy + travel expenses

JA2596

Appendix C- Documents reviewed for these opinions

1 Reports and CVs of:
   a. Williamson, Jerry
   b. Markenson, David
   c. Burroughs, Jonathan
   d. Hyde, John

2 Website of the Accreditation Council for Graduate Medical Education- www.acgme.org
3 Website of the National Residency Matching Program (NRMP)- www.nrmp.org
4 Website of the Medical Board of California- www.mbc.ca.gov
5 Website of the American Board of Medical Specialties- www.abms.org
6 Website of Educational Commission for Foreign Medical Graduates- www.ecfmg.org
7 Records from the American Board of Obstetrics and Gynecology (ABOG_nonparty_000001-00082)

Appendix D- Cases in Which Dr. Smith has testified or been deposed in the last four years

Toranto v. Jaffurs et. al.- (Paul Plevin is the law firm that I worked with)- Deposition in May, 2019

Rosenberg Fair Hearing Testimony- (Durham Jones and Pinegar is the law firm I worked with)- February, 2019

# Exhibit 3

1        IN THE UNITED STATES DISTRICT COURT

      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2             CIVIL ACTION NO. 18-5629

3

   MONIQUE RUSSELL, JASMINE          :
4  RIGGINS, ELSA M. POWELL,          :
   and DESIRE EVANS,                 :
5                                    :
                   Plaintiffs,       :
6                                    :
            vs.                      :
7                                    :
   EDUCATIONAL COMMISSION FOR        :
8  FOREIGN MEDICAL GRADUATES,        :
                                     :
9                  Defendant.        :
10
11             Deposition of DR. DAVID
12  MARKENSON taken in the above-entitled matter
13  before Suzanne J. Stotz, a Certified Realtime
14  Reporter, Registered Professional Reporter, and
15  Notary Public of the State of Colorado, taken
16  at the WESTIN DENVER AIRPORT, 8300 Pena
17  Boulevard, Denver, Colorado 80249, on
18  October 22, 2019, commencing at 10:14 a.m.
19
20
21
22
23
24

1    Plaintiff -- plaintiff, on that side.

2         Q.    On behalf of the infant's family?

3         A.    Yes.

4         Q.    Were you -- you were a medical

5    expert in that case?

6         A.    Administrative and medical.

7         Q.    When you say "administrative,"

8    explain to me what you mean.

9         A.    Hospital policies and procedures.

10        Q.    Did you provide expert testimony

11   regarding credentialing in that case?

12        A.    Let's see.  I'm trying to think if

13   we got into credentialing.  I don't believe we

14   got into credentialing.

15        Q.    Did you give any testimony

16   regarding the Educational Commission for

17   Foreign Medical Graduates in that case?

18        A.    No, I did not.

19        Q.    In any of these cases we just

20   discussed, was there an issue regarding the

21   sufficiency of the credentialing by ECFMG?

22        A.    No, there was not.

23        Q.    You mentioned that you had some

24   cases that fell outside of the time frame

Dr. David Markenson

```
 1   provided for by the Federal Rules for

 2   Disclosure with your expert report earlier

 3   today.

 4               Do you remember that?

 5       A.      Yes.

 6       Q.      Do you remember any of those cases?

 7       A.      Only a few -- several of them were

 8   filed against me as a physician.

 9       Q.      Sort of run-of-the-mill malpractice

10   types --

11       A.      Correct.

12       Q.      -- of cases?

13               In what specialty?

14       A.      Pediatric emergency and pediatric

15   critical care.

16       Q.      Did any concern your credentialing?

17       A.      I don't remember the specifics.  I

18   was a named defendant, so there may have

19   been -- there may have been something about

20   credentialing against me.  I don't know.  I

21   don't remember.  They were all dismissed.  I

22   don't remember most of the details.

23       Q.      Are you certified by ECFMG?

24       A.      No, I'm not.
```

Dr. David Markenson

1        Q.      Other than the Jenny Butler and the

2    Abid case listed here, have you ever served as

3    an expert witness other than the case that

4    brings us here today?

5        A.      I believe so, yes.

6        Q.      Do you recall in which cases?

7        A.      Not off the top of my head, no.

8        Q.      Do you recall, generally speaking,

9    the subject matter on which you have served as

10    an expert?

11        A.      It's varied either administratively

12    as a physician or in my specialties of

13    pediatrics.

14        Q.      Can you estimate to me how many

15    times other than the two listed on this

16    disclosure you've served as an expert witness?

17        A.      I think two or three roughly.

18        Q.      Do you recall whether you've ever

19    previously served as an expert witness

20    regarding credentialing?

21        A.      I may have been asked.  I don't

22    remember.  It may have been part of -- it may

23    have been part of the sort of overall hospital

24    administration and policies.

JA2603

1    Q.    Do you recall whether credentialing

2  was ever a central element of your opinions

3  other than in the case today?

4    A.    In the administrative cases, it

5  usually is part of it.  It's usually all the --

6  it's one of the aspects.

7    Q.    What are the other aspects in

8  administrative as you've been talking about it?

9    A.    Hospital policies and procedures,

10  transfer admission guidelines.

11    Q.    Say that last one again.

12    A.    Admission guidelines.

13    Q.    For a patient to be admitted to the

14  hospital?

15    A.    Correct.

16    Q.    When you served as an expert

17  witness regarding administrative types of

18  issues, was that always about hospital

19  administration?

20    A.    Yes, predominantly hospital

21  administration.

22    Q.    Anything other than hospital

23  administration?

24    A.    It may be associated healthcare,

1   communities.

2        Q.    Do you still see patients?

3        A.    I do.

4        Q.    Where?

5        A.    Right now I'm doing that as

6   per-diem or part-time work.

7        Q.    At a particular hospital?

8        A.    It varies.  They're usually

9   temporary assignments.

10       Q.    Generally in the Denver, Colorado,

11  area?

12       A.    It can be anywhere.

13       Q.    In what specialty?

14       A.    Either pediatric emergency or

15  pediatric critical care.

16       Q.    Are you trained as an

17  obstetrician/gynecologist?

18       A.    No, I am not.

19       Q.    So your typical patients are

20  pediatric patients; is that correct?

21       A.    Yes, they are.

22       Q.    In the course of your practice,

23  have you knowingly come across any patients

24  treated by Dr. Akoda?

1          A.     I have not.

2          Q.     If I use the name Dr. Akoda, do you

3    know to whom I am referring?

4          A.     I am familiar with who he is.

5          Q.     For ease today, I'm just going to

6    use that one name; but I do intend it to be the

7    individual that is the subject of the lawsuit

8    that we're here for.

9                 Do you understand that?

10         A.     Yes.

11         Q.     Okay.  Have you done any

12   examinations of any of the plaintiffs in this

13   lawsuit?

14         A.     No, I have not.

15         Q.     Have you met any of them?

16         A.     No, I have not.

17         Q.     Have you reviewed any of their

18   medical records?

19         A.     No, I have not.

20         Q.     Have you been able to evaluate

21   what, if any, harm has come to them by their

22   interactions Dr. Akoda?

23                MR. VETTORI:  Objection.  That's

24        not the scope of his expert testimony.

```
1    BY MS. McENROE:

2         Q.      You can answer the question anyway

3    unless he tells you not to?

4         A.      No, I have not.

5                 (Whereupon, Exhibit No. 4, Report

6         of David Samuel Markenson, MD, was marked

7         for identification.)

8                 MS. McENROE:  For the record, this

9         is a very wide table.

10   BY MS. McENROE:

11        Q.      All right.  So I just handed what's

12   been marked as Exhibit 4.

13        A.      Uh-huh.

14        Q.      Have you seen this document before?

15        A.      Yes, I have.

16        Q.      What is it?

17        A.      This is the report I had submitted.

18        Q.      In this lawsuit, correct?

19        A.      Correct.

20        Q.      I'd like to direct your attention

21   to page 5 in Exhibit 4, so page 5 of your

22   report?

23        A.      Yes.

24        Q.      The very last paragraph there says,
```

Case 2:18-cv-05629-JDW    Document 122-5    Filed 10/08/22    Page 1 of 2
Case 2:18-cv-05629-JDW    Document 122-5    Filed 09/08/22    Page 718 of 3041

1   "It is my opinion, to a reasonable degree of

2   professional certainty, that these failures on

3   the part of ECFMG to comply with the standard

4   of care were the direct cause of Akoda being

5   certified by ECFMG and which are the direct

6   cause of the harms caused to the plaintiffs and

7   the members of the class."

8         Do you see that?

9   A.    Yes, I do.

10   Q.    On what basis are you saying that

11   you know what the direct cause of harms is, the

12   cause to the plaintiffs having never met them,

13   having never evaluated them, and not having

14   reviewed their medical records?

15   A.    Had ECFMG not certified Dr. Akoda,

16   he would have not been licensed as a physician,

17   admitted to a residency, or allowed to treat

18   the patient.  So no harm from him would have

19   come to them had ECFMG done their actions and

20   not certified him.

21   Q.    So you're not giving this opinion

22   here in this last paragraph on page 5 on the

23   basis of any specific knowledge of alleged

24   harms caused to the plaintiffs; you're just

Case 2:23-1998-562 Document D-22 filenPage 719 iled 1 Date Filed Page 09/08/2022

1      Q.      And those reflected that he was

2   licensed to practice medicine in Nigeria,

3   correct?

4      A.      Without -- I don't know if they

5   were valid or not, but they do reflect that he

6   did attest to an ECFMG certified that he had.

7      Q.      So other than the course of events,

8   if you will --

9      A.      Uh-huh.

10     Q.      -- in this case, do you have any

11  knowledge or specific opinions about any

12  particular harms that you're making opinions

13  about for any of the plaintiffs in this case?

14             MR. VETTORI:  Objection.

15             You can answer.

16             THE WITNESS:  Sure.  Just that he

17        was allowed to hold himself out as a

18        physician having not met legal

19        requirements.

20             Obviously a patient who is going to

21        discover that someone who examined them,

22        you know, who was not who they said they

23        were is going to have an effect on that

24        patient.  It's tremendous invasion of

Case 2:18-1998 5620 Document 22-5 ent Page 5 720 d 1 Date Filed 09/08/2022

```
 1           privacy.  It's a tremendous invasion of
 2           their person.
 3                Anything that happened subsequent
 4           to that, in terms of all the medical care
 5           he rendered, would have never been allowed
 6           had the proper steps been done to not
 7           allow him to proceed.
 8  BY MS. McENROE:
 9      Q.     But do you know about any specific
10  harm caused to any specific plaintiff in this
11  case?
12      A.     I did not read -- as I've said, I
13  have not reviewed their medical records.  All I
14  know is that they've come to be aware that they
15  were treated by someone who wasn't who he said
16  he was.  They were examined by someone who
17  wasn't who he said he was, and that by itself
18  to anyone is going to have significant effect.
19      Q.     Are you able to say I know that
20  this person suffered that harm?  Are you able
21  to specifically say that about any of the
22  plaintiffs in this case?
23      A.     All I'm able to say is they would
24  have never been treated by him had ECFMG done
```

Case 2:23-1998562mdDo2nmen2a5-5enPa5e-721d 1Da1e/Filed Page:9/0830222

1    their due diligence, and I am sure that they

2    themselves are having effects of being treated

3    by someone who isn't who they say they were and

4    isn't the physician he supposedly was.

5        Q.    Other than your armchair

6    perspective, on what basis do you say you're

7    sure that that's what's happening?

8            MR. VETTORI:  Objection as to form.

9            THE WITNESS:  I am -- well, one had

10       ECFMG not certified him, he would never

11       would have been in contact with those

12       patients.  That's a binary

13       black-and-white.

14            Number 2, they have now come to

15       know that someone who treated, examined

16       the, including invasive examinations was

17       not who they say they were.

18   BY MS. McENROE:

19       Q.    If the licensing boards had not

20   granted him medical licenses, do you believe he

21   would have treated these patients?

22       A.    I believe had -- if ECFMG had not

23   certified --

24       Q.    I'm sorry.  I'm going to move to

Case 1:23-cv-01988-DLB Document 22-5 Filed 10/14/22 Page 712 of 841
Case 1:23-cv-01988-DLB Document 22-5 Filed 09/08/2022 Page 35

1    strike.

2            My question is specifically about

3    the medical boards.

4        A.      Uh-huh.

5        Q.      So I understand you're going back

6    to ECFMG, but I'm specifically asking --

7        A.      Uh-huh.

8        Q.      -- had the medical boards not

9    licensed him to practice medicine, is it your

10   position that he would have laid hands on the

11   patients anyway?

12       A.      I did -- so again, I was

13   communicating what's required to get licensed;

14   but if you want to just look at once he had a

15   license, without a license, he would not have

16   been able to obtain medical privileges.

17       Q.      Do you think the medical licensing

18   authorities in this case did what they should

19   have done regarding Dr. Akoda?

20           MR. VETTORI:  Objection.  It's

21       beyond the scope of his opinions.

22   BY MS. McENROE:

23       Q.      You may answer.

24       A.      The medical license boards as far

JA2612

1  as I can tell -- I haven't seen their internal

2  records -- but from the records provided to me,

3  they issued him a license.

4      Q.      Right.  Do you think they should

5  have done that?

6      A.      I would have to review all their

7  internal records.  I do know that they based it

8  on the documents submitted at USMLE ECFMG

9  certification.

10      Q.      Do they only base it on USMLE ECFMG

11  certification when they license a medical

12  physician in their date?

13      A.      Again, I would have to review their

14  internal records and his application; but the

15  process for license -- when one applies for

16  licensure, it's based on either medical school

17  verification in the U.S., not in the U.S.

18  ECFMG, passing of your USMLEs under the current

19  situation -- before USMLE, there were other

20  exams -- and completion of at least, in most

21  states, one year of internship.

22      Q.      As part of a residency program

23  typically?

24      A.      Typically, yes.

1        Q.        And he was accepted to a residency

2    program that he then later completed at Howard

3    University Hospital, correct?

4        A.        Correct.

5        Q.        Do you think without getting

6    admitted to Howard University Hospital's

7    residency program, he would have treated these

8    patients?

9                MR. VETTORI:  Objection.

10                You can answer.

11                THE WITNESS:  It's purely

12        speculative.  He would have had to have

13        done one year of training somewhere to

14        obtain licensure.

15    BY MS. McENROE:

16        Q.        And is it your understanding that

17    the year of training he did to obtain licensure

18    in this case took place at Howard University

19    Hospital?

20        A.        That is my understanding, yes.

21        Q.        Have you done any analysis of what

22    was submitted to Howard University Hospital for

23    him to be admitted to a residency program

24    there?

1      A.    I have not.  I have no part of

2  those records.

3      Q.    Have you ever played a role in

4  hiring any medical school graduates into

5  residency programs?

6      A.    Yes.

7      Q.    At what residency programs?

8      A.    I served as what's known as the DIO

9  or designated institutional official for

10  multiple hospitals while I was VP of GME for

11  Hospital Corporation of America.

12      Q.    Where was that located?

13      A.    There were several -- a multitude

14  of hospitals.

15      Q.    You can take a minute to explain

16  just briefly so I understand.

17      A.    Yes.  I served for what was known

18  as HealthONE, which were hospitals in the

19  greater Denver area; for -- what was the

20  hospital called -- a hospital in Kansas City.

21  I'm totally blanking.

22      Q.    Your C.V. is there in case it's

23  helpful for you.

24      A.    Yeah.  I'm trying to remember the

1    name of the one.  So it was Research Medical

2    Center in Kansas City which oversaw the --

3    included the hospitals in the Kansas City area

4    that were owned by HCA, Ogden Regional Medical

5    Center which included the Salt Lake City

6    hospitals owned by HCA and Eastern Idaho

7    Regional Medical Center.

8         Q.     Were the residency programs

9    involved in those medical centers only about

10   pediatric emergency or critical care?

11        A.     No, they were not.

12        Q.     All right.  So it was a broader

13   range of residency programs?

14        A.     Yes, it was.

15        Q.     Was it the full range of residency

16   programs available at those hospitals?

17        A.     I'm not sure what you mean.

18        Q.     Yeah.  So I'm not trying to ask you

19   a trick question in any sense.  I'm just trying

20   to understand in your role as DIO for these

21   organizations that we were just referring to,

22   were you overseeing the admission to the

23   residency programs for all the residency

24   programs that those facilities offered at any

Case 2:18-1998 56290 cDocument 22 - Fient Page 72 Fed 12 Date/Filed Page 08/20/22

1   given time?

2       A.      I was involved -- the decision is

3   the program director's, but I oversee the

4   processes, procedures, and the program

5   directors.

6       Q.      Have you ever served as the program

7   direct for any residency programs?

8       A.      No, I have not.

9       Q.      Have you ever interviewed anybody

10  applying to a residency program?

11      A.      Yes, I have.

12      Q.      Approximately how many times?

13  Hundreds?  Five?  You know, somewhere --

14      A.      Probably not hundreds, but close to

15  it.

16      Q.      Okay.  So a large number of times?

17      A.      Yes.

18      Q.      In your experience -- in your

19  various roles, was an interview always involved

20  before a resident would get offered a residency

21  program as far as you're aware?

22      A.      In most cases, the last step after

23  all the screening that is done, you know,

24  verification of board scores, eligibility for

Dr. David Markenson

1    residency, all the steps, most residencies do

2    use as interview as the last step in the

3    process.

4         Q.    Were you ever involved in residency

5    programs that did not interview their residents

6    before they admitted them?

7         A.    I think there may have been cases.

8    There's something called a scramble, you know,

9    fill your spots.  Some --

10        Q.    So after the Match, if there's not,

11   if there are extra spots left, you get --

12        A.    Sometimes a resident may get in

13   without a formal interview.

14        Q.    But would there usually been an

15   informal interview or a conversation before

16   that would happen?

17        A.    Usually.

18        Q.    Is that in the vast majority or

19   vast minority of cases?

20        A.    That's minority.

21        Q.    You referred to the interview

22   typically being the last step, in your

23   experience, for residency program admission.

24   And you mentioned some other screening.

Dr. David Markenson

```
 1              What else, in your experience, is
 2    involved in the offering of a residency
 3    position to a resident?
 4        A.     The initial screening is done to
 5    make sure that the person is eligible for
 6    residency.  So presence of medical school
 7    graduation, confirmation, or ECFMG
 8    certification.
 9              So it's sort of that's the first
10    step.  If they don't graduate medical school or
11    they don't have an ECFMG certification, the
12    process would stop.
13        Q.     Okay.
14        A.     Following that process, one that
15    has letters of reference, Dean's
16    recommendation, board scores; and there's
17    usually a cutoff to determine of those who then
18    obtain an interview.
19        Q.     When you say "of those," you mean
20    cutoff of the board scores?
21        A.     Board scores, letters of reference,
22    recommendations.
23        Q.     Any other information collected or
24    reviewed in connection with residency program
```

Dr. David Markenson

1   applications that you recall, you know, sitting

2   here today?

3         A.      Usually not, no.

4         Q.      Is there usually an application

5   form, like, they actually fill out like a job

6   application?

7         A.      They don't anymore.  It's all done

8   through the electronic system called ERAS.

9         Q.      Okay.  Previously, do you know

10  whether there had been applications to

11  residency programs in, say, the 2011 time

12  frame?

13        A.      There would have not been.  They

14  would have all been ERAS.

15        Q.      Even then?

16        A.      Yes.

17        Q.      In your experience, do residents

18  get paid?

19        A.      Yes, they do.

20        Q.      Do they get paid through any

21  sources of funding in particular?

22        A.      The hospital pays them.

23        Q.      Does the hospital typically

24  withhold taxes?

The header has overlapping text and "Dr. David Markenson" title.

1    certification.

2         Q.    Okay.  You said for a U.S. grad, it

3    was possible to do additional confirmations or

4    checks of their medical school graduation.

5         A.    Well, just other checks.  We

6    could -- if you were deciding between two

7    applicants, the last stage of an interview

8    process, you might be able to call up there

9    Dean and get a personal feedback or a clerkship

10   director.  So at the final stage, we had that

11   ability.

12        Q.    And you couldn't do that for

13   foreign educated doctors?

14        A.    It was not feasible or possible.

15        Q.    Why not?

16        A.    Just we didn't have the access or

17   the registries of who the schools were, or who

18   the clerkship directors were.

19              Again, that was a last process if

20   you were deciding between one or two.  You had

21   that additional nuance you could use.

22        Q.    Would you expect a U.S. medical

23   school to be the source of social security

24   numbers for applicants to residency programs?

Case 2:18-1998562 DocDumWentDc22H3enPtage5 732d 1D/4te/FileBage09/03/2022

1    A.    Traditionally, I don't -- as a

2  program director, we weren't -- I would not

3  have been involved in social security.  That

4  would have been HR department.

5    Q.    But you would not have relied on

6  the medical schools in United States to do some

7  sort of identity verification or check that a

8  social security number was valid?

9    A.    I don't believe they would

10  traditionally do that because they weren't

11  employing individuals.

12    Q.    And what about ECFMG doing that?

13    A.    I don't -- I believe ECFMG -- my

14  understanding was, as a program director, my

15  role here is ECFMG verifies identity and

16  medical school graduation, the link between the

17  two.

18    Q.    What do you mean by "identity"?

19    A.    That the person who was holding

20  themselves out as Individual A who graduated

21  medical school and provides a medical school

22  documentation is Individual A who does have

23  that medical school diploma.

24    Q.    How do you expect that they do

1    that?

2         A.      They would -- again, any -- they

3    would verify with the medical school that the

4    individual who was presenting themselves with

5    the application was the one who was issued the

6    diploma; and that would be through, obviously,

7    the names matching completely.

8                 And I know that ECFMG also uses

9    photographic identification too.

10        Q.      What's your understanding about how

11   photographic identification is used here?

12        A.      I believe, as I've seen, is that

13   it's on the application; and it's submitted

14   back to the medical school with the

15   verification.

16        Q.      Do you have any -- strike that.

17                Prior to being involved in this

18   lawsuit, had you ever seen an ECFMG

19   application?

20        A.      I had not.

21        Q.      Did you have any expectation prior

22   to being involved in this case about

23   photographic identification regarding ECFMG

24   certification?

1   A.     I had an expectation that it was

2   identity verification.  I didn't know the

3   mechanism used.

4   Q.     On what basis did you have an

5   expectation there was identity verification?

6   A.     ECFMG was held out to us based on

7   materials we had seen from them and just from

8   knowledge in the community that they were

9   responsible for and attesting to that the

10  individual who's applying to me, John Smith

11  I'll say, is, in fact, the John Smith who was

12  issued a medical school diploma from the

13  medical school in question.

14  Q.     So is it your expectation that

15  ECFMG would be certifying that the person who

16  would physically show up at your hospital was

17  the person who graduated from that medical

18  school?

19  A.     The person identified on their

20  certification.

21  Q.     Right.

22  A.     The person to which the

23  certification was issued was one and the same

24  with the person who had graduated the medical

1    school.

2         Q.     And you understood that was

3    completed through primary source verification

4    of the diploma?

5         A.     Correct.

6         Q.     And now you have the expectation

7    that it also had to do with the photograph?

8         A.     I knew that their -- I didn't know

9    the specific mechanism that they did, but now I

10   know that it was through photographic.

11        Q.     And you say that just based on

12   having seen applications in this case?

13        A.     Correct.

14        Q.     When hiring residents or

15   interviewing residents, have you come across

16   applicants who had failed components of the

17   USMLE?

18        A.     Yes.

19        Q.     And was it your expectation that

20   those individuals would have a higher or a

21   lower likelihood of being admitted into a

22   residency program?

23        A.     Someone who has failed would have a

24   lower likelihood than someone who had passed.

Case 22-1908, Document 22-5, Page 736, Date Filed 09/08/2022
Dr. David Markenson

1    Q.    When hiring residents, do you have

2  an expectation or recollection of how

3  successful you would expect a foreign educated

4  physician to be in applying for a residency

5  program if they had multiple failures on a

6  step?

7    A.    There's no generic answer because

8  different residencies will have different

9  standards.

10    Q.    Do you have an understanding of

11  whether having failed one or more steps

12  multiple times could make applying for a

13  residency program more challenging for an

14  applicant?

15    A.    Failing would make you less

16  attractive than someone who passed to a

17  residency program.

18    Q.    Are there enough residency program

19  slots for the applicants applying each year in

20  your experience?

21    A.    It depends on the specialty.

22    Q.    Are there some specialties for

23  which there would be more applicants than slots

24  in any given year?

Case 2:18-19856-... Document 22-5... Page 737... Date Filed 09/08/2022

Dr. David Markenson

```
 1    this morning, you are not ECFMG certified,

 2    correct?

 3         A.      Correct.

 4         Q.      And you are a medical physician in

 5    the United States?

 6         A.      Correct.

 7         Q.      You attended medical school in the

 8    United States?

 9         A.      Correct.

10         Q.      You are not currently an employee

11    of ECFMG, correct?

12         A.      Correct.

13         Q.      And have you ever been employed by

14    ECFMG?

15         A.      No, I have not.

16         Q.      Are you currently on the Board of

17    Trustees of ECFMG?

18         A.      No, I am not.

19         Q.      Have you ever been on the Board of

20    Trustees of ECFMG?

21         A.      No, I have not.

22         Q.      You've never sat on the Medical

23    Education Credentials Committee of the Board of

24    Trustees of ECFMG, correct?
```

Case 2:18-cv-05629-JDW Document 225-5 Filed 09/08/22 Page 738 of 3041 Date Filed 09/08/2022

```
1        A.      No, I have not.

2        Q.      Have you ever had direct personal

3   contact with that committee?

4        A.      I have not.

5        Q.      Prior to this case, did you know

6   that committee existed?

7        A.      I believe I've seen it in some of

8   the materials.

9        Q.      You mean some of ECFMG's materials?

10       A.      Correct.

11       Q.      Do you recall the circumstances in

12  which you saw that?

13       A.      I think it was just in learning

14  about it in some of them.

15       Q.      Prior to this case, had you ever

16  been personally involved in or aware of a case

17  or an allegation of irregular behavior by

18  ECFMG?

19       A.      By ECFMG?  No.

20       Q.      Have you ever been familiar with

21  the term of "irregular behavior" prior to this

22  case otherwise?

23       A.      Yes.

24       Q.      In what setting?
```

```
 1        A.      I have heard it be used in USMLE
 2  setting.
 3        Q.      Have you ever been personally aware
 4  of an allegation of irregular behavior in the
 5  USMLE setting?
 6        A.      Just heard about the process.
 7        Q.      You personally have not been
 8  involved in any irregular behavior proceedings?
 9        A.      I have not.
10        Q.      As a witness or otherwise?
11        A.      No, I have not.
12        Q.      Have you ever sat on any committees
13  or boards for the USMLE?
14        A.      I have not.
15        Q.      Have you ever been employed by
16  USMLE?
17        A.      I have not.
18        Q.      When you were coming through and
19  becoming medical licensed, was the USMLE in
20  existence?
21        A.      Yes, it was.
22        Q.      Okay.  And you took the USMLE steps
23  that existed at that time?
24        A.      Yes, I did.
```

Case 2:18-1998562-DoDum Worn Do 22-5 en Page 5: 740 ed 12:10e/ Filed Page: 09/08/2022

1      Q.      Was that Step 1, Step 2, and

2  Step 3?

3      A.      Yes.

4      Q.      And Steps 1 and 2 were prior to

5  residency.  And did you take Step 3 during your

6  residency?

7      A.      Yes, I did.

8      Q.      Aside from having read about the

9  Medical Education Credentialing Committee and

10  passing from some ECFMG materials, do you have

11  any other basis to have familiarity with the

12  work or business of the Medical Education

13  Credentials Committee?

14      A.      Not prior to this case.

15      Q.      Do you know anyone who sits on the

16  Medical Education Credentialing Committee?

17      A.      I do not believe so.

18      Q.      Have you spoken with, that you know

19  of, that sits on the Medical Education

20  Credentials Committee?

21      A.      No.

22      Q.      Do you know anybody on the board of

23  ECFMG?

24      A.      I do not.

Case 2:23-19985-20 Document 22-5 Page 741 Date Filed 09/08/2022
Case 2:23-19985-20 Document 22-5 Page 741 Date Filed 09/08/2022

```
 1          Q.      Do you know the composition of the

 2   board of ECFMG?

 3          A.      I do not know the composition.

 4          Q.      Do you know whether they're medical

 5   professionals or otherwise?

 6          A.      I believe they are, yes.

 7          Q.      You believe there are some doctors

 8   on?

 9          A.      Yes.

10          Q.      Do you have any basis for that

11   knowledge, or that's just your expectation?

12          A.      I believe there's representatives

13   of different associations, so I presume that

14   there were physicians on it.

15          Q.      How do you have that understanding?

16          A.      Just from general knowledge,

17   nothing specific.

18          Q.      You've never appeared before the

19   Medical Education Credentialing Committee; is

20   that correct?

21          A.      Correct.

22          Q.      Have you ever been involved, that

23   you know of, in a request for an exception to

24   the Medical Education Credentials Committee.
```

1    If I can give you an example of what I mean:

2    Has someone ever come to you or been a resident

3    for you all where they, for example, were from

4    a war-torn country, couldn't get access to

5    their medical school so had letters of

6    attestation prepared by others in the United

7    States?

8         A.    No.

9         Q.    Not that you know of?

10        A.    Not that I know of.

11        Q.    Okay.  Are you familiar with the

12   concept or have you ever heard of the

13   seven-year rule?

14        A.    I'm not sure what you're referring

15   to.

16        Q.    Okay.  So do you have any

17   understanding of whether there is a time

18   limitation within which certain steps need to

19   be passed in order for examination scores to

20   remain valid?

21        A.    I do.  There were not when I was

22   involved.

23        Q.    Okay.  So you've never been

24   involved in a request for an exception to that

Case 2:18-cv-05629-JDW Document 22 Page 748 Date Filed 09/05/2022
Case 2:18-cv-05629-JDW Document 22 Filed 1:18/22 Page 749 of 3041

1   you're surmising as opposed to some knowledge

2   or specialized experience you have with the

3   Medical Education Credentials Committee; is

4   that correct?

5       A.      Correct.  It's based on the facts

6   that are in the file.

7       Q.      The way you read the facts in the

8   file?

9       A.      I believe it's pretty

10  straightforward that he admitted identity

11  fraud.

12      Q.      Well, he admitted to using his

13  cousin's social security number, but he denied

14  being that individual, correct?

15      A.      Correct.  But he held himself out

16  as the holder of that identity or social

17  security identity.

18      Q.      Do you know what, if for any

19  purpose, ECFMG uses social security numbers?

20      A.      I do not know.

21      Q.      Do you know if foreign medical

22  graduates need to have a social security number

23  to apply to ECFMG?

24      A.      I do not.

Case 2:18-cv-05629-JDW Document 22 Filed 09/08/2022 Page 744 of 3041

1    Q.    Do you know what resources, if any,

2  were available to ECFMG for verifying a social

3  security number at that time?

4    A.    I do not know.

5    Q.    Do you know how the Medical

6  Education Credentials Committee deliberates

7  over allegations of irregular behavior?

8    A.    My knowledge is based on the files

9  provided by ECFMG; and as far as I can see, at

10  the time of this event, there were no policies

11  and procedures or at least provided how they

12  deliberate.

13    Q.    When you say "provided," you mean

14  provided to you?

15    A.    Yes.

16    Q.    Did you ask for them?

17    A.    I believe the policies and

18  procedures were asked for.  I believe there was

19  one provided on irregular behavior; but that

20  wasn't, as far as from the records, that was

21  not in effect at the time of this incident.

22    Q.    From your own professional

23  experience, do you have firsthand knowledge of

24  whether and what policies and procedures ECFMG

JA2634

1    had in time -- at the relevant time in place?

2        A.    I do not have any individual

3    knowledge.  I, as a physician, rely upon ECFMG

4    would have presume that they would have had

5    adequate policies and procedures to follow, to

6    process, verify, and adjudicate issues; but I

7    don't know those specific policies.  What -- I

8    have not seen any that were in effect at that

9    time.

10       Q.    But from your own professional

11   experience, you don't know one way or the other

12   whether ECFMG had policies in place at the

13   relevant time; is that correct?

14       A.    I believe from the depositions and

15   testimonies that were provided, there is claim

16   that they were not; but the policy was created

17   later.

18       Q.    I'm just trying to get an

19   understanding of your only personal knowledge

20   separate from this case.

21             Do you have any knowledge one way

22   or the other?

23       A.    I do not have any knowledge

24   separate from this case.

JA2635

Dr. David Markenson

```
 1        Q.     Do you know about USMLE's policies
 2   and procedures on irregular behavior?
 3        A.     I do not.
 4        Q.     Okay.  Do you know whether at the
 5   time they had policies on irregular behavior?
 6        A.     I have not reviewed any.
 7        Q.     But you don't know one way or the
 8   other?
 9        A.     I do not.
10        Q.     Do you have an understanding of
11   whether contemporaneously ECFMG staff evaluated
12   whether there was sufficient information to
13   bring an allegation of irregular behavior
14   against Dr. Akoda to the Medical Education
15   Credentials Committee?
16        A.     I'm sorry.  I'm losing you a little
17   bit in that question.
18        Q.     Sure.  Do you know if whether in
19   real time --
20        A.     Uh-huh.
21        Q.     -- ECFMG staff evaluated whether or
22   not in their experience and their view there
23   was sufficient information to bring an
24   allegation of irregular behavior against
```

JA2636

Case 2:23-cv-00562 Document 22-5 Filed 09/08/22 Page 747 of 3041

1      Q.      -- they had the real number?

2      A.      Unfortunately, I think some

3   individuals were less than reputable, figured

4   that out, and went in and literally stamped --

5   these were the days that you still stamped and

6   signed prescriptions.

7      Q.      Before electronic?

8      A.      Yes.

9      Q.      Yeah.  Do you have an understanding

10  of the whether Dr. Akoda perpetrated a fraud of

11  any sort?

12     A.      Yes.

13     Q.      Okay.  On whom do you believe

14  Dr. Akoda perpetrated a fraud?

15     A.      Well, Dr. Akoda as we've previously

16  talked about said he used someone else's social

17  security number at, I believe, it was Jersey

18  Shore Hospital.  So he used someone else other

19  than that.

20             And in these files, we've come to

21  see that multiple times he applied to ECFMG and

22  held out that he had never applied before.

23     Q.      You would agree that he perpetrated

24  a fraud on ECFMG?

Case 1:18-cv-00566-TJM-CFH Document 228-5 Filed 09/08/22 Page 748 of 3041

```
 1        A.      I believe, yeah, he submitted -- I

 2  believe he submitted an application that had

 3  incorrect information on it.

 4        Q.      Would you agree that he perpetrated

 5  a fraud on the Maryland licensing authority?

 6        A.      I'm not familiar with the

 7  application whatever he submitted to them, so I

 8  wouldn't be --

 9        Q.      Do you believe Dr. Akoda

10  perpetrated a fraud on the patients he treated?

11        A.      I believe he did, yes.

12        Q.      Do you believe that Dr. Akoda

13  perpetrated a fraud at the hospital system at

14  which he practiced?

15        A.      Again, I was not privy to their

16  credentialing files or processes.

17        Q.      Who first contacted you in

18  connection with this lawsuit?

19        A.      I'm trying to remember.  I believe

20  it was a referral expert institute or if I

21  remember now.

22        Q.      It may have been through a

23  consulting company?

24        A.      It may have been, yes.
```

JA2638

Dr. David Markenson

```
 1          Q.      And what consulting companies do

 2    you work with?

 3          A.      There are a couple, two or three,

 4    that list your name; and I believe I'm on

 5    several of them.

 6          Q.      Okay.  Do you know which ones

 7    you're on?

 8          A.      I think it's like a -- is it

 9    Rooters or Randolph's?

10          Q.      All right.  But do you recall who

11    represents plaintiffs?  Who first contacted you

12    the first time you were in contact with

13    plaintiffs' counsel in this case?

14          A.      I believe it was -- the way it

15    worked is this referral agency that lists my

16    name said there was a case would I be

17    interested, and then we had a phone call with

18    plaintiffs' attorneys to discuss the case.

19          Q.      Was anyone else on the call with

20    you and plaintiffs' counsel?

21          A.      I believe it was just us and the

22    plaintiffs' counsel.

23          Q.      Do you recall who you spoke to at

24    plaintiffs' counsel?
```

Case 2:18-cv-05629-JDW Document 225-1 Filed 09/08/22 Page 750 of 3041
Case 2:18-cv-05629-JDW Document 22-5 Filed 12/16/19 Page 124 of 202

```
 1        A.       Uh-huh.

 2        Q.       If there's anything else that we've

 3   not yet discussed today that you considered in

 4   rendering your opinions in this case?

 5        A.       Just I've just reviewed the

 6   materials that were sent by plaintiffs'

 7   counsel.

 8        Q.       Okay.  Did you ask for anything

 9   additional that you did not receive?

10        A.       The only thing I asked for was were

11   there policies and procedures that ECFMG used

12   at the time of this event.

13        Q.       And did you get any in response?

14        A.       We have not gotten any.

15        Q.       Have you ever read an ECFMG

16   information booklet?

17        A.       Yes.

18        Q.       Do you know what that is?

19        A.       Yes.

20        Q.       Can you describe what that

21   information booklet is?

22        A.       I believe -- what I -- what I've

23   read is from the website.  There's a booklet

24   that the ECFMG puts out that provides
```

JA2640

Dr. David Markenson

1    information.  I believe the target audience is

2    applicants, but I think it's also used by

3    residencies and hospitals and others.

4        Q.     And you said you looked at it on

5    the website.

6               So was that the most recent version

7    you were looking at?

8        A.     Yes.

9        Q.     Have you looked at any historic

10   information booklet?

11       A.     I have not.

12       Q.     Have you asked whether there was an

13   information booklet that controlled for the

14   relevant time period in this case?

15       A.     I had not.

16       Q.     Are you --

17       A.     I had asked for just policies and

18   procedures that they followed at the time.

19       Q.     So you received of the Bates

20   stamped ECFMG documents ECFMG '10 through '706,

21   correct?

22       A.     That's what it says, yes.

23       Q.     Are you aware that the production

24   ECFMG made that included those numbers also

```
 1   went all the way up to '3084?
 2        A.      I have not.
 3        Q.      And included historic information
 4   booklets containing policies and procedures
 5   from 1992 through 2012?
 6        A.      I'm not aware of that.
 7        Q.      Okay.  And you didn't see those or
 8   review those?
 9        A.      No.  I specifically asked for
10   policies and procedures at the time.
11        Q.      Is there a reason why you're
12   drawing a distinction between an information
13   booklet and policies and procedures?  You don't
14   think policies and procedures could be
15   reflected in an information booklet?
16            MR. VETTORI:  Objection as to form.
17            Go ahead.
18            THE WITNESS:  In general an
19        information booklet is a summary or a
20        promotional document and not necessarily
21        what staff or others would follow in an
22        organization to handle affairs.
23            It would be similar to hospital.
24        We put out brochures about our hospital,
```

Case 2:18-cv-05628-JDW Document 22-5 Filed 09/06/22 Page 753 of 3041

```
1        but I run the hospital by our policies and
2        procedures.
3   BY MS. McENROE:
4        Q.    Do you know whether ECFMG used
5   irregular behavior policy and procedures as
6   contained within the information booklet so
7   that the applicants have the entire policy
8   since it's important?
9        A.    All I know is what I saw in the, I
10  believe it was the deposition of, I believe it
11  was Mr. Kelly, who had said that at the time
12  that they didn't have one, and they created one
13  after this which is the current policies and
14  procedures.
15       Q.    We're going to take a quick break
16  to change the tape.
17       A.    Okay.
18            THE VIDEOGRAPHER:  The time is
19       12:52 p.m., and we are going off the
20       record -- 12:15 p.m.  We're going off the
21       record.
22            (Whereupon, a lunch break was
23       taken.)
24            THE VIDEOGRAPHER:  The time the
```

1        12:50 p.m., and we are back on the record.

2   BY MS. McENROE:

3        Q.     Good afternoon, Dr. Markenson.  You

4   understand you're still under oath?

5        A.     Yes.

6        Q.     Did you review any documents

7   produced by Howard University.

8        A.     I did not.

9        Q.     Okay.  Do you have any

10  understanding of whether or not those documents

11  were produced, that there were any Howard

12  University documents produced in this case?

13       A.     I do not.

14       Q.     Do you have any understanding of

15  what Howard University required from applicants

16  through their residency programs?

17       A.     I do not.

18       Q.     Do you know what Dr. Akoda provided

19  to Howard University in applying to their

20  residency programs?

21       A.     I do not.

22       Q.     Do you know under what name

23  Dr. Akoda applied to the Howard University

24  residency program?

Dr. David Markenson

1         A.      I do not know the specific name he

2    put on the application.

3         Q.      Do you know whether that name

4    matched the ECFMG certificate?

5         A.      I do not.

6         Q.      Have you seen any documents

7    produced in this case from the American Board

8    of Obstetrics and Gynecology?

9         A.      I have not.

10         Q.      Do you know whether or not

11    Dr. Akoda became certified in OB/GYN?

12         A.      I don't believe -- I don't remember

13    if there was anything I saw in the records that

14    said if he did or did not.

15         Q.      Would you be surprised to learn

16    that he did?

17         A.      Neither surprised or not.

18         Q.      Did you review any documents

19    produced in this case from Jersey Shore Medical

20    Center?

21         A.      Nothing produced -- the only

22    documents I saw were in the ECFMG file, a

23    letter from them to ECFMG.

24         Q.      So you haven't seen any documents

1   produced directly from Jersey Shore Medical

2   Center?

3       A.      No.

4       Q.      Unless they were duplicates?

5       A.      Yes.

6       Q.      Do you know whether Jersey Shore

7   Medical Center notified Maryland regarding

8   their dismissal of Dr. Akoda from their

9   residency program?

10      A.      I do not.

11      Q.      Do you know whether there are

12  certain moral or ethical standards for medical

13  licensing boards?

14      A.      I can speak to the states that I've

15  been a licensed in.

16      Q.      Sure.

17      A.      That they usually have is one of

18  the requirements that you can lose your license

19  and be reprimanded nonmoral or nonethical

20  behavior.  Sort of a catch-all phrase.

21      Q.      Moral torpitude types of things?

22      A.      Yeah.  They usually have some

23  catch-all.

24      Q.      So we discussed earlier this

1  relevant to your opinions in this case?

2      A.      I did not form an opinion about the

3  medical licensing of him other than -- I'm

4  sorry.

5          I have -- I've not seen this

6  letter, so it wasn't part of my opinion.

7      Q.      Okay.  Is it relevant to the

8  opinions you provided?

9      A.      To me, it's just further evidence

10  of his irregular behavior.

11      Q.      Right.  Or his fraud, right,

12  because he also was then defrauding Maryland

13  based on the information in this letter at

14  least?

15      A.      Based on this letter, they're

16  saying, yes, that he submitted an incorrect

17  one.

18      Q.      And Maryland knew that before they

19  issued him a medical license.

20          Do you see that as well?

21      A.      I don't know if Maryland knew or

22  didn't know or who did.

23      Q.      Would you expect that Maryland

24  would have issued him a medical license if

Case 2:18-cv-05619-JDW Document 22-5 Filed 12/16/21 Page 758 of 3041

1  Maryland had known that he had, Dr. Akoda, had

2  submitted a social security number that was not

3  his own to Maryland?

4      A.    I can't speak to what Maryland

5  would do with their processes or their rules.

6      Q.    But you can speak to ECFMG's

7  processes and rules?

8      A.    I can speak to what I know about

9  ECFMG and their failure to, you know, revoke a

10  certification when this came to light about --

11  based on irregular behavior.

12          The processes that a licensing

13  board may take or not take, I would have to

14  review to know.

15      Q.    Okay.  So you would need more

16  complete information on what Maryland did

17  before you could form your opinions; is that

18  what you are saying?

19      A.    Well, I would need to know what

20  their process was; did they investigate, what

21  they did or did not do.

22      Q.    So what do you know about ECFMG

23  processes?  So how are you proffering opinions

24  on ECFMG when you're saying you can't on

JA2648

Dr. David Markenson

1    Maryland?

2        A.    For what I've seen in the files

3    that ECFMG is has provided.

4        Q.    Well, that counsel has chosen to

5    provide to you, right?  That's only a subset of

6    the materials that ECFMG has provided.

7        A.    Well, I also have the depositions

8    of Mr. Kelly and -- hopefully I don't

9    mispronounce it -- Corda [sic] I believe --

10            MR. VETTORI:  Corrado.

11            THE WITNESS:  -- about the

12        processes that they follow.

13    BY MS. McENROE:

14        Q.    Did you get the deposition

15    transcript of Mr. Stephen Seeling?

16        A.    Yes.

17        Q.    Did you review that deposition

18    transcript?

19        A.    Yes.

20        Q.    Where is that listed on the

21    materials that I've been provided?  Why did you

22    not mention that previously?

23        A.    Well, what I mentioned to you is I

24    said I would have to review all the letters to

JA2649

1 know every document I reviewed.

2    Q.    Do you understand that there's a

3 federal requirement in submitting your expert

4 report to include a list of your materials

5 considered?

6    A.    I believe -- if there is such a

7 rule, yeah, I believe we've talked about the

8 rules, yes.  I think I would have listed on my

9 report all the things that I did.

10    Q.    Did you list on your report all the

11 things you did?

12    A.    Let's see.  I have to go back to

13 the report.

14    Q.    Sure.  It's Exhibit 4.

15    A.    I listed, yes, the documents which

16 includes the documents you obtained -- you

17 submitted -- you provided to me.  I did not

18 list every single one that they provided to me

19 by detail in this report.

20    Q.    Right.  And you also didn't list

21 the deposition transcript of Mr. Seeling,

22 correct?

23    A.    Uh-huh.  I did not list that here,

24 no.

Dr. David Markenson

1      Q.      But did you consider that?

2      A.      I believe that was one of the

3  documents I looked at, yes.

4      Q.      So what else did you look at that's

5  not listed here?

6      A.      I'd have to go, like I said earlier

7  in the day, pull all of the files and letters

8  that I was sent to be accurate of every single

9  document I was sent.  I don't remember off the

10  top of my head every document I was sent.

11  (REQUEST NO. 1)

12          MS. McENROE:  So Counsel, it's a

13      material deficiency that there's not a

14      full list of the materials provided either

15      with his expert report; and we've even

16      asked for it in follow-up.

17          So I'll ask that following this

18      deposition, we get a complete list of

19      materials considered; and at the end of

20      the day, I'll reserves rights to reopen

21      the deposition depending on the

22      information we've learned.

23          MR. VETTORI:  I'll take your

24      question under consideration.

JA2651

Case 2:18-cv-05629 Document 22-5 Page 762 Date/Filed 09/04/2022

```
 1    BY MS. McENROE:

 2         Q.      So sticking with your expert report

 3    you have in front of you.

 4         A.      Okay.

 5         Q.      Exhibit 4.

 6         A.      Yes.

 7         Q.      So you indicate that the documents

 8    you reviewed are documents that were provided

 9    to you.

10         A.      Right.

11         Q.      Did you do any other research

12    regarding ECFMG or anything else to help you

13    prepare this expert report?

14         A.      I think the only other thing that I

15    did is I went to ECFMG's website.

16         Q.      Okay.  And what did you do on

17    ECFMG's website?

18         A.      I looked at their "About," their

19    "Mission," their "Values," their "Statement."

20         Q.      Anything else?

21         A.      No.  I just looked through the

22    website.

23         Q.      Did you contact ECFMG?

24         A.      I did not.
```

Dr. David Markenson

1       Q.      Okay.  Did you initiate an

2   application to proceed through ECFMG's

3   certification process?

4       A.      I did not.

5       Q.      You have, if I may characterize it

6   correctly, you have at the beginning a summary

7   of the facts that you say you considered in

8   forming your opinions?

9       A.      I'm sorry?  Yes.

10      Q.      And then towards the back end, you

11  have opinions that you formed.

12              Is that a fair description of the

13  setup of your expert report?

14      A.      Yes.

15      Q.      Okay.  So in forming the "Facts"

16  section towards the beginning of your report --

17      A.      Sure.

18      Q.      -- from where did you get the facts

19  that you recite here in your expert report?

20              MR. VETTORI:  So for the record, I

21          instruct the witness not to answer any

22          questions about draft reports and whether,

23          in fact, it comes from a draft report that

24          he did and that counsel may have worked on

Case 1:18-cr-00526 Document 22-5 Filed 12/16/21 Page 764 of 3041

```
1        A.      Okay.

2        Q.      Do you see where I am?

3        A.      Yes, I do.

4        Q.      Okay.  It says, "In 2006,

5    IGBERASE."  I'm going to stop there for a

6    second.

7                You understand that's Dr. Akoda

8    that we've been talking about today?

9        A.      Yes.

10       Q.      "Using the name," quote, "'John

11   Charles Akoda,' and the 1623 SSN assigned to

12   Individual A, applied for residency at Howard

13   University."

14               Do you see that?

15       A.      Yes, I do.

16       Q.      It goes on to say, "In March of

17   2007, Howard University accepted IGBERASE into

18   its residency program, and asked IGBERASE to

19   submit evidence of legal residence in the

20   United States.  In response, IGBERASE submitted

21   a false permanent resident card in the name

22   "N. Akoda, John Charles."

23               Do you see that?

24       A.      Yes, I do.
```

JA2654

1    Q.    Okay.  Did you take into account

2    these false materials provided to Howard

3    University in their process in forming your

4    opinions in this case?

5    A.    I mean, I've reviewed this

6    material; but which specific -- what are you

7    referring to?

8    Q.    Sure.  So it's saying here that

9    Dr. Akoda submitted a false permanent resident

10   card to Howard University.

11   A.    Uh-huh.

12   Q.    As well as him having been required

13   to submit evidence of legal residence in the

14   United States.

15   A.    Yes.

16   Q.    Did you take into account the fact

17   that he submitted a false permanent resident

18   card to Howard University in forming your

19   opinions?

20   A.    I knew this fact, but I wasn't

21   asked to opine on Howard University's actions.

22   Q.    Okay.  Do you know what, if

23   anything, Howard University did to verify the

24   1623 social security number provided to it by

Case 2:18-1998 562 Document 122-5 en Page 5 766 ed 10 Date Filed 09/06/2022

```
1   Dr. Akoda?

2        A.      I do not know their processes.

3        Q.      Do you believe it's ECFMG'S fault

4   that Dr. Akoda submitted a false permanent

5   residency card to Howard University?

6        A.      I do not believe ECFMG -- I believe

7   he submitted the false residency card.

8        Q.      So Dr. Akoda perpetrated a fraud on

9   Howard University?

10       A.      He submitted a false

11  identification, yeah -- a false social security

12  number.

13       Q.      Okay.  Both a false social security

14  number and a false permanent residency card to

15  Howard University, correct?

16       A.      Yeah, I believe -- yes.

17       Q.      And to be a resident, I presume

18  someone needs to physically show up to finish a

19  residency program; is that correct?

20       A.      Yes.

21       Q.      And it's a quite a rigorous

22  experience, correct?

23       A.      It can be, yes.

24       Q.      And it's a lot of hours?
```

Case 2:23-1998562 Document 22 Filed 767 Date Filed 09/08/2022

1          A.      It can be, yes.

2          Q.      So Howard University would have

3     supervised Dr. Akoda quite extensively for him

4     to complete a residency program there?

5          A.      They would have complied with the

6     supervision requirements, yes.

7          Q.      And what are the supervision

8     requirements, if you know, generally speaking?

9          A.      Generally speaking, ECFMG requires

10    progressive supervision.  They define it as

11    different levels, direct and indirect,

12    observed, not observed.  And throughout your

13    residency, the degree of supervision varies as

14    you progress.

15         Q.      In your experience, are medical

16    residents permitted to actually examine

17    patients?

18         A.      Yes.

19         Q.      And are medical residents allowed

20    to actually treat patients?

21         A.      What do you mean by "treat"?

22         Q.      Lay hands on patients.

23         A.      They're allowed to, yeah, examine,

24    yes.

JA2657

Dr. David Markenson

1      Q.      Are they allowed to do any

2   procedures of any sort on patients?

3      A.      They are within their scope and

4   supervision requirements.

5      Q.      If a resident were to observe an

6   examination, for example, or were to examine a

7   patient but not lay hands on them, so take a

8   medical history, whatever it might be, would

9   their name necessarily appear in the medical

10  records, in the patient's medical records,

11  rather?

12     A.      Whether the resident's name appears

13  or not would really be related to what they did

14  and what the hospital's policies and procedures

15  are for documentation.

16     Q.      Sure.  So it's possible that a

17  resident can be involved in conducting an

18  examination, but their name would not appear in

19  a patient's medical records?

20     A.      It is possible.

21     Q.      Do you expect that somebody without

22  medical training could successfully complete a

23  residency program?

24     A.      It's a hard question.  I would

1   say -- I would like to say that they shouldn't,
2   but there probably is some ability -- there's
3   probably some ability that someone could have
4   in a certain -- in residencies.  Every
5   residency is different in requirements.
6           If they did some of their own
7   studying, virtual, who knows, that they might
8   be able to get through; but in general, one has
9   to have medical knowledge to get through a
10  residency.
11      Q.    And you would expect that to be
12  true for an OB/GYN specialist?
13      A.    I would expect in general, yes.
14  Not a hundred percent, it'd be a feat.
15      Q.    Going back to your expert report at
16  Exhibit 4.
17      A.    Uh-huh.
18      Q.    Page 3, third paragraph down.
19      A.    Page 3, third paragraph down.
20      Q.    I'm going to pick up where I had
21  just left off with the sentence that starts,
22  "He was licensed."
23      A.    Yes.
24      Q.    Do you see that?

```
 1        A.      Yes.

 2        Q.      It says, "He was licensed to

 3   practice medicine in Maryland and Virginia, and

 4   was granted privileges at Prince Georges'

 5   Hospital Center based on application and

 6   submission of required documentation including

 7   an ECFMG certificate."

 8                Do you see that?

 9        A.      Yes, I do.

10        Q.      So I'm going to break that down a

11   little bit.

12                Have you looked into you or do you

13   know about the licensing requirements for

14   Maryland or for Virginia?

15        A.      Specific licensing?  Every detail?

16   No, I do not.

17        Q.      Do you know in broad strokes the

18   licensing requirements for Maryland and

19   Virginia?

20        A.      I know that all states have

21   certain -- there are certain requirements for

22   licensure that applies everywhere, which is

23   verification of medical school completion,

24   verification of a year of training.
```

1    Q.    Okay.  What else would you expect

2    to be included?

3    A.    Usually -- I don't know if it's a

4    requirement to get the license, but usually

5    they require information.  They usually ask

6    about past training, past hospital employment,

7    other licenses.

8          But what the criteria is, each

9    state has their own Medical Practice Act.

10   Q.    Would you expect that a licensing

11   board would ask about residency programs from

12   which an applicant had been dismissed from?

13   A.    May or may not.  I've seen

14   different forms of applications.

15   Q.    Looking back -- so we'll keep

16   Exhibit 4.

17   A.    Okay.

18   Q.    But let's take out Exhibit 9 again.

19   A.    Okay.

20   Q.    Looking back where we left off in

21   Exhibit 9.

22   A.    Yes.

23   Q.    Where we left off, we'll pick up at

24   "In 2011."

Case 2:23-cv-19985-JMV-JSA Document 122-5 Filed 11/01/24 Page 772 of 3041 PageID: 8420

1              Do you see where I am?

2       A.     Yes, I do.

3       Q.     It says, "In 2011, after the

4    completion of his residency at Howard

5    University, IGBERASE, using the name 'Charles

6    John Nosa Akoda' and the 1623 SSN, applied for

7    medical licensure with the Maryland Board of

8    Physicians."

9              Do you see that?

10      A.     Yes, I do.

11      Q.     It goes on to say, "In support of

12   this application, IGBERASE submitted a false

13   permanent residence card, as well as a false

14   Nigerian passport."

15             Do you see that?

16      A.     Yes, I do.

17      Q.     It goes on to say, "In September

18   2011, the Maryland Board of Physicians granted

19   the requested medical license to IGBERASE under

20   the name," quote, "'Charles John Nosa Akoda,"

21   and IGBERASE began practicing medicine in the

22   field of obstetrics and gynecology."

23             Do you see that?

24      A.     Yes, I do.

Case 1:18-cv-00508-RC Document 22-5 Filed 10/16/18 Page 1 of 6
Case 2:23-cv-00985-JDW Document 22-5 Page 773 Date Filed 09/06/2022

1    Q.    Do you know what, if anything,

2  Maryland did to verify Dr. Akoda's permanent

3  residence card?

4    A.    I do not.

5    Q.    Do you know what, if anything,

6  Maryland did to verify Dr. Akoda's Nigerian

7  passport?

8    A.    I do not.

9    Q.    Following residency, in your

10 experience, would a medical license be required

11 to treat patients?

12   A.    Yes.  I -- yes, in States you're

13 required a license to practice.  Usually the

14 only exception is while in training.

15   Q.    Going back to where we were in your

16 expert report at page 3.

17   A.    Sure.

18   Q.    So we just talked about the

19 practicing of medicine in Maryland and

20 Virginia.

21         You also talked about Dr. Akoda

22 having been granted privileges at Prince

23 Georges' Hospital Center.

24         Do you remember that?

Dr. David Markenson

```
1      A.     Yes.  I see that here, yes.

2      Q.     So going back to Exhibit 9.

3      A.     Okay.

4      Q.     And where it starts, "In 2012."

5             Do you see where I am?

6      A.     Yes, I do.

7      Q.     It says, "In 2012, IGBERASE, using

8   the," quote, "'Akoda' identity, sought and

9   obtained medical privileges at Prince George's

10  Hospital Center," which they shorten to PGHC,

11  "in Maryland.  To do so, Igberase submitted a

12  false permanent residence card, as well as a

13  false Maryland driver's license."

14            Do you see that?

15     A.     Yes, I do.

16     Q.     Do you know what, if anything,

17  Prince George's did to verify Dr. Akoda's

18  permanent residence card?

19     A.     I do not.

20     Q.     Do you know what, if anything,

21  Prince George's did to verify Dr. Akoda's

22  driver's license?

23     A.     I do not.

24     Q.     Do you know anything about the
```

JA2664

```
1        A.     Again, since I wasn't provided them

2   and all I have is the draft, I can't say that.

3        Q.     So you don't know what the policies

4   and procedures are as we sit here today?

5        A.     I just know the standard.  I don't

6   know what their -- I've asked for policies and

7   procedures, and we haven't been provided any.

8        Q.     You say "we."  You mean you haven't

9   been provided any, correct?

10        A.     Uh-huh, correct.

11        Q.     Is it your opinion that ECFMG has a

12   duty or an obligation to make sure that

13   individuals it certifies never break the law?

14        A.     Again, I personally believe -- this

15   is from my expertise and knowledge -- that

16   ECFMG'S role is not as a law enforcement agency

17   but a certification body.

18        Q.     Okay.  And so I just want to make

19   sure I understand.

20               So if ECFMG certifies someone and

21   they go on to commit tax fraud later on in

22   their career, would you then look back and hold

23   ECFMG accountable that they should have figured

24   that out?
```

1    A.    No.  But if in order to practice

2  tax, they needed ECFMG certification to be

3  licensed, then they would have never been

4  allowed to practice tax.

5        So I don't -- I don't hold them

6  accountable to law enforcement; but anything

7  that an individual was allowed to do based on

8  their certification, they do have culpability

9  in that case.

10    Q.    So you think if a practitioner, a

11  physician, goes on to be a creep, a sexual

12  predator, is that somehow ECFMG'S fault if

13  ECFMG had certified that that person had, in

14  fact, graduated from medical school and passed

15  exams?

16    A.    Well, what they did was their

17  action at that point; but one has to

18  acknowledge that if ECFMG did not allow them

19  to -- did not certify them, allowing them to

20  obtain a license, they would not be a physician

21  at that point.

22    Q.    Right.  But there are U.S. graduate

23  physicians who go on to become creeps, right?

24    A.    There are.

Dr. David Markenson

1      Q.      Sexual predators.

2              MR. VETTORI:  Is that a technical

3      term?

4              MS. McENROE:  I changed it to

5      sexual predators.

6   BY MS. McENROE:

7      Q.      Okay.  Is that fair?

8      A.      There are, yes.  Unfortunately,

9   yes.

10     Q.      And do you deem that to be a

11  failure of the medical school community or, you

12  know, or is that that practitioner's fault that

13  they went on to be somebody who breaks the law?

14     A.      It is the practitioner's fault, but

15  there is well documented studies that show that

16  there are usually red flags throughout their

17  career if people intervene, that patient would

18  have never been harmed.

19     Q.      Usually, like, while they're

20  actually practicing medicine.

21     A.      No.  There's throughout their

22  entire career.  There's well documented studies

23  that show whether it's medical school

24  residency, application processes, there are

Case 2:18-cv-05629-JDW Document 122-5 Filed 1:Date Filed:09/08/2022 Page 778 of 3041

```
 1   links throughout a career that could have

 2   stopped a progression of events.

 3        Q.    So I'm just struggling with the

 4   idea that this is like the ultimate Monday

 5   morning quarterbacking, right?  You're saying

 6   this person ended up being a sexual predator.

 7   So looking back in history, we could pick up

 8   bread crumbs where someone could have, said,

 9   you don't graduate from middle school; you

10   don't graduate from high school; you don't

11   graduate from college.

12             So I'm just trying to understand --

13             MS. McENROE:  Let me finish my

14        question.

15             MR. VETTORI:  I am.

16   BY MS. McENROE:

17        Q.    I'm just trying to understand how

18   it is you pick where in that line you assume

19   and assign all of the fault, as you have with

20   ECFMG in this case?

21             MR. VETTORI:  Objection as to form.

22             THE WITNESS:  Where I've assigned

23        fault is the area I was asked to opine on,

24        which is he would not have been able to
```

Case 2:18-cv-09562... Document 22... Filed 09/08/2022... Page 779 of... Page 221 of...

1          obtain licensure or enter a residency had

2          ECFMG done the due diligence, picked up

3          the red flags and not certified him or

4          revoked the certification.

5    BY MS. McENROE:

6          Q.     So does your opinion basically boil

7    down to an on/off switch, that if ECFMG had

8    said he couldn't get a certificate, therefore,

9    he wouldn't have been able to practice

10   medicine; is that what you're saying?

11         A.     Well, as part of application for

12   residency and licensure, there are certain

13   things that are binary, yes or no; and in the

14   absence of them, you don't proceed to any other

15   steps.

16              ECFMG certification is a credential

17   that's binary.  You don't have it, you can't

18   get into residency.  Absent ECFMG

19   certification, you can't be licensed.  It is a

20   binary, that all the other things downstream

21   don't occur towards licensure if that binary

22   doesn't occur.

23         Q.     So if we were to take a step

24   forward and say graduation from a residency

1  program is binary, off and on or, you know, one

2  year of supervised practice, however you had

3  described it is binary off and on, you either

4  have that or you don't, that's another place

5  along the line, right?  That would either

6  on/off shut off the practicing medicine in the

7  United States?

8       A.     It depends on what the requirements

9  were.

10      Q.     And further stepping down the line,

11  eventually getting to the point of getting a

12  medical license is also off and on that in any

13  given jurisdiction, if you don't have a medical

14  license, you should not be lawfully be

15  practicing medicine, correct?

16      A.     Yes.  Without a medical license,

17  you can't practice medicine.

18      Q.     So that's another off/on switch,

19  correct?

20      A.     A medical license is an off/on,

21  yes.

22      Q.     Even if you have a ECFMG

23  certificate?

24      A.     If you have an ECFMG certificate

# Exhibit 4

JA2671

September 19, 2019


Danielle S. Dinsmore, Esquire
Paul M. Vettori, Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street
Baltimore, Maryland 21201

> Re: Monique Russell, et al. v. Educational Commission for Medical
> Graduates, Case No. 2:18-cv-05629-JW


Dear Ms. Dinsmore and Mr. Vettori:

   You have asked me to review this matter and provide a report of my expert opinions with respect to this matter.  This is my report.

   Attached is my Rule 26 case list.  Also attached is my Curriculum Vitae, which includes a list of all publications I have authored.

   I am billing my time for review and preparation of my report at $ 500 per hour and my time for deposition and trial at $ 5000 per day.

   I have reviewed and considered the documents you have provided to me, which include bates stamped documents you obtained from ECFMG, documents obtained from the Akoda criminal case, the Maryland Board of Physician's decision and the depositions (with exhibits) of William Kelly and Kara Corrado.

   The following is a summary of the facts considered by me in forming my opinions:

   On April 6, 1992 ECFMG received an application from Oluwafemi Charles Igberase to take the Foreign medial graduate examination in the Medical Sciences and the ECFMG English Test. He provided ECFMG with a diploma from the University of Ibadan dated June 19, 1987. Igberase failed both the basic medical science and clinical science components of the FMGEMS and passed the ECFMG English test.  He failed the Day 1 test again but passed it on the third try. On October 4, 1993, after he successfully completed steps 1 and 2 of the USMLE, ECFMG issued to him certificate number 0-482-700.

   On March 30, 1994, ECFMG received an application from Igberase Oluwafemi Charles to take Steps 1 and 2 of the USMLE examinations. He provided a date of birth that was different than the date of birth provided by Igberase.  The diploma he submitted was the identical diploma that had been submitted by Igberase.  On December 14, 1994, after Charles successfully completed the USMLE examinations, ECFMG issued to him certificate number 0-519-573-0.

JA2672

At some point after this, for reasons that do not appear in the records, ECFMG became suspicious that Igberase and Charles were one and the same person and began an investigation. Igberase/Charles explained his actions in a handwritten letter dated July 14, 1995 in which he admitted he had lied about not taking the examination previously and why he rearranged his names. As a result of the investigation, the ECFMG Committee on Medical Education Credentials invalidated certificate number 0-519-573-0 issued to Charles and revoked certificate number 0-482-700-2 issued to Igberase. Charles appealed the decision which led to a hearing on July 10, 1996. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke certificate number 0-482-700-2 but limited the length of the revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001. Thereafter, the ECFMG Committee on Medical Education Credentials extended the length of this revocation for a yet to be specified period of time and, ultimately, revoked permanently this certificate.

On January 3, 1996 and again on August 30, 1996, ECFMG received an application from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. He provided ECFMG with a diploma from the University of Benin dated February 6, 1998. On August 18, 1998, after he successfully completed the required examinations, ECFMG issued to him certificate number 0-553-258-5. Although his applications did not include a social security number, at some time in 1998 he provided ECFMG with social security number xxx-xx- 9065.

On July 1, 1998 Akoda entered the graduate residency program at Jersey Shore Medical Center. On July 24, 1998, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program. On September 2, 1998, ECFMG sent this validated form.

By letter dated August 11, 2000 from James McCorkel, M.D. to Rice Holmes, ECFMG was notified that the Jersey Shore Medical Center graduate residency program in which Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Dr. McCorkel that Akoda had provided ECFMG with social security no. xxx-xx-9065. This is the same number Akoda provided to the Jersey Shore Medical Center.

ECFMG sent Akoda a "charge letter" dated August 22, 2000 advising Akoda that ECFMG had received information alleging that Akoda may have engaged in irregular behavior. This letter was based on the matters presented by Dr. McCorkel. Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

The Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number – that of his cousin Charles Igberase - and because the green card he had provided the hospital was inconsistent with a subsequent green card he also provided.

Confidential Communication with Attorney

On December 22, 2000, William Kelly, Manager of the Medical Education Credentials Department of ECFMG, wrote a memorandum to Stephen S. Seeling, JD, Vice President of Operations of ECFMG, in which Mr. Kelly stated "[t]his memorandum is being written separately since I did not think it should be made part of the official file." He advised Mr. Seeling that both he and Dr. McCorkel believed Igberase and Akoda were one and the same person. He concluded that he did not think there was enough information for the ECFMG Credentials Committee.

In October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center for a graduate residency program, which included three letters of reference. In connection with this process, ECFMG attempted to verify the authenticity of these three letters of reference but never received responses from the persons passed off as references for Akoda.

Akoda successfully completed a graduate residency program at Howard University Medical Center. He was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center based on application and submission of required documentation including an ECFMG certificate.

The following are my opinions, which are based on the matters set out above and my education, training and experience:

ECFMG is the only organization that certifies that IMG's have successfully completed medical education at an approved foreign medical school and that they have successfully completed the required medical examinations. Without an ECFMG certification, an IMG cannot sir for required licensing exams, obtain a medical license, will not be accepted into a graduate medical education program and cannot obtain hospital privileges. The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow those procedures to ensure that IMG's comply with all requirements for certification. ECFMG has undertaken to provide certification services which are necessary for the protection of the general public. Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs. Licensing agencies, medical schools and hospitals, among others, rely upon ECFMG to act reasonably in performing these services.

It is my opinion, held to a reasonable degree of professional certainty, that ECFMG failed to adopt appropriate policies for certification of IMG's, failed to exercise reasonable care in its certification of Akoda and failed to exercise reasonable care in its investigation of allegations made about Akoda and that these failures caused harm to the named plaintiffs and members of the class.

While it is accurate to say that certification by ECFMG is only one of the steps needed for a foreign medial graduate to obtain a license to practice medicine in the United States, it is a requirement without which an IMG cannot obtain a license. It is also a required certification for entering residency and obtaining hospital privileges. If ECFMG had acted reasonably, it would have denied certification to Akoda, and would have revoked Akoda's certificate, he would not have been able to enter the Howard University residency program, he would not have been able

JA2674

Confidential Communication with Attorney

to obtain a Maryland medical license, he would not have been granted privileges at Prince Georges' Medical Center, and he would not have been able to harm the plaintiffs.

The ECFMG certification process and investigation of suspicious or irregular behavior by ECFMG is important to ensure that individuals seeking to act as physicians treating patients are qualified and meet professional standards of honesty, morality and character. These qualities are critical to the physician patient relationship.

ECFMG breached the standard of care in, among others, the following ways:

Failing to adopt written policies and procedures for the certification of IMG's;

Failing to adopt written policies and procedures for the investigation of allegations of irregular behavior;

Failing to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG;

Failing to investigate fully the relationship between Igberase and Akoda;

Failing to reasonably investigate Akoda's diploma from the University of Ibadan;

Failing to reasonably investigate discrepancies in official medical school seal on documents submitted for Akoda;

Failing to deny the requested waiver of a medical school confirmation of Akoda photograph based on the explanation of the Nigerian postal system not providing a rapid delivery;

Failing to deny the Akoda application due to it being incomplete;

Failing to reasonably investigate the allegations made by Dr. McCorkel;

Failing to refer Akoda to the Medical Education Credentials Committee;

Failing to follow its own procedures with respect to the charge letter sent to Akoda on August 22, 2000;

Failing to reasonably investigate the social security number provided to ECFMG by Akoda;

Failing to temporarily suspend pending investigation and discontinue to verify ECFMG certifications after Dr. McCorkel's allegation, admission by Akoda of using another's social security number and the ECFMG Investigator's concern that Akoda and Igberase were the same person.

4

JA2675

Confidential Communication with Attorney

Failing to compare photographs of Igberase and Akoda in its files;

Failing to reasonably act when Akoda admitted to identity theft in use of another's social security number;

Failing to conclude that the person – Charles -- who appeared for hours at the July 10, 1996 appeal hearing and the person who appeared in Mr. Kelly's office on September 27, 2000 – Akoda – were the same person;

Failing to investigate the authenticity of the passport and green card produced to Mr. Kelly by Akoda when he came to Mr. Kelly's office on September 27, 2000;

Failing to follow up on the conclusion reached by Mr. Kelly and Dr. McCorkel that Igberase and Akoda were the same person.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's, these would have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMF's, these would have included requirements that ECFMG investigate fully discrepancies in Akoda'a application and submitted materials.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's and investigations of irregular behavior, these would have included requirements that ECFMG investigate and refer to the Medical Education Credentials Committee in situations of identity fraud.

It is my opinion, to a reasonable degree of professional certainty, that, had ECFMG properly investigated the allegations of irregular behavior against Akoda, ECFMG would have referred the matter to the Medical Education Credentials Committee and that committee would have found that Akoda engaged in irregular behavior, which would have resulted in his certification being revoked.

It is my opinion, to a reasonable degree of professional certainty, that these failures on the part of ECFMG to comply with the standard of care were the direct cause of Akoda being certified by ECFMG and which are the direct cause of the harms caused to the plaintiffs and the members of the class.

JA2676

Confidential Communication with Attorney

Very truly yours,

David Samuel Markenson, MD

JA2677

# Exhibit 5

JA2678

**John C. Hyde, Ph.D., FACHE**
**Health Care Consultant**
**4301 Highway 35 North**
**Forest, MS  39074**


September 23, 2019


Ms. Karen E. Evans
The Cochran Firm
Attorneys at Law
110 New York Ave., NW
Suite 340, West Tower
Washington, DC  20005


Dear Ms. Evans

     This opinion has been prepared in regards to the matter of: ***Russell, et al v. Educational Commission for Foreign Medical Graduates, Case No. 2:18-cv-05629-JW.***  Currently, I am an adjunct Professor of Healthcare Administration at the George Washington University teaching healthcare management at the graduate level on a part-time basis; and, a full-time consultant in the field of healthcare administration. Recently, I retired as a full-time university Professor of health services administration and clinical outcomes research within an academic medical center campus; with former appointments in the School of Health Related Professions and the School of Medicine at the University of Mississippi Medical Center; and, in the School of Business at the University of Mississippi. My academic activities involved: teaching graduate-level students in areas of healthcare management; conducting health services research focusing on management and clinical outcomes analysis; and, providing expertise and consultations to the healthcare community at large. I have taught graduate level healthcare administration/outcome classes for the past 28+ years. My doctorate, master, and bachelor degrees are all in the area of healthcare administration. I have presented research findings at the regional, national and international levels and published articles, books and monographs related to various areas of healthcare delivery. I have provided lectures and addresses to international, national and regional audiences in areas of healthcare administration.

     Additionally, I have approximately 10 years' experience as a practicing healthcare administrator and multi-system executive with specific knowledge and expertise in the areas of physician credentialing/privileging, credential verification organizations, primary source verification, regulators, and overall healthcare management procedures. I am board-certified as a Certified Healthcare Executive (***FACHE- Fellow***) by the **American College of Healthcare Executives** in the specialty of health care administration.

     Attached is my Curriculum Vitae which includes a list of all publications I have authored, including those dealing with the credentialing process.


John C. Hyde, Ph.D.   Page 1 of 8      9/19/2019

JA2679

In the preparation of this preliminary opinion, I have examined the documents and information listed below and based my opinions on my professional knowledge of prevailing and prudent standards of healthcare administration which ultimately require an exercise of reasonable application of the process of Credentials Verification and use of Primary Sources:

## DOCUMENTS/INFORMATION REVIEWED:

Documents Received from Howard University
Documents Received from ECFMG
Documents Received from ABOG Production
ECFMG Information Booklet, ECFMG Certification and Application, 1996
Complaint
Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (2017)
 Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (2017)
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
ECFMG Complaint
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
Hallock JA & Kostis JB (2006). **Celebrating 50 Years of Experience: An ECFMG Perspective,** Academic Medicine, 81(12): S7-S16.
**Hospital Accreditation Standards**, The Joint Commission, 2008.
American Medical Association: **Joint Commission acceptance of AMA Physician Masterfile Data**, 2004.
**Credentialing by Medicare Advantage Organizations**, presented by E. Enriquez, Nurse Consultant, CMS Region II,

## Depositions Reviewed:

Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)

Based upon a review of these identified documents/information, coupled with my knowledge, training, education, experience and understanding of the practice of healthcare management, I have formulated the following opinions in this matter. These opinions have been based on regulations and industry standards that guide, and should guide the operations of a credentialing verification organization (CVO), such as Educational Commission for Foreign Medical Graduates (ECFMG).

## SUMMARY OF EVENTS

1.   ECFMG received two applications from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. The first on January 3, 1996, and again on August 30, 1996.

JA2680

2.    After he successfully completed the required examinations, ECFMG issued certificate number 0-553-258-5 to "Dr.".Akoda. At some time in 1998, he provided ECFMG with social security number xxx-xx- 9065.

3.    Akoda entered the graduate residency program at Jersey Shore Medical Center on July 1, 1998. Shortly thereafter,, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program.

4.    On September 2, 1998, ECFMG sent a validated form.

5.    About two years later, in 2000, ECFMG was notified that the Jersey Shore Medical Center graduate residency program where Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Jersey Shore Medical Center that Akoda had provided ECFMG with social security no. xxx-xx-9065 which was the same number Akoda provided to Jersey Shore Medical Center.

6.    On August 22, 2000, ECFMG acknowledged in a letter to Akoda that it had received information alleging that Akoda may have engaged in irregular behavior.

7.    Thereafter ECFMG sent a letter to Akoda acknowledging receipt of information from Jersey Shore to which Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. As proof of his identity,   Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

8.    Ultimately, Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number and because the green card he provided to the hospital was inconsistent with the other green card he provided. The social security number "Dr."Akoda used belonged to Charles Igberase, "his cousin".

9.    In December of 2000, an employee of ECFMG, William Kelly, wrote a memo which he said should NOT be made a part of the official file, to the VP of Operations at ECFMG, Stephen Seeling. In that memo, Mr. Kelly advised Mr. Seeling that both he and Jersey Shore believed Igberase and Akoda were the same person.  Then, curiously, Mr. Kelly concluded that there was not enough information for the ECFMG Credentials Committee.

10.    Thereafter in October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center's residency program. He provided three letters of reference.  ECFMG attempted to verify the authenticity of these three letters of reference but was unsuccessful. It is not the usual practice of ECFMG to seek to verify the authenticity of letters of reference from its applicants.

11.    Akoda successfully completed a graduate residency program at Howard University Medical Center, was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center.

12.    To obtain a license to practice medicine in Maryland, Akoda was required to submit, among other essential components, a valid ECFMG certificate.

13.    However, ECFMG should never have issued an ECFMG certificate to Charles Nosa Akoda.

14.    At the time of Akoda was issued an ECFMG certificate, ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias). ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias) and that he had: a) previously  lied about not taking the required examinations, b) rearranging his name, c) that he had been dismissed from the Jersey Shore residency program he used a false social security number to apply to the hospital ( his 'cousin' Charles Igberase) and used two green cards documenting different numbers, names, expiration dates, and dates of birth for "Dr. Akoda and  his certification had been previously revoked; d) that his ECFMG certification had been previously revoked; that there were irregularities regarding the authenticity of his medical school diplomas, and references.

15.    On June 1, 2016, U.S. Attorney's office indicted Mr. Akoda for fraud and aggravated identity theft, citing eleven aliases including Charles John Nosa Akoda.

16.    Using search warrants, law enforcement officers searched the home of Mr. Akoda on June 9, 2016, and discovered false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. They also found other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

17.    On October 19, 2016, Mr. Akoda was indicted again on a charge of social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.

18.    Mr. Akoda ultimately entered into a plea bargain agreement and pled guilty to social security fraud on November 15, 2016.

19. In the spring of 2017, Mr. Akoda's license to practice medicine in Virginia and Maryland was revoked.


**AREAS OF EXAMINATION/RESPONSES**

1.  **ECFMG Mission/Requirements**
    Since 1974, the Educational Commission for Foreign Medical Graduates (ECFMG) has promoted to the American public their preeminent, and exclusive, role in assuring: ***"quality health care for the public by <u>certifying</u> international [foreign] medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals"***. As such, this organization serves as the de facto credentials verification organization for

John C. Hyde, Ph.D.   Page 4 of 8     9/19/2019

JA2682

international [formerly foreign] medical graduates through primary source certification of the applicant's international medical education, international training, and successful completion of the United States Medical Licensure Examination (USMLE)- steps 1 and 2 and English proficiency; through administration of the testing process and subsequent applicant certification to graduate medical education sites for potential placement in postgraduate medical training programs--all of which is required for medical practice within the U.S.

In 1986, the ECFMG Board required that the medical diplomas of all graduates applying for ECFMG Certification be primary source verified with the medical school that issued the diploma. This required the ECFMG to physically send a letter to the medical school that issued the diploma and for the issuing medical school *"to attest to the veracity of the individual and the document being proffered"*. This was required by ECFMG to ensure that all diplomas would undergo this scrutiny--obviously to validate the authenticity of the individual and their successful completion of medical school training, along with the issuing medical school.

Fraudulent and misleading information submitted to the ECFMG is currently covered under its Policies and Procedures Regarding Irregular Behavior. This prescriptive set of policies and procedures defines and addresses what constitutes irregular behaviors. As stated, *"Irregular behavior includes all actions or attempted actions of the part of applicants, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG . . .".* When confronted with irregular behavior, it is incumbent on ECFMG to properly and thoroughly investigated, analyze and address such behaviors. Without proper resolution of the issues, ECFMG cannot fulfill its mission to the public mandating an international/foreign medical school graduate that possess all the requisite qualifications to pursue U.S. medical practice.

## 2. Duties of Credentials Verification Organizations

A healthcare CVO (credentials verification organization) as the name implies provides assurances to those entities that utilize their findings in making decisions on granting medical training program enrollment, licensure and ultimately medical practice privileges. In the late 1980's, JCAHO (former name of current, The Joint Commission) published conditions under which a CVO could be used by a hospital. According to the Joint Commission, a CVO is *"Any organization that provides information on an individual's professional credentials. An organization that bases a decision in part on information obtained from a CVO should have confidence in the completeness, accuracy and timeliness of information"*. Additionally, other CVOs within the healthcare industry such as the American Medical Association Physician Masterfile and Federation of State Medical Boards, among others, provide information that maintains these same criteria and likewise is based on primary source verification concerning vital information such as the issues of this matter. The National Committee for Quality Assurance (NCQA) has formalized and certifies CVOs. At the present time, there are

over 90 CVOs that have gained NCQA CVO Certification. Under prevailing CVO requirements, a CVO must assure the accuracy and completeness of the information that is provided. From a primary source perspective, foreign medical school education must be from the primary source.

The Centers for Medicare and Medicaid Services (CMS), has specified that primary source verification is required for: licensure, education and board certification (if applicable) in granting Medicare Advantage participation. They defined primary source as: ***"an organization or entity with legal responsibility for originating a document and ensuring the accuracy of the information it conveys"***.

As such, this concept of primary source verification entails that the CVO, in this case ECFMG, must be assured that the applicant does in fact possess a valid and authentic medical degree and other identification and credentials must undertake all efforts to make this assurance before certifying the applicant to further U.S. training, or medical licensure.

3.   **Professional/Organizational Negligence**

As developed above, the administrative standards for credentialing IMGs allowing for participation in the ECFMG program requires ECFMG to follow their mission and fulfill its duty to patients in that their actions will serve to assure all foreign educated physicians are properly and thoroughly investigated and deemed eligible for ECFMG Certification to pursue U.S. postgraduate medical education. Without this certification, there should never be an individual allowed to participate in such a program; and, therefore, there would never be fraudulent IMG physicians that progressed through ECFMG to practice U.S. medicine.

**ECFMG failed to act in a reasonable and prudent manner in the following ways**:

A.      As a fundamental matter, ECFMG was required to develop or adopt written policies and procedures and checklist for the certification of IMGs. Written policies and procedures for the investigation of allegations of irregular behavior would ensure reasonable and consistent application of defined criteria.
B.      ECFMG failed to investigate obvious discrepancies that raised the question of fraud and the identity of the applicant. For example, ECFMG failed to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG; the relationship between Igberase and Akoda, to name a few.
C.      ECFMG failed to follow through on its suspicions about the authenticity of the letters of recommendations.

D.      Curiously, ECFMG failed to adequately and with reasonable diligence investigate the allegations made by Dr. McCorkel and refer Akoda to the Medical Education Credentials Committee.

E.     ECFMG did not even follow its own procedures as noted in the 8/22/2000 charge letter sent to Akoda.

F.     ECFMG failed to investigate the social security number provided to ECFMG by Akoda.

G.     ECFMG obtained photographs of all applicants yet failed to compare photographs of Igberase and Akoda in its files when they had suspicions that they might be the same person.

H.     ECFMG missed a golden opportunity to discover if Akoda and Igberase( aka multiple alias) were the same person.

I.     ECFMG also failed to determine the authenticity of the passport and green card provided to Mr. Kelly by Akoda on 9/27/2000.

J.     ECFMG failed to follow up on its conclusion that Igberase and Akoda were the same person even though a memo with this conclusion was created by ECFMG employee Mr. Kelly.

K.     Instead, ECFMG negligently chose to bury this information in a memo that was not to be placed in the file.

It is my opinion, with a reasonable degree of professional certainty, ECFMG should have written policies and procedures for the certification of IMG should have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications and the other obvious discrepancies in the applications.

In my opinion, with a reasonable degree of professional certainty, an appropriate investigation would have resulted in referral of this matter to the ECFMG medical education credentials committee. An appropriate and reasonable investigation of the allegations and obvious discrepancies in the applications should have been conducted by ECFMG, and this matter should have been referred to the Medical Education Credentials Committee. This committee should have then found that Akoda engaged in irregular behavior, which should have then resulted in his certification being revoked.

With a high degree of professional certainty, it is my opinion that the above breaches of duties, by ECFMG caused Akoda to be certified by ECFMG, which allowed him to be accepted into a residency, secure a medical license in MD and gain access to and directly cause harm the plaintiffs and the members of the class. These actions and omissions were violations of the Standards of Care. Without the negligent ECFMG certification, Akoda would not have been accepted into a residency at Howard University Hospital; he would not have obtained a Maryland license; and he would not have been granted privileges at PG Hospital to care for Plaintiff and members of the class.

I reserve the right to alter, supplement or reverse these opinions should additional information be forthcoming.

John C. Hyde, Ph.D.   Page 7 of 8    9/19/2019

JA2685

Attached is my Rule 26 case list.

I am billing my time for review and preparation of my report at $ 375per hour and my time for deposition at $ 1,425 for a three (3) hour deposition and $ 3,750 for one day of trial, plus travel, meals, and lodging expenses.

Respectfully,

*John C. Hyde*

John C. Hyde, Ph.D., FACHE

JA2686

# Exhibit 6

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3
    MONIQUE RUSSELL, JASMINE    )
 4  RIGGINS, ELSA M. POWELL,    )
    and DESIRE EVANS,           )
 5                              )
            Plaintiffs,         )
 6                              ) Civil Action No. 18-5629
         vs.                    )
 7                              ) Honorable Joshua D.
    EDUCATIONAL COMMISSIONER    ) Wolson
 8  FOR FOREIGN MEDICAL         )
    GRADUATES,                  )
 9                              )
            Defendant.          )
10
11
12      VIDEOTAPED DEPOSITION OF JOHN CHARLES HYDE, Ph.D.
13                 (Taken by Defendant)
14                 November 18, 2019
15
                       9:40 a.m.
16
17
18
19
20        Renaissance Concourse Atlanta Hotel
            One Hartsfield Centre Parkway
21                 Atlanta, Georgia
22
23
24
    Reported by:   F. Renee Finkley, RPR, RMR, CRR, CLR,
25  CCR-B-2289
```

```
 1   definition of credentialing.  What I'm -- what I'm

 2   asking for is what you would actually look at in

 3   deciding whether or not to credential a physician.

 4        A.    Okay.  Licensure, training, which could

 5   include, obviously, not just internship, but

 6   residency and/or fellowship.  You would look at their

 7   experience.  Some of them may not have any.  You

 8   know, they may be fresh out of the residency program,

 9   others may not.  You would look at litigation

10   history.  You would look at board certification.  You

11   would look at health status.  And you would look at

12   sort of their general ability to get along with

13   others.  Do they play well with others?

14            So you -- you're looking at a lot of

15   different factors that's going to get you that.

16   Also, you would look and see the National

17   Practitioner Data Bank.  Have they had any payouts or

18   any convictions of any type of morally-related, moral

19   turpitude, which is typically the terminology.  You

20   would look at Office of Inspector General to see if

21   they have had any claims or had the ability to be

22   involved in Medicare/Medicaid.

23            You would look potentially at insurance

24   companies to see if they've been providing on-panels

25   within the insurance world for managed care, so to
```

1   speak.  I gave you more than a quarter's worth, but

2   that's sort of going down the list.

3        Q.    Anything else that you haven't mentioned

4   that you recall that you would look at in deciding

5   whether or not to credential a physician?

6        A.    Recommendations, obviously, from -- you

7   know, that goes without saying.  Previous history.

8   We would query the other hospitals if the individual

9   was on their -- it depends on their point in their

10  career.  If somebody's just out of residency, they're

11  not going to have a lot of previous experience or

12  experiential training outside of residency; but if

13  they were on staff at another hospital, you would ask

14  the hospital, Are they on staff, What level, Are they

15  in good standing.

16            You'd like to get more, but that's sort of

17  all you're going to get.  You would probably also

18  query their health grades.  You know, there's a lot

19  of different things that would give some idea of some

20  feedback.

21       Q.    Anything in addition to that that you

22  would look at when deciding about privileging?  If

23  you've just gone through all that for credentialing

24  an individual, how do you go about -- what do you

25  look at for privileging purposes?

JA2690

1   need to -- cause I -- yeah, I've hired a lot of

2   physicians, but what are you talking about from the

3   HR perspective?

4        Q.   So what I mean by that is have you ever

5   been involved in in-taking paperwork from them with

6   things like their Social Security number, getting

7   them enrolled in benefits programs or whatever it

8   might be, those sorts of Human Resources issues?

9        A.   I -- to be honest, when I first started,

10  we didn't hire a lot of physicians.  We hired some ER

11  docs mainly in radiology because we gave them

12  exclusive privileges.  But I've always been at a

13  level where I didn't do -- I was above that.  People

14  that did that reported to me -- reported to me.

15       Q.   Sure.

16       A.   And then the farther I got up, somebody

17  reported to me that somebody reported to them and

18  however long the chain was.  But did I physically

19  hand them certain things and check things?  No,

20  ma'am.

21       Q.   Okay.  So you weren't like running Social

22  Security numbers for the purpose of issuing a W-2 or

23  anything like that for taxpaying?

24       A.   No, I -- I wouldn't do that.  I never

25  have.  I know what it is; but, no, I didn't do that.

```
1        Q.     Sure.

2        A.     We had people to do that obviously.

3        Q.     And other than establishing before that

4   you are a Ph.D., not an M.D., do you have any other

5   medical clinical background?  Are you a nurse, a

6   nurse practitioner, any of that type of thing?

7        A.     None of the above.

8        Q.     Okay.

9        A.     I am not a clinician, and the only medical

10  care I've ever rendered to my kids, so -- and that is

11  questionable whether it was good or bad or

12  indifferent.  They're all alive, so I guess it was

13  okay.

14       Q.     We'll leave that for another deposition.

15       A.     Yes.

16       Q.     Have you ever attended any medical school?

17  Did you start and not finish?

18       A.     No.  I -- well, let me back up and say --

19  answer, too.  I've never been admitted nor applied.

20  Have I sat in on classes?  Yes.

21       Q.     Okay.

22       A.     Have I taught more classes than I sat in

23  on?  That is true.

24       Q.     On hospital administration?

25       A.     Well, statistical analysis, reading the
```

1    literature.  I wouldn't -- actually, it's more

2    research perspective that I've lectured.  And I don't

3    teach and haven't taught very many medical students,

4    but I have taught attendings and residents more

5    frequently, but, again, not in medicine.  Don't get

6    me wrong.

7              So I've sat in on classes just to get a

8    feel for it.  And like I said, I was at an academic

9    medical center, that and UAB for almost 30 years.  So

10   I've been around, but I've never -- I never would

11   teach medicine.

12       Q.    In the course of your career, have you --

13   that you know of -- ever come across any patients

14   treated by Dr. Akoda?

15       A.    Oh, no, ma'am.  I -- I can say I've never

16   even heard of him before this case.

17       Q.    And when I say Dr. Akoda, you understand

18   who I'm talking about and the doctor who is the

19   subject of the allegations in this lawsuit?

20       A.    Yeah.  I don't know what his real name is,

21   but -- you know, he's had three or four; but, yes,

22   that's one of them I -- I recall.

23       Q.    Can we stick with Dr. Akoda for today?

24   You'll understand who I'm talking about?

25       A.    Sure.

```
 1        Q.    Did you do any evaluation of the medical
 2   records of any of the plaintiffs in this case?
 3        A.    No.  I don't think I was given any medical
 4   records.  I don't believe they're in there.  And if
 5   they were, they were attached just in a -- as an
 6   exhibit, but I don't recall any medical records at
 7   all.
 8        Q.    Did you do any statistical analysis of any
 9   of the outcomes of Dr. Akoda's patients?
10        A.    No, I have not.  I know that for a fact.
11   I haven't.
12        Q.    Did you do any sort of analysis of the
13   outcomes for Dr. Akoda's patients?
14        A.    No, ma'am, I have not.
15        Q.    I asked whether you had met or come across
16   any of Dr. Akoda's patients.
17              I should also ask, have you ever come
18   across Dr. Akoda himself?
19        A.    Not that I recall.  Again, I've -- if
20   we've bumped into -- if it was a random occurrence, I
21   don't know, but I don't think so.
22        Q.    Do you have an understanding one way or
23   the other about whether he passed USMLE steps one and
24   two?
25        A.    My understanding is he ultimately did.
```

1        Let me back up.  Ultimately, somebody

2    passed them, and I'm not sure that it was him at all.

3    So, again -- well, I'll say it that way.  So somebody

4    passed using one of his names, or multiples of his

5    names actually.

6        Q.    Do you have any understanding that his

7    medical school, the University of Benin, verified a

8    diploma?

9        A.    I don't know if I -- I think I saw

10    verification of several medical degrees, two from a

11    different school with different dates, by the way,

12    and one date not even shown on the diploma.  And then

13    I don't -- again, they verified the name, maybe not

14    the person.

15        Q.    Do you know whether Dr. Akoda ever

16    finished a residency program?

17        A.    My understanding is one guy, I think

18    Akoda, finished the Howard's University OB/GYN

19    program.  But, again, I don't know who is what and

20    who's who in that -- in all the different names.

21        Q.    Do you know whether Dr. Akoda was board

22    certified in OB/GYN?

23        A.    There is a Dr. Akoda that became board

24    certified, yes.

25        Q.    Do you know anything about any medical

1   treatment or patients that Dr. Akoda may have treated

2   in Nigeria?

3        A.    In where?

4        Q.    In Nigeria.

5        A.    No, ma'am.  I don't think they were

6   included, so I don't know of any.

7        Q.    Do you know anything about the quality of

8   medical care provided by Dr. Akoda?

9        A.    No, not really.  I mean, I read that Stat

10  News, and that may have given me something, but I'm

11  not into the -- into the clinical aspect, so it's

12  really something I'm not going to spend a lot of time

13  with.

14       Q.    When you say Stat News, that was a

15  publication that you read from the Internet?

16       A.    Yes.  It was one of the ones I read and

17  the only one I printed.

18       Q.    Did you do any analysis of the

19  credentialing of Dr. Akoda by Prince George's

20  Hospital?

21       A.    No.  I don't think I saw the package or

22  the packet, the credentialing packet, credentialing

23  information file, whatever you want to call it, from

24  Prince George's Hospital.  Maybe it's Prince George's

25  County Hospital.  I forget the technical name.

JA2606

John Charles Hyde, Ph.D.

1      Q.    You might be more precise than I am.

2  Thank you.

3      A.    I think "county" is in there.

4      Q.    Have you ever issued opinions in any other

5  case regarding credentialing at Prince George's that

6  you can recall?

7      A.    And that's in Maryland, right?

8      Q.    Correct.

9      A.    You know, I don't know if I have.  Maybe

10  in the past.  I can't tell you.

11          MS. MCENROE:  You know, we've been going

12      about an hour.  How about we take a quick break?

13          MR. HAYNES:  Sure.

14          THE VIDEOGRAPHER:  We're now off the video

15      record.  The time is 10:46 a.m.

16          (A recess was taken.)

17          THE VIDEOGRAPHER:  We're back on the video

18      record with disc number two.  The time is 11:01

19      a.m.

20      Q.    (By Ms. McEnroe)  Dr. Hyde, you've never

21  applied to ECFMG for services, have you?

22      A.    You mean as being an international medical

23  graduate?

24      Q.    Correct.

25      A.    No, I have not, that is correct.

JA2607

1    Q.    And you've never been employed by ECFMG,

2  correct?

3    A.    That's correct.

4    Q.    You've never been a member of ECFMG's

5  Board of Trustees, correct?

6    A.    Correct.

7    Q.    And you've never been a member of the

8  Medical Education Credentials Committee for ECFMG,

9  correct?

10    A.    Likewise, correct.

11    Q.    You mentioned earlier this morning that in

12  certain instances you've come across ECFMG documents

13  when reviewing foreign medical graduates in other

14  settings, other expert cases, for example.  Have you

15  ever interacted directly with ECFMG in connection

16  with any of those cases?

17    A.    The cases that I've looked at

18  forensically, or however you want to look at it, no,

19  I have not.

20          I -- in the past, I think I've interacted

21  with them, but never in a -- under the auspices of a

22  case or litigation.

23    Q.    Can you tell me about those interactions,

24  please?

25    A.    We had a question years ago, somebody that

John Charles Hyde, Ph.D.

1   was later found out to be a non-medical graduate that

2   was -- got in through ECFMG.

3        Q.    What case was that?

4        A.    Oh, it wasn't -- I don't know the case.

5   It happened back in Kentucky back in the '70s or

6   '80s, probably the '80s, but I can't tell you the --

7   other than the fact that he was trying to come our

8   way and we found out about it.

9        Q.    Do you know if he was lying about ECFMG

10  certification?

11       A.    My understanding he was.  Had to do with

12  war torn unavailability of medical school

13  documentation.

14       Q.    And do you recall anything else about

15  those interactions with ECFMG back in the '70s or

16  '80s about this individual?

17       A.    Not really.  There may have been others

18  that I've contacted them about some questions about

19  things, but it's -- it's been very few and far

20  between.

21       Q.    When you say not really about recalling

22  anything else from the individual from the '70s or

23  '80s who you mentioned lied about ECFMG

24  certification, is there anything broadly that you

25  remember or anything specific that you remember?

JA2699

1    A.    About that case?

2    Q.    Yeah.

3    A.    Yes, I think anesthesiology, I think

4  everybody was after him including the federal

5  government, I want to say Lebanon came into -- the

6  country he was from, and I want to say that they

7  found out.  He was a medic in the -- maybe the

8  Lebanese Army or maybe it was another splinter group.

9  It was probably the Beirut-Lebanon-type era where

10  there was finding and bombing.  I just remember that,

11  and it was in central Kentucky.

12    Q.    Do you recall believing that ECFMG had

13  done anything wrong or insufficient in that instance?

14    A.    At the time, no; but in retrospect, if

15  somebody is from a war-torn country -- it's like

16  people from Cuba.  They decided not to give those

17  people credentials, and all the ones I know of did

18  not become licensed in the United States.  They had

19  to do a sub -- a sub level job even though they may

20  have been bona fide physicians or dentists.

21    Q.    Do you believe that bona fide physicians

22  from foreign locations where there are war issues

23  should not be able to become physicians in the

24  United States?

25         MR. HAYNES:  Object to the form.

1    CEO of a smaller hospital.

2         Q.    Tell me about that case.

3         A.    Well, that was -- the individual lived in

4    an adjoining or a couple counties over from us and

5    wanted privileges and got a bad recommendation from a

6    residency site, and then the residency site tried to

7    rescind it, and I wanted to find out a little more.

8    And, also, part of the process was, he was a foreign

9    medical, graduate, or international, whatever it was

10   called at that time, I think FMG still 30 years ago.

11        Q.    Sure.

12        A.    And just called to see -- give me a little

13   about the training, and they wouldn't give me a lot,

14   but I was able to get some information from them.

15        Q.    Do you recall any other instances that

16   you've had direct contact with ECFMG throughout your

17   career?

18        A.    Direct, no, ma'am.  Indirect, yeah.

19   There's other that I've heard about and am

20   knowledgeable about.

21        Q.    Prior to your engagement in this case,

22   have you ever looked at ECFMG's policies or

23   procedures?

24        A.    I think I have because, again, we've had

25   cases -- or there have been plaintiff theories that

```
1    have looked at somebody's credentialing of foreign

2    medical graduates or international medical graduates;

3    and if that was part and parcel of the information

4    that I was provided, I looked at that, and I've seen

5    that before.  I'm trying to remember under what

6    conditions, but I've seen -- I've seen their packet

7    before.  I don't know if I'd seen 1996, but I've seen

8    additional information.  And, also, you can pull it

9    up on the website to get how they have classified

10   what they are, who they -- the irregular behavior's

11   available on the Internet and through their website,

12   so I've seen a lot of their policies over the years.

13        Q.    In written form?

14        A.    Yes.  I'm sorry.  Yes.

15        Q.    And when you refer to information, and you

16   talked specifically about 1996, were you talking

17   about the information booklet?

18        A.    Yes, ma'am.  The booklet that was maybe

19   Exhibit 1 to the Kelly -- Mr. Kelly's deposition.

20        Q.    Have any of your opinions in any other

21   case ever turned on the sufficiency of ECFMG's

22   policies or procedures?

23        A.    No, I don't think so.  And when you mean

24   turn, where I -- that was a pivotal issue and --

25        Q.    Correct.
```

John Charles Hyde, Ph.D.

```
1        A.      -- and conclusion?

2                You're right, no.

3        Q.      Or something --

4        A.      No -- no others.

5        Q.      And -- or something that you looked at

6    specifically to look at sufficiency of the policies

7    and procedures of ECFMG?

8        A.      Well, now that's a different question.

9        Q.      Yeah.  I'm asking about that.

10       A.      Yeah, okay.  That's fine.

11               I think that in the past the ones that

12   I've looked at I felt comfortable with.  So I can

13   say, yes, I think -- because there were no irregular

14   behaviors or claims of irregular behavior or some

15   sort of falsification that I saw.

16       Q.      Do you know anybody who sits on the

17   Medical Education Credentials Committee of ECFMG?

18       A.      I haven't looked at the list of

19   individuals, so I don't know.  I don't think I do;

20   but if I go down a list, there may be people that I

21   recognize being around for 40 years in healthcare and

22   the medical training, academic medical center sort of

23   process, there may be some people I know of, but I

24   don't think so.

25       Q.      But sitting here today, you don't know of
```

```
1   knowing of anybody from Medical Education Credentials

2   Committee?

3        A.    That's correct, I do not.

4        Q.    Have you ever appeared before the Medical

5   Education Credentials Committee?

6        A.    No, ma'am, I have not.  I haven't been

7   asked to.

8        Q.    We discussed credentialing and privileges

9   a little bit earlier today, correct?

10       A.    I believe we have.

11       Q.    Yes.

12       A.    For quite a bit of time.

13       Q.    For quite a bit of time.  And so I just

14   want to make sure that I understand the flow of the

15   way that credentialing and privileging happens in the

16   healthcare industry from your perspective.

17       A.    Okay.

18       Q.    So an individual, regardless of whether

19   they graduate from U.S. or international medical

20   school, would apply to a residency program if that

21   was the path they were to take; that would be a first

22   step out of medical school, correct?

23       A.    Correct.

24       Q.    Okay.  And they would either get admitted

25   or not get admitted to the residency program based on
```

John Charles Hyde, Ph.D.

1   whatever criteria that residency program might have,

2   correct?

3       A.    Now, you started out saying credentialing.

4   This is not credentialing.

5       Q.    Sure.  I'm trying to understand the flow

6   through --

7       A.    Okay.

8       Q.    And I will get to how credentialing fits

9   in.

10      A.    Okay, yeah.  This -- this is not part of

11  the flow of credentialing what I'm trying to say.

12      Q.    Dr. Hyde, what would you characterize it

13  as?  I'm just trying --

14      A.    Well, that's --

15      Q.    -- to get the lifecycle?

16      A.    I'm sorry.  Credentialing and privileging

17  would be -- to be credentialed would be given the

18  right to practice medicine at a facility.

19      Q.    Sure.

20      A.    See, these individuals pre-residency are

21  not practicing anywhere, so they're not trying to get

22  privileges.  They're trying to get in the pipeline to

23  be able to get privileges at a later time.

24      Q.    So let's talk about the pipeline to get

25  credentials --

1    A.    Okay.

2    Q.    -- if that sounds okay.  So someone would

3  graduate from medical school?

4    A.    Correct.

5    Q.    And apply to a residency program,

6  presumably through the match, usually, but there are

7  other avenues as well.

8    A.    Typically, the match; but, yes, there's

9  other avenues.

10    Q.    And they would apply to those residency

11  programs, oftentimes including an interview, correct?

12    A.    They would apply, yes, ma'am.  Maybe

13  interview; maybe not.  Depends upon if they were a

14  high match or a low match.

15    Q.    And there could be all sorts of

16  application materials connected with the resident

17  applying to a residency program, correct?

18    A.    Sure, sure.  There -- there's quite a bit

19  of paperwork.

20    Q.    Yep.  And assuming that that individual

21  was lucky enough to get accepted into a residency,

22  they could choose to attend and participate in that

23  residency, correct?

24    A.    Correct.

25    Q.    And they would have some oversight of

1    their performance during the residency, correct?

2         A.    They'd have a lot of oversight, not just

3    some.

4         Q.    Yep, okay.  And at some point during that

5    residency, they might get a training license from a

6    licensing board, correct?

7         A.    It -- it depends upon the state.  You're

8    right.  Some states do; some don't.

9         Q.    Okay.  And that would involve applications

10   as well, right, to the licensing board?

11        A.    Yes, to the jurisdiction.  Typically, the

12   state licensure board.

13        Q.    And assuming that individual was

14   performing up to snuff, they -- they might complete

15   their residency program?

16        A.    Correct.

17        Q.    From the residency program, they might

18   apply to full licensure, correct?

19        A.    Correct.

20        Q.    Take step three and -- and get licensed,

21   correct?

22        A.    Yeah, take step three first, then get

23   licensed --

24        Q.    Yep.

25        A.    -- on their own, non-training status.

```
 1        Q.     Right.  So full, unrestricted medical
 2   license?
 3        A.     Yes.
 4        Q.     And that would involve an application to
 5   licensing board --
 6        A.     Yes.
 7        Q.     -- as well, correct?
 8        A.     I'm sorry.  Yes, ma'am.
 9        Q.     Okay.  Then the individual could become
10   board certified in a specialty?
11        A.     They could if they were eligible.
12        Q.     Or they could go ahead and get a
13   fellowship or some other sort of employment as a
14   physician, correct?
15        A.     Correct.
16        Q.     Is this where we get to credentialing?
17        A.     Well, if you're going to say -- throw the
18   word hospital and privileges or healthcare facility,
19   then we'll get to credentialing and privileging.
20        Q.     Great, okay.
21        A.     All of this -- let me back up.  A lot of
22   this is doing credentialing; but when I think of
23   credentialing and privileging, I think specifically
24   with the healthcare entity.
25        Q.     Sure.  Like a hospital or a nursing home,
```

1    something of that --

2         A.    Ambulatory surgical center, group

3    practice, yes, ma'am.

4         Q.    Urgent care or something like that?

5         A.    Right.

6         Q.    Okay.  So once that individual gets a full

7    unrestricted license to practice medicine, if they so

8    choose to go seek employment or affiliation with a

9    hospital or a hospital-like entity, they would then

10   get -- get into the pipeline for credentialing

11   process; is that correct?

12        A.    Yes, ma'am.  Specific for privileges, yes.

13        Q.    Yeah, okay.  And all of this would be

14   before they would be laying hands on a patient in a

15   hospital without supervision as the medical --

16   treating medical doctor; is that correct?

17        A.    Let me back up.  There are instances

18   where, for certain things, the resident may not be

19   supervised, so they would be laying hands upon

20   patients.  There might be some retrospective amount

21   of evaluation, which there would be, but they can lay

22   hands on -- when you go through, one's PGY1s, first

23   year or the interns, they don't do a lot

24   independently.  Twos begin it.  Threes are finishing

25   up.  If they become a fellow, whatever year it is --

John Charles Hyde, Ph.D.

1    one, two, three -- they're going to do more

2    independent work, but they're still -- even on --

3    even through fellowship, there's going to be some

4    modicum of supervision or a maximum of supervision on

5    the first year.

6        Q.    Sure.  Do you have any insight into what,

7    if anything, Howard University Hospital did in

8    evaluating whether Dr. Akoda should be accepted to

9    their residency program?

10       A.    No, ma'am.  I haven't seen any

11   documentation at all from Howard University.

12       Q.    Have you seen any documentation regarding

13   any oversight or evaluation of Dr. Akoda's

14   performance during his residency?

15       A.    No.  That would be part of that, and I

16   haven't seen any of that, no.

17       Q.    And have you seen any documentation

18   regarding any hiring decisions by Prince George's

19   Medical Center?

20       A.    No.  I -- I didn't know that he was hired.

21   Maybe he was hired.  I -- I haven't seen any

22   credentialing or anything really of any consequence

23   from Prince George's County Hospital.

24       Q.    Okay.  Are you aware of a lawsuit

25   regarding Prince George's County Hospital and the

JA2710

1    entity with legal responsibility for originating a

2    document and ensuring the accuracy of the information

3    it conveys?"  The prevailing definition of what a

4    Primary Source Verification is supposed to be and

5    what's the obligation of such.

6         Q.    So that would be like if you were trying

7    to primary source verify a diploma from the

8    University of Benin, it would be the University of

9    Benin that would tell you if it was valid or not?

10        A.    Yes, they're the -- the Primary Source

11   Verification is the entity that goes to the primary

12   source, which in your instance is exactly right,

13   would be the university itself.

14        Q.    The issuing university?

15        A.    Yes, the issuing granting university,

16   granted the degree.

17        Q.    Beyond that definition of the Primary

18   Source Verification, is it your opinion that

19   credentialing by Medicare Advantage organizations is

20   otherwise relevant to this case?

21        A.    No, it's not.  I mean, I just -- I was

22   asked different questions in our discussion and --

23   about -- it's sort of an educational thing.  I mean,

24   I'm a professor, so I like to give people definitions

25   that don't come from Dr. Hyde.  They come from other

1   sources.  I know them, but I want them to see it, see

2   the other sources.

3       Q.    And then in your pile of documentation you

4   brought, you have a copy of an article entitled,

5   "Celebrating 50 years of experience: An ECFMG

6   perspective," correct?

7       A.    Yes, ma'am, written by at the time the

8   president of ECFMG.

9       Q.    Yes.  Dr. Hallock and Dr. Kostis.

10      A.    Yes.  I think the first one was the

11  president.  I forget what the number two was.

12      Q.    Correct.  He was the president and CEO,

13  Dr. Hallock.

14      A.    Yes.

15      Q.    So then the next document was

16  paper-clipped together?

17      A.    Yes, ma'am.

18      Q.    And I want to get an understanding of what

19  it is from you and where you got it.

20      A.    Sure.

21      Q.    So I'll hand it over to you, if you

22  wouldn't mind.

23      A.    Okay.

24      Q.    Let me know.

25      A.    Sure.  I had referenced the 2008 Manual

1    For Joint Commission About Medical Staff

2    Credentialing --

3        Q.    Yes.

4        A.    -- for hospitals.  That was actually

5    listed in my opinion.  And I found that -- I used to

6    have going back 20 years all the hospital

7    accreditation standard manuals from the Joint

8    Commission; but, unfortunately, a few years ago I

9    didn't have any old-old cases, so I threw some away.

10   So -- but that's the first one is from '08, and it's

11   about the process of medical staff credentialing and

12   privileging at a hospital and, also, the acceptance

13   of certain entities as Primary Source Verification or

14   CVO, Credential Verification Organizations, that

15   would be such as ECFMG.

16            And then I ran across -- I did find an

17   older one, a 2004, again, Hospital Accreditation

18   Standards from the Joint Commission that actually

19   list out that the ECFMG is a primary source

20   designated CVO for foreign medical graduate

21   verification of their foreign medical school staff.

22   And then I did take -- or excuse me -- paper-clipped

23   these together just for -- I apologize, or to

24   whomever.

25       Q.    And I'm going to go ahead and mark these

```
 1    two together as Exhibit 6, cause we were not able to

 2    find these documents in our library, so that we can

 3    keep them with the deposition transcript --

 4         A.    Sure.

 5         Q.    -- If that's okay.

 6         A.    And they're out of my -- I have the whole

 7    manuals, but I didn't bring them cause I don't want

 8    them made exhibits and lose them.

 9         Q.    Sure.  I appreciate it.

10         A.    But they're bona fide and -- I'll get it.

11               (Exhibit 6 was marked for

12         identification.)

13         Q.    (By Ms. McEnroe)  Then next we have a copy

14    of your, it looks like resume that says

15    "Credentialing related factors" --

16         A.    Yes, ma'am.

17         Q.    -- at the top.  And it says handwritten,

18    "Old one.  New is updated to May 10th, 2018."

19         A.    Yeah.  I'm trying to remember if I updated

20    it mentally or if I -- if I did a new copy.

21         Q.    So this looks like sort of a cribbing of

22    your CV, if you want to take a look at it.

23         A.    Yeah.

24         Q.    It's a little bit more of a shorthand.

25               MR. HAYNES:  I'm going to object.  Just
```

John Charles Hyde, Ph.D.

1   from a different publication.  This is a textbook

2   that's out for master level healthcare administration

3   students.  I authored a chapter in the book.  It's

4   "Credentialing of healthcare providers."  It's one of

5   my publications.  I have five or six or more.  I

6   can't -- I'd have to look -- on issues of

7   credentialing.  And it's just -- well, I guess -- and

8   the brag part becomes, the reason that the first page

9   is on here, it's one of the text -- it's a textbook

10  that has been identified as the study guide for your

11  fellowship and attaining fellowship in the American

12  College of Healthcare Executives.  So that's the book

13  and I just --

14       Q.    I see.

15       A.    Yes.  And I'm not trying to brag too much,

16  but that's -- that is probably the most widely

17  accepted and adopted textbook in Human Resource

18  management in healthcare.

19       Q.    So you have a copy of this.  I'm going to

20  go ahead and mark that --

21       A.    Oh, I do.

22       Q.    -- if that's okay.

23       A.    You can have that.  I've got the book

24  itself, several copies of that.  That came out of --

25  that actually came out of ACHE, Healthcare Executive,

1    one of our weekly -- or, no, monthly publications

2    and --

3         Q.   So I see on this first page of what's now

4    Exhibit 8, there is a picture of the book that has

5    the cover and the second page; is that correct?

6         A.   Yes, ma'am.

7         Q.   Okay.

8         A.   And I didn't do that.  I just -- I did the

9    picture because I wanted you to see the book.

10        Q.   Sure.  I appreciate that.

11             MR. HAYNES:  I know it's listed on his CV

12        in his publication, but because of its

13        relevance, we asked him to print a copy and

14        bring it here today for your convenience.

15             MS. MCENROE:  I appreciate that.  Thank

16        you.

17             (Exhibit 8 was marked for

18        identification.)

19        Q.   (By Ms. McEnroe)  Then it looks like there

20    are a couple of other documents from the Internet, so

21    I can move a little quicker through them.  One of

22    them is the printout from the Joint Commission

23    Acceptance of AMA Physician Master File Data,

24    correct?

25        A.   Yes.

John Charles Hyde, Ph.D.

1      Q.    And you printed that off of the website?

2      A.    I did.  I -- yes, ma'am, probably the AMA

3    Master File website.  I think that's the source of

4    that.

5      Q.    Great.  And then you have a couple of

6    printouts from the ECFMG website.  You have one,

7    which is a document that has representative examples

8    of irregular behavior?

9      A.    Yes, ma'am.

10     Q.    You printed that off of ECFMG's website?

11     A.    I did, all of those.

12     Q.    And then there's another one -- another

13   document from ECFMG's website that looks like a

14   printout of the policies and procedures regarding

15   irregular behavior.

16     A.    Yes.

17     Q.    Correct?

18     A.    I did.  And that's where I got it, yes,

19   ma'am.

20     Q.    And then there's another document that's a

21   printout that is subject headed category, "Irregular

22   behavior," and then it has a subheading that says,

23   "USMLE takes action against individuals found to have

24   engaged in irregular behavior."  Is that correct?

25     A.    Yes.

```
 1      Q.    And you printed out this as well from

 2   ECFMG's website?

 3      A.    I did.

 4      Q.    While I'm doing that, I'll make sure I get

 5   all ECFMG printouts.  I see one more that appears to

 6   be from ECFMG's website that has a portion on the

 7   Certification Verification Service for ECFMG --

 8      A.    Yes.

 9      Q.    -- correct?  And another one that just is

10   from a page that says, "Certification verification,"

11   is that correct?

12      A.    Correct.

13      Q.    And you printed these off of ECFMG's

14   website as well?

15      A.    I did, to establish they declare

16   themselves a primary source verifier.

17      Q.    A couple of other documents that I want to

18   make sure we're just clear for purposes of the record

19   what we have in your Redwell that you brought today.

20   You have a copy of Defendant's Disclosure of Expert

21   Testimony, which is revealing Dr. Fenichel and

22   Dr. Goldberg dated September 23rd, 2019?

23      A.    Yes.

24      Q.    And it looks like a copy of your expert

25   report, which we have marked as Exhibit --
```

```
 1        A.    Four?  Three?

 2        Q.    -- 5?

 3        A.    Sorry, five.  Yes.

 4        Q.    So is this report here, this is the same

 5   as what we received; is that correct?

 6        A.    I believe so.  You printed it on two

 7   sides, and I didn't; but I think it's the same thing.

 8        Q.    That's fair, and it says --

 9        A.    It's the same date.

10        Q.    It says "filed" with an "E" after it.  Do

11   you see that?

12        A.    Yeah, E-filed.

13        Q.    Oh, E-filed.

14        A.    Electronically, I'm sorry, that's my --

15        Q.    Sure, that's fine.

16        A.    -- shorthand.

17        Q.    That's -- that's what your notation there

18   means?

19        A.    Yes, because they filed it electronically

20   with my signature, electronic signature.

21        Q.    Got it, okay.  And then it looks like a

22   printout from FSMB's website that says, "Credentials

23   verification process."

24        A.    Yes.

25        Q.    And you printed this off of FSMB's website
```

1  hospitals that he -- against ECFMG.  He perpetuated a

2  lot of frauds.  I haven't counted them all up, but

3  there's a lot of fraudulent -- and even he admitted

4  it -- giving wrongful information to me that's

5  fraudulent.  I'm not a lawyer.  So you hadn't asked

6  me that; I'll tell you.  But to me, doing something

7  that's illegal and unethical and untruthful is

8  probably -- forget unethical.  That is untruthful

9  would be fraudulent, but there's a lot of people.

10  Ultimately, it's the patients.

11       Q.    I'm going to direct your attention back to

12  Exhibit 5, which is your --

13       A.    Sure.

14       Q.    -- report.

15       A.    I'll get it.

16       Q.    So you can set the other exhibits aside.

17       A.    I'll put these in order and then pull out

18  five.  I've got it.

19       Q.    Prior to this case, had you ever had any

20  involvement with or come across any allegations of

21  irregular behavior?

22            MR. HAYNES:  Object to the form and

23       foundation.  You mean like in life?

24            MS. MCENROE:  Yeah.

25            MR. HAYNES:  Any irregular behavior?

```
 1                MS. MCENROE:  Yeah.  I'm using it as a
 2         defined term as you use it in your report,
 3         right.  So I'm going to go with, ECFMG has a
 4         definition of irregular behavior.  I can restate
 5         the question if your counsel would prefer.
 6         Q.    (By Ms. McEnroe)  Have you ever come
 7    across any allegations or investigations that you
 8    know of by ECFMG pertaining to irregular behavior
 9    prior to this case?
10                MR. HAYNES:  Okay.
11                THE WITNESS:  I've had knowledge.  I've
12         read things, sure, in the past.  Have I been
13         involved in those cases?  No, ma'am.
14         Q.    (By Ms. McEnroe)  Okay.
15         A.    But I'm aware of that term.  And at first
16    I thought irregular behavior any time.  And, yeah, we
17    have that.  We're humans.  There's irregular
18    behavior.  But I have never had a case where that's
19    been an issue, but I'm aware of the terminology.  And
20    I'm also aware of sort of the importance, or the
21    import of that from a standpoint of what does that
22    lead to and what's its consequence or outcome.
23         Q.    What do you mean by that?
24         A.    Well, you can have irregular behavior that
25    the individual gave the wrong -- I think he said the
```

1  birth date was wrong because his medical school had

2  the wrong birth date.  Well, that -- that's sort of,

3  Okay, that's -- that's a no-brainer.  Yes, that's

4  irregular, but what does it really mean?  Somebody

5  screwed up on the paperwork, if that was all.  So

6  that could be one of those instances of irregular

7  behavior that, yes, it's a technical -- it's like an

8  E -- EMTALA violation.  There could be technical

9  EMTALA violations that really have no effect on

10  anybody, but, technically, that was a violation.

11      Q.    What kind of violation were you just

12  saying?

13      A.    EMTALA, E-M-T-A-L-A.

14      Q.    What is that?

15      A.    The Emergency Medical Treatment and Labor

16  Act -- Active Labor Act.

17      Q.    You mean in a physician giving treatment

18  to a patient?

19      A.    No, no.

20          Okay.  Let me -- let me tell you what that

21  is.  Emergency Medical Treatment Active Labor Act,

22  that is the federal guidelines on -- it started out

23  on dumping hospitals that would -- somebody would

24  come into the ED either emergent or pregnant, you

25  know, sort of in the last stages or, you know, the

1    now you see it differently than how it was seen

2    contemporaneously, right?

3            MR. HAYNES:  Object to the form.

4        Misstates testimony.

5            THE WITNESS:  No.  The contemporaneous

6        part was when he apply -- when he was in an

7        appeals process with ECFMG and admitted lying on

8        different things, too.  So it had nothing to do

9        with his subsequent conviction of tax evasion or

10       whatever the -- I don't know what it was, his

11       federal conviction and time served.

12       Q.    (By Ms. McEnroe)  Right.  So that

13   admission and that appeals process where he showed up

14   and he admitted to -- lied, that was just with

15   respect to the identity for which ECFMG found to have

16   been irregular behavior three or four times, correct?

17   That was not the Akoda identity?

18       A.    That was -- see, other than the fact

19   that -- let me think.  There was an e-mail from Kelly

20   that went to Oluwafemi that came back answered by

21   Akoda.  So it's like --

22       Q.    Right.

23       A.    -- the Akoda name does come into it.

24            MR. HAYNES:  Let him finish.

25            MS. MCENROE:  I'm letting him finish.

John Charles Hyde, Ph.D.

```
1        Q.     (By Ms. McEnroe) Go ahead.

2        A.     I'm saying the -- the Akoda name does come

3    into it.

4               Now, you asked me a question.  I don't

5    know, technically, if when he was in front of the

6    ECFMG committee July 10th, '96, I -- but he says his

7    name now is Charles, comma, Igberase Oluwafemi.  He

8    didn't say Akoda.  You're right.

9        Q.     Right.  And -- and so the e-mail that you

10   raised having gone to one but coming back from the

11   other --

12       A.     Yeah.

13       Q.     -- that was an issue that Bill Kelly

14   identified contemporaneously, right?

15       A.     Yeah.  He didn't do anything about it.

16       Q.     But he --

17       A.     Okay, I'm sorry, he did.

18       Q.     Go ahead.

19              MR. HAYNES:  Go ahead.  Were you finished?

20              THE WITNESS:  I wasn't finished, no.  I'm

21        sorry.  We keep on -- I'm trying to pause

22        and --

23       Q.     (By Ms. McEnroe)  Go ahead.  You can

24   finish your answer.

25       A.     Okay.  The point is that that came back
```

John Charles Hyde, Ph.D.

```
 1   contemporaneously as it wasn't the conviction at all
 2   that sort of lets us Monday morning quarterback.
 3   We're going back, and I'm looking at things that were
 4   submitted by him contemporaneously, that, also,
 5   knowledge of taking the test without the proper
 6   identification, you know, false testing as -- I mean,
 7   all we have to do is look at Hollywood and getting
 8   into some exclusive schools to see what -- and people
 9   can violate the -- the testing protocols.
10           So I think that there's a lot of
11   contemporaneous information that I would have not
12   allowed him to go any further, to be honest.  He
13   would have been permanently revoked, and I wouldn't
14   give him a five-year revocation, then let this start
15   over again because that in and of itself sets us
16   where we are today.
17      Q.   Have you ever been in a position where
18   anyone looked to you to set the outcomes of findings
19   of irregular behavior by ECFMG?
20      A.   Oh, by ECFMG?  No, ma'am.  This is the
21   first.  I mean, the first time that I've been
22   involved with a case that I found that there was
23   irregular -- not only irregular behavior on the part
24   of the applicant, but also very much irregular
25   behavior upon the part of ECFMG.
```

1      Q.    And the hospital would play no role in

2  terms of having the Social Security number and

3  knowing that that was a real Social Security number

4  for that physician?

5      A.    That's correct.  And you're talking about

6  practicing physicians outside of residency and

7  everything?

8      Q.    Correct.

9      A.    Yes, yeah.  They would have no -- unless

10  they were employed by the hospital, because they're

11  independent -- you know, by and large, they're

12  independent if they -- let me say, by and large, if

13  they're independent, their income is coming from a

14  tertiary source, secondary source, not primary from

15  the hospital.

16      Q.    Do you know how, if at all, Dr. Akoda was

17  paid by Prince George's?

18      A.    I don't know if he was an employee or not.

19  I don't know.  If he submitted and they found out --

20  oh, Prince George's.  No, I don't.  Let me just say I

21  don't.

22      Q.    I'd like to direct your attention to page

23  4 of your expert report.

24      A.    Okay.

25      Q.    At the very top, there's paragraph number

John Charles Hyde, Ph.D.

1   12.  Do you see that?

2       A.    Yes.

3       Q.    And it says, "To obtain a license to

4   practice medicine in Maryland, Akoda was required to

5   submit, among other essential components, a valid

6   ECFMG certificate."  Do you see that?

7       A.    I do.

8       Q.    What do you mean by "other essential

9   components"?

10      A.    Well, he would have to -- when he was

11  getting licensed to practice, he'd have to give

12  residency information.  We can look on the form, it's

13  here, that shows the other vital information.  Let me

14  get that.

15      Q.    Is that the Maryland document we --

16      A.    Yes, ma'am.

17      Q.    And I do believe we marked that one as an

18  exhibit.

19      A.    Oh, okay.  We're up to 15.  I've lost sort

20  of -- other information, vital personal information,

21  chronology of activities after graduating medical

22  school, all the information about medical education.

23  Then it says, "Graduates of foreign medical school, a

24  copy of valid ECFMG certificate, a copy of my medical

25  school diploma and a certified translation."  Also,

1    he has other -- there's probably another dozen things

2    that -- that he has to apply, so that's among others.

3        Q.    Could you -- could you -- for the "among

4    others," could you read in what the other dozen

5    things are?

6        A.    Okay.  "I have completed part one of IML-2

7    verification of education English language

8    instruction form and sent a copy to the information

9    institution from which I received my medical degree.

10   I have listed all postgraduate training I have

11   undertaken in the U.S.  I've listed all medical

12   licensure examinations I have ever taken and

13   requested transcripts from the appropriate

14   administering authority.  I've listed every license

15   registration I have ever been issued in the U.S."

16            Also, it says, "I do not have to take the

17   special purpose exam.  I have answered all character

18   and fitness questions explained by yes.  I have

19   attached a two by -- two-inch-by-two-inch passport

20   quality color photograph."  He's read all the

21   statements and he has to sign and date, send in

22   money.  And then if there's any supporting

23   documentation, he has to have it -- application

24   signed and notarized.  And then he also has to have a

25   criminal history records check.

```
 1            Those are all the checklist things that

 2   you need in the State of Maryland for a medical

 3   license.

 4        Q.    Do you know one way or the other whether

 5   the State of Maryland primary source verifies foreign

 6   graduate -- sorry.  Sorry, start that one --

 7            Do you know one way or the other whether

 8   the Maryland medical licensing board primary source

 9   verifies medical diplomas of foreign medical

10   graduates?

11        A.    Do the -- they don't -- they ask for a

12   certificate, so there's no statement.  No, they don't

13   primary source verify that.  That's up to ECFMG.

14        Q.    Well, I'm asking:  Do you know that for a

15   fact that they do not?

16        A.    I just read the application, and it says

17   that they want a copy of the certificate so --

18        Q.    Correct.  They want a copy of the

19   certificate.  They also want copy of the medical

20   diploma --

21        A.    Right.

22        Q.    -- and a certified translation, correct?

23        A.    Yes.  And they don't -- they do not say

24   that they're going to verify.  Do I know that they

25   turn around and verify that?  I don't know, but I'd
```

1  be surprised if they even thought about doing it

2  because that's what EC --

3       Q.   So you don't know?

4       A.   Well --

5            MR. HAYNES:  You're interrupting him,

6       counsel, several times.

7            THE WITNESS:  Yeah.

8            MR. HAYNES:  You're not letting him finish

9       his answers.

10           THE WITNESS:  The point I know is that

11      ECFMG is a Primary Source Verification entity,

12      so there's no need for anybody else to do it.

13      Q.   (By Ms. McEnroe)  Right.  But that's not

14  an answer to my question.

15      A.   All right.

16      Q.   So my question is:  Do you know one way or

17  the other whether Maryland primary source verifies

18  themselves foreign medical graduates diploma?

19      A.   Well, I'm led to believe they don't based

20  upon the application itself.

21      Q.   Do you know?

22      A.   Well, I'm led to believe.  Do I know?  I

23  don't know yes or no.  But I know what ECFMG should

24  do, and I know what the application I just read into

25  the record states.

1    Q.    Okay.  Going back to page 4 of your

2   report.

3    A.    Sure.  Which one now?

4    Q.    Paragraph 18.

5    A.    Okay.

6    Q.    It says, "Mr. Akoda ultimately entered

7   into a plea bargain agreement and pled guilty to

8   Social Security fraud on November 15, 2016."

9   Correct?

10   A.    Yes, ma'am.

11   Q.    Then the next paragraph 19 says, "In the

12  spring of 2017, Mr. Akoda's license to practice

13  medicine in Virginia and Maryland was revoked."  Did

14  you see that?

15   A.    I did.

16   Q.    Okay.  Do you have any sense of what ECFMG

17  did following Dr. Akoda's guilty plea?

18   A.    I would have to look at the packet if

19  ECFMG permanently revoked.  I'm thinking they did.

20  I -- I can't recall that.  If you give me a page,

21  I'll go to it.

22       (Exhibit 16 was marked for

23       identification.)

24   Q.    (By Ms. McEnroe)  Dr. Hyde, I'm handing

25  you what I've marked as Exhibit 16.

# Exhibit 7

**Jerry Williamson, M.D., F.A.A.P., M.J., CHC., LHRM**

**24 Falconwood Court Fort Myers, Florida 33919**

 **Expert  Report:** Jerry Williamson M.D. FAAP. MJ.CHC.LHRM

**September 22, 2019**

**Re: Monique Russell, Jasmine Riggins, Elsa Powell, Desire Evans v. Educational Commission for Foreign Medical Graduates**

The following report is supported by over 40 years of both formal education and experience as a physician and administrator. My formal education accomplishments include my degree as a Doctor of Medicine, my master's in healthcare jurisprudence, and certifications in healthcare compliance and risk management. I have practiced clinical medicine in my specialty, pediatrics, in which I am Board Certified.

I have held administrative positions as a  Chief Medical Officer, Medical Director, and Vice President for Medical Affairs in both the ambulatory and inpatient settings. In these positions I served on and chaired credentialing committees. Based on my experience in these roles, I became knowledgeable concerning the primary source credentialing process of the ECFMG, as it applies to the standard of care.   In 2005, as CMO and Director of the Biomedical Informatics Program, I directed the implementation of an EMR for an FQHC, assisting in the development of policies and procedures. During this period, I was Co-Medical Director of the Community Health Center Alliance Electronic Medical Record Clinical Committee. This committee assisted other organizations in their development and implementation of EMR's. I also served as a Meaningful Use Clinician Champion to The Center for the Advancement of Health Information Technology, a Regional Extension Center in Florida.

I have been a national speaker for the past 25 years, with a focus on patient safety, communication inadequacies in health care, and the prevention of medical errors. My roles have included Clinical Instructor in the Department of Pediatrics, University of South Florida College of Medicine, Clinical Assistant Professor in the Department of Pediatrics at NOVA Southeastern University, College of Osteopathic Medicine, Clinical Associate Professor of Physician Assistant Sciences, College of Allied Health, NOVA Southeastern University, Clinical Assistant Professor of Pediatrics, and Clinical Clerkship Training Coordinator at The Florida State University College of Medicine, and Clinical Assistant Professor at the Florida State University College of Medicine, Department of Clinical Sciences, Family Medicine Residency Program. In 2012, I was the Recipient of the *"Heroes in Healthcare Award"* for Administrative Excellence in Healthcare, from the Naples Daily News.

1

JA2733

I had the opportunity to review the following documents that were provided to me from the law firm Janet, Janet & Suggs:

- Kara Corrado, 09/10/2019 Deposition Transcript with Exhibits 1-9
- William C. Kelly 08/20/2019 Deposition Transcript with Exhibits 1-53
- Class Action Civil Complaint and Exhibits
- Stephen S. Seeling 09/06/2019 Deposition
- Timeline of Events
- 1996 Information Booklet ECGMG
- Answer to Class Action Civil Complaint and Affirmative Defenses
- Defendant's Objections and Responses to Plaintiffs' Requests for Admissions of Facts and Genuineness of Documents
- Defendant's Objections and Responses to Plaintiffs' Second Requests for Admissions of Genuineness of Documents
- USMLE Letter (02-05-18); ECFMG Credentials Committee Document (11-30-16); U.S. DOJ Plea Agreement with Attachment A-Stipulated Facts; ECFMG Irregularity Report (09-1992) and Sanctions Update (11-30-16); ECFMG Press Release re: Launching Electronic Verification of Medical Credentials
- ECFMG emails

**Summary of Facts:**

1. Credentialing of healthcare practitioners is a screening process verifying that a physician is who he/she claims to be, and qualified to practice his or her profession. The process ensures that physicians have the education, knowledge, and competence to provide quality patient care. This is accomplished by obtaining the physician's essential information using primary source verification, to determine the accuracy of a qualification or documents reported by a physician. If the process fails for whatever reason, patient safety and quality is compromised, and patient harm may result. Primary source can be accomplished via direct correspondence, telephone and computer verification, and reports from credentials verification organizations. Credentialing organizations must be aware of any red flags, and immediately investigate them to avoid serious consequences.

2. The Educational Commission for Foreign Medical Graduates (ECFMG) is an organization that credentials international medical graduates for residency opportunities in the United States providing they have met all the requirements. This includes verifying

2

JA2734

successful completion of medical school, and passing standardized examinations administered by the United States Medical Licensing Examination (USMLE), a Clinical skills  Assessment Examination, and an English Test to determine competency in English.

3. Utilizing primary source verification, ECFMG documents the authenticity of the applicant's diploma, the medical school transcript, and any letters of recommendation. Once this process is successfully completed, ECFMG will provide the applicant a certificate of completion. Once the applicant begins applying to residency programs , ECFMG acts as "the deans office" (See Deposition William Kelly) and provides the residency program with a status report.

4. In 1991, Olufafemi Charles Igberase came to the U.S. from Nigeria, and submitted an application to ECFMG for certification. Over the next several years he used false identities, false social security numbers, false birthdates, false diplomas, and a false passport to obtain ECFMG certification.

5. In 1996, a third application was submitted by Igberase to ECFMG under the alias of John Charles Akoda. His application was accepted, so in 1998 after receiving ECFMG Certification, he applied for a residency position at Jersey Shore Medical Center (JSMC) and was accepted under the name John Charles Akoda and began his residency in July 1998.

6. During an on-site meeting in September 2000 at ECFMG's office, Akoda admitted to William Kelly, Manager of the Medical Education Credential Department at ECFMG,  that he used Igberase's social security number. Approximately three months later, JSMC advised ECFMG that Akoda was dismissed from their residency program for using a false social security number and false green card.

7. In 2006 Igberase applied and secured a residency at Howard University Hospital under the Akoda alias, using a false social security number. He completed his residency at Howard Hospital in 2011, and he applied for a Maryland license using the name Charles John Nosa Akoda. The information provided to the Maryland Licensing Board included a fake social security number, and fake passport.

8. In 2011 he became a staff member at Prince George's Hospital Center and began patient care in November 2011 under this fraudulent identity. The following year he was denied enrollment in The Center for Medicare and Medicaid Services (CMS) due to submitting an inaccurate social security number. While using the Akoda name, he practiced obstetrics and gynecology from 2008 through 2016. This included a private practice setting as well as employment with Dimensions Healthcare Associates.

3

JA2735

9. In June 2016, law enforcement conducted a search at Igberase's residence, medical office, and vehicle. They found a variety of fraudulent and altered documents. In November 2016, he signed a plea agreement admitting to misuse of a social security number.

10. The following month ECFMG revoked Akoda's certification. In March 2017, he was sentenced by the U.S. District Court for the District of Maryland. This resulted in the termination of his staff privileges at Prince George's Hospital, and the revocation of his Maryland license based upon his felony conviction.

11. The current class action lawsuit is based on allegations that Igberase performed inappropriate physical examinations of a sexual nature on women, creating boundary violations.

12. The key question that must be resolved is whether ECFMG's actions or failure to act resulted in foreseeable injuries or damages to Class Members.

**Analysis of Facts and Opinion:**

1. ECFMG in its Subject Notice #101 dated March 1, 2017-Irregular Behavior Cases and Associated Actions & Sanctions states the following:
   *The educational Commission for Foreign Medical Graduates (ECFMG) of the United States works on behalf of domestic and International medical regulatory authorities to protect the public through its programs and services, including primary source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs, or services to be* **Irregular behavior.**

2. The 1996 ECFMG Certification and Application Information Booklet addresses the issue of Irregular Behavior. It states that: *Irregular behavior includes all actions on the part of applicants and/ or examinees, or by others when solicited by an applicant and/or examinee, that subvert or attempt to subvert the examination process.* It describes specific examples of irregular behavior and includes *falsifying information on application or registration forms;* This booklet is provided to all the applicants seeking ECFMG and USLME certification.

3. Accrediting organizations such as the Joint Commission has stated the following:
   *The Joint Commission, the organization that evaluates and accredits U.S. health care organizations and programs, has determined that direct verification with ECFMG of a physician's certification status satisfies The Joint Commission's requirement for primary-source verification of medical school completion for graduates of international medical schools. ECFMG's Certification Verification Service (CVS) provides this primary-source confirmation of an individual's ECFMG certification status to medical licensing*

4

JA2736

*authorities, residency programs, hospitals, or other organizations that, in the judgment
of ECFMG, have a legitimate interest in such information.*

4.  There are several regulatory organizations including the Maryland Board of Physicians
    and numerous hospitals including Howard University Hospital and Prince George's
    Hospital Center that rely and trust the judgements of the ECFMG. Therefore, in this
    case, ECFMG owed a duty to the residency programs and the state licensing agencies to
    comprehensively review an application for certification. When ECFMG learned that
    Igberase was using a false social security number, and he admitted to doing so, it was
    imperative that they act as a prudent credentialing organization and comprehensively
    investigate this physician's background. .

5.  ECFMG had a duty to determine whether the documents provided by Igberase and his
    aliases strongly suggested that Igberase and Akoda was one in the same individual.
    ECFMG breached that duty by failing to learn and appropriately act on that information.

6.  There were several opportunities for ECFMG to intercede, still they breached the
    standard of care in the following ways:

    a.  When Igberase had a face to face meeting at ECFMG in September 2000 and
        provided a false passport. ECFMG failed to authenticate the document.

    b.  ECFMG failed to act when they learned that he misused his social security number.

    c.  ECFMG neglected to compare the photographs in Igberase and Akoda's application.
        That would have confirmed they were the same person.

    d.  ECFMG requested confirmation to authenticate three alleged letters of reference
        provided by Akoda, and the parties never returned a response. Nonetheless, ECFMG
        provided primary source verification to Howard University Hospital.

    e.  ECFMG provided primary source verification to the Maryland Board of Physicians
        and Prince George's County Hospital without notifying them of their doubts
        surrounding Akoda's identity and credentials.

7.  The December 22, 2000 Memorandum for the file From William Kelly to Stephen Seeling
    J.D. is difficult to comprehend . It was created as a memorandum for the file since
    William Kelly believed it should not be part of the official file. The memorandum was
    based on his discussion with James McCorkel M.D., Vice President for Academic Affairs,
    at the Jersey Shore Medical Center Residency Program. Dr. McCorkel believed Igberase
    and Akoda were one an the same person. Mr. Kelly confirmed he believed this as well

5

but stated in the Memorandum that he does not believe there is enough information for the Credentials Committee. He goes on to say *I sent Igberase an email and who should reply, but Akoda!*

8. As stated previously, ECFMG has many organizations that rely on their information and trust they are receiving accurate information when making decisions based on the information they receive from ECFMG. Not including critical information in the official file, places these organizations at a disadvantage. Another example of ECFMG's failure to act in a reasonable and prudent manner.

9. By not being more assertive in their investigation in this matter, and not escalating their concerns to their Credentialing Committee, ECFMG certified Acoda and assisted him in his acceptance to the Howard University residency program. Additionally, this permitted him to obtain a Maryland License to practice medicine and obtain privileges at Prince George's Hospital. Unfortunately, ECFMG's failure to act in a reasonable and prudent way permitted Acoda to practice medicine and increase the risk of harm to the plaintiffs in this class action lawsuit, and perhaps others.

10. It was not until December 2016 when ECFMG revoked Akoda's certificate (0-482-700-2) based upon his plea agreement with United States, citing the same conduct Igberase had admitted to in 2000. ECFMG's failure to properly investigate the matter, directly resulted in foreseeable injuries to Igberase/Akoda's patients.

11. ECFMG had a duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. However, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety. Patients have a right to receive medical treatment from physician's who have obtained ECFMG certification legitimately, not through falsities and misrepresentations.

**Conclusion:**

There were several missed opportunities to address the many irregularities in the Igberase/Acoda applications. Unfortunately, these missed opportunities, permitted this unqualified individual with multiple fraudulent identities to practice medicine for years. ECFMG breached its duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. Additionally, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety.

6

**Disclaimer:**

My conclusions are based on the information that I was able to review, that was provided to date, and I reserve the right to change my opinions based on any additional information that I receive.

Respectfully,

Jerry Williamson M.D. FAAP,MJ,CHC, LHRM

# Exhibit 8

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4       _____

         MONIQUE RUSSELL, JASMINE )

 5       RIGGINS, ELSA M. POWELL, )

         and DESIRE EVANS,        )   CIVIL ACTION NO.

 6                                 )   18-5629

                  Plaintiffs,      )

 7                                 )

         vs.                       )

 8                                 )

         EDUCATIONAL COMMISSION    )

 9       FOR FOREIGN MEDICAL       )

         GRADUATES,                )

10                                 )

                  Defendant.       )

11       _____)

12

13          VIDEO DEPOSITION OF JERRY WILLIAMSON, M.D.

14          DATE TAKEN:     Friday, November 22, 2019

15          TIME TAKEN:     10:00 a.m.

16          PLACE TAKEN:    9501 Market Place Rd.

                            Fort Myers, FL

17

            ON BEHALF OF:   Defendant

18

            REPORTER:       Wanda Jackson,

19                          Court Reporter

20

21

22

23

24

25
```

```
 1    question before you respond.  If you do not let me know

 2    that you do not understand that question, I will assume

 3    that you do, is that fair?

 4         A.   Fair.

 5         Q.   If you ever want me to restate a question, just

 6    let me know and I am happy to do so.  Okay?

 7         A.   Okay.

 8         Q.   And as we discussed before we came on the

 9    record, if at any time you need to take a break, that is

10    just fine.  No problem at all.  Just let me know and we

11    will go off the record.  I do ask though, if there is a

12    question pending, unless there is an issue of privilege

13    that you need to discuss with counsel, that you answer

14    whatever question is pending before we take a break.  Do

15    you understand?

16         A.   I do.

17         Q.   Do you understand you are here today as an

18    expert witness on behalf of the Plaintiffs in the lawsuit

19    filed against the Educational Commission For Foreign

20    Medical Graduates?

21         A.   Yes.

22              MS. MCENROE:  I am going to hand you what I have

23    marked as Exhibit 1, which I am marking really for the

24    purposes of the record.

25              (Thereupon, Exhibit 1 was marked for
```

```
 1    identification.)

 2    BY MS. MCENROE:

 3         Q.   This is your notice of deposition for your

 4    deposition today.  Have you seen this before (indicating)?

 5         A.   Yes, I have.

 6         Q.   And are you appearing pursuant to this

 7    deposition notice?

 8         A.   Yes.

 9         Q.   Have you testified in any case as an expert

10    witness in the last four years?

11         A.   No.

12         Q.   When was the last time you served as an expert

13    witness?

14         A.   Many years ago.  I -- I can't give you a

15    specific -- probably about 12, 14 years ago,

16    approximately.

17              MR. THRONSON:  Counsel, I am sorry.  Do you mean

18    testified or just retained?

19              MS. MCENROE:  Testified.

20              MR. THRONSON:  Okay.  Okay.

21         A.   12, maybe 14 years ago.

22    BY MS. MCENROE:

23         Q.   Great.  And do you remember the subject matter

24    of that case?

25         A.   It was clinical.  It was pediatrics, but I don't
```

JA2743

1    recall the specifics of it, no.

2        Q.    And did you testify at a trial or at a

3    deposition in that case?

4        A.    Both.

5        Q.    And then I presume that the other two or three

6    times that you served as an expert was prior to that?

7        A.    Correct.

8        Q.    And for those, did you testify just at a

9    deposition or also at a trial, do you recall?

10       A.    I don't recall.

11       Q.    Do you recall generally the subject matter of

12   those other testimonies?

13       A.    They were all clinical.

14       Q.    And when you say clinical, do you mean medically

15   clinical?

16       A.    Correct.

17       Q.    Did any involve the Educational Commission For

18   Foreign Medical Graduates?

19       A.    No.

20       Q.    Did any, to your recall, involve foreign medical

21   graduates or international medical graduates?

22       A.    I don't recall.

23       Q.    In terms of cases in which you served as an

24   expert and provided an expert report but did not testify,

25   do you recall when you most recently did that prior to

Jerry Williamson, M.D.

```
 1   this case?

 2       A.   That would have been -- well, there were -- I am

 3   trying to remember the case now.  That would have been

 4   a -- yes.  It would have been a fair hearing case where I

 5   provided an expert report.

 6       Q.   When was that?

 7       A.   Within the last year, perhaps a year and a half.

 8       Q.   When you say a fair hearing case, what do you

 9   mean?

10       A.   A fair hearing at a hospital for a physician.

11       Q.   And just very briefly, what kind of

12   circumstances is it that a physician has a fair hearing

13   case?

14       A.   Yeah.  The circumstances were a physician who

15   was dismissed from -- from the hospital for reasons that

16   we are not in agreement with.

17       Q.   And are you on the side of the doctor or on the

18   side of the hospital?

19       A.   Physician, yes.

20       Q.   Prior to that, do you recall when you last

21   served as an expert?

22       A.   That was also a fair hearing case that is

23   pending and very, very similar circumstances in a

24   different city and state.

25       Q.   Are you on the side of the physician or the
```

Jerry Williamson, M.D.

```
 1   hospital?

 2        A.   The physician.

 3        Q.   And prior to that?

 4        A.   Well, there was another fair hearing case.

 5        Q.   I am getting a sense of a pattern here.  Go

 6   ahead.

 7        A.   And this was a physician in a very similar type

 8   of situation.  And I was -- provided an expert report for

 9   the physician.

10        Q.   And prior to that?

11        A.   It was a credentialing case -- now, these are

12   all within the past four years.  I may not be giving them

13   to you in any particular order.

14        Q.   Okay.

15        A.   But they are all within the past four years.

16        Q.   I appreciate that.

17        A.   It was a negligent credentialing case where I

18   provided a report for the Plaintiff.

19        Q.   When you say negligent credentialing, of whom?

20        A.   Negligent credentialing of a hospital.

21        Q.   By a hospital but of whom?

22        A.   When you say of whom, I am not sure I understand

23   the question.

24        Q.   Who was the hospital negligent in credentialing?

25        A.   Was negligent in credentialing one of their
```

Jerry Williamson, M.D.

```
 1   nurses.

 2        Q.   A nurse?

 3        A.   Yes.

 4        Q.   And is that the Cane versus Memorial Hermann

 5   Health Systems case?

 6        A.   Is that Texas?

 7        Q.   That is from -- yes, the District Court of

 8   Texas, the 55th Judicial District.

 9        A.   Correct.  That is correct.

10        Q.   Separate from the Cane case, have you ever

11   testified or -- strike that.  I will start over.

12             Besides this case and the Cane case have

13   you ever previously served as an expert in any case

14   regarding credentialing?

15        A.   The case -- there was one other case that

16   actually the -- the fair hearing case involved peer review

17   and credentialing as well.

18        Q.   Each of the fair hearing cases or one in

19   particular?

20        A.   No.  One -- well, actually two in particular.

21   Let me think now.  Yes, two in particular, two of the

22   three.

23        Q.   And when you say that those two fair hearing

24   cases involved credentialing, credentialing of the

25   physicians but by whom?
```

Jerry Williamson, M.D.

```
 1        A.    Credentialing of the physicians by the hospital.

 2        Q.    And I have learned from various depositions in

 3   this case, there is a difference between credentialing and

 4   privileging?

 5        A.    Correct.  Correct.  Yes.

 6        Q.    Okay.  And so were the fair hearings -- they

 7   were specifically about credentialing as opposed to

 8   privileging or were they a combination sometimes?

 9        A.    Well, pretty much a combination.

10        Q.    Okay.  Are you drawing a distinction when you

11   say credentialing to exclude privileging or could it be

12   inclusive?

13        A.    It depends on who I am speaking with.

14        Q.    Okay.  Well, now, in describing your expert

15   experience, I just want to get an understanding if you are

16   using the term credentialing, could you also mean that to

17   be privileging as well?

18        A.    Well, they are very distinct.  They are

19   distinct.

20        Q.    In the cases in which you testified regarding

21   the credentialing of the physicians in the fair hearing

22   setting, and I think you said that there were two of them,

23   did both of those involve privileging as well?

24        A.    Correct.

25        Q.    Which specialities, if you don't mind?
```

JA2748

Jerry Williamson, M.D.

1      A.    Sure.   The -- one is OB-GYN.   One is I believe

2   vascular surgery.

3      Q.    Were you providing expert testimony regarding

4   their specialties, the OB-GYN or the vascular surgery, in

5   either of those cases?

6      A.    No.   I was there basically providing information

7   regarding hospital bylaws and credentialing processes as

8   they relate to the two physicians involved.

9      Q.    Has any of your expert experience ever concerned

10  the Educational Commission For Foreign Medical Graduates

11  aside from the case we are here for today?

12     A.    No.

13     Q.    Do you recall if any of your previous expert

14  experience ever involved foreign medical graduates aside

15  from the case that we are here for today?

16     A.    I don't recall.

17     Q.    Do you recall the outcome in the Cane matter in

18  Texas?

19     A.    Yes.   The Cane matter in Texas -- actually,

20  there was a mediation this week.

21     Q.    Oh, okay.

22     A.    And I have not received the results of that.

23     Q.    Okay.

24     A.    But it was being mediated this week.

25     Q.    Can you give a very, brief high-level summary of

1  what the subject matter of that case is about?

2      A.    Sure.  The subject matter is a nurse who

3  sexually abused a patient in the hospital by anesthetizing

4  the patient with a paralytic medication and then sexually

5  abused the patient.  And the credentialing was inadequate

6  on this particular individual.  This individual had a

7  history of doing this previously or something similar to

8  that.

9      Q.    In your experience do you expect that a hospital

10  has a certain level of rigor or a certain set of steps

11  they go through when they are hiring a nurse?

12      A.    Yes.

13      Q.    Do you expect that those steps are more rigorous

14  or less rigorous than when a hospital is hiring a

15  physician?

16      A.    They are different.

17      Q.    In what way?

18      A.    They are different in terms of the -- the

19  educational backgrounds are different.  The training is

20  different and in many cases experience as well.

21      Q.    Would you expect a hospital to be more rigorous

22  in its screening of a nurse than it would be of a

23  physician?

24      A.    I think they are at risk with both.

25      Q.    Dr. Williamson, do you know if there has ever

Case 2:22-cv-01995-DWL Document 22-5 Filed 12/19/22 Page 861 of 3041
Case 2:18-cv-05629-DWL Document 5 Filed 09/08/20 Page 15

1    been a motion to exclude or preclude your testimony in a

2    lawsuit for which you have served as an expert witness?

3        A.    No.

4        Q.    Aside from this case and the two fair hearing

5    cases that you mentioned earlier that involved

6    credentialing, do you recall having served as an expert in

7    any other matter at any time regarding credentialing or

8    privileging?

9        A.    I don't recall.

10       Q.    Have you ever served as an expert in a matter

11   where you gave testimony or opinions regarding the

12   licensing of a physician by a licensing board?

13       A.    No.

14       Q.    Have you ever given testimony or opinions in a

15   matter in which you served as an expert where there was an

16   issue of a physician becoming board certified by a

17   specialty board?

18       A.    No.

19       Q.    Have you ever served as an expert witness giving

20   testimony or opinion regarding a residency program having

21   decided or decided not to hire a resident candidate?

22       A.    No.

23            MS. MCENROE:  Dr. Williamson, I am handing you

24   what I have marked as Exhibit 2.

25            (Thereupon, Exhibit 2 was marked for

JA2751

1    identification.)

2    BY MS. MCENROE:

3        Q.   I presume this may look familiar.  Do you know

4    what this is?

5        A.   It appears to be my CV.

6        Q.   Yes.  Is this the CV that you provided in this

7    case?  Does this look like it is?

8        A.   I don't recall because I am looking at the

9    update on it.  And I believe there may be a more recent

10   update.

11       Q.   Okay.  So what leads you to believe that there

12   may be a more recent update?

13       A.   Well, I am just looking at the date and it says

14   June 17th.  I believe that I have -- I have one here.

15       Q.   Oh, do you have one with you?

16       A.   Yes, I do.

17       Q.   May I be able to see it, please?

18       A.   Yes.  May I get it?

19       Q.   Please.

20       A.   Sure.  August 2019.

21       Q.   Great.  Can I see it?

22       A.   Sure.

23       Q.   Wonderful.

24            MS. MCENROE:  And I am going to mark this as an

25   exhibit, if that is all right, and we will have it in the

1    a copy of that, but just Exhibit 3 would be great.

2         A.    (Witness complies).

3         Q.    Thank you.  And I see that the Morgan and Morgan

4    Law Blog from 2015 is entitled Doctors Without Conscience?

5         A.    Correct.

6         Q.    What was that about?

7         A.    I don't recall the specifics of that.

8         Q.    Okay.  Did that have anything to do with

9    physician credentialing?

10        A.    I don't believe so, but I can't say for sure.

11        Q.    And what about the Community Health Centers

12   Alliance publication or blog entitled The Devil Is In The

13   Details:  Resolve to Take a Second Look at Three

14   Meaningful Use Objectives?

15        A.    Yes.

16        Q.    Do you recall what that is about?

17        A.    Yes.  It was about the federal government's

18   Meaningful Use Program relating to electronic health

19   records.  And -- and I am getting caught up here.

20        Q.    Do you want to take a second?

21        A.    About the electronic health records and how they

22   have -- how this Meaningful Use Program has become a

23   significant burden on physicians.

24        Q.    In carrying out their duties?

25        A.    In carrying out their duties, correct, yes.

JA2753

1    Q.  I will give you back Exhibit 3.  Just hold onto

2  that for a second.  So do you have any professional

3  qualifications or certifications that are not listed here?

4  So, for example, a Ph.D. in something or something that

5  you deemed not relevant for these purposes but is a degree

6  that you hold?

7    A.  A degree, no.

8    Q.  Any other qualifications or certificates that

9  you hold that are not listed here other than like a

10  driver's license?

11    A.  No.

12    Q.  Okay.

13    A.  I don't believe -- I don't believe so.

14    Q.  And I see that in your graduate school section

15  you list Loyola University Chicago School Of Law?

16    A.  Yes.

17    Q.  Beazley Institute for Health Law and Policy that

18  you got a master's in health jurisprudence --

19    A.  Correct.

20    Q.  -- in 2010?

21    A.  Yes.

22    Q.  That is not a JD degree, correct?

23    A.  Correct.  It is an MJ.

24    Q.  And you are not a lawyer, correct?

25    A.  Correct.

1   Q.   Have you taken or sat for the bar exam in any

2   state?

3   A.   I have not.

4   Q.   And similarly in your appointments, I see that

5   you have had some interactions with legal institutions,

6   for example, being an adjunct professor of law at Loyola

7   University Chicago School of Law, correct?

8   A.   Correct.

9   Q.   Were you serving in a lawyerly capacity there,

10  if you will, or -- strike that.  I can restate it.

11           So what was the subject of your studies

12  that you did there?

13  A.   Risk -- subject of my studies or what I am

14  teaching?

15  Q.   Both.

16  A.   Okay.  The subject of my studies were pretty

17  much across the board in terms of risk management

18  compliance, regulatory issues.  It was a rather complete

19  program that ultimately ended up in a thesis.

20  Q.   And what was your thesis on there?

21  A.   My thesis was on -- let me think for a moment.

22  It was -- goodness.  It is a subject that I am actually

23  lecturing on now, and for some reason it has just

24  disappeared.

25  Q.   Sure.

Jerry Williamson, M.D.

```
1        A.   Let me think for a moment.

2        Q.   Does it relate to health and the law?

3        A.   Pardon me?

4        Q.   Does it relate to health and the law?

5        A.   Yes, it does.  It is specific to -- I have it

6   now.  Thank you.  Apology and disclosure.

7        Q.   And what do you mean by apology and disclosure?

8        A.   How physicians present themselves following a

9   medical mistake and what are some of the state law

10  requirements and what are their obligations ethically as

11  well.

12       Q.   When you say present themself, present themself

13  to who?

14       A.   To the patients and/or the family following a

15  medical mistake.  And basically it involves transparency.

16       Q.   So that is the subject both of your thesis and

17  also of the course that you have taught?

18       A.   That is a part of the subject matter in the

19  course, but that was my thesis, yes.

20       Q.   What is more broadly the subject matter of the

21  course you have taught?

22       A.   That I am currently teaching?

23       Q.   Correct.

24       A.   Risk management.

25       Q.   Have you taught any other courses at Chicago
```

JA2756

Jerry Williamson, M.D.

1    School of Law?

2         A.   We have had programs that are live programs

3    where I have presented similar types of programs in

4    conjunction with others, but they vary.  But it was a

5    single presentation.  It was not a course.

6         Q.   Sure.  Like a single lecture type of experience?

7         A.   Exactly.  Yes.

8         Q.   Have you ever taught a course called Torts?

9         A.   Called what?

10        Q.   Torts, Legal Torts?

11        A.   Torts.  No.  I have attended a course on torts

12   but, no, I have not taught it.

13        Q.   Okay.  So you are here serving as an expert, and

14   we have spoken a bit about your experience serving as an

15   expert.  I know you are also a medical doctor.  What would

16   you say your typical day job is?

17        A.   It varies.  Typically I am working with cases

18   like this.  I am teaching.  And I lecture around the

19   country in a variety of areas.  And I do consulting work

20   to assist physicians in developing compliance programs.

21        Q.   Are you currently credentialed at any medical

22   facility?  Are you on staff anywhere if I am not using the

23   right terminology?

24        A.   No.  I am not on staff, no.

25        Q.   Okay.  When were you last affiliated to be on

JA2757

Case 2:22-cv-00562-JDC Document 22-5 Filed 08/08/22 Page 868 of 3041 PageID #: 14090

```
 1    staff with a medical facility?

 2         A.   Oh, dear.  That would have been -- probably

 3    would have been Mease Hospital, and that would have been a

 4    number of years ago.  It is M-E-A-S-E.

 5         Q.   And you have also spent time working in hospital

 6    administration, is that correct?

 7         A.   I have.

 8         Q.   Okay.  Do you currently work in hospital

 9    administration for any medical center or hospital?

10         A.   Only as a consultant when asked, yes.

11         Q.   When did you last work more formally, not in

12    just a consulting role, in hospital administration?

13         A.   More formally would have been at Cape Coral

14    Hospital where I was the vice president for medical

15    affairs.

16         Q.   And when did you do that until?

17         A.   I would probably have to look at my CV.

18         Q.   Go ahead -- go ahead and take a look.  I am not

19    trying to do a pop quiz.

20         A.   I understand.  I would say on or about 1993,

21    '94, somewhere in that.

22         Q.   I see on the second page at the very top you

23    have Cape Coral Hospital until '94?

24         A.   Yes.

25         Q.   Is that right?
```

JA2758

Case 2:18-cv-01565-JDW Document 22-5 Filed 08/08/22 Page 869 of 1041 PageID 08/08/22

```
 1        A.    Yes.

 2        Q.    And I know you testified earlier about serving

 3   as an expert in fair -- physician fair hearings?

 4        A.    Yes.

 5        Q.    Did you also ever serve professionally in your

 6   role as a hospital administrator in physician fair

 7   hearings?

 8        A.    As vice president of medical affairs I have.

 9        Q.    When you served as the vice president for

10   medical affairs for Cape Coral Hospital, did you also play

11   any role in the hiring or credentialing or privileging of

12   physicians?

13        A.    Most definitely.

14        Q.    And in other roles prior to that, did you do

15   that as well?

16        A.    I did.

17        Q.    Did you ever play a role in the hiring or

18   evaluation of resident applicants?

19        A.    I may have in the past, but I don't recall

20   exactly when.

21        Q.    Okay.  Have you ever been in a role throughout

22   your career where you oversaw directly or indirectly the

23   work of residents?

24        A.    Well, I currently am on the faculty at Florida

25   State University, and I work in their residency program
```

JA2759

```
 1   locally here in Fort Myers.  So I wouldn't call it an

 2   oversight, but it is more of a -- I provide lectures to

 3   the residents.

 4        Q.   Do you have any say or responsibility in the

 5   hiring or recruiting of any of the residents from Florida

 6   State University?

 7        A.   No.

 8        Q.   And is that any particular specialty you are on

 9   the faculty for at Florida State University?

10        A.   Family practice.

11        Q.   Family practice.  Do you still treat patients,

12   Dr. Williamson?

13        A.   No.

14        Q.   Okay.  When did you stop treating patients?

15        A.   Oh, it's been approximately 10 years ago,

16   perhaps longer.  I can't say for sure.

17        Q.   Why?

18        A.   Why did I stop?

19        Q.   Yeah.

20        A.   I wanted to spend more time doing administrative

21   work.

22        Q.   In the course of your career, including when you

23   treated patients and since, have you ever to your

24   knowledge come across anybody who was also a patient of

25   Dr. Akoda?
```

Jerry Williamson, M.D.

```
1        A.    Of Dr. --

2        Q.    Akoda.

3        A.    No.

4        Q.    When I say Dr. Akoda, I am going to use that as

5    shorthand for the individual at issue in the litigation

6    here.  I know he has gone by a number of names.  And if I

7    need to make a distinction between the identities he's

8    used, I will try and make that clear.  But you understand

9    who I am talking about if I refer to Dr. Akoda?

10       A.    Yes, I do.

11       Q.    We talked just briefly earlier that you have

12   played some role in the hiring or credentialing or

13   privileging of physicians throughout your career.  I am

14   trying to get an understanding of what is involved in a

15   medical center or a hospital deciding to become affiliated

16   with a physician.

17              I understand using the word employed is

18   a little bit loaded in the physician sense.  A lot of

19   physicians are not directly employed, so I am not trying

20   to overstate it, but just trying to understand what that

21   process is typically like.

22       A.    Well, it is not a one size fits all.  It depends

23   on who you are representing, whether it is a hospital in a

24   patient setting, whether it is a FQHC, a federally

25   qualified health center, where I was medical director.
```

JA2761

1   Whether it is a health maintenance organization where I

2   was co-medical director and then medical director.  So it

3   varies depending upon whether it is an inpatient or

4   outpatient.  But I would say it is a very cumbersome and

5   very thorough process that requires significant attention

6   to the details.

7        Q.   What kind of details?

8        A.   The details in terms of the -- again, if we are

9   talking about residents or we are speaking to physicians

10  that have been employed previously that you are looking to

11  hire.  So it depends on what those details would be.

12       Q.   Sure.  So like a fresh hire of a brand-new

13  physician versus someone who maybe has had a career

14  elsewhere before, you are saying those are different

15  inquiries?

16       A.   Correct.

17       Q.   So let's talk about somebody coming more

18  directly through the education system out of a residency

19  program. What types of things in your experience would a

20  health care center or a hospital look at in trying to

21  decide whether or not they want to hire that individual?

22       A.   There is a list of items, and I am not sure that

23  I can give you the full list.

24       Q.   Sure.

25       A.   But we are certainly looking at the individual's

1    education as far as where they attended school.  And we

2    are certainly interested in finding out a little bit more

3    about the residency program that they attended as well.

4    We are interested in looking at whether there were any

5    national practitioner data bank issues involved, want to

6    know a little bit about their background.  We would do a

7    background check, looking at things like driver's license

8    and such.  Certainly we would consider looking at doing

9    things like drug testing to make certain that they were

10   clear.  And I am probably leaving some things out as well

11   I am sure.

12        Q.   Sure.

13        A.   But -- and it depends on -- on again whether it

14   is an inpatient or outpatient facility.  But again, it is

15   not a one size fits all, but it needs to be comprehensive

16   if one is going to not -- not have any potential

17   consequences as a result of the hire.  Additionally, I

18   would want to -- I always look at at least three

19   references, letters of reference.

20        Q.   When you say look at references, what do you

21   mean?

22        A.   Well, normally everything that we do is primary

23   source.  Everything I have done in the past in my career

24   has been primary source verification.  So when I say look

25   at the letters, receive the letters from the individuals

1    that were actually -- the ones that signed the letter and

2    wrote the letter.

3         Q.   So you are saying that you would directly

4    receive the letters of recommendation from the

5    recommenders themselves?

6         A.   Correct.  Either that -- and it is helpful when

7    we get those letters because it tells you a fair amount

8    about the individual, so that is helpful.  If in fact

9    there is something in the letter that is of concern to

10   me -- well, for the most part I was rather aggressive and

11   contacted all letters that I received.  And the reason for

12   that is because there's times where things are not placed

13   in a letter that is communicated best by telephone.

14        Q.   Sure.  There might be things that are more

15   unsaid than said?

16        A.   Nuances.

17        Q.   I understand.  Would you expect that there would

18   typically be an interview or in-person component?

19        A.   I have never hired an individual without an

20   interview.

21        Q.   Okay.  If the candidate were to have been

22   foreign educated, so educated outside the United States,

23   have you had experience with hiring foreign medical

24   graduates as well?

25        A.   Most certainly.

JA2764

```
1        A.    Well, I think in part the FQHC, their mission
2   quite often aligns with the mission of foreign medical
3   graduates.  And it is more difficult for them to find work
4   outside of the FQHC environment.
5        Q.    Why do you think that is?
6        A.    Oh, I am sure there are reasons.  I don't know.
7        Q.    When evaluating foreign medical graduate
8   candidates as opposed to US-educated candidates in the
9   processes that you have described, aside from the medical
10  schools being in different places, how does that process
11  vary between a foreign medical graduate versus a US
12  medical graduate?
13       A.    To my recollection, it did not vary that much
14  because we were rather -- again, under my guidance we were
15  rather stringent in terms of making certain that we turned
16  over every stone.
17       Q.    For foreign medical graduates as well as
18  domestic?
19       A.    For all -- for all applicants in those
20  facilities.
21       Q.    So would you, for example, run background checks
22  on the foreign medical graduate candidates that came
23  through?
24       A.    Yes.
25       Q.    Would that involve verifying social security
```

1    numbers?

2         A.   Yes.

3         Q.   And you mentioned having interacted with ECFMG

4    during some of those processes?

5         A.   Correct.

6         Q.   What information did you recall receiving from

7    ECFMG during those processes?

8         A.   There were -- I don't recall them all, but they

9    were very helpful, because what ECFMG provided to us, we

10   relied upon and did not in fact need to duplicate our

11   efforts.  So that was -- and there were -- in essence for

12   us a ECFMG certificate meant a lot.

13        Q.   Do you recall what information was communicated

14   through the ECFMG certificate?

15        A.   I don't.  Not -- I mean, I know that they

16   provided for us the medical education and letters of

17   reference and such, but I don't recall each -- each item.

18   I don't.

19        Q.   I know I asked earlier about whether you have

20   come across Dr. Akoda's patients in your career.  Have you

21   ever come across Dr. Akoda directly himself?

22        A.   No.

23        Q.   Given that you have never met Dr. Akoda directly

24   yourself, from where did you get the information regarding

25   Dr. Akoda and his background for the purposes of serving

Jerry Williamson, M.D.

1   as an expert in this case?

2       A.    I think it was provided to me by my attorney.

3       Q.    Did you get any information regarding Dr. Akoda

4   from outside research you conducted independently?

5       A.    The only thing that I received was the -- I

6   believe it was the Department of Justice, their charges

7   and their decision in terms of -- I am trying to think.

8   That came through the American Board of Obstetrics and

9   Gynecology.  So that is my recollection on that, yes.

10      Q.    Did you, like, sit down and google Dr. Akoda and

11  read news articles about him or anything of the like?

12      A.    No.  That was the only news article that I saw

13  was through the American Board of Obstetrics and

14  Gynecology.  All of the other information was rather

15  comprehensive and complete in terms of what I received and

16  the documents that I received.

17      Q.    Did you interact with or read posts by any of

18  the Plaintiffs in this case on social media?

19      A.    Could you repeat that question?

20      Q.    Yeah.  Have you interacted with any of the

21  Plaintiffs in this case through social media?

22      A.    I -- I don't participate in social media at all.

23      Q.    You haven't read Facebook posts, for example?

24      A.    No.

25      Q.    Have you ever interacted with any of the

JA2767

Jerry Williamson, M.D.

```
 1        A.   I do not.

 2        Q.   Do you expect that they should have?

 3        A.   I don't know the inner workings of the American

 4   Board of Internal Medicine, so I can't really say.

 5        Q.   Do you think that they would have or should have

 6   notified any other parties, hospital systems, boards of

 7   medicine?

 8        A.   Again, I don't know what their P&Ps are, their

 9   policies and procedures are.  It is out of my area of

10   expertise.

11        Q.   Okay.  Are ECFMG's policies and procedures

12   within your area of expertise?

13        A.   I would say yes.

14        Q.   So how do you know more about ECFMG's policies

15   and procedures than you know about the American Board of

16   Internal Medicine's policies and procedures?

17        A.   I have had a fair amount of experience working

18   with ECFMG over the years as I mentioned previously.  So

19   that is the reason why the American Board of Internal

20   Medicine -- as a pediatrician, I have had, you know,

21   limited exposure to them.

22        Q.   Okay.  The next folder here is entitled

23   Plaintiffs' Timeline.

24             MS. MCENROE:  It is a document that we will mark

25   for purposes of the record, and I actually think I have
```

JA2768

```
1   another copy here.  I might mark -- I am actually going

2   to mark this version with the highlighting on it as

3   Exhibit 11.

4            (Thereupon, Exhibit 11 was marked for

5   identification.)

6   BY MS. MCENROE:

7        Q.   So marking as Exhibit 11 the document from this

8   folder, and it includes a sticky note on the front page

9   there.  Could you read the sticky note into the record,

10  please?

11       A.   Sure.  Timeline by Plaintiffs' counsel not

12  exclusively relied on.  See enforcement timeline and

13  others in expert reports.

14       Q.   What does that mean?

15       A.   Well, that means that when I looked at this, I

16  had one document of the timeline.  But then I had other

17  documents of the timeline as well, specifically the

18  timeline that the Department of Justice had used in

19  developing their case.  And multiple timelines in terms of

20  the expert reports, not mine but the expert reports from

21  other experts.  So I pretty much had multiple timelines.

22  And I would say that for the most part the timelines --

23  the multiple timelines were pretty much consistent.

24       Q.   So the multiple timelines you had from the other

25  expert reports, did you have those timelines prior to the
```

1    issuance of your expert report?

2         A.    I am trying to remember which expert reports I

3    had prior to my expert report -- before developing my

4    expert report.  Again, I would have to look at that.

5         Q.    Go ahead and look at Exhibit 9.

6         A.    Okay.  Exhibit 9?

7         Q.    I believe 9 is your expert report.

8         A.    Yes.  I don't see it on there.

9         Q.    Okay.  So those were expert report timelines

10   that you would have had of the course of events after you

11   issued your expert report, correct?

12        A.    Yes.

13        Q.    Okay.  And so at the time of issuing your expert

14   report though, did you -- you had this timeline from

15   Plaintiffs' counsel, correct?

16        A.    Correct.

17        Q.    And that is what is reflected in your Materials

18   Considered list on page 2 of your report which is Exhibit

19   9 that says Timeline of Events, is that correct?

20        A.    Correct.

21        Q.    The next document here is in a folder entitled

22   ECFMG Rebuttals, is that correct?

23        A.    Uh-huh.

24        Q.    Is that yes?

25        A.    Yes.

```
1        Q.   And then it has a number of expert reports, one
2   for Dr. Beck, one for Dr. Finichel, another for Dr. Smith,
3   an expert disclosure for rebuttal testimony by Kara
4   Corrado and an expert rebuttal report by Dr. McDonald.
5   Did you review all of these rebuttal reports?
6        A.   I did.
7        Q.   And presumably since they were issued after your
8   report came out, they were after you prepared your expert
9   report?
10       A.   May I look?  I don't recall off the top of my
11  head.
12       Q.   Sure.
13       A.   Correct.
14       Q.   The next folder here is entitled ABOG/AKODA.
15  And it is a series of documents from the ABOG which has
16  Bates numbers ABOG_nonparty_1 through 82.  Are these
17  documents that you reviewed?
18       A.   Yes.
19       Q.   There's some highlighting and some flags and
20  whatnot in here, is that demarcation, is that yours?
21       A.   Yes.
22       Q.   And do you know what the ABOG is?
23       A.   What it is?
24       Q.   Yes.
25       A.   American Board of Obstetrics and Gynecology,
```

1    yes.

2         Q.   And the last folder is entitled Corrado Depo and

3    Exhibits.  And inside has a copy of Ms. Corrado's

4    deposition transcript with some highlighting and some

5    notes, is this yours?

6         A.   Yes, it is.

7              MS. MCENROE:  And there's some handwritten notes

8    appended to the back here that I think we will mark as an

9    exhibit as well.

10             (Thereupon, Exhibit 12 was marked for

11   identification.)

12   BY MS. MCENROE:

13        Q.   Is this your handwriting?

14        A.   Yes, it is.

15        Q.   And this is notes from your review of the

16   deposition of Ms. Corrado, is that correct?

17        A.   Correct.

18        Q.   And you prepared these notes yourself?

19        A.   I did.

20        Q.   I will add that to the pile of exhibits.  And

21   otherwise this includes a copy of Ms. Corrado's deposition

22   and her exhibits with some highlighting and other notes.

23   And all that highlighting and any notation, that is yours,

24   is that correct?

25        A.   That is correct.

1    Q.   So that's the sum total of the materials that

2    you indicated that you brought with you today.  Did you

3    bring anything else with you today?

4    A.   No.

5    Q.   And did you review anything else either before

6    the issuance of your report or after the issuance of your

7    report that we have not discussed today or was not listed

8    in the documents, either your expert report or the

9    addendum?

10   A.   Not to my recollection, no.

11   Q.   Okay.  A little bit earlier, I asked if you are

12   an expert on the policies and procedures of the American

13   Board of Internal Medicine and you said no.  And then I

14   asked if you were an expert about the policies and

15   policies of ECFMG and you indicated you had more

16   experience with ECFMG's policies and procedures, is that

17   correct?

18   A.   Correct.

19   Q.   Okay.  You have -- you went to medical school in

20   the United States, correct?

21   A.   Correct.

22   Q.   So you were never an applicant to ECFMG, is that

23   true?

24   A.   Correct.

25   Q.   Have you ever been an employee of ECFMG?

JA2773

Jerry Williamson, M.D.

```
 1        A.    Have not.

 2        Q.    Have you ever been on the Board of Trustees of

 3   ECFMG?

 4        A.    Was not.

 5        Q.    Have you ever been on the Medical Education

 6   Credentials Committee for ECFMG?

 7        A.    No.

 8        Q.    Do you know anyone on the Medical Education

 9   Credentials Committee for ECFMG?

10        A.    Do not.

11        Q.    Do you know of anyone in the past who has been

12   on the Medical Education Credentials Committee that you

13   know of?

14        A.    Not that I know of.

15        Q.    Okay.  And through your work -- through your

16   career, you made reference to having been a recipient of

17   reports and information from ECFMG over time, is that

18   correct?

19        A.    Correct.

20        Q.    Through those experiences, have you ever had a

21   situation where you were involved in any way in an

22   allegation of irregular behavior by the ECFMG?

23        A.    Not to my recollection, no.

24        Q.    Do you have any experience with or knowledge of

25   the policies and procedures of the USMLE?
```

JA2774

1      A.   Could you repeat that question?

2      Q.   Yeah.  Do you have any experience with the

3  policies and procedures of the USMLE?

4      A.   When you say the policies and procedures, I

5  understand the USMLE and what they do and their

6  examination process.  In terms of policies and procedures,

7  I would say very superficially.

8      Q.   Would you consider yourself an expert in USMLE

9  policies and procedures?

10      A.   No.  I would not.

11      Q.   So how is it that you have more experience with

12  ECFMG's policies and procedures than you have with USMLE's

13  policies and procedures?

14      A.   Again, more time.  And my career, in working

15  with foreign medical graduates I have spent more time

16  connecting with ECFMG and their -- and their work.  So

17  that is the only reason for that.

18      Q.   But both -- go ahead.

19      A.   The USMLE has been really more a question of

20  what their examination protocol is, and that is pretty

21  much it.

22      Q.   You understand that both foreign and domestic

23  medical graduates proceed through USMLE, is that correct?

24      A.   Correct.

25      Q.   Okay.  Do you believe that ECFMG credentials for

JA2775

Jerry Williamson, M.D.

1    they want to do in addition to that is entirely dependent

2    upon them.

3         Q.   Okay.  But you are not trying to say that the

4    facilities specifically rely on ECFMG to do all of the

5    things you just listed as, you know, for example, tox

6    screen, that sort of thing?

7              MR. THRONSON:  Object to the form.

8         A.   Correct.  The facility is relying upon ECFMG to

9    take them to the next level.

10   BY MS. MCENROE:

11        Q.   And when you say that, what do you mean?

12        A.   Well, what I mean is that -- again, as I said

13   earlier, depending upon the facility and what their

14   policies and procedures are, there may be things that

15   ECFMG is not doing that they have in their policies and

16   procedures that they will pursue as well and may also be

17   state dependant.

18        Q.   Do you have any understanding of the limitations

19   on what ECFMG does indicate through its certification?

20        A.   To a certain extent, yes.

21        Q.   And what do you understand that ECFMG certifies

22   when it issues an ECFMG certificate?

23        A.   Currently or in what timeline?

24        Q.   I will say relevant for Dr. Akoda's

25   circumstances.

JA2776

 1      A.   Okay.  Well, certainly they need to verify the

 2   individual's medical education.

 3      Q.   What do you mean by that?

 4      A.   Whether or not they attended a medical school in

 5   wherever in fact they were -- whatever country it might

 6   be.

 7      Q.   Yep.

 8      A.   And completed it successfully and

 9   satisfactorily.

10      Q.   Okay.  What else?

11      A.   They -- ECFMG does receive letters of reference,

12   letters of recommendation.

13      Q.   Yep.

14      A.   And that is something else that they -- they

15   verify as well, that they are accurate letters, that the

16   letters came from the people they say they came from.

17      Q.   And on what basis do you believe ECFMG held

18   itself out as verifying letters of recommendation?

19      A.   I believe -- I know I read it somewhere, and I

20   believe that they were doing that back when I was working

21   with ECFMG.  That in fact we -- when they verified the

22   letters, we did not pursue it although as I said, I was

23   whether aggressive and I wanted to connect with people as

24   well.

25      Q.   If I told you that ECFMG did not verify the

JA2777

Jerry Williamson, M.D.

1    letters of recommendation, would that surprise you?

2        A.   It would.

3        Q.   And you believe that ECFMG affirmatively

4    indicated to you that the letters of recommendation had

5    been primary-source verified?

6        A.   Correct.  Correct.  And what I did not know was

7    if in fact they were unable to verify those letters, that

8    that in fact took place.  So I would not be aware that

9    letters that were not verified were not verified.

10       Q.   Anything else you think that ECFMG was verifying

11   in the time that Dr. Akoda was coming through?

12       A.   I can't recall right now.  I believe there were

13   other things, but I don't recall what they were now.

14       Q.   Do you think that ECFMG held itself out as

15   verifying social security numbers?

16       A.   I don't believe so.

17       Q.   Do you think that ECFMG held itself out as

18   verifying permanent residency cards?

19       A.   I don't recall.

20       Q.   Okay.  Do you believe that ECFMG would certify

21   that a physician would conduct himself or herself

22   appropriately and not in an inappropriate sexual way?

23       A.   Well, I think that -- that ECFMG would, when you

24   say held itself out, meaning -- I mean, that is something

25   that is at times difficult to ascertain.

JA2778

1    Q.   Yeah.  I was going to ask you next how would

2    ECFMG know if an applicant coming through would, you know,

3    in the future act inappropriately in a sexual way?

4    A.   Well, I think that that is all part of the --

5    falls under the umbrella of professionalism.  And

6    professionalism includes honesty.  And a dishonest

7    individual should raise a flag that that individual may

8    not act appropriately going forward.  Now, whether it be

9    in a sexual or other nature, the concern that I would have

10   would be someone who is dishonest, someone who is not

11   being upfront, that there may be other issues as well.

12   Q.   Do you expect that residency programs have

13   standards to expect their residents to conduct themselves

14   in a certain level of professional --

15   A.   Most definitely.

16   Q.   And the same for hospitals or hospital systems

17   at which the physicians would work?

18   A.   Most definitely.

19   Q.   So that would include Howard University

20   Hospital where Dr. Akoda conducted his residency, as well

21   as Prince George's Medical Center?

22   A.   I can't speak to Howard because I don't know

23   what their policies or their requirements are.  Same thing

24   with Prince George, I can't speak to that.  But I can

25   say in general hospitals do require that.  Residency

1  programs require that as well.  That is an expectation, I

2  guess is the way I would leave that.

3      Q.    Understood.  Have you done any analysis of the

4  particulars of what Howard University Hospital did

5  vis-a-vis Dr. Akoda through his residency, what they

6  looked at with him, how they evaluated him or the like?

7      A.    No.

8      Q.    Have you done any evaluation of what Prince

9  George's Medical Center did with respect to Dr. Akoda,

10  evaluations of him, credentialing of him, privileging of

11  him?

12      A.    No.

13      Q.    Do you understand that Dr. Akoda did practice

14  medicine at Prince George's Medical Center?

15      A.    I do.

16      Q.    Including procedures like C-sections and the

17  like?

18      A.    Correct.

19      Q.    Would you expect from your experience that while

20  practicing medicine at Prince George's Medical Center,

21  that there would be periodic reviews or checks on Dr.

22  Akoda's practice?

23      A.    Again, it depends upon the hospital.  It depends

24  upon, did he follow JCAHO requirements.  It depends on

25  other considerations as well.  So I can't -- I can't say

Jerry Williamson, M.D.

1    that I would expect it or not expect it.  I think it is

2    a -- I think it is important that a physician in a

3    residency program or in any program be periodically

4    reviewed, and the Joint Commission has made that rather

5    clear.  I can't tell you offhand whether the Prince

6    George's Joint Commission accredited or not.  I don't

7    know.

8          Q.   Okay.  Are you aware of a lawsuit against

9    Dimensions?

10         A.   I am aware of it, yes.

11         Q.   Okay.  And when you say you are aware of it,

12   what do you know about it?

13         A.   Well, I am aware that Dr. Akoda had -- was

14   providing clinical care at Dimensions and that there was a

15   lawsuit brought against Dimensions.

16         Q.   Are you an expert in that lawsuit?

17         A.   I don't think so.

18         Q.   Okay.  Do you have an understanding of who the

19   Plaintiffs are in the lawsuit against Dimensions?

20         A.   I believe it is the same Plaintiffs that are in

21   the lawsuit against ECFMG, I guess.  I shouldn't say I

22   guess.  I shouldn't speculate.  I don't know.

23         Q.   Okay.  Have you read or reviewed any documents

24   from that case like the complaint or discovery responses?

25         A.   No.

JA2781

1    A.   Yes, because I am more familiar with the

2  policies of ECFMG than I am with the Maryland Board.

3    Q.   Is there any conceivable set of facts in which

4  you think the Maryland Board of Physicians should grant a

5  medical license to someone who had presented a false

6  medical residency -- sorry -- a false permanent residence

7  card and a false Nigerian passport to them in conjunction

8  with their application to practice medicine in that state?

9       MR. THRONSON:  Objection.  Speculation.

10      MS. MCENROE:  You can speculate.

11   A.   Okay.  It would be speculation on my part.

12 BY MS. MCENROE:

13   Q.   Yeah.

14   A.   I don't know.  It would be pure speculation.

15   Q.   You can't conceive of a set of facts in which

16 that would be appropriate, correct?

17   A.   Do I believe that it is appropriate or not?

18 Again, it depends on their policies.  I don't want to

19 speak for the Maryland Board.  I know nothing about the

20 Maryland Board to be perfectly candid.

21   Q.   So you think it is conceivable that their

22 policies could provide for a false permanent resident

23 card and a false passport to be okay for a physician

24 coming to practice medicine before them?

25   A.   I mean, there are considerations here, for

1   example, did they receive the letter?  I don't know

2   whether they received the letter.  I don't know how the

3   letter was mailed or how it was sent.  I don't know what

4   the communication was.  I don't know whether it was a

5   verbal communication along with the letter to someone.

6       Q.   So you are talking about Exhibit 14?

7       A.   Yes, ma'am.

8       Q.   What I am talking about is the findings of fact

9   from the Maryland Board.  That in 2011, when they had

10  issued the medical license, they had received a false

11  permanent residence card and a false Nigerian passport.

12      A.   Oh, I am sorry.  I may have misunderstood where

13  we were going.

14      Q.   Sure.

15      A.   So what you are reading, the Maryland Board of

16  Physicians granted the requested medical license.  Okay.

17  Let me read prior to that, if I may?

18      Q.   Of course.

19      A.   So he applied for medical licensure with the

20  Maryland Board of Physicians.  In support of the

21  application, he submitted these false documents.

22      Q.   Correct.

23      A.   Uh-huh.  And it goes on to say the Maryland

24  Board of Physicians granted the requested medical license.

25      Q.   Correct.

Jerry Williamson, M.D.

1      A.   So my question is when he submitted these false

2    documents, were they aware that they were false documents?

3    And what I am saying is that is a part of the policies and

4    procedures that is done at the Maryland Board.  So as a

5    result of that, I am not sure how I could determine -- I

6    just don't know.  It is saying here that they were false,

7    but were they determined to be false after the fact?

8      Q.   Right.  So you think it is okay that the

9    Maryland Board may not have known at the time that those

10   things were false, but it is not okay for ECFMG to have

11   been defrauded by Dr. Akoda in real time?

12        MR. THRONSON:  Objection.  Go ahead.

13     A.   It depends on each individual's organization's

14   policies in terms of what they hold themselves out

15   to be. Again, I am a lot more familiar with the ECFMG than

16   I am with the Maryland Board.

17     Q.   So you think it is conceivable that the Maryland

18   Board should have accepted a false passport from a foreign

19   national to practice medicine in their state, but it is

20   not conceivable that ECFMG could have also been mistaken

21   by the same false passport?  Do you think that is okay?

22     A.   No.  I -- I do not think it is okay.  That is

23   not what I am saying.  I guess what I am saying is how did

24   they make their determination?  What was used in making

25   that determination?  And what happened in that interim

1    time?  Did they in fact receive the letter?  Was it a

2    letter that we know they received and acted on it?  Maybe

3    -- I am sorry.  I may not be answering your question.  Can

4    you restate the question or rephrase the question?

5         Q.   Yes.  I just struggle to understand how it is

6    that you can be so certain with your opinions on what

7    ECFMG should have known in real time despite ECFMG

8    conducting investigations at the time into Dr. Akoda.

9    Also admitting that Dr. Akoda was defrauding at least some

10   parties but taking issue with ECFMG's findings but not

11   taking issue with the Maryland Board's findings.  I am not

12   understanding how they reconcile themselves.

13        A.   Well, I don't think they are -- I don't think

14   they are equal.  Okay?  And what I mean by I don't think

15   that they are equal is I don't think it ever would have

16   gotten to the Maryland Board had ECFMG done their

17   investigation properly and picked up on the red lights that

18   were flashing.  So it never would have gotten there.  That

19   is -- your question I guess is since it did get there, now

20   what?  And again, I don't -- I don't find this acceptable.

21        Q.   Do you think that Dr. Akoda could have treated

22   patients as he did that are Plaintiffs in this case if

23   the Maryland Board of Physicians had not granted him a

24   medical license like they did?

25        A.   If he was not granted a license, he would not

JA2785

1    have been able to do that.  All I am saying is that if we

2    look at the cascade of events, I think we have to take

3    what is most proximate as the time where this could have

4    been all avoided.  And it could have been avoided at the

5    level of ECFMG, not at the Maryland Board.  That is all --

6         Q.   Why could it not have been avoided if the

7    Maryland Board had determined that Dr. Akoda should not

8    have been granted a medical license?

9         A.   It could have been, but I am saying it could

10   have been avoided a lot sooner than that as a result of

11   ECFMG doing what in fact they held themselves out to do.

12        Q.   Okay.

13        A.   And to your question, I am not suggesting either

14   is -- is -- is correct or proper.

15        Q.   Okay.  Do you have any idea about how Dr. Akoda

16   got into the country?

17        A.   I read I believe that it was in the early

18   1990s, 1991 or such on a -- it was a visa, but I don't

19   recall what the visa was.

20        Q.   And if he had not been able to get a visa to

21   come into the United States, that also would have been

22   earlier in what you have called the cascade of events,

23   preventing him from practicing medicine and treating these

24   patients, correct?

25        A.   Correct.  Now, the question from my perspective

1    is, was there a reason that he should not have been

2    provided that visa?

3        Q.   Right.  But it is possible if they had

4    discovered that he was doing whatever it was that he was

5    doing and being a fraud in the many ways that you have

6    articulated and others have articulated, that he may not

7    have gotten a visa to come to the United States?

8        MR. THRONSON:  Objection.

9        A.   When you say doing a fraud, meaning in his

10   country before coming here?

11   BY MS. MCENROE:

12       Q.   No.  I mean in coming to the United States.  I

13   am saying do you know one way or the other?

14       A.   No.

15       Q.   But if they had not permitted him to come in,

16   that would have even predated ECFMG's conduct, correct?

17       A.   Correct.  But my question to you, Counselor, is

18   why would he not have been permitted that visa?  Was there

19   a reason at that point for them to deny that visa?

20       Q.   I am just asking you in abstract.

21       A.   Oh, okay.

22       Q.   Yeah.  Do you know what name was on Dr. Akoda's

23   ECFMG certificate?

24       A.   I saw it, but I don't recall what it was.  There

25   were multiple names, and I am not sure which one was being

1    J.N. Akoda, M.D., do you see that?

2          A.   I am not sure where are you.

3          Q.   At the first page of Exhibit 15.

4          A.   First page?

5          Q.   Yes.  That this final decision and order is with

6    regards to Charles J.N. Akoda, do you see that?

7          A.   I do.

8          Q.   And that name is presumably also Charles John

9     Nosa Akoda, MD?

10         A.   I would agree.

11         Q.   So that is different than what is on the ECFMG

12   certificate, is that correct?

13         A.   Correct.

14         Q.   Do you have any idea how that would have

15   happened?

16         A.   I don't.

17         Q.   I want to turn back to Exhibit 9, which is your

18   expert report.  You can set those documents aside.  That

19   is it.  And this is your report in this case, correct?

20         A.   Yes, it is.

21         Q.   And there is a section called Summary of Facts

22   that starts on the second page.

23         A.   Okay.

24         Q.   From where did you get the information for this

25   summary of facts?

    1        A.    From the documents that I reviewed.

    2        Q.    Including the summary that Plaintiffs' counsel

    3    provided you?

    4        A.    Including the summary that Plaintiffs' counsel

    5    provided me.

    6        Q.    The timeline of events?

    7        A.    Yes.  The timeline was included in this.

    8        Q.    Okay.  Did you do any validation or verification

    9    to make sure that what was in the timeline of events from

   10    counsel was accurate?

   11        A.    When you say verification, describe what you

   12    are --

   13        Q.    Did you compare it to other documents or look at

   14    any other underlying materials to make sure that every

   15    fact you relied on in the timeline of events from counsel

   16    was indeed accurate?

   17        A.    To some extent, but I would not say that I

   18    specifically went fact for fact, no.

   19        Q.    So there are some facts in here that you derived

   20    from the timeline of events from counsel that you did not

   21    otherwise confirm in other documentation?

   22        A.    No.  I don't think so.  I think whatever is in

   23    here were in other documents as well, yes.

   24        Q.    Did you write this whole report yourself?

   25        A.    I did.

```
 1        Q.   Did you have any help?

 2        A.   No.

 3        Q.   Do you have any legal assistants or do you

 4   dictate your report or anything of the like?

 5        A.   No.

 6        Q.   Do you have any secretarial help?

 7        A.   No.

 8        Q.   Do you still hold all of the opinions you have

 9   in this report today?

10        A.   Yes.

11        Q.   In looking at the series of events with regard

12   to Dr. Akoda, is it your view that ECFMG just totally

13   missed the issue and did not investigate, did not

14   acknowledge it, that Dr. Akoda sort of slipped through, or

15   do you think that they did conduct at least some

16   investigation?

17        A.   I think when they finally realized that there

18   were problems -- well, let me restate it differently.

19   I think that they made some proper investigations

20   initially, particularly when he had applied the first two

21   times.  And if my memory serves me, there was a revocation

22   of his first certificate.  And then there was -- I am not

23   sure if they revoked or if they delayed the second

24   certificate or they did something that I think went to

25   appeals and then it ended up being extended, if I am
```

Case 2:18-cv-05629-JDW Document 224-5 Filed 09/08/22 Page 1 of 72

Jerry Williamson, M.D.

```
 1      A.    This is what I was referring to, yes, ma'am.

 2      Q.    And so let's take a look at this memo together.

 3      A.    Okay.

 4      Q.    It says, attached is a copy of a memorandum for

 5   the file.  This memorandum is being written separately

 6   since I did not think it should be made part of the

 7   official file.  In my discussion with Dr. McCorkel he

 8   indicated he believed Igberase and Akoda were one in the

 9   same person.  He has no proof, just a strong suspicion.

10   Information he received from an "informant" provided

11   details that led him to believe this.

12                 I also believe Akoda and Igberase are

13   one and the same.  However, at this point the only

14   information that we have for the ECFMG Credentials

15   Committee is Akoda's written statement that he is NOT

16   Igberase, although he did admit in writing that he used

17   Igberase's social security number.  He has given us a

18   passport that appears to confirm his identity as John

19   Akoda.  I don't think this is enough for the Committee.

20                 Igberase has not replied to my letter.

21   The FedEx letter was returned undelivered.  I tried the

22   phone number he listed on his application and was told it

23   was a wrong number (although the correct address).  I sent

24   Igberase an E-mail -- and it has the E-mail address --

25   cfemi@hotmail.com and who should reply but Akoda!  Akoda
```

Jerry Williamson, M.D.

1    still has a valid ECFMG Certificate.  We need to

2    brainstorm on this one.  Maybe Shirley Williams (Miss

3    Sherlock) could sit in.  Is that correct?

4         A.   Correct.

5         Q.   Is it your opinion that ECFMG completely missed

6    and did not analyze at all whether Akoda was acting

7    appropriately or not?

8         A.   Well, let me start by saying this, that the idea

9    of placing this memorandum in terms of the first sentence,

10   memorandum is being written separately.  And since I do

11   not think it should be made a part of the official file,

12   that in and of itself is problematic.

13        Q.   Why?

14        A.   It is problematic because if it is not made part

15   of the official file, once that official file is -- and

16   again, I do not know what they do with their official

17   files or their non-official files, but my concern is

18   that the individuals or the organizations that reply upon

19   this information are not going to be provided that

20   information because it is not a part of the official file.

21        Q.   Do you have any sense or knowledge of whether

22   ECFMG's practice if this had became a part of the official

23   file, it would have been provided?

24        A.   No.  I don't.

25        Q.   You don't know one way or the other?

JA2792

Jerry Williamson, M.D.

```
 1      A.   I don't know one way or the other.  But if it is

 2   a part of an unofficial file or a memorandum to the file,

 3   I don't know what they do with it.  But if I am a CEO of a

 4   hospital and I am receiving a certificate, an individual

 5   who has been certified by ECFMG, I am assuming that

 6   everything is out in the open, that there is transparency.

 7   So that in itself is a concern to me.  I think that if

 8   you look at the issue of behavior that ECFMG addresses in

 9   their policy as far as what constitutes that -- I forget

10   the term they use in terms of bad behavior or --

11      Q.   Irregular behavior?

12      A.   Irregular.  Thank you.  Irregular behavior, this

13   meets the criteria very easily and should have

14   precipitated an investigation.

15      Q.   Right.  So according to you now, but Mr. Kelly

16   whose job it was to investigate irregular behavior

17   contemporaneous at the time was looking at this and was

18   saying there was not enough to bring to the committee

19   based on the record he had then.  Right?  He was doing

20   some analysis and looking at this issue at the time,

21   correct?  You may not agree with the outcome.

22      A.   Well, again, the decision that was made here was

23   just made based on any policies that the organization had.

24   And from what my reading was that the organization did not

25   have a policy other than a definition of irregular
```

1  behavior.  So whether they should have gone to

2  credentials, which is I believe the next step if they had

3  a concern, I think they kind of missed the boat with that.

4               There seems to be enough here or more

5  than enough in reading this letter and just at the very,

6  very bottom of what you just read, and it says something

7  to the effect of -- I forgot where it was with the

8  exclamation -- here it is.  I sent Igberase an E-mail and

9  who should reply but Akoda.  I mean, what more do you

10  need?  It seems like there is enough concern that the

11  concern should have been elevated to the next committee,

12  yes.

13      Q.   Do you know or understand the remit of the

14  Medical Education Credentials Committee?

15      A.   When you say the remit?

16      Q.   Do you know what their purpose is?  Do you know

17  what they do?

18      A.   Well, from what I have read is that they

19  basically make a decision on concerns that a lower

20  committee might have and make a determination on those

21  concerns.

22      Q.   Do you know how they go about deliberating if at

23  all?

24      A.   Well, what I read is that they deliberate I

25  believe three or four times per year.  They don't meet

Jerry Williamson, M.D.

1    that frequently is what I believe I read in terms of their

2    committee.  But beyond that, no.  I don't know the details

3    of how they arrive at decisions or whatever.

4                 But I guess what I am saying, Counselor,

5    is that for me reading this there is enough information

6    here that says that ECFMG should have been more aggressive

7    in pursuing this.  And there were other issues I think

8    even occurred prior in terms of, you know, his application

9    that he sent, I believe, to ECFMG, and the name on the

10   application and the name on the diploma were not

11   consistent as well, speaking of names here of the

12   certificate that you just provided me.

13       Q.   Do you have any sense of in the early 2000s

14   what the E-mail etiquette was as between cousins from

15   Nigeria, whether there was ever sharing of E-mail

16   addresses?

17       A.   I could not answer that.

18       Q.   You don't know one way or the other?

19       A.   No.

20       Q.   Do you know culturally about naming norms and

21   shortening of middle or surnames from people from Nigeria

22   during that time, what was customary?

23       A.   No.  I don't.

24       Q.   Okay.

25       A.   May I say one other thing on this letter?

```
 1        Q.   I don't presently have any question pending.  If
 2    you think any of your prior responses were not complete,
 3    then I would welcome completion of it.  Otherwise, I am
 4    not looking for just an open declaration.
 5        A.   No.  No.  I just wanted to go over one other
 6    sentence that you brought forward.
 7        Q.   Sure.
 8        A.   And you said, although he did admit in writing
 9    that he used Igberase's social security number.  And I
10    guess that in and of itself would meet the concerns
11    regarding the -- meeting the definition of his improper
12    behavior.
13        Q.   Irregular behavior?
14        A.   Irregular behavior.  Thank you.
15        Q.   Do you know whether the misuse of a social
16    security number in ECFMG's definition does qualify as
17    irregular behavior?
18        A.   In the definition it talks about presenting
19    information that is inaccurate or in -- it may not be
20    inaccurate, but if you look at the definition.  I think I
21    may have it.  I don't know if I have that or not with me,
22    but, yes, it is a part of the definition.
23        Q.   Do you know whether applicants to ECFMG need to
24    have social security numbers at all?
25        A.   I don't believe they require it, but if one
```

1    presents it, one should act upon it.  I think there is a

2    duty to act upon it.

3         Q.   Do you know whether or not ECFMG considers

4    criminal conduct outside of the credentialing process to

5    be irregular behavior?

6         A.   Say that one more time, please.

7         Q.   Do you know whether ECFMG considers criminal

8    conduct outside of the credentialing process to be

9    irregular behavior?

10        A.   I would have to look at the definition.

11        Q.   You don't know one way or the other?

12        A.   No.  I don't know one way or the other.  I would

13   have to look at the definition.

14        Q.   Do you know whether when Dr. Akoda was coming

15   through ECFMG received or verified medical school

16   transcripts?

17        A.   Whether ECFMG had received a verified medical

18   school transcripts, I don't recall.

19        Q.   You don't know one way or the other?

20        A.   I may have read it but I just don't -- I can't

21   say for sure.  I don't recall.

22        Q.   You note in paragraph 8 of the summary of

23   findings in your report -- that is on page 3 at the

24   bottom.

25        A.   Uh-huh.

JA2797

Jerry Williamson, M.D.

```
1       Q.    In the second sentence -- are you there?

2       A.    Uh-huh.

3       Q.    It says, the following year he was denied

4    enrollment in The Center for Medicare and Medicaid

5    Services (CMS) due to submitting an inaccurate social

6    security number, do you see that?

7       A.    Yes, I do.

8       Q.    What is the consequence of that, do you know?

9       A.    What is the consequence of that with CMS?

10   Well, what basically happened here is that they would not

11   provide him a number.  I don't know whether CMS would take

12   that any further in terms of whether they would contact

13   additional people to investigate that or make any further

14   determination other than not provide a number.

15      Q.    And CMS is a governmental entity, correct?

16      A.    It is.

17      Q.    So they could have taken that to the FBI for

18   example to say, hey, look, we have someone submitting an

19   inaccurate social security number?  They are conducting

20   social security fraud?

21      A.    Yeah.  I don't know what CMS' policies are

22   regarding that, specifically for a social security number.

23   And at times when -- well, for something like this, I

24   could not really say.

25      Q.    Do you know if Prince George's Hospital which
```

1   was employing Dr. Akoda would have known or found out that

2   he did not have enrollment in CMS?

3       A.   Well, again, I don't know a whole lot about

4   Prince George in terms of their patient population.  If

5   they had a significant Medicare population, I would think

6   that that would be something that they would require him

7   to have.  If they don't -- again, Prince George may be

8   predominantly a non-Medicare-type hospital.  So I really

9   -- I can't say.  But I would think that if he was

10  practicing there, he would need to have a Medicare number.

11      Q.   But yet he did not have one, right?  He was

12  denied one?

13      A.   Yes.  And again, I don't know what their

14  policies are.

15      Q.   In paragraph 11 on the next page you make

16  reference to inappropriate physical examinations of a

17  sexual nature, is that correct?  Take a look.

18      A.   Correct.

19      Q.   Did you evaluate any medical records in this

20  case?

21      A.   Did not.

22      Q.   And you did not conduct any medical evaluations

23  in conjunction with this case, correct?

24      A.   That is correct.

25      Q.   In your report you use the term duty a number of

```
 1   times.

 2        A.   Uh-huh.

 3        Q.   Is that correct?

 4        A.   Correct.

 5        Q.   And you use the term duty as between ECFMG and

 6   entities that received reports from ECFMG?

 7        A.   Okay.  Yes.

 8        Q.   And I am not trying to pull a fast one on you in

 9   any way.  I am looking at paragraphs 4 and 5 in the

10   Analysis of Facts and Opinions on page 5 of your report.

11        A.   Uh-huh.

12        Q.   Is that correct?

13        A.   Yes.  That is correct.

14        Q.   So are you putting forth expert opinion on the

15   duty, if any, ECFMG owed to any other party in this case?

16        A.   Yes.

17        Q.   Are you holding yourself out to be a legal

18   expert in any way in connection with this case?

19        A.   A legal expert, no.

20        Q.   Okay.

21        A.   What I will say is the word duty that is used

22   here is used synonymously with responsibility.

23        Q.   So what do you mean by duty?

24        A.   Just that, responsibility.  They are the

25   responsible party.  They are responsible for making
```

JA2800

Case 2:18-cv-05629-JDW Document 225 Filed 11/19/21 Page 911 of 3041
Case 2:18-cv-05629-JDW Document 225 Filed 09/06/2022 Page 911 of 3041
Jerry Williamson, M.D.

1    certain that everything we've talked about is done

2    properly.

3         Q.   As a matter of law?

4         A.   Well, I think it is certainly a matter of

5    ethics. It is certainly a matter of medical ethics.  And I

6    -- from a matter of law, if they are holding themselves

7    out to provide certain information and they don't, then

8    they have not met their responsibility.  I think it

9    certainly has legal implications.

10        Q.   So are you saying that this is a legal duty, an

11   ethical duty or both in the way you use the term?

12        A.   Both.

13        Q.   Okay.  So you are purporting to put forth a

14   legal opinion in this case?

15        A.   In that sense, yes.

16        Q.   And you are asking the Court to rely on your

17   expert opinion for legal purposes?

18        A.   I am not sure I understand the question.

19        Q.   So you are putting forth an expert opinion in

20   the interest of aiding the Court from a legal perspective

21   with respect to ECFMG's duty?

22        A.   Well, from a credentialing perspective.  If

23   credentialing falls upon -- it certainly falls upon the

24   ethical.  But if it falls upon the legal as well, then I

25   guess what you are saying is correct.

```
 1       Q.   Yeah.  I am not trying to use my words.  I am
 2   just trying to understand.  You use the word duty
 3   repeatedly in your report.  So I am just trying to
 4   understand what it is you are asking the Court to look to
 5   you for.  And if that includes in your opinion a legal
 6   view of what duty ECFMG purportedly owed to these
 7   entities?
 8       A.   Well, I use that -- again, I have had legal
 9   training and I do have a master's degree in that, but I am
10   not a lawyer.  So I can't -- I guess perhaps I can present
11   a legal opinion without being a lawyer.  I don't know.  If
12   not, then it is not a legal opinion.
13       Q.   But you are intending to use the term duty to
14   mean both ethically and legally in the way you are using
15   it?
16       A.   Correct.  They had a responsibility to those
17   individuals and those organizations.
18       Q.   And later on in paragraph 11 of your report on
19   page 6 -- I will wait until you get there.
20       A.   Okay.
21       Q.   In the last sentence there in paragraph 11, it
22   says patients have a right to receive medical treatment
23   from physicians who have obtained ECFMG Certification
24   legitimately, not through falsities and
25   misrepresentations, do you see that?
```

Jerry Williamson, M.D.

1      A.   Yes, I do.

2      Q.   And, again, in using the word right here

3  similarly to my questions on duty, are you intending to be

4  assisting the Court in evaluating a legal position on the

5  rights of patients in this case?

6      A.   Well, I think that it's rather simple that the

7  American Medical Association provides what patients'

8  rights are as do other organizations such as the American

9  Academy of Pediatrics and The American Board of Medicine

10 and such, and they define what those rights are.  And I am

11 not sure it necessarily has to be a legal issue, but it is

12 certainly an ethical issue in terms of what the patient's

13 rights are.  Now, whether it morphs into legal, I couldn't

14 -- I couldn't offer an opinion on that.

15     Q.   So it could, but you don't know?

16     A.   Yes.  Correct.

17     Q.   You use the word foreseeable in a couple of

18 places in your report as well.

19     A.   Uh-huh.

20     Q.   And in particular, for example, on page 4.  I am

21 going backwards a little bit, in paragraph 12.

22     A.   Page 4.

23     Q.   Let me know when you are there.  Page 4,

24 paragraph 12 in the section above.

25     A.   Okay.

Jerry Williamson, M.D.

```
1        Q.   It says, the key question that must be resolved
2   is whether ECFMG's actions or failure to act resulted in
3   foreseeable injuries or damages to class members.  Do you
4   see that?
5        A.   I do.
6        Q.   And again, do you mean that to be legally
7   foreseeable?
8        A.   Legally foreseeable.  What I mean it to be is
9   that their actions should have -- that's the way I said it
10  and I don't -- when I wrote this, I don't recall if I was
11  thinking about this necessarily legally or in what
12  context.
13       Q.   So, you know, I am just trying to understand
14  what you mean when you use the term foreseeable here
15  because, for example, in Exhibit 17 we were looking at,
16  which was Mr. Kelly's memo, do you think at the time when
17  he was writing that memo he foreseeably thought that Dr.
18  Akoda would plead guilty to social security fraud and
19  would have committed sexually inappropriate conduct on
20  patients yet reach the same conclusion he had in his memo?
21            MR. THRONSON:  Objection.
22       A.   Perhaps.
23  BY MS. MCENROE:
24       Q.   So you think that Mr. Kelly would have been
25  involved in three or four investigations that resulted in
```

1    the revocation of Dr. Igberase Oluwafemi's certificate and

2    and thought when he issued this memo in December of 2000

3    that it was possible that Dr. Akoda was someone who had

4    perpetrate the types of alleged injuries he has here and

5    yet permit this to go forward anyway?

6        A.   I guess what I am saying is that when you use

7    the term or the word foreseeable is that one should --

8    when something this strong takes place, one should in fact

9    think about what are the potential consequences going

10   forward.  Okay?  That to me is foreseeable.  Foreseeable

11   that they would commit sexual acts, that I can't say.

12   Okay?  But foreseeable that there may be potential

13   problems going forward with this individual.

14              And -- and again, what I guess I am

15   connecting is I am connecting an individual's not being --

16   being irresponsible in terms of providing false

17   information and what that ultimately can -- can lead to.

18   So providing false information, what might that ultimately

19   develop into?

20       Q.   You make some reference to saying that ECFMG's

21   conduct directly impacted patient safety?

22       A.   Where are you?

23       Q.   I am looking at paragraph 11 on page 6.  It is

24   in two places on page 6.  So I see it in paragraph 11 in

25   the middle sentence there that starts with however.  Do

1   the newspapers and such but, no.

2       Q.   And have you made any medical judgment on the

3   treatment that Dr. Akoda gave to the patients in this

4   case?

5       A.   Well, number one, I am not an OB-GYN.  So I

6   really can't talk about medical treatment by another

7   specialty.  I leave that to the OB-GYN.  But from what I

8   did read regarding some of the patients' complaints --

9   what I did read about a couple of instances of what I

10  would call what appear to be inappropriate even to a

11  physician who is a pediatrician.  I had some concerns,

12  yes.

13      Q.   Okay.  You had concerns, but are you expressing

14  opinions on what you are asking the judge or the jury to

15  rely with regard to Dr. Akoda's medical --

16      A.   No.  I can't because I am not an OB-GYN.

17      Q.   Okay.

18      A.   I guess I should rephrase that to a certain

19  extent.  I am not an OB-GYN so I can't opine on that as an

20  OB-GYN, but I think I can opine on that as a physician.

21      Q.   Have you reviewed the patients' medical files?

22      A.   Not the medical files.  I have reviewed the

23  patients' commentaries in some of the expert reports.

24      Q.   So that would be the expert reports provided by

25  Plaintiffs' counsel?

Jerry Williamson, M.D.

1       A.    Correct.

2       Q.    Do you know what ECFMG did upon receiving

3    Dr. Akoda's guilty plea?

4       A.    From what I recall they -- they did take action.

5    That -- that I am certain of.  But I don't recall exactly

6    what that action was in terms of his certificates and such

7    but, yes, they did take action.

8       Q.    Do you believe that Dr. Akoda is still ECFMG

9    certified today?

10      A.    He is not.  I will rephrase that.  I don't

11   believe that he is.

12      Q.    Do you have an understanding that Dr. Akoda

13   passed USMLE steps 1 and 2?

14      A.    My understanding is that he did take them more

15   than once.  I don't recall exactly how many times, but

16   that he did take the USMLE more than once and did not pass

17   them -- did not pass them once or twice and then took them

18   another time and then did pass them.  And I believe it was

19   the same thing possibly with the USMLE 3.  I know he

20   passed the 3, but I can't remember if that was the first

21   time or not.  I don't recall.

22      Q.    Do you know if step 3 is of any consequence to

23   ECFMG certification?

24      A.    No.

25      Q.    When you say no, do you mean it is a consequence

Jerry Williamson, M.D.

```
 1   or it is not a consequence?
 2       A.   When you say is it of consequence to the ECFMG
 3   --
 4       Q.   Correct.
 5       A.   -- that I would have to look at again.  I don't
 6   recall off -- I don't recall yes or no.  I don't -- I
 7   don't recall.
 8       Q.   So you don't know one way or the other whether
 9   an ECFMG certificate comes before or after step 3?
10       A.   Comes -- I -- I don't recall.
11       Q.   Do you have an understanding that a medical
12   school verified a diploma for John Nosa Akoda?
13       A.   Well, there's -- in reading the documents, there
14   was some question about whether or not that verification
15   was complete and accurate.
16       Q.   What do you mean by that?
17       A.   Well, what I mean is whether or not the -- the
18   diploma was in fact verified or real.
19       Q.   Right.  So was that from reading Plaintiffs'
20   timeline of events?
21       A.   That was from reading a variety of things that I
22   read in the course of the documents.
23           MS. MCENROE:  We are up to 18.
24           (Thereupon, Exhibit 18 was marked for
25   identification.)
```

```
1              MR. THRONSON:  It is coming up on 1:00.

2              MS. MCENROE:  Give me a couple more minutes and

3    we may be done.  No promises.

4    BY MS. MCENROE:

5         Q.   I am handing you what I have marked as Exhibit

6    18.  Have you seen this before?

7         A.   I believe I have.

8         Q.   Do you know what this is?

9         A.   This is something from Nigeria regarding his

10   University of Benin certification or his medical school.

11   Bachelor of medicine in surgery.  Uh-huh.

12        Q.   His medical school diploma?

13        A.   Correct.

14        Q.   So the first page is a form from ECFMG with the

15   name Dr. John Nosa Akoda on the top right-hand corner, if

16   you can take a look.

17        A.   Uh-huh.

18        Q.   Is that a yes?

19        A.   Yes.

20        Q.   And it says, I hereby certify that the attached

21   diploma or other credential for the individual noted above

22   is authentic and correct and that I am authorized to

23   certify this on behalf of this institution.  And then

24   it is signed and has a seal from the Dean of Faculty of

25   Medicine at the University of Benin.  Do you see that?
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

      Plaintiffs,

      v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

      Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S UNOPPOSED MOTION TO SEAL

For the reasons set forth in the attached memorandum of law, Defendant Educational Commission for Foreign Medical Graduates, by and through its undersigned counsel, moves to seal Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts, and Exhibits 42, 44, 45, 46, 47, 53, 55, 57, 59, 63, 67, and 74 thereto.

Dated: December 10, 2021

Respectfully submitted,

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:   +1.215.963.5000
Facsimile:   +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA2810

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021          _/s/ Brian W. Shaffer_
                                   Brian W. Shaffer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

      v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS UNOPPOSED MOTION TO SEAL

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG"), by and through its undersigned counsel, submits this memorandum of law in support of its Motion to Seal. ECFMG respectfully requests permission to file under seal Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts, and Exhibits 42, 44, 45, 46, 47, 53, 55, 57, 59, 63, 67, and 74 thereto.

"The common law presumes that the public has a right of access to judicial materials," including documents filed on the Court's public docket. *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 924 F.3d 662, 672, 675 (3d Cir. 2019). A party seeking to overcome this presumption in favor of public access must show that "the interest in secrecy outweighs the presumption," meaning that "the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party's seeking closure." *Id.* at 672. Courts have found that sensitive personal information (such as medical histories) is one type of information where a person's interest in secrecy outweighs the presumption of public access. *Davis v. Elwyn*, No. 20-05798, 2021 WL 4902333, at *4–5 (E.D. Pa. Oct. 20, 2021).

JA2812

Here, good cause exists to seal Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts, and Exhibits 42, 44, 45, 46, 47, 53, 55, 57, 59, 63, 67, and 74 thereto. This Court has already found that the presumption for public access was overcome for the following documents because they contain sensitive, private medical information, embarrassing personal histories, or personal identification information such as dates of birth that constitute unnecessary invasion of individuals' privacy:

- Exhibit 44: D. Evans Supplemental Responses to Interrogatories (redacted version previously filed as 50-1)

- Exhibit 45: E. Powell Supplemental Responses to Interrogatories (redacted version previously filed as 50-2)

- Exhibit 46: J. Riggins Supplemental Responses to Interrogatories (redacted version previously filed as 50-3)

- Exhibit 47: M. Russell Supplemental Responses to Interrogatories (redacted version previously filed as 50-4)

- Exhibit 74: Dr. Fenichel Report re: M. Russell (redacted version previously filed as 50-7)

- Exhibit 57: Dr. Fenichel Report re: D. Evans (redacted version previously filed as 50-8)

- Exhibit 67: Dr. Fenichel Report re: J. Riggins (redacted version previously filed as 46-12)

- Exhibit 63: Dr. Fenichel Report re: E. Powell (redacted version previously filed as 46-13)

JA2813

- Exhibit 53: Deposition Transcript of D. Evans (redacted version previously filed as 50-8), although consistent with this Court's policies and procedures, see Section I.C.2, ECFMG has only included the relevant excerpts of the transcript for this filing.

- Exhibit 59: Deposition Transcript of E. Powell (redacted version previously filed as 50-9), although consistent with this Court's policies and procedures, see Section I.C.2, ECFMG has only included the relevant excerpts of the transcript for this filing.

- Exhibit 55: D. Evans Responses to Interrogatories (redacted version previously filed as 50-5)

*See* ECF 49. For these documents, the Court has already done a "document-by-document review of the contents," *Avandia*, 924 F.3d at 672, and identified which portions have overcome the presumption. *See* ECF 49. To ease the Court's review of the briefing on ECFMG's Motion for Summary Judgment, ECFMG seeks to file these documents again, with unredacted versions of these documents filed under seal and the previously approved redacted versions of these documents filed publicly on the docket.

ECFMG also requests permission to file under seal its Memorandum of Law in Support of its Motion for Summary Judgment, Statement of Undisputed Material Facts, and Exhibit 42. The first two documents warrant sealing because they refer to information that the Court has found worthy of sealing. The third document contains redactions of information this Court has already deemed to overcome the presumption of public access, *i.e.*, personal identifying information and sensitive medical and personal information, disclosure of which would be an unnecessary invasion of individual's privacy.

Plaintiffs consent to the filing of these documents under seal.

ECFMG respectfully requests that the Court grant its Motion to Seal and permit ECFMG to file under seal Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts, and Exhibits 42, 44, 45, 46, 47, 53, 55, 57, 59, 63, 67, and 74 thereto.

                                      Respectfully submitted,

Dated: December 10, 2021            */s/ Brian W. Shaffer*
                                        Brian W. Shaffer, PA Bar No. 78851
                                        Elisa P. McEnroe, PA Bar No. 206143
                                        Matthew D. Klayman, PA Bar No. 319105
                                        MORGAN, LEWIS & BOCKIUS, LLP
                                        1701 Market Street
                                        Philadelphia, PA  19103-2921
                                        Telephone:    +1.215.963.5000
                                        Facsimile:    +1.215.963.5001
                                        brian.shaffer@morganlewis.com
                                        elisa.mcenroe@morganlewis.com
                                        matthew.klayman@morganlewis.com

                                        *Attorneys for the Educational Commission for Foreign Medical Graduates*

JA2815

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021                    /s/ Brian W. Shaffer
                                            Brian W. Shaffer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

      Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

      Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2022, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Motion to Seal and any response thereto, **IT IS HEREBY ORDERED** that ECFMG's Unopposed Motion to Seal is **GRANTED**.  Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Defendant's Statement of Undisputed Material Facts, and Exhibits 42, 44, 45, 46, 47, 53, 55, 57, 59, 63, 67, and 74 thereto. thereto shall be **FILED UNDER SEAL**.

BY THE COURT:

_____

Wolson, J.

JA2817

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,<br><br>　　　　　Defendant. | Civil Action No. 18-5629<br><br>Honorable Joshua D. Wolson |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES'
MOTION FOR SUMMARY JUDGMENT**

**The Educational Commission for Foreign Medical Graduates**

1.　　Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") is a private non-profit organization based in Philadelphia, Pennsylvania. About ECFMG page, https://ecfmg.org/about/index.html, attached Exhibit 1.

2.　　ECFMG promotes quality health care for the public by, among other things, certifying physicians who received their basic medical degree outside of the United States and Canada (known as international medical graduates or "IMGs") as having met specific minimum requirements to be candidates for graduate medical education programs in the United States. Dep. of Kara Corrado, attached as Exhibit 2, at 40:1-22; About ECFMG, History, https://ecfmg.org/about/history.html, attached as Exhibit 3.

3.　　At the relevant time, to qualify for ECFMG Certification, an IMG had to: (i) pass an English exam and two substantive exams, either Step 1 and Step 2 of the United States Medical Licensing Examination ("USMLE") or Basic Medical Science and Clinical Science of the Foreign

JA2818

Medical Graduate Examination in the Medical Sciences ("FMGEMS"); and (ii) have their medical school diploma successfully primary-source verified with the issuing medical school as authentic. ECFMG Certification Page, attached as Exhibit 4; Ex. 2 at 88:21-89:2; Sep. 17, 1993 Letter from Marjorie P. Wilson, attached as Exhibit 5

4. Once an applicant's record was verified and complete and the applicant passed the required substantive exams, ECFMG issued the applicant a certificate. Ex. 2 at 241:12-22.

### The Role of ECFMG Certification

5. ECFMG Certification status information is made available only to certain third parties in the medical field, like residency programs, hospitals, licensing boards, and employers. Ex. 2 at 244:1–8.

6. ECFMG Certification status information is not available to members of the general public (including patients of doctors who have received ECFMG Certification). Ex. 2 at 243:9-25.

7. At the relevant time, ECFMG Certification status reports for residency programs contained the following information:

    a.    IMG's name

    b.    USMLE number

    c.    medical school name and country

    d.    graduation year

    e.    ECFMG Certification status

    f.    validity of ECFMG Certification

    g.    date of issuance of ECFMG Certification

Ex. 2 at 248:16-249:2.

8. ECFMG Certification status reports for residency programs do **not** verify:

2

JA2819

     a.     an IMG's identity

     b.     Social Security number

     c.     immigration status

     d.     passport information

     e.     criminal background

     f.     readiness to treat patients

     g.     ethics

     h.     honesty

     i.     morality

     j.     character

Ex. 2 at 198:16-22, 200:13-15, 240:18-241:6, 242:6-243:3, 244:22-245:13.

9.     ECFMG Certification does not authorize an IMG to treat patients as a doctor. Ex. 2 at 244:22-245:1.

10.     Recipients of ECFMG Certification status reports, such as residency programs and hospitals, typically consider things like the following when evaluating IMGs:

     a.     in-person interviews

     b.     information provided directly by the IMG

     c.     letters of recommendation

     d.     skills assessments or additional examinations

     e.     reports from prior educational or training programs

     f.     medical school transcripts

     g.     information obtained as part of a background check

     h.     ongoing performance monitoring

3

Rebuttal Rep. of L. Beck, attached as Exhibit 6, at 4; Rebuttal Rep. of M. Smith, attached as Exhibit 7, at 2.

11.     The institution receiving the ECFMG Certification status report independently assesses the criteria enumerated in ¶ 8. Ex. 6 at 4–7.

12.     State licensing boards have their own requirements beyond ECFMG Certification for issuing a license to practice medicine. Ex. 6 at 3–4.

13.     In Maryland, those requirements include graduation from an approved medical school, being of good moral character, completion of at least 2 years of a residency program accredited by the Accreditation Council for Graduate Medical Education or the American Osteopathic Association, as well as further requirements.  Akoda App. to Md. Bd. of Physicians, attached as Exhibit 8. *See also* Ex. 6 at 4; Ex. 7 at 3-4.

14.     Residency programs typically track and evaluate residents on an ongoing basis based on a variety of factors other than ECFMG Certification status.  Ex. 7 at 3.  These evaluations often include annual progression reports, annual examinations, and ongoing supervision by the faculty of the residency program.  Ex. 7 at 3.

15.     Hospitals typically continue to evaluate their physicians on an ongoing basis through their Medical Director's office on attributes such as clinical performance, demeanor, and interactions with patients and staff. Ex. 6 at 6–7.

16.     IMGs are subject to normal employee processes—like payroll, taxes, healthcare programs and other requirements of employment— and residency programs and hospitals gather information from IMGs independently for these processes. Ex. 7 at 5.

17.     The American Board of Obstetrics and Gynecology has its own certification process independent of ECFMG Certification. Ex. 6 at 7.

4

18.     Medical specialty board certification typically requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of prior case logs, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. Ex. 6 at 7.

19.     Following medical specialty board certification, a candidate must comply with annual requirements for ongoing educational modules to maintain certification. Ex. 6 at 7.

### ECFMG's Irregular Behavior Processes

20.     ECFMG defines conduct that does or tries to subvert ECFMG's processes and programs as "irregular behavior" and has a process for evaluating suspected irregular behavior.  ECFMG Irregular Behavior Policy, attached as Exhibit 9; Ex. 2 at 55:23-56:7.

21.     When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused. Ex. 2 at 76:12-77:5.

22.     If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee ("MECC"), a sub-committee of ECFMG's Board of Trustees, for a formal determination on the merits. Ex. 2 at 76:24-77:5.

23.     Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. Ex. 2 at 181:9-23.

24.     If an IMG is found to have engaged in irregular behavior by ECFMG's MECC, ECFMG annotates the individual's record and can, *inter alia*, limit the individual's participation in ECFMG programs or withhold or revoke existing ECFMG Certificates. Ex. 9.

5

25.     ECFMG is not a government enforcement or investigative agency. Ex. 2 at 76:12-77:5.

**John Nosa Akoda and His Aliases**

26.     In 1992, an individual applied to ECFMG using the name Oluwafemi Charles Igberase. Verification Papers – University of Ibadan, attached as Exhibit 10.

27.     The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase presented ECFMG with a medical school diploma from the University of Ibadan in Nigeria. Ex. 10.

28.     University of Ibadan sent ECFMG verification of diplomas and credentials for Charles Oluwafemi Igberase. Ex. 10.

29.     In July of 1992, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and failed both the basic medical science component and the clinical science component of the FMGEMS. Sep. 15, 1992 Igberase Score Report, attached as Exhibit 11.

30.     In January of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and the clinical science component of the FMGEMS but failed the basic medical science component of the FMGEMS. Mar. 27, 1993 Igberase Score Report, attached as Exhibit 12.

31.     In July of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the basic science component of the FMGEMS. Ex. 5.

32.     In September of 1993, ECFMG notified the individual who had applied under the name Oluwafemi Charles Igberase that he had satisfied all testing criteria for ECFMG Certification. Ex. 5.

6

33.     ECFMG issued an ECFMG Certificate (No. 482-700-2) to the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase. June 22, 1995 Letter from W. Kelly, attached as Exhibit 13.

34.     The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase did not gain admission to a residency program. July 20, 1995 Letter from Igberase Oluwafemi Charles, attached as Exhibit 14, at 1–2.

35.     In 1994, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles. Plea Agreement Terms, attached as Exhibit 15, at 9.

36.     In the application under the name "Igberase Oluwafemi Charles," the individual answered "no" to the question of whether he had previously applied to ECFMG. Ex. 15 at 9; May 3, 2001 Letter from W. Kelly, attached as Exhibit 16.

37.     ECFMG issued an ECFMG Certificate (No. 0-519-573-0) to the individual who applied to ECFMG using the name Igberase Oluwafemi Charles. Dec. 7, 1995 Letter from W. Kelly, attached as Exhibit 17.

38.     Misrepresenting ECFMG application history to ECFMG can constitute irregular behavior. Ex. 17 at 14.

39.     ECFMG notified the individual who applied to ECFMG using the name Igberase Oluwafemi Charles that it was conducting an investigation of whether he had previously applied to ECFMG when he indicated on his application that he had not previously applied. Ex. 17 at 14.

40.     The individual who had applied to ECFMG under the name Igberase Oluwafemi Charles admitted that he had previously applied to ECFMG, despite representing otherwise on his application. Ex. 17 at 15–16.

JA2824

41.     ECFMG staff determined that there was sufficient evidence that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior by misrepresenting his application history with ECFMG to refer the matter to the MECC. Ex 17 at 13.

42.     The MECC found that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior and (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. Ex. 17.

43.     ECFMG later barred the individual who had applied to ECFMG under the names Oluwafemi Charles Igberase and Igberase Oluwafemi Charles from applying to ECFMG after he submitted additional fraudulent applications using other variations of the names Oluwafemi, Charles, and Igberase, each of which ECFMG identified and refused to process when received. Ex. 16; May 22, 2002 Letter from W. Kelly, attached as Exhibit 18.

44.     In 1996, an individual using the name John Nosa Akoda applied for ECFMG Certification with applicant number 0-553-258-5.  Akoda ECFMG Application, attached as Exhibit 19.

45.     The individual who had applied to ECFMG under the name John Nosa Akoda applied to take the March 1996 USMLE Step 2 exam and the June 1996 USMLE Step 1 exam. Aug. 22, 2000 Letter from W. Kelly, attached as Exhibit 20.

46.     The individual who had applied to ECFMG under the name John Nosa Akoda presented ECFMG with a medical school diploma from the University of Benin.  University of Benin Degree, attached as Exhibit 21.

47.     The University of Benin sent ECFMG verification of diploma and credentials for Johnbull Enosakhare Akoda. Ex. 21.

48.     The individual who applied to ECFMG under the name John Nosa Akoda misrepresented his ECFMG application history to ECFMG and made no reference to any previous applications to ECFMG. Ex. 19; Ex. 15 at 10.

49.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the English exam in August 1996. Aug. 12, 1997 Letter from N. Gary, attached as Exhibit 22.

50.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 2 Exam in August 1996. Ex. 22.

51.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 1 Exam in June 1997. Ex. 22.

52.     ECFMG certified the individual who had applied to ECFMG under the name John Nosa Akoda in 1997 based on his passing of Steps 1 and 2 of the USMLE and the primary source verification of a diploma by the University of Benin. Verification Papers – University of Benin, attached as Exhibit 23; John Nosa Akoda ECFMG Certificate, attached as Exhibit 24

53.     After obtaining this ECFMG Certification, the individual who had applied to ECFMG under the name John Nosa Akoda successfully passed Step 3 of the USMLE.  Md. State Bd. of Physicians Decision, attached as Exhibit 25, at 5.

54.     Oluwafemi Charles Igberase, Igberase Oluwafemi Charles and John Nosa Akoda were all the same person (hereinafter referred to as "Akoda"). Ex. 15 at 9–11.

### Akoda's Residency at Jersey Shore Medical Center

55.     Akoda applied to a residency program in internal medicine at Jersey Shore Medical Center ("JSMC"). Ex. 15 at 10.; Nov. 7, 2000 Letter from A.M. Sesso, attached as Exhibit 26.

56.     JSMC accepted Akoda as a resident in its internal medicine program in 1998. Akoda Request for Permanent Revalidation of Standard ECFMG Cert., attached as Exhibit 27.

57.     In 1999, JSMC received an allegation that Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. Aug. 11, 2000 Letter from J. McCorkel, attached as Exhibit 28.

58.     When JSMC tried to verify the Social Security number that Akoda provided directly to JSMC in his residency paperwork, JSMC concluded that it belonged to Charles Igberase. Ex. 28.

59.     JSMC notified ECFMG of its investigation into Akoda, but JSMC did not inform ECFMG of the source of the allegation against Akoda. Ex. 28.

60.     In an August 11, 2000 letter from James McCorkel at JSMC, Mr. McCorkel asked if ECFMG had received requests for Akoda's ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital. Ex. 28.

61.     ECFMG had no records indicating that Harlem Hospital Center or JFK Memorial Hospital had requested ECFMG verification for any of Akoda's aliases or USMLE / ECFMG identification numbers. Aug. 22, 2000 Letter from S. Seeling, attached as Exhibit 29.

62.     ECFMG conducted its own investigation to determine if Akoda and Igberase were the same person. Ex. Ex. 20; Sep. 27, 2000 Memo, attached as Exhibit 30; Dec. 21, 2000 Memo, attached as Exhibit 31.

63.     ECFMG required Akoda to submit an explanation for why it appeared he had previously applied to ECFMG but had answered "no" to the question whether he had previously submitted an application to ECFMG.  Ex. 20.

64.     In response to the inquiry from ECFMG, Akoda explained that "Igberase Charles" was his cousin and admitted using a social security number allegedly belonging to his cousin.  Aug. 29, 2000 Letter from Akoda, attached as Exhibit 32; Ex. 30.

JA2827

65.   Akoda provided ECFMG with what appeared to be his Nigerian passport and an international driving permit as documentation of his identity.  Ex. 32; Ex. 30.

66.   ECFMG staff determined that there was insufficient evidence of irregular behavior to bring Akoda before the ECFMG MECC on an allegation that he was Igberase.  Dec. 22, 2000 Memo, attached as Exhibit 33; Ex. 2 at 150:24-151:6.

67.   In 2000, JSMC discharged Akoda because of perceived discrepancies involving his Social Security number and green card, which was not part of his ECFMG application. Ex. 31.

68.   In a November 7, 2000 letter, JSMC wrote to the Maryland Board of Physicians about the discrepancies in Akoda's Social Security number and green card. Nov. 7. 2000 Letter from A.M. Sesso, attached as Exhibit 34.

69.   ECFMG continued to investigate Akoda but took no adverse action against him at that time because ECFMG staff concluded there was insufficient evidence of irregular behavior. Ex. 2 at 150:24-151:6; Nov. 22, 2006 Letter from W. Kelly, attached as Exhibit 35.

70.   ECFMG staff was nonetheless suspicious of Akoda's identity.  Ex. 33.

**Akoda's Residency at Howard University Hospital**

71.   Akoda applied to Howard University Hospital's residency program. March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital, attached as Exhibit 36.

72.   Howard sent Akoda a letter of acceptance dated March 16, 2007. Ex. 36.

73.   Akoda admitted to providing Howard a false permanent resident card in the name "N. Akoda, John Charles." Ex. 15 at 10.

74.   Akoda began Howard's residency program on July 1, 2007 and completed it on June 30, 2011. Howard University Hospital Certificate, attached as Exhibit 37.

JA2828

## State Licenses to Practice Medicine

75.     The Virginia Department of Health Professions licensed Akoda to practice medicine in the Commonwealth of Virginia in 2011. Virginia License Suspension, attached as Exhibit 38.

76.     The Maryland State Board of Physicians licensed Akoda to practice medicine in the state of Maryland in September of 2011. Ex. 25 at 5.

77.     On his application for medical licensure in Maryland, Akoda omitted his residency at JSMC. Akoda Md. Bd. of Physicians App., attached as Exhibit 39, at 5.

78.     Akoda's application for medical licensure in Maryland required that if his name was "not written the same way on all documents," he had to "submit documentation to explain how and why [his] name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree." Ex. 39 at 4.

79.     The ECFMG Certification status report for Dr. Akoda received by the Maryland Board of Physicians in 2011 stated that its purpose is to "indicate whether this individual is certified by ECFMG" and that ECFMG "verified medical school credentials directly with the medical schools[.]" ECFMG Certification Status Rep., attached as Exhibit 40.

80.     Akoda's name appeared differently on his medical licensure application ("John Charles Nosa Akoda" and "Charles John Nosa Akoda"), ECFMG Certificate ("John Nosa Akoda"), his medical school diploma ("Johnbull Enosakhare Akoda"), and his residency program certificate of completion ("John-Charles Nosa Akoda"). Ex. 25 at 3 n.4; Ex. 24; Ex. 23; Ex. 37.

81.     Akoda admitted to providing a false permanent resident card and a false Maryland driver's license in connection with:

        a.   His application for medical licensure in Maryland. Ex. 15 at 10.

        b.   His application for privileges at Prince George's Hospital Center.  Ex. 15 at 9.

JA2829

82. The Maryland Board of Physicians was aware of the allegations that Akoda had used other names and may have misrepresented his identity in 2014. Email Correspondence Between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41.

83. Akoda's Maryland medical license was not revoked until July 10, 2017. Ex. 25 at 8.

84. The grounds for revocation of Akoda's medical license were that he plead guilty in 2016 to Social Security fraud, which constituted a crime of moral turpitude requiring revocation. Ex. 25 at 5–6.

85. Akoda renewed his Maryland medical license through September 30, 2016, when it expired. Ex. 25 at 3.

86. The Virginia Department of Health Professions revoked Akoda's Virginia medical license on April 25, 2017 because of his criminal conviction. Ex. 38.

### Akoda's Employment at Prince George's Hospital and in Private Practice

87. Prince George's Hospital Center awarded Akoda medical privileges to treat patients in 2012. Ex. 15 at 9.

88. In a previous lawsuit, Plaintiff Evans claimed that Dimensions Healthcare, which operated Prince George's Hospital, could have "avoided all injuries, damages, . . . and disability" suffered by Ms. Evans:

> [Dimensions] and its duly authorized agents, apparent agents, servant and/or employees failed to perform an appropriate and proper investigation and background check of Akoda before granting him privileges to act as a practitioner and specialist in obstetrics and gynecology. Had they done so, as was required, Akoda's fraudulent conduct would have been discovered, and he would have been precluded from seeing patients at [Dimensions'] institutions or entities, thereby avoiding all of the injuries, damages (economic and non-economics) and disability suffered by this Plaintiff.

Evans Dimensions Rog. Answers, attached as Exhibit 42, at 2-3.

13

89.     In a previous lawsuit, Plaintiffs offered an expert in health care administration, credentialing, and privileging who believed Dimensions Healthcare was responsible for Plaintiffs' injuries, damages and permanent disability:

> [Dimensions] breached the applicable standards of administrative care by negligently failing to use required and reasonable care to investigate, credential, grant privileges, monitor and supervise their medical personnel including, but not limited to, Akoda and to discover, stop and report any professional misconduct of which they should have known. As a direct and proximate result of the Defendants' continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability. Had [Dimensions] complied with the applicable standards of administrative care the Claimants, and others similarly situated, would not have suffered their injuries, damages and permanent disability.

Bojko Rep., attached as Exhibit 43, at 3.

90.     Akoda also worked with medical practices run by Dr. Abdul Chaudry and Dr. Javaka Moore.  Evans Supp. Answers to Rogs., attached as Exhibit 44 at Rog. 1; Powell Supp. Answers to Rogs., attached as Exhibit 45 at Rog. 1; Riggins Supp. Answers to Rogs., attached as Exhibit 46, at Rog. 1; & Russell Supp. Answers to Rogs., attached as Exhibit 47, at Rog. 1.

### Other Entities Evaluating Akoda

91.     In 2012, Akoda submitted a Medicare Enrollment Application to the Centers for Medicare and Medicaid Services ("CMS"). Ex. 15 at 10.

92.     CMS denied the application based, in part, on CMS's determination that Akoda did not provide an accurate Social Security number. Ex. 15 at 10.

93.     American Board of Obstetrics and Gynecology ("ABOG") certified Akoda on January 31, 2014.  ABOG Board Letter to Akoda, attached as Exhibit 48.

94.     ABOG waited until January 2018 to revoke his diplomate status. Aug. 30, 2017 ABOG Letter, attached as Exhibit 49.

**Law Enforcement Involvement and Guilty Plea**

95.     In 2014, ECFMG received a subpoena from a U.S. Attorney's office regarding Akoda. 2014 Email Correspondence between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41.

96.     ECFMG cooperated with the investigation and followed instructions from federal authorities not to take adverse action against Akoda while the investigation was ongoing.  Ex. 41.

97.     In 2014, ECFMG worked together with the Maryland Board of Physicians to assist their investigation.  Ex. 41.

98.     In March 2016, Prince George's County Police Department contacted ECFMG about Akoda. Mar. 2016 ECFMG Email Chain, attached as Exhibit 50.

99.     ECFMG cooperated with the Prince George's County Police Department's investigation and followed additional instructions from law enforcement not to impede the investigation and not to take adverse action against Akoda while the investigation was ongoing. Nov. 2016 Email Chain, attached as Exhibit 51.

100.    On November 15, 2016, Akoda pled guilty to misuse of a Social Security number and stipulated that he and Oluwafemi Charles Igberase were the same person. Ex. 15.

101.    After Akoda pled guilty, ECFMG consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. March 1, 2017  ECFMG Notice, attached as Exhibit 52.

**Plaintiff Desire Evans**

102.    Plaintiff Desire Evans is a resident of Waldorf, Maryland. Evans Dep., attached as Exhibit 53, at 14:22-24.

103.    Ms. Evans gave birth to her son on March 17, 2016 at Prince George's Hospital in Maryland. Ex. 53 at 35:22-25, 42:20-23.

15

JA2832

104.    Ms. Evans did not know which doctor would be there for her induction. Ex. 53 at 42:4-13; 83:4-20.

105.    Ms. Evans consented to undergoing treatment by Akoda. March 16, 2016 Evans Consent Forms, attached as Exhibit 54.

106.    Ms. Evans did not conduct any research into the credentials of her primary OB/GYN doctor, Dr. Moore or the physicians at Dr. Moore's practice. Ex. 53 at 44:20-45:9, 45:23-46:4.

107.    Ms. Evans did not ask Akoda about his credentials or professional experience. Ex. 53 at 86:12-19, 87:2-5.

108.    Akoda treated Ms. Evans while she was in labor and then performed a C-section on her. Ex. 53. at 87:6-23, 93:18-19.

109.    Ms. Evans' son was delivered healthy. Ex. 53 at 95:16-17.

110.    Ms. Evans testified that Akoda used language with her that she found "inappropriate," including calling her "baby" and "mama." Ex. 53 at 158:158:4-11.

111.    Ms. Evans claims that Akoda performed "intrusive pelvic examinations" on her. Evans Rogs., attached as Exhibit 55, at 7.

112.    Ms. Evans alleges that Akoda "was, like, fondling my clitoris" during her labor and that during her labor, she felt that he mistreated her. Ex. 53 at 131:20-132:3, 137:22-138:3; Ex. 55 at 7.

113.    Ms. Evans testified that her husband questioned Akoda about how he touched Ms. Evans. Ex. 53 at 133:10-14.

114.    Ms. Evans testified that she discussed Akoda's conduct with her husband and her mother shortly after the birth. Ex. 53 at 138:6-17.

16

115.    Ms. Evans claims that her husband and mother were both in the room with her while Akoda treated her. Ex. 53 at 132:7-12.

<div style="background:black; height:2em;"></div>

<div style="background:black; height:2em;"></div>

117.    Ms. Evans learned of Akoda's identity after hearing a radio advertisement from a law firm in 2018. Ex. 53 at 73:12-74:13.

118.    Ms. Evans never sought treatment from a psychiatrist or psychologist prior to the birth of her son. Ex. 53 at 66:4-13.

119.    Ms. Evans has seen a doctor for her social anxiety since the birth of her son, and a physician's assistant recorded that Ms. Evans was experiencing "depression/anxiety" and "potential postpartum." Ex. 53 at 64:14-65:25, 105:24–106:5.

120.    Ms. Evans denied feeling anxious and depressed for most of her life, just "normal anxious." Ex. 53 at 112:19-113:5.

121.    Ms. Evans claims that she is afraid to see a doctor, does not know who to trust, and her trust in the medical profession has diminished. Ex. 53 at 165:8-21.

122.    None of Ms. Evans' medical records reference Akoda. Evans Dep. Ex. 3, attached as Exhibit 56.

123.    Ms. Evans had no knowledge of ECFMG when she was treated by Akoda. Ex. 53 at 82:20-22.

124.    Ms. Evans first learned of ECFMG from her lawyers. Ex. 53 at 70:24-71:17.

125.    Ms. Evans believes that ECFMG's purpose is "to verify identification documentation," not foreign medical diplomas, and that ECFMG is responsible for verifying IMGs' Social Security

numbers, birth certificates, green cards, state medical licenses, board certifications, and any other "piece of identifying information about a foreign medical graduate." Ex. 53 at 80:14-82:4.

126.    After conducting Internet research, Ms. Evans believed ECFMG "was some kind of credentialing company or something" and was not "100 perfect sure of the nature of the company." Ex. 53 at 72:18-19

127.    Dr. Gladys Fenichel examined Ms. Evans on September 9, 2019. Fenichel Rep. on Evans, attached as Exhibit 57, at 1.

128.    Dr. Fenichel did not find Ms. Evans' psychiatric conditions of major depression and panic disorder to be related to the allegations she made in the complaint against ECFMG. Ex. 57 at 8.

129.    Dr. Christine Tellefsen examined Ms. Evans on September 16, 2019. Tellefsen Rep., attached as Exhibit 58, at 4.

130.    Dr. Tellefsen concluded that Ms. Evans' conditions "is complicated by a number of other factors in her life." Ex. 58 at 4.

131.    Dr. Tellefsen also concluded that Ms. Evans likely has a "pseudotumor cerebri," causing her headaches and poor concentration. Ex. 58 at 4.

132.    Dr. Tellefsen found that Ms. Evans likely has Mood Disorder and Adjustment Disorder with Mixed Disturbance of Behavior. Ex. 58 at 5.

**Plaintiff Elsa Powell**

133.    Plaintiff Elsa Powell is a resident of Upper Marlboro, Maryland. Powell Dep., attached as Exhibit 59, at 20:1-3.

134.    Ms. Powell gave birth to her son on September 17, 2014. Ex. 59 at 22:4.

135.    Ms. Powell was originally supposed to be seen by Dr. Chaudry at his practice, but he was unavailable and she saw Akoda instead. Ex. 59 at 40:7-12.

136.   Ms. Powell consented to being treated by Akoda at Dr. Chaudry's practice and at Prince George's Hospital in Maryland during her pregnancy. Sep. 17, 2014 Powell Consent Forms, attached as 60; Ex. 59 at 40:7-12.

137.   Ms. Powell regularly saw Akoda starting in April of 2014, during her labor on September 17, 2014 and for post-natal care through January of 2015. Ex. 59 at 38:20-39:1-2, 39:21-40:16; Ex. 45 at 2, 8.

138.   Ms. Powell testified that Akoda was "flirtatious" towards Ms. Powell. Ex. 59 at 51:16-19.

139.   Ms. Powell testified that she requested that a nurse be present during her appointments with Dr. Akoda. Ex. 59 at 51:16-19.

140.   Ms. Powell testified that Akoda made lewd comments about her breasts.  Ex. 59 at 51:21-25.

141.   Ms. Powell claims Akoda performed "intrusive pelvic exams" on her. Powell Rog., attached as Exhibit 61, at 7.

142.   Akoda aided Ms. Powell in the delivery of her son. Ex. 59 at 44:11-14.

143.   Ms. Powell's son had no complications during delivery. Ex. 59 at 48:18-20.

144.   After the birth of her son, Ms. Powell experienced heavy bleeding while at the hospital, and Akoda took her into surgery. Ex. 59 at 45:12-46:7.

145.   Ms. Powell believes that before taking her into surgery, Akoda told her "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." Ex. 59  at 45:12-46:2.

146.   Ms. Powell recovered well from the emergency surgery that Akoda performed on her after she delivered her son. Ex. 59  at 47:20-24.

147.   Ms. Powell claimed she suffered from emotional anguish, fear, and anxiety from learning that Akoda was not properly credentialed.  Ex. 45 at 3.

19

148.    Ms. Powell claims she does not "have a peace of mind" since finding out Akoda was not who he said he was.  Ex. 59 at 98:20-24.

149.    Ms. Powell has never sought treatment from a psychologist, psychiatrist, or counselor and did not seek any treatment after hearing about the charges brought against Akoda. Ex. 59 at 32:10-17, 99:10-12.

150.    Ms. Powell has seen doctors since finding out about Akoda's identity. Ex. 59 at 25:22-24.

151.    Ms. Powell has not sought treatment from any health care provider for alleged injuries related to this lawsuit.  Ex. 45 at 7.

152.    Ms. Powell contends that PGHC was negligent and should have discovered Dr. Akoda's alias sooner. Powell Dimensions Rog., attached as Exhibit 62, at 3.

153.    Ms. Powell first learned about the social security fraud charged against Akoda in 2017. Powell Dep. at 63:12-17.

154.    Ms. Powell had no knowledge of ECFMG prior to this lawsuit.  Ex. 45 at 4.

155.    Ms. Powell learned about ECFMG from her attorney.  Ex. 59 at 90:9-16.

156.    Ms. Powell believes ECFMG licenses foreign medical doctors to practice medicine in the United States.  Ex. 59 at 91:6-11.

157.    Ms. Powell testified that she believed it was wrong for ECFMG to provide Akoda with a license to practice medicine. Ex. 59 at 93:18-23.

158.    Ms. Powell doubts Akoda had medical training. Ex. 59 at 80:5-7.

159.    Dr. Fenichel examined Ms. Powell on September 9, 2019.  Fenichel Rep. on Powell, attached as Exhibit 63, at 1.

20

160.     Dr. Fenichel did not find Ms. Powell to present with any symptoms compatible with a psychiatric disorder causally related to her allegations in the complaint against ECFMG. Ex. 63 at 6.

161.     Dr. Tellefsen examined Ms. Powell on September 13, 2019. Ex. 58 at 3.

162.     Dr. Tellefsen diagnosed Ms. Powell with Adjustment Disorder with Anxiety. Ex. 58 at 4.

**Plaintiff Jasmine Riggins**

163.     Plaintiff Jasmine Riggins is a resident of Washington, D.C.  Riggins Dep., attached as Exhibit 64, at 20:1-3.

164.     Ms. Riggins gave birth to her son at Prince George's Hospital in Maryland on March 18, 2013. Riggins Rog. Answers, attached as Exhibit 65, at 2.

165.     Ms. Riggins chose to be treated by Dr. Abdul Chaudry's practice, with whom Akoda worked at Prince George's Hospital. Ex. 46 at 2-3.

166.     Ms. Riggins consented to treatment by Akoda. Riggins Consent Forms, attached as Exhibit 66.

167.     Akoda performed a C-section on Ms. Riggins on March 18, 2013. Ex. 46 at 3.

168.     Ms. Riggins learned of Akoda's identity in July of 2017. Ex. 64 at 84:16-85:5.

169.     Ms. Riggins claims to have experienced emotional distress only once she found about Akoda being a "fake doctor."  Ex. 64 at 55:19-24.

170.     Ms. Riggins testified that she feels angry, sad, embarrassed, and ashamed because of Akoda's conduct.  Ex. 64 at 57:8-13.

171.     Ms. Riggins has not sought medical attention for any of her alleged injuries. Ex. 64. at 86:14-87:11.

JA2838

172.     Ms. Riggins has never been diagnosed with depression, post-traumatic stress disorder, a sleeping disorder or any psychiatric disorder. Fenichel Rep. on Riggins, attached as Exhibit 67 at 3; Riggins Dimensions RFA, attached as Exhibit 68 at 4.

173.     Since being treated by Akoda, Ms. Riggins does not typically feel anxious, worried, scared, or panicky. Ex. 64 at 60:7-9; Ex. 68 at 8.

174.     Ms. Riggins does not claim Akoda physically injured her. Ex. 64 at 56:4-6.

175.     Ms. Riggins has not suffered physical distress from learning about Akoda's guilty plea. Ex. 64 at 64:1-7.

176.     Ms. Riggins does not have a depressed mood or suicidal thoughts. Ex. 64 at 59:14-22.

177.     Ms. Riggins believed Dimensions' negligence "was the sole and proximate cause of [her] injuries". Ex. 64 at 123:7-15; Dimensions First Amended Compl., attached as Exhibit 69, ¶ 81.

178.     Ms. Riggins doubts whether PGHC performed a satisfactory background check on Akoda. Riggins Dimensions Dep., attached as Exhibit 70, at 78:2-8.

179.     Ms. Riggins has seen doctors since finding out about Akoda's identity. Ex. 64 at 103:9-104:18.

180.     Dr. Fenichel examined Ms. Riggins on September 20, 2019. Fenichel Rep. on Riggins, attached as Exhibit 71, at 1.

181.     Dr. Fenichel did not find Ms. Riggins to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 71 at 4.

182.     Ms. Riggins believes the Maryland Board of Physicians, the American Board of Obstetricians and Gynecologists, and Dr. Chaudry are also responsible for the injuries she has alleged. Ex. 64 at 56:7-57:2.

JA2839

183. Ms. Riggins had never heard of ECFMG until her lawyers informed her of the existence of the organization. Ex. 64 at 130:18-131:1.

184. Ms. Riggins believed ECFMG administers exams and licenses foreign doctors to practice medicine in the United States. Ex. 64 at 26:17-24, 27:20-24.

185. Ms Riggins believes ECFMG should "[b]e more careful about who they certify." Ex. 64 at 138:17-23.

186. Ms. Riggins testified that it might make a difference to her to know that ECFMG had cooperated with the U.S. Attorney's Office in its case against Akoda. Ex. 64 at 141;18-22.

**Plaintiff Monique Russell**

187. Plaintiff Monique Russell is a resident of Annapolis, Maryland. Russell Dep., attached as Exhibit 72, at 10:24-25.

188. Ms. Russell gave birth to her son on May 25, 2016 at Prince George's Hospital. Ex. 72 at 12:23-25, 32:24-25.

189. Ms. Russell's primary OB/GYN during her pregnancy was Dr. Waldrop from Dr. Moore's practice. Ex. 72 at 32:11-25, 34:19-24.

190. Ms. Russell knew before her delivery that Dr. Waldrop might be unavailable at the time and that her baby might be delivered by Akoda. Ex. 72 at 37:23-38:18.

191. Ms. Russell consented to being seen by Akoda if Dr. Waldrop were unavailable. Russell Consent Forms, attached as Exhibit 73; Ex. 72 at 38:12-19.

192. Akoda first treated Ms. Russell when she was in labor. Ex. 72 at 37:5-9.

193. Akoda helped deliver Ms. Russell's son in 2016 via an unplanned C-section. Ex. 72 at 12:23-25, 37:5-9, 41:4-14.

194. Ms. Russell consented to the C-section that Akoda performed. Ex. 72 at 45:1-3.

JA2840

195.    Ms. Russell described her recovery from the C-section performed by Akoda as "minor." Fenichel Rep. on Russell, attached as Exhibit 74, at 7.

196.    Ms. Russell believed that the course of treatment from Akoda "really was best/necessary." Russell Facebook comments, attached as Exhibit 75, at 4.

197.    Ms. Russell alleges that Akoda's conduct has exacerbated her innate trust issues. Ex. 47 at 2-3.

198.    Ms. Russell claimed she experienced anxiety upon learning of Akoda's identity. Russell Dimensions RFA, attached as Exhibit 76, at 8.

199.    Ms. Russell experienced no atypical symptoms after her C-section, and her son has had no health problems. Ex. 72 at 53:15-21.

200.    Ms. Russell has not sought treatment from a psychiatrist or psychologist at any point in her adult life, including before and after Akoda delivered her baby. Ex. 72 at 69:21-70:5.

201.    In 2018, Ms. Russell gave no indication of depression, anxiety, suicidal thoughts, or other mental health issues to her doctor. Ex. 72 at 98:22-99:8.

202.    Ms. Russell does not claim to suffer from post-traumatic stress disorder. Ex. 72 at 121:23-25; Ex. 76 at 4-6.

203.    Ms. Russell has never been formally diagnosed with depression, anxiety, a permanent disability, or a sleeping disorder. Ex. 72 at 122:1-123:18; Ex. 76 at 6-7, 11.

204.    In a previous lawsuit, Ms. Russell admitted to not having depression as a result of learning about Akoda's identity. Ex. 76 at 6-7.

205.    In a previous lawsuit, Ms. Russell admitted to not having a physical injury or suffering from physical pain as a result of learning about Akoda's identity. Ex. 76 at 9.

206.    Ms. Russell does not claim to suffer sleeplessness. Ex. 76 at 10.

JA2841

207.    Ms. Russell does not allege that Akoda sexually assaulted her. Ex. 72 at 129:16-130:11.

208.    Ms. Russell claims that her emotional distress and distrust of doctors were "amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda." Ex. 47 at 3. *See also* Ex. 69 ¶ 71.

209.    Ms. Russell has seen a doctor since finding out about Akoda. Ex. 72 at 60:4-10.

210.    Ms. Russell found out about Akoda's guilty plea in June of 2017. Ex. 72 at 31:1-7.

211.    Dr. Moore informed Ms. Russell that Dr. Moore's practice did not conduct a background check on Akoda. Ex. 72 at 57:11-21.

212.    Dr. Fenichel examined Ms. Russell on September 17, 2019. Ex. 74 at 1.

213.    Dr. Fenichel did not find Ms. Russell to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 74 at 7.

214.    Ms. Russell believes ECFMG is a governmental entity. Ex. 72 at 77:13-23.

215.    Ms. Russell believes ECFMG does background checks on applicants such as Akoda. Ex. 72 at 77:13-23.

216.    Ms. Russell believes Akoda is a "fake doctor," who "was not properly trained as a doctor or credentialed as a doctor." Ex. 72 at 45:7-14.

217.    Ms. Russell has alleged back pain as a result of Dr. Akoda's treatment but also indicated she does not know if the pain is attributable to Dr. Akoda. Ex. 72 at 123:19-124:19.


Dated: December 10, 2021                    Respectfully submitted,

                                            */s/ Brian W. Shaffer*
                                            Brian W. Shaffer, PA Bar No. 78851
                                            Elisa P. McEnroe, PA Bar No. 206143
                                            Matthew D. Klayman, PA Bar No. 319105

MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for*
*Foreign Medical Graduates*

JA2843

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021       */s/ Brian W. Shaffer*
                                         Brian W. Shaffer

# Exhibit 1

JA2845

# About ECFMG

Overview | Statement of Values, Mission, and Purposes | Board of Trustees | ECFMG|FAIMER Leadership | Initiatives | History | Careers at ECFMG

## Overview

ECFMG is a world leader in promoting quality health care—serving physicians, members of the medical education and regulatory communities, health care consu... issues in medical education and health workforce planning.

International medical graduates (IMGs) comprise nearly one-quarter of the U.S. physician workforce. Certification by ECFMG is the standard for evaluating the q... physicians before they enter U.S. graduate medical education (GME), where they provide supervised patient care. ECFMG Certification also is a requirement for I... three-step United States Medical Licensing Examination® (USMLE®) and to obtain an unrestricted license to practice medicine in the United States.

ECFMG provides other programs for IMGs pursuing U.S. GME, including those that assist them with the process of applying for U.S. GME positions; and that spon... J-1 visa for the purpose of participating in such programs. We offer a verification service that allows GME programs, state medical boards, hospitals, and credenti... States to obtain primary-source confirmation that their IMG applicants are certified by ECFMG. The ECFMG Certificate Holders Office (ECHO) offers free care... physicians pursuing ECFMG Certification.

Through more than six decades of certifying IMGs, ECFMG has developed unparalleled expertise on the world's medical schools, the credentials they issue to the... verification of those credentials. ECFMG expanded this expertise nearly 20 years ago to include primary-source verification of credentials related to postgradua... registration/licensure. Currently, ECFMG's Electronic Portfolio of International Credentials (EPIC$^{SM}$) service offers this expertise to individual physicians and the... educate, and employ them.

ECFMG's programs for the medical education community offer valuable services to international medical schools and their graduates, and promote quality in me... Through its GEMx$_{SM}$ program, ECFMG is building a global partnership, and supporting regional partnerships, for international educational exchange in medicine a... GEMx facilitates the elective exchange process for participating institutions and students alike, and provides students with increased access to exchange opportu... Medical School Web Portal (EMSWP), ECFMG provides access to several web-based services for international medical schools, including electronic Credentials V... Performance Data.

ECFMG's commitment to promoting excellence in international medical education led to the establishment of its nonprofit foundation, the Foundation for Advan... Medical Education and Research (FAIMER®). FAIMER has assumed responsibility for, and expanded upon, ECFMG's programs for international medical educat... agenda. Through FAIMER, ECFMG offers training in leadership and health professions education; creates and maintains data resources on medical education wor... research on international medical education programs, physician migration, and U.S. physician workforce issues.

Back to top

Last updated June 30, 2021.
® Registered in the US Patent and Trademark Office.
Copyright © 1996-2021 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

# Exhibit 2

JA2847



Deposition of:

## Kara Corrado

*September 10, 2019*

In the Matter of:

## Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

JA2848

```
                                           Page 1

 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    - - -
 4   MONIQUE RUSSELL, JASMINE :  Case No.
     RIGGINS, ELSA M. POWELL   :
 5   AND DESIRE EVANS,         :  2:18-cv-05629-JW
                               :
 6             Plaintiffs,     :
                               :
 7          vs.                :  Hon. Joshua D. Wolson
                               :
 8   EDUCATIONAL COMMISSION     :
     FOR FOREIGN MEDICAL        :
 9   GRADUATES,                 :
                               :
10             Defendant.      :
11                    - - -
12             September 10, 2019
13                    - - -
14        Oral deposition of KARA CORRADO, taken
15    at the offices of MORGAN LEWIS BOCKUS, LLP,
16   1701 Market Street, Philadelphia, Pennsylvania
17       beginning at 10:48 a.m., before
18   Jennifer L. McDonald, a Professional Reporter
19   and a Notary Public in and for the Commonwealth
20               of Pennsylvania.
21                    - - -
22     VERITEXT NATIONAL COURT REPORTING COMPANY
                MID-ATLANTIC REGION
23        1801 Market Street - Suite 1800
           Philadelphia, Pennsylvania 19103
24
```

KARA CORRADO

Page 39

```
 1        special investigations and the addition

 2        of case managers, it fell under the

 3        purview of the associate vice president,

 4        who was Bill Kelly, and I, at the time, a

 5        manager of operations program

 6        development.

 7                  So Bill, myself, and Virginia

 8        Kesting, who reported to me, we were the

 9        folks working on the irregular behavior.

10        So in that respect when I was working for

11        Bill, I was staff.

12  BY MR. THRONSON:

13        Q.       When did you get involved in

14  work on irregular behavior matters?

15        A.       That was around 2008 when I

16  moved -- changed position.

17        Q.       So the staff for the irregular

18  behavior is part of the special investigations

19  team?

20        A.       That is the special

21  investigations team now, yes.

22        Q.       Okay.  Got it.  How does ECFMG

23  serve the public?

24                  MS. McENROE:  Objection to form.
```

KARA CORRADO

Page 40

```
 1            THE WITNESS:  ECFMG serves the
 2     public in a number of ways.  Our original
 3     program which was the certification
 4     program severs the public in ensuring
 5     that those physicians that are educated
 6     outside of the U.S. and Canada meet
 7     certain minimum requirements in order to
 8     enter an accredited residency program in
 9     the United States.
10            We also serve the public in
11     facilitating an appropriate review of
12     them, at the same time making sure that
13     we are efficient about doing it, because
14     IMGs -- or International Medical
15     Graduates represent about 25 percent of
16     the physicians that are working in the
17     United States.
18            So it's important from a
19     physician-workforce point of view to make
20     sure we have qualified physicians.  So in
21     those two broad ways I would say that we
22     serve the public.
23  BY MR. THRONSON:
24     Q.      How does ECFMG serve medical
```

Page 41

1   residency programs?

2                   MS. McENROE:  Objection to form.

3                   THE WITNESS:  So ECFMG has a

4          certification program that is required

5          for entrance into ACGME accredited

6          residency programs.

7   BY MR. THRONSON:

8          Q.      Any other ways in which ECFMG

9   severs medical residency programs?

10                  MS. McENROE:  Objection to form.

11                  THE WITNESS:  So we also have an

12         exchange visitor sponsorship program.  We

13         are responsible for physicians who are

14         seeking residency and training in the

15         United States on a J-1 nonimmigrancy

16         step.

17  BY MR. THRONSON:

18         Q.      Beyond the ways in which you

19  serve medical residency programs that you

20  described, how else does ECFMG serve hospitals?

21                  MS. McENROE:  Objection to form.

22                  THE WITNESS:  I don't know that

23         I would say that we serve hospitals,

24         however, we do provide a service for

Page 54

1   obligated to exercise reasonable care in

2   performing those services?

3              MS. McENROE:  Objection to form;

4        calls for legal conclusion as does this

5        whole line of questioning.

6              THE WITNESS:  So ECFMG has a set

7        of policies and procedures that it

8        enforces when it is processing applicants

9        or certifying them.

10  BY MR. THRONSON:

11       Q.      Okay.  Is following -- does

12  ECFMG have the obligation to follow those

13  policies and procedures?

14             MS. McENROE:  Objection to form;

15       also calls for legal conclusion.

16             THE WITNESS:  I mean ECFMG, I

17       think, like any organization will follow

18       it's policies and procedures and the

19       staff will follow the policies and

20       procedures, and in the course of their

21       normal work will be working to make sure

22       they are appropriately following those

23       policies and procedures.

24  BY MR. THRONSON:

KARA CORRADO

Page 55

```
 1          Q.         Can you tell me about the
 2    various categories of policies and procedures
 3    that have applied perhaps at different times
 4    from 1996 to the present with respect to ECFMG
 5    certification of IMGs?
 6                     MS. McENROE:  Objection to form;
 7          calls for a narrative.
 8                     You can answer if you can.
 9                     THE WITNESS:  So there are
10          myriad policies and procedures that would
11          apply to ECFMG certification.  Is there a
12          specific one or type of policy that you
13          are interested in?
14    BY MR. THRONSON:
15          Q.         What I'm thinking of, is there a
16    set of policies on irregular behavior called
17    irregular behavior policies; is there a set of
18    policies called how to perform primary-source
19    verification of the diploma?
20                     Just sort of broad categories of
21    policies or names of sets of policies?
22                     MS. McENROE:  Objection to form.
23                     THE WITNESS:  So ECFMG has
24          irregular behavior policies and
```

KARA CORRADO

```
 1          procedures, and we also have an

 2          information booklet that's updated yearly

 3          that contains all of the policies related

 4          to ECFMG certification; eligibility for

 5          certification, eligibility for

 6          examinations, and those types of

 7          policies.

 8   BY MR. THRONSON:

 9          Q.       How about -- strike that.  Has

10   it had irregular behavior policies continuously

11   from 1996 to the present?

12          A.       Yes, that's my understanding.

13          Q.       Are there any internal irregular

14   behavior polices that are not necessarily

15   published on a website or in a booklet for the

16   benefit of IMGs?

17                   So basically internal procedures

18   that govern the operation of ECFMG with respect

19   to irregular behavior?

20                   MS. McENROE:  Objection to form.

21                   THE WITNESS:  So there are

22          policies that are published on the

23          website, but there are also procedures

24          that staff would follow in terms of
```

Case 2:18-cv-05629-JDW Document 22-5 Filed 12/16/21 Page 966 of 3041
Case 2:18-cv-05629-JDW Document 22-5 Filed 09/08/2022 Page 966 of 3041

```
 1          preparing cases for the committee and
 2          sending letters out and things like that
 3          that are not necessarily published.
 4   BY MR. THRONSON:
 5          Q.        One of the things that we've
 6   been seeking in this case is just to get all
 7   the relevant sets of polices and procedures,
 8   and we have gotten some, but I'm trying to get
 9   a sense of the universe of documents that might
10   be relevant to this case just so we have a full
11   picture of what ECFMG polices are.
12                   So if we were to, say, request
13   polices from the organization obviously one set
14   of polices that we would request would be --
15   actually have some meaning, would be a request
16   for the irregular behavior policies and
17   procedures, right?
18                   MS. McENROE:  Objection to form.
19                   THE WITNESS: (Nonverbal
20          response.)
21   BY MR. THRONSON:
22          Q.        Is there another set of polices
23   called -- that governs when to refer cases to
24   the credentialing committee?
```

Case 2:18-cv-00562-DLWenD0ument 22-5menPage: 9&ed 12ate/Filed Page09/08/2022

1      of.
2  BY MR. THRONSON:
3      Q.      So Mr. Kelly, in drafting this
4  document, never indicated to you that this is
5  something new that I'm putting in here, I think
6  we should change how we're doing a particular
7  thing?
8              MS. McENROE:  Objection to form.
9              THE WITNESS:  Not that I recall.
10 BY MR. THRONSON:
11     Q.      According to these procedures
12 when should an allegation of irregular behavior
13 be referred to the credentials committee?
14             MS. McENROE:  Objection to form.
15 BY MR. THRONSON:
16     Q.      By these procedures I mean the
17 ones in Exhibit 2.
18     A.      There is, on page 4, an
19 indication to send the allegation of irregular
20 behavior which in quotes we call "the charge
21 letter to the applicant."
22     Q.      Can you show me the language you
23 are referring to; read it for me?
24     A.      The bottom of page 4.  The very

Case 2:18-cv-05629-JDW Document 22-5 Filed 10/18/22 Page 968 of 3041 Date Filed 09/08/2022

```
 1   last two italicized phrases.
 2        Q.          I see that.  So I'm interested
 3   in knowing when staff becomes aware of an
 4   allegation of irregular behavior, is there
 5   anything in Exhibit 2 that indicates when staff
 6   should refer that allegation to the credentials
 7   committee?
 8                    MS. McENROE:  Objection to form.
 9   BY MR. THRONSON:
10        Q.          Or under what circumstances the
11   staff should refer to the --
12        A.          The document -- the procedures
13   are documenting walking through the process of
14   the investigation which starts with determining
15   whether the irregular behavior relates to
16   ECFMG, whether the source of the allegation is
17   credible, and the process you go through when
18   this comes to the source of the allegation.
19        Q.          Is it ECFMG's position that if
20   staff determines an allegation is credible,
21   that that allegation should be forwarded to the
22   credentials committee?
23                    MS. McENROE:  Objection to form.
24                    THE WITNESS:  So the policies
```

Case 2:13-cv-01998-WB Document 225-5 Filed 01/10/14 Page 969 of 2022

Page 77

```
 1          and procedures on irregular behavior
 2          indicate that if staff determines there
 3          is sufficient evidence of irregular
 4          behavior the matter will be referred to
 5          the credentials committee.
 6   BY MR. THRONSON:
 7          Q.        Is that language in this
 8   procedure; is it written down somewhere else?
 9          A.        So that language without sitting
10   and reading through here, I don't know for sure
11   if it's in this document or not; but it is in
12   the medical education credentials committee
13   polices and procedures on irregular behavior.
14          Q.        Okay.  Can you say that for me
15   again, if staff determines that there is
16   sufficient evidence; is that what you said?
17          A.        That is what I said, yes.
18          Q.        What is sufficient evidence?
19          A.        Sufficient evidence, it depends
20   on the case.  For example, if it's a falsified
21   credential and the school responded and said
22   the diploma is false, then that response would
23   be sufficient evidence to make an allegation of
24   irregular behavior on a falsified credential.
```

Case 2:18-cv-01568-DWL Document 22-5 Filed 11/10/19 Page 970 of 3041
Case 2:21-cv-00985-JDW Document 22-5 Filed 09/08/2022 Page 970 of 3041

1      Q.        Okay.  I'd like to walk through
2  some -- strike that.  Has it been ECFMG's
3  procedure since 1996 that if staff determines
4  that an allegation is supported by sufficient
5  evidence that the allegation is referred to the
6  credentials committee?
7      A.        That is my understanding, yes.
8      Q.        Does the evidence have to be in
9  a particular form?  For example, does there
10  have to be a particular kind of documentary
11  evidence, or does that depend on the case?
12      A.        It depends on the case.
13      Q.        On page 6 of the polices and
14  procedures, this is Bates 10203, the procedure
15  reads "if the third party is not already
16  provided the appropriate identifying
17  information about the individual" -- so on and
18  so forth -- "ECFMG staff must determine whether
19  the individual is an applicant to ECFMG for any
20  program or service such as ECFMG certification,
21  EPIC, et cetera.  To do this staff must use all
22  the appropriate search functions to query all
23  ECFMG databases," and it mentions AMES, OASIS,
24  and EPIC as examples of those databases.

Case 2:18-cv-00562-MRH Document 22-5 Filed 11/10/19 Page 971 of 3041
Case 2:18-cv-00562-MRH Document 22-5 Filed 11/10/19 Page 971 of 3041

1  went to medical school beyond that ECFMG

2  received these two diplomas that were source

3  verified by the institution?

4       A.      Yes, that's correct.

5       Q.      Does ECFMG have any information

6  apart from the source verification of those

7  diplomas that would indicate where this

8  individual actually went to medical school, if

9  anywhere?

10      A.      All of the information we have

11 about his medical education, aside from the

12 verification of the diploma by the medical

13 school's officials, would have been provided by

14 him on his applications to ECFMG.

15      Q.      So just to be totally clear,

16 apart from having these two diplomas that were

17 source verified by the institution and ECFMG's

18 belief, ECFMG can't say where and when this

19 individual, Akoda Igberase, went to medical

20 school, if anywhere?

21             MS. McENROE:  Objection to form.

22             THE WITNESS:  We could only

23      provide the information that the school

24      verified to us, which would include the

Case 2:18-mc-00085-ER Document 22-5 Filed 09/08/22 Page 972 of 3041

Page 88

1      graduation date on the diploma.

2   BY MR. THRONSON:

3      Q.      How did you obtain source

4   verification from the school?

5      A.      For those diplomas?

6      Q.      For those diplomas.

7      A.      We followed our processes at the

8   time for source verification which was to send

9   a copy of the diploma to the medical school

10  directly with a form for the school official to

11  complete, it's a safety paper form, and a

12  prepaid envelope, -- I'm sorry, it's not a

13  prepaid envelope, but an envelope addressed to

14  ECFMG to be returned to us.

15     Q.      At this time, did you also

16  request, we're talking about between 1992 to

17  2000, did you also request verification of

18  whether an individual was registered as a

19  medical practitioner or licensed to practice

20  medicine in his or her home country?

21     A.      The credentialing requirements

22  for certification at that time included source

23  verification of the diploma only, and the

24  individual was required to also submit a copy

KARA CORRADO

1  of their certificate of their full registration

2  or license, but those were not source-verified.

3          Q.        Why not?

4          A.        I don't know why they were not,

5  but the decision prior to me had been source

6  verification of diploma with a submission of

7  the license, which is not a requirement now.

8          Q.        Why did it cease becoming a

9  requirement?

10          A.        We introduced a clinical skills

11  assessment examination in 1998, and at that

12  time the organization determined it did not

13  need the license or certificate of registration

14  from an international medical graduate when it

15  introduced a clinic skill assessment which is

16  an in-person exam simulated with patients.

17          Q.        It has never been a requirement

18  for international medical graduates applying

19  for ECFMG certification to provide government

20  issued photoed identification, correct?

21          A.        It is a requirement to submit

22  photo identification currently, but it was not

23  in the past.

24          Q.        When did it become a

Case 2:18-cv-01253-DGW Document 22-5 filed 12/10/21 Page 974 of 3041

Page 90

1   requirement?

2       A.        It varies based on the service.

3   So the international credential services, EPIC,

4   when that program was launched, which I believe

5   was I was in 2012 or 2013, part of the

6   requirement was to submit a copy of the

7   passport and have it notarized -- an

8   identification form notarized and for ECFMG

9   certification that became part of the

10  requirement in 2017, I believe, or 2018; maybe

11  2018, more recently.

12      Q.        Why did it become a requirement?

13      A.        We were looking across our

14  processes and programs and we wanted to

15  standardize it, work towards standardization,

16  and bring, like have a notary -- the process is

17  essentially the same as it had been but we

18  wanted to tighten it up in terms of having one

19  notary that we contract with to provide

20  notarization of the identification forms to us.

21      Q.        Is that a separate requirement,

22  in terms of ECFMG now has a requirement that an

23  applicant provide government issued photo

24  identification if I'm understanding you right?

Case 2:18-1998562-Doc Dcument 22-5ment Page: 975ed 1 Date/File PageO09/08/20422

1  security number to ECFMG itself, correct?

2       A.       It would depend on whether -- I

3  mean we would have known, yeah.  I think we put

4  that in the letter to them, we got the social

5  security number.  So if -- if we knew because

6  they advised us that he had used the other

7  social security number that that was not his

8  social security number, yes.

9       Q.       If you turn to Exhibit 31, this

10 is the letter we were talking about earlier.

11 Exhibit 31 to the Kelly deposition from Steve

12 Seeling to James McCorkle.  In the second

13 paragraph Steve Seeling states the social

14 security number he provided ECFMG in 1998 is

15 9065?

16      A.       Yes, I see that.

17      Q.       Providing a false social

18 security number or using a false social

19 security number can be a federal, criminal

20 offense; correct?

21           MS. McENROE:  Objection to form;

22      calls for a legal conclusion.

23           THE WITNESS:  That's my

24      understanding, yes.

Page 150

1  BY MR. THRONSON:

2       Q.        At least based on the plea

3  agreement and so fourth --

4       A.        Yes.

5       Q.        Right, and it was also one of

6  the reasons that Akoda was ultimately kicked

7  out of the Jersey Shore residency, right?

8       A.        Yes.

9       Q.        Under ECFMG's judgement would

10  providing a false social security number to

11  ECFMG at that time have constituted irregular

12  behavior?

13       A.        I think it would depend on the

14  circumstances around how the information was

15  provided and what evidence we had of that.

16       Q.        Do you have a sense of what,

17  after ECFMG became aware that -- well, let me

18  back up.  You said it would depend on the

19  circumstances.  So under the circumstances of

20  this case, is it ECFMG's position that Akoda

21  providing a false social security number to

22  ECFMG in 1998 constituted irregular behavior?

23              MS. McENROE:  Objection to form.

24              THE WITNESS:  What I know is

1      that it constituted the allegation from

2      the residency program; constituted enough

3      information for us to do an investigation

4      on that, but we did not have sufficient

5      evidence of the irregular behavior to

6      charge him with irregular behavior.

7              So there would be a policy tie

8      to the provision of false information.

9      For example, I don't know where anybody

10     lives, you could put an address on the

11     application that is not really your

12     address.  You might be using someone

13     else's address that you know.  I don't

14     know that that necessarily constitutes

15     irregular.

16             So if I have evidence of -- if

17     someone wrote a social security number on

18     the application and maybe the number is

19     off, I don't have any way to verify

20     whether the social security is valid or

21     not.

22             So if you were providing a false

23     number to us, in addition to other pieces

24     of information, that would show that you

Case 2:18-cv-01998 Document 22-5 Page 978 Date Filed 09/08/2022
Case 2:18-cv-01998 Document 22-5 Page 978 Date Filed 09/08/2022

1       were trying to subvert our processes like

2       Dr. Igberase did in using different

3       pieces of information in order to subvert

4       the policy that you can't retake the

5       exam, then you would have evidence of

6       irregular behavior.

7  BY MR. THRONSON:

8       Q.     How about giving a false name on

9  an application, would you agree that in

10 applying for ECFMG certification in 1996 that

11 an individual identified himself as John Nosa

12 Akoda and that's a false name?

13           MS. McENROE:  Objection to form.

14           THE WITNESS:  Someone applied to

15      ECFMG in 1996 and used the name John Nosa

16      Akoda, and based on the facts that were

17      stipulated in plea bargain Igberase has

18      stated that he used John Nosa Akoda's

19      name.

20 BY MR. THRONSON:

21      Q.     It appears that Kelly suspected

22 in 2000 that Akoda and Igberase were the same

23 person, right?

24      A.     Yes.  He, I think, had a

Case 2:18-cv-05629-JDW Document 225-5 Filed 12/16/22 Page 979 of 3041 Date Filed 09/08/2022

Page 180

1          residency program presumably on his

2          merits, his own merits, and we would have

3          verified it, as we do with all residency

4          programs.

5                    What his certification status

6          was, which was true at the time that we

7          verified it to them, he had a certificate

8          that was issued to him in that name, and

9          it was valid.

10    BY MR. THRONSON:

11         Q.        That was information that -- the

12    certification information that ECFMG supplied,

13    that was one of the pieces of information that

14    Howard University had before when determining

15    whether to accept this person into its

16    residency program, correct?

17                    MS. McENROE:  Objection to form.

18                    THE WITNESS:  Yes.  They would

19          have received a status report through the

20          regular residency application process.

21    BY MR. THRONSON:

22         Q.        The same is true for the

23    Maryland Board of Physicians, in determining

24    whether to grant Igberase, Akoda a license to

Case 2:18-cv-09856-29-cv-Document 22-5 Page: 980  Date Filed: 09/08/2022

1   practice medicine it would have had before it
2   information supplied by ECFMG regarding his
3   ECFMG certification status?
4           A.      Yes.
5           Q.      The same is true for Prince
6   George's County Hospital?
7           A.      Yes.  I believe they requested a
8   verification of his certification status.
9           Q.      Did ECFMG ever tell anyone
10  outside of the organization of the suspicion of
11  at least one of it's staff members, perhaps
12  more, that Igberase and Akoda were the same
13  person, before the law enforcement
14  investigation?
15          A.      Before the law enforcement, not
16  that I'm aware of.  I don't think it would have
17  necessarily been appropriate for them to do
18  that if we didn't feel that we had evidence
19  that they were the same person, because we
20  could potentially be providing information that
21  was not substantiated that may have an impact
22  on a physician's career or on residency
23  program.
24          Q.      Did ECFMG ever notify anyone

Case 2:18-cv-19052-ID Document 22-5 en Page: 981 Date Filed 09/08/2022

Page 182

1   outside of the organization, before the law

2   enforcement investigation, that Jersey Shore

3   had dismissed him from their residency program?

4           A.      Not that I'm aware of.

5           Q.      Why not?

6           A.      Why didn't we tell anyone about

7   a potential suspicion?

8           Q.      Why didn't you tell anyone that

9   he had been dismissed from his residency

10  program among other things, providing --

11          A.      That kind of information, that's

12  not within our scope or responsibility to

13  report loss of residency, I assume.  Well,

14  maybe not loss, but residents are dismissed

15  from their programs for a variety of reasons.

16  Unless they are a J-1, which he was not, we

17  don't get that kind of information or keep it

18  on a regular basis, and it's not in our scope

19  to report that to other organizations.

20          Q.      If this same set of facts came

21  before ECFMG today, came before your

22  department, would you handle it the same way?

23                  MS. McENROE:  Objection to form;

24          calls for speculation.

Case 2:18-cv-00562 Document 22-5 filed 12/16/21 Page 982 Date Filed 09/06/2022

1  person?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  What other
4      information would we have expected?
5          MR. THRONSON:  Yeah.
6          THE WITNESS:  I don't know.  It
7      could be anything.
8  BY MR. THRONSON:
9      Q.      Is there any organization that
10 is better situated than ECFMG to determine
11 whether the applicant, who identified himself
12 as Igberase Charles, and the applicant who
13 identified himself as Akoda, were in fact the
14 same applicant?
15         MS. McENROE:  Objection to form.
16         THE WITNESS:  So the
17     verification of the identity of someone
18     who is showing up at the residency
19     program would be on the residency program
20     or the hospital, would be my assumption.
21         If they are hiring the
22     individual, they're not relying on ECFMG
23     to say that we identified -- that they
24     don't have to do their own review of who

Case 2:23-1998 562 Document 22-5 Document Page: 983 Date Filed 09/08/2022 Page: 983 1 of 11 Date Filed 09/08/2022

1          that person; is that what you're asking?
2     BY MR. THRONSON:
3          Q.          Who is better situated?  Are you
4     saying the hospitals are in a better
5     position to answer -- strike that.
6               Were the hospitals in this case
7     in a better position to answer whether Igberase
8     and Akoda are the same person; are you
9     contending they were?
10              MS. McENROE:  Objection to form.
11              THE WITNESS:  What I'm saying
12          is, each organization has its own process
13          to verify identities or certification of
14          identities.
15              We would not -- those processes
16          would differ.  We are not hiring the
17          person so whatever the requirements would
18          be for identity, for VISA status, for any
19          of those things, it wouldn't be
20          appropriate for us to check those because
21          it's not within our scope of the
22          certification program.
23              For example, other than the J-1
24          visas we sponsor, we don't confirm to

Case 2:18-cv-19859-JMV-JSA Document 84 Filed 09/08/22 Page 994 of 3041 PageID: 95562

1       residency programs that those individuals

2       have the appropriate visas to be in the

3       United States.

4               It is the responsibility of the

5       individual and then the organization

6       that's hiring them to do that kind of

7       identification and review of the

8       individual.

9               I don't know that one is in a

10      better position than the other.  It's

11      just that each organization has different

12      processes and ways to certify identities

13      and records.

14  BY MR. THRONSON:

15      Q.      So is it your contention, that

16  it would have been inappropriate for ECFMG to

17  do further investigation into this question of

18  identity, to determine whether Igberase and

19  Akoda are the same person?

20              MS. McENROE:  Objection to form.

21              MR. THRONSON:  Are you saying

22      that would have been inappropriate?

23              MS. McENROE:  Objection to form.

24              THE WITNESS:  I wouldn't use the

Case 2:23-1998 5629 Document 22-5 en Page: 985 1 D/10/21 Filed 09/08/2022

Page 200

```
 1          word inappropriate, but it wasn't part of
 2          our process to go further or to see if
 3          some -- I don't know what other
 4          organization we could have gone to at the
 5          time to see if the two people were the
 6          same; if that's what you are asking.
 7   BY MR. THRONSON:
 8          Q.       Could you have consulted with
 9   someone from the Nigeria Consulate to determine
10   if the passport was authentic from their
11   perspective?
12                   MS. McENROE:  Objection to form.
13                   THE WITNESS:  I suppose we could
14          have, but that wasn't part of our process
15          at the time.
16   BY MR. THRONSON:
17          Q.       Could you have called any of the
18   references that Akoda gave to determine whether
19   the letters of recommendation were authentic?
20                   MS. McENROE:  Objection to form.
21                   THE WITNESS:  We could have, and
22          we may have.  I just don't have any
23          documentation in the file that we made
24          the phone calls.
```

Case 2:23-1998562 Document 22-5 rennefag 986 11/10/21 04 Filed 09/08/2022

Page 201

1    BY MR. THRONSON:

2         Q.        Obviously you could have

3    compared the photos between the two

4    applications to see if they resemble each

5    other?

6                        MS. McENROE:  Objection to form.

7                        THE WITNESS:  Yes, we could.  We

8              did when we reviewed the file.  We would

9              have looked at both photographs when we

10             reviewed the file in 2000 in the

11             investigation, but again we would -- the

12             photos could be -- they could look like

13             each other, but I look like my cousin,

14             right, so they are not definitive in and

15             of themselves to say they are the same

16             person.

17                      We are not expert in being able

18             to do that between two photographs.

19   BY MR. THRONSON:

20        Q.        So you're saying that, ECFMG did

21   look through both applications; the

22   applications that Igberase Charles submitted

23   and the applications that Akoda submitted?

24        A.        In 2000 --

Case 2:18-cv-05540-DMV-MAH Document 22-5 Filed 09/08/2022 Page 987 of 3041

```
 1    Igberase's information.
 2          Q.         You were asked some questions a
 3    little bit earlier today regarding whether and
 4    when Dr. Akoda responded to the letter from
 5    Mr. Kelly dated August 22, 2000.  Do you recall
 6    that?
 7          A.         Yes.
 8          Q.         Does this refresh your
 9    recollection for that testimony?
10          A.         Yes.  So I think I said that he
11    had not responded within the requisite 15 days,
12    but looking at the receipt date on this it
13    appears that he did.
14          Q.         There was some discussion
15    earlier today about what it means to have a
16    finding of irregular behavior for false
17    information on an application.  Do you remember
18    generally that kind of testimony?
19          A.         Yes.
20          Q.         Can you clarify what could
21    constitute irregular behavior for false
22    information on an application to ECFMG?
23          A.         False information on an
24    application for ECFMG would, could consist of
```

Case 2:18-1998562-DocDocument 22-5entFilege: 958ed 1/10/71aFiled 09/08/2022

1  indicating to ECFMG that you had not taken an

2  exam previously when you had taken an exam.

3              It could also refer to your

4  medical school attendance and graduation if

5  when we sourced verified your diploma, it was

6  inauthentic.

7         Q.       Could an inaccurate address be

8  considered by ECFMG to be false information

9  that would constitute irregular behavior?

10        A.       That is not something that we

11 would consider irregular behavior.

12        Q.       What about the location of the

13 birth?

14        A.       No.

15        Q.       What about social security

16 number?

17        A.       No.

18        Q.       Is it possible for there to be

19 information that is false on an ECFMG

20 application that might constitute a violation

21 of law, but would not constitute a basis for

22 irregular behavior for ECFMG?

23        A.       Yes, that's possible.

24        Q.       Does ECFMG make allegations of

Case 2:18-cv-01998-DWL Document 22-5 Filed 10/16/18 Page 989 of 3041 Date Filed 09/03/2022

```
 1   irregular behavior for applicants' violations
 2   of law just because they are a violation of
 3   law?  So for example, rape or murder?
 4        A.       No.  The criminal activities of
 5   applicants are not within our jurisdiction for
 6   irregular behavior.
 7        Q.       There was a lot of discussion
 8   today about ECFMG certification, correct?
 9        A.       Yes.
10        Q.       What does an ECFMG certificate
11   signify?
12        A.       An ECFMG certificate signifies,
13   that the individual has met minimum
14   requirements which includes passing medical
15   licensing examinations, as well as meeting our
16   credentialing requirements.
17                 It signifies to an ACGME
18   accredited residency program that the
19   individual has met those requirements for
20   admission to GME, and it is part of the
21   requirements for eligibility for Step 3 and for
22   licensure.
23        Q.       Does an ECFMG certificate
24   signify certification of an applicant's
```

Case 2:18-cv-00562-... Document 22-5... Page: 990... Date Filed 09/08/2022

1    identity to a recipient of a ECFMG status

2    report indicating there's an ECFMG certificate

3    in place?

4          A.      No.

5          Q.      What do you mean by that?

6          A.      So when we certify the status of

7    an ECFMG certificate, we are not certifying to

8    the organization necessarily the identity of

9    the individual, but that an individual with

10   that name and date of birth has met the

11   requirements for certification and what the

12   validity is of their certificate and where they

13   went to medical school.

14         Q.      Is ECFMG certifying to the

15   recipients of the ECFMG certification

16   information that the applicant's social

17   security number is accurate?

18         A.      No.

19         Q.      Is ECFMG certifying to the

20   recipient of the ECFMG certification that the

21   location of the birth is accurate?

22         A.      No.

23         Q.      Is ECFMG certifying to the

24   recipients of the ECFMG certification status

Case 2:18-cv-05629-JDW Document 22-5 Filed 10/21/21 Page 99 of 116
Case 2:18-cv-05629-JDW Document 22-5 Filed 09/05/2022 Page 1 of 1

1    that the clinical clerkships are accurate as

2    represented on ECFMG's application?

3         A.        No.

4         Q.        Is it ECFMG's expectations that

5    individuals from the public rely on ECFMG

6    certification for any purpose?

7         A.        I'm sorry, can you say that

8    again?

9         Q.        Yes.  Is it ECFMG's expectation

10   that individuals from the public rely on ECFMG

11   status for any purpose?

12        A.        No.

13        Q.        So can an individual off the

14   street or who is examining the credentials of a

15   potential physician they want to go see, are

16   they entitled to contact ECFMG and ask about a

17   physician's certification status?

18        A.        No.  We would not release a

19   physician's certification status or a status

20   report to a member of the public.

21        Q.        Would ECFMG release a

22   certification status report to the individual

23   himself?

24        A.        No.

Case 2:18-cv-00562 Document 22-5 Page: 992 Date Filed 09/06/2022
Case 2:18-cv-00562 Document 22-5 Page: 992 Filed 10/10/21 Page 09/06/2022

Page 244

```
 1          Q.        To whom would ECFMG release a
 2    ECFMG certification status report?
 3          A.        To residency programs, licensing
 4    boards, and other organizations that are
 5    employing the physician as a physician.
 6          Q.        Like hospitals and --
 7          A.        Hospitals, right, CVOs that are
 8    working on behalf of the hospitals.
 9          Q.        Is it ECFMG's expectation that
10    recipients of ECFMG certification get
11    additional credentials before laying hands on
12    patients independently?  I can restate that if
13    you need?
14          A.        Yes, can you.
15          Q.        Yes.  So what I'm asking is
16    there was a lot of questions today about
17    whether an ECFMG certificate was necessary for
18    an applicant to do other things, for example go
19    to a residency program.  Do you remember that
20    testimony?
21          A.        Yes.
22          Q.        Is it ECFMG's understanding that
23    an ECFMG certificate is sufficient for an
24    applicant to treat patients?
```

Case 2:23-cv-01998-TJ-DEn Document 22-5 Page: 998 1 Date Filed 09/08/2022

Page 245

1          A.          No, it's not sufficient.

2          Q.          What else would be required

3     under ECFMG's expectations?

4          A.          So ECFMG certification is one of

5     the initial steps in the process for an

6     international medical graduate to ultimately

7     practice medicine in the United States.

8                     While ECFMG certification may be

9     required for entrance into residency or for

10    licensure, it is not the only requirement that

11    the residency programs and the licensing boards

12    have in order to admit those individuals to

13    their programs or to license those individuals.

14         Q.          So to make sure I understand.

15    After an applicant gets an ECFMG certificate,

16    do they take any other board exams?

17         A.          Yes.  They need to take USMLE

18    Step 3.  So essentially they have to become

19    ECFMG certified which is the beginning of the

20    process, taking the examinations required for

21    certification; have their credentials source

22    verified; go through the residency application

23    process; get accepted to a residency program,

24    and meet whatever requirements the residency

Case 2:23-1998 Document 22-5 Page: 994 Date Filed 09/08/2022

1    programs has.

2              They can then apply for Step 3,

3    and they have to be certified and meet the

4    eligibility requirements that the Federation of

5    State Medical Boards has for Step 3; complete

6    their training and then again meet whatever

7    requirements the licensing board would have on

8    them to be licensed.

9         Q.        You said "complete training,"

10   what do you mean by that?

11        A.        Graduate medical education

12   training is generally a requirement for

13   licensure in all states.

14        Q.        So in other words, would that be

15   like a residency program, for example?

16        A.        Yes, residency program.

17        Q.        So are the applicants coming

18   through ECFMG still in graduate medical

19   education as they are proceeding forward; do

20   they still have more education requirements

21   after they get an ECFMG certificate?

22        A.        To be licensed in the U.S., yes.

23        Q.        Is -- FSMB, that's an acronym

24   you just used, what does that stand for?

Case 2:18-cv-00562-... Document 22-5 ... Page 995 of ... Date Filed 09/08/2022

```
 1        A.        That is the Federation of State

 2   Medical Boards.

 3        Q.        Is that an entity under ECFMG's

 4   control?

 5        A.        No.

 6        Q.        That's a separate entity?

 7        A.        Yes.

 8        Q.        Thank you.

 9                  I have no further questions of

10   this witness.

11                  MR. THRONSON:  Just a few follow

12        ups to echo a few of Counsel's questions.

13                       - - -

14                  REDIRECT EXAMINATION

15                       - - -

16   BY MR. THRONSON:

17        Q.        Is it ECFMG's expectation that

18   state medical boards will rely on reports of

19   ECFMG certification status for any purpose?

20        A.        Yes.  To meet the requirement

21   that the board might have for ECFMG

22   certification.

23        Q.        Is it ECFMG's expectation that

24   residency programs, such as that at Howard
```

Case 2:23-1998562 Document 22-5 Page: 996 Date Filed: 09/08/2022

Page 248

1  University, would rely on ECFMG status for any

2  purpose?

3        A.        Yes, to demarcate that that

4  person met the certification so they could

5  enter GME among whatever other requirements the

6  program had.

7        Q.        It is ECFMG's expectation that

8  hospitals that are considering whether to grant

9  clinical privileges to a physician rely on

10  ECFMG status for any purpose?

11        A.        I think it would be fair to say

12  that they have the same expectation as the

13  licensing board and the residency programs have

14  on the status reports; on ECFMG providing

15  information about certificate status.

16        Q.        The status report that was

17  provided to the Howard residency program

18  regarding Akoda, what was all the information

19  that that status report contained?

20        A.        The status report would contain,

21  his name; his USMLE identification number; his

22  medical school; the year he graduated; the

23  country of medical school; the validity of his

24  ECFMG certificate, what the status is; whether

Case 2:18-cv-05629-JDW Document 122-5 Filed 11/10/22 Page 997 of 3041 Case 2:18-cv-05629 Document 122-5 Page: 997 Date Filed: 09/08/2022

1  it expired or valid indefinitely; and when it

2  was issued.

3       Q.       If there were any finding of

4  irregular behavior, would the status report

5  contain an annotation reflecting that finding?

6       A.       Yes.

7       Q.       Any other information that the

8  status report contains, in that was submitted

9  to the Howard Residency Program?

10      A.       The status report to the

11  residency program may have had the dates that

12  he passed the USMLE examinations; and that

13  would be for the exams that met ECFMG's

14  examination requirement, but we would not

15  include scores to the residency program because

16  they would get those through a USMLE

17  transcript.

18      Q.       Any other information?

19      A.       No, electronically through the

20  system I don't believe there's any other

21  information.

22      Q.       ECFMG also provided status

23  reports to the Maryland Board -- a status

24  report to the Maryland Board of Physicians,

Case 2:23-cv-01045-DDC-TJJ Document 22-5 Filed 12/16/21 Page 998 of 2022
Case 2:23-cv-01045-DDC-TJJ Document 22-5 Filed 09/08/2022

Page 250

1  right?

2        A.        Yes.

3        Q.        Would that status report have

4  contained all the information that you just

5  mentioned?

6        A.        Yes.

7        Q.        Would it have been the same

8  status report that was sent to them?

9        A.        It would have been the same

10  status report, yes.  In terms of the

11  information that is on it, it's in a different

12  format.  When Howard gets it electronically,

13  it's not a PDF it's data; and when the Maryland

14  board gets it, it would be in more of a PDF

15  format --

16        Q.        Okay.

17        A.        -- the substance is the same.

18        Q.        Any additional information that

19  was on the report to the Maryland Board of

20  Physicians?

21        A.        Other than, our -- we have some

22  disclaimers at the bottom, but other than that

23  there's no other information that I recall.

24        Q.        What are the disclaimers?

# Exhibit 3

Case 2:21-cv-05660 Document 1-25 Filed 11/08/22 Page 1000 of 3041 Date Filed 09/08/2022

# About ECFMG

## History

Physicians who received their basic medical degree from a school outside the United States and Canada (international medical graduates or IMGs) make up rough training and practice in the United States. Traditionally, IMGs have represented a significant percentage of the U.S. physician workforce.

Evaluating the readiness of IMGs to enter graduate medical education (GME) programs in the United States has long been a concern of medical organizations, hosp agencies, and the public. During the 1950s, the need for a formal program of evaluation intensified due to explosive growth in the demand for health care services opportunities for trained medical personnel, and a greater dependence on residents to provide medical care, which created a large number of available positions i

In 1956, a private, nonprofit organization, the Evaluation Service for Foreign Medical Graduates (ESFMG), was established to:

- provide information to and answer inquiries of IMGs planning to come to the United States for GME;
- evaluate IMGs' credentials, knowledge of medicine, and command of English; and
- certify that IMGs have met certain medical education and examination requirements.

Later that year, ESFMG changed its name to the Educational Council for Foreign Medical Graduates (ECFMG). ECFMG developed procedures to validate medical assistance of the National Board of Medical Examiners® (NBME®), developed a medical science examination and English language proficiency test. This formal ev of examinations and validation of medical education credentials, became known as ECFMG Certification.

In 1958, ECFMG administered its first examinations and certified the first IMGs. Within three years, ECFMG Certification had become the new standard for evalu health care system, required by the American Medical Association and the American Hospital Association of IMGs serving in patient care situations in hospitals in

The scope of ECFMG's responsibilities broadened in 1974 when it merged with the Commission on Foreign Medical Graduates (CFMG). CFMG's activities include IMGs and monitoring the visa sponsorship of medical Exchange Visitors in the United States. The combined organization was named the Educational Commission Graduates, retaining the acronym ECFMG. Through this merger, ECFMG acquired responsibility for the visa sponsorship of Exchange Visitor physicians participa and became increasingly involved with the international community, a trend that continues today.

ECFMG's experience in certifying IMGs has allowed it to develop programs that share its expertise with others involved in the assessment of physicians. Through International Credentials (EPIC$^{SM}$), ECFMG makes its world-class experience with the primary-source verification of medical education credentials available to e train, educate, and employ physicians worldwide. EPIC also provides services for individual physicians. ECFMG also has developed resources to support IMGs pur academic medical community in the United States, including the Exchange Visitor Sponsorship Program, ERAS® Support Services, Certification Verification Servi Certificate Holders Office (ECHO).

ECFMG has a long-standing commitment to promoting excellence in international medical education. Over the years, ECFMG has maintained a wealth of data tha research on international medical education, IMGs, and their impact on world health. ECFMG also developed a number of resources for the international medical exchange programs and consultation services for international medical schools and their faculties. In 2000, ECFMG expanded its commitment to the international establishing the Foundation for Advancement of International Medical Education and Research (FAIMER®). FAIMER, a nonprofit foundation of ECFMG, provides exclusively to research and programs that enrich international medical education. In 2015, ECFMG launched GEMx, a program dedicated to promoting and facilit educational exchange in medicine and the health professions. Through GEMx, ECFMG is building a global partnership, and supporting regional partnerships, of in commitment to making international exchange a part of their education programs and to providing students in medicine and the health professions increased acc opportunities.

In 2006, ECFMG celebrated 50 years of promoting excellence in international medical education. Established to evaluate the qualifications of IMGs entering GME ECFMG has grown to meet the needs of physicians, health care consumers, medical educators, researchers in medical education and health workforce planning, h agencies, and those involved in the evaluation and certification of health care professionals, both in the United States and abroad. Today, ECFMG is moving forwa including support for efforts to accredit international medical schools and expansion of web-based services for physicians, medical schools, and others in the inte Through such initiatives, ECFMG continues to translate its experience, expertise, and resources into quality programs and services, and to collaborate with other education and assessment.

Back to top

Last updated March 12, 2021.
® Registered in the US Patent and Trademark Office.

Copyright © 1996-2021 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

JA2890

# Exhibit 4

# Certification

About ECFMG Certification | New to Certification? | IMGs in the United States | Definition of an IMG | How the Certification Process Works | Requirements for Certification | 2023 Accreditation Requirement | Reference Guide for Medical Education Credentials | Eligibility for Examination | Verification of Credentials | Certification Verification | ECFMG Medical Credentials Reference Library

## About ECFMG Certification

ECFMG was founded in 1956 to assess, through a program of certification, whether international medical graduates (IMGs) are ready to enter residency or fellowship programs in the United States that are accredited by the Accreditation Council for Graduate Medical Education (ACGME). ACGME requires IMGs who enter ACGME-accredited programs to be certified by ECFMG. ECFMG Certification is also one of the eligibility requirements for IMGs to take Step 3 of the three-step United States Medical Licensing Examination (USMLE). Medical licensing authorities in the United States require that IMGs be certified by ECFMG, among other requirements, to obtain an unrestricted license to practice medicine.

The foundation of ECFMG's certification program has endured remarkably over the last five decades. Throughout the history of the program, the requirements have included examinations in the medical sciences, evaluation of English language proficiency, and documentation of medical education credentials. Over the years, there have been changes in the examinations accepted to meet the requirements for ECFMG Certification and changes to the requirements themselves. These changes have been made to enhance the certification program, respond to the needs of the U.S. graduate medical education community, comply with the changing immigration landscape, take advantage of new technologies, and achieve a common examination pathway to medical licensure for IMGs and U.S. medical graduates.

ECFMG Certification is an effective screening mechanism for ensuring that IMGs in patient care situations have met minimum standards. Each year, thousands of IMGs in the certification process apply to ECFMG for USMLE. Just over half of these individuals are successful in completing all the examination and medical education credential requirements for ECFMG Certification. During the 20-year period from 1991 through 2010, more than 295,000 international medical students/graduates applied to take their first examination with ECFMG; of this number, 60.7% have achieved certification.

Back to top

Last updated September 7, 2016.

® Registered in the US Patent and Trademark Office.

Copyright © 1996–2019 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

JA2892

Case 2:18-cv-05623-JMV-JBC Document 238-54 Filed 10/26/21 Page 1 of 1 PageID: 8022

# Certification

About ECFMG Certification | New to Certification? | IMGs in the United States | Definition of an IMG | How the Certification Process Works | Requirements for Certification | 2023 Accreditation Requirement | Reference Guide for Medical Education Credentials | Eligibility for Examination | Verification of Credentials | Certification Verification | ECFMG Medical Credentials Reference Library

## How the Certification Process Works

An international medical student/graduate (IMG) should begin the ECFMG Certification process by first confirming his/her medical school meets ECFMG requirements. Once an IMG confirms that students/graduates of his/her medical school are eligible to apply to ECFMG for ECFMG Certification and examination, he/she can apply for a USMLE/ECFMG Identification Number. Once an IMG has obtained this number, he/she can use it to complete the Application for ECFMG Certification. Once the Application for ECFMG Certification, including the notarized Certification of Identification Form (Form 186), has been accepted by ECFMG, the IMG may then apply for examination.

To be certified by ECFMG, an IMG must meet both examination and medical education credential requirements. These requirements include passing performance on medical science and clinical skills examinations—USMLE Step 1, Step 2 Clinical Knowledge (CK), and Step 2 Clinical Skills (CS) are the exams currently administered that satisfy these requirements—and primary-source verification of the IMG's medical education credentials, including the final medical diploma, final medical school transcript, and transcript(s) to document transferred academic credits (if applicable).

The time required to complete the certification process is different for each individual. Both medical school students and graduates may begin the certification process and may apply for the required exams as soon as they meet the eligibility requirements for examination. However, since one of the requirements for ECFMG Certification is that the final medical diploma be verified by ECFMG with the issuing medical school, an IMG cannot complete the certification process until after graduation from medical school. The time required for some aspects of the certification process, such as the time required by a medical school to verify medical education credentials, is beyond the control of ECFMG.

Back to top

Last updated September 13, 2018.
® Registered in the US Patent and Trademark Office.
Copyright © 1996-2019 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

# Exhibit 5

JA2894

APPLICANT ELIGIBLE FOR ECFMG CERTIFICATION       SEPTEMBER 17, 1993
EXAMINATION OF
JULY 13-14, 1993

APPLICANT NUMBER 0-482-700-2

BASIC
SCIENCE
76

DR OLUWAFEMI CHARLES IGBEKASE
P.O. BOX 1653
HYATTSVILLE, MD   20782

DEAR DOCTOR:

THE REPORT OF YOUR PERFORMANCE ON DAY 1 OF THE FOREIGN MEDICAL GRADUATE
EXAMINATION IN THE MEDICAL SCIENCES (FMGEMS) IS SHOWN ABOVE.

YOU:   <u>PASSED</u> THE BASIC MEDICAL SCIENCE COMPONENT

SINCE YOU PASSED A CLINICAL SCIENCE EXAMINATION ON JANUARY 20, 1993
AND PASSED AN ENGLISH TEST ON JANUARY 20, 1993, YOU HAVE MET ALL OF
THE REQUIREMENTS FOR ECFMG CERTIFICATION WHICH IS A PREREQUISITE FOR
ENTRY INTO ACCREDITED PROGRAMS OF GRADUATE MEDICAL EDUCATION IN THE
UNITED STATES.

YOU HAVE ALSO MET THE MEDICAL SCIENCE EXAMINATION REQUIREMENT UNDER THE
PROVISIONS OF PUBLIC LAW 94-484 TO OBTAIN A VISA, IF NEEDED, TO ENTER
THE UNITED STATES.

IF YOU APPLY FOR APPOINTMENT TO AN ACCREDITED GRADUATE MEDICAL EDUCATION
PROGRAM, SUBMIT A PHOTOCOPY OF THIS LETTER TO THE PROGRAM DIRECTOR.

YOUR STANDARD ECFMG CERTIFICATE WILL BE AVAILABLE WITHIN TWO WEEKS.
IN THE MEANTIME, THIS LETTER WILL SERVE AS CONFIRMATION OF YOUR
ELIGIBILITY FOR SUCH CERTIFICATION.

ECFMG REQUESTS PROGRAM DIRECTORS TO VERIFY <u>WITH ECFMG</u> INFORMATION
CONTAINED ON SCORE REPORTS.

MARJORIE P. WILSON, M.D.
PRESIDENT

PASSING PERFORMANCE ON ENGLISH TEST
VALID THROUGH JANUARY 1995.

ENCLOSURE:   INFORMATION BOOKLET

FORM 10A
SEPT. 93  JA2895

Confidential

ECFMG_RUSS_0003671

# Exhibit 6

JA2896

# Laurence H. Beck, MD, FACP

## 529 Broad Acres Road; Narberth PA 19072

October 14, 2019

Dear Elisa McEnroe:

In re: Russell et al v. ECFMG

I have been asked by Elisa McEnroe of Morgan, Lewis & Bockius LLP to review documents and other materials related to the above litigation, and to provide my expert opinion in such matters.  In particular, I have been asked to provide expert opinion on the processes involved, after an International Medical Graduate (IMG) receives certification from the ECFMG, in applying for, and receiving, (1) acceptance into a residency training program; (2) hospital staff privileges; (3) state licensure to practice medicine independently; and (4) Board certification in a medical specialty.

I have separately submitted my curriculum vitae, including publications.  I have had no publications in the previous 10 years.

I have not participated as an expert witness at trial or by deposition in the previous 4 years.

JA2897

I have been contracted for this work at the rate of $500 per hour.

In preparing this report, I have reviewed the expert reports of Dr. John Charles Hyde, Dr. Jonathan Burroughs, Dr. David Markenson, and Dr. Jerry Williamson. In addition, I have reviewed current published material from the Virginia Board of Medicine and the Maryland Board of Physicians concerning the process and requirements for an IMG to apply for a state license to practice medicine. I have reviewed published criteria from the American Board of Obstetrics and Gynecology, as well as from the American Board of Medical Specialties. I have also reviewed correspondence and records concerning Dr. Akoda from Jersey Shore Medical Center (Jersey Shore Medical Center 000006-000010). I have also reviewed correspondence and records concerning Dr. Akoda from the American Board of Obstetrics and Gynecology (ABOG nonparty 000001-000082).

Most importantly, I have drawn on my expertise in the matters related to the above issues. This expertise includes 50 years of leadership and practice of medicine in Pennsylvania, the District of Columbia, and Florida. During that time, I have held numerous leadership positions requiring participation in, and knowledge of, credentialing of IMG's, including: (1) Chairman of the Residency Selection Committee at the University of Pennsylvania School of Medicine; (2)

Program Director of Internal Medicine Residency at the Hospital of the University of Pennsylvania; (3) Chairman of the Departments of Medicine [at the University of Pennsylvania, Philadelphia Veterans Administration Hospital, Geisinger Medical Center, Georgetown University Medical Center, and Cleveland Clinic Florida] and (4) Associate Chief of Staff of a Hospital [Georgetown University Hospital]. I am Board Certified by the American Board of Internal Medicine (ABIM).

For an IMG to practice medicine in any State in the United States, he/she must pass through numerous steps of application and acceptance.

1. He/she must apply to and be accepted into a residency accredited by the ACGME (Accreditation Council for Graduate Medical Education). In order to be considered as a candidate, the IMG must have, in addition to certification by the ECFMG, numerous other documents and undergo scrutiny in several areas, as iterated below.

2. To receive a license to practice medicine in the State of Maryland and/or the Commonwealth of Virginia, the IMG must (in addition to ECFMG certification) have graduated from an approved medical school, must be of "good moral character", must have completed at least 2 years of an

accredited residency, and satisfy numerous other criteria, as spelled out below.

3. To be accepted as Staff at a Hospital in either of those jurisdictions, the IMG must have an unrestricted state license to practice medicine, and must meet numerous other criteria, as iterated below.

4. To achieve Board certification in a medical specialty (which is a voluntary decision, and not required for state licensure), the candidate must pass a certifying examination and be evaluated in numerous other categories, as iterated below.

At each of these steps, the program or institution has a specific set of requirements, which include verification of credentials and usually a personal interview. For application to a residency program, it is the responsibility of the residency program administration to ensure verification of primary-source credentials.  Typical additional requirements include: an in-person interview, letters of reference (with contact information for each writer), a current photograph, an up-to-date CV [curriculum vitae], evidence of proficiency in spoken and written English, review of visa status (usually J-1 or green card), and review of any prior residency, with a letter of recommendation from its program director.  Following review of an application, the candidate and the residency

program must participate in the National Residency Matching Program (NRMP), wherein each party submits a rank order list of their preference (the list of residency programs for the applicant; the list of candidates for the residency program).

Although it is sufficient for the residency program to accept primary source credential verification via ECFMG certification (or their ERAS program) for the medical credentials, the residency program must pursue the other requirements via their own resources. Based on my extensive knowledge and experience, the above requirements are typical of residency programs in the United States, and represent, in my opinion, a medical profession and industry standard.

An IMG's application to the Virginia and/or Maryland Board of Physicians for a license to practice requires ECFMG certification, as well as numerous other requirements. For either state, there is a personal interview, with verification of identity, reporting of all post-graduation residency or fellowship training, with letter(s) of recommendation from the program director(s), medical school transcripts (usually directly from the medical school), scores of FLEX or Step 3 of the USMLE, employment record from the date of medical school graduation, report of any disciplinary action, and competency in written and spoken English.

Each state also has a separate written licensure exam. The Maryland Board of Physicians states also "The Board requires primary source verification from medical schools, postgraduate training programs, national licensing entities (USMLE, FSMB, NBME, etc) and other state boards". Again, based on my extensive knowledge and experience, the above requirements are typical of state medical licensure boards in the United States, and represent, in my opinion, a medical profession and industry standard.

Similarly, Hospital staff privileges require a separate application process which, for the IMG, requires ECFMG certification, but also (usually) an interview, as well as a number of other areas of review, including one or more personal references with contact information for each, a current photograph, certificates of completion from all residencies and fellowships, letter of recommendation from program director(s), Social Security number, valid passport and/or birth certificate, malpractice insurance history, all licenses, including DEA certificate, a 2-year case log, fingerprinting for federal background check, and a urine drug screen. Furthermore, after achieving hospital staff privileges, all physicians are evaluated on an ongoing basis, usually by the Medical Director's office, on their clinical performance, demeanor, and interactions with patients and staff. Based on my extensive knowledge and experience, the above requirements are typical

JA2902

of hospitals in the United States, and represent, in my opinion, a medical profession and industry standard.

Certification by an American Board of a medical specialty requires a process involving examination, review of credentials, and evidence of satisfactory performance in that specialty. Typically, for the American Board of Obstetrics and Gynecology, that requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of case logs over the previous years, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. Following successful Board certification, a candidate must comply with annual requirements for ongoing educational modules as part of the MOC (maintenance of certification) process.

Dr. Akoda passed both the written and oral examinations of the ABOG, and his credentials were initially approved, so that he was given a one-year Board certification. He successfully complied with the MOC requirements for the first year after his certification, but then failed to continue that activity. As a result, the ABOG did not renew his certification. Subsequently, upon learning of his

criminal behavior, it revoked entirely his Board certification.  All these activities

were instigated by the ABOG and were not dependent upon input from ECFMG.

CONCLUSIONS

In reviewing the chronology of Dr. Akoda's progression through the above steps

leading to medical residency acceptance at Jersey Shore Medical Center and at

Howard University, licensure in Virginia and Maryland, staff privileges at Prince

George's Hospital Center, and certification by the American Board of Obstetrics

and Gynecology, there were numerous opportunities for the above institutions to

suspect and investigate Dr. Akoda's fraudulent behavior, except that these

opportunities appear to have been repeatedly hidden, or covered up, by Dr.

Akoda, through his apparent lies, false documents, and evasiveness.  As an

example, the residency program director at Howard University certainly should,

and I believe, would have pursued the question of why Dr. Akoda had left his third

year of residency at Jersey Shore Medical Center.  He/she should, and I believe,

would have called the program director at Jersey Shore Medical Center and

learned that Dr. Akoda was dismissed from that program.   It is likely that the

Howard University program did not pursue this discrepancy because they were

unaware of this history (because Dr. Akoda apparently either lied or failed to report it, on his application or in a personal interview).

Although residency programs, hospital staff boards, and state medical boards may rely on the ECFMG certification for verification of certain medical credentials, they must use their own resources to ascertain the validity of the numerous other requirements of acceptance (letters of recommendation, visas, social security information, etc.). There is no expectation of these institutions to receive additional information from the ECFMG after they have documented that the certificate is valid.

The primary or root cause of Dr. Akoda's movement through the system, licensure and ability to practice medicine at Prince George's Hospital Center was Dr. Akoda himself and his fraudulent and criminal activities. These activities effectively hid the inaccuracies and lies from all concerned, from the ECFMG, through to the residencies, hospital staff, and state Boards of Medicine. Any alleged harm to patients resulting from his repeatedly dishonest behavior are directly due to his dishonest behavior.

Sincerely yours,

*Laurence H. Beck, MD*

Laurence H. Beck, MD

# Exhibit 7

JA2907

October 14, 2019


Elisa P. McEnroe, Esq.
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103-2921


Re: *Russell et al. v. Educational Commission for Foreign Medical Graduates*,
No. 2:18-cv-05629

Dear Ms. McEnroe,

I was asked to review the case of *Russell et al. v. Educational Commission for Foreign Medical Graduates* (ECFMG) as an expert witness in hospital administration, graduate medical education, organized medical staffs, and credentialing. I was asked to opine on the processes that a foreign medical graduate must go through after ECFMG certification when applying for graduate education (residency and fellowship training) and, subsequent application for membership and privileges at a U.S. hospital.

I am qualified to offer an evaluation of this case due to my extensive experience and training in the subject areas. I have been a practicing surgeon in Southern California since July 1982. From 1982 through 2007, I practiced General and Vascular Surgery in private practice in Palm Springs, California with privileges at Desert Regional Medical Center and Eisenhower Medical Center. During that time, I was also the Medical Director and Managing General Partner of Desert Surgery Center, a multispecialty ambulatory surgery center, from 1988 to 2004. I began consulting in healthcare in 2002. From 2002 to 2007, I worked as a consultant for The Greeley Company. In 2007, I decided to close my private practice and became a Clinical Assistant Professor of Surgery at the University of California, Irvine where I practice and teach residents and medical students one week a month. My remaining time is spent in healthcare consulting. My major areas of interest in consulting are organized medical staffs, quality, peer review, credentialing and

JA2908

privileging and automated data processing. I have attached my full CV as Appendix A for further details in these areas.

My compensation for these endeavors is outlined on my fee schedule attached as Appendix B.

The documents that I reviewed for these opinions are listed in Appendix C.

A list of all cases in which I testified as an expert at trial or by deposition over the last 4 years is attached as Appendix D.

ECFMG provides a number of services relevant to a foreign medical graduate's (FMG's) pathway into clinical practice in the United States, including primary-source verification of foreign medical school diplomas.  ECFMG certification is a screening mechanism for ensuring that an FMG has met certain minimum criteria.

Once the FMG obtains his or her ECFMG certification, he or she will usually be applying for a graduate medical position through the National Residency Match Program (NRMP)/Accreditation Council for Graduate Medical Education (ACGME) process if he/she wants to practice in the U.S. It is a requirement of those programs that an FMG hold an EFCMG certificate to be able to enter the residency process. However, the FMG applicant will also need to complete the NRMP application, obtain interviews at an ACGME-approved institution with a desired residency, and be rated by those institutions for a position match. The NRMP application includes supporting documentation such as Medical Student Performance Evaluation (MSPE), medical school transcript, Letters of Reference, Photograph, USMLE (United States Medical Licensing Examination in 3 parts) transcript and the ECFMG certificate.

During the interview process, the FMG goes through a series of interviews with review of all information in the application (of which the ECFMG certificate is only one item as noted above).  These interviews are with multiple faculty typically and are designed to elicit information about the applicant's aspirations, program desires such as research, and ultimate goals. At the same time, the applicant gets to learn about the institution's programs, objectives and residency culture. This enables both sides to make rational rating decisions as most institutions will then rate their applicants while the applicants rate the institutions. These are all

submitted to NRMP, which applies its match algorithms to fill the residency position.

If an FMG is accepted for a residency, he or she is subjected to the ongoing review requirements set up by the ACGME. Each residency institution has to file an annual progression report on each resident with milestone achievements identified. Milestones are developed for each specialty but are based on the Six Core General Competencies and then applied to each level of residency from beginner to most advanced and ready to graduate out of residency. Thus, an annual report for any given resident is a complex report on multiple performance measurements that require judgment and explanation. In addition to these reports by the faculty, most specialties have an annual examination (e.g. ABSITE for surgery, IM-ITE for internal medicine) that is another check on the resident's progress.

All patient care delivered by residents is conducted under ongoing oversight by the faculty which puts the faculty in a position to know the strengths and weaknesses of the resident. Additionally, as an employee of the residency program, each resident is subject to normal employee processes such as payroll, taxes, visas if appropriate, healthcare programs and other conditions and requirements of employment.

If the FMG successfully completes all years of the residency fulfilling all requirements as determined both by ACGME and the institution's faculty, he or she may graduate the residency.[1]

Typically, at some point early in the residency, states like Maryland and Virginia require that the resident obtain a state medical license of some variety. This is another application process for which an FMG will need to supply a variety of information, including but certainly not limited to his or her ECFMG certificate. In addition, the state board typically requires information about education, clinical training, disciplinary actions, criminal record, practice impairments and a photograph among other data points. The state medical board or licensing agency

---

[1] At this point, the FMG may be ready to go out into practice or they may desire additional training through a fellowship. The process for entering a fellowship program is similar to the residency process with an application, interviews and match process. Once fellowship is completed in like manner, the FMG is ready to go out for practice of medicine. Fellowship is not required for all FMGs.

will consider the information, may or may not require interviews, and may or may not require a separate examination before issuing a medical license. Since medical licenses are state based, often times, applicants may need to obtain multiple licenses as their training hospitals may cross state lines.

When specialty training is complete, an FMG clinical graduate will be eligible for specialty board certification. The most recognized and accepted is the boards under the umbrella of the American Board of Medical Specialties (ABMS). Each specialty has its own application process but it tends to mirror similar types of information collected by state medical boards. ECFMG certification status is just one data point among many in such applications. This is evidenced in particular by looking at the American Board of Obstetrics and Gynecology's process in utilizing many sources of data in reaching its decision to grant Board Certification status.

When the graduate resident or fellow is applying for hospital medical staff membership and privileges, they will need to undergo an even more rigorous credentialing process. One part of this credential program will be the checking of the ECFMG certificate status. However, this is but one piece of information checked. Licensure, training, board status, personal references, and any clinical performance data available will also be evaluated. There may be in person interviews as well. The applicant typically will need to provide evidence of malpractice coverage and clinical coverage by other practitioners on staff. The credentials are usually reviewed at multiple levels, starting with the specialty service or department. They then may be reviewed by a Credentials committee as well as a Medical Executive Committee (MEC) for final recommendations. These recommendations are then transmitted by the MEC to the Board or Governing Authority which makes the final decision.

Once the FMG is on staff at a hospital, his or her clinical competence is immediately evaluated through a focused review process commonly known as FPPE (Focused Professional Practice Evaluation). If the FMG practitioner is successful here, they are then evaluated for clinical competence in an Ongoing Profession Practice Evaluation (OPPE) that is carried out more than once a year, typically every 6-8 months in most hospitals.

The FMG will need to renew his or her membership and privileges on regular intervals. The FMG's performance data, malpractice information and any other

relevant data will be reviewed in a fashion similar to the initial application with the final decision coming from the Governing Board.

Opinions

1. While ACGME residency programs require ECFMG certification for an FMG to be eligible, ECFMG certification is by no means the only or even the significant information point regarding an FMG's ability to practice medicine in the US.

2. Residencies and Fellowships should, and typically do, look for information regarding an FMG's background, character and aspirations, which requires gathering a large amount of data to see if he or she will be a fit for an institution's particular specialty training program. Residencies and Fellowships gather this data from a variety of sources. The ECFMG certificate is just one data point for them to check.

3. Hospitals should, and typically do, check the validity of training, quality of clinical care and goodness of character to see if the applicant matches the hospital's goals and requirements of their physicians when the Hospital is granting initial membership and privileges. Hospitals get this information from a variety of sources. A current ECFMG certificate is but one piece of information available to them.

4. Current clinical competence is a responsibility of the ACGME and institutional faculty during training and of the organized medical staff for hospital practice. Current clinical competence is determined based on an assessment of a wide array of information from a variety of sources. A current ECFMG certificate is only a single point of information in a large sea of performance data.

5. An FMG working as a resident or with privileges at a hospital is subject to normal employee processes such as payroll, taxes, healthcare programs and other conditions and requirements of employment. In connection with those processes, residency programs and hospitals should, and typically do, gather a wide variety of information about the FMG from a variety of sources other than ECFMG.

JA2912

I reserve the right to add to or modify these opinions if I am given further information to review.

Respectfully submitted,

Mark A. Smith, MD, MBA, FACS

Appendix A

CURRICULUM VITAE

Mark A. Smith, M.D., M.B.A., F.A.C.S., FACHE

Licenses

PA MD- 025431-E (Inactive)
CA00G47011 (Active)
Board Certification-  Gen'l Surg,
Vascular Surgery
American Board of Surgery- 1983
Recertified- 1990, 2004

747 Camino Norte

Palm Springs, CA 92262
Home Telephone- (760) 320-3851

Cell Phone- (760) 275-8204
Email- Vascu@aol.com

Certification Vascular Surgery-
November 1984
Recertified- 2013

Fellow of the American College of
Surgeons- October, 1985- Present

Married- Bonnie Heinen Smith
Children- 2 Daughters (Lisa, Lindsay)

Special Certification in Laser Asst
Angioplasty – January 1988

Certified- American Board of
Quality Assurance and Utili-
Zation  Review
Physicians- July 2005-  Dec.2015

Certified- Fellow of the American
College of Healthcare Executive, January
2011

Certified- Graduate Gemologist (GG),
May, 2015

Certified Specialist in Wine (CSW),
August, 2017

Certified Professional Healthcare Qualit
Dec. 2017

JA2914

## Education

| | | |
|---|---|---|
| Haverford Senior High School<br>Havertown, PA | 9/66- 6/69 | Diploma |
| University of Michigan<br>Ann Arbor, Michigan | 9/69- 8/72 | B.S. Zoology |
| Jefferson Medical College<br>Philadelphia, PA | 9/72- 6/76 | M.D. |
| University of Phoenix<br>Phoenix, AR | 1/92- 3/94 | M.B.A. |

## Training

### Internship

University California San Diego Medical Center   7/76- 6/77  Surgery
225 W. Dickinson Street
San Diego, CA
Marshall Orloff, M.D.

### Residency

University of Kansas Medical Center   7/77- 6/81  General Surgery
39th and Rainbow Blvd.
Kansas City, KS
William Jewell, M.D.

### Fellowship

Hospital of the University of Pennsylvania   7/81- 12/81  Cardiothoracic
34th and Spruce Streets                                          Surgery
Philadelphia, PA
L. Henry Edmunds, M.D.

Hospital of the University of Pennsylvania   1/82- 6/82  Vascular Surgery
34th and Spruce Streets
Philadelphia, PA
Brooke Roberts, M.D.

JA2915

Employment

Private Practice- Vascular and General Surgery       7/82- 3/2007
Coachella Valley Surgical Associates
1100 N. Palm Canyon Drive
#208
Palm Springs, CA 92262

Medical Director and Managing General Partner       12/88- 8/2004
Desert Surgery Center
1190 N. Palm Canyon Drive
Palm Springs, CA 92262

Senior Consultant       3/2002- 12/2007
Practice Director, Credentialing       1/2008- 6/30/2009
The Greeley Company
200 Hoods Lane
Marblehead, MA  01945

Independent Healthcare Consultant       7/1/2009- Present
HG HealthCare Consultants, LLC.

Assistant Professor of Surgery,       9/2007- Present
Division of Vascular Surgery
UCI Medical Center
333 City Blvd., Suite 1600
Orange, CA 92868

Chief Medical Officer       9/2011- 3/2014
Verisys Corporation
1001 N. Fairfax Street
Suite 640
Alexandria, VA 22314

Chief Medical Consultant       3/2012- 3/2015
Morrisey Associates, Inc.
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

JA2916

VP & Chief Medical Officer                                          3/2015- 12/2015
Morrisey Associates, Inc./Morcare
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

VP & Chief Medical Officer                                          1/2016- 1/31/2017
Morcare LLC.
222 South Riverside Plaza
Suite 1850
Chicago, IL 60606

Senior Medical Consultant                                          2/1/2017- 12/31/2017
Morrisey Associates Inc., A Healthstream Company

Chief Medical Officer                                               1/1/2018- 2/1/2019
Humanus Inc.

## Hospital Appointments

Desert Regional Medical Center                 Active Staff  7/82- 12/2007
1150 N. Indian Canyon Drive                    Emeritus Staff  1/2008- Present
Palm Springs, CA 92262

Eisenhower Medical Center                      Active Staff   9/82- 12/2007
39000 Bob Hope Drive
Rancho Mirage, CA 92270

UCI Medical Center                             Provisional Staff  5/08- 8/09
100 City Drive                                 Active Staff  8/09- Present
Orange, CA 92868

## Hospital Positions

President Elect- DRMC                           July 1988- June 1990

President- DRMC                                July 1990- June 1992

Past President- DRMC                            July 1992- June 1994

JA2917

| | |
|---|---|
| Chief of Surgery- DRMC | July 1993- June 1995 |
| Chairman, Peer Review Committee | July 2004- Jan, 2007 |
| Medical Director, Cardiac Surgery DRMC | August 2004- September, 2006 |
| Co-Surgeon Champion, NSQIP for University of California Irvine Medical Center, Department of Surgery | August 2010- 2012 |

Professional Memberships

American College of Surgeons, Fellow

American College of Physician Executives, Member

American College of Healthcare Executives, Fellow

Southern California Vascular Surgical Society, Member

National Association of Healthcare Quality, Member

Society of Vascular Surgery, Active Member

Other Memberships

Airplane Owner and Pilot's Association

Experimental Aircraft Association

American Philatelic Association, Life Member

Palm Springs Air Museum

Association Naval Aviators

United States Tennis Association

Defense Orientation Conference Association, Member since 1995

Interests

>Art Collecting, Reading, Flying, Tennis, Stamp Collecting

>Gemology, Sailing, Vintage Cars

Past Associations, Positions

>Palm Springs Desert Museum, Member of Board of Directors 1993-95

>Desert Surgery Center, General Partner and Medical Director 1987- 2004

>Palm Springs Professional Building, General Partner 1988- 1998

Publications

Assessing the Competency of Low Volume Providers, Smith, MA and Pelletier, S, HCPro, 2009

Effective Peer Review, Marder, R and Smith, MA, HCPro, 2005

Effective Peer Review 2nd Edition, Marder, R, Smith, M. and Sheff, R., HCPro, 2007

Proctoring and Focused Professional Practice Evaluation. Marder, R., Smith, MA, and Sagin, T., HCPro, 2006

Proctoring and FPPE, Marder, R and Smith, MA, HCPro, 2009

Measuring Physician Competency, Marder, R, Smith M.A., Smith, M. and Searcy, V., HCPro, 2007

Core Privileges for Physicians, Crimp, W, Pelletier, S., Searcy, V. and Smith, M, HCPro, 2007

The Credentials Committee Manual, Smith, M.A., HCPro, 2016

Effective Peer Review 4th Edition, Marder, R, HCPro, 2017. Contributed chapter on approach to team performance measurement

Optimal Resources for Surgical Quality and Safety, Editors Hoyt, D. and Ko, C., American College of Surgeons, 2017. Contributing Author.

JA2919

Seminars

Multiple seminars delivered on various topics related to Medical Staff including effective Medical Staff leadership, credentialing and privileging, peer review, surgical team summit, proctoring, physician performance profiles

Redesign of peer review system at approximately 75 hospitals in last fifteen years.

Keynote Speaker for Morrisey Users Conference, August 2010, "Moving from Competence to Excellence … Improving Patient Safety through Automation"

Faculty, American Association of Physician Leadership (previously American College of Physician Executives) 2011- Present

Member of Faculty Advisory Council, AAPL, August 2015- July, 2019

Faculty, Credentialing Resource Center, April 2017- present

Worked with ECRI on a number of evaluations and presentations  under their Patient Safety Organization

JA2920

Appendix B  Compensation

Legal Fee Schedule for Mark A. Smith, MD


Document Review and Letters: $500/hr
Deposition in my town- $600/hr
Traveling deposition or Trial Testimony- $6000/dy + travel expenses

Appendix C- Documents reviewed for these opinions

1  Reports and CVs of:
   a.  Williamson, Jerry
   b.  Markenson, David
   c.  Burroughs, Jonathan
   d.  Hyde, John

2  Website of the Accreditation Council for Graduate Medical Education- www.acgme.org
3  Website of the National Residency Matching Program (NRMP)- www.nrmp.org
4  Website of the Medical Board of California- www.mbc.ca.gov
5  Website of the American Board of Medical Specialties- www.abms.org
6  Website of Educational Commission for Foreign Medical Graduates- www.ecfmg.org
7  Records from the American Board of Obstetrics and Gynecology (ABOG_nonparty_000001-00082)

JA2922

Appendix D- Cases in Which Dr. Smith has testified or been deposed in the last four years

Toranto v. Jaffurs et. al.- (Paul Plevin is the law firm that I worked with)- Deposition in May, 2019

Rosenberg Fair Hearing Testimony- (Durham Jones and Pinegar is the law firm I worked with)- February, 2019

# Exhibit 8

711179

| Initial Medical Licensure PERSONAL INFORMATION 10/2009 INT | STOP! Completed application and check must be mailed to: **MARYLAND BOARD OF PHYSICIANS** P.O. Box 37217 • Baltimore, MD 21297 Telephone: 410-764-4777 Fax: 410-358-1298 Toll Free: 800-492-6836 | FOR BANK USE ONLY Date _____ Check Number _____ Amt Paid __890__ Name Code _____ ApplD 17 |

## APPLICATION FOR INITIAL MEDICAL LICENSURE

**Please print legibly or type the required information. Do not leave any item unanswered. If an item does not apply to you, write "N/A" (Not Applicable) for that item. An incomplete application form will delay the processing of your application.**

**1.** Your Complete Current Legal Name: As listed on your U.S. birth/marriage certificate, U.S. passport, or most recent document issued by the INS.

Last name and generational indicator (Jr., Sr., II, III, etc.):

| A | K | O | D | A | | | | | | | | | | | | | | | |

First name and middle name:

| C | H | A | R | L | E | S | | J | O | H | N | | N | O | S | A | | | |

(If applicable, please check a box and complete below) ☐ Complete Maiden Name OR ☐ Complete Former Name

**Stop!** If any credential you submit bears a name other than your current legal name as listed above, or if you have been licensed in another state under any name other than your current legal name, sign and date an attachment which includes each different name, an explanation of why the name differs from your current legal name, and a copy of the legal document to support the name change.

**2.** Public Address: Your public address of record. This address, usually your office, is available to the public and will be posted on the internet.

Street Address: If you change your address prior to being licensed, immediately notify the Board in writing.

City | State | Zip Code

**3.** Non-Public Address: This address, usually your home, is for Board use only. However, if no public address is listed, this address will be made public.

Street Address: (Do NOT use a P.O. Box) If you change your address prior to being licensed, immediately notify the Board in writing.

City | State | Zip Code

**4.** Telephone (s): Home | Office:

Cell/Pager: | E-mail address:

**5.** Date of Birth: Month | Day | Year

**6.** Gender: ☒ Male ☐ Female

**7.** Race: Multiracial applicants may select all applicable categories ☐ American Indian or Alaska Native ☐ Asian ☒ Black or African American ☐ Native Hawaiian or other Pacific Islander ☐ White

Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino

**8.** Social Security Number:

| For Board Use Only | License Number: | D | 7 | 3 | 0 | 4 | 9 | BPQA School Code: | 6 | 9 | 0 | 9 | 0 | 6 |
| | Date Issued: | 0 | 9 | 1 | 4 | 1 | 1 | Federation School Code: | 6 | 9 | 0 | 0 | 0 | 3 |
| | Licensed By: _DeFu_ | Licensing Exam: _US_ |

JA2925

10/2009 INT    Name: Erharikp John Ivza    Date: 7/28/11

**10. MEDICAL EDUCATION:** List all medical schools you have attended

University OF BENIN COLLEGE OF MEDICINE, NIGERIA

From: MM/YY to MM/YY    06/82 - 06/87

Medical School From Which You Received Your Medical Degree: University OF BENIN, Nigeria

Name of University Affiliation (if applicable): * _____

Street Address: 01 QUEEN Elizabeth Rd, MoKola, Ibadan

City: _____ State/Province: _____ Country of citizenship during medical education: Nigerian

Language(s) of Instruction: ENGLISH

Type of Degree: ☐ M.D.  ☐ D.O.  ☐ M.D./Ph.D  ☒ M.B.B.S.  ☐ M.B.B.Ch  ☐ Other: _____ (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc. was satisfied.

Month 0 6  Day 3 0  Year 8 7    ✗ D.O.G. 1988  Correct

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada) Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and Examinations Taken, Good Conduct Certificate or intern Certificate. The certificate must include your name, name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs and submit one of the following documents to support the name change; Passport, INS card, birth certificate, court document, marriage license, court decree.

**11.** How have you satisfied Maryland's *written and oral* English language competency requirements? (See *English Language Competency Requirements for Medical Licensure in Maryland* in the introductory material included with your application.)

a. ☒ I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate college, or university where English was the *only* language of instruction throughout (you must provide documentation); or

b. ☐ I passed either ☐ the TOEFL or ☐ the ECFMG English test after December 31, 1973 AND I passed the ☐ TSE or ☐ OPI. If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification of your scores directly to the Board;

c. ☐ I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? ☒ NO ☐ YES   If "YES," please write or call the Board for additional information.

JA2926

Initial Medical Licensure
POSTGRADUATE TRAINING
10/2009 INT

Print
Your
Name: Charles John Nosa AKoda Date: 7/28/11

Page 5 of 11

12. **POSTGRADUATE TRAINING** (DO NOT ATTACH RESUME OR CURRICULUM VITAE.) List in chronological order ALL postgraduate training undertaken in the United States, its territories or possessions, Puerto Rico, or Canada regardless of whether you did or did not complete the program, and regardless of whether you were or were not compensated. (Copies of training certificates are helpful, but not required.)

NOTE: On a case by case basis, the Board may consider full time teaching in an LCME accredited medical school in the United States as an alternative to the accredited postgraduate clinical medical education required in the Code of Maryland Regulations 10.32.01.03D. Applicants who intend to request consideration of teaching experience as an alternative to accredited postgraduate clinical medical education should contact the Board's licensure division for further information.

Effective October 1, 2000, graduates of all medical schools NOT in the U.S., its territories or possessions, Puerto Rico, or Canada are required to submit evidence acceptable to the Board of successful completion of 2 years of training in a postgraduate clinical medical education program accredited by an accrediting organization recognized by the Board (ACGME, AOA, or equivalent). If you have not met this requirement, DO NOT submit this application.

A Fifth Pathway Program graduate must have been a U.S. citizen during the time of medical education and must have successfully completed two years of ACGME accredited postgraduate clinical medical education after successfully completing a Board approved Fifth Pathway program. If you have not met these two criteria, DO NOT SUBMIT THIS APPLICATION.

If after 10/11/92 you passed any medical licensing exam (or part, step, or component thereof) that you failed three times, either before or after 10/11/92, then you must successfully complete another year of ACGME/AOA accredited clinical postgraduate training in addition to the year(s) usually required by Maryland. All of the additional year must have begun after the date of the last fail. Teaching will not be accepted as an alternative to a year required following three or more fails. If you have not met this requirement, DO NOT submit this application. If you failed any part, step, or component of a medical exam four times, DO NOT SUBMIT THIS APPLICATION; you are not eligible for medical licensure in Maryland.

**NOTE: Postgraduate training program cycles usually run from July 1 to June 30. If the dates of your postgraduate training are not within the usual cycle, fall short of the complete cycle, or extend beyond the usual cycle, please attach a complete explanation of why your training was "off-cycle."**

| PG Year #: 4 | Place of Training: HOWARD HOSPITAL | | month 06 year 07 | TO | month 06 year 11 |
|---|---|---|---|---|---|
| | Address: 2041 Georgia Ave NW DC 20060 | Specialty: OBGYN | Accredited by: ACGME ☑ AOA ☐ RCPSC ☐ | | |
| PG Year #: | Place of Training: | | month year | TO | month year |
| | Address: | Specialty: | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | |
| PG Year #: | Place of Training: | | month year | TO | month year |
| | Address: | Specialty: | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | |
| PG Year #: | Place of Training: | | month year | TO | month year |
| | Address: | Specialty: | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | |
| PG Year #: | Place of Training: | | month year | TO | month year |
| | Address: | Specialty: | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | |

**(ATTACH A SEPARATE SIGNED AND DATED PAGE IF ADDITIONAL SPACE IS NEEDED)**

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

JA2927



Just Finished residency.

Initial Medical Licensure
HOSPITAL PRIVILEGES
10/2009 INT

Print Your Name: Charles John Nosa AKODA    Date: 7/28/11

Page 6 of 11

13. Hospital Privileges After Postgraduate Training: Please list all hospitals where you have had privileges or have provided services after the completion of your postgraduate training for the five year period preceding the filing of this application. Copy this page if more space is needed and enclose each signed and dated addition.

| | mon. | yer. | TO | mon. | yer. |
|---|---|---|---|---|---|
| Hospital: | | | | | |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |
| Hospital: | mon. | yer. | TO | mon. | yer. |
| Complete Address: | Department | | | | |

JA2928

| Initial Medical Licensure<br>MEDICAL EXAMS<br>10/2009 PIT | Print<br>Your<br>Name: Charles John Nosa Akoda Date 7/28/11 | Page<br>7 of 11 |

**14. Medical Licensing Examinations** (USMLE, NBME, NBOME, FLEX, FLEX-Weighted Average, Medical Council of Canada, and licensing exams given by individual states prior to January 1, 1985) DO NOT SUBMIT THIS APPLICATION until you have received written verification of having passed all parts, steps, or components of your medical licensing examinations.

Identify below ALL the medical licensing examinations that you have ever taken. Ask the administering authority of each exam to send the complete medical licensing examination history and scores directly to this Board. In each examination category below, you will find information to help you contact the administering authority.

a. Have you ever failed any medical licensing examination (or part, step, or component thereof)? **NO**

b. Have you failed any medical licensing examination (or part, step, or component thereof) three or more times? **NO**

If you answered "Yes" to a. and b., you must have successfully completed another year of ACGME-accredited clinical postgraduate training, in addition to the year(s) of training usually required for licensure in Maryland. No part of the additional year may have been taken before the date of the last fail. If you have not met this requirement, you are not eligible for licensure in Maryland at this time. DO NOT submit this application until you have fulfilled this requirement.
**IF YOU HAVE FAILED ANY PART, STEP, COMPONENT OR APPROVED EXAMINATION COMBINATION MORE THAN 3 TIMES, You may not be eligible for medical licensure in Maryland. For a complete explanation see COMAR 10.32.01.03 Licensure—Qualifications for Initial Licensure**

a. **State Board Examination List state(s):** _N/A_
STATE BOARD DOES NOT INCLUDE STEP 3 OF USMLE, ORAL EXAMS, OR INTERVIEWS. State Board Examinations were licensing exams given by individual states. State Board Examinations taken after December 31, 1984 are not accepted for licensure in Maryland.
Send a copy of MBP IML7, *State Board Licensure and Examination Certification*, form to the state(s) which administered your licensing exam and ask the state(s) to send your exam results directly to the Maryland Board of Physicians. Also send a copy to each state that has ever issued you a license. NOTE: Many states charge a fee for exam transcripts. Contact each state board prior to sending form IML7, as all fees are the responsibility of the applicant.

**Federation of State Medical Boards** (See Page 8 if you took a combination of these exams or combined either with the NBME exams)

b. ☐ **FLEX-Weighted Average:** All FLEX-Weighted exams prior to 1985 must have been taken in one sitting (3 consecutive days). Flex weighted average exams taken in more than one sitting must have current ABMS or AOA Board Certification unless you are currently certified by a member board of the American Board of Medical Specialties.

c. ☐ **FLEX Components 1 and 2:** Examinations must be passed within 5 years of each other.

d. ☒ **USMLE Steps 1, 2, and 3:** Passing scores on all parts must have been completed within a 10-year period beginning with the month and year when the applicant first passed either step 1 or step 2.
If you took any of the above examinations you must ask the Federation of State Medical Boards (FSMB) to send your transcripts to the Board by accessing their website at www.fsmb.org. Click transcript requests.

e. ☐ **National Board of Medical Examiners** (See Page 8 if you combined this examination with FLEX or USMLE exams)
If you have received NBME certification, ask NBME to send to the Board both the Endorsement of Certification *and* the Record of Scores. All requests must be made through the NBME website at http://www.nbme.org or call 215-590-9592. If you took NBME exams but were not certified, or you took NBME as part of hybrid exams, ask NBME to send only your Record of Scores.

f. ☐ **National Board of Osteopathic Medical Examiners Certifications** issued before January 1, 1971 are not accepted for licensure in Maryland. If you have received NBOME certification, ask NBOME to send to this Board the verification of certification and the complete history of your medical examinations. Contact NBOME at 773-714-0622 for instructions and fee information.

g. ☐ **Medical Council of Canada**
Licentiate of the Medical Council of Canada
Please request that verification of your Licenciate Certification and a complete LMCC examination history be sent directly to this Board. Call MCC at 613-521-6012 for instructions and fee information.

CONTINUED ON PAGE 8

JA2929

Initial Medical Licensure
MEDICAL EXAMS
10/2000 INT

Print Your Name: Charles John Nosa Akoda Date: 7/28/11

Page 8 of 11

## HYBRID EXAMINATIONS

The following combinations are the only hybrid examinations accepted by the Maryland Board.

Passing scores on all parts of hybrid examinations must have been completed within a 10-year period, beginning with the month and year the examinee first passes a part or component or step of the combined examination. ALL HYBRID EXAMINATIONS MUST HAVE BEEN COMPLETED BEFORE JANUARY 1, 2000.

h. ☐ USMLE 1 + NBME II + NBME III

i. ☐ USMLE 1 + USMLE 2 + NBME III

j. ☐ USMLE 1 + NBME II + USMLE 3

k. ☐ NBME I + USMLE 2 + USMLE 3

l. ☐ NBME I + USMLE 2 + NBME III

m. ☐ NBME I + NBME II + USMLE 3

n. ☐ FLEX 1 + USMLE 3

o. ☐ FLEX 2 + USMLE 1 + NBME II

p. ☐ FLEX 2 + USMLE 1 + USMLE 2

q. ☐ FLEX 2 + NBME I + USMLE 2

r. ☐ FLEX 2 + NBME I + NBME II

- If your hybrid exams included any part of the NBME examination, contact NBME at http://www.nbme.org or call 215-590-9592 for instructions and request that your Endorsement of Certification *and* your Record of Scores be sent directly to the Maryland Board of Physicians.

- If your hybrid exams included only FLEX and USMLE examinations, request your transcript from the Federation of State Medical Boards at www.fsmb.org.

**15. Licensing History:**

a. ☐ I have never been licensed in the U.S., its territories, or Puerto Rico and have never been licensed or registered in Canada.

b. ☒ I have an application for license pending in the following states: LA _____ _____ _____ _____

c. Please list below all licenses ever issued to you by a U. S. state/territory or Puerto Rico. Also list all Canadian licenses and registrations.

d. Has any disciplinary action ever been taken against your license? ☒ No ☐ Yes   If yes, please enclose an explanation.

| STATE (Or Puerto Rico or Canadian Province) | LICENSE NUMBER or Registration Number | CURRENT STATUS | | | | | |
|---|---|---|---|---|---|---|---|
| | | Active | Inactive | Expired/Lapsed | Surrendered in good standing | Surrendered / Suspended | Revoked |
| Virginia | 0101250081 | ✓ | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(If more space is needed, please attach an additional signed and dated sheet.)

JA2930

| Initial Medical Licensure SPEX, Character/Fitness 10/2006 BYT | Print Your Name: Charles John Nosa AKODA Date: 7/28/11 | Page 9 of 11 |

**16.** Check YES or NO.

- [✓] [ ] Did you successfully complete a medical licensing exam (USMLE, NBME, etc.) within the 15-year period prior to filing this application?
- [✓] [ ] During the past 10 years, have you maintained uninterrupted licensure since you were first issued a license in the United States, its territories, Puerto Rico, or Canada?
- [ ] [✓] Do you have lifetime certification from, or within the past 10 years have you been certified or recertified by, a specialty board recognized by the American Board of Medical Specialties, the American Osteopathic Association, or the Royal College of Physicians and Surgeons of Canada?
  If "YES," in which specialty were you certified? _____ Date certified _____

⇒ If you have answered "NO" to all three of the above questions, you MUST take the Special Purpose Examination. After you submit this application, contact the Federation of State Medical Boards at 817-571-2949 and arrange to take the SPEX in Maryland and have scores sent to the Maryland Board directly.

**17.** Character and Fitness Questions (Check either YES or NO)

YES NO

a. Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, denied your application for licensure, reinstatement, or renewal?

b. Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, taken action against your license? Such actions include, but are not limited to, limitations of practice, required education admonishment, reprimand, suspension, or revocation. Refer to the document *Grounds for Board Action in Maryland* at the Board's website www.mbp.state.md.us.

c. Has any licensing or disciplinary board in any jurisdiction (including Maryland), or a comparable body in the armed services, filed any complaints or charges against you or investigated you for any reason?

d. Have you ever withdrawn your application for a medical license or other health professional license?

e. Has a hospital, related health care institution, HMO, or alternative health care system investigated you or brought charges against you?

f. Has a hospital, related health care facility, HMO, or alternative health care system denied your application for, or failed to renew your privileges; or limited, restricted, suspended, or revoked your privileges in any way?

g. Have you committed a criminal act to which you pled guilty or nolo contendere, or for which you were convicted or received probation before judgement?

h. Have you committed an offense involving alcohol or controlled dangerous substances to which you pled guilty or nolo contendere, or which you were convicted or received probation before judgement? Such offenses include, but are not limited to, driving while under the influence of alcohol and/or controlled dangerous substances.

i. Excluding minor traffic violations, are you currently under arrest or released on bond, or are there any current or pending charges against you in any court of law?

j. Do you illegally use drugs?

k. Do you have any physical or mental condition that currently impairs your ability to practice medicine or that would cause reasonable questions to be raised about your physical, mental, or professional competency?

l. Have you ever been named as a defendant in a medical malpractice action?

m. Are you in default of a service obligation that you incurred by receiving State or federal funds for your medical education?

n. Have you failed to make arrangements to satisfy State or Federal loans that financed your medical education?

o. Was your employment by any hospital, HMO, other health care facility or institution, or military entity been terminated for disciplinary reasons?

p. Have you voluntarily resigned from any hospital, HMO, other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

q. Has use of drugs and/or alcohol ever resulted in an impairment of your ability to practice your profession?

r. Have you surrendered your license or allowed it to lapse while you were under investigation by any licensing or disciplinary board of any jurisdiction or any entity of the armed services?

⇒⇒⇒ If you answered "YES" to any of the questions in item 17, on the following page please list all adverse actions taken against you and provide a complete explanation. Attach any supporting documentation that applies (copies of all complaints, malpractice claims, adverse or disciplinary actions, arrests, pleadings, judgements, or final orders). Sign and date all pages submitted.

JA2931

medical Boards, hospitals and other licensing bodies, the Healthcare Integrity and Protection Data Bank, the Federation of State medical Boards, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to signany subsequent release for information that may be requested by the Board.

Charles John Nosa Akoda                Charles Akoda          7/28/11

Applicant's Name (Printed)                 Applicant's Signature          Date

**20. (OPTIONAL) Third Party Release:** Although the Board encourages you to complete all aspects of your application on your own, if you plan to use an intermediary to receive information about the status of your application, please complete this release.

I agree that the Maryland Board of Physicians may release any information pertaining to the status of my application to the following person:

Name: _____ N/A _____

Phone: _____        _____        Applicant's Signature          Date

**21.** I agree that I will cooperate fully with any request for information or with any investigation related to my medical practice as a licensed physician in the State of Maryland, including the subpoena of documents or records or the inspection of my medical practice.

During the period in which my application is being processed, I shall inform the Board within 30 days of any change to any answer I originally gave in this application, any arrest or conviction, any change of address or any action that occurs based on accusations that would be grounds for disciplinary action under Md. Code Ann., Health Occ. § 14-404.

_____        7/28/11

Applicant's Signature                 Date

**22. Affidavit:** To be completed by the applicant in the presence of a notary public after the applicant's picture has been attached below.

I certify that I have personally reviewed all the responses to items 1-22 of this application and that the information I have given is true and accurate to the best of my knowledge. I understand and agree that I may not practice, attempt to practice, or offer to practice medicine in Maryland unless licensed by the Board.

X _____        8/3/11

Applicant's Signature                 Date

STATE OF _____ Maryland _____

CITY/COUNTY OF _____ Prince George's _____

I HEREBY CERTIFY that on this _3rd_ day of _August_, 20 _11_, before me, a Notary Public of the State and City/County aforesaid, personally appeared the Applicant, _Charles Akoda_, whose likeness is identifiable as that of
(print applicant's name)
the person in the photograph attached to this application and who has made oath in due form of law to be the person referred to in the above application for license to practice Medicine and Surgery in the State of Maryland, and to have stated the

truth in all statements made in this application.

AS WITNESS my hand and notarial seal. _____
                                         Notary Public

My Commission expires: _03-25-2012_                SEAL

GEORGE E. OKAI
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY, MARYLAND
MY COMMISSION EXPIRES 3-25-2012

STOP! Completed application and check must be mailed to Maryland Board of Physicians, P.O. Box 37217, Baltimore, Maryland 21297

JA2932



**BENIN CITY, NIGERIA**

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October* 1987

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

RECEIVED AUG 11 2011 MARYLAND BOARD OF PHYSICIANS

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE CHANCELLOR

JA2933

# EDUCATIONAL COMMISSION
## for
# FOREIGN MEDICAL GRADUATES

### CERTIFIES THAT

## — JOHN NOSA AKODA

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

RECEIVED AND HAS BEEN AWARDED THIS CERTIFICATE.

AUG 1 1 2011

**CERTIFICATE NUMBER** 0-553-258-5 / NO INS
MARYLAND BOARD
**MEDICAL EXAMINATION**

| | |
|---|---|
| **BASIC SCIENCE** | JUNE 11, 1997 |
| **CLINICAL SCIENCE** | AUGUST 28, 1996 |
| **ENGLISH EXAMINATION** | AUGUST 28, 1996 |
| **VALID THROUGH** | |

**CERTIFICATE NUMBER**
0-553-258-5
**ENGLISH EXAMINATION**
August 28, 1996
**VALID INDEFINITELY**

_____
**CHAIRMAN, BOARD OF TRUSTEES**

_____
**PRESIDENT, CHIEF EXECUTIVE OFFICER**

**DATE ISSUED** AUGUST 18, 1997

JA2934

HOWARD UNIVERSITY HOSPITAL AND AFFILIATED HOSPITALS

WASHINGTON, DISTRICT OF COLUMBIA

THIS IS TO CERTIFY THAT

# JOHN-CHARLES NOSA AKODA, MD

HAS SATISFACTORILY COMPLETED FOUR YEARS

OF POSTGRADUATE MEDICAL EDUCATION IN

## DEPARTMENT OF OBSTETRICS AND GYNECOLOGY

THROUGH OUR TRAINING PROGRAMS AT HOWARD UNIVERSITY.

JULY 1, 2007 - JUNE 30, 2011

*Fannie G. Brown*
DIRECTOR, GRADUATE MEDICAL EDUCATION

PROGRAM DIRECTOR

*Sidney Ribeau*
PRESIDENT OF THE UNIVERSITY

SECRETARY OF THE UNIVERSITY

JA2935



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October 1987*

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988



*M.*
REGISTRAR

Williams
VICE-CHANCELLOR

JA2936

MARYLAND BOARD OF PHYSICIANS
4201 Patterson Avenue ■ P.O.Box 2571
Baltimore, Maryland 21215-0095
Telephone: 410-764-4777    800-492-6836

Initial Medical Licensure
Supplemental Form
MBP IML3
10/2009 INT

| Side A |

VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION

**Part 1** | APPLICANT: Complete Part 1 and sign where indicated in the Part 2 instructions.  Print your name on top of the reverse page and send a form to the director of each postgraduate training program you attended. Be sure to copy both sides.

**a. Applicant's Name:** AKODA    CHARLES    JOHN    NOSA
Last Name and Generational Indicator (Jr., Sr., II, III, etc.)      First Name      Middle Name

**Address:**

**City:** _____  **State:** _____

**Date of Birth:** [ Month   Day   Year ]      **Social Security Number:**

**b. Name of Institution:** HOWAR UNIVERSITY HOSPITAL

**Department and Area of Training:** OBSTETRICS AND GYNECOLOGY

**Complete Address:** 2041 Georgia Avenue, NW

**City:** Washington      **State:** DC

**FROM:** [Month] 0 7 [Year] 0 7  **TO** [Month] 0 6 [Year] 1 1

**Part 2** | POSTGRADUATE TRAINING PROGRAM DIRECTOR: Please complete Part 2 according to the records available and send directly to the Maryland Board of Physicians at the above address. Please do not send original or copies to me.    **Applicant's Signature**

1. Did the applicant participate in postgraduate training in your department during the period listed above?*
[✓] YES   [ ] NO   If "No," please enter exact dates: _____ to _____

Program Specialty: OBGYN

*If training was part-time, please explain the training schedule after item 8 of this form.

2. During the time of the applicant's participation, was the postgraduate training program accredited?   [✓] YES   [ ] NO

Accredited by: [✓] ACGME: Program # 2201021065   [ ] AOA: ID #: _____   [ ] RCPSC

3. Did the applicant participate in all of the components of the training as required by the accrediting body?
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

4. Did the applicant successfully complete all requirements of each year of training?
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

5. During the applicant's year(s) of training, did the applicant have any break in training?
[✓] NO   [ ] YES   Comments (attach signed and dated additions as needed): _____

JA2937

Initial Medical Licensure
Character/Fitness Details
10/2009 INT

Print Your Name: Charles John Nosa Akoda  Date: 7/28/11

18 a.   If you answered "YES" to any of the questions in item 17, please provide an explanation below and attach all complaints, pleadings and judgments. Attach additional signed and dated pages as needed.

18 b.   If you answered yes to 17L - answer the following questions:

1.   Total number of malpractice claims ever filed in which you were named as a defendant? _____

2.   Total number of malpractice claims ever paid (settlement / judgment) in which you were named as a defendant? _____

3.   Within the last 60 months (5 years) provide the following:
Total number of medical malpractice claims filed _____ ; paid (settlement / judgment ) _____;
or dismissed _____; in which you were named as a defendant.

4.   For a claim filed at any time, but paid (settlement / judgment) within the last 60 months (5 years), list each claim by claimants name; describe the disposition of each claim; and provide a copy of the complaint, pleading, and judgment of each medical malpractice claim.

N/A

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

I have attached  the following number of pages to this application: _____

JA2938

**9. Chronology of Activities: DO NOT ATTACH RESUME OR CURRICULUM VITAE**

Beginning with the date you completed medical school and continuing through the present, list chronologically all of your activities. Account for all periods of time including each post-graduate training program you attended, regardless of whether or not you completed the program; each job you held, regardless of whether or not it was medically related or you were compensated; and any period of unemployment.

| Date Medical School was Completed: | month 06 | year 87 |

Activities after completing medical school: Please type or print.

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 06 | 07 | TO | 06 | 11 | OBGYN RESIDENCY |

Address: HOWARD HOSP 2041 GEORGIA AVEN, NW DC 20060

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 01 | 05 | TO | 06 | 07 | MAXICARE INC    PHYSICIAN Assistant |

Address: P.O. BOX 5036, Laytonsville m D 20882

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 05 | 00 (2000) | TO | 12 | 04 | MEDICAL DIRECTOR Vita Med ctr |

Address: Port Harcourt, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 07 | 92 | TO | 04 | 00 | MEDICAL OFFICER |

Address: Gen Hosp Ughelli, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 06 | 90 | TO | 06 | 92 | Resident OBGYN |

Address: University of Ibadan, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 01 | 89 | TO | 05 | 90 | Medical officer |

Address: Gen. Hosp. Benin City, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 07 | 87 | TO | 12 | 88 | Internship |

Address: Gen. Hosp. Warri, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| | | TO | | | |

Address:

**CONTINUED ON PAGE 3:** If you will need more space than page 3 allows, please photocopy page 3 for your use or attach a separate sheet. Please sign and date each sheet you attach.

JA2939

MARYLAND BOARD OF PHYSICIANS
WILLIAM CALHOUN
4201 PATTERSON AVE., 4TH FLOOR
BALTIMORE, MD, 21215-0095

State Board Code:
**021**
Please include this
number on all requests

## ECFMG® CERTIFICATION STATUS REPORT

USMLE™/ECFMG Identification Number: 0-553-258-5
Applicant's Name: JOHN NOSA AKODA
Applicant's Date of Birth: 01/01/1959
ECFMG Certified: Yes
    Certificate Issue Date: 08/18/1997
    English Test Valid Through:  Valid Indefinitely

| Passing Performance on Medical Science Examinations: | | Two Digit Score | Three Digit Score |
|---|---|---|---|
| Examination | Date | | |
| USMLE Step 1 | 11 Jun 1997 | * | * |
| USMLE Step 2 CK | 28 Aug 1996 | * | * |

Most Recent Passing Performance on Clinical Skills Examination:

| Examination | Date |
|---|---|
| Not Required for Certification | |

Most Recent Passing Performance on English Test: AUG 1996
Name of Medical School and Country: University of Benin College of Medicine, Benin, NIGERIA

Degree Year: 1988
† Medical Education Credentials Status:  Complete
This information is reported directly from ECFMG computer records and is current as of 09/14/11.

### How to Verify the Authenticity of this Report:

This report was issued to the named recipient on the date shown below.  To verify the authenticity of this report, visit
https://cvsonline2.ecfmg.org/verify/verify.aspx and enter the unique verification code at the bottom of the report. The information contained in this report is
current as of the issue date.  Any changes to the physician's status after the issue date will not be reflected, and you are encouraged to request an
updated report.

The purpose of this Status Report is to indicate whether this individual is certified by ECFMG. It reflects only examinations that were used to fulfill
requirements for ECFMG Certification. The most recent passing performance on the clinical skills examination is reflected, regardless of whether this
individual was required to take a clinical skills examination for ECFMG Certification. This Status Report is not a complete score history of all examinations
for this individual. This Status Report does not include examinations that were taken but not passed. Furthermore, if this individual passed examinations
that were not used to fulfill the requirements for ECFMG Certification, these examinations are not included.
* To obtain a complete history of and scores for USMLE Step examination(s) that may have been taken by this individual, contact the appropriate
registration entity to request a USMLE transcript.

† Since July 1986, ECFMG has verified medical school credentials directly with the medical schools, or through a reasonable alternative that has been
approved by the ECFMG Medical Education Credentials Committee.
**Important Note:**

Requesting organizations must normally secure and retain the physician's signed authorization to obtain certification information.
Organizations may not resell the information or make it available to any party beyond the initial request as authorized by the physician.
The information may only be used to confirm ECFMG certification for the purpose for which the physician provided authorization.
**Report Verification Code: DXD0C14D9F**

021
Form 282 B - 6/04

JA2940

**Initial Medical Licensure Supplemental Form**
**MBP IML3**
**10/2000 INT**

**MARYLAND BOARD OF PHYSICIANS**
**VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION**

| Side B |

Applicant's Name (print): _John Charles Nosa Akoda_

6. Did the applicant have any physical or mental problem that affected the applicant's ability to practice medicine during the period of training?

   If "Yes," please give a detailed explanation* _____

   _____

7. Was any action taken against the applicant by any training program, hospital, medical board, licensing authority, or court ? Such actions include, but are not limited to investigations, limitations of privileges or special conditions, requirements imposed for academic incompetence, disciplinary actions, probationary actions, etc.

   NO   YES   If "Yes," please give a detailed explanation* _____

8. In each year of training, did the applicant demonstrate sufficient academic and clinical ability to qualify for advancement without conditional or probationary status to the next year and next progressive level of responsibility in a designated specialty program?

   [✓] YES   [ ] NO   Comments:*

Control No: 111179                08/09/2011
Akoda. Charles John Nosa
*IML3-Accredited Training Programs*
Received: William Calhoun
Analyst: Dierdra Rufus

* If space is not sufficient, please attach a signed and dated detailed explanation.

Attestation: I attest that the information I have provided regarding the applicant is true, accurate, and complete according to all available records.

_Diana Broomfield_              M. D, FACOG, FACS.
Printed Name of Program Director          Title
_Howard University_            2041 Georgia Aven. Washington DC
Hospital                        Address
OBGYN                          202 - 865 - 7081

JA2941

10. **MEDICAL EDUCATION:** List all medical schools you have attended

From: MM/YY To MM/YY

University OF BENIN COLLEGE OF MEDICINE, NIGERIA          06/82 - 06/87

Medical School From Which You Received Your Medical Degree: University OF BENIN, Nigeria

Name of University Affiliation (if applicable): * _____

Street Address: 01 QUEEN Elizabeth Rd, MoKola, Ibadan

City: _____ State/Province: _____ Country of citizenship during medical education: Nigerian

Language(s) of Instruction: ENGLISH

Type of Degree: ☐ M.D.  ☐ D.O.  ☐ M.D./Ph.D  ☒ M.B.B.S.  ☐ M.B.B.Ch  ☐ Other: _____ (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc.
Was Conferred: was satisfied.        Month 0 6   Day 3 0   Year 8 7   * D.O.B 1988 *correct

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada)
Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and Examinations Taken, Good Conduct Certificate or Intern Certificate. The certificate must include your name, name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree.

11. How have you satisfied Maryland's *written* *and* *oral* English language competency requirements?
(See *English Language Competency Requirements for Medical Licensure in Maryland* in the introductory material included with your application.)

a. ☒ I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate college, or university where English was the *only* language of instruction throughout (you must provide documentation); or

b. ☐ I passed either ☐ the TOEFL or ☐ the ECFMG English test after December 31, 1973 AND I passed the ☐ TSE or ☐ OPI. If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification of your scores directly to the Board;

c. ☐ I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? ☒ NO ☐ YES     If "YES," please write or call the Board for additional information.

*2014*

🖶Print

DO NOT MAIL THIS TO THE BOARD.  RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number** D0073049 Dr. Charles John Nosa Akoda

| | |
|---|---|
| 2. | Individual National Provider Identifier NPI: 1952664278 ☐ I do not have an NPI<br>This is the NPI entered in the field for Rendering NPI on a claim (10 digit number)<br>❓ NPI Information |

3. **EMAIL ADDRESS**: Please enter your most current email address where we may contact you regarding your license.

adcfrancis@aol.com

**Address Changes (Non-Public and Public)**:
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2014 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

**4a. Non-Public Address:** This address is for Board use only and is **where your license will be mailed**. However, if no public address is listed, this address will also be made available to the public.

| | |
|---|---|
| Street | |
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

**4b. Public Address:** This address, usually your office, is available to the public and will be posted on the Internet.  If you do not designate a public address, your non-public address will be posted on the Internet.
☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| | |
|---|---|
| Street | 14909 Downey Court |
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? See instruction    ◉ Yes ○ No

CHARACTER AND FITNESS (Question 6)
6. The following questions pertain to the period since July 1, 2012. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
\* All questions must be answered Yes or No.

Yes  No
NO
Has any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the armed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes  No
NO
Have any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services?

JA2943



c. Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes    No
NO

Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

Yes    No
NO

ve you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes    No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

Yes    No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

Yes    No
NO

Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

Yes    No
NO

Do you have a physical or mental condition that currently impairs your ability to practice medicine?

Yes    No
NO

j. Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

Yes    No
NO

Do you illegally use drugs?

Yes    No
NO

Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

Yes    No
NO

Have you been named as a defendant in a filing or settlement of a medical malpractice action?

Yes    No
YES    I was a Resident rotating through Prince Georges Hospital in 2010 when a child delivered had Brachial nerve palsy. All staff including Residents involved in the delivery were name in the law-suit. I am being represented by Attorneys from Howard Residency program which is my training institution. The law-suit is still in its preliminary stages

n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

Yes    No
NO

Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

Yes    No
NO

p. Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

Yes    No
NO

Have you failed to make arrangements to satisfy any state or federal loans that financed your medical education?

Yes    No

JA2944

CONTINUING MEDICAL EDUCATION (Question 7)

- ⦿ **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1 continuing medical education activities within the two-year period immediately preceding submission of this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity and maintain documentation for a period of six years for possible inspection by the Board. For additional information on CME, see Maryland Regulations, 10.32.01.09.*

- ◯ **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first renewal after initial medical licensure in Maryland and I have completed the Board's New Physician Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were licensed prior to September 30, 2012 or reinstated, this does not apply to you. See New Physician Orientation Program web site. **Your license will not be renewed unless you have completed the orientation.**

- ◯ **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a. Gender ⦿ Male ◯ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin? (A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:

American Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America, and who maintains tribal affiliations or community attachment.)

Asian (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

Black or African American (A person having origins in any of the black racial groups of Africa.)

Native Hawaiian or other Pacific Islander (A person having origins in the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

White (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

Other

9. Are you employed by the Federal Government?

◯ Yes ⦿ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship (subspecialty) training program accredited by the ACGME.

**If you answer Yes** to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of this application.

a. In an accredited/approved internship or residency program?

◯ Yes ⦿ No

b. In an accredited fellowship (subspecialty) training program?

◯ Yes ⦿ No

11a. Which best describes your current area(s) of concentration:

| | |
|---|---|
| Primary Concentration | Obstetrics & Gynecology |
| Secondary Concentration | None |

JA2945

11b. SPECIALTY BOARD CERTIFICATION: List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

Primary Certification: Obstetrics & Gynecology

Secondary Certification: None

12. Please select all states (excluding Maryland) where you hold a medical license.

- ☐ Alabama
- ☐ Florida
- ☐ Kentucky
- ☐ Nebraska
- ☐ Oklahoma
- ☐ Utah
- ☐ Alaska
- ☐ Georgia
- ☐ Louisiana
- ☐ Nevada
- ☐ Oregon
- ☐ Vermont
- ☐ Arizona
- ☐ Guam
- ☐ Maine
- ☐ New Hampshire
- ☐ Pennsylvania
- ☑ Virginia
- ☐ Arkansas
- ☐ Hawaii
- ☐ Massachusetts
- ☐ New Jersey
- ☐ Puerto Rico
- ☐ Virgin Islands
- ☐ California
- ☐ Idaho
- ☐ Michigan
- ☐ New Mexico
- ☐ Rhode Island
- ☐ Washington
- ☐ Colorado
- ☐ Illinois
- ☐ Minnesota
- ☐ New York
- ☐ South Carolina
- ☐ West Virginia
- ☐ Connecticut
- ☐ Indiana
- ☐ Mississippi
- ☐ North Carolina
- ☐ South Dakota
- ☐ Wisconsin
- ☐ Delaware
- ☐ Iowa
- ☐ Missouri
- ☐ North Dakota
- ☐ Tennessee
- ☐ Wyoming
- ☐ District of Columbia
- ☐ Kansas
- ☐ Montana
- ☐ Ohio
- ☐ Texas

13a. How many weeks per year do you work?  48

13b. Please indicate below how the hours are allocated in your typical work week . The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

🛈 If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

*Patient Care Related Activities* include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

*Research* includes clinical, laboratory, and analytical research

*Teaching* includes the teaching of medical undergraduate & graduate students and other graduate students.

*Administration & Other:* Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

🛈 Use whole numbers. No fractional hours. If none enter 0.

| | | |
|---|---|---|
| a. Patient Care Related Activities | 60 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 10 | hours per week |
| d. Administration & Other | 10 | hours per week |
| Total Hours | 80 | hours per week |

14. If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next two years?

○ Yes ○ No

PRACTICE INFORMATION (Questions 15-26)

15. Do you plan to discontinue patient care related activities in the next two years?

○ Yes ● No

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

a. Number of locations in Maryland (if none, enter 0)   2

b.   0

Number of locations outside of Maryland (if none, enter 0)
ⓘ If you have locations outside Maryland, please answer (c) below after you answer (b).

c. Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?

○ Yes   ○ No   ○ Don't know

---

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

a. Number of hospitals in Maryland (if none, enter 0)          `1`

b. Number of hospitals outside of Maryland (if none, enter 0)  `0`

---

**18. Primary Practice / Office Location** Primary Practice / Office Location

ⓘ Please answer all Primary Practice questions

a. Organization Name            `Dr Abdul Chaudry`

   Organization Name2           ` `

b. Street Address               `6005 Landover Road, suite#5`

c. Street2                      ` `
                                ⓘ Enter suite or room number here. (Ex. Suite 101 or Room 101)

d. City                         `Cheverly`

e. State                        `Maryland`

f. Zip Code                     `20785`

g. Jurisdiction                 `PRINCE GEORGE'S`

h. Employer Tax ID      `00` - `0000000`   ⓘ If you do not have an EIN enter 00-0000000

   ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

   ○ I use an Organizational NPI for billing.   Please Enter >   ┌──────────────┐
                                                                 └──────────────┘
                                                                 Organizational NPI
   ○ I use my Individual NPI for billing.

   ● I do not bill public or private insurers.

j. You indicated in Question 13a, **60** hours of Patient Care Related Activities during a typical work week.
   How many of those Patient Care Related Activity hours in your typical work week are delivered at this practice/office location?          `60`
   ⓘ If none, enter 0.                                                                                        Hours

k. Setting          `Freestanding Physician Office`

l. Private/Public   `Private-For profit`

m. Practice         `Single-Specialty Group-Independent`

   Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-level medical providers is listed below.
   ⓘ If none, enter 0; if you don't know the number, enter 999

   Number of physicians (MDs, DOs, residents, fellows) including yourself at this location.   `2`

   Number of mid-level medical providers at this location.   `5`
   ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician assistants.

JA2947

19. Secondary Practice / Office Location

ⓘ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

a. Organization Name        Dr Abdul Chaudry

   Organization Name2

b. Street Address           6400 Marlboro Pike

c. Street2
                            ⓘ Enter suite or room number (Ex. Suite 101 or Room 101)

d. City                     District Heights

e. State                    Maryland

f. Zip Code                 20747

g. Jurisdiction             PRINCE GEORGE'S

h. Employer Tax ID          00 - 0000000      If you do not have an EIN enter 00-0000000
                            ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

   ◯ I use an Organizational NPI for billing.  Please Enter >
   ◯ I use my Individual NPI for billing.                          [          ]
   ◉ I do not bill public or private insurers.                     Organizational NPI

j. You indicated in Question 13a, **60 hours** of Patient Care Related Activities during a typical work
   week.
   How many of those Patient Care Related Activity hours in your typical work week are delivered at    [20]
   this practice/office location?                                                                      Hours
   ⓘ If none, enter 0.

k. Setting                  Freestanding Physician Office

l. Private/Public           Private-For profit

m. Practice                 Solo-independent

   Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-
   level medical providers is listed below.
   ⓘ If none, enter 0; if you don't know the number, enter 999

   Number of physicians (MDs, DOs, residents, fellows) including yourself at this location.       [2]

   Number of mid-level medical providers at this location.                                        [5]
   ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician
   assistants.

20-21 The Health Information Technology questions have been moved to a seperate section. You are required to complete the Health Information
Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public
insurance program patients.

   a.  Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc.          ◉      ◯
                                                                                                 Yes    No

   b.  Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed     ◉      ◯
       Care Organization)                                                                                        Yes    No

       b1. If Yes, are you accepting new Maryland Medical Assistance patients?                   ◉      ◯
                                                                                                 Yes    No

   c.  Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)?

JA2948

<table>
<tr><td></td><td>◉ Yes</td><td>○ No</td></tr>
</table>

c1. **If Yes, are you accepting new Medicare patients?**  ◉ Yes  ○ No

---

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes  ○ No  ◉ NA

---

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

| 0 |  hours per week.  ✪  If none, enter 0

---

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), please answer Q.25, otherwise:
☑ check this box and skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel, sometimes called direct, concierge, or retainer-based practice?

○ Yes  ○ No

---

26. Workers Compensation

Workers Compensation coverage: If you employ one or more persons, the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

◉ Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

✪ If you are a Maryland employer you must provide the information requested below.

Insurance Company  |                    |
Policy Number  |                    |
Expiration Date  |                    |  ✪  Enter as MM/DD/YYYY Enter as MM/DD/YYYY

HEALTH INFORMATION TECHNOLOGY

Please contact the Maryland Health Care Commission at 410-764-3330 for questions relating to this section.

**Electronic Health Record Incentive**

Beginning in 2011, physicians that adopt an electronic health record are eligible to receive an incentive either under Medicare or Medicaid. To receive this incentive, a physician must meet certain criteria, which varies depending on which program you choose. The Medicare incentive is up to $44,000 over five years and the Medicaid incentive is up to $63,750 over six years. Physicians are encouraged to learn more about these incentive opportunities by visiting the Centers for Medicare and Medicaid Services website  http://www.cms.gov/EHRIncentivePrograms/

This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients at your primary office/practice location, which you listed in
*Question 18 - Primary Practice / Office Location Primary Practice / Office Location*

*Please complete the following HIT questions for:* **Dr Abdul Chaudry**

1. This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients in your office.

Are you computerized in your office:
   a. To obtain information about treatment alternatives or recommended guidelines?

JA2949

⊙ Yes  ○ No

b. To send prescriptions electronically to a pharmacy?

⊙ Yes  ○ No

If you answered Yes to 1b, what percentage of prescriptions are submitted electronically?  90  %
(Enter Whole number)

c. To generate reminders for you about preventive services needed for your patients?

⊙ Yes  ○ No

d. To access patient notes, medication lists, or problem lists?

⊙ Yes  ○ No

e. For clinical data and image exchanges with other physicians?

○ Yes  ⊙ No

f. For clinical data and image exchanges with hospitals and laboratories?

○ Yes  ⊙ No

g. To communicate about clinical issues with patients by email?

○ Yes  ⊙ No

h. To obtain information on potential patient drug interactions with other drugs, allergies, and/or patient conditions?

⊙ Yes  ○ No

2. Does your primary office/practice location use electronic MEDICAL RECORDS (not including billing records)?

○ Yes, all electronic  ⊙ Yes, part paper and part electronic  ○ No  ○ Don't know

2a. If Yes, what is the name and version of the EHR system?
[ Other ▼ ]

Other  [ Lytec ]

2b. If **No**, please indicate your most significant reason for not using electronic medical records.

○ Capital cost outlays  ○ Lack of technology standards  ○ Retiring soon
○ Overburdened staff  ○ Intangible benefits  ○ Not my decision
○ Risk of privacy breaches

3. Have you used telemedicine for any purpose in the last 12 months?

⊙ Yes  ○ No

ℹ Telemedicine means, as it relates to the delivery of health care services, the use of interactive audio, video, or other telecommunications of electronic technology by a licensed health care provider to deliver health care service(s) within the scope of practice of the health care provider at a site other than the site at which the patient is located.

3a. Approximately how many times in the last 12 months have you used telemedicine for any purpose?  2
(Enter 0 if you did not use telemedicine)

3b. If you used telemedicine, what are your common uses of telemedicine technology (mark all that apply)?
☐ Second opinion
☐ Diagnosis
☑ Follow up
☐ Emergency
☐ Chronic disease management
☐ Other (specify) [                    ]

*The following questions are to be answered ONLY if your Practice Setting is one of the following:*
*(1) Solo;  (2) Single-Specialty Group;  (3) Multi-Specialty Group; or (4) HMO Group/Staff*

JA2950

4. Does your practice use high speed Internet?

◉ Yes ○ No

4a. | Comcast ▽ |   Please Specify : | |

5. How do you access the Internet?

○ DSL ○ Cable Modem ○ Fiber to the office ◉ Wireless ○ Other ○ Unknown

6. Do you provide Wi-Fi access to your patients in your waiting area?

○ Yes ◉ No ○ Unknown

PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.

* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime * | 3013250264 |

Nighttime* | |

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical   ☐ Biological   ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

☑ a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

☑ b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

☑ c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

☑ d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2014.

29. Please provide your electronic signature (type your name) below:

Name | Charles Akoda |

Today's Date | 8/12/2014 ▦ |

JA2951

Last four digits of Social
Security Number: _____

30. Select a Payment Option here to complete your application.
ⓘ Please note: Credit cards may be used for online payment only. If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

◉ Credit Card   ○ Send Check   ○ 3rd Party Check        **3rd Party Payer:** [_____]

PAYMENT
**APPLICATION COMPLETION INFORMATION:**
Date Application Started          8/12/2014
Date Application Submitted        8/12/2014
Confirmation Number
Payment Method                    Credit Card
Amount Paid                       $522.00
Credit Card Approval No.

JA2952

2012

## DO NOT MAIL THIS TO THE BOARD.  RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number D0073049** Dr. Charles John Nosa Akoda

2. Individual National Provider Identifier NPI: 1952664278    ☐ I do not have an NPI
   This is the NPI entered in the field for Rendering NPI on a claim (10 digit number)
   ⑦ NPI Information

3. **EMAIL ADDRESS**: This is your email address on file. If it has changed, please edit below. If you do not have an email address please indicate by checking the checkbox below.

adcfrancis@aol.com

☐ I do not have an email address

**Address Changes (Non-Public and Public)**:
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2012 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

**4a. Non-Public Address**: This address is for Board use only and is <u>where your license will be mailed</u>. However, if no public address is listed, this address will also be made available to the public.

| | |
|---|---|
| Street | |
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

**4b. Public Address**: This address, usually your office, is available to the public and will be posted on the Internet.  If you do not designate a public address, your non-public address will be posted on the Internet.

☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| | |
|---|---|
| Street | 14909 Downey Court |
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? <u>See instruction</u>        ⦿ Yes  ○ No

CHARACTER AND FITNESS (Question 6)
6. The following questions pertain to the period since July 1, 2010. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
* All questions must be answered Yes or No.

Yes  No
NO

' ' ~ any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the a...ed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes  No

lave any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services?

JA2953

NO

Yes  No    Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

NO

Yes  No    d. Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

NO

Yes  No    e. Have you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

YES

Yes due to NPI number error: On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My priviledges were rescinded on about May 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes  No    f. Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

NO

Yes  No    Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

NO

Yes  No    Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

NO

Yes  No    Do you have a physical or mental condition that currently impairs your ability to practice medicine?

NO

Yes  No    Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

NO

Yes  No    Do you illegally use drugs?

NO

Yes  No    Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

NO

Yes  No    Have you been named as a defendant in a filing or settlement of a medical malpractice action?

NO

Yes  No    n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

YES

Yes due to NPI number error On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My privileges were rescinded on about may 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes  No    Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

NO

Yes  No    Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

Yes   No

NO

Have you failed to make arrangements to satisfy any state or federal loans that financed your medical education?

CONTINUING MEDICAL EDUCATION (Question 7)

○ **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1 continuing medical education activities within the two year period immediately preceding submission of this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity and maintain documentation for a period of six years for possible inspection by the Board. For additional information on CME, see Maryland Regulations, 10.32.01.09.*

◉ **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first renewal after initial medical licensure in Maryland and I have completed the Board's New Physician Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were licensed prior to September 30, 2010 or reinstated, this does not apply to you. See New Physician Orientation Program web site. **Your license will not be renewed unless you have completed the orientation.**

○ **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a.   Gender ◉ Male ○ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin? (A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:

...erican Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America, and who maintains tribal affiliations or community attachment.)

....n (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

....or African American (A person having origins in any of the black racial groups of Africa.)

...ve Hawaiian or other Pacific Islander (A person having origins In the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

..ite (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

....er

9. Are you employed by the Federal Government?

○ Yes ◉ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship (subspecialty) training program accredited by the ACGME.

🖐 If you answer *Yes* to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of this application.

a.   In an accredited/approved internship or residency program?

○ Yes ◉ No

b.   In an accredited fellowship (subspecialty) training program?

○ Yes ◉ No

JA2955

**11a.** Which best describes your current area(s) of concentration:

| | |
|---|---|
| Primary Concentration | Obstetrics & Gynecology ▼ |
| Secondary Concentration | None ▼ |

**11b.** SPECIALTY BOARD CERTIFICATION: List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

| | |
|---|---|
| Primary Certification | None ▼ |
| Secondary Certification | None ▼ |

**12.** Please select all states (excluding Maryland) where you hold a medical license.

| | | | | |
|---|---|---|---|---|
| ☐ Alabama | ☐ Florida | ☐ Kentucky | ☐ Nebraska | ☐ Oklahoma | ☐ Utah |
| ☐ Alaska | ☐ Georgia | ☐ Louisiana | ☐ Nevada | ☐ Oregon | ☐ Vermont |
| ☐ Arizona | ☐ Guam | ☐ Maine | ☐ New Hampshire | ☐ Pennsylvania | ☑ Virginia |
| ☐ Arkansas | ☐ Hawaii | ☐ Massachusetts | ☐ New Jersey | ☐ Puerto Rico | ☐ Virgin Islands |
| ☐ California | ☐ Idaho | ☐ Michigan | ☐ New Mexico | ☐ Rhode Island | ☐ Washington |
| ☐ Colorado | ☐ Illinois | ☐ Minnesota | ☐ New York | ☐ South Carolina | ☐ West Virginia |
| ☐ Connecticut | ☐ Indiana | ☐ Mississippi | ☐ North Carolina | ☐ South Dakota | ☐ Wisconsin |
| ☐ Delaware | ☐ Iowa | ☐ Missouri | ☐ North Dakota | ☐ Tennessee | ☐ Wyoming |
| ☐ District of Columbia | ☐ Kansas | ☐ Montana | ☐ Ohio | ☐ Texas | |

**13a.** How many weeks per year do you work? 48 ▼

**13b.** Please indicate below how the hours in your typical work week are allocated. The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

ℹ️ If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

*Patient Care Related Activities* include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

*Research* includes clinical, laboratory, and analytical research

*Teaching* includes teaching of medical undergraduate & graduate students and other graduate students.

*Administration & Other:* Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

ℹ️ Use whole numbers. No fractional hours. If none enter 0.

| | | |
|---|---|---|
| a. Patient Care Related Activities | 36 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 0 | hours per week |
| d. Administration & Other | 4 | hours per week |
| Total Hours | 40 | hours per week |

**14.** If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next 2 years?

○ Yes ○ No

PRACTICE INFORMATION (Questions 15-26)

**15.** Do you plan to discontinue patient care related activities in the next two years?

○ Yes ⦿ No

JA2956

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

    a.   Number of locations in Maryland (if none, enter 0)      `0`

    b.   Number of locations outside of Maryland (if none, enter 0)

        ❼ If you have locations outside Maryland, please answer (c) below after you    `0`
        answer (b).

    c.   Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?

        ○ Yes ○ No ○ Don't know

---

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

  a.   Number of hospitals in Maryland (if none, enter 0)      `0`

  b.   Number of hospitals outside of Maryland (if none, enter 0)    `0`

---

**18. Primary Practice / Office Location Primary Practice / Office Location**
No Primary Location indicated from your response in Question 16
❼ Please answer all Primary Practice questions

---

**19. Secondary Practice / Office Location**
No Secondary Location indicated from your response in Question 16.
❼ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

---

20-21 Health Information Technology questions has been moved to a seperate section. You are required to complete the Health Information Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public insurance program patients.

| | | Yes | No |
|---|---|:---:|:---:|
| a. | Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc. | ○ | ◉ |
| b. | Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed Care Organization) | ○ | ◉ |
| | b1. If Yes, are you accepting new Maryland Medical Assistance patients? | ○ | ○ |
| c. | Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)? | ○ | ◉ |
| | c1. If Yes, are you accepting new Medicare patients? | ○ | ○ |

---

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes ○ No ◉ NA

---

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

`0` hours per week.    ❼ If none, enter 0

---

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), answer Q.25. Otherwise skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel (sometime called direct, concierge, or retainer-based practice)?

JA2957

○ Yes ○ No

___

## 26. Workers Compensation

Workers Compensation coverage: If you <u>employ one or more persons</u>, the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

○ Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

⚅ If you are a Maryland employer you must provide the information requested below.

| Insurance Company | |
|---|---|
| Policy Number | |
| Expiration Date | ⚅ Enter as MM/DD/YYYY Enter as MM/DD/YYYY |

### PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.)

\* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime \*    3013250264

Nighttime\*

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical    ☐ Biological    ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

☑    a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

☑    b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

☑    c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

___

☑    d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2012.

JA2958

29. Please provide your electronic signature (type your name) below:

Name | Charles John Nosa Akoda

Today's Date | 9/3/2012 | ▦

Last four digits of Social
Security Number: | ☐

30. Select a Payment Option here to complete your application.

🛈 Please note: Credit cards may be used for online payment only.  If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

◉ Credit Card ○ Send Check ○ 3rd Party Check    3rd Party Payer: | _____

PAYMENT
**APPLICATION COMPLETION INFORMATION:**
Date Application Started     9/3/2012
Date Application Submitted    9/3/2012
Confirmation Number         /     49
Payment Method            Credit Card
Amount Paid               $514.00
Credit Card Approval No.

JA2959

# Exhibit 9

# Irregular Behavior

Policies and Procedures Regarding Irregular Behavior | Representative Examples of Irregular Behavior

## Policies and Procedures Regarding Irregular Behavior

### A. Policies Regarding Irregular Behavior

1. *Irregular behavior* includes all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG, including, but not limited to, the ECFMG Exchange Visitor Sponsorship Program, ECFMG International Credentials Services (EICS), the Electronic Portfolio of International Credentials (EPIC), and Electronic Residency Application Service (ERAS) Support Services at ECFMG. Such actions or attempted actions are considered irregular behavior, regardless of when the irregular behavior occurs, and regardless of whether the individual is certified by ECFMG. Examples of irregular behavior include, but are not limited to, submission of any falsified or altered document to ECFMG, whether submitted by the individual or by a third party, such as a medical school, on behalf of the individual; failing to comply with United States Medical Licensing Examination® (USMLE®) or ECFMG policies, procedures, and/or rules; falsification of information on applications, submissions, or other materials to ECFMG; taking an examination when not eligible to do so, or submission of any falsified or altered ECFMG document to other entities or individuals.

2. The Medical Education Credentials Committee's determination of irregular behavior is sufficient cause for ECFMG to bar an individual from future examinations, to bar an individual from other ECFMG programs and services, to withhold and/or invalidate the results of an examination, to withhold an ECFMG Certificate, to revoke an ECFMG Certificate, or to take other appropriate actions for a specified period of time or permanently. ECFMG may report the Medical Education Credentials Committee's determination of irregular behavior to the USMLE Committee for Individualized Review, Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

3. If the Medical Education Credentials Committee determines that an individual engaged in irregular behavior, a permanent annotation to that effect will be included in the individual's ECFMG record. This annotation will appear on the ECFMG Certification Verification Service (CVS) and ECFMG Status Reports for the individual. If the individual has an EPIC Portfolio, a permanent annotation will be included on all EPIC Reports with respect to that individual. Additional information explaining the basis for the determination of irregular behavior and the resulting action(s) will accompany every ECFMG Status Report, CVS Report, and EPIC Report, and may also be provided to legitimately interested entities; this additional information may be provided, regardless of the date of the conduct or activity that comprises the irregular behavior. Notice of the Medical Education Credentials Committee's determination of irregular behavior is periodically reported to the ECFMG Board of Trustees.

### B. Procedures Regarding Irregular Behavior

1. After receipt of a report or other information suggesting irregular behavior on the part of an individual, ECFMG staff will review the information and will assess whether there is sufficient evidence of irregular behavior. When indicated and feasible, staff will conduct a follow-up investigation to gather additional information.

2. If the individual is an examinee and the review referenced above will not be concluded until after the typical period for the reporting of exam scores, the examinee will be notified that the reporting of the exam scores in question is being delayed.

3. If ECFMG staff finds that there exists a reasonable basis to conclude that an individual may have engaged in irregular behavior, the matter will be referred to the Medical Education Credentials Committee. ECFMG may withhold services from the individual pending a determination from the Medical Education Credentials Committee. If the individual is an examinee, the examinee's exam scores will be withheld, if not already released, and the examinee may not be permitted to sit for subsequent examinations, nor will applications for examination be processed.

4. Using the individual's last known address, the individual will be advised in writing of the nature of the alleged irregular behavior and will be provided with a copy of the *ECFMG Policies and Procedures Regarding Irregular Behavior*. If the alleged irregular behavior is related to a shared ECFMG and USMLE policy, the USMLE Program will also be advised of the allegation. The individual will be given an opportunity to provide written explanation and to present other relevant information. Any such written explanation or other relevant information must be received by ECFMG by the deadline set forth in ECFMG's writing to the individual. Submissions received after the deadline will be considered by the Medical Education Credentials Committee at its discretion. The individual may also request the opportunity to appear personally before the Medical Education Credentials Committee, and may be represented by legal counsel, if the individual so wishes. In instances in which the individual appears personally before the Medical Education Credentials Committee, a stenographic or audio recording will be made of that portion of the proceedings during which the individual is in attendance. Any statements made by the individual during a personal appearance before the Medical Education Credentials Committee will be under oath.

5. Individuals who have been charged with irregular behavior who wish to request a deferral of the ECFMG Committee's review of the allegation must (1) submit the request in writing and (2) provide the reason for the request. If ECFMG staff determine that the granting of the request could have a material impact on the individual's opportunity to refute the allegation then staff, at its discretion, can grant the request and defer an ECFMG action for up to six (6) months. Unless the individual can demonstrate compelling circumstances, ECFMG staff should not grant more than two deferral requests. Notwithstanding the foregoing, if the individual charged with irregular behavior is ECFMG Certified, a candidate for residency, or practicing medicine, ECFMG staff will only grant the request for deferral if, in its sole discretion, ECFMG believes that public health and safety is not at risk. If the deferral request is granted, ECFMG will notify appropriate institutions and authorities of the individual's pending irregular behavior charge.

6. All pertinent information regarding the irregular behavior, including any explanation or other information that the individual may provide, will be provided to the Medical Education Credentials Committee. The Medical Education Credentials Committee, based on the information available to it, will determine whether the preponderance of the evidence indicates that the individual engaged in irregular behavior. If the Medical Education Credentials Committee determines that the individual engaged in irregular behavior, the Medical Education Credentials Committee will determine what action(s) will be taken as a result of the irregular behavior. ECFMG will notify the individual whether the Medical Education Credentials Committee determined the individual engaged in irregular behavior and of any action(s) taken pursuant thereto.

7. The Medical Education Credentials Committee's determination of irregular behavior and any action(s) taken pursuant thereto (a "decision" of the Medical Education Credentials Committee) may be appealed to the Review Committee for Appeals if the individual has a reasonable basis to believe the Medical Education Credentials Committee did not act in compliance with the Medical Education Credentials Committee Policies and Procedures or that the Medical Education Credentials Committee's decision was clearly contrary to the weight of the evidence before it. The notice of appeal must be received by ECFMG within thirty (30) days of the date on which the notification advising the individual of the Medical Education Credentials Committee's decision was mailed to the individual. The appeal of a decision of the Medical Education Credentials Committee is governed by the Rules of Appellate Procedure.

8. Petitions for reconsideration of a decision of the Medical Education Credentials Committee will be reviewed by the Medical Education Credentials Committee only in extraordinary cases. Any such petition must first be considered by ECFMG staff, who, after discussion with the Medical Education Credentials Committee Chair, may deny the request or place it on the agenda for consideration by the full Medical Education Credentials Committee at a regularly scheduled meeting. Absent the submission of newly discovered material evidence not previously available to the petitioner and, therefore, not available to the Medical Education Credentials Committee, petitions for reconsideration typically will be denied.

JA2961

# Exhibit 10

RECEIVED *nmcg*

JUL 1 3 1992

ECFMG

**RETURN TO:**    ECFMG
3624 Market Street
Philadelphia, PA 19104-2685
U.S.A.

Re: 482-700-2

Dr. Oluwafemi
Charles Ogberase

I hereby certify that the attached diploma or other credential for the individual
noted above is authentic and correct and that I am authorized to certify this on
behalf of this institution.

_____
**Signature**

3rd June, 1992
**Date**

JUDE  UZOMA  OHAERI
**Name (Please Print or Type)**

SUB-DEAN (UNDERGRADUATE)  ✓
**Title**

COLL OF MED, UNIVERSITY OF IBADAN, NIGERIA.
**Name of Medical School**



I **cannot** certify that the diploma or other credential for the individual noted
above is authentic and correct because _____

_____

_____

_____

_____
**Signature**

_____
**Date**

_____
**Name (Please Print or Type)**

_____
**Title**

_____
**Name of Medical School**

**Seal**

Form 399A
March 1983

Confidential

ECFMG_RUSS_0004003

## Charles Olufemi Igberaese

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

## Bachelor of Medicine

and

## Bachelor of Surgery

**VICE-CHANCELLOR**

DATE *June 19, 1987*

**REGISTRAR**

ECFMG RUSS 0004003

RECEIVED

JUL 1 3 1992

ECFMG

UNIVERSITY OF IBADAN

University of Ibadan

Faculties of Clinical Sciences

This is to certify that the person here named has this day been admitted to the degree of

Bachelor of Medicine
and
Bachelor of Surgery

COLLEGE OF MEDICINE
& DENTISTRY
FACULTY OF CLINICAL SCIENCES
UNIVERSITY OF IBADAN

Confidential

ECFMG_RUSS_0004004

JA2965

# University of Ibadan



## Charles Olufemi Igberaese

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

## Bachelor of Medicine

and

## Bachelor of Surgery

VICE-CHANCELLOR

DATE *June 19, 1987*

REGISTRAR

JA2966

Confidential

ECFMG_RUSS_0004005

482-700

RECEIVED
APR - 6 1992
ECFMG

JA2967

Confidential                                                    ECFMG_RUSS_0004006

# Exhibit 11

SCORE REPORT

SEPTEMBER 15, 1992
EXAMINATION OF
JULY 21-22, 1992

APPLICANT NUMBER 0-482-700-2

| | BASIC SCIENCE | CLINICAL SCIENCE | ENGLISH TEST |
|---|---|---|---|
| | 69 | 72 | PASSED |

DR OLUWAFEMI CHARLES IGBERASE
2041 MARTIN LUTHER KING, JR. AVE. SE
SUITE M2
WASHINGTON, DC   20020

DEAR DOCTOR:

THE REPORT OF YOUR PERFORMANCE ON THE FOREIGN MEDICAL GRADUATE
EXAMINATION IN THE MEDICAL SCIENCES (FMGEMS) AND THE ECFMG
ENGLISH TEST IS SHOWN ABOVE.

YOU:   FAILED THE BASIC MEDICAL SCIENCE COMPONENT
       FAILED THE CLINICAL SCIENCE COMPONENT
       PASSED THE ECFMG ENGLISH TEST

ECFMG REQUESTS PROGRAM DIRECTORS TO VERIFY WITH ECFMG INFORMATION
CONTAINED ON SCORE REPORTS.

MARJORIE P. WILSON, M.D.
PRESIDENT

ENCLOSURES:   INFORMATION BOOKLETS

FORM 7
SEPTEMBER 1982969

Confidential                                                           ECFMG_RUSS_0003668

# Exhibit 12

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104, U.S.A.     PHONE: 215 386-5900     CABLE: EDCOUNCIL, PHILADELPHIA

SCORE REPORT

MARCH 27, 1993
EXAMINATION OF
JANUARY 19-20, 1993

APPLICANT NUMBER 0-482-700-2

| | BASIC SCIENCE | CLINICAL SCIENCE | ENGLISH TEST |
|---|---|---|---|
| | 74 | 75 | PASSED |

DR OLUWAFEMI CHARLES IGBERASE
P.O. BOX 1414
LAUREL, MD   20725

DEAR DOCTOR:

THE REPORT OF YOUR PERFORMANCE ON THE FOREIGN MEDICAL GRADUATE EXAMINA-
TION IN THE MEDICAL SCIENCES (FMGEMS) AND THE ECFMG ENGLISH TEST IS
SHOWN ABOVE.

YOU:    FAILED THE BASIC MEDICAL SCIENCE COMPONENT
        PASSED THE CLINICAL SCIENCE COMPONENT
        PASSED THE ECFMG ENGLISH TEST

YOU HAVE SEVEN YEARS FROM THE DATE OF THE EXAMINATION TO PASS THE
BASIC SCIENCE EXAMINATION.  PLEASE REFER TO POLICY STATEMENTS
REGARDING REPEAT FMGEMS EXAMINATIONS AND USMLE REEXAMINATIONS IN THE
ENCLOSED INFORMATION BOOKLETS.

ECFMG REQUESTS PROGRAM DIRECTORS TO VERIFY WITH ECFMG INFORMATION
CONTAINED ON SCORE REPORTS.

MARJORIE P. WILSON, M.D.
PRESIDENT

ENCLOSURES:   INFORMATION BOOKLETS

FORM 4
MARCH 93     JA2971

Confidential                                                                ECFMG_RUSS_0003672

# Exhibit 13

JA2972



**EDUCATIO L COMMISSION for FOREIC MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

June 22, 1995

Dr. Charles Olufemi Igberase                    USMLE/ECFMG Identification No.
P.O. Box 1653                                    0-482-700-2
Hyattsville, MD 20788

Dear Doctor:

When you applied for admission to ECFMG's administrations of the September 1994 Step 1, August/September 1994 Step 2 and September 1994 ECFMG English test, you responded "No" to the question "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG." You also stated your name as "Igberase Oluwafemi Charles" and your date of birth as April 17, 1961. You certified that this information, as well as the other information on your application "is true and accurate to the best of my knowledge ..." and you swore to this in the presence of a Notary Public.

You were assigned USMLE/ECFMG Identification Number 0-519-573-0 and took the Step 1, Step 2 and ECFMG English test. You submitted copies of your medical education credentials, which were verified by ECFMG with an official of your medical school. A Standard ECFMG Certificate was subsequently issued to you under the name Igberase Oluwafemi Charles with the number 0-519-573-0.

A check of ECFMG records shows that, despite what you certified to on the application referred to above, you had applied for and taken examinations administered by ECFMG prior to your application for the 1994 examinations. You first applied to ECFMG for the July 1992 administration of FMGEMS and the ECFMG English test under the name "Oluwafemi Charles Igberase" and certified that your date of birth was April 17, 1962. You failed both the basic medical science (Day 1) and clinical science (Day 2) components of the July 1992 FMGEMS and passed the ECFMG English test.

You subsequently applied for and took the January 1993 administration of FMGEMS and the ECFMG English test, failing Day 1, but passing Day 2 and the English test. You then applied for and took the July 1993 administration of Day 1 of FMGEMS which you passed. Since, at that time, you had also met the medical education credential requirements for ECFMG certification, you were issued Standard ECFMG Certificate Number 0-482-700-2.

You also applied for and took the September 1992 and September 1993 administrations of Step 1, failing the September 1992 examination, but passing the examination held in September 1993.

Confidential

JA2973

ECFMG_RUSS_0003572

Dr. Igberase Oluwafemi Charles
June 22, 1995
Page 2

When you applied to ECFMG, you certified on your application form that, among other items, "falsification of this application" and "engaging in ...conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to ...invalidate the results of my examination ...to revoke a certificate, or to take other appropriate action."

In addition, the policies regarding taking Step 1 and Step 2 of the USMLE as outlined in the ECFMG Information Booklet, which you certified you had read and understood, include the statement "If one Step is passed, applicants may not repeat that Step and will have seven years to pass the other Step." You, however, took and passed Step 1 in September 1993 and again in September 1994.

ECFMG is conducting an investigation of this matter. You must write to ECFMG immediately to explain why you certified on your application form that you had not previously applied for an ECFMG examination when, in fact you had, and also to explain why you repeated Step 1 when the policy states applicants who pass the Step may not repeat it. Your letter must be received by ECFMG within 15 days of your receipt of this letter.

Your explanation, together with the documents in your file, will be reviewed by the ECFMG Committee on Medical Education Credentials at a future meeting. After its review, the Committee will make a recommendation to the ECFMG Board of Trustees.

Your response must be sent to the following special address:

ECFMG
P.O. Box 13467
Philadelphia, PA 19101-3467

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck

Confidential

# Exhibit 14

Page One

**RECEIVED**
CREDENTIALS DEPT.

JUL 20 1995    USMLE / ECFMG # 0-482-700-2

**ECFMG**    July 14th 1995
P.O. Box 1653
Hyattsville md 20788

Mr William C. Kelly.
Manager, Medical Education
Credential Processing
ECFMG.

Dear Sir

I hereby with the following explanations explain the reasons for my repeating the ECFMG examinations.

When I came into the US, I was very hard up financially, no good books and I was very emotionally troubled.

It was at this same period I was attempting the ECFMG examinations.

I had a very difficult time passing these tests as you can see in my records.

I finally managed to pass, but of all the over 150 residency applications that I sent to various institutions, no Hospital considered my results and the number of attempts competitive enough.

I tried again one year later and it

ECFMG-000433

JA2976
ECFMG_RUSS_0000433

Page two

Came down to the same result.
This again gave me a lot of
depression especially since my family
were still in Nigeria and I had no
means of looking after them.
As a result of these, I explained
to my friends who felt I should take
the tests over again to improve on
my scores despite my difficult position.
They suggested that since I had
already been issued one ECFMG
certificate, I could not possibly
use that same number again to
sit for new tests.
For this reasons, I LIED that I
had not taken the test before when
I was filling out the forms.
I did not deliberately change my
date of birth (DOB) on the forms.
The initial mistake was made
by my school when they recorded my
DOB as 04 17 61.
I wrote a letter to inform them
about the mistake and that my actual
DOB was 04 17 62.
As at the time I was filling out

ECFMG-000434

JA2977
ECFMG_RUSS_0000434

Case 2:12-cv-05629-JDW Document 232-12 Filed 10/01/19 Page 1 of 6
Case 2:19-cv-05030 Document 1 Filed 11/08/19 Page 10 of 22

## Page Three

the latest form, I had not recieved
back from my school a reply for
the change.
   I did not realise at this time
that the previous form I filled had
my corrected DOB on it. So, I
used my DOB that was in my
school file since I had not
recieved a change from my school.
   I attached here-with a photocopy
of my Birth Certificate.
   I am willing to pay for the
verification of the 041761 DOB
with my school and the fact that
I have written a letter to them for
a change/correction at the same
period that I filled out the first
ECFMG application forms.
   As for the arrangement of
my name. This is an on-going
feud among the family members.
   It usually depended on who
registered me for what examinations
- My father, my mother or my
uncle.
   This accounts for the variations

ECFMG-000435

JA2978
ECFMG_RUSS_0000435

Page Four

as represented in my Birth Certificate, medical School Certificate, Permanent Medical Council Certificate and my first Leaving School certificate.

The name is actually a Compound Last name IGBERASE—CHARLES.

I have decided for future records to use the name as it appears on my Birth Certificate and passport (Nigerian Passport).

i.e. IGBERASE OLUWAFEMI CHARLES I always thought that so long as all the names were represented, there was no problems.

Having said all these, I must say how deeply sorry and remorseful I am for allowing myself to be involved in such a despicable act of shame.

I took this step out of pain and anguish and as a desperate move to helping my family — I am the bread-winner of both my immediate and extended family, my parents are very aged and my children are very very young.

ECFMG-000436

JA2979
ECFMG_RUSS_0000436

Page Five

I therefore plead fervently with the committee members who are going to review my case to temper justice with mercy
God bless you all.

Sincerely,
Igberase oluwafemi Charles
0-519-573-0

RECEIVED
CREDENTIALS DEPT.

ECFMG

ECFMG-000437

JA2980
ECFMG_RUSS_0000437

# Exhibit 15

Case: 2:18-cv-05629-JDW Document 22-5 Filed 12/01/21 Page 2 of 22
Case: 2:18-cv-05629-JDW Document 80-33 Filed 10/07/19 Page 2 of 22
ATTACHMENT 1

Case 8:16-cr-00277-PWG   Document 49   Filed 11/15/16   Page 1 of 7



**U.S. Department of Justice**

United States Attorney
District of Maryland
Southern Division

| | | | |
|---|---|---|---|
| Kelly O. Hayes | Mailing Address: | Office Location: | DIRECT: 301-344-0041 |
| Assistant United States Attorney | 6500 Cherrywood Lane, Suite 200 | 6406 Ivy Lane, 8th Floor | MAIN: 301-344-4433 |
| Kelly.Hayes@usdoj.gov | Greenbelt, MD 20770-1249 | Greenbelt, MD 20770-1249 | FAX: 301-344-4516 |

October 31, 2016

Peter Goldman, Esq.
O'Reilly & Mark, P.C.
524 King Street
Alexandria, VA 22314

PWG 16-0277

Re:   United States v. Oluwafemi Charles Igberase,
a/k/a "Charles John Nosa Akoda,"
Criminal No. PWG-16-277

Dear Mr. Goldman,

This letter confirms the plea agreement, together with the sealed supplement, which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **November 4, 2016**, it will be deemed withdrawn. **The plea agreement is entered into and will be submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).** The terms of the agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty to Count One of the Superseding Indictment now pending against him, which charges him with misuse of a Social Security Account Number, in violation of 42 U.S.C. § 408(a)(7)(B). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the Defendant falsely represented a number to be the Social Security Account Number assigned to him by the Commissioner of Social Security; (2) the Defendant made that false statement with the intent to deceive or for any other purpose; and (3) the Defendant acted knowingly and willfully.

ECFMG-000011

ECFMG_RUSS_0000011
JA2982

## Penalties

3.   The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five years of imprisonment, a fine of $250,000, and a period of supervised release of three years. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.   The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.   If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.   If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.   If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

ECFMG_000012

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Indeed, because the Defendant is pleading guilty to the identity fraud charges in this case, and because he is an illegal alien, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences, even if the consequence is his automatic removal from the United States.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take   into account the advisory guidelines range in establishing a reasonable sentence.

3

ECFMG-000013

ECFMG_ROSS_0000013

JA2984

## Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.     The base offense level is 6, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(2).

b.     Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means, and because the resulting offense level is less than level 12, the offense level is increased to 12.

c.     A 3-level enhancement applies, pursuant to U.S.S.G. § 3B1.3, because the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.

d.     This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. If the Defendant receives a 2-level reduction, the final offense level will be 13.

7.     The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.     This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Rule 11(c)(1)(C) Plea

9.     The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement, is the appropriate disposition of this case. This agreement does not affect the Court's

4

ECFMG-000014

discretion to impose any lawful fine or to set any additional lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

<u>Obligations of the United States Attorney's Office and the Defendant</u>

10.     At the time of sentencing, the parties will jointly request the Court to accept the stipulated sentence of six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement. At the time of sentencing, this Office will move to dismiss all open counts.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

<u>Agreement Not to Prosecute Other Offenses the Defendant May Have Committed</u>

12.     Other than the offense to which the Defendant has agreed to plead guilty, and with the exception of crimes of violence, crimes against children and tax violations, this Office will not prosecute the Defendant for any other violations of federal criminal law that arise from the facts stipulated by the Defendant and this Office, attached hereto and incorporated herein as Attachment A, that form the basis of this plea agreement.

<u>Waiver of Appeal</u>

13.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b.     If the Court accepts this Plea Agreement and imposes the agreed-upon sentence, the Defendant and this Office knowingly waive all rights, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal the sentence imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

5

ECFMG-000015


ECFMG_RUSS_0000015

d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<div align="center">Obstruction or Other Violations of Law</div>

14.    The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

<div align="center">Entire Agreement</div>

15.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Kelly O. Hayes
Assistant United States Attorney

<div align="center">6</div>

ECFMG-000016

ECFMG_RUSS_0000016
JA2987

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/15/16
Date

Oluwafemi Charles Igberase
a/k/a "Charles John Nosa Akoda"

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

11/15/16
Date

Peter Goldman, Esq.

7

ECFMG-000017

ECFMG_RUSS_0000017
JA2988

## ATTACHMENT A - Stipulated Facts

*The United States and the Defendant stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. The parties further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

In October 1991, the Defendant, **OLUWAFEMI CHARLES IGBERASE** ("**IBGERASE**"), entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, **IGBERASE** applied for and obtained a Social Security number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, **IGBERASE** applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase Jr." and a false date of birth. In September 1998, **IGBERASE**, this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, **IGBERASE** fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, **IGBERASE** submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). **IGBERASE** submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, **IGBERASE** failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is Step 2 of the USMLE. In January 1993, **IGBERASE** again failed the basic medical science (Day 1) component of the FMGEMS. In September 1993, **IGBERASE** failed Step 1 of the USMLE. Eventually, between July 1992 and September 1993, **IGBERASE** passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, **IGBERASE** submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, **IGBERASE** passed all three steps of the USMLE and was issued a second ECFMG certificate under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that **IGBERASE** had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December 1995, ECFMG revoked or suspended both ECFMG certifications assigned to **IGBERASE**.

8

ECFMG-000018

ECFMG_R999_0000018
JA2989

In August 1996, **IGBERASE** submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, **IGBERASE** submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, **IGBERASE**, as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, **IGBERASE** applied for and was accepted into a residency program at Jersey Shore Medical Center ("JSMC"). In 2000, JSMC learned that the SSN that **IGBERASE** used belonged not to "Akoda" but rather to **IGBERASE**. **IGBERASE** was suspended from JSMC's residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, **IGBERASE**, using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at Howard University. In March 2007, Howard University accepted **IGBERASE** into its residency program, and asked **IGBERASE** to submit evidence of legal residence in the United States. In response, **IGBERASE** submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after the completion of his residency at Howard University, **IGBERASE**, using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, **IGBERASE** submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to **IGBERASE** under the name "Charles John Nosa Akoda," and **IGBERASE** began practicing medicine in the field of obstetrics and gynecology.

In 2012, **IGBERASE**, using the "Akoda" identity, sought and obtained medical privileges at Prince George's Hospital Center ("PGHC") in Maryland. To do so, **IGBERASE** submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, **IGBERASE** submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied **IGBERASE**'s application based, in part, on CMS's determination that **IGBERASE** did not provide an accurate SSN.

On June 9, 2016, law enforcement executed search warrants at **IGBERASE**'s residence, medical practice, and vehicle. From **IGBERASE**'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From **IGBERASE**'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

9

Case 2:21-cv-05629-JDW Document 32-5 Filed 10/07/19 Page 11 of 21
Case 2:18-cv-05629-JDW Document 32-5 Filed 10/07/19 Page 11 of 21
Case 8:16-cr-00277-PWG   Document 49-1   Filed 11/15/16   Page 3 of 3

Throughout the above-referenced scheme, **IGBERASE** also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

\* \* \*

I have read this statement of facts and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

11/15/16
Date

Oluwafemi Charles Igberase
a/k/a Charles John Nosa Akoda

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed the statement of facts with him.

11/15/16
Date

Peter Goldman, Esq.

10

ECFMG-000020

JA2991
ECFMG_RUSS_0000020

# Exhibit 16

JA2992

ATTACHMENT 7



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

May 3, 2001

Personal and Confidential
Via Certified Mail — Return Receipt Requested

Dr. Igberase Oluwafemi.Charles
16327 Chadsford Ave.
Baton Rouge, LA 70817

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Charles:

This is notice of the decision of the ECFMG Committee on Medical Education Credentials made on April 18, 2001. A brief procedural history is set forth below.

On November 27, 1995, the ECFMG Committee on Medical Education Credentials reviewed the allegation that you submitted a falsified application to ECFMG and that you applied to take the United States Medical Licensing Examination™ Step 2 which you had already passed. The falsification was in your reply "No" in response to Item 1 (USMLE/ECFMG Identification Number) of the application, "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG?"

Following review in November 1995, the ECFMG Committee took action to invalidate the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-519-573-0, to inform the USMLE Committee on Irregular Behavior for its information and possible action and to revoke the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-482-700-2.

You subsequently filed an appeal of the ECFMG Committee's decision. The ECFMG Review Committee for Appeals considered this appeal on July 10, 1986. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-482-700-2, but limited the length of revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001.

In October 2000, you submitted to ECFMG an application for the USMLE Step 1 and Step 2. In Item 1 of the application, you answered "No" to the question, "Have you ever submitted an application to ECFMG for any examination, even if you did not take

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Dr. Igberase Oluwafemi Charles
May 3, 2001
Page 2

the examination?"

On April 18, 2001, the ECFMG Committee on Medical Education Credentials reviewed the allegation that the application you submitted in October 2000 was falsified and that you applied to take the USMLE Step 1 and Step 2 which you had already passed. The falsification was in your reply of "No" in response to Item 1 (USMLE/ECFMG Identification Number) of the application, "Have you ever submitted an application to ECFMG for any examination, even if you did not take the examination?"

Following this review, the ECFMG Committee took action to extend the length of the revocation of your Standard ECFMG Certificate for a yet to be specified period of time, to refer this new matter to the USMLE Committee on Irregular Behavior for its review and to review this matter again after the USMLE Committee's decision.

ECFMG will send notification of this action to state medical licensing boards, graduate medical education program directors in the United States, the Federation of State Medical Boards' Action Data Bank, Canadian licensing authorities and other interested entities.

Actions of the ECFMG Committee on Medical Education Credentials are subject to the ECFMG Rules of Appellate Procedure. A copy of the ECFMG Rules of Appellate Procedure is enclosed.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

# Exhibit 17



EDUCATIC AL COMMISSION for FOREI I MEDICAL GRADUATES

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

December 7, 1995

Mr. Kenneth Cotton
USMLE Secretariat
3750 Market Street
Philadelphia, PA  19104-3190

> Re:  Dr. Igberase Oluwafemi Charles
> USMLE/ECFMG Identification No.
> 0-482-700-2

Dear Mr. Cotton:

On November 27, 1995, the ECFMG Committee on Medical Education Credentials reviewed the matter with respect to Dr. Charles's admission that he falsified an application form submitted to ECFMG in order to retake an examination he had already taken and passed.

Dr. Charles initially submitted an application form to ECFMG in April 1992 in order to take the July 1992 FMGEMS and the ECFMG English test. At that time, he used the name "Oluwafemi Charles Igberase" and certified that his date of birth was April 17, 1962. He was assigned identification number 0-482-700-2.

In addition to FMGEMS, and also using identification number 0-482-700-2, Dr. Charles applied for and took the September 1992 and September 1993 administrations of Step 1, failing the September 1992 examination, but passing the examination held in September 1993.

The applicant met the medical science, English test and medical education credential requirements for ECFMG Certification and was issued Standard ECFMG Certificate No. 0-482-700-2 in October 1993.

In March 1994, Dr. Charles again submitted an application form to ECFMG, applying for admission to ECFMG's administrations of the September 1994 Step 1, August/September 1994 Step 2 and September 1994 ECFMG English test. However, on the application, he responded "No" to the question "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG." He also stated his name as "Igberase Oluwafemi Charles" and date of birth as April 17, 1961.

Since the name on the application was altered and the year of birth changed, ECFMG's search of its database at that time did not show that he had previously applied and been assigned an ECFMG Identification number. He was then assigned number 0-

ECFMG-000074

JA2996
ECFMG_RUSS_0000074

Mr. Kenneth Cotton
December 7, 1995
Page 2

519-573-0. He took and passed the August 1994 Step 2 and the September 1994 ECFMG English test and September 1994 Step 1. His medical education credentials were again verified with his medical school and he was issued Standard ECFMG Certificate 0-519-573-0.

When he applied to ECFMG, Dr. Charles certified on his application form that, among other items, "falsification of this application" and "engaging in ...conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to ...invalidate the results of my examination ...to revoke a certificate, or to take other appropriate action."

In addition, the policies regarding taking Step 1 and Step 2 of the USMLE as outlined in the ECFMG Information Booklet, which he certified he had read and understood, include the statement "If one Step is passed, applicants may not repeat that Step and will have seven years to pass the other Step." The applicant, however, took and passed Step 1 in September 1993 and, due to the falsified application form, took it again in September 1994.

After this matter was discovered by ECFMG, on June 22, 1995, ECFMG wrote to Dr. Charles to request an explanation for his actions. In response, he sent ECFMG a letter, dated July 14, 1995, in which he stated the examinations in order to improve his scores and be more competitive in his applications for residency programs. Consequently, he "lied" but, he states, did not deliberately change his date of birth and that he thought the date given initially had been the incorrect one in his school files. In addition, depending on the documents he has, the order of his names varies.

The examinations, dates and scores for examinations taken are as follows:

ECFMG #0-482-700-2                    ECFMG #0-519-573-0

| DATE | EXAM | SCORE | DATE | EXAM | SCORE |
|------|------|-------|------|------|-------|
| July 1992 | Day 1 FMGEMS | 69 (Fail) | | | |
| | Day 2 FMGEMS | 72 (Fail) | | | |
| | English test | Pass | | | |
| Sept. 1992 | Step 1 | 70 (Fail) | | | |
| Jan. 1993 | Day 1 FMGEMS | 74 (Fail) | | | |
| | Day 2 FMGEMS | 75 (Pass) | | | |
| | English test | Pass | | | |
| July 1993 | Day 1 FMGEMS | 76 (Pass) | | | |
| Sept. 1993 | Step 1 | 76 (Pass) | | | |
| | | | Aug. 1994 | Step 2 | 76 (Pass) |
| | | | Sept. 1994 | Step 1 | 78 (Pass) |
| | | | Sept. 1994 | English test | Pass |

ECFMG-000075

JA2997
ECFMG_RUSS_0000075

Mr. Kenneth Cotton
December 7, 1995
Page 3

After its review at the November 27, 1995 meeting, the ECFMG Committee on Medical Education Credentials took the following actions:

- Invalidate the Standard ECFMG Certificate issued to Dr. Charles under the second identification number 0-519-573-0;

- Inform the United States Medical Licensing Examination (USMLE) Committee on Irregular Behavior of this matter for its information and possible action; and

- Revoke the Standard ECFMG Certificate issued to Dr. Charles under the first identification number 0-482-700-2.

For information, I am enclosing copies of the following items:

1. Application to ECFMG received April 6, 1992.
2. Application to ECFMG received March 30, 1994.
3. ECFMG letter to Dr. Charles dated June 22, 1995.
4. Dr. Charles' July 14, 1995 letter to ECFMG.
5. ECFMG letter to Dr. Charles dated December 7, 1995.

Please inform Marie L. Shafron or me of the disposition of this matter. If you need additional information, please let me know.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck
Enclosures

# PLEASE DO . . NOT DETACH

## Foreign Medical Graduate Examination in the Medical Sciences and the ECFMG English Test

### PART A

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examinations or application will not be accepted.
Use typewriter or block print in ink.

| | | |
|---|---|---|
| ① EXAMINATION HISTORY: | Have you previously applied to take one or more of the examinations administered by ECFMG? ☐ Yes ☒ No | |
| | If you have been assigned an ECFMG Applicant Number, enter the number in this box. | 482-700 |

② NAME:
Print your name as you want it to appear on the Standard ECFMG Certificate

First Name: OLUWAFEMI  Middle Name: CHARLES
Last Name (Surname): IGBERASE
Full Maiden Name (For married women only):

②.1 If you have previously applied to ECFMG under another name, provide that name
Previous Name
Please include a copy of the legal document that verifies this name change.

③ ADDRESS:
Use address to which admission permit and other notification from ECFMG should be sent

Number/Street: 9701 EVENING PRIMROSE DRIVE
Apartment Number: 2D        Post Office Box Number:
City: LAUREL
State/Country: MARYLAND        Zip or Postal Code: 20723

④ SOCIAL SECURITY NUMBER:
If you have a United States Social Security Number, enter the number in this box.        5054

⑤ STATUS OF MEDICAL SCHOOL STUDENT:
Must be completed by students

If you are applying for Day 1, will you have completed two years of medical school by the date of that examination?   ☐ Yes  ☐ No

If you are applying for Day 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school?   ☐ Yes  ☐ No

⑥ EXAMINATION REGISTRATION:
Check ☑ box(es) to indicate the component(s) for which you are applying

Examination Date (Month/Year): JULY 1992
☒ Basic Medical Science Component (Day 1)
☒ Clinical Science Component and ECFMG English Test (Day 2)
☐ ECFMG English Test (administered on second day only)

E  CK
I  RH
P
DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY

⑥.1 EXAMINATION CENTER:
See ECFMG Information Booklet for list of centers

If you do not indicate a second choice of center and the first choice is not available, ECFMG reserves the right to assign a center.
Select two:   1st Choice   City: BALTIMORE   Center No.: 300
2nd Choice   City: WASHINGTON, D.C.   Center No.: 350

⑦ EXAMINATION FEE(S):
Enter the amount enclosed or the line provided

RECEIVED
APR - 6 1992
ECFMG

Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash.

Basic Medical Science Component (Day 1 only)   $265
Clinical Science Component and ECFMG English Test (Day 2 only)   $265
Basic Medical Science Component, Clinical Science Component and ECFMG English Test (Day 1 and Day 2)   $425
ECFMG English Test only   $ 25   Enter amount enclosed $

0
B.N.C
DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY

@ ECFMG 1992 All Rights Reserved        Form 104, FEB 1992

ECFMG-000155

JA2999
ECFMG_RUSS_0000155

**PART B**

| (8) SECONDARY SCHOOL COLLEGE/ UNIVERSITY: | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | IMMACULATE CONCEPTION COLLEGE | BENIN CITY NIGERIA | JUNE 1974 SEPT 1979 | 5 |

| (9) MEDICAL SCHOOL: Use precise name and list all schools attended 690-010 | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | UNIVERSITY OF IBADAN COLLEGE OF MEDICINE | IBADAN NIGERIA | JUNE 1982 JUNE 1987 | 5 |

| (9.1) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | MEDICINE | | | DR ONWUKA | MAR 1988 JUNE 19 |
| | SURGERY | SPECIALIST | | MR IDIAKHOA | SEPT 1988 DEC 198 |
| | PAEDIATRICS | HOSPITAL | NIGERIA | DR ASEMOTA | DEC 1987 MAR 198 |
| | OBSTETRICS | BENIN CITY | | DR ODJEGBA | JUNE 198 SEPT 19 |
| | GYNAECOLOGY | | | | |

If additional lines are necessary use the reverse side of Part C.

| (9.2) MEDICAL DEGREE: Conferred or Expected | Title of Degree __MBBS__ Date Conferred/Expected: __1987__ |
|---|---|

| (10) MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: __YES__ Country or state in which you are licensed: __NIGERIA__ |
|---|---|

| (11) HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |

| (11.1) EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: MARY LAND MED. LABORATORY Street: 1021 Sulphur spring Road BOX 18290 City/State/Country: Baltimore MD 21227 | Phleboto-mist | 1992 |

| (12) BIRTHDATE/ BIRTHPLACE: | Day/Month/Year: 17-4-67 Location: ILE-IFE. OSHUN. NIGERIA City, Province, Country |
|---|---|

| (13) SEX: | Please check one: ✓ Male __ Female | (14) NATIVE LANGUAGE: YORUBA |
|---|---|---|

| (15) CITIZENSHIP: | (Complete all three) | |
|---|---|---|
| | A. AT BIRTH USA ☐ | Other ☐ (Specify) NIGERIAN 05% |
| | B. UPON ENTERING MEDICAL SCHOOL USA ☐ | Other ☐ (Specify) NIGERIAN |
| | C. NOW USA ☐ | Other ☐ (Specify) NIGERIAN ✓ |

ECFMG-000156

JA3000
ECFMG_RUSS_0000156

## PART C

Students and graduates must sign the application in the presence of their Mec. School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(16) **CERTIFICATION BY APPLICANT**

I hereby certify that the information given in this application is true and accurate to the best of my knowledge, and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the ECFMG Information Booklet for FMGEMS and am aware of its contents.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Seal, stamp or signature of official *must cover a* portion of the attached photograph.

**(Must be completed in English)**

Signature of Applicant X _____
(in Latin Characters)

(16.1) **CERTIFICATION BY MEDICAL SCHOOL OFFICIAL.**

A. I hereby certify that the photograph, signature, and information entered on this form accurately apply to the individual named above.

X _____
Signature of Medical School Official

**OR**

Official Title _____  Date _____  Institution _____

**NOTARIZATION WITH EXPLANATION (Pertains to graduates only)**

B. Subscribed and sworn to before me this _31_ day of _March_ , 19 _92_

X _____
Signature of Consular Official, First Class Magistrate, Notary Public

Notary Public
Official Title

338/I/D

B.1 **Explain below** why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

RECEIVED

APR - 6 1992

ECFMG

LINDA R. KISHTER
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires September 9, 1994

4822700

(17) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?   ☐ Yes   ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

JA3001
ECFMG_RUSS_0000157

TO BE USED AS CONTINUATION OF SECTION 9.1 IN PART B

ECFMG-000158

JA3002

ECFMG_RUSS_0000158

## PLEASE DO NOT DETACH

STEP 1 AND/OR STEP 2 EXAMINATIONS

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOL

THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA

PHONE: 215 386-5900 · CABLE: EDCOUNCIL,PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examination
Use typewriter or block print in ink.

| | |
|---|---|
| ① ECFMG EXAMINATION HISTORY: | Have you previously submitted an application to take one or more of the examinations administered by ECFMG? ☐ Yes<br>If yes, place your USMLE Identification Number (ECFMG Applicant Number) in this box |
| ② NAME:<br>Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record | First Name: IGBERASE    Middle Name: OLUWAFEMI<br>Last Name (Surname): CHARLES<br>Full Maiden Name (For married women only)    482-700-2 |
| ②.1 If you have previously applied to ECFMG under another name, provide that name | N/A<br>Previous Name<br>Please include a copy of the legal document that verifies this name change. |
| ③ ADDRESS:<br>Use address to which admission permit and other notification from ECFMG should be sent | Number/Street<br>Apartment Number    Post Office Box Number: 1653<br>City: HYATTSVILLE<br>State/Country: MD    Zip or Postal Code: 20788 |
| ④ U.S. SOCIAL SECURITY AND/OR CANADIAN SOCIAL INSURANCE NUMBERS: | Enter numbers in boxes provided<br>U.S. Social Security Number    Canadian Social Insurance Number |

| ⑤ REGISTRATION:<br>Check ☑ box(es) of selected examinations | Step 1 | June 8 - 9, 1994 | ☐ or | September 22 - 23, 1994 ☑ |
|---|---|---|---|---|
| | Step 2 | March 30 - 31, 1994 | or | August 31 - September 1, 1994 ☐ |
| | ECFMG English Test | March 31, 1994 | or | September 1, 1994 ☑ |

⑤.1 TEST CENTER:
Select three ECFMG centers for each Step and/or ECFMG English Test. See the information Booklet in which this application was enclosed for a list of ECFMG centers

If your center selections are not available, ECFMG reserves the right to assign a center.

Step 1: (1) RICHMOND  City  182 Center No. (2) Baltimore  300 City Center No. (3) _____ City Center No.

Step 2 and/or ECFMG English Test: (1) Richmond City 182 Center No. (2) Baltimore City 300 Center No. (3) _____ City Center No.

| ⑥ EXAMINATION FEE(S):<br>Enter the amount enclosed on the line provided | Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash. | |
|---|---|---|
| | Step 1 Basic Medical Science Examination | $400 |
| | Step 2 Clinical Science Examination | $400 |
| | ECFMG English Test | $ 30 |
| | Enter amount enclosed  $ | OB FOR OFFICE USE ONLY |

⑦ HANDEDNESS: ☑ Right Handed  ☐ Left Handed

APPLICATION FORM 104S, August, 1993
©ECFMG 1993 All Rights Reserved

FOR OFFICE USE ONLY  E___  P  30

PART B

| (8) SECONDARY SCHOOL COLLEGE/ UNIVERSITY: | Schools Attended | Location (exact address) | Dates Attended | | No. School Years |
|---|---|---|---|---|---|
| | | | From MO. YR. | To MO. YR. | |
| | Immaculate Conception College | Benin City Nigeria | 06 74 | 06 79 | 05 |

| (9) MEDICAL SCHOOL: Use precise name and list all schools attended | Schools Attended | Location (exact address) | Dates Attended | | No. School Years |
|---|---|---|---|---|---|
| 6401 010 | University of Ibadan | Ibadan Nigeria | From MO. YR. 680 06 82 | To MO. YR. 06 87 | 05 |

| (9.1) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | MEDICINE | SPECIALIST HOSP. | BENIN CITY | DR Onwuka | 1988 |
| | SURGERY | " | " | Dr Idiakhoa | 1988 |
| | OBGYN | " | " | Dr Uymbor | 1988 |
| | PEDIATRICS | " | " | Dr ASEMOTA | 1987 |
| If additional lines are necessary use the reverse side of Part C. | | | | | |

| (9.2) MEDICAL DEGREE: Conferred or Expected | Title of Degree MBBS Date Conferred/Expected: 06 87 * If the degree has been conferred, a photocopy should be sent to ECFMG. See Medical Education Credentials Section of the ECFMG Information Booklet. |
|---|---|

| (10) MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: 1988 Country or state in which you are licensed:* NIGERIA * If the license has been issued, a photocopy should be sent to ECFMG. See Medical Education Credentials Section of the ECFMG Information Booklet. |
|---|---|

| (11) HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | N/A | | |

| (12) EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: N/A | | |
| | Street: | | |
| | City/State/Country: | | |

| (13) BIRTHDATE/ BIRTHPLACE: | Day 017 Month 04 Year 61 Location: ILE IFE OYO NGERIA City, Province, Country |
|---|---|

| (14) GENDER: | Please check one: ✓ Male ___ Female | (15) NATIVE LANGUAGE: YORUBA |
|---|---|---|

| (16) CITIZENSHIP: | (Complete all three) | | 056 |
|---|---|---|---|
| | A. AT BIRTH | USA ☐ Other ☑ (Specify) NIGERIAN | |
| | B. UPON ENTERING MEDICAL SCHOOL | USA ☐ Other ☑ (Specify) NIGERIAN | |
| | C. NOW | USA ☐ Other ☑ (Specify) NIGERIAN | |

| (17) OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS: Indicate the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you by that organization as | ORGANIZATION | DATE OF MOST RECENT EXAMINATION TAKEN | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|---|
| | ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | MO. YR. | |
| | ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | | |

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A above.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) and must explain in writing why the application form could not be signed in the presence of a medical school official (See B.1 below)

JA3004

ECFMG_RUSS_0000152

NUMBERS:
Indicate the organizations to which you have applied previously; enter the date of the most recent examination that was administered to you by that organization as

| | MO. | YR. |
|---|---|---|

STATE LICENSING AUTHORITY
IN THE UNITED STATES

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(18) **CERTIFICATION BY APPLICANT**

(Must be completed in English)

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the Information Booklet on USMLE Step 1 and Step 2 examinations and ECFMG Certification, am aware of its contents and meet the eligibility requirements set therein.

Seal, stamp or signature of official *must* cover a portion of the attached photograph.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

(18.1) **(Must be completed in English)**

**CERTIFICATION BY MEDICAL SCHOOL OFFICIAL**

**OR**

**NOTARIZATION WITH EXPLANATION**
(Pertains to graduates only)

Signature of Applicant X _Charles Egbeme Ohifemi_ Date _03/26/94_
(In Latin Characters)

A. I hereby certify that the photograph, signature, and information entered on Section 9 of this form accurately apply to the individual named above.

X _____
Signature of Medical School Official

| Official Title | Date | Institution |
|---|---|---|

B. Subscribed and sworn to before me this _26th_ day of _March_, 19 _94_

X _Jack L. Katz_
Signature of Consular Official, First Class Magistrate, Notary Public

JACK L. KATZ
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires June 1, 1997

B.1 Explain in the space below why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

_Due to the fact that I reside in the United States as at time of filling this application_

| FOR OFFICE USE ONLY | |
|---|---|
| FORM | DATE |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | |
| 325 ✓ | |

(19) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?  ☐ Yes  ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

(20) Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item 20 blank.

Select the one which best describes your racial/ethnic background.

| 1 ☐ American Indian/Alaskan Native | 2 ☐ Asian Pacific Islander | 3 ☐ Hispanic | 4 ☐ Black (not of Hispanic Origin) | 5 ☐ White (not of Hispanic Origin) | 6 ☐ Other |
|---|---|---|---|---|---|

ECFMG-000153

JA3005
ECFMG_RUSS_0000153

For Continuation of 5.1 Clinical Clerkships

| Clinical Clerkship | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ECFMG-000154

JA3006
ECFMG_RUSS_0000154



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

June 22, 1995

Dr. Charles Olufemi Igberase
P.O. Box 1653
Hyattsville, MD 20788

USMLE/ECFMG Identification No.
0-482-700-2

Dear Doctor:

When you applied for admission to ECFMG's administrations of the September 1994 Step 1, August/September 1994 Step 2 and September 1994 ECFMG English test, you responded "No" to the question "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG." You also stated your name as "Igberase Oluwafemi Charles" and your date of birth as April 17, 1961. You certified that this information, as well as the other information on your application "is true and accurate to the best of my knowledge ..." and you swore to this in the presence of a Notary Public.

You were assigned USMLE/ECFMG Identification Number 0-519-573-0 and took the Step 1, Step 2 and ECFMG English test. You submitted copies of your medical education credentials, which were verified by ECFMG with an official of your medical school. A Standard ECFMG Certificate was subsequently issued to you under the name Igberase Oluwafemi Charles with the number 0-519-573-0.

A check of ECFMG records shows that, despite what you certified to on the application referred to above, you had applied for and taken examinations administered by ECFMG prior to your application for the 1994 examinations. You first applied to ECFMG for the July 1992 administration of FMGEMS and the ECFMG English test under the name "Oluwafemi Charles Igberase" and certified that your date of birth was April 17, 1962. You failed both the basic medical science (Day 1) and clinical science (Day 2) components of the July 1992 FMGEMS and passed the ECFMG English test.

You subsequently applied for and took the January 1993 administration of FMGEMS and the ECFMG English test, failing Day 1, but passing Day 2 and the English test. You then applied for and took the July 1993 administration of Day 1 of FMGEMS which you passed. Since, at that time, you had also met the medical education credential requirements for ECFMG certification, you were issued Standard ECFMG Certificate Number 0-482-700-2.

You also applied for and took the September 1992 and September 1993 administrations of Step 1, failing the September 1992 examination, but passing the examination held in September 1993.

Dr. Igberase Oluwafemi Charles
June 22, 1995
Page 2

When you applied to ECFMG, you certified on your application form that, among other items, "falsification of this application" and "engaging in ...conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to ...invalidate the results of my examination ...to revoke a certificate, or to take other appropriate action."

In addition, the policies regarding taking Step 1 and Step 2 of the USMLE as outlined in the ECFMG Information Booklet, which you certified you had read and understood, include the statement "If one Step is passed, applicants may not repeat that Step and will have seven years to pass the other Step." You, however, took and passed Step 1 in September 1993 and again in September 1994.

ECFMG is conducting an investigation of this matter. You must write to ECFMG immediately to explain why you certified on your application form that you had not previously applied for an ECFMG examination when, in fact you had, and also to explain why you repeated Step 1 when the policy states applicants who pass the Step may not repeat it. Your letter must be received by ECFMG within 15 days of your receipt of this letter.

Your explanation, together with the documents in your file, will be reviewed by the ECFMG Committee on Medical Education Credentials at a future meeting. After its review, the Committee will make a recommendation to the ECFMG Board of Trustees.

Your response must be sent to the following special address:

ECFMG
P.O. Box 13467
Philadelphia, PA 19101-3467

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck

ECFMG-000086

JA3008
ECFMG_RUSS_0000086

Page One

RECEIVED
CREDENTIALS DEPT

JUL 2 0 1995

ECFMG

USMlE | ECFMG # O-482-700-2

July 14th 1995
P. O. Box 1653
Hyattsville md 20788

Mr William C. Kelly.
Manager, Medical Education
Credential processing
 ECFMG.

Dear Sir
        I hereby with the following
explanations explain the reasons for
my repeating the ECFMG examinations.
        When I came into the US, I was
very hard up financially, no good books
and I was very emotionally troubled
    It was at this same period I was
attempting the ECFMG examinations.
        I had a very difficult time passing
these tests as you can see in my
records.
        I finally managed to pass, but of
all the over 150 residency applications
that I sent to various institutions
no Hospital considered my results
and the number of attempts
competitive enough.
    I tried again one year later and it

ECFMG-000078

JA3009
ECFMG_RUSS_0000078

Page two

Came down to the same result.
    This again gave me a lot of
depression especially since my family
were still in Nigeria and I had no
means of looking after them.
    As a result of these, I explained
to my friends who felt I should take
the tests over again to improve on
my scores despite my difficult position
    They suggested that since I had
already been issued one ECFMG
Certificate, I could not possibly
use that same number again to
sit for new tests
    For this reasons, I <u>LIED</u> that I
had not taken the test before when
I was filling out the forms.
    I did not deliberately change my
date of birth (DOB) on the forms.
The initial mistake was made
by my school when they recorded my
DOB as 04 7 61.
    I wrote a letter to inform them
about the mistake and that my actual
DOB was 04 7 62.
    As at the time I was filling out

ECFMG-000079

JA3010
ECFMG_RUSS_0000079

Page Three

the latest form, I had not recieved
back from my school a reply for
the change.
   I did not realise at this time
that the previous form I filled had
my corrected DOB on it. So, I
used my DOB that was in my
school file since I had not
recieved a change from my school
'I attached here-with a photocopy
of my Birth Certificate.
   I am willing to pay for the
verification of the 041761 DOB
with my school and the fact that
I have written a letter to them for
a change/correction at the same
period that I filled out the first
ECFMG application forms.
   As for the arrangement of
my name. This is an on-going
feud among the family members.
   It usually depended on who
registers me for what examinations
— My father, my mother or my
uncle.
This accounts for the variations

ECFMG-000080

JA3011

ECFMG_RUSS_0000080

Page Four

as represented in my Birth Certificate, medical School Certificate, Permanent Medical Council Certificate and my first Leaving School certificate.

The name is actually a Compound Last name IGBERASE-CHARLES.

I have decided for future records to use the name as it appears on my Birth Certificate and passport (Nigerian Passport)

i.e. IGBERASE OLUWAFEMI CHARLES I always thought that so long as all the names were represented, There was no problems.

Having said all these, I must say how deeply sorry and remorseful I am for allowing myself to be involved in such a despicable act of shame.

I took this step out of pain and anguish and as a desperate move to helping my family — I am the bread winner of both my immediate and extended family, my parents are very aged and my children are very very young.

ECFMG-000081

JA3012
ECFMG_RUSS_0000081

Page five

I therefore plead fervently with
the committee members who are
going to review my case to to
<u>temper justice with mercy</u>
God bless you all.

Sincerely

Igberase oluwafemi Charles
0-519-573-0

RECEIVED
PERSONNEL DEPT

JUL 10

FILM G




Executive Officer
IFE CENTRAL LOCAL
GOVERNMENT, ILE—
15th Sept 1973

A 01948

UNITY AND FAITH

OSUN STATE OF NIGERIA.

# CERTIFICATE OF REGISTRATION OF BIRTH

I, Mrs. Grace Fatunoase Registrar of Births in Ife Central Local Government in Ile-Ife Division of Osun State of Nigeria do hereby certify that I have this 14th day of September 19 93 registered, in folio number 042 of Birth Register The birth of Ibeirase Olusola Charles

Male / Female, born at Ile-Ife on 12th day of April 19 82 the child of Mr. Ibeirase David

(Father's Name)

and Mrs. Ibeirase Foyeke both Ile-Ife

(Mother's Name)

14/9 19 93

C Fatunoase

Signature of Registrar

ECFMG-000083

JA3014
ECFMG_RUSS_0000083



EDUCATIC**AL COMMISSION for FOREI****J MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

Via Certified Mail
Return Receipt Requested

December 7, 1995

Dr. Igberase Oluwafemi Charles
P.O. Box 1653
Hyattsville, MD 20788

USMLE/ECFMG Identification No.
0-482-700-2

Dear Doctor:

On November 27, 1995 the ECFMG Committee on Medical Education Credentials met to review the matter with respect to your falsification of an application form submitted to ECFMG. The Committee reviewed the documentation available, including your July 14, 1995 letter.

Following review the Committee took the following actions:

1. To invalidate the Standard ECFMG Certificate issued to you under the second identification number 0-519-573-0;

2. To inform the United States Medical Licensing Examination (USMLE) Committee on Irregular Behavior of this matter for its information and possible action; and

3. To revoke the Standard ECFMG Certificate issued to you under the first identification number 0-482-700-2.

Please return the two Standard ECFMG Certificates to my attention immediately. I suggest you send them by certified mail.

Enclosed is a copy of the ECFMG Rules of Appellate Procedure.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck
Enclosure

# Exhibit 18

JA3016



# PROCESSED

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

May 22, 2002

Dr. Oluwafemi Charles Igberase
c/o Gwendolyn Mensah
3516 Darthmoor Lane
Olney, MD 20832

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Igberase:

On behalf of the ECFMG Medical Education Credentials Committee, I am writing to inform you the Committee has completed its second review regarding your alleged irregular behavior in connection with the response to Item 1 on the application for the USMLE Step 1 received by ECFMG on October 23, 2000. With that application, you were applying for the USMLE Step 1 that you had previously taken and passed. This review by the ECFMG Committee was on remand from the USMLE Committee on Irregular Behavior.

The ECFMG Medical Education Credentials Committee previously reviewed this matter in April 2001. On May 3, 2001, I wrote to advise you that the ECFMG Committee took action to extend the length of the revocation of your Standard for a yet to be specified period of time, to refer this new matter to the USMLE Committee on Irregular Behavior for its review and to review this matter again after the USMLE Committee's decision.

At its subsequent review in May 2002, the ECFMG Medical Education Credentials Committee took action to revoke permanently your Standard ECFMG Certificate.

In accordance with ECFMG policies and procedures, an annotation that you engaged in irregular behavior will be included in your ECFMG record. This annotation shall appear on your ECFMG Certification Verification Service Report and ECFMG Status Report. In addition, ECFMG will report the determination of irregular behavior and permanent revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards, state medical licensing authorities, directors of graduate medical education programs and other interested entities.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

JA3017

Dr. Oluwafemi Charles Igberase
May 22, 2002
Page 2

As noted in the enclosed ECFMG Rules of Appellate Procedure, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the time limit specified, i.e., within 60 days of the date of this notification.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

JA3018

Confidential

ECFMG_RUSS_0003802

# Exhibit 19

## PLEASE DO NOT DETACH

**UNITED STATES MEDICAL LICENSING EXAMINATION (USMLE)**
**STEP 1 AND/OR STEP 2 EXAMINATIONS**

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOLS BY
THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, USA
PHONE: 215 386-5900 CABLE: EDCOUNCIL,PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and reexamination or application will not be accepted.
Use typewriter or block print in ink.

| | | |
|---|---|---|
| ① **ECFMG EXAMINATION HISTORY:** | Have you ever submitted an application to ECFMG for any examination, even if you did not take the examination? ☒ Yes ☐ No | If yes, enter your USMLE Identification Number (ECFMG Applicant Number) in this box. O-553-258-5 |
| ② **NAME:** Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record | First Name: J I O H N  Middle Name: M O S A  Last Name (Surname): A K O D A  Full Maiden Name (For married women only): | |
| ②.1 If you have previously applied to ECFMG under another name, provide that name | Previous Name: Please include a copy of the legal document that verifies this name change. | |
| ③ **ADDRESS:** Use address to which admission permit and other notification from ECFMG should be sent | Number/Street: 5 8 0 0 Q U A N T R E L L A V E N U E  Apartment Number: A P T N O 8 1 1 0  Post Office Box Number:  City: A L E X A N D R I A  State/Country: V I R G I N I A  Zip or Postal Code: 2 2 3 1 2 | |
| ④ **U.S. SOCIAL SECURITY AND/OR NATIONAL IDENTIFICATION NUMBERS:** | Enter U.S. Social Security Number: ☐☐☐ ☐☐ ☐☐☐☐  Enter National Identification Number and Country:  Country: | |
| ⑤ **STATUS OF MEDICAL SCHOOL STUDENT:** *Must* be completed by students. | If you are applying for Step 1, will you have completed two years of medical school by the date of that examination? ☒ Yes ☐ No  If you are applying for Step 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school by the date of that examination? ☐ Yes ☐ No | |

| ⑥ **REGISTRATION:** Select no more than one box for each Step and/or ECFMG English test for which you are applying. | Step 1 (Check one box only) | Step 2 (Check one box only) | ECFMG English Test (Check one box only) |
|---|---|---|---|
| | ☐ June 11-12, 1996 **or** ☒ October 15-16, 1996 | ☐ March 5-6, 1996 **or** ☐ August 27-28, 1996 | ☐ March 6, 1996 **or** ☐ August 28, 1996 |

| ⑥.1 **TEST CENTER:** Select three different ECFMG centers in order of preference for each Step and/or ECFMG English Test. See the information Booklet in which this application was enclosed for a list of ECFMG centers. | If your center selections are not available, ECFMG reserves the right to assign a center. |
|---|---|
| | Step 1: (1) NEW YORK 330 City Center No. (2) NEW YORK 330 City Center No. (3) City Center No. |
| | Step 2 and/or ECFMG English Test: (1) City Center No. (2) City Center No. (3) City Center No. |

| ⑦ **EXAMINATION FEE(S):** Enter the amount enclosed on the line provided | Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash. | |
|---|---|---|
| | Step 1 Basic Medical Science Examination $440  Step 2 Clinical Science Examination $440  ECFMG English Test $ 40  Enter amount enclosed $ PAID/Credit | FOR OFFICE USE ONLY |

| ⑧ **HANDEDNESS:** | ☒ Right Handed ☐ Left Handed |
|---|---|

APPLICATION FORM 104S, February, 1996

*ECFMG All Rights Reserved

ECFMG-000643

PART B

| ⑨ SECONDARY SCHOOL/ COLLEGE UNIVERSITY ATTENDED: | List any secondary school, college, or university attended. | Dates Attended | | | | No. School Years |
|---|---|---|---|---|---|---|
| | | From | | To | | |
| | | MO. | YR. | MO. | YR. | |
| | Name City/State/Country University OF Benin. Nigeria | 10 | 81 | 10 | 87 | 6 yrs |
| | Name City/State/Country Kings College Lagos Nigeria | 06 | 74 | 06 | 79 | 5 yrs |

| ⑩ MEDICAL DEGREE AND | Title of Medical Degree M.B.B.S. * If the degree has been conferred, a photocopy must be sent to ECFMG. See Medical Education Credentials section of the ECFMG Information Booklet. | Date Conferred:/Expected: * MO. 10 YR. 87 |
|---|---|---|

| ⑩.1 MEDICAL SCHOOL: | Name of Medical School from which you graduated or expect to graduate. LIST EXACT NAME AND ADDRESS. UNIVERSITY OF IBENIN. | Dates Attended | | | | No. of Years Attended |
|---|---|---|---|---|---|---|
| | | From | | To | | |
| | | MO. | YR. | MO. | YR. | |
| | City/State/Country EDO STATE NIGERIA. | 10 | 81 | 10 | 87 | 6 |

| ⑩.2 OTHER MEDICAL SCHOOLS ATTENDED: | Name City/State/Country | | | | | |
|---|---|---|---|---|---|---|
| | Name City/State/Country | | | | | |
| | Name City/State/Country | | | | | |

| ⑩.2 CLINICAL CLERKSHIPS: | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | See Part D of this application for entering clinical clerkships. | | | | |

| ⑪ MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: MO. 01 YR. 89    Country or state in which you are licensed: * NIGERIA * If the license has been issued, a photocopy must be sent to ECFMG. See Medical Education Credentials section of the ECFMG Information Booklet. |
|---|---|

| ⑫ HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |

| ⑬ EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: | | |
| | Street: | | |
| | City/State/Country: | | |

| ⑭ BIRTHDATE/ BIRTHPLACE: | Day 01 Month 01 Year 59 Location: BENIN CITY EDO STATE. City, Province, Country |
|---|---|

| ⑮ GENDER: | Please check one: ✓ Male ___ Female | ⑯ NATIVE LANGUAGE: EDO |
|---|---|---|

| ⑰ CITIZENSHIP: | (Complete all three) |
|---|---|
| | A. AT BIRTH NIGERIAN  USA ☐  or  Other ☐ (Specify) |
| | B. UPON ENTERING MEDICAL SCHOOL ___  USA ☐  or  Other ☐ (Specify) |
| | C. NOW NIGERIAN  USA ☐  or  Other ☐ (Specify) |

| ⑱ OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS: | Check below the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you and the identification number that was assigned to you by that organization. |
|---|---|

| ORGANIZATION | DATE OF MOST RECENT EXAMINATION TAKEN | | | | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|---|---|---|
| ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | MO. | 1 9 YR. | NBME Parts I/II | | |
| | MO. | 1 9 YR. | USMLE Steps 1/2 | | |
| ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | MO. | 1 9 YR. | FLEX | FEDERATION IDENTIFICATION NUMBER (FIN) | |

PART C

ECFMG-000644

JA3021

ECFMG_RUSS_0000644

STATE LICENSING AUTHORITY
IN THE UNITED STATES

MO. | 1 9 | YR.

## PART C

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

**⑲ CERTIFICATION BY APPLICANT**

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition (that which pertains to the administration for which I am registering) of the combined Information Booklet on ECFMG Certification and Application for USMLE Step 1 and Step 2 examinations and USMLE Bulletin of Information, am aware of the contents of both sections and accept the eligibility requirements set therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See Information Booklet for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant  X _____  Date 8 /29 /96
(In Latin Characters)

**⑲.1 CERTIFICATION BY MEDICAL SCHOOL OFFICIAL**

**OR**

A. I hereby certify that the photograph, signature, and information entered on Section 10 of this form accurately apply to the individual named above.

X _____
Signature of Medical School Official (In Latin Characters)

_____    _____    _____
Official Title                Date                      Institution

**CERTIFICATION OF IDENTIFICATION WITH EXPLANATION**
(Pertains to graduates only)

B. I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this _____ day of _____, 19 _____.

X _____
Signature of Consular Official, First Class Magistrate, Notary Public (In Latin Characters)    Official Title

| FOR OFFICE USE ONLY | |
| --- | --- |
| FORM | DATE |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | |
| 325 | |
| R | M 9/16 |

B.1 Explain in the space below why the application could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

**⑳** Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?    ☐ Yes    ☑ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

**㉑** Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item ㉑ blank.

Select the one which best describes your racial/ethnic background.

| 1 ☐ American Indian/Alaskan Native | 2 ☐ Asian Pacific Islander | 3 ☐ Hispanic | 4 ☑ Black (not of Hispanic Origin) | 5 ☐ White (not of Hispanic Origin) | 6 ☐ Other |

ECFMG-000645

JA3022
ECFMG_RUSS_0000645

PART D

| (10.2) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|---|
| | Medicine | Specialist Hosp. Benin | Warri | | Dr Onwuka | 1988 |
| | Pediatrics | Specialist Hosp Benin | Warri | | Dr Akenoba | 1987-88 |
| | OBGYN | Specialist Hosp Benin | Warri | | Dr Ujinko | 1988 |
| | Surgery | Specialist Hosp Benin | Warri | | Dr Idabloa | 1988 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

ECFMG-000646

# Exhibit 20



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

August 22, 2000

Dr. John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

Re: USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Akoda:

The Educational Commission for Foreign Medical Graduates (ECFMG) has received information alleging that you may have engaged in irregular behavior.

According to ECFMG records, in January 1996, you submitted an application to ECFMG to take the March 1996 United States Medical Licensing Examination (USMLE) Step 2 and June 1996 USMLE Step 1. You certified on the application that your name was "John Nosa Akoda" and that you had not previously submitted an application to ECFMG. You also certified, among other information, that your date of birth was January 1, 1959 and that you graduated from the Faculty of Medicine, University of Benin, Nigeria, in 1987.

According to information recently received by ECFMG, it is alleged you may have previously applied to ECFMG using the names "Oluwafemi Charles Igberase" (USMLE/ECFMG Identification No. 0-482-700-2) and "Igberase Oluwafemi Charles" (USMLE/ECFMG Identification No. 0-519-573-0). In November 1995, the ECFMG Committee on Medical Education Credentials took action to invalidate Standard ECFMG Certificate No. 0-519-573-0 and revoke Standard ECFMG Certificate No. 0-482-700-2. An appeal of these actions was taken to the ECFMG Review Committee on Appeals. After hearing the appeal, the ECFMG Review Committee on Appeals upheld the actions of the ECFMG Committee on Medical Education Credentials, but limited the length of the revocation of Standard ECFMG Certificate No. 0-482-700-2 to five years, i.e., until July 10, 2001.

When you applied to ECFMG, you certified on your application that the "falsification of this application or the submission of any falsified educational documents to ECFMG ...may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, revoke a certificate, or to take other appropriate action." A copy of the certification statement you signed is enclosed.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Confidential                                                                                          ECFMG_RUSS_0004194

Dr. John Akoda
August 22, 2000
Page 2

ECFMG requires an explanation from you in writing within fifteen (15) days of your receipt of this letter. The information in your ECFMG file, together with your explanation and any other material you submit, will be referred to the ECFMG Committee on Medical Education Credentials for review at its next scheduled meeting.

Please send all communications and material in this matter to my attention. If you have any questions, please telephone me at (215) 823-2277.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

JA3026

Confidential                                           ECFMG_RUSS_0004195

# Exhibit 21

JA3027

RECEIVED
JUN 29 1996
APR 22 1996

Return to:    ECFMG
              3624 Market Street
              Philadelphia PA 19104-2685
              USA

**ECFMG**

Re:        0-553-258-5

DR John Nosa Akoda

I hereby certify that the attached diploma or other credential for the individual noted above is authentic and correct and that I am authorized to certify this on behalf of this institution.

_____ | 21st MAY 1996
             Signature                              Date

PROFESSOR L.I. OJGWU, FRCP.
      Name (Printed or Typed)

DEAN   FACULTY OF MEDICINE
                Title

UNIVERSITY OF BENIN, BENIN CITY, NIGERIA
           Name of Medical School

*(seal: UNIVERSITY OF BENIN, BENIN CITY, Seal, HEALTH SCIENCE)*

I <u>cannot</u> certify that the diploma or other credential for the individual noted above is authentic and correct because:

_____

_____

_____

_____

_____

_____

_____ |
             Signature                              Date

_____
      Name (Printed or Typed)

_____
                Title                              Seal

_____
      Name of Medical School

Form 399A--English
Rev. August 1995

JA3028

Confidential                                          ECFMG_RUSS_0004016

Certificate No. **F 15575**

3x

| Name | Address | Date of Registration | |
|------|---------|---------------------|---|
| AKODA, Johnbull Enosakhare | 1, Akoda Street, Oselu Quarters, Benin-City. | 19 **89.** <br><br> January 3rd | |

I HEREBY CERTIFY THAT this is a true Copy of the entry of the above specified Name
Council of Nigeria Register, and that the prescribed fee of Sixty Naira has been duly received fo

ECFMG_RUSS_0004017

JA3029

RECEIVED

JAN   3 1996

ECFMG

JA3030

Confidential                                          ECFMG_RUSS_0004018

# UNIVERSITY OF BENIN



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October* 1987

has been admitted to the degree

of

**Bachelor of Medicine: Bachelor of Surgery**

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE-CHANCELLOR

Confidential

ECFMG RUSS 0004019

RECEIVED

JAN 3 1996

Confidential

553-258

JA3032

ECFMG_RUSS_0004020

# Exhibit 22

APPLICANT ELIGIBLE FOR ECFMG CERTIFICATION    AUGUST 12, 1997
                                              EXAMINATION OF
                                              JUNE 10-11, 1997


APPLICANT NUMBER 0-553-258-5




Dr John Nosa Akoda
5800 Quantrell Avenue
Apt. #810
Alexandria, VA  22312



DEAR DOCTOR:

ENCLOSED WITH THIS ECFMG REPORT IS THE SCORE REPORT OF YOUR PERFORMANCE
ON STEP 1 (BASIC MEDICAL SCIENCE) OF THE UNITED STATES MEDICAL LICENSING
EXAMINATION (USMLE) ADMINISTERED BY ECFMG IN JUNE 1997.

                        ECFMG STATUS REPORT

YOU HAVE MET ALL OF THE REQUIREMENTS FOR ECFMG CERTIFICATION:

    BASIC MEDICAL SCIENCE EXAMINATION - PASSED JUNE 1997
    CLINICAL SCIENCE EXAMINATION - PASSED AUGUST 1996
    ENGLISH TEST - PASSED AUGUST 1996
             - VALID THROUGH AUGUST 1998
    MEDICAL EDUCATION CREDENTIAL REQUIREMENT - FULFILLED

YOUR STANDARD ECFMG CERTIFICATE WILL BE MAILED TO YOU WITHIN THE NEXT
TWO WEEKS.  THIS LETTER MAY BE USED TO APPLY FOR APPOINTMENT TO AN
ACCREDITED GRADUATE MEDICAL EDUCATION PROGRAM IN THE UNITED STATES
(INCLUDING PUERTO RICO).

YOU HAVE MET THE MEDICAL SCIENCE EXAMINATION REQUIREMENT UNDER THE
PROVISIONS OF PUBLIC LAW 94-484 TO OBTAIN A VISA, IF NEEDED, TO ENTER
THE UNITED STATES.

PLEASE SEE THE ENCLOSED SPECIAL ANNOUNCEMENT ON CLINICAL SKILLS
ASSESSMENT (FORM 97-1) WHICH SUPERSEDES THE SPECIAL ANNOUNCEMENT
(FORM 96-8) PREVIOUSLY INSERTED INTO THE 1997 ECFMG INFORMATION BOOKLET.

ECFMG REQUESTS PROGRAM DIRECTORS TO VERIFY WITH ECFMG INFORMATION
CONTAINED IN THIS REPORT.



                              Nancy E. Gary, MD

                        NANCY E. GARY, M.D.
                        PRESIDENT


ENCLOSURES: USMLE SCORE REPORT                    FORM 10-UA
            INFORMATION BOOKLET                   AUGUST 1997

                                                  JA3034

# Exhibit 23

RECEIVED *nmcg*

JUL 1 3 1992

ECFMG

**RETURN TO:**     ECFMG
                  3624 Market Street
                  Philadelphia, PA 19104-2685
                  U.S.A.

Re: *482-700-2*

*Dr. Oluwafemi*
*Charles Ogberase*

I hereby certify that the attached diploma or other credential for the individual
noted above is authentic and correct and that I am authorized to certify this on
behalf of this institution.

_____          3rd June, 1992
        Signature                      Date

JUDE   UZOMA   OHAERI
**Name (Please Print or Type)**

SUB-DEAN (UNDERGRADUATE)
        **Title**

COLL OF MED, UNIVERSITY OF IBADAN, NIGERIA.
    **Name of Medical School**



I **cannot** certify that the diploma or other credential for the individual noted
above is authentic and correct because _____

_____

_____

_____

_____          _____
        Signature                      Date

_____
**Name (Please Print or Type)**

_____
        **Title**

_____
**Name of Medical School**          Seal

**Form 399A**
**March 1985**

Confidential

Charles Olufemi Igberaese

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

Bachelor of Medicine

and

Bachelor of Surgery

VICE-CHANCELLOR

DATE June 19, 1987

REGISTRAR

ECFMG RUSS 0004003

0-483-700-2

RECEIVED
JUL 13 1992
ECFMG

University of Ibadan

Charles Oluyemi [illegible]

having fulfilled all the requirements of the University
and passed the prescribed examinations has this day
been admitted to the degree of

Bachelor of Medicine
and
Bachelor of Surgery

DEAN (UNDERGRADUATE)
FACULTY OF CLINICAL SCIENCES
& DENTISTRY
COLLEGE OF MEDICINE
UNIVERSITY OF IBADAN
NIGERIA

CHAIRMAN

REGISTRAR

JA3038

# University of Ibadan



## Charles Olufemi Igberaese

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

## Bachelor of Medicine

and

## Bachelor of Surgery

VICE-CHANCELLOR

DATE June 19, 1987

REGISTRAR

JA3039

Confidential

ECFMG_RUSS_0004005

482-700

RECEIVED
APR - 6 1992
ECFMG

JA3040

Confidential

ECFMG_RUSS_0004006

# Exhibit 24

for

# FOREIGN MEDICAL GRADUATES

## CERTIFIES THAT

### — JOHN NOSA AKODA

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

RECEIVED AND HAS BEEN AWARDED THIS CERTIFICATE.

AUG 1 1 2011

CERTIFICATE NUMBER    0-553-258-5

MARYLAND BOARD OF PHYSICIANS

MEDICAL EXAMINATION

BASIC SCIENCE    JUNE 11, 1997

CLINICAL SCIENCE    AUGUST 28, 1996

ENGLISH EXAMINATION    AUGUST 28, 1996

VALID THROUGH

CERTIFICATE NUMBER
0-553-258-5
ENGLISH EXAMINATION
August 28, 1996
VALID INDEFINITELY



CHAIRMAN, BOAR

PRESIDENT, CHIEF EXEC

DATE ISSUED    AUGUST

JA3042

# Exhibit 25

JA3043

| IN THE MATTER OF | * | BEFORE THE MARYLAND |
|---|---|---|
| CHARLES J.N. AKODA, M.D. | * | STATE BOARD OF PHYSICIANS |
| Respondent. | * | Case Number 2017-0083B |
| License Number D73049 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FINAL DECISION AND ORDER

### PROCEDURAL HISTORY

On November 15, 2016, Charles J.N. Akoda, M.D., a physician licensed[1] by the Maryland State Board of Physicians ("Board"), entered a plea of guilty to one count of Social Security Account Number Fraud in the United States District Court for the District of Maryland ("U.S. District Court"), in violation of 42 U.S.C. § 408(a)(7)(B). (Case No. PWG-8-16-CR-00277-001). On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00. Dr. Akoda has not filed an appeal of his conviction and the time for filing an appeal has passed.

On April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine, pursuant to section 14-404(b)(2) of the Health Occupations Article, which provides:

> After completion of the appellate process if the conviction has not been reversed or the plea has not been set aside with respect to a crime involving moral turpitude, a disciplinary panel shall order the revocation of a license on the certification by the Office of the Attorney General.

---

[1] Dr. Akoda allowed his license to expire on September 30, 2016. The Board was notified of Dr. Akoda's criminal indictment in August of 2016 and began its investigation prior to the expiration of Dr. Akoda's license. Pursuant to Section 14-403 of the Health Occupations Article, the license of an individual regulated by the Board "may [not] lapse by operation of law while the individual is under investigation . . ." Md. Code. Ann., Health Occ. § 14-403(a) (2014 Repl. Vol.). Therefore, by operation of law, Dr. Akoda's license was not permitted to expire during the pendency of these proceedings.

Attached to the Petition were certified copies of the criminal docket entries, indictment, superseding indictment, plea agreement with stipulated facts, sentencing order, the judgment entered, and a show cause order[2] mandating that Dr. Akoda show cause in writing by May 8, 2017 if there were any reason why his license to practice medicine should not be revoked. To date, the Board has not received a response from Dr. Akoda.

Having reviewed and considered the entire record in these § 14-404(b)(2) proceedings, Panel B issues this Final Decision and Order.

## FINDINGS OF FACT

Panel B finds the following facts by a preponderance of the evidence:

1. Dr. Akoda was originally licensed to practice medicine in the State of Maryland on September 14, 2011, having been issued License Number D73049. Dr. Akoda continuously renewed his license until September 30, 2016 when his license expired.[3]

2. On June 1, 2016, in Case No. PWG-8-16-CR-00277-001, the United States Attorney filed an indictment charging Dr. Akoda[4] with social security account number fraud, 42 U.S.C. § 408(a)(7)(B), and aggravated identity theft, 18 U.S.C. § 1028A(a)(1).

3. On October 19, 2016, in a superseding indictment, Dr. Akoda was charged with an additional count of social security account number fraud, 42 U.S.C. § 408(a)(7)(B); false statement relating to a health care matter, 18 U.S.C. § 1035(a); an additional count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1); and fraud and misuse of an immigration document, 18 U.S.C. § 1546(a).

4. On November 15, 2016, Dr. Akoda pled guilty to social security account number fraud, in violation of 42 U.S.C. § 408(a)(7)(B).[5] The plea agreement was based on the following statement of facts, which Dr. Akoda acknowledged were true and correct:

---

[2] An updated show cause order was mailed to Dr. Akoda on April 6, 2017 with the same response date of May 8, 2017.

[3] As discussed above, because of the Board's continuing investigation of Dr. Akoda throughout these proceedings, his license to practice medicine did not lapse or expire.

[4] The indictment included eleven different names for Dr. Akoda, including Charles John Nosa Akoda, the name under which Dr. Akoda applied for and was granted a license by the Board.

[5] 42 U.S.C. § 408(a)(7)(B) provides: "Whoever . . . for the purpose of causing an increase in any payment authorized under this title (or any other program financed in whole or in part from Federal funds), or for the purpose of causing a payment under this title (or any such other program) to be made when no payment is authorized thereunder, or for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such

2

In October 1991, [Dr. Akoda] entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, [Dr. Akoda] applied for and obtained a Social Security Number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, [Dr. Akoda] applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase, Jr." and a false date of birth. In September 1998, [Dr. Akoda] this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, [Dr. Akoda] fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, [Dr. Akoda] submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). [Dr. Akoda] submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 SSN and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, [Dr. Akoda] failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is step 2 of the USMLE. Eventually, between July 1992 and September 1993, [Dr. Akoda] passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, [Dr. Akoda] submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, [Dr. Akoda] passed all three steps of the USMLE and was issued a second ECMFG Certification under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that [Dr. Akoda] had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December

---

other person) is not entitled, or for the purpose of obtaining anything of value from any person, or for any other purpose . . . with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person . . . shall be guilty of a felony and upon conviction thereof shall be fined under title 18, United States Code, or imprisoned for not more than five years, or both."

3

JA3046

1995, ECFMG revoked or suspended both ECFMG certifications assigned to [Dr. Akoda].

In August 1996, [Dr. Akoda] submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, [Dr. Akoda] submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, [Dr. Akoda], as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, [Dr. Akoda] applied for and was accepted into a residency program at [Facility A].[6] In 2000, [Facility A] learned that the SSN that [Dr. Akoda] used belonged not to "Akoda" but rather to Igberase. [Dr. Akoda] was suspended from [Facility A's] residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, [Dr. Akoda], using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at [Facility B]. In March 2007, [Facility B] accepted [Dr. Akoda] into its residency program, and asked [Dr. Akoda] to submit evidence of legal residence in the United States. In response, [Dr. Akoda] submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after completion of his residency at [Facility B], [Dr. Akoda], using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, [Dr. Akoda] submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to [Dr. Akoda] under the name "Charles John Nosa Akoda," and [Dr. Akoda] began practicing medicine in the field of obstetrics and gynecology.

In 2012, [Dr. Akoda], using the "Akoda" identity, sought and obtained medical privileges at [Facility C] in Maryland. To do so, [Dr. Akoda] submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, [Dr. Akoda] submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied [Dr. Akoda]'s application based, in part, on CMS's determination that [Dr. Akoda] did not provide an accurate SSN.

---

[6] In order to maintain confidentiality, facility names will not be used in this Order.

4

On June 9, 2016, law enforcement executed search warrants at [Dr. Akoda]'s residence, medical practice, and vehicle. From [Dr. Akoda]'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From [Dr. Akoda]'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

Throughout the above-referenced scheme, [Dr. Akoda] also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

5.      On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

6.      April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine pursuant to Health Occ. § 14-404(b)(2).

7.      Dr. Akoda did not appeal his conviction within the time prescribed by law and the guilty plea and conviction have not been set aside.

## CONCLUSIONS OF LAW

Dr. Akoda does not dispute that he pled guilty to a crime involving moral turpitude and has not filed a response to the petition to revoke his license. Panel B makes the following conclusions of law.

Dr. Akoda's plea of guilty to social security account number fraud, a felony, in violation of 42 U.S.C. § 408(a)(7)(B), constitutes a crime involving moral turpitude *per se.* The essential elements of the crime include intent to deceive. Dr. Akoda admitted that he knowingly and willfully falsely represented several different numbers to be the social security number assigned to him with the intent to deceive.

Maryland appellate courts have repeatedly held that if dishonesty, fraud, or intent to deceive is an essential element of a statute under which a defendant is convicted, the crime involves moral turpitude as a matter of law. *See Board of Physician Quality Assurance v.*

5

JA3048

*Felsenberg,* 351 Md. 288, 295 (1998) (crimes involving fraud are crimes involving moral turpitude); *Attorney Grievance Comm'n v. Klauber,* 289 Md. 446, 457-59, *cert. denied,* 451 U.S. 1018 (1981) (the term "moral turpitude" connotes a fraudulent or dishonest intent); *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 459-60 (1977) (a crime of moral turpitude is characterized by dishonesty, fraud, or deceit); *Oltman v. Maryland State Bd. of Physicians,* 162 Md. App. 453, 485-87, *cert. denied,* 389 Md. 125 (2005) (crime was one of moral turpitude [because] it was dishonest, and characterized by fraud).

It is also settled that "the related group of offenses involving intentional dishonesty for purposes of personal gain are crimes involving moral turpitude." *Oltman,* 162 Md. App. at 486 (citations and quotation marks omitted). By using false social security numbers to open bank accounts, apply for federal education loans for his children and obtain a medical license, Dr. Akoda intended to defraud and deceive the government and Board for purposes of personal financial gain to which he was not entitled. His conduct involved repeated fraud, deceit, and intentional dishonesty for purposes of his own personal gain. The facts underlying Dr. Akoda's criminal offenses, therefore, also establish moral turpitude. *Oltman,* 162 Md. App. at 486.

In the instant case, Dr. Akoda was convicted of social security number fraud, in violation of 42 U.S.C. § 408(a)(7)(B). Dr. Akoda was intentionally dishonest in committing an act of willful deception on a massive scale for a prolonged duration of time for purposes of his own personal financial gain. Panel B concludes that Dr. Akoda was convicted of a crime involving moral turpitude and the time for filing an appeal has passed, thus the revocation of Dr. Akoda's license to practice medicine is required under Health Occ. § 14-404(b)(2).

6

## ORDER

It is, on the affirmative vote of a majority of the quorum of Disciplinary Panel B, hereby

**ORDERED** that the medical license of Charles J.N. Akoda, M.D., license number

**D73049**, is **REVOKED**, as mandated by Health Occ. §14-404(b)(2); and it is further

**ORDERED** that this final decision and order is a **PUBLIC DOCUMENT**.

07/10/2017
Date

*Christine A. Farrelly*
Christine A. Farrelly, Executive Director
Maryland State Board of Physicians

## NOTICE OF RIGHT TO PETITION FOR JUDICIAL REVIEW

Pursuant to Md. Code Ann., Health Occ. § 14-408, Dr. Akoda has the right to seek judicial review of this Final Decision and Order. Any petition for judicial review shall be filed within thirty (30) days from the date of mailing of his Final Decision and Order. The cover letter accompanying this final decision and order indicates the date the decision is mailed. Any petition for judicial review shall be made as provided for in the Administrative Procedure Act, Md. Code Ann., State Gov't § 10-222 and Title 7, Chapter 200 of the Maryland Rules of Procedure.

If Dr. Akoda files a petition for judicial review, the Board is a party and should be served with the court's process at the following address:

> **Maryland State Board of Physicians**
> **Christine A. Farrelly, Executive Director**
> **4201 Patterson Avenue**
> **Baltimore, Maryland 21215**

Notice of any petition should also be sent to the Board's counsel at the following address:

> **Stacey M. Darin**
> **Assistant Attorney General**
> **Department of Health and Mental Hygiene**
> **300 West Preston Street, Suite 302**
> **Baltimore, Maryland 21201**

JA3050

# Exhibit 26

JA3051



BRICK HOSPITAL
JERSEY SHORE MEDICAL CENTER
POINT PLEASANT HOSPITAL
RIVERVIEW MEDICAL CENTER

**Meridian**
*Health System*

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

November 7, 2000

State of Maryland Board of Physician Assurance
4201 Patterson Avenue, P.O. Box 2571
Baltimore, Maryland 21215

RE:  John Charles Nosa Akoda
     aka John-Charles Nosa-Igberase Akoda
     aka Charles Johnbull Nosakhare Akoda
     aka Charles N. Akoda
     aka Charles J. Akoda

To Whom It May Concern:

We have discovered in the file of John Charles Nosa Akoda, M.D., a third-year resident
in Internal Medicine at Jersey Shore Medical Center, an application for initial medical
licensure in the State of Maryland. That application includes a Social Security Number
which Dr. Akoda has stated is not his own.

Having earlier suspended Dr. Akoda we have now made a decision to terminate him
effective November 21, 2000, for reasons as specified in our letter (and attachment) to the
New Jersey State Board of Medical Examiners. Dr. Akoda was afforded his due-process
rights of appeal of his termination, but the time for receipt of such an appeal has now
been exhausted.

Very truly yours,

*Anna Marie Sesso, M.D., M.P.H.*

Anna Marie Sesso, M.D., M.P.H.
Associate Director of Academic Affairs

Copy to: New Jersey State Board of Medical Examiners

# Exhibit 27

JA3053



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

## REQUEST FOR PERMANENT REVALIDATION OF STANDARD ECFMG CERTIFICATE

This form is to be completed for graduates of foreign medical schools who have entered programs of graduate medical education in the United States accredited by the Accreditation Council for Graduate Medical Education (ACGME) and who are requesting that their Standard ECFMG Certificate be made valid indefinitely.

**RECD**

**JUL 2 4 1998**

**ECFMG**

### I. TO BE COMPLETED BY APPLICANT (type or print)

| USMLE/ECFMG Applicant Identification No. | Program ID No. (as listed in American Medical Association's *Graduate Medical Education Program Directory*) |
|---|---|
| 0-553-258-5 | 140-33-12-236 |

Name **John-Charles Akoda**

U.S. Social Security Number **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** Date of Birth **04 / 17 / 63**
Month Day Year

Mailing Address for Sticker **P.O. Box 192**

City **Neptune**    State **NJ**    Zip Code **07754**

Check Here if this is a Change in Permanent Address for ECFMG Records ☐

Country _____

Telephone Number ( **732** ) **775-1092**  Fax ( **732** ) **775-1092**
Area Code    Area Code

Signature **John Charles Akoda**    Date **7/10/98**

**VISA STATUS: (if applicable)**
(check one)
Immigrant ☒
Non-Immigrant
　J-1 ☐
　H-1B ☐
　Other (please specify) ☐

### II. TO BE COMPLETED BY PROGRAM DIRECTOR, DIRECTOR OF GRADUATE MEDICAL EDUCATION, OR OTHER AUTHORIZED OFFICIAL (type or print)

INSTITUTION (as listed in AMA's *Graduate Medical Education Program Directory*)

**JERSEY SHORE MEDICAL CENTER**

CITY **NEPTUNE**    STATE _____

SPECIALTY **INTERNAL MEDICINE**

Telephone Number ( **732** ) **776-4420**  Fax ( **732** ) **776-4619**
Area Code    Area Code

Name and Title of Institution Official    **JOHN A. CROCCO, M.D.**
**PROGRAM DIRECTOR/DEPT. CHAIR OF MEDICINE**

Signature of Institution Official _____  Date **7-17-98**

**ENTRY DATE OF APPLICANT TO ACGME ACCREDITED PROGRAM:**

**7 / 1 / 98**
month  day  year

**APPLICANT ENTERED AS:**
(check one)
Resident ☒
Clinical Fellow ☐
Other (please specify) ☐

Please affix institution or corporate seal, or if not available, complete acknowledgment by a notary.

**VALID INDEFINITELY**
**SENT**

(INSTITUTION, CORPORATE OR NOTARIAL SEAL)

STATE OF _____

COUNTY OF _____

On this _____ day of _____, 19____, before me appeared _____, satisfactorily proven to me to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.
In witness whereof, I hereunto set my hand and official seals.

**OCT 2 1998**

**BY**

_____
Notary Public

Upon receipt of this form and verification of the information, ECFMG will mail a revalidation sticker to the applicant at the mailing address listed in Item I.

SEE REVERSE SIDE OF THIS FORM FOR ECFMG'S POLICY AND PROCEDURES

Form 246

JA3054

Confidential

ECFMG_RUSS_0003845

# Exhibit 28

RLEY SHORE MEDICAL CENTER
EDICAL CENTER OF OCEAN COUNTY
BRICK AND POINT PLEASANT DIVISIONS
VERVIEW MEDICAL CENTER



**Meridian**
*Health System®*

Friday, August 11, 2000

*via telefax to (215) 386-9196*

to pill

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

www.meridianhealth.com

Rice Holmes
Education Commission for Foreign Medical Graduates
364 Market Street
Philadelphia, PA 19104-2685

**RECEIVED**

IAUG 1 1 2000

ECFMG
AIS

*Personal and Confidential*

Dear Mr. Holmes:

An allegation has been made that a resident at Jersey Shore Medical Center/Meridian Hospitals Corporation who goes by the name of John Charles Akoda (ECFMG certificate # 0-553-258-5 in the name of John Nosa Akoda, issued August 18, 1997) has also served as a resident in two other U.S. residency programs under the name of Oluwafemi Charles Igberasi. On verifying his social security number (     -9065) we have discovered that it was issued to "Charles Igberase". When presented with this information late yesterday, this doctor stated that he has used all of these names and that he has never served in another U.S. ACGME-accredited residency program. The three birth dates given by this individual are 04/17/62, 1/1/63, and 4/17/63.

This request is that you search your files to ascertain whether there may be a <u>second</u> ECFMG certificate issued in the name of Oluwafemi Charles Igberasi (or Ibgerase) or some combination of the six names he has given us (John, Nosa, and Akoda being the other three). Also, we would be interested in knowing whether you have had requests for verification of Dr. Akoda AKA Dr. Igberasi's ECFMG certificate(s) status from other teaching hospitals including Harlem Hospital Center in the time period of approx. 1995-96 or JFK Memorial Hospital in 1997-98.

Obviously, we are concerned that we resolve this issue promptly. Your priority attention is requested.

I can be reached by phone at (732) 776-4732. My secretary is Terry Smith, and should I not be available at my private line number as listed, she can be telephoned at (732) 776-4179 in an attempt to reach me.

Thank you in advance for your cooperation.

Very truly yours,

James McCorkel, Ph.D., Vice President, Academic Affairs
Jersey Shore Medical Center, Meridian Hospitals Corporation

ECFMG-000559

JA3056
ECFMG_RUSS_0000559

Case 1:21-cv-05026-JMF Document 122-5 Filed 07/21/22 Page 8 of 22

# Exhibit 29

JA3057

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE
3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential

August 22, 2000

James McCorkel, Ph.D.
Vice President for Academic Affairs
Jersey Shore Medical Center
1945 State Route 33
Neptune, NJ 07754-0397

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. McCorkel:

This is in response to your letter of August 11, 2000 and telephone conversations of August 14 and 15, 2000. You indicated in your letter and subsequent conversations that Jersey Shore Medical Center/Meridian Hospitals Corporation is conducting an investigation whether a resident at your institution by the name of John Charles Akoda may have also served as a resident at two other institutions using the name Oluwafemi Charles Igberase. To aid in your investigation, you asked for certain information in possession of the Educational Commission for Foreign Medical Graduates (ECFMG).

According to applications submitted to ECFMG, Dr. Akoda's full name is "John Nosa Akoda." He certified his date of birth to be January 1, 1959. The medical diploma he submitted indicated he received his medical degree in 1988 from the Faculty of Medicine, University of Benin, Nigeria. This medical diploma was verified by ECFMG with the medical school. Dr. Akoda was issued ECFMG Certificate No. 0-553-258-5 on August 18, 1997. The social security number he provided ECFMG in 1998 is 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.

ECFMG also has a file for "Oluwafemi Charles Igberase." Using the name "Oluwafemi Charles Igberase," an individual submitted an application and certified his date of birth to be April 17, 1962 and his social security number as 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. The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria. This medical diploma was verified by ECFMG with the medical school. He was issued ECFMG Certificate No. 0-482-700-2 on October 4, 1993. This ECFMG Certificate was revoked in November 1995. The revocation is through July 10, 2001.

This same individual also submitted an application using the name "Igberase Oluwafemi Charles." He certified his date of birth to be April 17, 1961. He also certified on the application that he had not previously submitted an application to ECFMG and

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG-000552

JA3058
ECFMG_RUSS_0000552

James McCorkel, Ph.D.
August 22, 2000
Page 2

was assigned a new USMLE/ECFMG Identification Number 0-519-573-0. The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria. This medical diploma was verified by ECFMG with the medical school. He did not provide a social security number under this USMLE/ECFMG Identification Number. He was issued ECFMG Certificate No. 0-519-573-0 on December 14, 1994. This ECFMG Certificate was invalidated in November 1995.

ECFMG has no record of receipt of requests for verification of the ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital concerning any of these three names or USMLE/ECFMG Identification Numbers.

Thank you for bringing this matter to our attention.

Sincerely,

Stephen S. Seeling, J.D.
Vice President for Operations

SSS/wck

ECFMG-000553

JA3059
ECFMG_RUSS_0000553

# Exhibit 30

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

September 27, 2000

Memorandum

To:        File #0-553-258-5
           John Akoda

From:      William Kelly

Dr. Akoda came to the ECFMG office today.  He reiterated that he is not "Igberase Charles" and said he was his cousin.  He said he did use Charles's social security number.

Akoda provided his original Nigerian passport and Nigerian "international driving permit."  I made copies.

Akoda indicated that Jersey Shore Medical Center had suspended him pending outcome of ECFMG's investigation.  Akoda asked when his case will be reviewed.

I told him I understood Jersey Shore was conducting its own investigation.  I asked him to send me a copy of the letter he received form the hospital.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

JA3061
ECFMG_RUSS_0000556

Case 1:21-cv-05090-JMF, Document 122-5, Filed 07/01/22, Page 1172

# Exhibit 31

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 • FAX: 215-386-9767 • INTERNET: www.ecfmg.org

December 21, 2000

### Memorandum

To:        File #0-553-258-5
           John Akoda

From:      Bill Kelly

Today I spoke by telephone with Jim McCorkel, Ph.D., Jersey Shore Medical Center. Telephone: (732) 776-4732.

Dr. McCorkel advised that Dr. Akoda was dismissed from Jersey Shore Medical Center for the following reasons:

- Akoda used a false social security number when he applied to the hospital. He acknowledged he used the social security number of his cousin, Charles Igberase. He said his cousin (Igberase) had used Akoda's passport and visa to enter the United States, so Igberase allowed Akoda to use his social security number.

- The green card Akoda initailly had provided the hospital was inconsistent with a subsequent green card he also provided (different number, name, expiration date and date of birth).

Dr. Akoda was suspended August 29, 2000. He did not appeal. His official dismissal date was November 17, 2000.

Dr. McCorkel indicated that he hoped to provide this information in writing to ECFMG in the future, but it required approval form the hospital counsel. He also indicated that he expected to provide information to INS

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG-000554

JA3063
ECFMG_RUSS_0000554

# Exhibit 32

John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

August 29, 2000

RECEIVED
CREDENTIALS DEPT

SEP 1 2000

Mr. William C. Kelly
Manager, Medical Education
Credentials Department/ECFMG
3624 Market Street
Philadelphia, PA 19104

ECFMG

Re: USMILE/ECFMG Identification No. 0-553-258

Dear Mr. Kelly:

I am writing in response to your letter dated August 22, 2000 in which it was alleged that
I took ECFMC under various names. **These allegations are false.** The identification
numbers listed in your letter apparently belong to my cousin Dr. Igberase Oluwafemi
Charles, who left the country to practice, I believe, in South Africa. We are two different
persons who attended two different Colleges of Medicine. However, I did use his social
security number pending INS clearance of my own social security number. I have only
taken the examination in my name, John NOSA Akoda. I will provide you with my
country issued passport (presently submitted for renewal) if you so desire.

Thank you for your assistance with resolving this unfortunate confusion.

Sincerely,

John Akoda, MD

Transfer to Le

ECFMG-000557
JA3065
ECFMG_RUSS_0000557

# Exhibit 33

JA3066



## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

December 22, 2000

**Memorandum**

To:     Stephen S. Seeling, JD

From:   William Kelly

Subject:  Dr. John Akoda, ID No. 0-553-258-5

Attached is a copy of a Memorandum for the file.

This memorandum is being written separately since I did not think it should be made part of the official file.

In my discussion with Dr. McCorkel he indicated he believed Igberase and Akoda were one and the same person. He has no proof, just a strong suspicion. Information he received from an "informant" provided details that led him to believe this.

I also believe Akoda and Igberase are one and the same. However, at this point, the only information that we have for the ECFMG Credentials Committee is Akoda's written statement that he is NOT Igberase, although he did admit in writing that he used Igberase's social security number. He has given us a passport that appears to confirm his identity as John Akoda. I don't think this is enough for the Committee.

Igberase has not replied to my letter. The FedEx letter was returned undelivered. I tried the phone number he listed on his application and was told it was a wrong number (although the correct address). I sent Igberase an email (cfemi@hotmail.com) and who should reply, but Akoda!

Akoda still has a valid ECFMG Certificate. We need to brainstorm on this one. Maybe Shirley Williams (Miss Sherlock) could sit in.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Confidential

# Exhibit 34

JA3068



BRICK HOSPITAL
JERSEY SHORE MEDICAL CENTER
POINT PLEASANT HOSPITAL
RIVERVIEW MEDICAL CENTER

**Meridian**
*Health System*

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

November 7, 2000

State of Maryland Board of Physician Assurance
4201 Patterson Avenue, P.O. Box 2571
Baltimore, Maryland 21215

RE:  John Charles Nosa Akoda
       aka John-Charles Nosa-Igberase Akoda
       aka Charles Johnbull Nosakhare Akoda
       aka Charles N. Akoda
       aka Charles J. Akoda

To Whom It May Concern:

We have discovered in the file of John Charles Nosa Akoda, M.D., a third-year resident in Internal Medicine at Jersey Shore Medical Center, an application for initial medical licensure in the State of Maryland. That application includes a Social Security Number which Dr. Akoda has stated is not his own.

Having earlier suspended Dr. Akoda we have now made a decision to terminate him effective November 21, 2000, for reasons as specified in our letter (and attachment) to the New Jersey State Board of Medical Examiners. Dr. Akoda was afforded his due-process rights of appeal of his termination, but the time for receipt of such an appeal has now been exhausted.

Very truly yours,

*Anna Marie Sesso, M.D., M.P.H.*

Anna Marie Sesso, M.D., M.P.H.
Associate Director of Academic Affairs

Copy to:  New Jersey State Board of Medical Examiners

# Exhibit 35



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATE

324 Market Street
iladelphia PA 19104-2685 USA
5-386-5900 | 215-386-9767 Fax
w.ecfmg.org

November 22, 2006

Personal and Confidential
Via Federal Express

Charles A. Francis, M.D.
Department of the Air Force
1st Medical Operations Squadron
Langley AFB, VA 23665-2080

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Francis:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa Akoda submitted to the Educational Commission for Foreign Medical Graduates (ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have concerning Dr. Akoda such as; date of birth, medical school and medical school graduation date.

Thank you for your assistance in this matter. If you have any questions or need additional information, please contact me. My telephone number is (215) 823-2277, my fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record
Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.

ECFMG-000647

JA3071
ECFMG_RUSS_0000647



**DEPARTMENT OF THE AIR FORCE**
1st MEDICAL OPERATIONS SQUADRON
LANGLEY AIR FORCE BASE, VA

RECEIVED

OCT 0 5 2006

S.H.
10/16

ERAS

757-225-1616

October 1,2006

Re: John- Charles Nosa Akoda M.D.

LETTER OF REFERENCE

I am very pleased to write this letter of reference on behalf of the above named Physician.

Dr Akoda, "CHUCK" as we know him worked with me as an assistant from July 2005 to date.

His medical knowledge is outstanding, his application to his duties excellent and his interaction with patient and staff tremendously excellent to say the least.

He is very well liked by staff and patient.

I have personally observed and supervised this physician on numerous occasions, He stood out compared to my other assistants in terms of knowledge base and enthusiasm to learn and work.

It is my sincere opinion that he will be an asset to whatever program he is accepted into.

I have no reservation whatsoever in recommending him for his postgraduate pursuit.

Feel free to contact me at the above number 757- 764-4017 if you need more information.

Yours Sincerely,

Charles. A .Francis M.D.
(Dept Of Obstetrics and Gynecology 1st FW LAFB)

COPY
Originals required for
this document type.
ERAS Support Services

Charles A. Francis, M.D., USAF, MC
AU4675027-1194 Civilian Provider
1ST Medical Group (ACC)
Langley AFB, Virginia 23665-2080

*Global Power For America*

ECFMG-000650

JA3072
ECFMG_RUSS_0000650

 **ECFMG**™  | EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

Personal and Confidential
Via Federal Express

November 22, 2006

A.O. Roberts, M.D., MB.BS., F.R.C.S.
Department of Obstetrics and Gynecology
University of Ibadan
Ibadan, Nigeria

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Roberts:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa
Akoda submitted to the Educational Commission for Foreign Medical Graduates
(ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is
authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have
concerning Dr. Akoda such as, date of birth, medical school and medical school
graduation date.

Thank you for your assistance in this matter. If you have any questions or need
additional information, please contact me. My telephone number is (215) 823-2277, my
fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record
Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.

ECFMG-000648

JA3073
ECFMG_RUSS_0000648

**COLLEGE OF MEDICINE**
PROVOST:
PROFESSOR BABATUNDE OSOTIMEHIN
MD (Birm.) FMC Path, FWACP, FRCP (Lond)
SECRETARY:
MR. C. O. AROWOLO; J.P, LLB (Lond.), M. A., (Illinois.)
F.C.I.S.; B.L.; M.I.P.M.

OUR REF:

YOUR REF:



UNIVERSITY OF IBADAN,
IBADAN, NIGERIA.
Cables & Telegram: UNIVERSITY IBADAN
Telephone: IBADAN UCH 400010—400029
Exts. 3119, 3122, 3267

**FACULTY OF CLINICAL SCIENCES & DENTISTRY**
DEAN: PROFESSOR O. A. ADEBO M.B., B.S., (Ib.) F.R.C.S. C., Dip. A.B.S., Dip, A.B.T.S., F.A.C.S., F.W.A.C.S., F.M.C.S.

SUB-DEANS:

(Postgraduate)
Dr. F. Omokhodion
MB.BS. (Ib), M.Sc. (Lond.), Ph.D.
(Lond.) F.W.A.C.P.

(Undergraduate)
Dr. S. Kadiri
M.B., B.S. (Ib.), F.M.C.P. (Nig.),
F.W.A.C.P.

(DENTISTRY):
Dr. G. A. Aderinokun
B.D.S. (Ib.) M.P.H. (U.C.L.A.)

(FACULTY OFFICER):
E. B. Famewo (Mrs)
D.P.A. (Ife), D.S.S. (Toronto)

*Dept of Obstetrics and Gynecology*
*University Of Ibadan.*
*20 August, 2006.*

RE: Dr John-Charles Nosa Akoda,
Candidate Number 36682

LETTER OF ATTESTATION TO POSTGRADUATE STUDIES

The Doctor named above was admitted to the Residency program in
the department of Obstetrics and Gynecology as a PGY-1 on
30 June 1990.
He completed a total of two calendar years and left on his own
Volition on 31 July 1992 before completing the entire program.
While he was a Resident, he conducted himself with utmost dignity.
He was well ahead of his peers in terms of intellect. His attitude
towards learning was very commendable. His scores on the
Resident's annual aptitude test was in the 99th percentile.

Please feel free to contact my office if more Information is required.

Sincerely,

Dr A.O.Roberts.
MB.BS(IB) F.R.C.S.(ENG)
Head of Dept. Obstetrics and Gynecology.
DEPT. OF OBSTETRICS
AND GYNAECOLOGY
UNIVERSITY OF IBADAN
NIGERIA.

RECEIVED SH
OCT 0 5 2006
ERAS 10/14

ECFMG-000651
JA3074
ECFMG_RUSS_0000651



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2665 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

Personal and Confidential
Via Federal Express

November 22, 2006

Phil Robertson, M.D.
Maxicare, Inc.
P.O.Box 5036
Laytonsville, MD 20882

> Re: Dr. John Nosa Akoda
> USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Robertson:

I am enclosing a copy of a "Letter of Recommendation" that Dr. John Nosa Akoda submitted to the Educational Commission for Foreign Medical Graduates (ECFMG) Electronic Residency Application Service (ERAS).

Kindly write to me as soon as possible to advise whether the enclosed letter is authentic. Please fax a copy of your letter to me at (215) 386-9767.

In addition, please provide me with any biographic information you may have concerning Dr. Akoda such as, date of birth, medical school and medical school graduation date.

Thank you for your assistance in this matter. If you have any questions or need additional information, please contact me. My telephone number is (215) 823-2277, my fax number is (215) 386-9767 and my email address is bkelly@ecfmg.org.

Sincerely,

William C. Kelly
Director, Credentialing and Record
Services

/wck
Enclosure

ECFMG® is an organization committed to promoting excellence in international medical education.



# MAXICARE, INC.
### HEALTH CARE SERVICES

28 September, 2006

## DR JOHN-CHARLES AKODA

## LETTER OF RECOMMENDATION:

I hereby write a letter of recommendation for the Doctor referenced above.

I have known this doctor for approximately 5years through which he worked for my establishment-Maxi care Inc. in various categories including registered Nurse which licensure he obtained through our corporation.

He was very knowledgeable in the field of medicine especially reproductive medicine which he was quick to unassumingly reminded me that he had a 2year residency program in hence he knew a little more than the rest of the staff.
He was very modest, very professional with his staff and patients, everybody loved him.
He was usually the first to arrive at the office and the last to leave.
He had a very voracious appetite for learning and he is well verse about life in general.

Without hesitation or reservations, I write this letter knowing what a brilliant Physician he is.

For questions, please contact me at 301-802-0481.

Thank you,

Phil Robertson M.D.
(Medical Director)

**RECEIVED** SH
OCT 0 5 2006
ERAS  10/16

P.O.BOX 5036. Laytonsville, Maryland 20882. Tel:301-802-0481 Fax:757-238-3267

MG-000652

JA3076
ECFMG_RUSS_0000652

# Exhibit 36

JA3077



HOWARD
UNIVERSITY
HOSPITAL

2041 Georgia Avenue, N.W.
Washington, D.C. 20060

202/865-6100
202/745-3731 fax

March 16, 2007

John-Charles Akoda, M.D.
P.O. Box 744
Carrolton, VA 23314

Dear Dr. John-Charles Akoda:

The Department of Obstetrics and Gynecology at Howard University is pleased to inform you that you have matched for the categorical first year postgraduate position for the academic year 2007-2008. It is requested that you submit evidence of legal residence in the United States to the office a soon as possible.

Please contact Dr. Grace Ansah at Howard University International Services 202.806.7517, if there is a need for you to be sponsored for an H-1 Visa.

All residents will receive from the department a contract that enumerates compensation, benefits and the responsibilities of both parties, yourself and Howard University Hospital, the hospital's orientation packet from the Graduate Medical Education Office, as well as a packet from Howard University Hospital, Human Resources Department in the near future.

Please sign below to accept this offer and attach information that will confirm the most appropriate mailing address and telephone numbers and a current email address that will allow us to maintain contact with you. You may fax your signed letter back to the attention of Ms. Angela Taylor, at 202.865.4171 and mail the hard copy.

Congratulations and welcome to the Howard University Hospital family.

Sincerely,

Olanrewaju Adeyiga, M.D.
Chair and Program Director
Department if Obstetrics and Gynecology

Accept:

Date: 3/26/07

**HU 000256**

JA3078

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' NOTICE OF EXHIBITS

Filed along herewith, please find Exhibits 37 to 76 to Defendant Educational Commission for Foreign Medical Graduates' Statement of Undisputed Material Facts (ECF No. 85).

Dated: December 10, 2021

/s/ Matthew D. Klayman
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA3079

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

Dated: December 11, 2021                   */s/ Matthew D. Klayman*
                                            Matthew D. Klayman

JA3080

# Exhibit 37

JA3081

HOWARD UNIVERSITY HOSPITAL AND AFFILIATED HOSPITALS
WASHINGTON, DISTRICT OF COLUMBIA

THIS IS TO CERTIFY THAT

# JOHN-CHARLES NOSA AKODA, MD

HAS SATISFACTORILY COMPLETED FOUR YEARS
OF POSTGRADUATE MEDICAL EDUCATION IN

# DEPARTMENT OF OBSTETRICS AND GYNECOLOGY

THROUGH OUR TRAINING PROGRAMS AT HOWARD UNIVERSITY.

JULY 1, 2007 - JUNE 30, 2011



DIRECTOR, GRADUATE MEDICAL EDUCATION

PROGRAM DIRECTOR

PRESIDENT OF THE UNIVERSITY

SECRETARY OF THE UNIVERSITY

**HU 000016**

Howard University Hospital0000000016

JA3082

# Exhibit 38



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000123578941
Process Date: 05/05/2017
Page: 1    of    3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

## AKODA, CHARLES JOHN

### DEPARTMENT OF HEALTH PROFESSIONS

**STATE LICENSURE ACTION**      **Date of Action: 04/25/2017**

| Initial Action | Basis for Initial Action |
|---|---|
| - SUSPENSION OF LICENSE | - CRIMINAL CONVICTION |

| **A. REPORTING ENTITY** | | |
|---|---|---|
| | Entity Name: | DEPARTMENT OF HEALTH PROFESSIONS |
| | Address: | 9960 MAYLAND DR STE 300 |
| | | PERIMETER CENTER |
| | City, State, Zip: | RICHMOND, VA 23233-1485 |
| | Country: | |
| | Name or Office: | JAMES L. BANNING, DIRECTOR |
| | Title or Department: | ADMINISTRATIVE PROCEEDINGS DIVISION |
| | Telephone: | (804) 367-4402 |
| | Entity Internal Report Reference: | 177618 |
| | Type of Report: | INITIAL |

| **B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)** | | |
|---|---|---|
| | Subject Name: | AKODA, CHARLES JOHN |
| | Other Name(s) Used: | |
| | Gender: | UNKNOWN |
| | Date of Birth: | |
| | Organization Name: | |
| | Work Address: | |
| | City, State, ZIP: | |
| | Organization Type: | |
| | Home Address: | |
| | City, State, ZIP: | |
| | Deceased: | NO |
| | Federal Employer Identification Numbers (FEIN): | |
| | Social Security Numbers (SSN): | |
| | Individual Taxpayer Identification Numbers (ITIN): | |
| | National Provider Identifiers (NPI): | |
| | Professional School(s) & Year(s) of Graduation: | BENIN U-NIGERIA (1987) |
| | Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| | State License Number, State of Licensure: | 0101250081, VA |
| | Specialty: | UNSPECIFIED |
| | Drug Enforcement Administration (DEA) Numbers: | |
| | Unique Physician Identification Numbers (UPIN): | |
| | Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| | Business Address of Affiliate: | |
| | City, State, ZIP: | |
| | Nature of Relationship(s): | |

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL      ABOG_nonparty_JA0084

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000123578941
Process Date: 05/05/2017
Page: 2   of   3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

| | |
|---|---|
| **C. INFORMATION REPORTED** | |
| Type of Adverse Action: | STATE LICENSURE |
| Basis for Action: | CRIMINAL CONVICTION (19) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | DHP OF VA ACTION |
| Adverse Action Classification Code(s): | SUSPENSION OF LICENSE (1135) |
| Date Action Was Taken: | 04/25/2017 |
| Date Action Became Effective: | 04/25/2017 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Agency Action: Mandatory Suspension.   Virginia License Number: 0101250081.     A printable copy of the order detailing this case can be found by selecting the license look up at the Virginia Department of Health Professions website. When you get to the license look up page, enter the Virginia License Number listed above in the License Number field in License Look Up, then click the Search button. The public information for that licensee will be displayed. If a red YES appears under the Additional Public Information heading, click on it and follow the links to access the Order. If you do not have web access, you can telephone 804 367 4444 to provide the license number and a copy of the Order will be mailed to you. |
| Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of Patient(s)?: | NO |

☐ Subject identified in Section B has appealed the reported adverse action.

| | |
|---|---|
| **D. SUBJECT STATEMENT** | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |

| | |
|---|---|
| **E. REPORT STATUS** | Unless a box below is checked, the subject of this report identified in Section B has not contested this report. |

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL                    ABOG_nonparty_JA3085



NATIONAL PRACTITIONER DATA BANK

**NPDB**

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000123578941
Process Date: 05/05/2017
Page: 3 of 3
AKODA, CHARLES JOHN
For authorized use by:
AMERICAN BOARD OF OB/GYN

At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:     05/05/2017
Date of Most Recent Change:     05/05/2017

**F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK**

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

The Data Bank attempted to notify the Subject Identified in Section B on 05/05/2017 at the address below, but the attempt was unsuccessful.

14909 DOWNEY CT
BOWIE, MD 20721

**This report is maintained under the provisions of:** Section 1921

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

——————————————— **END OF REPORT** ———————————————

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

CONFIDENTIAL                    ABOG_nonparty JA3086

# Exhibit 39

JA3087

711179

| Initial Medical Licensure PERSONAL INFORMATION 10/2009 INT | STOP! Completed application and check must be mailed to: **MARYLAND BOARD OF PHYSICIANS** P.O. Box 37217 • Baltimore, MD 21297 Telephone: 410-764-4777   Fax: 410-358-1298   Toll Free: 800-492-6836 | FOR BANK USE ONLY |
|---|---|---|

**APPLICATION FOR INITIAL MEDICAL LICENSURE**

FOR BANK USE ONLY
Date _____
Check Number _____
Amt Paid _____ 890
Name Code _____
ApplID 17

Please print legibly or type the required information. Do not leave any item unanswered. If an item does not apply to you, write "N/A" (Not Applicable) for that item. An incomplete application form will delay the processing of your application.

**1.** Your Complete Current Legal Name: As listed on your U.S. birth/marriage certificate, U.S. passport, or most recent document issued by the INS.

Last name and generational indicator (Jr., Sr., II, III, etc.):

A K I O D I A

First name and middle name:

C H A R L E S   J O H N   N O S A

(If applicable, please check a box and complete below)  ☐ Complete Maiden Name OR  ☐ Complete Former Name

**Stop!** If any credential you submit bears a name other than your current legal name as listed above, or if you have been licensed in another state under any name other than your current legal name, sign and date an attachment which includes each different name, an explanation of why the name differs from your current legal name, and a copy of the legal document to support the name change.

**2.** Public Address: Your public address of record. This address, usually your office, is available to the public and will be posted on the internet.

Street Address: If you change your address prior to being licensed, immediately notify the Board in writing.

City                          State          Zip Code

**3.** Non-Public Address: This address, usually your home, is for Board use only. However, if no public address is listed, this address will be made public.

Street Address: (Do NOT use a P.O. Box) If you change your address prior to being licensed, immediately notify the Board in writing.

City                          State          Zip Code

**4.** Telephone (s): Home                     Office:

Cell/Pager:                    E-mail address:

**5.** Date of Birth:   Month   Day   Year        **6.** Gender:   ☒ Male   ☐ Female

**7.** Race: Multiracial applicants may select all applicable categories  ☐ American Indian or Alaska Native  ☐ Asian  ☒ Black or African American  ☐ Native Hawaiian or other Pacific Islander  ☐ White

Ethnicity:  ☐ Hispanic or Latino  ☐ Not Hispanic or Latino

**8.** Social Security Number:

| For Board Use Only | License Number: | D 7 3 0 4 9 | BPQA School Code: | 6 9 0 9 0 6 |
|---|---|---|---|---|
| | Date Issued: | 0 9 4 1 1 | Federation School Code: | 6 9 0 0 0 3 |
| | Licensed By: | Dr. Fu | Licensing Exam: | U.S. |

JA3088

10/2009 INT          Name: CHUKWU JOHN IVOSA          Date: 7/28/11

**10. MEDICAL EDUCATION:** List all medical schools you have attended

University OF BENIN COLLEGE
OF MEDICINE, NIGERIA          From: MM/YY to MM/YY  06/82 - 06/87

Medical School From Which You Received Your Medical Degree: University OF BENIN, Nigeria

Name of University Affiliation (if applicable): * _____

Street Address: 01 QUEEN Elizabeth Rd, Mokola, Ibadan

City: _____ State/Province: _____ Country of citizenship during medical education: Nigerian

Language(s) of Instruction: ENGLISH

Type of Degree: ☐ M.D.   ☐ D.O.   ☐ M.D./Ph.D   ☒ M.B.B.S.   ☐ M.B.B.Ch   ☐ Other: ____ (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc.
Was Conferred: was satisfied.          Month ☐0☐6   Day ☐3☐0   Year ☐8☐7   ✗ D.O.G. 1988  correct

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada)
Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and
   Examinations Taken, Good Conduct Certificate or intern Certificate. The certificate must include your name,
   name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs
and submit one of the following documents to support the name change; Passport, INS card, birth certificate, court document, marriage
license, court decree.

**11.** How have you satisfied Maryland's *written and oral* English language competency requirements?
(See *English Language Competency Requirements for Medical Licensure in Maryland* in the introductory material included with your
application.)

a. ☒ I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate
college, or university where English was the *only* language of instruction throughout (you must provide documentation); or

b. ☐ I passed either ☐ the TOEFL or ☐ the ECFMG English test after December 31, 1973 AND I passed the ☐ TSE or ☐ OPI.
If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral
Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification
of your scores directly to the Board;

c. ☐ I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? ☒ NO ☐ YES      If "YES," please write or call the Board for additional information.

JA3089

Print
Your
Name: Charles John Nosa A Koda   Date: 7/28/11

**12.** POSTGRADUATE TRAINING (DO NOT ATTACH RESUME OR CURRICULUM VITAE.) List in chronological order ALL postgraduate training undertaken in the United States, its territories or possessions, Puerto Rico, or Canada regardless of whether you did or did not complete the program, and regardless of whether you were or were not compensated. (Copies of training certificates are helpful, but not required.)

NOTE: On a case by case basis, the Board may consider full time teaching in an LCME accredited medical school in the United States as an alternative to the accredited postgraduate clinical medical education required in the Code of Maryland Regulations 10.32.01.03D. Applicants who intend to request consideration of teaching experience as an alternative to accredited postgraduate clinical medical education should contact the Board's licensure division for further information.

Effective October 1, 2000, graduates of all medical schools NOT in the U.S., its territories or possessions, Puerto Rico, or Canada are required to submit evidence acceptable to the Board of successful completion of 2 years of training in a postgraduate clinical medical education program accredited by an accrediting organization recognized by the Board (ACGME, AOA, or equivalent). If you have not met this requirement, DO NOT submit this application.

A Fifth Pathway Program graduate must have been a U.S. citizen during the time of medical education and must have successfully completed two years of ACGME accredited postgraduate clinical medical education after successfully completing a Board approved Fifth Pathway program. If you have not met these two criteria, DO NOT SUBMIT THIS APPLICATION.

If after 10/11/92 you passed any medical licensing exam (or part, step, or component thereof) that you failed three times, either before or after 10/11/92, then you must successfully complete another year of ACGME/AOA accredited clinical postgraduate training in addition to the year(s) usually required by Maryland. All of the additional year must have begun after the date of the last fail. Teaching will not be accepted as an alternative to a year required following three or more fails. If you have not met this requirement, DO NOT submit this application. If you failed any part, step, or component of a medical exam four times, DO NOT SUBMIT THIS APPLICATION; you are not eligible for medical licensure in Maryland.

**NOTE: Postgraduate training program cycles usually run from July 1 to June 30. If the dates of your postgraduate training are not within the usual cycle, fall short of the complete cycle, or extend beyond the usual cycle, please attach a complete explanation of why your training was "off-cycle."**

| PG Year # | Place of Training: | HOWARD HOSPITAL | | | month | year | TO | month | year |
|---|---|---|---|---|---|---|---|---|---|
| 4 | | | | | 0 6 | 0 7 | | 0 6 | 1 1 |
| | Address: 2041 Georgia Ave NW DC 20060 | | Specialty: OBGYN | | Accredited by: ACGME ☑ AOA ☐ RCPSC ☐ | | | | |
| PG Year # | Place of Training: | | | | month | year | TO | month | year |
| | Address: | | Specialty: | | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | | | |
| PG Year # | Place of Training: | | | | month | year | TO | month | year |
| | Address: | | Specialty: | | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | | | |
| PG Year # | Place of Training: | | | | month | year | TO | month | year |
| | Address: | | Specialty: | | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | | | |
| PG Year # | Place of Training: | | | | month | year | TO | month | year |
| | Address: | | Specialty: | | Accredited by: ACGME ☐ AOA ☐ RCPSC ☐ | | | | |

**(ATTACH A SEPARATE SIGNED AND DATED PAGE IF ADDITIONAL SPACE IS NEEDED)**

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

JA3090



Just Finished residency.

13. **Hospital Privileges After Postgraduate Training:** Please list all hospitals where you have had privileges or have provided services after the completion of your postgraduate training for the five year period preceding the filing of this application. Copy this page if more space is needed and enclose each signed and dated addition.

Initial Medical Licensure
HOSPITAL PRIVILEGES
10/2009 INT

Print Your Name: Charles John Nosa Akoda   Date: 7/28/11

Page 6 of 11

| Initial Medical Licensure **MEDICAL EXAMS** 10/2009 RT | Print Your Name: Charles John Nosa Akoda Date 7/28/11 | Page **7 of 11** |

14. **Medical Licensing Examinations** (USMLE, NBME, NBOME, FLEX, FLEX-Weighted Average, Medical Council of Canada, and licensing exams given by individual states prior to January 1, 1985) DO NOT SUBMIT THIS APPLICATION until you have received written verification of having passed all parts, steps, or components of your medical licensing examinations.

Identify below ALL the medical licensing examinations that you have ever taken. Ask the administering authority of each exam to send the complete medical licensing examination history and scores directly to this Board. In each examination category below, you will find information to help you contact the administering authority.

a. Have you ever failed any medical licensing examination (or part, step, or component thereof)?   **NO**

b. Have you failed any medical licensing examination (or part, step, or component thereof) three or more times?   **NO**

If you answered "Yes" to a. and b., you must have successfully completed another year of ACGME-accredited clinical postgraduate training, in addition to the year(s) of training usually required for licensure in Maryland. No part of the additional year may have been taken before the date of the last fail. If you have not met this requirement, you are not eligible for licensure in Maryland at this time. DO NOT submit this application until you have fulfilled this requirement.
IF YOU HAVE FAILED ANY PART, STEP, COMPONENT OR APPROVED EXAMINATION COMBINATION MORE THAN 3 TIMES, You may not be eligible for medical licensure in Maryland. For a complete explanation see COMAR 10.32.01.03 Licensure—Qualifications for Initial Licensure

---

a. **State Board Examination** List state(s):_____ N/A
STATE BOARD DOES NOT INCLUDE STEP 3 OF USMLE, ORAL EXAMS, OR INTERVIEWS. State Board Examinations were licensing exams given by individual states. State Board Examinations taken after December 31, 1984 are not accepted for licensure in Maryland.
Send a copy of MBP IML7, *State Board Licensure and Examination Certification*, form to the state(s) which administered your licensing exam and ask the state(s) to send your exam results directly to the Maryland Board of Physicians. Also send a copy to each state that has ever issued you a license. NOTE: Many states charge a fee for exam transcripts. Contact each state board prior to sending form IML7, as all fees are the responsibility of the applicant.

---

**Federation of State Medical Boards** (See Page 8 if you took a combination of these exams or combined either with the NBME exams)

b. ☐ **FLEX-Weighted Average:** All FLEX-Weighted exams prior to 1985 must have been taken in one sitting (3 consecutive days). Flex weighted average exams taken in more than one sitting must have current ABMS or AOA Board Certification unless you are currently certified by a member board of the American Board of Medical Specialties.

c. ☐ **FLEX Components 1 and 2:** Examinations must be passed within 5 years of each other.

d. ☒ **USMLE Steps 1, 2, and 3:** Passing scores on all parts must have been completed within a 10-year period beginning with the month and year when the applicant first passed either step 1 or step 2.
If you took any of the above examinations you must ask the Federation of State Medical Boards (FSMB) to send your transcripts to the Board by accessing their website at www.fsmb.org. Click transcript requests.

---

e. ☐ **National Board of Medical Examiners** (See Page 8 if you combined this examination with FLEX or USMLE exams)
If you have received NBME certification, ask NBME to send to the Board both the Endorsement of Certification *and* the Record of Scores. All requests must be made through the NBME website at http://www.nbme.org or call 215-590-9592. If you took NBME exams but were not certified, or you took NBME as part of hybrid exams, ask NBME to send only your Record of Scores.

---

f. ☐ **National Board of Osteopathic Medical Examiners** Certifications issued before January 1, 1971 are not accepted for licensure in Maryland. If you have received NBOME certification, ask NBOME to send to this Board the verification of certification and the complete history of your medical examinations. Contact NBOME at 773-714-0622 for instructions and fee information.

---

g. ☐ **Medical Council of Canada**
Licentiate of the Medical Council of Canada
Please request that verification of your Licenciate Certification and a complete LMCC examination history be sent directly to this Board. Call MCC at 613-521-6012 for instructions and fee information.

---

CONTINUED ON PAGE 8

JA3092

| Initial Medical Licensure<br>MEDICAL EXAMS<br>10/2000 INT | Print<br>Your<br>Name: Charles John Nosa Akoda Date: 7/28/11 | Page<br>8 of 11 |

## HYBRID EXAMINATIONS

The following combinations are the only hybrid examinations accepted by the Maryland Board.

Passing scores on all parts of hybrid examinations must have been completed within a 10-year period, beginning with the month and year the examinee first passes a part or component or step of the combined examination. ALL HYBRID EXAMINATIONS MUST HAVE BEEN COMPLETED BEFORE JANUARY 1, 2000.

h. ☐ USMLE 1 + NBME II + NBME III

i. ☐ USMLE 1 + USMLE 2 + NBME III

j. ☐ USMLE 1 + NBME II + USMLE 3

k. ☐ NBME I + USMLE 2 + USMLE 3

l. ☐ NBME I + USMLE 2 + NBME III

m. ☐ NBME I + NBME II + USMLE 3

n. ☐ FLEX 1 + USMLE 3

o. ☐ FLEX 2 + USMLE 1 + NBME II

p. ☐ FLEX 2 + USMLE 1 + USMLE 2

q. ☐ FLEX 2 + NBME I + USMLE 2

r. ☐ FLEX 2 + NBME I + NBME II

- If your hybrid exams included any part of the NBME examination, contact NBME at http://www.nbme.org or call 215-590-9592 for instructions and request that your Endorsement of Certification *and* your Record of Scores be sent directly to the Maryland Board of Physicians.

- If your hybrid exams included only FLEX and USMLE examinations, request your transcript from the Federation of State Medical Boards at www.fsmb.org.

## 15. Licensing History:

a. ☐ I have never been licensed in the U.S., its territories, or Puerto Rico and have never been licensed or registered in Canada.

b. ☒ I have an application for license pending in the following states: LA _____ _____ _____

c. Please list below all licenses ever issued to you by a U. S. state/territory or Puerto Rico. Also list all Canadian licenses and registrations.

d. Has any disciplinary action ever been taken against your license? ☒ No ☐ Yes   If yes, please enclose an explanation.

| STATE<br>(Or Puerto Rico or<br>Canadian Province) | LICENSE NUMBER<br>or<br>Registration Number | CURRENT STATUS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Active | Inactive | Expired/Lapsed | Surrendered in<br>good standing | Surrendered /<br>Suspended | Revoked |
| Virginia | 0101250081 | ✓ | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(If more space is needed, please attach an additional signed and dated sheet.)

MARYLAND BOARD OF PHYSICIANS AUG 1 2011 RECEIVED

JA3093

| Initial Medical Licensure SPEX, Character/Fitness 10/2008 P/T | Print Your Name: | Charles John Nosa AKODA  Date: 7/28/11 | Page 9 of 11 |

**16.** Check YES or NO.

☑ ☐ Did you successfully complete a medical licensing exam (USMLE, NBME, etc.) within the 15-year period prior to filing this application?

☑ ☐ During the past 10 years, have you maintained uninterrupted licensure since you were first issued a license in the United States, its territories, Puerto Rico, or Canada?

☐ ☑ Do you have lifetime certification from, or within the past 10 years have you been certified or recertified by, a specialty board recognized by the American Board of Medical Specialties, the American Osteopathic Association, or the Royal College of Physicians and Surgeons of Canada?

If "YES," in which specialty were you certified? _____ Date certified _____

⇒ If you have answered "NO" to all three of the above questions, you MUST take the Special Purpose Examination. After you submit this application, contact the Federation of State Medical Boards at 817-571-2949 and arrange to take the SPEX in Maryland and have scores sent to the Maryland Board directly.

**17.** Character and Fitness Questions (Check either YES or NO)

| | YES | NO | |
|---|---|---|---|
| a. | | | Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, denied your application for licensure, reinstatement, or renewal? |
| b. | | | Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, taken action against your license? Such actions include, but are not limited to, limitations of practice, required education admonishment, reprimand, suspension, or revocation. Refer to the document Grounds for Board Action in Maryland at the Board's website www.mbc.state.md.us. |
| c. | | | Has any licensing or disciplinary board in any jurisdiction (including Maryland), or a comparable body in the armed services, filed any complaints or charges against you or investigated you for any reason? |
| d. | | | Have you ever withdrawn your application for a medical license or other health professional license? |
| e. | | | Has a hospital, related health care institution, HMO, or alternative health care system investigated you or brought charges against you? |
| f. | | | Has a hospital, related health care facility, HMO, or alternative health care system denied your application for, or failed to renew your privileges; or limited, restricted, suspended, or revoked your privileges in any way? |
| g. | | | Have you committed a criminal act to which you pled guilty or nolo contendere, or for which you were convicted or received probation before judgement? |
| h. | | | Have you committed an offense involving alcohol or controlled dangerous substances to which you pled guilty or nolo contendere, or which you were convicted or received probation before judgement? Such offenses include, but are not limited to, driving while under the influence of alcohol and/or controlled dangerous substances. |
| i. | | | Excluding minor traffic violations, are you currently under arrest or released on bond, or are there any current or pending charges against you in any court of law? |
| j. | | | Do you illegally use drugs? |
| k. | | | Do you have any physical or mental condition that currently impairs your ability to practice medicine or that would cause reasonable questions to be raised about your physical, mental, or professional competency? |
| l. | | | Have you ever been named as a defendant in a medical malpractice action? |
| m. | | | Are you in default of a service obligation that you incurred by receiving State or federal funds for your medical education? |
| n. | | | Have you failed to make arrangements to satisfy State or Federal loans that financed your medical education? |
| o. | | | Have your employment by any hospital, HMO, other health care facility or institution, or military entity been terminated for disciplinary reasons? |
| p. | | | Have you voluntarily resigned from any hospital, HMO, other health care facility, or institution, or military entity while under investigation by that institution for disciplinary reasons? |
| q. | | | Has use of drugs and/or alcohol ever resulted in an impairment of your ability to practice your profession? |
| r. | | | Have you surrendered your license or allowed it to lapse while you were under investigation by any licensing or disciplinary board of any jurisdiction or any entity of the armed services? |

⟫⟫ If you answered "YES" to any of the questions in item 17, on the following page please list all adverse actions taken against you and provide a complete explanation. Attach any supporting documentation that applies (copies of all complaints, malpractice claims, adverse or disciplinary actions, arrests, pleadings, judgements, or final orders). Sign and date all pages submitted.

JA3094

medical Boards, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to signany subsequent release for information that may be requested by the Board.

_Charles John Nosa Akoda_     _Charles Akoda_    7/28/11

Applicant's Name (Printed)                        Applicant's Signature            Date

**20. (OPTIONAL) Third Party Release:** Although the Board encourages you to complete all aspects of your application on your own, if you plan to use an intermediary to receive information about the status of your application, please complete this release.

I agree that the Maryland Board of Physicians may release any information pertaining to the status of my application to the following person:

Name: _____ N/A _____

Phone: _____                   Applicant's Signature          Date

**21.** I agree that I will cooperate fully with any request for information or with any investigation related to my medical practice as a licensed physician in the State of Maryland, including the subpoena of documents or records or the inspection of my medical practice.

During the period in which my application is being processed, I shall inform the Board within 30 days of any change to any answer I originally gave in this application, any arrest or conviction, any change of address or any action that occurs based on accusations that would be grounds for disciplinary action under Md. Code Health Occ. § 14-404.

                                  7/28/11

Applicant's Signature                               Date

**22. Affidavit:** To be completed by the applicant in the presence of a notary public after the applicant's picture has been attached below.

I certify that I have personally reviewed all the responses to items 1-22 of this application and that the information I have given is true and accurate to the best of my knowledge. I understand and agree that I may not practice, attempt to practice or offer to practice medicine in Maryland unless licensed bythe Board.

_____           8/3/11

Applicant's Signature              Date

STATE OF _Maryland_

CITY/COUNTY OF _Prince George's_

I HEREBY CERTIFY that on this _3rd_ day of _August_, 20_11_, before me, a Notary Public of the State and City/County aforesaid, personally appeared the Applicant, _Charles Akoda_, whose likeness is identifiable as that of

(print applicant's name)

the person in the photograph attached to this application and who has made oath in due form of law to be the person referred to in the above

application for license to practice Medicine and Surgery in the State of Maryland, and to have stated the

truth in all statements made in this application.

AS WITNESS my hand and notorial seal. _____

                             Notary Public

My Commission expires: _03-25-2012_        **SEAL**

GEORGE E. OKAI
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY, MARYLAND
MY COMMISSION EXPIRES 3-25-2012

STOP! Completed application and check must be mailed to Maryland Board of Physicians, P.O. Box 37217, Baltimore, Maryland 21297

JA3095



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October* 1987

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE-CHANCELLOR

JA3096

# EDUCATIONAL COMMISSION
## for
# FOREIGN MEDICAL GRADUATES

CERTIFIES THAT

— **JOHN NOSA AKODA**

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

RECEIVED AND HAS BEEN AWARDED THIS CERTIFICATE.

AUG 1 1 2011

CERTIFICATE NUMBER **0-553-258-5**

MARYLAND BOARD OF PHYSICIANS
MEDICAL EXAMINATION

| | |
|---|---|
| BASIC SCIENCE | JUNE 11, 1997 |
| CLINICAL SCIENCE | AUGUST 28, 1996 |
| ENGLISH EXAMINATION | AUGUST 28, 1996 |
| VALID THROUGH | |

**CERTIFICATE NUMBER**
0-553-258-5
**ENGLISH EXAMINATION**
August 28, 1996
**VALID INDEFINITELY**

_____
CHAIRMAN, BOARD OF TRUSTEES

_____
PRESIDENT, CHIEF EXECUTIVE OFFICER

DATE ISSUED  AUGUST 18, 1997

JA3097

HOWARD UNIVERSITY HOSPITAL AND AFFILIATED HOSPITALS

WASHINGTON, DISTRICT OF COLUMBIA

THIS IS TO CERTIFY THAT

# JOHN-CHARLES NOSA AKODA, MD

HAS SATISFACTORILY COMPLETED FOUR YEARS

OF POSTGRADUATE MEDICAL EDUCATION IN

## DEPARTMENT OF OBSTETRICS AND GYNECOLOGY

THROUGH OUR TRAINING PROGRAMS AT HOWARD UNIVERSITY.

JULY 1, 2007 - JUNE 30, 2011

DIRECTOR, GRADUATE MEDICAL EDUCATION

PROGRAM DIRECTOR

PRESIDENT OF THE UNIVERSITY

SECRETARY OF THE UNIVERSITY

JA3098



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October 1987*

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

REGISTRAR

VICE-CHANCELLOR



JA3099

| Initial Medical Licensure<br>Supplemental Form<br>MBP IML3<br>10/2000 INT | MARYLAND BOARD OF PHYSICIANS<br>4201 Patterson Avenue ■ P.O.Box 2571<br>Baltimore, Maryland 21215-0095<br>Telephone: 410-764-4777  800-492-6836 | Side A |

**VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION**

Vac a poved 7/08 9/ff 9/6/2011

**Part 1** APPLICANT: Complete Part 1 and sign where indicated in the Part 2 instructions.  Print your name on top of the reverse page and send a form to the director of each postgraduate training program you attended. Be sure to copy both sides.

**a. Applicant's Name:** AKODA   CHARLES   JOHN   NOSA
Last Name and Generational Indicator (Jr., Sr., II, III, etc.)          First Name          Middle Name

**Address:**

**City:** _____  **State:** Y

**Date of Birth:** [ Month  Day  Year ]  **Social Security Number:** _____

**b. Name of Institution:** HOWAR UNIVERSITY HOSPITAL

**Department and Area of Training:** OBSTETRICS AND GYNECOLOGY

**Complete Address:** 2041 Georgia Avenue, NW

**City:** Washington   **State:** DC

**FROM:** [ 0 7 ] [ 0 7 ]  **TO** [ 0 6 ] [ 1 1 ]
Month  Year     Month  Year

**Part 2** POSTGRADUATE TRAINING PROGRAM DIRECTOR: Please complete Part 2 according to the records available and send directly to the Maryland Board of Physicians at the above address. Please do not send original or copies to me.     Applicant's Signature _____

1. Did the applicant participate in postgraduate training in your department during the period listed above?*
[✓] YES   [ ] NO   If "No," please enter exact dates: _____ to _____

Program Specialty: OBGYN

*If training was part-time, please explain the training schedule after item 8 of this form.

2. During the time of the applicant's participation, was the postgraduate training program accredited?  [✓] YES   [ ] NO

Accredited by: [✓] ACGME: Program # 2201021065   [ ] AOA: ID #: _____   [ ] RCPSC

3. Did the applicant participate in all of the components of the training as required by the accrediting body?
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

4. Did the applicant successfully complete all requirements of each year of training?
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

5. During the applicant's year(s) of training, did the applicant have any break in training?
[✓] NO   [ ] YES   Comments (attach signed and dated additions as needed): _____

JA3100

Print
Your
Name: Charles John Nosa Akoda   Date: 7/28/11

**18 a.** If you answered "YES" to any of the questions in item 17, please provide an explanation below and attach all complaints, pleadings and judgments. Attach additional signed and dated pages as needed.

**18 b.** If you answered yes to 17L - answer the following questions:

1. Total number of malpractice claims ever filed in which you were named as a defendant?_____

2. Total number of malpractice claims ever paid (settlement / judgment) in which you were named as a defendant? _____

3. Within the last 60 months (5 years) provide the following:
   Total number of medical malpractice claims filed _____ ; paid (settlement / judgment ) _____ ; or dismissed _____ ; in which you were named as a defendant.

4. For a claim filed at any time, but paid (settlement / judgment) within the last 60 months (5 years), list each claim by claimants name; describe the disposition of each claim; and provide a copy of the complaint, pleading, and judgment of each medical malpractice claim.

N/A

RECEIVED
AUG 1 1 2011
MARYLAND BOARD OF PHYSICIANS

I have attached the following number of pages to this application:_____

JA3101

**9. Chronology of Activities: DO NOT ATTACH RESUME OR CURRICULUM VITAE**

Beginning with the date you completed medical school and continuing through the present, list chronologically all of your activities. Account for all periods of time including each post-graduate training program you attended, regardless of whether or not you completed the program; each job you held, regardless of whether or not it was medically related or you were compensated; and any period of unemployment.

| Date Medical School was Completed: | month | year |
|---|---|---|
| | 06 | 87 |

Activities after completing medical school: Please type or print.

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 06 | 07 | TO | 06 | 11 | OBGYN RESIDENCY |

Address: HOWARD HOSP 2041 GEORGIA AVEN. NW DC 20060

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 01 | 05 | TO | 06 | 07 | MAXICARE INC    PHYSICIAN Assistant |

Address: P.O. BOX 5036, Laytonsville MD 20882

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 05 | 00 (2000) | TO | 12 | 04 | MEDICAL DIRECTOR Vita Med ctr |

Address: Port Harcourt, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 07 | 92 | TO | 04 | 00 | MEDICAL OFFICER |

Address: Gen Hosp Ughelli, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 06 | 90 | TO | 06 | 92 | Resident OBGYN |

Address: University of Ibadan, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 01 | 89 | TO | 05 | 90 | Medical officer |

Address: Gen. Hosp. Benin City, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| 07 | 87 | TO | 12 | 88 | Internship |

Address: Gen. Hosp. Warri, Nigeria

| month | year | | month | year | Activity: |
|---|---|---|---|---|---|
| | | TO | | | |

Address:

CONTINUED ON PAGE 3: If you will need more space than page 3 allows, please photocopy page 3 for your use or attach a separate sheet. Please sign and date each sheet you attach.

www.ecfmg.org

MARYLAND BOARD OF PHYSICIANS
WILLIAM CALHOUN
4201 PATTERSON AVE., 4TH FLOOR
BALTIMORE, MD, 21215-0095

**State Board Code:**
**021**
Please include this
number on all requests

## ECFMG® CERTIFICATION STATUS REPORT

USMLE™/ECFMG Identification Number: 0-553-258-5
Applicant's Name: JOHN NOSA AKODA
Applicant's Date of Birth: 01/01/1959
ECFMG Certified: Yes
    Certificate Issue Date: 08/18/1997
    English Test Valid Through: Valid Indefinitely

| Passing Performance on Medical Science Examinations: | | Two Digit Score | Three Digit Score |
|---|---|---|---|
| Examination | Date | | |
| USMLE Step 1 | 11 Jun 1997 | * | * |
| USMLE Step 2 CK | 28 Aug 1996 | * | * |

Most Recent Passing Performance on Clinical Skills Examination:

| Examination | Date |
|---|---|
| Not Required for Certification | |

Most Recent Passing Performance on English Test: AUG 1996
Name of Medical School and Country: University of Benin College of Medicine, Benin, NIGERIA

Degree Year: 1988
† Medical Education Credentials Status: Complete
This information is reported directly from ECFMG computer records and is current as of 09/14/11.

### How to Verify the Authenticity of this Report:

This report was issued to the named recipient on the date shown below. To verify the authenticity of this report, visit https://cvsonline2.ecfmg.org/verify/verify.aspx and enter the unique verification code at the bottom of the report. The information contained in this report is current as of the issue date. Any changes to the physician's status after the issue date will not be reflected, and you are encouraged to request an updated report.

The purpose of this Status Report is to indicate whether this individual is certified by ECFMG. It reflects only examinations that were used to fulfill requirements for ECFMG Certification. The most recent passing performance on the clinical skills examination is reflected, regardless of whether this individual was required to take a clinical skills examination for ECFMG Certification. This Status Report is not a complete score history of all examinations for this individual. This Status Report does not include examinations that were taken but not passed. Furthermore, if this individual passed examinations that were not used to fulfill the requirements for ECFMG Certification, these examinations are not included.
* To obtain a complete history of and scores for USMLE Step examination(s) that may have been taken by this individual, contact the appropriate registration entity to request a USMLE transcript.

† Since July 1986, ECFMG has verified medical school credentials directly with the medical schools, or through a reasonable alternative that has been approved by the ECFMG Medical Education Credentials Committee.
**Important Note:**

Requesting organizations must normally secure and retain the physician's signed authorization to obtain certification information. Organizations may not resell the information or make it available to any party beyond the initial request as authorized by the physician. The information may only be used to confirm ECFMG certification for the purpose for which the physician provided authorization.
**Report Verification Code: DXD0C14D9F**

021
Form 282 B - 6/04

JA3103

**Initial Medical Licensure Supplemental Form**
**MBP IML3**
**10/2009 INT**

**MARYLAND BOARD OF PHYSICIANS**
**VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION**

Side B

Applicant's Name (print): John Charles Nosa Akoda

6. Did the applicant have any physical or mental problem that affected the applicant's ability to practice medicine during the period of training?

   If "Yes," please give a detailed explanation* _____

7. Was any action taken against the applicant by any training program, hospital, medical board, licensing authority, or court? Such actions include, but are not limited to investigations, limitations of privileges or special conditions, requirements imposed for academic incompetence, disciplinary actions, probationary actions, etc.

   NO   YES   If "Yes," please give a detailed explanation* _____

8. In each year of training, did the applicant demonstrate sufficient academic and clinical ability to qualify for advancement without conditional or probationary status to the next year and next progressive level of responsibility in a designated specialty program?

   [✓] YES   [ ] NO   Comments:*

Control No: 111179          08/09/2011
Akoda. Charles John Nosa
*IML3-Accredited Training Programs*
Received: William Calhoun
Analyst: Dierdra Rufus

* If space is not sufficient, please attach a signed and dated detailed explanation.

**Attestation:** I attest that the information I have provided regarding the applicant is true, accurate, and complete according to all available records.

Diana Broomfield
Printed Name of Program Director

Howard University
Hospital

OBGYN

M. D, FACOG, FACS.
Title

2041 Georgia Aven. Washington DC
Address

202-865-7081

JA3104

10. **MEDICAL EDUCATION:** List all medical schools you have attended

From: MM/YY To MM/YY

University OF BENIN COLLEGE OF MEDICINE, NIGERIA     06|82 – 06|87

Medical School From Which You Received Your Medical Degree: University OF BENIN, Nigeria

Name of University Affiliation (if applicable): * _____

Street Address: 01 QUEEN ELIzabeth Rd, MoKola, Ibadan

City: _____ State/Province: _____ Country of citizenship during medical education: Nigerian

Language(s) of Instruction: ENGLISH

Type of Degree: ☐ M.D.   ☐ D.O.   ☐ M.D./Ph.D   ☒ M.B.B.S.   ☐ M.B.B.Ch   ☐ Other: (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc.
Was Conferred: was satisfied.   Month 0 6   Day 3 0   Year 8 7   * D.O.C. 1988  *Correct

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada)
Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and Examinations Taken, Good Conduct Certificate or Intern Certificate. The certificate must include your name, name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs and submit one of the following documents to support the name change; Passport, INS card, birth certificate, court document, marriage license, court decree.

11. How have you satisfied Maryland's *written and oral* English language competency requirements?
(See *English Language Competency Requirements for Medical Licensure in Maryland* in the introductory material included with your application.)

a. ☒ I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate college, or university where English was the *only* language of instruction throughout (you must provide documentation); or

b. ☐ I passed either ☐ the TOEFL or ☐ the ECFMG English test after December 31, 1973 AND I passed the ☐ TSE or ☐ OPI. If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification of your scores directly to the Board;

c. ☐ I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? ☒ NO ☐ YES   If "YES," please write or call the Board for additional information.

2014

🖨 Print

DO NOT MAIL THIS TO THE BOARD. RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number** D0073049 Dr. Charles John Nosa Akoda

2. | Individual National Provider Identifier NPI: 1952664278    ☐ I do not have an NPI
   This is the NPI entered in the field for Rendering NPI on a claim (10 digit number)
   ❓ NPI Information

3. **EMAIL ADDRESS**: Please enter your most current email address where we may contact you regarding your license.

   adcfrancis@aol.com

**Address Changes (Non-Public and Public)**:
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2014 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

**4a. Non-Public Address**: This address is for Board use only and is **where your license will be mailed**. However, if no public address is listed, this address will also be made available to the public.

| Street | |
|---|---|
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

**4b. Public Address**: This address, usually your office, is available to the public and will be posted on the Internet. If you do not designate a public address, your non-public address will be posted on the Internet.
☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| Street | 14909 Downey Court |
|---|---|
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? See instruction    ⦿ Yes ○ No

CHARACTER AND FITNESS (Question 6)
6. The following questions pertain to the period since July 1, 2012. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
\* All questions must be answered Yes or No.

Yes   No
NO      Has any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the armed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes   No
NO      Have any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services?

JA3106



c. Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes   No
NO

Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

Yes   No
NO

Have you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes   No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

Yes   No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

Yes   No
NO

Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

Yes   No
NO

Do you have a physical or mental condition that currently impairs your ability to practice medicine?

Yes   No
NO

j. Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

Yes   No
NO

k. Do you illegally use drugs?

Yes   No
NO

Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

Yes   No
NO

Have you been named as a defendant in a filing or settlement of a medical malpractice action?

Yes   No
YES   I was a Resident rotating through Prince Georges Hospital in 2010 when a child delivered had Brachial nerve palsy. All staff including Residents involved in the delivery were name in the law-suit. I am being represented by Attorneys from Howard Residency program which is my training institution. The law-suit is still in its preliminary stages

n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

Yes   No
NO

Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

Yes   No
NO

p. Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

Yes   No
NO

Have you failed to make arrangements to satisfy any state or federal loans that financed your medical education?

Yes   No

CONTINUING MEDICAL EDUCATION (Question 7)

◉ **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1 continuing medical education activities within the two-year period immediately preceding submission of this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity and maintain documentation for a period of six years for possible inspection by the Board. For additional information on CME, see Maryland Regulations, 10.32.01.09.*

○ **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first renewal after initial medical licensure in Maryland and I have completed the Board's New Physician Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were licensed prior to September 30, 2012 or reinstated, this does not apply to you. See New Physician Orientation Program web site, **Your license will not be renewed unless you have completed the orientation.**

○ **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a. Gender ◉ Male ○ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin? (A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:

American Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America, and who maintains tribal affiliations or community attachment.)

Asian (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

Black or African American (A person having origins in any of the black racial groups of Africa.)

Native Hawaiian or other Pacific Islander (A person having origins in the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

White (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

Other

9. Are you employed by the Federal Government?
○ Yes ◉ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship (subspecialty) training program accredited by the ACGME.

**If you answer *Yes* to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of this application.**

a. In an accredited/approved internship or residency program?
○ Yes ◉ No

b. In an accredited fellowship (subspecialty) training program?
○ Yes ◉ No

11a. Which best describes your current area(s) of concentration:

| | |
|---|---|
| Primary Concentration | Obstetrics & Gynecology |
| Secondary Concentration | None |

JA3108

11b. SPECIALTY BOARD CERTIFICATION: List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

Primary Certification: Obstetrics & Gynecology
Secondary Certification: None

12. Please select all states (excluding Maryland) where you hold a medical license.

| | | | | | |
|---|---|---|---|---|---|
| ☐ Alabama | ☐ Florida | ☐ Kentucky | ☐ Nebraska | ☐ Oklahoma | ☐ Utah |
| ☐ Alaska | ☐ Georgia | ☐ Louisiana | ☐ Nevada | ☐ Oregon | ☐ Vermont |
| ☐ Arizona | ☐ Guam | ☐ Maine | ☐ New Hampshire | ☐ Pennsylvania | ☑ Virginia |
| ☐ Arkansas | ☐ Hawaii | ☐ Massachusetts | ☐ New Jersey | ☐ Puerto Rico | ☐ Virgin Islands |
| ☐ California | ☐ Idaho | ☐ Michigan | ☐ New Mexico | ☐ Rhode Island | ☐ Washington |
| ☐ Colorado | ☐ Illinois | ☐ Minnesota | ☐ New York | ☐ South Carolina | ☐ West Virginia |
| ☐ Connecticut | ☐ Indiana | ☐ Mississippi | ☐ North Carolina | ☐ South Dakota | ☐ Wisconsin |
| ☐ Delaware | ☐ Iowa | ☐ Missouri | ☐ North Dakota | ☐ Tennessee | ☐ Wyoming |
| ☐ District of Columbia | ☐ Kansas | ☐ Montana | ☐ Ohio | ☐ Texas | |

13a. How many weeks per year do you work?   48

13b. Please indicate below how the hours are allocated in your typical work week . The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

🛈 If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

*Patient Care Related Activities* include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

*Research* includes clinical, laboratory, and analytical research

*Teaching* includes the teaching of medical undergraduate & graduate students and other graduate students.

*Administration & Other:* Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

🛈 Use whole numbers. No fractional hours. If none enter 0.

| | | |
|---|---|---|
| a. Patient Care Related Activities | 60 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 10 | hours per week |
| d. Administration & Other | 10 | hours per week |
| Total Hours | 80 | hours per week |

14. If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next two years?

○ Yes  ○ No

PRACTICE INFORMATION (Questions 15-26)

15. Do you plan to discontinue patient care related activities in the next two years?

○ Yes  ⦿ No

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

a.  Number of locations in Maryland (if none, enter 0)   2

b.   0

JA3109

Number of locations outside of Maryland (if none, enter 0)

ⓘ If you have locations outside Maryland, please answer (c) below after you answer (b).

   c. Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?

    ○ Yes    ○ No    ○ Don't know

---

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

  a. Number of hospitals in Maryland (if none, enter 0)      `1`

  b. Number of hospitals outside of Maryland (if none, enter 0)      `0`

---

**18. Primary Practice / Office Location** Primary Practice / Office Location

ⓘ Please answer all Primary Practice questions

| | | |
|---|---|---|
| a. | Organization Name | `Dr Abdul Chaudry` |
| | Organization Name2 | | |
| b. | Street Address | `6005 Landover Road, suite#5` |
| c. | Street2 | |

               ⓘ Enter suite or room number here. (Ex. Suite 101 or Room 101)

| | | |
|---|---|---|
| d. | City | `Cheverly` |
| e. | State | `Maryland` |
| f. | Zip Code | `20785` |
| g. | Jurisdiction | `PRINCE GEORGE'S` |

h. Employer Tax ID    `00` - `0000000`    ⓘ If you do not have an EIN enter 00-0000000

          ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

     ○ I use an Organizational NPI for billing.   Please Enter >

     ○ I use my Individual NPI for billing.

     ◉ I do not bill public or private insurers.

                                          Organizational NPI

j. You indicated in Question 13a, **60** hours of Patient Care Related Activities during a typical work week.

How many of those Patient Care Related Activity hours in your typical work week are delivered at this practice/office location?     `60`

ⓘ If none, enter 0.                                    Hours

| | | |
|---|---|---|
| k. | Setting | `Freestanding Physician Office` |
| l. | Private/Public | `Private-For profit` |
| m. | Practice | `Single-Specialty Group-Independent` |

Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-level medical providers is listed below.

ⓘ If none, enter 0; if you don't know the number, enter 999

Number of physicians (MDs, DOs, residents, fellows) including yourself at this location.     `2`

Number of mid-level medical providers at this location.     `5`

ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician assistants.

19. Secondary Practice / Office Location

ⓘ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

a. Organization Name | Dr Abdul Chaudry
   Organization Name2 |
b. Street Address | 6400 Marlboro Pike
c. Street2 |
   ⓘ Enter suite or room number (Ex. Suite 101 or Room 101)
d. City | District Heights
e. State | Maryland
f. Zip Code | 20747
g. Jurisdiction | PRINCE GEORGE'S

h. Employer Tax ID | 00 | - | 0000000 | ⓘ If you do not have an EIN enter 00-0000000
   ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

○ I use an Organizational NPI for billing. Please Enter >
○ I use my Individual NPI for billing.
⦿ I do not bill public or private insurers.

Organizational NPI

j. You indicated in Question 13a, **60** hours of Patient Care Related Activities during a typical work week.
   How many of those Patient Care Related Activity hours in your typical work week are delivered at this practice/office location? | 20
   ⓘ If none, enter 0. | Hours

k. Setting | Freestanding Physician Office
l. Private/Public | Private-For profit
m. Practice | Solo-independent

   Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-level medical providers is listed below.
   ⓘ If none, enter 0; if you don't know the number, enter 999

   Number of physicians (MDs, DOs, residents, fellows) including yourself at this location. | 2

   Number of mid-level medical providers at this location. | 5
   ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician assistants.

20-21 The Health Information Technology questions have been moved to a seperate section. You are required to complete the Health Information Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public insurance program patients.

a. Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc. | ⦿ Yes ○ No

b. Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed Care Organization) | ⦿ Yes ○ No

   b1. If Yes, are you accepting new Maryland Medical Assistance patients? | ⦿ Yes ○ No

c. Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)?

JA3111

Case: 2:21-cv-00356 Document 22-5 Page 1222 Date Filed 09/06/2022

|  | ● Yes | ○ No |
|---|---|---|

c1. If Yes, are you accepting new Medicare patients?

|  | ● Yes | ○ No |
|---|---|---|

---

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes   ○ No   ● NA

---

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

`0` hours per week.   🕑 If none, enter 0

---

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), please answer Q.25, otherwise:
☑ check this box and skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel, sometimes called direct, concierge, or retainer-based practice?

○ Yes   ○ No

---

26. Workers Compensation

Workers Compensation coverage: If you employ one or more persons, the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

● Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

   🕑 If you are a Maryland employer you must provide the information requested below.

| Insurance Company |  |
|---|---|
| Policy Number |  |
| Expiration Date |  |  🕑 Enter as MM/DD/YYYY Enter as MM/DD/YYYY

---

HEALTH INFORMATION TECHNOLOGY

Please contact the Maryland Health Care Commission at 410-764-3330 for questions relating to this section.

> **Electronic Health Record Incentive**
>
> Beginning in 2011, physicians that adopt an electronic health record are eligible to receive an incentive either under Medicare or Medicaid. To receive this incentive, a physician must meet certain criteria, which varies depending on which program you choose. The Medicare incentive is up to $44,000 over five years and the Medicaid incentive is up to $63,750 over six years. Physicians are encouraged to learn more about these incentive opportunities by visiting the Centers for Medicare and Medicaid Services website  http://www.cms.gov/EHRIncentivePrograms/

This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients at your primary office/practice location, which you listed in
*Question 18 - Primary Practice / Office Location Primary Practice / Office Location*

*Please complete the following HIT questions for:* Dr Abdul Chaudry

1. This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients in your office.

Are you computerized in your office:
   a. To obtain information about treatment alternatives or recommended guidelines?

JA3112

⦿ Yes ○ No

b. To send prescriptions electronically to a pharmacy?

⦿ Yes ○ No

If you answered Yes to 1b, what percentage of prescriptions are submitted electronically? [90] %
(Enter Whole number)

c. To generate reminders for you about preventive services needed for your patients?

⦿ Yes ○ No

d. To access patient notes, medication lists, or problem lists?

⦿ Yes ○ No

e. For clinical data and image exchanges with other physicians?

○ Yes ⦿ No

f. For clinical data and image exchanges with hospitals and laboratories?

○ Yes ⦿ No

g. To communicate about clinical issues with patients by email?

○ Yes ⦿ No

h. To obtain information on potential patient drug interactions with other drugs, allergies, and/or patient conditions?

⦿ Yes ○ No

2. Does your primary office/practice location use electronic MEDICAL RECORDS (not including billing records)?

○ Yes, all electronic ⦿ Yes, part paper and part electronic ○ No ○ Don't know

2a. If Yes, what is the name and version of the EHR system?
[Other ▼]

Other [Lytec]

2b. If **No**, please indicate your most significant reason for not using electronic medical records.

○ Capital cost outlays   ○ Lack of technology standards   ○ Retiring soon
○ Overburdened staff   ○ Intangible benefits   ○ Not my decision
○ Risk of privacy breaches

3. Have you used telemedicine for any purpose in the last 12 months?

⦿ Yes ○ No

> 🕮 Telemedicine means, as it relates to the delivery of health care services, the use of interactive audio, video, or other telecommunications of electronic technology by a licensed health care provider to deliver health care service(s) within the scope of practice of the health care provider at a site other than the site at which the patient is located.

3a. Approximately how many times in the last 12 months have you used telemedicine for any purpose? [2]
(Enter 0 if you did not use telemedicine)

3b. If you used telemedicine, what are your common uses of telemedicine technology (mark all that apply)?
☐ Second opinion
☐ Diagnosis
☑ Follow up
☐ Emergency
☐ Chronic disease management
☐ Other (specify) [_____]

*The following questions are to be answered ONLY if your Practice Setting is one of the following:*
*(1) Solo;  (2) Single-Specialty Group;  (3) Multi-Specialty Group; or (4) HMO Group/Staff*

JA3113

4. Does your practice use high speed Internet?

◉ Yes ○ No

4a. [Comcast ▽]   Please Specify : [          ]

5. How do you access the Internet?

○ DSL ○ Cable Modem ○ Fiber to the office ◉ Wireless ○ Other ○ Unknown

6. Do you provide Wi-Fi access to your patients in your waiting area?

○ Yes ◉ No ○ Unknown

PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.

* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime *        [3013250264                    ]
Nighttime*       [                              ]

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical ☐ Biological ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

☑ a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

☑ b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

☑ c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

☑ d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2014.

29. Please provide your electronic signature (type your name) below:

Name             [Charles Akoda            ]
Today's Date     [8/12/2014    🔢]

JA3114

Last four digits of Social
Security Number:

30. Select a Payment Option here to complete your application.

🖰 Please note: Credit cards may be used for online payment only. If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

◉ **Credit Card**    ○ **Send Check**    ○ **3rd Party Check**        **3rd Party Payer:**

PAYMENT
**APPLICATION COMPLETION INFORMATION:**
| | |
|---|---|
| Date Application Started | 8/12/2014 |
| Date Application Submitted | 8/12/2014 |
| Confirmation Number | |
| Payment Method | Credit Card |
| Amount Paid | $522.00 |
| Credit Card Approval No. | |

2012

🖨Print

DO NOT MAIL THIS TO THE BOARD. RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number D0073049** Dr. Charles John Nosa Akoda

| | |
|---|---|
| 2. | Individual National Provider Identifier NPI: 1952664278  ☐ I do not have an NPI<br>This is the NPI entered in the field for Rendering NPI on a claim (10 digit number)<br>ⓘ NPI Information |

3. **EMAIL ADDRESS**: This is your email address on file. If it has changed, please edit below. If you do not have an email address please indicate by checking the checkbox below.

adcfrancis@aol.com

☐ I do not have an email address

**Address Changes (Non-Public and Public):**
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2012 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

4a. **Non-Public Address**: This address is for Board use only and is _where your license will be mailed_. However, if no public address is listed, this address will also be made available to the public.

| | |
|---|---|
| Street | |
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

4b. **Public Address**: This address, usually your office, is available to the public and will be posted on the Internet. If you do not designate a public address, your non-public address will be posted on the Internet.

☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| | |
|---|---|
| Street | 14909 Downey Court |
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? See instruction    ◉ Yes ○ No

CHARACTER AND FITNESS (Question 6)
6. The following questions pertain to the period since July 1, 2010. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
* All questions must be answered Yes or No.

Yes  No
NO

. ' '-- any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the a....ed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes  No

. lave any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services?

JA3116

NO

Yes  No

Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

NO

Yes  No

d. Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

NO

Yes  No

e. Have you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

YES

Yes due to NPI number error: On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My priviledges were rescinded on about May 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes  No

f. Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

NO

Yes  No

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

NO

Yes  No

Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

NO

Yes  No

Do you have a physical or mental condition that currently impairs your ability to practice medicine?

NO

Yes  No

Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

NO

Yes  No

Do you illegally use drugs?

NO

Yes  No

Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

NO

Yes  No

Have you been named as a defendant in a filing or settlement of a medical malpractice action?

NO

Yes  No

n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

YES

Yes due to NPI number error On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My privileges were rescinded on about may 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes  No

Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

NO

Yes  No

Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

JA3117

Yes   No    Have you failed to make arrangements to satisfy any state or federal loans that financed your medical
            education?
NO

CONTINUING MEDICAL EDUCATION (Question 7)

○  **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1
   continuing medical education activities within the two year period immediately preceding submission of
   this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity
   and maintain documentation for a period of six years for possible inspection by the Board. For additional
   information on CME, see Maryland Regulations, 10.32.01.09.*

◉  **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first
   renewal after initial medical licensure in Maryland and I have completed the Board's New Physician
   Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were
   licensed prior to September 30, 2010 or reinstated, this does not apply to you. <u>See New Physician
   Orientation Program web site</u>. **Your license will not be renewed unless you have completed the
   orientation.**

○  **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is
   my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a.   Gender  ◉ Male   ○ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin?  (A person of Cuban, Mexican, Puerto Rican, South or Central
American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:
      American Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America,
      and who maintains tribal affiliations or community attachment.)

      (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example,
      Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

      or African American (A person having origins in any of the black racial groups of Africa.)

      Native Hawaiian or other Pacific Islander (A person having origins in the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

      White (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

      er

9. Are you employed by the Federal Government?
   ○ Yes  ◉ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical
Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship
(subspecialty) training program accredited by the ACGME.

   If you answer *Yes* to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of
   this application.

a.   In an accredited/approved internship or residency program?
     ○ Yes  ◉ No

b.   In an accredited fellowship (subspecialty) training program?
     ○ Yes  ◉ No

JA3118

**11a.** Which best describes your current area(s) of concentration:

| | |
|---|---|
| Primary Concentration | Obstetrics & Gynecology |
| Secondary Concentration | None |

**11B. SPECIALTY BOARD CERTIFICATION:** List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

| | |
|---|---|
| Primary Certification | None |
| Secondary Certification | None |

**12.** Please select all states (excluding Maryland) where you hold a medical license.

- [ ] Alabama
- [ ] Alaska
- [ ] Arizona
- [ ] Arkansas
- [ ] California
- [ ] Colorado
- [ ] Connecticut
- [ ] Delaware
- [ ] District of Columbia
- [ ] Florida
- [ ] Georgia
- [ ] Guam
- [ ] Hawaii
- [ ] Idaho
- [ ] Illinois
- [ ] Indiana
- [ ] Iowa
- [ ] Kansas
- [ ] Kentucky
- [ ] Louisiana
- [ ] Maine
- [ ] Massachusetts
- [ ] Michigan
- [ ] Minnesota
- [ ] Mississippi
- [ ] Missouri
- [ ] Montana
- [ ] Nebraska
- [ ] Nevada
- [ ] New Hampshire
- [ ] New Jersey
- [ ] New Mexico
- [ ] New York
- [ ] North Carolina
- [ ] North Dakota
- [ ] Ohio
- [ ] Oklahoma
- [ ] Oregon
- [ ] Pennsylvania
- [ ] Puerto Rico
- [ ] Rhode Island
- [ ] South Carolina
- [ ] South Dakota
- [ ] Tennessee
- [ ] Texas
- [ ] Utah
- [ ] Vermont
- [x] Virginia
- [ ] Virgin Islands
- [ ] Washington
- [ ] West Virginia
- [ ] Wisconsin
- [ ] Wyoming

**13a.** How many weeks per year do you work?  48

**13b.** Please indicate below how the hours in your typical work week are allocated. The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

🛈 If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

***Patient Care Related Activities*** include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

***Research*** includes clinical, laboratory, and analytical research

***Teaching*** includes teaching of medical undergraduate & graduate students and other graduate students.

***Administration & Other:*** Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

🛈 Use whole numbers. No fractional hours. If none enter 0.

| | | |
|---|---|---|
| a. Patient Care Related Activities | 36 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 0 | hours per week |
| d. Administration & Other | 4 | hours per week |
| Total Hours | 40 | hours per week |

**14.** If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next 2 years?

○ Yes  ○ No

PRACTICE INFORMATION (Questions 15-26)

**15.** Do you plan to discontinue patient care related activities in the next two years?

○ Yes  ⦿ No

JA3119

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

   a.  Number of locations in Maryland (if none, enter 0)  `0`

   b.  Number of locations outside of Maryland (if none, enter 0)  `0`
       ℹ If you have locations outside Maryland, please answer (c) below after you answer (b).

   c.  Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?

       ○ Yes  ○ No  ○ Don't know

---

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

   a.  Number of hospitals in Maryland (if none, enter 0)  `0`

   b.  Number of hospitals outside of Maryland (if none, enter 0)  `0`

---

**18. Primary Practice / Office Location Primary Practice / Office Location**
No Primary Location indicated from your response in Question 16
ℹ Please answer all Primary Practice questions

---

19. Secondary Practice / Office Location
No Secondary Location indicated from your response in Question 16.
ℹ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

---

20-21 Health Information Technology questions has been moved to a seperate section. You are required to complete the Health Information Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public insurance program patients.

| | | Yes | No |
|---|---|---|---|
| a. | Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc. | ○ | ◉ |
| b. | Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed Care Organization) | ○ | ◉ |
| | b1. If Yes, are you accepting new Maryland Medical Assistance patients? | ○ | ○ |
| c. | Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)? | ○ | ◉ |
| | c1. If Yes, are you accepting new Medicare patients? | ○ | ○ |

---

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes  ○ No  ◉ NA

---

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

`0` hours per week.  ℹ If none, enter 0

---

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), answer Q.25. Otherwise skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel (sometime called direct, concierge, or retainer-based practice)?

JA3120

○ Yes   ○ No

_____

**26. Workers Compensation**

Workers Compensation coverage: If you <u>employ one or more persons,</u> the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

○ Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

☞ If you are a Maryland employer you must provide the information requested below.

| | |
|---|---|
| Insurance Company | |
| Policy Number | |
| Expiration Date | ☞ Enter as MM/DD/YYYY Enter as MM/DD/YYYY |

PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.)

* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime *    3013250264

Nighttime*

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical   ☐ Biological   ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

☑   a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

☑   b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

☑   c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

_____

☑   d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2012.

JA3121

29. Please provide your electronic signature (type your name) below:

Name | Charles John Nosa Akoda

Today's Date | 9/3/2012 ▦

Last four digits of Social
Security Number: | ☐

30. Select a Payment Option here to complete your application.

🛈 Please note: Credit cards may be used for online payment only. If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

◉ Credit Card   ◯ Send Check   ◯ 3rd Party Check        3rd Party Payer: _____

PAYMENT
**APPLICATION COMPLETION INFORMATION:**
Date Application Started        9/3/2012
Date Application Submitted    9/3/2012
Confirmation Number                      /        49
Payment Method                  Credit Card
Amount Paid                         $514.00
Credit Card Approval No.

JA3122

# Exhibit 40

JA3123

711179

| Initial Medical Licensure PERSONAL INFORMATION 10/2009 INT | STOP! Completed application and check must be mailed to: MARYLAND BOARD OF PHYSICIANS P.O. Box 37217 • Baltimore, MD 21297 Telephone: 410-764-4777    Fax: 410-358-1298    Toll Free: 800-492-6836 | FOR BANK USE ONLY |
|---|---|---|

**APPLICATION FOR INITIAL MEDICAL LICENSURE**

For Bank Use Only:
- Date
- Check Number
- Amt Paid ~~890~~
- Name Code
- ApplID 17

Please print legibly or type the required information. Do not leave any item unanswered. If an item does not apply to you, write "N/A" (Not Applicable) for that item. An incomplete application form will delay the processing of your application.

**1. Your Complete Current Legal Name:** As listed on your U.S. birth/marriage certificate, U.S. passport, or most recent document issued by the INS.

Last name and generational indicator (Jr., Sr., II, III, etc.):

`A K O D A`

First name and middle name:

`C H A R L E S     J O H N     N O S A`

(If applicable, please check a box and complete below)  ☐ Complete Maiden Name OR  ☐ Complete Former Name

**Stop!** If any credential you submit bears a name other than your current legal name as listed above, or if you have been licensed in another state under any name other than your current legal name, sign and date an attachment which includes each different name, an explanation of why the name differs from your current legal name, and a copy of the legal document to support the name change.

**2. Public Address:** Your public address of record. This address, usually your office, is available to the public and will be posted on the internet.

Street Address: If you change your address prior to being licensed, immediately notify the Board in writing.

City / State / Zip Code

**3. Non-Public Address:** This address, usually your home, is for Board use only. However, if no public address is listed, this address will be made public.

Street Address: (Do NOT use a P.O. Box) If you change your address prior to being licensed, immediately notify the Board in writing.

City / State / Zip Code

**4. Telephone (s):** Home / Office / Cell/Pager / E-mail address:

**5. Date of Birth:** Month / Day / Year    **6. Gender:** ☒ Male   ☐ Female

**7. Race:** Multiracial applicants may select all applicable categories   ☐ American Indian or Alaska Native   ☐ Asian   ☒ Black or African American   ☐ Native Hawaiian or other Pacific Islander   ☐ White

**Ethnicity:** ☐ Hispanic or Latino   ☐ Not Hispanic or Latino

**8. Social Security Number:**

| For Board Use Only | License Number: | D 2 3 0 4 9 | BPQA School Code: | 6 9 0 9 0 6 |
|---|---|---|---|---|
| | Date Issued: | 0 9 4 1 1 | Federation School Code: | 6 9 0 0 0 3 |
| | Licensed By: Dr. Fu | | Licensing Exam: US | |

JA3124

10/2009 INT     Name: _Crag & RO John Ivosa_     Date: _7/28/11_     **

**10. MEDICAL EDUCATION:** List all medical schools you have attended

_University OF BENIN COLLEGE OF MEDICINE, NIGERIA_     From: MM/YY To MM/YY  _06/82 – 06/87_

Medical School From Which You Received Your Medical Degree: _University OF BENIN, Nigeria_

Name of University Affiliation (if applicable): * _____

Street Address: _01 QUEEN Elizabeth Rd, Mokola Ibadan_

City: _____ State/Province: _____ Country of citizenship during medical education: _Nigerian_

Language(s) of instruction: _ENGLISH_

Type of Degree: ☐ M.D.   ☐ D.O.   ☐ M.D./Ph.D   ☒ M.B.B.S.   ☐ M.B.B.Ch   Other: _____ (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc.
Was Conferred: was satisfied.     Month [0][6] Day [3][0] Year [8][7]   ☒ D.O.C. 1988  *Correct*

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada)
Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and Examinations Taken, Good Conduct Certificate or intern Certificate. The certificate must include your name, name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs and submit one of the following documents to support the name change; Passport, INS card, birth certificate, court document, marriage license, court decree.

**11.** How have you satisfied Maryland's _written and oral_ English language competency requirements?
(See _English Language Competency Requirements for Medical Licensure in Maryland_ in the introductory material included with your application.)

a. ☒ I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate college, or university where English was the _only_ language of instruction throughout (you must provide documentation); or

b. ☐ I passed either ☐ the TOEFL or ☐ the ECFMG English test after December 31, 1973 AND I passed the ☐ TSE or ☐ OPI. If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification of your scores directly to the Board;

c. ☐ I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? ☒ NO ☐ YES     If "YES," please write or call the Board for additional information.

JA3125

Initial Medical Licensure
**POSTGRADUATE TRAINING**
10/2008 INT

Print Your Name: Charles John Nosa Akoda    Date: 7/28/11

12.  **POSTGRADUATE TRAINING** (DO NOT ATTACH RESUME OR CURRICULUM VITAE.) List in chronological order ALL postgraduate training undertaken in the United States, its territories or possessions, Puerto Rico, or Canada regardless of whether you did or did not complete the program, and regardless of whether you were or were not compensated. (Copies of training certificates are helpful, but not required.)

NOTE: On a case by case basis, the Board may consider full time teaching in an LCME accredited medical school in the United States as an alternative to the accredited postgraduate clinical medical education required in the Code of Maryland Regulations 10.32.01.03D. Applicants who intend to request consideration of teaching experience as an alternative to accredited postgraduate clinical medical education should contact the Board's licensure division for further information.

Effective October 1, 2000, graduates of all medical schools NOT in the U.S., its territories or possessions, Puerto Rico, or Canada are required to submit evidence acceptable to the Board of successful completion of 2 years of training in a postgraduate clinical medical education program accredited by an accrediting organization recognized by the Board (ACGME, AOA, or equivalent). If you have not met this requirement, DO NOT submit this application.

A Fifth Pathway Program graduate must have been a U.S. citizen during the time of medical education and must have successfully completed two years of ACGME accredited postgraduate clinical medical education after successfully completing a Board approved Fifth Pathway program. If you have not met these two criteria, DO NOT SUBMIT THIS APPLICATION.

If after 10/1/92 you passed any medical licensing exam (or part, step, or component thereof) that you failed three times, either before or after 10/1/92, then you must successfully complete another year of ACGME/AOA accredited clinical postgraduate training in addition to the year(s) usually required by Maryland. All of the additional year must have begun after the date of the last fail. Teaching will not be accepted as an alternative to a year required following three or more fails. If you have not met this requirement, DO NOT submit this application. If you failed any part, step, or component of a medical exam four times, DO NOT SUBMIT THIS APPLICATION; you are not eligible for medical licensure in Maryland.

**NOTE: Postgraduate training program cycles usually run from July 1 to June 30. If the dates of your postgraduate training are not within the usual cycle, fall short of the complete cycle, or extend beyond the usual cycle, please attach a complete explanation of why your training was "off-cycle."**

| PG Year # | | | month | year | TO | month | year |
|---|---|---|---|---|---|---|---|
| 4 | Place of Training: | HOWARD HOSPITAL | 0 6 | 0 7 | | 0 6 | 1 1 |
| | Address: | 2041 Georgia Ave NW DC 20060 | Specialty: OBGYN | Accredited by: ACGME ☑   AOA ☐   RCPSC ☐ | | | |
| PG Year # | Place of Training: | | month | year | TO | month | year |
| | Address: | | Specialty: | Accredited by: ACGME ☐   AOA ☐   RCPSC ☐ | | | |
| PG Year # | Place of Training: | | month | year | TO | month | year |
| | Address: | | Specialty: | Accredited by: ACGME ☐   AOA ☐   RCPSC ☐ | | | |
| PG Year # | Place of Training: | | month | year | TO | month | year |
| | Address: | | Specialty: | Accredited by: ACGME ☐   AOA ☐   RCPSC ☐ | | | |
| PG Year # | Place of Training: | | month | year | TO | month | year |
| | Address: | | Specialty: | Accredited by: ACGME ☐   AOA ☐   RCPSC ☐ | | | |

**(ATTACH A SEPARATE SIGNED AND DATED PAGE IF ADDITIONAL SPACE IS NEEDED)**

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

JA3126



Just Finished residency.

Initial Medical Licensure
HOSPITAL PRIVILEGES
10/2009 INT

Print Your Name: **Charles John Nosa AKODA** Date: **7/28/11**

Page 6 of 11

13. Hospital Privileges After Postgraduate Training: Please list all hospitals where you have had privileges or have provided services after the completion of your postgraduate training for the five year period preceding the filing of this application. Copy this page if more space is needed and enclose each signed and dated addition.

| | month | year | TO | month | year |
|---|---|---|---|---|---|
| Hospital: | | | | | |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |
| Hospital: | month | year | TO | month | year |
| Complete Address: | Department | | | | |

JA3127

| Initial Medical Licensure MEDICAL EXAMS 10/2009 IXT | Print Your Name: | Charles John Nosa Akoda | Date: 7/28/11 | Page 7 of 11 |

**14. Medical Licensing Examinations** (USMLE, NBME, NBOME, FLEX, FLEX-Weighted Average, Medical Council of Canada, and licensing exams given by individual states prior to January 1, 1985) **DO NOT SUBMIT THIS APPLICATION until you have received written verification of having passed all parts, steps, or components of your medical licensing examinations.**

Identify below ALL the medical licensing examinations that you have ever taken. Ask the administering authority of each exam to send the complete medical licensing examination history and scores directly to this Board. In each examination category below, you will find information to help you contact the administering authority.

a. Have you ever failed any medical licensing examination (or part, step, or component thereof)?   **NO**

b. Have you failed any medical licensing examination (or part, step, or component thereof) three or more times?   **NO**

If you answered "Yes" to a. and b., you must have successfully completed another year of ACGME-accredited clinical postgraduate training, in addition to the year(s) of training usually required for licensure in Maryland. No part of the additional year may have been taken before the date of the last fail. If you have not met this requirement, you are not eligible for licensure in Maryland at this time. DO NOT submit this application until you have fulfilled this requirement.
**IF YOU HAVE FAILED ANY PART, STEP, COMPONENT OR APPROVED EXAMINATION COMBINATION MORE THAN 3 TIMES, You may not be eligible for medical licensure in Maryland. For a complete explanation see COMAR 10.32.01.03 Licensure—Qualifications for Initial Licensure**

a. **State Board Examination** List state(s): _____N/A_____
STATE BOARD DOES NOT INCLUDE STEP 3 OF USMLE, ORAL EXAMS, OR INTERVIEWS. State Board Examinations were licensing exams given by individual states. State Board Examinations taken after December 31, 1984 are not accepted for licensure in Maryland.
Send a copy of MBP IML7, *State Board Licensure and Examination Certification*, form to the state(s) which administered your licensing exam and ask the state(s) to send your exam results directly to the Maryland Board of Physicians. Also send a copy to each state that has ever issued you a license. NOTE: Many states charge a fee for exam transcripts. Contact each state board prior to sending form IML7, as all fees are the responsibility of the applicant.

**Federation of State Medical Boards** (See Page 8 if you took a combination of these exams or combined either with the NBME exams)

b. ☐ **FLEX-Weighted Average:** All FLEX-Weighted exams prior to 1985 must have been taken in one sitting (3 consecutive days). Flex weighted average exams taken in more than one sitting must have current ABMS or AOA Board Certification unless you are currently certified by a member board of the American Board of Medical Specialties.

c. ☐ **FLEX Components 1 and 2:** Examinations must be passed within 5 years of each other.

d. ☒ **USMLE Steps 1, 2, and 3:** Passing scores on all parts must have been completed within a 10-year period beginning with the month and year when the applicant first passed either step 1 or step 2.
If you took any of the above examinations you must ask the Federation of State Medical Boards (FSMB) to send your transcripts to the Board by accessing their website at www.fsmb.org. Click transcript requests.

e. ☐ **National Board of Medical Examiners** (See Page 8 if you combined this examination with FLEX or USMLE exams)
If you have received NBME certification, ask NBME to send to the Board both the Endorsement of Certification *and the* Record of Scores. All requests must be made through the NBME website at http://www.nbme.org or call 215-590-9592. If you took NBME exams but were not certified, or you took NBME as part of hybrid exams, ask NBME to send only your Record of Scores.

f. ☐ **National Board of Osteopathic Medical Examiners** Certifications issued before January 1, 1971 are not accepted for licensure in Maryland. If you have received NBOME certification, ask NBOME to send to this Board the verification of certification and the complete history of your medical examinations. Contact NBOME at 773-714-0622 for instructions and fee information.

g. ☐ **Medical Council of Canada**
Licentiate of the Medical Council of Canada
Please request that verification of your Licenciate Certification and a complete LMCC examination history be sent directly to this Board. Call MCC at 613-521-6012 for instructions and fee information.

**CONTINUED ON PAGE 8**

JA3128

| Initial Medical Licensure<br>MEDICAL EXAMS<br>10/2000 INT | Print<br>Your<br>Name: Charles John Nosa Akoda Date: 7/28/11 | Page<br>8 of 11 |

## HYBRID EXAMINATIONS

The following combinations are the only hybrid examinations accepted by the Maryland Board.

Passing scores on all parts of hybrid examinations must have been completed within a 10-year period, beginning with the month and year the examinee first passes a part or component or step of the combined examination. ALL HYBRID EXAMINATIONS MUST HAVE BEEN COMPLETED BEFORE JANUARY 1, 2000.

h. ☐ USMLE 1 + NBME II + NBME III  
i. ☐ USMLE 1 + USMLE 2 + NBME III  
j. ☐ USMLE 1 + NBME II + USMLE 3  
k. ☐ NBME I + USMLE 2 + USMLE 3  
l. ☐ NBME I + USMLE 2 + NBME III  
m. ☐ NBME I + NBME II + USMLE 3  

n. ☐ FLEX 1 + USMLE 3  
o. ☐ FLEX 2 + USMLE 1 + NBME II  
p. ☐ FLEX 2 + USMLE 1 + USMLE 2  
q. ☐ FLEX 2 + NBME I + USMLE 2  
r. ☐ FLEX 2 + NBME I + NBME II  

- If your hybrid exams included any part of the NBME examination, contact NBME at http://www.nbme.org or call 215-590-9592 for instructions and request that your Endorsement of Certification and your Record of Scores be sent directly to the Maryland Board of Physicians.

- If your hybrid exams included only FLEX and USMLE examinations, request your transcript from the Federation of State Medical Boards at www.fsmb.org.

## 15. Licensing History:

a. ☐ I have never been licensed in the U.S., its territories, or Puerto Rico and have never been licensed or registered in Canada.

b. ☒ I have an application for license pending in the following states: LA _____ _____ _____ _____

c. Please list below all licenses ever issued to you by a U.S. state/territory or Puerto Rico. Also list all Canadian licenses and registrations.

d. Has any disciplinary action ever been taken against your license? ☒ No ☐ Yes   If yes, please enclose an explanation.

| STATE<br>(Or Puerto Rico or<br>Canadian Province) | LICENSE NUMBER<br>or<br>Registration Number | CURRENT STATUS | | | | | |
|---|---|---|---|---|---|---|---|
| | | Active | Inactive | Expired/Lapsed | Surrendered in<br>good standing | Surrendered /<br>Suspended | Revoked |
| Virginia | 0101250081 | ✓ | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(If more space is needed, please attach an additional signed and dated sheet.)

JA3129

| Initial Medical Licensure SPEX, Character/Fitness 10/2008 PrT | Print Your Name: Charles John Nosa AKODA   Date: 7/28/11 | Page 9 of 11 |

**16. Check YES or NO.**

[✓] [ ] Did you successfully complete a medical licensing exam (USMLE, NBME, etc.) within the 15-year period prior to filing this application?

[✓] [ ] During the past 10 years, have you maintained uninterrupted licensure since you were first issued a license in the United States, its territories, Puerto Rico, or Canada?

[ ] [✓] Do you have lifetime certification from, or within the past 10 years have you been certified or recertified by, a specialty board recognized by the American Board of Medical Specialties, the American Osteopathic Association, or the Royal College of Physicians and Surgeons of Canada?

If "YES," in which specialty were you certified? _____ Date certified _____

⇒ If you have answered "NO" to all three of the above questions, you MUST take the Special Purpose Examination. After you submit this application, contact the Federation of State Medical Boards at 817-571-2949 and arrange to take the SPEX in Maryland and have scores sent to the Maryland Board directly.

**17. Character and Fitness Questions (Check either YES or NO)**

YES   NO

a. Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, denied your application for licensure, reinstatement, or renewal?

b. Has a state licensing or disciplinary board (including Maryland), or a comparable body in the armed services, taken action against your name? Such actions include, but are not limited to, limitations of practice, required education admonishment, reprimand, suspension, or revocation. Refer to the document Grounds for Board Action in Maryland at the Board's website www.mbp.state.md.us.

c. Has any licensing or disciplinary board in any jurisdiction (including Maryland), or a comparable body in the armed services, filed any complaints or charges against you or investigated you for any reason?

d. Have you ever withdrawn your application for a medical license or other health professional license?

e. Has a hospital, related health care institution, HMO, or alternative health care system investigated you or brought charges against you?

f. Has a hospital, related health care facility, HMO, or alternative health care system denied your application for, or failed to renew your privileges; or limited, restricted, suspended, or revoked your privileges in any way?

g. Have you committed a criminal act to which you pled guilty or nolo contendere, or for which you were convicted or received probation before judgement?

h. Have you committed an offense involving alcohol or controlled dangerous substances to which you pled guilty or nolo contendere, or for which you were convicted or received probation before judgement? Such offenses include, but are not limited to, driving while under the influence of alcohol and/or controlled dangerous substances.

i. Excluding minor traffic violations, are you currently under arrest or released on bond, or are there any current or pending charges against you in any court of law?

j. Do you illegally use drugs?

k. Do you have any physical or mental condition that currently impairs your ability to practice medicine or that would cause reasonable questions to be raised about your physical, mental, or professional competency?

l. Have you ever been named as a defendant in a medical malpractice action?

m. Are you in default of a service obligation that you incurred by receiving State or federal funds for your medical education?

n. Have you failed to make arrangements to satisfy State or Federal loans that financed your medical education?

o. Have your employment by any hospital, HMO, other health care facility or institution, or military entity been terminated for disciplinary reasons?

p. Have you voluntarily resigned from any hospital, HMO, other health care facility, or institution, or military entity while under investigation by that institution for disciplinary reasons?

q. Has use of drugs and/or alcohol ever resulted in an impairment of your ability to practice your profession?

r. Have you surrendered your license or allowed it to lapse while you were under investigation by any licensing or disciplinary board of any jurisdiction or any entity of the armed services?

⟫⟫⟫ If you answered "YES" to any of the questions in item 17, on the following page please list all adverse actions taken against you and provide a complete explanation. Attach any supporting documentation that applies (copies of all complaints, malpractice claims, adverse or disciplinary actions, arrests, pleadings, judgements, or final orders). Sign and date all pages submitted.

JA3130

medical Boards, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent release for information that may be requested by the Board.

Charles John Nosa Akoda | Charles Akoda | 7/28/11

Applicant's Name (Printed) | Applicant's Signature | Date

**20. (OPTIONAL) Third Party Release:** Although the Board encourages you to complete all aspects of your application on your own, if you plan to use an intermediary to receive information about the status of your application, please complete this release.

I agree that the Maryland Board of Physicians may release any information pertaining to the status of my application to the following person:

Name: _____ N/A _____

Phone: _____

Applicant's Signature | Date

**21.** I agree that I will cooperate fully with any request for information or with any investigation related to my medical practice as a licensed physician in the State of Maryland, including the subpoena of documents or records or the inspection of my medical practice.

During the period in which my application is being processed, I shall inform the Board within 30 days of any change to any answer I originally gave in this application, any arrest or conviction, any change of address or any action that occurs based on accusations that would be grounds for disciplinary action under Md. Code Ann., Health Occ. § 14-404.

7/28/11

Applicant's Signature | Date

**22. Affidavit:** To be completed by the applicant in the presence of a notary public after the applicant's picture has been attached below.

I certify that I have personally reviewed all the responses to items 1-22 of this application and that the information I have given is true and accurate to the best of my knowledge. I understand and agree that I may not practice, attempt to practice, or offer to practice medicine in Maryland unless Licensed by the Board.

8/3/11

Applicant's Signature | Date

STATE OF ____Maryland____

CITY/COUNTY OF ____Prince George's____

I HEREBY CERTIFY that on this ___3rd___ day of ___August___, 20 _11_, before me, a Notary Public of the State and City/County aforesaid, personally appeared the Applicant, ____Charles Akoda____, whose likeness is identifiable as that of

(print applicant's name)

the person in the photograph attached to this application and who has made oath in due form of law to be the person referred to in the above

application for license to practice Medicine and Surgery in the State of Maryland, and to have stated the

truth in all statements made in this application.

AS WITNESS my hand and notorial seal. _____

Notary Public

My Commission expires: __03-25-2012__

GEORGE S. OKAI
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY MARYLAND
MY COMMISSION EXPIRES 3-25-2012

SEAL

STOP! Completed application and check must be mailed to Maryland Board of Physicians, P.O. Box 37217, Baltimore, Maryland 21297

JA3131



**BENIN CITY, NIGERIA**

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October* 1987

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

RECEIVED AUG 11 2011 MARYLAND BOARD OF PHYSICIANS

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE-CHANCELLOR

JA3132

# EDUCATIONAL COMMISSION
## for
# FOREIGN MEDICAL GRADUATES

### CERTIFIES THAT

## JOHN NOSA AKODA

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

RECEIVED AND HAS BEEN AWARDED THIS CERTIFICATE.

AUG 11 2011

MARYLAND BOARD OF PHYSICIANS

CERTIFICATE NUMBER    0-553-258-5

MEDICAL EXAMINATION

| | |
|---|---|
| BASIC SCIENCE | JUNE 11, 1997 |
| CLINICAL SCIENCE | AUGUST 28, 1996 |
| ENGLISH EXAMINATION | AUGUST 28, 1996 |
| VALID THROUGH | |

**CERTIFICATE NUMBER**
0-553-258-5
**ENGLISH EXAMINATION**
August 28, 1996
**VALID INDEFINITELY**

CHAIRMAN, BOARD OF TRUSTEES

PRESIDENT, CHIEF EXECUTIVE OFFICER

DATE ISSUED    AUGUST 18, 1997

JA3133

## HOWARD UNIVERSITY HOSPITAL AND AFFILIATED HOSPITALS
### WASHINGTON, DISTRICT OF COLUMBIA

THIS IS TO CERTIFY THAT

# JOHN-CHARLES NOSA AKODA, MD

HAS SATISFACTORILY COMPLETED FOUR YEARS

OF POSTGRADUATE MEDICAL EDUCATION IN

# DEPARTMENT OF OBSTETRICS AND GYNECOLOGY

THROUGH OUR TRAINING PROGRAMS AT HOWARD UNIVERSITY.

JULY 1, 2007 - JUNE 30, 2011

*Fannie G. Brown*
DIRECTOR, GRADUATE MEDICAL EDUCATION

PROGRAM DIRECTOR

*Sidney Ribeau*
PRESIDENT OF THE UNIVERSITY

SECRETARY OF THE UNIVERSITY

JA3134



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October 1987*

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of *February* 1988



*M.*
*My* REGISTRAR

*Williams*
VICE-CHANCELLOR

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

JA3135

Initial Medical Licensure
Supplemental Form
MBP IML3
10/2000 INT

**MARYLAND BOARD OF PHYSICIANS**
4201 Patterson Avenue ■ P.O.Box 2571
Baltimore, Maryland 21215-0095
Telephone: 410-764-4777   800-492-6836

| Side A |
|---|

*Voc a form*
*7/08  98  9/26/2011*

**VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION**

| Part 1 | APPLICANT: Complete Part 1 and sign where indicated in the Part 2 instructions.  Print your name on top of the reverse page, and send a form to the director of each postgraduate training program you attended. Be sure to copy both sides. |
|---|---|

**a. Applicant's Name:** AKODA   CHARLES   JOHN   NOSA
Last Name and Generational Indicator (Jr., Sr., II, III, etc.)      First Name      Middle Name

**Address:**

**City:** _____   **State:** r

**Date of Birth:** | Month | Day | Year |     **Social Security Number:** |

**b. Name of Institution:** HOWAR UNIVERSITY HOSPITAL

**Department and Area of Training:** OBSTETRICS AND GYNECOLOGY

**Complete Address:** 2041 Georgia Avenue, NW

**City:** Washington   **State:** DC

**FROM:** | Month 0 7 | Year 0 7 |  **TO**  | Month 0 6 | Year 1 1 |

| Part 2 | POSTGRADUATE TRAINING PROGRAM DIRECTOR: Please complete Part 2 according to the records available and send directly to the Maryland Board of Physicians at the above address. Please do not send original or copies to me.    Applicant's Signature |
|---|---|

**1. Did the applicant participate in postgraduate training in your department during the period listed above?**
[✓] YES   [ ] NO   If "No," please enter exact dates: _____ to _____

**Program Specialty:** OBGYN

*RECEIVED*
*AUG - ? 20?*
*MARYLAND BD ??*

*If training was part-time, please explain the training schedule after item 8 of this form.

**2. During the time of the applicant's participation, was the postgraduate training program accredited?** [✓] YES   [ ] NO

**Accredited by:** [✓] ACGME: Program # 2201021065   [ ] AOA: ID #: _____   [ ] RCPSC

**3. Did the applicant participate in all of the components of the training as required by the accrediting body?**
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

**4. Did the applicant successfully complete all requirements of each year of training?**
[✓] YES   [ ] NO   Comments (attach signed and dated additions as needed): _____

**5. During the applicant's year(s) of training, did the applicant have any break in training?**
[✓] NO   [ ] YES   Comments (attach signed and dated additions as needed): _____

JA3136

STATE MEDICAL LICENSURE
Character/Fitness Details
10/2003 INT

Print Your Name: Charles John Nosa Akoda   Date: 7/28/11

Page 10 of 11

18 a.   If you answered "YES" to any of the questions in item 17, please provide an explanation below and attach all complaints, pleadings and judgments. Attach additional signed and dated pages as needed.

18 b.   If you answered yes to 17L - answer the following questions:

1.   Total number of malpractice claims ever filed in which you were named as a defendant?_____

2.   Total number of malpractice claims ever paid (settlement / judgment) in which you were named as a defendant? _____

3.   Within the last 60 months (5 years) provide the following:
Total number of medical malpractice claims filed _____ ; paid (settlement / judgment ) _____ ; or dismissed_____ ; in which you were named as a defendant.

4.   For a claim filed at any time, but paid (settlement / judgment) within the last 60 months (5 years), list each claim by claimants name; describe the disposition of each claim; and provide a copy of the complaint, pleading, and judgment of each medical malpractice claim.

N/A

RECEIVED
AUG 1 1 201
MARYLAND BOARD OF PHYSICIANS

I have attached  the following number of pages to this application:_____

JA3137

**9. Chronology of Activities: DO NOT ATTACH RESUME OR CURRICULUM VITAE**

Beginning with the date you completed medical school and continuing through the present, list chronologically all of your activities. Account for all periods of time including each post-graduate training program you attended, regardless of whether or not you completed the program; each job you held, regardless of whether or not it was medically related or you were compensated; and any period of unemployment.

| Date Medical School was Completed: | month 06 | year 87 |
|---|---|---|

Activities after completing medical school: Please type or print.

| month 06 | year 07 | TO | month 06 | year 11 | Activity: OBGYN RESIDENCY |
|---|---|---|---|---|---|

Address: HOWARD HOSP 2041 GEORGIA AVEN. NW DC 20060

| month 01 | year 05 | TO | month 06 | year 07 | Activity: MAXICARE Inc    PHYSICIAN Assistant |
|---|---|---|---|---|---|

Address: P.O. BOX 5036, Laytonsville MD 20882

| month 05 | year 00 (2000) | TO | month 12 | year 04 | Activity: MEDICAL DIRECTOR Vita Med ctr |
|---|---|---|---|---|---|

Address: Port Harcourt, Nigeria.

| month 07 | year 92 | TO | month 04 | year 00 | Activity: MEDICAL OFFICER |
|---|---|---|---|---|---|

Address: Gen Hosp Ughelli, Nigeria

| month 06 | year 90 | TO | month 06 | year 92 | Activity: Resident OBGYN |
|---|---|---|---|---|---|

Address: University of Ibadan, Nigeria.

| month 01 | year 89 | TO | month 05 | year 90 | Activity: Medical officer |
|---|---|---|---|---|---|

Address: Gen. Hosp. Benin City, Nigeria

| month 07 | year 87 | TO | month 12 | year 88 | Activity: Internship |
|---|---|---|---|---|---|

Address: Gen. Hosp. Warri, Nigeria.

| month | year | TO | month | year | Activity: |
|---|---|---|---|---|---|

Address:

**CONTINUED ON PAGE 3:** If you will need more space than page 3 allows, please photocopy page 3 for your use or attach a separate sheet. Please sign and date each sheet you attach.

JA3138

MARYLAND BOARD OF PHYSICIANS
WILLIAM CALHOUN
4201 PATTERSON AVE., 4TH FLOOR
BALTIMORE, MD, 21215-0095

**State Board Code:**
**021**
Please include this
number on all requests

## ECFMG® CERTIFICATION STATUS REPORT

USMLE™/ECFMG Identification Number: 0-553-258-5
Applicant's Name: JOHN NOSA AKODA
Applicant's Date of Birth: 01/01/1959
ECFMG Certified:Yes
    Certificate Issue Date: 08/18/1997
    English Test Valid Through: Valid Indefinitely

| Passing Performance on Medical Science Examinations: | | Two Digit Score | Three Digit Score |
|---|---|---|---|
| Examination | Date | | |
| USMLE Step 1 | 11 Jun 1997 | * | * |
| USMLE Step 2 CK | 28 Aug 1996 | * | * |

Most Recent Passing Performance on Clinical Skills Examination:

| Examination | Date |
|---|---|
| Not Required for Certification | |

Most Recent Passing Performance on English Test: AUG 1996
Name of Medical School and Country:University of Benin College of Medicine, Benin, NIGERIA

Degree Year: 1988
† Medical Education Credentials Status: Complete
This information is reported directly from ECFMG computer records and is current as of 09/14/11.

### How to Verify the Authenticity of this Report:

This report was issued to the named recipient on the date shown below. To verify the authenticity of this report, visit
https://cvsonline2.ecfmg.org/verify/verify.aspx and enter the unique verification code at the bottom of the report. The information contained in this report is
current as of the issue date. Any changes to the physician's status after the issue date will not be reflected, and you are encouraged to request an
updated report.

The purpose of this Status Report is to indicate whether this individual is certified by ECFMG. It reflects only examinations that were used to fulfill
requirements for ECFMG Certification. The most recent passing performance on the clinical skills examination is reflected, regardless of whether this
individual was required to take a clinical skills examination for ECFMG Certification. This Status Report is not a complete score history of all examinations
for this individual. This Status Report does not include examinations that were taken but not passed. Furthermore, if this individual passed examinations
that were not used to fulfill the requirements for ECFMG Certification, these examinations are not included.
* To obtain a complete history of and scores for USMLE Step examination(s) that may have been taken by this individual, contact the appropriate
registration entity to request a USMLE transcript.

† Since July 1986, ECFMG has verified medical school credentials directly with the medical schools, or through a reasonable alternative that has been
approved by the ECFMG Medical Education Credentials Committee.
**Important Note:**

Requesting organizations must normally secure and retain the physician's signed authorization to obtain certification information.
Organizations may not resell the information or make it available to any party beyond the initial request as authorized by the physician.
The information may only be used to confirm ECFMG certification for the purpose for which the physician provided authorization.
**Report Verification Code: DXD0C14D9F**

021
Form 282 B - 6/04

JA3139

**Initial Medical Licensure
Supplemental Form
MBP IML3
10/2009 INT**

MARYLAND BOARD OF PHYSICIANS
VERIFICATION OF POSTGRADUATE MEDICAL EDUCATION

Side B

Applicant's Name (print): *John Charles Nosa Akoda*

6.  Did the applicant have any physical or mental problem that effected the applicant's ability to practice medicine during the period of training?

If "Yes," please give a detailed explanation* _____

7.  Was any action taken against the applicant by any training program, hospital, medical board, licensing authority, or court ? Such actions include, but are not limited to investigations, limitations of privileges or special conditions, requirements imposed for academic incompetence, disciplinary actions, probationary actions, etc.

☐ YES   ☐ NO   If "Yes," please give a detailed explanation* _____

8.  In each year of training, did the applicant demonstrate sufficient academic and clinical ability to qualify for advancement without conditional or probationary status to the next year and next progressive level of responsibility in a designated specialty program?

☑ YES   ☐ NO   Comments:*

Control No: 111179            08/09/2011
Akoda. Charles John Nosa
*IML3-Accredited Training Programs*
Received: William Calhoun
Analyst: Dierdra Rufus

* If space is not sufficient, please attach a signed and dated detailed explanation.

**Attestation:** I attest that the information I have provided regarding the applicant is true, accurate, and complete according to all available records.

*Diana Broomfield*
Printed Name of Program Director

*Howard University*
Hospital

OBGYN

M. D, FACOG, FACS.
Title

2041 Georgia Aven. Washington DC
Address

202 - 865 - 7081

JA3140

10. **MEDICAL EDUCATION:** List all medical schools you have attended

University OF BENIN COLLEGE OF MEDICINE, NIGERIA

From: MM/YY To MM/YY  06/82 - 06/87

Medical School From Which You Received Your Medical Degree: University OF BENIN, Nigeria

Name of University Affiliation (if applicable): *

Street Address: O1 QUEEN ELIzabeth Rd, MoKola, Ibadan, Nigeria

City: \_\_\_\_\_ State/Province: \_\_\_\_\_ Country of citizenship during medical education: Nigerian

Language(s) of Instruction: ENGLISH

Type of Degree: [ ] M.D.  [ ] D.O.  [ ] M.D./Ph.D  [X] M.B.B.S.  [ ] M.B.B.Ch  [ ] Other: \_\_\_\_\_ (specify)

Date Degree The date you officially received your degree after all prerequisite obligations, required training, government service, etc. Was Conferred: was satisfied.

Month [0][6]  Day [3][0]  Year [8][7]  ✱ D.O.G. 1988  Correct

**GRADUATES OF FOREIGN MEDICAL SCHOOLS** (Schools not in the U.S. or its territories, Puerto Rico, or Canada) Attach the following documents to this application:

1) A copy of your valid ECFMG certificate or Fifth Pathway Certificate;

2) A copy of your medical school diploma and a certified translation;

3) If you listed an affiliation above (see * in 10 above), attach a copy of the Certificate of Medical Education and Examinations Taken, Good Conduct Certificate or Intern Certificate. The certificate must include your name, name of the medical school, name of the university, and a certified translation.

If your name is not written the same way on all documents, you must submit documentation to explain how and why your name differs and submit one of the following documents to support the name change; Passport, INS card, birth certificate, court document, marriage license, court decree.

11. How have you satisfied Maryland's *written and oral* English language competency requirements? (See *English Language Competency Requirements for Medical Licensure in Maryland* in the introductory material included with your application.)

a. [X] I graduated from a medical school or, after at least three years of attendance, a high school (includes GED), undergraduate college, or university where English was the *only* language of instruction throughout (you must provide documentation); or

b. [ ] I passed either [ ] the TOEFL or [ ] the ECFMG English test after December 31, 1973 AND [ ] passed the [ ] TSE or [ ] OPI. If you have taken the Test of English as a Foreign Language (TOEFL) and either the Test of Spoken English (TSE) or the Oral Proficiency Interview (OPI), please request that Education Testing Service and/or Language Testing International send verification of your scores directly to the Board;

c. [ ] I passed the USMLE Step 2 Clinical Skills Exam.

Are you claiming speech impairment? [X] NO  [ ] YES  If "YES," please write or call the Board for additional information.

2014

🖨 **Print**

## DO NOT MAIL THIS TO THE BOARD. RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number** D0073049 Dr. Charles John Nosa Akoda

| 2. | Individual National Provider Identifier NPI: 1952664278 ☐ I do not have an NPI |
|---|---|
| | This is the NPI entered in the field for Rendering NPI on a claim (10 digit number) |
| | ⑦ NPI Information |

3. **EMAIL ADDRESS:** Please enter your most current email address where we may contact you regarding your license.

adcfrancis@aol.com

**Address Changes (Non-Public and Public):**
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2014 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

**4a. Non-Public Address:** This address is for Board use only and is **where your license will be mailed**. However, if no public address is listed, this address will also be made available to the public.

| Street | |
|---|---|
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

**4b. Public Address:** This address, usually your office, is available to the public and will be posted on the Internet. If you do not designate a public address, your non-public address will be posted on the Internet.

☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| Street | 14909 Downey Court |
|---|---|
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? See instruction    ● Yes ○ No

CHARACTER AND FITNESS (Question 6)

6. The following questions pertain to the period since July 1, 2012. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
* All questions must be answered Yes or No.

| Yes No<br>NO | Has any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the armed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404? |
|---|---|
| Yes No<br>NO | Have any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services? |

JA3142



c. Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes No
NO

Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

Yes No
NO

Have you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

Yes No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

Yes No
NO

Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

Yes No
NO

Do you have a physical or mental condition that currently impairs your ability to practice medicine?

Yes No
NO

j. Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

Yes No
NO

k. Do you illegally use drugs?

Yes No
NO

Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

Yes No
NO

Have you been named as a defendant in a filing or settlement of a medical malpractice action?

Yes No
YES

I was a Resident rotating through Prince Georges Hospital in 2010 when a child delivered had Brachial nerve palsy. All staff including Residents involved in the delivery were name in the law-suit. I am being represented by Attorneys from Howard Residency program which is my training institution. The law-suit is still in its preliminary stages

n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

Yes No
NO

Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

Yes No
NO

p. Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

Yes No
NO

Have you failed to make arrangements to satisfy any state or federal loans that financed your medical education?

Yes No

JA3143

CONTINUING MEDICAL EDUCATION (Question 7)

⊙ **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1 continuing medical education activities within the two-year period immediately preceding submission of this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity and maintain documentation for a period of six years for possible inspection by the Board. For additional information on CME, see Maryland Regulations, 10.32.01.09.*

○ **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first renewal after initial medical licensure in Maryland and I have completed the Board's New Physician Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were licensed prior to September 30, 2012 or reinstated, this does not apply to you. See New Physician Orientation Program web site, **Your license will not be renewed unless you have completed the orientation.**

○ **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a. Gender ⊙ Male ○ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin? (A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:

American Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America, and who maintains tribal affiliations or community attachment.)

Asian (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

Black or African American (A person having origins in any of the black racial groups of Africa.)

Native Hawaiian or other Pacific Islander (A person having origins in the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

White (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

Other

9. Are you employed by the Federal Government?

○ Yes ⊙ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship (subspecialty) training program accredited by the ACGME.

🖐 If you answer *Yes* to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of this application.

a. In an accredited/approved internship or residency program?

○ Yes ⊙ No

b. In an accredited fellowship (subspecialty) training program?

○ Yes ⊙ No

11a. Which best describes your current area(s) of concentration:

| | |
|---|---|
| Primary Concentration | Obstetrics & Gynecology ⌄ |
| Secondary Concentration | None ⌄ |

JA3144

11b. SPECIALTY BOARD CERTIFICATION: List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

Primary Certification: Obstetrics & Gynecology
Secondary Certification: None

12. Please select all states (excluding Maryland) where you hold a medical license.

| | | | | | |
|---|---|---|---|---|---|
| ☐ Alabama | ☐ Florida | ☐ Kentucky | ☐ Nebraska | ☐ Oklahoma | ☐ Utah |
| ☐ Alaska | ☐ Georgia | ☐ Louisiana | ☐ Nevada | ☐ Oregon | ☐ Vermont |
| ☐ Arizona | ☐ Guam | ☐ Maine | ☐ New Hampshire | ☐ Pennsylvania | ☑ Virginia |
| ☐ Arkansas | ☐ Hawaii | ☐ Massachusetts | ☐ New Jersey | ☐ Puerto Rico | ☐ Virgin Islands |
| ☐ California | ☐ Idaho | ☐ Michigan | ☐ New Mexico | ☐ Rhode Island | ☐ Washington |
| ☐ Colorado | ☐ Illinois | ☐ Minnesota | ☐ New York | ☐ South Carolina | ☐ West Virginia |
| ☐ Connecticut | ☐ Indiana | ☐ Mississippi | ☐ North Carolina | ☐ South Dakota | ☐ Wisconsin |
| ☐ Delaware | ☐ Iowa | ☐ Missouri | ☐ North Dakota | ☐ Tennessee | ☐ Wyoming |
| ☐ District of Columbia | ☐ Kansas | ☐ Montana | ☐ Ohio | ☐ Texas | |

13a. How many weeks per year do you work?   48

13b. Please indicate below how the hours are allocated in your typical work week . The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

ℹ️ If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

*Patient Care Related Activities* include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

*Research* includes clinical, laboratory, and analytical research

*Teaching* includes the teaching of medical undergraduate & graduate students and other graduate students.

*Administration & Other:* Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

ℹ️ Use whole numbers. No fractional hours. If none enter 0.

| | | |
|---|---|---|
| a. Patient Care Related Activities | 60 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 10 | hours per week |
| d. Administration & Other | 10 | hours per week |
| Total Hours | 80 | hours per week |

14. If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next two years?

○ Yes ○ No

PRACTICE INFORMATION (Questions 15-26)

15. Do you plan to discontinue patient care related activities in the next two years?

○ Yes ⦿ No

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

a. Number of locations in Maryland (if none, enter 0)    2

b.    0

JA3145

Number of locations outside of Maryland (if none, enter 0)
ⓘ If you have locations outside Maryland, please answer (c) below after you
answer (b).

   c. Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?
      ○ Yes  ○ No  ○ Don't know

---

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

   a. Number of hospitals in Maryland (if none, enter 0)     `1`

   b. Number of hospitals outside of Maryland (if none, enter 0)     `0`

---

**18. Primary Practice / Office Location Primary Practice / Office Location**

ⓘ Please answer all Primary Practice questions

| | | |
|---|---|---|
| a. | Organization Name | Dr Abdul Chaudry |
| | Organization Name2 | |
| b. | Street Address | 6005 Landover Road, suite#5 |
| c. | Street2 | |
| | | ⓘ Enter suite or room number here. (Ex. Suite 101 or Room 101) |
| d. | City | Cheverly |
| e. | State | Maryland |
| f. | Zip Code | 20785 |
| g. | Jurisdiction | PRINCE GEORGE'S |

h. Employer Tax ID  `00` - `0000000`  ⓘ If you do not have an EIN enter 00-0000000

ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

   ○ I use an Organizational NPI for billing.  Please Enter >     [  Organizational NPI  ]

   ○ I use my Individual NPI for billing.

   ⦿ I do not bill public or private insurers.

j. You indicated in Question 13a, **60** hours of Patient Care Related Activities during a typical work week.
How many of those Patient Care Related Activity hours in your typical work week are delivered at this practice/office location?    `60` Hours
ⓘ If none, enter 0.

| | | |
|---|---|---|
| k. | Setting | Freestanding Physician Office |
| l. | Private/Public | Private-For profit |
| m. | Practice | Single-Specialty Group-Independent |

Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-level medical providers is listed below.
ⓘ If none, enter 0; if you don't know the number, enter 999

Number of physicians (MDs, DOs, residents, fellows) including yourself at this location.    `2`

Number of mid-level medical providers at this location.    `5`
ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician assistants.

JA3146

19. Secondary Practice / Office Location

ⓘ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

a. Organization Name  | Dr Abdul Chaudry |
   Organization Name2 | |
b. Street Address      | 6400 Marlboro Pike |
c. Street2             | |
   ⓘ Enter suite or room number (Ex. Suite 101 or Room 101)
d. City                | District Heights |
e. State               | Maryland ⌄ |
f. Zip Code            | 20747 |
g. Jurisdiction        | PRINCE GEORGE'S ⌄ |

h. Employer Tax ID     | 00 | - | 0000000 |   ⓘ If you do not have an EIN enter 00-0000000
   ⓘ What is Employer tax ID?

i. Please select one of the following related to the NPI used for billing insurers:

   ○ I use an Organizational NPI for billing.  Please Enter >
   ○ I use my Individual NPI for billing.                              | |
   ● I do not bill public or private insurers.                          Organizational NPI

j. You indicated in Question 13a, **60** hours of Patient Care Related Activities during a typical work week.
   How many of those Patient Care Related Activity hours in your typical work week are delivered at this practice/office location?    | 20 |
   ⓘ If none, enter 0.                                                                                                                Hours

k. Setting            | Freestanding Physician Office ⌄ |
l. Private/Public     | Private-For profit ⌄ |
m. Practice           | Solo-independent ⌄ |
   Please answer the following regarding staffing at this practice/office location on a typical day. Definition of mid-level medical providers is listed below.
   ⓘ If none, enter 0; if you don't know the number, enter 999

   Number of physicians (MDs, DOs, residents, fellows) including yourself at this location.    | 2 |

   Number of mid-level medical providers at this location.    | 5 |
   ⓘ Mid-level medical providers: nurse practitioners, nurse midwives, nurse anesthetists and physician assistants.

20-21 The Health Information Technology questions have been moved to a seperate section. You are required to complete the Health Information Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public insurance program patients.

   a. Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc.    ● Yes   ○ No

   b. Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed Care Organization)    ● Yes   ○ No

      b1. If Yes, are you accepting new Maryland Medical Assistance patients?    ● Yes   ○ No

   c. Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)?

JA3147

○ Yes ○ No
● Yes ○ No
  c1. If Yes, are you accepting new Medicare patients?        ● Yes ○ No

---

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes  ○ No  ● NA

---

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

[ 0 ]  hours per week.  🕊 If none, enter 0

---

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), please answer Q.25, otherwise:
☑ check this box and skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel, sometimes called direct, concierge, or retainer-based practice?

○ Yes  ○ No

---

26. Workers Compensation

Workers Compensation coverage: If you employ one or more persons, the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

● Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

🕊 If you are a Maryland employer you must provide the information requested below.

Insurance Company  [                    ]
Policy Number      [                    ]
Expiration Date    [                    ]  🕊 Enter as MM/DD/YYYY Enter as MM/DD/YYYY

---

HEALTH INFORMATION TECHNOLOGY

Please contact the Maryland Health Care Commission at 410-764-3330 for questions relating to this section.

**Electronic Health Record Incentive**

Beginning in 2011, physicians that adopt an electronic health record are eligible to receive an incentive either under Medicare or Medicaid. To receive this incentive, a physician must meet certain criteria, which varies depending on which program you choose. The Medicare incentive is up to $44,000 over five years and the Medicaid incentive is up to $63,750 over six years. Physicians are encouraged to learn more about these incentive opportunities by visiting the Centers for Medicare and Medicaid Services website  http://www.cms.gov/EHRIncentivePrograms/

This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients at your primary office/practice location, which you listed in
*Question 18 - Primary Practice / Office Location Primary Practice / Office Location*

*Please complete the following HIT questions for:* **Dr Abdul Chaudry**

1. This question is about the use of computers and other forms of information technology, such as hand-held computers, in diagnosing or treating your patients in your office.

Are you computerized in your office:
    a. To obtain information about treatment alternatives or recommended guidelines?

JA3148

◉ Yes  ○ No

b. To send prescriptions electronically to a pharmacy?
◉ Yes  ○ No

If you answered Yes to 1b, what percentage of prescriptions are submitted electronically? [90] %
(Enter Whole number)

c. To generate reminders for you about preventive services needed for your patients?
◉ Yes  ○ No

d. To access patient notes, medication lists, or problem lists?
◉ Yes  ○ No

e. For clinical data and image exchanges with other physicians?
○ Yes  ◉ No

f. For clinical data and image exchanges with hospitals and laboratories?
○ Yes  ◉ No

g. To communicate about clinical issues with patients by email?
○ Yes  ◉ No

h. To obtain information on potential patient drug interactions with other drugs, allergies, and/or patient conditions?
◉ Yes  ○ No

2. Does your primary office/practice location use electronic MEDICAL RECORDS (not including billing records)?
○ Yes, all electronic  ◉ Yes, part paper and part electronic  ○ No  ○ Don't know

2a. If Yes, what is the name and version of the EHR system?
[Other ▼]

Other [Lytec]

2b. If **No**, please indicate your most significant reason for not using electronic medical records.
○ Capital cost outlays  ○ Lack of technology standards  ○ Retiring soon
○ Overburdened staff  ○ Intangible benefits  ○ Not my decision
○ Risk of privacy breaches

3. Have you used telemedicine for any purpose in the last 12 months?
◉ Yes  ○ No

🕮 Telemedicine means, as it relates to the delivery of health care services, the use of interactive audio, video, or other telecommunications of electronic technology by a licensed health care provider to deliver health care service(s) within the scope of practice of the health care provider at a site other than the site at which the patient is located.

3a. Approximately how many times in the last 12 months have you used telemedicine for any purpose? [2]
(Enter 0 if you did not use telemedicine)

3b. If you used telemedicine, what are your common uses of telemedicine technology (mark all that apply)?
☐ Second opinion
☐ Diagnosis
☑ Follow up
☐ Emergency
☐ Chronic disease management
☐ Other (specify) [                    ]

*The following questions are to be answered ONLY if your Practice Setting is one of the following:*
(1) Solo;  (2) Single-Specialty Group;  (3) Multi-Specialty Group; or (4) HMO Group/Staff

4. Does your practice use high speed Internet?

⦿ Yes  ○ No

4a. | Comcast ▼ |  Please Specify : | |

5. How do you access the Internet?

○ DSL  ○ Cable Modem  ○ Fiber to the office  ⦿ Wireless  ○ Other  ○ Unknown

6. Do you provide Wi-Fi access to your patients in your waiting area?

○ Yes  ⦿ No  ○ Unknown

PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.

* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime *    | 3013250264 |
Nighttime*   | |

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical  ☐ Biological  ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

☑ a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

☑ b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

☑ c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

☑ d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2014.

29. Please provide your electronic signature (type your name) below:

Name        | Charles Akoda |
Today's Date | 8/12/2014 | ▦ |

JA3150

Last four digits of Social
Security Number: _____

**30.** Select a Payment Option here to complete your application.

⊙ Please note: Credit cards may be used for online payment only. If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

⊙ **Credit Card** ○ **Send Check** ○ **3rd Party Check**     **3rd Party Payer:** [_____]

PAYMENT

**APPLICATION COMPLETION INFORMATION:**

| | |
|---|---|
| Date Application Started | 8/12/2014 |
| Date Application Submitted | 8/12/2014 |
| Confirmation Number | |
| Payment Method | Credit Card |
| Amount Paid | $522.00 |
| Credit Card Approval No. | |

JA3151

2012

🖨 Print

DO NOT MAIL THIS TO THE BOARD.  RETAIN THIS APPLICATION FOR YOUR RECORDS.

Application for renewal of: **Physicians**

1. **License Number D0073049** Dr. Charles John Nosa Akoda

| 2. | Individual National Provider Identifier NPI: 1952664278    ☐ I do not have an NPI<br>This is the NPI entered in the field for Rendering NPI on a claim (10 digit number)<br>ⓘ NPI Information |
|---|---|

3. **EMAIL ADDRESS**: This is your email address on file. If it has changed, please edit below. If you do not have an email address please indicate by checking the checkbox below.

adcfrancis@aol.com

☐ I do not have an email address

**Address Changes (Non-Public and Public):**
You must submit a Public and Non-Public address. If either address has changed, please correct here.
Your address(es) on the online renewal application is current as of July 1, 2012 . If you requested any changes to your address(es) that are not reflected on this application, please make the change at this time. These changes will be updated in the main database.

4a. **Non-Public Address**: This address is for Board use only and is <u>where your license will be mailed</u>. However, if no public address is listed, this address will also be made available to the public.

| Street | |
| Street (2) | |
| Street (3) | |
| City | |
| State | |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | |
| Country | |

4b. **Public Address**: This address, usually your office, is available to the public and will be posted on the Internet.  If you do not designate a public address, your non-public address will be posted on the Internet.

☐ Check if Public Address is the same as your Non-Public address (the address above will be automatically entered below.)

| Street | 14909 Downey Court |
| Street (2) | |
| Street (3) | |
| City | Bowie |
| State | Maryland |
| | If selecting a country other than USA or Canada, please choose "Foreign" as your state |
| ZipCode | 20721 |
| Country | United States |

5. Do you give the Maryland Board of Physicians permission to report your date of birth to the Federation of State Medical Boards' Physician Data Center? See instruction          ⦿ Yes ○ No

CHARACTER AND FITNESS (Question 6)
6. The following questions pertain to the period since July 1, 2010. If this is your first renewal, these questions apply to the period commencing with the date of your initial licensure or reinstatement. Check the box YES or NO next to each question. *If you answer Yes, provide an explanation at the prompt.*
* All questions must be answered Yes or No.

Yes    No
NO
'··· any licensing or disciplinary board of any jurisdiction (except this licensing board), or any entity of the a....ed services denied your application for licensure, reinstatement or renewal, or taken any action against your license, including but not limited to reprimand, suspension, revocation, a fine, or nonjudicial punishment, for an act that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes    No
.lave any complaints, investigations or charges been brought against you or are any currently pending in any jurisdiction by any licensing or disciplinary board (except this licensing board) or an entity of the armed services?

JA3152

NO

Yes No
NO

Has your application for a medical or health professional license been withdrawn for reasons that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes No
NO

d. Has an investigation or charge been brought against you by a hospital, related institution, or alternative health care system that would be grounds for action under Md. Code Ann. Health Occ. §14-404?

Yes No
YES

e. Have you had any denial of application for privileges, failure to renew your privileges, or limitation, restriction, suspension, revocation or loss in privileges in a hospital, related health care facility, or alternative health care system that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404?

Yes due to NPI number error: On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My priviledges were rescinded on about May 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes No
NO

f. Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other diversionary disposition of any criminal act, excluding traffic violations?

Yes No
NO

Have you had a plea of guilty, nolo contendere, conviction, or receipt of probation before judgment or other versionary disposition for an alcohol or controlled dangerous substance offense, including but not limited to driving while under the influence of alcohol or controlled dangerous substances?

Yes No
NO

Are there any pending criminal charges against you in any court of law, excluding minor traffic violations?

Yes No
NO

Do you have a physical or mental condition that currently impairs your ability to practice medicine?

Yes No
NO

Has the use of drugs and/or alcohol resulted in an impairment of your ability to practice your profession?

Yes No
NO

Do you illegally use drugs?

Yes No
NO

Have you surrendered or allowed your license to lapse while under investigation by any licensing or disciplinary board of any jurisdiction or an entity of the armed services?

Yes No
NO

Have you been named as a defendant in a filing or settlement of a medical malpractice action?

Yes No
YES

n. Has your employment by any hospital, HMO, related health care or other institution, or military entity been terminated for any diciplinary reasons?

Yes due to NPI number error On February 2012 I applied for Hospital privileges at Prince Georges Hospital. I inadvertently supplied an organizational NPI number rather than an Individual NPI number. My priviledges were rescinded on about may 30th 2012. I have since obtained an individual NPI number 1952664278 which I have submitted to the hospital. I am in the process of re-credentialing.

Yes No
NO

Have you voluntarily resigned from any hospital, HMO, or other health care facility or institution, or military entity while under investigation by that institution for disciplinary reasons?

Yes No

Are you in default of a service obligation resulting from your receipt of state or federal funding for your medical education?

JA3153

Yes   No     Have you failed to make arrangements to satisfy any state or federal loans that financed your medical
NO            education?

CONTINUING MEDICAL EDUCATION (Question 7)

○ **a. CME met.** I have completed and have been granted credit for at least 50 credit hours of Category 1 continuing medical education activities within the two year period immediately preceding submission of this application for license renewal. *Physician is obliged to obtain requisite documentation of CME activity and maintain documentation for a period of six years for possible inspection by the Board. For additional information on CME, see Maryland Regulations, 10.32.01.09.*

◉ **b. First Renewal & NPO.** I am exempt from CME during the renewal period because this is my first renewal after initial medical licensure in Maryland and I have completed the Board's New Physician Orientation Program. The New Physician Orientation is for **NEWLY** licensed physicians only. If you were licensed prior to September 30, 2010 or reinstated, this does not apply to you. See New Physician Orientation Program web site. **Your license will not be renewed unless you have completed the orientation.**

○ **c. First Renewal after reinstatement.** I am exempt from CME during the renewal period because this is my first renewal after reinstatement of my medical licensure in Maryland.

PERSONAL AND PROFESSIONAL INFORMATION (Questions 8-17)

8a.   Gender ◉ Male  ○ Female

8b. RACE/ETHNIC IDENTIFICATION - PLEASE CHECK ALL THAT APPLY

Are you of Hispanic or Latino origin? (A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.)

Select one or more of the following racial categories:

    ..erican Indian or Alaska Native (A person having origins in any of the original peoples of North or South America, including Central America, and who maintains tribal affiliations or community attachment.)

    ..n (A person having origin in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.)

    ..or African American (A person having origins in any of the black racial groups of Africa.)

    ..e Hawaiian or other Pacific Islander (A person having origins in the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.)

    ..ite (A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.)

    ..er

9. Are you employed by the Federal Government?

○ Yes  ◉ No

10. Please indicate if you are currently in: a) a residency program accredited by the Accreditation Council for Graduate Medical Education or an internship or residency program approved by the American Osteopathic Association; or b) a fellowship (subspecialty) training program accredited by the ACGME.

🖐 If you answer *Yes* to either a. or b. you will not be required to complete the Practice Information section (Questions 15-26) of this application.

a.   In an accredited/approved internship or residency program?

○ Yes  ◉ No

b.   In an accredited fellowship (subspecialty) training program?

○ Yes  ◉ No

JA3154

**11a. Which best describes your current area(s) of concentration:**

| Primary Concentration | Obstetrics & Gynecology ▾ |
| Secondary Concentration | None ▾ |

**11B. SPECIALTY BOARD CERTIFICATION:** List up to two (2) specialty areas only if certified by a recognized board of the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA).

| Primary Certification | None ▾ |
| Secondary Certification | None ▾ |

**12. Please select all states (excluding Maryland) where you hold a medical license.**

☐ Alabama ☐ Florida ☐ Kentucky ☐ Nebraska ☐ Oklahoma ☐ Utah
☐ Alaska ☐ Georgia ☐ Louisiana ☐ Nevada ☐ Oregon ☐ Vermont
☐ Arizona ☐ Guam ☐ Maine ☐ New Hampshire ☐ Pennsylvania ☑ Virginia
☐ Arkansas ☐ Hawaii ☐ Massachusetts ☐ New Jersey ☐ Puerto Rico ☐ Virgin Islands
☐ California ☐ Idaho ☐ Michigan ☐ New Mexico ☐ Rhode Island ☐ Washington
☐ Colorado ☐ Illinois ☐ Minnesota ☐ New York ☐ South Carolina ☐ West Virginia
☐ Connecticut ☐ Indiana ☐ Mississippi ☐ North Carolina ☐ South Dakota ☐ Wisconsin
☐ Delaware ☐ Iowa ☐ Missouri ☐ North Dakota ☐ Tennessee ☐ Wyoming
☐ District of Columbia ☐ Kansas ☐ Montana ☐ Ohio ☐ Texas

---

**13a. How many weeks per year do you work?** 48 ▾

13b. Please indicate below how the hours in your typical work week are allocated. The sum of these hours should reflect the number of hours in your typical work week. Definitions of these categories are listed below.

🛈 If you allocate **0 hours per week** to a. Patient Care Related Activities you will not be required to complete the Practice Information section (Questions 15-26) of this application.

***Patient Care Related Activities*** include seeing patients, writing prescriptions, patient-related clinical activities (such as pathologic and radiologic assessments), maintaining patient records, obtaining and reviewing test results, arranging referrals, consulting with other providers about patients, talking with a patient's family members.

***Research*** includes clinical, laboratory, and analytical research

***Teaching*** includes teaching of medical undergraduate & graduate students and other graduate students.

***Administration & Other:*** Administration includes practice management (billing, contract negotiations, personnel, regulatory activities) & management of institutions or programs (health departments, health insurance, hospitals, other health-related institutions or programs); Other

🛈 Use whole numbers. No fractional hours. If none enter 0.

| a. Patient Care Related Activities | 36 | hours per week |
| b. Research | 0 | hours per week |
| c. Teaching | 0 | hours per week |
| d. Administration & Other | 4 | hours per week |
| Total Hours | 40 | hours per week |

---

14. If you indicated in Question 13 that you are not engaged in patient care related activities, do you intend to resume patient care related activities in the next 2 years?

○ Yes ○ No

---

PRACTICE INFORMATION (Questions 15-26)

15. Do you plan to discontinue patient care related activities in the next two years?

○ Yes ◉ No

JA3155

16. Please indicate below the number of practice/office locations at which you routinely deliver patient care for reimbursement.

    a.  Number of locations in Maryland (if none, enter 0)        `0`

    b.  Number of locations outside of Maryland (if none, enter 0)        `0`
        ⓘ If you have locations outside Maryland, please answer (c) below after you answer (b).

    c.  Do you routinely treat Maryland patients at your practice/office location(s) outside of Maryland?

        ○ Yes   ○ No   ○ Don't know

17. Please indicate below the number of hospitals at which you currently have admitting privileges.

    a.  Number of hospitals in Maryland (if none, enter 0)        `0`

    b.  Number of hospitals outside of Maryland (if none, enter 0)        `0`

**18. Primary Practice / Office Location** Primary Practice / Office Location
No Primary Location indicated from your response in Question 16
ⓘ Please answer all Primary Practice questions

**19. Secondary Practice / Office Location**
No Secondary Location indicated from your response in Question 16.
ⓘ If you have a secondary practice/office location and you've checked the box above, you will see a series of questions that must be completed.

20-21 Health Information Technology questions has been moved to a seperate section. You are required to complete the Health Information Technology section ONLY if you have a Primary Practice Location.

22. Please indicate if you participate in the following private and public insurance programs, and whether you are currently accepting new public insurance program patients.

| | | Yes | No |
|---|---|---|---|
| a. | Participate in any PRIVATE insurance plan networks, including PPO, EPO, HMO, etc. | ○ | ◉ |
| b. | Participate in the MARYLAND MEDICAL ASSISTANCE PROGRAM (in either the traditional program or a Managed Care Organization) | ○ | ◉ |
| | b1. If Yes, are you accepting new Maryland Medical Assistance patients? | ○ | ○ |
| c. | Participate in the MEDICARE (in either the traditional program or a Medicare Advantage Plan)? | ○ | ◉ |
| | c1. If Yes, are you accepting new Medicare patients? | ○ | ○ |

23. Do you offer a sliding fee scale based on ability to pay? (Utilize a standardized fee reduction schedule for low-income)

○ Yes   ○ No   ◉ NA

24. Please report the typical number of hours per week you personally provide care to patients on a charity basis (do not include bad debt).

`0`   hours per week.    ⓘ If none, enter 0

If you are practicing as an adult primary care specialist (internal medicine, family practice, general medicine), answer Q.25. Otherwise skip to Q.26.

25. Do you charge patients an annual fee for participating on your patient panel (sometime called direct, concierge, or retainer-based practice)?

○ Yes ○ No

_____

## 26. Workers Compensation

Workers Compensation coverage: If you <u>employ one or more persons</u>, the Md. Code Ann. Health Occ. §1-202 requires that you verify that you are complying with the Workers' Compensation Law for your renewal to be issued.

I hereby certify:

○ Not Applicable (Do not complete below)

○ I do not practice in Maryland.

○ I do not employ anyone in my practice in Maryland.

○ I employ one or more persons in my Maryland practice and have the following Workers Compensation coverage.

    📧 If you are a Maryland employer you must provide the information requested below.

| | |
|---|---|
| Insurance Company | |
| Policy Number | |
| Expiration Date | 📧 Enter as MM/DD/YYYY Enter as MM/DD/YYYY |

### PHYSICIANS EMERGENCY CONTACT INFORMATION

27. As part of Maryland's emergency preparedness efforts, the Department of Health and Mental Hygiene has identified the need for certain contact information for licensed physicians in Maryland who may be needed to respond to a catastrophic health emergency. (Public Safety Article, Sec. 14-3A-01 et seq. and Health General Article Section 18-901 et seq. sets forth the powers of the Governor and Secretary of the Department of Health and Mental Hygiene.)

* Required Field

Please provide the phone number that should be used in the event of an actual emergency.

Daytime *      3013250264

Nighttime*

Indicate by checking any box that applies whether you have any particular training and experience regarding the following specific agents:

☐ Chemical    ☐ Biological    ☐ Radiological

If you are interested in being contacted about training opportunities provided by the Board of Physicians, please visit the Maryland Professional Volunteer Corps website at https://mdresponds.dhmh.maryland.gov/.

*Thank you for your assistance!*

### 28. CERTIFICATION AND AUTHORIZATION OF LICENSE APPLICATION

    ☑      a. I certify that I have personally reviewed all responses to the items in this application and that the information I have given is true and correct to the best of my knowledge and that any false information provided as part of my application may be cause for the denial of my application.

    ☑      b. I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for renewal from any person or agency, including but not limited to former and current employers, government agencies, the National Practitioners Data Bank, the Healthcare Integrity and Protection Data Bank, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent releases for information that may be requested by the Board.

    ☑      c. I shall inform the Board, by certified mail, return receipt requested, within 30 days of: (a) action that would be grounds for disciplinary action under Md. Code Ann. Health Occ. §14-404, that occurred at any time during the application period; (b) change in any answer that was originally given in this application.

_____

    ☑      d. Check Here if you wish to have the option of viewing your completed application online after you renew your license. Otherwise, your application will not be available online for your later viewing. If selected, viewing is available until 12/1/2012.

JA3157

29. Please provide your electronic signature (type your name) below:

Name | Charles John Nosa Akoda

Today's Date | 9/3/2012 🖳

Last four digits of Social
Security Number: | 🔲

30. Select a Payment Option here to complete your application.

ℹ️ Please note: Credit cards may be used for online payment only. If you or a 3rd party is sending in payment, it must be by check.

Your renewal fee is:

◉ Credit Card   ○ Send Check   ○ 3rd Party Check     **3rd Party Payer:** [＿＿＿＿＿＿＿＿＿]

PAYMENT
**APPLICATION COMPLETION INFORMATION:**

| | |
|---|---|
| Date Application Started | 9/3/2012 |
| Date Application Submitted | 9/3/2012 |
| Confirmation Number | /     49 |
| Payment Method | Credit Card |
| Amount Paid | $514.00 |
| Credit Card Approval No. | |

JA3158

Case 1:21-cv-06056-JMW Document 122-5 Filed 12/12/21 Page 1269 of 3041

# Exhibit 41

JA3159

**Kesting, Virginia**

| | |
|---|---|
| **From:** | Kesting, Virginia |
| **Sent:** | Wednesday, October 15, 2014 1:33 PM |
| **To:** | Kruakaew, Rattakan |
| **Subject:** | RE: Subpoena |
| **Attachments:** | ECFMG and Maryland Board of Physicians E-mail Correspondence.pdf |

Hi Rattakan,

Per our conversation, attached please find additional material to be included for the file of **John Nosa Akoda  0-553-258-5**.

Virginia

---

**From:** Kruakaew, Rattakan
**Sent:** Thursday, October 09, 2014 11:35 AM
**To:** Fitzpatrick, Eleanor; Kelly, Bill; Dahn, Susan; Kesting, Virginia; Corrado, Kara; Spizuco, Matthew; Griffin, Darrell; Steans, Frances; Donatto, Thai
**Subject:** Subpoena
**Importance:** High

Good morning,

We received a subpoena requesting for records of these two applicants:

0-482-700-2 Oluwafemi Charles Igberase
0-553-258-5 (John Nosa Akoda)

If you have any records related to the two applicants, kindly send me copies by end of tomorrow, Friday 10/10. Please let me know if you have any questions or concerns.

Thanks so much for your prompt assistance.

Rattakan

**(Ms.) Rattakan Kruakaew, M.S.**
Administrative Assistant to William Kelly, MS.
Associate Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104
Tel: 215.823.2103
Fax: 215.966.7581

1

JA3160

Confidential

ECFMG_RUSS_0003956

**Kesting, Virginia**

| | |
|---|---|
| **From:** | Dierdra Rufus -DHMH- [dierdra.rufus@maryland.gov] |
| **Sent:** | Monday, September 29, 2014 3:27 PM |
| **To:** | Kesting, Virginia |
| **Subject:** | akoda |
| **Attachments:** | DOC052.PDF |

--

Dierdra Rufus
Supervisor, Licensure Unit
Maryland Board of Physicians
410-764-5977

CONFIDENTIALITY NOTICE: This message and the accompanying documents are intended only for the use of the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this email in error, please notify the sender immediately and destroy the original transmission.

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

1

Confidential

ECFMG RUSS 0003957

# UNIVERSITY OF BENIN



BENIN CITY, NIGERIA

## Johnbull Enosakhare Akoda

having satisfied all the requirements of the University
and passed the prescribed examinations held in

### October 1987

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6th day of February 1988

REGISTRAR

VICE-CHANCELLOR

JA3162

Confidential

ECFMG_RUSS_0003958

RECEIVED AUG 11 2011 MARYLAND BOARD OF PHYSICIANS

## Kesting, Virginia

| | |
|---|---|
| From: | Kesting, Virginia |
| Sent: | Monday, September 29, 2014 3:57 PM |
| To: | 'dierdra.rufus@maryland.gov' |
| Cc: | Griffin, Darrell |
| Subject: | FW: akoda |
| Attachments: | DOC052.PDF; ECFMG Verification Form (Form 399A)  John Nosa Akoda 0-553-258-5.pdf |

| Tracking: | Recipient | Delivery |
|---|---|---|
| | 'dierdra.rufus@maryland.gov' | |
| | Griffin, Darrell | Delivered: 9/29/2014 3:57 PM |

Dierdra,

Attached please find a copy of the completed ECFMG Verification Form (Form 399A)  sent from the University of Benin, Nigeria, to ECFMG for  John Nosa Akoda 0-553-258-5.

The copy of the diploma you forwarded to ECFMG matches the copy of the diploma the University of Benin, Nigeria, certified was authentic.

If you need any additional information, please contact me.

Virginia Kesting, Manager
Credentials Services

 **ECFMG**

Educational Commission for Foreign Medical Graduates
3624 Market Street | Philadelphia, PA 19104-2685
e-mail: vkesting@ecfmg.org | Phone:215.823-2177

**From:** Dierdra Rufus -DHMH- [mailto:dierdra.rufus@maryland.gov]
**Sent:** Monday, September 29, 2014 3:27 PM
**To:** Kesting, Virginia
**Subject:** akoda

--
Dierdra Rufus
Supervisor, Licensure Unit
Maryland Board of Physicians
410-764-5977

CONFIDENTIALITY NOTICE. This message and the accompanying documents are intended only for the use of the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this email in error, please notify the sender immediately and destroy the original transmission.

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

1

Confidential

ECFMG RUSS 0003959

Case 1:18-cr-05623-JDW Document 39-5 Filed 12/11/21 Page 18 of 28

RECEIVED

MM 29 1996  5-690-003

APR 22 1996

Return to: ECFMG
3624 Market Street
Philadelphia PA 19104-2685
USA

**ECFMG**

Re: 0-553-258-5

DR John Nosa Akoda

I hereby certify that the attached diploma or other credential for the individual noted above is authentic and correct and that I am authorized to certify this on behalf of this institution.

_____ | 21st MAY 1996
Signature | Date

PROFESSOR L. I. OJGWU, FRCP.
Name (Printed or Typed)

DEAN  FACULTY OF MEDICINE
Title

UNIVERSITY OF BENIN, BENIN CITY, NIGERIA
Name of Medical School

*Seal: FACULTY OF MEDICINE · University of Benin · BENIN CITY · HEALTH SCIENCES*

I **cannot** certify that the diploma or other credential for the individual noted above is authentic and correct because:

_____

_____

_____

_____

_____

_____ 
Signature                                    Date

_____
Name (Printed or Typed)

_____
Title                                              Seal

_____
Name of Medical School

Form 399A--English
Rev. August 1995

Confidential

ECFMG RUSS 0003960

# UNIVERSITY OF BENIN



### BENIN CITY, NIGERIA

## Johnbull Enosakhare Akoda

having satisfied all the requirements of the University
and passed the prescribed examinations held in

## October 1987

has been admitted to the degree

of

## Bachelor of Medicine: Bachelor of Surgery

Given at Benin City this 6<sup>th</sup> day of February 1988

RECEIVED
AUG 11 2011
MARYLAND BOARD OF PHYSICIANS

_M._
REGISTRAR

_Ernest Eller Williams_
VICE CHANCELLOR

JA3165

Confidential

ECFMG_RUSS_0003961

Kesting, Virginia

| | |
|---|---|
| **From:** | Brooks Whigham -DHMH- [brooks.whigham@maryland.gov] |
| **Sent:** | Thursday, October 09, 2014 2:52 PM |
| **To:** | Kesting, Virginia |
| **Cc:** | Dierdra Rufus -DHMH- |
| **Subject:** | Charles Akoda, M.D. |
| **Attachments:** | Application Release - Akoda.PDF |

Good afternoon Ms. Kesting,

Ms. Rufus forwarded me your email stating ECFMG cannot release confidential information without a release signed by Dr. Akoda. Please see the attached release Dr. Akoda signed for his Maryland Board of Physicians licensure application authorizing the Board to request any information relating to his license.

If you have any questions, please feel free to ask.

Thank you,

Brooks Whigham
Compliance Analyst

--
Brooks Whigham
Compliance Analyst, Investigations
Maryland Board of Physicians
4201 Patterson Avenue
4th Floor
Baltimore, Md 21215

CONFIDENTIALITY NOTICE: This message and the accompanying documents are intended only for the use of the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this email in error, please notify the sender immediately and destroy the original transmission.

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

1

Confidential

| Initial Medical Licensure Release and Certification 10/2009 INT | **RELEASE AND CERTIFICATION** | Page 11 of 11 |

**19. Release:**

I agree that the Maryland Board of Physicians (the Board) may request any information necessary to process my application for medical licensure in Maryland from any person or agency, including but not limited to postgraduate program directors, individual physicians, government agencies, the National Practitioner Data Bank, the Healthcare Integrity and Protection Data Bank, the Federation of State Medical Boards, hospitals and other licensing bodies, and I agree that any person or agency may release to the Board the information requested. I also agree to sign any subsequent release for information that may be requested by the Board.

Charles John Nosa Akoda          *Charles Akoda*          7 / 28 / 11

Applicant's Name (Printed)          Applicant's Signature          Date

**20. (OPTIONAL) Third Party Release:** Although the Board encourages you to complete all aspects of your application on your own, if you plan to use an intermediary to receive information about the status of your application, please complete this release.

I agree that the Maryland Board of Physicians may release any information pertaining to the status of my application to the following person:

Name: _____ N/A _____

Phone: _____          _____     _____

                                        Applicant's Signature          Date

**21.** I agree that I will cooperate fully with any request for information or with any investigation related to my medical practice as a licensed physician in the State of Maryland including the subpoena of documents or records or the inspection of my medical practice.

During the period in which my application is being processed, I shall inform the Board within 30 days of any change to any answer I originally gave in this application, any arrest or conviction, any change of address or any action that occurs based on accusations that would be grounds for disciplinary action under Md. Code Ann., Health Occ. § 14-404.

*Charles Akoda*          7 / 28 / 11

Applicant's Signature          Date

**22. Affidavit:** To be completed by the applicant in the presence of a notary public after the applicant's picture has been attached below.

I certify that I have personally reviewed all the responses to items 1-22 of this application and that the information I have given is true and accurate to the best of my knowledge. I understand and agree that I may not practice, attempt to practice or offer to practice medicine in Maryland unless licensed by the Board.

*Charles Akoda*          8 / 3 / 11

Applicant's Signature          Date

STATE OF _____ Maryland _____

CITY/COUNTY OF _____ Prince George's _____

I HEREBY CERTIFY that on this _____ 3rd _____ day of _____ August _____, 20 11, before me, a Notary Public of the State and City/County aforesaid, personally appeared the Applicant, _____ Charles Akoda _____, whose likeness is identifiable as that of
                                                                    (print applicant's name)
the person in the photograph attached to this application and who has made oath in due form of law to be the person referred to in the above application for license to practice Medicine and Surgery in the State of Maryland, and to have stated the truth in all statements made in this application.

AS WITNESS my hand and notorial seal. _____
                                        Notary Public

My Commission expires _____ 03-25-2012 _____          **SEAL**

GEORGE E. OKAI
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY, MARYLAND
MY COMMISSION EXPIRES 3-25-2012

STOP! Completed application and check must be mailed to Maryland Board of Physicians, P.O. Box 37217, Baltimore, Maryland 21297

JA3167

Confidential

**Kesting, Virginia**

| | |
|---|---|
| **From:** | Kesting, Virginia |
| **Sent:** | Wednesday, October 15, 2014 12:05 PM |
| **To:** | 'Dierdra Rufus -DHMH-' |
| **Subject:** | RE: Maryland Board |
| **Attachments:** | John Nosa Akoda United States Medical Licensing Examination® (USMLE)  Application and Identification Documents.pdf |

Dierdra,

Good afternoon.

This is in response to your e-mail.

Pursuant to receipt by ECFMG of the release Dr. Akoda signed for his Maryland Board of Physicians licensure application authorizing the Board to request any information relating to his license, please see attached copies of identification documents and a copy of one of the United States Medical Licensing Examination® (USMLE)  applications  John Nosa Akoda 0-553-258-5 submitted to ECFMG.

If you have any questions, please contact me.

Virginia Kesting, Manager
Credentials  Services



Educational Commission for Foreign Medical Graduates
3624 Market Street │ Philadelphia, PA 19104-2685
e-mail: vkesting@ecfmg.org │ Phone:215.823-2177

---

**From:** Dierdra Rufus -DHMH- [mailto:dierdra.rufus@maryland.gov]
**Sent:** Thursday, October 09, 2014 11:42 AM
**To:** Kesting, Virginia
**Subject:** Maryland Board

Good morning Ms. Kesting, thanks for your previous help with information concerning  Dr. Charles Akoda/ Ikwofemi Igberose.  I would like to ask for a copy of what the doctor provided to you for identification.( passport, resident card, visa)


Thanks in advance for all of your help.

 Charles Ako


--
Dierdra Rufus
Supervisor, Licensure Unit
Maryland Board of Physicians
410-764-5977

CONFIDENTIALITY NOTICE: This message and the accompanying documents are intended only for the use of the individual or entity to which they are addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, you are hereby notified that you are strictly prohibited from reading, disseminating, distributing, or copying this communication. If you have received this email in error, please notify the sender immediately and destroy the original transmission.

JA3168

Confidential

ECFMG_RUSS_0003964

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

JA3169

Confidential

ECFMG_RUSS_0003965

## PLEASE DO ☐ NOT DETACH

**UNITED STATES MEDICAL LICENSING EXAMINATION (USMLE)**
**STEP 1 AND/OR STEP 2 EXAMINATIONS**

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOLS BY
THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, USA
PHONE: 215 386-5900   CABLE: EDCOUNCIL,PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and reexamination or application will not be accepted.
*Use typewriter or block print in ink.*

| | | |
|---|---|---|
| ① **ECFMG EXAMINATION HISTORY:** | Have you ever submitted an application to ECFMG for any examination, even if you did not take the examination? <br> ☒ Yes   ☐ No | If yes, enter your USMLE Identification Number (ECFMG Applicant Number) in this box. <br> 0-553-258-5 |

② **NAME:**
Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record

First Name: J O H N
Middle Name:
Last Name (Surname): A K O D I A   M O S A
Full Maiden Name (For married women only):

②1 If you have previously applied to ECFMG under another name, provide that name.
Previous Name
Please include a copy of the legal document that verifies this name change.

③ **ADDRESS:**
Use address to which admission permit and other notification from ECFMG should be sent

Number/Street: 5 8 0 0 Q U A N T R E L L   A V E N U E
Apartment Number: A P T   N O 8 1 0
Post Office Box Number:
City: A L E X A N D R I A
State/Country: V I R G I N I A
Zip or Postal Code: 2 2 3 1 2

④ **U.S. SOCIAL SECURITY AND/OR NATIONAL IDENTIFICATION NUMBERS:**
Enter U.S. Social Security Number: ☐☐☐ ☐☐ ☐☐☐☐
Enter National Identification Number and Country
Country:

⑤ **STATUS OF MEDICAL SCHOOL STUDENT:** *Must be completed by students.*
If you are applying for Step 1, will you have completed two years of medical school by the date of that examination? ☒ Yes ☐ No
If you are applying for Step 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school by the date of that examination? ☐ Yes ☐ No

⑥ **REGISTRATION:**
Select no more than one box for each Step and/or ECFMG English test for which you are applying.

| Step 1 (Check one box only) | Step 2 (Check one box only) | ECFMG English Test (Check one box only) |
|---|---|---|
| ☐ June 11-12, 1996 **or** | ☐ March 5-6, 1996 **or** | ☐ March 6, 1996 **or** |
| ☒ October 15-16, 1996 | ☐ August 27-28, 1996 | ☐ August 28, 1996 |

⑥1 **TEST CENTER:**
Select three different ECFMG centers in order of preference for each Step and/or ECFMG English Test. See the information Booklet in which this application was enclosed for a list of ECFMG centers.

If your center selections are not available, ECFMG reserves the right to assign a center
Step 1: (1) NEW YORK 330 (City / Center No.) (2) NEW YORK 330 (City / Center No.) (3) ___ (City / Center No.)
Step 2 and/or ECFMG English Test: (1) ___ (City / Center No.) (2) ___ (City / Center No.) (3) ___ (City / Center No.)

⑦ **EXAMINATION FEE(S):**
Enter the amount enclosed on the line provided

Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash.

Step 1 Basic Medical Science Examination   $440
Step 2 Clinical Science Examination   $440
ECFMG English Test   $ 40
Enter amount enclosed $ PAID/Credit

FOR OFFICE USE ONLY

⑧ **HANDEDNESS:**   ☒ Right Handed   ☐ Left Handed

APPLICATION FORM 104S, February, 1996

*ECFMG 1996 All Rights Reserved

Confidential

JA3170

ECFMG_RUSS_0003966

## PART B

| | | | Dates Attended | | | | No. School Years |
|---|---|---|---|---|---|---|---|

⑨ SECONDARY SCHOOL/ COLLEGE/ UNIVERSITY ATTENDED:

List any secondary school, college, or university attended.

| | | From | | To | | |
|---|---|---|---|---|---|---|
| | | MO. | YR. | MO. | YR. | |
| Name: University OF Benin, Nigeria | City/State/Country | 10 | 81 | 10 | 87 | 6yrs |
| Name: KINGS COLLEGE LAGOS NIGERIA | City/State/Country | 06 | 74 | 06 | 79 | 5yrs |

⑩ MEDICAL DEGREE AND

Title of Medical Degree: M.B.B.S. Date Conferred/Expected: MO. 10 YR. 87

If the degree has been conferred, a photocopy must be sent to ECFMG. See *Medical Education Credentials* section of the ECFMG Information Booklet.

⑩.1 MEDICAL SCHOOL:

Name of Medical School from which you graduated or expect to graduate. LIST EXACT NAME AND ADDRESS.

UNIVERSITY OF IBENIN
City/State/Country: EDO STATE NIGERIA

| From | | To | | No. of Years Attended |
|---|---|---|---|---|
| MO. | YR. | MO. | YR. | |
| 10 | 81 | 10 | 87 | 6 |

⑩.2 OTHER MEDICAL SCHOOLS ATTENDED:

Name / City/State/Country (x3, blank)

⑩.2 CLINICAL CLERKSHIPS:

See Part D of this application for entering clinical clerkships.

⑪ MEDICAL LICENSURE: Present or Future

Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine:
MO. 01 YR. 89 Country or state in which you are licensed: NIGERIA

⑫ HOSPITAL TRAINING: Residency or fellowship (blank)

⑬ EMPLOYMENT: Present employment only (blank)

⑭ BIRTHDATE/BIRTHPLACE: Day 01 Month 01 Year 59 Location: BENIN CITY EDO STATE

⑮ GENDER: ✓ Male ___ Female   ⑯ NATIVE LANGUAGE: EDO

⑰ CITIZENSHIP:
A. AT BIRTH NIGERIAN
B. UPON ENTERING MEDICAL SCHOOL NIGERIAN
C. NOW NIGERIAN

⑱ OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS: (blank)

## PART C

JA3171

ECFMG_RUSS_0003967

Confidential

## PART C

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) and must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(19) **CERTIFICATION BY APPLICANT**

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition (that which pertains to the administration for which I am registering) of the combined Information Booklet on ECFMG Certification and Application for USMLE Step 1 and Step 2 examinations and USMLE Bulletin of Information, am aware of the contents of both sections and meet the eligibility requirements set forth.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See Information Booklet for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant   X _John Doe Akoda_   Date _8/29/96_
(In Latin Characters)

(19) **CERTIFICATION BY MEDICAL SCHOOL OFFICIAL**

OR

A. I hereby certify that the photograph, signature, and information entered on Section 10 of this form accurately apply to the individual named above.

X _____
Signature of Medical School Official (In Latin Characters)

_Perm. of College_          _29/7/96_       _Benn City_
Official Title              Date            Institution

**CERTIFICATION OF IDENTIFICATION WITH EXPLANATION (Pertains to graduates only)**

B. I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this _____ day of _____, 19____.

X _____
Signature of Consular Official, First Class Magistrate, Notary Public (In Latin Characters)       Official Title

B.1 Explain in the space below why the application could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

| FOR OFFICE USE ONLY | |
| --- | --- |
| FORM | DATE |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | |
| 325 | |
| R.   M 9/11/96 | |

(20) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?   ☐ Yes   ☐ No.

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

(21) Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item (21) blank.

Select the one which best describes your racial/ethnic background.

| 1 ☐ American Indian/ Alaskan Native | 2 ☐ Asian Pacific Islander | 3 ☐ Hispanic | 4 ☑ Black (not of Hispanic Origin) | 5 ☐ White (not of Hispanic Origin) | 6 ☐ Other |
| --- | --- | --- | --- | --- | --- |

RECEIVED AUG 30 1996 ECFMG

PART D

| | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| (10.2) **CLINICAL CLERKSHIPS:** Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pregraduate internships) for each clinical discipline. | Medicine | Specialist Hosp. | Benn/warri | Dr Onwuka | 1988 |
| | Pediatrics | Specialist Hosp | Benn/warri | Dr Asemota | 1987-18 |
| | OBGYN | Specialist Hosp | Benn/warri | Dr Uyimbo | 1988 |
| | Surgery | Specialist Hosp | Benn/warri | Dr Idabbea | 1988 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Confidential

REPUBLIC OF NIGERIA

INTERNATIONAL MOTOR TRAFFIC

INTERNATIONAL DRIVING PERMIT

Convention on Road Traffic of 19th September 1949

№ 222541

Issued at..........LAGOS-NIGERIA

Date..........6 — 12 — 95

NOT VALID
FOR DRIVING
IN NIGERIA

VALID FOR FIVE YEARS



PLA

+ Signature or Seal of the
Association empowered
by the Authority

REPUBLIC OF NIGERIA
PRINCIPAL
LICENSING AUTHORITY
6/73/95

Confidential

ECFMG_RUSS_0002078



Confidential

Confidential

**CAUTION**

*This passport remains the property of the Government of the Federal Republic of Nigeria and may be withdrawn at any time. It is a valuable document and should not be altered in any way or allowed to pass into the possession of unauthorised person. If lost or destroyed the fact and circumstances should be immediately reported to the Passport Office, Abuja, or the nearest Nigerian Mission or Consulate and to the local police. New passports can be issued in such cases only after exhaustive enquiries.*



FEDERAL REPUBLIC OF NIGERIA

PASSPORT
PASSEPORT

Type / Type    Country code / Code du pays    Passport No. / Passeport N°
P              NGA                             A0662562

Surname / Nom
AKODA

Given names / Prénoms
JOHN NOSAKHANE CHARLES

Nationality / Nationalité
NIGERIAN

Date of birth / Date de naissance    Authority / Autorité
01 JAN / JAN 59                      370

Sex / Sexe    Place of birth / Lieu de naissance
M             LAGOS

Date of issue / Date de délivrance    Holder's signature / Signature du titulaire
11 SEP / SEPT 00

Date of expiry / Date d'expiration
10 SEP / SEPT 05

P<NGAAKODA<<JOHN<NOSAKHANE<CHARLES<<<<<<<<<<
A0662562<7NGA5901010M0509101<<<<<<<<<<<<<<02

JA3177

Confidential                                    ECFMG_RUSS_0003973

Confidential

This passport is valid for all countries
Ce passeport est valable pour tous pays

Previously held Passport No. A29 4517

Issued at 313 on 29|6|89 which has been cancelled and a new one issued.

Passport Control Officer

Renewals / Renouvellements

Observations

THIS PASSPORT CONTAINS 32 NUMBERED PAGES
CE PASSEPORT CONTIENT 32 PAGES NUMÉROTÉES



FEDERAL REPUBLIC OF

# NIGERIA

RÉPUBLIQUE FÉDÉRALE DU
NIGÉRIA



PASSPORT
PASSEPORT

A0662562

ECFMG_RUSS_0003975

JA3179

FEDERAL REPUBLIC OF

NIGERIA

PASSPORT

ECFMG_RUSS_0003976

Confidential

Indication relatives au conducteur:

Nom 1
Prénoms 2
Lieu de naissance 3
Date de naissance 4
Domicile 5

Tillnamn 1
Förnamn 2
Födelseort 3
Födelsedag 4
Hemvist 5

motorfordon:

| | |
|---|---|
| ...don och motorfordon på | A |
| ...r och som, utöver plats för ...t för befordran av gods och ...kg (7.700 lbs), Till dylika | B |
| ...uch vars tillåtna maximivikt ...fordon får kopplas ett lätt | C |
| ...r och som har mer an åtta ...refordon får kopplas ett lätt | D |
| ...D, och för vilka föraren är | E |

...av fordonets vikt, då det är färdigt

...s av vederbörande myndighet i det

...ikt icke överstiger 750 kg (1,650 lbs)

| ... | Indragningar (land I - VIII) |
|---|---|
| ...f | |
| ...n | |
| ...s | |
| ...d | |

Catégorie de véhicules pour lesquels le permis est valable:

| | | |
|---|---|---|
| Motocycles avec ou sans sidecar, voitures d'infirmes et automobiles à trois roues dont le poids à vide n'excede pas 400 kg (700 livres). | A |
| Automobiles affectées au transport des personnes et comportant, outre le siège du conducteur, huit places assises au maximum ou affectées au transport des marchandises et ayant un poids maximum autorisé qui n'excede pas 3,500 kg (7,700 livres). Aux automobiles de cette catégorie peut etre attelée une remorque légère. | B |
| Automobiles affectés au transport des marchandises et dont le poids maximum autorisé excede 3,500 kg (7,700 livres). Aux automobiles de cette catégorie peut etre attelée une remorque légère. | C |
| Automobiles affectées au transport des personnes et comportant, outre le siège du conducteur, plus de huit places assis. Aux automobiles de cette catégorie peut etre attelée une remorque légère. | D |
| Automobiles des catégories B, C ou D pour lesquelles le conducteur est habilité, avec remorques autres qu'une remorque légère. | E |

...e terme "poids maximum autorisé" d'un véhicule désigne le poids du véhicule en ordre de ...arche et de la charge maximum. Le terme "charge maximum" désigne le poids du ...argement déclaré admissible par l'autorité compétente du pays d'immatriculation du ...hicule. Les remorques légères sont telles dont le poids maximum autorisé ne dépasse pas ...0 kg (1,650 livres).

| EXCLUSION | Exclusions (pays I - VIII) |
|---|---|
| ...titulaire est déchu du droit de conduire sur le territoire ...(pays) ...raison de _____ ...Sceau ou ...caches de ...l'autorité Lieu _____ ...Date _____ Signature | |

...crire l'exclusion dans tout autre espace prévu à cet ...et, si l'espace réservé ci-dessus est déjà utilisé.

ALOLA
JOHN NOSACHARLES IGBERASE
LAGOS
01 1555
21 CARTER STREET YABA LAGOS

EXCLUSIONS
(pays)

I. _____ V. _____
II. _____ VI. _____
III. _____ VII. _____
IV. _____ VIII. _____

ECFMG_RUSS_0003977

JA3181

This permit is valid in the territory of all the Contracting States with the exception of the territory of the Contracting State where issued, for the period of one year from the date of issue, for the driving of vehicles included in the category or categories mentioned on the last page of this permit.

## LIST OF CONTRACTING STATES

United Kingdom (together with
  Aden State
  Bahamas
  Barbados
  British Honduras
  Fiji
  Gibraltar
  Grenada
  Guernsey
  Hong Kong
  Isle of Man
  Jersey
  Mauritius
  Southern Rhodesia
  St. Lucia
  St. Vincent
  Seychelles
  Swaziland)
Algeria
Argentina
Australia (together with Papua
  and the Trust Territory of
  New Guinea)
Austria
Belgium
Botswana
Bulgaria
Burundi
Cambodia
Cameroon
Canada
Central African Republic
Ceylon
Chad
Chile
Congo (Brazzaville)
Zaire
Cuba
Cyprus
Czechoslovakia
Dahomey
Denmark
Dominican Republic
Ecuador
Finland
Formosa
France (together with all French
  Overseas Territories and the
  Principality of Andorra)
Gabon
Gambia
Ghana
Greece
Guatemala
Guinea
Guyana
Haiti
Holy See
Hungary
India
Ireland, Republic of

Israel
Italy
Ivory Coast
Jamaica
Japan
Jordan
Laos
Lebanon
Luxemburg
Malagasy, Republic of
Malawi
Malaysia
Mali
Malta
Mauritania
Monaco
Morocco
Netherlands (together with Nether-
  lands Antilles, Netherlands New
  Guinea and Surinam)
New Zealand
Niger
Nigeria
Norway
Paraguay
Peru
Philippines
Poland
Portugal (together with all Overseas
  Provinces except Macao)
Rumania
Rwanda
San Marino
Senegal
Sierra Leone
Republic of South Africa (together
  with South West Africa)
Spain (together with African locali-
  ties and provinces)
Sweden
Syria
Tanzania, United Republic of
Thailand
Togo
Trinidad and Tobago
Tunisia
Turkey
Uganda
U.S.S.R.
United Arab Republic
U.S.A. (together with all territories
  for whose international relations
  the U.S.A. is responsible)
Upper Volta
Venezuela
Viet Nam, Republic of
Western Samoa
Yugoslavia
Zambia

— It is understood that this permit shall in no way affect the obligation of the holder to conform strictly to the laws and regulations relating to residence or to "the exercise of a profession which are in force in each country through which he travels.

Particular Concerning the Driver

NOT VALID
FOR DRIVING
IN N RIA

Vehicle for which the permit is valid: s valid:

THIS PERMIT MUST
BE PRODUCED TO THE
AUTHORITIES OF THE
COUNTRIES VISITED
FOR RECOGNITION

Surname 1
Other Names 2
Date of birth 3
Place of birth 4
Permanent place of residence 5

| | |
|---|---|
| Motor cycles, with or without a side-car, invalid carriages and three-wheels motor vehicles with an unladen weight not exceeding 400 kg (900 lb). | A |
| Motor vehicles used for the transport of passengers and comprising, in addition to the driver's seat, at most eight seats, or those used for the transport of goods and having a permissible maximum weight not exceeding 3,500 kg (7,700 lb). Vehicles in this category may be coupled with a light trailer. | B |
| Motor vehicles used for the transport of goods and of which the permissible maximum weight exceeds 3,500 kg (7,700 lb). Vehicles in this category may be coupled with a light trailer. | C |
| Motor vehicles used for the transport of passengers and comprising, in addition to the driver's seat, more than eight seats. Vehicles in this category may be coupled with a light trailer. | D |
| Motor vehicles of categories B, C or D, as authorized above, with other than a light trailer. | E |

"Permissible maximum weight of a vehicle means the weight of the vehicle and its ma load when the vehicle is ready for the road.

"Maximum load" means the weight of the load declared permissible by the com authority of the country of registration of the vehicle.

"Light trailers" shall be those of a permissible maximum weight not exceeding (1,650 lb).

### EXCLUSION

Holder of this permit is deprived of the right to drive in (country)
by reason of

Seal or
stamp of
authority

Place
Date

Signature

Exclusions :
(countries
I–VIII)

Should the above space be already filled, use any other space provided for "Exclusion".



AKOLA
SOSA SOSACHARLES
LASOS
21 CARTER STREET

EXCLUSIONS
(pays)

I.                    V.

II.                   VI.

III.                  VII.

IV.                   VIII.

ECFMG_RUSS_0003978

JA3182

# Exhibit 42

**REDACTED**

JANE DOE NO. 1, et al.,           \*    IN THE

     Plaintiffs,                \*    CIRCUIT COURT

v.                            \*    FOR

DIMENSIONS HEALTHCARE SYSTEM,   \*    PRINCE GEORGE'S COUNTY
d/b/a DIMENSIONS HEALTH
CORPORATION                    \*    Case No. CAL-17-37091

     Defendants.               \*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## NOTICE OF SERVICE OF DISCOVERY MATERIALS

I HEREBY CERTIFY on this _10th_ day of July, 2018, that I served a copy of

Plaintiff Desire Evans' Answers to Interrogatories of Defendant Dimensions Healthcare

Corporation d/b/a Prince George's Hospital Center, on all counsel of record and all pro se

parties, and that I will retain the original of this document in my possession without alteration

until the case is concluded in this Court, the time for noting an appeal has expired and any

appeal noted has been decided.

 

                             _____
                             Jonathan Schochor, Esquire
                             Schochor, Federico and Staton, P.A.
                             The Paulton
                             1211 St. Paul Street
                             Baltimore, Maryland 21202
                             (410) 234-1000 - office
                             (410) 234-1010 - fax

                             *Attorneys for the Plaintiff*

JANE DOE NO. 1, et al.,       \*    IN THE

    Plaintiffs,        \*    CIRCUIT COURT

v.             \*    FOR

DIMENSIONS HEALTHCARE SYSTEM,  \*    PRINCE GEORGE'S COUNTY
d/b/a DIMENSIONS HEALTH
CORPORATION       \*    Case No. CAL-17-37091

Defendants.       \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### PLAINTIFF DESIRE EVAN'S ANSWERS TO INTERROGATORIES OF DEFENDANT DIMENSIONS HEALTHCARE CORPORATION, D/B/A PRINCE GEORGE'S HOSPITAL CENTER

COMES NOW the Plaintiff, Desire Evans, by and through her attorneys, Jonathan Schochor and Schochor, Federico and Staton, P.A., in answer to the Interrogatories of Defendant Dimensions Healthcare Corporation, d/b/a Prince George's Hospital Center, respectfully states as follows:

Interrogatory No. 1:    State your full name; present address and all addresses for the past ten (10) years; date of birth; social security number; present marital status, and all previous marital status, including the dates of marriage and dates of termination of each marriage and the full name and present address of each spouse. Also in order to ascertain whether you have been in the past, or likely in the future to become a Medicare beneficiary, please provide your claim number (HICN).

    **Answer to Interrogatory No. 1:**
    Desire Evans
    4057 Parker Court
    Waldorf Maryland, 20602
    (April 1, 2018 – Present)

    Marital Status: Married
    Spouse: Michael Evans
    4057 Parker Court
    Waldorf Maryland, 20602

    Previous Addresses:

JA3185

11529 Leland Place
Waldoft, Maryland 20601
(January 1, 2017 – April 1, 2018)

2528 Hateras Cir
Waldorf Maryland 20601
(January 2016 – January 2017)

1353 South View Drive
Oxen Hill, Maryland 20745
(2013-2016)

7679 Arbory Court
Laurel Maryland 20707
(Approximately 2011 -2013)

14004 Korba Place
Laurel Maryland 20707
(Approximately 2007 – 2011)

For identity protection, the Plaintiff will provide her social security number informally, under separate cover.

Interrogatory No. 2:     State the exact nature of each act or omission which you claim was negligently committed or omitted by Defendants.  For each act or omission, state all particulars with relation to such act, including the time and place of the act or omission, and a complete description of the act or omission, including whether and how you contend the act or omission breached any relevant standard of care.

**Answer to Interrogatory No. 2:**     Objection is made to this interrogatory as it overly broad and unduly burdensome.  Without waiving this objection, the Defendant is referred to the Plaintiff's Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District.

The Defendant's agent, servant and/or employee Charles J. N. Akoda (hereinafter "Akoda") unlawfully practiced medicine, serving in the capacity of her attending physician

JA3186

during her labor on March 17, 2016 and the subsequent delivery of her infant. The Defendant and its duly authorized agents, apparent agents, servant and/or employees failed to perform an appropriate and proper investigation and background check of Akoda before granting him privileges to act as a practitioner and specialist in obstetrics and gynecology. Had they done so, as was required, Akoda's fraudulent and unlawful conduct would have been discovered, and he would have been precluded from seeing patients at the Defendant's institutions or entities, thereby avoiding all of the injuries, damages (economic and non-economic) and disability suffered by this Plaintiff.

This answer will be supplemented as discovery continues.

Interrogatory No. 3:    State the exact nature of each act of commission or omission which you claim was negligently committed or omitted by any individual you claim to be an employee, agent, or servant of Defendants, including but not limited to Dr. Akoda. Include in your answer whether you contend Dr. Akoda was negligent in his performance of any care rendered to you, and in so doing, state whether you contend he performed medical services that were not required/ medically necessary or improperly performed medically needed services, including, but not limited to testing, studies, procedures, and/ or surgery, or whether you contend he failed to perform needed tests, studies, procedures, and/ or surgery, and if so, identify in detail your contention(s).

For each act or omission, state all particulars with relation to such act, including the name of the person whom you claim to have been guilty of the act or commission, the time and place of the act or omission and a complete description of the act or omission, including whether and how you contend the act or omission breached any relevant standard of care.

**Answer to Interrogatory No. 3:**    Objection is made to this interrogatory as it overly broad and unduly burdensome. Without waiving this objection, the Plaintiff incorporates Answer to Interrogatory No. 2. This answer will be supplemented as discovery continues.

Interrogatory No. 4:    Give the full name, business address, home address, home telephone number, business telephone number and occupation of every person who has investigated the facts giving rise to the occurrence complained of in this case for you or on your behalf, and in so doing, state whether you or they made any review or inquiry as to Dr. Akoda's licensing, training, or other background information prior to or subsequent to submitting to care by him, and the details of any such investigation.

JA3187

**Answer to Interrogatory No. 4:**     This Plaintiff's attorneys have investigated this claim on her behalf.  This Plaintiff objects to the portion of the interrogatory that requests the specific nature and extent of investigation undertaken after Akoda's care, as it requests information that is protected by the attorney/client privilege, the attorney work product doctrine and the statutory peer review privilege.

The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, and the investigations of other entities, including but not limited to:

- Maryland Board of Physicians;
- Virginia Department of Health Professions;
- Department of Justice;
- United States Centers for Medicare & Medicaid Services;
- United States Department of Health and Human Services;
- Educational Commission for Foreign Medical Graduates (ECFMG);
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration.

Contact information for these entities is publicly available.

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC.

This answer will be supplemented as additional information becomes available.

4

JA3188

Interrogatory No. 5:   State the full name, home address, business address, occupation and employer of every expert whom you expect to call as an expert witness at trial and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. For each expert, specify in your answer whether or not that expert claims any particular expertise in a given field of medicine or science, describing precisely the field of the expertise claimed and specify whether such person shall testify regarding (a) the liability of the Defendant to the Claimant, and (b) the nature and extent of the injuries which you allege were sustained in the occurrence. Attach with your answers copies of all reports, statements and curriculum vitae and/ or resumes prepared by each expert witness.

**Answer to Interrogatory No. 5:**   This Plaintiff has not yet determined which expert

witnesses she will call at trial of this matter.  This Plaintiff will issue a Designation of Expert

Witnesses in accordance with the Court's Scheduling Order.

Interrogatory No. 6:   Identify each known written statement or report relative to any of the facts giving rise to the occurrence of which you complain. In so doing, name the person who gave the statement or report; specify the date of each statement or report; name its present custodian; attach exact copies of all written statements or reports which have been prepared or signed by the Defendant or persons whom you allege to be agents, servants, or employees of the Defendant.

**Answer to Interrogatory No. 6:**    This Plaintiff objects to this interrogatory as it is overly

broad, unduly burdensome and solicits information protected by the attorney-client privilege

and work product doctrine.  Without waiving the objection or disclosing privileged information,

the Plaintiffs are in possession of the following documents which contain written statements or

reports relative to the facts giving rise to his occurrence:

- Judgment and Stipulated Facts dated February 28, 2017
- Transcript of Pre-Trial Detention Hearing
- Virginia Department of Health Professions Order of Mandatory Suspension
- Maryland State Board of Physicians Final Decision and Order

The Defendant is also referred generally to Akoda's criminal indictment, Case

No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland,

5

Southern District, which includes filings and transcripts tending supporting the allegations in the Plaintiffs complaint, including stipulated facts executed by Oluwafemi Charles Igberase, a.k.a. Charles Akoda in connection with a guilty plea entered in 2016. Copies of these proceedings are publicly available via Public Access to Court Electronic Records.

Additionally, it is anticipated that written statements or reports relative to the facts giving rise to his occurrence will be included within the records, proceedings and files of various entities, including but not limited to:

- Maryland Board of Physicians
- Virginia Department of Health Professions
- Department of Justice
- United States Centers for Medicare & Medicaid Services
- United States Department of Health and Human Services
- Educational Commission for Foreign Medical Graduates (ECFMG)
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC. This answer will be supplemented as more information becomes available.

Interrogatory No. 7: Describe the nature and subject matter of each picture, diagram, document, audio or video tape, x-ray, or other objects (real evidence) which is known to you and which is relative to this occurrence or its consequences. In so doing, name each object's present custodian and state the date the object was produced or obtained.

**Answer to Interrogatory No. 7:** This Plaintiff objects to this interrogatory as it is overly broad, unduly burdensome and solicits information protected by the attorney-client privilege

6

and work product doctrine. Without waiving the objection or disclosing privileged information, the Plaintiffs are in possession of the following materials relative to this occurrence:

- Judgment and Stipulated Facts dated February 28, 2017
- Transcript of Pre-Trial Detention Hearing
- Virginia Department of Health Professions Order of Mandatory Suspension
- Maryland State Board of Physicians Final Decision and Order

The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District, which includes filings and transcripts tending supporting the allegations in the Plaintiffs complaint, including stipulated facts executed by Oluwafemi Charles Igberase, a.k.a. Charles Akoda in connection with a guilty plea entered in 2016. Copies of these proceedings are publicly available via Public Access to Court Electronic Records.

Additionally, it is anticipated that documents and other materials relative to this occurrence or its consequences will be included within the records, proceedings and files of various entities, including but not limited to:

- Maryland Board of Physicians
- Virginia Department of Health Professions
- Department of Justice
- United States Centers for Medicare & Medicaid Services
- United States Department of Health and Human Services
- Educational Commission for Foreign Medical Graduates (ECFMG)
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration

7

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC.

This answer will be supplemented as more information becomes available.

Interrogatory No. 8:    Identify and give the substance of each statement, action or admission against interest, declaration against interest, or otherwise, whether oral, written, by conduct, silence or otherwise which you contend was made by the Defendant or any person whom you allege to be the agent, servant and/ or employee of said Defendant. Give the name and occupation of each person who has personal knowledge of the making of each such statement. State the place and date when each such statement was made.

**Answer to Interrogatory No. 8:**  Oluwafemi Charles Igberase, a.k.a. Charles Akoda executed stipulated facts in connection with a guilty plea entered in 2016, which is anticipated to already be the custody of the Defendants.  The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District.  Additionally, the Defendant is referred to the Plaintiff's medical records, which are already in the possession, custody and/or control of the Defendants, and will confirm that Akoda was referred to as a practicing physician at all times relevant to this dispute.

Moreover, although these documents are not currently in the possession of the Plaintiff, it is anticipated that agents, servants and/ or employees of the Defendant may have made statements relating to the alleged malpractice in connection with investigations by entities, including but not limited to:

- Maryland Board of Physicians;
- Virginia Department of Health Professions;
- Department of Justice;
- United States Centers for Medicare & Medicaid Services;
- United States Department of Health and Human Services;

8

- Educational Commission for Foreign Medical Graduates (ECFMG);
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration.

This response will be supplemented as more information becomes available.

Interrogatory No. 9:   If you contend that any portion of any medical record, chart, or report prepared by any Defendant, or anyone deemed to be an agent, servant and/ or employee of such Defendant, is inaccurate, false, has been altered, or has been destroyed, specifically identify each portion of each record, chart, or report you contend is inaccurate, false, has been altered, or has been destroyed, and provide in detail the factual basis for this contention.

**Answer to Interrogatory No. 9:**   To the extent that this Plaintiff's medical records refer to Akoda as a physician, that is inaccurate and false. This answer will be supplemented as discovery proceeds.

Interrogatory No. 10:   If you contend that the applicable standards of care or any other issues in this matter are established by any articles, treatises, textbooks or other publications in the medical or scientific field, state the title of each publication, the journal, magazine, or series wherein each was published; the name and address of the publisher; date of the publication; and the name of the author and the volume and page or section referred to.

**Answer to Interrogatory No. 10:**   This Plaintiff objects to this interrogatory which solicits information which is not discoverable.   Furthermore, this Plaintiff has not yet determined which expert witnesses she intends to call at trial of this matter.   This Plaintiff will issue a Designation of Expert Witnesses in accordance with the Court's Scheduling Order. Should any of Plaintiff's expert witnesses rely on any such medical literature to support their respective opinions on the applicable standard of care or any other issue in this matter, such information will be disclosed in a timely manner.

Interrogatory No. 11:   Itemize the nature and amount of all expenses made or incurred by you, or for which you intend to make claims as a result of the Defendant's alleged negligence,

9

including hospital and doctor bills. In so doing, specify which of the above expenses have been paid, and indicate when and by whom they were paid.

**Answer to Interrogatory No. 11:**    This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as damage to her marital relationship. This Plaintiff has in the past, is presently, and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety. This Plaintiff will be claiming economic damages for past, present and future medical expenses, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiffs' life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.

Interrogatory No. 12:    Describe in detail the injuries, disabilities, infirmities, sicknesses and each activity in which you contend you sustained as a result of the occurrence that is the subject matter of this suit. Specify whether each injury is permanent in nature and, if so, state the extent of such permanency.

**Answer to Interrogatory No. 12:**    This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 13:    Give the name, address and dates of examination or treatment for every physician who has ever examined or treated you and state the cause for and nature of each such examination or treatment rendered; and state the name, address and dates of admission of every hospital where you have ever been admitted, the cause for and nature of each such admission and the treatment rendered.

**Answer to Interrogatory No. 13:**    This Plaintiff objects to this interrogatory which is overbroad and vague. Without waiving these objections, this Plaintiff refers to her medical records which are in the Defendant's possession, custody and control. Additionally, the Plaintiff has treated with the following healthcare providers:

Shaunda Smith, M.D. (psychiatry)
Kaiser Permanente

10

JA3194

1221 Mercantile Lane
Largo, MD 20774

Javaka Moore, M.D. (OBGYN)
Largo, MD
(October 2015)
Prenatal Care

Dionne Lucas, PA-C
12070 Orion Center, Suite 100
Waldorf Maryland 2102
(2016)

Laurel Medical Center
Emergency Department
(Various Occasions)

Southern Maryland Hospital ED
(Various Occasions)

PG Hospital Center
(Various Occasions)

Washington Hospital Center
2015 (hospitalization related to a fall)


This answer will be supplemented as discovery proceeds.

Interrogatory No. 14:    If you have ever filed an action against or made a claim against any person, firm or corporation for personal injuries or physical conditions, or for any benefits under any insurance policy, state the injuries or conditions for which each claim was made, the dates of each injury, the names and addresses of the persons, firms or corporations to whom or against whom each were made, the nature and amount of any payments received therefore and the date each was made.

**Answer to Interrogatory No. 14:**    This Plaintiff objects to this interrogatory which solicits information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory No. 15:    Give the date, circumstances and injuries sustained with relation to any occurrence or accident in which you were involved and in which you sustained any personal injury.

11

**Answer to Interrogatory No. 15:**    This Plaintiff incorporates Answer to Interrogatory No. 14.  Additionally, in 2015, the Plaintiff lost footing and fell, resulting in hospitalization for approximately one week at Washington Hospital Center.

Interrogatory No. 16:    State the name, address, dates of employment for each employer you had during the last ten (10) years. With respect to each employer for each of the last ten (10) years, state your yearly gross income, yearly net income, and the name and address of the person, firm or corporation having custody of any papers pertaining to your income.

**Answer to Interrogatory No. 16:**    The following is a summary of the Plaintiff's employment history:

CareFirst BlueCross BlueShield
Senior Customer Service Advisor
(2015-Present)

Arbitron
Customer Service/Interviewer
(2012-2015)

HealthStream Research
Medical Interviewer
(2008-2011)

Applebees
Server
2007-2008
Olive Garden
Server
2007-2008

Interrogatory No. 17:    If you have lost any time from employment as a result of the occurrence for which this suit is brought, state the name and address of all employers from which time was lost, the period of time lost from each such employer, and the hourly rate and total income lost from all such periods from each such employer.

**Answer to Interrogatory No. 17:**    None at this time.  This answer will be supplemented as discovery proceeds.

JA3196

Interrogatory No. 18: State whether you contend you will lose any future earnings and/ or income as a result of the occurrence referred to in your Complaint. If so, state the basis for your contention and if any doctor or other expert has expressed such an opinion state their name, address, and the date and circumstances when you were informed that you would lose future income.

**Answer to Interrogatory No. 18:** None at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 19: If you contend that a previous injury or condition was aggravated by the occurrence for which this suit is brought, describe such condition and give the names and addresses of all persons or institutions who treated you therefore and the approximate dates of such treatment.

**Answer to Interrogatory No. 19:** This Plaintiff does not so contend at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 20: If you have ever used any drugs or medications in connection with any injury which you claim was caused by the occurrence for which this suit is brought, state for each drug or medication the name and address of the doctor who prescribed it, the inclusive dates on which it was taken, the dosage, the number of times taken daily, and the cost of such medication or drugs. And if you have received any mental healthcare, counseling, or other healthcare services which you claim was caused by the occurrence for which this suit is brought, state for each drug or medication the name and address of the doctor who prescribed it, the inclusive dates on which it was taken, the dosage, the number of times taken daily, and the cost of such services

**Answer to Interrogatory No. 20:** The Plaintiff is undergoing care from a psychiatrist, and i█████████████████████████████████████ This answer will be supplemented as discovery proceeds.

Interrogatory No. 21: For each conversation that you have had with any Defendant or anyone you contend was acting as an agent, servant, or employee of any Defendant, or with Dr. Akoda relating to the facts relevant to your injury claims, state: the date of the conversation, where the conversation took place, the name, address, and telephone number of every person present during each conversation and as precisely as possible recount what each person to the conversation said.

13

JA3197

**Answer to Interrogatory No. 21:**   This Plaintiff had multiple conversations with many health care providers at the Defendant's institution during her labor and delivery which is the subject of this claim.   It is unduly burdensome and overly broad to request that this Plaintiff reconstruct each of those conversations.   This Plaintiff refers to conversations memorialized in her medical records from the Defendant's institution.   Some but not all conversations would have been documented in the medical records, which are in the possession, custody and/or control of the Defendants.   At all times, the Defendant's agents, servants and employees led the Plaintiff to believe that Akoda was indeed a physician.   At no time did this Defendant's agents, servants and employees provide notice that Akoda was not a Maryland licensed or hospital credentialed physician.   This answer will be supplemented as discovery proceeds, including through the deposition testimony of the Plaintiff.

Interrogatory No. 22:    State all economic losses you contend were sustained as a result of the occurrence referenced in the Complaint, including all past and future medical expenses and any past or future lost wages/ diminished earnings capacity.

**Answer to Interrogatory No. 22:**   This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 23:    State the name, address, home telephone number, work telephone number and occupation of each person not previously mentioned, who has or claims to have personal knowledge of the occurrence, injuries, damages, or any other facts relevant to this case.

**Answer to Interrogatory No. 23:**   This Plaintiff's family and treating health care providers may have personal knowledge of her care and treatment by Akoda, as well as her current injuries.   These include her husband, Michael Evans, as well as her mother, Renee Clifton.   This Plaintiff refers to her medical records which are in the Defendant's possession, custody and control. This answer will be supplemented as discovery proceeds.

14

Interrogatory No. 24:    State whether you have entered into any settlements, releases, loan receipt agreements or similar agreement in connection with the occurrence for injuries for which this suit is brought.  If your answer is in the affirmative, state the identities of all parties and dates of all releases, settlements, loan receipt agreements, or similar agreement, the terms of all such agreements, and if you will do so without a Request for Production of Documents, attach a copy hereto of all such releases, settlements or agreements.

**Answer to Interrogatory No. 24:**    None known.  This answer will be supplemented as discovery proceeds.

Interrogatory No. 25:    Identify in detail every service or interaction you contend was negligently provided or undertaken by Dr. Akoda, including the number and description of the interactions or services rendered, the dates of said services or interactions, the location of said services or interactions, whether and what surgical treatment was rendered, whether the care involved touching, whether the care involved "penetration," whether and how the care involved "boundary violations," whether there was a physical examination and if so the details of the examination(s), whether the care involved breast exam or pelvic exam, any testing you contend was improperly provided, whether you contend Dr. Akoda made inappropriate statements, and whether Dr. Akoda delivered your child/ children, and if so, whether delivery was vaginally or by caesarean section delivery.

**Answer to Interrogatory No. 25:**    This Plaintiff contends that all care and treatment provided by Akoda was negligent, including but not limited to, the fact that he was not an appropriately licensed and credentialed physician.  He oversaw this Plaintiff's labor care, including the performance of intrusive pelvic examinations, and he performed the Plaintiff's delivery.

Prior to delivery, Ms. Evans felt that Akoda was unprofessional, and was made uncomfortable by the way he touched her.  Her husband also felt uncomfortable with Akoda's conduct.  Additionally, while Ms. Evan was pushing, Akoda started manipulating the Plaintiff's clitoris.  Akoda told Ms. Evans that he had to get her aroused, which would help the baby come out.

Ms. Evans feels as though she was sexually molested, particularly given what is now known about Akoda.   The baby was ultimately delivered via c-section.   He was not properly

licensed, credentialed or qualified to provide any of this case. This Plaintiff would never have

exposed herself or her child to a non-health care provider had she been appropriately advised

that he was not a validly licensed or credentialed physician. This answer will be supplemented

as discovery proceeds.

Interrogatory No. 26:    Identify in detail any and all physical pain and/ or disability
you allege the Defendants' actions caused you, including the date on which it occurred or began,
whether it is ongoing, and describe any and all care or treatment you have sought or received
for it, including the dates on which you received care, by whom, and a description of the care
received.

**Answer to Interrogatory No. 26:**    This Plaintiff incorporates Answer to Interrogatory

No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 27:    Identify in detail any psychological distress, emotional anguish
or distress, fear, anxiety, humiliation, embarrassment or other mental or emotional injuries you
allege Defendants' and/or Dr. Akoda's actions caused you, including the date on which it
occurred or began, whether it is ongoing, whether and if so, what physical manifestations you
or anyone else to your knowledge has observed, and any and all care, treatment, therapy and/
or psychological counseling you have sought or received for it, including any, the dates on
which you received care, by whom, and a description of the care received.

**Answer to Interrogatory No. 27:**    This Plaintiff incorporates Answer to Interrogatory

No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 27 (28):    State in detail the factual basis for your negligent
entrustment action against Defendants, including what was entrusted to Dr. Akoda, by whom,
whether you contend he used the entrusted items improperly apart from your allegation he was
practicing without a valid license, whether and how Dr. Akoda negligently used or operated
entrusted items, and whether and how you were injured by the entrusted items.

**Answer to Interrogatory No. 27 (28):**    The Defendant is referred to the Plaintiff's

Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including

Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's criminal

indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of

16

Maryland, Southern District. The Defendant is further referred to the Plaintiff's Answers to

Interrogatories No. 2, 6 and 7.

This Plaintiff's entire labor and delivery, including access to the hospital's equipment

and facilities was negligently entrusted by this Defendant to Akoda, who the Defendant knew

or should have known was not a properly licensed or credentialed physician. He should not

have managed the labor, conducted intrusive pelvic examinations or performed this Plaintiff's

delivery.

This answer will be supplemented as discovery proceeds.

Interrogatory No. 28 (29): Identify with specific detail each and every risk,
alternative, benefit, or other information you contend Defendants, Dr. Akoda and/ any other
person or entity was required to provide to you but did not provide to you in connection with
the informed consent process relating to the care and treatment you received, who you contend
was required to provide such information, and the details of the information you contend was
actually provided to you, by whom, when, and where with relation to informed consent process
for care rendered by Dr. Akoda.

**Answer to Interrogatory No. 28 (29):** It is alleged that Akoda, as well as the duly

authorized agents, apparent agents, servants and/or employees of the Defendants failed to

inform the Plaintiff that Akoda had no valid or lawful medical license with which to practice

medicine or surgery -- in continuing violation of the standards of care.

It is alleged that the Plaintiff, as well as any reasonable and prudent individuals, would

have refused consent to Akoda's practice of medicine and/or surgery, including any treatment

and/or surgery involving them and her child. It is alleged that had Akoda or the duly authorized

agents, apparent agents, servants and/or employees of the Defendants properly requested

informed consent to practice medicine or surgery on the Plaintiff with no valid medical license,

the Plaintiff, as well as other reasonable and prudent individuals similarly situated would have

refused. It is alleged that had the Plaintiff known of Akoda's background and the fact that he

JA3201

had no lawful medical license, she would have refused any and all treatment, and all of the injuries, damages (both economic and non-economic) and the disability suffered by the Plaintiff in the past, present and future would have been avoided.

Additionally, the Defendant is referred to Plaintiff's Answers to Interrogatories Nos. 2, 6, 7 and 21. This answer will be supplemented as discovery proceeds.

Interrogatory No. 29 (30): Identify with specific detail each and every action you contend Defendants and/or Dr. Akoda made that was extreme or outrageous as the basis of your intentional infliction of emotional distress claim, including the date and location of any alleged action(s), any and all witnesses to the action(s), a detailed description of the action(s), and whether you contend Defendants and/ or Dr. Akoda intended by the action(s) to cause severe emotional distress, and if so, provide your factual basis for that contention.

**Answer to Interrogatory No. 29 (30):** The Plaintiff alleges that Akoda's conduct was intentional and/or reckless when he continued to practice medicine and surgery without a lawful license, without authorization and informed consent. It is asserted that Akoda's conduct involved was extreme, outrageous and unreasonable, and occurred when he acted as a duly authorized agent, apparent agent, servant and/or employee of the Defendants. As a result, the Claimants, and others similarly situated, sustained severe emotional distress.

The Defendant is further referred to the Plaintiff's Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District. The Defendant is further referred to the Plaintiff's Answers to Interrogatories No. 2, 6 and 7.

This answer will be supplemented as discovery proceeds.

Interrogatory No. 30 (31): Identify with specific detail each and every privacy you contend Defendants, Dr. Akoda, and/ or any other person or entity intruded upon, the dates of the intrusion, the manner of the intrusion, who intruded, when and how you became aware of the intrusion, and any witnesses to the intrusion.

JA3202

**Answer to Interrogatory No. 30 (31):** This Plaintiff objects to this Interrogatory, as it exceeds the number of interrogatories the Defendant may propound within the Maryland Rules of Discovery. Without waiving this objection, this Plaintiff hereby incorporates Answers to Interrogatories Nos. 25, 27, 28 (29) and 29 (30).

JA3203

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

Desire Evans

Respectfully submitted,

Jonathan Schochor
Schochor, Federico and Staton, P.A.
1211 St. Paul Street
Baltimore, MD 21202
pfederico@sfspa.com
410-234-1000
Attorneys for the Plaintiff

20

# Exhibit 43

MONIQUE RUSSELL, et al.,          *     IN THE

     Claimants               *     HEALTH CARE

v.                              *     ALTERNATIVE DISPUTE

DIMENSIONS HEALTH CORPORATION,  *     RESOLUTION OFFICE

     Healthcare Provider        *     HCA NO. 2017-400

    *     *     *     *     *     *     *     *     *     *     *

## <u>CLAIMANTS' CERTIFICATE OF MERIT</u>

1.     I, Thomas Bojko, am competent to testify.

2.     I have reviewed the captioned Class Action Amended Statement of Claim, the Final Decision and Order of the Board of Maryland Board of Physicians, the Department of Justice materials, the proceedings of the criminal case against Dr. Charles Akoda/Igberase, and/or other related materials regarding the above-captioned case.

3.     I certify that there have been violations of the applicable standards of administrative care by Dimensions Health Corporation, and Dimensions Health Corporation d/b/a Prince George's Hospital Center, individually and through their duly authorized agents, apparent agents, servants and/or employees including, but not limited to, Charles J. Akoda/Oluwafemi Charles Igberase which have directly and proximately resulted in the damages, injuries and permanent disability to the Claimants, and other similarly situated.

4.     I further certify that I am an expert in Health Care Administration and Credentialing/Privileging; that I have clinical and administrative experience; and have provided consultation relating to the issues involved in this litigation and/or have taught healthcare administration and credentialing/privileging in the fields of health care in which the Defendants have provided care and/or provided treatment to the Claimants, within five (5) years of the date of the alleged acts or omissions giving rise to this cause of action.

5.     I do not devote more than 20% of my annual professional activities to activities that directly involve testimony in personal injury and corporate negligence claims.

Thomas Bojko, M.D., M.S., J.D.

2



**Thomas Bojko, MD, MS, JD**

President & Managing Partner

February 26, 2018

Paul Vettori, Esq.
Law Offices of Peter G. Angelos, P.C.
One Charles Center
100 N. Charles Street – 20<sup>th</sup> Floor
Baltimore, MD 21201

<div align="center">Re:   Monique Russell, et al. v. Dimensions Health Corporation</div>

Dear Mr. Vettori:

This is to acknowledge that after a review of materials involved in the above-referenced case, I have concluded that there have been violations of the applicable standards of administrative care by Dimensions Health Corporation d/b/a Prince George's Hospital Center, individually and through their duly authorized agents, apparent agents, servants and/or employees including, but not limited to, Charles J. Akoda/Oluwafemi Charles Igberase ("Akoda"), which have directly and proximately resulted in injuries, damages, and permanent disability to the Claimants and others similarly situated.

It is my opinion that the Defendants breached the applicable standards of administrative care by negligently failing to use required and reasonable care to investigate, credential, grant privileges, monitor and supervise their medical personnel including, but not limited to, Akoda and to discover, stop and report any professional misconduct of which they should have known. As a direct and proximate result of the Defendants' continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability. Had the Defendants complied with the applicable standards of administrative care the Claimants, and others similarly situated, would not have suffered their injuries, damages and permanent disability.

I am an expert in Healthcare Administration and in Credentialing/privileging. I have had experience, provided consultation relating to practice and/or taught healthcare administration in the applicable specialties or related specialties of health care, within five (5) years of the date of the alleged acts and/or omissions giving rise to the causes of action.

Accordingly, I have concluded that the case filed before the Health Care Alternative Dispute Resolution Office of Maryland is meritorious. I also acknowledge that less than twenty percent of my annual professional time directly involves testimony in personal injury or corporate negligence claims.

This report represents a broad summary of my opinions for purposes of certifying the merits of this matter. I specifically reserve the right to modify, amend and/or supplement my

opinions as further information about this case is made available to me through discovery and/or other means.

Very truly yours,

Dr. Thomas Bojko

JA3209

# Exhibit 44

**REDACTED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,     *
ELSA M. POWELL AND DESIRE EVANS,

      *     Case No. 2:18-cv-05629-WB

      Plaintiffs

      *     Hon. Wendy Beetlestone

      v.       *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES     *

      Defendant       *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF DESIRE EVANS'S SUPPLEMENTAL ANSWERS TO FIRST SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff, Desire Evans, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

JA3211

By providing information in response to the interrogatories, Plaintiff does not admit the

relevance or admissibility of any of the information supplied but instead reserves the right to object

to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda,
including how you chose Akoda as your doctor, the date you were a patient, and the specific
nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome,
and concerns matters which are more appropriately addressed by deposition. Without
waiving this objection, the Plaintiff was a patient of Akoda during her labor on March 17,
2016 and the subsequent delivery of her infant. The Plaintiff further refers Defendant to the
Plaintiff's medical records for details relating to her care and treatment by Akoda. The
Plaintiff went to Prince George's Hospital Center for her delivery because her primary
OBGYN treated patients there.**

### SUPPLEMENTAL ANSWER:

*Subject to and without waiving these objections, all medical records in the possession of
the Plaintiff and her counsel have been produced to ECFMG. The Defendant is again referred
to the medical records of the Plaintiff for detailed information concerning her treatment by
Igberase.*

### INTERROGATORY NO. 7:

Describe in detail all facts that support the allegation in the Complaint that you chose
Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained
all necessary credentials and certifications required of physicians practicing in the United States,

2

including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services. Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud. Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff is relying on her attorneys for the specific facts related to the ECFMG certification process. She had no prior knowledge of ECFMG in particular.*

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition. Plaintiff's contacts with Akoda are reflected in the medial records which are being produced. The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of**

JA3213

ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

<u>SUPPLEMENTAL ANSWER:</u>

*Subject to and without waiving these objections, the Plaintiff has communicated generally with members of her family, including her husband, Michael Evans, her mother, Renee Clifto, and her cousin, Terel Newton. The Plaintiff can recall no other discoverable communications other than those set forth in these responses.  The Plaintiffs deposition in the Dimensions matter has been previously produced.*

<u>INTERROGATORY NO. 9:</u>

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

<u>ANSWER:</u>

**Plaintiff adopts by reference her Answer to Interrogatory No. 2.  The amount of these damages is for the jury to determine.  Plaintiff seeks damages for these injuries as determined by the jury.**

<u>SUPPLEMENTAL ANSWER</u>

*Plaintiff has lost substantial time from work since her pregnancy, caused by the emotional distress associated with Igeberase's conduct.  The Plaintiffs are obtaining tax documentation to provide further support for this claim, which will be provided upon receipt.*

<u>INTERROGATORY NO. 11:</u>

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

<u>ANSWER:</u>

4

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

SUPPLEMENTAL ANSWER:

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements.*

INTERROGATORY NO. 12:

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

ANSWER:

Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery. Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records. Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

SUPPLEMENTAL ANSWER:

*Subject to and without waiving these objections, attachment A is a list of persons represented by Schochor, Federico & Staton, P.A.*

INTERROGATORY NO. 15:

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant. Without waiving this objection, the Plaintiff had received medical care from Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, and in addition to the Plaintiff's prior discovery responses, Plaintiff has received medical care in the past from -Danielle Waldrop, M.D./Javaka Moore, M.D., -Dionne Lucas, PA-C, -Southern Maryland Hospital, Washington Hospital Center and Shanda Smith, M.D. Medical records from these providers are being provided. The Plaintiff is currently seeing Ebony Cross, M.D., a psychiatrist.*

## SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

### General Objections

1. Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2. Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and

JA3216

conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from

these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The Plaintiffs have provided a copy of the Complaint in this matter and the Defendant's Answer.*

8

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is vague, overly broad and unduly burdensome. Moreover, documents filed in the Dimensions litigation are readily obtainable from the Prince George's County Circuit Court. Other documents, including attorney work product and documents concerning expert witnesses in that matter, are beyond the scope of discovery in this matter. The Plaintiff is not is possession of any documents or other communications responsive to this request.*

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation are available.*

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

JA3219

Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case. If Defendant will clarify it, Plaintiff will attempt to respond.

**SUPPLEMENTAL RESPONSE:**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12*

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this response as it is vague. The materials relating to ECFMG in the possession of the Plaintiff or her counsel were obtained from the Defendant ECFMG, or are otherwise in the possession of the Defendant ECFMG.*

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

Plaintiff adopts by reference her response to Request No. 5.

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this response as it is vague, overbroad and unduly burdensome, and to the extent it seeks information protected by attorney work product. Documents filed in*

*litigation with Dimensions Healthcare are readily obtainable from the Prince George's County*

*Circuit Court in Maryland.*

## REQUEST NO. 21:

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## SUPPLEMENTAL RESPONSE:

*Objection is made to this request to the extent it seeks confidential documents concerning settlement discussions, including materials produced for mediation, to include mediation statements and expert reports produced for purposes of mediation. Objection is further made to this request to the extent it seeks correspondence between counsel as it is beyond the scope of discovery and represents attorney work product. Documents filed in litigation with Dimensions Healthcare are readily obtainable from the Prince George's County Circuit Court in Maryland.*

## REQUEST NO. 30:

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

## RESPONSE:

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

## SUPPLEMENTAL RESPONSE:

JA3221

*Objection is further made to this request as it seeks attorney work product. Subject to and without waiving these objections, to the extent any such discoverable documents exist, they will or have been produced.*

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents on the grounds that she is not making any claim for lost income.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, the Plaintiff is currently collecting tax returns, which will be provided upon receipt.*

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action. To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 36:**

JA3222

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records and bills in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, all medical records and bills in the possession of the Plaintiff and her counsel have been produced.*

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

JA3223

Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.

<u>SUPPLEMENTAL RESPONSE:</u>

*Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Dimensions litigation.*

<u>REQUEST NO. 42:</u>

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

<u>RESPONSE:</u>

Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.

<u>SUPPLEMENTAL RESPONSE:</u>

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

<u>REQUEST NO. 43:</u>

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.

**SUPPLEMENTAL RESPONSE:**

*There are no financial arrangements with anyone other than Plaintiff's attorneys, as set forth in response to Interrogatory No. 11.*

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

Any discoverable documents responsive to this request will be produced.

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is overly broad and vague. Without waiving this objection, the Plaintiff is seeking to obtain tax returns, which will be provided upon receipt.*

CONRAD & O'BRIEN, P.C.

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100

JA3225

Telephone: (215) 864-9600
Fax: (215) 864-9620

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschochor@sfspa.com
Lauren Schochor (Identification No. 87618)
lschochor@sfspa.com
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

June 17, 2019

16

## VERIFICATION

I, Desire Evans, hereby aver that the factual statements in the foregoing Supplemental *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Supplemental Answers* are made subject to the penalties relating to unsworn falsification to authorities.

Desire Evans

Dated: June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic

mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

June 17, 2019

**EXHIBIT A: Represented Clients of Schochor, Federico & Staton, P.A.**

| <u>**Last Name**</u> | <u>**First name**</u> | <u>**DOB**</u> |
|---|---|---|
| Achike | Nkemdilim | |
| Aikens | Regina | |
| Alex-Jimda | Olajomoke | |
| Allen | Angel | |
| Allen | Darnisha | |
| Allen | Jovanna | |
| Allen | Krystin | |
| Allen | Tyhee | |
| Alleyne | Martina | |
| Anderson | Keira | |
| Anderson | Latoya | |
| Andrews | Dnia | |
| Anthony | Deborah | |
| Anthony | Ivori | |
| Anthony | Londyn | |
| Ashu | Grace | |
| Ballard | Monique | |
| Balmes | Yolanda | |
| Beard | Pauline | |
| Becoats-Greer | Shantanette | |
| Bennett | Aisha | |
| Berger | Richelle | |
| Bowman | Vanessa | |
| Boykin | Michelle | |
| Bradwell | Tanina | |
| Brame | Shatore | |
| Braxton | Shaunte | |
| Brice | Christina | |
| Britton | Janis | |
| Brooks | Stacey | |
| Brown | Yolanda | |
| Butler | Onikaia | |
| Calliham | Kristen | |
| Carey | Tishana | |
| Carroll | DeTanicha | |
| Cavers | Ada | |
| Cavers | Sabrina | |
| Chase | Chamoney | |
| Chase | Chavonne | |
| Chase | Tameia | |
| Collins | Tamu | |

JA3230

| | |
|---|---|
| Crawford | Tiffany |
| Damilare-Raji | Temitope |
| Davis | Towana |
| Davison | Dawn |
| Day | Kavonna |
| Dew | Briana |
| Dews | Christina |
| Drewery | Dekwarna |
| Driver | Myeshia |
| Durant | Tasia |
| Ellis | Princess |
| Evans | Desire |
| Faulkner | Samuella |
| Ferrell | Sade |
| Ferrell | Shavonne |
| Fiti | Tele |
| Ford | Marquette |
| Francis | Priyanka |
| Frazier | Nyia |
| Freeman-Taylor | Octavia |
| Garay | Jocelyn |
| Gaymon | Latisa |
| Gibbs | Gabrielle |
| Glover | Donita |
| Godby | Vanessa |
| Goldston | Darmeshia |
| Gordon | Antaja |
| Hall | Shannon |
| Hammond | Angelique |
| Harrell | Alecia |
| Harris | Dynita |
| Harris | Myah |
| Harrison-Gray | Deveda |
| Hayes | Chanita |
| Henry | Shaquella |
| Hines | Sonya |
| Holder | Kimisha |
| Holmes | Naqirah |
| Hooker | Ronnetta |
| Hughes-Keen | LaTonya |
| Igbalajobi | Oluwaseyi |
| Ihuoma | Adewunmi |
| Jackson | Lakisha |
| Jacob | Darlene |

JA3231

| | |
|---|---|
| Jallow | Amie |
| Jay | Chantell |
| Jefferies | April |
| Jeffries | Lisa |
| Johnson | Brittany |
| Johnson | Krishanna |
| Johnson | Sandra |
| Johnson | Shynese |
| Johnson | Tierra |
| Jones | Kiwannah |
| Jones | Londra |
| Jones | Shamere / Dezmond Jones |
| Jones | Shamika |
| Kamara | Isata |
| Kamara | Maiatu / Isatu Sillah |
| Kamara | Veronica |
| Keemer-Gray | Nicole |
| King | Demetrice |
| King | Latashia |
| Kyles | Tameka |
| Lacy | Tamara |
| Lawal | Adejumoke |
| Layo | Titi |
| Lee (now Gogarty) | Jessica |
| | |
| Lewis | Natasha |
| Logan | Chadiamond |
| Lowery | Alisha |
| Lozano | Siomara |
| Lynch | Ashley |
| Magruder | Tatyana |
| Maiden | Brittany |
| Martin | Shirnelle |
| Mason | LaQuonda |
| Mathis | Felicia |
| McCarthy | Kharesia |
| Miles | Jammie |
| Miles | Jasmine |
| Miller | Jasmine |
| Mitchell | Savanna |
| Molua | Irene |
| Moyler | Jovan |
| Ndiformutieh | Victorine |

JA3232

| | |
|---|---|
| Nkengfack | Josephine |
| Nwalokomobi / Mgbolu | Imilar |
| Nyanzu | Diana |
| Omogbadegun | Ibironke |
| Oswald | Mariah |
| Otis | Jacqueline |
| Oyesiji | Jubril |
| Parker | Ericka |
| Perkins | Iysha |
| Petty | Arlene |
| Plater | Portia |
| Powell | Elsa |
| Powell | Tyeisha |
| Reynolds | Monique |
| Robinson | Jamie |
| Robinson | Janni |
| Rouse | Autumn |
| Scott | Dajzhe |
| Sesay | Finda |
| Shaw | Lakisha |
| Shearin | Sherita |
| Simmons | Jasmine |
| Simmons | Jennifer |
| Simms | Katrina |
| Simms | Natasha |
| Smith | Patria |
| Smith | Tyissha |
| Smith-Buani | Yema |
| Smith-Reynolds | Allanda |
| Spears | Nishika |
| Spriggs | Charmisa |
| Streater | Roneka |
| Strong | Adoniqua |
| Stubbs | Andrea |
| Tazi | Anyinkeng |
| Terry | Pasche |
| Thornes | Quiana |
| Tinsley | Jazmine |
| Townes | Danielle |
| Tyler | Rhonda |
| Tyler | TaNeishia |
| Udefiagbon | Bukola |
| Vail-Pardich | Jamesha |

JA3233

| | |
|---|---|
| Valentine | Diamisha |
| Vaughan | Aurelia |
| Velasquez | Carmen |
| Walston | Crystal |
| Ward | Danielle |
| Warrick | Brittany |
| White | Jerica |
| Wilcox | Joyce |
| Williams | Amber |
| Williams | LaShanta |
| Williams | Latisha |
| Williams | Mercedes |
| Wimberly | Lisa |
| Wimpye | Briana |
| Wingfield | Ashleigh |
| Woo | Mary |
| Woodfork | April |
| Wright | April |
| Young | Tina |



# Exhibit 45

**REDACTED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | | |
| | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**PLAINTIFF ELSA POWELL'S SUPPLEMENTAL
ANSWERS TO FIRST SET OF INTERROGATORIES
AND SUPPLEMENTAL RESPONSES
TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Elsa Powell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

JA3236

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition. Without waiving this objection, the Plaintiff was treated by Akoda during portions of her prenatal care, beginning in approximately April of 2014, during her labor on September 17, 2014, for the subsequent delivery of her infant, and for post-natal care through January of 2015. The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda. The Plaintiff was referred to the practice of Abdul Chaudry, M.D. for prenatal care by another obstetrician-gynecologist, which is where she first encountered Akoda.**

### SUPPLEMENTAL ANSWER:

*Subject to and without waiving these objections, all medical records in the possession of the Plaintiff and her counsel have been produced to ECFMG. The Defendant is again referred to the medical records of the Plaintiff for detailed information concerning her treatment by Igberase.*

2

**INTERROGATORY NO. 2:**

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

**ANSWER:**

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiff's loss to her marital relationship. This Plaintiff has in the past, is presently, and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety, as a result of learning that Akoda was a fraud. This Plaintiff will also be claiming economic damages for past, present and future medical expenses, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiff's life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.**

**The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct. She first learned this information from another patient of Adbul Chaudry M.D.'s practice in late 2018. She subsequently looked up information about Akoda on the internet.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has not seen any health care providers for treatment of these injuries.*

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States,

3

including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services. Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud. Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff is relying on her attorneys for the specific facts related to the ECFMG certification process. She had no prior knowledge of ECFMG in particular.*

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition. Plaintiff's contacts with Akoda are reflected in the medial records which are being produced. The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of ECFMG, nor any member of the media. The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, the Plaintiff has communicated generally with members of her family, specifically, her husband, Gregory Powell, and a friend, Latisa Gaymon.* *The Plaintiff can recall no other discoverable communications other than those set forth in these responses.* *The Plaintiffs deposition in the Dimensions matter has been previously produced.*

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

**Plaintiff adopts by reference her Answer to Interrogatory No. 2. The amount of these damages is for the jury to determine. Plaintiff seeks damages for these injuries as determined by the jury.**

**SUPPLEMENTAL ANSWER:**

*Plaintiff is not making a claim for economic damages.*

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

JA3240

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

**Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery. Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records. Plaintiff is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, attachment A is a list of persons represented by Schochor, Federico & Staton, P.A.*

**INTERROGATORY NO. 15:**

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

JA3241

**ANSWER:**

Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant. Without waiving this objection, to date, the Plaintiff has not undergone medical treatment from health care providers relating to the emotional distress she has sustained in this matter.

**SUPPLEMENTAL ANSWER:**

*Subject to and without waiving these objections, Plaintiff has not sought treatment from any health care provider for the injuries she is seeking to recover in this litigation. Plaintiff has received medical care in the past from Sandy Clemente, M.D., whose office is at Kaiser Permanente's Camp Springs Medical Center, which is located at 6104 Old Branch Ave Temple Hills, MD 20748. Dr. Clemente is Plaintiff's primary care physician (PCP). Plaintiff received care from Kaiser Permanente's Marlow Heights Medical Center, which is located at 5100 Auth Way, Camp Springs, MD 20746, for prenatal care. She was primarily seen by Brian Kingsley, M.D. during her prenatal course in 2015-2016. Plaintiff delivered her fifth child at Kaiser Permanente's Washington Hospital Center which is located at 110 Irving St NW, Washington, DC 20010. Plaintiff received medical care from Kaiser Permanente's Fair Oaks Medical Center which is located at 12255 Fair Lakes Pkwy, Fairfax, VA 22033,* ▮▮▮▮▮ *on December 5, 2016. Plaintiff received medical care from Kaiser Permanent's Camp Springs Medical Center on January 22, 2018 for left hip and back pain and for a TDAP (diphtheria, tetanus and acellular pertussis) vaccination. She was seen by Emily Lo, M.D. during that visit. Plaintiff sought treatment from Medstar Medical Group's Waldorf facility, located at 12090 Old*

JA3242

*Line Center, Waldorf, Maryland 20602 on February 27, 2018 for left hip and back pain. Plaintiff again sought treatment from Kaiser Permanente's Camp Springs Medical Center on February 28, 2018 for ongoing left hip and back pain on February 28, 2018. She was seen by Dr. Emily Lo and Omar Javery, M.D. (radiology) during that visit. Plaintiff returned to Kaiser Permanente's Camp Springs Medical Center to see Dr. Emily Lo on July 13, 2018 and July 17, 2018 for treatment of an acquired renal cyst. Plaintiff again saw Dr. Emily Lo at Kaiser Permanente's Camp Springs Medical Center on August 14, 2018 for an influenza vaccination.*

*Ms. Powell saw Dr. Abdul Chaudry for prenatal care beginning on August 25, 2014 at his office located at 6005 Landover Road, Suite 5, Cheverly, Maryland 20785. Ms. Powell underwent a dilatation and curettage procedure for postpartum hemorrhage on September 17, 2014 that was performed by Dr. Charles Akoda at Prince Georges Hospital Center located at 3001 Hospital Drive, Cheverly, Maryland 20785. Ms. Powell saw Dr. Chaudry at his office for postnatal care on October 14, 2014, October 21, 2014, October 28, 2014 and November 18, 2014.*

## SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

### General Objections

1. Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2. Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

JA3243

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiff's possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

JA3244

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The Plaintiff has provided a copy of the Complaint in this matter and the Defendant's Answer.*

**REQUEST NO. 4:**

JA3245

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is vague, overly broad and unduly burdensome. Moreover, documents filed in the Dimensions litigation are readily obtainable from the Prince George's County Circuit Court. Other documents, including attorney work product and documents concerning expert witnesses in that matter, are beyond the scope of discovery in this matter.*

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation have been produced.*

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

JA3246

Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case. If Defendant will clarify it, Plaintiff will attempt to respond.

**SUPPLEMENTAL RESPONSE:**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request as it is vague. The materials relating to ECFMG in the possession of the Plaintiff or her counsel were obtained from the Defendant ECFMG, or are otherwise in the possession of the Defendant ECFMG.*

**REQUEST NO. 20:**

All documents relating to Dimensions Healthcare Associates and Akoda.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this response as it is vague, overbroad and unduly burdensome, and to the extent it seeks information protected by attorney work product. Documents filed in*

JA3247

*litigation with Dimensions Healthcare are readily obtainable from the Prince George's County*

*Circuit Court in Maryland.*

**REQUEST NO. 21:**

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**SUPPLEMENTAL RESPONSE:**

*Objection is made to this request to the extent it seeks confidential documents concerning settlement discussions, including materials produced for mediation, to include mediation statements and expert reports produced for purposes of mediation. Objection is further made to this request to the extent it seeks correspondence between counsel as it is beyond the scope of discovery and represents attorney work product. Documents filed in litigation with Dimensions Healthcare are readily obtainable from the Prince George's County Circuit Court in Maryland.*

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Objection is further made to this request as it seeks attorney work product. Subject to and without waiving these objections, to the extent any such discoverable documents exist, they will or have been produced.*

## REQUEST NO. 34:

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

## RESPONSE:

**Objection**. **Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents on the grounds that she is not making any claim for lost income.**

## SUPPLEMENTAL RESPONSE:

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant or discoverable.*

## REQUEST NO. 35:

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

## RESPONSE:

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action. To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be produced.**

## SUPPLEMENTAL RESPONSE:

JA3249

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury. All medical records in the possession of the Plaintiff and her counsel have been produced.*

## REQUEST NO. 36:

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

## RESPONSE:

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

## SUPPLEMENTAL RESPONSE:

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

## REQUEST NO. 37:

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

## RESPONSE:

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

## SUPPLEMENTAL RESPONSE:

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

## REQUEST NO. 41:

JA3250

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Akoda litigation.*

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**SUPPLEMENTAL RESPONSE:**

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a)

16

providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**SUPPLEMENTAL RESPONSE:**

*There are no financial arrangements with anyone other than Plaintiff's attorneys, as set forth in response to Interrogatory No. 11.*

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced.**

**SUPPLEMENTAL RESPONSE:**

*Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

JA3252

CONRAD & O'BRIEN, P.C.

 /s/ Nicholas M. Centrella
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

JA3253

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschochor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

June 17, 2019

**VERIFICATION**

I, Elsa Powell, hereby aver that the factual statements in the foregoing Supplemental *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Supplemental Answers* are made subject to the penalties relating to unsworn falsification to authorities.

_____
Elsa Powell

Dated: June 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories* to be served on the following via electronic

mail:

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

June 17, 2019

**EXHIBIT A: Represented Clients of Schochor, Federico & Staton, P.A.**

| Last Name | First name | DOB |
|-----------|------------|-----|
| Achike | Nkemdilim | |
| Aikens | Regina | |
| Alex-Jimda | Olajomoke | |
| Allen | Angel | |
| Allen | Darnisha | |
| Allen | Jovanna | |
| Allen | Krystin | |
| Allen | Tyhee | |
| Alleyne | Martina | |
| Anderson | Keira | |
| Anderson | Latoya | |
| Andrews | Dnia | |
| Anthony | Deborah | |
| Anthony | Ivori | |
| Anthony | Londyn | |
| Ashu | Grace | |
| Ballard | Monique | |
| Balmes | Yolanda | |
| Beard | Pauline | |
| Becoats-Greer | Shantanette | |
| Bennett | Aisha | |
| Berger | Richelle | |
| Bowman | Vanessa | |
| Boykin | Michelle | |
| Bradwell | Tanina | |
| Brame | Shatore | |
| Braxton | Shaunte | |
| Brice | Christina | |
| Britton | Janis | |
| Brooks | Stacey | |
| Brown | Yolanda | |
| Butler | Onikaia | |
| Calliham | Kristen | |
| Carey | Tishana | |
| Carroll | DeTanicha | |
| Cavers | Ada | |
| Cavers | Sabrina | |
| Chase | Chamoney | |
| Chase | Chavonne | |
| Chase | Tameia | |
| Collins | Tamu | |

JA3257

| | |
|---|---|
| Crawford | Tiffany |
| Damilare-Raji | Temitope |
| Davis | Towana |
| Davison | Dawn |
| Day | Kavonna |
| Dew | Briana |
| Dews | Christina |
| Drewery | Dekwarna |
| Driver | Myeshia |
| Durant | Tasia |
| Ellis | Princess |
| Evans | Desire |
| Faulkner | Samuella |
| Ferrell | Sade |
| Ferrell | Shavonne |
| Fiti | Tele |
| Ford | Marquette |
| Francis | Priyanka |
| Frazier | Nyia |
| Freeman-Taylor | Octavia |
| Garay | Jocelyn |
| Gaymon | Latisa |
| Gibbs | Gabrielle |
| Glover | Donita |
| Godby | Vanessa |
| Goldston | Darmeshia |
| Gordon | Antaja |
| Hall | Shannon |
| Hammond | Angelique |
| Harrell | Alecia |
| Harris | Dynita |
| Harris | Myah |
| Harrison-Gray | Deveda |
| Hayes | Chanita |
| Henry | Shaquella |
| Hines | Sonya |
| Holder | Kimisha |
| Holmes | Naqirah |
| Hooker | Ronnetta |
| Hughes-Keen | LaTonya |
| Igbalajobi | Oluwaseyi |
| Ihuoma | Adewunmi |
| Jackson | Lakisha |
| Jacob | Darlene |

JA3258

| | |
|---|---|
| Jallow | Amie |
| Jay | Chantell |
| Jefferies | April |
| Jeffries | Lisa |
| Johnson | Brittany |
| Johnson | Krishanna |
| Johnson | Sandra |
| Johnson | Shynese |
| Johnson | Tierra |
| Jones | Kiwannah |
| Jones | Londra |
| Jones | Shamere / Dezmond Jones |
| Jones | Shamika |
| Kamara | Isata |
| Kamara | Maiatu / Isatu Sillah |
| Kamara | Veronica |
| Keemer-Gray | Nicole |
| King | Demetrice |
| King | Latashia |
| Kyles | Tameka |
| Lacy | Tamara |
| Lawal | Adejumoke |
| Layo | Titi |
| Lee (now Gogarty) | Jessica |
| Lewis | Natasha |
| Logan | Chadiamond |
| Lowery | Alisha |
| Lozano | Siomara |
| Lynch | Ashley |
| Magruder | Tatyana |
| Maiden | Brittany |
| Martin | Shirnelle |
| Mason | LaQuonda |
| Mathis | Felicia |
| McCarthy | Kharesia |
| Miles | Jammie |
| Miles | Jasmine |
| Miller | Jasmine |
| Mitchell | Savanna |
| Molua | Irene |
| Moyler | Jovan |
| Ndiformutieh | Victorine |

JA3259

| | |
|---|---|
| Nkengfack | Josephine |
| Nwalokomobi / Mgbolu | Imilar |
| Nyanzu | Diana |
| Omogbadegun | Ibironke |
| Oswald | Mariah |
| Otis | Jacqueline |
| Oyesiji | Jubril |
| Parker | Ericka |
| Perkins | Iysha |
| Petty | Arlene |
| Plater | Portia |
| Powell | Elsa |
| Powell | Tyeisha |
| Reynolds | Monique |
| Robinson | Jamie |
| Robinson | Janni |
| Rouse | Autumn |
| Scott | Dajzhe |
| Sesay | Finda |
| Shaw | Lakisha |
| Shearin | Sherita |
| Simmons | Jasmine |
| Simmons | Jennifer |
| Simms | Katrina |
| Simms | Natasha |
| Smith | Patria |
| Smith | Tyissha |
| Smith-Buani | Yema |
| Smith-Reynolds | Allanda |
| Spears | Nishika |
| Spriggs | Charmisa |
| Streater | Roneka |
| Strong | Adoniqua |
| Stubbs | Andrea |
| Tazi | Anyinkeng |
| Terry | Pasche |
| Thornes | Quiana |
| Tinsley | Jazmine |
| Townes | Danielle |
| Tyler | Rhonda |
| Tyler | TaNeishia |
| Udefiagbon | Bukola |
| Vail-Pardich | Jamesha |

JA3260

| | |
|---|---|
| Valentine | Diamisha |
| Vaughan | Aurelia |
| Velasquez | Carmen |
| Walston | Crystal |
| Ward | Danielle |
| Warrick | Brittany |
| White | Jerica |
| Wilcox | Joyce |
| Williams | Amber |
| Williams | LaShanta |
| Williams | Latisha |
| Williams | Mercedes |
| Wimberly | Lisa |
| Wimpye | Briana |
| Wingfield | Ashleigh |
| Woo | Mary |
| Woodfork | April |
| Wright | April |
| Young | Tina |



# Exhibit 46

**REDACTED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,  
ELSA M. POWELL AND DESIRE EVANS,    *

                    *      Case No. 2:18-cv-05629-WB

         Plaintiffs

                    *      Hon. Wendy Beetlestone

    v.                             *

EDUCATIONAL COMMISSION FOR     *  
FOREIGN MEDICAL GRADUATES

         Defendant            *

     *     *     *     *     *     *     *     *     *     *     *

**PLAINTIFF JASMINE RIGGINS' SUPPLEMENTAL ANSWERS TO FIRST  
SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES TO  
FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Jasmine Riggins, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Supplemental Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### SUPPLEMENTAL ANSWER:

**Plaintiff believes, but is not certain, that she recalls the dates she saw Akoda in his office and the dates she was at Prince Georges' Hospital Center where Akoda delivered her baby, Messiah Denver Brown, by C-section on March 18, 2013. Her best recollection is that Akoda provided prenatal care from August 2012 to March 18, 2013. Plaintiff refers Defendant to the medical records which Plaintiff is producing. Plaintiff chose Dr. Chaudry's practice because it was conveniently located. She was never treated by Dr. Chaudry but rather by Akoda.**

*The prenatal records from Dr. Abdul Chaudry were produced to ECFMG. They indicate that Plaintiff first saw Akoda on 10/15/2012. These records appear to indicate that Plaintiff had pre-natal visits on 10/23/2012; 12/03/2012; 12/20/2012; 12/31/2012; 1/17/2013; 2/19/2013; 2/22/2013; 3/01/2013; 3/13/2013; and 3/18/2013. These records are bates stamped 0000001995-0000002026.*

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

JA3264

SUPPLEMENTAL ANSWER:

Plaintiff has suffered financial, physical and emotional injuries. In addition to these injuries, Akoda's surgery on Plaintiff has limited her birth control options. Plaintiff requested a tubal ligation to ensure against future pregnancies and she was denied due to the tissue damage caused by Akoda's surgery. Plaintiff suffered extreme pain for several months after Akoda's surgery. After returning to work and continuing for a few months, approximately twice a week Plaintiff was unable to complete her work shift, leaving work two hours early, because of the extreme pain, that at times would cause her to double over, and resulted in lost income. Plaintiff had confidence and trust in her OB/GYN provider, Abdul Chaudry, M.D., that the doctors working under his practice and that treated her were, at the very least, legitimately credentialed, legally licensed, possessed the proper education and were real doctors. In addition, Plaintiff had confidence and trust in Prince George's Hospital Center that the doctors given privileges at their facility to perform surgery would also, at the very least, be legitimately credentialed, legally licensed, possess the proper education and were real doctors. Akoda performed a C-section on Plaintiff on March 18, 2013, when he was not legitimately credentialed, used fraud to obtain a medical license, and did not graduate from a medical school. Upon learning Akoda was a fraud, impersonating a doctor, Plaintiff felt extremely violated, betrayed, embarrassed, sad, very angry and shocked. As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

*Plaintiff has not seen any health care providers for treatment of these injuries.*
*Plaintiff began experiencing these injuries when she learned in July 2017 that Akoda was not*

JA3265

*really a doctor. Plaintiff learned this from Monique Russell. Plaintiff is seeking only non-*

*economic damages.*

## INTERROGATORY NO. 7:

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

## SUPPLEMENTAL ANSWER:

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

*Plaintiff is relying on her attorneys for these allegations and Plaintiff has no personal*

*knowledge of them.*

## INTERROGATORY NO. 9:

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

## SUPPLEMENTAL ANSWER:

**Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these**

**damages is for the jury to determine. Plaintiff seeks damages for these injuries as**

**determined by the jury.**

*Plaintiff is not making a claim for economic damages.*

## INTERROGATORY NO. 11:

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

4

JA3266

**SUPPLEMENTAL ANSWER:**

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements. All clients retained by the Law Offices of Peter G. Angelos, P.C., the Law Offices of David Ellin and Z Law, LLC have signed the same retainer agreement.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**SUPPLEMENTAL ANSWER:**

Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

*Attachment A is a list of persons represented jointly by the Law Office of Peter G. Angelos, P.A., the Law Offices of David Ellin and Z Law, LLC.*

5

## INTERROGATORY NO. 15:

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

## SUPPLEMENTAL ANSWER:

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome. As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda. It is not limited in time or scope and seeks information that is not relevant.**

*Subject to and without waiving these objections, Plaintiff has not sought treatment from any health care provider for the injuries she is seeking to recover in this litigation. Plaintiff has received medical care in the past from Charter Health Care, a clinic in the District of Columbia, and following the delivery of her child by Akoda from Unity Health Care, another clinic in the District of Columbia. Plaintiff has two other children: Santana* ▮▮▮▮▮ *and Taniya* ▮▮▮▮▮▮ *and the Plaintiff has terminated two other pregnancies.*

## SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

### General Objections

1.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

JA3268

3.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.     To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.     Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.     These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

JA3269

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**SUPPLEMENTAL RESPONSE:**

**None.**

***The transcript of Plaintiff's deposition and Plaintiff's Answers to Interrogatories in the Akoda litigation will be produced.***

8

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case. If Defendant will clarify it, Plaintiff will attempt to respond.**

*Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

*Subject to and without waiving these objections, to the extent any such documents exist, they will or have been produced.*

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**SUPPLEMENTAL RESPONSE:**

9

JA3271

Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant.*

## REQUEST NO. 35:

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

## SUPPLEMENTAL RESPONSE:

Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury. The only medical care Plaintiff can recall is in connection with her pregnancies and deliveries.*

## REQUEST NO. 36:

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

## SUPPLEMENTAL RESPONSE:

The requested documents will be produced.

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

JA3272

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**SUPPLEMENTAL RESPONSE:**

**The requested documents will be produced.**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming in this litigation. Plaintiff has no bills or expense documentation.*

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**SUPPLEMENTAL RESPONSE:**

**Objection. Plaintiff has not obtained any statements. Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

*Subject to and without waiving these objections, Plaintiff will produce the transcript of her deposition and her answers to interrogatories in the Akoda litigation.*

**REQUEST NO. 42:**

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on**

JA3273

the grounds that it requests documents which are not relevant to any claim or defense in this action.

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

## REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

## SUPPLEMENTAL RESPONSE:

**Plaintiff adopts by reference her response to Request No. 42.**

*There are no financial arrangements with anyone other than Plaintiff's attorneys.*

## REQUEST NO. 44:

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

12

JA3274

CONRAD & O'BRIEN, P.C.

/s/ Nicholas M. Centrella
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

LAW OFFICES OF PETER G. ANGELOS, P.C.

/s/ Paul M. Vettori
Jay D. Miller (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
Danielle S. Dinsmore (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
Paul M. Vettori (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
One Charles Center
100 North Charles Street
Baltimore, MD 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff, Jasmine Riggins*

Dated: June 13 , 2019

## VERIFICATION

I, Jasmine Riggins, hereby aver that the factual statements in the foregoing *Answers to Interrogatories* are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Jasmine Riggins

Dated: June 13, 2019

14

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories and Document Requests* to be served on the

following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

/s/ *Nicholas M. Centrella*
Nicholas M. Centrella

June 13 , 2019

JA3277

**ATTACHMENT A TO SUPPLEMENTAL DISCOVERY RESPONSES**

JA3278

**NAME**                           **D/O/B**

| Name | |
|------|---|
| Abudu, Yemis | |
| Adams, Jonae | |
| Adebayo, Atinuke O. | |
| Adebayo, Titilope | |
| Adekanbi, Comfort | |
| Adeoye, Aebola | |
| Adesalu, Folasade | |
| Adigwe, Susan | |
| Akinwekomi, Taiwo | |
| Akosile, Abosede | |
| Alleyne, Dionne | |
| Anderson, Fatama | |
| Andrews, Ivona | |
| Arrey, Gennette Nker | |
| Ashton, Jennifer | |
| Atemnkeng, Precilia | |
| Ayodele, Olushola | |
| Ayoola, Abeni | |
| Azienwi, Marie Takem | |
| Bailey, Lameche | |
| Barnes, Whitney | |
| Barney, (Burc) Kededra | |
| Bell, Jimekiah | |
| Bendu, Makala | |
| Benford, (Walder) Tiffany | |
| Benjamin, Daneylle | |
| BienAime, Lise | |
| Bonaparte, Karen | |
| Bowden, Natasha | |
| Braima, Memunatu | |
| Braxton, Jovan | |
| Briscoe, Myeshia | |
| Broomes, To Asia | |
| Brown, Brittney | |
| Brown, Christine | |
| Brown, Sharon | |
| Brown, Shaunelle | |

JA3279

| NAME | D/O/B |
|------|-------|
| Brown, Tiffany | |
| Bryant, Ladorsha | |
| Burris, Donika | |
| Burris, Rainelle | |
| Butler, Renee | |
| Byrd, Sekeithia | |
| Caldwell, Amisha | |
| Calix, Karina | |
| Coleman, Rashena | |
| Coley, Takia | |
| Collins, Jayde | |
| Cosby, Taylor | |
| Craig, Candace | |
| Derricott, Tiara | |
| Donnell, Tyche | |
| Davis, Renita | |
| Daniels, Brittany | |
| Davis, Amoni | |
| Davis, Ashle | |
| Davis, Stefanie | |
| Deville, Ashley | |
| Deville, Ebony | |
| Deville, Tiffany | |
| Diamond, Ashley | |
| Dinga, Andin | |
| Dunham, Deneise | |
| Eley, Marra | |
| Faison, Markinda | |
| Felder, Andrea | |
| Felix, Altagracia | |
| Ferguson, Darnisha | |
| Ferguson, Zenea | |
| Fornah, Fatu | |
| Franklin, Alexis | |
| Franklin, Khenae | |
| Fungafat, Tandika | |
| Garcia, Yancia | |

| NAME | D/O/B |
|------|-------|
| Gaskins, Richana | |
| Gibbs, Gabrielle | |
| Gines, Jasmine | |
| Ginyard, Angela | |
| Goldston, Shadona | |
| Gonzales, Hazzmin | |
| Green, Crystal | |
| Grier, Gethsamane | |
| Hall, Asia | |
| Hall, Monica | |
| Hansberry, Yvette | |
| Harley, Ashley | |
| Harper, Aqueba | |
| Harper, Deshonta | |
| Harris, Dayshelle | |
| Harris, Kimberly | |
| Harrison, Charnika | |
| Hearst, Lashell | |
| Henry, Lazett | |
| Henry, Shaquella | |
| Herron, Angela | |
| Holder, Kimberly | |
| Hudson, Chanell | |
| Ifekoya, Adeola | |
| Jackson, Danielle | |
| Jalloh, Ramatulie | |
| Jawla, Dalla | |
| Jenkins-Williams, Tris | |
| Jimason, Tasha | |
| Jobe, Princess | |
| Johnson, Alonda | |
| Johnson, Deidra | |
| Johnson, Jasmine | |
| Johnson, Keisha | |
| Jones, Carol | |
| Jones, Jasmine | |
| Jordan-Worthy, Krytiseya | |

JA3281

| NAME | D/O/B |
|------|-------|
| Judd, Yvonnda | |
| Kaffo, Urowoli (Lucy) | |
| Kamara, Etta | |
| Kamara, Isatu | |
| Kanu, Fatmata | |
| King, Leia | |
| Knox-Stokes, Ashanta | |
| Koroma, Bridgetta | |
| Koroma, Margaret | |
| Kosh, Charmayne | |
| Kosh, Nia | |
| Kwi, Courage | |
| Langford, Deja | |
| Leslie, Hazel | |
| Lewis, Dawnesheia | |
| Lindsay, Chelsey | |
| Little, Ciera | |
| Lofland, Zymira | |
| Lovell, Erica | |
| Madubuatta, Miriam Ada | |
| Martin, Crystal | |
| Mathis, Markquonda | |
| Maynard, LaChey | |
| Mayo, Tamia | |
| McAllister, Tara | |
| McGee, Lakenyatta | |
| McKnight, Denia | |
| McLaughlin, Ann Marie | |
| Metts, Torquesa | |
| Moorman, Shanita | |
| Morgan, Patricia | |
| Nickens, Klea | |
| Nadav, Mattu | |
| Nguti, Mirabel | |
| Nkeng, Sylvia | |
| Oakes, Ashley | |
| Olukoga, Emily | |

JA3282

| NAME | D/O/B |
| --- | --- |
| Oni, Abimbola | |
| Palmer, Brittany | |
| Parker, Jazzman | |
| Parker, Sylvia | |
| Pitts, Ashley | |
| Platt, Endia | |
| Powell, Tina | |
| Proctor, Latika | |
| Proctor, Shabray | |
| Proctor, Shamika | |
| Randall, Amina | |
| Ray-Gie, Trayeshia | |
| Reed, Brishona | |
| Reeves, Chimere | |
| Reid, Patricia | |
| Riggins, Jasmine | |
| Robbins, Lashawnda | |
| Robinson, Clara | |
| Ross, Dinah | |
| Rush, Shartae | |
| Russell, Monique | |
| Sambola, Arku | |
| Samuel, Titilayo | |
| Savoy, Keyona | |
| Savoy, Sheika | |
| Sawyer, Racquetta | |
| Sawyer, Ursula | |
| Scarbourough, Micaela | |
| Seegars, Toniesha | |
| Sesay, Finda | |
| Shobowale, Oritoke | |
| Simpkins, Leslei | |
| Simpson, Felicia | |
| Smith, Jalisa M. | |
| Smith, Iris Samone | |
| Smith, Tammy | |
| Snowden, Caprice | |

| NAME | D/O/B |
|------|-------|
| Snowden, Imani | ███ |
| Sorrell, Tiara | ███ |
| Spencer, Cassandra | ███ |
| Spencer, Faatimah | ███ |
| Spencer, Nafiysha | ███ |
| Spriggs, Tiara | ███ |
| Stagg, Shanika | ███ |
| Stallings, Lynette | ███ |
| Stallings, Christina | ███ |
| Stocks, Artavia | ███ |
| Streater, Roneka | ███ |
| Sykes, Tyiesha | ███ |
| Taylor, Chauntice | ███ |
| Taylor, Latiffany | ███ |
| Thomas, Tanja | ███ |
| Thomas, Victoria | ███ |
| Thomas-Walker, Carla | ███ |
| Thornton, Lisa | ███ |
| Tilghman, Chantell | ███ |
| Tilghman, Chernell | ███ |
| Tilghman, Faith | ███ |
| Toure-Davis, Nathalie | ███ |
| Tyler, Alexa | ███ |
| Valentine, Diamisha | ███ |
| Van-Overbeek, April Cain | ███ |
| Veney, Lauren | ███ |
| Wade, Britnee | ███ |
| Wade, Kayla | ███ |
| Walker, Alicea | ███ |
| Wallace, Shelly | ███ |
| Walton, Aisha | ███ |
| Ward, Iesha | ███ |
| Watts, Ericka | ███ |
| White, Shavonda | ███ |
| Whitley, Alexis Joanne | ███ |
| Williams, Alexis | ███ |
| Williams, Apryl Monet | ███ |

| NAME | D/O/B |
|------|-------|
| Williams, Candice | |
| Williams, Lynette | |
| Williams, Michelle | |
| Williamson, Keyinoshia | |
| Wilson, Breanna | |
| Woodfolk, (nee Torri) | |

JA3285

# Exhibit 47

**REDACTED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL AND DESIRE EVANS,     *

           Plaintiffs     *     Case No. 2:18-cv-05629-WB

                     *     Hon. Wendy Beetlestone

      v.     *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES     *

      Defendant     *

    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF MONIQUE RUSSELL'S SUPPLEMENTAL ANSWERS TO FIRST SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES TO <u>FIRST SET OF</u> <u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>

      Plaintiff, Monique Russell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Supplemental Answers to First Set of Interrogatories propounded by the defendant.

      The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

      Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

JA3287

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### SUPPLEMENTAL ANSWER:

**Akoda was the on-call physician when Plaintiff presented at PGHC on May 25, 2016. Akoda delivered Plaintiff's son, Luka Romero Russell, on May 25, 2016.**

***Plaintiff did not choose Akoda as her doctor. She was a patient of Moore & Associates. Akoda did not provide prenatal care to Plaintiff.***

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### SUPPLEMENTAL ANSWER:

**Plaintiff has suffered severe and substantial emotional injuries as a result of the negligence described in the Complaint. As a survivor of ▮▮▮▮▮▮▮▮▮ Plaintiff had made great progress with regard to issues of trust and with violations or encroachments on her personal space, especially with regard to her body, previous to her interactions with Akoda. However, upon learning that Akoda was not in fact a licensed physician, her trust issues were exacerbated and came back in full force. These trust issues have flowed over into Plaintiff's marriage, interfering with her intimacy with her husband**

2

JA3288

as she finds it very difficult to engage in sexual relations with him.  Plaintiff not only feels violated by Akoda, but also feels she was sexually and physically abused by him.  Akoda performed vaginal examinations on Plaintiff during labor and performed Cesarean section surgery on her to deliver her child.  Before learning the truth about Akoda, Plaintiff had worked hard to overcome her deep fear and distrust, and to develop and maintain confidence and trust in her OB/GYN provider, Moore & Associates, believing that the doctors working under the practice and that treated her were, at the very least, legitimately credentialed, legally licensed, and possessed the proper education necessary in the practice of medicine.   On June 19, 2017, Plaintiff was horrified and devastated to discover Akoda was not a "real" doctor. She became obsessed with her search for understanding of how Akoda received privileges at Prince George's Hospital to touch her, and to "cut into her." Plaintiff's search for understanding of this situation has created in her a substantial distrust of doctors and because of this distrust, she is now unable to seek medical treatment.  This lack of trust was amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda before allowing him to perform surgeries in its hospital.  Plaintiff's lack of trust is impeding her ability to select any new health or mental care provider, and consequently, seeking medical and mental health care for the emotional trauma she has suffered.  She continues to cope daily with her feelings of violation and harm as best she can, but has been emotionally devastated by this situation.  As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

*Plaintiff has not seen any health care providers for treatment of these injuries. Plaintiff began experiencing these injuries when she learned in June 2017 that Akoda was not*

3

*really a doctor. Plaintiff learned from an online Moore & Associates website when she*

*searched for the name of the doctor who delivered her son that Akoda's photograph had been*

*removed. She then located the hospital paperwork showing Akoda's name and she then*

*searched the internet to see where he was practicing. Through this search Plaintiff found a*

*U.S. Justice Department press release detailing Akoda's criminal charges. Plaintiff is seeking*

*only non-economic damages.*

## INTERROGATORY NO. 7:

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

## SUPPLEMENTAL ANSWER:

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

*Plaintiff is relying on her attorneys for these allegations and Plaintiff has no personal*

*knowledge of them.*

## INTERROGATORY NO. 9:

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

## SUPPLEMENTAL ANSWER:

**Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these**

**damages is for the jury to determine. Plaintiff seeks damages for these injuries as**

**determined by the jury.**

*Plaintiff is not making a claim for economic damages.*

4

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**SUPPLEMENTAL ANSWER:**

**Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, Plaintiff has a standard contingency fee agreement with her attorneys, pursuant to which she pays no fees unless there is a recovery and counsel advances expenses. There are no other financial arrangements. All clients retained by the Law Offices of Peter G. Angelos, P.C., the Law Offices of David Ellin and Z Law, LLC have signed the same retainer agreement.*

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**SUPPLEMENTAL ANSWER:**

**Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.**

JA3291

*Attachment A is a list of persons represented jointly by the Law Office of Peter G.*

*Angelos, P.A., the Law Offices of David Ellin and Z Law, LLC.*

## INTERROGATORY NO. 15:

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

## SUPPLEMENTAL ANSWER:

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome. As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda. It is not limited in time or scope and seeks information that is not relevant.**

*Plaintiff is able at present to recall the following medical history:*

- *For the past ten years, Plaintiff's family doctor has been Mark Major, M.D., 1300 Spring Street, Silver Spring, MD 20910*

- *Shelly Williams, M.D., 8241 Georgia Avenue, Silver Spring, MD 20910 was Plaintiff's family doctor before Dr. Major*

- *Shawn Howell, M.D., 2311 M Street NW, Washington DC was Plaintiff's cardiologist, who diagnosed her with vasovagal syncope. After the diagnosis, Plaintiff did not see Dr. Howell again until her pregnancy*

- *Danielle Waldrop, M.D., 7525 Greenway Center Drive, Suite 216, Greenbelt, MD 20770 was Plaintiff's Ob-Gyn during her pregnancy*

- *ATI Physical Therapy, 2900 Belcrest Center Drive, Suite 104-A, Hyattsville, MD 20782 (treatment for back pain)*

6

- *Silver Spring Medical Center, 11301 Amherst Avenue, Suite 102, Silver Spring,*
  *MD 20902 (physical therapy following motor vehicle accident).*

## SUPPLEMENTAL RESPONSES TO DOCUMENT REQUESTS

### General Objections

1.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.      Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.      To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

JA3293

7.      Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.      These responses are made without waiver of: (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action; (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action; and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and

8

every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant. Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 7:**

     All documents relating to Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

     **Objection. This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case. If Defendant will clarify it, Plaintiff will attempt to respond.**

     *Plaintiff is producing a list of all persons represented by the law firms identified in answer to Interrogatory No. 12.*

**REQUEST NO. 30:**

     All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**SUPPLEMENTAL RESPONSE:**

     **Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

     *Subject to and without waiving these objections, to the extent any such documents exist, they will or have been produced.*

**REQUEST NO. 34:**

JA3295

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.**

*Subject to and without waiving these objections, Plaintiff is not making any claim for economic damages and therefore the requested documents are not relevant.*

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

**SUPPLEMENTAL RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, Plaintiff has never sought nor received treatment for any mental health diagnosis, illness of injury. Plaintiff's medical records relating to the history set out in response to interrogatory no. 15 are not relevant.*

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**SUPPLEMENTAL RESPONSE:**

**The requested documents will be produced.**

10

JA3296

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming*

*in this litigation. Plaintiff has no bills or expense documentation.*

## REQUEST NO. 37:

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff has not sought nor received medical treatment for the injuries she is claiming*

*in this litigation. Plaintiff has no bills or expense documentation.*

## REQUEST NO. 41:

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

## SUPPLEMENTAL RESPONSE:

**Objection. Plaintiff has not obtained any statements. Upon advice of counsel,**

**Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and**

**declines to produce the requested documents on the grounds that they are protected from**

**discovery by the work-product doctrine.**

*Subject to and without waiving these objections, Plaintiff has not made any sworn*

*statements in the Akoda litigation.*

## REQUEST NO. 42:

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

## SUPPLEMENTAL RESPONSE:

JA3297

**Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

*Subject to and without waiving these objections, see Supplemental Answer to Interrogatory No. 11.*

## REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

## SUPPLEMENTAL RESPONSE:

**Plaintiff adopts by reference her response to Request No. 42.**

*There are no financial arrangements with anyone other than Plaintiff's attorneys.*

## REQUEST NO. 44:

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

## SUPPLEMENTAL RESPONSE:

**The requested documents will be produced.**

*Plaintiff is seeking only non-economic damages; there are no documents responsive to this request.*

JA3298

CONRAD & O'BRIEN, P.C.

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

LAW OFFICES OF PETER G. ANGELOS, P.C.

*/s/ Paul M. Vettori*
Jay D. Miller (*Pro Hac Vice Forthcoming*)
jmiller@lawpga.com
Danielle S. Dinsmore (*Pro Hac Vice Forthcoming*)
ddinsmore@lawpga.com
Paul M. Vettori (*Pro Hac Vice Forthcoming*)
pvettori@lawpga.com
One Charles Center
100 North Charles Street
Baltimore, MD 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150
*Attorneys for Plaintiff, Monique Russell*

Dated: June ___, 2019

13

JA3299

## VERIFICATION

I, Monique Russell, hereby aver that the factual statements in the foregoing *Supplemental Answers to Interrogatories* are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Monique Russell

Dated:  June  7 , 2019

14

JA3300

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Supplemental Answers to Interrogatories and Document Requests* to be served on the

following via electronic mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

<div align="right">

/s/ *Nicholas M. Centrella*_____
Nicholas M. Centrella

</div>

June 13 , 2019

JA3301

**ATTACHMENT A TO SUPPLEMENTAL DISCOVERY RESPONSES**

| NAME | D/O/B |
|------|-------|
| Abudu, Yemis | |
| Adams, Jonae | |
| Adebayo, Atinuke O. | |
| Adebayo, Titilope | |
| Adekanbi, Comfort | |
| Adeoye, Aebola | |
| Adesalu, Folasade | |
| Adigwe, Susan | |
| Akinwekomi, Taiwo | |
| Akosile, Abosede | |
| Alleyne, Dionne | |
| Anderson, Fatama | |
| Andrews, Ivona | |
| Arrey, Gennette Nker | |
| Ashton, Jennifer | |
| Atemnkeng, Precilia | |
| Ayodele, Olushola | |
| Ayoola, Abeni | |
| Azienwi, Marie Takem | |
| Bailey, Lameche | |
| Barnes, Whitney | |
| Barney, (Burc) Kededra | |
| Bell, Jimekiah | |
| Bendu, Makala | |
| Benford, (Walder) Tiffany | |
| Benjamin, Daneylle | |
| BienAime, Lise | |
| Bonaparte, Karen | |
| Bowden, Natasha | |
| Braima, Memunatu | |
| Braxton, Jovan | |
| Briscoe, Myeshia | |
| Broomes, To Asia | |
| Brown, Brittney | |
| Brown, Christine | |
| Brown, Sharon | |
| Brown, Shaunelle | |

| NAME | D/O/B |
|------|-------|
| Brown, Tiffany | |
| Bryant, Ladorsha | |
| Burris, Donika | |
| Burris, Rainelle | |
| Butler, Renee | |
| Byrd, Sekeithia | |
| Caldwell, Amisha | |
| Calix, Karina | |
| Coleman, Rashena | |
| Coley, Takia | |
| Collins, Jayde | |
| Cosby, Taylor | |
| Craig, Candace | |
| Derricott, Tiara | |
| Donnell, Tyche | |
| Davis, Renita | |
| Daniels, Brittany | |
| Davis, Amoni | |
| Davis, Ashle | |
| Davis, Stefanie | |
| Deville, Ashley | |
| Deville, Ebony | |
| Deville, Tiffany | |
| Diamond, Ashley | |
| Dinga, Andin | |
| Dunham, Deneise | |
| Eley, Marra | |
| Faison, Markinda | |
| Felder, Andrea | |
| Felix, Altagracia | |
| Ferguson, Darnisha | |
| Ferguson, Zenea | |
| Fornah, Fatu | |
| Franklin, Alexis | |
| Franklin, Khenae | |
| Fungafat, Tandika | |
| Garcia, Yancia | |

JA3304

| NAME | D/O/B |
|------|-------|
| Gaskins, Richana | |
| Gibbs, Gabrielle | |
| Gines, Jasmine | |
| Ginyard, Angela | |
| Goldston, Shadona | |
| Gonzales, Hazzmin | |
| Green, Crystal | |
| Grier, Gethsamane | |
| Hall, Asia | |
| Hall, Monica | |
| Hansberry, Yvette | |
| Harley, Ashley | |
| Harper, Aqueba | |
| Harper, Deshonta | |
| Harris, Dayshelle | |
| Harris, Kimberly | |
| Harrison, Charnika | |
| Hearst, Lashell | |
| Henry, Lazett | |
| Henry, Shaquella | |
| Herron, Angela | |
| Holder, Kimberly | |
| Hudson, Chanell | |
| Ifekoya, Adeola | |
| Jackson, Danielle | |
| Jalloh, Ramatulie | |
| Jawla, Dalla | |
| Jenkins-Williams, Tris | |
| Jimason, Tasha | |
| Jobe, Princess | |
| Johnson, Alonda | |
| Johnson, Deidra | |
| Johnson, Jasmine | |
| Johnson, Keisha | |
| Jones, Carol | |
| Jones, Jasmine | |
| Jordan-Worthy, Krytiseya | |

JA3305

| NAME | D/O/B |
|------|-------|
| Judd, Yvonnda | |
| Kaffo, Urowoli (Lucy) | |
| Kamara, Etta | |
| Kamara, Isatu | |
| Kanu, Fatmata | |
| King, Leia | |
| Knox-Stokes, Ashanta | |
| Koroma, Bridgetta | |
| Koroma, Margaret | |
| Kosh, Charmayne | |
| Kosh, Nia | |
| Kwi, Courage | |
| Langford, Deja | |
| Leslie, Hazel | |
| Lewis, Dawnesheia | |
| Lindsay, Chelsey | |
| Little, Ciera | |
| Lofland, Zymira | |
| Lovell, Erica | |
| Madubuatta, Miriam Ada | |
| Martin, Crystal | |
| Mathis, Markquonda | |
| Maynard, LaChey | |
| Mayo, Tamia | |
| McAllister, Tara | |
| McGee, Lakenyatta | |
| McKnight, Denia | |
| McLaughlin, Ann Marie | |
| Metts, Torquesa | |
| Moorman, Shanita | |
| Morgan, Patricia | |
| Nickens, Klea | |
| Nadav, Mattu | |
| Nguti, Mirabel | |
| Nkeng, Sylvia | |
| Oakes, Ashley | |
| Olukoga, Emily | |

JA3306

| NAME | D/O/B |
|------|-------|
| Oni, Abimbola | |
| Palmer, Brittany | |
| Parker, Jazzman | |
| Parker, Sylvia | |
| Pitts, Ashley | |
| Platt, Endia | |
| Powell, Tina | |
| Proctor, Latika | |
| Proctor, Shabray | |
| Proctor, Shamika | |
| Randall, Amina | |
| Ray-Gie, Trayeshia | |
| Reed, Brishona | |
| Reeves, Chimere | |
| Reid, Patricia | |
| Riggins, Jasmine | |
| Robbins, Lashawnda | |
| Robinson, Clara | |
| Ross, Dinah | |
| Rush, Shartae | |
| Russell, Monique | |
| Sambola, Arku | |
| Samuel, Titilayo | |
| Savoy, Keyona | |
| Savoy, Sheika | |
| Sawyer, Racquetta | |
| Sawyer, Ursula | |
| Scarbourough, Micaela | |
| Seegars, Toniesha | |
| Sesay, Finda | |
| Shobowale, Oritoke | |
| Simpkins, Leslei | |
| Simpson, Felicia | |
| Smith, Jalisa M. | |
| Smith, Iris Samone | |
| Smith, Tammy | |
| Snowden, Caprice | |

JA3307

**NAME**                                    D/O/B

| Name | D/O/B |
|---|---|
| Snowden, Imani | |
| Sorrell, Tiara | |
| Spencer, Cassandra | |
| Spencer, Faatimah | |
| Spencer, Nafiysha | |
| Spriggs, Tiara | |
| Stagg, Shanika | |
| Stallings, Lynette | |
| Stallings, Christina | |
| Stocks, Artavia | |
| Streater, Roneka | |
| Sykes, Tyiesha | |
| Taylor, Chauntice | |
| Taylor, Latiffany | |
| Thomas, Tanja | |
| Thomas, Victoria | |
| Thomas-Walker, Carla | |
| Thornton, Lisa | |
| Tilghman, Chantell | |
| Tilghman, Chernell | |
| Tilghman, Faith | |
| Toure-Davis, Nathalie | |
| Tyler, Alexa | |
| Valentine, Diamisha | |
| Van-Overbeek, April Cain | |
| Veney, Lauren | |
| Wade, Britnee | |
| Wade, Kayla | |
| Walker, Alicea | |
| Wallace, Shelly | |
| Walton, Aisha | |
| Ward, Iesha | |
| Watts, Ericka | |
| White, Shavonda | |
| Whitley, Alexis Joanne | |
| Williams, Alexis | |
| Williams, Apryl Monet | |

**NAME**                          **D/O/B**

| NAME | D/O/B |
|------|-------|
| Williams, Candice | |
| Williams, Lynette | |
| Williams, Michelle | |
| Williamson, Keyinoshia | |
| Wilson, Breanna | |
| Woodfolk, (nee Torri) | |

JA3309

# Exhibit 48



Larry C. Gilstrap, III, M.D.
Executive Director
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX 75204
Phone: (214) 871-1619
Fax: (214) 871-1943

January 31, 2014

John-Charles Akoda, M.D.



Dear Dr. Akoda,

Congratulations! In recognition of your fulfillment of all requirements, you are now a Diplomate of The American Board of Obstetrics and Gynecology, Inc. Your certification is effective January 31, 2014 through December 31, 2014. Your certificate must be renewed annually by completion of all the assignments in the ABOG Maintenance of Certification (MOC) process.

Please carefully review the spelling of your name on this letter as that name will be printed on the certificate you will receive. If there is a correction, please notify our office no later than February 14, 2014. If you have not heard from the printer regarding your diploma by April 30, 2014, please contact the Board office.

You may apply for the 2014 MOC process at www.abog.org. There is no fee for MOC for the first year. However, if you are not an ACOG fellow or junior fellow, you must pay for the category I CME credit, as that is a benefit of ACOG membership.

We hope you will maintain an active interest in the specialty, and you will continue to improve the care of women.

Best Wishes,

*Larry C. Gilstrap II, MD*

Larry Gilstrap, III M.D.
Executive Director

LG

ABOG ID: 9025829

Incorporated 1930
A founding member of The American Board of Medical Specialties
www.abog.org

610240

CONFIDENTIAL

ABOG_nonparty_000046

JA3311

# Exhibit 49



American Board of Obstetrics + Gynecology
**First in Women's Health®**

August 30, 2017

<u>CERTIFIED RETURN RECEIPT REQUESTED</u>

John-Charles Akoda, MD

█████████

Dear Dr. Akoda:

The American Board of Obstetrics and Gynecology (ABOG) was recently made aware through a Disciplinary Action Notification System (DANS) report that the Maryland State Board of Physicians took adverse action on your license on July 10, 2017. Your Maryland medical license was revoked in a Final Decision and Order for the following:

1. You pled guilty to a crime involving moral turpitude on November 15, 2016.

2. You were convicted of social security number fraud, a felony, in violation of 42 U.S.C. 408(a)(7)(B) In the United States District Court for the District of Maryland.

3. You were sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

The ad hoc committee of the Credentials Committee has reviewed the above information and determined that you do not meet the terms of the requirements to maintain certification by the ABOG. The committee voted unanimously that you have violated the moral and ethical standards of the practice of medicine accepted by organized medicine because your license was revoked and you were convicted of a felony. Your ABOG certificate expired December 31, 2016. The committee has determined that you currently are ineligible to participate in the ABOG Re-entry exam/ MOC Process.

Disqualification or Diplomate revocation may occur whenever the physician's license has had his/her license revoked. Disqualification or Diplomate revocation may also occur whenever the physician has been convicted of a felony or has pled guilty to a felony. The ABOG policies require Diplomates to have an unrestricted license to practice in all states in which they are licensed. This information is under the Policies section at
https://www.abog.org/new/n_policies.aspx?title=revocation

2915 Vine Street, Dallas, Texas 75204 | P: 214.871.1619 | F: 214.871.1943 | E: info@abog.org | W: ABOG.org

CONFIDENTIAL

ABOG_nonparty_JA08003

The ad hoc committee also voted to refer your case to the Credentials Committee for consideration of revocation of certification. The Credentials Committee will review your case for possible revocation of your certification at the next Board of Directors meeting in January 2018. You may submit any additional information that you think may aid the Credentials Committee in consideration of the revocation of your certification. Please submit any information to me in writing or by email, and we will see that the committee has the information to consider at the meeting.

Please feel free to contact us if you have any further questions.

Sincerely,

Susan M. Ramin, M.D.
Associate Executive Director
Maintenance of Certification
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX 75204
Phone: (214) 721-7510
Fax: (214) 871-1943


ABOG Diplomate # 9025829
SMR/kw

CONFIDENTIAL

ABOG_nonparty_JA08104

# Exhibit 50

**Message**

| | |
|---|---|
| **From:** | Corrado, Kara [/O=ECFMG/OU=PHILADELPHIA/CN=RECIPIENTS/CN=KOLEYN] |
| **Sent:** | 3/18/2016 8:20:18 AM |
| **To:** | Cover, Lisa [/O=ECFMG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cover, Lisa5df]; Paolini, Suzann [/O=ECFMG/OU=Philadelphia/cn=Recipients/cn=SPaolini] |
| **CC:** | Mizak, Roman [/O=ECFMG/OU=Philadelphia/cn=Recipients/cn=RMizak] |
| **Subject:** | RE: Prince George's County Police Department-Federal investigation |

Hi all,

Igbarse is a name that familiar to me – he was a creds committee case from about 15 years ago. I'll follow up with Virginia to see if there is additional background to help with context.

Kara

_____

Ms. Kara Corrado, J.D.
Director, Credentials Services
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

_____

**From:** Cover, Lisa
**Sent:** Thursday, March 17, 2016 6:14 PM
**To:** Paolini, Suzann; Corrado, Kara
**Cc:** Mizak, Roman
**Subject:** Re: Prince George's County Police Department-Federal investigation

Great, let's connect w Kara in the am.

Sent from my iPhone

On Mar 17, 2016, at 5:33 PM, Paolini, Suzann <SPaolini@ECFMG.org> wrote:

> Lisa,
>
> No, he didn't elaborate on documentation previously received. I recorded the call, and he was pretty specific about next steps, so we can listen to the call tomorrow.
>
> This is a complex case and it appears that Dr. Charles is well known to the Credentials Committee. We have three recorded instances for which there has been allegation that Dr. Charles provided a false response to item 1 on an application for the USMLE and applied to take a Step that he had already passed. Our records also indicate that he received two ECFMG certificates, obviously obtained by falsifying information on subsequent applications.
>
> In addition Naima, who took the initial call from Detective Evan, was able to locate an additional Identification number under the name Oluwafemi Charles Igberase, 0-482-700-2, and has request for this file. Once we have the additional file we'll be in a better position to determine what the authorities might be looking for.
>
> I'll be in all day tomorrow so just let me know when you'd like to discuss this case.

JA3316

Confidential

ECFMG_RUSS_0003414

Have a good evening!
Suzann

---

**From:** Cover, Lisa
**Sent:** Thursday, March 17, 2016 1:34 PM
**To:** Paolini, Suzann
**Subject:** RE: Prince George's County Police Department-Federal investigation

Did he receive the information that we sent to the agency in 2014? Did he say what more he wants from us?

---

**From:** Paolini, Suzann
**Sent:** Thursday, March 17, 2016 1:32 PM
**To:** Cover, Lisa
**Subject:** FW: Prince George's County Police Department-Federal investigation

Lisa,

Here is the request from Detective Evans. He indicated that his preference would be to come to the office to discuss this case and have the ability to conference in the Maryland AG's office.

Applicant details:
USMLE ID # 05532585
Certified 8/18/97
Medical school - University of Benin School of Medicine, NIGERIA
Citizenship – Nigerian
Exams for certification:
Step 2 CK – 8/28/96 (P)
English    - 8/28/96 (P)
Step 1     - 6/11/97 (P)

Address as of 5/30/2011
3013 Kasar Ct
Waldorf MD 20603

Suzann

---

**From:** Evans, Kenneth P. [mailto:KPEvans@co.pg.md.us]
**Sent:** Thursday, March 17, 2016 12:58 PM
**To:** Paolini, Suzann
**Subject:** Prince George's County Police Department-Federal investigation

Dear Susan,

Attached are the copies of the Federal Subpoena and response from your Custodian of Records. Please get back to me when you can, either by phone or email is fine. Again, thank you for calling back so quickly today in this matter.

JA3317

Confidential

ECFMG_RUSS_0003415

&lt;image001.png&gt;

**Detective Evans #2434**
**Prince George's County Police Department**
**Criminal Investigation Division**
**Sexual Assault Unit**
**301-772-4908 main**
**301-772-4273 direct**

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

JA3318

Confidential

ECFMG_RUSS_0003416

# Exhibit 51

## Message

| | |
|---|---|
| **From:** | Corrado, Kara [/O=ECFMG/OU=PHILADELPHIA/CN=RECIPIENTS/CN=KOLEYN] |
| **Sent:** | 11/29/2016 11:30:07 AM |
| **To:** | Cover, Lisa [/O=ECFMG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Cover, Lisa5df] |
| **Subject:** | RE: Google Alert - "educational commission for foreign medical graduates" |

Will do.

_____

Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

**From:** Cover, Lisa
**Sent:** Tuesday, November 29, 2016 11:29 AM
**To:** Corrado, Kara
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

```
              Privileged
```

Lisa

**From:** Corrado, Kara
**Sent:** Tuesday, November 29, 2016 11:14 AM
**To:** Cover, Lisa
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Lisa -- please review!
```
                    Privileged
```

```



                    Privileged



```

_____

Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG

Confidential

3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

---

**From:** Amy Buono [mailto:ABuono@NBME.org]
**Sent:** Wednesday, November 23, 2016 12:09 PM
**To:** Corrado, Kara; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Hi Kara,

Glad to know you are already aware of the case.  Can you provide an update as to the work you've done so far with the US Attorney's Office?

Thanks again and Happy Thanksgiving!

Amy

---

**From:** Corrado, Kara [mailto:KCorrado@ecfmg.org]
**Sent:** Wednesday, November 23, 2016 11:31 AM
**To:** Amy Buono; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** RE: Google Alert - "educational commission for foreign medical graduates"

Hi Amy,

We have been involved with this case and worked closely with the US Attorney's Office in Maryland on it.  At Maryland's request, we did not move forward in our irregular behavior process until Maryland had completed its investigation. We are now moving forward with our process.  As soon as we complete our irregular behavior process, we will certainly provide you with an update.

Have a happy thanksgiving!

Kara

_____
Ms. Kara Corrado, J.D.
Assistant Vice President for Operations
ECFMG
3624 Market Street
Philadelphia, PA 19104
United States of America

TEL: 001.215.823.2273
FAX: 001.215.386.9767
EMAIL: kcorrado@ecfmg.org

---

**From:** Amy Buono [mailto:ABuono@NBME.org]
**Sent:** Wednesday, November 23, 2016 10:37 AM
**To:** Corrado, Kara; Cover, Lisa
**Cc:** Shelley Green; Suzanne Williams; Katie DiMartino; Lola Greenwalt; Trish Weaver; Dave Johnson; Gerry Dillon
**Subject:** FW: Google Alert - "educational commission for foreign medical graduates"

JA3321

Confidential

Good morning Kara and Lisa,

Hope you are well and taking some time off for the holiday.

I'm passing along the below notice from the US Attorney's Office in Maryland re: an individual who sat for USMLE under different aliases and allegedly obtained multiple fraudulent ECFMG Certifications. After you have conducted an investigation, please let me know your findings.

The aliases we've identified in USMLE records are:

**Oluwafemi Charles Igberase**, USMLE ID 0-482-700-2  (There is Irregular Behavior listed under this identity.)

**John Nosa Akoda**, USMLE ID 0-553-258-5

-Amy

---

**From:** Shelley Green
**Sent:** Tuesday, November 22, 2016 3:34 PM
**To:** Gerry Dillon; 'David Johnson (FSMB)'; Amy Buono; Mary Beth St. John; Suzanne Williams
**Cc:** Trish Weaver
**Subject:** FW: Google Alert - "educational commission for foreign medical graduates"

I thought you would be interested in the information below concerning prosecution of an individual who obtained fraudulent ECFMG certifications in the 1990s and a medical license in 2011.  We are looking into his interactions with USMLE.

https://www.justice.gov/usao-md/pr/bowie-man-pleads-guilty-misusing-social-security-number-fraudulently-obtain-medical

---

NEWS

**Bowie Man Pleads Guilty to Faking Medical License**
Patch.com
Between 1992 and 1998, Igberase obtained three certifications from the **Educational Commission for Foreign Medical Graduates** under different ...

       Flag as irrelevant

See more results | Edit this alert

JA3322

Confidential

ECFMG_RUSS_0007349

*This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.*

_____

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

_____


_____

This Email has been scanned for all viruses Scanning Services, utilizing A proprietary SkyScan infrastructure.

_____

JA3323

Confidential

ECFMG_RUSS_0007350

# Exhibit 52

JA3324



EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

**Date:** March 1, 2017

**To:**

American Medical Association
Australian Health Practitioner Regulation Agency
Australian Medical Council
Australian State and Territory Medical Boards
Bahamas Medical Council
Canadian Provincial Medical Licensing Boards
Danish Patient Safety Authority
Dubai Health Authority
Dutch Individual Healthcare Professions Register
Electronic Residency Application Service, AAMC
Federation of Medical Regulatory Authorities of Canada
Federation of State Medical Boards of the United States
General Medical Council of the United Kingdom

Health Professions Council of South Africa
Medical and Dental Council of Nigeria
Medical and Dental Practitioners Council of Zimbabwe
Medical Council of Canada
Medical Council of Ireland
Medical Council of New Zealand
National Board of Medical Examiners
National Resident Matching Program
Norwegian Directorate of Health
Other Medical Regulatory Authorities
Seychelles Medical and Dental Council
Uganda Medical and Dental Practitioners Council
U.S. Graduate Medical Education Staff
U.S. State Medical Licensing Authorities

**From:** Lisa L. Cover, MHA
Senior Vice President for Business Development & Operations

**Subject: Notice #101 – Irregular Behavior Cases and Associated Actions & Sanctions**

The Educational Commission for Foreign Medical Graduates (ECFMG®) of the United States works on behalf of domestic and international medical regulatory authorities to protect the public through its programs and services, including primary-source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs or services to be *irregular behavior*. The Medical Education Credentials Committee of the ECFMG Board of Trustees reviews allegations of irregular behavior and makes determinations about them in accordance with its policies and procedures. The following are actions and sanctions issued by the Medical Education Credentials Committee.

We hope that you find this information helpful as you work to protect the public. If you have any questions, please do not hesitate to contact me at lcover@ecfmg.org or 001-215-823-2107.

| Date of Action | Name & Identification # | Determination |
|---|---|---|
| *INDIVIDUALS FOUND TO HAVE ENGAGED IN IRREGULAR BEHAVIOR* | | |
| | **Concerns Other Applicants** | |

ECFMG® is an organization committed to promoting excellence in international medical education.

JA3325

ECFMG_RUSS_0006448

**Concerns Other Applicants**

*INDIVIDUAL WITH A CHANGE IN SANCTION*

**Concerns Other Applicants**

JA3326

ECFMG_RUSS_0006449

ECFMG Actions,
Notification #101
Page 3 of 3

| UPDATE ON INDIVIDUAL SANCTIONED BY ECFMG | | |
|---|---|---|
| November 30, 2016 | AKODA, JOHN NOSA<br><br>ECFMG/USMLE 0-553-258-5<br><br>**Also Known As:** IGBERASE, OLUWAFEMI CHARLES*<br><br>ECFMG/USMLE 0-482-700-2<br><br>**Also Known As:** OLUWAFEMI, CHARLES IGBERASE*<br><br>ECFMG/USMLE 0-519-573-0<br><br>***Standard ECFMG Certificate had previously been permanently revoked by ECFMG.*** | **Description**<br>• As part of an October 2016 plea agreement with the United States, applicant admitted to previously providing a falsified passport to ECFMG which he used to obtain ECFMG Certification under the alias John Nosa Akoda.<br><br>**Actions Taken & Sanctions**<br>• Permanent revocation of Standard ECFMG Certificate.<br>• Permanent annotation included on reports sent by ECFMG. |

JA3327

ECFMG_RUSS_0006450

# Exhibit 53

**REDACTED**

JA3328

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    -------------------------------x

 5    MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 6    ELSA M. POWELL, and DESIRE EVANS,    18-5629

 7           Plaintiffs,                   Honorable

                                          Joshua D. Wolson

 8    v.

 9    EDUCATIONAL COMMISSION FOR FOREIGN

10    MEDICAL GRADUATES,

11           Defendant.

12    -------------------------------x

13

14

15           VIDEOTAPED DEPOSITION OF DESIRE EVANS

16                     Washington, D.C.

17              Thursday, September 5, 2019

18

19

20

21

22

23              GOLKOW LITIGATION SERVICES

24          T 877.370.3377 | F 917.591.5672

25                    deps@golkow.com
```

JA3329

<div style="column-layout">

Page 2

1
2
3
4
5      Thursday, September 5, 2019
6            10:32 a.m.
7
8
9
10
11        The following is the transcript of the
12   videotaped deposition of DESIRE EVANS held at the
13   offices of Morgan, Lewis & Bockius, LLP, 1111
14   Pennsylvania Avenue, NW, Washington, DC 20004.
15
16
17
18
19   Reported by:  Linda S. Kinkade, RDR CRR RMR RPR CSR
20   Registered Diplomate Reporter, Nationally Certified
21   Realtime Reporter, Registered Professional Reporter
22   with Merit Distinction, Certified Shorthand Reporter
23   (CA), Notary Public, within and for the District of
24   Columbia, and official duly authorized to administer
25   oaths and/or affirmations.

Page 4

1   A P P E A R A N C E S (continued):
2
3   On Behalf of Defendant EDUCATIONAL COMMISSION FOR
4   FOREIGN MEDICAL GRADUATES:
5        Morgan, Lewis & Bockius, LLP
6        1701 Market Street
7        Philadelphia, Pennsylvania 19103
8        (215) 963-5609
9        By:  Elisa P. McEnroe, Esq.
10       By:  Matthew D. Klayman, Esq.
11
12
13
14
15
16
17
18
19
20
21
22   Also present:
23        Crystal Strawbridge, Videographer
24
25

Page 3

1   A P P E A R A N C E S:
2
3
4   On Behalf of Plaintiffs MONIQUE RUSSELL, JASMINE
5   RIGGINS, ELSA M. POWELL, and DESIRE EVANS:
6        Schochor, Federico and Staton, P.A.
7        1211 St. Paul Street
8        Baltimore, Maryland 21202
9        (410) 234-1000
10       By:  Brent Ceryes, Esq.
11
12
13   -and-
14
15       Law Offices of Peter G. Angelos
16       One Charles Center
17       100 N. Charles Street
18       Baltimore, Maryland 21201
19       (410) 649-2000
20       By:  Paul M. Vettori, Esq.
21
22
23
24
25

Page 5

1            INDEX OF EXAMINATION
2
3   EXAMINATION OF DESIRE EVANS              PAGE
4        BY MS. MCENROE              8
5        BY MR. CERYES              181
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

</div>

| Page 6 | Page 8 |
|---|---|

**Page 6**

```
 1            E X H I B I T S
 2
 3  NO.        DESCRIPTION            PAGE
 4  Exhibit 1   Amended Notice of Deposition of ...  60
 5            Plaintiff Desire Evans
 6  Exhibit 2   History and Physical Examination ..  100
 7            re Desire Evans
 8  Exhibit 3   Medical Records re Desire Evans ...  108
 9            Smith 000001 - Smith 000023
10  Exhibit 4   Civil Action re Russell, et al. ...  148
11            v. ECFMG
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1            DESIRE EVANS,
 2       having been first duly sworn and/or affirmed
 3  on their oath, was thereafter examined and testified
 4  as follows:
 5            EXAMINATION
 6  BY MS. MCENROE:
 7       Q.  Good morning, Ms. Evans.
 8       A.  Good morning.
 9       Q.  My name is Elisa McEnroe, counsel for the
10  Educational Commission for Foreign Medical Graduates.
11  We met briefly this morning for the first time; is
12  that correct?
13       A.  Yes, ma'am.
14       Q.  Could you please state and spell your name
15  for the record?
16       A.  Desire, D-E-S-I-R-E, Evans, E-V-A-N-S.
17       Q.  Great.  And your birthday is ▮▮▮▮▮▮
18       ▮▮▮▮   is that correct?
19       A.  Yes, ma'am.
20       Q.  That makes you ▮▮ years old?
21       A.  Yes.
22       Q.  Thank you.
23       A.  Tell everybody.
24       Q.  We'll mark parts of the deposition
25  confidential as needed.
```

**Page 7**

```
 1         P R O C E E D I N G S
 2       VIDEO SPECIALIST:  We're now on the record.
 3  My name is Crystal Strawbridge.  I'm a videographer
 4  for Golkow Litigation Services.  Today's date is
 5  September 5th, 2019, and the time is 10:32 a.m.
 6       This video deposition is being held at 1111
 7  Pennsylvania Avenue, northwest, Washington, D.C., in
 8  the matter of Monique Russell, et al. v. Educational
 9  Commission for Foreign Medical Graduates, Civil Action
10  number 18-5629, for the United States District Court,
11  for the Eastern District of Pennsylvania.  The
12  deponent is Desire Evans.
13       Will counsel please identify themselves.
14       MR. CERYES:  Brent Ceryes on behalf of the
15  plaintiff.
16       MR. VETTORI:  Paul Vettori on behalf of the
17  plaintiffs.
18       MS. MCENROE:  Good morning.  Elisa McEnroe
19  for Morgan, Lewis & Bockius on behalf of defendant
20  Educational Commission for Foreign Medical Graduates,
21  and today I have with me my colleague, Matt Klayman.
22       VIDEO SPECIALIST:  The court reporter is
23  Linda Kinkade and will now swear in the witness.
24  //
25  //
```

**Page 9**

```
 1       And you understand that you're here today
 2  because you filed a lawsuit against my client, the
 3  Educational Commission for Foreign Medical Graduates,
 4  correct?
 5       A.  Yes, ma'am.
 6       Q.  Because of the nature of the allegations in
 7  the lawsuit, certain of the topics we discuss today
 8  may be particularly sensitive for you.  And so I want
 9  to let you know that, if you need to take a break or
10  you need to take a minute, you just let us know.  This
11  is not meant to be a marathon today.  I want to make
12  sure you're in a position to be able to tell the truth
13  and a full answer every time I ask a question.  Do you
14  understand?
15       A.  Yes, ma'am.
16       Q.  If at any time today you do need to take a
17  break, I just ask that the question that's pending be
18  answered, and then I'd be happy to take a break.
19  Okay?
20       A.  Yes, ma'am.
21       Q.  And you've been deposed before?
22       A.  Yes, ma'am.
23       Q.  So you generally have a sense of how this
24  works?
25       A.  Yes, ma'am.
```

Page 10

1    Q.  I'm going to ask you some questions.  I'm
2  going to ask that you give me answers.
3    A.  Yes, ma'am.
4    Q.  And it works best if we don't talk on top
5  of each other, correct?
6    A.  Yes, ma'am.
7    Q.  Great.  And so you've been deposed
8  previously.  How many times?
9    A.  One time.
10    Q.  Okay.  And was that on March 28th, 2019?
11    A.  Yes.
12    Q.  And was that in connection with another
13  lawsuit that you had filed?
14    A.  Yes.
15    Q.  Against whom?
16    A.  Dimensions Health Systems, I believe.
17    Q.  In Maryland?
18    A.  Yes.
19    Q.  And you understand that there's a
20  deposition transcript that came out of that
21  deposition?
22    A.  Yes.
23    Q.  Have you seen that deposition transcript?
24    A.  Yes.
25    Q.  Do you confirm that what you testified to

Page 11

1  in that Dimensions deposition is true and correct?
2    A.  Yes.
3    MR. CERYES:  Objection to the breadth of
4  the question.
5    You can answer.
6    A.  Yes.
7    Q.  And from time to time your counsel will
8  object, so we'll just give him a second in case he
9  needs to get those in.
10    So, is that correct, that you confirmed that
11  you told the truth at the Dimensions deposition?
12    A.  Yes.
13    MR. CERYES:  Same objection.
14    Q.  Anything you'd like to change or clarify
15  from your testimony as you recall from the deposition
16  in the Dimensions matter?
17    MR. CERYES:  Same objection.
18    A.  No.
19    Q.  To help save some time, I may not ask you
20  every question that was asked there, but if there is
21  something in particular that, as we proceed today, you
22  remember that you would like to correct about either
23  your testimony today or your testimony at the
24  Dimensions deposition, I ask that you please let us
25  know.  Okay?

Page 12

1    A.  Yes, ma'am.
2    Q.  Otherwise, we're going to take that
3  everything you tell us today and everything you told
4  the court when you were deposed in the Dimensions
5  litigation was the truth.  Do you understand?
6    A.  Yes, ma'am.
7    Q.  Is there any reason that you can't tell the
8  truth today?
9    A.  No, ma'am.
10    Q.  Okay.  Are you taking any medications that
11  make you confused or foggy at the moment?
12    A.  I am on medication, but I haven't taken
13  anything today.
14    Q.  And so your memory is clear?
15    A.  Yes.
16    Q.  Have you ever used a different last name
17  than Evans?
18    A.  My maiden name is Clifton.
19    Q.  And so at a point in time did you use the
20  name Desire Nichole Clifton?
21    A.  Yes.
22    Q.  Is it fair to say that you changed your
23  name because you got married?
24    A.  Yes, ma'am.
25    Q.  And when was that?

Page 13

1    A.  I got married December 31st, 2015.
2    Q.  To whom?
3    A.  Michael Evans.
4    Q.  And is he still your husband?
5    A.  Yes, ma'am.
6    Q.  And is he the father of the child that
7  we'll discuss a little bit later today that you have?
8    A.  Yes, ma'am.
9    Q.  Great.  And what is that child's name?
10    A.  Peyton Alexander Evans.
11    Q.  And you still have your dog?
12    A.  Huh?
13    Q.  And you still have your dog?
14    A.  Yes.
15    Q.  Okay.  Great.  Do you have any other
16  children living with you?
17    A.  No, ma'am.
18    Q.  Do you have any other biological children
19  that you've birthed?
20    A.  No, ma'am.
21    Q.  What is Mr. Evans' profession?
22    A.  He is a bus operator for Metro.
23    Q.  For Metro.  Great.  And has that been
24  consistent over time?
25    A.  Well, he just started working there.  He

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  was previously a supervisor for Circulator, a
2  different transportation place in D.C., but same line
3  of work.
4      Q. So he was a bus driver previously as well?
5      A. Well, he was a road supervisor. He was
6  promoted from a bus driver to a road supervisor, but
7  he went to Metro as a bus driver.
8      Q. And since you guys were married has he
9  worked in the transportation industry?
10     A. Yes.
11     Q. And does he work full-time?
12     A. Yes.
13     Q. Does he have any FMLA or ADA leave that
14  he's on at the moment?
15     A. No.
16     Q. Has he ever to your knowledge had FMLA or
17  ADA leave?
18     A. During the birth of our child he did FMLA.
19     Q. And how long did he take?
20     A. I don't remember. Maybe two weeks. It
21  wasn't long.
22     Q. Is your current address 4057 Parker Court
23  in Waldorf, Maryland?
24     A. Yes, ma'am.
25     Q. You previously testified at the Dimensions

**Page 16**

1  end of the week. So it's a full-time schedule.
2      Q. So to restate it just to make sure I
3  understand, do you log in from a computer terminal at
4  home?
5      A. Yes.
6      Q. And you complete the coursework as it fits
7  your schedule?
8      A. Yes.
9      Q. And that's a full-time course load, Monday
10  through Friday?
11     A. Yes. Yes.
12     Q. How many hours a day Monday through Friday
13  would you estimate you spend on your studies?
14     A. Four and a half.
15     Q. Hours?
16     A. Yes, four and a half hours.
17     Q. Thank you. Does that involve other
18  homework outside of that, or is that inclusive of all
19  of your work for Strayer University each day?
20     A. That's -- that's my just for Strayer
21  University each day.
22     Q. And you said that's just for Strayer
23  University. Do you do other work as well?
24     A. Well, I work from home, so once I get off
25  of work from working for BlueCross BlueShield, I start

| Page 15 | Page 17 |
|---|---|

**Page 15**

1  deposition about your education and your professional
2  background, so I'm not going to get into all of those
3  details just to save us a little bit of time, but I am
4  going to do some of the just basic nuts and bolts to
5  make sure I have an understanding. Is that fair?
6      A. Yes.
7      Q. You graduated high school in 1997; is that
8  correct?
9      A. Yes, ma'am.
10     Q. And you attended Strayer University to
11  study cybersecurity; is that correct?
12     A. Current.
13     Q. Have you finished that program of study?
14     A. No, ma'am. I'm currently there.
15     Q. And when are you scheduled to finish?
16     A. '22.
17     Q. 2022?
18     A. Yes, 2022. I'm on the dean's list too.
19     Q. Congratulations.
20     A. Thank you.
21     Q. Is that a part-time schedule? How does
22  that work with your work?
23     A. No, so it's online school. I go -- it's
24  Monday through Friday. I just have to complete my
25  assignment, you know. They set assignments before the

**Page 17**

1  doing my Strayer work.
2      Q. And the BlueCross BlueShield job that you
3  just mentioned, is that the same job that you had when
4  you were deposed in the Dimensions litigation?
5      A. Yes, ma'am.
6      Q. Are you in the same position you were in
7  then?
8      A. Yes, ma'am.
9      Q. So that's the senior customer service
10  advisor; is that correct?
11     A. Yes, ma'am.
12     Q. How many hours a day would you estimate you
13  work for BlueCross BlueShield?
14     A. Eight.
15     Q. Monday through Friday?
16     A. Yes.
17     Q. Do any of your job responsibilities for
18  BlueCross BlueShield bleed into the weekend?
19     A. No.
20     Q. Is it shift work for BlueCross BlueShield,
21  like you have a certain time you're supposed to be on
22  and then you get off at a certain time?
23     A. Yes, 8:30 to 5:00.
24     Q. Is that a preset schedule?
25     A. Yes.

| Page 18 |
|---|

1  Q. And you mentioned that you work from out of
2 your home; is that correct?
3      A. Yes.
4      Q. Tell me a little bit about your office
5 setup at home.
6      A. It's just an office. It's in the down --
7 downstairs area of my home.
8      Q. Is it a separate room?
9      A. Yeah, it's a separate room.
10      Q. With a door that closes?
11      A. Yes, ma'am. I have -- it's a setup
12 office -- a desk, printer, shredder, TV.
13      Q. I presume a telephone?
14      A. Yeah, telephone.
15      Q. You spend a lot of time on the telephone in
16 that job?
17      A. Yes.
18      Q. Is that the majority of your job is spent
19 on the telephone?
20      A. It is, yes.
21      Q. And just very briefly, in terms of your job
22 responsibilities, as a senior customer service
23 advisor, I understand you spend a lot of time on the
24 phone. What is it, just generally speaking, you're
25 doing when you're on the phone?

| Page 19 |
|---|

1      A. Help answering questions for insured
2 members, so fixing the claims. I have a long list of
3 duties.
4      Q. But, generally, sort of contained within
5 that universe?
6      A. Yes.
7      Q. How long have you had the job with
8 BlueCross BlueShield?
9      A. Since, I want to say, June 25th, 2015. I
10 might -- the day might be wrong, but it was June 2015.
11      Q. That was before you had your son, correct?
12      A. Yes.
13      Q. Prior to having your son did you work from
14 home?
15      A. No.
16      Q. Did you work in an office setting?
17      A. Yes.
18      Q. Where was that office?
19      A. In Fairfax, Virginia.
20      Q. How far is that from where you reside, or
21 resided at the time, I should say?
22      A. About an hour, 45 minutes to an hour.
23      Q. Hour or 45-minute commute each way?
24      A. Yes.
25      Q. Would you drive?

| Page 20 |
|---|

1      A. Yes.
2      Q. When did you stop working out of the
3 office?
4      A. I want to -- after I had my son. I want to
5 say maybe two months after I had my son.
6      Q. Did you take time out of work for the birth
7 of your child?
8      A. I did.
9      Q. How long?
10      A. I stopped working in February, at the end
11 of February. I want to say maybe four weeks prior.
12      Q. You stopped four weeks before you had your
13 son?
14      A. I believe it was four weeks prior, yes.
15      Q. And then how long were you out after you
16 had your son?
17      A. Another maybe additional 30 days. I can't
18 really remember.
19      Q. After you had your son, did you return to
20 work in the office physically for
21 BlueCross BlueShield?
22      A. No.
23      Q. Did you switch directly to working from
24 home for them?
25      A. Yes.

| Page 21 |
|---|

1      Q. And when did you start your studying for
2 your cybersecurity certificate from Strayer
3 University?
4      A. In April of this year.
5      Q. So that would be April 2019?
6      A. 2019, yes.
7      Q. How old is your son, Peyton?
8      A. Three. I was trying to make sure I started
9 in April. I have to think about -- I'm not sure if it
10 was in April -- I'm not sure if I started the spring
11 or the winter semester.
12      Q. But 2019 either way?
13      A. 2019, yes.
14      Q. So either winter or spring 2019 for sure.
15      A. Yes.
16      Q. Thank you. I appreciate you keeping your
17 answers precise.
18      So Peyton is three years old, you said?
19      A. Yes, ma'am.
20      Q. And what is his schedule like? Does he
21 have a childcare provider other than you and your
22 husband? Does he go to daycare?
23      A. No, he doesn't go to daycare. He just
24 recently, since my husband started working for Metro,
25 started going to his grandmoms' house during the day

| Page 22 |
|---|

1 so I can work and concentrate on school.

2     Q. Is that your mom or is that your husband's

3 mom?

4     A. Both.

5     Q. Oh.

6     A. Mondays and Fridays he's with my mother and

7 Tuesdays, Wednesdays and Thursdays he's with my

8 husband's mother.

9     Q. What kind of hours?

10     A. Six in the morning until 5 p.m.

11     Q. So it's about 6 a.m. to 5 p.m.?

12     A. Yes, ma'am.

13     Q. And how far do those grandmothers live from

14 where you reside?

15     A. My mother lives about ten minutes away, and

16 my husband's mother lives here in D.C., so about an

17 hour.

18     Q. When did this arrangement with the

19 grandmother childcare, I'll call it that, begin? When

20 did that start?

21     A. I want to say approximately 11 weeks ago

22 when my husband started for Metro.

23     Q. So for the period of time between when

24 Peyton was born and about 11 weeks ago when he started

25 having some care during the day from his grandmothers,

| Page 23 |
|---|

1 were you primarily responsible for his childcare?

2     A. Yes.

3     Q. So there was a period of time when you were

4 working full-time for BlueCross BlueShield, doing

5 full-time studies at Strayer University, and having

6 full childcare responsibilities as well?

7     A. Yes. Yes.

8     Q. Prior to your husband joining Metro, what

9 was the company you said he worked for?

10     A. Circulator First Transit is the actual...

11     Q. Where was that located?

12     A. Here in D.C.

13     Q. And you said that's about an hour from your

14 home?

15     A. Yes.

16     Q. What kind of hours did he work when he was

17 at Circulator First Transit?

18     A. He worked evening hours.

19     Q. And what does that mean?

20     A. So that was like 5 to 1.

21     Q. 5 p.m. to 1 a.m.?

22     A. Yeah, 5 p.m. to 1 p.m. and on the weekends

23 8 p.m. to 4 a.m.

24     Q. I want to make sure I got the first --

25 during the weekdays, when was it?

| Page 24 |
|---|

1     A. About 5 p.m. to 1 p.m. -- I mean 5 p.m. to

2 1 a.m. Excuse me.

3     Q. 1 a.m., great, okay. Just trying to make

4 sure we're on the same page.

5     So he was working the night shift?

6     A. Yes.

7     Q. Is he working the night shift currently

8 with Metro?

9     A. It fluctuates, because he's still in his 90

10 days in training. So he doesn't really have a set

11 schedule yet.

12     Q. And what is his commute like now that he's

13 working for Metro?

14     A. It's about -- it's the same. It's about 45

15 minutes to an hour.

16     Q. Prior to 11 weeks ago when you began using

17 the grandmothers' help for caring for Peyton during

18 the day, did you have any other adult help while you

19 were working or in school for watching Peyton? So did

20 you have any babysitters, someone from the

21 neighborhood who would come, like a nanny?

22     A. No, just my husband.

23     Q. Just you and your husband?

24     A. Yes, ma'am.

25     Q. When your husband was working for

| Page 25 |
|---|

1 Circulator and he was working the night shift, when

2 would he sleep?

3     A. Never. That's the truth. He literally was

4 working 20 hours a day at a point, like going from one

5 job to the next because he was doing Metro at the same

6 time.

7     So he would get home around 2:00 in the

8 morning, go to sleep maybe around 3:00, be up again by

9 4:30, 5:00 so he could be out to take Peyton by 6.

10     Q. To take him to --

11     A. His grandmom's house.

12     Q. The grandmothers. But before --

13     A. Before that, before that, he was -- he was

14 still working two jobs, so he was still having the

15 same amount of sleep, get home around 1:30 or get home

16 around 2:00, be asleep by 3:00, up by 4:30, 5:00, so

17 he can go to Metro.

18     Q. So before he was working at Metro when he

19 was working at Circulator, was he working another job

20 as well?

21     A. He was working overtime at Circulator.

22 Sometimes working double shifts.

23     Q. And when you say "double shifts," you mean

24 he would work the night shift and the day shift?

25     A. Yes, ma'am.

<table>
</table>

Page 26

1    Q.  Is he doing that also now that he's working
2  at Metro?
3    A.  No.  Now he's just working one job.
4    Q.  Why the switch 11 weeks ago to have the
5  grandmother care?
6    A.  Because my husband was no longer going to
7  be able to be there during the day and his schedule
8  was going to be unpredictable.  So in order for me to
9  be able to work and be productive, I needed someone --
10 I needed help because I couldn't -- Peyton is three
11 now, so it's not like I could lay him down for a nap.
12 He's running all -- he's very, very active.  So he
13 needed to be with other adults, other children, so we
14 decided to try to do that.
15   Q.  When he was -- when your husband was
16 working at Circulator, how frequently was he working
17 overtime so he was doing double shifts?
18   A.  He would work overtime Thursday, Fridays,
19 and Saturdays.  So mostly on Fridays and Saturdays, he
20 would go in around -- he would go in around maybe 8:30
21 in the morning and work until 4:30 in the morning.
22   Q.  And then he'd have an hour commute home?
23   A.  Mm-hmm.  Yes.  I'm sorry.
24   Q.  Thank you.  You remember well from your
25 last deposition to give oral responses.

Page 27

1    A.  Yes, ma'am.
2    Q.  I appreciate that.  Thank you.
3      So we talked a little bit about your husband's
4  sleep.  Let's talk a quick minute about your sleep
5  between your work and your childcare responsibilities.
6      When Peyton came home from the hospital, did he
7  sleep through the night?
8    A.  At -- yeah, he was a pretty good baby.
9    Q.  He was a pretty good baby?  Were you
10 breastfeeding?
11   A.  Yes.
12   Q.  And did you have to get up in the night to
13 feed him?
14   A.  Yes.
15   Q.  How frequently approximately at the
16 beginning?
17   A.  About every three hours.  I would actually
18 have to wake him up to feed him.
19   Q.  Has Peyton stayed a good sleeper?
20   A.  No.
21   Q.  You laughed and said that.  So what do you
22 mean by that?
23   A.  No, now -- now it's -- I mean, once he goes
24 to sleep, it's fine.  It's just a struggle to get him
25 to go to sleep just because he thinks he's going to

Page 28

1  miss something.
2    Q.  And what time is bedtime for him at your
3  house?
4    A.  I try 8:00.
5    Q.  P.m.?
6    A.  P.m., yes.  That's my goal.
7    Q.  And when is, realistically, when he sets
8  his head down to sleep?
9    A.  Around 9:30-ish, 10:00, depends on what
10 time his dad gets in the house sometimes, because
11 sometimes I can't get him to go to sleep until he sees
12 his dad.
13   Q.  Sure.  And so when is he sleeping until
14 once he goes to sleep?  When does he wake up?
15   A.  He'll sleep until he gets to his grandmom's
16 house, because we don't really wake him up in the
17 morning.  We just take him out of the bed and take him
18 straight to his grandmom's house so we don't wake him
19 up.
20     So he sleeps through the night until he gets to
21 his grandmom's house, and she will do whatever she
22 does.
23   Q.  Does he still nap?
24   A.  Yes.
25   Q.  About how long?

Page 29

1    A.  About an hour and a half, two hours
2  depending.
3    Q.  Once a day or twice a day?
4    A.  Once a day.
5    Q.  On the weekends also?
6    A.  No.
7    Q.  Okay.  So that's just during the weekday?
8    A.  Yeah, just on the weekday.  I let him have
9  free time during the weekend, unless he's tired.  If
10 he's tired, I don't stop him from taking a nap, but I
11 don't force naps on weekend.
12   Q.  When were you most recently treated by a
13 doctor for anything?
14   A.  I'm treated by a doctor now.  The last time
15 I went to the doctor --
16   Q.  Correct.
17   A.  -- was, I want to say, August 1st maybe --
18   Q.  For what?
19   A.  -- August 2nd.  I went to see my
20 psychologist, Dr. Donato.
21   Q.  Why?
22   A.  He's my psychologist and I speak to him
23 often, and it was time to review my FMLA.
24   Q.  You say you speak to him often.  Are you
25 talking by telephone, in person?

Page 30

1    A. Both.
2    Q. How frequently do you speak to Dr. Donato?
3    A. Sometimes, depending on how much I need
4  him, twice a week sometimes or twice a month. It
5  depends. It just really depends. I don't really have
6  a set time to talk to him.
7    Q. How do you arrange speaking with him?
8    A. I can just call the front desk and just let
9  them know that I need to speak to him, and he'll
10 either call me back or we can set up an appointment.
11   Q. Dr. Donato works in a practice?
12   A. Yes.
13   Q. And they have a reception area, it sounds
14 like?
15   A. Yes.
16   Q. Where is Dr. Donato's office located?
17   A. In 600 Post Office Road in Waldorf,
18 Maryland.
19   Q. How far is that from your home?
20   A. About five minutes.
21   Q. When did you first start seeing Dr. Donato?
22   A. I don't remember the exact date. I want to
23 say it was like April of '18 maybe. I can't really
24 remember the month, but it was 2018.
25   Q. Around spring of 2018?

Page 31

1    A. Spring or summer, somewhere around there,
2  2018.
3    Q. Besides Dr. Donato, are you currently under
4  the care of any physicians?
5    A. Yes, I'm also seeing Ebony Cross. She is a
6  psychiatrist and medication management.
7    Q. How often do you see Dr. Cross?
8    A. Once a month.
9    Q. Is that a regularly scheduled appointment?
10   A. Well, we schedule it at the end of each
11 appointment, so it's not like a set date.
12   Q. So you'll schedule it out the next time
13 each time you're there?
14   A. Yes.
15   Q. And do you physically go see Dr. Cross in
16 person?
17   A. Yes.
18   Q. You mentioned medication management from
19 Dr. Cross. Does Dr. Donato prescribe you medication
20 as well?
21   A. No, he cannot prescribe medication.
22   Q. Besides Dr. Donato and Dr. Cross, are you
23 presently under the care of any other physicians?
24   A. No.
25   Q. Do you currently have an ob/gyn?

Page 32

1    A. No.
2    Q. And you understand, when I use the phrase
3  "ob/gyn," I mean obstetrician/gynecologist?
4    A. Yes, ma'am.
5    Q. It's okay with you if I use the term
6  ob/gyn?
7    A. Yes, ma'am.
8    Q. It's a little easier for me to say, so I
9  appreciate that.
10   Do you have a primary care physician?
11   A. I have one assigned to me from my
12 insurance. Do I see her? No.
13   Q. What do you mean you have one assigned to
14 you from your insurance?
15   A. So I have an HMO, so they have to assign
16 you a primary care physician through the insurance.
17   Q. And who is your primary care physician
18 assigned to you from your HMO?
19   A. Dainty Jackson.
20   Q. Have you ever seen Dr. Jackson?
21   A. I saw her once, yes.
22   Q. When was that?
23   A. Maybe September of '17 maybe. I really
24 don't remember.
25   Q. Do you remember your purpose for visiting

Page 33

1  with Dr. Jackson?
2    A. I needed blood work for medication
3  management.
4    Q. Blood work from medication management by
5  whom?
6    A. From -- at the time I was seeing Shanda --
7  what was her name? My goodness.
8    Q. Would that be Dr. Smith?
9    A. Shanda Smith from Kaiser.
10   Q. Are you still seeing Dr. Smith?
11   A. No.
12   Q. When did you start seeing Dr. Smith, do you
13 recall?
14   A. February -- I don't know if it was '17 or
15 '18. I don't remember the year, ma'am. I'm sorry.
16   Q. Do you remember when you stopped seeing
17 Dr. Smith?
18   A. It was in -- so I want to say it was '18,
19 because I started -- stopped seeing her right before I
20 started seeing Dr. Donato, which was in, like, June --
21 April, June-ish.
22   Q. So I just want to make sure that I'm
23 understanding. So are you saying you believe you
24 started seeing Dr. Smith approximately in February
25 2018?

Page 34

```
 1      A. Mm-hmm.
 2      Q. That's correct?
 3      A. Yes.  Yes.  I'm sorry.  Yes.
 4      Q. And you made the decision to switch from
 5  Dr. Smith to Dr. Donato; is that correct?
 6      A. My insurance changed, so I had to.
 7      Q. Was it an issue of having a physician in
 8  network?
 9      A. Correct.  We were using my husband's
10  insurance at first and he had Kaiser, so we had to use
11  Kaiser.
12      Q. And then you switched insurance?
13      A. Yes, through my own employer.
14      Q. I presume that was BlueCross BlueShield
15  Insurance?
16      A. Yes, ma'am.
17      Q. Okay.  Were you covered by insurance when
18  you delivered Peyton?
19      A. I had Medicaid.
20      Q. Even though you were working for
21  BlueCross BlueShield?
22      A. I was a temp at the time.
23      Q. Ah.  Okay.  So when you first started
24  working for BlueCross BlueShield, were you a full-time
25  employee?
```

Page 35

```
 1      A. So I started as a temp in June.
 2      Q. Of what year?
 3      A. Of 2015.  I became permanent in January of
 4  2016, but my benefits didn't kick in until April of
 5  2016.
 6      Q. So when you had Peyton, you were a
 7  full-time employee and not a temp, but you didn't have
 8  your benefits accruing yet?
 9      A. Correct.
10      Q. Okay.  And then did you switch from being
11  on BlueCross BlueShield to being on your husband's
12  insurance?
13      A. No.
14      Q. Can you explain how that worked?
15      A. So -- so I went to my -- I went to my
16  husband's insurance, because we weren't -- we weren't
17  married when I got pregnant with Peyton, so I needed
18  my own insurance.  So I was on Medicaid.  Once we got
19  married and Peyton came, then we -- then I went to my
20  husband's insurance, and then I switched to
21  BlueCross BlueShield.
22      Q. I see.  When was Peyton born?
23      A. In March of '16.
24      Q. When in March of '16?
25      A. March 17.  Excuse me.
```

Page 36

```
 1      Q. I have it marked down that you were married
 2  on December 31st, 2015.  Is that not correct?
 3      A. Mm-hmm.
 4      Q. That is correct?
 5      A. Correct.
 6      Q. So you were married to your husband in
 7  December 2015?
 8      A. Right, and had Peyton in March of '16.
 9      Q. And you had him in March of '16?
10      A. Right.  I was seven months pregnant when we
11  got married.
12      Q. I see.  I want to back up a minute, because
13  I got a little off on to a different topics.  Back to
14  doctors you're currently being treated by.
15         So you mentioned that you're currently being
16  treated by Drs. Donato and Cross.
17      A. Yes.
18      Q. And you technically have a primary care
19  physician assigned to you, but you do not go to
20  Dr. Jackson for treatment; is that correct?
21      A. Correct.
22      Q. Are you currently being seen by any other
23  physicians?
24      A. No.
25      Q. In the time between when you had Peyton and
```

Page 37

```
 1  now, have you seen any other physicians besides
 2  Dr. Smith we just talked about?
 3      A. Besides going to the ER?
 4      Q. We'll get to that in one quick second.
 5      A. No.
 6      Q. And you mentioned going to the ER.  When
 7  did you go to the emergency room?
 8      A. It was before the last deposition.  So I
 9  want to say maybe March of '19.
10      Q. For what reason did you go to the emergency
11  room?
12
13
14
15      Q. Did that visit to the emergency room result
16  in an overnight stay at the hospital?
17      A. No.
18
19
20                                       ob/gyn.
21      Q. And did you have an ob/gyn in March of
22  2019?
23      A. No.
24      Q. Did you actually go see an ob/gyn for
25  treatment in March of 2019?
```

JA3338

Page 38

1    A. No.
2    Q. Did you have health insurance in March of
3 2019?
4    A. Yes.

7    A. Yes.
8    Q. Besides going to the emergency room in

13   A. No.
14   Q. Prior to giving birth to Peyton, what
15 physicians were you treated by?
16   A. Javaka Moore was my OB, and I really didn't
17 have a primary care. Everything was basically done
18 through the ob/gyn.
19   Q. When did Dr. Moore become your ob/gyn?
20   A. In June of 2015.
21   Q. And pardon me for not knowing this, but is
22 Dr. Moore a woman or a man?
23   A. A man.
24   Q. Did you see Dr. Moore prior to becoming
25 pregnant with Peyton?

Page 39

1    A. No.
2    Q. How far along in your pregnancy with Peyton
3 did you become a patient of Dr. Moore's?
4    A. Seven weeks?
5    Q. When you saw him, was Dr. Moore a member of
6 a medical practice?
7    A. Yes.
8    Q. Were you ever treated by any other doctors
9 in Dr. Moore's practice?
10   A. No.
11   Q. Were you ever seen by any doctors other
12 than Dr. Moore in his practice?
13   A. Yes, but I don't know her name.
14   Q. And when you say you were seen by her, did
15 you have an appointment and she covered that
16 appointment?
17   A. Yes.
18   Q. Did you ever see any other medical
19 professionals in connection with your pregnancy? And
20 what I mean is somebody like a midwife or a doula.
21   A. No.
22   Q. Do you know what a doula is?
23   A. Yes, ma'am.
24   Q. Do you know what a midwife does?
25   A. Yes, ma'am.

Page 40

1    Q. When did you stop being a patient of
2 Dr. Moore's?
3    A. After I had my son, so -- I never went
4 back.
5    Q. When you say you never went back, what do
6 you mean?
7    A. After I had my child, I never went back to
8 that practice.
9    Q. The other doctor you mentioned in
10 Dr. Moore's practice who you were seen by, that was a
11 woman doctor, you said?
12   A. Yes. I think it was -- her first name was
13 Donna. I'm not one hundred percent sure. Caucasian
14 lady.
15   Q. Donna, you said?
16   A. I think.
17   Q. Thank you.
18   A. Diane, Donna, something like that.
19   Q. Probably started with a D?
20   A. It definitely started with a D.
21   Q. How did you come to be a patient of
22 Dr. Moore's?
23   A. It was assigned by Medicaid.
24   Q. When you say that Dr. Moore was assigned by
25 Medicaid, do you mean Dr. Moore in particular or

Page 41

1 Dr. Moore's practice?
2    A. Dr. Moore's practice.
3    Q. Do you know how many doctors were in
4 Dr. Moore's practice?
5    A. I do not.
6    Q. Do you know if Dr. Moore's practice was
7 affiliated with any hospitals?
8    A. I do not. Well, I'm lying. I'm lying. So
9 during the -- not lying.
10   I'm sorry. That was wrong. I didn't mean to
11 say it.
12   So during the time that they were setting up
13 my -- my induction --
14   Q. Yep.
15   A. -- they were saying that he was affiliated
16 with Dimensions Hospital, but I didn't know that prior
17 to that.
18   Q. Thank you. So when you said that when they
19 were setting up the induction, who do you mean they
20 were?
21   A. Like the front desk at the doctor's office.
22   Q. At Dr. Moore's office?
23   A. Yes.
24   Q. Is it fair to say that, when you were
25 setting up your induction at Dr. Moore's office, they

Case 2:23-cv-01956-DOC Document 22-5 Page 71 450 of 143 Filed 09/08/2022
Case 2:23-cv-01956-DOC Document 22-5 Page 71 450 of 143 Date Filed 09/08/2022
Desire Evans

| Page 42 | Page 44 |
|---|---|
| 1 explained to you that you would be induced at Prince<br>2 George's Hospital?<br>3　　A. Correct.<br>4　　Q. When you were setting up your induction<br>5 with Dr. Moore's practice, did they tell you what<br>6 physician would be doing your induction?<br>7　　A. I was under the impression it would be<br>8 Dr. Moore.<br>9　　Q. Did they tell you, though --<br>10　　A. No.<br>11　　Q. -- who it would be?<br>12　　A. But I was under the impression it would be<br>13 Dr. Moore.<br>14　　Q. What time of day, if you remember, were you<br>15 scheduled to have your induction?<br>16　　A. I was scheduled at 8 a.m.<br>17　　Q. Do you remember what day of the week it<br>18 was?<br>19　　A. I want to say maybe a Thursday.<br>20　　Q. Having looked at your medical records, is<br>21 it correct that you did actually go to Prince George's<br>22 Hospital to be induced?<br>23　　A. Yes.<br>24　　Q. And was that at the scheduled time that you<br>25 had arranged with Dr. Moore's office? | 1　　Q. And was that while you were pregnant with<br>2 your son?<br>3　　A. What?<br>4　　Q. The time period we're talking about.<br>5　　A. Yes.<br>6　　Q. Prior to being pregnant with your son, have<br>7 you ever been treated by a psychologist or a<br>8 psychiatrist?<br>9　　A. No.<br>10　　Q. When your insurance set you up with<br>11 Dr. Moore's practice, how did Dr. Moore come to be<br>12 your physician in particular?<br>13　　　MR. CERYES:  Objection, foundation.<br>14　　You can answer.<br>15　　A. Huh?<br>16　　　MR. CERYES:  You can answer.<br>17　　A. Oh.  He just came in the room.  I wasn't --<br>18 I didn't ask for him or anything.  He just was the<br>19 doctor assigned to me at the practice.<br>20　　Q. Did you do any research into the physicians<br>21 at the practice Dr. Moore was a part of?<br>22　　A. No.<br>23　　Q. Did you do any research into Dr. Moore's<br>24 credentials or background?<br>25　　A. No. |

| Page 43 | Page 45 |
|---|---|
| 1　　A. No.  They called me and rescheduled me to a<br>2 later time.<br>3　　Q. How much later?<br>4　　A. Two.<br>5　　Q. Two days?<br>6　　A. No, at 2:00.<br>7　　Q. Oh, 2:00 in the afternoon?<br>8　　A. Yeah, because they were -- they were saying<br>9 they were going to call me and let me know, but I was<br>10 already two weeks past due at that time, so I wasn't<br>11 having that.  So I said I'll just come up there and<br>12 sit and wait until you guys are ready.<br>13　　Q. So did you go at 2 p.m. to be induced?<br>14　　A. I went around 11:30, so I sat there until<br>15 they took me back.<br>16　　Q. At Prince George's Hospital?<br>17　　A. At Prince George's Hospital.<br>18　　Q. Aside from Dr. Moore, who you mentioned<br>19 having been treated by prior to delivering Peyton,<br>20 were you under the care of any other physicians or<br>21 psychiatrists at the time?<br>22　　A. No.<br>23　　Q. Any psychologists you were being treated<br>24 by?<br>25　　A. No. | 1　　Q. Did you do any research into Dr. Moore's<br>2 educational history?<br>3　　A. No.<br>4　　Q. Did you do any research into whether<br>5 Dr. Moore was board certified?<br>6　　A. No.<br>7　　Q. Did you talk to any of his other patients,<br>8 Dr. Moore's?<br>9　　A. No.<br>10　　Q. Prior to having Dr. Moore as your<br>11 physician, had you ever previously been treated by an<br>12 ob/gyn?<br>13　　A. Previously?<br>14　　Q. Yeah.<br>15　　A. Like anytime in my life?<br>16　　Q. Anytime in your life.<br>17　　A. Yes.<br>18　　Q. And who was that?<br>19　　A. I don't remember their names.<br>20　　Q. Okay.  But other ob/gyn's previously in<br>21 your life?<br>22　　A. Mm-hmm.  Yes, ma'am.<br>23　　Q. Do you remember doing any research into any<br>24 of their credentials or educational background?<br>25　　A. No. |



**Page 46**

1     Q. Do you remember doing any research into any
2 of their certifications or whether they were a member
3 of any board?
4     A. No.
5     Q. It sounded like before Dr. Moore you had
6 seen more than one ob/gyn previously; is that correct?
7     A. Mm-hmm.
8     Q. Can you estimate for me about how many you
9 think you've seen over the course of your life?
10     A. Maybe two.
11     Q. Do you remember if they were male
12 physicians or woman physicians?
13     A. Women physicians.
14     Q. Both women physicians?
15     A. (Nodding head up and down.)
16     Q. Having had another moment to think about
17 it, do you remember either of their names?
18     A. No. I do know that Dr. Moore is the only
19 male ob/gyn I've ever had. That I can attest to.
20     Q. Do you remember any medical practice or
21 hospital that those two prior ob/gyn's were affiliated
22 with?
23     A. No.
24     Q. Prior to delivering Peyton, had you been
25 pregnant previously?

**Page 47**

4     Q. And were you treated by an ob/gyn during
5 that experience?
8     Q. Did you have a specific ob/gyn attending to
9 you?
10     A. I mean, not that I can remember. I wasn't
11 going to an office, no, at that time.
13     Q. Did you go to the emergency room?
14     A. I did.
15
17     A. Right.
22     Q. Do you remember when that occurred?
23     A. Approximately one year prior to having
24 Peyton.
25     Q. Aside from the _____ you testified

**Page 48**

1 about from March 2019 and the _____
2 about a year before you had Peyton, have you ever
3 otherwise been treated in an emergency room?
4     A. Oh, yes. I'm sorry.
5     Q. _____ you said?
6     A. Yes, the _____
7 _____ I'm sorry. I
8 forgot about that.
9     Q. Did you go to the emergency room for that?
10     A. I did.
11     Q. That was May of 2019?
12     A. Mm-hmm. Yes.
13     Q. Were you treated by a physician then?
14     A. Yes.
15     Q. What kind of treatment did they give you
16 for

**Page 49**

1     A. Yes.
2     Q. So aside from the _____ the
3 _____ and the _____ have you otherwise
4 ever gone to the emergency room for yourself?
5     A. Not that I can remember.
6     Q. Did you go to the emergency room for
7 falling down the steps?
8     A. I did.
9     Q. Can you tell me about that?
10     A. I'm sorry. That was in 2014 or '15. I
11 fell down the steps, and I had a ruptured disc, I
12 believe. I was in the hospital for a week.
13     Q. Was that a back injury?
14     A. Back injury, yes.
15     Q. Where were you when you fell down the
16 steps?
17     A. I was at home. I was living in Oxon Hill
18 at the time.
19     Q. This is a different home than where you
20 live now?
21     A. Yes.
22     Q. Were those interior steps or exterior
23 steps?
24     A. Interior steps.
25     Q. Were those carpeted or was there other kind

Case 2:18-cv-09562-DSC Document 22-5 Filed 11/15/19 Page 147 of 452
Case 2:23-cv-01998-DC Document 71-1 Filed 09/08/22 Page 1452 of 3029
Desire Evans

Page 50

1  of material on them?
2      A.  No, just a wooden step.
3      Q.  So hardwood?
4      A.  Mm-hmm.
5      Q.  In the home you live now, is that where
6  you've lived since you had Peyton?
7      A.  No, we moved.  We bought that house in
8  April.
9      Q.  Of what year?
10     A.  I'm sorry, ma'am.
11     Q.  It's okay.
12     A.  2018.  We've been there for a little bit
13  over a year.
14     Q.  And did you move directly from the place
15  you had lived when you fell down the steps to where
16  you live now?
17     A.  No.  So we lived in a place where I fell
18  down the steps, and then we moved to Waldorf, which
19  was -- do you need the address?
20     Q.  If you would just describe it so I can talk
21  about it generally, that's fine.
22     A.  Holly Station.  Moved there, stayed there
23  for about a year, and then we moved in with my mother,
24  which was also in Waldorf.
25     Q.  Is that where you reside now?

Page 51

1      A.  No.  We stayed --
2      Q.  So you moved again?
3      A.  We stayed there for about a year, and then
4  we moved to where I live now.
5      Q.  And that's about a five-, ten-minute drive
6  from your house now, you said?
7      A.  Yes.
8      Q.  In which of those homes did you live when
9  you delivered Peyton?
10     A.  In Holly Station.
11     Q.  Was it a house or an apartment?
12     A.  Apartment -- a townhouse.
13     Q.  Did it have steps?
14     A.  Yes.
15     Q.  And what was the covering, if any, on those
16  steps?
17     A.  Carpet.
18     Q.  Carpet.  And how many floors was the Holly
19  Station home?
20     A.  Two.
21     Q.  And your mother's home, does it have
22  interior steps?
23     A.  Yes.
24     Q.  Is it a standalone house?
25     A.  It's a townhouse also.

Page 52

1      Q.  Townhouse also?  What kind of covering are
2  there on the steps?
3      A.  Wood.
4      Q.  And where you live now, is that an
5  apartment, a townhouse?
6      A.  A house.
7      Q.  And are there interior steps?
8      A.  Yes.
9      Q.  And what are those covered with?
10     A.  Carpet.
11     Q.  Going back to your fall, and you said that
12  was in 2014 or 2015; is that correct?
13     A.  Mm-hmm, yes.
14     Q.  Do you remember what time of year it was?
15     A.  I don't.  I don't want to make up anything.
16  I just want to say between July and September maybe.
17     Q.  Of which year, do you remember?
18     A.  No, I don't.  2014, '15, somewhere around
19  there.
20     Q.  And you mentioned you were hospitalized for
21  five days; is that correct?
22     A.  Yes.
23     Q.  And did you only injure your back during
24  that fall?
25     A.  Yes.

Page 53

1      Q.  What kind of treatment did you receive for
2  your back?
3      A.  They really didn't treat me at all.  They
4  just kept me there under observation and gave me a lot
5  of medication, and then gave me PT while I was there.
6      Q.  And by "PT" do you mean physical therapy?
7      A.  Physical therapy, yes.
8      Q.  Did you do physical therapy after you left?
9      A.  No.
10     Q.  Why not?
11     A.  I didn't have any insurance, I don't think,
12  at that time.
13     Q.  Did you do any follow-up visits with anyone
14  about your back?
15     A.  I had one follow-up visit, and that was so
16  I can return to work.
17     Q.  Okay.  So that was to get permission to go
18  to work?
19     A.  Yes.
20     Q.  Because at that time you were working in an
21  office setting, correct?
22     A.  Correct.
23     Q.  When you were discharged from the hospital
24  from your back injury, did they recommend to you that
25  you continue doing physical therapy?

Page 54

1    A. I don't recall. I don't recall.
2    Q. When you were discharged from the hospital
3  after your back injury, did you continue taking
4  medication?
5    A. The medication that was prescribed to me,
6  yes.
7    Q. Do you recall how long after you left the
8  hospital you continued to take medication relating to
9  your back injury?
10    A. I don't know. Maybe, I don't know, 30 days
11  maybe, I'm not -- I'm not 100 percent sure.
12    Q. Are you still on medication relating to
13  your back injury?
14    A. No.
15    Q. When you were pregnant with Peyton, were
16  you on medication relating to your back injury?
17    A. No.
18    Q. When you were pregnant with Peyton, were
19  you on any medication?
20    A. No. ██████████ does that count?
21    Q. Anything you were on.
22    A. Progesterone, yes.
23    Q. And what were you being treated for?

Page 55

1    A. Yes.

6    A. No.
7    Q. Any other emergency room visits in your
8  life that you remember having had other than the ones
9  you've talked about already today?
10    A. Not that I can recall. I really don't
11  remember.
12    Q. Any other hospitalizations that you've ever
13  had other than for delivering Peyton and relating to
14  your back injury you've already testified about?
15    A. No.
16    Q. Have you ever taken FMLA leave?
17    A. Yes.
18    Q. Are you presently taking any leave for
19  FMLA?
20    A. Yes.
21    Q. Could you explain to me what you're taking
22  for FMLA at the present time?
23    A. I have, like my condition, the reason why
24  I'm --
25    Q. Well, I'm first asking about how that

Page 56

1  impacts on your schedule, so how many hours a week
2  maybe or in a day.
3    A. Okay. So I'm scheduled for eight hours of
4  FMLA a day three days a week, so 24 hours a week of
5  FMLA.
6    Q. And who -- have you seen a doctor in
7  connection with getting paperwork relating to that?
8    A. Mm-hmm, Dr. Donato.
9    Q. When did you first get that FMLA leave from
10  Dr. Donato?
11    A. June, maybe June of last year, June of
12  2018, I'm assuming.
13    Q. Around that summertime?
14    A. Yes, ma'am.
15    Q. Prior to that, were you on FMLA leave?
16    A. No.
17    Q. Prior to the FMLA leave that you're on now
18  for which you've gotten paperwork from Dr. Donato,
19  have you ever been on FMLA leave?
20    A. No.
21    Q. Are you currently on any ADA leave?
22    A. Yes.
23    Q. Can you tell me about that?
24    A. ADA is the reason why I work from home. So
25  they afford me the opportunity to, you know, work from

Page 57

1  home and not have to travel into the office.
2    Q. Is that the accommodation you have through
3  the ADA?
4    A. Yes.
5    Q. Do you have any other accommodations
6  through the ADA?
7    A. No.
8    Q. Do you have any doctor paperwork that you
9  had to get in order to have that accommodation awarded
10  to you?
11    A. Yes.
12    Q. And from who?
13    A. Dr. Donato.
14    Q. When did you get that?
15    A. Excuse me. Sorry. Around the same time.
16    Q. At the same visit?
17    A. Yeah.
18    Q. Prior to the ADA leave that you just
19  described, had you ever been on ADA leave before?
20    A. No.
21    Q. Had you ever had any ADA accommodations
22  before?
23    A. No, ma'am.
24    Q. We discussed a little bit earlier today
25  that you've been deposed in a matter concerning

Case 2:22-cv-01985-GJP   Document 22-5   Filed 12/14/22   Page 17 of 29
Case 2:23-cv-01998-GAM   Document 1-5   Filed 09/08/2023   Page 18 of 29
Desire Evans

Page 58

1  Dimensions.  Do you remember that?
2      A.  Yes, ma'am.
3      Q.  And it's fair to say you were a plaintiff
4  in that matter?
5      A.  Yes, ma'am.
6      Q.  Aside from that lawsuit and aside from this
7  lawsuit, have you ever been involved in any other
8  lawsuit?
9      A.  No, ma'am.
10     Q.  Have you ever sued anybody other than ECFMG
11 and Dimensions?
12     A.  No, ma'am.
13     Q.  Have you ever been a defendant in any
14 lawsuit?
15     A.  No, ma'am.
16     Q.  Have you ever been a defendant in any
17 criminal matters?
18     A.  No, ma'am.
19     Q.  Have you ever been a witness in any civil
20 or criminal matters that you went to testify like at a
21 trial or a hearing?
22     A.  No, ma'am.
23     Q.  In the Dimensions litigation, is it fair to
24 say that, just like in this litigation, you're what
25 you would consider a Class representative?

Page 59

1      A.  Yes, ma'am.
2      Q.  Do you know what that means?
3      A.  Yes, ma'am.
4      Q.  Other than the Dimensions litigation and
5  this litigation, have you ever been a Class
6  representative?
7      A.  No, ma'am.
8      Q.  Have you ever considered being a Class
9  representative in any litigation besides Dimensions
10 and the ECFMG litigation?
11     A.  No, ma'am.
12     Q.  Do you know what the allegations are in the
13 litigation against Dimensions?
14     A.  Yes, ma'am.
15     Q.  And have you ever reviewed the complaint
16 that was filed in that case?
17     A.  Yes, ma'am.
18     Q.  Do you believe the allegations in the
19 complaint against Dimensions are true and correct?
20     A.  Yes, ma'am.
21     Q.  Have you provided discovery responses in
22 the Dimensions litigation?
23     A.  Yes, ma'am.  Yes, ma'am.
24     Q.  Were those responses true and correct?
25     A.  Yes, ma'am.

Page 60

1      Q.  Aside from a lawsuit, have you ever made a
2  claim for injury against anybody, any business, any
3  workplace?
4      A.  No, ma'am.
5      Q.  Any person?
6      A.  No.
7      Q.  Have you ever made a workers' compensation
8  claim?
9      A.  No, ma'am.
10     Q.  Have you ever suffered an injury at work?
11     A.  No, ma'am.
12     Q.  Have you ever suffered, aside from the
13 issues involved in this litigation, have you ever
14 suffered any physical, emotional, or sexual abuse from
15 any person?
16     A.  No, ma'am.
17     Q.  Have you ever been the victim of a crime?
18     A.  No, ma'am.
19     Q.  I would like to hand you what I'm going to
20 mark as Exhibit 1.
21         (Exhibit 1 marked for
22         identification: Amended Notice of
23         Deposition of Plaintiff Desire Evans)
24     Q.  Have you ever seen this document before?
25     A.  Yes.

Page 61

1      Q.  And this is the Amended Notice of
2  Deposition of Plaintiff Desire Evans.  Do you see
3  that?
4      A.  Yes.
5      Q.  And that's you?
6      A.  Yes.
7      Q.  And you're appearing today pursuant to this
8  deposition notice to be deposed?
9      A.  Yes.
10     Q.  So like I'm going to do a couple times
11 today, we've been going about an hour, so we'll take a
12 quick break, if that's okay.
13         MR. CERYES:  Sounds good.
14         VIDEO SPECIALIST:  We're going off the
15 record at 11:28.
16         (Proceedings recessed)
17         VIDEO SPECIALIST:  We're back on the record
18 at 11:39.
19 BY MS. MCENROE:
20     Q.  Ms. Evans, I want to ask you whether you
21 have ever been treated by a psychiatrist named
22 Dr. Nnamani.  Am I saying that correctly?
23     A.  Yeah.
24     Q.  Are you currently being treated by
25 Dr. Nnamani?

Case 2:19-cv-00562-DWL Document 22-5 Filed 12/13/19 Page 18 of 24
Case 2:22-1998-562 Document 22-5 Client Page 471455 Filed 1 Date Filed 09/08/2022

Desire Evans



Page 62

1   A. No. That was one visit.
2   Q. One visit?
3   A. One visit.
4   Q. Okay. And when was that?
5   A. I was -- I want to say maybe September
6   of -- had to be '18 because we're in '19 now. I was
7   referred to her by Dr. Donato.
8   Q. For what purpose?
9   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10  Q. You mentioned you only went to her one
11  time?
12  A. Yes.
13  Q. Why did you only go to her one time?
14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17  Q. And did you choose to switch then to a
18  different physician?
19  A. Yes. That's when I switched to Ebony
20  Cross.
21  Q. So it was your choice to switch from
22  Dr. Nnamani to Dr. Cross?
23  A. Yes.
24  Q. What kind of considerations did you take
25  into account when you were deciding to switch from

Page 63

1   Dr. Nnamani to Dr. Cross?
2   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6   Q. You weren't clicking; is that a fair way to
7   say it?
8   A. No. Yeah.
9   Q. Did you feel uncomfortable being treated by
10  Dr. Nnamani?
11  A. A little.
12  Q. Why? Do you know?
13  A. Just certain --
14  I can answer this?
15  MR. CERYES: To the best of your
16  understanding.
17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22  Q. Is she a woman doctor?
23  A. Yes.
24  Q. And Ms. Cross -- sorry. Dr. Cross is a
25  woman doctor as well?

Page 64

1   A. Yes.
2   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4   A. Mm-hmm.
5   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6   A. Maybe for the past two years.
7   Q. When did you get your driver's license?
8   A. When I was 19.
9   Q. So about 21 years ago?
10  A. Tell everybody.
11  Q. So you've been -- but you've been driving
12  for over 20 years?
13  A. Mm-hmm.
14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16  A. No.
17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ what
18  do you mean?
19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 65

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2   A. Yes.
3   Q. You said that began around two years ago?
4   A. Yeah, about.
5   Q. Do you have an estimation of more
6   specifically when?
7   A. No. No, it's just something that's getting
8   increasingly worse. I can't really put a time stamp
9   on the exact time that it started. It's just been
10  something that's been getting increasingly worse from
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  Q. So including the driving, but more than
13  that?
14  A. Yes.
15  Q. And so you would say you had that to some
16  extent before two years ago, is that right ▓▓▓▓▓
17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25  to having had your son?

Page 66

1    A. Not that I could identify

4    Q. Prior to having your son did you ever have
5  depression?
6    A. No.
7    Q. Prior to having your son have you ever had
8  any treatment by any psychiatrist or psychologist?
9    A. No.
10    Q. A school counselor?
11    A. About depression?
12    Q. Or anxiety.
13    A. No.
14    Q. School counselor for anything else?
15    A. School stuff.
16    Q. Okay. When you were switching from
17  Dr. Nnamani to Dr. Cross, how did you find Dr. Cross?
18    A. I found Dr. Cross through another provider
19  within Dr. Donato's office, so -- because she was --
20  she goes to her. So she told me that I should try her
21  out, because she was more of a -- she was -- she just
22  said that she was a good psychiatrist and she
23  recommended her.
24    Q. Fair to say it was more of like a
25  word-of-mouth kind of recommendation?

Page 67

1    A. Yes.
2    Q. Did you do any research about Dr. Cross
3  before you started going to her?
4    A. Nothing besides talking to the people that
5  I knew that she went to, that go to her, no.
6    Q. Did you Google her?
7    A. No. Yeah, I did actually Google her.
8    Q. Did you see where she went to school?
9    A. No.
10    Q. What did you see when you Googled
11  Dr. Cross?
12    A. Just the practices that she has.
13    Q. The areas that she treats?
14    A. Mm-hmm.
15    Q. Anything else?
16    A. No, ma'am.
17    Q. Did you do any research into Dr. Donato
18  before you went to see her?
19    A. No.
20    Q. No Googling?
21    A. No.
22    Q. Did you do any research into Dr. Moore
23  either before you saw him or once you started being
24  treated by him?
25    A. No.

Page 68

1    Q. You never Googled him?
2    A. Nope.
3    Q. Aside from Dr. Cross, you mentioned that
4  you had done a little bit of research into -- do you
5  know if you ever known where any of your physicians
6  have attended medical school?
7    A. No.
8    Q. Have you ever asked that you know of?
9    A. No.
10    Q. Do you know if any of your physicians
11  you've been treated by have gone to medical school
12  outside of the United States?
13    A. No.
14    Q. Do you think some of them could have, you
15  just don't know?
16    A. I can't -- I don't know.
17    Q. You don't know one way or the other?
18    A. Right. Yeah, I wouldn't know to have to
19  ask that question. I would think that I could take
20  them at their word that they have done the things that
21  they say they did.
22    Q. Right, but you never, like, looked to see
23  did Dr. Moore go to -- I'm making this up -- Johns
24  Hopkins or Harvard or something?
25    A. Nope.

Page 69

1    Q. Okay. Do you have any medical doctors in
2  your family?
3    A. I do.
4    Q. Who is a medical doctor in your family?
5    A. Terrell Newton.
6    Q. How is Dr. Newton related to you?
7    A. He's my cousin.
8    Q. On which side, your mom's side or your
9  dad's side?
10    A. My mom's side.
11    Q. An aunt's child or an uncle's child?
12    A. Aunt.
13    Q. So it's your mom's sister's son?
14    A. Yep. Yes, ma'am.
15    Q. Any other physicians in your family?
16    A. No.
17    Q. And what does Dr. Newton's specialize in?
18    A. He's an anesthesiologist.
19    Q. Where does he practice?
20    A. I don't know. He has his own practice in
21  Florida for pain management.
22    Q. In Florida?
23    A. Yeah. I don't know the name of it.
24    Q. Do you know where Dr. Newton went to
25  medical school?

Page 70

```
 1      A.  North Carolina.
 2      Q.  In the United States?
 3      A.  Yes.  What's the school down in North
 4  Carolina?  I can't think of the name of the school.
 5  It's a school in North Carolina.
 6      Q.  But a medical school in North Carolina?
 7      A.  Mm-hmm.
 8      Q.  And Dr. Newton is not an ob/gyn?
 9      A.  No.
10      Q.  Are you friends with any other medical
11  doctors?
12      A.  No.
13      Q.  Are you acquainted with or know anybody who
14  went to medical school outside of the United States?
15      A.  No.
16      Q.  You understand that my client, the
17  Educational Commission for Foreign Medical Graduates,
18  is the defendant in this case, correct?
19      A.  Yes.
20      Q.  Is it okay if I refer to them as ECFMG?
21      A.  Yes, ma'am.
22      Q.  You'll know what I'm talking about?
23      A.  Yes, ma'am.
24      Q.  Prior to meeting counsel in connection with
25  this lawsuit or the Maryland lawsuit, had you ever
```

Page 71

```
 1  heard of ECFMG before?
 2      A.  No.
 3      Q.  Do you have any understanding of what ECFMG
 4  does?
 5      A.  Yes.
 6      Q.  And from where did you get that
 7  understanding?
 8          MR. CERYES:  Objection.
 9          MS. MCENROE:  Not asking for specifics.
10  I'm just asking generally where she got the
11  understanding from.
12      Q.  I'm not trying to get into specific
13  conversations you had with counsel, but I'm just
14  trying to understand from where did you get that
15  understanding?
16          MR. CERYES:  I'll allow you to answer it.
17      A.  From counsel.
18      Q.  Aside from conversations you had with
19  counsel, have you learned anything about ECFMG outside
20  of what counsel told you?
21      A.  Well, I did -- once I found out what their
22  responsibilities were, I did look them up, yes.
23      Q.  So you Googled them?
24      A.  Yes.
25      Q.  And you read some information about ECFMG
```

Page 72

```
 1  on the Internet?
 2      A.  Yes.
 3      Q.  Do you remember what you read on the
 4  Internet?
 5      A.  Just what their job responsibilities were,
 6  where they are located.
 7      Q.  Was that from the ECFMG website?
 8      A.  Yeah.  I just Googled.
 9      Q.  You said you looked up what the job
10  responsibilities were for ECFMG.  What do you mean by
11  that?
12      A.  I wanted to know exactly what kind of
13  company it was.  So not exactly -- I didn't look up,
14  you know, exactly job responsibility, but what kind of
15  company it was and what they performed, what they did.
16      Q.  What do you mean by what kind of company
17  they are?
18      A.  So I just knew that it was some kind of
19  credentialing company or something, but I wasn't sure.
20  Like, I wasn't 100 percent sure of the nature of the
21  company, so I wanted to know exactly what the nature
22  of the company was.
23      Q.  And when did you conduct this Internet
24  research, before you met counsel or after you met
25  counsel?
```

Page 73

```
 1      A.  After.
 2      Q.  When did you first meet the counsel that
 3  represents you in this litigation and in the
 4  Dimensions litigation?
 5      A.  I don't remember.  Was it November?  I
 6  think the first meeting was in November.
 7      Q.  Of what year?
 8      A.  '18?
 9  You don't know?  You can't help me.
10          MR. CERYES:  Do your best.
11      A.  I'm sorry.
12      Q.  Do you remember how you came to meet
13  counsel?
14      A.  Yeah.  I heard an ad.
15      Q.  You heard an advertisement for a law firm?
16      A.  An advertisement, uh-huh.
17      Q.  Do you remember for which law firm?
18      A.  For Schochor, Federico and Staton.
19      Q.  And you said you heard it.  How did you
20  hear it?
21      A.  Actually my husband heard it on the radio.
22      Q.  When was that?
23      A.  Ma'am, I'm old.  You keep asking me all
24  these dates.  I don't know.  I don't know.  Maybe
25  summer of 2018 maybe.
```

Page 74

1      Q. Did you hear the radio advertisement at any
2  time personally?
3      A. Yes. I heard it after the fact, yes.
4      Q. When you say "after the fact" --
5      A. Well, after my husband heard it.
6      Q. Did you hear it? Did you personally hear
7  it before you contacted counsel?
8      A. Yes.
9      Q. What did the radio advertisement say?
10     A. If you were seen by Charles Akoda, give us
11 a call, something to that effect.
12     Q. Did it say anything about why?
13     A. I don't think it went into detail.
14     Q. Was the firm that was advertised in that
15 radio advertisement the same firm that you then
16 reached out to?
17     A. Yes.
18     Q. Had you consulted with any other lawyers?
19     A. No.
20     Q. You mentioned earlier that you conducted
21 some Internet research into ECFMG. Do you remember
22 that discussion?
23     A. Yes.
24     Q. Do you know what it means for a foreign
25 medical graduate to be certified by ECFMG?

Page 75

1      A. Yes.
2      Q. To you what does that mean?
3      A. To me it means that they have completed
4  everything that they were supposed to do successfully
5  in order to gain the certification from ECFMG to
6  practice.
7      Q. Do you understand or -- strike that.
8      Do you have an understanding of whether or not
9  a foreign medical graduate can come to the
10 United States, get an ECFMG certification, and then
11 practice medicine, or if they have to do something
12 else before that?
13     A. My understanding is you have to do
14 something before that.
15     Q. Do you know what that something is?
16     A. Certifications, some kind of testing?
17     Q. Okay. Do you know what a residency program
18 is --
19     A. I do.
20     Q. -- for a physician? What does that mean to
21 you?
22     A. A residency program is kind of like an
23 internship for doctors.
24     Q. And that's still medical education. Do you
25 understand that?

Page 76

1      A. Mm-hmm.
2      Q. Is that a yes?
3      A. Yes.
4      Q. Okay. And the medical care -- strike that.
5      Where Peyton was delivered, was that in
6  Maryland?
7      A. Yes.
8      Q. And do you have an understanding of whether
9  Maryland requires physicians to be licensed by the
10 State of Maryland to practice medicine there?
11     A. No. I would assume that they would.
12     Q. So you think that they do.
13     A. Yeah.
14     Q. Okay. So that's just what I'm trying to
15 ask. Do you have an understanding that the State of
16 Maryland requires physicians doing medical care there
17 to be licensed by the state?
18     A. Yes.
19     Q. Okay. Have you ever heard of the
20 United States Medical Licensing Examinations?
21 Sometimes it's called USMLE.
22     A. No.
23     Q. Do you have any understanding that, in
24 order to become a physician in the United States,
25 graduates of medical school need to take what's called

Page 77

1  medical boards?
2      A. Yes.
3      Q. Do you have an understanding of whether
4  some physicians can get additional credentialing by
5  becoming board certified?
6      A. No.
7      Q. Okay. So you've never heard like he's a
8  board -- he's board certified in --
9      A. Yes.
10     Q. -- and then a specialty?
11     A. Yes.
12     Q. You've heard that before?
13     A. Yes, I've heard that before.
14     Q. Okay. And what does that mean to you?
15     A. That they were certified by some type of
16 medical board.
17     Q. Okay. Do you know whether Dr. Akoda --
18 when I say "Dr. Akoda," do you know who I'm referring
19 to?
20     A. Yes.
21     Q. Okay. Do you know whether Dr. Akoda took
22 any United States medical licensing examinations?
23        MR. CERYES: Objection, foundation. You
24 can answer to the extent you're able.
25     A. Yeah. I mean, I'm assuming he did, yes.

Page 78

1    Q. Okay. Do you know whether Dr. Akoda passed
2  the USMLE components?
3       MR. CERYES: Same objection.
4    A. If he passed, after failing? Yes.
5    Q. So you're asserting that you think that
6  Dr. Akoda failed them.
7    A. I don't -- I mean, that's my assumption.
8  That's --
9    Q. Why is that your assumption?
10   A. Because I read through the documents that
11 were given to me.
12   Q. What documents were given to you?
13   A. The discovery and things like that.
14   Q. What discovery was given to you?
15   A. From my -- this stuff (indicating) that
16 my -- that my counsel gave to me.
17   Q. Okay. What did they show you that made you
18 think that Dr. Akoda had failed examinations?
19      MR. CERYES: I'm going to object to the
20 extent I think we're getting into attorney-client
21 privilege. I can proffer to you what she's talking
22 about, if that's helpful.
23   Q. Were these documents that were produced in
24 this litigation? Did they have Bates-stamped numbers
25 on the bottom?

Page 79

1       MR. CERYES: Are you asking me?
2       MS. MCENROE: I'm asking whoever will tell
3  me.
4       MR. CERYES: I think what she's referring
5  to is the complaint.
6       MS. MCENROE: The complaint.
7    A. The complaint.
8    Q. Okay. So you've seen the allegations
9  drafted as by counsel --
10   A. Correct.
11   Q. -- about Dr. Akoda.
12   A. Correct.
13   Q. Okay. Have you ever seen underlying
14 original documents -- and by "original," I mean they
15 could be copies -- but underlying documents regarding
16 Dr. Akoda's credentials?
17   A. No.
18   Q. Have you ever seen his medical school
19 diploma?
20   A. No.
21   Q. Were you lead to believe he did not
22 graduate from medical school?
23   A. I wasn't lead to believe anything. I'm
24 just going off of what I read in the complaint myself,
25 ma'am.

Page 80

1    Q. Right. So those are allegations in the
2  complaint.
3    A. Mm-hmm.
4    Q. Did you write the complaint?
5    A. No.
6    Q. Do you know who wrote the complaint?
7    A. My counsel, I would assume.
8    Q. Okay. Do you know whether any of the other
9  physicians you've ever been treated by in your life
10 have been ECFMG certified?
11   A. I don't know.
12   Q. You don't know one way or the other?
13   A. No.
14   Q. Do you know if, as part of ECFMG
15 certification program, it verifies Social Security
16 numbers?
17   A. No. Well, I'm assuming that they do.
18   Q. You're assuming they do?
19   A. I would hope so.
20   Q. On what basis?
21   A. Because you have someone coming from
22 another country, how else are you going to identify
23 them besides their identification number, which is
24 their Social.
25   Q. Do you know for a fact whether as part of

Page 81

1  its certification program ECFMG verifies birth
2  certificates?
3    A. I would assume they should.
4    Q. On what basis are these assumptions made
5  on?
6    A. Because how else are you going to identify
7  someone without those identification things?
8    Q. And you think that ECFMG's purpose is to
9  verify identification documentation?
10   A. Yes.
11   Q. Do you know if, as part of its
12 certification program, ECFMG verifies green cards?
13   A. I don't know, but I would assume they
14 would.
15   Q. Do you know whether if, as part of its
16 certification programs, ECFMG verifies state medical
17 licenses?
18   A. I would assume they would.
19   Q. Same basis?
20   A. Yes.
21   Q. And do you know whether for a fact, as part
22 of its certification program, ECFMG verifies board
23 certifications?
24   A. I would assume as well.
25   Q. Okay. So is it your understanding that

Page 82

1 ECFMG is responsible for verifying any piece of
2 identifying information about a foreign medical
3 graduate?
4     A. Absolutely.
5         MR. CERYES: Object to the extent I think
6 we're getting into expert testimony, but you can
7 answer to the best of your understanding.
8         MS. MCENROE: Well, I'm asking about the
9 witness's understanding, so I think that's a fair --
10     A. Yes.
11     Q. So on what basis do you have that
12 understanding?
13     A. The basis that if you are -- if someone is
14 going to be caring over someone medically, that I
15 would assume that they would do their due diligence to
16 find out that this person is who they say they are,
17 and you would have to go through all of those things
18 to make sure that this person is exactly who they are
19 stating to be.
20     Q. Is it fair to say that, when you were
21 treated by Dr. Akoda, you had not heard of ECFMG?
22     A. Correct.
23     Q. Is it fair to say that we're here today
24 because of Dr. Akoda's treatment of you?
25         MR. CERYES: Objection, form, foundation.

Page 83

1     You can answer, if you understand the question.
2     Q. I'm not trying to make this a hard one.
3 I'm just trying to transition to another general area.
4     Have you ever been treated by a doctor who
5 called himself Dr. Akoda?
6     A. Yes.
7     Q. When was that?
8     A. March 16th into 17th of 2008 -- '16.
9 Jesus, '16.
10     Q. Why were you being treated by Dr. Akoda,
11 for what condition?
12     A. Delivery, pregnancy.
13     Q. How did you come to be treated by
14 Dr. Akoda?
15     A. He was the doctor on call, I guess.
16     Q. Where?
17     A. At Dimensions Health Systems.
18     Q. Earlier today we were discussing you being
19 induced to have your labor; is that correct?
20     A. Yes.
21     Q. Was Dr. Akoda the doctor that induced you
22 to labor?
23     A. No. The nurse -- a nurse gave me the
24 medication.
25     Q. So you were originally seen by another

Page 84

1 medical professional to get that process started?
2     A. By another -- mm-hmm, yes.
3     Q. And that would have been Pitocin; is that
4 correct?
5     A. Yes. Yes, ma'am.
6     Q. How did you react to the Pitocin? Did that
7 work for you?
8     A. Yes.
9     Q. How long were you in labor?
10     A. Twenty-two, 24 hours, 26 hours, somewhere
11 between there.
12     Q. And did you spend a period of that time
13 pushing?
14     A. Twelve hours.
15     Q. Twelve hours. Was Dr. Akoda your physician
16 the entire 22, 24, 26 hours that you were in labor?
17     A. Yes.
18     Q. Did you see any other ob/gyn's during your
19 labor or delivery?
20     A. No.
21     Q. You already made reference to one nurse.
22 Do you recall being treated by nurses while you were
23 laboring and delivering?
24     A. Yes.
25     Q. Do you recall about how many?

Page 85

1     A. Two.
2     Q. At any one time or over the course of time?
3     A. Over the course of time. It was shift
4 work.
5     Q. Do you remember the names?
6     A. I do not.
7     Q. Were the nurses men or women?
8     A. Women.
9     Q. Can you tell me about when you first met
10 Dr. Akoda?
11     A. He just came in and introduced himself, and
12 I guess -- I don't remember -- asked me a few
13 questions and then --
14     Q. Sure. Did you ask -- oh, go ahead.
15     A. And then said that he was going to prepare
16 the room for delivery.
17     Q. Did he actually prepare the room for
18 delivery?
19     A. He and another nurse.
20     Q. What did they do to prepare the room for
21 delivery?
22     A. They brought in like a little table and
23 some supplies and moved my bed from where it was into
24 like the middle of the floor.
25     Q. How far along was this in the 22, 24, or 26

Page 86

1  hours you were describing for your labor?
2      A.  So I got there around -- so this was
3  approximately 10:00 in the morning on the 17th.  So I
4  got there the day before on the 16th around 11:30, and
5  I was taken back around 1:00-ish.
6      Q.  Were you being treated by Dr. Akoda before
7  you got taken back?
8      A.  No.
9      Q.  Were you being treated by any ob/gyn before
10  you got taken back?
11      A.  No.
12      Q.  When you first met Dr. Akoda, did you ask
13  him at all about his credentials or his background?
14      A.  No.
15      Q.  Did you at any point ask him about his
16  background or his experience?
17      A.  No.
18      Q.  About his credentials?
19      A.  I was in labor, ma'am.  No.
20      Q.  I understand.  I'm just asking questions.
21      A.  Oh.  No.
22      Q.  Do you know whether Dr. Akoda completed a
23  residency program?
24      A.  I don't know.
25      Q.  You don't know?

Page 87

1      A.  No.
2      Q.  Do you know whether Dr. Akoda was board
3  certified by the American Board of Obstetrics and
4  Gynecology?
5      A.  No.
6      Q.  So I want to talk a little bit more about
7  your labor and delivery experience.  About how long
8  between when Dr. Akoda started treating you and you
9  delivered Peyton, about how long was that period of
10  time?
11      A.  About 11, 12 hours or so.
12      Q.  Was Dr. Akoda in the room with you that
13  entire time?
14      A.  No.
15      Q.  Okay.  Did he come in and out of the room?
16      A.  Yes.
17      Q.  Approximately how many times, do you know?
18      A.  No, ma'am.
19      Q.  Was it on a regular schedule or was it just
20  sort of --
21      A.  Just -- from my understanding, he was the
22  only physician there, so he was delivering other
23  babies.
24      Q.  Did a nurse stay with you the entire time?
25      A.  They were both in and out.  No one was in

Page 88

1  the room with me for the entire time.
2      Q.  Was your husband with you?
3      A.  Yes.
4      Q.  Was your mother with you?
5      A.  Yep.
6      Q.  Was anybody else with you?
7      A.  No.
8      Q.  Did your husband and mother remain with
9  you --
10      A.  Yes.
11      Q.  -- barring bathroom trips or whatnot the
12  entire time?
13      A.  Yes, uh-huh.
14      Q.  Does your husband have any other children
15  besides Peyton?
16      A.  Mm-hmm.
17      Q.  How many children does he have?
18      A.  Three.
19      Q.  Do they reside with you?
20      A.  No.
21      Q.  How old are they?
22      A.  Fifteen, eleven, and seven.
23      Q.  And seven?
24      A.  Yeah.
25      Q.  Okay.  Are they boys or girls?

Page 89

1      A.  Mixed, two boys and one girl.
2      Q.  And how old is the girl?
3      A.  The girl is seven.
4      Q.  Okay.  So the older two are boys.
5      A.  Yes.
6      Q.  Do you know if your husband was present for
7  their deliveries?
8      A.  I don't know.
9      Q.  Are the three of them with the same mother?
10      A.  No.
11      Q.  Okay.  Do any of them share a mom?
12      A.  Yes, two of them.
13      Q.  Which two?
14      A.  The two boys have the same mom.
15      Q.  How many children does your mother have?
16      A.  Two.
17      Q.  Do you know if that's the number of
18  children she delivered?

22      A.  No, I don't know.
23      Q.  So you have one sibling?
24      A.  Yes.
25      Q.  Is it a brother or a sister?

Page 90

```
1      A.  A brother.
2      Q.  Older or younger?
3      A.  Younger.
4      Q.  And he's not a physician?
5      A.  No.
6      Q.  What does he do?
7      A.  He is a general manager for a nightclub.
8      Q.  In the area?
9      A.  Yes.
10     Q.  Does he have any children?
11     A.  No.
12     Q.  About how much time total would you
13  estimate you spent with Dr. Akoda.
14     A.  Out of that 12 hours, I want to say maybe
15  eight hours.
16     Q.  So he was with you for eight out of the 12
17  hours?
18     A.  Yeah, in and out.  I was having
19  difficulties pushing, so he was in and out trying to,
20  you know, he would come in and then leave and then
21  come back, leave and then come back, and try to get me
22  to push again, that type of situation.
23     Q.  Got it.  Okay.  And each time he would come
24  in, approximately how long would he be in the room
25  for, a couple minutes at a time?
```

Page 91

```
1      A.  Maybe 10, 15 minutes.
2      Q.  And you testified that you were pushing for
3  a long time; is that correct?
4      A.  Yes.
5      Q.  Okay.  I apologize for the personal nature
6  of this question, but were your legs in stirrups or
7  were people holding your feet?
8      A.  They were holding my feet.
9      Q.  And who was holding your feet?
10     A.  My mom and my husband.
11     Q.  So your mom was holding one and your
12  husband was holding the other?
13     A.  Yes, ma'am.  At a later point there was a
14  nurse there holding -- holding my other leg while my
15  husband was down there with Dr. Akoda.
16     Q.  Okay.  So that was one of the two nurses
17  you were talking about --
18     A.  Yes.
19     Q.  -- who was holding one of the legs --
20     A.  Yes.
21     Q.  -- while your husband was standing next to
22  Dr. Akoda?
23     A.  Yes.
24     Q.  And how long was your husband standing next
25  to Dr. Akoda while he treated you and a nurse held
```

Page 92

```
1  your leg?
2      A.  During that particular time, I want to say
3  it might have been around 30 minutes, because at that
4  time the baby's head started coming out but kept going
5  back in.  So he stayed in the room for a little bit
6  longer at that -- at that time.
7      Q.  Did he use forceps or any other tools in
8  that way?
9      A.  No.
10     Q.  Did you have an epidural during your labor?
11     A.  Mm-hmm.
12     Q.  Is that a yes?
13     A.  Yes, ma'am.  Sorry.
14     Q.  Around what time during this whole process
15  do you remember getting an epidural?
16     A.  The epidural was the night before, so I
17  want to say maybe 11 or 12 in the evening after they
18  had given me the first dosage of Pitocin.
19     Q.  So 11 or 12 the night before you delivered?
20     A.  Yes.
21     Q.  After you got the epidural, were you
22  connected to an IV?
23     A.  Mm-hmm.  Yes.
24     Q.  Is that yes?  And you were confined to your
25  bed; is that correct?
```

Page 93

```
1      A.  Yes.
2      Q.  Did the epidural work?  Were your legs
3  numb?
4      A.  Yes.
5      Q.  Yes.  Okay.  You ultimately ended up having
6  a C-section; is that correct?
7      A.  Yes.
8      Q.  And do you understand whether they used the
9  C-section as the anesthesia -- I'm sorry.  Strike
10  that.
11         Do you know whether they used the epidural as
12  the anesthesia for your C-section or if they gave you
13  something else?
14     A.  They gave me something else.
15     Q.  And did you remain awake during your
16  C-section?
17     A.  Yes.
18     Q.  Who conducted your C-section?
19     A.  Dr. Akoda.
20     Q.  So when you were laboring and your mom and
21  husband had one foot and then later the nurse swapped
22  in for your husband, were you laying on your back?
23     A.  Yes.
24     Q.  And did you have a sheet over your legs --
25     A.  Well.
```

Page 94

1    Q. -- a blanket or something?
2    A. Yeah. I mean, it wasn't over my legs any
3  longer because my legs was up, but, yeah, it was one
4  covering my stomach area.
5    Q. And were you able to see your baby's head
6  coming in and out --
7    A. Yes.
8    Q. -- over your tummy?
9    A. Well, because I was up.
10   Q. How were you positioned?
11   A. I was like up.
12   Q. If you could describe it a little. We have
13 the video camera, but it would be helpful if you could
14 describe it as well.
15   A. I wasn't laying flat. I mean, I was on my
16 back, but I was kind of in a C kind of position.
17   Q. Yep.
18   A. So my body was up like this, and they were
19 holding my legs like this. So I was pushing -- they
20 were -- it's hard to explain.
21   Q. Yeah.
22   A. They were pulling my legs back this way
23 trying to get the baby out.
24   Q. Yep.
25   A. So I'm up like, and they were pulling my

Page 95

1  legs back. Does that make sense?
2    Q. Got it. I think it does. So if I can
3  articulate it correctly, was your -- you were seated
4  somewhat with your legs elevated.
5    A. Yes.
6    Q. And you were pushing?
7    A. Yes. Yes.
8    Q. Is that correct?
9    A. Yes.
10   Q. And did you actually see the baby's head
11 when it was coming in and out?
12   A. Yeah, I saw it twice.
13   Q. And did Peyton have hair when he was
14 delivered?
15   A. A lot. He still has a lot.
16   Q. Peyton was delivered healthy?
17   A. Yes.
18   Q. Any issues or concerns from breastfeeding?
19   A. No.
20   Q. Was he a good eater?
21   A. Yes.
22   Q. How was your labor and delivery recovery
23 yourself?
24   A. It was okay.
25   Q. How was your C-section incision?

Page 96

1    A. It was okay.
2    Q. You had no infection?
3    A. No.
4    Q. How long after you had Peyton did you go
5  back to working? And I understand you were working
6  from home, but did you return to working?
7    A. I want to say -- I want to say I was out
8  for maybe two months, but I'm not 100 percent sure.
9  I'm pretty sure it was like eight weeks.
10   Q. Do you know if there were any medical
11 students or residents present for your labor or
12 delivery?
13   A. I don't recall.
14   Q. Is it possible that there could have been
15 other medical professionals coming in and out of the
16 room?
17   A. It's possible.
18   Q. Do you know who placed your epidural? Was
19 it an anesthesiologist?
20   A. Yes.
21   Q. So that was a doctor different from
22 Dr. Akoda?
23   A. Yes.
24   Q. Was that doctor, the anesthesiologist,
25 present during your C-section, do you know?

Page 97

1    A. I don't think it was the same doctor.
2    Q. But was there an anesthesiologist --
3    A. Yes.
4    Q. -- present during your C-section?
5    A. Yes. Yes, because they gave me additional
6  medication before.
7    Q. You mentioned earlier that, when you came
8  in for your induction or when you scheduled your
9  induction, you expected you would be delivered by
10 Dr. Moore; is that correct?
11   A. Yes.
12   Q. When did you learn that that was not going
13 to happen?
14   A. When Dr. Akoda came in the room and said
15 that he was going to be delivering my baby.
16   Q. So you didn't find that out beforehand?
17   A. No.
18   Q. Did you ask any questions about why
19 Dr. Moore would not be delivering your baby?
20   A. No. At that point I just wanted the baby
21 out.
22   Q. How long did you stay in the hospital after
23 you had Peyton?
24   A. Five days? Five days.
25   Q. Do you know if that was the standard length

Page 98

1  of time or if you stayed any longer for any reason?
2  A. I believe that's the standard length of
3  time for a C-section.
4  Q. Did Peyton remain in the hospital with you
5  that whole time?
6  A. Yes.
7  Q. Is Prince George's Hospital a rooming in
8  hospital? Do you know what that means?
9  A. No.
10  Q. Did they have the baby sleep with you in
11  your hospital room?
12  A. Yes. Yes.
13  Q. Was he sleeping while he was in the
14  hospital at least some of the time?
15  A. Yes.
16  Q. Did he need to be treated with anything
17  initially when he was born? Did he have jaundice or
18  any of those types of newborn things?
19  A. No, huh-uh.
20  Q. You said he was good?
21  A. He was good, yes.
22  Q. And did a pediatrician come to treat Peyton
23  while you were in the hospital, do you remember?
24  Treat, or I should say observe.
25  A. Yeah.

Page 99

1  Q. Yep.
2  A. Yeah.
3  Q. After you delivered, did any ob/gyn's come
4  to visit you? Did Dr. Moore come and see you at any
5  time during those five days?
6  A. No.
7  Q. Did any other physicians come to you?
8  A. No, just had a nurse after that.
9  Q. Just a nurse?
10  A. (Nodding head up and down.)
11  Q. Okay. Did anyone talk to you about
12  postpartum depression when you were being released
13  from the hospital or during your hospital stay?
14  A. Not that I can remember, no.
15  Q. Do you know what postpartum depression is?
16  A. Yes.
17  Q. Do you believe you've suffered ever from
18  postpartum depression?
19  A. No.
20  Q. Have you ever spoken to any of your
21  training psychologists or psychiatrists about
22  postpartum depression?
23  A. No.
24  Q. Were you ever treated by somebody named
25  Dionne Lucas? Maybe a physician's assistant.

Page 100

1  A. Dionne Lucas...
2  Q. I might be saying the name wrong. It's
3  D-I-O-N-N-E.
4  A. I believe I went to her for a physical. I
5  don't remember when, though. ████████████
   ████████████████████████████████████
8  (Exhibit 2 marked for
9  identification: History and Physical
10  Examination re Desire Evans)
11  MR. CERYES: Thank you.
12  Q. Ms. Evans, I'm handing you a copy of some
13  medical records that we've received in discovery in
14  this case. So you'll see the first page is an
15  Affidavit of Authentication of Records. Do you see
16  that?
17  A. Mm-hmm. Yes.
18  Q. And you'll see at the bottom there's a
19  little number that starts with the word "plaintiffs."
20  A. Yes.
21  Q. And then a number of zeros and then it says
22  5833. Do you see that at the way bottom, Plaintiffs'
23  5833, all the way at the bottom?
24  A. Oh, yeah, yeah, yeah.
25  Q. So that's what we call a Bates stamp. So

Page 101

1  if I refer you to a Bates stamp, it's the individually
2  numbered page number specific for this litigation.
3  Okay?
4  A. Mm-hmm.
5  Q. Do you see that?
6  A. Yes.
7  Q. Okay. And I'd like to direct you to the
8  second page in that document, which at the top says
9  History and Physical Examination. Do you see that?
10  A. Mm-hmm.
11  Q. Okay. And you said yes?
12  A. Yes.
13  Q. Okay. And at the top it says DOS and then
14  July 25th, 2016. Do you see that?
15  A. Yes.
16  Q. Is that around the time you think you saw
17  Dionne Lucas?
18  A. Yes.
19  Q. And to help refresh your recollection, if
20  you take a look at the very next page, you'll see that
21  the document was electronically signed by Dionne Lucas
22  two days after that date. Do you see that?
23  A. Yes.
24  Q. Does that sound familiar to you that you
25  would have been treated by this physician's assistant

1  in July 2016?

2      A.  Yes.

3      Q.  And looking back to the page that has

4  History and Physical Examination at the top, do you

5  see that?

6      A.  Mm-hmm.

7      Q.  There's a section that says, History of

8  Present Illness.  Is that correct?  Do you see that?

9  I'd like to direct you to the first paragraph there,

10  and it starts -- do you see where I am?

11      A.  Mm-hmm.

12      Q.  It says, "this is a new patient to our

13  practice.  She is complaining of feeling sad all the

14  time and having severe anxiety.  She just had a baby

15  in 03/16 and since then has not been able to sleep."

16  Do you see that?

17      A.  Mm-hmm.  Yes.

18      Q.  Did you say yes?  Is that correct for what

19  you presented to Dionne Lucas for when you went to see

20  her?

21      A.  Yes.

22      Q.  The next sentence goes on to say, "She is

23  afraid to drive her car.  She is afraid of walking

24  down the steps with her son because she thinks she

25  might drop him.  She is afraid to let her son be

1  watched by other people."  Do you see that?

2      A.  Yes.

3      Q.  And was that accurate to how you were

4  feeling at the time?

5      A.  Yes.

6      Q.  Did you get help having others watch Peyton

7  when he was an infant?

8      A.  What do you mean "get help," like mental

9  help?

10      Q.  No, I'm sorry, I mean physical help.  Did

11  you have others come watch him and so that you could

12  get a break, take a shower?

13      A.  Yeah, like my family, my mom, my husband.

14      Q.  Your family.  And how frequently would

15  others come in to help watch Peyton?

16      A.  Daily.  Having other people watch him, like

17  sending him to daycare, like that's what --

18      Q.  So your concern was not letting other

19  people outside of your family watch him?

20      A.  Yes, yes.

21      Q.  Okay.  And then it continues to say, "she

22  is losing her hair."  Do you see where I am?

23      A.  Mm-hmm.

24      Q.  "And has not been able to go into work

25  since her maternity leave ended.  When she saw her

1  gynecologist, they gave her a note for reasonable

2  accommodation, which allowed her to work from home

3  until August 1st, 2016."  Do you see that?

4      A.  Yes.

5      Q.  Which gynecologist gave you a note to work

6  from home?

7      A.  I believe that that was Donna from

8  Dr. Moore's office.

9      Q.  Is that a gynecologist at Dr. Moore's

10  office?

11      A.  Well, that's the gynecological office, so I

12  would assume that she's a gynecologist.

13      (Clarification by reporter.)

14      Q.  So that was the other ob/gyn at Dr. Moore's

15  practice you testified about having met with earlier?

16      A.  Yes.

17      Q.  And did you see her after you delivered

18  Peyton?

19      A.  For my six-week checkup, I believe.

20      Q.  And so you went to Dr. Moore's practice but

21  saw the other ob/gyn after you delivered Peyton; is

22  that correct?

23      A.  Yes.

24      Q.  Is that the only time you saw that other

25  doctor besides Dr. Moore at Dr. Moore's practice?

1      A.  Yes.

2      Q.  It was after you had delivered?

3      A.  (Nodding head up and down.)

4      Q.  That's a yes?

5      A.  Yes.  Sorry.

6      Q.  Thank you.  Did any doctor or nurse talk to

7  you about hair loss after delivery?

8      A.  No.

9      Q.  Has anyone ever -- any physician ever

10  talked to you about hair loss after delivery?

11      A.  No.

12      Q.  The document goes on to say, "she is

13  asking --"  Do you see where I am?

14      A.  Uh-huh.

15      Q.  "She is asking for an updated letter and

16  evaluation/treatment for this complaint.  Prior to

17  having her baby she did not have any issues with

18  anxiety or depression."  Do you see that?

19      A.  Yes.

20      Q.  And then going on to the next page there,

21  there is a section that's called "Impression/Plan."

22  Do you see that?

23      A.  Yes.

24      Q.  And the first bullet point there says,

25  "depression/anxiety" and then in parentheses,

Page 106

1  "possible postpartum."  Do you see that?
2       A.  Yes.
3       Q.  And so are you saying that the physician's
4  assistant, Dionne Lucas, who you saw in July 2016 did
5  not talk to you about postpartum depression?
6       A.  No.
7       Q.  Was this physician's assistant who you saw
8  the first medical professional you discussed your
9  anxiety with or your depression with after delivering
10  Peyton?
11       A.  Yes.
12       Q.  On that same paragraph I was just talking
13  about, the number 1 under Impression/Plan, do you see
14  that?
15       A.  Yes.
16       Q.  The last sentence says, "a reassessment
17  during the week of 090516 will be made in our office."
18  Do you see that?
19       A.  Yes.
20       Q.  And did you actually go back for that
21  reassessment?
22       A.  No.
23       Q.  And the sentence before that says, "I have
24  written her a note extending the reasonable
25  accommodations until the week of 09-12-2016."  Do you

Page 107

1  see that?
2       A.  Yes.
3       Q.  So this was in July, and this visit you
4  came out of it with a note extending your
5  accommodations to work from home until mid September;
6  is that a fair summary?
7       A.  Yes.
8       Q.  Do you recall now, having seen these
9  medical records, does it refresh your recollection at
10  all about how long you stayed out on maternity leave
11  or when you returned to work?
12       A.  No, because I was -- I still returned to
13  work; I just was working from home.
14       Q.  Right.  I'm sorry.  I used rather imprecise
15  language.
16       So what I meant was return to the workforce.
17  So returning to working.
18       A.  Yes.
19       Q.  So do you remember with any more precision
20  having now seen this note of medical treatment in July
21  when it is after you delivered Peyton you returned to
22  the workforce?
23       A.  Yeah, I was still working.
24       Q.  So you were working?
25       A.  Yeah.

Page 108

1       Q.  As of July?
2       A.  Yeah.
3       Q.  Do you know how long you had been working
4  since your delivery with Peyton as of this time?
5       A.  I was out of work for like eight weeks.
6       Q.  Okay.
7            (Exhibit 3 marked for
8            identification: Medical Records re
9            Desire Evans
10            Smith 000001 - Smith 000023)
11       Q.  Ms. Evans, I'm going to hand you some more
12  medical records that were produced to us in this
13  litigation for you.  And you'll see the very first
14  page is a certification of medical records from Kaiser
15  Permanente.  Do you see that?
16       A.  Yes.
17       Q.  Turning to the second page of that
18  document, so it has a Bates number ending in 5736 at
19  the bottom, do you see that?
20       A.  Yes.
21       Q.  Okay.  It's double-sided.  Thank you.
22       There's a big redacted box up top.  Do you know
23  what that's covering?
24       A.  No.
25       Q.  These are records for you visiting

Page 109

1  Dr. Shanda Smith.  Do you see that?  On that second
2  page, right under the redaction box, it says, under
3  "Provider Name," "Smith, Shanda J, (MD)."  Do you see
4  that?
5       A.  Yes.
6       Q.  And this was the Dr. Smith you referred to
7  a little bit earlier this morning; is that correct?
8       A.  Yes.
9       Q.  Have you ever seen these medical records
10  before?
11       A.  No.
12       Q.  Can you remind me, how is it that you first
13  came to meet Dr. Smith?
14       A.  I had Kaiser and she was one of the doctors
15  there.
16       Q.  When you say you had Kaiser, that was your
17  insurance company?
18       A.  Yes.
19       Q.  They referred you to her?
20       A.  Yes.
21       Q.  And how did they come to refer her to you?
22  So how did they know you were looking for a doctor
23  like Dr. Smith?
24       A.  I called and asked for a doctor.  I called
25  to make an appointment, and she was the doctor that

Page 110

1    was assigned to me.
2        Q.  So these records appear to me to have begun
3    from, at least what we can see, in early 2018.  Does
4    that line up with when you believe you first started
5    seeing Dr. Smith, or do you believe you had seen her
6    prior to that?
7        A.  No, I believe I said February of '18.
8        Q.  February of '18.  Okay.  So January of '18
9    is sort of in the ballpark?
10       A.  Yeah.  Yes.
11       Q.  I'd like to direct your attention to the
12   document Bates-stamped ending in 5742, 5742, and
13   you'll see there's a section there in the middle that
14   starts with the words "Progress Notes," it's like a
15   heading.  Do you see that?  Is that a yes?
16       A.  Yes.
17       Q.  And it says, it's from Shanda Smith, MD, on
18   January 17th, 2018 at 4:10 p.m.  Do you see that?
19       A.  Yes.
20       Q.  And then it says it was signed, right?
21       A.  Mm-hmm, yes.
22       Q.  And it says, "Psychiatric Evaluation, new
23   evaluation"; is that correct?
24       A.  Yes.
25       Q.  So this, just trying to orient the timing,

Page 111

1    was after you had delivered Peyton, correct?
2        A.  Correct.
3        Q.  And was it before or after you had met
4    Plaintiffs' counsel in connection with this or the
5    Maryland litigation?
6        A.  Before.
7        Q.  Before you had met counsel.
8        A.  (Nodding head up and down.)
9        Q.  So continuing down the page from where we
10   were, it says "depression and anxiety."  Do you see
11   that?
12       A.  Yes.
13       Q.  Okay.  And it says, "Desire N. Evans" --
14   and that's you, right?
15       A.  Yes.
16       Q.  --                              who presents
17   voluntarily to Kaiser Permanente Largo Medical Center
18   Behavioral Health for psychiatric evaluation."  That's
19   correct, you presented voluntarily, correct?
20       A.  Yes.
21       Q.  "She is self-referred after consultation
22   with her primary care doctor, Dilasha Katwal MD, MD."
23   Do you see that?
24       A.  Yes.
25       Q.  Is that the primary care physician you were

Page 112

1    referring to earlier, or is that a different doctor?
2        A.  No, I never saw this doctor.  This could
3    have been -- Kaiser also assigns you doctors, so that
4    could have just been a doctor that was listed on my
5    Kaiser card at the time.
6        Q.  So that would have been from the insurance
7    company's perspective --
8        A.  Correct.
9        Q.  -- who they told you your primary --
10       A.  My primary care is, correct.
11       Q.  And did you ever go to a primary care
12   physician when you had your Kaiser insurance?
13       A.  No.
14       Q.  And then it goes on to say, "Desire N.
15   Evans is a                              who
16   presents for psychiatric evaluation."  Do you see
17   where I am?
18       A.  Yes.

Page 113

1        A.  I wouldn't say most of my life, no.
2        Q.  But at any time prior to this had you felt
3    anxious/depressed?
4        A.  As I mentioned, normal anxious, but nothing
5    that I would need to seek help for, no.
6        Q.  So you think that these medical records are
7    inaccurate?
8            MR. CERYES:  Objection, form, foundation.
9        A.  Yes.
10       Q.  It goes on to say, "reports significant
11   anxiety described as excess worry that is difficult to
12   control, intermittent panic," it looks like that's
13   "sx's," which I think is a medical terminology, then
14   in parentheses it says, "SOB/palpitations/insolable
15   weeping."  Do you see that?
16       A.  Mm-hmm.
17       Q.  Is that yes?
18       A.  Yes.
19       Q.  And then it says, "cries seemingly out of
20   the blue for no reason."  Is that part that I just
21   read accurate?
22       A.  Yes.

JA3357



**Page 114**

1 attachment to her two-year-old son," quote, 'he keeps
2 me going,'" end quote. Do you see that?
3     A. Yes.
4     Q. Was that accurate?
5     A. I guess, yes.
6     Q. Then it goes on to say, "endorses depressed
7 mood, anhedonia," I think it's another medical term,
8 then "initial/middl███████████████ you see
10 that?
11     A. Yes.
12     Q. Aside from the medical word that I don't
13 know what it means -- but if you do you can tell me --
14 is that accurate?
15     A. Yes.
16     Q. And then it says, "also poor focus at times
17 because of anxiety/thoughts jumping around"; is that
18 correct?
19     A. Yes.
20     Q. And then it says, "works from home so she
21 can watch her son but he's growing more --
22 growing/more active and this is becoming more of a
23 challenge"; is that correct?
24     A. Correct.
25     Q. So this is from January 2018, and then it

**Page 115**

1 was only up until 11 weeks ago you started getting
2 more help outside of yourself and your husband for
3 watching your son during the day?
4     A. Correct.
5     Q. Then the next thing is it goes on to say,
6 "denies any specific stressors/changes. Does note not
7 feeling satisfied with where she is in life. 'I have
8 so many ideas,' end quote. Says she cannot focus or
9 pursue any of her goals ██████████████ Do you
10 see that?
11     A. Yes.
12     Q. Is that accurate?
13     A. Yes.
14     Q. And was that before you were doing your
15 coursework at Strayer University?
16     A. Yes.
17     Q. It goes on to say, "patient describes
18 herself as very private. ██████████████████
20 mother as well, but their response is to give her
21 space, and she often can be short/easily irritated,
22 which pushes them away"; is that correct?
23     A. Yes.
24     Q. And then it says, ██████████████"; is

**Page 116**

1 that correct?
2     A. Yes.
8     A. Correct.
9     Q. Then it goes on to say, "Past Psychiatric
10 History." Do you see where I am?
11     A. Yes.
12     Q. And it says, "Hx," which I think might be
13 history, "of symptoms on/off throughout adult life."
14 Do you see that?
15     A. Yes.
16     Q. And you think that's not correct?
17     A. No.
18     Q. What do you mean "no"?
19     A. Because it wasn't -- it wasn't that kind of
20 situation. My mom and -- my mom and dad -- ████████

**Page 117**

1     Q. When you say it was being forced on you,
2 what do you mean?
3     A. Like my -- people trying to make it seem
4 like I was a certain way. Like I have a stigma on me
5 that I have an attitude or that type of thing, where I
6 don't.
9     A. No.
10     Q. So when you said that they were trying to
11 put it on you -- tell me if I'm misstating things --
12 when you said they were trying to put it on you so
13 that you would talk to someone about it, what did you
14 mean about so that you would talk to someone about it?
20 go stay with my grandmom.
21     Q. And how old were you approximately when
22 this was happening?
23     A. I don't know. Sixteen maybe.

Case 2:23-cv-09562-DSF-E Document 83-17 Filed 12/12/... Page ... of ...



25   A. No.

25   take it?



Page 122

5    A.  Ebony Cross.

6    Q.  Dr. Cross?

Page 124

Page 125

Do you take Peyton to a pediatrician?

11    A.  No.  I took Peyton the last time -- I took

12   Peyton on -- in March for the first time since he was

13   six months, because I was thinking about putting him

14   in daycare and he needed shots.

16    A.  Yes.

17    Q.  So he was about two and a half years old

18   when you took him to the pediatrician; is that

19   correct?

20    A.  Yes.

21    Q.  Was he diagnosed with anything when you

22   took him to the pediatrician?

23    A.  No.

24    Q.  Does he have any developmental or

25   neurological delays?

Case 2:23-cv-01998 Document 22-5 Page 7147 Filed 12/21/22 Page 34 of 129
Case 2:23-1998562 Document 22-5 Page 7147 Filed 12/21/22 Page 34 of 22

Desire Evans



Page 126

1    A. No. I'm not a doctor, but --
2    Q. That you know of.
3    A. No, I don't think -- I think he's a normal
4 three-year-old, I guess.
5    Q. When you took him to the pediatrician about
6 six months ago, was he measuring on anticipated
7 schedule?
8    A. Yes.
9    Q. Did you take him to the pediatrician when
10 he was an infant?
11    A. Yes.
12    Q. And when you took him last six months ago,
13 how long had it been since you had taken him to the
14 pediatrician before that?
15    A. He was six months.
16    Q. When he was six months old?
17    A. Mm-hmm.
18    Q. Okay. Did you take him back to the same
19 pediatrician when he was two and a half?
20    A. Yes.
21    Q. In the document that I've handed you marked
22 as Exhibit 3, on the page ending 5743 -- so that was
23 the page we were just last looking at -- in the middle
24 there's a section that says ███████████ Do you
25 see that?

Page 127

1    A. Mm-hmm.
2    Q. And then there's a section that says █████
███ ███ Do you see where I am?
4    A. Yes.
5    Q. And it says, ████████████████████
█ █ Do you see that?
7    A. Yes.
8    Q. Is that referring to ██████
9    A. Yes.
██ ████████████████████████
██ ███
12    A. No.
13    MR. CERYES: I'm going to object and advise
14 you not to answer any questions ████████████
██ ███
16    A. Oh. Sorry.
17    MR. CERYES: Okay.
18    Q. Were you working at the time in January
19 2018 when you went to go see Dr. Smith --
20    A. Yes.
21    Q. -- for BlueCross BlueShield?
22    A. Yes.
██ █████████████████████████
25    MR. CERYES: Objection, form, foundation,

Page 128

1 and I'm going to advise you not to answer that
2 question.
3    Q. So you're going to accept your counsel's
4 instruction not to answer?
5    A. Yes.
6    Q. So we looked in these records from
7 Dr. Smith, and I could not find any mention of
8 Dr. Akoda. Did you mention your experience with
9 Dr. Akoda to Dr. Smith?
10    A. Yes.
11    Q. What did you tell her?
12    A. I just told her that I felt uncomfortable
13 and that I was touched in a way that I felt was
14 inappropriate and I didn't know how to deal with it.
15    Q. Did you tell her by whom?
16    A. No.
17    Q. Did you explain to her that it was during
18 your delivery of your son?
19    A. Mm-hmm, yes.
20    Q. Yes? You said you felt uncomfortable and
21 you believed you were touched inappropriately; is that
22 correct?
23    A. Yes.
24    Q. Did you say something else too? I may not
25 have gotten it down.

Page 129

1    A. No, that's what I said.
2    Q. Do you believe you told her the name
3 Dr. Akoda at that time?
4    A. No.
5    Q. Did you believe you told her that it was
6 your obstetrician/gynecologist at the time?
7    A. I told her during the delivery of my son.
8    Q. And did you mention it was a doctor?
9    A. Mm-hmm, yes.
10    Q. Is that yes? Thank you.
11    Within the same Exhibit 3, if you could turn
12 back to the page ending in 5741, which is just
13 flipping it back a page, there's a section that says
14 "Obstetric History." Do you see that?
15    A. Mm-hmm.
16    Q. Is that a yes?
17    A. Yes.
18    Q. And it says, "Obstetric History." "The
19 patient has not been asked about pregnancy." Do you
20 see that?
21    A. Mm-hmm, yes.
22    Q. And you believe that's incorrect; you did
23 talk about your labor and delivery at least?
24    MR. CERYES: Objection, form, foundation.
25    You can answer.

Page 130

1    A.  Yes.  She didn't ask.
2    Q.  She didn't ask?
3    A.  Right, she didn't ask, but I told her why I
4  was feeling the way that I was feeling.
5    Q.  Okay.  And you explained to her that it was
6  connected with your obstetric history?
7    A.  Yes.
8    Q.  Did she say anything in response to you
9  when you told her that you had felt uncomfortable or
10  you were touched inappropriately during your delivery
11  of Peyton?
12    A.  Just about how I felt about it and how I
13  felt it was affecting me, and I just told her that I
14  didn't want to be touched.  And I also explained
15  how -- to her how it was affecting my relationship
16  with my husband.
17    Q.  What did you tell her in January of 2018
18  about how your experience during your delivery of
19  Peyton has affected your relationship with your
20  husband?
21    A.  Because I don't want anybody to touch me,
22  and we wanted to have another baby, so that was not an
23  option anymore.
24    Q.  Is that still the case?
25    A.  Yes.

Page 131

1    Q.  When's the last time you engaged in sexual
2  relations with your husband?
3    A.  Eight months ago.
4    Q.  From now?
5    A.  Yeah.
6    Q.  Eight months ago prior?  Are you still
7  trying to have a baby?
8    A.  No.
9    Q.  Did you want to have a baby in January of
10  2018 when you met with Dr. Smith?
11    A.  Well, we wanted to -- after I had my son,
12  that was -- I no longer wanted to have another baby.
13    Q.  So if I can say it back to you, and you can
14  tell me if I said it the right way.
15    So is it fair to say that, prior to having
16  Peyton, you had intended to have more than one child,
17  but after having delivered him you only wanted to stay
18  with having one child?
19    A.  Correct.
20    Q.  And we've made some vague references to
21  it -- and I know this may not be the easiest thing to
22  talk about -- but for the record and just so that I
23  fully understand, can you please describe to me the
24  experience with Dr. Akoda that you're talking about
25  with him touching you during your delivery?

Page 132

1    A.  He was -- he was, like, fondling my
2  clitoris, saying that he needed to do that in order to
3  stimulate me to push the baby.
4    Q.  And he verbalized that to you?
5    A.  Yeah, because my husband asked him what was
6  he doing.
7    Q.  And were your husband and mother and the
8  delivery nurses in the room at the same time this was
9  occurring?
10    A.  Yes.  I don't -- I don't remember if the
11  delivery nurse was in there, but my husband for sure
12  and my mother for sure.
13    Q.  Was this during the time that your husband
14  was standing next to Dr. Akoda?
15    A.  Yes.
16    Q.  And so was the delivery nurse holding one
17  of your legs at that time?
18    MR. CERYES:  Objection, foundation.
19    Q.  Well, we talked about it earlier.  I can
20  restate the question.
21    A.  Yes.  Yes.
22    Q.  So during the time your husband was
23  standing --
24    A.  I'm not -- see, I'm not one hundred percent
25  sure because there was a point where they were holding

Page 133

1  my legs and there was a point where we were just
2  laying there, he was trying to get me to relax and to
3  push.  So I don't really know if the nurse was in
4  there at that particular moment.
5    Q.  Okay.  And was it one moment when this
6  happened with Dr. Akoda?
7    A.  I mean, he -- no.  He did it several times,
8  but it was only spoken of one time because he made it
9  seem like that was the normal.
10    Q.  Did your husband ask him about it the first
11  time that it happened?
12    A.  Mm-hmm.
13    Q.  Is that a yes?
14    A.  Yes.
15    MR. CERYES:  Let us know if you need to
16  take a break at any time.
17    A.  I'm all right.
18    MR. CERYES:  Okay.  I'll get some tissues.
19    MS. MCENROE:  Do we have a box?
20    A.  Thank you.
21    Q.  When Dr. Akoda was stimulating your
22  clitoris, how long did each instance of that last, do
23  you know?
24    A.  I don't know.  A few seconds maybe.
25    Q.  And do you have an estimation of how many

| Page 134 |
|---|

1  times that happened?
2     A.  Several.
3     Q.  Were you ever alone with Dr. Akoda in the
4  room?
5     A.  No.
6     Q.  Other than taking Pitocin -- which was used
7  to start your induction, correct?
8     A.  Yes.
9     Q.  -- and the experience we were just talking
10  about with Dr. Akoda, did your medical professional
11  team try any other ways to help speed along your
12  delivery?
13     A.  No.
14     Q.  Did they feed you spicy food?  I don't
15  know.  Just anything you can remember.
16     A.  No, no.
17     Q.  Okay.  Do you know if they continued
18  treating you with Pitocin as you were pushing?
19     A.  I don't remember.
20     Q.  If you remember.
21     A.  I don't remember.
22     Q.  Is your mother married?
23     A.  No.
24     Q.  Does she have a boyfriend?
25     A.  Yes.

| Page 135 |
|---|

1     Q.  Has she had that boyfriend for a while?
2     A.  Yes.
3     Q.  For about how long?
4     A.  Over ten years.
5     Q.  Do you guys get along, you and your
6  mother's boyfriend?
7     A.  He's okay.
8     Q.  Directing you back to the exhibit we were
9  just looking at, which I think was Exhibit 3, take a
10  look at the page ending in 50.  It's a little further
11  along in the document.  Let me know when you get
12  there.  And they are double-sided again.
13     A.  Okay.
14     Q.  Are you there?
15     A.  Mm-hmm.  Yes.
16     Q.  And this in the middle of the page says,
17  "Telephone Contact Summary."  Do you see that?
18     A.  Yes.
19     Q.  And it's from February 6th, 2018.  Do you
20  see that?
21     A.  Yes.
22     Q.  Do you believe you spoke with Dr. Smith in
23  or around February 6th, 2018 by telephone?
24     A.  Yes, I guess.  I mean, if she says so, I
25  guess.  I don't remember.

| Page 136 |
|---|

1     Q.  Do you have any reason to think you didn't?
2     A.  No.
3     Q.  And there's -- it then says "encounter
4  documentation."  Do you see that?  Right above --
5     A.  Yes.
6     Q.  -- where it says scheduled telephone --
7  "medication management visit."  Do you see that?
8     A.  Yes.
9     Q.  And it says, "patient called for scheduled
10  follow-up, symptoms assessment and medication review."
11  Does that refresh your recollection of having spoken
12  to Dr. Smith?
13     A.  Yes.
14     Q.  "Chart and history reviewed,
15    [REDACTED]
16
17
18
19
20
21
22
23
24
25     A.  Yes.

| Page 137 |
|---|

1    [REDACTED]
2     A.  Yes.
3     Q.  Because of those -- the side effects?
4     A.  Yes.
5     Q.  It goes on to say:
6    [REDACTED]
15    Do you see that?
16     A.  Yes.
17     Q.  Is that all accurate?
18     A.  Yes.
19     Q.  Is the home that you were buying at that
20  time the home you now live in?
21     A.  Yes.
22     Q.  At the time you delivered Peyton were you
23  dissatisfied with Dr. Akoda's care?
24     A.  Yes.
25     Q.  Tell me about that.

JA3363

Page 138

1   A. I felt like he was inappropriately touching
2  me, which made me uncomfortable for the rest of my
3  stay there.
4   Q. Did you tell anybody about that?
5   A. Outside of the people in the room, no.
6   Q. When you say outside the people in the
7  room, did you tell anybody about that who was in the
8  room?
9   A. No. Well, my husband was there, and I told
10 my mom. And she really didn't know, like, she wasn't
11 fully aware of what was going on until we explained it
12 to her.
13   Q. Okay. Even though she had been present in
14 the room?
15   A. Mm-hmm.
16   Q. That's a yes?
17   A. Yes.
18   Q. And did your husband, do you know, if he
19 said anything to anybody about Dr. Akoda's conduct
20 that you've described while you were at the hospital?
21   A. No, not that I'm aware of.
22   Q. Have you ever spoken to an ob/gyn about the
23 treatment you got from Dr. Akoda?
24   A. No.
25   Q. Have you ever talked to any psychiatrist or

Page 139

1  psychologist about the details of treatment from
2  Dr. Akoda?
3   A. Yes.
4   Q. Have you ever gotten a medical opinion from
5  any of them on the medical treatment from Dr. Akoda?
6   A. No.
7   MS. MCENROE: So it's about 1:00. It might
8  be a good time to take a lunch break.
9   VIDEO SPECIALIST: We're going off the
10 record at 1:04.
11   (Proceedings recessed)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1   AFTERNOON SESSION
2   VIDEO SPECIALIST: We're back on the record
3  at 1:44.
4   EXAMINATION (resumed)
5  BY MS. MCENROE:
6   Q. Good afternoon, Ms. Evans.
7   A. Good afternoon.
8   Q. You understand you're still under oath?
9   A. Yes.
10   Q. And you need to still tell the truth?
11   A. Yes.
12   Q. What did you do, if anything, to prepare
13 for today's deposition?
14   A. Nothing.
15   Q. Did you meet with counsel?
16   A. Oh, we had a phone call just about dates
17 and times.
18   MR. CERYES: Don't discuss any information
19 about what we discussed, but I'll let you share that.
20   A. No, we just talked about what time to be
21 there and that time of situation.
22   Q. And when did you speak with counsel about
23 the deposition?
24   A. Yesterday.
25   Q. For how long?

Page 141

1   A. Fifteen, 20 minutes.
2   Q. Is yesterday the first you had learned that
3  you were going to be deposed in this case?
4   A. No.
5   MR. CERYES: I'm going to object. I think
6  we're getting into attorney-client privileged
7  material.
8   MS. MCENROE: Sure. That's not my
9  intention. So let me just restate it this way.
10   Q. Prior to your short phone call yesterday,
11 had you previously prepared for today's deposition by
12 speaking with counsel?
13   A. No. I just received the phone call that I
14 would be getting a phone call yesterday about the
15 deposition today.
16   Q. Okay. Did you do anything to prepare for
17 your deposition in the Dimensions matter?
18   A. No.
19   Q. Did you review any documents in preparation
20 for today?
21   A. No, nothing that I already didn't have.
22   Q. And what do you already have about this
23 case?
24   A. Nothing particular to this case, but I
25 reviewed my previous deposition.

JA3364

Page 142

1    Q. So you have a copy of that deposition
2  transcript?
3    A. Yes.
4    Q. And you reviewed that deposition transcript
5  before your deposition today?
6    A. Mm-hmm.
7    Q. Is that a yes?
8    A. Yes, ma'am. Sorry.
9    Q. Do you have a copy of the complaint in this
10  case?
11    A. I don't have my own copy, no.
12    Q. Have you reviewed it recently?
13    A. Yes.
14    Q. Do you remember when you most recently saw
15  the complaint in this case?
16    A. No.
17    MR. CERYES: Object. Again, I think we're
18  getting into attorney-client material. I'm not sure
19  any of this is relevant or discoverable.
20    MS. MCENROE: Well, it's publicly available
21  information. The complaint can be found online.
22    MR. CERYES: Sure.
23    MS. MCENROE: I'm just --
24    Q. I'm not trying to ask what your counsel
25  told you, but you don't personally have a copy of the

Page 143

1  complaint in this case?
2    A. No.
3    Q. Did you read and verify it before it was
4  filed?
5    A. Read and verify?
6    Q. Yeah.
7    A. I believe it was shown to me, yeah, before.
8    Q. Did you review it before it was filed?
9    A. Yes.
10    (Clarification by reporter.)
11    Q. We discussed earlier today that you met
12  your counsel as a result of a radio ad that you heard;
13  is that correct?
14    A. Yes.
15    Q. And first your husband heard the radio ad
16  and then you heard the radio ad; is that accurate?
17    A. Yes.
18    Q. Thereafter, how did you make contact with
19  counsel?
20    A. I called him.
21    Q. On the telephone?
22    A. Yes, ma'am.
23    Q. Did you meet anybody in person?
24    MS. MCENROE: That's not privileged.
25    MR. CERYES: I think it is. I think we've

Page 144

1  gotten to the point where she has retained counsel,
2  and in terms of any other communication she has had
3  with her firm, that was for purposes of being
4  represented in this matter.
5    MS. MCENROE: Right.
6    MR. CERYES: So the details, the times and
7  the dates --
8    MS. MCENROE: -- is not privileged. It's
9  all information that should be on a privilege log or
10  could be put on a privilege log, if you were doing
11  that.
12    So I didn't ask her what you talked about or
13  what you told her. I'm just asking if she met with
14  anybody in person after she spoke to them on the
15  telephone.
16    MR. CERYES: I'll let you answer that
17  question.
18    A. Yes.
19    Q. Do you remember when that was?
20    A. I do not.
21    Q. Until you first communicated with
22  counsel -- strike that.
23    Do you have any understanding of whether or not
24  Dr. Akoda has pleaded guilty to any crimes in a court
25  of law?

Page 145

1    A. Yes.
2    Q. Could you tell me about that?
3    A. I saw on the Internet that he got six
4  months in jail.
5    Q. Do you know for what?
6    A. No. I'm not exactly sure what he was
7  charged with.
8    Q. So have you read the indictment?
9    A. No, I haven't read it.
10    Q. Have you read his guilty plea?
11    A. No.
12    Q. Do you have any understanding of whether or
13  not he was found to have committed Social Security
14  fraud?
15    A. No, I do not.
16    Q. Do you have any understanding of whether or
17  not his criminal conviction had anything to do with
18  practicing medicine without a license?
19    A. I do not.
20    Q. You don't know one way or the other?
21    A. No.
22    Q. Did you ever look into that?
23    A. Briefly. I just saw that he got six months
24  in jail, but I don't know anything -- anything in
25  depth about it.

Page 146

1    Q.  Did you read an article about him getting
2  six months in jail?
3    A.  I saw it on the news and then I looked it
4  up.
5    Q.  You saw it on the news on the television?
6    A.  Yes.
7    Q.  And when you say you saw it on the news, do
8  you recall what news station you were watching?
9    A.  No, just local news.
10    Q.  Do you watch a particular station?
11    A.  Fox, I guess.
12    Q.  And you don't believe that they mentioned
13  what he actually went to jail for?
14    A.  If they do -- if they did, I don't recall.
15  I just remember the timing, six months.  That's what
16  stuck out to me.
17    Q.  The six months?
18    A.  Yep.
19    Q.  But not what it was that he was -- actually
20  pleaded guilty to.
21    A.  Right.  I know it wasn't what he did to me.
22    Q.  What do you mean by that?
23    A.  I wasn't -- for how I felt that I was
24  treated, I know that he wasn't in jail for that, so
25  that was my concern.

Page 147

1    Q.  Did you ever pursue trying to have criminal
2  charges brought up against him for what he did to you?
3    A.  No.  I -- no.
4    Q.  Did you ever pursue a medical malpractice
5  suit against Dr. Akoda?
6    A.  No.
7    Q.  Did you ever pursue litigation or a lawsuit
8  against Dr. Akoda himself?
9    A.  No.
10    Q.  Sitting here today, do you know where
11  Dr. Akoda went to medical school?
12    A.  No.
13    Q.  Sitting here today, do you know whether
14  Dr. Akoda went to medical school?
15    A.  No.
16    Q.  Sitting here today -- strike that.
17    Until you had heard or -- strike that.
18    Comparing the timing between when you heard the
19  radio ad and when you saw on the news that Dr. Akoda
20  had gone to jail, which happened first?
21    A.  The radio ad.
22    Q.  To make sure I'm understanding, so you
23  first contacted counsel in connection with the lawsuit
24  against Dimensions and then eventually ECFMG before
25  you heard about Dr. Akoda having pleaded guilty and

Page 148

1  serving six months in jail; is that correct?
2    A.  Correct.
3    Q.  Do you know how long it was in between
4  those two things?
5    A.  No.
6    Q.  Were they close in time?
7    A.  I mean, everything happened pretty fast, so
8  I would say so.  I would say -- I would say within two
9  months or so.
10    Q.  Until you had heard the radio ad for the
11  law firm, had you had any suspicion that Dr. Akoda did
12  not go to medical school?
13    A.  No.
14    Q.  And until you had heard the radio ad, did
15  you have any reason to believe that Dr. Akoda was not
16  a licensed physician?
17    A.  No.
18       (Exhibit 4 marked for
19       identification: Civil Action re
20       Russell, et al. v. ECFMG)
21    MS. MCENROE:  Do you want a copy for Paul
22  also?
23    MR. CERYES:  No, that's okay.
24    Q.  Ms. Evans, I'm handing you what has been
25  marked as Exhibit 4.  Do you recognize this document?

Page 149

1  You can take a minute and look at it.
2    A.  Yes.
3    Q.  What is it?
4    A.  The complaint.
5    Q.  So this is the complaint in the lawsuit
6  that you and some others have filed against the
7  Educational Commission for Foreign Medical Graduates,
8  correct?
9    A.  Yes.
10    Q.  And just so the record is clear, this is
11  the Philadelphia Court of Common Pleas complaint that
12  has since been removed to federal court.
13    And, Ms. Evans, you testified that you saw this
14  before it was filed, correct?
15    A.  Yes.
16    Q.  And I'd like to direct your attention
17  within that document -- it might be easier to find it
18  from the back.  Actually it may be the very last page.
19    If you flip all the way to the very last page,
20  the back of the documents, I think it's the page after
21  that one you're looking at.  Is that your signature?
22    A.  Yes.
23    Q.  Okay.  And at the top of it, it says
24  "Verification."  Do you see that?
25    A.  Yes.

JA3366

Page 150

1   Q.  And it says, "I verify that the statements
2  made in this complaint are true and correct to the
3  best of my knowledge and belief."  Do you see that?
4      A.  Yes.
5      Q.  "I understand that false statements herein
6  are made subject to the penalties of 18 Pa. C.S.
7  Section 4904 relating to unsworn falsification to
8  authorities."  Do you see that?
9      A.  Yes.
10     Q.  It's dated November 9th, 2018, and that's
11  your signature, correct?
12     A.  Yes.
13     Q.  So earlier I had asked if you had reviewed
14  and verified the complaint.  Does this refresh your
15  recollection that you did verify the complaint?
16     A.  Yes.
17     Q.  Is it still your belief today that the
18  information about which you have knowledge and belief
19  that's contained in the complaint is true and
20  accurate?
21     A.  Yes.
22     Q.  Are there things contained in the complaint
23  as you recall it that you did not have knowledge or
24  belief about?
25     A.  No.

Page 151

1      Q.  So the information in here is all stuff you
2  knew to be true yourself?
3         MR. CERYES:  Objection, form, foundation.
4      A.  From what I read through, yes.  I didn't
5  find anything that I didn't agree with.
6      Q.  I see.  So is it fair, just to make sure I
7  understand, to say that you had no reason to disagree
8  with any of the information in here?
9      A.  Correct.
10     Q.  But is it also fair to say that there are
11  some things in here about which you did not have
12  personal independent knowledge?
13     A.  Correct.
14     Q.  Okay.  Sitting here today, do you know of
15  anything contained in the complaint that you now
16  believe to be false or inaccurate?
17     A.  No.
18     Q.  I'd like to direct your attention, you'll
19  see within the document there are paragraph numbers,
20  so if you keep flipping until the meat of the
21  complaint gets started, there are paragraph numbers.
22  Could you please flip to paragraph 43?
23     That paragraph reads -- are you there?  I'll
24  give you a second.
25     A.  One second.

Page 152

1      Q.  It's on page 9.
2      A.  Okay.
3      Q.  That paragraph reads:
4         "The Plaintiff Desire Evans was a
5         patient of Igberase on or about March
6         17th, 2016.  Igberase delivered her
7         child on that date at Prince George's
8         Hospital Center."
9      Do you see that?
10     A.  Yes.
11     Q.  And Ms. Desire Evans, that's referring to
12  you; is that correct?
13     A.  Yes.
14     Q.  And do you understand that Dr. Igberase is
15  another way to refer to Dr. Akoda as used in this
16  complaint?
17     A.  Yes.
18     Q.  So is that correct as written in paragraph
19  43?
20     A.  Yes.
21     Q.  All right.  So I want to direct you --
22  sorry.  We're going to hop around in this document a
23  little bit.
24     I want to direct you all the way back to the
25  beginning of the complaint, so it will be page 2 at

Page 153

1  the bottom.  And you'll see there's a heading that
2  says "Class Action Civil Complaint."  Do you see that?
3      A.  Yes.
4      Q.  And there are a number of plaintiffs
5  listed, including Desire Evans.  Do you see that?
6      A.  Yes.
7      Q.  And then it says, "on their own behalf and
8  on behalf of all others similarly situated through
9  their undersigned attorneys."  Do you see that?
10     A.  Yes.
11     Q.  Do you have an understanding of what that
12  means, the on their own behalf and on behalf of all
13  others similarly situated?
14     A.  Yes.
15     Q.  What does that mean?
16     A.  Not only am I speaking for myself but
17  everyone who was affected.
18     Q.  And when you say "everyone who was
19  affected," what do you mean?
20     A.  Everyone who was affected by Dr. Akoda
21  Igberase, whatever -- everyone that was affected by
22  his actions.
23     Q.  When you say "affected by his actions,"
24  what do you mean?
25     A.  Everyone that -- everyone that he treated,

JA3367

Page 154

1 everyone who saw him, everyone who -- all of his
2 patients.
3     Q. Do you think that all of his patients had
4 the same experience you did?
5     A. I don't know.
6     Q. Have you ever spoken to any of Dr. Akoda or
7 Dr. Igberase's other patients?
8     A. No.
9     Q. Have you ever met another person who has
10 been treated or had seen Dr. Akoda?
11     A. No.
12     Q. And I'm going to use the name Dr. Akoda,
13 but you understand that's also to include
14 Dr. Igberase, as we've been discussing?
15     A. Mm-hmm, yes.
16     Q. I'd like to direct you back to paragraph
17 44. So that's on the top of page 10 of the complaint.
18 Do you see where I am?
19     A. Yes.
20     Q. It reads:
21        "The Plaintiffs and others similarly
22        situated chose Igberase, who they
23        knew as Akoda, as their
24        obstetrician/gynecologist, on the
25        basis of their belief that Akoda had

Page 155

1        obtained all necessary credentials
2        and certifications required of
3        physicians practicing in the
4        United States, including
5        certification from ECFMG."
6 Do you see that?
7     A. Yes.
8     Q. Is that true of yourself?
9     A. No.
10     Q. What do you mean by that?
11     A. I didn't choose Dr. Akoda.
12     Q. Did you have any knowledge about his
13 credentials when he came to start treating you?
14     A. No.
15     MR. CERYES: Objection, form, foundation.
16     Q. Did you have any knowledge about his
17 certifications when he came to treat you?
18     A. No.
19     Q. I'd like to direct you to paragraph 45, so
20 I'm just going to keep reading, if you're on the same
21 page.
22     It says, "None of Igberase's patients,
23 including those at Howard University Hospital, Prince
24 George's Hospital Center, and the medical practice of
25 Abdul G. Chaudry, M.D., knew Igberase's true identity

Page 156

1 but rather knew him as Akoda." Do you see that?
2     A. Yes.
3     Q. Is it true that you knew Dr. Igberase as
4 Dr. Akoda?
5     A. Correct.
6     Q. Do you know if anybody else knew of
7 Dr. Akoda actually being Dr. Igberase when they were
8 treated by him?
9     MR. CERYES: Objection, form, foundation.
10     A. I'm not aware.
11     MS. MCENROE: Well, it says none of the
12 patients knew and she's a plaintiff in this case.
13     MR. CERYES: But you said anyone, not just
14 patients, which would refer potentially to ECFMG
15 personnel.
16     Q. Sure. So let me -- let me restate that.
17 Do you know if any of Dr. Igberase's patients
18 knew he was Dr. Igberase when he was using the name
19 Dr. Akoda?
20     A. I'm not -- I've never spoken to anyone
21 else.
22     Q. Do you know about any consents that
23 Dr. Igberase or Dr. Akoda's patients provided to him
24 in connection with their treatment?
25     A. No.

Page 157

1     Q. I'd like to direct you to paragraph 47.
2 It's still on page 10. It starts:
3        "On many occasions, Igberase
4        penetrated his patients with parts of
5        his body through the vaginal canal
6        and through the stomach in performing
7        medical services. Additionally,
8        Igberase performed inappropriate
9        examinations of a sexual nature while
10        utilizing inappropriate and explicit
11        sexual language.
12        Igberase's penetrations of his
13        patients were clear boundary
14        violations."
15 Do you see that?
16     A. Yes.
17     Q. So I have a couple questions. I just want
18 to clarify. It says with parts of his body that he
19 penetrated his patients. Did Dr. Akoda penetrate you
20 with anything other than his hands or his fingers?
21     A. No.
22     Q. He didn't ever penetrate you with his
23 penis?
24     A. No.
25     Q. And when it says that he penetrated you

Case 2:23-cv-01956-MSG Document 22-5 Filed 11/14/24 Page 71 of 129
Case 2:23-cv-01956-MSG Document 22-5 Filed 04/08/2024 Page 1479 of 3041
Desire Evans

Page 158

1  through the stomach, was that in connection with
2  performing a C-section?
3      A.  Yes.
4      Q.  Did Dr. Igberase use explicit sexual
5  language with you?
6      A.  I felt the language was inappropriate,
7  calling me "Baby" and "Mama" and stuff like that.
8      Q.  So besides calling you "Baby" and "Mama,"
9  was there any other inappropriate language that
10  Dr. Akoda used with you?
11      A.  No.
12      Q.  I'm sorry.  I didn't hear you.
13      A.  No.  I'm sorry.
14      Q.  Thank you.  The last sentence in that
15  paragraph says, "Igberase's penetrations of his
16  patients were clear boundary violations."  Do you see
17  that?
18      A.  Yes.
19      Q.  Did the words "clear boundary violations"
20  come from you?  Are those words you used?
21      A.  I didn't say them.
22      Q.  Do you know what's meant here by "clear
23  boundary violations"?
24      A.  Yeah.
25      Q.  What?

Page 159

1      A.  Touching, touching someone and talking to
2  them in the way that he did is not -- is a boundary
3  violation between patient and provider, so 100
4  percent.
5      Q.  Are you characterizing your C-section as a
6  boundary violation?
7      A.  I'm characterizing the way that he touched
8  me prior to my C-section being a boundary violation.
9      Q.  And when you say that, are you specifically
10  referring to the clitoral stimulation?
11      A.  Yes.
12      Q.  To any other part of his treatment?
13      MR. CERYES:  Objection, foundation.
14      You can answer.
15      A.  No.
16      Q.  Moving on to paragraph 48, still on page
17  10, you'll see there's a heading that says "Class
18  Action Allegations P.a. Rule 1702."  Do you see where
19  that is?
20      A.  Yes.
21      Q.  Paragraph 48 says, "Named Plaintiffs bring
22  this action on behalf of a class which consists of."
23  Do you see where I am?
24      A.  Yes.
25      Q.  And then it says, "All patients examined

Page 160

1  and/or treated in any manner by Oluwafemi Charles
2  Igberase," and then in parentheses it says "(a/k/a
3  Charles J. Akoda M.D.)."  Do you see that?
4      A.  Yes.
5      Q.  And we already talked about that you have
6  not met any other person who is defined in that class;
7  is that correct?
8      A.  Correct.
9      Q.  Have you ever spoken or corresponded with
10  anybody else that is defined in that class that you
11  know of?
12      A.  No.
13      Q.  Have you ever met with, in person or on a
14  videoconference or by telephone, anybody else who is
15  defined in that class that you know of?
16      A.  No.
17      MR. CERYES:  Objection, asked and answered.
18      Q.  Moving along to page 11, paragraph 54 says,
19  "Named Plaintiffs will fairly and adequately assert
20  and protect the interests of the Class under the
21  criteria set forth in Rule 1709.  The interests of
22  named Plaintiffs and of all other members of the Class
23  are identical."  Do you see that?
24      A.  Yes.
25      Q.  Do you know if your interests and those of

Page 161

1  everybody else who has been treated by Dr. Akoda are
2  identical?
3      MR. CERYES:  Objection, form, foundation.
4      A.  I don't know.
5      Q.  Do you know if any of Dr. Akoda's patients
6  were satisfied with his treatment?
7      A.  I don't know.
8      Q.  Do you think it's possible?
9      MR. CERYES:  Objection, form, foundation.
10      A.  I don't know.
11      MR. CERYES:  Calls for speculation.
12      Q.  In paragraph 55 it says, "Named Plaintiffs
13  are cognizant of their duties and responsibilities to
14  the Class."  Do you see that?
15      A.  Yes, ma'am.
16      Q.  Earlier today I think I asked you if you
17  knew what your responsibilities were as a Named
18  Plaintiff.  Do you remember that?
19      A.  Yes, ma'am.
20      Q.  What are those responsibilities?
21      A.  Just to give my account to the best of my
22  knowledge and to represent everyone else that feels
23  the same.
24      Q.  Did you also provide any input for
25  discovery responses in this case?

JA3369

Page 162

1    A. Did I do what?
2    Q. Provide input for any discovery responses
3  in this case.
4    A. I don't understand that question.
5       MR. CERYES: Objection to form.
6    Q. Have you ever heard the word
7  "interrogatories"?
8    A. Yes. Oh, yes.
9    Q. Did you provide any input to support the
10 drafting of responses to interrogatories in this case?
11   A. Yes.
12   Q. Having done that and having given input on
13 the complaint, which I think we talked about earlier
14 today, have you done anything else in furtherance of
15 your role as a named plaintiff in this lawsuit?
16   A. No.
17   Q. Aside from showing up today?
18   A. Right. No, besides this kind of stuff
19 here.
20   Q. So I'd like to move to paragraph 65 at the
21 bottom of page 12. It says:
22       "The likelihood that individual
23       members of the Class will prosecute
24       separate actions is remote. Also,
25       because most Class members do not

Page 163

1       know that a claim against ECFMG
2       exists."
3    Did I read that correctly?
4    A. Yes.
5    Q. We talked earlier about the allegations in
6  this lawsuit being about alleged boundary violations
7  by Dr. Akoda; is that correct?
8    A. Yes.
9    Q. Is it your belief that members of the Class
10 don't know that their boundaries were violated by
11 Dr. Akoda?
12      MR. CERYES: Objection, form, foundation.
13 You can answer.
14   A. No, I can't say that. I wouldn't imagine
15 them joining a class if they didn't feel like their
16 boundaries were violated.
17   Q. Do you know if every single one of
18 Dr. Akoda's patients feels as if they had their
19 boundaries violated?
20   A. I do not know that.
21   Q. What are you hoping to get out of this
22 lawsuit?
23      MR. CERYES: Objection.
24   A. What I'm hoping is for someone to take
25 responsibility or maybe even do their job a little bit

Page 164

1  more diligently next time. Because this situation
2  affected not only me but a lot of other people. And I
3  believe that, if it was done correctly, that none of
4  us would be going through this.
5       So I just want whoever this person is to pay
6  for what he's done, and I want -- I want the facility
7  that is supposed to make sure these people are who
8  they are, I want them to make sure that they are doing
9  that.
10   Q. When you refer to a male, "he," in your
11 last answer, were you referring to saying about
12 Dr. Akoda?
13   A. Correct.
14   Q. Are you specifically seeking money from
15 ECFMG in this lawsuit?
16   A. I'm not seeking --
17      MR. CERYES: Objection, form, foundation.
18 The complaint says what we're seeking on behalf of
19 Ms. Evans and the Class.
20      MS. MCENROE: I'm allowed to ask the
21 witness about the damages she is seeking, if any.
22   A. Yes. Yeah, because I missed work. I've
23 had doctors' appointments. I've had a lot of things
24 that I was affected by.
25   Q. Have you done any calculation of how much

Page 165

1  money that is?
2    A. No.
3    Q. Have you collected up any invoices or bills
4  from any of those experiences to be able to help
5  catalog what that might be?
6    A. I haven't collected them, but they're
7  readily available, if I needed anything.
8    Q. So what injury, if any, did you experience
9  as a result of ECFMG's conduct?
10      MR. CERYES: Objection, form, foundation,
11 calls for somewhat of a legal conclusion, but you can
12 answer.
13   A. Okay. I feel that, because of them, I'm
14 afraid to seek a doctor. I don't know who to trust.
15 I don't know who to send my son to. Because if the
16 places that are supposed to be doing these
17 credentialing, if I can't trust what they're telling
18 me, I don't really know how to do my own investigation
19 to find out if a doctor is really a doctor or who they
20 say they are. So it has diminished my trust in the
21 medical profession.
22   Q. Do you have a belief that Dr. Akoda is not
23 a doctor?
24      MR. CERYES: Objection.
25   A. Yes.

Page 166

1    Q. From where did you get that belief?
2    A. Well, from the fact that he's using two
3 different names, we really don't even know who he is,
4 so I don't know -- I can't say what he's done.
5    Q. Right. But you used a different name
6 before you got married, right?
7    A. That's different. My name is going to
8 change as a woman. Unless his name is hyphenated, I
9 can't really see that is the same.
10    Q. Do you think there are no scenarios in
11 which someone could use a different name and still be
12 a physician?
13    MR. CERYES: Objection, form, foundation.
14    A. Use a different name along with a different
15 Social? No.
16    Q. Do you know if any of the other physicians
17 who have ever treated you have you ever had
18 convictions for any crimes?
19    A. No, I do not.
20    Q. Do you know if any of them have ever been
21 convicted for tax fraud?
22    A. No, I do not.
23    Q. Do you know if any of them have ever been
24 convicted for not paying their housekeeper or their
25 nanny aboveboard?

Page 167

1    A. No, ma'am.
2    Q. Do you know if any of them have ever smoked
3 pot?
4    A. No. No, ma'am.
5    Q. Do you believe that doing any of those
6 things would make them any less of a doctor than they
7 were when they treated you?
8    MR. CERYES: Objection, form.
9    A. I don't think -- I don't think one has
10 anything to do with the other, but no.
11    Q. So Social Security fraud would have nothing
12 to do with whether someone was actually a doctor.
13    A. Using someone else's Social Security
14 number? Absolutely. Because you don't know who that
15 person is. You have no idea who you're dealing with.
16 You're born with one Social Security number. That
17 doesn't never change.
18    Q. Do you know the process for a foreign-born
19 individual to obtain a Social Security number in the
20 United States?
21    A. No, but I do believe, once you get it, it
22 doesn't change.
23    Q. Do you -- so you draw a line between a
24 doctor committing tax fraud and a doctor committing
25 Social Security fraud?

Page 168

1    A. Yes.
2    Q. Do you draw -- where do you draw the line
3 compared to insurance fraud? Is that okay for a
4 doctor or not okay for a doctor?
5    A. No, I mean, nothing is okay. However, when
6 you're dealing with other -- when you're dealing with
7 people's lives and you're treating people, you should
8 be who you say you are.
9    So him having tax fraud has nothing to do with
10 him faking his identity and telling me that he's
11 somebody that he's not. It's not the same.
12    So he should pay for whatever crime he commits,
13 absolutely, but lying about your identity to become a
14 doctor or whatever he did is a totally different
15 situation.
16    Q. Is that something you believe or something
17 someone told you?
18    A. That's what I believe.
19    Q. And you think it's okay to be treated by a
20 doctor who smoked pot?
21    MR. CERYES: Objection, form, foundation,
22 relevance.
23    MS. MCENROE: Well, it's a violation of law
24 and I'm allowed to explore. This is squarely at issue
25 for the claims she has brought in this case.

Page 169

1    A. Depends on which state they live in because
2 smoking pot is not illegal everywhere.
3    Q. Is smoking pot legal in Maryland?
4    A. No, but it's legal in D.C.
5    Q. So it's not that you have an issue with
6 your doctor breaking the law necessarily; it's that
7 you have an issue specifically with Social Security
8 fraud.
9    MR. CERYES: Objection to form.
10    A. I have -- I have an issue with not knowing
11 who was treating me, yes.
12    Q. But it's not an issue of whether the doctor
13 has the skills to treat you; it's about whether the
14 doctor is who they say they are when they're treating
15 you. Is that right?
16    MR. CERYES: Objection to form.
17    A. I wouldn't know if they really had the
18 skills if they're not using their correct identity.
19    Q. So if a doctor cuts open your abdomen,
20 completes a C-section, and mommy and baby both come
21 out healthy, you doubt that that person is a doctor?
22    MR. CERYES: Objection, form.
23    A. Yeah.
24    Q. And if someone completed a residency
25 program, which is part of medical graduate education,

Page 170

1 you still doubt that that person's a doctor?
2     MR. CERYES: Objection, form, foundation.
3     A. Yes.
4     Q. And if a person completed all the
5 substantive examinations required to become a
6 physician in the United States, do you still doubt
7 that that person is a doctor?
8     MR. CERYES: Objection to form, foundation.
9     A. Yes, when you're using a different
10 identity, who is to say it was the same person every
11 time that they went to take the certification?
12 Because obviously the facility is not checking to make
13 sure this is the same person or to see if this person
14 has been there before.
15     So I don't know if that was the same person
16 that took all of those residencies or that went
17 through those programs. I have no idea.
18     Q. So you are doubting that Dr. Akoda who
19 completed the residency is not who actually delivered
20 your baby?
21     A. That's not what I'm saying. What I'm
22 saying is, is that he could have gotten -- there's a
23 lot of people who know how to deliver babies who
24 didn't go through medical training, like it happens
25 all the time. People give birth in the back of taxi

Page 171

1 cabs. It happens all the time. It's something that
2 people can do.
3     So he could have had some kind of other
4 training, I'm not sure, but I don't know who he is and
5 I don't know what school he went to. I don't know
6 anything about that because he chose to use a
7 different identity.
8     Q. Did you ask any of those questions before
9 he delivered your baby?
10     A. I didn't know I had to.
11     Q. Did -- have you ever heard of a taxi driver
12 delivering a baby by C-section?
13     A. No.
14     Q. Have you ever heard of a taxi driver
15 completing a residency program who is not a physician?
16     A. Nope.
17     Q. What do the words "excruciating emotional
18 anguish" mean to you?
19     A. How I feel when I have to talk about what
20 Dr. Akoda did to me.
21     Q. Are those your words? Are those words that
22 you would use naturally?
23     A. No. It's how I feel, though.
24     Q. Trying to speed this up a little. Sorry.
25     Did you feel differently about your birth

Page 172

1 experience of Peyton before you heard the radio ad
2 than you did after you heard the radio ad?
3     A. No. That was the reason why my husband
4 told me about the radio ad is because it was something
5 that was in our discussion since we had Peyton and we
6 didn't know how to deal with it.
7     Q. What do you mean you didn't know how to
8 deal with it?
9     A. We didn't know what course we can take,
10 whether what he did was wrong. We didn't know. We
11 didn't know anything. We didn't know what to do, but
12 we were both uncomfortable. I was uncomfortable and
13 it affected me.
14     So when I heard the ad about Dr. Akoda, he was
15 like, oh, my God, this is probably what we were
16 feeling the whole time, you know, like, so reach out
17 to them because you're not the only person that he's
18 done this to.
19     So I wasn't even aware at the time that it was
20 about him possibly not being a doctor. I thought it
21 was about him touching women inappropriately, because
22 that's how I felt, and that was my main -- my main
23 issue at the beginning.
24     Q. How did you feel when you got the
25 impression that it was possibly about him not being a

Page 173

1 doctor?
2     A. I felt even worse about it.
3     Q. And if it had turned out that he actually
4 was really a doctor, would that being told that maybe
5 he wasn't really a doctor be part of what has made
6 your experience worse since that time?
7     MR. CERYES: Objection, form, foundation.
8     A. So can you say it again?
9     Q. So if it turns out that it was wrong that
10 he was not a doctor, so he actually was a doctor, was
11 having been told that he was not a doctor part of what
12 caused you anguish since that time?
13     MR. CERYES: Objection, form, foundation.
14     A. I was already feeling anguish, but, yes, it
15 made it worse.
16     Q. How did you come to have the impression
17 that Dr. Akoda may not have been a doctor?
18     MR. CERYES: Objection, form, foundation.
19     A. Through speaking to counsel.
20     Q. Did you do any independent investigation
21 about whether that was true?
22     A. What, if Dr. Akoda wasn't actually a
23 doctor?
24     Q. Correct.
25     A. I mean, I Googled it. I Googled him. And

JA3372

Page 174

1  as I mentioned, I saw the news ad where he was
2  actually in jail, so...
3      Q.  But you mentioned earlier you didn't see
4  why he was in jail.
5      A.  No, but I saw that he was in jail.
6      Q.  So you didn't investigate about whether
7  that was for unlawful practice of medicine?
8      A.  No.
9      Q.  So did you do anything other than consult
10  with counsel to find out whether Dr. Akoda was a
11  doctor or not?
12      A.  No.
13      Q.  You just mentioned a moment ago that your
14  husband and yourself had discussed your experience
15  with Dr. Akoda following Peyton's birth; is that
16  correct?
17      A.  Yes.
18      Q.  Approximately how many times?
19      A.  It was quite -- it was quite often.  It
20  was --
21      Q.  More frequently at one point than another
22  or consistently throughout?
23      A.  Consistently throughout.
24      Q.  Was this a daily conversation?
25      A.  I mean, not daily, but it was something

Page 175

1  that -- that affected -- that affected us.
2      Q.  Did you discuss your experience with
3  Dr. Akoda from your birth with Peyton with your mother
4  following the birth of Peyton?
5      A.  Yes.
6      Q.  How frequently?
7      A.  Maybe three, four times.
8      Q.  When most recently?
9      A.  Most recently?  Letting her know that I was
10  coming to a deposition.
11      Q.  Before that time, when most recently to
12  that?
13      A.  Oh.  Maybe a few months ago.
14      Q.  And before that?
15      A.  Probably a few months before that.  I can't
16  really say.
17      Q.  And do you remember after Peyton's birth
18  when the first time you spoke again with your mother
19  about Dr. Akoda's conduct was?  Maybe how old Peyton
20  was, if that's helpful.
21      A.  I told -- we discussed it, like, as soon as
22  I got home.
23      Q.  Do you remember what you discussed?
24      A.  How -- what he did and how it made me feel
25  uncomfortable.  And then she said I didn't even notice

Page 176

1  that.  And then my husband -- me and my husband
2  explained to her what happened.
3      Q.  Did you discuss anything else?
4      A.  No.
5      Q.  Through your discussions with your husband
6  or with your mother, did you consider going to consult
7  legal counsel?
8      A.  We were thinking about it.
9      Q.  Did you ever consult with legal counsel
10  prior to hearing the radio ad?
11      A.  No.
12      Q.  Did you ever consult with another physician
13  other than Dr. Newton?
14      A.  No.
15      Q.  Did you consider going to consult with
16  another physician?  I don't mean for medical
17  treatment.  I mean regarding your experiences with
18  Dr. Akoda after your delivery with Peyton.
19      A.  No.
20      Q.  And Dr. Newton is your cousin, we discussed
21  earlier, correct?
22      A.  Yes.
23      Q.  And have you discussed your experiences
24  with Dr. Akoda with Dr. Newton?
25      A.  At the very beginning, yes.

Page 177

1      Q.  When was that approximately?
2      A.  Maybe April 2016.
3      Q.  Do you remember what you talked about with
4  Dr. Newton?
5      A.  I was just explaining to him -- well, I was
6  asking him about how -- I was telling him that I felt
7  uncomfortable and I didn't really know if there was
8  anything that I could do about it or, like, should he
9  have done that, like, am I right for feeling this way.
10  I just wasn't -- I wasn't 100 percent sure if he would
11  even -- like, if that's really something that you do,
12  is that really how you stimulate for a baby to come
13  out.
14      Like I had no idea, so I was just trying to get
15  a little bit more information about if I -- what I was
16  feeling was -- what's the word I'm looking for -- not
17  accurate, but if what I was feeling was right.  Was I
18  right in feeling that he wasn't supposed to treat me
19  like that, or he was violating his place, and he said
20  that he thought so.
21      Q.  What did Dr. Newton tell you?
22      A.  He said he thought -- he said he thought
23  so.  He said he wouldn't touch anyone that way.
24      Q.  He's an anesthesiologist, correct?
25      A.  Mm-hmm.

JA3373

Page 178

1    Q. Is that yes?
2    A. Yes.
3    Q. So for his profession do you know if he's
4  touching anybody's private parts?
5    A. No.
6    Q. Do you know when the last time Dr. Newton
7  delivered a baby was?
8    A. No, I don't.
9    Q. Do you know if Dr. Newton has ever
10  delivered a baby?
11    A. I don't know if he's ever delivered a baby.
12  Valid, if my feelings were valid, that's the
13  word I was looking for.
14    Q. Oh, from your earlier answer.
15    A. Yes. Yes.
16    Q. Do you use any social media, Ms. Evans?
17    A. Yes.
18    Q. What social media do you use?
19    A. I have Facebook.
20    Q. Are you on Facebook as Desire Evans?
21    A. Yes.
22    Q. Are you an active user of Facebook?
23    A. Yeah, you can say that.
24    Q. Do you keep a diary, Ms. Evans?
25    A. No.

Page 179

1    Q. Do you have a blog?
2    A. No.
3    Q. Do you keep a calendar or a daily diary of
4  your activities?
5    A. No.
6    Q. Do you have in your possession any medical
7  records that were not provided to counsel in this
8  litigation?
9    A. No.
10    Q. You mentioned that you are currently being
11  treated by a Paul Donato, correct?
12    A. Yes.
13    Q. Do you know if you signed a consent form
14  for Dr. Donato's office to release records about your
15  treatment?
16    A. I'm pretty sure I did.
17    Q. Do you know if you signed a release or a
18  consent form for Dr. Nnamani's office to release
19  records?
20    A. I'm pretty sure I did.
21    Q. Have you ever seen those doctors' records
22  from either Drs. Donato or Nnamani?
23    A. No.

Page 180

2    A. No.
3    Q. Do you have any documentation about that
4  experience at all?
5    A. No.
6    MS. MCENROE: I'd like to take a quick
7  break.
8    MR. CERYES: Okay.
9    VIDEO SPECIALIST: We're going off the
10  record at 2:29.
11    (Proceedings recessed)
12    VIDEO SPECIALIST: We're back on the record
13  at 2:41.
14  BY MS. MCENROE:

18    A. Yes.

21    A. Yes.
22    Q. What hospital was that at?
23    A. Laurel?
24    Q. Where?
25    A. Wait. Hold on. I was living in -- Laurel

Page 181

1  Regional Medical Center, I'm assuming.
2    Q. In Maryland?
3    A. Yes.
4    MS. MCENROE: From our perspective,
5  counsel, there's still some significant open medical
6  records that have not been produced, most notably from
7  Dr. Donato and Dr. Nnamani,
8
9    So pending those productions and our ability to
10  review them, we're going to suspend the deposition and
11  leave it open.
12    We appreciate your attending here today and
13  answering my questions.
14    MR. CERYES: Okay. And we'll evaluate from
15  our perspective -- we have requested those records, so
16  once they come in, we'll discuss the propriety of
17  reopening the deposition at that time.
18    MS. MCENROE: We look forward to reviewing.
19  Thank you.
20    THE WITNESS: I'm going to have to come
21  back?
22    MR. CERYES: We'll see about that.
23    Ms. Evans, I do have just a couple follow-up
24  questions for you.
25    EXAMINATION

| | Page 182 |
|---|---|
| 1 | BY MR. CERYES: |
| 2 | Q.  First of all, you were asked by counsel |
| 3 | some questions about your knowledge of the process |
| 4 | that physicians have to go through in order to |
| 5 | become -- in order to see and treat patients.  Do you |
| 6 | recall those questions? |
| 7 | A.  Yes. |
| 8 | Q.  Okay.  Prior to undergoing care and |
| 9 | treatment from Akoda, was it your belief that |
| 10 | physicians did have to go through a process in order |
| 11 | to be entrusted with the responsibility of seeing and |
| 12 | treating patients as a physician? |
| 13 | MS. MCENROE:  Objection to form, leading. |
| 14 | A.  Yes. |
| 15 | Q.  Okay.  And was it your assumption in |
| 16 | agreeing to undergo treatment by the person you |
| 17 | knew -- you knew as Dr. Akoda, that he had gone |
| 18 | through that process in a lawful way without having |
| 19 | misrepresented his identity? |
| 20 | MS. MCENROE:  Objection to form, leading. |
| 21 | A.  Yes. |
| 22 | Q.  Okay.  And had you understood that Akoda |
| 23 | had misrepresented his identity in order to go through |
| 24 | that process, would you have agreed to undergo |
| 25 | treatment from him? |

| | Page 184 |
|---|---|
| 1 | at 2:44 p.m.) |
| 2 | // |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 183 |
|---|---|
| 1 | MS. MCENROE:  Objection to form, leading. |
| 2 | A.  No. |
| 3 | Q.  Okay.  You were also asked some questions |
| 4 | about your role as a Class representative in this |
| 5 | case.  Do you recall those questions? |
| 6 | A.  Yes. |
| 7 | Q.  Is it your intention in this case to seek |
| 8 | on behalf of yourself and others who are patients of |
| 9 | Dr. Akoda compensatory damages, meaning monetary |
| 10 | damages, for the emotional distress caused by having |
| 11 | undergone treatment by Akoda in an amount that a jury |
| 12 | deems appropriate? |
| 13 | MS. MCENROE:  Objection to form -- |
| 14 | A.  Yes. |
| 15 | MS. MCENROE:  -- leading.  Counsel is |
| 16 | testifying. |
| 17 | MR. CERYES:  That's all I have. |
| 18 | MS. MCENROE:  No questions from us.  Again, |
| 19 | we suspend the deposition.  Thank you. |
| 20 | VIDEO SPECIALIST:  We're going off the |
| 21 | record at 2:44. |
| 22 | |
| 23 | // |
| 24 | // |
| 25 | (The deposition of DESIRE EVANS adjourned |

| | Page 185 |
|---|---|
| 1 | ACKNOWLEDGMENT OF DEPONENT |
| 2 | |
| 3 | I, DESIRE EVANS, do hereby acknowledge that |
| 4 | I have read and examined the foregoing testimony and |
| 5 | that the same is a true, correct and complete |
| 6 | transcription of the testimony given by me, with the |
| 7 | exception of the noted corrections, if any, appearing |
| 8 | on the attached errata page(s). |
| 9 | _____    _____ |
| 10 | DATE             DESIRE EVANS |
| 11 | |
| 12 | |
| 13 | Subscribed and sworn to before me this _____ day of |
| 14 | _____, 20_____ . |
| 15 | _____ (Notary Public) |
| 16 | My Commission expires: _____ |
| 17 | |
| 18 | |
| 19 | |
| 20 | [SEAL] |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 186

```
 1          C E R T I F I C A T E
 2
 3      I, LINDA S. KINKADE, Registered Diplomate
 4  Reporter, Certified Realtime Reporter, Registered
 5  Merit Reporter, Certified Shorthand Reporter, and
 6  Notary Public, do hereby certify that prior to the
 7  commencement of examination the deponent herein was
 8  duly sworn by me to testify truthfully under penalty
 9  of perjury.
10      I FURTHER CERTIFY that the foregoing is a true
11  and accurate transcript of the proceedings as reported
12  by me stenographically to the best of my ability.
13      I FURTHER CERTIFY that I am neither counsel for
14  nor related to nor employed by any of the parties to
15  this case and have no interest, financial or
16  otherwise, in its outcome.
17      IN WITNESS WHEREOF, I have hereunto set my hand
18  and affixed my notarial seal this 9th day of
19  September, 2019.
20      My commission expires:  July 31, 2022
21
22  _____
23  NOTARY PUBLIC IN AND FOR
24  THE DISTRICT OF COLUMBIA
25
```

Page 187

```
 1          WITNESS ERRATA SHEET
 2  REF. NO. 225851        Page 1 of _____
 3  NAME OF CASE: RUSSELL, et al. v. ECFMG
 4  DEPONENT:  DESIRE EVANS
 5  DATE OF DEPOSITION: September 5, 2019
 6  PLEASE INSERT REASON FOR CHANGE:
 7        1. To clarify the record.
          2. To conform to the facts.
 8        3. To correct a transcription error.
 9  Page      Line      Reason No.
10  From _____ to _____
11  Page      Line      Reason No. _____
12  From _____ to _____
13  Page      Line      Reason No.
14  From _____ to _____
15  Page      Line      Reason No.
16  From _____ to _____
17  Page      Line      Reason No.
18  From _____ to _____
19  Page      Line      Reason No.
20  From _____ to _____
21
22
23  SIGNED: _____ DATE: _____
24  (Signature of DESIRE EVANS)
25
```

JA3376

# Exhibit 54

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ▬▬▬▬

MRN: 11087140
FIN: 307873133

* Auth (Verified) *

"HR#"%MEDRECHRN%"Enc#"%ENCNO%%DOCTYPENAME% 03-16-2016 09:11:05

## Consent to Treatment

PHYSICIANS NOT AS EMPLOYEES: I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstatrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians ARE NOT employees of the hospital. I understand that I will receive a separate bill from each of these private providers of service.     Patient/Patient Representative Initials: ____

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

*Medical Education and Training.* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS.

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11:00 a.m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles.

*Personal Property and Valuables:* I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient at discharge or departure from DHS premises.

*Only Applicable for Medicare Beneficiaries:* Statement for Payment of Medicare Benefits to Hospital and/or Physicians — I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf.

*Insurance Billing and Assignment of Benefits:* I assign the benefits payable for hospital or physician services to DHS and or any physician which renders service to me and authorize them to submit the necessary claims to Medicare for payment. I certify the registration statements are true and if, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not alleviate my responsibility for payment. I agree to pay all amounts owed by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to verification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network.

*Notification of Credit Bureaus Reporting:* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

## Release of Information

I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it.

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks.

I understand that DHS is the owner of any radiographic images and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic images will be provided, to me or my authorized agent upon written request for a reasonable fee. Tissue blocks will not be available for recut; but will be available for examination under supervision at our facility upon written request.

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device. I release DHS from any liability that might result from the release of this information.

| UNIVERSAL CONSENT (SIDE1) |
| DIMENSIONS HEALTHCARE SYSTEMS |

MR:11087140  9
CLIFTON ,DESIRE

307873133
03/17/16   MOORE, JAVAKA
36Y F        OBS

PGHC CLIFTON, DESIRE NICHOLE Enc #  307873133 3/16/2016 Page 1 of 2

Patient Name: CLIFTON, DESIRE NICHOLE

Date of Birth: ▮▮▮▮▮

MRN: 11087140
FIN: 307873133

**\* Auth (Verified) \***

"MRB"%MEDRECMRN%"Encl"%ENCNO%%DOCTYPENAME% 03-16-2016 09:11:05

**Authorization For The Release Of Medical Information To The Maryland Insurance Administration:**

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal.

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider.

I understand that my records may be used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above.

In the event I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows:

1. I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2. I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated.
3. I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation.
4. I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues.
5. I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal.

To establish and maintain the safest possible environment in which to deliver care/service/treatment, Dimensions Healthcare System's campus buildings, property, parking lots and operated vehicles are smoke and tobacco-free. Dimensions Healthcare System is dedicated to maintaining a smoke and tobacco-free campus environment.

**Dimensions Healthcare Public Health Initiative:** If you smoke, please stop smoking.

**This form has been explained to me and I understand its contents. I acknowledge the following:**

☒ Receipt of a copy of DHS Notice of Privacy Practices
☒ My communication needs identified by completing the *Communication Assessment Form*
☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
☒ Receipt of DHS brochure "What You Should Know As A Patient"

**PLEASE NOTE:** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form.

| | | | |
|---|---|---|---|
| *Signature of Patient* | 3/16/2016 9:08:34 AM<br>*Date* | Signed by LEWIS, JANET on 16-Mar-2016<br>09:11:04 -0400<br>*Signature of Witness* | 3/16/2016 9:08:34 AM<br>*Date* |

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box):*
☐ Minor _____ years of age without decision-making capacity     ☐ Lacks decision-making capacity
☐ Other: _____

| | | |
|---|---|---|
| | 3/16/2016 9:08:34 AM | |
| *Patient Representative Signature* | *Date* | *Relationship to Patient* |
| | 3/16/2016 9:08:34 AM | |
| *Witness signature* | *Date* | |

| UNIVERSAL CONSENT (SIDE 2) | | MR:11087140 |
|---|---|---|
| DIMENSIONS HEALTHCARE SYSTEMS | | CLIFTON, DESIRE |
| | | 36Y F |
| | | 03/17/16   MOORE, JAVAKA     OBS |

PGHC CLIFTON, DESIRE NICHOLE Enc # 307873133 3/16/2016 Page 2 of 2

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ▬

MRN: 11087140
FIN: 307873133

**\* Auth (Verified) \***

Patient: _Desire Clifton_     Date: _3.14.16_     Time _10.05_

I hereby authorize Dr. or Midwife _____ to perform an induction of labor, and any other surgical or diagnostic procedures that may be required to complete delivery of the baby.

**Type of Induction** (*Please Indicate*):  ☐ **Elective**   ☐ **Medically Indicated**

**Please initial each paragraph. If you have questions, please ask the Doctor/midwife before initialing.**

**Possible Benefits and Risks of Labor Induction:** I have discussed the risks and benefits of this procedure and I accept the risks of the procedure as opposed to simply allowing labor to begin spontaneously at a later date.

**Patient Initials**

_DC_    I have reviewed the benefits of labor induction with my physician/midwife which may include:
- Choosing my delivery date
- Choosing provider who delivers my baby
- Preventing complications for me or my baby due to prolonging my pregnancy

_DC_    I have discussed the use of medication for cervical ripening with my provider and I understand the risks of:
- Excessive stimulation of the uterus to the point that may require an emergency delivery, either vaginally or abdominally.
- I also understand that rarely the uterus may rupture under these circumstances and cause death of my baby and severe bleeding and/or death to myself

_DC_    I understand that inducing labor increases my risk for complications when compared to mothers who begin labor "naturally." Significant risks for me and my baby include (although frequency not defined):

**Risks for Me**
- ❖ Nausea and vomiting
- ❖ Contractions may be increased in intensity and result in increased pain
- ❖ Contractions that occur too frequently, too hard and too long, can result in uterine rupture which will result in a C-section
- ❖ Ineffective contractions after lengthy use of Pitocin may result in a need for a C-section
- ❖ Excessive bleeding after delivery may require use of medication to contract the uterus and/or the need for blood transfusion
- ❖ Water intoxication may occur after 24 hours of Pitocin use
- ❖ Abnormal heart beats
- ❖ Severe allergic reaction

**Risks for my Baby**
- ❖ Treatment in the Neonatal Intensive Care Unit
- ❖ Lower Apgar score (rating of breathing, heart rate, muscle tone, reflexes and color)
- ❖ Seizures; brain damage and fetal death can result from decreased oxygen to the baby
- ❖ Cardiac arrhythmias including heart rate too high or too low
- ❖ Hemorrhage in the eyes; jaundice of the newborn

---

**INDUCTION OF LABOR (Page 1 of 3)**
DIMENSIONS HEALTHCARE SYSTEM

4-491 (09/13)

PATIENT LABEL
MR:11087140
CLIFTON ,DESIRE
307873133
DOB 03/16/1▬ ▬79  36Y F    L/D
▬E, JAVAKA

Facility: Prince George's

JA3380

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ████

MRN: 11087140
FIN: 307873133

* Auth (Verified) *

**Patient Initials**

_____ I have discussed that there is an increased risk that instruments may be used to accomplish a vaginal delivery if necessary

_____ I acknowledge that there may be an increased risk for the need of a blood transfusion which could expose me to hepatitis C HIV and other infectious diseases

_____ I have discussed the risks associated with various analgesic drugs and techniques that may be used to reduce the pain associated with labor and delivery, either vaginally or by cesarean section, and I understand and accept these risks

_____ I have discussed the possibility of failure of the induction attempt with my provider, and I am prepared to be released from the hospital to my home when failure to enter satisfactory labor has been established and it is safe for me and my baby to do so (not applicable for medically indicated induction).

_____ I also realize that if I have a cesarean birth it would increase the risks of cesarean sections for subsequent pregnancies based on the reason for the cesarean section and the type of incision or cut into the uterus. I will incur the usual risks associated with cesarean section that I might have avoided had I had this birth vaginally.

_____ I understand the nature and the purpose of these procedures and I affirm that the risks, benefits, possibility of complications, as well as expected results and medical alternatives, including the expected consequences of my refusing the recommended procedure(s), have been explained to me by my physician and that I have been given the opportunity to ask questions, and have my questions answered to my satisfaction.

_____ I can refuse this procedure without jeopardizing any current or future medical treatments.

_____ I further acknowledge that no guarantees have been given to me regarding the results of this or other necessary procedures during my care.

My doctor/midwife has explained to me the risks, benefits, possibility for complications, as well as the expected results, medical alternatives, and the expected consequences of my refusing the recommended procedure(s) if induction is medically indicated. These have been explained to me by my provider and I have been given the opportunity to ask questions, and have my questions answered. I wish to go forward with the induction and accept the risks of the procedure as opposed to simply allowing labor to begin spontaneously at a later date.

I have read and fully understand this consent form. I understand I should not sign this form if all items, including my questions, have not been explained or answered to my satisfaction. I understand that I can withdraw this consent at any time before the beginning of the procedure. I understand that I can request that this form be read to me.

_____          _____
Witness                            Signed:            Patient

---

**REFUSAL OF INDUCTION**
The consequences of refusal of induction of labor have been explained by my physician/midwife and I have decided to refuse this procedure.

_____          _____
Witness                            Signed:            Patient

| **INDUCTION OF LABOR (Page 2 of 3)** | PATIENT LABEL |
| DIMENSIONS HEALTHCARE SYSTEM | MR:11087140 |

CLIFTON ,DESIRE
307873133
DOB                        36Y F
03/16/18    MOORE, JAVAKA        L/D

4-491(09/13)

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ▮▮▮▮▮

MRN: 11087140
FIN: 307873133

* Auth (Verified) *

---

**Complete the following section if consent is not obtained from the patient.**

Patient is unable to make an informed decision because patient is *(Check appropriate box)*:

☐ Minor _____ years of age without decision-making capacity
☐ Lacks decision-making capacity
☐ Other: _____

_____
Patient Representative Signature

_____
Relationship to Patient

_____
Witness Signature (1)

_____
Witness signature (2)

Consent obtained (Check one): ☐ In person ☐ By Telephone **[Requires two (2) witness signature]**
**Two physician signatures are required in an emergency for consent:**

_____ M.D.

_____ M.D.

---

**PHYSICIAN/MIDWIFE DECLARATION:** Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

I checked and the patient is not currently under the influence of any narcotic or mind altering drugs that influences their decision.

Physician /Midwife Signature _____ Date 3/14/16 Time: 10am

---

**INDUCTION OF LABOR (Page 3 of 3)**
DIMENSIONS HEALTHCARE SYSTEM

4-491 (09/13))

MR:11087140
CLIFTON ,DESIRE
307873133
DOB 03/16/16    36Y F
JAVAKA    L/D

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ▮▮▮

MRN: 11087140
FIN: 307873133

**\* Auth (Verified) \***

**DO NOT SIGN THIS FORM UNTIL A PHYSICIAN HAS EXPLAINED IT TO YOU, YOU HAVE READ IT AND FULLY UNDERSTAND ITS CONTENTS.**

Patient: _____     Date: _____     Time _____

The following has been explained to me in general terms and I hereby authorize the performance of a **VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION (C-SECTION)** which is the delivery of the infant through the birth canal:

| | |
|---|---|
| **PROCEDURE** | Vaginal Birth |
| **PURPOSE** | Delivery of your infant through the birth canal with the possible use of forceps or vacuum extraction. An episiotomy (an enlargement of the vagina by an incision in the space between the vagina and anus) may be performed as part of the delivery. |
| **BENEFIT:** | No abdominal incision scars, lower infection rate and decreased healing time |

**RISKS (*This is not an exhaustive list meaning that there can be other unlisted risks*):**

- **Maternal:** Paralysis or partial paralysis, paraplegia or quadriplegia, brain damage, uterine inversion, uterine rupture, need for an emergency C-section, placenta previa, placenta abruption, anal sphincter injury, bowel injury, bladder injury or injury to other abdominal structures, possible fistula formation (opening between bowel, bladder, ureter, vagina and/or skin), perineal or genital tears and scars, possible formation of clots; possible emboli (clots or other material that may travel to other parts of the body), hysterectomy (removal of uterus) with possible removal of fallopian tubes and/or ovaries, persistent perineal pain, amniotic emboli, sexual dysfunction, anal incontinence, urinary urge incontinence, urinary stress incontinence, DIC (disseminated intravascular coagulation), pelvic floor prolapse, cardiac arrest, maternal death and fetal death.
- **Infant:** The infant can experience oxygen deficit from a prolapsed cord, brachial plexus injury, nuchal cord, scalp infection from fetal scalp monitoring, facial nerve injury, precipitous delivery, bleeding in the brain, cerebral palsy, meconium aspiration, newborn neurological symptoms and be stillborn.

**POTENTIAL PROCEDURES AND THEIR RISKS:** During labor, we may have to perform one or more of the following procedures or utilize one or more of the following in order to assist you with your delivery process:

- **Artificial Rupture of Membranes:** a rupture of the membranes by a third party to accelerate labor. **Risks:** Amniotic emboli, prolapsed cord, fetal decelerations/fetal distress
- **Amnioinfusion:** Instillation of fluid into the amniotic cavity through an intrauterine pressure catheter during labor after rupture of the fetal membranes. **Risks:** increased pressure in uterus, rupture of the uterus, and placenta abruption.
- **Episiotomy:** A surgical incision made to widen the vaginal opening during childbirth to facilitate delivery. **Risks:** extension into the anal sphincter and/or rectum, infection, increased pain, increased bleeding, prolonged healing time, and increased discomfort once sexual intercourse is resumed.
- **Forceps:** An instrument used to grasp and extract the fetal head to aid in the vaginal delivery of fetus. **Risk for mom:** vaginal trauma and tears. **Risk for baby:** Extra and intracranial hemorrhage, facial nerve palsy, and lower brain injury.
- **Leopold's maneuver:** A series of four steps used in palpating the abdomen to determine position and presentation of the fetus. **Risk:** Low risk for placenta abruption.
- **McRobert's maneuver:** typically done when the baby's shoulder is stuck in the birth canal. Mother is placed in a position that provides flexion of the maternal hips. This position is achieved by hyperflexion of the mother's legs toward her shoulders with or without suprapubic pressure. **Risk for mom:** discomfort **Risk for baby:** neonatal bone or nerve injury associated with shoulder dystocia
- **Woods screw maneuver:** this procedure involves the progressive rotation of the posterior shoulder in corkscrew fashion to release the opposite impacted *anterior* shoulder. **Risk for mom:** vaginal trauma and tears. **Risk for baby:** fracture of clavicle.
- **Zavanelli maneuver:** is an obstetric maneuver that involves pushing back the delivered fetal head into the birth canal in anticipation of an emergent caesarean section. **Risk for mom:** vaginal tearing, **Risk for baby:** neonatal bone or nerve injury and fetal death.
- **Manual Placenta Removal:** procedure where the placenta in separated from the uterine wall and removed from the vagina by the hand of the provider. **Risk:** postpartum hemorrhage, retain placental fragments, and pain

| VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION (PAGE 1 OF 3) |
|---|
| DIMENSIONS HEALTHCARE SYSTEM |

PATIENT LABEL

MR:11087140
CLIFTON ,DESIRE

307873133
DOB
JAVARA        L/D

4-495 (09/13)

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth ▮▮▮▮

MRN: 11087140
FIN: 307873133

* Auth (Verified) *

**POTENTIAL PROCEDURES AND THEIR RISKS (Continued)**

- **Emergency C-Section:** a surgical procedure in which incisions are made through a woman's abdomen and uterus to deliver the fetus. **Risk for mom:** bleeding, pain, infection, death and extended hospital stay. **Risk for baby:** Incidental Surgical Injuries, respiratory distress, and death
- **Cardiotocography:** the monitoring of the fetal heart rate and uterine contractions during labor and delivery. **Risk for baby:** No risks are associated with external monitoring. Fetal scalp infection with internal monitoring.
- **Pelvimetry:** measurement of the capacity and diameter of the pelvis. **Risk:** discomfort and pain
- **Induction or augmentation of labor:** use of medication to initiate labor or increase the frequency of uterine contractions. **Risk for mom:** over stimulation of the uterus, uterine rupture, and placenta abruption. **Risk for baby:** inability to tolerate medication administration resulting in fetal bradycardia, fetal distress, and neurological damage.
- **Transfusion of blood/blood products:** is a procedure to replace blood loss. **Risk:** carries the risk of exposure to HIV, hepatitis and other infectious diseases and allergic reactions.

**ALTERNATIVE PROCEDURES, TREATMENTS AND THEIR RISKS:** The only alternative to a vaginal delivery is a cesarean section (C-Section). *(This is not an exhaustive list meaning that there can be other unlisted risks).*
- **Maternal:** Paralysis, urgent hysterectomy, thromboembolic events (blood clots), DIC (disseminated intravascular coagulation), anesthetic complications, major puerperal infection, amniotic fluid embolism, uterine artery pseudoaneurysm, wound infection, hematomas, wound disruption, bladder puncture, ureteral and bowel laceration, persistent pain at the incision site, cesarean scar endometriosis, cesarean scar ectopic pregnancy, placental accretia, dense intra-abdominal adhesions, increased hospital stays, lengthy physical recovery, increased risk of readmission, chronic pelvic pain, and future uterine ruptures, maternal death and cardiac arrest.
- **Infant:** Respiratory distress, pulmonary hypertension, excess risk of not breast feeding, surgical lacerations and fetal death.

THE INFORMATION GIVEN ABOVE IS NOT AN EXHAUSTIVE LIST MEANING THAT THERE CAN BE OTHER UNLISTED RISKS. WE CANNOT PREDICT WHETHER OR NOT ANY OF THE ABOVE MAY BE NEEDED OR MAY OCCUR.

I understand that the physician, medical personnel and other assistants will rely on statements about the patient, the patient's medical history, and other information in determining whether to perform the procedure or the course of treatment for the patient's condition and in recommending the above procedure.

I understand the practice of medicine is not an exact science and that NO GUARANTEES OR ASSURANCES HAVE BEEN MADE TO ME concerning the results of this procedure.

I understand that during the course of the procedure described above it may be necessary or appropriate to perform additional procedures which are unforeseen or not know to be needed at the time this consent is given. I consent to and authorize the persons described herein to make the decisions concerning such procedures. I also consent to and authorize the performance of such additional procedures as they deem necessary or appropriate.

I also consent to diagnostic studies, tests, anesthesia, x-ray examinations and other treatment or courses of treatment relating to the diagnosis or procedures described herein.

BY SIGNING THIS FORM, I ACKNOWLEDGE THAT I HAVE READ OR HAD THIS FORM READ AND/OR EXPLAINED TO ME, THAT I FULLY UNDERSTAND ITS CONTENTS, AND THAT I HAVE BEEN GIVEN AMPLE OPPORTUNITY TO ASK QUESTIONS AND THAT ANY QUESTIONS HAVE BEEN ANSWERED SATISFACTORILY. ALL BLANKS OR STATEMENTS REQUIRING COMPLETION WERE FILLED IN AND ALL STATEMENTS I DO NOT APPROVE OF WERE STRICKEN BEFORE I SIGNED THIS FORM.

| **VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION** (PAGE 2 OF 3) | PATIENT LABEL |
|---|---|
| **DIMENSIONS HEALTHCARE SYSTEM** | MR:11087140  CLIFTON ,DESIRE  307873133  DOB ▮▮▮▮ 36Y F  03/16/16  MOORE, JAVAKA  L/D |
| 4-495 (09/13) | |

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ▮▮▮▮

MRN: 11087140
FIN: 307873133

**\* Auth (Verified) \***

I voluntarily consent to allow Dr. _____ or any physician designated or selected by him or her and all medical personnel under the direct supervision and control of such physician and all other personnel who may otherwise be involved in performing such procedures to perform the procedures described or otherwise referred to herein.  **Unless rescinded, this consent will remain in effect until delivery.**

_____
Witness

Signed: _____
Patient

---

### Complete the following section if consent is not obtained from the patient.

Patient is unable to make an informed decision because patient is *(Check appropriate box)*:

- ☐ Minor _____ years of age without decision-making capacity
- ☐ Lacks decision-making capacity
- ☐ Other: _____

_____
Patient Representative Signature

_____
Relationship to Patient

_____
Witness Signature (1)

_____
Witness signature (2)

Consent obtained (Check one):   ☐ In person   ☐ By Telephone **[Requires two (2) witness signature]**
**Two physician signatures are required in an emergency for consent:**

_____ M.D.

_____ M.D.

---

**PHYSICIAN DECLARATION:** Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications.  I confirm the above surgery/procedure is correct as to procedure, side and site.

I checked and the patient is not currently under the influence of any narcotic or mind altering drugs that influences their decision.

Physician Signature _____  Date 3/16/16   Time 2³⁰ p

Additional materials used, if any, during the informed consent process for this procedure: _____

---

| **VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION** (PAGE 3 OF 3) | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | MR:11087140<br>CLIFTON ,DESIRE<br>30 ▮▮▮▮ 36Y F<br>03/16/16   MOORE, JAVAKA   L/D |

4-495 (09/13)

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth:

MRN: 11087140
FIN: 307702910

* Auth (Verified) *

**Consent to Treatment**

**PHYSICIANS NOT AS EMPLOYEES: I** acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians **ARE NOT** employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service.      Patient/Patient Representative Initials: _____

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners, consulting, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

*Medical Education and Training:* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS.

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11:00 a.m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles.

*Personal Property and Valuables:* I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient at discharge or departure from DHS premises.

*Only Applicable for Medicare Beneficiaries:* Statement for Payment of Medicare Benefits to Hospital and/or Physicians.— I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf.

*Insurance Billing and Assignment of Benefits:* I assign the benefits payable for hospital or physician services to DHS and or any physician which renders service to me and authorize them to submit the necessary claims to Medicare for payment. I certify the registration statements are true and I, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not alleviate my responsibility for payment. I agree to pay all amounts owned by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to verification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network.

*Notification of Credit Bureaus Reporting:* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

**Release of Information**
I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it.

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks.

I understand that DHS is the owner of any radiographic images and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic images will be provided, to me or my authorized agent upon written request for a reasonable fee. Tissue blocks will not be available for recut; but will be available for examination under supervision at our facility upon written request.

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device, I release DHS from any liability that might result from the release of this information.

| UNIVERSAL CONSENT (SIDE1) | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEMS | 11087140 OLE |
| 0088 (11/14) | 307702910 12/14/15  DEVEREAUX, DANIEL  L/D |

**\* Auth (Verified) \***

**Authorization For The Release Of Medical Information To The Maryland Insurance Administration:**

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal.

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider.

I understand that my records may be used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above.

In the event that I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows:

1. I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2. I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated.
3. I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation.
4. I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues.
5. I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal.

To establish and maintain the safest possible environment in which to deliver care/service/treatment, Dimensions Healthcare System's campus buildings, property, parking lots and operated vehicles are smoke and tobacco-free. Dimensions Healthcare System is dedicated to maintaining a smoke and tobacco-free campus environment.

**Dimensions Healthcare Public Health Initiative:** If you smoke, please stop smoking.

*This form has been explained to me and I understand its contents. I acknowledge the following:*

☐ Receipt of a copy of DHS Notice of Privacy Practices
☐ My communication needs identified by completing the *Communication Assessment Form*
☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
☐ Receipt of DHS brochure "What You Should Know As A Patient"

**PLEASE NOTE:** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form.

| Signature of Patient | Date 12-14-15 | Signature of Witness | Date 12-14-15 |

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box):*
☐ Minor: _____ years of age   ☐ Incubated   ☐ Unconscious   ☐ Emergency Psych Services
☐ Other: _____

| Patient Representative Signature | Date | Relationship to Patient |

| Witness signature | Date |

| **UNIVERSAL CONSENT  (SIDE 2)** |
| DIMENSIONS HEALTHCARE SYSTEMS |

11087140
307702910   36Y  F
12/14/15  DEVEREAUX, DANIELL  L/D

0088 (11/14)

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth:

MRN: 11087140
FIN: 307705442

**\* Auth (Verified) \***

**Consent to Treatment**

**PHYSICIANS NOT AS EMPLOYEES:** I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians **ARE NOT** employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service.   Patient/Patient Representative Initials: _____

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

*Medical Education and Training:* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS.

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11:00 a.m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles.

*Personal Property and Valuables:* I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient at discharge or departure from DHS premises.

*Only Applicable for Medicare Beneficiaries:* Statement for Payment of Medicare Benefits to Hospital and/or Physicians — I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf.

*Insurance Billing and Assignment of Benefits:* I assign the benefits payable for hospital or physician services to DHS and or any physician which renders service to me and authorize them to submit the necessary claims to Medicare for payment. I certify the registration statements are true and I, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not alleviate my responsibility for payment. I agree to pay all amounts owned by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to verification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network.

*Notification of Credit Bureaus Reporting:* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

**Release of Information**
I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it.

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks.

I understand that DHS is the owner of any radiographic images and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic images will be provided, to me or my authorized agent upon written request for a reasonable fee. Tissue blocks will not be available for recut, but will be available for examination under supervision at our facility upon written request.

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device. I release DHS from any liability that might result from the release of this information.

| UNIVERSAL CONSENT (SIDE1) |
| DIMENSIONS HEALTHCARE SYSTEMS |



11087140  0▉              36Y F
CLIFTON ,DESIRE NICHOLE
307705442
12/15/15  SPANGLER, RYAN        L/D

0068 (11/14)

Patient Name: CLIFTON, DESIRE NICHOLE
Date of Birth: ███████

MRN: 11087140
FIN: 307705442

* Auth (Verified) *

**Authorization For The Release Of Medical Information To The Maryland Insurance Administration:**

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal.

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider.

I understand that my records may be used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above.

In the event I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows:

1. I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2. I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated.
3. I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation.
4. I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues.
5. I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal.

To establish and maintain the safest possible environment in which to deliver care/service/treatment, Dimensions Healthcare System's campus buildings, property, parking lots and operated vehicles are smoke and tobacco-free. Dimensions Healthcare System is dedicated to maintaining a smoke and tobacco-free campus environment.

**Dimensions Healthcare Public Health Initiative:** If you smoke, please stop smoking.

*This form has been explained to me and I understand its contents. I acknowledge the following:*

- ☑ Receipt of a copy of DHS Notice of Privacy Practices
- ☑ My communication needs identified by completing the *Communication Assessment Form*
- ☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
- ☐ Receipt of DHS brochure "What You Should Know As A Patient"

**PLEASE NOTE:** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form.

X _Desire Clif_     12/15/15       _Cynthia R. Vansmith RN_    12/15/15
Signature of Patient    Date        Signature of Witness    Date

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box):*
- ☐ Minor: ---------- years of age
- ☐ Incubated
- ☐ Unconscious
- ☐ Emergency Psych Services
- ☐ Other: _____

_____     _____     _____
Patient Representative Signature     Date     Relationship to Patient

_____     _____
Witness signature     Date

| UNIVERSAL CONSENT (SIDE 2) | PATIENTLABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEMS | 11087140 |
| | CLIFTON ,D████████ 36Y F |
| | 307705442 |
| 0088 (11/14) | 12/15/15 SPANGLER, RYAN    L/D |

# Exhibit 55

**REDACTED**

JA3390

JA3391

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |
| *    *    *    *    *    * | *    *    *    *    * | |

## PLAINTIFF DESIRE EVANS'S ANSWERS TO FIRST SET OF INTERROGATORIES AND RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff, Desire Evans, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition. Without waiving this objection, the Plaintiff was a patient of Akoda during her labor on March 17, 2016 and the subsequent delivery of her infant. The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda. The Plaintiff went to Prince George's Hospital Center for her delivery because her primary OBGYN treated patients there.**

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### ANSWER:

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiffs' loss to her marital relationship. This Plaintiff has in the past, is presently, and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety, as a result of learning that Akoda was a fraud. This Plaintiff will also be claiming**

2

JA3392

economic damages for past, present and future medical expenses, lost wages, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiffs' life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.

The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct.  She first learned this information from the radio.  She subsequently looked up information about Akoda on the internet.

The Plaintiff is undergoing care from a psychologist, Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D. and is currently taking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮  This answer will be supplemented as discovery proceeds.

## INTERROGATORY NO. 3:

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.

## ANSWER:

 Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion.  Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 5, 10-47 and 69-69.

ECFMG holds itself out as protecting the public through its programs and services, including primary-source verification of physician credentials. ECFMG undertook to render certification services and primary source verification services, among others, for Igberase on multiple occasions, under multiple identifies, and to represent to Howard University

3

JA3393

Hospital, Prince George's Hospital Center, the Maryland Board of Physicians, among others, that Igberase was a bona fide medical doctor.

ECFMG owed a duty to Plaintiffs and other members of the Class to carefully review Igberase's multiple applications for certification, appropriately perform primary source verification and to carefully investigate Igberase when it was informed that Igberase was using a false social security number, potentially a false name, and other false documentation.

The Plaintiffs' investigation is ongoing.

**INTERROGATORY NO. 4:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 70-80.

ECFMG, in breach of its duty to the Plaintiffs and Putative Class Members, failed to detect that Igberase's medical school diploma was in the name of Johnbull Enosakhare Akoda, not John Charles Akoda or John Charles Nosa Akoda or John Nosa Akoda, all names used in documents submitted by Akoda.

ECFMG was negligent in failing to learn that Akoda was Igberase. Among other things, ECFMG knew that in August 2000 allegations had been made to the JSMC that Akoda and Igberase were the same person. The JSMC notified ECFMG of this and told ECFMG that Akoda was using Igberase's social security number.

Igberase appeared at the offices of ECFMG on September 27, 2000 and told ECFMG that Igberase was his cousin and admitted he had used Igberase's social security number

4

"pending INS clearance of his own social security number." Additionally, the passport Igberase provided to ECFMG at that meeting contained one too few numbers and could not have been valid.

There was no effort by ECFMG to authenticate the passport. In breach of its duty, ECFMG failed to take any action against Igberase for this misuse of a social security number.

Further in breach of its duty, ECFMG failed to compare the photograph of Igberase in its files with the person claiming to be Akoda who was sitting in ECFMG's office in Philadelphia. Had ECFMG done so, ECFMG would have known that Akoda and Igberase are the same person.

ECFMG, in breach of its duty, failed to advise the Howard University Hospital residency program, the Maryland Board of Physicians or Prince George's Hospital Center of the information in its files that Igberase may have had a previous certification that was revoked, that ECFMG had investigated whether Akoda is Igberase or that Igberase was barred under another certification.

ECFMG, in breach of its duty, and in breach of its own policies and procedures regarding irregular behavior, failed to take reasonable steps to verify the truth of the references submitted by Igberase when he applied for the residency program at Howard University Hospital under the Akoda identity. In 2006 Igberase submitted three (3) letters of recommendations through ERAS under the Akoda identity. ECFMG sent letters to each of the references, with copies of their respective alleged letters of recommendations, seeking to learn if they were authentic. ECFMG did not receive responses from the supposed references. Nevertheless, ECFMG provided primary source verification to Howard University Hospital about "Akoda" – a fictitious identity.

5

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint.**

**The numerous breaches of duty by ECFMG led to the fraudulent certification of Igberase, under various names, but for which he would not have been admitted to the Howard University Hospital residency program, he would not have received a Maryland medical license, he would not have obtained privileges at Prince George's Hospital Center, he would not have been able to practice medicine, and he would not have been able to cause the harms to Plaintiffs.**

**ECFMG's numerous breaches of duty increased the risk of harm to Plaintiffs and other members of the Class by Igberase's conduct.**

**As a direct, proximate, immediate and foreseeable result of ECFMG's conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matters more appropriately addressed at deposition. Without waiving this**

JA3396

objection, the named Plaintiff contends that all care and treatment provided by Akoda was inappropriate, including but not limited to the fact that he was not an appropriately licensed and credentialed physician. He oversaw this Plaintiff's labor care, including the performance of intrusive pelvic examinations, and he performed the Plaintiff's delivery.

Prior to delivery, the Plaintiff felt that Akoda was unprofessional, and was made uncomfortable by the way he touched her. Her husband also felt uncomfortable with Akoda's conduct. Additionally, while Ms. Evans was pushing, Akoda started manipulating the Plaintiff's clitoris. Akoda told Ms. Evans that he had to get her aroused, which would help the baby come out.

Ms. Evans feels as though she was sexually molested, particularly given what is now known about Akoda. The baby was ultimately delivered via c-section. He was not properly licensed, credentialed or qualified to provide any of this case. This Plaintiff would never have exposed herself or her child to a non-health care provider had she been appropriately advised that he was not a validly licensed or credentialed physician. This answer will be supplemented as discovery proceeds.

The Defendant is further referred to the medical records.

Plaintiffs investigation is ongoing.

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

7

JA3397

**Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services. Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications necessary to practice medicine on the basis of identity fraud. Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.**

## INTERROGATORY NO. 8:

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

## ANSWER:

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition. Plaintiff's contacts with Akoda are reflected in the medial records which are being produced. The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of ECFMG, nor any member of the media. The Plaintiff has also given a deposition in the matter of *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.**

## INTERROGATORY NO. 9:

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

## ANSWER:

8

JA3398

Plaintiff adopts by reference her Answer to Interrogatory No. 2. The amount of these damages is for the jury to determine. Plaintiff seeks damages for these injuries as determined by the jury.

## INTERROGATORY NO. 10:

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

## ANSWER:

Objection is made to this request as it seeks to elicit information which goes beyond the proper scope of discovery. Without waiving this objection, the Plaintiff is a named class representative in a class action filed in the Circuit Court for Prince George's County, Maryland, *Dews et al. v. Dimensions Healthcare System, et. al,* Case No. CAL-17-37091.

## INTERROGATORY NO. 11:

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

## ANSWER:

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

## INTERROGATORY NO. 12:

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

## ANSWER:

9

JA3399

Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery. Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records. Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but are not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

The Plaintiff's attorneys assisted in the preparation of these answers.

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

In addition to the plaintiff and her attorneys, the Defendant is referred to the Plaintiff's initial disclosures. This Plaintiff's family and treating health care providers may have personal knowledge of her care and treatment by Akoda, as well as her current injuries. These include her husband, Michael Evans, as well as her mother, Renee Clifton. This answer will be supplemented as discovery proceeds.

**INTERROGATORY NO. 15:**

JA3400

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

**ANSWER:**

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and is not limited in time or scope and seeks information that is not relevant. Without waiving this objection, the Plaintiff had received medical care from Paul Donoto, PhD and a psychiatrist, Ijeoma N. Nnamani, M.D.**

**INTERROGATORY NO. 16:**

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as fact witnesses a trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

**ANSWER:**

**Plaintiff has not determined who she may call as expert witnesses at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2), or as otherwise ordered by the Court.**

**INTERROGATORY NO. 18:**

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

JA3401

Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection. By way of further answer, and without waiver, discovery and Plaintiffs' investigation are still continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.

## DOCUMENT REQUESTS

### General Objections

1.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.    Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections. The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

JA3402

6. To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7. Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8. These responses are made without waiver of: (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action; (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action; and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9. Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10. These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11. The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff. Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of

JA3403

Plaintiff.

12.    The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

JA3404

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced. Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement. To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

JA3405

Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case.  If Defendant will clarify it, Plaintiff will attempt to respond.

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

**RESPONSE:**

Objection.  This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

Other than the medical records, none.

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

Other than the records deposition subpoena served on ECFMG, there are none.

**REQUEST NO. 12:**

16

All documents about JSMC and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 13:**

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

**Objection. This request is overly broad and unduly burdensome. Without waiver,**

a**ny discoverable documents responsive to this request which are in the possession of the**

**Plaintiff or her counsel will be produced limited to the class members in this case.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

JA3407

Objection.  This request appears to be duplicative of other requests to which Plaintiff

has responded that, if she has any such documents, they will be produced.

## REQUEST NO. 17:

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Any discoverable documents responsive to this request which are in the possession of**

**the Plaintiff or her counsel will be produced.**

## REQUEST NO. 18:

All documents relating to A.G. Chaudry, M.D. and Akoda.

## RESPONSE:

**Any discoverable documents responsive to this request which are in the possession of**

**the Plaintiff or her counsel will be produced. Other than the medical records, none.**

## REQUEST NO. 19:

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Other than the medical records, none.**

## REQUEST NO. 20:

All documents relating to Dimensions Healthcare Associates and Akoda.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## REQUEST NO. 21:

18

JA3408

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 5.**

**REQUEST NO. 22:**

All documents relating to the Maryland Board of Physicians and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel he requested documents will be produced.**

**REQUEST NO. 25:**

19

JA3409

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 26:**

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by**

**attorney client privilege or the work product doctrine, without waiving this objection. The**

**Defendant is referred to the medical records.**

**REQUEST NO. 29:**

JA3410

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

**Objection is made to the request to the extent it concerns a medical and/or legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, the Defendant is referred to the medical records.**

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**Objection is made to this request to the extent it calls for a legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

JA3411

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

**Objection is made to this request as it is overly broad and not properly limited in time and scope. Without waiving this objection, documentation to support the Plaintiff's claim for lost wages will be produced as it is received.**

**REQUEST NO. 35:**

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

JA3412

**RESPONSE:**

Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action. To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, and are in the possession of Plaintiff or her counsel, these documents will be produced.

**REQUEST NO. 36:**

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

Documents addressing the Plaintiffs examination and treatment of alleged injuries will be provided as they are received.

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. Medical bills related to examination and treatment for her injuries relevant to this lawsuit will be provided as they are recieved.

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

JA3413

**RESPONSE:**

      **None.**

**REQUEST NO. 39:**

      All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

      **Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

**REQUEST NO. 40:**

      All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

**RESPONSE:**

      **Objection is made to the extent that any documents responsive to this request were prepared in anticipation of litigation or at the request of counsel. Any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 41:**

      All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

      **Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-**

JA3414

product doctrine. Without waiving this objection, the Plaintiff Desire Evans has not

obtained any statements from ECFMG.

## REQUEST NO. 42:

All documents and communications relating to any arrangements that you have made
with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial
obligations associated with the bringing of this lawsuit.

## RESPONSE:

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds**

**that it seeks documents protected from discovery by the attorney-client privilege and on the**

**grounds that it requests documents which are not relevant to any claim or defense in this**

**action.**

## REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing
agreements, relating to individuals or entities, other than you or your attorneys, that are (a)
providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b)
providing any information, services, or assistance concerning this lawsuit to you or your
attorneys, either directly or indirectly; or (c) have a financial interest or right to receive
compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or
otherwise; or (d) are receiving any form of compensation or remuneration for providing any
information, services, or assistance concerning this lawsuit.

## RESPONSE:

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds**

**that it seeks documents protected from discovery by the attorney-client privilege and on**

**the grounds that it requests documents which are not relevant to any claim or defense in**

**this action.**

## REQUEST NO. 44:

All documents and communications relating to the remedies you seek, including each
element of damages or other relief to which you allegedly are entitled, the method of calculating

JA3415

each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

      **Any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 45:**

      All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

**RESPONSE:**

      **Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 46:**

      All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

      **Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.**

**REQUEST NO. 47:**

      All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

      **Plaintiff has not decided what documents it will introduce at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).**

CONRAD & O'BRIEN, P.C.

_/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor_____
Jonathan Schochor (Admitted Pro Hac Vice )
jschoehor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

Dated: March 29, 2019

JA3417

**VERIFICATION**

I, Desire Evans, hereby aver that the factual statements in the foregoing *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Answers* are made subject to the penalties relating to unsworn falsification to authorities.

Desire Evans

Dated: March 28, 2019

JA3418

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

<div align="center">

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

</div>

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

Dated: March 29, 2019

# Exhibit 56



**KAISER PERMANENTE.**

## CERTIFICATION OF MEDICAL RECORDS

As custodian of records at Kaiser Permanente, I certify that the attached photocopies consisting of **19** pages are true photocopies of the medical records and **2** pages of the itemized billing statement pertaining to:

**PATIENT NAME:** Desire N Evans      **MRN# 88245320**

Based on federal and state privacy rules that protect a patient's health information, we have redacted certain information from the enclosed records. The information has been redacted because: (1) We must have the patient's written consent or a court order before we can release certain health information , even in response to a subpoena and/or. (2) The information redacted is not responsive to the subpoena. The information redacted in the attached records is specified below and/or marked accordingly.

*Billing Report:*

The original of said records are maintained by Kaiser Permanente. Subsequent re-disclosure of this patient's medical records is prohibited by law.

Name: Esther T Ross Hict
Health Information Management Services Supervisor/Designee

8/17/2018

DEFENDANT'S DEPOSITION EXHIBIT 3

Plaintiffs0000005735

JA3421
D. Clifton a.k.a. D. Evans. Smith 000001

# MA_PM1510_HIMS_Itemized_Billing_Statement_Report

 **KAISER PERMANENTE**

| Report Date Option: | Custom Date Range |
| Date Range: | 1/1/2003 - 8/17/2018 |
| Home Center: | CAMP SPRINGS |
| Patient Name: | EVANS,DESIRE N |
| Patient MRN: | 88245320 |

Plaintiffs000005736

D. Clifton a.k.a. D. Evans: Smith 000002

| Date Of Service | Provider Name | Diagnosis Code | Diagnosis Name | Department Name | Procedure Code | Payment Date | Modifier One | Procedure Name | Fee | Patient Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |



| Date Of Service | Provider Name | Diagnosis Code | Diagnosis Name | Department Name | Procedure Code | Payment Date | Modifier One | Procedure Name | Fee | Patient Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/17/2018 | SMITH, SHANDA J (M.D.) | F33.2 | MAJOR DEPRESSV DISORDER, RECURRENT SEVERE W/O PSYCH FEATURES | PSYCHIATRY LARGO | 90792 | | | PSYCHIATRIC DIAGNOSTIC EVAL W/MEDICAL SERVICES | $455.00 | 0.0 |
| | | | | PSYCHIATRY LARGO | 1003 | 1/17/2018 12:0 | | POS MEMBER COPAY GUAR PAYMENT | | -20.0 |

**MA_PM1510_HIMS_Itemized_Billing_Statement_Report.rpt v1.0**

Report Run Date: 8/17/201

Kaiser Foundation Health Plan off tihe Mid\tilantic Stiaties
2101 Easti Jefferson Stireeti
Rockville, MD 20852- 6611

Tax I.D. number - 520954463

This reporti contiains confifdential and proprietiary information and musti be tireatied accordingly is ffor intiernal use only Copyrighti ©2010, Kaiser Permanentie

**Patient Name:** EVANS,DESIRE N
**Patient MRN:** 88245320

| Date Of Service | Provider Name | Diagnosis Code | Diagnosis Name | Department Name | Procedure Code | Payment Date | Modifier One | Procedure Name | Fee | Patient Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/6/2018 1 | SMITH, SHANDA J (M.D.) | F33.2 | MAJOR DEPRESSV DISORDER, RECURRENT SEVERE W/O PSYCH FEATURES | PSYCHIATRY LARGO 99442 | | | | PHYS/QHP TELEPHONE EVALUATION 11-20 MIN | $60.00 | 0.0 |

**Total Charges :** $1,883.0

**Total Patient Payments :** $(50.00

**Total Patient Refund :**

Plaintiffs000005737

D. Clifton a.k.a. D. Evans: Smith 000003

MA_PM1510_HIMS_Itemized_Billing_Statement_Report.rpt v1.0

Report Run Date: 8/17/201

Kaiser Foundation Health Plan off the MidAtilantic Stiaties
2101 Easti Jefferson Stireetl
Rockville, MD 20852- 6611

Tax I.D. number - 520954463

This reporti contiains conffdential and proprietiary infformation and musti be tireatied accordingly is ffor intiernal use onlyCopyrighti ©2010, Kaiser Permanentie

Patient History Report for Evans,Desire N [88245320]: Temporary report setting [3152712] -- Submitted 8/17/2018 9:29:08 AM

| Date ▼ | Time ▲ | Leng | Status | Dept/Loc ▲ | Providers | Type |
|--------|--------|------|--------|------------|-----------|------|
| 02/16/2018 | 1:50 PM | 20 | No Show | PSY LA [1300030068] | Smith, Shanda J (M.D.) | VID VIS MM [4464] |
| 02/06/2018 | 3:30 PM | 20 | Completed | PSY LA [1300030068] | Smith, Shanda J (M.D.) | PHONE-20 BH [4360] |
| 01/17/2018 | 4:10 PM | 60 | Completed | PSY LA [1300030068] | Smith, Shanda J (M.D.) | NE [1090] |

Plaintiffs0000005738

D. Clifton a.k.a. D. Evans: Smith 000004

JA3424

# Encounters

Plaintiffs0000005739

JA3425

D. Clifton a.k.a. D. Evans: Smith 000005



**KAISER PERMANENTE**®

## Patient Demographics

| Patient Name | MRN | Sex | DOB | Address | Phone |
|---|---|---|---|---|---|
| Evans, Desire N | 882453 20 | Female | 3/25/19 79 | 11529 LELAND PLACE WALDORF MD 20601 | 301-256-7195 (Home) 000-000-0000 X00000 (Work) 301-256-7195 (Mobile) |

## Registration

Non- EpicCare Patient

## PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Dilasha (M.D.) Katwal, M.D. | 301-702-6100 | None |

## PCP and Location

| PCP | Location |
|---|---|
| DILASHA KATWAL MD, MEDICAL DOCTOR | CAMP SPRINGS[130014] |

## Immunization Summary
<div align="right">Reviewed on 11/14/2017</div>

No immunizations on file.

## Allergies

<div align="right">Reviewed On: <b>11/14/2017</b> By: <b>Sinkiewicz, Melissa (D.O.), D.O.</b></div>

### Allergies as of 8/17/2018

| | Severity | Noted | Reaction Type | Reactions |
|---|---|---|---|---|
| **Iodine [iodinated Glycerol]** | Not Specified | 11/10/2017 | | Anaphylaxis |

## Problem List

### Problem List as of 08/17/2018

| Problem | Noted |
|---|---|
| **MAJOR DEPRESSIVE DISORDER, RECURRENT EPISODE, SEVERE W ANXIOUS STRESS** | 1/17/2018 |

## Medications

### Medications at Start of Encounter

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **LORazepam (ATIVAN) 0.5 mg Oral Tab** | 20 | 0/0 | 2/6/2018 | 2/26/2018 |
| Sig - Route: Take 1 to 2 tablets orally up to once a day ONLY AS NEEDED for severe anxiety**TAKE SPARINGLY** - Oral | | | | |
| Class: Fill in 4 hours | | | | |
| **traZODone (DESYREL) 50 mg Oral Tab** | 60 | 1/1 | 1/23/2018 | 1/23/2019 |
| Sig - Route: Take 1 to 2 tablets at bedtime ONLY AS NEEDED for insomnia; may take up to 4 tablets if needed - Oral | | | | |
| Class: Fill in 4 hours | | | | |
| **FLUoxetine (PROZAC) 10 mg Oral Cap** | 60 | 1/1 | 1/17/2018 | 1/17/2019 |
| Sig - Route: Take 1 capsule daily for 1 week then increase to 2 capsules - Oral | | | | |
| Class: Fill Now | | | | |
| **hydrOXYzine HCl (ATARAX) 50 mg Oral Tab** | 60 | 1/1 | 1/17/2018 | 1/17/2019 |

<div align="center">Evans, Desire N<br>MRN: 88245320</div>

Page 1

Plaintiffs0000005740

## Medications (continued)

### Medications at Start of Encounter (continued)

| | Disp | Refills | Start | End |
|---|---|---|---|---|

Sig - Route: take 1-2 tablets at bedtime ONLY AS NEEDED for insomnia; may take one-half to 1 tablet up to twice a day as needed for anxiety - Oral
Class: Fill Now

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| Diclofenac Sodium (VOLTAREN) 50 mg Oral TBEC DR Tab | 60 | 2/2 | 11/14/2017 | 11/14/2018 |

Sig - Route: Take 1 tablet by mouth 2 times a day as needed for pain - Oral
Class: Fill Now

## Medical and Surgical History

### Medical History

No past medical history on file.

### Surgical History

No past surgical history on file.

## Obstetric History

### Obstetric History

The patient has not been asked about pregnancy.

## Social History

### Family and Education

Marital Status
Married

### Substance & Sexual Activity

No substance use or sexual activity history on file.

### Social Documentation

No social documentation on file.

## Family and Employment History

### Family History

No family history on file.

### Employment History

No employment history on file.

### Encounter Status

Open

## END OF REPORT



KAISER
PERMANENTE.

Evans, Desire N
MRN: 88245320

Page 2

3 of 19

Plaintiffs0000005741

D. Clifton a.k.a. D. Evans. Smith 000007
JA3427

Family and Employment History (continued)

**Desire N Evans**
1/17/2018 4:10 PM   Office Visit
MRN: 88245320

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**
Department: **Psychiatry Largo**

Encounter #: **250876505**
Center: **LARGO**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Dilasha (M.D.) Katwal, M.D. | 301-702-6100 | CAMP SPRINGS |

### Registration

Non- EpicCare Patient

### Reason for Visit

**PSYCHIATRIC EXAM**

### Diagnoses

|  | Codes | Comments |
|---|---|---|
| **MAJOR DEPRESSIVE DISORDER, RECURRENT EPISODE, SEVERE W ANXIOUS STRESS**   - Primary | F33.2 |  |

## Progress Notes

Smith, Shanda (M.D.), M.D. at 1/17/2018  4:10 PM

Status:  Signed

**PSYCHIATRIC EVALUATION**
New Evaluation.

**CC**: depression and anxiety
**ID: Desire N Evans** is a 38 yr old  female  who presents voluntarily to Kaiser Permanente Largo  Medical Center  Behavioral Health for psychiatric evaluation. She
is self-referred after consultation with her primary care doctor DILASHA KATWAL MD, M.D.

**HPI:** Desire N Evans is a 38 yr old African-American female who presents for a psychiatric evaluation.
Pt reports feeling anxious/depressed for most of her life but worse over the past near one year since her
birthday in March.  Reports significant anxiety described as excess worry that is difficult to control,
intermittent panic sx's (SOB/palpitations/insolable weeping).   Cries seemingly out of the blue for no reason.
Has had passive thoughts of death related to hopelessness but denies any intent/plans b/c of her strong
attachment to her 2yo son; "he keeps me going".
Endorses depressed mood, anhedonia, initial/middle insomnia related to anxious thoughts, low energy, and
low appetite.  Also poor focus at times because of anxiety/thoughts jumping around.
Works from home so she can watch her son but he's growing/more active and this is becoming more of a
challenge.
Denies any specific stressors/changes.  Does note not feeling satisfied with where she is in life; "I have so
many ideas"; says she cannot focus or pursue any of her goals b/c of anxiety.
Pt describes herself as very private; husband aware of her depression but feels he doesn't know how to
respond; mother as well but their response is to give her space as she often can be short/easily irritated

Evans, Desire N
MRN: 88245320

Page 3

Plaintiffs0000005742

D. Clifton a.k.a. D. Evans-Smith 000008

JA3428

## Progress Notes (continued)

Smith, Shanda (M.D.), M.D. at 1/17/2018 4:10 PM (continued)

which pushes them away.
Open to start both medication and psychotherapy to target depression.

**Past Psychiatric History**:
Hx of symptoms on/off through-out adult life;
One suicide attempt by overdose in '09; admitted for psychiatric tx for about 5d;
Started on Fluoxetine but stopped soon after d/c;
No additional/continued care

**Family Psychiatric History**:
None known

**Social History:**
B/R by grandparents as father was incarcerated on/off and mother was often out of the home;
Has one brother 9y younger by her parents who were married/divorced in '09;
Functioned as a parent to younger brother;
Moved often while growing up b/t family
Completed education through HS and some college
Works FT for Care First Blue Cross; works from home
Married x 2y and has a 2yo son

**Substance Use:**
Alcohol: rarely
Tobacco: denies
**Drug use**: daily MJ use to help with sleep

**Medical History**:
No past medical history on file.

**ALLERGIES**

| Allergen | Reactions |
|---|---|
| • Iodine [Iodinated Glycerol] | Anaphylaxis |

**Medications**: No active medications on file as of 01/17/2018

**MENTAL STATUS EXAMINATION.:**
**Orientation**: Alert and Oriented to self, time, place, situation; **Appearance:** Appropriately groomed with good hygiene; **Psychomotor**: mild PMA/ noPMR; **Speech**: normal rate, tone, volume; **Mood**: depressed; **Affect**: Sad/tearful and mood congruent
**Thought Process**: Linear, goal-directed, organized; **Thought Content:** centered on the situation, denies active SI, intent/plan to harm self; no overt evidence of psychosis or ideas of reference **Cognition**: Grossly intact based on overall recall of recent and remote memory; **Insight/Judgment**: fair/intact

**Risk Assessment:**
Risk Factors: hx of suicide attempt in '09
Protective Factors: no active desire to die; is help seeking; strongly attached to 2yo son; +supports; future oriented
Overall Risk Level: low

Evans, Desire N
MRN: 88245320

Page 4

Plaintiffs0000005743

D. Clifton a.k.a. D. Evans: Smith 000009
JA3429

## Progress Notes (continued)

Smith, Shanda (M.D.), M.D. at 1/17/2018 4:10 PM (continued)

Patient is at low risk of self-harm given no active suicidal ideation/intent or plan to harm herself; strong attachment to her 2yo son and says she would never harm herself/be away from him.

Safety plan has been reviewed. Patient agrees to call 911 and inform family/friends of crisis and/or reach out for support if active self-harm thoughts develop.

### Diagnoses:
Major Depressive D/O, Recurrent, Severe with Anxious Stress
Unhealthy Substance Behavior

### Treatment plan:
Risk Assessment: Patient was found to be at low risk for danger to self or danger to others and is safe for treatment on the outpatient level of care.

Psychoeducation was provided.

1. Prozac 10mg: one cap daily for 1 week then increase to 2 capsules daily
2. Hydroxyzine 50mg: **one to two** tablets ONLY AS NEEDED for difficulty **sleeping**;
   **1/2 to 1** tablet as needed for severe anxiety
3. Video Visit: Friday Feb 16th at 1:50pm
4. Psychotherapy NE on Friday 1/19 at 3pm at Marlow Heights

Please feel free to secure message me through kp.org or call this clinic at 301 386-6800 for any questions or concerns related to your medication(s) prior to our next appointment

Electronically signed by Smith, Shanda (M.D.), M.D.,1/19/2018 4:44 PM

---

## Visit Disposition

Disposition
Return in about 1 month (around 2/17/2018).

## Medications

### Ordered Medications

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| FLUoxetine (PROZAC) 10 mg Oral Cap | 60 | 1/1 | 1/17/2018 | 1/17/2019 |
| Take 1 capsule daily for 1 week then increase to 2 capsules - Oral | | | | |
| hydrOXYzine HCl (ATARAX) 50 mg Oral Tab | 60 | 1/1 | 1/17/2018 | 1/17/2019 |
| take 1-2 tablets at bedtime ONLY AS NEEDED for insomnia; may take one-half to 1 tablet up to twice a day as needed for anxiety - Oral | | | | |

### Infusion Orders

No relevant orders to display.

### Level of Service

Evans, Desire N
MRN: 88245320

Page 5

6 of 19

Plaintiffs0000005744

D. Clifton a.k.a. D. Evans. Smith 000010  JA3430

Level of Service (continued)

Level of Service
**PSYCHIATRIC DIAGNOSTIC EVAL W MEDICAL SERVICES [90792A]**

Encounter Status
Completed By Smith, Shanda (M.D.), M.D. on 1/19/18 at 4:44 PM

Delivery Summary - Mom

## END OF REPORT

 KAISER
PERMANENTE®

**After Visit Summary**
**1/17/2018**

Desire N Evans
MRN: 88245320

## Visit Information

Visit Information

| Date & Time | Provider | Department | Encounter # |
|---|---|---|---|
| 1/17/2018  4:10 PM | Smith, Shanda J (M.D.), M.D. | PSYCHIATRY LARGO | 250876505 |

Diagnoses

| | Codes | Comments |
|---|---|---|
| **MAJOR DEPRESSIVE DISORDER, RECURRENT EPISODE, SEVERE W ANXIOUS STRESS**   - Primary | F33.2 | |

## Instructions and Follow-Up

Patient Instructions
1. Prozac 10mg: one cap daily for 1 week then increase to 2 capsules daily
2. Hydroxyzine 50mg: **one to two** tablets ONLY AS NEEDED for difficulty **sleeping**;
   **1/2 to 1** tablet as needed for severe anxiety
3. Video Visit: Friday Feb 16th at 1:50pm
4. Psychotherapy NE on Friday 1/19 at 3pm at Marlow Heights

Please feel free to secure message me through kp.org or call this clinic at 301 386-6800 for any questions or concerns related to your medication(s) prior to our next appointment

Follow-up and Disposition
Return in about 1 month (around 2/17/2018).

Evans, Desire N
MRN: 88245320

Page 6

7 of 19

Plaintiffs0000005745

JA3431
D. Clifton a.k.a. D. Evans: Smith 000011

**Instructions and Follow-Up (continued)**

**Medications**

Medications Started This Visit
   FLUoxetine (PROZAC) 10 mg Oral Cap
   hydrOXYzine HCl (ATARAX) 50 mg Oral Tab

**Additional Information**

Do you need to cancel an appointment?
   Please inform us at least 24 hours in advance if you need to cancel an appointment.  You can
   cancel appointments online at kp.org or by calling our appointment line at 703-359-7878 or toll
   free at 1-800-777-7904 (TTY 703-359-7919 or toll free at 1-800-700-4901) and selecting option 1.
   For Behavioral Health, please call 1-866-530-8778.

kp.org Information
   Are you a registered member of kp.org?  If not, please visit **www.kp.org** to register and to begin using this
   exceptional feature.  Via the website, you can view recent lab test results, past office visit information,
   immunizations, and medication allergies.  You can also  send secure e-mail messages with questions to your
   provider or to the advice nurse, and you can refill prescriptions as well as have the ability to check your
   eligibility and benefits.  Secure, easy to access and always available.

Evans, Desire N
MRN: 88245320

Page 7

Plaintiffs0000005746

D. Clifton a.k.a. D. Evans: Smith 000012

JA3432



## KAISER PERMANENTE®

**Desire N Evans**
1/22/2018 5:47 PM   Patient Secure Message
MRN: 88245320

Encounter #: **251670299**
Center: **LARGO**

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**
Department: **Psychiatry Largo**

---

## Visit Summary

**Reason for Visit**

---

### Telephone Contact Summary

**Call Information**

| | Provider | Department | Center |
|---|---|---|---|
| 1/22/2018 5:47 PM | Smith, Shanda (M.D.), M.D. | Psychiatry Largo | LARGO |

**Encounter Documentation**

No notes of this type exist for this encounter.

**Encounter Messages**

RE: Medication Question

| From | To | Sent and Delivered |
|---|---|---|
| Shanda J (M.D.) Smith, M.D. | Desire N Evans | 1/23/2018 2:16 PM |

Last Read in kp.org
2/2/2018 3:16 PM by Desire N Evans

Good afternoon,

Yes there are other options.

Please stop the Hydroxyzine.

I will send a Rx for Trazodone to the Camp Springs pharmacy. You can take 1-2 tablets at bedtime as needed for insomnia.

The maximum dosage is 200mg so you if needed you can increase up to 4 tabs at bedtime.

Dr. Smith

Previous Messages

----- Message -----
From: Desire N. Evans
Sent: 1/22/2018 5:47 PM EST
To: SHANDA SMITH MD, M.D.
Subject: Medication Question

Good Evening

I'm writing because the sleep medication I was prescribed gives me migraines. I even tried to take half, and although the headache was not as severe, taking half did not get rid of my symptoms. Are there any other

---

Evans, Desire N
MRN: 88245320

Plaintiffs0000005747

JA3433
D. Clifton a.k.a. D. Evans: Smith 000013

Telephone Contact Summary (continued)

Encounter Messages (continued)

options?

Medication Question

| From | To | Sent |
|---|---|---|
| Desire N Evans | Shanda J (M.D.) Smith, M.D. | 1/22/2018  5:47 PM |
| Good Evening | | |

I'm writing because the sleep medication I was prescribed gives me migraines. I even tried to take half, and although the headache was not as severe, taking half did not get rid of my symptoms. Are there any other options?

Patient Secure Message Encounter Routing History

Patient Instructions

None

## END OF REPORT

Evans, Desire N
MRN: 88245320

Page 9

Plaintiffs0000005748

JA3434

D. Clifton a.k.a. D. Evans: Smith 000014



**KAISER PERMANENTE.**

**Desire N Evans**
1/23/2018 2:15 PM   Orders Only
MRN: 88245320

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**

Encounter #: **251837674**
Center:

Department: **Lab Services Regl Lab**

## Visit Summary

### PCP and Center

| Primary Care Provider | Phone | Center |
|---|---|---|
| Dilasha (M.D.) Katwal, M.D. | 301-702-6100 | CAMP SPRINGS |

### Registration
Non- EpicCare Patient

### Reason for Visit

### Progress Notes
No notes of this type exist for this encounter.

## Medications

### Ordered Medications

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **traZODone (DESYREL) 50 mg Oral Tab** | 60 | 1/1 | 1/23/2018 | 1/23/2019 |
| Take 1 to 2 tablets at bedtime ONLY AS NEEDED for insomnia; may take up to 4 tablets if needed - Oral | | | | |

### Infusion Orders
No relevant orders to display.

### Encounter Status
Completed By Mas Interface, Default User on 1/25/18 at 2:04 AM

### Delivery Summary - Mom

---

## END OF REPORT

---

Evans, Desire N
MRN: 88245320

Plaintiffs0000005749

JA3435
D. Clifton a.k.a. D. Evans: Smith 000015

 **KAISER PERMANENTE**®

**Desire N Evans**
2/6/2018 3:30 PM   Scheduled Telephone Encounter
MRN: 88245320

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**

Encounter #: **253087182**
Center: **LARGO**

Department: **Psychiatry Largo**

---

## Visit Summary

### Reason for Visit
**ANXIETY**

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **MAJOR DEPRESSIVE DISORDER, RECURRENT EPISODE, SEVERE W ANXIOUS STRESS**   - Primary | F33.2 | |

---

### Telephone Contact Summary

#### Outgoing Call

| | Provider | Department | Center |
|---|---|---|---|
| 2/6/2018 3:32 PM | Smith, Shanda (M.D.), M.D. | Psychiatry Largo | LARGO |

---

### Encounter Documentation

**Smith, Shanda (M.D.), M.D. at 2/6/2018 3:55 PM**

Status: Signed

#### Scheduled Telephone Medication Management Visit

**S:** Pt called for scheduled follow-up, symptoms assessment and medication review.  Chart and history reviewed.  Called pt in response to secure message; notes initial improvement in mood; not crying as much after starting Prozac and titrated to 20mg successfully; however about 1.5 week after increasing to 20mg experienced heightened anxiety, chest palpitations, shakiness; on further discussion pt under significant stress; feels bad about still living in her mother's home after 1y; "I"m almost 40, married, and have a son"; some issues w/ mother's mate; also pt in the process of buying a home which has been stressful. Feels she is tolerating Prozac well.
Rec pt continue Prozac 20mg and also discussed r/b/se of sparing use of Ativan for severe anxiety/palpitations; discussed it can be habit forming and cautioned against regular use. Appeared to understand.
No SI

**Current Meds:**
Prozac 20mg
Trazodone 50mg hs prn

**Mental Status Exam:**
She sounds awake alert, cooperative.

---

Evans, Desire N
MRN: 88245320

Page 11

12 of 19

Plaintiffs0000005750

## Encounter Documentation (continued)

Smith, Shanda (M.D.), M.D. at 2/6/2018  3:55 PM (continued)

Speech: spontaneous, nl rate/volume/tone
Mood: anxious/stressed
Thought Process: logical, goal-directed.
Thought Content: Denies suicidal ideation/intent/plan. No evidence of homicidal ideation, delusions, or hallucinations.
Cognition: grossly intact
Insight/Judgment: intact

**Diagnosis:**
MDD, Rec, Mod with Anxious Stress

**Plan**:
1. Start Ativan 0.5mg: 1-2 prn severe anxiety
2. Continue Prozac 20mg
3. F/u with me on 2/16 as scheduled

**Encouraged to f/u** via kp.org sooner if needed.

The risks, benefits, side effects and alternatives for the various medications (including not taking medications) started today were reviewed with the pt.

I have confirmed the presence of the above clinical diagnoses, which were considered in the current and ongoing care of the patient. At the time of this visit, the patient states, and/or the medical record indicates, that there are no changes in these conditions, unless otherwise noted, and the patient has been advised to follow up with PCP or specialist as treatment warrants.

Electronically signed by Smith, Shanda (M.D.), M.D., 2/6/2018  3:59 PM

**Contacts**

| | Type | Contact | Phone |
|---|---|---|---|
| 02/06/2018 03:32 PM | Phone (Outgoing) | Evans, Desire N (Self) | |

**Level of Service**

Level of Service
**PHYS TAV, EST PAT, 11-20 MIN OF MEDICAL DISCUSSION [99442A]**

**Encounter Messages**

No messages in this encounter

**Patient Secure Message Encounter Routing History**

**Patient Instructions**

None

## END OF REPORT

Evans, Desire N
MRN: 88245320

Plaintiffs0000005751

JA3437
D. Clifton a.k.a. D. Evans: Smith 000017



**KAISER PERMANENTE**

**Desire N Evans**
2/6/2018 11:48 AM   Patient Secure Message
MRN: 88245320

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**

Encounter #: **253059819**
Center: **LARGO**

Department: **Psychiatry Largo**

---

## Visit Summary

### Reason for Visit

### Telephone Contact Summary

**Call Information**

| | Provider | Department | Center |
|---|---|---|---|
| 2/6/2018 11:48 AM | Smith, Shanda (M.D.), M.D. | Psychiatry Largo | LARGO |

**Encounter Documentation**
No notes of this type exist for this encounter.

**Encounter Messages**

RE: Medication Question

| From | To | Sent |
|---|---|---|
| Desire N Evans | Shanda J (M.D.) Smith, M.D. | 2/6/2018  2:14 PM |

The hydroxyzine was giving me migraines, and you changed me to trazadone which doesn't work at all. The nausea is not coming from the medicine. My anxiety/nervousness is causing my stomach to feel this way and unable to eat. I literally feel like I'm sitting in the doctors office waiting to hear the worst news of my life. I don't know why I feel so nervous and scared.

Previous Messages

----- Message -----
From: SHANDA SMITH MD, M.D.
Sent: 2/6/2018  1:58 PM EST
To: Desire N. Evans
Subject: RE: Medication Question

Good afternoon,

Thank-you for the update.

It doesn't sound like this medication is working well.

For now I recommend you reduce the Prozac back down to just one tablet daily (10mg) to reduce the side effects (shakiness, nausea etc).

Prozac (Fluoxetine) typically takes 4-6 weeks for maximal effect of your anxiety.

The Hydroxyzine can be used short term to help with your anxiety/nervousness until the Prozac is effective. What has your response been to the Hydroxyzine?

---

Evans, Desire N
MRN: 88245320

Page 13

Plaintiffs0000005752

JA3438
D. Clifton a.k.a. D. Evans: Smith 000018

## Telephone Contact Summary (continued)

Dr. Smith

----- Message -----
From: Desire N. Evans
Sent: 2/6/2018 11:48 AM EST
To: SHANDA SMITH MD, M.D.
Subject: Medication Question

Good Morning
I have been trying to email since last wee, I hope this one make it through. I am writing because the first
week and half on my medication, I was doing a lot better. I still have extreme anxiety, but I was not as
depressed or sad. Fast forward to last week I began to feel worse than I was before even with the medication.
I became really sad and depressed again almost angry. My anxiety is to the put that I'm feeling nauseous I
can't eat because I'm so nervous I feel like I'm going to vomit. I don't know what I should do at this point my
hands are literally shaking.

RE: Medication Question

| From | To | Sent and Delivered |
|---|---|---|
| Shanda J (M.D.) Smith, M.D. | Desire N Evans | 2/6/2018 1:58 PM |

Last Read in kp.org
2/6/2018 2:33 PM by Desire N Evans
Good afternoon,

Thank-you for the update.

It doesn't sound like this medication is working well.

For now I recommend you reduce the Prozac back down to just one tablet daily (10mg) to reduce the side effects
(shakiness, nausea etc).

Prozac (Fluoxetine) typically takes 4-6 weeks for maximal effect of your anxiety.

The Hydroxyzine can be used short term to help with your anxiety/nervousness until the Prozac is effective. What
has your response been to the Hydroxyzine?

Dr. Smith

Previous Messages

----- Message -----
From: Desire N. Evans
Sent: 2/6/2018 11:48 AM EST
To: SHANDA SMITH MD, M.D.
Subject: Medication Question

Good Morning
I have been trying to email since last wee, I hope this one make it through. I am writing because the first
week and half on my medication, I was doing a lot better. I still have extreme anxiety, but I was not as
depressed or sad. Fast forward to last week I began to feel worse than I was before even with the medication.
I became really sad and depressed again almost angry. My anxiety is to the put that I'm feeling nauseous I
can't eat because I'm so nervous I feel like I'm going to vomit. I don't know what I should do at this point my

Evans, Desire N
MRN: 88245320

Page 14

Plaintiffs0000005753

D. Clifton a.k.a. D. Evans. Smith 000019
JA3439

Telephone Contact Summary (continued)

Encounter Messages (continued)

hands are literally shaking.

Medication Question

| From | To | Sent |
|---|---|---|
| Desire N Evans | Shanda J (M.D.) Smith, M.D. | 2/6/2018 11:48 AM |

Good Morning

I have been trying to email since last wee, I hope this one make it through. I am writing because the first week and half on my medication, I was doing a lot better. I still have extreme anxiety, but I was not as depressed or sad. Fast forward to last week I began to feel worse than I was before even with the medication. I became really sad and depressed again almost angry. My anxiety is to the put that I'm feeling nauseous I can't eat because I'm so nervous I feel like I'm going to vomit. I don't know what I should do at this point my hands are literally shaking.

Patient Secure Message Encounter Routing History

Patient Instructions

None

## END OF REPORT

Evans, Desire N
MRN: 88245320

Page 15

Plaintiffs0000005754

D. Clifton a.k.a. D. Evans: Smith 000020

JA3440



**KAISER PERMANENTE®**

**Desire N Evans**
2/16/2018 1:59 PM   Telephone
MRN: 88245320

Encounter #: **253752948**
Center: **LARGO**

Description: **38 year old female**
Provider: **SHANDA J SMITH MD**
Department: **Psychiatry Largo**

---

**Visit Summary**

**Reason for Visit**

---

**Telephone Contact Summary**

**Call Information**

| | Provider | Department | Center |
|---|---|---|---|
| 2/16/2018 1:59 PM | Smith, Shanda (M.D.), M.D. | Psychiatry Largo | LARGO |

**Encounter Documentation**

**Smith, Shanda (M.D.), M.D. at 2/16/2018  1:59 PM**

Status:  Signed

Attempted to reach pt who didn't log in for today's Video Visit.

Reached her VM and left message w/ my name/return number.

Encouraged her to reach out to me either through kp.org or by phone for any questions/concerns

Electronically signed by Smith, Shanda (M.D.), M.D., 2/16/2018  2:00 PM

---

**Encounter Messages**
No messages in this encounter

**Patient Secure Message Encounter Routing History**

**Patient Instructions**
None

---

### END OF REPORT

---

Evans, Desire N
MRN: 88245320

Page 16

17 of 19

Plaintiffs0000005755

JA3441
D. Clifton a.k.a. D. Evans: Smith 000021

RW MDL RH 1417974

**KAISER PERMANENTE**®
(*Kaiser Permanente entitles are listed on reverse side of this form)

**AUTHORIZATION FOR USE OR DISCLOSURE OF PATIENT HEALTH INFORMATION**
Note: Fees may apply to certain requests

Patient Name: _____
Medical Record number: _____ Birth Date: _____
Address: _____
City: _____ State: _____
Zip Code: _____ Phone #: (___) ___-____
Email: _____

---

Kaiser Permanente may release this information to: ☑ Check if same as above
**Recipient Name:** _____
Address: _____ City: _____ State: _____ Zip Code: _____
Phone # (___) _____ Email: _____

---

This disclosure can be used for the following purpose(s): ☐ Personal Use  ☐ Legal  ☐ Insurance
☐ Medical Treatment  ☐ Medical Condition Verification  ☐ Disability  ☑ FMLA  ☐ Workers' Comp

---

Check ONLY one of the following three options to identify the health information to be released.
☑ **Option 1:** Form Completion (a substitute form or relevant medical records may be released)
☐ **Option 2:** Last 2 years of Kaiser Permanente Medical Office and Kaiser Foundation Hospital records
☐ **Option 3:** Records as specified. You must complete Step 1 and Step 2 below.
   Step 1. Enter date range or date(s) of the records to be released: _____
   Step 2. Select types of records to be released:
   ☐ KP Medical Office  ☐ Kaiser Foundation Hospital  ☐ Immunization  ☐ Lab Results
   ☐ Diagnostic Images  ☐ Copays & Deductibles  ☐ Itemized Billing  ☐ Pharmacy
   ☐ Other (provider, department, specialty): _____

---

NOTE: Hospital and Medical Office records released as part of this authorization may contain references related to mental health, addiction, and HIV medical conditions.

Check the boxes below if you want this release to include the following information, Otherwise, this information will be excluded.
☒ Mental Health Treatment Records  ☐ Addiction Medicine Treatment Records  ☐ HIV Test Results

---

Media Type: ☐ Electronic  ☑ Paper  Delivery Preference: ☑ Electronic  ☑ Mail  ☒ Pickup

---

**DURATION:** Authorization shall remain in effect for one year from the date of signature below. However, in Washington, D.C. permission to release addiction medicine treatment records expires after six (6) months.

**REVOCATION:** You or your personal representative may cancel this authorization for future releases by submitting a written request to the Release of Information Unit listed for your region of service on the reverse side of this form. Your cancellation will not affect information that was released prior to receipt of the written request.

**REDISCLOSURE:** Once this information is released, it may not be protected under federal privacy law (HIPAA). State or other federal law may require the recipient to obtain your authorization before further disclosure.

---

Kaiser Permanente may not condition treatment, payment, enrollment, or eligibility for benefits on whether you sign this authorization. This disclosure is made at your request. For Virginia patients, a copy of this authorization, and a note stating to whom your information was disclosed will be included in your medical record. A copy of the original authorization is valid. You have a right to a copy of this completed authorization.

Date _____  Signature _____  If personal representative, print name/relationship

KPMA-0122 (REV-4-17)  ORIGINAL - BILLING PARTY  CANARY - PATIENT  242168

Plaintiffs0000005756

JA3442
D. Clifton a.k.a. D. Evans: Smith 000022

## Health Care Provider Certification for the Family Medical Leave Act (FMLA)
Employee's Own Serious Health Condition

| Employee Section |
| --- |

⚠ **Important!**
1. Your health care provider must complete **all** questions on this form.
2. You **must** call Aon Hewitt at 1-888-763-6468, option 2, to initiate your leave of absence **before** you submit this form. Failure to contact Aon Hewitt to report your leave may affect your job, pay, and benefits.
3. Fax this **completed** form to 1-847-554-1934 **or** mail it to Aon Hewitt, P.O. Box 785002, Orlando, FL 32878-5002.

| Name (Print) Desive Evans | Employee ID |
| --- | --- |

| Health Care Provider Section – Answer ALL Questions |
| --- |

**1. Check the serious health condition(s) requiring this employee to take a leave of absence:** *(See definitions page for more information.)*

☐ Absence Plus Treatment ☐ Chronic Conditions Requiring Treatment ☐ Hospital Care ☐ Pregnancy

☐ Permanent/Long-Term Conditions Requiring Supervision ☑ Multiple Treatments (Nonchronic Conditions)

**2. Describe the medical facts that support the condition(s) identified above:** *(not required for employees working in California)*

Major Depressive Disorder, Recurrent Episode Severe w/Anxious Stress

**3. Can the employee do work of any kind? (Check one.)**

☒ Yes, the employee can do his or her job.

☐ Yes, the employee can do *part* of his or her job.

☐ No, the employee cannot do any work.

☐ Yes, the employee can work but cannot do his or her job. Explain the restrictions: _____

**4. The employee needs to miss work:**

☐ Continuously-An uninterrupted absence for a single illness or injury

☑ Intermittently-Occasional absences due to a single illness or injury (includes reduced schedule)

**If intermittently,**
a) Check **one** and provide the related information:

☐ **Planned, Regular Schedule**
   What's the requested reduced schedule (for example, 20 hours a week)? _____
   How many hours can this employee work each day (for example, 5 hours)? _____

☑ **Unplanned, Unknown, or As Needed**
   How often will this employee be away from work (for example, twice a month)? twice/month
   How long will this employee be away from work each time (for example, four hours)? 8 hours

b) Is it medically necessary for the employee to miss work due to the health condition(s)? ☑ Yes ☐ No
*Note: The employee is required to provide a requested leave schedule to his or her manager.*

| **5. Start Date:** Date employee is/was first unable to work due to the serious health condition(s) above: 01 / 17 / 2018 <br> mm dd yyyy <br> *If intermittent, use the first date of the most recent period of absence.* | **6. Return Date:** Date employee can return to work at his or her normal schedule: 01 / 17 / 2019 <br> mm dd yyyy <br> *If chronic or permanent condition(s), the return date will be no greater than one year after the leave start date.* |
| --- | --- |

**Health Care Provider Acknowledgment**

Name (Print): Shanda Smith MD.   Date: 1/22/18   Phone: 301-618-5500

Address: 12201 Mercantile Ln Largo MD 20721

☞ **Signature:** _____ MD

KAISER PERMANENTE
LARGO MEDICAL CENTER
1221 Mercantile Lane
Largo, Maryland 20774

Copyright © 2010 Hewitt Associates LLC

19 of 19

000020194 0002-V000001

JA3443
D. Clifton a.k.a. D. Evans. Smith 000023

# Exhibit 57

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE:  *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe

On September 9, 2019, I had the opportunity to see Desire Evans for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Evans' psychiatric condition in relation to the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Evans that the examination was not for purposes of treatment and it was not a confidential examination.  I discussed with Ms. Evans that I would prepare a report based on the psychiatric evaluation and review of records.

The file included the following documents:

1. Medical Records: Plaintiffs0000000001 – Plaintiffs0000000571; Plaintiffs0000005735 – Plaintiffs0000006016
2. Complaint in *Russell et al. v. ECFMG* (12/31/2018)
3. Desire Evans' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Desire Evans' Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5. Deposition of Desire Evans (9/5/2019)
6. Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7. Desire Evans Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8. Deposition of Desire Evans, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9. Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10. Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

JA3445

**HISTORY REPORTED BY DESIRE EVANS:**

Desire Evans (███████████████████) said that she is involved in a lawsuit because the doctor who delivered her son had "identity fraud."  Ms. Evans said that he used different names and Social Security numbers to obtain his certification.

Ms. Evans said she assumed that Dr. Akoda had hurt other women because she felt that he had hurt her during the delivery of her son.  Ms. Evans said that when she heard an ad telling anyone who had been Dr. Akoda's patient to call a phone number, Ms. Evans assumed that Dr. Akoda had touched other women inappropriately.  Ms. Evans said that when she called the number, she learned that the lawsuit was not, per se, malpractice. Ms. Evans said that it is her understanding that Dr. Akoda failed several certification tests, and he had reapplied using different Social Security numbers and names.  Ms. Evans said she believes that Dr. Akoda was trying to degrade people.  Ms. Evans could not understand why Dr. Akoda continued to submit applications to ECFMG using different names.  Ms. Evans continued, "How do you even know he is who he said he was?  I still don't know who he is."  Ms. Evans said that the experience with Dr. Akoda affected her.  Ms. Evans said that she lost complete trust in the medical field and has problems with trust.  For example, she said she did not feel comfortable going in a car with a driver she did not know, and her husband took off from work to drive her to the independent psychiatric examination.

Ms. Evans said that her prenatal care was at the practice of Javaka Moore, MD. She said that during her pregnancy, she had to go to the practice chosen by Medicaid.  She said she saw Dr. Moore and nurse practitioners.  She said she had started to dilate at five months, and she was treated with progesterone.  Ms. Evans said she was scheduled to be induced because she was two weeks past her due date.  Ms. Evans said she expected that Dr. Moore would deliver her baby. She said she met Dr. Akoda on the day of the induction.  She said a nurse had put in the epidural and given her Pitocin.  She said she did not meet Dr. Akoda until her water broke, and at that time, she was in labor.

Ms. Evans said that Dr. Akoda was the only doctor in and out of the delivery room.  She said that when her labor was not progressing, Dr. Akoda began to stimulate her clitoris.  Ms. Evans said she questioned what he was doing, and he told her and her husband that this stimulation would help the baby come out.  Ms. Evans said she was in labor and this felt weird and uncomfortable.  Ms. Evans said she thinks the nurse was in the delivery room.  Ms. Evans said she was not in stirrups at that time, but rather her mother and her husband were holding her legs.  Ms. Evans repeated that Dr. Akoda made her feel uncomfortable.  Ms. Evans said that she had an emergency C-section.

Ms. Evans had a six-week checkup with the nurse practitioner.  Ms. Evans said that she had severe back and leg pain after the epidural, and she said she still has sciatic pain.  She talked about the sciatic pain at her six-week checkup.  She did not say anything about Dr. Akoda's behavior during the delivery of her son.

Ms. Evans said she has not had any follow-up gynecologic care since her son was born.  She said, "I don't want anyone touching me down there."  Ms. Evans said that she lost trust after the

JA3446

RE:  Desire Evans
Page 3

delivery because her doctor did not show up, and the doctor who delivered her son was "another doctor who was supposed to be a doctor."  She said that she was uncomfortable with how he touched her.  Ms. Evans said she does not see a primary care physician.  She said she has been in treatment with a psychiatrist and a psychologist, and she has blood pressure and weight checks.

Ms. Evans began to cry.  She said that she and her husband have only had sex two or three times since her son was born.  She said that she feels uncomfortable if he tries to touch her.  She said that her husband loves her.  Ms. Evans said she is trying to work through this, and it is embarrassing.

Ms. Evans has Family Medical Leave for diagnoses of anxiety, depression, and posttraumatic stress disorder, and she has ADA accommodations for anxiety.  Ms. Evans said that Dr. Ebony Cross is her psychiatrist, and she has been in treatment with Dr. Cross since April 2019.  Ms. Evans said that her medications include ██████████████████████████████████████████████████.  Ms. Evans said that she has really bad anxiety that affects her sleep.  She said that she does not believe she had postpartum depression. She said that she believes her problem was a consequence of losing complete trust in the medical field.

Ms. Evans said she has been in treatment with Dr. Donato for two years.  Ms. Evans said that Dr. Donato has recommended YouTube videos about stress.  Ms. Evans said that she is not a person who opens up to other people, and she does not like to talk about herself.  She said that she schedules appointments with Dr. Donato as needed, and he completes forms for ADA and FMLA.  Ms. Evans said that her ADA accommodations allow her to work from home, and her Family Medical Leave accommodations allow her to take days off for doctors' appointments and anxiety.  She can be out of work eight hours a day, three days a week.  Ms. Evans said that she probably works 26 to 30 hours a week.  Ms. Evans was crying as she related her history. Ms. Evans said that her ADA accommodations are permanent, but her FMLA leave requires updates.

Ms. Evans said that she will sometimes talk to Dr. Donato on the phone.  She said that she spoke to her previous psychiatrist, Dr. Shanda Smith, on the phone.  Ms. Evans said that it is her anxiety that keeps her up and it is her anxiety that affects her ability to focus.  She said, "I walk around with a big ball of stress."

Ms. Evans said that she had anxiety after the hospital experience, and she had serious trust issues about everything after the experience with Dr. Akoda.  She said that her problems with trust increased when she learned about a lawsuit regarding Dr. Akoda.

Ms. Evans said that Dr. Donato referred her for a psychiatric evaluation with Dr. Nnamani.  Ms. Evans said that she had only one appointment with Dr. Nnamani because the office was one hour from Ms. Evans' home.  Ms. Evans said that Dr. Nnamani diagnosed her with posttraumatic stress disorder.  Ms. Evans said that she has a lot of pent up trauma and there was no specific abuse, but neglect.  Ms. Evans said that she grew up in the church and her grandmother was a Pentecostal pastor who passed away in 2007.  Ms. Evans said that she was 19 years old in 2007, through her date of birth shows that she would have been 28 years old in 2007.  Ms. Evans said that her mother was 19 or 20 years old when Ms. Evans was born, and Ms. Evans' grandmother

was the constant person in her life. Ms. Evans said that she and her grandmother had everyday bible study. Ms. Evans said 50 or 60 people followed her grandmother's preaching. Ms. Evans said that after her grandmother died, she lost faith. Ms. Evans said that her grandmother was the most faithful servant of God, and she was a perfect human being. Ms. Evans said that her grandmother had breast cancer. Ms. Evans said she thought God was going to heal her grandmother, and she did not have any treatment. Ms. Evans was crying. She said she did not go back to the church after her grandmother's death.

Ms. Evans said that she had other trauma related to her brother. She said that she felt that she had to raise him. Ms. Evans said that she does not believe her mother acted in an intentional way not to care for her and her brother, but her mother was not available to raise her or her brother.

Ms. Evans said she did not have trust issues with doctors before the birth of her son. Ms. Evans said that she had trust issues with God. She repeated that since the birth of her son, she is not interested in sex. She said that she does not want to be touched by anyone. Ms. Evans said that she believes her husband has looked at her in a different way since the childbirth experience. She said that she has not wanted to talk about her experience in labor with her husband. She said that she feels that this is her issue.

Ms. Evans described her mood as a big ball of stress. She said that she has dreams that are very scary. She said that she cannot pinpoint the content of the dreams, and they are not recurring dreams. In response to a question about her appetite, she commented that she is fat. She said that she is 5 feet, 3 inches tall and she weighs 180 pounds. She said that she started gaining weight after she had her son and she weighed 156 pounds after her son was born. Ms. Evans said she feels a little better because she had recently lost 15 pounds. She reported that she eats late at night, and she believes that this contributes to the weight gain. Ms. Evans said that she has problems with her concentration. She said that she feels she is all over the place, and it is hard to stay on task. Ms. Evans said that she has problems with energy. She said that she tries to have a good time with Peyton and other family members. Ms. Evans said that she does not have suicidal thoughts. Ms. Evans said she can feel the most depressed in the world, but she will then focus on her son and her husband. Ms. Evans said that she has anxiety attacks, but she does not know what causes them. She said that when she feels the anxiety increasing, she takes a Klonopin.

Ms. Evans said that everything scares her. Ms. Evans said that she did not have her son vaccinated until he was three years old because of her fears. She said that she feels every day is Halloween, and she is terrified of the world. She said that her feelings of terror increased after her son was born. She reported that she does not like to be around people, and she does not like to leave the house because everything worries her.

Ms. Evans returned to discussing the lawsuit. Ms. Evans said that Dr. Akoda said he was a doctor. Ms. Evans said that she is now under the impression that he may not be a doctor. Ms. Evans said that she feels she was harmed and that Dr. Akoda touched her in an inappropriate way during the delivery. She repeated that she does not know if he is a doctor, and she does not know if he has the certification necessary to be a doctor.

JA3448

## PAST MEDICAL/PAST PSYCHIATRIC HISTORY:

In June 2014, Ms. Evans fell down wooden stairs.  She said that there were 15 steep steps in her apartment.  She said that she lost her footing.  She said that she did not lose consciousness and did not go to the hospital right away.  Ms. Evans said that she realized that she was having a significant problem with her back and her legs.  She said that she told her husband that it was bad, and she went to the emergency room.  She said that she was in the hospital for five days.  She said that she had a lot of tests.  She said that she had occupational therapy and physical therapy before she was discharged.  She said that she did not have any physical therapy after her discharge, and she did not have any follow-up.  Ms. Evans said that she and her husband live in a three-bedroom house with her office in the basement.  She said there are stairs in the house, and all the stairs are carpeted.

█████████████████████████████  She said that she just wanted to move out; she did not want to co-parent with her mother any longer.  Ms. Evans said that she has always been the adult.  She said that she told her mother that she had taken ████████ of Tylenol PM, and her mother took her to the hospital.  Ms. Evans said that she tried to explain that she had not taken any pills, but she was treated in the hospital ███████████████████████  Ms. Evans said that she was given charcoal.  She said that she had taken █████████████  She said her stupidity got her into the situation.  Ms. Evans said that she believes that this was an involuntary hospitalization.  She said that she believes she was treated with fluoxetine.  Ms. Evans said that she knew there was nothing wrong with her, and she did not have any follow-up.

Ms. Evans said she did not have any psychiatric or psychological treatment until she began treatment with Dr. Smith in January 2018.

## SOCIAL HISTORY:

Ms. Evans said that she has been married for four years, but she and her husband have been together for seven years.  Their son, Peyton, was born on March 17, 2016.  She said that her husband has three children from a previous relationship, including a 15-year-old boy, an 11-year-old boy, and a 7-year-old girl.

Ms. Evans reported that she has been working for Blue Cross Blue Shield in customer service since June 2015. She was not hired to a permanent position until January 2016 and she did not have any maternity leave.  She said that she took off eight weeks and was then able to work from home.

Ms. Evans said that she is studying cybersecurity at Strayer University.  She said that she takes two classes a semester and has gotten all A's.  Ms. Evans said that she believes she can finish her degree in three or four years.  Ms. Evans said she wants to work in the private sector.  She said that she is concerned about issues related to voting.  She said that her grandmother always worked at the polls, and her grandmother was very politically involved.

Ms. Evans said that she has a good job with health benefits.  She said that all the calls are recorded, and five calls a month are reviewed.  She said that the job is micromanaged.  She said

that she needs to be on the phone 82% of the time.  She said that she cannot be longer than seven minutes on any call, and she only has two minutes to enter the information.

Ms. Evans said that she and her husband, a bus driver, get along well.  She said that he is really laid back.  Ms. Evans described her son Peyton as "awesome," very active, and headstrong.

Ms. Evans said that her mother is 61 years old, healthy, and works in a doctor's office.  She said that her father has been in and out of jail for drugs and robbery.  She said that her parents were divorced in 2008.

Ms. Evans said that she left school at 16 or 17.  She said that she wanted to help her mom.  She said that she got a high school diploma and studied a trade to be a nursing assistant.

Ms. Evans denied the use of alcohol.  She denied the use of drugs, including marijuana.  [Note: Ms. Evans had reported to Dr. Smith that she was using daily marijuana to help with sleep.]

## MENTAL STATUS EXAMINATION:

Mental status examination revealed a casually groomed 40-year-old woman.  Her speech was goal-directed and spontaneous.  Although Ms. Evans discussed her problems with trust, she spoke in a spontaneous fashion, provided a detailed personal history, and easily established rapport.

Ms. Evans described her mood as a big ball of stress.  Her affect was labile with frequent crying.  She denied suicidal ideation.  She would never leave her husband and her son.

Ms. Evans said that she has anxiety attacks.  She cannot identify a precipitant.  She said that she has vivid dreams, but she does not recall the content of the dreams.

Ms. Evans said that Dr. Donato sent her to a psychiatrist who diagnosed posttraumatic stress disorder.  Ms. Evans said that the posttraumatic stress disorder relates to all the previous trauma.

Memory and intelligence were grossly within normal limits.

## REVIEW OF RECORDS:

I have reviewed the records identified at the start of the report.  The following summaries of information reported in medical records focus on the provided records that referred to psychiatric complaints.

1.  Shanda Smith, MD

Ms. Evans had a new patient evaluation on January 17, 2018.  The chief complaint was depression and anxiety.  Ms. Evans was self-referred after consultation with a primary care doctor.  Ms. Evans reported feeling anxious and depressed for most of her life, but worse over the past year since her birthday in March.  Ms. Evans reported significant anxiety, described as

excess worry that was difficult to control.  Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping.  Ms. Evans seemed to cry out of the blue for no reason.  Ms. Evans had passive thoughts of death related to hopelessness but denied any intent or plans because of her strong attachment to her two-year-old son.  Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite.  Ms. Evans had poor focus because of anxiety and thoughts jumping around.  Ms. Evans was working at home so she could watch her son.  He was growing more active, and this was becoming more of a challenge.  Ms. Evans denied any specific stressors or changes.  She did note that she was not satisfied with her life.  She said she could not focus or pursue her goals because of anxiety.  She described herself as very private.  Her husband was aware of her depression, but she felt he did not know how to respond.

In regard to past psychiatric history, Ms. Evans reported histories of symptoms on and off throughought her adult life.  She had one suicide attempt by overdose in 2009.  She was admitted to a psychiatric hospital for about five days.  Ms. Evans was started on fluoxetine but stopped it soon after discharge.  There was no additional or continued care.

Ms. Evans reported that when her parents were divorced, she functioned as a parent to her younger brother, who was nine years younger.

The diagnosis was major depressive disorder, recurrent, severe, with anxious stress, and unhealthy substance behavior, referring to daily marijuana use to help with sleep.  The treatment plan was for Prozac and hydroxyzine as needed for sleep and severe anxiety.  There would be a video visit on February 16, 2018 and a psychotherapy appointment on January 19, 2018.

The records included correspondence from Ms. Evans to Dr. Smith regarding medication.  The plan was to stop hydroxyzine and prescribe trazodone.

The appointment on February 6, 2018 was a structured telephone medication management visit.  Ms. Evans reported initial improvement in mood.  She was not crying as much since starting Prozac, but about one and a half weeks after increasing to 20 mg, her anxiety increased.  The plan was to continue Prozac and use Ativan sparingly for severe anxiety and palpitations.  She was taking Prozac 20 mg and trazodone 50 mg at bedtime as needed.

Dr. Smith completed a Family Medical Leave form dated January 22, 2018.  The diagnosis was major depressive disorder, recurrent episodes, severe, with anxious stress.  The recommendation was for unplanned leave twice a month for eight hours.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

2.  Shah Associates Family Practice

The records included a note from Dionne Lucas, PAC dated July 25, 2016.  Ms. Evans was a new patient to the practice.  Ms. Evans was complaining of feeling sad all the time and having severe anxiety.  She had a baby in March 2016, and since then she had not been able to sleep.  Ms. Evans was afraid to drive a car.  She was afraid of walking down steps with her son because

she thought she might drop him.  She was afraid to let her son be watched by other people.  She was losing hair.  She had not been able to go into work since her maternity leave ended.  When Ms. Evans saw her gynecologist, she was given a note for reasonable accommodation, which allowed her to work from home until August 1, 2016.  Ms. Evans was asking for an updated letter and evaluation for this complaint.

Ms. Evans said before she had her baby, she did not have any issues with anxiety and depression.  Her husband and mother were described as very supportive.  During her pregnancy, Ms. Evans started to complain of lower back pain that would shoot down her left leg.  The symptoms continued.  She said it was like a vibrating cell phone in her left back pocket.  She had not used any medication for this complaint.  She had reached her pre-pregnancy weight.  Her only injuries to the back occurred during the summer of 2015 from C3 to C5, affecting the right side.

Ms. Evans said her lower back had never been an issue.  Her past history included depression, anxiety, and anemia.  She was taking naproxen every 12 hours and sertraline 50 mg.  She said she had been gaining weight.  She was fatigued.  She was not able to fall asleep or stay asleep.  The impression was depression, anxiety, possiblly postpartum.  She was started on Zoloft 50 mg.  Ms. Evans was given information to consult a mental health professional.  She received a note extending reasonable accommodations until the week of September 12, 2016.  She had lumbago and sciatica.  She had an order for an x-ray of the lumbar spine and an appointment for a nerve conduction study.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

## SUMMARY AND IMPRESSION:

It is my opinion that Ms. Evans does not have a psychiatric disorder related to the allegations in the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.  It is my opinion Ms. Evans has psychiatric conditions of major depression and panic disorder, documented in the available records, but there is no relation between those psychiatric conditions and the allegations in the Complaint.  Ms. Evans discussed her feelings about the inappropriate behavior of Dr. Akoda during the delivery of her son.  Ms. Evans acknowledged that she did not report this behavior to another treating doctor or nurse or discuss her feelings about Dr. Akoda with her husband.  Ms. Evans said that her husband, her mother, and a nurse were in the delivery room and aware of Dr. Akoda's treatment during the delivery.   Ms. Evans did not file a malpractice complaint about Dr. Akoda in relation to the delivery of her son.

Ms. Evans has ADA and FMLA accommodations for conditions of depression and anxiety. The symptoms of major depression and panic disorder were documented in the psychiatric report from Shanda Smith, MD, regarding the new patient evaluation on January 17, 2018.  This report did not include any reference to Dr. Akoda or ongoing litigation. The chief complaints were depression and anxiety. Ms. Evans reported feeling anxious and depressed for most of her life.  Ms. Evans reported significant anxiety, described as excess worry that was difficult to control.  Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping.  Ms. Evans seemed to cry out of the blue for no reason.  Ms. Evans had ███████ ████████████ related to hopelessness but denied any intent or plans because of her strong

attachment to her two-year-old son. Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite. Ms. Evans had poor focus because of anxiety and thoughts jumping around.

During the evaluation, Ms. Evans said that the current lawsuit relates to a question about Dr. Akoda's "several different names and Social Security numbers," but she could not identify how this allegation has caused her to experience depression and anxiety or cause an increase in her depression and anxiety.

Although Ms. Evans reported ongoing depression and anxiety, she has many strengths. She described a strong marriage and her love for her "awesome" son Peyton. Ms. Evans continues to work, and she is also in school. She believes she can finish her degree in three or four years. Ms. Evans wants to work in the private sector and is concerned about issues related to voting.

In conclusion, it is my opinion that Ms. Evans does not have a psychiatric disorder causally related to her allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*, and there was no exacerbation of Ms. Evans' psychiatric conditions as a consequence of the allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD
GSF/jne

# Exhibit 58

JA3454

# CHRISTIANE TELLEFSEN MD
301 Saint Paul Place
Suite 815 POB
Baltimore, MD 21202
CTellefsen@aol.com
Telephone: (410) 323-8767
Facsimile: (410) 560-7247

September 20, 2019

Danielle S. Dinsmore, Esquire
The Law Offices of Peter Angelos, P.C.
100 North Charles Street
Baltimore, Maryland 21201

Re:    "Charles Akoda" Cases

Dear Ms. Dinsmore:

At your request, I have evaluated three plaintiffs in a lawsuit related to the activities of Charles Akoda. The plaintiffs are among multiple obstetric and gynecologic patients who were evaluated or treated by Akoda in Prince George's County. These plaintiffs learned at some point after their treatment that he had fraudulently obtained his medical license by using different Social Security numbers and assuming false identities. He has since been convicted and served time for fraud. Many of these plaintiffs also complained that Akoda behaved in a sexually inappropriate manner with them, making them feel uncomfortable or disturbed.

Akoda reported going through medical school in Nigeria and was certified by the Educational Commission for Foreign Medical Graduates (ECFMG). He later completed a residency at Howard University Hospital using his fake identity. The plaintiffs have filed suit against the ECFMG for failure to properly vet and certify this man. What follows is a brief summary of these evaluations as well as a discussion about the nature of their alleged traumatic exposure and subsequent symptoms. For the individual summaries I have used code names for privacy, with a key attached in an addendum.

Qualifications of Examiner:

You have a copy of my Curriculum Vitae and Case List which states my qualifications to perform this examination. This also lists my publications. I charge $500 per hour for any time spent on this case. Over more than 30 years of practice, I have evaluated hundreds of cases in which there have been allegations of sexual assault or inappropriate sexual behavior, with many of the victims being in fiduciary relationships with the perpetrators. I have evaluated victims and perpetrators in



both forensic and clinical contexts. My experience has included evaluations of individuals who have been subjected to sexual assault, battery, inappropriate sexual touching, or surreptitious sexual surveillance as well as other professional boundary violations.

## Summary:

The Akoda cases center on allegations of boundary violations, betrayal of trust by a treating physician and inappropriate sexual behavior. Boundaries are an important aspect of a therapeutic relationship between a patient and their physician. The boundary allows for a professional distance that fosters mutual respect between patient and physician. Sexual or inappropriate physical contact between a physician and patient is a profound boundary violation, as it exploits the dependency of the patient on the physician and the inherent power differential.

Patients trust that their individual physicians are working in their interest. This trust leads to a belief that they will not be taken advantage of, used for the physicians' own personal gain or have their confidences revealed. The physician patient relationship is founded upon this trust which allows patients to be vulnerable, to share intimacies and to be touched for medical purposes. When this trust is violated, the patient suffers a betrayal that may have myriad emotional consequences.

Individuals who have been sexually abused by physicians or other authority figures often develop characteristic symptoms, which may occur soon after the victimization or with a delayed onset. These symptoms and conditions may include depression, anxiety, paranoia, sleep disturbances and nightmares, reliving phenomena, self-harm, self-doubt and poor self-esteem. Many victims report feeling shame and guilt over these situations and often blame themselves for allowing the assault or situation to occur. Many of these victims berate themselves for getting involved with their victimizer and question their ongoing judgment. Many find it difficult to develop trusting relationships with subsequent caregivers, or may avoid future care. Some women develop symptoms of Posttraumatic Stress Disorder or Adjustment Disorders with characteristic reliving phenomena, heightened general anxiety, numbing and fears.

Likewise, patients place trust in institutions that employ physicians or otherwise certify their qualifications or competence. When that trust is broken, similar symptoms may arise, not the least of which may be an inability to trust in any doctor they see in the future or their sponsoring or associated facilities.

These cases are additionally complicated by being obstetric care. The breach of trust has an impact on the mother child relationship, with a high potential for guilt and self-recrimination over not protecting their babies. That these cases involve prenatal care and deliveries at which other family members participated or were present provides potential for further trauma. This may lead to an additional emotional burden of coping with shame and embarrassment in front of partners and family members.

Interview Summaries:

*Plaintiff Alpha*:

I saw her in my office in Baltimore on September 19, 2019 for a ninety-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Prince George's Hospital Center and Charles Akoda's outpatient treatment, as well as her deposition.

This 27-year-old woman underwent what she perceived as routine treatment with Charles Akoda in 2012. He provided her with prenatal care and performed her C-section. She did however believe her recovery was more painful than her recovery after her other two C-sections. She worried that a surgical mishap on his part might have led to this pain. She reported shock and dismay after learning of Charles Akoda's false identity. This was intense at first and subsequently was diminished but lingered. She has a recurrence of her shock, anger and dismay when she thinks about the situation, and these thoughts may arise unbidden. It has not otherwise interfered with her ability to function in her life and she has not had symptoms to such an extent that she sought any psychiatric treatment. She had an uneventful subsequent pregnancy and delivery with another physician.

Her description of these events suggest that while she has had ongoing emotional distress from the situation, it has not progressed to a diagnosable mental disorder. She reported having a heightened sense of apprehension about new physicians and other people in whom she needs to place trust in her life. She is far more cautious than she used to be and finds herself avoiding treatment if she has an inkling of discomfort, which she had not done previously.

*Plaintiff Bravo*:

I saw her in my office in Baltimore on September 13, 2019 for a ninety-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Kaiser Permanente and Prince George's Hospital Center, as well as her deposition.

This 32-year-old woman was a patient of Charles Akoda for prenatal care. He performed her delivery and then a D&C after a postpartum hemorrhage at Prince George's Hospital Center. She reported feeling uncomfortable around him during her prenatal care, enough so that she requested a chaperone during his examinations. She attributed the hemorrhage to his care, in that she had not had this problem with any of her other deliveries. She became dismayed, shocked and ultimately angry when she learned that he was not who he said he was and that his credentials were fake. She keeps a cellphone photograph of the blood clots from her hemorrhage, which serves as a frequent reminder of her traumatic experience and leads to painful reliving. She feels betrayed. She has become suspicious of any other professionals she allows in to her life. Her symptoms have not interfered with her day-to-day functioning but have caused ongoing distress. Her distrust of doctors led her to decline an appropriate examination because of her fearfulness and discomfort.

Case 22-1998 Document 22-5 Page 1568 Date Filed: 09/08/2022

Her condition is most consistent with the psychiatric disorder, Adjustment Disorder with Anxiety. She would, more likely than not, benefit from a course of psychotherapy to assist her in processing what happened to her and promote less avoidant future behavior.

*Plaintiff Charlie:*

I saw her in my office in Baltimore on September 16, 2019 for a two-hour and thirty-minute interview. In addition to the psychiatric interview, I also reviewed her medical records from Prince George's Hospital Center, psychiatric records from Ijeoma Nnamani, MD as well as her deposition.

Charlie is a 40 year old woman who reported increasing problems with anxiety and depressed mood after her delivery which Akoda attended. She reported difficulty concentrating and an inability to be touched. She was evaluated by several psychiatrists who diagnosed her with Anxiety and Mood Disorders and treated her with antidepressants and anti-anxiety and sleep medications. She has also had an attempt at psychotherapy but has felt uncomfortable with this male therapist and does not feel like she has gotten much relief from that process. She continues to have depressed and anxious mood, poor concentration, excessive guilt and insomnia.

She attributed a lot of her anxiety symptoms to her reaction to having been Charles Akoda's patient, in terms of his identity theft. However, she also reported feeling like he was sexually inappropriate with her during her delivery. She said he began stimulating her clitoris in front of her husband and mother in the delivery room. She continues to ruminate about this situation and blames herself for not having said anything. At the time she felt confused, embarrassed, humiliated and disgusted by his actions which interfered with the joy of giving birth to her first child. Since the birth, she has been unable to reestablish her sex life with her husband, a loss she fears will lead to marital strife in the future.

Her condition is complicated by a number of other factors in her life, one of which is her difficult work schedule and the coordination of her and her husband's working hours. This lack of coordination exacerbates her problems with sleep. She has reported difficulty initiating sleep but she also has limited time available to her to sleep.

The other complicating factor is the more recent development of what sounds like, from her description, a pseudotumor cerebri, which is still being evaluated. She has been having headaches and a worsening of her already poor concentration. She is currently attempting to make a decision about going through with a lumbar puncture which is typically a necessary procedure to evaluate for this potential diagnosis. She has resisted having this test because of her ongoing concerns about trust with physicians. This is a particularly difficult test for her in that it requires her to expose her lower back to a physician with whom she has no ongoing relationship, while facing away and not being able to see what is happening. She has cancelled the appointment for the test several weeks ago and has not yet responded to the doctor's office's calls to reschedule it.

Her collection of symptoms is most consistent with a psychiatric diagnosis of Mood Disorder. This diagnosis accounts for the multiple sources of her symptoms. Her condition arose in

the postpartum period suggesting some hormonal contribution, but it has continued now for several years. She also now has new onset of a probable pseudotumor the symptoms of which have intensified her existing symptoms of depression.

She also has elements of a stress disorder, most likely Adjustment Disorder with Mixed Disturbance of Behavior. She reported many of her symptoms began because of her perception of Akoda's inappropriate actions during her delivery. She attributes her subsequent sex aversion and fear of being touched to this event. Her condition was then complicated by the shocking news about Charles Akoda's identity theft. Her fears about doctors and being touched is now having a direct negative impact on her evaluation for the pseudotumor. If this condition is left untreated, it could lead to blindness, other severe health problems or death.

She is currently in psychiatric treatment for medication management with a psychiatric nurse practitioner. Her situation, however, is tremendously complicated. She would benefit from treatment with a psychiatrist. Because of her history with Charles Akoda, she would benefit from a psychiatrist who could see her for both medications and the psychotherapy. She also has a potentially life-threatening medical condition now that needs to be addressed as soon as possible. She would benefit from more emergent psychiatric support to get her through this diagnostic process for her neurologic condition.

Analysis:

The three examined cases represent a spectrum of conditions with varying severity related to their experience with Charles Akoda. All of the women reported shock, dismay, anger, recrimination and guilt. They were all immediately distressed when they learned of his arrest and have had waxing and waning degrees of distress and horror over the subsequent years. Their level of distress tends to re-emerge with events in their lives that remind them of the experience.

Alpha reported having no symptoms unless she was thinking about the case, at which point she would have moments of intense anger, anxiety and tearfulness. Apart from that, this plaintiff has no interference with her day-to-day function. She has ongoing but intermittent emotional distress from the experience with Charles Akoda.

Bravo reported similar symptoms but in a more lingering fashion. This plaintiff also reported inappropriate sexual behavior that made her uncomfortable during her prenatal visits. She remains concerned that the complication of postpartum hemorrhage that she had with her delivery was somehow related to Charles Akoda's care. She, too, continues with intermittent symptoms of anger, confusion and concern for the future, but with frequent intrusive or unbidden memories. Her condition is diagnosable as an Adjustment Disorder.

Adjustment Disorders are diagnosed when various psychiatric symptoms arise in the face of stress. By definition, the condition continues until the stress is removed. Adjustment Disorders are related to Posttraumatic Stress Disorder but differ in that the inciting stress is not life-threatening as it would be in Posttraumatic Stress Disorder. Other than that, symptoms may be very similar and

Dinsmore/Charles Akoda cases: September 20, 2019
Page 6 of 7

include emotional distress, heightened general anxiety, sleep disturbance, re-living phenomena, avoidance and myriad other symptoms, such as anger and behavioral disturbances.

Charlie represents a more extreme emotional response to the situation. Her condition is also complicated by a number of other factors and stressors in her life and the recent development of other serious health problems. This plaintiff is clearly suffering from a Mood Disorder that has been diagnosed by her practitioners as Major Depression. Clearly this Mood Disorder was exacerbated by her experience with Charles Akoda. Her condition is impairing and currently endangering her physical health. She would benefit from assessment and treatment with a psychiatrist skilled in both psychosomatics as well as trauma.

I trust this addresses your concerns. I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath. Please feel free to contact me if you have any questions.

Sincerely,

Christiane Tellefsen, M.D.

Dinsmore/Charles Akoda cases: September 20, 2019
Page 7 of 7

Appendix

| PLAINTIFF | PRIVACY DESIGNATION |
|---|---|
| JASMINE RIGGINS | Alpha |
| ELSA POWELL | Bravo |
| DESIREE EVANS | Charlie |

# Exhibit 59

**REDACTED**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5   --------------------------------x

 6   MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 7   ELSA M. POWELL, and DESIRE EVANS,    18-5629

 8        Plaintiffs,                     Honorable

                                          Joshua D. Wolson

 9   v.

10   EDUCATIONAL COMMISSION FOR FOREIGN

11   MEDICAL GRADUATES,

12        Defendants.

13   --------------------------------x

14

15

16            VIDEOTAPED DEPOSITION OF ELSA POWELL

17                    Washington, D.C.

18              Friday, September 6, 2019

19

20

21

22

23            GOLKOW LITIGATION SERVICES

24        T 877.370.3377 | F 917.591.5672

25                  deps@golkow.com
```

Page 2

```
1
2
3
4
5          Friday, September 6, 2019
6                 9:32 a.m.
7
8
9
10
11         The following is the transcript of the
12   videotaped deposition of ELSA POWELL held at the
13   offices of Morgan, Lewis & Bockius, LLP, 1111
14   Pennsylvania Avenue, NW, Washington, DC 20004.
15
16
17
18
19   Reported by:  Linda S. Kinkade, RDR CRR RMR RPR CSR
20   Registered Diplomate Reporter, Nationally Certified
21   Realtime Reporter, Registered Professional Reporter
22   with Merit Distinction, Certified Shorthand Reporter
23   (CA), Notary Public, within and for the District of
24   Columbia, and official duly authorized to administer
25   oaths and/or affirmations.
```

Page 4

```
1                    INDEX OF EXAMINATION
2
3    EXAMINATION OF ELSA POWELL              PAGE
4       BY MS. MCENROE             7
5       BY MR. CERYES             109
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    A P P E A R A N C E S :
2
3    On Behalf of Plaintiffs MONIQUE RUSSELL, JASMINE
4    RIGGINS, ELSA M. POWELL, and DESIRE EVANS:
5       Schochor, Federico and Staton, P.A.
6         1211 St. Paul Street
7         Baltimore, Maryland 21202
8         (410) 234-1000
9       By:  Brent Ceryes, Esq.
10
11
12
13   On Behalf of Defendant EDUCATIONAL COMMISSION FOR
14   FOREIGN MEDICAL GRADUATES:
15       Morgan, Lewis & Bockius, LLP
16         1701 Market Street
17         Philadelphia, Pennsylvania 19103
18         (215) 963-5609
19       By:  Elisa P. McEnroe, Esq.
20       By:  Matthew D. Klayman, Esq.
21
22
23   Also present:
24       Crystal Strawbridge, Videographer
25
```

Page 5

```
1                    E X H I B I T S
2
3    NO.         DESCRIPTION              PAGE
4    Exhibit 1    Amended Notice of Deposition of ...  55
5                 Plaintiff Elsa Powell
6    Exhibit 2    Civil Action re Russell, et al. ...  91
7                 v. Educational Commission for
8                 Foreign Medical Graduates
9    Exhibit 3    Plaintiff Elsa Powell's Answers ...  100
10                to First Set of Interrogatories
11                and Responses to First Set of
12                Requests for Production of
13                Documents
14   Exhibit 4    Plaintiff Elsa Powell's ...........  100
15                Supplemental Answers to First Set
16                of Interrogatories and
17                Supplemental Responses to First
18                Set of Requests for Production of
19                Documents
20
21
22
23
24
25
```

Page 6

```
1          P R O C E E D I N G S
2      VIDEO SPECIALIST:  We are now on the
3  record.  My name is Crystal Strawbridge.  I'm a
4  videographer for Golkow Litigation Services.  Today's
5  date is September 6th, 2019.  The time is 9:32 a.m.
6      This deposition is being held at 1111
7  Pennsylvania Avenue, Northwest, Washington, D.C., in
8  the matter of Monique Russell, et al. v. Educational
9  Commission for Foreign Medical Graduates, Civil
10  Action No. 18-5629, for the United States District
11  Court for the Eastern District of Pennsylvania.  The
12  deponent is Elsa Powell.
13      Will counsel please identify themselves?
14      MR. CERYES:  Brent Ceryes on behalf of the
15  plaintiffs.
16      MS. MCENROE:  Good morning.  Elisa McEnroe
17  for Morgan, Lewis & Bockius on behalf of the
18  Educational Commission for Foreign Medical Graduates,
19  and together with me today I have my colleague, Matt
20  Klayman.
21      VIDEO SPECIALIST:  The court reporter
22  today is Linda Kinkade and will now swear in the
23  witness.
24  //
25  //
```

Page 7

```
1          ELSA POWELL,
2      having been first duly sworn and/or
3  affirmed on her oath, was thereafter examined and
4  testified as follows:
5          EXAMINATION
6  BY MS. MCENROE:
7      Q.  Good morning, Ms. Powell.
8      A.  Good morning, ma'am.
9      Q.  For the record, could you just state your
10  complete name for me?
11      A.  Elsa Miguelina Powell.
12      Q.  And is it correct that your birthday is
13  ████████████
14      A.  That's correct.
15      Q.  And that makes you ██ years old today?
16      A.  That's correct.
17      Q.  You understand that I'm here because you
18  have filed a lawsuit against the Educational
19  Commission for Foreign Medical Graduates; is that
20  correct?
21      A.  Yes, ma'am.
22      Q.  And we'll be taking your deposition today.
23  Do you understand that?
24      A.  Yes, ma'am.
25      Q.  And you've been deposed once before; is
```

Page 8

```
1  that correct?
2      A.  Yes, ma'am.
3      Q.  Was that in the Dimensions lawsuit in
4  Maryland?
5      A.  Yes, ma'am.
6      Q.  Have you ever been deposed otherwise?
7      A.  No, ma'am.
8      Q.  So you may remember from that deposition
9  that the way it works is that I'll ask you some
10  questions, and I'll ask that you answer them.  Do you
11  understand that?
12      A.  Yes, ma'am.
13      Q.  And it works best if I get to get my full
14  questions out and you get to get your full answers
15  out so we're not talking on top of each other.  Does
16  that make sense?
17      A.  Yes, ma'am.
18      Q.  If at any time today you don't understand
19  my question or you find it confusing, please let me
20  know.  I'd be happy to restate it.  If you do answer
21  the question, I'm going to assume that you understood
22  it.  Does that make sense?
23      A.  Yes, ma'am.
24      Q.  Because of the allegations in the lawsuit,
25  some of the questions today may be a bit personal or
```

Page 9

```
1  sensitive.  If you need to take a break or a moment,
2  just let me know, and I'm happy to do that as needed.
3  I just ask that, if there's a question that's
4  pending, that you answer the question before we take
5  a break.  Does that make sense?
6      A.  Yes, ma'am.
7      Q.  We just discussed a moment ago that you
8  were deposed in the Dimensions lawsuit in Maryland;
9  right?
10      A.  Yes, ma'am.
11      Q.  Do you remember when that took place?
12      A.  2017, '18, around there.
13      Q.  If -- if I told you the deposition was on
14  March 27th, 2019, would that refresh your
15  recollection?
16      A.  No, ma'am.
17      Q.  Okay.  And why is that?
18      MR. CERYES:  Objection, form, foundation.
19      MS. MCENROE:  I can restate it.
20      Q.  Do you believe that it happened earlier
21  than that, your deposition?
22      A.  Yes, ma'am, 2019.
23      Q.  In 2019?  Okay.
24      A.  Yes.
25      Q.  And sitting here today, do you believe
```

Page 10

1    that the answers you gave during that deposition were
2    true and correct?
3        A. Yes, ma'am.
4        Q. And you stand by the answers you gave at
5    that deposition?
6        A. Yes, ma'am.
7        Q. So that will help us speed things along a
8    little bit today.
9        So I'm not going to necessarily ask you
10   everything they asked you in that deposition, so, for
11   example, about your employment or education
12   background, but if there's anything today that, as
13   I'm asking you questions, you remember that you
14   testified previously inaccurately for any reason,
15   please let us know, because, otherwise, we're going
16   to take those past answers as having been correct.
17       Do you understand?
18       A. Yes, ma'am.
19       Q. Is there any reason you can't tell the
20   truth today?
21       A. No reason at all.
22       Q. Any medication that would impair your
23   ability to understand or answer my questions?
24       A. No, ma'am.
25       Q. Has your name always been Elsa Powell, or

Page 11

1    did you have another name before you got married?
2        A. I had another name.
3        Q. What was that name?
4        A. Delvillar-Mejia.
5        Q. That was the last name?
6        A. Yes.
7        Q. And was that hyphenated?
8        A. Yes.
9        Q. And have you used any other names besides
10   those we just discussed?
11       A. No, ma'am.
12       Q. And am I correct to assume that you
13   changed your name because you got married?
14       A. Correct.
15       Q. Do I have it right that you were married
16   in January 2015?
17       A. That's correct.
18       Q. To Gregory Lamont Powell?
19       A. That's correct.
20       Q. Is he still your husband today?
21       A. Yes, ma'am.
22       Q. How many children do you have?
23       A. I have five children.
24       Q. Would you please tell me their names and
25   ages?

Page 12

1        A. Lucy Mercedes, she is 14; Nestor Mercedes,
2    he's 13; Josiah Rodriguez, he's 9; Jaiden Powell, he
3    is 4, soon to be 5; and Tatiana Powell, she is 3.
4        Q. Does Mr. Powell have any other children?
5        A. No, ma'am.
6        Q. Do all five of your children live with
7    you?
8        A. Yes, ma'am.
9        Q. Is Jaiden in school?
10       A. Yes, he is.
11       Q. In pre-K or kindergarten?
12       A. Pre-K.
13       Q. And does Tatiana go to daycare?
14       A. No.
15       Q. Okay. How does she get cared for during
16   the day?
17       A. I take care of her.
18       Q. Do you work from home?
19       A. I work overnights.
20       Q. Who is home with the children overnight
21   while you're working?
22       A. Sometimes my husband; sometimes my oldest
23   child.
24       Q. That would be Lucy?
25       A. Yes.

Page 13

1        Q. Are your kids good sleepers?
2        A. Yes.
3        Q. That makes it easier.
4        A. It does.
5        Q. You said you work overnights. What are
6    your typical hours of your shifts?
7        A. I work 2100 hours to 05.
8        Q. So if my math is correct --
9        A. Nine to 5 -- 9 p.m. to 5 a.m.
10       Q. Thank you. 9 p.m. to 5 a.m.?
11       A. Yes.
12       Q. Where do you work?
13       A. NIH Bethesda.
14       Q. How long have you worked at NIH Bethesda?
15       A. One year and three months.
16       Q. What do you do there?
17       A. I'm in admin. I do admin for the security
18   company, Paragon Systems.
19       Q. Is that the security company for the
20   building that you're working in?
21       A. It's for the whole entire campus.
22       Q. For the whole camp-- --
23       A. Yes.
24       Q. It's an NIH campus?
25       A. Yes.

Page 14

1    Q. You say you do admin. Just very briefly
2  what does that entail?
3    A. Contact officers, when we have call-outs,
4  I cover those shifts, answer phones, do daily
5  reports, sometimes give officer breaks,
6  administrative work.
7    Q. And when you say you step in for shifts
8  sometimes, that's acting as a security guard?
9    A. Yes, acting lieutenant.
10   Q. Are the shifts you do from 9 p.m. to 5
11 a.m. Monday through Friday?
12   A. Yes.
13   Q. Do you do shifts on the weekend ever?
14   A. No.
15   Q. Is it a regular set schedule so you expect
16 that you will be working Monday through Friday for
17 those times?
18   A. Yes.
19   Q. How far do you live from where you work?
20   A. Forty-five minutes without traffic.
21   Q. Is there usually traffic?
22   A. Not around that time, unless there's an
23 accident or a game, FedExField.
24   Q. So you usually expect it will take you
25 about 45 minutes to get to and from work?

Page 15

1    A. Uh-huh.
2    Q. Each way?
3    A. Yes.
4    Q. So usually you'll leave around 8 p.m. and
5  get home around 6 a.m.?
6    A. Yes.
7    Q. Is that fair?
8    A. Mm-hmm.
9    Q. What time does Tatiana wake up?
10   A. She wakes up around 9 to 10 in the
11 morning.
12   Q. And what time is bedtime at your house for
13 the kids?
14   A. Nine, 9 to 9:30.
15   Q. Nine to 9:30 p.m.?
16   A. Yes.
17   Q. Does Tatiana nap?
18   A. No.
19   Q. When do you sleep during your usual
20 schedule?
21   A. On the weekends. Honestly, on the
22 weekends.
23   Q. What -- how much sleep do you -- do you
24 estimate you get during the workweek?
25   A. Sometimes 30 minutes, 45 minutes.

Page 16

1    Q. A day or at a time are you saying?
2    A. A day.
3    Q. And how -- how long have you been holding
4  that kind of schedule?
5    A. For a year and three months.
6    Q. When did Jaiden start in pre-K?
7    A. Pre-K? He started last year, early pre-K,
8  put him in early entry pre-K so he could get the
9  experience.
10   Q. Prior to that who was caring for him?
11   A. I was.
12   Q. Were you working night shifts at that same
13 time?
14   A. No.
15   Q. So were you working at all or were you
16 home with him? I mean, being home with him is work,
17 so I don't mean to say that, but were you working
18 outside the home in addition?
19   A. No. I was a stay-at-home mom because
20 Tatiana was born with a kidney issue, so I was taking
21 care of her.
22   Q. So you were home with both of them?
23   A. Yes.
24   Q. What kind of kidney issue was Tatiana born
25 with?

Page 17

1    A. She was born with a dilated kidney.
2    Q. And I'm not a medical person, so what does
3  that mean, just in basic terms?
4    A. One kidney was bigger than the other one
5  because it was filled with, like, fluids and stuff.
6    Q. That's something you said she was born
7  with?
8    A. Yes.
9    Q. Has she been able to be treated for that?
10   A. Yes. She received surgery and everything.
11   Q. How is she doing now?
12   A. She's doing good. Thank you.
13   Q. When did she have her surgery?
14   A. April of 2017.
15   Q. Will she require more surgeries or
16 treatments for this kidney problem?
17   A. Just exams, MRIs and MAG3 scans,
18 ultrasounds.
19   Q. How frequently would you say she goes in
20 for medical care?
21   A. Due to the kidney, at first it was
22 every -- every two weeks, but then after the surgery
23 it was every six months.
24   Q. Is she going to a specialist or her
25 regular pediatrician for the follow-up care?

Page 18

1     A.  A specialist.
2     Q.  Does she also go to a regular
3  pediatrician?
4     A.  Yes, she does.
5     Q.  Is that a general practitioner, family
6  medicine kind of person?
7     A.  Kaiser.
8     Q.  Do your other children get medical care?
9     A.  Yes.
10    Q.  Do they see a pediatrician as well?
11    A.  Yes.
12    Q.  Is Lucy still seeing a pediatrician?
13    A.  Yes, she is.
14    Q.  Is she seeing an obstetrician/gynecologist
15 as well?
16    A.  I haven't taken her yet, but -- I just
17 don't feel comfortable taking her yet.  It's
18 something that we have talked about.
19    Q.  And, again, she's 14, right?
20    A.  Yes.
21    Q.  What grade is she in?
22    A.  She's in high school.  She's in ninth
23 grade.
24    Q.  She just started high school?
25    A.  (Nodding head up and down.)

Page 19

1     Q.  This week?
2     A.  Yes.
3     Q.  Do Tatiana, Jaiden, Josiah, Nestor and
4  Lucy all go to the same pediatrician?
5     A.  No.  Josiah goes to Children's in Clinton,
6  because he has a different insurance than what they
7  have.  And then Jaiden and Angel, they have the same
8  pediatrician.  And then Lucy and Tatiana have the
9  same pediatrician.
10    Q.  And you referred to one of your children
11 as "Angel."  Which one of your children do you call
12 Angel?
13    A.  Oh, I'm sorry.  Nestor.  I'm so sorry.
14    Q.  No, no reason to apologize, but Nestor
15 also goes by Angel sometimes?
16    A.  Yes.  That's his middle name.
17    Q.  And I'm sorry to be a little forward about
18 this, but these five children are yours.  Did you
19 birth each of them?
20    A.  Yes, I did.
21    Q.  Okay.  I just wanted to make sure I
22 understood whether I needed to come to you in a
23 different way.
24    Do I have your address correct, 12 -- sorry.
25 I'm going to start over with the number.

Page 20

1     Do I have your address correct, 12705 Live Oak
2  Place, Upper Marlboro, Maryland?
3     A.  Yes.
4     Q.  I may have said that a little bit off, but
5  that's the right address?
6     A.  Yes, it is.
7     Q.  Okay.  Did you graduate from high school?
8     A.  Yes, I did.
9     Q.  Have you gone to any school after that?
10    A.  I went to college, Everest and Kaplan
11 University.
12    Q.  Did you get a degree?
13    A.  Unfortunately, I was unable to finish.
14 Mommy duties first.
15    Q.  How much do you have left?
16    A.  I only had six months left.
17    Q.  When did you stop attending school?
18    A.  2013, '14.
19    Q.  And you referred to it as "mommy duties"
20 taking you out of school, so tell me about which
21 child joined you that you -- or how that worked that
22 you ended up leaving school?
23    A.  I was working.  I was working two jobs to
24 take care of, at the time, three children, so I
25 had --

Page 21

1     Q.  That was when you had Lucy, Angel and
2  Josiah?
3     A.  Correct.
4     Q.  You said you were working two jobs.  What
5  jobs were you working then when you were also taking
6  care of your three children?
7     A.  I was a concierge in D.C., and I was also
8  doing hair on the side, hairdresser.
9     Q.  At a salon or in people's homes?
10    A.  In a salon, which is owned by Nestor and
11 Lucy's grandmother.
12    Q.  When, compared to that timing, did you get
13 a certificate for being a security guard?
14    A.  I got that around 2010.  I was working at
15 Howard University as a security guard on the campus,
16 and then I got my SPO and started working at George
17 Washington Hospital.
18    Q.  You used the acronym "SPO."  What does
19 that stand for?
20    A.  Special police officer.
21    Q.  So am I correct that -- you said that was
22 in 2010, so that was before the time that you left
23 Everest and Kaplan from going to school, so that was
24 before you were working, like you said, the two jobs,
25 working doing hair and as a concierge in D.C.?

Elsa Powell

Page 22

1    A.  Yes.
2    Q.  When did you switch to being a
3  stay-at-home mom?
4    A.  After I had Jaiden in 2014.
5    Q.  Was it immediately after having Jaiden?
6    A.  Yes.
7    Q.  Had you been working while you were
8  pregnant with Jaiden?
9    A.  Yes, I did.
10   Q.  In -- in what job?
11   A.  Concierge in D.C.
12   Q.  Were you still working at the salon?
13   A.  No.
14   Q.  So it was just the one job as a concierge
15  in D.C. --
16   A.  Yes.
17   Q.  -- while you were pregnant with Jaiden?
18   A.  Yes.
19   Q.  When did you make the decision you wanted
20  to switch to be a stay-at-home mom?
21   A.  After I had Jaiden, I don't have any
22  help, so with a newborn and then three other
23  children, I had no choice but to stop working.
24   Q.  Does Mr. Powell work?
25   A.  Yes.

Page 23

1    Q.  What is his job?
2    A.  He's a Prince George's County police
3  officer.
4    Q.  What kind of schedule does he work?
5    A.  Crazy schedule.  Sometimes he -- he works
6  evenings for four days, and sometimes he works day
7  work for four days or five days.  Then every three to
8  four months he works midnights for a whole month.
9    Q.  Is his job shift work as well, so he'll
10  know he's on a certain time and he's off a certain
11  time --
12   A.  Yes.
13   Q.  -- when he gets his schedule?
14   A.  Yes.  He gets his schedule for the whole
15  entire year.
16   Q.  Oh, all at once?
17   A.  All at once, yeah.
18   Q.  How long has he been a police officer?
19   A.  Six years.
20   Q.  Is that the entire -- that's through the
21  whole time you've been married he's been a police
22  officer?
23   A.  Yes.
24   Q.  Do you have full custody of Lucy, Angel
25  and Josiah?

Page 24

1    A.  Yes.
2    Q.  And you have full-time care, then,
3  responsibility for them as well?
4    A.  Yes.
5    Q.  And I think I had asked but just to
6  confirm, Lucy, Angel and Josiah are all in school as
7  well?
8    A.  Correct.
9    Q.  How do they get to and from school?  Do
10  they take a school bus?
11   A.  Lucy takes a school bus.  I drop and pick
12  up Nestor, Josiah and Jaiden.
13   Q.  And does that involve taking Tatiana with
14  you to go do drop-offs?
15   A.  Sometimes it does when her father is not
16  home.
17   Q.  For pick-ups as well?
18   A.  Yes.
19   Q.  And how far is Angel and Josiah's school
20  from where you live?
21   A.  Angel and Josiah's school, from where I
22  live, is about 20 to 25 minutes --
23   Q.  And how --
24   A.  -- without traffic.
25   Q.  And how far is Jaiden's pre-K from their

Page 25

1  school?
2    A.  Five minutes.
3    Q.  So do you do that in sort of one trip; you
4  go drop all the kiddoes off at school?
5    A.  Yes.
6    Q.  I think in the Dimensions litigation you
7  testified about working for a company called MVM; is
8  that correct?
9    A.  (Nodding head up and down.)
10   Q.  How is that related, if at all, to the job
11  you have at NIH?
12   A.  MVM -- I started with MVM at NIH.  So the
13  contract was almost over, so Paragon took over.
14   Q.  Did your job responsibilities change
15  between when it shifted from MVM to Paragon?
16   A.  Nope.  Same duties, same shift, same
17  schedule.
18   Q.  So the answers you gave in the Dimensions
19  litigation about your job would still hold true
20  today?
21   A.  Correct.
22   Q.  When were you most recently seen by a
23  doctor for anything?
24   A.  About two or three months ago.
25   Q.  For what?

Elsa Powell

Page 26

1    A. I was having ███████████████.
2    Q. In like your ██████████?
3    A. On my -- ████ a little bit up from my
4 ████████.
5    Q. Yeah.
6    A. So they said I had an ██████████.
7    Q. Did you have to have any treatment for
8 that?
9    A. Ibuprofen. They mostly recommended
10 ibuprofen and, of course, take it easy. Iron
11 tablets, because I also suffer from low iron, and
12 it's called -- something called thalassemia alpha
13 trait.
14    Q. Do you know what that was for?
15    A. It's something that I've always had. You
16 have -- your blood cells, low blood cells, yeah.
17    Q. You say that's something you've always
18 had, since you were a child?
19    A. Yes.
20    Q. And is that a medication you've taken
21 since you were a child?
22    A. Well, they mainly recommend to take iron
23 tablets.
24    Q. Besides the medications you just
25 described, do you take any other medications?

Page 27

1    A. No.
2    Q. Besides going in two to three months ago
3 when you were ████████████████████
4 ██ checkups?
5
6    A. No.
7    Q. Do you have a primary care physician?
8    A. Yes.
9    Q. Who is that?
10    A. It was Emily Lo, but they've changed her,
11 and, honestly, I do not remember her name, the new
12 one that I have. I haven't seen her yet.
13    Q. Do you plan to go see her?
14    A. No.
15    Q. When you went in two to three months ago
16 because ████████████████████
17 ██████████████████he
18 emergency room?
19    A. I went to Kaiser Urgent Care.
20    Q. Were you admitted to the hospital?
21    A. No.
22    Q. Were you released the same day?
23    A. Yes.
24    Q. Prior to that visit to the Kaiser Urgent
25 Care, do you remember the time before that you were

Page 28

1 most recently treated by a doctor?
2    A. After that I saw Emily Lo, which is my --
3 was my primary. I had a ████████████
4 ████████████████.
5    Q. Is that the treatment that you discussed
6 at your last deposition you got cough medicine for?
7    A. Yes.
8    Q. Prior to that, do you remember when you
9 last went to a primary care physician or any doctor?
10    A. Prior to that I was at the emergency room
11 at Southern Maryland because I was having ████████
12 ████. They said I had an ██████████.
13    Q. Do you know ████████████ they were
14 saying it was?
15    A. No. I never followed up.
16    Q. Did that pain stop?
17    A. Yes.
18    Q. Do you still have that pain today?
19    A. No.
20    Q. Do you recall any other visits to the
21 emergency room you've ever made for yourself?
22    A. No. Besides that one, no.
23    Q. Aside from any times you may have been in
24 the hospital when you were delivering your children,
25 do you remember ever being hospitalized?

Page 29

1    A. No, just when I delivered the children.
2    Q. Did you deliver each of your children in a
3 hospital?
4    A. Yes.
5    Q. Was each of your children delivered by an
6 OB/GYN?
7    A. Yes.
8    Q. And when I say OB/GYN, you know what I'm
9 talking about, an obstetrician/gynecologist?
10    A. Yes, I do.
11    Q. It would be easier if I could say the
12 shorter one. Thank you.
13    Have you ever been treated by or seen a
14 midwife or a doula?
15    A. No.
16    Q. Do you know what a midwife or a doula --
17 do you know what they are?
18    A. Yes.
19    Q. Do you currently have an OB/GYN?
20    A. Yes, I do.
21    Q. Who is that?
22    A. Honestly, I do not know her name.
23    Q. Is that -- is that through Kaiser?
24    A. Yes. I haven't seen her yet.
25    Q. It's a woman?

1    A.  From what my primary care physician said,
2  yes, it's a woman.
3    Q.  When you said your primary care physician
4  said, is that Emily Lo?
5    A.  No, it's the new lady I have.  I haven't
6  seen her yet either.
7    Q.  You haven't seen her, but have you spoken
8  to her?
9    A.  I have messaged her --
10    Q.  Tell --
11    A.  -- through the Kaiser app.
12    Q.  Tell me a little bit about your messages
13  with the primary care physician.
14    A.  When I got discharged from Urgent Care,
15  they did some scans, and they said they were going to
16  send it to her.  A couple days passed by, I didn't
17  hear anything, so I sent her a couple messages.
18    That's when she finally wrote back and said
19  that, you know, ███████████ and I had
20  to take it easy.  If the pain came back, take
21  ibuprofen, and if the symptoms get worse, to contact
22  her and go see her.  And that's when she said that I
23  have to go see an OB/GYN, because also I have
24  ██████████ which she was concerned about.
25  ████████████

[large redacted block]

14    Q.  Was that between certain of your children,
15  do you remember?
16    A.  Yes.  Yes, Josiah.
17    Q.  After Josiah?
18    A.  After Josiah.  Actually was it after
19  Josiah?  Yeah.  Jaiden.
20    Q.  After Jaiden?
21    A.  It was after Jaiden.
22    Q.  And after you delivered Jaiden, at any
23  point did you go on to birth control of any sort?
24    A.  I was on birth control when I had
25  Jaiden --

1    Q.  What kind of birth control was that?
2    A.  -- when I got pregnant with Jaiden.  I was
3  on the depo shot.
4    Q.  Did you continue on that treatment after
5  you had Jaiden?
6    A.  No.
7    Q.  Did you switch to a different kind of
8  birth control, or did you come off of birth control?
9    A.  I came off birth control.
10    Q.  Have you ever received treatment from a
11  psychologist or a psychiatrist?
12    A.  No.
13    Q.  Have you ever --
14    A.  I never went to see one, no.
15    Q.  Have you ever gotten treatment from any
16  sort of counselor?
17    A.  No.
18    Q.  Generally speaking, how do you choose your
19  doctors?
20    A.  Kaiser chooses them, and sometimes I could
21  switch, but I don't because, like I said, I don't go
22  see them unless I'm seriously injured or seriously in
23  pain.
24    Q.  You said Kaiser chooses them.  Is Kaiser
25  your insurance company?

1    A.  Yes.
2    Q.  Is that insurance that you have through
3  your or your husband's employment?
4    A.  My husband's employment.
5    Q.  When did you get on to your husband's
6  Kaiser insurance?
7    A.  In 2015.
8    Q.  Upon getting married?
9    A.  Yes.
10    Q.  Did you have insurance before that?
11    A.  Yes, I did.
12    Q.  What insurance did you have then?
13    A.  It was through the state, Medicaid.
14    Q.  So just trying to understand the timing of
15  getting on to Kaiser insurance as compared to your --
16  the birth of your children, did you switch to Kaiser
17  insurance while you were pregnant with Jaiden?
18    A.  No.
19    Q.  Can you explain that to me, how that
20  timing worked?
21    A.  I had Medicaid when I was pregnant with
22  Jaiden.  Then once I got married, my husband put the
23  children and I on Kaiser.
24    Q.  That was after you had Jaiden?
25    A.  After I had Jaiden, correct.

Page 34

1    Q.  Thank you for straightening out my
2    timeline.
3        Where did you deliver Tatiana?
4        A.  Holy Cross, Montgomery -- Montgomery
5    County.
6        Q.  Who was your OB/GYN who delivered Tatiana?
7        A.  Mr. Kingsley.  It was through Kaiser.
8        Q.  Is he the doctor you saw for any prenatal
9    care for her?
10       A.  Yes.
11       Q.  And you sought prenatal care while you
12   were pregnant with Tatiana?
13       A.  Yes.
14       Q.  How regularly?
15       A.  First it was every -- every two to three
16   weeks, and then every -- once I got to, like, six
17   months or so, it was every -- every often.
18       Q.  When they told you to come?
19       A.  Yes.
20       Q.  And you saw Dr. Kingsley for ultrasounds,
21   physical exams, that sort of thing?
22       A.  Yes.  Correct.
23       Q.  How did you select Dr. Kingsley as your
24   OB/GYN?
25       A.  I went to Kaiser when I first found out I

Page 35

1    was pregnant, and he was the one that, you know, did
2    all the exam and stuff, and then I just kept him from
3    there.
4        Q.  And you stuck with him from there?
5        A.  Mm-hmm.
6        Q.  And did he do post-delivery treatment for
7    you after you had Tatiana?
8        A.  Yes.
9        Q.  When did you last see Dr. Kingsley?
10       A.  For my six-weeks checkup, and then that
11   was it.
12       Q.  So you went to your six-week checkup?
13       A.  Mm-hmm.
14       Q.  That's a yes?
15       A.  Yes.  I'm sorry.  Yes.
16       Q.  How old was Tatiana when her kidney issue
17   sort of presented itself, when you found out she had
18   a kidney problem?
19       A.  I was pregnant when they detected it.
20       Q.  Oh, you knew when you were pregnant?
21       A.  Mm-hmm.  Yes.  I was eight months pregnant
22   when they detected it.
23       Q.  Aside from Tatiana's kidney issue, have
24   any of your other children had any health issues
25   other than broken bones or normal kid stuff?

Page 36

1        A.  No.
2        Q.  When you first started going to see
3    Dr. Kingsley, did you check out his résumé or his
4    credentials, anything like that?
5        A.  Yes, I did my research.
6        Q.  What --
7        A.  Kaiser has a website which tells you his
8    experience and stuff like that, every hospital that
9    he has worked on.
10       Q.  And did you do research into his
11   certifications or education?
12       A.  No, because Kaiser had all that laid out
13   on their website.
14       Q.  So fair to say you checked out what Kaiser
15   had?
16       A.  What Kaiser had.
17       Q.  You mentioned that Kaiser -- with Kaiser,
18   you're able to ask to switch doctors --
19       A.  Yes.
20       Q.  -- in some -- have you ever done that?
21       A.  No.
22       Q.  When you had Medicaid, did you ever ask to
23   switch doctors?
24       A.  No.
25       Q.  When you had Medicaid, how was it that you

Page 37

1    went about finding a doctor?
2        A.  They have a list of doctors nearby, so I
3    chose the one that was closer to where I lived.
4        Q.  Would it be fair to say they have certain
5    doctors that are considered like in network or that
6    you can -- you're sort of covered if you go see them?
7        A.  Yes.
8        Q.  And you said you -- you selected those
9    doctors by proximity, how close they were to you?
10       A.  Yes.
11       Q.  Did you do any other research other than
12   figuring out how close they were to you?
13       A.  No.
14       Q.  How did you know where they were located
15   about whether they were close to you or not?
16       A.  The address.
17       Q.  So did the list that was provided to you
18   include their addresses?
19       A.  Yes.
20       Q.  Fair to say that, when you had Medicaid,
21   you did nothing other than look at the list that
22   Medicaid provided to you with the names and addresses
23   of the doctors available to you?
24       A.  Correct.
25       Q.  Do you remember who your OB/GYN was who

Page 38

1  delivered Lucy?  It was a long time ago.
2      A.  It was in Manassas, Virginia, but I do not
3  remember.
4      Q.  Was it a man OB/GYN or a woman OB/GYN?
5      A.  I -- Jesus Christ.  I do not remember,
6  honestly.
7      Q.  Okay.  But it was -- it was an OB/GYN,
8  though, who delivered you then?
9      A.  Yes, yes.
10      Q.  Did you have a different doctor to deliver
11  Angel?
12      A.  Yes.  That was in Fairfax County, and I do
13  not remember.  I do not remember.  Josiah, he was a
14  male.
15      Q.  The OB/GYN was a male?
16      A.  Yes.
17      Q.  And where was he located, generally
18  speaking?
19      A.  In Arlington, Virginia hospital.
20      Q.  How did you come to select your OB/GYN to
21  deliver Jaiden?
22      A.  So I was seeing the lady -- it was a lady
23  at first on Saint Barnabas Road, which was close to
24  where I lived at the time.  So after I became six
25  months, she said that she had to refer me to another

Page 39

1  doctor's office, because that's when she stopped
2  seeing patients.
3      Q.  You said it was a lady, so it was a female
4  OB/GYN?
5      A.  Yes.
6      Q.  Did she refer you to another doctor?
7      A.  Yes.
8      Q.  To whom did she refer you?
9      A.  Dr. Chaudhry.
10      Q.  Is Dr. Chaudhry an OB/GYN?
11      A.  Yes.
12      Q.  Where is he located?
13      A.  In District Heights.
14      Q.  How close to you is that?
15      A.  At the time where I lived, it was about 15
16  minutes.
17      Q.  Did you move at some point since then?
18      A.  Yes, I did.
19      Q.  Have you moved more than once since then?
20      A.  Since then, yes.
21      Q.  And so did you actually ever go see
22  Dr. Chaudhry?
23      A.  I did not see Dr. Chaudhry.  He was never
24  in there.  I saw Dr. Akoda.
25      Q.  Did you go to Dr. Chaudhry's practice?

Page 40

1      A.  Yes, his office.
2      Q.  So just tell me a little bit about how
3  that works.  Did you call up to make an appointment
4  at Dr. Chaudhry's practice?  Did the lady OB/GYN call
5  for you and make appointments, or how did that
6  transition happen, if you remember?
7      A.  She gave me the referral.  I called up
8  there and made an appointment.  So when I got to my
9  appointment, they said that Dr. Chaudhry had to step
10  out, but Dr. Akoda was there.  So I said, that's
11  fine, I just need to get care, I don't care who I
12  see.  I was at my last stage of pregnancy.
13      Q.  You were about six months, you said?
14      A.  About six months, yes.  So then that's
15  when I saw Dr. Akoda, and then all my regular
16  visits -- two weeks after that, every two weeks.
17      Q.  Starting every two weeks?
18      A.  Yes.
19      Q.  Where did those visits take place?
20      A.  At Dr. Chaudhry's office in District
21  Heights.
22      Q.  Prior to going to Dr. Chaudhry's practice,
23  did you do any research into him, Dr. Chaudhry?
24      A.  No.
25      Q.  Can you tell me just a little bit about

Page 41

1  what Dr. Chaudhry's practice looked like?  Is there a
2  reception area, a waiting room, that kind of thing?
3      A.  There was a waiting -- a waiting room, and
4  then on the left-hand side, it's the entrance, and
5  then there's the receptionist, and then on the
6  right-hand side is the rooms, the examination rooms.
7      Q.  Were there nurses or other medical
8  professionals who worked there as well as the
9  doctors?
10      A.  Nurses.  There was nurses.
11      Q.  Did you see other patients there while you
12  were there?
13      A.  Yes.
14      Q.  In the waiting room?
15      A.  Yes.
16      Q.  Okay.  Aside from Dr. Akoda, were you ever
17  treated by any other physician at Dr. Chaudhry's
18  practice?
19      A.  No.
20      Q.  So you said it started out with Dr. Akoda
21  that your appointments were about every two weeks?
22      A.  Yes.
23      Q.  At some point did that become more
24  frequent?
25      A.  When I got closer to my due date.

Page 42

1    Q.  They began weekly?
2    A.  Yes.
3    Q.  Did your labor with Jaiden begin
4  naturally?
5    A.  Yes.  I was induced.
6    Q.  Who induced you?
7    A.  Dr. Akoda.
8    Q.  Where?
9    A.  PGH hospital.
10    Q.  Did you have an appointment for that?
11    A.  Yes.
12    Q.  Why?
13    A.  Because from my understanding that was the
14  policy.  You had to make an appointment to get
15  induced.
16    Q.  How far along were you when you were
17  induced, do you recall?
18    A.  I was almost nine months, eight and a half
19  to nine.
20    Q.  Do you remember if there was a medical
21  reason that you needed to get induced?
22    A.  No.
23    Q.  So is it fair to say that you had an
24  appointment to get induced and then you showed up at
25  PGH hospital then to actually be induced --

Page 43

1    A.  Yes.
2    Q.  -- at the time of your appointment?
3    A.  Yes.
4    Q.  And at the time of your appointment, did
5  you expect it would be Dr. Akoda who would be doing
6  the induction?
7    A.  I honestly didn't know who was coming, if
8  it was Chaudhry or Akoda.
9    Q.  Sure.
10    A.  Yeah, just...
11    Q.  But either of those two from that
12  practice?
13    A.  Yes.
14    Q.  Have you ever been treated by
15  Dr. Chaudhry?
16    A.  No.
17    Q.  Have you ever seen Dr. Chaudhry in person?
18    A.  I saw him going out the door, but that --
19  that was it.
20    Q.  Did you ever meet him?
21    A.  Just saw him going out the door.  I never
22  actually, you know, met, hey, doctor, no.
23    Q.  How long was your labor with Jaiden?
24    A.  Ooh.
25    Q.  Sorry for needing to ask, but...

Page 44

1    A.  It was hours.
2    Q.  Hours?
3    A.  It was hours, and induced me on the 16th
4  and he wasn't born until the 17th, so about -- tell
5  you, it was more than nine, ten hours.
6    Q.  Nine to ten hours of labor?  Did you have
7  an epidural?
8    A.  Yes, I did.
9    Q.  Did it work?
10    A.  Yes.
11    Q.  Who was your treating physician while you
12  were in labor?
13    A.  It was -- I know Dr. Akoda was there, and
14  there was another lady in there.  I do not remember.
15    Q.  Another physician?
16    A.  Yeah -- no, it's the nurse.
17    Q.  Oh, the nurse.
18    A.  The nurses.  It was two nurses and
19  Dr. Akoda.
20    Q.  Did you have an anesthesiologist come and
21  place the epidural?
22    A.  Yes.
23    Q.  And that was a different doctor?
24    A.  Yes.
25    Q.  Do you remember if that was a lady or a

Page 45

1  man doctor?
2    A.  That was a man doctor.
3    Q.  Were you able to deliver Jaiden vaginally?
4    A.  Yes.
5    Q.  Have you ever had to have a C-section for
6  any of your deliveries?
7    A.  No.
8    Q.  Have you ever had complications from any
9  of your deliveries?
10    A.  Yes.
11    Q.  Tell me about that.
12    A.  So after I had Jaiden, my bleeding was
13  really heavy.  I had to change my -- the padding
14  every three to five seconds, and it was going through
15  the sheets and everything.  So I had texted a friend
16  who was also being seen at Dr. Chaudhry's office, and
17  I had sent her a picture.
18    I said, I don't think this is normal, because
19  it was blood clots as well.  It was bigger than
20  normal blood clots.  So that's when she said, it's
21  not, you need to tell the nurse that she needs to get
22  the doctor in there as soon as possible.
23    So that's when I told the nurse, and she
24  called the doctor, Dr. Akoda.  He came in, and he
25  kept saying, I'm sorry, I should have detected it

Page 46

1  sooner, I'm so sorry, we're getting the O.R. ready
2  for you.  So they rushed me to the O.R.
3      Next thing you know, I woke up with tubes
4  everywhere, and I was just crying.  I didn't know --
5  I was concerned about my baby.  I didn't know what
6  was going on, why was I bleeding, why these blood
7  clots were so huge.  I just -- I didn't know.
8      Q.  Did this take place while you were at PGH
9  hospital?
10     A.  Yes.
11     Q.  Was -- how long in time was it after you
12  had delivered Jaiden?
13     A.  It was about two or three after I had him.
14     Q.  Two to three hours, so it was that same
15  day?
16     A.  Uh-huh, it was the same day.
17     Q.  Do you remember what time of day you
18  delivered Jaiden?
19     A.  Actually I do not remember what time.
20     Q.  Sure.  Who was the friend that you texted?
21     A.  Her name is Tisa.  I call her Tisa,
22  Latisa.
23     Q.  Latisa?
24     A.  Latisa.
25     Q.  What's her last name?

Page 47

1      A.  Gaymon.
2      Q.  Does it start with a G?
3      A.  G, yes.
4      Q.  So you -- you had the bleeding and the
5  blood clots that you found to be troubling, and you
6  told a nurse then?
7      A.  Yes.
8      Q.  Okay.  And the nurse went and got
9  Dr. Akoda; is that right?
10     A.  Yes.
11     Q.  And Dr. Akoda came and he took you to
12  surgery?
13     A.  Yes.
14     Q.  Do you know who conducted the surgery for
15  you?
16     A.  It was Dr. Akoda.
17     Q.  How long were you in the hospital after
18  you delivered Jaiden?
19     A.  Three days.  Two to three days.
20     Q.  After the surgery that you had from
21  Dr. Akoda after delivering Jaiden, how was your
22  recovery?
23     A.  You know what?  The recovery was fine.  I
24  did meet Dr. Chaudhry.
25     Q.  Tell me about that.

Page 48

1      A.  He was the one who removed the bandages at
2  the hospital.
3      Q.  After the surgery?
4      A.  After the surgery.
5      Q.  Okay.  Where were the bandages?
6      A.  In -- inside me.
7      Q.  Inside your vaginal canal?
8      A.  Yes.
9      Q.  Okay.  But they didn't have to cut open
10  your abdomen at all?
11     A.  No.
12     Q.  Okay.  And, I'm sorry, you -- you had said
13  that after you were released from the hospital, then
14  your post-delivery recovery from Jaiden was normal?
15     A.  Mm-hmm.
16     Q.  Is that a yes?
17     A.  Yes.
18     Q.  Did Jaiden have any complications from his
19  delivery?
20     A.  No.
21     Q.  Was Jaiden a good eater?
22     A.  Picky eater.
23     Q.  Well, as an infant, was he breastfed?
24     A.  Yes.
25     Q.  Okay.  And how did he do with feeding?

Page 49

1      A.  Lasted about two weeks, and then he would
2  just take Similac.
3      Q.  He wanted to switch to formula?
4      A.  Yes.
5      Q.  And bottles?
6      A.  Yes.
7      Q.  And how was he as a sleeper after
8  delivery?
9      A.  A good sleeper.
10     Q.  Did you breastfeed all your children?
11     A.  Yes.
12     Q.  How long did you breastfeed Tatiana for?
13     A.  Seven months.
14     Q.  Aside from the bleeding and the clots that
15  you had after delivering Jaiden, did you have any
16  other concerns about your delivery of Jaiden?
17     A.  I did.  Because, like I said, I'm
21     Q.  Did you ask?
22     A.  I did, but I never got the answer.
23     Q.  When you say you asked, who did you ask?
24     A.  I asked Dr. Akoda.
25     Q.  While you were in the hospital?

Page 50

1    A. Yes.
2    Q. Do you know if you signed a consent form
3  to get a blood transfusion?
4    A. I don't remember, honestly.
5    Q. Do you know if they talked to you about
6  getting a blood transfusion before you went into
7  labor?
8    A. I don't remember.
9    Q. Any other concerns unrelated to the
10 bleeding and the clotting issue from your delivery
11 with Jaiden?
12   A. Not after the delivery.
13   Q. Okay. What about during the delivery?
14   A. During, no.
15   Q. Or before delivery?
16   A. Before, no.
17   Q. Let's get back to your prenatal care for
18 Jaiden. You were going about once every two weeks
19 once you were six months pregnant to see Dr. Akoda;
20 is that correct?
21   A. Correct.
22   Q. And that was always at Dr. Chaudhry's
23 medical practice?
24   A. Correct.
25   Q. Was that in a private exam room?

Page 51

1    A. Yes.
2    Q. Would you first get seen by a nurse for
3  like blood pressure and weight and that kind of
4  stuff?
5    A. Yes.
6    Q. And then when -- you would be taken back,
7  and you would see Dr. Akoda?
8    A. Correct.
9    Q. Was a nurse with you for those
10 examinations by Dr. Akoda?
11   A. No.
12   Q. Okay. Sometimes yes, sometimes no, or
13 always no?
14   A. At first no. Then after I requested one
15 to be there.
16   Q. And when did you request to have a nurse
17 present with your examinations of Dr. Akoda?
18   A. When Dr. Akoda was starting being very
19 flirtatious.
20   Q. When was that?
21   A. He would do -- examine my breasts and
22 stuff and make comments about I have nice breasts and
23 stuff like that. So then I felt uncomfortable. That
24 was -- I was eight months pregnant at that time,
25 seven and a half to eight.

Page 52

1    Q. So it wasn't the first time you went to
2  see Dr. Akoda that this happened?
3    A. It wasn't the first time, no.
4    Q. And you went a couple times before that
5  had happened?
6    A. Correct.
7    Q. Okay. You said he would examine your
8  breasts. Do you mean like a breast exam?
9    A. Yes.
10   Q. Palpitating your breasts, feeling for
11 lumps, that kind of thing?
12   A. Correct.
13   Q. The first time that you said Dr. Akoda
14 began being flirtatious, following that, is that when
15 you asked to have a nurse present for your next
16 examination?
17   A. Yes.
18   Q. So was it one time that this happened with
19 Dr. Akoda when you were alone with him?
20   A. No, it was a few times.
21   Q. So were you seen by Dr. Akoda alone after
22 you had requested to have a nurse present?
23   A. At first, yes. She would step out of the
24 room, and then I wouldn't seen her. But then I said
25 something again to the front desk requesting a nurse,

Page 53

1  and from that point on, every time I saw him, there
2  was a nurse present.
3    Q. Do you remember, did they have female
4  nurses, male nurses accommodation?
5    A. Female.
6    Q. All female nurses?
7    A. It was all female nurses.
8    Q. Was that true both for your prenatal care
9  and for your delivery, they were all female nurses?
10   A. Yes.
11   Q. At any point after you said Dr. Akoda
12 became flirtatious, did you ask to be seen instead by
13 a different OB/GYN?
14   A. No.
15   Q. Other than the comments to you in
16 connection with the breast exams, did Dr. Akoda do or
17 say anything else that you felt was flirtatious?
18   A. No, that was it.
19   Q. And by "flirtatious" I also mean or sexual
20 in any way. Do you understand that?
21   A. Yes.
22   Q. Okay. So the answer is still no?
23   A. Still no.
24     MS. MCENROE: We've been going just about
25 an hour. It might be a good time for a little break,

Page 54

1  if that's okay.
2      THE WITNESS:  If that's what you guys want
3  to do.  I mean, I'm fine.
4      MS. MCENROE:  That sounds good.  Let's
5  take a quick break.
6      MR. CERYES:  Okay.
7      VIDEO SPECIALIST:  We're going off the
8  record at 10:26.
9      (Proceedings recessed.)
10     VIDEO SPECIALIST:  We're back on the
11 record at 10:36.
12 BY MS. MCENROE:
13     Q.  Ms. Powell, what, if anything, did you do
14 to prepare for today's deposition?
15     A.  Just be here.
16     Q.  Did you review any documents in advance of
17 today for your deposition?
18     A.  Yes, I did.
19     Q.  What did you review?
20     A.  For starters, the address.
21     Q.  That's good.  Anything else?
22     A.  I had to remember again what ECFG [sic]
23 was.
24     Q.  Anything else?
25     A.  That's -- that's mainly -- mainly what I

Page 55

1  was --
2      Q.  And what do you mean you had to remind
3  yourself what ECFMG is?
4      A.  Because I didn't know at first who you
5  guys were.
6      Q.  And how did you remind yourself what ECFMG
7  is?
8      A.  I looked -- I looked it up, how the
9  documentation had said that I had from my lawyer.
10     Q.  What documentation?
11     A.  The deposition.
12     Q.  Was that your deposition from the
13 Dimensions litigation?
14     A.  No.  It was the one that my lawyer had
15 sent me of where to come and who I was going to meet.
16     Q.  Okay.
17         (Exhibit 1 marked for
18         identification:  Amended Notice of
19         Deposition of Plaintiff Elsa Powell)
20 BY MS. MCENROE:
21     Q.  I'd like to hand you what I'm marking as
22 Exhibit 1 -- that was a good toss -- which you'll see
23 at the top says Amended Notice of Deposition of Elsa
24 Powell.  Do you see that?
25     A.  Yes.

Page 56

1      Q.  Have you seen this deposition notice
2  before?
3      A.  Yes.
4      Q.  Is that what you reviewed?
5      A.  Yes.
6      Q.  Okay.  Aside from this amended notice of
7  deposition, did you review anything else in
8  preparation for your deposition today?
9      A.  No.
10     Q.  Did you look up any information on the
11 Internet in preparation for today's deposition?
12     A.  No.
13     Q.  Did you speak with anyone to prepare for
14 today's deposition?
15     A.  No.
16     MR. CERYES:  You can share the fact -- if
17 we discussed, you can share the fact that we had
18 communications, just not --
19     A.  That's including my lawyer?
20     Q.  Correct.
21     A.  Oh, okay.
22     Q.  So not what you said to one another, but
23 just the fact of having spoken with counsel.
24     A.  Oh, yes, my attorney.
25     Q.  And who did you speak with?

Page 57

1      A.  My attorney.
2      Q.  And is that Brent sitting next to you?
3      A.  Mr. Brent, yes, that's correct.
4      Q.  And did you speak to him in person or on
5  the telephone?
6      A.  In person and the telephone.
7      Q.  How long was that for?
8      A.  In person?  A good 25, 30 minutes.
9      Q.  And on the telephone?
10     A.  Forty minutes.
11     Q.  When did those conversations take place?
12     A.  Yesterday.
13     Q.  Both the in person and the telephone?
14     A.  No, the one in person was today.
15     Q.  This morning?
16     A.  Yes, this morning.
17     Q.  Okay.  Great.  Thank you.  Here?
18     A.  Yes.
19     Q.  How did you first meet your counsel?
20     A.  It was a meeting that we had about the
21 Akoda case once I've learned what was going on.
22     Q.  When you say it was a meeting that you
23 had, was that an in-person meeting?
24     A.  It was an in-person meeting, yes, with a
25 group of young ladies.

Page 58

1  Q. So there were other clients there in
2  addition to yourself?
3  A. Yes.
4  Q. And some lawyers as well?
5  A. Correct.
6  Q. Do you know any of the other ladies who
7  were there with you?
8  A. Just one.
9  Q. Who was that?
10  A. My friend, Latisa.
11  Q. Would Gaymon sound correct for her name?
12  A. Yes.
13  Q. G-A-Y-M-O-N?
14  A. Yes.
15  Q. Is that who you also texted when you were
16  bleeding after delivering Jaiden?
17  A. Correct.
18  Q. Aside from Ms. Gaymon, did you know any of
19  the other ladies who were also meeting with counsel?
20  A. No.
21  Q. Approximately how long did that meeting
22  last?
23  A. About two hours or so.
24  Q. Do you remember when that was?
25  A. No, it's -- it's -- it's been like around

Page 59

1  2017 or so.
2  Q. Was that before you filed any lawsuits?
3  A. Yes.
4  Q. Had you hired counsel by then?
5  A. No. I wasn't aware of what was going on
6  by then.
7  Q. Can you estimate how many ladies were in
8  the group who were at that meeting with counsel?
9  A. I wouldn't know to tell you. It was --
10  Q. Was it closer to four or 20 or --
11  A. No, it was -- it was about -- more than 20
12  or so.
13  Q. Did you have any other more group meetings
14  with counsel like that?
15  A. No.
16  Q. Where did that meeting take place?
17  A. It was a hotel lobby, but I -- not lobby
18  but conference area, but I don't remember the exact
19  name.
20  Q. Aside from the group of ladies who were
21  there, you mentioned counsel was there as well?
22  A. Correct.
23  Q. How many lawyers were there?
24  A. A good four or five.
25  Q. Was anyone else there besides the lawyers

Page 60

1  and the -- as you described them, the group of
2  ladies?
3  A. No, it's just us.
4  Q. How did you know to be at that meeting?
5  A. My friend told me about it.
6  Q. Had you spoken to any lawyers before you
7  went to that meeting?
8  A. No.
9  Q. Did you speak to any lawyers at that
10  meeting?
11  A. Yes.
12  Q. Who did you speak to?
13  A. I do not remember.
14  Q. Did you hire counsel at that meeting?
15  A. Yes.
16  Q. Did you sign anything at that meeting?
17  A. Yes.
18  Q. Do you have a copy of what you signed in
19  that meeting?
20  A. Not with -- no, not on me, no.
21  Q. Not necessarily with you, but do you have
22  a copy of it?
23  A. No.
24  Q. When you were going to that meeting, do
25  you know what you thought the purpose of the meeting

Page 61

1  was?
2  A. Yes.
3  Q. What did you think the purpose of the
4  meeting was going to be?
5  A. Learn more information about how the
6  doctor that I thought was a real doctor unfortunately
7  wasn't who he said he was or what his name was.
8  Q. Is that Dr. Akoda you're talking about?
9  A. That's correct.
10  Q. Is that in fact what you learned at the
11  meeting?
12  A. That's --
13  MR. CERYES: Object. I think we're
14  starting to get into the substance of what was
15  discussed at that meeting. So I'm going to advise
16  you not to answer that question.
17  BY MS. MCENROE:
18  Q. Let me restate it a different way, or I'll
19  just ask a different question actually.
20  So how did you come to have the expectation
21  that that was what you were going to hear about at
22  the meeting?
23  A. Because my friend had actually told me,
24  and she had learned it through a TV ad. So I said, I
25  don't believe it, I don't -- this has got to be some

JA3478

Page 62

1    kind of joke. That's when she said was like, well,
2    they're having a meeting. If you don't believe me,
3    we can attend the meeting. I'm sure you can get the
4    information that you're so confused about.
5        Q. Did you ever see the TV ad Ms. Gaymon was
6    referring to?
7        A. No.
8        Q. Was it Ms. Gaymon you were just talking
9    about?
10       A. Correct.
11       Q. Did you ever hear any radio ads?
12       A. After the fact, yes.
13       Q. When you say "after the fact," you mean
14   after this meeting?
15       A. After the meeting.
16       Q. What did the radio ad say?
17       A. It was -- whatchamacallit -- the radio --
18   not the radio -- the radio station, not a -- not like
19   an ad, the radio station. They were talking about
20   how there was a doctor who was delivering children,
21   and come to find out that he lied about his identity,
22   and they were talking about that.
23       So that's when I had called my friend Tisa. I
24   was like, wow, it's everywhere. I -- I still can't
25   believe it.

Page 63

1        Q. Had you seen or heard any other news media
2    coverage about Dr. Akoda?
3        A. Online I did.
4        Q. What did you see?
5        A. I saw how they were talking about his real
6    name wasn't Akoda, and that he had lied and was being
7    charged with security fraud.
8        Q. Social Security fraud?
9        A. Social Security fraud, yes.
10       Q. Any other news coverage that you saw or
11   heard?
12       A. That was it. After that, I didn't want to
13   see anything else.
14       Q. When did Ms. Gaymon first contact you
15   regarding these allegations about Dr. Akoda?
16       A. I don't know the specific day or month,
17   but I know it was in 2017.
18       Q. What year was Jaiden born again?
19       A. 2014.
20       Q. Okay. Following Jaiden's delivery, did
21   you do post-delivery care with Dr. Akoda?
22       A. I sure did.
23       Q. Okay. For how long? Until when?
24       A. My -- I did my six-weeks checkup. He had
25   said that I had an ovarian cyst and that it needed to

Page 64

1    be burned. And he did the procedure right there at
2    Dr. Chaudhry's office.
3        Q. In the office?
4        A. Yes.
5        Q. Did you have any complications from having
6    the ovarian cyst treated?
7        A. Just -- it was irritation and pain, but
8    that was it.
9        Q. And how long did that irritation and pain
10   last after the procedure?
11       A. Three to four -- three to four days.
12       Q. Three to four days? Okay. Following the
13   treatment of that ovarian cyst, did you get treatment
14   or have an examination by Dr. Akoda after that?
15       A. After that, no.
16       Q. Did you see any obstetricians or
17   gynecologists between then and then when you were
18   again pregnant with Tatiana?
19       A. No.
20       Q. Did you see any obstetricians or
21   gynecologists between when you delivered Lucy and
22   finished that postnatal care and when you became
23   pregnant with Angel?
24       A. No.
25       Q. Did you see any obstetricians or

Page 65

1    gynecologists between when you were done with your
2    postnatal care from Angel and when you became
3    pregnant with Josiah?
4        A. No, I --
5        Q. Did you see any OB/GYNs between when you
6    finished your post -- postnatal care of Josiah and
7    when you became pregnant with Jaiden?
8        A. No.
9        Q. How did you become friends with
10   Ms. Gaymon?
11       A. I met her at the doctor's office, my
12   OB/GYN, when I found out I was pregnant with Jaiden.
13   I do not remember her name, but it was at the office
14   on Saint Barnabas Road.
15       Q. With the woman OB/GYN, correct?
16       A. Yes.
17       Q. Okay. And she was pregnant at the same
18   time you were pregnant?
19       A. Correct.
20       Q. Did she then go on, do you know, to switch
21   to Dr. Chaudhry's practice around the time you did as
22   well?
23       A. Yes.
24       Q. Did you guys talk about that?
25       A. Yes, we did.

Page 66

1  Q. What did you talk about?
2  A. I told her that they had changed me over
3  to Dr. Chaudhry's office, but I wasn't too happy
4  because I didn't want to deliver Jaiden at PGH with
5  all the negative reviews that I had heard from PGH.
6  So that's when she said, well, I'm delivering there
7  too, so you're not alone.
8  And our dates were different, doctor's
9  appointments were different, so I would call her and
10  say, hey, I saw Dr. Akoda. And she was like, oh, I'm
11  going next week, okay, we'll follow up next week.
12  But eventually we went weeks without speaking
13  until I had called her and told her I was in labor.
14  And then she went to see me afterwards.
15  Q. Did she come to see you in the hospital?
16  A. Yes.
17  Q. Was she still pregnant or had she had her
18  baby?
19  A. She was still pregnant.
20  Q. Did she deliver a healthy baby?
21  A. Yes.
22  Q. And did Dr. Akoda deliver her baby, do you
23  know?
24  A. Yes.
25  Q. Did she have a boy or a girl?

Page 67

1  A. A girl.
2  Q. How long after you had Jaiden?
3  A. A week after I had Jaiden.
4  Q. So pretty close in time?
5  A. Uh-huh.
6  Q. Did you guys overlap in the hospital at
7  all?
8  A. No.
9  Q. And did she actually deliver at PGH?
10  A. Yes.
11  Q. When did she come visit you in the
12  hospital?
13  A. The -- right after I had my surgery, a
14  couple hours after I had my surgery.
15  Q. When you were in recovery?
16  A. Yes.
17  Q. By the way, how was Jaiden when you saw
18  him after your surgery?
19  A. It was good seeing him. He was sleeping.
20  It was really nice.
21  Q. Good. Yeah. And was your husband in the
22  hospital with you as well?
23  A. No.
24  Q. Was he working?
25  A. No. We weren't together at that time.

Page 68

1  Q. So did you have anyone else with you
2  supporting you in the hospital when you had Jaiden?
3  A. No.
4  Q. Okay. Was he with nurses when you had
5  your surgery?
6  A. Yes.
7  Q. Okay. And then when did Latisha come to
8  you -- or did I say that wrong? I'm sorry,
9  Ms. Gaymon. Stick with Ms. Gaymon.
10  A. It was a couple hours. It was -- it was
11  later, later that day.
12  Q. How long did she stay with you in the
13  hospital?
14  A. About 45 minutes to an hour.
15  Q. Did you have any other visitors when you
16  were in the hospital having delivered Jaiden?
17  A. No.
18  Q. Do you have any family members living
19  nearby, your mom, your dad, siblings?
20  A. No. They're all in Massachusetts.
21  Q. Oh, they all live in Massachusetts?
22  A. Yes.
23  Q. Do you have siblings?
24  A. No -- in Massachusetts. They are all in
25  Massachusetts.

Page 69

1  Q. Do you have brothers and sisters, though?
2  A. Six brothers.
3  Q. Six brothers?
4  A. Yes.
5  Q. They all live in Massachusetts?
6  A. Yes.
7  Q. Do they have any children?
8  A. Yes, they do.
9  Q. Do you get up there to see them?
10  A. Sometimes, when I can.
11  Q. Are your parents still living?
12  A. Yes.
13  Q. And -- and they live in Massachusetts?
14  A. My father lives in Massachusetts. My
15  mother lives in Florida.
16  Q. Did either of them come to visit you after
17  you had Jaiden?
18  A. No.
19  Q. When you went home after having delivered
20  Jaiden, was there anyone there to help you?
21  A. My children and my neighbor.
22  Q. And who is your neighbor?
23  A. Lord, what's her name? I do not remember
24  her name. I just -- Peterson is her last name, but I
25  do not remember her name.

Page 70

1    Q. Ms. Peterson came to help you some?
2    A. Yes.
3    Q. And what kind of help did she provide?
4    A. She was the one who took care of the
5  children while I was in the hospital.
6    Q. Did she stay to help after you came home
7  with Jaiden?
8    A. Yes, because she was literally my
9  next-door neighbor.
10    Q. Did she stay over to help so that you
11  could sleep --
12    A. Yes.
13    Q. -- and take a shower?
14    A. Yes.
15    Q. How much time do you think Ms. Peterson
16  spent at your home after you had Jaiden?
17    A. Probably about -- I'd say about an hour or
18  two a day.
19    Q. For -- for how long did that go on, do you
20  think?
21    A. For the first -- first two weeks. Or, if
22  I needed her, I went over to her house.
23    Q. At some point after you had Jaiden did you
24  and Mr. Powell get together or move into the same
25  home?

Page 71

1    A. Not aft- -- until we got married.
2    Q. So how long was it that you got married
3  after you had Jaiden?
4    A. Let's see. I had Jaiden in September '14.
5  We got married in January 2015. It was a couple
6  months.
7    Q. Did he help with any of the child care
8  responsibilities before you got married?
9    A. No.
10    Q. Does he help with any child care
11  responsibilities now?
12    A. Yes.
13    Q. We were talking about Ms. Gaymon had a
14  baby girl, healthy baby girl, about a week after you
15  had Jaiden; is that right?
16    A. Yes.
17    Q. Does she live nearby where you live, or at
18  least at the time did she?
19    A. No. At the time lived, let's see -- I
20  lived in Temple Hills. She lived in Fort Washington.
21  So it was probably 30, 40 minutes away from me.
22    Q. Did you visit with one another after you
23  both had your babies?
24    A. Like six -- six or seven months after.
25    Q. And did you talk at all about your birth

Page 72

1  experiences with Dr. Akoda?
2    A. She spoke about her cesarean because she
3  had a cesarean, and that's when I said I've never had
4  a cesarean, and that was the conversation.
5    Q. Do you know how her recovery went after
6  her C-section?
7    A. Not really. Honestly, not really.
8    Q. Do you know if she talked to you about any
9  infection or scarring, anything like that?
10    A. No.
11    Q. Does she have other children, do you know,
12  other than that daughter?
13    A. Yes, she has two older children.
14    Q. Before she had that daughter?
15    A. Yes.
16    Q. Do you know if she's had any children
17  since?
18    A. No, she has not.
19    Q. You said that you guys got together about
20  six or seven months after your -- Jaiden and her
21  daughter had been born. Do you know if you saw each
22  other then thereafter, before you had the meeting
23  with counsel we talked about earlier?
24    A. Yes, we did.
25    Q. About how frequently?

Page 73

1    A. Not frequently.
2    Q. For about how many times?
3    A. How many times after that? I would say
4  about four to five.
5    Q. Were those of a social nature, those
6  meetings?
7    A. Yes, gatherings at my house from kids'
8  birthday parties, stuff like that.
9    Q. Aside from seeing each other, would you
10  stay in touch over social media or texting, anything
11  of the like?
12    A. Yes.
13    Q. Okay. How?
14    A. Facebook. And she would text me time to
15  time and see how I'm doing, see how the kids are
16  doing, and to tell me she's -- Maddie, which is her
17  daughter that she had -- Maddie is asking when she's
18  going to see Jaiden and when she's going to come
19  over.
20    Q. Is Maddie a healthy kid, from what you
21  know?
22    A. Yes.
23    Q. What name do you use on Facebook?
24    A. Miguella Powell.
25    Q. Miguella Powell? So your -- your current



Page 74

1  middle name and last name?

2      A.  My nickname.

3      Q.  Oh, you go by -- is that your nickname?

4      A.  Yes.  Because my father's name is Miguel,

5  so everybody calls me Miguella.

6      Q.  Do you use any other social media?

7

8

14                              number.

14      Q.  Okay.  And is that your cell phone number?

15      A.  Yes.

16      Q.  And what is that number?

1

19      A.  No.

20      Q.  Do you have any blogs?

21      A.  No.

22      Q.  Do you do any other sort of journaling?

23  Do you have any hard-copy journals you keep?

24      A.  No.  I barely have time to sleep.

25      Q.  You mentioned that Ms. Gaymon was the

Page 75

1  first one to be in touch with you to talk about the

2  allegations about Dr. Akoda and his identity; is that

3  correct?

4      A.  That's correct.

5      Q.  How was she first in touch with you about

6  that?

7      A.  She called me.

8      Q.  On the telephone?

9      A.  Yes.

10      Q.  What did she say?

11      A.  She said, girl, you will not believe this.

12  I said, what.  She was like, Dr. Akoda is not who he

13  said he is.  I said, you're lying.  She's like, no,

14  I'm not lying.  I said, girl, I don't believe you,

15  whatever.  So she said, if you don't believe me,

16  there's going to be a meeting that you can go and see

17  it for yourself, so...

18      Q.  Was that just one conversation before you

19  then went to the meeting with counsel?

20      A.  Yes.

21      Q.  Do you know how she found out?

22      A.  She said she -- through an ad.

23      Q.  On the television?

24      A.  On the television.

25      Q.  Did she describe that ad to you?

Page 76

1      A.  No.

2      Q.  Did she tell you what station it was on?

3      A.  No.

4      Q.  What was her mood like when she called

5  you?

6      A.  Shocked.

7      Q.  Do you know anyone else other than

8  Ms. Gaymon who was treated or examined by Dr. Akoda?

9      A.  No.

10      Q.  Did you become friends with anyone else in

11  the waiting room of any of your OB/GYNs?

12      A.  No.

13      Q.  And we covered this, I think, but you

14  delivered Jaiden vaginally, correct?

15      A.  Correct.

16      Q.  And Ms. Gaymon had a C-section?

17      A.  Correct.

18      Q.  Do you know if your birthing experiences

19  were similar?

20      MR. CERYES:  Objection, form, foundation.

21      You can answer to the extent you know and

22  understand the question.

23      A.  I don't know.

24      Q.  Okay.  So you had a vaginal delivery and

25  she had a C-section?

Page 77

1      A.  Yes.

2      Q.  So I'm just asking if you think that your

3  delivery experiences with Dr. Akoda were similar.

4      MR. CERYES:  Same objection.

5      A.  I don't -- I don't -- I don't know,

6  honestly.  I thought mine was harsh.  I don't know

7  what she went through.

8      Q.  You mean your labor and delivery was --

9  was a tough one?

10      A.  Yes.

11      Q.  Do you know about the experiences of any

12  of the other patients of Dr. Akoda's?

13      A.  No.

14      Q.  Do you know if Ms. Gaymon had the same

15  experiences with breast exams that you had with

16  Dr. Akoda?

17      A.  I don't know.

18      Q.  Did you talk to her about that experience?

19      A.  No.

20      Q.  Have you ever spoken to her about that

21  experience?

22      A.  No.

23      Q.  Has Ms. Gaymon ever told you that there

24  was anything flirtatious or sexual about any of her

25  interactions with Dr. Akoda?

Page 78

1    A. No.
2    Q. She has not told you that?
3    A. No, she has not.
4    Q. Other than the issue of Dr. Akoda's
5  identity, has Ms. Gaymon raised any concerns about
6  Dr. Akoda's treatment of her with you?
7    A. She hasn't told me anything, no.
8    Q. Sitting here today, do you believe that
9  Dr. Akoda is a doctor?
10   MR. CERYES: Objection, form, foundation.
11   You can answer.
12  BY MS. MCENROE:
13   Q. Just asking for what you -- what your
14  belief is.
15   A. My honest opinion? I don't know what to
16  believe.
17   Q. So you don't know one way or the other?
18   A. I don't know what -- he said his name was
19  Akoda, and come to find out it wasn't. I mean, I
20  don't know what to believe.
21   Q. Okay. And does him using a different name
22  have some sort of special significance to you? What
23  is it that -- that is the problem with that?
24   A. It's the problem --
25   MR. CERYES: Objection, form, foundation.

Page 79

1  You can answer.
2    A. Yeah, it's a problem. You told me your
3  name was Akoda and come to find out it's not. I
4  mean, what other secrets are you hiding? I -- I
5  trusted you. You know, you touched my body. I mean,
6  that's -- I thought Akoda, you know, was my doctor,
7  who I trusted to do my exams and -- and touch my body
8  and deliver my baby.
9    I don't -- I don't know whatever his name is.
10  I don't -- it's beyond disturbing, it is. So, yeah,
11  it has -- it has a lot to do with his name, because
12  it's shocking. It's disturbing. I felt violated by
13  somebody who I don't know.
14   Q. When did you feel violated by Dr. Akoda?
15  When is it that you came to feel violated, if that
16  makes sense?
17   A. When I found out that Akoda was not Akoda.
18   Q. When he used a different name -- that he
19  had used a different name?
20   A. Yeah. So I was like, who -- who -- who
21  was it that was touching me, who was it that I had
22  trusted to say -- to put my -- my life on the line.
23  If my -- if my kids, my older kids -- if I would --
24  did die in that O.R. room, you know, and my kids have
25  questions, and come to find out, oh, you know, it

Page 80

1  wasn't Dr. Akoda who did the surgery. Come to find
2  out it's -- it's some other man. I mean, how are
3  they going to feel? Like, it's -- it's disturbing.
4  It's beyond disturbing.
5    Q. Sitting here today, do you have any reason
6  to doubt that Dr. Akoda had medical training?
7    A. Yeah. Yes, I do.
8    Q. You've -- you've had a number of OB/GYNs
9  over the span of your experience in birthing
10  children. Was there anything out of the ordinary
11  about Dr. Akoda's care of you compared to the other
12  OB/GYNs you've had?
13   MR. CERYES: Objection to the extent it's
14  already been answered.
15   But you can answer.
16   A. I mean, besides that he was flirtatious,
17  and, certain extent, disrespectful because,
18  you know --
19   Q. But I'm talking about the medical care
20  itself.
21   A. No. I mean, when you go to get checked
22  out, you don't -- you don't actually focus on, you
23  know, what is he doing. I mean, I didn't go to
24  medical school, so I don't know what -- what a doctor
25  is supposed to do.

Page 81

1    Q. You've delivered other children before, so
2  I'm just trying to understand if in your experience,
3  your treatment with Dr. Akoda -- and we've talked
4  about the flirtatious issues -- setting that aside,
5  the medical treatment he provided to you was
6  different or notable in some way compared to the
7  other treatment you've had from other OB/GYNs that
8  you've seen.
9    A. Well, this one, yes, it was different. I
10  almost -- I almost bled to death, so, yeah, it was
11  definitely different --
12   Q. From your --
13   A. -- from other experience.
14   Q. From your post-delivery birth bleeding
15  issue?
16   A. Yeah, so definitely it was different.
17   Q. And leading into your delivery, was any of
18  your prenatal care different, aside from the
19  flirtatious issue?
20   A. No, those were not.
21   Q. And the actual delivery experience of
22  Jaiden, was that different from your other delivery
23  experiences, aside from the bleeding issue?
24   A. No.
25   Q. So it was the same --

Page 82

1    A.  Mm-hmm.
2    Q.  -- as your others?  Is that a yes?
3    A.  Yes.
4    Q.  And Dr. Akoda did a procedure on you to
5  help stop the bleeding and the clotting; is that
6  correct?
7    A.  From my understanding, he removed the
8  blood clots.  How, I don't know.
9    Q.  Okay.
10   A.  But, yeah, and then after that he put some
11  bandages to stop the bleeding.
12   Q.  And it did stop the bleeding, correct?
13   A.  Yes.
14   Q.  Okay.  Do you know one way or another
15  about whether Dr. Akoda was ever board certified in
16  obstetrics and gynecology?
17   A.  No, I do not know.
18   Q.  Do you know what board certification means
19  in that kind of setting?
20   A.  In that kind of setting, yes.
21   Q.  That they have taken extra exams and
22  passed oral and written exams?
23   A.  Correct.
24   Q.  Would it surprise you to learn that he was
25  board certified in obstetrics and gynecology?

Page 83

1       MR. CERYES:  Objection, form, foundation.
2    You can answer.
3    A.  I mean, I know you have to -- to be a
4  physician, a doctor, you have to take some type of,
5  you know, classes and -- and exams and stuff, but I
6  really don't know what he had.
7    Q.  Okay.  Did you do any investigation into
8  his training or certification?  I think we maybe
9  talked earlier that you had not; is that right?
10   A.  No, I did not.
11   Q.  You are a plaintiff in this lawsuit; is
12  that correct?
13   A.  That's correct.
14   Q.  And you are a plaintiff in the lawsuit in
15  Maryland; is that correct?
16   A.  That's correct.
17   Q.  Against Dimensions?
18   A.  That's correct.
19   Q.  Have you ever been a plaintiff in any
20  other lawsuit before?
21   A.  No.
22   [REDACTED]
25   Q.  Tell me about that.

Page 84

17   Q.  And everything was okay with Jaiden
18  following that?
19   A.  Yes.
20   Q.  Okay.  That was prior to you seeing
21  Dr. Akoda; is that correct?
22   A.  Correct.
23   Q.  Have you otherwise -- strike that.
24       Have you otherwise ever been a defendant in a
25  lawsuit?

Page 85

1    A.  No.
2    Q.  Have you ever, to your knowledge, had a
3  lawsuit threatened against you; someone told you they
4  were going to file one?
5    A.  No.
6    Q.  Have you ever threatened a lawsuit that
7  you did not file?
8    A.  No.
9    Q.  Have you ever filed a workers'
10  compensation claim?
11   A.  No.
12   Q.  Have you ever sought accommodations under
13  the ADA?
14   A.  No.
15   Q.  Americans with Disabilities Act?
16   A.  No.
17   Q.  Have you ever taken FMLA, Family Medical
18  Leave Act?
19   A.  No.
20   Q.  Did you get maternity leave or time out of
21  work for any of your other -- strike that.
22       Have you gotten maternity leave or parental
23  leave from any of your deliveries?
24   A.  No.
25   Q.  Have you ever been convicted of a crime?

Page 86

1    A.  No.
2    Q.  Have you ever been the victim of a crime?
3    A.  No.
4    Q.  You mentioned your husband is a police
5    officer.  Does he go out into the field?
6    A.  Yes.
7    Q.  Can you describe to me what he does?  Is
8    he like a beat officer, or what does he do?
9    A.  Yes, he's a patrol officer for station 5
10   in Clinton.
11   Q.  Does he patrol in a car, on a bike?
12   A.  A car, a cruiser.
13   Q.  Or a horse, I guess, is also an option.
14   In a -- in a car?
15   A.  Yes, in a cruiser.
16   Q.  Has he ever been injured in the line of
17   duty?
18   A.  Yes.
19   Q.  Can you tell me a little bit about that?
20   A.  Car -- cruiser crashed.  He had some
21   fractured ribs.
22   Q.  When was that?
23   A.  2016?  '15, '16?
24   Q.  Is he doing okay now?
25   A.  Yes.  And then -- that's -- that's --

Page 87

1    that's the biggest one.  Other ones are just little
2    minor, you know, chasing a suspect and
3    trip-and-falls, stuff like that.
4    Q.  So we'll knock on wood that we keep him
5    that way.
6    A.  Yeah.  Yes.
7    Q.  We keep him nice and safe.
8    And has he ever gotten into any violent
9    altercations while in the line of duty involving his
10   firearm?
11   A.  Yes.  He has been through a shooting.
12   Q.  Has he been shot?
13   A.  No.  Thank God, no.
14   Q.  I'll knock on wood again.
15   Has he been shot at in the line of duty?
16   A.  Yes.
17   Q.  Has he sought medical care?
18   A.  No.
19   Q.  Do you know if he gets any mental health
20   treatment?
21   A.  No, he does not.
22   Q.  Did your husband, Mr. Powell, ever meet
23   Dr. Akoda?
24   A.  Yes, he did.
25   Q.  When was that?

Page 88

1    A.  When I went for my six-weeks checkup.
2    Q.  Was that the first time you met Dr. Akoda?
3    A.  Who, me?
4    Q.  Oh, I'm sorry.  Strike that.  I was --
5    six-month checkup is what I was thinking when you
6    said --
7    A.  Six weeks.
8    Q.  So it was post-delivery.
9    A.  Yes.
10   Q.  Okay.  So -- so let me start that over
11   again.
12   So Mr. Powell, your husband, came with you to
13   your six-week post-delivery appointment; is that
14   correct?
15   A.  Yes.
16   Q.  And your husband met Dr. Akoda at that
17   time?
18   A.  Yes.
19   Q.  Did anything happen at that appointment
20   other than you getting checked out?
21   A.  He stayed in the lobby and I went in, and
22   that's when he burned an ovarian cyst that he said
23   that I had.
24   Q.  So your husband waited in the waiting
25   room?

Page 89

1    A.  Correct.
2    Q.  And did he get to meet Dr. Akoda?
3    A.  Yes, when Dr. Akoda came -- came out.
4    Q.  At the beginning of the appointment or
5    after the appointment?
6    A.  After the appointment.
7    Q.  Did your husband and Dr. Akoda ever speak?
8    A.  How you doing, sir, that's it.
9    Q.  Just an introduction?
10   A.  Yeah.  Yes.
11   Q.  Do you have any medical doctors in your
12   family?
13   A.  No.
14   Q.  Any of your six brothers a doctor?
15   A.  No.
16   Q.  Okay.  Do you have any friends, close
17   friends or other acquaintances who are medical
18   doctors?
19   A.  No.
20   Q.  Do you know anyone close or sort of in
21   passing, neighbors, friends, family, who have gone to
22   medical school outside of the United States?
23   A.  No.
24   Q.  When did you first hear of the Educational
25   Commission for Foreign Medical Graduates?

Page 90

1    A.  Back in 2018.
2    Q.  How?
3    A.  Through my lawyer.
4    Q.  And if I call them ECFMG today, is that
5  okay?  You'll know what I'm talking about?
6    A.  Yes.
7    Q.  It will be a little shorter for everybody.
8    A.  Yes.
9    Q.  So it's fair to say that, before you met
10  counsel in connection with the lawsuits about
11  Dr. Akoda, you had not heard of ECFMG before?
12    A.  No.
13    Q.  Other than counsel, have you ever gotten
14  any information about who ECFMG is or what they have
15  done?
16    A.  No.
17    Q.  Have you ever looked them up on the
18  Internet?
19    A.  No.
20    Q.  Met anyone who works there?
21    A.  No.
22    Q.  Do you have an understanding of what ECFMG
23  does?
24    A.  Yes.
25    Q.  What's your understanding of what ECFMG

Page 91

1  does?
2    A.  It's for foreigners.  It's pretty much a
3  -- they give the license for foreigners from -- yeah.
4    Q.  In what kind of context?
5    A.  Medical license and stuff like that.
6    Q.  So it's your understanding that ECFMG
7  licenses foreign medical doctors --
8    A.  Yes.
9    Q.  -- to practice medicine in the
10  United States?
11    A.  Correct.
12    Q.  Have you ever heard of the United States
13  Medical Licensing Examination?
14    A.  No.
15    Q.  Sometimes called USMLE?
16    A.  No.
17    Q.  We talked about just a minute ago that you
18  are a plaintiff in this litigation against ECFMG,
19  correct?
20    A.  Correct.
21    Q.  And you're a named plaintiff.  Do you
22  understand that?
23    A.  Yes.
24        (Exhibit 2 marked for
25        identification:  Civil Action re

Page 92

1        Russell, et al. v. Educational
2        Commission for Foreign Medical
3        Graduates)
4  BY MS. MCENROE:
5    Q.  I just handed you what I marked as Exhibit
6  2.  That is a copy of the complaint that was filed in
7  this lawsuit against ECFMG.  Have you ever seen this
8  before?
9    A.  Yes.
10    Q.  Have you ever read it before?
11    A.  Yes.
12    Q.  Did you read it before it was filed?
13    A.  Yes.
14    Q.  Did you suggest any edits or changes to
15  it?
16    A.  No.
17    Q.  Did you sign anything relating to a
18  verification or anything like that?
19    A.  Yes.
20    Q.  Did you swear that it was true and
21  accurate --
22    A.  Yes.
23    Q.  -- under penalty of perjury?
24    A.  Yes.
25        MR. CERYES:  Objection, form, foundation.

Page 93

1  BY MS. MCENROE:
2    Q.  Do you believe the allegations in the
3  complaint to be true?
4    A.  Yes.
5    Q.  Sitting here today, anything you would
6  change in the complaint now that you know what you
7  know?
8    A.  No.
9    Q.  In your own words, can you tell me what
10  you think ECFMG did wrong?
11        MR. CERYES:  Objection to form,
12  foundation, calls for an expert opinion.
13        You can answer with respect to your
14  understanding.
15    A.  Yes, I understand that they did wrong --
16  they did wrong, allowed him to practice with a fake
17  name.
18    Q.  Any more specifics about what you think
19  that ECFMG did wrong?  And I don't mean this as a pop
20  quiz; I'm just trying to get your best understanding.
21    A.  They -- they failed to -- look over his
22  documentations and actually provide him with a
23  license to practice.
24    Q.  I'd like to direct your attention to
25  paragraph 42.  You'll see each of the -- once you get

Page 94

1  into the meat of the complaint, each paragraph has a
2  number.  Do you see that?  So it's on page 9,
3  paragraph 42.  Let me know when you're there.
4      A.  I'm here.
5      Q.  Great.  That paragraph says, "the
6  plaintiff, Elsa Powell" -- that's you?
7      A.  Correct.
8      Q.  "-- was a patient of Igberase on or about
9  September 17th, 2014, and on several occasions
10 thereafter Igberase delivered Elsa Powell's son on
11 that date at Prince George's Hospital Center."
12     Did I read that correctly?
13     A.  That's correct.
14     Q.  And do you understand in the complaint
15 that the reference to Igberase is also Dr. Akoda?
16     A.  Unfortunately, yes.
17     Q.  Okay.  But you understand that those mean
18 the same for the purposes of this complaint; is that
19 correct?
20     A.  Correct.
21     Q.  Are the -- is the information in paragraph
22 42 correct?
23     A.  That's correct.
24     Q.  I'd like to direct your attention to
25 paragraph 44, which is on the next page on the top.

Page 95

1  It says:
2          "The plaintiffs and others similarly
3          situated chose Igberase who they
4          knew as Akoda as their
5          obstetrician/gynecologist on the
6          basis of their belief that Akoda had
7          obtained all necessary credentials
8          and certifications required of
9          physicians practicing in the
10         United States, including
11         certification from ECFMG."
12     Did I read that correctly?
13     A.  Yes, you read it correctly.
14     Q.  Do you know on what basis others -- so not
15 yourself, but other patients of Dr. Akoda's chose him
16 as their physician?
17     A.  I can't speak on others, but I can speak
18 on myself.  I didn't choose Igberase, whatever his
19 name is -- Akoda.  I -- I went with the intentions of
20 seeing Dr. Chaudhry.  Dr. Chaudhry was never there,
21 so pretty much I was stuck with Dr. Akoda.
22     Q.  When you started seeing Dr. Akoda as a
23 physician, did you specifically rely on the concept
24 that he had an ECFMG certification?  Was that
25 something that was in your head?

Page 96

1      A.  No.
2          MR. CERYES:  Objection, form, foundation.
3  BY MS. MCENROE:
4      Q.  Because you didn't even know ECFMG existed
5  at the time, correct?
6      A.  No.  All's in my head was getting prenatal
7  care and delivering my baby.
8      Q.  A healthy -- healthy baby, healthy mommy?
9      A.  Healthy baby.
10     Q.  So is it fair to say -- it might save us
11 some time to not go through each of the paragraphs --
12 but you -- you don't know what any of Dr. Akoda's
13 patients, other than yourself, knew or thought or
14 expected about Dr. Akoda, correct?
15     A.  That's correct.
16     Q.  Do you think you can speak on their
17 behalf?
18     A.  I mean --
19         MR. CERYES:  Objection, form, foundation.
20 You can answer.
21     A.  We all went through similar shockness.  I
22 mean, we're all going through this together.  I mean,
23 I -- I can speak on behalf of them when I can tell
24 you that we all feel violated, we -- lied to,
25 disrespected.

Page 97

1      Q.  How do you know that?
2      A.  How do I know that?
3      Q.  You said we all feel this way.
4      A.  Yes.
5      Q.  How do you know that?  Are you surmising
6  that you think they all should feel that way, or do
7  you actually know that that's how they feel?
8          MR. CERYES:  Objection, form.
9      A.  Anybody who get lied to feel that way, and
10 that's what in -- this case is, we've been lied to.
11     Q.  Do you have any special reason to know
12 that, or did you talk to other patients of
13 Dr. Akoda's, other than Ms. Gaymon --
14     A.  No.
15     Q.  -- to know how anyone feels?
16     A.  No, I have not.
17         MR. CERYES:  Objection, form, foundation.
18 You can answer.
19 BY MS. MCENROE:
20     Q.  Do you know about any consents that any of
21 Dr. Akoda's other patients may have provided for his
22 treatment of them?
23     A.  No.
24     Q.  What are you hoping to get out of this
25 lawsuit?

Page 98

1    A.  Some sort of -- somebody needs to be
2  accountable for what happened.
3    Q.  Have you sued Dr. Akoda or Dr. Igberase?
4    A.  No.
5    Q.  Have you brought a medical malpractice
6  claim against him?
7    A.  No.
8    Q.  You did sue Dimensions, though, right?
9    A.  I sure did.
10    Q.  Did you review a complaint in connection
11  with the lawsuit against Dimensions?
12    A.  Yes, I did.
13    Q.  Do you believe that the allegations in
14  that complaint are true and correct as written?
15    A.  That's correct.
16    MR. CERYES:  Objection, form, foundation.
17  BY MS. MCENROE:
18    Q.  What injury, if any, are you claiming in
19  this lawsuit?
20    A.  What injury am I claiming in this lawsuit?
21  Well, besides the fact that I almost lost my life
22  because of a fake doctor who I thought was a doctor.
23  I don't have a peace of mind since I found out that
24  he wasn't who he said he was.
25    Q.  So breaking that down, I just -- it

Page 99

1  sounded like there are two separate things that you
2  just articulated there.  There was a physical concern
3  about the bleeding and clotting issue after delivery
4  of Jaiden; is that correct?
5    A.  Of course.
6    Q.  And then there's more of an emotional and
7  mental issue separately, then, that we talked about
8  just a second ago?
9    A.  I won't say mental, but emotionally, yes.
10    Q.  Okay.  Have you sought any treatment or
11  help for that emotional concern?
12    A.  No.
13    Q.  Okay.  So just so the record's clear, the
14  -- the concern for your life that you were referring
15  to, that was the post-delivery bleeding and clotting,
16  correct?
17    A.  Correct.
18    Q.  Have you ever heard the term
19  "interrogatory" before?
20    A.  Yes, I have.
21    Q.  You -- you understand that interrogatories
22  are questions that get asked in the course of
23  litigation; is that correct?
24    A.  Correct.
25    Q.  Did you play any role in drafting the

Page 100

1  responses of any interrogatories in this litigation?
2    A.  No.
3    Q.  Did you provide any information to your
4  counsel in connection with the responses to
5  interrogatories?
6    A.  No.
7    MS. MCENROE:  This will be 3, and this
8  will be 4.  They go together.
9    (Exhibit 3 marked for
10    identification:  Plaintiff Elsa
11    Powell's Answers to First Set of
12    Interrogatories and Responses to
13    First Set of Requests for Production
14    of Documents)
15    (Exhibit 4 marked for
16    identification:  Plaintiff Elsa
17    Powell's Supplemental Answers to
18    First Set of Interrogatories and
19    Supplemental Responses to First Set
20    of Requests for Production of
21    Documents)
22  BY MS. MCENROE:
23    Q.  Ms. Powell, I'm handing you what I've
24  marked as Exhibits 3 and 4.  Take a quick second.
25  I'm not going to quiz you on everything in there, but

Page 101

1  I just want to give you a minute to familiarize
2  yourself before I start asking questions.
3    So in Exhibit 3, I'd like to point you to the
4  second-to-last page in the document, the next page
5  after that.
6    MR. CERYES:  In the back of that page.
7    A.  Mm-hmm.
8    Q.  It's double-sided.
9    A.  I'm here.
10    Q.  And it says "Verification" at the top.  Do
11  you see that?
12    A.  Mm-hmm.
13    Q.  And it reads:
14    "I, Elsa Powell, hereby aver that
15    the factual statements in the
16    foregoing answers to interrogatories
17    are true and correct to the best of
18    my knowledge, information and
19    belief, and that these answers are
20    made subject to the penalties
21    relating to unsworn falsification to
22    authorities."
23  Do you see that?
24    A.  Mm-hmm.
25    Q.  Is that a yes?

Case 2:23-cv-01998-MAK Document 22-5 Filed 12/11/23 Page 31 of 90
Case 2:23-cv-01998-MAK Document 22-5 Filed 09/08/2023 Page 1599 of 3041
Elsa Powell

Page 102

1     A. Yes.
2     Q. Is that your signature?
3     A. Yes.
4     Q. Did you actually review the answers to the
5  interrogatories before you signed this?
6     A. Yes.
7     Q. Okay. And you believed them to be true
8  and correct?
9     A. Yes.
10    Q. Great. So you can set Exhibit 3 aside.
11    And let's look at Exhibit 4, which is a
12 supplemental set of interrogatory responses. It's
13 something that happens sometimes in -- in discovery.
14    Toward the back of the document, there's a
15 long list of names, but a couple pages before that is
16 another verification page. I'm hoping you can look
17 at that with me.
18    A. Mm-hmm.
19    Q. And it's a verification, and it says:
20    "I, Elsa Powell, hereby aver that
21    the factual statements in the
22    foregoing supplemental answers to
23    interrogatories are true and correct
24    to the best of my knowledge,
25    information and belief, and that

Page 103

1    these supplemental answers are made
2    subject to the penalties relating to
3    unsworn falsification to
4    authorities."
5    Did I read that correctly?
6    A. Yes.
7    Q. Then there's a -- it looks like maybe more
8  of an electronic signature or something there. Is
9  that your signature?
10    A. Yes.
11    Q. Okay. And so did you review the responses
12 to the supplemental answers to interrogatories as
13 well?
14    A. Yes.
15    Q. And you believed them to be true and
16 accurate as written?
17    A. Yes.
18    Q. It might save us a little bit of time.
19    Are there any changes or issues or concerns
20 you have about any of the interrogatory responses as
21 written or supplemented?
22    A. No.
23    Q. Okay. So there's nothing today you'd like
24 to change or amend about your discovery responses?
25    A. No.

Page 104

1     Q. In the Exhibit 4, that list at the back,
2  Ms. Gaymon is listed, right, on the second page
3  there? It's alphabetical by last name.
4     A. Correct.
5     Q. Latisa Gaymon, that's the friend you've
6  been talking about today?
7     A. Correct.
8     Q. Correct? Okay. So you can set those
9  aside.
10    We talked a little earlier today about the way
11 that you go about choosing a medical doctor, and it's
12 been different depending on the insurance you have;
13 is that fair to say?
14    A. Yes.
15    Q. When you've gotten a new medical doctor,
16 have you ever done any sort of background or criminal
17 check on them?
18    A. Yes, if I go see them.
19    Q. Which doctor?
20    A. My children's doctor.
21    Q. Your children's doctor?
22    A. Yes. I haven't seen my doctors yet,
23 unless I need to, which was Ms. Em- -- Emily Lo, and
24 I did my research on her.
25    Q. Right. And you did a criminal background

Page 105

1  check on her?
2     A. Yes.
3     Q. Okay. How did you do that?
4     A. Online.
5     Q. Okay. So you Googled her?
6     A. Mm-hmm.
7     Q. Did you --
8     A. Yes.
9     Q. Is that a yes?
10    Did you pay to have anyone perform an actual
11 criminal background check on her?
12    A. No.
13    Q. Okay. Did you ask your husband to do any
14 sort of special police check on her or anything?
15    A. No.
16    Q. Do you know if any of the doctors you've
17 seen in the past have ever been convicted of tax
18 fraud?
19    A. No.
20    Q. Okay. Do you know if any of them have
21 ever been found to have failed to have paid their
22 nannies or their housekeepers?
23    A. No.
24    Q. Do you know if any of them have ever
25 smoked pot in a place where that's not legal?

Page 106

1    A. No.
2    Q. Do you know if any of them have ever
3  committed [sic] of Social Security fraud other than
4  Dr. Akoda?
5    A. No.
6    Q. Do you know if any of those doctors have
7  ever perjured themselves or lied in a court of law?
8    A. No.
9    Q. Do you know if any of them have ever been
10 sued for malpractice, any doctor you've ever gone to?
11   A. No.
12   Q. You don't know one way or the other?
13   A. No.
14      MS. MCENROE: Let's take a quick break.
15      VIDEO SPECIALIST: We're going off the
16 record at 11:32.
17   (Proceedings recessed)
18      VIDEO SPECIALIST: We're back on the
19 record at 11:42.
20 BY MS. MCENROE:
21
22
23
24
25   A. Yes.

Page 107

1
2
3
4    A. Yes.
5
6  pregnant or you had had Jaiden already?
7    A. I had Jaiden.
8    Q. Okay. How old was Jaiden, do you know,
9  when you got sued?
10   A. He was a couple months old.
11
12
13
14
15
16
17
18
19
20
21
22   Q. Okay. Again, that was when Jaiden was
23 just a couple months old?
24   A. Correct.
25   Q. Jumping back to your treatment by

Page 108

1  Dr. Akoda real quick, was the person who treated you
2  as Dr. Akoda the same man throughout the treatment?
3  Did you recognize him to be the same person?
4    A. Yes.
5    Q. Okay. And can you describe to me very
6  briefly what he looked like?
7    A. Tall, dark-skinned. He was bald-headed,
8  slim.
9    Q. Did he speak with an accent?
10   A. Yes.
11   Q. And the person who delivered Jaiden is the
12 same person who did your prenatal care, Dr. Akoda?
13   A. Correct.
14   Q. I did have one other question for your
15 counsel, just as a housekeeping matter.
16      MS. MCENROE: We've gotten some of the
17 medical records like we had talked about yesterday
18 that have some redactions on them, so I think we may
19 need to discuss or revisit -- we can do that off the
20 record afterwards.
21      MR. CERYES: Sure.
22      MS. MCENROE: But pending any resolution
23 of figuring out some of that medical record cleanup,
24 I have no further questions for today.
25      MR. CERYES: Okay.

Page 109

1      EXAMINATION
2  BY MR. CERYES:
3    Q. And I do, just very briefly, have one or
4  two for you.
5    A. Yes.
6    Q. You were -- you were asked by counsel some
7  questions about how you came to be a patient of
8  Akoda. Do you remember that?
9    A. Yes.
10   Q. Okay. And you explained that he -- it's
11 not -- he's not someone you picked from a list, but
12 rather you had been referred to him -- initially to
13 Chaudhry and then to Akoda, do you recall that?
14      MS. MCENROE: Objection to form, leading.
15   A. Yes.
16   Q. When you agreed to receive treatment from
17 Akoda, was it your assumption and belief that he had
18 gone through the appropriate and lawful process in
19 order to become a physician?
20      MS. MCENROE: Objection to form, leading.
21   A. Yes.
22   Q. Okay. And had you understood that he had
23 not gone through that lawful process to become a
24 licensed physician, would you have agreed to receive
25 treatment from him?

JA3490

## Page 110

1    MS. MCENROE:  Objection to form, leading.
2  A.  Never.
3    MR. CERYES:  That's all I have.
4    MS. MCENROE:  Thank you.
5    VIDEO SPECIALIST:  That completes the
6  deposition.  We're going off the record at 11:45.
7
8  //
9    (The deposition of ELSA POWELL adjourned
10  at 11:45 a.m.)
11  //
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 111

1    ACKNOWLEDGMENT OF DEPONENT
2
3    I, ELSA POWELL, do hereby acknowledge that
4  I have read and examined the foregoing testimony and
5  that the same is a true, correct and complete
6  transcription of the testimony given by me, with the
7  exception of the noted corrections, if any, appearing
8  on the attached errata page(s).
9  _____  _____
10  DATE    ELSA POWELL
11
12
13  Subscribed and sworn to before me this _____ day of
14  _____, 20_____ .
15  _____ (Notary Public)
16  My Commission expires: _____
17
18
19
20  [SEAL]
21
22
23
24
25

## Page 112

1    C E R T I F I C A T E
2
3    I, LINDA S. KINKADE, Registered Diplomate
4  Reporter, Certified Realtime Reporter, Registered
5  Merit Reporter, Certified Shorthand Reporter, and
6  Notary Public, do hereby certify that prior to the
7  commencement of examination the deponent herein was
8  duly sworn by me to testify truthfully under penalty
9  of perjury.
10    I FURTHER CERTIFY that the foregoing is a true
11  and accurate transcript of the proceedings as
12  reported by me stenographically to the best of my
13  ability.
14    I FURTHER CERTIFY that I am neither counsel
15  for nor related to nor employed by any of the parties
16  to this case and have no interest, financial or
17  otherwise, in its outcome.
18    IN WITNESS WHEREOF, I have hereunto set my
19  hand and affixed my notarial seal this 10th day of
20  September, 2019.
21    My commission expires:  July 31, 2022
22
23  _____
24  NOTARY PUBLIC IN AND FOR
25  THE DISTRICT OF COLUMBIA

## Page 113

1    WITNESS ERRATA SHEET
2  REF. NO. 225850        Page 1 of _____
3  NAME OF CASE: Russell, et al. v. ECFMG
4  DEPONENT:  ELSA POWELL
5  DATE OF DEPOSITION: September 6, 2019
6  PLEASE INSERT REASON FOR CHANGE:
7    1. To clarify the record.
     2. To conform to the facts.
8    3. To correct a transcription error.
9  Page    Line    Reason No.
10  From _____ to _____
11  Page    Line    Reason No. _____
12  From _____ to _____
13  Page    Line    Reason No.
14  From _____ to _____
15  Page    Line    Reason No.
16  From _____ to _____
17  Page    Line    Reason No.
18  From _____ to _____
19  Page    Line    Reason No.
20  From _____ to _____
21
22
23  SIGNED: _____ DATE: _____
24  (Signature of ELSA POWELL)
25

# Exhibit 60

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: 4
MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

"MR#"%MEDRECMRN%"Enc#"%ENCNO%%DOCTYPENAME% 09-16-2014 20:10:14

 

### Consent to Treatment

**PHYSICIANS NOT AS EMPLOYEES:** I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians **ARE NOT** employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service. Patient/Patient Representative Initials: ____

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

*Medical Education and Training:* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS.

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11:00 a.m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles.

*Personal Property and Valuables:* I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient at discharge or departure from DHS premises.

*Only Applicable for Medicare Beneficiaries:* Statement for Payment of Medicare Benefits to Hospital and/or Physicians — I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf.

*Insurance Billing and Assignment of Benefits:* I assign the benefits payable for hospital or physician services to DHS and or any physician which renders service to me and authorize DHS to submit the necessary claims to Medicare for payment. I certify the registration statements are true and I, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not alleviate my responsibility for payment. I agree to pay all amounts owned by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to verification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network

*Notification of Credit Bureaus Reporting:* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

### Release of Information

I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it.

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks.

I understand that DHS is the owner of any radiographic images and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic images will be provided, to me or my authorized agent upon written request for a reasonable fee. Tissue blocks will not be available for recut; but will be available for examination under supervision at our facility upon written request.

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device. I release DHS from any liability that might result from the release of this information.

| UNIVERSAL CONSENT (SIDE1) | PATIENT LABEL | |
|---|---|---|
| DIMENSIONS HEALTHCARE SYSTEMS | DEL VILLAR MEJIA, ELSA | 4/14/1987 |
| UNIVERSAL CONSENT  | 306832007 | 11057873 |
| | AKODA, CHARLES, MD | |

PGHC DEL VILLAR MEJIA, ELSA Enc # 306832007 9/16/2014 Page 1 of 2

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: ▮▮▮▮

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

"HR%"%MEDRECMRN%"Fac#%%%CNO%%DOCTY.PENAME% 09-16-2014 20:10:14



**Authorization For The Release Of Medical Information To The Maryland Insurance Administration:**

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal.

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider.

I understand that my records may be used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above.

In the event I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows:

1. I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2. I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated.
3. I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation.
4. I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues.
5. I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal.

To establish and maintain the safest possible environment in which to deliver care/service/treatment, Dimensions Healthcare System's campus buildings, property, parking lots and operated vehicles are smoke and tobacco-free. Dimensions Healthcare System is dedicated to maintaining a smoke and tobacco-free campus environment.

**Dimensions Healthcare Public Health Initiative:** If you smoke; please stop smoking.

*This form has been explained to me and I understand its contents. I acknowledge the following:*

☒ Receipt of a copy of DHS Notice of Privacy Practices
☒ My communication needs identified by completing the *Communication Assessment Form*
☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
☒ Receipt of DHS brochure "What You Should Know As A Patient"

**PLEASE NOTE:** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form.

| _(signature)_ | 9/16/2014 8:09:28 PM | Signed by ANDERSON, CYNTHIA on 16-Sep-2014 20:10:13 -0400 | 9/16/2014 8:09:28 PM |
|---|---|---|---|
| Signature of Patient | Date | Signature of Witness | Date |

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box)*:
☐ Minor _____ years of age without decision-making capacity     ☐ Lacks decision-making capacity
☐ Other: _____

| | 9/16/2014 8:09:28 PM | |
|---|---|---|
| Patient Representative Signature | Date | Relationship to Patient |

| | 9/16/2014 8:09:28 PM |
|---|---|
| Witness signature | Date |

| UNIVERSAL CONSENT (SIDE 2) | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEMS | DEL VILLAR MEJIA, ELSA |
|  | 306832007      11057873 |
|  | 9/16/2014      AKODA, CHARLES, MD |

PGHC DEL VILLAR MEJIA, ELSA Enc # 306832007 9/16/2014 Page 2 of 2

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: [REDACTED]

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

● ● ● ● ●

Patient: _Elsa Delvillar_    Date: _9/16/14_   Time _2050_

I hereby authorize Dr. or Midwife ____HKoda____ to perform an induction of labor, and any other surgical or diagnostic procedures that may be required to complete delivery of the baby.

**Type of Induction** (*Please Indicate*):   ☒ **Elective**    ☐ **Medically Indicated**

**Please initial each paragraph. If you have questions, please ask the Doctor/midwife before initialing.**

**Possible Benefits and Risks of Labor Induction:** I have discussed the risks and benefits of this procedure and I accept the risks of the procedure as opposed to simply allowing labor to begin spontaneously at a later date.

**Patient Initials**

_____

_ED_

_ED_

I have reviewed the benefits of labor induction with my physician/midwife which may include:
- Choosing my delivery date
- Choosing provider who delivers my baby
- Preventing complications for me or my baby due to prolonging my pregnancy

I have discussed the use of medication for cervical ripening with my provider and I understand the risks of:
- Excessive stimulation of the uterus to the point that may require an emergency delivery, either vaginally or abdominally.
- I also understand that rarely the uterus may rupture under these circumstances and cause death of my baby and severe bleeding and/or death to myself

I understand that inducing labor increases my risk for complications when compared to mothers who begin labor "naturally." Significant risks for me and my baby include (although frequency not defined):

**Risks for Me**
- ❖ Nausea and vomiting
- ❖ Contractions may be increased in intensity and result in increased pain
- ❖ Contractions that occur too frequently, too hard and too long, can result in uterine rupture which will result in a C-section
- ❖ Ineffective contractions after lengthy use of Pitocin may result in a need for a C-section
- ❖ Excessive bleeding after delivery may require use of medication to contract the uterus and/or the need for blood transfusion
- ❖ Water intoxication may occur after 24 hours of Pitocin use
- ❖ Abnormal heart beats
- ❖ Severe allergic reaction

**Risks for my Baby**
- ❖ Treatment in the Neonatal Intensive Care Unit
- ❖ Lower Apgar score (rating of breathing, heart rate, muscle tone, reflexes and color)
- ❖ Seizures; brain damage and fetal death can result from decreased oxygen to the baby
- ❖ Cardiac arrhythmias including heart rate too high or too low
- ❖ Hemorrhage in the eyes; jaundice of the newborn

| **INDUCTION OF LABOR (Page 1 of 3)** |
|---|
| DIMENSIONS HEALTHCARE SYSTEM |

4-491 (09/13)    Induction of Labor

PATIENT LABEL
MR: 11057873
DEL VILLAR MEJI, ELSA
306832007
AKODA, CHARLES, MD   L/D

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: [REDACTED]

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

● ● ● ● ●

**Patient Initials**

*ED*    I have discussed that there is an increased risk that instruments may be used to accomplish a vaginal delivery if necessary

*ED*    I acknowledge that there may be an increased risk for the need of a blood transfusion which could expose me to hepatitis C HIV and other infectious diseases

*ED*    I have discussed the risks associated with various analgesic drugs and techniques that may be used to reduce the pain associated with labor and delivery, either vaginally or by cesarean section, and I understand and accept these risks

*ED*    I have discussed the possibility of failure of the induction attempt with my provider, and I am prepared to be released from the hospital to my home when failure to enter satisfactory labor has been established and it is safe for me and my baby to do so (not applicable for medically indicated induction).

*ED*    I also realize that if I have a cesarean birth it would increase the risks of cesarean sections for subsequent pregnancies based on the reason for the cesarean section and the type of incision or cut into the uterus. I will incur the usual risks associated with cesarean section that I might have avoided had I had this birth vaginally.

*ED*    I understand the nature and the purpose of these procedures and I affirm that the risks, benefits, possibility of complications, as well as expected results and medical alternatives, including the expected consequences of my refusing the recommended procedure(s), have been explained to me by my physician and that I have been given the opportunity to ask questions, and have my questions answered to my satisfaction.

I can refuse this procedure without jeopardizing any current or future medical treatments.

I further acknowledge that no guarantees have been given to me regarding the results of this or other necessary procedures during my care.

My doctor/midwife has explained to me the risks, benefits, possibility for complications, as well as the expected results, medical alternatives, and the expected consequences of my refusing the recommended procedure(s) if induction is medically indicated. These have been explained to me by my provider and I have been given the opportunity to ask questions, and have my questions answered. I wish to go forward with the induction and accept the risks of the procedure as opposed to simply allowing labor to begin spontaneously at a later date.

**I have read and fully understand this consent form. I understand I should not sign this form if all items, including my questions, have not been explained or answered to my satisfaction. I understand that I can withdraw this consent at any time before the beginning of the procedure. I understand that I can request that this form be read to me.**

_____    _____
Witness                          Signed:                Patient

---

**REFUSAL OF INDUCTION**
**The consequences of refusal of induction of labor have been explained by my physician/midwife and I have decided to refuse this procedure.**

_____    _____
Witness                          Signed:                Patient

---

| **INDUCTION OF LABOR (Page 2 of 3)** | PATIENT LABEL |
| --- | --- |
| DIMENSIONS HEALTHCARE SYSTEM | |

4-491(09/13)

DEL VILLAR MEJI ,ELSA    MR: 11057873

09/16/14    27Y F
AKODA, CHARLES, MD.    L/D

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: ▆▆▆▆

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

| | |
|---|---|
| **Complete the following section if consent is not obtained from the patient.** | |

Patient is unable to make an informed decision because patient is (Check appropriate box):

☐ Minor _____ years of age without decision-making capacity
☐ Lacks decision-making capacity
☐ Other _____

_____          _____
Patient Representative Signature                      Relationship to Patient

_____          _____
Witness Signature (1)                                    Witness signature (2)

Consent obtained (Check one): ☐ In person     ☐ By Telephone (Requires two (2) witness signature)
**Two physician signatures are required in an emergency for consent:**

_____ M.D.     _____ M.D.

**PHYSICIAN/MIDWIFE DECLARATION:** Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

I checked and the patient is not currently under the influence of any narcotic or mind altering drugs that influences their decision.

Physician /Midwife Signature _____   Date  9/16/14    Time: 2050

---

**INDUCTION OF LABOR (Page 3 of 3)**
DIMENSIONS HEALTHCARE SYSTEM

MR: 11057873
DEL VILLAR MEJI ,ELSA
3▆▆▆▆07
DOB ▆▆▆▆         27Y F
09/16/14   AKODA, CHARLES, MD    L/D

4-491 (08/13)

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth:

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

**DO NOT SIGN THIS FORM UNTIL A PHYSICIAN HAS EXPLAINED IT TO YOU, YOU HAVE READ IT AND FULLY UNDERSTAND ITS CONTENTS.**

Patient: Elsa Delvillar     Date: 9/16/14     Time: 2050

The following has been explained to me in general terms and I hereby authorize the performance of a **VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION (C-SECTION)** which is the delivery of the infant through the birth canal:

| | |
|---|---|
| **PROCEDURE** | Vaginal Birth |
| **PURPOSE** | Delivery of your infant through the birth canal with the possible use of forceps or vacuum extraction. An episiotomy (an enlargement of the vagina by an incision in the space between the vagina and anus) may be performed as part of the delivery. |
| **BENEFIT:** | No abdominal incision scars, lower infection rate and decreased healing time |

**RISKS (This is not an exhaustive list meaning that there can be other unlisted risks):**

- **Maternal:** Paralysis or partial paralysis, paraplegia or quadriplegia, brain damage, uterine inversion, uterine rupture, need for an emergency C-section, placenta previa, placenta abruption, anal sphincter injury, bowel injury, bladder injury or injury to other abdominal structures, possible fistula formation (opening between bowel, bladder, ureter, vagina and/or skin), perineal or genital tears and scars, possible formation of clots; possible emboli (clots or other material that may travel to other parts of the body), hysterectomy (removal of uterus) with possible removal of fallopian tubes and/or ovaries, persistent perineal pain, amniotic emboli, sexual dysfunction, anal incontinence, urinary urge incontinence, urinary stress incontinence, DIC (disseminated intravascular coagulation), pelvic floor prolapse, cardiac arrest, maternal death and fetal death.
- **Infant:** The infant can experience oxygen deficit from a prolapsed cord, brachial plexus injury, nuchal cord, scalp infection from fetal scalp monitoring, facial nerve injury, precipitous delivery, bleeding in the brain, cerebral palsy, meconium aspiration, newborn neurological symptoms and be stillborn.

**POTENTIAL PROCEDURES AND THEIR RISKS:** During labor, we may have to perform one or more of the following procedures or utilize one or more of the following in order to assist you with your delivery process:

- **Artificial Rupture of Membranes:** a rupture of the membranes by a third party to accelerate labor. **Risks:** Amniotic emboli, prolapsed cord, fetal decelerations/fetal distress
- **Amnioinfusion:** Instillation of fluid into the amniotic cavity through an intrauterine pressure catheter during labor after rupture of the fetal membranes. **Risks:** increased pressure in uterus, rupture of the uterus, and placenta abruption.
- **Episiotomy:** A surgical incision made to widen the vaginal opening during childbirth to facilitate delivery. **Risks:** extension into the anal sphincter and/or rectum, infection, increased pain, increased bleeding, prolonged healing time, and increased discomfort once sexual intercourse is resumed.
- **Forceps:** An instrument used to grasp and extract the fetal head to aid in the vaginal delivery of fetus. **Risk for mom:** vaginal trauma and tears. **Risk for baby:** Extra and intracranial hemorrhage, facial nerve palsy, and lower brain injury.
- **Leopold's maneuver:** A series of four steps used in palpating the abdomen to determine position and presentation of the fetus. **Risk:** Low risk for placenta abruption.
- **McRobert's maneuver:** typically done when the baby's shoulder is stuck in the birth canal. Mother is placed in a position that provides flexion of the maternal hips. This position is achieved by hyperflexion of the mother's legs toward her shoulders with or without suprapubic pressure. **Risk for mom:** discomfort **Risk for baby:** neonatal bone or nerve injury associated with shoulder dystocia
- **Woods screw maneuver:** this procedure involves the progressive rotation of the posterior shoulder in corkscrew fashion to release the opposite impacted *anterior* shoulder. **Risk for mom:** vaginal trauma and tears. **Risk for baby:** fracture of clavicle.
- **Zavanelli maneuver:** is an obstetric maneuver that involves pushing back the delivered fetal head into the birth canal in anticipation of an emergent caesarean section. **Risk for mom:** vaginal tearing, **Risk for baby:** neonatal bone or nerve injury and fetal death.
- **Manual Placenta Removal:** procedure where the placenta in separated from the uterine wall and removed from the vagina by the hand of the provider. **Risk:** postpartum hemorrhage, retain placental fragments, and pain

| **VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION** (PAGE 1 OF 3) | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | DEL VILLAR MEJI ,ELSA   MR: 11057873 |
| 4-495 (09/13) | 306832007   DOB 16/14   27Y F   ARUDA, CHARLES, MD   L/O |

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: █████

MRN: 11057873
FIN: 306832007

* Auth (Verified) *

   

**POTENTIAL PROCEDURES AND THEIR RISKS (Continued)**

- **Emergency C-Section:** a surgical procedure in which incisions are made through a woman's abdomen and uterus to deliver the fetus. **Risk for mom:** bleeding, pain, infection, death and extended hospital stay. **Risk for baby:** Incidental Surgical injuries, respiratory distress, and death
- **Cardiotocography:** the monitoring of the fetal heart rate and uterine contractions during labor and delivery. **Risk for baby:** No risks are associated with external monitoring. Fetal scalp infection with internal monitoring.
- **Pelvimetry:** measurement of the capacity and diameter of the pelvis. **Risk:** discomfort and pain
- **Induction or augmentation of labor:** use of medication to initiate labor or increase the frequency of uterine contractions. **Risk for mom:** over stimulation of the uterus, uterine rupture, and placenta abruption. **Risk for baby:** inability to tolerate medication administration resulting in fetal bradycardia, fetal distress, and neurological damage.
- **Transfusion of blood/blood products:** is a procedure to replace blood loss. **Risk:** carries the risk of exposure to HIV, hepatitis and other infectious diseases and allergic reactions.

**ALTERNATIVE PROCEDURES, TREATMENTS AND THEIR RISKS:** The only alternative to a vaginal delivery is a cesarean section (C-Section). **(This is not an exhaustive list meaning that there can be other unlisted risks).**
- **Maternal:** Paralysis, urgent hysterectomy, thromboembolic events (blood clots), DIC (disseminated intravascular coagulation), anesthetic complications, major puerperal infection, amniotic fluid embolism, uterine artery pseudoaneurysm, wound infection, hematomas, wound disruption, bladder puncture, ureteral and bowel laceration, persistent pain at the incision site, cesarean scar endometriosis, cesarean scar ectopic pregnancy, placental accreta, dense intra-abdominal adhesions, increased hospital stays, lengthy physical recovery, increased risk of readmission, chronic pelvic pain, and future uterine ruptures, maternal death and cardiac arrest.
- **Infant:** Respiratory distress, pulmonary hypertension, excess risk of not breast feeding, surgical lacerations and fetal death.

THE INFORMATION GIVEN ABOVE IS NOT AN EXHAUSTIVE LIST MEANING THAT THERE CAN BE OTHER UNLISTED RISKS. WE CANNOT PREDICT WHETHER OR NOT ANY OF THE ABOVE MAY BE NEEDED OR MAY OCCUR.

I understand that the physician, medical personnel and other assistants will rely on statements about the patient, the patient's medical history, and other information in determining whether to perform the procedure or the course of treatment for the patient's condition and in recommending the above procedure.

I understand the practice of medicine is not an exact science and that NO GUARANTEES OR ASSURANCES HAVE BEEN MADE TO ME concerning the results of this procedure.

I understand that during the course of the procedure described above it may be necessary or appropriate to perform additional procedures which are unforeseen or not know to be needed at the time this consent is given. I consent to and authorize the persons described herein to make the decisions concerning such procedures. I also consent to and authorize the performance of such additional procedures as they deem necessary or appropriate.

I also consent to diagnostic studies, tests, anesthesia, x-ray examinations and other treatment or courses of treatment relating to the diagnosis or procedures described herein.

BY SIGNING THIS FORM, I ACKNOWLEDGE THAT I HAVE READ OR HAD THIS FORM READ AND/OR EXPLAINED TO ME, THAT I FULLY UNDERSTAND ITS CONTENTS, AND THAT I HAVE BEEN GIVEN AMPLE OPPORTUNITY TO ASK QUESTIONS AND THAT ANY QUESTIONS HAVE BEEN ANSWERED SATISFACTORILY. ALL BLANKS OR STATEMENTS REQUIRING COMPLETION WERE FILLED IN AND ALL STATEMENTS I DO NOT APPROVE OF WERE STRICKEN BEFORE I SIGNED THIS FORM.

---

**VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION** (PAGE 2 OF 3)
DIMENSIONS HEALTHCARE SYSTEM

PATIENT LABEL


DEL VILLAR MEJI, ELSA   MR: 11057873
306832007
DOB
09/18/1█   27Y F
AKODA, CHARLES, MD
L/D

4-465 (09/13)

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: ███

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

I voluntarily consent to allow Dr. _____ or any physician designated or selected by him or her and all medical personnel under the direct supervision and control of such physician and all other personnel who may otherwise be involved in performing such procedures to perform the procedures described or otherwise referred to herein. **Unless rescinded, this consent will remain in effect until delivery.**

_____          Signed: _____
Witness                                                        Patient

---

### Complete the following section if consent is not obtained from the patient.

Patient is unable to make an informed decision because patient is (Check appropriate box).

☐ Minor _____ years of age without decision-making capacity
☐ Lacks decision-making capacity
☐ Other: _____

_____                              _____
Patient Representative Signature                     Relationship to Patient

_____                              _____
Witness Signature (1)                                      Witness signature (2)

Consent obtained (Check one):   ☐ In person   ☐ By Telephone [Requires two (2) witness signature]
**Two physician signatures are required in an emergency for consent:**

_____ M.D.                    _____ M.D.

---

**PHYSICIAN DECLARATION:** Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

I checked and the patient is/not currently under the influence of any narcotic or mind altering drugs that influences their decision.

Physician Signature _____   Date 9/16/14   Time: 2050

Additional materials used, if any, during the informed consent process for this procedure:

_____

_____

---

VAGINAL DELIVERY WITH POSSIBLE CESAREAN SECTION (PAGE 3 OF 3)
DIMENSIONS HEALTHCARE SYSTEM

PATIENT LABEL
DEL VILLAR MEJIA, ELSA   MR: 11057873
306832007
DOB ██/██/██   27Y F
AKUDA, CHARLES, MD

4-495 (09/13)

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth: ██████

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

● ● ● ● ●

**NOTE:** BOTH sides of this form MUST be completed to be VALID.

Patient: _____ Date: _____ Time: _____

1. I hereby authorize the performance of the following operation(s)/procedure(s): _Suction Curettage_

   under the direction of Dr.(s): _Akode_

2. I have been informed that qualified individuals such as physicians' assistants, surgical assistants and licensed physicians may perform significant surgical tasks to include but not limited to opening and closing, harvesting grafts, dissecting tissue, removing tissue, implanting devices, altering tissues under the direction and supervision of the primary physician listed above.
3. I have been informed that a vendor representative may be present during the procedure to observe my procedure and/or assist with product selection and placement.
4. I have been advised of the nature of my condition, the nature and purpose of the proposed operative procedure, and the alternative to this procedure, the risks, benefits, and side effects attendant to both the proposed procedure and the alternatives, the probability of success of both the proposed procedure and the alternatives, and the prognosis of the proposed procedure if the alternatives are not performed.
5. I am also aware that the practice of medicine and surgery is not an exact science and that there are risks and complications associated with the operative procedure. The risks associated with the performance of the proposed and any surgical procedure include but are not limited to severe blood loss, infection and in rare instances cardiac arrest.
6. I have also been informed of potential problems that might occur during recuperation.
7. I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of operations and procedures which are different from or in addition to those now contemplated.
8. This procedure may necessitate the use of blood/blood products which when anticipated will require separate specific informed consent and related documentation. However, in the event of an emergency when specific consent is not possible, I agree to the administration of such products as ordered by my physician.
9. I impose no specific limitations or prohibitions regarding treatment other than those that follow (if none, so state): _____

10. I authorize the examination by an authorized individual of any tissue, organ(s) or body part(s) removed during the procedure and the disposal of such tissue, organ(s) or body part(s) in accordance with hospital policies.
11. I consent to the admittance of appropriate observers and to the taking and publication of any photographs in the course of this procedure for the purpose of advancing medical education. I understand that my identity will remain confidential.
12. All of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed operative treatment(s).

I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.

_____ _____ _____ _____
Witness                          Signed:                          Patient

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is (Check appropriate box):
☐ Minor _____ years of age without decision-making capacity ☐ Lacks decision-making capacity
☐ Other: _____

_____                          _____
Patient Representative Signature                          Relationship to Patient

_____                          _____
Witness Signature (1)                          Witness signature (2)

Consent obtained (Check one): ☐ In person ☐ By Telephone [Requires two (2) witness signatures]
Two physician signatures are required in an emergency for consent:

_____ M.D. _____ M.D.

PHYSICIAN DECLARATION: Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

Physician Signature _____ Date _9/17/14_ Time: _____

**CONSENT FOR OPERATIONS AND OTHER PROCEDURES**

DIMENSIONS HEALTHCARE SYSTEM

2-567 (7/11)

PATIENT LABEL
DEL VILLAR MEJI, ELSA          MR: 11057873
3068320
DOB          27Y F
09/16/14     AKODA, CHARLES, MD          L/D

Patient Name: DEL VILLAR MEJIA, ELSA
Date of Birth:

MRN: 11057873
FIN: 306832007

**\* Auth (Verified) \***

NOTE: BOTH sides of this form MUST be completed to be VALID.

Patient: _Del Villar Meji, Elsa_ Date: _4.17.14_ Time: _OBX_

1. I hereby authorize the Anesthesia Care Team or _____ to administer the following type(s) of anesthetics: General/Regional/Local / IV Sedation/Conscious Sedation and procedures performed in the provision of anesthesia including placing an intravenous (IV) catheter and maintaining an airway.

2. The risks associated with anesthesia include but are not limited to worsening of a pre-existing medical problem, airway difficulties and drug reactions. Drug reactions can include a rash, nausea, vomiting, muscle aches, headache, wheezing and very rarely, shock. Maintaining an airway may include placement of an oral or nasal airway, laryngeal mask airway or an endotracheal tube. Reactions to artificial airways include laryngospasm which requires immediate corrective treatment. Manipulation of the airway may result in damage to caps, bridges or damaged teeth and very rarely to sound teeth. Some individuals experience a sore lip, throat or hoarseness. Regional anesthesia blocks may cause headache, numbness or tingling, bleeding or swelling and rarely, weakness or paralysis. Occasionally nerve injuries from positioning may occur. IV catheters can cause inflammation, swelling or bleeding.

3. I am also aware that the practice of medicine and anesthesia is not an exact science and that there are risks and complications associated with the anesthesia and anesthetic technique. I have been informed that the aspiration of stomach contents into the lungs, drug reactions including malignant hyperthermia and anaphylactic shock, heart failure, airway closure, paralysis and rarely death may be associated with any anesthetic or anesthetic technique.

4. I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of anesthetic techniques and administration of anesthesia which are different from or in addition to those now contemplated.

5. I impose no specific limitations or prohibitions regarding anesthesia other than those that follow (if none, so state): _____

6. All of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed administration of anesthetic(s) and anesthetic techniques.

I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.

_____ Witness     Signed: _____ Patient

---

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is (Check appropriate box):
☐ Minor _____ years of age without decision-making capacity     ☐ Lacks decision-making capacity
☐ Other: _____

_____ Patient Representative Signature          _____ Relationship to Patient

_____ Witness Signature (1)          _____ Witness signature (2)

Consent obtained (Check one): ☐ In person     ☐ By Telephone [Requires two (2) witness signatures]
Two physician signatures are required in an emergency for consent:

_____ M.D.          _____ M.D.

---

RESUSCITATION STATUS DURING ANY PROCEDURE REQUIRING INFORMED CONSENT: This section is to be completed for patients undergoing any procedure requiring informed consent, who also have orders withholding resuscitation.

☐ Patient/surrogate decision-maker requests that DNR order be suspended during any procedure.
☐ Patient/surrogate decision-maker requests that DNR order be honored during any procedure.
Describe the key features of the discussion(s) pertaining to the DNR issues: _____

PHYSICIAN DECLARATION: Prior to the time of the planned anesthesia above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, and possible complications.

_____ Physician Signature     Date _____     Time: _____

| CONSENT FOR ADMINISTRATION OF ANESTHESIA | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | MR: 11057873 |
| 2-567 (7/11) | DEL VILLAR MEJI ,ELSA |
| | 306832007   27Y |
| | CHARLES, MD     L/D. |

# Exhibit 61

Case: 2:18-cv-05629 Document: 225 Page: 1614 Date Filed: 09/08/2020

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,   *
ELSA M. POWELL AND DESIRE EVANS,

                                *      Case No. 2:18-cv-05629-WB

        Plaintiffs

                                *      Hon. Wendy Beetlestone

     v.

                                *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES      *

        Defendant            *

    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF ELSA POWELL'S ANSWERS TO FIRST SET OF
## INTERROGATORIES AND RESPONSES TO FIRST SET OF
## <u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>

      Plaintiff, Elsa Powell, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

      The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

      Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

1

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Objection is made to this interrogatory as it overly broad and unduly burdensome, and concerns matters which are more appropriately addressed by deposition. Without waiving this objection, the Plaintiff was treated by Akoda during portions of her prenatal care, beginning in approximately April of 2014, during her labor on September 17, 2014, for the subsequent delivery of her infant, and for post-natal care through January of 2015. The Plaintiff further refers Defendant to the Plaintiff's medical records for details relating to her care and treatment by Akoda. The Plaintiff was referred to the practice of Abdul Chaudry, M.D. for prenatal care by another obstetrician-gynecologist, which is where she first encountered Akoda.**

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### ANSWER:

**This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiffs' loss to her marital relationship. This Plaintiff has in the past, is presently,**

2

JA3505

and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety, as a result of learning that Akoda was a fraud. This Plaintiff will also be claiming economic damages for past, present and future medical expenses, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiffs' life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.

The Plaintiff first experienced her injuries and damages relevant to this matter upon learning about Akoda's fraudulent conduct. She first learned this information from another patient of Adbul Chaudry M.D.'s practice in late 2018. She subsequently looked up information about Akoda on the internet.

**INTERROGATORY NO. 3:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 5, 10-47 and 69-69.

ECFMG holds itself out as protecting the public through its programs and services, including primary-source verification of physician credentials. ECFMG undertook to render certification services and primary source verification services, among others, for Igberase on multiple occasions, under multiple identifies, and to represent to Howard University

JA3506

Hospital, Prince George's Hospital Center, the Maryland Board of Physicians, among others, that Igberase was a bona fide medical doctor.

ECFMG owed a duty to Plaintiffs and other members of the Class to carefully review Igberase's multiple applications for certification, appropriately perform primary source verification and to carefully investigate Igberase when it was informed that Igberase was using a false social security number, potentially a false name, and other false documentation.

The Plaintiffs' investigation is ongoing.

**INTERROGATORY NO. 4:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

**ANSWER:**

Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint, including but not limited to paragraphs 70-80.

ECFMG, in breach of its duty to the Plaintiffs and Putative Class Members, failed to detect that Igberase's medical school diploma was in the name of Johnbull Enosakhare Akoda, not John Charles Akoda or John Charles Nosa Akoda or John Nosa Akoda, all names used in documents submitted by Akoda.

ECFMG was negligent in failing to learn that Akoda was Igberase. Among other things, ECFMG knew that in August 2000 allegations had been made to the JSMC that Akoda and Igberase were the same person. The JSMC notified ECFMG of this and told ECFMG that Akoda was using Igberase's social security number.

Igberase appeared at the offices of ECFMG on September 27, 2000 and told ECFMG that Igberase was his cousin and admitted he had used Igberase's social security number

4

"pending INS clearance of his own social security number."  Additionally, the passport Igberase provided to ECFMG at that meeting contained one too few numbers and could not have been valid.

There was no effort by ECFMG to authenticate the passport.  In breach of its duty, ECFMG failed to take any action against Igberase for this misuse of a social security number.

Further in breach of its duty, ECFMG failed to compare the photograph of Igberase in its files with the person claiming to be Akoda who was sitting in ECFMG's office in Philadelphia.  Had ECFMG done so, ECFMG would have known that Akoda and Igberase are the same person.

ECFMG, in breach of its duty, failed to advise the Howard University Hospital residency program, the Maryland Board of Physicians or Prince George's Hospital Center of the information in its files that Igberase may have had a previous certification that was revoked, that ECFMG had investigated whether Akoda is Igberase or that Igberase was barred under another certification.

ECFMG, in breach of its duty, and in breach of its own policies and procedures regarding irregular behavior, failed to take reasonable steps to verify the truth of the references submitted by Igberase when he applied for the residency program at Howard University Hospital under the Akoda identity.  In 2006 Igberase submitted three (3) letters of recommendations through ERAS under the Akoda identity.  ECFMG sent letters to each of the references, with copies of their respective alleged letters of recommendations, seeking to learn if they were authentic.  ECFMG did not receive responses from the supposed references.  Nevertheless, ECFMG provided primary source verification to Howard University Hospital about "Akoda" – a fictitious identity.

JA3508

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and calls for a legal conclusion. Without waiving this objection, the facts that support these allegations are set forth in the Complaint.**

**The numerous breaches of duty by ECFMG led to the fraudulent certification of Igberase, under various names, but for which he would not have been admitted to the Howard University Hospital residency program, he would not have received a Maryland medical license, he would not have obtained privileges at Prince George's Hospital Center, he would not have been able to practice medicine, and he would not have been able to cause the harms to Plaintiffs.**

**ECFMG's numerous breaches of duty increased the risk of harm to Plaintiffs and other members of the Class by Igberase's conduct.**

**As a direct, proximate, immediate and foreseeable result of ECFMG's conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matters more appropriately addressed at deposition. Without waiving this**

6

objection, the named Plaintiff contends that all care and treatment provided by Akoda was inappropriate, including but not limited to the fact that he was not an appropriately licensed and credentialed physician. He oversaw this Plaintiff's labor care, including the performance of intrusive pelvic examinations, and he performed the Plaintiff's delivery.

Akoda's demeanor during her examines was flirtatious, and during one examination, told the Plaintiff that she had "nice breasts." He oversaw aspects of Plaintiff's prenatal, oversaw her labor care, performed intrusive pelvic examinations, breast exams, and her child's delivery. He was not properly licensed, credentialed or qualified to provide any of this case. This Plaintiff would never have exposed herself or her child to a non-health care provider had she been appropriately advised that he was not a validly licensed or credentialed physician. This answer will be supplemented as discovery proceeds. The Defendant is further referred to the medical records.

Plaintiffs investigation is ongoing.

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

Objection is made to this request to the extent it elicits communications between the Plaintiff and her counsel subject to the attorney-client privilege, particularly with regard to knowledge about ECFMG and its services. Without waiving this objection, Plaintiff would not have agreed to receive treatment for a physician who had obtained certifications

JA3510

necessary to practice medicine on the basis of identity fraud.  Plaintiff naturally assumed Akoda was a physician who had been lawfully credentialed.

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Objection is made to this request as it is overly broad and unduly burdensome, and concerns matter better addressed through deposition.  Plaintiff's contacts with Akoda are reflected in the medial records which are being produced.    The Plaintiff has had no communication with any medical licensing board, employee, agent or representative of ECFMG, nor any member of the media.  The Plaintiff has also given a deposition in the matter of** *Dews et al. v. Dimensions Healthcare System, et. al,* **Case No. CAL-17-37091.**

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

**Plaintiff adopts by reference her Answer to Interrogatory No. 2.  The amount of these damages is for the jury to determine.  Plaintiff seeks damages for these injuries as determined by the jury.**

**INTERROGATORY NO. 10:**

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

JA3511

**ANSWER:**

Objection is made to this request as it seeks to elicit information which goes beyond the proper scope of discovery.  Without waiving this objection, the Plaintiff is a named class representative in a class action filed in the Circuit Court for Prince George's County, Maryland, *Dews et al. v. Dimensions Healthcare System, et. al,* **Case No. CAL-17-37091.**

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

Objection is made to this interrogatory as it overly broad, and goes beyond the scope of appropriate discovery.  Plaintiff's counsel represents numerous persons who are putative members of the class.  Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class, many of whom have been confirmed as patients of Akoda through review of medical records.   Plaintiffs is also aware that other attorneys in this case represent numerous persons who are putative members of the class,

9

but are not aware of their identities. **Plaintiff believes that there are approximately 1,000**

**patients seen or treated by Akoda.**

## INTERROGATORY NO. 13:

Identify each and every person who provided information used to answer these
Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided
information.

## ANSWER:

**The Plaintiff's attorneys assisted in the preparation of these answers.**

## INTERROGATORY NO. 14:

Identify all persons with knowledge relating to the allegations and claims in the
Complaint, and for each person, describe the subject(s) about which they have knowledge.

## ANSWER:

**In addition to the plaintiff and her attorneys, the Defendant is referred to the**

**Plaintiff's initial disclosures. The Plaintiff's husband was also present with her for certain**

**doctor's appointments.**

## INTERROGATORY NO. 15:

Identify and describe in detail each and every health care provider (including but not
limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought
treatment, and for each health care provider, state whether you sought treatment from the health
care provider to address the alleged injuries for which you are seeking to recover in this
litigation.

## ANSWER:

**Plaintiff objects to this interrogatory on the grounds that it is overly broad and**

**unduly burdensome, and is not limited in time or scope and seeks information that is not**

**relevant.  Without waiving this objection, to date, the Plaintiff has not undergone medical**

JA3513

treatment from health care providers relating to the emotional distress she has sustained in this matter.

## INTERROGATORY NO. 16:

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

## ANSWER:

Plaintiff has not determined who she may call as fact witnesses a trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(3), or as otherwise ordered by the Court.

## INTERROGATORY NO. 17:

Identify any and all persons you intend to call as an expert witness relating to this lawsuit at the time of trial.

## ANSWER:

Plaintiff has not determined who she may call as expert witnesses at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(a)(2), or as otherwise ordered by the Court.

## INTERROGATORY NO. 18:

Identify the jurisdiction whose law you contend governs each of the claims in the Complaint and describe in detail all facts supporting your contention.

## ANSWER:

Plaintiff objects to this interrogatory to the extent that it calls for information subject to work-product protection. By way of further answer, and without waiver, discovery and Plaintiffs' investigation are still continuing and full identification of the relevant facts for a choice of law analysis are yet to be determined.

## DOCUMENT REQUESTS

JA3514

## General Objections

1.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to each of Defendant's requests to the extent that the request is vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.     Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.     To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.     Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

JA3515

8.      These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.     These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.     The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.     The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

13

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 3:**

All pleadings filed in Akoda litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 4:**

All documents relating to Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

JA3517

**REQUEST NO. 5:**

All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request will be produced. Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are subject to a Confidentiality Agreement. To the extent that ECFMG can obtain the consent of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 7:**

All documents relating to Putative Class Members.

**RESPONSE:**

**Objection. This request is ambiguous, overbroad, and seeks information that is not proportionate to the needs of the case. If Defendant will clarify it, Plaintiff will attempt to respond.**

**REQUEST NO. 8:**

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

**RESPONSE:**

15

**Objection. This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 9:**

All communications between you and Akoda.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 10:**

All documents relating to ECFMG.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 11:**

All communications between you and ECFMG relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Other than the records deposition subpoena served on ECFMG, there are none.**

**REQUEST NO. 12:**

All documents about JSMC and Akoda.

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

**REQUEST NO. 13:**

16

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

    **None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

    **Objection. This request is overly broad and unduly burdensome. Without waiver,**

a**ny discoverable documents responsive to this request which are in the possession of the**

**Plaintiff or her counsel will be produced limited to the class members in this case.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

    **None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

    **Objection.  This request appears to be duplicative of other requests to which**

**Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 17:**

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

JA3520

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced.**

## REQUEST NO. 18:

All documents relating to A.G. Chaudry, M.D. and Akoda.

## RESPONSE:

**Any discoverable documents responsive to this request which are in the possession of the Plaintiff or her counsel will be produced. Other than the medical records, none.**

## REQUEST NO. 19:

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Other than the medical records, none.**

## REQUEST NO. 20:

All documents relating to Dimensions Healthcare Associates and Akoda.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## REQUEST NO. 21:

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## REQUEST NO. 22:

All documents relating to the Maryland Board of Physicians and Akoda.

18

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**


**REQUEST NO. 23:**

All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 24:**

All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by**

**attorney client privilege or the work product doctrine. Without waiving this objection, any**

**discoverable documents responsive to this request which are in the possession of the**

**Plaintiff or her counsel he requested documents will be produced.**

**REQUEST NO. 25:**

All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

**Any discoverable documents responsive to this request which are in the possession**

**of the Plaintiff or her counsel will be produced.**


**REQUEST NO. 26**

19

JA3522

All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

**Other than the medical records, none.**

**REQUEST NO. 27:**

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**Objection is made to this request to the extent is seeks information protected by**

**attorney client privilege or the work product doctrine, without waiving this objection. The**

**Defendant is referred to the medical records.**

**REQUEST NO. 29:**

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

**Objection is made to the request to the extent it concerns a medical and/or legal**

**conclusion, and to the extent is seeks information protected by attorney client privilege or**

**the work product doctrine. Without waiving this objection, the Defendant is referred to the**

**medical records.**

20

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request also appears to be duplicative of other requests to which – subject to the above-stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**Objection is made to this request to the extent it calls for a legal conclusion, and to the extent is seeks information protected by attorney client privilege or the work product doctrine. Without waiving this objection, this request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. Without waiving this objection, this request appears**

21

to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.

## REQUEST NO. 33:

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

## RESPONSE:

**The requested documents will be produced.**

## REQUEST NO. 34:

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

## RESPONSE:

**Objection**. **Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents on the grounds that she is not making any claim for lost income.**

## REQUEST NO. 35:

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

## RESPONSE:

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action. To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be produced.**

## REQUEST NO. 36:

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

**RESPONSE:**

**To the extent the Plaintiff receives treatment concerning her condition and injuries relevant to this lawsuit, these documents will be provided.**

**REQUEST NO. 37:**

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are not relevant to any claim or defense in this action. To the extent that the Plaintiff incurs medical bills related to examination and treatment for her injuries relevant to this lawsuit, they will be provided.**

**REQUEST NO. 38:**

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 39:**

All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

JA3526

Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.

## REQUEST NO. 40:

All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

## RESPONSE:

Objection is made to the extent that any documents responsive to this request were prepared in anticipation of litigation or at the request of counsel. Any discoverable documents responsive to this request will be produced.

## REQUEST NO. 41:

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

## RESPONSE:

Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine. Without waiving this objection, the Plaintiff Elsa Powell has not obtained any statements from ECFMG.

## REQUEST NO. 42:

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

## RESPONSE:

24

**Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

## REQUEST NO. 43:

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

## RESPONSE:

**Objection. Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

## REQUEST NO. 44:

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

## RESPONSE:

**Any discoverable documents responsive to this request will be produced.**

## REQUEST NO. 45:

All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

## RESPONSE:

JA3528

Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.

**REQUEST NO. 46:**

All documents and communications relating to the claims asserted in the Complaint.

**RESPONSE:**

Objection is made to this request to the extent it seeks documents protected by the attorney-client privilege and attorney work product. Without waiving this objection, any discoverable documents responsive to this request will be produced.

**REQUEST NO. 47:**

All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

Plaintiff has not decided what documents it will introduce at trial. Plaintiff will comply with her obligations under F.R.C.P. 26(1)(3).

CONRAD & O'BRIEN, P.C.

_/s/ Nicholas M. Centrella_____
Nicholas M. Centrella, Esquire (ID No. 67666)
ncentrella@conradobrien.com
Howard M. Klein, Esquire (ID No. 33632)
Benjamin O. Present, Esquire (ID No. 322682)
1500 Market Street
Centre Square, West Tower, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600
Fax: (215) 864-9620

JA3529

SCHOCHOR, FEDERICO AND STATON, P.A.

/s/ Jonathan Schochor
Jonathan Schochor (Admitted Pro Hac Vice )
jschoehor@sfspa.com
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (Admitted Pro Hac Vice)
bceryes@sfspa.com
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

Dated: March 29, 2019

JA3530

**VERIFICATION**

I, Elsa Powell, hereby aver that the factual statements in the foregoing *Answers to Interrogatories*, are true and correct to the best of my knowledge, information, and belief, and that these *Answers* are made subject to the penalties relating to unsworn falsification to authorities.


_____
Elsa Powell


Dated: March 28, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe,
Mathew D. Klayman
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*/s/ Nicholas M. Centrella*
Nicholas M. Centrella

Dated: March 29, 2019

# Exhibit 62

| JANE DOE NO. 1, et al., | * | IN THE |
| | * | |
| Plaintiffs, | * | CIRCUIT COURT |
| | * | |
| v. | * | FOR |
| | * | |
| DIMENSIONS HEALTHCARE SYSTEM, | * | PRINCE GEORGE'S COUNTY |
| d/b/a DIMENSIONS HEALTH | | |
| CORPORATION | * | Case No. CAL-17-37091 |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF SERVICE OF DISCOVERY MATERIALS

I HEREBY CERTIFY on this *10th* day of July, 2018, that I served a copy of
Plaintiff Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare
Corporation d/b/a Prince George's Hospital Center, on all counsel of record and all pro se
parties, and that I will retain the original of this document in my possession without alteration
until the case is concluded in this Court, the time for noting an appeal has expired and any
appeal noted has been decided.

Jonathan Schochor, Esquire
Schochor, Federico and Staton, P.A.
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000 - office
(410) 234-1010 - fax

*Attorneys for the Plaintiff*

JA3534

JANE DOE NO. 1, et al.,        *     IN THE

    Plaintiffs,          *     CIRCUIT COURT

v.               *     FOR

DIMENSIONS HEALTHCARE SYSTEM,   *     PRINCE GEORGE'S COUNTY
d/b/a DIMENSIONS HEALTH
CORPORATION            *     Case No. CAL-17-37091

    Defendants.         *

*   *   *   *   *   *   *   *   *   *   *   *   *

### PLAINTIFF ELSA POWELL'S ANSWERS TO INTERROGATORIES OF DEFENDANT DIMENSIONS HEALTHCARE CORPORATION, D/B/A PRINCE GEORGE'S HOSPITAL CENTER

COMES NOW the Plaintiff, Elsa Powell, by and through her attorneys, Jonathan Schochor and Schochor, Federico and Staton, P.A., in answer to the Interrogatories of Defendant Dimensions Healthcare Corporation, d/b/a Prince George's Hospital Center, respectfully states as follows:

Interrogatory No. 1:    State your full name; present address and all addresses for the past ten (10) years; date of birth; social security number; present marital status, and all previous marital status, including the dates of marriage and dates of termination of each marriage and the full name and present address of each spouse. Also in order to ascertain whether you have been in the past, or likely in the future to become a Medicare beneficiary, please provide your claim number (HICN).

**Answer to Interrogatory No. 1:**

Elsa Miguelina Powell
DOB: 4/14/1987

12705 Live Oak Place
Upper Malboro, MD
August 2016 – Present

Marital Status: Married
Spouse: Gregory Powell
Date of Marriage:  January 13, 2015
Maiden Name:  Delvillar-Mejia

Previous Addresses:
    3505 Manis Road
    Clinton Maryland,
    (June 2015 – August 2016)

    4002 28th Avenue, Apt B2
    Temple Hills, MD
    (Approximately 2012 – 2015)

    4900 Vienna Drive
    Clinton MD 20735
    (2012)

    Apartment Complex
    5457 16th Avenue, Apt 203
    Hyattsville, Maryland
    (2011-2012)

    1509 Madison Street, Apt 4
    Hyattsville, Maryland
    2010-2011
    24th Place
    Arlington Virginia
    (2007-2010)

The Plaintiff was a Medicaid beneficiary.

For identify protection, the Plaintiff will provide her social security number informally, under separate cover.

Interrogatory No. 2:    State the exact nature of each act or omission which you claim was negligently committed or omitted by Defendants. For each act or omission, state all particulars with relation to such act, including the time and place of the act or omission, and a complete description of the act or omission, including whether and how you contend the act or omission breached any relevant standard of care.

**Answer to Interrogatory No. 2:**    Objection is made to this interrogatory as it overly broad and unduly burdensome. Without waiving this objection, the Defendant is referred to the Plaintiff's Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's

2

criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the

District of Maryland, Southern District.

The Defendant's agent, servant and/or employee Charles J. N. Akoda (hereinafter

"Akoda") unlawfully practiced medicine, serving in the capacity of her attending physician

during portions of her prenatal care, during her labor on September 17, 2014, and the subsequent

delivery of her infant. The Defendant and its duly authorized agents, apparent agents, servant

and/or employees failed to perform an appropriate and proper investigation and background

check of Akoda before granting him privileges to act as a practitioner and specialist in obstetrics

and gynecology. Had they done so, as was required, Akoda's fraudulent and unlawful conduct

would have been discovered, and he would have been precluded from seeing patients at the

Defendant's institutions or entities, thereby avoiding all of the injuries, damages (economic and

non-economic) and disability suffered by this Plaintiff.

This answer will be supplemented as discovery continues.

Interrogatory No. 3:    State the exact nature of each act of commission or omission
which you claim was negligently committed or omitted by any individual you claim to be an
employee, agent, or servant of Defendants, including but not limited to Dr. Akoda. Include in
your answer whether you contend  Dr. Akoda was negligent in his  performance of any care
rendered to you, and in so doing, state whether you contend he performed medical services that
were not required/ medically necessary or improperly performed medically needed services,
including, but not limited to, testing, studies, procedures, and/ or surgery, or whether you
contend he failed to perform needed tests, studies, procedures, and/ or surgery, and  if so,
identify in detail your contention(s).

For each act or omission, state all particulars with relation to such act, including  the
name of the person whom you claim to have been guilty of the act or commission, the time and
place of the act or omission and a complete description of the act or omission, including whether
and how you contend the act or omission breached any relevant  standard  of care.

**Answer to Interrogatory No. 3:**    Objection is made to this interrogatory as it overly

broad and unduly burdensome.  Without waiving this objection, the Plaintiff incorporates

Answer to Interrogatory No. 2. This answer will be supplemented as discovery continues.

3

Interrogatory No. 4:     Give the full name, business address, home address, home telephone number, business telephone number and occupation of every person who has investigated the facts giving rise to the occurrence complained of in this case for you or on your behalf, and in so doing, state whether you or they made any review or inquiry as to Dr. Akoda's licensing, training, or other background information prior to or subsequent to submitting to care by him, and the details of any such investigation.

**Answer to Interrogatory No. 4:**     This Plaintiff's attorneys have investigated this claim on her behalf. This Plaintiff objects to the portion of the interrogatory that requests the specific nature and extent of investigation undertaken after Akoda's care, as it requests information that is protected by the attorney/client privilege, the attorney work product doctrine and the statutory peer review privilege.

The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, and the investigations of other entities, including but not limited to:

- Maryland Board of Physicians;
- Virginia Department of Health Professions;
- Department of Justice;
- United States Centers for Medicare & Medicaid Services;
- United States Department of Health and Human Services;
- Educational Commission for Foreign Medical Graduates (ECFMG);
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration.

Contact information for these entities is publicly available.

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-

4

03106-TDC.

This answer will be supplemented as additional information becomes available.

Interrogatory No. 5:    State the full name, home address, business address, occupation and employer of every expert whom you expect to call as an expert witness at trial and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. For each expert, specify in your answer whether or not that expert claims any particular expertise in a given field of medicine or science, describing precisely the field of the expertise claimed and specify whether such person shall testify regarding (a) the liability of the Defendant to the Claimant, and (b) the nature and extent of the injuries which you allege were sustained in the occurrence. Attach with your answers copies of all reports, statements and curriculum vitae and/ or resumes prepared by each expert witness.

**Answer to Interrogatory No. 5:**    This Plaintiff has not yet determined which expert witnesses she will call at trial of this matter.  This Plaintiff will issue a Designation of Expert Witnesses in accordance with the Court's Scheduling Order.

Interrogatory No. 6:    Identify each known written statement or report relative to any of the facts giving rise to the occurrence of which you complain. In so doing, name the person who gave the statement or report; specify the date of each statement or report; name its present custodian; attach exact copies of all written statements or reports which have been prepared or signed by the Defendant or persons whom you allege to be agents, servants, or employees of the Defendant.

**Answer to Interrogatory No. 6:**    This Plaintiff objects to this interrogatory as it is overly broad, unduly burdensome and solicits information protected by the attorney-client privilege and work product doctrine.  Without waiving the objection or disclosing privileged information, the Plaintiffs are in possession of the following documents which contain written statements or reports relative to the facts giving rise to his occurrence:

- Judgment and Stipulated Facts dated February 28, 2017
- Transcript of Pre-Trial Detention Hearing
- Virginia Department of Health Professions Order of Mandatory Suspension

5

- Maryland State Board of Physicians Final Decision and Order

The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District, which includes filings and transcripts tending supporting the allegations in the Plaintiffs complaint, including stipulated facts executed by Oluwafemi Charles Igberase, a.k.a. Charles Akoda in connection with a guilty plea entered in 2016. Copies of these proceedings are publicly available via Public Access to Court Electronic Records.

Additionally, it is anticipated that written statements or reports relative to the facts giving rise to his occurrence will be included within the records, proceedings and files of various entities, including but not limited to:

- Maryland Board of Physicians
- Virginia Department of Health Professions
- Department of Justice
- United States Centers for Medicare & Medicaid Services
- United States Department of Health and Human Services
- Educational Commission for Foreign Medical Graduates (ECFMG)
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC. This answer will be supplemented as more information becomes available.

Interrogatory No. 7: Describe the nature and subject matter of each picture, diagram, document, audio or video tape, x-ray, or other objects (real evidence) which is known to you

JA3540

and which is relative to this occurrence or its consequences. In so doing, name each object's present custodian and state the date the object was produced or obtained.

**Answer to Interrogatory No. 7:** This Plaintiff objects to this interrogatory as it is overly broad, unduly burdensome and solicits information protected by the attorney-client privilege and work product doctrine. Without waiving the objection or disclosing privileged information, the Plaintiffs are in possession of the following materials relative to this occurrence:

- Judgment and Stipulated Facts dated February 28, 2017
- Transcript of Pre-Trial Detention Hearing
- Virginia Department of Health Professions Order of Mandatory Suspension
- Maryland State Board of Physicians Final Decision and Order

The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District, which includes filings and transcripts tending supporting the allegations in the Plaintiffs complaint, including stipulated facts executed by Oluwafemi Charles Igberase, a.k.a. Charles Akoda in connection with a guilty plea entered in 2016. Copies of these proceedings are publicly available via Public Access to Court Electronic Records.

Additionally, it is anticipated that documents and other materials relative to this occurrence or its consequences will be included within the records, proceedings and files of various entities, including but not limited to:

- Maryland Board of Physicians
- Virginia Department of Health Professions
- Department of Justice
- United States Centers for Medicare & Medicaid Services
- United States Department of Health and Human Services

JA3541

- Educational Commission for Foreign Medical Graduates (ECFMG)
- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;
- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;
- United States Social Security Administration

Additionally, the Defendant is referred to Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC.

This answer will be supplemented as more information becomes available.

Interrogatory No. 8: Identify and give the substance of each statement, action or admission against interest, declaration against interest, or otherwise, whether oral, written, by conduct, silence or otherwise which you contend was made by the Defendant or any person whom you allege to be the agent, servant and/ or employee of said Defendant. Give the name and occupation of each person who has personal knowledge of the making of each such statement. State the place and date when each such statement was made.

**Answer to Interrogatory No. 8:** Oluwafemi Charles Igberase, a.k.a. Charles Akoda executed stipulated facts in connection with a guilty plea entered in 2016, which is anticipated to already be the custody of the Defendants. The Defendant is also referred generally to Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District. Additionally, the Defendant is referred to the Plaintiff's medical records, which are already in the possession, custody and/or control of the Defendants, and will confirm that Akoda was referred to as a practicing physician at all times relevant to this dispute.

Moreover, although these documents are not currently in the possession of the Plaintiff, it is anticipated that agents, servants and/ or employees of the Defendant may have made statements relating to the alleged malpractice in connection with investigations by entities, including but not limited to:

8

- Maryland Board of Physicians;

- Virginia Department of Health Professions;

- Department of Justice;

- United States Centers for Medicare & Medicaid Services;

- United States Department of Health and Human Services;

- Educational Commission for Foreign Medical Graduates (ECFMG);

- Residency Programs including but not limited to Howard University and in New Jersey, including applications for residency;

- Defendants' Privileging and Credentialing Committee, Quality Assurance Committee and/or other committees, departments or offices of the Defendants;

- United States Social Security Administration.

This response will be supplemented as more information becomes available.

Interrogatory No. 9:    If you contend that any portion of any medical record, chart, or report prepared by any Defendant, or anyone deemed to be an agent, servant and/ or employee of such Defendant, is inaccurate, false, has been altered, or has been destroyed, specifically identify each portion of each record, chart, or report you contend is inaccurate, false, has been altered, or has been destroyed, and provide in detail the factual basis for this contention.

**Answer to Interrogatory No. 9:**    To the extent that this Plaintiff's medical records refer to Akoda as a physician, that is inaccurate and false. This answer will be supplemented as discovery proceeds.

Interrogatory No. 10:    If you contend that the applicable standards of care or any other issues in this matter are established by any articles, treatises, textbooks or other publications in the medical or scientific field, state the title of each publication, the journal, magazine, or series wherein each was published; the name and address of the publisher; date of the publication; and the name of the author and the volume and page or section referred to.

**Answer to Interrogatory No. 10:**    This Plaintiff objects to this interrogatory which solicits information which is not discoverable.   Furthermore, this Plaintiff has not yet determined which expert witnesses she intends to call at trial of this matter. This Plaintiff will issue a Designation of Expert Witnesses in accordance with the Court's Scheduling Order. Should any of Plaintiff's expert witnesses rely on any such medical literature to support their

9

respective opinions on the applicable standard of care or any other issue in this matter, such information will be disclosed in a timely manner.

Interrogatory No. 11:    Itemize the nature and amount of all expenses made or incurred by you, or for which you intend to make claims as a result of the Defendant's alleged negligence, including hospital and doctor bills. In so doing, specify which of the above expenses have been paid, and indicate when and by whom they were paid.

**Answer to Interrogatory No. 11:**    This Plaintiff will be claiming non-economic damages for her pain and suffering, as well as Plaintiffs' loss to their marital relationship. This Plaintiff has in the past, is presently, and will in the future continue to suffer excruciating emotional anguish as well as fear and anxiety. This Plaintiff will be claiming economic damages for past, present and future medical expenses, future health and life care needs, including but not limited to psychiatric and/or psychological counseling. The Plaintiff also experiences kidney pain which she attributes to care provided by Akoda. Copies of billing invoices for prior medical care will be provided as they become available. Copies of Plaintiffs' life care plan and economic report will be provided upon completion. This answer will be supplemented as discovery proceeds.

Interrogatory No. 12:        Describe in detail the injuries, disabilities, infirmities, sicknesses and each activity in which you contend you sustained as a result of the occurrence that is the subject matter of this suit. Specify whether each injury is permanent in nature and, if so, state the extent of such permanency.

**Answer to Interrogatory No. 12:**    This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 13:    Give the name, address and dates of examination or treatment for every physician who has ever examined or treated you and state the cause for and nature of each such examination or treatment rendered; and state the name, address and dates of admission of every hospital where you have ever been admitted, the cause for and nature of each such admission and the treatment rendered.

10

**Answer to Interrogatory No. 13:**    This Plaintiff objects to this interrogatory which is overbroad and vague.  Without waiving these objections, this Plaintiff refers to her medical records which are in the Defendant's possession, custody and control.    Additionally, the Plaintiff has treated with the following health care providers:

> Brian Kinsley, M.D. (OBGYN)
> Kaiser Permanente
> 2015- 2016
>
> Emily Lo, M.D. (Primary Care)
> Kaiser Permanente
> 2018
>
> Southern Maryland Hospital
> Lower abdominal pain 2015

Interrogatory No. 14:    If you have ever filed an action against or made a claim against any person, firm or corporation for personal injuries or physical conditions, or for any benefits under any insurance policy, state the injuries or conditions for which each claim was made, the dates of each injury, the names and addresses of the persons, firms or corporations to whom or against whom each were made, the nature and amount of any payments received therefore and the date each was made.

**Answer to Interrogatory No. 14:**    This Plaintiff objects to this interrogatory which solicits information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving the objection, no such claims are known.  The case resolved with confidentiality.

Interrogatory No. 15:    Give the date, circumstances and injuries sustained with relation to any occurrence or accident in which you were involved and in which you sustained any personal injury.

**Answer to Interrogatory No. 15:**    This Plaintiff objects to this interrogatory which solicits information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.   Without waiving this objection, the Plaintiff was involved in a car accident in 2014, and received care at Southern Maryland Hospital, but sustained no injuries.

JA3545

Interrogatory No. 16:    State the name, address, dates of employment for each employer you had during the last ten (10) years. With respect to each employer for each of the last ten (10) years, state your yearly gross income, yearly net income, and the name and address of the person, firm or corporation having custody of any papers pertaining to your income.

**Answer to Interrogatory No. 16:**    The Plaintiff's employment history is as follows:

MVM
Security Guard
June 2018 – Present

Blueline Security Services
851 Brightseat Rd
Landover, MD 20785
Supervisor
November 2017- April 2018

VMG Resources
Front Desk Agent
2630 12th St NE
Washington, DC 20018
February 2014 – July2014

Little Imaginations Development Center
April 2013 – June 2013

Aloft Hotel
Hanover, MD
Front Desk
Feb 2013 – May 2013

George Washington Hospital
Special Police Officer
November 2011 – 2013

City Security
Security Officer, Howard University
September 2010 – 2012

Server/Hostess
Caribbean Breeze
Arlington, VA
2007 – 2009

Interrogatory No. 17:    If you have lost any time from employment as a result of the occurrence for which this suit is brought, state the name and address of all employers from

which time was lost, the period of time lost from each such employer, and the hourly rate and total income lost from all such periods from each such employer.

**Answer to Interrogatory No. 17:** None at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 18: State whether you contend you will lose any future earnings and/ or income as a result of the occurrence referred to in your Complaint. If so, state the basis for your contention and if any doctor or other expert has expressed such an opinion state their name, address, and the date and circumstances when you were informed that you would lose future income.

**Answer to Interrogatory No. 18:** None at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 19: If you contend that a previous injury or condition was aggravated by the occurrence for which this suit is brought, describe such condition and give the names and addresses of all persons or institutions who treated you therefore and the approximate dates of such treatment.

**Answer to Interrogatory No. 19:** This Plaintiff does not so contend at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 20: If you have ever used any drugs or medications in connection with any injury which you claim was caused by the occurrence for which this suit is brought, state for each drug or medication the name and address of the doctor who prescribed it, the inclusive dates on which it was taken, the dosage, the number of times taken daily, and the cost of such medication or drugs. And if you have received any mental healthcare, counseling, or other healthcare services which you claim was caused by the occurrence for which this suit is brought, state for each drug or medication the name and address of the doctor who prescribed it, the inclusive dates on which it was taken, the dosage, the number of times taken daily, and the cost of such services

**Answer to Interrogatory No. 20:** This Plaintiff does not so contend at this time. This answer will be supplemented as discovery proceeds.

Interrogatory No. 21: For each conversation that you have had with any Defendant or anyone you contend was acting as an agent, servant, or employee of any Defendant, or with Dr.

Akoda relating to the facts relevant to your injury claims, state: the date of the conversation, where the conversation took place, the name, address, and telephone number of every person present during each conversation and as precisely as possible recount what each person to the conversation said.

**Answer to Interrogatory No. 21:** This Plaintiff had multiple conversations with many health care providers at the Defendant's institution during her labor and delivery. It is unduly burdensome and overly broad to request that this Plaintiff reconstruct each of those conversations. This Plaintiff refers to conversations memorialized in her medical records from the Defendant's institution. Some but not all conversations would have been documented in the medical records, which are in the possession, custody and/or control of the Defendants. At all times, the Defendant's agents, servants and employees led this Plaintiff to believe that Akoda was indeed a physician. At no time did this Defendant's agents, servants and employees provide notice that Akoda was not a Maryland licensed or hospital credentialed physician. This answer will be supplemented as discovery proceeds, including through the deposition testimony of the Plaintiff.

Interrogatory No. 22: State all economic losses you contend were sustained as a result of the occurrence referenced in the Complaint, including all past and future medical expenses and any past or future lost wages/ diminished earnings capacity.

**Answer to Interrogatory No. 22:** This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 23: State the name, address, home telephone number, work telephone number and occupation of each person not previously mentioned, who has or claims to have personal knowledge of the occurrence, injuries, damages, or any other facts relevant to this case.

**Answer to Interrogatory No. 23:** This Plaintiff's family and treating health care providers may have personal knowledge of her care and treatment by Akoda, as well as her

current injuries. This Plaintiff refers to her medical records which are in the Defendant's possession, custody and control. This answer will be supplemented as discovery proceeds.

Interrogatory No. 24: State whether you have entered into any settlements, releases, loan receipt agreements or similar agreement in connection with the occurrence for injuries for which this suit is brought. If your answer is in the affirmative, state the identities of all parties and dates of all releases, settlements, loan receipt agreements, or similar agreement, the terms of all such agreements, and if you will do so without a Request for Production of Documents, attach a copy hereto of all such releases, settlements or agreements.

**Answer to Interrogatory No. 24:** None known. This answer will be supplemented as discovery proceeds.

Interrogatory No. 25: Identify in detail every service or interaction you contend was negligently provided or undertaken by Dr. Akoda, including the number and description of the interactions or services rendered, the dates of said services or interactions, the location of said services or interactions, whether and what surgical treatment was rendered, whether the care involved touching, whether the care involved "penetration," whether and how the care involved "boundary violations," whether there was a physical examination and if so the details of the examination(s), whether the care involved breast exam or pelvic exam, any testing you contend was improperly provided, whether you contend Dr. Akoda made inappropriate statements, and whether Dr. Akoda delivered your child/ children, and if so, whether delivery was vaginally or by caesarean section delivery.

**Answer to Interrogatory No. 25:** This Plaintiff contends that all care and treatment provided by Akoda was negligent, including but not limited to, the fact that he was not an appropriately licensed and credentialed physician. She describes Akoda's demeanor as flirtatious, and during one examination, told the Plaintiff that she had "nice breasts." He oversaw aspects of Plaintiff's prenatal, oversaw her labor care, performed intrusive pelvic examinations, breast exams, and her child's delivery. He was not properly licensed, credentialed or qualified to provide any of this case. This Plaintiff would never have exposed herself or her child to a non-health care provider had she been appropriately advised that he was not a validly licensed or credentialed physician. This answer will be supplemented as discovery proceeds.

15

Interrogatory No. 26:    Identify in detail any and all physical pain and/ or disability you allege the Defendants' actions caused you, including the date on which it occurred or began, whether it is ongoing, and describe any and all care or treatment you have sought or received for it, including the dates on which you received care, by whom, and a description of the care received.

**Answer to Interrogatory No. 26:**   This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 27:    Identify in detail any psychological distress, emotional anguish or distress, fear, anxiety, humiliation, embarrassment or other mental or emotional injuries you allege Defendants' and/or Dr. Akoda's actions caused you, including the date on which it occurred or began, whether it is ongoing, whether and if so, what physical manifestations you or anyone else to your knowledge has observed, and any and all care, treatment, therapy and/ or psychological counseling you have sought or received for it, including any, the dates on which you received care, by whom, and a description of the care received.

**Answer to Interrogatory No. 27:**   This Plaintiff incorporates Answer to Interrogatory No. 11. This answer will be supplemented as discovery proceeds.

Interrogatory No. 27 (28):    State in detail the factual basis for your negligent entrustment action against Defendants, including what was entrusted to Dr. Akoda, by whom, whether you contend he used the entrusted items improperly apart from your allegation he was practicing without a valid license, whether and how Dr. Akoda negligently used or operated entrusted items, and whether and how you were injured by the entrusted items.

**Answer to Interrogatory No. 27 (28):**   The Defendant is referred to the Plaintiff's Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District.  The Defendant is further referred to the Plaintiff's Answers to Interrogatories No. 2, 6 and 7.

This Plaintiff's entire labor and delivery, including access to the hospital's equipment and facilities was negligently entrusted by this Defendant to Akoda, who the Defendant knew or should have known was not a properly licensed or credentialed physician.  He should not

16

Help

Interrogatory No. 29 (30):    Identify with specific detail each and every action you contend Defendants and/or Dr. Akoda made that was extreme or outrageous as the basis of your intentional infliction of emotional distress claim, including the date and location of any alleged action(s), any and all witnesses to the action(s), a detailed description of the action(s), and whether you contend Defendants and/ or Dr. Akoda intended by the action(s) to cause severe emotional distress, and if so, provide your factual basis for that contention.

**Answer to Interrogatory No. 29 (30):**    The Plaintiff alleges that Akoda's conduct was intentional and/or reckless when he continued to practice medicine and surgery without a lawful license, without authorization and informed consent.  It is asserted that Akoda's conduct involved was extreme, outrageous and unreasonable, and occurred when he acted as a duly authorized agent, apparent agent, servant and/or employee of the Defendants.  As a result, the Claimants, and others similarly situated, sustained severe emotional distress.

The Defendant is further referred to the Plaintiff's Complaint, as well as Complaints filed on behalf of other patients of Charles Akoda, including Case Nos. CAL18-07863; CAL17-22761; and 8:17-cv-03106-TDC, and Akoda's criminal indictment, Case No. 8:16-cr-00277-PWG in the United States District Court of the District of Maryland, Southern District.  The Defendant is further referred to the Plaintiff's Answers to Interrogatories No. 2, 6 and 7.

This answer will be supplemented as discovery proceeds.

Interrogatory No. 30 (31):    Identify with specific detail each and every privacy you contend Defendants, Dr. Akoda, and/ or any other person or entity intruded upon, the dates of the intrusion, the manner of the intrusion, who intruded, when and how you became aware of the intrusion, and any witnesses to the intrusion.

**Answer to Interrogatory No. 30 (31):**    This Plaintiff objects to this Interrogatory, as it exceeds the number of interrogatories the Defendant may propound within the Maryland Rules of Discovery.  Without waiving this objection, this Plaintiff hereby incorporates Answers to Interrogatories Nos. 25, 27, 28 (29) and 29 (30).

18

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

_____
Elsa Powell

Respectfully submitted,

_____
Jonathan Schochor
Schochor, Federico and Staton, P.A.
1211 St. Paul Street
Baltimore, MD 21202
pfederico@sfspa.com
410-234-1000
Attorneys for the Plaintiff

JA3553

# Exhibit 63

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

**RE: *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe:

On September 10, 2019, I had the opportunity to see Elsa Powell for an independent psychiatric evaluation. The evaluation was requested to comment on Ms. Powell's psychiatric condition in relation to the Complaint in *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the evaluation, I discussed with Ms. Powell that the evaluation was not for purposes of treatment and it was not a confidential examination. I discussed with Ms. Powell that I would prepare a report based on psychiatric evaluation and review of records.

In preparation for this report, I have reviewed the following records:

1. Medical Records: Plaintiffs0000000572 – Plaintiffs0000000929; Plaintiffs0000006174 – Plaintiffs0000006363; Plaintiffs0000118377 – Plaintiffs0000118653
2. Complaint in *Russell et al. v. ECFMG*
3. Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5. Deposition of Elsa Powell (9/6/2019)
6. Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7. Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8. Deposition of Elsa Powell in CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9. Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10. Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

JA3555

## HISTORY REPORTED BY ELSA POWELL:

Elsa Powell (date of birth ▮▮▮▮▮▮) said that she understood that the examination was requested, "To see my state of mind with this situation." I asked Ms. Powell to explain the "situation." Ms. Powell said that she had a doctor whom she understood to be somebody other than who he was. Ms. Powell said the doctor had fake names and Social Security numbers. Ms. Powell said that it hurt her because she had trusted him. Ms. Powell said that she does not know his name and he was not Dr. Akoda. Ms. Powell said she knew him as Dr. Akoda and that was not his real name. She said that she has felt betrayed. Ms. Powell said that she does not know who this person was whom she allowed to examine her body and deliver her child. Ms. Powell said that she had complications with the childbirth, and Dr. Akoda did surgery. Ms. Powell said that she thanks God that she did not pass away. Ms. Powell said that she just feels really mad because he was not locked up. Ms. Powell said she questions who allowed him to practice with fake names, and she believes that someone should be responsible. Ms. Powell said that she believes that she was one of Dr. Akoda's "victims" because he lied about who he was and he touched "our body parts." Ms. Powell said that it is hard to explain, but she felt shocked. She repeated that she feels angry. Ms. Powell acknowledged that there are moments when she is okay. She said that she has put her feelings aside in relation to her anger. She said that she has not talked to anybody about her feelings because "everybody depends on me."

Ms. Powell said a friend called her and told her that Dr. Akoda was not really Dr. Akoda. Ms. Powell said that she then heard the story on the news about Dr. Akoda. Ms. Powell said that her friend told her to call a particular number to talk to attorneys. Ms. Powell said that she was told that his credentials were fake. She said that she feels bad that she did not check Dr. Akoda's credentials. She said that he preyed on innocent woman. She said that this is more than nothing.

Ms. Powell said that she was very focused on delivering a healthy baby, and Dr. Akoda did deliver a healthy baby. Ms. Powell said she is not knocking what he did as a doctor, but he lied to all of these vulnerable women. Ms. Powell said that she views him as a predator, and she said that the women were his target. Ms. Powell said that she has never read anything about the doctor's training, but she said he had a fake Social Security number and a fake name. She said that he did a very serious procedure and that she questions whether he lied about the procedure. She said he is a fraud to her and that he did not have any respect for "[m]e and all the patients he saw." She said that no one wants to feel that she is lied to. She repeated that Dr. Akoda had examined her body and that she trusted him.

Ms. Powell said Dr. Chaudhry was supposed to be her doctor, but she never saw Dr. Chaudhry; she saw Dr. Akoda. She said that she saw Dr. Akoda first when she was 5½ to 6 months pregnant. Ms. Powell said that her pregnancy was not a high-risk pregnancy. She said that she has had low iron since she was 16. She said that the last appointment with Dr. Akoda was at her six-week checkup after Jaiden was born.

Ms. Powell said that after she had Jaiden, she was bleeding a lot. She said that she was not married to Jaiden's father, who is now her husband. Ms. Powell said that she was alone in the hospital. Ms. Powell said she was rushed to the operating room. She recalled that she was told to count

backwards from five and when she woke up, there were tubes everywhere. She recalled that she was crying. Ms. Powell said that she saw Dr. Akoda the day after the surgery and that he told her to take iron pills. She said Dr. Chaudhary came in the second day post-op.

Ms. Powell said that there were no complications in regard to Jaiden. She reported that he was a healthy boy who weighed 8 pounds, 5 ounces, and that the complications were after Jaiden's delivery. Ms. Powell said that she saw Dr. Akoda for her six-week checkup. He told her she had an ovarian cyst. She said he did a procedure in the office.

Ms. Powell said that she thought Dr. Akoda was very flirtatious. Ms. Powell said that she requested that a nurse be present when he did examinations. Ms. Powell said that he made comments about her breasts. She recalled that she spoke to a nurse about Dr. Akoda, but she did not make any formal complaint.

Ms. Powell said that when Jaiden was about four or five months old, she moved, her health insurance changed, and she was pregnant with her fifth child, Tatiana. She said that she had a different doctor and a different hospital for the delivery of Tatiana. She reported that Tatiana was born with an enlarged kidney. Ms. Powell said that she knew before the delivery from ultrasounds that Tatiana had a kidney problem. She reported that Tatiana had surgery before she was one year old and needs ultrasounds once a year.

Ms. Powell said that her oldest child, Lucy Mercedes, is 14 years old; her second child, Nester, is 13 years old; and her third child is Josiah Rodriguez. She said that Josiah's father is career military and lives in North Carolina. Ms. Powell said that "Powell" is her married name. She said that she was not married to Mr. Powell when Jaiden was born and again, he was not at the delivery. Ms. Powell said that Jaiden and Tatiana have the same father.

Ms. Powell said that she works full time for a security company at the National Institutes of Health. She said that she works from 9 p.m. to 5 a.m. She said that her husband is a police officer, and his current shift is 11:30 p.m. to 7:30 a.m. Ms. Powell said that she is home in the morning with her four older children before they go to school and that Tatiana is home with her all day.

Ms. Powell described herself as independent and a great, great mother. She said that she is strict. Ms. Powell said she works hard and that her main concern is her children. Ms. Powell said that she is a loner and is not the type of person who chills with friends. She said that she just enjoys spending time home with her children. Ms. Powell said that she is very caring, likes to help people, and will give a person the shirt off of her back.

Ms. Powell described her mood as up and down. She said that she is not depressed but she is not one to talk too much about her feelings. Ms. Powell said that she does not sleep very much because of her work schedule and taking care of her kids. She said that in her opinion, a good night's sleep would be four hours. She said that she is 5 feet, 4 inches tall and that her weight is up and down, ranging from 180 pounds to 204 pounds. She said her concentration is good. She said that she enjoys her family, sleep, and time with her husband. She denied suicidal ideation. She denied the experience of anxiety attacks.

JA3557

Ms. Powell said that she has never been evaluated or had treatment with a psychiatrist or psychologist. Ms. Powell said that she has an appointment scheduled through her attorney for a psychiatric evaluation on September 13, 2019. Ms. Powell denied a history of drug use or alcohol abuse. She denied a history of physical, mental, or sexual abuse.

**MEDICAL HISTORY:**

Ms. Powell said that she has a primary care physician through Kaiser, but she does not go to doctors' appointments. She said that she has thalassemia alpha trait. She said that she tries to eat food high in iron and takes iron pills. She said that she does not see a hematologist.

Ms. Powell said that she has not been evaluated by a gynecologist since her six-week follow-up appointment after Tatiana was born.

Ms. Powell said that ███████████████ in 2010. She said that she was given the wrong medication at CVS and this caused complications. She acknowledged she did not know she was pregnant at the time ███████████ Ms. Powell said a doctor had given her pain medication, but CVS gave her the wrong prescription. She said that she ███████████ the same night that she got the prescription, and there was a lawsuit related to the wrong prescription, which settled out of court.

Ms. Powell said that she has recently been evaluated at urgent care for pain in her left side. She said that she had an enlarged spleen. Ms. Powell said that she needs to follow-up about this problem. She said that she was only diagnosed with thalassemia when she was pregnant with Tatiana. She said that she had an MRI scheduled through urgent care.

**SOCIAL HISTORY:**

Ms. Powell said that she grew up in Massachusetts. Her parents split up when she was seven years old. Ms. Powell said she has three brothers from her mother's relationship with her father. Ms. Powell said her mother had three sons in another relationship. She said that she is close to all of her siblings.

Ms. Powell said that she met Lucy and Nester's father when he was on vacation in Massachusetts. She said that she moved in with his family in Virginia. Ms. Powell said that she received her high school diploma in 2005 when she was living with Lucy and Nester's father's family. She said that she left Nester and Lucy's father because he was cheating. Ms. Powell said that she returned to Massachusetts for about a year, but the kids' father wanted to see them, and she moved back to Virginia. Ms. Powell said that she met Josiah's father in Virginia when she was working as a waitress. She said that she returned to Virginia and worked two jobs while she was in school. She said that Josiah's father was in the military, and when he had orders to go to Alaska, they ended the relationship. Ms. Powell said that she met her current husband at the local firehouse where he was her training lieutenant. She said that her husband regrets that he was not at Jaiden's delivery.

JA3558

Ms. Powell described a traumatic event in 2009 or 2010. She began to cry. She said that she lived in a house with two apartments, and the whole house burned down. She said that she lost everything except her passport and $200. Ms. Powell was in school at the time at Everest College, and she was studying Homeland Security. She said she believes that God saved her life. She said she did not see a psychiatrist or psychologist, and she repeated that she is not one who likes to talk about feelings. Ms. Powell said people describe her as a brick wall, including her husband, her family, and coworkers.

Ms. Powell said she stopped school in 2013, and it would only take two months to finish her degree at Kaplan. She said she does not want to work for Homeland Security now. She said she is planning to take classes in Maryland to receive certification to work as an interpreter in the courthouse. She would like to work in Virginia. Ms. Powell said that there is a high population of Hispanics in Virginia and she will be able to earn $40 to $60 an hour.

Ms. Powell said that she was in a minor motor vehicle accident when she was pregnant with Jaiden. She said that it was a love tap really. She said no one was hurt. She said she hit the other car, and she was sued.

Ms. Powell denied a family history of psychiatric disorders or substance abuse.

## MENTAL STATUS EXAMINATION:

Mental status examination revealed a casually groomed 32-year-old woman. Her speech was goal-directed and spontaneous. She easily established rapport.

Ms. Powell described her mood stating that she feels just really mad when she thinks about her experiences with Dr. Akoda. In general, she is happy with her family. She said that she is not depressed. She said she is not one who talks much about her feelings. Her affect was full and appropriate to content. She cried during the evaluation when she talked about the house fire and losing everything except her passport and $200. She said, "I'm a tough cookie."

Ms. Powell denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

## REVIEW OF RECORDS:

I have reviewed the records identified at the start of the report. At this time there are no medical records related to psychiatric complaints or treatment, and as such I will not comment on a review of any records.

**SUMMARY AND IMPRESSION:**

It is my opinion that Ms. Powell does not have any psychiatric disorder causally related to Ms. Powell's allegations in the Complaint. The conclusion is based on the following facts:

1. Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis.
2. Ms. Powell does not have a history of any psychiatric/psychological treatment in relation to the issues in the Complaint or related to other stressors that she reported.
3. Ms. Powell is doing well with her marriage, children, and job, and she has clear plans for the future in regard to her career.
4. Ms. Powell said that she had no complaints about the doctor's treatment during delivery, surgery after delivery, or the post-delivery checkup.

It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the issues in the Complaint. Although Ms. Powell testified that she almost lost her life because of a fake doctor whom she thought was a doctor, Ms. Powell said during the evaluation that Dr. Akoda delivered a healthy baby. She had a procedure after Jaiden was born, and there were no complications from that procedure. She saw Dr. Akoda for a visit after Jaiden was born, and Dr. Akoda did another procedure. Ms. Powell did not have any complications or complaints about the medical treatment.

It is my opinion Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Powell described herself as independent and a great, great mother. She works hard. Her main concern is her children, and she said her children are doing well. She has a steady job and she is also planning to receive certification to work as an interpreter in the Virginia court system. She has done the research and there is a large Hispanic population in the area where she plans to work. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/dmb

JA3560

# Exhibit 64

JA3561

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4     --------------------------------

 5     MONIQUE RUSSELL, JASMINE

       RIGGINS, ELSA M. POWELL, and

 6     DESIRE EVANS,

                   Plaintiffs,        Case No. 18-5629

 7          v.

       EDUCATIONAL COMMISSION FOR

 8     FOREIGN MEDICAL GRADUATES,

                   Defendants.

 9     --------------------------------

10                    Washington, D.C.

11               Friday, September 12, 2019

12            Deposition of JASMINE RIGGINS, a witness

13     herein, called for examination by counsel for the

14     Defendant in the above-entitled matter, pursuant

15     to notice, the witness being duly sworn by Barbara

16     DeVico, a Notary Public in and for the District of

17     Columbia, taken at the offices of MORGAN, LEWIS &

18     BOCKIUS, LLP, 1111 Pennsylvania Avenue,

19     Washington, D.C., at 11:33 a.m.,

20     Thursday,September 12, 2019, and the proceedings

21     being taken down by Stenotype by BARBARA De VICO,

22     CRR, RMR, and transcribed under her direction.

23

24

25
```

Jasmine Riggins

```
 1   APPEARANCES:

 2      On Behalf of the Plaintiffs

 3          CORY L. ZAJDEL, ESQUIRE

 4          Z LAW, LLC

 5          2345 York Road, #B-13

 6          Timonium, MD   21093

 7

 8      On behalf of the Defendant:

 9          BRIAN W. SHAFFER, ESQUIRE

10          MORGAN, LEWIS & BOCKIUS, LLP

11          1701 Market Street

12          Philadelphia, PA   19103-2921

13          brian.shaffer@morganlewis.com

14

15

16

17   Also Present:  Nam Ngo, Videographer

18

19

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS

 2                         WITNESSES

 3   WITNESS                                         PAGE

 4   BY MR. SHAFFER                                    5

 5

 6

 7

                  _____EXHIBITS_____
 8

     EXHIBIT         DESCRIPTION                     PAGE
 9

     Exhibit 1    Medical records                     36
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  This is the

 3      start of the videotaped deposition of

 4      Jasmine Riggins in the matter of Monique

 5      Russell et al. versus Educational

 6      Commission for Foreign Medical Graduates

 7      in the United States District Court for

 8      the Eastern District of Pennsylvania.

 9              This deposition is being held at

10      Morgan Lewis, 1111 Pennsylvania Avenue, NW

11      about, Washington, D.C. on September 12,

12      2019, at approximately 11:34 a.m.

13              My name is Nam Ngo from Golkow

14      Litigation Services, and I'm the legal

15      video specialist.  The court reporter is

16      Barbara DeVico.  Would counsel please

17      introduce yourself.

18                  (Attorneys stated their

19                  appearances for the record.)

20              THE VIDEOGRAPHER:  Would the court

21      reporter please swear in the witness.

22              ***********************

23

24

25
```

Jasmine Riggins

```
 1                    JASMINE RIGGINS,

 2    having been called as a witness on behalf of the

 3     Plaintiffs and having been first duly sworn, was

 4     examined and testified as follows:

 5    EXAMINATION BY

 6    MR. SHAFFER:

 7            Q.    Ms. Riggins, good morning.

 8            A.    Good morning.

 9            Q.    We met very briefly this morning.

10    My name is Brian Shaffer.  I'm an attorney that

11    represents the defendant in a lawsuit that you and

12    several other plaintiffs have brought.  My client

13    is the Educational Commission for Foreign Medical

14    Graduates, ECFMG.  Do you understand that if I call

15    it ECFMG what we're referring to?

16            A.    Yes.

17            Q.    Great.  We're here to take your

18    deposition in connection with the lawsuit that you

19    filed in Pennsylvania against ECFMG, correct?

20            A.    Correct.

21            Q.    And have you had your deposition

22    taken before?

23            A.    Yes.

24            Q.    How many times?

25            A.    Once.
```

JA3566

1    Q.    And was that earlier this year?

2    A.    Yes.

3    Q.    Okay.  Was that in connection with

4    another lawsuit that you filed?

5    A.    Yes.

6    Q.    And was that a lawsuit that was

7    filed in Maryland against Dimensions Healthcare?

8    A.    Yes.

9    Q.    And that's the only deposition

10   you've ever given besides this one?

11   A.    Correct.

12   Q.    Okay.  A few ground rules just to

13   remind you about how a deposition works.

14        The oath that you gave this morning is the

15   same one that you would give in a courtroom before

16   a judge and a jury.

17        Do you understand that?

18   A.    Yes.

19   Q.    And we're here to ask you some

20   questions and get your best answer and

21   understanding as to those questions.

22        Do you understand that?

23   A.    Yes.

24   Q.    If I ask a question and you don't

25   understand what I'm asking, will you tell me that?

```
1              A.      Yes.

2              Q.      And I'll be happy to try to correct

3    it.  That's what I want you to tell me.

4              A.      Okay.

5              Q.      If you don't hear me, the court

6    reporter can read the question back or I'll repeat

7    the question for you.  Is that fair?

8              A.      Sure.

9              Q.      We're taking your testimony down

10   both by the court reporter here that will come in a

11   little booklet on a page as well as on a videotape.

12             Do you understand that?

13             A.      Yes.

14             Q.      It's important that you speak as

15   loudly and as clear as you can.  We all have little

16   microphones, but it will still be easier for

17   everyone if you try to speak up.  If somebody

18   doesn't hear you, I may ask you to repeat yourself

19   just so everyone can hear you.  Is that okay?

20             A.      Yes.

21             Q.      Same thing, even though on the

22   videotape we might see a nod of the head or a shake

23   of the head, the court reporter can't take that

24   down as clearly, so I may ask you for an audible

25   response.  Again I'm not trying to be difficult.
```

1  I'm just trying to make sure there's no confusion

2  as to what you meant when you shake your head.

3         Is that fair?

4         A.    Yes.

5         Q.    We'll take a break at any point that

6  you need to today as long as there's not a question

7  that's pending.  This isn't an endurance contest.

8  If you need to take a break for any reason, we'll

9  do that, okay?

10        A.    Okay.

11        Q.    There are some topics that we may

12 talk about today about your personal health that

13 may be sensitive or uncomfortable, and I apologize

14 for that.  I'm not trying to be intrusive.  But

15 there are certain questions that I may need to ask,

16 and I'm going to try to do that as best I can.  If

17 you feel uncomfortable about that, will you let me

18 know?

19        A.    Yes.

20        Q.    Thank you.

21        Do you have any questions before we begin

22 the deposition?

23        A.    No.

24        Q.    What did you do to prepare, if

25 anything, for coming in here today?

```
1         A.     Just practiced, talked to my
2   attorneys.
3         Q.     Okay.  So you met with your
4   attorney, Mr. Zajdel, who is here with us this
5   morning?
6         A.     Yes.
7         Q.     How many times did you meet with him
8   to prepare for the deposition?
9         A.     Just once.
10        Q.     When was that?
11        A.     No.  Tuesday.  I spoke with Cory,
12  I'm sorry.  Not Cory, David, my apologies.
13        Q.     Okay.
14        A.     I spoke with David on Tuesday.
15        Q.     Okay.  And David is another one of
16  your lawyers?
17        A.     Yes.
18        Q.     So you spoke with David by the
19  telephone on Tuesday?
20        A.     Yes.
21        Q.     Okay.  For how long did you talk to
22  David?
23        A.     Not long.  A few minutes.
24        Q.     Less than 30 minutes?
25        A.     Yes.
```

JA3570

Case 2:22-cv-01995-WB Document 22-5 Filed 12/12/23 Page 168 of 202
Case 2:22-cv-01995-WB Document 22-5 Filed 12/12/23 Page 168 of 202
Jasmine Riggins

```
 1              Q.     Did you look at any documents while

 2     you were talking to David?  Did David show you any

 3     documents?

 4                     MR. ZAJDEL:  Objection.  Don't

 5              answer that.

 6              Q.     I'll rephrase.

 7              Did you look at any documents in connection

 8     with preparing for the deposition?

 9              A.     Yes.

10              Q.     What documents did you look at?

11              A.     My deposition documents.

12              Q.     So your deposition transcript from

13     the Maryland Dimensions case?

14              A.     Yes.

15              Q.     The transcript, the little booklet

16     that had questions and answers, is that what you're

17     referring to?

18              A.     Yes.

19              Q.     When did you review that?

20              A.     A few days ago.

21              Q.     What other documents did you review

22     before coming in to testify today?

23              A.     Just that.

24              Q.     Okay.  Did you do any online

25     Internet research or review before coming in to
```

```
 1   testify today?

 2          A.     Not today.

 3          Q.     Have you done any Internet research

 4   in connection with this lawsuit ever?

 5          A.     Yes.

 6          Q.     When was that?

 7          A.     About a few weeks ago.  It's been

 8   ongoing, different times.

 9          Q.     What did you look at a few weeks ago

10   online in connection with this lawsuit?

11          A.     Just the Akoda case, just about the

12   case and what was going on with him.  Just

13   basically researching him pretty much.

14          Q.     Okay.  So you were, for lack of a

15   better word, Googling Dr. Akoda's name and looking

16   online for information about him?

17          A.     Something like that, yes.

18          Q.     You tell me what you did.  I wasn't

19   there.

20          A.     Well, basically I was just looking

21   at, just looking at the things that were posted

22   years ago.

23          Q.     Okay.

24          A.     About, you know, the fraud, him

25   being a fraud and everything like that.
```

```
 1            Q.      And what kind of things were they?
 2    Were they newspaper articles?
 3            A.      No.
 4            Q.      Were they court filings?
 5            A.      I don't recall.
 6            Q.      Were they -- what do you recall
 7    about what they were?
 8            A.      Just about him being fraudulent.  I
 9    don't really recall word for word.
10            Q.      And you said you looked at those few
11    weeks ago?
12            A.      Uh-huh.
13            Q.      Was that before or after you knew
14    you were going to give a deposition in this case?
15            A.      It was before.
16            Q.      And other than talking with your
17    counsel on Tuesday of this week, did you have any
18    additional conversations with anyone before coming
19    in to testify here today?
20            A.      I've spoken to Monique Russell, but
21    I haven't spoken to her in the past month or so.
22            Q.      When was the last time you spoke
23    with Ms. Russell?
24            A.      I don't recall.  It's been a little
25    while.
```

1      Q.      Would it be more than a month or

2   less than a month?

3      A.      A little more than a month.

4      Q.      Did you ever text with Ms. Russell?

5      A.      No.

6      Q.      Did you ever email with Ms. Russell?

7      A.      I have.

8      Q.      And when was the last time you

9   emailed Ms. Russell?

10     A.      The last time I spoke with her.

11     Q.      So the last communication you had

12  with her, more than a month ago, was by email?

13     A.      Yes.

14     Q.      And what was the -- did your

15  communications have anything to do with Dr. Akoda?

16     A.      Yes.

17     Q.      What was the nature of your

18  communications with Ms. Russell about Dr. Akoda?

19     A.      Just about how I felt and how she

20  felt.

21     Q.      Okay.  Was this a communication that

22  she initiated or that you initiated?

23     A.      I initiated it.

24     Q.      And this is something that you have

25  in your emails?

JA3574

```
1            A.     I should.

2            Q.     Did you communicate with her through

3    like a Facebook direct message, or this was direct

4    message?

5            A.     Just like a Facebook message.

6            Q.     And this was a Facebook message in

7    the last month or so, a little more than a month

8    ago?

9            A.     Yes.

10           Q.     Okay.  And have you spoken with

11   Ms. Russell or communicated with Ms. Russell at any

12   time in the last month?

13           A.     No.

14           Q.     Have you spoken with Ms. Russell

15   about your lawsuit against ECFMG?

16           A.     I don't recall.

17           Q.     Did you speak with Ms. Russell about

18   your lawsuit against Dimensions Healthcare in

19   Maryland?

20           A.     Yes.

21           Q.     And what did you and Ms. Russell

22   discuss about the lawsuit against Dimensions

23   Healthcare in Maryland?

24           A.     We just talked about the lawsuit.

25   We didn't really -- I don't recall the full details
```

1    of our conversation.  She was asking me about how I

2    felt about it.  Just basically about our feelings.

3         Q.    And this was by email again, or was

4    this a phone call?

5         A.    I believe this was a phone call.  I

6    don't recall.  It could have been an email or phone

7    call.

8         Q.    As you sit here today, have you had

9    discussions with Ms. Russell at any point in time

10   about your lawsuit against ECFMG?

11        A.    I don't recall.

12        Q.    Do you still have a Facebook account

13   where you and Ms. Russell are connected as friends

14   through Facebook?

15        A.    Yes, but I don't have the password.

16   I can't recover the password.

17        Q.    Okay.  How did you communicate with

18   her by Facebook if you couldn't recover the

19   password?

20        A.    It's a messenger app that I had on

21   my old phone, but I have a new phone.

22        Q.    So some time between the last time

23   you communicated with Ms. Russell and today, you no

24   longer have access to the Facebook directory?

25        A.    I can get it, but I don't have

JA3576

1    access at this moment, no.

2          Q.     But that's something you can get?

3          A.     Yes.  It's a process you have to go

4    through.

5          Q.     At any point in time were you asked

6    to provide lawyers for ECFMG with any documents you

7    have related to Dr. Akoda or the lawsuit or your

8    feelings about Dr. Akoda, anything like that?

9                 MR. ZAJDEL:  Objection.  Form.

10               You can answer.

11         A.     So what is your question?

12         Q.     At any point in time after having

13   filed a lawsuit against ECFMG, did you ever become

14   aware of a request by lawyers for ECFMG for any

15   documents that you might have related to Dr. Akoda?

16                MR. ZAJDEL:  Objection.  That's

17               attorney-client privilege.

18                MR. SHAFFER:  I'm not asking for

19               the substance of the communication.  I'm

20               asking if she was aware.

21                MR. ZAJDEL:  I would suggest that

22               you ask it differently.

23   BY MR. SHAFFER:

24         Q.     Did you ever collect Facebook direct

25   messages, email communications, text messages that

1   you might have in your possession related to

2   Dr. Akoda and give them to anybody?

3          A.    No.  Did I ever collect it and give

4   it to anyone?

5          Q.    Yes.

6          A.    No.

7          Q.    Did you ever forward it to anybody

8   or pull it all together and provide it to anybody?

9          A.    No.

10          Q.    And I take it you were not asked to

11   do that?

12          A.    No.

13          Q.    And I think as you testified, at

14   least email communications or direct messaging

15   application messages you could still access, you

16   just can't do it while we're sitting here with your

17   new phone; correct?

18          A.    Correct.

19          Q.    Okay.

20              MR. SHAFFER:  Counsel, I'm going

21          to make a request for the documents that

22          are in the possession of Ms. Riggins that

23          are responsive to our requests for

24          production of documents which would

25          include these types of communications and

```
 1              which have not been produced.

 2                   MR. ZAJDEL:  I would suggest that

 3              you do that in writing so that we can

 4              respond in writing.

 5   BY MR. SHAFFER:

 6        Q.     Ms. Riggins, in preparing for the

 7   deposition today, you said you reviewed your

 8   deposition transcript from your deposition earlier

 9   this year in the Dimensions Healthcare case;

10   correct?

11        A.     Right.

12        Q.     In reviewing that deposition

13   transcript, did you identify any answers that you

14   gave that you now believe are wrong?

15        A.     I'm not sure.  Can you ask me that

16   again.

17        Q.     In reviewing the transcript, you

18   were under oath like you are today; right?

19        A.     Uh-huh.

20        Q.     You've now had a chance to review

21   that transcript before coming in to testify today.

22   And my question is whether when you read through

23   the transcript this week you said Oh, boy, I made a

24   mistake.  What I testified to wasn't correct in my

25   deposition in the Dimension case.
```

```
1            A.      No.

2            Q.      And part of this is to try to save

3    time today.  So I guess my question having read the

4    deposition just a few days ago, as you sit here

5    today do you still believe that everything you

6    testified earlier this year in the Dimensions

7    Healthcare deposition is true and accurate to the

8    best of your ability?

9            A.      Yes.

10           Q.      I'm going to jump around a little

11   bit then and try to hit on some questions just to

12   make sure I'm correct.  But if I jump around too

13   quickly and you don't follow where I'm going, just

14   let me know because I'm trying to, again, save some

15   time because we won't need to ask every question

16   that was asked in the Dimensions deposition again

17   today, okay?

18           A.      Okay.

19           Q.      Are you currently on any medication?

20           A.      No.

21           Q.      Is there any reason that you can

22   think of sitting here today that you couldn't

23   testify truthfully and to the best of your ability?

24           A.      No.

25           Q.      You mentioned your full name before
```

```
 1   as Jasmine Riggins, correct?

 2          A.    Yes.

 3          Q.    Is your birthday July 4, 1992?

 4          A.    Yes.

 5          Q.    And how old would that make you?

 6          A.    27.

 7          Q.    Are you currently married?

 8          A.    No.

 9          Q.    Do you have any children?

10          A.    Yes.

11          Q.    How many children?

12          A.    Three.

13          Q.    And can you give me their names and

14   their current ages?

15          A.    Santana is 10, Messiah is 10, Taniya

16   will be two next month.

17          Q.    Are Santana and Messiah both boys?

18          A.    Yes.

19          Q.    And Taniya is a girl?

20          A.    Yes.

21          Q.    And earlier this year in your

22   deposition in the Dimensions case you indicated

23   that you were engaged.  Is that status the same, or

24   has it changed?

25          A.    It's the same.
```

```
 1          Q.      What's your current address?

 2          A.      3699 J Street, Apartment 301, N.E.,

 3   Washington, D.C. 20019.

 4          Q.      How long have you lived there?

 5          A.      Almost a year.

 6          Q.      You have a high school GED, is that

 7   right?

 8          A.      Yes.

 9          Q.      Do you have any other subsequent

10   education beyond that?

11          A.      No.

12          Q.      Are you currently employed?

13          A.      Yes.

14          Q.      Where is that?

15          A.      Potbelly Sandwich Shop.

16          Q.      When did you start working there?

17          A.      April of this year.

18          Q.      And you've worked at Potbelly's

19   since April of this year?

20          A.      Yes.

21          Q.      And how many hours a week,

22   approximately, do you work?

23          A.      About 22.  Slower season.

24          Q.      So is this part-time work?

25          A.      Yes.
```

1          Q.      Prior to working at Potbelly

2    starting earlier this year, had you worked -- had

3    you worked anywhere else in 2019, or was there a

4    period of time when you weren't working?

5          A.      I was working at the Home Depot.

6          Q.      And how long -- did you leave

7    directly from Home Depot and go to Potbelly, or was

8    there a break?

9          A.      There was about a month break, a

10   month or so.

11         Q.      And again for purposes of trying to

12   speed this up, in the Maryland Dimensions

13   Healthcare litigation you gave some written

14   response to questions.

15         Do you recall having done that?  We call

16   them interrogatories.

17         A.      Yes.

18         Q.      And one of the interrogatories you

19   were asked in that case was to list your prior

20   employment.  And you indicated in that case that

21   you had started working at Home Depot in March of

22   2017.  Does that sound correct?

23         A.      Yes.

24         Q.      And so you worked at Home Depot from

25   March of 2017 to about February or March of 2019?

```
 1              A.      Yes.

 2              Q.      And then you started at Potbelly in

 3    April of 2019 and are still working there through

 4    today?

 5              A.      Yes.

 6              Q.      Great.  Prior to working at Home

 7    Depot starting in March of 2017, was there a period

 8    of time before that that you were not working?

 9    Immediately before, I'm looking at the beginning

10    part of 2017.

11              A.      No.  No.

12              Q.      Where were you working when you

13    went, before you went to Home Depot?

14              A.      At Paul Bakery.

15              Q.      Got it.  And how long did you work

16    there, approximately?

17              A.      About almost two years.

18              Q.      And would it be correct then to say

19    that you worked at Paul Bakery from about March of

20    2015 to March of 2017?

21              A.      Yes.

22              Q.      Was there a period of time between

23    Paul Bakery and Home Depot when you weren't

24    working, or did you go right from one to the next?

25              A.      Yes, that's exactly what happened.
```

 1    I went from one to the next.

 2              Q.    Again, just to make sure that I'm

 3    not missing anything, before coming in to testify

 4    today, you didn't review the complaint that was

 5    filed against ECFMG in the federal court or the

 6    court in Pennsylvania; correct?

 7              A.    You said I didn't.

 8              Q.    You didn't review that?

 9              A.    Not that I can recall.  I'm sorry.

10    I can't recall.

11              Q.    Okay.  As you sit here today, you

12    don't have a recollection of looking at the

13    complaint that you filed against ECFMG?

14              A.    Oh, yes.  I'm sorry.  I'm sorry.

15    I'm sorry.  I didn't understand what you were

16    asking me.

17              Q.    That's all right.

18              A.    I did receive that -- did I get that

19    in the email?  I believe so.  I'm sorry.

20              Q.    That's okay.  When you say you think

21    you may have received it in an email, who was the

22    email from?

23              A.    I'm sure I've seen it.  I'm sure

24    I've seen it.  Yeah, I'm sure I've seen it.

25              Q.    Do you know when it was filed,

```
 1   approximately?

 2          A.     I don't recall.

 3          Q.     Do you know whether it was filed in

 4   2019?  Since January or earlier than that.

 5          A.     I'm sorry, I don't recall.

 6          Q.     Okay.  That's okay.  Again, I'm just

 7   asking for your best understanding and recollection

 8   as you sit here today without guessing.

 9          But I take it that since you can't remember

10   when you might have seen it but you think you did

11   that you didn't review it specifically to come in

12   here today.  Is that correct?

13          A.     That's correct.

14          Q.     And I take it from your earlier

15   answers, but I just want to make sure, that when

16   you said a couple of weeks ago you went online

17   looking at Dr. Akoda information, you didn't go to

18   the ECFMG website, for example; correct?

19          A.     Correct.

20          Q.     Have you ever gone to the ECFMG

21   website?

22          A.     No.

23          Q.     And you've not ever reviewed any of

24   the information that is on the ECFMG website,

25   correct?
```

JA3586

```
 1          A.     No.

 2          Q.     When was the first time you ever

 3    heard of ECFMG?

 4          A.     From my attorneys.

 5          Q.     Okay.  And approximately when was

 6    that?

 7          A.     I don't recall.

 8          Q.     Is it fair to say that at no point

 9    prior to having spoken with the attorneys that

10    currently represent you that you had ever heard of

11    ECFMG?

12          A.     Repeat that again.

13          Q.     Sure.  Prior to speaking with your

14    current attorneys who are bringing the lawsuit

15    against ECFMG, you had never even heard of ECFMG?

16          A.     That is correct.

17          Q.     Okay.  As you sit here today, what

18    do you know about ECFMG?

19          A.     I know that they're a business who

20    gives foreigners their certificates or give them

21    permission to practice medicine in the United

22    States.

23          Q.     Do you know whether or not ECFMG is

24    a nonprofit organization?

25          A.     I do not.
```

Case 2:18-cv-05629-JDW Document 22-5 Filed 12/12/22 Page 1698 of 3041
Case 2:18-cv-05629-JDW Document 22-5 Filed 12/12/22 Page 1698 of 3041
Jasmine Riggins

1    Q.    Do you know whether people who apply

2    to ECFMG could be U.S. citizens or not?

3    A.    I do not.

4    Q.    You don't know?

5    A.    You said -- no, because it's for

6    foreigners; correct?

7    Q.    I'm trying to get your

8    understanding.  So your understanding is that a

9    U.S. citizen could not apply to ECFMG for

10   certification or any services by ECFMG.  It's only

11   for foreigners?

12   A.    Correct.

13   Q.    And is it your understanding, I

14   think you said that -- and please correct me

15   because I'm just trying to remember back what you

16   said -- that ECFMG is responsible for certifying

17   you to practice medicine in the United States.  Is

18   that correct?

19   A.    I believe so.

20   Q.    Okay.  And what is it that you think

21   ECFMG does to certify people to practice medicine

22   in the United States?

23   A.    Give an exam.  I'm not -- give an

24   exam.

25   Q.    Okay.

```
 1            A.      Questions, interviews, background

 2      checks.

 3            Q.      Okay.  And your understanding is

 4      that among the things that ECFMG does is do

 5      background checks on foreigners who want to come

 6      and practice medicine in the United States?

 7            A.      Yes.

 8            Q.      And what's the basis for that

 9      understanding?

10                    MR. ZAJDEL:  Objection.  You can

11              answer.

12                    MR. SHAFFER:  I'll rephrase the

13              question.

14      BY MR. SHAFFER:

15            Q.      Other than from information told to

16      you by your lawyers, do you have any other source

17      of information of any kind about what ECFMG is,

18      what it does, what it doesn't do, who can apply,

19      who can't apply, what types of things ECFMG

20      requires?

21            Do you have any source of information about

22      any of that other than your lawyers?

23            A.      No.

24            Q.      I'm sorry?

25            A.      No.
```

Jasmine Riggins

```
1              Q.    Okay.  We asked a couple of
2    questions earlier that referenced, and I think your
3    answer might have been the first to reference a
4    Dr. Akoda.
5              Do you recall mentioning Dr. Akoda?
6              A.    Not a Dr. Akoda, no.
7              Q.    You understand that there is an
8    individual who you saw in connection with one of
9    the children that you gave birth to, correct?
10             A.    I'm sorry?
11             Q.    Well, I'll rephrase that.
12             So you're not aware of a Dr. Akoda.  You
13   never heard that phrase before?
14             A.    Yes, I've heard that -- I heard that
15   phrase, yes.
16             Q.    Okay.
17             A.    Can I run to the bathroom, please?
18   I'm sorry.  You're in the middle of a question.  My
19   apologies.
20             Q.    You answered the question, which was
21   you've heard reference to a Dr. Akoda.  So we'll
22   take a break and then go ahead to the rest room and
23   then we'll come back.
24                   THE VIDEOGRAPHER:  We are going
25            off the record.  The time is 11:53 a.m.
```

JA3590

Jasmine Riggins

```
 1                    (Recess)

 2                    THE VIDEOGRAPHER:  We are back on

 3             the record.  The time is 11:57 a.m.

 4   BY MR. SHAFFER:

 5        Q.    Okay, Ms. Riggins, we're back on the

 6   record, and we were talking before a quick break

 7   there about an individual named Dr. Akoda, an

 8   individual, and I think you took some issue with

 9   calling him Dr. Akoda.  Why is that?

10        A.    He's not a doctor.

11        Q.    And why do you say that?

12        A.    Because he doesn't have credentials

13   and certifications to be a doctor.

14        Q.    Do you know -- and just so again I

15   want to make sure that we're talking about the same

16   things today so we don't have to go back later on,

17   when we refer to an individual known as Dr. Akoda

18   or the person that you believe is not a doctor

19   about, we're talking about the person that you saw

20   in connection with the birth of your second child;

21   correct?

22        A.    Correct.

23        Q.    And, at the time that you were being

24   seen by him and actually gave birth with him

25   through C-section, correct?
```

```
 1            A.      Correct.

 2            Q.      You understood and knew him to be

 3    Dr. Akoda?  Correct?  I'm sorry.

 4            A.      Correct.

 5            Q.      And since that time you've come to

 6    learn that Dr. Akoda pled guilty to using a

 7    different Social Security number, correct?

 8            A.      Correct.

 9            Q.      Okay.  And so based on that

10    information, it's your belief that the person that

11    you knew as Dr. Akoda is not a doctor?

12            A.      Correct.

13            Q.      Okay.  Do you know whether that

14    individual went to medical school?

15            A.      No, no.

16            Q.      He did not go to medical school?

17            A.      No.

18            Q.      How do you know that?

19            A.      I'm saying no, I don't.

20            Q.      You don't know whether he went?

21            A.      Yeah.

22            Q.      As you sit here today, do you have

23    any information or facts that would allow you to

24    say he didn't go to medical school?

25            A.      The fact that he pled guilty and the
```

JA3592

1  fact that he had fake credentials.

2      Q.    Okay.  And the fact that he pled

3  guilty, he didn't plead guilty to not going to

4  medical school; correct?

5      A.    Correct.

6      Q.    And do you know whether or not

7  Dr. Akoda's medical school in Nigeria ever verified

8  the authenticity of his diploma to Educational

9  Commission?

10          MR. ZAJDEL:  Objection.  Assumes

11      facts.  You can answer that question.

12      Q.    Do you know whether or not?

13      A.    No.

14      Q.    Would it surprise you to learn that

15  a medical school in Nigeria verified Dr. Akoda's

16  diploma to ECFMG?

17          MR. ZAJDEL:  Objection.  Assumes

18      facts.

19      Q.    You can go ahead and answer.

20      A.    Okay.  You said would it surprise

21  me?

22      Q.    Yes.

23      A.    Yes.

24      Q.    Why is that?

25      A.    Because it would be a surprise to me

JA3593

1  that he had information provided that he's a real

2  doctor or went to medical school.

3          Q.     During the time that you were being

4  treated by Dr. Akoda, you never had any reason to

5  question whether or not he had gone to medical

6  school; correct?

7          A.     When I was being seen by him?  No.

8  I wouldn't -- had I have known I wouldn't have

9  chosen him.

10         Q.     And there was nothing about his care

11 and treatment of you in connection with your

12 pregnancy and the birth of Messiah that ever caused

13 you to doubt that he had gone to medical school and

14 was a real medical doctor, correct?

15         A.     You said during my treatment with

16 him, no.

17         Q.     When was it that you first received

18 any information that caused you to question whether

19 the person you had seen, Dr. Akoda, was not a real

20 doctor, as you say?

21         A.     You said when was --

22         Q.     When did you first, first come to

23 have any information where you said everything

24 seemed fine while I was being treated with him but

25 now there's a problem?  When was that?

```
 1           A.      Well, there were problems after my
 2   pregnancy, after the delivery, I had issues.
 3           Q.      What were those issues?
 4           A.      Pain, severe pain in my stomach and
 5   my abdominal at work, I would have pain throughout
 6   the day.  And I couldn't have my tubes tied due to
 7   the damaged tissues on my C-section, which caused a
 8   lot of pain.
 9           Q.      And so this is after the birth of
10   Messiah, and Messiah was born by C-section;
11   correct?
12           A.      Correct.
13           Q.      And you said at a later point in
14   time you wanted to have a tubal ligation and were
15   told you couldn't have one?
16           A.      Correct.
17           Q.      And you were told it was because of
18   scarring that was present from earlier C-sections?
19           A.      Correct.
20           Q.      And was that scarring that you say
21   precluded you from having the tubal ligation, that
22   was something you attribute to the C-section
23   Dr. Akoda did?
24           A.      Correct.
25           Q.      And why do -- why do you do that?
```

1        A.      Because it was able to be done

2    before, but I decided against it.

3        Q.      When was it able to be done before?

4        A.      With my first son.

5        Q.      Do you know whether or not -- and

6    your first son, Santana; correct?

7        A.      Correct.

8        Q.      Was born by C-section, correct?

9        A.      Correct.

10       Q.      And who was the doctor that you saw

11   for Santana?

12       A.      I don't recall her name.

13       Q.      Was it at Howard University?

14       A.      Correct.

15       Q.      And do you know whether or not there

16   was any scarring that was later identified from the

17   C-section that you received at Howard University?

18       A.      No, there was not.  There wasn't

19   any.

20       Q.      If there had been some, do you think

21   that's the kind of thing that would be shown in

22   medical records of you that would have come later?

23       A.      Could you repeat your question.

24       Q.      Sure.  You told me you don't think

25   there was any scarring from the first C-section,

```
 1   correct?

 2          A.     Correct.

 3          Q.     And I take it that that's because

 4   immediately following the C-section you were told

 5   you could have a tubal ligation?

 6          A.     No.  Correct, correct, I'm sorry.

 7          Q.     Okay.  But then after the second,

 8   the birth of your second child and the second

 9   C-section, you were told you couldn't have one?

10          A.     After the third.

11          Q.     After the third?

12          A.     Correct.

13          Q.     And after the third, you were told

14   that there was significant scarring from your other

15   C-section; correct?

16          A.     Correct.

17          Q.     If Dr. Akoda had seen significant

18   scarring at the time that he did the second

19   C-section, that would suggest that that scarring

20   came from the first C-section; right?

21          A.     Correct.

22          Q.     Because scarring doesn't happen

23   overnight.  It takes time to develop.  Correct?

24          A.     Correct.

25                        (Exhibit 1, medical records,
```

1                  was marked for identification.)

2        Q.    Ms. Riggins, we're handing you

3   what's been marked as Riggins-1, which I'll

4   represent to you is medical records that relate to

5   your treatment at Prince George Hospital Center in

6   2013.

7        Could you take a quick look at that, and

8   then I'll have some quick questions.

9        A.    (Witness complies with request.)

10       Q.    Just let me know when you're ready.

11              MR. ZAJDEL:  Put it on the record

12          that we reserve the right to make

13          everything confidential after the

14          deposition.

15       Q.    I'm not going to ask you about every

16   word, but let me focus on a couple of things here.

17       So Riggins-1 is a document Bates labeled

18   Plaintiff's -2024 and -2025, which again I'll

19   represent to you was produced to us in this case,

20   and it appears to be an operative report for you,

21   Jasmine Riggins.  And it references a date of a

22   procedure on 3/18/2013.

23       Do you see on the top part of the page?

24       A.    Yes.

25       Q.    Did you have a procedure at Prince

```
1    George's County on 3/18/2013?

2           A.    Yes.

3           Q.    What did you have?

4           A.    A C-section.

5           Q.    That's when Messiah was born?

6           A.    Yes.

7           Q.    And you can see that this is a

8    two-page record signed by Charles Akoda, M.D. --

9    not signed but his name appears at the end of the

10   document.  Correct?

11          A.    Yes.

12          Q.    And if you look -- well, the top of

13   the page there's a fax server date and time.  It

14   says, "3/19/2013 at 2:42:42 p.m."

15          Do you see that?

16          A.    Yes.

17          Q.    So does this appear to be a record

18   then that would have been created and sent

19   immediately after your C-section with Messiah in

20   March of 2013?

21                MR. ZAJDEL:  Objection.

22          A.    Yes.

23          Q.    That's the date you had the

24   C-section, right, 3/18/2013?

25          A.    Yes.
```

JA3599

```
 1              Q.     If you look at the description here

 2    of what occurred, and it's a little bit technical

 3    in medical terms, but if you look at the findings

 4    at the bottom of page 1.  So flip back to the first

 5    page of it.  Under Findings it says, "Male infant,

 6    encephalic presentation."

 7              Do you see that?

 8              A.     Yes.

 9              Q.     Do you understand that to be

10    Messiah, when he went in to do the C-section,

11    that's the male infant that he saw?

12              A.     Yes.

13              Q.     Okay.  And the next sentence,

14    section of that finding says, "Significant scarring

15    and adhesion formation."

16              Do you see that?

17              A.     Yes.

18              Q.     And so does that indicate that in

19    addition to finding Messiah when he went in to do

20    the C-section, he also saw significant scarring and

21    adhesion formation section?

22              A.     Okay.

23              Q.     Right?

24              A.     Okay, yes.

25              Q.     That's what it says, right?
```

1          A.     Uh-huh.

2          Q.     I'm sorry.

3          A.     Yes, yes, yes, yes.  My children,

4   I'm sorry.

5                    THE VIDEOGRAPHER:  We are going

6               off the record.  The time is 12:11 p.m.

7                         (Recess)

8                    THE VIDEOGRAPHER:  We are back on

9               the record.  The time is 12:24 p.m.

10                   MR. SHAFFER:  This is Brian

11              Shaffer for ECFMG.  We're back on the

12              record after a short break.

13                   We've had a couple of logistical

14              issues come up this morning with respect

15              to Ms. Riggins and her child care, and we

16              got started a little bit late this morning

17              due to some travel and traffic issues.

18              And so we've been talking offline here to

19              try to solve for those things and make

20              sure that we get the deposition completed.

21                   And what we've discussed here is

22              that we will adjourn the deposition today

23              now with the questions that we've gotten

24              asked and answered so far.  We will

25              reconvene on Monday morning, the 16th,

```
 1              here at the same place starting at 9:30,

 2              and we will pick up with Ms. Riggins'

 3              deposition at that point in time.

 4                   This is being done as an

 5              accommodation to schedules and not for any

 6              other reason, and so for that reason I've

 7              discussed with both counsel and

 8              Ms. Riggins the understanding that she'll

 9              have no substantive discussions with

10              anyone, including her counsel, any person,

11              witness, Ms. Russell, anybody else about

12              the case, about her testimony here today,

13              her testimony that she'll give on Monday.

14              It will be as if we were picking up right

15              now.  Instead we will be picking up Monday

16              at 9:30.

17                   That will include no text messages,

18              no, emails.  She also had agreed that

19              she'll not do any research or go online or

20              look at any documents or do anything other

21              than what she came here today prepared to

22              talk about.

23                   Is that a correct recitation of our

24              agreement?

25                   MR. ZAJDEL:  Yes.
```

```
 1                    THE WITNESS:  Yes.

 2                    MR. ZAJDEL:  With the exception

 3           that I'm certainly going to send an email

 4           with a date and the time to be here on

 5           Monday.  You said no communication.  I

 6           just want to make sure, no substantive

 7           communication about the contents of the

 8           deposition.  That's agreed.

 9                    MR. SHAFFER:  And then we will

10           continue with Ms. Riggins' deposition on

11           Monday at 9:30.  After we complete that

12           we'll move forward with the other

13           deposition that's been noticed for 10:30

14           but that we've agreed will start after

15           the completion of Ms. Riggins.  Correct?

16                    MR. ZAJDEL:  Yes, and I will take

17           care of adjusting Ms. Russell to let her

18           know.

19                    MR. SHAFFER:  I think that is it

20           for the record here today, and we will

21           pick back up on Monday.

22                    THE VIDEOGRAPHER:  We are going

23           off the record.  The time is 12:27 p.m.

24                    (Proceedings adjourned at

25           12:26 p.m.)
```

```
 1    DISTRICT OF COLUMBIA:                    SS

 2       I, Barbara DeVico, a Registered Court Reporter

 3    of the District of Columbia, do hereby certify

 4    that these proceedings took place before me at the

 5    time and place herein set out, and the proceedings

 6    were recorded stenographically by me and this

 7    transcript is a true record of the proceedings.

 8

 9       I further certify that I am not of counsel to

10    any of the parties, nor an employee of counsel nor

11    related to any of the parties, nor in any way

12    interested in the outcome of this action.

13

14

15

16                    _____

17                    BARBARA DeVICO, CRR, RMR

18

19    _____

20    My Commission Expires:

21    July 31, 2023

22

23

24

25
```

Jasmine Riggins

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


- - - - - - - - - - - - - - - - X

MONIQUE RUSSELL, JASMINE          :

RIGGINS, ELSA M. POWELL           :

and DESIRE EVANS,                 : Civil Action No.

    Plaintiffs,        :  18-5629

v.                                :

EDUCATIONAL COMMISSION FOR        :

FOREIGN MEDICAL GRADUATES,        :

    Defendant.         :

- - - - - - - - - - - - - - - - X


Volume II

Continued Videotaped Deposition Of JASMINE RIGGINS

Washington, D.C.

Monday, September 16, 2019

9:56 a.m.



Job No. 88391

Pages:  44 - 145

Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

JA3605

Jasmine Riggins

```
 1

 2

 3

 4

 5                                September 16, 2019

 6                                9:56 a.m.

 7

 8

 9

10        Continued Videotaped Deposition of JASMINE

11   RIGGINS, held at the law offices of Morgan, Lewis

12   & Bockius, LLP, 1111 Pennsylvania Avenue,

13   Northwest, Washington, D.C., before Dana C. Ryan,

14   Registered Professional Reporter, Certified

15   Realtime Reporter, Certified Shorthand Reporter

16   (GA) and Notary Public in and for the District of

17   Columbia.

18

19

20

21

22

23

24

25
```

Jasmine Riggins

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         CORY L. ZAJDEL, Esquire

 5         Z Law, LLC

 6         2345 York Road, #B-13

 7         Timonium, Maryland 21093

 8         Telephone:  (443) 213-1977

 9         Email: clz@zlawmaryland.com

10

11    ON BEHALF OF THE DEFENDANT:

12         BARRY W. SHAFFER, Esquire

13         MATTHEW D. KLAYMAN, Esquire

14         Morgan, Lewis & Bockius, LLP

15         1701 Market Street

16         Philadelphia, Pennsylvania 19103

17         Telephone: (215) 963-5100

18         Email: barry.shaffer@morganlewis.com

19         Email: matthew.klayman@morganlewis.com

20

21    Also present:

22         David Campbell, Videographer

23

24

25
```

JA3607

Jasmine Riggins

```
 1                   C O N T E N T S
 2   EXAMINATION OF JASMINE RIGGINS:          PAGE:
 3   By Mr. Klayman                              51
 4   By Mr. Shaffer                             111
 5
 6
 7
 8                   E X H I B I T S
 9           (Attached to the Transcript)
10   RIGGINS DEPOSITION                        PAGE:
11   Exhibit 2    September 23, 2016 J Unity     71
12                Health Care Progress Note
13                For Jasmine Riggins, Bates
14                Stamped Plaintiffs0000006408
15                Through 0000006411
16   Exhibit 3    February 19, 2017 J Unity     78
17                Health Care Progress Note
18                For Jasmine Riggins, Bates
19                Stamped Plaintiffs0000007576
20                Through 0000007579
21
22
23
24
25
```

JA3608

Jasmine Riggins

```
 1        E X H I B I T S   C O N T I N U E D

 2            (Attached to the Transcript)

 3   RIGGINS DEPOSITION                        PAGE:

 4   Exhibit 4    Plaintiff Jasmine Riggins'      82

 5                Supplemental Answers To First

 6                Set Of Interrogatories And

 7                Supplemental Responses To

 8                First Set Of Requests For

 9                Production Of Documents

10   Exhibit 5    September 7, 2017 J Unity       87

11                Health Care Progress Note

12                For Jasmine Riggins, Bates

13                Stamped Plaintiffs0000006442

14                Through 0000006444

15   Exhibit 6    October 13, 2017 J Unity        90

16                Health Care Progress Note

17                For Jasmine Riggins, Bates

18                Stamped Plaintiffs0000006478

19                Through 000000479

20   Exhibit 7    Class Action Complaint          95

21   Exhibit 8    November 9, 2017 J Unity        96

22                Health Care Progress Note

23                For Jasmine Riggins, Bates

24                Stamped Plaintiffs0000006480

25                Through 0000006482
```

Jasmine Riggins

```
 1         E X H I B I T S   C O N T I N U E D

 2              (Attached to the Transcript)

 3    RIGGINS DEPOSITION                          PAGE:

 4    Exhibit 9     Complaint Filed To Initiate    101

 5                  The Lawsuit On November 14,

 6                  2018

 7    Exhibit 10    April 18, 2019 J Unity         103

 8                  Health Care Progress Note

 9                  For Jasmine Riggins, Bates

10                  Stamped Plaintiffs0000006488

11                  Through 0000006490

12    Exhibit 11    Plaintiff Jasmine Riggins'     105

13                  Responses To Defendants'

14                  Requests For Admissions,

15                  Bates Stamped

16                  Plaintiffs0000006513 Through

17                  0000006537

18    Exhibit 12    Stipulation Of Dismissal       114

19                  Without Prejudice, Bates

20                  Stamped Plaintiffs0000118860

21                  Through 0000118863

22    Exhibit 13    First Amended Class Action     120

23                  Complaint

24    Exhibit 14    Claimants' Certificate Of      124

25                  Merit
```

JA3610

Jasmine Riggins

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now on the
 3   record.  My name is David Campbell.  I am the
 4   videographer for Golkow Litigation Services.
 5              Today's date is September 16th, 2019,
 6   and the time is 9:56 a.m.
 7              This video deposition is being held at
 8   1111 Pennsylvania Avenue, Northwest, Washington,
 9   D.C. 20004, in the matter of Monique Russell, et
10   al., versus Educational Commission for Foreign
11   Medical Graduates.  This is in the United States
12   District Court for the Eastern District of
13   Pennsylvania, Number 18-5629.
14              The deponent today is Jasmine Riggins.
15              The court reporter is Dana Ryan.
16              Counsel, will you please identify
17   yourselves for the record, and then the court
18   reporter will please swear in the witness and we
19   can proceed.
20              MR. ZAJDEL:  Cory Zajdel on behalf of
21   Ms. Riggins.
22              MR. SHAFFER:  Brian Shaffer on behalf
23   of defendant Educational Commission for Foreign
24   Medical Graduates.
25              MR. KLAYMAN:  Matthew Klayman, counsel
```

Case 2:18-cv-09535-PD Document 22-5 Filed 12/12/22 Page 1722 of 3041
Case 2:18-cv-09535-PD Document 22-5 Filed 12/12/22 Page 1722 of 3041
Jasmine Riggins

```
 1   for the Educational Commission for Foreign Medical

 2   Graduates, the defendant.

 3             (Mr. Shaffer exits the deposition

 4   proceedings.)

 5             - - - - - - - - - - - - - - -

 6               JASMINE RIGGINS,

 7   having been duly sworn, testified as follows:

 8             - - - - - - - - - - - - - - -

 9       EXAMINATION BY COUNSEL FOR THE DEFENDANT

10       BY MR. KLAYMAN:

11       Q      Good morning, Ms. Riggins.

12       A      Good morning.

13       Q      We met a moment ago, but I'm Matthew

14   Klayman.  I'm colleagues with Brian Shaffer.  I'm

15   going to ask you some questions this morning.

16       A      Okay.

17       Q      We're picking up from a deposition that

18   began on Thursday; correct?

19       A      Correct.

20       Q      Now, between Thursday and today, have

21   you had any substantive communications about your

22   testimony with anybody?

23       A      No.

24       Q      Have you done any independent research

25   about the substance of your testimony or the facts
```

Page 52

1   or circumstances of the case?

2        A     No.

3        Q     I understand that on Thursday you were

4   asked about certain communications that you had

5   with Monique Russell.

6              Do you -- do you remember that?

7        A     Yes.

8        Q     Certain written communications.

9              And I understand that you are -- that

10  there was some discussion about you going to look

11  for them or gather them.

12             Do you recall that?

13       A     Correct.

14       Q     Did you do anything like that?

15       A     I have not.

16       Q     Were you asked to do that?

17             MR. ZAJDEL:  Objection.  That would be

18  attorney-client privilege.

19             Well, to the extent you're not asking

20  attorney-client privilege, I could see how that

21  would be answerable.

22             So you can answer the question to the

23  extent he's not asking you about communications

24  between you or any of your attorneys.

25             THE WITNESS:  Okay.  So could you

1   repeat your question?

2        BY MR. KLAYMAN:

3        Q     So were you asked to look for copies of

4   communications you had with Monique Russell?

5        A     Yes.

6        Q     Did you find any communications with

7   Monique Russell?

8        A     I didn't look for them.

9        Q     Oh, you didn't look for them?

10       A     No.

11       Q     Okay.  Is that something you would be

12  willing to do?

13       A     Yes.

14       Q     Okay.  Is that -- when do you think

15  you'd be able to complete a search for

16  communications you had with Monique Russell?

17       A     I will try to get that done by the end

18  of this week.

19       Q     Okay.

20       A     Yes.

21       Q     Great.

22             This was the subject of written

23  communications from Mr. Shaffer, my colleague, so

24  I want to just make sure that we have on the

25  record that you'll go take a look and that

Jasmine Riggins

1   responsive communications would be produced.

2             MR. ZAJDEL:  Well, she testified she

3   will look for them and she'll produce them to me,

4   and then we'll decide whether it's discoverable,

5   and if they are, we'll produce them.

6             MR. KLAYMAN:  Sure.

7         BY MR. KLAYMAN:

8         Q    Now, at the beginning of your

9   deposition on Thursday, I understand Mr. Shaffer

10  went through some -- some ground rules about

11  telling the truth, not speaking over one another,

12  that kind of thing.

13            Do you remember that?

14        A    Yes.

15        Q    Is that -- I just want to make sure

16  that we're still on the same page, so I don't --

17  so if you could, to make sure that the transcript

18  is clear, I won't speak over you and you won't

19  speak over me.

20        A    We didn't --

21        Q    Do you --

22        A    -- have --

23        Q    -- understand?

24        A    -- that issue.

25        Q    Great.

Jasmine Riggins

```
 1      A      We didn't have that issue at all.
 2      Q      Just making sure.
 3      A      No, that was not an issue.
 4      Q      Okay.  Great.
 5             Okay.  Now, we're here today because
 6      you've brought a lawsuit against the Educational
 7      Commission for Foreign Medical Graduates; correct?
 8      A      Correct.
 9      Q      I'm going to refer to them as ECFMG, so
10      you'll understand what I mean when I say ECFMG?
11      A      Correct.
12      Q      And you allege that you've suffered
13      emotional distress; correct?
14      A      Correct.
15      Q      And that distress was the result of
16      learning about Dr. Akoda's guilty plea; is that
17      correct?
18      A      I'm sorry?
19      Q      So the -- the emotional distress that's
20      the subject of the lawsuit --
21      A      Uh-huh.
22      Q      -- when did that start?
23      A      Right when I found out about him being
24      a fake doctor.
25      Q      And when about was that, if you recall?
```

Jasmine Riggins

1    A    A couple of years ago.

2    **Q    Was it, you know, talking 2015, 2016?**

3    A    Yeah, around that time, 2016.

4    **Q    Okay.  Now, is emotional distress the**

5    **only injury that you're suing for in this lawsuit?**

6    A    Correct.

7    **Q    And you're suing ECFMG because you**

8    **contend that ECFMG is responsible, in whole or in**

9    **part, for your emotional distress?**

10   A    Correct.

11   **Q    Do you also contend that Prince**

12   **George's Hospital Center is responsible, in whole**

13   **or in part, for your emotional distress?**

14   A    Correct.

15   **Q    Do you also contend that the Maryland**

16   **Board of Physicians is responsible, in whole or in**

17   **part, for your emotional distress?**

18   A    Correct.

19   **Q    Do you also contend that Dr. Abdul**

20   **Chaudry is responsible, in whole or in part, for**

21   **your emotional distress?**

22   A    Correct.

23   **Q    Do you also contend that the American**

24   **Board of Obstetricians and Gynecologists are**

25   **responsible, in whole or in part, for your**

Jasmine Riggins

1   emotional distress?

2        A    Correct.

3        Q    So you would say that anyone that you

4   contend did anything to enable Dr. Akoda to

5   practice medicine is responsible, in whole or in

6   part, for your emotional distress?

7        A    Correct.

8        Q    Tell me about your emotional distress.

9        A    I feel angry, sad, embarrassed,

10  ashamed.  My emotions are, like, all over the

11  place.  I can't even put them into as many words

12  that I can think of.  I just can't believe that

13  someone would do that.  It's beyond me.

14       Q    And when you say "that," what are you

15  referring to?

16       A    To pretend to be someone that they're

17  not, to practice something that they had no rights

18  to practice without the proper process of it all.

19       Q    And by "proper process of it all," what

20  do you mean?

21       A    Going about it the correct way.

22       Q    And by "the correct way," you mean

23  what?

24       A    Receiving proper documents, being

25  truthful, being honest, doing the things that a

1  real doctor would do.

2      **Q      So you're saying that a real doctor**

3  **would be honest?**

4      A      Correct.

5      **Q      And someone who is not honest is not a**

6  **real doctor?**

7      A      No, not necessarily.  But if you're

8  pretending to be something that you're not, that's

9  not being honest.

10     **Q      And by "something that you're not,"**

11  **what do you mean?**

12     A      Not a real doctor.  By practicing on

13  women, you have no rights to do that, period, if

14  you don't have the proper credentials.  Just going

15  through school, anything that you need to do

16  properly to become a doctor, you should do that

17  before you do anything that a doctor does.

18     **Q      Do you know one way or the other if**

19  **Dr. Akoda went to medical school?**

20             MR. ZAJDEL:  Objection: asked and

21  answered.

22             But you can answer.

23             THE WITNESS:  No, I do not.

24     BY MR. KLAYMAN:

25     **Q      Now, getting back to when you first**

Jasmine Riggins

 1    learned about the basis for this lawsuit, you

 2    learned about it from Facebook; is that correct?

 3        A    Correct, from --

 4        Q    And that was from a post by Monique

 5    Russell?

 6        A    Correct.

 7        Q    And that's one of the communications

 8    that we were talking about this morning; right?

 9        A    Correct.

10        Q    So -- so you'll go take a look to see

11    if you can find that post that Monique Russell

12    made that you saw?

13        A    I can try to find that, yes.

14        Q    Now, with respect to your emotional

15    distress, do you have anxiety or worry?

16        A    When it comes to physicians.

17        Q    So not in general?

18        A    No, not necessarily.

19        Q    Do you have a depressed mood?

20        A    No.

21        Q    Do you have suicidal thoughts?

22        A    No.

23        Q    Are you able to laugh and see the funny

24    side of things?

25        A    Yes.

Jasmine Riggins

```
 1        Q       Do you look forward with enjoyment to
 2   things?
 3        A       Yes.
 4        Q       Do you blame yourself unnecessarily
 5   when things go wrong?
 6        A       No.
 7        Q       Are you anxious or worried for no good
 8   reason?
 9        A       No.
10        Q       Do you feel scared or panicky for no
11   good reason?
12        A       No.
13        Q       Do you feel that things are getting on
14   top of you?
15               MR. ZAJDEL:  Objection.  It --
16               You can answer the question.
17               THE WITNESS:  What -- what do you mean?
18        BY MR. KLAYMAN:
19        Q       Do you feel that things overwhelm you
20   sometimes?
21        A       Yes.
22        Q       Do you have difficulty sleeping?
23        A       Sometimes.
24        Q       How long has that been going on?
25        A       For some time -- quite some time.
```

JA3621

Jasmine Riggins

1     Q      If you had to give your best estimate,

2   are we talking a few -- a few weeks, many years?

3     A      Yeah, probably like a couple of years.

4     Q      Couple of years?

5     A      (Witness nods head.)

6     Q      If you had to give your best estimate

7   about when that began --

8     A      I can't.

9     Q      You can't.

10          Do you feel sad or miserable?

11    A      Not miserable, no.  I -- I mean, in

12  general, no, not sad.

13    Q      Are you so unhappy that you cry?

14    A      Are we, like, in general?  At times --

15  I feel like these questions can be -- at times I

16  can feel sad to the point where I want to cry, so

17  are you speaking in general, at times?

18    Q      Sure.

19          Let's say over the last six months,

20  have you -- have you at any time been so unhappy

21  that you've cried?

22    A      Yes.

23    Q      And do you recall what made you

24  unhappy?

25    A      Yes.

Page 62

1    Q    And what was that?

2    A    I don't want to talk about it.

3    Q    I -- I understand that you might not

4    want to talk about it, but you're under oath so

5    I -- I need an answer to the question.

6             MR. ZAJDEL:  Objection.  If it's

7    unrelated -- if the question is related to the

8    case, then I would agree she would have to talk

9    about it.  But if it's -- I'm sorry, if she's

10   saying it's unrelated to the case, I don't know

11   why it would be relevant.

12            MR. KLAYMAN:  Well, it's -- she's

13   bringing a claim for emotional distress, so other

14   things going on in her life that might be factors

15   in emotional distress that she's suffering is

16   directly relevant to the claim.

17            MR. ZAJDEL:  Well, I wouldn't agree

18   with that.  I'll have --

19            MR. KLAYMAN:  Let me -- maybe I'll --

20   let me try a question.

21   BY MR. KLAYMAN:

22   Q    Is the cause of that unhappiness that

23   you referred to completely unrelated to the facts

24   of this case?

25   A    Sometimes.  So the things that make me

Jasmine Riggins

1   unhappy for -- so far as this case, just knowing

2   what I know about it, the way it makes me feel,

3   the fact that I had to -- I got a second -- second

4   C-section, and I didn't have to get that.  That

5   makes me very unhappy sometimes, yes.

6        **Q    But to your testimony just now, there**

7   **are other things going on in your life that also**

8   **make you very unhappy or, as I asked, so unhappy**

9   **that you cry?**

10       A    Okay.  So there's one thing.  My

11  grandmother had back surgery and it made me sad.

12  That was about it.

13       **Q    I'm sorry to hear that.  That just --**

14       A    Yeah, so . . .

15       **Q    And that's what you were referring to**

16  **when you --**

17       A    Correct.

18       **Q    -- said you'd rather not talk about it?**

19            **Now, does the thought of harming**

20  **yourself occur to you?**

21       A    No.

22       **Q    Do you have post-traumatic stress**

23  **disorder because of the events giving rise to this**

24  **lawsuit, sometimes known as PTSD?**

25       A    No.

Jasmine Riggins

1      Q      Have you suffered any physical distress

2   after learning about Dr. Akoda in -- from Monique

3   Russell's Facebook post?

4      A      Physically -- no, not necessarily.

5      Q      When you say "not necessarily," is that

6   a no?

7      A      No.

8      Q      Have you ever been diagnosed with

9   depression?

10      A      No.

11      Q      Have you ever seen a medical

12   professional to discuss depression?

13      A      No.

14      Q      Have you ever discussed your emotional

15   distress with a medical professional?

16      A      No.

17      Q      If you were asked by a medical

18   professional about your emotional distress, would

19   you tell the truth?

20      A      Yes.

21      Q      And if you had been asked by a medical

22   professional in the past about your emotional

23   distress, you would have told the truth?

24      A      Yes.

25      Q      Do you typically tell the truth to

Jasmine Riggins

```
 1   medical professionals when they ask you questions
 2   in the course of treatment?
 3        A    Yes.
 4        Q    Have you always told the truth to
 5   medical professionals when they're treating you?
 6        A    Yes.
 7        Q    When was the last time you saw a
 8   medical professional for treatment, any -- any
 9   medical professional?
10        A    Okay.  I went to the doctor last month,
11   not -- yeah, last month I had a doctor's
12   appointment.
13        Q    So that would be -- I forget what
14   month -- August?
15        A    Yes, in August.
16        Q    August of 2019?
17        A    Yes.
18        Q    Okay.  And where was that?
19        A    That was Unity Health Care.
20        Q    What is Unity Health Care?
21        A    It's a doctor's office.  It's a clinic.
22        Q    If you recall -- do you recall which
23   doctor you were seeing?
24        A    Dr. King.
25        Q    Dr. King.
```

JA3626

Jasmine Riggins

```
 1              Do you know Dr. King's first name?
 2     A        I don't recall.
 3     Q        Is Dr. King a man or a woman?
 4     A        A woman.
 5     Q        What kind of doctor is Dr. King?
 6     A        She's a physician.
 7     Q        Is she a specialist or a general
 8   practitioner, if you know?
 9     A        I don't recall.
10     Q        Were you going for a routine physical?
11     A        Correct.
12     Q        How did you choose Dr. King as your
13   doctor?
14     A        Well, I was referred to her.
15     Q        Okay.  And referred by whom?
16     A        My cousin.
17     Q        Okay.  Your cousin.
18              And who is your cousin?
19     A        You need her name?
20     Q        Just for the record, yeah.
21     A        Oh, okay.  Her name is Davida Limes.
22     Q        How do you spell the last name?
23     A        L-I-M-E-S.
24     Q        L-I-M-E-S.
25              So -- so your cousin referred you to
```

JA3627

Jasmine Riggins

1    Dr. King.

2              Did you do anything to research

3    Dr. King before you went to see her for treatment?

4        A      Yes.

5        Q      What did you do?

6        A      I asked my cousin about her.  I went to

7    the doctor's office to meet her prior to my visit.

8        Q      So you met Dr. King once before you

9    became a patient?

10       A      Yes.

11       Q      Did you look at Dr. King's resume?

12       A      No.

13       Q      Did you ask for references beyond that

14   of your cousin?

15       A      No.

16       Q      Did you check to see if Dr. King had

17   any specific credentials or certificates?

18       A      No.

19       Q      Did you ask to see Dr. King's test

20   scores or medical school transcript or anything

21   like that?

22       A      No.

23       Q      Have you ever switched doctors?

24       A      Yes.

25       Q      So if you don't like a doctor you're

Jasmine Riggins

1    seeing, you -- you find a new doctor?

2         A    Yes.

3         Q    Now, other than to deliver a child,

4    have you ever been hospitalized?

5         A    Yes.

6         Q    And when was that?

7         A    I think it was 2015, I believe.

8         Q    And what was the reason for the

9    hospitalization?

10        A    My birth control was giving me some bad

11   side effects.

12        Q    Do you remember how long you were in

13   the hospital?

14        A    I'm just a -- overnight, maybe a few

15   hours.

16        Q    What was that?  I'm sorry.

17        A    It was late morning, and I didn't leave

18   until, like, the next morning, so I don't know if

19   that's considered overnight or a few hours or --

20        Q    Sure.

21             But you came in on one date and you

22   left on the next date?

23        A    It was the same day I got there, maybe

24   midnight; and I left maybe 9:00 in the next

25   morning.

Jasmine Riggins

```
 1        Q     Oh, I see.
 2        A     So that's why -- yeah, I didn't know if
 3   that was -- just to be technical.
 4        Q     I appreciate that.
 5              So you got in really late at night or
 6   really early in the morning?
 7        A     Yeah.
 8        Q     Depending on how you're looking at it,
 9   I guess?
10        A     Yes.
11        Q     And then you left on the same date; it
12   was just several hours later?
13        A     Correct.
14        Q     Any other times that you were
15   hospitalized that you recall other than child
16   birth, again?
17        A     No, not that I can recall.
18        Q     Have you ever been to an emergency
19   room?
20        A     Yes.
21        Q     About how many times?
22        A     A few.  I don't recall.
23        Q     Do you recall what -- what was the
24   reason for going to the emergency room?
25        A     Being sick, you know.
```

```
 1        Q      A variety of reasons?

 2        A      Yes.  Correct.

 3        Q      Anything traumatic like a -- for a car

 4   accident, for example, or --

 5        A      No.

 6        Q      All right.  Do you have health

 7   insurance?

 8        A      Yes.

 9        Q      Does insurance play a role in which

10   medical professionals you use?

11        A      Yes.

12        Q      Tell me about what role it plays.

13        A      Because of the insurance, I have these

14   certain doctors I can go -- certain offices that

15   accepts my insurances, and some doesn't.

16        Q      What insurance is that, if -- if you

17   know?

18        A      Amerigroup.

19        Q      Does your insurance company assign you

20   doctors?

21        A      Yes, but you don't have to stick with

22   that doctor.

23        Q      Okay.  So -- so the -- so am I right to

24   say that the insurance company will assign you a

25   doctor, but then you have the choice to then go to
```

Jasmine Riggins

```
 1    some -- another doctor if you prefer?
 2        A    Correct.
 3        Q    Did you have insurance when you were
 4    treated by Dr. Akoda?
 5        A    Yes.
 6        Q    Do you remember if he was in network or
 7    if he -- if he -- if his treatment was covered by
 8    insurance?
 9        A    Yes.
10        Q    Okay.
11             (Riggins Deposition Exhibit 2 was
12    marked for identification and attached to the
13    transcript.)
14        BY MR. KLAYMAN:
15        Q    So --
16             THE COURT REPORTER:  Wait a minute.
17        BY MR. KLAYMAN:
18        Q    The court reporter --
19             THE COURT REPORTER:  Let me give it to
20    her.
21             There you go.  Thank you.
22        BY MR. KLAYMAN:
23        Q    So you've just been handed a document
24    that we've marked Riggins 2.  It's a record
25    produced by the plaintiffs that they received from
```

Jasmine Riggins

```
 1    Unity Health Care which is the company we were
 2    just discussing; right?
 3         A     Yes.
 4         Q     Okay.  And you see that it's dated
 5    September 23rd, 2016?
 6         A     Yes.
 7         Q     And just for the record, it's Bates
 8    number Plaintiffs, and then a bunch of zeros, and
 9    then 6408.  So if I ask you to turn to a
10    particular page as we go through, I'm just going
11    to refer to the number at the end of --
12         A     Okay.
13         Q     -- that stamp.  We call it a Bates
14    stamp.  I don't know who Mr. Bates was.
15               So I want to ask you a couple of
16    questions about this.  Do you recall -- how long
17    have you been a patient at Unity Health Care?
18         A     It's been years.  I don't recall the
19    exact year, but I've always been in that area with
20    that doctor, this office.
21         Q     This office?
22         A     Yeah.
23         Q     So -- so this would have been your
24    doctor's office in September 2016?
25         A     Correct.
```

Jasmine Riggins

```
 1        Q      Do you know who Alison Lesht is?  Her
 2   name is on the top right next to progress note.
 3        A      I don't recall.
 4        Q      From the "NP," I would gather that
 5   she's a nurse practitioner.
 6               Does that refresh your recollection
 7   or --
 8        A      No.
 9        Q      Now, you see the first bolded language
10   at the top of page 6408, it says, Reason for
11   Appointment.
12               Do you see that?
13        A      Yes.
14        Q      And it says, Medical - Adult EST
15   Patient.  That was next to 1.
16               And then 2, Accepted HIV Test - Serum
17   Test Needed.
18               3, Physical Exam.
19               Do you see that?
20        A      Yes.
21        Q      Does that sound like the kinds of
22   treatment you've gotten from Unity Health Care in
23   the past?
24        A      Yes.
25        Q      Okay.  So next it says, History of
```

Jasmine Riggins

```
 1    Present Illness.  And then it starts, PHQ-2.

 2              Do you know what PHQ-2 means?

 3    A      No.

 4    Q      So in the text underneath it, it says,

 5    PHQ-2 Little interest or pleasure in doing things.

 6    And then it again repeats, Little interest or

 7    pleasure in doing things: No.  Feeling down,

 8    depressed or hopeless: No.

 9              Do you see that?

10    A      Yes.

11    Q      Were those questions that you were

12    asked?

13    A      I don't recall.

14    Q      You don't recall.

15              But in September 2016, were those true

16    statements?

17    A      Yes.

18    Q      And it wouldn't surprise you if you had

19    told that to your treating physician --

20    A      No.

21    Q      -- if asked these questions?

22    A      Right.

23           No.

24    Q      If you could turn to the next page, so

25    it's Bates 6409.  Under Family History, which is
```

JA3635

```
 1    the first item at the top, in the third line down
 2    all the way on the right, it says, Two sons -
 3    Healthy.
 4               Is that -- do you see what I'm -- what
 5    I'm referring to?
 6    A    Yes.
 7    Q    Was that true at the time -- that was
 8    true at the time that this was written; right?
 9    A    Yes.
10    Q    All right.  Now, under -- moving on to
11    the next section, which is Social History, we're
12    going to go through -- the first one is tobacco
13    use.  And it says, Tobacco Use Questions Current
14    or past tobacco use:  Current some day smoker.
15               Do you see that?
16    A    Yes.
17    Q    Was that -- and that was true and
18    correct in September 2016?
19    A    Correct.
20    Q    Skipping ahead to Drug/Alcohol Use, do
21    you see where I'm --
22    A    Yes.
23    Q    Do you see where I am?
24    A    Yes.
25    Q    So it says, Drug Use Questions.  Date
```

Jasmine Riggins

1  updated 09/23/2016.  Past or current drug use?

2  Yes - current use.  Which drugs used:  Marijuana.

3  Current Use/Frequency - Marijuana: occasionally.

4          Alcohol Use Questions.  Dated updated:

5  09/23/2016.  Past or current alcohol use:  Yes.

6  What type of alcohol?  Wine.  (One drink equals

7  one glass equals five ounces.)  How often?  Once

8  or a few times a week.  How many drinks in one

9  sitting?  Four drinks (guideline for max per

10 sitting, for men).

11         Did I read that right?

12     A     Uh-huh.

13     Q     Was that true and acc- -- and that was

14 true and accurate in September 2016?

15         MR. ZAJDEL:  Objection.  And I'm going

16 to instruct the witness not to answer the question

17 with respect to marijuana use.

18         You can answer the rest of that

19 question.

20     BY MR. KLAYMAN:

21     Q     So you can -- yeah, you can go ahead.

22     A     Okay.  So to the drinking, yes.

23         MR. KLAYMAN:  Are you -- are you

24 instructing her to assert her Fifth Amendment

25 privilege?

Jasmine Riggins

```
 1              MR. ZAJDEL:  Yes.  You're -- you're
 2   asking a question about -- I've instructed her not
 3   to answer, and --
 4              MR. KLAYMAN:  I'm just trying to
 5   understand the basis.  Is it the Fifth Amendment?
 6              MR. ZAJDEL:  Yes.
 7         BY MR. KLAYMAN:
 8         Q     And you're accepting counsel's
 9   instruction not to answer?
10         A     Yes.
11              MR. ZAJDEL:  Also, just -- and I'm not
12   trying to make a speaking objection.  I just want
13   to put on the record -- and we did this in the
14   previous deposition -- that there's a -- with all
15   these medical records and some testimony will be
16   some information that we think deserves a
17   confidentiality stamp.  We just want to reserve
18   the right to mark anything confidential before a
19   final transcript is released, including any
20   exhibits.
21              MR. KLAYMAN:  Okay.  That's -- that's
22   a -- your comment is noted, and we can -- we can
23   discuss that.
24         BY MR. KLAYMAN:
25         Q     Now, going down to the section on OB
```

Jasmine Riggins

1    History.  If you'll see, it's right in the middle

2    of that page?

3         A    Yes.

4         Q    It says, Total pregnancies, four;

5    abortions, two; C-sections, two.

6              Do you see that?

7         A    Yes.

8         Q    Was that a true -- that was a true and

9    accurate statement in September 2016; correct?

10        A    Correct.

11        Q    When, if you recall, were the

12   abortions?  Ballpark time period.

13        A    I don't recall.

14        Q    Were they -- do you recall if they were

15   before the C-sections?

16        A    Yes.

17        Q    And they -- and they were before the

18   C-sections?

19        A    Yes.

20        Q    Okay.  I'm sorry.  I just -- I asked a

21   bad question, so . . .

22              (Riggins Deposition Exhibit 3 was

23   marked for identification and attached to the

24   transcript.)

25              BY MR. KLAYMAN:

Jasmine Riggins

1    Q     So the court reporter just handed you

2    the document beginning with Bates number 7576

3    that's been marked Riggins Exhibit 3.

4              And this, again, is a Unity Health Care

5    record; right?

6    A     Yes.

7    Q     And the date for this one is

8    February 19th, 2017.  Do you see that --

9    A     Yes.

10   Q     -- on the top left?

11             And you were still a patient at Unity

12   Health Care at this time?

13   A     Yes.

14   Q     Have you been a patient at Unity Health

15   Care continuously from, I guess, the last record,

16   September 2016, at least until today?

17   A     Correct.

18   Q     And, again, next to the progress note,

19   it says Martine H. Tchinda, NP.

20             Do you know who Martine H. Tchinda, NP

21   is?

22   A     No.

23   Q     But, again, the "NP" seems to signify

24   nurse practitioner, so it could be someone that

25   treated you; correct?

Jasmine Riggins

```
 1              MR. ZAJDEL:  Objection.
 2              THE WITNESS:  Right.
 3         BY MR. KLAYMAN:
 4         Q     So moving down to the reason for
 5    appointment.  Do you see where I'm at?
 6         A     Yes.
 7         Q     It says, 1, Medical - Walk-in pregnancy
 8    test.
 9              Does that sound like a reason you
10    would -- does that refresh your recollection --
11    let me strike that.
12              Do you recall why you were going to
13    Unity Health Care in February 2017?
14         A     Yes.
15         Q     And why was that?
16         A     For a pregnancy test.
17         Q     If you skip down to the section on
18    surgical history -- that's still on page 7576.
19    It's the third bolded section from the bottom.
20              Do you see where it is?
21         A     Yes.
22         Q     So it says, C-sections times two;
23    surgical abortion 2/2016.
24              Do you see that?
25         A     Yes.
```

Jasmine Riggins

```
 1        Q      Does that refresh your recollection at
 2   all about when the abortions happened?
 3        A      Yes.
 4        Q      And when did those happen?
 5        A      2016.
 6        Q      2016.
 7        A      About that time somewhat.
 8        Q      Now, if you move out -- move on to the
 9   next page, so 7577.  I'm looking at smack in the
10   middle where it says, Review of Systems.
11               Do you see that in the bolded language?
12        A      Yes.
13        Q      So if you go down to the last
14   underlined item in that section where it says,
15   Psych, do you see that?
16        A      Yes.
17        Q      And it says, Negative for
18   anxiety/worry, depressed mood, suicidal thoughts.
19               Did I read that right?
20        A      Yes.
21        Q      And that was a true and accurate --
22   accurate statement of your well-being in
23   February 2017?
24        A      Yes.
25               MR. KLAYMAN:  That will be 4.
```

Jasmine Riggins

1           (Riggins Deposition Exhibit 4 was

2    marked for identification and attached to the

3    transcript.)

4       BY MR. KLAYMAN:

5       Q    **So the court reporter has just handed**

6    **you the document that's been marked Riggins**

7    **Exhibit 4.**

8            **Do you recognize the document?**

9       A    I can't say yes or no.

10      Q    **Are you familiar with -- with**

11   **interrogatories?**

12      A    Yes.

13      Q    **So -- so as you can see from the title**

14   **there, this document is entitled, Plaintiff**

15   **Jasmine Riggins' Supplemental Answers to First Set**

16   **of Interrogatories and Supplemental Responses to**

17   **First Set of Requests for Production of Documents.**

18      A    Uh-huh.

19      Q    **Right?**

20      A    Yes.

21      Q    **So these are discovery requests that**

22   **were served by your counsel on ECFMG in response**

23   **to certain interrogatories and document requests.**

24           **Does it -- and if you turn to the back,**

25   **let's see, there's a long list of names, but right**

Jasmine Riggins

```
 1   before that, there's a certificate of service, and
 2   then the page before that, there's a page called
 3   Verification.
 4        A    Oh, yeah.
 5        Q    It has a 14 at the bottom.
 6             Do you see that?
 7        A    Yes.
 8        Q    Okay.  And it says, I, Jasmine Riggins,
 9   hereby aver that the factual statements in the
10   foregoing answers to interrogatories are true and
11   correct to the best of my knowledge, information
12   and belief, and that these answers are made
13   subject to the penalties relating to unsworn
14   falsification to authorities.
15             Right?
16        A    Yes.
17        Q    And then it's dated June 13, 2019; is
18   that right?
19        A    Yes.
20        Q    And then there's a line for -- and a
21   signature that -- are those your signature for
22   Jasmine Riggins?
23        A    Yes.
24        Q    Does that refresh your recollection
25   about if whether you've seen this document before?
```

Jasmine Riggins

```
 1      A      Yes.
 2      Q      Earlier today, you testified that you
 3   weren't sure of when you saw the Facebook post
 4   from Monique Russell.
 5             Do you recall that?
 6      A      You said that I wasn't sure that --
 7      Q      Yeah, that you said you weren't sure.
 8      A      Okay.
 9      Q      Of the date; is that right?
10      A      The date, yes.
11      Q      Yes.
12      A      Correct.
13      Q      So if you could turn to page 3 of the
14   interrogatories.
15      A      Okay.
16      Q      I'll just direct you to the very
17   bottom, the first full line where it says,
18   Plaintiff began experiencing these injuries when
19   she learned in July 2017 that Akoda was not really
20   a doctor.
21             Do you see that?
22      A      Yes.
23      Q      Does that refresh your recollection
24   about when you saw Monique Russell's Facebook post
25   about Dr. Akoda?
```

JA3645

```
 1        A       Correct.
 2        Q       And -- and when was that?
 3        A       In 2017.
 4        Q       In July 2017; right?
 5        A       Yes.
 6        Q       Okay.  So all of the medical records
 7   that we've looked at so far -- so that would be
 8   Riggins Exhibit 2 and Exhibit 3 -- were from
 9   before July of 2017; right?
10                You can pull them up again if you want
11   to --
12        A       Yeah, they say -- this is 2016.
13                Yes.
14        Q       How soon after learning, as you say in
15   your interrogatory response, that Akoda was not
16   really a doctor, did you begin experiencing
17   emotional distress?
18        A       Immediately once I --
19        Q       Immediately?
20        A       Yeah, once I found out, I just felt
21   really bad, yeah.
22        Q       Did you experience the emotional
23   distress continuously after that time, or was it
24   intermittent?
25        A       Yeah, intermittent.
```

Jasmine Riggins

```
 1          Q        Intermittent?

 2          A        Yeah.

 3          Q        So it would come and it would go, in

 4     other words?

 5          A        Yes.

 6          Q        How frequently would you experience the

 7     emotional distress?

 8          A        More often than not, yeah.  The more I

 9     thought about it, it weighed on me, yeah.

10          Q        And how often would you think about it?

11          A        Almost every day, every other day.  I

12     tried not to think about it, but it would always

13     come up in my mind.

14          Q        So on page 3 of the -- of Exhibit 4,

15     the second line from the bottom says, Plaintiff

16     has not seen any health care providers for

17     treatment of these injuries.

18                   Do you see that?

19          A        Yes.

20          Q        And that was a true and accurate

21     statement when these were -- when you signed the

22     verification in June of 2019; correct?

23          A        Correct.

24          Q        And that's still a true and accurate

25     statement --
```

Jasmine Riggins

```
 1        A      Correct.
 2        Q      -- correct?
 3               Have you thought about going to see a
 4    health care provider for treatment of your
 5    injuries?
 6        A      Yeah, I thought about it.
 7        Q      And you decided against it?
 8        A      It just so -- it was just a thought,
 9    like -- yeah, you could say I decided against it.
10    Just wasn't something I really wanted to keep
11    talking about.
12               (Riggins Deposition Exhibit 5 was
13    marked for identification and attached to the
14    transcript.)
15    BY MR. KLAYMAN:
16        Q      So the court reporter has handed you
17    the document that's been marked Riggins Exhibit 5
18    which begins on Bates number 6442.  And this again
19    looks like a Unity Health Care record; right?
20        A      Yes.
21        Q      And in the top left, the date here is
22    September 7th, 2017 --
23        A      Yes.
24        Q      -- is that right?
25               So that's after the July 2017 date that
```

 1    was referred to in the interrogatories?

 2         A    Correct.

 3         Q    And up in the top right where it says

 4    progress note, this time it says, Yolanda E.

 5    Klemmer, CNM.

 6              Do you know who Dr. Klemmer is?

 7         A    Yes.

 8         Q    And who is Dr. Klemmer?

 9              MR. ZAJDEL:  Objection: misstates

10    facts.  It says certified nurse --

11              MR. KLAYMAN:  Oh, sure.  I forgot.

12    Forgive me.

13         BY MR. KLAYMAN:

14         Q    So do you know who Yolanda Klemmer is?

15         A    Yes.

16         Q    And who is Yolanda Klemmer?

17         A    She was my OB when I was at Unity.

18         Q    Was it your understanding that she was

19    a medical doctor or that she is a medical doctor?

20              Do you still -- strike that.  Let me

21    start again.

22              Do you still see Yolanda Klemmer?

23         A    No.

24         Q    When was the last time you saw Yolanda

25    Klemmer for treatment?

JA3649

Jasmine Riggins

1     A     Back in 27 -- 2018 after I had my baby.

2     Q     But you're not a current patient of

3  Yolanda Klemmer?

4     A     No.

5     Q     And it was your understanding when you

6  were a patient that she was a medical doctor?

7     A     Yes.

8     Q     Would you refer to her as Dr. Klemmer

9  when you saw her?

10     A     Yes.

11     Q     Now, if you look at, again, the Reason

12  for Appointment --

13            That will be the first bolded language.

14  Do you say where I'm at?

15     A     Yeah.

16     Q     Okay.  So it says, 1, medical - OB

17  visit.  2, prenatal care.

18            And that's a true and accurate

19  statement of the treatment you were receiving from

20  Klemmer in September 2017?

21     A     Yes.

22     Q     Moving on to the next bolded language

23  where it says History of Present Illness, do you

24  see that?

25     A     Yes.

Jasmine Riggins

```
 1        Q      So here is again that reference to
 2   PHQ-2.  And it says PHQ-2, little interest or
 3   pleasure in doing things.  Little interest or
 4   pleasure in doing things, no.  Feeling down,
 5   depressed or hopeless, no.
 6               Did I read that right?
 7        A      Yes.
 8        Q      And that's -- and that's a true and
 9   accurate statement of your well-being in
10   September 2017; correct?
11        A      Yes.
12               (Riggins Deposition Exhibit 6 was
13   marked for identification and attached to the
14   transcript.)
15        BY MR. KLAYMAN:
16        Q      So the court reporter just handed you
17   another document.  This one is Riggins Exhibit 6.
18   And it begins on Bates number 6478.  And this also
19   appears to be a Unity Health Care medical record;
20   right?
21        A      Yes.
22        Q      And the date up in the top left is
23   October 13, 2017.
24        A      Yes.
25        Q      And again, next to Progress Note it has
```

Jasmine Riggins

```
 1    Yolanda E. Klemmer; right?
 2         A    Yes.
 3         Q    And here it says -- go through again
 4    what we did in the last record.
 5              So Reason for Appointment, 1, medical,
 6    dash, OB visit.
 7              Do you see that?
 8         A    Yes.
 9         Q    And that's a true and accurate
10    statement for why you were seeing Yolanda Klemmer
11    in October 2017?
12         A    Yes.
13         Q    Klemmer was treating you in connection
14    with your -- with the birth of your third child;
15    is that right?
16         A    Yes.
17         Q    So again moving down to the PHQ-2,
18    PHQ-2, little interest or pleasure in doing
19    things.  Little interest or pleasure in doing
20    things, no.  Feeling down depressed or hopeless,
21    no.
22              Do you see that?
23         A    Yes.
24         Q    And that's a true and accurate
25    statement of your well-being in October 2017?
```

JA3652

Jasmine Riggins

1    A    Yes.

2    Q    **Now, moving down to the next underlined**

3    **section which is postpartum visit.**

4         **So I gather from postpartum that this**

5    **is after you gave birth?**

6    A    Yes.

7    Q    **When -- when -- when did you give birth**

8    **for -- in 2017?**

9    A    It was on October 2nd.

10   Q    **Okay.  So this is within two weeks of**

11   **the -- of the birth?**

12   A    Yes.

13   Q    **Okay.  We're going to read through it**

14   **and I'll ask you a couple of questions.**

15        So, Delivery (if not captured in

16   flowsheet), Maternal date of discharge October 4,

17   2017.  Newborn date of discharge, October 4, 2017.

18   Date of delivery, October 2nd, 2017.

19        So that's the same date you just said;

20   right?

21   A    Yes.

22   Q    **Right.**

23        **Intrapartum complications, none.  Type**

24   **of delivery, C/S.  That's probably a reference to**

25   **a C-section; is that right?**

Jasmine Riggins

1      A      I believe so.

2      Q      You delivered your child in 2017

3  through a C-section?

4      A      Yes.

5      Q      Place of delivery, Washington Hospital

6  Center; is that right?

7      A      Yes.

8      Q      Anesthesia, epidural/spinal.  And

9  that's the correct method of anesthesia that you

10  had during delivery?

11      A      Correct.

12      Q      Gender, female.  I take it that

13  that's -- I take it that's --

14      A      Correct.

15      Q      -- for your daughter?

16      A      Yes.

17      Q      Birth weight pounds, 7; birth weight

18  ounces, 13.

19              So next is postpartum depression

20  screening.  I have been able to laugh and see the

21  funny side of things: 0 - As much as I always

22  could.  I have looked forward with enjoyment to

23  things: 0 - As much as I ever did.  I have blamed

24  myself unnecessarily when things went wrong: 0 -

25  No, never.  I have been anxious or worried for no

Jasmine Riggins

```
 1   good reason: 0 - No, not at all.  I felt scared or
 2   panicky for no good reason: 0 - No, not at all.
 3   Things have been getting on top of me:  0 - No, I
 4   have been coping as well as ever.  I have been so
 5   unhappy that I have had difficulty sleeping: 0 -
 6   No, not at all.  I have felt sad or miserable:
 7   0 - No, not at all.  I've been so unhappy that I
 8   have been crying: 0 - No, never.  The thought of
 9   harming myself has occurred to me: 0 - Never.
10   Total score: 0.  Score is 12 or higher:  No.
11   Negative screening result: Yes.
12             Did I read that all correctly?
13        A    Yes.
14        Q    Now, I know that was a lot of
15   questions, but was that a true and correct
16   statement of your well-being in October 2017?
17        A    Correct.
18        Q    And then name of child, Taniya?
19        A    Taniya.
20        Q    Taniya?
21        A    Yes.
22        Q    Oh.  Even better.  Taniya Richardson.
23   Great.
24             Just give me one second while I figure
25   something out.
```

Jasmine Riggins

1              So you're the named plaintiff in --
2       strike that.
3              You were a named plaintiff in
4       litigation relating to Dr. Akoda in Maryland; is
5       that right?
6       A     Yes.
7       Q     Do you recall when that lawsuit was
8       filed?
9       A     No, I don't recall.
10             MR. KLAYMAN:  This is 7.
11             (Riggins Deposition Exhibit 7 was
12       marked for identification and attached to the
13       transcript.)
14       BY MR. KLAYMAN:
15       Q     So the court reporter has just handed
16       you a document that's been marked Riggins
17       Exhibit 7.
18             Do you recognize the document?
19       A     Yes.
20       Q     And what is it?
21       A     It's a class action complaint.
22       Q     And it's in the Circuit Court for
23       Prince George's County, Maryland?
24       A     Correct.
25       Q     And your name is in the top left of the

Jasmine Riggins

```
 1    caption, so it says -- right underneath Monique
 2    Russell, it says Jasmine Riggins, 312 37th Street,
 3    Apartment Number 304, Washington, D.C., 20019?
 4         A    Yes.
 5         Q    And that's you?
 6         A    Yes.
 7         Q    And then if you look at the stamp
 8    that's kind of sideways on the front page, you see
 9    the -- the year is a little fuzzy, I guess, but it
10    looks like 2000 -- to my eye it looks like 2017,
11    September 11.
12              Do you see that?
13         A    Yes.
14         Q    So does that refresh your recollection
15    about when the lawsuit was filed in Maryland?
16         A    Yes.
17         Q    And when was that?
18         A    In September of 2017.
19         Q    Okay.
20              (Riggins Deposition Exhibit 8 was
21    marked for identification and attached to the
22    transcript.)
23         BY MR. KLAYMAN:
24         Q    So the court reporter has handed you a
25    document that's been marked Riggins Exhibit 8, and
```

Jasmine Riggins

```
 1    the Bates number on the bottom is 6480.  And it
 2    looks like another united -- Unity Health Care
 3    medical record; right?
 4         A    Yes.
 5         Q    And in the top left of this first page,
 6    the date on it is November 9th, 2017.
 7              Do you see that?
 8         A    Yes.
 9         Q    And again, the progress note has
10    Yolanda E. Klemmer; right?
11         A    Yes.
12         Q    And this time the Reason for
13    Appointment is -- you see where I'm at --
14         A    Yes.
15         Q    -- looking at the top?
16              So 1, Medical - OB visit; 2, Pregnancy
17    test; 3, Postpartum exam.
18              Is that a true and correct statement of
19    the reasons you went to Unity Health Care in
20    November 2017?
21         A    Correct.
22         Q    Again, under History of Present
23    Illness, it says at the first couple of lines,
24    PHQ-2, little interest or pleasure of doing
25    things.  Little pleasure or interest in doing
```

Jasmine Riggins

```
 1   things, no.  Feeling down, depressed or hopeless,
 2   no.
 3            Do you see that?
 4   A     Yes.
 5   Q     And that's a true and accurate
 6   statement of your well-being in November of 2017?
 7   A     Yes.
 8   Q     And again if you go down to postpartum
 9   visit, so it's underlined, I'm going to skip the
10   first couple of lines, but in the fifth line down
11   right in the middle, do you see the words
12   "postpartum depression screening"?
13   A     Yes.
14   Q     Okay.  I'm just going to read it into
15   the record.  I have been able to laugh and see the
16   funny side of things: 0 - As much as I always
17   could.  I have looked forward with enjoyment to
18   things:  0 - As much as I ever did.  I have blamed
19   myself unnecessarily when things went wrong:  2 -
20   Yes, some of the time.  I have been anxious or
21   worried for no good reason:  0 - No, not at all.
22   I have felt scared or panicky for no good reason:
23   0 - No, not at all.  Things have been getting on
24   top of me:  0 - No, I have been coping as well as
25   ever.  I have been so unhappy that I have had
```

Jasmine Riggins

```
 1    difficulty sleeping:  0 - No, not at all.  I have
 2    felt sad or miserable:  0 - No, not at all.  I
 3    have been so unhappy that I have been crying:  0 -
 4    No, never.  The thought of harming myself has
 5    occurred to me:  0 - Never.  Total score: 2.
 6    Score is 12 or higher:  No.  Negative screening
 7    result:  Yes.
 8              Did I read that all correctly?
 9    A    Yes.
10    Q    And is that a true and accurate
11    statement of your well-being in November of 2017?
12    A    Yeah.
13              MR. ZAJDEL:  Objection.
14              THE WITNESS:  Sorry.  Sorry.
15              MR. ZAJDEL:  Objection: compound
16    question.
17              She can answer it.
18              MR. KLAYMAN:  Sure.  So -- so --
19              MR. ZAJDEL:  I think she already did,
20    but --
21        BY MR. KLAYMAN:
22    Q    Yeah.  So each of those -- so each of
23    those is a true statement of your well-being in
24    November 2017?
25    A    Yes.
```

Jasmine Riggins

```
 1        Q      If you recall earlier, I asked you
 2   about your difficulty sleeping.
 3               Do you remember I asked you that -- a
 4   question about that?
 5        A      Yes.
 6        Q      So does the statement here from
 7   November 2017, I've been so unhappy that I've had
 8   difficulty sleeping, 0, no, not at all.  Does that
 9   refresh your recollection about when any sleep
10   difficulties you've testified to earlier began?
11        A      Yes, but this is -- I haven't been so
12   unhappy that it caused difficulty sleeping.
13        Q      Oh, okay.  So the difficulty sleeping
14   is unrelated to your emotional distress?
15               MR. ZAJDEL:  Objection.  The question
16   was asked and answered.
17               You can answer -- you can answer the
18   question.
19               THE WITNESS:  What was the question?
20        BY MR. KLAYMAN:
21        Q      The question was so is the difficulty
22   sleeping that you testified to earlier unrelated
23   to your emotional distress?
24        A      Correct.  I'd say that.
25               MR. KLAYMAN:  I'm sorry.  Just give me
```

Jasmine Riggins

```
 1    one second.

 2         BY MR. KLAYMAN:

 3         Q      Do you recall when this lawsuit was

 4    filed?

 5         A      In 2017?  This one?

 6         Q      So, I'm not talking about the Maryland

 7    litigation.  I'm talking about the litigation

 8    that's here against ECFMG that we're here for

 9    today?

10         A      I believe it was -- I don't recall.  I

11    don't want to give the wrong day.

12                (Riggins Deposition Exhibit 9 was

13    marked for identification and attached to the

14    transcript.)

15         BY MR. KLAYMAN:

16         Q      So the court reporter has just handed

17    you a document that is marked Riggins Exhibit 9.

18                Have you seen this document before?

19                You can flip through it to see if

20    it . . .

21         A      (Witness reviews document.)

22                I honestly . . .

23                (Witness continues reviewing document.)

24                Okay.  I'm not honestly sure.

25                Sorry.  I don't recall seeing this.
```

Jasmine Riggins

1    Some of it looks familiar, but I can't --

2        Q    Okay.  Well, on the third page of the

3    document, which has a -- a case caption, you'll

4    see -- or, yeah, right there.

5            Underneath Monique Russell, it says

6    Jasmine Riggins, 312 37th Street, Apartment Number

7    304 --

8        A    Yes.

9        Q    -- Washington, D.C. 20019.

10           Right?

11       A    Yes.

12       Q    And that's you?

13       A    Yes.

14       Q    So this is the complaint that was filed

15   to initiate this lawsuit?

16       A    (Witness nods head.)

17       Q    And on the front page, do you see --

18   there's a stamp -- there are two stamps, actually.

19           One says -- one in the middle says,

20   Filed Pro Prothy, November 14, 2018.

21           Do you see that?

22       A    Yes.

23       Q    Does that refresh your recollection at

24   all as to when the lawsuit was filed?

25       A    Yes.

Jasmine Riggins

1      Q       And -- and when was it filed?

2      A       November of 2018.

3      Q       Okay.  You can set that aside for a

4   moment.

5              (Riggins Deposition Exhibit 10 was

6   marked for identification and attached to the

7   transcript.)

8      BY MR. KLAYMAN:

9      Q       So the court reporter has handed you a

10  document that's marked Riggins Exhibit 10, and the

11  Bates number is 6488 is where it begins.

12             And again this looks like a Unity

13  Health Care medical record; right?

14     A       Yes.

15     Q       And this time the date is April 18th,

16  2019, in the top left; is that right?

17     A       Yes.

18     Q       And next to the progress note, it says,

19  Taisei Suzuki, DO.

20             Do you know who that is?

21     A       Yes.

22     Q       And who is that?

23     A       He's a doctor at Unity Health Care, but

24  he's a -- he's a doctor at Unity Health Care.

25     Q       He's a doctor at Unity Health Care you

1    said?

2         A    Yeah.

3         Q    I'm sorry.  I just couldn't hear you.

4         A    Yeah.  Sorry about that.

5         Q    Do you know what kind of doctor, like,

6    an OB or a general practitioner or you're not

7    sure?

8         A    I'm not sure.

9         Q    Okay.  And moving to the first, it

10   says, Reason for Appointment, 1, Medical - adult

11   EST patient, patient request birth control

12   referral; 2, FP - birth control.

13              Do you see -- did I read that right?

14        A    Yes.

15        Q    And that's a true and accurate

16   statement of the reasons why you went to Unity

17   Health Care in April of 2019?

18        A    Yes.

19        Q    And moving down, excuse me, to -- under

20   History of Present Illness, so the second

21   underline is PHQ-2 where it says, PHQ-2, little

22   interest or pleasure in doing things.  Little

23   interest or pleasure in doing things, no.  Feeling

24   down, depressed or hopeless, no.

25              Do you see that?

Jasmine Riggins

```
 1      A      Yes.
 2      Q      Is that a true and accurate statement
 3   of your well-being in April 2019?
 4      A      Yes.
 5      Q      Have you ever testified to feeling
 6   depressed?
 7      A      I'm sorry?
 8      Q      Have you ever testified to feeling
 9   depressed?
10      A      I don't recall.
11             MR. KLAYMAN:  Is this 11?
12             THE COURT REPORTER:  Uh-huh.
13             (Riggins Deposition Exhibit 11 was
14   marked for identification and attached to the
15   transcript.)
16          BY MR. KLAYMAN:
17      Q      So the court reporter has just handed
18   you what's been marked Russell -- uh, Riggins -- I
19   get them confused here -- Riggins Exhibit 11.
20             Do you recognize this document?
21      A      (Witness reviews document.)  Yes.
22             Yes.
23      Q      Yes?
24             And what is it?
25      A      Response to defendants' request for
```

Jasmine Riggins

```
 1   admissions.
 2        Q     And you can see from the top of the
 3   first page it's in the Circuit Court for Prince
 4   George's County, Maryland?
 5        A     Yes.
 6        Q     And in the case caption, it's Monique
 7   Russell, et al. -- there are multiple names,
 8   but -- versus Dimensions Health Corp.
 9              Do you see that?
10        A     Yes.
11        Q     Okay.  And this is the other lawsuit
12   that you were a plaintiff in?
13        A     Correct.
14        Q     So if you turn to request number 21, it
15   says, You claim that you suffer from depression as
16   a result of your allegations against the
17   defendants.
18              And then the response is an objection.
19   And then it says, As plaintiff testified at her
20   deposition, she has been depressed.
21        A     Okay.
22        Q     Do you see that?
23        A     Yes.
24        Q     So does that refresh your recollection
25   about whether you testified --
```

Page 107

```
 1       A     Yes.
 2       Q     -- about feeling depressed?
 3       A     Uh-huh.  I don't recall the dates.
 4       Q     You don't recall the dates, you said?
 5       A     Yeah.
 6       Q     Oh, okay.
 7       A     Yeah.
 8       Q     Of -- the dates of what?
 9       A     Of the question.
10       Q     Oh, of when the -- when you answered
11   this question?
12       A     Yes.
13       Q     Okay.  But you -- but you do recall
14   having testified at your deposition --
15       A     Correct.
16       Q     -- that you were feeling depressed?
17       A     Correct.
18             It's cold in here.
19       Q     So in April 2019, in Riggins
20   Exhibit 10, you told your medical professional
21   that you were not feeling depressed; right?
22       A     Yes.
23       Q     But then at your deposition in the
24   Maryland litigation, you testified that you were
25   feeling depressed?
```

Jasmine Riggins

Page 108

```
 1     A     Correct.  I was not feeling depressed
 2  at that time of my visit.
 3     Q     At the time of your visit?
 4     A     Yeah, I was not feeling depressed at
 5  that time.
 6     Q     Okay.  So you're -- and you're talking
 7  about your visit to Unity Health Care?
 8     A     Correct.
 9     Q     Okay.  Do you recall being asked about
10  feeling depressed when you visited Unity Health
11  Care?
12     A     Yes.  They always ask those questions.
13     Q     Okay.  Did you ever think to say to
14  them that you had been feeling depressed in
15  between visits?
16     A     No.
17     Q     Did they ever ask if you were feeling
18  depressed in between visits?
19     A     No.
20     Q     Did they ask these orally or did they
21  ask them in writing, if you recall?
22     A     They asked them orally.
23     Q     Orally.
24           And you gave the same answer from
25  Riggins Exhibit 10 in several of the other Unity
```

Jasmine Riggins

1  Health Care medical records that we went through;

2  right?

3      A     Correct.  They asked about that day.

4      Q     Okay.  So each time you -- you went,

5  you were answering about that day?

6      A     Correct.

7      Q     And you never thought to tell them that

8  you were feeling depressed in between your visits?

9      A     No.

10     Q     During any of these time periods?

11     A     No.

12     Q     Why do you think your -- that Unity

13 Health Care was asking you these questions?

14     A     Because it's just something that they

15 want to know how you feel during that day at the

16 time of visit.

17     Q     Do you think they would be interested

18 to -- in -- in terms of treating you, do you think

19 they would have wanted to know if you had been

20 depressed in between visits?

21     A     I'm not honestly sure.  I don't think

22 there's something -- I didn't think that that was

23 something that they would consider, something that

24 they would deal with.  I would think that I would

25 go to another place for that.

JA3670

Jasmine Riggins

1    Q    Another place?

2    A    Yeah.

3    Q    What do you mean?

4    A    Like to see someone else versus this

5    Unity Health Care.

6    Q    Where else would you have gone to seek

7    treatment?

8    A    Other places that help, like a

9    therapist or anybody else that has to do with

10   emotional depression, things like that, how you

11   feel.

12   Q    Do you know whether Unity Health Care

13   has therapists on staff?

14   A    I do -- no, not really.

15   Q    Did you ever ask?

16   A    No.

17   Q    Why not?

18   A    It just didn't seem like that type of

19   place.

20   Q    Did you ever ask them for a referral to

21   a -- to a -- a place that would be more equipped

22   in your estimation to treat your feeling -- your

23   intermittent depression, I guess?

24   A    You said would I ask them?

25   Q    Would you have asked -- or did you ask

1  them for a referral to somewhere that could treat

2  your depression?

3       A    No.

4       Q    Do you think they would be able to

5  refer you to someone who could treat your -- your

6  feeling depressed?

7       A    I'm not honestly sure.

8            MR. KLAYMAN:  We've been going for a

9  little while, so why don't we take a quick break

10  if that's all right.

11           THE WITNESS:  Okay.

12           THE VIDEOGRAPHER:  Off the record at

13  11:23.

14           (Recess -- 11:23 a.m.)

15           (After recess -- 11:35 a.m.)

16           THE VIDEOGRAPHER:  We are back on the

17  record at 11:35.

18     EXAMINATION BY COUNSEL FOR THE DEFENDANT

19     BY MR. SHAFFER:

20       Q    Ms. Riggins, I want to ask you some

21  questions about the litigation that you initiated

22  in Maryland state court against Dimensions Health

23  Care, okay?

24       A    Okay.

25       Q    When did you file that lawsuit?

Jasmine Riggins

```
 1              MR. ZAJDEL:  Objection: asked and

 2      answered.

 3              You can answer.

 4              MR. SHAFFER:  When?  This morning?

 5              MR. ZAJDEL:  (Indicating

 6      affirmatively.)

 7          BY MR. SHAFFER:

 8          Q    Okay.  So you told my colleague that it

 9      was in September of 2017; is that correct?

10          A    Correct.

11          Q    Okay.  And why did you file that

12      lawsuit?

13          A    I'm sorry.

14          Q    That's okay.

15              My question was why you filed the

16      lawsuit.  Was -- was the reason you filed the

17      lawsuit because you believed that Dimensions

18      Health Care was responsible for your emotional

19      injuries related to your interactions with

20      Dr. Akoda?

21          A    Correct.

22          Q    Okay.  And you're one of the named

23      plaintiffs in that lawsuit; correct?

24          A    Correct.

25          Q    Okay.  Is that lawst- -- lawsuit still
```

JA3673

Jasmine Riggins

```
 1   active today?
 2        A     Correct.
 3        Q     It is?
 4        A     I believe -- I'm sorry.
 5        Q     If you don't know, just --
 6        A     Yeah.  I don't recall.  I'm sorry.
 7        Q     Okay.  Have you gotten any money from
 8   Dimensions Health Care in connection with your
 9   lawsuit?
10        A     No.
11        Q     Has anybody told you that you will be
12   getting money from Dimensions Health Care?
13        A     No.
14        Q     Okay.  Did anybody tell you whether
15   they were going to dismiss your lawsuit against
16   Dimensions Health Care?
17              MR. ZAJDEL:  Objection.  That would be
18   attorney-client privilege.
19        BY MR. SHAFFER:
20        Q     Well, do you know whether your lawsuit
21   against Dimensions Health Care has been dismissed
22   or not?
23        A     I don't recall.
24        Q     Okay.  So it might have been, but it
25   might not have been?
```

Jasmine Riggins

```
 1        A     Correct.  It might have --
 2        Q     Isn't that kind of a big deal, like if
 3   you filed a lawsuit and then it got dismissed, you
 4   would know?
 5        A     Correct.
 6        Q     But you -- as you sit here today, you
 7   don't know?
 8        A     I don't recall, correct.
 9        Q     Okay.
10              (Riggins Deposition Exhibit 12 was
11   marked for identification and attached to the
12   transcript.)
13        BY MR. SHAFFER:
14        Q     Ms. Riggins, I've handed you what's
15   been marked as Exhibit 12 in your deposition.
16   It's a pleading in the Circuit Court for Prince
17   George's County, Maryland, entitled Stipulation of
18   Dismissal Without Prejudice.
19              Take a look at that and let me know
20   when you're finished.
21        A     (Witness reviews document.)  Okay.
22        Q     Okay.  Have you had a chance to look at
23   that?
24        A     Yes.
25        Q     And if you flip over to the very last
```

1    page, which has the Bates number ending in 8683,

2    you'll see that it's a certificate of service

3    dated September 3rd, 2019, which was 13 days ago.

4            Have you ever seen this document

5    before?

6       A    No.

7       Q    Do you know what this document is?

8       A    A stipulation of dismissal without

9    prejudice in the Circuit Court of Prince George's

10   County, Maryland.

11      Q    What's your understanding of what

12   this -- what this document does?

13      A    Dismisses a case.

14      Q    Okay.  Do you know whether this is the

15   lawsuit that you held -- you are a plaintiff in

16   against Dimensions Health Care?

17      A    Yes.

18      Q    It is?

19      A    Yes, I see my name.

20      Q    Okay.  I think you have some exhibits

21   in front of you.  Do you want to look back at

22   Exhibit 7 that Mr. Klayman showed you this

23   morning?

24            And if you take a look at the first

25   page of Riggins 7, there's a case number on the

Case 1:22-cv-00586-DLB Document 125-5 Filed 09/08/22 Page 1787 of 3041
Case 1:22-cv-00586-DLB Document 125-5 Filed 09/08/22 Page 1787 of 3041

Jasmine Riggins

Page 116

```
 1    right-hand side in the middle, handwritten,
 2    CAL17-22761 --
 3         A      Uh-huh.
 4         Q      Do you see that?
 5         A      Yes.
 6         Q      And then if you look at Riggins 12 and
 7    look at the top caption on the first page, it
 8    says, Monique Russell, et al., versus Dimensions
 9    Health Corp., et al., and the number is the same,
10    CAL17-22761?
11         A      Correct.
12         Q      Okay.  Looking at Riggins 7 and
13    Riggins 12, as you sit here today, do you have an
14    understanding of whether your case against
15    Dimensions Health Care in Maryland has been
16    dismissed?
17         A      Yes.
18         Q      It has; correct?
19         A      Correct.
20         Q      And how do you know that?
21         A      From the information.
22         Q      What information?
23                MR. ZAJDEL:  Objection to the extent
24    you're asking questions about communications
25    between attorney-client.
```

JA3677

```
 1      BY MR. SHAFFER:
 2          Q    Well, here's what I'm trying to get at.
 3      I asked you a few moments ago if you knew whether
 4      the case was dismissed or not, and you said you
 5      didn't remember.
 6               We had that discussion --
 7          A    Okay.
 8          Q    -- do you recall that?
 9          A    Yes.
10          Q    Okay.  And now I've showed you these
11      two documents including a stipulation of dismissal
12      from 13 days ago.
13               My question is:  Do you now recall that
14      your case has been dismissed against Dimensions
15      Health Care?
16          A    Yes.
17          Q    And how long ago did you learn that
18      your case against Dimensions Health Care had been
19      dismissed?
20          A    My memory was refreshed today.
21          Q    Okay.  Did you know that your case
22      against Dimensions Health Care had been dismissed
23      before September 3rd?
24          A    Yes.  I don't recall.  I'm sorry.  I
25      don't recall.
```

Jasmine Riggins

```
 1        Q      Okay.

 2        A      I don't recall the dates.

 3        Q      But you are aware, as you sit here

 4   today, that sometime before today you were aware

 5   that your case had been dismissed?

 6        A      Correct.

 7        Q      Okay.  And what are the terms on which

 8   you understand that dismissal occurred?

 9        A      I'm sorry?

10        Q      Are you getting any money for

11   dismissing the case?

12        A      No.

13        Q      Did you have to agree to pay any money

14   to Dimensions Health Care as part of dismissing

15   that case?

16        A      No.

17        Q      Did you have to agree whether the

18   statute of limitations would or would not be

19   impacted by your dismissal of the case?

20        A      No.

21        Q      Did you have any discussions with

22   anyone besides your lawyers about dismissing that

23   case?

24        A      No.

25        Q      Okay.  You believed Dimensions Health
```

JA3679

Jasmine Riggins

```
 1    Care was responsible for what you say are your
 2    emotional injuries from Dr. Akoda, but yet you
 3    dismissed the case against them without getting
 4    any money; correct?
 5         A     Correct.
 6         Q     Why did you do that?
 7               MR. ZAJDEL:  Objection.
 8               To the extent he's asking for
 9    communications between your attorneys and
10    yourself.
11               THE WITNESS:  So what's the question?
12         BY MR. SHAFFER:
13         Q     I don't want to know about your
14    communication with your lawyers.  I'm just asking
15    you the question why did you agree to dismiss this
16    case.
17               Well, let me -- let me back up.  Did
18    you agree to dismiss the case?
19         A     Correct.
20         Q     Why did you agree?
21         A     Something I talked to my attorneys
22    about.
23         Q     Did you agree to dismiss the case
24    because statements you made in that litigation
25    against Dimensions Health were not true?
```

Jasmine Riggins

```
 1      A      No.
 2      Q      Okay.  You still believe everything you
 3   said in that case is true and correct to the best
 4   of your ability; right?
 5      A      Correct.
 6      Q      Let's take a look at -- at Riggins 7
 7   which is the class action complaint that was
 8   filed.
 9      A      Okay.
10      Q      Actually, I'm going to give you an
11   amended complaint that you filed in that case,
12   just because that's the one I have marked up so it
13   will be easier if we go through that one.  I'm
14   going to mark it as exhibit Riggins 13 and give
15   you a copy.
16             (Riggins Deposition Exhibit 13 was
17   marked for identification and attached to the
18   transcript.)
19      BY MR. SHAFFER:
20      Q      And, Ms. Riggins, looking at what has
21   been marked as Exhibit 13, do you recognize that
22   as the first amended class action complaint that
23   you filed in Prince George's County, Maryland,
24   against Dimensions Health Corporation --
25      A      Yes.
```

Jasmine Riggins

```
 1        Q     -- in December of 2017?

 2        A     Yes.

 3        Q     If we turn to page 3 of that document,

 4   paragraph 14, just at the bottom.

 5        A     Okay.

 6        Q     You state, Jasmine Riggins was a

 7   patient of Oluwafemi Charles Igberase between

 8   August 2012 and March 2013 at Dimensions, period.

 9   Jasmine Riggins knew Oluwafemi Charles Igberase as

10   Akoda.

11              Is that true to the best of your

12   knowledge?

13        A     Yes.

14        Q     Turn to page 11, and look at

15   paragraph 66 where you state, Between 2008 and

16   2016, Akoda was an actual and/or apparent, duly

17   authorized agent, servant and/or employee of

18   Dimensions, holding a medical staff position

19   and/or enjoying hospital privileges.

20              Is that true and correct to the best of

21   your knowledge?

22        A     Yes.

23        Q     I'm sorry?

24        A     Yes.

25        Q     Okay.  Okay.  Turn to the next page.
```

Jasmine Riggins

```
 1    Actually, let's -- let's go back to paragraph 67
 2    where you state, Between 2008 and 2016, Dimensions
 3    was responsible to assure and maintain patient
 4    safety and privacy for members of the public who
 5    received treatment from its agents, servants
 6    and/or employees, such as physicians who were
 7    medical staff members and/or enjoyed hospital
 8    privileges, including specifically but not limited
 9    to Akoda.
10              Again, true and correct to the best of
11    your knowledge?
12         A    Yes.
13         Q    Okay.  Paragraph 71 on the next page,
14    you wrote, Dimensions knew or should have known,
15    that Oluwafemi Charles Igberase had assumed a fake
16    identity using the name Charles J. Akoda, M.D.;
17    correct?
18         A    Correct.
19         Q    And that was true and correct to the
20    best of your knowledge --
21         A    Correct.
22         Q    -- correct?
23              Okay.  If you look at paragraphs 72,
24    73, 74, 75, 76, 77, 78, 79, 80, all of those
25    statements relate to things that you believed
```

1    Dimensions knew or should have done to protect you

2    from Dr. Akoda; correct?

3         A    Correct.

4         Q    And those are true and correct to the

5    best of your knowledge?

6         A    Correct.

7         Q    Okay.  And in paragraph 81, you state

8    that Dimensions' negligence was the sole and

9    proximate cause of the injuries, damages, and

10   permanent disability of named plaintiffs and class

11   members with named plaintiffs and class members

12   being in no way contributorily negligent.

13              Again, that's your statement and true

14   and correct to the best of your knowledge?

15        A    Correct.

16        Q    Turning to page 16 of this document,

17   you stated, Dimensions is liable and vicariously

18   liable for Akoda's conduct.

19              And you believe that to be true and

20   correct to the best of your knowledge?

21        A    Correct.

22        Q    In paragraph 88 you say that

23   Dimensions' negligence was the sole and proximate

24   cause of the injuries, damages and permanent

25   disability of named plaintiffs in the class, with

Jasmine Riggins

1    named plaintiffs in the class being in no way

2    contributorily negligent.

3              Correct?

4              MR. ZAJDEL:  Okay.  Before you answer,

5    what paragraph was --

6              MR. SHAFFER:  88.

7              MR. ZAJDEL:  Okay.  You can answer.

8         BY MR. SHAFFER:

9         Q    I'm going to rephrase the question.

10             In paragraph 88 you wrote that

11   Dimensions' negligence was the sole and proximate

12   cause of the injuries, damages and permanent

13   disability of named plaintiffs in the class, with

14   named plaintiffs in the class being in no way

15   contributorily negligent.

16             And you understand and believe that to

17   be true and correct; right?

18        A    Correct.

19             (Riggins Deposition Exhibit 14 was

20   marked for identification and attached to the

21   transcript.)

22        BY MR. SHAFFER:

23        Q    I'm going to hand you what's been

24   marked as Exhibit 14.

25             Riggins 14 is a document again from the

```
 1    matter of Monique Russell versus Dimensions Health
 2    Corporation entitled Claimants' Certificate of
 3    Merit.
 4              Take a quick look at this if you would.
 5        A    (Witness reviews document.)
 6        Q    Ms. Riggins, this document is entitled
 7    Claimants' Certificate of Merit, and the first
 8    page is a certificate by a gentleman named Thomas
 9    Bojko.
10              Do you see that?
11        A    Yes.
12        Q    I'm sorry.  Just try to keep your voice
13    up.
14        A    Yeah, it's a little cold in here.  I'm
15    sorry.  I'm just trying --
16        Q    That's okay.  We'll try to get it
17    warmer.
18              Okay.  Do you know who Mr. Bojko is?
19        A    I do not.
20        Q    Okay.  Do you see in the second
21    paragraph that he says he has reviewed the
22    captioned Class Action Amended Statement of Claim,
23    a final decision and order of the Board of
24    Maryland Board of Physicians, Department of
25    Justice materials, proceedings of the criminal
```

Jasmine Riggins

```
 1    case against Dr. Charles Akoda/Igberase and other

 2    related materials regarding the above captioned

 3    case?

 4         A    Yes.

 5         Q    Okay.  Do you know whether or not

 6    Mr. Bojko was hired by your lawyers to offer

 7    opinions about Dimensions Health Corporation's

 8    conduct?

 9         A    No.

10         Q    Okay.  Do you see in paragraph 3 of

11    Riggins 14 where Mr. Bojko certifies that there

12    have been violations of the applicable standards

13    of administrative care by Dimensions Health

14    Corporation and Dimensions Health Corporation

15    d/b/a Prince George's Hospital Center,

16    individually and through their duly authorized

17    agents, apparent agents, servants and/or

18    employees, including but not limited to Charles J.

19    Akoda/Oluwafemi Charles Igberase which have

20    directly and proximately resulted in damages,

21    injuries and permanent disability to the claimants

22    and others situated.

23              Do you understand what Mr. Bojko is

24    saying there?

25         A    Not really.
```

Jasmine Riggins

```
 1      Q     Okay.  Were you aware of these
 2   certifications and statements by Mr. Bojko before
 3   you dismissed your case against Dimensions Health
 4   Corporation?
 5      A     No.
 6      Q     Okay.  Turn to the third page of
 7   Exhibit 14, which is a letter dated February 26th,
 8   2018, to a Paul Vettori.
 9            Do you know Mr. Vettori?
10      A     Yes.
11      Q     Who is he?
12      A     He's an attorney.
13      Q     Okay.  Is he one of your attorneys in
14   the lawsuit in Maryland and in Philadelphia?
15      A     Yes.
16      Q     Okay.  This is a letter to him from
17   Thomas Bojko, M.D., M.S., J.D., president and
18   managing partner of Aviva Healthcare Solutions.
19   And he writes to Mr. Vettori in the first
20   paragraph, This is to acknowledge that after a
21   review of materials involved in the
22   above-referenced case, I have concluded that there
23   have been violations of the applicable standards
24   of administrative care by Dimensions Health
25   Corporation d/b/a Prince George's Hospital Center,
```

```
 1    individually and through their duly authorized
 2    agents, apparent agents, servants and/or
 3    employees, including but not limited to Charles J.
 4    Akoda/Oluwafemi Charles Igberase ("Akoda"), which
 5    have directly and proximately resulted in
 6    injuries, damages and permanent disability to the
 7    claimants and others similarly situated.
 8              Do you see that?
 9        A    Yes.
10        Q    Were you aware of Mr. Bojko's opinions
11    related to the activities of Dimensions Health
12    Corporation?
13        A    No.
14              MR. ZAJDEL:  Objection: asked and
15    answered.
16              BY MR. SHAFFER:
17        Q    Okay.  Look at the second paragraph of
18    this letter.  Mr. Bojko states, It is my opinion
19    the defendants, Dimensions Health Corporation,
20    breached the applicable standards of
21    administrative care by negligently failing to use
22    required and reasonable care to investigate,
23    credential, grant privileges, monitor and
24    supervise their medical personnel, including but
25    not limited to, Akoda and to discover, stop and
```

Jasmine Riggins

1    report any professional misconduct of which they

2    should have known.

3              Do you agree with Mr. Bojko?

4        A    Yes.

5        Q    Okay.  Next sentence he writes, As a

6    direct and proximate result of the defendants'

7    continuing negligence, the claimants, and others

8    similarly situated, suffered physical pain,

9    emotional anguish, and damages as well as personal

10   disability.

11             Do you agree with that?

12       A    Yes.

13       Q    Is that a yes?

14       A    Yes.

15       Q    Thank you.

16             And then he writes, Had the defendants

17   complied with the applicable standards of

18   administrative care the claimants, and others

19   similarly situated, would not have suffered their

20   injuries, damages and permanent disability.

21             Do you agree with that?

22             MR. ZAJDEL:  Objection: calls for a

23   legal conclusion.

24             You can answer.

25             THE WITNESS:  Yes.

Jasmine Riggins

1    BY MR. SHAFFER:

2        Q    Okay.  Do you know who hired Dr. Akoda

3    to work at Prince George's?

4        A    No.

5        Q    I just want to ask a question to make

6    sure that we're on the same page.  When we talked

7    on Thursday, I think you told me that you did not

8    have any information about ECFMG except what you

9    may have been told by your lawyers; correct?

10       A    Correct.

11       Q    Okay.  And is it fair for me to then

12   assume that if this matter were to go to a trial,

13   that you would not come to trial and expect to

14   testify about ECFMG; is that fair?

15       A    Could you repeat your question?  I'm

16   sorry.

17       Q    Sure.

18            You don't know anything about ECFMG

19   today other than what your lawyers told you;

20   right?

21       A    Correct.

22       Q    You don't have any firsthand knowledge,

23   firsthand interactions, never spoke to anybody at

24   ECFMG, never went to their Web site, never looked

25   at any of their materials; correct?

Jasmine Riggins

```
 1        A     Correct.
 2        Q     Okay.  And my question is, if you come
 3   to trial in this matter, will you agree that
 4   because you don't have that information and
 5   anything your lawyers told you isn't something you
 6   know personally, that you're not going to come to
 7   trial and testify about things regarding ECFMG?
 8                MR. ZAJDEL:  Objection.  That's a
 9   decision that's going to be made by her attorneys,
10   so I -- don't answer that question.  I instruct
11   the witness not to answer that question.
12                MR. SHAFFER:  On what grounds?
13                MR. ZAJDEL:  You're asking her about a
14   decision that's to be made between her and her
15   counsel.  You're going to -- you -- you've
16   propounded discovery.  I'm sure we've listed who
17   our witnesses are, or whatever the deadline date
18   is for discovery closing we'll list who the
19   witnesses are, and if her name is not there, she
20   won't be testifying at trial.  If her name is
21   there, she'll be testifying at trial.
22                MR. SHAFFER:  And my question was a
23   little -- it was a little more specific.
24        BY MR. SHAFFER:
25        Q     I understand you may come testify at
```

Page 132

1    trial.  What I don't want to have happen is

2    there's a situation where you come and you've

3    looked at a whole bunch of documents and materials

4    that you didn't look at before you came in here

5    today.

6              MR. SHAFFER:  So that's my question.

7    If the answer is the same, we'll take it up at the

8    appropriate time.

9              MR. ZAJDEL:  Well, I'm still going to

10   object to that question because I can't confirm or

11   deny what Ms. Riggins will see or not see before

12   the trial in preparing for a trial.

13             But if what you're trying to find out

14   is is she going to testify to her personal

15   knowledge about ECFMG differently than what she

16   testified to today, then I -- I believe that

17   answer is not going to change.  Her knowledge as

18   of today was her knowledge as of today.

19             MR. SHAFFER:  Right.

20        BY MR. SHAFFER:

21        Q    Again, in the interest of trying to

22   move this along, take a look at Riggins 11 which

23   has already been marked this morning.

24             And these are Plaintiff Jasmine Riggins

25   Responses to Defendants' Requests for Admissions

Jasmine Riggins

1    that you served on the defendants in the

2    Dimensions Health Care Corporation case in

3    Maryland, and I think Mr. Klayman asked you a

4    question or two about this?

5        A    Yes.

6        Q    And my question is in responding to

7    these requests for admissions, were you trying to

8    be as truthful and as accurate as you could be in

9    answering the questions that were asked?

10       A    Yes.

11       Q    And as you sit here today, do you

12   believe that the answers that you gave in response

13   to these requests for admissions back in the

14   Dimensions Health Care case are still true and

15   accurate to the best of your ability?

16       A    Yes.

17       Q    You don't want to change any of these

18   answers today based on the dismissal of the

19   Dimensions Health Care case; right?

20       A    No.

21       Q    Okay.

22            MR. SHAFFER:  Let's go off the record

23   for a minute.

24            THE VIDEOGRAPHER:  Off the record at

25   12:06.

Jasmine Riggins

```
 1                   (Recess -- 12:06 p.m.)

 2                   (After recess -- 12:14 p.m.)

 3                   THE VIDEOGRAPHER:  We are back on the

 4      record at 12:14.

 5           BY MR. SHAFFER:

 6           Q     Ms. Riggins, we're almost done here.  I

 7      have a few more questions for you.  I want to make

 8      sure I cover a couple of things that we started to

 9      talk about on Thursday and didn't get to finish.

10                   I think we talked a little bit about

11      the different doctors that you have seen in

12      connection with your three children.  There were

13      three different doctors that you saw, one for each

14      birth; correct?

15           A     Correct.

16           Q     And you had a C-section in connection

17      with each of them; correct?

18           A     Correct.

19           Q     And I think we saw in the medical

20      record that was prepared after your C-section

21      involving Messiah reporting the existence of

22      significant scarring at that time.

23                   Do you recall that?

24           A     Correct.

25           Q     And I think we talked about how that
```

1    was something you were not aware of prior to

2    Thursday; correct?

3         A     Correct.

4         Q     Prior to Thursday, what you had been

5    told or assumed was that that scarring had

6    occurred during the second C-section because it

7    was noted in your discussions with your third

8    doctor; correct?

9         A     Correct.

10        Q     Okay.  I think you also mentioned

11   briefly on Thursday that following the birth of

12   Messiah -- and it was a good birth; right?  He was

13   born healthy; correct?

14        A     Correct.

15        Q     -- that you have had some pain

16   resulting after the birth; is that correct?

17        A     Correct.

18        Q     What -- what exactly were you

19   describing there?  What was the condition that you

20   were describing?

21        A     The abdominal pains in my stomach.

22        Q     And do you think that that was the

23   result of having had the C-section?

24        A     Yes.

25        Q     Okay.  And have you had pain following

Jasmine Riggins

```
 1    each of the C-sections that you've had in your
 2    abdominal area?
 3         A     No, not as bad, no.
 4         Q     Okay.  It might not have been as bad,
 5    but is it fair to say that C-section is a major
 6    surgery in your abdominal area?
 7         A     Correct, but I was --
 8         Q     Okay.  Did you have abdominal pain
 9    after the first C-section?
10         A     Slight.
11         Q     And if you were experiencing pain as a
12    result of the C-section, that's something that you
13    would have reported to your doctors; correct?
14         A     I'm sorry?
15         Q     If you were experiencing pain --
16    abdominal pain following the C-sections, that's
17    something you would have reported to your doctors?
18         A     Correct.
19         Q     Okay.  I saw somewhere in -- in the
20    documents we've received reference to Charter
21    Health Clinic.
22               Do you know who that is?
23         A     Yes.
24         Q     Who is that?
25         A     It's the office -- doctor's office I
```

Jasmine Riggins

Page 137

1   used to go to.
2        Q      Okay.  When did you go there?
3        A      Years ago.
4        Q      Okay.  What kind of doctor's office?
5        A      The same as Unity.  It was actually
6   Charter before it was Unity.
7        Q      Okay.  So it was your general
8   practitioner physician?
9        A      Correct.
10       Q      Okay.  For what reasons would you go to
11  Charter Health Clinic?
12       A      Regular checkups, if I was feeling ill.
13       Q      When was the last time you were there?
14       A      I don't recall.
15       Q      Do you know whether they still have any
16  medical records from you?
17       A      I do not know that.
18       Q      Okay.  And I apologize.  I know you
19  went over this, I think, with Mr. Klayman.  But
20  when we talked on Thursday, you had mentioned some
21  communications with Monique Russell a month or so
22  ago, and we talked about and made a request at the
23  deposition that you bring those with you today.
24              And you have not done that; correct?
25       A      Correct.

Jasmine Riggins

```
 1        Q       And you have not looked for those;
 2    correct?
 3        A       Correct.
 4        Q       Why not?
 5        A       I've had other things going on,
 6    unfortunately.
 7        Q       Is that something that you are still
 8    willing to collect and provide to your attorneys
 9    to provide to us?
10        A       Yes.
11        Q       Okay.  And just so I'm clear, the
12    things that you think Dr. Akoda did that were
13    wrong are what?
14        A       Performing on women, doing C-sections,
15    looking at women's private parts, violating them,
16    touching them, not being honest with them.
17        Q       And what is it that you think ECFMG
18    should have done?
19        A       Paid attention to his credentials and
20    actually paid attention to him being interviewed
21    under two different names.  Just be more careful
22    about their job, pretty much.  Be more careful
23    about who they certify.
24        Q       And do you know whether or not they
25    identified instances where Dr. Akoda had used
```

Jasmine Riggins

1    multiple names?

2         A    I'm sorry?

3         Q    **Are you aware of whether or not ECFMG**

4    **actually identified situations where Dr. Akoda had**

5    **used different names?**

6         A    Could you rephrase your question?  I'm

7    sorry.

8              MR. SHAFFER:  Can you read it back?

9              (The Record was read as requested.)

10             THE WITNESS:  I'm not aware.

11             MR. ZAJDEL:  I'm sorry.  I didn't hear

12   that.

13             MR. SHAFFER:  She said, I think, I'm

14   not aware.

15             THE WITNESS:  I -- no.  Sorry.

16             MR. ZAJDEL:  Can -- are you answering

17   the question no, you're not aware?  I want to make

18   sure --

19             MR. SHAFFER:  Yeah.

20             MR. ZAJDEL:  -- I understand.  I'm not

21   trying to be in the way.

22             THE WITNESS:  Right.

23             So you're asking if I'm aware -- I'm

24   sorry.

25             MR. SHAFFER:  That's all right.

Page 140

```
 1    Let's --
 2              THE WITNESS:  I'm --
 3              MR. SHAFFER:  -- try --
 4              THE WITNESS:  -- having --
 5              MR. SHAFFER:  -- again.
 6              THE WITNESS:  -- a hard time
 7    comprehending this question.
 8              MR. ZAJDEL:  So you haven't answered
 9    the question yet?
10              THE WITNESS:  No.
11              MR. ZAJDEL:  Okay.  I didn't know if
12    she was answering your question or.
13              MR. SHAFFER:  I'm not sure either.  So
14    we're going to have --
15              THE WITNESS:  Sorry.
16              MR. SHAFFER:  -- the court reporter --
17    that's okay.  We're going to have the court
18    reporter read it back and see if -- see if we can
19    get there.
20              (The Record was read as requested.)
21              THE WITNESS:  No.  I'm sorry.  I'm
22    having a hard time comprehending that question.
23         BY MR. SHAFFER:
24         Q    Well, let me -- let me ask it again
25    because I don't want there to be any confusion
```

Jasmine Riggins

```
 1    about it.

 2            You said ECFMG should be more careful;

 3    right?

 4       A    Uh-huh.

 5       Q    Those were your words?

 6       A    Yes.

 7       Q    All right.  And my question, you said

 8    sort of -- strike that.

 9            And I guess my question was, do you

10    know or would it make a difference in your mind if

11    you were to learn that ECFMG actually did find

12    situations where Dr. Akoda had tried to use

13    different names?

14       A    Would it make a difference in my mind?

15            I'm sorry.

16       Q    You don't know?

17       A    No.

18       Q    Would it make a difference in your mind

19    if you were to learn that ECFMG had cooperated

20    with the U.S. Attorney's Office and helped them

21    build a case against Dr. Akoda?

22       A    Possibly, you know.

23       Q    Okay.  And tell me again what you think

24    Dimensions Health Care should have done to prevent

25    Dr. Akoda from seeing you?
```

Jasmine Riggins

1        MR. ZAJDEL:  Objection: asked and
2   answered.
3              You can answer.
4              THE WITNESS:  Okay.  Just be more
5   careful about who they allow to practice in their
6   offices, hospitals; pay more attention; be more --
7   take more pride in what they do, you know what I
8   mean, like -- just being on top -- being more
9   careful.
10             MR. SHAFFER:  Okay.  I don't -- I don't
11  have any more questions at this time.  We reserve
12  the right to -- to requestion Ms. Riggins in light
13  of additional documents that might be produced or
14  a change in her position regarding the information
15  that she has not been able to speak to from
16  personal knowledge here today, whether regarding
17  ECFMG or something else.
18             But subject to those comments, we'll
19  adjourn the deposition.
20             MR. ZAJDEL:  Okay.  I don't have any
21  questions.
22             THE VIDEOGRAPHER:  If that is
23  everything, we are off the record on
24  September 16th, 2019, at 12:26.
25

Jasmine Riggins

1                    (Signature having not been waived, the

2    Videotaped Deposition of JASMINE RIGGINS ended at

3    12:26 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA3704

Jasmine Riggins

```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2              I, Dana C. Ryan, Registered Professional

 3   Reporter, Certified Realtime Reporter, the officer

 4   before whom the foregoing proceedings were taken

 5   do hereby certify that the foregoing transcript is

 6   a true and correct record to the best of my

 7   ability of the proceedings; that said proceedings

 8   were taken by me stenographically and thereafter

 9   reduced to typewriting under my supervision; and

10   that I am neither counsel for, related to, nor

11   employed by any of the parties to this case and

12   have no interest, financial or otherwise, in its

13   outcome.

14              IN WITNESS WHEREOF, I have hereunto set

15   my hand and affixed my notarial seal this 26th day

16   of September 2019.

17   My Commission expires:

18   July 15, 2020

19

20

21

22   _____

23   NOTARY PUBLIC IN AND FOR THE

24   DISTRICT OF COLUMBIA

25
```

JA3705

Jasmine Riggins

1          ACKNOWLEDGMENT OF DEPONENT

2              I, Jasmine Riggins, do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true,

5    correct and complete transcription of the

6    testimony given by me and any corrections appear

7    on the attached Errata sheet signed by me.

8

9

10

11   _____          _____

12   (DATE)                       (SIGNATURE)

13

14

15          CERTIFICATE OF NOTARY PUBLIC

16   Sworn and subscribed to before me this

17   _____ day of _____, _____

18

19

20   _____          _____

21   NOTARY PUBLIC                MY COMMISSION EXPIRES

22

23

24

25

JA3706

Jasmine Riggins

| Exhibits | | | |
|---|---|---|---|

**Riggins 02**
47:11 71:11 85:8

**Riggins 03**
47:16 78:22 79:3 85:8

**Riggins 04**
48:4 82:1,7 86:14

**Riggins 05**
48:10 87:12,17

**Riggins 06**
48:15 90:12,17

**Riggins 07**
48:20 95:11,17 115:22

**Riggins 08**
48:21 96:20,25

**Riggins 09**
49:4 101:12,17

**Riggins 10**
49:7 103:5,10 107:20 108:25

**Riggins 11**
49:12 105:13, 19 132:22

**Riggins 12**
49:18 114:10, 15 116:6,13

**Riggins 13**
49:22 120:14, 16,21

**Riggins 14**
49:24 124:19, 24,25 126:11 127:7

---

**"**

**"akoda** 128:4

---

**0**

**0** 93:21,23,24 94:1,2,3,5,7,8, 9,10 98:16,18, 21,23,24 99:1, 2,3,5 100:8

**09/23/2016**
76:1,5

---

**1**

**1** 73:15 80:7 89:16 91:5 97:16 104:10

**10** 103:5,10 107:20 108:25

**11** 96:11 105:11,13,19 121:14 132:22

**1111** 50:8

**11:23** 111:13, 14

**11:35** 111:15, 17

**12** 94:10 99:6 114:10,15 116:6,13

**12:06** 133:25 134:1

**12:14** 134:2,4

**12:26** 142:24

**13** 83:17 90:23

---

93:18 115:3 117:12 120:14, 16,21

**14** 83:5 102:20 121:4 124:19, 24,25 126:11 127:7

**16** 123:16

**16th** 50:5 142:24

**18-5629** 50:13

**18th** 103:15

**19th** 79:8

---

**2**

**2** 71:11,24 73:16 85:8 89:17 97:16 98:19 99:5 104:12

**2/2016** 80:23

**2000** 96:10

**20004** 50:9

**20019** 96:3 102:9

**2008** 121:15 122:2

**2012** 121:8

**2013** 121:8

**2015** 56:2 68:7

**2016** 56:2,3 72:5,24 74:15 75:18 76:14 78:9 79:16 81:5,6 85:12 121:16 122:2

---

**2017** 79:8 80:13 81:23 84:19 85:3,4,9 87:22, 25 89:20 90:10,23 91:11,25 92:8, 17,18 93:2 94:16 96:10,18 97:6,20 98:6 99:11,24 100:7 101:5 112:9 121:1

**2018** 89:1 102:20 103:2 127:8

**2019** 50:5 65:16 83:17 86:22 103:16 104:17 105:3 107:19 115:3 142:24

**21** 106:14

**23rd** 72:5

**26th** 127:7

**27** 89:1

**2nd** 92:9,18

---

**3**

**3** 73:18 78:22 79:3 84:13 85:8 86:14 97:17 121:3 126:10

**304** 96:3 102:7

**312** 96:2 102:6

**37th** 96:2 102:6

**3rd** 115:3 117:23

---

**4**

**4** 81:25 82:1,7 86:14 92:16,17

---

**5**

**5** 87:12,17

---

**6**

**6** 90:12,17

**6408** 72:9 73:10

**6409** 74:25

**6442** 87:18

**6478** 90:18

**6480** 97:1

**6488** 103:11

**66** 121:15

**67** 122:1

---

**7**

**7** 93:17 95:10, 11,17 115:22, 25 116:12 120:6

**71** 122:13

**72** 122:23

**73** 122:24

**74** 122:24

**75** 122:24

**7576** 79:2 80:18

**7577** 81:9

---

Jasmine Riggins

| | | | | |
|---|---|---|---|---|
| **76** 122:24 | **abortion** 80:23 | 126:13 127:24 128:21 129:18 | **agree** 62:8,17 118:13,17 | **allow** 142:5 |
| **77** 122:24 | **abortions** 78:5, 12 81:2 | **admissions** 106:1 132:25 | 119:15,18,20, 23 129:3,11,21 | **almost** 86:11 134:6 |
| **78** 122:24 | **above** 126:2 | 133:7,13 | 131:3 | **along** 132:22 |
| **79** 122:24 | **above-** | **adult** 73:14 104:10 | **ahead** 75:20 76:21 | **already** 99:19 132:23 |
| **7th** 87:22 | **referenced** 127:22 | **affirmatively** 112:6 | **Akoda** 57:4 58:19 64:2 | **also** 56:11,15, 19,23 63:7 |
| | **acc-** 76:13 | | 71:4 84:19,25 85:15 95:4 | 77:11 90:18 135:10 |
| **8** | **Accepted** 73:16 | **after** 64:2 85:14,23 87:25 89:1 92:5 | 112:20 119:2 121:10,16 | **always** 65:4 72:19 86:12 |
| **8** 96:20,25 | **accepting** 77:8 | 111:15 127:20 134:2,20 | 122:9,16 123:2 128:25 130:2 | 93:21 98:16 108:12 |
| **80** 122:24 | **accepts** 70:15 | 135:16 136:9 | 138:12,25 139:4 141:12, | **amended** 120:11,22 |
| **81** 123:7 | **accident** 70:4 | **again** 69:16 74:6 79:4,18, | 21,25 | 125:22 |
| **8683** 115:1 | **accurate** 76:14 78:9 81:21,22 | 23 85:10 87:18 88:21 89:11 | **Akoda's** 55:16 123:18 | **Amendment** 76:24 77:5 |
| **88** 123:22 124:6,10 | 86:20,24 89:18 90:9 91:9,24 | 90:1,25 91:3, 17 97:9,22 | **Akoda/igberase** 126:1 | **American** 56:23 |
| | 98:5 99:10 104:15 105:2 | 98:8 103:12 122:10 123:13 | **Akoda/** | **Amerigroup** 70:18 |
| **9** | 133:8,15 | 124:25 132:21 140:5,24 | **oluwafemi** 126:19 128:4 | **and/or** 121:16, 17,19 122:6,7 |
| **9** 101:12,17 | **acknowledge** 127:20 | 141:23 | **alcohol** 76:4,5, 6 | 126:17 128:2 |
| **9:00** 68:24 | **action** 95:21 120:7,22 | **against** 55:6 87:7,9 101:8 | **Alison** 73:1 | **anesthesia** 93:8,9 |
| **9:56** 50:6 | 125:22 | 106:16 111:22 113:15,21 | **all** 55:1 57:10, 18,19 70:6 | **angry** 57:9 |
| **9th** 97:6 | **active** 113:1 | 115:16 116:14 117:14,18,22 | 75:2,10 77:14 81:2 85:6 94:1, | **anguish** 129:9 |
| | **activities** 128:11 | 119:3,25 120:24 126:1 | 2,6,7,12 98:21, 23 99:1,2,8 | **another** 54:11 71:1 90:17 |
| **A** | **actual** 121:16 | 127:3 141:21 | 100:8 102:24 111:10 122:24 | 97:2 109:25 110:1 |
| **a.m.** 50:6 111:14,15 | **actually** 102:18 120:10 122:1 | **agent** 121:17 | 139:25 141:7 | **answerable** 52:21 |
| **abdominal** 135:21 136:2, | 137:5 138:20 139:4 141:11 | **agents** 122:5 126:17 128:2 | **allegations** 106:16 | **answering** 109:5 133:9 |
| 6,8,16 | **additional** 142:13 | **ago** 51:13 56:1 115:3 117:3, | **allege** 55:12 | |
| **Abdul** 56:19 | **adjourn** 142:19 | 12,17 137:3,22 | | |
| **ability** 120:4 133:15 | **administrative** | | | |
| **able** 53:15 59:23 93:20 98:15 111:4 142:15 | | | | |

Jasmine Riggins

139:16 140:12

**answers** 82:15 83:10,12 133:12,18

**anxiety** 59:15

**anxiety/worry** 81:18

**anxious** 60:7 93:25 98:20

**anybody** 51:22 110:9 113:11, 14 130:23

**anyone** 57:3 118:22

**anything** 52:14 57:4 58:15,17 67:2,20 70:3 77:18 130:18 131:5

**Apartment** 96:3 102:6

**apologize** 137:18

**apparent** 121:16 126:17 128:2

**appears** 90:19

**applicable** 126:12 127:23 128:20 129:17

**appointment** 65:12 73:11 80:5 89:12 91:5 97:13 104:10

**appreciate** 69:4

**appropriate** 132:8

**April** 103:15 104:17 105:3 107:19

**area** 72:19 136:2,6

**around** 56:3

**ashamed** 57:10

**aside** 103:3

**assert** 76:24

**assign** 70:19, 24

**assume** 130:12

**assumed** 122:15 135:5

**assure** 122:3

**attached** 71:12 78:23 82:2 87:13 90:13 95:12 96:21 101:13 103:6 105:14 114:11 120:17 124:20

**attention** 138:19,20 142:6

**attorney** 127:12

**Attorney's** 141:20

**attorney-client** 52:18,20 113:18 116:25

**attorneys** 52:24 119:9,21 127:13 131:9 138:8

**August** 65:14, 15,16 121:8

**authorities** 83:14

**authorized** 121:17 126:16 128:1

**Avenue** 50:8

**aver** 83:9

**Aviva** 127:18

**aware** 118:3,4 127:1 128:10 135:1 139:3, 10,14,17,23

---

### B

**baby** 89:1

**back** 58:25 63:11 82:24 89:1 111:16 115:21 119:17 122:1 133:13 134:3 139:8 140:18

**bad** 68:10 78:21 85:21 136:3,4

**Ballpark** 78:12

**based** 133:18

**basis** 59:1 77:5

**Bates** 72:7,13, 14 74:25 79:2 87:18 90:18 97:1 103:11 115:1

**became** 67:9

**become** 58:16

**before** 58:17 67:3,8 77:18

78:15,17 83:1, 2,25 85:9 101:18 115:5 117:23 118:4 124:4 127:2 132:4,11 137:6

**began** 51:18 61:7 84:18 100:10

**begin** 85:16

**beginning** 54:8 79:2

**begins** 87:18 90:18 103:11

**behalf** 50:20,22

**being** 50:7 55:23 57:24,25 58:9 69:25 108:9 123:12 124:1,14 138:16,20 142:8

**belief** 83:12

**believe** 57:12 68:7 93:1 101:10 113:4 120:2 123:19 124:16 132:16 133:12

**believed** 112:17 118:25 122:25

**besides** 118:22

**best** 61:1,6 83:11 120:3 121:11,20 122:10,20 123:5,14,20 133:15

**better** 94:22

**between** 51:20 52:24 108:15, 18 109:8,20 116:25 119:9 121:7,15 122:2 131:14

**beyond** 57:13 67:13

**big** 114:2

**birth** 68:10 69:16 91:14 92:5,7,11 93:17 104:11, 12 134:14 135:11,12,16

**bit** 134:10

**blame** 60:4

**blamed** 93:23 98:18

**Board** 56:16,24 125:23,24

**Bojko** 125:9,18 126:6,11,23 127:2,17 128:18 129:3

**Bojko's** 128:10

**bolded** 73:9 80:19 81:11 89:13,22

**born** 135:13

**bottom** 80:19 83:5 84:17 86:15 97:1 121:4

**breached** 128:20

**break** 111:9

**Brian** 50:22 51:14

Jasmine Riggins

**briefly** 135:11

**bring** 137:23

**bringing** 62:13

**brought** 55:6

**build** 141:21

**bunch** 72:8
132:3

---

**C**

**C-SECTION**
63:4 92:25
93:3 134:16,20
135:6,23
136:5,9,12

**C-SECTIONS**
78:5,15,18
80:22 136:1,16
138:14

**C/s** 92:24

**CAL17-22761**
116:2,10

**call** 72:13

**called** 83:2

**calls** 129:22

**came** 68:21
132:4

**Campbell** 50:3

**can't** 57:11,12
61:8,9 82:9
102:1 132:10

**caption** 96:1
102:3 106:6
116:7

**captioned**
125:22 126:2

**captured** 92:15

**car** 70:3

**care** 65:19,20
72:1,17 73:22
79:4,12,15
80:13 86:16
87:4,19 89:17
90:19 97:2,19
103:13,23,24,
25 104:17
108:7,11
109:1,13
110:5,12
111:23 112:18
113:8,12,16,21
115:16 116:15
117:15,18,22
118:14 119:1
126:13 127:24
128:21,22
129:18 133:2,
14,19 141:24

**careful** 138:21,
22 141:2
142:5,9

**case** 52:1 62:8,
10,24 63:1
102:3 106:6
115:13,25
116:14 117:4,
14,18,21
118:5,11,15,
19,23 119:3,
16,18,23
120:3,11
126:1,3 127:3,
22 133:2,14,19
141:21

**cause** 62:22
123:9,24
124:12

**caused** 100:12

**Center** 56:12

93:6 126:15
127:25

**certain** 52:4,8
70:14 82:23

**certificate** 83:1
115:2 125:2,7,
8

**certificates**
67:17

**certifications**
127:2

**certified** 88:10

**certifies** 126:11

**certify** 138:23

**chance** 114:22

**change** 132:17
133:17 142:14

**Charles** 121:7,
9 122:15,16
126:1,18,19
128:3,4

**Charter** 136:20
137:6,11

**Chaudry** 56:20

**check** 67:16

**checkups**
137:12

**child** 68:3
69:15 91:14
93:2 94:18

**children** 134:12

**choice** 70:25

**choose** 66:12

**Circuit** 95:22
106:3 114:16
115:9

**circumstances**
52:1

**claim** 62:13,16
106:15 125:22

**claimants**
126:21 128:7
129:7,18

**Claimants'**
125:2,7

**class** 95:21
120:7,22
123:10,11,25
124:1,13,14
125:22

**clear** 54:18
138:11

**clinic** 65:21
136:21 137:11

**closing** 131:18

**CNM** 88:5

**cold** 107:18
125:14

**colleague**
53:23 112:8

**colleagues**
51:14

**collect** 138:8

**come** 86:3,13
130:13 131:2,
6,25 132:2

**comes** 59:16

**comment** 77:22

**comments**
142:18

**Commission**
50:10,23 51:1
55:7

**communication**
119:14

**communication
s** 51:21 52:4,8,
23 53:4,6,16,
23 54:1 59:7
116:24 119:9
137:21

**company**
70:19,24 72:1

**complaint**
95:21 102:14
120:7,11,22

**complete** 53:15

**completely**
62:23

**complications**
92:23

**complied**
129:17

**compound**
99:15

**comprehending**
140:7,22

**concluded**
127:22

**conclusion**
129:23

**condition**
135:19

**conduct** 123:18
126:8

**confidential**
77:18

**confidentiality**
77:17

**confirm** 132:10

JA3710

Jasmine Riggins

**confused** 105:19

**confusion** 140:25

**connection** 91:13 113:8 134:12,16

**consider** 109:23

**considered** 68:19

**contend** 56:8, 11,15,19,23 57:4

**continues** 101:23

**continuing** 129:7

**continuously** 79:15 85:23

**contributorily** 123:12 124:2, 15

**control** 68:10 104:11,12

**cooperated** 141:19

**copies** 53:3

**coping** 94:4 98:24

**copy** 120:15

**Corp** 106:8 116:9

**Corporation** 120:24 125:2 126:14 127:4, 25 128:12,19 133:2

**Corporation's** 126:7

**correct** 51:18, 19 52:13 55:7, 8,11,13,14,17 56:6,10,14,18, 22 57:2,7,21, 22 58:4 59:2,3, 6,9 63:17 66:11 69:13 70:2 71:2 72:25 75:18,19 78:9,10 79:17, 25 83:11 84:12 85:1 86:22,23 87:1,2 88:2 90:10 93:9,11, 14 94:15,17 95:24 97:18,21 100:24 106:13 107:15,17 108:1,8 109:3, 6 112:9,10,21, 23,24 113:2 114:1,5,8 116:11,18,19 118:6 119:4,5, 19 120:3,5 121:20 122:10, 17,18,19,21,22 123:2,3,4,6,14, 15,20,21 124:3,17,18 130:9,10,21,25 131:1 134:14, 15,17,18,24 135:2,3,8,9,13, 14,16,17 136:7,13,18 137:9,24,25 138:2,3

**correctly** 94:12 99:8

**Cory** 50:20

**counsel** 50:16, 25 51:9 82:22 111:18 131:15

**counsel's** 77:8

**County** 95:23 106:4 114:17 115:10 120:23

**couple** 56:1 61:3,4 72:15 92:14 97:23 98:10 134:8

**course** 65:2

**court** 50:12,15, 17 71:16,18,19 79:1 82:5 87:16 90:16 95:15,22 96:24 101:16 103:9 105:12,17 106:3 111:22 114:16 115:9 140:16,17

**cousin** 66:16, 17,18,25 67:6, 14

**cover** 134:8

**covered** 71:7

**credential** 128:23

**credentials** 58:14 67:17 138:19

**cried** 61:21

**criminal** 125:25

**cry** 61:13,16 63:9

**crying** 94:8 99:3

**current** 75:13, 14 76:1,2,3,5 89:2

---

**D**

---

**D.C.** 50:9 96:3 102:9

**d/b/a** 126:15 127:25

**damages** 123:9,24 124:12 126:20 128:6 129:9,20

**Dana** 50:15

**dash** 91:6

**date** 50:5 68:21,22 69:11 75:25 79:7 84:9,10 87:21, 25 90:22 92:16,17,18,19 97:6 103:15 131:17

**dated** 72:4 76:4 83:17 115:3 127:7

**dates** 107:3,4,8 118:2

**daughter** 93:15

**David** 50:3

**Davida** 66:21

**day** 68:23 75:14 86:11 101:11 109:3, 5,15

**days** 115:3 117:12

**deadline** 131:17

**deal** 109:24 114:2

**December** 121:1

**decide** 54:4

**decided** 87:7,9

**decision** 125:23 131:9, 14

**defendant** 50:23 51:2,9 111:18

**defendants** 106:17 128:19 129:16 133:1

**defendants'** 105:25 129:6 132:25

**deliver** 68:3

**delivered** 93:2

**delivery** 92:15, 18,24 93:5,10

**deny** 132:11

**Department** 125:24

**Depending** 69:8

**deponent** 50:14

**deposition** 50:7 51:3,17 54:9 71:11 77:14 78:22 82:1 87:12 90:12 95:11 96:20 101:12

JA3711

Jasmine Riggins

103:5 105:13 106:20 107:14, 23 114:10,15 120:16 124:19 137:23 142:19

**depressed** 59:19 74:8 81:18 90:5 91:20 98:1 104:24 105:6,9 106:20 107:2, 16,21,25 108:1,4,10,14, 18 109:8,20 111:6

**depression** 64:9,12 93:19 98:12 106:15 110:10,23 111:2

**describing** 135:19,20

**deserves** 77:16

**diagnosed** 64:8

**difference** 141:10,14,18

**different** 134:11,13 138:21 139:5 141:13

**differently** 132:15

**difficulties** 100:10

**difficulty** 60:22 94:5 99:1 100:2,8,12,13, 21

**Dimensions** 106:8 111:22 112:17 113:8,

12,16,21 115:16 116:8, 15 117:14,18, 22 118:14,25 119:25 120:24 121:8,18 122:2,14 123:1,17 125:1 126:7,13,14 127:3,24 128:11,19 133:2,14,19 141:24

**Dimensions'** 123:8,23 124:11

**direct** 84:16 129:6

**directly** 62:16 126:20 128:5

**disability** 123:10,25 124:13 126:21 128:6 129:10, 20

**discharge** 92:16,17

**discover** 128:25

**discoverable** 54:4

**discovery** 82:21 131:16, 18

**discuss** 64:12 77:23

**discussed** 64:14

**discussing** 72:2

**discussion** 52:10 117:6

**discussions** 118:21 135:7

**dismiss** 113:15 119:15,18,23

**dismissal** 114:18 115:8 117:11 118:8, 19 133:18

**dismissed** 113:21 114:3 116:16 117:4, 14,19,22 118:5 119:3 127:3

**Dismisses** 115:13

**dismissing** 118:11,14,22

**disorder** 63:23

**distress** 55:13, 15,19 56:4,9, 13,17,21 57:1, 6,8 59:15 62:13,15 64:1, 15,18,23 85:17,23 86:7 100:14,23

**District** 50:12

**doctor** 55:24 58:1,2,6,12,16, 17 65:10,23 66:5,13 67:25 68:1 70:22,25 71:1 72:20 84:20 85:16 88:19 89:6 103:23,24,25 104:5 135:8

**doctor's** 65:11, 21 67:7 72:24

136:25 137:4

**doctors** 67:23 70:14,20 134:11,13 136:13,17

**document** 71:23 79:2 82:6,8,14,23 83:25 87:17 90:17 95:16,18 96:25 101:17, 18,21,23 102:3 103:10 105:20, 21 114:21 115:4,7,12 121:3 123:16 124:25 125:5,6

**documents** 57:24 82:17 117:11 132:3 136:20 142:13

**done** 51:24 53:17 123:1 134:6 137:24 138:18 141:24

**down** 74:7 75:1 77:25 80:4,17 81:13 90:4 91:17,20 92:2 98:1,8,10 104:19,24

**drink** 76:6

**drinking** 76:22

**drinks** 76:8,9

**drug** 75:25 76:1

**Drug/alcohol** 75:20

**drugs** 76:2

**duly** 51:7 121:16 126:16

128:1

**during** 93:10 109:10,15 135:6

---

**E**

---

**each** 99:22 109:4 134:13, 17 136:1

**earlier** 84:2 100:1,10,22

**early** 69:6

**easier** 120:13

**Eastern** 50:12

**ECFMG** 55:9,10 56:7,8 82:22 101:8 130:8, 14,18,24 131:7, 132:15 138:17 139:3 141:2, 11,19 142:17

**Educational** 50:10,23 51:1 55:6

**effects** 68:11

**either** 140:13

**embarrassed** 57:9

**emergency** 69:18,24

**emotional** 55:13,19 56:4, 9,13,17,21 57:1,6,8 59:14 62:13,15 64:14,18,22 85:17,22 86:7 100:14,23

Jasmine Riggins

110:10 112:18
119:2 129:9

**emotions** 57:10

**employee**
121:17

**employees**
122:6 126:18
128:3

**enable** 57:4

**end** 53:17
72:11

**ending** 115:1

**enjoyed** 122:7

**enjoying**
121:19

**enjoyment** 60:1
93:22 98:17

**entitled** 82:14
114:17 125:2,6

**epidural/spinal**
93:8

**equals** 76:6,7

**equipped**
110:21

**EST** 73:14
104:11

**estimate** 61:1,6

**estimation**
110:22

**et al** 106:7
116:8,9

**even** 57:11
94:22

**events** 63:23

**every** 86:11

**everything**
120:2 142:23

**exact** 72:19

**exactly** 135:18

**exam** 73:18
97:17

**EXAMINATION**
51:9 111:18

**example** 70:4

**except** 130:8

**excuse** 104:19

**exhibit** 71:11
78:22 79:3
82:1,7 85:8
86:14 87:12,17
90:12,17
95:11,17
96:20,25
101:12,17
103:5,10
105:13,19
107:20 108:25
114:10,15
115:22 120:14,
16,21 124:19,
24 127:7

**exhibits** 77:20
115:20

**existence**
134:21

**exits** 51:3

**expect** 130:13

**experience**
85:22 86:6

**experiencing**
84:18 85:16
136:11,15

**extent** 52:19,23
116:23 119:8

**eye** 96:10

---

**F**

**Facebook** 59:2
64:3 84:3,24

**fact** 63:3

**factors** 62:14

**facts** 51:25
62:23 88:10

**factual** 83:9

**failing** 128:21

**fair** 130:11,14
136:5

**fake** 55:24
122:15

**falsification**
83:14

**familiar** 82:10
102:1

**Family** 74:25

**far** 63:1 85:7

**February** 79:8
80:13 81:23
127:7

**feel** 57:9 60:10,
13,19 61:10,
15,16 63:2
109:15 110:11

**feeling** 74:7
90:4 91:20
98:1 104:23
105:5,8 107:2,
16,21,25
108:1,4,10,14,
17 109:8
110:22 111:6
137:12

**felt** 85:20 94:1,
6 98:22 99:2

**female** 93:12

**few** 61:2 68:14,
19 69:22 76:8
117:3 134:7

**fifth** 76:24 77:5
98:10

**figure** 94:24

**file** 111:25
112:11

**filed** 95:8 96:15
101:4 102:14,
20,24 103:1
112:15,16
114:3 120:8,
11,23

**final** 77:19
125:23

**find** 53:6 59:11,
13 68:1 132:13
141:11

**finish** 134:9

**finished** 114:20

**first** 58:25 66:1
73:9 75:1,12
82:15,17 84:17
89:13 97:5,23
98:10 104:9
106:3 115:24
116:7 120:22
125:7 127:19
136:9

**firsthand**
130:22,23

**five** 76:7

**flip** 101:19
114:25

**flowsheet**
92:16

**following**
135:11,25
136:16

**follows** 51:7

**foregoing**
83:10

**Foreign** 50:10,
23 51:1 55:7

**forget** 65:13

**Forgive** 88:12

**forgot** 88:11

**forward** 60:1
93:22 98:17

**found** 55:23
85:20

**four** 76:9 78:4

**FP** 104:12

**frequently** 86:6

**front** 96:8
102:17 115:21

**full** 84:17

**funny** 59:23
93:21 98:16

**fuzzy** 96:9

---

**G**

**gather** 52:11
73:4 92:4

**gave** 92:5
108:24 133:12

**Gender** 93:12

**general** 59:17

Jasmine Riggins

61:12,14,17
66:7 104:6
137:7

**gentleman**
125:8

**George's** 56:12
95:23 106:4
114:17 115:9
120:23 126:15
127:25 130:3

**getting** 58:25
60:13 94:3
98:23 113:12
118:10 119:3

**give** 61:1,6
71:19 92:7
94:24 100:25
101:11 120:10,
14

**giving** 63:23
68:10

**glass** 76:7

**Golkow** 50:4

**gone** 110:6

**good** 51:11,12
60:7,11 94:1,2
98:21,22
135:12

**gotten** 73:22
113:7

**Graduates**
50:11,24 51:2
55:7

**grandmother**
63:11

**grant** 128:23

**Great** 53:21
54:25 55:4
94:23

**ground** 54:10

**grounds**
131:12

**guess** 69:9
79:15 96:9
110:23 141:9

**guideline** 76:9

**guilty** 55:16

**Gynecologists**
56:24

---

**H**

**hand** 124:23

**handed** 71:23
79:1 82:5
87:16 90:16
95:15 96:24
101:16 103:9
105:17 114:14

**handwritten**
116:1

**happen** 81:4
132:1

**happened** 81:2

**hard** 140:6,22

**harming** 63:19
94:9 99:4

**having** 51:7
107:14 135:23
140:4,22

**head** 61:5
102:16

**health** 65:19,20
70:6 72:1,17
73:22 79:4,12,
14 80:13 86:16
87:4,19 90:19

97:2,19
103:13,23,24,
25 104:17
106:8 108:7,10
109:1,13
110:5,12
111:22 112:18
113:8,12,16,21
115:16 116:9,
15 117:15,18,
22 118:14,25
119:25 120:24
125:1 126:7,
13,14 127:3,24
128:11,19
133:2,14,19
136:21 137:11
141:24

**Healthcare**
127:18

**healthy** 75:3
135:13

**hear** 63:13
104:3 139:11

**held** 50:7
115:15

**help** 110:8

**helped** 141:20

**here** 55:5 87:21
90:1 91:3
100:6 101:8
105:19 107:18
114:6 116:13
118:3 125:14
132:4 133:11
134:6 142:16

**here's** 117:2

**higher** 94:10
99:6

**hired** 126:6
130:2

**history** 73:25
74:25 75:11
78:1 80:18
89:23 97:22
104:20

**HIV** 73:16

**holding** 121:18

**honest** 57:25
58:3,5,9
138:16

**honestly**
101:22,24
109:21 111:7

**hopeless** 74:8
90:5 91:20
98:1 104:24

**hospital** 56:12
68:13 93:5
121:19 122:7
126:15 127:25

**hospitalization**
68:9

**hospitalized**
68:4 69:15

**hospitals** 142:6

**hours** 68:15,19
69:12

---

**I**

**identification**
71:12 78:23
82:2 87:13
90:13 95:12
96:21 101:13
103:6 105:14
114:11 120:17
124:20

**identified**
138:25 139:4

**identify** 50:16

**identity** 122:16

**lgberase** 121:7,
9 122:15
126:19 128:4

**ill** 137:12

**Illness** 74:1
89:23 97:23
104:20

**Immediately**
85:18,19

**impacted**
118:19

**including** 77:19
117:11 122:8
126:18 128:3,
24

**independent**
51:24

**indicating**
112:5

**individually**
126:16 128:1

**information**
77:16 83:11
116:21,22
130:8 131:4
142:14

**initiate** 102:15

**initiated** 111:21

**injuries** 84:18
86:17 87:5
112:19 119:2
123:9,24
124:12 126:21
128:6 129:20

**injury** 56:5

**instances**

Jasmine Riggins

138:25

**instruct** 76:16
131:10

**instructed** 77:2

**instructing**
76:24

**instruction**
77:9

**insurance** 70:7,
9,13,16,19,24
71:3,8

**insurances**
70:15

**interactions**
112:19 130:23

**interest** 74:5,6
90:2,3 91:18,
19 97:24,25
104:22,23
132:21

**interested**
109:17

**intermittent**
85:24,25 86:1
110:23

**interrogatories**
82:11,16,23
83:10 84:14
88:1

**interrogatory**
85:15

**interviewed**
138:20

**into** 57:11
98:14

**Intrapartum**
92:23

**investigate**

128:22

**involved**
127:21

**involving**
134:21

**issue** 54:24
55:1,3

**item** 75:1 81:14

---

**J**

**J.D.** 127:17

**Jasmine** 50:14
51:6 82:15
83:8,22 96:2
102:6 121:6,9
132:24

**job** 138:22

**July** 84:19
85:4,9 87:25

**June** 83:17
86:22

**Justice** 125:25

---

**K**

**keep** 87:10
125:12

**kind** 54:12 66:5
96:8 104:5
114:2 137:4

**kinds** 73:21

**King** 65:24,25
66:3,5,12 67:1,
3,8,16

**King's** 66:1
67:11,19

**Klayman** 50:25
51:10,14 53:2
54:6,7 58:24
60:18 62:12,
19,21 71:14,
17,22 76:20,23
77:4,7,21,24
78:25 80:3
81:25 82:4
87:15 88:11,13
90:15 95:10,14
96:23 99:18,21
100:20,25
101:2,15 103:8
105:11,16
111:8 115:22
133:3 137:19

**Klemmer** 88:5,
6,8,14,16,22,
25 89:3,8,20
91:1,10,13
97:10

**knew** 117:3
121:9 122:14
123:1

**knowing** 63:1

**knowledge**
83:11 121:12,
21 122:11,20
123:5,14,20
130:22 132:15,
17,18 142:16

**known** 63:24
122:14 129:2

---

**L**

**L-I-M-E-S**
66:23,24

**language** 73:9
81:11 89:13,22

**last** 61:19 65:7,

10,11 66:22
79:15 81:13
88:24 91:4
114:25 137:13

**late** 68:17 69:5

**later** 69:12

**laugh** 59:23
93:20 98:15

**lawst-** 112:25

**lawsuit** 55:6,20
56:5 59:1
63:24 95:7
96:15 101:3
102:15,24
106:11 111:25
112:12,16,17,
23,25 113:9,
15,20 114:3
115:15 127:14

**lawyers** 118:22
119:14 126:6
130:9,19 131:5

**learn** 117:17
141:11,19

**learned** 59:1,2
84:19

**learning** 55:16
64:2 85:14

**least** 79:16

**leave** 68:17

**left** 68:22,24
69:11 79:10
87:21 90:22
95:25 97:5
103:16

**legal** 129:23

**Lesht** 73:1

**let** 62:19,20
71:19 80:11

88:20 114:19
119:17 140:24

**letter** 127:7,16
128:18

**liable** 123:17,
18

**life** 62:14 63:7

**light** 142:12

**like** 52:14 57:10
61:3,14,15
67:21,25 68:18
70:3 73:21
80:9 87:9,19
96:10 97:2
103:12 104:5
110:4,8,10,18
114:2 142:8

**Limes** 66:21

**limitations**
118:18

**limited** 122:8
126:18 128:3,
25

**line** 75:1 83:20
84:17 86:15
98:10

**lines** 97:23
98:10

**list** 82:25
131:18

**listed** 131:16

**litigation** 50:4
95:4 101:7
107:24 111:21
119:24

**little** 74:5,6
90:2,3 91:18,
19 96:9 97:24,
25 104:21,22

Jasmine Riggins

111:9 125:14
131:23 134:10

**long** 60:24
68:12 72:16
82:25 117:17

**looked** 85:7
93:22 98:17
130:24 132:3
138:1

**looking** 69:8
81:9 97:15
116:12 120:20
138:15

**looks** 87:19
96:10 97:2
102:1 103:12

**lot** 94:14

---

**M**

---

**M.D.** 122:16
127:17

**M.S.** 127:17

**made** 59:12
61:23 63:11
83:12 119:24
131:9,14
137:22

**maintain** 122:3

**major** 136:5

**make** 53:24
54:15,17 62:25
63:8 77:12
130:5 134:7
139:17 141:10,
14,18

**makes** 63:2,5

**making** 55:2

**man** 66:3

**managing**
127:18

**many** 57:11
61:2 69:21
76:8

**March** 121:8

**marijuana** 76:2,
3,17

**mark** 77:18
120:14

**marked** 71:12,
24 78:23 79:3
82:2,6 87:13,
17 90:13
95:12,16
96:21,25
101:13,17
103:6,10
105:14,18
114:11,15
120:12,17,21
124:20,24
132:23

**Martine** 79:19,
20

**Maryland** 56:15
95:4,23 96:15
101:6 106:4
107:24 111:22
114:17 115:10
116:15 120:23
125:24 127:14
133:3

**materials**
125:25 126:2
127:21 130:25
132:3

**Maternal** 92:16

**matter** 50:9
125:1 130:12

131:3

**Matthew** 50:25
51:13

**max** 76:9

**may** 130:9
131:25

**maybe** 62:19
68:14,23,24

**mean** 55:10
57:20,22 58:11
60:17 61:11
110:3 142:8

**means** 74:2

**medical** 50:11,
24 51:1 55:7
58:19 64:11,
15,17,21 65:1,
5,8,9 67:20
70:10 73:14
77:15 80:7
85:6 88:19
89:6,16 90:19
91:5 97:3,16
103:13 104:10
107:20 109:1
121:18 122:7
128:24 134:19
137:16

**medicine** 57:5

**meet** 67:7

**members**
122:4,7 123:11

**memory** 117:20

**men** 76:10

**mentioned**
135:10 137:20

**Merit** 125:3,7

**Messiah**
134:21 135:12

**met** 51:13 67:8

**method** 93:9

**middle** 78:1
81:10 98:11
102:19 116:1

**midnight** 68:24

**might** 62:3,14
113:24,25
114:1 136:4
142:13

**mind** 86:13
141:10,14,18

**minute** 71:16
133:23

**misconduct**
129:1

**miserable**
61:10,11 94:6
99:2

**misstates** 88:9

**moment** 51:13
103:4

**moments** 117:3

**money** 113:7,
12 118:10,13
119:4

**Monique** 50:9
52:5 53:4,7,16
59:4,11 64:2
84:4,24 96:1
102:5 106:6
116:8 125:1
137:21

**monitor** 128:23

**month** 65:10,
11,14 137:21

**months** 61:19

**mood** 59:19
81:18

**more** 86:8
110:21 131:23
134:7 138:21,
22 141:2
142:4,6,7,8,11

**morning** 51:11,
12,15 59:8
68:17,18,25
69:6 112:4
115:23 132:23

**move** 81:8
132:22

**moving** 75:10
80:4 89:22
91:17 92:2
104:9,19

**much** 93:21,23
98:16,18
138:22

**multiple** 106:7
139:1

---

**N**

---

**name** 50:3
66:1,19,21,22
73:2 94:18
95:25 115:19
122:16 131:19,
20

**named** 95:1,3
112:22 123:10,
11,25 124:1,
13,14 125:8

**names** 82:25
106:7 138:21
139:1,5 141:13

**necessarily**
58:7 59:18

Jasmine Riggins

64:4,5

**need** 58:15
62:5 66:19

**Needed** 73:17

**Negative** 81:17
94:11 99:6

**negligence**
123:8,23
124:11 129:7

**negligent**
123:12 124:2,
15

**negligently**
128:21

**network** 71:6

**never** 93:25
94:8,9 99:4,5
109:7 130:23,
24

**new** 68:1

**Newborn** 92:17

**next** 68:18,22,
24 73:2,15,25
74:24 75:11
79:18 81:9
89:22 90:25
92:2 93:19
103:18 121:25
122:13 129:5

**night** 69:5

**nods** 61:5
102:16

**none** 92:23

**Northwest** 50:8

**note** 73:2 79:18
88:4 90:25
97:9 103:18

**noted** 77:22
135:7

**November**
97:6,20 98:6
99:11,24 100:7
102:20 103:2

**NP** 73:4 79:19,
20,23

**number** 50:13
72:8,11 79:2
87:18 90:18
96:3 97:1
102:6 103:11
106:14 115:1,
25 116:9

**nurse** 73:5
79:24 88:10

---

**O**

---

**oath** 62:4

**OB** 77:25 88:17
89:16 91:6
97:16 104:6

**object** 132:10

**objection** 52:17
58:20 60:15
62:6 76:15
77:12 80:1
88:9 99:13,15
100:15 106:18
112:1 113:17
116:23 119:7
128:14 129:22
131:8 142:1

**Obstetricians**
56:24

**occasionally**
76:3

**occur** 63:20

**occurred** 94:9
99:5 118:8
135:6

**October** 90:23
91:11,25 92:9,
16,17,18 94:16

**off** 111:12
133:22,24
142:23

**offer** 126:6

**office** 65:21
67:7 72:20,21,
24 136:25
137:4 141:20

**offices** 70:14
142:6

**often** 76:7 86:8,
10

**Oluwafemi**
121:7,9 122:15

**once** 67:8 76:7
85:18,20

**one** 54:11
58:18 59:7
63:10 68:21
75:12 76:6,7,8
79:7 90:17
94:24 101:1,5
102:19 112:22
120:12,13
127:13 134:13

**only** 56:5

**opinion** 128:18

**opinions** 126:7
128:10

**orally** 108:20,
22,23

**order** 125:23

**others** 126:22
128:7 129:7,18

**ounces** 76:7
93:18

**over** 54:11,18,
19 57:10 61:19
114:25 137:19

**overnight**
68:14,19

**overwhelm**
60:19

---

**P**

---

**p.m.** 134:1,2

**paid** 138:19,20

**pain** 129:8
135:15,25
136:8,11,15,16

**pains** 135:21

**panicky** 60:10
94:2 98:22

**paragraph**
121:4,15
122:1,13
123:7,22
124:5,10
125:21 126:10
127:20 128:17

**paragraphs**
122:23

**part** 56:9,13,17,
20,25 57:6
118:14

**particular**
72:10

**partner** 127:18

**parts** 138:15

**past** 64:22
73:23 75:14
76:1,5

**patient** 67:9
72:17 73:15
79:11,14 89:2,
6 104:11 121:7
122:3

**Paul** 127:8

**pay** 118:13
142:6

**penalties** 83:13

**Pennsylvania**
50:8,13

**Performing**
138:14

**period** 58:13
78:12 121:8

**periods** 109:10

**permanent**
123:10,24
124:12 126:21
128:6 129:20

**personal** 129:9
132:14 142:16

**personally**
131:6

**personnel**
128:24

**Philadelphia**
127:14

**PHQ-2** 74:1,2,5
90:2 91:17,18
97:24 104:21

**physical** 64:1
66:10 73:18
129:8

**Physically** 64:4

Jasmine Riggins

physician 66:6
74:19 137:8

physicians
56:16 59:16
122:6 125:24

picking 51:17

place 57:11
93:5 109:25
110:1,19,21

places 110:8

plaintiff 82:14
84:18 86:15
95:1,3 106:12,
19 115:15
132:24

plaintiffs 71:25
72:8 112:23
123:10,11,25
124:1,13,14

play 70:9

plays 70:12

plea 55:16

pleading
114:16

pleasure 74:5,7
90:3,4 91:18,
19 97:24,25
104:22,23

point 61:16

position 121:18
142:14

Possibly
141:22

post 59:4,11
64:3 84:3,24

post-traumatic
63:22

postpartum
92:3,4 93:19
97:17 98:8,12

pounds 93:17

practice 57:5,
17,18 142:5

practicing
58:12

practitioner
66:8 73:5
79:24 104:6
137:8

prefer 71:1

pregnancies
78:4

pregnancy
80:7,16 97:16

prejudice
114:18 115:9

prenatal 89:17

prepared
134:20

preparing
132:12

Present 74:1
89:23 97:22
104:20

president
127:17

pretend 57:16

pretending
58:8

pretty 138:22

prevent 141:24

previous 77:14

pride 142:7

Prince 56:11
95:23 106:3
114:16 115:9
120:23 126:15
127:25 130:3

prior 67:7
135:1,4

privacy 122:4

private 138:15

privilege 52:18,
20 76:25
113:18

privileges
121:19 122:8
128:23

Pro 102:20

probably 61:3
92:24

proceed 50:19

proceedings
51:4 125:25

process 57:18,
19

produce 54:3,5

produced 54:1
71:25 142:13

Production
82:17

professional
64:12,15,18,22
65:8,9 107:20
129:1

professionals
65:1,5 70:10

progress 73:2
79:18 88:4
90:25 97:9
103:18

proper 57:18,
19,24 58:14

properly 58:16

propounded
131:16

protect 123:1

Prothy 102:20

provide 138:8,9

provider 87:4

providers
86:16

proximate
123:9,23
124:11 129:6

proximately
126:20 128:5

Psych 81:15

PTSD 63:24

public 122:4

pull 85:10

put 57:11 77:13

___

**Q**

question 52:22
53:1 60:16
62:5,7,20
76:16,19 77:2
78:21 99:16
100:4,15,18,
19,21 107:9,11
112:15 117:13
119:11,15
124:9 130:5,15
131:2,10,11,22
132:6,10
133:4,6 139:6,
17 140:7,9,12,

22 141:7,9

questions
51:15 61:15
65:1 72:16
74:11,21
75:13,25 76:4
92:14 94:15
108:12 109:13
111:21 116:24
133:9 134:7
142:11,21

quick 111:9
125:4

quite 60:25

___

**R**

rather 63:18

read 76:11
81:19 90:6
92:13 94:12
98:14 99:8
104:13 139:8,9
140:18,20

real 58:1,2,6,12

really 69:5,6
84:19 85:16,21
87:10 110:14
126:25

reason 60:8,11
68:8 69:24
73:10 80:4,9
89:11 91:5
94:1,2 97:12
98:21,22
104:10 112:16

reasonable
128:22

reasons 70:1
97:19 104:16
137:10

Jasmine Riggins

**recall** 52:12
55:25 61:23
65:22 66:2,9
69:15,17,22,23
72:16,18 73:3
74:13,14
78:11,13,14
80:12 84:5
95:7,9 100:1
101:3,10,25
105:10 107:3,
4,13 108:9,21
113:6,23 114:8
117:8,13,24,25
118:2 134:23
137:14

**received** 71:25
122:5 136:20

**receiving** 57:24
89:19

**recess** 111:14,
15 134:1,2

**recognize** 82:8
95:18 105:20
120:21

**recollection**
73:6 80:10
81:1 83:24
84:23 96:14
100:9 102:23
106:24

**record** 50:3,17
53:25 66:20
71:24 72:7
77:13 79:5,15
87:19 90:19
91:4 97:3
98:15 103:13
111:12,17
133:22,24
134:4,20 139:9
140:20 142:23

**records** 77:15

85:6 109:1
137:16

**refer** 55:9 72:11
89:8 111:5

**reference** 90:1
92:24 136:20

**references**
67:13

**referral** 104:12
110:20 111:1

**referred** 62:23
66:14,15,25
88:1

**referring** 57:15
63:15 75:5

**refresh** 73:6
80:10 81:1
83:24 84:23
96:14 100:9
102:23 106:24

**refreshed**
117:20

**regarding**
126:2 131:7
142:14,16

**Regular** 137:12

**relate** 122:25

**related** 62:7
112:19 126:2
128:11

**relating** 83:13
95:4

**released** 77:19

**relevant** 62:11,
16

**remember** 52:6
54:13 68:12
71:6 100:3

117:5

**repeat** 53:1
130:15

**repeats** 74:6

**rephrase** 124:9
139:6

**report** 129:1

**reported**
136:13,17

**reporter** 50:15,
18 71:16,18,19
79:1 82:5
87:16 90:16
95:15 96:24
101:16 103:9
105:12,17
140:16,18

**reporting**
134:21

**request** 104:11
105:25 106:14
137:22

**requested**
139:9 140:20

**requestion**
142:12

**requests** 82:17,
21,23 132:25
133:7,13

**required**
128:22

**research** 51:24
67:2

**reserve** 77:17
142:11

**respect** 59:14
76:17

**responding**

133:6

**response** 82:22
85:15 105:25
106:18 133:12

**Responses**
82:16 132:25

**responsible**
56:8,12,16,20,
25 57:5 112:18
119:1 122:3

**responsive**
54:1

**rest** 76:18

**result** 55:15
94:11 99:7
106:16 129:6
135:23 136:12

**resulted** 126:20
128:5

**resulting**
135:16

**resume** 67:11

**review** 81:10
127:21

**reviewed**
125:21

**reviewing**
101:23

**reviews** 101:21
105:21 114:21
125:5

**Richardson**
94:22

**riggins** 50:14,
21 51:6,11
71:11,24 78:22
79:3 82:1,6
83:8,22 85:8
87:12,17

90:12,17
95:11,16 96:2,
20,25 101:12,
17 102:6
103:5,10
105:13,18,19
107:19 108:25
111:20 114:10,
14 115:25
116:6,12,13
120:6,14,16,20
121:6,9
124:19,25
125:6 126:11
132:11,22,24
134:6 142:12

**Riggins'** 82:15

**right-hand**
116:1

**rights** 57:17
58:13

**rise** 63:23

**role** 70:9,12

**room** 69:19,24

**routine** 66:10

**rules** 54:10

**Russell** 50:9
52:5 53:4,7,16
59:5,11 84:4
96:2 102:5
105:18 106:7
116:8 125:1
137:21

**Russell's** 64:3
84:24

**Ryan** 50:15

---

**S**

---

**sad** 57:9 61:10,

Jasmine Riggins

12,16 63:11
94:6 99:2

**safety** 122:4

**said** 63:18
84:6,7 92:19
104:1 107:4
110:24 117:4
120:3 139:13
141:2,7

**same** 54:16
68:23 69:11
92:19 108:24
116:9 130:6
132:7 137:5

**saw** 59:12 65:7
84:3,24 88:24
89:9 134:13,19
136:19

**say** 55:10 57:3,
14 61:19 64:5
70:24 82:9
85:12,14 87:9
89:14 100:24
108:13 119:1
123:22 136:5

**saying** 58:2
62:10 126:24

**says** 73:10,14,
25 74:4 75:2,
13,25 78:4
79:19 80:7,22
81:10,14,17
83:8 84:17
86:15 88:3,4,
10 89:16,23
90:2 91:3 96:1,
2 97:23 102:5,
19 103:18
104:10,21
106:15,19
116:8 125:21

**scared** 60:10

94:1 98:22

**scarring**
134:22 135:5

**school** 58:15,
19 67:20

**score** 94:10
99:5,6

**scores** 67:20

**screening**
93:20 94:1
98:12 99:6

**search** 53:15

**second** 63:3
86:15 94:24
101:1 104:20
125:20 128:17
135:6

**section** 75:11
77:25 80:17,19
81:14 92:3

**seek** 110:6

**seem** 110:18

**seems** 79:23

**seen** 64:11
83:25 86:16
101:18 115:4
134:11

**sentence** 129:5

**September**
50:5 72:5,24
74:15 75:18
76:14 78:9
79:16 87:22
89:20 90:10
96:11,18 112:9
115:3 117:23
142:24

**Serum** 73:16

**servant** 121:17

**servants** 122:5
126:17 128:2

**served** 82:22
133:1

**service** 83:1
115:2

**Services** 50:4

**set** 82:15,17
103:3

**several** 69:12
108:25

**Shaffer** 50:22
51:3,14 53:23
54:9 111:19
112:4,7 113:19
114:13 117:1
119:12 120:19
124:6,8,22
128:16 130:1
131:12,22,24
132:6,19,20
133:22 134:5
139:8,13,19,25
140:3,5,13,16,
23 142:10

**she'll** 54:3
131:21

**should** 58:16
122:14 123:1
129:2 138:18
141:2,24

**showed** 115:22
117:10

**sick** 69:25

**side** 59:24
68:11 93:21
98:16 116:1

**sideways** 96:8

**signature**
83:21

**signed** 86:21

**significant**
134:22

**signify** 79:23

**similarly** 128:7
129:8,19

**sit** 114:6
116:13 118:3
133:11

**site** 130:24

**sitting** 76:9,10

**situated** 126:22
128:7 129:8,19

**situation** 132:2

**situations**
139:4 141:12

**six** 61:19

**skip** 80:17 98:9

**Skipping** 75:20

**sleep** 100:9

**sleeping** 60:22
94:5 99:1
100:2,8,12,13,
22

**Slight** 136:10

**smack** 81:9

**smoker** 75:14

**Social** 75:11

**sole** 123:8,23
124:11

**Solutions**
127:18

**someone**

57:13,16 58:5
79:24 110:4
111:5

**something**
53:11 57:17
58:8,10 87:10
94:25 109:14,
22,23 119:21
131:5 135:1
136:12,17
138:7 142:17

**sometime**
118:4

**sometimes**
60:20,23 62:25
63:5,24

**somewhat** 81:7

**somewhere**
111:1 136:19

**sons** 75:2

**soon** 85:14

**sorry** 55:18
62:9 63:13
68:16 78:20
99:14 100:25
101:25 104:3,4
105:7 112:13
113:4,6 117:24
118:9 121:23
125:12,15
130:16 136:14
139:2,7,11,15,
24 140:15,21
141:15

**sort** 141:8

**sound** 73:21
80:9

**speak** 54:18,19
142:15

**speaking** 54:11

Jasmine Riggins

61:17 77:12

**specialist** 66:7

**specific** 67:17 131:23

**specifically** 122:8

**spell** 66:22

**spoke** 130:23

**staff** 110:13 121:18 122:7

**stamp** 72:13,14 77:17 96:7 102:18

**stamps** 102:18

**standards** 126:12 127:23 128:20 129:17

**start** 55:22 88:21

**started** 134:8

**starts** 74:1

**state** 111:22 121:6,15 122:2 123:7

**stated** 123:17

**statement** 78:9 81:22 86:21,25 89:19 90:9 91:10,25 94:16 97:18 98:6 99:11,23 100:6 104:16 105:2 123:13 125:22

**statements** 74:16 83:9 119:24 122:25 127:2

**states** 50:11 128:18

**statute** 118:18

**stick** 70:21

**still** 54:16 79:11 80:18 86:24 88:20,22 112:25 120:2 132:9 133:14 137:15 138:7

**stipulation** 114:17 115:8 117:11

**stomach** 135:21

**stop** 128:25

**Street** 96:2 102:6

**stress** 63:22

**strike** 80:11 88:20 95:2 141:8

**subject** 53:22 55:20 83:13 142:18

**substance** 51:25

**substantive** 51:21

**such** 122:6

**suffer** 106:15

**suffered** 55:12 64:1 129:8,19

**suffering** 62:15

**suicidal** 59:21 81:18

**suing** 56:5,7

**supervise** 128:24

**Supplemental** 82:15,16

**surgery** 63:11 136:6

**surgical** 80:18, 23

**surprise** 74:18

**Suzuki** 103:19

**swear** 50:18

**switched** 67:23

**sworn** 51:7

**Systems** 81:10

---

**T**

**Taisei** 103:19

**take** 53:25 59:10 93:12,13 111:9 114:19 115:24 120:6 125:4 132:7,22 142:7

**talk** 62:2,4,8 63:18 134:9

**talked** 119:21 130:6 134:10, 25 137:20,22

**talking** 56:2 59:8 61:2 87:11 101:6,7 108:6

**Taniya** 94:18, 19,20,22

**Tchinda** 79:19, 20

**technical** 69:3

**telling** 54:11

**terms** 109:18 118:7

**test** 67:19 73:16,17 80:8, 16 97:17

**testified** 51:7 54:2 84:2 100:10,22 105:5,8 106:19,25 107:14,24 132:16

**testify** 130:14 131:7,25 132:14

**testifying** 131:20,21

**testimony** 51:22,25 63:6 77:15

**text** 74:4

**than** 68:3 69:15 86:8 130:19 132:15

**their** 126:16 128:1,24 129:19 130:24, 25 138:22 142:5

**therapist** 110:9

**therapists** 110:13

**thing** 54:12 63:10

**things** 57:25 59:24 60:2,5, 13,19 62:14,25

63:7 74:5,7 90:3,4 91:19, 20 93:21,23,24 94:3 97:25 98:1,16,18,19, 23 104:22,23 110:10 122:25 131:7 134:8 138:5,12

**third** 75:1 80:19 91:14 102:2 127:6 135:7

**Thomas** 125:8 127:17

**thought** 63:19 86:9 87:3,6,8 94:8 99:4 109:7

**thoughts** 59:21 81:18

**three** 134:12,13

**through** 54:10 58:15 72:10 75:12 91:3 92:13 93:3 101:19 109:1 120:13 126:16 128:1

**Thursday** 51:18,20 52:3 54:9 130:7 134:9 135:2,4, 11 137:20

**time** 50:6 56:3 60:25 61:20 65:7 75:7,8 78:12 79:12 81:7 85:23 88:4,24 97:12 98:20 103:15 108:2,3,5 109:4,10,16

Jasmine Riggins

132:8 134:22
137:13 140:6,
22 142:11

**times** 61:14,15,
17 69:14,21
76:8 80:22

**title** 82:13

**tobacco** 75:12,
13,14

**today** 50:14
51:20 55:5
79:16 84:2
101:9 113:1
114:6 116:13
117:20 118:4
130:19 132:5,
16,18 133:11,
18 137:23
142:16

**Today's** 50:5

**told** 64:23 65:4
74:19 107:20
112:8 113:11
130:7,9,19
131:5 135:5

**top** 60:14 73:2,
10 75:1 79:10
87:21 88:3
90:22 94:3
95:25 97:5,15
98:24 103:16
106:2 116:7
142:8

**Total** 78:4
94:10 99:5

**touching**
138:16

**transcript**
54:17 67:20
71:13 77:19
78:24 82:3

87:14 90:14
95:13 96:22
101:14 103:7
105:15 114:12
120:18 124:21

**traumatic** 70:3

**treat** 110:22
111:1,5

**treated** 71:4
79:25

**treating** 65:5
74:19 91:13
109:18

**treatment** 65:2,
8 67:3 71:7
73:22 86:17
87:4 88:25
89:19 110:7
122:5

**trial** 130:12,13
131:3,7,20,21
132:1,12

**tried** 86:12
141:12

**true** 74:15 75:7,
8,17 76:13,14
78:8 81:21
83:10 86:20,24
89:18 90:8
91:9,24 94:15
97:18 98:5
99:10,23
104:15 105:2
119:25 120:3
121:11,20
122:10,19
123:4,13,19
124:17 133:14

**truth** 54:11
64:19,23,25
65:4

**truthful** 57:25
133:8

**try** 53:17 59:13
62:20 125:12,
16 140:3

**trying** 77:4,12
117:2 125:15
132:13,21
133:7 139:21

**turn** 72:9 74:24
82:24 84:13
106:14 121:3,
14,25 127:6

**Turning** 123:16

**two** 75:2 78:5
80:22 92:10
102:18 117:11
133:4 138:21

**type** 76:6 92:23
110:18

**typically** 64:25

**U**

**U.S.** 141:20

**Uh-huh** 55:21
76:12 82:18
105:12 107:3
116:3 141:4

**under** 62:4
74:25 75:10
97:22 104:19
138:21

**underline**
104:21

**underlined**
81:14 92:2
98:9

**underneath**

74:4 96:1
102:5

**understand**
52:3,9 54:9,23
55:10 62:3
77:5 118:8
124:16 126:23
131:25 139:20

**understanding**
88:18 89:5
115:11 116:14

**unfortunately**
138:6

**unhappiness**
62:22

**unhappy** 61:13,
20,24 63:1,5,8
94:5,7 98:25
99:3 100:7,12

**united** 50:11
97:2

**Unity** 65:19,20
72:1,17 73:22
79:4,11,14
80:13 87:19
88:17 90:19
97:2,19
103:12,23,24,
25 104:16
108:7,10,25
109:12 110:5,
12 137:5,6

**unnecessarily**
60:4 93:24
98:19

**unrelated** 62:7,
10,23 100:14,
22

**unsworn** 83:13

**until** 68:18
79:16

**updated** 76:1,4

**use** 70:10
75:13,14,20,25
76:1,2,4,5,17
128:21 141:12

**Use/frequency**
76:3

**used** 76:2
137:1 138:25
139:5

**using** 122:16

**V**

**variety** 70:1

**verification**
83:3 86:22

**versus** 50:10
106:8 110:4
116:8 125:1

**Vettori** 127:8,9,
19

**vicariously**
123:17

**video** 50:7

**violating**
138:15

**violations**
126:12 127:23

**visit** 67:7 89:17
91:6 92:3
97:16 98:9
108:2,3,7
109:16

**visited** 108:10

**visits** 108:15,
18 109:8,20

Jasmine Riggins

**voice** 125:12

---

## W

**Wait** 71:16

**Walk-in** 80:7

**want** 53:24
54:15 61:16
62:2,4 72:15
77:12,17 85:10
101:11 109:15
111:20 115:21
119:13 130:5
132:1 133:17
134:7 139:17
140:25

**wanted** 87:10
109:19

**warmer** 125:17

**Washington**
50:8 93:5 96:3
102:9

**way** 57:21,22
58:18 63:2
75:2 123:12
124:1,14
139:21

**Web** 130:24

**week** 53:18
76:8

**weeks** 61:2
92:10

**weighed** 86:9

**weight** 93:17

**well-being**
81:22 90:9
91:25 94:16
98:6 99:11,23
105:3

**went** 54:10
58:19 65:10
67:3,6 93:24
97:19 98:19
104:16 109:1,4
130:24 137:19

**whatever**
131:17

**whether** 54:4
83:25 106:25
110:12 113:14,
20 115:14
116:14 117:3
118:17 126:5
137:15 138:24
139:3 142:16

**while** 94:24
111:9

**whole** 56:8,12,
16,20,25 57:5
132:3

**whom** 66:15

**will** 50:16,18
53:17 54:3
70:24 77:15
81:25 89:13
113:11 120:13
131:3 132:11

**willing** 53:12
138:8

**Wine** 76:6

**within** 92:10

**without** 57:18
114:18 115:8
119:3

**witness** 50:18
52:25 58:23
60:17 61:5
76:16 80:2
99:14 100:19
101:21,23

102:16 105:21
111:11 114:21
119:11 125:5
129:25 131:11
139:10,15,22
140:2,4,6,10,
15,21 142:4

**witnesses**
131:17,19

**woman** 66:3,4

**women** 58:13
138:14

**women's**
138:15

**words** 57:11
86:4 98:11
141:5

**work** 130:3

**worried** 60:7
93:25 98:21

**worry** 59:15

**writes** 127:19
129:5,16

**writing** 108:21

**written** 52:8
53:22 75:8

**wrong** 60:5
93:24 98:19
101:11 138:13

**wrote** 122:14
124:10

---

## Y

**year** 72:19 96:9

**years** 56:1
61:2,3,4 72:18
137:3

**yet** 119:2 140:9

**Yolanda** 88:4,
14,16,22,24
89:3 91:1,10
97:10

**yourself** 60:4
63:20 119:10

**yourselves**
50:17

---

## Z

**Zajdel** 50:20
52:17 54:2
58:20 60:15
62:6,17 76:15
77:1,6,11 80:1
88:9 99:13,15,
19 100:15
112:1,5 113:17
116:23 119:7
124:4,7 128:14
129:22 131:8,
13 132:9
139:11,16,20
140:8,11
142:1,20

**zeros** 72:8

# Exhibit 65

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | * | |
| | * | Case No. 2:18-cv-05629-WB |
| Plaintiffs | * | Hon. Wendy Beetlestone |
| v. | * | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF JASMINE RIGGINS' ANSWERS TO FIRST SET OF
INTERROGATORIES AND RESPONSES TO FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff, Jasmine Riggins, pursuant to Federal Rules Civil Procedure 26, 33 and 34, serves the following Answers to First Set of Interrogatories propounded by the defendant.

The information supplied in these answers is not based solely on the knowledge of the executing party, but includes, where applicable, that of her agents, representatives and, unless privileged, attorneys. Furthermore, the precise word usage and sentence structure is that of the executing party's' attorneys and does not purport to be, and is not necessarily, the exact language of the executing party.

Plaintiff objects to the instructions and definitions that accompany the interrogatories to the extent that those instructions and definitions impose upon her obligations beyond those imposed by the Federal Rules of Civil Procedure.

By providing information in response to the interrogatories, Plaintiff does not admit the relevance or admissibility of any of the information supplied but instead reserves the right to object to the admissibility of the information.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail each and every instance in which you were a patient of Akoda, including how you chose Akoda as your doctor, the date you were a patient, and the specific nature of the treatments and examinations performed.

### ANSWER:

**Plaintiff believes, but is not certain, that she recalls the dates she saw Akoda in his office and the dates she was at Prince Georges' Hospital Center where Akoda delivered her baby, Messiah Denver Brown, by C-section on March 18, 2013. Her best recollection is that Akoda provided prenatal care from August 2012 to March 18, 2013. Plaintiff refers Defendant to the medical records which Plaintiff is producing. Plaintiff chose Dr. Chaudry's practice because it was conveniently located. She was never treated by Dr. Chaudry but rather by Akoda.**

### INTERROGATORY NO. 2:

Describe in detail the alleged injuries for which you are seeking to recover in this litigation, including when you first became aware of those injuries, how you became aware of those injuries, whether you have seen any health care provider for treatment of those alleged injuries and if so, who and when, and each and every aspect of those injuries.

### ANSWER:

**Plaintiff has suffered financial, physical and emotional injuries. In addition to these injuries, Akoda's surgery on Plaintiff has limited her birth control options. Plaintiff requested a tubal ligation to ensure against future pregnancies and she was denied due to the tissue damage caused by Akoda's surgery. Plaintiff suffered extreme pain for several months after Akoda's surgery. After returning to work and continuing for a few months, approximately twice a week Plaintiff was unable to complete her work shift, leaving work two hours early, because of the extreme pain, that at times would cause her to double over,**

2

and resulted in lost income. Plaintiff had confidence and trust in her OB/GYN provider, Abdul Chaudry, M.D., that the doctors working under his practice and that treated her were, at the very least, legitimately credentialed, legally licensed, possessed the proper education and were real doctors. In addition, Plaintiff had confidence and trust in Prince George's Hospital Center that the doctors given privileges at their facility to perform surgery would also, at the very least, be legitimately credentialed, legally licensed, possess the proper education and were real doctors. Akoda performed a C-section on Plaintiff on March 18, 2013, when he was not legitimately credentialed, used fraud to obtain a medical license, and did not graduate from a medical school. Upon learning Akoda was a fraud, impersonating a doctor, Plaintiff felt extremely violated, betrayed, embarrassed, sad, very angry and shocked. As discovery is ongoing, Plaintiff reserves the right to supplement this Answer.

## INTERROGATORY NO. 3:

Describe in detail all facts that support the allegation in the Complaint that ECFMG owed a duty to Plaintiffs and the Putative Class Members.


## ANSWER:

The facts that support these allegations are set forth in the Complaint. See, e.g., paragraphs 5, 10-47, and 68-69. Plaintiff's investigation is continuing.

## INTERROGATORY NO. 4:

Describe in detail all facts that support the allegation in the Complaint that ECFMG breached a duty owed to Plaintiffs and the Putative Class Members.

## ANSWER:

The facts that support these allegations are set forth in the Complaint. See, e.g., paragraphs 70-80. Plaintiff's investigation is continuing.

JA3727

**INTERROGATORY NO. 5:**

Describe in detail all facts that support the allegation in the Complaint that ECFMG's supposed negligence was the "sole and proximate cause" of your alleged injuries and damages.

**ANSWER:**

**Plaintiff adopts by reference her answer to Interrogatory No. 4.**

**INTERROGATORY NO. 6:**

Describe in detail all facts that support the allegations in the Complaint that Akoda "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language" and committed "boundary violations."

**ANSWER:**

**Based on information obtained by counsel, Plaintiff believes that, with respect to**

**certain class members, Akoda made lewd comments and inappropriate touchings.**

**Plaintiff's investigation is continuing.**

**INTERROGATORY NO. 7:**

Describe in detail all facts that support the allegation in the Complaint that you chose Akoda as your "obstetrician/gynecologist" on the basis of [your] belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG," including facts relating to when you first learned about ECFMG, its certification services, and its certification of Akoda.

**ANSWER:**

**Plaintiff would not have chosen anyone as her Ob/Gyn who was not a real physician.**

**Plaintiff naturally assumed Akoda was a real physician.**

**INTERROGATORY NO. 8:**

Identify and describe in detail each and every communication you had with anyone (other than with your attorneys) about the claims or facts underlying the claims that you are asserting in the Complaint, including all such communications with Akoda's medical practice, any medical licensing board, any employee, agent or representative of ECFMG, and all such communications with a journalist, reporter, or member of the media.

**ANSWER:**

**Plaintiff spoke with Monique Russell. Plaintiff's contacts with Akoda are reflected**

**in the medial records which are being produced.**

**INTERROGATORY NO. 9:**

Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

**ANSWER:**

**Plaintiff adopts by reference her answer to interrogatory no. 2. The amount of these**

**damages is for the jury to determine. Plaintiff seeks damages for these injuries as**

**determined by the jury.**

**INTERROGATORY NO. 10:**

Identify each civil (including bankruptcy filings), criminal and administrative action to which you have been a party or in which you have served as a witness, including the matter name, court or agency.

**ANSWER:**

**Plaintiff is a named class representative in two class action cases filed in the Circuit**

**Court for Prince George's County, Maryland. They are both captioned "Monique Russell,**

**et al. v. Dimensions Health Corp." They are Case Nos. CAL 17-22761 and CAL 18-07863.**

**INTERROGATORY NO. 11:**

Describe in detail any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**ANSWER:**

JA3729

Plaintiff objects to this Interrogatory on the grounds that the information requested is protected from discovery by the attorney-client privilege and on the grounds that it is not relevant to any claim or defense in this action.

**INTERROGATORY NO. 12:**

Identify each and every Putative Class Member of whom you are aware, and for each person, describe in detail all facts supporting your contention that he or she is a Putative Class Member.

**ANSWER:**

Plaintiff's counsel represents numerous persons who are putative members of the class. Counsel for Plaintiff has a list of persons who have been retained by Plaintiff's counsel as members of the putative class. Plaintiff's counsel has sufficient information to establish that these clients were seen or treated by Akoda. Plaintiff's counsel is also aware that other attorneys in this case represent numerous persons who are putative members of the class, but is not aware of their identities. Plaintiff believes that there are approximately 1,000 patients seen or treated by Akoda.

**INTERROGATORY NO. 13:**

Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

**ANSWER:**

My attorneys assisted in the preparation of these answers.

**INTERROGATORY NO. 14:**

Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

**ANSWER:**

6

In addition to the named plaintiffs and my attorneys, those persons or entities identified in Plaintiff's initial disclosures. Further, Lisa Williams, Messiah Brown's grandmother, took Plaintiff to several of her doctor appointments with Akoda. Plaintiff's sister, Candis Riggins, attended one of Plaintiff's doctor appointments with Akoda. Plaintiff's mother, Felicia Riggins, went with Plaintiff to her last OB visit, which was on the day Plaintiff was admitted to Prince George's Hospital Center, to deliver her infant.

Lisa Williams
2722 Lorring Drive
Forestville, MD 20747

Candis Riggins
6004 Springhill Drive
Greenbelt, MD 20770

Felicia Riggins
Address Unavailable

## INTERROGATORY NO. 15:

Identify and describe in detail each and every health care provider (including but not limited to physicians, psychologists, nurses, and/or therapists) from whom you have sought treatment, and for each health care provider, state whether you sought treatment from the health care provider to address the alleged injuries for which you are seeking to recover in this litigation.

## ANSWER:

Plaintiff objects to this interrogatory on the grounds that it is overly broad and burdensome. As worded, this Interrogatory seeks information about Plaintiff's health care that is unrelated to her treatment by Akoda. It is not limited in time or scope and seeks information that is not relevant.

## INTERROGATORY NO. 16:

Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

7

**ANSWER:**

Plaintiff has not determined who she may call as fact witnesses a trial.  Plaintiff will

comply with her obligations under F.R.C.P. 26(a)(3) or as otherwise ordered by the Court.

**INTERROGATORY NO. 17:**

Identify any and all persons you intend to call as an expert witness relating to this lawsuit
at the time of trial.

**ANSWER:**

Plaintiff has not determined who she may call as expert witnesses at trial.  Plaintiff

will comply with her obligations under F.R.C.P. 26(a)(2).

**INTERROGATORY NO. 18:**

Identify the jurisdiction whose law you contend governs each of the claims in the
Complaint and describe in detail all facts supporting your contention.

**ANSWER:**

Plaintiff objects to this interrogatory to the extent that it calls for information

subject to work-product protection.  By way of further answer, and without waiver,

discovery and Plaintiff's investigation are continuing and full identification of the relevant

facts for a choice of law analysis are yet to be determined.

## DOCUMENT REQUESTS

### General Objections

1.      Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks

to impose obligations in excess of the requirements of the Federal Rules of Civil Procedure.

2.      Plaintiff objects to each of Defendant's requests to the extent that the request is

vague or ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to

the discovery of admissible evidence.

8

3.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents that are publicly available or that Defendant may more directly, easily, and conveniently obtain from other sources.

4.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks documents beyond Plaintiffs' possession, custody or control.

5.    Plaintiff objects to each of Defendant's requests to the extent that Defendant seeks the production of materials or the disclosure of information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable protections.  The inadvertent production of materials or information subject to the protections of the attorney-client privilege, the attorney work product doctrine, or similar privileges or protections from discovery shall not constitute a waiver of any such privileges or protections.

6.    To the extent that Defendant requests documents and information that constitute sensitive, confidential, or proprietary information, Plaintiff will produce such documents only after the execution of a suitable confidentiality agreement between the parties.

7.    Because Defendant's requests contain numerous redundant items, documents may respond to multiple requests and it is therefore impractical and unduly burdensome to identify the specific requests to which documents respond.

8.    These responses are made without waiver of:  (i) any objections to competency, relevancy, materiality, privilege, and the admissibility of each response, including documents produced and the subject matter thereof, in any further proceedings in this action;  (ii) the right to object to the use of any document provided pursuant to this response, or the subject matter thereof, on any ground in any further proceedings in this action;  and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

JA3733

9.      Plaintiff expressly reserves the right to rely at any time, including in any further proceedings in this action, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

10.      These responses and any further responses or documents produced pursuant thereto are made without any acknowledgment or concession that the documents requested are relevant to the subject matter of this action.

11.      The statement in any given response that documents will be produced means that documents will be produced, as limited by the relevant objections, provided that such documents exist and are in the possession, custody or control of Plaintiff.  Plaintiff's stated willingness to produce certain classes of documents should in no way be construed as an affirmative acknowledgment that such documents either exist or are in the possession, custody or control of Plaintiff.

12.      The foregoing General Objections are hereby incorporated by Plaintiff into the responses to each and every one of Plaintiff's specific requests set forth below, and to each and every amendment, supplement or modification to these responses hereinafter provided to the specific requests propounded by the Defendant.  Plaintiff does not intend to waive any General Objection responsive to any specific request.

**REQUEST NO. 1:**

All documents identified in your Rule 26(a)(1) disclosures.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 2:**

All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

JA3734

**RESPONSE:**

 **The requested documents will be produced.**

**REQUEST NO. 3:**

 All pleadings filed in Akoda litigation.

**RESPONSE:**

 **The requested documents will be produced.**

**REQUEST NO. 4:**

 All documents relating to Akoda Litigation.

**RESPONSE:**

 **The requested documents will be produced.**

**REQUEST NO. 5:**

 All documents produced by you or to you in Akoda Litigation.

**RESPONSE:**

 **Certain documents produced to Plaintiff by Dimensions in the Akoda litigation are**

**subject to a Confidentiality Agreement.  To the extent that ECFMG can obtain the consent**

**of Dimensions, Plaintiff will produce the requested documents.**

**REQUEST NO. 6:**

 All sworn statements executed by you in Akoda Litigation.

**RESPONSE:**

 **None.**

**REQUEST NO. 7:**

 All documents relating to Putative Class Members.

**RESPONSE:**

11

**Objection.  This request is ambiguous, overbroad and seeks documents which are not proportionate to the needs of this case.  If Defendant will clarify it, Plaintiff will attempt to respond.**

REQUEST NO. 8:

All documents relating to Akoda, including documents relating to treatments or examinations performed by Akoda.

RESPONSE:

**Objection.  Upon advice of counsel, Plaintiff objects to this request.  This request also appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

REQUEST NO. 9:

All communications between you and Akoda.

RESPONSE:

**Other than the medical records, none.**

REQUEST NO. 10:

All documents relating to ECFMG.

RESPONSE:

**The requested documents will be produced.**

REQUEST NO. 11:

All communications between you and ECFMG relating to the claims or facts underlying the claims that you are asserting in the Complaint.

RESPONSE:

**Other than the records deposition subpoena served on ECFMG, there are none.**

JA3736

**REQUEST NO. 12:**

All documents about JSMC and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 13:**

All communications between you and JSMC relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 14:**

All documents relating to Howard University Hospital and Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 15:**

All communications between you and Howard University Hospital relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**None.**

**REQUEST NO. 16:**

All documents relating to Prince George's Hospital Center and Akoda.

**RESPONSE:**

**Objection. Upon advice of counsel, Plaintiff objects to this request. This request also appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

JA3737

## REQUEST NO. 17:

All communications between you and Prince George's Hospital Center relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**None.**

## REQUEST NO. 18:

All documents relating to A.G. Chaudry, M.D. and Akoda.

## RESPONSE:

**Other than the medical records, none.**

## REQUEST NO. 19:

All communications between you and A.G. Chaudry, M.D. relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Other than the medical records, none.**

## REQUEST NO. 20:

All documents relating to Dimensions Healthcare Associates and Akoda.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## REQUEST NO. 21:

All communications between you and Dimensions Healthcare Associates relating to the claims or facts underlying the claims that you are asserting in the Complaint.

## RESPONSE:

**Plaintiff adopts by reference her response to Request No. 5.**

## REQUEST NO. 22:

All documents relating to the Maryland Board of Physicians and Akoda.

JA3738

**RESPONSE:**

     **The requested documents will be produced.**

**REQUEST NO. 23:**

     All communications with the Maryland Board of Physicians relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

     **None.**

**REQUEST NO. 24:**

     All documents and communications relating to your allegations that "Igberase never attended or graduated from a medical school."

**RESPONSE:**

     **The requested documents will be produced.**

**REQUEST NO. 25:**

     All documents and communications relating to your allegation that the Centers for Medicare and Medicaid Services "denied Igberase's application to enroll for Medicare reimbursement."

**RESPONSE:**

     **The requested documents will be produced.**

**REQUEST NO. 26:**

     All documents and communications relating to your decision to have Akoda treat or examine you.

**RESPONSE:**

     **Other than the medical records, none.**

**REQUEST NO. 27:**

JA3739

All documents and communications relating to your alleged "belief that Akoda had obtained all necessary credentials and certifications required of physicians practicing in the United States, including certification from ECFMG."

**RESPONSE:**

**None.**

**REQUEST NO. 28:**

All documents and communications relating to your allegation that "Igberase performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language."

**RESPONSE:**

**None.**

**REQUEST NO. 29:**

All documents and communications relating to your allegation that "Igberase's penetrations of his patients were clear boundary violations."

**RESPONSE:**

**None.**

**REQUEST NO. 30:**

All documents and communications relating to your allegation that ECFMG owed a duty to you and Putative Class Members.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request.  This request also appears to be duplicative of other requests to which, subject to the above stated objection, Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 31:**

JA3740

All documents and communications relating to your allegation that ECFMG breached a duty owed to you and Putative Class Members.

**RESPONSE:**

**This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 32:**

All documents and communications relating to your allegation that ECFMG's negligence was the "sole and proximate cause" of your alleged injuries and damages.

**RESPONSE:**

**Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it calls for a legal conclusion as to any documents that may be responsive to this request. This request appears to be duplicative of other requests to which Plaintiff has responded that, if she has any such documents, they will be produced.**

**REQUEST NO. 33:**

All documents and communications relating to injuries (physical, mental, emotional, psychological, or otherwise) that you contend you have suffered or will continue to suffer because of ECFMG's negligence.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 34:**

All W-2 forms, wage documents, and state and federal income tax returns, including all forms, schedules, and attachments.

**RESPONSE:**

17

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce any documents other than the documents showing the time she may have missed from work for a brief period of time after her surgery.**

### REQUEST NO. 35:

All medical records, pharmacy records, doctor's notes, or similar documents relating to any physical or mental health diagnosis, illness, injury, or treatment you have experienced or received.

### RESPONSE:

**Objection. Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that it is overly broad and burdensome in that it is not limited in time or scope and that it seeks information that is not relevant to any claim or defense in this action.**

### REQUEST NO. 36:

All medical bills, statements, and other documents relating to expenses you incurred for examination and treatment of alleged injuries.

### RESPONSE:

**The requested documents will be produced.**

### REQUEST NO. 37:

All medical bills, statements, and other documents relating to expenses paid on your behalf by any insurance carrier or health plan for examination and treatment of alleged injuries.

### RESPONSE:

**The requested documents will be produced.**

### REQUEST NO. 38:

All communications between you and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

### RESPONSE:

JA3742

None.

**REQUEST NO. 39:**

All communications between one or more of your attorneys and a journalist, reporter, or member of the media relating to the claims or facts underlying the claims that you are asserting in the Complaint.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request and declines to produce the requested documents on the grounds that the requested documents are protected from discovery by the attorney work product doctrine and are not relevant to any claim or defense in this action.**

**REQUEST NO. 40:**

All personal records, notes, journals, calculations, calendars, and/or diaries that make reference to your examination or treatment by Akoda.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 41:**

All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

**RESPONSE:**

**Objection.  Plaintiff has not obtained any statements.  Upon advice of counsel, Plaintiff objects to this request insofar as it seeks statements obtained by her attorneys and declines to produce the requested documents on the grounds that they are protected from discovery by the work-product doctrine.**

**REQUEST NO. 42:**

JA3743

All documents and communications relating to any arrangements that you have made with your attorneys or others relating to payment of the costs, attorneys' fees, or other financial obligations associated with the bringing of this lawsuit.

**RESPONSE:**

**Objection.  Upon advice of counsel, Plaintiff objects to this request on the grounds that it seeks documents protected from discovery by the attorney-client privilege and on the grounds that it requests documents which are not relevant to any claim or defense in this action.**

**REQUEST NO. 43:**

All documents and communications, including but not limited to consulting or financing agreements, relating to individuals or entities, other than you or your attorneys, that are (a) providing any funding of any attorneys' fees, expenses, or costs related to this lawsuit; (b) providing any information, services, or assistance concerning this lawsuit to you or your attorneys, either directly or indirectly; or (c) have a financial interest or right to receive compensation that is contingent on the outcome of this lawsuit by settlement, judgment, or otherwise; or (d) are receiving any form of compensation or remuneration for providing any information, services, or assistance concerning this lawsuit.

**RESPONSE:**

**Plaintiff adopts by reference her response to Request No. 42.**

**REQUEST NO. 44:**

All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, the method of calculating each such element of damages or other relief, and the amount of each element of damages or other relief.

**RESPONSE:**

**The requested documents will be produced.**

**REQUEST NO. 45:**

All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

JA3744

**RESPONSE:**

  **The requested documents will be produced.**

**REQUEST NO. 46:**

  All documents and communications relating to the claims asserted in the Complaint.
**RESPONSE:**

  **The requested documents will be produced.**

**REQUEST NO. 47:**

  All documents you may introduce as exhibits at trial in this lawsuit.

**RESPONSE:**

  **Plaintiff has not decided what documents she will introduce at trial. Plaintiff will**

**comply with her obligations under F.R.C.P. 26(1)(3).**


       CONRAD & O'BRIEN, P.C.


       _/s/ Nicholas M. Centrella_
       Nicholas M. Centrella, Esquire (ID No. 67666)
       ncentrella@conradobrien.com
       Howard M. Klein, Esquire (ID No. 33632)
       Benjamin O. Present, Esquire (ID No. 322682)
       1500 Market Street
       Centre Square, West Tower, Suite 3900
       Philadelphia, PA 19102-2100
       Telephone: (215) 864-9600
       Fax: (215) 864-9620


Dated: March 29, 2019

JA3745

LAW OFFICES OF PETER G. ANGELOS, P.C.

_/s/ Jay D. Miller_
**Jay D. Miller** (_Pro Hac Vice Forthcoming_)
jmiller@lawpga.com
**Danielle S. Dinsmore** (_Pro Hac Vice Forthcoming_)
ddinsmore@lawpga.com
**Paul M. Vettori** (_Pro Hac Vice Forthcoming_)
pvettori@lawpga.com
**One Charles Center**
**100 North Charles Street**
**Baltimore, MD 21201**
**Telephone: (410) 649-2000**
**Fax: (410) 649-2150**
_Attorneys for Plaintiff, Jasmine Riggins_

## <u>VERIFICATION</u>

I, Jasmine Riggins, hereby aver that the factual statements in the foregoing _Answers to Interrogatories_ are true and correct to the best of my knowledge, information and belief, and that these Answers are made subject to the penalties relating to unsworn falsification to authorities.

_____
Jasmine Riggins

Dated: March 25, 2019

24

JA3746

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I caused a true and correct copy of the

foregoing *Answers to Interrogatories* to be served on the following via electronic mail:

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

/s/ *Nicholas M. Centrella*
Nicholas M. Centrella

March 29, 2019

23

JA3747

# Exhibit 66

## Consent to Treatment

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

*Medical Education and Training:* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS.

*Physicians Not As Employees:* I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physician are not employees or agents of the hospital. I understand that I may receive a separate bill from each of these providers of service.

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11:00 a.m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles.

*Personal Property and Valuables:* I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient within thirty (30) days of discharge or departure from DHS premises.

*Only Applicable for Medicare Beneficiaries:* Statement for Payment of Medicare Benefits to Hospital and/or Physicians — I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf.

*Insurance Billing and Assignment of Benefits:* I assign the benefits payable for hospital or physician services to DHS and or any physician which renders service to me and authorize them to submit the necessary claims to Medicare for payment. I certify the registration statements are true and I, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not alleviate my responsibility for payment. I agree to pay all amounts owned by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to verification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network.

*Notification of Credit Bureaus Reporting:* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

## Release of Information

I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it.

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks.

I understand that DHS is the owner of any radiographic films and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic films and/or samples of the tissue/specimens will be provided, if duplication is possible, to me or my authorized agent upon written request for a reasonable fee.

| UNIVERSAL CONSENT *(Side 1)* | PATIENT LABEL |
|---|---|
| **DIMENSIONS HEALTHCARE SYSTEM** | RIGGINS, JASMINE |
| | 305955064          11021375 |
| UNIVCONS (6/10) | 3/18/2013    CHAUDRY, ABDUL |

## Release of Information (Cont'd)

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device. I release DHS from any liability that might result from the release of this information.

## Authorization For The Release Of Medical Information To The Maryland Insurance Administration:

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal.

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider.

I understand that my records may by used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above.

In the event I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows:

1. I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2. I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated.
3. I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation.
4. I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues.
5. I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal.

I acknowledge the following:

☒ This form has been explained to me and I understand its contents     ☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
☒ Receipt of a copy of DHS Notice of Privacy Practices     ☒ Receipt of DHS brochure "What You Should Know As A Patient"
☒ My communication needs identified by completing the *Communication Assessment Form*
➤ **Dimensions Healthcare Public Health Initiative:** If you smoke, please stop smoking.

**PLEASE NOTE:** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form.

| *(signature)* | 3/18/2013 | Signed by ANDERSON, CYNTHIA on 18-Mar-2013 18:08:15 -0400 | 3/18/2013 |
|---|---|---|---|
| Signature of Patient | Date | Signature of Witness | Date |

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is (Check appropriate box):
☐ Minor   _years of age without decision-making capacity    ☐ Lacks decision-making capacity
☐ Other:

| | 3/18/2013 | |
|---|---|---|
| Patient Representative Signature | Date | Relationship to Patient |
| Witness signature | 3/18/2013 Date | |

| **UNIVERSAL CONSENT *(Side 2)*** | PATIENT LABEL |
|---|---|
| **DIMENSIONS HEALTHCARE SYSTEM** | RIGGINS, JASMINE |
| UNIVCONS (6/10) | 305955064    11021375 |
| | 3/18/2013   CHAUDRY, ABDUL |

JA3750

NOTE:    BOTH sides of this form MUST be completed to be VALID.

Patient: Riggins    Jasmine    Date: 3/18/13    Time: 2100

1. I hereby authorize the performance of the following operation(s)/procedure(s): Repeat low transverse Cesarean Section & probable blood Transfusion
under the direction of Dr.(s): _____

2. I have been informed that qualified individuals such as physicians' assistants, surgical assistants and licensed physicians may perform significant surgical tasks to include but not limited to opening and closing, harvesting grafts, dissecting tissue, removing tissue, implanting devices, altering tissues under the direction and supervision of the primary physician listed above.

3. I have been informed that a vendor representative may be present during the procedure to observe my procedure and/or assist with product selection and placement.

4. I have been advised of the nature of my condition, the nature and purpose of the proposed operative procedure, and the alternative to this procedure, the risks benefits, and side effects attendant to both the proposed procedure and the alternatives, the probability of success of both the proposed procedure and the alternatives, and the prognosis of the proposed procedure if the alternatives are not performed.

5. I am also aware that the practice of medicine and surgery is not an exact science and that there are risks and complications associated with the operative procedure. The risks associated with the performance of the proposed and any surgical procedure include but are not limited to severe blood loss, infection and in rare instances cardiac arrest.

6. I have also been informed of potential problems that might occur during recuperation.

7. I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of operations and procedures which are different from or in addition to those now contemplated.

8. This procedure may necessitate the use of blood/blood products which when anticipated will require separate specific informed consent and related documentation. However, in the event of an emergency when specific consent is not possible, I agree to the administration of such products as ordered by my physician.

9. I impose no specific limitations or prohibitions regarding treatment other than those that follow (if none, so state): _____
_____

10. I authorize the examination by an authorized individual of any tissue, organ(s) or body part(s) removed during the procedure and the disposal of such tissue, organ(s) or body part(s) in accordance with hospital policies.

11. I consent to the admittance of appropriate observers and to the taking and publication of any photographs in the course of this procedure for the purpose of advancing medical education. I understand that my identity will remain confidential.

12. All of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed operative treatment(s).

I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.

_____    _____    _____
Witness    Signed:    Patient

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box)*:
☐ Minor _____ years of age without decision-making capacity    ☐ Lacks decision-making capacity
☐ Other: _____

_____    _____
Patient Representative Signature    Relationship to Patient

_____    _____
Witness Signature (1)    Witness signature (2)

Consent obtained (Check one): ☐ In person    ☐ By Telephone [Requires two (2) witness signatures]
Two physician signatures are required in an emergency for consent:

_____ M.D.    _____ M.D.

PHYSICIAN DECLARATION: Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

Physician Signature _____    Date 3/18/13    Time: 2100

## CONSENT FOR OPERATIONS AND OTHER PROCEDURES
### DIMENSIONS HEALTHCARE SYSTEM

2-567 (7/11)

PATIENT LABEL

11021375    20Y F
RIGGINS ,JASMINE    L200H1
305955064
03/18/13    AKODA JAMES, MD    OBS

Case 22-499805-JCo Document 582-5 Filed 09/08/22 Page 306 of 1212 Date Filed: 09/08/2022

Patient: Riggins, Jasmine    Date: 18 Mar 13    Time: 2107

1. I hereby authorize the Anesthesia Care Team or _____ to administer the following type(s) of anesthetics:
**General/Regional/Local + IV Sedation/Conscious Sedation** and procedures performed in the provision of anesthesia including placing an intravenous (IV) catheter and maintaining an airway.

2. The risks associated with anesthesia include but are not limited to worsening of a pre-existing medical problem, airway difficulties and drug reactions. Drug reactions can include a rash, nausea, vomiting, muscle aches, headache, wheezing and very rarely, shock. Maintaining an airway may include placement of an oral or nasal airway, laryngeal mask airway or an endotracheal tube. Reactions to artificial airways include laryngospasm which requires immediate corrective treatment. Manipulation of the airway may result in damage to caps, bridges or damaged teeth and very rarely to sound teeth. Some individuals experience a sore lip, throat or hoarseness. Regional anesthesia blocks may cause headache, numbness or tingling, bleeding or swelling and rarely, weakness or paralysis. Occasionally nerve injuries from positioning may occur. IV catheters can cause inflammation, swelling or bleeding.

3. I am also aware that the practice of medicine and anesthesia is not an exact science and that there are risks and complications associated with the anesthesia and anesthetic technique. I have been informed that the aspiration of stomach contents into the lungs, drug reactions including malignant hyperthermia and anaphylactic shock, heart failure, airway closure, paralysis and rarely death may be associated with any anesthetic or anesthetic technique.

4. I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of anesthetic techniques and administration of anesthesia which are different from or in addition to those now contemplated.

5. I impose no specific limitations or prohibitions regarding anesthesia other than those that follow (if none, so state): _____
_____

6. All of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed administration of anesthetic(s) and anesthetic techniques.

**I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.**

Witness _____    Signed: _____ Patient

---

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is (Check appropriate box):
- ☐ Minor _____ years of age without decision-making capacity
- ☐ Other: _____
- ☐ Lacks decision-making capacity

_____
Patient Representative Signature

_____
Relationship to Patient

_____
Witness Signature (1)

_____
Witness signature (2)

Consent obtained (Check one): ☐ In person    ☐ By Telephone **[Requires two (2) witness signatures]**
**Two physician signatures are required in an emergency for consent:**

_____ M.D.    _____ M.D.

---

**RESUSCITATION STATUS DURING ANY PROCEDURE REQUIRING INFORMED CONSENT**: This section is to be completed for patients undergoing any procedure requiring informed consent, who also have orders withholding resuscitation.

- ☐ Patient/surrogate decision-maker requests that DNR order be <u>suspended</u> during any procedure.
- ☐ Patient/surrogate decision-maker requests that DNR order be <u>honored</u> during any procedure.

Describe the key features of the discussion(s) pertaining to the DNR issues: _____
_____

**PHYSICIAN DECLARATION**: Prior to the time of the planned anesthesia above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, and possible complications.

Physician Signature _____    Date 18 Mar 13    Time: 2103

# CONSENT FOR ADMINISTRATION OF ANESTHESIA
**DIMENSIONS HEALTHCARE SYSTEM**

20Y F
11021375    L200H1
RIGGINS ,JASMINE
305955064
03/18/13    AKODA, CHARLES, MD    OBS

2-567 (7/11)

JJ3752

NOTE: **BOTH sides of this form MUST be completed to be VALID.**

Patient: Riggins, Jasmine    Date: 3 | 18 | 13    Time: 1700

1. I hereby authorize the performance of the following operation(s)/procedure(s): Repeat Cesarean
   Section
   under the direction of Dr.(s): Afooda Chandy

2. I have been informed that qualified individuals such as physicians' assistants, surgical assistants and licensed physicians may perform significant surgical tasks to include but not limited to opening and closing, harvesting grafts, dissecting tissue, removing tissue, implanting devices, altering tissues under the direction and supervision of the primary physician listed above.

3. I have been informed that a vendor representative may be present during the procedure to observe my procedure and/or assist with product selection and placement.

4. I have been advised of the nature of my condition, the nature and purpose of the proposed operative procedure, and the alternative to this procedure, the risks benefits, and side effects attendant to both the proposed procedure and the alternatives, the probability of success of both the proposed procedure and the alternatives, and the prognosis of the proposed procedure if the alternatives are not performed.

5. I am also aware that the practice of medicine and surgery is not an exact science and that there are risks and complications associated with the operative procedure. The risks associated with the performance of the proposed and any surgical procedure include but are not limited to severe blood loss, infection and in rare instances cardiac arrest.

6. I have also been informed of potential problems that might occur during recuperation.

7. I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of operations and procedures which are different from or in addition to those now contemplated.

8. This procedure may necessitate the use of blood/blood products which when anticipated will require separate specific informed consent and related documentation. However, in the event of an emergency when specific consent is not possible, I agree to the administration of such products as ordered by my physician.

9. I impose no specific limitations or prohibitions regarding treatment other than those that follow (if none, so state): _____

10. I authorize the examination by an authorized individual of any tissue, organ(s) or body part(s) removed during the procedure and the disposal of such tissue, organ(s) or body part(s) in accordance with hospital policies.

11. I consent to the admittance of appropriate observers and to the taking and publication of any photographs in the course of this procedure for the purpose of advancing medical education. I understand that my identity will remain confidential.

12. All of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed operative treatment(s).

**I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.**

_____    Signed: _____
Witness                                            Patient

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box)*:
☐ Minor _____ years of age without decision-making capacity        ☑ Lacks decision-making capacity
☐ Other: _____

_____                         _____
Patient Representative Signature                          Relationship to Patient

_____                         _____
Witness Signature (1)                                       Witness signature (2)

Consent obtained (Check one): ☐ In person    ☐ By Telephone [Requires two (2) witness signatures]
Two physician signatures are required in an emergency for consent:

_____ M.D.                    _____ M.D.

**PHYSICIAN DECLARATION**: Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications. I confirm the above surgery/procedure is correct as to procedure, side and site.

Physician Signature _____    Date 3 | 18 | 13    Time: 1700

## CONSENT FOR OPERATIONS AND OTHER PROCEDURES
**DIMENSIONS HEALTHCARE SYSTEM**

2-567 (7/11)

PATIENT LABEL

Riggins, Jasmine
JA3753

# Exhibit 67

JA3754

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 25, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE:** *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*

Dear Ms. McEnroe:

On September 20, 2019, I had the opportunity to see Jasmine Riggins for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Riggins's psychiatric condition in relation to the Complaint in *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Riggins that I would prepare a report based on the psychiatric evaluation and review of records.  I discussed with Ms. Riggins that the examination was not for purposes of treatment and I was not her doctor.

In preparation of this report I have reviewed the following documents:

1. Medical Records: Plaintiffs0000001134 – Plaintiffs0000001242; Plaintiffs0000001995 – Plaintiffs0000002026; Plaintiffs0000006394 – Plaintiffs0000006512; Plaintiffs0000007418 – Plaintiffs0000007425; Plaintiffs0000007426 – Plaintiffs0000007652
2. Complaint in *Russell et al. v. ECFMG*
3. Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)
6. Jasmine Riggins's Responses to Requests for Admission, CAL 18-07863
7. Jasmine Riggins's Answers to Interrogatories, CAL 18-07863 (3/29/2019)
8. Deposition of Jasmine Riggins, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (4/1/2019)

**HISTORY REPORTED BY JASMINE RIGGINS:**

Jasmine Riggins (date of birth      ) said that she is involved in the current litigation because her son was delivered by a man who is "not a doctor." Ms. Riggins said that Dr. Akoda falsified information that he was a doctor. Ms. Riggins said she was in a Facebook group called Embracing Mommies. Ms. Riggins said she did not recall when she joined this Facebook group. Ms. Riggins said that she would check the Facebook group Embracing Mommies a couple times a week for notifications and information that could be helpful for her and her children. Ms. Riggins said she believes that she saw a Facebook post about Dr. Akoda sometime in 2016. Ms. Riggins said that the post was written by Monique Russell. Ms. Riggins said she did not recall the exact words from the post; but she recognized the name Dr. Akoda and wanted to get more information. Ms. Riggins said she learned that Dr. Akoda is not a doctor. Ms. Riggins said that she had communicated with Ms. Russell on Facebook, but she had never met Ms. Russell in person until they appeared for depositions on the same day.

Ms. Riggins said that she has three children. Her oldest child, Santana, was born on ▮▮▮▮ at Howard University Hospital. Ms. Riggins said she moved to Maryland, and she chose Dr. Abdul Chaudry's practice for her second pregnancy. She said Dr. Akoda was a physician in the practice and he was her doctor during the pregnancy. Ms. Riggins said she did not have any problems with the treatment during her pregnancy. Ms. Riggins said that she needed an emergency c-section and her son Messiah was born on ▮▮▮▮. Ms. Riggins explained that her mother went with her to a prenatal OB appointment with Dr. Akoda. Ms. Riggins had reported a decrease in fetal movement, and she said she was told to go to the hospital to deliver her baby.

Ms. Riggins said she was in the hospital for four or five days after she delivered Messiah, and she said that she continued to have pain for a couple months after he was born. Ms. Riggins said that she had been working at a bowling alley 20 hours a week during her pregnancy with Messiah, and she went back to work a few months after Messiah was born. Ms. Riggins said that she did not have concerns about her treatment with Dr. Akoda in the prenatal visits, during the c-section, or after his birth. She did have a post-delivery visit with Dr. Akoda.

Ms. Riggins said she stopped seeing any doctors for medical or gynecologic treatment until she became pregnant with her third child. Ms. Riggins said she started prenatal care a couple months after she learned that she was pregnant. Her daughter Taniya was born on 10/02/17 at Washington Hospital Center. She said the pregnancy was good. She said she had a scheduled c-section and she did not have problems after the c-section. She said she has a current gynecologist at Unity Health Care. Ms. Riggins said that the medical care provided by Dr. Akoda was no different from the treatment from the doctors who delivered her first child and her third child.

Ms. Riggins said when she learned about the lawsuit, she felt embarrassed that something like this had happened, that Dr. Akoda was not really a doctor. Ms. Riggins said that her everyday life did not change.

Ms. Riggins said she tries not to think about the lawsuit. Ms. Riggins said she feels upset for the women who had complications as a result of the care provided by Dr. Akoda, but she does not

know any of these women. Ms. Riggins said that she does not like the fact that Dr. Akoda looked at her private area, and he was not supposed to do that. She said that she feels frustrated, angry, and very sad. She said it is frustrating that she trusted Dr. Akoda, and she should not have trusted him because he is not a doctor. Ms. Riggins did not have any specific information about ECFMG. Ms. Riggins said that she has felt like she is part of a Lifetime Movie because Dr. Akoda was her doctor during her second pregnancy and delivered her son, and he was not a real doctor.

Ms. Riggins said that her mood is okay most of the time. She said her sleep is okay. Sometimes she said she feels "bothered" when she thinks about Dr. Akoda and the lawsuit. Ms. Riggins said she did not read any newspaper articles about Dr. Akoda. She said that she has only read information that she received from her attorney. Ms. Riggins denied problems with her appetite and she said her concentration is pretty good. She said she is able to experience pleasure and loves to be active with her children. Ms. Riggins said she has never had suicidal ideation or anxiety attacks.

Ms. Riggins discussed her thoughts about her future. She thinks about her career, and she wants to own a home. She wants to continue to do what she can for her children. Ms. Riggins said her children are her future. She said that she and her boyfriend are good in regard to their intimate relationship. Ms. Riggins said that she thinks that probably there were a few weeks after she found out about Dr. Akoda that she was "not in the mood."

**MEDICAL HISTORY**:

Ms. Riggins said that she had asthma as a child, and she believes that she had a hospitalization for asthma when she was a child. Ms. Riggins said that she has not had problems with asthma for years, and she does not have an inhaler.

Ms. Riggins also said that she has low iron. She was told about her low iron by her primary care physician at Unity Health Care.

Ms. Riggins denied a history of any psychiatric problems or history of treatment with a psychiatrist, psychologist, or counselor. Ms. Riggins said she has never been diagnosed with depression, anxiety, or other psychiatric disorder.

**SOCIAL HISTORY**:

Ms. Riggins said she left high school in 12th grade because she did not have enough help to take care of her son, Santana. Ms. Riggins said that Santana and Messiah have the same father and she has a joint custody arrangement with him.

Ms. Riggins said that she thought that she had received a GED. She said she had paid $57 to a company and she took the test for a GED. Ms. Riggins said that she received a certificate that she had a GED, but the certificate was not valid. The company had falsified the document, and the company is now out of business. Ms. Riggins said she did not remember the year she first took the test for the GED.

JA3757

Ms. Riggins said that she is now in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.  Ms. Riggins said that she will be in this program for approximately two and a half years.  She said the program has a daycare center and Ms. Riggins takes her daughter Taniya to the daycare center when she is in school.  Ms. Riggins said that she is at the Goodwill Center approximately four hours a day, Monday to Thursday.

Ms. Riggins denied a history of any physical, mental, or sexual abuse.  She denied a history of alcohol abuse or drug use.  Ms. Riggins said that her mother has seven biological children and her father has seven biological children.  Her mother and father had two children together.  Ms. Riggins denied a family history of depression, anxiety, or substance abuse.

**MENTAL STATUS EXAMINATION**:

Mental status examination revealed a 27-year-old woman who paid attention to her appearance evidenced by her clothes, jewelry, and makeup.  Ms. Riggins answered questions in a spontaneous fashion, but she said she would not answer a question about Facebook contacts with Ms. Russell unless she called her attorney.

Ms. Riggins described her mood as most of the time okay.  Her affect was full.  She had tears in her eyes when she talked about her feelings of embarrassment when she learned that Dr. Akoda was not a real doctor.  She denied suicidal ideation.  She denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS**:

The file did not include any records regarding psychiatric or psychological treatment.

The records included multiple notes from a primary care physician that included the Patient Health Questionnaire 2. The scores were always two or lower, indicating that Ms. Riggins did not have problems with depression or anxiety or need for counseling.  (Dates of PHQ 2: 09/07/17, 09/23/16, 10/13/17, 11/09/17, 04/18/19)

**IMPRESSION**:

It is my opinion that Ms. Riggins does not have any psychiatric disorder, and in particular, she does not have a psychiatric disorder causally related to her allegations in the Complaint *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

In support of this opinion, Ms. Riggins discussed her history and her current well-being. She denied a history of any mental health treatment, and she denied a plan to see a psychiatrist or a psychologist. Ms. Riggins said that she did not have any problems with the treatment provided by Dr. Akoda during her pregnancy and with the delivery of her second child.  Ms. Riggins said that the care she received from Dr. Akoda was no different from the treatment from the doctors

who delivered her first child and her third child. Ms. Riggins is in school at the Goodwill Excel Center. She will receive a high school diploma and then study computer science. Ms. Riggins discussed her strong relationships with her partner and her children and goals for her future and for her family.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/plr

# Exhibit 68

JA3760

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

| | | |
|---|---|---|
| MONIQUE RUSSELL, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL17-22761 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| JANE DOE NO. 1, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL17-37091 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| MONIQUE RUSSELL, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL18-07863 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF JASMINE RIGGINS' RESPONSES TO DEFENDANTS' REQUESTS FOR ADMISSIONS

Plaintiff, Jasmine Riggins, by her undersigned attorneys, responds as follows to the Defendants' Requests for Admissions.

## GENERAL OBJECTIONS

A.    Plaintiff objects to each and every Request to the extent the Request seeks privileged information and documents protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine, and/or that were created in anticipation of litigation.

B.    The information supplied in these Responses to Requests for Admission is not based solely on the knowledge of the executing party, but includes knowledge of the party's agents, representatives and attorneys, unless privileged.  Any admission made herein is made with the state of knowledge and information now available to the Defendants, their agents, representatives and attorneys.

C.    In those instances in which the Plaintiff has admitted the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, but has not been called upon to admit the time when Plaintiff learned of the document, the admission of the genuineness of the document should not be construed as an

JA3761

admission that the Plaintiff knew of the document when it was created. Such an admission should be construed only as indicating that, based upon information currently known and obtained by Plaintiff and/or counsel for the Plaintiff, the genuineness of the document is now admitted.

     D.    An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission that the document was unchanged from a prior form, or was otherwise relied upon or acted upon in the form of its production, or remained unchanged at any subsequent time relevant, or at all times relevant, to this case.

     E.    An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission of the truth or falsity of any statement, whether of law or fact, contained in the document.

     F.    An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission that the document is complete or in the page order in which the document was held.

     G.    An admission by the Plaintiff as to the genuineness of a document, or not an admission that the document is material, relevant and/or admissible for any purpose or at any proceeding in this case.

     H.    Plaintiff generally objects to the genuineness of a document when a request to admit or deny the genuineness of a document provides no context or reference about the source of the document.

     I.    Plaintiff objects to these Requests for Admissions to the extent that they purport to impose obligations on the Plaintiff beyond those required by the Maryland Rules.

     J.    Plaintiff generally objects to these Requests for Admissions to the extent that in most instances they ask Plaintiff to admit a fact, but fail to provide reference to any particular document for Plaintiff to review and would otherwise require Plainiff to search for a document that may or may not exist to prove or disprove a proposed fact that may or may not be accurate.

## SPECIFIC RESPONSES

**REQUEST NO. 1:**   You were a Claimant in the initial Health Care Alternative Dispute Resolution Office ("HCADRO") action *Doe v. Dimensions Healthcare System.*

2

JA3762

**RESPONSE:**      Denied.

**REQUEST NO. 2:**    At this time, you are still unaware that the individual known to Defendants as Akoda had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:**      **Denied that Akoda had been certified by ECFMG to practice medicine. Plaintiff admits that she does not have personal knowledge of these matters, but is relying on her attorneys for this information.**

**REQUEST NO. 3:**    In 2017, you filed your Statement of Claim with the Health Care Alternative Dispute Resolution Office in *Doe v. Dimensions Healthcare System.*

**RESPONSE:**      **Denied.**

**REQUEST NO. 4:**    You filed your Complaint in the above-captioned matter in the Circuit Court for Prince George's County, Maryland on or about November 20, 2017.

**RESPONSE:**      **Denied.**

**REQUEST NO. 5:**    You have heard radio advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**      **Denied.**

**REQUEST NO. 6:**    You are a class Plaintiff in the above-captioned action.

**RESPONSE:**      **Plaintiff denies she is a named class Plaintiff in CAL17-37091.**

JA3763

**REQUEST NO. 7:** Your Family was not affected by your alleged symptoms of Post-Traumatic Stress Disorder until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 8:** You did not and have not specifically verified the facts about the qualifications to practice medicine of the individual known to Defendants as Dr. Akoda, which were provided to you as the basis of the events giving rise to your Claim.

**RESPONSE:** **Admitted.**

**REQUEST NO. 9:** You had not retained or had contact with an attorney for purposes of bringing suit for your Claims in this action until seeing/hearing television, radio, and/or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Denied.**

**REQUEST NO. 10:** You had not retained or had contact with an attorney for purposes of bringing suit for your Claims in this case until you saw or heard news coverage or other publicity regarding the events giving rise to your Claim.

**RESPONSE:** **Denied.**

**REQUEST NO. 11:** You did not contribute to or have any role in any news coverage or publicity related to the events you now allege in this action, including, but not limited to, participation in the Dr. Oz Show.

**RESPONSE:** **Admitted.**

JA3764

**REQUEST NO. 12:** You claim that you suffer from Post-Traumatic Stress Disorder as a result of your allegations against the Defendants.

**RESPONSE:** Denied.

**REQUEST NO. 13:** You claim that your alleged Post-Traumatic Stress Disorder has affected your relationship with your Family.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 14:** You have seen television advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Denied.

**REQUEST NO. 15:** You did not experience your alleged symptoms of Post-Traumatic Stress Disorder during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 16:** Your Family was not affected by your alleged symptoms of Post-Traumatic Stress Disorder during the period you were being cared for by Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 17:** You did not experience your alleged symptoms of Post-Traumatic Stress Disorder until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

JA3765

**RESPONSE:**          Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 18:** You do not suffer from depression as a result of the events giving rise to your Claim.

**RESPONSE:**          Upon advice of counsel, Plaintiff objects to this request.   As Plaintiff testified at her deposition, she has been depressed.

**REQUEST NO. 19:** You do not suffer from Post-Traumatic Stress Disorder as a result of the events giving rise to your Claim.

**RESPONSE:**          Admitted.

**REQUEST NO. 20:** It would have been reassuring to you had you known that the individual known to Defendants as Akoda had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:**          Upon advice of counsel, Plaintiff objects to this request.   In this context, Plaintiff does not understand the meaning of "reassuring."   Subject to and without waiving this objection, the stated matters would not change Plaintiff's belief that Akoda was a fraud and a deceit.

**REQUEST NO. 21:** You claim that you suffer from depression as a result of your allegations against the Defendants.

6

JA3766

**RESPONSE:**    Upon advice of counsel, Plaintiff objects to this request.    As Plaintiff testified at her deposition, she has been depressed.

**REQUEST NO. 22:** You claim that your alleged depression has affected your relationship with your Family.

**RESPONSE:**    Denied.

**REQUEST NO. 23:** You have never been formally diagnosed with depression.

**RESPONSE:**    Admitted.

**REQUEST NO. 24:** You did not experience your alleged depression during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:**    Admitted.

**REQUEST NO. 25:** Your Family was not affected by your alleged depression during the period you were being cared for by Dr. Akoda.

**RESPONSE:**    Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 26:** You did not experience your alleged depression until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**    Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 27:** You have seen news coverage or other publicity regarding the events giving rise to your Claim.

**RESPONSE:**    Denied.

**REQUEST NO. 28:** Your Family was not affected by your alleged symptoms of anxiety, if at all, until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 29:** Your Family was not affected by your alleged depression, if at all, until you saw/hear television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 30:** You claim that you suffer from anxiety as a result of your allegations against the Defendants.

**RESPONSE:** Denied.

**REQUEST NO. 31:** You claim that your alleged anxiety has affected your relationship with your Family.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 32:** You did not experience your alleged anxiety during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

JA3768

**REQUEST NO. 33:** You had no complications with your delivery on or about March 18, 2013.

**RESPONSE:** Admitted.

**REQUEST NO. 34:** You claim that your alleged physical injury has affected your relationship with your Family.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 35:** Your Family was not affected by your alleged anxiety during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 36:** You have never been formally diagnosed with anxiety.

**RESPONSE:** Admitted.

**REQUEST NO. 37:** You have never been formally diagnosed with Post-Traumatic Stress Disorder.

**RESPONSE:** Admitted.

**REQUEST NO. 38:** You do not suffer from anxiety as a result of the events giving rise to this Complaint.

**RESPONSE:** Admitted.

**REQUEST NO. 39:** You claim that you suffer from physical pain as a result of your allegations against the Defendants.

**RESPONSE:** **Plaintiff admits that her C-section caused her pain.**

9

**REQUEST NO. 40:** You have never been diagnosed with a physical injury resulting from your allegations against the Defendants.

**RESPONSE:** Admitted.

**REQUEST NO. 41:** You did not experience your alleged physical injury as a result of your allegations during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 42:** Your Family was not affected by your alleged symptoms of physical pain during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 43:** You did not experience your alleged symptoms of a permanent disability during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 44:** Your Family was not affected by your alleged symptoms of physical pain until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

JA3770

**REQUEST NO. 45:** You did not report any physical pain or injury to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 46:** You claim that you suffer from difficulty sleeping as a result of your allegations against the Defendants.

**RESPONSE:** **Denied.**

**REQUEST NO. 47:** You claim that you suffer from "permanent disability" as a result of your allegations against the Defendants.

**RESPONSE:** **Admitted that Plaintiff's emotional injuries are permanent.**

**REQUEST NO. 48:** You do not suffer from permanent disability as a result of the care you received from Dr. Akoda.

**RESPONSE:** **Denied. Plaintiff believes her conditions of being depressed, frustrated, angry, emotional, heartbreaking, sad, loss of trust of doctors is permanent.**

**REQUEST NO. 49:** You claim that your alleged permanent disability has affected your relationship with your Family.

**RESPONSE:** **Denied.**

**REQUEST NO. 50:** You have never been diagnosed with a permanent disability.

**RESPONSE:** **Admitted.**

JA3771

**REQUEST NO. 51:** Your Family was not affected by your alleged permanent disability during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 52:** You have not done any independent research to determine the status of ECFMG certification, residency program completion, licensure, or board certification for the individual known to Defendants as Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 53:** You did not experience your alleged permanent disability until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 54:** Your Family was not affected by your alleged permanent disability until you saw/heard television, [sic].

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 55:** You saw Dr. Akoda at Dr. Chaudry's office regularly throughout your prenatal care.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. The term "regularly" is ambiguous. Plaintiff will interpret it to mean on multiple occasions, and, as such, it is admitted.**

JA3772

**REQUEST NO. 56:** You claim that your alleged difficulty sleeping has affected your relationship with your Family.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 57:** Your Family was not affected by your alleged "lack of trust in physicians and in medical institutions" during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 58:** You have never been diagnosed with a sleeping condition or disorder.

**RESPONSE:** **Admitted.**

**REQUEST NO. 59:** You do not suffer from a sleeping disorder or condition as a result of the events giving rise to your Claim.

**RESPONSE:** **Admitted.**

**REQUEST NO. 60:** You do not have a lack of trust in physicians or in medical institutions at this point in time.

**RESPONSE:** **Denied.**

**REQUEST NO. 61:** Your Family was not affected by your alleged difficulty sleeping during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

JA3773

**REQUEST NO. 62:** You did not experience your alleged difficulty sleeping until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 63:** You did not experience your alleged symptoms of anxiety, if at all, until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 64:** Your Family was not affected by your alleged difficulty sleeping until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 65:** You claim that you suffer from "a lack of trust in physicians and in medical institutions" as a result of your allegations against the Defendants.

**RESPONSE:** Admitted.

**REQUEST NO. 66:** You claim that your alleged "lack of trust in physicians and in medical institutions" has affected your relationship with your Family.

**RESPONSE:** Denied.

14

**REQUEST NO. 67:** You did not experience your alleged "lack of trust in physicians and in medical institutions" during your visit(s) with Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 68:** You have taken your child(ren) to see medical professionals since you learned of the Claim.

**RESPONSE:** Admitted.

**REQUEST NO. 69:** Any information you claim to now have about the status of Dr. Akoda's license to practice medicine, you learned from your Attorney(s).

**RESPONSE:** Admitted.

**REQUEST NO. 70:** Your Family was not affected by your alleged "lack of trust in physicians and in medical institutions" until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 71:** You claim that your alleged "lack of trust in physicians and in medical institutions" has discouraged you from or made you feel uncomfortable from seeing medical professionals.

**RESPONSE:** Admitted.

**REQUEST NO. 72:** You did not experience your alleged symptoms of physical pain, resulting from your allegations against the Defendants, if any, until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

JA3775

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 73:** You claim that your alleged "lack of trust in physicians and in medical institutions" has discouraged you from or made your feel uncomfortable taking your child(ren) to medical professionals.

**RESPONSE:** Admitted.

**REQUEST NO. 74:** You have seen medical professionals since your last visit with Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 75:** You have taken your child(ren) to see medical professionals since your last visit with Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 76:** You have seen medical professionals since you learned of the events giving rise to this Claim.

**RESPONSE:** Admitted.

**REQUEST NO. 77:** After seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim, you began to feel that you were personally violated by Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

JA3776

**REQUEST NO. 78:** You did not experience your alleged "lack of trust in physicians and in medical institutions" until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 79:** You will continue to see medical professionals in the future.

**RESPONSE:** **Admitted.**

**REQUEST NO. 80:** If you were to require emergency medical treatment, you would seek emergency medical services.

**RESPONSE:** **Admitted.**

**REQUEST NO. 81:** If a member of your Family were to require emergency treatment, you would seek emergency medical services.

**RESPONSE:** **Admitted.**

**REQUEST NO. 82:** During your visit(s) with Dr. Akoda, you never refused services or procedures.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. The request is confusing.**

**REQUEST NO. 83:** You do not claim to question Dr. Akoda's competency to practice medicine.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. Akoda's competency to practice medicine includes honesty and truthfulness and a person who lies and deceives is not competent.**

17

**REQUEST NO. 84:** You did not report concerns about Dr. Akoda's competency to practice medicine to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:**        Admitted.

**REQUEST NO. 85:** During your visit(s) with Dr. Akoda, you never felt you had reason to question his competency to practice medicine.

**RESPONSE:**        Admitted.

**REQUEST NO. 86:** After seeing/hearing television, radio, or internet advertisement(s) related to the events you allege in this action, you began to question Dr. Akoda's competency.

**RESPONSE:        Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 87:** The last time you saw Dr. Akoda was on or about March 13, 2013.

**RESPONSE:**        Admitted.

**REQUEST NO. 88:** You will continue to take your child(ren) to see medical professionals in the future.

**RESPONSE:**        Admitted.

**REQUEST NO. 89:** You do not claim that you felt personally violated by Dr. Akoda.

**RESPONSE:**        Denied.

18

**REQUEST NO. 90:** During your visit(s) with Dr. Akoda, you never felt you were personally violated.

**RESPONSE:** **Admitted.**

**REQUEST NO. 91:** You did not report feeling personally violated by Dr. Akoda to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:** **Admitted.**

**REQUEST NO. 92:** You do not claim that your life was in danger during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 93:** You do not claim that your baby's life was in danger during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 94:** During your visit(s) with Dr. Akoda, you never felt your life was in danger.

**RESPONSE:** **Admitted.**

**REQUEST NO. 95:** During your visit(s) with Dr. Akoda, you never felt your baby's life was in danger.

**RESPONSE:** **Admitted.**

**REQUEST NO. 96:** You only began to feel that your life was in danger when cared for by Dr. Akoda after seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim.

JA3779

**RESPONSE:**      Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 97:** You did not report to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda that you felt that your or your baby's life was in danger

**RESPONSE:**      Admitted.

**REQUEST NO. 98:** It was not important to you to research the status of Dr. Akoda's license to practice medicine while receiving care from Dr. Akoda.

**RESPONSE:**      Upon advice of counsel, Plaintiff objects to this request. Plaintiff denies it was not important, but instead had no reason to research these matters.

**REQUEST NO. 99:** At the time of your care by Dr. Akoda, you were unaware that the individual known to Defendants as Akoda: had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:**      Upon advice of counsel, Plaintiff objects to this request. It contains multiple requests which should be set forth separately. Denied that Plaintiff was unaware that Akoda was licensed to practice medicine in the State of Maryland.

20

JA3780

**REQUEST NO. 100:** You only began to feel that your baby's life was in danger when treated by Dr. Akoda after seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 101:** You do not claim that you were abused sexually by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 102:** During your visit(s) with Dr. Akoda, you never felt as if you were being abused sexually.

**RESPONSE:** **Admitted.**

**REQUEST NO. 103:** You did not report any sexual abuse to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 104:** After seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim, you began to feel that you had been sexually abused by Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 105:** You do not believe the competency of a physician can be determined from his or her name.

JA3781

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. The request is confusing.**

**REQUEST NO. 106:** You do not believe that the name of the physician is a determining factor in choosing an OBGYN.

**RESPONSE:** **Admitted.**

**REQUEST NO. 107:** You have seen physicians in your lifetime whose names you do not remember today.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It is overly broad and burdensome. Plaintiff cannot be required to remember what she cannot remember. Plaintiff will admit that she may not be able to recall every physician she has seen in her lifetime.**

**REQUEST NO. 108:** During the period(s) you were being treated by Dr. Akoda, you were unaware that he completed his medical residency at Howard University Hospital.

**RESPONSE:** **Admitted.**

**REQUEST NO. 109:** You were not aware that Dr. Akoda had been indicted or pleaded guilty to criminal charges prior to seeing/hearing radio, television, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Denied.**

**REQUEST NO. 110:** You were not seeing an OB/GYN for annual exams prior to the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

JA3782

**REQUEST NO. 111:** You have not seen an OB/GYN for annual exams since the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Denied.

**REQUEST NO. 112:** You did not forego medical care despite needing it before the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 113:** You have not foregone medical care despite needing it, since the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 114:** During the period(s) you were being treated by Dr. Akoda, you were not aware of the status of Dr. Akoda's license to practice medicine.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. Plaintiff believed Akoda was licensed to practice medicine.

**REQUEST NO. 115:** During the period(s) you were being treated by Dr. Akoda, you were not aware that Dr. Akoda was licensed to practice medicine by the State of Maryland.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. Plaintiff believed Akoda was licensed to practice medicine by the State of Maryland.

**REQUEST NO. 116:** It was not important to you to research the status of Dr. Akoda's license to practice medicine after receiving care from Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. Plaintiff had no reason to research the status of Akoda's license.

JA3783

**REQUEST NO. 117:** During the period(s) you were being treated by Dr. Akoda, you were not aware that Dr. Akoda was licensed to practice medicine by the Commonwealth of Virginia.

    **RESPONSE:**        **Admitted.**

**REQUEST NO. 118:** It was not important to you to research the status of Dr. Akoda's license to practice medicine prior to receiving care from Dr. Akoda.

    **RESPONSE:**        **Upon advice of counsel, Plaintiff objects to this request. Plaintiff had no reason to research the status of Akoda's license.**

**REQUEST NO. 119:** Any information you claim to now have regarding the status of Dr. Akoda's license to practice medicine, you learned from television, radio, or internet advertisement(s) regarding the events giving rise to your claim.

    **RESPONSE:**        **Denied. Plaintiff is relying on the information of her attorneys.**

**REQUEST NO. 120:** You have seen internet advertisement(s) regarding the events giving rise to your Claim.

    **RESPONSE:**        **Admitted.**

JA3784

Respectfully submitted,

LAW OFFICES OF PETER G. ANGELOS, P.C.

By: _____

Jay D. Miller
jmiller@lawpga.com
Paul M. Vettori
pvettori@lawpga.com
Danielle S. Dinsmore, Esquire
ddinsmore@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
*Attorneys for Plaintiff*

25

# Exhibit 69

## IN THE CIRCUIT COURT
## FOR PRINCE GEORGE'S COUNTY, MARYLAND

MONIQUE RUSSELL
(Prince George's County, Maryland)

JASMINE RIGGINS

    *on their own behalf and on behalf of*
    *all others similarly situated,*

    Plaintiffs,

    v.

DIMENSIONS HEALTH CORPORATION

    Defendant.

JURY TRIAL REQUESTED

Case No. CAL 17-22761

---

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Monique Russell and Jasmine Riggins (collectively "Named Plaintiffs" or individually "Russell" or "Riggins"), on their own behalf and on behalf of all others similarly situated, through their attorney Cory L. Zajdel, Esq. and Z LAW, LLC , Jay D. Miller, Esq. and the Law Offices of Peter G. Angelos, P.C., hereby submits this First Amended Class Action Complaint against Defendant Dimensions Health Corporation ("Dimensions") and for support state as follows:

## I.   PARTIES AND JURISDICTION

1.    Plaintiff Monique Russell is a natural person currently residing at 2811 63rd Place, Cheverly, MD 20785 (Prince George's County, Maryland).

2.    Plaintiff Jasmine Riggins is a natural persons currently residing at 312 37th Street, Apt. #304, Washington, DC 20019.



EXHIBIT
Riggins
13
9-16-19

JA3787

3.     Defendant Dimensions Health Corporation ("Dimensions") is a corporation organized under the laws of the State of Maryland and located in Prince George's County, Maryland, to provide medical services to the members of the public, operating as a health care facility, specializing in various areas of medicine, and specifically, in this case, in the field of obstetrics and gynecology, including by way of example and not by way of limitation: administration, staffing, credentialing, and/or supervision of personnel and employees, which held itself out to the public and to the Plaintiffs that it, and its agents, servants, credentialed doctors, and/or employees, possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent, licensed, credentialed, and competent medical providers practicing under the same or similar circumstances as those involving Plaintiffs.

4.     Defendant Dimensions Health Corporation is also known as Dimensions Healthcare System, Prince George's Hospital Center, Laurel Regional Hospital, Bowie Health Center and Family Health and Wellness Center.

5.     At all times relevant, Oluwafemi Charles Igberase also known as Charles J. Akoda, M.D. ("Akoda") was the actual and/or apparent, duly authorized agent, servant and/or employee of Dimensions and carried on a regular medical practice in Prince George's County, Maryland.

6.     At all times relevant, Akoda was purportedly licensed as a physician in the State of Maryland, in the practice of Obstetrics and Gynecology, who represented to the public and to the Plaintiffs that he possessed the degree of skill, knowledge and ability ordinarily possessed by reasonably prudent OB/GYN practicing under the same or similar circumstances as those involving the Plaintiffs.

- 2 -

7.     At all times relevant, Akoda acquired, serviced and performed invasive obstetrical procedures on patients in his medical office and through Dimensions facilities including but not limited to Prince George's Hospital Center and Family Health and Wellness Center as Akoda.

8.     The matter in controversy exceeds the sum of thirty thousand dollars ($30,000.00), exclusive of interest and costs.

9.     This Court has jurisdiction over this case under MD. CODE ANN., CTS. & JUD. PROC. § 1-501.

10.     This Court has personal jurisdiction over Dimensions pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-103(1)-(3), as Dimensions systematically and continually transacts business in Maryland, the case arises out of conduct that took place within Maryland and Dimensions is a Maryland corporation with its headquarters in Maryland.

11.     The Circuit Court of Maryland for Prince George's County is the appropriate venue under MD. CODE ANN., CTS. & JUD. PROC. § 6-201 and 6-202 because the acts giving rise to the claims occurred in Prince George's County, Maryland and Dimensions maintains its principal offices and carries on regular business in Prince George's County, Maryland.

## II.     FACTS COMMON TO ALL COUNTS

12.     Monique Russell was a patient of Oluwafemi Charles Igberase on or about May 25, 2016 at Dimensions. Monique Russell knew Oluwafemi Charles Igberase as Akoda.

13.     Akoda delivered Monique Russell's child through unplanned emergency cesarean section surgery.

14.     Jasmine Riggins was a patient of Oluwafemi Charles Igberase between August 2012 and March 2013 at Dimensions. Jasmine Riggins knew Oluwafemi Charles Igberase as Akoda.

JA3789

15.     Akoda delivered Jasmine Riggins' child through unplanned emergency cesarean section surgery.

16.     Prior to using the name Akoda, Oluwafemi Charles Igberase was raised and lived outside of the United States of America.

17.     Akoda never attended or graduated from a medical school.

18.     At some time in 1991 Akoda entered the United States of America on a Nonimmigrant Visa.

19.     In April 1992, Akoda submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States.

20.     In October 1993, ECFMG issued a certification to Akoda but only after multiple attempts to pass the three-part United States Medical Licensing Examination ("USMLE"). Because Akoda did not pass the USMLE in a competent manner, he was denied acceptance into an accredited residency program.

21.     In order to resolve this problem, Akoda created a false identity by obtaining a fraudulent social security number. In March of 1994, Akoda applied for and received a second ECFMG certification under the name of "Igbarese Oluwafemi Charles."

22.     The ECFMG Committee on Medical Education Credentials determined that Oluwafemi Charles Igberase fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth and revoked both ECFMG certifications in December 1995.

JA3790

23.     Oluwafemi Charles Igberase again passed the ECFMG in 1998 this time using the name "John Nosa Akoda."

24.     Oluwafemi Charles Igberase, using the name Akoda, applied for and was accepted into a residency program at Jersey Shore Medical Center in 2000.

25.     Jersey Shore Medical Center quickly learned that Oluwafemi Charles Igberase's social security number and identity as Akoda did not match up and later suspended Oluwafemi Charles Igberase from the residency program in August 2000 and dismissed Oluwafemi Charles Igberase in November 2000.

26.     In 2006, Akoda was accepted into a residency program at Howard University using the name "John Charles Akoda," a fake SSN and fake permanent resident card. He completed this program in 2011. He thereafter applied for and received a Maryland medical license using "Charles John Nosa Akoda", a fake SSN, fake permanent residence card and fake Nigerian passport.

27.     In early 2012, Akoda applied for and obtained privileges and became a member of the medical staff at Dimensions under the name "Charles John Nosa Akoda"-which was different than the name on his ECFMG certification and also using a fake permanent resident card, fake Maryland driver's license, fake Nigerian passport and fake letters of recommendation.

28.     In 2012, Dimensions knew or should have known that the ECFMG certification was under a different name and the social security number, permanent resident card, driver's license, passport and letters of recommendation provided to Dimensions by   Akoda were fraudulent.

29.     In March 2012, the Center of Medicare and Medicaid Services denied Akoda's application to enroll for Medicare reimbursement using the Akoda identity and the same

documentation used for privileges at Dimensions due to the Center of Medicare and Medicaid Services' determination that Akoda did not provide an accurate social security number.

30.     Akoda acted an as obstetrician-gynecologist in the State of Maryland between the years of 2008 and 2016 at all times practicing under the name Charles John Nosa Akoda.

31.     From 2008 through 2016, Akoda acted as a doctor practicing obstetrics and gynecology as an actual and/or apparent agent, servant and/or employee of Dimensions under the name Akoda.

32.     On June 9, 2016, law enforcement executed search warrants at Akoda's residence, medical office and vehicle where they found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

33.     In February 2017, Akoda plead guilty to social security fraud in the United States District Court for the District of Maryland and was sentenced to six (6) months incarceration, three (3) years supervised release, home detention for six (6) months and an assessment of one hundred dollars ($100.00).

34.     Shortly thereafter in early 2017, Dimensions terminated Akoda's employment and medical privileges at Dimensions.

35.     On or about July 10, 2017, the Maryland Board of Physicians revoked Akoda's medical license on the basis of a fraud and felony conviction.

36.     None of Akoda's patients knew his true identity as Oluwafemi Charles Igberase, but rather, knew Oluwafemi Charles Igberase as Akoda.

- 6 -

37.     The Plaintiffs herein did not learn of Akoda's impersonation of a medical doctor until March 16, 2017. Additionally, the Plaintiffs were in no position to suspect or question Akoda was impersonating a physician and therefore had no reason to inquire.

38.     None of Akoda's patients gave consent to this physician impersonator to perform examinations, invasive procedures and surgeries on their persons.

39.     Class members chose Akoda as their obstetrician relying on his representations that he would deliver Plaintiffs' babies at Dimensions, where he was credentialed to deliver babies.

40.     Akoda informed the Plaintiffs that they would have to seek obstetrical care elsewhere if they did not wish to deliver at Dimensions. Similarly, Plaintiffs would not have allowed Akoda to manage their pregnancies if he did not have privileges at Dimensions. Additionally, Plaintiffs were informed and aware that their pregnancies would be co-managed in some respects with the medical providers at Dimensions.

41.     On many occasions, Akoda penetrated his patients with parts of his body through the vaginal canal and through the stomach in performing medical services. Additionally, Akoda performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language.

42.     Akoda's penetrations of his patients were clear boundary violations.

## III.  CLASS ACTION ALLEGATIONS

43.     Named Plaintiffs bring this action on behalf of a Class which consists of:

All patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.).

### Subclass

All patients examined and/or treated in any manner at a

- 7 -

JA3793

Dimensions Health Corporation facility by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.).

44.     Excluded from the Class Definition are patients of Akoda whose examination or treatment took place in a location outside the state of Maryland.  Also excluded from the Class Definition are those who were examined and/or treated after Akoda's medical privileges were terminated by Dimensions Health Corporation.

45.     The Class and Subclass, as defined above, are identifiable.  The Named Plaintiffs are members of the Class and Subclass.

46.     The Class consists of more than five hundred (500) patients and is thus so numerous that joinder of all members is clearly impracticable.

47.     The Subclass consists of more than five hundred (500) patients and is thus so numerous that joinder of all members is clearly impracticable.

48.     There are questions of law and fact which are not only common to the Class and Subclass but which predominate over any questions affecting only individual Class Members.

49.     The common and predominating questions include, but are not limited to:

(a)     Whether Akoda was an actual and/or apparent agent, servant and/or employee of Dimensions at all relevant times herein.

(b)     Whether Akoda committed boundary violations on class members.

(c)     Whether Dimensions' actions and/or alleged failures to act, including their alleged negligent failure to properly investigate, credential, qualify, select, monitor and supervise Akoda, directly and proximately resulted in foreseeable injuries or damages to Class Members.

- 8 -

JA3794

50.      Claims of Named Plaintiffs are typical of the claims of the respective members of the Class and are based on and arise out of similar facts constituting the wrongful conduct of Dimensions.

51.      Named Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Named Plaintiffs and of all other members of the class are identical.

52.      Named Plaintiffs are cognizant of their duties and responsibilities to the Class.

53.      Named Plaintiffs are committed to vigorously litigating this matter.

54.      Further, Named Plaintiffs have secured counsel experienced in handling class actions and complex litigation.

55.      Undersigned Counsel are uniquely qualified to represent the Class given each firm's resources and vast experience representing Maryland residents in significant and complex litigation at the trial and appellate level, up to and including the United States Supreme Court. Representative cases include, but are not limited to: the 1998 tobacco litigation that resulted in a four billion two hundred million dollar ($4,200,000,000.00) settlement on behalf of the State of Maryland; the Tower Securities litigation that resulted in a one hundred seventeen million five hundred thousand dollar ($117,500,000.00) recovery for the Steamship Trade Association pension fund; a one billion dollar ($1,000,000,000.00) verdict against ExxonMobil Corp. on behalf of four hundred sixty six (466) Baltimore County residents whose water aquifer was polluted with 26,000 gallons of gasoline; a class action suit against Dr. Mark Midei and Catholic Health Initiatives based upon allegations he was implanting unnecessary coronary stents in his patients. Moreover, the Law Offices of Peter G. Angelos has been litigating a separate medical malpractice and credentialing case against Akoda since 2015 and, therefore, has already done a significant amount of investigation and discovery about his conduct that no other Firm can claim.

- 9 -

56. Neither Named Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this claim.

57. This action is properly maintained as a class action under Md. Rule 2-231(b)(l)(A) in that separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the Class that could establish incompatible standards of conduct for Class Members as well as Dimensions.

58. This action is properly maintainable as a class action pursuant to Md. Rule 2-231(b)(l)(B) in that separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not party to the adjudications, or would substantially impair or impede their ability to protect themselves. The Class also fits within the ambit of a limited fund class as Dimensions may contend that it is an eleemosynary institution with limited funds with which to satisfy the thousands of claims which will be made.

59. This action is also properly maintainable as a Class in that questions of law or fact common to members of the Class predominate over any questions affecting only individual members under MD. RULE 2-231(b)(3).

60. A class action is superior to other available methods for the fair and efficient adjudication of this controversy between the class and Dimensions.

61. The commonality of issues of law and fact in this case are clear. Many of the members of the Class are unaware of their rights to prosecute a claim against Dimensions. This class action can be managed without undue difficulty because Named Plaintiffs will

JA3796

vigorously pursue the interests of the Class by virtue of the fact that Named Plaintiffs have suffered the same injuries as other Class Members.

62. The difficulties likely to be encountered in the management of a class action in this litigation are insignificant, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Class through thousands of separate actions.

63. The likelihood that individual members of the Class will prosecute separate actions is remote also because most class members do not know that a claim against Dimensions exists.

64. Counsel for Named Plaintiffs and the Class is experienced in class actions and foresees little difficulty in the management of this case as a class action.

## IV.   CAUSE OF ACTION

### COUNT ONE
#### (Negligent and Grossly Negligent Hiring, Retention, Supervision, Selection, Qualification and Credentialing)

65. Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

66. Between 2008 and 2016, Akoda was an actual and/or apparent, duly authorized agent, servant and/or employee of Dimensions, holding a medical staff position and/or enjoying hospital privileges.

67. Between 2008 and 2016, Dimensions was responsible to assure and maintain patient safety and privacy for members of the public who received treatment from its agents, servants, and/or employees, such as physicians who were medical staff members and/or enjoyed hospital privileges, including specifically but not limited to Akoda.

68. Between 2008 and 2016, Dimensions had a duty under applicable standards of

JA3797

administrative practice and common law to properly investigate, credential, qualify, select, monitor, supervise, and retain only competent physicians and surgeons who practice medicine and/or surgery in accordance with the standards of care and who are not guilty of boundary violations and/or other improper, unlawful or inappropriate behavior including but not limited to violations of internal protocols established by Dimensions.

69.     Dimensions also failed to discover, stop, and report any professional misconduct of which they knew or should have known. This common law duty is non-delegable and was known or by the exercise of due care should have been known to all health care providers including Dimensions herein.

70.     Between 2008 and 2016, Dimensions had a duty under the applicable standards of care and common law to promulgate proper and effective standards, procedures, protocols, systems and rules to ensure quality care, safety and privacy of its patients.

71.     D i m e n s i o n s knew or should have known, that Oluwafemi Charles Igberase had assumed a fake identity using the name Charles J. Akoda, M.D.

72.     Dimensions knew or should have known that Akoda had not graduated medical school and therefore did not have the requisite education, training and competence to provide medical care to its patients and the community.

73.     D i m e n s i o n s knew or should have known, that A k o d a engaged in improper, unlawful and unprofessional conduct by undertaking medical services on his patients without consent or authorization.

74.     D i m e n s i o n s knew or should have known, that A k o d a engaged in boundary violations during his care and treatment of N a m e d Plaintiffs and the Class.

75.     Dimensions breached i t s common law duties and the applicable standards of

- 12 -

JA3798

administrative practice on an ongoing basis by negligently failing to investigate, credential, qualify, select, monitor and supervise its medical personnel and to discover, stop and report Akoda.

76.     Dimensions' continuing breaches of common law and the applicable standards of administrative care constituted negligence, gross negligence, carelessness, recklessness and wanton misconduct.

77.     Dimensions as an institution and/or its officers, directors, management and/or staff committed breaches of the duties owed to Named Plaintiffs and members of the Class including but not limited to the following:

> (a)     negligently failed to properly supervise and oversee Oluwafemi Charles Igberase;
>
> (b)     negligently credentialed Oluwafemi Charles Igberase;
>
> (c)     knew or should have known about Oluwafemi Charles Igberase's identity and activity but negligently failed to report, stop and/or prevent its continuation;
>
> (d)     negligently failed to observe Oluwafemi Charles Igberase's activity;
>
> (e)     negligently failed to train staff to recognize and report conduct of this type and/or;
>
> (f)     negligently failed to have or enforce policies and procedures that would prevent this type of activity.

78.     Dimensions further breached the applicable standards of administrative care and common law duties on a continuing basis by:

- 13 -

(a)     failing to properly investigate A k o d a during his employment and/or association with the Dimensions;

(b)     failing to properly investigate Akoda's i d e n t i t y ;

(c)     failing to take appropriate actions to ensure the safety and privacy of patients who came under Akoda's care;

(d)     failing to appropriately credential, qualify, select, investigate, monitor and supervise Akoda;

(e) continuing Akoda's privileges and employment when Dimensions knew or should have known that he engaged in wrongful, unlawful and outrageous conduct including, but not limited to, assuming the identity of another person, performing medical services on patients without authorization or consent, in addition to engaging in boundary violations, and/or violating other standards of care and/or internal protocols, rules, systems, and procedures;

(f)     granting privileges to an applicant who was not properly educated, trained and competent to provide obstetrical and gynecologic care;

(g)     granting privileges to an applicant who used a false ECFMG certification, false passport, driver's license and resident card and using forged letters of recommendation.

79.     Dimensions' continuing breaches of the applicable standards of administrative care and Dimensions' common law duties constituted negligence, gross negligence, carelessness and recklessness.

80.     Dimensions' ongoing breaches of the common law and violations of the standards of care proximately caused the N a m e d Plaintiffs a n d a l l c l a s s m e m b e r s physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and

- 14 -

other physical and emotional injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future.

81.     Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of N a m e d  P l a i n t i f f s  a n d  c l a s s  m e m b e r s  with N a m e d  Plaintiffs and Class Members being in no way contributorily negligent.

82.     As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, N a m e d  Plaintiffs and C l a s s  M e m b e r s  have and/or will suffer permanent economic and non-economic damages including but not limited to:

      (a)     Great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

      (b)     Severe mental anguish and psychological distress;

      (c)     The cost past, present and future cost of medical care, including but not limited to therapy and psychological counseling; and

      (d)     Lost earnings and diminished earnings capacity

## COUNT TWO
### (Invasion of Privacy - Intrusion Upon Seclusion)

83.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

84.     Akoda intruded upon the solitude, seclusion or private affairs and concerns of Named Plaintiffs and class members by viewing private areas of each patient's body, performing medical procedures on each patient, inserting his extremities inside each patient, performing surgical procedures on patients and other boundary violations all without authorization or consent.

85.     These intrusions are highly offensive to a reasonable individual, such as

JA3801

Named Plaintiffs and the Class, and was totally unwarranted and unjustified, constituting invasion of privacy, and a violation of The Health Insurance Portability and Accountability Act (HIPAA).

86. Dimensions is liable and vicariously liable for Akoda's conduct.

87. As a direct and proximate result of Akoda's acts, Named Plaintiffs suffered physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other emotional, physical and injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future.

88. Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and the class, with Named Plaintiffs and the class being in no way contributorily negligent.

89. As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and class members have and/or will suffer permanent economic and non-economic damages including but not limited to:

(a) Great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

(b) Severe mental anguish and psychological distress;

(c) The past, present and future cost of medical care, including but not limited to therapy and psychological counseling; and

(d) Lost earnings and diminished earnings capacity.

## COUNT THREE
### (Intentional Infliction of Emotional Distress)

90. Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

- 16 -

JA3802

91.     Akoda's ongoing conduct was intentional and/or reckless when he viewed private areas of each patient's body, performed medical procedures on each patient, inserted his extremities inside each patient, performed surgical procedures on patients and other boundary violations all without authorization or consent.

92.     Akoda's conduct involved extreme, outrageous and unreasonable conduct and occurred when he acted as a duly authorized agent and/or employee of Dimensions. As a result, Named Plaintiffs and class members sustained severe emotional distress resulting in physical manifestations, physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries, damages (both economic and non-economic) and permanent disability, in the past, present and future, for which this claim is made. The injuries suffered by the Named Plaintiffs and class members are substantial, continuing, and permanent.

93.     Dimensions is liable and vicariously liable for Akoda's conduct.

94.     The emotional distress that has been sustained by Named Plaintiffs and Class Members was the natural and proximate result of the ongoing wrongful, unlawful and outrageous conduct on the part of the Dimensions as alleged herein.

95.     Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and class members, with Named Plaintiffs and Class Members being in no way contributorily negligent.

96.     As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

- 17 -

(a)     great indignity, humiliation, shame, mortification and other injuries

to their physical, mental, emotional and nervous systems;

(b)     severe mental anguish and psychological distress;

(c)     the past, present and future cost of medical care including but not

limited to therapy and psychological counseling; and

(d)     lost earnings and diminished earnings capacity.

## COUNT FOUR
### (Battery)

97.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

98.     Akoda intentionally and without Named Plaintiffs or class members' consent made unpermitted, harmful and offensive sexual and/or other contact with Named Plaintiffs and Class Members.

99.     At all relevant times, Akoda acted as a duly authorized agent and/or employee of Dimensions.

100.    These contacts would offend an ordinary person's reasonable sense of personal dignity, and constituted an intentional, unpermitted touching of Named Plaintiffs and Class Members.

101.    Dimensions is liable and vicariously liable for Akoda's conduct.

102.    As a result of Dimensions' conduct, Named Plaintiffs and Class Members sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries, damages (both economic and non- economic) and permanent disability, in the past, present and future, for which this claim is made.

JA3804

103. The injuries suffered by Named Plaintiffs and Class Members are substantial, continuing and permanent. Dimensions is responsible for Akoda's conduct due to its ongoing failure to investigate, credential, qualify, select, monitor and supervise its medical personnel and to discover, stop and report Akoda.

104. Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and Class Members, with Named Plaintiffs and Class Members being in no way contributorily negligent.

105. As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

      (a)    great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

      (b)    severe mental anguish and psychological distress;

      (c)    the past, present and future cost of medical care including but not limited to therapy and psychological counseling; and

      (d)    lost earnings and diminished earnings capacity.

### COUNT FIVE
### (Negligent Entrustment)

106. Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

107. At all times relevant hereto Dimensions appointed, engaged, employed and/or contracted with Akoda to act as its actual and/or apparent, duly authorized agent, servant and/or employee and permitted him to remain as such from 2012 to 2016.

108. At all times relevant hereto, Dimensions granted privileges to Akoda to

- 19 -

JA3805

practice as an obstetrician/gynecologist in its medical facilities and on its patients including Named Plaintiffs and Class Members.

109.    In connection with granting Akoda these privileges Dimensions entrusted Akoda with the use of its medical facilities, devices, equipment, machines and/or supplies to provide care and treatment to his and the Dimensions' patients, including Named Plaintiffs and Class Members.

110.    At all times relevant hereto, Dimensions owed a continuing duty to Named Plaintiffs and Class Members to use reasonable care to ensure that Akoda was trustworthy, competent, and fit to safely and appropriately utilize the medical facilities, devices, equipment, machines, and/or supplies it entrusted to him to treat its patients such as Named Plaintiffs and Class Members.

111.    At all times relevant hereto, Dimensions knew or should have known, and/or had actual or constructive knowledge and/or reasonable suspicion that Akoda was using the Dimensions' medical facilities, devices, equipment, machines, and/or supplies to engage in unprofessional, unlawful and outrageous conduct by viewing private areas of each patient's body, performing medical procedures on each patient, inserting his extremities inside each patient, performing surgical procedures on patients and other boundary violations all without authorization or consent.

112.    Dimensions breached these duties owed to Named Plaintiffs and Class Members by entrusting Akoda with the medical facilities, devices, equipment, machines, and/or supplies which he used to perform the acts which are the subject of this Amended Complaint.

113.    Dimensions negligently breached these duties owed to Named Plaintiffs and

- 20 -

class members and failed to carry out their responsibilities in accordance with the level of care and skill expected of a reasonably prudent medical corporation under the same or similar circumstances, by entrusting Akoda with their patients, including Named Plaintiffs and Class Members, and with the use of medical facilities, devices, equipment, machines, and/or supplies.

114.    As a result of this negligence by Dimensions, Named Plaintiffs and Class Members sustained severe emotional distress and physical pain, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries, damages (both economic and non- economic) and permanent disability, in the past, present and future, for which this claim is made. The injuries suffered by Named Plaintiffs and class members are substantial, continuing and permanent.

115.    Dimensions' negligence was the sole and proximate cause of the injuries, damages and permanent disability of Named Plaintiffs and class members, with Named Plaintiffs and class members being in no way contributorily negligent.

116.    As a direct, proximate, immediate and foreseeable result of Dimensions' conduct, Named Plaintiffs and Class Members have and/or will suffer permanent economic and non-economic damages including but not limited to:

(a)    great indignity, humiliation, shame, mortification and other injuries to their physical, mental, emotional and nervous systems;

(b)    severe mental anguish and psychological distress;

(c)    the past, present and future cost of medical care including but not limited to therapy and psychological counseling; and

(d)    lost earnings and diminished earnings capacity.

JA3807

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs respectfully pray that this Court:

A.  assume jurisdiction of this case;

B.  enter an order certifying the Class under MD. RULE 2-231(b)(1)(A-B) and 2-231(b)(3);

C.  appoint Named Plaintiffs as Class Representatives;

D.  appoint Named Plaintiffs' Counsel as Class Counsel;

E.  enter a judgment against Dimensions finding it liable to Named Plaintiffs and each Class Member;

F.  award compensatory damages to each class member in an amount which exceeds seventy five thousand dollars;[1]

G.  award punitive damages to each Class Member;

H.  award the costs and expenses of this case, including attorneys' fees;

I.  award pre-judgment and post-judgment interest; and

J.  award such other relief as the court deems appropriate.

Respectfully submitted,

Z LAW, LLC

Dated: December 15, 2017                    By: _____

Cory L. Zajdel, Esq.
2345 York Road, Suite #B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com

---

[1] Pursuant to MD. RULE 2-305, Named Plaintiffs state that each of their claims exceed seventy five thousand dollars ($75,000.00).

- 22 -

JA3808

Jay D. Miller, Esq.
LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
JMiller@lawpga.com

**Attorneys for Plaintiffs**

### JURY TRIAL

Named Plaintiffs on behalf of themselves and all others similarly situated demands trial by jury on all issues so triable.

_____
Cory L. Zajdel

### CERTIFICATE OF SERVICE

I certify that on this 15th day of December, 2017, I caused a copy of the foregoing First Amended Class Action Complaint to be placed in the mail for delivery using first class postage prepaid to:

Joseph B. Chazen, Esq.
Gina M. Smith, Esq.
Samuel T. Wolf, Esq.
Meyers, Rodbell & Rosenbaum, P.A.
6801 Kenilworth Avenue, Suite 400
Riverdale, Maryland 20737

**Counsel for Defendant Dimensions Health Corporation**

_____
Cory L. Zajdel

- 23 -

JA3809

# Exhibit 70

JA3810

Page 1

```
 1     IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

 2   MONIQUE RUSSELL, et al.     :

 3      Plaintiffs              : Case No.:

 4         Vs.                  : CAL17-22761

 5   DIMENSIONS HEALTH CORP., : CAL17-37091

 6   et al.                     : CAL18-07863

 7      Defendants              :

 8                     --------------------

 9

10           Deposition of JASMINE RIGGINS was taken

11   via videotape on Monday, April 1, 2019, commencing

12   at 10:03 a.m., at Law Office of David Ellin, P.C.,

13   154 Westminster Pike, Reisterstown, Maryland,

14   before MICHELE D. LAMBIE, Notary Public.

15                     --------------------

16

17

18

19

20

21   Reported By:   Michele D. Lambie, CSR-RPR
```

Jasmine Riggins                                    April 1, 2019

Page 74

1  opportunity to object before answering the next
2  series of questions.
3       MR. ELLIN:  Objection.
4  BY MR. CATHELL:
5    Q.  Did you meet with your attorneys before
6  the Complaint was filed?
7    A.  Yes.
8    Q.  And do you recall how long?
9    A.  How long did we meet?
10   Q.  How long did you meet prior to the
11 Complaint being filed?
12   A.  I do not recall.
13   Q.  Since the Complaint was filed, have you
14 met with your attorneys?
15   A.  Yes.
16   Q.  And do you recall how many times you have
17 met with your attorneys?
18   A.  No.  We've met multiple times.
19   Q.  And when was the last time you met with
20 your attorneys?
21   A.  Other than this morning?

Page 75

1    Q.  Yes.
2    A.  Friday, I believe.
3       MR. ELLIN:  And just to clarify, too.
4  Meeting, like telephone conference I think that
5  she's using that as well --
6       THE WITNESS:  Yeah.
7       MR. ELLIN:  -- as well as an actual
8  meeting.
9  BY MR. CATHELL:
10   Q.  So, without getting into any of the
11 specifics of the communications, how often have you
12 communicated with your lawyers regarding this case?
13   A.  Often.  I don't -- I don't have a
14 specific number.
15   Q.  Have you read any of the papers that have
16 been filed in court in this case, other than the
17 Complaint?
18   A.  Not that I can recall.
19   Q.  Have you gone to court to any of the
20 hearings that have occurred in this case?  I have
21   A.  No.  I've -- I was aware of them.  I have

Page 76

1  not been physically there.
2    Q.  And why did you not attend those
3  hearings?
4    A.  My attorney didn't advise me that I
5  needed to be there.
6    Q.  Do you plan on going to court hearings in
7  this case regarding class certification?
8    A.  If my attorneys need me there.
9    Q.  Do you know what class certification is?
10   A.  Vaguely.
11   Q.  Okay.  And what is your understanding as
12 to what class certification is?
13   A.  Well, I know that it's a process of
14 the -- the class action representative.  It's
15 something that they're supposed to have or do.  I'm
16 not honestly sure of exactly what it is.
17   Q.  Do you know what causes of action are
18 being asserted in the Complaint in this matter?
19       MR. ELLIN:  Objection.  You can answer to
20 the best of your ability.
21       THE WITNESS:  Okay.  What is the question

Page 77

1  again?
2  BY MR. CATHELL:
3    Q.  Sure.  Do you know what causes of action
4  are being asserted in the Complaint in this matter?
5    A.  Can you rephrase that?  I don't -- what
6  causes of action are being asserted?  Not that
7  I -- no.  Causes of action?
8    Q.  Do you want me to rephrase it
9  or --
10   A.  Please, yes.
11   Q.  Well, do you -- do you know what a cause
12 of action is?
13   A.  Yes.
14   Q.  Okay.  And do you know what the causes of
15 action that you're bringing in this case are?
16   A.  The causes of action that I'm bringing to
17 the case?
18       MR. ELLIN:  What -- what we're alleging
19 they did wrong.
20       THE WITNESS:  Yes.
21       MR. ELLIN:  Is that -- is that fair?

Veritext Legal Solutions
JA3812

Page 78

1  Okay.
2          THE WITNESS:  Okay.  The fact that
3  the -- the hospital wasn't very -- what's the word?
4  Good at -- they weren't very good at who they
5  allowed practice in their hospital.  They didn't do
6  a good job at checking into his background, making
7  sure everything was legit, making sure that he was
8  actually saying who he was.
9  BY MR. CATHELL:
10     Q.  Do you know what damages the Complaint is
11  seeking?
12     A.  What damages we're seeking?
13     Q.  Yes.
14     A.  The damages -- yes.
15          MR. ELLIN:  Are you talking about like
16  the specific amount in the Complaint?  I just want
17  to make sure we're --
18          THE WITNESS:  Yeah, we are clear.
19  BY MR. CATHELL:
20     Q.  Just any understanding.  I mean, that's a
21  yes or no.  Do you know what the damages the

Page 79

1  Complaint is seeking?
2     A.  Yes.
3     Q.  Okay.  And what is your understanding as
4  to what the damages sought are?
5     A.  So far as him not being legit and as far
6  being fraud, are you talking about that?
7  Like --
8     Q.  I'm just asking your understanding of the
9  damages in your Complaint.
10          MR. ELLIN:  And if you don't know them
11  all, it's fine.
12          THE WITNESS:  Yeah.
13          MR. ELLIN:  Again, it's not a trick
14  question.
15          THE WITNESS:  Yeah, not at this time.
16  BY MR. CATHELL:
17     Q.  Yeah.  This is my opportunity just to
18  explore what you know, so I'm not --
19     A.  Right.
20     Q.  -- implying anything with my question.  I
21  just want to know what your understanding of

Page 80

1  specific things in the lawsuit are, okay?
2     A.  Okay.
3     Q.  Do you know the names of the Defendants
4  that are being sued in this case?
5     A.  Yes.
6     Q.  Okay.  And what are the names of the
7  Defendants?
8     A.  Dimensions Healthcare.
9          MR. ELLIN:  Oh.  We lost the -- there you
10  go.
11  BY MR. CATHELL:
12     Q.  Anyone else?
13     A.  The Dimensions Healthcare.  I'm sorry.
14     Q.  Anyone else?
15     A.  No, other than --
16     Q.  Did --
17     A.  Oh, go ahead.
18     Q.  Were you finished your answer?
19     A.  Yes.
20     Q.  Have you met with any of the other
21  Plaintiffs?

Page 81

1     A.  No.
2     Q.  Other than Ms. Russell, who we've
3  discussed, are you aware of the names of any other
4  Plaintiff?
5     A.  Not every -- no, not the names.
6     Q.  Are you aware that the Complaint is
7  asking the court to certify this matter as a class
8  action?
9     A.  Yes.
10     Q.  And do you know what it means to proceed
11  as a class action?
12     A.  Yes.
13     Q.  And what does that mean, to proceed as a
14  class action?
15     A.  That this is an act of a class of
16  multiple people.  That it's more than one person.
17     Q.  Anything else?  Any further
18  understanding?
19     A.  No.
20     Q.  Do you know how many proposed class
21  members there are?

# Exhibit 71

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 25, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

**RE:** ***Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates***

Dear Ms. McEnroe:

On September 20, 2019, I had the opportunity to see Jasmine Riggins for an independent psychiatric evaluation. The evaluation was requested to comment on Ms. Riggins's psychiatric condition in relation to the Complaint in *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Riggins that I would prepare a report based on the psychiatric evaluation and review of records. I discussed with Ms. Riggins that the examination was not for purposes of treatment and I was not her doctor.

In preparation of this report I have reviewed the following documents:

1. Medical Records: Plaintiffs0000001134 – Plaintiffs0000001242; Plaintiffs0000001995 – Plaintiffs0000002026; Plaintiffs0000006394 – Plaintiffs0000006512; Plaintiffs0000007418 – Plaintiffs0000007425; Plaintiffs0000007426 – Plaintiffs0000007652
2. Complaint in *Russell et al. v. ECFMG*
3. Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)
6. Jasmine Riggins's Responses to Requests for Admission, CAL 18-07863
7. Jasmine Riggins's Answers to Interrogatories, CAL 18-07863 (3/29/2019)
8. Deposition of Jasmine Riggins, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (4/1/2019)

JA3815

Case 22-cv-00580-ABC  Document 122-5  Page 3502  Filed Date: 09/08/2022
Case 22-cv-00580-ABC  Document 122-5  Page 3502  Filed Date: 09/08/2022

RE:  JASMINE RIGGINS
Page 2

**HISTORY REPORTED BY JASMINE RIGGINS:**

Jasmine Riggins ( ███████████████ ) said that she is involved in the current litigation because her son was delivered by a man who is "not a doctor."  Ms. Riggins said that Dr. Akoda falsified information that he was a doctor. Ms. Riggins said she was in a Facebook group called Embracing Mommies.  Ms. Riggins said she did not recall when she joined this Facebook group. Ms. Riggins said that she would check the Facebook group Embracing Mommies a couple times a week for notifications and information that could be helpful for her and her children. Ms. Riggins said she believes that she saw a Facebook post about Dr. Akoda sometime in 2016. Ms. Riggins said that the post was written by Monique Russell.  Ms. Riggins said she did not recall the exact words from the post; but she recognized the name Dr. Akoda and wanted to get more information.  Ms. Riggins said she learned that Dr. Akoda is not a doctor.  Ms. Riggins said that she had communicated with Ms. Russell on Facebook, but she had never met Ms. Russell in person until they appeared for depositions on the same day.

Ms. Riggins said that she has three children.  Her oldest child, Santana, was born on 07/25/19 at Howard University Hospital. Ms. Riggins said she moved to Maryland, and she chose Dr. Abdul Chaudry's practice for her second pregnancy. She said Dr. Akoda was a physician in the practice and he was her doctor during the pregnancy. Ms. Riggins said she did not have any problems with the treatment during her pregnancy. Ms. Riggins said that she needed an emergency c-section and her son Messiah was born on 03/18/13.  Ms. Riggins explained that her mother went with her to a prenatal OB appointment with Dr. Akoda.  Ms. Riggins had reported a decrease in fetal movement, and she said she was told to go to the hospital to deliver her baby.

Ms. Riggins said she was in the hospital for four or five days after she delivered Messiah, and she said that she continued to have pain for a couple months after he was born.  Ms. Riggins said that she had been working at a bowling alley 20 hours a week during her pregnancy with Messiah, and she went back to work a few months after Messiah was born. Ms. Riggins said that she did not have concerns about her treatment with Dr. Akoda in the prenatal visits, during the c-section, or after his birth.  She did have a post-delivery visit with Dr. Akoda.

Ms. Riggins said she stopped seeing any doctors for medical or gynecologic treatment until she became pregnant with her third child. Ms. Riggins said she started prenatal care a couple months after she learned that she was pregnant.  Her daughter Taniya was born on 10/02/17 at Washington Hospital Center.  She said the pregnancy was good.  She said she had a scheduled c-section and she did not have problems after the c-section.  She said she has a current gynecologist at Unity Health Care.  Ms. Riggins said that the medical care provided by Dr. Akoda was no different from the treatment from the doctors who delivered her first child and her third child.

Ms. Riggins said when she learned about the lawsuit, she felt embarrassed that something like this had happened, that Dr. Akoda was not really a doctor.  Ms. Riggins said that her everyday life did not change.

Ms. Riggins said she tries not to think about the lawsuit.  Ms. Riggins said she feels upset for the women who had complications as a result of the care provided by Dr. Akoda, but she does not

know any of these women.  Ms. Riggins said that she does not like the fact that Dr. Akoda looked at her private area, and he was not supposed to do that.  She said that she feels frustrated, angry, and very sad.  She said it is frustrating that she trusted Dr. Akoda, and she should not have trusted him because he is not a doctor.  Ms. Riggins did not have any specific information about ECFMG.  Ms. Riggins said that she has felt like she is part of a Lifetime Movie because Dr. Akoda was her doctor during her second pregnancy and delivered her son, and he was not a real doctor.

Ms. Riggins said that her mood is okay most of the time.  She said her sleep is okay.  Sometimes she said she feels "bothered" when she thinks about Dr. Akoda and the lawsuit.  Ms. Riggins said she did not read any newspaper articles about Dr. Akoda.  She said that she has only read information that she received from her attorney.  Ms. Riggins denied problems with her appetite and she said her concentration is pretty good.  She said she is able to experience pleasure and loves to be active with her children.  Ms. Riggins said she has never had suicidal ideation or anxiety attacks.

Ms. Riggins discussed her thoughts about her future.  She thinks about her career, and she wants to own a home.  She wants to continue to do what she can for her children.  Ms. Riggins said her children are her future.  She said that she and her boyfriend are good in regard to their intimate relationship.  Ms. Riggins said that she thinks that probably there were a few weeks after she found out about Dr. Akoda that she was "not in the mood."

**MEDICAL HISTORY**:

Ms. Riggins said that she had asthma as a child, and she believes that she had a hospitalization for asthma when she was a child.  Ms. Riggins said that she has not had problems with asthma for years, and she does not have an inhaler.

Ms. Riggins also said that she has low iron.  She was told about her low iron by her primary care physician at Unity Health Care.

Ms. Riggins denied a history of any psychiatric problems or history of treatment with a psychiatrist, psychologist, or counselor.  Ms. Riggins said she has never been diagnosed with depression, anxiety, or other psychiatric disorder.

**SOCIAL HISTORY**:

Ms. Riggins said she left high school in 12th grade because she did not have enough help to take care of her son, Santana.  Ms. Riggins said that Santana and Messiah have the same father and she has a joint custody arrangement with him.

Ms. Riggins said that she thought that she had received a GED.  She said she had paid $57 to a company and she took the test for a GED.  Ms. Riggins said that she received a certificate that she had a GED, but the certificate was not valid.  The company had falsified the document, and the company is now out of business.  Ms. Riggins said she did not remember the year she first took the test for the GED.

Ms. Riggins said that she is now in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.  Ms. Riggins said that she will be in this program for approximately two and a half years.  She said the program has a daycare center and Ms. Riggins takes her daughter Taniya to the daycare center when she is in school.  Ms. Riggins said that she is at the Goodwill Center approximately four hours a day, Monday to Thursday.

Ms. Riggins denied a history of any physical, mental, or sexual abuse.  She denied a history of alcohol abuse or drug use.  Ms. Riggins said that her mother has seven biological children and her father has seven biological children.  Her mother and father had two children together.  Ms. Riggins denied a family history of depression, anxiety, or substance abuse.

**MENTAL STATUS EXAMINATION**:

Mental status examination revealed a 27-year-old woman who paid attention to her appearance evidenced by her clothes, jewelry, and makeup.  Ms. Riggins answered questions in a spontaneous fashion, but she said she would not answer a question about Facebook contacts with Ms. Russell unless she called her attorney.

Ms. Riggins described her mood as most of the time okay.  Her affect was full.  She had tears in her eyes when she talked about her feelings of embarrassment when she learned that Dr. Akoda was not a real doctor.  She denied suicidal ideation.  She denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS**:

The file did not include any records regarding psychiatric or psychological treatment.

The records included multiple notes from a primary care physician that included the Patient Health Questionnaire 2. The scores were always two or lower, indicating that Ms. Riggins did not have problems with depression or anxiety or need for counseling.  (Dates of PHQ 2: 09/07/17, 09/23/16, 10/13/17, 11/09/17, 04/18/19)

**IMPRESSION:**

It is my opinion that Ms. Riggins does not have any psychiatric disorder, and in particular, she does not have a psychiatric disorder causally related to her allegations in the Complaint *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

In support of this opinion, Ms. Riggins discussed her history and her current well-being. She denied a history of any mental health treatment, and she denied a plan to see a psychiatrist or a psychologist. Ms. Riggins said that she did not have any problems with the treatment provided by Dr. Akoda during her pregnancy and with the delivery of her second child. Ms. Riggins said that the care she received from Dr. Akoda was no different from the treatment from the doctors

who delivered her first child and her third child. Ms. Riggins is in school at the Goodwill Excel Center. She will receive a high school diploma and then study computer science. Ms. Riggins discussed her strong relationships with her partner and her children and goals for her future and for her family.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/plr

# Exhibit 72

Monique Russell

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - X

MONIQUE RUSSELL, JASMINE          :

RIGGINS, ELSA M. POWELL           :

and DESIRE EVANS,                 : Civil Action No.

         Plaintiffs,           :   18-5629

v.                                :

EDUCATIONAL COMMISSION FOR        :

FOREIGN MEDICAL GRADUATES,        :

        Defendant.            :

- - - - - - - - - - - - - - - - X


Videotaped Deposition Of MONIQUE RUSSELL

Washington, D.C.

Monday, September 16, 2019

1:51 p.m.


Job No. 88394

Pages:  1 - 136

Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

JA3821

Monique Russell

```
 1   of the head, we might be able to see it on the
 2   video, but it might not be clear on the
 3   transcript.  And, so, if I ask you for an audible
 4   response or if I repeat your answer to make sure
 5   that I heard it correctly, that's why I'm doing
 6   it, so that the court reporter can take down the
 7   questions and answers as best she can.
 8             Is that understood?
 9        A    Yes.
10        Q    This is not an endurance contest.  If
11   you need to take a break at any point in time, use
12   the facilities, talk to your counsel, that's fine.
13   Just let me know and we'll -- we'll go ahead and
14   do that, okay?
15        A    Okay.
16        Q    There may be questions that I have to
17   ask you today that relate to subjects of a
18   personal nature, and I'm not trying to pry or do
19   anything other than get facts that I need to have
20   to understand the basis for the lawsuit, and
21   that's why I'm asking those questions, okay?
22        A    Okay.
23        Q    If at any time you don't understand my
24   question or didn't hear my question and want me to
25   repeat it or rephrase it, just let me know, and
```

Page 10

```
 1    either the court reporter will read it back to you

 2    or I'll try again to do a better job of asking my

 3    question, okay?

 4         A    Okay.

 5         Q    Are you on any medication today that

 6    would affect your ability to remember things or to

 7    testify truthfully?

 8         A    No.

 9         Q    Okay.  As you sit here today, can you

10    think of any reason why you couldn't testify

11    truthfully and answer questions to the best of

12    your ability?

13         A    No.

14         Q    Okay.  Do you have any questions for me

15    before we start?

16         A    Not at this time.

17         Q    Okay.  Can you give me your full name,

18    please?

19         A    Sure.  My name is Monique Melissa

20    Russell.

21         Q    Okay.  And your date of birth?

22         A    July 16th, 1977.

23         Q    And what's your current address?

24         A    In the States, it is 1906 Beeches Glory

25    Path, Annapolis, Maryland 21401, but I am
```

Monique Russell

1    currently residing in Costa Rica on a two-year

2    contract.

3        Q      Okay.  And when did you start your time

4    in Costa Rica?

5        A      On August of last year.

6        Q      So August of 2018?

7        A      Yes.

8        Q      And when are you scheduled to return

9    completely from the two-year contract?  August of

10   '20?

11       A      I'm in the second year of my two-year

12   contract.

13       Q      And who is the contract with?

14       A      Country Day School.

15       Q      And what job are you doing in Costa

16   Rica for them?

17       A      I'm the curriculum coordinator for the

18   early childhood and elementary schools.

19       Q      And what is your responsibilities in

20   that job?

21       A      I work with the principals of both

22   schools on alignment of curriculum from

23   prekindergarten to fifth grade, and provide

24   training and professional development to all of

25   the teachers and work with them in planning

```
 1   meetings.
 2        Q     And when you say the two schools, there
 3   are two separate schools in Costa Rica?
 4        A     No, they call them schools.  Country
 5   Day School is a campus that goes from early
 6   childhood to high school, and so there are four
 7   schools, the early childhood, elementary, middle
 8   and high school, and I work with the two lower
 9   schools.
10        Q     And are you in Costa Rica by yourself,
11   or is your family with you?
12        A     My family is with me.
13        Q     And who is that that's with you there?
14        A     My husband and my son.
15        Q     Okay.  And your husband's name is?
16        A     Christopher William Russell.
17        Q     Okay.  And how old is he?
18        A     He is -- how old am I? -- 46.
19        Q     And your son?
20        A     Is Luka.
21        Q     Okay.  And how old is Luka?
22        A     Three.
23        Q     Okay.  And was Luka born or May 25th,
24   2016?
25        A     Yes.
```

Monique Russell

```
 1          Q       Okay.  Do you have any other children?
 2          A       No.
 3          Q       And how long have you been married?
 4          A       For five years in October.
 5          Q       Okay.  And you are here in Washington,
 6     D.C. today having returned from Costa Rica;
 7     correct?
 8          A       Yes, I flew from Costa Rica.
 9          Q       Okay.  And when did you arrive here in
10     Washington?
11          A       Last night.
12          Q       Okay.  And what, if anything, have you
13     done to prepare to come and testify here today in
14     this deposition?
15          A       I reviewed my interrogatories and the
16     paperwork of the course --
17          Q       Uh-huh.
18          A       -- of the case, but that's about it.
19          Q       Okay.  You -- you have filed, as I
20     understand it, two different lawsuits related to
21     your interactions with a Dr. Charles Akoda;
22     correct?
23          A       Yes.
24          Q       Did you review materials related to
25     both of those cases before coming in to testify
```

Monique Russell

```
 1    teacher?
 2        A     When I was a classroom teacher, I
 3    worked ten months.  I did not work summers.
 4        Q     Okay.  And what did you do during the
 5    summers?
 6        A     Some summers I would work; I would wait
 7    tables.
 8        Q     Uh-huh.
 9        A     Or -- I'm trying to think what other --
10    but jobs like that.  One summer I traveled.
11        Q     Okay.  Recuperated and got ready for
12    the next school year?
13        A     Yes.
14        Q     I don't blame you.
15              I want to talk a little bit about --
16    what do I want to talk about?  Strike that.
17              Let me ask you some background
18    questions about the lawsuit so I understand
19    what -- what you know and what you're familiar
20    with.
21              When did you first decide to retain
22    Mr. Zajdel as your -- as your counsel?
23        A     I don't know exactly what month, but it
24    was probably more than a month after I found out
25    about Akoda.
```

Monique Russell

1     Q     And if I understand from your discovery
2   responses in the case, you believe that you found
3   out about the fact that Dr. Akoda, who I believe
4   helped deliver your son, Luka, you found out he
5   had pled guilty in June of 2017?
6     A     I'm not sure if that's the time, but if
7   that's what your record shows, probably.
8     Q     We can go through, and we probably will
9   go through, some of the questions.  I'm not trying
10   to -- to trick you on that, so . . .
11          Why don't you tell me just generally
12   how you came to learn about any issues with
13   Dr. Akoda?
14     A     Sure.  So I -- in the neighborhood
15   where I lived at the time, there was a parent
16   listserv where people would post recommendations
17   or ask for advice and things like that.  And
18   someone asked for a recommendation for an OB/GYN.
19   And I wanted to recommend my OB/GYN, Dr. Waldrop,
20   but I wanted to make sure that the person knew if
21   they went to Dr. Waldrop that there was a chance
22   that they would end up having their baby delivered
23   with Akoda, and I did not have a good experience
24   with him during the delivery, and so I wanted to
25   make sure the person was aware of that.

Monique Russell

1          And I went to his Web site to confirm

2     the spelling of his name, and he wasn't on their

3     Web site anymore.  So I went and looked at my

4     paperwork, confirmed the spelling, I looked him up

5     to see like, maybe he moved somewhere else so that

6     wouldn't be an issue for this person.  And I

7     discovered a press release from the Department of

8     Justice saying that he had been arrested for

9     charges of fraud very shortly after he performed a

10    C-section on me.

11         Q     And the physician that you mentioned,

12    Dr. Waltrop?

13         A     Waldrop.

14         Q     Waldrop.  That was your OB/GYN?

15         A     Yes.

16         Q     How long -- when did you first start

17    going to see Dr. Waldrop?

18         A     I'm not sure.  Maybe three months into

19    my pregnancy.

20         Q     And how did you come to start visiting

21    Dr. Waldrop?

22         A     She was recommended by a woman that I

23    met on the hospital tour.

24         Q     Okay.  And what hospital was that?

25         A     P.G. County, Dimensions Hospital.

Case 2:23-1998562 Document 22.5 Page 361 9410 12/ate Filed Page 09/08/2029

1      Q      And did you have a OB/GYN before

2   Dr. Waldrop?

3      A      I had a -- I saw a high-risk

4   specialist, but I didn't have a regular OB/GYN.

5      Q      Okay.  And what was the name of the

6   high-risk specialist?

7      A      I don't remember.  I didn't see that

8   doctor for the most of my pregnancy.

9             Dr. Footer, I think.

10     Q      F-O-O-T-E-R?

11     A      Yes.  But there are two Dr. Footers.

12     Q      Okay.

13     A      The older Dr. Footer.

14     Q      And that was -- and, again, I'm not

15  trying to be overly personal on this.  I'm just

16  trying to get the information.

17            Were you at high risk because of your

18  age or because of other conditions?

19     A      Yes, primarily because of my age, and I

20  had bleeding at the beginning of my pregnancy, and

21  so they wanted to monitor that.

22     Q      And, so, who was it that -- if anyone,

23  that directed you to Dr. Footer as the high-risk

24  specialist?

25     A      A coworker.

Monique Russell

```
 1        Q       Okay.  So this was someone at the D.C.
 2   Public Schools who said here's someone to -- to go
 3   see as a high-risk specialist?
 4        A       Yes.
 5        Q       Okay.  And I think you were saying that
 6   you didn't see Dr. Footer for all that long during
 7   your pregnancy, but within about the first three
 8   months, you had decided to go see Dr. Waldrop?
 9        A       Yes.
10        Q       And how did you come to see
11   Dr. Waldrop?  That was a recommendation on the
12   hospital tour?
13        A       Yes, from another -- another woman in
14   the tour was asking a lot of the same questions
15   that I would be asking, and so she seemed to want
16   the same things in her birth, and I asked her who
17   she -- who her doctor was, and she recommended
18   Dr. Waldrop.
19        Q       Okay.  I saw references in your
20   discovery responses to a Dr. Moore?
21        A       Yes.
22        Q       Who is Dr. Moore?
23        A       Dr. Moore owns the practice that
24   Dr. Waldrop works for and Akoda was working for.
25        Q       And -- and is that Moore and
```

Case 2:23-cv-01998 Document 22-5 Page 61 of 142 Date Filed 09/08/2022
Case 2:23-cv-01998 Document 22-5 Filed 12/12/22 Page 1942 of 3041

Monique Russell

1   Associates; is that --

2       A       Yes.

3       Q       -- how they're known as?

4       A       Yes.

5       Q       Okay.  And did you ever meet Dr. Moore

6   during your pregnancy?

7       A       I did.

8       Q       Okay.

9       A       I may have been seen by Dr. Moore once.

10  I met him for sure, like, just to see -- know who

11  he was in case he were to deliver my baby, and I

12  may have been seen by him once when Dr. Waldrop

13  wasn't available.

14      Q       Okay.  Do you know how many other

15  doctors besides Dr. Akoda and Dr. Waldrop and

16  Dr. Moore that were in the practice when you were

17  going there?

18      A       I believe there were only those three.

19      Q       Okay.  Did you ever hear of a

20  Dr. Chaudry?

21      A       I have heard of him.

22      Q       And how do you know of Dr. Chaudry?

23      A       I believe that Akoda was working for

24  him in a separate practice at the time.

25      Q       And how did you come to learn that?

1     A     From Dr. Moore.

2     Q     **When you -- when you decided to go with**
3  **Dr. Waldrop of Dr. Moore's practice as your**
4  **primary OG -- OB/GYN, what type of research did**
5  **you do on Dr. Waldrop?**

6     A     I looked up her -- I looked up reviews.
7  I looked her up on different sites where they give
8  information about credentials and patient reviews.

9     Q     **Do you remember what any of those were**
10  **called?**

11     A     I don't know all of them.  I know I
12  looked on Yelp because they give patient reviews,
13  and I think they're pretty honest, but I don't
14  know where I looked up her affiliations.

15     Q     **Okay.  Do you know whether you went to**
16  **State of Maryland licensing or credential sites to**
17  **look up Dr. Waldrop?**

18     A     No, I did not.

19     Q     **Do you know whether you went to the**
20  **American Medical Association to look up**
21  **Dr. Waldrop?**

22     A     I may have gone to the American Medical
23  Association.

24     Q     **Okay.**

25     A     Or the association for gynecologists.

Monique Russell

1    Q    Okay.  And do you know whether there

2  was information on Dr. Waldrop there?

3    A    If there was, I didn't find anything

4  negative.

5    Q    Okay.  And when you went to meet with

6  Dr. Waldrop -- I think you mentioned already you

7  met with Dr. Moore at least once, perhaps, as

8  well -- did you ever meet with Dr. Akoda?

9    A    I did not before I was in labor.

10    Q    Okay.  But you understood he was a

11  member of the practice of Dr. Moore; correct?

12    A    Yes, but he did not see patients.

13    Q    How do you know he didn't see patients?

14    A    They told me that he did not see

15  patients; that he only assisted them at the

16  hospital.

17    Q    Okay.  Who told you that?

18    A    Dr. Moore.

19    Q    Okay.  And was that after you gave

20  birth to Luka or was that in an earlier meeting

21  while you were --

22    A    That was before.

23    Q    Okay.  Did you understand from

24  Dr. Waldrop that it was possible that she would

25  not be available to help you in labor and

1    delivery, including a C-section if that were

2    necessary?

3         A     Yes, I did.

4         Q     How did you know that?

5         A     Because Dr. Moore told me that there

6    were three doctors and that if Dr. Waldrop was not

7    available, that Dr. Moore or Akoda would deliver

8    the baby.  And that if Waldrop was not available

9    during the practice, then he could see me --

10   Dr. Moore could see me but Akoda would not see me

11   because he only worked at the hospital.

12        Q     And do you recall whether you filled

13   out a consent with Dr. Waldrop that acknowledged

14   that that could be the case and that you could be

15   seen by other doctors other than her if she was

16   not available?

17        A     I don't recall, but I'm sure that I

18   did.

19        Q     Okay.

20              MR. SHAFFER:  I'll mark this.  Well,

21   hold on.  We'll get to it.

22        BY MR. SHAFFER:

23        Q     Did you have any issues with your

24   pregnancy?

25        A     I did have some complications.  As I

JA3835

Monique Russell

1    mentioned, I had some bleeding early on.  I also

2    have a -- a uncommon but benign

3    cardio-neurological disorder called vasovagal

4    syncope that under everyday conditions is truly

5    benign, but pregnancy exacerbated the condition.

6        **Q      Uh-huh.  And what are some of the risks**

7    **or symptoms that go along with that condition?**

8        A      Getting dizzy and passing out.

9        **Q      Okay.**

10       A      Which is benign unless you hurt

11   yourself on the way down.

12       **Q      Right.  Or -- or a baby if you have a**

13   **baby?**

14       A      Yes.

15       **Q      And, so, as a result of that, were you**

16   **taking any extra precautions while you were**

17   **pregnant?  Were you anticipating the possibility**

18   **of having to have medication or anything like**

19   **that?**

20       A      I was not anticipating the need for any

21   medication.  I was seeing a cardiologist in

22   conjunction with my gynecological visits.  And

23   after seven months, I was put on essentially kind

24   of house arrest where I could do everything.  I

25   just couldn't be alone for much unless -- in case

1  I got dizzy.

2      Q    Uh-huh.  And did you get -- I saw some

3  reference in your -- your medical records to an

4  accommodation from D.C. Public Schools where maybe

5  you were able to work at home for a period of

6  time.

7           Was that part of this situation?

8      A    Yes.

9      Q    Okay.  And . . .

10      A    So and --

11      Q    I'm sorry.  Go ahead.

12      A    I could be alone.  I couldn't be, like,

13  out driving alone or, so I worked from home.  But

14  if I was going to go out and do things, then I

15  needed somebody to be with me.

16      Q    Okay.  Did -- did this condition and

17  having this condition and worrying about it cause

18  you stress during the time that you were pregnant?

19      A    No, not really because I've had the

20  condition for most of my life.

21      Q    Uh-huh.

22      A    It was -- once I realized that it

23  wouldn't impact my job, there wasn't much stress

24  related to it.

25      Q    Okay.  And -- and I think you said

Monique Russell

```
 1   earlier that -- that Luka was born in May of 2017;
 2   correct?
 3        A    Yes.
 4        Q    And was he born by C-section?
 5        A    Yes.
 6        Q    And was that a planned C-section?
 7        A    No, it was not.
 8        Q    What were the circumstances that led to
 9   him being born by C-section?
10        A    I had been in labor for, I believe, 32
11   hours at that point, and after a period of time,
12   they recommended that I take a drug called Pitocin
13   that they hoped would -- Akoda recommended it to
14   speed up contractions so that I would dilate.
15        Q    Uh-huh.
16        A    It did not have that effect.
17             And then after 30, 32 hours, he
18   recommended an epidural.  Immediately after he did
19   the epidural, he said that my baby was in distress
20   and that he needed an emergency C-section.
21        Q    Okay.  And was your original plan for
22   birth to go to the hospital and have someone from
23   Dr. Moore's practice deliver vaginally?
24        A    Yes, that was my original plan.
25        Q    Okay.  I saw a reference in your
```

Monique Russell

```
 1   records to a doula or maybe two doulas?
 2        A     Yes.
 3        Q     What role, if any, had you anticipated
 4   doulas playing in the birth?
 5        A     Doulas provide emotional support during
 6   the birth.  They also help to give the father a
 7   break and help the father or partner --
 8        Q     Uh-huh.
 9        A     -- to be a more supportive partner.
10        Q     And had you planned on having a doula
11   present for your birth?
12        A     I did.
13        Q     Okay.  And did that occur?
14        A     Yes.
15        Q     Okay.  And who was that?
16        A     Her name is Emily.  I forget her last
17   name right now.  But it was Doulas of Capitol
18   Hill.
19        Q     Uh-huh.
20        A     And in the contract, the doula is
21   present for the first 24 hours and then after that
22   they can switch to a backup.  I believe that Emily
23   was there for maybe 28 hours before she switched
24   to a backup which was her partner Nicole.
25        Q     And did the doula meet you at the
```

Monique Russell

1   hospital or were you with the doula before you
2   went to the hospital?
3        A    I believe that she met me at the
4   hospital.
5        Q    And when you were describing the length
6   of your labor -- and I'm sorry for that length of
7   labor -- was that all at the hospital, or did it
8   start at home and then continue while you were
9   there?
10       A    It started at Dr. Waldrop's office --
11       Q    Okay.
12       A    -- during an examination.  My water
13  broke.
14       Q    And -- and my understanding, because I
15  have children, too, is that sometimes when your
16  water breaks, the rest of the body may not be
17  ready to give birth vaginally, but that once the
18  water breaks, there's a certain period of time
19  before a baby is supposed to be gotten out.
20            Is that -- is that a fair summary of
21  your understanding at the time?
22       A    That is my understanding.
23       Q    Okay.  And Pitocin, which you indicated
24  Dr. Akoda gave you, is one of the very common
25  medicines that they will give to try to move along

1  contractions when somebody's water breaks, isn't
2  it?
3      A     That is my understanding.
4      Q     Okay.  And -- and -- and is it also
5  your understanding that sometimes it works and
6  sometimes it doesn't work as well?
7      A     I did not have much -- much
8  understanding of Pitocin.
9      Q     Okay.  Did you receive any information
10  from your husband or either of the doulas that
11  were in the room with you that -- when Dr. Akoda
12  said a C-section was necessary because of the baby
13  being in distress, that that wasn't a good idea;
14  that you shouldn't go ahead with that?
15      A     My husband did not agree.
16      Q     Okay.  What did he want to do?
17      A     He had been watching the monitors, and
18  he saw that the stats had gone back up and thought
19  that, you know, it looked better; that it should
20  be waited out.
21      Q     Okay.  And what about the doulas?
22      A     The doulas do not advise on medical
23  decisions.
24      Q     Okay.
25      A     They're there for emotional support.

Monique Russell

```
 1        Q       And ultimately, the decision to have
 2    the C-section was yours then?
 3        A       Yes.
 4        Q       And --
 5        A       I followed Akoda's advice because at
 6    the time I believed him to be a real doctor.
 7        Q       And when you say "a real doctor," you
 8    believe today that he is not a real doctor;
 9    correct?
10        A       He is a fake doctor.
11        Q       And what do you mean when you say he's
12    a fake doctor?
13        A       That he was not properly trained as a
14    doctor or credentialed as a doctor.
15        Q       What -- what is it about his training
16    that you believe either does or does not make him
17    a doctor?
18        A       That he used fake documents to get into
19    the country and was allowed to take medical boards
20    without proper credentials.
21        Q       As you sit here today, do you know
22    whether or not Dr. Akoda has gone to medical
23    school?
24        A       I do not know.  The federal trial
25    transcript that I read, the U.S. government said
```

Monique Russell

1    that there was no evidence that he ever attended

2    or graduated from medical school.

3        Q      Okay.  Do you know whether or not

4    Dr. Akoda's medical school in Nigeria ever

5    verified the authenticity of his diploma to

6    anyone?

7        A      I do not --

8               MR. ZAJDEL:  Objection.  Hold on for a

9    second.

10              Objection:  The question assumes facts.

11              But you can answer.

12              THE WITNESS:  I don't know.

13       BY MR. SHAFFER:

14       Q      Do you know whether Dr. Akoda's medical

15   school in Nigeria ever verified the authenticity

16   of Dr. Akoda's diploma to ECFMG?

17              MR. ZAJDEL:  Objection:  The question

18   assumes facts.  You can answer it.

19              THE WITNESS:  I'll decline.

20              Should I answer these?

21              MR. ZAJDEL:  Yeah, you can answer.

22              THE WITNESS:  I don't know.

23              MR. ZAJDEL:  Okay.

24       BY MR. SHAFFER:

25       Q      Did -- I take it from your answers that

JA3843

Monique Russell

```
 1    looked them up, but that was two years ago.
 2         Q     Okay.  Do you know whether or not --
 3    strike that.
 4               You mentioned that you understood that
 5    ECFMG -- I forget what the word is -- verifies
 6    documentation of foreign medical students or
 7    graduates; correct?
 8         A     Yes.
 9         Q     What documents is it your understanding
10    ECFMG is supposed to verify?
11         A     I don't know exactly, but I would
12    understand a diploma --
13         Q     Okay.
14         A     -- for one.  From my -- it's been a
15    while since I looked this up, but I remember that
16    there were schools that were specifically, like,
17    vetted or listed with the commission, and so they
18    would have to verify that those diplomas were real
19    or that the person graduated from that
20    institution.
21         Q     Anything else?
22         A     I don't know.
23         Q     Do you know where Dr. Waldrop went to
24    medical school?
25         A     I believe she did a residency at
```

JA3844

Monique Russell

1    Howard.

2        Q      Okay.  And how about medical school
3    before that?

4        A      I don't remember.

5        Q      Okay.  And do you know where Dr. Moore
6    went to medical school?

7        A      I don't remember.

8        Q      Okay.  Do you know whether Dr. Moore is
9    a -- went to a U.S. medical school or a foreign
10   medical school?

11       A      I do not know.

12       Q      Okay.  I'll finish up on -- on the
13   birth of Luka.  You had the C-section after a very
14   lengthy labor.

15              Was -- how was Luka's birth?  Was he
16   born okay?  Any health problems?

17       A      Luka has had no health problems.

18       Q      Great.

19              And did you have any symptoms or
20   physical conditions after the C-section?

21       A      No, I did not, nothing atypical.

22       Q      Right.

23              It's a major abdominal surgery, so
24   there was probably some recovery; right?

25       A      Yes.

Case 2:23-1998562 Document 22-5 Page 61956 1 Date Filed 09/08/2029

1     Q     **Okay.**

2     A     Having knowing what -- that Akoda is a

3    fraud, I do question whether or not my C-section

4    was necessary.

5     **Q     Okay.  And that was something that you**

6    **started -- you thought of after you found the**

7    **information sometime in 2017 related to**

8    **Dr. Akoda's guilty plea?**

9     A     Well, before that because my husband at

10   the time did not believe that it was necessary,

11   and then once I found that information out, it

12   made me question it more.

13    **Q     Okay.  Do you know what the -- did you**

14   **ever ask Dr. Moore or Dr. Waldrop whether they**

15   **would have had you do a C-section after 32 hours**

16   **of labor and a baby in distress?**

17    A     I did not speak to Dr. Moore --

18   Dr. Waldrop once I found out Akoda was a fraud.

19    **Q     Did you speak with Dr. Moore at any**

20   **point after you learned the information about**

21   **Dr. Akoda?**

22    A     I did.

23    **Q     Okay.  Tell me about that.**

24    A     I went to him to find out, A, if he

25   knew; and why he had not notified patients that

Case 2:23-cv-01956-DOC Document 22-5 Filed 09/08/2022 Page 1957 of 3041 Date Filed 09/08/2022

1    Akoda was a fraud.

2        Q    And at this point in time, you were not

3    a patient in that practice anymore; correct?

4        A    No, I was no longer --

5        Q    Okay.  And --

6        A    I would have still been, but I wasn't

7    pregnant or needing women's care.

8        Q    Right.

9             So you -- why did you go to Dr. Moore

10   instead of Dr. Waldrop?

11       A    Because Dr. Moore is the head of the

12   practice.

13       Q    Okay.  And how did you make contact to

14   go meet with Dr. Moore?

15       A    I set an appointment.

16       Q    Okay.

17       A    I called the office.

18       Q    Okay.  Did you tell them what you

19   wanted to talk about?

20       A    No.  I might have.  I don't know.

21       Q    Okay.  And do you remember how long

22   after you had met with -- you had seen the

23   information of Dr. Akoda's guilty plea that you

24   went to talk to Dr. Moore?

25       A    I don't know, but it was fairly soon.

JA3847

1     Q    Okay.  And what do you recall about

2  that meeting with Dr. Moore?

3     A    Dr. Moore seemed just as surprised, and

4  he told me that he had also been working for

5  another doctor's office, Dr. Chaudry.

6     Q    Okay.  Did you ask Dr. Moore any

7  questions or express any views to him?

8     A    I did.  I asked him -- I was trying to

9  make sense of what happened, and he told me they

10  raided his -- Akoda's office, I believe, at

11  Chaudry's office and his home, and they discovered

12  machines that make, like things to make diplomas

13  with and details like that.

14        I asked him why he didn't notify

15  patients.

16     Q    Uh-huh.

17     A    And he said that wasn't a requirement

18  or . . .

19     Q    How did you feel about that response?

20     A    It's upsetting because I think every

21  woman who has ever been a patient of Akoda should

22  know that he was not a real doctor.

23     Q    And the response you got from Dr. Moore

24  who, if I'm understanding it correctly, had hired

25  Dr. Akoda into his practice, was it wasn't his

Monique Russell

1    place to do it or he didn't have to do it; it

2    wasn't a requirement for him to do it?

3        A      He felt -- and I don't remember exactly

4    how he said it, but he felt that he had been duped

5    as well.

6        Q      Okay.  Did you ask him what type of

7    investigation or vetting he had done of Dr. Akoda

8    before hiring him?

9        A      I did, and he said he had worked with

10   him in the residency program at Howard University.

11       Q      Did you ask him about doing any kind of

12   background check or investigation of him before

13   hiring him?

14       A      I did, and he said that he had worked

15   with him in the Howard residency program.

16       Q      Okay.  Did he tell you whether he had

17   done a background check or not?

18       A      He did not.

19       Q      He did not tell you or he did not do

20   one?

21       A      He said he did not do one.

22       Q      Okay.  What was your reaction to that

23   answer?

24       A      I was surprised, but he said that

25   because of all of the certifications and everyone

Case 222-1908 562 Document D 22-5 ent Page 361 9 Filed 12/06/09 08/2022

1  who had would have had to do it by contracts, that

2  he didn't feel it was necessary --

3       **Q      Okay.**

4       A       -- because he had been -- he had gotten

5  privileges at P.G. County; he had been approved

6  from these other organizations.

7       **Q      Did he tell you whether or not he in**

8  **the future would be considering doing background**

9  **checks of people he hired to be doctors in his**

10 **practice?**

11      A       Yes, he did.

12      **Q      What did he say?**

13      A       He said he would consider doing that.

14      **Q      And what was your reaction to that?**

15      A       I thought that that would be a good

16 idea.

17      **Q      In your position at D.C. Public**

18 **Schools, did they have to do a background check on**

19 **you before hiring you?**

20      A       Yes, they do.

21      **Q      And they're your employer; right?**

22      A       Yes.

23              MR. SHAFFER:  Let's take a short --

24 short five-minute break --

25              THE WITNESS:  Okay.

Monique Russell

 1                MR. SHAFFER:  -- and then we'll pick

 2     back up.

 3                THE VIDEOGRAPHER:  Off the record at

 4     2:50.

 5                (Recess -- 2:50 p.m.)

 6                (After recess -- 3:15 p.m.)

 7                THE VIDEOGRAPHER:  We are back on the

 8     record at 3:15.

 9           BY MR. SHAFFER:

**10           Q     Ms. Russell, we're back on the record**

**11     after a short break.  You understand you're still**

**12     under oath?**

13           A     Yes.

**14           Q     Okay.  I'm going to talk a little bit**

**15     about some of the doctors that you've seen over**

**16     your adult life and I'll just make sure I**

**17     understand some of the chronology on that.**

**18                Do you currently have a primary care**

**19     doctor that you see?**

20           A     Not really.

**21           Q     Do you have a doctor that you've seen**

**22     from time to time for general issues, colds or**

**23     antibiotics or anything like that?**

24           A     I did, but not since discovering about

25     Akoda.  I have not found a primary care doctor.

Monique Russell

```
 1        Q      So as of today, you don't have a
 2   primary care doctor?
 3        A      No.
 4        Q      Have you seen -- have you seen any
 5   doctor of any kind since June of 2017?
 6        A      Yes.
 7        Q      Who is that?
 8        A      I have seen -- I don't know the
 9   doctor's name.  It was at an urgent care facility
10   in Costa Rica called (speaking Spanish).
11        Q      Okay.  And why did you go there?
12        A      I -- Dr. Waldrop, after my son was
13   born --
14        Q      Uh-huh.
15        A      -- placed an IUD --
16        Q      Uh-huh.
17        A      -- and I was having complications from
18   the IUD.
19        Q      Okay.  And, again, just so I get the
20   timeline correct, Luka was born in May of '16.
21        A      Yes.
22        Q      When did you have the IUD implanted?
23        A      Probably six months after.
24        Q      Okay.  So end of 2016?
25        A      That's pretty -- yes.
```

Monique Russell

```
 1          Q       Beginning of 2017, something like that?
 2          A       Something around there.
 3          Q       Okay.  And when did your contract
 4   with -- when did you go to Costa Rica?
 5          A       In the last week of July of 2018.
 6          Q       And -- and since July of 2018, when
 7   have you come back to the States?
 8          A       I came back for the December break last
 9   year.
10          Q       So that would have been December of
11   '18?
12          A       Yes.
13                  And then I came back this summer in
14   July -- essentially the month of July.
15          Q       Okay.  And in neither December of
16   '18 or summer of '19, you didn't see any doctors
17   here in the U.S.; correct?
18          A       No.
19          Q       Okay.  And before going to Costa Rica
20   in around July of '18, had you seen any doctors
21   between when you got the IUD put in and you went
22   to Costa Rica?
23          A       I -- I'm not sure when I last saw
24   Dr. Major.  Dr. Major was my primary care
25   physician for about ten years.
```

Monique Russell

1    I go for urgent care.

2         Q      Okay.  And, excuse me, what -- what are

3    you doing physical therapy for?

4         A      My back.

5         Q      Okay.  And is that -- how long have you

6    had that condition?

7         A      Probably since my son was about a year

8    old, so about 2017.

9         Q      And has it -- has it been diagnosed

10   as --

11        A      Stress related.

12        Q      Okay.  And when did the stress start or

13   the stress that -- that you've been told relates

14   to the back injury?

15        A      The pain started after my son was about

16   a year, which would have been June of 2017.

17        Q      And had you ever suffered from stress

18   or anxiety prior to June of 2017?

19        A      Yes.

20        Q      Okay.  And what -- what can you tell me

21   about that?

22        A      When I lost my sister in 2007, I had

23   stress-related back pain.

24        Q      Okay.  And that was -- were you treated

25   for depression or anxiety or stress in -- in 2007?

Monique Russell

```
 1        A      I was treated for depression, briefly.

 2        Q      Okay.

 3        A      And for, maybe two weeks, given

 4   medication for my back and then taught breathing

 5   exercises to alleviate the pain when stressful

 6   situations occurred.

 7        Q      Okay.  Were you ever provided an

 8   antidepressant or anything like that?

 9        A      I was shortly after my sister's death.

10        Q      Okay.  And do you remember which one?

11        A      I think it was Lexapro.

12        Q      Okay.  And for how long did you take

13   that?

14        A      Several months, maybe -- no more than

15   six months.

16        Q      Okay.  Are you on any medications

17   today?

18        A      No.

19        Q      Okay.

20        A      Just vitamins.

21        Q      In terms of other types of treatment,

22   have you ever in your adult life seen a

23   psychologist or a psychiatrist for treatment?

24        A      No.

25        Q      Have you ever gone into therapy at any
```

Monique Russell

1    point in your adult life?

2        A     No.

3        Q     And, so, you're not currently being

4    treated by a psychiatrist or psychologist?

5        A     No, I'm not.

6        Q     Other than Dr. Major and Dr. Moore's

7    practice, and the doctor at urgent care and the

8    doctor that you saw in Costa Ricia -- Rica

9    regarding the IUD and your physical therapist,

10   what other doctors have you seen in your adult

11   life?

12       A     I have a cardiologist who helped

13   diagnose my condition.

14       Q     And that's the --

15       A     Dr. Howell, Shawn Howell.

16       Q     And that's the condition you were

17   talking about earlier?

18       A     Yes, vasovagal syncope.

19       Q     You said it better than me.

20       A     And I did see her periodically

21   throughout my pregnancy for monitoring.

22       Q     And this is Shawn Howell?

23       A     Yes.

24       Q     And where is she -- where does she

25   practice?

Monique Russell

```
 1      A      I believe on K Street.
 2      Q      A couple of blocks from us here?
 3      A      Yes, very close by.
 4      Q      Does she have hospital privileges?
 5      A      I don't know.
 6      Q      Okay.  Do you know where she went to
 7   medical school?
 8      A      I don't remember.  It might have been
 9   Howard.
10      Q      Okay.  And do you know if she's board
11   certified?
12      A      I believe she is.
13      Q      Okay.  Do you know by what board?
14      A      I do not.
15      Q      Okay.  Any other doctors?
16      A      In my adult life, certainly.  I don't
17   remember any more than that.  I know there are --
18   I know it -- before Dr. Major I had a different
19   primary care physician and a different OB/GYN.  I
20   don't remember their names.
21      Q      Okay.  And do you know how you went to
22   start seeing Dr. Howell?
23      A      I was recommended by Dr. Major.
24      Q      Okay.  And I apologize if I asked you
25   this already, but I can't remember the answer.
```

Monique Russell

1          And I don't feel equipped to do

2     background checks on doctors myself.

3          I feel violated, and it makes it very

4     difficult to -- I'm sorry.  It makes it very

5     difficult to see an OB/GYN.

6        **Q     And I take it that when you found out**

7     **about Dr. Akoda's guilty plea regarding the use of**

8     **Social Security numbers, that . . .**

9          MR. SHAFFER:  There's some tissues back

10    there.

11        BY MR. SHAFFER:

12       **Q     Here you go.**

13         **I take it when you found out about the**

14    **guilty plea, you -- you were angry with Dr. Moore**

15    **and Dr. Waldrop who you had seen in connection**

16    **with that pregnancy; right?**

17       A     No.  I was angry in general, but I

18    don't necessarily hold blame or anger towards

19    Dr. Waldrop and Dr. Moore because they relied on

20    sources they should have been able to trust.  For

21    example, I was a teacher.  I had to have

22    background -- extensive background checks done in

23    order to hold a job within DCPS.  So when I rented

24    my basement apartment, and as a mother I wanted to

25    find somebody safe to live in the home with us,

Monique Russell

1   and a teacher applied, I didn't feel like I needed

2   to run the full background check on them because I

3   knew that they had gone through that background

4   check with the public school system.  So, instead,

5   I could do -- rely on other sources because I

6   trusted the school system's background check.

7            So I didn't hold anger.  I was very

8   surprised that Dr. Moore hadn't done a background

9   check, but I understood why he relied on

10  institutions like the commission to certify

11  foreign medical graduates instead of doing it all

12  over again himself.

13       Q    And your view there is that your

14  understanding of ECFMG as a governmental entity,

15  that it would do background checks on people like

16  Dr. Akoda --

17       A    Yes.

18       Q    -- correct?

19            And I --

20       A    Yes --

21       Q    I'm sorry.  Go ahead.

22       A    At least to verify that they had

23  attended and graduated school.

24       Q    And do you know whether ECFMG tried to

25  do that?

Monique Russell

```
 1        A       I do not know.

 2        Q       Okay.

 3        A       But if they did, they seemed to have

 4     failed.

 5        Q       Do you know whether ECFMG ever

 6     identified that Dr. Akoda had used multiple names

 7     to try to come and take examinations with ECFMG?

 8        A       I do not know.

 9        Q       Do you know whether ECFMG ever helped

10     the Department of Justice build a case and

11     prosecute a case against Dr. Akoda?

12        A       I do not know.

13        Q       Okay.  And do you know whether or not

14     ECFMG ever received verification from Dr. Akoda's

15     Nigerian medical school as to whether or not his

16     diploma was authentic?

17                MR. ZAJDEL:  Objection.  That assumes

18     facts.

19                You can answer.

20                THE WITNESS:  I do not know.

21                MR. SHAFFER:

22        Q       You filed a suit against Dimensions

23     Health Care in Maryland; correct?

24        A       Yes.

25        Q       When did you do that?
```

JA3860

Monique Russell

1    that you believe it started about a year after

2    your -- his pregnancy.  That's not reflected in

3    this report; right?

4         A    No.

5              MR. ZAJDEL:  Objection.  I think that

6    misstates facts.  I just think you misspoke.

7              THE WITNESS:  Can you restate?

8         BY MR. SHAFFER:

9         Q    I'll ask you the question again just to

10   make sure we're clear.

11        A    Thank you.

12        Q    You were -- you were saying that -- I

13   think you testified here earlier today that the

14   back pain that you were experiencing you think

15   started about a year after Luka was born; right?

16        A    Yes.

17        Q    Okay.  And this report doesn't

18   reference --

19        A    It does --

20        Q    -- Monique has had back pain for the

21   past year; it just says muscle spasm since after

22   pregnancy.  It's not specific as to time.

23        A    Correct.

24        Q    Okay.  It also makes reference to right

25   elbow pain.  Do you know what that was?

Monique Russell

```
 1      A     It was a pain in my right elbow.  I
 2   don't know why.
 3      Q     Okay.  Do you recall being treated for
 4   it?
 5      A     The pain in my elbow?
 6      Q     Uh-huh.
 7      A     Yes.
 8      Q     Okay.
 9      A     Dr. Major recommended that I get a
10   brace -- a compression brace.
11      Q     Uh-huh.
12      A     That helped.
13      Q     Okay.  Looking again at the report
14   again here from June of 2018, under the ROS
15   section, this is on page 670.
16            It references that you were reporting
17   arthralgias and joint pain.
18      A     It was a shooting pain up my legs.
19      Q     Okay.  And so that was accurate in
20   terms of what was reflected there; correct?
21      A     Yes.
22      Q     Okay.  And then later down in the
23   report there, it states that she -- referring to
24   you -- reports no depression, no sleep
25   disturbances, feeling safe in a relationship, no
```

1  alcohol abuse, no anxiety, no hallucinations, and
2  no suicidal thoughts; correct?
3      A    Yes.
4      Q    And that's what you would have reported
5  at that time to Dr. Major?
6      A    If he asked, then I would.  But when I
7  go see a doctor, they don't ask you all of those
8  questions every time.
9      Q    Okay.  If we turn to page 672 are the
10 last three, this is -- it looks like a visit to
11 see Dr. Major again in July of 2018?
12     A    Yes.
13     Q    Do you see that?
14          Okay.  So that was an additional time
15 you went to see Dr. Major, after the June visit?
16     A    Yes.  I'm looking to see why.
17     Q    Under the chief complaint box on 672,
18 it says, Patient was seen in office today for a
19 physical exam only.
20     A    That may have been a requirement for my
21 new job.
22     Q    Okay.  You had to get a physical exam
23 before you went to --
24     A    Costa Rica.
25     Q    -- Costa Rica?

```
 1                    Okay.  And you would have gone to see
 2     Dr. --
 3          A     Major.
 4          Q     -- Major for that?
 5          A     Yes.
 6          Q     And, again, looking at the report of
 7     that visit, if we turn to the page 674, there's
 8     the ROS section.  Again it reports, No fever, no
 9     night sweats, no significant weight gain, no
10     significant weight loss, no exercise intolerance,
11     a bunch of other negative responses.
12                    And then it again states, She reports
13     no depression, no sleep disturbances, feeling safe
14     in a relationship, no alcohol abuse, no anxiety,
15     no hallucinations and no suithidal -- suicidal
16     thoughts.
17                    Correct?
18          A     It also says that I report no GERD, no
19     vomiting blood, no hematuria, which are not things
20     that I would have been asked.
21          Q     Okay.  So you don't believe you were
22     asked about these things?
23          A     I do not believe I was asked about
24     these each visit.
25          Q     Okay.  You were asked about them at
```

1  University Hospital?

2       A     I did not.

3       Q     How about --

4       A     I saw that he was board certified.

5       Q     How about through his licensure to

6  practice medicine in the state of Maryland?

7       A     I did look to see that he was on the

8  Web site for licensed doctors.

9       Q     How about whether he was licensed to

10 practice medicine in the Commonwealth of Virginia?

11      A     No.

12      Q     And how about if he was board certified

13 by the American College of Obstetricians and

14 Gynecologists?

15      A     I saw it, but I did not go to the

16 board.

17      Q     Okay.  Request number 12, turning back

18 to page 791, says, You claim that you suffer from

19 post-traumatic stress disorder as result of

20 allegations against defendants.

21            And you denied that; correct?

22      A     Yes.

23      Q     You're not claiming post-traumatic

24 stress disorder?

25      A     No.

Monique Russell

1    Q      Request number 18 at the bottom of 792

2    says, You do not suffer depression as a result of

3    the events giving rise to your claim.

4           And you admit that; correct?

5    A      Correct.

6    Q      You're not claiming that you suffer

7    from depression as a result of the events

8    involving Dr. Akoda?

9    A      No.

10   Q      And request number 24 -- I'm jumping

11   ahead a little bit to try to move this along, 794,

12   question number 24, says, You have never been

13   formally diagnosed with depression.

14          And you admit that; correct?

15   A      Correct.  I did see a doctor after --

16   my family doctor after my sister died who

17   prescribed antidepressants --

18   Q      Uh-huh.

19   A      -- but I was not formally diagnosed.

20   Q      And since June of 2017, no diagnosis or

21   treatment for depression of any kind?

22   A      No.

23   Q      On page 795, request 31 says, You claim

24   that you suffer from anxiety as a result of your

25   allegations against the defendants.

Monique Russell

```
 1       A      Yes.
 2       Q      And you admit that, so you do say you
 3  have anxiety from these issues; correct?
 4       A      Yes.
 5       Q      Okay.  And 32 says, You claim that
 6  you're alleged anxiety has affected your
 7  relationship with your family.
 8              And you deny that --
 9       A      Yes.
10       Q      -- correct?
11              So you have anxiety, but it's not
12  affected your relationship with your family?
13       A      Correct.
14       Q      Okay.  And 37 on the next page says,
15  You have never been formally diagnosed with
16  anxiety.
17              That's correct?
18       A      Correct.
19       Q      And 39 says, You claim that you suffer
20  from physical pain as a result of your allegations
21  against the defendants.
22              And that is denied?
23       A      That is correct.
24       Q      Okay.
25       A      That's what I wrote.
```

Monique Russell

1    Q     Is that true today?

2    A     Since you brought up the timeline of

3   when my back pain started, I'm not sure that it's

4   true.

5    Q     Okay.  And this is your reference to

6   your testimony that about a year after your son

7   was born, you started having back pain?

8    A     Yes.

9    Q     And request number 40 says, You have

10  never been diagnosed with a physical injury

11  resulting from your allegations against the

12  defendants.

13          And that's admitted; correct?

14  A     Correct.

15   Q     Is that true today?

16  A     Again, I don't know if my back pain is

17  related to that because of the timeline.

18   Q     Okay.  And no doctor has told you that

19  it is related to that --

20  A     No.

21   Q     -- correct?

22  A     But I've not talked to any doctor I've

23  seen for my back pain about Akoda.

24   Q     Other than Dr. Major?

25  A     Yes, but Dr. Major didn't treat my back

# Exhibit 73

JA3869

* Auth (Verified) *



DO NOT SIGN THIS FORM UNTIL A PHYSICIAN HAS EXPLAINED IT TO YOU, YOU HAVE READ IT AND FULLY UNDERSTAND ITS CONTENTS.

Patient: Monique M Russell    Date 5/24/2016    Time _____

The following has been explained to me in general terms and I hereby authorize the performance of a **CESAREAN SECTION (PRIMARY OR REPEAT)** and I understand the following. *Only in the case of a medically necessary event or emergency.*

**PROCEDURE**      Delivery of a baby through a cut (incision) in the mother's belly and uterus
**PURPOSE**        Delivery of your infant through an incision in your abdominal wall
**BENEFIT:**       Planned delivery date, reduced risk of fetal birth trauma and fetal hypoxia

**RISKS (This is not an exhaustive list meaning that there can be other unlisted risks):**
- **Maternal:**  Urgent hysterectomy, thromboembolic events (blood clots), DIC (disseminated intravascular coagulation), anesthetic complications, major puerperal infection, amniotic fluid embolism, uterine artery pseudoaneurysm, wound infection, hematomas, wound disruption, bladder puncture, urethral and bowel laceration, persistent pain at the incision site, cesarean scar endometriosis, cesarean scar ectopic pregnancy, placental accreta, dense intra-abdominal adhesions, increased hospital stays, lengthy physical recovery, increased risk of readmission, chronic pelvic pain, increased risk of complications in future deliveries, future uterine ruptures, increased risk of future C-sections, death and cardiac arrest
- **Infant:**  The infant can experience, among other things, surgical cut or injury to infant's scalp or presenting part, increased risk of infant death, respiratory distress, pulmonary hypertension, excess risk of not breast feeding, and surgical lacerations

**POTENTIAL PROCEDURES AND THEIR RISKS:** We may have to perform one or more of the following procedures in order to assist you with your delivery process

- **Forceps:** An instrument used to grasp and extract the fetal head to facilitate delivery    **Risk for mom:** Discomfort    **Risk for baby:** Skull fracture, intracranial hemorrhage, facial nerve palsy, and brain injury.
- **Ventouse (vacuum):** A suction cup that attaches to the head of the baby to assist in delivery of fetus    **Risk for mom:** vaginal trauma and tears    **Risk for baby:** scalp lacerations, cephalohematomas, subgaleal hematomas, intracranial hemorrhage, facial nerve palsies, hyperbilirubinemia, bruising, and retinal hemorrhage
- **Manual Placenta Removal:** placenta is separated from the uterine wall and removed by hand    **Risk:** post partum hemorrhage, retained placental fragments, and pain
- **Cardiotocography:** the monitoring of the fetal heart rate and uterine contractions during labor and delivery    **Risk for baby** No risks are associated with external monitoring  Fetal scalp infection with internal monitoring
- **Pelvimetry:** measurement of the capacity and diameter of the pelvis    **Risk:** discomfort and pain
- **Pitocin administration:** delivery of medication post delivery to increase uterine activity    **Risk for mom:** over stimulation of the uterus, uterine rupture  Failure to administer could result in increased risk of bleeding and its associated outcomes including loss of uterus and death.  Yes_____ No_____
- **Transfusion of blood/blood products:** is a procedure to replace blood loss    **Risk:**  carries the risk of exposure to HIV, hepatitis and other infectious diseases and allergic reactions

_Monique Russell_

**CESAREAN SECTION (PRIMARY OR REPEAT)**
**(Page 1 of 3)**
DIMENSIONS HEALTHCARE SYSTEM

PATIENT LABEL
MR 11096170
RUSSELL ,MONIQUE MELISSA
308005529
DOB      7      38Y F
05/24/16  MOORE, JAVAKA      L/D

4-487 (09/13)

Patient Name: RUSSELL, Case: 2:21-cv-00506 Document 122-5 Filed 02/08/2022 Page 3798 Filed Date Filed: 09/08/2022    MRN: 11096170

Date of Birth:                                                                                                                                                       FIN: 308005529

* Auth (Verified) *



**ALTERNATIVE PROCEDURES, TREATMENTS AND THEIR RISKS:**  The only alternative to a C-Section is a vaginal delivery.

- **Maternal.** Paralysis or partial paralysis, paraplegia or quadriplegia, brain damage, uterine inversion, uterine rupture, need for an emergency C-section, placenta previa, placenta abruption, anal sphincter injury, bowel injury, bladder injury or injury to other abdominal structures, possible fistula formation (opening between bowel, bladder, ureter, vagina and/or skin), perineal or genital tears and scars, possible formation of clots; possible emboli ( clots or other material that may travel to other parts of the body) hysterectomy (removal of uterus, fallopian tubes and/or ovaries) persistent perineal pain, pre-eclampsia, amniotic emboli, sexual dysfunction, anal incontinence, urinary urge incontinence, urinary stress incontinence, DIC (disseminated intravascular coagulation) and pelvic floor prolapse, cardiac arrest, maternal death and fetal death
- **Infant**  Can experience oxygen deficit from a prolapsed cord, brachial plexus injury, nuchal cord, scalp infection from fetal scalp monitoring, facial nerve injury, precipitous delivery, subdural hematoma, sub-arachnoid hematoma, cerebral palsy, meconium aspiration, and newborn neurological symptoms and can be stillborn

THE INFORMATION GIVEN ABOVE IS NOT AN EXHAUSTIVE LIST MEANING THAT THERE CAN BE OTHER UNLISTED RISKS  WE CANNOT PREDICT WHETHER OR NOT ANY OF THE ABOVE MAY BE NEEDED OR MAY OCCUR

I understand that the physician, medical personnel and other assistants will rely on statements about the patient, the patient's medical history, and other information in determining whether to perform the procedure or the course of treatment for the patient's condition and in recommending the above procedure

I understand the practice of medicine is not an exact science and that NO GUARANTEES OR ASSURANCES HAVE BEEN MADE TO ME concerning the results of this procedure

I understand that during the course of the procedure described above it may be necessary or appropriate to perform additional procedures which are unforeseen or not know to be needed at the time this consent is given.  I consent to and authorize the persons described herein to make the decisions concerning such procedures   I also consent to and authorize the performance of such additional procedures as they deem necessary or appropriate.

I also consent to diagnostic studies, tests, anesthesia, x-ray examinations and other treatment or courses of treatment relating to the diagnosis or procedures described herein

BY SIGNING THIS FORM, I ACKNOWLEDGE THAT I HAVE READ OR HAD THIS FORM READ AND/OR EXPLAINED TO ME, THAT I FULLY UNDERSTAND ITS CONTENTS, AND THAT I HAVE BEEN GIVEN AMPLE OPPORTUNITY TO ASK QUESTIONS AND THAT ANY QUESTIONS HAVE BEEN ANSWERED SATISFACTORILY.  ALL BLANKS OR STATEMENTS REQUIRING COMPLETION WERE FILLED IN AND ALL STATEMENTS I DO NOT APPROVE OF WERE STRICKEN BEFORE I SIGNED THIS FORM

I voluntarily consent to allow Dr _Waldrup or Moore_  or any physician designated or selected by him or her and all medical personnel under the direct supervision and control of such physician and all other personnel who may otherwise be involved in performing such procedures to perform the procedures described or otherwise referred to herein  **Unless rescinded, this consent will remain in effect until delivery.**

_____        _____
          Witness                                    Signed                        **Patient**

---

| **CESAREAN SECTION (PRIMARY OR REPEAT)** **(Page 2 of 3)** | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | MR. 11096170<br>RUSSELL ,MONIQUE MELISSA<br>308005529        38Y F        L/D<br>DOB<br>05/24/16    MOORE, JAVAKA |

4-487 (09/13)

**\* Auth (Verified) \***

NOTE:    __BOTH__ sides of this form __MUST__ be completed to be __VALID.__

Patient _____     Date _____     Time _____

1   I hereby authorize the performance of the following operation(s)/procedure(s) _____
_____

under the direction of Dr (s) _____

2   I have been informed that qualified individuals such as physicians' assistants, surgical assistants and licensed physicians may perform significant surgical tasks to include but not limited to opening and closing, harvesting grafts, dissecting tissue, removing tissue, implanting devices, altering tissues under the direction and supervision of the primary physician listed above

3   I have been informed that a vendor representative may be present during the procedure to observe my procedure and/or assist with product selection and placement

4   I have been advised of the nature of my condition, the nature and purpose of the proposed operative procedure, and the alternative to this procedure, the risks benefits, and side effects attendant to both the proposed procedure and the alternatives, the probability of success of both the proposed procedure and the alternatives, and the prognosis of the proposed procedure if the alternatives are not performed

5   I am also aware that the practice of medicine and surgery is not an exact science and that there are risks and complications associated with the operative procedure  The risks associated with the performance of the proposed and any surgical procedure include but are not limited to severe blood loss, infection and in rare instances cardiac arrest

6   I have also been informed of potential problems that might occur during recuperation

7   I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of operations and procedures which are different from or in addition to those now contemplated

8   This procedure may necessitate the use of blood/blood products which when anticipated will require separate specific informed consent and related documentation  However, in the event of an emergency when specific consent is not possible, I agree to the administration of such products as ordered by my physician

9   I impose no specific limitations or prohibitions regarding treatment other than those that follow (if none, so state) _____
_____

10  I authorize the examination by an authorized individual of any tissue, organ(s) or body part(s) removed during the procedure and the disposal of such tissue, organ(s) or body part(s) in accordance with hospital policies

11  I consent to the admittance of appropriate observers and to the taking and publication of any photographs in the course of this procedure for the purpose of advancing medical education  I understand that my identity will remain confidential

12  All of my questions have been answered to my satisfaction  I believe that I have adequate knowledge upon which to base an informed consent to the proposed operative treatment(s)

**I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED**

_____        _____        _____
        Witness                          Signed                          Patient

---

*Complete the following section if consent is not obtained from the patient*

Patient is unable to make an informed decision because patient is (Check appropriate box)
☐  Minor _____ years of age without decision-making capacity          ☐  Lacks decision-making capacity
☐  Other _____

_____        _____
   Patient Representative Signature              Relationship to Patient

_____        _____
   Witness Signature (1)                        Witness signature (2)

Consent obtained (Check one) ☐ In person      ☐ By Telephone [Requires two (2) witness signatures]
                      **Two physician signatures are required in an emergency for consent.**

_____ M D        _____ M D

---

**PHYSICIAN DECLARATION**  Prior to the performance of the procedure described above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, alternative treatments, possible consequences and possible complications  I confirm the above surgery/procedure is correct as to procedure, side and site

_____        Date _____        Time _____
   Physician Signature

| **CONSENT FOR OPERATIONS AND OTHER PROCEDURES** | PATIENT LABEL |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | MR 11096170 |
| | RUSSELL MONIQUE MELISSA |
| | 308005529 |
| | DOB          38Y F |
| | 05/25/16   MOORE, JAVAKA      OBS |

2-567  (7/11)

**\* Auth (Verified) \***

NOTE **BOTH** sides of this form MUST be completed to be VALID.

Patient   *Russell Monique*    Date 5/25/16    Time _____

1   I hereby authorize the Anesthesia Care Team or _____ to administer the following type(s) of anesthetics **General/Regional/Local + IV Sedation/Conscious Sedation** and procedures performed in the provision of anesthesia including placing an intravenous (IV) catheter and maintaining an airway

2   The risks associated with anesthesia include but are not limited to worsening of a pre-existing medical problem, airway difficulties and drug reactions  Drug reactions can include a rash, nausea, vomiting, muscle aches, wheezing and very rarely, shock  Maintaining an airway may include placement of an oral or nasal airway, laryngeal mask airway or an endotracheal tube  Reactions to artificial airways include laryngospasm which requires immediate corrective treatment  Manipulation of the airway may result in damage to caps, bridges or damaged teeth and very rarely to sound teeth  Some individuals experence a sore lip, throat or hoarseness  Regional anesthesia blocks may cause headache, numbness or tingling, bleeding or swelling and rarely, weakness or paralysis  Occasionally nerve injures from positioning may occur  IV catheters can cause inflammation, swelling or bleeding

3   I am also aware that the practice of medicine and anesthesia is not an exact science and that there are risks and complications associated with the anesthesia and anesthetic technique  I have been informed that the aspiration of stomach contents into the lungs, drug reactions including malignant hyperthermia and anaphylactic shock, heart failure, airway closure, paralysis and rarely death may be associated with any anesthetic or anesthetic technique

4   I have been informed that circumstances may arise during the course of treatment that would necessitate the performance of anesthetic techniques and administration of anesthesia which are different from or in addition to those now contemplated

5   I impose no specific limitations or prohibitions regarding anesthesia other than those that follow (if none, so state)  _____

6   All of my questions have been answered to my satisfaction  I believe that I have adequate knowledge upon which to base an informed consent to the proposed administration of anesthetic(s) and anesthetic techniques

**I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE, AND THAT ALL BLANKS OR STATEMENT REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED**

_____          X  _____
Witness                                                  Signed                Patient

---

*Complete the following section if consent is not obtained from the patient*

Patient is unable to make an informed decision because patient is (Check appropriate box)
☐  Minor _____ years of age without decision-making capacity          ☐  Lacks decision-making capacity
☐  Other _____

_____                    _____
Patient Representative Signature                          Relationship to Patient

_____                    _____
Witness Signature (1)                                    Witness signature (2)

Consent obtained (Check one) ☐ In person    ☐ By Telephone **[Requires two (2) witness signatures]**
**Two physician signatures are required in an emergency for consent**

_____ M D                    _____ M D

---

**RESUSCITATION STATUS DURING ANY PROCEDURE REQUIRING INFORMED CONSENT**  This section is to be completed for patients undergoing any procedure requiring informed consent, who also have orders withholding resuscitation

☐  Patient/surrogate decision-maker requests that DNR order be suspended during any procedure
☐  Patient/surrogate decision-maker requests that DNR order be honored during any procedure
Describe the key features of the discussion(s) pertaining to the DNR issues _____

**PHYSICIAN DECLARATION**  Prior to the time of the planned anesthesia above, I have explained to the patient/surrogate decision-maker the nature, purpose, benefits, risks, and possible complications

Physician Signature _____    Date  5 25 16    Time _____

---

**CONSENT FOR ADMINISTRATION OF ANESTHESIA**
DIMENSIONS HEALTHCARE SYSTEM

MR·11096170
RUSSELL ,MONIQUE MELISSA
308005529
DOB                      38Y F
05/24/16   MOORE, JAVAKA      L/D

2-567 (7/11)

**\* Auth (Verified) \***

"MR#"%MEDRECMRN%"    %ENCNO%%DOCTYPENAME% 05-24-2016 18 22 01

### Consent to Treatment

<u>PHYSICIANS NOT AS EMPLOYEES:</u> **I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians <u>ARE NOT</u> employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service.** Patient/Patient Representative Initials: _____

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services

*Medical Education and Training.* I understand that DHS is approved to train medical students, residents, nurses and allied health students. I also understand students and residents may observe or participate in patient care. I agree to permit such involvement, unless I notify DHS to the contrary in writing with the understanding the students or resident's work will be under the supervision of a qualified instructor or physician on the medical staff of DHS

*For Inpatient Only:* Room charges are incurred for the day of admission or any part thereof, but not the date of discharge. I acknowledge that check-out time is 11 00 a m. Any balances known to be due for services not covered or partially covered by insurance will be payable at the time of discharge, including but not limited to applicable coinsurance or deductibles

*Personal Property and Valuables:* **I agree that DHS will not be responsible for patient valuables, clothes, personal items, money or other personal property. I also release DHS from any responsibility for loss or damage to any article not claimed from safekeeping by or for the patient at discharge or departure from DHS premises.** Patient/Patient Representative Initials: _____

*Only Applicable for Medicare Beneficiaries.* Statement for Payment of Medicare Benefits to Hospital and/or Physicians — I certify that the information given by me for payment under title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Center for Medicare and Medicaid Services (CMS) or Medicare Intermediaries or Carriers any information needed for these services or a related claim. I request that payment of authorized benefits be made on my behalf

*Insurance Billing and Assignment of Benefits.* I assign the benefits payable for hospital or physician services to DHS or any physician which renders service to me and authorize them to submit the necessary claims to Medicare for payment. I certify the registration statements are true and I, as guarantor, agree to pay all amounts owed for care and treatment to the full extent permitted by law. DHS may submit claims to my third party payor or, if legally permissible, bill me directly for full or partial payment. I understand that DHS may, at its option, delay billing me directly and this does not allleviate my responsibility for payment. I agree to pay all amounts owned by me, or the Insured, Member or Subscriber, for treatment to the full extent permitted by law. I assign any benefits which I or the Insured, Member or Subscriber may have or be entitled to, to DHS towards payment of my hospital bills and physician bills. I understand that my insurance, HMO, or other healthcare benefits are subject to venification by DHS and that I will remain responsible for any unpaid amounts whether or not covered by this assignment to the full extent permitted by law. I understand and agree that I am responsible to pay for any charges for care/treatment/service when I access care/treatment/service outside of my insurance plan network.

*Notification of Credit Bureaus Reporting.* I understand that DHS may report any outstanding self-pay balances to Credit Bureaus.

### Release of Information

I understand that my medical information is confidential and under certain circumstances is protected under federal and state laws and regulations and cannot be released without my written authorization unless otherwise provided for in said regulations. I also understand that I may revoke this consent at anytime except to the extent that action has been taken in reliance on it

I understand that it may be necessary for DHS, its employees, agents, independent contractors and/or my physician to release and/or disclose all or part of my confidential medical information to third parties for the purposes of providing certain diagnostic treatment and/or testing which may not be available within DHS.

I understand that for the sake of convenience and speed of reference, and to further the timeliness and quality of diagnosis and treatment rendered to me, that any physician, nurse, or business office representative who has been involved with my treatment at a DHS facility may request that the hospital send by facsimile transmission to the physician of record, consulting physician or third party carrier any relevant data from my medical record necessary for continuity of care or reimbursement. It is further understood that with any facsimile transmission there is a possibility that medical records may inadvertently be misdirected. Not withstanding such risk, I hereby authorize release of any relevant data in my medical record by facsimile transmission to any physician who has participated in my diagnosis or treatment at the hospital or to any third party carrier for reimbursement and hereby release DHS from any liability associated with those risks

I understand that DHS is the owner of any radiographic images and/or tissue/specimens obtained during the course of my care and treatment. The original radiographic films and/or all of the tissue/specimens will not be released. Copies of radiographic images will be provided, to me or my authorized agent upon written request for a reasonable fee. Tissue blocks will not be available for recut, but will be available for examination under supervision at our facility upon written request

I understand that the Federal Safe Medical Devices act requires manufacturers of certain medical devices to track the distribution and use of said devices. I understand that DHS must facilitate the tracking of these devices by providing the information to the manufacturer with respect to the patient receiving such a device, which includes releasing my social security number to the manufacturer of the medical device I may receive, in accordance with the federal law and regulations. I understand that my social security number may be used by the manufacturer to help locate me if there is a need to contact me with regard to this medical device. I release DHS from any liability that might result from the release of this information

| UNIVERSAL CONSENT    (SIDE 1) | MR 11096170 |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | RUSSELL ,MONIQUE MELISSA |
| | **308005529** |
| 008a (00/16) | DOB          38F F |
| | 05/25/16   MOORE, JAVAKA          OBS |

PGHC RUSSELL, MONIQUE MELISSA Enc #  308005529 5/24/2016 Page 1 of 2

**\* Auth (Verified) \***

"MR#"%MEDRECMRN%"E    ENCNO%%DOCTYPENAME% 05-24-2016 18 22 01

**Authorization For The Release Of Medical Information To The Maryland Insurance Administration:**

Under Maryland law, I have the right to contest a decision by an HMO or health insurer that a proposed or delivered health care service was not medically necessary. The law allows the Health Education and Advocacy Unit (HEAU) of the office of the Attorney General to assist me in filing an internal grievance with the HMO or health insurer and allows me to externally appeal the final decision to the Maryland Insurance Administration (MIA). I may appeal the initial decision directly to the MIA if I can demonstrate a compelling reason not to file an internal grievance with the HMO or health insurer. A health care provider may also file an internal grievance or external appeal on my behalf. By signing this form, I either wish to file an internal grievance or appeal, or I authorize a health care provider to file such a grievance or appeal

I understand that, as part of the HEAU assisting me with my internal grievance, or MIA handling my external appeal, the HEAU or MIA will contact my HMO or health insurer for an explanation as to its actions in connection with my internal grievance or external appeal, or an internal grievance or external appeal filed on my behalf.

I further understand that MIA may receive advice from medical experts or an Independent Review Organization (IRO) while determining whether to uphold or overturn the HMO or health insurer's decision that a health care service was not medically necessary.

Throughout the grievance or appeal process, the confidentiality of my medical records will be maintained in accordance with Maryland and federal law. I understand that if I have questions about the contents of my medical records to be released, I should contact my health care provider

I understand that my records may be used to develop general statistical information on grievances and appeals, and any statistical reports will not identify me or contain any identifying information. I do not authorize the release of any information that would identify me to anyone not mentioned above

In the event I, or a provider on my behalf, file an internal grievance or an external appeal, I authorize the release of my medical records as follows.

1.  I authorize the Attorney General and MIA to obtain medical records and insurance information for the purpose of investigating my grievance or appeal.
2.  I authorize the Attorney General to release my medical records to MIA so that my appeal or grievance may be investigated, and authorize MIA to release my medical records to the Attorney General so that my appeal or grievance may be investigated
3.  I authorize MIA to release my medical records to the relevant HMO or health insurer, and/or the HMO's or health insurer's legal counsel for the purpose of investigating my grievance or appeal or handling any hearing which may result from such investigation
4.  I authorize MIA to transfer my medical records to the Department of Health and Mental Hygiene if my grievance or appeal involves potential issues of quality of care so that the Department may conduct an investigation into these particular issues
5.  I authorize MIA to release my medical records to medical experts who may assist MIA with my grievance or appeal

To establish and maintain the safest possible environment in which to deliver care/service/treatment, Dimensions Healthcare System's campus buildings, property, parking lots and operated vehicles are smoke and tobacco-free. Dimensions Healthcare System is dedicated to maintaining a smoke and tobacco-free campus environment.

**Dimensions Healthcare Public Health Initiative:** If you smoke, please stop smoking.

*This form has been explained to me and I understand its contents. I acknowledge the following.*

☒ Receipt of a copy of DHS Notice of Privacy Practices
☒ My communication needs identified by completing the *Communication Assessment Form*
☐ Receipt of "An Important Message from Medicare" to Medicare beneficiaries
☒ Receipt of DHS brochure "What You Should Know As A Patient"

**PLEASE NOTE.** All patients 18 and over must sign this consent form themselves, unless they have a legal guardian, personal representative or are incapacitated. If so, the signer must submit written proof of guardianship or representation with this consent form

| | | | |
|---|---|---|---|
| _(signature)_ | 5/24/2016 6 19 34 | Signed by JOHNSON, HOLLY on 24-May-2016 18 20 42 -0400 | 5/24/2016 |
| Signature of Patient | Date | Signature of Witness | Date |

*Complete the following section if consent is not obtained from the patient.*

Patient is unable to make an informed decision because patient is *(Check appropriate box)*
☐ Minor ___ years of age   ☐ Intubated   ☐ Unconscious   ☐ Emergency Psych Services
☐ Other ___

5/24/2016 6 19 34

_____    _____    _____
Patient Representative Signature    Date    Relationship to Patient
    5/24/2016 6 19 34 PM

_____    _____
Witness signature    Date

---

| UNIVERSAL CONSENT    (SIDE 2) | |
|---|---|
| DIMENSIONS HEALTHCARE SYSTEM | |

‖‖‖‖‖‖‖‖ MR11096170
RUSSELL ,MONIQUE MELISSA
‖‖‖‖‖‖‖‖
308005529
DOB    38Y F
05/25/16  MOORE, JAVAKA    OBS

C0BB (03/16)

Case 1:19-cr-00056-JMF Document 122-5, Filed 11/21/21, Page 1 of 22

# Exhibit 74

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

**RE: Monique Russell et al. v. Educational Commission for Foreign Medical Graduates**

Dear Ms. McEnroe,

On September 17, 2019, I had the opportunity to see Monique Russell for an independent psychiatric evaluation.

The examination was requested to comment on Ms. Russell's psychiatric condition in relation to the Complaint in *Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Russell that the evaluation was not for purposes of treatment and that it was not a confidential examination. I discussed with Ms. Russell that I would prepare a report based on the psychiatric evaluation and review of records.

In preparation of this report I have reviewed the following documents:

1. Medical Records:
   Plaintiffs0000000932 – Plaintiffs0000001133;
   Plaintiffs0000001243 – Plaintiffs0000001685;
   Plaintiffs0000001686 – Plaintiffs0000001839;
   Plaintiffs0000001840 – Plaintiffs0000001845;
   Plaintiffs0000001846 – Plaintiffs0000001994;
   Plaintiffs0000005338 – Plaintiffs0000005429;
   Plaintiffs0000067757 – Plaintiffs0000067847;
   Plaintiffs0000118654 – Plaintiffs0000118679
2. Complaint in *Russell et al. v. ECFMG*
3. Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)

JA3877

6.  Monique Russell's Responses to Defendants' Request for Admissions in CAL 18-07863 (7/10/2018)

## HISTORY REPORTED BY MONIQUE RUSSELL:

Monique Russell (date of birth ▮▮▮▮▮▮▮) stated that she instigated the lawsuit *Russell et al v. ECFMG* because of her feeling that she was violated by the man who had identified himself as Dr. Akoda.  She said that Dr. Akoda was not a real doctor, and there is no real evidence that this man had attended medical school.  Ms. Russell said that she read the "transcripts" from his federal trial.  She said that she believes that Dr. Akoda had faked his way into residency programs. Ms. Russell said it is her opinion that "without consent she was subjected to assault." As a consequence of her reported experience with Dr. Akoda, Ms. Russell said she feels that she cannot trust the medical system or doctors. Ms. Russell said that she believes that Dr. Akoda had three different Social Security numbers and three different names.  Ms. Russell said that she believes Dr. Akoda had applied to take the medical board examinations three times.  Ms. Russell said that she does not know if Dr. Akoda could have had his license reinstated in another state.

Ms. Russell said that Dr. Akoda was not her doctor.  She said that she had chosen to have her OB treatment with Dr. Danielle Waldrop at the practice of Javaka Moore, M.D.  Ms. Russell said that she had expected that either Dr. Moore or Dr. Waldrop would deliver her baby, but it was Dr. Akoda who was in the delivery room.  Ms. Russell said that she later wanted to recommend Dr. Waldrop to a friend who was looking for an obstetrician.  Ms. Russell said that she had told this friend that if she went to the practice with Dr. Waldrop and Dr. Akoda was still in the practice, she may be treated by Dr. Akoda, and Ms. Russell had not had a good experience with him.  Ms. Russell said that when she looked for information about Dr. Moore's practice, she saw that Dr. Akoda was not on the list of practitioners.  Ms. Russell said that in June 2017, she began an investigation and found a release from the Justice Department regarding Dr. Akoda.  Ms. Russell said that she was blown away and horrified.  She said that she spent days and nights trying to make sense of the available information.  Ms. Russell questioned how it was possible that this "alleged doctor" had delivered her child.  Ms. Russell acknowledged that the consequences to her regarding the treatment she received from Dr. Akoda were, "For me, minor."  Ms. Russell said that she read about another lawsuit against Dr. Akoda alleging that there were permanent injuries to a child as a consequence of his treatment.  Ms. Russell said Dr. Akoda should never have had access to women.

Ms. Russell said that when she learned this information about Dr. Akoda, she was reminded of prior trauma and abuse.  She said that she was ▮▮▮▮▮▮▮▮▮▮ when she was a child and again when she was in her early twenties.

Ms. Russell said that she does not have regular gynecologic appointments.  Ms. Russell said that she has problems with trust in regard to the credentials of doctors.  Ms. Russell said that the experience with Dr. Akoda has gotten in the way of family planning.  She said that she wanted other children, but she has not had gynecologic treatment. Ms. Russell also said that she does not know if the caesarean section was medically necessary.  She said that there was no damage to her son, but she questions the medical decision that Dr. Akoda made.

Ms. Russell had a doula in the delivery room.  Her husband and her mother-in-law were also in the delivery room.  Ms. Russell said that she did not like Dr. Akoda's behavior.  She said that he would come into the delivery room and talk to her husband and not to her.  She said that she found him to be really misogynistic. Ms. Russell said that she told her husband that if Dr. Akoda spoke to him one more time about her vagina, then they would need a different doctor.  Ms. Russell said that after her husband spoke to Dr. Akoda, he began to talk to her, but she said that she did not like him.

Ms. Russell said that she was in labor for 32 hours.  She said that she was given antibiotics after 18 hours because her water had broken.  She said that she was only 1 cm dilated and was started on Pitocin.  Ms. Russell said that she had horrible contractions, but she still did not dilate.  Dr. Akoda suggested an epidural hoping that the epidural would relax her and help with the contractions.  Ms. Russell said that the baby went into distress.  Although the baby's stats went back to normal, Dr. Akoda recommended an emergency caesarean section.  Ms. Russell repeated that she trusted that Dr. Akoda was a real doctor.  Ms. Russell said that looking back, she does not know if she had an unnecessary surgery.  Ms. Russell said that she continues to have itching at the scar from the surgery.  Ms. Russell said when she thinks about the caesarean section, she thinks that Dr. Akoda was rough, and he was "playing football with my organs."  Ms. Russell said that she was discharged from the hospital after three days.  She said that her husband took two weeks off and she had help from a postpartum doula and her mother-in-law.

Ms. Russell said that she had an appointment with Dr. Waldrop for an IUD when her son was six months old.  In response to the question of how the experience with Dr. Akoda affected her family planning, Ms. Russell said that she found it hard to be intimate with her husband after she learned about Dr. Akoda.

Ms. Russell said that she thinks she went back to see Dr. Moore after she learned about the charges against Dr. Akoda.  She described the visit as a meeting with Dr. Moore, and not a medical appointment.  Ms. Russell said that she questioned Dr. Moore about why she had not been notified about Dr. Akoda's federal charges, and Dr. Moore told her that it was not his practice's responsibility to notify the patients.  Ms. Russell said that she disagreed.  Ms. Russell said that she believes it was someone's job to notify patients about Dr. Akoda.  Ms. Russell said that Dr. Moore was not defensive, but rather surprised about her questions.  Ms. Russell said that she was really angry and really in shock.

Ms. Russell then provided additional information of what she has learned about Dr. Akoda.  She said that Dr. Akoda did not have an office practice with Dr. Moore, but he worked in Dr. Chaudry's practice.  She said that Dr. Akoda delivered babies for Dr. Moore's practice and for Dr. Chaudry.  Ms. Russell said that Dr. Akoda's office and home were raided. Ms. Russell said that multiple passports were found, along with a machine to create diplomas.  Ms. Russell said that she has to have her fingerprints checked every two years to be a Washington, DC public school teacher.  Ms. Russell said that she does not understand how Dr. Akoda was able to apply to ECFMG three times, especially after he was kicked out of a residency program in New Jersey when it was discovered he was a fraud.  Ms. Russell said that she believes that this information about the New Jersey residency was reported to ECFMG.  She said that after "this reported doctor" was kicked out of the New Jersey program, he reapplied to ECFMG using different

names and different Social Security numbers. Ms. Russell said that Dr. Akoda got through ECFMG and was able to finish an OB/GYN residency program at Howard University. She said that Dr. Akoda met Dr. Chaudry and Dr. Moore, who were both attendings at Howard University. Ms. Russell said that in between Dr. Akoda's first residency program and the residency at Howard, Dr. Akoda had worked in Florida as a nurse. She said again there is no evidence that he had graduated from medical school.

Ms. Russell said that she believes that she was the first patient who found out about Dr. Akoda's identity and criminal charges. Ms. Russell said that she chose an attorney who was recommended to her by a friend.

Ms. Russell said that she would like to get pregnant again, but she does not have a doctor. She said that she did have complications (bleeding and cramping) with her IUD in 2018 or 2019. She said that a doctor removed the IUD at an urgent care in Costa Rica. Ms. Russell said that she was really anxious about the IUD removal. She said that she did look up information about the doctor, and she leaned the doctor was American-trained. Ms. Russell said that the experience was okay.

Ms. Russell described her mood noting that she is a pretty positive person. She tries to keep things in perspective. Ms. Russell said that she does not sleep enough, but she has a toddler and a demanding job. Ms. Russell said she does focus on self-care. She said that she walks one to two miles every day and that she does yoga. Ms. Russell said that she gets up between 5:00 a.m. – 5:30 a.m. She said that she tries to go to sleep by 10:00 p.m. – 11:00 p.m. and she does sleep through the night. Ms. Russell said that she does not have problems with her appetite. She said her concentration is fine. She said she is able to experience pleasure. Ms. Russell said she enjoys her job, and she likes to walk, hike, do yoga, and read. Ms. Russell said that she has a lot of plans for her future with her husband and son.

Ms. Russell said that in a way she feels lucky. She said that the situation could have been worse. She acknowledged there were no physical consequences to the medical experience with Dr. Akoda. She said the experience with Dr. Akoda brought up past trauma ███████████████ ███████████ Ms. Russell said that the suffering she experienced may be less than what other women experienced, but she feels a responsibility to stand up for other women who had trauma as a consequence of their experiences with Dr. Akoda. Ms. Russell repeated that she remains concerned that Dr. Akoda will try to practice medicine again. Ms. Russell wants to make sure in any way she can that it will be impossible for Dr. Akoda to practice medicine again.

## PAST MEDICAL HISTORY

Ms. Russell said that she had an emergency appendectomy in 2000. She said her appendix did not rupture.

Ms. Russell had ████████████ in 2004.

In 2005, Ms. Russell had bleeding and ████████████████████ This was not a planned pregnancy.

In 2012, Ms. Russell had an unplanned pregnancy.  She did not plan to terminate the pregnancy. She had ███████████ at six weeks.

Ms. Russell said when she became pregnant with her son, she spoke to doctors and nurses about her history of miscarriages.  Ms. Russell said that she learned that women often have miscarriages before they know they are pregnant.  Ms. Russell said that she was not concerned about her history of miscarriages with her pregnancy with her son.

Ms. Russell said that her pregnancy with her son was challenging.  She said that she had early bleeding.  She had an evaluation with a high-risk pregnancy doctor, and she was closely monitored in the first trimester.  Ms. Russell said that at 6.5 months, she developed problems with vomiting; she would throw up whenever she ate, but she continued to gain weight.

Ms. Russell has a condition known as vasovagal syncope that she was diagnosed with when she was in her thirties.  She said that she had to be careful during her pregnancy for dizzy spells.  Ms. Russell said that she learned what to do when she felt dizzy, and she was able to watch for triggers.  Ms. Russell said that in the last two months of her pregnancy, she was on modified bedrest.  She said that she was able to work from home.  Ms. Russell said that she has only had one vasovagal episode since her son was born.

Ms. Russell said that she has a history of chronic back pain that she believes is stress related. Ms. Russell said that she developed back pain after her sister died such that she could not walk. Ms. Russell said that she learned breathing techniques and has been doing daily meditation for many years.  Ms. Russell said that when her son was about one year old, she developed back pain again, and she had a course of physical therapy.

## PAST PSYCHIATRIC HISTORY:

Ms. Russell said that she had counseling growing up. She said that she was five years old when she and her sister were adopted, and four years later, her parents adopted a baby girl.  Ms. Russell said that her biological sister had problems with acting out, and they had counseling.

Ms. Russell said that she was sexually molested by a family member when she was six or seven years old.  She said that she did not report the abuse until she was 15 years old.  Ms. Russell said she reported the abuse when her baby sister was the same age as when the assault happened to her. Ms. Russell said that the first person she told was a male guidance counselor, and the guidance counselor called Ms. Russell's parents and the police.  Ms. Russell said she wanted to make sure that her sister was protected.  Ms. Russell said that the guidance counselor started a support group for young girls who were victims of sexual abuse or assault.

Ms. Russell said that she was sexually assaulted as an adult when she was in her early twenties. She said that this was date rape. Ms. Russell said this was perhaps her third date with this man. She said that he did not listen when she told him to stop, and he apologized to her afterward. Ms. Russell said that she did not see a counselor and that she does not know if she dealt with the

consequences of this reported date rape effectively. Ms. Russell said later on that she did some personal work to examine her relationships and her underlying beliefs.

Ms. Russell said that her adopted sister had depression and committed suicide at the age of 21 in 2007. Ms. Russell said that her sister had a history of prior suicide attempts that Ms. Russell believes were calls for attention. Ms. Russell said that she did not go to counseling when her sister committed suicide. Ms. Russell said her family doctor prescribed ████ and she took the medication for six months after the suicide of her sister. Ms. Russell said that she did not see the suicide coming. Ms. Russell said that she had trouble functioning after her sister's suicide. She said that she was then a student at the University of Maryland and that she was also working. She said that her professors and her employer were understanding, and she had a really strong network of friends.

## SOCIAL HISTORY:

Ms. Russell said that she lives in Costa Rica and works at a private international school as the curriculum coordinator for early childhood to fifth grade. Ms. Russell said that her contract is up in August 2020. She said she thinks that she will renew the contract and stay in Costa Rica. She said that she can stay in one place for up to five years working for this company.

Ms. Russell said that her undergraduate degree is from the University of Maryland in studio arts and education. Ms. Russell said that she was certified in 2009 to teach early childhood to third grade. She has a Master of Arts in Teaching from Trinity University that she completed in 2014. She said that in this program she took a deep dive into literacy instruction. Ms. Russell said that she has bounced back from jobs supporting teachers to teaching in the classroom. She said in 2014, she was working as an instructional specialist in the Washington, DC public schools.

Ms. Russell said that she grew up in a Catholic family, and she became a Quaker in her early twenties. She said that she knew by the age of 13 that she did not believe in Catholicism. She said that her mother told her not to proceed with confirmation if she did not believe in all the tenets. Ms. Russell said that she and her sister tried out different houses of worship. She said when she went to a Quaker meeting, she realized this was home. Ms. Russell said that she has a home meeting in Washington, DC. There is a Quaker settlement three or four hours from where she lives in Costa Rica, but she has not gone to meetings.

Ms. Russell said that she met her husband on a dating site in 2014. She said that they went on three dates in three days, and they knew that this was it. She said he proposed after five months. Ms. Russell said she and her husband met in February 2014, and they were married on October 3, 2014. She said that she was 35 and he was the man of her dreams.

Ms. Russell said that her husband is a DJ, and he travels to Washington, DC to work at weddings. She said that he cannot work in Costa Rica because of his visa. Ms. Russell said she always wanted to live in Costa Rica. She said that the culture is warm and family-oriented. She said that she works from 7:30 a.m. until 4:30 p.m. and her son is in school from 7:30 a.m. until 3:00 p.m.

RE:  Monique Russell
Page 7

**MENTAL STATUS EXAMINATION:**

Mental status examination revealed a casually groomed 42-year-old woman who appeared younger than her stated age.  Her speech was goal-directed and spontaneous, and she easily established rapport.  Ms. Russell provided a detailed history and explained how she had learned about the federal charges against Dr. Akoda.

Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  Ms. Russell said in a way she feels lucky that what happened to her with Dr. Akoda was not worse.  She said that she had no physical consequences from the birth of her son.  She said that she feels responsible to stand up for women who were subjected to trauma.  Ms. Russell revealed a full range of affect appropriate to content.  She denied a history of suicidal ideation.

Ms. Russell denied a history of anxiety attacks.

Memory, intelligence, and fund of knowledge were grossly within normal limits.

**REVIEW OF RECORDS:**

I have reviewed the records identified at the start of the report.  There were no records that referred to any psychiatric or psychological treatment or complaints of anxiety or depression to a treating doctor.

**SUMMARY AND IMPRESSION:**

It is my opinion Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint.

Ms. Russell related a past history of counseling and treatment with the ███████████████ ████████████  She reported a history of seeking treatment and medication at times of stress. Ms. Russell did not engage in treatment related to learning information about Dr. Akoda. Ms. Russell acknowledged that the consequences in regard to the treatment she received from Dr. Akoda were, "For me, minor."

It is my opinion Ms. Russell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  She has strong relationships with her husband and her son, and she is optimistic about her future. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Russell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.

RE:  Monique Russell
Page 8

I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/cl

# Exhibit 75

JA3885

   

 **Monique Russell**
Exactly. The state of Virginia suspended his license based on the federal conviction, but his Maryland license expired while he was awaiting trial.

2 yrs   **Like   Reply   More**

 **Karlena Walker**
I can't believe it was just suspended and not outright revoked permanently.

2 yrs   **Like   Reply   More**

 **Monique Russell**
Same here. The letter they wrote said that in order to reinstate the license, he would have to re-apply and fay the applicable fees. My FIL (who is a lawyer) thinks that is just CYA language and that they would not reinstate it. But something should be noted on the MD board. Also, I want to see background checks as a part of the process of getting a license. Checking SS numbers and fingerprinting could have kept him from being able to do this.

2 yrs   **Like   Reply   More**

 **Nakki A. Price**
I mean, is it even clear that he had some medical training?! I read the link above and that wasn't clear.



2 yrs   **Like**   Reply   More



**HoneyDip Dani**
I think people should contact their personal lawyer at this point.

2 yrs   Like   Reply   More



**Monique Russell**
Honestly, I'm not sure there's much to do at this point. I've been in touch with a lawyer. He's been convicted at the federal level, and we've spoken to the US Attorney who prosecuted the case. He's basically said it's over and done with, and he doubts he's still in the country. So I'm not sure if the state would pursue criminal charges. However, he's used at least 4 different social security numbers and a number of different names over the years to keep practicing under fraudulent licenses in MD and VA. If enough of his patients are identified, it could make way for a class action lawsuit, but individually, there's not much that can be done. However, I've found at least 1 settlement for a negligence claim against him. If there are others, those women could re-open their cases and fight for more money because he should have never been operating on them.

2 yrs   **Like**   Reply   More

   Write a reply...   Reply

   

JA3887



**Karlena Walker**
**Monique Russell** This is horrifying. I am so, so, sorry you're having to deal with this. My only hope is that it opens more eyes and allows structures to be put in place that can prevent this from happening again. It's hard enough to trust medical professionals as it is, without the stress of worrying if your doctor actually earned their license. I don't know what I can do to help, but please let me know. *hugs*



2 yrs     Love     Reply     More

**Monique Russell**
**Karlena Walker** Thanks, chica. I do consider myself lucky. Luka is perfect, and I seem to be healing as expected, though this really makes me second-guess things. I was in labor for 32 hours and ended up needing an emergency c-section. I think the route we went really was best/ necessary. But, what about mothers like the one in that settlement above, mothers who had complications or whose babies sustained injuries? They should know that he might be at fault for that. They have a right to know, and no one is notifying patients.



2 yrs     Like     Reply     More

**Ebony Scott-Bey Cutchin**
Monique Russell, the State of
Maryland now requires





JA3888

# Exhibit 76

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

| | | |
|---|---|---|
| MONIQUE RUSSELL, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL17-22761 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

*******************************************************************************

| | | |
|---|---|---|
| JANE DOE NO. 1, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL17-37091 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

*******************************************************************************

| | | |
|---|---|---|
| MONIQUE RUSSELL, *et al.* | * | |
| Plaintiff(s) | * | |
| v. | * | CAL18-07863 |
| DIMENSIONS HEALTH CORP., *et al.* | * | |
| Defendant(s) | * | |

*******************************************************************************

## PLAINTIFF MONIQUE RUSSELL'S RESPONSES TO
## DEFENDANTS' REQUESTS FOR ADMISSIONS

Plaintiff, Monique Russell, by her undersigned attorneys, responds as follows

to the Defendants' Requests for Admissions.

### GENERAL OBJECTIONS

A.      Plaintiff objects to each and every Request to the extent the Request seeks privileged information and documents protected from disclosure by the attorney-client privilege and/or attorney work-product doctrine, and/or that were created in anticipation of litigation.

B.      The information supplied in these Responses to Requests for Admission is not based solely on the knowledge of the executing party, but includes knowledge of the party's agents, representatives and attorneys, unless privileged.  Any admission made herein is made with the state of knowledge and information now available to the Defendants, their agents, representatives and attorneys.

C.      In those instances in which the Plaintiff has admitted the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, but has not been called upon to admit the time when Plaintiff learned of the document, the admission of the genuineness of the document should not be construed as an

JA3890

admission that the Plaintiff knew of the document when it was created. Such an admission should be construed only as indicating that, based upon information currently known and obtained by Plaintiff and/or counsel for the Plaintiff, the genuineness of the document is now admitted.

D.      An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission that the document was unchanged from a prior form, or was otherwise relied upon or acted upon in the form of its production, or remained unchanged at any subsequent time relevant, or at all times relevant, to this case.

E.      An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission of the truth or falsity of any statement, whether of law or fact, contained in the document.

F.      An admission by the Plaintiff as to the genuineness of a document, or the qualification of a document as a business record for hearsay purposes, is not an admission that the document is complete or in the page order in which the document was held.

G.      An admission by the Plaintiff as to the genuineness of a document, or not an admission that the document is material, relevant and/or admissible for any purpose or at any proceeding in this case.

H.      Plaintiff generally objects to the genuineness of a document when a request to admit or deny the genuineness of a document provides no context or reference about the source of the document.

I.      Plaintiff objects to these Requests for Admissions to the extent that they purport to impose obligations on the Plaintiff beyond those required by the Maryland Rules.

J.      Plaintiff generally objects to these Requests for Admissions to the extent that in most instances they ask Plaintiff to admit a fact, but fail to provide reference to any particular document for Plaintiff to review and would otherwise require Plaintiff to search for a document that may or may not exist to prove or disprove a proposed fact that may or may not be accurate.

## SPECIFIC RESPONSES

**REQUEST NO. 1:**   You were a Claimant in the initial Health Care Alternative

Dispute Resolution Office ("HCADRO") action *Doe v. Dimensions Healthcare System.*

JA3891

**RESPONSE:**    **Denied.**

**REQUEST NO. 2:**    In 2017, you filed your Statement of Claim with the Health Care Alternative Dispute Resolution Office in *Doe v. Dimensions Healthcare System*.

**RESPONSE:**    **Denied.**

**REQUEST NO. 3:**    You filed your Complaint in the above-captioned matter in the Circuit Court for Prince George's County, Maryland on or about November 20, 2017.

**RESPONSE:**    **Denied.**

**REQUEST NO. 4:**    You had no complications with your delivery on or about May 25, 2016.

**RESPONSE:**    **Denied.**

**REQUEST NO. 5:**    You have heard radio advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**    **Denied.**

**REQUEST NO. 6:**    At this time, you are still unaware that the individual known to Defendants as Akoda: had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:**    **Denied that Akoda had been certified by ECFMG to practice medicine. Plaintiff admits that she does not have personal knowledge of these matters, but is relying on her attorneys for this information.**

JA3892

**REQUEST NO. 7:**   You are a class Plaintiff in the above-captioned action.

**RESPONSE:**   **Plaintiff denies she is a named class Plaintiff in CAL17-37091.**

**REQUEST NO. 8:**   Your Family was not affected by your alleged symptoms of Post-Traumatic Stress Disorder until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**   **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 9:**   You did not and have not specifically verified the facts about the qualifications to practice medicine of the individual known to Defendants as Dr. Akoda, which were provided to you as the basis of the events giving rise to your Claim.

**RESPONSE:**   **Admitted.**

**REQUEST NO. 10:**   You had not retained or had contact with an attorney for purposes of bringing suit for your Claims in this action until seeing/hearing television, radio, and/or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**   **Denied.**

**REQUEST NO. 11:**   You did not contribute to or have any role in any news coverage or publicity related to the events you now allege in this action, including, but not limited to, participation in the Dr. Oz Show.

**RESPONSE:**   **Admitted.**

**REQUEST NO. 12:**   You claim that you suffer from Post-Traumatic Stress Disorder as a result of your allegations against the Defendants.

JA3893

**RESPONSE:** **Denied.**

**REQUEST NO. 13:** You claim that your alleged Post-Traumatic Stress Disorder has affected your relationship with your Family.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 14:** You have seen television advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Denied.**

**REQUEST NO. 15:** You did not experience your alleged symptoms of Post-Traumatic Stress Disorder during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 16:** Your Family was not affected by your alleged symptoms of Post-Traumatic Stress Disorder during the period you were being cared for by Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 17:** You did not experience your alleged symptoms of Post-Traumatic Stress Disorder until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 18:** You do not suffer from depression as a result of the events giving rise to your Claim.

5

RESPONSE:          Admitted.

**REQUEST NO. 19:** You had not retained or had contact with an attorney for purposes of bringing suit for your Claims in this case until you saw or heard news coverage or other publicity regarding the events giving rise to your Claim.

RESPONSE:          Admitted.

**REQUEST NO. 20:** You do not suffer from Post-Traumatic Stress Disorder as a result of the events giving rise to your Claim.

RESPONSE:          Admitted.

**REQUEST NO. 21:** It would have been reassuring to you had you known that the individual known to Defendants as Akoda: had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:          Upon advice of counsel, Plaintiff objects to this request.  In this context, Plaintiff does not understand the meaning of "reassuring."  Subject to and without waiving this objection, the stated matters would not change Plaintiff's belief that Akoda was a fraud and deceit.**

**REQUEST NO. 22:** You claim that you suffer from depression as a result of your allegations against the Defendants.

JA3895

**RESPONSE:**          Denied.

**REQUEST NO. 23:** You claim that your alleged depression has affected your relationship with your Family.

**RESPONSE:**          Denied.

**REQUEST NO. 24:** You have never been formally diagnosed with depression.

**RESPONSE:**          Admitted.

**REQUEST NO. 25:** Your Family was not affected by your alleged depression during the period you were being cared for by Dr. Akoda.

**RESPONSE:**          **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 26:** You did not experience your alleged depression until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**          **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 27:** You have seen news coverage or other publicity regarding the events giving rise to your Claim.

**RESPONSE:**          Admitted.

**REQUEST NO. 28:** Your Family was not affected by your alleged symptoms of anxiety, if at all, until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

JA3896

**RESPONSE:**     Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 29:** Your Family was not affected by your alleged depression, if at all, until you saw/hear television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**     Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 30:** You did not experience your alleged depression during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:**     Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 31:** You claim that you suffer from anxiety as a result of your allegations against the Defendants.

**RESPONSE:**     Admitted.

**REQUEST NO. 32:** You claim that your alleged anxiety has affected your relationship with your Family.

**RESPONSE:**     Denied.

**REQUEST NO. 33:** You did not experience your alleged anxiety during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:**     Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 34:** You claim that your alleged physical injury has affected your relationship with your Family.

8

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 35:** You do not suffer from anxiety as a result of the events giving rise to this Complaint.

**RESPONSE:** **Denied.**

**REQUEST NO. 36:** Your Family was not affected by your alleged anxiety during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 37:** You have never been formally diagnosed with anxiety.

**RESPONSE:** **Admitted.**

**REQUEST NO. 38:** You have never been formally diagnosed with Post-Traumatic Stress Disorder.

**RESPONSE:** **Admitted.**

**REQUEST NO. 39:** You claim that you suffer from physical pain as a result of your allegations against the Defendants.

**RESPONSE:** **Denied.**

**REQUEST NO. 40:** You have never been diagnosed with a physical injury resulting from your allegations against the Defendants.

**RESPONSE:** **Admitted.**

**REQUEST NO. 41:** You did not experience your alleged physical injury as a result of your allegations during the period(s) you were cared for by Dr. Akoda.

JA3898

**RESPONSE:**      **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 42:** Your Family was not affected by your alleged symptoms of physical pain during the period(s) you were cared for by Dr. Akoda.

**RESPONSE:**      **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 43:** Your Family was not affected by your alleged symptoms of physical pain until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**      **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 44:** You did not report any physical pain or injury to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:**      **Admitted.**

**REQUEST NO. 45:** You claim that you suffer from difficulty sleeping as a result of your allegations against the Defendants.

**RESPONSE:**      **Denied.**

**REQUEST NO. 46:** You claim that you suffer from "permanent disability" as a result of your allegations against the Defendants.

**RESPONSE:**      **Admitted that Plaintiff's emotional injuries are permanent.**

JA3899

**REQUEST NO. 47:** You do not suffer from permanent disability as a result of the care you received from Dr. Akoda.

**RESPONSE:** **Denied. Plaintiff's emotional injuries are permanent.**

**REQUEST NO. 48:** The last time you saw Dr. Akoda was on or about May 28, 2016.

**RESPONSE:** **Admitted.**

**REQUEST NO. 49:** You claim that your alleged permanent disability has affected your relationship with your Family.

**RESPONSE:** **Denied.**

**REQUEST NO. 50:** You have never been diagnosed with a permanent disability.

**RESPONSE:** **Admitted.**

**REQUEST NO. 51:** Your Family was not affected by your alleged permanent disability during the period(s) you were seeing Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 52:** You claim that your alleged difficulty sleeping has affected your relationship with your Family.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 53:** You have not done any independent research to determine the status of ECFMG certification, residency program completion, licensure, or board certification for the individual known to Defendants as Akoda.

JA3900

RESPONSE:          Admitted.

REQUEST NO. 54: You did not experience your alleged permanent disability until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

RESPONSE:          Denied.

REQUEST NO. 55: Your Family was not affected by your alleged permanent disability until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

RESPONSE:          **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

REQUEST NO. 56: You have never been diagnosed with a sleeping condition or disorder.

RESPONSE:          Admitted.

REQUEST NO. 57: Your Family was not affected by your alleged difficulty sleeping during the period(s) you were seeing Dr. Akoda.

RESPONSE: **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

REQUEST NO. 58: You do not suffer from a sleeping disorder or condition as a result of the events giving rise to your Claim.

RESPONSE:          Admitted.

REQUEST NO. 59: You do not have a lack of trust in physicians or in medical institutions at this point in time.

12

JA3901

RESPONSE:          Denied.

**REQUEST NO. 60:** Your Family was not affected by your alleged "lack of trust in physicians and in medical institutions" during the period(s) you were seeing Dr. Akoda.

**RESPONSE:          Upon advice of counsel, Plaintiff objects to this request.  It assumes matters which are untrue.**

**REQUEST NO. 61:** You did not experience your alleged difficulty sleeping until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:          Upon advice of counsel, Plaintiff objects to this request.  It assumes matters which are untrue.**

**REQUEST NO. 62:** You did not experience your alleged symptoms of anxiety, if at all, until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

RESPONSE:          Denied.

**REQUEST NO. 63:** Your Family was not affected by your alleged difficulty sleeping until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:          Upon advice of counsel, Plaintiff objects to this request.  It assumes matters which are untrue.**

**REQUEST NO. 64:** You claim that you suffer from "a lack of trust in physicians and in medical institutions" as a result of your allegations against the Defendants.

RESPONSE:          Admitted.

JA3902

**REQUEST NO. 65:**  You claim that your alleged "lack of trust in physicians and in medical institutions" has affected your relationship with your Family.

**RESPONSE:**        **Denied.**

**REQUEST NO. 66:**  You did not experience your alleged "lack of trust in physicians and in medical institutions" during your visit(s) with Dr. Akoda.

**RESPONSE:**        **Admitted.**

**REQUEST NO. 67:**  You have taken your child(ren) to see medical professionals since you learned of the Claim.

**RESPONSE:**        **Admitted.**

**REQUEST NO. 68:**  Any information you claim to now have about the status of Dr. Akoda's license to practice medicine, you learned from your Attorney(s).

**RESPONSE:**        **Denied.**

**REQUEST NO. 69:**  Your Family was not affected by your alleged "lack of trust in physicians and in medical institutions" until you saw/heard television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**        **Upon advice of counsel, Plaintiff objects to this request.  It assumes matters which are untrue.**

**REQUEST NO. 70:**  You did not experience your alleged symptoms of a permanent disability during the period(s) you were seeing Dr. Akoda.

**RESPONSE:**        **Upon advice of counsel, Plaintiff objects to this request.  It assumes matters which are untrue.**

14

**REQUEST NO. 71:** You did not experience your alleged symptoms of physical pain, resulting from your allegations against the Defendants, if any, until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 72:** You claim that your alleged "lack of trust in physicians and in medical institutions" has discouraged you from or made your feel uncomfortable taking your child(ren) to medical professionals.

**RESPONSE:** **Admitted.**

**REQUEST NO. 73:** You have seen medical professionals since your last visit with Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 74:** You have taken your child(ren) to see medical professionals since your last visit with Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 75:** You have seen medical professionals since you learned of the events giving rise to this Claim.

**RESPONSE:** **Admitted.**

**REQUEST NO. 76:** After seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim, you began to feel that you were personally violated by Dr. Akoda.

JA3904

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 77:** You did not experience your alleged "lack of trust in physicians and in medical institutions" until seeing/hearing television, radio, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 78:** You will continue to see medical professionals in the future.

**RESPONSE:** Admitted.

**REQUEST NO. 79:** If you were to require emergency medical treatment, you would seek emergency medical services.

**RESPONSE:** Admitted.

**REQUEST NO. 80:** If a member of your Family were to require emergency treatment, you would seek emergency medical services.

**RESPONSE:** Admitted.

**REQUEST NO. 81:** During your visit(s) with Dr. Akoda, you never refused services or procedures.

**RESPONSE:** Admitted.

**REQUEST NO. 82:** You do not claim to question Dr. Akoda's competency to practice medicine.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. Akoda's competency to practice medicine includes honesty and truthfulness and a person who lies and deceives is not competent.

16

JA3905

**REQUEST NO. 83:** You did not report concerns about Dr. Akoda's competency to practice medicine to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:** **Admitted.**

**REQUEST NO. 84:** During your visit(s) with Dr. Akoda, you never felt you had reason to question his competency to practice medicine.

**RESPONSE:** **Admitted.**

**REQUEST NO. 85:** After seeing/hearing television, radio, or internet advertisement(s) related to the events you allege in this action, you began to question Dr. Akoda's competency.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 86:** You will continue to take your child(ren) to see medical professionals in the future.

**RESPONSE:** **Admitted.**

**REQUEST NO. 87:** You do not claim that you felt personally violated by Dr. Akoda.

**RESPONSE:** **Denied.**

**REQUEST NO. 88:** During your visit(s) with Dr. Akoda, you never felt you were personally violated.

**RESPONSE:** **Admitted.**

JA3906

**REQUEST NO. 89:** You did not report feeling personally violated by Dr. Akoda to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda or PGHC.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 90:** You do not claim that your life was in danger during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 91:** You do not claim that your baby's life was in danger during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 92:** During your visit(s) with Dr. Akoda, you never felt your life was in danger.

**RESPONSE:** **Admitted.**

**REQUEST NO. 93:** During your visit(s) with Dr. Akoda, you never felt your baby's life was in danger.

**RESPONSE:** **Denied.**

**REQUEST NO. 94:** You only began to feel that your life was in danger when cared for by Dr. Akoda after seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

JA3907

**REQUEST NO. 95:** You did not report to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda that you felt that your or your baby's life was in danger

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.

**REQUEST NO. 96:** It was not important to you to research the status of Dr. Akoda's license to practice medicine while receiving care from Dr. Akoda.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. Plaintiff denies it was not important, but instead had no reason to research these matters.

**REQUEST NO. 97:** At the time of your care by Dr. Akoda, you were unaware that the individual known to Defendants as Akoda: had been certified by ECFMG to practice medicine; had applied for, was accepted, and successfully completed an accredited residency program through Howard University Hospital; was licensed to practice medicine in the state of Maryland; was licensed to practice medicine in the Commonwealth of Virginia; and was Board Certified by the American College of Obstetricians and Gynecologists.

**RESPONSE:** Upon advice of counsel, Plaintiff objects to this request. It contains multiple requests which should be set forth separately. Denied that Plaintiff was unaware that Akoda was licensed to practice medicine in the State of Maryland.

JA3908

**REQUEST NO. 98:** You only began to feel that your baby's life was in danger when treated by Dr. Akoda after seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE: Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 99:** You do not claim that you were abused sexually by Dr. Akoda.

**RESPONSE:** **Admitted.**

**REQUEST NO. 100:** You claim that your alleged "lack of trust in physicians and in medical institutions" has discouraged you from or made you feel uncomfortable from seeing medical professionals.

**RESPONSE:** **Admitted.**

**REQUEST NO. 101:** During your visit(s) with Dr. Akoda, you never felt as if you were being abused sexually.

**RESPONSE:** **Admitted.**

**REQUEST NO. 102:** You did not report any sexual abuse to any law enforcement or hospital personnel during the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. It assumes matters which are untrue.**

**REQUEST NO. 103:** After seeing/hearing television, radio or internet advertisement(s) regarding the events giving rise to your Claim, you began to feel that you had been sexually abused by Dr. Akoda.

JA3909

**RESPONSE:**     Denied.

**REQUEST NO. 104:** You do not believe the competency of a physician can be determined from his or her name.

**RESPONSE:**     Admitted.

**REQUEST NO. 105:** You do not believe that the name of the physician is a determining factor in choosing an OBGYN.

**RESPONSE:**     Admitted.

**REQUEST NO. 106:** You have seen physicians in your lifetime whose names you do not remember today.

**RESPONSE:**     **Upon advice of counsel, Plaintiff objects to this request. It is overly broad and burdensome. Plaintiff cannot be required to remember what she cannot remember. Plaintiff will admit that she may not be able to recall every physician she has seen in her lifetime.**

**REQUEST NO. 107:** During the period(s) you were being treated by Dr. Akoda, you were unaware that he completed his medical residency at Howard University Hospital.

**RESPONSE:**     Admitted.

**REQUEST NO. 108:** You were not aware that Dr. Akoda had been indicted or pleaded guilty to criminal charges prior to seeing/hearing radio, television, or internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:**     Denied.

JA3910

**REQUEST NO. 109:** You were not seeing an OB/GYN for annual exams prior to the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Denied.

**REQUEST NO. 110:** You have not seen an OB/GYN for annual exams since the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 111:** You did not forego medical care despite needing it before the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Admitted.

**REQUEST NO. 112:** You have not foregone medical care despite needing it, since the period(s) you were being treated by Dr. Akoda.

**RESPONSE:** Denied.

**REQUEST NO. 113:** During the period(s) you were being treated by Dr. Akoda, you were not aware of the status of Dr. Akoda's license to practice medicine.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. Plaintiff believed Akoda was licensed to practice medicine.**

**REQUEST NO. 114:** During the period(s) you were being treated by Dr. Akoda, you were not aware that Dr. Akoda was licensed to practice medicine by the State of Maryland.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. Plaintiff believed Akoda was licensed to practice medicine.**

JA3911

**REQUEST NO. 115:** It was not important to you to research the status of Dr. Akoda's license to practice medicine after receiving care from Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. Plaintiff had no reason to research the status of Akoda's license.**

**REQUEST NO. 116:** During the period(s) you were being treated by Dr. Akoda, you were not aware that Dr. Akoda was licensed to practice medicine by the Commonwealth of Virginia.

**RESPONSE:** **Admitted.**

**REQUEST NO. 117:** You have seen internet advertisement(s) regarding the events giving rise to your Claim.

**RESPONSE:** **Denied.**

**REQUEST NO. 118:** You did not see Dr. Akoda for any prenatal care.

**RESPONSE:** **Admitted.**

**REQUEST NO. 119:** It was not important to you to research the status of Dr. Akoda's license to practice medicine prior to receiving care from Dr. Akoda.

**RESPONSE:** **Upon advice of counsel, Plaintiff objects to this request. Plaintiff had no reason to research the status of Akoda's license.**

**REQUEST NO. 120:** Any information you claim to now have regarding the status of Dr. Akoda's license to practice medicine, you learned from television, radio, or internet advertisement(s) regarding the events giving rise to your claim.

**RESPONSE:** **Denied. Plaintiff is relying on the information of her attorneys and her discovery of the U.S. Department of Justice press release.**

Respectfully submitted,

LAW OFFICES OF PETER G. ANGELOS, P.C.

By:_____

Jay D. Miller
jmiller@lawpga.com
Paul M. Vettori
pvettori@lawpga.com
Danielle S. Dinsmore, Esquire
ddinsmore@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
*Attorneys for Plaintiffs*

JA3913

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, | |
| Plaintiffs, | Civil Action No. 18-5629 |
| v. | Honorable Joshua D. Wolson |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

## STIPULATION

AND NOW, this 14th day of January 2022, it is hereby STIPULATED and AGREED by and between the undersigned counsel that Plaintiffs Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans (collectively, "Plaintiffs") and Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") stipulate as follows:

1.    On December 10, 2021, ECFMG filed a Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Expert Dr. Annie Steinberg (ECF 82).  ECFMG filed the motion contemporaneously with its Motion for Summary Judgment (ECF 81).

2.    On January 8, 2022, Plaintiffs' counsel notified ECFMG's counsel of its intent to withdraw Dr. Steinberg as an expert witness.

3.    Plaintiffs withdraw and will not call Dr. Steinberg as a witness, and will not rely on her opinions, in the above-captioned case.

4.    Plaintiffs and ECFMG agree that as a result of Plaintiffs' withdrawal of Dr. Steinberg, ECFMG's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiff's Expert Dr. Annie Steinberg (ECF 82) is moot.

JA3914

Respectfully submitted,

Dated: January 14, 2022

/s/ Nicholas M. Centrella
Nicholas M. Centrella (Pa. I.D. No. 67666)
Howard M. Klein (Pa. I.D. No. 33632)
Robin S. Weiss (Pa. I.D. No. 312071)
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, PA 19102-2100
(215) 864-9600 (phone)

Attorneys for Plaintiffs

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:        +1.215.963.5000
Facsimile:        +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

Attorneys for the Educational Commission for
Foreign Medical Graduates

SO ORDERED:

/s/ Joshua D. Wolson

Dated:  January 14, 2022

JOSHUA D. WOLSON, J.
U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629<br>Honorable Joshua D. Wolson |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT, EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' MOTION FOR SUMMARY JUDGMENT**

For the reasons set forth in the attached Memorandum of Law, Plaintiffs, Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans, by and through their undersigned counsel, oppose Defendant Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment and respectfully request that the Motion for Summary Judgment be denied.

Dated: January 14, 2022                        Respectfully submitted,

JANET, JANET & SUGGS, LLC                CONRAD O'BRIEN PC

/s/ Patrick Thronson                          /s/ Robin S. Weiss
  Patrick A. Thronson                          Nicholas M. Centrella (Pa. ID 67666)
  Brenda A. Harkavy                            Robin S. Weiss (Pa. ID 312071)
  4 Reservoir Circle, Suite 200                1500 Market Street, Suite 3900
  Baltimore, MD 21208                          Philadelphia, PA 19102-2100
  (410) 653-3200                               (215) 864-9600

JA3916

LAW OFFICES OF PETER G. ANGELOS, P.C.

  Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000


Z LAW, LLC

  Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977

SCHOCHOR, FEDERICO AND STATON

  Brent Ceryes
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000


THE COCHRAN FIRM

  Karen E. Evans
David E. Haynes
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,      *
ELSA M. POWELL AND DESIRE EVANS,

                                       *       Case No. 2:18-cv-05629-JW

         Plaintiffs

                                        *       Hon. Joshua D. Wolson

      v.

                                        *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,          *

         Defendant                      *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

       Plaintiffs, by their undersigned counsel, submit the following Response to Defendant's Statement of Material Facts (ECF No. 85). Plaintiffs also submit a Statement of Additional Material Facts. Any admissions made herein are made solely for the purpose of Defendant's Motion for Summary Judgment and Plaintiffs' Response thereto. In all circumstances where there is an admission or reference to Akoda herein, Plaintiffs are referring to the fictitious "Akoda" identity. Plaintiffs make no admission that Akoda or Dr. Akoda was a real person.

### RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1-3.          Admitted.

4.          Denied. The phrase "once an applicant's record was verified and incomplete" is inaccurate. The only thing ECFMG verifies is an applicant's diploma. Ex. 3, Kelly depo. at 18, 34, 35; Ex. 2, Corrado depo. at 88.

5.          Admitted. However, the transcript reference is incorrect.

6-19.          Admitted.

20.        Objection.  There is no evidence that this "process" was published in the period 1992 through 2006.

21-25.        Admitted.

26.        Denied.  ECFMG Exhibit 10 is Akoda's alleged diploma, not an application.

27.        Admitted.

28.        Plaintiffs cannot admit or deny this statement because they have no personal knowledge of the "verification," nor did Ibaden purport to verify any credentials other than the diploma.

29-40.        Admitted.

41.        Plaintiffs cannot admit or deny paragraph 41.  ECFMG Exhibit 17 does not state this.

42-46.        Admitted.

47.        Plaintiffs cannot admit or deny this statement because they have no personal knowledge of the "verification," nor did Ibaden purport to verify any credentials other than the diploma.

48-54.        Admitted.

55.        Objection.  This letter has not been authenticated and is hearsay and is inadmissible.

56-58.        Admitted.

59.        Plaintiffs admit that JSMC notified ECFMG of its investigation but there is no evidence in the record that ECFMG ever requested of JSMC the identity of the source of the allegation against Akoda.

JA3919

60-64.         Admitted.

65.            Plaintiffs admit that Igberase provided ECFMG with a passport and an international driving permit but ECFMG made no effort to verify the authenticity of these documents.  Ex. 2, Corrado depo. at 161.

66.            Admitted.  Further, ECFMG made no effort to refer "Akoda" to the ECFMG MECC for his misuse of a social security number or for providing false information on his application.  Ex. 3, Kelly depo. at 201.

67.            Admitted.

68.            Objection.  There is no evidence in the record authenticating this letter.  Furthermore, it is hearsay and is inadmissible.

69.            Admitted.

70.            W. Kelly believed Akoda and Igberase were one and the same.  ECFMG Ex. 33.

71-77.         Admitted.

78.            The application is a document which speaks for itself.

81.            Admitted.

82.            Objection.  There is no evidence authenticating this letter.  Furthermore, it is hearsay and is inadmissible.

83-87.         Admitted.

88.            Objection.  The quoted language is from a Complaint which was dismissed without prejudice.  It is irrelevant and inadmissible.

89.            Objection.  The quoted language is from a prior case which was dismissed without prejudice.  It is irrelevant and inadmissible.

3

90.          Objection.  This information is irrelevant and inadmissible.

91-94.       Admitted.

95-99.       Objection.  The exhibits referenced are not authenticated and are hearsay and inadmissible.

100-104.     Admitted.

105.         Denied.  The consent was invalid due to Akoda's fraudulent conduct.

106-115.     Admitted.

116.         Redacted.

117-135.     Admitted.

136.         Denied.  The consent was invalid due to Akoda's fraudulent conduct.

137-151.     Admitted.

152.         Objection.  This statement is irrelevant and inadmissible.

153-165.     Admitted.

166.         Denied.  The consent was invalid due to Akoda's fraudulent conduct.

167-176.     Admitted.

177.         Objection. This statement is irrelevant and inadmissible.

178.         Objection.  This statement is irrelevant and inadmissible.

179-181.     Admitted.

182.         Objection.  This statement is irrelevant and inadmissible.

183-190.     Admitted.

191.         Denied.  The consent was invalid due to Akoda's fraudulent conduct.

192-193.     Admitted.

194.         Denied.  The consent was invalid due to Akoda's fraudulent conduct.

195-203.        Admitted.

204-205.        Objection.  This statement is irrelevant and inadmissible.

206-217.        Admitted.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      William C. Kelly worked for ECFMG for almost 38 years.   He retired in May 2015.  Ex. 3, Kelly depo. at 7, 9.  He became manager of the credentials department and the vice-president for operations that included credentials.  Ex. 3, Kelly depo at 187-188.

2.      The ECFMG Certificate is required to obtain a medical license.  Ex. 3, Kelly depo. at 19.

3.      The first step needed to obtain a certificate from ECFMG is an application.  Ex. 3, Kelly depo. at 13.

4.      An identification number is assigned to the application.  If the applicant becomes certified, the certificate number would be the same as the identification number. Id. at 15.

5.      An IMG needs an ECFMG certificate to obtain a medical license.  Ex. 3, Kelly depo. at 19.

6.      ECFMG works on behalf of domestic regulatory authorities to protect the public through programs and services including primary source verification of physician credentials.  Ex. 3, Kelly depo. at 22.

7.      ECFMG received an Application from Igberase on April 6,1992.  Ex 4.

8.      He included a date of birth of April 17, 1962, and a social security number ending in 5054.  Ex. 3, Kelly depo at 29.  Ex. 4.

9.      Igberase submitted a diploma from the University of Ibadan June 19, 1987.  ECFMG Ex. 10; Ex. 3, Kelly depo. at 31.

10.     In order to have the diploma verified, ECFMG would send it to the medical school to verify it. Ex. 3, Kelly depo. at 35.

11.     ECFMG received an Application from Igberase Oluwafemi Charles on March 30, 1994. Ex. 5. It did not include a social security number but included a birthdate of April 17, 1961. Id.; Ex. 3, Kelly depo. at 35-36.

12.     A new I.D. number was assigned because they concluded he ("Charles") had never applied before. Ex. 3, Kelly depo at 57-58.

13.     On June 22, 1995, Kelly wrote to Igberase to advise him that ECFMG was conducting an investigation about his multiple applications. ECFMG Ex. 13.

14.     ECFMG received a 5-page handwritten response from Charles in which he admitted that he and Igberase were one and the same person. He admitted to lying. ECFMG Ex. 14; Ex. 3, Kelly depo. at 42-43.

15.     The credentials committee met on 11/27/1995 and decided to invalidate the "Charles" certificate and to revoke the Igberase certificate. Ex. 6; Ex. 3, Kelly depo. at 45-46.

16..    On December 7, 1995, Kelly wrote a letter to the USMLE advising of events re "Charles" and Igberase. Ex. 21.

17.     Where there was a discrepancy between the name on the diploma and the name on the Application, the applicant would have been required to submit some sort of documentation to connect the names. But this policy was not in effect at the time. Ex. 3, Kelly depo. at 51.

18.     "Charles" took an appeal from the decision to invalidate his certificate. The review committee held a hearing and affirmed but limited Igberase's length of revocation to 5 years (i.e., 7/16/2001). Ex. 7; Ex. 3, Kelly depo at 53-55.

JA3923

19.   ECFMG received an Application from Femi Charles Igberaese on October 23, 2000.  Ex. 22.  It included a birthdate of April 17, 1962, the same date on the first Igberase application.  Ex. 3, Kelly depo. at 56-57.

20.   In less than a month, ECFMG concluded he was the same Igberase who had been told his certification was revoked.  Ex. 3, Kelly depo at 57-58.

21.   On November 16, 2000 Kelly wrote to Igberase for an explanation and advising him the matter would go the credentials committee.  Ex. 23.

22.   On May 3, 2001 Kelly wrote to "Charles" notifying him that the credentials committee extended the revocation of his certificate for an unspecified period.  Ex. 8.

23.   ECFMG received a letter from Igberase on July 2, 2001.  Ex. 9.  Igberase explained that his childhood friend had made a mistake on the application.  Igberase referred to his cousin "Akoda."

24.   On May 22, 2002 Kelly wrote to Igberase advising him his certificate was permanently revoked.  It's one year later because they waited for review by USMLE.  Ex. 10; Ex. 3, Kelly depo. at 64.

25.   On March 19, 2002 ECFMG received an Application by "Charles" Ugberaese Oluwafemi" with a birth date of March 1, 1963 and no social security information    Ex. 24.

26.   Charles Ugberaese Oluwafemi submitted a diploma from the University of Ibadan dated June 18, 1996.  Ex. 11.  Kelly doesn't know if it was ever verified by the University of Ibadan.  Ex. 3, Kelly depo. at 67-68.

27.   On November 12, 2002 Kelly wrote to Igberase Oluwafemi Charles advising him that the Credentials Committee found him to have engaged in irregular behavior.  Ex. 25.

28.   He believes the names are just re-arranged.  Ex. 3, Kelly depo. at 73.

7

29.     He is not aware that the diploma submitted by Charles and verified by the University is the same diploma submitted by Igberase.  Ex. 3, Kelly depo. at 73.

30.     ECFMG thought "Charles" and Igberase were two different persons.  Ex. 3, Kelly depo. at 75, 77.

31.      ECFMG realized within a short period of time that the person using the name Oluwafem was really the person certified as Igberase.  Ex. 3, Kelly depo. at 79.

32.     ECFMG received an Application from John Nosa Akoda on January 3, 2003. ECFMG Ex. 19.

33.     There was no social security number included.  Ex. 3, Kelly depo. at 88.  A photograph is required with the application.  Id. at 89.

34.     ECFMG received a second Application from Akoda on August 30, 1996.  Ex. 26. He said he had previously applied.  Kelly doesn't know why there is a second application.  Ex. 3, Kelly depo. at 93.

35.     Akoda submitted a diploma from the University of Benin for Johnbull Enosakhare Akoda dated February 6, 1988.  Ex. 27.  The name is different than on the application.

36.     He does not know if the diploma was verified by the University of Benin.  Ex. 3, Kelly depo. at 95.

37.  In a letter dated August 22, 2000,  Kelly says that Akoda provided a social security number ending in 9065.  Ex.28.

38.     ECFMG received a completed Permanent Revalidation Form on September 22, 1998. ECFMG Ex. 27.  It shows that he had started a residency program at JSMC.  Ex. 3, Kelly depo. at 107.

39.    ECFMG serves as the dean station for ERAS for IMGs.  Ex. 3, Kelly depo. at 108.

40.    On August 11, 2000, ECFMG received a letter from James McCorkel (Jersey Shore Medical Center) saying Akoda, a resident, may have served at two other residency programs and has used Igberase's social security number.  ECFMG Ex. 28; Ex. 3, Kelly depo. at 111.

41.    The social security number Igberase gave JSMC is the same one he gave to ECFMG.  Ex. 3, Kelly depo. at 112.

42.    Stephen S. Seeling replied to McCorkel's letter on August 22, 2000.  Ex. 28. Kelly ghost wrote it for Seeling.  Ex. 3, Kelly depo. at 112.

43.    There is no diploma with the legal name "Charles."  Ex. 3, Kelly depo. at 113-114.

44.    Kelly wrote to Akoda on August 22, 2000 telling him they have recent information that he may have previously applied and that the matter will be referred to the Credentials Committee. He asked Akoda to provide an explanation.  Ex. 29.

45.    Kelly received a call from McCorkel on August 20, 2000, telling him Akoda took a leave of absence and he was waiting to hear from Harlem Hospital.  Ex. 30.

46.    Igberase under the Akoda identity wrote a letter in response to the Kelly's letter dated August 29, 2000.  ECFMG Ex. 32.   He denied taking exams under other names.  He stated that "Charles" is his cousin.  He admitted using Charles' social security number.

47.    On September 13, 2000, McCorkel called Kelly saying Akoda has been suspended.  McCorkel's discussions with Harlem Hospital were "not definitive."  Ex. 12.

48.    Kelly made handwritten notes of his conversation with McCorkel.  Ex. 31.

9

49.     On September 27, 2000 Akoda came to Kelly's office.  ECFMG Ex. 30.   He again admitted using his cousin's social security number.  He gave Kelly his passport and his international driving permit.  Ex. 13.

50.     Kelly doesn't remember if he made any attempt to verify the authenticity of the passport or license.  Ex. 3, Kelly depo. at 125, 129.

51.     The date of birth on Akoda's passport (Ex. 13) and on the Request for Permanent Revalidation Form (ECFMG Ex. 27) are different.  Ex 3, Kelly depo. at 126-127.

52.     He does not remember searching ECFMG's data base to try to determine whether Akoda and Igberase were one and the same person.  Ex. 3, Kelly depo. at 129.

53.     He doesn't know if he compared photographs but he had the ability to do so. Ex. 3, Kelly depo. at 129-130.

54.     He was present at Igberase's appeal hearing in 1996.  Ex. 3, Kelly depo. at 131, 133.

55.     Kelly made notes of a call with McCorkel on October 5, 2000.  Ex. 32.  It comments on two different green cards presented by Akoda.  It states that Harlem Hospital thinks he may be the same and that Akoda used two social security numbers.

56.     Kelly emailed Igberase December 21, 2000 and Akoda replied December 2, 2000. Ex. 33.  Kelly was surprised.

57.     On the same day he sent the email to Igberase, Kelly spoke with McCorkel. ECFMG Ex. 31.  McCorkel told Kelly that Akoda was dismissed from JSMC residency for using a false social security number and green cards inconsistent with a later one.

58.     He does not recall ever asking McCorkle who the informant was.  Ex. 3, Kelly depo. at 147.

59. McCorkel says he believed Igberase and Akoda were one and the same person. "I also believe it" Kelly said. "We need to brainstorm on this one." ECFMG Ex. 33.

60. It seemed strange that Akoda would reply to the email to Igberase. Ex. 3, Kelly depo. at 149-150.

61. He doesn't recall if they brainstormed this matter further. Ex. 3, Kelly depo. at 150.

62. He knew there was some connection, a relationship between Igberase and Akoda. Ex. 3, Kelly depo. 153.

63. He doesn't recall if he ever learned that Igberase was licensed as a nurse in NY. Ex. 3, Kelly depo. at 158.

64. ECFMG used the ERAS to submit for Akoda the three letters of reference... He wrote to the three doctors who provided letters of recommendation.    Ex. 14.  None of the three doctors responded to Kelly's letters.  ECFMG Ex. 35; Ex. 3, Kelly depo. at 167-168.

65. As part of the ERAS program, ECFMG acts as the dean's office. Ex. 3, Kelly depo. at 162.

66. One of the goals of ECFMG is to ensure IMGs are competent physicians.   Ex. 3, Kelly depo. at 184-185.

67. A goal of ECFMG is to protect the American public. Ex. 3, Kelly depo. at 185.

68. ECFMG acts as the Dean's office for IMGs by facilitating the components of an application for a residency program and submits them on behalf of the graduate through the ERAS.  Ex. 3, Kelly depo. at 194.

11

69.     It was not a routine procedure to verify letters of recommendation.  Kelly did it because Akoda was "otherwise being investigated."  He had some concerns about Akoda's credibility.  Ex. 3, Kelly depo. at 195.

70.     None of the three doctors responded to his letters.  Ex. 3, Kelly depo. at 196.

71.     Kelly did not attempt to find out if any of the three doctors were real.  Ex. 3, Kelly depo. at 202.

72.     Kelly was concerned that Akoda and Igberase were the same person.  Ex. 3, Kelly depo. at 203.

73.     Kelly didn't think there was enough evidence to go to the credentials committee. Ex. 3, Kelly depo. at 211.

74.     Kara Corrado is the ECFMG Vice President for Operations.  Ex. 2, Corrado depo. at 6.

75.     ECFMG has a certification program that is required for entrance into a ACGME accredited residency program.  Id. at 41. It is ECFMG's expectation that state medical boards, residency programs, and hospitals rely on ECFMG as they make decisions about physician applications. Id. at 247-248.

76.     Part of ECFMG's mission is to promote public health and to protect the public. Id. at 47.  ECFMG serves the public in a number of ways, for example, making sure we have qualified physicians.  Id. at 40.

77.     There is a written "Draft" procedures written in 2015 which the staff had been using since at least 2008.  Id. at 60.

78.     As a general matter if a charge letter is sent to an applicant the matter should be referred to the credentials committee for review.  Id. at 80.

JA3929

79. The credentialing requirements for certification at that time included source verification of the diploma only. Id. at 88.

80. It is a requirement to submit photo identification currently but it was not in the past. Id. at 89.

81. It was not part of ECFMG's process to verify that the applicant's name or date of birth was the same on the request for permanent revalidation and the name that was on file for the applicant. Id. at 130.

82. ECFMG didn't do anything to determine whether the passport and international driving license Igberase provided under the Akoda identity were genuine or authentic. Id. at 161.

83. The passport and applications for Akoda listed different places of birth. Id. at 162.

84. ECFMG could have consulted with the Nigerian consulate to determine if the passport was authentic but it's not part of their process. Id. at 200.

85. Corrado doesn't believe ECFMG ever reached out to Akoda's alleged cousin. Id. at 204.

86. Corrado agrees with Kelly that part of ECFMG's role is to protect the American public. Id. at 222. She agrees that patients have the right to not be treated by physicians who have obtained ECFMG certification based on false pretenses. Id. at 53.

87. Akoda needed a valid ECFMG certificate to get into a training program. Id. at 230.

88. If ECFMG believed the letters of recommendation were fraudulent, they would have reported it to Howard University. Id. at 233-234.

13

89.     As Vice President of Operations, Stephen S. Seeling oversaw the certificate process.  Ex. 19, Seeling depo. at 13.

90.     William Kelly reported to S. Seeling.  Id.

91.     As a general rule, an IMG must have an ECFMG certification to enter into a residency program.  Id. at 23.

92.     One of the potential consequences, a potential sanction, for irregular behavior is revocation or invalidation of the individual's certification.  Id. at 55.

93.     Seeling agrees that it probably would warrant referral to the credentials committee if he believed that Akoda and Igberase were one and the same person.  Id. at 79.

94.     The decision that the Akoda matter should not go to the credentials committee was made without anyone speaking to Igberase about whether he and Akoda were the same person.  Id.

95.     Monique Russell is a 46 year old mother of one child, Luka, born May 25, 2016.  Ex. 15, Russell depo. at 12.

96.     Igberase delivered Ms. Russell's baby by emergency C-section.  Ex. 15, Russell depo. at 41.

97.     Ms. Russell learned of Igberase's guilty plea from a Department of Justice press release.  Ex. 15, Russell depo. at 31-32.

98.     Ms. Russell red the federal sentencing transcript.  Ex. 15, Russell depo. at 82.

99.     She suffers from emotional distress as a result of learning about Akoda.  Ex. 15, Russell depo. at 75-76.  Ms. Russell feels Igberase violated her.  Ex. 15, Russell depo. at 76.

100.     She has difficulty going to the gynecologist, distrusts the medical community and distrusts institutions that credential doctors.  Ex. 15, Russell depo. at 75.

14

101.     She also suffers from intimacy issues and feels like a victim of sexual assault because Igberase examined her vagina under false pretenses.  Ex. 15, Russell depo. at 90, 130.

102.  Ms. Riggins is a 27 year old mother of three children, ages 10, 6 and 2.  Ex. 16, Riggins depo. at 20.

103.  She lives in northeast Washington, DC.  Riggins depo. at. 21. She has a high school GED.  Ex. 16, Riggins depo. at 21.

104.  Ms. Riggins was a patient of Akoda between August 2012 and March 2013.  Ex. 16, Riggins depo. at 121. Akoda delivered her second child by C-section.  Ex. 16, Riggins depo. at. 30. Messiah, her son, was born on March 18, 2013.  Ex. 16, Riggins depo. at 38.

105.  After the C-section, Ms. Riggins suffered severe abdominal pain and could not undergo a tubal ligation because of scarring.  Ex. 16, Riggins depo. at 34.

106.  As a result of what she learned about who she believed to be Akoda, she has suffered emotional distress.  Ex. 16, Riggins depo. at 56.  After learning the truth about Igberase from a Facebook group, "Embracing Mommies," Ms. Riggins felt angry, sad, embarrassed, and ashamed about receiving treatment from Igberase.  Ex. 16, Riggins depo. at 57.  Ms. Riggins was deeply affected by what Igberase did and felt outraged because his dishonesty enabled him to perform C-sections, examine women's genitals, touch and violate them.  Ex. 16, Riggins depo. at 138.  See also Def's SUMF (ECF No. 85), Ex. 58, Dr. Tellefson Report.

107.  Ms. Powell is a 32 year old mother of five children.  Ex. 17, Powell depo. at 7, 11.

108.  Ms. Powell initially encountered Igberase, whom she knew as Charles Akoda, upon presentation to the medical office of Abdul Chaudry, M.D., in 2014.  Ex. 17, Powell depo. at 40, 94. Ms. Powell had been referred to Dr. Chaudry for obstetric care but was assigned to Igberase due to Dr. Chaudry's unavailability.  Ex. 17, Powell depo. at. 39-40.  During her pregnancy,

15

JA3932

Igberse acted in a flirtatious manner that made her feel uncomfortable, but she nevertheless trusted that he was a competent and appropriately credentialed physician providing appropriate medical care.  Ex. 34, Declaration of Elsa Powell.

109.  Igberase also delivered her child at Prince George's Hospital Center and saw Ms. Powell post-delivery as well.  Ex. 17, Powell depo. at 42, 88. The delivery was complicated by significant bleeding requiring surgery.  Ex. 34, Declaration of Elsa Powell.

110.   Ms. Powell trusted that Igberase was a duly licensed and credentialed physician and suffered emotional harm upon learning that the man she trusted to touch the most intimate parts of her body and deliver her baby, had lied about his identity and background. Ex. 17, Powell depo. at 79; Ex. 34, Declaration of Elsa Powell.  Ms. Powell was shocked and disturbed and felt violated by someone she did not know.  Ex. 17, Powell depo. at 79.  See also Def's SUMF (ECF No. 85) Ex. 58, Dr. Tellefson Report.  As a result of learning about Igberase's conduct, Ms. Powell experienced recurrent nausea, stomach discomfort, fear, confusion, sleeplessness, crying, anger, nervous sweating and panic attacks.  Ex. 34, Declaration of Elsa Powell.  Ms. Powell  would not have consented to treatment had she known Igberase's identity and conduct.  Ex. 34, Declaration of Elsa Powell.

111.  Desiree Evans is a 40 year old mother of one child.  Ex. 18, Evans depo. at 8, 13.

112.  Ms. Evans first encountered Igberase, whom she knew as Charles Akoda, at Prince George's Hospital Center for the delivery of her child by C-section in March of 2016.  Ex. 18, Evans depo. at 83; Ex. 35, Declaration of Desire Evans.  During Ms. Evans's labor, Igberase manipulated her clitoris, telling her he needed to do so to stimulate her to push the baby.  Ex. 18, Evans depo. at 132.  Ex. 35, Declaration of Desire Evans.  As this was her first experience

JA3933

Case: 22-1900 Document 22-5 Page 1 of 44 Date Filed: 09/08/2022

having a baby, she trusted that his explanation for his conduct was medically valid. Ex. 35, Declaration of Desire Evans.

113.   Ms. Evans has suffered emotional distress upon learning that physician whom she trusted for medical care misrepresented his identity. Ex. 18, Evans depo. at 165,172; Ex. 35, Declaration of Desire Evans.  Ms. Evans is afraid to seek medical care for her and her child and has lost trust in the medical system.  Ex. 18, Evans depo at 165, 172; Ex. 35, Declaration of Desire Evans.  See also Def.'s SUMF (ECF No. 85) Ex. 58, Dr. Tellefson Report.  As a result of learning about Igberase's conduct, her intimate relationship with her spouse has been damaged. Ex. 35, Declaration of Desire Evans.  As a result of learning about Igberase's conduct, Ms. Evans experienced feelings of nausea, disgust, depression, sadness, sleepless nights reflecting on Igberase's conduct, stress and anxiety, crying, impacts on her intimate relationship with her spouse, and nervousness.  Many of these symptoms continue today.  Ex. 35, Declaration of Desire Evans.  Ms. Evans would not have consented to treatment had she known Igberase's identity and conduct.  Ex. 35, Declaration of Desire Evans.

114.   Plaintiffs have identified David Markenson, M.D., John C. Hyde Ph.D., FACHE, and Jerry Williamson, M.D., F.A.A.P., M.J, CHC., LHRM as experts to testify with respect to standard of care and elements of causation.  These experts have issued reports containing opinions and have given deposition testimony.  *See* Exs. 20, 36 and 37, respectively, Reports of Dr. Markenson, Dr. Hyde and Dr. Williamson.  *See also* Ex. 1, Depo of. Dr. Markenson.

Dated: January 14, 2022                    Respectfully submitted,

JANET, JANET & SUGGS, LLC              CONRAD O'BRIEN PC

*/s/ Patrick Thronson*                      */s/ Robin S. Weiss*
  Patrick A. Thronson                      Nicholas M. Centrella (Pa. ID 67666)
  Brenda A. Harkavy                        Robin S. Weiss (Pa. ID 312071)

17

JA3934

4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200

1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
(215) 864-9600

LAW OFFICES OF PETER G. ANGELOS, P.C.

SCHOCHOR, FEDERICO AND STATON

Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000

Brent Ceryes
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Z LAW, LLC

THE COCHRAN FIRM

Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977

Karen E. Evans
David E. Haynes
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS,

Plaintiffs,

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

Defendant.

CIVIL ACTION NO. 18-5629
Honorable Joshua D. Wolson

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## ITS OPPOSITION TO DEFENDANT EDUCATIONAL COMMISSION FOR
## FOREIGN MEDICAL GRADUATES MOTION FOR SUMMARY JUDGMENT

Dated: January 14, 2022

Respectfully submitted,

JANET, JANET & SUGGS, LLC

/s/ Patrick Thronson
  Patrick A. Thronson
  Brenda A. Harkavy
  4 Reservoir Circle, Suite 200
  Baltimore, MD 21208
  (410) 653-3200

CONRAD O'BRIEN PC

/s/ Robin S. Weiss
  Nicholas M. Centrella (Pa. ID 67666)
  Robin S. Weiss (Pa. ID 312071)
  1500 Market Street, Suite 3900
  Philadelphia, PA 19102-2100
  (215) 864-9600

LAW OFFICES OF PETER G. ANGELOS, P.C.

  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th Floor
  Baltimore, Maryland 21201
  (410) 649-2000

SCHOCHOR, FEDERICO AND STATON

  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

JA3936

Z LAW, LLC

Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977

THE COCHRAN FIRM

Karen E. Evans
David E. Haynes
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Plaintiffs, on behalf of
themselves and all others similarly situated*

ii

JA3937

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

ECFMG's Role in the American Healthcare System ..................................... 2

Igberase obtains initial ECFMG certification after failing medical examination twice. 3

Igberase obtains second certification under the "Charles" identity. ECFMG investigates and revokes Igberase's certification. ......................................... 3

Igberase applies and is certified under the "Akoda" identity. ...................... 4

ECFMG learns Akoda and Igberase are the same person. .............................. 4

ECFMG nonetheless represents to Howard University's residency program, the State of Maryland, and Prince George's Hospital Center that "Akoda" has a valid ECFMG certificate. ..................................................................................................... 6

Igberase faces six felony charges and pleads guilty to one. .......................... 7

Damages to the Plaintiffs ............................................................................ 8

PLAINTIFFS ...................................................................................................... 8

LEGAL STANDARD ......................................................................................... 10

ARGUMENT ..................................................................................................... 11

I.    The Plaintiffs May Recover Damages for their Emotional Distress .................... 11

    1.    The Plaintiffs have sustained a physical impact under the standards for recover of emotional distress damages. ..................................................................... 11

    2.    The reasoning which permits recovery for those in the "zone of danger" supports recovery for emotional distress damages here. ...................................... 13

    3.    Historical concerns limiting recovery for emotional distress do not apply here. 14

II.    ECFMG Owed the Plaintiffs A Duty of Care; ..................................................... 16

    1.    ECFMG has undertaken a critical gatekeeping role in the United States Medical system for the protection of patients, and thereby owes a duty of care to patients. ............ 16

    2.    The Defendants owe the Plaintiffs a duty under the Restatement (Second) of Torts § 324A ................................................................................................ 17

    3.    The Defendants Owe the Plaintiffs a Duty under the Atlhaus factors. ............. 23

    4.    ECFMG is liable to Plaintiffs under Maryland law ......................................... 29

III.    ECFMG Was a Proximate Cause of Plaintiffs' Emotional Distress ...................... 31

IV.    ECFMG's Breach Was a But-For Cause of Plaintiffs' Emotional Distress ......... 33

V.    The Plaintiffs Did Not Consent to Treatment by Igberase. ................................. 35

VI.    The Plaintiffs' Severe Emotional Distress is Compensable ................................. 37

VII.    The Claims of Plaintiffs Powell and Evans are not Barred by the Statute of Limitations    39

CONCLUSION .................................................................................................. 40

iii

## TABLE OF AUTHORITIES

**Cases**

*Albany Urology Clinic, P.C. v. Cleveland,* 528 S.E.2d 777 (Ga. 2000) ...................................... 37

*Alderwoods (Pa.), Inc. v. Duquesne Light Co.*, 106 A.3d 27 (2014) ........................................... 16

*Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000).............................................. 17, 23, 25, 30

*Anderson v. Bushong Pontiac Co.*, 171 A.2d 771 (Pa. 1961).................................................. 27, 28

Ashburn v. Anne Arundel Cty., 510 A.2d 1078 (Md. 1986) ......................................... 30

*Brown v. Phila. College of Osteopathic Med.*, 674 A.2d 1130 (Pa. Super. 1996)................. 11, 12

*Campo v. St. Luke's Hosp.*, 755 A.2d 20 (Pa. Super 2000)............................................ 16

*Cantwell v. Allegheny Cty.*, 483 A.2d 1350 (1984) ....................................................... 21

*Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa 1984) ...................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ................................................... 10

*Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133 (Pa Super 2006)......................... 17, 33

*DeJesus v. United States VA*, 2005 WL 2175174 (E.D. Pa. Sep. 6, 2005).................................... 37

*DiMarco v. Lynch Homes-Chester Cty., Inc.*, 583 A.2d 422 (1990) ............................... 16, 22, 24

*Doe I v. Evanchick*, 355 F. Supp. 3d 197, 213 (E.D. Pa. 2019).................................... 10

*Doe v. Bradley*, 58 A.3d 429 (Del. Super. Ct. 2012) .................................................... 18

*Doyle v. South Pittsburgh Water Co.*, 199 A.2d 875 (1964) ........................................ 22

*Duttry v. Patterson*, 771 A.2d 1255 (2001) ............................................................... 36

*E.G. Rock, Inc. v. Danly*, 633 A.2d 485 (Md App. 1993)............................................. 31

*Emerich v. Phila. Ctr. For Human Dev., Inv.*, 720 A.2d 1032 (Pa. 1998) ..................... 24

*Faya v. Almaraz*, 620 A.2d 327 (1993) ....................................................................... 30

*Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020) .................. 27

JA3939

*Galullo v. Fed. Express Corp.*, 937 F. Supp. 392 (E.D. Pa. 1996) .................................. 33

*Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057 (Md. Ct. Spec. App. 1986) ....................... 30

*Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, (1998) .................................. 30

*Kapil v. Association of Pa. State College and Univ. Facilities*, 470 A.2d 482 (Pa. 1983)........... 39

*Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997) .................................. 36

*Korinko v. Come Ready Nutrition, LLC*, 2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) ............. 12

*Love v. Cramer*, 606 A.2d 1175 (Pa. Super 1992)........................................ 38

*Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281 (Pa Super 2005)........................................ 32

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) .................. 10

*Migyanko v. Thistlethwaite*, 419 A.2d 12 (Pa. Super 1980) ........................................ 16

*Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555 (7th Cir. 1991) ............................ 37

*Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000) .................................. 10

*Niederman v. Brodsky*, 261 A.2d 84, 85 (Pa. 1970) ......................................... 1, 11, 12, 13, 14, 37

*Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 100 (N.Y. 1928) ......................................... 16

*Pendleton v. State*, 921 A.2d 196 (Md. 2007) ......................................... 30

*Phillips v. Cricket Lighters*, 841 A.2d 1000 (2003)........................................ 25

*Potere v. Philadelphia*, 112 A. 2d 100 (Pa. 1955)............................................... 11, 12

*Prince v. Esposito*, 628 S.E.2d 601 (Ga. App. 2006) ............................................ 6, 7, 8, 9, 26, 36

*Quinby v. Plumsteadville Fam. Prac. Inc.*, 907 A.2d 1061 (Pa. 2006) ........................................ 31

*Reilly v. Tiergarten Inc.*, 633 A.2d 208 (Pa. Super. 1993) ........................................ 31

*Rice v. Brakel*, 310 P.3d 16 (Ariz. Ct. App. 2013) ......................................... 36

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360 (3d Cir. 1990) ......................................... 34

*Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL 1330669

   (E.D. Pa. Mar. 23, 2020) ........................................................................... 29, 30

*Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.)*, 223 A.3d 633 (Pa. 2019) ............... 39, 40

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538

   (3d Cir. 2006) ........................................................................................ 11

*Shumosky v. Lutheran Welfare Svcs. of Northeastern Pa.*, 784 A.2d 196 (Pa. Super. 2001) ....... 12

*Sinn v. Burd*, 404 A.2d 672 (Pa. 1996) ........................................................... 11, 12, 14

*Stoddard v. Davidson*, 513 A.2d 419 (Pa. Super. 1986) ............................................. 12

*Straw v. Fair,* , 187 A.3d 966 (Pa. Super. 2018) ................................................. 31

*Takach v. B. M. Root Co.*, 420 A.2d 1084 (Pa Super 1980) ......................................... 34

*Taylor v. Johnson*, 985 P.2d 460 (Alaska 1999) ................................................. 35, 36

*Toney v. Chester Cty. Hosp.*, 36 A.3d 83 (Pa. 2011) ............................................ 14, 15

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F. Supp. 3d 531 (E.D. Pa. 2019) ....... 24

*Vance v. Vance*, 408 A.2d 728, 733–34 (Md. 1979) ................................................. 30

*Vattimo v. Lower Bucks Hosp., Inc.,* , 465 A.2d 1231 (Pa. 1983) ................................ 31

*Welsh v. Bulger,*  698 A.2d 581 (Pa 1997) ...................................................... 18

*Willard v. Interpool, Ltd.,*  758 A.2d 684 (Pa. Super. 2000) ................................... 32

*Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009) .............................................. 39

*Zelinsky v. Chimics*, 175 A.2d 351 (Pa. Super. 1961) ........................................... 12

### Other Authorities

42 Pa. Cons. Stat. Ann. § 5502 ................................................................. 39

Fed. R. Civ. P. 56 ............................................................................. 10

Fed. R. Evid. 801 ............................................................................. 20

Fed. R. Evid. 802 ........................................................................................ 20

Fed. R. Evid. 803 ........................................................................................ 20

Fed. R. Evid. 804 ........................................................................................ 20

Fed. R. Evid. 805 ........................................................................................ 20

Restatement (Second) of Torts § 15 ....................................................... 19, 38

Restatement (Second) of Torts § 436A .................................................. 37, 38

Restatement (Second) of Torts § 7 ............................................................. 19

Restatement (Second) of Torts, § 892 ........................................................ 35

JA3942

## **INTRODUCTION**

Plaintiffs are four individuals who were fraudulently induced to undergo medical procedures, including childbirth, by a man who utilized a fictious identity, and who, the evidence indicates, had no medical degree whatsoever, and no medical license, privileges or board certification in his name. What credentials were associated with his fictious name, "Akoda," were the product of fraud and misrepresentation.

ECFMG's negligence made this possible. ECFMG was aware of allegations of fraud concerning Igberase's "Akoda" identity well before he began treating patients. As a quasi-public entity with a stated mission to promote quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education, ECFMG owed a duty to the Plaintiffs by virtue of their unique role within the United States medical system and the foreseeability that their negligence would result in the harm alleged in this case. As the Plaintiffs' experts have opined, ECFMG was required under the applicable standard of care to take action to prevent Igberase from continuing to perform medical procedures on patients. ECFMG breached that duty, which caused Plaintiffs to suffer severe emotional harm. ECFMG is answerable in tort for the consequences of its negligence.

As noted by the Court in *Niederman v. Brodsky*, 261 A.2d 84, 85 (Pa. 1970), "it is fundamental to our common law system that one may seek redress for every substantial wrong," and that "'[t]he best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequences of his misconduct . . . .'" *Id*. (citation omitted). The Plaintiffs are entitled to redress for their emotional harm, which occurred as a natural and proximate consequence of ECFMG's breach of its duty to the Plaintiffs.

## STATEMENT OF FACTS

This action arises from allegations that Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") negligently investigated and certified Oluwafemi Charles Igberase, a/k/a John Nosa Akoda (among other aliases), as eligible to enter a residency program, notwithstanding compelling evidence that Igberase/"Akoda" had committed extensive fraud as to his identity and credentials. As Plaintiffs allege, ECFMG knew of Igberase's fraud, but failed to appropriately investigate and respond to it. ECFMG failed to inform state medical boards, residency programs, and hospitals of Igberase's fraud, even as it attested that Igberase held a valid ECFMG certification.

ECFMG acknowledges that "patients have the right not to be treated by physicians who have obtained ECFMG certification based on false pretenses."  Plaintiff's Statement of Additional Material Facts ¶86 (hereinafter "¶___").  Yet ECFMG failed to respect this right and protect the public. As a result, Igberase had the opportunity to examine, touch, harass, and sexually abuse hundreds of women under the guise of providing OB/GYN care. These patients would never have consented to examination and treatment by Igberase had they known—as ECFMG did—that Igberase had obtained his credentials through repeated acts of fraud, later found to constitute a "crime of moral turpitude." Defendant's Statement of Undisputed Material Facts ¶84 (hereinafter "Def.'s SUMF ¶____").

### ECFMG's Role in the American Healthcare System

According to Defendant, "[p]art of ECFMG's mission is to promote public health and to protect the public."  ¶76.  ECFMG certifies international medical graduates ("IMGs," defined as those who attend medical school outside the U.S. and Canada) as eligible to enter US graduate medical education programs and verifies an IMG's credentials for hospitals and state medical licensing boards. Def.'s SUMF ¶2.

2

JA3944

To practice medicine in the U.S., an IMG must first apply to ECFMG, which verifies from primary sources that the IMG has obtained a valid diploma from a medical school recognized by the school's home country. An IMG must also pass portions of the United States Medical Licensing Examination (USMLE) and a clinical skills assessment. When these steps are satisfactorily completed, ECFMG issues a certificate to the IMG. Def.'s SUMF ¶4. ECFMG also acts as a dean's office for IMG's applying to residency programs. ¶68.

**Igberase obtains initial ECFMG certification after failing medical examination twice.**

In 1992, Igberase applied to ECFMG to take the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS") and the ECFMG English Test. Igberase provided ECFMG with a purported 1987 diploma from the University of Ibadan in Nigeria. Def.'s SUMF ¶27; ¶9.

Igberase failed the FMGEMS of multiple occasions, first failing both the basic medical science and clinical science components of the July 1992 FMGEMS, and subsequently failing the medical science component yet again in January 1992. ECFMG SUMF ¶45. Igberase next applied for and failed Step 1 of the USMLE in September 1992. *Id.* ECFMG issued him a certificate in 1993 after he passed steps 1 and 2 of the USMLE. ECFMG SUMF ¶4.

**Igberase obtains second certification under the "Charles" identity. ECFMG investigates and revokes Igberase's certification.**

In 1994, ECFMG received a second application from Igberase, using the name "Igberase Oluwafemi Charles," to take steps 1 and 2 of the USMLE examination (again). ¶11. His application falsely represented he had never taken the USMLE examination before. After "Charles" successfully completed the USMLE examinations, ECFMG issued him a certificate under the Charles identity. ECFMG SUMF ¶37.

Shortly thereafter, ECFMG investigated whether Igberase and Charles were the same person. Igberase admitted he had lied about his identity and examination history because

3

residency programs had rejected him for repeatedly failing the USMLE examinations. ¶14, ECFMG SUMF ¶40.

ECFMG referred the matter to its Committee on Medical Education Credentials. The Committee found Igberase had engaged in "irregular behavior," invalidated the certificate issued to "Charles" and revoked Igberase's original certificate. ¶6.  In 1996, after Igberase appealed, ECFMG's Review Committee for Appeals limited the period of revocation to five years.  ¶18. Thereafter, the Committee extended the revocation period indefinitely.  ¶22.  Igberase wrote to ECFMG and admitted that he had previously taken the MSLE exams.  ¶23.  Ultimately, the Committee revoked permanently Igberase's certificate.  ¶24.

**Igberase applies and is certified under the "Akoda" identity.**

While appealing this revocation, Igberase submitted a third application to ECFMG to take Steps 1 and 2 of the USMLE examination under the name "John Nosa Akoda."  ¶32; Def.'s SUMF ¶44.  This time, he provided ECFMG a purported 1988 diploma issued to "Johnbull Enosakhare Akoda" from the University of Benin. ¶35.   ECFMG takes no position on where or whether Igberase/"Akoda" actually went to medical school.   It merely claims that it verified Igberase's diploma from primary sources.  Def.'s SUMF ¶28.  It did not, however, verify Akoda's purported certificate of registration as a physician in Nigeria. ¶9.

After he passed the required examinations, ECFMG issued "Akoda" a certificate in 1998. Def's SUMF ¶52.  Akoda then entered a residency program at Jersey Shore Medical Center (JSMC).  ECFMG sent a permanently validated ECFMG certificate for Akoda to JSMC.  ¶38; Def.'s SUMF ¶52.

**ECFMG learns Akoda and Igberase are the same person.**

 In August 2000, JSMC notified ECFMG it was investigating whether Akoda had used a Social Security number issued to Igberase and whether he had attended two other residency

4

JA3946

programs. ¶40; Def's SUMF ¶57. ECFMG sent Akoda a "charge letter" advising it had received information alleging he may have engaged in irregular behavior and demanded a written explanation within fifteen days. ¶44; Def.'s SUMF ¶63. Akoda admitted in a written response to ECFMG that he used the Social Security number of his "cousin," purportedly named Igberase Oluwafemi Charles. ¶46; Def.'s SUMF ¶64. As noted, ECFMG had previously revoked the certificate of Charles.

JSMC advised ECFMG that it had suspended Akoda due to "inconsistencies." Igberase met with William Kelly ("Kelly"), Manager of ECFMG's Medical Education Credentials Department at Kelly's office. ¶49. This was not the first time Kelly had met Igberase: Kelly attended a hearing on the revocation of Igberase's certificate, where Igberase testified. ¶54. Igberase gave Kelly a fraudulent Nigerian passport and international driving permit listing the Akoda identity. ¶49; ECFMG SUMF ¶65. But Kelly did not make any effort to verify the authenticity of these documents, even though he believed Igberase and Akoda were the same person. ¶50, 82, 84. A phone call to the Nigerian Consulate would have revealed that the passport was a forgery. ECFMG also failed to compare information on the passport with other information provided by "Akoda." For example, ¶38, the Request for Permanent Revalidation of Standard ECFMG Certificate, was sent on September 2, 1998. Igberase stated on this document that Akoda's date of birth was April 17, 1963. The passport he presented to Kelly stated that Akoda's date of birth was January 11, 1959. Def.'s SUMF ¶65. The Application to take the MSLE exams for Akoda stated that Akoda's date of birth was January 1, 1959. JSMC had advised ECFMG that Akoda had already used three different dates of birth: April 12, 1962; January 1, 1993 and April 17, 1963, ECFMG Ex. 28. At this time, he was using a fourth date of birth. Yet all of this was ignored by ECFMG merely because Akoda denied being Igberase.

Misuse of a Social Security number was enough for JSMC to dismiss Akoda from its residency program and for the government to charge and convict him of a crime of moral turpitude. But it was not enough for ECFMG to even send the matter to its credentials committee. As ECFMG has testified, usually when a charge letter is sent, the matter is sent to the credentials committee. ¶78.  With Akoda, however, ECFMG ignored its usual practice.

In December 2000, ECFMG learned that JSMC dismissed Akoda from its residency program, because he had used a false Social Security number and provided JSMC with two inconsistent green cards. ¶37.

In a December 22, 2000, memorandum that Kelly intentionally left out of "Akoda's" official file, Kelly stated he and the director of JSMC's residency program believed that Igberase and Akoda were the same person. ¶59.  In that same memo, he reported that he had sent Igbease an email "and who should reply but Akoda!" Id.  Kelly testified that was surprised at this. ¶60. Somehow, Kelly did not think there was enough information to refer the matter to the ECFMG's Credentials Committee for investigation.  Had the Committee known, Kelly acknowledges, it would have investigated and charged Akoda with "providing false information to ECFMG on an application, among other things," as it did after discovering that Igberase's initial application in his own name was fraudulent.  ¶93.

**ECFMG nonetheless represents to Howard University's residency program, the State of Maryland, and Prince George's Hospital Center that "Akoda" has a valid ECFMG certificate.**

In October 2006, Akoda used ECFMG's Electronic Residency Application System (ERAS) to apply for residency at Howard University Medical Center. ¶64.  The application included three purported letters of reference.  *Id.*  Although not part of the ERAS process, Kelly undertook to verify the letters' authenticity, because he doubted Akoda's credibility. He never

received responses from the supposed authors. ¶69. Kelly never notified anyone outside the organization of his concerns, and ECFMG did not investigate the matter further. ¶¶67, 70, 71.

Later, ECFMG verified Akoda had a valid ECFMG certificate to the Maryland Board of Physicians and Prince George's Hospital Center (PGHC). In 2011, Akoda obtained privileges and became a member of the medical staff at PGHC. He began seeing patients there in 2011. Def.'x SUMF ¶¶76, 79, 87.

ECFMG never notified any residency program, hospital, or other entity of the concerning information it had obtained regarding Igberase/Akoda's character and fitness—and the conclusions it drew from that information—until law enforcement became involved. Def.'s SUMF ¶100.

**Igberase faces six felony charges and pleads guilty to one.**

ECFMG had not investigated the matter further since Akoda's residency application. In June 2016, officers executed search warrants at Igberase's residence, medical office and vehicle. They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation and birth certificates. ECFMG Ex. 15.

Igberase was charged with six felony counts. On November 15, 2016, Igberase signed a plea agreement admitting to felony misuse of a Social Security number to obtain a medical license.

In 2017, the United States District Court for the District of Maryland sentenced Igberase to six months incarceration, followed by probation. PGHC terminated his privileges and the Maryland Board of Physicians revoked "Akoda's" medical license. ECFMG Ex. 15, Def.'s SUMF ¶ 84.

7

## Damages to the Plaintiffs

As Plaintiffs allege, none of Akoda's patients knew his true identity as Igberase, but rather knew Igberase as Akoda. Akoda's penetrations of his patients were clear boundary violations. From 2011 through 2016, Igberase (using the Akoda identity) acted as a medical doctor practicing the specialty of obstetrics and gynecology on the Plaintiffs, and others similarly situated. During this time, he unlawfully practiced medicine and surgery and provided obstetric and gynecological services to the Plaintiffs, and others similarly situated, at Prince George's Hospital Center. None of Igberase's patients (the Plaintiffs and others similarly situated) knew his true identity or of his fraudulent background and conduct. Moreover, none of Igberase's patients were capable of giving consent for any of the medical services he provided.

On a continuing basis, Igberase touched and penetrated his patients, constituting battery, and committed ongoing boundary violations by performing inappropriate examinations of a sexual nature and utilizing inappropriate language. Igberase also recommended and performed— or failed to perform—tests, studies, procedures, or surgery that were required.

## **<u>PLAINTIFFS</u>**

**Monique Russell** is a 46 year old mother of one child, Luka, born May 25, 2016. ¶95. Igberase delivered Ms. Russell's baby by emergency C-section. ¶96. Ms. Russell learned of Igberase's guilty plea from a Department of Justice press release. ¶97. Ms. Russell read the federal sentencing transcript. ¶98. She has suffered from emotional distress as a result of learning about Igberase. ¶99. Ms. Russell feels Igberase violated her. ¶99. She has difficulty going to the gynecologist, distrusts the medical community, and distrusts institutions that credential doctors. ¶100. She also suffers from intimacy issues and anxiety, and feels like a victim of sexual assault because Igberase examined her vagina under false pretenses. ¶101.

JA3950

**Jasmine Riggins** is a 27 year old mother of three children, ages 10, 6 and 2. ¶102. She lives in northeast Washington, DC. She has a high school GED. ¶103. Ms. Riggins was a patient of Igberase between August 2012 and March 2013. ¶103. Igberase delivered her second child by C-section. ¶104. Messiah, her son, was born on March 18, 2013. Ms. Riggins was in the hospital for several days following delivery. ¶104. After the C-section, Ms. Riggins suffered severe abdominal pain and could not undergo a tubal ligation because of scarring. ¶105. As a result of what she learned about who she believed to be Akoda, she has suffered emotional distress. ¶106. After learning the truth about Igberase from a Facebook group, "Embracing Mommies," Ms. Riggins felt angry, sad, embarrassed, and ashamed about receiving treatment from Igberase. ¶106. Ms. Riggins was deeply affected by what Igberase did and felt outraged because his dishonesty enabled him to perform C-sections, examine women's genitals, touch and violate them. ¶106.

**Elsa Powell** is a 32 year old mother of five children. ¶107. Ms. Powell initially encountered Igberase, whom she knew as Charles Akoda, upon presentation to the medical office of Abdul Chaudry, M.D., in 2014. Ms. Powell had been referred to Dr. Chaudry for obstetric care, but was assigned to Igberase due to Dr. Chaudry's unavailability. ¶108. Igberase also delivered her child at Prince George's Hospital Center, and saw Ms. Powell post-delivery as well. ¶109. The delivery was complicated by significant bleeding requiring additional medical care. ¶109. Ms. Powell trusted that Igberase was a duly licensed and credentialed physician and suffered emotional harm upon learning that the man she trusted to touch the most intimate parts of her body and deliver her baby, had lied about his identity and background. ¶110.

**Desiree Evans** is a 40 year old mother of one child. ¶111. Ms. Evans first encountered Igberase, whom she knew as Charles Akoda, at Prince George's Hospital Center for the delivery

JA3951

of her child in March of 2016. During Ms. Evans's labor, Igberase manipulated her clitoris, telling her he needed to do so to stimulate her to push the baby. ¶112. Ms. Evans has suffered emotional distress upon learning that physician whom she trusted for medical care misrepresented his identity. ¶113. Ms. Evans is afraid to seek medical care for her and her child and has lost trust in the medical system. ¶113.

## LEGAL STANDARD

"Granting summary judgment is an extraordinary remedy." *Doe I v. Evanchick*, 355 F. Supp. 3d 197, 213 (E.D. Pa. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000).

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Only once that burden has been met, must the nonmoving party set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

10

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

## ARGUMENT

### I. The Plaintiffs May Recover Damages for their Emotional Distress

Pennsylvania law recognizes that negligent acts can result in compensable emotional distress. While Pennsylvania historically permitted recovery for emotional distress only where this distress was accompanied by "physical impact," Pennsylvania courts have expanded the grounds upon which plaintiffs can recover for emotional distress damages, even in the absence of physical impact, including when the plaintiff is in the zone of danger and at risk of an immediate physical injury; where the plaintiff had a contemporaneous perception of a tortious injury to a close relative; or where the defendant had a contractual or fiduciary duty toward the Plaintiff. *See Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970) (adopting the zone of danger as a basis for an NIED claim); *Sinn v. Burd*, 404 A.2d 672 (Pa. 1996) (recognizing a bystander's right to pursue an NIED claim for observance of injury to a close relative); *Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 89 (Pa. 2011)(persuasive opinion of an evenly divided court, recognizing that a plaintiff can bring an NIED claim based upon a plaintiff's special relationship with a defendant).

### 1. The Plaintiffs have sustained a physical impact under the standards for recover of emotional distress damages.

A "physical impact" occurs "where … a plaintiff sustains bodily injuries, *even though trivial* or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages." *Niederman v. Brodsky*, 261 A.2d 84, 86 (Pa. 1970), quoting *Potere v. Philadelphia*, 112 A. 2d 100, 104 (Pa. 1955) (emphasis original); *see also Brown v. Phila. College of Osteopathic Med.*, 674 A.2d 1130 (Pa. Super. 1996). Neither

11

JA3953

*Niederman* nor *Sinn* abrogated a plaintiff's right to recover for emotional distress suffered from a physical impact or injury. *Brown*, 674 A.2d at 1134; *Shumosky v. Lutheran Welfare Svcs. of Northeastern Pa.*, 784 A.2d 196 (Pa. Super. 2001).

If the slightest impact has occurred, "the plaintiff can recover for any damages which resulted from the accompanying fright." *Niederman*, 261 A.2d at 86; *see also Zelinsky v. Chimics*, 175 A.2d 351, 353 (Pa. Super. 1961) ("[I]f a plaintiff receives physical injury or physical impact to any degree, no matter how slight, he is entitled to recovery for fright or emotional distress."). The requirements of the impact rule have been met by mere touching that results in no physical injury. *See Brown*, 674 A.2d at 1134 (finding that the plaintiff was physically impacted after a miscarriage, when a nurse handed her the deceased fetus to hold); *Stoddard v. Davidson*, 513 A.2d 419 (Pa. Super. 1986) (finding that the jostling of an automobiles occupants while it drove over a corpse was a "physical impact"); *Korinko v. Come Ready Nutrition, LLC*, 2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) ("emotional distress caused by unwanted touching could plausibly fall under … the "impact rule.").

It is not necessary that the physical impact occur directly with the defendant, nor is it necessary that the impact occur simultaneously with the negligent act. In this regard, the *Stoddard* Court explained as follows:

> In *Potere*, . . . the city negligently maintained a water line which leaked into an underground tunnel dug by a contractor which caused subsidence and a cave-in of the road while plaintiff was driving a truck on it. One of plaintiff's claims was for negligent infliction of emotional distress. In *Potere* as here, the **impact was not directly with the defendant, nor did it occur simultaneously with the negligent act**. **However, as long as the plaintiff's suffering or mental fright is "directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages**."

*Stoddard*, 513 A.2d at 422 (citing *Potere v. City of Phila.*, 112 A.2d 100, 104 (Pa. 1955)) (emphasis added).

12

Each of the Plaintiffs were subjected to physical medical treatment, satisfying this rule. Each of the Plaintiffs testified that Igberase engaged in physical contact, without appropriate consent, satisfying the physical impact requirement. He delivered the children of each of the Plaintiffs and in some instances performed Caesarean sections as part of the delivery process ¶96; ¶ 104; ¶109; ¶ 112. In some instances, Igberase engaged in patently offensive physical contact. ¶112 ("[H]e was fingering my clitoris."). Because there is a physical component to the Plaintiffs' interaction with Igberase that led to their subsequent emotional harm, the physical injury standard for recovery for emotional distress has been met.

### 2. The reasoning which permits recovery for those in the "zone of danger" supports recovery for emotional distress damages here.

In *Niederman*, in adopting the zone of danger rule, the court held that permitting recovery for emotional distress in the absence of physical impact presented no insurmountable challenge to establishing medical causation and no appreciable risk of fictious or fraudulent claims. *Niederman v. Brodsky*, 261 A.2d 84, 90 (Pa. 1970). It also held that the fear of "an avalanche of claims" was neither justified, nor an appropriate basis to restrict access to justice for those who have suffered a substantial wrong. *Id.* The *Neiderman* court chose to "abandon the requirement of a physical impact as a precondition to recovery" in certain circumstances where the plaintiff was in personal danger of physical impact and actually feared the impact. *Id.* at 90.

Here, the Plaintiffs underwent life threatening and intensively private gynecologic and obstetric procedures by an imposter, operating under a fictious identity with fictitious and fraudulently obtained credentials. This conduct, which occurred as a direct and proximate result of ECFMG's failure to carry out its gatekeeping role with respect to IMGs, presented substantial risk of physical harm to the Plaintiffs, given the potential for serious medical complications. Upon realizing this conduct occurred, the Plaintiffs suffered severe emotional distress. The

13

Court in *Niederman* recognized that the conventional justifications for the physical impact rule were without basis, and adopted a more flexible standard for emotional distress damages, recognizing "the gravity of appellant's injury and the inherent humanitarianism of our judicial process and its responsiveness to the current needs of justice." *Niederman,* 261 A.2d 85. The Plaintiffs here are similarly entitled to relief.

### 3. Historical concerns limiting recovery for emotional distress do not apply here.

The Pennsylvania Supreme Court has evaluated historical restrictions on recovery of emotional distress damages and concluded that medical science has sufficiently developed such that under appropriate circumstances, a Plaintiff should have an opportunity to present his case to a jury even in the absence of a physical injury. *Niederman v. Brodsky,* 261 A.2d 84 (Pa. 1970). The Court has further recognized that conventional tort principals of foreseeability will provide the necessary limits on the scope of a defendants' liability. *Niederman v. Brodsky,* 261 A.2d 84 (Pa. 1970); *Sinn v. Burd*, 404 A.2d 672 (Pa. 1996).

Here, it was highly foreseeable to ECFMG that its negligence would result in emotional distress on the part of patients subjected to treatment from unqualified individuals, particularly those practicing as OBGYNs.  Part of ECFMG's mission in certifying foreign medical graduates to practice medicine in the United States is to promote public health and to protect the public. ¶¶6, 76.   ECFMG negligently failed to carry out its mission, subjecting patients to medical and obstetrical care from an unqualified OBGYN.  It is highly foreseeable that these circumstances would result in severe emotional distress. The relationship between an OBGYN and its patients is one which the Supreme Court has acknowledged is "very sensitive and emotionally charged" and has the potential to cause compensable emotional distress. *Toney*, 36 A.3d at 95.  Here, as a result of the Defendants' negligence, the Plaintiffs have experienced shock, nausea, nervous

14

sweating, anxiety, disgust, feelings of having been violated, and have developed distrust in the medical community. ¶99; ¶106; ¶110; ¶113. In some cases, the substantial and severe emotional distress suffered by the Plaintiffs has impacted their intimate relationships. ¶101; ¶113.

Additionally, medical causation for the Plaintiffs' damages is supported by expert testimony. Three of the Plaintiffs have been evaluated by Christine Tellefsen, M.D., a specialist in forensic psychiatry. Dr. Tellefsen has offered a report based on her evaluation of Plaintiffs Riggins, Powell, and Evans. Def.'s SUMF ¶58. In each case, Dr. Tellefsen has concluded that the Plaintiffs have suffered emotional distress as result of learning that the individual they trusted as their physician to perform obstetric and gynecologist procedures was in fact a fraud. *Id*. The Plaintiffs have met their burden of establishing medical causation with respect to these damages for purposes of summary judgment.

The circumstances of this case, wherein an individual without a medical diploma or lawful medical license, relied upon a false identity to perform gynecologic and obstetric procedures and examinations on the Plaintiffs, resulting in emotional distress of patients, meets the requirements of Pennsylvania law for the recovery of damages for emotional distress. The Plaintiffs' emotional distress is a predictable and foreseeable result of ECFMG's failure in adequately carrying out its gatekeeping role, particularly given the special and emotionally charged relationship between a patient and their OBGYN. *See Toney*, 36 A.3d at 95. The underlying conduct physically impacted the Plaintiffs, placed them in reasonable fear of potential medical complications, and placed their newborn children at similar risk of harm. The Plaintiffs' emotional distress is compensable under Pennsylvania law.

15

II.     **ECFMG Owed the Plaintiffs A Duty of Care;**

1. **ECFMG has undertaken a critical gatekeeping role in the United States Medical system for the protection of patients, and thereby owes a duty of care to patients.**

In determining the existence of a duty of care, the time-honored test formulated by Judge Cardozo is that "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Migyanko v. Thistlethwaite*, 419 A.2d 12, 14 (Pa. Super 1980), (citing *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 100 (N.Y. 1928)). "[O]nly when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff." *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 24, 755 (Pa. Super 2000).

Pennsylvania law recognizes that a Defendant owes a duty to a Plaintiff where the Defendant has undertaken to render services necessary for the protection of third persons under the circumstances set forth in the Restatement (Second) of Torts, § 324. *Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa 1984); *DiMarco v. Lynch Homes-Chester Cty., Inc.*, 583 A.2d 422 (1990). Additionally, when necessary to evaluate a previously unrecognized duty[1], Pennsylvania courts have held that the determination of whether a duty exists in a particular case involves the weighing of several discrete factors, which include (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Walters v. UPMC Presbyterian*

---

[1] As Pennsylvania already recognizes a duty under Restatement (Second) of Torts, § 324, it is not necessary for the Court to evaluate the *Althaus* factors. *See*, *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 222 (Pa. 2018); *Alderwoods (Pa.), Inc. v. Duquesne Light Co.*, 106 A.3d 27, 40-41 (2014) ("we find [the Althaus factors] to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario. Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application.")

16

*Shadyside*, 187 A.3d 214, 222 (Pa. 2018), citing *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa.

2000); *see also Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 2006 PA Super 305 (Pa.

Super 2006). ECFMG owes a duty to the Plaintiffs both under the Restatement § 324A and also

in consideration of the *Althaus* factors.

### 2. The Defendants owe the Plaintiffs a duty under the Restatement (Second) of Torts § 324A

ECFMG is liable to the Plaintiffs under the Restatement (Second) of Torts, § 324. This

provision provides:

> One who undertakes, gratuitously or for consideration, to render services to
> another which he should recognize as necessary for the protection of a third
> person or his things, is subject to liability to the third person for physical harm
> resulting from his failure to exercise reasonable care to protect his undertaking,
> if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon
> the undertaking.

#### a) ECMFG undertook to render to services necessary for the protection of third persons – the Plaintiffs.

ECFMG's stated mission is to promote quality health care for the public by certifying

international medical graduates for entry into U.S. graduate medical education. Def.'s SUMF ¶2.

If their certification process promotes quality healthcare, it is axiomatic that attempts to thwart

the legitimacy of their certification would put patients at risk. ECFMG undertook to provide

primary source verification, along with testing of basic competence, for the benefit of residency

programs, hospitals, and medical boards, who relied upon ECFMG's services in granting IMGs

licensure and privileges. These services are necessary for the protection of that IMG's future

patients, including the Plaintiffs.

17

**b) ECMFG's conduct meets each of the three criteria of liability under § 324A.**

In this circumstance, ECFMG's negligence in granting Igberase certification under the Akoda identity in 1996, despite numerous irregularities, not only increased, but was the inciting cause for the risk of harm to the Plaintiffs. In the absence of ECFMG certification, or had ECFMG revoked Igberase's certification when still more irregularities were noted in 2000, Igberase would not have been able to practice medicine whatsoever. ECFMG's negligence increased the risk of harm to the Plaintiffs as under subsection (a) of § 324A.

ECFMG is liable to the Plaintiffs under subsections (b) and (c) of § 324 as well. ECFMG certification is a condition precedent for IMGs to practice medicine in the United States. Other entities, like residency programs, medical boards, and future employers, rely on the service provided by ECFMG in credentialing and licensing IMGs. ¶¶ 75, 114. ECFMG has therefore undertaken to perform a duty which hospitals and other medical employers otherwise owe to their patients under subsection (b) of § 324 – the duty to provide appropriate credentialing of medical providers. *See, e.g. Welsh v. Bulger*, 698 A.2d 581, 585 (Pa 1997) (recognizing a hospital's duty to patients to select and retain competent physicians). Additionally, as set forth within subsection (c) § 324, the emotional distress the Plaintiffs have suffered occurred because subsequent medical entities – residency programs, medical boards and employers – relied on ECFMG's undertaking. *See, e.g. Doe v. Bradley*, 58 A.3d 429, 461 (Del. Super. Ct. 2012) (finding that the Plaintiffs, minors sexually abused by a pediatrician, plead a viable claim under § 324A as to the Delaware Medical Society, a voluntary association of physicians, where that entity was made aware of a complaint regarding the physician's conduct, performed an initial investigation, but took no further act to further report the physician to the Delaware Board of Medical Practice). Thus ECFMG possesses a duty under each of the three potential criteria of Restatement § 324A. ECMFG has undertaken to provide a credentialing service, for a fee, to

promote quality and safe healthcare, with full knowledge that medical entities like residencies and hospitals rely upon their services and determinations. It must be held liable for its failure to exercise due care.

### c) The Plaintiffs have suffered physical harm as defined under the Restatement

The Defendants incorrectly assert that the Plaintiffs have not suffered physical harm. Under the Restatement, the words "physical harm" "denote the physical impairment of the human body, or of land or chattels." Restatement (Second) of Torts § 7. A comment to § 7 explains that where the harm is impairment of the body, it is called "bodily harm," which in turn, is defined in Restatement (Second) of Torts § 15, as any physical impairment of the condition of another's body, or physical pain or illness. A comment to section 15 explains further that "[t]here is an impairment of the physical condition of another's body if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm." *Id*. at cmt. A.

In this action, each of the Plaintiffs has undergone extensive medical care, without appropriate consent. This conduct represents physical and bodily harm under the Restatement. In fact, Illustration 1 to section 15 provides the example where a physician provides unconsented medical care as bodily harm:

> A has a wart on his neck. His physician, B, advises him to submit to an operation for its removal. A refuses to do so. Later A consents to another operation, and for that purpose is anesthetized. B removes the wart. The removal in no way affects A's health, and is in fact beneficial. A has suffered bodily harm.

Restatement (Second) of Torts, § 15. Here, Igberase performed medical procedures on each of the Plaintiffs that qualify as alteration of the body. Igberase delivered the children of each of the named Plaintiffs. ¶96; ¶ 104; 109; 112. He performed a Cesarean section on Ms. Russell, Ms. Riggins, and Ms. Evans. ¶96; ¶104; ¶112 In some instances, the unauthorized physical contact

JA3961

went beyond performing C-sections and/or delivering children and included sexualized conduct. ¶112. Some of this unconsented medical treatment involved permanent medical injury. For example, Ms. Riggins testified that she is unable to receive a tubal ligation as a result of the C-section performed by Igberase. ¶105. Igberase's medical treatment of the Plaintiffs satisfies the physical harm standard of the Restatement (Second) of Torts § 324A.

### d) ECFMG's contention that they should be immune on the basis of an alleged instruction from law enforcement after Igberase had begun practicing medicine is hearsay and irrelevant.

ECFMG next contends that there was a window of time in which ECFMG was "told not to take action." First, this is hearsay, and not supported by any evidence beyond the representations of ECFMG personnel. The only evidence offered in support of this fact is an email sent by ECFMG Assistant Vice President for Operations, Kara Corrado, to an employee of the National Board of Medical Examiners, stating that they did not move forward with their irregular behavior process "[a]t Maryland's request." ECFMG Exhibit 51. This is inadmissible hearsay within hearsay, as a statement made by Kara Corrado, describing a statement allegedly made by an unidentified individual within the United States Attorneys Office, to prove the truth of the matter asserted – that ECFMG was precluded from taking action on the "Akoda" certification during the investigation by law enforcement. Fed. R. Evid. 801; 802; 805. This e-mail and any testimony from Ms. Corrado do not meet any hearsay exception. Fed. R. Evid. 803; 804. It can neither be admitted at trial nor support a motion for summary judgment. Second, to the extent this is accurate and admissible, it is reasonably foreseeable that forbearing from contacting hospitals and patients to warn them about Igberase would prolong the period within which the Plaintiffs would be exposed to Igberase. ECFMG is liable for the foreseeable consequences of its negligence. Further, ECFMG had more than sufficient opportunity to further

investigate Igberade's fraud and revoke the Akoda certification over many years prior to the US Attorney's office beginning its investigation.

> **e) Pennsylvania case law interpreting Restatement § 324A supports the imposition of liability in this case.**

Defendant's citation to *Cantwell v. Allegheny Cty.*, 483 A.2d 1350 (1984) is misplaced. In *Cantwell*, the Plaintiff had been arrested and charged with multiple rapes, after a rape victim identified him as the perpetrator. *Cantwell v. Allegheny Cty.*, 506 Pa. at n.7. As part of discovery in his criminal matter, the Plaintiff requested certain testing from the crime lab performing laboratory testing for the police, which he believed would exculpate him. The crime lab either refused to test the samples, on the basis that the tests would be unreliable, or performed the tests incorrectly. Later, the crime lab tested and retested certain samples, and on the basis of the results, the district attorney's office concluded that the Plaintiff could not have been the rapist in three of the eight rapes. The Plaintiff brought suit against the crime lab for mistaken incarceration, alleging that the crime lab should have known that its services were necessary for the protection of criminal defendants, and that they negligently failed to perform testing in the manner the Plaintiff deemed necessary.

The court found that "the Crime Lab does not exist or render its services for the protection of suspects or potential suspects; rather, its purpose is to assist the police and the Commonwealth in collecting and analyzing evidence which may be relevant in presenting a case to a jury." *Cantwell*, 483 A.2d 1354. The court further reasoned that the discretion of the Commonwealth in conducting criminal prosecutions precluded the crime lab from being able to foresee how their decisions may have impacted outcomes for criminal defendants. In particular, the court noted that even if the testing had been performed as requested, the Plaintiff may still have been charged on the basis of other evidence, including eyewitness evidence.

21

Here, ECFMG renders its service for the protection of patients, consistent with its self-described mission to promote the quality of healthcare.  Additionally, while evidence from the crime lab was just one piece of the puzzle, ECFMG plays a unique and ultimately determinative role with respect to their role in the certification of IMGs.  Subsequent entities like residency programs and hospitals rely on their determination that, for example, an IMG attended medical school, and lack any effective ability to consider other evidence regarding this conclusion.

The circumstances of this case are more analogous to *DiMarco v. Lynch Homes-Chester Cty., Inc*., 583 A.2d 422 (1990), wherein the Pennsylvania Supreme Court found that a physician was liable to a third party under the Restatement (Second) of Torts § 324A, for having given a patient incorrect information regarding the risks of spreading a communicable disease.  In that case, the Court noted that "physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others." The Court further noted that advising patients on precautions to prevent the spread of disease were "taken not to protect the health of the patient, whose well-being has already been compromised, rather such precautions are taken to safeguard the health of others." *DiMarco v. Lynch Homes-Chester Cty., Inc*., 583 A.2d 422 (1990). "Thus, the duty of a physician in such circumstances extends to those 'within the foreseeable orbit of risk of harm.'" *Id*. (quoting *Doyle v. South Pittsburgh Water Co*., 199 A.2d 875 (1964)).  Here, ECFMG is not only the first line of defense against fraudulent conduct of the type undertaken by Igberase—as the only entity which provides primary source verification of foreign medical graduates—but also a line of defense on which state medical boards, hospitals, and other healthcare institutions rely in their own efforts to safeguard patients. ECMFG possesses libraries of information not available to subsequent medical entities, and those subsequent medical entities rely upon that

determination, without the resources to engage in their own assessment of the available evidence. ECFMG Ex. 3. Instead, ECFMG provides a conclusion to subsequent medical entities, with the knowledge and expectation that it will be relied upon, without further discretion, by residency programs and hospitals. ¶75.

### 3. The Defendants Owe the Plaintiffs a Duty under the *Althaus* factors.

In *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214 (Pa. 2018), the Supreme Court applied the *Althaus* factors to consider whether a defendant hospital owed a duty to third parties who had been infected with hepatitis by the Defendant's former employee. The Defendant hospital had been made aware that the employee, a radiology technician, diverted drugs by using a fentanyl syringe intended for a patient, and later refilled that syringe with saline. The defendant discharged the employee, allegedly reported this conduct to the state Attorney General, but did not report the conduct to US Drug Enforcement Agency. *Id.* at 242. The radiology technician went on to employment with other health care providers, where he continued his conduct and caused patients to be infected with hepatitis. *Id.* at 219. In evaluating whether the medical center owed a duty to future patients of other health care providers, the Pennsylvania Supreme Court applied each of the *Althaus* factors, concluding that the medical center did owe future patients a duty to report this conduct to the DEA. *Id.* at 240. The existence of ECFMG's duty is even more obvious here, where ECFMG has undertaken a unique gatekeeping role in certifying foreign medical graduates in the interest of public health, with the understanding that residency programs and future potential employers will rely upon that certification.

#### a) Relationship of the Parties

A defendant need not have a direct relationship with the plaintiff to impose a duty. *See*, *Walters* 187 A.3d 214 (imposing a duty on a hospital as to patients of a separate medical

23

JA3965

facility); *Emerich v. Phila. Ctr. For Human Dev., Inv.,* 720 A.2d 1032, 1044 (Pa. 1998) (holding that a mental health counselor had a duty to protect a woman from her ex-boyfriend who threatened to harm her during a counseling session); *DiMarco v. Lynch Homes-Chester Cty., Inc.*, 583 A.2d 422 (1990) (physician liable to third parties for harm resulting negligent medical advice to patient).

As set forth above, ECFMG owes a duty to patients pursuant to Restatement § 324A, on the basis of ECFMG's undertaking to provide services that others rely upon for the protection of patients. "ECFMG—like professional membership organizations and accreditation associations—is a 'quasi-public' private organization because it 'exercises significant authority in areas of public concern.'" *Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F. Supp. 3d 531, 543 (E.D. Pa. 2019). ECFMG's existence is premised on its unique role in verifying the credentials of foreign medical graduates and ensuring a basic level of competence to practice medicine on patients in the United States through the administration of the USMLE. ¶76. No other entity provides this service for IMGs, and each subsequent step of an IMG's journey to become a physician relies upon ECFMG's certification. ¶¶ 5, 75. ECFMG's own staff acknowledges the role they play in ensuring quality medical care in the US. ¶¶ 6, 76. The Pennsylvania Superior Court acknowledged the duty that entities like ECMFG play with respect to patient safety.

In this particular instance, ECFMG had numerous opportunities to restrict Igberase's ability to practice medicine under the Akoda identity, beginning immediately with Akoda's application, which contained numerous irregularities, and continuing as ECFMG was later advised of yet further and substantial irregularities and evidence of fraud. Under these circumstances, particularly in the context of ECFMG's prior knowledge of Igberase's

24

misconduct, ECFMG possessed a special relationship both as to Igberase, whose conduct they had a unique ability to restrict and control, and his ultimate patients, who would be harmed by this misconduct.

### b) Social Utility of the Actor's Conduct

The second *Althaus* factor has been interpreted to consider the social utility of asserted negligent conduct, if any, the social utility of imposing a duty, or the social utility of the defendant's conduct generally.  *See Walters*, 187 A.3d at 235; *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1009 (2003).  In this case, despite conducting an interview of Igberase, learning that "Akoda" had, at a minimum, used a fraudulent social security number in his application, and reaching the belief that "Akoda" was in fact Igberase, ECFMG elected not to bring this matter to the ECFMG Credentials Committee for review.  There is no social utility in this behavior. The underlying facts of this case show that ECFMG disregarded information from credible sources, that if acknowledged, would have prevented Igberase from practicing medicine.  **¶¶ 42, 72.** ECFMG claims it has no role in whether an IMG is accepted to a residency program, and yet the primary materials submitted for acceptance into a residency is their graduate record (which is this case ECMFG negligently failed to detect as fraudulent), and their ECMFG examination record, which demonstrates medical competence.  Id.  The Defendant contends that there is little social utility in imposing a duty on ECFMG to carry out its functions in a manner consistent with the standards of care.  Instead, ECFMG suggests that subsequent medical entities, like hospitals or residencies, should second guess their determination and should have disregarded ECFMG's decision to maintain a certification under the "Akoda" identity.

ECFMG may not now disclaim its role in the certification of IMGs, where so many entities have relied on their services as the sole accreditation association for IMGs.  In the absence of certification, Igberase would not have been eligible for residency, and subsequent

JA3967

medical entities, including Howard University and Prince George's Hospital Center, would not have relied upon ECFMG's gatekeeping services in allowing him to engage in the practice of medicine.  ¶ 114.   This factor clearly favors imposition of a duty to ECFMG. ¶ 5.

### c)   Nature of the risk imposed and foreseeability of the harm incurred.

Just as in *Walters*, [i]t would be difficult to overstate the risk to public health that this case presents." *Walters*, 187 A.3d at 236. Igberase forged multiple medical school transcripts, repeatedly failed basic assessments of competence administered by ECFMG under a variety of identities, used ECFMG to pass forged letters of recommendation to residency programs, and then obtained a medical license under a fictious name.  He then provided intensively personal and risky obstetric and gynecologic operations and assessments on unsuspecting patients under this assumed name.  The risk to patients associated with this conduct is clear and expansive given the number of years during which Igberase was permitted to practice medicine.

In *Walters*, in considering this factor, the court concluded that it was reasonably foreseeable on the part of his employers that (1) if the radiologist repeated this conduct, he could go on to create a serious risk of transmission of infectious disease to future patients; and (2) that given the nature of addiction, this technician would likely to engage in this conduct again. *Walters*, 187 A.3d at 236.  The Court concluded that "taking no action beyond terminating [the technician] from the hospital created a foreseeable risk that [the technician] would continue to work in the field and repeat the same dangerous behaviors. *Id* at 237.

Here, it is plainly foreseeable to ECFMG that failing to take action on Igberase's fraud would subject obstetric and gynecologic patients to treatment from an individual without appropriate education, and without any lawful credentials or licensure to do so. This is particularly true as ECFMG's relevance in the United States medical system depends on residency programs and hospitals to be able to rely upon ECFMG's determination.

26

This case is clearly distinguishable from *Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020), cited by the Defendant.  In *Fragale*, the plaintiff was the victim of a fraudulent scheme perpetrated by a third party, in which the plaintiff was induced to wire money to a Wells Fargo bank account under false pretenses. The wired funds were immediately withdrawn by the third party, preventing recovery of those funds.  The plaintiff alleged that Wells Fargo owed the plaintiff a duty of care, and should have recognized the potential for fraud, given that they were "generally on notice that such schemes exist." *Fragale*, 480 F. Supp. 3d 664.  The Court noted, "Plaintiff does not allege any facts to suggest that when Wells Fargo actually opened the [third party's] Account, it should have been on notice that this particular account was being opened for criminal or fraudulent purposes."  *Fragale*, 480 F. Supp. 3d, 664. Here, very unlike *Fragale*, ECFMG had notice that Igberase had engaged in fraud in the past, believed that Igberase and "Akoda" were the same person, and certainly knew that he would likely go on to treat patients under this fraudulent identity.   More than just reasonably foreseeable, ECFMG knew precisely what Igberase intended to do and did nothing to prevent it. Instead, ECFMG's, gave him the continued opportunity and ability to do so.

Pennsylvania courts have found far less predictable outcomes foreseeable, for purposes of establishing a duty.  In *Anderson v. Bushong Pontiac Co*., 171 A.2d 771 (Pa. 1961), examined by the *Fragale* Court, the Court held that a car dealership had a duty to a pedestrian, where that pedestrian had been struck by a vehicle stolen from the dealership.  In *Anderson*, the defendant car dealership was aware that teenagers had frequently trespassed on the lot and had discovered that the keys to one of the cars had been stolen.  The dealership left the lot unattended, during which time a teenager stole the vehicle, drove it in a reckless manner, and injured the pedestrian. *Id*. at 772.  The court concluded that it was reasonably foreseeable that a teenager might steal the

27

car and that the plaintiff, as a pedestrian, was within the class of persons endangered by the

defendant's negligence. *Anderson,* 171 A.2d, 775. The foreseeability of harm is far more

obvious here, where ECFMG was on notice that "Akoda" was a fictious identity held by

Igberase, created for the purpose of rendering medical treatment to patients.

### d) The consequences of imposing a duty upon the actor

Even where imposing a duty upon a defendant could come at potentially great cost

(which is not the case here), "the potential for tremendous harm to innocent patients cannot be

gainsaid." *Walters*, 187 A.3d at 238. In *Walters*, the Court observed that it needed to determine

who should bear the cost of harm: the defendant with the opportunity and/or obligation to take

steps to prevent the harm, or the victims and society at large. *Walters*, 187 A.3d at 238-39.

In *Walters*, the Court acknowledged the breadth of potential liability which could result

from imposing a duty upon a medical center to report the conduct of radiology technician, but

ultimately found that the social utility of imposing this duty outweighed the costs. *Walters*, 187

A.3d at 240. The court imposed this duty despite the fact that the facility's reporting obligations

were tangential to the business of the defendant – providing medical care. Here, imposition of a

duty simply requires the Defendant to do what it exists to do – verify the applications of IMG,

assess them for potential fraud, and revoke their certifications when necessary. The Defendant

characterizes the duty the Plaintiffs seek to impose as one to "disclose suspicions about Dr.

Akoda[2] to third parties" or to "become a guarantor of each IMG's trustworthiness." These are

not the duties at issue here. Instead, ECMFG had a duty to investigate and ultimately revoke the

certification granted to "Akoda," having been provided notice and soon thereafter confirmation

---

[2] The Defendants continue to refer to Igberase as "Dr. Akoda," despite ECFMG's
acknowledgement that Akoda never existed, there is no evidence to suggest that Igberase
possessed a valid medical degree, and that any credential obtained under the Akoda identity was
premised on countless substantive misrepresentations and fraud.

that this certification was granted on the basis of fraud. ¶¶ 42-72..   This duty is limited and consistent with the primary role and mission of ECFMG. Imposing a duty on ECFMG to perform this function in a manner consistent with the standards of care imposes no further cost or burden.

### e)  The overall public interest in the proposed solution

The public interest clearly weighs in favor of imposing a duty to require ECFMG to revoke certifications found to have been obtained through fraud. Such a duty is necessary to protect future patients from inadequately trained individuals and those engaged in acts of repeated fraud.  This duty is limited and narrow, and is necessary where, as here, ECFMG is in a unique position to identify fraud, and where ECFMG's determination regarding an IMG's training and background will be relied upon by subsequent medical entities.  ECFMG cannot disclaim responsibility when their failures result in harm to patients.  Sound public policy favors ECFMG taking all reasonable steps to prevent improperly certified IMGs from treating patients.

### 4.  ECFMG is liable to Plaintiffs under Maryland law

ECFMG asserts that there are two conflicts of law between Maryland and Pennsylvania, and that Maryland law should apply.  As briefed in connection with the Plaintiffs' Motion for Class Certification, and consistent with this Court's Order Granting Certification, Pennsylvania law applies to this dispute. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL 1330669 (E.D. Pa. Mar. 23, 2020).   Further, regardless of whether Maryland or Pennsylvania law applies, ECFMG is liable to the Plaintiffs for emotional distress.

Pennsylvania has a strong interest in regulating the conduct of its domiciliary corporations by applying its substantive tort law, and other jurisdictions have no interest in applying their own law if, as the Defendants claim, doing so would limit their citizen's right to recover for the benefit of a foreign corporation. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187–88 (3d Cir. 1991). As this Court has already concluded, Pennsylvania law should apply with

29

respect to all the claims in this case. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL 1330669 (E.D. Pa. Mar. 23, 2020).

Even assuming *arguendo* that Maryland law applies, however, ECFMG is liable to the Plaintiffs for their emotional distress. As this Court has already recognized, although Maryland does not recognize negligent infliction of emotional distress as a distinct claim, Maryland permits recovery for emotional distress arising out of negligence, and the same result would ensue under Maryland or Pennsylvania law. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL 1330669 (E.D. Pa. Mar. 23, 2020) (citing *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986)). Damages for emotional distress are available in Maryland where there has been a physical impact, such as damages arising out of the provision of medical care, as here, or in the absence of a physical impact, where a Plaintiff has suffered an injury that is "capable of objective determination." *See, e.g., Vance v. Vance*, 408 A.2d 728, 733–34 (Md. 1979) (upholding damages for spouse's distress in discovering her marriage was void); *Faya v. Almaraz*, 620 A.2d 327, 337-39 (Md. 1993) (holding that patients of a surgeon who did not disclose he had AIDS, but who did not themselves become infected with HIV, could nonetheless recover for their mental and emotional distress they experienced between the time they learned of the physician's HIV-positive status and the time they learned they were not infected); *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 537-38 (1998) (holding that a plaintiff mistakenly misdiagnosed with cancer may recover emotional distress damages).

Defendant next cites to an alleged difference in the legal standards for the imposition of duty as between Maryland and Pennsylvania, comparing the list of factors set forth in *Althaus*, with those in *Pendleton v. State,* 921 A.2d 196, 205 (Md. 2007) *(quoting Ashburn v. Anne Arundel Cty.,* 510 A.2d 1078, 1083 (Md. 1986)). This too is a false conflict. First, both

Maryland and Pennsylvania recognize a duty under Restatement § 324A, and therefore a duty exists in this matter under both Maryland and Pennsylvania law. *E.G. Rock, Inc. v. Danly*, 633 A.2d 485, 491 (Md App. 1993) (recognizing that the terms of Restatement 324A are part of Maryland law).  Further, as to *Althaus* and *Pendleton*, Defendant does not identify any substantive distinctions in the two sets of analysis, as there are none which would impact the outcome of this matter.  Both analyses consider questions of public policy, foreseeability and the costs of imposing a duty.  *See* Section II, *supra*.  For the reasons set forth above, imposition of a duty is appropriate under either Pennsylvania or Maryland law.

## III.    ECFMG Was a Proximate Cause of Plaintiffs' Emotional Distress

To establish causation, a plaintiff must "demonstrate that the breach was both the proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993).  Proximate cause is defined as "a wrongful act which was a substantial factor in bringing about the plaintiff's harm." *Dudley v. USX Corp.*, 606 A.2d 916, 923 (Pa. Super. 1992) (citations omitted). The question of whether Defendant's negligence was a proximate cause of the injury is ordinarily one to be decided by the fact finder.  *Quinby v. Plumsteadville Fam. Prac. Inc.*, 589 Pa. 183, 907 A.2d 1061, 1077 (Pa. 2006).  If a jury may reasonably differ on whether the defendant's conduct was a substantial factor in causing the injury, generally, the case must go to the jury on those issues. *Straw v. Fair*, , 187 A.3d 966, 994 (Pa. Super. 2018) (citing *Vattimo v. Lower Bucks Hosp., Inc*., , 465 A.2d 1231, 1233-1234 (Pa. 1983)).

Pennsylvania courts have identified several considerations which are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

31

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281, 1287 (Pa Super 2005), (citing *Willard v. Interpool, Ltd.,* 758 A.2d 684, 688 (Pa. Super. 2000)).

ECFMG asserts that there is "undisputed negligence of intervening third parties," which preclude ECFMG from being a legal cause of the injuries, without identifying those acts of negligence or intervening third parties. There is no evidence before this Court that any other entity was negligent in bringing about the harm in this case. Plaintiffs' experts have testified that ECFMG was negligent. ¶114. Defendant's expert does not assert that any other entity was negligent in failing to prevent Igberase from treating patients. ECFMG Ex. 6. To the contrary, subsequent entities relied upon ECFMG's decision to certify and retain the "Akoda" certification, which ECFMG retained despite possessing clear evidence that it was obtained via fraud. Residencies, state licensure boards, and credentialling committees rely on ECFMG to provide primary source verification of foreign medical graduates. ¶ 114. That Igberase was able to proceed through a residency, state licensure and obtain privileges represents an unbroken chain that began when ECFMG ignored evidence from Jersey Shore Medical Center that Igberase was a fraud.

ECFMG actively maintained Igberase's credentials for many years, and participated in submitting his application materials to Howard. ¶ 64. In fact, ECFMG staff identified further concerns regarding the "Akoda" identity at the time of the residency application, but continued to take no action to revoke or restrict his certification ¶¶ 69-71. ECFMG's negligence continued, on an active basis, to the time of his residency application and beyond.

In *Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133 (Pa Super 2006), cited by the Defendant, the plaintiff, a bank, alleged that the defendant, also a bank, had reason to know that an individual was operating a check-kiting scheme, but failed to report the behavior or shut down the perpetrator's account. The plaintiff incurred monetary losses and alleged that they based their decision to open an account for the perpetrator in part based on the fact that they possessed an account at the defendant bank, without further background checks. The court concluded that the defendant owed no duty to the plaintiff, in part, because the two entities had no relationship. The court further noted that even assuming there was such a duty, it would affirm the trial court's grant of summary judgment with respect to proximate cause. The court concluded that the defendant's conduct was only "one minor factor" in the entire chain of events. Unlike the defendant bank, which had no relationship with the plaintiff bank, and undertook to provide no service to them or anyone else, ECFMG holds itself out to residency programs, hospitals and licensing organizations as providing the service of verifying the credentials of foreign medical graduates. There services are unique, and all IMG's must utilize ECMFG's services before applying to these programs. Unlike the defendant in *Commerce Bank,* which maintained no role and undertook to perform no duty to their peer institutions, ECFMG knew that subsequent entities would rely on ECFMG's decision to maintain Igberase's certification as Akoda. That Igberase would go on to practice medicine as Akoda, and cause the harm alleged, is an outcome that "reasonable people would consider fair, natural, and probable." *Commerce Bank*, 911 A.2d at 142 (Pa Super 2006).

## IV.    ECFMG's Breach Was a But-For Cause of Plaintiffs' Emotional Distress

Cause in fact, or "but for" causation, requires proof that the alleged injury would not have occurred but for the negligent conduct of the defendant. *Galullo v. Fed. Express Corp.,* 937 F. Supp. 392, 395 (E.D. Pa. 1996) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366 (3d

Cir. 1990)).  The "but for" standard is a *de minimis* standard of causation, under which even the most remote and insignificant force may be considered the cause of an occurrence.  *Takach v. B. M. Root Co*., 420 A.2d 1084, 1086 (Pa Super 1980).

Defendant's assessment of "but for" causation confuses concepts of proximate cause with "but for" causation, and argues factual issues not appropriate for resolution by summary judgment, including whether ECFMG was negligent, and what was required under the applicable standards of care.  Defendant continues to mischaracterize Igberase's acts, ECFMG's role, and the basis for the Plaintiff's emotional distress.  Among virtually endless acts of fraud, there is no evidence that Igberase ever attended medical school, and the medical transcripts submitted to ECFMG, which ECFMG "verified," were fraudulent.  He was admitted to a residency program only a result of ECFMG's decision to allow Igberase to continue to perpetrate his fraud.

It is undisputed that in the absence of ECFMG certification, Igberase would never have practiced medicine in the United States.  ¶ 87.  It is further undisputed that when ECFMG last investigated Igeberase, they concluded that he had engaged in fraud, and revoked his ECFMG certification.  ECFMG Ex. 24.  Thus, it cannot seriously be disputed that had ECFMG conducted a reasonable investigation, the ECFMG certification in the name of "Akoda" would have been revoked.  Further, the Plaintiffs have designated multiple experts who will opine that the standards of care required that ECFMG revoke Igberase's certification.  ¶114.  Under these circumstances, Igberase would never have performed obstetric and gynecologic procedures on the Plaintiffs, and all harm would have been avoided.  The Plaintiffs have established "but for" causation.

## V.     The Plaintiffs Did Not Consent to Treatment by Igeberase.

The Defendant next suggests that Igberase's misrepresentations were not substantial enough to vitiate the Plaintiffs consent, and that the Plaintiffs should therefore be precluded from recovery under Restatement (Second) of Torts, § 892B.  This is bereft of plausibility.

Restatement (Second) of Torts § 892B(2) states:

> If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.

The medical care these Plaintiffs received was provided by an individual using a fake name, who had no valid medical school diploma, had been admitted to a residency program with false letters of recommendation.  Dr. Akoda did not exist.  Igberase, who is an actual person, had no medical license, was not board certified, and was not employed by any hospital.  Igberase, not "Akoda," performed gynecologic examinations of the Plaintiffs which constituted unconsented touching, purportedly for the purpose of medical treatment, and complex medical surgeries, including the delivery of their children.  ECFMG's arguments imply that these Plaintiffs are entitled to no autonomy in their decision making regarding which physician they trust to provide their medical care.  This is plainly not the case.

Defendant cites numerous cases which it represents demonstrates that "[c]ourts have uniformly held that misrepresentations like Dr. Akoda's—including those concerning the experience or credentials of a licensed physician—do not vitiate consent." ECFMG Brief at  35.  This is inaccurate and is not supported by the cases cited by Defendant. ECFMG cites *Taylor v. Johnson*, 985 P.2d 460 (Alaska 1999), in which the court explicitly noted "that a battery claim may lie if a person falsely claiming to be a physician touches a patient, even for the purpose of providing medical assistance." *Taylor*, 985 P.2d at 465.  The Court found no battery under those

JA3977

particular facts because the Defendant "had a medical degree, was certified by the American Board of Physical Medicine and Rehabilitation, and was licensed to practice in Alaska." *Id*. None of those facts are true here, as Igberase lacked a medical degree and possessed no certification or licensure in his name.

The *Taylor* case goes on to cite *Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997), a more analogous case to this one, in which a Plaintiff brought a claim for battery against a provider of dental care, on the basis that the provider was not licensed by the Connecticut Department of Health. . Concluding that the Plaintiff possessed a cause of action for battery, the Court held that "plaintiff's consent … should … be negated because the defendant allegedly misrepresented himself as a licensed dentist to the plaintiff in order to obtain the plaintiff's consent to perform dental work on him. *Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997). The same applies here.

Defendant's other cited cases do not support its argument. In *Duttry v. Patterson*, 771 A.2d 1255 (2001), the Court found that a physician's misrepresentation regarding the number of times he performed a surgery (approximately nine total times, rather than once per month, as represented) could not form the basis of a claim for lack of informed consent, as this particular tort theory was limited to lack of information concerning the risks of a particular procedure. *Id*. The Court acknowledged the availability of other potential forms of tort recovery. *Id*.

The Defendant's other citations are similarly distinguishable. *See, e.g.*, *Prince v. Esposito*, 628 S.E.2d 601 (Ga. App. 2006) (failure of chiropractor to disclose allegation of sexual battery by other patient years earlier was not failure of informed consent); *Rice v. Brakel*, 310 P.3d 16 (Ariz. Ct. App. 2013) (physician's dependency on unprescribed prescription drugs did not form the basis of informed consent claims); *Albany Urology Clinic, P.C. v. Cleveland,* 528

36

JA3978

S.E.2d 777 (Ga. 2000) (physician was not required to disclose cocaine use to patient for informed consent). None of these cases bear any similarity to this matter, where the Plaintiffs received gynecologic and obstetric case from a man, Igberase, who lacked any medical license or valid medical degree. Moreover, each of these matters involve allegations of informed consent, which the Plaintiffs have not pled.

## VI. The Plaintiffs' Severe Emotional Distress is Compensable

The Defendant next claims that the Plaintiffs must experience physical manifestations of their emotional distress for this injury to be compensable. This Court has interpreted the requirement for "proof of physical manifestation in emotional distress cases as a substitute for proof of injury caused by a physical impact." *DeJesus v. United States VA*, 2005 WL 2175174 (E.D. Pa. Sep. 6, 2005); citing *Niederman*, 261 A.2d at 85; *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1561 (7th Cir. 1991). Therefore, it is not necessary that the Plaintiffs establish both a physical manifestation of emotional distress as well as a physical impact. As set forth above, the Plaintiffs have pled and established through deposition testimony and medical records proof of physical impact, by virtue of the medical procedures undertaken by Igberase. Thus, the Plaintiffs may recover for their emotional distress in the absence in a physical manifestation of that distress.

This is consistent with *Armstrong v. Paoli Mem'l Hosp.,* 633 A.2d 605 (Pa. Super 1993), cited by the Defendants. As the Court explained in *Armstrong*, the requirement that "physical harm" must accompany emotional distress to state a cause of action is based on the Restatement (Second) of Torts § 436A. *Armstrong,* 633 A.2d at 609. Section 436A states:

> If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance.

37

JA3979

Restatement (Second) of Torts, § 436A.

As set forth in Section II (2) above, the requirement of "bodily harm" is met "if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm." Restatement (Second) of Torts, § 15 comment a. As described above, the obstetric and gynecologic procedures performed by Igberase on the Plaintiffs satisfies the requirement of "bodily harm." Thus, the limitation of liability set forth in § 436A does not apply to the Plaintiffs, as their emotional distress is associated with bodily injury.

Even assuming, however, that there is a requirement for physical manifestations of emotional distress, the Plaintiffs have met this burden. Pennsylvania Courts have held that "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm" sufficiently stated physical manifestations of emotional suffering to sustain a cause of action. *Love v. Cramer*, 606 A.2d 1175 (Pa. Super 1992) As the Court noted in *Armstrong*, cases from other jurisdictions cite "depression, nightmares, nervousness, insomnia and hysteria as physical symptoms warranting recovery." *Armstrong*, 633 A.2d 609.

Each of the Plaintiffs have suffered from conditions which meet the criteria for physical manifestations. ¶¶99 - 101; ¶106; ¶110; and ¶113 Additionally, Christine Tellefsen, M.D., a forensic psychiatrist, examined each of the Plaintiffs. Based upon her examinations and a review of the facts in this case, Dr. Tellefsen has diagnosed two of the Plaintiffs, Ms. Powell and Ms. Evans, with the need for future treatment as a result of their experiences with Igberase. ECFMG SUMF ¶58.

38

### VII. The Claims of Plaintiffs Powell and Evans are not Barred by the Statute of Limitations

Limitations periods are computed from the time the cause of action accrued. 42 Pa. Cons. Stat. Ann. § 5502(a). Under Pennsylvania law, a cause of action accrues at "the time when the plaintiff could have first maintained the action to a successful conclusion*." Kapil v. Association of Pa. State College and Univ. Facilities*, 470 A.2d 482, 485 (Pa. 1983).

The discovery rule is an exception that tolls the statute of limitations when an injury or its cause is not reasonably knowable. *Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.*), 223 A.3d 633, 640 (Pa. 2019)  The discovery rule will toll the applicable statute until a plaintiff could reasonably discover the cause of his action, including in circumstances where the connection between the injury and the conduct of another are not readily apparent. *Id*. (citing *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009).  Although objective, the objective reasonable diligence standard is "sufficiently flexible ... to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question," and, as such, "is to be applied with reference to individual characteristics." *Saksek*, 223 A.3d at 640.  Pennsylvania courts have expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis. *Saksek*, 223 A.3d at 640-41 (citing *Wilson*, 964 A.2d at 365).

Each of the Plaintiffs, including Ms. Evans and Ms. Powell, have filed suit against ECFMG for damages related to the emotional distress that has resulted from their discovery that the individual they knew as "Dr. Akoda" was in fact, Oluwafemi Igberase, who possessed no medical degree, and no medical license.  These damages accrued, at the earliest, when they became aware of criminal proceedings against Igberase.  ¶108; ¶112.  In the case of Ms. Evans

39

and Ms. Powell, this realization compounded certain concerns that they held at the time of their treatment. In the case of Ms. Evans, she possessed concerns about his conduct, but trusted that her physician was behaving consistent with the standards of care. ¶112. As contemplated by *Saksek* 223 A.3d at 640-41, as a layperson, Ms. Evans trusted the individual she believed to be her physician. Moreover, this incident certainly did not provide her constructive knowledge of Igberase's fraud – the basis for the cause of action asserted here.

Ms. Powell also expressed certain concerns about her treatment from the man she knew as Dr. Akoda, but she does not seek medical malpractice damages associated with the potentially delayed treatment of her post-partum bleeding, or any flirtatious conduct. Instead, as with the other plaintiffs, she seeks separate damages – emotional distress damages incurred as a result of learning that "Dr. Akoda" was a fictious persona of Oluwafemi Igberase. ¶110. To find that the causes of action of Ms. Powell of Evans accrued for these separate damages at a time before hospitals, medical boards, and the Howard residency program knew of Igberase's conduct is clearly inappropriate.

## **CONCLUSION**

For these reasons, the Court should deny summary judgment.

Dated: January 14, 2022                    Respectfully submitted,

JANET, JANET & SUGGS, LLC          CONRAD O'BRIEN PC

*/s/ Patrick Thronson*                      */s/ Robin S. Weiss*
Patrick A. Thronson                      Nicholas M. Centrella (Pa. ID 67666)
Brenda A. Harkavy                       Robin S. Weiss (Pa. ID 312071)
4 Reservoir Circle, Suite 200            1500 Market Street, Suite 3900
Baltimore, MD 21208                    Philadelphia, PA 19102-2100
(410) 653-3200                          (215) 864-9600

40

JA3982

LAW OFFICES OF PETER G. ANGELOS, P.C.

  Paul M. Vettori
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000

Z LAW, LLC

  Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977

SCHOCHOR, FEDERICO AND STATON

  Brent Ceryes
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

THE COCHRAN FIRM

  Karen E. Evans
David E. Haynes
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Plaintiffs, on behalf of
themselves and all others similarly situated*

JA3983

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629<br>Honorable Joshua D. Wolson |
| **Plaintiffs,** | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| **Defendant.** | |

## [PROPOSED] ORDER

**AND NOW**, this ___ day of _____ 2022, upon consideration of Defendant, Educational Commission for Foreign Medical Graduates' Motion for Summary Judgment and Plaintiffs, Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans' Response in Opposition thereto, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

BY THE COURT:

_____

Wolson, J.

JA3984

# Exhibit 1

JA3985

CERTIFIED COPY

Dr. David Markenson

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 18-5629

MONIQUE RUSSELL, JASMINE          :
RIGGINS, ELSA M. POWELL,          :
and DESIRE EVANS,                 :
                                  :
            Plaintiffs,           :
                                  :
        vs.                       :
                                  :
EDUCATIONAL COMMISSION FOR        :
FOREIGN MEDICAL GRADUATES,        :
                                  :
            Defendant.            :


            Deposition of DR. DAVID

MARKENSON taken in the above-entitled matter

before Suzanne J. Stotz, a Certified Realtime

Reporter, Registered Professional Reporter, and

Notary Public of the State of Colorado, taken

at the WESTIN DENVER AIRPORT, 8300 Pena

Boulevard, Denver, Colorado 80249, on

October 22, 2019, commencing at 10:14 a.m.

```
 1    I'm going to talk about a couple of them just
 2    to make sure I understand.
 3              So the third failing down, if you
 4    will -- I don't have a better way to refer to
 5    it -- says -- oh, no, you know what, we talked
 6    about that one already.
 7              Keep on going down to the one that
 8    talks about the diploma from the University of
 9    Ibadan.  It says, "Failing to reasonably
10    investigate Akoda's diploma from the University
11    of Ibadan."
12              Do you see that?
13    A.        Yes.
14    Q.        That looks like the fifth one down.
15    A.        Correct.
16    Q.        Which diploma are you talking about
17    because I don't believe I've seen a diploma
18    from the University of Ibadan with Akoda's name
19    on it?
20    A.        Let's see.  Can I go back to the --
21    Q.        Sure.  You can look at the exhibits
22    we were looking at.
23    A.        Thank you so much.  Yeah.
24              I am wondering whether that is --
```

Dr. David Markenson

```
 1        Q.       And on page 4, there is a, sort of
 2   the second full paragraph down, if you will --
 3   it's just one line.  It says, "ECFMG breached
 4   the standard of care in, among others, the
 5   following ways."
 6               Do you see that?
 7        A.       Yes, I do.
 8        Q.       And then there's a number of
 9   entries, all starting with the word "failing"
10   on the rest of page 4 and at the top of page 5.
11               Do you see that?
12        A.       Yes, I do.
13        Q.       And are those each an opinion that
14   you're offering in this case?
15        A.       Yes, that is.
16        Q.       Okay.  And we talked about the
17   standard of care a few minutes ago.
18               Were you referring to the same
19   standard of care here that you have been
20   previously in your report?
21        A.       Yes.
22        Q.       Okay.  I'm not going to go through
23   every single one because some of them
24   conceptually we've talked about already, but
```

Dr. David Markenson

```
 1    but you don't have a license, yes, you cannot

 2    practice medicine.

 3              Before you ask another question, is

 4    this an okay time to break?

 5        Q.    Sure.  Absolutely.

 6        A.    I saw you reading up.  I just

 7    wanted to make sure.

 8        Q.    Go ahead.

 9        A.    Thank you.

10              MS. McENROE:  Let's take a break.

11              (Discussion held off the record.)

12              THE VIDEOGRAPHER:  The time is

13        2:10 p.m., and we are going off the

14        record.

15              (Whereupon, a short break was

16        taken.)

17              THE VIDEOGRAPHER:  The time is

18        2:20 p.m., and we are back on the record.

19    BY MS. McENROE:

20        Q.    We were just looking at your expert

21    report at Exhibit 4 before we went off the

22    record.

23              Do you recall that, Dr. Markenson?

24        A.    Yes.
```

Dr. David Markenson

```
 1   program is binary, off and on or, you know, one
 2   year of supervised practice, however you had
 3   described it is binary off and on, you either
 4   have that or you don't, that's another place
 5   along the line, right?  That would either
 6   on/off shut off the practicing medicine in the
 7   United States?
 8        A.     It depends on what the requirements
 9   were.
10        Q.     And further stepping down the line,
11   eventually getting to the point of getting a
12   medical license is also off and on that in any
13   given jurisdiction, if you don't have a medical
14   license, you should not be lawfully be
15   practicing medicine, correct?
16        A.     Yes.  Without a medical license,
17   you can't practice medicine.
18        Q.     So that's another off/on switch,
19   correct?
20        A.     A medical license is an off/on,
21   yes.
22        Q.     Even if you have a ECFMG
23   certificate?
24        A.     If you have an ECFMG certificate
```

JA3990

Dr. David Markenson

```
 1         obtain licensure or enter a residency had
 2         ECFMG done the due diligence, picked up
 3         the red flags and not certified him or
 4         revoked the certification.
 5  BY MS. McENROE:
 6         Q.      So does your opinion basically boil
 7  down to an on/off switch, that if ECFMG had
 8  said he couldn't get a certificate, therefore,
 9  he wouldn't have been able to practice
10  medicine; is that what you're saying?
11         A.      Well, as part of application for
12  residency and licensure, there are certain
13  things that are binary, yes or no; and in the
14  absence of them, you don't proceed to any other
15  steps.
16              ECFMG certification is a credential
17  that's binary.  You don't have it, you can't
18  get into residency.  Absent ECFMG
19  certification, you can't be licensed.  It is a
20  binary, that all the other things downstream
21  don't occur towards licensure if that binary
22  doesn't occur.
23         Q.      So if we were to take a step
24  forward and say graduation from a residency
```

JA3991

Dr. David Markenson

1    links throughout a career that could have

2    stopped a progression of events.

3         Q.    So I'm just struggling with the

4    idea that this is like the ultimate Monday

5    morning quarterbacking, right?  You're saying

6    this person ended up being a sexual predator.

7    So looking back in history, we could pick up

8    bread crumbs where someone could have, said,

9    you don't graduate from middle school; you

10   don't graduate from high school; you don't

11   graduate from college.

12              So I'm just trying to understand --

13              MS. McENROE:  Let me finish my

14        question.

15              MR. VETTORI:  I am.

16   BY MS. McENROE:

17        Q.    I'm just trying to understand how

18   it is you pick where in that line you assume

19   and assign all of the fault, as you have with

20   ECFMG in this case?

21              MR. VETTORI:  Objection as to form.

22              THE WITNESS:  Where I've assigned

23        fault is the area I was asked to opine on,

24        which is he would not have been able to

Dr. David Markenson

1    Q.    **Sexual predators.**

2         MR. VETTORI:  Is that a technical

3    term?

4         MS. McENROE:  I changed it to

5    sexual predators.

6    BY MS. McENROE:

7    Q.    **Okay.  Is that fair?**

8    A.    There are, yes.  Unfortunately,

9    yes.

10   Q.    **And do you deem that to be a**

11   **failure of the medical school community or, you**

12   **know, or is that that practitioner's fault that**

13   **they went on to be somebody who breaks the law?**

14   A.    It is the practitioner's fault, but

15   there is well documented studies that show that

16   there are usually red flags throughout their

17   career if people intervene, that patient would

18   have never been harmed.

19   Q.    **Usually, like, while they're**

20   **actually practicing medicine.**

21   A.    No.  There's throughout their

22   entire career.  There's well documented studies

23   that show whether it's medical school

24   residency, application processes, there are

Dr. David Markenson

```
 1       A.      No.  But if in order to practice
 2  tax, they needed ECFMG certification to be
 3  licensed, then they would have never been
 4  allowed to practice tax.
 5            So I don't -- I don't hold them
 6  accountable to law enforcement; but anything
 7  that an individual was allowed to do based on
 8  their certification, they do have culpability
 9  in that case.
10       Q.      So you think if a practitioner, a
11  physician, goes on to be a creep, a sexual
12  predator, is that somehow ECFMG'S fault if
13  ECFMG had certified that that person had, in
14  fact, graduated from medical school and passed
15  exams?
16       A.      Well, what they did was their
17  action at that point; but one has to
18  acknowledge that if ECFMG did not allow them
19  to -- did not certify them, allowing them to
20  obtain a license, they would not be a physician
21  at that point.
22       Q.      Right.  But there are U.S. graduate
23  physicians who go on to become creeps, right?
24       A.      There are.
```

Dr. David Markenson

1  A.  No. But if in order to practice

2 tax, they needed ECFMG certification to be

3 licensed, then they would have never been

4 allowed to practice tax.

5    So I don't -- I don't hold them

6 accountable to law enforcement; but anything

7 that an individual was allowed to do based on

8 their certification, they do have culpability

9 in that case.

10  **Q. So you think if a practitioner, a**

11 **physician, goes on to be a creep, a sexual**

12 **predator, is that somehow ECFMG'S fault if**

13 **ECFMG had certified that that person had, in**

14 **fact, graduated from medical school and passed**

15 **exams?**

16  A.  Well, what they did was their

17 action at that point; but one has to

18 acknowledge that if ECFMG did not allow them

19 to -- did not certify them, allowing them to

20 obtain a license, they would not be a physician

21 at that point.

22  **Q. Right. But there are U.S. graduate**

23 **physicians who go on to become creeps, right?**

24  A.  There are.

JA3995

```
 1        A.      Again, since I wasn't provided them
 2   and all I have is the draft, I can't say that.
 3        Q.      So you don't know what the policies
 4   and procedures are as we sit here today?
 5        A.      I just know the standard.  I don't
 6   know what their -- I've asked for policies and
 7   procedures, and we haven't been provided any.
 8        Q.      You say "we."  You mean you haven't
 9   been provided any, correct?
10        A.      Uh-huh, correct.
11        Q.      Is it your opinion that ECFMG has a
12   duty or an obligation to make sure that
13   individuals it certifies never break the law?
14        A.      Again, I personally believe -- this
15   is from my expertise and knowledge -- that
16   ECFMG'S role is not as a law enforcement agency
17   but a certification body.
18        Q.      Okay.  And so I just want to make
19   sure I understand.
20                So if ECFMG certifies someone and
21   they go on to commit tax fraud later on in
22   their career, would you then look back and hold
23   ECFMG accountable that they should have figured
24   that out?
```

Dr. David Markenson

```
 1        Q.      So is your participation with the

 2   clear evaluation process, are you sitting on a

 3   committee of ACGME?

 4        A.      Committee, yes.

 5        Q.      Is that a volunteer position?

 6        A.      Yes, it is.

 7        Q.      And when did you begin that?

 8        A.      I believe about a year and a half

 9   ago.

10        Q.      Any other current involvement in

11   residency programs?

12        A.      Not direct, no.

13        Q.      Not directly, but anything else

14   indirectly?

15        A.      I still have academic appointments

16   at Columbia University in New York -- sorry,

17   Colorado university and New York Medical

18   College.  So I could be asked to give a lecture

19   from time to time within Colorado or in

20   New York to residents.

21        Q.      Do residents typically get

22   lectures?

23        A.      Yes.

24        Q.      So just so that I understand, would
```

Dr. David Markenson

1      Q.      Do you still have any role or
2    responsibilities for any residency programs?
3      A.      Not directly anymore.
4      Q.      When you say "not directly," do you
5    indirectly?
6      A.      I serve on a national committee
7    with the ACGME.
8      Q.      What role do you serve with ACGME?
9      A.      They have a committee that oversees
10   what's known as their clear clinical learning
11   environment review program, and I serve on that
12   committee.
13     Q.      What does the clear committee do?
14     A.      It helps them set the standards for
15   the Clear Evaluation program.
16     Q.      What is the Clear Evaluation
17   program?
18     A.      It evaluates hospitals' learning
19   environments for residencies.
20     Q.      Is that there accreditation
21   program?
22     A.      It is separate from the
23   accreditation.
24     Q.      Is it a higher level than

JA3998

Dr. David Markenson

1    schools, typically the Dean writes a letter for

2    every graduate, which summarizes their medical

3    school experience and provides evaluation of

4    the student.

5         Q.      And for U.S. medical school

6    graduates, you said that as an initial

7    screening for eligibility, there would be

8    verification of medical school graduation; is

9    that correct?

10        A.      Correct.

11        Q.      How would that usually be

12   accomplished in your experience?

13        A.      Through the ERAS process.

14        Q.      What do you mean by that?

15        A.      The programs themselves don't do

16   it.  It's done in the ERAS system.  So that's

17   the program that the residents apply through,

18   and that program does the verification of the

19   medical school.

20        Q.      For lack of a better term, is it

21   like a portal you can log into and check or

22   how --

23        A.      It's a portal you can log into and

24   check.

JA3999

Dr. David Markenson

1      Q.      In your experience in hiring

2    residents or residency programs, what, if

3    anything, was done with the letters of

4    reference that were submitted?

5      A.      Letters of reference are submitted

6    through ERAS and then become part of an

7    electronic file that the program director can

8    review.

9      Q.      Do you know if anything else was

10    done typically other than just review them?

11      A.      Typically they're just read by the

12    residency director.  Sometimes they would also

13    be read by an interviewer prior to an

14    interview.

15      Q.      Do you know if there was anything

16    done typically to validate that the letters of

17    recommend were legitimate?

18      A.      I know that -- I've never -- I've

19    never seen a residency program do it, and I do

20    not believe that ERAS's normal procedures --

21    sorry -- are to verify them.

22      Q.      You mentioned a Dean's

23    recommendation.  What is that?

24      A.      So for graduates of U.S. medical

JA4000

Dr. David Markenson

1        A.        Typically, yes.

2        Q.        When you say "typically," do you

3    know of any circumstances when they don't

4    withhold taxes?

5        A.        I believe it's different -- sorry.

6    Hospitals employ them or the university

7    sometimes does.  Withholding is done as would

8    be per whatever the employment standards are

9    for taxes and other fees.

10        Q.        Which would require, in addition to

11    other potential information, a social security

12    number?

13        A.        That is correct.

14        Q.        Do you know what the source of the

15    social security number is for residents coming

16    into residency programs?  So I can say that

17    another way.  Strike that.  Let me restate

18    that.

19                Do you know from where the

20    residency programs get the social security

21    number for the applicants coming to them?

22        A.        Again, I'm not involved in the HR

23    department, but my understanding is it comes

24    from the applicant.

Dr. David Markenson

Page 43

```
 1    applications that you recall, you know, sitting
 2    here today?
 3         A.      Usually not, no.
 4         Q.      Is there usually an application
 5    form, like, they actually fill out like a job
 6    application?
 7         A.      They don't anymore.  It's all done
 8    through the electronic system called ERAS.
 9         Q.      Okay.  Previously, do you know
10    whether there had been applications to
11    residency programs in, say, the 2011 time
12    frame?
13         A.      There would have not been.  They
14    would have all been ERAS.
15         Q.      Even then?
16         A.      Yes.
17         Q.      In your experience, do residents
18    get paid?
19         A.      Yes, they do.
20         Q.      Do they get paid through any
21    sources of funding in particular?
22         A.      The hospital pays them.
23         Q.      Does the hospital typically
24    withhold taxes?
```

JA4002

Dr. David Markenson

1          What else, in your experience, is

2     involved in the offering of a residency

3     position to a resident?

4          A.     The initial screening is done to

5     make sure that the person is eligible for

6     residency.  So presence of medical school

7     graduation, confirmation, or ECFMG

8     certification.

9               So it's sort of that's the first

10    step.  If they don't graduate medical school or

11    they don't have an ECFMG certification, the

12    process would stop.

13         Q.     Okay.

14         A.     Following that process, one that

15    has letters of reference, Dean's

16    recommendation, board scores; and there's

17    usually a cutoff to determine of those who then

18    obtain an interview.

19         Q.     When you say "of those," you mean

20    cutoff of the board scores?

21         A.     Board scores, letters of reference,

22    recommendations.

23         Q.     Any other information collected or

24    reviewed in connection with residency program

# Exhibit 2



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

## Russell, Monique Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

JA4005

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                       -  -  -
 4   MONIQUE RUSSELL, JASMINE :   Case No.
     RIGGINS, ELSA M. POWELL   :
 5   AND DESIRE EVANS,         :   2:18-cv-05629-JW
                               :
 6            Plaintiffs,      :
                               :
 7            vs.              :   Hon. Joshua D. Wolson
                               :
 8   EDUCATIONAL COMMISSION    :
     FOR FOREIGN MEDICAL       :
 9   GRADUATES,                :
                               :
10            Defendant.       :
11                       -  -  -
12               September 10, 2019
13                       -  -  -
14          Oral deposition of KARA CORRADO, taken
15     at the offices of MORGAN LEWIS BOCKUS, LLP,
16   1701 Market Street, Philadelphia, Pennsylvania
17          beginning at 10:48 a.m., before
18   Jennifer L. McDonald, a Professional Reporter
19   and a Notary Public in and for the Commonwealth
20                of Pennsylvania.
21                       -  -  -
22     VERITEXT NATIONAL COURT REPORTING COMPANY
                MID-ATLANTIC REGION
23          1801 Market Street - Suite 1800
          Philadelphia, Pennsylvania 19103
24
```

KARA CORRADO

Page 6

1   as a representative of ECFMG?

2          A.        Yes, that's correct.

3          Q.        You're providing testimony today

4   in the capacity of a representative of ECFMG?

5          A.        Yes.

6          Q.        So for clarity sake, I will try

7   to refer, ask questions as refer to ECFMG, but

8   if I happen to say "U" or something like that,

9   if you could just interpret that as referring

10  to ECFMG I'd appreciate that?

11         A.        Yes.

12         Q.        Do you work at ECFMG?

13         A.        Yes.

14         Q.        Can you tell us what ECFMG

15  stands for?

16         A.        Educational Commission for

17  Foreign Medical Graduates.

18         Q.        What is your position there?

19         A.        I'm the Vice President for

20  Operations.

21         Q.        Is it fair to say you're an

22  officer of ECFMG?

23                   MS. McENROE:  Objection to form.

24                   You can answer, if you know.

JA4007

KARA CORRADO

Page 41

```
 1   residency programs?
 2                    MS. McENROE:  Objection to form.
 3                    THE WITNESS:  So ECFMG has a
 4        certification program that is required
 5        for entrance into ACGME accredited
 6        residency programs.
 7   BY MR. THRONSON:
 8        Q.        Any other ways in which ECFMG
 9   severs medical residency programs?
10                    MS. McENROE:  Objection to form.
11                    THE WITNESS:  So we also have an
12        exchange visitor sponsorship program.  We
13        are responsible for physicians who are
14        seeking residency and training in the
15        United States on a J-1 nonimmigrancy
16        step.
17   BY MR. THRONSON:
18        Q.        Beyond the ways in which you
19   serve medical residency programs that you
20   described, how else does ECFMG serve hospitals?
21                    MS. McENROE:  Objection to form.
22                    THE WITNESS:  I don't know that
23        I would say that we serve hospitals,
24        however, we do provide a service for
```

JA4008

KARA CORRADO

Page 47

1    worldwide.

2                    So I don't know when the ACGME

3    determined that in order to accept

4    international graduates they would have this

5    requirement of certification; but I think it's

6    important for them from a credentialing

7    perspective to make sure to know what the

8    status of the person is entering their program.

9         Q.       Part of ECFMG's mission is to

10   promote public health, correct?

11        A.       Part of ECFMG's mission is to

12   promote public health and to protect the

13   public, yes.

14        Q.       Is part of ECFMG's mission also

15   to promote patient safety?

16                    MS. McENROE:  Objection to form.

17                    THE WITNESS:  ECFMG's mission is

18        broader in terms of what we state about

19        the improvement of the world's health

20        essentially.

21   BY MR. THRONSON:

22        Q.       Why is primary-source

23   verification of an applicant's identity and

24   credentials important?

KARA CORRADO

Page 53

1          Q.          Sure.   Do you believe patients
2    have the right to be treated by physicians who
3    did not obtain ECFMG certification through
4    misrepresentations?
5                          MS. McENROE:   Objection to form.
6    BY MR. THRONSON:
7          Q.          That is who obtained ECFMG
8    certification by providing accurate
9    information?
10                         MS. McENROE:   Objection to form.
11                         THE WITNESS:   So you're asking,
12        if they have the right not to be; is that
13        what you said?   I'm sorry.
14   BY MR. THRONSON:
15         Q.          No, it's okay.   It's my fault.
16   Do you believe that patients have the right to
17   not be treated by physicians who have obtained
18   ECFMG certification based on false pretenses?
19                         MS. McENROE:   Objection to form.
20                         THE WITNESS:   Yes.
21   BY MR. THRONSON:
22         Q.          Do you believe in providing the
23   services that we've been discussing to
24   hospitals and residency programs that ECFMG is

KARA CORRADO

Page 60

1    on our website and that is given to

2    individuals.

3                 The document that I'm referring

4    to that says "draft" is the procedures that

5    staff had been doing probably -- was probably

6    drafted around 2015 time frame, was put to

7    paper in 2015.

8         Q.       Did any procedure exist before

9    that time that applied to how the organization

10   should conduct irregular behavior

11   investigations and when the staff should refer

12   matters to the creds committee?

13        A.       Yes, those procedures that were

14   documented in 2015 were the procedures that

15   staff had been using at least since I started

16   working directly on cases of irregular

17   behavior, which is 2008 onward, and my

18   understanding would be prior to that as well.

19   I just wasn't working on those cases then.

20        Q.       So is it fair to say that up

21   until 2015, those procedures were a custom of

22   the organization in terms of how to conduct

23   investigations and when to refer matters to the

24   committee and then they were written down in

JA4011

KARA CORRADO

Page 80

1          Q.          Do you know the names of any of

2     those databases?

3          A.          I don't know if we have a name

4     for the database or if there's multiple

5     databases.  We have a variety of software

6     programs that we use, and this is saying to

7     make sure we check in each of our lines of

8     service to see if the applicant exists in those

9     lines of service.

10          Q.          As a general matter, if a charge

11     letter is sent to an applicant should the

12     matter be referred to the credentials committee

13     for review?

14                    MS. McENROE:  Objection to form.

15                    THE WITNESS:  That is our

16          current process.

17     BY MR. THRONSON:

18          Q.          How long has that been a

19     process?

20          A.          That has been the process at

21     least since I've been working with the

22     credentials committee which is since 2008, and

23     I believe prior to that probably somewhere

24     around the late 90s early 2000s.

KARA CORRADO

Page 88

1     graduation date on the diploma.

2  BY MR. THRONSON:

3       Q.       How did you obtain source

4  verification from the school?

5       A.       For those diplomas?

6       Q.       For those diplomas.

7       A.       We followed our processes at the

8  time for source verification which was to send

9  a copy of the diploma to the medical school

10  directly with a form for the school official to

11  complete, it's a safety paper form, and a

12  prepaid envelope, -- I'm sorry, it's not a

13  prepaid envelope, but an envelope addressed to

14  ECFMG to be returned to us.

15       Q.       At this time, did you also

16  request, we're talking about between 1992 to

17  2000, did you also request verification of

18  whether an individual was registered as a

19  medical practitioner or licensed to practice

20  medicine in his or her home country?

21       A.       The credentialing requirements

22  for certification at that time included source

23  verification of the diploma only, and the

24  individual was required to also submit a copy

KARA CORRADO

Page 89

1    of their certificate of their full registration

2    or license, but those were not source-verified.

3         Q.       Why not?

4         A.       I don't know why they were not,

5    but the decision prior to me had been source

6    verification of diploma with a submission of

7    the license, which is not a requirement now.

8         Q.       Why did it cease becoming a

9    requirement?

10        A.       We introduced a clinical skills

11   assessment examination in 1998, and at that

12   time the organization determined it did not

13   need the license or certificate of registration

14   from an international medical graduate when it

15   introduced a clinic skill assessment which is

16   an in-person exam simulated with patients.

17        Q.       It has never been a requirement

18   for international medical graduates applying

19   for ECFMG certification to provide government

20   issued photoed identification, correct?

21        A.       It is a requirement to submit

22   photo identification currently, but it was not

23   in the past.

24        Q.       When did it become a

KARA CORRADO

1      Q.        When ECFMG received a request

2    like this, would it look anything up in the

3    system about the applicant before granting the

4    request?

5      A.        ECFMG would process these in the

6    system, the information you would be looking up

7    would be related to the certification status;

8    keying in the ID number and pulling up the

9    correct record.

10      Q.        Is part of that process -- was

11    it the procedure of ECFMG to verify that the

12    applicant's name was consistent between the

13    request for permanent revalidation and the name

14    that was on file for the applicant?

15      A.        That was not part of the process

16    that I'm aware of.

17      Q.        Was it the process of ECFMG to

18    verify that the date of birth given on the

19    request for permanent revalidation was

20    consistent with the date of birth on file with

21    ECFMG for the applicant?

22      A.        Not that I'm aware of.

23      Q.        Was there -- did ECFMG have any

24    requirements for its staff as to verifying

KARA CORRADO

Page 161

1    have been an admin support for the board or for

2    the committee as well, but I'm not sure what

3    her specific role was.

4         Q.        Did ECFMG do anything to

5    determine whether the passport and

6    international driving certified that Akoda

7    provided to ECFMG in 2000 were genuine or

8    authentic?

9         A.        Other than their appearance of

10   being genuine or authentic, no.

11        Q.        What would it have done to

12   investigate -- what did it do to investigate

13   the appear -- when you say appearance were

14   there particular things that ECFMG assessed

15   from the document?

16        A.        My assumption would be that if

17   Dr. Akoda came in with a photocopy of a

18   passport and tried to pass it as an original

19   that would have triggered a question about it.

20             So I don't know that we were

21   looking at any specific details on the

22   passport, but if somebody hands you a passport

23   it looked and felt to Mr. Kelly to be an actual

24   passport and driver's license.

KARA CORRADO

```
 1    to page two of that.   This is an application
 2    that Akoda submitted to ECFMG?
 3           A.       Yes.
 4           Q.       What's the place of birth listed
 5    there?
 6           A.       Benin City, Nigeria.
 7           Q.       Those are different cities?
 8           A.       Yes, that's my understanding.
 9           Q.       If you turn to Exhibit 15, it's
10    an application that Igberase submitted to
11    ECFMG?
12           A.       Yes.
13           Q.       Dated, I guess, he signed it
14    10/18/2000 on the last page?
15           A.       Yes.
16           Q.       Turn to the third page of the
17    application Bates 3467?
18           A.       Yes.
19           Q.       I'm sorry.  The first page of it
20    3465.  What's the place of birth that Igberase
21    listed on his application?
22           A.       Lagos, Nigeria.
23           Q.       Obviously this is an exercise
24    that Mr. Kelly could have done at the time?
```

KARA CORRADO

Page 200

```
 1          word inappropriate, but it wasn't part of
 2          our process to go further or to see if
 3          some -- I don't know what other
 4          organization we could have gone to at the
 5          time to see if the two people were the
 6          same; if that's what you are asking.
 7     BY MR. THRONSON:
 8          Q.        Could you have consulted with
 9     someone from the Nigeria Consulate to determine
10     if the passport was authentic from their
11     perspective?
12                    MS. McENROE:  Objection to form.
13                    THE WITNESS:  I suppose we could
14          have, but that wasn't part of our process
15          at the time.
16     BY MR. THRONSON:
17          Q.        Could you have called any of the
18     references that Akoda gave to determine whether
19     the letters of recommendation were authentic?
20                    MS. McENROE:  Objection to form.
21                    THE WITNESS:  We could have, and
22          we may have.  I just don't have any
23          documentation in the file that we made
24          the phone calls.
```

KARA CORRADO

Page 204

1       Q.       Did you ever reach out to the
2   alleged cousin after Akoda came into the
3   office?
4       A.       You mean Igberase?
5       Q.       Yeah, and describe the
6   situation, say we have this allegation, Akoda
7   showed up, he says you're his cousin, and used
8   his social security number, is that true?
9       A.       I don't believe that we did
10  that.
11      Q.       Why not?
12      A.       I don't know.
13      Q.       So essentially if I understand
14  it, ECFMG's reason for believing that it
15  compared the two files of Akoda and Igberase at
16  the time in 2000, is that that was the standard
17  practice?
18      A.       In investigations like that,
19  yes.
20      Q.       But there is no direct evidence
21  that you are aware of that that was, in fact,
22  performed?
23              MS. McENROE:  Objection to form.
24              THE WITNESS:  Correct.

KARA CORRADO

1    Q.        Igberase and Akoda both needed

2  ECFMG certification in order to be able to --

3  strike that.  The individual identifying

4  himself as Igberase and Akoda needed ECFMG

5  certification to be able to practice medicine

6  in the United States, correct?

7                    MS. McENROE:  Objection to form.

8                    THE WITNESS:  I would say he

9          needed a license to practice medicine,

10         but as an international medical graduate,

11         part of the requirements for him to get

12         into a training program, which would be a

13         requirement for licensure and to take

14         Step 3, was that he have a valid ECFMG

15         certificate.

16 BY MR. THRONSON:

17     Q.        So an ECFMG certificate was a

18 necessary condition for him to be able to

19 practice medicine in --

20                    MS. McENROE:  Objection to form.

21                    THE WITNESS:  Generally

22         speaking, unless the state board made an

23         exception for him.  The state boards, the

24         regulatory authorities, have autonomy and

JA4020

KARA CORRADO

Page 233

```
1        Q.        Are you aware of any other

2    routes, beside through ECFMG certification, by

3    which Akoda could have obtained a license to

4    practice medicine in Maryland?

5        A.        Other than the exception process

6    by the licensing board, that I sort of just

7    described, no.

8        Q.        Do you know if Maryland has that

9    exception process?

10       A.        I do not know.

11       Q.        Have you ever spoken with Akoda?

12       A.        No, I don't believe so.

13       Q.        If ECFMG had believed that the

14   letters of recommendation it received in

15   connection with Akoda's eras*** application,

16   residency application, were not authentic,

17   would ECFMG have had an obligation to inform

18   the residency programs to which he was a part

19   of?

20                 MS. McENROE:  Objection to form.

21                 THE WITNESS:  I wouldn't say

22          that we would have an obligation, but if

23          we determine that letters of

24          recommendation were fraudulent, we would
```

KARA CORRADO

Page 234

1          report it to the residency programs.  It

2          would be reported to residency programs

3          in general through our official

4          notification process.

5    BY MR. THRONSON:

6          Q.        Is the public entitled to have

7    confidence that ECFMG is acting in a reasonably

8    prudent fashion in assessing and verifying the

9    credentials and qualifications of international

10   medical graduates?

11             MS. McENROE:  Objection to form;

12          calls for legal conclusion.

13             THE WITNESS:  I wouldn't say

14          that they're entitled.  I would say that

15          they may have an expectation that ECFMG

16          or any organization is following its

17          procedures appropriately et cetera.

18   BY MR. THRONSON:

19         Q.        Should they have that

20   confidence?

21             MR. McENROE:  Objection to form.

22             THE WITNESS:  I mean, yes, I

23          think they could have that expectation.

24   BY MR. THRONSON:

JA4022

Page 247

1        A.        That is the Federation of State
2    Medical Boards.
3        Q.        Is that an entity under ECFMG's
4    control?
5        A.        No.
6        Q.        That's a separate entity?
7        A.        Yes.
8        Q.        Thank you.
9                  I have no further questions of
10    this witness.
11                  MR. THRONSON:  Just a few follow
12        ups to echo a few of Counsel's questions.
13                        - - -
14                  REDIRECT EXAMINATION
15                        - - -
16    BY MR. THRONSON:
17        Q.        Is it ECFMG's expectation that
18    state medical boards will rely on reports of
19    ECFMG certification status for any purpose?
20        A.        Yes.  To meet the requirement
21    that the board might have for ECFMG
22    certification.
23        Q.        Is it ECFMG's expectation that
24    residency programs, such as that at Howard

Page 248

1  University, would rely on ECFMG status for any

2  purpose?

3         A.       Yes, to demarcate that that

4  person met the certification so they could

5  enter GME among whatever other requirements the

6  program had.

7         Q.       It is ECFMG's expectation that

8  hospitals that are considering whether to grant

9  clinical privileges to a physician rely on

10 ECFMG status for any purpose?

11        A.       I think it would be fair to say

12 that they have the same expectation as the

13 licensing board and the residency programs have

14 on the status reports; on ECFMG providing

15 information about certificate status.

16        Q.       The status report that was

17 provided to the Howard residency program

18 regarding Akoda, what was all the information

19 that that status report contained?

20        A.       The status report would contain,

21 his name; his USMLE identification number; his

22 medical school; the year he graduated; the

23 country of medical school; the validity of his

24 ECFMG certificate, what the status is; whether

# Exhibit 3



**Planet Depos**
We Make It *Happen*™

# Transcript of William C. Kelly

**Date:** August 20, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

JA4026

1                                         Volume I
                                          Pages 1-224
2
          IN THE UNITED STATES DISTRICT COURT
3      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

4                    Case No. 2:18-cv-05629-JW

5                    Hon. Joshua D. Wolson

6

7

8  MONIQUE RUSSELL, JASMINE RIGGINS

9  ELSA M. POWELL AND DESIRE EVANS,

10      Plaintiffs,

11  vs.

12  EDUCATIONAL COMMISSION FOR

13  FOREIGN MEDICAL GRADUATES

14      Defendant.

15

16

17           DEPOSITION OF WILLIAM C. KELLY

18       Tuesday, August 20, 2019 at 9:40 a.m.

19     Law Offices of Morgan, Lewis & Bockius, LLP

20               One Federal Street

21          Boston, Massachusetts 02110-176

22

23

24   ----------Jennifer A. Doherty, CSR--------------

25          Certified Shorthand Reporter

Transcript of William C. Kelly
Conducted on August 20, 2019                                    3

```
 1                           I N D E X
          Testimony of:            Direct   Cross
 2
          WILLIAM KELLY
 3            by Mr. Vettori          6
              by Mr. Ceryes                    179
 4

 5

 6                    E X H I B I T S

 7        No.          Description              For I.D.

 8        Exhibit 1 Bates ECFMG RUSS 0000982-1032     15

 9        Exhibit 2 Bates ECFMG RUSS 0000155-158      27

10        Exhibit 3 Bates ECFMG RUSS 0000105          31

11        Exhibit 4 Bates ECFMG RUSS 0000407-409      35

12        Exhibit 5 Bates ECFMG RUSS 0003572-3573     40

13        Exhibit 6 Bates ECFMG RUSS 0000433-437      41

14        Exhibit 7 Bates ECFMG RUSS 0000167          45

15        Exhibit 8 Bates ECFMG RUSS 0000074-167      47

16        Exhibit 9 Bates ECFMG RUSS 0000440          54

17        Exhibit 10 Bates ECFMG RUSS 0003465-3468    55

18        Exhibit 11 Bates ECFMG RUSS 0003463-3468    58

19        Exhibit 12 Bates ECFMG RUSS 0000446-447     60

20        Exhibit 13 Bates ECFMG RUSS 0000202         61

21        Exhibit 14 Bates ECFMG RUSS 0000268-269     63

22        Exhibit 15 Bates ECFMG RUSS 0000116-119     65

23        Exhibit 16 Bates ECFMG RUSS 0000267         67

24        Exhibit 17 Bates ECFMG RUSS 0003471-3472    68

25        Exhibit 18 Bates ECFMG RUSS 0004007-4014    70
```

JA4028

Transcript of William C. Kelly
Conducted on August 20, 2019                                4

```
 1                    E X H I B I T S

 2      No.     Description                      For I.D.

 3      Exhibit 19 Bates ECFMG 000464-462            78

 4      Exhibit 20 Bates ECFMG RUSS 0000348-351      81

 5      Exhibit 21 Bates ECFMG RUSS 0000021-22       86

 6      Exhibit 22 Bates ECFMG RUSS 0000023          86

 7      Exhibit 23 Bates ECFMG RUSS 0000703-706      87

 8      Exhibit 24 Bates ECFMG RUSS 0000643          90

 9      Exhibit 25 Bates ECFMG RUSS 0000586          94

10      Exhibit 26 Bates IGBERASE 1908               95

11      Exhibit 27 Bates ECFMG RUSS 0000567          97

12      Exhibit 28 Bates ECFMG RUSS 0000666          99

13      Exhibit 29 Bates ECFMG RUSS 0000679         100

14      Exhibit 30 Bates ECFMG RUSS 0000568         102

15      Exhibit 31 Bates ECFMG RUSS 0000640-641     103

16      Exhibit 32 Bates ECFMG RUSS 0000576         105

17      Exhibit 33 Bates ECFMG RUSS 0000617         106

18      Exhibit 34 Bates ECFMG RUSS 0000559         110

19      Exhibit 35 Bates ECFMG RUSS 0000552-553     112

20      Exhibit 36 Bates ECFMG RUSS 0004194-4195    115

21      Exhibit 37 Bates ECFMG RUSS 0000560         118

22      Exhibit 38 Bates ECFMG RUSS 0000557         119

23      Exhibit 39 Bates ECFMG RUSS 0000555         120

24      Exhibit 40 Bates ECFMG RUSS 0004476         121

25      Exhibit 41 Bates ECFMG RUSS 0000556         123
```

JA4029

1    tell me.

2         A.    I will.

3         Q.    Because if you answer the question, I'm

4    going to assume you understood it.  Fair enough?

5         A.    Fair enough.

6         Q.    Can we have, for the record, your full

7    name and address?

8         A.    My name is William Kelly, K-E-L-L-Y.  My

9    home address is 47 Powerhouse, P-O-W-E-R-H-O-U-S-E,

10   Hill, H-I-L-L, Lane.  That's in Rockport, Maine

11   04856.

12        Q.    So you at one time worked for ECFMG, the

13   Educational Commission for Foreign Medical

14   Graduates?

15        A.    Yes.

16        Q.    And when did you leave that company's

17   employment?

18        A.    I retired in May 2015.

19        Q.    So when you left ECFMG, you didn't take

20   employment elsewhere?

21        A.    When I left ECFMG, I worked full-time.  I

22   worked as a consultant for them for one year

23   part-time.

24        Q.    What years would that be?

25        A.    That would be May 2015 until I think it

JA4030

1    was June 2016.

2         Q.    Okay.  But since June 2016 you've been

3    completely retired?

4         A.    No.  I do contracting work with the State

5    Department, their International Visitor Leadership

6    Program.  I'm a liaison officer.

7         Q.    How much of your time does that take?

8         A.    It varies from year to year and this year

9    it will be a total of maybe ten weeks.

10        Q.    What's your educational background?

11        A.    My undergraduate, I have a Bachelor of

12   Arts from LaSalle University in Philadelphia and

13   graduate school I have a Master of Science from the

14   University of Pennsylvania.

15        Q.    Did you work in Pennsylvania?

16        A.    Yes.

17        Q.    When you graduated from college, did you

18   go immediately into your master's program or did you

19   work first?

20        A.    I worked first.

21        Q.    For how long?

22        A.    About twenty years.

23        Q.    So who did you work for in that twenty

24   year period?

25        A.    From when I graduated from college?

Transcript of William C. Kelly
Conducted on August 20, 2019                    9

```
1        Q.   Yes, sir.
2        A.   I first worked for an insurance company,
3   Liberty Mutual Insurance Company.  And then I worked
4   for ECFMG.
5        Q.   When did you start with ECFMG?
6        A.   October 1977.
7        Q.   Is that thirty-eight years you were with
8   the company?
9        A.   Almost.
10       Q.   Congratulations.
11       A.   Thank you.
12       Q.   And congratulations on your
13   semi-retirement.
14       A.   Okay.
15       Q.   I need to ask you, what did you do to
16   prepare for this deposition once you learned you
17   were coming here for this deposition?
18       A.   On my own?
19       Q.   Well, in any way.  Did you do anything on
20   your own?  Did you talk with anybody?  Did you
21   review any documents?  I can ask those as separate
22   questions, but basically I will start with:  What
23   did you do to prepare for this deposition?
24            MS. MCENROE:  Objection to form.
25       A.   Well, I met with counsel.
```

JA4032

Transcript of William C. Kelly
Conducted on August 20, 2019                    13

```
1        A.    Could you repeat the question?

2        Q.    Could you explain how that certification

3   process works or worked at the time you were

4   employed at ECFMG?

5              MS. MCENROE:  Objection to form.

6        A.    There was an evaluation and certification

7   process where international medical graduates passed

8   a series of examinations, documented their education

9   and credentials and -- that were verified by

10  ECFMG.

11       Q.    So fair enough.  What is the first step in

12  this process that ultimately leads to certification

13  by ECFMG?

14             MS. MCENROE:  Objection to form.

15  BY MR. VETTORI:

16       Q.    Do you understand my question?

17       A.    The first step related to ECFMG?

18       Q.    Yes, yes.

19       A.    My recollection is it would be an

20  application to ECFMG.

21       Q.    So is that an application to take steps

22  one and/or two of the USLME?  Is that what that

23  application is all about?

24       A.    Those were some of the exams.  There were

25  different exams over time, but those were some of
```

JA4033

1    me fast-forward.  If that same applicant to whom a

2    number had been assigned, when he filed his

3    application or her application, ultimately became

4    certified, would the certification number be the

5    same as that identification number?  Again, I'm

6    talking abut the '92, '93 period.

7        A.   Yes.

8              MR. VETTORI:  So can you mark

9    Exhibit 1?

10             (Exhibit No. 1 marked for

11   identification.)

12   BY MR. VETTORI:

13       Q.   So again, I'm not trying to mislead you.

14   This is a 1996 booklet, not a 1992 or 1993 booklet.

15   Okay?

16       A.   Okay.

17       Q.   But do you recognize the document that's

18   been marked as Exhibit 1?

19       A.   Yes.

20       Q.   And is this the type -- is this document

21   given to any applicant -- was this document given

22   to any IMG applicant who applied to take any of the

23   USLME exams in 1996?

24             MS. MCENROE:  Objection to form.

25       A.   I think they would have had to have it in

JA4034

Transcript of William C. Kelly
Conducted on August 20, 2019                                    18

1    meant.

2          A.    Yes.

3          Q.    And was step two basic clinical science

4    material?

5          A.    Yes.

6          Q.    And both were, at that time, two-day

7    multiple choice tests administered by ECFMG; is that

8    correct?

9          A.    My -- that -- I have no independent

10   recollection of that.  Just from what's on the form

11   the answer would be yes.

12         Q.    So am I correct that in addition to

13   successfully -- again, I'm in this 1992 to 1996

14   period.  Am I correct that in addition to pass --

15   successfully completing steps one and two of the

16   USLME exams an applicant would also -- an IMG

17   applicant would also have to pass an English test?

18         A.    Yes.

19         Q.    And in addition, before ECFMG would

20   certify an applicant there had to be primary source

21   verification of that applicant's medical

22   credentials; is that correct?

23         A.    Of their medical diploma, yes.

24         Q.    Nothing more than their diploma?

25         A.    Generally not.

JA4035

```
1         Q.   And am I correct also that in that same
2    time period in order -- I'm sorry, was -- in that
3    time period were steps one and two and was the
4    English exam administered by ECFMG?
5         A.   To the best of my recollection, yes.
6         Q.   Step three was not administered by ECFMG,
7    was it?
8         A.   It was not.
9         Q.   It was administered by whom?
10        A.   My recollection was that it was
11   administered by state medical boards.
12        Q.   And am I correct in saying that an IMG
13   applicant could not sit for step three of the USLME
14   unless he or she was certified by ECFMG?
15             MS. MCENROE:  Objection to form.
16        A.   I believe that was the process in most, if
17   not all states, yes.
18   BY MR. VETTORI:
19        Q.   So again, this is just a general question,
20   Mr. Kelly.  And again, we're referring to this time
21   period that I framed from 1992 through 2000.  Let's
22   say through 1996.
23             Is it correct to say that an IMG couldn't
24   practice medicine in the United States without being
25   certified by ECFMG?
```

JA4036

Case: 22-1998    Document: 22-5    Page: 2147    Date Filed: 09/08/2023

1    BY MR. VETTORI:

2        Q.   Do you agree with that statement?

3        A.   Would you repeat that for me, please?

4    BY MR. VETTORI:

5        Q.   ECFMG works on behalf of domestic and

6    international regulatory authorities to protect the

7    public through its programs and services, including

8    primary source verification of physician

9    credentials?

10               MS. MCENROE:  Objection to form.

11       A.   That appears to be a statement of what it

12   currently does and I really don't have any direct

13   knowledge of that.  It appears to be a contemporary

14   statement.

15   BY MR. VETTORI:

16       Q.   You don't believe that statement applied

17   during the period of time you were employed by

18   ECFMG?

19       A.   During part of that period.

20       Q.   When did that --

21       A.   The international part I don't think was

22   part of it back in the time frame you're talking

23   about.

24       Q.   Okay.  So let me rephrase it, give you --

25   ask you if you agree with the following statement.

JA4037

```
 1    ECFMG works on behalf of domestic regulatory
 2    authorities to protect the public through its
 3    programs and services including primary source
 4    verification of physician credentials?
 5              MS. MCENROE:  Objection to form.
 6        A.   I would say yes.
 7    BY MR. VETTORI:
 8        Q.   Would it be accurate to say that ECFMG
 9    protects the public by, among other ways, seeing
10    that foreign medical graduates have completed an
11    acceptable medical education?
12              MS. MCENROE:  Objection to form.
13        A.   In that that's part of the certification
14    process, yes.
15    BY MR. VETTORI:
16        Q.   And would it be accurate to say that ECFMG
17    serves to protect the public by seeing to it that
18    foreign medical graduates can successfully pass the
19    requirements of the USLME examinations?
20              MS. MCENROE:  Objection to form.
21        A.   Yes.
22    BY MR. VETTORI:
23        Q.   Would it also be accurate to say that
24    ECFMG protects the public by ensuring that foreign
25    medical graduates meet certain standards of
```

JA4038

1    left, it looks like it was filed, that is received

2    by ECFMG on April 6, 1992; is that correct?

3         A.   Yes.

4         Q.   And do you see in the middle of page 1

5    that he submitted a Social Security number ending in

6    5054?

7         A.   Yes.

8         Q.   Item four?

9         A.   Yes, I see that.

10        Q.   If you'll turn to page 2, what is the date

11   of birth he provided?

12        A.   It looks as though it says the 17th of

13   April 1962.

14        Q.   When ECFMG receives -- I'm sorry.  When

15   ECFMG received this application, was any of the

16   information contained on this form, I guess it's

17   Exhibit 2, inputted into a -- this is a dinosaur

18   talking, I don't know computer terminology -- into a

19   computer program?

20             MS. MCENROE:  Objection to form.

21        A.   That was the procedure at this time.  What

22   happened to this specific one, I could not say for

23   certain.

24   BY MR. VETTORI:

25        Q.   And this may be difficult to answer, but

1    outside.

2          Q.    And how about in 1996?

3          A.    I don't recall.

4                (Exhibit No. 3 marked for

5    identification.)

6    BY MR. VETTORI:

7          Q.    As part of your review in preparation for

8    this deposition, did you review this document?

9          A.    I don't recall this specific one, but I

10   may have.

11         Q.    For the record, this is what purports to

12   be a diploma from the University of Ibadan for

13   someone by the name of Charles Olufemi,

14   O-L-U-F-E-M-I, Igberase, I-G-B-E-R-A-E-S-E.  Would

15   it be the normal practice of ECFMG in 1992 to

16   require someone like Mr. Igberase who filled out the

17   application we just reviewed to also submit a

18   diploma?

19         A.    Yes.

20         Q.    But you don't have any specific

21   recollection about this diploma?

22         A.    No.

23         Q.    Do you have an independent recollection or

24   a recollection that's been refreshed by your review

25   of documents in this case as to whether ECFMG issued

JA4040

Transcript of William C. Kelly
Conducted on August 20, 2019                                    34

1          Q.    Thank you.  You testified a little earlier

2      that ECFMG required IMGs to submit diplomas,

3      correct?

4          A.    Yes.

5          Q.    And it was only the diploma that had to be

6      verified; is that your testimony?

7          A.    At that time, yes.

8          Q.    When did that change?

9          A.    I don't know that it changed.  I have no

10     independent knowledge that it changed.

11         Q.    So your recollection is that during the

12     entire -- what did we say, thirty-five, thirty-eight

13     years that you were at ECFMG?

14         A.    Thirty-seven and a half.

15         Q.    It didn't change, only the diplomas were

16     required?

17         A.    Not the whole time.  And there was a

18     period before 1986 -- 1984 or 1986 where we did not

19     require primary source verification directly with

20     the medical school.

21         Q.    But in the period of time that we're

22     talking about here today, which I've mentioned

23     probably too many times already, the diploma was the

24     only thing that had to be verified?

25               MS. MCENROE:  Objection to form.

1     A.    As a general rule, yes.

2   BY MR. VETTORI:

3     Q.    IMGs who applied for certification by

4   ECFMG were not required to submit transcripts of

5   their medical school, were they, or were they?

6               MS. MCENROE:   Objection to form.

7     A.    At that time, no.

8   BY MR. VETTORI:

9     Q.    So when an applicant such as Mr. Igberase

10  provided you -- I'm sorry -- provided ECFMG with a

11  diploma, would I be correct in stating that ECFMG

12  would forward that with a form to the medical school

13  for the medical school to verify the accuracy or the

14  authenticity of that document, the diploma?

15    A.    That was the procedure, yes.

16              (Exhibit No. 4 marked for

17  identification.)

18  BY MR. VETTORI:

19    Q.    Do you recall reviewing this document as

20  part of the review you did in preparation for this

21  deposition?

22    A.    I have no recollection of this specific

23  document.

24    Q.    I'll represent to you that this is an

25  application filed by someone with the last name

JA4042

Case: 22-1993 Document: 22-5 Page: 2153 Date Filed: 09/08/2022

1    Charles, first name Igberase, middle name Oluwafemi,

2    and this looks like -- I'm going to ask you to

3    verify this -- that it was received by ECFMG on

4    March 30, 1994?

5         A.   I can't make out the date, but it could be

6    that, yes.  It's difficult to read.

7         Q.   Do you see anywhere -- do you see in item

8    four whether a Social Security number was

9    provided?

10        A.   I do not see one on this copy.

11        Q.   And again, I'm sorry, for the record this

12   is Bates number 0000407, correct?

13        A.   Yes.

14        Q.   So turn to page 408, the next page.  What

15   date of birth is provided?

16        A.   17th day, fourth month, year '61.

17        Q.   So I take it since you don't recall

18   reviewing this, you can't tell me whether the

19   medical information -- the medical school

20   information on that form is almost identical to the

21   information on the form filed by Mr. Igberase,

22   correct?

23             MS. MCENROE:  Objection to form.

24   BY MR. VETTORI:

25        Q.   You didn't make that comparison?

Case: 22-1008 Document: 22-5 Page: 2154 Date Filed: 09/08/2022

1    identification.)

2              (Discussion off the record.)

3    BY MR. VETTORI:

4        Q.    So Mr. Kelly, Exhibit 6 is a handwritten

5    letter, which is dated in the upper right-hand side

6    July 14, 1995, and received at ECFMG on July 20,

7    1995.  Can we agree on that?

8        A.    Yes.

9        Q.    And it's Bates number 0000433 through 437.

10   Can we agree on that?

11       A.    Yes.

12       Q.    And it is signed -- well, it says,

13   "Sincerely, Igberase Oluwafemi Charles" and it has

14   that 519 certification number.  Do you see that?

15       A.    Yes.

16       Q.    And is it your understanding -- I'm sorry,

17   have you had time to look at it?

18       A.    Give me a minute.  I can look at this,

19   yeah.

20           (Complies.)

21             MS. MCENROE:  I've finished reviewing

22   it.

23   BY MR. VETTORI:

24       Q.    Okay.  Do you remember this letter?

25       A.    Remember?

JA4044

Transcript of William C. Kelly
Conducted on August 20, 2019                              43

```
 1        Q.    Do you have an independent recollection of
 2   receiving this letter?
 3        A.    No.
 4        Q.    As part of your review to prepare for this
 5   deposition, did you review it?
 6        A.    This letter, yes.
 7        Q.    So would you agree with me that this is a
 8   letter in response to the prior exhibit when you
 9   wrote to him saying you were investigating the
10   matter and he should write to you?
11        A.    Yes.
12        Q.    And would you agree with me that in this
13   letter he confesses to the fact that he's really
14   Igberase, that he and Igberase are one and the same
15   person?
16        A.    Yes.
17        Q.    And would you agree with me that basically
18   he blamed what he did on his friends?
19              MS. MCENROE:  Objection to form.
20        A.    I don't know that I would characterize it
21   that way.
22   BY MR. VETTORI:
23        Q.    Well, take a look at the middle of page 2.
24   He says, "As a result of these" -- meaning his
25   inability to get into 150 residency programs, any of
```

1   future -- that the future records he was going to

2   use the name Igberase Oluwafemi Charles?

3       A.   Yes.

4       Q.   So after receiving this handwritten letter

5   in response to your letter, did the committee on

6   medical education credentials meet to review the

7   matter?

8       A.   That is my recollection, yes.

9              MR. VETTORI:  Let me show him the

10  letter and we can stop right here after this.

11             (Exhibit No. 7 marked for

12  identification.)

13  BY MR. VETTORI:

14      Q.   It's a short letter.  Why don't you read

15  it, please.

16      A.   (Complies.)  I finished reading it.

17      Q.   So this letter is signed by you?

18      A.   Yes.

19      Q.   And this letter is telling, I guess both

20  Charles and Igberase, what the results are of the

21  meeting of the education -- ECFMG committee on

22  medical education credentials; is that correct?

23      A.   Yes.

24      Q.   And as I understand it, the decision of

25  the committee was to invalidate the ECFMG

JA4046

Transcript of William C. Kelly
Conducted on August 20, 2019                                    46

1     certificate issued as 0519573-0, correct?

2          A.   Yes.

3          Q.   That's the one that was issued to the

4     gentleman by the name of Charles, correct?

5          A.   I have no independent knowledge of that.

6          Q.   And also is telling Charles and Igberase

7     that ECFMG was revoking the certificate issued under

8     0482700-2, correct?

9          A.   Yes.

10         Q.   And isn't that the certificate issued to

11    Mr. Igberase?

12         A.   That I don't know.

13              MR. VETTORI:  This is a good time to

14    take a break.

15              MS. MCENROE:  Off the record.

16              (Discussion off the record.)

17              MS. MCENROE:  So can we hop back on

18    the record just for two quick things for the

19    purposes of the record?

20              On behalf of ECFMG we are reserving

21    the right to review and sign today's transcript.

22    And we've also discussed with counsel a stipulation

23    that all objections, except as to the form, are

24    reserved for the time of trial, if that is

25    acceptable with you-all as well.

1    the diploma and the person whose name is on the

2    application are really the same person?

3                    MS. MCENROE:  Objection to form.

4         A.   Yes.

5    BY MR. VETTORI:

6         Q.   Okay.  When did that policy, practice, or

7    procedure first go into effect?

8         A.   I don't recall the date.

9         Q.   Was it effective as of 1995?

10        A.   I don't recall it being in effect at that

11   time.

12        Q.   What is that policy, practice, or

13   procedure?

14        A.   Okay.  And I'm -- again, this is at the

15   time it was in place when I was there.  I mean,

16   again, I don't know what it is now, that if there is

17   a -- a significant -- a discrepancy between the name

18   on the diploma and the name they're using when they

19   apply for the examination that they provide

20   certain -- some sort of documentation to connect

21   that -- to indicate the two names belong to the same

22   person.

23        Q.   But is it your testimony that you don't

24   believe that policy was in effect, at least not in

25   1995?

JA4048

```
 1        Q.    Okay.  And so it looks to me like the
 2   person who took the July 1992 day one and day two
 3   exams failed; is that correct?
 4        A.    Failed in July 1992.
 5        Q.    Correct.
 6        A.    Yes.
 7        Q.    And failed step one in September 1992; is
 8   that correct?
 9        A.    Yes.
10        Q.    And failed day one in January 1993; is
11   that correct?
12        A.    Yes.
13        Q.    Do you have an independent recollection or
14   a recollection refreshed by any review of documents
15   you made prior to this deposition as to whether the
16   applicant by the name of Charles took an appeal from
17   the decision of the committee that's reflected in
18   your December 7, 1995, letter?
19        A.    My recollection is that he took an appeal,
20   but I don't know which -- I don't recall which
21   decision.
22        Q.    Do you remember whether that appeal
23   resulted in a hearing?
24        A.    My recollection is that there was a
25   hearing, yes.
```

Transcript of William C. Kelly
Conducted on August 20, 2019                    54

```
 1        Q.   And bear with me one second.
 2             Do you remember when that appeal hearing
 3   took place?
 4        A.   No.
 5        Q.   I'll come back to that later.  Do you
 6   remember the outcome of the appeal?
 7        A.   Yes.
 8        Q.   What was the outcome?
 9        A.   My recollection is that the appeal was
10   denied.
11        Q.   Is that the same thing as saying the
12   decision to invalidate one certificate and revoke
13   the other was affirmed?
14        A.   Yes, but that there was a -- a change in I
15   believe the length of time of the revocation of the
16   one certificate, the specification of the date.
17             (Exhibit No. 9 marked for
18   identification.)
19   BY MR. VETTORI:
20        Q.   It's a one-page letter, sir.  If you take
21   your time to read it, I'd appreciate it.  Thank you,
22   Mr. Kelly.
23        A.   (Complies.)  Yes, I've read it.
24        Q.   So who is Marie Shafron?
25        A.   At that time Ann Marie Shafron was the
```

JA4050

Transcript of William C. Kelly
Conducted on August 20, 2019                    55

1    vice president of operations at ECFMG.

2         Q.    And would you agree with me that this

3    letter is outlining to the gentleman by the name of

4    Charles the results of the appeal hearing?

5         A.    Yes.

6         Q.    And do you see where this letter recites

7    that the appeal was considered on July 10, 1996?

8    It's in the middle paragraph.

9         A.    Yes.

10        Q.    In Washington, DC?

11        A.    Yes.

12        Q.    And would you agree with me that the

13   decision of the review committee affirmed the

14   decision invalidating one certificate and revoking

15   the other, but limited the length of the revocation

16   of certificate 04827002 to five years from July 10,

17   1996, until July 10, 2001?

18        A.    Yes.

19        Q.    Thank you.

20              (Exhibit No. 10 marked for

21   identification.)

22   BY MR. VETTORI:

23        Q.    So Mr. Kelly, what is this document?

24        A.    It appears to be a photocopy of an

25   application for USMLE exams.

```
 1        Q.    Which exams was he applying for?
 2        A.    According to the application, the -- both
 3   the step one and the step two.
 4        Q.    And what is the name of the applicant?
 5        A.    On the application it's Femi Charles
 6   Igberase.
 7        Q.    Do you see whether any Social Security
 8   number was provided?
 9        A.    I see no Social Security number on the
10   application.
11        Q.    And can you tell from the Bates stamp on
12   the document when it was received by ECFMG?
13        A.    Yes.
14        Q.    When was it received?
15        A.    October 23, 2000.
16        Q.    Do you see the date of birth on the --
17   towards the bottom of Page 1 of that application?
18        A.    Yes.
19        Q.    What is the date of birth?
20        A.    17th day of the fourth month in 1962.
21        Q.    April 17?
22        A.    Yes.
23        Q.    Isn't that the same date as on the 1992
24   application by Igberase?
25        A.    I would have to look.
```

JA4052

1    Q.   Please do.  It's one of the early -- it's

2    the second exhibit, I think.

3    A.   Yes, it is.

4    Q.   So did you review this document, the

5    application, Exhibit 10, in preparation for this

6    deposition?

7    A.   I don't recall this specific -- no.

8    Q.   Am I correct that ECFMG pretty quickly

9    picked up on the fact this is the same Igberase

10   whose certificate had been revoked for five years

11   through and including July 10, 2001?

12   A.   My recollection is that at some point, I

13   don't know the time period, but I know subsequent to

14   this, there was an allegation that he provided false

15   information on his application, yes.

16   Q.   What do you mean by there was an

17   allegation?

18   A.   My recollection is subsequent to this we

19   alleged that he had engaged in irregular behavior.

20   Q.   Just to help answer this question, I'm

21   going to show you in a minute your letter dated

22   November 16, 2000, about this application.

23   A.   Okay.

24   Q.   So it appears to me that within less than

25   a month's time ECFMG has concluded that this is the

JA4053

1    same Igberase who had been told that his

2    certification was revoked through July 10, 2001.

3    Would you agree with me?

4                    MS. MCENROE:   Objection.

5         A.   We made that allegation, yes.

6    BY MR. VETTORI:

7         Q.   So do you have an independent recollection

8    as to how you came to that determination?

9         A.   No.

10        Q.   So do you remember me reading to you from

11   Charles's handwritten letter that for future records

12   he is going to use the name Igberase Oluwafemi

13   Charles?  Do you recall that?

14        A.   Yes, I do.

15        Q.   He didn't do that here, did he?

16        A.   No, he did not.

17                    (Exhibit No. 11 marked for

18   identification.)

19   BY MR. VETTORI:

20        Q.   Let me know after you've read it, okay,

21   Mr. Kelly?  Thank you.

22        A.   (Complies.)  I finished reading it.

23        Q.   Okay.  Can we go back to the prior

24   exhibit, No. 10?  Put that in front of you, please.

25                    Would you agree with me that this

```
 1    look on his face and I think I had the same one, but
 2    I think I got the answer.
 3        A.   Okay.  I finished reading.
 4    BY MR. VETTORI:
 5        Q.   So this is a letter dated May 22, 2002,
 6    this being Exhibit 14, correct?
 7        A.   Yes.
 8        Q.   And it's your letter?
 9        A.   It's from me, yes.
10        Q.   This is approximately a year after your
11    previous letter, correct?
12        A.   Yes.
13        Q.   Can I offer what I think is the
14    explanation for that period of time and see if you
15    agree with me?
16        A.   Yes.
17        Q.   I think in an earlier letter you wrote
18    that you would reconsider the matter after the
19    decision by the USMLE and their remand to you.  Do
20    you remember that?
21        A.   Yes.
22        Q.   Is that the reason for this letter being
23    almost a year later?
24        A.   That would have been the process, yes.
25        Q.   Thank you.
```

1   received April 18th?

2      Q.   March 18th.

3      A.   March 18th, yes, that would have been.

4          MS. MCENROE:   Do you want to take a

5   break?

6          MR. VETTORI:   No.

7          (Exhibit No. 16 marked for

8   identification.)

9   BY MR. VETTORI:

10      Q.   Mr. Kelly, Exhibit 16, which is Bates

11   number 0000267, appears to be a copy of something

12   that purports to be a diploma from the University of

13   Ibadan for a person named Charles Igberase

14   Oluwafemi. Do you see that?

15      A.   Yes.

16      Q.   Do you know whether this was submitted to

17   ECFMG as part of the application we just

18   discussed?

19      A.   I do not know.

20      Q.   You don't have any independent

21   recollection of this?

22      A.   I do not.

23      Q.   Do you have any recollection whether this

24   diploma was ever verified with the University of

25   Ibadan?

JA4056

```
 1        A.    I have no knowledge.

 2        Q.    Do you have any knowledge whether any

 3   information was inputted into the computer system

 4   when this application was filed?

 5        A.    I have no knowledge.

 6        Q.    Do you have a recollection that ECFMG

 7   determined within a short period of time after this

 8   application was filed by this gentleman with the

 9   last name Oluwafemi that it was the same person that

10   applied as Igberase and as Charles?

11        A.    I don't recall that, no.

12                    (Exhibit No. 17 marked for

13   identification.)

14   BY MR. VETTORI:

15        Q.    March 18, 2002.

16        A.    Okay, I finished.  I read -- reviewed the

17   letter.

18        Q.    So does this refresh your recollection

19   that ECFMG realized pretty quickly after the March

20   18, 2002, application that this person by the name

21   of Oluwafemi is really the same as the person

22   identified as Charles and as Igberase?

23        A.    It doesn't refresh my recollection, but

24   the letter tells me that that is what happened.

25        Q.    You wouldn't have written that if it
```

JA4057

1    already established that, Mr. Kelly.

2                    MS. MCENROE:   Objection to form.

3    BY MR. VETTORI:

4         Q.   Isn't that correct?

5         A.   If that is what we did, then this was a

6    different applicant, yes.

7         Q.   Correct.  Are you aware that this is the

8    identical diploma submitted by the person with the

9    name Charles Oluwafemi Igberase that you verified

10   with the school?

11        A.   I'm not aware of that.

12        Q.   So again, we have a situation where the

13   applicant's name is different than the name on the

14   diploma, correct?

15                   MS. MCENROE:   Objection.

16        A.   The name -- the sequence of names is

17   different, yes.

18   BY MR. VETTORI:

19        Q.   Correct.  And is there any documentation

20   to indicate to ECFMG an explanation for that?

21        A.   I see none.

22        Q.   So as I -- is it correct to say that ECFMG

23   relied on a verification of a diploma for someone

24   whose name is different than the applicant Igberase

25   Oluwafemi Charles?

JA4058

1    assigned to him the number 0519573-0.  ECFMG

2    certified both of those individuals with different

3    certification numbers.

4          A.    Yes.

5          Q.    And that's because, isn't it, Mr. Kelly,

6    that ECFMG thought they were two different people?

7          A.    I don't know that I would have used that

8    language, but they were two separate applicants,

9    yes, yes, individuals, yes.

10         Q.    ECFMG would never assign two certification

11   numbers and -- I'm sorry -- two identification

12   numbers and actually certify with two different

13   certification numbers the same person, would it?

14              MS. MCENROE:  Objection to form.

15         A.    Not knowingly.

16   BY MR. VETTORI:

17         Q.    So again, ECFMG relied on a verification

18   of a diploma for a person whose name is different

19   than the name on the application.  You would agree

20   with that, wouldn't you?

21              MS. MCENROE:  Objection to form.

22         A.    The sequence of names on the diploma are

23   different than the sequence of names on the

24   application.

25   BY MR. VETTORI:

JA4059

1    raised a flag.

2    BY MR. VETTORI:

3         Q.   So why then when Igberase Oluwafemi

4    Charles applied, didn't ECFMG question whether it

5    was just a rearrangement of names or not?

6                   MS. MCENROE:  Objection to form.

7         A.   I would have to go back to the application

8    and look.

9    BY MR. VETTORI:

10        Q.   Well, we know from one of your letters

11   that you said the reason why you didn't make that

12   determination when the application, the second

13   application was filed, that is the one by

14   Mr. Charles or Dr. Charles was because his date of

15   birth was different and the order of his name was

16   different, correct?  You remember that letter?

17        A.   Yes, yes, yes.

18        Q.   So you thought they were two different

19   people, even though the names were similar, they

20   were in a different arrangement; isn't that

21   correct?

22                   MS. MCENROE:  Objection to form.

23        A.   That would be correct, yes.

24   BY MR. VETTORI:

25        Q.   I'm just curious why there's not a diploma

JA4060

```
 1    stamp, we established from some other letters that
 2    it clearly was March 18, 2002; do you agree?
 3         A.   Yes.
 4         Q.   I think my question to you was, it appears
 5    to me -- I'm sorry.
 6              Would you agree with me that ECFMG
 7    realized within a short period of time after this
 8    March 18, 2002 application was filed that this
 9    person using the name Charles Igberase Oluwafemi was
10    really the person certified under number
11    0482700-2?
12         A.   Yes.
13         Q.   And so you wrote a letter on July 22,
14    2002, to someone by the name of Charles Igberase
15    Oluwafemi, correct?
16         A.   Yes.
17         Q.   His application had not referenced any
18    identification or certification number, had it?
19         A.   Yes.
20         Q.   Yes, it had not?
21         A.   That is correct.
22         Q.   But you referenced the 0482700-2
23    certification number, correct?
24         A.   Correct.
25         Q.   And that was the one assigned to Igberase
```

Transcript of William C. Kelly
Conducted on August 20, 2019                    88

1    dated January 3, 1996.  Can you confirm that?

2         A.    That appears to be the receipt date,

3    yes.

4         Q.    Right.  Does it list a Social Security

5    number?

6         A.    There is none listed on there.

7         Q.    What is the date of birth?  Second page.

8         A.    January 1, 1959.

9         Q.    And does this applicant, John Nosa Akoda,

10   indicate what medical school he attended?

11        A.    Yes.

12        Q.    Which one?

13        A.    University of Benin, Nigeria.

14        Q.    Does he indicate when he graduated?

15        A.    He does not list the degree date.  He

16   lists his attendance dates.

17        Q.    What are the attendance dates?

18        A.    October '81 to October '87.

19        Q.    If you look at Bates page 40705, which I

20   think is the third page the application, part C.

21        A.    Yes.

22        Q.    There is a photograph attached or there is

23   a photograph on that page; is there not?

24        A.    It appears to be a photograph.

25        Q.    Isn't that a requirement of all

1    applications, that they attach a photograph?

2              MS. MCENROE:  Objection to form.

3        A.    That is, yes.

4    BY MR. VETTORI:

5        Q.    And doesn't that photograph have to be

6    verified by the dean of the medical school?

7              MS. MCENROE:  Objection to form.

8        A.    It does not have to be.

9    BY MR. VETTORI:

10       Q.    What was the procedure in 1996 at ECFMG

11   with respect to the verification of a photograph on

12   an application?

13       A.    I don't recall.

14       Q.    So in section B1, down towards the bottom,

15   the form says, "Explain in the space below why the

16   application could not be signed in the presence of

17   your medical school dean, vice dean, or register --

18   any registrar.  Any explanation must be acceptable

19   to ECFMG and must be provided each time you submit

20   an application to ECFMG."

21             Do you see that?

22       A.    Yes.

23       Q.    And the handwritten answer was "because

24   the postal system to Nigeria could not be guaranteed

25   within the available time."  Did I read that

Transcript of William C. Kelly
Conducted on August 20, 2019

```
 1    any time while you were employed by ECFMG?
 2         A.   Yes.
 3         Q.   What?
 4         A.   You would check the name and the seal
 5    against samples in the reference library, in the
 6    credential reference library.
 7         Q.   But you don't know when that was?
 8         A.   No.
 9         Q.   You don't know if that reference library
10    was utilized in the 1996 time period?
11         A.   I don't recall.
12         Q.   Does it appear to you that the dates of
13    attendance at the University of Benin are the same
14    on Exhibits 24 and 23?
15         A.   Yes.
16         Q.   From your review of the many records in
17    preparation for this deposition or from your
18    independent personal knowledge, do you know why this
19    occurred, the individual applied once, didn't take
20    any exams and then applied again?
21         A.   No, I don't know.
22         Q.   You don't remember?
23              MS. MCENROE:   I'm just going to -- he
24    stated he didn't remember, but I think testified he
25    didn't know.
```

Transcript of William C. Kelly
Conducted on August 20, 2019                                    95

```
1         A.    Yes.
2         Q.    And the middle name on the diploma is
3    Enosekhare, E-N-O-S-E-K-H-A-R-E, correct?
4         A.    Yes.
5         Q.    And Akoda is the same on both, correct?
6         A.    Yes.
7         Q.    Do you know if ECFMG verified this
8    diploma?
9         A.    I do not know.
10        Q.    Do you know whether John Nosa Akoda was
11   ever certified by ECFMG?
12        A.    My recollection is that he was.
13              MR. VETTORI:   Off the record.
14              (Discussion off the record.)
15              (Exhibit No. 26 marked for
16   identification.)
17   BY MR. VETTORI:
18        Q.    So Mr. Kelly, what is this document?
19        A.    It -- to me it's got a photocopy of an
20   ECFMG certificate.
21        Q.    Are you familiar with this form of
22   document?
23        A.    Yes.
24        Q.    So would I be correct in stating that when
25   an applicant is certified, they receive one of
```

JA4065

Transcript of William C. Kelly
Conducted on August 20, 2019                    107

1    that the gentleman by the name of Akoda is
2    participating in a residency program at Jersey Shore
3    Medical Center?
4        A.    Strictly speaking that he had started the
5    program.
6        Q.    And this completed form was received by
7    ECFMG on July 24, 1990 -- I can't tell the date.
8    Can you read that date?
9        A.    I can read the July 24, but not the
10   rest.
11       Q.    I think it's '99.
12       A.    Since the valid indefinitely sticker was
13   sent in 1998, it's likely 1998 is the date it was
14   received.
15       Q.    So it's my somewhat limited understanding
16   that as of 1998 when a IMG who has been certified by
17   ECFMG and who has passed step three of the USMLE
18   applies to a residency program, ECFMG in some
19   fashion assists in that application if requested to
20   do so?  Is that understanding correct?
21            MS. MCENROE:  Objection for form.
22       A.    Assist in the application?
23   BY MR. VETTORI:
24       Q.    Yes.  And you can restate it, if it helps
25   you

JA4066

1      A.    Yeah.   I mean, we work with the

2  Association of Medical -- American Medical Colleges

3  for the electronic residency application service

4  where we serve as the dean station for international

5  medical graduates applying for residency programs.

6  So in that sense we are a part of that process.

7      Q.    So as part of your participation in the

8  ERAS process, is it correct that -- when an

9  applicant -- I'm sorry.  When an IMG applies to a

10  residency program using ERAS, another acronym, ECFMG

11  transmits a status report to the residency program;

12  is that correct?

13      A.    That was the process, yes.

14      Q.    As part of that ERAS process, again I'm

15  talking about this 1998 time period, did the -- was

16  the applicant required to send to ECFMG supporting

17  documents for further transmission to the residency

18  program?

19      A.    I am not sure.

20      Q.    As part of the ERAS program, in the time

21  period we're talking about, was it the practice for

22  ECFMG to transmit the IMGs USMLE transcripts as

23  requested by the applicant?

24      A.    If requested by the applicant, yes.

25      Q.    Do you know what, generally speaking,

JA4067

```
 1        A.    Okay.  I reviewed it.

 2        Q.    Okay.  Are you familiar with this

 3   letter?

 4        A.    I've seen this letter before, yes.

 5        Q.    This is a letter from James McCorkel who

 6   is vice president of academic affairs at Jersey

 7   Shore Medical Center to Eric Holmes at ECFMG

 8   dated -- I don't know what the date is, but it was

 9   received by ECFMG on August 11, 2000, correct?

10        A.    That's the received date, yes.  There is a

11   Friday, August 11, 2000, that date under Meridian

12   Health Systems.

13        Q.    Thank you.  What does the AIS stand for

14   under ECFMG?

15        A.    Applicant Information Services.

16        Q.    Are you the "To Bill" on the top?

17        A.    Very likely, yes.

18        Q.    I take it Mr. Holmes holds a pretty steep

19   position or did at ECFMG?

20        A.    His name was Royce, R-O-Y-C-E, and he

21   since died and he was in the information services

22   department.

23        Q.    Would you agree with me that in this

24   letter Doctor McCorkel is notifying ECFMG that John

25   Charles Akoda certificate 05532585 who is a resident
```

JA4068

```
 1   in the Jersey Shore residency program presented to
 2   Jersey Shore Medical Center a Social Security number
 3   that was issued to Igberase?
 4        A.   That is what he states, yes.
 5        Q.   That Social Security number ended in
 6   9065?
 7        A.   That's what the letter says, yes.
 8        Q.   That's the same 9065 number that was
 9   provided to you in Exhibit 32 in 1998, correct?
10        A.   Exhibit 31, yes.
11        Q.   Did I mix my numbers up?  Okay.  I stand
12   corrected.  Thank you.  It looks to me like Stephen
13   Seeling replied to that letter on August 22, 2000.
14   Do you remember we talked about that earlier?
15        A.   That's Exhibit 31.
16             MR. VETTORI:  Can we mark that,
17   please?
18        A.   I have a letter.
19        Q.   I think you told me you wrote this
20   letter?
21        A.   Yes, I'm sure I did.
22             (Exhibit No. 35 marked for
23   identification.)
24        Q.   This letter that you ghosted for
25   Mr. Seeling indicates that the medical diploma of
```

Case: 22-1998 Document: 22-5 Page: 2180 Date Filed: 09/08/2022

1   the individual certified under 482700-2 was verified

2   with the medical school.  Do you see that in the

3   third paragraph?

4        A.   Yes.

5        Q.   And it says the same thing in the second

6   paragraph about the diploma of the individual

7   certified as number 0553-285-5, correct?

8        A.   Yes.

9        Q.   We've already established for the record

10  that it was the same diploma, correct?

11             MS. MCENROE:  Objection to form.

12       Q.   Let me restate the question.  There is no

13  diploma in the name of -- hold on a second.  Let me

14  make sure I got the right name -- Igberase Oluwafemi

15  Charles?

16             MS. MCENROE:  Objection to form.

17       A.   I have to go back and look at the

18  diploma.

19       Q.   I can represent to you -- you can look at

20  anything you want.  I can represent to you we talked

21  about this for about five minutes and the last name

22  on the diploma is Igberase.  This is the one you

23  said was the order of the names was different?

24       A.   Yes.

25       Q.   But there is in fact no diploma with the

```
 1   last name Charles on it?
 2                   MS. MCENROE:  Objection.
 3        A.   Listed as the last name on the diploma?
 4        Q.   Correct.
 5        A.   Yes.
 6        Q.   In Mr. McCorkel's letter to you, the prior
 7   exhibit, he also talks about the fact that Jersey
 8   Shore Medical Center would be interested in knowing
 9   whether ECFMG had requested for verification of
10   Doctor Akoda, also known as Doctor Igberase, ECFMG's
11   certification status from other teaching hospitals
12   including Harlem Hospital Center in the period of
13   time of approximately 1995 to '96 or JFK Memorial
14   Hospital in 1997, '98.  Do you see that?
15        A.   Yes, I do.
16        Q.   In the letter you ghosted for Mr. Seeling
17   it was stated that on the last paragraph, "ECFMG has
18   no record of receipt of request for verification of
19   the certification status from Harlem Hospital Center
20   or JFK Memorial Hospital Center."  Do you see
21   that?
22        A.   Yes.
23        Q.   I take it you or somebody at your
24   direction made an investigation of that before
25   writing that letter?
```

JA4071

Transcript of William C. Kelly
Conducted on August 20, 2019

125

```
1        A.   Yes.

2        Q.   He told you that he's not Igberase

3   Charles, but rather than he's his cousin?

4        A.   That's what he said, yes.

5        Q.   And --

6        A.   -- according to the memo.

7        Q.   I apologize, Mr. Kelly.  He again admits

8   to using his cousin's Social Security number,

9   correct?

10       A.   Yes.

11       Q.   And so he provided you with an original

12  Nigerian passport and Nigerian international driving

13  permit and you made copies, right?

14       A.   That's what it says.

15       Q.   He told you that he'd been suspended by

16  Jersey Shore?

17       A.   Yes.

18       Q.   Did you make any attempt at that time to

19  verify the authenticity of his passport?

20            MS. MCENROE:  Objection to form.

21       A.   I don't remember.

22       Q.   Did you at any time make an attempt to

23  verify the authenticity of his passport?

24            MS. MCENROE:  Objection to form.

25       A.   I don't remember.
```

JA4072

Transcript of William C. Kelly
Conducted on August 20, 2019                    126

1        Q.   Do you remember whether his passport
2   showed a date of birth?
3        A.   I would have to look at it, but generally
4   I know passports have dates of birth.
5        Q.   And did you ever go back and check the
6   date of birth on his passport in comparison with the
7   date of birth on Exhibit 33, his request for
8   permanent revalidation of standard ECFMG
9   certificate?
10       A.   I don't know if I did.
11       Q.   Do you know how you would go about
12  checking the authenticity of a Nigerian passport?
13            MS. MCENROE:  Objection to form.
14       A.   Do I know?
15       Q.   Did you know at that time?
16       A.   I may have.  That would be trying to
17  project or guessimate what would have happened.
18            MR. VETTORI:  Shut up.  That was my
19  watch I was talking to.
20            MS. MCENROE:  Let the record
21  reflect.
22       Q.   Take a look at Exhibit 33 for me, would
23  you, please?
24       A.   Yes.
25       Q.   What is the date of birth listed on

Transcript of William C. Kelly
Conducted on August 20, 2019                              127

```
1    there?
2         A.    April 17, 1963.
3                    (Exhibit No. 42 marked for
4    identification.)
5         Q.    While looking at -- Mr. Kelly, this is a
6    copy of Federal Republic of Nigeria passport
7    produced to us by ECFMG.  Would you agree with what
8    I just said?
9         A.    Is this the copy that was in his ECFMG
10   record?
11        Q.    It was produced to us by ECFMG.  It's got
12   a Bates number on it.
13        A.    Then it is.
14        Q.    Would this have been what he produced to
15   you at this meeting?
16        A.    If this is in the ECFMG records as having
17   been produced, yes.  I don't know just by looking at
18   it.
19        Q.    I appreciate that.  What is his date of
20   birth on his passport?
21        A.    It looks like January 1, 1959.
22        Q.    That's different from the birth date on
23   Exhibit 33?
24        A.    Yes.
25        Q.    So I'm not sure, maybe this is a function
```

JA4074

 1    telling you that is the number system now.

 2              MS. MCENROE:  Objection to form.

 3         Q.   I don't think there's a question pending.

 4    I think he's told me he doesn't know.

 5         A.   I don't know.

 6         Q.   It's fair to say that, though, that you

 7    have no recollection of making any attempt to verify

 8    the authenticity of that passport?

 9              MS. MCENROE:  Objection to form.

10         A.   I do not remember making an attempt,

11    yes.

12         Q.   So either before Akoda came into your

13    office on September 27 or after he came into your

14    office, did you undertake any investigation of your

15    database to try to determine whether Akoda and

16    Igberase were one and the same person?

17         A.   I don't remember.

18         Q.   I think we've established from some of the

19    applications that we've gone over here today that

20    photographs are attached to the applications?

21         A.   Photographs of the applicant, yes.

22         Q.   Those are maintained in ECFMG's

23    database?

24         A.   Yes.

25         Q.   If you, either before or after September

JA4075

1    27, had gone into the database to look for a

2    photograph of Igberase and looked for a photograph

3    of Akoda, you could have done that?

4            MS. MCENROE:  Objection to form.

5       A.   I believe I could have, yes.

6       Q.   You didn't do that?

7       A.   I don't know if I did.

8       Q.   So how long did Igberase spend in your

9    office on the 27th of September 2000?

10      A.   I do not know.

11      Q.   I take it you didn't recognize him as

12    somebody you'd seen before?

13      A.   I don't know.  I don't recall.

14      Q.   Well, I take it if you had recognized him

15    as someone you had seen before, you would have

16    memorialized that in some fashion, wouldn't you?

17            MS. MCENROE:  Objection to form.

18      A.   It depends on what you mean by someone

19    I've seen before.

20      Q.   Seen as a someone holding himself out to

21    be someone by the name of Charles or by the name of

22    Igberase?

23            MS. MCENROE:  Objection to form.

24      A.   I believe I would have, yes.

25      Q.   So you actually had seen Charles before,

JA4076

1   hadn't you?

2                   MS. MCENROE:  Objection to form.

3        A.   I don't recall.

4        Q.   So do you remember when I asked you some

5   questions earlier today about -- humor me -- the

6   history of the events with Igberase and Charles?

7        A.   Yes.

8        Q.   Do you remember you told me, because you

9   wrote it in a letter when you were reciting that

10  history, that he took an appeal from the original

11  invalidation and revocation of the two

12  certificates?

13       A.   Yes.

14       Q.   And that there was an appeal hearing in

15  Washington, D.C. on July 11, 2016.

16       A.   I remember there was an appeal hearing.

17       Q.   And you were there?

18       A.   Yes.

19       Q.   And you were there for a number of

20  hours?

21       A.   Okay.

22                   MS. MCENROE:  Objection to form.

23       Q.   Is that correct?

24       A.   I remember being there, yes.

25       Q.   And so you sat in a room with this person

JA4077

1    identification.)

2        A.   I'm leafing through it.

3        Q.   Please do.  I can tell you that I didn't

4    find any start date for that transcript, but if you

5    look on the last page it ends at 11:50.

6        A.   Okay.

7        Q.   Don't take my word for it.  Please verify

8    it.

9        A.   Okay.  Yes.

10       Q.   And on the cover sheet it shows you as

11   being present, correct?

12       A.   Yes.

13       Q.   And I'll represent to you that this

14   individual who goes by the name of Charles who is

15   also we know now Igberase testified at this

16   hearing?

17       A.   Yes.

18       Q.   So whether it's an hour or two hours or

19   three hours, it's some period of time that you were

20   present in Washington, D.C. at a proceeding where

21   the individual calling himself Charles appeared and

22   testified, correct?

23       A.   Yes.

24       Q.   And a person calling himself Akoda, who

25   was in your office having been accused of really

JA4078

```
 1    Igberase and Akoda were one and the same person,
 2    correct?
 3         A.   Yes.
 4         Q.   And he said he has no proof, just a strong
 5    suspicion, correct?
 6         A.   Yes.
 7         Q.   And he said information he received from
 8    an informant provided details that led him to
 9    believe this, correct?
10         A.   Yes.
11         Q.   Do you know who that informant is?
12         A.   No.
13         Q.   Did you ever ask him?
14         A.   I don't recall.
15         Q.   You didn't memorialize that anywhere in
16    any memos or notes, did you?
17         A.   If I had, it would be in the record.
18         Q.   "I also believe Akoda and Igberase are one
19    and the same," that's you talking, correct?
20         A.   Yes.
21         Q.   Why did you believe that?
22         A.   I don't remember, but from reviewing the
23    records I thought there was a nexus between the
24    two.
25         Q.   After all the time we spent here today
```

```
 1        A.    I don't remember.
 2        Q.    So in many of the letters we've reviewed
 3   here today when you talked about verifying
 4   applicant's credentials, you also go out and state
 5   you verified their medical school credentials
 6   including their diploma, correct?
 7        A.    Yes.
 8        Q.    Would it be safe or fair for me to assume
 9   that if you had verified the accuracy or
10   authenticity of his passport, you would have made a
11   statement to that effect somewhere?
12              MS. MCENROE:   Objection to form.
13        A.    Yes.
14        Q.    So you indicate that you sent Igberase an
15   e-mail, correct?
16        A.    Yes.
17        Q.    That's the one we went over a little while
18   ago, right?
19        A.    Yes.
20        Q.    And you state, quote, "And who should
21   reply but Akoda, exclamation mark"?
22        A.    Yes.
23        Q.    Correct?  That's your emphasis?
24        A.    Yes.
25        Q.    That surprised you, didn't it?
```

Transcript of William C. Kelly
Conducted on August 20, 2019                           150

```
1        A.   You mean at the time he answered?
2        Q.   At the time you wrote this memo.  Why did
3   you put an exclamation "but Akoda, exclamation
4   mark"?
5        A.   For emphasis or something like that,
6   yes.
7        Q.   Emphasis to what effect?
8        A.   That it seemed strange.
9        Q.   Okay.  "We need to brainstorm on this
10  one."  You wrote that, correct?
11       A.   Yes.
12       Q.   "Maybe Shirley Williams, parens, Ms.
13  Sherlock" -- is that a reference to Sherlock
14  Holmes?
15       A.   Most likely, yes.
16       Q.   I'm sure it's an affectionate reference.
17  I don't know Ms. Williams.  "Maybe Shirley Williams,
18  parens, Ms. Sherlock could sit in."  You wrote that,
19  correct?
20       A.   Yes.
21       Q.   Did you and Mr. Seeling with or without
22  the assistance of Ms. Sherlock brainstorm this
23  matter further?
24       A.   I don't remember.
25       Q.   Can you point to me any record, any
```

Transcript of William C. Kelly
Conducted on August 20, 2019                    153

1      A.    Yes.

2      Q.    And you knew as of late December 2000 that

3    ECFMG had invalidated and/or revoked the

4    certificates issued to Igberase and Charles,

5    correct?

6      A.    Yes.

7      Q.    You knew there was some connection, a

8    relationship between Igberase and Akoda, correct?

9      A.    Yes.

10     Q.    And you knew that Akoda had used a Social

11   Security number of Igberase when he applied to the

12   residency program at Jersey Shore Medical Center,

13   correct?

14     A.    Yes.

15     Q.    And I think we've already established

16   this, I know I'm repeating myself, but bear with me,

17   you had the ability to look up all the computer

18   photographs of Igberase and Akoda to verify whether

19   they were one and the same person, correct?

20           MS. MCENROE:  Objection to form.

21     A.    Yes.

22     Q.    And you didn't do that, correct?

23           MS. MCENROE:  Objection to form.

24     A.    If I can circle back, the internal

25   document with the comparison, so it would have had

JA4082

```
 1        A.    The irregular behavior he would have been
 2   charged with would be providing false information
 3   to ECFMG on an application, among other things.
 4        Q.    Which would be the Social Security
 5   number?
 6        A.    If he provided it on an application.
 7        Q.    So you're aware that Jersey Shore Medical
 8   Center dismissed him from a residency program he was
 9   participating in and had been participating in for
10   several years for, among other things, submitting
11   and using someone else's Social Security number?
12        A.    Yes.
13        Q.    You may not be able to answer this.  Have
14   you ever been advised of what he was convicted of or
15   what he pled guilty to in the federal court?
16        A.    No.
17        Q.    Do you recall that apparently Igberase was
18   licensed as a -- I'm sorry -- Akoda was licensed as
19   a nurse in New York?
20        A.    No.
21        Q.    Do you remember any information provided
22   to ECFMG by Akoda about him being licensed as a
23   nurse in the State of New York?
24        A.·   No.
25        Q.    Same set of questions about Igberase.  Do
```

Transcript of William C. Kelly
Conducted on August 20, 2019                    162

1       A.    Yes.

2       Q.    At the bottom it looks like -- is that the

3  ECFMG ERAS stamp or did I miss --

4       A.    Yes.

5       Q.    And that's October 5, 2006, correct?

6       A.    Yes.

7       Q.    So given that this is an ERAS document

8  submission form, wouldn't that necessarily mean that

9  this is related to some attempt to obtain a

10  residency program?

11              MS. MCENROE:  Objection to form.

12       A.    It's part of the electronic residency

13  application service, yes.

14       Q.    But it doesn't have any use outside

15  residency programs, does it?

16              MS. MCENROE:  Objection to form.

17       A.    The form?

18       Q.    The whole ERAS process.

19       A.    Not to my knowledge.

20       Q.    Because you told me before that as part of

21  the ERAS program, ECFMG in effect acts as the dean's

22  office for foreign medical graduates or

23  international medical graduates to assist them in

24  applying for residency programs, correct?

25       A.    Yes.

```
1        Q.   That's Bates stamp 000651?

2        A.   Yes.

3        Q.   And you'll note on Bates stamp 000651

4    there is a stamp received October 5, 2006 ERAS,

5    correct?

6        A.   Yes.

7        Q.   If you go back to Exhibit 50, the ERAS

8    document submission form that references these three

9    letters of reference you'll see the ERAS form was

10   received on the same date; is that correct?

11       A.   Yes.

12       Q.   Continuing, the next page in this exhibit

13   is Bates stamp 000649, November 22, 2006, your

14   letter to Phil Robertson, MD, correct?

15       A.   Yes.

16       Q.   Again, enclosing a letter of reference

17   purportedly from Phil Robertson, MD on behalf of

18   Doctor John Charles Akoda dated 28 September, 2006,

19   correct?

20       A.   Yes.

21       Q.   It's got the same October 5, 2005 ERAS

22   stamp on it, does it not?

23       A.   Yes.

24       Q.   Do you have any recollection whether

25   Doctor A.O. Roberts, Doctor Phil Robertson, or
```

JA4085

Transcript of William C. Kelly
Conducted on August 20, 2019                                    168

```
 1    Doctor Charles Francis ever replied to your
 2    letters?
 3         A.    I have no recollection.
 4         Q.    In your review in preparation for this
 5    deposition, did you see any such records?
 6         A.    I don't recall seeing any.
 7                     (Exhibit No. 52 marked for
 8    identification.)
 9         A.    Okay.  I've read this.
10         Q.    What is this document?
11         A.    It is a screen print from the ECFMG
12    applicant status program.
13         Q.    About Akoda?
14         A.    Yes.
15         Q.    What does applicant restrictions mean?
16         A.    That's what we called flags from the flag
17    file.
18         Q.    Flag to file for what purpose?
19         A.    There are myriad a number of reasons.
20         Q.    Like in this case what was the reason?
21         A.    There would always be a reason listed
22    here.  It's other, other, credentials investigation,
23    credentials investigation, credentials
24    investigation, other.
25         Q.    What does release date mean?
```

1   line of communication with those institutions?

2               MS. MCENROE:  Objection to form.

3        A.    In some cases, yes.

4        Q.    Do you know if ECFMG had such a

5   relationship with the University of Ibadan College

6   of Medicine?

7        A.    I do not know.

8        Q.    What about the University of Benin?

9        A.    I do not know.

10       Q.    I assume there are cases in which ECFMG

11  determines an applicant has engaged in some fraud in

12  the course of submitting an application?  Fair?

13       A.    Yes, there were instances.

14       Q.    Can you provide me some estimate in terms

15  of how frequent an occurrence that was, let's say

16  between 1990 and 2000, maybe as a percentage of

17  total applicants?

18               MS. MCENROE:  Objection to form.

19       A.    I really don't have any idea how many were

20  done, but just to let you know that we always

21  reported and there is notification so it could be

22  reconstructed.

23       Q.    And as I understand it, one of the

24  principle goals at ECFMG is to make sure or to do --

25  is to verify that those people who are applying to

JA4087

```
 1   practice medicine here in the United States have
 2   authentic credentials when they come here to
 3   practice medicine.  Fair?
 4        A.   To assure they're competent physicians,
 5   yes.
 6        Q.   And in your role with ECFMG you understood
 7   that one of the -- well, that residency programs and
 8   state medical boards rely upon ECFMG to conduct that
 9   verification of foreign medical graduate credentials
10   prior to those individuals coming here to practice
11   medicine.  Fair?
12              MS. MCENROE:  Objection to form.
13        A.   That was one of the components of ECFMG
14   certification, yes.
15        Q.   And would you agree that ECFMG plays an
16   important role in public health by verifying that
17   physicians who come here to practice medicine have
18   the necessary and requisite credentials to do so?
19              MS. MCENROE:  Objection to form.
20        A.   That is part of it, to protect the
21   American public, yes.
22        Q.   And another role that ECFMG plays is
23   detecting or endeavoring to detect when an
24   individual lacks the -- well, when an individual has
25   not been honest in presenting their identity or
```

JA4088

Case: 22-1998    Document: 22-5    Page: 2199    Date Filed: 09/08/2023

1        A.   It was standing committee of the ECFMG at

2    Board of Trustees for the specific charge of

3    reviewing policies and procedures, making

4    recommendations to the Board for any changes or

5    modifications to the certification requirements, and

6    to review allegations for irregular behavior.

7        Q.   And who, if any, at ECFMG had the ability

8    to elevate potential suspicious conduct such that it

9    would be considered by the credentialing

10   committee?

11       A.   It was generally a group, a review of a

12   group recommendation or decision of staff.

13       Q.   Sure.  If you in particular -- and did you

14   hold the same position from approximately 1991 until

15   your retirement?

16       A.   No.

17       Q.   Can you describe how your position with

18   ECFMG changed during that period of time?

19            MS. MCENROE:  Objection to form.

20   Calls for a narrative over 38 years.

21       A.   And I'm not sure of the exact dates for

22   some of these, but around 1991 I think I was the

23   manager of the information services department.  I

24   was not involved in credentials, but around 1992 or

25   1993 I became a manager of the credentials

JA4089

Transcript of William C. Kelly
Conducted on August 20, 2019                    188

1   department for a period of time, and then I became
2   director of the credentials and records services,
3   and then at the time I retired, I was associate vice
4   president for operations areas of credentials and
5   information services, records-keeping, and a number
6   of other areas.
7       Q.   Okay.  So from the time beginning when you
8   were the manager of the credentialing department
9   through until your retirement, if you had a
10  particular concern about an applicant, would you
11  have the ability to elevate that concern to the
12  credentialing committee?
13      A.   By myself solely?  So long as nobody
14  objected, I think I might have.
15      Q.   Okay.  What was Stephen Seeling's role
16  with ECFMG?
17      A.   He was the vice president for operations.
18      Q.   If Mr. Seeling had a concern about a
19  potential applicant, would he also have the ability
20  to independently bring that before the credentialing
21  committee?
22          MS. MCENROE:  Objection to form.
23      A.   When you say independently, he would have
24  done that in conjunction with me.  I would have been
25  part of that.  I don't know that he would take an

JA4090

Transcript of William C. Kelly
Conducted on August 20, 2019                                    194

```
 1   a dean station?

 2       A.   Dean's office.

 3       Q.   Dean's office.  So what do you mean by

 4   that?

 5       A.   It's the facilitator for the process to

 6   gather together all the components of an application

 7   for a residency program and submit them on behalf of

 8   the graduate.  Unlike in the US, the University of

 9   Pennsylvania School of Medicine, that dean's office,

10   would gather together all the documents for its

11   graduates to submit to the residency programs.

12   ECFMG did that for international medical

13   graduates.

14       Q.   And how was ECFMG compensated for that

15   effort?

16       A.   There was a fee for the ERAS token, and my

17   recollection is that that's how it was

18   compensated.

19       Q.   That was paid by the applicant?

20       A.   By the -- yes.

21       Q.   And so is it generally the fact that

22   residency programs require letters of reference as

23   part of an application?

24            MS. MCENROE:  Objection to form.

25       A.   Letters of recommendation they called
```

Transcript of William C. Kelly
Conducted on August 20, 2019                          195

```
 1   them, but yes.
 2       Q.    And ECFMG undertook the role to provide
 3   some verification with respect to those letters of
 4   recommendation?
 5       A.    No.
 6       Q.    In this particular case you reviewed with
 7   Mr. Vettori a series of letters that you wrote in
 8   response to an application written by Akoda asking
 9   those individuals to verify that the letters of
10   recommendation were authentic.  Do you recall
11   that?
12       A.    Yes.
13       Q.    Is that not something that you would do in
14   the normal course?
15       A.    That was not a routine procedure.
16       Q.    And why is it that you elected to do it in
17   this case?
18       A.    My belief is that because he was otherwise
19   being investigated.
20       Q.    And so safe to say that at that point in
21   2006 you had some concerns about Akoda's
22   credibility?
23            MS. MCENROE:  Objection to form.
24       A.    Yes.
25       Q.    And so under these circumstances you
```

JA4092

1    thought it was important to reach out to those

2    individuals from whom Akoda had offered letters of

3    recommendation to find out if they were in fact

4    authentic?

5              MS. MCENROE:  Objection to form.

6         A.   That is correct.

7         Q.   And as far as what is reflected in the

8    record and to the best of your recollection, none of

9    those individuals responded to your letters,

10   correct?

11        A.   That is correct.

12        Q.   In other words, your concerns regarding

13   Akoda's credibility were not alleviated by that

14   process that you went through in sending out these

15   letters to those individuals?

16             MS. MCENROE:  Objection to form.

17        A.   We did not receive verification of those

18   letters of recommendation.

19        Q.   Did you -- if you would turn to Exhibit

20   51.

21        A.   Yes.

22        Q.   First of all -- actually, if we would go

23   to the actual letter of reference reportedly from a

24   Charles Francis, when -- actually, I'm going to step

25   back just a minute.

1    Operations Squadron, you of course would have

2    reviewed this letter of reference prior to writing

3    this letter to Charles A. Francis, MD, correct?

4                MS. MCENROE:  Objection to form.

5       A.   I don't know -- I don't know that I

6    personally may have reviewed it, but someone would

7    have reviewed it.

8       Q.   Okay.  You, I'm sure -- well.  Had you

9    reviewed this letter of reference, can we agree that

10    this document would raise red flags for you based

11    upon your years of experience in terms of the

12    credibility assigned to this particular letter of

13    reference?

14                MS. MCENROE:  Objection to form.

15       Q.   Is it what it purports to be?

16                MS. MCENROE:  Objection.

17       A.   I've seen all kinds of letters of

18    recommendation, and I can't say that there is any

19    one that I would be more concerned about this than

20    maybe other ones that turned out to be legitimate.

21       Q.   Did you make any effort or did anyone in

22    your office make any effort to confirm that Charles

23    A. Francis is in fact a licensed medical

24    physician?

25       A.   Verifying someone's licensure status would

Transcript of William C. Kelly
Conducted on August 20, 2019                                   202

```
 1    not have been something we would have done.
 2         Q.   Okay.  Certainly you would have the
 3    ability to do that if you wanted to.  Someone in
 4    Virginia in 2006, you could have determined whether
 5    they had a -- there's a licensed physician by the
 6    name of Charles A. Francis as of that point in
 7    time?
 8              MS. MCENROE:  Objection.
 9         A.   I'm sure there was a process, yes.
10         Q.   Did you make any effort to find out if
11    Charles A. Francis actually existed as a person?
12         A.   By writing to him would be the only way I
13    see here.
14         Q.   Your effort in that regard was not -- did
15    not neither confirm nor deny that he was an existing
16    person?
17         A.   That is correct.
18         Q.   At the top of Exhibit 51 there are some
19    notes.  Is it your handwriting?
20         A.   Part of it is my handwriting, I believe,
21    yes.
22         Q.   Can you read for me what's written up
23    there?
24         A.   Okay.  The part that's in my handwriting
25    is, "Igberase transcript, question mark," and the
```

1    letters SSS.

2        Q.    Can you read what's below that?

3        A.    I believe it says, "Why some things are

4    suspicions or suspicious."  And that's in a

5    different handwriting.

6        Q.    All right.  This is a letter of

7    recommendation purportedly on behalf of Akoda and

8    not Igberase, correct?

9              MS. MCENROE:  Objection to form.

10       A.    Correct.

11       Q.    What were you indicating by writing

12   "Igberase transcript, question mark"?

13       A.    I don't know.

14       Q.    Fair to say at this point you had some

15   concerns that Igberase and Akoda maybe have been one

16   and the same person?

17             MS. MCENROE:  Objection.

18       A.    Based on the other documents, yes.

19       Q.    Do you know what transcript you're

20   referring to?

21       A.    No.

22       Q.    What does the SSS mean?

23       A.    I believe it referenced Stephen Seeling

24   the vice president of operations.

25       Q.    And to what purpose or to what end?

```
 1   obviously was included.

 2        Q.   Do you know if this was in fact within a

 3   file on behalf of an official file for Akoda versus

 4   kept somewhere else with ECFMG's records?

 5             MS. MCENROE:  Objection to form.

 6        A.   I don't know.

 7        Q.   Is there any justification that you can

 8   think of as we sit here today as to why a document

 9   concerning a physician's credibility and honesty

10   would not be included within their official file?

11             MS. MCENROE:  Objection to form.

12        A.   I don't know.

13        Q.   You conclude that in the conclusion of

14   Paragraph No. 4 that you don't think this is enough

15   for the committee.

16             Help me understand in view of the

17   various documents previously discussed why you did

18   not believe that this was sufficient evidence to

19   even raise before a credentialing committee.

20             MS. MCENROE:  Objection to form.

21        A.   Based on experience and working with the

22   documents and presumably maybe talking with other

23   people that, you know, there was a staff had to

24   review all the materials that were part of the --

25   that were the result of the investigation, and part
```

# Exhibit 4



**PLEASE DO    NOT DETACH**

EXHIBIT 2
Kelly
JD 8/20/19

Foreign Medical Graduate Examination in the Medical Sciences and the ECFMG English Test

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examinations or application will not be accepted.
Use typewriter or block print in ink.

| ① | **EXAMINATION HISTORY:** | Have you previously applied to take one or more of the examinations administered by ECFMG?  ☐ Yes  ☒ No |
|---|---|---|
| | | If you have been assigned an ECFMG Applicant Number, enter the number in this box.  482-700 |

| ② | **NAME:** Print your name as you want it to appear on the Standard ECFMG Certificate | First Name: OLUWAFEMI    CHARLES    Middle Name |
|---|---|---|
| | | Last Name (Surname): IGBERASE |
| | | Full Maiden Name (For married women only) |

| ②.1 | If you have previously applied to ECFMG under another name, provide that name | Previous Name |
|---|---|---|
| | | Please include a copy of the legal document that verifies this name change. |

| ③ | **ADDRESS:** Use space to which admission permit and other notification from ECFMG should be sent | Number/Street: 9701 EVENING PRIMROSE DRIVE |
|---|---|---|
| | | Apartment Number: 2D    Post Office Box Number |
| | | City: LAUREL |
| | | State/Country: MARYLAND    Zip or Postal Code: 20723 |

| ④ | **SOCIAL SECURITY NUMBER:** | If you have a United States Social Security Number, enter the number in this box.    -5054 |
|---|---|---|

| ⑤ | **STATUS OF MEDICAL SCHOOL STUDENT:** Must be completed by students | If you are applying for Day 1, will you have completed two years of medical school by the date of that examination?  ☐ Yes  ☐ No |
|---|---|---|
| | | If you are applying for Day 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school?  ☐ Yes  ☐ No |

| ⑥ | **EXAMINATION REGISTRATION:** Check ☑ box(es) to indicate the component(s) for which you are applying | Examination Date (Month/Year): JULY 1992 |
|---|---|---|
| | | ☒ Basic Medical Science Component (Day 1) |
| | | ☒ Clinical Science Component and ECFMG English Test (Day 2) |
| | | ☐ ECFMG English Test (administered on second day only) |

E CK
I
P RH
DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY

| ⑥.1 | **EXAMINATION CENTER:** See ECFMG Information Booklet for list of centers | If you do not indicate a second choice of center and the first choice is not available, ECFMG reserves the right to assign a center. |
|---|---|---|
| | | Select two: 1st Choice    City: BALTIMORE    Center No.: 300 |
| | | 2nd Choice    City: WASHINGTON, D.C.    Center No.: 350 |

| ⑦ | **EXAMINATION FEE(S):** Enter the amount enclosed on the line provided | Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash. |
|---|---|---|
| | | Basic Medical Science Component (Day 1 only)    $265 |
| | | Clinical Science Component and ECFMG English Test (Day 2 only)    $265 |
| | | Basic Medical Science Component, Clinical Science Component and ECFMG English Test (Day 1 and Day 2)    $425 |
| | | ECFMG English Test only    $ 25    Enter amount enclosed  $ |

O
B. Dil
DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY

RECEIVED
APR - 6 1992
ECFMG

© ECFMG 1992 All Rights Reserved    Form 104, FEB 1992

ECFMG-000155

JA4099
ECFMG_RUSS_0000155

## PART B

| (8) SECONDARY SCHOOL COLLEGE/ UNIVERSITY: | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | IMMACULATE CONCEPTION COLLEGE | BENIN CITY NIGERIA | JUNE 1974 SEPT 1979 | 5 |

| (9) MEDICAL SCHOOL: Use precise name and list all schools attended 690-010 | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | UNIVERSITY OF IBADAN COLLEGE OF MEDICINE | IBADAN NIGERIA | JUNE 1982 JUNE 1987 | 5 |

| (9.1) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | MEDICINE | | | DR ONWUKA | MAR 1988 JUNE 19 |
| | SURGERY | SPECIALIST | | MR IDIA-KHOA | SEPT 1988 DEC 198 |
| | PAEDIATRICS | HOSPITAL | NIGERIA | DR ASEMOTA | DEC 1987 MAR 198 |
| | OBSTETRICS | BENIN CITY | | DR ODJE IBA | JUNE 198 SEPT 198 |
| | GYNAECOLOGY | | | | |

If additional lines are necessary use the reverse side of Part C.

| (9.2) MEDICAL DEGREE: Conferred or Expected | Title of Degree __MBBS__ | Date Conferred/Expected: __1987__ |
|---|---|---|

**(10) MEDICAL LICENSURE:** Present or Future

Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine:
__YES__ Country or state in which you are licensed: __NIGERIA__

| (11) HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |
| | | | |

| (11.1) EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: MARY LAND MED LABORATORY | Phlebto-mist | 1992 |
| | Street: 1901 Sulphur Spring Road BOX 18290 | | |
| | City/State/Country: Baltimore MD 21227 | | |

**(12) BIRTHDATE/ BIRTHPLACE:**
Day/Month/Year: 17-4-67   Location: ILE-IFE, OSHUN, NIGERIA
City, Province, Country

**(13) SEX:** Please check one: ✓ Male ___ Female   **(14) NATIVE LANGUAGE:** YORUBA

**(15) CITIZENSHIP:** (Complete all three)

| | | | |
|---|---|---|---|
| A. AT BIRTH | USA ☐ | Other ☐ (Specify) | NIGERIAN 056 |
| B. UPON ENTERING MEDICAL SCHOOL | USA ☐ | Other ☐ (Specify) | NIGERIAN ✓ |
| C. NOW | USA ☐ | Other ☐ (Specify) | NIGERIAN ✓ |

ECFMG-000156

## PART C

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

Seal, stamp or signature of official *must cover a portion of the attached photograph.*

(16) CERTIFICATION BY APPLICANT

I hereby certify that the information given in this application is true and accurate to the best of my knowledge, and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the ECFMG Information Booklet for FMGEMS and am aware of its contents.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

(Must be completed in English)

Signature of Applicant X _____ (in Latin Characters)

(16.1) CERTIFICATION BY MEDICAL SCHOOL OFFICIAL

A. I hereby certify that the photograph, signature, and information entered on this form accurately apply to the individual named above.

X _____
Signature of Medical School Official

OR

Official Title _____ Date _____ Institution _____

NOTARIZATION WITH EXPLANATION (Pertains to graduates only)

B. Subscribed and sworn to before me this **31** day of **March**, 19 **92**

X _____
Signature of Consular Official, First Class Magistrate, Notary Public

Official Title _____ *Notary Public*

B.1 Explain below why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

338/I/D

RECEIVED

APR - 6 1992

ECFMG

LINDA R. KISHTA
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires September 2, 1994

482-700

(17) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority ever been suspended or revoked? ☐ Yes ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

ECFMG-000157

JA4101
ECFMG_RUSS_0000157

TO BE USED AS CONTINUATION OF SECTION 9.1 IN PART B

ECFMG-000158

# Exhibit 5

## PLEASE DO ( NOT DETACH (

| STEP 1 AND/OR STEP 2 EXAMINATIONS | ATTACHMENT 2 |

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOLS BY
THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, USA
PHONE: 215 386-5900 CABLE: EDCOUNCIL,PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examinations or application will not be accepted.
Use typewriter or block print in ink.

| ① ECFMG EXAMINATION HISTORY: | Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG?  ☐ Yes  ☑ No | 513-573-t |
| | If yes, place your USMLE Identification Number (ECFMG Applicant Number) in this box. | |

**② NAME:**
Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record

First Name: IGBIERASE   Middle Name: OLUWAFEMI
Last Name (Surname): CHARLES
Full Maiden Name (For married women only): 482-700-2

**②.1 If you have previously applied to ECFMG under another name, provide that name**
N/A
Previous Name
Please include a copy of the legal document that verifies this name change.

**③ ADDRESS:**
Use address to which admission permit and other notification from ECFMG should be sent

Number/Street: 1653
Apartment Number: #    Post Office Box Number:
City: HYATTSVILLE
State/Country: MD    Zip or Postal Code: 20788

**④ U.S. SOCIAL SECURITY AND/OR CANADIAN SOCIAL INSURANCE NUMBERS:**
Enter numbers in boxes provided
U.S. Social Security Number:    Canadian Social Insurance Number:

**⑤ REGISTRATION:**
Check ☑ box(es) of selected examinations

| Step 1 | June 8 - 9, 1994 ☐ | **or** | September 22 - 23, 1994 ☑ |
| Step 2 | March 30 - 31, 1994 ☐ | **or** | August 31 - September 1, 1994 ☑ |
| ECFMG English Test | March 31, 1994 ☐ | **or** | September 1, 1994 ☑ |

**⑤.1 TEST CENTER:**
Select three ECFMG centers for each Step and/or ECFMG English Test. See the Information Booklet in which this application was enclosed for a list of ECFMG centers

If your center selections are not available, ECFMG reserves the right to assign a center.

Step 1: (1) Richmond   Center No. 182  (2) Baltimore   Center No. 300  (3) ____  City ____ Center No.

Step 2 and/or ECFMG English Test: (1) Richmond   Center No. 182  (2) Baltimore   Center No. 300  (3) ____  City ____ Center No.

**⑥ EXAMINATION FEE(S):**
Enter the amount enclosed on the line provided

Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash.

| Step 1 Basic Medical Science Examination | $400 |
| Step 2 Clinical Science Examination | $400 |
| ECFMG English Test | $ 30 |

Enter amount enclosed $ ____

FOR OFFICE USE ONLY   OB

**⑦ HANDEDNESS:** ☑ Right Handed   ☐ Left Handed

APPLICATION FORM 1043, August, 1993
*ECFMG 1993 All Rights Reserved

| FOR OFFICE USE ONLY | E ___ | P 30 |

160

ECFMG-000407


EXHIBIT 4
Kelly
20   8/20/19
PENGAD 800-631-6989

JA4104
ECFMG_RUSS_0000407

**PART B**

| ⑧ SECONDARY SCHOOL/ COLLEGE/ UNIVERSITY: | Schools Attended | | Location (exact address) | Dates Attended From MO. YR. | To MO. YR. | No. School Years |
|---|---|---|---|---|---|---|
| | Immaculate Conception College | | Benin City Nigeria | 06 74 | 06 79 | 05 |

| ⑨ MEDICAL SCHOOL: Use precise name and list all schools attended  690- 010 | Schools Attended | | Location (exact address) | Dates Attended From MO. YR. | To MO. YR. | No. School Years |
|---|---|---|---|---|---|---|
| | University of Ibadan | | Ibadan Nigeria | 06 82 | 06 87 | 05 |

| ⑨1 CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | MEDICINE | SPECIALIST HOSP. | BENIN CITY | DR Onwuka | 1988 |
| | SURGERY | ✓ | ✓ | DR Idiakhoa | 1988 |
| | OBGYN | ✓ | ✓ | DR Uyinbor | 1988 |
| | PEDIATRICS | ✓ | ✓ | DR ASEMOTA | 1987 |

If additional lines are necessary use the reverse side of Part C.

| ⑨2 MEDICAL DEGREE: Conferred or Expected |
|---|
| Title of Degree __MBBS__ Date Conferred:/Expected:* __06 87__ <br> * If the degree has been conferred, a photocopy should be sent to ECFMG. See *Medical Education Credentials* Section of the ECFMG Information Booklet. |

| ⑩ MEDICAL LICENSURE: Present or Future |
|---|
| Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: __1988__ <br> Country or state in which you are licensed:* __NIGERIA__ <br> * If the license has been issued, a photocopy should be sent to ECFMG. See *Medical Education Credentials* Section of the ECFMG Information Booklet. |

| ⑪ HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | N/A | | |

| ⑫ EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: N/A <br> Street: <br> City/State/Country: | | |

| ⑬ BIRTHDATE/ BIRTHPLACE: |
|---|
| Day __Ø17__ Month __04__ Year __61__ Location: __IFE IFE OYO NIGERIA__ <br> City, Province, Country |

| ⑭ GENDER: | Please check one: ✓ Male ___ Female | ⑮ NATIVE LANGUAGE: __YORUBA__ |
|---|---|---|

| ⑯ CITIZENSHIP: | (Complete all three) | | |
|---|---|---|---|
| | A. AT BIRTH | USA ☐ Other ☑ (Specify) __NIGERIAN__ | 056 |
| | B. UPON ENTERING MEDICAL SCHOOL | USA ☐ Other ☑ (Specify) __NIGERIAN__ | |
| | C. NOW | USA ☐ Other ☑ (Specify) __NIGERIAN__ | |

| ⑰ OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS: Indicate the organizations with which you may have applied previously; enter the date of the most recent examination that was administered to you | ORGANIZATION | DATE OF MOST RECENT EXAMINATION TAKEN | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|---|
| | NATIONAL BOARD OF MEDICAL EXAMINERS | MO. YR. | |
| | STATE LICENSING AUTHORITY IN THE UNITED STATES | | |

School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)
If a graduate cannot sign the application form in the presence of a medical school...

ECFMG-000408

(161)

JA4105
ECFMG_RUSS_0000408

IN THE UNITED STATES

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(18) CERTIFICATION BY APPLICANT

(Must be completed in English)

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the Information Booklet on USMLE Step 1 and Step 2 examinations and ECFMG Certification, am aware of its contents and meet the eligibility requirements set therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant x _Charles Egberowe Oyefemi_ Date 03 /26 /94
(in Latin Characters)

(18.1) (Must be completed in English)

CERTIFICATION BY MEDICAL SCHOOL OFFICIAL

OR

A. I hereby certify that the photograph, signature, and information entered on Section 9 of this form accurately apply to the individual named above.

x _____
Signature of Medical School Official

| Official Title | Date | Institution |

NOTARIZATION WITH EXPLANATION (Pertains to graduates only)

B. Subscribed and sworn to before me this _26th_ day of _March_, 19 _94_

x _Jack L. Katz_
Signature of Consular Official, First Class Magistrate, Notary Public

JACK L. KATZ
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires June 1, 1997

B.1 Explain in the space below why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

_Due to the fact that I reside in the United States as at time of filling this application_

| FOR OFFICE USE ONLY | |
|---|---|
| FORM | DATE |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | ✓ |
| 325 | ✓ |

5:9-573

(19) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked? ☐ Yes ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

(20) Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information however, the processing of your application will not be affected if you choose to leave item 20 blank.

Select the one which best describes your racial/ethnic background.

1 ☐ American Indian/ Alaskan Native  2 ☐ Asian Pacific Islander  3 ☐ Hispanic  4 ☐ Black (not of Hispanic Origin)  5 ☐ White (not of Hispanic Origin)  6 ☐ Other

recent examination that was administered to you by that organization as

Seal, stamp or signature of official *must* cover a portion of the attached photograph.

MAR 30 1994
ECFMG

(162)

ECFMG-000409

JA4106
ECFMG_RUSS_0000409

# Exhibit 6



EXHIBIT 7

Kelly
MD 8/20/19



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

Via Certified Mail
Return Receipt Requested

December 7, 1995

COPY

Dr. Igberase Oluwafemi Charles
P.O. Box 1653
Hyattsville, MD  20788

USMLE/ECFMG Identification No.
0-482-700-2

Dear Doctor:

On November 27, 1995 the ECFMG Committee on Medical Education Credentials met to review the matter with respect to your falsification of an application form submitted to ECFMG.  The Committee reviewed the documentation available, including your July 14, 1995 letter.

Following review the Committee took the following actions:

1.     To invalidate the Standard ECFMG Certificate issued to you under the second identification number 0-519-573-0;

2.     To inform the United States Medical Licensing Examination (USMLE) Committee on Irregular Behavior of this matter for its information and possible action; and

3.     To revoke the Standard ECFMG Certificate issued to you under the first identification number 0-482-700-2.

Please return the two Standard ECFMG Certificates to my attention immediately.  I suggest you send them by certified mail.

Enclosed is a copy of the ECFMG Rules of Appellate Procedure.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck
Enclosure

# Exhibit 7

EXHIBIT 9
Kelly
10 8 2019



## EDUCATION COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

ATTACHMENT 3

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 • FAX: 215-387-9963 • CABLE: EDCOUNCIL, PHA.

Via Express Mail

July 31, 1996

Dr. Igberase Oluwafemi Charles
P.O. Box 1653
Hyattsville, MD 20788

USMLE/ECFMG Identification No.
0-482-700-2

Dear Dr. Charles:

By letter dated December 7, 1995, you were notified of the decision of the Committee on Medical Education Credentials of the Educational Commission for Foreign Medical Graduates (ECFMG) to take certain actions: to invalidate the Standard ECFMG Certificate No. 0-519-573-0, to inform the USMLE Committee on Irregular Behavior for its information and possible action and to revoke Standard ECFMG Certificate No. 0-482-700-2.

On March 7, 1996, ECFMG received on your behalf a request for an appeal of the decision to revoke Standard ECFMG Certificate No. 0-482-700-2, under the ECFMG Rules of Appellate Procedure. Your oral appeal was considered on July 10, 1996 in Washington, D.C. by a Review Committee consisting of Floyd J. Malveaux, M.D., Ph.D., Chairman, Marvin R. Dunn, M.D. and Alexander H. Williams, III. The Committee considered all of the evidence before it, including correspondence between and among you, your attorney, the USMLE Committee on Irregular Behavior and ECFMG.

The Review Committee affirmed the decision of the Committee on Medical Education Credentials, but limited the length of the revocation of Standard ECFMG Certificate No. 0-482-700-2 to five (5) years from July 10, 1996, i.e., July 10, 2001. At that time, Standard ECFMG Certificate No. 0-482-700-2 will be reinstated if you remain otherwise eligible for ECFMG certification.

Decisions of the Review Committee are subject to the ECFMG Rules of Appellate Procedure, a copy of which is enclosed.

The Review Committee wishes to thank you for your cooperation.

ECFMG REVIEW COMMITTEE

Floyd J. Malveaux, M.D., Ph.D.
Marvin R. Dunn, M.D.
Alexander H. Williams, III

By: _____

Marie L. Shafron
Vice President for Operations
Educational Commission for
Foreign Medical Graduates
At the direction of the
ECFMG Review Committee

MLS/wck
Enclosure
cc: Louis M. Freeman, Esq.

*ECFMG is an organization committed to promoting excellence in international medical education.*

# Exhibit 8



ATTACHMENT 7

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 • FAX: 215-386-9767 • INTERNET: www.ecfmg.org



May 3, 2001

Personal and Confidential
Via Certified Mail – Return Receipt Requested

Dr. Igberase Oluwafemi Charles
16327 Chadsford Ave.
Baton Rouge, LA 70817

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Charles:

This is notice of the decision of the ECFMG Committee on Medical Education Credentials made on April 18, 2001. A brief procedural history is set forth below.

On November 27, 1995, the ECFMG Committee on Medical Education Credentials reviewed the allegation that you submitted a falsified application to ECFMG and that you applied to take the United States Medical Licensing Examination™ Step 2 which you had already passed. The falsification was in your reply "No" in response to Item 1 (USMLE/ECFMG Identification Number) of the application, "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG?"

Following review in November 1995, the ECFMG Committee took action to invalidate the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-519-573-0, to inform the USMLE Committee on Irregular Behavior for its information and possible action and to revoke the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-482-700-2.

You subsequently filed an appeal of the ECFMG Committee's decision. The ECFMG Review Committee for Appeals considered this appeal on July 10, 1986. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke the Standard ECFMG Certificate issued to you under USMLE/ECFMG Identification No. 0-482-700-2, but limited the length of revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001.

In October 2000, you submitted to ECFMG an application for the USMLE Step 1 and Step 2. In Item 1 of the application, you answered "No" to the question, "Have you ever submitted an application to ECFMG for any examination, even if you did not take

*ECFMG® is an organization committed to promoting excellence in international medical education.*

Dr. Igberase Oluwafemi Charles
May 3, 2001
Page 2

the examination?"

On April 18, 2001, the ECFMG Committee on Medical Education Credentials reviewed the allegation that the application you submitted in October 2000 was falsified and that you applied to take the USMLE Step 1 and Step 2 which you had already passed. The falsification was in your reply of "No" in response to Item 1 (USMLE/ECFMG Identification Number) of the application, "Have you ever submitted an application to ECFMG for any examination, even if you did not take the examination?"

Following this review, the ECFMG Committee took action to extend the length of the revocation of your Standard ECFMG Certificate for a yet to be specified period of time, to refer this new matter to the USMLE Committee on Irregular Behavior for its review and to review this matter again after the USMLE Committee's decision.

ECFMG will send notification of this action to state medical licensing boards, graduate medical education program directors in the United States, the Federation of State Medical Boards' Action Data Bank, Canadian licensing authorities and other interested entities.

Actions of the ECFMG Committee on Medical Education Credentials are subject to the ECFMG Rules of Appellate Procedure. A copy of the ECFMG Rules of Appellate Procedure is enclosed.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

ECFMG-000447

JA4113

ECFMG_RUSS_0000447

# Exhibit 9

OLUWAFEMI CHARLES IGBERASE

RECEIVED @ MR AYO ALUKO-OLOKUN#6 ADEJOBI STREET,
CREDENTIALS DEPT.

JUL 2 2001

ECFMG

OKEKOTO,VIA ELERE POLICE BARRACKS,

AGEGE,LAGOS,NIGERIA.

ECFMG#0-482-700-2
June 17,2001



EXHIBIT 13
Kelly
LO 8/20/19

Dear Mr Kelly,

I am hereby responding to your letter dated,nov,16 2001.

Like I stated in the E-mail I sent to you,I did not deliberately reapply to take the ecfmg again,after waiting for about five years for the initial penalty to be lifted.I had asked my childhood friend to help me apply to take the spex exam,to put myself in a position to re-apply for my ecfmg certificate that was suspended.Like I said to you previously,this was just to prove to the panel that I am still very current eith the latest in medicine.i told him to check on the form that I had never taken the test(spex)before,which is the truth.

I did not find out on time about the mistake,until he came visiting his parents in Nigeria,that he told me you were trying to get in contact with me regarding my ecfmg application.It was then that I looked at the copies that he had with him and realized the major mistake.

Why in the world will I repeat the same mistake after waiting five whole years.

I however,do take full responsibility for the error,and,I am ready to accept the judgement of the review panel.

I hope to be able to come to the United States if so desired of me.Presently,I have some problems with the INS,which I hope will be resolved before then.

I hope the panelists understand my plight.

I did not deliberately ask him to fill out the wrong application form,and I have waited too long to make the same mistake a second time.

He wrote not applicable for the social security number because at that time the Ins were going to discontinue the number due to the problems involving my cousing Dr Akoda and the use of my work papers.

It was not to deceive your office.

I hope the panelist review my situation in a very positive light.

Yours sincerely,

Femi Charles Igberase.M.D.

ECFMG-000202

JA4115
ECFMG_RUSS_0000202

# Exhibit 10


EXHIBIT 14
Kelly
JO 8/20/19

PROCESSED

**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

May 22, 2002

Dr. Oluwafemi Charles Igberase
c/o Gwendolyn Mensah
3516 Darthmoor Lane
Olney, MD 20832

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Igberase:

On behalf of the ECFMG Medical Education Credentials Committee, I am writing to inform you the Committee has completed its second review regarding your alleged irregular behavior in connection with the response to Item 1 on the application for the USMLE Step 1 received by ECFMG on October 23, 2000. With that application, you were applying for the USMLE Step 1 that you had previously taken and passed. This review by the ECFMG Committee was on remand from the USMLE Committee on Irregular Behavior.

The ECFMG Medical Education Credentials Committee previously reviewed this matter in April 2001. On May 3, 2001, I wrote to advise you that the ECFMG Committee took action to extend the length of the revocation of your Standard for a yet to be specified period of time, to refer this new matter to the USMLE Committee on Irregular Behavior for its review and to review this matter again after the USMLE Committee's decision.

At its subsequent review in May 2002, the ECFMG Medical Education Credentials Committee took action to revoke permanently your Standard ECFMG Certificate.

In accordance with ECFMG policies and procedures, an annotation that you engaged in irregular behavior will be included in your ECFMG record. This annotation shall appear on your ECFMG Certification Verification Service Report and ECFMG Status Report. In addition, ECFMG will report the determination of irregular behavior and permanent revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards, state medical licensing authorities, directors of graduate medical education programs and other interested entities.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG-000268

JA4117
ECFMG_RUSS_0000268

Dr. Oluwafemi Charles Igberase
May 22, 2002
Page 2

    As noted in the enclosed ECFMG Rules of Appellate Procedure, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the time limit specified, i.e., within 60 days of the date of this notification.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

ECFMG-000269

JA4118
ECFMG_RUSS_0000269

# Exhibit 11





EXHIBIT 16
Kelly
DP 8/20/19

# University of Ibadan



*Charles Ugbeoese Oluwofemi*

having fulfilled all the requirements of the University

and passed the prescribed examinations has this day

been admitted to the degree of

## Bachelor of Medicine

and

## Bachelor of Surgery

VICE-CHANCELLOR

DATE *June 18, 1996*

REGISTRAR

ECFMG-000267

JA4120
ECFMG_RUSS_0000267

# Exhibit 12

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

EXHIBIT 39
Kelly
LD 8/20/19

September 13, 2000

Memorandum

To:      File #0-553-258-5
          John Akoda

From:    William Kelly

I spoke with J. McCorkle today. He said the hospital has notified Akoda he is being suspended from program due to "inconsistencies." He has 15 days to appeal (until Sept. 15).

McCorkle said he would notify ECFMG shortly after Sept. 15 if Akoda does not appeal. If he does, appeal, an additional 15 days (until @ Sept. 30) will be required for the appeal process. During that time period McCorkle will not be able to give any further information to ECFMG.

Essentially, according to McCorkle, Akoda claims he is the cousin of "Igberase Charles." McCorkle also said his discussions with Harlem Hospital were "not definitive."

*ECFMG® is an organization committed to promoting excellence in international medical education.*

# Exhibit 13



EXHIBIT 42
Kelly
JD 8/30/19

FEDERAL REPUBLIC OF NIGERIA

| PASSPORT | Type / Type | Country code / Code du pays | Passport No. / Passeport N° |
| PASSEPORT | P | NGA | A0662562 |

Surname / Nom
AKODA
Given names / Prénoms
JOHN NOSAKHANE CHARLES
Nationality / Nationalité
NIGERIAN
Date of birth / Date de naissance          Authority / Autorité
01 JAN / JAN 59                             370
Sex / Sexe     Place of birth / Lieu de naissance
M             LAGOS
Date of issue / Date de délivrance          Holder's signature / Signature du titulaire
11 SEP / SEPT 00
Date of expiry / Date d'expiration
10 SEP / SEPT 05                             Charles Akoda

P<NGAAKODA<<JOHN<NOSAKHANE<CHARLES<<<<<<<<<<
A0662562<7NGA5901010M0509101<<<<<<<<<<<<<<<02

ECFMG-000544

JA4124

# Exhibit 14

Revised June 2006

Use your browser's print button to print the following ERAS Documer



Mail Id : 53313

## ERAS® Document Submission Form

**Instructions:**
Please submit this form along with any document(s) you want processed for your ERAS application including: original MSPE, photograph, original Letters of Recommendation (LoRs) and copy of medical school transcript. For LoRs, please be sure to list the names of the letter writers in the grid provided below. If you agreed to waive your right to view your LoR(s), your letter writer(s) must submit the "LOR Cover Sheet / Instructions for International Medical Graduates". The form can be found and downloaded at http://www.aamc.org/students/eras/resources/.

**Note:** Please **do not** send any documents that you do not intend to assign to programs as part of your application.

Applicant Name / AAMC ID: _John. C. Nosa AKoda / 11450936_

Applicant Signature: _Charles AKoda ._

### Documents submitted with this form: (Please circle)

1. MSPE (must be an original)                                    YES        (NO)

2. Color Photograph                                          (YES)        NO

3. Medical School Transcript (copy)                            YES        (NO)
   (ERAS cannot access a medical transcript or photo that you may
   have sent to ECFMG for the purpose of ECFMG Certification.)

4. Original Letter(s) of Recommendation that are included in this mailing (enter name of letter writer):

| Letter Writer Names | |
|---|---|
| Name: Dr A.O. Roberts | Name: |
| Name: Dr Phil Robertson | Name: |
| Name: Dr Charles Francis | Name: |
| Name: | Name: |
| Name: | Name: |

### Submit the completed form with your documents to:

**Regular mail:**
ECFMG / ERAS Documents
PO Box 11746
Philadelphia, PA 19101-0746 USA

**Courier service:**
ECFMG / ERAS Documents
3624 Market Street
Philadelphia, PA 19104-2685 USA

For Official Use Only P/CD   S-DN

Date Sent: 10|3|06        Via: USPS (E+P).        SH 10/16

Comments: No Photo in this Packet                RECEIVED

OCT 0 5 2006

ERAS



EXHIBIT
Kelly 50
JP 8/20/19

Confidential

JA4126
ECFMG_RUSS_0003899

# Exhibit 15

CERTIFIED COPY

Monique Russell

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - X

MONIQUE RUSSELL, JASMINE          :

RIGGINS, ELSA M. POWELL           :

and DESIRE EVANS,                 : Civil Action No.

          Plaintiffs,             :   18-5629

v.                                :

EDUCATIONAL COMMISSION FOR        :

FOREIGN MEDICAL GRADUATES,        :

          Defendant.             :

- - - - - - - - - - - - - - - - - X


Videotaped Deposition Of MONIQUE RUSSELL

Washington, D.C.

Monday, September 16, 2019

1:51 p.m.


Job No. 88394

Pages:  1 - 136

Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

Monique Russell

```
 1              A P P E A R A N C E S

 2

 3     ON BEHALF OF THE PLAINTIFFS:

 4          CORY L. ZAJDEL, Esquire

 5          Z Law, LLC

 6          2345 York Road, #B-13

 7          Timonium, Maryland 21093

 8          Telephone:   (443) 213-1977

 9          Email: clz@zlawmaryland.com

10

11     ON BEHALF OF THE DEFENDANT:

12          BARRY W. SHAFFER, Esquire

13          MATTHEW D. KLAYMAN, Esquire

14          Morgan, Lewis & Bockius, LLP

15          1701 Market Street

16          Philadelphia, Pennsylvania 19103

17          Telephone: (215) 963-5100

18          Email: barry.shaffer@morganlewis.com

19          Email: matthew.klayman@morganlewis.com

20

21     Also present:

22          David Campbell, Videographer

23

24

25
```

JA4129

Monique Russell

```
 1
 2           E X H I B I T S   C O N T I N U E D
 3              (Attached to the Transcript)
 4   RUSSELL DEPOSITION                              PAGE:
 5   Exhibit 4      Medical Records From Major         91
 6                  Medical, LLC, For Monique
 7                  Russell, Bates Stamped
 8                  Plaintiffs0000118654 Through
 9                  0000118679
10   Exhibit 5      June 27, 2017 Facebook Post       105
11                  By Monique Russell To The
12                  MaMa Sisterhood Of Prince
13                  George's County Facebook
14                  Group
15   Exhibit 6      Stipulation Of Dismissal          113
16                  Without Prejudice, Bates
17                  Stamped Plaintiffs0000118860
18                  Through 0000118863
19   Exhibit 7      Plaintiff Monique Russell's       116
20                  Responses To Defendants'
21                  Requests For Admission
22
23
24
25
```

Monique Russell

```
 1                  The oath that you just took from the
 2    court reporter is the same one that you would take
 3    in a court of law before a judge and a jury.
 4                  Do you understand that?
 5        A     Yes, I do.
 6        Q     And the court reporter sitted to my --
 7    seated to my left is taking down my questions and
 8    your answers into a little booklet that will be
 9    transcribed, and you'll have the opportunity to
10    review after we complete the deposition today.
11                  Do you understand that?
12        A     Yes.
13        Q     And, so, because she's going to be
14    taking down the questions and the answers, it's
15    important that we try not to talk over top of each
16    other because she can't take us both down at the
17    same time.
18                  I'll try to do that on my part.  Will
19    you -- will you do the same?
20        A     Yes.
21        Q     We also have a videographer here who's
22    taking the deposition on video so that we'll be
23    able to see the questions and answers as well.
24    But even so, the court reporter -- it's hard for
25    her to take down nonverbal responses.  So a shake
```

Monique Russell

```
 1   meetings.
 2        Q       And when you say the two schools, there
 3   are two separate schools in Costa Rica?
 4        A       No, they call them schools.  Country
 5   Day School is a campus that goes from early
 6   childhood to high school, and so there are four
 7   schools, the early childhood, elementary, middle
 8   and high school, and I work with the two lower
 9   schools.
10        Q       And are you in Costa Rica by yourself,
11   or is your family with you?
12        A       My family is with me.
13        Q       And who is that that's with you there?
14        A       My husband and my son.
15        Q       Okay.  And your husband's name is?
16        A       Christopher William Russell.
17        Q       Okay.  And how old is he?
18        A       He is -- how old am I? -- 46.
19        Q       And your son?
20        A       Is Luka.
21        Q       Okay.  And how old is Luka?
22        A       Three.
23        Q       Okay.  And was Luka born or May 25th,
24   2016?
25        A       Yes.
```

Monique Russell

```
 1      Q       Okay.  Do you have any other children?

 2      A       No.

 3      Q       And how long have you been married?

 4      A       For five years in October.

 5      Q       Okay.  And you are here in Washington,

 6   D.C. today having returned from Costa Rica;

 7   correct?

 8      A       Yes, I flew from Costa Rica.

 9      Q       Okay.  And when did you arrive here in

10   Washington?

11      A       Last night.

12      Q       Okay.  And what, if anything, have you

13   done to prepare to come and testify here today in

14   this deposition?

15      A       I reviewed my interrogatories and the

16   paperwork of the course --

17      Q       Uh-huh.

18      A       -- of the case, but that's about it.

19      Q       Okay.  You -- you have filed, as I

20   understand it, two different lawsuits related to

21   your interactions with a Dr. Charles Akoda;

22   correct?

23      A       Yes.

24      Q       Did you review materials related to

25   both of those cases before coming in to testify
```

Monique Russell

```
 1        Q       And if I understand from your discovery
 2   responses in the case, you believe that you found
 3   out about the fact that Dr. Akoda, who I believe
 4   helped deliver your son, Luka, you found out he
 5   had pled guilty in June of 2017?
 6        A       I'm not sure if that's the time, but if
 7   that's what your record shows, probably.
 8        Q       We can go through, and we probably will
 9   go through, some of the questions.  I'm not trying
10   to -- to trick you on that, so . . .
11                Why don't you tell me just generally
12   how you came to learn about any issues with
13   Dr. Akoda?
14        A       Sure.  So I -- in the neighborhood
15   where I lived at the time, there was a parent
16   listserv where people would post recommendations
17   or ask for advice and things like that.  And
18   someone asked for a recommendation for an OB/GYN.
19   And I wanted to recommend my OB/GYN, Dr. Waldrop,
20   but I wanted to make sure that the person knew if
21   they went to Dr. Waldrop that there was a chance
22   that they would end up having their baby delivered
23   with Akoda, and I did not have a good experience
24   with him during the delivery, and so I wanted to
25   make sure the person was aware of that.
```

Monique Russell

```
 1              And I went to his Web site to confirm
 2    the spelling of his name, and he wasn't on their
 3    Web site anymore.  So I went and looked at my
 4    paperwork, confirmed the spelling, I looked him up
 5    to see like, maybe he moved somewhere else so that
 6    wouldn't be an issue for this person.  And I
 7    discovered a press release from the Department of
 8    Justice saying that he had been arrested for
 9    charges of fraud very shortly after he performed a
10    C-section on me.
11         Q      And the physician that you mentioned,
12    Dr. Waltrop?
13         A      Waldrop.
14         Q      Waldrop.  That was your OB/GYN?
15         A      Yes.
16         Q      How long -- when did you first start
17    going to see Dr. Waldrop?
18         A      I'm not sure.  Maybe three months into
19    my pregnancy.
20         Q      And how did you come to start visiting
21    Dr. Waldrop?
22         A      She was recommended by a woman that I
23    met on the hospital tour.
24         Q      Okay.  And what hospital was that?
25         A      P.G. County, Dimensions Hospital.
```

Monique Russell

```
 1    earlier that -- that Luka was born in May of 2017;
 2    correct?
 3         A    Yes.
 4         Q    And was he born by C-section?
 5         A    Yes.
 6         Q    And was that a planned C-section?
 7         A    No, it was not.
 8         Q    What were the circumstances that led to
 9    him being born by C-section?
10         A    I had been in labor for, I believe, 32
11    hours at that point, and after a period of time,
12    they recommended that I take a drug called Pitocin
13    that they hoped would -- Akoda recommended it to
14    speed up contractions so that I would dilate.
15         Q    Uh-huh.
16         A    It did not have that effect.
17              And then after 30, 32 hours, he
18    recommended an epidural.  Immediately after he did
19    the epidural, he said that my baby was in distress
20    and that he needed an emergency C-section.
21         Q    Okay.  And was your original plan for
22    birth to go to the hospital and have someone from
23    Dr. Moore's practice deliver vaginally?
24         A    Yes, that was my original plan.
25         Q    Okay.  I saw a reference in your
```

Monique Russell

```
 1    lower school; right?

 2        A     Yes.

 3        Q     Okay.  And I understand that you, as

 4    you've said in -- in written responses to

 5    interrogatories, that you -- you have suffered

 6    from emotional distress as a result of learning

 7    about Dr. Akoda; is that right?

 8        A     Yes.

 9        Q     And what in particular is it that you

10    are experiencing as a result of what you found out

11    about Dr. Akoda?

12        A     I feel violated by Dr. Akoda.  I feel a

13    sense of distrust in the medical community in

14    general.  Like I wouldn't want, for example, to go

15    find a therapist to see to talk to about these

16    things because how do I what their certification

17    is worth or their licensure is worth based on how

18    far doctor -- not even a doctor, how far Akoda got

19    with false papers.

20            I don't trust the institutions that are

21    in place to -- to check that these doctors are who

22    they say they are, doing the right thing, or have

23    the credentials they do, which makes it very hard

24    for me to then use sources I would have used to

25    check on a doctor.
```

Monique Russell

```
 1              And I don't feel equipped to do
 2    background checks on doctors myself.
 3              I feel violated, and it makes it very
 4    difficult to -- I'm sorry.  It makes it very
 5    difficult to see an OB/GYN.
 6         Q    And I take it that when you found out
 7    about Dr. Akoda's guilty plea regarding the use of
 8    Social Security numbers, that . . .
 9              MR. SHAFFER:  There's some tissues back
10    there.
11         BY MR. SHAFFER:
12         Q    Here you go.
13              I take it when you found out about the
14    guilty plea, you -- you were angry with Dr. Moore
15    and Dr. Waldrop who you had seen in connection
16    with that pregnancy; right?
17         A    No.  I was angry in general, but I
18    don't necessarily hold blame or anger towards
19    Dr. Waldrop and Dr. Moore because they relied on
20    sources they should have been able to trust.  For
21    example, I was a teacher.  I had to have
22    background -- extensive background checks done in
23    order to hold a job within DCPS.  So when I rented
24    my basement apartment, and as a mother I wanted to
25    find somebody safe to live in the home with us,
```

Monique Russell

1    Q    And do you know whether Dr. Akoda ever

2   lied to ECFMG?

3    A    To my understanding, he did.  He used

4   three different Social Security numbers and

5   multiple names to come through and get approved to

6   take boards multiple times.

7    Q    Do you know whether Dr. Akoda did a

8   residency in the U.S.?

9    A    My understanding is that he started a

10  residency in New Jersey before they discovered

11  that he was a fraud and referred back to the

12  commission to certify foreign medical graduates,

13  and that he was still then approved again through

14  the commission and eventually received residency

15  at Howard University.

16   Q    And what's the basis for that

17  understanding?

18   A    The court documents that I read from

19  his federal trial.

20   Q    This is the -- the guilty plea of

21  Dr. Akoda?

22   A    The transcript of the trial.

23   Q    Okay.  And do you know whether ECFMG

24  certification is sufficient to allow a person to

25  obtain a residency in the United States?

Monique Russell

```
 1      A      I don't understand the --

 2      Q      Well, I -- I -- I've heard you say that

 3   you blame ECFMG, at least in part, because I think

 4   you've called them the first gatekeeper, and I was

 5   trying to understand whether you believe that

 6   ECFMG certification in and of itself is sufficient

 7   to allow a person to be in a residency program.

 8      A      I don't think so.  I think that it's

 9   required for them to be able to take the medical

10   boards in the first place which is a requirement

11   for a residency program.

12      Q      And the basis for that understanding

13   is?

14      A      The documents that I read from the

15   federal trial.

16              MR. SHAFFER:  Okay.  Let's go ahead and

17   mark this.  You know what?  Off the record a

18   second.

19              THE VIDEOGRAPHER:  Off the record at

20   3:47.

21              (Recess -- 3:47 p.m.)

22              (After recess -- 3:50 p.m.)

23              THE VIDEOGRAPHER:  Back on the record

24   at 3:50.

25              BY MR. SHAFFER:
```

Monique Russell

```
 1    bottom, 1129, at the top it references questions
 2    about substance abuse, and the answer is none.
 3            Was that accurate from your perspective
 4    there; that if you were asked about substance
 5    abuse, you would say there was none?
 6        A    Yes.
 7        Q    Okay.  And then there's a reference to
 8    sexual -- a history of sexual abuse, and the
 9    answer is, referenced here again, no; correct?
10        A    Yes.
11        Q    In connection with your discovery
12    responses, you say that your experiences with
13    Dr. Akoda have flowed into your marriage and
14    created intimacy issues; correct?
15        A    Yes.
16        Q    In what way has that interfered with
17    your marital relationship?
18        A    It has been difficult to be sexually
19    intimate, and it's impacted family planning
20    because we want more children, and that is
21    challenging when it is hard to see an OB/GYN.  And
22    it's -- intimacy with my husband is better now,
23    but it's -- it's not like it was before.  And
24    after I found out about this, it was very
25    difficult.
```

JA4141

Monique Russell

1          **And you admit that; correct?**

2      A     I do.

3      Q     **So you did not feel that during your**

4  **visits with Dr. Akoda that you were being abused**

5  **sexually?**

6      A     At the time I did not feel that way.

7      Q     **Do you believe -- do you feel that way**

8  **now?**

9      A     I feel violated for a fake doctor to be

10  in my vagina, yes.  I feel like I'm a victim of

11  sexual assault now.

12     Q     **Have you reported that to the**

13  **authorities?**

14     A     No, that's why I'm doing a class action

15  lawsuit so that every woman who he has ever seen

16  can be notified.

17     Q     **Do you know whether any of them have**

18  **been notified?**

19     A     I'm sure some have because there have

20  been ads, I understand.  I posted where I could

21  notify women.  So I know that some have.  I don't

22  know how many women there are over the close to

23  ten years that he's been doing this who would

24  still need to be notified.

25          MR. SHAFFER:  Let's go off the record

JA4142

# Exhibit 16

 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    -------------------------------

 5    MONIQUE RUSSELL, JASMINE

      RIGGINS, ELSA M. POWELL, and

 6    DESIRE EVANS,

              Plaintiffs,        Case No. 18-5629

 7         v.

      EDUCATIONAL COMMISSION FOR

 8    FOREIGN MEDICAL GRADUATES,

              Defendants.

 9    -------------------------------

10              Washington, D.C.

11            Friday, September 12, 2019

12          Deposition of JASMINE RIGGINS, a witness

13    herein, called for examination by counsel for the

14    Defendant in the above-entitled matter, pursuant

15    to notice, the witness being duly sworn by Barbara

16    DeVico, a Notary Public in and for the District of

17    Columbia, taken at the offices of MORGAN, LEWIS &

18    BOCKIUS, LLP, 1111 Pennsylvania Avenue,

19    Washington, D.C., at 11:33 a.m.,

20    Thursday,September 12, 2019, and the proceedings

21    being taken down by Stenotype by BARBARA De VICO,

22    CRR, RMR, and transcribed under her direction.

23

24

25

```
 1   as Jasmine Riggins, correct?

 2           A.      Yes.

 3           Q.      Is your birthday July 4, 1992?

 4           A.      Yes.

 5           Q.      And how old would that make you?

 6           A.      27.

 7           Q.      Are you currently married?

 8           A.      No.

 9           Q.      Do you have any children?

10           A.      Yes.

11           Q.      How many children?

12           A.      Three.

13           Q.      And can you give me their names and

14   their current ages?

15           A.      Santana is 10, Messiah is 10, Taniya

16   will be two next month.

17           Q.      Are Santana and Messiah both boys?

18           A.      Yes.

19           Q.      And Taniya is a girl?

20           A.      Yes.

21           Q.      And earlier this year in your

22   deposition in the Dimensions case you indicated

23   that you were engaged.  Is that status the same, or

24   has it changed?

25           A.      It's the same.
```

```
 1          Q.      What's your current address?

 2          A.      3699 J Street, Apartment 301, N.E.,

 3   Washington, D.C. 20019.

 4          Q.      How long have you lived there?

 5          A.      Almost a year.

 6          Q.      You have a high school GED, is that

 7   right?

 8          A.      Yes.

 9          Q.      Do you have any other subsequent

10   education beyond that?

11          A.      No.

12          Q.      Are you currently employed?

13          A.      Yes.

14          Q.      Where is that?

15          A.      Potbelly Sandwich Shop.

16          Q.      When did you start working there?

17          A.      April of this year.

18          Q.      And you've worked at Potbelly's

19   since April of this year?

20          A.      Yes.

21          Q.      And how many hours a week,

22   approximately, do you work?

23          A.      About 22.  Slower season.

24          Q.      So is this part-time work?

25          A.      Yes.
```

```
 1                     (Recess)

 2                     THE VIDEOGRAPHER:  We are back on

 3            the record.  The time is 11:57 a.m.

 4    BY MR. SHAFFER:

 5            Q.    Okay, Ms. Riggins, we're back on the

 6    record, and we were talking before a quick break

 7    there about an individual named Dr. Akoda, an

 8    individual, and I think you took some issue with

 9    calling him Dr. Akoda.  Why is that?

10            A.    He's not a doctor.

11            Q.    And why do you say that?

12            A.    Because he doesn't have credentials

13    and certifications to be a doctor.

14            Q.    Do you know -- and just so again I

15    want to make sure that we're talking about the same

16    things today so we don't have to go back later on,

17    when we refer to an individual known as Dr. Akoda

18    or the person that you believe is not a doctor

19    about, we're talking about the person that you saw

20    in connection with the birth of your second child;

21    correct?

22            A.    Correct.

23            Q.    And, at the time that you were being

24    seen by him and actually gave birth with him

25    through C-section, correct?
```

```
1            A.    Well, there were problems after my
2    pregnancy, after the delivery, I had issues.
3            Q.    What were those issues?
4            A.    Pain, severe pain in my stomach and
5    my abdominal at work, I would have pain throughout
6    the day.  And I couldn't have my tubes tied due to
7    the damaged tissues on my C-section, which caused a
8    lot of pain.
9            Q.    And so this is after the birth of
10   Messiah, and Messiah was born by C-section;
11   correct?
12           A.    Correct.
13           Q.    And you said at a later point in
14   time you wanted to have a tubal ligation and were
15   told you couldn't have one?
16           A.    Correct.
17           Q.    And you were told it was because of
18   scarring that was present from earlier C-sections?
19           A.    Correct.
20           Q.    And was that scarring that you say
21   precluded you from having the tubal ligation, that
22   was something you attribute to the C-section
23   Dr. Akoda did?
24           A.    Correct.
25           Q.    And why do -- why do you do that?
```

JA4148

```
 1   George's County on 3/18/2013?

 2          A.    Yes.

 3          Q.    What did you have?

 4          A.    A C-section.

 5          Q.    That's when Messiah was born?

 6          A.    Yes.

 7          Q.    And you can see that this is a

 8   two-page record signed by Charles Akoda, M.D. --

 9   not signed but his name appears at the end of the

10   document.  Correct?

11          A.    Yes.

12          Q.    And if you look -- well, the top of

13   the page there's a fax server date and time.  It

14   says, "3/19/2013 at 2:42:42 p.m."

15          Do you see that?

16          A.    Yes.

17          Q.    So does this appear to be a record

18   then that would have been created and sent

19   immediately after your C-section with Messiah in

20   March of 2013?

21                MR. ZAJDEL:  Objection.

22          A.    Yes.

23          Q.    That's the date you had the

24   C-section, right, 3/18/2013?

25          A.    Yes.
```

JA4149

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4       - - - - - - - - - - - - - - - - X

 5       MONIQUE RUSSELL, JASMINE          :

 6       RIGGINS, ELSA M. POWELL           :

 7       and DESIRE EVANS,                 : Civil Action No.

 8                   Plaintiffs,           :   18-5629

 9       v.                                :

10       EDUCATIONAL COMMISSION FOR        :

11       FOREIGN MEDICAL GRADUATES,        :

12                   Defendant.            :

13       - - - - - - - - - - - - - - - - X

14

15                        Volume II

16       Continued Videotaped Deposition Of JASMINE RIGGINS

17                    Washington, D.C.

18              Monday, September 16, 2019

19                      9:56 a.m.

20

21

22       Job No. 88391

23       Pages:  44 - 145

24       Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

25
```

Jasmine Riggins

```
 1      A      A couple of years ago.

 2      Q      Was it, you know, talking 2015, 2016?

 3      A      Yeah, around that time, 2016.

 4      Q      Okay.  Now, is emotional distress the

 5   only injury that you're suing for in this lawsuit?

 6      A      Correct.

 7      Q      And you're suing ECFMG because you

 8   contend that ECFMG is responsible, in whole or in

 9   part, for your emotional distress?

10      A      Correct.

11      Q      Do you also contend that Prince

12   George's Hospital Center is responsible, in whole

13   or in part, for your emotional distress?

14      A      Correct.

15      Q      Do you also contend that the Maryland

16   Board of Physicians is responsible, in whole or in

17   part, for your emotional distress?

18      A      Correct.

19      Q      Do you also contend that Dr. Abdul

20   Chaudry is responsible, in whole or in part, for

21   your emotional distress?

22      A      Correct.

23      Q      Do you also contend that the American

24   Board of Obstetricians and Gynecologists are

25   responsible, in whole or in part, for your
```

Jasmine Riggins

```
 1    emotional distress?

 2         A      Correct.

 3         Q      So you would say that anyone that you

 4    contend did anything to enable Dr. Akoda to

 5    practice medicine is responsible, in whole or in

 6    part, for your emotional distress?

 7         A      Correct.

 8         Q      Tell me about your emotional distress.

 9         A      I feel angry, sad, embarrassed,

10    ashamed.  My emotions are, like, all over the

11    place.  I can't even put them into as many words

12    that I can think of.  I just can't believe that

13    someone would do that.  It's beyond me.

14         Q      And when you say "that," what are you

15    referring to?

16         A      To pretend to be someone that they're

17    not, to practice something that they had no rights

18    to practice without the proper process of it all.

19         Q      And by "proper process of it all," what

20    do you mean?

21         A      Going about it the correct way.

22         Q      And by "the correct way," you mean

23    what?

24         A      Receiving proper documents, being

25    truthful, being honest, doing the things that a
```

JA4152

Jasmine Riggins

```
 1      Q      -- in December of 2017?

 2      A      Yes.

 3      Q      If we turn to page 3 of that document,

 4   paragraph 14, just at the bottom.

 5      A      Okay.

 6      Q      You state, Jasmine Riggins was a

 7   patient of Oluwafemi Charles Igberase between

 8   August 2012 and March 2013 at Dimensions, period.

 9   Jasmine Riggins knew Oluwafemi Charles Igberase as

10   Akoda.

11             Is that true to the best of your

12   knowledge?

13      A      Yes.

14      Q      Turn to page 11, and look at

15   paragraph 66 where you state, Between 2008 and

16   2016, Akoda was an actual and/or apparent, duly

17   authorized agent, servant and/or employee of

18   Dimensions, holding a medical staff position

19   and/or enjoying hospital privileges.

20             Is that true and correct to the best of

21   your knowledge?

22      A      Yes.

23      Q      I'm sorry?

24      A      Yes.

25      Q      Okay.  Okay.  Turn to the next page.
```

Jasmine Riggins

```
 1        Q       And you have not looked for those;
 2    correct?
 3        A       Correct.
 4        Q       Why not?
 5        A       I've had other things going on,
 6    unfortunately.
 7        Q       Is that something that you are still
 8    willing to collect and provide to your attorneys
 9    to provide to us?
10        A       Yes.
11        Q       Okay.  And just so I'm clear, the
12    things that you think Dr. Akoda did that were
13    wrong are what?
14        A       Performing on women, doing C-sections,
15    looking at women's private parts, violating them,
16    touching them, not being honest with them.
17        Q       And what is it that you think ECFMG
18    should have done?
19        A       Paid attention to his credentials and
20    actually paid attention to him being interviewed
21    under two different names.  Just be more careful
22    about their job, pretty much.  Be more careful
23    about who they certify.
24        Q       And do you know whether or not they
25    identified instances where Dr. Akoda had used
```

JA4154

# Exhibit 17

JA4155

Elsa Powell

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5    --------------------------------x

 6    MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 7    ELSA M. POWELL, and DESIRE EVANS,    18-5629

 8         Plaintiffs,                     Honorable

                                           Joshua D. Wolson

 9    v.

10    EDUCATIONAL COMMISSION FOR FOREIGN

11    MEDICAL GRADUATES,

12         Defendants.

13    --------------------------------x

14

15

16         VIDEOTAPED DEPOSITION OF ELSA POWELL

17                  Washington, D.C.

18              Friday, September 6, 2019

19

20

21

22

23         GOLKOW LITIGATION SERVICES

24     T 877.370.3377 | F 917.591.5672

25              deps@golkow.com
```

JA4156

Elsa Powell

```
1                    ELSA POWELL,
2          having been first duly sworn and/or
3   affirmed on her oath, was thereafter examined and
4   testified as follows:
5                    EXAMINATION
6   BY MS. MCENROE:
7          Q.  Good morning, Ms. Powell.
8          A.  Good morning, ma'am.
9          Q.  For the record, could you just state your
10  complete name for me?
11         A.  Elsa Miguelina Powell.
12         Q.  And is it correct that your birthday is
13  April 14th, 1987?
14         A.  That's correct.
15         Q.  And that makes you 32 years old today?
16         A.  That's correct.
17         Q.  You understand that I'm here because you
18  have filed a lawsuit against the Educational
19  Commission for Foreign Medical Graduates; is that
20  correct?
21         A.  Yes, ma'am.
22         Q.  And we'll be taking your deposition today.
23  Do you understand that?
24         A.  Yes, ma'am.
25         Q.  And you've been deposed once before; is
```

JA4157

1    did you have another name before you got married?

2          A.   I had another name.

3          Q.   What was that name?

4          A.   Delvillar-Mejia.

5          Q.   That was the last name?

6          A.   Yes.

7          Q.   And was that hyphenated?

8          A.   Yes.

9          Q.   And have you used any other names besides

10   those we just discussed?

11         A.   No, ma'am.

12         Q.   And am I correct to assume that you

13   changed your name because you got married?

14         A.   Correct.

15         Q.   Do I have it right that you were married

16   in January 2015?

17         A.   That's correct.

18         Q.   To Gregory Lamont Powell?

19         A.   That's correct.

20         Q.   Is he still your husband today?

21         A.   Yes, ma'am.

22         Q.   How many children do you have?

23         A.   I have five children.

24         Q.   Would you please tell me their names and

25   ages?

Elsa Powell

```
 1    doctor's office, because that's when she stopped
 2    seeing patients.
 3         Q.  You said it was a lady, so it was a female
 4    OB/GYN?
 5         A.  Yes.
 6         Q.  Did she refer you to another doctor?
 7         A.  Yes.
 8         Q.  To whom did she refer you?
 9         A.  Dr. Chaudhry.
10         Q.  Is Dr. Chaudhry an OB/GYN?
11         A.  Yes.
12         Q.  Where is he located?
13         A.  In District Heights.
14         Q.  How close to you is that?
15         A.  At the time where I lived, it was about 15
16    minutes.
17         Q.  Did you move at some point since then?
18         A.  Yes, I did.
19         Q.  Have you moved more than once since then?
20         A.  Since then, yes.
21         Q.  And so did you actually ever go see
22    Dr. Chaudhry?
23         A.  I did not see Dr. Chaudhry.  He was never
24    in there.  I saw Dr. Akoda.
25         Q.  Did you go to Dr. Chaudhry's practice?
```

Elsa Powell

1        A.   Yes, his office.

2            Q.   So just tell me a little bit about how

3    that works.  Did you call up to make an appointment

4    at Dr. Chaudhry's practice?  Did the lady OB/GYN call

5    for you and make appointments, or how did that

6    transition happen, if you remember?

7            A.   She gave me the referral.  I called up

8    there and made an appointment.  So when I got to my

9    appointment, they said that Dr. Chaudhry had to step

10   out, but Dr. Akoda was there.  So I said, that's

11   fine, I just need to get care, I don't care who I

12   see.  I was at my last stage of pregnancy.

13           Q.   You were about six months, you said?

14           A.   About six months, yes.  So then that's

15   when I saw Dr. Akoda, and then all my regular

16   visits -- two weeks after that, every two weeks.

17           Q.   Starting every two weeks?

18           A.   Yes.

19           Q.   Where did those visits take place?

20           A.   At Dr. Chaudhry's office in District

21   Heights.

22           Q.   Prior to going to Dr. Chaudhry's practice,

23   did you do any research into him, Dr. Chaudhry?

24           A.   No.

25           Q.   Can you tell me just a little bit about

JA4160

Elsa Powell

```
1        Q.  They began weekly?

2        A.  Yes.

3        Q.  Did your labor with Jaiden begin

4   naturally?

5        A.  Yes.  I was induced.

6        Q.  Who induced you?

7        A.  Dr. Akoda.

8        Q.  Where?

9        A.  PGH hospital.

10        Q.  Did you have an appointment for that?

11        A.  Yes.

12        Q.  Why?

13        A.  Because from my understanding that was the

14   policy.  You had to make an appointment to get

15   induced.

16        Q.  How far along were you when you were

17   induced, do you recall?

18        A.  I was almost nine months, eight and a half

19   to nine.

20        Q.  Do you remember if there was a medical

21   reason that you needed to get induced?

22        A.  No.

23        Q.  So is it fair to say that you had an

24   appointment to get induced and then you showed up at

25   PGH hospital then to actually be induced --
```

```
 1              You can answer.

 2         A.  Yeah, it's a problem.  You told me your

 3    name was Akoda and come to find out it's not.  I

 4    mean, what other secrets are you hiding?  I -- I

 5    trusted you.  You know, you touched my body.  I mean,

 6    that's -- I thought Akoda, you know, was my doctor,

 7    who I trusted to do my exams and -- and touch my body

 8    and deliver my baby.

 9         I don't -- I don't know whatever his name is.

10    I don't -- it's beyond disturbing, it is.  So, yeah,

11    it has -- it has a lot to do with his name, because

12    it's shocking.  It's disturbing.  I felt violated by

13    somebody who I don't know.

14         Q.  When did you feel violated by Dr. Akoda?

15    When is it that you came to feel violated, if that

16    makes sense?

17         A.  When I found out that Akoda was not Akoda.

18         Q.  When he used a different name -- that he

19    had used a different name?

20         A.  Yeah.  So I was like, who -- who -- who

21    was it that was touching me, who was it that I had

22    trusted to say -- to put my -- my life on the line.

23    If my -- if my kids, my older kids -- if I would --

24    did die in that O.R. room, you know, and my kids have

25    questions, and come to find out, oh, you know, it
```

Case: 22-1008   Document: 22-5   Page: 2273   Date Filed: 00/00/2022

```
 1          A.   When I went for my six-weeks checkup.

 2          Q.   Was that the first time you met Dr. Akoda?

 3          A.   Who, me?

 4          Q.   Oh, I'm sorry.  Strike that.  I was --

 5     six-month checkup is what I was thinking when you

 6     said --

 7          A.   Six weeks.

 8          Q.   So it was post-delivery.

 9          A.   Yes.

10          Q.   Okay.  So -- so let me start that over

11     again.

12          So Mr. Powell, your husband, came with you to

13     your six-week post-delivery appointment; is that

14     correct?

15          A.   Yes.

16          Q.   And your husband met Dr. Akoda at that

17     time?

18          A.   Yes.

19          Q.   Did anything happen at that appointment

20     other than you getting checked out?

21          A.   He stayed in the lobby and I went in, and

22     that's when he burned an ovarian cyst that he said

23     that I had.

24          Q.   So your husband waited in the waiting

25     room?
```

JA4163

Elsa Powell

```
 1    into the meat of the complaint, each paragraph has a
 2    number.  Do you see that?  So it's on page 9,
 3    paragraph 42.  Let me know when you're there.
 4         A.  I'm here.
 5         Q.  Great.  That paragraph says, "the
 6    plaintiff, Elsa Powell" -- that's you?
 7         A.  Correct.
 8         Q.  "-- was a patient of Igberase on or about
 9    September 17th, 2014, and on several occasions
10    thereafter Igberase delivered Elsa Powell's son on
11    that date at Prince George's Hospital Center."
12         Did I read that correctly?
13         A.  That's correct.
14         Q.  And do you understand in the complaint
15    that the reference to Igberase is also Dr. Akoda?
16         A.  Unfortunately, yes.
17         Q.  Okay.  But you understand that those mean
18    the same for the purposes of this complaint; is that
19    correct?
20         A.  Correct.
21         Q.  Are the -- is the information in paragraph
22    42 correct?
23         A.  That's correct.
24         Q.  I'd like to direct your attention to
25    paragraph 44, which is on the next page on the top.
```

# Exhibit 18

Desire Evans

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    --------------------------------x

 5    MONIQUE RUSSELL, JASMINE RIGGINS,     Civil Action No.

 6    ELSA M. POWELL, and DESIRE EVANS,     18-5629

 7          Plaintiffs,                     Honorable

                                            Joshua D. Wolson

 8    v.

 9    EDUCATIONAL COMMISSION FOR FOREIGN

10    MEDICAL GRADUATES,

11          Defendant.

12    --------------------------------x

13

14

15         VIDEOTAPED DEPOSITION OF DESIRE EVANS

16                   Washington, D.C.

17             Thursday, September 5, 2019

18

19

20

21

22

23              GOLKOW LITIGATION SERVICES

24         T 877.370.3377 | F 917.591.5672

25                  deps@golkow.com
```

Desire Evans

```
 1                    DESIRE EVANS,
 2            having been first duly sworn and/or affirmed
 3    on their oath, was thereafter examined and testified
 4    as follows:
 5                    EXAMINATION
 6    BY MS. MCENROE:
 7         Q.   Good morning, Ms. Evans.
 8         A.   Good morning.
 9         Q.   My name is Elisa McEnroe, counsel for the
10    Educational Commission for Foreign Medical Graduates.
11    We met briefly this morning for the first time; is
12    that correct?
13         A.   Yes, ma'am.
14         Q.   Could you please state and spell your name
15    for the record?
16         A.   Desire, D-E-S-I-R-E, Evans, E-V-A-N-S.
17         Q.   Great.  And your birthday is March 25th,
18    1979; is that correct?
19         A.   Yes, ma'am.
20         Q.   That makes you 40 years old?
21         A.   Yes.
22         Q.   Thank you.
23         A.   Tell everybody.
24         Q.   We'll mark parts of the deposition
25    confidential as needed.
```

Desire Evans

```
1           A.  I got married December 31st, 2015.

2           Q.  To whom?

3           A.  Michael Evans.

4           Q.  And is he still your husband?

5           A.  Yes, ma'am.

6           Q.  And is he the father of the child that

7   we'll discuss a little bit later today that you have?

8           A.  Yes, ma'am.

9           Q.  Great.  And what is that child's name?

10          A.  Peyton Alexander Evans.

11          Q.  And you still have your dog?

12          A.  Huh?

13          Q.  And you still have your dog?

14          A.  Yes.

15          Q.  Okay.  Great.  Do you have any other

16  children living with you?

17          A.  No, ma'am.

18          Q.  Do you have any other biological children

19  that you've birthed?

20          A.  No, ma'am.

21          Q.  What is Mr. Evans' profession?

22          A.  He is a bus operator for Metro.

23          Q.  For Metro.  Great.  And has that been

24  consistent over time?

25          A.  Well, he just started working there.  He
```

Desire Evans

```
 1          You can answer, if you understand the question.

 2          Q.  I'm not trying to make this a hard one.

 3   I'm just trying to transition to another general area.

 4          Have you ever been treated by a doctor who

 5   called himself Dr. Akoda?

 6          A.  Yes.

 7          Q.  When was that?

 8          A.  March 16th into 17th of 2008 -- '16.

 9   Jesus, '16.

10          Q.  Why were you being treated by Dr. Akoda,

11   for what condition?

12          A.  Delivery, pregnancy.

13          Q.  How did you come to be treated by

14   Dr. Akoda?

15          A.  He was the doctor on call, I guess.

16          Q.  Where?

17          A.  At Dimensions Health Systems.

18          Q.  Earlier today we were discussing you being

19   induced to have your labor; is that correct?

20          A.  Yes.

21          Q.  Was Dr. Akoda the doctor that induced you

22   to labor?

23          A.  No.  The nurse -- a nurse gave me the

24   medication.

25          Q.  So you were originally seen by another
```

```
1              A.  He was -- he was, like, fondling my

2     clitoris, saying that he needed to do that in order to

3     stimulate me to push the baby.

4              Q.  And he verbalized that to you?

5              A.  Yeah, because my husband asked him what was

6     he doing.

7              Q.  And were your husband and mother and the

8     delivery nurses in the room at the same time this was

9     occurring?

10             A.  Yes.  I don't -- I don't remember if the

11    delivery nurse was in there, but my husband for sure

12    and my mother for sure.

13             Q.  Was this during the time that your husband

14    was standing next to Dr. Akoda?

15             A.  Yes.

16             Q.  And so was the delivery nurse holding one

17    of your legs at that time?

18             MR. CERYES:  Objection, foundation.

19             Q.  Well, we talked about it earlier.  I can

20    restate the question.

21             A.  Yes.  Yes.

22             Q.  So during the time your husband was

23    standing --

24             A.  I'm not -- see, I'm not one hundred percent

25    sure because there was a point where they were holding
```

Desire Evans

```
 1    money that is?

 2            A.   No.

 3            Q.   Have you collected up any invoices or bills

 4    from any of those experiences to be able to help

 5    catalog what that might be?

 6            A.   I haven't collected them, but they're

 7    readily available, if I needed anything.

 8            Q.   So what injury, if any, did you experience

 9    as a result of ECFMG's conduct?

10            MR. CERYES:  Objection, form, foundation,

11    calls for somewhat of a legal conclusion, but you can

12    answer.

13            A.   Okay.  I feel that, because of them, I'm

14    afraid to seek a doctor.  I don't know who to trust.

15    I don't know who to send my son to.  Because if the

16    places that are supposed to be doing these

17    credentialing, if I can't trust what they're telling

18    me, I don't really know how to do my own investigation

19    to find out if a doctor is really a doctor or who they

20    say they are.  So it has diminished my trust in the

21    medical profession.

22            Q.   Do you have a belief that Dr. Akoda is not

23    a doctor?

24            MR. CERYES:  Objection.

25            A.   Yes.
```

Desire Evans

```
 1    experience of Peyton before you heard the radio ad

 2    than you did after you heard the radio ad?

 3         A.   No.  That was the reason why my husband

 4    told me about the radio ad is because it was something

 5    that was in our discussion since we had Peyton and we

 6    didn't know how to deal with it.

 7         Q.   What do you mean you didn't know how to

 8    deal with it?

 9         A.   We didn't know what course we can take,

10    whether what he did was wrong.  We didn't know.  We

11    didn't know anything.  We didn't know what to do, but

12    we were both uncomfortable.  I was uncomfortable and

13    it affected me.

14         So when he heard the ad about Dr. Akoda, he was

15    like, oh, my God, this is probably what we were

16    feeling the whole time, you know, like, so reach out

17    to them because you're not the only person that he's

18    done this to.

19         So I wasn't even aware at the time that it was

20    about him possibly not being a doctor.  I thought it

21    was about him touching women inappropriately, because

22    that's how I felt, and that was my main -- my main

23    issue at the beginning.

24         Q.   How did you feel when you got the

25    impression that it was possibly about him not being a
```

# Exhibit 19



**Planet Depos**
We Make It *Happen*™

# Transcript of Stephen S. Seeling

**Date:** September 16, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3       _____

4    MONIQUE RUSSELL, JASMINE     :  CASE NO.

5    RIGGINS, ELSA M. POWELL      :  2:18-cv-05629-JW

6    and DESIRE EVANS,            :

7                                 :

8             Plaintiffs          :

9                                 :

10         vs.                    :

11                                :

12   EDUCATIONAL COMMISSION       :

13   FOR FOREIGN MEDICAL          :

14   GRADUATES,                   :

15                                :

16            Defendants          :

17   _____

18                      -  -  -

19            Monday, September 16, 2019

20                      -  -  -

21        Deposition of STEPHEN S. SEELING was taken

22   pursuant to notice at 1701 Market Street, Philadelphia,

23   Pennsylvania, before Nancy Carides, RPR, CRR and Notary

24   Public, on the above date, and commencing at 12:00 p.m.

25
```

JA4175

Transcript of Stephen S. Seeling
Conducted on September 16, 2019                    13

```
1                    THE WITNESS:  I had no expectations.
2    BY MR. CERYES:
3         Q.     What was your role as Vice President of
4    Operations of ECFMG?
5                    MS. McENROE:  Objection to form.
6                    THE WITNESS:  I oversaw most of the
7          operational programs, including the
8          certification program.
9    BY MR. CERYES:
10        Q.     Did you also oversee the ERAS program?
11        A.     I did not.
12        Q.     Under whose oversight was the ERAS
13   program during the time you were at ECFMG?
14        A.     I can't recall.
15        Q.     Do you know the name of that position
16   that would be responsible for oversight of the ERAS
17   program?
18        A.     I just can't recall.
19        Q.     You worked with William Kelly at ECFMG?
20        A.     Bill Kelly, yes.
21        Q.     And were you responsible for the
22   oversight of Bill Kelly in carrying out the essential
23   functions of his job?
24        A.     He reported to me.
25        Q.     So, among your job responsibilities
```

JA4176

1          Q.      And another program is the ERAS

2     process; is that correct?

3          A.      Yes.

4          Q.      And with respect to ECFMG

5     certification, the purpose of that program is to

6     assess whether international medical graduates are

7     ready to enter U.S. graduate medical education

8     programs?

9          A.      It's to assess the readiness of

10    international medical graduates, yes.

11         Q.      And in particular, their readiness to

12    begin a residency program?

13         A.      Yes.

14         Q.      And it is and has been the case since

15    1990 or so that in order for international medical

16    graduates to enter a residency program, they must be

17    certified by ECFMG?

18         A.      As a general rule, that's correct.

19    There are some minor kind of esoteric exceptions, but

20    as a general rule, that's correct.

21         Q.      What are those exceptions?

22         A.      If someone is a hot-shot surgeon in

23    Timbuktu, and Harvard recruits them for six months to

24    teach a procedure to the residents of Harvard, and

25    Massachusetts has a special VIP license, then that

```
1               THE WITNESS:  Well, again, this letter
2          speaks for itself.  I mean, the first
3          paragraph, I think, is responsive to your
4          question, sir, "with respect to your
5          falsification of an application form submitted
6          to ECFMG."
7    BY MR. CERYES:
8          Q.     Okay.  So, to your understanding, what
9    happened here is that Igberase made a false response
10   on one of his applications, and the remedy or the
11   consequence that ECFMG provided for Igberase was to
12   revoke and invalidate his ECFMG certificate, correct?
13         A.     That's what this letter of December
14   7th, 1995 seems to indicate.
15         Q.     So, when you were employed with ECFMG
16   as Vice President of Operations, was it also your
17   understanding that when an applicant makes a false
18   statement on an application, that one of the potential
19   outcomes of that could be revocation or invalidation
20   of that individual's certificate?
21         A.     That's a potential consequence, a
22   potential sanction for any instance of irregular
23   behavior.
24         Q.     Why is it that making a false statement
25   on an application for ECFMG certification can be
```

JA4178

1    snapshot, things can change subsequent to, but I just

2    don't have a recollection whether or not there were

3    other cases where a charge letter was issued and then

4    subsequently a re-evaluation took place.  I know that

5    was always built into the process.  I just don't

6    remember whether or not that, in fact, happened.

7          Q.    And you refer to the process.  This is

8    not a written process, correct?

9          A.    Well, I mean, there were procedures set

10   forth in the documents relating to the credentials

11   committee in terms of the process of the hearing and

12   that kind of thing.  Again, at some point, I can't

13   recall, but sometime after I came onboard, those

14   procedures were substantially revised.  So, there were

15   documents that pertained, generally, to the scope and

16   purview and authority of the credentials committee.

17         Q.    If, in fact, you believed that Akoda

18   and Igberase were, in fact, one and the same person,

19   you would agree that in that circumstance that would

20   warrant referral to the Committee on Medical Education

21   Credentials?

22               MS. McENROE:  Objection to form.

23               THE WITNESS:  Probably, yes.

24   BY MR. CERYES:

25         Q.    And why is that?

JA4179

# Exhibit 20

September 19, 2019

Danielle S. Dinsmore, Esquire
Paul M. Vettori, Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street
Baltimore, Maryland 21201

        Re: Monique Russell, et al. v. Educational Commission for Medical
        Graduates, Case No. 2:18-cv-05629-JW

Dear Ms. Dinsmore and Mr. Vettori:

    You have asked me to review this matter and provide a report of my expert opinions with
respect to this matter. This is my report.

    Attached is my Rule 26 case list. Also attached is my Curriculum Vitae, which includes a
list of all publications I have authored.

    I am billing my time for review and preparation of my report at $ 500 per hour and my time
for deposition and trial at $ 5000 per day.

    I have reviewed and considered the documents you have provided to me, which include bates
stamped documents you obtained from ECFMG, documents obtained from the Akoda criminal
case, the Maryland Board of Physician's decision and the depositions (with exhibits) of William
Kelly and Kara Corrado.

    The following is a summary of the facts considered by me in forming my opinions:

    On April 6, 1992 ECFMG received an application from Oluwafemi Charles Igberase to take
the Foreign medial graduate examination in the Medical Sciences and the ECFMG English Test.
He provided ECFMG with a diploma from the University of Ibadan dated June 19, 1987.
Igberase failed both the basic medical science and clinical science components of the FMGEMS
and passed the ECFMG English test. He failed the Day 1 test again but passed it on the third try.
On October 4, 1993, after he successfully completed steps 1 and 2 of the USMLE, ECFMG
issued to him certificate number 0-482-700.

    On March 30, 1994, ECFMG received an application from Igberase Oluwafemi Charles to
take Steps 1 and 2 of the USMLE examinations. He provided a date of birth that was different
than the date of birth provided by Igberase. The diploma he submitted was the identical diploma
that had been submitted by Igberase. On December 14, 1994, after Charles successfully
completed the USMLE examinations, ECFMG issued to him certificate number 0-519-573-0.



EXHIBIT
2/
10-22-19

Confidential Communication with Attorney

At some point after this, for reasons that do not appear in the records, ECFMG became suspicious that Igberase and Charles were one and the same person and began an investigation. Igberase/Charles explained his actions in a handwritten letter dated July 14, 1995 in which he admitted he had lied about not taking the examination previously and why he rearranged his names. As a result of the investigation, the ECFMG Committee on Medical Education Credentials invalidated certificate number 0-519-573-0 issued to Charles and revoked certificate number 0-482-700-2 issued to Igberase. Charles appealed the decision which led to a hearing on July 10, 1996. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke certificate number 0-482-700-2 but limited the length of the revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001. Thereafter, the ECFMG Committee on Medical Education Credentials extended the length of this revocation for a yet to be specified period of time and, ultimately, revoked permanently this certificate.

On January 3, 1996 and again on August 30, 1996, ECFMG received an application from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. He provided ECFMG with a diploma from the University of Benin dated February 6, 1998. On August 18, 1998, after he successfully completed the required examinations, ECFMG issued to him certificate number 0-553-258-5. Although his applications did not include a social security number, at some time in 1998 he provided ECFMG with social security number xxx-xx- 9065.

On July 1, 1998 Akoda entered the graduate residency program at Jersey Shore Medical Center. On July 24, 1998, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program. On September 2, 1998, ECFMG sent this validated form.

By letter dated August 11, 2000 from James McCorkel, M.D. to Rice Holmes, ECFMG was notified that the Jersey Shore Medical Center graduate residency program in which Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Dr. McCorkel that Akoda had provided ECFMG with social security no. xxx-xx-9065. This is the same number Akoda provided to the Jersey Shore Medical Center.

ECFMG sent Akoda a "charge letter" dated August 22, 2000 advising Akoda that ECFMG had received information alleging that Akoda may have engaged in irregular behavior. This letter was based on the matters presented by Dr. McCorkel. Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

The Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number – that of his cousin Charles Igberase - and because the green card he had provided the hospital was inconsistent with a subsequent green card he also provided.

2

JA4182

Confidential Communication with Attorney

On December 22, 2000, William Kelly, Manager of the Medical Education Credentials Department of ECFMG, wrote a memorandum to Stephen S. Seeling, JD, Vice President of Operations of ECFMG, in which Mr. Kelly stated "[t]his memorandum is being written separately since I did not think it should be made part of the official file." He advised Mr. Seeling that both he and Dr. McCorkel believed Igberase and Akoda were one and the same person. He concluded that he did not think there was enough information for the ECFMG Credentials Committee.

In October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center for a graduate residency program, which included three letters of reference. In connection with this process, ECFMG attempted to verify the authenticity of these three letters of reference but never received responses from the persons passed off as references for Akoda.

Akoda successfully completed a graduate residency program at Howard University Medical Center. He was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center based on application and submission of required documentation including an ECFMG certificate.

The following are my opinions, which are based on the matters set out above and my education, training and experience:

ECFMG is the only organization that certifies that IMG's have successfully completed medical education at an approved foreign medical school and that they have successfully completed the required medical examinations. Without an ECFMG certification, an IMG cannot sir for required licensing exams, obtain a medical license, will not be accepted into a graduate medical education program and cannot obtain hospital privileges. The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow those procedures to ensure that IMG's comply with all requirements for certification. ECFMG has undertaken to provide certification services which are necessary for the protection of the general public. Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs. Licensing agencies, medical schools and hospitals, among others, rely upon ECFMG to act reasonably in performing these services.

It is my opinion, held to a reasonable degree of professional certainty, that ECFMG failed to adopt appropriate policies for certification of IMG's, failed to exercise reasonable care in its certification of Akoda and failed to exercise reasonable care in its investigation of allegations made about Akoda and that these failures caused harm to the named plaintiffs and members of the class.

While it is accurate to say that certification by ECFMG is only one of the steps needed for a foreign medial graduate to obtain a license to practice medicine in the United States, it is a requirement without which an IMG cannot obtain a license. It is also a required certification for entering residency and obtaining hospital privileges. If ECFMG had acted reasonably, it would have denied certification to Akoda, and would have revoked Akoda's certificate, he would not have been able to enter the Howard University residency program, he would not have been able

3

JA4183

Confidential Communication with Attorney

to obtain a Maryland medical license, he would not have been granted privileges at Prince Georges' Medical Center, and he would not have been able to harm the plaintiffs.

The ECFMG certification process and investigation of suspicious or irregular behavior by ECFMG is important to ensure that individuals seeking to act as physicians treating patients are qualified and meet professional standards of honesty, morality and character. These qualities are critical to the physician patient relationship.

ECFMG breached the standard of care in, among others, the following ways:

Failing to adopt written policies and procedures for the certification of IMG's;

Failing to adopt written policies and procedures for the investigation of allegations of irregular behavior;

Failing to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG;

Failing to investigate fully the relationship between Igberase and Akoda;

Failing to reasonably investigate Akoda's diploma from the University of Ibadan;

Failing to reasonably investigate discrepancies in official medical school seal on documents submitted for Akoda;

Failing to deny the requested waiver of a medical school confirmation of Akoda photograph based on the explanation of the Nigerian postal system not providing a rapid delivery;

Failing to deny the Akoda application due to it being incomplete;

Failing to reasonably investigate the allegations made by Dr. McCorkel;

Failing to refer Akoda to the Medical Education Credentials Committee;

Failing to follow its own procedures with respect to the charge letter sent to Akoda on August 22, 2000;

Failing to reasonably investigate the social security number provided to ECFMG by Akoda;

Failing to temporarily suspend pending investigation and discontinue to verify ECFMG certifications after Dr. McCorkel's allegation, admission by Akoda of using another's social security number and the ECFMG Investigator's concern that Akoda and Igberase were the same person.

4

Confidential Communication with Attorney

Failing to compare photographs of Igberase and Akoda in its files;

Failing to reasonably act when Akoda admitted to identity theft in use of another's social security number;

Failing to conclude that the person – Charles -- who appeared for hours at the July 10, 1996 appeal hearing and the person who appeared in Mr. Kelly's office on September 27, 2000 – Akoda – were the same person;

Failing to investigate the authenticity of the passport and green card produced to Mr. Kelly by Akoda when he came to Mr. Kelly's office on September 27, 2000;

Failing to follow up on the conclusion reached by Mr. Kelly and Dr. McCorkel that Igberase and Akoda were the same person.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's, these would have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMF's, these would have included requirements that ECFMG investigate fully discrepancies in Akoda'a application and submitted materials.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's and investigations of irregular behavior, these would have included requirements that ECFMG investigate and refer to the Medical Education Credentials Committee in situations of identity fraud.

It is my opinion, to a reasonable degree of professional certainty, that, had ECFMG properly investigated the allegations of irregular behavior against Akoda, ECFMG would have referred the matter to the Medical Education Credentials Committee and that committee would have found that Akoda engaged in irregular behavior, which would have resulted in his certification being revoked.

It is my opinion, to a reasonable degree of professional certainty, that these failures on the part of ECFMG to comply with the standard of care were the direct cause of Akoda being certified by ECFMG and which are the direct cause of the harms caused to the plaintiffs and the members of the class.

5

JA4185

Confidential Communication with Attorney

Very truly yours,

David Samuel Markenson, MD

6

JA4186

# Exhibit 21



EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

December 7, 1995

Mr. Kenneth Cotton
USMLE Secretariat
3750 Market Street
Philadelphia, PA 19104-3190

Re: Dr. Igberase Oluwafemi Charles
USMLE/ECFMG Identification No.
0-482-700-2

Dear Mr. Cotton:

On November 27, 1995, the ECFMG Committee on Medical Education Credentials reviewed the matter with respect to Dr. Charles's admission that he falsified an application form submitted to ECFMG in order to retake an examination he had already taken and passed.

Dr. Charles initially submitted an application form to ECFMG in April 1992 in order to take the July 1992 FMGEMS and the ECFMG English test. At that time, he used the name "Oluwafemi Charles Igberase" and certified that his date of birth was April 17, 1962. He was assigned identification number 0-482-700-2.

In addition to FMGEMS, and also using identification number 0-482-700-2, Dr. Charles applied for and took the September 1992 and September 1993 administrations of Step 1, failing the September 1992 examination, but passing the examination held in September 1993.

The applicant met the medical science, English test and medical education credential requirements for ECFMG Certification and was issued Standard ECFMG Certificate No. 0-482-700-2 in October 1993.

In March 1994, Dr. Charles again submitted an application form to ECFMG, applying for admission to ECFMG's administrations of the September 1994 Step 1, August/September 1994 Step 2 and September 1994 ECFMG English test. However, on the application, he responded "No" to the question "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG." He also stated his name as "Igberase Oluwafemi Charles" and date of birth as April 17, 1961.

Since the name on the application was altered and the year of birth changed, ECFMG's search of its database at that time did not show that he had previously applied and been assigned an ECFMG Identification number. He was then assigned number 0-



EXHIBIT 8
Kelly
JO 8/20/19

ECFMG-000074

JA4188
ECFMG_RUSS_0000074

Mr. Kenneth Cotton
December 7, 1995
Page 2

519-573-0. He took and passed the August 1994 Step 2 and the September 1994 ECFMG English test and September 1994 Step 1. His medical education credentials were again verified with his medical school and he was issued Standard ECFMG Certificate 0-519-573-0.

When he applied to ECFMG, Dr. Charles certified on his application form that, among other items, "falsification of this application" and "engaging in ...conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to ...invalidate the results of my examination ...to revoke a certificate, or to take other appropriate action."

In addition, the policies regarding taking Step 1 and Step 2 of the USMLE as outlined in the ECFMG Information Booklet, which he certified he had read and understood, include the statement "If one Step is passed, applicants may not repeat that Step and will have seven years to pass the other Step." The applicant, however, took and passed Step 1 in September 1993 and, due to the falsified application form, took it again in September 1994.

After this matter was discovered by ECFMG, on June 22, 1995, ECFMG wrote to Dr. Charles to request an explanation for his actions. In response, he sent ECFMG a letter, dated July 14, 1995, in which he stated he wished to retake the examinations in order to improve his scores and be more competitive in his applications for residency programs. Consequently, he "lied" but, he states, did not deliberately change his date of birth and that he thought the date given initially had been the incorrect one in his school files. In addition, depending on the documents he has, the order of his names varies.

The examinations, dates and scores for examinations taken are as follows:

**ECFMG #0-482-700-2**          **ECFMG #0-519-573-0**

| DATE | EXAM | SCORE | DATE | EXAM | SCORE |
|---|---|---|---|---|---|
| July 1992 | Day 1 FMGEMS | 69 (Fail) | | | |
| | Day 2 FMGEMS | 72 (Fail) | | | |
| | English test | Pass | | | |
| Sept. 1992 | Step 1 | 70 (Fail) | | | |
| Jan. 1993 | Day 1 FMGEMS | 74 (Fail) | | | |
| | Day 2 FMGEMS | 75 (Pass) | | | |
| | English test | Pass | | | |
| July 1993 | Day 1 FMGEMS | 76 (Pass) | | | |
| Sept. 1993 | Step 1 | 76 (Pass) | | | |
| | | | Aug. 1994 | Step 2 | 76 (Pass) |
| | | | Sept. 1994 | Step 1 | 78 (Pass) |
| | | | Sept. 1994 | English test | Pass |

ECFMG-000075

JA4189
ECFMG_RUSS_0000075

Mr. Kenneth Cotton
December 7, 1995
Page 3

After its review at the November 27, 1995 meeting, the ECFMG Committee on Medical Education Credentials took the following actions:

- Invalidate the Standard ECFMG Certificate issued to Dr. Charles under the second identification number 0-519-573-0;

- Inform the United States Medical Licensing Examination (USMLE) Committee on Irregular Behavior of this matter for its information and possible action; and

- Revoke the Standard ECFMG Certificate issued to Dr. Charles under the first identification number 0-482-700-2.

For information, I am enclosing copies of the following items:

1. Application to ECFMG received April 6, 1992.
2. Application to ECFMG received March 30, 1994.
3. ECFMG letter to Dr. Charles dated June 22, 1995.
4. Dr. Charles' July 14, 1995 letter to ECFMG.
5. ECFMG letter to Dr. Charles dated December 7, 1995.

Please inform Marie L. Shafron or me of the disposition of this matter. If you need additional information, please let me know.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck
Enclosures

## PLEASE DO    NOT DETACH

### Foreign Medical Graduate Examination in the Medical Sciences and the ECFMG English Test

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examinations or application will not be accepted.
Use typewriter or block print in ink.

| | | |
|---|---|---|
| ① **EXAMINATION HISTORY:** | Have you previously applied to take one or more of the examinations administered by ECFMG? ☐ Yes ☒ No | |
| | If you have been assigned an ECFMG Applicant Number, enter the number in this box. | 482-700 |
| ② **NAME:** Print your name as you want it to appear on the Standard ECFMG Certificate | OLUWAFEMI CHARLES — First Name / Middle Name | |
| | IGBERASE — Last Name (Surname) | |
| | Full Maiden Name (For married women only) | |
| ②.1 If you have previously applied to ECFMG under another name, provide that name | Previous Name | |
| | Please include a copy of the legal document that verifies this name change. | |
| ③ **ADDRESS:** Use address to which admission permit and other notification from ECFMG should be sent | 9701 EVENING PRIMROSE DRIVE — Number/Street | |
| | 2D — Apartment Number / Post Office Box Number | |
| | LAUREL — City | |
| | MARYLAND — State/Country | 20723 — Zip or Postal Code |
| ④ **SOCIAL SECURITY NUMBER:** | If you have a United States Social Security Number, enter the number in this box. | 5054 |
| ⑤ **STATUS OF MEDICAL SCHOOL STUDENT:** *Must be completed by students* | If you are applying for Day 1, will you have completed two years of medical school by the date of that examination? | ☐ Yes ☐ No |
| | If you are applying for Day 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school? | ☐ Yes ☐ No |
| ⑥ **EXAMINATION REGISTRATION:** Check ✓ box(es) to indicate the component(s) for which you are applying | Examination Date (Month/Year) JULY 1992 | E CK EIP RH — DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY |
| | ☒ Basic Medical Science Component (Day 1) | |
| | ☒ Clinical Science Component and ECFMG English Test (Day 2) | |
| | ☐ ECFMG English Test (administered on second day only) | |
| ⑥.1 **EXAMINATION CENTER:** See ECFMG Information Booklet for list of centers | If you do not indicate a second choice of center and the first choice is not available, ECFMG reserves the right to assign a center. | |
| | Select two: 1st Choice BALTIMORE — City  300 — Center No. | |
| | 2nd Choice WASHINGTON, D.C. — City  350 — Center No. | |
| ⑦ **EXAMINATION FEE(S):** Enter the amount enclosed on the line provided | Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash. | |
| | Basic Medical Science Component (Day 1 only)  $265 | |
| | Clinical Science Component and ECFMG English Test (Day 2 only)  $265 | 0 B. D.C — DO NOT WRITE IN THIS SPACE FOR OFFICE USE ONLY |
| | Basic Medical Science Component, Clinical Science Component and ECFMG English Test (Day 1 and Day 2)  $425 | |
| | ECFMG English Test only  $ 25   Enter amount enclosed  $ | |

RECEIVED
APR - 6 1992
ECFMG

© ECFMG 1992 All Rights Reserved     Form 104, FEB 1992

**PART B**

| (8) SECONDARY SCHOOL COLLEGE/ UNIVERSITY: | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | IMMACULATE CONCEPTION COLLEGE | BENIN CITY NIGERIA | JUNE 1974 SEPT 1979 | 5 |

| (9) MEDICAL SCHOOL: Use precise name and list all schools attended 690-010 | Schools Attended | Location (exact address) | Dates Attended (month and year) | No. School Years |
|---|---|---|---|---|
| | UNIVERSITY OF IBADAN COLLEGE OF MEDICINE | IBADAN NIGERIA | JUNE 1982 JUNE 1987 | 5 |

| (9.1) CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | MEDICINE | SPECIALIST HOSPITAL BENIN CITY | NIGERIA | DR ONWUKA | MAR 1988 - JUNE 19 |
| | SURGERY | | | MR IDIAKHOA | SEPT 1988 - DEC 19 |
| | PAEDIATRICS | | | DR ASEMOTA | DEC 1987 - MAR 198 |
| | OBSTETRICS | | | DR ODJEBA | JUNE 198 - SEPT 19 |
| | GYNAECOLOGY | | | | |

If additional lines are necessary use the reverse side of Part C.

| (9.2) MEDICAL DEGREE: Conferred or Expected | Title of Degree _MBBS_ | Date Conferred /Expected: _1987_ |
|---|---|---|

| (10) MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine: _YES_ Country or state in which you are licensed: _NIGERIA_ |
|---|---|

| (11) HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |

| (11.1) EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: MARY LAND MED. LABORATORY Street: 1901 SULPHUR SPRING ROAD BOX 18490 City/State/Country: Baltimore MD 21227 | Phlebotomist | 1992 |

| (12) BIRTHDATE/ BIRTHPLACE: | Day/Month/Year: 17-4-67 | Location: ILE-IFE. OSHUN. NIGERIA City, Province, Country |
|---|---|---|

| (13) SEX: | Please check one: ✓ Male ___ Female | (14) NATIVE LANGUAGE: YORUBA |
|---|---|---|

| (15) CITIZENSHIP: | (Complete all three) | | |
|---|---|---|---|
| | A. AT BIRTH | USA ☐ | Other ☐ (Specify) NIGERIAN 056 |
| | B. UPON ENTERING MEDICAL SCHOOL | USA ☐ | Other ☐ (Specify) NIGERIAN ✓ |
| | C. NOW | USA ☐ | Other ☐ (Specify) NIGERIAN ✓ |

ECFMG-000156

JA4192
ECFMG_RUSS_0000156

## PART C

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

**(16) CERTIFICATION BY APPLICANT**

I hereby certify that the information given in this application is true and accurate to the best of my knowledge, and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the ECFMG Information Booklet for FMGEMS and am aware of its contents.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Seal, stamp or signature of official must cover a portion of the attached photograph.

**(Must be completed in English)**

Signature of Applicant X _____

**(16.1) CERTIFICATION BY MEDICAL SCHOOL OFFICIAL.**

A. I hereby certify that the photograph, signature, and information entered on this form accurately apply to the individual named above.

X _____
Signature of Medical School Official

**OR**

| Official Title | Date | Institution |

**NOTARIZATION WITH EXPLANATION (Pertains to graduates only)**

B. Subscribed and sworn to before me this _31_ day of _March_ , 19 _92_

X _____
Signature of Consular Official, First Class Magistrate, Notary Public          Official Title _Notary Public_

B.1 Explain below why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

338/I/D

RECEIVED

APR - 6 1992

ECFMG

LINDA R. KISHTU
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires September 2, 1994
4829700

(17) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?   ☐ Yes   ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

TO BE USED AS CONTINUATION OF SECTION 9.1 IN PART B

ECFMG-000158

JA4194

ECFMG_RUSS_0000158

## PLEASE DO NOT DETACH

STEP 1 AND/OR STEP 2 EXAMINATIONS

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOL
THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA
PHONE: 215 386-5900 CABLE: EDCOUNCIL,PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and repeat examination
Use typewriter or block print in ink.

| ① ECFMG EXAMINATION HISTORY: | Have you previously submitted an application to take one or more of the examinations administered by ECFMG? ☐ Yes | |
| --- | --- | --- |
| | If yes, place your USMLE Identification Number (ECFMG Applicant Number) in this box | |

② NAME:
Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record

First Name: IGBIERASE   Middle Name: OLUWAFEMI
Last Name (Surname): CHARLES
Full Maiden Name (For married women only)

482-700-2

②.1 If you have previously applied to ECFMG under another name, provide that name

Previous Name: N/A
Please include a copy of the legal document that verifies this name change.

③ ADDRESS:
Use address to which admission permit and other notification from ECFMG should be sent

Number/Street
Apartment Number    Post Office Box Number: 1653
City: HYATTSVILLE
State/Country: MD    Zip or Postal Code: 20788

| ④ U. S. SOCIAL SECURITY AND/OR CANADIAN SOCIAL INSURANCE NUMBERS: | Enter numbers in boxes provided | |
| --- | --- | --- |
| | U.S. Social Security Number | Canadian Social Insurance Number |

⑤ REGISTRATION:
Check ☑ box(es) of selected examinations

| | | | |
| --- | --- | --- | --- |
| Step 1 | June 8 - 9, 1994 ☐ | or | September 22 - 23, 1994 ✓ |
| Step 2 | March 30 - 31, 1994 ☐ | or | August 31 - September 1, 1994 |
| ECFMG English Test | March 31, 1994 ☐ | or | September 1, 1994 ✓ |

⑤.1 TEST CENTER:
Select three ECFMG centers for each Step and/or ECFMG English Test. See the Information Booklet in which this application was enclosed for a list of ECFMG centers

If your center selections are not available, ECFMG reserves the right to assign a center.

Step 1: (1) Richmond  City  182 Center No.  (2) Baltimore  300 City Center No.  (3) City Center No.

Step 2 and/or ECFMG English Test: (1) Richmond 182  (2) Baltimore 300  (3) City Center No.

⑥ EXAMINATION FEE(S):
Enter the amount enclosed on the line provided

Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash.

Step 1 Basic Medical Science Examination $400
Step 2 Clinical Science Examination $400
ECFMG English Test $ 30

Enter amount enclosed $

FOR OFFICE USE ONLY

⑦ HANDEDNESS: ☑ Right Handed    ☐ Left Handed

APPLICATION FORM 104S, August, 1993
®ECFMG 1993 All Rights Reserved

FOR OFFICE USE ONLY  E  P. 30

ECFMG-000151

**JA4195**

ECFMG_RUSS_0000151

PART B

| | Schools Attended | Location (exact address) | Dates Attended From MO. YR. To MO. YR. | No. School Years |
|---|---|---|---|---|
| ⑧ SECONDARY SCHOOL COLLEGE/ UNIVERSITY: | Immaculate Conception College | Benin City Nigeria | 06 74 06 79 | 05 |

| | Schools Attended | Location (exact address) | Dates Attended From MO. YR. To MO. YR. | No. School Years |
|---|---|---|---|---|
| ⑨ MEDICAL SCHOOL: Use precise name and list all schools attended 690-010 | University of Ibadan | Ibadan Nigeria | 06 82 06 87 | 05 |

| | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| ⑨1 CLINICAL CLERKSHIPS: Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. List clerkships (rotations, pre-graduate internships) for each clinical discipline. | MEDICINE | SPECIALIST HOSP. | BENIN CITY | DR Onwuka | 1988 |
| | SURGERY | ✓ | | DR Idiakhoa | 1988 |
| | OB GYN | ✓ | | DR Iyanbor | 1988 |
| | PEDIATRICS | ✓ | ✓ | DR Asemota | 1987 |

If additional lines are necessary use the reverse side of Part C.

| ⑨2 MEDICAL DEGREE: Conferred or Expected | Title of Degree MBBS | Date Conferred:/Expected: 06 87 |
|---|---|---|

* If the degree has been conferred, a photocopy should be sent to ECFMG. See *Medical Education Credentials* Section of the ECFMG Information Booklet.

| ⑩ MEDICAL LICENSURE: Present or Future | Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine:* 1988 | Country or state in which you are licensed:* NIGERIA |
|---|---|---|

* If the license has been issued, a photocopy should be sent to ECFMG. See *Medical Education Credentials* Section of the ECFMG Information Booklet.

| ⑪ HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | N/A | | |

| ⑫ EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: N/A | | |
| | Street: | | |
| | City/State/Country: | | |

| ⑬ BIRTHDATE/ BIRTHPLACE: | Day 017 Month 04 Year 61 | Location: IFE IFE OYO NIGERIA City, Province, Country |
|---|---|---|

| ⑭ GENDER: | Please check one: ✓ Male ___ Female | ⑮ NATIVE LANGUAGE: YORUBA |
|---|---|---|

| ⑯ CITIZENSHIP: | (Complete all three) | | |
|---|---|---|---|
| | A. AT BIRTH | USA ☐ Other ☑ (Specify) NIGERIAN | 056 |
| | B. UPON ENTERING MEDICAL SCHOOL | USA ☐ Other ☑ (Specify) NIGERIAN | |
| | C. NOW | USA ☐ Other ☑ (Specify) NIGERIAN | |

| ⑰ OTHER EXAMINA-TION HISTORY AND APPLICANT NUMBERS: Indicate the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you by that organization as | ORGANIZATION ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | DATE OF MOST RECENT EXAMINATION TAKEN MO. YR. | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|---|
| | ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | | |

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official (See B 1 below)

JA4196
ECFMG_RUSS_0000152

NUMBERS:
Indicate the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you by that organization as

| | MO. | YR. |

STATE LICENSING AUTHORITY IN THE UNITED STATES

Students and graduates must sign the application in the presence of their Medical School Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

(18) CERTIFICATION BY APPLICANT

(Must be completed in English)

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition of the Information Booklet on USMLE Step 1 and Step 2 examinations and ECFMG Certification, am aware of its contents and meet the eligibility requirements set therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action.

I understand that the ECFMG certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any Federal, State, or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Seal, stamp or signature of official must cover a portion of the attached photograph.

(18.1) (Must be completed in English)

CERTIFICATION BY MEDICAL SCHOOL OFFICIAL

OR

NOTARIZATION WITH EXPLANATION (Pertains to graduates only)

Signature of Applicant x *Charles Ikponmwonba Ufeisemi*   Date *03/26/94*
(In Latin Characters)

A. I hereby certify that the photograph, signature, and information entered on Section 9 of this form accurately apply to the individual named above.

x _____
Signature of Medical School Official

Official Title          Date          Institution

B. Subscribed and sworn to before me this *26th* day of *March*, 19 *94*

x *Jack L. Katz*
Signature of Consular Official, First Class Magistrate, Notary Public

JACK L. KATZ
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires June 1, 1997

B.1 Explain in the space below why the application form could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

*Due to the fact that I reside in the United States as at time of filling this application*

S 9 1573

FOR OFFICE USE ONLY

| FORM | DATE |
| --- | --- |
| S.A. | |
| I.D. | |
| 338 | |
| 339 | ✓ |
| 325 | ✓ |

(19) Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?   ☐ Yes  ☐ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

(20) Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item ⑳ blank.

Select the one which best describes your racial/ethnic background.

| 1 ☐ American Indian/ Alaskan Native | 2 ☐ Asian Pacific Islander | 3 ☐ Hispanic | 4 ☐ Black (not of Hispanic Origin) | 5 ☐ White (not of Hispanic Origin) | 6 ☐ Other |

ECFMG-000153

JA4197
ECFMG_RUSS_0000153

For Continuation of 8.1 Clinical Clerkships

| Clinical Clerkships | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ECFMG-000154

JA4198
ECFMG_RUSS_0000154



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

June 22, 1995

Dr. Charles Olufemi Igberase       USMLE/ECFMG Identification No.
P.O. Box 1653                                0-482-700-2
Hyattsville, MD 20788

Dear Doctor:

When you applied for admission to ECFMG's administrations of the September 1994 Step 1, August/September 1994 Step 2 and September 1994 ECFMG English test, you responded "No" to the question "Have you previously submitted an application to ECFMG to take one or more of the examinations administered by ECFMG." You also stated your name as "Igberase Oluwafemi Charles" and your date of birth as April 17, 1961. You certified that this information, as well as the other information on your application "is true and accurate to the best of my knowledge ..." and you swore to this in the presence of a Notary Public.

You were assigned USMLE/ECFMG Identification Number 0-519-573-0 and took the Step 1, Step 2 and ECFMG English test. You submitted copies of your medical education credentials, which were verified by ECFMG with an official of your medical school. A Standard ECFMG Certificate was subsequently issued to you under the name Igberase Oluwafemi Charles with the number 0-519-573-0.

A check of ECFMG records shows that, despite what you certified to on the application referred to above, you had applied for and taken examinations administered by ECFMG prior to your application for the 1994 examinations. You first applied to ECFMG for the July 1992 administration of FMGEMS and the ECFMG English test under the name "Oluwafemi Charles Igberase" and certified that your date of birth was April 17, 1962. You failed both the basic medical science (Day 1) and clinical science (Day 2) components of the July 1992 FMGEMS and passed the ECFMG English test.

You subsequently applied for and took the January 1993 administration of FMGEMS and the ECFMG English test, failing Day 1, but passing Day 2 and the English test. You then applied for and took the July 1993 administration of Day 1 of FMGEMS which you passed. Since, at that time, you had also met the medical education credential requirements for ECFMG certification, you were issued Standard ECFMG Certificate Number 0-482-700-2.

You also applied for and took the September 1992 and September 1993 administrations of Step 1, failing the September 1992 examination, but passing the examination held in September 1993.

ECFMG-000085

**JA4199**
ECFMG_RUSS_0000085

Dr. Igberase Oluwafemi Charles
June 22, 1995
Page 2

When you applied to ECFMG, you certified on your application form that, among other items, "falsification of this application" and "engaging in ...conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to ...invalidate the results of my examination ...to revoke a certificate, or to take other appropriate action."

In addition, the policies regarding taking Step 1 and Step 2 of the USMLE as outlined in the ECFMG Information Booklet, which you certified you had read and understood, include the statement "If one Step is passed, applicants may not repeat that Step and will have seven years to pass the other Step." You, however, took and passed Step 1 in September 1993 and again in September 1994.

ECFMG is conducting an investigation of this matter. You must write to ECFMG immediately to explain why you certified on your application form that you had not previously applied for an ECFMG examination when, in fact you had, and also to explain why you repeated Step 1 when the policy states applicants who pass the Step may not repeat it. Your letter must be received by ECFMG within 15 days of your receipt of this letter.

Your explanation, together with the documents in your file, will be reviewed by the ECFMG Committee on Medical Education Credentials at a future meeting. After its review, the Committee will make a recommendation to the ECFMG Board of Trustees.

Your response must be sent to the following special address:

ECFMG
P.O. Box 13467
Philadelphia, PA 19101-3467

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck

ECFMG-000086

JA4200
ECFMG_RUSS_0000086

Page One
RECEIVED
CREDENTIALS DEPT

JUL 2 0 1995

ECFMG

USMLE | ECFMG # O-482-700-2

July 14th 1995
P.O. Box 1653
Hyattsville md 20788

Mr William C Kelly.
Manager, Medical Education
Credential Processing
ECFMG.

Dear Sir

I hereby with the following explanations explain the reasons for my repeating the ECFMG examinations.

When I came into the US, I was very hard up financially, no good books and I was very emotionally troubled

It was at this same period I was attempting the ECFMG examinations.

I had a very difficult time passing these tests as you can see in my records.

I finally managed to pass, but of all the over 150 residency applications that I sent to various institutions, no Hospital considered my results and the number of attempts competitive enough.

I tried again one year Later and it

ECFMG-000078

JA4201

ECFMG_RUSS_0000078

Page two

Came down to the same result.

This again gave me a lot of depression especially since my family were still in Nigeria and I had no means of looking after them.

As a result of these, I explained to my friends who felt I should take the tests over again to improve on my scores despite my difficult position.

They suggested that since I had already been issued one ECFMG Certificate, I could not possibly use that same number again to sit for new tests.

For this reasons, I LIED that I had not taken the test before when I was filling out the forms.

I did not deliberately change my date of birth (DOB) on the forms. The initial mistake was made by my school when they recorded my DOB as 04 17 61.

I wrote a letter to inform them about the mistake and that my actual DOB was 04 17 62.

As at the time I was filling out

ECFMG-000079

JA4202

ECFMG_RUSS_0000079

Case 2:13-cv-00562 Document 22-5 Page 2313 Filed 01/14/Filed Page 08/2022

# Page Three

the latest form, I had not recieved back from my school a reply for the change.

I did not realise at this time that the previous form I filled had my corrected DOB on it. So, I used my DOB that was in my school file since I had not recieved a change. From my school I attached here-with a photocopy of my Birth Certificate.

I am willing to pay for the verification of the 041761 DOB with my school and the fact that I have written a letter to them for a change/correction at the same period that I filled out the first ECFMG application forms.

As for the arrangement of my name. This is an on-going feud among the family members. It usually depended on who registers me for what examinations - my father, my mother or my uncle.

This accounts for the variations

ECFMG-000080

JA4203
ECFMG_RUSS_0000080

Page Four

as represented in my Birth Certificate, medical School Certificate, Permanent Medical Council Certificate and my first Leaving school certificate.

The name is actually a Compound Last name IGBERASE - CHARLES.

I have decided for future records to use the name as it appears on my Birth Certificate and passport (Nigerian Passport)

i.e. IGBERASE OLUWAFEMI CHARLES

I always thought that so long as all the names were represented, there was no problems.

Having said all these, I must say how deeply sorry and remorseful I am for allowing myself to be involved in such a despicable act of shame.

I took this step out of pain and anguish and as a desperate move to helping my family — I am the bread winner of both my immediate and extended family, my parents are very aged and my children are very very young.

ECFMG-000081

JA4204

ECFMG_RUSS_0000081

Page five

I therefore plead fervently with the committee members who are going to review my case to temper justice with mercy

God bless you all.

Sincerely

Igberase Oluwafemi Charles

0-519-573-0

RECEIVED
PERSONAL DEPT




[Executive Officer]
IFE CENTRAL LOCAL
GOVERNMENT, ILE-
13 Sept. 1973

A 01948

### OSUN STATE OF NIGERIA.

# CERTIFICATE OF REGISTRATION OF BIRTH

I, Mrs. Grace Fatunbase Registrar

of Births in Ife Central Local Government

in Ile-Ife Division of Osun State

of Nigeria do hereby certify that I have this 14th day

of September 19 93 registered, in folio

number 0442 of Birth Register

The birth of Iberase Oluwasun Charles

Male / Female, born at Ile-Ife

on 12th day of April 19 62

the child of Mr. Iberase David
(Father's Name)

and Mrs. Iberase Foyeke both
(Mother's Name)

Ile-Ife.

14/9 19 73                    C. Fatunbase
                              Signature of Registrar

ECFMG-000083

JA4206

ECFMG_RUSS_0000083



**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● CABLE: EDCOUNCIL, PHA.

Via Certified Mail
Return Receipt Requested

December 7, 1995

Dr. Igberase Oluwafemi Charles
P.O. Box 1653
Hyattsville, MD 20788

USMLE/ECFMG Identification No.
0-482-700-2

Dear Doctor:

On November 27, 1995 the ECFMG Committee on Medical Education Credentials met to review the matter with respect to your falsification of an application form submitted to ECFMG. The Committee reviewed the documentation available, including your July 14, 1995 letter.

Following review the Committee took the following actions:

1. To invalidate the Standard ECFMG Certificate issued to you under the second identification number 0-519-573-0;

2. To inform the United States Medical Licensing Examination (USMLE) Committee on Irregular Behavior of this matter for its information and possible action; and

3. To revoke the Standard ECFMG Certificate issued to you under the first identification number 0-482-700-2.

Please return the two Standard ECFMG Certificates to my attention immediately. I suggest you send them by certified mail.

Enclosed is a copy of the ECFMG Rules of Appellate Procedure.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credential Processing

/wck
Enclosure

# Exhibit 22

C C P Y

RECEIVED

OCT 23 2000

E C F M G
MAILROOM

ED STATES MEDICAL LICENSING EXAMINATION™ (USMLE™)
**2001 STEP 1 AND/OR STEP 2 APPLICATION**

R STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOLS REGISTERED BY
**THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES**
TELEPHONE: (215) 386-5900   INTERNET: http://www.ecfmg.org

reign Medical Graduates          **OR**        via courier service to:
                                                ECFMG
Philadelphia, PA 19182-0992 USA                 3624 Market Street
                                                Philadelphia, PA 19104-2685 USA

**NOTE:** *All items on all sides of the application must be filled out completely for initial and reexamination or application will be rejected.*
*Use typewriter or print carefully in ink using uppercase letters.*

## PART A — BIOGRAPHICAL INFORMATION

**1  ECFMG EXAMINATION HISTORY:** Have you ever submitted an application to ECFMG for **any** examination, even if you did not take
the examination?  ☐ Yes  ☒ No
If yes, enter your USMLE/ECFMG Identification Number in the following boxes:   ☐-☐☐☐-☐☐☐-☐ N/A

**2  NAME:**

First Name: F E M I
Middle Name: C H A R L E S
Last Name (Surname/Family Name): I G B E R A E S E

**(2)  PREVIOUS/MAIDEN NAME:** N/A

First Name:
Middle Name:
Last Name (Surname/Family Name):

**3  MAILING ADDRESS:**

Street Address/Post Office Box: 1 6 3 2 7   C H A D S F O R D   A V E N U E

Address Continued:

City (Include Postal Code as required for non-USA/non-Canadian address.): B A T O N   R O U G E
State/Province: L O U I S I A N A

Zip/Postal Code: 7 0 8 1 7
Country: U S A

**TELEPHONE NUMBER, FAX NUMBER AND E-MAIL ADDRESS:**

Country Code:
City/Area Code: 2 2 5
Telephone Number: 7 5 3 - 8 8 0 9
City/Area Code:
Fax Number:

E-Mail Address: CFEMI @ hotmail . com .

**4  U.S. SOCIAL SECURITY AND/OR NATIONAL IDENTIFICATION NUMBERS:**  N/A

U.S. Social Security Number:
National Identification Number:
Country:

**5  BIRTHDATE/BIRTHPLACE:**
Location: City: LAGOS
Day 1 7  Month 0 4  Year 1 9 6 2
Province: LAGOS   Country: NIGERIA

**6  GENDER:**  ☒ Male  ☐ Female
**7  NATIVE LANGUAGE:**

**8  CITIZENSHIP:**
A. At Birth:  ☐ USA or ☒ Other (Specify) NIGERIAN
B. Upon Entering Medical School:  ☐ USA or ☒ Other (Specify) NIGERIAN
C. Now:  ☐ USA or ☒ Other (Specify) NIGERIAN

**9  ETHNICITY:** Provision of the following information
is voluntary. See *Instructions* for details.
1 ☐ American Indian/Alaskan Native   4 ☒ Black (not of Hispanic Origin)
2 ☐ Asian/Pacific Islander   5 ☐ White (not of Hispanic Origin)
3 ☐ Hispanic   6 ☐ Other

APPLICATION FORM 104S-W, July 2000          Page 1 of 4          ©ECFMG 2000 All Rights Reserved


EXHIBIT 10
Kelly
LN 8/20/11
PENGAD 800-631-6989

DERAESE FEMI CHARLES
(Last, First, Middle)

Enter your USMLE/ECFMG Identification Number, if one has been assigned to you: N/A

**PART B — REGISTRATION INFORMATION**

### ELIGIBILITY PERIOD:

| ✓ | STEP 1 — ELIGIBILITY PERIOD |
|---|---|
| | November 1, 2000 – January 31, 2001* |
| ☒ | December 1, 2000 – February 28, 2001* ✓ |
| | January 1, 2001 – March 31, 2001* |
| | February 1, 2001 – April 30, 2001 |
| | March 1, 2001 – May 31, 2001 |
| | April 1, 2001 – June 30, 2001 |
| | May 1, 2001 – July 31, 2001 |
| | June 1, 2001 – August 31, 2001 |
| | July 1, 2001 – September 30, 2001 |
| | August 1, 2001 – October 31, 2001 |
| | September 1, 2001 – November 30, 2001 |
| | October 1, 2001 – December 31, 2001 |

| ✓ | STEP 2 — ELIGIBILITY PERIOD |
|---|---|
| | November 1, 2000 – January 31, 2001* |
| | December 1, 2000 – February 28, 2001* |
| ☒ | January 1, 2001 – March 31, 2001* ✓ |
| | February 1, 2001 – April 30, 2001 |
| | March 1, 2001 – May 31, 2001 |
| | April 1, 2001 – June 30, 2001 |
| | May 1, 2001 – July 31, 2001 |
| | June 1, 2001 – August 31, 2001 |
| | July 1, 2001 – September 30, 2001 |
| | August 1, 2001 – October 31, 2001 |
| | September 1, 2001 – November 30, 2001 |
| | October 1, 2001 – December 31, 2001 |

*USMLE Step 1/Step 2 are not offered during the first two weeks of January.

### 11. TESTING REGION AND INTERNATIONAL TEST DELIVERY SURCHARGE:

| ✓ | STEP 1 — TESTING REGION | SURCHARGE |
|---|---|---|
| | Africa | $100 |
| | Asia | $100 |
| | Australia | $100 |
| | China (For Hong Kong, select Asia testing region.) | $100 |
| | Europe | $125 |
| | India | $100 |
| | Indonesia | $100 |
| | Japan | $245 |
| | Korea | $125 |
| | Latin America | $100 |
| | Middle East (For Tel Aviv, select Europe testing region.) | $100 |
| | Thailand | $100 |
| | Taiwan | $125 |
| | United States and Canada | $0 |

| ✓ | STEP 2 — TESTING REGION | SURCHARGE |
|---|---|---|
| | Africa | $110 |
| | Asia | $110 |
| | Australia | $110 |
| | China (For Hong Kong, select Asia testing region.) | $110 |
| | Europe | $140 |
| | India | $110 |
| | Indonesia | $110 |
| | Japan | $270 |
| | Korea | $140 |
| | Latin America | $110 |
| | Middle East (For Tel Aviv, select Europe testing region.) | $110 |
| | Thailand | $110 |
| | Taiwan | $140 |
| | United States and Canada | $0 |

### 12. FEES:

**STEP 1 — FEES**

12.1 Examination Fee $ 6 1 5 . 0 0

12.2 Enter amount of the International Test Delivery Surcharge for the testing region you selected above: + [ ] . 0 0

12.3 TOTAL STEP 1 FEE = $ [ ] . 0 0

**STEP 2 — FEES**

12.4 Examination Fee $ 6 1 5 . 0 0

12.5 Enter amount of the International Test Delivery Surcharge for the testing region you selected above: + [ ] . 0 0

12.6 TOTAL STEP 2 FEE = $ [ ] . 0 0

### 12.7 TOTAL FEE(S) FOR ALL EXAMS:

Add the amounts on lines 12.3 and 12.6 and enter total at right: → $ 1,230.00 ←

### 13. PAYMENT — Check method of payment and complete all information requested for that payment method.

☐ Charge my credit card. Check One: ☐ Visa ☐ MasterCard ☐ Discover

Credit Card Number: [ ]

Total Exam Fee(s): $ [ ] , [ ] . 0 0

Credit Card Processing Fee + [ ] 2 0 . 0 0

Total Amount = $ [ ] , [ ] . 0 0

Expiration Date: ___ / ___
MONTH / YEAR

Address of Card Holder: _____

Name of Card Holder: _____

Signature of Card Holder: _____

☒ My check, bank draft or money order, made payable to ECFMG, is enclosed.

Total Amount: $ 1,230

☐ I have sent a wire transfer to ECFMG.

Date sent: _____

Originating bank: _____

Total Amount: $ _____

Bank Reference Number: _____

Name of sender, if different from applicant: _____

You must send full payment of the total amount with this application form. If you do not include full payment, this application will be rejected.

### 14. EXAMINEES WITH DOCUMENTED DISABILITIES.

I have a documented disability covered under the Americans with Disabilities Act and am requesting test accommodations for the exam(s) selected above. ☐ Yes ☒ No

Confidential

JA4210

ECFMG_RUSS_0003466

N/A

Name: IGBERAESE FEMI CHARLES
(Last, First, Middle)

Enter your USMLE/ECFMG Identification Number, if one has been assigned to you

☐☐☐-☐☐☐-☐

## PART C — MEDICAL EDUCATION INFORMATION

### MEDICAL SCHOOL NAME AND ADDRESS

List the exact name and address of the medical school from which you graduated or expect to graduate.

Official Name of Medical School: UNIVERSITY COLLEGE HOSPITAL IBADAN

Street Address:

City: IBADAN

State/Province: UNIVERSITY OF

Postal Code: IBADAN

University Name (if applicable)

Country: NIGERIA

### MEDICAL SCHOOL INFORMATION:

■ Attendance Dates: From 06/1982 (MONTH/YEAR) to 06/1987 (MONTH/YEAR)   ■ Number of Years Attended: 5

■ Date you graduated (or expect to graduate): 06/1987 (MONTH/YEAR)

■ Date your medical diploma was issued (or expect to be issued): 06/1987 (MONTH/YEAR)

■ Title of Medical Degree you received or will receive: MBBS
Refer to the "Reference Guide for Medical Education Credentials" on pages 45-48 of the 2001 Information Booklet for the list of medical degrees required by ECFMG.

### STATUS OF MEDICAL SCHOOL STUDENT — Must be completed by all students: N/A

■ If you are applying for Step 1, will you have completed 2 years of medical school by the beginning of your requested eligibility period (see PART B, 10) and are you now officially enrolled and will you be officially enrolled at the time you take the exam? Check yes or no: ☐ Yes ☐ No

■ If you are applying for Step 2, will you be within 12 months of completion of the formal didactic curriculum at your medical school by the beginning of your requested eligibility period (see PART B, 10) and are you now officially enrolled and will you be officially enrolled at the time you take the exam? Check yes or no: ☐ Yes ☐ No

### STATUS OF MEDICAL SCHOOL DIPLOMA — Must be completed by all graduates: If you have graduated from medical school,

you must include 2 photocopies of your medical diploma if you have not sent them previously. If you graduated from medical school but your medical diploma has not yet been issued, you must submit with your application a letter signed by your Medical School Dean, Vice Dean or Registrar that confirms you graduated from medical school, have met all requirements to receive your medical diploma and states the date your medical diploma will be issued. (See "Provision of Credentials and Translations" on page 22 of the 2001 Information Booklet.)

Graduates must check one:

☒ I have graduated from medical school and am enclosing 2 photocopies of my medical diploma.

☐ I have graduated from medical school and have previously submitted to ECFMG 2 photocopies of my medical diploma.

☐ I have graduated from medical school, but my medical diploma has not yet been issued. I am enclosing a letter from my medical school that confirms I graduated, have met the requirements to receive my medical diploma and states the date my medical diploma will be issued.

Note: Your application will be rejected if you graduated from medical school and have not submitted photocopies of your medical diploma or a letter from your medical school that confirms your graduation (as described above).

### OTHER MEDICAL SCHOOL(S) ATTENDED — Continue on a separate sheet of paper, if necessary:

List the names, addresses and dates of attendance of all other medical schools you attended. N/A

Official Name of Medical School:

Street Address:

City:

State/Province:

Postal Code:

Country:

University Name (if applicable)

Attendance Dates: From ___/___ (MONTH/YEAR) to ___/___ (MONTH/YEAR)

### TRANSFER CREDITS:

Did you transfer academic credits from any school(s) to the medical school that conferred or will confer your medical degree? ☐ Yes ☒ No
If Yes, indicate on a separate sheet of paper the name of the school(s) from which the credits were transferred, the number of credits transferred and the course titles for all credits transferred.

### MEDICAL LICENSURE:

Date you received an unrestricted license or certificate of full registration to practice medicine: 8/1989 (MONTH/YEAR)

Country or state in which you are licensed: LAGOS, NIGERIA

### EMPLOYMENT — Present employment only. NONE

| Institution/Company | | Position(s) | Dates |
|---|---|---|---|
| Street | | | |
| City/State/Country | | | |

*PART C CONTINUES ON THE REVERSE SIDE.*    Page 3 of 4

JA4211

Confidential    ECFMG_RUSS_0003467

Name: **IGBERAESE FEMI CHARLES**
(Last, First, Middle)

Enter your USMLE/ECFMG Identification Number, if one has been assigned to you:

N/A

## PART C — MEDICAL EDUCATION, LICENSURE AND EMPLOYMENT INFO

**CERTIFICATION BY APPLICANT**

Students and graduates must sign the application in the presence of their Medical School Dean, Vice Dean or Registrar. (See 19.2.A below)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See 19.2.B below) and must explain in writing why the application form could not be signed in the presence of a medical school official. (See 19.2.B.1 below).

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature. All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

I hereby certify that I currently meet examination eligibility requirements and that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed were taken within 6 months of the date of this application.

I also certify and acknowledge that I have reviewed the appropriate edition (that which pertains to the eligibility period for which I am registering, PART B, 10 above), of the ECFMG *Information Booklet* and USMLE *Bulletin of Information*, am aware of the contents of both sections, meet the eligibility requirements set therein and agree to abide by the policies and procedures therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See page 15 of the 2001 *Information Booklet* for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the Standard ECFMG Certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant (in Latin Characters) X _____
(Signature must match full legal name as given in PART A-2.)

| | 1 | 8 | | 1 | 0 | | 2 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Day | | | Month | | | Year | | | |

Seal or stamp of official *must cover a portion* of the attached photograph.

**19.2.A CERTIFICATION BY MEDICAL SCHOOL OFFICIAL (Must be completed for medical school students):**

N/A

I hereby certify that the photograph, signature, and information entered in all parts of Section 15 of this form, including medical school and attendance dates, accurately apply to the individual named above, and that this individual is: (must check one) ☐ officially enrolled in or ☐ a graduate of the institution indicated below. I have affixed the medical school seal or stamp over a portion of the photograph above.

Signature of Medical School Official (in Latin Characters) X _____

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Day | | | Month | | | Year | | | | |

**OR** Print Name and Official Title (in Latin Characters with English translation, where applicable.) | Institution

My Commission Expires July 20, 2004

**19.2.B CERTIFICATION BY IDENTIFICATION WITH EXPLANATION (Pertains to graduates only):**

I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this **19** day, of the month of **OCT** , in the year **2000** .

X _Juliet D Providence_
Signature of Consular Official, First Class Magistrate, Notary Public (in Latin Characters with English translations, where applicable.) | Official Title

**19.2.B.1 EXPLANATION (Pertains to graduates only)** – Explain in the space below why the application could not be signed in the presence of your Medical School Dean, Vice Dean or Registrar. This explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

MY MEDICAL SCHOOL IS OVERSEAS AND THE MAIL SYSTEM IS VERY UNRELIABLE.

## CLINICAL CLERKSHIPS — Continue on a separate sheet of paper, if necessary

| Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|
| SURGERY | NEW ERA HOSPITAL | WARRI, NIGERIA | DR ODIAMEN | 12 87 – 2 88 |
| OBGYN | NEW ERA HOSPITAL, WARRI, NIGERIA | | DR AIGBOJIE | 3 88 – 6 88 |
| PEDIATRICS | NEW ERA HOSPITAL, WARRI, NIGERIA | | DR OSAGIE | 7 88 – 10 88 |

## PART D — OTHER EXAM HISTORY AND APPLICANT NUMBERS

### OTHER EXAM HISTORY and APPLICANT NUMBERS

Check below the **organizations** (other than ECFMG) to which you previously applied for examinations. Enter the date of the most recent examination that was administered to you and the identification number that was assigned to you by that organization.

| | | NBME Parts I/II | | |
|---|---|---|---|---|
| N/A ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | Applicant Identification Number: | | Date of Most Recent Examination Taken: | Month ___ Year 1 9 ___ |
| | | USMLE Steps 1/2 | | |
| | Applicant Identification Number: | ___ – ___ – ___ | Date of Most Recent Examination Taken: | Month ___ Year ___ |
| A ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | FIN – Federation Identification Number: | FLEX | Date of Most Recent Examination Taken: | Month ___ Year 1 9 ___ |

Page 4 of 4

JA4212

Confidential

ECFMG_RUSS_0003468

# Exhibit 23



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express



November 16, 2000

Dr. Femi Charles Igberase
16327 Chadsford Ave.
Baton Rouge, LA 70817

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Igberase.

The Educational Commission for Foreign Medical Graduates (ECFMG) received on October 23, 2000 your application for the United States Medical Licensing Examination (USMLE™) Step 1 and Step 2.

In Item 1 of the application, you answered "no" to the question, "have you ever submitted an application to ECFMG for **any** examination, even if you did not take the examination?" In Item 2 of the application, you certified your name is "Femi Charles Igberase." Additionally, in Item 4 of the application, requesting your U.S. Social Security and/or National Identification Number, you wrote "N/A."

Based on our review of ECFMG records, you previously submitted applications to ECFMG. ECFMG records further reflect that on November 27, 1995, the ECFMG Committee on Medical Education Credentials revoked your Standard ECFMG Certificate. You appealed that action to the ECFMG Review Committee on Appeals. The ECFMG Review Committee considered your appeal on July 10, 1996 and affirmed the action of the ECFMG Committee on Medical Education Credentials, but limited the length of the revocation of your Standard ECFMG Certificate to five years from July 10, 1996, i.e., until July 10, 2001.

Additionally, according to your prior applications to ECFMG, you indicated you do have a U.S. Social Security Number, 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.

On your ECFMG application, you certified that "falsification of this application …may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. A copy of the certification statement you signed is enclosed.

Please be advised that ECFMG requires an explanation in writing from you concerning this matter within fifteen (15) days of your receipt of this letter. The ECFMG Committee on Medical Education Credentials will review the information that we have in

*ECFMG® is an organization committed to promoting excellence in international medical education.*

JA4214
ECFMG_RUSS_0003463

Dr. Charles Olufemi Igberase
November 16, 2000
Page 2

your file, together with your explanation, at its next scheduled meeting. You will be notified of the outcome of the review by the Committee and your status.

Please send all communications to ECFMG in this matter to my attention. If you have any questions, please telephone me at (215) 823-2277.

Sincerely yours,

William C. Kelly
Manager, Medical Education
Credentials Dept.

/wck
Enclosures

Confidential

# Exhibit 24

JA4216



EXHIBIT 15

Kelly
LP 8/30/19

3787 37318

RECEIVED JUL 18 2002

CENTRAL PROCESSING DEPARTMENT

USMLE 2002

IMPORTANT DELIVERY

**MEDICAL LICENSING EXAMINATION™ (USMLE™)**
**2002 STEP 1 AND/OR STEP 2 APPLICATION**
FOR INTERNATIONAL MEDICAL STUDENTS/GRADUATES REGISTERED BY
**THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES**
TELEPHONE: (215) 386-5900     INTERNET: www.ecfmg.org

US·MLE
United States
Medical
Licensing
Examination ™

**MAILING INSTRUCTIONS:**

via regular mail to:
Educational Commission for Foreign Medical Graduates
P.O. Box 820992
Philadelphia, PA 19182-0992 USA

OR

via courier service to:
ECFMG
c/o PNC Lockbox 820992
Route 38 & Eastgate Drive
Moorestown, NJ 08057 USA

NOTE: All items on all pages of the application must be filled out completely for initial and reexamination or application will be rejected.
*Use typewriter or print carefully in ink using uppercase letters.*

## PART A — BIOGRAPHICAL INFORMATION

**1. ECFMG® EXAMINATION HISTORY:**

Have you ever submitted an application to ECFMG for **any** examination, even if you did not take the examination?  ☐ Yes  ☒ No

If yes, complete either 1.A or 1.B:
1.A Enter your USMLE/ECFMG Identification Number: ☐☐-☐☐☐☐-☐☐☐-☐
1.B Check here if you do not know your number. ☐

**2. NAME:**

| C | H | A | R | L | E | S | | | | | | | | | | U | G | B | E | R | A | E | S | E | | | |

First Name / Middle Name

| O | L | U | W | A | F | E | M | I | | | | | | | | | | | | | | | | | | | |

Last Name (Surname/Family Name)

**2.1 PREVIOUS/MAIDEN NAME:**

First Name / Middle Name

Last Name (Surname/Family Name)

**2.2 NAME ON MEDICAL DIPLOMA (Pertains to graduates only)**

| C | H | A | R | L | E | S | | | | | | | | | | U | G | B | E | R | A | E | S | E | | | |

First Name / Middle Name

| O | L | U | W | A | F | E | M | I | | | | | | | | | | | | | | | | | | | |

Last Name (Surname/Family Name)
Note: See Instructions if this name is different from the name you entered in Item 2.

**3. CONTACT INFORMATION:**

ADDRESS

| | | | 1 | 8 | 3 | 3 | 6 | | S | T | R | E | A | M | S | I | D | E | | D | R | I | V | E |

Street Address/Post Office Box

Address Continued

| G | A | I | T | H | E | R | S | B | U | R | G | | | | | | | | M | A | R | Y | L | A | N | D |

City (Include Postal Code as required for non-USA/non-Canadian address.) / State/Province

| 2 | 0 | 8 | 7 | 9 | | | | | | U | S | A |

Zip/Postal Code / Country

PHONE
Country Code: 301   City/Area Code: 325   Telephone Number: 0264
FAX: 301   City/Area Code: 947   Fax Number: 5649

E-MAIL ADDRESS: (PRINT CLEARLY) Charlesoluwafemi@Hotmail.Com

**4. U.S. SOCIAL SECURITY AND/OR NATIONAL IDENTIFICATION NUMBERS:**

U.S. Social Security Number / National Identification Number / Country

**5. BIRTHDATE/BIRTHPLACE:**

Day 01   Month 03   Year 1967

Location: City: LAGOS
Province: LAGOS   Country: NIGERIA

**6. GENDER:** ☒ Male ☐ Female

**7. NATIVE LANGUAGE:** YORUBA

APPLICATION FORM 1049-W, August 2001

Page 1 of 5

® ECFMG 2001 All Rights Reserved

ECFMG-000116

JA4217
ECFMG_RUSS_0000116

Name: OLUWAFEMI CHARLES UGBERAESE    Enter your USMLE/ECFMG Identification Number, if one has been assigned to you: [ ]-[ ][ ][ ]-[ ][ ][ ]-[ ]

(Last, First, Middle — as entered in Item 2)

| 8. CITIZENSHIP: | 9. ETHNICITY: Provision of the following information is voluntary. See *Instructions* for details. |
|---|---|
| 8.1 At Birth: ☐ USA **or** ☒ Other (Specify) Nigerian | 1 ☒ American Indian/ Alaskan Native    4 ☒ Black (not of Hispanic Origin) |
| 8.2 Upon Entering Medical School: ☐ USA **or** ☒ Other (Specify) Nigerian | 2 ☐ Asian/Pacific Islander    5 ☐ White (not of Hispanic Origin) |
| 8.3 Now: ☐ USA **or** ☐ Other (Specify) Nigerian | 3 ☐ Hispanic    6 ☐ Other |

## PART B — REGISTRATION INFORMATION

**10. EXAMINEES WITH DOCUMENTED DISABILITIES:** I have a documented disability and am covered under the Americans with Disabilities Act. I am requesting test accommodations for the exam(s) selected below.    ☐ Yes    ☒ No

**11. STEP 1: Fill in completely one circle each for eligibility period and testing region.**

**11.1 Eligibility Period — select one:**
- ○ November 1, 2001 – January 31, 2002*
- ○ December 1, 2001 – February 28, 2002*
- ○ January 1, 2002 – March 31, 2002*
- ○ February 1, 2002 – April 30, 2002
- ○ March 1, 2002 – May 31, 2002
- ◉ April 1, 2002 – June 30, 2002
- ○ May 1, 2002 – July 31, 2002
- ○ June 1, 2002 – August 31, 2002
- ○ July 1, 2002 – September 30, 2002
- ○ August 1, 2002 – October 31, 2002
- ○ September 1, 2002 – November 30, 2002
- ○ October 1, 2002 – December 31, 2002

*USMLE Step 1/Step 2 are not offered during the first two weeks of January.

**11.2 Testing Region — select one:**

| REGION | SURCHARGE |
|---|---|
| ☒ United States and Canada | $0 |
| ○ Africa | $110 |
| ○ Asia | $110 |
| ○ Australia | $110 |
| ○ China (For Hong Kong, select Asia testing region.) | $110 |
| ○ Europe | $140 |
| ○ India | $110 |
| ○ Indonesia | $110 |
| ○ Japan | $270 |
| ○ Korea | $140 |
| ○ Latin America | $110 |
| ○ Middle East (For Tel Aviv, select Europe testing region.) | $110 |
| ○ Taiwan | $140 |
| ○ Thailand | $110 |

**11.3 Fees**

11.3.1 Step 1 Exam Fee    $ [6][4][5] . [0][0]

11.3.2 International Test Delivery Surcharge (For United States and Canada, enter $0.)    + [ ][ ] . [0][0]

11.3.3 Step 1 Subtotal    = $ [6][4][5] . [0][0]

**12. STEP 2: Fill in completely one circle each for eligibility period and testing region.**

**12.1 Eligibility Period — select one:**
- ○ November 1, 2001 – January 31, 2002*
- ○ December 1, 2001 – February 28, 2002*
- ○ January 1, 2002 – March 31, 2002*
- ○ February 1, 2002 – April 30, 2002
- ○ March 1, 2002 – May 31, 2002
- ○ April 1, 2002 – June 30, 2002
- ○ May 1, 2002 – July 31, 2002
- ○ June 1, 2002 – August 31, 2002
- ○ July 1, 2002 – September 30, 2002
- ○ August 1, 2002 – October 31, 2002
- ○ September 1, 2002 – November 30, 2002
- ○ October 1, 2002 – December 31, 2002

*USMLE Step 1/Step 2 are not offered during the first two weeks of January.

**12.2 Testing Region — select one:**

| REGION | SURCHARGE |
|---|---|
| ○ United States and Canada | $0 |
| ○ Africa | $120 |
| ○ Asia | $120 |
| ○ Australia | $120 |
| ○ China (For Hong Kong, select Asia testing region.) | $120 |
| ○ Europe | $155 |
| ○ India | $120 |
| ○ Indonesia | $120 |
| ○ Japan | $295 |
| ○ Korea | $155 |
| ○ Latin America | $120 |
| ○ Middle East (For Tel Aviv, select Europe testing region.) | $120 |
| ○ Taiwan | $155 |
| ○ Thailand | $120 |

**12.3 Fees**

12.3.1 Step 2 Exam Fee    $ [6][4][5] . [0][0]

12.3.2 International Test Delivery Surcharge (For United States and Canada, enter $0.)    + [ ][ ] . [0][0]

12.3.3 Step 2 Subtotal    = $ [6][4][5] . [0][0]

**13. TOTAL FEE(S) FOR ALL EXAMS:**

Add the subtotals from 11.3.3 and 12.3.3 and enter total here and in Item 14.2 on page 3.    $ [1] , [2][9][0] . [0][0]

**14. PAYMENT** — Refer to page 3 of this application.

To submit payment, complete page 3 of this application.

You must send full payment of the total amount with this application.

If you do not include full payment, this application will be rejected.

**For Office Use Only**

ACCOUNT CREDITED

USMLE 2002

Page 2 of 5

ECFMG-000117

JA4218
ECFMG_RUSS_0000117

Name: OLUWAFEMI CHARLES UGBERAESE  Enter your USMLE/ECFMG Identification Number, if one has been assigned to you: ☐-☐☐☐-☐☐☐-☐
(Last, First, Middle — as entered in Item 2)

## PART C — MEDICAL EDUCATION, LICENSURE AND EMPLOYMENT INFORMATION

USMLE 2002

### 15. MEDICAL SCHOOL NAME AND ADDRESS:
List the exact name and address of the medical school from which you graduated or expect to graduate.

Official Name of Medical School: UNIVERSITY OF IBADAN

Street Address: ORITA MEFFA

City: IBADAN   State/Province: OSHUN   Postal Code:

Country: NIGERIA   University Name (if applicable)

### 15.1 MEDICAL SCHOOL INFORMATION:
■ Attendance Dates: From 06/1991 to 06/1996   ■ Number of Years Attended: 5 years

■ Date you graduated (or expect to graduate): 06/1996

■ Date your medical diploma was issued (or is expected to be issued): 06/1996

■ Title of Medical Degree you received or will receive: M.B. BS
Refer to the "Reference Guide for Medical Education Credentials" on pages 45-48 of the 2002 Information Booklet for the list of medical degrees required by ECFMG.

### 15.2 STATUS OF MEDICAL SCHOOL STUDENT — Must be completed by all students:
■ If you are applying for Step 1, will you have completed 2 years of medical school by the beginning of your requested eligibility period (see PART B, 11.1) and are you now officially enrolled and will you be officially enrolled at the time you take the exam? Check yes or no: ☒ Yes ☐ No

■ If you are applying for Step 2, will you be within 12 months of completion of the formal didactic curriculum at your medical school by the beginning of your requested eligibility period (see PART B, 12.1) and are you now officially enrolled and will you be officially enrolled at the time you take the exam? Check yes or no: ☒ Yes ☐ No

### 15.3 MEDICAL SCHOOL DIPLOMA (Must be completed by all graduates: If you have graduated from medical school, you must include one photocopy of your medical diploma if you have not sent one previously. If you graduated from medical school but your medical diploma has not yet been issued, you must submit with your application a letter signed by your Medical School Dean, Vice Dean or Registrar that confirms you graduated from medical school, have met all requirements to receive your medical diploma and states the date your medical diploma will be issued. Additionally, the name on your medical diploma must match the name you entered in Item 2. If the name on your medical diploma is different from the name you entered in Item 2, you must submit legal documentation that verifies the name on your diploma is/was your name. (See "Provision of Credentials and Translations" on page 34 of the 2002 Information Booklet).

Graduates must check one:

☒ I have graduated from medical school and am enclosing one photocopy of my medical diploma.

☐ I have graduated from medical school and have previously submitted to ECFMG one photocopy of my medical diploma.

☐ I have graduated from medical school, but my medical diploma has not yet been issued. I am enclosing a letter from my medical school that confirms I graduated, have met the requirements to receive my medical diploma and states the date my medical diploma will be issued.

Note: ECFMG requires a copy of the original language medical diploma or letter from the medical school. If the medical diploma is not in English, you must also submit an official English translation. Your application will be rejected if you graduated from medical school and have not submitted a photocopy of your medical diploma or a letter from your medical school that confirms your graduation (as described above).

### 16. OTHER MEDICAL SCHOOL(S) ATTENDED — Continue on a separate sheet of paper, if necessary:
List the names, addresses and dates of attendance of all other medical schools you attended.

Official Name of Medical School: NA

Street Address:

City:   State/Province:   Postal Code:

Country:   University Name (if applicable)

Attendance Dates: From __/__ to __/__

### 16.1 TRANSFER CREDITS:
Did you transfer academic credits from any school(s) to the medical school that conferred or will confer your medical degree? ☐ Yes ☐ No
If Yes, indicate on a separate sheet of paper the name of the school(s) from which the credits were transferred, the number of credits transferred and the course titles for all credits transferred.

### 17. MEDICAL LICENSURE: Date you received an unrestricted license or certificate of full registration to practice medicine: 10/1998
Country or State in which you are licensed: NIGERIA

### 18. EMPLOYMENT:

| Institution/Company | Position(s) | Dates |
|---|---|---|
| GENERAL HOSPITAL | MEDICAL OFFICER | DEC 1998— |
| Street 45 ILEDE ST | | JAN |
| City/State/Country ITA OSUN ILE-IFE NIGERIA | | |

PART C CONTINUES ON PAGE 5.   Page 4 of 5

ECFMG-000118

JA4219
ECFMG_RUSS_0000118

Name: OLUWAFEMI CHARLES UGBERAESE
(Last, First, Middle — as entered in item 2)

Enter your USMLE/ECFMG Identification Number, if one has been assigned to you: [ ]-[ ][ ][ ]-[ ][ ][ ]-[ ]

## PART C — MEDICAL EDUCATION, LICENSURE AND EMPLOYMENT INFORMATION (Continued)

### 19. CERTIFICATION BY APPLICANT:
Students and graduates must sign the application in the presence of their Medical School Dean, Vice Dean or Registrar. (See 19.2.A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See 19.2.B below) and must explain in writing why the application form could not be signed in the presence of a medical school official. (See 19.2.B.1 below.) Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature. All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

I hereby certify that I currently meet the examination eligibility requirements and that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed were taken within 6 months of the date of this application.

I also certify and acknowledge that I have read the appropriate edition (that which pertains to the eligibility period for which I am registering [PART B, 11.1 and 12.1]), of the ECFMG Information Booklet and USMLE Bulletin of Information, am aware of the contents of both publications, meet the eligibility requirements set therein and agree to abide by the policies and procedures therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified ECFMG documents to other agencies, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See page 24 of the 2002 Information Booklet for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the Standard ECFMG Certificate and any and all copies thereof remain the property of ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant (In Latin Characters)  X _Charles Oluwafemi_
(Signature must match full legal name as given in PART A-2.)

| | | |
|---|---|---|
| 1 3 | 0 3 | 2 0 0 2 |
| Day | Month | Year |

### 19.2.A CERTIFICATION BY MEDICAL SCHOOL OFFICIAL (Must be completed for medical school students):
I hereby certify that the photograph, signature, and information entered in all parts of Section 15 of this form, including medical school and attendance dates, accurately apply to the individual named above, and that this individual is: (must check one) ☐ officially enrolled in or ☐ a graduate of the institution indicated below. I have affixed the medical school seal or stamp over a portion of the photograph above.

Signature of Medical School Official (In Latin Characters) X_____

| | | |
|---|---|---|
| | | |
| Day | Month | Year |

OR  Print Name and Official Title (In Latin Characters with English translation, where applicable.)    Institution

### 19.2.B CERTIFICATION BY IDENTIFICATION WITH EXPLANATION (Pertains to graduates only):
I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this ___13___ day, of the month of ___MARCH___, in the year ___2002___.

X _Tariq Mehal_
Signature of Consular Official, First Class Magistrate, Notary Public (In Latin Characters with English translations, where applicable.)    Official Title

### 19.2.B.1 EXPLANATION (Pertains to graduates only) — Explain in the space below why the application could not be signed in the presence of your Medical School Dean, Vice Dean or Registrar. This explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG or your application will be rejected.

Non guaranteed mailing system.

U
S
M
L
E
2
0
0
2

### 20. CLINICAL CLERKSHIPS — Continue on a separate sheet of paper, if necessary:

| Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|
| SURGERY | GEN. HOSP ILE-IFE | ILE-IFE | DR AFELOMO | 8/96 - 11/96 |
| MEDICINE | GEN.HOSP. ILE-IFE | ILE-IFE | DR TEMITOPE | 12/91 - 3/97 |
| OBGYN/PED. | GEN HOSP ILE-IFE | ILE-IFE | DR N.TOKU/DR ABI | 4/97 - 7/97 |
| | | | | 8/97 - 12/97 |

## PART D — OTHER EXAM HISTORY AND APPLICANT NUMBERS

### 21. OTHER EXAM HISTORY AND APPLICANT NUMBERS:
Check below the organizations (other than ECFMG) to which you previously applied for examinations. Enter the date of the most recent examination that was administered to you and the identification number that was assigned to you by that organization.

| | | | Month Year |
|---|---|---|---|
| ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | Applicant Identification Number: | **NBME Parts I/II** | Date of Most Recent Examination Taken: 1 9 |
| | Applicant Identification Number: | **USMLE Steps 1/2** [ ]-[ ]-[ ] | Date of Most Recent Examination Taken: Month Year |
| ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | FIN – Federation Identification Number: | **FLEX** | Date of Most Recent Examination Taken: Month Year 1 9 |

Page 5 of 5

ECFMG-000119

JA4220
ECFMG_RUSS_0000119

# Exhibit 25



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential
Via Federal Express

**EXHIBIT** 17
Kelly
JP 8/20/19

November 12, 2002

Dr. Igberase Oluwafemi Charles
18336 Streamside Drive
Gaithersburg, MD 20879

Re: USMLE™/ECFMG® Identification No. 0-482-700-2

Dear Dr. Charles:

On behalf of the ECFMG Medical Education Credentials Committee, I am writing to inform you the Committee has completed its review of the available information related to the allegation you engaged in irregular behavior in connection with the false response to Item 1 on the application for the USMLE Step 1 received by ECFMG on March 18, 2002 and your applying to take the USMLE Step 1 when you have already passed the USMLE Step 1.

In advance of the review, members of the Committee were provided with copies of the following materials: (1) your application for the USMLE Step 1 received by ECFMG on March 18, 2002, (2) medical diploma submitted with this application, (3) ECFMG's May 22, 2002 letter to you, (4) ECFMG's July 22, 2002 letter to you and (5) ECFMG's September 20, 2002 letter to you. The ECFMG Committee also had information on prior actions taken by the ECFMG Medical Education Credentials Committee and USMLE Committee on Irregular Behavior.

Following careful review of this matter, the ECFMG Medical Education Credentials Committee determined that you had engaged in irregular behavior in connection with the false response to Item 1 on the application for the USMLE Step 1 received by ECFMG on March 18, 2002 and your applying to take the USMLE Step 1 when you have already passed the USMLE Step 1.

The ECFMG Medical Education Credentials Committee took action to bar you permanently from admission to all ECFMG examinations and from ECFMG certification and to refer this matter to the USMLE Committee on Irregular Behavior. As you were advised in my May 22, 2002 letter, at its May 2, 2002 meeting, the ECFMG Committee took action to revoke your Standard ECFMG Certificate permanently.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

JA4222
ECFMG_RUSS_0003471

Dr. Igberase Oluwafemi Charles
November 12, 2002
Page 2

      Also, in accordance with ECFMG policies and procedures, an annotation that you engaged in irregular behavior will be included in your ECFMG record. This annotation will appear on your ECFMG Certification Verification Service Report and ECFMG Status Report. In addition, ECFMG will report the determination of irregular behavior and revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards, state medical licensing authorities and directors of graduate medical education programs.

      As noted in the enclosed ECFMG Rules of Appellate Procedure, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the 60 day time limit specified.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

Confidential

# Exhibit 26



EXHIBIT 24
Kelly
LD 8/20/19
PENGAD 800-631-6989

**PLEASE DO        NOT DETACH**

United States Medical Licensing Examination

**UNITED STATES MEDICAL LICENSING EXAMINATION (USMLE)**
**STEP 1 AND/OR STEP 2 EXAMINATIONS**

ADMINISTERED TO STUDENTS/GRADUATES OF FOREIGN MEDICAL SCHOOLS BY
THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, 3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, USA
PHONE: 215 386-5900 • CABLE: EDCOUNCIL, PHA

**PART A**

NOTE: All items on all sides of the application must be filled out completely for initial and reexamination or application will not be accepted.
Use typewriter or block print in ink.

| | | |
|---|---|---|
| ① ECFMG EXAMINATION HISTORY: | Have you ever submitted an application to ECFMG for any examination, even if you did not take the examination?  ☑ Yes  ☐ No | If yes, enter your USMLE Identification Number (ECFMG Applicant Number) in this box. 0-553-258-5 |
| ② NAME: Print your name as you want it to appear on the Standard ECFMG Certificate and on your official USMLE record | First Name: J O H N   Last Name (Surname): A K O D A   Middle Name: M O S A   Full Maiden Name (For married women only): | |
| ②.1 If you have previously applied to ECFMG under another name, provide that name | Previous Name: Please include a copy of the legal document that verifies this name change. | |
| ③ ADDRESS: Use address to which admission permit and other notification from ECFMG should be sent | Number/Street: 5 8 0 0  Q U A N T R E L L  A V E N U E  Apartment Number: A P T  N O 8 1 0   Post Office Box Number:  City: A L E X A N D R I A  State/Country: V I R G I N I A   Zip or Postal Code: 2 2 3 1 2 | |
| ④ U.S. SOCIAL SECURITY AND/OR NATIONAL IDENTIFICATION NUMBERS: | Enter U.S. Social Security Number: ☐☐☐ ☐☐ ☐☐☐☐   Enter National Identification Number and Country:  Country: | |
| ⑤ STATUS OF MEDICAL SCHOOL STUDENT: *Must* be completed by students. | If you are applying for Step 1, will you have completed two years of medical school by the date of that examination? ☑ Yes ☐ No  If you are applying for Step 2, will you have completed or be within 12 months of completion of the formal didactic curriculum at your medical school by the date of that examination? ☐ Yes ☐ No | |

| ⑥ REGISTRATION: Select no more than one box for each Step and/or ECFMG English test for which you are applying. | Step 1 (Check one box only) | Step 2 (Check one box only) | ECFMG English Test (Check one box only) |
|---|---|---|---|
| | ☐ June 11-12, 1996 **or** ☑ October 15-16, 1996 | ☐ March 5-6, 1996 **or** ☐ August 27-28, 1996 | ☐ March 6, 1996 **or** ☐ August 28, 1996 |

| ⑥.1 TEST CENTER: Select three different ECFMG centers in order of preference for each Step and/or ECFMG English Test. See the information Booklet in which this application was enclosed for a list of ECFMG centers. | Step 1: (1) NEW YORK 330 City / Center No. (2) NEW YORK 330 City / Center No. (3) _____ City / Center No.  Step and/or ECFMG English Test: (1) _____ City / Center No. (2) _____ City / Center No. (3) _____ City / Center No. |
|---|---|

| ⑦ EXAMINATION FEE(S): Enter the amount enclosed on the line provided | Fees must be paid in United States funds. Checks, bank drafts or money orders are to be made payable to the ECFMG. Do not send cash.  Step 1 Basic Medical Science Examination  $440  Step 2 Clinical Science Examination  $440  ECFMG English Test  $ 40   Enter amount enclosed  $ PAID/Credit | FOR OFFICE USE ONLY |
|---|---|---|

| ⑧ HANDEDNESS: | ☑ Right Handed    ☐ Left Handed |
|---|---|

APPLICATION FORM 104S, February, 1996

*ECFMG 1996 All Rights Reserved

ECFMG-000643

JA4225
ECFMG_RUSS_0000643

PART B

| | | | Dates Attended | | | | No. School Years |
|---|---|---|---|---|---|---|---|
| | | | From | | To | | |
| | | | MO. | YR. | MO. | YR. | |
| ⑨ SECONDARY SCHOOL/ COLLEGE UNIVERSITY ATTENDED: | List any secondary school, college, or university attended. | | | | | | |
| | Name | University OF Benin. Nigeria | 10 | 81 | 10 | 87 | 6 yrs |
| | City/State/Country | | | | | | |
| | Name | Kings COLLEGE LAGOS NIGERIA | 06 | 74 | 06 | 79 | 5 yrs |
| | City/State/Country | | | | | | |

⑩ MEDICAL DEGREE AND

Title of Medical Degree M.B.B.S.    Date Conferred:/Expected: * MO. 10 YR. 87
* If the degree has been conferred, a photocopy must be sent to ECFMG. See *Medical Education Credentials* section of the ECFMG Information Booklet.

| | | | Dates Attended | | | | No. of Years Attended |
|---|---|---|---|---|---|---|---|
| | | | From | | To | | |
| | | | MO. | YR. | MO. | YR. | |
| ⑩.1 MEDICAL SCHOOL: | Name of Medical School from which you graduated or expect to graduate. LIST EXACT NAME AND ADDRESS. | | | | | | |
| | UNIVERSITY OF IBENIN. | | | | | | |
| | City/State/Country  EDO STATE NIGERIA. | | 10 | 81 | 10 | 87 | 6 |

| ⑩.2 OTHER MEDICAL SCHOOLS ATTENDED: | Name | |
|---|---|---|
| | City/State/Country | |
| | Name | |
| | City/State/Country | |
| | Name | |
| | City/State/Country | |

| ⑩.2 CLINICAL CLERKSHIPS: | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| | *See Part D of this application for entering clinical clerkships.* | | | | |

⑪ MEDICAL LICENSURE: Present or Future

Date you received (or expect to receive) an unrestricted license or certificate of full registration to practice medicine:

MO. 01 YR. 89    Country or state in which you are licensed: * NIGERIA
* If the license has been issued, a photocopy must be sent to ECFMG. See *Medical Education Credentials* section of the ECFMG Information Booklet.

| ⑫ HOSPITAL TRAINING: Residency or fellowship | Hospitals | Position(s) | Dates |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| ⑬ EMPLOYMENT: Present employment only | Institution/Company | Position | Dates |
|---|---|---|---|
| | Name: | | |
| | Street: | | |
| | City/State/Country: | | |

⑭ BIRTHDATE/ BIRTHPLACE:    Day 01  Month 01  Year 59  Location: BENIN CITY  EDO STATE
City, Province, Country

⑮ GENDER:    Please check one: ✓ Male ___ Female    ⑯ NATIVE LANGUAGE: EDO

⑰ CITIZENSHIP:    (Complete all three)
A. AT BIRTH NIGERIAN  USA ☐ or Other ☐ (Specify) _____
B. UPON ENTERING MEDICAL SCHOOL  USA ☐ or Other ☐ (Specify) _____
C. NOW NIGERIAN  USA ☐ or Other ☐ (Specify) _____

⑱ OTHER EXAMINATION HISTORY AND APPLICANT NUMBERS:

Check below the organizations to which you may have applied previously; enter the date of the most recent examination that was administered to you and the identification number that was assigned to you by that organization.

| ORGANIZATION | DATE OF MOST RECENT EXAMINATION TAKEN | | | APPLICANT IDENTIFICATION NUMBER |
|---|---|---|---|---|
| ☐ NATIONAL BOARD OF MEDICAL EXAMINERS | MO. | 1 9 YR. | NBME Parts I/II | |
| | MO. | 1 9 YR. | USMLE Steps 1/2 | |
| ☐ STATE LICENSING AUTHORITY IN THE UNITED STATES | MO. | 1 9 YR. | FLEX | FEDERATION IDENTIFICATION NUMBER (FIN) |

PART C

ECFMG-000644

JA4226
ECFMG_RUSS_0000644

STATE LICENSING AUTHORITY
IN THE UNITED STATES

| | 1 | 9 | |
MO.        YR.

PART C

Students and graduates must sign the application in the presence of their Medical School'Dean, Medical School Vice Dean, or Medical School Registrar. (See A below.)

If a graduate cannot sign the application form in the presence of a medical school official noted above, he/she must sign the application form in the presence of a Consular Official, First Class Magistrate or Notary Public (See B below) *and* must explain in writing why the application form could not be signed in the presence of a medical school official. (See B.1 below.)

Application forms are to be mailed to ECFMG from the office of the official or notary who witnesses the applicant's signature.

All information on the application form is subject to verification and acceptance by the Educational Commission for Foreign Medical Graduates.

**(19) CERTIFICATION BY APPLICANT**

I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me.

I also certify and acknowledge that I have received the current edition (that which pertains to the administration for which I am registering) of the combined Information Booklet on ECFMG Certification and Application for USMLE Step 1 and Step 2 examinations and USMLE Bulletin of Information, am aware of the contents of both sections and meet the eligibility requirements set therein.

I understand that (1) falsification of this application, or (2) the submission of any falsified educational documents to ECFMG, or (3) the submission of any falsified ECFMG documents to other agencies, or (4) the giving or receiving of aid in the examination as evidenced either by observation at the time of the examination or by statistical analysis of my answers and those of one or more other participants in that examination, or engaging in other conduct that subverts or attempts to subvert the examination process, may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action. (See Information Booklet for additional details concerning Validity of Scores and Irregular Behavior.)

I understand that the ECFMG certificate and any and all copies thereof remain the property of the ECFMG and must be returned to ECFMG if ECFMG determines that the holder of the Certificate was not eligible to receive it or that it was otherwise issued in error.

I hereby authorize the Educational Commission for Foreign Medical Graduates to transmit any information contained in this application, or information that may otherwise become available to ECFMG, to any federal, state or local governmental department or agency, to any hospital or to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

Signature of Applicant X _Iola aska Alcda_ Date 8 /29 /96
(In Latin Characters)

**(19.1) CERTIFICATION BY MEDICAL SCHOOL OFFICIAL**

**OR**

**CERTIFICATION OF IDENTIFICATION WITH EXPLANATION (Pertains to graduates only)**

A. I hereby certify that the photograph, signature, and information entered on Section 10 of this form accurately apply to the individual named above.

X _____
Signature of Medical School Official (In Latin Characters)

Official Title          Date          Institution

B. I certify that on the date set forth below the individual named above did appear personally before me and that I did identify this applicant by: (a) comparing his/her physical appearance with the photograph on the identifying document presented by the applicant and with the photograph affixed hereto, and (b) comparing the applicant's signature made in my presence on this form with the signature on his/her identifying document. The statements in this document are subscribed and sworn to before me by the applicant on this _____ day of _____, 19_____.

X _____
Signature of Consular Official, First Class Magistrate, Notary Public (In Latin Characters)          Official Title

**FOR OFFICE USE ONLY**

| FORM | DATE |
|------|------|
| S.A. | |
| I.D. | |
| 338 | |
| 339 | |
| 325 | |
| R | —M 9/11/96 |

B.1 Explain in the space below why the application could not be signed in the presence of your medical school dean, vice dean or registrar. Any explanation must be acceptable to ECFMG and must be provided each time you submit an application to ECFMG.

**(20)** Have you ever been denied licensure or authority to practice medicine by any medical licensing or registering authority, or has any such license or authority to practice medicine ever been suspended or revoked?    ☐ Yes   ☑ No

If the answer to this question is "Yes," please explain fully on a separate sheet of paper, giving details such as date, location, charge, and action taken; and provide any supporting documents.

**(21)** Provision of the following information is voluntary. The information will be used for research purposes only. You are encouraged to provide the information; however, the processing of your application will not be affected if you choose to leave item (21) blank.

Select the one which best describes your racial/ethnic background.

1 ☐ American Indian/Alaskan Native   2 ☐ Asian Pacific Islander   3 ☐ Hispanic   4 ☐ Black (not of Hispanic Origin)   5 ☐ White (not of Hispanic Origin)   6 ☐ Other

RECEIVED
AUG 3 0 1996
ECFMG

DEAN COLLEGE OF
signature of official if must cover a portion of the attached photograph.

ECFMG-000645

JA4227

ECFMG_RUSS_0000645

PART D

| (10.2) CLINICAL CLERKSHIPS: | Clinical Discipline | Hospital/Clinic | Location (exact address) | Supervising Physician | Dates of Clerkship |
|---|---|---|---|---|---|
| Refers to that period of medical education in the clinical disciplines during which as a medical student you gained practical experience in hospitals or clinics. | Medicine | Specialist Hosp. Benin | Warri | Dr Onwuka | 1988 |
| | Pediatrics | Specialist Hosp Benin | Warri | Dr Asemota | 1987-8 |
| List clerkships (rotations, pre-graduate internships) for each clinical discipline. | OBGYN | Specialist Hosp Benin | Warri | Dr Ujinfo | 1988 |
| | Surgery | Specialist Hosp Benin | Henri | Dr Idahosa | 1988 |

ECFMG-000646

JA4228

ECFMG_RUSS_0000646

# Exhibit 27



EXHIBIT 25
Kelly
JP 8/20/19

# UNIVERSITY OF BENIN



BENIN CITY, NIGERIA

*Johnbull Enosakhare Akoda*

having satisfied all the requirements of the University
and passed the prescribed examinations held in

*October 1987*

has been admitted to the degree

of

Bachelor of Medicine: Bachelor of Surgery

RECEIVED AUG 1 1 2011 MARYLAND BOARD OF PHYSICIANS

Given at Benin City this 6th day of *February* 1988

REGISTRAR

VICE-CHANCELLOR

ECFMG-000586

JA4230
ECFMG_RUSS_0000586

# Exhibit 28





# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

Personal and Confidential

August 22, 2000

James McCorkel, Ph.D.
Vice President for Academic Affairs
Jersey Shore Medical Center
1945 State Route 33
Neptune, NJ 07754-0397

Re: Dr. John Nosa Akoda
USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. McCorkel:

This is in response to your letter of August 11, 2000 and telephone conversations of August 14 and 15, 2000. You indicated in your letter and subsequent conversations that Jersey Shore Medical Center/Meridian Hospitals Corporation is conducting an investigation whether a resident at your institution by the name of John Charles Akoda may have also served as a resident at two other institutions using the name Oluwafemi Charles Igberase. To aid in your investigation, you asked for certain information in possession of the Educational Commission for Foreign Medical Graduates (ECFMG).

According to applications submitted to ECFMG, Dr. Akoda's full name is "John Nosa Akoda." He certified his date of birth to be January 1, 1959. The medical diploma he submitted indicated he received his medical degree in 1988 from the Faculty of Medicine, University of Benin, Nigeria. ·This medical diploma was verified by ECFMG with the medical school. Dr. Akoda was issued ECFMG Certificate No. 0-553-258-5 on August 18, 1997. The social security number he provided ECFMG in 1998 is 9065.

ECFMG also has a file for "Oluwafemi Charles Igberase." Using the name "Oluwafemi Charles Igberase," an individual submitted an application and certified his date of birth to be April 17, 1962 and his social security number as ·5054. The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria. This medical diploma was verified by ECFMG with the medical school. He was issued ECFMG Certificate No. 0-482-700-2 on October 4, 1993. This ECFMG Certificate was revoked in November 1995. The revocation is through July 10, 2001.

This same individual also submitted an application using the name "Igberase Oluwafemi Charles." He certified his date of birth to be April 17, 1961. He also certified on the application that he had not previously submitted an application to ECFMG and

*ECFMG® is an organization committed to promoting excellence in international medical education.*

James McCorkel, Ph.D.
August 22, 2000
Page 2

was assigned a new USMLE/ECFMG Identification Number 0-519-573-0. The medical diploma he submitted indicated he received his medical degree in 1987 from the Faculty of Medicine, University of Ibadan, Nigeria. This medical diploma was verified by ECFMG with the medical school. He did not provide a social security number under this USMLE/ECFMG Identification Number. He was issued ECFMG Certificate No. 0-519-573-0 on December 14, 1994. This ECFMG Certificate was invalidated in November 1995.

ECFMG has no record of receipt of requests for verification of the ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital concerning any of these three names or USMLE/ECFMG Identification Numbers.

Thank you for bringing this matter to our attention.

Sincerely,

*Stephen S. Seeling*

Stephen S. Seeling, J.D.
Vice President for Operations

SSS/wck

ECFMG-000641

JA4233
ECFMG_RUSS_0000641

# Exhibit 29



## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES
PHILADELPHIA OFFICE
3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org



Personal and Confidential
Via Federal Express

August 22, 2000

Dr. John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

Re: USMLE™/ECFMG® Identification No. 0-553-258-5

Dear Dr. Akoda:

The Educational Commission for Foreign Medical Graduates (ECFMG) has received information alleging that you may have engaged in irregular behavior.

According to ECFMG records, in January 1996, you submitted an application to ECFMG to take the March 1996 United States Medical Licensing Examination (USMLE) Step 2 and June 1996 USMLE Step 1. You certified on the application that your name was "John Nosa Akoda" and that you had not previously submitted an application to ECFMG. You also certified, among other information, that your date of birth was January 1, 1959 and that you graduated from the Faculty of Medicine, University of Benin, Nigeria, in 1987.

According to information recently received by ECFMG, it is alleged you may have previously applied to ECFMG using the names "Oluwafemi Charles Igberase" (USMLE/ECFMG Identification No. 0-482-700-2) and "Igberase Oluwafemi Charles" (USMLE/ECFMG Identification No. 0-519-573-0). In November 1995, the ECFMG Committee on Medical Education Credentials took action to invalidate Standard ECFMG Certificate No. 0-519-573-0 and revoke Standard ECFMG Certificate No. 0-482-700-2. An appeal of these actions was taken to the ECFMG Review Committee on Appeals. After hearing the appeal, the ECFMG Review Committee on Appeals upheld the actions of the ECFMG Committee on Medical Education Credentials, but limited the length of the revocation of Standard ECFMG Certificate No. 0-482-700-2 to five years, i.e., until July 10, 2001.

When you applied to ECFMG, you certified on your application that the "falsification of this application or the submission of any falsified educational documents to ECFMG ...may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold and/or invalidate the results of my examination, to withhold a certificate, revoke a certificate, or to take other appropriate action." A copy of the certification statement you signed is enclosed.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

JA4235

ECFMG_RUSS_0004194

Dr. John Akoda
August 22, 2000
Page 2

ECFMG requires an explanation from you in writing within fifteen (15) days of your receipt of this letter. The information in your ECFMG file, together with your explanation and any other material you submit, will be referred to the ECFMG Committee on Medical Education Credentials for review at its next scheduled meeting.

Please send all communications and material in this matter to my attention. If you have any questions, please telephone me at (215) 823-2277.

Sincerely,

William C. Kelly
Manager, Medical Education
Credentials Department

/wck
Enclosure

JA4236

Confidential

ECFMG_RUSS_0004195

# Exhibit 30

**EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

August 28, 2000

EXHIBIT 37
Kelly
JD 8/20/19

**Memorandum**

**To:**  File #0-553-258-5
Dr. John Akoda

**From:**  William Kelly

Today I received a telephone call from James McCorkel, Ph.D., Jersey Shore Medical Center. His telephone is (732) 776-4732.

He stated Dr. Akoda was still in the residency program, but had requested a leave of absence effective august 30, 2000, stating his father in Nigeria had died and he was going to travel there. Dr. Akoda also told him he required surgery.

Dr. McCorkel also stated he had contacted Harlem Hospital concerning the identity of Dr. Igberase Charles. He had sent them a photograph. He was waiting to hear from Harlem Hospital.

Dr. McCorkel stated he would keep us informed of developments.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

# Exhibit 31

JA4239

EXHIBIT 40
Kelly
LO 8/30/19

McCorkel   9/13

Same story to McCorkle :

due process 15 day appeal
period
until 9/15

suspension due to inconsistencies
nothing to do w/ quality of
patient care

move this to
EC 176 was to    — He'll talk to atty
probate?

— if appeal will not
communicate
add'l 15 days
we'll hear
Waiver of kids? name — Otherwise in a week
name different
not different

While Akodu said he was going
to Nigeria — they have
info he is in Maryland
CEO
— rec'd Communications — off record
cannot share not different
but do not have this concern

# Exhibit 32

10/5   McCook

Akoda – meeting scheduled w/ Akoda at 11:00 AM
then at 2:00 pm →

- inconsistencies in file
- w/ Dr. Frank / program director...

- final meeting next week

Akoda
- on suspension until 10/1 asking him
  to clarify inconsistencies
  - 2 different green cards / diff dates,
    fingerprints, birthdates, #s,
    - driver's license

- indicated he was going to Nigeria + return on 10/15
- but he is in USA.
                                    Wednesday 2:00 (?)
                                    10/11
- due process / review panel — not yet there

Harlem
Home / Hospital – Nigeria
    thinks he may be same..

10/19 – Notice to Akoda he will be term
    in 30 days — if he does not appear in 10 days..
    re: 2 SS. #s.

EXHIBIT 44
Kelly
#2 8/30/19
PENGAD 800-631-6989

Confidential
ECFMG_RUSS_0003742

# Exhibit 33

EXHIBIT

45

Kelly

JD 8/20/19

## Kelly Bill

| | |
|---|---|
| **From:** | femi charles [cfemi@hotmail.com] |
| **Sent:** | Thursday, December 21, 2000 7:12 PM |
| **To:** | Kelly Bill |
| **Subject:** | Re: USMLE application |

hi mr kelly,
i have been trying to reach you for a while,left several messages on your
machine,but no response.
the last time I spoke with my cousin( dr Igberase) was about 3 months or so
in nigeria.he told me he will be either in florida or louisiana when he
comes back to the country.i haven,t spoken with him since then.
i don,t know if he,s back or not.
i wonder why he gave you this e-mail address.he does not use this address
any more.he uses igberaseoluwafemi@yahoo.com at least as at when he last
e-mailed my sister.
i hope to talk with you soon.
you could reach me at home (301)482-1441.
thanks for your usual support,
sincerely,
john Akoda M.D.


>From: Kelly Bill <BKelly@ECFMG.org>
>To: "'cfemi@hotmail.com'" <cfemi@hotmail.com>
>Subject: USMLE application
>Date: Thu, 21 Dec 2000 16:39:05 -0500
>
>Dr. Igberase,
>
>I have been trying to contact you concerning your application submitted to
>ECFMG.  Please contact me as soon as possible.
>
>William Kelly
>Manager, Medical Educ. Credentials Dept.
>ECFMG
>3624 Market St., 4th Floor
>Philadelphia, PA 19104
>
>Telephone: (215) 823-2277
>Fax: (215) 386-9767
>Email: bkelly@ecfmg.org
>

Get your FREE download of MSN Explorer at http://explorer.msn.com

1

ECFMG-000671

JA4244
ECFMG_RUSS_0000671

# Exhibit 34

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,     *
ELSA M. POWELL AND DESIRE EVANS,

          *      Case No. 2:18-cv-05629-JW

     Plaintiffs

          *      Hon. Joshua D. Wolson

     v.

          *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,      *

     Defendant          *

*    *    *    *    *    *    *    *    *    *    *    *

## DECLARATION OF ELSA POWELL

I, Elsa Powell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I first encountered Oluwafemi Igberase, whom I knew as "Dr. Charles Akoda," in 2014, having been referred to the medical practice of Abdul Chaudry, M.D. for prenatal care. Oluwafemi Igberase, using the identity of "Charles Akoda," saw me on several occasions during my pregnancy in connection with that medical practice. He also performed the delivery of my son, Jaiden.

2. Igberase's treatment of me involved physical contact, including invasive pelvic examinations, and the delivery of my child. Additionally, following delivery of my child, Igberase performed a surgery on me as a result of significant postpartum bleeding.

3. During my pregnancy, Igberase acted in a flirtatious manner with me that made me feel uncomfortable, but I nevertheless trusted that he was a competent and appropriately credentialed physician providing appropriate medical care.

JA4246

4.      Throughout all procedures and examinations performed on me by Igberase, I believed that he had received all appropriate and necessary medical training and was practicing obstetrics and gynecology as a duly licensed and credentialed physician.  I trusted the organizations responsible for verifying the credentials of physicians when I agreed to submit to medical care from him.

5.      I first learned that the man I knew as "Dr. Akoda" had used a fraudulent identity and had not taken the appropriate steps to engage in the practice of medicine, in approximately 2018.

6.      I trusted "Akoda" with my prenatal care, the delivery of my child, and subsequent surgical procedures.  Upon learning that he had engaged in this fraud, I felt extremely violated, and experienced severe emotional distress.  As a result of this realization, I experienced recurrent nausea, stomach discomfort, fear, confusion, sleeplessness, crying, anger, nervous sweating, and panic attacks.  I experienced difficulty trusting physicians and reluctance to seek medical care. These symptoms were recurrent and severe, and continue to today, particularly when confronted with the need to see a medical provider.  I felt betrayed by "Akoda" and the organizations responsible for verifying the qualifications of physicians.

7.      I entrusted the man I knew as "Akoda" with my life and the life of my then unborn child.  I allowed him to touch and perform invasive examinations of my body.  Had I understood that the man I knew to be "Akoda" had engaged in identity fraud, and had not gone through the appropriate process to become credentialed as a physician, including by not submitting valid proof of having attended medical school, I would never have agreed to submit to medical and surgical treatment by him.  His physical contact with me, including the delivery of my child, was obtained without my consent and through fraud.

JA4247

I declare under the penalties of perjury of the laws of the United States of America that the

foregoing is true and correct.

Date: 1/10/2022                          By: _____

Elsa Powell

JA4248

# Exhibit 35

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,    *
ELSA M. POWELL AND DESIRE EVANS,

     *     Case No. 2:18-cv-05629-JW

      Plaintiffs

     *     Hon. Joshua D. Wolson

    v.             *

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,    *

      Defendant      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF DESIRE EVANS

I, Desire Evans, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.     I first encountered Oluwafemi Igberase, whom I knew as "Dr. Charles Akoda," at Prince George's Hospital Center in Chevery, Maryland, for the delivery of my child in March of 2016.

2.     Igberase's treatment of me involved physical contact, including pelvic examinations, and the delivery of my child by c-section. Igberase additionally engaged in touching that made me feel uncomfortable at the time of my medical care, including the fondling of my clitoris, which he indicated would assist in my delivery. As this was my first experience having a baby, I trusted that his explanation for his conduct was medically valid.

3.     Throughout all procedures and examinations performed by Igberase, I believed that he had received all appropriate and necessary medical training and was practicing obstetrics and gynecology as a duly licensed and credentialed physician. I trusted the organizations

1 of 2

JA4250

responsible for verifying the credentials of physicians when I agreed to submit to medical care from him.

4.      I first learned that the man I knew as "Dr. Akoda" had used a fraudulent identity and had not taken the appropriate steps to engage in the practice of medicine, in 2018.

5.      Upon learning that the man I trusted to perform obstetric examinations and surgical procedures on me had engaged in this fraud, I experienced severe emotional distress. After learning this information, I experienced feelings of nausea, disgust, depression, sadness, sleepless nights reflecting on "Akoda's" conduct, stress and anxiety, crying, impacts on my intimate relationship with my spouse, and nervousness. These symptoms were most serious in the first two years after I learned about Igberase's conduct, but many of these symptoms continue today.  In particular, I continue to have depression, anxiety and trust issues relating to doctors, as well as intimacy issues with my husband.

6.      I entrusted the man I knew as "Akoda" with my life and the life of my child.  Had I understood that the man I knew to be "Akoda" had engaged in identity fraud, and had not gone through the appropriate process to become credentialed as a physician, including by not submitting valid proof of having attended medical school, I would never have agreed to submit to medical and surgical treatment by him.  His physical contact with me, including the performance of a c-section, was obtained without my consent and through fraud.

I declare under the penalties of perjury of the laws of the United States of America that the foregoing is true and correct.

Date:   1/12/2022                          By:   _____

                                                  Desire Evans

JA4251

# Exhibit 36

JA4252

<div align="center">

**John C. Hyde, Ph.D., FACHE**
**Health Care Consultant**
**4301 Highway 35 North**
**Forest, MS  39074**

</div>

September 23, 2019

Ms. Karen E. Evans
The Cochran Firm
Attorneys at Law
110 New York Ave., NW
Suite 340, West Tower
Washington, DC  20005

Dear Ms. Evans

This opinion has been prepared in regards to the matter of: ***Russell, et al v. Educational Commission for Foreign Medical Graduates, Case No. 2:18-cv-05629-JW.***  Currently, I am an adjunct Professor of Healthcare Administration at the George Washington University teaching healthcare management at the graduate level on a part-time basis; and, a full-time consultant in the field of healthcare administration. Recently, I retired as a full-time university Professor of health services administration and clinical outcomes research within an academic medical center campus; with former appointments in the School of Health Related Professions and the School of Medicine at the University of Mississippi Medical Center; and, in the School of Business at the University of Mississippi. My academic activities involved: teaching graduate-level students in areas of healthcare management; conducting health services research focusing on management and clinical outcomes analysis; and, providing expertise and consultations to the healthcare community at large. I have taught graduate level healthcare administration/outcome classes for the past 28+ years. My doctorate, master, and bachelor degrees are all in the area of healthcare administration. I have presented research findings at the regional, national and international levels and published articles, books and monographs related to various areas of healthcare delivery. I have provided lectures and addresses to international, national and regional audiences in areas of healthcare administration.

Additionally, I have approximately 10 years' experience as a practicing healthcare administrator and multi-system executive with specific knowledge and expertise in the areas of physician credentialing/privileging, credential verification organizations, primary source verification, regulators, and overall healthcare management procedures. I am board-certified as a Certified Healthcare Executive (***FACHE- Fellow***) by the **American College of Healthcare Executives** in the specialty of health care administration.

Attached is my Curriculum Vitae which includes a list of all publications I have authored, including those dealing with the credentialing process.

John C. Hyde, Ph.D.   Page 1 of 8     9/19/2019

JA4253

In the preparation of this preliminary opinion, I have examined the documents and information listed below and based my opinions on my professional knowledge of prevailing and prudent standards of healthcare administration which ultimately require an exercise of reasonable application of the process of Credentials Verification and use of Primary Sources:

**DOCUMENTS/INFORMATION REVIEWED**:

Documents Received from Howard University
Documents Received from ECFMG
Documents Received from ABOG Production
ECFMG Information Booklet, ECFMG Certification and Application, 1996
Complaint
Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (2017)
Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (2017)
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
ECFMG Complaint
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
Hallock JA & Kostis JB (2006). **Celebrating 50 Years of Experience: An ECFMG Perspective,** Academic Medicine, 81(12): S7-S16.
**Hospital Accreditation Standards**, The Joint Commission, 2008.
American Medical Association: **Joint Commission acceptance of AMA Physician Masterfile Data**, 2004.
**Credentialing by Medicare Advantage Organizations**, presented by E. Enriquez, Nurse Consultant, CMS Region II,

**Depositions Reviewed**:

Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)

Based upon a review of these identified documents/information, coupled with my knowledge, training, education, experience and understanding of the practice of healthcare management, I have formulated the following opinions in this matter. These opinions have been based on regulations and industry standards that guide, and should guide the operations of a credentialing verification organization (CVO), such as Educational Commission for Foreign Medical Graduates (ECFMG).

**SUMMARY OF EVENTS**

1. ECFMG received two applications from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. The first on January 3, 1996, and again on August 30, 1996.

2.  After he successfully completed the required examinations, ECFMG issued certificate number 0-553-258-5 to "Dr.".Akoda. At some time in 1998, he provided ECFMG with social security number xxx-xx- 9065.

3.  Akoda entered the graduate residency program at Jersey Shore Medical Center on July 1, 1998. Shortly thereafter,, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program.

4.  On September 2, 1998, ECFMG sent a validated form.

5.  About two years later, in 2000, ECFMG was notified that the Jersey Shore Medical Center graduate residency program where Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Jersey Shore Medical Center that Akoda had provided ECFMG with social security no. xxx-xx-9065 which was the same number Akoda provided to Jersey Shore Medical Center.

6.  On August 22, 2000, ECFMG acknowledged in a letter to Akoda that it had received information alleging that Akoda may have engaged in irregular behavior.

7.  Thereafter ECFMG sent a letter to Akoda acknowledging receipt of information from Jersey Shore to which Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. As proof of his identity,   Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

8.  Ultimately, Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number and because the green card he provided to the hospital was inconsistent with the other green card he provided. The social security number "Dr."Akoda used belonged to Charles Igberase, "his cousin".

9.  In December of 2000, an employee of ECFMG, William Kelly, wrote a memo which he said should NOT be made a part of the official file, to the VP of Operations at ECFMG, Stephen Seeling. In that memo, Mr. Kelly advised Mr. Seeling that both he and Jersey Shore believed Igberase and Akoda were the same person.  Then, curiously, Mr. Kelly concluded that there was not enough information for the ECFMG Credentials Committee.

10.  Thereafter in October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center's residency program. He provided three letters of reference.  ECFMG attempted to verify the authenticity of these three letters of reference but was unsuccessful. It is not the usual practice of ECFMG to seek to verify the authenticity of letters of reference from its applicants.

11.  Akoda successfully completed a graduate residency program at Howard University Medical Center, was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center.

12.    To obtain a license to practice medicine in Maryland, Akoda was required to submit, among other essential components, a valid ECFMG certificate.

13.    However, ECFMG should never have issued an ECFMG certificate to Charles Nosa Akoda.

14.    At the time of Akoda was issued an ECFMG certificate, ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias). ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias) and that he had: a) previously lied about not taking the required examinations, b) rearranging his name, c) that he had been dismissed from the Jersey Shore residency program he used a false social security number to apply to the hospital ( his 'cousin' Charles Igberase) and used two green cards documenting different numbers, names, expiration dates, and dates of birth for "Dr. Akoda and his certification had been previously revoked; d) that his ECFMG certification had been previously revoked; that there were irregularities regarding the authenticity of his medical school diplomas, and references.

15.    On June 1, 2016, U.S. Attorney's office indicted Mr. Akoda for fraud and aggravated identity theft, citing eleven aliases including Charles John Nosa Akoda.

16.    Using search warrants, law enforcement officers searched the home of Mr. Akoda on June 9, 2016, and discovered false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. They also found other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

17.    On October 19, 2016, Mr. Akoda was indicted again on a charge of social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.

18.    Mr. Akoda ultimately entered into a plea bargain agreement and pled guilty to social security fraud on November 15, 2016.

19. In the spring of 2017, Mr. Akoda's license to practice medicine in Virginia and Maryland was revoked.


**AREAS OF EXAMINATION/RESPONSES**

1.  **ECFMG Mission/Requirements**
      Since 1974, the Educational Commission for Foreign Medical Graduates (ECFMG) has promoted to the American public their preeminent, and exclusive, role in assuring: ***"quality health care for the public by <u>certifying</u> international [foreign] medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals"***. As such, this organization serves as the de facto credentials verification organization for

John C. Hyde, Ph.D.   Page 4 of 8      9/19/2019

international [formerly foreign] medical graduates through primary source certification of the applicant's international medical education, international training, and successful completion of the United States Medical Licensure Examination (USMLE)- steps 1 and 2 and English proficiency; through administration of the testing process and subsequent applicant certification to graduate medical education sites for potential placement in postgraduate medical training programs--all of which is required for medical practice within the U.S.

In 1986, the ECFMG Board required that the medical diplomas of all graduates applying for ECFMG Certification be primary source verified with the medical school that issued the diploma. This required the ECFMG to physically send a letter to the medical school that issued the diploma and for the issuing medical school *"to attest to the veracity of the individual and the document being proffered"*. This was required by ECFMG to ensure that all diplomas would undergo this scrutiny--obviously to validate the authenticity of the individual and their successful completion of medical school training, along with the issuing medical school.

Fraudulent and misleading information submitted to the ECFMG is currently covered under its Policies and Procedures Regarding Irregular Behavior. This prescriptive set of policies and procedures defines and addresses what constitutes irregular behaviors. As stated, *"Irregular behavior includes all actions or attempted actions of the part of applicants, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG . . .".* When confronted with irregular behavior, it is incumbent on ECFMG to properly and thoroughly investigated, analyze and address such behaviors. Without proper resolution of the issues, ECFMG cannot fulfill its mission to the public mandating an international/foreign medical school graduate that possess all the requisite qualifications to pursue U.S. medical practice.

2. **Duties of Credentials Verification Organizations**

A healthcare CVO (credentials verification organization) as the name implies provides assurances to those entities that utilize their findings in making decisions on granting medical training program enrollment, licensure and ultimately medical practice privileges. In the late 1980's, JCAHO (former name of current, The Joint Commission) published conditions under which a CVO could be used by a hospital. According to the Joint Commission, a CVO is *"Any organization that provides information on an individual's professional credentials. An organization that bases a decision in part on information obtained from a CVO should have confidence in the completeness, accuracy and timeliness of information"*.  Additionally, other CVOs within the healthcare industry such as the American Medical Association Physician Masterfile and Federation of State Medical Boards, among others, provide information that maintains these same criteria and likewise is based on primary source verification concerning vital information such as the issues of this matter. The National Committee for Quality Assurance (NCQA) has formalized and certifies CVOs. At the present time, there are

over 90 CVOs that have gained NCQA CVO Certification. Under prevailing CVO requirements, a CVO must assure the accuracy and completeness of the information that is provided. From a primary source perspective, foreign medical school education must be from the primary source.

The Centers for Medicare and Medicaid Services (CMS), has specified that primary source verification is required for: licensure, education and board certification (if applicable) in granting Medicare Advantage participation. They defined primary source as: ***"an organization or entity with legal responsibility for originating a document and ensuring the accuracy of the information it conveys"***.

As such, this concept of primary source verification entails that the CVO, in this case ECFMG, must be assured that the applicant does in fact possess a valid and authentic medical degree and other identification and credentials must undertake all efforts to make this assurance before certifying the applicant to further U.S. training, or medical licensure.

3. **Professional/Organizational Negligence**

As developed above, the administrative standards for credentialing IMGs allowing for participation in the ECFMG program requires ECFMG to follow their mission and fulfill its duty to patients in that their actions will serve to assure all foreign educated physicians are properly and thoroughly investigated and deemed eligible for ECFMG Certification to pursue U.S. postgraduate medical education. Without this certification, there should never be an individual allowed to participate in such a program; and, therefore, there would never be fraudulent IMG physicians that progressed through ECFMG to practice U.S. medicine.

**ECFMG failed to act in a reasonable and prudent manner in the following ways**:

A.      As a fundamental matter, ECFMG was required to develop or adopt written policies and procedures and checklist for the certification of IMGs. Written policies and procedures for the investigation of allegations of irregular behavior would ensure reasonable and consistent application of defined criteria.
B.      ECFMG failed to investigate obvious discrepancies that raised the question of fraud and the identity of the applicant. For example, ECFMG failed to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG; the relationship between Igberase and Akoda, to name a few.
C.      ECFMG failed to follow through on its suspicions about the authenticity of the letters of recommendation.

D.      Curiously, ECFMG failed to adequately and with reasonable diligence investigate the allegations made by Dr. McCorkel and refer Akoda to the Medical Education Credentials Committee.

John C. Hyde, Ph.D.   Page 6 of 8      9/19/2019

JA4258

E.      ECFMG did not even follow its own procedures as noted in the 8/22/2000 charge letter sent to Akoda.

F.      ECFMG failed to investigate the social security number provided to ECFMG by Akoda.

G.      ECFMG obtained photographs of all applicants yet failed to compare photographs of Igberase and Akoda in its files when they had suspicions that they might be the same person.

H.      ECFMG missed a golden opportunity to discover if Akoda and Igberase( aka multiple alias) were the same person.

I.      ECFMG also failed to determine the authenticity of the passport and green card provided to Mr. Kelly by Akoda on 9/27/2000.

J.      ECFMG failed to follow up on its conclusion that Igberase and Akoda were the same person even though a memo with this conclusion was created by ECFMG employee Mr. Kelly.

K.      Instead, ECFMG negligently chose to bury this information in a memo that was not to be placed in the file.

It is my opinion, with a reasonable degree of professional certainty, ECFMG should have written policies and procedures for the certification of IMG should have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications and the other obvious discrepancies in the applications.

In my opinion, with a reasonable degree of professional certainty, an appropriate investigation would have resulted in referral of this matter to the ECFMG medical education credentials committee. An appropriate and reasonable investigation of the allegations and obvious discrepancies in the applications should have been conducted by ECFMG, and this matter should have been referred to the Medical Education Credentials Committee. This committee should have then found that Akoda engaged in irregular behavior, which should have then resulted in his certification being revoked.

With a high degree of professional certainty, it is my opinion that the above breaches of duties, by ECFMG caused Akoda to be certified by ECFMG, which allowed him to be accepted into a residency, secure a medical license in MD and gain access to and directly cause harm the plaintiffs and the members of the class. These actions and omissions were violations of the Standards of Care. Without the negligent ECFMG certification, Akoda would not have been accepted into a residency at Howard University Hospital; he would not have obtained a Maryland license; and he would not have been granted privileges at PG Hospital to care for Plaintiff and members of the class.

I reserve the right to alter, supplement or reverse these opinions should additional information be forthcoming.

John C. Hyde, Ph.D.   Page 7 of 8      9/19/2019

JA4259

Attached is my Rule 26 case list.

I am billing my time for review and preparation of my report at $ 375per hour and my time for deposition at $ 1,425 for a three (3) hour deposition and $ 3,750 for one day of trial, plus travel, meals, and lodging expenses.

Respectfully,

*John C. Hyde*

John C. Hyde, Ph.D., FACHE

JA4260

# Exhibit 37

JA4261

## Jerry Williamson, M.D., F.A.A.P., M.J., CHC., LHRM

## 24 Falconwood Court Fort Myers, Florida 33919

**Expert Report:** Jerry Williamson M.D. FAAP. MJ.CHC.LHRM

### September 22, 2019

### Re: Monique Russell, Jasmine Riggins, Elsa Powell, Desire Evans v. Educational Commission for Foreign Medical Graduates

The following report is supported by over 40 years of both formal education and experience as a physician and administrator. My formal education accomplishments include my degree as a Doctor of Medicine, my master's in healthcare jurisprudence, and certifications in healthcare compliance and risk management. I have practiced clinical medicine in my specialty, pediatrics, in which I am Board Certified.

I have held administrative positions as a Chief Medical Officer, Medical Director, and Vice President for Medical Affairs in both the ambulatory and inpatient settings. In these positions I served on and chaired credentialing committees. Based on my experience in these roles, I became knowledgeable concerning the primary source credentialing process of the ECFMG, as it applies to the standard of care. In 2005, as CMO and Director of the Biomedical Informatics Program, I directed the implementation of an EMR for an FQHC, assisting in the development of policies and procedures. During this period, I was Co-Medical Director of the Community Health Center Alliance Electronic Medical Record Clinical Committee. This committee assisted other organizations in their development and implementation of EMR's. I also served as a Meaningful Use Clinician Champion to The Center for the Advancement of Health Information Technology, a Regional Extension Center in Florida.

I have been a national speaker for the past 25 years, with a focus on patient safety, communication inadequacies in health care, and the prevention of medical errors. My roles have included Clinical Instructor in the Department of Pediatrics, University of South Florida College of Medicine, Clinical Assistant Professor in the Department of Pediatrics at NOVA Southeastern University, College of Osteopathic Medicine, Clinical Associate Professor of Physician Assistant Sciences, College of Allied Health, NOVA Southeastern University, Clinical Assistant Professor of Pediatrics, and Clinical Clerkship Training Coordinator at The Florida State University College of Medicine, and Clinical Assistant Professor at the Florida State University College of Medicine, Department of Clinical Sciences, Family Medicine Residency Program. In 2012, I was the Recipient of the *"Heroes in Healthcare Award"* for Administrative Excellence in Healthcare, from the Naples Daily News.

1



EXHIBIT ___ 9
WIT: _____
DATE: _____
ANGELA M. COKER, COURT REPORTER

I had the opportunity to review the following documents that were provided to me from the law firm Janet, Janet & Suggs:

- Kara Corrado, 09/10/2019 Deposition Transcript with Exhibits 1-9
- William C. Kelly 08/20/2019 Deposition Transcript with Exhibits 1-53
- Class Action Civil Complaint and Exhibits
- Stephen S. Seeling 09/06/2019 Deposition
- Timeline of Events
- 1996 Information Booklet ECGMG
- Answer to Class Action Civil Complaint and Affirmative Defenses
- Defendant's Objections and Responses to Plaintiffs' Requests for Admissions of Facts and Genuineness of Documents
- Defendant's Objections and Responses to Plaintiffs' Second Requests for Admissions of Genuineness of Documents
- USMLE Letter (02-05-18); ECFMG Credentials Committee Document (11-30-16); U.S. DOJ Plea Agreement with Attachment A-Stipulated Facts; ECFMG Irregularity Report (09-1992) and Sanctions Update (11-30-16); ECFMG Press Release re: Launching Electronic Verification of Medical Credentials
- ECFMG emails

### Summary of Facts:

1. Credentialing of healthcare practitioners is a screening process verifying that a physician is who he/she claims to be, and qualified to practice his or her profession. The process ensures that physicians have the education, knowledge, and competence to provide quality patient care. This is accomplished by obtaining the physician's essential information using primary source verification, to determine the accuracy of a qualification or documents reported by a physician. If the process fails for whatever reason, patient safety and quality is compromised, and patient harm may result. Primary source can be accomplished via direct correspondence, telephone and computer verification, and reports from credentials verification organizations. Credentialing organizations must be aware of any red flags, and immediately investigate them to avoid serious consequences.

2. The Educational Commission for Foreign Medical Graduates (ECFMG) is an organization that credentials international medical graduates for residency opportunities in the United States providing they have met all the requirements. This includes verifying

2

successful completion of medical school, and passing standardized examinations administered by the United States Medical Licensing Examination (USMLE), a Clinical skills Assessment Examination, and an English Test to determine competency in English.

3. Utilizing primary source verification, ECFMG documents the authenticity of the applicant's diploma, the medical school transcript, and any letters of recommendation. Once this process is successfully completed, ECFMG will provide the applicant a certificate of completion. Once the applicant begins applying to residency programs , ECFMG acts as "the deans office" (See Deposition William Kelly) and provides the residency program with a status report.

4. In 1991, Olufafemi Charles Igberase came to the U.S. from Nigeria, and submitted an application to ECFMG for certification. Over the next several years he used false identities, false social security numbers, false birthdates, false diplomas, and a false passport to obtain ECFMG certification.

5. In 1996, a third application was submitted by Igberase to ECFMG under the alias of John Charles Akoda. His application was accepted, so in 1998 after receiving ECFMG Certification, he applied for a residency position at Jersey Shore Medical Center (JSMC) and was accepted under the name John Charles Akoda and began his residency in July 1998.

6. During an on-site meeting in September 2000 at ECFMG's office, Akoda admitted to William Kelly, Manager of the Medical Education Credential Department at ECFMG, that he used Igberase's social security number. Approximately three months later, JSMC advised ECFMG that Akoda was dismissed from their residency program for using a false social security number and false green card.

7. In 2006 Igberase applied and secured a residency at Howard University Hospital under the Akoda alias, using a false social security number. He completed his residency at Howard Hospital in 2011, and he applied for a Maryland license using the name Charles John Nosa Akoda. The information provided to the Maryland Licensing Board included a fake social security number, and fake passport.

8. In 2011 he became a staff member at Prince George's Hospital Center and began patient care in November 2011 under this fraudulent identity. The following year he was denied enrollment in The Center for Medicare and Medicaid Services (CMS) due to submitting an inaccurate social security number. While using the Akoda name, he practiced obstetrics and gynecology from 2008 through 2016. This included a private practice setting as well as employment with Dimensions Healthcare Associates.

3

9. In June 2016, law enforcement conducted a search at Igberase's residence, medical office, and vehicle. They found a variety of fraudulent and altered documents. In November 2016, he signed a plea agreement admitting to misuse of a social security number.

10. The following month ECFMG revoked Akoda's certification. In March 2017, he was sentenced by the U.S. District Court for the District of Maryland. This resulted in the termination of his staff privileges at Prince George's Hospital, and the revocation of his Maryland license based upon his felony conviction.

11. The current class action lawsuit is based on allegations that Igberase performed inappropriate physical examinations of a sexual nature on women, creating boundary violations.

12. The key question that must be resolved is whether ECFMG's actions or failure to act resulted in foreseeable injuries or damages to Class Members.

**Analysis of Facts and Opinion:**

1. ECFMG in its Subject Notice #101 dated March 1, 2017-Irregular Behavior Cases and Associated Actions & Sanctions states the following:
   *The educational Commission for Foreign Medical Graduates (ECFMG) of the United States works on behalf of domestic and International medical regulatory authorities to protect the public through its programs and services, including primary source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs, or services to be **Irregular behavior.***

2. The 1996 ECFMG Certification and Application Information Booklet addresses the issue of Irregular Behavior. It states that: *Irregular behavior includes all actions on the part of applicants and/ or examinees, or by others when solicited by an applicant and/or examinee, that subvert or attempt to subvert the examination process.* It describes specific examples of irregular behavior and includes *falsifying information on application or registration forms;* This booklet is provided to all the applicants seeking ECFMG and USLME certification.

3. Accrediting organizations such as the Joint Commission has stated the following:
   *The Joint Commission, the organization that evaluates and accredits U.S. health care organizations and programs, has determined that direct verification with ECFMG of a physician's certification status satisfies The Joint Commission's requirement for primary-source verification of medical school completion for graduates of international medical schools. ECFMG's Certification Verification Service (CVS) provides this primary-source confirmation of an individual's ECFMG certification status to medical licensing*

4

*authorities, residency programs, hospitals, or other organizations that, in the judgment of ECFMG, have a legitimate interest in such information.*

4. There are several regulatory organizations including the Maryland Board of Physicians and numerous hospitals including Howard University Hospital and Prince George's Hospital Center that rely and trust the judgements of the ECFMG. Therefore, in this case, ECFMG owed a duty to the residency programs and the state licensing agencies to comprehensively review an application for certification. When ECFMG learned that Igberase was using a false social security number, and he admitted to doing so, it was imperative that they act as a prudent credentialing organization and comprehensively investigate this physician's background. .

5. ECFMG had a duty to determine whether the documents provided by Igberase and his aliases strongly suggested that Igberase and Akoda was one in the same individual. ECFMG breached that duty by failing to learn and appropriately act on that information.

6. There were several opportunities for ECFMG to intercede, still they breached the standard of care in the following ways:

   a. When Igberase had a face to face meeting at ECFMG in September 2000 and provided a false passport. ECFMG failed to authenticate the document.

   b. ECFMG failed to act when they learned that he misused his social security number.

   c. ECFMG neglected to compare the photographs in Igberase and Akoda's application. That would have confirmed they were the same person.

   d. ECFMG requested confirmation to authenticate three alleged letters of reference provided by Akoda, and the parties never returned a response. Nonetheless, ECFMG provided primary source verification to Howard University Hospital.

   e. ECFMG provided primary source verification to the Maryland Board of Physicians and Prince George's County Hospital without notifying them of their doubts surrounding Akoda's identity and credentials.

7. The December 22, 2000 Memorandum for the file From William Kelly to Stephen Seeling J.D. is difficult to comprehend . It was created as a memorandum for the file since William Kelly believed it should not be part of the official file. The memorandum was based on his discussion with James McCorkel M.D., Vice President for Academic Affairs, at the Jersey Shore Medical Center Residency Program. Dr. McCorkel believed Igberase and Akoda were one an the same person. Mr. Kelly confirmed he believed this as well

5

but stated in the Memorandum that he does not believe there is enough information for the Credentials Committee. He goes on to say *I sent Igberase an email and who should reply, but Akoda!*

8.  As stated previously, ECFMG has many organizations that rely on their information and trust they are receiving accurate information when making decisions based on the information they receive from ECFMG. Not including critical information in the official file, places these organizations at a disadvantage. Another example of ECFMG's failure to act in a reasonable and prudent manner.

9.  By not being more assertive in their investigation in this matter, and not escalating their concerns to their Credentialing Committee, ECFMG certified Acoda and assisted him in his acceptance to the Howard University residency program. Additionally, this permitted him to obtain a Maryland License to practice medicine and obtain privileges at Prince George's Hospital. Unfortunately, ECFMG's failure to act in a reasonable and prudent way permitted Acoda to practice medicine and increase the risk of harm to the plaintiffs in this class action lawsuit, and perhaps others.

10. It was not until December 2016 when ECFMG revoked Akoda's certificate (0-482-700-2) based upon his plea agreement with United States, citing the same conduct Igberase had admitted to in 2000. ECFMG's failure to properly investigate the matter, directly resulted in foreseeable injuries to Igberase/Akoda's patients.

11. ECFMG had a duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. However, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety. Patients have a right to receive medical treatment from physician's who have obtained ECFMG certification legitimately, not through falsities and misrepresentations.

**Conclusion:**

There were several missed opportunities to address the many irregularities in the Igberase/Acoda applications. Unfortunately, these missed opportunities, permitted this unqualified individual with multiple fraudulent identities to practice medicine for years. ECFMG breached its duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. Additionally, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety.

6

**Disclaimer:**

My conclusions are based on the information that I was able to review, that was provided to date, and I reserve the right to change my opinions based on any additional information that I receive.

Respectfully,

Jerry Williamson M.D. FAAP, MJ, CHC, LHRM

JA4268

## Jerry Williamson, M.D., F.A.A.P., M.J., CHC

### ADDENDUM: AS OF NOVEMBER 21, 2019

After submitting my expert report that included the documents, I reviewed pursuant to Rule 26, there were additional documents reviewed. The following list represents the additional documents I received and reviewed from legal counsel at Janet, Janet, and Suggs.

- Deposition of David Markenson Expert-Taken October 22, 2019.
- Deposition of Elsa Powell Plaintiff- Taken September 6, 2019
- Deposition of Desire Evans Plaintiff-Taken September 5, 2019
- Deposition of Jasmine Riggins Plaintiff-Taken September 12, 2019
- Deposition of Monique Russell- Taken September 16, 2019
- Expert Report, David Markenson M.D.-September 19, 2019
- Expert Report, Christiane Tellefsen M.D.-September 20, 2019
- Expert Report, John C. Hyde Ph.D-September 23, 2019
- Expert Report, Annie Steinberg M.D.-September 23, 2019
- Expert Report, Richard L. Luciani M.D.-
- Expert Report, Douglas R. Phillips M.D.-October 11, 2019
- Expert Report, Jonathan H. Burroughs M.D.-September 21, 2019
- ECFMG-Irregularity Report-September 22,23 1992

Reviewing the aforementioned documents did not change my opinion in any material way. My conclusions have not changed.

Jerry Williamson M.D.



EXHIBIT 10
WIT:
DATE:
ANGELA M. COX A4269ORTER

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be electronically filed and served upon all counsel of record by electronic filing. This document is available for viewing and downloading from the Court's ECF system.

Dated: 1/14/2022                              */s/ Robin S. Weiss*
                                             Robin S. Weiss

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MONIQUE RUSSELL, JASMINE RIGGINS,　　　:
ELSA M. POWELL AND DESIRE EVANS,　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　　Case No. 2:18-cv-05629-JDW
　　　　　Plaintiffs　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　　Hon. Joshua D. Wolson
　　　　v.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
EDUCATIONAL COMMISSION FOR　　　　　　　:
FOREIGN MEDICAL GRADUATES,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　Defendant.　　　　　　　　　　　:
_____:

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS'
EXPERTS DR. DAVID MARKENSON, DR. JOHN CHARLES HYDE,
<u>AND DR. JERRY WILLIAMSON</u>**

For the reasons set forth in the attached Memorandum of Law, Plaintiffs, by and through

their undersigned counsel, oppose Defendant's Motion to Exclude the Opinions and Anticipated

Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry

Williamson, and respectfully request that the Motion be denied.

Dated: January 14, 2022　　　　　　　　　　　　Respectfully Submitted,

JANET, JANET & SUGGS, LLC　　　　　　　CONRAD O'BRIEN PC

<u>/s/ Patrick Thronson</u>　　　　　　　　<u>/s/ Robin S. Weiss</u>
　Patrick A. Thronson　　　　　　　　　　Nicholas M. Centrella (Pa. ID 67666)
　Brenda A. Harkavy　　　　　　　　　　　Robin S. Weiss (Pa. ID 312071)
　4 Reservoir Circle, Suite 200　　　　　　1500 Market Street, Suite 3900
　Baltimore, MD 21208　　　　　　　　　　Philadelphia, PA 19102-2100
　(410) 653-3200　　　　　　　　　　　　　(215) 864-9600

JA4271

LAW OFFICES OF PETER G. ANGELOS, P.C.

  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th Floor
  Baltimore, Maryland 21201
  (410) 649-2000

Z LAW, LLC
  Cory L. Zajdel
  2345 York Rd. Suite B-13
  Timonium, MD 21093
  (443) 213-1977

SCHOCHOR, FEDERICO AND STATON

  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

THE COCHRAN FIRM
  Karen E. Evans
  David E. Haynes
  1100 New York Avenue, N.W.
  Suite 340, West Tower
  Washington, DC 20005
  (202) 682-5800

*Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated*

JA4272

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | : | |
| | : | |
| | : | Case No. 2:18-cv-05629-JDW |
| Plaintiffs | : | |
| | : | Hon. Joshua D. Wolson |
| v. | : | |
| | : | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS' EXPERTS DR. DAVID MARKENSON, DR. JOHN CHARLES HYDE, AND DR. JERRY WILLIAMSON**

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................. 1

II.  FACTUAL BACKGROUND ........................................................................................... 1

III. STANDARD OF REVIEW ............................................................................................. 2

IV.  LEGAL ARGUMENT ..................................................................................................... 4

   A.   Defendant's Motion to Exclude is Premature. ................................................................. 4

   B.   Plaintiffs' Experts Are Qualified. .................................................................................... 5

      i.   Qualifications of Plaintiffs' Individual Experts ............................................................. 5

         a.   Dr. David Markenson ............................................................................................. 5

         b.   Dr. John Charles Hyde ........................................................................................... 7

         c.   Dr. Jerry Williamson .............................................................................................. 9

      ii.  Plaintiffs' Experts Qualifications, in Combination with their Education, Training and Experience Are Sufficient to Qualify Them as Experts in this Case and Render their Opinions Useful to the Jury .............................................................................................. 11

   C.   Plaintiffs' Experts' Opinions and Methodology are Reliable and Non-Speculative. ....... 12

      i.   Opinions and Methodology of Plaintiffs' Experts ........................................................ 12

         a.   Dr. David Markenson ........................................................................................... 12

         b.   Dr. John Charles Hyde ......................................................................................... 14

         c.   Dr. Jerry Williamson ............................................................................................ 15

      ii.  Plaintiffs' Experts' Methodologies are Sufficiently Reliable and Satisfy the Standards for Admissibility under Rule 702 and *Daubert* ............................................................... 16

   D.   Plaintiffs' Experts Do Not Offer Legal Conclusions. ..................................................... 19

   E.   Plaintiffs' Experts Rely Upon Data Reasonably Relied Upon by Experts in their Fields, and the Probative Value of their Testimony Outweighs Any Purported Risk of Prejudice to Defendant ...................................................................................................................... 24

V.   CONCLUSION .............................................................................................................. 25

JA4274

# TABLE OF AUTHORITIES

**Cases**

*Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) .................................. 20

*Burger v. Mays*, 176 F.R.D. 153 (E.D. Pa. 1997) ......................................................... 22

*Bushman v. Halm*, 798 F.2d 651 (3d Cir. 1986) ........................................................... 20

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003) ............................ 21, 22

*Daddio v. Nemours Found.*, 399 F. App'x 711 (3d Cir. 2010) ....................................... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................. passim

*Elswick v. Nichols*, 144 F.Supp.2d 758 (E.D. Ky. 2001) ................................................ 9

*Flickinger v. Toys R US-Delaware, Inc.*, 492 F. App'x 217 (3d Cir. 2012) ................................. 20

*Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417 (W.D. Pa. 2006) ...... 21, 22

*Gradel v. Inouye*, 421 A.2d 674 (Pa. 1980) ............................................................... 20

*Hammond v. Int'l Harvester Co.*, 691 F.2d 646 (3d Cir. 1982) ....................................... 11

*Heichel v. Marriott Hotel Servs., Inc.*, No. CV 18-1981, 2019 WL 2202759
(E.D. Pa. May 20, 2019) ....................................................................................... 19

*Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777 (3d Cir. 1996) ........................................ 12

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ........................................ passim

*Jones v. LA Fitness Int'l, LLC*, No. CIV.A. 11-0632, 2013 WL 3789807
(E.D. Pa. July 22, 2013) ....................................................................................... 22

*Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997) ................................ 3, 16, 17, 19

*Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir. 1979) ............................................... 11

*Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781 (3d Cir. 2009) ...................... 19

*Mestre v. Garden Homes Mgmt. Corp.*, No. 1:16-cv-03231-JDW-AMD,
2020 WL 3962267 (D.N.J. July 13, 2020) ............................................................... 21, 24

*Microchip Tech. Inc. v. Aptiv Srvcs. US LLC*, No. 1:17-cv-01194-JDW,
2020 WL 5203600 (D. Del. Sep. 1, 2020) ............................................................... 19

*Miville v. Abington Mem'l Hosp.*, 377 F. Supp. 2d 488 (E.D. Pa. 2005) ................................ 20

*Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008) ................................................ passim

*Quagliarello v. Dewees*, 802 F. Supp. 2d 620 (E.D. Pa. 2001) ........................................ 4

*Quinn Const., Inc. v. Skanska USA Bldg., Inc.*, No. CIV.A. 07-406, 2009 WL 1489954
(E.D. Pa. May 26, 2009) ....................................................................................... 22

*Redland Soccer Club, Inc. v. Dep't of Army of the United States*, 55 F.3d 827 (3d Cir. 1995) ... 20

*Schneider ex rel. Est of Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) ........................... passim

*Svindland et al v Nemours Foundation et al* No. 07-2627, 2008 WL 2531198
(3d Cir. June 26, 2008) ....................................................................................... 8

*Svindland v. A.I. DuPont Hosp. for Children of the Nemours Foundation*,
2006 WL 3209953 (E.D. Pa. 2006) ....................................................................... 8

*Tschappat v. Groff*, Civ. A. No. 3:CV-01-2279, 2004 WL 5509087 (M.D. Pa. June 2, 2004) .... 22

*Ucciardi v. E.I. Du Pont Nemours & Co.*, No. CV 13-4952 (FLW), 2016 WL 7338533
(D.N.J. Dec. 19, 2016) ....................................................................................... 22

*United States v. Downing¸* 753 F.2d 1244 (3d Cir. 1985) ............................................. 17

JA4275

*United States v. Roman*, 121 F.3d 136 (3d Cir. 1997) ........................................................................ 4

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998) ................................................................................ 11

*Warren v. Prime Care Med. Inc.*, 431 F. Supp. 3d 565 (E.D. Pa. 2019) ................................ 19, 20

**Other Authorities**

Hon. Joshua D. Wolson, Policies and Procedures .......................................................................... 4

**Rules**

Fed. R. Evid. 403 ........................................................................................................... 4, 24, 25

Fed. R. Evid. 701 .................................................................................................................. 4

Fed. R. Evid. 702 ........................................................................................................... passim

Fed. R. Evid. 703 ........................................................................................................ 2, 3, 24, 25

Fed. R. Evid. 704 ........................................................................................................... 3, 4, 20

JA4276

## I.   <u>INTRODUCTION</u>

This action arises from allegations that Defendant, Educational Commission for Foreign Medical Graduates ("ECFMG"), negligently investigated and certified Oluwafemi Charles Igberase ("Igberase"), a/k/a John Nosa Akoda (among other aliases), as eligible to enter a residency program, and negligently failed to revoke that certification, notwithstanding compelling evidence that Igberase had committed extensive fraud as to his identity and credentials. ECFMG knew of Igberase's fraud but failed to appropriately investigate and respond to it. ECFMG failed to inform state medical boards, residency programs and hospitals of Igberase's fraud, even as it attested that Igberase held a valid ECFMG certification.

As a result of ECFMG's negligence, Igberase had the opportunity to perform gynecologic examinations of the Plaintiffs which constituted unconsented touching, purportedly for the purpose of medical treatment, and complex medical surgeries, including the delivery of Plaintiffs' children through vaginal or cesarean delivery under his "Akoda" alias. Absent ECFMG's negligence, Igberase would never have been able to practice medicine in the United States and would have never performed obstetric and gynecologic procedures on the Plaintiffs.

Simultaneously with filing a Motion for Summary Judgment (ECF No. 81), ECFMG filed a Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson ("the Motion" or "Motion to Exclude") (ECF No. 83). For the reasons described herein, the Motion should be denied.

## II.   <u>FACTUAL BACKGROUND</u>

Plaintiffs have submitted the reports of three (3) experts who opine that ECFMG breached the standard of care: Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson. Dr. Markenson's expert report and *curriculum vitae* are attached hereto as Exhibits

JA4277

1 and 2, respectively. Relevant portions of Dr. Markenson's deposition testimony are attached hereto as Exhibit 3. Dr. Hyde's expert report and *curriculum vitae* are attached hereto as Exhibits 4 and 5, respectively. Relevant portions of Dr. Hyde's deposition testimony are attached hereto as Exhibit 6. Dr. Williamson's expert reports and *curriculum vitae* are attached hereto as Exhibits 7 and 8, respectively. Relevant portions of Dr. Williamson's deposition testimony are attached hereto as Exhibit 9.

These experts are appropriately qualified to testify as to the applicable standard of care, and ECFMG's breach of that standard. Further, the opinions set forth in their reports do not constitute impermissible legal conclusions, and the information and methodologies they relied upon in formulating their opinions are sufficiently reliable. Finally, their opinions and testimony will be helpful to the trier of fact. In summary, as set forth in detail below, these experts have satisfied the standards set forth in Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). There is no basis for excluding these experts' opinions and testimony.

## III.  STANDARD OF REVIEW

Courts have wide discretion in determining whether to admit or exclude expert testimony. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;
**(c)** the testimony is the product of reliable principles and methods; and
**(d)** the expert has reliably applied the principles and methods to the facts of the case.

JA4278

Fed. R. Evid. 702. The Advisory Committee Notes to Rule 702 state:

> For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments.

Courts have held that Rule 702 imposes three predicates to admitting expert testimony, as recognized by the Supreme Court in *Daubert*, 509 U.S. 579: qualifications, reliability (including helpfulness) and fit. *Schneider ex rel. Est of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)). These operate under the "strong and undeniable preference" for admitting any evidence which may potentially assist the trier of fact. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997). Rule 702 has a "liberal policy of admissibility." *Pineda*, 520 F.3d at 244.

Rule 703 of the Federal Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Rule 704 of the Federal Rules of Evidence provides:

> **(a) In General--Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

> **(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

3

Fed R. Evid. 704. Pursuant to Rule 704, expert opinion testimony is not objectionable merely because it embraces an ultimate issue to be decided. *Quagliarello v. Dewees*, 802 F. Supp. 2d 620, 623-24 (E.D. Pa. 2001) (citing *United States v. Roman*, 121 F.3d 136, 141 (3d Cir. 1997)). However, the testimony can be excluded if it is not otherwise admissible. *Quagliarello*, 802 F. Supp. 2d at 624. (citing Fed. R. Evid. 704 (a)). "As the Rules Advisory Committee explained, '[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions,' because the expert testimony must be helpful to the trier of fact and not waste time pursuant to Rules 701, 702 and 403.'" *Id.* (citing Fed. R. Evid. 704 advisory committee note).

Finally, Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence".

As discussed in further detail below, none of these standards justify excluding the opinions and testimony of Drs. Markenson, Hyde and Williamson.

## IV. <u>LEGAL ARGUMENT</u>

### A. <u>Defendant's Motion to Exclude is Premature.</u>

Defendant does not mention Drs. Markenson, Hyde or Williamson in its Motion for Summary Judgment (ECF No. 81), nor does the Motion for Summary Judgment reference ECFMG's Motion to Exclude (ECF No. 83). This Court's Policies and Procedures provide that "[i]f a party's motion for summary judgment . . . is based in whole or in part on an argument that expert testimony is not admissible, the party must raise such argument in a contemporaneous *Daubert* motion." Hon. Joshua D. Wolson, Policies and Procedures, § B.4, p. 7. Since Defendant's Motion for Summary Judgment in no way states or references that it is based on an

4

argument that expert testimony is not admissible, the Motion to Exclude is premature and should therefore be denied. Notwithstanding that the Motion is not ripe for determination, should the Court consider the Motion on its merits, it should be denied on numerous grounds.

### B. Plaintiffs' Experts Are Qualified.

As set forth in further detail below, Plaintiff's experts are qualified to offer opinions regarding ECFMG's conduct because they possess specialized knowledge, skills, training and experience beyond that of the average layperson, which will assist the trier of fact in understanding the evidence and determining facts at issue.

#### i. Qualifications of Plaintiffs' Individual Experts

##### a. Dr. David Markenson

As his CV reflects, David Markenson, M.D. is board-certified by the American Board of Pediatrics, the American Board of Preventive Medicine and the American Board of Emergency Medicine. He is a Fellow of the American College of Healthcare Executives, a certified Professional in Healthcare Quality and a Certified Physician Executive of the Certifying Commission on Medical Management. He is also a Fellow or member of numerous professional groups including, *inter alia*, the American Academy of Physicians, the American College of Critical Care Medicine, the American College of Emergency Physicians, the American College of Health Care Executives, and the American College of Physician Executives and the American Medical Informatics Association. *See* Ex. 2.

Dr. Markenson obtained his medical degree in 1994 from the Albert Einstein College of Medicine. He did his internship and residency in Pediatrics at the New York University School of Medicine. He completed two fellowships in Pediatric Emergency Medicine and Pediatric Critical Care Medicine. Dr. Markenson also obtained a Master of Business Administration from

JA4281

the University of Massachusetts Isenberg School of Management, Amhurst in 2011. He has more than 15 years health care experience as a physician executive with a publicly traded national hospital corporation, large regional health system, academic medical center, medical school, municipal hospitals and community hospitals. He has served on the CLER Evaluation Committee of the Accreditation Counsel for Graduate Medical Education since 2018. *Id.*

Dr. Markenson served as the designated institutional official for multiple hospitals while Vice President of Graduate Medical Education (GME) for Hospital Corporation of America, in which capacity he oversaw the processes, procedures and program directors and played a role in hiring medical school graduates into residency programs. *See* Ex. 3 at 38-40. He continues to serve on a national committee of ACGME that oversees their clear clinical learning environment review program. *Id.* at 47. As Chief Medical Officer with Sky Ridge and his prior role with Westchester Medical Center as Chief of Services, he is directly involved with hiring staff physicians for his department. *Id.* at 65.

Dr. Markenson is an expert in verifying and using medical school credentials. *Id.* at 111. He also considers himself to be an expert on ECFMG's or USMLE processes. *Id.* He considers himself to be knowledgeable about what the standard would be for primary source verification which is the function ECFMG holds itself out as performing for IMGs, and what a certification body should do to memorialize their policies and procedures to assure it meets the necessary standards. *Id.* at 211. Dr. Markenson's experience includes working with hospitals for certification of physicians' credentials and privileges, with AGCME about residency certification and with professional organizations for fellowship certification. *Id.* at 212.

### b. **Dr. John Charles Hyde**

John C. Hyde, Ph.D., FACHE possesses significant professional knowledge and experience relating to policies and procedures and prevailing and prudent standards of healthcare administration and physician credentialing. As his CV reflects, Dr. Hyde is an adjunct Professor of Healthcare Administration at the George Washington University, teaching healthcare management at the graduate level on a part-time basis. He is also a full-time consultant in the field of healthcare administration. Recently, he retired as a full-time university professor of health services administration and clinical outcomes research within an academic medical center campus, with former appointments in the School of Health-Related Professions and the School of Medicine at the University of Mississippi Medical Center, as well as in the School of Business at the University of Mississippi. His academic activities include teaching graduate-level students in areas of healthcare management, conducting health services research focusing on management and clinical outcomes analysis, and providing expertise and consultations to the healthcare community at large. He has taught graduate level healthcare administration/outcome classes for over 28 years. *See* Ex. 5.

Dr. Hyde's doctorate, master's, and bachelor's degrees are all in the field of healthcare administration. He has presented research findings at the regional, national and international levels, and published articles, books and monographs related to various areas of healthcare delivery. He has provided lectures and addresses to international, national and regional audiences in healthcare administration. His *curriculum vitae* includes a list of all publications he authored, including those dealing with the credentialing process. Dr. Hyde is qualified to offer expert opinions regarding ECFMG's conduct. At his deposition, he testified as an expert regarding the methods and principles for evaluation of the credentials of a physician. *See* Ex. 6 at 48-49.

JA4283

While not a clinician, Dr. Hyde is Board-certified as a Certified Healthcare Executive (FACHE Fellow) by American College of Healthcare Executives in the specialty of health care administration. He also has approximately 10 years' experience as a practicing healthcare administrator and multi-system executive with specific knowledge and expertise in the areas of physician credentialing/privileging, credential verification organizations, primary source verification, regulators, and overall healthcare management procedures. *See* Ex. 5.

Defendant cites *Svindland v. A.I. DuPont Hosp. for Children of the Nemours Foundation*, 2006 WL 3209953 (E.D. Pa. 2006), an unreported decision, for the argument that Dr. Hyde should not be allowed to testify as an expert witness in the case at bar. Defendant's reliance on *Svidland* is misplaced. In *Svindland*, the plaintiffs' claim of negligent credentialing was "precluded both by Delaware's peer review privilege and lack of sufficient evidence of causation." *Id.* at \*2. Essentially, Dr. Hyde declined to overreach, as he did not give opinions outside his professional expertise. The *Svindland* court explained that under **Delaware** law, "to establish proximate cause for a negligent credentialing claim such as this, expert testimony must show that the physician was medically *unqualified* to perform the procedure in question and therefore should not have been credentialed." *Id.* at \*5. Dr. Hyde, who is not a physician, made it clear that he could not and would not give medical causation opinions. According to the *Svindland* court, "[p]laintiffs fail to state that but for the hospital's insufficient oversight, Dr. Norwood would not have been credentialed and would not have negligently performed Ian's surgery." *Id.* at \*6. Subsequently, on appeal of the *Svindland* matter, the original judge who disallowed expert testimony was found to have committed prejudicial errors. *Svindland et al v. Nemours Foundation, et al.*, No. 07-2627, 2008 WL 2531198 (3d Cir. June 26, 2008).

*Elswick v. Nichols*, 144 F.Supp.2d 758 (E.D. Ky. 2001) is also inapposite. *Elswick* had

nothing to do with credentialing issues, credential verification organizations, or primary source

verification. Rather, *Elswick* arose from an infection that the plaintiff alleged was introduced into

his wound due to the defendants' negligence. However, the plaintiff lacked the ability to provide

evidence of medical causation as required by Kentucky law.

Plaintiffs submit to this Court that the *Elswick* case from two decades ago has no bearing

on the reliability of Dr. Hyde's testimony. Defendant's effort to brandish an unsuccessful result

in a completely unrelated lawsuit in the past amounts to an improper effort to portray Dr. Hyde

as having a disposition, propensity or habit of "overreaching" simply because the plaintiff's case

in *Elswick* lacked sufficient data to establish the alleged failure of a hospital's infection control

policy. In the interests of justice, Plaintiffs in the case at bar are entitled to have their case

proceed on its own merits, with its expert witnesses, without the infusion of an unrelated case in

Kentucky from over twenty years ago.

The Motion further suggests that this Court impose a condition on Dr. Hyde – *i.e.*, being

a medical doctor – that is not required under the law or the Rules of Evidence. Dr. Hyde has not

given medical causation opinions, nor did he give opinions outside of his area of professional

expertise. Defendant's arguments as to Dr. Hyde based on qualification go only to the weight,

not the admissibility, of Dr. Hyde's opinions and testimony.

### c. **Dr. Jerry Williamson**

Dr. Jerry Williamson possesses numerous qualifications that will assist the jury in this

matter. *See* Ex. 8. Dr. Williamson is a board-certified physician, *See* Ex. 9, 22:15 and 76:25, and

he received a master's in health jurisprudence in 2010 from Loyola University Chicago School

of Law. Ex. 9, at 19:14-21. Dr. Williamson has also worked in and consulted for hospital

JA4285

administration, where his role included physician credentialing and privileging. *Id.* at 23:8-24:16. He is on faculty at Florida State University and teaches residents. *Id.* at 24:24-25:10. He has experience hiring foreign medical graduates. *Id.* at 29:21-25. He has taught courses at Loyola on risk management. *Id.* at 21:22-24.

Dr. Williamson is not a professional expert but has been sought out for his expertise. At the time of his deposition, he had not testified as an expert during the past four years. *Id.* at 7:9-10. He had, however, been retained as an expert in several fair hearing or negligent credentialing cases within the last four years, as well as clinical matters. *Id.* at 7:17-12:1.

ECFMG attempts to minimize Dr. Williamson's experience and highlights that he was not able to immediately recall some details of ECFMG's credentialing processes and his prior interactions with ECFMG. (ECF No. 83-1 at 9-10). But Dr. Williamson has actually dealt with ECFMG in his administrative capacities and relied on ECFMG's certificates in physician credentialing. Ex. 9, 32:3-33:18. He is familiar with ECFMG's policies and procedures. *Id.* at 59. He has reviewed extensive materials associated with his work in this case. (A substantial portion of the deposition transcript, which catalogued the materials he reviewed, was omitted from the partial transcript attached to the Motion, but is attached here. *See id.* at 36:1-58:9; 136-137.)

Dr. Williamson is familiar with the standard of care applicable to ECFMG. *See id.* at 133-136. He provided details about ECFMG's processes, the use of ECFMG certificates in credentialing, and the process of a foreign medical graduate becoming an appropriately licensed practicing physician. *Id.* at 32-33, 59, 68:7-70:2, 79:24-80:2. ECFMG clearly disagrees with Dr. Williamson's perspective on ECFMG, but that disagreement is for a jury to resolve. Whether he could exhaustively recall all of the information communicated in an ECFMG certificate has little import here, where "Akoda's" actual certificate has been disclosed in discovery, was discussed

and marked as an exhibit at the deposition, *Id.* at 101, and will be available to the jury at trial. Dr. Williamson cannot be disqualified based on a game of Memory.

### ii. Plaintiffs' Experts Qualifications, in Combination with their Education, Training and Experience Are Sufficient to Qualify Them as Experts in this Case and Render their Opinions Useful to the Jury.

Qualification requires that the witness possess specialized expertise. *Schneider*, 320 F.3d at 404. The Third Circuit has interpreted this requirement liberally. *Id.* at 404; *Paoli*, 35 F.3d at 741. Rule 702's liberal policy of admissibility extends to both the substantive and formal qualifications of experts. *Pineda*, 520 F.3d at 244; *Paoli*, 35 F.3d at 741. The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and ha[s] been satisfied with more generalized qualifications." *Paoli*, 35 F.3d at 741 (citing *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982) and *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87-88 (3d Cir. 1979)). A broad range of knowledge, skills and training can qualify an expert. *Pineda*, 520 F.3d at 244 (citing *Paoli*, 35 F.3d at 741). An expert witness must possess skill or knowledge beyond that of the average layman. *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).

ECFMG's broad attack on Plaintiffs' experts' qualifications to testify is based, in part, on the fact that they have never worked for ECFMG. (ECF No. 83-1 at 8-9). This argument is a non-starter. ECFMG adduces no authority to indicate than an expert must have worked for or with the defendant to be qualified. An expert in credentialing policies and procedures is not required to have been an ECFMG applicant, employee, board member or Medical Educational Credentials Committee member. The standard proposed by ECFMG would turn the flexible *Daubert* standard into a tool for tort immunity. A defendant should not be empowered to, in effect, set its own standard of care.

ECFMG acknowledges that all three experts have interacted with ECFMG over the course of their careers. (ECF No. 83-1 at 9). Further, Plaintiffs' experts' qualifications, in combination with their education, training, experience and expertise, and their familiarity with ECFMG and the physician credentialing process, are more than sufficient to qualify them to render expert opinions in this case which would provide substantial assistance to the trier of fact.

"[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244 (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)); *see also Schneider*, 320 F.3d at 407 (holding that the plaintiff's expert, an invasive cardiologist, was qualified to testify about the standard of care for interventional cardiologists performing angioplasties given his knowledge and experience, and that the district court had abused its discretion in excluding his testimony). Plaintiffs' experts are appropriately qualified to render the opinions they have set forth in this case. Accordingly, the Motion to Exclude should be denied.

## C. Plaintiffs' Experts' Opinions and Methodology are Reliable and Non-Speculative.

### i. Opinions and Methodology of Plaintiffs' Experts

#### a. Dr. David Markenson

Dr. Markenson opines that the standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow them to ensure that IMGs comply with all the requirements for certification. *See* Ex. 1. Prior to 2015, there were no written policies or procedures governing how the Medical Education Credentials department of ECFMG conducted its investigations of allegations of irregular behavior. *See* relevant portions of testimony of Kara Corrado, J.D., attached hereto as Exhibit 10, at 59-61. In

his report, Dr. Markenson recites the facts he considered in forming his opinions, which traces Igberase's history from 1992 through his conviction and loss of his medical license in 2016. For the most part, the facts underlying his opinions can be found in Igberase's plea agreement. *See* Exhibit 11.

Dr. Markenson made it clear that he evaluates the standard of care applicable to ECFMG's certification process based on his experience with other entities that are required to verify medical school completion for U.S. medical school graduates, such as licensing boards, hospitals and Joint Commission, and the Centers for Medicaid Services. *See* Ex. 3, at 189-191. He is using the standard of care that is used to verify medical school completion for U.S. graduates. *Id.* at 191. There are multiple processes that use primary source verification. In the setting of foreign graduates, ECFMG does it for foreign medical school graduation. He is using the standard within healthcare for primary source verification. This includes credentialing. *Id.* at 192, 214. This is part of Dr. Markenson's professional experience.

Based on the facts of this case and his education, training and experience, Dr. Markenson has expressed the opinion (among others) that:

> ECFMG is the only organization that certifies that IMG's have successfully completed medical education at an approved foreign medical school and that they have successfully completed the required medical examinations. Without an ECFMG certification, an IMG cannot sit for required licensing exams, obtain a medical license, will not be accepted into a graduate medical education program and cannot obtain hospital privileges. The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow those procedures to ensure that IMG's comply with all requirements for certification. ECFMG has undertaken to provide certification services which are necessary for the protection of the general public. Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs. Licensing agencies, medical schools and hospitals, among others, rely upon ECFMG to act reasonably in performing these services.

*See* Ex. 1. The opinions expressed in his report are not speculative nor based on incomplete facts, and the conduct of other organizations is not determinative with respect to whether ECFMG breached the standard of care applicable to its own conduct.

### b. Dr. John Charles Hyde

In his report, Dr. Hyde summarizes the events he considered in forming his opinions, together with the documents, information and deposition testimony he reviewed in the preparation of his testimony. He reviewed the deposition testimony of William C. Kelly, ECFMG; Stephen Seeling, J.D., Vice President of Operations, ECFMG; and Kara Corado, J.D., Current VP of Operations, ECFMG. Dr. Hyde's opinions are based on his knowledge, training, education, experience and understanding of the practice of healthcare management, coupled with his professional knowledge of prevailing and prudent standards of healthcare administration which ultimately require an exercise of reasonable application of the process of Credentials Verification and use of Primary Sources. *See.* Ex. 4 at 2-3.

It is Dr. Hyde's opinion, with a reasonable degree of professional certainty, that ECFMG should have written policies and procedures for the certification of IMGs and should have included requirements that ECFMG investigate fully the differences in the name on "Akoda's" medical school diploma and the name on his applications, and the other obvious discrepancies in the applications. In Dr. Hyde's opinion, an appropriate investigation would have resulted in referral of this matter to the ECFMG medical education credentials committee. This committee should have then found that "Akoda" engaged in irregular behavior, which should have then resulted in his certification being revoked. Ex. 4.

Dr. Hyde opined with a high degree of professional certainty that the breaches of duties by ECFMG caused "Akoda" to be certified by ECFMG, which allowed him to be accepted into a

residency, secure a medical license in Maryland, and gain access to and directly cause harm to Plaintiffs and the members of the putative class. These actions and omissions were violations of the applicable standards of care. Without ECFMG's negligence, Dr. Hyde opined, "Akoda" would not have been accepted into a residency at Howard University Hospital; he would not have obtained a Maryland license; and he would not have been granted privileges at Prince George's Hospital Center. *Id.* These opinions are clearly supported by a reasonable application of the facts of this case to Dr. Hyde's experience and expertise.

### c.   **Dr. Jerry Williamson**

Based upon his review of the facts of this case, including various deposition transcripts and various documents exchanged in discovery and his forty (40) years of both formal education and experience as a physician and administrator, Dr. Williamson concludes that ECFMG breached its duty to its clients, including medical licensing authorities, residency programs, hospitals and others through the various missed opportunities to address the many irregularities in the Igberase/ "Akoda" applications, which failures permitted an unqualified individual to practice medicine for many years and directly impacted patient safety.  *See* Ex. 7, pp. 1-2, 6, and Addendum of 11/21/2019.

ECFMG criticizes Dr. Williamson for not reviewing the Plaintiffs' medical records because he has no basis to "offer expert opinions about plaintiffs' alleged emotion [sic] distress." (ECF 83-1 at 14). Dr. Williamson reviewed the deposition transcripts of all four Plaintiffs. *See* Ex. 7, Addendum of 11/21/2019.  He is a standard of care expert in this case. He has not and will not be offering testimony on the nature and extent of Plaintiffs' emotional harm. Review of Plaintiffs' medical records was unnecessary.

JA4291

Dr. Williamson did not simply review "a limited set of materials curated by Plaintiffs' counsel," an assertion for which ECFMG offered no support. The extensive depositions and documentary material he reviewed is summarized in his reports and at pages 36-58 and 136-137 of his deposition. *See* Exs. 7 and 9. ECFMG points to no specific documents that Dr. Williamson allegedly failed to review. It merely argues that he did not exhaustively research non-party health care entities to the case whose interactions with Igberase do not vitiate ECFMG's liability. This is insufficient to deprive the jury of the benefit of his perspective.

ECFMG's only other attack on Dr. Williamson's methodology is an assertion that his report and deposition conflicted on the question of whether hospital credentialing procedures are extensive. There is no contradiction between the two. Even if there were, it would have no bearing upon his opinions. ECFMG's argument here is wholly obscure.

> ## ii. Plaintiffs' Experts' Methodologies are Sufficiently Reliable and Satisfy the Standards for Admissibility under Rule 702 and *Daubert*.

Courts admit an expert's testimony if the process or technique the expert utilized is reliable. *Kannankeril,* 128 F.3d at 806. The expert's testimony must be based on scientific methods and procedures, not subjective belief or unsupported speculation. *Id.* (citing *Paoli*, 35 F.3d at 744); *Schneider*, 320 F.3d at 404. The question is not which opinion has the best foundation, but simply whether any particular opinion is based on valid reasoning and reliable methodology. *Kannankeril,* 128 F.3d at 806. The party seeking the admission of the expert's testimony need only demonstrate, by a preponderance of the evidence, that the opinion is based on "good grounds." *Id.* at 807; *Schneider*, 320 F.3d at 404. The Court's focus in this inquiry must be on the expert's principles and methodology, rather than their conclusions. *Daubert,* 590 U.S. at 590, 595, *Daddio v. Nemours Found.*, 399 F. App'x 711, 713 (3d Cir. 2010).

16

The inquiry under Rule 702 is intended to be a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles underlying the proposed expert submission. *Daubert*, 509 U.S. at 594-95. Trial courts may consider several factors in evaluating whether a particular methodology is reliable, including, *inter alia*: (1) whether the method has a testable hypothesis; (2) whether the technique has been subject to peer review and publication; (3) known or potential rate of error; (4) the existence of applicable standards controlling the technique's operation; (5) whether the methodology has gained general acceptance in the scientific community; (6) the relationship of the technique to methods established to be reliable; (7) the qualification of the expert testifying based on the methodology; and (8) the non-judicial uses for which the technique has been utilized. *Pineda*, 520 F.3d at 247-48 (citing *Daubert* and *United States v. Downing*¸ 753 F.2d 1244 (3d Cir. 1985)). The factors courts use to evaluate whether a scientific methodology is reliable are not exhaustive nor applicable to every case, but instead provide a convenient starting point for analyzing an expert's opinion. *Kannankeril*, 128 F.3d at 806-07.

> As the Court of Appeals for the Third Circuit has explained:
>
> The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

*Paoli*, 35 F.3d at 744. The reliability requirement must not be used by the court as a tool to exclude all questionably reliable evidence. *Id.* Rather:

> [T]he primary limitation on the judge's admissibility determinations is that the judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions.

17

*Paoli*, 35 F.3d at 746.

Plaintiffs' experts' methodologies are sufficiently reliable to satisfy the standards for admissibility. Their opinions are supported by the facts and evidence that has developed in this case, as well as their respective education, training, experience and expertise, and are therefore based on "good grounds". Defendant's attempts to tarnish Plaintiffs' experts with a bald assertion of "rank speculation" does not undermine their methodologies in any respect. Plaintiffs respectfully submit that a judge may not substitute his or her judgment for an expert's, as to what data are sufficiently reliable to form the basis for the expert's opinion, provided that such reliance falls within broad bounds of reasonableness.

Plaintiffs' experts' reports also satisfy the requirements of "helpfulness" and "fit" under Rule 702. As the Court of Appeals for the Third Circuit has recognized, "[t]he 'ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.' . . . A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate.'' *Paoli*, 35 F.3d at 744-45.

> Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 V. and. L. Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918.

*Warren v. Prime Care Med. Inc.*, 431 F. Supp. 3d 565, 589 (E.D. Pa. 2019) (citing Fed. R. Evid. 702, Advisory Committee Notes, 1972 Proposed Rules). Since Plaintiffs' experts' opinions and testimony are reliable and involve specialized knowledge beyond that of the ordinary layman, they would be helpful to the trier of fact and should not excluded.

The element of "fit" requires that the expert's testimony be relevant to the case and assist the trier of fact to understand the evidence or determine a fact at issue. *Schneider*, 320 F.3d at 404; *Microchip Tech. Inc. v. Aptiv Srvcs. US LLC*, No. 1:17-cv-01194-JDW, 2020 WL 5203600 at \*3 (D. Del. Sep. 1, 2020) (Wolson, J.). The standard for fit is "not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009). There is no question that the requirement of "fit" is satisfied here.

Drs. Markenson, Hyde and Williamson clearly satisfy the admissibility requirements of Rule 702 and *Daubert*. Given Rule 702's "liberal policy of admissibility," *Pineda*, 520 F.3d at 244, and the "strong and undeniable preference" for admitting any evidence which may potentially assist the trier of fact", *Kannankeril*, 128 F.3d at 806 (3d Cir. 1997), Defendant's Motion to Exclude should be denied.

**D. Plaintiffs' Experts Do Not Offer Legal Conclusions.**

Plaintiffs agree that the question of whether a duty exists is a question of law for the Court, and whether a party is liable in damages for negligence is a question of fact for the jury. Expert testimony is admissible and often **required**, however, to assist the jury in understanding the nature and content of a duty, should the Court find that one is owed. *See Heichel v. Marriott Hotel Servs., Inc.*, No. CV 18-1981, 2019 WL 2202759, at \*4 (E.D. Pa. May 20, 2019) ("When an expert witness is required, the expert must clearly articulate and reference a standard of care

19

by which the defendant's actions can be measured."). A court's legal finding *that* a duty exists does not provide facts a jury can use to determine *whether* it was breached.

Federal Rule of Evidence 704 permits experts to give testimony that "embraces an ultimate issue to be decided by the trier of fact." *Flickinger v. Toys R US-Delaware, Inc.*, 492 F. App'x 217, 224 (3d Cir. 2012) (citing *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006)). Further, "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Colkitt*, 455 F.3d at 218. Here, Plaintiffs' experts' opinions regarding duty and breach are not impermissible legal conclusions. *See* Exs. 1, 4 and 7.

Courts have often recognized that expert testimony is required to establish the elements of a negligence claim. For example, expert testimony regarding the standard of care (duty), breach and causation are required in all but the most obvious medical malpractice cases, because a jury of laypersons generally lacks the knowledge to determine whether the conduct in question breached the applicable standard of care. *Warren v. Prime Care Med. Inc.*, 431 F. Supp. 3d 565, 589 (E.D. Pa. 2019); *Miville v. Abington Mem'l Hosp.*, 377 F. Supp. 2d 488, 491 (E.D. Pa. 2005). Expert testimony is also often required with respect to the issues of causation and damages. *See, e.g.*, *Redland Soccer Club, Inc. v. Dep't of Army of the United States*, 55 F.3d 827, 852 (3d Cir. 1995) (citing *Gradel v. Inouye*, 421 A.2d 674, 679 (Pa. 1980)) (noting that it is well settled that when "the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson . . . the law requires that expert medical testimony be employed"); *Bushman v. Halm*, 798 F.2d 651, 659 (3d Cir. 1986) ("If the question of causal relation is so esoteric that lay minds cannot form any intelligent judgment about it

without expert aid in an opinion from an expert may be required."). Such expert opinions, of course, concern the elements of the claims at issue. Nonetheless, they are permitted and often required.

Courts routinely allow experts to testify to opinions that embrace an ultimate issue in a case, including the standard of care and breach, so long as that testimony would be helpful to the trier of fact and otherwise satisfies the admissibility requirements of the Federal Rules of Evidence. *See, e.g.*, *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) (recognizing that the district court allowed a psychologist with a specialty in human factors engineering to testify about how to design an effective warning, and to opine that the warning on a jet ski deviated from the proper criteria, thereby "making the vehicle unreasonably dangerous and defective, especially for youthful operators"); *Mestre v. Garden Homes Mgmt. Corp.*, No. 1:16-cv-03231-JDW-AMD, 2020 WL 3962267 at *3 (D.N.J. July 13, 2020) (Wolson, J.) (holding, where the plaintiff filed a lawsuit against a mobile home community for failing to evict a tenant with a criminal history who caused him personal injuries, that plaintiff's expert— a former security guard, state trooper and certified protection professional—could offer opinion testimony about the standard of care that the residential community should have employed and whether it fell short of that standard of care, because he combined his personal knowledge with principles and methodologies from a variety of sources relating to residential security and the management of rental communities, and thus his opinions were based on more than speculation or subjective belief); *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 422-23 (W.D. Pa. 2006) (recognizing that an expert may be helpful to the trier of fact in a bad faith case, and that testimony regarding insurance claims adjusting procedure, the defendant's compliance with industry customs and standards, and whether the defendant lacked a reasonable

21

JA4297

basis for denying the claim may be relevant and admissible); *Burger v. Mays*, 176 F.R.D. 153 (E.D. Pa. 1997) (allowing a criminologist to testify that an officer did not follow proper police procedure in apprehending the plaintiff); *Tschappat v. Groff*, Civ. A. No. 3:CV-01-2279, 2004 WL 5509087 (M.D. Pa. June 2, 2004) (Blewitt, M.J.) (allowing a police expert to testify regarding proper procedures for apprehending a subject and whether the defendant failed to follow those procedures); *Quinn Const., Inc. v. Skanska USA Bldg., Inc.*, No. CIV.A. 07-406, 2009 WL 1489954, at *3 (E.D. Pa. May 26, 2009) (McLaughlin, J.) (noting that, although the plaintiff's claims did not *require* expert testimony, this does not mean that expert testimony regarding an architect's standard of care or causation would not be permitted; rather, such testimony may be admissible if helpful to the jury and if compliant with the Rules of Evidence); *Jones v. LA Fitness Int'l, LLC*, No. CIV.A. 11-0632, 2013 WL 3789807, at *6 (E.D. Pa. July 22, 2013) (Pratter, J.) (holding that the expert's testimony was admissible with regard to the industry standards and rules for basketball courts, and whether the design and condition of the basketball court in question met those standards even though ordinary principals of negligence and the conditions of the premises were well within the jury's comprehension); *Ucciardi v. E.I. Du Pont Nemours & Co.*, No. CV 13-4952 (FLW), 2016 WL 7338533, at *3 (D.N.J. Dec. 19, 2016) ("An expert's opinion may be used to prove elements of negligence, particularly if the subject matter of the alleged negligent act is technical or beyond the kin of the factfinder."). Further, even where courts have found an expert's report to include impermissible legal conclusions—often involving the use of legal terms— they have stricken only those portions of the expert's testimony while allowing the testimony otherwise proceed. *See, e.g., Calhoun*, 350 F.3d at 322, *Gallatin Fuels, Inc.*, 410 F. Supp. 2d at 422-23; *Burger*, 16 F.R.D. 153.

ECFMG falsely asserts that Drs. Markenson and Williamson "confirmed" at their deposition that they will "continue to offer legal conclusions" outside their scope of expertise. (ECF No. 83-1 at 12). This argument is based on selective citation to the record, which creates an inaccurate impression. With respect to Dr. Markenson, the cited testimony arose from a line of hypothetical questions relating to other crimes such as tax fraud, and whether he believes ECFMG has a duty or obligation to make sure individuals it certifies never break the law—hypotheticals which Dr. Markenson attempted to distinguish. *See* Ex. 3, at 217:11-221-4.

Dr. Williamson made clear that he is not holding himself out to be a legal expert in the case. *See* Ex. 9, p. 116:16-19. By "duty," he was careful to note, he meant "responsib[ility] for making certain that everything we've talked about is done properly." *Id.* at 116:17-117:2; 119:10-14. ECFMG's failure to act appropriately "is a matter of ethics" and has "legal implications"—and it was only "in that sense" that Dr. Williamson stated at deposition he was offering a legal opinion. *Id.* at 116-117. This does not amount to an impermissible legal conclusion.

Dr. Williamson resisted repeated attempts to be boxed in at his deposition as to whether he purported to set forth a legal opinion in the case. ECFMG's brief mistakenly casts statements made in conditional form as affirmative representations to the effect that Dr. Williamson would be testifying on the existence of a duty. *Id.* at 118:1-12. Instead, Dr. Williamson outlined in his report and at his deposition what ECFMG was required to do under the prevailing industry standard of care. *See generally* Ex. 7; Ex. 9 at 104:17-112:22. There is also no indication his testimony on whether the damages to plaintiffs were foreseeable will in any way usurp the jury's role as factfinder. Ex. 9 at 120-121. He merely testified that ECFMG should have acted because

JA4299

it should have understood that an individual who provided false information on an application could later commit misconduct against patients. Ex. 9 120-121, 137-138.

For the reasons set forth above, the opinions of Drs. Markenson, Hyde and Williamson, with respect to issues of standard of care, breach and causation do not constitute impermissible legal conclusions; rather these are appropriate matters for expert testimony given that the subject matter in question is technical and beyond the knowledge of the ordinary layperson. *See* Exs. 1, 4, and 7. Plaintiffs' experts are in no way attempting to usurp the Court's role to make legal conclusions or the jury's role to make factual ones. Should the Court have concerns about the terminology to be used by experts in their testimony at trial (e.g., "duty," "breach," "foreseeable") they can be addressed through an appropriate ruling *in limine* when ripe, rather than through the drastic remedy of a wholesale exclusion of experts.

### E. Plaintiffs' Experts Rely Upon Data Reasonably Relied Upon by Experts in their Fields, and the Probative Value of their Testimony Outweighs Any Purported Risk of Prejudice to Defendant.

ECFMG's effort to exclude Plaintiffs' experts' opinions based on Rules 403 and 703 offers no additional arguments beyond those discussed above, and should be denied for the same reasons.[1] Under Rule 703, experts may rely on hearsay statements in formulating their opinions, and may even disclose those statements to the jury if their probative value substantially outweighs their prejudicial effect. *See, e.g.*, *Mestre*, 2020 WL 3962267 at *3. Here, Plaintiffs' experts' opinions are sufficiently reliable, are based upon good grounds, and rely upon data

---

[1] Of note, one of the cases relied upon by Defendant in support of this argument, *Therasense, Inc. v. Becton Dickinson Co.*, No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008) involved "[o]ne of the worst abuses in civil litigation [through] the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' [relating to the material composition of a coating] to a hired expert who then 'relie[d]' on ["a rigged and biased source of information" relating to a "materially important fact"] . . . to express an opinion"; circumstances which clearly and plainly are not present here. *Therasense, Inc.*, 2008 WL 2323856 at *1-*2.

reasonably relied upon by experts in the field. *Paoli*, 35 F.3d at 749. As such, their testimony is admissible and should not be precluded pursuant to Rules 703 and 403.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion to Exclude Expert Testimony be denied.


Dated: January 14, 2022                                    Respectfully submitted,


JANET, JANET & SUGGS, LLC                   CONRAD O'BRIEN PC

*/s/ Patrick Thronson*                              */s/ Robin S. Weiss*
  Patrick A. Thronson                                Nicholas M. Centrella (Pa. ID 67666)
  Brenda A. Harkavy                                  Robin S. Weiss (Pa. ID 312071)
  4 Reservoir Circle, Suite 200                      1500 Market Street, Suite 3900
  Baltimore, MD 21208                                Philadelphia, PA 19102-2100
  (410) 653-3200                                     (215) 864-9600


LAW OFFICES OF PETER G. ANGELOS,            SCHOCHOR, FEDERICO AND STATON
P.C.
                                                    Brent Ceryes
  Paul M. Vettori                                   The Paulton
  One Charles Center                                1211 St. Paul Street
  100 N. Charles Street, 20th Floor                 Baltimore, Maryland 21202
  Baltimore, Maryland 21201                         (410) 234-1000
  (410) 649-2000


Z LAW, LLC                                  THE COCHRAN FIRM
  Cory L. Zajdel                                    Karen E. Evans
  2345 York Rd. Suite B-13                          David E. Haynes
  Timonium, MD 21093                                1100 New York Avenue, N.W.
  (443) 213-1977                                    Suite 340, West Tower
                                                    Washington, DC 20005
                                                    (202) 682-5800

                                                    *Attorneys for Plaintiffs, on behalf of*
                                                    *themselves and all others similarly situated*

JA4301

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | : : : | |
| Plaintiffs | : : | Case No. 2:18-cv-05629-JDW |
| v. | : : | Hon. Joshua D. Wolson |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | : : : | |
| Defendant. | : : | |

**[PROPOSED]**
**ORDER**

AND NOW, this ____ day of _____, 2022, upon consideration of

Defendant's Motion to Exclude the Opinions and Testimony of Plaintiffs' Experts Dr. David

Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson and Plaintiffs' Response in

Opposition Thereto, **IT IS HEREBY ORDERED AND DECREED** that Defendant's Motion is

**DENIED**.

BY THE COURT:

_____

Wolson, J.

JA4302

# EXHIBIT 1

September 19, 2019

Danielle S. Dinsmore, Esquire
Paul M. Vettori, Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street
Baltimore, Maryland 21201

> Re: Monique Russell, et al. v. Educational Commission for Medical
> Graduates, Case No. 2:18-cv-05629-JW

Dear Ms. Dinsmore and Mr. Vettori:

You have asked me to review this matter and provide a report of my expert opinions with respect to this matter. This is my report.

Attached is my Rule 26 case list. Also attached is my Curriculum Vitae, which includes a list of all publications I have authored.

I am billing my time for review and preparation of my report at $ 500 per hour and my time for deposition and trial at $ 5000 per day.

I have reviewed and considered the documents you have provided to me, which include bates stamped documents you obtained from ECFMG, documents obtained from the Akoda criminal case, the Maryland Board of Physician's decision and the depositions (with exhibits) of William Kelly and Kara Corrado.

The following is a summary of the facts considered by me in forming my opinions:

On April 6, 1992 ECFMG received an application from Oluwafemi Charles Igberase to take the Foreign medial graduate examination in the Medical Sciences and the ECFMG English Test. He provided ECFMG with a diploma from the University of Ibadan dated June 19, 1987. Igberase failed both the basic medical science and clinical science components of the FMGEMS and passed the ECFMG English test. He failed the Day 1 test again but passed it on the third try. On October 4, 1993, after he successfully completed steps 1 and 2 of the USMLE, ECFMG issued to him certificate number 0-482-700.

On March 30, 1994, ECFMG received an application from Igberase Oluwafemi Charles to take Steps 1 and 2 of the USMLE examinations. He provided a date of birth that was different than the date of birth provided by Igberase. The diploma he submitted was the identical diploma that had been submitted by Igberase. On December 14, 1994, after Charles successfully completed the USMLE examinations, ECFMG issued to him certificate number 0-519-573-0.

Confidential Communication with Attorney

At some point after this, for reasons that do not appear in the records, ECFMG became suspicious that Igberase and Charles were one and the same person and began an investigation. Igberase/Charles explained his actions in a handwritten letter dated July 14, 1995 in which he admitted he had lied about not taking the examination previously and why he rearranged his names. As a result of the investigation, the ECFMG Committee on Medical Education Credentials invalidated certificate number 0-519-573-0 issued to Charles and revoked certificate number 0-482-700-2 issued to Igberase. Charles appealed the decision which led to a hearing on July 10, 1996. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke certificate number 0-482-700-2 but limited the length of the revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001. Thereafter, the ECFMG Committee on Medical Education Credentials extended the length of this revocation for a yet to be specified period of time and, ultimately, revoked permanently this certificate.

On January 3, 1996 and again on August 30, 1996, ECFMG received an application from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. He provided ECFMG with a diploma from the University of Benin dated February 6, 1998. On August 18, 1998, after he successfully completed the required examinations, ECFMG issued to him certificate number 0-553-258-5. Although his applications did not include a social security number, at some time in 1998 he provided ECFMG with social security number xxx-xx- 9065.

On July 1, 1998 Akoda entered the graduate residency program at Jersey Shore Medical Center. On July 24, 1998, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program. On September 2, 1998, ECFMG sent this validated form.

By letter dated August 11, 2000 from James McCorkel, M.D. to Rice Holmes, ECFMG was notified that the Jersey Shore Medical Center graduate residency program in which Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Dr. McCorkel that Akoda had provided ECFMG with social security no. xxx-xx-9065. This is the same number Akoda provided to the Jersey Shore Medical Center.

ECFMG sent Akoda a "charge letter" dated August 22, 2000 advising Akoda that ECFMG had received information alleging that Akoda may have engaged in irregular behavior. This letter was based on the matters presented by Dr. McCorkel. Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

The Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number – that of his cousin Charles Igberase - and because the green card he had provided the hospital was inconsistent with a subsequent green card he also provided.

2

JA4305

On December 22, 2000, William Kelly, Manager of the Medical Education Credentials Department of ECFMG, wrote a memorandum to Stephen S. Seeling, JD, Vice President of Operations of ECFMG, in which Mr. Kelly stated "[t]his memorandum is being written separately since I did not think it should be made part of the official file." He advised Mr. Seeling that both he and Dr. McCorkel believed Igberase and Akoda were one and the same person. He concluded that he did not think there was enough information for the ECFMG Credentials Committee.

In October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center for a graduate residency program, which included three letters of reference. In connection with this process, ECFMG attempted to verify the authenticity of these three letters of reference but never received responses from the persons passed off as references for Akoda.

Akoda successfully completed a graduate residency program at Howard University Medical Center. He was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center based on application and submission of required documentation including an ECFMG certificate.

The following are my opinions, which are based on the matters set out above and my education, training and experience:

ECFMG is the only organization that certifies that IMG's have successfully completed medical education at an approved foreign medical school and that they have successfully completed the required medical examinations. Without an ECFMG certification, an IMG cannot sir for required licensing exams, obtain a medical license, will not be accepted into a graduate medical education program and cannot obtain hospital privileges. The standard of care applicable to ECFMG's certification process requires ECFMG to adopt reasonable policies and procedures and to follow those procedures to ensure that IMG's comply with all requirements for certification. ECFMG has undertaken to provide certification services which are necessary for the protection of the general public. Its failure to exercise reasonable care in providing these services increases the risk of harm to the general public, including plaintiffs. Licensing agencies, medical schools and hospitals, among others, rely upon ECFMG to act reasonably in performing these services.

It is my opinion, held to a reasonable degree of professional certainty, that ECFMG failed to adopt appropriate policies for certification of IMG's, failed to exercise reasonable care in its certification of Akoda and failed to exercise reasonable care in its investigation of allegations made about Akoda and that these failures caused harm to the named plaintiffs and members of the class.

While it is accurate to say that certification by ECFMG is only one of the steps needed for a foreign medial graduate to obtain a license to practice medicine in the United States, it is a requirement without which an IMG cannot obtain a license. It is also a required certification for entering residency and obtaining hospital privileges. If ECFMG had acted reasonably, it would have denied certification to Akoda, and would have revoked Akoda's certificate, he would not have been able to enter the Howard University residency program, he would not have been able

Confidential Communication with Attorney

to obtain a Maryland medical license, he would not have been granted privileges at Prince Georges' Medical Center, and he would not have been able to harm the plaintiffs.

The ECFMG certification process and investigation of suspicious or irregular behavior by ECFMG is important to ensure that individuals seeking to act as physicians treating patients are qualified and meet professional standards of honesty, morality and character. These qualities are critical to the physician patient relationship.

ECFMG breached the standard of care in, among others, the following ways:

Failing to adopt written policies and procedures for the certification of IMG's;

Failing to adopt written policies and procedures for the investigation of allegations of irregular behavior;

Failing to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG;

Failing to investigate fully the relationship between Igberase and Akoda;

Failing to reasonably investigate Akoda's diploma from the University of Ibadan;

Failing to reasonably investigate discrepancies in official medical school seal on documents submitted for Akoda;

Failing to deny the requested waiver of a medical school confirmation of Akoda photograph based on the explanation of the Nigerian postal system not providing a rapid delivery;

Failing to deny the Akoda application due to it being incomplete;

Failing to reasonably investigate the allegations made by Dr. McCorkel;

Failing to refer Akoda to the Medical Education Credentials Committee;

Failing to follow its own procedures with respect to the charge letter sent to Akoda on August 22, 2000;

Failing to reasonably investigate the social security number provided to ECFMG by Akoda;

Failing to temporarily suspend pending investigation and discontinue to verify ECFMG certifications after Dr. McCorkel's allegation, admission by Akoda of using another's social security number and the ECFMG Investigator's concern that Akoda and Igberase were the same person.

Confidential Communication with Attorney

Failing to compare photographs of Igberase and Akoda in its files;

Failing to reasonably act when Akoda admitted to identity theft in use of another's social security number;

Failing to conclude that the person – Charles -- who appeared for hours at the July 10, 1996 appeal hearing and the person who appeared in Mr. Kelly's office on September 27, 2000 – Akoda – were the same person;

Failing to investigate the authenticity of the passport and green card produced to Mr. Kelly by Akoda when he came to Mr. Kelly's office on September 27, 2000;

Failing to follow up on the conclusion reached by Mr. Kelly and Dr. McCorkel that Igberase and Akoda were the same person.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's, these would have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMF's, these would have included requirements that ECFMG investigate fully discrepancies in Akoda'a application and submitted materials.

It is my opinion, to a reasonable degree of professional certainty, that, had there been written policies and procedures for the certification of IMG's and investigations of irregular behavior, these would have included requirements that ECFMG investigate and refer to the Medical Education Credentials Committee in situations of identity fraud.

It is my opinion, to a reasonable degree of professional certainty, that, had ECFMG properly investigated the allegations of irregular behavior against Akoda, ECFMG would have referred the matter to the Medical Education Credentials Committee and that committee would have found that Akoda engaged in irregular behavior, which would have resulted in his certification being revoked.

It is my opinion, to a reasonable degree of professional certainty, that these failures on the part of ECFMG to comply with the standard of care were the direct cause of Akoda being certified by ECFMG and which are the direct cause of the harms caused to the plaintiffs and the members of the class.

JA4308

Confidential Communication with Attorney

Very truly yours,

David Samuel Markenson, MD

6

JA4309

# EXHIBIT 2

**Curriculum Vitae**

## David Samuel Markenson, MD, MBA, FAAP, FACEP, FCCM, FACHE
### 6324 E Stanford Ave
### Cherry Hills Village, CO 80111
### (917) 626-6541 (personal cell phone)
### docmarkenson@gmail.com (personal e-mail)

## PROFILE:

Health care physician executive with 15-plus years' experience in leadership roles (Division Vice President, Chief Medical Officer, Vice President, Medical Director, Section Chief, Academic Chairman, Center Director and Designated Institutional Official) with a publicly traded national hospital corporation, large regional health system, academic medical center, medical school, municipal hospitals and community hospital.

- Chosen to lead organizations, departments and programs during startup phase to build enterprises that achieved clinical excellence, operational efficiency, sustained growth and financial success.
- Requested to assume oversight of programs, services and departments facing critical challenges, based on expertise in assessing structure and operations, developing multi-faceted strategic and operational plans, and building, recruiting and engaging teams to reach goals.
- A highly regarded healthcare leader, clinician, educator and advisor, approachable and collaborative, respected by healthcare leaders, medical staff, nursing staff and facility staff.
- Served as first CMO of complex community tertiary care facility during rapid growth phase where improved quality and led innovation in clinical care delivery, achieving top hospital status and straight Leap Frog A grade. In subsequent role oversaw three divisions encompassing 7 states and over 30 hospitals with transformation of hospitals to academic medical center to establish over 200 residency positions and 15 programs that supported workforce needs, strategic growth plans, hospital quality, efficiency and finances.
- Strong leadership, interpersonal and communication skills, strategic thinker with ability to implement, analytical, persuasive, guided by data, outcome metrics and scientific evidence (EBM), driven to results. Successful in leading clinicians to embrace change through subject matter expertise, ability to present data, operational plans and finances clearly, and skill in engaging support from physician decision makers, thought leaders and champions.

## Employment History and Primary Positions/Appointments

American Red Cross, Washington, DC
*Chief Medical Officer, Training Services February 2019 to present*
*National Chair, Scientific Advisory Council 2005 to present*
*Member, Advisory Council of First Aid and Safety 2002- present*

New York Medical College School of Health Sciences and Practice (formerly School of Public Health)
*Medical Director, Center for Disaster Medicine 2013 to present*
*Director, Center for Disaster Medicine August 2005 to 2013*
*Interim Chair, Department of Epidemiology and Community Health (Epidemiology and Biostatistics merged with Behavioral Science and Health Promotion) June 2009 to 2010*
*Interim Chair, Department of Epidemiology and Biostatistics August 2008 to June 2009*

Hospital Corporation of America Physician Services Group, Nashville, TN
*Division Vice President for Graduate Medical Education for the Continental, Mountain and Mid-America Divisions, September 2016 to May 2018*
*Designated Institutional Official HealthONE, Research Medical Center, Ogden Regional Medical Center and Eastern Idaho Regional Medical Center (each entity is a separate ACGME Institutional Sponsor), July 2015 to May 2018*
*Chair, Institutional Review Board, HealthONE, January 2016 to May 2018*

JA4311

Hospital Corporation of America
Sky Ridge Medical Center, Lone Tree, CO
*Chief Medical Officer, May 2013 to August 2016*
*SRMC PHO Facility Lead and Board Member, May 2013 to December 2015*

International Federation of Red Cross and Red Crescent Societies
Chair and Co-Founder, First Aid and Health Evidence Based Network, 2011 to Present
Co-Editor-in-Chief, 2021, 2016 and 2011 IFRC First Aid and Resuscitation Guidelines

Westchester Medical Center and Maria Fareri Children's Hospital, Valhalla, N.Y.
*Director Partnership for Patients, Clinical Informatics, and Quality Data, June 2012 to May 2013*
*Medical Director Regional Emergency Services and Disaster Medicine (VP title and authority but titled*
*Medical Director for physician), December 2009 to May 2013*
*Chief, Pediatric Emergency Medicine August 2005 to December 2009*
*Attending, Pediatric Emergency Medicine August 2005 to 2010*
*Attending, Pediatric Critical Care September 2005 to May 2013*

Jamaica Hospital Medical Center and Flushing Hospital Medical Center, New York, N.Y.
*Director Pediatric Critical Care 2005 to 2010*
*Director Child Protection 2005 to 2006*

Columbia University, Mailman School of Public Health, New York, N.Y.
*Director Program for Pediatric Preparedness May 2003 to May 2005*
*Deputy Director National Center for Disaster Preparedness May 2003 to May 2005*

Children's Hospital at Montefiore
*Medical Director, The Program for Pediatric Preparedness October 2002 to April 2004*
*Fellow, Pediatric Critical Care October 2002 to April 2004*

Harlem Hospital Center, New York, N.Y.
*Director of Pediatric Critical Care and Child Protection May 2001 to November 2002*
*Director Family Support Program and Child Protection May 2001 to November 2002*
*Assistant Attending Pediatric Emergency and Critical Care October 2000 to June 2004*

New York Presbyterian Hospital, New York, N.Y.
*Clinical Fellow in Pediatric Critical Care January 2000 to May 2001*

NYU Medical Center Tisch Hospital and Bellevue Hospital Center, New York, N.Y.
*Medical Director National Child Protection Project July 1996-June 2004*
*Member, Center for Pediatric Emergency Medicine, July 1995-June 2004*
*Fellow Pediatric Emergency Medicine, July 1998 to December 1999*
*Chief Resident July 1997 to June 1998*
*House Officer July 1994 to June 1997*

## Academic Appointments and Positions

University of Colorado School of Medicine
*Clinical Professor of Pediatrics March 2015 to present*

University of Colorado School of Public Health
*Adjunct Professor of Public Heath November 2014 to present*

New York Medical College School of Medicine
*Professor of Pediatrics, 2009-2013*
*Associate Professor of Pediatrics, 2006-2009*
*Assistant Professor of Pediatrics, 2005-2006*

2

JA4312

New York Medical College School of Health Sciences and Practice (formerly School of Public Health)
*Senior Fellow, Center for Disaster Medicine, 2013-2018*
*Professor of Clinical Public Health 2010 to 2013*
*Associate Professor of Public Health 2006 to 2009*
*Assistant Professor of Public Health 2005 to 2006*
*Director, Center for Disaster Medicine August 2005 to 2013*
*Interim Chair, Department of Epidemiology and Community Health (Epidemiology and Biostatistics merged with Behavioral Science and Health Promotion) June 2009 to 2010*
*Interim Chair, Department of Epidemiology and Biostatistics August 2008 to June 2009*
*Program Director, Emergency Preparedness MPH and Certificate Program, Department of Health Policy and Management March 2006 to 2009*

Columbia University, Mailman School of Public Health, New York, N.Y.
*Adjunct Assistant Professor of Population and Family Health January 2005 to 2007*
*Director Program for Pediatric Preparedness May 2003 to May 2005*
*Deputy Director National Center for Disaster Preparedness May 2003 to May 2005*
*Assistant Professor of Population and Family Health, 2003-2005*

Columbia University College of Physicians and Surgeons, New York, NY
*Assistant Professor of Pediatrics May 2001 to June 2005*

New York University School of Medicine, New York, N.Y.
*Instructor of Pediatrics July 1997 to June 2001*
*Teaching Assistant in Pediatrics July 1996 to June 1997*

## Education:

University of Massachusetts Isenberg School of Management, Amherst, M.B.A.
Master of Business Administration, May 2011

Albert Einstein College of Medicine, Bronx, N.Y.
*Doctor of Medicine June, 1994*
*Honors Distinction in Pediatric Emergency Medicine Research*

Union College, Schenectady, N.Y.
*Bachelor of Arts June, 1990*

## Internship and Residency
New York University School of Medicine, New York, N.Y.
*Primary Care Pediatrics Intern July 1994 to June 1995*

New York University School of Medicine, New York, N.Y.
*Primary Care Pediatrics Resident July 1995 to June 1997*

New York University School of Medicine, New York, N.Y.
*Pediatric Chief Resident July 1997 to June 1998*

## Fellowship
Bellevue Hospital, New York University School of Medicine, New York, N.Y.
*Fellow in Pediatric Emergency Medicine July 1998 to December 1999*

Cornell Medical College, New York Presbyterian Hospital, New York, NY
*Fellow in Pediatric Critical Care January 2000 to May 2001*

JA4313

D. Markenson, MD, CV, Continued

Children's Hospital at Montefiore, Albert Einstein College of Medicine, New York, NY
*Fellow in Pediatric Critical Care October 2002 to April 2004*

## Board Certification
American Board of Pediatrics – Pediatrics Certified October 1998, MOC Current

American Board of Pediatrics – Pediatric Critical Care Certified November 2004, MOC Current

American Board of Preventative Medicine – Clinical Informatics Certified 2014, MOC Current

American Board of Emergency Medicine – Emergency Medical Services Certified 2014, MOC Current

## Professional Licenses:

Alaska Division of Corporations, Business, and Professional Licensing Physician #142262

Colorado Division of Professional Licenses DR.0052535

Nebraska Department of Health and Human Services Physician #31320

New York State Department of Education License to Practice Medicine and Surgery #199931

Ohio State Medical Board Physician #35.135973

## Additional Hospital/Professional Appointments and Per Diem/Locums Roles

Kendal Regional Medical Center
*Pediatric Critical Care Attending November 2018 to December 2018*

Mountainland Pediatrics, Thorton, CO
*Pediatric Attending July2018 to August 2018*

International Children's Hart Foundation, Nashville, TN
*Volunteer Pediatric Critical Care Attending July 2018 to present*

Sky Ridge Medical Center (Carepoint, PC), Lone Tree, CO
*Pediatric Emergency Physician July 2013 to February 2014*

Swedish Medical Center (Carepoint, PC), Englewood, CO
*Pediatric Emergency Physician July 2013 to February 2014*

Presbyterian Medical Center and Rocky Mountain Hospital for Children (Carepoint, PC), Denver, CO
*Pediatric Emergency Physician July 2013 to February 2014*

PM Pediatrics, Mamaroneck, NY
*Per Diem Pediatric Emergency Medicine Attending December 2010 to April 2013*

White Plains Hospital, White Plains, NY
*Emergency and Pediatric Emergency Attending October 2004 to 2006*

St. Lukes Roosevelt Hospital, New York, N.Y.
*Attending Pediatric Critical Care August 2004 to December 2006*
*Attending Pediatric Emergency Medicine January 2000 to December 2002*

4  Revised 6/6/2019

JA4314

Beth Israel Medical Center, New York, N.Y.
*Pediatric Critical Care Attending Physician August 2004 to December 2006*
*Pediatric Emergency Attending Physician June 1997 to January 2001*

Hospital for Joint Diseases, New York, N.Y.
*Pediatric Attending Physician June 1996 to January 2003*

Lenox Hill Hospital, New York, N.Y.
*Pediatric Emergency Room Physician November 1995 to December 1998*

## Professional Certification

American College of Healthcare Executives – Fellow
Certified Professional in Healthcare Quality (CPHQ)
Certifying Commission on Medical Management – Certified Physician Executive
Six Sigma Certified Black Belt

## Professional Membership:

American Academy of Pediatrics - Fellow
American College of Critical Care Medicine - Fellow
American College of Emergency Physicians - Fellow
American College of Health Care Executives - Fellow
American College of Physician Executives - Member
American Medical Informatics Association - Member
Arapahoe Douglass Ebert Medical Society – Past-President and Member
Colorado Medical Society – President-Elect, and Board of Directors and Member
New York Academy of Medicine – Fellow
Society of Critical Care Medicine – Member

## Hospital Committee Membership

HealthONE
*Division Formulary Steering Committee – Member 2015-2018*

Sky Ridge Medical Center
*Performance Improvement Committee – Ex-officio member 2013-2016*
*Peer Review Committee - Ex-officio member 2013-2016*
*Credential Committee - Ex-officio member 2013-2016*
*Medical Executive Committee - Ex-officio member 2013-2016*
*Pharmaceutical and Therapeutics Committee – Member 2013-2016*
*Critical Care Committee - Ex-officio member 2013-2016*
*Pediatric Service Line – Member 2013-2016*
*Emergency Service Line – Member 2013-2016*
*Trauma Committee – Member 2013-2016*
*Physician Satisfaction Team – Member 2013-2016*

Westchester Medical Center
*Child Protection Committee – Member 2005 to 2011*
*Disaster Committee – Chair 2008 and member 2006 to 2013*
*Environment of Care Committee – Chair 2011 to 2013, member 2009 to 2013*
*Medical Operations – Member 2009 to 2013*
*Pediatric Education Committee – Member 2006 to 2013*
*Pediatric Medical Operation Committee – Member 2005 to 2013*
*Pharmacy and Therapeutics Committee – Member 2006 to 2013*

Revised 6/6/2019

JA4315

D. Markenson, MD, CV, Continued

*Trauma Committee – Member 2005-2013*
*Trauma Peer and M&M – Member 2005-2013*
*Pediatric Trauma Committee – 2008-2013*
*Utilization Management – Member 2011 to 2013*

Flushing Hospital Medical Center
*Critical Care Committee – Member 2004 to 2010*
*Child Protection Committee – Member 2004 to 2010, Chair 2004 to 2006*
*Pediatric QA Committee – Member 2004 to 2010*

Jamaica Hospital Medical Center
*Critical Care Committee – Member 2005 to 2010*
*Child Protection Committee – Member 2005 to 2010; Chair 2005 to 2006*
*Pediatric QA Committee – Member 2005 to 2010*
*Trauma Committee – Member 2005-2010*

Harlem Hospital Medical Center
*Child Protection Committee – Chair January 2001 to November 2002*
*Critical Care Committee – Member May 2001 to November 2002*
*Trauma Committee – Member 2001-2002*

Bellevue Hospital Medical Center
*Medical Board – Member and Executive Committee Member 1996 to 2000*
*Formulary Sub-Committee – Member 1997 to 2000*
*House Staff Affairs Sub-Committee – Member 1997 to 2000*

## CME Instructor Certifications:

American Academy of Pediatrics
*Neonatal Resuscitation Program Regional Trainer, 1998 to 2005*
*Neonatal Resuscitation Program Instructor, 1992 to 2005*

American College of Surgeons
*ATLS Provider, 1994-2010*
*ATLS Instructor, 2001-2004*

American Heart Association
*Advanced Cardiac Life Support Instructor, 1991 to 2003*
*Pediatric Advanced Life Support Instructor, 1993 to 2003*
*Pediatric Advanced Life Support Affiliate Faculty, 1994 to 2003*

American Medical Association
*National Disaster Life Support Instructor, 2009 to present*

American Red Cross
*Volunteer Health and Safety Specialist, 1990 to present*
*Basic Disaster Services Instructor, 1990 to present*
*Instructor Trainer in HIV/AIDS Education, 1990 to present*
*Instructor Trainer in Water Safety and Lifeguard Training, 1989 to present*
*Instructor Trainer in First Aid, 1989 to present*
*Instructor Trained in CPR, 1988 to present*

National Association of E.M.T.s
*Pre-Hospital Trauma Life Support Instructor, 1991 to 2000*
*Pediatric Prehospital Care National Medical Director, 1998 to 2000*

6                                                    Revised 6/6/2019

JA4316

D. Markenson, MD, CV, Continued

New York State Department of Health
*EMS Hazardous Materials Awareness Instructor, 1993 to 2000*
*Paramedic Instructor, 1992 to 2000*
*Pre-Hospital Pediatric Care Course Instructor, 1992 to 2000*
*Ambulance Accident Prevention Seminar Instructor, 1991-1997*
*Emergency Medical Technician Instructor, 1989 to 2000*

Society of Critical Care Medicine
*Pediatric Fundamental Critical Care Support Course Instructor, 2010 to 2014*
*Fundamental Critical Care Support Instructor, 2002 to 2014*
*Fundamental Disaster Medicine Instructor, 2003 to 2014*

TEEX DHS Programs
*Medical Management Of CBRNE Events (PER 211), Chair Medical Advisory Board 2004-2015, Instructor 2003 to 2016*
*Pediatric Disaster Response And Emergency Preparedness (MGT439), Chair Medical Advisory Board, Development Team and instructor 2011-2016*

Revised 6/6/2019

JA4317

D. Markenson, MD, CV, Continued

## Research and Grant Activities:

Community Based Care Center Model Plan and Toolkit Education April 2011 to August 2011
*Principal Investigator*
*Awarded $35,000 sub-award from NYS DOH Hospital Emergency Preparedness Program Grant*
*Having been selected by New York State Department of Health to develop model for Community Based Care Center (original name-alternate care sites) and an accompanying toolkit for implementation to address patient surge for pandemic influenza, mass casualty events and other disasters, awarded additional funding for implementation and education. Conducted statewide education on use of toolkit.*

Dutchess County Surge Planning April 2010 to September 2010
*Principal Investigator*
*Awarded $35,000 grant from Dutchess County Department of Health*
*Conceptualized and directed grant which facilitated the Dutchess Department of Health and Office of Emergency Management in development of a county wide surge plan based on our prior validated models. In addition developed standards for alternate care sties including triage and care protocols.*

Regional Resource Center August 2009 to 2013
Principal Investigator
*Awarded $275,000 2011-12 (325,000 prior years) per year from NYS DOH Hospital Emergency Preparedness Program*
*Grant provided to operate Regional Resource which provides training, drills support and research of preparedness in the Hudson Valley Region*

Alternate Care Site Model Plan and Toolkit April 2009 to 2010
*Principal Investigator*
*Awarded $95,000 sub-award from NYS DOH Hospital Emergency Preparedness Program Grant*
*Selected by New York State Department of Health to develop model for alternate care sites and an accompanying toolkit for implementation of alternate care sites to address patient surge in the event of pandemic influenza, mass casualty events and other disasters. Once developed this model and toolkit is to become the NYS standard and will be required to be used by all local health departments in NYS.*

Emergency Departments Appropriate for Pediatrics May 2008 to 2010
*Principal Investigator*
*Awarded $100,000 initial grant and $90,000 second year grant from R Baby Foundation*
*Conceptualized and directed grant to assess community emergency departments for their ability to care for infants and young children. Then based on the assessment and review of the evidence based literature, develop guidelines and an educational program to create emergency departments appropriate for infants and young children which will be piloted in the Hudson Valley and then distributed nationally.*

Hudson Valley Regional Emergency Preparedness Training and Exercise December 2008 to 2009
*Principal Investigator*
*Awarded $55,000 sub-award from NYS DOH Hospital Emergency Preparedness Program Grant*
*Developed program to assess education gap in emergency preparedness knowledge in the Hudson Valley and then to design and deliver educational program to fill this gap. Program will also develop, conduct and evaluate drills and exercises to test the impact of this education.*

Broome County Child Protection and Epidemiological Support August 2008 to 2010
*Principal Investigator*
*Awarded $50,000 per year contract which has been renewed for an additional year*
*Oversaw grant to provide epidemiological and biostatistics support to the Broome County Department of Health. In addition provided direction on the expansion of health department child protection activities including the child fatality review team, case review and multi-disciplinary team creation and protocols. Also developed with health department official's research study regarding child maltreatment prevalence in Broome County.*

Revised 6/6/2019

JA4318

D. Markenson, MD, CV, Continued

Alternate Care Site Planning Grant February 2008 to June 2008
*Principal Investigator*
*Awarded $180,000 grant from NYS Department of Health Hospital Emergency Preparedness Program*
*Conceptualized and directed grant which assessed issues regarding patient triage and care at alternate*
*care sites for disaster medical services. In addition developed standards for alternate care sties including*
*triage mechanisms and care protocols.*

Hudson Valley Region Surge Assessment May 2007 – September 2007
*Principal Investigator*
*Awarded $50,000 contract through Regional Resource Center from NYS Department of Health*
*Conceptualized and directed grant to assess the surge capacity of EMS, hospitals and community health*
*assets in the Hudson valley region.*

Putnam Community Wide Preparedness Project October 2006- September 2007
*Principal Investigator*
*Awarded $125,000 for one year grant from NYS Department of Health*
*Conceptualized project, developed grant and direction project to conduct community based preparedness*
*project targeted and schools with inclusion of public health, EMS, fire, law enforcement and emergency*
*management.*

Lifeguarding and Resuscitation Evidence Based Guidelines June 2006 to June 2009
*Principal Investigator*
*Awarded $150,000 for 2 year grant from the National Pool and Spa Foundation*
*Developed project, process and chaired program to develop evidence based approaches and guidelines*
*for drowning prevention, water rescue and the drowning process resuscitation.*

Prehospital Provider Recognition of Child Neglect 2005 to 2006
*Principal Investigator*
*Research project funded through departmental funds*
*Developed and conducted both pilot and formal research project to assess Prehospital provider's ability*
*to recognize, assess, document and report child neglect. Submitted several applications for funding for*
*this research. At this time this research is funded through NYMC Public Health Departmental funds.*

Consensus Conference on the Needs of Children and Persons with Disabilities in Disasters September
2003 to 2007
*Principal Investigator*
*Awarded $380,000 for 2 year grant from Agency for Healthcare Research and Quality*
*Conceptualized project and drafted grant application for grant to hold a repeat National Consensus*
*Conference on the needs of children in disasters with a new added focus on person with disabilities and*
*to establish a research agenda to answer the questions regarding the needs of children and person with*
*disabilities in disasters.*

Center for Public Health Preparedness September 2004 to 2006
*Co-Investigator May 2005 to 2006 (involvement ended with my departure from Columbia University)*
*Co- Principal Investigator September 2004 to May 2005*
*Awarded $5,500,000 for 5 year grant from the Centers for Disease Control*
*Co-Principal investigator on grant to continue the work of a Center for Public Health Preparedness at a*
*School of Public Health to support the activities of the departments of health and improve preparedness*
*through research and education on public health preparedness.*

Academic Departments of Public Health February 2004 to January 2005
*Principal Investigator*
*Awarded $100,000 for 1 year grant from the Association of Schools Public Health/Centers for Disease*
*Control*
*Conceptualized project and drafted grant application for ASPH/CDC grant to develop the models for*
*departments of health to become more academic. Grant involves active collaboration with the New York*

Revised 6/6/2019

JA4319

*City Department of Health and Mental Hygiene to test these models for improved academic activity and then to disseminate finds as a replicable model.*

Bioterrorism Curriculum Enhancement *October 2003 to June 2005*
*Principal Investigator (grant period)*
*Co-Investigator (grant extension)*
*Awarded $780,000 for 2 year grant from the Health Resources Services Administration*
*Helped to conceptualize and draft application for HRSA grant to enhance the curriculum of all the schools of the Columbia University Health Science Campus to include bioterrorism and emergency preparedness. After awarding of grant served as co-principal investigator and directed grant including supervision of all staff, oversight of all activities and product creation.*

Centers for Disease Control Linkages of EMS and Acute Care with Public Health Departments *October 2003 to 2007*
*Principal Investigator*
*Initially Awarded $100,000 for 1 year grant from the Centers for Disease Control.*
*Awarded Additional $225,000 for 3 year grant from the Center for Disease Control*
*Conceptualized project and drafted grant application for CDC grant to foster linkages between EMS and State and Local Departments of Health involving disaster and terrorism preparedness. In addition project included assessment of EMS provider's knowledge of bioterrorism, equipment for terrorism and knowledge and attitudes regarding EMS and public health.*

Consensus Conference on the Needs of Children in Disasters *November 2002 to October 2003*
*Principal Investigator*
*Awarded $50,000 for 1 year grant from Agency for Healthcare Research and Quality*
*Conceptualized project and drafted grant application for grant to hold a National Consensus Conference on the needs of children in disasters and to establish a research agenda to answer the questions regarding the needs of children in disasters.*

Center for Public Health Preparedness *September 2000 to August 2004*
*Co- Investigator May 2003 – August 2004*
*Awarded $4,000,000 for 4 year grant from the Associations of Schools of Public Health*
*Senior investigator on grant to establish a Center for Public Health Preparedness at a School of Public Health to support the activities of the departments of health and improve preparedness through research and education on public health preparedness.*

Maternal and Child Health Bureau EMS for Children Model Pediatric Component for State Disaster Plans *March 2001 to February 2004*
*Principal Investigator*
*Awarded $600,000 for 3 year grant from Maternal Child Health Bureau.*
*Conceptualized project and drafted grant application for EMSC Targeted Issues Grant to evaluate the needs of children in disaster planning, preparation and response, build collaboration between pediatric experts and emergency management professionals and based on data driven consensus process develop a model pediatric component for state disaster plans.*

Renal Function in Older Children and Adolescents with Perinatal HIV-1 Infection *May 2001 to April 2003*
*Principal Investigator*
*Funded by Family Care Center and Glaxo Smith Kline*
*Conceptualized project and drafted IRB application for study to evaluate previously undetected renal impairment in older children and adolescents with perinatal HIV-1 infection.*

Levalbuterol versus Albuterol for Continuous Nebulization *May 2001 to April 2003*
*Principal Investigator*
*Research project funded through departmental funds*
*Conceptualized project and drafted IRB application for study to evaluate the difference in efficacy, pharmakinetics and adverse effects for levalbuterol versus albuterol as a continuous nebulization.*

Revised 6/6/2019

D. Markenson, MD, CV, Continued

Renal Clearance and Adverse Reactions for Sedative Medication in Children May 2001 to April 2003
*Principal Investigator*
*Research project funded through departmental funds*
*Conceptualized project to study the difference in efficacy, pharmakinetics, protein binding, renal clearance and adverse effects for the commonly used sedative in children.*

National Children's Alliance January 2002 to December 2004
*Principal Investigator*
*Awarded $50,000 grant from National Children's Alliance and Department of Juvenile Justice*
*Drafted grant and administer grant to enhance child protection group into fully accredited Child Advocacy Center.*

Maternal and Child Health Bureau EMS For Children Network Development Demonstration Project (NDDP) September 2001- June 2003
*Co-Investigator*
*Awarded Grant $500,000 from Health Resources and Services Administration*
*Co-authored grant application and conceptualization of project. Will serve in project management and oversight of a project designed to demonstrate the value of establishing an infrastructure or network that can serve as a platform from which to conduct investigations on the effectiveness of treatments, transport, and care responses, including those preceding the arrival of children to hospital emergency departments.*

Maternal and Child Health Bureau EMS For Children Target Issues Grant National Child Protection Project August 1999- July 2003
*Project Medical Director*
*Awarded $350,000 Grant from Health and Resources Services Administration*
*Designed and conducted pilot study of EMS provider's knowledge and attitudes regarding child abuse and neglect recognition and reporting. Directed the administration of the federal grant to further this study on a national level, designed and analyzed research project and then design an educational resource to help better educate prehospital personnel on this subject.*

On-Scene Administration of Albuterol by EMT-Basic for Bronchospasm August 1998 to June 2003
*Principal Investigator*
*Research project funded through departmental funds*
*Designed and conducted study to determine the ability of EMT-Basic to correctly assess patient's for bronchospasm and then to provide therapy with albuterol via a nebulizer system. Study was approved by the NYS Commissioner of Health for deviation in standard of care as part of this study. Study involved 20 EMS agencies treating patients in the 5 boroughs of New York City.*

Nebulized Epinephrine versus Albuterol for treatment of Bronchiolitis January 1998 to December 2000
*Principal Investigator*
*Designed and conducted double blind study to compare the efficacy and patient outcome of epinephrine versus albuterol for the treatment of bronchospasm secondary to bronchiolitis.*

Maternal and Child Health Bureau EMS for Children Grant November, 1998 to October 2001
*Educational Coordinator, Investigator and editor for three year federal grant to develop an Instructor's*
*Awarded $375,000 Grant from Health Resources and Services Administration*
*Resource for Teaching Prehospital Pediatrics for the EMT Intermediate and Paramedic and then studying the impact of this resource on prehospital provider education.*

Prehospital Provider Knowledge and Attitudes Regarding Child Maltreatment and National Child Protection Project July 1996 – June 1998
*Principal Investigator*
*Research project funded through departmental funds*

11

Revised 6/6/2019

JA4321

*Designed and conducted a study of the knowledge and attitudes of EMTs and paramedics related to child maltreatment. In addition assessed their attitude and desire for additional education in child maltreatment.*

Maternal and Child Health Bureau EMS for Children Grant November 1994 to October 1998
*Educational Coordinator, Investigator and editor for three year federal grant to develop an Instructor's Awarded $375,000 Grant from Health Resources and Services Administration*
*Resource for Teaching Prehospital Pediatrics for the EMT Basic and then studying the impact of this resource on prehospital provider education.*

Primary Care Access and Emergency Department Usage Study October 1994 to May 1998
*Principal Investigator*
*Research project funded through departmental funds*
*Designed and implemented study to analyze the effect of access to primary care, telephone triage and patient education on emergency department usage in a large urban hospital.*

EMT and Paramedic Diagnostic Accuracy February 1994 to January 1996
*Principal Investigator*
*Research project funded through departmental funds*
*Designed and conducted a study of the abilities of EMTs and paramedics to correctly diagnose patients.*

Pre-Hospital Pediatric Spinal Immobilization September 1993 to June 1997
*Principal Investigator*
*Research project funded through departmental funds*
*Designed and implemented a study to analyze patterns and effectiveness of spinal immobilization by Emergency Medical Technicians and Paramedics and on in hospital management are to be studied.*

New York City EMS Systems Study, September 1993 to September 1996
*Principal Investigator*
*Research project funded through departmental funds*
*Conducted a study using a mail survey of the different types of Emergency Medical Services Systems that exist in New York City.*

Pre-Hospital Medication Administration by Basic Emergency Medical Technicians March 1993 to June 2004
*Principal Investigator*
*Research project funded through departmental funds*
*Designed a three arm study looking at the ability of Basic Emergency Medical Technicians to administer medications in terms of the efficacy, safety and complications; obtained permission for deviation from the standards of provider care from the Regional and State Emergency Medical Advisory Board and the Commissioner of the Department of Health; developed and taught a training course for the EMT's in the study for a pilot study with Epinephrine and provisional approval for a full study with Albuterol..*

Effects of Alternative Staffing Patterns on ALS Protocols as Established by the Regional Medical Advisory Board of New York City January 1993 to January 1996
*Principal Investigator*
*Research project funded through departmental funds*
*Designed and organized a study to determine the effects of alternative staffing patterns on decision making, technical accuracy and efficiency in the prehospital advanced life support treatment.*

Maternal and Child Health Bureau EMS for Children Grant November 1992 to December, 1994
*Educational Coordinator, Investigator and instructor for two year federal grant to develop and implement a curriculum to train paramedics how to assess, intubate and obtain intraosseous access in children.*

Predictors of Sepsis in an Infant with a Fever Summer, 1991

Revised 6/6/2019

JA4322

*Participated in a study of patients under two months of age admitted to an urban hospital with a fever greater than 100.5 degrees Fahrenheit to determine the ability to use clinical appearance, white blood cell count, erythrocyte sedimentation rate, chest x-ray and urine dip stick as predictors of possible sepsis and to determine the need for hospitalization and antibiotic therapy.*

Indirect Oxidative Mitogenesis of T-Lymphocytes  Summer, 1985
*Participated in a research group at the Weismann Institute of Science, Rehovot, Israel,  studying the mechanisms of indirect oxidative mitogenesis of T-Lymphocytes.*

## Federal Research Loan Repayment Programs
Pediatric Research Loan Repayment Program
Recipient and Principal Investigator September 2003 to present
*Awarded grant for loan repayment based on my activity in Pediatric Research in the areas of Emergency Preparedness, Critical Care, Child Abuse Pediatrics and Emergency Medicine.*

## Federal Grant Review Panels:

Agency for Healthcare Research and Quality, Department of Health and Human Services
Objective Review Panel for Emergency Preparedness Grants – January 2004

Maternal and Child Health Bureau, Department of Health and Human Services
Objective Review Panel for Targeted Issues Grants – December, 2001

Maternal and Child Health Bureau, Department of Health and Human Services
Objective Review Panel for Continuing Education and Development Grants – August, 1997

## Federal Advisory Panels:

FEMA National Advisory Committee
Appointed to national advisory committee to the administrator of the Federal Emergency Management Agency representing In-patient Medical Providers, 2009-2012.

National Advisory Committee to the Secretary of Health and Human Services on Children and Terrorism
Selected by CDC to serve as advisor and helped with drafting of report of Advisory committee to the Secretary of Health and Human Services on defining the needs of children in terrorism preparedness, response and recovery and making recommendations for necessary changes, research and initiatives.

## National Committee Membership:

Accreditation Council for Graduate Medical Education
CLER Evaluation Committee – Appointed to term beginning July 2018

American Academy of Pediatrics
*Committee on Pediatric Emergency Medicine May 1995 to June 2004*

American College of Emergency Physicians
*Committee on Pediatric Emergency Medicine, January 2007 to 2010*
*Disaster Committee, January 2011 to present*

American Heart Association and American Red Cross
*First Aid Guidelines Task Force – Member 2010-2015*
*ECC International First Aid Science Advisory Board – Chair 2006 to 2010*
*ECC National First Aid Science Advisory Board – Chair February 2004 to 2005*

Revised 6/6/2019

JA4323

American Medical Association
*NDLS Education Consortium Executive Committee 2011-2012*

American Red Cross
*National Scientific Advisory Council (formerly National Advisory Committee on First Aid, Aquatics, Safety and Preparedness), Chair 2005 to present, Member 2002- present*
*HIV/AIDS National Faculty and Implementation Group, 1990*
*Volunteer Health and Safety Specialist, National, 1989 to 1997*

EMSC National Resource Center
*EMSC 2000 National Congress Planning Committee – Member 1998 to 2000*
*EMSC Public Information Task Force Committee – Member 1999 to 2002*

International Liaison Committee Resuscitation
*2015 COSTR Process – Member 2010-2015*
*First Aid Task Force – Member 2010-2015*
National Association of EMS Physicians
*Education Committee - Member 1991- 1995*
*Pediatric Committee - Chair 1997 to 2000 and Member since 1993*
*Research Committee - Member 1994 to 2000*
*Standards and Practice Committee - Member 1994 to 2000*

National Association of EMTs
*Pediatric Prehospital Care Course Committee – Chair and National Medical Director 1998 to 2001*

Society for Academic Emergency Medicine
*Education Committee - Member 1996-1997*

Society for Critical Care Medicine
*Fundamental Disaster Medicine Committee – Member 2005 to 2007*
*Job Description and Contracts in Critical Care Task Force – Member 2010 to 2013*
*MCCKAP Committee – Member 2006 to 2013*
*PFCCS Committee – Member 2011 to 2013, 2018 to present*
*Pediatrics Mock On-Line Learning Committee – Chair and Member 2011to 2014*

## National and International Projects:

Institute of Medicine of the National Academies, Committee on the Treatment of Cardiac Arrest
Member 2013-2015
*Served as a member of Institute of Medicine study group to evaluate treatment of cardiac arrest in US and develop report with analysis and recommendations..*

International First Aid Consensus on Science and Treatment Recommendations and Guidelines
Member 2005- 2010 and 2010-2015
*Served as member of the international evidence review of first aid treatment as part of the Emergency Cardiac Care and International Liaison Committee on Resuscitation 2010 and 2015 evidence review process. This international evidence review will lead to publication of updated and expanded Consensus on Science and Treatment Recommendations and First Aid Guidelines.*

National First Aid Consensus on Science and Treatment Recommendations and Guidelines
Co-Chair February 2004- 2005
*Served as Co-Chair for the first evidence review of first aid treatment as part of the Emergency Cardia Care and International Liaison Committee on Resuscitation 2005 evidence review process. This international evidence review will lead to publication of the first Consensus on Science and Treatment Recommendations and National First Aid Guidelines.*

Revised 6/6/2019

JA4324

Pediatric Disaster and Terrorism Preparedness: A National Consensus Conference
Principal Investigator November 2002 to June 2003
*Served as principal investigator to bring together a coalition of experts, professional organizations representing pediatrics, emergency medicine, emergency management, EMS and related health care professions and representatives of federal agencies involved in disaster and terrorism preparedness. Then to hold a consensus meeting with individuals from this coalition to develop guideline and recommendations for children in disaster and terrorism preparedness and to develop a future research agenda on this topic.  Lastly to draft and publish an executive summary and final report of the meeting outcomes.*

Model Pediatric EMS Protocols 2003 Revision Principal Investigator January 2003 to December 2003
*Served as principal investigator for federally funded project to revise with the latest evidence a previously developed evidence based consensus process set of Model Pediatric Protocols for EMS Providers, EMS Educators and EMS Medical Directors.  Conducted the data review, coordinated and directed consensus meeting and served as lead author for project.*
Model Pediatric EMS Protocols Co-Principal Investigator June 1998 to August 1999
*Served as principal investigator for federally funded project to develop an evidence based consensus process set of Model Pediatric Protocols for EMS Providers, EMS Educators and EMS Medical Directors. Conducted the data review, coordinated and directed consensus meeting and served as lead author for project.*

EMS and Managed Care Federal Roundtable Participant January 1998 to December 2000
*Invited to be participant in federal roundtable sponsored by the Department of Health and Human Services Maternal Child Health Bureau and the National Traffic Highway Safety Administration to identify issues of agreement and dispute between Emergency Medical Services and Managed care.  Then to develop recommendations for future actions to be undertook by federal, state and local governments to improve EMS and managed care relationships.*

Revision of the EMT-Intermediate and Paramedic: National Standard Curricula and Associated Refresher Courses Adjunct Author January 1995-December 1998
*Selected as Adjunct Author of United States Department of Transportation and US Department of Health Maternal and Child Health Bureau project to revise the EMT-Intermediate and Paramedic: National Standard Curricula.   Worked as author for pediatric section and as peer reviewer for entire project.*

## National Task Forces

EMS for Children Public Information and Education Project Task Force
*Invited participant in a national task force conducted by both Maternal Child and Health Bureaus' EMS For Children Division and the National Highway Traffic Safety Administration to establish and oversee a federally funded national public information and education campaign.*

Pediatric Education Task Force
*Invited participant in a national task force conducted by both Maternal Child and Health Bureaus' EMS for Children Division and the National Highway Traffic Safety Administration to establish national guidelines for the training of paramedics in pediatrics.*

## State and Local Advisory Panels:

Colorado Governor's Expert Emergency Epidemic Response Committee (GEEERC)
*Appointed to standing advisory group to the governor for preparation and during an emerging or ongoing public health threat representing pediatrics and hospital, 2014 to present.*

Revised 6/6/2019

JA4325

# Bibliography

## Editorial Positions

Disaster Medicine and Public Health Preparedness
*Deputy Editor-in-Chief, August 2012 to present*
*Associate Editor, December 2006 to 2012*

American Journal of Disaster Medicine
*Editorial Board Member, November 2006 to 2014*

## Peer-Reviewed Journals Edited
Journal of Public Health Management and Practice. Guest Editor, Supplement on Bioterrorism and Public Health Preparedness Education. To be published, November 2005

## Published Articles:

Tobin JM, Rossano JW, Wernicki PG, Fielding R, Quan L, Markenson D. Dry drowning: A distinction without a difference. Resuscitation. 118:e5-e6. September 2017

Naim MY, Burke RV, McNally BF, Song L, Griffis HM, Berg RA, Vellano K, Markenson D, Bradley RN, Rossano JW. Association of Bystander Cardiopulmonary Resuscitation With Overall and Neurologically Favorable Survival After Pediatric Out-of-Hospital Cardiac Arrest in the United States: A Report From the Cardiac Arrest Registry to Enhance Survival Surveillance Registry. JAMA Pediatrics. 171(2):133-141. February, 2017.

Zideman DA, Singletary EM, De Buck ED, Chang WT, Jensen JL, Swain JM, Woodin JA, Blanchard IE, Herrington RA, Pellegrino JL, Hood NA, Lojero-Wheatley LF, Markenson DS, Yang HJ; Part 9: First aid: 2015 International Consensus on First Aid Science with Treatment Recommendations. Resuscitation. (95):e225-61. October, 2015.

Singletary EM, Zideman DA, De Buck ED, Chang WT, Jensen JL, Swain JM, Woodin JA, Blanchard IE, Herrington RA, Pellegrino JL, Hood NA, Lojero-Wheatley LF, Markenson DS, Yang HJ. Part 9: First Aid: 2015 International Consensus on First Aid Science With Treatment Recommendations. Circulation. 132(16 Suppl 1):S269-311. October, 2015.

Rossano JW, Jones WE, Lerakis S, Millin MG, Nemeth I, Cassan P, Shook J, Kennedy S, Markenson D, Bradley RN. The Use of Automatic External Defibrilators in Children. Pediatric Emergency Care. 31(7):526-30. July, 2015

Markenson D. Disruptive Innovations. Disaster Med Public Health Preparedness. 9(3):230—1. June 2015

Markenson D., Howe, L. American Red Cross Digital Operations Center (DigiDOC): An Essential Emergency Management Tool for the Digital Age. Disaster Medicine and Public Health Preparedness. 8(5):445-51, October 2014

O'Malley PJ, Barata IA, Snow SK., et al. Death of A Child in the Emergency Department. Journal of Emergency Nursing 40(4):301-4, July, 2014.

Markenson, D., Have We Forgotten About the Needs of Children?. Disaster Med Public Health Preparedness. 8(3):188-90, June 2014

Revised 6/6/2019

JA4326

D. Markenson, MD, CV, Continued

Markenson, D., Wolf, S., Redlener, I. and Reilly, M. Disaster Medicine and Public Health Preparedness of Health Professions Students: A Multidisciplinary Assessment of Knowledge, Confidence, and Attitudes. Disaster Medicine and Public Health Preparedness 7(5):499-506, October 2013.

Fox JH, Burkle FM Jr, Bass J, Pia FA, Epstein JL, Markenson D. The effectiveness of psychological first aid as a disaster intervention tool: research analysis of peer-reviewed literature from 1990-2010. Disaster Medicine and Public Health Preparedness. 6(3): 247-52. October 2012.

Lerner E.B., Cone, D.C., Weinstein E.S. et al (16). Mass Casualty Triage: an evaluation of the science and refinement of a national guideline. Disaster Medicine and Public Health Prep 8 Suppl 2:S228-38., September 2011.

Wernicki, P., Chambers, P., Fielding, R., Lees, T., Markenson, D. et al. Analysis and Rebuttal of Development of an In-Water Intervention in a Lifeguard Protocol: International Journal of Aquatic Research and Education 5:6-13, 2011.

Reilly, M.J. and Markenson, D. Hospital Referral Patterns: How Emergency Medical Care Is Accessed in a Disaster. Disaster Medicine and Public Health Preparedness 4(3): 226-31. Oct, 2010.

Markenson D, Ferguson JD, Chameides L, et al. Part 13: First aid: 2010 American Heart Association and American Red Cross International Consensus on First Aid Science With Treatment Recommendations. Circulation 126 (16 Supple 2):S582-605. November, 2010.

Markenson D, Ferguson JD, Chameides L, et al. Part 17: first aid: 2010 American Heart Association and American Red Cross Guidelines for First Aid. Circulation 122 (SUppl 3):S934-46. November, 2010.

Reilly, M.J. and Markenson, D. Utilizing Paramedics for In-Patient Critical Care Surge Capacity. American Journal of Disaster Medicine 5(3):163-8. May/June 2010.

Fielding, R., Pia F., Wernicki, P. and Markenson, D. Scientific Review of Avoiding Hyperventilation. International Journal of Aquatic research 3(4):432-49, November 2009.

Langendorpher, S., Quan, L., Fielding, R., Pia F., Wernicki, P. and Markenson, D. Scientific Review on Minimum Age for Swim Lessons. International Journal of Aquatic research 3(4):432-49, November 2009.

Markenson, D. and Krug. S. Developing Pediatric Emergency Preparedness Performance Measures. Clinical Pediatric Emergency Medicine 10(3): 229-39. September 2009

Reilly, M. and Markenson, D.Education and Training of Hospital Workers: Who Are Essential Personnel during a Disaster?. Prehospital and Disaster Medicine 24(3) 239-45, May-June, 2009.

Markenson, D. Developing consensus on appropriate standards of hospital disaster care: ensuring that the needs of children are addressed. Disaster Medicine and Public Health Preparedness. 3(1):5-7, March 2009.

Lerner EB, Schwartz RB, Coule PL, Weinstein ES, Cone DC, Hunt RC, Sasser SM, Liu JM, Nudell NG, Wedmore IS, Hammond J, Bulger EM, Salomone JP, Sanddal TL, Markenson D, et al. Mass casualty triage: an evaluation of the data and development of a proposed national guideline. Disaster Medicine and Public Health Preparedness 2008 2 Suppl 1:S25-34, September, 2008.

Revised 6/6/2019

JA4327

Italo Subbarao, James M. Lyznicki, Edbert B. Hsu, Kristine M. Gebbie, David Markenson, et al. A Consensus-based Educational Framework and Competency Set for the Discipline of Disaster Medicine and Public Health Preparedness. Disaster Medicine And Public Health Preparedness 2: 57-68, 2008.

Frederick M. Burkle Jr, Edbert B. Hsu, Michael Loehr, Michael D. Christian, David Markenson, et al. Definition and Functions of Health Unified Command and Emergency Operations Centers for Large-scale Bioevent Disasters Within the Existing ICS. Disaster Medicine And Public Health Preparedness 1: 135-141, 2007.

Reilly, M and Markenson, D. Comfort Level Of Emergency Medical Service Providers In Responding To Weapons Of Mass Destruction Events: Impact Of Training And Equipment. Prehospital and Disaster Medicine. 22(4):297-303. July-August, 2007.

Markenson, D., Pyles, L. et al. Ventricular fibrillation and the use of automated external defibrillators on children. Pediatrics. 2007 Nov;120(5):e1368-79. October, 2007.

Markenson D., Tunik M., Cooper A., et al. A National Assessment Of Knowledge, Attitudes, And Confidence Of Prehospital Providers In The Assessment And Management Of Child Maltreatment. Pediatrics. 119(1):e103-8. January, 2007.

Duarte, C. S., Hoven, C. W., Wu, P.; Cotel, S., Mandell, D., Nagasawa, M., Balaban, V., Wernicoff, L., Markenson, D. Posttraumatic Stress in Children with First Responders in their Families. Journal of Traumatic Stress, 19(2): 301-306, 2006.

Markenson, D. and Reynolds, S. The Pediatrician and Disaster Preparedness. Pediatrics 2006; 117(2): e340-e362, February, 2006.

DiMaggio, C., Markenson, D., Henning, K., et al. Partnership for Preparedness: A Model of Academic Public Health. Journal of Public Health Management & Practice. 12(1):22-7, January/February 2006.

Markenson, D., Hamill, W. et al. American Red Cross and American Heart Association First Aid Guidelines. Circulation 112 [Suppl I]: IV-196-203, December 2005.

Dimaggio, C., Markenson, D. Loo, g. et al The Willingness of U.S. Emergency Medical Technicians to Respond to Terrorist Incidents. Biosecurity and Biodefense 3(4): 331-7, December 2005.

Markenson, D., Hamill, W. et al. American Red Cross and American Heart Association First Aid Consensus on Science and Treatment Recommendations. Circulation and Resuscitation Circulation 112 [Suppl I]: III-115-125, November 2005.

Markenson, D. and Westphal, R. Public Health Preparedness Training: Resources Are There: Guest Editorial. Journal of Public Health Practice and Management 11(S): S1, November 2005.

Markenson,D, Reilly, M.,DiMaggio, C. Public Health Department Training of Emergency Medical Technicians for Bioterrorism and Public Health Emergencies: Results of a National Assessment. Journal of Public Health Practice and Management 11(S): S68-74, November 2005.

Markenson, D. The treatment of children exposed to pathogens linked to bioterrorism. Infectious Disease Clinics of North America 19(3):731-45, September 2005.

Markenson, D., DiMaggio, C. and Redlener, I. Terrorism, Disaster, and Public Health Emergency Preparedness: Core Competencies For Students In The Health Professions. Academic Medicine 80(6): 517-25. June, 2005.

JA4328

Markenson, D., DiMaggio, C. and Redlener, I. Pediatric Terrorism Preparedness National Guidelines and Recommendations: Findings of an Evidenced based Consensus Process. Biosecurity and Biodefense 2(4): 301-19. December 2004.

Markenson, D., DiMaggio, C. and Redlener, I. The Role of PAs in Disasters: What should you know and when should you know it? Physician Assistant 18(3): 40-53. March, 2005.

Redlener, I. and Markenson, D. Disaster and terrorism preparedness: What pediatricians need to know. Diseases Monthly 50(1):6-40. January 2004.

Markenson, D., Foltin G., Tunik, M., Cooper, A., and Caravaglia, K. Albuterol Sulfate Administration by EMT Basic: Results of a Demonstration Project. Prehospital Emergency Care 8(1):34-40. January-March 2004.

Hazinski MF, Markenson D, Neish S, et al. Response to cardiac arrest and selected life-threatening medical emergencies: the medical emergency response plan for schools. A statement for healthcare providers, policymakers, school administrators, and community leaders. Simultaneous publication in Pediatrics. 113(1 Pt 1):155-68. January 2003, Circulation. 20;109(2):278-91. January 2004 and Epub 2004 Jan 05. and Annals of Emergency Medicine 43(1):83-99. January 2004.

Redlener I, Markenson D. Disaster and terrorism preparedness: What pediatricians need to know. Advances in Pediatrics 50:1-37. 2003.

Markenson D, Domeier RM et al. The use of automated external defibrillators in children. Prehospital Emergency Care. 7(2):258-64. Apr-Jun 2003.

Markenson D. AEDs: does the early defibrillation standard of care leave kids out?. Emergency Medical Services 31(9):65-70, September 2002.

Markenson, D., Bannister, M. and Manikian, A. Near-fatal Strangulation Injury: A Unique Case Caused by a Turnstile: Pediatric Emergency Care 18(4): 292-4, August 2002.

Markenson, D. Foltin G., Matza-Haughton, H., Cooper, A. and Treiber, M. Knowledge and Attitude Assessment and Education of Prehospital Personnel in Child Abuse and Neglect: Report of a National Blue Ribbon Panel. Simultaneous Publication in: Annals of Emergency Medicine, 40(1):89-101, July 2002, Pediatric Emergency Care, 6(3): 261-72, July/Sept 2003, and Prehospital Emergency Care, June/July 2002.

Foltin G. Markenson D. Tunik M. Wellborn C. Treiber M. Cooper A. Assessment of pediatric patients by emergency medical technicians-basic. *Pediatric Emergency Care 18(2):81-5, April 2002.*

Cooper, A., DiScala, C., Foltin, G., Tunik, M., Markenson, D., and Welborn, C.: Prehospital Endotracheal Intubation for Severe Head Injury in Children: A Reappraisal. *Seminars in Pediatric Surgery* 10(1): 3-6, February 2001.

Mulligan-Smith, D., O'Connor, R., and Markenson, D.: EMSC Partnership for Children: National Association of EMS Physicians Model Pediatric Protocols. *Prehospital Emergency Care* 4(2): 111-130, April/June 2000.

Markenson, D., Levine, D. and Schacht, R.: Primary Peritonitis as a Presenting Feature of Nephrotic Syndrome. Case Report and Review of the Literature. *Pediatric Emergency Care* 15(6):407-9, December 1999.

Revised 6/6/2019

JA4329

D. Markenson, MD, CV, Continued

Markenson, D., and Foltin, G.: The New Emergency Medical Technician-Paramedic and Emergency Medical Technician – Intermediate Curricula: History, Changes, and Controversies. *Clinical Pediatric Emergency Care 1(1): 54-69, December 1999.*

Markenson, D., Foltin G., Tunik, M., et al..: Kendrick's Extrication Device Used for Pediatric Spinal Immobilization. *Prehospital Emergency Care. Prehospital Emergency Care 3(1):66-69, January/March 1999.*

Gausche, M., Henderson, D., Brownstein, D. et al: The Education of Out-of-Hospital Emergency Medical Personnel in Pediatrics: Report of a National Task Force. *Prehospital Emergency Care* 2(1):56-61 January/March 1998 and *Annals of Emergency Medicine* 31(1):58-64 January 1998.

Markenson, D., Foltin, G., Tunik, M., Cooper, A. and Treiber, M.: First Responder: A Comprehensive Model for Pediatric Training. *Pediatric Emergency Care* 13(2):134-146, April 1997.

Markenson, D. and Lippner, A. : Prehospital Emergency Drugs: Non-Cardiac Emergencies. *Trauma.* 36(3):67-82, October 1994.

Markenson, D. and Greenberg, M.: Emergency Vascular Access - Internal Jugular Venous Central Lines. *Emergency Physician.* October, 1993.

Markenson, D. and Greenberg, M.: Cyclic Antidepressant Overdose: Mechanism to Management. *Emergency Physician.* 25(11):48-56, August 1993.

Markenson, D. and Lippner, A.: Prehospital Emergency Drugs: Respiratory and Cardiovascular Emergencies. *Trauma.* 34(4):25-64, December, 1992.

Lippner, A. and Markenson, D.: Prehospital Emergency Drugs: The Fundamentals. *Trauma.* 33(4):95-110, December 1991.

Revised 6/6/2019

JA4330

## Abstracts

Markenson, D., DiMaggio, C. and Redlener, I. A Survey of Student Attitudes Toward and Knowledge of Disaster Preparedness. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Markenson, D., DiMaggio, C. and Redlener, I. The Willingness Of Emergency Medical Technicians To Respond To Terrorist Incidents. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Madrid, P., Grant, R., Markenson D., et al. An Emotional Preparedness and Resilience Curriculum for High Risk 4th Grade Children: An Essential Aspect of Comprehensive Disaster Preparedness. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Markenson, D., DiMaggio, C. and Redlener, I. Core Competencies for Terrorism, Disaster and Public Health Emergency Preparedness Education for Health Profession Schools. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Markenson, D. and Redlener, I. Pediatric Terrorism Preparedness National Guidelines and Recommendations: Findings of an Evidenced Based Consensus Process. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Degnan, A., Thomas, G. and Markenson, D. How The NYC School System, Its Teachers, Leadership And Students Assured Health And Safety On 9/11. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Madrid, P., Grant, R., Markenson D., et al. Helping Children in Disasters Through Alleviating their Parent's Anxiety: Psychosocial Group Interventions Post-Disaster. Prehospital and Disaster Medicine 20(2): Supplement, March/April 2005.

Markenson, D., Foltin, G., et al: Eyewitness to Child Abuse and Neglect. Prehospital Emergency Care 6(1): 166, January/March 2002.

Markenson, D., Mojica, M. and Foltin, G.: Double Blind Comparison of Epinephrine versus Albuterol for Respiratory Distress Secondary to Bronchiolitis. Critical Care Medicine, January 2001.

Tunik, M., Foltin, G., Cooper, A., Treiber, M., Markenson, D., et al: Paramedic Basic Airway Management and Ventilation of Children: Is there Room for Improvement? Impact of an Intensive Multimedia Training Program. Pediatric Emergency Care 13(4):301, August, 1997.

Tunik, M., Foltin, G., Cooper, A., Treiber, M., Markenson, D., et al: Paramedic Intubation of Children: Improvement after an Intensive Multimedia Training Program. Pediatric Emergency Care 13(4):301, August, 1997.

Markenson, D., Foltin G., Tunik M., Welborn C., Cooper A. and Treiber M.: Accuracy of Pediatric Assessment by EMT-Basics. Archives of Pediatric and Adolescent Medicine 149(4):89, April, 1995.

Markenson, D., Foltin G., Tunik M., Welborn C., Cooper A. and Treiber M.: Accuracy of Pediatric Assessment by EMT-Basics. Academic Emergency Medicine 2(5):375, May, 1995.

*Note: The above list is not inclusive of the publication of abstracts which were associated with oral and poster presentations and published in non peer-reviewed journals.*

Revised 6/6/2019

JA4331

## Peer-Reviewed Reports Published:

Emergency Preparedness: Addressing the Needs of Persons with Disabilities. A National Consensus Conference. Markenson, D. and Redlener I. March 2007

Pediatric Emergency Preparedness for Natural Disasters, Terrorism and Public Health Emergencies: A National Consensus Conference. Executive Summary and Final Report. Markenson, D. and Redlener I. March 2007

Executive Summary and Final Report Uncommon Sense, Uncommon Courage: *How The New York City School System, Its Teachers, Leadership, And Students Responded To The Terror Of September 11.* Degnan, A., Thomas, G., Markenson, D., et al. National Center for Disaster Preparedness, October 2004.

InfoBrief: Pediatric Atropine Auto-Injector Usage. Markenson, D. National Center for Disaster Preparedness, June 2004.

Pediatric Disaster and Terrorism Preparedness National Consensus Conference: Executive Summary. Markenson, D. and Redlener, I. National Center for Disaster Preparedness, March 2003.

## Position Papers:

Ventricular Fibrillation and the Use of Automated External Defibrillators on Children. Committee on Pediatric Emergency Medicine. Pediatrics. 120(5):1159-61, November, 2007.

The Role of the Pediatrician in Disasters. Lead Author, Committee on Pediatric Emergency Medicine. Pediatrics 117(2): 560-565, February 2006.

The Use of Automated External Defibrillators in Children. Pediatric Task Force, National Association of EMS Physicians. Prehospital Emergency Care March/April 2003.

Care of Children in the Emergency Department: Guidelines for Preparedness. Committee on Pediatric Emergency Medicine. *Pediatrics* 107(4): pp 777-784, April, 2001.

Pediatricians' Liability during Disasters. Committee on Pediatric Emergency Medicine. *Pediatrics* 106(6): pp 1492-3, December, 2000.

Consensus Report for Regionalization of Services for Critically Ill and Injured Children. American College of Critical Care Medicine and American Academy of Pediatric Committee on pediatric Emergency Medicine. *Pediatrics* 105(1): 152-155, January, 2000.

Emergency Preparedness for Children with Special Health Care Needs, Committee on Pediatric Emergency Medicine. *Pediatrics* 104(4): e53, October, 1999.

Pediatric Care Recommendations for Freestanding Urgent Care Facilities, Committee on Pediatric Emergency Medicine. *Pediatrics* 103(5): 1048-1049, May, 1999.

The Pediatrician's Role in Disaster Preparedness, Committee on Pediatric Emergency Medicine. *Pediatrics* 99(1): 130-133, January, 1997.

JA4332

D. Markenson, MD, CV, Continued

## Books Published

Hospital Emergency Preparedness. Reilly, M. and Markenson, D., Jones and Bartlet, Baltimore. June, 2010.

Pediatric Prehospital Care. Markenson, D., Brady Publishing, Upper Saddle River, NJ, 2001.
Pediatric Prehospital Care Course Instructor's Resource Manual. Markenson, D., Brady Publishing, Upper Saddle River, NJ, 2001.

## Books Edited:

Basic Disaster Life Support, Sweinton, R, Subaro, I. and Markenson, D. (Deputy Editor), American Medical Association. March 2012

Fundamental Disaster Medicine. Pediatric Editor, Society of Critical Care Medicine, 2004.

## Invited Chapters:

Wilderness Medicine, 7th Edition. Injury Prevention: Decision Making, Safety, and Accident Avoidance. Elsevier, 2017

Disaster Nursing and Emergency Preparedness, 3rd Edition. Hospital and Emergency Department Preparedness. Springer, United Kingdom, 2012.

Wilderness Medicine, 6th Edition. Injury Prevention. Elsevier, 2011

Pediatric Prehospital Research. Emergency Medical Services Clinical Practice and Oversight: Evaluating and Improving Quality Volume 3. National Association OF EMS Physicians, Kendall Hunt Professional Publishing, 2009.

Pediatrics and Terrorism. Essentials of Terrorism Medicine. Springer, United Kingdom, 2009.

Pediatric Emergency Preparedness. Pediatric Fundamental Critical Care Support 1st Edition. Society of Critical Care Medicine, 2008.

Emergency Preparedness. Pediatric Critical Care 1st Edition. Springer, United Kingdom, 2007.

Bioterrorism. Current Pediatric Therapy 18th Edition, Elsevier Publication, NY. 2005.

Pediatric Issues in Disaster 2nd Edition, Oxford Press, England, 2005.

Revised 6/6/2019

JA4333

## National Presentations and Scientific Exhibitions

## Oral Research Presentations:

Comfort of EMS providers in responding to WMD events: Impact of Training and Equipment. International Conference on Healthcare System Preparedness and Response to Emergencies and Disasters, January 2012.

Willingness of US Emergency Medical Technical to Respond to Terrorist Incidents. International Conference on Healthcare System Preparedness and Response to Emergencies and Disasters, January 2012.

Core Competencies for Emergency Preparedness Education for Health Profession Schools, World Association of Disaster Emergency Medicine, May 2011.

Survey of Health Professions Students Attitudes Towards and Knowledge of Emergency Preparedness, World Association of Disaster Emergency Medicine, May 2011.

Developing Pediatric Emergency Preparedness Performance Measures, World Association of Disaster Emergency Medicine, May 2011.

Development of Model Medical Care Protocols for Alternate Care Sites during Pandemics and Public Health Emergencies, World Association of Disaster Emergency Medicine, May 2011.

Enhancing preparedness of emergency health services, American Public Health Association Conference, November 2010.

A Survey of Student Attitudes Toward and Knowledge of Emergency Preparedness, Asia-Pacific Conference on Disaster Medicine, August 2010

Core Competencies for Emergency Preparedness Education for Health Profession Schools, Asia-Pacific Conference on Disaster Medicine, August 2010

Development of Model Medical Care Protocols for Alternate Care Sites during Pandemics and Public Health Emergencies, Asia-Pacific Conference on Disaster Medicine, August 2010

Developing Methodologies to Assess Resource Needs and Ability to Provide Interventions for Children in Disasters, Terrorism and Public Health Emergencies, Asia-Pacific Conference on Disaster Medicine, August 2010

Designing community-based alternate care sites for pandemics and public health emergencies, American Public Health Association, November 2009

Hospital emergency department referral patterns in a disaster, American Public Health Association, November 2009

Utilizing paramedics to provide in-hospital, critical care surge capacity, American Public Health Association, November 2009

Evidence Based Emergency Preparedness Guidelines for Persons with Disabilities. World Congress on Disaster Emergency medicine, May 2009.

Emergency Preparedness Guidelines for Children. World Congress on Disaster Emergency medicine, May 2009.

JA4334

Public Health Department Training of Emergency Medical Technicians for Bioterrorism and Public Health Emergencies: Results of a National Assessment. World Congress on Disaster Emergency medicine, May 2009.

Comfort level of EMS providers in responding to WMD events: Impact of training and equipment. World Congress on Disaster Emergency medicine, May 2009.

The Willingness of US Emergency Medical Technicians to Respond to Terrorist Incidents. World Congress on Disaster Emergency medicine, May 2009.

Core Competencies for Emergency Preparedness Education for Health Profession Schools. World Congress on Disaster Emergency medicine, May 2009.

Altered standards of care for emergency medical services (EMS) personnel during a public health emergency. American Public Health Association Meeting, November 2007.

Role of the emergency medical services (EMS) system as part of public health emergency response. American Public Health Association Meeting, November 2007.

Pediatric and persons with disabilities emergency preparedness national guidelines and recommendations: Findings of an evidenced-based consensus process. American Public Health Association Meeting, November 2006.

Emergency Preparedness for Pediatrics and Persons with Disabilities: Report of an Evidence Based Consensus Process. Presented at Pan-Asian Disaster Conference, November 2006.

Preparedness for Disaster, Terrorism and Public Health Emergencies. National Guidelines and Recommendations for Children and Person with Disabilities: Findings of an Evidenced Based Consensus Process. Presented at Pediatric Academic Societies, 2006.

A National Assessment of Knowledge, Attitudes, and Confidence of Prehospital Providers in the Assessment and Management of Child Maltreatment. Presented at Pediatric Academic Societies, 2006.

Comfort level of EMS providers in responding to WMD events: Impact of training and equipment. Presented at Pan-Asian Disaster Conference, November 2006.

A Survey of Student Attitudes Toward and Knowledge of Disaster Preparedness. Presented at the World Congress on Disaster Emergency Medicine, May 2005

The Willingness Of Emergency Medical Technicians To Respond To Terrorist Incidents. Presented at the World Congress on Disaster Emergency Medicine, May 2005

An Emotional Preparedness and Resilience Curriculum for High Risk 4th Grade Children: An Essential Aspect of Comprehensive Disaster Preparedness. Presented at the World Congress on Disaster Emergency Medicine, May 2005

Core Competencies for Terrorism, Disaster and Public Health Emergency Preparedness Education for Health Profession Schools. Presented at the World Congress on Disaster Emergency Medicine, May 2005

Pediatric Terrorism Preparedness National Guidelines and Recommendations: Findings of an Evidenced Based Consensus Process. Presented at the World Congress on Disaster Emergency Medicine, May 2005

How The NYC School System, Its Teachers, Leadership And Students Assured Health And Safety On 9/11. Presented at the World Congress on Disaster Emergency Medicine, May 2005

Revised 6/6/2019

JA4335

D. Markenson, MD, CV, Continued

Helping Children in Disasters Through Alleviating their Parent's Anxiety: Psychosocial Group Interventions Post-Disaster. Presented at the World Congress on Disaster Emergency Medicine, May 2005

Accuracy of Pediatric Assessment by EMT-Basics. Markenson, D., Foltin G., Tunik M., Welborn C., Treiber M. and Cooper A. Presented at the Society of Academic Emergency Medicine Annual Meeting, San Antonio, Texas, May 23, 1995.

## **Poster Research Presentations:**

Student Attitudes Toward and Knowledge of Emergency Preparedness. International Conference on Healthcare System Preparedness and Response to Emergencies and Disasters, January 2012.

Developing Methodologies to Assess Resource Needs and Ability to Provide Interventions and Care for Children in Disasters, Terrorism and Public Health Emergencies. World Association of Disaster Emergency Medicine, May 2011

Developing Methodologies to Assess Resource Needs and Ability to Provide Interventions and Care for Children in Disasters, Terrorism and Public Health Emergencies. World Congress on Disaster Emergency Medicine, May 2009

A Survey of Student Attitudes Toward and Knowledge of Emergency Preparedness. World Congress on Disaster Emergency Medicine, May 2009

Assessment of Knowledge, Attitudes, and Confidence of Prehospital Providers in the Assessment and Management of Child Maltreatment. 5th European Congress on Emergency Medicine, September 2008.

Evidence Based Emergency Preparedness Guidelines for Persons with Disabilities. 5th European Congress on Emergency Medicine, September 2008.

Emergency Preparedness Guidelines for Children. 5th European Congress on Emergency Medicine, September 2008.

Hospital workers: Who are essential personnel during a disaster? Presented at American Public Health Association Meeting, November 2007.

Designing Sustainable Hospital Preparedness Training: A Three Phased Approach. Presented at Pan-Asian Disaster Conference, November 2006.

Role of the emergency medical services (EMS) system as part of public health emergency response. Presented at Pan-Asian Disaster Conference, November 2006.

Hospital Workers: Who are essential personnel during a disaster? Presented at Pan-Asian Disaster Conference, November 2006.

Role of emergency medical services (EMS) agencies during a hospital evacuation or need for mass patient transfer. Presented at Pan-Asian Disaster Conference, November 2006.

National Assessment of Knowledge, Attitudes, and Confidence of Prehospital Providers in Assessment and Management of Child Maltreatment. Presented at the Ambulatory Pediatric Association, May 2006

Eyewitness to Child Abuse and Neglect: A National Assessment of EMS Providers Education in Child Abuse and Neglect. Presented at the Society of Academic Emergency Medicine, May 2002.

Revised 6/6/2019

JA4336

D. Markenson, MD, CV, Continued

Eyewitness to Child Abuse and Neglect: A National Assessment of EMS Providers Self-Efficacy Regarding Recognition and Reporting of Child Abuse and Neglect. Presented at the Ambulatory Pediatric Association, May 2002.

Eyewitness to Child Abuse and Neglect: A National Assessment of EMS Providers Knowledge of Child Abuse and Neglect. Presented at the Ambulatory Pediatric Association, May 2002.

Eyewitness to Child Abuse and Neglect: A National Assessment of EMS Providers Knowledge of Child Abuse and Neglect. Presented at the EMSC National Congress, April 2002.

Eyewitness to Child Abuse and Neglect. Presented at the National Association of EMS Physicians, January 2002.

Double Blind Comparison of Epinephrine versus Albuterol for Respiratory Distress Secondary to Bronchiolitis.  Presented at the Society for Critical Care Medicine, San Francisco, February 2001. Accuracy of Pediatric Assessment by EMT-Basics. Markenson, D., Foltin G., Tunik M., Welborn C., Treiber M. and Cooper A.  Presented at the Ambulatory Pediatric Association Annual Meeting, San Diego, California, May 11, 1995.

## Legislative Testimony:

Invited Testimony, Joint New York State Assembly Standing Committee on Governmental Operations, March 2004
Testified on EMS preparedness, funding, education and equipment to Emergency First Responders Hearing

Revised 6/6/2019

JA4337

D. Markenson, MD, CV, Continued

# <u>Educational Activities</u>

## <u>Medical Student</u>
### <u>Teaching</u>

| | |
|---|---|
| 2013-2015 | Preceptor and Lecturer: Pediatric Emergnecy Medicine<br>2-4 hours per week |
| 2008-2010 | Course Director: Epidemiology and Biostatistics<br>2 week course per year |
| 2005-present | Course Director: Pediatric Emergency  Medicine and Disaster Medicine Summer Fellowship Program<br>4-8 hr/wk for 8 weeks per year. |
| 2005-present | Preceptor and Lecturer: Pediatric Rotation Maria Fareri Children's Hospital<br>2-6 hrs/wk for 1 year |
| 2005-2006 | Preceptor and Lecturer: Pediatric Rotation Flushing Hospital<br>2-6 hrs/wk for 1 year |
| 2001-2003 | Preceptor: Pediatric Critical Care Elective Harlem Hospital<br>4 hrs/wk for 2 years |
| 1998 | Awarded Fellow Teaching Award, Department of Pediatrics' |
| 1997-2001 | Preceptor and lecturer: Pediatric Rotation NYU/Bellevue<br>2-6 hrs/wk for 4 years |

### <u>Curriculum Development</u>

| | |
|---|---|
| 2008-2010 | <u>Epidemiology and Biostatistics</u><br>Began redesign and pilot testing of the first year medical student course, Epidemiology and Biostatistics Course. |
| 2003-2005 | <u>Disaster Medicine</u><br>Developed and implemented a disaster medicine curriculum for medical students which were integrated across all four years of medical school. |
| 1998-2000 | <u>Emergency Medicine</u><br>Developed Emergency Medicine Skills Course for Students |
| 1991-1994 | <u>Pre-Hospital Emergency Medicine Course for Medical Students</u><br>*Designed and instructed the first pilot program at Albert Einstein College of Medicine of this course, which  is a ten week program designed to teach second, third and fourth year medical students how to perform patient assessment and initial management utilizing resources available outside of a hospital.* |

### <u>Administration</u>

| | |
|---|---|
| 2010-2013 | Member, First Year Student Promotions Committee |
| 2005-2010 | Member, Medical Student Education Committee First and Second Years Subcommittee |
| 2001-2003 | Member, Pediatric Medical Student Education Committee |
| 2001-2004 | Member, Pediatric Education Committee |

Revised 6/6/2019

JA4338

D. Markenson, MD, CV, Continued

## Residents
### Teaching

| | |
|---|---|
| 2013-2018 | Internal Medicine, Family Medicine and Surgery Non-Core Faculty and Lecturer<br>1-2 hrs/wk |
| 2005-2010 | Pediatric Emergency Medicine Rotation Director<br>10 hrs/wk (rounds/lectures/instruction of procedures) for 10 months per year for 1 year |
| 2005-2006 | Pediatric Ward Attending<br>10 hrs/wk (rounds/lectures) for 2 months per year for 2 years |
| 2005-2006 | Pediatric Critical Care Rotation Director<br>10 hrs/wk (rounds/lectures/instruction of procedures) for 10 months per year for 2 years |
| 2003-2004 | Fellow: Pediatric Critical Care Rotation<br>10 hrs/wk (rounds/lectures/instruction of procedures) for 4 months per year for 1 ½ years |
| 2001-2003 | Pediatric Ward Attending<br>10 hrs/wk (rounds/lectures) for 2 months per year for 2 years |
| 2001-2003 | Pediatric Critical Care Attending<br>10 hrs/wk (rounds/lectures/instruction of procedures) for 10 months per year for 2 years |
| 2002 | Awarded Faculty of the Year for Teaching, Harlem Hospital Department of Pediatrics |
| 1997-2000 | Chief Resident and Fellow: Pediatric Rotation and Pediatric Emergency<br>10-20 hrs/wk for 1 year as Chief Resident<br>2-6 hrs/wk for 2 years as fellow |

### Curriculum Development

| | |
|---|---|
| 2013-2018 | Internal Medicine, General Surgery, Family Medicine, Psychiatry, Neurology and Emergency Medicine<br>In partnership with Program Directors developed curriculum, didactic plan, evaluation instruments and program application for new residency programs. |
| 2005-2010 | Pediatric Emergency Medicine Resident Rotation<br>Revised required Pediatric Emergency Medicine Rotation and developed new curriculum and objectives |
| 2005-2006 | Pediatric Critical Care Resident Rotation<br>Developed new required Pediatric Critical Care Rotation |
| 2005-2006 | Pediatric Transport and Research Resident Rotation<br>Developed new required Pediatric Transport and Research Rotation |
| 2001-2002 | Pediatric Critical Care Education<br>Developed Pediatric Critical Care Education Program for Residents |
| 1997-1998 | Advanced Pediatric Life Support<br>Developed Advanced Pediatric Life Support Program for Residents |

JA4339

## Administration

| | |
|---|---|
| 2015-present | Chair Graduate Medical Education Committee, HealthONE, Research Medical Center, Ogden Regional Medical Center and Eastern Idaho Regional Medical Center |
| 2005-present | Member, Resident Education Committee, Maria Fareri Children's Hospital |
| 2001-2002 | Member, Resident Education Committee, Harlem Hospital Center |
| 1997-1998 | Member, Resident Education Committee, New York University School of Medicine |

# Public Health
## Teaching

| | |
|---|---|
| 2008-2010 | Advanced Epidemiology, Course Leader<br>3-4 hrs/wk |
| 2006-2013 | Introduction to Health Policy and Management, Lecturer<br>1-2 hrs/wk |

## Curriculum Development:

| | |
|---|---|
| 2009 to 2010 | Epidemiology Doctoral Program<br>*Lead process to revise doctoral curriculum including curriculum design of two new courses.* |
| 2009 to 2010 | Epidemiology Masters Program<br>*Lead process to revise master curriculum including creating new terminal activities, developing curriculum for courses in applied epidemiology and improving evaluation metrics and processes.* |
| 2009 to 2010 | Disaster Medicine Certificate Program<br>*Developed certificate program, course curriculum and terminal objectives for new certificate in Disaster Medicine and Public Health Emergencies* |
| 2004 to 2005 | Disaster Medicine Certificate Program<br>*Developed certificate program, course curriculum and terminal objectives for new certificate in Disaster Medicine* |

## Administration

| | |
|---|---|
| 2008-2010 | Member, Curriculum Committee, New York Medical College School of Health Science and Practice |
| 2006-2012 | Member, Academic Policy Committee, New York Medical College School of Health Science and Practice |
| 2006-2013 | Member, Research Committee, New York Medical College School of Health Sciences and Practice |

# Continuing Medical Education
## Curriculum Development:

| | |
|---|---|
| 2010 to 2013 | Basic Disaster Life Support |

JA4340

D. Markenson, MD, CV, Continued

|  | Participated as Deputy Editor in development of revision national continuing medical education course Conducted by the American Medical Association |
|---|---|
| 2006 | **Pediatric Critical Care Transport Course**<br>*Developed extensive CME course for Paramedics and RN to function as members of a pediatrics critical care transport course.* |
| 2005 to 2007 | **Fundamental Disaster Medicine**<br>*Participated in initial development of new national continuing medical education Course and subsequent course revisions Conducted by the Society of Critical Care Medicine* |
| 2005 | **Emergency Preparedness Academy**<br>*Developed one day academy to educate healthcare providers, business leaders, school officials and emergency mangers about current emergency management concepts and networking between these fields.* |
| 2004 | **Pediatric Emergency Preparedness On-Line Module**<br>*Developed pediatric module for on-line emergency preparedness course offered by Columbia University as part of HRSA funded healthcare provide education program.* |
| 2003-2005 | **On-Line Incident Management Course**<br>*Developed as a Center for Public Health Preparedness project, an on-line module to teach public health workers incident management.* |
| 2002-2003 | **Pediatric Emergency Preparedness Course**<br>*Developed a course on unique pediatric aspects of emergency preparedness for physicians, nurses and allied health providers* |
| 2001-2004 | **Prehospital Pediatric Care Course**<br>*Developed a national continuing medical education course on prehospital pediatric care for the National Association of EMTs based on my textbook on the same subject.* |
| 1996-2000 | **Prehospital Provider Assessment, Treatment and Reporting of Child Maltreatment Course**<br>*Develop a course for Prehospital providers in the assessment, treatment and reporting of child maltreatment. Initial pilot courses developed and delivered in NYC. Course then updated based on results of National Child Protection Project. Subsequently train-the-trainer model implemented to allow national delivery of this program.* |
| 1994-1996 | **Certified First Responder Pediatric Assessment and Treatment Session**<br>*Developed, authored and Co-Edited the pediatric section for the New York State Department of Health Certified First Responder Course* |
| 1998-present | **Emergency Medical Technician Continuing Medical Education Program**<br>*Developed and taught a monthly continuing medical education to several urban volunteer ambulance service* |
| 1987-1990 | **Paramedic Continuing Medical Education Program**<br>*Provided continuing medical education to paramedics in the Schenectady County area from September, 1987 to, June 1990 using a format which was didactic, practical skill review or call review.* |

Revised 6/6/2019

JA4341

D. Markenson, MD, CV, Continued

1989-1990      <u>Advanced Life Support Assistance</u>
*This course was designed to allow Emergency Medical Technicians to assist Advanced Emergency Medical Technicians in the performance of Advanced Life Support. This sixteen hour course included didactic, practical skills and testing sessions. Students were instructed in the assembly, inspection and maintenance of equipment necessary for intravenous therapy, medication administration, cardiac monitoring, defibrillation/cardioversion and intubation.*

1989-present     <u>Advanced Life Support for the Basic Emergency Technician</u>
*This course was designed to allow Emergency Medical Technicians to administer albuterol for bronchospasm, nitroglycerin for ischemic chest pain and epinephrine for anaphylaxis. This twelve hour course included didactic, practical skills and testing sessions. Both a student and instructor text was written for this program. Students in this training program are part of a study to determine the ability of Basic Emergency Medical Technicians to administer advanced life support interventions. After adoption by New York State program, I revised this program in 2000.*

## Grand Rounds:

Orange Regional Medical Center, November 2011
Pediatric Trauma

UCLA Children's Hospital, August 2010
Pediatric Preparedness for Disasters, Terrorism and Public Health Emergencies

Maria Fareri Children's Hospital, September 2009
H1N1 and Pandemic Influenza Overview

Norwalk Hospital, September 2009
H1N1 and Pandemic Influenza Overview

Maria Fareri Children's Hospital, September 2007
Evidenced Based Resuscitation and First Guidelines

Northern Westchester Hospital, March 2007
Pediatric Disaster Considerations

Phelps Hospital, January 2006
Pediatric Disaster Considerations

Maria Fareri Children's Hospital, September 2005
Pediatric Disaster Considerations

Methodist Hospital, May 2005
Pediatric Disaster Considerations

Flushing Hospital Medical Center, March 2005
Pediatric Disaster Preparedness

Long Island College Hospital, January 2005
Pediatric Disaster Medicine

Beth Israel Medical Center, October 2004

Revised 6/6/2019

JA4342

Pediatric Disaster Medicine

Israel Ministry of Health and Home Front Command, October 2003
Pediatric Disaster Medicine

Oklahoma Medical Center, December 2002
Pediatric Disaster Medicine

Harlem Hospital Center, February 2001
Conscious Sedation

New York Hospital Queens, December 2000
Seizure and Status Epilepticus, A Pediatric Perspective

## Invited Presentations:

Speaker, International First Aid Education Conference
Canadian Red Cross, April 2018
Future of First Aid Education

Speaker, International First Aid Education Conference
Canadian Red Cross, April 2016
Evidence Based Education

Speaker, Emergency Preparedness Conference
Joint Commission Resources, April 2012
Alternate Care Site Planning

Speaker, Trauma Symposium
Good Samaritan Hospital, November 2011
Presented session on Pediatric Trauma

Speaker, Canadian Association of Emergency Physicians 2011 Annual
Conference
Canadian Association of Emergency Physicians, June 2011
Presented session on ACLS 2010- Update and Controversies

Workgroup Leader, Pediatric Disaster Preparedness Curriculum Development
Conference
National Center for Disaster Medicine and Public Health, March 2011
Presented session on Pediatric Preparedness Curriculum for Prehospital
Providers

Speaker, Second European First Aid Manual Development Meeting
Belgium and German Red Cross, February 2011
Presented session on Evidence Based First Aid Guidelines

Speaker, European First Aid Manual Development Meeting
Belgium Red Cross, January 2011
Presented session on Evidence Based First Aid Guidelines

Speaker, Disaster Symposium
UCLA Health System, November 2010
Presented session on Special Population Management in Disasters: Pediatrics

Revised 6/6/2019

JA4343

D. Markenson, MD, CV, Continued

Speaker, Experiences from the Front Line: H1N1 Conference
Medical Society of the State of New York, May 2010
Presented session on Novel Influenza A (H1N1): Pandemic Pediatric
Implications

Roundtable Presenter, Public Health Preparedness Summit 2009
Presented session on Pediatric Preparedness Guidelines

Workshop Leader and Presenter, Public Health Preparedness Summit 2009
Lead workshop and presented on Alternative Care Site as Post-Conference
Workshop

Speaker, FEMA Urban Hazards Forum V: Conference on Emergency
Preparedness for Special Needs Populations, August 2008
Presented session on All Inclusive Emergency Preparedness: Pediatric
Improvements and Challenges Which Remain

Speaker and Panel Member, Pediatric Reunification Meeting
Los Angeles Children's Hospital, June 2008
Presented sessions on Pediatric Disaster Reunification

Faculty , Workshop Consensus Recommendations on Pediatrics and Special
Populations During Disasters and Public Health Emergencies
Pediatric Academic Societies, 2007.

Faculty, Harvard Pediatric Post Gradate CME Course
Harvard Department of Pediatrics, December 2007
Presented sessions on Pediatric Disaster preparedness and Pediatric
Assessment

Speaker, Homeland Security WMD Affiliate Faculty Training
Presented sessions on pediatric anatomy, physiology, development and
emergency preparedness, June 2007

Speaker Michigan Preparedness Conference
Michigan Department of Public Safety, May 2007
Presented session on unique aspects of pediatric disaster and terrorism
preparedness

Speaker National Allergy and Asthma Network
Case Western Reserve Medical Center, May2007
Presented session on unique aspects of pediatric emergency preparedness for
childen with chronic illness

Speaker Case Western Regional Disaster Conference
Case Western Reserve Medical Center, April 2007
Presented session on unique aspects of pediatric disaster and terrorism
preparedness

Workshop Leader Public Health Preparedness Summit
National Association of County and City Health Officials, February 2007
Conducted workshop on unique aspects of disaster, public health and terrorism
preparedness for special populations including children and persons with
disabilities

Faculty Pediatric Critical Care Current Concepts Course

Revised 6/6/2019

JA4344

Society of Critical Care Medicine Annual Meeting, February 2007
Presented session on unique aspects of pediatric disaster and terrorism
preparedness

Speaker Internal Conference on Disaster Medicine,
February 2007
Presented session on unique aspects of pediatric disaster and terrorism
preparedness

Speaker Morristown Medical Center Pediatric Emergency Medicine Update
Morristown Medical Center, May 2005
Presented session on unique aspects of pediatric disaster and terrorism
preparedness

Faculty Fundamental Disaster Medicine course, January 2005
Faculty for Society of Critical Care Medicine Annual Meeting CME Course on
Disaster Preparedness.

Course Director and Presenter Westchester Emergency Preparedness Academy
Westchester American Red Cross, December 2004
Directed and presented at 1 day CME academy on emergency preparedness

Presenter, Preparedness Conference
Michigan Office of Public Health Preparedness Conference, December 2004
Presented sessions on Pediatric Disaster Medicine

Presenter Native American EMS Conference, November 2004
Presented sessions on Pediatric Disaster Medicine and Child Maltreatment

Presenter EMS Expo, October 2004
Lectured on Pediatric Disaster Medicine and Child Protection

Presenter Heartland EMSC Conference, September 2004
Faculty for conference and presented on topic of the needs of children in
disasters

Speaker WMD Affiliate Faculty Training
Presented sessions on pediatric anatomy, physiology, development and
emergency preparedness

Presenter AHRQ Surge Capacity Web Cast July 2004
Presented sessions on Pediatric Disaster and Terrorism Surge Capacity
Considerations

Presenter EMS for Children Annual Conference June 2004
Presented sessions on Pediatric Disaster and Terrorism Preparedness for EMS

Presenter Westchester Medical Center Preparedness Conference June 2004
Presented sessions on Pediatric Disaster and Terrorism Preparedness for EMS

Presenter HRSA Bioterrorism Curriculum Development Conference May 2004
Presented sessions on Pediatric Terrorism Preparedness Education

Presenter AHRQ Workshop for State Officials on BT and Other Preparedness
Tools, May 2004

Revised 6/6/2019

JA4345

Presented sessions on Pediatric Disaster Medicine, Pediatric Terrorism Preparedness and Hospital Preparedness

Presenter Pediatric Academic Societies, April 2004
Presented sessions on Pediatric Disaster Medicine and Hospital Preparedness

Presenter Greater New York Hospital Association, January 2004
Presented sessions on Pediatric Disaster Medicine and Hospital Preparedness

Presenter New England Regional EMSC Conference, November 2003
Presented sessions on Pediatric Disaster Medicine and Child Maltreatment

Presenter Native American EMS Conference, November 2003
Presented sessions on Pediatric Disaster Medicine and Child Maltreatment

Presenter National Association of EMTs Conference, September 2003
Presented sessions on Pediatric Disaster Medicine and Critical Care

Presenter Illinois Bioterrorism Summit, June 2003
Presented session on Pediatric Disaster and Terrorism Preparedness

Speaker Pacific Region EMSC Conference, June 2003
Presented session on Pediatric Disaster Preparedness

Presenter CARE Conference, January 2003
Presented session on Pediatric Disaster Medicine

Presenter AED and Schools a National Forum, January 2003
Presented session on Pediatric Defibrillation

Presenter NYS Vital Signs EMS Conference, November 2002
Faculty for Preconference Pediatric Colloquium and conference session in Mandate Reporting

Presenter Southeastern Regional EMSC Conference, September 2002
Faculty for conference and presented on topic of the needs of children in disasters

Presenter Emergency Cardiac Care Update, September 2000
Presented session on Pediatric Defibrillation the NYC and London Experience

Presenter Red River/South Central Regional EMSC Conference, August 2002
Faculty for conference and presented on topic of the needs of children in disasters

Presenter EMSC National Congress, April 2002
*Presented lead lecture during special session on Pediatric Cardiac Arrest Defibrillation*

Presenter NAEMSP 2002 Annual Meeting, January 2002
*Presented lead lecture during special session on Pediatric Defibrillation*

Faculty NAEMT 2001 Annual Meeting, October 2001
*Faculty for Pre-Conference Pediatric Prehospital Care Course National Roll-Out*

Faculty National Association of EMS Educators Meeting, September 2001

JA4346

*Presented lecture on Children with Special Health Care Needs*

<u>Faculty</u> National Resource Center Child Neglect Meeting, July 2001
*Presented research on child maltreatment knowledge and attitudes of EMS providers*

<u>Presenter</u> Emergency Medical Services for Children Grants Meeting, June, 2001
*Presented summary of design and objectives of an on-going EMS for Children grant to study EMS providers knowledge and attitude towards child maltreatment*

<u>Faculty</u> NAEMT 2000 Annual Meeting, October 2000
*Faculty for Pre-Conference Pediatric Prehospital Care Course*

<u>Faculty</u> EMSC National Congress, March 2000
*Faculty for Panel of EMSC Protocols Development and Implementation and Presenter for session on the State of the Art in Asthma Treatment*

<u>Faculty</u> NAEMSP 2000 Annual Meeting, January 2000
*Faculty and Moderator for Pediatric Track and Faculty for Post-conference Workshop on Development Workshop to Create a Teaching Resource for Instructors in Prehospital Pediatrics for Paramedics*

<u>Faculty</u> NAEMT 1999 Annual Meeting, October 1999
*Faculty for Conference Workshop on a Teaching Resource for Instructors in Prehospital Pediatrics for Paramedics*

<u>Faculty</u> NAEMSP 1999 Annual Meeting, January 1999
*Faculty for Post-conference Workshop on Development Workshop to Create a Teaching Resource for Instructors in Prehospital Pediatrics for Paramedics*

<u>Faculty</u> Virginia EMS Symposium, November 1998
*Lead Faculty for Update on Prehospital Pediatrics Workshop*

<u>Faculty</u> Regional EMS Council of New York City Instructor Update, June, 1998
*Course Faculty*

<u>Faculty</u> Vital Signs 97: NYS Annual EMS Conference, November, 1997
*Course Faculty for Pre-Conference Workshop*

<u>Faculty</u> National Association of EMS Educators Annual Education Symposium, September, 1997
*Participated in Workshop – Rollout of the Teaching Resource for Instructor in Prehospital Pediatrics*

<u>Faculty</u> Louisiana Association of Nationally Registered EMTs Annual Conference, June, 1997
*Conducted lecture on EMS – Children, The Program: EMS Services as the Relate to pediatric Emergency Services*

<u>Faculty</u> National Association of EMS Physicians Conference, January, 1996
*Conducted workshop on Pediatric EMS Education for Medical Directors and EMS Educators*

<u>Faculty</u> NYS Department of Health Vital Signs Conference, November, 1995
*Conducted workshop on Pediatric EMS Education for NYS EMT's, Paramedics and Instructors*

Revised 6/6/2019

JA4347

Faculty Connecticut Department of Health EMS Conference, March 1995
*Lectured on Pediatric Assessment and Respiratory Emergencies to EMT's and Paramedics*

Presenter Emergency Medical Services for Children Projects Meeting, February, 1995
*Presented summary of design and objectives of an on-going EMS for Children grant to develop an Instructor's Resource for Teaching Prehospital Pediatrics*

Presenter Food and Drug Administration and National Institute of Health Public Forum on Informed Consent in Clinical Research Conducted in Emergency Circumstances, January, 1995
*Presented oral and written testimony on the impact of the current FDA and NIH regulations on Pediatric and Prehospital emergency medicine research*

Course Leader American Red Cross Eastern Territory HIV/AIDS I.T. Workshop, January, 1990
*Designed and conducted initial training of Instructor Trainers for the Eastern Territory of the American Red Cross in the Centers for Disease Control and American Red Cross HIV/AIDS Education Program.*

Lead Lecturer American Red Cross Eastern Territory Water Safety Retraining, December, 1989
*Organized and lectured on changes in course delivery due to changes in educational materials used in American Red Cross Water Safety Courses*

Guest Lecturer Schenectady American Red Cross Aquatics Facility Manager Workshop, June, 1989
*Lectured on establishing an emergency action plan and interacting with the local EMS system.*

Lead Lecturer American Red Cross Eastern Territory Standard First Aid Regional Retraining, June, 1989
*Organized and lectured on changes in course delivery due to changes in educational materials used in American Red Cross First Aid Courses.*

Lead Lecturer American Red Cross Eastern Territory CPR Regional Retraining, June, 1988
*Organized and lectured on changes in course delivery due to 1985 ECC standards and changes in educational materials used in American Red Cross CPR Courses.*

Revised 6/6/2019

JA4348

## Other Administrative Responsibilities
### State and Regional Committee Membership:
American College of Emergency Physicians
*New York Chapter Key Contacts - Member 1993 to 2001*
*EMS Committee - Member 1994 to 2003*

American Academy of Pediatrics
*District II Committee on Emergency Medical Services for Children - Member 1993 to 2000*

American Red Cross
*American Red Cross Mile High Chapter – Member, Board of Directors 2014 - present*
*American Red Cross of Westchester County – Member, Board of Directors 2004 to 2008*
*American Red Cross of Greater N.Y. Bronx Safety and Health Committee Chairman 1991 to 1992*

American Heart Association
*New York City Affiliate Pediatric Advanced Life Support Subcommittee - Member 1994 to 2001*
*New York City Affiliate Pediatric Advanced Life Support Regional Faculty - 1994 to 2001*

Arapahoe Douglass Ebert Medical Society
*Board Member 2013 to present*
*President 2015 to present*
*President-Elect 2014*

Colorado Medical Society
*Nominated for President-Elect*
*Treasurer 2017 – present*
*Board Member 2016 - present*

Medical Society of the State of New York
*Committee on Emergency Medical Services - Member 1996 to 2000*
*Committee on Child Abuse and Domestic Violence - Member 1997 - 2000*

Regional Emergency Medical Services Council
*Regional Emergency Medical Services Council - Alternate Member Fall 1994 to 1996*
*Education and Training Sub - Committee - Member 1995 to 1999*

Regional Emergency Medical Advisory Council
*Regional Emergency Medical Advisory Council - Alternate Member Fall 1994 to 2000*
*Advanced Life Support Testing and Training Subcommittee - Member 1993 to 2000*
*Basic Life Support Sub - Committee - Member 1993 to 2000*
*Basic Life Support Quality Assurance/Quality Improvement Subcommittee – Member  1993 to 2000*
*Basic Life Support Research and Development Subcommittee - Vice-Chair 1993 to 2000*

Schenectady Emergency Medical Services Council Committees:
*Emergency Medical Services Council - Member 1988 to 1990*

Schenectady County Fire Coordinator's Office
*Emergency Medical Services Liaison 1988 to 1990*

## EMS Experience:

Board of Directors Center for Pediatric Emergency Medicine, New York, N.Y.
*Helped to found and currently direct center for pediatric emergency medicine research, injury prevention, education and EMS for Children*

Revised 6/6/2019

JA4349

D. Markenson, MD, CV, Continued

<u>Associate Director and Educational Coordinator</u> New York City EMS for Children Project, New York, N.Y.
*Worked on project, which provides training and medical oversight of EMS for Children in New York City.*

<u>Medical Director</u> North Salem Volunteer Ambulance Serve
*Served as medical director for ALS volunteer ambulance service*

<u>Coordinator of Training</u> Upper East Side Attala Volunteer Ambulance Service, New York, N.Y.
*Planned and conducted all training activities and responded to emergencies as a paramedic.*

<u>Director and Paramedic</u> Union College Emergency Medical Service, Schenectady, New York
*Founded and served as first director of college ambulance service.*

Revised 6/6/2019

JA4350

# EXHIBIT 3

1       IN THE UNITED STATES DISTRICT COURT

     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2         CIVIL ACTION NO. 18-5629

3

   MONIQUE RUSSELL, JASMINE     :

4  RIGGINS, ELSA M. POWELL,     :

   and DESIRE EVANS,          :

5                        :

           Plaintiffs,    :

6                        :

         vs.             :

7                        :

   EDUCATIONAL COMMISSION FOR    :

8  FOREIGN MEDICAL GRADUATES,    :

                        :

9         Defendant.     :

10

11       Deposition of DR. DAVID

12  MARKENSON taken in the above-entitled matter

13  before Suzanne J. Stotz, a Certified Realtime

14  Reporter, Registered Professional Reporter, and

15  Notary Public of the State of Colorado, taken

16  at the WESTIN DENVER AIRPORT, 8300 Pena

17  Boulevard, Denver, Colorado 80249, on

18  October 22, 2019, commencing at 10:14 a.m.

19

20

21

22

23

24

1     A.    I have not.  I have no part of

2  those records.

3     Q.    Have you ever played a role in

4  hiring any medical school graduates into

5  residency programs?

6     A.    Yes.

7     Q.    At what residency programs?

8     A.    I served as what's known as the DIO

9  or designated institutional official for

10  multiple hospitals while I was VP of GME for

11  Hospital Corporation of America.

12     Q.    Where was that located?

13     A.    There were several -- a multitude

14  of hospitals.

15     Q.    You can take a minute to explain

16  just briefly so I understand.

17     A.    Yes.  I served for what was known

18  as HealthONE, which were hospitals in the

19  greater Denver area; for -- what was the

20  hospital called -- a hospital in Kansas City.

21  I'm totally blanking.

22     Q.    Your C.V. is there in case it's

23  helpful for you.

24     A.    Yeah.  I'm trying to remember the

1  name of the one.  So it was Research Medical

2  Center in Kansas City which oversaw the --

3  included the hospitals in the Kansas City area

4  that were owned by HCA, Ogden Regional Medical

5  Center which included the Salt Lake City

6  hospitals owned by HCA and Eastern Idaho

7  Regional Medical Center.

8       Q.     Were the residency programs

9  involved in those medical centers only about

10  pediatric emergency or critical care?

11       A.     No, they were not.

12       Q.     All right.  So it was a broader

13  range of residency programs?

14       A.     Yes, it was.

15       Q.     Was it the full range of residency

16  programs available at those hospitals?

17       A.     I'm not sure what you mean.

18       Q.     Yeah.  So I'm not trying to ask you

19  a trick question in any sense.  I'm just trying

20  to understand in your role as DIO for these

21  organizations that we were just referring to,

22  were you overseeing the admission to the

23  residency programs for all the residency

24  programs that those facilities offered at any

 1    given time?

 2         A.      I was involved -- the decision is

 3    the program director's, but I oversee the

 4    processes, procedures, and the program

 5    directors.

 6         Q.      Have you ever served as the program

 7    direct for any residency programs?

 8         A.      No, I have not.

 9         Q.      Have you ever interviewed anybody

10    applying to a residency program?

11         A.      Yes, I have.

12         Q.      Approximately how many times?

13    Hundreds?  Five?  You know, somewhere --

14         A.      Probably not hundreds, but close to

15    it.

16         Q.      Okay.  So a large number of times?

17         A.      Yes.

18         Q.      In your experience -- in your

19    various roles, was an interview always involved

20    before a resident would get offered a residency

21    program as far as you're aware?

22         A.      In most cases, the last step after

23    all the screening that is done, you know,

24    verification of board scores, eligibility for

Dr. David Markenson

```
1              What else, in your experience, is
2    involved in the offering of a residency
3    position to a resident?
4         A.    The initial screening is done to
5    make sure that the person is eligible for
6    residency.  So presence of medical school
7    graduation, confirmation, or ECFMG
8    certification.
9              So it's sort of that's the first
10   step.  If they don't graduate medical school or
11   they don't have an ECFMG certification, the
12   process would stop.
13        Q.    Okay.
14        A.    Following that process, one that
15   has letters of reference, Dean's
16   recommendation, board scores; and there's
17   usually a cutoff to determine of those who then
18   obtain an interview.
19        Q.    When you say "of those," you mean
20   cutoff of the board scores?
21        A.    Board scores, letters of reference,
22   recommendations.
23        Q.    Any other information collected or
24   reviewed in connection with residency program
```

1    applications that you recall, you know, sitting

2    here today?

3         A.    Usually not, no.

4         Q.    Is there usually an application

5    form, like, they actually fill out like a job

6    application?

7         A.    They don't anymore.  It's all done

8    through the electronic system called ERAS.

9         Q.    Okay.  Previously, do you know

10   whether there had been applications to

11   residency programs in, say, the 2011 time

12   frame?

13        A.    There would have not been.  They

14   would have all been ERAS.

15        Q.    Even then?

16        A.    Yes.

17        Q.    In your experience, do residents

18   get paid?

19        A.    Yes, they do.

20        Q.    Do they get paid through any

21   sources of funding in particular?

22        A.    The hospital pays them.

23        Q.    Does the hospital typically

24   withhold taxes?

Dr. David Markenson

1    A.    Typically, yes.

2    Q.    When you say "typically," do you

3    know of any circumstances when they don't

4    withhold taxes?

5    A.    I believe it's different -- sorry.

6    Hospitals employ them or the university

7    sometimes does.  Withholding is done as would

8    be per whatever the employment standards are

9    for taxes and other fees.

10    Q.    Which would require, in addition to

11    other potential information, a social security

12    number?

13    A.    That is correct.

14    Q.    Do you know what the source of the

15    social security number is for residents coming

16    into residency programs?  So I can say that

17    another way.  Strike that.  Let me restate

18    that.

19         Do you know from where the

20    residency programs get the social security

21    number for the applicants coming to them?

22    A.    Again, I'm not involved in the HR

23    department, but my understanding is it comes

24    from the applicant.

1    Q.      In your experience in hiring

2    residents or residency programs, what, if

3    anything, was done with the letters of

4    reference that were submitted?

5    A.      Letters of reference are submitted

6    through ERAS and then become part of an

7    electronic file that the program director can

8    review.

9    Q.      Do you know if anything else was

10   done typically other than just review them?

11   A.      Typically they're just read by the

12   residency director.  Sometimes they would also

13   be read by an interviewer prior to an

14   interview.

15   Q.      Do you know if there was anything

16   done typically to validate that the letters of

17   recommend were legitimate?

18   A.      I know that -- I've never -- I've

19   never seen a residency program do it, and I do

20   not believe that ERAS's normal procedures --

21   sorry -- are to verify them.

22   Q.      You mentioned a Dean's

23   recommendation.  What is that?

24   A.      So for graduates of U.S. medical

 1    schools, typically the Dean writes a letter for

 2    every graduate, which summarizes their medical

 3    school experience and provides evaluation of

 4    the student.

 5        Q.    And for U.S. medical school

 6    graduates, you said that as an initial

 7    screening for eligibility, there would be

 8    verification of medical school graduation; is

 9    that correct?

10        A.    Correct.

11        Q.    How would that usually be

12    accomplished in your experience?

13        A.    Through the ERAS process.

14        Q.    What do you mean by that?

15        A.    The programs themselves don't do

16    it.  It's done in the ERAS system.  So that's

17    the program that the residents apply through,

18    and that program does the verification of the

19    medical school.

20        Q.    For lack of a better term, is it

21    like a portal you can log into and check or

22    how --

23        A.    It's a portal you can log into and

24    check.

1    Q.    Do you still have any role or

2   responsibilities for any residency programs?

3    A.    Not directly anymore.

4    Q.    When you say "not directly," do you

5   indirectly?

6    A.    I serve on a national committee

7   with the ACGME.

8    Q.    What role do you serve with ACGME?

9    A.    They have a committee that oversees

10   what's known as their clear clinical learning

11   environment review program, and I serve on that

12   committee.

13    Q.    What does the clear committee do?

14    A.    It helps them set the standards for

15   the Clear Evaluation program.

16    Q.    What is the Clear Evaluation

17   program?

18    A.    It evaluates hospitals' learning

19   environments for residencies.

20    Q.    Is that there accreditation

21   program?

22    A.    It is separate from the

23   accreditation.

24    Q.    Is it a higher level than

1    Q.    So is your participation with the

2  clear evaluation process, are you sitting on a

3  committee of ACGME?

4    A.    Committee, yes.

5    Q.    Is that a volunteer position?

6    A.    Yes, it is.

7    Q.    And when did you begin that?

8    A.    I believe about a year and a half

9  ago.

10    Q.    Any other current involvement in

11  residency programs?

12    A.    Not direct, no.

13    Q.    Not directly, but anything else

14  indirectly?

15    A.    I still have academic appointments

16  at Columbia University in New York -- sorry,

17  Colorado university and New York Medical

18  College.  So I could be asked to give a lecture

19  from time to time within Colorado or in

20  New York to residents.

21    Q.    Do residents typically get

22  lectures?

23    A.    Yes.

24    Q.    So just so that I understand, would

Dr. David Markenson

```
 1        A.      As chief medical officer with

 2   Sky Ridge and my prior role with Westchester

 3   Medical Center as chiefs of services, in some

 4   cases, I would have directly been hiring staff

 5   members for my department.  In more senior

 6   leadership role, I may have been more involved

 7   in not hiring, but contracting groups to

 8   provide physicians or occasionally involved in

 9   recruitment of certain, you know, high-need

10   specialties.

11        Q.      When you refer to staff members

12   just now, were you talking about physicians?

13        A.      Yes.

14        Q.      In your experience, can you just

15   briefly explain what's involved in the

16   interviewing and hiring of a physician?

17        A.      Highly variable depending on who it

18   is and which role.  So very different.

19        Q.      In your experience, do the

20   hospitals do any sort of background check or

21   identification confirmation of any sort when

22   hiring a physician?

23        A.      At the -- it depends on the

24   facility.  You know, when -- some facilities
```

1   you're being asked to provide?

2        A.      I believe it was on my expectations

3   from of ECFMG's certification of a physician as

4   it relates to its use, you know, within

5   hospitals of privileging, credentialing,

6   residency application.

7        Q.      Would you consider yourself an

8   expert on policies and procedures for

9   organizations like ECFMG, USMLE, and the like?

10       A.      I would consider myself an expert

11  on verification of medical school credentials

12  and the use of them.

13       Q.      Would you consider yourself to be

14  an expert on ECFMG's policies and procedures or

15  USMLE policies and procedures for entities like

16  that?

17       A.      I would, yes, on the processes,

18  yes.

19       Q.      When's the last time you reviewed

20  USMLE's policies and procedures?

21       A.      I probably looked over what's

22  publicly available when I was involved with

23  residencies.

24       Q.      Have you ever discussed USMLE

1    BY MS. McENROE:

2         Q.     How do you evaluate the standard of

3    care that you say is applicable to ECFMG'S

4    certification process?

5         A.     Sure.  One is how they hold

6    themselves out; but two, there are other

7    entities that, as part of their process, are

8    required to verify medical school completion.

9    That would be licensing boards, hospitals for

10   part of the -- sorry, not process of

11   privileging -- credentialing process for which

12   there are accepted standards by Joint

13   Commission, Centers for Medicaid Services.

14        Q.     So those other -- in the second

15   category, those others you're saying are

16   required to verify medical school credentials,

17   they also are verifying graduates' medical

18   credentials as well?

19        A.     Correct.  For a U.S. medical

20   graduate, you're required to do primary source

21   verification.

22        Q.     I thought you had said that took

23   place through ERAS?

24        A.     For credentialing and privileging,

1    ERAS is not part of the credentialing and

2    privileging.  That's for residents.

3          Q.    And do you know whether

4    credentialing and privileging uses ECFMG

5    certification as opposed to how you U.S.

6    graduates no longer use ERAS at that point in

7    the process?

8          A.    So for credentialing, you would do

9    primary source verification for an American

10   grad -- sorry, U.S. grad; and for a foreign

11   grad, you use ECFMG to attest to the primary

12   source verification.

13         Q.    Do you know that that's true for

14   all hospitals?

15         A.    That is Joint Commission and CMS's

16   accepted approach.

17         Q.    So that's accepted if a hospital

18   were to primary source verify themselves, you

19   don't think that would be sufficient?

20         A.    For a foreign grad?

21         Q.    Yeah.

22         A.    As far as I know, they could; but

23   hospitals in the U.S., the standard is to use

24   ECFMG.  I don't know of a prohibition against

Dr. David Markenson

1    them doing it.

2         Q.    So you're applying the standard of

3    care that you view to be the standard of care

4    that applies to U.S. applicants?

5         A.    To verification of medical school

6    graduates.

7         Q.    To the application -- to the

8    verification of U.S. medical school graduates;

9    is that what you're saying?

10        A.    To the standard that, yeah, primary

11   source would be done.

12        Q.    For U.S. graduates?

13        A.    Predominantly for U.S. graduates,

14   yes.

15        Q.    When you say "predominantly," I'm

16   just trying to understand is there some other

17   measure you're using for anyone other than

18   ECFMG to measure the standard of care for ECFMG

19   for foreign medical graduates?

20        A.    What I'm saying is I'm using the

21   standard as applied -- that others use to do

22   the primary source verification.

23              There are multiple processes that

24   use primary source verification.  In the

1  setting of foreign grads, ECFMG does it for

2  foreign medical school graduation.  And I'm

3  using the standard within healthcare for

4  primary source verification, examples being

5  credentialing as one of them.

6      Q.    Are you using as a standard of care

7  any other entity's primary source verification

8  for foreign medical graduates?

9      A.    Other sources?  No.

10     Q.    Other than poking around on ECFMG'S

11 website and documents provided to you by

12 counsel in this case, do you have any other

13 basis to understand or know the policies and

14 procedures ECFMG had in place at the relevant

15 time?

16     A.    The only information I have is from

17 ECFMG'S website and what was provided via

18 counsel to counsel.

19     Q.    You didn't do any other

20 investigation into ECFMG'S policies and

21 procedures?

22     A.    I did not.

23     Q.    We've discussed a little bit

24 earlier -- I know some of the names get a

Dr. David Markenson

1    to be documented, articulate how the process of

2    certification occurs should be documented.

3         Q.     And on what basis are you saying

4    that?

5         A.     As what I -- as a standard that

6    would be followed for a certifying body.

7         Q.     What kind of certifying body?

8         A.     There are a multitude of certifying

9    bodies, those that do board certification,

10   those that do residency accreditation.

11        Q.     Do you consider yourself to be an

12   expert on ECFMG'S policies and procedures?

13        A.     I'm not sure what you mean by that;

14   but since at the time they apparently, as far

15   as I know, didn't have them, I'm not sure what

16   you mean by an expert on them.

17        Q.     Are you considering yourself to be

18   an expert on the way ECFMG conducted themselves

19   in the 1990s?

20        A.     I'm not -- I'm not ECFMG.  I'm

21   saying I consider myself to be knowledgeable

22   about at that time what the standard would be

23   for primary source verification, which is the

24   function they achieved and held themselves out

1  for international medical graduates and what a

2  certification body should do to memorialize

3  their policies and procedures to assure it

4  meets standards.

5      Q.    When you say "a certification

6  body," what sort of certification bodies do you

7  have personal experience with?

8      A.    Certification bodies?  Well, I've

9  worked, obviously, within -- we -- within

10  hospitals, we do certification of physicians'

11  credentials and privileges.

12            I've worked ACGME about residency

13  certification.

14            I've worked with professional

15  organizations for fellowship certification.

16      Q.    So those are at different stages in

17  the medical career progression timeline, if you

18  will; is that correct?

19      A.    They are at different stages, yes.

20      Q.    Have you ever had any role or

21  involvement with some of the threshold, if you

22  will, issues as you had articulated it before

23  for authentication of graduate -- or of medical

24  school graduation status?

1  articulated earlier on, about figuring out

2  whether an international medical graduate had

3  actually graduated from medical school?

4      A.    So again, in terms of terminology,

5  credentialing is obviously specific to an

6  independent licensed practitioner in a

7  hospital.

8           While as part of residency, we do

9  have primary source verification either by the

10  facility as part of our HR process or ECFMG for

11  people entering residency.

12     Q.    Okay.

13     A.    And the standard has to be the same

14  because we're held to the same standard for

15  international as U.S.

16           So I am involved in the U.S.

17  standard, but the ECFMG does that function for

18  us and holds themselves out; but the standard

19  has to be the same because the end product is

20  the same.  It's entering residency.

21     Q.    How is the U.S. standard

22  articulated?  Who controls that?

23     A.    For facilities, such as a hospital,

24  we rely upon Joint Commission; Centers for

1    A.    Again, since I wasn't provided them

2    and all I have is the draft, I can't say that.

3    Q.    So you don't know what the policies

4    and procedures are as we sit here today?

5    A.    I just know the standard.  I don't

6    know what their -- I've asked for policies and

7    procedures, and we haven't been provided any.

8    Q.    You say "we."  You mean you haven't

9    been provided any, correct?

10    A.    Uh-huh, correct.

11    Q.    Is it your opinion that ECFMG has a

12    duty or an obligation to make sure that

13    individuals it certifies never break the law?

14    A.    Again, I personally believe -- this

15    is from my expertise and knowledge -- that

16    ECFMG'S role is not as a law enforcement agency

17    but a certification body.

18    Q.    Okay.  And so I just want to make

19    sure I understand.

20    So if ECFMG certifies someone and

21    they go on to commit tax fraud later on in

22    their career, would you then look back and hold

23    ECFMG accountable that they should have figured

24    that out?

Dr. David Markenson

1        A.      No.  But if in order to practice

2   tax, they needed ECFMG certification to be

3   licensed, then they would have never been

4   allowed to practice tax.

5             So I don't -- I don't hold them

6   accountable to law enforcement; but anything

7   that an individual was allowed to do based on

8   their certification, they do have culpability

9   in that case.

10       Q.      So you think if a practitioner, a

11  physician, goes on to be a creep, a sexual

12  predator, is that somehow ECFMG'S fault if

13  ECFMG had certified that that person had, in

14  fact, graduated from medical school and passed

15  exams?

16       A.      Well, what they did was their

17  action at that point; but one has to

18  acknowledge that if ECFMG did not allow them

19  to -- did not certify them, allowing them to

20  obtain a license, they would not be a physician

21  at that point.

22       Q.      Right.  But there are U.S. graduate

23  physicians who go on to become creeps, right?

24       A.      There are.

1        Q.      Sexual predators.

2                MR. VETTORI:  Is that a technical

3        term?

4                MS. McENROE:  I changed it to

5        sexual predators.

6    BY MS. McENROE:

7        Q.      Okay.  Is that fair?

8        A.      There are, yes.  Unfortunately,

9    yes.

10       Q.      And do you deem that to be a

11   failure of the medical school community or, you

12   know, or is that that practitioner's fault that

13   they went on to be somebody who breaks the law?

14       A.      It is the practitioner's fault, but

15   there is well documented studies that show that

16   there are usually red flags throughout their

17   career if people intervene, that patient would

18   have never been harmed.

19       Q.      Usually, like, while they're

20   actually practicing medicine.

21       A.      No.  There's throughout their

22   entire career.  There's well documented studies

23   that show whether it's medical school

24   residency, application processes, there are

1    links throughout a career that could have

2    stopped a progression of events.

3         Q.    So I'm just struggling with the

4    idea that this is like the ultimate Monday

5    morning quarterbacking, right?  You're saying

6    this person ended up being a sexual predator.

7    So looking back in history, we could pick up

8    bread crumbs where someone could have, said,

9    you don't graduate from middle school; you

10   don't graduate from high school; you don't

11   graduate from college.

12              So I'm just trying to understand --

13              MS. McENROE:  Let me finish my

14        question.

15              MR. VETTORI:  I am.

16   BY MS. McENROE:

17        Q.    I'm just trying to understand how

18   it is you pick where in that line you assume

19   and assign all of the fault, as you have with

20   ECFMG in this case?

21              MR. VETTORI:  Objection as to form.

22              THE WITNESS:  Where I've assigned

23        fault is the area I was asked to opine on,

24        which is he would not have been able to

1          obtain licensure or enter a residency had

2          ECFMG done the due diligence, picked up

3          the red flags and not certified him or

4          revoked the certification.

5     BY MS. McENROE:

6          Q.     So does your opinion basically boil

7     down to an on/off switch, that if ECFMG had

8     said he couldn't get a certificate, therefore,

9     he wouldn't have been able to practice

10    medicine; is that what you're saying?

11         A.     Well, as part of application for

12    residency and licensure, there are certain

13    things that are binary, yes or no; and in the

14    absence of them, you don't proceed to any other

15    steps.

16             ECFMG certification is a credential

17    that's binary.  You don't have it, you can't

18    get into residency.  Absent ECFMG

19    certification, you can't be licensed.  It is a

20    binary, that all the other things downstream

21    don't occur towards licensure if that binary

22    doesn't occur.

23         Q.     So if we were to take a step

24    forward and say graduation from a residency

Dr. David Markenson

1   program is binary, off and on or, you know, one

2   year of supervised practice, however you had

3   described it is binary off and on, you either

4   have that or you don't, that's another place

5   along the line, right?  That would either

6   on/off shut off the practicing medicine in the

7   United States?

8        A.     It depends on what the requirements

9   were.

10       Q.     And further stepping down the line,

11  eventually getting to the point of getting a

12  medical license is also off and on that in any

13  given jurisdiction, if you don't have a medical

14  license, you should not be lawfully be

15  practicing medicine, correct?

16       A.     Yes.  Without a medical license,

17  you can't practice medicine.

18       Q.     So that's another off/on switch,

19  correct?

20       A.     A medical license is an off/on,

21  yes.

22       Q.     Even if you have a ECFMG

23  certificate?

24       A.     If you have an ECFMG certificate

```
 1   but you don't have a license, yes, you cannot

 2   practice medicine.

 3             Before you ask another question, is

 4   this an okay time to break?

 5       Q.    Sure.  Absolutely.

 6       A.    I saw you reading up.  I just

 7   wanted to make sure.

 8       Q.    Go ahead.

 9       A.    Thank you.

10             MS. McENROE:  Let's take a break.

11             (Discussion held off the record.)

12             THE VIDEOGRAPHER:  The time is

13       2:10 p.m., and we are going off the

14       record.

15             (Whereupon, a short break was

16       taken.)

17             THE VIDEOGRAPHER:  The time is

18       2:20 p.m., and we are back on the record.

19   BY MS. McENROE:

20       Q.    We were just looking at your expert

21   report at Exhibit 4 before we went off the

22   record.

23             Do you recall that, Dr. Markenson?

24       A.    Yes.
```

1     Q.    And on page 4, there is a, sort of

2   the second full paragraph down, if you will --

3   it's just one line.  It says, "ECFMG breached

4   the standard of care in, among others, the

5   following ways."

6          Do you see that?

7     A.    Yes, I do.

8     Q.    And then there's a number of

9   entries, all starting with the word "failing"

10  on the rest of page 4 and at the top of page 5.

11         Do you see that?

12    A.    Yes, I do.

13    Q.    And are those each an opinion that

14  you're offering in this case?

15    A.    Yes, that is.

16    Q.    Okay.  And we talked about the

17  standard of care a few minutes ago.

18         Were you referring to the same

19  standard of care here that you have been

20  previously in your report?

21    A.    Yes.

22    Q.    Okay.  I'm not going to go through

23  every single one because some of them

24  conceptually we've talked about already, but

Dr. David Markenson

```
 1    I'm going to talk about a couple of them just
 2    to make sure I understand.
 3              So the third failing down, if you
 4    will -- I don't have a better way to refer to
 5    it -- says -- oh, no, you know what, we talked
 6    about that one already.
 7              Keep on going down to the one that
 8    talks about the diploma from the University of
 9    Ibadan.  It says, "Failing to reasonably
10    investigate Akoda's diploma from the University
11    of Ibadan."
12              Do you see that?
13    A.        Yes.
14    Q.        That looks like the fifth one down.
15    A.        Correct.
16    Q.        Which diploma are you talking about
17    because I don't believe I've seen a diploma
18    from the University of Ibadan with Akoda's name
19    on it?
20    A.        Let's see.  Can I go back to the --
21    Q.        Sure.  You can look at the exhibits
22    we were looking at.
23    A.        Thank you so much.  Yeah.
24              I am wondering whether that is --
```

# EXHIBIT 4

**John C. Hyde, Ph.D., FACHE**
**Health Care Consultant**
**4301 Highway 35 North**
**Forest, MS  39074**

September 23, 2019

Ms. Karen E. Evans
The Cochran Firm
Attorneys at Law
110 New York Ave., NW
Suite 340, West Tower
Washington, DC  20005

Dear Ms. Evans

This opinion has been prepared in regards to the matter of: ***Russell, et al v. Educational Commission for Foreign Medical Graduates, Case No. 2:18-cv-05629-JW.***  Currently, I am an adjunct Professor of Healthcare Administration at the George Washington University teaching healthcare management at the graduate level on a part-time basis; and, a full-time consultant in the field of healthcare administration. Recently, I retired as a full-time university Professor of health services administration and clinical outcomes research within an academic medical center campus; with former appointments in the School of Health Related Professions and the School of Medicine at the University of Mississippi Medical Center; and, in the School of Business at the University of Mississippi. My academic activities involved: teaching graduate-level students in areas of healthcare management; conducting health services research focusing on management and clinical outcomes analysis; and, providing expertise and consultations to the healthcare community at large. I have taught graduate level healthcare administration/outcome classes for the past 28+ years. My doctorate, master, and bachelor degrees are all in the area of healthcare administration. I have presented research findings at the regional, national and international levels and published articles, books and monographs related to various areas of healthcare delivery. I have provided lectures and addresses to international, national and regional audiences in areas of healthcare administration.

Additionally, I have approximately 10 years' experience as a practicing healthcare administrator and multi-system executive with specific knowledge and expertise in the areas of physician credentialing/privileging, credential verification organizations, primary source verification, regulators, and overall healthcare management procedures. I am board-certified as a Certified Healthcare Executive (***FACHE- Fellow***) by the **American College of Healthcare Executives** in the specialty of health care administration.

Attached is my Curriculum Vitae which includes a list of all publications I have authored, including those dealing with the credentialing process.

JA4382

In the preparation of this preliminary opinion, I have examined the documents and information listed below and based my opinions on my professional knowledge of prevailing and prudent standards of healthcare administration which ultimately require an exercise of reasonable application of the process of Credentials Verification and use of Primary Sources:

## DOCUMENTS/INFORMATION REVIEWED:

Documents Received from Howard University
Documents Received from ECFMG
Documents Received from ABOG Production
ECFMG Information Booklet, ECFMG Certification and Application, 1996
Complaint
Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (2017)
Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (2017)
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
ECFMG Complaint
Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)
Hallock JA & Kostis JB (2006). **Celebrating 50 Years of Experience: An ECFMG Perspective,** Academic Medicine, 81(12): S7-S16.
**Hospital Accreditation Standards**, The Joint Commission, 2008.
American Medical Association: **Joint Commission acceptance of AMA Physician Masterfile Data**, 2004.
**Credentialing by Medicare Advantage Organizations**, presented by E. Enriquez, Nurse Consultant, CMS Region II,

## Depositions Reviewed:

Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)


Based upon a review of these identified documents/information, coupled with my knowledge, training, education, experience and understanding of the practice of healthcare management, I have formulated the following opinions in this matter. These opinions have been based on regulations and industry standards that guide, and should guide the operations of a credentialing verification organization (CVO), such as Educational Commission for Foreign Medical Graduates (ECFMG).


## SUMMARY OF EVENTS

1.  ECFMG received two applications from John Nosa Akoda to take Steps 1 and 2 of the USMLE examinations. The first on January 3, 1996, and again on August 30, 1996.

2.   After he successfully completed the required examinations, ECFMG issued certificate number 0-553-258-5 to "Dr.".Akoda. At some time in 1998, he provided ECFMG with social security number xxx-xx- 9065.

3.   Akoda entered the graduate residency program at Jersey Shore Medical Center on July 1, 1998. Shortly thereafter,, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program.

4.   On September 2, 1998, ECFMG sent a validated form.

5.   About two years later, in 2000, ECFMG was notified that the Jersey Shore Medical Center graduate residency program where Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. ECFMG advised Jersey Shore Medical Center that Akoda had provided ECFMG with social security no. xxx-xx-9065 which was the same number Akoda provided to Jersey Shore Medical Center.

6.   On August 22, 2000, ECFMG acknowledged in a letter to Akoda that it had received information alleging that Akoda may have engaged in irregular behavior.

7.   Thereafter ECFMG sent a letter to Akoda acknowledging receipt of information from Jersey Shore to which Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. As proof of his identity,   Akoda provided ECFMG with a Nigerian passport and a Nigerian "international driving permit."

8.   Ultimately, Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number and because the green card he provided to the hospital was inconsistent with the other green card he provided. The social security number "Dr."Akoda used belonged to Charles Igberase, "his cousin".

9.   In December of 2000, an employee of ECFMG, William Kelly, wrote a memo which he said should NOT be made a part of the official file, to the VP of Operations at ECFMG, Stephen Seeling. In that memo, Mr. Kelly advised Mr. Seeling that both he and Jersey Shore believed Igberase and Akoda were the same person.  Then, curiously, Mr. Kelly concluded that there was not enough information for the ECFMG Credentials Committee.

10.   Thereafter in October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center's residency program. He provided three letters of reference.  ECFMG attempted to verify the authenticity of these three letters of reference but was unsuccessful. It is not the usual practice of ECFMG to seek to verify the authenticity of letters of reference from its applicants.

11.   Akoda successfully completed a graduate residency program at Howard University Medical Center, was licensed to practice medicine in Maryland and Virginia, and was granted privileges at Prince Georges' Hospital Center.

John C. Hyde, Ph.D.   Page 3 of 8      9/19/2019

JA4384

12.    To obtain a license to practice medicine in Maryland, Akoda was required to submit, among other essential components, a valid ECFMG certificate.

13.    However, ECFMG should never have issued an ECFMG certificate to Charles Nosa Akoda.

14.    At the time of Akoda was issued an ECFMG certificate, ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias). ECFMG knew or should have known that Charles Nosa Akoda was the same person as Oluwafemi Charles Igberase (aka multiple alias) and that he had: a) previously lied about not taking the required examinations, b) rearranging his name, c) that he had been dismissed from the Jersey Shore residency program he used a false social security number to apply to the hospital ( his 'cousin' Charles Igberase) and used two green cards documenting different numbers, names, expiration dates, and dates of birth for "Dr. Akoda and his certification had been previously revoked; d) that his ECFMG certification had been previously revoked; that there were irregularities regarding the authenticity of his medical school diplomas, and references.

15.    On June 1, 2016, U.S. Attorney's office indicted Mr. Akoda for fraud and aggravated identity theft, citing eleven aliases including Charles John Nosa Akoda.

16.    Using search warrants, law enforcement officers searched the home of Mr. Akoda on June 9, 2016, and discovered false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. They also found other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts, letters of recommendation and birth certificates.

17.    On October 19, 2016, Mr. Akoda was indicted again on a charge of social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.

18.    Mr. Akoda ultimately entered into a plea bargain agreement and pled guilty to social security fraud on November 15, 2016.

19. In the spring of 2017, Mr. Akoda's license to practice medicine in Virginia and Maryland was revoked.


**AREAS OF EXAMINATION/RESPONSES**

1. **ECFMG Mission/Requirements**
        Since 1974, the Educational Commission for Foreign Medical Graduates (ECFMG) has promoted to the American public their preeminent, and exclusive, role in assuring: ***"quality health care for the public by <u>certifying</u> international [foreign] medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals"***. As such, this organization serves as the de facto credentials verification organization for

international [formerly foreign] medical graduates through primary source certification of the applicant's international medical education, international training, and successful completion of the United States Medical Licensure Examination (USMLE)- steps 1 and 2 and English proficiency; through administration of the testing process and subsequent applicant certification to graduate medical education sites for potential placement in postgraduate medical training programs--all of which is required for medical practice within the U.S.

In 1986, the ECFMG Board required that the medical diplomas of all graduates applying for ECFMG Certification be primary source verified with the medical school that issued the diploma. This required the ECFMG to physically send a letter to the medical school that issued the diploma and for the issuing medical school **"to attest to the veracity of the individual and the document being proffered"**. This was required by ECFMG to ensure that all diplomas would undergo this scrutiny--obviously to validate the authenticity of the individual and their successful completion of medical school training, along with the issuing medical school.

Fraudulent and misleading information submitted to the ECFMG is currently covered under its Policies and Procedures Regarding Irregular Behavior. This prescriptive set of policies and procedures defines and addresses what constitutes irregular behaviors. As stated, **"Irregular behavior includes _all_ actions or attempted actions of the part of applicants, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG . . .".** When confronted with irregular behavior, it is incumbent on ECFMG to properly and thoroughly investigated, analyze and address such behaviors. Without proper resolution of the issues, ECFMG cannot fulfill its mission to the public mandating an international/foreign medical school graduate that possess all the requisite qualifications to pursue U.S. medical practice.

2. **Duties of Credentials Verification Organizations**

A healthcare CVO (credentials verification organization) as the name implies provides assurances to those entities that utilize their findings in making decisions on granting medical training program enrollment, licensure and ultimately medical practice privileges. In the late 1980's, JCAHO (former name of current, The Joint Commission) published conditions under which a CVO could be used by a hospital. According to the Joint Commission, a CVO is **"Any organization that provides information on an individual's professional credentials. An organization that bases a decision in part on information obtained from a CVO should have confidence in the completeness, accuracy and timeliness of information"**. Additionally, other CVOs within the healthcare industry such as the American Medical Association Physician Masterfile and Federation of State Medical Boards, among others, provide information that maintains these same criteria and likewise is based on primary source verification concerning vital information such as the issues of this matter. The National Committee for Quality Assurance (NCQA) has formalized and certifies CVOs. At the present time, there are

JA4386

over 90 CVOs that have gained NCQA CVO Certification. Under prevailing CVO requirements, a CVO must assure the accuracy and completeness of the information that is provided. From a primary source perspective, foreign medical school education must be from the primary source.

The Centers for Medicare and Medicaid Services (CMS), has specified that primary source verification is required for: licensure, education and board certification (if applicable) in granting Medicare Advantage participation. They defined primary source as: ***"an organization or entity with legal responsibility for originating a document and ensuring the accuracy of the information it conveys"***.

As such, this concept of primary source verification entails that the CVO, in this case ECFMG, must be assured that the applicant does in fact possess a valid and authentic medical degree and other identification and credentials must undertake all efforts to make this assurance before certifying the applicant to further U.S. training, or medical licensure.

3. **Professional/Organizational Negligence**

As developed above, the administrative standards for credentialing IMGs allowing for participation in the ECFMG program requires ECFMG to follow their mission and fulfill its duty to patients in that their actions will serve to assure all foreign educated physicians are properly and thoroughly investigated and deemed eligible for ECFMG Certification to pursue U.S. postgraduate medical education. Without this certification, there should never be an individual allowed to participate in such a program; and, therefore, there would never be fraudulent IMG physicians that progressed through ECFMG to practice U.S. medicine.

**ECFMG failed to act in a reasonable and prudent manner in the following ways**:

A.　　As a fundamental matter, ECFMG was required to develop or adopt written policies and procedures and checklist for the certification of IMGs. Written policies and procedures for the investigation of allegations of irregular behavior would ensure reasonable and consistent application of defined criteria.

B.　　ECFMG failed to investigate obvious discrepancies that raised the question of fraud and the identity of the applicant. For example, ECFMG failed to investigate the differences in the name on Akoda's medical school diploma and the name on his applications submitted to ECFMG; the relationship between Igberase and Akoda, to name a few.

C.　　ECFMG failed to follow through on its suspicions about the authenticity of the letters of recommendation.

D.　　Curiously, ECFMG failed to adequately and with reasonable diligence investigate the allegations made by Dr. McCorkel and refer Akoda to the Medical Education Credentials Committee.

E.      ECFMG did not even follow its own procedures as noted in the 8/22/2000 charge letter sent to Akoda.

F.      ECFMG failed to investigate the social security number provided to ECFMG by Akoda.

G.      ECFMG obtained photographs of all applicants yet failed to compare photographs of Igberase and Akoda in its files when they had suspicions that they might be the same person.

H.      ECFMG missed a golden opportunity to discover if Akoda and Igberase( aka multiple alias) were the same person.

I.      ECFMG also failed to determine the authenticity of the passport and green card provided to Mr. Kelly by Akoda on 9/27/2000.

J.      ECFMG failed to follow up on its conclusion that Igberase and Akoda were the same person even though a memo with this conclusion was created by ECFMG employee Mr. Kelly.

K.      Instead, ECFMG negligently chose to bury this information in a memo that was not to be placed in the file.

It is my opinion, with a reasonable degree of professional certainty, ECFMG should have written policies and procedures for the certification of IMG should have included requirements that ECFMG investigate fully the differences in the name on Akoda's medical school diploma and the name on his applications and the other obvious discrepancies in the applications.

In my opinion, with a reasonable degree of professional certainty, an appropriate investigation would have resulted in referral of this matter to the ECFMG medical education credentials committee. An appropriate and reasonable investigation of the allegations and obvious discrepancies in the applications should have been conducted by ECFMG, and this matter should have been referred to the Medical Education Credentials Committee. This committee should have then found that Akoda engaged in irregular behavior, which should have then resulted in his certification being revoked.

With a high degree of professional certainty, it is my opinion that the above breaches of duties, by ECFMG caused Akoda to be certified by ECFMG, which allowed him to be accepted into a residency, secure a medical license in MD and gain access to and directly cause harm the plaintiffs and the members of the class. These actions and omissions were violations of the Standards of Care. Without the negligent ECFMG certification, Akoda would not have been accepted into a residency at Howard University Hospital; he would not have obtained a Maryland license; and he would not have been granted privileges at PG Hospital to care for Plaintiff and members of the class.

I reserve the right to alter, supplement or reverse these opinions should additional information be forthcoming.

John C. Hyde, Ph.D.   Page 7 of 8      9/19/2019

JA4388

Attached is my Rule 26 case list.

I am billing my time for review and preparation of my report at $ 375per hour and my time for deposition at $ 1,425 for a three (3) hour deposition and $ 3,750 for one day of trial, plus travel, meals, and lodging expenses.

Respectfully,

*John C. Hyde*

John C. Hyde, Ph.D., FACHE

# EXHIBIT 5

JA4390

# Dr. John Charles Hyde, II, FACHE

Consulting Office                             (601) 469-7888
Consulting Office Fax                     (601) 469-1777

## EDUCATION:

Ph.D.         **THE UNIVERSITY OF ALABAMA AT BIRMINGHAM-**
DEPARTMENT OF HEALTH SERVICES ADMINISTRATION and
SCHOOL OF BUSINESS -Birmingham, Alabama-- 1994
(Health Care Administration/Research and Organizational Studies)

M.S.H.A.      **TRINITY UNIVERSITY**-San Antonio, Texas-- 1981
(Health Care Administration)

B.S.          **WESTERN KENTUCKY UNIVERSITY**- Bowling Green, Kentucky
(Health Care Administration) --1979
(Biology)-- 1977

## WORK EXPERIENCE:

Jan. 1992     **Dr. John C. Hyde- Hyde Consulting Group, LLC**
to present     Health Care Consultant-Principal

Provide independent expertise and advice to various hospitals, healthcare
organizations, healthcare trade/professional associations, medical/hospital
malpractice/regulatory attorneys, and other health-related entities. Served as
lead consultant on numerous engagements-450+. Provide advice to
healthcare delivery organizations on a current basis regarding issues of
administration, provider credentialing, physician/trustee development,
employee management, regulatory and certificate of need issues, strategic
and tactical planning, clinical and management outcomes, and other various
healthcare related needs.

Jan. 2018     **GEORGE WASHINGTON UNIVERSITY**, Washington, DC
To present    Adjunct Professor- Dept. of Health Policy and Management- School of
                  Public Health

Teaching and mentorship to graduate students in a Masters of Healthcare
Administration (MHA) program. Continuing research and publications
within the field of healthcare administration and maintain a healthcare
based consulting practice.

EXHIBIT
Hyde-3
18|9

PENGAD 800-631-6989

1

JA4391

| | |
|---|---|
| June 1995<br>to Sept. 2017<br>**[RETIRED]** | **UNIVERSITY OF MISSISSIPPI MEDICAL CENTER**-Jackson, MS<br>Professor- Dept. of Health Sciences- School of Health Related<br>        Professions: Promoted [7/1/03]<br>        Associate Professor- Dept. of Health Sciences-SHRP:<br>        Promoted [7/1/98]; Tenured [7/1/00]<br>        Assistant Professor- Dept. of Health Sciences-SHRP:<br>        [Appointed 6/1/96]<br>        Assistant Professor- Dept. of Family Medicine- School of<br>        Medicine: [Appointed 11/1/96] |

Teaching, research and administrative responsibilities in healthcare management, health services research, clinical outcomes, and research designs. Serve as a co-investigator with medical school faculty members, advisor to graduate students, and submit scholarly work for publication. Provide service to the University and the professional community. Advise healthcare community on management and admin-legal issues.

| | |
|---|---|
| Aug. 2011<br>to Sept. 2017 | **UNIVERSITY OF MISSISSIPPI**- Oxford, MS<br>Adjunct Professor- Dept. of Management- School of Business |

Teaching in the newly formulated Master of Healthcare Administration program, a joint program offering with the University of Mississippi Medical Center. Serve as the lead professor within the program.

| | |
|---|---|
| Jan. 2009<br>June 2009 | **UNIVERSITY OF ALABAMA AT BIRMINGHAM**- Birmingham, AL<br>Visiting Professor- Dept. of Health Care Organization- School of Public<br>    Health |

Research sabbatical- interacted with scholars on issues of research aimed at disaster healthcare delivery planning, particularly healthcare providers.

| | |
|---|---|
| Aug. 1994<br>May 1995 | **TRINITY UNIVERSITY**- San Antonio, TX<br>Assistant Professor- Graduate Program in Health Care Administration |

Teaching and research responsibilities for the following classes/areas: Quantitative Methods and Information Management; Quality Outcomes; Operational Management. Served as advisor to students and community providers. Involved in scholarly research and publications. Involved in local Community Health Information Network development.

| | |
|---|---|
| Sept. 1990<br>July 1994 | **UNIVERSITY OF ALABAMA AT BIRMINGHAM**- Birmingham, AL<br>Adjunct Faculty, Research Fellow, Student |

JA4392

Undergraduate and Graduate teaching experience in School of Business and the School of Health Related Professions. Taught 14 classes in Business and Health Care Administration. Performed independent and collaborative research. Completed Ph.D. program.

Joint research position UAB/Birmingham VA Medical Center 9/92-7/94 Participated in funded research projects in the areas of physician decision making, outcomes research, healthcare management, and statistical methods. Conducted independent research as a principal investigator on several studies.

Jan. 1986  **COMMONWEALTH HEALTH CORPORATION**- Bowling Green, KY
May 1990  CHC Vice President/Corporate Officer (4/87 to 5/90)

Corporate responsibilities for all proprietary operations of six affiliated corporations, with ten healthcare and non-healthcare businesses. Managed development of planned business diversifications and potential market acquisitions. Involved in other corporate activities and related hospital council operations.

Vice President- Medical Center at Bowling Green (4/87 to 12/88)

Involved in corporate planning activities and development of proposed corporate business ventures. Formulated business development plans and served as senior hospital operations executive.

Associate Administrator- Medical Center at Bowling (1/86 to 4/87)

Involved in planning and development of a corporate wide re-organization into alternate business ventures. Shaped corporate re-direction into major regional healthcare delivery system. Responsible for senior level hospital operations.

June 1983  **TAYLOR COUNTY HOSPITAL**- Campbellsville, KY
Dec. 1985  Administrator/CEO

Responsible for total operations of a small, rural hospital. Involved in various certificate of need applications, regulatory and governmental relations, and implementation of a management re-organization plan.

Jan. 1981  **MEDICAL CENTER AT BOWLING GREEN**- Bowling Green, KY
June 1983  Assistant Administrator

Responsible for operations of four departments with a staff of 75 employees and 10 managers. Involved in various certificate of need

applications, governmental relations, and board development. Served as member of the executive hospital management council.

Administrative Resident
Served in various staff and line assignments. Participated as an administrative manager during residency period. Developed a prospective staffing and budget reporting system. Period fulfilled residency requirement for Master degree.

**PUBLICATIONS:**

Fottler MD, Malvey D, Hyde JC & Deschamps C (2015). Human Resources Management in Fottler MD, Malvey D & Slovensky DJ (Eds.), Handbook of Healthcare Management, Northhampton, MA: Elgar Publishing.

Hyde JC (2015). Credentialing Health Care Providers in Fried BJ and Fottler MD (Eds.), Human Resources in Healthcare: Managing for success (4th ed.). Chicago, IL Health Administration Press.

Peden A, Hyde J, Hoover K, May W, Coleman P. (2010). Factors affecting adoption of electronic health record (EHR) systems in the U.S. hospitals, XVI Congress of International Federation of Health Records Organizations Proceedings, Milan, ITALY.

Winters KC, Wyatt S, Nick TG, Hewlett PO, Hyde JC & Johnson WD. (2010). Race, stability of health insurance coverage, and prescription medication. ABNF Journal, 21(1): 21-26.

Hyde JC (2010). Trustee Resource Manual: Mississippi Council of Hospital Trustees. Jackson, MS: Mississippi Hospital Association.

Livingston HM, Messura J, Dellinger TM, Holder R & Hyde JC (2008). Meta-analysis: An introduction into a research process. Specialty Care in Dentistry, 28(4): 125-130.

Hyde JC (2007). Trustee Resource Manual: Mississippi Council of Hospital Trustees. Jackson, MS: Mississippi Hospital Association.

Livingston HM, Dellinger TM, Hyde JC & Holder R (2004). The aging and diminishing dental faculty. Journal of Dental Education, 68(3): 345-354.

Hyde JC (2003). Trustee Resource Manual: Mississippi Council of Hospital Trustees. Jackson, MS: Mississippi Hospital Association.

Hyde JC (2003). Physician credentialing: Developing a proactive credentialing process. The Journal of Legal Nurse Consulting, 14(1): 3-6.

JA4394

Hyde JC (2002). Managed care and its impact on the healthcare system: Is it an accident waiting to happen or will it improve patient outcomes? The Journal of Legal Nurse Consulting, 13(2): 26-29.

Weber MD, Hyde JC, Nick TG, Coleman PJ, Geissler W, Freeland A (2002). Factors that influence the change in physical function of patients with adhesive capsulitis. Journal of Orthopedics and Sports Physical Therapy, 32(1); A-11.

Scott CK & Hyde JC (2001). The measurement of patient satisfaction in rehabilitation: An information synthesis. Health Policy Resource, 1(4): 9-14.

Hyde JC, Hart-Hester S & Beebe D (2001). Variables predictive of family medicine residency success. AHSR Annual Meeting Proceedings.

Hart-Hester S, Hyde JC & Beebe D (2001). Predictive variables for success in family medicine residency. Society of Teachers in Family Medicine Annual Meeting Proceedings.

Malvey DM, Hyde JC, Topping SL & Woodrell FD (2000). Getting off the bandwagon: Rural academic health center takes a different strategic path. Journal of Healthcare Management, 45(6): 381-394.

Hoover KM & Hyde JC (2000). Impact of managed care penetration, hospital organizational variables, and nurse staffing ratios on hospital ALOS and mortality in 3 Southern states. AHSR Annual Meeting Proceedings.

Wilson TG, Hyde JC & Breaux DA (2000). Community attitudes, operational indicators, and hospital administration: Examining the determinants surrounding the conversion of government owned rural acute care facilities to critical access hospitals. AHSR Annual Meeting Proceedings.

Topping SL, Hyde JC, Barker J & Woodrell FD (1999). Academic health centers in turbulent times: Strategies for survival. Health Care Management Review, 24(2): 7-18.

Hyde JC & Keller S (1999). The Jackson Medical Mall Clinic Study: Evaluation of HEDIS outcomes in selected primary care settings among historically underserved minorities. AHSR Annual Meeting Proceedings.

Topping SL, Hyde JC, Barker J & Woodrell FD (1998). Adaptive strategies of academic health centers: Will they survive or go the way of the dinosaurs? Academy of Management Proceedings, [*Best Paper Award*].

Hyde JC, Replogle WR, Brown K, Beisel B, Boyd J & Ross B (1998). Determinants of hypertension control: a longitudinal study of an urban, residency site family medicine clinic. MEDLARS- HealthSTAR.

Hyde JC (1998). Theoretical foundations of TQM and CQI: Does "quality" really have its own theory? Topics of Health Information Management, 18(3), 60-68.

Hansen CF, Nick TG, Hyde JC & Tsao A. (1998) Meta-Analysis of continuous passive motion use in total knee arthroplasty. Physical Therapy, 78(5): S74.

Hyde JC (1998). Who are your patients? Mississippi Hospital Trustee, Winter Edition, Mississippi Hospital Association.

Hyde JC (1998). Mississippi: Its Hospitals and Demographics. Trustee Resource Book. Jackson, MS: Mississippi Hospital Association.

Joiner CL and Hyde JC (1998). Performance Appraisal in Fottler MD, Hernandez SR and Joiner CL (Eds.), Essentials of Human Resources Management. Albany, NY: Delmar.

Joiner CL, Metzger N, Hyde JC and Malvey DM (1998). Labor Relations in Fottler MD, Hernandez SR and Joiner CL (Eds.), Essentials of Human Resources Management. Albany, NY: Delmar

Hyde JC and Drake ML (1997). Rural therapists' assessment of capability for autonomous practice. ACRES Proceedings, 216-221.

Hyde JC and Fottler MD (1996). Service utilization and practice guidelines as determinants of patient care: The case of mild hypertension. Southern Management Association Proceedings, 344-347.

Hyde JC, Topping S and Woodrell FD (1996). Organization performance indicators: The case of CQI implementation within an academic medical center. MEDLARS- HealthSTAR.

Fottler MD and Hyde JC (1995). Employer attitudes toward various health care cost containment options. Academy of Management Proceedings.

Hyde JC and Fottler MD (1995). The impact of practice guidelines and resource utilization on the quality of patient care. MEDLARS- HealthSTAR.

Hyde JC and Fottler MD (1995). Determinants of rural hospital utilization of multiskilled health practitioners. Health Services Management Research, 8(1), 64-72.

Hyde JC and Fottler MD (1994). Determinants of physician vacancy rates in rural hospitals. Journal of Rural Health, 10(1), 38-48.

Joiner CL and Hyde JC (1994). Performance Appraisal in Fottler MD, Hernandez SR and Joiner CL (Eds.), Strategic Management of Human Resources in Health Service Organizations (2nd ed.). Albany, NY: Delmar.

Joiner CL and Hyde JC (1994). Preventive Labor Relations in Fottler MD, Hernandez SR and Joiner CL (Eds.), Strategic Management of Human Resources in Health Service Organizations (2nd ed.). Albany, NY: Delmar.

Hyde JC and Fottler MD (1992). Application of the multiskilled staffing innovation to the health care information professional. Journal of Health Information Management Association, 63(11), 54-60.

Hyde JC and Fottler MD (1992). A system analysis approach to developing a multiskilled health practitioner program. in Blayney KD (Ed.) Healing Hands: Customizing your health team for institutional survival. Battle Creek, MI: Kellogg Foundation.

Fottler MD and Hyde JC (1992). Characteristics of hospitals which adopt managerial innovations: The case of the multiskilled health practitioner. Southern Management Association Proceedings, 564-567.

Hyde JC and Fottler MD (1992). Determinants of physician vacancy rates in rural hospitals. Academy of Management Proceedings.

Hyde JC (1992). Determinants of personnel strategies in rural hospitals. SRIRAS.

Hyde JC (1992). Implications of multiskilled health care professional utilization in rural hospitals. Southern Allied Health Association Proceedings.

Hyde JC (1991). Physician recruitment perspectives. Abstract-CEO Briefings, 21(3).

## SCHOLARLY PRESENTATIONS:

Peden A, Hyde J, Hoover K, May W, Coleman P. (2010). Factors affecting adoption of electronic health record (EHR) systems in the U.S. hospitals, XVI Congress of International Federation of Health Records Organizations, Milan, ITALY.

Weber MD, Hyde JC & Nick TG (2002). Factors influencing health status outcomes of patients with adhesive capsulitis. Academy for Health Services Research and Health Policy 2002, Washington, DC.

Weber MD, Hyde JC, Nick TG, Coleman PJ, Geissler W, Freeland A (2002). Factors that influence the change in physical function of patients with adhesive capsulitis. American Physical Therapy Association: Combined Sections Meeting, 2002, Orlando, FL.

Hyde JC, Hart-Hester SM & Beebe DK (2001). Variables predictive of Family Medicine Residency Success. Academy for Health Services Research and Health Policy 2001, Atlanta, GA.

Hart-Hester SM, Hyde JC & Beebe DK (2001). Predictive variables for success in family medicine residency. Annual Conference Society of Teachers of Family Medicine, Denver, CO.

Hoover KM & Hyde JC (2000). Impact of managed care penetration, hospital organizational variables, and nurse staffing ratios on hospital ALOS and mortality in 3 Southern states. 17th Annual Association for Health Services Research, Los Angeles, CA.

Wilson TG, Hyde JC & Breaux DA (2000). Community attitudes, operational indicators, and hospital administration: Examining the determinants surrounding the conversion of government owned rural acute care facilities to critical access hospitals. 17th Annual Association for Health Services Research, Los Angeles, CA.

Hyde JC & Wainright CW (2000). How to de-mystify the consulting experience. American College of Healthcare Executives, Chicago, IL.

Hyde JC, Keller S & Replogle WR (1999). The Jackson Medical Mall Clinic Study: Evaluation of HEDIS outcomes in selected primary care settings among historically underserved minorities. 16th Annual Association for Health Services Research, Chicago, IL.

Hyde JC, Malvey DM, Brunson C, Blair J & Fottler MD (1999). Innovation of Medical Group Management: Environmental and strategic adaptation. 15th Annual Congress on Healthcare Management, Chicago, IL.

Topping SL, Hyde JC, Barker J & Woodrell FD (1998). Adaptive strategies of academic health centers: Will they survive or go the way of the dinosaurs? 58th Annual Meeting of the Academy of Management, San Diego, CA.

Hyde JC, Replogle WR, Brown K, Beisel B, Boyd J & Ross B (1998). Determinants of hypertension control: a longitudinal study of an urban, residency site family medicine clinic. 15th Annual Association for Health Services Research, Washington, DC.

JA4398

Hyde JC, Barker JR & Woodrell FD (1998). The Jackson Medical Mall: A community-based health delivery innovation. 14th Annual Congress on Healthcare Management, Chicago, IL.

Hansen CF, Nick TG, Hyde JC & Tsao A. (1998) Meta-Analysis of continuous passive motion use in total knee arthroplasty. Scientific Meeting & Exposition of the American Physical Therapy Association, Orlando, FL.

Nick TG and Hyde JC (1997). Quantifying the predictive information of categories with logistic regression models on health-risk behaviors. 1997 International Conference on Health Policy Research, Georgetown University Medical School, Washington, DC.

Hyde JC and Drake ML (1997). Rural therapists' assessment of capability for autonomous practice. Second Annual SHRP Research Day- SHRP, University of Mississippi Medical Center, Jackson, MS.

Hyde JC and Drake ML (1997). Rural therapists' assessment of capability for autonomous practice. ACRES, San Antonio, TX.

Hyde JC and Fottler MD (1996). Service utilization and practice guidelines as determinants of patient care: The case of mild hypertension. Southern Management Association, New Orleans, LA.

Hyde JC, Topping S and Woodrell FD (1996). Organizational performance indicators: The case of CQI implementation within an academic medical center. 13th Annual Association for Health Services Research, Atlanta, GA.

Hyde JC and Fottler MD (1996). The impact of practice guidelines and resource utilization on the quality of patient outcomes. First Annual SHRP Research Day- SHRP, University of Mississippi Medical Center, Jackson, MS.

Hyde JC and Slovensky DJ (1996). Effects of integrated delivery system development on the scope and direction of information management systems. First Annual SHRP Research Day- SHRP, University of Mississippi Medical Center, Jackson, MS.

Hyde JC, Roswell RH, Quintana JB and Nick TG (1995). Methodological issues in a pair-wise matched (1:1) case-control study: The case of the Persian Gulf War Syndrome. 1995 International Conference on Health Policy Research, Harvard Medical School/Massachusetts General Hospital, Boston, MA.

Fottler MD and Hyde JC (1995). Employer attitudes toward various health care cost containment options. 55th Annual Meeting of the Academy of Management, Vancouver, BC, Canada.

Hyde JC and Fottler MD (1995). The impact of practice guidelines and resource utilization on the quality of patient care outcomes. Association for Health Services Research, Chicago, IL.

Hyde JC and Slovensky DJ (1995). Effects of integrated delivery system development on the scope and direction of information management systems: A case study. AUPHA Annual Meeting, Chicago, IL.

Hyde JC and Fottler MD (1993). Employer attitudes toward various health care cost containment options. AUPHA Annual Meeting, Atlanta, GA.

Hyde JC and Fottler MD (1992). Determinants of physician vacancy rates in rural hospitals. 52nd Annual Meeting of the Academy of Management, Las Vegas, NV.

Fottler MD and Hyde JC (1992). Characteristics of hospitals which adopt managerial innovations: The case of the multiskilled health practitioner. Southern Management Association, New Orleans, LA.

Hyde JC (1992). Determinants of personnel strategies in rural hospitals. 13th Annual Southern Regional Industrial Relations Academic Seminar, Dothan, AL. Hyde JC and Fottler MD (1992). Determinants of rural hospital utilization of multiskilled health practitioners. AUPHA Annual Meeting, Washington, DC.

Hyde JC (1991). Implications of multiskilled health care practitioner utilization in hospitals. Fourth Annual Southeastern Allied Health Research Symposium, Birmingham, AL.


**INDUSTRY/ASSOCIATION PRESENTATIONS:**

Hyde JC (2014). Trends and Implications of Negligent Credentialing. American Association of Legal Nurse Consultants.

Hyde JC (2008). When ethics and law collide. Memorial Hospital of Gulfport (MS) - Annual Ethics Conference.

Hyde JC (2007). When Ethics and Law Collide. Continuing Health Profession Education, UMMC (MS) 2007 Ethics Summit- Ethical Dilemmas: Moral reasoning and practical reality.

Hyde JC (2005). Trustee Development Forum. Grenada Lake (MS) Medical Council.

Hyde JC (2003). Trustee Resource Manual: Mississippi Council of Hospital Trustees. Mississippi Hospital Association Annual Trustee Forum.

Hyde JC (2001). An overview of the American Health Care System: System versus chaos. Mississippi Consortium for International Development. Visiting Russian physician group.

Hyde JC (2000). Development of management faculty in an academic health center. Academy of Management Annual Meeting, Healthcare Management Division.

Hyde JC (2000). Health care in the United States: An Overview into Americanized Medicine. Mississippi Consortium for International Development. Visiting Russian physician group.

Hyde JC (1999). Facing the New Millennium in Health Care. Mississippi Hospital Association for Human Resources Management.

Hyde JC (1999). What an academic health center has to offer. Academy of Management Annual Meeting, Healthcare Management Division.

Hyde JC (1999). Managed care and its impact on healthcare organizations and systems of health care. American Association of Legal Nurse Consultants.

Hyde JC (1998). Managed care in Mississippi: The potential impact on behavioral health services. Mississippi Hospital Association for Behavioral Health Services.

Hyde JC (1998). The people and hospitals of Mississippi. Mississippi Hospital Association Annual Trustee Forum.

Hyde JC (1997). A hypertension study: Determinants of quality. Jackson (MS) Veterans Affairs Medical Center.

Hyde JC (1997). The United States health care system: An Overview into Americanized Medicine. Mississippi Consortium for International Development. Visiting Russian physician group.

Hyde JC (1997). Managed Care Activities in Mississippi and Impacts on Providers. Mississippi Hospital Association Society for Purchasing and Materiel Management.

Hyde JC (1997). Perspectives on Managed Care. Natchez (MS) Regional Medical Center.

Hyde JC (1996). Health Services Management Workshop. Mississippi Conference on Health Care Reform.

Hyde JC (1996). Changing Health Care Paradigms. Mississippi Hospital Association Society for Healthcare Education.

Hyde JC (1996). Attributes of Leaders for Future Health Care Systems. Mississippi Hospital Association Organization of Nurse Executives.

Hyde JC (1996). Transitioning into the year 2000. Mississippi Hospital Association Society for Purchasing and Materiel Management.

Hyde JC (1995). Outcomes-Based Research: A vehicle for clinical practice and Health Services research. University of Mississippi School of Medicine, Department of Family Medicine.

Hyde JC (1995). Organizational Performance Analysis: The key to high performers. Methodist Healthcare System (San Antonio, TX).

Hyde JC (1994). Issues of data privacy, security and confidentiality within a comprehensive health information network. San Antonio (TX) Health Care Partnership.

Hyde JC (1994). Management effectiveness: Team building techniques for improved operations. University of Alabama at Birmingham Health Services Administration Continuing Education.

Hyde JC (1994). Management through database analysis. Veterans Affairs Management Development Program (AL).

## RESEARCH DISSERTATION DIRECTION:
Dissertation Chair-
    Kim Hoover, RN (completed: Ph.D. -4/00)
    Kaye Bender, RN (completed: Ph.D. -4/01)
    Sheila Keller (completed: Ph.D. -4/01)
    Mark Webber, PT (completed: Ph.D. -7/01)
    Marcella McKay, RN (completed: Ph.D. - 11/02)
    Frances Gordy, DDS (pre-proposal status)
    Ann Peden (completed: Ph.D.-5/09)
    Sabrina Bryant (completed: Ph.D.-6/12)

Dissertation Committee Member-
    Tom G. Wilson (Mississippi State University student in Ph.D. Public Administration program, completed: 6/00)
    Pam Manor (pre-proposal status)
    Cyndi Scott (completed: Ph.D.-12/02)
    Karen Winters (completed: Ph.D. - 2/04)
    Larry L. Smith (completed: Ph.D. -4/07)
    Amy Sullivan (completed: Ph.D. -4/09)
    Renae Wadley (completed: Ph.D. - 11/15)

JA4402

Stephanie McCullough (pre-proposal)

## MANUSCRIPT REVIEWER:
### Academy of Management
 1994- Division of Health Care Management
 1995- Division of Health Care Management
 1997- Division of Health Care Management
 1998- Division of Health Care Management
 1999- Division of Health Care Management
 2000- Division of Health Care Management
 2001- Division of Health Care Management
 2002- Division of Health Care Management
 2003- Division of Health Care Management
 2004- Division of Health Care Management
 2005- Division of Health Care Management
 2007- Division of Health Care Management
 2008- Division of Health Care Management
 2011- Division of Health Care Management

### Southern Management Association
 1994- Division of Health Care Management
 1995- Division of Health Care Management
 1996- Division of Health Care Management/Hospitality
 1997- Division of Health Care Management/Hospitality
 2000- Division of Health Care Management/Hospitality
 2001- Division of Health Care Management/Hospitality

### Archives of Internal Medicine [JAMA]
 1998-guest reviewer

### Health Care Management Review
 1999 to current

### Journal of Healthcare Management
 2010 to current

## ACADEMIC SESSION DISCUSSANT:
### Academy of Management
 1997- Division of Health Care Management
 1999- Division of Health Care Management
 2000- Division of Health Care Management

### Southern Management Association

1996- Division of Health Care Management/Hospitality
2000- Division of Health Care Management/Hospitality

## WORKING RESEARCH MANUSCRIPTS:

Predictive variables of family medicine residency success.

Stakeholder analysis of physician executives in group practices.

Dynamics of organizational change within an academic medical center associated with structural re-organization.

Determinants of decision making among medical residents within an academic medical center environment.

Clinical practice guidelines and medical outcomes.

Integrated delivery systems and the process of information flows.

## IRB APPROVED RESEARCH:

ARIC- Atherosclerosis Risk in Communities. Funded by NHLBI. JC Hyde, Investigator, ARIC CMS Analysis and Outcomes Research Committee

HEDIS outcomes among primary care patients within a community medical clinic. June 1998- JC Hyde, Co-Principal Investigator

Outcomes among mildly hypertensive patients within an ambulatory Family Medicine clinic setting. April 1997- JC Hyde, Principal Investigator
Predictive variables for success in Family Medicine Residency Programs. February 1997- JC Hyde, Co-Principal Investigator

Rural therapist assessment of capability for autonomous practice. September 1996- JC Hyde, Co-Principal Investigator

Assessment of perceived social/physical dysfunctions among ambulatory primary care clinic veterans. December 1993- JC Hyde, Principal Investigator

Impact of physician decision making on the costs and quality of patient care. October 1993- JC Hyde, Principal Investigator
Level of resource utilization/health outcomes associated with clinical decision supports. May 1993- JC Hyde, Principal Investigator

**GRANTS/CONTRACTS (FUNDED):**

Summer '98    **American Academy of Family Physicians**, Department of Family
Medicine. The University of Mississippi Medical Center. Student Research
Externship. Investigator.

Summer '97    **American Academy of Family Physicians**. Department of Family
Medicine. The University of Mississippi Medical Center. Student Research
Externship. Investigator.

Dec. '96    **School of Health Related Professions**. The University of Mississippi
Medical Center. Development Fund Grant. Co-Principal Investigator.

Summer '95    **Summer Research Stipend**. Trinity University. Principal Investigator.
(did not accept due to move to UMC)

Aug. '92    **VA Health Services Research and Developmental Grant**. Birmingham
Veterans Affairs Medical Center. Investigator.


**RECENT COMMITTEE MEMBERSHIPS:**

1995 to
2001    **Institutional Review Board**. The University of Mississippi
Medical Center. *Member*. Review, evaluate and approve all
human research conducted on the UMC campus and all research conducted
regardless of sites by UMC researchers. Issues of human protection,
informed consent and respondent safety are guiding concerns.

1995 to
1998 &
2000 to
2001    **Graduate Faculty Council**. The University of Mississippi Medical Center.
*Member*. Council provides overall direction and serves as the final
authority on issues of graduate education on the medical campus.

1997 to
2000    **Graduate Faculty Council Sub-Committee, Evaluation of Campus-
wide Graduate Programs**. The University of Mississippi Medical Center.
*Member*. Evaluate all graduate programs at UMC and formulate general
requirements of admission, course requirements, and degree fulfillment

1995 to
2010    **Graduate Faculty Admissions Committee**. The University of Mississippi
Medical Center. Former *Chairman and Member*. Committee develops
criteria and overall process for admission to the M.S. and Ph.D. programs
within the School of Health Related Professions.

1995 to
1997    **Joint Graduate Faculty Admissions Committee**. The University of
Mississippi Medical Center. *Member* and current *Chairman*. Committee

oversees graduate admissions within the School of Health Related Professions and the School of Nursing.

1994 to **Sub-Committee on Privacy, Security and Confidentiality**. San Antonio
1995 Health Care Partnership. *Chairman*. Development of a Community Health Information Network and specifically address issues of data integrity and confidentiality.

**PROFESSIONAL/COMMUNITY SERVICE (healthcare only):**

2007 to Community Place Nursing Home- Board Member
2009

2000 to Trinity University Department of Health Care Administration- Past
2016 President, Finance Chair, Board Member

2005 to Trinity University National Alumni Association- HCAD Representative
2007

2002 to University of Alabama at Birmingham- Health Information Management
2007 Program Advisory Committee Member

2000 to Central Mississippi Sickle Cell Foundation- Board Member
2006

2000 to American College of Healthcare Executives Mississippi Chapter- former
2004 Chapter President, President-Elect, Board Member

1999 to American College of Healthcare Executives Mississippi Regent's Advisory
2007 Council Member

1998 to Academy of Management Division of Health Care Management- former
2004 Board Member and Membership Chair

**PROFESSIONAL MEMBERSHIPS:**
American College of Healthcare Executives- Fellow
Academy of Management
Association of University Programs in Healthcare Administration
Healthcare Financial Management Association
Southern Management Association
American Health Planning Association

*As of January 2019*

# EXHIBIT 6

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3

    MONIQUE RUSSELL, JASMINE     )
 4  RIGGINS, ELSA M. POWELL,     )
    and DESIRE EVANS,            )
 5                               )
                Plaintiffs,      )
 6                               )  Civil Action No. 18-5629
           vs.                   )
 7                               )  Honorable Joshua D.
    EDUCATIONAL COMMISSIONER     )  Wolson
 8  FOR FOREIGN MEDICAL          )
    GRADUATES,                   )
 9                               )
                Defendant.       )
10

11

12     VIDEOTAPED DEPOSITION OF JOHN CHARLES HYDE, Ph.D.
13                  (Taken by Defendant)
14                  November 18, 2019
15
                        9:40 a.m.
16

17

18

19

20        Renaissance Concourse Atlanta Hotel
             One Hartsfield Centre Parkway
21                  Atlanta, Georgia
22

23

24

    Reported by:   F. Renee Finkley, RPR, RMR, CRR, CLR,
25  CCR-B-2289
```

JA4408

```
 1    definition of credentialing.  What I'm -- what I'm

 2    asking for is what you would actually look at in

 3    deciding whether or not to credential a physician.

 4        A.    Okay.  Licensure, training, which could

 5    include, obviously, not just internship, but

 6    residency and/or fellowship.  You would look at their

 7    experience.  Some of them may not have any.  You

 8    know, they may be fresh out of the residency program,

 9    others may not.  You would look at litigation

10    history.  You would look at board certification.  You

11    would look at health status.  And you would look at

12    sort of their general ability to get along with

13    others.  Do they play well with others?

14            So you -- you're looking at a lot of

15    different factors that's going to get you that.

16    Also, you would look and see the National

17    Practitioner Data Bank.  Have they had any payouts or

18    any convictions of any type of morally-related, moral

19    turpitude, which is typically the terminology.  You

20    would look at Office of Inspector General to see if

21    they have had any claims or had the ability to be

22    involved in Medicare/Medicaid.

23            You would look potentially at insurance

24    companies to see if they've been providing on-panels

25    within the insurance world for managed care, so to
```

JA4409

1    speak.  I gave you more than a quarter's worth, but

2    that's sort of going down the list.

3         Q.    Anything else that you haven't mentioned

4    that you recall that you would look at in deciding

5    whether or not to credential a physician?

6         A.    Recommendations, obviously, from -- you

7    know, that goes without saying.  Previous history.

8    We would query the other hospitals if the individual

9    was on their -- it depends on their point in their

10   career.  If somebody's just out of residency, they're

11   not going to have a lot of previous experience or

12   experiential training outside of residency; but if

13   they were on staff at another hospital, you would ask

14   the hospital, Are they on staff, What level, Are they

15   in good standing.

16         You'd like to get more, but that's sort of

17   all you're going to get.  You would probably also

18   query their health grades.  You know, there's a lot

19   of different things that would give some idea of some

20   feedback.

21         Q.    Anything in addition to that that you

22   would look at when deciding about privileging?  If

23   you've just gone through all that for credentialing

24   an individual, how do you go about -- what do you

25   look at for privileging purposes?

JA4410

# EXHIBIT 7

## Jerry Williamson, M.D., F.A.A.P., M.J., CHC., LHRM

## 24 Falconwood Court Fort Myers, Florida 33919

**Expert Report:** Jerry Williamson M.D. FAAP. MJ.CHC.LHRM

### September 22, 2019

### Re: Monique Russell, Jasmine Riggins, Elsa Powell, Desire Evans v. Educational Commission for Foreign Medical Graduates

The following report is supported by over 40 years of both formal education and experience as a physician and administrator. My formal education accomplishments include my degree as a Doctor of Medicine, my master's in healthcare jurisprudence, and certifications in healthcare compliance and risk management. I have practiced clinical medicine in my specialty, pediatrics, in which I am Board Certified.

I have held administrative positions as a Chief Medical Officer, Medical Director, and Vice President for Medical Affairs in both the ambulatory and inpatient settings. In these positions I served on and chaired credentialing committees. Based on my experience in these roles, I became knowledgeable concerning the primary source credentialing process of the ECFMG, as it applies to the standard of care. In 2005, as CMO and Director of the Biomedical Informatics Program, I directed the implementation of an EMR for an FQHC, assisting in the development of policies and procedures. During this period, I was Co-Medical Director of the Community Health Center Alliance Electronic Medical Record Clinical Committee. This committee assisted other organizations in their development and implementation of EMR's. I also served as a Meaningful Use Clinician Champion to The Center for the Advancement of Health Information Technology, a Regional Extension Center in Florida.

I have been a national speaker for the past 25 years, with a focus on patient safety, communication inadequacies in health care, and the prevention of medical errors. My roles have included Clinical Instructor in the Department of Pediatrics, University of South Florida College of Medicine, Clinical Assistant Professor in the Department of Pediatrics at NOVA Southeastern University, College of Osteopathic Medicine, Clinical Associate Professor of Physician Assistant Sciences, College of Allied Health, NOVA Southeastern University, Clinical Assistant Professor of Pediatrics, and Clinical Clerkship Training Coordinator at The Florida State University College of Medicine, and Clinical Assistant Professor at the Florida State University College of Medicine, Department of Clinical Sciences, Family Medicine Residency Program. In 2012, I was the Recipient of the *"Heroes in Healthcare Award"* for Administrative Excellence in Healthcare, from the Naples Daily News.

1



EXHIBIT ___ 9
WIT: _____
DATE: _____
ANGELA M. COKER, COURT REPORTER

I had the opportunity to review the following documents that were provided to me from the law firm Janet, Janet & Suggs:

- Kara Corrado, 09/10/2019 Deposition Transcript with Exhibits 1-9
- William C. Kelly 08/20/2019 Deposition Transcript with Exhibits 1-53
- Class Action Civil Complaint and Exhibits
- Stephen S. Seeling 09/06/2019 Deposition
- Timeline of Events
- 1996 Information Booklet ECGMG
- Answer to Class Action Civil Complaint and Affirmative Defenses
- Defendant's Objections and Responses to Plaintiffs' Requests for Admissions of Facts and Genuineness of Documents
- Defendant's Objections and Responses to Plaintiffs' Second Requests for Admissions of Genuineness of Documents
- USMLE Letter (02-05-18); ECFMG Credentials Committee Document (11-30-16); U.S. DOJ Plea Agreement with Attachment A-Stipulated Facts; ECFMG Irregularity Report (09-1992) and Sanctions Update (11-30-16); ECFMG Press Release re: Launching Electronic Verification of Medical Credentials
- ECFMG emails

## Summary of Facts:

1. Credentialing of healthcare practitioners is a screening process verifying that a physician is who he/she claims to be, and qualified to practice his or her profession. The process ensures that physicians have the education, knowledge, and competence to provide quality patient care. This is accomplished by obtaining the physician's essential information using primary source verification, to determine the accuracy of a qualification or documents reported by a physician. If the process fails for whatever reason, patient safety and quality is compromised, and patient harm may result. Primary source can be accomplished via direct correspondence, telephone and computer verification, and reports from credentials verification organizations. Credentialing organizations must be aware of any red flags, and immediately investigate them to avoid serious consequences.

2. The Educational Commission for Foreign Medical Graduates (ECFMG) is an organization that credentials international medical graduates for residency opportunities in the United States providing they have met all the requirements. This includes verifying

2

successful completion of medical school, and passing standardized examinations administered by the United States Medical Licensing Examination (USMLE), a Clinical skills Assessment Examination, and an English Test to determine competency in English.

3. Utilizing primary source verification, ECFMG documents the authenticity of the applicant's diploma, the medical school transcript, and any letters of recommendation. Once this process is successfully completed, ECFMG will provide the applicant a certificate of completion. Once the applicant begins applying to residency programs , ECFMG acts as "the deans office" (See Deposition William Kelly) and provides the residency program with a status report.

4. In 1991, Olufafemi Charles Igberase came to the U.S. from Nigeria, and submitted an application to ECFMG for certification. Over the next several years he used false identities, false social security numbers, false birthdates, false diplomas, and a false passport to obtain ECFMG certification.

5. In 1996, a third application was submitted by Igberase to ECFMG under the alias of John Charles Akoda. His application was accepted, so in 1998 after receiving ECFMG Certification, he applied for a residency position at Jersey Shore Medical Center (JSMC) and was accepted under the name John Charles Akoda and began his residency in July 1998.

6. During an on-site meeting in September 2000 at ECFMG's office, Akoda admitted to William Kelly, Manager of the Medical Education Credential Department at ECFMG, that he used Igberase's social security number. Approximately three months later, JSMC advised ECFMG that Akoda was dismissed from their residency program for using a false social security number and false green card.

7. In 2006 Igberase applied and secured a residency at Howard University Hospital under the Akoda alias, using a false social security number. He completed his residency at Howard Hospital in 2011, and he applied for a Maryland license using the name Charles John Nosa Akoda. The information provided to the Maryland Licensing Board included a fake social security number, and fake passport.

8. In 2011 he became a staff member at Prince George's Hospital Center and began patient care in November 2011 under this fraudulent identity. The following year he was denied enrollment in The Center for Medicare and Medicaid Services (CMS) due to submitting an inaccurate social security number. While using the Akoda name, he practiced obstetrics and gynecology from 2008 through 2016. This included a private practice setting as well as employment with Dimensions Healthcare Associates.

3

9.  In June 2016, law enforcement conducted a search at Igberase's residence, medical office, and vehicle. They found a variety of fraudulent and altered documents. In November 2016, he signed a plea agreement admitting to misuse of a social security number.

10. The following month ECFMG revoked Akoda's certification. In March 2017, he was sentenced by the U.S. District Court for the District of Maryland. This resulted in the termination of his staff privileges at Prince George's Hospital, and the revocation of his Maryland license based upon his felony conviction.

11. The current class action lawsuit is based on allegations that Igberase performed inappropriate physical examinations of a sexual nature on women, creating boundary violations.

12. The key question that must be resolved is whether ECFMG's actions or failure to act resulted in foreseeable injuries or damages to Class Members.

## Analysis of Facts and Opinion:

1.  ECFMG in its Subject Notice #101 dated March 1, 2017-Irregular Behavior Cases and Associated Actions & Sanctions states the following:
    *The educational Commission for Foreign Medical Graduates (ECFMG) of the United States works on behalf of domestic and International medical regulatory authorities to protect the public through its programs and services, including primary source verification of physician credentials. ECFMG considers all actions or attempted actions taken to subvert its processes, programs, or services to be **Irregular behavior.***

2.  The 1996 ECFMG Certification and Application Information Booklet addresses the issue of Irregular Behavior. It states that: *Irregular behavior includes all actions on the part of applicants and/ or examinees, or by others when solicited by an applicant and/or examinee, that subvert or attempt to subvert the examination process.* It describes specific examples of irregular behavior and includes *falsifying information on application or registration forms;* This booklet is provided to all the applicants seeking ECFMG and USLME certification.

3.  Accrediting organizations such as the Joint Commission has stated the following:
    *The Joint Commission, the organization that evaluates and accredits U.S. health care organizations and programs, has determined that direct verification with ECFMG of a physician's certification status satisfies The Joint Commission's requirement for primary-source verification of medical school completion for graduates of international medical schools. ECFMG's Certification Verification Service (CVS) provides this primary-source confirmation of an individual's ECFMG certification status to medical licensing*

4

*authorities, residency programs, hospitals, or other organizations that, in the judgment of ECFMG, have a legitimate interest in such information.*

4. There are several regulatory organizations including the Maryland Board of Physicians and numerous hospitals including Howard University Hospital and Prince George's Hospital Center that rely and trust the judgements of the ECFMG. Therefore, in this case, ECFMG owed a duty to the residency programs and the state licensing agencies to comprehensively review an application for certification. When ECFMG learned that Igberase was using a false social security number, and he admitted to doing so, it was imperative that they act as a prudent credentialing organization and comprehensively investigate this physician's background. .

5. ECFMG had a duty to determine whether the documents provided by Igberase and his aliases strongly suggested that Igberase and Akoda was one in the same individual. ECFMG breached that duty by failing to learn and appropriately act on that information.

6. There were several opportunities for ECFMG to intercede, still they breached the standard of care in the following ways:

   a. When Igberase had a face to face meeting at ECFMG in September 2000 and provided a false passport. ECFMG failed to authenticate the document.

   b. ECFMG failed to act when they learned that he misused his social security number.

   c. ECFMG neglected to compare the photographs in Igberase and Akoda's application. That would have confirmed they were the same person.

   d. ECFMG requested confirmation to authenticate three alleged letters of reference provided by Akoda, and the parties never returned a response. Nonetheless, ECFMG provided primary source verification to Howard University Hospital.

   e. ECFMG provided primary source verification to the Maryland Board of Physicians and Prince George's County Hospital without notifying them of their doubts surrounding Akoda's identity and credentials.

7. The December 22, 2000 Memorandum for the file From William Kelly to Stephen Seeling J.D. is difficult to comprehend . It was created as a memorandum for the file since William Kelly believed it should not be part of the official file. The memorandum was based on his discussion with James McCorkel M.D., Vice President for Academic Affairs, at the Jersey Shore Medical Center Residency Program. Dr. McCorkel believed Igberase and Akoda were one an the same person. Mr. Kelly confirmed he believed this as well

5

but stated in the Memorandum that he does not believe there is enough information for the Credentials Committee. He goes on to say *I sent Igberase an email and who should reply, but Akoda!*

8.  As stated previously, ECFMG has many organizations that rely on their information and trust they are receiving accurate information when making decisions based on the information they receive from ECFMG. Not including critical information in the official file, places these organizations at a disadvantage. Another example of ECFMG's failure to act in a reasonable and prudent manner.

9.  By not being more assertive in their investigation in this matter, and not escalating their concerns to their Credentialing Committee, ECFMG certified Acoda and assisted him in his acceptance to the Howard University residency program. Additionally, this permitted him to obtain a Maryland License to practice medicine and obtain privileges at Prince George's Hospital. Unfortunately, ECFMG's failure to act in a reasonable and prudent way permitted Acoda to practice medicine and increase the risk of harm to the plaintiffs in this class action lawsuit, and perhaps others.

10. It was not until December 2016 when ECFMG revoked Akoda's certificate (0-482-700-2) based upon his plea agreement with United States, citing the same conduct Igberase had admitted to in 2000. ECFMG's failure to properly investigate the matter, directly resulted in foreseeable injuries to Igberase/Akoda's patients.

11. ECFMG had a duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. However, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety. Patients have a right to receive medical treatment from physician's who have obtained ECFMG certification legitimately, not through falsities and misrepresentations.

**Conclusion:**

There were several missed opportunities to address the many irregularities in the Igberase/Acoda applications. Unfortunately, these missed opportunities, permitted this unqualified individual with multiple fraudulent identities to practice medicine for years. ECFMG breached its duty to its aforementioned clients, including medical licensing authorities, residency programs, hospitals, and others. Additionally, ECFMG's failure to act in a reasonable and prudent manner directly impacted patient safety.

6

**Disclaimer:**

My conclusions are based on the information that I was able to review, that was provided to date, and I reserve the right to change my opinions based on any additional information that I receive.

Respectfully,

Jerry Williamson M.D. FAAP,MJ,CHC, LHRM

## Jerry Williamson, M.D., F.A.A.P., M.J., CHC

## ADDENDUM: AS OF NOVEMBER 21, 2019

After submitting my expert report that included the documents, I reviewed pursuant to Rule 26, there were additional documents reviewed. The following list represents the additional documents I received and reviewed from legal counsel at Janet, Janet, and Suggs.

- Deposition of David Markenson Expert-Taken October 22, 2019.
- Deposition of Elsa Powell Plaintiff- Taken September 6, 2019
- Deposition of Desire Evans Plaintiff-Taken September 5, 2019
- Deposition of Jasmine Riggins Plaintiff-Taken September 12, 2019
- Deposition of Monique Russell- Taken September 16, 2019
- Expert Report, David Markenson M.D.-September 19, 2019
- Expert Report, Christiane Tellefsen M.D.-September 20, 2019
- Expert Report, John C. Hyde Ph.D-September 23, 2019
- Expert Report, Annie Steinberg M.D.-September 23, 2019
- Expert Report, Richard L. Luciani M.D.-
- Expert Report, Douglas R. Phillips M.D.-October 11, 2019
- Expert Report, Jonathan H. Burroughs M.D.-September 21, 2019
- ECFMG-Irregularity Report-September 22,23 1992

Reviewing the aforementioned documents did not change my opinion in any material way. My conclusions have not changed.

Jerry Williamson M.D.



EXHIBIT _10_
WIT: _____
DATE: _____
ANGELA M. COX 4419 REPORTER

# EXHIBIT 8

JA4420

# JERRY WILLIAMSON, M.D. F.A.A.P. MJ. CHC. L.H.R.M.

24 Falconwood Court
Fort Myers, FL 33919
Updated August 2019

Cell: (239) 849-1400
Residence: (239) 277-1445
E-mail: jwchsi@outlook.com

**PROFILE:**  Board certified physician and health care executive with over 30 years experience in private practice and healthcare management including:

- Managed care initiatives
- Participated in the design and implementation of a staff model HMO
- Acquisition of physician practices
- PHO development
- MSO development
- Physician recruitment/retention
- Care Mapping
- Strategic planning
- National speaker
- Electronic Medical Record implementation
- Medical liability initiatives including E-Discovery

## PROFESSIONAL EXPERIENCE

**Collier Health Services, Inc**  February 1998 –2014
1454 Madison Ave
Immokalee, FL  34142
**Community Health Center**
**Chief Medical Officer/Medical Director/Chief of Medical Informatics**

**Independent Health Care Consultant**  1994 – Present

**Plan Services, Inc.  Tampa, FL**  1992 – 1997
**Third Party Administrator**
**Part Time Medical Director/Consultant**

- Supervise approximately 35 physician advisors with reference to the quality and judgment of their utilization reviews, regarding medical necessity, medical appropriateness and length of stay determinations
- Provide the next level of authority; above the physician advisor regarding physician or member appeals
- Assist in establishing the design and implementation of the utilization management program and policies concerning pre-admission certification, length of stay determination, reasonable and customary charges and discharge management
- Assist nurse reviewers in case reviews to include the accuracy of coding parameters
- Instrumental in developing continuing education programs for nurse reviewers that relate to the changes in utilization management policies



EXHIBIT 3
WIT:
DATE:
ANGELA M. COKER, COURT REPORTER

JERRY WILLIAMSON, M.D. F.A.A.P. MJ. CHC. L.H.R.M.

### Cape Coral Hospital: Cape Coral, FL   1992 – 1994
A 280 bed not for profit community hospital with 300 medical staff members representing all specialties.
### Vice-president for Medical Affairs/Interim Chief Operating Officer

- Participated in the development of a PHO
- Responsible for physician recruitment and retention.
- Directed the acquisition of physician practices and contract negotiations project
- Initiated the development of a managed care contract committee
- Responsible for the utilization management and quality assurance programs and activities
- Facilitated continuing education programs
- Liaison to community and other health care organizations
- Liaison to the media representing hospital issues
- Participated in the interfacing with regulatory agencies (JCAHO) and assisted in developing and implementing policies in accordance with Joint Commission Standards
- Coordinated and participated in the development of an MSO
- Responsible for the credentials and privileges of physicians
- Interfaced with general council in the development of special educational programs for the physician and nursing staffs
- Instrumental in developing and directing a care mapping team
- Successfully assisted legal council in representing the hospital in medical malpractice issues as well as physician fair hearings
- Negotiated the leasing of office space to physicians through positive and productive relationships with them
- Informed and advised Executive Directors and Board members of the current healthcare financial trends, problems and implications to facilitate policy making
- Assisted in staffing determinations, reductions in staff, capital equipment and improvement needs, prepared budget recommendation for medical and non-medical departments
- Negotiated contracts with vendors regarding equipment and supplies
- Directed the preparation and implementation of equipment and supply service contracts, confers with medical staff and department heads to identify needs and services based on the available financial resources
- Supervised a large medical and administrative staff, making hiring and disciplinary decisions
- Participate in the development and implementation of a strategic plan for improving the census of the hospital
- Participated as a key member of a planning team to determine the feasibility of a merger/consolidation with another hospital
- Participated in the design and implementation of medical staff bylaw revisions.
- Participated as a key member of the "management turn around team"

JA4422

- Assisted the chief of the medical staff in coordinating medical activities of the hospital and in maintaining compliance with medical staff bylaws and rules and regulations
- Served in an advisory capacity to the medical staff departmental chairmen and committee chairmen assisting them in carrying out their administrative responsibilities
- Responsible for providing all the necessary information to the clinical department chairmen regarding patterns of practice in their department and assisting them in making the appropriate recommendations to the medical executive committee regarding credentialing, re-credentialing and privileging of departmental staff
- Responsible for and actively involved in the resolution of medical administrative problems regarding issues of policy as they relate to the medical staff
- Responsible for and actively involved in the resolution of patient care and physician/nurse problems
- Assisted in developing and implementing protocols for newborns with hypoglycemia and hepatitis positive mothers
- Created departments of Obstetrics/Gynecology and Pediatrics
- Created a Prenatal Committee

**Plan Services Inc.** Tampa, Florida   1982 – 1992
**Third Party Administrator**
**Physician Advisor**

**Mease Clinic:** Dunedin, Florida   1980 – 1992
100 physician multi-specialty group

**Private Practice (Pediatrics)**
- Managed a very successful and efficient private practice with two full time employees
- Served as Chairman of the Department of Pediatrics at Mease Hospital
- Previously held the position of clinical instructor, at the University of South Florida Department of Pediatrics
- Implemented educational programs to include prenatal and Lamaze childbirth classes
- Appeared as a guest on both television and radio talk show programs regarding pediatric medical issues and the approaches to prevention
- Consultant and part time medical director to managed care organizations (Travelers, Aetna) specifically involved in policy making and the credentialing process

**JERRY WILLIAMSON, M.D. F.A.A.P. MJ. CHC. L.H.R.M.**

**Prepaid Health Care:** Clearwater, Florida 1978 – 1980
Staff Model Health Maintenance Organization
The first HMO in this county
**Chief of Pediatrics/Assistant Medical Director 1978**
**Medical Director   1979 – 1980**
- Established a successful pediatric practice
- Developed a department of pediatrics
- Responsible for physician recruitment and retention
- Responsible for the marketing of our health care product and negotiating contracts with consulting physicians and hospitals
- Instrumental in developing a utilization management and quality assurance program
- Assisted in the supervision of the day to day operations of the health care facility
- Facilitated the compliance with local, state and federal regulatory agencies

**Education:** **Queens College,** Queens, New York
B.A. (Sociology), 1970

**Graduate** **Columbia University School of Dental and Oral Surgery**
**School:** New York City New York 1970 – 1972

**Medical College of Pennsylvania,** M.D. 1975
Philadelphia, Pennsylvania

**Loyola University Chicago School of Law, Beazley Institute for Health Law and Policy:** Master's in health jurisprudence- MJ. August 2010**.**
Chicago, Illinois

**Post Medical**
**Training:** **University of Michigan, C.S. Mott Children's Hospital**
Ann Arbor, Michigan
Pediatrics   1975 – 1976

**University of Miami School of Medicine**
Jackson Memorial Hospital
Miami, Florida
Pediatrics 1976 – 1977

**University of Florida, College of Medicine**
Shands Teaching Hospital and Clinics
Gainesville, Florida
Pediatrics   1977 – 1978

JA4424

**JERRY WILLIAMSON, M.D. F.A.A.P. MJ. CHC. L.H.R.M.**

| | |
|---|---|
| **Military:** | U.S. Air Force Reserves   1967 – 1973 |
| | Received Certificate of Appreciation, 1967 |

| | |
|---|---|
| **Honors:** | Arthur and Bertha Weisman Award for Excellence in Child Psychiatry |
| **1975** | Dr. Jean Crump Memorial Prize for Excellence |

| | |
|---|---|
| **Board Certification:** | Diplomat of the American Board of Pediatrics |
| | May 1980, #24400 |

Former Diplomat of the American Board of Quality Assurance Utilization Review Physicians. Aug. 1991 Certified in Health Care Quality Management

Licensed Health Care Risk Manager
August 6, 1999   #5502287

Certified in Healthcare Compliance
March 5, 2011, Healthcare Compliance Association

Florida Supreme Court Certified Dependency Mediator
November 16, 2001   #14275D

American Arbitration Association – Former Member

| | |
|---|---|
| **Current M.D. Licensure:** | Florida: ME 29350 |

| | |
|---|---|
| **Appointments:** | Affiliate, Center for Innovative Collaboration in Medicine and Law, Florida State University College of Medicine |

Former Clinical Assistant Professor of Pediatrics, in the Department of Clinical Sciences, Florida State University College of Medicine

Clinical Assistant Professor at the Florida State University College of Medicine, Department of Clinical Sciences, Family Medicine Residency Program

Adjunct Professor of Law at Loyola University Chicago School of Law.

Member – American Health Lawyers Association Health Information & Technology Practice Group Task Force on Legal Liability for EHRs, PHRs, & HIE

Served as a mediator for the FMQAI – Florida Medicare Quality Improvement Organization

Served as a volunteer mediator/arbitrator for Florida Bar Grievance Mediation and Arbitration Program

Co-Medical Director, Community Health Center Alliance Electronic Medical Record Clinical Committee

## JERRY WILLIAMSON, M.D. F.A.A.P. MJ. CHC. L.H.R.M.

**Professional Affiliations:**
Florida Regional Extension Center, Former "Meaningful Use" Associate
American Academy of Pediatrics, Fellow
American Academy of Pediatrics, Pediatric Dermatology
Florida Bar Health Law Division, Affiliate Member
Florida Bar Fee Arbitration Committee Former Member
American Health Lawyers – Member
Health Care Compliance Association – Member
American Association of Professional Coders-Consultant

**Awards:**
2012 Recipient of the "Heroes in Healthcare Award" for Administrative Excellence in Healthcare, from the Naples Daily News.

**Publications:**
St. Anthony Publishing, 3rd Edition, 1998
*Evaluating & Management Coding and Documentation Guide*

Community Health Centers Alliance: Meaningful Use Files Blog
*The Devil is in the Details: Resolve to Take a Second Look at Three Meaningful Use Objectives: 2012*

Morgan and Morgan Law: Blog-*Doctors Without Conscience; 2015*

# EXHIBIT 9

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4        _____

         MONIQUE RUSSELL, JASMINE )

5        RIGGINS, ELSA M. POWELL, )

         and DESIRE EVANS,       )  CIVIL ACTION NO.

6                                )  18-5629

              Plaintiffs,        )

7                                )

         vs.                     )

8                                )

         EDUCATIONAL COMMISSION   )

9        FOR FOREIGN MEDICAL      )

         GRADUATES,               )

10                               )

              Defendant.         )

11       _____)

12

13            VIDEO DEPOSITION OF JERRY WILLIAMSON, M.D.

14            DATE TAKEN:     Friday, November 22, 2019

15            TIME TAKEN:     10:00 a.m.

16            PLACE TAKEN:    9501 Market Place Rd.

                              Fort Myers, FL

17

              ON BEHALF OF:   Defendant

18

              REPORTER:       Wanda Jackson,

19                            Court Reporter

20

21

22

23

24

25
```

Jerry Williamson, M.D.

```
 1    identification.)

 2    BY MS. MCENROE:

 3         Q.   This is your notice of deposition for your

 4    deposition today.  Have you seen this before (indicating)?

 5         A.   Yes, I have.

 6         Q.   And are you appearing pursuant to this

 7    deposition notice?

 8         A.   Yes.

 9         Q.   Have you testified in any case as an expert

10    witness in the last four years?

11         A.   No.

12         Q.   When was the last time you served as an expert

13    witness?

14         A.   Many years ago.  I -- I can't give you a

15    specific -- probably about 12, 14 years ago,

16    approximately.

17              MR. THRONSON:  Counsel, I am sorry.  Do you mean

18    testified or just retained?

19              MS. MCENROE:  Testified.

20              MR. THRONSON:  Okay.  Okay.

21         A.   12, maybe 14 years ago.

22    BY MS. MCENROE:

23         Q.   Great.  And do you remember the subject matter

24    of that case?

25         A.   It was clinical.  It was pediatrics, but I don't
```

JA4429

1    recall the specifics of it, no.

2         Q.   And did you testify at a trial or at a

3    deposition in that case?

4         A.   Both.

5         Q.   And then I presume that the other two or three

6    times that you served as an expert was prior to that?

7         A.   Correct.

8         Q.   And for those, did you testify just at a

9    deposition or also at a trial, do you recall?

10        A.   I don't recall.

11        Q.   Do you recall generally the subject matter of

12   those other testimonies?

13        A.   They were all clinical.

14        Q.   And when you say clinical, do you mean medically

15   clinical?

16        A.   Correct.

17        Q.   Did any involve the Educational Commission For

18   Foreign Medical Graduates?

19        A.   No.

20        Q.   Did any, to your recall, involve foreign medical

21   graduates or international medical graduates?

22        A.   I don't recall.

23        Q.   In terms of cases in which you served as an

24   expert and provided an expert report but did not testify,

25   do you recall when you most recently did that prior to

1    this case?

2          A.    That would have been -- well, there were -- I am

3    trying to remember the case now.  That would have been

4    a -- yes.  It would have been a fair hearing case where I

5    provided an expert report.

6          Q.    When was that?

7          A.    Within the last year, perhaps a year and a half.

8          Q.    When you say a fair hearing case, what do you

9    mean?

10         A.    A fair hearing at a hospital for a physician.

11         Q.    And just very briefly, what kind of

12   circumstances is it that a physician has a fair hearing

13   case?

14         A.    Yeah.  The circumstances were a physician who

15   was dismissed from -- from the hospital for reasons that

16   we are not in agreement with.

17         Q.    And are you on the side of the doctor or on the

18   side of the hospital?

19         A.    Physician, yes.

20         Q.    Prior to that, do you recall when you last

21   served as an expert?

22         A.    That was also a fair hearing case that is

23   pending and very, very similar circumstances in a

24   different city and state.

25         Q.    Are you on the side of the physician or the

```
 1   hospital?

 2        A.   The physician.

 3        Q.   And prior to that?

 4        A.   Well, there was another fair hearing case.

 5        Q.   I am getting a sense of a pattern here.  Go

 6   ahead.

 7        A.   And this was a physician in a very similar type

 8   of situation.  And I was -- provided an expert report for

 9   the physician.

10        Q.   And prior to that?

11        A.   It was a credentialing case -- now, these are

12   all within the past four years.  I may not be giving them

13   to you in any particular order.

14        Q.   Okay.

15        A.   But they are all within the past four years.

16        Q.   I appreciate that.

17        A.   It was a negligent credentialing case where I

18   provided a report for the Plaintiff.

19        Q.   When you say negligent credentialing, of whom?

20        A.   Negligent credentialing of a hospital.

21        Q.   By a hospital but of whom?

22        A.   When you say of whom, I am not sure I understand

23   the question.

24        Q.   Who was the hospital negligent in credentialing?

25        A.   Was negligent in credentialing one of their
```

```
 1    nurses.

 2         Q.   A nurse?

 3         A.   Yes.

 4         Q.   And is that the Cane versus Memorial Hermann

 5    Health Systems case?

 6         A.   Is that Texas?

 7         Q.   That is from -- yes, the District Court of

 8    Texas, the 55th Judicial District.

 9         A.   Correct.  That is correct.

10         Q.   Separate from the Cane case, have you ever

11    testified or -- strike that.  I will start over.

12              Besides this case and the Cane case have

13    you ever previously served as an expert in any case

14    regarding credentialing?

15         A.   The case -- there was one other case that

16    actually the -- the fair hearing case involved peer review

17    and credentialing as well.

18         Q.   Each of the fair hearing cases or one in

19    particular?

20         A.   No.  One -- well, actually two in particular.

21    Let me think now.  Yes, two in particular, two of the

22    three.

23         Q.   And when you say that those two fair hearing

24    cases involved credentialing, credentialing of the

25    physicians but by whom?
```

JA4433

1     A.   Credentialing of the physicians by the hospital.

2     Q.   And I have learned from various depositions in

3  this case, there is a difference between credentialing and

4  privileging?

5     A.   Correct.  Correct.  Yes.

6     Q.   Okay.  And so were the fair hearings -- they

7  were specifically about credentialing as opposed to

8  privileging or were they a combination sometimes?

9     A.   Well, pretty much a combination.

10     Q.   Okay.  Are you drawing a distinction when you

11  say credentialing to exclude privileging or could it be

12  inclusive?

13     A.   It depends on who I am speaking with.

14     Q.   Okay.  Well, now, in describing your expert

15  experience, I just want to get an understanding if you are

16  using the term credentialing, could you also mean that to

17  be privileging as well?

18     A.   Well, they are very distinct.  They are

19  distinct.

20     Q.   In the cases in which you testified regarding

21  the credentialing of the physicians in the fair hearing

22  setting, and I think you said that there were two of them,

23  did both of those involve privileging as well?

24     A.   Correct.

25     Q.   Which specialities, if you don't mind?

JA4434

```
 1        Q.   I will give you back Exhibit 3.  Just hold onto

 2   that for a second.  So do you have any professional

 3   qualifications or certifications that are not listed here?

 4   So, for example, a Ph.D. in something or something that

 5   you deemed not relevant for these purposes but is a degree

 6   that you hold?

 7        A.   A degree, no.

 8        Q.   Any other qualifications or certificates that

 9   you hold that are not listed here other than like a

10   driver's license?

11        A.   No.

12        Q.   Okay.

13        A.   I don't believe -- I don't believe so.

14        Q.   And I see that in your graduate school section

15   you list Loyola University Chicago School Of Law?

16        A.   Yes.

17        Q.   Beazley Institute for Health Law and Policy that

18   you got a master's in health jurisprudence --

19        A.   Correct.

20        Q.   -- in 2010?

21        A.   Yes.

22        Q.   That is not a JD degree, correct?

23        A.   Correct.  It is an MJ.

24        Q.   And you are not a lawyer, correct?

25        A.   Correct.
```

JA4435

1        Q.    Have you taken or sat for the bar exam in any

2    state?

3        A.    I have not.

4        Q.    And similarly in your appointments, I see that

5    you have had some interactions with legal institutions,

6    for example, being an adjunct professor of law at Loyola

7    University Chicago School of Law, correct?

8        A.    Correct.

9        Q.    Were you serving in a lawyerly capacity there,

10    if you will, or -- strike that.  I can restate it.

11                    So what was the subject of your studies

12    that you did there?

13        A.    Risk -- subject of my studies or what I am

14    teaching?

15        Q.    Both.

16        A.    Okay.  The subject of my studies were pretty

17    much across the board in terms of risk management

18    compliance, regulatory issues.  It was a rather complete

19    program that ultimately ended up in a thesis.

20        Q.    And what was your thesis on there?

21        A.    My thesis was on -- let me think for a moment.

22    It was -- goodness.  It is a subject that I am actually

23    lecturing on now, and for some reason it has just

24    disappeared.

25        Q.    Sure.

JA4436

```
 1       A.    Let me think for a moment.

 2       Q.    Does it relate to health and the law?

 3       A.    Pardon me?

 4       Q.    Does it relate to health and the law?

 5       A.    Yes, it does.  It is specific to -- I have it

 6    now.  Thank you.  Apology and disclosure.

 7       Q.    And what do you mean by apology and disclosure?

 8       A.    How physicians present themselves following a

 9    medical mistake and what are some of the state law

10    requirements and what are their obligations ethically as

11    well.

12       Q.    When you say present themself, present themself

13    to who?

14       A.    To the patients and/or the family following a

15    medical mistake.  And basically it involves transparency.

16       Q.    So that is the subject both of your thesis and

17    also of the course that you have taught?

18       A.    That is a part of the subject matter in the

19    course, but that was my thesis, yes.

20       Q.    What is more broadly the subject matter of the

21    course you have taught?

22       A.    That I am currently teaching?

23       Q.    Correct.

24       A.    Risk management.

25       Q.    Have you taught any other courses at Chicago
```

Jerry Williamson, M.D.

1    School of Law?

2         A.   We have had programs that are live programs

3    where I have presented similar types of programs in

4    conjunction with others, but they vary.  But it was a

5    single presentation.  It was not a course.

6         Q.   Sure.  Like a single lecture type of experience?

7         A.   Exactly.  Yes.

8         Q.   Have you ever taught a course called Torts?

9         A.   Called what?

10        Q.   Torts, Legal Torts?

11        A.   Torts.  No.  I have attended a course on torts

12   but, no, I have not taught it.

13        Q.   Okay.  So you are here serving as an expert, and

14   we have spoken a bit about your experience serving as an

15   expert.  I know you are also a medical doctor.  What would

16   you say your typical day job is?

17        A.   It varies.  Typically I am working with cases

18   like this.  I am teaching.  And I lecture around the

19   country in a variety of areas.  And I do consulting work

20   to assist physicians in developing compliance programs.

21        Q.   Are you currently credentialed at any medical

22   facility?  Are you on staff anywhere if I am not using the

23   right terminology?

24        A.   No.  I am not on staff, no.

25        Q.   Okay.  When were you last affiliated to be on

JA4438

```
 1   staff with a medical facility?

 2        A.   Oh, dear.  That would have been -- probably

 3   would have been Mease Hospital, and that would have been a

 4   number of years ago.  It is M-E-A-S-E.

 5        Q.   And you have also spent time working in hospital

 6   administration, is that correct?

 7        A.   I have.

 8        Q.   Okay.  Do you currently work in hospital

 9   administration for any medical center or hospital?

10        A.   Only as a consultant when asked, yes.

11        Q.   When did you last work more formally, not in

12   just a consulting role, in hospital administration?

13        A.   More formally would have been at Cape Coral

14   Hospital where I was the vice president for medical

15   affairs.

16        Q.   And when did you do that until?

17        A.   I would probably have to look at my CV.

18        Q.   Go ahead -- go ahead and take a look.  I am not

19   trying to do a pop quiz.

20        A.   I understand.  I would say on or about 1993,

21   '94, somewhere in that.

22        Q.   I see on the second page at the very top you

23   have Cape Coral Hospital until '94?

24        A.   Yes.

25        Q.   Is that right?
```

JA4439

Jerry Williamson, M.D.

```
 1        A.    Yes.

 2        Q.    And I know you testified earlier about serving

 3   as an expert in fair -- physician fair hearings?

 4        A.    Yes.

 5        Q.    Did you also ever serve professionally in your

 6   role as a hospital administrator in physician fair

 7   hearings?

 8        A.    As vice president of medical affairs I have.

 9        Q.    When you served as the vice president for

10   medical affairs for Cape Coral Hospital, did you also play

11   any role in the hiring or credentialing or privileging of

12   physicians?

13        A.    Most definitely.

14        Q.    And in other roles prior to that, did you do

15   that as well?

16        A.    I did.

17        Q.    Did you ever play a role in the hiring or

18   evaluation of resident applicants?

19        A.    I may have in the past, but I don't recall

20   exactly when.

21        Q.    Okay.  Have you ever been in a role throughout

22   your career where you oversaw directly or indirectly the

23   work of residents?

24        A.    Well, I currently am on the faculty at Florida

25   State University, and I work in their residency program
```

Jerry Williamson, M.D.

1    that were actually -- the ones that signed the letter and

2    wrote the letter.

3         Q.   So you are saying that you would directly

4    receive the letters of recommendation from the

5    recommenders themselves?

6         A.   Correct.  Either that -- and it is helpful when

7    we get those letters because it tells you a fair amount

8    about the individual, so that is helpful.  If in fact

9    there is something in the letter that is of concern to

10   me -- well, for the most part I was rather aggressive and

11   contacted all letters that I received.  And the reason for

12   that is because there's times where things are not placed

13   in a letter that is communicated best by telephone.

14        Q.   Sure.  There might be things that are more

15   unsaid than said?

16        A.   Nuances.

17        Q.   I understand.  Would you expect that there would

18   typically be an interview or in-person component?

19        A.   I have never hired an individual without an

20   interview.

21        Q.   Okay.  If the candidate were to have been

22   foreign educated, so educated outside the United States,

23   have you had experience with hiring foreign medical

24   graduates as well?

25        A.   Most certainly.

1    numbers?

2        A.    Yes.

3        Q.    And you mentioned having interacted with ECFMG

4    during some of those processes?

5        A.    Correct.

6        Q.    What information did you recall receiving from

7    ECFMG during those processes?

8        A.    There were -- I don't recall them all, but they

9    were very helpful, because what ECFMG provided to us, we

10   relied upon and did not in fact need to duplicate our

11   efforts.  So that was -- and there were -- in essence for

12   us a ECFMG certificate meant a lot.

13       Q.    Do you recall what information was communicated

14   through the ECFMG certificate?

15       A.    I don't.  Not -- I mean, I know that they

16   provided for us the medical education and letters of

17   reference and such, but I don't recall each -- each item.

18   I don't.

19       Q.    I know I asked earlier about whether you have

20   come across Dr. Akoda's patients in your career.  Have you

21   ever come across Dr. Akoda directly himself?

22       A.    No.

23       Q.    Given that you have never met Dr. Akoda directly

24   yourself, from where did you get the information regarding

25   Dr. Akoda and his background for the purposes of serving

1    as an expert in this case?

2        A.   I think it was provided to me by my attorney.

3        Q.   Did you get any information regarding Dr. Akoda

4    from outside research you conducted independently?

5        A.   The only thing that I received was the -- I

6    believe it was the Department of Justice, their charges

7    and their decision in terms of -- I am trying to think.

8    That came through the American Board of Obstetrics and

9    Gynecology.  So that is my recollection on that, yes.

10        Q.   Did you, like, sit down and google Dr. Akoda and

11    read news articles about him or anything of the like?

12        A.   No.  That was the only news article that I saw

13    was through the American Board of Obstetrics and

14    Gynecology.  All of the other information was rather

15    comprehensive and complete in terms of what I received and

16    the documents that I received.

17        Q.   Did you interact with or read posts by any of

18    the Plaintiffs in this case on social media?

19        A.   Could you repeat that question?

20        Q.   Yeah.  Have you interacted with any of the

21    Plaintiffs in this case through social media?

22        A.   I -- I don't participate in social media at all.

23        Q.   You haven't read Facebook posts, for example?

24        A.   No.

25        Q.   Have you ever interacted with any of the

1              (Whereupon, a brief break was taken.)

2              VIDEOGRAPHER:  Back on the record at 10:43.

3    BY MS. MCENROE:

4         Q.   So, Dr. Williamson, I want to make sure we get

5    for purposes of the record a clear indication of what it

6    is that you have brought with you today.  And is this the

7    sum total of the materials you have looked at and

8    considered in the preparation of your report?

9         A.   Correct.  You haven't looked at these

10   (indicating).  This is a part of it as well.

11        Q.   Thank you.

12        A.   You're welcome.

13        Q.   We will look through this as well.

14   So the first thing I want to do is go through a black

15   binder that you handed up that has a label on the side

16   that says Class Action Lawsuit ECFMG, Janet, Janet &

17   Suggs.  And in the front pocket there was some handwritten

18   notes it looks like by you.  Is this your handwriting?

19        A.   Correct.

20             MS. MCENROE:  And I am going to go ahead and mark

21   this as Exhibit 4 so we can keep it as part of the record.

22             (Thereupon, Exhibit 4 was marked for

23   identification.)

24   BY MS. MCENROE:

25        Q.   And it is subject lined or you have written on

1    the top of it, Kelly Depo Key Points, is that correct?

2         A.    Correct.

3         Q.    And those are your notes from Mr. Kelly's

4    deposition?

5         A.    Correct.

6         Q.    I don't have a paper clip but we can hold those

7    together.

8              MR. THRONSON:  I have got one.

9              MS. MCENROE:  Great.

10   BY MS. MCENROE:

11        Q.    And that was in the front pocket of a binder

12   that has an index with the following entries, and so I am

13   just going to read these into the record.

14              The first is William Kelly, 8-20-19

15   deposition transcript with Exhibits 1 to 25.  And that is

16   material you reviewed and considered, is that correct?

17        A.    Correct.

18        Q.    And then it says Tab B is the class action

19   complaint, is that correct?

20        A.    I can't see it from here.

21        Q.    Did you review the class action complaint in

22   this case?

23        A.    I did.  Yes.

24        Q.    And that was the complaint from this case, is

25   that correct?

```
 1       A.   Correct.

 2       Q.   Have you reviewed the complaint in any other

 3  case filed by these Plaintiffs?

 4       A.   I don't understand the question.

 5       Q.   Have you reviewed any complaint filed by the

 6  same group of Plaintiffs in any other case against any

 7  defendant other than ECFMG?

 8       A.   No.

 9       Q.   And then it says Tab C is the Answer to Class

10  Action Complaint and Alternative Defenses.  Do you recall

11  reviewing that?

12       A.   I do.

13       Q.   Okay.  And then the next tab is Defendant's

14  Responses and Objections to Plaintiff Jasmine Riggins'

15  First Set Of Interrogatories and First Request For

16  Production.  Do you recall having reviewed those?

17       A.   May I ask, is that highlighted?

18       Q.   It is highlighted.

19       A.   Whatever is highlighted, I reviewed.

20       Q.   Okay.  So the things that are not highlighted,

21  you did not review?

22       A.   Correct.

23       Q.   Okay.  So that one is highlighted.  The next one

24  is also highlighted, Defendant's Objections and Responses

25  to Plaintiffs' Request For Admission Of Facts and
```

JA4446

Jerry Williamson, M.D.

1   Genuineness Of Documents.  Do you recall having reviewed

2   that?

3        A.   Yes.

4        Q.   Okay.  Then there are two more entries that are

5   not highlighted.  One is Defendant's Objections And

6   Responses to Plaintiffs' Second Request For Admission Of

7   Facts and Genuineness of Documents.  That is not

8   highlighted.  Does that mean you did not review it?

9        A.   I don't recall reviewing that, but I can't say

10  for certain.

11       Q.   Okay.  And then the last thing in this binder is

12  a non-highlighted tab that says ECFMG web pages.

13       A.   I did look at that.

14       Q.   You did look at that?

15       A.   Yes.

16       Q.   And I want to take a quick look at what that is.

17  In fact, I am going to hand this back to you to see if you

18  can point me to what that is.

19       A.   Okay.

20       Q.   You might be better able to navigate than I am

21  through this.  We'll get you all mic'd back up.

22       A.   I did not look at that.

23       Q.   Okay.  And can I just see what that is real

24  quick?

25       A.   Sure.

JA4447

1    Q.   Thank you.  So for the purposes of the record

2    the ECFMG web pages references here are the About ECFMG

3    page, the About Certification page, Continued

4    Certification Information --

5    A.   Oh, I am sorry.  My mistake.  I did look at

6    that.

7    Q.   Okay.  So the part that you did review is the

8    policies and procedures regarding irregular behavior?

9    A.   Correct.

10   Q.   Okay.  And that is from ECFMG's website?

11   A.   It's what's here.

12   Q.   Great.  Okay.  And then there is an article,

13   USMLE Takes Action Against Individuals Found to Have

14   Engaged in Irregular Behavior.  Have you reviewed that?

15   A.   I believe so.

16   Q.   And then there is an ECFMG certification fact

17   sheet.  Have you reviewed that?

18   A.   I don't believe so.

19   Q.   Okay.  And then there is a page entitled ERAS

20   Support Services for ECFMG?

21   A.   The reason -- if I may, Ms. McEnroe?

22   Q.   Yes.

23   A.   The reason -- I am thinking in terms of -- I

24   also saw some of this material on a website.  I also saw

25   some of this material elsewhere.  And I may not have seen

1    this particular document, but what you are describing or

2    listing, I have seen that material.  I just don't know

3    exactly where.

4        Q.   Understood.  So some of that may be material you

5    saw on ECFMG's website directly?

6        A.   Correct.  Yes.

7        Q.   And were you directed to those web pages or did

8    you navigate to those web pages independently?

9        A.   No.  I navigated independently.

10       Q.   And the last one in this set of ECFMG web pages

11   is a page entitled An Announcement Regarding Fraudulent

12   Letters of Recommendation.  Do you recall having reviewed

13   that?

14       A.   No.

15       Q.   Okay.  There is a Tab L in this binder that has

16   a piece of paper at the top of it that says ECFMG Fast

17   Facts.  Do you recall if you reviewed this page?

18       A.   Again, I may have seen that same information on

19   the website.  I don't know what's on that page.  I can't

20   -- I can't say.

21       Q.   Okay.

22       A.   May I see that?

23       Q.   Yes.  Absolutely.  It looks like there's a

24   couple of copies of the same thing.  So I might ask if you

25   don't mind comparing that to the page behind it, and then

JA4449

```
 1   we can take one of those out and mark it as an exhibit.

 2        A.   They are duplicate.

 3        Q.   Great.  Thank you.

 4             MS. MCENROE:  I am going to mark this as Exhibit

 5   5.  And again, this came out of Tab L from Dr.

 6   Williamson's binder.

 7             (Thereupon, Exhibit 5 was marked for

 8   identification.)

 9   BY MS. MCENROE:

10        Q.   And so at the top it says ECFMG Fast Facts.  Do

11   you see that?

12        A.   Yes.

13        Q.   Okay.

14        A.   And I am familiar with this.  And I can't tell

15   you specifically which document had the same information

16   but --

17        Q.   Okay.  Thank you.  Can I see the binder back?

18        A.   Sure.

19        Q.   Thank you.  Who put this binder together, did

20   you?

21        A.   No.  It was -- I received it as such.  I changed

22   the binder itself because the other binder was too small.

23        Q.   Oh, the physical binder?

24        A.   The physical binder, correct.

25        Q.   You brought other hard copy materials with you
```

JA4450

1   in addition to this binder including a pile you had handed

2   me with a number of binder-clipped sets of documents

3   together?

4        A.   Yes.

5        Q.   The first one I am looking at has a cover page

6   in all caps that says JW-NOTES: MONIQUE RUSSELL

7   DEPOSITION:.  Did you prepare this cover page?

8        A.   I did.

9        Q.   And then it looks behind it that it has Monique

10  Russell's deposition transcript with a couple of

11  highlightings and some flags.  Is that highlighting and

12  are those flags yours?

13       A.   Yes.

14       Q.   And on the front cover it says 2.0 hours.  Is

15  that your handwriting?

16       A.   Yes.

17       Q.   Does that mean you spent two hours looking at

18  this?

19       A.   Correct.

20            MS. MCENROE:  And for the purposes of the record,

21  I am just going to mark this cover page.

22            (Thereupon, Exhibit 6 was marked for

23  identification.)

24  BY MS. MCENROE:

25       Q.   Did you prepare these notes prior to issuing

1    your expert report?

2         A.    No.

3         Q.    When did you prepare those notes?

4         A.    Shortly after I reviewed them.  And that was

5    after my expert report.  I don't recall the exact date and

6    time.

7         Q.    Okay.  Did you receive Ms. Russell's deposition

8    transcript prior to issuing your expert report?

9         A.    No.

10        Q.    When did you receive it?

11        A.    I don't know exactly, but it was after the

12   expert report.

13        Q.    Okay.  And the next set of pages here from the

14   same pile has a cover page that says JW-NOTES: ELSA

15   POWELL DEPOSITION:, and then it has some all-caps notes.

16   Again, are these your notes?

17        A.    Yes, they are.

18        Q.    And behind it is appended Ms. Powell's

19   deposition transcript with handwriting of 1.6 hours.  Is

20   that your handwriting?

21        A.    Correct.

22        Q.    And is that the time you spent?

23        A.    Correct.

24        Q.    And there is again highlighting and tabs, and

25   that is your highlighting and your tabs?

```
 1        A.    That is correct.

 2              MS. MCENROE:  And for the purposes of our record,

 3   I am just going to mark this cover page as well.  And this

 4   will be Exhibit 7.

 5              (Thereupon, Exhibit 7 was marked for

 6   identification.)

 7   BY MS. MCENROE:

 8        Q.    And again, did you receive Ms. Powell's

 9   deposition transcript following the issuance of your

10   expert report?

11        A.    Yes.

12        Q.    Okay.  And then the next thing in the pile is a

13   copy of a deposition transcript from Jasmine Riggins dated

14   September 12th, 2019.  And you wrote .7 hours on it.  And

15   there is a handwritten note that says deposition

16   interrupted to accommodate schedules.  Discussion focuses

17   on -- I can't read that.  What does that say next?

18        A.    Okay.  Discussion focuses on adhesions.

19        Q.    Okay.  Can you keep reading the rest of the

20   note?

21        A.    Sure.  Noted by Akoda following C-section.

22   Ms. Riggins holds Akoda accountable.

23        Q.    And is that your handwriting?

24        A.    Yes, it is.

25        Q.    And those are your notes?
```

JA4453

```
 1      A.   Yes, it is.

 2      Q.   And is the .7 noted there the time you spent

 3  looking at the deposition transcript?

 4      A.   Correct.

 5      Q.   Did you receive that deposition transcript

 6  before or after you issued your expert report?

 7      A.   After.

 8      Q.   Thank you.

 9      A.   You are welcome.

10      Q.   And the next in this pile is a set of pages that

11  has on the top of it a cover page headed JW-NOTES: DESIRE

12  EVANS DEPOSITION: and then a series of all caps notes and

13  one handwritten that says, unwillingness to take her child

14  to PEDI; loss of trust.  Are those your notes?

15      A.   Yes.

16      Q.   And I assume the P-E-D-I means pediatrician?

17      A.   Correct.

18      Q.   And behind this cover page is a copy of Ms.

19  Evan's deposition transcript with some highlighting and

20  flags.  Are the highlighting and flags yours?

21      A.   Yes.

22           MS. MCENROE:  I am going to mark this cover note

23  as Exhibit 8.

24           (Thereupon, Exhibit 8 was marked for

25  identification.)
```

JA4454

1   BY MS. MCENROE:

2      Q.   And did you receive and review this deposition

3   transcript following the issuance of your expert report in

4   this case?

5      A.   I did.

6      Q.   Okay.  And the next thing in this pile is a

7   printout of the deposition of David Markenson.  And it

8   doesn't have any cover notes to it.  It does have some

9   highlighting in it.  Is the highlighting yours?

10     A.   Yes.

11     Q.   When did you review this deposition transcript?

12     A.   I don't recall.

13     Q.   Okay.  It is dated October 22nd, 2019.  So that

14  would have been following the issuance of your expert

15  report, correct?

16     A.   I would have to look at my expert report date.

17  I don't recall what the date on that is, if I may?

18     Q.   Sure.

19         MS. MCENROE:  I am handing you what I have marked

20  as Exhibit 9.

21             (Thereupon, Exhibit 9 was marked for

22  identification.)

23  BY MS. MCENROE:

24     Q.   You will see at the top it is labeled Jerry

25  Williamson, M.D., F.A.A.P., M.J., CHC., LHRM and then it

1    says September 22nd, 2019?

2         A.   Yes.

3         Q.   And is that your expert report in this case?

4         A.   Yes.

5         Q.   And that date, September 22nd, 2019, is to the

6    day, a month before Dr. Markenson's deposition, correct?

7         A.   Correct.

8         Q.   So you reviewed Dr. Markenson's deposition

9    transcript after you provided your expert report in this

10   case?

11        A.   Yes.

12        Q.   There is another whole set of documents here,

13   and I will go through what they are for the purposes of

14   the record, but is there a reason this set was set aside

15   separately from the rest of the documents?  Are these

16   specific documents received after your expert report or is

17   it just the way that they ended up being organized?

18        A.   It's just the way they were organized.

19        Q.   Okay.  Moving to the file folder set you have

20   here, I am just going to go through the contents of each

21   for purposes of the record, trying not to take the whole

22   day with this, but just making sure we have this clear.

23   The very first thing in here is what you have headed on

24   your folder, Joint Commission Comment.

25        A.   Yes.

JA4456

Jerry Williamson, M.D.

```
1        Q.   In a manila folder?

2        A.   Uh-huh.

3        Q.   And then the contents though are about ECFMG's

4   certification page, is that correct?

5        A.   That is correct.

6        Q.   And why did you do that?  Why did you put that

7   in that folder?

8        A.   Well, because the Joint Commission has made it

9   rather clear that the credentialing -- the primary source

10  credentialing by ECFMG is satisfactory for any other

11  credentialing organization to accept.

12       Q.   Then you have a folder entitled Williamson

13  Expert Report, and it has a sticky note inside that says

14  ForensisGroup, Inc, Thomson Reuters, The Expert Institute.

15  Do you see that?

16       A.   Yes.  I put that in there just to remind myself

17  in the event that you want to know who I potentially work

18  with in terms of expert companies that retain me.

19       Q.   Okay.  And are you working in this case through

20  any of those expert groups?

21       A.   I have no idea who I am working through.

22       Q.   Okay.  That is fair.  So these are groups that

23  you have worked through before?

24       A.   Worked through before, yes.

25       Q.   Okay.  And there is highlighting on this copy of
```

JA4457

1   your expert report.  Is that your highlighting?

2        A.   Yes, it is.

3        Q.   And why did you highlight some of this?

4        A.   Just to remind myself of some key points.

5        Q.   Okay.  The next file folder is entitled ECFMG

6   Irregularity Report, is that correct?

7        A.   Yes.

8        Q.   And that is a folder that includes a one page

9   document Bates number ECFMG_RUSS_90, 9-0, and it is

10  subject headed ECFMG Irregularity Report, so it make

11  senses why you called it the ECFMG Irregularity Report.

12  Did you receive this prior to the issuance of your expert

13  report?

14       A.   No.

15       Q.   Do you recall when you received that?

16       A.   Within the past week.

17       Q.   Did you ask for that?

18       A.   I did.

19       Q.   Okay.  And what specifically did you ask for?

20       A.   If there was an irregularity report.  I believe

21  that you had -- when I received my deposition request,

22  that that was an item that was specifically on your list

23  as well.

24       Q.   The next folder is called Dr. David Markenson

25  Exhibits.  And it has the set of exhibits with some

```
 1  handwritten notes and some highlighting.  Are these notes

 2  and highlighting yours?

 3       A.   Yes.

 4       Q.   Did you receive these exhibits at the same time

 5  you received the -- I am sorry -- the deposition

 6  transcript for Dr. Markenson?

 7       A.   I don't recall.

 8       Q.   Do you know Dr. Markenson?

 9       A.   I do not.

10       Q.   Have you ever spoken to him before?

11       A.   I have not.

12       Q.   Have you ever met with him or been in a meeting

13  with him that you know of?

14       A.   I have not.

15       Q.   Okay.  The next folder is subject headed

16  Addendum of Documents Rule 26.  And it says -- at the top

17  it has your name and then it says addendum as of November

18  21st, 2019.  And then it looks to be a disclosure of

19  additional documents.  There's a couple of copies in here.

20  So I will hand you one of them.

21       A.   Yes.

22       Q.   Is that intended for disclosure today?

23       A.   Yes.

24       Q.   Okay.  This might help shortcut some of the

25  discussion of what was reviewed when.
```

1      A.    Sure.

2            MS. MCENROE:  I am marking this as Exhibit 10.

3            (Thereupon, Exhibit 10 was marked for

4      identification.)

5      BY MS. MCENROE:

6      Q.    And you write:  After submitting my expert

7      report that included the documents I reviewed pursuant to

8      Rule 26, there were additional documents reviewed.  The

9      following list represents the additional documents I

10     received and reviewed from legal counsel at Janet, Janet &

11     Suggs.  And then you have a list, right?

12     A.    Correct.

13     Q.    And then you say reviewing the aforementioned

14     documents did not change my opinion in any material way.

15     My conclusions have not changed.  And then you have your

16     name at the bottom, is that correct?

17     A.    Correct.

18     Q.    So is this an intended addendum of your expert

19     report which we have as Exhibit 9?

20     A.    For completeness, yes.

21     Q.    Would you have any other intended addenda or

22     modifications of your expert report aside from this

23     Exhibit 10 I think we marked it?

24     A.    I don't believe so, no.

25     Q.    Do you know why you received these?  Did you ask

1    for them?

2         A.   I don't recall.

3         Q.   Okay.  Moving along in the manila folders that

4    you have brought.  There is a folder named Plaintiff's

5    expert report Jonathan Burroughs, M.D., and then a copy of

6    Dr. Burroughs' expert report in this matter.  Did you

7    review that?

8         A.   I did.

9         Q.   When?

10        A.   I believe in the past week.

11        Q.   So it was after the issuance of your expert

12   report?

13        A.   Yes.

14        Q.   Do you know Dr. Burroughs?

15        A.   I do not.

16        Q.   Do you have any understanding of whether

17   Dr. Burroughs is still being put forward as an expert in

18   this case?

19        A.   I have no idea.

20        Q.   You don't know one way or the other?

21        A.   Don't know.

22        Q.   To your knowledge, have you ever spoken to

23   Dr. Burroughs?

24        A.   No.  I have not.

25        Q.   To your knowledge, have you ever been in a

1   meeting with him?

2      A.   I suspect -- not to my knowledge, but I suspect

3   that he has attended the same meetings that I have because

4   we are both members of AHLA.  And at AHLA meetings where

5   I have either presented a program or attended as an

6   attendee, I suspect he may very well have been there.

7      Q.   But not related to this case in particular?

8      A.   No.

9      Q.   Okay.  The next folder is entitled Plaintiff's

10  Expert Disclosure, Plaintiff's Rebuttal Expert Disclosure.

11  And it includes a copy of two filings from this case,

12  Plaintiffs' Rebuttal Expert Disclosure and Plaintiffs'

13  Expert Disclosure, the actual sort of written-up documents

14  that are formal court documents.  Did you review these in

15  connection with forming your opinion?

16     A.   I did.  I did -- not in forming my opinion.

17     Q.   So these would have been received afterwards?

18     A.   Correct.

19     Q.   Okay.  The next folder is entitled Expert

20  Reports Plaintiff Dr. Tellefsen/John Hyde.  And inside

21  there is a copy of Dr. Tellefsen's report dated September

22  20th, 2019, in connection with this case and the report of

23  Dr. Hyde dated September 23rd, 2019, in this case.  Did

24  you review these two reports?

25     A.   I did.

```
 1      Q.   Okay.  Is there a reason why you put them
 2   together in the same folder?
 3      A.   Just to save on a folder.
 4      Q.   Okay.  There is some highlighting here.  Is that
 5   your highlighting?
 6      A.   It is.
 7      Q.   Do you know Dr. Tellefsen?
 8      A.   Do not.
 9      Q.   Have you ever been in a meeting with her to your
10   knowledge?
11      A.   Not to my knowledge.
12      Q.   Do you know Dr. Hyde?
13      A.   I do not.
14      Q.   Have you ever been in a meeting with him to your
15   knowledge?
16      A.   Not to my knowledge.
17      Q.   Have you spoken to either Drs. Tellefsen or
18   Hyde?
19      A.   I have not.
20      Q.   We are making process here.  The next folder
21   is entitled Plaintiff Expert Reports
22   Markenson/Phillips/Luciani.  And then inside there is a
23   copy of an expert report from Dr. Markenson, a copy of a
24   report from Dr. Luciani and a report from Dr. Phillips.
25   Have you reviewed these reports?
```

JA4463

1        A.    I have.

2        Q.    And the highlighting or handwritten notes on

3    these, are those yours?

4        A.    They are.

5        Q.    Do you know Drs. Luciani, Markenson or

6    Phillips?

7        A.    Do not.

8        Q.    Have you spoken to any of them?

9        A.    I have not.

10        Q.    To your knowledge have you been in a meeting

11    with any of them?

12        A.    To my knowledge, I have not.

13        Q.    In advance of providing your expert report, did

14    you review any drafts of any other expert reports in this

15    case?

16        A.    Whatever is listed in my expert report is what I

17    reviewed.

18        Q.    So if there are no drafts listed there, then you

19    did not review any drafts, is that correct?

20        A.    Drafts from?

21        Q.    Other experts.

22        A.    Other experts.  I did not.

23        Q.    Okay.  The next in this set of documents and

24    without a manila folder is a copy of the rough transcript

25    of Stephen Seeling.  And at the top it is handwritten

1   deposition of Stephen Seeling, do you see that?

2       A.   Yes.

3       Q.   Is this something that you reviewed in

4   conjunction with the preparation of your expert report?

5       A.   I did.

6       Q.   And there are flags and handwritten notes and

7   some highlighting in these.  Is that marcation yours?

8       A.   Yes, it is.

9       Q.   Okay.  The next folder in what you brought is

10  subject line -- or I should say is titled Expert Report

11  Plaintiff Annie Steinberg, M.D., and then inside is a copy

12  of Dr. Steinberg's report and there's highlighting on

13  this.  Is that highlighting yours?

14      A.   Yes.

15      Q.   Do you know Dr. Steinberg?

16      A.   I do not.

17      Q.   Have you spoken to Dr. Steinberg?

18      A.   I have not.

19      Q.   Do you know if you have ever been in a meeting

20  with Dr. Steinberg?

21      A.   Not to my knowledge.

22      Q.   Okay.  The next folder is entitled ABIM

23  Report/Akoda.  And then inside I see the cover page is a

24  subpoena to produce documents, information or objects or

25  to permit inspection on premises in a civil action

JA4465

1    directed to the American Board of Internal Medicine.  And

2    then some documents that it looks like they produced

3    behind that.  Do you know when you received these

4    documents?

5         A.   I don't recall.

6         Q.   Okay.  Do you know if you reviewed them in

7    conjunction with the preparation of your report?

8         A.   If it is not listed, then I did not.  It is not

9    listed in my expert report.

10        Q.   Okay.  On the third page from the back of this

11   set of documents, you highlighted a line that says

12   unsatisfactory, consistently falls short of reasonable.

13   And then you have some handwritten notes.  Could you

14   please read those notes into the record?

15        A.   How conclusions were reached.  Go to moral and

16   ethical impacting patient safety.  Risks to patients

17   increased.  Rights to be free from sexual assault.

18   Question mark, ABIM notify ECFMG.

19        Q.   And what did you mean by that last --

20        A.   Whether or not the American Board of Internal

21   Medicine had notified ECFMG regarding this report.

22        Q.   Can I see that back?

23        A.   Uh-huh.

24        Q.   And do you know one way or another if the

25   American Board of Internal Medicine did notify ECFMG?

JA4466

Jerry Williamson, M.D.

```
1        A.   I do not.

2        Q.   Do you expect that they should have?

3        A.   I don't know the inner workings of the American

4    Board of Internal Medicine, so I can't really say.

5        Q.   Do you think that they would have or should have

6    notified any other parties, hospital systems, boards of

7    medicine?

8        A.   Again, I don't know what their P&Ps are, their

9    policies and procedures are.  It is out of my area of

10   expertise.

11       Q.   Okay.  Are ECFMG's policies and procedures

12   within your area of expertise?

13       A.   I would say yes.

14       Q.   So how do you know more about ECFMG's policies

15   and procedures than you know about the American Board of

16   Internal Medicine's policies and procedures?

17       A.   I have had a fair amount of experience working

18   with ECFMG over the years as I mentioned previously.  So

19   that is the reason why the American Board of Internal

20   Medicine -- as a pediatrician, I have had, you know,

21   limited exposure to them.

22       Q.   Okay.  The next folder here is entitled

23   Plaintiffs' Timeline.

24            MS. MCENROE:  It is a document that we will mark

25   for purposes of the record, and I actually think I have
```

1    that correct?

2        A.    Once ECFMG provides that certificate for the

3    physician, then we are looking at a residency program,

4    and the residency program needs to be completed

5    satisfactorily.  At that point in time, the individual can

6    go ahead and practice medicine with a license.

7        Q.    Okay.  So there are more steps between ECFMG

8    certification and licensure than just a certificate is

9    issued and then there is a license issued, correct?

10       A.    Correct.  No, there are additional steps, but

11   the ECFMG point in the cascade of events is critical for

12   the others to take place.

13       Q.    Right.

14       A.    So it is a -- it is an important -- possibly the

15   most important step in moving forward.

16       Q.    So moving forward from ECFMG certification, the

17   next step would be application and acceptance with a

18   residency program, correct?

19       A.    Correct.

20       Q.    And if no residency program accepts an

21   applicant, then that is just as critical as if ECFMG

22   didn't issue an ECFMG certificate, is that fair?

23       A.    That is fair.  And I would then ask why did the

24   residency program not accept the individual.

25       Q.    Are you aware of reasons why a residency program

1    may not accept an individual?

2         A.   Well, their -- the basic one is that they don't

3    have any room.

4         Q.   Sure.

5         A.   That they are full in terms of the number of

6    residents they have.  Other reasons that the specialty or

7    the -- I should not say the specialty, but that the

8    applicant's application did not meet certain criteria.

9         Q.   Including, for example, there could be failures

10   on USMLE steps?

11        A.   That I could not say.  That I don't know.

12        Q.   Okay.  And then in the next steps -- so after an

13   individual is accepted to a residency program they then

14   need to actually perform, right, and participate in the

15   residency program satisfactorily so they can complete the

16   residency, is that correct?

17        A.   That is correct.

18        Q.   Okay.  And at some point during the residency,

19   presumably they would take step 3 of the USMLE as well?

20        A.   Correct.

21        Q.   And they would need to be able to pass step 3?

22        A.   Correct.

23        Q.   In your experience, are residents supervised or

24   not supervised during the course of the residency program?

25        A.   When you say supervised, there are various

JA4469

1    levels of supervision.  So depending upon where they are

2    in their program, whether they are a first, second or

3    third year resident would make that determination in terms

4    of what the oversight would be.

5         Q.   So they would start out being more supervised at

6    the beginning of their residency and presumably could be

7    less towards the end?

8         A.   Correct.

9         Q.   And then they would -- presumably if they finish

10   their residency and they passed step 3, they then would be

11   eligible to apply for licensure?

12        A.   That is correct.

13        Q.   And in some states -- do I have this correct,

14   that there could be a restricted license during the course

15   of a residency sort of like a student license?

16        A.   That is my understanding as well, yes.

17        Q.   Okay.  But some states don't really have that

18   kind of concept?

19        A.   Correct.

20        Q.   But then for full unrestricted licensure in the

21   United States, you need to finish your residency program

22   satisfactorily, correct?

23        A.   Yes.

24        Q.   And then have you been licensed to practice

25   medicine in any states in the United States?

JA4470

1    The American Academy of Pediatrics.

2         Q.   That is what I am getting at.  So you would say

3    you are board certified in pediatrics?

4         A.   I am.

5         Q.   Are you board certified in any other

6    specialties?

7         A.   No.

8         Q.   Have you ever been involved in admitting anybody

9    to a specialty board?  And what I mean by that is, have

10   you ever been, you know, a participant on the other side

11   trying to decide if someone should or should not be

12   admitted to a specialty board?

13        A.   Have not.

14        Q.   Do you have an understanding of whether

15   residents get paid?

16        A.   Do they get paid?

17        Q.   Yes.

18        A.   Most definitely.

19        Q.   And do they get paid as W-2 employees, do you

20   know?

21        A.   I don't know what the -- how that -- how the

22   payment is made, no.  I don't know.

23        Q.   Do you know if they provide social security

24   numbers and if those are run through in order to do

25   payroll?  Do you know one way or the other?

JA4471

 1    background checks.

 2         A.   A CVO.  Yeah.  CVO, credential verification

 3    organization, yes.  And at times they will do that.  At

 4    times -- and there are -- I think right now there's

 5    probably about hundred of these organizations that have

 6    been certified or credentialed to be a CVO.

 7         Q.   Would you expect that, for example, ECFMG checks

 8    whether each applicant coming through it has an active or

 9    restricted driver's license?

10         A.   Do I know whether they do or not?

11         Q.   Yes.

12         A.   No.  I don't know.

13         Q.   Okay.  But if a foreign applicant would be

14    coming through, the CVO that would be doing that kind of

15    check would be a different CVO than ECFMG, correct?

16         A.   If -- I am not sure I understand the question.

17         Q.   Sure.  So my question is if you are having

18    applicants come through, is there any background check

19    done for foreign medical graduates aside from just an

20    ECFMG certificate?

21         A.   Again, that depends on the individual

22    organization, the individual facility as far as what their

23    policies and procedures are in terms of what they do.  But

24    what I said earlier is that these facilities generally

25    will rely on ECFMG to provide accurate and comprehensive

```
 1    information to that facility and not necessarily repeat
 2    those -- those -- that work.
 3        Q.   Right.  But do you have any reason to believe
 4    that ECFMG actually conducts a background check of every
 5    foreign medical graduate that comes through that would
 6    include, for example, whether there is an active or
 7    restricted driver's license?
 8        A.   Oh, I thought your question was what would a
 9    facility do in terms of doing a background check.  I
10    didn't understand the question in terms of being specific
11    to ECFMG.
12        Q.   Got it.  Okay.  And so you are saying that the
13    facility -- you are saying that the facility looking to
14    hire or credential the individual would be doing these
15    sorts of background checks, correct?
16        A.   Correct.  Correct.
17        Q.   They would not necessarily look to ECFMG to have
18    done the full plethora of background check that you
19    described?
20        A.   No.  They would look to ECFMG specifically for
21    what ECFMG holds themselves out to do.
22        Q.   Right.
23        A.   So whatever it is they hold themselves out to
24    do, then they rely upon that information.  And then
25    depending upon the facility or the organization, whatever
```

1    used at the time.

2              MS. MCENROE:  I am handing you what I have marked

3    as Exhibit 16.

4              (Thereupon, Exhibit 16 was marked for

5    identification.)

6    BY MS. MCENROE:

7         Q.   I am handing you a copy of Dr. Akoda's ECFMG

8    certificate.

9         A.   Okay.

10        Q.   Have you seen this before?

11        A.   I believe I have.

12        Q.   What name was issued -- what name is on this

13   ECFMG certificate?

14        A.   John Nosa Akoda.

15        Q.   And then pull out Exhibit 15 at the same time,

16   if you could.

17        A.   Okay.

18        Q.   And I will direct you back to that same

19   paragraph where you were looking before.  So page 4, third

20   paragraph from the bottom, you will see that the medical

21   license was issued to a Charles John Nosa Akoda, do you

22   see that?

23        A.   That is correct.

24        Q.   And if you look all of the way to the beginning

25   of Exhibit 15, you will see that it pertains to a Charles

1      Q.   Did you have any help?

2      A.   No.

3      Q.   Do you have any legal assistants or do you

4  dictate your report or anything of the like?

5      A.   No.

6      Q.   Do you have any secretarial help?

7      A.   No.

8      Q.   Do you still hold all of the opinions you have

9  in this report today?

10     A.   Yes.

11     Q.   In looking at the series of events with regard

12 to Dr. Akoda, is it your view that ECFMG just totally

13 missed the issue and did not investigate, did not

14 acknowledge it, that Dr. Akoda sort of slipped through, or

15 do you think that they did conduct at least some

16 investigation?

17     A.   I think when they finally realized that there

18 were problems -- well, let me restate it differently.

19 I think that they made some proper investigations

20 initially, particularly when he had applied the first two

21 times.  And if my memory serves me, there was a revocation

22 of his first certificate.  And then there was -- I am not

23 sure if they revoked or if they delayed the second

24 certificate or they did something that I think went to

25 appeals and then it ended up being extended, if I am

1    correct in my memory.

2              So I think that was proper in terms of

3    doing that.  But subsequent to that, there were numerous

4    flashing red lights that I think ended up getting missed.

5    And I mean, there were multiple issues that they should

6    have acted on.  So to answer your question, yes, I think

7    that there was some proper investigation initially, but

8    then subsequent to that, it was -- it was lost.

9        Q.    So do you think that the Igberase and Oluwafemi

10   type of identities that got caught earlier on -- and

11   I'll represent for the record, there were more than two --

12   but you think that was proper investigation that resulted

13   in the revocation of his certificate, but that later on

14   that what was done with Dr. Akoda was a total miss?

15       A.    Well, when you say a total miss, I think it

16   becomes a total miss as the story continues.  And there

17   are more issues that are surfacing.  And then as we talked

18   about earlier, that subsequently led to a certificate into

19   a residency program which ultimately eventually turned

20   into a licensure and then harmed the patients.  So when

21   you say a total miss, I think the end result becomes a

22   total miss.  Yes.

23       Q.    The end result becomes a total miss, but along

24   the way there was thought given by ECFMG to whether

25   there was a problem here, correct?

1      A.   No.  I don't agree with that.  I think that they

2  initially saw a problem and having the two certificates

3  and doing the revocation and such.  But then as other

4  things surfaced even prior to that, such as medical school

5  -- or not medical school, but photographs that they had

6  from these multiple -- well, the same individual with

7  multiple names.

8           For example, not identifying the proper

9  photograph, and there were others that I can't recall

10  right at the moment.  But I think even the 2000 letter

11  from -- the letter that went to the file from -- I think

12  it was Mr. Kelly to the COO -- I am trying to remember his

13  name.  You had his deposition on the table before.

14      Q.   I can hand it to you right now.

15      A.   Thank you.  But I think that letter is very,

16  very disturbing and very of concern.  Make sure it's the

17  same letter.

18           MS. MCENROE:  So I am handing you Exhibit 17,

19  which is a December 22nd, 2000 memorandum from William

20  Kelly to Stephen Seeling.

21           (Thereupon, Exhibit 17 was marked for

22  identification.)

23           WITNESS:  Correct.

24  BY MS. MCENROE:

25      Q.   Is this what you were referring to?

Jerry Williamson, M.D.

```
1        A.    This is what I was referring to, yes, ma'am.

2        Q.    And so let's take a look at this memo together.

3        A.    Okay.

4        Q.    It says, attached is a copy of a memorandum for

5   the file.  This memorandum is being written separately

6   since I did not think it should be made part of the

7   official file.  In my discussion with Dr. McCorkel he

8   indicated he believed Igberase and Akoda were one in the

9   same person.  He has no proof, just a strong suspicion.

10  Information he received from an "informant" provided

11  details that led him to believe this.

12                I also believe Akoda and Igberase are

13  one and the same.  However, at this point the only

14  information that we have for the ECFMG Credentials

15  Committee is Akoda's written statement that he is NOT

16  Igberase, although he did admit in writing that he used

17  Igberase's social security number.  He has given us a

18  passport that appears to confirm his identity as John

19  Akoda.  I don't think this is enough for the Committee.

20                Igberase has not replied to my letter.

21  The FedEx letter was returned undelivered.  I tried the

22  phone number he listed on his application and was told it

23  was a wrong number (although the correct address).  I sent

24  Igberase an E-mail -- and it has the E-mail address --

25  cfemi@hotmail.com and who should reply but Akoda!  Akoda
```

1    still has a valid ECFMG Certificate.  We need to

2    brainstorm on this one.  Maybe Shirley Williams (Miss

3    Sherlock) could sit in.  Is that correct?

4         A.   Correct.

5         Q.   Is it your opinion that ECFMG completely missed

6    and did not analyze at all whether Akoda was acting

7    appropriately or not?

8         A.   Well, let me start by saying this, that the idea

9    of placing this memorandum in terms of the first sentence,

10   memorandum is being written separately.  And since I do

11   not think it should be made a part of the official file,

12   that in and of itself is problematic.

13        Q.   Why?

14        A.   It is problematic because if it is not made part

15   of the official file, once that official file is -- and

16   again, I do not know what they do with their official

17   files or their non-official files, but my concern is

18   that the individuals or the organizations that reply upon

19   this information are not going to be provided that

20   information because it is not a part of the official file.

21        Q.   Do you have any sense or knowledge of whether

22   ECFMG's practice if this had became a part of the official

23   file, it would have been provided?

24        A.   No.  I don't.

25        Q.   You don't know one way or the other?

Jerry Williamson, M.D.

```
1        A.   I don't know one way or the other.  But if it is
2   a part of an unofficial file or a memorandum to the file,
3   I don't know what they do with it.  But if I am a CEO of a
4   hospital and I am receiving a certificate, an individual
5   who has been certified by ECFMG, I am assuming that
6   everything is out in the open, that there is transparency.
7   So that in itself is a concern to me.  I think that if
8   you look at the issue of behavior that ECFMG addresses in
9   their policy as far as what constitutes that -- I forget
10  the term they use in terms of bad behavior or --
11       Q.   Irregular behavior?
12       A.   Irregular.  Thank you.  Irregular behavior, this
13  meets the criteria very easily and should have
14  precipitated an investigation.
15       Q.   Right.  So according to you now, but Mr. Kelly
16  whose job it was to investigate irregular behavior
17  contemporaneous at the time was looking at this and was
18  saying there was not enough to bring to the committee
19  based on the record he had then.  Right?  He was doing
20  some analysis and looking at this issue at the time,
21  correct?  You may not agree with the outcome.
22       A.   Well, again, the decision that was made here was
23  just made based on any policies that the organization had.
24  And from what my reading was that the organization did not
25  have a policy other than a definition of irregular
```

1  behavior.  So whether they should have gone to

2  credentials, which is I believe the next step if they had

3  a concern, I think they kind of missed the boat with that.

4              There seems to be enough here or more

5  than enough in reading this letter and just at the very,

6  very bottom of what you just read, and it says something

7  to the effect of -- I forgot where it was with the

8  exclamation -- here it is.  I sent Igberase an E-mail and

9  who should reply but Akoda.  I mean, what more do you

10 need?  It seems like there is enough concern that the

11 concern should have been elevated to the next committee,

12 yes.

13     Q.   Do you know or understand the remit of the

14 Medical Education Credentials Committee?

15     A.   When you say the remit?

16     Q.   Do you know what their purpose is?  Do you know

17 what they do?

18     A.   Well, from what I have read is that they

19 basically make a decision on concerns that a lower

20 committee might have and make a determination on those

21 concerns.

22     Q.   Do you know how they go about deliberating if at

23 all?

24     A.   Well, what I read is that they deliberate I

25 believe three or four times per year.  They don't meet

1  that frequently is what I believe I read in terms of their

2  committee.  But beyond that, no.  I don't know the details

3  of how they arrive at decisions or whatever.

4            But I guess what I am saying, Counselor,

5  is that for me reading this there is enough information

6  here that says that ECFMG should have been more aggressive

7  in pursuing this.  And there were other issues I think

8  even occurred prior in terms of, you know, his application

9  that he sent, I believe, to ECFMG, and the name on the

10  application and the name on the diploma were not

11  consistent as well, speaking of names here of the

12  certificate that you just provided me.

13     Q.   Do you have any sense of in the early 2000s

14  what the E-mail etiquette was as between cousins from

15  Nigeria, whether there was ever sharing of E-mail

16  addresses?

17     A.   I could not answer that.

18     Q.   You don't know one way or the other?

19     A.   No.

20     Q.   Do you know culturally about naming norms and

21  shortening of middle or surnames from people from Nigeria

22  during that time, what was customary?

23     A.   No.  I don't.

24     Q.   Okay.

25     A.   May I say one other thing on this letter?

1     Q.   I don't presently have any question pending.  If

2  you think any of your prior responses were not complete,

3  then I would welcome completion of it.  Otherwise, I am

4  not looking for just an open declaration.

5     A.   No.  No.  I just wanted to go over one other

6  sentence that you brought forward.

7     Q.   Sure.

8     A.   And you said, although he did admit in writing

9  that he used Igberase's social security number.  And I

10  guess that in and of itself would meet the concerns

11  regarding the -- meeting the definition of his improper

12  behavior.

13     Q.   Irregular behavior?

14     A.   Irregular behavior.  Thank you.

15     Q.   Do you know whether the misuse of a social

16  security number in ECFMG's definition does qualify as

17  irregular behavior?

18     A.   In the definition it talks about presenting

19  information that is inaccurate or in -- it may not be

20  inaccurate, but if you look at the definition.  I think I

21  may have it.  I don't know if I have that or not with me,

22  but, yes, it is a part of the definition.

23     Q.   Do you know whether applicants to ECFMG need to

24  have social security numbers at all?

25     A.   I don't believe they require it, but if one

```
1    times.

2         A.   Uh-huh.

3         Q.   Is that correct?

4         A.   Correct.

5         Q.   And you use the term duty as between ECFMG and

6    entities that received reports from ECFMG?

7         A.   Okay.  Yes.

8         Q.   And I am not trying to pull a fast one on you in

9    any way.  I am looking at paragraphs 4 and 5 in the

10   Analysis of Facts and Opinions on page 5 of your report.

11        A.   Uh-huh.

12        Q.   Is that correct?

13        A.   Yes.  That is correct.

14        Q.   So are you putting forth expert opinion on the

15   duty, if any, ECFMG owed to any other party in this case?

16        A.   Yes.

17        Q.   Are you holding yourself out to be a legal

18   expert in any way in connection with this case?

19        A.   A legal expert, no.

20        Q.   Okay.

21        A.   What I will say is the word duty that is used

22   here is used synonymously with responsibility.

23        Q.   So what do you mean by duty?

24        A.   Just that, responsibility.  They are the

25   responsible party.  They are responsible for making
```

1   certain that everything we've talked about is done

2   properly.

3        Q.   As a matter of law?

4        A.   Well, I think it is certainly a matter of

5   ethics. It is certainly a matter of medical ethics.  And I

6   -- from a matter of law, if they are holding themselves

7   out to provide certain information and they don't, then

8   they have not met their responsibility.  I think it

9   certainly has legal implications.

10       Q.   So are you saying that this is a legal duty, an

11  ethical duty or both in the way you use the term?

12       A.   Both.

13       Q.   Okay.  So you are purporting to put forth a

14  legal opinion in this case?

15       A.   In that sense, yes.

16       Q.   And you are asking the Court to rely on your

17  expert opinion for legal purposes?

18       A.   I am not sure I understand the question.

19       Q.   So you are putting forth an expert opinion in

20  the interest of aiding the Court from a legal perspective

21  with respect to ECFMG's duty?

22       A.   Well, from a credentialing perspective.  If

23  credentialing falls upon -- it certainly falls upon the

24  ethical.  But if it falls upon the legal as well, then I

25  guess what you are saying is correct.

1      Q.   Yeah.  I am not trying to use my words.  I am

2  just trying to understand.  You use the word duty

3  repeatedly in your report.  So I am just trying to

4  understand what it is you are asking the Court to look to

5  you for.  And if that includes in your opinion a legal

6  view of what duty ECFMG purportedly owed to these

7  entities?

8      A.   Well, I use that -- again, I have had legal

9  training and I do have a master's degree in that, but I am

10  not a lawyer.  So I can't -- I guess perhaps I can present

11  a legal opinion without being a lawyer.  I don't know.  If

12  not, then it is not a legal opinion.

13     Q.   But you are intending to use the term duty to

14  mean both ethically and legally in the way you are using

15  it?

16     A.   Correct.  They had a responsibility to those

17  individuals and those organizations.

18     Q.   And later on in paragraph 11 of your report on

19  page 6 -- I will wait until you get there.

20     A.   Okay.

21     Q.   In the last sentence there in paragraph 11, it

22  says patients have a right to receive medical treatment

23  from physicians who have obtained ECFMG Certification

24  legitimately, not through falsities and

25  misrepresentations, do you see that?

1      A.   Yes, I do.

2      Q.   And, again, in using the word right here

3  similarly to my questions on duty, are you intending to be

4  assisting the Court in evaluating a legal position on the

5  rights of patients in this case?

6      A.   Well, I think that it's rather simple that the

7  American Medical Association provides what patients'

8  rights are as do other organizations such as the American

9  Academy of Pediatrics and The American Board of Medicine

10  and such, and they define what those rights are.  And I am

11  not sure it necessarily has to be a legal issue, but it is

12  certainly an ethical issue in terms of what the patient's

13  rights are.  Now, whether it morphs into legal, I couldn't

14  -- I couldn't offer an opinion on that.

15      Q.   So it could, but you don't know?

16      A.   Yes.  Correct.

17      Q.   You use the word foreseeable in a couple of

18  places in your report as well.

19      A.   Uh-huh.

20      Q.   And in particular, for example, on page 4.  I am

21  going backwards a little bit, in paragraph 12.

22      A.   Page 4.

23      Q.   Let me know when you are there.  Page 4,

24  paragraph 12 in the section above.

25      A.   Okay.

JA4487

1      Q.   It says, the key question that must be resolved

2   is whether ECFMG's actions or failure to act resulted in

3   foreseeable injuries or damages to class members.  Do you

4   see that?

5      A.   I do.

6      Q.   And again, do you mean that to be legally

7   foreseeable?

8      A.   Legally foreseeable.  What I mean it to be is

9   that their actions should have -- that's the way I said it

10   and I don't -- when I wrote this, I don't recall if I was

11   thinking about this necessarily legally or in what

12   context.

13      Q.   So, you know, I am just trying to understand

14   what you mean when you use the term foreseeable here

15   because, for example, in Exhibit 17 we were looking at,

16   which was Mr. Kelly's memo, do you think at the time when

17   he was writing that memo he foreseeably thought that Dr.

18   Akoda would plead guilty to social security fraud and

19   would have committed sexually inappropriate conduct on

20   patients yet reach the same conclusion he had in his memo?

21           MR. THRONSON:  Objection.

22      A.   Perhaps.

23   BY MS. MCENROE:

24      Q.   So you think that Mr. Kelly would have been

25   involved in three or four investigations that resulted in

1  the revocation of Dr. Igberase Oluwafemi's certificate and

2  and thought when he issued this memo in December of 2000

3  that it was possible that Dr. Akoda was someone who had

4  perpetrate the types of alleged injuries he has here and

5  yet permit this to go forward anyway?

6       A.   I guess what I am saying is that when you use

7  the term or the word foreseeable is that one should --

8  when something this strong takes place, one should in fact

9  think about what are the potential consequences going

10 forward.  Okay?  That to me is foreseeable.  Foreseeable

11 that they would commit sexual acts, that I can't say.

12 Okay?  But foreseeable that there may be potential

13 problems going forward with this individual.

14            And -- and again, what I guess I am

15 connecting is I am connecting an individual's not being --

16 being irresponsible in terms of providing false

17 information and what that ultimately can -- can lead to.

18 So providing false information, what might that ultimately

19 develop into?

20      Q.   You make some reference to saying that ECFMG's

21 conduct directly impacted patient safety?

22      A.   Where are you?

23      Q.   I am looking at paragraph 11 on page 6.  It is

24 in two places on page 6.  So I see it in paragraph 11 in

25 the middle sentence there that starts with however.  Do

```
 1   Williamson.

 2            THE WITNESS:  Thank you.

 3                    CROSS-EXAMINATION

 4   BY MR. THRONSON:

 5       Q.   Dr. Williamson, are you familiar with the

 6   standard of care as it applies to ECFMG?

 7            MS. MCENROE:  Objection to form.

 8       A.   To the standard of care?

 9   BY MR. THRONSON:

10       Q.   Uh-huh.

11       A.   In terms of their credentialing process is well

12   recognized by the Joint Commission on accreditation as

13   being a -- my interpretation is that of an excellent CVO,

14   connection verification organization, so I would think

15   that it would meet the highest standard of care.  And with

16   what we have discussed throughout this deposition, and I

17   will repeat what I said is that I believe that they did

18   not meet the standard of care in terms of this particular

19   practitioner.

20       Q.   And how -- how do you know in terms of your

21   education, training and experience that certain

22   individuals at ECFMG as you have outlined in your report

23   and expressed today did not meet the standard of care?

24            MS. MCENROE:  Objection to form.

25       A.   Simply that there were multiple opportunities to
```

1    learn that this physician was a fraud, and those

2    opportunities were not acted upon.  And it resulted in

3    what we have been discussing in terms of potential harm to

4    patients.

5        Q.   You have had, as we discussed, the opportunity

6    to work -- strike that.

7                    During the course of your

8    professional experience, have you had -- I believe we have

9    discussed that you have had occasion to have interactions

10   with ECFMG in the course of privileging and credentialing

11   positions, is that correct?

12       A.   In the course -- in the course of credentialing,

13   yes.

14       Q.   And so you have -- have you gained experience

15   through that process with ECFMG as an organization and the

16   role that it plays?

17          MS. MCENROE:  Objection to form.

18       A.   Could you repeat that again for me?

19   BY MR. THRONSON:

20       Q.   Sure.  I believe you've testified that during

21   the course of interacting with ECFMG and given your

22   background and credentials in the hospital administration

23   credentialing, you have gained familiarity with ECFMG's

24   practices?

25          MS. MCENROE:  Objection to form.

JA4491

```
 1   BY MR. THRONSON:

 2       Q.   Is that right?

 3       A.   Yes, I have.  Yes, I have.

 4       Q.   Do you -- is it your opinion that the

 5   obligations of ECFMG when encountering potential

 6   fraudulent conduct are similar to the obligations of a

 7   credentialing organization like a hospital credentialing

 8   committee?

 9            MS. MCENROE:  Objection to form.

10       A.   I would probably suggest that they are at a --

11   at least at the same level, perhaps at a higher level of

12   credentialing, yeah.  I think they -- particularly with

13   foreign medical graduates, they are the go-to

14   organization.  And many hospitals and other organizations

15   rely upon the accuracy and completeness of their

16   evaluation.

17       Q.   Does the standard of care in your view require

18   that ECFMG's employees when confronting circumstances that

19   suggest that a physician has or a candidate for a

20   certification has behaved in a fraudulent fashion or has

21   made false representations in an effort to obtain ECFMG

22   certification, does the standard of care in those

23   circumstances require that ECFMG act in a reasonably

24   prudent manner to rule out that fraud has been committed?

25            MS. MCENROE:  Objection to form including
```

1    leading.

2    A.   Yeah, most definitely.  And again, they hold

3  themselves out to be that organization.  And as I

4  mentioned in the course of the deposition that there were

5  multiple times over this timeline that ECFMG should have

6  acted more prudently and did not, did not.  So the

7  standard of care there, whether you are CVO or a hospital

8  credentialing an individual, should be the same and they

9  missed their mark.

10    Q.   Is it -- did you review the deposition of Kara

11  Corrado?

12    A.   I did.

13    Q.   Did you review the exhibits to that deposition?

14    A.   I did.

15    Q.   And did you rely on that deposition and those

16  exhibits in forming your opinions in this case?

17    A.   I did.

18    Q.   Did you read the deposition of William Kelly?

19    A.   I did.

20    Q.   Did you review all of the exhibits to the

21  deposition of William Kelly?

22    A.   I did.

23    Q.   And did Mr. Kelly's deposition and the exhibits

24  thereto form part of the basis of your opinion in this

25  case?

1      A.   Yes.

2      Q.   Is it your understanding that ECFMG took no

3    additional investigatory action between the time that

4    Mr. Kelly wrote the note that was not to be made a part of

5    the official file in Exhibit 17 and when ECFMG began --

6    was alerted by the Department of Justice of its

7    investigation into Dr. Akoda?

8           MS. MCENROE:  Objection to form.

9      A.   That is my understanding.

10   BY MR. THRONSON:

11     Q.   Do you believe -- strike that.

12          Do you believe it was foreseeable at the

13   time that Mr. Kelly wrote the note in Exhibit 17 that

14   Akoda would come in contact with patients?

15          MS. MCENROE:  Objection to form.

16     A.   Yes.

17   BY MR. THRONSON:

18     Q.   Do you believe it was foreseeable that Akoda

19   would perform medical examinations on patients of an

20   intimate nature?

21          MS. MCENROE:  Objection to form.

22     A.   I am trying to remember whether he was looking

23   for certification in OB-GYN or what specialty specifically

24   he was planning to enter.  So the answer if it was known

25   that it was OB-GYN, I would say yes.  If he was going to

Jerry Williamson, M.D.

```
1    provide adult medicine, which I presume that that was the
2    case here, he would still have contact with individuals
3    both male and female in a sensitive way, yes.  So I think
4    regardless of what direction he would have gone, he would
5    have been providing sensitive examinations to patients,
6    more so if he was an OB-GYN would be of greater concern,
7    yes.
8         Q.   Are you familiar with the concept of informed
9    consent?
10        A.   I am.
11        Q.   How are you familiar with that?
12        A.   I lecture on that.  And it is part of my
13   curriculum at Loyola Law School, the curriculum in terms
14   of the course that I teach.
15        Q.   Is -- do you believe obtaining informed consents
16   -- strike that.
17             Is informed consents important in medical
18   care?
19             MS. MCENROE:  Objection to form.
20        A.   Informed consent is very important.  And
21   informed consent needs to be -- it is a process as opposed
22   to a signature on a piece of paper.  So, yes, it is very
23   important.
24   BY MR. THRONSON:
25        Q.   Is part of informed consent that a patient
```

JA4495

# EXHIBIT 10



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

## Russell, Monique Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

# Exhibit 4

JA4498

KARA CORRADO

Page 59

1    investigations and referrals to the committee?

2                    MS. McENROE:   Objection to form.

3                    THE WITNESS:   Those procedures

4        are the procedures we follow, and have

5        followed, for quite some time in

6        reviewing the investigations of an

7        irregular behavior and referring matters

8        to the committee.

9    BY MR. THRONSON:

10        Q.        Are you aware of any other

11   irregular -- procedures that apply to how to

12   conduct irregular behavior investigations or

13   when to refer matters to a committee that have

14   applied from 1996 to the present, besides the

15   policy labeled "draft policy" that you just

16   mentioned?

17        A.        Not that I'm aware of.

18        Q.        How long has the policy that you

19   mentioned been in effect?

20        A.        The document I mentioned is, and

21   I might be splitting hairs, but it's

22   procedures.

23                  So we have an irregular behavior

24   policy that governs the process that we publish

JA4499

KARA CORRADO

1  on our website and that is given to

2  individuals.

3            The document that I'm referring

4  to that says "draft" is the procedures that

5  staff had been doing probably -- was probably

6  drafted around 2015 time frame, was put to

7  paper in 2015.

8       Q.      Did any procedure exist before

9  that time that applied to how the organization

10  should conduct irregular behavior

11  investigations and when the staff should refer

12  matters to the creds committee?

13       A.      Yes, those procedures that were

14  documented in 2015 were the procedures that

15  staff had been using at least since I started

16  working directly on cases of irregular

17  behavior, which is 2008 onward, and my

18  understanding would be prior to that as well.

19  I just wasn't working on those cases then.

20       Q.      So is it fair to say that up

21  until 2015, those procedures were a custom of

22  the organization in terms of how to conduct

23  investigations and when to refer matters to the

24  committee and then they were written down in

KARA CORRADO

Page 61

1    2015 in the document that we've been talking

2    about?

3                     MS. McENROE:  Objection to form.

4                     THE WITNESS:  So I don't know if

5            I would characterize them as a custom,

6            but they were documented together in

7            2015.

8                     But when I started working on

9            irregular behavior cases those procedures

10           were -- I was trained on those procedures

11           and how to conduct the case.

12   BY MR. THRONSON:

13       Q.      Was there a written policy --

14   sorry, written procedure that predated the 2015

15   procedure?

16                    MS. McENROE:  Objection to form.

17                    THE WITNESS:  Not that I can

18           recall.

19   BY MR. THRONSON:

20       Q.      So as part of your training in

21   how to conduct irregular behavior

22   investigations prior to 2015, you weren't

23   trained on a particular written procedure; fair

24   to say?

# EXHIBIT 11



U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

| | | |
|---|---|---|
| Kelly O. Hayes<br>Assistant United States Attorney<br>Kelly.Hayes@usdoj.gov | Mailing Address:<br>6500 Cherrywood Lane, Suite 200<br>Greenbelt, MD 20770-1249 | Office Location:<br>6406 Ivy Lane, 8th Floor<br>Greenbelt, MD 20770-1249 | DIRECT: 301-344-0041<br>MAIN: 301-344-4433<br>FAX: 301-344-4516 |

October 31, 2016

Peter Goldman, Esq.
O'Reilly & Mark, P.C.
524 King Street
Alexandria, VA 22314

PWG 16-0277

Re:   United States v. Oluwafemi Charles Igberase,
      a/k/a "Charles John Nosa Akoda,"
      Criminal No. PWG-16-277

Dear Mr. Goldman,

This letter confirms the plea agreement, together with the sealed supplement, which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **November 4, 2016**, it will be deemed withdrawn. **The plea agreement is entered into and will be submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).** The terms of the agreement are as follows:

## Offense of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Superseding Indictment now pending against him, which charges him with misuse of a Social Security Account Number, in violation of 42 U.S.C. § 408(a)(7)(B). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

## Elements of the Offense

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the Defendant falsely represented a number to be the Social Security Account Number assigned to him by the Commissioner of Social Security; (2) the Defendant made that false statement with the intent to deceive or for any other purpose; and (3) the Defendant acted knowingly and willfully.

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five years of imprisonment, a fine of $250,000, and a period of supervised release of three years. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

        a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

        b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

        c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

ECFMG-000012

ECFMG-000012_0000012

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Indeed, because the Defendant is pleading guilty to the identity fraud charges in this case, and because he is an illegal alien, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences, even if the consequence is his automatic removal from the United States.

### Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

3

ECFMG-000013

ECFMG_R093_0000013
JA4505

## Factual and Advisory Guidelines Stipulation

6.    This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.    The base offense level is 6, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(2).

b.    Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means, and because the resulting offense level is less than level 12, the offense level is increased to 12.

c.    A 3-level enhancement applies, pursuant to U.S.S.G. § 3B1.3, because the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.

d.    This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. If the Defendant receives a 2-level reduction, the final offense level will be 13.

7.    The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.    This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Rule 11(c)(1)(C) Plea

9.    The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement, is the appropriate disposition of this case. This agreement does not affect the Court's

4

ECFMG-000014

ECFMG-000014_0000014

discretion to impose any lawful fine or to set any additional lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

## Obligations of the United States Attorney's Office and the Defendant

10.     At the time of sentencing, the parties will jointly request the Court to accept the stipulated sentence of **six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement.** At the time of sentencing, this Office will move to dismiss all open counts.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

## Agreement Not to Prosecute Other Offenses the Defendant May Have Committed

12.     Other than the offense to which the Defendant has agreed to plead guilty, and with the exception of crimes of violence, crimes against children and tax violations, this Office will not prosecute the Defendant for any other violations of federal criminal law that arise from the facts stipulated by the Defendant and this Office, attached hereto and incorporated herein as Attachment A, that form the basis of this plea agreement.

## Waiver of Appeal

13.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

        b.      If the Court accepts this Plea Agreement and imposes the agreed-upon sentence, the Defendant and this Office knowingly waive all rights, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal the sentence imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

        c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

5

ECFMG-000015

ECFMG_ROSS_0000015

   d.   The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<div align="center">Obstruction or Other Violations of Law</div>

   14.   The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

<div align="center">Entire Agreement</div>

   15.   This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

   If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

                         Very truly yours,

                         Rod J. Rosenstein
                         United States Attorney

                    By: _____
                         Kelly O. Hayes
                         Assistant United States Attorney

<div align="center">6</div>

ECFMG-000016

JA4508
ECFMG_RUSS_0000016

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

__11/15/16__
Date

Oluwafemi Charles Igberase
a/k/a "Charles John Nosa Akoda"

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

__11/15/16__
Date

Peter Goldman, Esq.

7

ECFMG-000017

ECFMG_RUSS_0000017
JA4509

## ATTACHMENT A - Stipulated Facts

*The United States and the Defendant stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. The parties further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

In October 1991, the Defendant, **OLUWAFEMI CHARLES IGBERASE** ("**IBGERASE**"), entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, **IGBERASE** applied for and obtained a Social Security number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962.  In January 1995, **IGBERASE** applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase Jr." and a false date of birth.  In September 1998, **IGBERASE**, this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN").  In or about 2011, **IGBERASE** fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, **IGBERASE** submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG").  **IGBERASE** submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 and date of birth April 17, 1962.  ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care.  Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE").  All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States.  In July 1992, **IGBERASE** failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is Step 2 of the USMLE.  In January 1993, **IGBERASE** again failed the basic medical science (Day 1) component of the FMGEMS.  In September 1993, **IGBERASE** failed Step 1 of the USMLE.  Eventually, between July 1992 and September 1993, **IGBERASE** passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, **IGBERASE** submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth.  Between August 1994 and September 1994, **IGBERASE** passed all three steps of the USMLE and was issued a second ECFMG certificate under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that **IGBERASE** had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth.  In December 1995, ECFMG revoked or suspended both ECFMG certifications assigned to **IGBERASE**.

8

ECFMG-000018

ECFMG_R0319_0000018

In August 1996, **IGBERASE** submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, **IGBERASE** submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, **IGBERASE**, as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, **IGBERASE** applied for and was accepted into a residency program at Jersey Shore Medical Center ("JSMC"). In 2000, JSMC learned that the SSN that **IGBERASE** used belonged not to "Akoda" but rather to **IGBERASE**. **IGBERASE** was suspended from JSMC's residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, **IGBERASE**, using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at Howard University. In March 2007, Howard University accepted **IGBERASE** into its residency program, and asked **IGBERASE** to submit evidence of legal residence in the United States. In response, **IGBERASE** submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after the completion of his residency at Howard University, **IGBERASE**, using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, **IGBERASE** submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to **IGBERASE** under the name "Charles John Nosa Akoda," and **IGBERASE** began practicing medicine in the field of obstetrics and gynecology.

In 2012, **IGBERASE**, using the "Akoda" identity, sought and obtained medical privileges at Prince George's Hospital Center ("PGHC") in Maryland. To do so, **IGBERASE** submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, **IGBERASE** submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied **IGBERASE**'s application based, in part, on CMS's determination that **IGBERASE** did not provide an accurate SSN.

On June 9, 2016, law enforcement executed search warrants at **IGBERASE**'s residence, medical practice, and vehicle. From **IGBERASE**'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From **IGBERASE**'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

9

Case 2:18-cv-05629-JDW Document 135-2 Filed 10/04/23 Page 11 of 21
Case 2:18-cv-05629-JDW Document 22-5 Filed 12/21 Page 11 of 21

Case 8:16-cr-00277-PWG   Document 49-1   Filed 11/15/16   Page 3 of 3

Throughout the above-referenced scheme, **IGBERASE** also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

\* \* \*

I have read this statement of facts and carefully reviewed it with my attorney.  I acknowledge that it is true and correct.

11/15/16
Date

Oluwafemi Charles Igberase
      a/k/a Charles John Nosa Akoda

I am Oluwafemi Charles Igberase's attorney.  I have carefully reviewed the statement of facts with him.

11/15/16
Date

Peter Goldman, Esq.

10

ECFMG-000020

ECFMG_RUSS_0000020

JA4512

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be electronically filed and served upon all counsel of record by electronic filing. This document is available for viewing and downloading from the Court's ECF system.

Dated: 1/14/2022                          */s/ Robin S. Weiss*
                                          Robin S. Weiss

JA4513

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629 |
| Plaintiffs, | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION**

JA4514

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

I.    ECFMG mischaracterizes the Third Circuit's view of the suitability of issue-class certification ain this case and the advantages of individualized proceedings............................ 1

II.   The Reexamination Clause—and, in particular, the Seventh Circuit's decision in *Rhone Poulenc*—cannot bar certification here, because it does not prohibit overlapping presentations of evidence in separate trials. ................................................................ 4

III.  None of the alleged procedural, substantive, constitutional, or statutory rights Defendant enumerates will be impaired by class certification ................................... 7

IV.  The issue-class certification in *Gates* does not resemble the one Plaintiffs propose here....... 10

V.   Defendant's argument regarding predominance and superiority breaks no new ground and is not responsive to the Third Circuit's opinion. .......................................... 11

CONCLUSION .................................................................................................................. 11

CERTIFICATE OF SERVICE ......................................................................................... 13

CERTIFICATE OF COMPLIANCE .............................................................................. 14

JA4515

## INTRODUCTION

ECFMG's supplemental briefing goes well beyond the narrow areas of error the Third Circuit identified (i.e., an absent determination of whether the class satisfied Rule 23(b) and an analysis of *Gates* factors 3 and 9) and attempts to have the Court broadly reevaluate its earlier determination on class certification. It does so based on arguments this Court and the Third Circuit have rejected. And it presents a systematically inaccurate perspective of the Third Circuit's opinion—which actually counsels approving issue-class certification here.

The arguments ECFMG advances in its brief are fairly addressed in Plaintiff's supplemental brief (ECF No. 79). Plaintiffs address those arguments below that may warrant additional comment.

## ARGUMENT

## I.     ECFMG mischaracterizes the Third Circuit's view of the suitability of issue-class certification in this case and the advantages of individualized proceedings.

It is simply false that "[t]he Third Circuit explained that the overall complexity of the case (*Gates* factor 2) and the lack of efficiencies to be gained from an issue class proceeding in light of realistic procedural alternatives (*Gates* factor 3) weigh strongly against issue class certification." ECF No. 80 at 7. On the very page cited by ECFMG for this proposition, the opinion states the opposite:

> Of course, the District Court **may very well be correct** that "there are efficiencies to be gained by certifying a class on these issues . . . Duty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages. <u>It is true that deciding if the Commission had a duty to investigate requires balancing several factors. *Id.*</u> **But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence:** How much investigating did the Commission do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including the New Jersey residency program? Should it have followed up in later years once Igberase was admitted to another residency program? No absent class member would have anything special to add in her

1

individual trial. <u>There will be plenty left for individual proceedings, but **these major issues could be resolved on a class-wide basis.**</u>

*Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 272–73 (3d Cir. 2021) (emphasis added) (citations omitted).

The mere fact that issues will remain for resolution in individual proceedings following an issues trial favorable to Plaintiffs is insufficient to defeat certification. The key question is, "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"[1] As Plaintiffs have explained, repeated full-blown trials after denial of issue certification will needlessly require repeated, expensive presentations of expert evidence and an extensive factual record at trial.

Juries hearing individual claims will not need to hear "virtually all" of the evidence in a class trial "[t]o determine causation, understand who Dr. Akoda was, and even have a basic understanding of the theory of liability against ECFMG." (ECF No. 80 at 7. ECFMG insists on uniformly referring to Igberase as "Dr. Akoda" throughout its supplemental briefing. "Dr. Akoda" does not exist and has never existed.) None of these issues require presentation of expert testimony on standard of care, as will occur at the class trial. "Who Dr. Akoda was" and "the theory of liability against ECFMG" are academic at a mini-trial on causation and damages. What is relevant is whether ECFMG was a cause of a plaintiff's injuries. The jury will well understand Igberase from testimony about a plaintiff's interactions with him. The ins and outs of his fraud and ECFMG turning a blind eye to it will not be necessary to determining causation and damages. Essential background

---

[1] *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012), *cert. granted, judgment vacated*, 569 U.S. 1015 (2013), and *judgment reinstated*, 727 F.3d 796. (7th Cir. 2013).

JA4517

information on ECFMG and its conduct can be provided through special interrogatories and stipulated instructions that the parties, under the Court's direction, can work to craft collaboratively.

ECFMG also falsely asserts that a class jury will have to "consider the entire chain of events relevant to the class member at issue—including any alleged wrongdoing by ECFMG, JSMC, Howard, the Maryland Board of Physicians, the Virginia Board of Medicine, Dr. Chaudry, Dr. Moore, ABOG, and/or law enforcement—that will already have been presented to the issue class jury." ECF No. 80 at 3. First, the "alleged wrongdoing" of another entity has no relevance to the issue class proceeding, and likely none to any individual damages proceeding either. There is no other "alleged wrongdoing" in this case other than ECFMG's. ECFMG has not proffered evidence of "alleged wrongdoing" by any specific individual or entity it identifies. Its Answer does not specifically identify any other entity as negligent. None of its retained experts' reports and discovery responses do, either. It has not deposed any person on its list of other potentially responsible parties. And Plaintiffs do not allege here that any of the individuals ECFMG identifies (e.g., law enforcement, the Maryland Board of Physicians) was negligent or proximately caused injury. The Court should not decline to certify a class based on purely hypothetical liability of another entity that has failed to materialize over the last three years of litigation.

Second, any potential liability on the part of other actors cannot eliminate ECFMG's liability. The relevant inquiry is whether ECFMG's negligence was *a* factual cause of Plaintiffs' injuries, not, as the opinion's dicta implied, whether ECFMG was *the* cause. Pa. SSJI (CIV), 13.20; *Gorman v. Costello*, 2007 PA Super 224, ¶ 13, 929 A.2d 1208, 1212 (2007). ECFMG was the first link, and the only indispensable link, in the causal chain that led to Igberase being able to see patients. ECFMG,

JA4518

uniquely, certifies foreign medical graduates as eligible to enter residency programs in the United States.

Third, ECFMG can always file a contribution action to recover some of a judgment or settlement from the other entities it identifies if it believes it is shouldering an unfair share of financial responsibility for the outcome here. Under present circumstances—where ECFMG has not sought to implead any other defendant, has made no specific allegations concerning the liability of any other party, and advances no expert testimony to support liability on behalf of any other party— that is the appropriate course for ECFMG to take if it believes it is paying more than its fair share.

## II.     The Reexamination Clause—and, in particular, the Seventh Circuit's decision in *Rhone-Poulenc*—cannot bar certification here, because it does not prohibit overlapping presentations of evidence in separate trials.

Plaintiffs' previous discussion of the Reexamination Clause and its interplay with *Gates* rebuts all of the arguments ECFMG advances on this issue. ECF No. 79 at 12-18. Plaintiffs write here to discuss *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), the principal case Defendant cites. The present case suffers from none of the infirmities that plagued *Rhone-Poulenc*. And the present case hardly threatens to bankrupt an industry manufacturing lifesaving pharmaceuticals, unlike *Rhone-Poulenc*.

*Rhone-Poulenc* concerned a nationwide class action lawsuit, brought on behalf of people suffering from hemophilia who were HIV-positive, against pharmaceutical companies who manufactured blood solids that contained clotting factors. *Id.* at 1294. The case involved approximately 12,000 potential claimants—twelve times the number in this case. *Id.* at 1296. It came before the Seventh Circuit on a petition for writ of mandamus following certification under Rule 23(c)(4). *Id.* at 1294. The district court certified particular issues of negligence concerning the major

4

theories of liability advanced by the plaintiffs. If the plaintiffs prevailed, class members would use the verdict in individual tort suits around the country and attempt to use collateral estoppel to block relitigation of the issue of negligence (which, the appellate court found, would not work in the absence of a final judgment). *Id.* at 1297.

In writing for the court, Judge Richard Posner elicited three primary concerns, "none of them necessarily sufficient in itself but cumulatively compelling" (*id.* at 1299; *see also id.* at 1304), which persuaded the court that the district court had abused its discretion:

(1)     "a concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability," where defendants had prevailed in 12 of the first 13 trials involving similar claims;[2]

(2)     the jury would decide a novel "serendipity theory" under a "legal standard that does not exist anywhere in the world" akin to the sort of "general" federal common law rejected by *Erie*; and

(3)     Seventh Amendment concerns. The district court ordered the first jury would "determine whether one or more of the defendants was negligent under one of the two theories" (i.e., ordinary negligence and the "serendipity theory"). *Id.* at 1303. A subsequent jury would then

---

[2] The court estimated that the defendants, following class certification, would "suddenly be facing thousands of plaintiffs" and "might, therefore, easily be facing $25 billion in potential liability (conceivably more), and with it bankruptcy." *Id.* at 1298. They thus would be "under intense pressure to settle," making the final judgment unreviewable. *Id.* Thus, the court concluded, "it is not a waste of judicial resources to conduct more than one trial, before more than six jurors, to determine whether a major segment of the international pharmaceutical industry is to follow the asbestos manufacturers into Chapter 11." *Id.* at 1300.

consider whether the plaintiffs were comparatively negligent and decide proximate causation. *Id.* The opinion contains a lone assertion that proximate causation "overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence." *Id.* It then goes on to say that the class jury might find the defendants negligent, but a subsequent jury might find the defendant's action was not a proximate cause of the injury. *Id.* That is the extent of the court's analysis of the matter.

Here, none of these concerns—which the court repeatedly declined to say were sufficient in themselves to warrant mandamus—preclude certification. As to concerns (1) and (2), ECFMG does not argue—and there is no credible argument—that the lawsuit will force ECFMG into bankruptcy or that ECFMG is likely to succeed on the merits. And there is no prospect the Court will adopt a legal standard unmoored from state tort law.

As to concern (3), this case does not present Reexamination Clause concerns, as Plaintiffs extensively argued in their principal supplemental brief. ECF No. 79 at 12-18. The Reexamination Clause does not apply to the issue of duty, since the Court will determine the existence of a duty. The foreseeability prong of the duty analysis thus cannot be "reexamined" by a subsequent jury. Furthermore, ECFMG's argument again improperly conflates the foreseeability inquiry appropriate to resolving duty with the separate and distinct inquiry appropriate to resolving proximate causation, which this Court noted and rejected in its initial class certification decision. ECF No. 57 at 16-17. Reexamination Clause problems also do not attend the issue of breach. The class jury will not decide "negligence," but rather the issue of whether ECFMG breached its duty to class members. Subsequent juries will not decide these issues.

6

Even if it were on point, "[b]y and large, other courts have not picked up and run with Judge Posner's Seventh Amendment concerns." *Anderson Living Tr. v. WPX Energy Prod.*, LLC, 306 F.R.D. 312, 416 (D.N.M.), *adhered to on reconsideration*, 312 F.R.D. 620 (D.N.M. 2015). "Most other commentators and several courts have also rejected Posner's Seventh Amendment arguments." Daniel Klerman, *Posner and Class Actions*, 86 U. Chi. L. Rev. 1097, 1107-08 (2018). And Judge Posner embraced the utility and constitutionality of common issue classes that, like this one, did not threaten to bankrupt a critical industry. *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 492 (7th Cir. 2012); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 912 (7th Cir. 2003).

## III. None of the alleged procedural, substantive, constitutional, or statutory rights Defendant enumerates will be impaired by class certification.

Plaintiffs address the alleged undue settlement pressure of class certification in section III of their principal supplemental brief. (ECF No. 79 at 8.) Plaintiffs add that counsel's assertion that it has strong defenses (an opinion the Third Circuit did not advance) hardly makes class certification improper or unfair. The argument improperly injects merits questions into class certification. *See Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

Moreover, "pressure" does not mean "undue pressure." As Judge Posner observed in *Rhone-Poulenc*, "We do not want to be misunderstood as saying that class actions are bad because they place pressure on defendants to settle. That pressure is a reality, but it must be balanced against the undoubted benefits of the class action that have made it an authorized procedure for employment by federal courts." *Rhone-Poulenc*, 51 F.3d at 1299. Similarly, in later affirming a district court's

7

certification under Rule 23(c)(4) of an issue class on whether there was unlawful contamination and the extent of the contamination, Judge Posner explained:

> When enormous consequences turn on the correct resolution of a complex factual question, the risk of error in having it decided once and for all by one trier of fact rather than letting a consensus emerge from several trials may be undue.

> This is not such a case. First, the two questions that the judge has set for class treatment—whether there was unlawful contamination and what the geographical scope of the contamination was—are not especially complex. Second, even if these questions are answered against Met-Coil, the consequences for it will not be catastrophic. The individual class members will still have to prove the fact and extent of their individual injuries. The need for such proof will act as a backstop to the class-wide determinations.

*Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 912 (7th Cir. 2003) (citations omitted). Plainly this case is also not one where enormous consequences turn on resolution of a complex factual question. This is a damages lawsuit by 1,000 or fewer plaintiffs against an insured defendant with over $168 million in assets and over $90 million in revenue for FY2019.[3]

For the first time, ECFMG proposes that the Court conduct numerous full-blown bellwether trials. (ECF No. 80 at 12. The only other "realistic procedural alternative" proposed is coordinating discovery between different proceedings, *id.*, which is of little moment given the advanced stage of discovery.) Repetitive individual trials, requiring repetitive, costly expert testimony and trial costs that may well exceed the recovery of an individual plaintiff, offer no advantage over the proposed issue-class action. Again, the central question before the Court is one formulated by Judge Posner: "Is it more efficient, in terms both of economy of judicial resources and of the

---

[3] *See* Educational Commission for Foreign Medical Graduates, Form 990 for the period ending December 31, 2019, at 1, *available at* https://tinyurl.com/2p8z64rt.

expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"[4] As Plaintiffs have argued extensively, trying duty and breach on a class basis will afford numerous advantages and efficiencies over trying the same issues "again, and again, and again." ECF No. 57 at 26.

Finally, choice of law cannot bar class certification here. First, ECFMG confuses the burden of showing certification is warranted with the burden of addressing conflicts of law. Plaintiffs bear the latter burden only when the defendant first demonstrates that multiple bodies of law apply. *See, e.g.*, Principles of the Law of Aggregate Litigation § 2.05 cmt. f (2020); Patrick Woolley, *Choice of Law and the Protection of Class Members in Class Suits Certified Under Federal Rule of Civil Procedure 23(b)(3)*, 2004 Mich. St. L. Rev. 799, 811 (2004). Under Pennsylvania law, a class-action defendant has the burden of showing that the law of another state applies or, if it does, that a true conflict exists. *See, e.g.*, *Parsky v. First Union Corp.*, 51 Pa. D. & C.4th 468, at 12 & n.28 (Com. Pl. 2001). Defendant has not shown that multiple states' laws apply and has certainly not shown that a true conflict exists.

This Court has already determined that Pennsylvania law applies to the Plaintiffs' claims. ECFMG gives the Court no reason to change its mind. Its sole new argument on this score on remand is that "difficult constitutional questions would arise under the Commerce Clause" if Pennsylvania law is applied to the claims of out-of-state plaintiffs. (ECF No. 80 at 9.) The sole case it cites concerns whether a Connecticut beer-pricing statute unconstitutionally discriminated against interstate commerce. *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989). *Healy* nowhere discusses choice of law. ECFMG never shows how applying Pennsylvania law to a Pennsylvania corporation's conduct

---

[4] *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012), *cert. granted, judgment vacated*, 569 U.S. 1015 (2013), and *judgment reinstated*, 727 F.3d 796. (7th Cir. 2013).

JA4524

in Pennsylvania would discriminate against interstate commerce. Even if the Court determined another state's law applied and a true conflict existed, it could create a subclass using Rule 23(c)(5) and instruct the jury on any meaningful differences in the applicable law (differences the Court and the parties have not found).

## IV. The issue-class certification in *Gates* does not resemble the one Plaintiffs propose here.

ECFMG incorrectly analogizes the issue certification on duty and breach in this case to that proposed in *Gates*. In *Gates*, the class sought certification only on medical monitoring and property damage claims, solely regarding only one among several contaminants (vinyl chloride) and exposure through only one of several alleged pathways (via a shallow aquifer into the air). *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 259 (3d. Cir. 2011). The class trial would only have determined whether defendants discharged vinyl chloride into the lagoon that seeped into the shallow aquifer and whether vinyl chloride evaporated into the air from the shallow aquifer. *Gates*, 655 F.3d at 274. The Third Circuit concluded resolving that issue would not substantially aid resolution of liability and causation.

The issue class certification proposed here, by contrast, will resolve the issues of duty and breach of duty as to all class members on all theories. Unlike the narrow issues proposed for class treatment in *Gates*, which would have left whole claims untouched for resolution, the class proceedings in this matter will resolve two major elements of each cause of action for all plaintiffs.

JA4525

## V.     Defendant's argument regarding predominance and superiority breaks no new ground and is not responsive to the Third Circuit's opinion.

Defendant erroneously claims that the issue of duty and breach cannot be resolved on a classwide basis, because class members encountered Akoda at different times. Defendant ignores the Third Circuit's explicit statement to the contrary: "It is true that deciding if the Commission had a duty to investigate requires balancing several factors. But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence." *Russell*, 15 F.4th at 272. Here, ECFMG's relevant course of conduct relative to the claims of each plaintiff is the same: ECFMG negligently certified Igberase and then failed to act on an ongoing basis from 2000 until 2016, despite multiple opportunities to do so. Whether ECFMG acted reasonably in failing to act upon an alleged request from law enforcement in 2013 is immaterial: it should never have certified Igberase in the first place. Having certified him, it should have acted long before 2013 to revoke his certification and warn hospitals, medical boards, and patients.

Finally, ECFMG's argument again conflates foreseeability as a question of proximate cause with foreseeability as a question of duty, which the district court observed in rejecting this same argument in opposition to Plaintiffs' initial motion for class certification. ECF No. 57 at 16-17.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court adhere to its initial class certification decision.

11

JA4526

Dated: <u>January 14, 2022</u>

JANET, JANET & SUGGS, LLC

<u>/s/ Patrick Thronson</u>
  Patrick A. Thronson
  Brenda A. Harkavy
  4 Reservoir Circle, Suite 200
  Baltimore, MD 21208
  (410) 653-3200

LAW OFFICES OF PETER G. ANGELOS, P.C.
  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th Floor Baltimore, Maryland 21201
  (410) 649-2000

SCHOCHOR, FEDERICO AND STATON
  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

Respectfully submitted,

CONRAD O'BRIEN PC
  Nicholas M. Centrella
  Robin S. Weiss
  1500 Market Street, Suite 3900
  Philadelphia, PA 19102-2100
  (215) 864-9600

THE COCHRAN FIRM
Karen E. Evans, R.N., J.D.
David Haynes
1100 New York Ave, N.W.
Washington, D.C. 20005
(202) 682-5800

Z LAW, LLC
  Cory L. Zajdel
  2345 York Rd. Suite B-13 Timonium, MD 21093
  (443) 213-1977

*Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated*

JA4527

## **CERTIFICATE OF SERVICE**

I certify that on January 14, 2022, I caused the foregoing document to be served upon all counsel of record through the Court's CM/ECF filing system.

Dated: <u>January 14, 2022</u>                                          <u>/s/ *Patrick Thronson*</u>

                                                                            Patrick A. Thronson

JA4528

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing document contains 3,424 words, excepting the caption, table of contents, signature block, and certificates, in compliance with the Court's Scheduling Order of November 9, 2021 (ECF No. 77).

Dated: <u>January 14, 2022</u>                <u>/s/ *Patrick Thronson*</u>

                                                              Patrick A. Thronson

JA4529

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

---

### DEFENDANT'S OPPOSITION BRIEF IN RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING CLASS CERTIFICATION

Dated: January 14, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
Telephone:    +1.713.890.5000
Facsimile:    +1.713.890.5001
william.peterson@morganlewis.com

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

JA4530

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.      Plaintiffs Have Not Demonstrated That an Issue Class Satisfies Rule 23(b)(3). ..................................................................................................... 1

         A.     Plaintiffs have not satisfied Rule 23(b)(3)'s predominance requirement. ........................................................................... 2

         B.     Plaintiffs have not satisfied Rule 23(b)(3)'s superiority requirement. ........................................................................... 2

II.     Plaintiffs Have Not Demonstrated That an Issue Class Satisfies Rule 23(c)(4). ..................................................................................................... 3

         A.     Plaintiffs do not address most of the *Gates* factors................................... 4

         B.     The need to present the same evidence at issue class and individual proceedings drastically undermines any supposed gains in efficiency................................................................................ 4

         C.     Plaintiffs overstate the supposed differences in efficiencies between issue class certification and realistic procedural alternatives. .......................................................................... 6

         D.     Plaintiffs' proposal to focus individual proceedings only on Dr. Akoda, not ECFMG, is fundamentally flawed. ......................................... 7

         E.     Plaintiffs have not proposed a trial plan that would avoid Seventh Amendment violations. ........................................................... 8

         F.     Treating duty as a question of law does not favor class certification. ........................................................................... 9

         G.     Issue certification creates a serious risk of undue settlement pressure. ........................................................................... 10

III.    Plaintiffs' Attempt to Limit the Third Circuit's Decision Is Meritless................ 10

CONCLUSION ................................................................................................... 11

JA4531

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...............................................................................1, 2

*Arch v. Am. Tobacco Co., Inc.*,
175 F.R.D. 469 (E.D. Pa. 1997).......................................................................8

*Blain v. Smithkline Beecham Corp.*,
240 F.R.D. 179 (E.D. Pa. 2007).......................................................................3

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...............................................................................2, 9

*In re Domestic Drywall Antitrust Litig.*,
MDL No. 2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017)................................3

*Jackson v. Se. Pa. Transp. Auth.*,
260 F.R.D. 168 (E.D. Pa. 2009)......................................................................10

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001).......................................................................3

*Mwantembe v. TD Bank, N.A.*,
268 F.R.D. 548 (E.D. Pa. 2010).......................................................................3

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
15 F.4th 259 (3d Cir. 2021) ................................................................ *passim*

*Sanneman v. Chrysler Corp.*,
191 F.R.D. 441 (E.D. Pa. 2000).......................................................................3

*Spence v. Bd. of Educ. of the Christina Sch. Dist.*,
806 F.2d 1198 (3d Cir. 1986).......................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).......................................................................2

OTHER AUTHORITIES

Seventh Amendment.......................................................................8, 9

Rule 23 .......................................................................1, 9, 10

ii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Rule 23(a).................................................................................................................2

Rule 23(b)(3)..................................................................................................... *passim*

Rule 23(c)(4)..............................................................................................1, 3, 4, 6

JA4533

## INTRODUCTION

Plaintiffs have not satisfied Rule 23, and nothing in their Supplemental Memorandum alters that conclusion. Since that filing, Plaintiffs' counsel has admitted in writing that they "have no idea what the first jury trial in this case is going to look like." Ex. A. That is essentially a concession that Plaintiffs have not carried their burden on the predominance and superiority requirements of Rule 23(b)(3) and issue-class certification requirements of Rule 23(c)(4) and the *Gates* factors. The Court cannot certify an issue class without a clear understanding of how it would facilitate the most fair and efficient resolution of the controversy. Plaintiffs offer only general assurances that some time down the road in this case they will somehow, some way, avoid the inefficiencies and substantive problems recognized by the Third Circuit. Rule 23 demands much more. Class certification should be denied.

## ARGUMENT

### I.  Plaintiffs Have Not Demonstrated That an Issue Class Satisfies Rule 23(b)(3).

Plaintiffs' application of Rule 23(b)(3) to the facts of this case comprises only half a page. *See* Pls' Supp. Mem. 6. Rather than address the predominance and superiority requirements separately or at length, Plaintiffs' Supplemental Memorandum presents a brief and conclusory analysis of "matters pertinent" to Rule 23(b)(3). *Id.* Plaintiffs do not explain why this case is different than the typical personal injury-type case, in which each plaintiff "has a significant interest in individually controlling the prosecution" of her case and "a substantial stake in making individual decisions on whether and when to settle." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616 (1997). Nor do they explain how the absence of similar litigation favors certification when Plaintiffs' counsel purports to represent "at least 550 plaintiffs" who would supposedly file suit if certification were denied. Pls.' Supp. Mem. 12. This is not a case where the class action device is necessary to avoid the loss of class members' rights.

1

A "rigorous analysis" of Rule 23(b)(3) requires the Court to take a "close look" at the predominance and superiority requirements and to "find" based on "evidentiary proof" that they are satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). As explained below, Plaintiffs have not satisfied those requirements, and no class should be certified.

### A.    Plaintiffs have not satisfied Rule 23(b)(3)'s predominance requirement.

Plaintiffs' predominance argument is premised on several out-of-circuit cases and treatises standing for the truism that common questions predominate when only common questions are considered. *See* Pls.' Supp. Mem. 7.

But the Third Circuit did not hold—and Plaintiffs have not shown—that "whether [ECFMG] owed a relevant legal duty to the Plaintiffs that it subsequently breached," *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270 (3d Cir. 2021), is in fact a question "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). *See also Amchem Prods., Inc.*, 521 U.S. at 624 (explaining that Rule 23(b)(3)'s "predominance criterion is far more demanding" than Rule 23(a)'s commonality requirement). As explained in ECFMG's Supplemental Brief (at 10–13), it is not. Even if proof of ECFMG's conduct may not differ significantly among cases, the legal import of that conduct may vary drastically. Plaintiffs' varied theories of liability admit the possibility that ECFMG breached a duty owed to some class members but not others. Accordingly, common issues do not predominate.

### B.    Plaintiffs have not satisfied Rule 23(b)(3)'s superiority requirement.

Plaintiffs' discussion of superiority and the "likely difficulties in managing a class action" is three lines long and simply states, without elaboration, that such difficulties "pale in comparison to the likely difficulties and drain on judicial resources, of handling these claims individually."

2

Pls' Supp. Mem. 6. Plaintiffs do not meaningfully discuss any "other available methods" for adjudicating the controversy, Fed. R. Civ. P. 23(b)(3), let alone offer a trial plan demonstrating that their proposed issue class is superior to those methods. *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 455 (E.D. Pa. 2000) ("[I]n order to find superiority, a court must find all other methods of resolving the issues in a case to be inferior to a class action."). This is perhaps unsurprising given their admission they do not know what an issue class trial would look like. *See* Ex. A.

Courts regularly hold that superiority is not satisfied where, as here, plaintiffs fail to provide a trial plan or otherwise demonstrate that the benefits of class certification exceed those of other methods for resolving the controversy. *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 195 (3d Cir. 2001) (rejecting class certification where it was not "the best 'available method[] for the fair and efficient adjudication of the controversy'"); *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 195 (E.D. Pa. 2007) (finding superiority lacking where proposed trial plan involving jury interrogatories on emotional distress claims left "an overwhelming number of individual issues … unresolved for each class member" and "adjudication of the proposed common issues would not materially advance a disposition of the case as a whole"); *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2017 WL 3700999, at *15 (E.D. Pa. Aug. 24, 2017) (noting that the plaintiffs' failure to present a trial plan weighed against a finding of superiority); *Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548, 563 (E.D. Pa. 2010) ("Despite the numerous problems presented with adjudicating, administering and trying these cases, the plaintiffs have not submitted a proposed trial plan addressing these problems."). On this record, given the absence of argument by Plaintiffs, the Court cannot find that Rule 23(b)(3)'s superiority requirement has been met.

## II. Plaintiffs Have Not Demonstrated That an Issue Class Satisfies Rule 23(c)(4).

Plaintiffs' arguments with respect to Rule 23(c)(4) and the *Gates* factors are muddled and unpersuasive. Plaintiffs disregard large portions of the Third Circuit's opinion describing the

JA4536

difficulties arising from the proposed issue class. They adopt inconsistent positions about whether they intend to prove essential elements of their claims and, if so, who would decide the element and at which stage of the proceeding. They offer no clear trial plan and propose no real solutions to looming violations of ECFMG's constitutional rights. Plaintiffs have not done enough to demonstrate that their proposed issue class satisfies Rule 23(c)(4).

**A.    Plaintiffs do not address most of the *Gates* factors.**

The Third Circuit held that this Court's prior class certification order "failed to rigorously consider several *Gates* factors." *Russell*, 15 F.4th at 272. Its opinion gives several "example[s]" of *Gates* factors that were not sufficiently addressed. *Id.* But the Third Circuit never indicated that those examples were a comprehensive or exclusive list of *Gates* factors that were not analyzed rigorously. *See id.* at 273 n.5 ("there may yet be other problems with the issue class"). Its opinion did not endorse this Court's analysis of any particular *Gates* factor or otherwise suggest that individual *Gates* factors should be reevaluated in isolation without reweighing all of the factors.

Plaintiffs' Supplemental Memorandum discusses only a few of the *Gates* factors. *See* Pls.' Supp. Mem. 8–18. It does not address all of the *Gates* factors or explain how all of the *Gates* factors, taken together, show that issue class certification is "appropriate" in this case. The Court should not find Rule 23(c)(4) satisfied when Plaintiffs have not supplied the Court with an adequate basis to rigorously analyze all of the *Gates* factors.

**B.    The need to present the same evidence at issue class and individual proceedings drastically undermines any supposed gains in efficiency.**

The Third Circuit correctly recognized that Plaintiffs' proposed issue class will leave "plenty … for individual proceedings," including "whether each Plaintiff was injured; whether [ECFMG]'s breach of the relevant duty (if it had a duty that was breached) actually and proximately caused those injuries; whether those injuries are due a particular amount of damages;

4

and whether [ECFMG] could raise any affirmative defense, including, presumably, whether each Plaintiff's consent to medical treatment by [Dr. Akoda] breaks the causal chain." *Russell*, 15 F.4th at 265, 273.

Plaintiffs' only basis for claiming that issue class certification would promote efficiency (*Gates* factor 3) is their contention that it would avoid the need to present the same evidence at multiple proceedings. *See* Pls.' Supp. Mem. 11–12.

The Third Circuit expressly rejected that argument. It held that if an issue class were certified, "once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of [ECFMG's] negligence as to each Plaintiff." *Russell*, 15 F.4th at 272 (citing *Spence v. Bd. of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986)). It further reiterated that "emotional distress damages must be evaluated in light of all the circumstances surrounding [ECFMG's] alleged misconduct." *Id.* (quoting *Spence*, 806 F.2d at 1202). The law requires that evidence of ECFMG's negligence be presented at both the issue class and individual phases of the case proposed by Plaintiffs. That holding eviscerates any claim that improved efficiencies warrant class certification.

Plaintiffs' response is to pretend that the Third Circuit's holding does not exist. Their Supplemental Memorandum cites out-of-circuit cases and decades-old Third Circuit decisions to argue that ECFMG's alleged negligence is irrelevant to the alleged emotional distress here. *See* Pls.' Supp. Mem. 16. Plaintiffs also argue that *Spence* "is of no moment here" because it involved a "tangled and complex fact situation." *Id.* at 17.[1] They made exactly this argument on appeal, Appellees' Br., Dkt. 47, at 57–59, but the Third Circuit rejected it, holding that *Spence* applies,

---

[1] Notably, Plaintiffs previously argued that "complexity" here weighed in favor of class certification. *See* ECF 32-1 at 21.

that each individual jury "will have to" assess ECFMG's alleged negligence, and that emotional distress damages "must" be evaluated in light of ECFMG's alleged negligence. *Russell*, 15 F.4th at 272. This conclusion was not dicta but was a necessary part of the Third Circuit's reasoning in reversing class certification, and this Court may not disregard the Third Circuit's holding about how Plaintiffs must prove emotional distress and what individual proceedings would require.

### C. Plaintiffs overstate the supposed differences in efficiencies between issue class certification and realistic procedural alternatives.

Plaintiffs argue that the efficiencies to be gained from an issue class (*Gates* factor 3) favor certification because "no efficient alternative exists." Pls.' Supp. Mem. 11. According to Plaintiffs, the Court must choose between either conducting a single issue-class trial "followed by individualized determinations on causation and damages," or conducting "full-blown trials for each of at least 550 plaintiffs" on all issues. *Id.* at 12.

That is a false dichotomy in three respects. First, Plaintiffs ignore meaningful alternatives to issue class certification, including coordinated discovery between individual proceedings and bellwether proceedings on all issues. Plaintiffs have never explained why bellwether trials on all issues—including those proposed for class certification—would be unfair or inefficient. In reality, bellwethers offer all of the supposed benefits of issue class certification and avoid some of biggest drawbacks, such as undue settlement pressure (*Gates* factor 7) and risks of improper claim-splitting or reexamination (*Gates* factor 9). *See* Manual for Complex Litigation, Fourth, § 22.315 (2004) (explaining that test cases can "enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases may have if resolution is attempted on a group basis"). Just as certification is not superior under Rule 23(b)(3), it is not efficient under Rule 23(c)(4).

6

JA4539

Second, Plaintiffs have no intention of pursuing "individualized determinations" or "full-blown trials" for hundreds of plaintiffs. Plaintiffs told the Third Circuit there would "likely not" be hundreds of individual proceedings after an issue class trial because "[a]fter litigating a number of these, eventually, the parties are able -- it facilitates settlements and an appropriate valuation of the case." 3d Cir. Oral Arg. Tr., Dkt. 64, at 20:1, 21:17–20. The same would be true of individual proceedings on all issues without an issue class.

Third, Plaintiffs understate the issues that must be resolved in individual proceedings under the proposed issue class. Individual proceedings would not be limited to "causation and damages" (both significant matters in and of themselves); they would also include, at minimum, the fact of injury and ECFMG's affirmative defenses. *See Russell*, 15 F.4th at 265, 272.

### D. Plaintiffs' proposal to focus individual proceedings only on Dr. Akoda, not ECFMG, is fundamentally flawed.

Plaintiffs argue that issue class certification would promote efficiency (*Gates* factor 3) and avoid the risk of improper reexamination (*Gates* factor 9) because individual proceedings would consider only whether **Dr. Akoda** caused each class member emotional distress, not whether ECFMG caused each class member emotional distress. *See* Pls.' Supp. Mem. 17.

Plaintiffs' proposal is inconsistent with the Third Circuit's holding described above. Class members' alleged injuries and damages cannot be determined without also considering ECFMG's alleged negligence and all of the attendant circumstances. *See Russell*, 15 F.4th at 272. Nor could a jury decide whether ECFMG's alleged negligence caused a class member to suffer emotional distress without considering the lengthy causal chain separating ECFMG from that class member. *See* Pls. Supp. Mem. 17 (conceding ECFMG had no direct contact with class members). As the Third Circuit correctly recognized, evidence that "[m]any other actors played a role in [Dr. Akoda]'s fraud" tends to show that ECFMG's alleged breach "did not cause Plaintiffs' harm."

7

*Russell*, 15 F.4th at 272. The same evidence presented to the issue class jury would have to be presented to each individual jury, eliminating any supposed efficiencies and drastically increasing the risk of inappropriate reexamination.

In an attempt to address this problem, Plaintiffs propose that individual juries would be "instructed that ECFMG is responsible for putting [Dr. Akoda] in a position to damage Plaintiffs in the first place." Pls.' Supp. Mem. 17. But that is a causation issue that Plaintiffs do not propose to submit to an issue class jury. Their proposal, laid bare, is to never try causation but merely to instruct individual juries that it already has been determined. That proposal would violate ECFMG's due process rights and presents an insurmountable obstacle to issue class certification. *See Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 493 (E.D. Pa. 1997) (rejecting similar trial plan as "violative of defendants' due process right to a fair trial"). The Court cannot adopt Plaintiffs' proposal to assume—without ever having a jury decide—whether ECFMG's breach of a legal duty was the actual and proximate cause of Dr. Akoda treating Plaintiffs.

### E. Plaintiffs have not proposed a trial plan that would avoid Seventh Amendment violations.

Plaintiffs argue that the Court should certify an issue class even if each individual jury must consider the same evidence as the issue class jury because that duplicative presentation of evidence would not necessarily violate the Seventh Amendment and unspecified "management devices" tools could theoretically be deployed to solve problems that arise. *See* Pls.' Supp. Mem. 12–18.

Plaintiffs' argument fails in two respects. First, the need to re-present evidence to more than one jury weighs against issue class certification under *Gates* because it is inefficient, even if it does not violate the Seventh Amendment. *Russell*, 15 F.4th at 272 ("*Gates* disfavors this.").

Second, Plaintiffs have yet to show that their proposed issue class could avoid violating the Seventh Amendment. They concede that "[s]pecial interrogatories have not been crafted," Pls.'

Supp. Mem. 14, and, it bears repeating, acknowledge that they "have no idea what the first jury trial in this case is going to look like," Ex. A. The Court lacks any assurance that there are workable procedures to conduct serial trials consistent with the Seventh Amendment. As explained in ECFMG's Supplemental Brief (at 5), there are not.

Plaintiffs attempt to shift the burden to ECFMG to solve for the Seventh Amendment issues they propose to create. *See* Pls.' Supp. Mem. 15. That is improper. It is Plaintiffs' burden to establish "through evidentiary proof" that the requirements of Rule 23 are satisfied consistent with the parties' constitutional rights. *Comcast Corp.*, 569 U.S. at 33. Plaintiffs' argument (at 15) that the issue is not "ripe" merely confirms that they have not carried their burden.

### F. Treating duty as a question of law does not favor class certification.

Plaintiffs have staked out inconsistent positions on the issue of duty. At times, Plaintiffs contend it is a question of law to be decided by the Court, so it presents no risk of reexamination by multiple juries (*Gates* factor 9). *See* Pls.' Supp. Mem. 16. At other times, Plaintiffs suggest it is a question of fact most efficiently resolved through an issue class trial. *See id.* at 12 (noting the supposed need for repetitive presentations of evidence on duty); *id.* at 6 (claiming that absent class certification there would be "hundreds of separate answers to the questions surrounding [ECFMG]'s legal duties"). Plaintiffs cannot have it both ways.

If duty is a question of law to be decided by the Court, there is no need to certify a class on the issue. This Court could decide that legal question in an individual proceeding, which could be promptly appealed to the Third Circuit, thus providing binding precedent for all subsequent cases. Such an approach would efficiently—and conclusively—resolve an important question for all parties without the downsides or complexities of issue class certification. And without any need to certify a class on the question of duty, there is even less reason to certify any class in this case.

## G. Issue certification creates a serious risk of undue settlement pressure.

Plaintiffs' Supplemental Memorandum downplays the Third Circuit's recognition that issue class certification may cause ECFMG to "face undue pressure to settle, even if [its] breach did not cause Plaintiffs' harm." *Russell*, 15 F.4th at 272.

Plaintiffs instead argue that ECFMG's defenses are meritless and urge the Court to pressure ECFMG to settle notwithstanding those defenses. *See* Pls.' Supp. Mem. 9–11. But ECFMG has strong defenses, including the absence of any duty, the limitations on claims of negligent infliction of emotional distress, class members' consent to treatment by Dr. Akoda, and a very strong causation defense. *See Russell*, 15 F.4th at 272. ECFMG has a right to present those defenses. To the extent class certification "might unfairly prompt a settlement where [ECFMG] would otherwise never consider one," that consideration weighs against class certification. *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 185 (E.D. Pa. 2009).

Plaintiffs also suggest that Rule 23's protection against undue settlement pressure is somehow a reason to certify a class that risks imposing undue settlement pressure. *See* Pls.' Supp. Mem. 8. That is simply a non sequitur. Because class certification here would risk creating undue settlement pressure, the Court should deny class certification under Rule 23.

## III. Plaintiffs' Attempt to Limit the Third Circuit's Decision Is Meritless.

Plaintiffs argue that the Third Circuit's decision vacated this Court's class certification order only with respect to Plaintiffs' claim for negligent infliction of emotional distress and not their claim for negligence. *Id.* at 3. But neither this Court nor the Third Circuit distinguished between those claims. And ECFMG is unaware of any legal difference between them: a claim based on negligence seeking recovery only for emotional distress is a claim for negligent infliction of emotional distress. As a practical matter, other than possible choice-of-law issues (that Plaintiffs have not thoroughly examined) there is no meaningful difference between Plaintiffs' claims.

10

Plaintiffs never asked the Third Circuit to limit its ruling and to distinguish between their claims, and the Third Circuit did not do so.

## CONCLUSION

ECFMG respectfully requests that the Court deny class certification.

Dated: January 14, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
Telephone:     +1.713.890.5000
Facsimile:     +1.713.890.5001
william.peterson@morganlewis.com

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5000
Facsimile:     +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

**CERTIFICATION OF LENGTH OF BRIEF**

I do hereby certify that the foregoing Defendant's Opposition Brief in Response to Plaintiffs' Supplemental Briefing Regarding Class Certification contains less than 3,500 words.

DATED: January 14, 2022                    */s/ Brian W. Shaffer*
                                           Brian W. Shaffer

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.


DATED:  January 14, 2022          <u>*/s/ Brian W. Shaffer*          </u>
                                        Brian W. Shaffer

# EXHIBIT A

| | |
|---|---|
| **From:** | Shaffer, Brian W. |
| **Sent:** | Wednesday, December 15, 2021 11:30 AM |
| **To:** | Patrick A. Thronson |
| **Cc:** | Paul Vettori; Cory Zajdel; 'David Haynes'; kevans@cochranfirm.com; Brent Ceryes; ncentrella_conradobrien.com; McEnroe, Elisa P.; Klayman, Matthew D.; rweiss@conradobrien.com; Leslie F. Reaser |
| **Subject:** | RE: Russell v. ECFMG - Daubert motions |

Patrick,

We are not sure why Plaintiffs are "very surprised" by the filing of Daubert motions at this time. Among other things, per Section II.B.4 of Judge Wolson's Policies and Procedures, to the extent the inadmissibility of expert testimony may impact summary judgment, ECFMG was required "to raise such argument in a contemporaneous Daubert motion." We noted in our Daubert motions why we do not believe the challenged experts' opinions, reports and other materials can be relied upon to preclude summary judgment for ECFMG.

Further, given that part of the inquiry on class certification is the superiority inquiry under Rule 23(b)(3) and numerous Gates factors that require the court to consider how class certification would impact trial, and given summary judgment obviously impacts what issues may need to be tried (whether on a class or individual basis), we do not see how or why the Court should be asked to simply defer all admissibility questions about Plaintiffs' experts based on your email below. Indeed, Plaintiffs have already cited to the number of experts as a factor weighing in favor of issue class certification. See, e.g., ECF 32-1 at 22. Of course, nothing stops Plaintiffs from arguing in opposition that some or all parts of the Daubert motions should be denied without prejudice because Plaintiffs "have no idea what the first jury trial in this case is going to look like" and, as a result, do not yet know whether they propose to use the challenged experts and, if so, for what purpose. If you do so, we'd obviously be entitled to respond on reply.

We are willing to agree that Plaintiffs' responses to the Daubert motions may be filed contemporaneously with the deadline for the response to the summary judgment motion. It was certainly not our intention to create a separate interim deadline for Plaintiffs' counsel to meet over the holidays.

Brian

**Brian W. Shaffer**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5103 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
brian.shaffer@morganlewis.com | www.morganlewis.com
Assistant: Marlene E. Mackason | +1.215.963.4930 | marlene.mackason@morganlewis.com
Pronouns: He/Him/His



---

**From:** Patrick A. Thronson <PThronson@jjsjustice.com>
**Sent:** Tuesday, December 14, 2021 4:53 PM
**To:** Shaffer, Brian W. <brian.shaffer@morganlewis.com>
**Cc:** Paul Vettori <pvettori@lawpga.com>; Cory Zajdel <clz@zlawmaryland.com>; 'David Haynes' <DHaynes@CochranFirm.com>; kevans@cochranfirm.com; Brent Ceryes <bceryes@sfspa.com>; ncentrella_conradobrien.com <ncentrella@conradobrien.com>; McEnroe, Elisa P. <elisa.mcenroe@morganlewis.com>; Klayman, Matthew D. <matthew.klayman@morganlewis.com>;

JA4548

rweiss@conradobrien.com; Leslie F. Reaser <LReaser@jjsjustice.com>
**Subject:** Russell v. ECFMG - Daubert motions

[EXTERNAL EMAIL]
Brian,

We've reviewed and conferred on Defendants' filings late last Friday night. We were very surprised to receive Daubert challenges/motions in limine as to four of our experts. ECFMG's counsel never mentioned it planned to file these motions during the status conference or in the meet and confer between counsel before that conference. This would have been important information for us and the Court to have, particularly in establishing a workable briefing schedule this time of year.

There are several ripeness issues inherent in resolving these Daubert challenges/motions in limine now. We have no idea what the first jury trial in this case is going to look like. This is not a toxic tort or medical malpractice case, where a plaintiff would have to rely on an expert to establish nearly any element of a claim. (In fact, ECFMG appears to be taking the position that the testimony of our experts is relevant to little if any issues to be resolved at an issues trial or in individual proceedings.) The motions are necessarily untethered to any indication on our part as to which experts we will use, on which issues, in which among several trial plans that might be chosen by the Court. Without a ruling on class certification, we don't know the shape of the case and the issues or claims to be resolved at the various stages of the case. Asking the Court to rule now on the admissibility of these experts on various issues, in various future trial scenarios, is highly premature.

We plan to ask the Court to hold the Daubert motions you filed in abeyance until resolution of the summary judgment and class certification motions, unless, of course, you are willing to withdraw them without prejudice. We plan to ask the Court in the alternative to limit the scope of any Daubert challenges only to what is necessary to resolve the summary judgment motions, and extend the deadline for responses to any Daubert challenges to be contemporaneous with the deadline for responses to the summary judgment motion. We read the rules to indicate that responses to the Daubert motions would be due 14 days from the date of filing.

So that we can submit a timely request to the Court, please indicate by 12 PM tomorrow, 12/14/21, your position on the above requests we intend to make.

Patrick

_____
Patrick A. Thronson*
Janet, Janet & Suggs, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, Maryland 21208
Phone: (410) 653-3200
Direct dial: (443) 471-0753
Fax: (410) 653-9030
www.JJSjustice.com

*Licensed in Maryland, Illinois, and Minnesota

JA4549

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

       Plaintiffs,

   v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

       Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

---

## DEFENDANT'S REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Dated: January 28, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street
Suite 4000
Houston, TX  77002
Telephone:  +1.713.890.5000
Facsimile:    +1.713.890.5001
william.peterson@morganlewis.com

Brian W. Shaffer, Bar No. 78851
Elisa P. McEnroe, Bar No. 206143
Matthew D. Klayman, Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for Educational Commission for Foreign Medical Graduates*

JA4550

## <u>TABLE OF CONTENTS</u>

**Page**

I.    Plaintiffs Cannot Recover for Emotional Distress from Learning Information. ............... 2

    A.    The "zone of danger" allows recovery only with fear of physical impact............ 3

    B.    The "physical impact" exception allows recovery only when emotional distress accompanies contemporaneous physical impact. .................................... 3

II.    Plaintiffs Cannot Demonstrate that Pennsylvania Imposes a Duty on ECFMG................ 4

    A.    Plaintiffs misread Restatement (Second) of Torts Section 324A. ......................... 5

    B.    This Court cannot create a new duty under Pennsylvania law. ............................ 6

        1.    Relationship between the parties. ............................................................ 7

        2.    Social Utility of the Actor's Conduct. ...................................................... 7

        3.    Nature of the Risk and Foreseeability of the Harm. ................................. 7

        4.    Consequences of imposing a duty upon the actor...................................... 8

        5.    The overall public interest in the proposed solution................................. 9

III.    Plaintiffs Have Failed to Identify Legally Sufficient Evidence of Proximate Causation................................................................................................................... 10

IV.    Plaintiffs Have Failed to Identify Legally Sufficient Evidence of But-For Causation................................................................................................................... 10

V.    Plaintiffs' Consent Bars Their Claims. ................................................................... 12

VI.    Plaintiffs Fail to Identify Evidence of Compensable Emotional Distress. ..................... 12

VII.    Evans' and Powell's Claims Are Barred by the Statute of Limitations.......................... 14

CONCLUSION.................................................................................................................. 15

JA4551

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Celotex Corp. v. Catrett*,
    *477 U.S. 317 (1986)* ................................................................................12

*Doe 56 v. Mayo Clinic Health Sys.--Eau Claire Clinic, Inc.*,
    880 N.W.2d 681 (Wis. 2016) ..............................................................15

*Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*,
    745 A.2d 25 (Pa. Super. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001)..........4

*Evans v. Liberty Mut. Ins. Co.*,
    398 F.2d 665 (3d Cir. 1968) ..................................................................5

*Feleccia v. Lackawanna Coll.*,
    215 A. 3d 3 (Pa. 2019) ...........................................................................7

*Kazatsky v. King David Mem'l Park, Inc.*,
    527 A.2d 988 (Pa. 1987) ........................................................................3

*Love v. Cramer*,
    606 A.2d 1175 (Pa. Super. Ct. 1992) ...................................................14

*Mazzagatti v. Everingham by Everingham*,
    516 A.2d 672 (Pa. 1986) ......................................................................10

*Nicolaou v. Martin*,
    195 A.3d 880 (Pa. 2018) ......................................................................15

*Niederman v. Brodsky*,
    261 A.2d 84 (Pa. 1970) ......................................................................3, 4

*Patentas v. United States*,
    687 F.2d 707 (3d Cir. 1982)...................................................................5

*Potere v. City of Philadelphia*,
    112 A.2d 100 (Pa. 1955) ........................................................................4

*Rice v. Diocese of Altoona-Johnstown*,
    255 A.3d 237 (2021) ........................................................................2, 14

*Schmidt v. Boardman Co.*,
    11 A.3d 924 (Pa. 2011) ..........................................................................3

ii

**TABLE OF AUTHORITIES**
(Continued)

<div align="right">

**Page(s)**

</div>

*Seebold v. Prison Health Servs, Inc.*,
    618 Pa. 632 (2012)...........................................................................................7

*Sheridan v. NGK Metals Corp.*,
    609 F.3d 239 (3d Cir. 2010)............................................................................6

*Shumosky v. Lutheran Welfare Servs. of Ne. PA, Inc.*,
    784 A.2d 196 (Pa. Super. Ct. 2001)...............................................................11

*SodexoMAGIC, LLC v. Drexel Univ.*,
    19-1028, 2022 WL 176427 (3d Cir. Jan. 20, 2022)......................................13

*Stoddard v. Davidson*,
    513 A.2d 419 (Pa. Super. 1986)......................................................................3

*Travelers Indem. Co. v. Dammann & Co.*,
    594 F.3d 238 (3d Cir. 2010)............................................................................6

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*,
    824 F. App'x 134 (3d Cir. 2020) ....................................................................7

*Walters v. UPMC Presbyterian Shadyside*,
    187 A.3d 214 (Pa. 2018).....................................................................7, 8, 9, 10

*Williams v. Guzzardi*,
    875 F.2d 46 (3d Cir. 1989)..............................................................................3

**Other Authorities**

Restatement (Second) of Torts Section 324A.......................................................1, 5, 6

JA4553

Plaintiffs' arguments in response to ECFMG's Motion for Summary Judgment are a moving target.  For example, despite repeatedly disclaiming—both to this Court and the Third Circuit—any recovery based on the medical treatment provided by Dr. Akoda, Plaintiffs invoke their individual treatments when they believe it helps them.  *See, e.g.*, Resp. at 13 ("In some instances, Igberase engaged in patently offensive physical contact."); *see also* Resp. at 19-20 & 38 (alleging Dr. Akoda committed "bodily harm").  But to avoid the statute of limitations (and in seeking class certification), they simultaneously deny their claims have anything to with their treatment.  *See*, *e.g.*, Resp. at 40 (claims arise from "learning that 'Dr. Akoda' was a fictious persona").  Similarly, Plaintiffs truthfully concede that "Akoda and Igberase are the same person," Resp. at 4, but later disingenuously assert that the individual who treated them "had no medical license, was not board certified, and was not employed by any hospital."  Resp. at 35.

Plaintiffs must perform these contortions because the undisputed facts confirm that as a matter of law, their claims against ECFMG are meritless.  Most obviously, there is no evidence that Plaintiffs suffered either (1) fear from being in the "zone of danger" of a physical harm; or (2) emotional distress accompanying contemporaneous physical impact.  Their theory—emotional distress arising from information they learned years after their contact with Dr. Akoda—is precisely what Pennsylvania's limits on recovery of emotional distress preclude.

Plaintiffs' responses to ECFMG's other arguments fare no better.  Plaintiffs' misread Section 324A as expanding a parties' obligations, and their request for this Court to impose a new common-law duty fails to satisfy the strict test for creating a duty under Pennsylvania law and is inconsistent with this Court's role under *Erie*.  Plaintiff's proximate causation argument cannot overcome the lengthy chain between any of ECFMG's actions and their treatment by Dr. Akoda and the undisputed evidence concerning the roles of the hospitals, employers and licensing boards that allowed Dr. Akoda to treat Plaintiffs.  And with respect to but-for causation, Plaintiffs cannot

deny—and have no response to the fact—that any emotional distress was caused by their misunderstanding of the facts and not by the true state of affairs. Nor does the admissible evidence submitted by Plaintiffs rise to the level of compensable emotional distress.

Finally, with respect to the statute of limitations, Plaintiffs simply ignore the governing Pennsylvania Supreme Court authority that ECFMG cited: *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237 (2021). It is irrelevant that Plaintiffs Evans and Powell did not know (or had not suffered) the full extent of their injuries. Evans and Powell both testified that they had knowledge of "at least some form of significant harm," *id*. at 247, which started the accrual of their claims, well outside the limitations period. Plaintiffs do not offer any response to the fact that under Rice v. Diocese, the claims of Evans and Powell are barred by limitations.

## I.    Plaintiffs Cannot Recover for Emotional Distress from Learning Information.

Pennsylvania permits recovery of damages for negligently inflicted emotional distress in very limited circumstances. Mot. at 15–17. Plaintiffs' claims for "emotional distress that has resulted from their discovery that the individual they knew as 'Dr. Akoda' was in fact, Oluwafemi Igberase," Resp. at 39, years after their treatment by Dr. Akoda, falls far outside these limits.

To their credit, Plaintiffs do not invoke the "special relationship" theory, which ECFMG explained is inapplicable here. *See* Mot. at 16–17. Instead, Plaintiffs rely on the "zone of danger" (at 13–14) exception and "physical impact" exception (at 11–13). But neither exception applies because of significant time—years—separating Plaintiffs' treatment by Dr. Akoda from their alleged emotional distress. Plaintiffs' request (at 13–15) that this Court ignore the limits that Pennsylvania law places on emotional recovery is revealing: Plaintiffs know that under Pennsylvania law as it stands, they cannot recover, and this Court, as a federal court sitting in diversity, must take state law as it finds it. This Court cannot create novel theories of recovery

JA4555

under state law, as Plaintiffs request.  *See infra* pp. 6–10.

**A.     The "zone of danger" allows recovery only with fear of physical impact**.

The "zone of danger" exception is inapplicable here.  It allows recovery only for a plaintiff who was (1) "in personal danger of physical impact;" and (2) "where plaintiff actually did fear the physical impact."  *Niederman v. Brodsky*, 261 A.2d 84, 90 (Pa. 1970).  Plaintiffs speak only to the first requirement.  *See* Resp. at 13 (arguing that the conduct "presented substantial risk of physical harm to the Plaintiffs").  But they do not—and cannot—argue that their emotional distress arose from the fear of harm.  To the contrary, they admit that at the time of treatment, they were unaware of any risk related to the information about Dr. Akoda that they learned years later.  *See* Resp. 8–10; Pls.' Ex. 34 at ¶¶ 3–4; Pls.' Ex. 35 at ¶ 3.  By their own theory, Plaintiffs did not know they were in a "zone of danger" and thus cannot recover for emotional distress under the exception.

**B.     The "physical impact" exception allows recovery only when emotional distress accompanies contemporaneous physical impact**.

Plaintiffs rely primarily on the theory that their treatment by Dr. Akoda constituted a "physical impact" that allows them to recover for emotional distress.  Resp. at 11–13.  Plaintiffs cannot prevail under this theory because the "physical impact" occurred years before their alleged emotional distress.  The impact need not occur "simultaneously with the negligent act," Resp. at 12 (quoting *Stoddard v. Davidson*, 513 A.2d 419, 422 (Pa. Super. 1986)), but the impact and **emotional distress** must be "contemporaneous."  *Schmidt v. Boardman Co*., 11 A.3d 924, 948 (Pa. 2011) (noting recovery for "trauma derived from a contemporaneous physical impact").

The emotional distress must "accompany" the physical impact.  *See, e.g., Kazatsky v. King David Mem'l Park, Inc*., 527 A.2d 988, 992 (Pa. 1987) (allowing recovery for "emotional distress only if it was accompanied by a physical injury or impact"); *Williams v. Guzzardi*, 875 F.2d 46, 51 (3d Cir. 1989) (same); *Niederman v. Brodsky*, 261 A.2d 84, 86 (Pa. 1970) (noting that the rule allowed recovery, when there was an impact, for "accompanying fright"); *Potere v. City of*

JA4556

*Philadelphia*, 112 A.2d 100, 104 (Pa. 1955) (allowing recovery for "bodily injuries, even though trivial or minor in character, which are accompanied by fright or mental suffering").

Plaintiffs' alleged emotional distress did not accompany the alleged "physical impact." The two were not "contemporaneous" but, according to Plaintiffs, occurred years apart. Pennsylvania does not allow recovery for emotional distress unaccompanied by a contemporaneous physical impact. *See also Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 29 (Pa. Super. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001) (holding that "vaccines, which were not the cause of any lasting physical or emotional effects" did not constitute a "physical impact" allowing recovery for subsequent emotional distress based on fear of HIV).

Absent one of these narrow exceptions, Pennsylvania law does not permit recovery for emotional distress from learning information. Because Plaintiffs did not suffer a contemporaneous physical impact accompanying any emotional distress and did not feel fear because they were within a "zone of danger," their claims for emotional distress fail as a matter of law.

## II.     Plaintiffs Cannot Demonstrate that Pennsylvania Imposes a Duty on ECFMG.

Plaintiffs' duty arguments are another moving target: they never squarely identify the precise legal duty that they ask this Court to impose on ECFMG. *See Resp.* at 16 ("duty of care"); Resp. at 16 ("owes a duty to a Plaintiff"); Resp. at 18 ("failure to exercise due care"); Resp. at 25 ("This factor clearly favors imposition of a duty to [sic] ECFMG."). To the extent they describe it, they do so inconsistently. *See* Resp. at 18 ("duty to provide appropriate credentialing of medical providers"); Resp. at 28 ("a duty to investigate and ultimately revoke the certification"); Resp. at 29 ("a duty to require ECFMG to revoke certifications found to have been obtained through fraud"). Without plainly and unambiguously articulating the duty they seek to impose on ECFMG, Plaintiffs necessarily failed to show that Pennsylvania recognizes a duty that would allow their claims for emotional distress to proceed. In any event, neither Section 324-A of the Restatement

nor the *Althaus* factors would support a legally cognizable duty on the part of ECFMG to Plaintiffs.

### A. Plaintiffs misread Restatement (Second) of Torts Section 324A.

Section 324A of the Restatement (Second) of Torts imposes a duty to exercise reasonable care on a party "who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person." Restatement (Second) of Torts § 324A. The duty under Section 324A does not extend beyond the specific services rendered: "The foundation of the good samaritan rule [Sections 323 and 324A] is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently." *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982). "In other words, the scope of a good samaritan's duty is measured by the scope of his or her undertaking." *Id.*

In *Evans v. Liberty Mutual Insurance Co.*, 398 F.2d 665, 666-67 (3d Cir. 1968), applying Section 324A under Pennsylvania law, a plaintiff sought to hold a defendant liable for a negligent inspection. *Id.* The defendant inspected some machines but not the particular machine at issue. *Id.* The decision held that "absent a showing either that the defendant had undertaken to inspect the specific instrument causing the injury or to inspect the entire plant of which that instrument was a part, the employee could not recover." *Patentas*, 687 F.2d at 716 (describing *Evans*).

Plaintiffs err by seeking to impose responsibilities on ECFMG under Section 324A beyond the specific tasks that ECFMG undertook to perform. For purposes of summary judgment, Plaintiffs' description of the narrow and limited services ECFMG provided to third parties can be accepted as correct: "ECFMG undertook to provide primary source verification, along with testing of basic competence, for the benefit of residency programs, hospitals, and medical boards, who relied upon ECFMG's services in granting IMGs licensure and privileges." Resp. at 17. Thus, the only "undertakings" by ECFMG that could give rise to a duty under Section 324A are (1) primary source verification and (2) testing of basic competence. Plaintiffs do not argue—much less submit

JA4558

evidence—that ECFMG failed to act with reasonable care in performing these tasks.

Instead, Plaintiffs erroneously seek to expand ECFMG's duty under Section 324A beyond these specific tasks and into a general duty of "appropriate credentialing." Resp. at 18. But Section 324A duty concerns only the specific tasks ECFMG allegedly did "for the benefit of third parties"—it cannot be used, as Plaintiffs attempt, to impose a duty to do **more**, requiring background checks, immigration status review, employment vetting, and other actions as a part of "credentialing" generally.[1] Thus, Section 324A offers no support for Plaintiffs' duty theory.

**B.      This Court cannot create a new duty under Pennsylvania law**.

Because Section 324A does not apply, any duty Plaintiffs seek to impose on ECFMG could arise only under Pennsylvania common law, based on the *Althaus* factors. Plaintiffs do not deny that no case has ever held that ECFMG owes a duty to patients of international medical graduates ("IMGs"). Plaintiffs thus ask this Court to create a new duty under state law.

The Third Circuit forbids this Court from creating novel theories of recovery: "Unlike our role in interpreting federal law, we may not 'act as a judicial pioneer' in a diversity case." *Sheridan v. NGK Metals Corp*., 609 F.3d 239, 254 (3d Cir. 2010) (quotation omitted). If there is any uncertainty about state law, this Court must "opt for the interpretation that restricts liability, rather than expands it, until the [Pennsylvania Supreme Court] decides differently." *Travelers Indem. Co. v. Dammann & Co*., 594 F.3d 238, 253 (3d Cir. 2010) (citation omitted).

And Pennsylvania does not "enter into the creation of new common law duties lightly." *Feleccia v. Lackawanna Coll*., 215 A. 3d 3, 13 (Pa. 2019). Pennsylvania courts will create new

---

[1] To the extent that Plaintiffs rely on ECFMG's investigation of credentialed IMGs as an "undertaking," they have no evidence that ECMFG's investigation (a) increased a risk of harm (it did not); (b) was in performance of a duty owed by third parties to Patients; or (c) was relied on by third parties or Plaintiffs. Restatement (Second) of Torts § 324A. To the contrary, the evidence shows that third parties relied on ECFMG only for (1) primary source verification; and (2) testing of basic competence. *See* ECFMG SUMF at ¶¶ 3, 7; Pls. Resp. SUMG at ¶¶ 3, 7.

JA4559

duties only when "the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating." *Seebold v. Prison Health Servs, Inc.*, 618 Pa. 632, 653-54 (2012). Here, the *Althaus* factors weigh against creation of a duty.

### 1. Relationship between the parties.

Plaintiffs do not deny that they had no relationship with ECFMG. Mot. at 18. In *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214 (Pa. 2018), on which Plaintiffs rely heavily (at 23-29), the defendants "were in respective master-servant relationships with [the doctor] when the putative duty to report arose." 187 A.3d at 234. No such relationship exists here—Dr. Akoda was not an employee or agent of ECFMG—and this factor weighs strongly against duty.

### 2. Social Utility of the Actor's Conduct.

Plaintiffs err (at 25) by focusing on the social utility of Dr. Akoda's conduct, rather than ECFMG's conduct. *Walters* recognized the value of "limiting . . . health care providers' liability exposure and managing health care costs," *Walters*, 187 A.3d at 235, both of which would be threatened by accepting Plaintiffs' boundless theory that ECFMG owes a duty to every patient of every IMG in the country. And Pennsylvania recognizes a significant interest in providing due process rights to accused individuals where a decision by private organization could "depriv[e] a member or prospective member of substantial economic or professional advantage." *Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 824 F. App'x 134, 137 (3d Cir. 2020) (quotation omitted). Imposing the duty sought by Plaintiffs would create incentives to avoid liability by revoking certifications when any suspicion arises, undermining the interest that Pennsylvania recognizes in protecting individuals (like IMGs) from wrongly suffering economic or professional injuries.

### 3. Nature of the Risk and Foreseeability of the Harm.

Dr. Akoda was accepted into and completed a residency program, was licensed to practice medicine by multiple states, and received board certification. Plaintiffs present no evidence that

JA4560

he was incompetent as a physician, and Plaintiffs are not asserting any claims based on negligent treatment. Plaintiffs have identified no evidence of any risk that they would have been treated by an incompetent physician. Nor do Plaintiffs present any evidence that Dr. Akoda's deception—not merely of ECFMG but also residency programs, employers, hospitals, licensing boards, specialty boards, and private practitioners (and other professionals he interacted with on a daily basis)—was foreseeable or that it was foreseeable that none of these entities would take action to bar him from treating Plaintiffs. The absence of any risk and the tenuous nature and unforeseeability of the alleged harm weigh against imposing a duty on ECFMG.

**4.    Consequences of imposing a duty upon the actor.**

Plaintiffs' settlement demands belie their assertion that a duty will not impose "great cost" on ECFMG. Resp. at 28. And it is false. A quarter of U.S. doctors are ECFMG Certified. Mot. at 22. Imposing any duty on ECFMG to any patient treated by any IMG would be extraordinary.

Far from supporting Plaintiffs, *Walters v. UPMC Presbyterian Shadyside* confirms that Pennsylvania would not recognize a duty. In *Walters*, the Pennsylvania Supreme Court considered imposing a duty on two different entities: a hospital (UPMC Presbyterian) and a staffing agency (Maxim). 187 A.3d at 219. Although the decision held that the hospital owed a duty, the staffing agency did not. *Id.* at 242–43. The duty Plaintiffs seek to impose on ECFMG resembles the duty rejected against the staffing company far more closely than the duty imposed on the hospital. The hospital had preexisting reporting duties under federal law, which "illuminate[d] a way to meaningfully circumscribe its duty." 187 A.3d at 239. But for the staffing agency, the duty could not be squarely defined, and thus "the quantum, breadth, and durability of liability [it] would face for the violation of such a duty somewhat outweighs the foreseeable risk of harm." *Id.*

The ill-defined, indeterminate nature of the duty that Plaintiffs seek to impose on ECFMG also makes it like the one that the Pennsylvania Supreme Court refused to impose on the staffing

agency in *Walters*. Indeed, if a duty were to be imposed here, then any investigation by ECFMG of any IMG could always be subject to second-guessing by plaintiffs' lawyers (and their paid experts). This is precisely what *Walters* rejected as "too amorphous" with "potential consequences . . . too difficult to anticipate." 187 A.3d at 242. The generalized, ill-defined duty to investigate that Plaintiffs seek to impose on ECFMG is foreclosed by *Walters*.

### 5. The overall public interest in the proposed solution.

In discussing the public interest, Plaintiffs again recast their proposed duty, suggesting that they seek only "a duty to require ECFMG to revoke certifications found to have been obtained through fraud." Resp. at 29. If this Court accepts this framing of the duty, it should grant ECFMG summary judgment on breach. Plaintiffs concede that ECFMG did not "find" that the certificate was obtained through fraud—their theory of liability is based on ECMFG's failure to uncover Dr. Akoda's fraud earlier. *See* Resp. at 6 ("Kelly did not think there was enough information[.]").

In truth, Plaintiffs seek to impose a duty on ECFMG to "further investigate" potential fraud committed by IMGs, Resp. at 21, with the threat of potential civil liability to innumerable patients treated by the IMG in the event that an investigation (in hindsight) is found to be inadequate.

Plaintiffs cannot seriously argue—and they do not—that imposing this duty is in the public interest. Imposing such liability on ECFMG would require a far more heightened screening process, restricting the ability of IMGs to practice medicine and harming the public's interest in "efficient, affordable care." *Walters*, 187 A.3d at 239. And given the role of state governments in physician licensing, to the extent any State believes that greater scrutiny of IMG's backgrounds is warranted, the State is free to mandate or perform such an investigation itself. But such a decision should come from the political branches of a State, not from this Court.

None of the *Althaus* factors supports the creation of a new common-law duty on ECFMG, and *Walters* squarely forecloses such a duty. At a minimum, the factors do not so strongly favor

JA4562

creation of duty as to eliminate all uncertainty under state law.  Sitting in diversity, this Court cannot be a "judicial pioneer" and must refuse Plaintiffs' invitation to create a novel duty.

## III. Plaintiffs Have Failed to Identify Legally Sufficient Evidence of Proximate Causation.

Plaintiffs do not deny that ECFMG's actions and any emotional injury that Plaintiffs suffered are separated by physical distance, by years of time, and by the actions of numerous intervening third parties.  The chain of events that separates their treatment from ECFMG's actions includes "residency, state licensure and obtain[ing] privileges."  Resp. at 32.  And the chain between their treatment and their eventual alleged emotional suffering is even further attenuated.

Much of Plaintiff's proximate causation argument truly concerns but-for causation, but even if Plaintiffs can show but-for causation, these claims—which are extraordinarily remote from the defendant's actions—are precisely what proximate causation prevents.  "At some point along the causal chain, the passage of time and the span of distance mandate a cut-off point for liability." *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 676 (Pa. 1986).  If time and distance ever cut off liability, then they surely do so here, where the alleged acts and harms separated by many years (perhaps decades), many miles, and many third parties (including at least two state actors).  No Pennsylvania case has expanded proximate causation to this extreme.

## IV. Plaintiffs Have Failed to Identify Legally Sufficient Evidence of But-For Causation.

In its motion, ECFMG raised two discrete arguments regarding but-for causation.  The first, that any Plaintiff's emotional distress arises from a mistaken understanding of the facts rather than the true state of affairs, goes unanswered by Plaintiffs.  As ECFMG explained—and Plaintiffs do not deny—their deposition testimony shows that their purported emotional distress is based on a gross misunderstanding of the facts, including false beliefs about whether the individual who treated them was licensed to practice medicine, whether ECFMG is a government agency or private entity, whether ECFMG conducts background checks, and whether ECFMG licenses

JA4563

individuals to practice medicine.  Mot. at 33.  Pennsylvania law does not allow a plaintiff to recover for emotional distress based on a plaintiff's "mistaken belief."  *Shumosky v. Lutheran Welfare Servs. of Ne. PA, Inc.*, 784 A.2d 196, 202 (Pa. Super. Ct. 2001) (denying recovery for "symptoms [that] were caused by a mistaken belief that the plaintiffs were exposed to the virus.").  There is, on the record, no evidence that any Plaintiff suffered emotional distress that resulted from a correct understanding of the facts.  For this reason alone, summary judgment is necessary.

In responding to the second argument—the absence of evidence that further investigation by ECFMG would have prevented Dr. Akoda from treating Plaintiffs—Plaintiffs' response is a *non sequitur* and without any evidentiary support.  Here are the only two relevant sentences:

> It is further undisputed that when ECFMG last investigated Igeberase [sic], they concluded that he had engaged in fraud, and revoked his ECFMG certification. ECFMG Ex. 24.  Thus, it cannot seriously be disputed that had ECFMG conducted a reasonable investigation, the ECFMG certification in the name of "Akoda" would have been revoked.

Resp. at 34.  Exhibit 24 simply shows Dr. Akoda's certification.  Exhibit 52 shows that it was revoked on November 30, 2016, based on "an October 2016 plea agreement with the United States."  Mot., Ex. 52 at 4.  It does not follow, as Plaintiffs assert, that the result of the 2016 inquiry, which came after a guilty plea, necessarily means that any "reasonable investigation" at some early point in time (including before the guilty plea) would have led to the same conclusion.

Plaintiffs make no other attempt to satisfy their burden of but-for causation.  None.  They identify no evidence about what would have occurred if ECFMG had made referrals to the MECC and no evidence about what would have occurred if ECFMG had conducted an additional investigation or made additional disclosures.  Mot. at 33–34.  Plaintiffs' logical fallacy is no substitute for **evidence**.  Plaintiffs "fai[l] to make a showing sufficient to establish the existence of an element essential to [their] case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

JA4564

## V.     Plaintiffs' Consent Bars Their Claims.

Plaintiffs do not deny that they consented to the treatment they received.  Nor do Plaintiffs deny that if their consent was effective, it bars their claims.  The only issue is whether any misrepresentations by Dr. Akoda vitiated that consent.

They did not.  Plaintiffs' response is wordplay, arguing only that no medical license was issued under the name "Igberase."  Resp. at 35–36.  This is gamesmanship.  Plaintiffs concede that "Akoda and Igberase are the same person."  Resp. at 4.  The individual who provided medical treatment to Plaintiffs (1) had a medical license, (2) was Board certified; and (3) practiced medicine at a hospital.  Igberase was not charged with battery or unlicensed practice of medicine.  This is not a case where an individual who had not completed a residency or was not licensed to practice medicine impersonated a doctor—it is a case where Plaintiffs allege that a doctor should not have been licensed.  The individual who treated Plaintiffs undeniably held a medical license, albeit in another name.  No court has permitted a plaintiff to look beyond a medical license and assert a claim that a doctor should not have been licensed.  *See* Mot. at 35-36 (citing cases).

Plaintiffs' theory—that consent turns on a doctor's name—leads to absurd consequences.  Consider a married physician whose credentialing documents were in her maiden name but who uses her married name professionally.  If Plaintiffs are correct, this physician commits battery on every patient she treats because her credentialing documents are in a different name.  Nonsense.

The undeniable fact that the individual who treated Plaintiffs completed a residency program, was licensed by multiple states to practice medicine, was board certified, and had hospital privileges is fatal to their claims.  Any misrepresentations about this individual's identity did not vitiate consent.  *See* Mot. at 35–36 (citing cases).

## VI.     Plaintiffs Fail to Identify Evidence of Compensable Emotional Distress.

Plaintiffs cite no evidence showing the physical manifestations required to support a claim

JA4565

of emotional distress.  Paragraphs 99 to 101 of Plaintiffs' Statement of Additional Material Facts (about Russell) and 106 (about Riggins) do not identify any physical manifestations of their alleged emotional distress.  The declarations (Resp., Exs. 34, 35) supporting Paragraphs 110 (about Powell) and 113 (about Evans) conflict with evidence produced in discovery and should be struck.[2]

Dr. Tellefsen did not identify physical manifestations for Riggins (id. at 3) or Powell (*id.* at 3-4).  For Evans, Dr. Tellefsen identified physical manifestations linked to her medical treatment or other causes (postpartum hormones), not from learning Dr. Akoda's identity.  *Id*. at 4-5.

Plaintiffs' purported physical manifestations include things like "shock" and feelings of violation or breach of trust.  *See* Pls.' SAMF at ¶¶ 99, 100, 110 & 113.  And they include statements about intimate relationships.  *Id*. at ¶¶ 101, 113.  Plaintiffs cite no support for the theory that "distress and horror," "shock," feelings of violation or breach of trust or damage to intimate relationships constitute physical manifestations sufficient to support a claim for emotional distress.

To the contrary, *Armstrong v. Paoli Memorial Hospital* explained that "[t]emporary fright, nervous shock, nausea, grief, rage, and humiliation if transitory are not compensable harm." 633 A.2d 605, 609 (Pa. Super. Ct. 1993).  Only "long, continued nausea or headaches, repeated hysterical attacks or mental aberration"—for which Plaintiffs have no evidence—"are compensable injuries." *Id. Love v. Cramer*, 606 A.2d 1175, 1176 (Pa. Super. Ct. 1992), also does

---

[2] The "sham declaration" rule forbids using affidavits that conflict with previous discovery to create an issue of fact at the summary judgment stage. *SodexoMAGIC, LLC v. Drexel Univ.*, 19-1028, 2022 WL 176427, at *11 (3d Cir. Jan. 20, 2022).  In these declarations, for the first time, Powell states that she experienced a variety of new symptoms—recurrent "nausea," "stomach discomfort," "confusion," "crying," "nervous sweating," and "panic attacks" "[a]s a result of this realization" about Dr. Akoda (ECF 93-37 at ¶ 6)—none of which was disclosed in discovery. Evans now declares that she experienced "nausea" as a result of learning this information about Dr. Akoda (ECF 93-38 at ¶ 5), conflicting with prior evidence that her nausea was caused by medication.  These symptoms were not disclosed in discovery at all (for Ms. Powell) or as being the result of learning about Dr. Akoda (for Ms. Evans), even though directly called for in discovery: in response to Interrogatory No. 2 (ECF 86-8; 86-9), at deposition (ECF 86-25 at 2–3 & ECF 86-17 at 165), and in their independent medical examinations (ECF 86-22; 86-27).

JA4566

not help Plaintiffs. Love was permitted to pursue a claim for negligent infliction of emotional distress only because she became "severely depressed, suffered nightmares, stress and intense anxiety, and was forced to undergo prolonged psychological treatment." *Id.*; *see also id.* at 1179 (injuries "of a continuing nature" that "have required her to obtain psychological treatment"). None of Plaintiffs' alleged symptoms remotely approach those in *Love*. And none of the Plaintiffs have sought psychological treatment from having learned of Dr. Akoda's identity.[3]

Having disclaimed any recovery based on their "experiences" generally and opting for a narrow emotional-distress-from-learning-information claim, Dr. Tellefsen's diagnosis is irrelevant. Plaintiffs have no evidence that they have suffered compensable emotional distress from learning about Dr. Akoda's identity.

## VII.   **Evans' and Powell's Claims Are Barred by the Statute of Limitations**.

In response to ECFMG's arguments regarding the statute of limitations, Plaintiffs ignore the controlling Pennsylvania Supreme Court authority, which makes clear that that limitations period commences with "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247 (Pa. 2021). The Pennsylvania Supreme Court has expressly rejected Plaintiffs' "legal injury" accrual theory. *See Nicolaou v. Martin*, 195 A.3d 880, 893 n.14 (Pa. 2018) (a plaintiff need not have "knowledge of the cause of action associated with the harm").

Plaintiffs cannot deny that Evans and Powell had knowledge, at the time of their treatment, of "at least some form of significant harm" with a "factual caused linked to" Dr. Akoda's conduct. It is irrelevant that they did not know of the full extent of their injuries or their precise cause.

---

[3] Plaintiffs vaguely imply Dr. Tellefsen diagnosed Powell and Evans with the need for future treatment. Resp. at 38. But critically, Dr. Tellefsen did not diagnose Powell and Evans with a need for treatment as a result of any emotional distress from learning Dr. Akoda's identity.

The Supreme Court of Wisconsin, in a factually analogous case, rejected an attempt to evade limitations by recharacterizing a claim from wrongful medical treatment to emotional distress based on learning that treatment was wrong. *See Doe 56 v. Mayo Clinic Health Sys.--Eau Claire Clinic, Inc*., 880 N.W.2d 681, 688 (Wis. 2016) ("[T]he physical injurious change occurs at the time of the touching. These boys suffered an injury when Dr. Van de Loo physically touched their genitals in an allegedly inappropriate way."). It was irrelevant that the Doe plaintiffs, like Evans, may not have recognized the conduct as wrongful: "The fact the Does may not have known at the time that the touching was allegedly inappropriate or that the manipulation of their genitals constituted the physical injurious change does not change this fact." *Id*. at 689. The alternative "would result in a limitless extension of the medical malpractice statute of limitations and change the causation connection in medical malpractice cases from the negligent act to a fortuitous event—here the media reporting about the criminal charges." *Id*. And a plaintiff cannot evade this rule by reframing their claim as seeking emotional distress for learning information: "Adopting the Does' argument in this case would eviscerate the three-year statute of limitations . . . simply by alleging his emotional distress began even decades after the allegedly unnecessary and improper treatment occurred." *Id*. at 372 n.14. The reasoning of the Supreme Court of Wisconsin is sound. Because Powell and Evans allege improper actions by Dr. Akoda during their medical treatment, their claims accrued at that time and are barred by limitations.

## CONCLUSION

ECFMG respectfully renews its request that its motion for summary judgment be granted.

Dated: January 28, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street
Suite 4000
Houston, TX 77002
Telephone:    +1.713.890.5000
Facsimile:    +1.713.890.5001
william.peterson@morganlewis.com

/s/ Brian W. Shaffer
Brian W. Shaffer, Bar No. 78851
Elisa P. McEnroe, Bar No. 206143
Matthew D. Klayman, Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for Educational Commission for Foreign Medical Graduates*

JA4569

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

Dated: January 28, 2022

*/s/ Brian W. Shaffer*
Brian W. Shaffer, Bar No. 78851

JA4570

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS AND REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") hereby responds to Plaintiffs' Statement of Additional Material Facts and below replies to Plaintiffs' Response to Defendant's Statement of Material Facts (ECF 93-1).

## ECFMG'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

The length of this submission should not give the misimpression of any genuine disputes of material facts. Many of the "facts" Plaintiffs submitted as "Additional" are duplicative of one another, are duplicative of facts ECFMG submitted, or are not material (or some combination thereof). ECFMG provides the below chart to help with clarity, because many of Plaintiffs' submitted "facts" are riddled with imprecision (*e.g.*, ambiguous use of pronouns) and/or errors (*e.g.*, erroneous citations to the record). And for the Court's convenience, all of the Parties' "facts" submitted regarding summary judgment are listed below. Nothing in Plaintiffs' Statement of Additional Material Facts (or Plaintiffs' Response to ECFMG's Statement of Material Facts) creates a genuine issue of material fact or changes that summary judgment should be granted.

1

JA4571

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 1 | William C. Kelly worked for ECFMG for almost 38 years. He retired in May 2015. Ex. 3, Kelly depo. at 7, 9. He became manager of the credentials department and the vice-president for operations that included credentials. Ex. 3, Kelly depo at 187-188. | Admitted. As a point of clarity, Kelly became manager of the credentials department and the vice-president for operations during the time he worked for ECFMG, not after his retired. |
| 2 | The ECFMG Certificate is required to obtain a medical license. Ex. 3, Kelly depo. at 19. | Denied. ECFMG Certification is for international medical graduates ("IMGs"), not graduates of U.S. or Canadian medical schools. ECFMG Ex. 2 at 245:2–13. Medical licensing authorities can elect their own criteria for licensure, which may include ECFMG Certification for IMGs. Further, Plaintiffs' citation does not support the proposition asserted. |
| 3 | The first step needed to obtain a certificate from ECFMG is an application. Ex. 3, Kelly depo. at 13. | Admitted. |
| 4 | An identification number is assigned to the application. If the applicant becomes certified, the certificate number would be the same as the identification number. Id. at 15. | Admitted. |
| 5 | An IMG needs an ECFMG certificate to obtain a medical license. Ex. 3, Kelly depo. at 19. | Admitted this is generally true for IMGs seeking medical licensure in the United States, but it misses certain nuances. For example, it is up to the medical licensing authorities within the United States to decide whether an ECFMG Certificate is required for medical licensure (always or for a specific applicant) or to offer alternative pathways for IMGs to obtain licensure. See Kelly Dep. at 19–20, attached as ECFMG Reply Exhibit 1. By way of further example, an IMG could also attend a U.S. medical school despite having previously graduated from a foreign medical school. Additionally, Plaintiffs' citation does not support the proposition asserted. |

JA4572

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 6 | ECFMG works on behalf of domestic regulatory authorities to protect the public through programs and services including primary source verification of physician credentials. Ex. 3, Kelly depo. at 22. | Admitted that Kelly testified to what is in Plaintiffs' Paragraph 6. As further clarification, ECFMG does not work "on behalf" of "domestic regulatory authorities;" instead, ECFMG provides a service that medical licensing authorities may choose to utilize for the primary source verification of an IMG's medical school diploma and confirmation of passage of certain examinations. |
| 7 | ECFMG received an Application from Igberase on April 6,1992. Ex 4. | Admitted. |
| 8 | He included a date of birth of April 17, 1962, and a social security number ending in 5054. Ex. 3, Kelly depo at 29. Ex. 4. | Admitted. |
| 9 | Igberase submitted a diploma from the University of Ibadan June 19, 1987. ECFMG Ex. 10; Ex. 3, Kelly depo. at 31. | Admitted. |
| 10 | In order to have the diploma verified, ECFMG would send it to the medical school to verify it. Ex. 3, Kelly depo. at 35. | Admitted. |
| 11 | ECFMG received an Application from Igberase Oluwafemi Charles on March 30, 1994. Ex. 5. It did not include a social security number but included a birthdate of April 17, 1961. Id.; Ex. 3, Kelly depo. at 35-36. | Admitted. |
| 12 | A new I.D. number was assigned because they concluded he ("Charles") had never applied before. Ex. 3, Kelly depo at 57-58. | Admitted only that ECFMG issued Charles a new identification number. ECFMG does not admit that it "concluded" that Charles "had never applied before." Plaintiffs' citation does not support the proposition asserted. |
| 13 | On June 22, 1995, Kelly wrote to Igberase to advise him that ECFMG was conducting an investigation about his multiple applications. ECFMG Ex. 13. | Admitted that Kelly wrote to Igberase to advise him that ECFMG was investigating whether he had applied before. ECFMG Ex. 13. |
| 14 | ECFMG received a 5-page handwritten response from Charles in which he admitted that he and Igberase were one and the same person. He admitted to lying. ECFMG Ex. 14; Ex. 3, Kelly depo. at 42-43. | Admitted. |

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 15 | The credentials committee met on 11/27/1995 and decided to invalidate the "Charles" certificate and to revoke the Igberase certificate. Ex. 6; Ex. 3, Kelly depo. at 45-46. | Admitted. |
| 16 | On December 7, 1995, Kelly wrote a letter to the USMLE advising of events re "Charles" and Igberase. Ex. 21. | Admitted. |
| 17 | Where there was a discrepancy between the name on the diploma and the name on the Application, the applicant would have been required to submit some sort of documentation to connect the names. But this policy was not in effect at the time. Ex. 3, Kelly depo. at 51. | Admitted that Kelly testified about a later ECFMG policy concerning name discrepancies that was not in place in 1995 and thus is irrelevant to applications received in 1995 or earlier. Plaintiffs Ex. 3 at 51–52. |
| 18 | "Charles" took an appeal from the decision to invalidate his certificate. The review committee held a hearing and affirmed but limited Igberase's length of revocation to 5 years (i.e., 7/16/2001). Ex. 7; Ex. 3, Kelly depo at 53-55. | Admitted. |
| 19 | ECFMG received an Application from Femi Charles Igberase on October 23, 2000. Ex. 22. It included a birthdate of April 17, 1962, the same date on the first Igberase application. Ex. 3, Kelly depo. at 56-57. | Admitted. |
| 20 | In less than a month, ECFMG concluded he was the same Igberase who had been told his certification was revoked. Ex. 3, Kelly depo at 57-58. | Admitted. |
| 21 | On November 16, 2000 Kelly wrote to Igberase for an explanation and advising him the matter would go the credentials committee. Ex. 23. | Admitted. |
| 22 | On May 3, 2001 Kelly wrote to "Charles" notifying him that the credentials committee extended the revocation of his certificate for an unspecified period. Ex. 8. | Admitted. |
| 23 | ECFMG received a letter from Igberase on July 2, 2001. Ex. 9. Igberase explained that his childhood friend had made a mistake on the application. Igberase referred to his cousin "Akoda." | Admitted. |
| 24 | On May 22, 2002 Kelly wrote to Igberase advising him his certificate was permanently revoked. It's one year later because they waited for review by USMLE. Ex. 10; Ex. 3, Kelly depo. at 64. | Admitted. |

JA4574

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 25 | On March 19, 2002 ECFMG received an Application by "Charles" Ugberaese Oluwafemi" [*sic*] with a birth date of March 1, 1963 and no social security information Ex. 24. | Admitted except as to the birthdate. The birthdate provided on the application is March 1, 1967. Plaintiffs Ex. 24. |
| 26 | Charles Ugberaese Oluwafemi submitted a diploma from the University of Ibadan dated June 18, 1996. Ex. 11. Kelly doesn't know if it was ever verified by the University of Ibadan. Ex. 3, Kelly depo. at 67-68. | Admitted. |
| 27 | On November 12, 2002 Kelly wrote to Igberase Oluwafemi Charles advising him that the Credentials Committee found him to have engaged in irregular behavior. Ex. 25. | Admitted. |
| 28 | He believes the names are just re-arranged. Ex. 3, Kelly depo. at 73. | Assuming, "he" refers to Kelly, ECFMG admits Kelly testified that "the sequences of names is different" on the application submitted by Igberase Oluwafemi Charles and the accompanying diploma. Plaintiffs Ex. 3 at 73; ECFMG Reply Ex. 1 at 72–73. |
| 29 | He is not aware that the diploma submitted by Charles and verified by the University is the same diploma submitted by Igberase. Ex. 3, Kelly depo. at 73. | Assuming "he" refers to Kelly, ECFMG admits that Kelly testified that he was unaware whether the diploma submitted by Igberase Oluwafemi Charles was identical to the diploma submitted by Charles Oluwafemi Igberase.  Plaintiffs Ex. 3 at 73. |
| 30 | ECFMG thought "Charles" and Igberase were two different persons. Ex. 3, Kelly depo. at 75, 77. | Admitted. |
| 31 | ECFMG realized within a short period of time that the person using the name Oluwafem [*sic*] was really the person certified as Igberase. Ex. 3, Kelly depo. at 79. | Admitted that Kelly agreed at his deposition with the content of Plaintiffs' Paragraph 31. |
| 32 | ECFMG received an Application from John Nosa Akoda on January 3, 2003. ECFMG Ex. 19. | Denied.  ECFMG first received an application from John Nosa Akoda in 1996. ECFMG Ex. 19; ECFMG Reply Ex. 1 at 87–88. Plaintiffs' citation is to the 1996 application. ECFMG Ex. 19. |
| 33 | There was no social security number included. Ex. 3, Kelly depo. at 88. A photograph is required with the application. Id. at 89. | Admitted. |

JA4575

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 34 | ECFMG received a second Application from Akoda on August 30, 1996. Ex. 26. He said he had previously applied. Kelly doesn't know why there is a second application. Ex. 3, Kelly depo. at 93. | Admitted. |
| 35 | Akoda submitted a diploma from the University of Benin for Johnbull Enosakhare Akoda dated February 6, 1988. Ex. 27. The name is different than on the application. | Admitted. |
| 36 | He does not know if the diploma was verified by the University of Benin. Ex. 3, Kelly depo. at 95. | Assuming "he" refers to Kelly, it is admitted Kelly testified he did not know whether ECFMG verified Akoda's diploma. Plaintiffs Ex. 3 at 95. ECFMG verified Akoda's University of Benin diploma. ECFMG Ex. 23. |
| 37 | In a letter dated August 22, 2000, Kelly says that Akoda provided a social security number ending in 9065. Ex. 28. | Admitted. |
| 38 | ECFMG received a completed Permanent Revalidation Form on September 22, 1998. ECFMG Ex. 27. It shows that he had started a residency program at JSMC. Ex. 3, Kelly depo. at 107. | Admitted, assuming "he" refers to Akoda. |
| 39 | ECFMG serves as the dean station for ERAS for IMGs. Ex. 3, Kelly depo. at 108. | ECFMG admits that Kelly testified to this proposition, assuming that "ERAS" refers to the "electronic residency application service" of the Association of American Medical Colleges. Plaintiffs Ex. 3 at 108. |
| 40 | On August 11, 2000, ECFMG received a letter from James McCorkel (Jersey Shore Medical Center) saying Akoda, a resident, may have served at two other residency programs and has used Igberase's social security number. ECFMG Ex. 28; Ex. 3, Kelly depo. at 111. | Admitted. |
| 41 | The social security number Igberase gave JSMC is the same one he gave to ECFMG. Ex. 3, Kelly depo. at 112. | Admitted. |
| 42 | Stephen S. Seeling replied to McCorkel's letter on August 22, 2000. Ex. 28. Kelly ghost wrote it for Seeling. Ex. 3, Kelly depo. at 112. | Admitted. |
| 43 | There is no diploma with the legal name "Charles." Ex. 3, Kelly depo. at 113-114. | Admitted only that, with regard to Akoda and his aliases, ECFMG did not receive a diploma where "Charles" was the last name. ECFMG denies the |

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| | | remainder of Plaintiffs' Paragraph 43 as ECFMG receives many thousands of diplomas unrelated to this matter. |
| 44 | Kelly wrote to Akoda on August 22, 2000 telling him they have recent information that he may have previously applied and that the matter will be referred to the Credentials Committee. He asked Akoda to provide an explanation. Ex. 29. | Admitted. |
| 45 | Kelly received a call from McCorkel on August 20, 2000, telling him Akoda took a leave of absence and he was waiting to hear from Harlem Hospital. Ex. 30. | Admitted. |
| 46 | Igberase under the Akoda identity wrote a letter in response to the Kelly's letter dated August 29, 2000. ECFMG Ex. 32. He denied taking exams under other names. He stated that "Charles" is his cousin. He admitted using Charles' social security number. | Admitted. |
| 47 | On September 13, 2000, McCorkel called Kelly saying Akoda has been suspended. McCorkel's discussions with Harlem Hospital were "not definitive." Ex. 12. | Admitted. |
| 48 | Kelly made handwritten notes of his conversation with McCorkel. Ex. 31. | Admitted. |
| 49 | On September 27, 2000 Akoda came to Kelly's office. ECFMG Ex. 30. He again admitted using his cousin's social security number. He gave Kelly his passport and his international driving permit. Ex. 13. | Admitted. |
| 50 | Kelly doesn't remember if he made any attempt to verify the authenticity of the passport or license. Ex. 3, Kelly depo. at 125, 129. | Admitted. |
| 51 | The date of birth on Akoda's passport (Ex. 13) and on the Request for Permanent Revalidation Form (ECFMG Ex. 27) are different. Ex 3, Kelly depo. at 126-127. | Admitted. |
| 52 | He does not remember searching ECFMG's data base to try to determine whether Akoda and Igberase were one and the same person. Ex. 3, Kelly depo. at 129. | Admitted, assuming "he" refers to Kelly. |
| 53 | He doesn't know if he compared photographs but he had the ability to do so. Ex. 3, Kelly depo. at 129-130. | Assuming "he" refers to Kelly, admitted that Kelly testified that he could have compared photographs |

JA4577

| | *Plaintiffs' Statement of Additional Material Facts* | *ECFMG's Response* |
|---|---|---|
| | | of Akoda and Igberase but that he did not know if he had. Plaintiffs Ex. 3 at 129–30. |
| 54 | He was present at Igberase's appeal hearing in 1996. Ex. 3, Kelly depo. at 131, 133. | Plaintiffs' citations refer to an appeal hearing on July 11, 2016. Plaintiffs Ex. 3 at 131, 133. Assuming "he" refers to Kelly, admitted only that Kelly testified he attended an appeal hearing in 2016. |
| 55 | Kelly made notes of a call with McCorkel on October 5, 2000. Ex. 32. It comments on two different green cards presented by Akoda. It states that Harlem Hospital thinks he may be the same and that Akoda used two social security numbers. | Admitted. |
| 56 | Kelly emailed Igberase December 21, 2000 and Akoda replied December 2, 2000. Ex. 33. Kelly was surprised. | Plaintiffs' citation shows Akoda replied on December 21, 2000, not December 2, 2000. |
| 57 | On the same day he sent the email to Igberase, Kelly spoke with McCorkel. ECFMG Ex. 31. McCorkel told Kelly that Akoda was dismissed from JSMC residency for using a false social security number and green cards inconsistent with a later one. | Admitted that ECFMG Ex. 31 states both that Kelly spoke with McCorkel on December 21, 2000 and that McCorkel told Kelly what is asserted in Plaintiffs' Paragraph 57. |
| 58 | He does not recall ever asking McCorkle [*sic*] who the informant was. Ex. 3, Kelly depo. at 147. | Admitted, assuming "he" refers to Kelly. |
| 59 | McCorkel says he believed Igberase and Akoda were one and the same person. "I also believe it" Kelly said. "We need to brainstorm on this one." ECFMG Ex. 33. | Admitted that ECFMG Ex. 33 is a memo written by Kelly which states what is asserted in Plaintiffs' Paragraph 59. |
| 60 | It seemed strange that Akoda would reply to the email to Igberase. Ex. 3, Kelly depo. at 149-150. | Assuming Plaintiffs' Paragraph 60 is about Kelly, admitted that Kelly testified that he found it strange that Akoda replied to an email Kelly had sent to Igberase. |
| 61 | He doesn't recall if they brainstormed this matter further. Ex. 3, Kelly depo. at 150. | Admitted, assuming "he" refers to Kelly and "they" refers to Kelly's colleagues specified at the citation to Kelly's deposition transcript. Plaintiffs Ex. 3 at 150. |
| 62 | He knew there was some connection, a relationship between Igberase and Akoda. Ex. 3, Kelly depo. 153. | Assuming "he" refers to Kelly, admitted that Kelly testified that he knew there was a connection |

8

JA4578

| Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|
| | between Igberase and Akoda. Plaintiffs Ex. 3 at 153. |
| 63  He doesn't recall if he ever learned that Igberase was licensed as a nurse in NY. Ex. 3, Kelly depo. at 158. | Admitted, assuming "he" refers to Kelly. |
| 64  ECFMG used the ERAS to submit for Akoda the three letters of reference... He wrote to the three doctors who provided letters of recommendation. Ex. 14. | As to the first sentence, ECFMG admits Plaintiffs Ex. 14 is a form from Akoda requesting ECFMG submit his letters of reference through ERAS.  Assuming "he" refers to Kelly, the second sentence is admitted. |
| 64  None of the three doctors responded to Kelly's letters. ECFMG Ex. 35; Ex. 3, Kelly depo. at 167-168. | Admitted. The correct citation is Plaintiffs Ex. 3 at 196. |
| 65  As part of the ERAS program, ECFMG acts as the dean's office. Ex. 3, Kelly depo. at 162. | Assuming that "ERAS" refers to the "electronic residency application service" of the Association of American Medical Colleges, ECFMG admits that Kelly testified that ECFMG acted as a dean's office for IMGs for the ERAS program. Plaintiffs Ex. 3 at 108, 162. |
| 66  One of the goals of ECFMG is to ensure IMGs are competent physicians. Ex. 3, Kelly depo. at 184-185. | Admitted that Kelly testified to this proposition, but otherwise denied. As further clarification, ECFMG plays various roles in the medical community, including by issuing ECFMG Certificates (ECFMG Ex. 2 at 40:1–22), which only indicates that an IMG had a medical school diploma primary source verified and passed certain exams (ECFMG Ex. 2 at 241:12–22). ECFMG does not hold itself out as "ensur[ing] IMGs are competent physicians." Moreover, ECFMG's "goals" are irrelevant and immaterial to the Motion for Summary Judgment. |
| 67  A goal of ECFMG is to protect the American public. Ex. 3, Kelly depo. at 185. | Admitted that Kelly testified to this proposition, but otherwise denied. As further clarification, ECFMG plays various roles in the medical community, |

9

| | *Plaintiffs' Statement of Additional Material Facts* | *ECFMG's Response* |
|---|---|---|
| | | including by issuing ECFMG Certificates (ECFMG Ex. 2 at 40:1–22), which only indicated that an IMG had a medical school diploma primary source verified and passed certain exams (ECFMG Ex. 2 at 241:12–22). ECFMG does not hold itself out as undertaking the duty of "protect[ing] the American Public." Moreover, ECFMG's "goals" are irrelevant and immaterial to the Motion for Summary Judgment. |
| 68 | ECFMG acts as the Dean's office for IMGs by facilitating the components of an application for a residency program and submits them on behalf of the graduate through the ERAS. Ex. 3, Kelly depo. at 194. | Denied as stated. Plaintiffs' Paragraph 68 appears to be aimed at the same material covered in Plaintiffs' Paragraphs 39 and 65, but using ambiguous and unclear phrasing that does not precisely describe ECFMG's role regarding the ERAS program (*e.g.*, "facilitating the components"). |
| 69 | It was not a routine procedure to verify letters of recommendation. Kelly did it because Akoda was "otherwise being investigated." He had some concerns about Akoda's credibility. Ex. 3, Kelly depo. at 195. | Admitted. |
| 70 | None of the three doctors responded to his letters. Ex. 3, Kelly depo. at 196. | Admitted, assuming "the three doctors" refer to the doctors who wrote letters of recommendation for Akoda and "his letters" refer to the letters Kelly wrote to those doctors. |
| 71 | Kelly did not attempt to find out if any of the three doctors were real. Ex. 3, Kelly depo. at 202. | Denied, assuming "the three doctors" are the doctors who wrote letters of recommendation for Akoda. Kelly wrote to the doctors to determine if the letters were authentic. Plaintiffs Ex. 3 at 195. Further, Plaintiffs' citation only mentions one of the doctors who wrote a letter of recommendation for Akoda. |
| 72 | Kelly was concerned that Akoda and Igberase were the same person. Ex. 3, Kelly depo. at 203. | Admitted that Kelly testified that upon receipt of Akoda's letters of recommendation that Kelly had |

10

JA4580

| | *Plaintiffs' Statement of Additional Material Facts* | *ECFMG's Response* |
|---|---|---|
| | | some concerns that Akoda and Igberase were maybe the same person. Plaintiffs Ex. 3 at 203. |
| 73 | Kelly didn't think there was enough evidence to go to the credentials committee. Ex. 3, Kelly depo. at 211. | Admitted that Kelly testified that in December of 2000 he did not believe there was enough evidence to refer Akoda to the Medical Education Credentials Committee ("MECC"). ECFMG Reply Ex. 1 at 211–12. |
| 74 | Kara Corrado is the ECFMG Vice President for Operations. Ex. 2, Corrado depo. at 6. | Admitted that at the time of her deposition, Kara Corrado's position at ECFMG was Vice President of Operations. By way of clarification, Kara Corrado's name is now "Kara Oleyn." Kara Oleyn's position at ECFMG is now Vice President for Programs & Services. |
| 75 | ECFMG has a certification program that is required for entrance into a ACGME accredited residency program. Id. at 41. It is ECFMG's expectation that state medical boards, residency programs, and hospitals rely on ECFMG as they make decisions about physician applications. Id. at 247-248. | Admitted that Kara Oleyn testified that ECFMG primary source verifies IMGs' diplomas and certifies their passage of specific exams to certain entities such as medical boards, residency programs, and hospitals. ECFMG Ex. 2 at 244:1–8; Plaintiffs Ex. 2 at 247–48. ECFMG also admits that the Accreditation Council for Graduate Medical Education ("ACGME") requires IMGs participating in ACGME-accredited residency programs to be ECFMG Certified. Further, Kara Oleyn only testified that medical boards, residency programs, and hospitals rely on ECFMG to determine whether an applicant has ECFMG certification. Plaintiffs Ex. 2 at 247–48. |
| 76 | Part of ECFMG's mission is to promote public health and to protect the public. Id. at 47. ECFMG serves the public in a number of ways, for example, making sure we have qualified physicians. Id. at 40. | Admitted that Kara Oleyn testified that ECFMG helps to ensure physicians educated outside of the U.S. and Canada have met certain minimum requirements. Corrado Deposition, attached as ECFMG Reply Ex. 2, at 40. As further clarification, |

11

| Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|
| | ECFMG plays various roles in the medical community, including by issuing ECFMG Certificates (ECFMG Ex. 2 at 40:1–22), which only indicated that an IMG had a medical school diploma primary source verified and passed certain exams (ECFMG Ex. 2 at 241:12–22). ECFMG does not hold itself out as "protect[ing] the public." Moreover, ECFMG's "mission" is irrelevant and immaterial to the Motion for Summary Judgment. |
| 77 | There is a written "Draft" procedures written in 2015 which the staff had been using since at least 2008. Id. at 60. | Admitted that Kara Oleyn testified that ECFMG memorialized certain procedures in writing in 2015 and had been following those procedures since at least 2008, if not earlier. Plaintiffs Ex. 2 at 60. |
| 78 | As a general matter if a charge letter is sent to an applicant the matter should be referred to the credentials committee for review. Id. at 80. | Admitted that generally if a "charge letter" alleging irregular behavior is sent to an individual, the matter is often—but not always—referred to the MECC. ECFMG Reply Ex. 2 at 82:18–23. However, ECFMG's "charge letters" ask for an explanation from the subject individual, and when provided, such explanations may cause the matter to not necessarily be referred to the MECC, as occurred with Akoda, for example. ECFMG Reply Ex. 2 at 82:4–13. |
| 79 | The credentialing requirements for certification at that time included source verification of the diploma only. Id. at 88. | Denied. ECFMG is unsure what Plaintiffs mean by "credentialing requirements." Between 1992 and 2000, the only part of an IMG's application that was primary source verified by ECFMG was the diploma. Plaintiffs Ex. 2 at 88–89. |
| 80 | It is a requirement to submit photo identification currently but it was not in the past. Id. at 89. | Admitted that it is presently a requirement to submit a photo, assuming "requirement" refers to ECFMG's requirements for applicants seeking ECFMG |

12

JA4582

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| | | Certification, and that submitting a photo was not always a requirement for ECFMG Certification. |
| 81 | It was not part of ECFMG's process to verify that the applicant's name or date of birth was the same on the request for permanent revalidation and the name that was on file for the applicant. Id. at 130. | Admitted that it was not part of the process in 1998. |
| 82 | ECFMG didn't do anything to determine whether the passport and international driving license Igberase provided under the Akoda identity were genuine or authentic. Id. at 161. | Admitted only that ECFMG took no further steps regarding Akoda's passport and international driving license after seeing them. Plaintiffs Ex. 2 at 161. |
| 83 | The passport and applications for Akoda listed different places of birth. Id. at 162. | Admitted. |
| 84 | ECFMG could have consulted with the Nigerian consulate to determine if the passport was authentic but it's not part of their process. Id. at 200. | Admitted that Kara Oleyn testified in response to a hypothetical question that she "suppose[d]" ECFMG "could have [communicated with the Nigerian consulate], but that wasn't part of our process at the time." Plaintiffs Ex. 2 at 200. ECFMG otherwise denies Plaintiffs' Paragraph 44 because it is unfounded speculation. For example, there is no evidence as to whether the Nigerian consulate would have responded to an inquiry from ECFMG, a non-governmental private U.S.-based entity, and validated (or invalidated) a Nigerian-appearing passport provided to ECFMG by a Nigerian citizen. |
| 85 | Corrado doesn't believe ECFMG ever reached out to Akoda's alleged cousin. Id. at 204. | Denied. ECFMG had various contacts with the individual ECFMG had understood at the time to be Akoda's cousin (going by the name "Igberase"). |
| 86 | Corrado agrees with Kelly that part of ECFMG's role is to protect the American public. Id. at 222. She agrees that patients have the right to not be treated by physicians who have obtained ECFMG certification based on false pretenses. Id. at 53. | Admitted that Kara Oleyn testified that she agreed that part of ECFMG's role was to protect the American public and that patients have a right not to be treated by physicians who have obtained ECFMG certification based on false pretenses. As further clarification, ECFMG plays various roles in the medical community, including by issuing ECFMG |

JA4583

| | *Plaintiffs' Statement of Additional Material Facts* | *ECFMG's Response* |
|---|---|---|
| | | Certificates (ECFMG Ex. 2 at 40:1–22), which only indicated that an IMG had a medical school diploma primary source verified and passed certain exams (ECFMG Ex. 2 at 241:12–22). ECFMG does not hold itself out as "protect[ing] the American public" and is not responsible for practicing physicians treating patients. |
| 87 | Akoda needed a valid ECFMG certificate to get into a training program. Id. at 230. | Admitted that when Akoda applied to ECFMG, as an IMG without a U.S. medical degree, he would have needed ECFMG Certification to be accepted to an ACGME-accredited training program. |
| 88 | If ECFMG believed the letters of recommendation were fraudulent, they would have reported it to Howard University. Id. at 233-234. | Admitted assuming the letters of recommendation referenced were those of Akoda. |
| 89 | As Vice President of Operations, Stephen S. Seeling oversaw the certificate process. Ex. 19, Seeling depo. at 13. | Admitted when Seeling was in that role from 1998 to 2013. Seeling Deposition, attached as ECFMG Reply Ex. 3 at 6:16–7:9. |
| 90 | William Kelly reported to S. Seeling. Id. | Admitted that Kelly reported to Seeling when Seeling was Vice President of Operations at ECFMG. |
| 91 | As a general rule, an IMG must have an ECFMG certification to enter into a residency program. Id. at 23. | Denied as stated. ECFMG refers to its responses to Plaintiffs' Paragraphs 5 and 87. |
| 92 | One of the potential consequences, a potential sanction, for irregular behavior is revocation or invalidation of the individual's certification. Id. at 55. | Admitted. |
| 93 | Seeling agrees that it probably would warrant referral to the credentials committee if he believed that Akoda and Igberase were one and the same person. Id. at 79. | Admitted. |
| 94 | The decision that the Akoda matter should not go to the credentials committee was made without anyone speaking to Igberase about whether he and Akoda were the same person. Id. | Admitted that Seeling did not personally meet with Akoda before ECFMG decided whether or not to refer the matter to the MECC. Seeling Deposition, attached as ECFMG Reply Ex. 3, at 79–80. ECFMG communicated with the individual using the name |

14

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| | | Akoda about this specific point through its letter dated August 22, 2000 and Akoda's response thereto dated August 29, 2000. |
| 95 | Monique Russell is a 46 year old mother of one child, Luka, born May 25, 2016. Ex. 15, Russell depo. at 12. | Admitted. |
| 96 | Igberase delivered Ms. Russell's baby by emergency C-section. Ex. 15, Russell depo. at 41. | Admitted. |
| 97 | Ms. Russell learned of Igberase's guilty plea from a Department of Justice press release. Ex. 15, Russell depo. at 31-32. | Admitted. |
| 98 | Ms. Russell red [*sic*] the federal sentencing transcript. Ex. 15, Russell depo. at 82. | Admitted. |
| 99 | She suffers from emotional distress as a result of learning about Akoda. Ex. 15, Russell depo. at 75-76. | Assuming "she" refers to Ms. Russell, ECFMG admits that Ms. Russell makes this assertion, but ECFMG denies that any of Ms. Russell's claimed emotional distress is as a result of learning about Akoda. ECFMG Ex. 74 at 7. |
| 99 | Ms. Russell feels Igberase violated her. Ex. 15, Russell depo. at 76. | ECFMG admits that Ms. Russell makes this assertion, but ECFMG denies Ms. Russell has suffered any compensable emotional distress due to learning information about Akoda. Dr. Fenichel determined "Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint." ECFMG Ex. 74 at 7. |
| 100 | She has difficulty going to the gynecologist, distrusts the medical community and distrusts institutions that credential doctors. Ex. 15, Russell depo. at 75. | Assuming "she" refers to Ms. Russell, ECFMG admits that Ms. Russell makes this assertion, but ECFMG denies Ms. Russell has suffered any emotional distress due to learning about Akoda's identity. Dr. Fenichel determined "Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint." ECFMG Ex. 74 at 7. |

JA4585

| | Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|---|
| 101 | She also suffers from intimacy issues and feels like a victim of sexual assault because Igberase examined her vagina under false pretenses. Ex. 15, Russell depo. at 90, 130. | Assuming "she" refers to Ms. Russell, ECFMG admits that Ms. Russell makes this assertion, but ECFMG denies Ms. Russell has suffered any emotional distress due to Akoda's identity. Dr. Fenichel determined "Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint." ECFMG Ex. 74 at 7. |
| 102 | Ms. Riggins is a 27 year old mother of three children, ages 10, 6 and 2. Ex. 16, Riggins depo. at 20. | Admitted. |
| 103 | She lives in northeast Washington, DC. Riggins depo. at 21. She has a high school GED. Ex. 16, Riggins depo. at 21. | Admitted. |
| 104 | Ms. Riggins was a patient of Akoda between August 2012 and March 2013. Ex. 16, Riggins depo. at 121. Akoda delivered her second child by C-section. Ex. 16, Riggins depo. at 30. Messiah, her son, was born on March 18, 2013. Ex. 16, Riggins depo. at 38. | Admitted. |
| 105 | After the C-section, Ms. Riggins suffered severe abdominal pain and could not undergo a tubal ligation because of scarring. Ex. 16, Riggins depo. at 34. | Admitted that Ms. Riggins has testified about severe abdominal pain and an inability to undergo a tubal ligation because of scarring, but it is denied that there is evidence that the scarring was because of Akoda. Dr. Jay Goldberg, an OB/GYN, examined Ms. Riggins's medical records and noted that Ms. Riggins experienced "[n]o intra-operative complications" and "no post-operative complications" and that "[a]n elective repeat cesarean section with no complications resulted in delivery of a healthy baby." Goldberg Expert Rep., attached as ECFMG Reply Ex. 5, at 8. |
| 106 | As a result of what she learned about who she believed to be Akoda, she has suffered emotional distress. Ex. 16, Riggins depo. at 56. After learning the truth about Igberase from a Facebook group, "Embracing Mommies," Ms. Riggins felt angry, sad, embarrassed, and ashamed about receiving treatment from Igberase. Ex. 16, Riggins depo. at 57. | Assuming "she" refers to Ms. Riggins, ECFMG admits that Ms. Riggins makes this assertion, but ECFMG denies Ms. Riggins has suffered any emotional distress due to Akoda's identity. Dr. Fenichel determined Ms. Riggins "does not have any |

JA4586

| *Plaintiffs' Statement of Additional Material Facts* | *ECFMG's Response* |
|---|---|
| Ms. Riggins was deeply affected by what Igberase did and felt outraged because his dishonesty enabled him to perform C-sections, examine women's genitals, touch and violate them. Ex. 16, Riggins depo. at 138. See also Def's SUMF (ECF No. 85), Ex. 58, Dr. Tellefson Report. *[sic]* | psychiatric disorder, and in particular, she does not have any psychiatric disorder causally related to her allegations in the Complaint." ECFMG Ex. 67 at 4. |
| 107 Ms. Powell is a 32 year old mother of five children. Ex. 17, Powell depo. at 7, 11. | Admitted. |
| 108 Ms. Powell initially encountered Igberase, whom she knew as Charles Akoda, upon presentation to the medical office of Abdul Chaudry, M.D., in 2014. Ex. 17, Powell depo. at 40, 94. Ms. Powell had been referred to Dr. Chaudry for obstetric care but was assigned to Igberase due to Dr. Chaudry's unavailability. Ex. 17, Powell depo. at. 39-40. During her pregnancy, Igberse [sic] acted in a flirtatious manner that made her feel uncomfortable, but she nevertheless trusted that he was a competent and appropriately credentialed physician providing appropriate medical care. Ex. 34, Declaration of Elsa Powell. | The first sentence in Plaintiffs' Paragraph 108 is admitted.<br><br>The second sentence in Plaintiffs' Paragraph 108 is admitted.<br><br>For the third sentence in Plaintiffs' Paragraph 108, ECFMG admits that Ms. Powell makes these assertions. |
| 109 Igberase also delivered her child at Prince George's Hospital Center and saw Ms. Powell post-delivery as well. Ex. 17, Powell depo. at. 42, 88. The delivery was complicated by significant bleeding requiring surgery. Ex. 34, Declaration of Elsa Powell. | Admitted. |
| 110 Ms. Powell trusted that Igberase was a duly licensed and credentialed physician and suffered emotional harm upon learning that the man she trusted to touch the most intimate parts of her body and deliver her baby, had lied about his identity and background. Ex. 17, Powell depo. at 79; Ex. 34, Declaration of Elsa Powell. Ms. Powell was shocked and disturbed and felt violated by someone she did not know. Ex. 17, Powell depo. at 79. See also Def's SUMF (ECF No. 85) Ex. 58, Dr. Tellefson Report. | ECFMG admits that Ms. Powell makes these assertions, but ECFMG denies Ms. Powell has suffered any emotional distress due to Akoda's identity. Dr. Fenichel determined that "there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the issues in the Complaint." ECFMG Ex. 63 at 6 |
| 110 As a result of learning about Igberase's conduct, Ms. Powell experienced recurrent nausea, stomach discomfort, fear, confusion, sleeplessness, crying, anger, nervous sweating and panic attacks. Ex. 34, Declaration of Elsa Powell | Denied. ECFMG denies that Ms. Powell has ever testified to experiencing nausea, stomach discomfort, confusion, crying, nervous sweating or panic attacks as a result of Akoda's conduct. *See* |

JA4587

| *Plaintiffs' Statement of Additional Material Facts* | | *ECFMG's Response* |
|---|---|---|
| | | *generally* ECFMG Ex. 59. Ms. Powell specifically denied experiencing anxiety attacks to Dr. Fenichel. ECFMG Ex. 34. Further, Ms. Powell did not report these symptoms to either Dr. Fenichel or Dr. Tellefsen. ECFMG Ex. 34; ECFMG Ex. 58. <br><br> Moreover, Plaintiffs Ex. 34 is improper and in conflict with Ms. Powell's previous admissions in interrogatories, at deposition and in independent medical examinations. *See* ECFMG's Reply in Support of Motion for Summary Judgment at 13 n.2. |
| 110 | Ms. Powell would not have consented to treatment had she known Igberase's identity and conduct. Ex. 34, Declaration of Elsa Powell. | ECFMG admits that Ms. Powell testified to this in her deposition. |
| 111 | Desiree Evans is a 40 year old mother of one child. Ex. 18, Evans depo. at 8, 13. | Admitted. |
| 112 | Ms. Evans first encountered Igberase, whom she knew as Charles Akoda, at Prince George's Hospital Center for the delivery of her child by C-section in March of 2016. Ex. 18, Evans depo. at 83; Ex. 35, Declaration of Desire Evans. During Ms. Evans's labor, Igberase manipulated her clitoris, telling her he needed to do so to stimulate her to push the baby. Ex. 18, Evans depo. at 132. Ex. 35, Declaration of Desire Evans. As this was her first experience having a baby, she trusted that his explanation for his conduct was medically valid. Ex. 35, Declaration of Desire Evans. | The first sentence in Plaintiffs' Paragraph 112 is admitted. <br><br> For the remainder of Plaintiffs' Paragraph 112, ECFMG admits that Ms. Evans makes these assertions. |
| 113 | Ms. Evans has suffered emotional distress upon learning that physician whom she trusted for medical care misrepresented his identity. Ex. 18, Evans depo. at 165,172; Ex. 35, Declaration of Desire Evans. Ms. Evans is afraid to seek medical care for her and her child and has lost trust in the medical system. Ex. 18, Evans depo at 165, 172; Ex. 35, Declaration of Desire Evans. See also Def.'s SUMF (ECF No. 85) Ex. 58, Dr. Tellefson Report. As a result of learning about Igberase's conduct, her intimate relationship with her spouse has been damaged. | ECFMG denies that Ms. Evans has testified to experiencing nausea as a result of Akoda's conduct. *See generally* ECFMG Ex. 56. ECFMG admits that Ms. Evans has testified to experiencing certain other symptoms, but Dr. Fenichel found Ms. Evans' symptoms to be unrelated to her experiences with Akoda. ECFMG Ex. 57. |

| Plaintiffs' Statement of Additional Material Facts | ECFMG's Response |
|---|---|
| Ex. 35, Declaration of Desire Evans. As a result of learning about Igberase's conduct, Ms. Evans experienced feelings of nausea, disgust, depression, sadness, sleepless nights reflecting on Igberase's conduct, stress and anxiety, crying, impacts on her intimate relationship with her spouse, and nervousness. Many of these symptoms continue today. Ex. 35, Declaration of Desire Evans. Ms. Evans would not have consented to treatment had she known Igberase's identity and conduct. Ex. 35, Declaration of Desire Evans. | Moreover, Plaintiffs Ex. 35 is improper and in conflict with Ms. Evans' previous admissions in interrogatories, at deposition and in independent medical examinations. *See* ECFMG's Reply in Support of Motion for Summary Judgment at 13 n.2. |
| 114 | Plaintiffs have identified David Markenson, M.D., John C. Hyde Ph.D., FACHE, and Jerry Williamson, M.D., F.A.A.P., M.J, CHC., LHRM as experts to testify with respect to standard of care and elements of causation. These experts have issued reports containing opinions and have given deposition testimony. See Exs. 20, 36 and 37, respectively, Reports of Dr. Markenson, Dr. Hyde and Dr. Williamson. See also Ex. 1, Depo of. Dr. Markenson. | ECFMG admits that Plaintiffs have proffered these experts, who are the subject of Defendant's Motion to Exclude the Opinions and Anticipated Testimony of Plaintiffs' Experts Dr. David Markenson, Dr. John Charles Hyde, and Dr. Jerry Williamson. ECF 83. These experts lack the qualifications to offer opinions on ECFMG, reach improper legal conclusions, and lack reliable methodologies to support their opinions. Their opinions should be excluded pursuant to *Daubert* and Federal Rules of Evidence 403, 702, and 703. |

**REPLY TO PLAINTIFFS'**
**RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

As a preliminary matter, Plaintiffs' evidentiary objections proffered in response to certain record citations in ECFMG's Statement of Material Facts fail and are premature in any event.

*First*, Plaintiffs object to certain of ECFMG's exhibits as hearsay and unauthenticated. "Hearsay statements can be considered on a motion for summary judgment if they are capable of being admitted at trial." *Coulter v. Chase Bank USA, N.A.*, No. CV 18-1538, 2020 WL 5820700, at *8 (E.D. Pa. Sept. 30, 2020) (citing *FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016)). ECFMG "need only explain the admissible form that is anticipated." *FOP*, 842 F.3d at 238. Additionally, at the summary judgment stage, evidence need not yet be authenticated. *Egan v. Live Nation Worldwide, Inc.*, 764 Fed. App'x 204, 208 (3d Cir. 2019). Moreover, "the burden of proof for authentication is slight." *Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005). Federal Rule of Evidence 901(a) "requires a proponent of evidence to produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Berger v. Zeghibe*, 465 F. App'x 174, 183 (3d Cir. 2012).

Plaintiffs raise hearsay objections for ECFMG's Exhibits 26, 34, 41, 50, and 51. Exhibits 26 and 34 (duplicates of the same document) are admissible as both a recorded recollection pursuant to Fed. R. Evid. 803(5) and a business record pursuant to Fed. R. Evid. 803(6). Exhibits 41, 50, and 51 are not being offered for their truth and are thus not hearsay. Fed. R. Evid. 801(c). Rather, they are being offered to show ECFMG's motivation for its conduct at the time and are therefore admissible for that purpose. *See Fahnestock v. Carlisle Reg'l Med. Ctr.*, 659 Fed. App'x 75, 78 (3d Cir. 2016); *compare with* Fed. R. Evid. 801(c)(2).

Plaintiffs also raise authentication objections for ECFMG's Exhibits 26, 34, 41, 50, and 51. As explained above, authentication is not even required for summary judgment. *See Egan*, 764 Fed. App'x 204 at 208. But even if it were, ECFMG has met the low bar:

- Exhibit 26/34 could be authenticated several ways, but on its own provides sufficient information about the author of the letter and its recipient that it could be authenticated at trial, which meets ECFMG's burden. *See Berger*, 465 F. App'x at 183. Further, several pieces of evidence that Plaintiffs do not dispute support the authenticity of the letter in Exhibit 26/34, given its contents and date. *See, e.g.*, ECFMG Ex. 25, 27, 28.

- Exhibits 41, 50, and 51 contain emails, and "courts have authenticated emails by relying on the email addresses in the headers, explanations in the body of the emails, conduct after receiving the emails, and other circumstantial evidence." *United States v. CVS Caremark Corp.*, No. 09-4672, 2015 WL 5582553, at *32 n.24 (E.D. Pa. Sept. 22, 2015), *aff'd on other grounds sub nom. United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746 (3d Cir. 2017). Given the email addresses in the headers, the contents of the emails, and the undisputed facts of this case, these emails can be properly authenticated for summary judgment.

**Second**, Plaintiffs object to ECFMG's use of Plaintiffs' verified responses to ECFMG's interrogatories (ECFMG Exs. 44, 45, 46, 47). Those objections fail. Fed. R. Civ. P. 56(c)(1)(A) explicitly allows interrogatory answers to support factual positions at summary judgment. *See also Giuliani v. Springfield Twp.*, 238 F. Supp. 3d 670, 689 (E.D. Pa. 2017), *aff'd*, 726 F. App'x 118 (3d Cir. 2018).

**Third**, Plaintiffs object to ECFMG's use of Plaintiffs' own statements from a lawsuit Plaintiffs filed against a different defendant, Dimensions Healthcare System (ECFMG Exs. 42, 43, 62, 64, 69, 70, 76). However, all of those documents are admissible as evidence under Fed. R. Evid. 801(d)(2) as statements of a party opponent. *See Koresko v. United States*, 123 F. Supp. 3d 654, 669–70 (E.D. Pa. 2015) (explaining that pleadings, including amended, withdrawn, or superseded pleadings, and evidentiary admissions, including interrogatories, from related litigation may be admissible as evidence).

With respect to the particular position articulated by Plaintiffs in response to each fact in ECFMG's Statement of Material Facts, and for completeness' sake, ECFMG replies as follows:

JA4592

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 1 | Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") is a private non-profit organization based in Philadelphia, Pennsylvania. About ECFMG page, https://ecfmg.org/about/index.html, attached Exhibit 1. | Admitted. | n/a |
| 2 | ECFMG promotes quality health care for the public by, among other things, certifying physicians who received their basic medical degree outside of the United States and Canada (known as international medical graduates or "IMGs") as having met specific minimum requirements to be candidates for graduate medical education programs in the United States. Dep. of Kara Corrado, attached as Exhibit 2, at 40:1-22; About ECFMG, History, https://ecfmg.org/about/history.html, attached as Exhibit 3. | Admitted. | n/a |
| 3 | At the relevant time, to qualify for ECFMG Certification, an IMG had to: (i) pass an English exam and two substantive exams, either Step 1 and Step 2 of the United States Medical Licensing Examination ("USMLE") or Basic Medical Science and Clinical Science of the Foreign Medical Graduate Examination in the Medical Sciences ("FMGEMS"); and (ii) have their medical school diploma successfully primary-source verified with the issuing medical school as authentic. ECFMG Certification Page, attached as Exhibit 4; Ex. 2 at 88:21-89:2; Sep. 17, 1993 Letter from Marjorie P. Wilson, attached as Exhibit 5. | Admitted. | n/a |
| 4 | Once an applicant's record was verified and complete and the applicant passed the required substantive exams, ECFMG issued the applicant a certificate. Ex. 2 at 241:12-22. | Denied. The phrase "once an applicant's record was verified and incomplete" [sic] is inaccurate. The only thing ECFMG verifies is | ECFMG agrees that it only primary source verified medical diplomas as part of its ECFMG Certification process at the pertinent time. However, ECFMG also required applicants to |

JA4593

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | an applicant's diploma. Ex. 3, Kelly depo. at 18, 34, 35; Ex. 2, Corrado depo. at 88. | pass substantive exams prior to issuing an ECFMG Certificate. ECFMG Ex. 2 at 241:12-22. |
| 5 | ECFMG Certification status information is made available only to certain third parties in the medical field, like residency programs, hospitals, licensing boards, and employers. Ex. 2 at 244:1–8. | Admitted. However, the transcript reference is incorrect. | Plaintiffs are mistaken. ECFMG Ex. 2 at 244:1–8 states:<br><br>"Q. To whom would ECFMG release a ECFMG certification status report? A. To residency programs, licensing boards, and other organizations that are employing the physician as a physician. Q. Like hospitals and -- A. Hospitals, right, CVOs that are working on behalf of the hospitals." |
| 6 | ECFMG Certification status information is not available to members of the general public (including patients of doctors who have received ECFMG Certification). Ex. 2 at 243:9-25. | Admitted. | n/a |
| 7 | At the relevant time, ECFMG Certification status reports for residency programs contained the following information: | Admitted. | n/a |
| 7.a. | IMG's name | Admitted. | n/a |
| 7.b. | USMLE number | Admitted. | n/a |
| 7.c. | medical school name and country | Admitted. | n/a |
| 7.d. | graduation year | Admitted. | n/a |
| 7.e. | ECFMG Certification status | Admitted. | n/a |

JA4594

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 7.f. | validity of ECFMG Certification | Admitted. | n/a |
| 7.g. | date of issuance of ECFMG Certification. Ex. 2 at 248:16-249:2. | Admitted. | n/a |
| 8 | ECFMG Certification status reports for residency programs do **not** verify: | Admitted. | n/a |
| 8.a. | an IMG's identity | Admitted. | n/a |
| 8.b. | Social Security number | Admitted. | n/a |
| 8.c. | immigration status | Admitted. | n/a |
| 8.d. | passport information | Admitted. | n/a |
| 8.e. | criminal background | Admitted. | n/a |
| 8.f. | readiness to treat patients | Admitted. | n/a |
| 8.g. | ethics | Admitted. | n/a |
| 8.h. | honesty | Admitted. | n/a |
| 8.i. | morality | Admitted. | n/a |
| 8.j. | Character. Ex. 2 at 198:16-22, 200:13-15, 240:18-241:6, 242:6-243:3, 244:22-245:13. | Admitted. | n/a |
| 9 | ECFMG Certification does not authorize an IMG to treat patients as a doctor. Ex. 2 at 244:22-245:1. | Admitted. | n/a |
| 10 | Recipients of ECFMG Certification status reports, such as residency programs and hospitals, typically consider things like the following when evaluating IMGs: | Admitted. | n/a |
| 10.a. | in-person interviews | Admitted. | n/a |
| 10.b. | information provided directly by the IMG | Admitted. | n/a |
| 10.c. | letters of recommendation | Admitted. | n/a |
| 10.d. | skills assessments or additional examinations | Admitted. | n/a |
| 10.e. | reports from prior educational or training programs | Admitted. | n/a |
| 10.f. | medical school transcripts | Admitted. | n/a |
| 10.g. | information obtained as part of a background check | Admitted. | n/a |
| 10.h. | information obtained as part of a background check. Rebuttal Rep. of L. Beck, attached as Exhibit 6, at 4; Rebuttal Rep. of M. Smith, attached as Exhibit 7, at 2. | Admitted. | n/a |

JA4595

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 11 | The institution receiving the ECFMG Certification status report independently assesses the criteria enumerated in ¶ 8. Ex. 6 at 4–7. | Admitted. | n/a |
| 12 | State licensing boards have their own requirements beyond ECFMG Certification for issuing a license to practice medicine. Ex. 6 at 3–4. | Admitted. | n/a |
| 13 | In Maryland, those requirements include graduation from an approved medical school, being of good moral character, completion of at least 2 years of a residency program accredited by the Accreditation Council for Graduate Medical Education or the American Osteopathic Association, as well as further requirements. Akoda App. to Md. Bd. of Physicians, attached as Exhibit 8. See also Ex. 6 at 4; Ex. 7 at 3-4. | Admitted. | n/a |
| 14 | Residency programs typically track and evaluate residents on an ongoing basis based on a variety of factors other than ECFMG Certification status. Ex. 7 at 3. These evaluations often include annual progression reports, annual examinations, and ongoing supervision by the faculty of the residency program. Ex. 7 at 3. | Admitted. | n/a |
| 15 | Hospitals typically continue to evaluate their physicians on an ongoing basis through their Medical Director's office on attributes such as clinical performance, demeanor, and interactions with patients and staff. Ex. 6 at 6–7. | Admitted. | n/a |
| 16 | IMGs are subject to normal employee processes—like payroll, taxes, healthcare programs and other requirements of employment—and residency programs and hospitals gather information from IMGs independently for these processes. Ex. 7 at 5. | Admitted. | n/a |
| 17 | The American Board of Obstetrics and Gynecology has its own certification process independent of ECFMG Certification. Ex. 6 at 7. | Admitted. | n/a |
| 18 | Medical specialty board certification typically requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of prior case logs, letters of recommendation from residency and fellowship directors, and | Admitted. | n/a |

JA4596

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. Ex. 6 at 7. | | |
| 19 | Following medical specialty board certification, a candidate must comply with annual requirements for ongoing educational modules to maintain certification. Ex. 6 at 7. | Admitted. | n/a |
| 20 | ECFMG defines conduct that does or tries to subvert ECFMG's processes and programs as "irregular behavior" and has a process for evaluating suspected irregular behavior. ECFMG Irregular Behavior Policy, attached as Exhibit 9; Ex. 2 at 55:23-56:7. | Objection. There is no evidence that this "process" was published in the period 1992 through 2006. | Plaintiffs' objection is irrelevant and does not create a genuine issue of material fact. Even if ECFMG's process and procedures were not "published" at the time, ECFMG followed an internal process then nonetheless. Plaintiffs Ex. 2 at 60 ("Yes, those procedures that were documented in 2015 were the procedures that staff had been using at least since I started working directly on cases of irregular behavior, which is 2008 onward, and my understanding would be prior to that as well.") |
| 21 | When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, inter alia, communicating with the source of the suspicion and with the accused. Ex. 2 at 76:12-77:5. | Admitted. | n/a |

JA4597

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 22 | If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee ("MECC"), a sub-committee of ECFMG's Board of Trustees, for a formal determination on the merits. Ex. 2 at 76:24-77:5. | Admitted. | n/a |
| 23 | Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. Ex. 2 at 181:9-23. | Admitted. | n/a |
| 24 | If an IMG is found to have engaged in irregular behavior by ECFMG's MECC, ECFMG annotates the individual's record and can, inter alia, limit the individual's participation in ECFMG programs or withhold or revoke existing ECFMG Certificates. Ex. 9. | Admitted. | n/a |
| 25 | ECFMG is not a government enforcement or investigative agency. Ex. 2 at 76:12-77:5. | Admitted. | n/a |
| 26 | In 1992, an individual applied to ECFMG using the name Oluwafemi Charles Igberase. Verification Papers – University of Ibadan, attached as Exhibit 10. | Denied. ECFMG Exhibit 10 is Akoda's alleged diploma, not an application. | Plaintiffs' objection does not create a genuine issue of material fact. Exhibit 10 contains ECFMG's verification of a University of Ibadan diploma for Charles Olufemi Igebraese. Other sources Plaintiffs have not objected to also indicate that Akoda first applied to ECFMG in 1992. *See, e.g.*, ECFMG Ex. 25. |
| 27 | The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase presented ECFMG with a medical school diploma from the University of Ibadan in Nigeria. Ex. 10. | Admitted. | n/a |

JA4598

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 28 | University of Ibadan sent ECFMG verification of diplomas and credentials for Charles Oluwafemi Igberase. Ex. 10. | Plaintiffs cannot admit or deny this statement because they have no personal knowledge of the "verification," nor did Ibaden [*sic*] purport to verify any credentials other than the diploma. | Plaintiffs' response does not dispute ECFMG's Paragraph 28, and does not create a genuine issue of material fact. |
| 29 | In July of 1992, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and failed both the basic medical science component and the clinical science component of the FMGEMS. Sep. 15, 1992 Igberase Score Report, attached as Exhibit 11. | Admitted. | n/a |
| 30 | In January of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and the clinical science component of the FMGEMS but failed the basic medical science component of the FMGEMS. Mar. 27, 1993 Igberase Score Report, attached as Exhibit 12. | Admitted. | n/a |
| 31 | In July of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the basic science component of the FMGEMS. Ex. 5. | Admitted. | n/a |
| 32 | In September of 1993, ECFMG notified the individual who had applied under the name Oluwafemi Charles Igberase that he had satisfied all testing criteria for ECFMG Certification. Ex. 5. | Admitted. | n/a |
| 33 | ECFMG issued an ECFMG Certificate (No. 482-700-2) to the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase. June 22, 1995 Letter from W. Kelly, attached as Exhibit 13. | Admitted. | n/a |

JA4599

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 34 | The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase did not gain admission to a residency program. July 20, 1995 Letter from Igberase Oluwafemi Charles, attached as Exhibit 14, at 1–2. | Admitted. | n/a |
| 35 | In 1994, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles. Plea Agreement Terms, attached as Exhibit 15, at 9. | Admitted. | n/a |
| 36 | In the application under the name "Igberase Oluwafemi Charles," the individual answered "no" to the question of whether he had previously applied to ECFMG. Ex. 15 at 9; May 3, 2001 Letter from W. Kelly, attached as Exhibit 16. | Admitted. | n/a |
| 37 | ECFMG issued an ECFMG Certificate (No. 0-519-573-0) to the individual who applied to ECFMG using the name Igberase Oluwafemi Charles. Dec. 7, 1995 Letter from W. Kelly, attached as Exhibit 17. | Admitted. | n/a |
| 38 | Misrepresenting ECFMG application history to ECFMG can constitute irregular behavior. Ex. 17 at 14. | Admitted. | n/a |
| 39 | ECFMG notified the individual who applied to ECFMG using the name Igberase Oluwafemi Charles that it was conducting an investigation of whether he had previously applied to ECFMG when he indicated on his application that he had not previously applied. Ex. 17 at 14. | Admitted. | n/a |
| 40 | The individual who had applied to ECFMG under the name Igberase Oluwafemi Charles admitted that he had previously applied to ECFMG, despite representing otherwise on his application. Ex. 17 at 15–16. | Admitted. | n/a |
| 41 | ECFMG staff determined that there was sufficient evidence that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior by | Plaintiffs cannot admit or deny paragraph 41. | Plaintiffs' response does not dispute ECFMG's Paragraph 41, and does not create a genuine issue of |

JA4600

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | misrepresenting his application history with ECFMG to refer the matter to the MECC. Ex 17 at 13. | ECFMG Exhibit 17 does not state this. | material fact. ECFMG Ex. 17 summarizes on its face the individual's irregular behavior and informs him that his case was referred to the MECC. ECFMG Ex. 17 at 13–14. It is a writing that speaks for itself. |
| 42 | The MECC found that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior and (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. Ex. 17. | Admitted. | n/a |
| 43 | ECFMG later barred the individual who had applied to ECFMG under the names Oluwafemi Charles Igberase and Igberase Oluwafemi Charles from applying to ECFMG after he submitted additional fraudulent applications using other variations of the names Oluwafemi, Charles, and Igberase, each of which ECFMG identified and refused to process when received. Ex. 16; May 22, 2002 Letter from W. Kelly, attached as Exhibit 18. | Admitted. | n/a |
| 44 | In 1996, an individual using the name John Nosa Akoda applied for ECFMG Certification with applicant number 0-553-258-5. Akoda ECFMG Application, attached as Exhibit 19. | Admitted. | n/a |
| 45 | The individual who had applied to ECFMG under the name John Nosa Akoda applied to take the March 1996 USMLE Step 2 exam and the June 1996 USMLE Step 1 exam. Aug. 22, 2000 Letter from W. Kelly, attached as Exhibit 20. | Admitted. | n/a |
| 46 | The individual who had applied to ECFMG under the name John Nosa Akoda presented ECFMG with a medical school diploma from the University of Benin. University of Benin Degree, attached as Exhibit 21. | Admitted. | n/a |

JA4601

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 47 | The University of Benin sent ECFMG verification of diploma and credentials for Johnbull Enosakhare Akoda. Ex. 21. | Plaintiffs cannot admit or deny this statement because they have no personal knowledge of the "verification," nor did Ibaden [*sic*] purport to verify any credentials other than the diploma. | Plaintiffs' response does not dispute ECFMG's Paragraph 47 and does not create a genuine issue of material fact because ECFMG's Paragraph 47 relates to verification from the University of ***Benin***, not the University of ***Ibadan***. |
| 48 | The individual who applied to ECFMG under the name John Nosa Akoda misrepresented his ECFMG application history to ECFMG and made no reference to any previous applications to ECFMG. Ex. 19; Ex. 15 at 10. | Admitted. | n/a |
| 49 | The individual who had applied to ECFMG under the name John Nosa Akoda passed the English exam in August 1996. Aug. 12, 1997 Letter from N. Gary, attached as Exhibit 22. | Admitted. | n/a |
| 50 | The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 2 Exam in August 1996. Ex. 22. | Admitted. | n/a |
| 51 | The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 1 Exam in June 1997. Ex. 22. | Admitted. | n/a |
| 52 | ECFMG certified the individual who had applied to ECFMG under the name John Nosa Akoda in 1997 based on his passing of Steps 1 and 2 of the USMLE and the primary source verification of a diploma by the University of Benin. Verification Papers – University of Benin, attached as Exhibit 23; John Nosa Akoda ECFMG Certificate, attached as Exhibit 24. | Admitted. | n/a |
| 53 | After obtaining this ECFMG Certification, the individual who had applied to ECFMG under the name John Nosa Akoda successfully | Admitted. | n/a |

32

JA4602

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | passed Step 3 of the USMLE. Md. State Bd. of Physicians Decision, attached as Exhibit 25, at 5. | | |
| 54 | Oluwafemi Charles Igberase, Igberase Oluwafemi Charles and John Nosa Akoda were all the same person (hereinafter referred to as "Akoda"). Ex. 15 at 9–11. | Admitted. | n/a |
| 55 | Akoda applied to a residency program in internal medicine at Jersey Shore Medical Center ("JSMC"). Ex. 15 at 10.; Nov. 7, 2000 Letter from A.M. Sesso, attached as Exhibit 26. | Objection. This letter has not been authenticated and is hearsay and is inadmissible. | There is no genuine dispute about this fact. Plaintiffs admit that Akoda was a resident at JSMC, which would require that he applied for the residency. *See* Plaintiffs' Paragraph 38 ("It shows that [Akoda] had started a residency program at JSMC.") And Plaintiffs' own exhibits support the fact that Akoda applied to a residency program at JSMC. *See* Plaintiffs Ex. 3 at 153. Further, see ECFMG's response regarding the admissibility of Exhibit 26 in the preliminary statement preceding this chart. Moreover, several other pieces of evidence that Plaintiffs do not dispute support the authenticity of Exhibit 26, given its contents and date. *See* ECFMG Ex. 25, 27, 28. |

JA4603

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 56 | JSMC accepted Akoda as a resident in its internal medicine program in 1998. Akoda Request for Permanent Revalidation of Standard ECFMG Cert., attached as Exhibit 27. | Admitted. | n/a |
| 57 | In 1999, JSMC received an allegation that Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. Aug. 11, 2000 Letter from J. McCorkel, attached as Exhibit 28. | Admitted. | n/a |
| 58 | When JSMC tried to verify the Social Security number that Akoda provided directly to JSMC in his residency paperwork, JSMC concluded that it belonged to Charles Igberase. Ex. 28. | Admitted. | n/a |
| 59 | JSMC notified ECFMG of its investigation into Akoda, but JSMC did not inform ECFMG of the source of the allegation against Akoda. Ex. 28. | Plaintiffs admit that JSMC notified ECFMG of its investigation but there is no evidence in the record that ECFMG ever requested of JSMC the identity of the source of the allegation against Akoda. | Plaintiffs' response to ECFMG's Paragraph 59 does not create a genuine issue of material fact because the response is irrelevant to the undisputed fact that the JSMC did not inform ECFMG of the source of the allegation. |
| 60 | In an August 11, 2000 letter from James McCorkel at JSMC, Mr. McCorkel asked if ECFMG had received requests for Akoda's ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital. Ex. 28. | Admitted. | n/a |
| 61 | ECFMG had no records indicating that Harlem Hospital Center or JFK Memorial Hospital had requested ECFMG verification for any of Akoda's aliases or USMLE / ECFMG identification numbers. Aug. 22, 2000 Letter from S. Seeling, attached as Exhibit 29. | Admitted. | n/a |

JA4604

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 62 | ECFMG conducted its own investigation to determine if Akoda and Igberase were the same person. Ex. Ex. 20; Sep. 27, 2000 Memo, attached as Exhibit 30; Dec. 21, 2000 Memo, attached as Exhibit 31. | Admitted. | n/a |
| 63 | ECFMG required Akoda to submit an explanation for why it appeared he had previously applied to ECFMG but had answered "no" to the question whether he had previously submitted an application to ECFMG. Ex. 20. | Admitted. | n/a |
| 64 | In response to the inquiry from ECFMG, Akoda explained that "Igberase Charles" was his cousin and admitted using a social security number allegedly belonging to his cousin. Aug. 29, 2000 Letter from Akoda, attached as Exhibit 32; Ex. 30. | Admitted. | n/a |
| 65 | Akoda provided ECFMG with what appeared to be his Nigerian passport and an international driving permit as documentation of his identity. Ex. 32; Ex. 30. | Plaintiffs admit that Igberase provided ECFMG with a passport and an international driving permit but ECFMG made no effort to verify the authenticity of these documents. Ex. 2, Corrado depo. at 161. | Plaintiffs admit the material facts of ECFMG's Paragraph 65. The remainder of Plaintiffs' response does not create a genuine issue of material fact and is irrelevant to whether Akoda provided the passport and driving permit as documentation of his identity. |
| 66 | ECFMG staff determined that there was insufficient evidence of irregular behavior to bring Akoda before the ECFMG MECC on an allegation that he was Igberase. Dec. 22, 2000 Memo, attached as Exhibit 33; Ex. 2 at 150:24-151:6. | Admitted. Further, ECFMG made no effort to refer "Akoda" to the ECFMG MECC for his misuse of a social security number or for | Plaintiffs admit the material facts of ECFMG's Paragraph 66. Plaintiffs' supplemental statement is not supported by their citation, see Plaintiffs Ex. 3 at 201, and |

35

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | providing false information on his application. Ex. 3, Kelly depo. at 201. | does not create a genuine issue of material fact. |
| 67 | In 2000, JSMC discharged Akoda because of perceived discrepancies involving his Social Security number and green card, which was not part of his ECFMG application. Ex. 31. | Admitted. | n/a |
| 68 | In a November 7, 2000 letter, JSMC wrote to the Maryland Board of Physicians about the discrepancies in Akoda's Social Security number and green card. Nov. 7. 2000 Letter from A.M. Sesso, attached as Exhibit 34. | Objection. There is no evidence in the record authenticating this letter. Furthermore, it is hearsay and is inadmissible. | ECFMG incorporates by reference its reply regarding ECFMG's Paragraph 55, noting that Exhibits 24 and 36 are the same document. |
| 69 | ECFMG continued to investigate Akoda but took no adverse action against him at that time because ECFMG staff concluded there was insufficient evidence of irregular behavior. Ex. 2 at 150:24-151:6; Nov. 22, 2006 Letter from W. Kelly, attached as Exhibit 35. | Admitted. | n/a |
| 70 | ECFMG staff was nonetheless suspicious of Akoda's identity. Ex. 33. | W. Kelly believed Akoda and Igberase were one and the same. ECFMG Ex. 33. | Plaintiffs' response is a non-sequitur and does not create a genuine issue of material fact regarding ECFMG's Paragraph 70. Exhibit 33 is a document that speaks for itself. |
| 71 | Akoda applied to Howard University Hospital's residency program. March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital, attached as Exhibit 36. | Admitted. | n/a |
| 72 | Howard sent Akoda a letter of acceptance dated March 16, 2007. Ex. 36. | Admitted. | n/a |

36

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 73 | Akoda admitted to providing Howard a false permanent resident card in the name "N. Akoda, John Charles." Ex. 15 at 10. | Admitted. | n/a |
| 74 | Akoda began Howard's residency program on July 1, 2007 and completed it on June 30, 2011. Howard University Hospital Certificate, attached as Exhibit 37. | Admitted. | n/a |
| 75 | The Virginia Department of Health Professions licensed Akoda to practice medicine in the Commonwealth of Virginia in 2011. Virginia License Suspension, attached as Exhibit 38. | Admitted. | n/a |
| 76 | The Maryland State Board of Physicians licensed Akoda to practice medicine in the state of Maryland in September of 2011. Ex. 25 at 5. | Admitted. | n/a |
| 77 | On his application for medical licensure in Maryland, Akoda omitted his residency at JSMC. Akoda Md. Bd. of Physicians App., attached as Exhibit 39, at 5. | Admitted. | n/a |
| 78 | Akoda's application for medical licensure in Maryland required that if his name was "not written the same way on all documents," he had to "submit documentation to explain how and why [his] name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree." Ex. 39 at 4. | The application is a document which speaks for itself. | Plaintiffs' response does not dispute ECFMG's Paragraph 78 and does not create a genuine issue of material fact with respect thereto. |
| 79 | The ECFMG Certification status report for Dr. Akoda received by the Maryland Board of Physicians in 2011 stated that its purpose is to "indicate whether this individual is certified by ECFMG" and that ECFMG "verified medical school credentials directly with the medical schools[.]" ECFMG Certification Status Rep., attached as Exhibit 40. | [No answer.] | Plaintiffs failed to respond to ECFMG's Paragraph 79 and therefore waived any objection or denial. There is no genuine issue of material fact with respect to this paragraph. |
| 80 | Akoda's name appeared differently on his medical licensure application ("John Charles Nosa Akoda" and "Charles John Nosa Akoda"), ECFMG Certificate ("John Nosa Akoda"), his medical school diploma ("Johnbull Enosakhare Akoda"), and his residency | [No answer.] | Plaintiffs failed to respond to ECFMG's Paragraph 79 and therefore waived any objection or denial. There is no genuine issue of material |

JA4607

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | program certificate of completion ("John-Charles Nosa Akoda"). Ex. 25 at 3 n.4; Ex. 24; Ex. 23; Ex. 37. | | fact with respect to this paragraph. |
| 81 | Akoda admitted to providing a false permanent resident card and a false Maryland driver's license in connection with: | Admitted. | n/a |
| 81.a. | His application for medical licensure in Maryland. Ex. 15 at 10. | Admitted. | n/a |
| 81.b. | His application for privileges at Prince George's Hospital Center. Ex. 15 at 9. | Admitted. | n/a |
| 82 | The Maryland Board of Physicians was aware of the allegations that Akoda had used other names and may have misrepresented his identity in 2014. Email Correspondence Between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41. | Objection. There is no evidence authenticating this letter. Furthermore, it is hearsay and is inadmissible. | See ECFMG's response regarding the admissibility of Exhibit 41 in the preliminary statement preceding this chart. |
| 83 | Akoda's Maryland medical license was not revoked until July 10, 2017. Ex. 25 at 8. | Admitted. | n/a |
| 84 | The grounds for revocation of Akoda's medical license were that he plead guilty in 2016 to Social Security fraud, which constituted a crime of moral turpitude requiring revocation. Ex. 25 at 5–6. | Admitted. | n/a |
| 85 | Akoda renewed his Maryland medical license through September 30, 2016, when it expired. Ex. 25 at 3. | Admitted. | n/a |
| 86 | The Virginia Department of Health Professions revoked Akoda's Virginia medical license on April 25, 2017 because of his criminal conviction. Ex. 38. | Admitted. | n/a |
| 87 | Prince George's Hospital Center awarded Akoda medical privileges to treat patients in 2012. Ex. 15 at 9. | Admitted. | n/a |
| 88 | In a previous lawsuit, Plaintiff Evans claimed that Dimensions Healthcare, which operated Prince George's Hospital, could have "avoided all injuries, damages, . . . and disability" suffered by Ms. Evans: | Objection. The quoted language is from a Complaint which was dismissed without prejudice. It | The information in ECFMG's Paragraph 88 and ECFMG Ex. 42 is relevant and admissible. It is from a sworn statement of a Plaintiff and pertains |

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | [Dimensions] and its duly authorized agents, apparent agents, servant and/or employees failed to perform an appropriate and proper investigation and background check of Akoda before granting him privileges to act as a practitioner and specialist in obstetrics and gynecology. Had they done so, as was required, Akoda's fraudulent conduct would have been discovered, and he would have been precluded from seeing patients at [Dimensions'] institutions or entities, thereby avoiding all of the injuries, damages (economic and non-economics) and disability suffered by this Plaintiff.<br><br>Evans Dimensions Rog. Answers, attached as Exhibit 42, at 2-3. | is irrelevant and inadmissible. | directly to the subject of this lawsuit. *See* Fed. R. Evid. 401. Also see ECFMG's response regarding the admissibility of Exhibit 42 in the preliminary statement preceding this chart. |
| 89 | In a previous lawsuit, Plaintiffs offered an expert in health care administration, credentialing, and privileging who believed Dimensions Healthcare was responsible for Plaintiffs' injuries, damages and permanent disability:<br><br>[Dimensions] breached the applicable standards of administrative care by negligently failing to use required and reasonable care to investigate, credential, grant privileges, monitor and supervise their medical personnel including, but not limited to, Akoda and to discover, stop and report any professional misconduct of which they should have known. As a direct and proximate result of the Defendants' continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability. Had [Dimensions] complied with the applicable standards of administrative care the Claimants, and others similarly situated, would not have suffered their injuries, damages and permanent disability.<br><br>Bojko Rep., attached as Exhibit 43, at 3. | Objection. The quoted language is from a prior case which was dismissed without prejudice. It is irrelevant and inadmissible. | The information in ECFMG's Paragraph 89 and ECFMG Ex. 43 is relevant and admissible. It is an expert report offered by Plaintiffs in another lawsuit and pertains directly to the subject of this lawsuit. *See* Fed. R. Evid. 401. Also see ECFMG's response regarding the admissibility of Exhibit 43 in the preliminary statement preceding this chart. In addition, ECFMG has designated this testimony pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) in its October 14, 2019 |

JA4609

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | | Disclosure of Rebuttal Expert Testimony. |
| 90 | Akoda also worked with medical practices run by Dr. Abdul Chaudry and Dr. Javaka Moore. Evans Supp. Answers to Rogs., attached as Exhibit 44 at Rog. 1; Powell Supp. Answers to Rogs., attached as Exhibit 45 at Rog. 1; Riggins Supp. Answers to Rogs., attached as Exhibit 46, at Rog. 1; & Russell Supp. Answers to Rogs., attached as Exhibit 47, at Rog. 1. | Objection. This information is irrelevant and inadmissible. | This information is plainly relevant, as some of the Plaintiffs came to be treated by Akoda through the practices run by Dr. Chaudry and Dr. Moore. *See* Fed. R. Evid. 401. Furthermore, ECFMG Exhibits 44-47 are Plaintiffs' sworn supplemental answers to ECFMG's interrogatories from this case. Also see ECFMG's response regarding the admissibility of Exhibits 44-47 in the preliminary statement preceding this chart. |
| 91 | In 2012, Akoda submitted a Medicare Enrollment Application to the Centers for Medicare and Medicaid Services ("CMS"). Ex. 15 at 10. | Admitted. | n/a |
| 92 | CMS denied the application based, in part, on CMS's determination that Akoda did not provide an accurate Social Security number. Ex. 15 at 10. | Admitted. | n/a |
| 93 | American Board of Obstetrics and Gynecology ("ABOG") certified Akoda on January 31, 2014. ABOG Board Letter to Akoda, attached as Exhibit 48. | Admitted. | n/a |
| 94 | ABOG waited until January 2018 to revoke his diplomate status. Aug. 30, 2017 ABOG Letter, attached as Exhibit 49. | Admitted. | n/a |

JA4610

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 95 | In 2014, ECFMG received a subpoena from a U.S. Attorney's office regarding Akoda. 2014 Email Correspondence between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41. | Objection. The exhibits referenced are not authenticated and are hearsay and inadmissible. | This information is relevant and admissible. See ECFMG's response regarding the admissibility of Exhibit 41 in the preliminary statement preceding this chart. There is additional record evidence on this point as well. *See, e.g.*, Oct. 1, 2014 Subpoena, attached as ECFMG Reply Ex. 4. |
| 96 | ECFMG cooperated with the investigation and followed instructions from federal authorities not to take adverse action against Akoda while the investigation was ongoing. Ex. 41. | Objection. The exhibits referenced are not authenticated and are hearsay and inadmissible. | This information is relevant and admissible. See ECFMG's response regarding the admissibility of Exhibit 41 in the preliminary statement preceding this chart. There is additional record evidence on this point as well. *See, e.g.*, Oct. 1, 2014 Subpoena, attached as ECFMG Reply Ex. 4. |
| 97 | In 2014, ECFMG worked together with the Maryland Board of Physicians to assist their investigation. Ex. 41. | Objection. The exhibits referenced are not authenticated and are hearsay and inadmissible. | This information is relevant and admissible. See ECFMG's response regarding the admissibility of Exhibit 41 in the preliminary statement preceding this chart. |

JA4611

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 98 | In March 2016, Prince George's County Police Department contacted ECFMG about Akoda. Mar. 2016 ECFMG Email Chain, attached as Exhibit 50. | Objection. The exhibits referenced are not authenticated and are hearsay and inadmissible. | This information is relevant and admissible. See ECFMG's response regarding the admissibility of Exhibit 50 in the preliminary statement preceding this chart. |
| 99 | ECFMG cooperated with the Prince George's County Police Department's investigation and followed additional instructions from law enforcement not to impede the investigation and not to take adverse action against Akoda while the investigation was ongoing. Nov. 2016 Email Chain, attached as Exhibit 51. | Objection. The exhibits referenced are not authenticated and are hearsay and inadmissible. | This information is relevant and admissible. See ECFMG's response regarding the admissibility of Exhibit 51 in the preliminary statement preceding this chart. |
| 100 | On November 15, 2016, Akoda pled guilty to misuse of a Social Security number and stipulated that he and Oluwafemi Charles Igberase were the same person. Ex. 15. | Admitted. | n/a |
| 101 | After Akoda pled guilty, ECFMG consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. March 1, 2017 ECFMG Notice, attached as Exhibit 52. | Admitted. | n/a |
| 102 | Plaintiff Desire Evans is a resident of Waldorf, Maryland. Evans Dep., attached as Exhibit 53, at 14:22-24. | Admitted. | n/a |
| 103 | Ms. Evans gave birth to her son on March 17, 2016 at Prince George's Hospital in Maryland. Ex. 53 at 35:22-25, 42:20-23. | Admitted. | n/a |
| 104 | Ms. Evans did not know which doctor would be there for her induction. Ex. 53 at 42:4-13; 83:4-20. | Admitted. | n/a |
| 105 | Ms. Evans consented to undergoing treatment by Akoda. March 16, 2016 Evans Consent Forms, attached as Exhibit 54. | Denied. The consent was invalid due to Akoda's fraudulent conduct. | Plaintiffs' response does not create a genuine issue of material fact with respect to ECFMG's Paragraph 105. |

JA4612

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | | Plaintiffs do not dispute that at the time of treatment by Akoda, Ms. Evans gave her consent. Plaintiffs are attempting to argue the legal significance of that fact, but it does not change the truth of the fact stated therein. |
| 106 | Ms. Evans did not conduct any research into the credentials of her primary OB/GYN doctor, Dr. Moore or the physicians at Dr. Moore's practice. Ex. 53 at 44:20-45:9, 45:23-46:4. | Admitted. | n/a |
| 107 | Ms. Evans did not ask Akoda about his credentials or professional experience. Ex. 53 at 86:12-19, 87:2-5. | Admitted. | n/a |
| 108 | Akoda treated Ms. Evans while she was in labor and then performed a C-section on her. Ex. 53. at 87:6-23, 93:18-19. | Admitted. | n/a |
| 109 | Ms. Evans' son was delivered healthy. Ex. 53 at 95:16-17. | Admitted. | n/a |
| 110 | Ms. Evans testified that Akoda used language with her that she found "inappropriate," including calling her "baby" and "mama." Ex. 53 at 158:158:4-11. | Admitted. | n/a |
| 111 | Ms. Evans claims that Akoda performed "intrusive pelvic examinations" on her. Evans Rogs., attached as Exhibit 55, at 7. | Admitted. | n/a |
| 112 | Ms. Evans alleges that Akoda "was, like, fondling my clitoris" during her labor and that during her labor, she felt that he mistreated her. Ex. 53 at 131:20-132:3, 137:22-138:3; Ex. 55 at 7. | Admitted. | n/a |
| 113 | Ms. Evans testified that her husband questioned Akoda about how he touched Ms. Evans. Ex. 53 at 133:10-14. | Admitted. | n/a |
| 114 | Ms. Evans testified that she discussed Akoda's conduct with her husband and her mother shortly after the birth. Ex. 53 at 138:6-17. | Admitted. | n/a |
| 115 | Ms. Evans claims that her husband and mother were both in the room with her while Akoda treated her. Ex. 53 at 132:7-12. | Admitted. | n/a |

JA4613

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 116 | [*See* ECFMG's Statement of Undisputed Material Facts filed under seal, ECF 85, at ¶ 116.] | Redacted. | ECFMG served Plaintiffs an unredacted version of its Statement of Undisputed Material Facts. Plaintiffs have failed to file or provide ECFMG with an unsealed or unredacted copy of their Response. Plaintiffs have therefore failed to provide an answer to ECFMG's Paragraph 116 and has waived any objection or denial; Plaintiffs' response thus does not create a genuine issue of material fact with respect to this paragraph. |
| 117 | Ms. Evans learned of Akoda's identity after hearing a radio advertisement from a law firm in 2018. Ex. 53 at 73:12-74:13. | Admitted. | n/a |
| 118 | Ms. Evans never sought treatment from a psychiatrist or psychologist prior to the birth of her son. Ex. 53 at 66:4-13. | Admitted. | n/a |
| 119 | Ms. Evans has seen a doctor for her social anxiety since the birth of her son, and a physician's assistant recorded that Ms. Evans was experiencing "depression/anxiety" and "potential postpartum." Ex. 53 at 64:14-65:25, 105:24–106:5. | Admitted. | n/a |
| 120 | Ms. Evans denied feeling anxious and depressed for most of her life, just "normal anxious." Ex. 53 at 112:19-113:5. | Admitted. | n/a |
| 121 | Ms. Evans claims that she is afraid to see a doctor, does not know who to trust, and her trust in the medical profession has diminished. Ex. 53 at 165:8-21. | Admitted. | n/a |

44

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 122 | None of Ms. Evans' medical records reference Akoda. Evans Dep. Ex. 3, attached as Exhibit 56. | Admitted. | n/a |
| 123 | Ms. Evans had no knowledge of ECFMG when she was treated by Akoda. Ex. 53 at 82:20-22. | Admitted. | n/a |
| 124 | Ms. Evans first learned of ECFMG from her lawyers. Ex. 53 at 70:24-71:17. | Admitted. | n/a |
| 125 | Ms. Evans believes that ECFMG's purpose is "to verify identification documentation," not foreign medical diplomas, and that ECFMG is responsible for verifying IMGs' Social Security numbers, birth certificates, green cards, state medical licenses, board certifications, and any other "piece of identifying information about a foreign medical graduate." Ex. 53 at 80:14-82:4. | Admitted. | n/a |
| 126 | After conducting Internet research, Ms. Evans believed ECFMG "was some kind of credentialing company or something" and was not "100 perfect sure of the nature of the company." Ex. 53 at 72:18-19. | Admitted. | n/a |
| 127 | Dr. Gladys Fenichel examined Ms. Evans on September 9, 2019. Fenichel Rep. on Evans, attached as Exhibit 57, at 1. | Admitted. | n/a |
| 128 | Dr. Fenichel did not find Ms. Evans' psychiatric conditions of major depression and panic disorder to be related to the allegations she made in the complaint against ECFMG. Ex. 57 at 8. | Admitted. | n/a |
| 129 | Dr. Christine Tellefsen examined Ms. Evans on September 16, 2019. Tellefsen Rep., attached as Exhibit 58, at 4. | Admitted. | n/a |
| 130 | Dr. Tellefsen concluded that Ms. Evans' conditions "is complicated by a number of other factors in her life." Ex. 58 at 4. | Admitted. | n/a |
| 131 | Dr. Tellefsen also concluded that Ms. Evans likely has a "pseudotumor cerebri," causing her headaches and poor concentration. Ex. 58 at 4. | Admitted. | n/a |
| 132 | Dr. Tellefsen found that Ms. Evans likely has Mood Disorder and Adjustment Disorder with Mixed Disturbance of Behavior. Ex. 58 at 5. | Admitted. | n/a |

JA4615

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 133 | Plaintiff Elsa Powell is a resident of Upper Marlboro, Maryland. Powell Dep., attached as Exhibit 59, at 20:1-3. | Admitted. | n/a |
| 134 | Ms. Powell gave birth to her son on September 17, 2014. Ex. 59 at 22:4. | Admitted. | n/a |
| 135 | Ms. Powell was originally supposed to be seen by Dr. Chaudry at his practice, but he was unavailable and she saw Akoda instead. Ex. 59 at 40:7-12. | Admitted. | n/a |
| 136 | Ms. Powell consented to being treated by Akoda at Dr. Chaudry's practice and at Prince George's Hospital in Maryland during her pregnancy. Sep. 17, 2014 Powell Consent Forms, attached as 60; Ex. 59 at 40:7-12. | Denied. The consent was invalid due to Akoda's fraudulent conduct. | Plaintiffs' response does not create a genuine issue of material fact with respect to ECFMG's Paragraph 136. Plaintiffs do not dispute that at the time of treatment by Akoda, Ms. Powell gave her consent. Plaintiffs are attempting to argue the legal significance of that fact, but it does not change the truth of the fact stated therein. |
| 137 | Ms. Powell regularly saw Akoda starting in April of 2014, during her labor on September 17, 2014 and for post-natal care through January of 2015. Ex. 59 at 38:20-39:1-2, 39:21-40:16; Ex. 45 at 2, 8. | Admitted. | n/a |
| 138 | Ms. Powell testified that Akoda was "flirtatious" towards Ms. Powell. Ex. 59 at 51:16-19. | Admitted. | n/a |
| 139 | Ms. Powell testified that she requested that a nurse be present during her appointments with Dr. Akoda. Ex. 59 at 51:16-19. | Admitted. | n/a |
| 140 | Ms. Powell testified that Akoda made lewd comments about her breasts. Ex. 59 at 51:21-25. | Admitted. | n/a |
| 141 | Ms. Powell claims Akoda performed "intrusive pelvic exams" on her. Powell Rog., attached as Exhibit 61, at 7. | Admitted. | n/a |

| | ECFMG's Statement of<br>Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 142 | Akoda aided Ms. Powell in the delivery of her son. Ex. 59 at 44:11-14. | Admitted. | n/a |
| 143 | Ms. Powell's son had no complications during delivery. Ex. 59 at 48:18-20. | Admitted. | n/a |
| 144 | After the birth of her son, Ms. Powell experienced heavy bleeding while at the hospital, and Akoda took her into surgery. Ex. 59 at 45:12-46:7. | Admitted. | n/a |
| 145 | Ms. Powell believes that before taking her into surgery, Akoda told her "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." Ex. 59 at 45:12-46:2. | Admitted. | n/a |
| 146 | Ms. Powell recovered well from the emergency surgery that Akoda performed on her after she delivered her son. Ex. 59 at 47:20-24. | Admitted. | n/a |
| 147 | Ms. Powell claimed she suffered from emotional anguish, fear, and anxiety from learning that Akoda was not properly credentialed. Ex. 45 at 3. | Admitted. | n/a |
| 148 | Ms. Powell claims she does not "have a peace of mind" since finding out Akoda was not who he said he was. Ex. 59 at 98:20-24. | Admitted. | n/a |
| 149 | Ms. Powell has never sought treatment from a psychologist, psychiatrist, or counselor and did not seek any treatment after hearing about the charges brought against Akoda. Ex. 59 at 32:10-17, 99:10-12. | Admitted. | n/a |
| 150 | Ms. Powell has seen doctors since finding out about Akoda's identity. Ex. 59 at 25:22-24. | Admitted. | n/a |
| 151 | Ms. Powell has not sought treatment from any health care provider for alleged injuries related to this lawsuit. Ex. 45 at 7. | Admitted. | n/a |
| 152 | Ms. Powell contends that PGHC was negligent and should have discovered Dr. Akoda's alias sooner. Powell Dimensions Rog., attached as Exhibit 62, at 3. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 152 and ECFMG Ex. 62 are relevant and admissible as they pertain directly to the subject of this lawsuit and whom Plaintiffs blame for |

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | | their alleged injuries. *See* Fed. R. Evid. 401. See ECFMG's response regarding the admissibility of Exhibit 62 in the preliminary statement preceding this chart. |
| 153 | Ms. Powell first learned about the social security fraud charged against Akoda in 2017. Powell Dep. at 63:12-17. | Admitted. | n/a |
| 154 | Ms. Powell had no knowledge of ECFMG prior to this lawsuit. Ex. 45 at 4. | Admitted. | n/a |
| 155 | Ms. Powell learned about ECFMG from her attorney. Ex. 59 at 90:9-16. | Admitted. | n/a |
| 156 | Ms. Powell believes ECFMG licenses foreign medical doctors to practice medicine in the United States. Ex. 59 at 91:6-11. | Admitted. | n/a |
| 157 | Ms. Powell testified that she believed it was wrong for ECFMG to provide Akoda with a license to practice medicine. Ex. 59 at 93:18-23. | Admitted. | n/a |
| 158 | Ms. Powell doubts Akoda had medical training. Ex. 59 at 80:5-7. | Admitted. | n/a |
| 159 | Dr. Fenichel examined Ms. Powell on September 9, 2019. Fenichel Rep. on Powell, attached as Exhibit 63, at 1. | Admitted. | n/a |
| 160 | Dr. Fenichel did not find Ms. Powell to present with any symptoms compatible with a psychiatric disorder causally related to her allegations in the complaint against ECFMG. Ex. 63 at 6. | Admitted. | n/a |
| 161 | Dr. Tellefsen examined Ms. Powell on September 13, 2019. Ex. 58 at 3. | Admitted. | n/a |
| 162 | Dr. Tellefsen diagnosed Ms. Powell with Adjustment Disorder with Anxiety. Ex. 58 at 4. | Admitted. | n/a |
| 163 | Plaintiff Jasmine Riggins is a resident of Washington, D.C. Riggins Dep., attached as Exhibit 64, at 20:1-3. | Admitted. | n/a |

48

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 164 | Ms. Riggins gave birth to her son at Prince George's Hospital in Maryland on March 18, 2013. Riggins Rog. Answers, attached as Exhibit 65, at 2. | Admitted. | n/a |
| 165 | Ms. Riggins chose to be treated by Dr. Abdul Chaudry's practice, with whom Akoda worked at Prince George's Hospital. Ex. 46 at 2-3. | Admitted. | n/a |
| 166 | Ms. Riggins consented to treatment by Akoda. Riggins Consent Forms, attached as Exhibit 66. | Denied. The consent was invalid due to Akoda's fraudulent conduct. | Plaintiffs' response does not create a genuine issue of material fact with respect to ECFMG's Paragraph 166. Plaintiffs do not dispute that at the time of treatment by Akoda, Ms. Riggins gave her consent. Plaintiffs are attempting to argue the legal significance of that fact, but it does not change the truth of the fact stated therein. |
| 167 | Akoda performed a C-section on Ms. Riggins on March 18, 2013. Ex. 46 at 3. | Admitted. | n/a |
| 168 | Ms. Riggins learned of Akoda's identity in July of 2017. Ex. 64 at 84:16-85:5. | Admitted. | n/a |
| 169 | Ms. Riggins claims to have experienced emotional distress only once she found about Akoda being a "fake doctor." Ex. 64 at 55:19-24. | Admitted. | n/a |
| 170 | Ms. Riggins testified that she feels angry, sad, embarrassed, and ashamed because of Akoda's conduct. Ex. 64 at 57:8-13. | Admitted. | n/a |
| 171 | Ms. Riggins has not sought medical attention for any of her alleged injuries. Ex. 64. At 86:14-87:11. | Admitted. | n/a |
| 172 | Ms. Riggins has never been diagnosed with depression, post-traumatic stress disorder, a sleeping disorder or any psychiatric | Admitted. | n/a |

JA4619

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | disorder. Fenichel Rep. on Riggins, attached as Exhibit 67 at 3; Riggins Dimensions RFA, attached as Exhibit 68 at 4. | | |
| 173 | Since being treated by Akoda, Ms. Riggins does not typically feel anxious, worried, scared, or panicky. Ex. 64 at 60:7-9; Ex. 68 at 8. | Admitted. | n/a |
| 174 | Ms. Riggins does not claim Akoda physically injured her. Ex. 64 at 56:4-6. | Admitted. | n/a |
| 175 | Ms. Riggins has not suffered physical distress from learning about Akoda's guilty plea. Ex. 64 at 64:1-7. | Admitted. | n/a |
| 176 | Ms. Riggins does not have a depressed mood or suicidal thoughts. Ex. 64 at 59:14-22. | Admitted. | n/a |
| 177 | Ms. Riggins believed Dimensions' negligence "was the sole and proximate cause of [her] injuries". Ex. 64 at 123:7-15; Dimensions First Amended Compl., attached as Exhibit 69, ¶ 81. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 77 and ECFMG Ex. 69 are relevant and admissible as they pertain directly to the subject of this lawsuit and whom Plaintiffs blame for their alleged injuries. *See* Fed. R. Evid. 401. See ECFMG's response regarding the admissibility of Exhibit 69 in the preliminary statement preceding this chart. |
| 178 | Ms. Riggins doubts whether PGHC performed a satisfactory background check on Akoda. Riggins Dimensions Dep., attached as Exhibit 70, at 78:2-8. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 178 and ECFMG Ex. 70 are relevant and admissible as they pertain directly to the subject of this lawsuit and whom Plaintiffs blame for their alleged injuries. *See* Fed. R. Evid. 401. See |

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| | | | ECFMG's response regarding the admissibility of Exhibit 70 in the preliminary statement preceding this chart. |
| 179 | Ms. Riggins has seen doctors since finding out about Akoda's identity. Ex. 64 at 103:9-104:18. | Admitted. | n/a |
| 180 | Dr. Fenichel examined Ms. Riggins on September 20, 2019. Fenichel Rep. on Riggins, attached as Exhibit 71, at 1. | Admitted. | n/a |
| 181 | Dr. Fenichel did not find Ms. Riggins to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 71 at 4. | Admitted. | n/a |
| 182 | Ms. Riggins believes the Maryland Board of Physicians, the American Board of Obstetricians and Gynecologists, and Dr. Chaudry are also responsible for the injuries she has alleged. Ex. 64 at 56:7-57:2. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 182 and ECFMG Ex. 64 are relevant and admissible as they pertain directly to the subject of this lawsuit and whom Plaintiffs blame for their alleged injuries. *See* Fed. R. Evid. 401. See ECFMG's response regarding the admissibility of Exhibit 64 in the preliminary statement preceding this chart. |
| 183 | Ms. Riggins had never heard of ECFMG until her lawyers informed her of the existence of the organization. Ex. 64 at 130:18-131:1. | Admitted. | n/a |
| 184 | Ms. Riggins believed ECFMG administers exams and licenses foreign doctors to practice medicine in the United States. Ex. 64 at 26:17-24, 27:20-24. | Admitted. | n/a |

JA4621

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 185 | Ms. Riggins believes ECFMG should "[b]e more careful about who they certify." Ex. 64 at 138:17-23. | Admitted. | n/a |
| 186 | Ms. Riggins testified that it might make a difference to her to know that ECFMG had cooperated with the U.S. Attorney's Office in its case against Akoda. Ex. 64 at 141;18-22. | Admitted. | n/a |
| 187 | Plaintiff Monique Russell is a resident of Annapolis, Maryland. Russell Dep., attached as Exhibit 72, at 10:24-25. | Admitted. | n/a |
| 188 | Ms. Russell gave birth to her son on May 25, 2016 at Prince George's Hospital. Ex. 72 at 12:23-25, 32:24-25. | Admitted. | n/a |
| 189 | Ms. Russell's primary OB/GYN during her pregnancy was Dr. Waldrop from Dr. Moore's practice. Ex. 72 at 32:11-25, 34:19-24. | Admitted. | n/a |
| 190 | Ms. Russell knew before her delivery that Dr. Waldrop might be unavailable at the time and that her baby might be delivered by Akoda. Ex. 72 at 37:23-38:18. | Admitted. | n/a |
| 191 | Ms. Russell consented to being seen by Akoda if Dr. Waldrop were unavailable. Russell Consent Forms, attached as Exhibit 73; Ex. 72 at 38:12-19. | Denied. The consent was invalid due to Akoda's fraudulent conduct. | Plaintiffs' response does not create a genuine issue of material fact with respect to ECFMG's Paragraph 191. Plaintiffs do not dispute that at the time of treatment by Akoda, Ms. Russell gave her consent. Plaintiffs are attempting to argue the legal significance of that fact, but it does not change the truth of the fact stated therein. |
| 192 | Akoda first treated Ms. Russell when she was in labor. Ex. 72 at 37:5-9. | Admitted. | n/a |
| 193 | Akoda helped deliver Ms. Russell's son in 2016 via an unplanned C-section. Ex. 72 at 12:23-25, 37:5-9, 41:4-14. | Admitted. | n/a |

JA4622

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 194 | Ms. Russell consented to the C-section that Akoda performed. Ex. 72 at 45:1-3. | Denied. The consent was invalid due to Akoda's fraudulent conduct. | Plaintiffs' response does not create a genuine issue of material fact with respect to ECFMG's Paragraph 194. Plaintiffs do not dispute that at the time of treatment by Akoda, Ms. Russell gave her consent. Plaintiffs are attempting to argue the legal significance of that fact, but it does not change the truth of the fact stated therein. |
| 195 | Ms. Russell described her recovery from the C-section performed by Akoda as "minor." Fenichel Rep. on Russell, attached as Exhibit 74, at 7. | Admitted. | n/a |
| 196 | Ms. Russell believed that the course of treatment from Akoda "really was best/necessary." Russell Facebook comments, attached as Exhibit 75, at 4. | Admitted. | n/a |
| 197 | Ms. Russell alleges that Akoda's conduct has exacerbated her innate trust issues. Ex. 47 at 2-3. | Admitted. | n/a |
| 198 | Ms. Russell claimed she experienced anxiety upon learning of Akoda's identity. Russell Dimensions RFA, attached as Exhibit 76, at 8. | Admitted. | n/a |
| 199 | Ms. Russell experienced no atypical symptoms after her C-section, and her son has had no health problems. Ex. 72 at 53:15-21. | Admitted. | n/a |
| 200 | Ms. Russell has not sought treatment from a psychiatrist or psychologist at any point in her adult life, including before and after Akoda delivered her baby. Ex. 72 at 69:21-70:5. | Admitted. | n/a |
| 201 | In 2018, Ms. Russell gave no indication of depression, anxiety, suicidal thoughts, or other mental health issues to her doctor. Ex. 72 at 98:22-99:8. | Admitted. | n/a |

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 202 | Ms. Russell does not claim to suffer from post-traumatic stress disorder. Ex. 72 at 121:23-25; Ex. 76 at 4-6. | Admitted. | n/a |
| 203 | Ms. Russell has never been formally diagnosed with depression, anxiety, a permanent disability, or a sleeping disorder. Ex. 72 at 122:1-123:18; Ex. 76 at 6-7, 11. | Admitted. | n/a |
| 204 | In a previous lawsuit, Ms. Russell admitted to not having depression as a result of learning about Akoda's identity. Ex. 76 at 6-7. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 204 and ECFMG Ex. 76 are relevant and admissible as they pertain directly to the subject of this lawsuit and the injuries alleged by Ms. Russell. *See* Fed. R. Evid. 401. See ECFMG's response regarding the admissibility of Exhibit 76 in the preliminary statement preceding this chart. |
| 205 | In a previous lawsuit, Ms. Russell admitted to not having a physical injury or suffering from physical pain as a result of learning about Akoda's identity. Ex. 76 at 9. | Objection. This statement is irrelevant and inadmissible. | ECFMG's Paragraph 205 and ECFMG Ex. 76 are relevant and admissible as they pertain directly to the subject of this lawsuit and the injuries alleged by Ms. Russell. *See* Fed. R. Evid. 401. See ECFMG's response regarding the admissibility of Exhibit 76 in the preliminary statement preceding this chart. |
| 206 | Ms. Russell does not claim to suffer sleeplessness. Ex. 76 at 10. | Admitted. | n/a |

54

| | ECFMG's Statement of Undisputed Material Facts | Plaintiffs' Response | ECFMG's Reply |
|---|---|---|---|
| 207 | Ms. Russell does not allege that Akoda sexually assaulted her. Ex. 72 at 129:16-130:11. | Admitted. | n/a |
| 208 | Ms. Russell claims that her emotional distress and distrust of doctors were "amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda." Ex. 47 at 3. See also Ex. 69 ¶ 71. | Admitted. | n/a |
| 209 | Ms. Russell has seen a doctor since finding out about Akoda. Ex. 72 at 60:4-10. | Admitted. | n/a |
| 210 | Ms. Russell found out about Akoda's guilty plea in June of 2017. Ex. 72 at 31:1-7. | Admitted. | n/a |
| 211 | Dr. Moore informed Ms. Russell that Dr. Moore's practice did not conduct a background check on Akoda. Ex. 72 at 57:11-21. | Admitted. | n/a |
| 212 | Dr. Fenichel examined Ms. Russell on September 17, 2019. Ex. 74 at 1. | Admitted. | n/a |
| 213 | Dr. Fenichel did not find Ms. Russell to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 74 at 7. | Admitted. | n/a |
| 214 | Ms. Russell believes ECFMG is a governmental entity. Ex. 72 at 77:13-23. | Admitted. | n/a |
| 215 | Ms. Russell believes ECFMG does background checks on applicants such as Akoda. Ex. 72 at 77:13-23. | Admitted. | n/a |
| 216 | Ms. Russell believes Akoda is a "fake doctor," who "was not properly trained as a doctor or credentialed as a doctor." Ex. 72 at 45:7-14. | Admitted. | n/a |
| 217 | Ms. Russell has alleged back pain as a result of Dr. Akoda's treatment but also indicated she does not know if the pain is attributable to Dr. Akoda. Ex. 72 at 123:19-124:19. | Admitted. | n/a |

JA4625

A concluding point on the facts as alleged and presented by the parties: Plaintiffs take issue with ECFMG's use of the term "Dr. Akoda" to discuss the IMG at issue in this litigation. *See, e.g.*, ECF 93-2 at 28 n.2, 35, 40. ECFMG uses "Dr. Akoda" for consistency and ease of use because the contemporaneous documents and deposition testimony refer to that individual using that name. ECFMG does not dispute that "John Nosa Akoda" or "Dr. Akoda" were aliases of the individual the U.S. Department of Justice referred to as "Oluwafemi Charles Igberase, a/k/a 'Charles John Nosa Akoda,'" who pleaded guilty to Social Security Fraud in violation of 42 U.S.C. § 408(a)(&)(B), *see* ECFMG Ex. 15, and that, as Plaintiffs admit, "Akoda and Igberase are the same person." ECF 93-2 at 4.

Dated: January 28, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
Telephone:   +1.713.890.5000
Facsimile:    +1.713.890.5001
william.peterson@morganlewis.com

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:   +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for Educational Commission for Foreign Medical Graduates*

JA4626

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: January 28, 2022

*/s/ Brian W. Shaffer*
Brian W. Shaffer

JA4627

# EXHIBIT 1



# Transcript of William C. Kelly

**Date:** August 20, 2019

**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
1                                        Volume I
                                         Pages 1-224
2
              IN THE UNITED STATES DISTRICT COURT
3          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

4                      Case No. 2:18-cv-05629-JW

5                      Hon. Joshua D. Wolson

6

7

8     MONIQUE RUSSELL, JASMINE RIGGINS

9     ELSA M. POWELL AND DESIRE EVANS,

10         Plaintiffs,

11    vs.

12    EDUCATIONAL COMMISSION FOR

13    FOREIGN MEDICAL GRADUATES

14         Defendant.

15

16

17            DEPOSITION OF WILLIAM C. KELLY

18         Tuesday, August 20, 2019 at 9:40 a.m.

19      Law Offices of Morgan, Lewis & Bockius, LLP

20                 One Federal Street

21           Boston, Massachusetts 02110-176

22

23

24    ----------Jennifer A. Doherty, CSR--------------

25             Certified Shorthand Reporter
```

JA4630

1    meant.
2         A.   Yes.
3         Q.   And was step two basic clinical science
4    material?
5         A.   Yes.
6         Q.   And both were, at that time, two-day
7    multiple choice tests administered by ECFMG; is that
8    correct?
9         A.   My -- that -- I have no independent
10   recollection of that.  Just from what's on the form
11   the answer would be yes.
12        Q.   So am I correct that in addition to
13   successfully -- again, I'm in this 1992 to 1996
14   period.  Am I correct that in addition to pass --
15   successfully completing steps one and two of the
16   USLME exams an applicant would also -- an IMG
17   applicant would also have to pass an English test?
18        A.   Yes.
19        Q.   And in addition, before ECFMG would
20   certify an applicant there had to be primary source
21   verification of that applicant's medical
22   credentials; is that correct?
23        A.   Of their medical diploma, yes.
24        Q.   Nothing more than their diploma?
25        A.   Generally not.

1        Q.    And am I correct also that in that same

2    time period in order -- I'm sorry, was -- in that

3    time period were steps one and two and was the

4    English exam administered by ECFMG?

5        A.    To the best of my recollection, yes.

6        Q.    Step three was not administered by ECFMG,

7    was it?

8        A.    It was not.

9        Q.    It was administered by whom?

10       A.    My recollection was that it was

11   administered by state medical boards.

12       Q.    And am I correct in saying that an IMG

13   applicant could not sit for step three of the USLME

14   unless he or she was certified by ECFMG?

15            MS. MCENROE:  Objection to form.

16       A.    I believe that was the process in most, if

17   not all states, yes.

18   BY MR. VETTORI:

19       Q.    So again, this is just a general question,

20   Mr. Kelly.  And again, we're referring to this time

21   period that I framed from 1992 through 2000.  Let's

22   say through 1996.

23            Is it correct to say that an IMG couldn't

24   practice medicine in the United States without being

25   certified by ECFMG?

```
 1                    MS. MCENROE:  Objection to form.

 2        A.   That is not correct.

 3   BY MR. VETTORI:

 4        Q.   How would they practice without a

 5   certification from ECFMG?

 6        A.   My -- the best of my recollection is that

 7   state licenses are granted by the individual state

 8   medical boards and there were different pathways,

 9   for example, the Fifth Pathway program for graduates

10   of medical schools in Mexico that were not required

11   to have ECFMG certificates.

12        Q.   Are there any other countries where that

13   applied?

14        A.   I don't recall.

15        Q.   How about Nigeria?  Did it apply to

16   graduates of medical schools in Nigeria?

17        A.   I do not believe so.

18        Q.   So with respect to graduates of Nigeria

19   medical schools in the time period we're talking

20   about, an IMG couldn't obtain a medical license in

21   the United States without being certified by ECFMG,

22   correct?

23                    MS. MCENROE:  Objection to form.

24        A.   It would have been very, very unlikely,

25   yes.
```

JA4633

1   BY MR. VETTORI:

2        Q.   Well, can you even sit for the -- at that

3   time period, could you even sit for step three exams

4   without being certified by ECFMG?

5                MS. MCENROE:  Objection to form.

6        A.   A graduate of a Nigerian medical school?

7   BY MR. VETTORI:

8        Q.   Yes.

9        A.   To best of my recollection, no.

10       Q.   And in that same time period a graduate of

11  a Nigerian medical school wouldn't be permitted to

12  take -- wouldn't be licensed by any state in the

13  United States unless he or she successfully

14  completed step three of USMLE; isn't that correct?

15               MS. MCENROE:  Objection to form.

16       A.   If they were applying for an initial

17  license and had not passed the earlier licensing

18  examination, yes.

19  BY MR. VETTORI:

20       Q.   So would you agree with me that ECFMG

21  works on behalf of domestic and international

22  regulatory authorities to protect the public for

23  which programs and services, including primary

24  source verification, of physician credentials?

25               MS. MCENROE:  Objection.

Case 22-1998, Document 122-5, 12/28/2022, 3447459, Page27 of 33
Case 1:19-cv-05050, Document 122-5, Filed 09/08/2022, Page 28 of 34

Transcript of William C. Kelly
Conducted on August 20, 2019                                    71

1    identification.)

2              MR. VETTORI:  Off the record a

3    minute.

4              (Discussion off the record.)

5         A.  I've reviewed this document, Exhibit 18.

6    BY MR. VETTORI:

7         Q.  Have you seen these before or do you

8    recall seeing them before?

9         A.  Yes, I do.

10        Q.  As part of your preparation for this

11   deposition?

12        A.  Yes.

13        Q.  This page 1, 4007 -- 4007 appears to me to

14   be an ECFMG form; is that correct?

15        A.  Yes.

16        Q.  And if I understand from your prior

17   testimony, the practice would have been for ECFMG to

18   use this form to forward the diploma provided to it

19   by the applicant; is that correct?

20        A.  That was the process, yes.

21        Q.  And so I'm just going by the sequence of

22   numbers that they were produced to us.  Immediately

23   following 4007 is page 4008 and it's a diploma,

24   correct?

25        A.  Yes.

1      Q.   But it's not a diploma for somebody by the

2   name of Charles, is it?

3              MS. MCENROE:  Objection to form.

4      A.   It says Charles right on it.

5   BY MR. VETTORI:

6      Q.   What is the last name?

7      A.   It's Charles Oluwafemi Igberase.

8      Q.   It's not Igberase Oluwafemi Charles, is

9   it?

10              MS. MCENROE:  Objection to form.

11     A.   The names are in a different order.

12   BY MR. VETTORI:

13     Q.   Correct.  And you were treating the person

14   with the name Igberase Oluwafemi Charles as someone

15   different from the person with the name Charles

16   Oluwafemi Igberase, weren't you?

17              MS. MCENROE:  Objection to form.  Are

18   you asking --

19   BY MR. VETTORI:

20     Q.   When I say "you," I mean ECFMG for

21   purposes of its certification.

22     A.   I don't recall that.

23     Q.   Well, you assigned it a separate

24   identification number to Igberase Oluwafemi Charles

25   than you did to Charles Oluwafemi Igberase.  We've

Transcript of William C. Kelly
Conducted on August 20, 2019                               73

```
 1   already established that, Mr. Kelly.
 2                   MS. MCENROE:  Objection to form.
 3   BY MR. VETTORI:
 4        Q.   Isn't that correct?
 5        A.   If that is what we did, then this was a
 6   different applicant, yes.
 7        Q.   Correct.  Are you aware that this is the
 8   identical diploma submitted by the person with the
 9   name Charles Oluwafemi Igberase that you verified
10   with the school?
11        A.   I'm not aware of that.
12        Q.   So again, we have a situation where the
13   applicant's name is different than the name on the
14   diploma, correct?
15                   MS. MCENROE:  Objection.
16        A.   The name -- the sequence of names is
17   different, yes.
18   BY MR. VETTORI:
19        Q.   Correct.  And is there any documentation
20   to indicate to ECFMG an explanation for that?
21        A.   I see none.
22        Q.   So as I -- is it correct to say that ECFMG
23   relied on a verification of a diploma for someone
24   whose name is different than the applicant Igberase
25   Oluwafemi Charles?
```

1          MS. MCENROE:  Objection to form.

2      A.   What I can say is I, at this time in 1994,

3  I do not believe ECFMG considered them, the name not

4  to do -- to belong to this applicant.  It was not

5  uncommon for people from different cultures and

6  certain countries to have their name, you know, in

7  different sequences.

8  BY MR. VETTORI:

9      Q.   Then why did you apply -- I'm sorry.  Why

10 did you assign different identification numbers to

11 these two people?

12         MS. MCENROE:  Objection to form.

13     A.   Yeah, you have me a little confused.

14 My -- I don't know.  I don't have the two records in

15 front of me so I would have to see.

16     Q.   I understand, but let me tell you what the

17 record that we developed here today shows.  A

18 gentleman by the name of Charles Oluwafemi Igberase,

19 a name on a diploma, filed an application with ECFMG

20 in 1992 and you assigned -- ECFMG assigned to him

21 the O482700-2 number.  That's established in the

22 record.

23     A.   Yes.

24     Q.   A gentleman by the name of Igberase

25 Oluwafemi Charles applied to ECFMG in 1994 and ECFMG

JA4638

```
 1        A.    Yes.

 2        Q.    But again, do you remember any notices

 3   other than the one I just referenced in your

 4   review?

 5              MS. MCENROE:  Objection to form.

 6        A.    No, I don't recall.

 7   BY MR. VETTORI:

 8        Q.    So let me ask it a little different way.

 9   Did you review this December 19, 2016 letter that

10   Karen Corrada wrote?

11        A.    No.

12              MS. MCENROE:  Can you mark that or do

13   you want --

14              MR. VETTORI:  I can, if you want me

15   to.

16              MS. MCENROE:  Just for purpose of the

17   record of what it was he did not review.

18              (Exhibit No. 21 marked for

19   identification.)

20              (Exhibit No. 22 marked for

21   identification.)

22   BY MR. VETTORI:

23        Q.    So Mr. Kelly, before you look at it I'm

24   telling you this is an incomplete document.  This is

25   just page 1 of a multiple page document.  Take a
```

Transcript of William C. Kelly
Conducted on August 20, 2019                87

1   look at it for a moment and then I'm going to ask

2   you a question about it.

3       A.   (Complies.)  Okay.

4       Q.   So this is dated March 1, 2017, and I

5   think we've already agreed that you weren't with

6   ECFMG at the time?

7       A.   That's correct.

8       Q.   So you don't know what information is

9   contained on the other pages of this document,

10  obviously?

11      A.   That is correct.

12      Q.   Have you even seen this document before?

13      A.   No.

14              MR. VETTORI:  Let's mark it as 23

15  anyway.

16              (Exhibit No. 23 marked for

17  identification.)

18  BY MR. VETTORI:

19      Q.   So tell us what Exhibit 23 is.

20      A.   It is a photocopy of an application for a

21  USMLE examination.

22      Q.   By whom?

23      A.   The name on the application is John Nosa

24  Akoda.

25      Q.   A-K-O-D-A.  It appears to me that it's

Transcript of William C. Kelly
Conducted on August 20, 2019                88

1  dated January 3, 1996.  Can you confirm that?

2       A.   That appears to be the receipt date,

3  yes.

4       Q.   Right.  Does it list a Social Security

5  number?

6       A.   There is none listed on there.

7       Q.   What is the date of birth?  Second page.

8       A.   January 1, 1959.

9       Q.   And does this applicant, John Nosa Akoda,

10 indicate what medical school he attended?

11      A.   Yes.

12      Q.   Which one?

13      A.   University of Benin, Nigeria.

14      Q.   Does he indicate when he graduated?

15      A.   He does not list the degree date.  He

16 lists his attendance dates.

17      Q.   What are the attendance dates?

18      A.   October '81 to October '87.

19      Q.   If you look at Bates page 40705, which I

20 think is the third page the application, part C.

21      A.   Yes.

22      Q.   There is a photograph attached or there is

23 a photograph on that page; is there not?

24      A.   It appears to be a photograph.

25      Q.   Isn't that a requirement of all

```
1    applications, that they attach a photograph?
2                    MS. MCENROE:  Objection to form.
3         A.   That is, yes.
4    BY MR. VETTORI:
5         Q.   And doesn't that photograph have to be
6    verified by the dean of the medical school?
7                    MS. MCENROE:  Objection to form.
8         A.   It does not have to be.
9    BY MR. VETTORI:
10        Q.   What was the procedure in 1996 at ECFMG
11   with respect to the verification of a photograph on
12   an application?
13        A.   I don't recall.
14        Q.   So in section B1, down towards the bottom,
15   the form says, "Explain in the space below why the
16   application could not be signed in the presence of
17   your medical school dean, vice dean, or register --
18   any registrar.  Any explanation must be acceptable
19   to ECFMG and must be provided each time you submit
20   an application to ECFMG."
21             Do you see that?
22        A.   Yes.
23        Q.   And the handwritten answer was "because
24   the postal system to Nigeria could not be guaranteed
25   within the available time."  Did I read that
```

JA4642

```
 1   memorandum was being written separately since I did
 2   not think it should be made part of the official
 3   file."
 4                    If not in the official file, where
 5   was this document located?
 6        A.   I don't know.
 7        Q.   Okay.  What was your thinking or purpose
 8   in not including this within an official file on
 9   behalf of Akoda?
10                    MS. MCENROE:  Objection to form.
11   Covered extensively by co-counsel.
12        A.   Yeah, I don't know.
13        Q.   What is the significance of a document
14   being inside the file versus outside the file?
15                    MS. MCENROE:  Objection to form.
16        Q.   What are the criteria that would dictate
17   whether a document goes in an applicant file versus
18   outside a file?
19                    MS. MCENROE:  Objection to form.
20        A.   I don't know.
21        Q.   Presumably on December 22, 2000 there was
22   some purpose in not including this document within
23   Akoda's file, correct?
24                    MS. MCENROE:  Objection to form.
25        A.   Or an intention not to include it.  It
```

1    obviously was included.

2         Q.   Do you know if this was in fact within a

3    file on behalf of an official file for Akoda versus

4    kept somewhere else with ECFMG's records?

5              MS. MCENROE:  Objection to form.

6         A.   I don't know.

7         Q.   Is there any justification that you can

8    think of as we sit here today as to why a document

9    concerning a physician's credibility and honesty

10   would not be included within their official file?

11             MS. MCENROE:  Objection to form.

12        A.   I don't know.

13        Q.   You conclude that in the conclusion of

14   Paragraph No. 4 that you don't think this is enough

15   for the committee.

16             Help me understand in view of the

17   various documents previously discussed why you did

18   not believe that this was sufficient evidence to

19   even raise before a credentialing committee.

20             MS. MCENROE:  Objection to form.

21        A.   Based on experience and working with the

22   documents and presumably maybe talking with other

23   people that, you know, there was a staff had to

24   review all the materials that were part of the --

25   that were the result of the investigation, and part

JA4644

1    of it was a determination whether there was

2    enough -- we thought there was enough information

3    for the committee in its review to make an informed

4    decision.

5         Q.    Were you ever part of any presentation to

6    the credentials committee regarding a Doctor John

7    Akoda?

8         A.    I don't believe so.

9         Q.    Mr. Kelly, after -- well, do you know

10   how -- we discussed previously the letters of

11   recommendation that were sent out or sent to you in

12   2006 or to ECFMG.

13              Do you have any understanding as to

14   how that concern that you articulated previously was

15   ultimately addressed?  Was there any formal decision

16   that we should proceed with sending out these

17   materials on behalf of a Doctor Akoda?

18              MS. MCENROE:  Objection to form.

19        A.    Can you restate that?

20        Q.    Sure.  At what point was it determined

21   that despite some concerns regarding Akoda's

22   credentiality that ECFMG through the ERAS service

23   should proceed with sending out this material on

24   behalf of Akoda the individual to various residency

25   programs or a program?

JA4645

Transcript of William C. Kelly
Conducted on August 20, 2019                                    213

1            MS. MCENROE:  Objection to form.

2       A.   I don't know.

3       Q.   You've not seen any documentation in the

4  file reflecting a decision one way or the other in

5  that regard?

6       A.   I have not.

7       Q.   You've not seen any correspondence to any

8  particular residency program regarding Akoda --

9  well, strike that -- with the exception of the ERAS

10 form that you previously alluded to?

11      A.   That is correct.

12      Q.   With respect to the levels of flags that

13 we discussed that concept generally, I understand

14 you might not have a recollection specifically of

15 what the different levels mean.  This is Exhibit 52.

16      A.   I have it.

17      Q.   What is the general concern that is being

18 addressed through the use of flags on internal ECFMG

19 servicers with regard to who can see what?

20            MS. MCENROE:  Objection to form.

21      A.   Well, it's not just who can see what.

22 It's what you can do with the record, and that would

23 vary based upon the reason behind it.

24      Q.   Certainly one of the purposes of the flags

25 in situations like in 2006 when someone went to

JA4646

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS
     Worcester, ss.
3
              I, Jennifer A. Doherty, Certified
4    Shorthand Reporter and Notary Public duly
     commissioned and qualified in and for the
5    Commonwealth of Massachusetts, do hereby certify
     that there came before me on the 20th day of August,
6    2019, the person hereinbefore named, who was by me
     duly sworn to testify to the truth and nothing but
7    the truth of their knowledge touching and concerning
     the matters in controversy in this cause; that they
8    were thereupon examined upon their oath, and their
     examination reduced to typewriting under my
9    direction and that the deposition is a true record
     of the testimony given by the deponent.
10             I further certify that I am neither
     attorney nor counsel for, nor related to or employed
11   by, any of the parties to the action in which this
     deposition is taken, and further that I am not a
12   relative or employee or financially interested in
     this action.
13
              IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY
14   HAND AND SEAL THIS 1ST DAY OF SEPTEMBER, 2019.

15

16

17                    _____
                      Notary Public
18                    My Commission Expires:
                      October 19, 2023
19                    CSR No. 1398F95

20

21

22

23

24

25

# EXHIBIT 2

JA4648



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

## Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

JA4649

Case 2:18-cv-05629-JW Document 122-5 Filed 09/08/2022 Page 3276 of 3041
Case 2:18-cv-05629-JW Document 122-5 Filed 09/08/2022 Page 2760 of 3041
Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4   MONIQUE RUSSELL, JASMINE :  Case No.
     RIGGINS, ELSA M. POWELL   :
 5   AND DESIRE EVANS,         :  2:18-cv-05629-JW
                               :
 6             Plaintiffs,     :
                               :
 7        vs.                  :  Hon. Joshua D. Wolson
                               :
 8   EDUCATIONAL COMMISSION    :
     FOR FOREIGN MEDICAL       :
 9   GRADUATES,                :
                               :
10             Defendant.      :
11                      - - -
12              September 10, 2019
13                      - - -
14          Oral deposition of KARA CORRADO, taken
15     at the offices of MORGAN LEWIS BOCKUS, LLP,
16   1701 Market Street, Philadelphia, Pennsylvania
17        beginning at 10:48 a.m., before
18    Jennifer L. McDonald, a Professional Reporter
19   and a Notary Public in and for the Commonwealth
20                of Pennsylvania.
21                      - - -
22     VERITEXT NATIONAL COURT REPORTING COMPANY
                  MID-ATLANTIC REGION
23        1801 Market Street - Suite 1800
          Philadelphia, Pennsylvania 19103
24
```

```
 1              special investigations and the addition

 2              of case managers, it fell under the

 3              purview of the associate vice president,

 4              who was Bill Kelly, and I, at the time, a

 5              manager of operations program

 6              development.

 7                      So Bill, myself, and Virginia

 8              Kesting, who reported to me, we were the

 9              folks working on the irregular behavior.

10              So in that respect when I was working for

11              Bill, I was staff.

12      BY MR. THRONSON:

13              Q.      When did you get involved in

14      work on irregular behavior matters?

15              A.      That was around 2008 when I

16      moved -- changed position.

17              Q.      So the staff for the irregular

18      behavior is part of the special investigations

19      team?

20              A.      That is the special

21      investigations team now, yes.

22              Q.      Okay.  Got it.  How does ECFMG

23      serve the public?

24                      MS. McENROE:  Objection to form.
```

KARA CORRADO

Page 40

```
 1              THE WITNESS:  ECFMG serves the
 2        public in a number of ways.  Our original
 3        program which was the certification
 4        program severs the public in ensuring
 5        that those physicians that are educated
 6        outside of the U.S. and Canada meet
 7        certain minimum requirements in order to
 8        enter an accredited residency program in
 9        the United States.
10              We also serve the public in
11        facilitating an appropriate review of
12        them, at the same time making sure that
13        we are efficient about doing it, because
14        IMGs -- or International Medical
15        Graduates represent about 25 percent of
16        the physicians that are working in the
17        United States.
18              So it's important from a
19        physician-workforce point of view to make
20        sure we have qualified physicians.  So in
21        those two broad ways I would say that we
22        serve the public.
23  BY MR. THRONSON:
24        Q.      How does ECFMG serve medical
```

KARA CORRADO

Page 41

```
 1   residency programs?
 2              MS. McENROE:  Objection to form.
 3              THE WITNESS:  So ECFMG has a
 4        certification program that is required
 5        for entrance into ACGME accredited
 6        residency programs.
 7   BY MR. THRONSON:
 8        Q.      Any other ways in which ECFMG
 9   severs medical residency programs?
10              MS. McENROE:  Objection to form.
11              THE WITNESS:  So we also have an
12        exchange visitor sponsorship program.  We
13        are responsible for physicians who are
14        seeking residency and training in the
15        United States on a J-1 nonimmigrancy
16        step.
17   BY MR. THRONSON:
18        Q.      Beyond the ways in which you
19   serve medical residency programs that you
20   described, how else does ECFMG serve hospitals?
21              MS. McENROE:  Objection to form.
22              THE WITNESS:  I don't know that
23        I would say that we serve hospitals,
24        however, we do provide a service for
```

KARA CORRADO

Page 81

1      Q.      So you believe that was also the
2  process in the late 90s, early 2000s?
3      A.      Yes.
4      Q.      Okay.  Do you know of any --
5  strike that.  Do you know of any circumstances
6  where you would -- where ECFMG would vary from
7  that process?
8              MS. McENORE:  Objection to form.
9  BY MR. THRONSON:
10     Q.      That is, would vary from the
11  process of once a charge letter is sent to an
12  applicant to refer the matter to the
13  credentials committee for investigation?
14     A.      Prior to -- like I said, I think
15  it was around '99, 2000 that the matter would
16  be referred.
17              Let me just clarify.  Unless
18  there was some exculpatory evidence that we
19  discovered after we sent the charge letter,
20  then we would withdraw the charge letter and it
21  wouldn't be referred to the credentials
22  committee; but prior to that there are cases
23  where we contacted the applicant to ask them to
24  provide information about an allegation or an

KARA CORRADO

Page 82

```
 1   anomaly.  In some of those cases they were not
 2   referred to the committee, if that applicant
 3   did not respond.
 4        Q.        If the applicant did not respond
 5   they were not referred to the committee?
 6        A.        In some cases.  Right, you asked
 7   me if we always referred them.
 8        Q.        Sure.
 9        A.        And the answer is no, because
10   there are some cases that are old, prior to my
11   time, that we contacted the individual about
12   the allegation but they are not necessarily
13   referred to the credentials committee.
14        Q.        Do you know why they were not
15   referred to the credentials committee in those
16   cases?
17        A.        I don't.
18        Q.        But as a general rule after a
19   charge letter was sent, the matter was referred
20   to the credentials committee as a matter of
21   course?
22             MS. McENROE:  Objection to form.
23             THE WITNESS:  Yes.
24   BY MR. THRONSON:
```

1      Q.      Obviously this case has a long

2  history and we covered a lot of this in the

3  deposition of William Kelly.  Did you happen to

4  read that deposition?

5      A.      I did not.

6      Q.      Was it made available to you for

7  review?

8      A.      No.

9      Q.      Do you know that it had taken

10  place?

11      A.      No.

12      Q.      Did ask you for a transcript?

13      A.      No, I did not.

14      Q.      Why not?

15          MS. McENROE:  Objection to form.

16          THE WITNESS:  I don't know.  I

17      didn't ask for one.

18  BY MR. THRONSON:

19      Q.      You didn't feel it was important

20  for your testimony today?

21          MS. McENROE:  Objection to form.

22          THE WITNESS:  I don't think I

23      thought about it to be perfectly honest.

24  BY MR. THRONSON:

KARA CORRADO

Page 259

```
1                C E R T I F I C A T E
2

    COMMONWEALTH OF PENNSYLVANIA:
3

    COUNTY OF PHILADELPHIA:
4
5        I, Jennifer L. McDonald, a Notary
    Public within and for the County and State
6   aforesaid, do hereby certify that the foregoing
    deposition of KARA CORRADO was taken before me,
7   pursuant to notice, at the time and place
    indicated; that said deponent was by me duly
8   sworn to tell the truth, the whole truth, and
    nothing but the truth; that the testimony of
9   said deponent was correctly recorded in machine
    shorthand by me and thereafter transcribed
10  under my supervision with computer-aided
    transcription; that the deposition is a true
11  record of the testimony given by the witness;
    and that I am neither of counsel nor kin to any
12  party in said action, nor interested in the
    outcome thereof.
13
         WITNESS my hand and official seal this
14  16th day of Sept
15
16
17       _____
         Jennifer L. McDonald,
18                Notary Public
19
20
21
22
23
24
```

# EXHIBIT 3



# Transcript of Stephen S. Seeling

**Date:** September 16, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

JA4659

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3    _____

 4    MONIQUE RUSSELL, JASMINE    :   CASE NO.

 5    RIGGINS, ELSA M. POWELL     :   2:18-cv-05629-JW

 6    and DESIRE EVANS,           :

 7                                :

 8            Plaintiffs          :

 9                                :

10        vs.                     :

11                                :

12    EDUCATIONAL COMMISSION      :

13    FOR FOREIGN MEDICAL         :

14    GRADUATES,                  :

15                                :

16            Defendants          :

17    _____

18                    -  -  -

19            Monday, September 16, 2019

20                    -  -  -

21            Deposition of STEPHEN S. SEELING was taken

22    pursuant to notice at 1701 Market Street, Philadelphia,

23    Pennsylvania, before Nancy Carides, RPR, CRR and Notary

24    Public, on the above date, and commencing at 12:00 p.m.

25
```

```
1   court reporter can take down my questions and your
2   answers.  Please, first of all, wait for me to finish
3   my question before you answer, and I will wait for you
4   to finish your answer before I ask another question.
5   Okay?
6           A.     Yes.
7           Q.     If at any point in time I ask you a
8   question that you don't understand, please let me know
9   and I'll make an effort to rephrase the question.
10  Okay?
11          A.     Yes.
12          Q.     If you answer a question that I've
13  asked, I'm going to assume that you've understood the
14  question.  Is that fair?
15          A.     Yes.
16          Q.     And if you need to take a break at any
17  point in time, please let me know and we'll take a
18  break.  Okay?
19          A.     Um-hum.  Yes.
20                 MR. CERYES:  Patrick, are you hearing
21      us okay?
22                 MR. THRONSON:  I am.  Thanks.
23  BY MR. CERYES:
24          Q.     All right.  Mr. Seeling, are you
25  currently employed?
```

1          A.      I am not.

2          Q.      Where were you last employed?

3          A.      I was a consultant with St. George's

4     School of Medicine.

5          Q.      When were you last employed with ECFMG?

6          A.      2013.

7          Q.      And when did you begin with ECFMG?

8          A.      1998.

9          Q.      Mr. Seeling, can you describe for me

10     your educational background?

11          A.      Sure.  College and beyond?

12          Q.      Let's start with college.

13          A.      Graduated from Tufts University in

14     Medford, Massachusetts in 1971.  Graduated from Temple

15     University School of Law in 1976.

16          Q.      And can you provide for me a brief

17     narrative of your professional career since the

18     completion of your law degree?

19          A.      Sure.  My first job was in the

20     Philadelphia District Attorney's Office beginning in

21     1976.  We relocated to South Carolina.  I was an

22     Assistant Attorney General in South Carolina.

23     Subsequent to that, I became the Executive Director of

24     the South Carolina State Board of Medical Examiners.

25     I then had a position as Vice President and General

JA4662

1    Counsel with UCI Medical Affiliates and with a

2    practice management firm in South Carolina.  Then in

3    1998 I was recruited by ECFMG, and I returned to the

4    Philadelphia area.

5            Q.     When you started at ECFMG, what role

6    did you come into?

7            A.     Vice President of Operations.

8            Q.     Is that a role that you maintained

9    until you left in 2013?

10           A.     Yes, sir.

11           Q.     So, where did you go after you left

12   ECFMG?

13           A.     I worked with St. George's University

14   School of Medicine, which the campus is in Grenada.

15           Q.     What caused you to leave ECFMG in 2013?

16           A.     I had had a really good run of almost

17   fifteen years.  I was a bit bored, and I had a very

18   good opportunity with St. George's.

19           Q.     And when did you leave St. George's?

20           A.     I worked with St. George's for two

21   years.

22           Q.     Would that be approximately 2015 when

23   you left?

24           A.     Yes.

25           Q.     What caused you to leave St. George's?

JA4663

Transcript of Stephen S. Seeling
Conducted on September 16, 2019                    8

```
1           A.      My wife was retiring, we were
2    relocating outside the Philadelphia area, and I
3    thought that it was time to relax a bit.
4           Q.      Have you left each of your professional
5    roles, positions, on a volunteer basis through the
6    course of your career?
7           A.      Yes.
8           Q.      Have you ever been a defendant in any
9    criminal matter since turning the age of eighteen?
10          A.      No.
11          Q.      Now, while you were with ECFMG, did you
12   participate in any criminal investigation of an
13   individual who was variously known as Akoda or
14   Igberase?
15          A.      Let me make sure I understand.  You're
16   asking about a criminal investigation?
17          Q.      Correct.
18          A.      No.
19          Q.      Okay.  Did you participate in any
20   internal investigation by ECFMG regarding the person,
21   again, variously known as Akoda or Igberase after
22   approximately the year 2006?
23               MS. McENROE:  Objection to form.
24               THE WITNESS:  I just don't remember
25        after 2006.
```

```
 1          that question, because it seems that it

 2          involves both hindsight, foresight, and

 3          speculation.  So, again, this letter speaks

 4          for itself.  In typical fashion, I would have

 5          approved a letter like this.  Again, I have no

 6          specific recollection of this letter.  But I

 7          can't answer your question further.

 8  BY MR. CERYES:

 9          Q.    How often did the committee meet?

10          A.    Generally speaking, it met in

11  conjunction with board meetings, like, three times a

12  year.

13          Q.    So, I would assume, based upon what we

14  discussed earlier, in most cases, there will be some

15  matters for the committee to consider and to schedule

16  a meeting; fair?

17          A.    They generally had a fairly full

18  agenda.

19          Q.    Can you recall any other instance in

20  which an applicant received a letter setting forth

21  charges of irregular behavior but that matter did not

22  get brought to the attention of the medical education

23  credentials committee?

24          A.    You know, I don't have a recollection

25  yay or nay.  I would say just generally that this is a
```

Transcript of Stephen S. Seeling
Conducted on September 16, 2019                    79

1    snapshot, things can change subsequent to, but I just
2    don't have a recollection whether or not there were
3    other cases where a charge letter was issued and then
4    subsequently a re-evaluation took place.  I know that
5    was always built into the process.  I just don't
6    remember whether or not that, in fact, happened.
7            Q.    And you refer to the process.  This is
8    not a written process, correct?
9            A.    Well, I mean, there were procedures set
10   forth in the documents relating to the credentials
11   committee in terms of the process of the hearing and
12   that kind of thing.  Again, at some point, I can't
13   recall, but sometime after I came onboard, those
14   procedures were substantially revised.  So, there were
15   documents that pertained, generally, to the scope and
16   purview and authority of the credentials committee.
17           Q.    If, in fact, you believed that Akoda
18   and Igberase were, in fact, one and the same person,
19   you would agree that in that circumstance that would
20   warrant referral to the Committee on Medical Education
21   Credentials?
22               MS. McENROE:  Objection to form.
23               THE WITNESS:  Probably, yes.
24   BY MR. CERYES:
25           Q.    And why is that?

Transcript of Stephen S. Seeling
Conducted on September 16, 2019                    80

```
1          A.     Because there was precedent.
2          Q.     And what's the precedent that you're
3    referring to?  Is that Igberase's history?
4          A.     No, I'm talking about other cases.
5          Q.     So, describe what you mean by
6    precedent.  What are the other instances?
7          A.     I think you know what a precedent
8    means.  It means that there may have been other cases
9    in the past where the question number 1, have you
10   ever, was answered incorrectly.
11         Q.     Did you ever meet with Akoda,
12   personally?
13         A.     No.
14         Q.     Did you instruct Bill Kelly to meet
15   with Akoda, personally?
16         A.     I don't have any recollection of that.
17         Q.     I'd like to direct your attention to
18   Exhibit Number 37 from Mr. Kelly's deposition.  This
19   is a memo to the file from William Kelly.  My first
20   question is when a memorandum was written to a
21   particular file, such as this, was there a physical
22   file that it would get slipped into for a particular
23   applicant?
24         A.     In 2000?
25         Q.     Yes.
```

1          A.      Probably.

2          Q.      So, was there, and I'm just kind of

3    trying to wrap my ahead around it, was there a

4    particular manila folder, or something to that effect,

5    in a file room where if everything was going to plan

6    you could go down to the file, pick out the Akoda

7    file, and there would be a memo such as this from

8    William Kelly in that file?

9          A.      Well, there were cases that were under

10   review by the credentials committee, and those files

11   were maintained.

12         Q.      Was Akoda's file under review by the

13   credentials committee?

14         A.      I may have misspoke or I may have

15   misled.  When there was an allegation that was being

16   looked at, generally, a file would be generated.

17         Q.      I assume that every applicant at ECFMG

18   has some kind of file, a physical file, or did have in

19   2000?

20         A.      Back in those days, yes.

21         Q.      So, when there was an allegation of

22   irregular conduct, a secondary file would be created

23   relating to that allegation?

24              MS. McENROE:  Objection to form.

25              THE WITNESS:  You know, I, A, can't

JA4668

1                  C E R T I F I C A T I O N

2

3       I hereby certify that the proceedings and

4   evidence noted are contained fully and accurately in

5   the stenographic notes taken by me in the foregoing

6   matter, and that this is a correct transcript of the

7   same.

8

9

10

11

12   _____

13       NANCY CARIDES, RPR, CRR

14       Notary Public

15

16

17

18       (The foregoing certification of this transcript

19   does not apply to any reproduction of the same by any

20   means unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

25

# EXHIBIT 4

Received 10/7/14
OVP

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

14-1 / 14GJ3409 / 14 - 3664

for the

Eastern District of Virginia

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:

Custodian of Records
Educational Commission for Foreign Medical Graduates
3634 Market Street
Philadelphia, PA 19104-2685

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: U.S. District Court 401 Courthouse Square Alexandria, VA 22314 | Date and Time: October 23, 2014   9:30 a.m. |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*: **See attached.**

Date: October 01, 2014

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are Rebeca H. Bellows, AUSA
Office of the United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314   (703) 299-3700

ECFMG-Akoda-000001
JA4671

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* _____
was received by me on *(date)* _____.

    ❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

    ❑  I returned the subpoena unexecuted because: _____

_____

I declare under penalty of perjury that this information is true.

Date: _____

                                                  _____
                                                      *Server's signature*

                                                  _____
                                                      *Printed name and title*

                                                  _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

ECFMG-Akoda-000002
JA4672



U.S. Department of Justice

*United States Attorney*
*Eastern District of Virginia*

*Justin W. Williams United States Attorney's Building*
*2100 Jamieson Avenue*          *703-299-3700*
*Alexandria, Virginia 22314*     *FAX 703-299-3981*

Custodian of Records                                          October 01, 2014
Educational Commission for Foreign Medical Graduates
3634 Market Street
Philadelphia, PA 19104-2685

    Re: 14-1 / 14GJ3409 / 14-3664

Dear Sir or Madam:

    You have been served with a subpoena issued in connection with a criminal investigation being conducted in this District. That subpoena directs you to produce certain records on 10/23/2014, before the grand jury in Alexandria, Virginia.

    **Because premature disclosure of this request might impede the investigation in this case, you are requested not to disclose the existence of this subpoena.**

    As a convenience, you may, if you wish, deliver the requested documents in lieu of appearing personally before the grand jury to: Rebeca H. Bellows, United States Attorney's Office, 2100 Jamieson Avenue, Alexandria, VA 22314. Any questions pertaining to the records under subpoena should be directed to Rebeca H. Bellows at (703) 299-3700.

    I appreciate your cooperation in this matter. If you have any questions, please feel free to contact this office at 703-299-3700.

        Sincerely,

        Dana J. Boente
        United States Attorney

        By: Rebeca H. Bellows
        Rebeca H. Bellows
        Assistant United States Attorney

Enclosure

Custodian of Records
Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104-2685

Attachment

Any and all records relating to the following individuals:

Oluwafemi Charles Igberase
a/k/a Oluwafemi C. Igberase
a/k/a Igberase Oluwafemi Charles
a/k/a Igberase Charles
DOB: 4-17-1962
SSN: 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

Charles John Nosa Akoda
a/k/a Charles N. Akoda
a/k/a John C. Akoda
a/k/a John Charles Akoda,
a/k/a John-Charles Akoda,
a/k/a John-Charles Nosa Akoda,
a/k/a Charles John Akoda
DOB: 1-1-1959

An individual who has identified himself as Oluwafemi Charles Igberase has
represented to a federal agency or department that the Educational Commission for
Foreign Medical Graduates issued a certificate to him on December 14, 1994,
certifying that he successfully passed its examinations. The certificate provided by
Igberase identifies him as "Igberase Oluwafemi Charles."

An individual who has identified himself as Charles John Nosa Akoda has
represented to a state agency that the Educational Commission for Foreign Medical
Graduates issued a certificate to him on August 18, 1997, certifying that he
successfully passed its examinations. The certificate provided by Akoda identifies
him as "John Nosa Akoda." Oluwafemi Igberase has used the alias Charles John
Nosa Akoda and variations of that name.

ECFMG-Akoda-000004
JA4674

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS**
**PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____ (name), attest under penalties of perjury (or criminal punishment for false statement or false attestation) that I am employed by _____ (business), and that my official title is _____ (title). I am a custodian of records for such business entity. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of _____ (business), and that I am the custodian of the attached records consisting of _____ pages. I have provided the following records to the United States:

_____

_____

_____

_____

_____

_____

I further state that:

A.  all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by, or from information transmitted by, a person with knowledge of those matters;

B.  such records were kept in the course of a regularly conducted business activity of _____ (business); and

C.  such records were made by _____ (business) as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____
(Signature)

_____
(Date)

_____
(Address)

14-1 / 14GJ3409 / 14-3664

_____
(Phone)

ECFMG-Akoda-000005
JA4675

# EXHIBIT 5

# 8005 Navajo Street, Philadelphia, PA 19118

September 23, 2019

Brian Shaffer, Esq.
Elisa McEnroe, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**Re:  Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" / ECFMG**

Dear Counsel,

I have completed my initial review of the above case, including the following records:

- Records produced by Howard University Hospital
- Guilty Plea
- Records produced by the American Board of Obstetricians and Gynecologists ("ABOG")
- Records of Desire Evans
  - Plaintiffs0000000001 – Plaintiffs0000000571
  - Plaintiffs0000005735 – Plaintiffs0000006016
  - Complaint and Notice of Removal to EDPA
  - Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - Desire Evans's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - Deposition of Desire Evans
  - Documents Related to Maryland Litigation
  - Class Action Complaint in CAL 17-34091
  - Desire Evans's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Elsa Powell
  - Plaintiffs0000000572 – Plaintiffs0000000929
  - Plaintiffs0000006174 – Plaintiffs0000006363
  - Plaintiffs0000118377 – Plaintiffs0000118653
  - Complaint and Notice of Removal to EDPA
  - Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents

JA4677

- o Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
- o Deposition of Elsa Powell
- o Documents Related to Maryland Litigation
- o Class Action Complaint in CAL 17-37091
- o Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Jasmine Riggins
  - o Plaintiffs0000001134 – Plaintiffs0000001242
  - o Plaintiffs0000001995 – Plaintiffs0000002026
  - o Plaintiffs0000006394 – Plaintiffs0000006512
  - o Plaintiffs0000007418 – Plaintiffs0000007425
  - o Plaintiffs0000007426 – Plaintiffs0000007652
  - o Complaint and Notice of Removal to EDPA
  - o Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Jasmine Riggins
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863
  - o Jasmine Riggins's Responses to Requests for Admission in CAL 18-07863
  - o Jasmine Riggins's Answers to Interrogatories in CAL 18-07863
  - o Deposition of Jasmine Riggins in CAL 17-22761, CAL 17-37091, and CAL 18-07863
- Records of Monique Russell
  - o Plaintiffs0000000932 – Plaintiffs0000001133
  - o Plaintiffs0000001243 – Plaintiffs0000001685
  - o Plaintiffs0000001686 – Plaintiffs0000001839
  - o Plaintiffs0000001840 – Plaintiffs0000001845
  - o Plaintiffs0000001846 – Plaintiffs0000001994
  - o Plaintiffs0000005338 – Plaintiffs0000005429
  - o Plaintiffs0000067757 – Plaintiffs0000067847
  - o Plaintiffs0000118654 – Plaintiffs0000118679
  - o Complaint and Notice of Removal to EDPA
  - o Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Monique Russell
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863

JA4678

      o   Monique Russell's Responses to Defendants' Requests for
             Admissions in CAL 18-07863

      I have been requested to review materials provided by counsel for the Educational Commission for Foreign Medical Graduates ("ECFMG") regarding four patients who were treated by Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" ("Dr. Akoda").

      For time spent on this matter, I will be compensated $400 per hour for reviewing materials and writing a report; $2,000 for deposition testimony; and $4,000 for trial testimony.

      I have attached a copy of my CV. I have also attached a list of trial and deposition testimony within the past four years.

---

JA4679

## Desire Evans

### Summary

At the time of her 3/17/16 delivery, Ms. Evans was a 36-year-old gravida 3 para 0-0-2-0 at 41 weeks. She had a past history of depression and anxiety, ████████████████, and used marijuana daily.

On 3/16/16, Dr. Akoda was the assigned OB/GYN when Ms. Evans's labor was induced at Prince George's Hospital. Dr. Akoda was the only OB/GYN who treated her during her labor and delivery. (Evans Dep. 83-86.) Her prenatal care was not provided by Dr. Akoda, but rather by Dr. Javaka Moore. (Evans Dep. 97.)

Ms. Evans's labor was induced / augmented with Cytotec and Pitocin.

She received an epidural.

She progressed to completely dilated. Extensive caput was noted.

Dr. Akoda recommended cesarean delivery due to a non-reassuring FHT and arrest of descent.

On 3/17/16, Dr. Akoda performed a cesarean section. Delivery resulted in a healthy 6 pound 14 ounce baby boy (Peyton) with Apgar scores of 8 and 9 at 1 and 5 minutes, respectively. EBL was 400 ml. There were no intra-operative complications.

Ms. Evans has no complaints about her incision. (Evans Dep. 95-96.)

Her post-operative course was uneventful.

On 3/20/16, POD#3, she was discharged.

She was later diagnosed with depression and anxiety. (Evans Dep. 102.)

On 1/17/18, she had an appointment with Shanda Smith, MD, at Kaiser Permanente Largo Medical Center for a psychiatric evaluation. "*I just told her that I felt uncomfortable and that I was touched in a way* (by Dr. Akoda) *that I felt was inappropriate and I didn't know how to deal with it.*" (Evans Dep. 128.) She stated, "*he was, like, fondling my clitoris, saying that he needed to do that in order to stimulate me to push the baby.*" She stated that Dr. Akoda did this several times. (Evans Dep. 132-34.) Her husband and mother were present.

At age three, Peyton was a healthy child. (Evans Dep. 26.)

JA4680

Ms. Evans did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a radio ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson.  A cesarean section with no complications resulted in delivery of a healthy baby. Ms. Evans had no post-operative complications.

---

JA4681

## Elsa Powell

**Summary**

In 2014, Ms. Powell was treated by Dr. Akoda during prenatal visits and her labor and delivery. She was a 30-year-old gravida 4 para 3-0-0-3.

When she arrived at a scheduled prenatal appointment with Dr. Abdul Chaudry, "*they said that Dr. Chaudry had to step out, but Dr. Akoda was there.*" She then saw Dr. Akoda every couple of weeks and then weekly for her remaining prenatal visits. (Powell Dep. 40.)

She stated that Dr. Akoda was flirtatious with her at her prenatal visits. He examined her breasts and made "*comments about I have nice breasts and stuff like that. So then I felt uncomfortable. … I was eight months pregnant at that time.*" She then asked for a nurse to be present for her next exam. She states that this occurred "*a few times.*" She did not request to be seen by a different doctor. (Powell Dep. 51-53.)

On 9/17/14, at 39+ weeks, Dr. Akoda induced Ms. Powell's labor at Prince George's Hospital. She had no support people with her.

She had a vaginal delivery of a healthy baby boy (Jaiden).

She reported having vaginal bleeding and passing blood clots several hours after her delivery. After she informed a nurse, Dr. Akoda came to evaluate her and diagnosed her with a postpartum hemorrhage.

On 9/18/14, Dr. Akoda performed a suction dilation and curettage ("D&C") under general anesthesia. EBL was 250 ml. Findings were "*Extensive amounts of cauliflower-like lesions in the vagina. … The lower uterine segments were not contracted. Bleeding from the upper part of the cervix and significant oozing from the cauliflower-like lesions from the vagina.*" The vagina was packed with gauze at the end of the surgery. (Powell Dep. 46).

Ms. Powell stated that she was anemic and uncertain if she received a blood transfusion. She stated that she asked but did not receive an answer from Dr. Akoda. (Powell Dep. 49.)

On 9/19/14, postpartum day #2, Ms. Powell was doing well. She had minimal bleeding. Her vital signs were stable. Her hemoglobin was 9.3. She was discharged. She was to follow up in six weeks.

JA4682

Ms. Powell stated that at her postpartum visit, Dr. Akoda treated an ovarian cyst in the office. She was then in pain for three or four days.

Jaiden is a healthy boy.

Ms. Powell did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a friend who saw a TV ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A vaginal delivery resulted in delivery of a healthy baby. Ms. Powell had a postpartum hemorrhage that was due to uterine atony and extensive genital vaginal warts. Dr. Akoda appropriately performed a D&C and packed the vagina with gauze. Vaginal warts result from a sexually transmitted infection with HPV. Such vaginal warts commonly bleed after delivery.

JA4683

**Jasmine Riggins**

**Summary**

Between August 2012 and March 2013, Ms. Riggins was a patient of Dr. Akoda at Dimensions Healthcare.

On 3/18/13, she presented for a scheduled repeat elective cesarean section to Dimensions Healthcare. She was a 20-year-old gravida 4 para 1-0-2-1 at 40+ weeks. Her pregnancy was complicated by gonorrhea x 2 and late presentation for prenatal care. She had one prior cesarean section and ███████████████████.

Dr. Akoda performed a repeat elective cesarean section. Delivery occurred of an 8+ pound male with Apgar scores of 9 and 9 at 1 and 5 minutes, respectively. Extensive adhesions were noted. EBL was 1,300 ml. No intra-operative complications were noted.

She had no post-operative complications.

On 3/21/13, POD #3, she was discharged.

Ms. Riggins did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a Facebook post by Monique Russell in 2017.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. An elective repeat cesarean section with no complications resulted in delivery of a healthy baby. She had no post-operative complications.

JA4684

## Monique Russell

**Summary**

At the time of her 5/25/16 delivery, she was a 38-year-old gravida 4 para 0-0-3-0 at 37+ weeks. ███████████████████████████████, depression, and stress-related back pain. (Russell Dep. 63-64, 79.)

At 37+ weeks, she presented to Prince George's Hospital with ruptured membranes.

Due to a non-reassuring FHT remote from delivery (2 cm), Dr. Akoda recommended a cesarean section. Ms. Russell's husband did not agree with the need for a cesarean section, but Ms. Russell listened to Dr. Akoda. (Russell Dep. 26, 37.)

On 5/25/16, Dr. Akoda performed a cesarean section at Prince George's Hospital. Delivery occurred of a 7+ pound male (Luka) with Apgar scores of 9 and 9 at 1 and 5 minutes, repectively. EBL was 400 ml. No intra-operative complications were noted.

Ms. Russell had no post-operative complications.

On 5/28/16, POD #3, she was discharged.

Luka is a healthy child.

Ms. Russell did not file a medical malpractice lawsuit against Dr. Akoda. Soon after the delivery she discovered an online press release from the Department of Justice about Dr. Akoda.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A cesarean section with no complications appropriately performed due to non-reassuring FHT remote from delivery resulted in a healthy baby. Ms. Russell had no post-operative complications.

JA4685

**Conclusions**

      The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. All four of the women's deliveries resulted in healthy babies and good outcomes. The only complication, a postpartum hemorrhage due primarily to bleeding from extensive vaginal warts, was not caused by Dr. Akoda and was appropriately treated by Dr. Akoda.

      Review of the records reveals that Dr. Akoda successfully completed an OB/GYN residency training program at Howard University Hospital. Dr. Akoda met requirements, including written and oral examinations, to become board certified by the American Board of Obstetrics and Gynecology ("ABOG"). He also successfully completed requirements for ABOG's board recertification via the Maintenance of Certification ("MOC") program through 2015.

      All opinions stated are with a reasonable degree of medical certainty.

Sincerely,

Jay Goldberg, MD, MSCP
Professor of OB/GYN

JA4686

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

---

### DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF PLAINTIFFS' EXPERTS DR. DAVID MARKENSON, DR. JOHN CHARLES HYDE, <u>AND DR. JERRY WILLIAMSON</u>

Dated: January 28, 2022

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
Telephone:   +1.713.890.5000
Facsimile:   +1.713.890.5001
william.peterson@morganlewis.com

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:   +1.215.963.5000
Facsimile:   +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for Educational Commission for Foreign Medical Graduates*

JA4687

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................... 1

I.      PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEIR EXPERTS ARE QUALIFIED TO OFFER OPINIONS ON ECFMG. ................................... 1

II.     DRS. MARKENSON, HYDE, AND WILLIAMSON OFFER OPINIONS ON DUTY THAT ARE CONCLUSORY, AND OFTENTIMES IMPERMISSIBLE LEGAL CONCLUSIONS. ..................................................... 3

III.    PLAINTIFFS' CONCLUSIONS REGARDING WHETHER ECFMG BREACHED A DUTY ARE NOT PERMISSIBLE OPINIONS ON THE STANDARD OF CARE. ..................................................................... 4

IV.    THESE EXPERTS' OPINIONS REGARDING CAUSATION STEM FROM UNRELIABLE METHODOLOGIES. ................................................... 6

V.     RULES 403 AND 703 ALSO SUPPORT EXCLUDING THE OPINIONS OF DRS. MARKENSON, HYDE, AND WILLIAMSON. ................................... 8

VI.    ECFMG'S MOTION TO EXCLUDE THE OPINIONS OF DRS. MARKENSON, HYDE, AND WILLIAMSON IS NOT PREMATURE. ............. 9

CONCLUSION ................................................................................................. 9

JA4688

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006) .................................................................4

*Calhoun v. Yamaha Motor Corp. U.S.A.*,
    350 F.3d 316 (3d Cir. 2003) ...............................................................2

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................1, 8, 9

*Dorshimer v. Zonar Sys.*,
    No. 3:13-0553, 2016 WL 4179480 (M.D. Pa. Aug. 8, 2016) ...................5

*First Nat. State Bank of New Jersey v. Reliance Elec. Co.*,
    668 F.2d 725 (3d Cir. 1981) .............................................................4, 6

*Flickinger v. Toys R Us-Delaware, Inc.*,
    492 F. App'x 217 (3d Cir. 2012) .........................................................5

*Goodman v. Burlington Coat Factory*,
    No. 11-4395 (JHR), 2019 WL 4567366 (D.N.J. Sept. 20, 2019) ...........7, 8

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .................................................................9

*Lux v. Gerald E. Ort Trucking, Inc.*,
    887 A.2d 1281 (Pa. Super. 2005) .........................................................6

*Mestre v. Garden Homes Mangmt. Corp.*,
    No. 1:16-cv-03231-JDW-AMD, 2020 WL 3962267 (D.N.J. July 13, 2020) ...........7

*Montgomery v. Aetna Cas. & Sur. Co.*,
    898 F.2d 1537 (11th Cir. 1990) .........................................................4

*QVC, Inc v. MJC America Ltd.*,
    No. 08-3830, 2012 WL 13565 (E.D. Pa. Jan. 4, 2012) .........................5

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ...............................................................3

*Wolfe v. McNeil-PPC, Inc.*,
    No. 07-348, 2011 WL 1673805 (E.D. Pa. May 4, 2011) ....................5, 6, 8

JA4689

# TABLE OF AUTHORITIES
(continued)

Page

**OTHER AUTHORITIES**

Fed. R. Evid. 403 .................................................................................................................1, 8, 9

Fed. R. Evid. 702 ...........................................................................................................................1

Fed. R. Evid. 703 ......................................................................................................................1, 8

Fed. R. Evid. 704 ......................................................................................................................3, 4

Restatement (Second) of Torts § 324A..........................................................................................4

JA4690

**INTRODUCTION**

The opinions and conclusions of Plaintiffs' proposed experts on medical credentialing (Drs. Markenson, Hyde, and Williamson) should be excluded pursuant to the Court's gatekeeping function under Federal Rules of Evidence 702 and 703 and the standard from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Nothing in Plaintiffs' opposition to ECFMG's motion to exclude these experts (ECF 94-1) changes that. Plaintiffs' arguments fail to meaningfully engage with the *Daubert* factors and rely on conclusory assertions that the experts "are sufficiently reliable;" that they considered "facts and evidence developed in this case;" and that such evidence is "good grounds" and not "rank speculation." ECF 94-1 at 17–18. This Court should reject Plaintiffs' hollow assurances, especially when: (i) the opinions on ECFMG's duty have no discernable methodology and are legal conclusions; (ii) the opinions on breach are conclusory, and not permissible standard-of-care opinions; and (iii) Plaintiffs have not addressed the significant methodological deficiencies in the experts' causation opinions. Not only are these experts unqualified to offer the opinions they do, but presentation of their unreliable and flawed opinions at trial would confuse and mislead the jury, making exclusion on the basis of Federal Rule 403 also appropriate.

**ARGUMENT**

## I. Plaintiffs Have Not Demonstrated That Their Experts Are Qualified to Offer Opinions on ECFMG.

Plaintiffs' recitation of their experts' resumes, and clinical and hospital administration experience (ECF 94-1 at 5–11) does not address or remedy these experts' lack of familiarity with ECFMG's circumscribed role in the credentialing of physicians. Drs. Markenson, Hyde, and Williamson may well be qualified to offer expert opinions on hospitals' and medical employers' hiring and privileging processes, but their backgrounds do not qualify them to opine on ECFMG's

interactions with IMGs and the allegedly deficient investigation at issue in this case. Allowing them to do so because their backgrounds and ECFMG both generally involve the medical field would conflict with Third Circuit authority: "While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003). Plaintiffs have still not provided sufficient evidence that their experts have the specific knowledge to support their specific opinions regarding ECFMG.

Plaintiffs respond instead to a strawman: suggesting that ECFMG asks the Court to only accept experts that had worked for or with ECFMG. *Id.* at 11. Not so. What matters is that they have never worked at an entity like ECFMG or otherwise acquired any expertise in verification or investigations. ECFMG has identified multiple instances where Drs. Markenson, Hyde, and Williamson conceded their limited knowledge of and interaction with ECFMG. *See* ECF 83-1 (8–11). Not only have the witnesses never worked for ECFMG, but they have never been involved with an investigation of "irregular behavior," ECFMG's disciplinary process. *Id.* at 8–9. Drs. Hyde's and Williamson's interactions with ECFMG were minimal, occurred over a decade ago, and they struggled to recall any meaningful specifics of those interactions. ECF 83-1 at 10. Dr. Markenson relied heavily on ECFMG's public website, which is not enough to give him specialized knowledge beyond what a lay person may acquire. ECF 83-1 at 10. All three experts, however, plan to offer opinions to a jury on what ECFMG should have referred to its Medical Education Credentials Committee, and to speculate about what that Committee would have found and done. ECF 94-1 at 14; ECF 83-6 at 6; ECF 83-9 at 7. This type of testimony does not require **medical** expertise—it requires **investigatory** expertise, which Plaintiffs' witnesses admittedly lack. *See, e.g.*, ECF 83-9 (Dr. Williamson offering opinions on ECFMG's alleged "failure to properly investigate" and condemning ECFMG for "not being more assertive in their

2

JA4692

investigation" without detailing relevant investigative experience or a description of what the applicable investigatory standard would be).

Plaintiffs' comparison of their experts to the expert in *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) does not help establish their experts' qualifications. There, a cardiologist was permitted to testify on a different cardiology subspecialty because he had routine contact with that subspecialty and regularly advised cardiologists in that subspecialty performing the at-issue procedure. *Id.* at 406. The combination of this routine and regular contact is what led the *Schneider* court to conclude the expert was qualified to give opinions on the cardiology subspecialty. *Id.* at 407. As described above, Plaintiffs cannot demonstrate that their experts have anywhere close to equivalent routine and regular contact with ECFMG to be able to opine on ECFMG, its investigatory procedures and processes, or its particular role in the medical field.

## II. Drs. Markenson, Hyde, and Williamson Offer Opinions On Duty That Are Conclusory, and Oftentimes Impermissible Legal Conclusions.

All three of Plaintiffs' experts opine (somewhat inconsistently) on what duties ECFMG allegedly owed Plaintiffs. For example, Dr. Hyde opines that ECFMG is required "to follow their mission and fulfill its duty to patients in that their actions will serve to assure all foreign educated are properly and thoroughly investigated and deemed eligible for ECFMG certification to pursue U.S. postgraduate medical education." ECF 83-7 at 6. Dr. Williamson proposes multiple duties, including: "to determine whether the documents provided by Igberase and his aliases strongly suggested that Igberase and Akoda was one in the same individual." ECF 83-9 at 5.

Not only do Plaintiffs identify no methodology (much less a reliable one) by which their experts reached these opinions, they are—on their face—impermissible legal conclusions. In responding to ECFMG's argument, Plaintiffs misread (at 20–22) Federal Rule of Evidence 704. Although an opinion may not be excluded merely because it concerns a so-called "ultimate issue,"

JA4693

Rule 704 makes clear that experts **may not** invade the province of the Court and speak to legal conclusions: "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Offering a legal opinion is **precisely** what Plaintiffs' experts purport to do.

Dr. Williamson's and Dr. Hyde's claims that ECFMG owes a duty to patients and the general public to investigate its applicants certainly fall into this province of the Court. Dr. Markenson's legal conclusions on duty are even more obvious, merely parroting the Restatement (Second) of Torts § 324A: "ECFMG has **undertaken to provide certification services which are necessary for the protection of the general public**. Its **failure to exercise reasonable care** in providing these services **increases the risk of harm to the general public**, including plaintiffs." ECF 83-6 at 3 (emphasis added to show Dr. Markenson's regurgitation of § 324A). Courts consistently exclude expert opinions on whether a party owes a duty in such situations. *See Berckeley Inv. Group, Ltd.*, 455 F.3d at 218 (referencing *First Nat. State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725 (3d Cir. 1981), where court found that expert was not permitted to give his opinion on legal duties arising from industry custom); *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (excluding expert opinion focused on whether defendant had a duty to hire tax counsel). The opinions on whether ECFMG owed a duty, and what such a duty supposedly was, are similarly impermissible here.

### III. Plaintiffs' Conclusions Regarding Whether ECFMG Breached a Duty Are Not Permissible Opinions on the Standard of Care.

Plaintiffs argue that their experts are doing nothing more than opining on the applicable standard of care to provide the jury with facts it can use to determine whether a duty was breached. ECF 94-1 at 20. This is wrong. All three experts give conclusory opinions that ECFMG breached

4

the standard of care.  ECF 83-6 at 4-5; ECF  83-7 at 6–8; ECF 83-9 at 5–6.  Some notable examples include: Dr. Markenson's claim that ECFMG breached the standard of care by "[f]ailing to investigate fully the relationship between Igberase and Akoda" (ECF 83-6 at 4); Dr. Hyde's characterization that "ECFMG negligently chose to bury this information in a memo that was not to be placed in the file" (ECF 83-7 at 7); Dr. Williamson opinion that ECFMG "breached the standard of care" when it "provided primary source to the Maryland Board of Physicians and Prince George's County Hospital without notifying them of their doubts surrounding Akoda's identity and credentials" (ECF 83-9 at 5).

These examples show that Plaintiffs' experts leave no room for a factfinder to assess whether ECFMG breached a duty based on the alleged facts; they simply provide the factfinder with the conclusion.  "Expert testimony that 'merely tells the [factfinder] what result to reach is improper.'"  *QVC, Inc v. MJC America Ltd.*, No. 08-3830, 2012 WL 13565, at *2 (E.D. Pa. Jan. 4, 2012) (quoting *Burger v. Mays*, 176 F.R.D. 153, 156 (E.D. Pa. 1997)).  "Experts 'may not ... apply the resulting law to the facts of [a] case to draw a legal conclusion.  In essence, the experts may testify as to their factual conclusions so long as they do not offer a legal opinion as to the legal implications of those conclusions.'"  *Id.* at *2 (internal citations omitted).

Courts routinely exclude such conclusions on breach and negligence.  *See Flickinger v. Toys R Us-Delaware, Inc.*, 492 F. App'x 217, 224 (3d Cir. 2012); *Dorshimer v. Zonar Sys.*, No. 3:13-0553, 2016 WL 4179480 (M.D. Pa. Aug. 8, 2016) ("Additionally, experts can provide an opinion about the ultimate issue in a case, but may not give an opinion tied to any legal conclusion, such as whether a defendant was negligent") (internal citations omitted); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *8 (E.D. Pa. May 4, 2011) ("[T]o the extent Dr. Goldberg plans to testify that [defendant] behaved negligently in the conduct of its business, such testimony constitutes an improper legal opinion.").

IV.     **These Experts' Opinions Regarding Causation Stem from Unreliable Methodologies.**

Drs. Markenson, Hyde, and Williamson all offer opinions on whether ECFMG caused harm to Plaintiffs and Dr. Akoda's patients.  ECF 83-1 at 3–5,16; ECF 83-6 at 3, 5; ECF 83-7 at 7; ECF 83-9 at 6.  For example, Dr. Markenson opines that that ECFMG was "the **direct cause** of the harms caused to the plaintiffs and the members of the class."  ECF 83-6 at 5 (emphasis added).  Similarly, Dr. Williamson states "ECFMG's failure to properly investigate the matter, **directly resulted in foreseeable injuries** to Igberase/Akoda's patients."  ECF 83-9 (emphasis added).  Plaintiffs assert that these opinions "are sufficiently reliable;" are based on "facts and evidence developed in this case;" and that such evidence is "good grounds" and not "rank speculation."  ECF 94-1 at 17–18.  Yet, Plaintiffs (i) admit that their experts did not evaluate and consider data necessary to these opinions; and (ii) fail to address instances where their experts made unfounded assumptions about the chain of causation, contradicted by the evidence of record.

*First,* Plaintiffs admit that their experts did not evaluate the records and conduct of other organizations and entities in the chain of causation, claiming that "conduct of other organizations is not determinative with respect to whether ECFMG breached the standard of care applicable to its own conduct."  ECF 94-1 at 14; *see also id.* at 16 (suggesting that failure to research other entities in the causal chain does not "vitiate ECFMG's liability").  Plaintiffs miss the point.  Even if the conduct of others is not "determinative" with respect to breach, it is undeniably relevant (indeed, crucial) to causation.  Courts review the causal chain between the conduct and the injury by looking at considerations including the number of factors that contributed to the harm, the effect of those factors on the harm, and the lapse of time.  *See Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1287 (Pa. Super. 2005) (internal quotation and citation omitted); *see also* ECFMG's Motion for Summary Judgment Argument, ECF 81 -1, at 29–32.  Plaintiffs' defense of the failure of Drs. Markenson, Hyde, and Williamson to review the causal chain does not address the effect

6

this has on the reliability of the causation opinions. This Court has correctly excluded expert opinions on causation in other cases when the proffered expert did not have a methodology or principle that could support such an opinion. *See, e.g.*, *Mestre v. Garden Homes Mangmt. Corp.*, No. 1:16-cv-03231-JDW-AMD, 2020 WL 3962267, at *3 (D.N.J. July 13, 2020) (Wolson, J.). These experts' causation opinions must be excluded for the same reason.

*Second*, these experts' opinions on causation are all premised on speculation that if ECFMG had conducted its investigation differently, various other actors would have all acted a particular way, and Akoda would never have treated Plaintiffs. Expert opinions that are "predicated upon impermissible speculation and assumption in part" must be excluded. *Goodman v. Burlington Coat Factory*, No. 11-4395 (JHR), 2019 WL 4567366, at *9 (D.N.J. Sept. 20, 2019).

Plaintiffs have failed to explain how these causation opinions rest on anything other than speculation. For example, they identify no basis for Drs. Markenson and Hyde predicting the outcome of a hypothetical Medical Education Credentials Committee meeting, a committee with which neither has any familiarity. *Compare* ECF 83-1 at 18-19 *with* ECF 94-1 at 14 (claiming, without any basis, Dr. Hyde's conclusion in this regard is made to "reasonable degree of professional certainty"). Nor do Plaintiffs defend Dr. Williamson's speculation regarding ECFMG's file management system, speculation which forms the basis for his unsubstantiated opinions that treatment of Dr. Akoda's file supposedly breached ECFMG's irregular behavior policies, kept other organizations from receiving "critical information," and led to Plaintiffs' harms. ECF 83-1 at 19–20; ECF 83-9 at 5–6. These "expert" opinions rest on nothing more than guesses and *ipse dixit* and must be excluded.

## V.  Rules 403 and 703 Also Support Excluding the Opinions of Drs. Markenson, Hyde, and Williamson.

Rules 403 and 703 provide an additional basis for exclusion.  Regarding Rule 703, Plaintiffs simply assert, again without any factual support, that their experts rely on data reasonably relied upon by experts in the field. ECF 94-1 at 24–25.  This fails to satisfy the standard for admissibility.  Similarly, they ignore the serious Rule 403 concerns that permitting these experts to provide impermissible legal opinions will confuse or mislead the jury.  *Id.* at 24.  Courts regularly exclude opinions on this basis.  *See, e.g.*, *Wolfe*, 2011 WL 1673805, at *9 (excluding expert under *Daubert* and Rule 403 because a jury would be encouraged to impose liability on an improper legal opinion offered by that expert).

Finally, after excluding impermissible legal opinions and speculative opinions on causation, all that remains are Drs. Markenson's, Hyde's, and Williamson's opinions on ECFMG's role in the credentialing and licensing of IMGs.  Plaintiffs' Response to the Statement of Undisputed Material Facts reveals that such opinions have little to no probative value.  Plaintiffs concede ECFMG's strictly circumscribed role, *see* ECFMG's Statement of Undisputed Material Facts ("SUMF") ¶¶ 7–16, ECF 85 (detailing (i) the limited amount of information on ECFMG Certification status reports, (ii) criteria ECFMG does not verify, (iii) the fact that certification does not authorize an IMG to treat patients as a doctor, and (iv) the wide variety of other criteria residency programs, licensing entities, and employers consider and independently assess when evaluating an IMG); Plaintiffs' Response to SUMF at 1, ECF 93-1 (admitting that ¶¶ 7–16 are not in dispute).  Drs. Markenson's, Hyde's, and Williamson's opinions on the role of ECFMG conflict with these facts that Plaintiffs already admit are established by the record.  These experts are, therefore, not only unqualified to opine on ECFMG's role and processes and have no reliable methodology to do so, but their opinions on ECFMG's role and processes conflict with the

8

undisputed facts and would only confuse the jury. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 747 (3d Cir. 1994) ("[B]ecause expert evidence is often more misleading than other evidence, Rule 403 gives a judge more power over experts than over lay witnesses.") (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993)).

## VI. ECFMG's Motion to Exclude the Opinions of Drs. Markenson, Hyde, and Williamson is Not Premature.

Plaintiffs argue that ECFMG's Motion is premature, despite this Court's policies and procedures requiring contemporaneous *Daubert* challenges when a summary judgment motion **or opposition** is based on the admissibility of expert testimony. Hon. Joshua D. Wolson Policies and Procedures, § II.B.4. ECFMG anticipated that Plaintiffs would cite to the contested experts in their opposition to ECFMG's Motion for Summary Judgment. Plaintiffs did so. *See* ECF 93-1 at 17, ¶114 (referencing these experts' reports and anticipated testimony on "the standard of care and elements of causation"); ECF 93-2 at 18 (citing experts in support of argument that ECFMG has a duty arising from Restatement § 324A), 26 (citing experts in discussion on second *Althaus* factor), 32 ("Plaintiffs' experts have testified that ECFMG was negligent."), 34 (referencing experts in discussion on causation). Plaintiffs cannot argue that a ruling on the admissibility of their experts' opinions would be premature, while simultaneously telling the court that summary judgment should be precluded on the basis of these experts' opinions.

## CONCLUSION

Because the opinions of Drs. Markenson, Hyde, and Williamson do not meet the requirements of proper expert testimony, ECFMG respectfully requests that the Court exclude their opinions and anticipated testimony in their entirety.

JA4699

Dated: January 28, 2022

/s/ Brian W. Shaffer

William R. Peterson (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
Telephone:     +1.713.890.5000
Facsimile:      +1.713.890.5001
william.peterson@morganlewis.com

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for Educational Commission for Foreign Medical Graduates*

10

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED:  January 28, 2022                          */s/ Brian W. Shaffer*

Brian W. Shaffer

JA4701

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,** | **Case No. 2:18-cv-05629-JDW** |
| *Plaintiffs,* | |
| v. | |
| **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** | |
| *Defendant.* | |

## ORDER

    **AND NOW**, this 31st day of January, 2022, it is **ORDERED** that Oral Argument on summary judgment and class certification is **RESCHEDULED** for March 29, 2022, at 10:00 a.m., in Courtroom 3B of the James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106.

                              BY THE COURT:

                              */s/ Joshua D. Wolson*
                              JOSHUA D. WOLSON, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS,

**Plaintiffs,**

v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

**Defendant.**

CIVIL ACTION NO. 18-5629
Honorable Joshua D. Wolson

---

## PLAINTIFFS' SUR-REPLY IN SUPPORT OF
## ITS OPPOSITION TO DEFENDANT EDUCATIONAL COMMISSION FOR
## FOREIGN MEDICAL GRADUATES MOTION FOR SUMMARY JUDGMENT

Dated: February 11, 2022

# TABLE OF CONTENTS

I.      **Plaintiffs' emotional distress meets the criteria for recovery under Pennsylvania law. 1**

    A.     Plaintiffs have suffered a physical impact..............................................................1

    B.     Zone of Danger................................................................................................2

II.    **ECFMG has a duty to the Plaintiff ................................................................2**

    A.     ECFMG possesses a duty to the Plaintiffs under Restatement Section 324A.................2

    B.     The duty imposed here is recognized under Pennsylvania law, and is consistent with the *Althaus* factors. ..................................................................................................3

III.   **Plaintiffs have established proximate cause...................................................5**

IV.   **Plaintiffs have established but-for causation.................................................5**

V.    **Plaintiffs did not consent to treatment. ........................................................6**

VI.   **Plaintiffs have met the criteria for recovery of emotional harm damages.....................6**

VII.  **Evans and Powell's claims accrued upon learning of Igberase's fraud. ........................7**

VII.  **Conclusion………………………………………………………………………..7**

# TABLE OF AUTHORITIES

## CASES

*Alderwoods (Pa.), Inc. v. Duquesne Light Co.*, 106 A.3d 27 (Pa. 2014) ...................5

*DeJesus v. United States VA*, 2005 WL 2175174  (E.D. Pa. Sep. 6, 2005)..................9

*Doe 56 v. Mayo Clinic Health Sys.—Eau Claire Clinic, Inc.*, 880 N.W.2d 681 (Wis. 2016) .......................10

*Evans v. Liberty Mutual Insurance Co.*, 398 F.2d 665 (3d Cir. 1968) ....................5

*Kazatsky v. King David Mem. Park, Inc.*, 527 A.2d 988 (Pa. 1987) ..................3

*Love v. Cramer*, 606 A.2d 1175 (Pa. Super. 1992)..................9

*Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281 (Pa. Super 2005).................7

*Nicolaou v. Martin*, 195 A.3d 880 (Pa. 2018)....................10

*Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237 (Pa. 2021) .................9

*Schmidt v. Boardman Co.*, 11 A.3d 924 (Pa. 2011) ....................3

*Shumosky v. Lutheran Welfare Servs. of Ne. Pa.*, 784 A.2d 196 (Pa. Super 2001) .................... 4, 8

*SodexoMAGIC, LLC v. Drexel Univ.*, 2022 WL 176427  (3d Cir. Jan. 20, 2022) ....................9

*Stoddard v. Davidson*, 513 A.2d 419 (Pa. Super 1986) ...................4

*Toney v. Chester Cty. Hosp.*, 36 A.3d 83 (Pa. 2011)....................4

*Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214 (Pa. 2018) ................6

## STANDARD JURY INSTRUCTIONS

Pennslyvania Suggested Standard Civil Jury Instructions, §13.40 (2020). ..................9

JA4705

This litigation seeks to hold ECFMG accountable under general negligence principles and section 324A of the Restatement (Second) of Torts for negligence in its undertaking to provide primary source verification of foreign medical graduates. As a result of ECFMG's negligence, Igberase was permitted to practice medicine, and fraudulently induced the Plaintiffs to undergo medical procedures, including childbirth, using a fictitious identity, while possessing no medical degree, and having no valid medical license, privileges or board certification. The Plaintiffs seek recovery of damages for emotional harm upon learning of Igberase's conduct, which are foreseeable to an entity which holds itself out as protecting the public. These damages are further consistent with the criteria for recovery of damages for emotional harm under Pennsylvania law.

## I. Plaintiffs' emotional distress meets the criteria for recovery under Pennsylvania law.

### A. Plaintiffs have suffered a physical impact.

ECFMG incorrectly asserts Pennsylvania law requires that the "impact and the emotional distress must be contemporaneous." Reply at 3. This is not a requirement of Pennsylvania law. Defendant cites *Schmidt v. Boardman Co.*, 11 A.3d 924, 948 (Pa. 2011). *Schmidt* was a strict products liability matter. The Court specifically distinguished the damages available under strict liability and negligence theories, limiting damages available under strict liability given their "no fault" nature, and that "foreseeability has no place in Pennsylvania's strict liability law." *Id.* at 950, 953. No other case cited by the Defendant supports this statement either, requiring only that harm "accompany" the physical impact. *See, e.g. Kazatsky v. King David Mem. Park, Inc.*, 527 A.2d 988 (Pa. 1987).

To the contrary, Pennsylvania permits recovery for non-economic damages in negligence cases where the emotional harm arose after the physical impact, as here. *See, e.g. Shumosky v. Lutheran Welfare Servs. of Ne. Pa.*, 784 A.2d 196 (Pa. Super 2001) (nurse sustained the physical impact of a needle stick, later learning that the patient she was treating had AIDS, causing emotional distress); *see also Stoddard v. Davidson,* 513 A.2d 419, 421 (Pa. Super 1986) (emotional distress occurred, at least

JA4706

partly, from prolonged police questioning after the physical impact); *Walsh v. Univ. of Pittsburgh*, 2015 WL 128104 (W.D. Pa. Jan. 8, 2015) (noting requirement of "a prior <u>or</u> contemporaneous physical injury" under the physical impact theory) (emphasis added).

### B. Zone of Danger

The Court in *Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970) permitted recovery where the plaintiff was in danger of physical impact and feared the impact. *Id.* at 90. ECFMG asserts that the Plaintiffs cannot "argue that their emotional distress arose from the fear of harm." Reply at 3. To the contrary, the Plaintiffs' damages do arise from fear of harm. The discovery of Igeberase's conduct caused them concern about the care they and their child obtained, rendering them fearful and distrustful of doctors. *See, e.g.* ECF 93-1 ¶¶ 100, 110, 113 (hereinafter "¶___"); ECF 93-37; 93-38; 86-22; 86-27 p. 7. This fear is the type of harm the Supreme Court recognized as consistent with the "special and emotionally charged relationship between a patient and their OBGYN." *Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 89 (Pa. 2011). Plaintiffs satisfy the *Neiderman* criteria.

## II. ECFMG has a duty to the Plaintiff

ECFMG accuses the Plaintiff of failing to identify "the precise legal duty" imposed on ECFMG. Reply at 4. Their duty is to "exercise reasonable care," under general negligence principles and section 324A of the Restatement. The particulars of what constitutes "reasonable care" in the factual context of this case is a factual question for expert testimony and resolution by a jury, not a legal question for resolution by summary judgment.

### A. ECFMG possesses a duty to the Plaintiffs under Restatement Section 324A.

ECFMG accepts that it "undertook to provide primary source verification, along with testing of basic competence, for the benefit of residency programs, hospitals, and medical boards, who relied upon ECFMG's services in granting IMGs licensure and privileges." Reply at 5. Plaintiffs' experts have opined that ECFMG failed to carry out this undertaking in a manner

JA4707

consistent with the standard of care. *See, e.g.* ECF 93-23, 93-39; 93-40. Plaintiffs' experts have opined

that ECFMG failed to conduct reasonable primary-source verification in evaluating the application

of "Akoda" and failed to act when provided credible information that portions of his application

were fraudulent.  *Id.* The assertion that Plaintiffs "do not argue – much less submit evidence – that

ECFMG failed to act with reasonable care" is simply ignorance of the factual record.  Reply at 5-6.

ECFMG's citations provide its argument no support. In *Evans v. Liberty Mutual Insurance Co.*,

398 F.2d 665, 666-67 (3d Cir. 1968), for example, the allegedly negligent undertaking did not

increase the risk of harm, and the plaintiff did not rely on the undertaking. *Id.*  Here, ECFMG

undertook to perform services which were relied upon by a residency program, medical boards,

hospital, and indirectly, the Plaintiffs. *See, e.g.* ECF-93-23.

### B. The duty imposed here is recognized under Pennsylvania law, and is consistent with the *Althaus* factors.

The duty owed by ECFMG to Plaintiffs is a common law duty reflected in Section 324A of

the Restatement. "Common-law duties stated in general terms are framed in such fashion for the

very reason that they have broad-scale application." *Alderwoods (Pa.), Inc. v. Duquesne Light Co.*, 106

A.3d 27, 40-41 (Pa. 2014). "It is not necessary to conduct a full-blown public policy assessment in

every instance in which a longstanding duty imposed on members of the public at large arises in a

novel factual scenario." *Id.*  As the *Althaus* factors were reviewed in depth in Plaintiffs' Response,

Plaintiffs address only new assertions in ECFMG's brief.

 **First**, ECFMG suggests that imposing a duty would conflict with extending due process

rights to IMGs. This is a false dichotomy. That ECFMG might feel incentivized to take shortcuts in

fulfilling its duties by revoking certifications on suspicions alone, without due diligence, and might

thereby violate the rights of others, is no justification against imposing a duty on ECFMG.

**Second**, ECFMG offers a confused summary of the foreseeability criteria.  ECFMG's own

testimony establishes that it was foreseeable that residencies, medical boards and employers would

rely on its undertaking, and its negligence resulted in the damages asserted. ¶¶ 6, 75, 76. That residency programs and medical boards would not "second guess" ECFMG's certification decision, and that an individual could go on to defraud patients and cause the harm alleged, is certainly foreseeable. Id.

**Third**, ECFMG asserts that Plaintiffs' settlement demands "belie their assertion that a duty will not impose 'great cost' on ECFMG."[1] Reply at 8.  Plaintiffs could likewise portray Defendant's settlement offers in a negative light, but this motion is not the appropriate forum.  The duty imposed on ECFMG is proportionate to its role in the United States and its monopoly over the certification of foreign medical graduates.

**Fourth**, ECFMG also compares the analysis of duty here to *Walters v. UPMC Presbyterian Shadyside,* 187 A.3d 214 (Pa. 2018).  While ECFMG's obligations to conduct primary source verification are not codified by statute, as it was for the hospital in *Walters,* they are discrete and well-defined.   ECFMG must carry out its undertaking "to provide primary source verification, along with testing of basic competence, for the benefit of residency programs, hospitals, and medical boards, who relied upon ECFMG's services in granting IMGs licensure and privileges" with reasonable care. See, e.g. Reply at 5.

**Fifth**, in discussing the overall public interest in imposing a duty, ECFMG again predicts calamity if it is obligated to carry out its undertakings with reasonable care, supposing that ECFMG would need to change its screening process, restrict blameless IMGs from practicing medicine and thereby harm the public interest by restricting access to care. These unsupported, baseless and histrionic factual assertions have no place in a motion for summary judgment.

---

[1]  Defendant's characterization of settlement demands violates Fed. R. Evid. 408, and is certainly inappropriate for consideration in the *Althaus* analysis.

## III. Plaintiffs have established proximate cause.

ECFMG certification was an indispensable step in Igberase being able to practice medicine in the United States. No IMG can practice medicine in the U.S. without ECFMG certification. ECFMG acknowledges its undertaking in the primary source verification process, and acknowledges it is foreseeable that residencies, medical boards, and future employers will rely on their decisions. Reply at 5; ¶¶ 75. *See also*, ¶¶ 114. ECFMG's conduct is certainly a substantial factor in bringing about the harm here, which was the product of an unbroken chain of events originating from ECFMG's negligence. *See Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281, 1287 (Pa Super 2005).

## IV. Plaintiffs have established but-for causation.

Plaintiffs have testified about the emotional harm they experienced from undergoing examinations, procedures and surgeries by an individual who misrepresented his identity, never went to medical school and obtained his medical credentials through fraud. *See, e.g.* ¶ 99; ¶ 106; ¶ 110; ¶ 113. ECFMG offers its own narrative, continuing to call Igberase "Dr. Akoda" (despite lacking the sole qualification for the honorific—a medical degree), and analogizing this case to a circumstance where a physician changes his or her name after marriage.[2] Reply at 12. That ECFMG calls this a mistaken belief does not make it so, and ECFMG's criticisms of Plaintiffs' understanding of ECFMG addresses no element of this claim. None of these arguments have any bearing here.

ECFMG ignores extensive deposition testimony and expert reports in charactering the evidence in this case. The evidence proves that had ECFMG acted in accordance with the standards of care, Igberase would never have practiced medicine. ECFMG staff believed "Akoda"/Igberase was misrepresenting his identity in approximately 2000. ¶ 59. Those circumstances should have

---

[2] ECFMG cites to *Shumosky v. Lutheran Welfare Servs. of Ne. PA, Inc.*, 784 A.2d 196, 202 (Pa. Super. 2001), characterizing the case as "denying recovery "for symptoms [that] were caused by a mistaken belief." On the contrary, the Court allowed recovery for the plaintiff's reasonable fears of having been exposed to AIDS.

JA4710

prompted referral to the credentials committee. ¶ 78, ¶ 93; See e.g., ECF 93-23.  Conducted appropriately, these deliberations would have resulted in revocation of his certification, as ECFMG had in 1996, when Igberase last attempted a similar fraud. ¶ 15, ¶ 24; See, e.g. ECF 93-23.[3]  Plaintiffs have met their burden.

## V.    Plaintiffs did not consent to treatment.

ECFMG accuses the Plaintiffs of gamesmanship, suggesting that "Dr. Akoda" was an appropriately licensed physician, and that Plaintiffs' claims amount to "consent turn[ing] on a doctors name." Reply at 12. This Court is familiar enough with the facts of this case to know which party is engaged in gamesmanship. Plaintiffs did not consent to treatment from Igberase – a man without a medical degree, whose credentials were the product of fraud, and who could not have practiced medicine in the United States absent ECFMG's negligent certification of him.

## VI.   Plaintiffs have met the criteria for recovery of emotional harm damages.

Where—as here—there has been a physical impact, there is no need to prove physical manifestations of emotional distress.  *See DeJesus v. United States VA*, 2005 WL 2175174 at *9 (E.D. Pa. Sep. 6, 2005); *Sinn v. Burd*, 404 A.2d 672, 679 (Pa. 1979) ("psychic injury is capable of being proven despite the absence of a physical manifestation of such injury"); *See also*, Pa. SSJI (Civ), §13.40 (2020). Even if such a demonstration were necessary, Plaintiffs have met that burden.  As described in the affidavits of Elsa Powell and Desire Evans, this incident has caused them longstanding physical impacts consistent with the criteria set forth in *Love v. Cramer*, 606 A.2d 1175 (Pa. Super. Ct. 1992) and *Armstrong v. Paoli Memorial Hospital*, 633 A.2d 605 (Pa. Super. 1993).  ¶¶99 - 101; ¶106; ¶110; and ¶113.[4]  Jasmine Riggins and Monique Russell have provided sworn testimony

---

[3] Plaintiffs' opposition included a typographical error on page 34, citing to Exhibit 24, instead of ¶ 24, which is noted by the ECFMG in their Reply at 11. This reference should have read "¶ 15, 24."
[4] ECFMG vaguely references the "sham affidavit rule" at Reply 13, fn. 2, allowing a court to disregard a later statement by a deponent where it contradicts the witness's deposition testimony, and the discrepancy is neither supported by record evidence nor satisfactorily explained.

that they suffered similar physical effects of their emotional harm such as anxiety, shock and

anger.  *See, e.g.* ECF 86-9; 86-11; 86-28; 86-29; 86-32; 86-36; 86-40 and 76; ¶¶ 99-106.

## VII.    Evans and Powell's claims accrued upon learning of Igberase's fraud.

ECFMG cites to *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237 (Pa. 2021), which involved a

complaint for sexual abuse 35 years after-the-fact. The court rejected plaintiff's arguments that the

statute of limitations began when to run when she became aware "of a second cause" of a known

legal injury. *Id.* at 251.  There, the nature of the injury was known to the plaintiff.  Here, the damages

asserted are entirely distinct from any harm experienced by the Plaintiffs at the time of treatment.  In

the case of Ms. Powell, her complaints related to flirtatious conduct, which is unrelated to the legal

injury asserted here. Similarly, for Ms. Evans, the harm she suffered then, involving the

manipulation of her clitoris during delivery, is distinct from the injury she sustained upon learning of

Igberase's fraud.  Their statute of limitations began when the harm began—when they learned of

Igberase's fraud.  *See also Nicolaou v. Martin*, 195 A.3d 880 (Pa. 2018) (statute of limitations was a jury

question where plaintiff was unaware that she had been misdiagnosed over nine years).  *Doe 56 v.*

*Mayo Clinic Health Sys.—Eau Claire Clinic, Inc.*, 880 N.W.2d 681 (Wis. 2016) is distinguishable, as the

opinion in that case was particular to Wisconsin's distinct medical negligence statute of limitations,

and Ms. Evans is not pursuing a claim for sexual abuse.  Instead, she is pursuing an emotional

distress claim for having underwent medical examinations and procedures by a physician

impersonator—damages which only occurred upon revelation of the true nature of his conduct.

## VIII.    Conclusion

For these reasons, Plaintiffs respectfully request that the Court deny summary judgment.

---

*SodexoMAGIC, LLC v. Drexel Univ.,* 2022 WL 176427  (3d Cir. Jan. 20, 2022). Plaintiffs' affidavits do
not contradict their prior statements. In reality, ECFMG did not ask the Plaintiffs to identify
whether they had physical manifestations.

Dated: February 11, 2022                                    Respectfully submitted,


SCHOCHOR, FEDERICO AND STATON          CONRAD O'BRIEN PC

*/s/ Brent Ceryes*                                       */s/ Robin S. Weiss*
  The Paulton                                         Nicholas M. Centrella (Pa. ID 67666)
  1211 St. Paul Street                                 Robin S. Weiss (Pa. ID 312071)
  4 Reservoir Circle, Suite 200                        1500 Market Street, Suite 3900
  Baltimore, Maryland 21202                            Philadelphia, PA 19102-2100
  (410) 234-1000                                       (215) 864-9600


LAW OFFICES OF PETER G. ANGELOS,           JANET, JANET & SUGGS, LLC
P.C.                                                       SCHOCHOR, FEDERICO AND STATON

  Paul M. Vettori                                      Patrick A. Thronson
  One Charles Center                                   Brenda A. Harkavey
  100 N. Charles Street, 20th Floor                    4 Reservoir Circle, Suite 200
  Baltimore, Maryland 21201                            Baltimore, MD 21208
  (410) 649-2000                                       (410) 653-3200


Z LAW, LLC                                                 THE COCHRAN FIRM, DC/BALTIMORE

  Cory L. Zajdel                                       Karen E. Evans
  2345 York Rd. Suite B-13                             David E. Haynes
  Timonium, MD 21093                                   1666 K Street, N.W.
  (443) 213-1977                                       Suite 1150
                                                            Washington, DC 20005
                                                            (202) 682-5800


                                                          *Attorneys for Plaintiffs, on behalf of themselves and all*
                                                          *others similarly situated*

JA4713

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused the foregoing document to be electronically filed and served upon all counsel of record by electronic filing. This document is available for viewing and downloading from the Court's ECF System.


Dated: 2/11/2022                                   /s/ *Robin S. Weiss*
                                                    Robin S. Weiss

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,** | Case No. 2:18-cv-05629-JDW |
| *Plaintiffs,* <br> v. | |
| **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** | |
| *Defendant.* | |

## ORDER

**AND NOW,** this 22nd day of March, 2022**,** it is **ORDERED** that Oral Argument on summary judgment and class certification motions, currently scheduled for March 29, 2022, at 10:00 a.m., is **CANCELED**.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

JA4715

No. 21-_____

In the

# Supreme Court of the United States

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

*Respondents*.

**On Petition for a Writ of Certiorari to the
United States Court of Appeals for the
Third Circuit**

**PETITION FOR A WRIT OF CERTIORARI**

| | |
|---|---|
| Brian W. Shaffer | William R. Peterson |
| Elisa P. McEnroe | *Counsel of Record* |
| Matthew D. Klayman | MORGAN, LEWIS & BOCKIUS LLP |
| MORGAN, LEWIS & BOCKIUS LLP | 1000 Louisiana St., Suite 4000 |
| 1701 Market St. | Houston, TX 77002 |
| Philadelphia, PA 19103 | (713) 890-5188 |
| | william.peterson@morganlewis.com |

*Counsel for Petitioner*

i

## QUESTION PRESENTED

Rule 23(b)(3) mandates that when a party seeks to certify a class action that involves both common and individual issues, certification is proper when the common issues predominate over the individual issues and a class action is a superior method of adjudicating the controversy as a whole. Fed. R. Civ. P. 23(b)(3).

The decision below holds that there is an alternate route to certification under Rule 23(b)(3), which allows certification even when the common issues do not predominate over the individual issues for a single claim. Under this theory, if certification of common issues is "appropriate" under Rule 23(c)(4), a court analyzes predominance under Rule 23(b)(3) by considering only the certified (common) issues, ignoring the uncertified (individual) issues.

The question presented is:

Whether, when an action involves both common and individual questions, a court may certify common questions for class treatment under Rule 23(b)(3) without finding that the common questions predominate over the individual questions.

ii

## PARTIES TO THE PROCEEDINGS
## AND RULE 29.6 STATEMENT

The parties to the proceedings include those listed on the cover.

Educational Commission for Foreign Medical Graduates (ECFMG) has no parent corporation and no publicly held corporation owns more than 10% of its stock.

## STATEMENT OF RELATED PROCEEDINGS

This case arises from and is related to the following proceedings:

- *Russell v. Educational Commission for Foreign Medical Graduates*, No. 2:18-cv-05629-JDW, United States District Court for the Eastern District of Pennsylvania. Order granting motion for class certification entered March 23, 2020; and

- *Russell v. Educational Commission for Foreign Medical Graduates*, No. 20-2128, United States Court of Appeals for the Third Circuit. Opinion and judgment entered September 24, 2021.

There are no other proceedings in state or federal trial or appellate courts, or in this Court, directly related to this case within the meaning of this Court's Rule 14.1(b)(iii).

iv

## TABLE OF CONTENTS

Page

Question Presented.....................................................i

Parties to the Proceedings and Rule 29.6
Statement................................................................ ii

Statement of Related Proceedings ......................... iii

Table of Contents.....................................................iv

Table of Authorities .................................................vi

Petition for a Writ of Certiorari ..............................1

Opinions and Orders Below.....................................1

Statement of Jurisdiction .........................................1

Constitutional and Statutory  Provisions
Involved....................................................................1

Statement..................................................................3

Reasons for Granting the Petition .........................11

I.    The Decision Below Deepens an
      Entrenched, Acknowledged Circuit Split
      Regarding the Interaction of Rule 23(c)(4)
      and Rule 23(b)(3)..............................................11

      A.    The Fifth and Eighth Circuits Hold
            That Rule 23(c)(4) Cannot Be Used to
            Evade the Requirements of Rule
            23(b)(3). ...................................................12

      B.    A Plurality of Circuits Allow Class
            Certification Even When Common
            Issues Do Not Predominate Over
            Individual Issues. ...................................15

v

C.    The Circuit Split Is Acknowledged
and Entrenched....................................22

II.   Rule 23(c)(4) Does Not Permit Evasion of
Rule 23(b)(3). ....................................23

A.    The plurality view would nullify the
predominance requirement of Rule
23(b)(3). ....................................23

B.    The error arises from a misreading of
the Advisory Committee Notes. .............26

C.    The correct reading does not nullify
subdivision (c)(4)................................28

III.  The Interaction of Rule 23(b)(3) and Rule
23(c)(4) Is an Important Question That
Should Be Decided by this Court....................29

IV.   This Case Is an Excellent Vehicle. .................31

Conclusion.............................................32

APPENDIX A – Court of Appeals Opinion
(Sept. 24, 2021)................................1a

APPENDIX B – Court of Appeals Order
Granting Petition for Leave to Appeal
(May 11, 2020)................................33a

APPENDIX C – District Court Order
Granting Motion for Class Certification
(Mar. 23, 2020) ..............................35a

APPENDIX D – District Court Memorandum
(Mar. 23, 2020) ..............................38a

vi

## TABLE OF AUTHORITIES

Page(s)

<small>CASES</small>

*Allison v. Citgo Petroleum Corp.*, 151 F.3d
    402 (5th Cir. 1998) ............................................ 13

*Amchem Prods., Inc. v. Windsor*, 521 U.S.
    591 (1997) ........................................................... 4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ......................................... 25

*AT&T Mobility LLC v. Concepcion*, 563 U.S.
    333 (2011) ......................................................... 30

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th
    Cir. 1996) ................................................... 12, 13

*Comcast Corp. v. Behrend*, 569 U.S. 27
    (2013) ......................................................... 25, 26

*Corley v. Orangefield Indep. Sch. Dist.*, 152
    F. App'x 350 (5th Cir. 2005) ........................... 13

*D.C. by & through Garter v. County of San
    Diego*, 783 F. App'x 766 (9th Cir. 2019) ........... 17

*Ebert v. Gen. Mills, Inc.*, 823 F.3d 472 (8th
    Cir. 2016) ................................................... 13, 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ..........................................23

*Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d
    Cir. 2011) ..................................................*passim*

*Gonzalez v. Corning*, 885 F.3d 186 (3d Cir.
    2018)..................................................................18

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d
    417 (4th Cir. 2003)......................................11, 21

*In re Nassau Cnty. Strip Search Cases*, 461
    F.3d 219 (2d Cir. 2006).............................*passim*

*In re Nat'l Hockey League Players'
    Concussion Inj. Litig.*, 327 F.R.D. 245 (D.
    Minn. 2018).......................................................14

*In re St. Jude Med., Inc.*, 522 F.3d 836 (8th
    Cir. 2008) ...................................................11, 14

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) .......................21, 22

*Martin v. Behr Dayton Thermal Prods. LLC*,
    896 F.3d 405 (6th Cir. 2018) ....................*passim*

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d
    215 (2d Cir. 2008) .............................................17

*Rahman v. Mott's LLP*, 693 F. App'x 578 (9th
    Cir. 2017) ..........................................................17

viii

*Reitman v. Champion Petfoods USA, Inc.*,
    830 F. App'x 880 (9th Cir. 2020) ......................19

*Reitman v. Champion Petfoods USA, Inc.*,
    No. CV181736DOCJPRX, 2019 WL
    7169792 (C.D. Cal. Oct. 30, 2019) ....................19

*Robinson v. Metro–N. Commuter R.R.*, 267
    F.3d 147 (2d Cir. 2001) ...............................18, 22

*Russell v. Educ. Comm'n for Foreign Med.
    Graduates*, 15 F.4th 259 (3d Cir. 2021) ........1, 11

*Seijas v. Republic of Argentina*, 606 F.3d 53
    (2d Cir. 2010) ....................................................24

*Smith v. Texaco, Inc.*, 263 F.3d 394 (5th Cir.
    2001) ................................................................13

*Tasion Commc'ns, Inc. v. Ubiquiti Networks,
    Inc.*, 308 F.R.D. 630 (N.D. Cal. 2015) ...............19

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.
    442 (2016) ............................................25, 26, 28

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d
    1227 (9th Cir. 1996) ...................................15, 19

**STATUTES**

28 U.S.C. § 1254(1) ...................................................1

ix

## RULES

Fed. R. Civ. P.

23 ........................................................ 1, 3, 21, 26
23(a) .......................................................... *passim*
23(a)(3) ............................................................. 20
23(b) .......................................................... *passim*
23(b)(1) ........................................................ 4, 20
23(b)(2) ........................................................ 4, 20
23(b)(3) ...................................................... *passim*
23(c) ............................................................... 2, 4
23(c)(1) .............................................................. 4
23(c)(2) .............................................................. 4
23(c)(3) .............................................................. 4
23(c)(4) ...................................................... *passim*
23(c)(4)(A) ...................................................... 22
23(f) .................................................................. 9
23, Advisory Committee Notes ................... 26, 27

## OTHER AUTHORITIES

2 W. Rubenstein, Newberg on Class Actions
§ 4:50 (5th ed. 2012) ........................................... 28

Benjamin Kaplan, *A Prefatory Note*, 10 B.C.
Ind. & Com. L. Rev. 497 (1969) ........................... 4

Restatement (Second) of Torts
§ 313 .................................................................. 7
§ 324A .............................................................. 7
§ 876 .................................................................. 7

x

Robert H. Klonoff, *The Decline of Class
   Actions*, 90 Wash. U.L. Rev. 729 (2013)............11

1

## PETITION FOR A WRIT OF CERTIORARI

Petitioner Educational Commission for Foreign Medical Graduates ("ECFMG") respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Third Circuit.

## OPINIONS AND ORDERS BELOW

The panel order vacating and remanding the district court's class certification order (App. 1a) is reported at 15 F.4th 259 (3d Cir. 2021). The order of the district court (App. 35a) and the opinion of the district court (App. 38a) are unreported.

## STATEMENT OF JURISDICTION

The court of appeals entered its judgment on September 24, 2021. App. 1a. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Rule 23 of the Federal Rules of Civil Procedure provides, in pertinent part:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

. . .

2

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

. . .

(4) Particular Issues. When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

3

## STATEMENT

The decision below deepens an entrenched circuit split regarding the interaction of Rule 23(b) and Rule 23(c)(4), specifically, whether Rule 23(c)(4) may be used to evade the requirements of Rule 23(b)(3) and certify classes that cannot satisfy Rule 23(b)(3)'s predominance requirement under the ordinary test.

Respondents asserted claims on behalf of a putative interstate class against ECFMG for negligent infliction of emotional distress. For these claims, individual questions—including causation and injury—predominate over any common questions.

Nonetheless, in the decision below, the Third Circuit held that predominance of the purportedly common issues—duty and breach—over the individual issues involved in the claims is not required for class certification under Rule 23(c)(4) and Rule 23(b)(3).

1.     Federal Rule of Civil Procedure 23 governs class certification. Class certification is permissible only if the party seeking certification satisfies both Rule 23(a) and one of the paragraphs of Rule 23(b).

Rule 23(a) provides that a class action must satisfy four requirements. The first two concern the proposed class action: (1) the class must be "so numerous that joinder of all members is

4

impracticable," and (2) there must be "questions of law or fact common to the class." The third and fourth requirements concern the representative parties, who (3) must possess "claims or defenses" that "are typical of the claims or defenses of the class" and (4) must "fairly and adequately protect the interests of the class."

Rule 23(b) creates three different types of class actions. This petition concerns the third type, a class action seeking damages under Rule 23(b)(3), "'the most adventuresome' innovation" in the 1966 class-action amendments. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997) (quoting Benjamin Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)).

Certification under Rule 23(b)(3) requires a court to find both *predominance*—"that the questions of law or fact common to class members predominate over any questions affecting only individual members"—and *superiority*—"that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Rule 23(c) governs various procedural aspects of the class action device and applies whether a class action is certified under Rule 23(b)(1), (b)(2), or (b)(3). Rule 23(c) prescribes the contents of the certification order (Rule 23(c)(1)), the form of notice and any opt-out required (Rule 23(c)(2)), and the form of judgment (Rule 23(c)(3)). This petition concerns Rule 23(c)(4), which provides—as Rule

5

23(b)(3) contemplates—that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."

2.    Respondents—named    plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans—are former patients of a physician who was licensed to practice medicine by the State of Maryland in 2011, App. 9a, after completing a residency at Howard University Hospital.    App. 41a.[1] Respondents do not assert claims based on the quality of the medical care they received from their physician: he delivered respondents' children and successfully    performed    unplanned    emergency cesarean-section surgery on Russell and Riggins. App. 10a.

Respondents instead claim that even if they received capable medical treatment, they suffered emotional distress upon learning that their physician—who they knew as "John Akoda"—used a false name and misused another's social security numbers in applying for his residency program and was truly named "Oluwafemi Charles Igberase." App. 6a, 9a, 10a.

---

[1] The district court incorrectly states that the physician who treated respondents "was not a doctor at all." App. 38a.  To the contrary, it is undisputed that the individual who treated respondents completed a residency program and was licensed to practice medicine.  Respondents' claim is that he should not have been licensed, not that he was not licensed.

6

Rather than suing Akoda, the hospitals that employed him, the state medical board that licensed him, or the residency program from which he graduated, respondents sued petitioner, Educational Commission for Foreign Medical Graduates, a non-profit organization based in Philadelphia that certifies international medical graduates as ready to enter post-graduate medical education in the United States by verifying (1) that a recognized foreign medical school has confirmed the authenticity of the graduate's medical school diploma and (2) that the graduate received passing grades on tests of medical knowledge and English proficiency. App. 39a.

Respondents contend that ECFMG should have performed further investigation, discovered Dr. Akoda's deception, and prevented him from treating patients. App. 9a. They claim to have suffered compensable emotional distress as a result of ECFMG's certification of Dr. Akoda.

3.    Respondents sought certification under Rule 23(b)(3) of a class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." App. 42a. They proposed two alternatives. They first sought certification of a class as to liability. *Id.* In the alternative, they sought certification of nine specific issues:

> (1) whether ECFMG undertook or otherwise owed a duty to class members who were patients of Igberase;

7

(2) whether ECFMG breached its duty to class members;

(3) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable for foreseeable injuries to third persons such as class members pursuant to Restatement (Second) of Torts § 324A;

(4) whether ECFMG breached its duty to hospitals and state medical boards;

(5) whether the emotional distress and other damages that Plaintiffs allege were a foreseeable result of ECFMG's conduct;

(6) whether ECFMG's conduct involved an unusual risk of causing emotional distress to others under Restatement (Second) of Torts § 313;

(7) whether ECFMG is subject to liability under Restatement (Second) of Torts § 876 for assisting Igberase in committing fraud;

(8) whether ECFMG knew or should have known that Akoda was, in fact, Igberase; and

(9) whether it was foreseeable that ECFMG's conduct could result in emotional distress experienced by class members

App. 42a-43a.

The district court first concluded that respondents satisfied the requirements of

Rule 23(a). App. 50a-56a. Rather than proceeding to address Rule 23(b)(3), however, the district court held that because the plaintiffs sought certification of particular issues, it was unnecessary to consider Rule 23(b), and a court should only consider the "*Gates* factors" (the test applied only by the Third Circuit for whether certification is "appropriate" under Rule 23(c)(4)): "[T]he Court will consider Rule 23(a) and then turn to the Gates factors in conducting its analysis." App. 45a.

Recognizing that causation and damages are individual questions, the district court readily rejected the proposed liability class: "Given the individual nature of the causation and damages inquiry, the Court will not certify a class to tackle liability as a whole." App. 58a. "There would be little efficiency to be gained from such a certification because the evidence in the class action portion of the case would overlap with the evidence in the individual portion of the case." *Id.*

The district court agreed, however, to certify a class for the issues that "relate to whether ECFMG had a relevant legal duty and whether it breached that duty." App. 59a. It concluded that issue certification under Rule 23(c)(4) was "appropriate" based on the *Gates* factors. App. 59a-61a.

The district court's analysis covers only three paragraphs. It first states that "the questions of duty and breach favor issue certification because they are questions of law and/or fact common to all class members and subject to common proof." App.

9

59a.  This essentially restates that a common issue has been identified.  The district court next stated that certification would allow "a single trial with a single, preclusive determination," App. 60a, a truism about a class proceeding.  And finally, the district court stated that "[p]artial certification will not damage any class member's statutory or constitutional rights."  App. 60a.

The district court did not make any findings about superiority or predominance under Rule 23(b)(3).

3.     After the Third Circuit granted its Rule 23(f) petition, ECFMG briefed the merits of the appeal to the Third Circuit.  Respondents did not cross-appeal.  In addition to challenging the district court's analysis of the Rule 23(a) factors, App. 24a n.4, ECFMG raised two arguments relating to the district court's certification under Rule 23(c)(4).  First, ECFMG argued that Rule 23(c)(4) is not an alternative means of class certification and that certification under Rule 23(b)(3) is unavailable unless the common questions predominate over the individual questions for a claim.  App. 23a-24a.  Second, in the alternative, ECFMG argued that the district court abused its discretion in applying the *Gates* factors and refusing to consider Rule 23(b).  App. 24a.  ECFMG requested that the Third Circuit render judgment that no class could be certified.

The Third Circuit, in an opinion written by Judge Restrepo, rejected ECFMG's primary argument about the interaction of Rule 23(b)(3) and

Rule 23(c)(4) (which would have led to rendition of a judgment that no class certification was permissible). The opinion holds that *Gates* (and Rule 23(c)(4)) "permit[s] the certification of issues that do not resolve liability." App. 20a. Put bluntly, "Rule 23(c)(4) can be used even though full Rule 23(b)(3) certification is not possible due to the predominance infirmities." App. 28a-29a.

The Third Circuit agreed, however, that the district court erred because it "did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3)." App. 23a. And the district court "failed to rigorously consider several *Gates* factors." App. 25a. As a result, it vacated the class certification and remanded to the district court. App. 32a.

ECFMG respectfully now petitions this Court for certiorari.

11

**REASONS FOR GRANTING THE PETITION**

**I.    The Decision Below Deepens an Entrenched, Acknowledged Circuit Split Regarding the Interaction of Rule 23(c)(4) and Rule 23(b)(3).**

The courts of appeals are sharply divided on the interaction of Rule 23(c)(4) and Rule 23(b)(3). The split has persisted for more than a quarter century and been acknowledged by numerous decisions. *See, e.g., In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 273 (3d Cir. 2021); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 444 (4th Cir. 2003); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 411 (6th Cir. 2018); *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). Commentators, too, have discussed this split for years. *See, e.g.*, Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U.L. Rev. 729, 807-15 (2013) ("[Rule 23(c)(4)] has created significant conflict and confusion among the courts[.]").    This Court's guidance on this complicated and important question of class action jurisprudence is long overdue.

At a high level, the split concerns whether Rule 23(c)(4) may be used to certify a class action under Rule 23(b)(3) when common issues do not predominate over individual issues.    The Fifth Circuit and (it appears) the Eighth Circuit hold—

12

correctly, in petitioner's view—that certification under Rule 23(b)(3) always requires predominance to be satisfied for a cause of action as a whole.

The Second, Third, Sixth, and Ninth Circuits hold instead that if a court certifies common issues for class treatment under Rule 23(c)(4), then a class may be certified under Rule 23(b)(3), even when the (uncertified) individual questions predominate over the (certified) common questions.

Even within the plurality, however, there is significant division over both (1) when it is "appropriate" to certify issues under Rule 23(c)(4); and (2) how (and whether) the subsequent Rule 23(b)(3) inquiry should be conducted.

This Court's intervention is required to provide much needed guidance on the proper interaction between Rule 23(b)(3) and Rule 23(c)(4).

## A. The Fifth and Eighth Circuits Hold That Rule 23(c)(4) Cannot Be Used to Evade the Requirements of Rule 23(b)(3).

The Fifth Circuit has rejected "the nimble use of subdivision (c)(4)" to "manufacture predominance" by first limiting the case to common issues and then applying Rule 23(b)(3). *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996). Instead, the Fifth Circuit holds, a "cause of action, as a whole, must satisfy the predominance requirement of (b)(3)." *Id.*

13

If the common issues predominate over the individual issues, Rule 23(c)(4) then "allows courts to sever the common issues for a class trial." *Id.*

The alternative—"[r]eading Rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues"—"would eviscerate the predominance requirement of Rule 23(b)(3)" and effectively allow "automatic certification in every case where there is a common issue, a result that could not have been intended." *Id.*

The Fifth Circuit remains steadfast in its interpretation of the interaction between Rule 23(b)(3) and Rule 23(c)(4). *See Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 355 (5th Cir. 2005) (applying *Castano* to hold that "plaintiffs must first show that the cause of action, taken as whole, satisfies the predominance requirement of Rule 23(b)(3)"); *Smith v. Texaco, Inc.*, 263 F.3d 394, 409–10 (5th Cir. 2001) (applying *Castano* to hold that "the cause of action, as a whole, must satisfy Rule 23(b)(3)'s predominance requirement"), *opinion withdrawn, cause dismissed*, 281 F.3d 477 (5th Cir. 2002); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421–22 (5th Cir. 1998) (applying *Castano* and declining to certify the first stage of a pattern or practice claim).

The Eighth Circuit appears also to hold that class certification requires satisfying Rule 23(b)(3)'s predominance requirement for the cause of action as a whole, regardless of Rule 23(c)(4). In *Ebert v.*

14

*General Mills, Inc.*, the Eighth Circuit reversed an order certifying the issue of liability under Rule 23(c)(4) in an environmental contamination lawsuit. 823 F.3d 472 (8th Cir. 2016). It held that the district court erred in its "deliberate limiting of issues": "[B]y bifurcating the case and narrowing the question for which certification was sought, the district court limited the issues and essentially manufactured a case that would satisfy the Rule 23(b)(3) predominance inquiry." *Id.* at 479. Considering the cause of action as a whole, the Eighth Circuit held that "[a]lthough there may be common matters in this litigation that can be decided on a class-wide basis," the matter is "unsuitable for class certification under Rule 23(b)(3)" because "individual issues predominate the analysis of causation and damages." *Id.* at 480.

Although *Ebert* does not cite Rule 23(c)(4) directly, the analysis cites *In re St. Jude Medical, Inc.*, which notes the conflict regarding issue certification under Rule 23(c)(4). *See Ebert*, 823 F.3d at 480 (citing 522 F.3d at 841 (discussing "issue certification under Rule 23(c)(4)")). And at least one district court has recognized that *Ebert* bears on certification under Rule 23(c)(4). *See In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 257 (D. Minn. 2018) (citing *Ebert* in rejecting certification under Rule 23(c)(4)).

Although perhaps not conclusive as to the Eighth Circuit's view, *Ebert* provides a strong indication that the Eighth Circuit shares the Fifth

15

Circuit's refusal to permit Rule 23(c)(4) to be used to evade Rule 23(b)(3).

> **B.      A Plurality of Circuits Allow Class Certification Even When Common Issues Do Not Predominate Over Individual Issues.**

In contrast, the Second, Third, Sixth, and Ninth Circuits hold that Rule 23(c)(4) allows issues to be certified for class treatment under Rule 23(b)(3), even when common issues do not predominate for the claim as a whole: "[W]e hold that a court may employ subsection (c)(4) to certify a class as to liability [under Rule 23(b)(3)] regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Nassau Cnty.*, 461 F.3d at 227; *accord* App. 23a ("[The Third Circuit] does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies a subsection of Rule 23(b)[.]"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (issue certification permitted "[e]ven if the common questions do not predominate over the individual questions").

In these circuits, when a party seeking certification (ordinarily, the plaintiff) invokes Rule 23(c)(4), the district court must consider whether the common issues are "appropriate" for class certification.

16

If so, only these certified issues (the common issues[2]) are considered during any Rule 23(b)(3) predominance analysis. *See Nassau Cnty.*, 461 F.3d at 221 ("[A] court must first identify the issues potentially appropriate for certification and . . . then apply the other provisions of the rule, i.e., subsection (b)(3) and its predominance analysis[.]" (internal quotation marks and citation omitted)); App. 24a ("Plaintiffs [must] demonstrate that the issues they seek to certify satisfy one of Rule 23(b)'s subsections."); *Martin*, 896 F.3d at 411 (directing lower courts to "apply the Rule 23(b)(3) predominance and superiority prongs after common issues have been identified for class treatment under Rule 23(c)(4)"). The issues not identified as "appropriate" for certification are ignored, and no comparison of the individual and common issues occurs.

In these circuits, then, when Rule 23(c)(4) is cited, the focus of the class certification inquiry has shifted from Rule 23(b)(3)'s requirements to whether certification is "appropriate" under Rule 23(c)(4).

---

[2] This assumes that the movant has successfully identified common issues. In this case, ECFMG denies that the certified issues of breach and duty are truly common and is opposing class certification on remand on this basis. For purposes of this petition, ECFMG assumes that the certified issues on which certification is sought—breach and duty—are "common" and would, if considered without reference to the uncertified issues, satisfy Rule 23(b)(3).

17

But although the circuits agree on this approach at a high level, within the plurality, there is significant disagreement, both about (1) when issue certification is "appropriate"; and (2) how issue certification affects the Rule 23(b)(3) inquiry. Indeed, it appears that no two circuits apply precisely the same the test in all respects.

**1.  Within the plurality, the circuits disagree about the test for when issue certification is "appropriate."**

The Sixth and Ninth Circuits hold that certification of an issue class is "appropriate" (and thus permissible under Rule 23(c)(4)) when it would "materially advanc[e] the disposition of the litigation as a whole." *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017); *see also D.C. by & through Garter v. County of San Diego*, 783 F. App'x 766, 767 (9th Cir. 2019), *cert. denied sub nom. D. C. by & through Garter v. San Diego County*, 141 S. Ct. 255 (2020) ("significantly advance the resolution of the underlying case"); *Martin*, 896 F.3d at 416 ("materially advance the litigation").

The Second Circuit appears to agree: "Certifying, for example, the issue of defendants' scheme to defraud, would not materially advance the litigation[.]" *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008), *abrogated on other grounds*, *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S.

18

639 (2008); *see also Robinson v. Metro–N. Commuter R.R.*, 267 F.3d 147, 168 (2d Cir. 2001) ("reduce the range of issues in dispute and promote judicial economy").

These circuits thus reduce issue class certification to an essentially functional inquiry.

The Third Circuit, as shown in the decision below, stands alone in applying a multi-factor test— the "*Gates* factors"—under Rule 23(c)(4). *See* App. 17a–18a. This analysis, the Third Circuit has held, is "analytically independent" from Rule 23(b)(3). App. 31a (quoting *Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018), *as amended* (Apr. 4, 2018)). To determine whether issue class certification is "appropriate," a district court must consider a "non-exclusive" list of nine factors that the Third Circuit adopted a decade ago. *Id.*; *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011).

No other circuit has adopted the *Gates* factors—or any other list of factors—to determine whether certification is "appropriate" under Rule 23(c)(4). Even among the circuits that generally agree that Rule 23(c)(4) permits certification of classes otherwise impermissible, the Third Circuit stands alone.

19

### 2. Within the plurality, the circuits disagree about how Rule 23(b)(3) applies.

Similarly, if a court determines that certification of issues under Rule 23(c)(4) is "appropriate," there is a conflict among the plurality regarding how the Rule 23(b)(3) analysis should be performed.

The Ninth Circuit appears to hold that no analysis of predominance is necessary: "[P]redominance was not required for certifying a class under Rule 23(c)(4)." *Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x 880, 882 (9th Cir. 2020); *see also Reitman v. Champion Petfoods USA, Inc.*, No. CV181736DOCJPRX, 2019 WL 7169792, at *14 (C.D. Cal. Oct. 30, 2019) ("[P]redominance need not be met to be certified under Rule 23(c)(4)."); *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015) ("[A] Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))."). *But see Valentino*, 97 F.3d at 1234 ("The district court abused its discretion by not adequately considering the predominance requirement before certifying the [issue] class."). The decisions do not appear to address how superiority should be considered.

The Sixth Circuit, in contrast, requires "a robust application of predominance and superiority

to the issues . . . certified for class treatment." *Martin*, 896 F.3d at 413.

The Second Circuit appears to apply the predominance inquiry to the issues certified under Rule 23(c)(4) but the superiority inquiry to the litigation as a whole. *Nassau Cnty.*, 461 F.3d at 230.

The decision below appears to expand the split even further, apparently holding that when issues are certified under Rule 23(c)(4), not only all of Rule 23(b)(3)—but also Rule 23(a)[3]—must be evaluated only with respect to those issues. *See* App. 14a ("A party seeking to certify 'particular issues' for class treatment must show . . . that those issues satisfy Rule 23(a)'s prerequisites and that those issues are maintainable under Rule 23(b)(1), (2), or (3)." (internal quotation marks and citation omitted)).

> **3.** **These holdings have created confusion among the cases and among the district courts.**

The description above represents our best understanding of the positions of the different circuits, but their positions are far from clear.

---

[3] There is no textual basis for this statement. Rule 23(a)(3) plainly requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," not typical with respect to issues within those claims or defenses.

21

The Fourth Circuit, for example, is often described as joining with the Second, Sixth, and Ninth Circuits. *See Martin*, 896 F.3d at 412 ("In addition to the Second and Ninth Circuits, the Fourth and Seventh Circuits have supported this approach."); App. 29a ("That view, the so-called 'broad view,' has been adopted or supported by the Second, Fourth, Sixth, Seventh, and Ninth Circuits.").

But in the case ordinarily cited as support for this proposition, *Gunnells v. Healthplan Services, Inc.*, the Fourth Circuit made clear that it was not taking sides in the split:

> [W]e have no need to enter that fray . . . because . . . Plaintiffs' cause of action as a whole against TPCM satisfies the predominance requirements of Rule 23. Thus even if the view adopted by the Fifth Circuit (that predominance must be established within a given cause of action to invoke (c)(4)) rather than that of the Ninth Circuit (that this is not necessarily required) constituted the law of this circuit, our holding here would be in full accordance with the Fifth Circuit view.

348 F.3d at 444–45.

Similarly, the Seventh Circuit's authority appears to be mixed. In *Kartman v. State Farm Mutual Automobile Insurance Co.*, the Seventh

22

Circuit held that certification under Rule 23(c)(4) was not "appropriate," explaining that because "the ultimate relief sought is money damages, . . . the requirements for certification of a damages class under Rule 23(b)(3) must be satisfied." 634 F.3d 883, 886 (7th Cir. 2011). The case explained class certification consistently with petitioner's view: "A damages class may be certified under Rule 23(b)(3) and particular issues identified for resolution on a class-wide basis pursuant to Rule 23(c)(4)." *Id.* at 895.

But the decision below reads the Seventh Circuit as consistent with the Second, Sixth, and Ninth Circuits. App. 29a n.6.

### C.     The Circuit Split Is Acknowledged and Entrenched.

The circuits have repeatedly acknowledged the divide in their understandings of Rule 23(c)(4)(A). *See Robinson*, 267 F.3d at 167 n.12. The Third Circuit, in the decision below, reaffirmed its unique approach (i.e., the *Gates* factors). No circuit has reconsidered its position, and there is no reasonable prospect that one will do so.

The circuits have not provided—and will not provide—a clear and definitive answer to the interaction of Rule 23(c)(4) and Rule 23(b)(3). Further percolation will not be helpful, and the necessary guidance can come only from this Court.

**II.    Rule 23(c)(4) Does Not Permit Evasion of Rule 23(b)(3).**

Review is warranted all the more because the plurality understanding of Rule 23(c)(4) is incorrect. This Court has explained that "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (citation omitted). There is no basis for limiting the predominance inquiry to only some of the elements of the underlying cause of action.

**A.    The plurality view would nullify the predominance requirement of Rule 23(b)(3).**

Most obviously, the plurality view cannot be correct because it would nullify the predominance requirement of Rule 23(b)(3).

As the decision below indicates, the plurality view relies on a false dichotomy between "partial Rule 23(b)(3)" certification under Rule 23(c)(4) and "full Rule 23(b)(3) certification." *See* App. 29a (holding that certification under Rule 23(c)(4) "can be used even though full Rule 23(b)(3) certification is not possible due to the predominance infirmities").

Not only do the concepts of "partial" and "full" Rule 23(b)(3) certification have no basis in the rules, but the distinction makes no difference. Both forms of certification have exactly the same effect: If a claim receives "full" Rule 23(b)(3) certification

because the common questions predominate over individual questions, then the common question will be resolved classwide and the individual questions resolved in subsequent individual proceedings. If a claim receives "partial" Rule 23(b)(3) certification of the common questions under Rule 23(c)(4), the common questions will be resolved classwide, and the individual questions resolved in subsequent individual proceedings.

The only difference between "full Rule 23(b)(3) certification" and the "partial certification" (wrongly permitted by some courts of appeals) is that partial certification is a far less difficult standard for achieving exactly the same result.[4]

Under the reasoning of the Second, Third, Sixth, and Ninth Circuits, if certifying the common issues is "appropriate" under Rule 23(c)(4), then there is no need to prove that those common issues predominate over the (uncertified) individual issues.

---

[4] For example, courts have held that liability-only classes can be created both under the orthodox Rule 23(b)(3) analysis and (more easily) through Rule 23(c)(4). *Compare Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (holding that a liability-only class satisfies Rule 23(b)(3)'s predominance requirement for the claim as a whole even though "damages may have to be ascertained on an individual basis") *with Nassau Cnty.*, 461 F.3d 227 ("[A] court may employ [Rule 23(c)(4)] to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement."). There is no difference between the liability-only classes created by these two different routes to certification.

25

If a claim involves both common issues and individual issues, class counsel should always cite Rule 23(c)(4) and seek certification only of common issues under that provision. Indeed, it would verge on malpractice for class counsel to intentionally choose the more difficult route of "full Rule 23(b)(3) certification" rather than the easier "partial" Rule 23(c)(4) route. There is no reason that the predominance comparison expressly mandated by Rule 23(b)(3) should ever take place.

As a result, every word that this Court has written about predominance should be meaningless. *E.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (discussing predominance); *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (same); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (same). If the plurality view were correct, this Court discussed predominance in each of these cases only because plaintiffs' counsel erred in failing to invoke Rule 23(c)(4). Had plaintiffs' counsel invoked Rule 23(c)(4) in those cases, whether the common questions predominated over (uncertified) individual questions would have been irrelevant.

Rule 23(b)(3) expressly requires that when a claim involves common and individual issues, class certification is appropriate only if the common questions predominate over "any individual questions." A reading of the Rules that renders this provision superfluous cannot be correct.

26

### B. The error arises from a misreading of the Advisory Committee Notes.

The genesis of the error appears to be a misreading of the Advisory Committees Notes regarding Rule 23.

As this Court has explained, the predominance requirement of Rule 23(b)(3) does not require that there be no individual questions. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson*, 577 U.S. at 453 (internal quotation marks and citation omitted). When common issues predominate, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately[.]" *Id.*; *see also Comcast Corp.*, 569 U.S. at 41 (Ginsburg and Breyer, JJ., dissenting) ("This predominance requirement . . . scarcely demands commonality as to all questions.").

Thus, the Advisory Committee Notes to subdivision (b)(3) explain, class certification is proper where "questions common to the class predominate over the questions affecting individual members." Fed. R. Civ. P. 23, Advisory Committee Notes to Subdivision (b)(3). The Notes use a fraud claim as an example of circumstances in which common liability questions might predominate over individual damages questions: "[A] fraud perpetrated on numerous persons by the use of

similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." *Id.*

Later, in discussing subdivision (c)(4), the Advisory Committee Notes return to this example: "For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." Fed. R. Civ. P. 23, Advisory Committee Notes to Subdivision (c)(4).

The Advisory Committee Notes confirm petitioner's understanding of Rule 23(b). In a fraud claim involving the use of similar misrepresentations on numerous persons, the common liability questions may predominate over individual damages questions and certification may be proper under Rule 23(b)(3). If so, Rule 23(c)(4) allows the common issue of liability to be adjudicated on a classwide basis and the individual issues to be adjudicated individually.

In other words, in the fraud example in the Advisory Committee Notes, Rule 23(c)(4) could be employed to adjudicate liability on a classwide basis *because* (as Rule 23(b)(3) required) the common liability questions predominated over the individual damages questions.

28

The Second Circuit misread the note to subdivision (c)(4). Overlooking the fraud example in subdivision (b)(3), the Second Circuit assumed that the fraud example in (c)(4) was an exception to Rule 23(b)(3). *See Nassau Cnty.*, 461 F.3d at 226 (relying on the fraud liability example as circumstances "when common questions predominate only as to the 'particular issues' of which the provision speaks"). In other words, the Advisory Committee Notes describe certification under subdivision (c)(4) in circumstances where subdivision (b)(3) *has been satisfied* for the claim as a whole. But the Second Circuit misread the example to justify certification under subdivision (c)(4) even though subdivision (b)(3) *was not satisfied*.

## C. The correct reading does not nullify subdivision (c)(4).

As the Advisory Committee Notes demonstrate, the proper understanding of Rule 23(b)(3) and Rule 23(c)(4) does not "rende[r] subsection (c)(4) virtually null." *Nassau Cnty.*, 461 F.3d at 226. To the contrary, Rule 23(c)(4) is employed—either explicitly or implicitly—nearly every time a class action is certified under Rule 23(b)(3).

By definition, an "individual question" cannot be certified for class treatment or resolved on a classwide basis. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member[.]'" *Tyson Foods*, 577 U.S. at 453 (quoting 2

29

W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).

Any time a claim involves both common and individual questions, a court certifying a Rule 23(b)(3) class necessarily uses Rule 23(c)(4) to certify only the common questions for class adjudication. As discussed above, the decision below rests on a false dichotomy between "full Rule 23(b)(3) certification" and cases involving Rule 23(c)(4). App. 28a-29a.

Nor does the correct approach require "pretend[ing] that subsection (c)(4)—a provision specifically included to make a class action more manageable—does not exist until after the manageability determination [has been] made." *Nassau Cnty.*, 461 F.3d at 227 (citation omitted). Petitioner's view is that Rule 23(c)(4) is what authorizes courts to separate common issues from individual issues for class treatment. The ability of a court (under Rule 23(c)(4)) to resolve only the common issues on a classwide basis is critical to the Rule 23(b)(3) superiority and manageability analyses, regardless of whether the provision is cited expressly.

### III. The Interaction of Rule 23(b)(3) and Rule 23(c)(4) Is an Important Question That Should Be Decided by this Court.

This issue is important and recurring, and this area of the law warrants clarity from this Court.

Whether Rule 23(b)(3)'s predominance requirement must always be satisfied by comparing common issues to individual ones—or whether Rule 23(c)(4) can allow certification of a class even when these requirements are not met—will dramatically affect the scope of permissible class certification.

If respondents are correct, then certification is theoretically permissible for any case involving a common issue, limited only by the creativity of plaintiffs' counsel in identifying common issues for class treatment.

This Court has already recognized the "risk of 'in terrorem' settlements" created by class actions. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). And the decision below recognizes the potential pressure that certification exerts on the facts of this case: "If an issue-class jury finds that the Commission owed Plaintiffs a legal duty that it subsequently breached, the Commission may face undue pressure to settle, even if their breach did not cause Plaintiffs' harm." App. 25a.

Class actions are tremendously powerful procedural tools, but that power requires strict rules and vigilance against their misuse. Particularly for important oft-arising issues of federal procedure, the circuits should be in harmony, and they should be correct. Uniformity and clarity can come only from this Court.

31

## IV. This Case Is an Excellent Vehicle.

This case provides an ideal vehicle for this Court to consider the issue. The argument is determinative. It is difficult to imagine a claim less suitable for class treatment than a claim for negligent infliction of emotional distress, and when the claim is considered as a whole, the individual issues—including causation, injury, and damages—predominate over the narrow (allegedly-common) issues of duty and breach that respondents seek to certify. If ECFMG is correct that predominance under Rule 23(b)(3) requires comparing the common questions against the individual questions, then certification is unavailable and judgment should have been rendered denying class certification (rather than remanding for additional consideration by the district court).

This case is a perfect example of a matter in which "full Rule 23(b)(3) certification is not possible due to the predominance infirmities." App. 29a. Certification is possible only if the decision below was correct to hold that Rule 23(c)(4) creates some special form of "partial" Rule 23(b)(3) certification.

This case also illustrates the dangers of the incorrect interpretation of Rule 23(c)(4), in which plaintiffs' counsel seek (and receive) certification of an issue class for the purpose of settlement pressure, without any real plan for trying the case.

32

The issue is important, and it is ripe for decision. The split is implicated in this case, and a decision on the legal rule in favor of ECFMG would lead to a different result.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,


William R. Peterson
    *Counsel of Record*
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
T: 713.890.5188
F: 713.890.5001
william.peterson@morganlewis.com

*Counsel for Petitioner*

DECEMBER 2021

**APPENDIX A**

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————

No. 20-2128

——————

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

v.

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

Appellant

——————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:18-cv-05629)
District Judge: Honorable Joshua D. Wolson

——————

Argued February 11, 2021

Before: RESTREPO, BIBAS, and PORTER,
*Circuit Judges*

(Filed: September 24, 2021)

——————

(1a)

William R. Peterson [ARGUED]
Morgan, Lewis & Bockius
1000 Louisiana Street, Suite 4000
Houston, TX 77002

Matthew D. Klayman
Brian W. Shaffer
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

*Counsel for Appellant*

Nicholas M. Centrella
Robin S. Weiss
Conrad O'Brien
1500 Market Street
West Tower, Suite 3900
Philadelphia, PA 19102

Brent P. Ceryes
Schochor Federico & Staton
1211 Saint Paul Street
Baltimore, MD 21202

Brenda Harkavy
Patrick A. Thronson [ARGUED]
Janet Janet & Suggs
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC 20009

Paul M. Vettori
Law Offices of Peter G. Angelos
100 North Charles Street
One Charles Center, 22nd Floor
Baltimore, MD 21201

Cory L. Zajdel
Z Law
2345 York Road, Suite B-13
Timonium, MD 21093

> *Counsel for Appellee*

Diana Huang
American Medical Association
25 Massachusetts Avenue, N.W., Suite 600
Washington, DC 20001

Leonard A. Nelson
American Medical Association
330 North Wabash Avenue, Suite 39300
Chicago, IL 60611

> *Counsel for Amicus American Medical As-*
> *sociation, Association of American Medical*
> *Colleges, and Pennsylvania Medical Society*
> *in support of Appellant*

Gilbert Dickey
McGuireWoods
201 North Tryon Street, Suite 3000
Charlotte, NC 28202

Matthew A. Fitzgerald
McGuireWoods
800 East Canal Street
Gateway Plaza
Richmond, VA 23219

> *Counsel for Amicus Chamber of Commerce*
> *in support of Appellant*

———————

## OPINION OF THE COURT

———————

RESTREPO, *Circuit Judge.*

This case presents the question whether the District Court abused its discretion when it certified an "issue class" pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure. We hold that it did. According to Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." For "an action" to be "brought or maintained as a class action," the party seeking class status must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Further, in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), we enumerated a "non-exclusive list of factors" relevant to assessing whether the certification of an issue class under Rule 23(c)(4) is "appropriate." *Id.* at 272 (quoting *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004)). So when a party seeks to certify "particular issues" for class treatment, the district court must ask three questions. *First*, does the proposed issue class satisfy Rule 23(a)'s requirements? *Second*, does the pro-

posed issue class fit within one of Rule 23(b)'s catego-
ries? *Third*, if it does, is it "appropriate" to certify this
as an issue class? Fed. R. Civ. P. 23(c)(4). Here, lacking
clear guidance, the District Court failed to determine
whether the issues identified for class treatment fit
within one of Rule 23(b)'s categories and then failed to
explicitly consider a few of the *Gates* factors. Accord-
ingly, for the reasons that follow, we will vacate the Dis-
trict Court's issue-class certification and remand for fur-
ther proceedings.

## I.   FACTUAL BACKGROUND

### A.  The Educational Commission for Foreign Medical Graduates

Graduates of foreign medical schools who wish to be
accepted to a United States medical-residency program
must have graduated from a recognized foreign institu-
tion, demonstrated English-language proficiency, and
passed the first two steps of the United States Medical
Licensing Examination. Defendant-Appellant Educa-
tional Commission for Foreign Medical Graduates ("the
Commission") is a Philadelphia-based nonprofit that
certifies that such graduates have satisfied those re-
quirements. The Commission carries out this function in
two ways. First, it administers the English-language
and medical examinations the foreign medical school
graduates must pass. Second, the Commission verifies,
using primary sources, that the applicant received a
medical degree from a qualifying institution.

As the central certification agency for graduates of
foreign medical schools, the Commission also investi-
gates what it calls "irregular behavior." According to in-
ternal policies, the Commission may investigate "all ac-
tions or attempted actions on the part of applicants . . .

that would or could subvert the examination, certification or other processes, programs, or services of [the Commission]." J.A. 254. The Commission's investigation of such behavior proceeds as follows. When the Commission receives an allegation that an applicant committed irregular behavior, it reviews the allegation and determines whether sufficient evidence supports the charge. If sufficient evidence supports the charge, the Commission notifies the applicant of the allegation and invites him to submit a written explanation or present any other relevant information. The applicant may also request a hearing and hire legal counsel. After the applicant is heard, the Commission then determines whether, by a preponderance of the evidence, the applicant engaged in the irregular behavior that was charged. The Commission may take various disciplinary actions, up to and including permanent revocation of a certification. The charged individual has a right of appeal, but petitions to reconsider decisions are granted "only in extraordinary cases." *Id.* And whatever the case, if the Commission "determines that an individual engaged in irregular behavior, a permanent annotation to that effect will be included in the individual's [Commission] record." *Id.*

## B.  A Foreign Doctor Named Charles Igberase

In early 1992, a man named Oluwafemi Charles Igberase applied to the Commission for certification. He eventually passed the medical-licensing and English-language examinations and was issued the Commission's certification. But no residency program accepted him. So, in March 1994, Igberase submitted a second application for certification to the Commission. In that application, however, Igberase rearranged his name ("Igberase Oluwafemi Charles" instead of "Oluwafemi Charles Igberase"); used a different date of birth (April

17, 1961 instead of April 17, 1962); and responded "No" to the question of whether he had ever previously submitted an application to the Commission. Igberase passed each required examination and was certified by the Commission for a second time. But in June 1995, the Commission learned that Igberase had obtained two of its certifications under different names and dates of birth, and had lied on his second application about not seeking certification previously. So it invalidated Igberase's second certification and revoked the first, and informed the United States Medical Licensing Examination Committee of his deception. J.A. 237.

In 1996, Igberase applied to the Commission for certification for yet a third time. In this application, Igberase ditched his first two names and invented another one: "John Nosa Akoda." J.A. 263. As he had twice before, Igberase (as Akoda) eventually passed the medical-licensing and English-language examinations and received the Commission's certification. After receiving the certification as "Akoda," Igberase applied for and was admitted to a residency program in New Jersey. But in August 2000, the residency program learned that the social security number Akoda used in his application belonged to Igberase. The residency program informed the Commission of the inconsistency, provisionally suspended the doctor it knew as Akoda, and, after an internal investigation, in November 2000, dismissed him.

Once it learned of Akoda's possible misuse of Igberase's social security number, the Commission launched its own investigation. Based on the information it had received from the residency program, the Commission sent Akoda a "charge letter." In it, the Commission told Akoda that it had "received information alleging that you may have engaged in irregular behavior,"

specifically that he had twice before applied for certification using the name "Igberase." J.A. 284. The Commission told Akoda that the allegations "require[ ] an explanation," and granted him fifteen days to submit a written response. J.A. 285.

A week later, as Akoda, Igberase responded. He denied the allegations, telling the Commission that "[t]he identification numbers listed in your letter apparently belong to my cousin Dr. Igberase Oluwafemi Charles, who left the country to practice, I believe, in South Africa." J.A. 287. Akoda admitted using Igberase's social security number but insisted that they were "two different persons who attended two different Colleges of Medicine." *Id.* He reiterated that he had "only taken the examination once in my name, John NOSA Akoda," and offered to provide the Commission with his passport if it requested it. J.A. 287.

The Commission official overseeing Akoda's case apparently did not buy the explanation. In a December 2000 memorandum intentionally not made part of Akoda's official file, the official wrote that he and others believed Igberase and Akoda were one in the same. J.A. 293. But the official concluded that he did not have enough evidence to recommend Akoda's case to the Commission's credentialing committee. So Akoda's credential remained active.

In October 2006, Igberase, again as "Akoda," applied to a residency program at Howard University Medical Center. As part of his application, he submitted to the Commission three letters of recommendation. But the Commission was suspicious of Akoda, so one of its officials attempted to verify the authenticity of these

three letters of reference. The official sent each reference the recommendation letter submitted by Akoda and asked each whether the letter was authentic. The record does not reflect whether the official received a response from any of the references.

Despite the official's reservations, Igberase (as Akoda) was admitted to Howard's residency program. He successfully completed the program in 2011. After completing the program, he applied for and received a Maryland medical license using fake identification documents. That same year, he became a member of the medical staff at Prince George's Hospital Center and began seeing patients there.

In June 2016, law enforcement officials executed search warrants at Igberase's residence, medical office, and vehicle. They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation, and birth certificates. On November 15, 2016, Igberase signed a plea agreement. In it, he pleaded guilty to misuse of a social security account number to fraudulently obtain a Maryland medical license and admitted that "Akoda" was a pseudonym. *Id.*

The Commission subsequently invalidated Akoda's foreign-doctor certification, and the Maryland Board of Physicians revoked his medical license.

### C.  Patients of Igberase sue the Commission

The named Plaintiffs are Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans. Each received medical treatment from the doctor known as "Akoda," who was certified by the Commission in 1997. Igberase

performed unplanned emergency cesarean-section surgery on Russell and Riggins and delivered Evans's and Powell's children. These Plaintiffs also seek to represent a class of similarly situated individuals who likewise received medical treatment from "Akoda." But the Plaintiffs (appellees here) did not sue Igberase. Instead, they sued the Commission, and asserted claims of negligent infliction of emotional distress arising out of the Commission's certification of Igberase as "Akoda."

Eventually, the district court certified a class of "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/ka [sic] Charles J. Akoda) beginning with his enrollment in a postgraduate medical education program at Howard University in 2007." J.A. 63-64. But the district court did not certify the class under any subsection of Rule 23(b). Instead, the court certified the class as an "issue class" pursuant to Rule 23(c)(4). The court certified the class with respect to these issues:

(1) whether the Commission undertook or otherwise owed a duty to class members.

(2) whether the Commission breached any duty that it owed to class members.

(3) whether the Commission undertook or otherwise owed a duty to hospitals and state medical boards, such that it may be held liable to class members pursuant to the Restatement (Second) of Torts § 324A.

(4) whether the defendant breached any duty that it owed to hospitals and state medical boards.

In short, the particular issues the district court certified for class treatment concern only the duty and breach elements of Plaintiffs' claim. The district court

therefore left for individualized proceedings whether each Plaintiff was injured; whether the Commission's breach of the relevant duty (if it had a duty that was breached) actually and proximately caused those injuries; whether those injuries are due a particular amount of damages; and whether the Commission could raise any affirmative defense, including, presumably, whether each Plaintiff's consent to medical treatment by Igberase breaks the causal chain. In the wake of the Rule 23(c)(4) certification, the Commission successfully petitioned for leave to appeal under Rule 23(f). We must decide whether that certification was proper.

## II. THE LEGAL FRAMEWORK OF ISSUE-CLASS CERTI-FICATION

### A. Rule 23 outlines one procedure for pursuing aggregate litigation

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2009) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). One reason the class action is an exceptional form of litigation is because final judgments in such actions may implicate the procedural and substantive rights of absent persons.

The Supreme Court recently reiterated the principle that absent persons may not be bound by federal-court judgments unless one of a limited number of historically recognized exceptions is satisfied. *See Taylor v. Sturgell*, 553 U.S. 880, 893 (2008). A "properly conducted" class action is one such exception. *Id.* at 894-95. A properly conducted class action requires that (1) "[t]he interests of the nonparty and her representative

are aligned"; (2) "either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty"; and (3) there was "notice of the original suit to the persons alleged to have been represented." *Id.* at 900.

In the class context, "these limitations are implemented by the procedural safeguards in Federal Rule of Civil Procedure 23." *Id.* at 900-01. The procedural safeguards of Rule 23, in turn, are constitutionally mandated and "grounded in due process." *Id.* at 901. Rule 23 thus provides a constitutional safe harbor for litigants to pursue class treatment on behalf of absent persons. But the party seeking to certify a class "bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015) (discussing and clarifying preponderance of evidence standard in class certification determinations).

The requirements of Rule 23 are these. The party seeking class certification must demonstrate, first, that the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To satisfy Rule 23(a), a plaintiff must "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).

Once beyond Rule 23(a)'s four prerequisites, plaintiffs then must seek to certify a class of one of three "types," each with additional requirements. *See* Fed. R. Civ. P. 23(b). For instance, Rule 23(b)(3), a provision at

issue here, states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."[1]

Rule 23(c) provides two additional pathways to a form of class certification. Rule 23(c)(5) permits a district court, "[w]hen appropriate," to "divide[ ]" a class "into subclasses that are each treated as a class under [Rule 23]." So if a district court detects dissimilarities of interests between the putative class representative and absent class members, it may divide the full class into subclasses to isolate atypical issues or claims, or resolve conflicts of interest that otherwise would preclude full class certification. *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 432 (3d Cir. 2016); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[A] class divided between holders of present and future claims . . . requires division into homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel."). And Rule 23(c)(4), the provision center stage here, states that

---

[1] There are two additional "types" of class actions maintainable under Rule 23(b). Rule 23(b)(1) allows a class to be maintained where "prosecuting separate actions by or against individual class members would create a risk of" either "(A) inconsistent or varying adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Rule 23(b)(2), by contrast, applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

"[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Pursuant to that provision, we have previously held that a district court may certify for class treatment issues that would, upon their resolution, determine a defendant's course of conduct. *See Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004). In what follows, we examine the scope of issue-class certification under Rule 23(c)(4).

**B. Issue-class certification under Rule 23(c)(4) grants district courts broad but well-defined discretion to certify particular issues for class treatment**

Let us restate the text of Rule 23(c)(4). It says that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Rule, therefore, permits an issue class to be brought or maintained "as a class action." But with that permission comes restrictions. To be a "class action," a party must satisfy Rule 23 and all its requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305, 310 (3d Cir. 2008) ("[A] class may not be certified without a finding that each Rule 23 requirement is met."). In other words, "[i]n addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). A party seeking to certify "particular issues" for class treatment must show the same. That party must show that those issues "satisfy[] Rule 23(a)'s prerequisites" and that those issues are "maintainable under Rule 23(b)(1), (2), or (3)." *See id.*

But neither Rule 23(c)(4) nor its commentary outlines the "appropriate[ness]" inquiry, or discusses which types of "issues" might be suitable for class treatment and which may not be. At the provision's adoption, the Rules Committee, in its commentary, suggested that the issue-class device may be used to bifurcate the "adjudication of liability to the class" from follow-on proceedings needed to "prove the amounts of [class members'] respective claims." Fed. R. Civ. P. 23(c)(4) advisory committee's note to 1966 amendment. That commentary does not illuminate much. In a typical Rule 23(b)(3) class action, for example, individualized damages determinations often remain after common questions have been decided. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-60 (2016); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-70 (2013). Further, Rule 23(c)(4) talks about "issues," not "liability" (or "claims" or "causes of action"), so there is no obvious textual basis to limit issue-class certification to issues that, upon *their* resolution, necessarily establish a defendant's liability as to all claimants.

We explained Rule 23(c)(4)'s "appropriate[ness]" inquiry in *Gates v. Rohm & Haas*, 655 F.3d 255 (3d Cir. 2011). In *Gates*, we considered the appropriateness of issue-class certification for property owners who alleged that a chemical company's pollution decreased their property values. In 2005, Rohm & Haas acquired a chemical-processing plant in Ringwood, Illinois. *Id.* at 258. For the half-century or so prior to Rohm & Haas's acquisition, the Ringwood facility was owned and operated by a company called Morton International. *Id.* During at least some of that time, Morton dumped wastewater produced by its chemical processing into an on-site lagoon. *Id.* The wastewater contained vinylidene

chloride, a molecule used in the production of vinyl chloride, which is important in the production of plastics and a known carcinogen. "In 1978, Morton ceased using the on-site lagoon and covered it." *Id.* But environmental testing in the 1970s and 1980s suggested that Morton's dumping of vinylidene chloride was polluting the surrounding environment. In 1973, for example, "tests of a shallow aquifer under the Ringwood facility showed elevated levels of ammonia and chloride." *Id.* And in 1984, water samples from wells that Morton had installed at Ringwood showed elevated levels of vinylidene chloride and vinyl chloride. *Id.*

In 2006, residents of a nearby residential village filed a class-action complaint alleging, among other things, that Morton's dumping of the vinylidene chloride caused their residential community to become less attractive and their property values to decrease.[2] *Id.* at 259, 271. Before the district court, with respect to their property damage claim, the plaintiffs moved to certify two classes—a Rule 23(b)(3) class of property owners who allegedly suffered loss in property values due to the defendants' contamination and an "issue only" class that would decide defendants' liability but leave damages for individual trials. *Id.* at 272.

---

[2] The plaintiffs' complaint asserted several claims for relief, including medical monitoring, property damage claims, relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, the Illinois Environmental Protection Act, 415 Ill. Comp. Stat. § 5/1 *et seq.*, and state-law fraudulent misrepresentation and willful and wanton misconduct claims. But they chose to proceed on a class basis only on the medical monitoring and property damage claims and, as noted, solely with regard to vinyl chloride exposure. *Gates*, 655 F.3d at 259.

The district court declined to certify either class. As to the plaintiffs' proposed Rule 23(b)(3) class, the district court found that common questions did not predominate over individual ones. The court observed "that resolution of [common] questions leaves significant and complex questions unanswered, including questions relating to causation of contamination, extent of contamination, fact of damages, and amount of damages." *Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 233-34 (E.D. Pa. 2010). The district court likewise rejected plaintiffs' attempt to certify a Rule 23(c)(4) issue class. The court found that an issue class "would not advance the resolution of class members' claims" because, like in the Rule 23(b)(3) context, "the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quotation marks omitted). We affirmed.

In affirming the district court's decision not to certify a Rule 23(c)(4) issue class, we adopted a "non-exclusive list of factors [to] guide courts" faced with motions to certify particular issues. *Gates*, 655 F.3d at 273. *Id.* The factors, which number nine, are these:

1. the type of claim(s) and issue(s) in question;

2. the overall complexity of the case;

3. the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;

4. the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates

the issue(s) from other issues concerning liability or remedy;

5. the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);

6. the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;

7. the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;

8. the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others;

9. and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

When assembled, the *Gates* factors construct a functional framework to aid the district courts tasked with resolving issue-class certification questions.[3] But

---

[3] The *Gates* factors grew out of our opinion in *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009). In *Hohider*, we provided relevant considerations on when a district court may wish "to carve at the joints to form issue classes." *Gates*, 655 F.3d at 273. As source for the factors, the *Hohider* court cited the American Law Institute's "Proposed Final Draft of the Principles of the Law of Aggregate Litigation." *Hohider*, 574 F.3d at 200-02. By the time

*Gates* did not define which "issues" would be appropriate for class treatment or, more importantly, which would not. Specifically, *Gates* did not answer whether the term "particular issues" in Rule 23(c)(4) could encompass claim elements (like duty or breach, or causation or reliance) and defenses (like consent or intervening cause), or if the "particular issues" that the district court could certify "when appropriate" must be limited to questions that would resolve a defendant's liability.

At several points, *Gates* appears to suggest that the certified "issues" should (perhaps except in exceptional circumstances) be able to resolve a defendant's liability. *See, e.g., id.* at 272 ("[T]he [district] court declined to certify a liability-only class."); *id.* at 273 ("The trial court here did not abuse its discretion by declining to certify a liability-only issue class when it found liability inseverable from other issues that would be left for follow-up proceedings."); *id.* ("Nor did the court err in finding no marked division between damages and liability."); *id.* at 274 ("Plaintiffs have neither defined the scope of the liability-only trial nor proposed what common proof would be presented."); *id.* ("A trial on whether the [issues proposed] is unlikely to substantially aid resolution of the substantial issues on liability and causation.").

Reading "issues" in Rule 23(c)(4) to exclude claim elements is supported by later cases from our Court. In *Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018), for example, the only published opinion from this Court to apply *Gates*, we reiterated that issue-class certification

---

*Gates* issued, the ALI had finalized the Principles, and we incorporated many of them as the factors district courts should consider in assessing whether to certify an issue class. *Gates*, 655 F.3d at 273.

"*might* be appropriate" if "liability is capable of class-wide treatment but damages are not[.]" *Id.* at 202-03 (emphasis added). Said another way, issue-class certification *is not* appropriate if class-wide resolution of the "issues" does not resolve liability. *See id.* (noting that declining issue-class certification was appropriate because plaintiffs offered "no theories of *liability* for which classwide treatment is apt") (emphasis added).

But at various other points, *Gates* suggests that claim elements *may* be appropriate for issue-class treatment in certain circumstances. For example, the *Gates* Court "agreed" with the district court's finding that an issue class was not feasible and would not advance the resolution of class members' claims because "both the fact of damages and the amount of damages would remain following the class-wide determination of any common issues, and further that causation and extent of contamination would need to be determined at follow-up proceedings." *Gates*, 655 F.3d at 272 (quoting district court). In other words, for the district court, the fact that claim elements (like causation) would remain after resolution of the class issues was a *reason* for the inappropriateness of certifying an issue class. But neither the district court nor the court of appeals concluded that claim elements remaining after resolution of class issues *barred* issue-class certification.

Viewing *Gates* to permit the certification of issues that do not resolve liability comports with our pre-*Gates* caselaw. In *Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004), we noted "that courts commonly use Rule 23(c)(4) to certify some *elements* of liability for class determination, while leaving other elements to individual adjudication—or, perhaps more realistically, settlement." *Id.*

at 267 (emphasis added). So there, we affirmed the district court's certification of an issue class limited to determining the defendant's course of conduct (whether a federal agency placed "thousands of Virgin Islanders, almost all of whom were Black, Hispanic, or female," on a "phony, illegal waiting list" when those individuals sought to apply to a "loan program[] intended to help low income rural families obtain homes and make repairs to existing homes," *id.* at 259-60, 263), but left for subsequent individual adjudication the issue of whether those individuals were eligible for the loans in the first place. *Id.* at 267.

Other courts of appeals have permitted the certification of non-liability issue classes in analogous circumstances. The Seventh Circuit, for example, has affirmed the certification of an issue class where the issues, once resolved, stopped short of establishing a defendant's liability to any claimant. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (in employment case, endorsing the use of a Rule 23(c)(4) issue class to determine the disparate impact of a challenged corporate policy, with "separate trials . . . to determine which class members were actually adversely affected . . . and if so what loss each class member sustained"); *cf. Pella Corp. v. Saltzman*, 606 F.3d 391, 393-94 (7th Cir. 2010) (in consumer fraud case, upholding certification of Rule 23(b)(3) class when common issues left components of causation for individualized determination).

Moreover, the text of Rule 23(c)(4) supports the reading that the "issues" a district court may certify for class treatment need not be limited to those that decide a party's liability. The Rule permits an action to be brought or maintained as a class action "with respect to

particular issues," not just those that decide liability. We therefore hold that district courts may certify "particular issues" for class treatment even if those issues, once resolved, do not resolve a defendant's liability, provided that such certification substantially facilitates the resolution of the civil dispute, preserves the parties' procedural and substantive rights and responsibilities, and respects the constitutional and statutory rights of all class member and defendants.

\* \* \* \* \*

In sum, district courts tasked with resolving motions to certify issue classes must make three determinations. First, does the proposed issue class satisfy Rule 23(a)'s requirements? Second, does the proposed issue class fit within one of Rule 23(b)'s categories? Third, if the proposed issue class does both those things, is it "appropriate" to certify these issues as a class? Fed. R. Civ. P. 23(c)(4). The first two steps will be informed by general class-action doctrine. The third step will be informed by *Gates. See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 201 (3d Cir. 2009). In other words, Rule 23(a) and Rule 23(b) decide if the proposed issues *can* be brought or maintained as class action, while the *Gates* factors determine whether they *should*.

## III. DISCUSSION

Guided by Rule 23(c)(4) and *Gates*, in this case, we must determine whether the District Court appropriately certified for class treatment whether the Commission owed a relevant legal duty to the Plaintiffs that it subsequently breached, but left for individual proceedings whether Plaintiffs were injured; whether the Commission's breach of the relevant duty actually and proximately caused those injuries; whether those injuries

are due a particular amount of damages; and whether the Commission's affirmative defenses (including, presumably, that each Plaintiff consented to medical treatment by Igberase) can refute Plaintiffs' claim.

We review the District Court's decision to certify the duty and breach issues of Plaintiffs' negligent infliction of emotion distress claim for abuse of discretion. *Gates*, 655 F.3d at 262. A district court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (quoting *In re Hydrogen Peroxide*, 552 F.3d 305, 320 (3d Cir. 2009)). Whether the district court employed the correct legal standard is reviewed *de novo. In re Hydrogen Peroxide*, [552] F.3d at 312 (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)). Conducting that review, we conclude that the District Court abused its discretion.

## A. The District Court erred in certifying this issue class

Two reasons, each independently sufficient, support the conclusion that the District Court misapplied *Gates* when it certified for class treatment the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim.

*First*, the District Court did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3). The Court correctly observed that *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies Rule 23(b)(3). J.A. 42-43 ("[The Commission]'s argument that the Court should require Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement before turning to these factors parrots one of the camps that

the Third Circuit acknowledged but refused to join in *Gates*. Because the Third Circuit rejected that view, this Court must do the same."); *see also* J.A. 56 ("Having determined that Plaintiffs can satisfy the Rule 23(a) factors, the Court turns to the question of whether to certify an issues class under Rule 23(c)(4)."). But while *Gates* does not require Plaintiffs seeking issue-class certification to prove that their cause of action as a whole satisfies a subsection of Rule 23(b), for reasons we have explained, Rule 23(c)(4) does require that the Plaintiffs demonstrate that the issues they seek to certify satisfy one of Rule 23(b)'s subsections. On remand, the Plaintiffs may be able to make such a showing, but we will leave that inquiry to the District Court to consider in the first instance.[4]

---

[4] The Commission also insists that the District Court erred in finding that Plaintiffs' satisfied Rule 23(a)'s typicality and adequacy requirements. Appellant Br. 18-19. It argues the Plaintiffs are atypical and inadequate class representatives because they propose to inflict emotional distress on absent class members currently ignorant of the underlying allegations, and that Plaintiffs' decision to seek relief only for their emotional distress makes them inadequate representatives of absent class members who have suffered physical injuries. Neither argument is persuasive. For one, we find no support for the proposition that absent class members ignorant of their potential legal injury might cause named plaintiffs (who are aware of their injury) to be inadequate or atypical class representatives. For another, if the District Court determines that some cognizable subset of absent class members may also have live legal claims for physical injuries, then it has ample tools at its disposal to manage those divergences, including by creating subclasses pursuant to Rule 23(c)(5) or the notice requirements of Rule 23(c)(4). We have "set a low threshold for typicality." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (internal quotations omitted). And "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or

*Second*, separate and apart from the District Court's failure to determine whether the duty and breach elements of Plaintiffs' claim satisfied any subsection of Rule 23(b), the Court also failed to rigorously consider several *Gates* factors. For example, the Court does not explicitly discuss whether the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues. Many other actors played a role in Igberase's fraud, including the residency programs that admitted and trained him, the state medical boards that licensed him, the hospitals that gave him privileges, the specialty board that certified him, and the law enforcement officers (state and federal) who investigated him. If an issue-class jury finds that the Commission owed Plaintiffs a legal duty that it subsequently breached, the Commission may face undue pressure to settle, even if their breach did not cause Plaintiffs' harm.

Relatedly, the District Court did not rigorously consider what efficiencies would be gained by resolution of the certified issues. To be sure, the District Court briefly discussed the efficiencies of a single trial and broached other options with the parties. J.A. 60-61. But more was needed. To prove their claim that the Commission negligently inflicted emotional distress, Plaintiffs will need to show (as with all causes of action arising under state tort law) duty, breach, cause, and harm. But the District Court certified an issue class with respect to the duty and breach elements only. So even if the District Court finds that the Commission owed a relevant legal duty to the Plaintiffs that it subsequently

where the claim arises from the same practice or course of conduct." *Id.*

breached, each Plaintiff, in individual proceedings, will have to prove that they were injured; that the Commission's breach of the relevant duty actually and proximately caused those injuries; that those injuries are due a particular amount of damages; and that the Commission's affirmative defenses (including, presumably, each Plaintiff's consent to medical treatment by Igberase) are not decisive.

The District Court may also wish to consider whether the duty and breach elements of Plaintiffs' negligent infliction of emotional distress claim are suitable for issue-class treatment. Under Pennsylvania law, for example, to determine whether the Commission owed the Plaintiffs a relevant legal duty, the class jury will have to weigh several factors, including the "foreseeability of the harm incurred." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (citations omitted). And once beyond the class trial, to determine and measure emotional damages, each individual jury will have to assess the degree of the Commission's negligence as to each Plaintiff. *See Spence v. Bd. of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (finding no abuse of discretion where the District Court joined for trial the issues of liability and damages for emotional distress, explaining that "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct"). So the issue-class jury, like each individual jury, may need to consider evidence regarding the harm the Commission allegedly caused. And each individual jury, like the issue-class jury, may need to consider evidence regarding the Commission's overall conduct, which likely will include the nature of the legal duty it owed Plaintiffs (if any) and the extent to which it breached that duty. *Gates*

disfavors this. *See* 655 F.3d at 273 (holding that "the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s)" counsels against certification of those common issues).

Of course, the District Court may very well be correct that "there are efficiencies to be gained by certifying a class on these issues because it will allow for a single trial with a single, preclusive determination about [the Commission]'s conduct, rather than the presentation of the same evidence about [the Commission] again, and again, and again to separate juries." J.A. 60. Duty is an issue of law. Therefore, it must be decided separately from breach, causation, and damages. *See Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003). It is true that deciding if the Commission had a duty to investigate requires balancing several factors. *Id.* But none of that requires individual evidence, for each patient shared the same distanced relationship of trust with the Commission. Likewise, breach would require only common evidence: How much investigating did the Commission do? Did it know or should it have known that Igberase was a fraud? Did it take enough steps to investigate him based on warnings received from various parties, including the New Jersey residency program? Should it have followed up in later years once Igberase was admitted to another residency program? No absent class member would have anything special to add in her individual trial. There will be plenty left for individual proceedings, but these major issues could be resolved on a class-wide basis.[5]

---

[5] These two reasons are sufficient to support our decision to vacate the District Court's certification for class treatment the duty

## B. The Commission's remaining arguments for reversal are unavailing or inapposite

The Commission and its amicus offer two additional bases on which to reverse the District Court. The Commission first argues that "the plain text of Rule 23 and the cases interpreting it" demand that "the party seeking to certify a class must satisfy one of the prongs of Rule 23(b)" and, "[b]ecause the district court failed to find that Named Plaintiffs satisfied Rule 23(b)(3) or any other prong of Rule 23(b), the class certification must be reversed." Appellant's Br. 39; *see also* Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 5-16.

That is not accurate. A majority of the courts of appeals have concluded that in appropriate cases Rule

---

and breach elements of Plaintiffs' negligent infliction of emotional distress claim. But there may yet be other problems with the issue class, including the possibility that Plaintiffs' legal claim implicates multiple states' laws. Under *Gates*, a district court, tasked with resolving a motion to certify an issue class, must assess the "substantive law underlying the claim(s), including any choice-of-law questions [that law] may present." 655 F.3d at 273. Here, the District Court concluded that the various state laws that may be implicated do not meaningfully differ and that Pennsylvania law would govern anyway. *Russell v. Educational Comm'n for Foreign Med. Graduates*, 2020 WL 1330699, at *4-5 (E.D. Pa. Mar. 23, 2020). That seems like a close question. It may well be true that Pennsylvania has the greatest interest in this case (the Commission's alleged tortious conduct occurred here, after all), but various other states have a substantial interest in the resolution of the claims, too. But because the conflict-of-law question was briefed before the District Court in the context of a motion for class certification, we will leave it to the District Court to determine which state's law applies to each Plaintiff's claim, if the question of which state's law applies becomes relevant in future proceedings.

23(c)(4) can be used even though full Rule 23(b)(3) certi-
fication is not possible due to the predominance infirmi-
ties. That view, the so-called "broad view," has been
adopted or supported by the Second, Fourth, Sixth, Sev-
enth, and Ninth Circuits.[6] Under the broad view, courts
apply the Rule 23(b)(3) predominance and superiority
prongs after common issues have been identified for

---

[6] For discussions of the broad view from these courts of appeals,
see, *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d
Cir. 2006) (permitting issue certification "regardless of whether the
claim as a whole satisfies Rule 23(b)(3)'s predominance require-
ment"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439-45
(4th Cir. 2003) (holding that courts may employ Rule 23(c)(4) to cer-
tify a class as to one claim even though all of the plaintiffs' claims,
taken together, do not satisfy the predominance requirement);
*Martin v. Behr Dayton Thermal Prods.*, 896 F.3d 405 (6th Cir.
2018) (noting that "Rule 23(c)(4) contemplates using issue certifica-
tion . . . where common questions predominate within certain issues
and where class treatment of those issues is the superior method of
resolution"); *McReynolds v. Merrill Lynch, Pierce, Fenner &
Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) ("Rule 23(c)(4) pro-
vides that 'when appropriate, an action may be brought or main-
tained as a class action with respect to particular issues.' The prac-
tices challenged in this case present a pair of issues that can most
efficiently be determined on a class-wide basis, consistent with the
rule just quoted."), *abrogated on other grounds by Phillips v. Sher-
iff of Cook Cty.*, 828 F.3d 541, 559 (7th Cir.), *reh'g and suggestion
for reh'g en banc denied,* (7th Cir. Aug. 3, 2016); *Pella Corp. v. Saltz-
man*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the
discretion to split a case by certifying a class for some issues, but
not others, or by certifying a class for liability alone where damages
or causation may require individualized assessments."); *Valentino
v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if
the common questions do not predominate over the individual ques-
tions so that class certification of the entire action is warranted,
Rule 23 authorizes the district court in appropriate cases to isolate
the common issues under Rule 23(c)(4)[] and proceed with class
treatment of these particular issues.").

class treatment under Rule 23(c)(4). The broad view permits utilizing Rule 23(c)(4) even where predominance has not been (or cannot be) satisfied for the cause of action as a whole.

The Fifth Circuit, however, in a footnote adopted what is known as "the narrow view," which prohibits issue-class certification if Rule 23(b)(3) predominance has not been satisfied for the cause of action as a whole. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). But *Castano*'s approach has not been adopted by any other circuit, and subsequent caselaw from the Fifth Circuit suggests that any potency the narrow view once held has dwindled. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that bifurcation might serve "as a remedy for the obstacles preventing a finding of predominance" but that the plaintiffs had not made such a proposal to the district court).[7]

---

[7] Further, the Advisory Committee on Civil Rules appears to agree that issues can be certified for class treatment even if predominance cannot be satisfied for the action as a whole. At their April 2015 meeting, the Committee noted that "[a] major reason for considering possible rule amendments to deal with issue classes is that there has seemed to be a split in the circuits about whether they can only be allowed if (b)(3) predominance is established." *See* Rule 23 Subcommittee Report, in Advisory Committee on Civil Rules 243-99 (Apr. 9-10, 2015). But the Committee went on to note that "recent reports suggest that all the circuits are coming into

The Commission's attempts to avoid the majority view by arguing not so much that full-class Rule 23(b)(3) certification must *precede* Rule 23(c)(4) certification, but that the District Court here failed to consider Rule 23(b)(3) at all. But "certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3)," though predominance concerns may be relevant to both. *See Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018) ("While Plaintiffs are correct to point out that the appropriateness of certifying a Rule 23(c)(4) class is analytically independent from the predominance inquiry under Rule 23(b)(3), a case may present concerns relevant to both.").

Amicus Chamber of Commerce offers yet another reason to reverse the District Court: that the District Court's Rule 23(c)(4) ruling, if adopted, "will permit a flood of abusive class actions, with troubling and far-reaching consequences for businesses, shareholders, employees, customers, and the judicial system." Brief for U.S. Chamber of Commerce as Amici Curiae Supporting Appellant 16-18. The Chamber's concerns seem overblown. Even capacious rules for issue-class certification (which we do not purport to advance in this holding) likely will not encourage "a flood of abusive class actions" because few lawyers will have an incentive to file them. Any lucrative potential payday for class action lawyers arises from securing a damages award, not from obtaining an order on a particular issue. That order, which can be thought of as a type of declaratory judg-

---

relative agreement that in appropriate cases Rule 23(c)(4) can be used *even though full Rule 23(b)(3) certification is not possible* due to the predominance requirement." *Id.* at 280 (emphasis added).

ment, may eventually transform into a judgment award-
ing damages, but even then it is not clear that the future
individualized proceedings would be controlled by the
lawyers that won the issue-class order. In any case, even
if a lawyer could obtain a quasi-declaratory ruling on a
subset of common issues, the transformation of the case
from a proposed class action to a set of individualized
proceedings would spoil any settlement leverage that
the lawyer had. Of course, the lawyer representing the
class would prefer a favorable issue-class order to no or-
der at all, but the defendant, once facing just individual-
ized proceedings, could return to the very tactics that
may have given it an advantage in the first place. From
the defense perspective, such tactics could have the
added benefit of deterring other class-action lawyers
from attempting similar bifurcated class actions in the
future.

* * * * *

Because the District Court failed to determine
whether the proposed issues satisfied a subsection of
Rule 23(b), and because it failed to rigorously analyze
several *Gates* factors, we will vacate the District Court's
issue-class certification and remand for further proceed-
ings consistent with this opinion.

## IV. Conclusion

For these reasons, we vacate the District Court's
Order certifying for aggregate treatment the duty and
breach elements of Plaintiffs' negligent infliction of emo-
tional distress claim, and remand for further proceed-
ings consistent with this opinion.

**APPENDIX B**

UNITED STATES COURT OF APPEALS FOR
THE THIRD CIRCUIT

CCO-065

No. <u>20-8024</u>

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; DESIRE EVANS

v.

EDUCATIONAL COMMISSION FOR FOR-
EIGN MEDICAL GRADUATES,

Petitioner

(E.D. Pa. No. 2-18-cv-05629)

Present: JORDAN, KRAUSE, and MATEY, <u>Circuit
Judges</u>

1. Petition by Educational Commission for Foreign
   Medical Graduates for Leave to Appeal Pursuant
   to Fed. R. Civ. P. 23(f)

2. Respondents' Response in Opposition

3. Petitioner's Unopposed Motion for Leave to File
   Reply in Support of Petition, with Reply At-
   tached

Respectfully,
Clerk/CJG

(33a)

34a

_____ORDER_____

The foregoing petition for leave to appeal is granted, and the foregoing unopposed motion for leave to file reply is granted.

> By the Court,
> s/ Cheryl Ann Krause
> Circuit Judge

Dated: May 11, 2020
Lmr/cc: All Counsel of Record



A True Copy:

Patricia S. Dodszuweit, Clerk

# APPENDIX C

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,**<br><br>*Defendant.* | **Case No. 2:18-cv-05629-JDW** |

## ORDER

AND NOW, this 23rd day of March, 2020, upon consideration of Plaintiff's Motion for Class Certification (ECF No. 32), all material submitted in support and opposition, and following oral argument, for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motion is **GRANTED**.

(35a)

JA4793

It is **FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 23(c)(1)(B) the Court certifies the following class: "All patients examined or treated in any manner by Oluwafemi Charles Igberase (a/ka Charles J. Akoda) beginning with his enrollment in a postgraduate medical education program at Howard University in 2007."

It is **FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 23(c)(4), the Court certifies the class with respect to the following issues: (1) whether Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") undertook or otherwise owed a duty to class members; (2) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable to class members pursuant to Restatement (Second) of Torts § 324A; (3) whether ECFMG breached any duty that it owed to class members; and (4) whether ECFMG breached any duty that it owed to hospitals and state medical boards.

It is **FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 23(g)(1), the Court appoints the following class counsel: Conrad O'Brien PC; The Cochran Firm; Janet Janet & Suggs LLC; Law Offices of Peter Angelos, P. C.; and Schochor Federico & Staton, PA.

It is **FURTHER ORDERED** that the Court will hold a status call with the Parties on March 31, 2020, at 10:00 a. m. EDT. Plaintiffs' counsel shall initiate the call and contact chambers at (267) 299-7320 when all counsel are on the line.

37a

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

## APPENDIX D

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,** | **Case No. 2:18-cv-05629-JDW** |
| *Plaintiffs,* | |
| v. | |
| **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** | |
| *Defendant.* | |

## MEMORANDUM

For years, a man using the name "John Charles Akoda" passed himself off as an OB/GYN. It turns out he was not a doctor at all. Now, four of his former patients ask the Court to certify a class of his former patients. But they aren't suing him. They are suing the Educational Commission For Foreign Medical Graduates ("ECFMG"), a non-profit organization that certified

(38a)

that the man posing as Akoda had graduated from medical school abroad. Plaintiffs claim that ECFMG was negligent when it certified him as a doctor and when it failed to investigate allegations of identity fraud against him. They want the Court to certify a class only on liability issues so that, if they prevail, they can proceed to individual proceedings about the emotional damages that they claim. For the reasons that follow, the Court will certify a class to consider the duty and breach elements of Plaintiffs' claims, which are subject to common proof, but will decline to certify issues about causation and damages, which are not.

## I.  BACKGROUND

### A.  ECFMG's Role In Qualifying International Medical Graduates

ECFMG is a non-profit based in Philadelphia. It certifies international medical graduates ("IMGs")—*i.e.*, individuals who received a medical education outside of the United States and Canada—to practice medicine in the United States. It verifies that IMGs received a degree from an appropriate institution and administers tests of medical knowledge and English proficiency. For qualified IMGs, it issues a certification, which IMGs can then use to apply to residency and other graduate medical education programs and to apply for state medical licenses.

ECFMG has a process for investigating what it calls "irregular behavior," meaning actions that might subvert ECFMG's certification process. It conducts investigations that include interviews with accused IMGs, as well as other individuals involved, and review of relevant

documents. If ECFMG concludes that an IMG has engaged in irregular behavior, it can revoke its certification of that IMG, or it can take lesser actions.

### B. Igberase/Akoda

In April 1992, Oluwafemi Charles Igberase applied to ECFMG for certification. He failed ECFMG's medical licensing exam twice but passed on his third try. ECFMG then issued him a certificate as an IMG. However, he did not gain admission to a residency program. In March 1994, Igberase submitted a second application to ECFMG for certification. In this second application, he used a false date of birth and a different name: Igberase Oluwafemi Charles. ECFMG approved this second application in December 1994. In November 1995, ECFMG determined that Igberase fraudulently applied for two ECFMG certifications under two different names and revoked each certification.

Igberase applied for certification to ECFMG a third time in 1996, using a fake passport and yet another name: John Charles Akoda. ECFMG certified Akoda in August 1997. In 1998, Igberase applied for and was admitted to a residency program at Jersey Shore Medical Center ("JSMC"). In August 2000, JSMC asked ECFMG to investigate Akoda because JSMC learned that the individual known as "Akoda" had served as a resident in two other U.S. residency programs under the name Igberase. ECFMG began an investigation. Using the "Akoda" identity, Igberase disputed the JSMC allegations. In December 2000, JSMC advised ECFMG that it had dismissed Akoda from its residency

program for using a false social security number. Plaintiffs allege that ECFMG took no action to retract Akoda's certification.

In 2006, Igberase applied for a residency at Howard University Hospital, using the Akoda identity and another individual's social security number. After completing the program in 2011, he applied for and received a Maryland medical license using fake identification documents. That same year, he became a member of the medical staff at Prince George's Hospital Center and began seeing patients there.

On June 9, 2016, law enforcement executed search warrants concerning Igberase/Akoda and discovered fraudulent or altered documents, including medical diplomas, transcripts, and letters of recommendation. He signed a plea agreement admitting to misuse of a social security number. ECFMG revoked the certification it had issued to Akoda. In March 2017, Igberase was sentenced by the United States District Court for the District of Maryland. Shortly thereafter, Prince George's Hospital Center terminated his medical privileges, and the Maryland Board of Physicians revoked his license.

## C.  Procedural History

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans are former patients of Igberase (who they knew as "Akoda"). He performed unplanned emergency cesarean section surgery on Ms. Russell and Ms. Riggins. He also delivered Ms. Evans' child and Ms. Powell's child. None of the patients knew Igberase's true identity, and all assumed he was a doctor. They allege that he touched them without informed

consent and that he performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language.

Plaintiffs assert claims of negligence and negligent infliction of emotional distress ("NIED") against ECFMG, arising out of its certification of Igberase. They ask the Court to certify a class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." (ECF No. 1, Ex. A at ¶ 48.) Plaintiffs ask the Court to certify the class as to liability, which they describe as "Option A." Alternatively, they propose nine specific issues for which the Court should certify a class ("Option B"): (1) whether ECFMG undertook or otherwise owed a duty to class members who were patients of Igberase; (2) whether ECFMG breached its duty to class members; (3) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable for foreseeable injuries to third persons such as class members pursuant to Restatement (Second) of Torts § 324A; (4) whether ECFMG breached its duty to hospitals and state medical boards; (5) whether the emotional distress and other damages that Plaintiffs allege were a foreseeable result of ECFMG's conduct; (6) whether ECFMG's conduct involved an unusual risk of causing emotional distress to others under Restatement (Second) of Torts § 313; (7) whether ECFMG is subject to liability under Restatement (Second) of Torts § 876 for assisting Igberase in committing fraud; (8) whether ECFMG knew or should have known that Akoda was, in fact, Igberase; and (9) whether it was foreseeable that ECFMG's conduct could result in emotional distress experienced by class

members. (ECF No. 32-1 at 11.) Of these, issues 5, 6, and 9 focus on questions of causation and damages (the "Damages Issues"), while the others relate to questions of liability. The Court held oral argument on January 30, 2020.

## II.  STANDARD OF REVIEW

A court must not certify a class "casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D. Pa. 2015). Instead, class "certification is proper only if the trial court is satisfied, after a rigorous analysis" that all of the necessary requirements have been fulfilled. *Ferreras v. American Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (*citing Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). A rigorous analysis requires that factual determinations be made by a preponderance of the evidence. *See id.* This inquiry will at times require a court to examine issues that overlap, to some extent, with issues left for the final merits determination. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). However, the Court should only do so to the extent necessary to resolve the class certification motion, and no more. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

A party seeking to certify a class must satisfy the requirements of Federal Rule of Civil Procedure 23, which ordinarily means the four requirements of Rule 23(a) and the requirements of one subparagraph of Rule 23(b). *See Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018), *as amended* (Apr. 4, 2018). Here, however, Plaintiffs seek to proceed with an issues class under Rule 23(c)(4), which provides that, "[w]hen appropriate,

an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). ECFMG argues that Plaintiffs cannot certify an issues class until Plaintiffs show that "the common issues predominate over the individual issues," *i.e.*, that Plaintiffs satisfy Rule 23(b)(3). (ECF No. 48 at 4.)

ECFMG's argument misunderstands the law in the Third Circuit. In *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011), the Circuit noted a disagreement among courts about how to apply Rule 23(b)(3)'s predominance requirement in cases arising under Rule 23(c)(4): some courts held that a plaintiff had to satisfy Rule 23(b)(3)'s predominance requirement for a case as a whole before certifying certain issues; while other courts allowed certification of an issue even if common issues did not predominate in the case as a whole. *See id.* at 272-73. The Third Circuit declined to join "either camp in the circuit disagreement" and instead set forth a list of factors that courts should consider: (a) the type of claim(s) and issue(s) in question; (b) the overall complexity of the case; (c) the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; (d) the substantive law underlying the claim(s), including any choice of law questions it might present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; (e) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (f) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (g) the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; (h)

the impact individual proceedings may have upon one another, including whether remedies are undividable such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and (i) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). *Id.* at 273.

ECFMG's argument that the Court should require Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement before turning to these factors parrots one of the camps that the Third Circuit acknowledged but refused to join in *Gates*. Because the Third Circuit rejected that view, this Court must do the same. Therefore, the Court will consider Rule 23(a) and then turn to the *Gates* factors in conducting its analysis. At each stage, the burden will remain on Plaintiffs to show by a preponderance of the evidence that the Court should certify a class.

## III. ANALYSIS

### A.  Choice Of Law

Before tackling the question of class certification, the Court addresses the law that applies here. It does so because the parties spar about the applicable choice of law and ECFMG contends that multiple state laws might apply, thereby making class certification inappropriate. The Third Circuit has held that a "district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements" for class certification. *Gates*, 655 F.3d at 270. Thus, the Court must resolve the parties' genuine

legal dispute about the choice of law so that it can then answer the question of whether to certify a class.

A federal court sitting in diversity must apply the choice-of-law rules of the forum state, so Pennsylvania choice-of-law rules apply. *See Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941). Pennsylvania employs a flexible approach that considers both contacts establishing significant relationships with a state and a qualitative appraisal of the relevant states' policies with respect to the controversy. *See Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219-20 (3d Cir. 2005); *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (1964). First, the court must determine whether an actual conflict exists between the laws of two or more states. Then, if an actual conflict exists, the court must determine whether the conflict is "true," "false," or "unprovided-for." *Rose v. Dowd*, 265 F. Supp.3d 525, 530 (E.D. Pa. 2017). No actual conflict exists if the laws between the states are the same or "if the same result would ensue under the laws of the forum state and those of the foreign jurisdiction." *Id.*; *see also Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If no conflict exists, the law of the forum state governs, and the court may end its choice-of-law analysis. *Id.*

Several states aside from Pennsylvania are implicated in this case: New Jersey, Maryland, and the District of Columbia, at a minimum. Other states might have some connection, but the parties have not identified them with any certainty, so the Court has not analyzed them. In any event, the Court concludes that those states' interests in the case would be far weaker than Pennsylvania's interest and that Pennsylvania law would therefore apply. Not surprisingly, there is little,

if any, variation between each state's law governing negligence and NIED.

The elements of negligence and negligent infliction of emotional distress are the same under Pennsylvania, New Jersey, and DC law. Even looking past the elements themselves, the Court discerns no real difference between them, and the parties have not identified any. Nor is there a conflict with Maryland law. While Maryland does not recognize NIED as a separate claim, "[r]ecovery may be had in a tort action for emotional distress arising out of negligent conduct." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986). So the same result would ensue under Maryland or Pennsylvania law. As such, there is no "actual" conflict between Maryland and Pennsylvania law, and Pennsylvania law applies.

Even if there were a true conflict between Pennsylvania law and any other state's law, the Court would apply Pennsylvania law to all of the claims in the case. The Court must apply the law of the state with the "most significant contacts or relationships with the particular issue." *Hammersmith*, 480 F.3d at 229-30. ECFMG suggests that Maryland has a greater interest because it involves treatment of Maryland residents by a fake doctor in Maryland. (ECF No. 40 at 19-20.) But this case is not about Igberase's conduct; it is about ECFMG's conduct. Under the circumstances of this case, Pennsylvania has a greater interest than Maryland, DC, New Jersey, or any other state in determining what duties apply to its corporate citizen and whether that citizen has fulfilled those duties.

**B.  Class Certification**

**1.  Class definition/ascertainability**

A plaintiff seeking certification of a class must provide a proper class definition. *See* Fed. R. Civ. P. 23(c)(1)(B); *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 591-92 (3d Cir. 2012). In addition, a plaintiff seeking certification of a class generally must prove that the certified class is ascertainable. *See Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The ascertainability inquiry is twofold, requiring a plaintiff to show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* (quotes omitted). A plaintiff need not identify all of the class members at the time of the class certification. Instead, she only has to show that class members can be identified. *See id.* However, courts should shy away from methods that rely on potential class members' say-so. *See Carrera v. Bayer Corp.*, 725 F.3d 300, 306 (3d Cir. 2013).

Here, Plaintiffs ask the Court to certify a class that includes "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." (ECF No. 32-1 at 10.) ECFMG complains that the class is not ascertainable because it captures patients that [Igberase] encountered in Nigeria, before ECFMG certified him. At oral argument, Plaintiffs clarified that they intend the class to capture only patients that Igberase encountered after ECFMG certified his application. (Tr. at 9:5-10:5.)

ECFMG also contends that the class is not ascertainable because the phrase "examined and/or treated in any manner" is vague and would lead to confusion. The Court disagrees. The class definition is intended to capture any patient who received medical care or treatment from Igberase after ECFMG certified him. That phrase does not raise the type of questions that would require individual fact-finding or a subjective determination in order to identify class members.

Finally, ECFMG argues that there is no way to identify class members. Plaintiffs, however, point to medical records from the treating facilities and note that they have already used those records to identify more than 700 class members. (Tr. at 14:13-14:11.) Those records, which Plaintiffs can obtain by subpoena after certification, provide the type of objective, administratively feasible mechanism required to identify class members. By obtaining the relevant records from Prince George's Hospital Center, Plaintiffs have satisfied their burden of demonstrating that the class is ascertainable; the Court is not just taking their word for it. ECFMG speculates that Howard might not have records from the relevant time frames because records retention requirements would not require it. The possibility that some records might have been lost, however, does not render the class not ascertainable. *See Byrd*, 784 F.3d at 164 ("[A]scertainability only requires the plaintiff to show that class members *can be identified*. Accordingly, there is no records requirement.") (emphasis in original) (internal quotation omitted).

## 2. Rule 23(a) factors

Rule 23(a) sets forth four threshold requirements for all class actions: numerosity; commonality; typicality; and adequacy of representation. *See* Fed. R. Civ. P. 23(a). The Court addresses each requirement in turn.

### a. Numerosity

A plaintiff seeking certification must demonstrate that the class is so numerous that joinder of all members is impracticable. "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016) (citation omitted). Here, Plaintiffs have shown that the potential class includes at least the 712 people that Igberase treated at Prince George's Hospital Center. That number alone would render joinder all but impossible, and the class is more expansive than that. Plaintiffs have therefore satisfied the numerosity requirement. Notably, ECFMG does not argue otherwise.

### b. Commonality

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.' " *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quoting *Dukes*, 564 U.S. at 359). However, the common issue must be "central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. There can be legal and factual differences among members of the class, as long as the defendant subjected

them all to the same harmful conduct. Ultimately, the commonality bar is not a high one. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013).

Here, Plaintiffs have identified several common legal and factual questions that are central to the validity of their claims. In particular, questions about whether ECFMG owed a legal duty either to class members or hospitals and state medical boards, and questions about whether ECFMG breached those duties, are common to all members of the class. Plaintiffs have therefore satisfied the commonality requirement.

ECFMG contends that questions about duty and breach are not common throughout the class because choice-of-law questions might result in different outcomes. Because the Court has already resolved the choice-of-law question, that argument has no impact. ECFMG also argues that determining whether a duty exists requires the Court to assess "the foreseeability of harm to a plaintiff in a particular situation." (Tr. of Hearing dated 1/30/20 at 47:19-48:2.) ECFMG's argument conflates "foreseeability" as it relates to a duty and "foreseeability" as it relates to causation. Although the concept is embedded in both inquiries, it is not the same.

"The type of foreseeability that determines a duty of care, as opposed to proximate cause, is not dependent on the foreseeability of a specific event. Instead, in the context of duty, the concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury." *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1369 (3d Cir. 1993) (in-

ternal quotations and citations omitted). Duty is predicated on the relationship existing between the parties at the relevant time, *i.e.*, the time that ECFMG certified Igberase to apply to a U.S. residency program and/or the time that it investigated (or failed to investigate) his identity fraud. *See, e.g.*, *Zanine v. Gallagher*, 497 A.2d 1332, 1334 (Pa. Super. Ct. 1985).

ECFMG's argument would leave open the possibility that a duty would not be fixed until after the fact because the circumstances that define the existence of a duty would not be known at the time that the defendant has to decide how to conduct itself. The law should not sanction such uncertainty. Parties are entitled to know the duties incumbent upon them when they decide how to conduct themselves, not later.

### c. Typicality

The third requirement, typicality, is normally met where "claims of representative Plaintiffs arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004); FRCP 23(a)(3). "Typicality" aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." *Marcus*, 687 F.3d at 594 (citation omitted).

To determine whether a named plaintiff is so different as to prevent a finding of typicality, a court must address three distinct concerns: "(1) the claims of the class representative must be the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the

class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* at 598. The Third Circuit has set a "low threshold" for typicality, such that even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quotes omitted).

Here, Plaintiffs' claims are typical of class members to the extent that the class members consist of Igberase's patients during and after his residency. All of the claims arise from the same legal theory: negligence. The claims also arise from a single course of conduct by ECFMG: the certification and subsequent (allegedly inadequate) investigation of his identity. ECFMG has not suggested any Plaintiff is subject to a unique defense. And nothing before the Court demonstrates that the Plaintiffs have incentives that are at odds with the class they seek to represent.

ECFMG notes that Igberase treated all of the Plaintiffs after entering private practice and obtaining his license and therefore suggests that Plaintiffs are not typical of patients that Igberase treated at Howard. That difference does not render Plaintiffs atypical, however. Patients treated during and after residency all have claims based on the same course of ECFMG's conduct.

However, Plaintiffs' claims are not typical of class members to the extent that the class members consist of Igberase's patients at JSMC. Those patients can assert negligence claims based on ECFMG's initial certification of Akoda, but they cannot assert claims based on ECFMG's subsequent investigation because ECFMG did not conduct the investigation until after Igberase had treated those patients. Because the named Plaintiffs' claims are different from patients at JSMC in a meaningful way, the Court will exclude patients from JSMC from the class.

ECFMG also claims that Plaintiffs are not typical because they claim only to have suffered emotional damages, and some class members might have suffered physical harm at Igberase's hands as well. Again, these distinctions exist, but they do not overcome the fact that the Plaintiffs' claims arise from the same facts and legal theories as members of the class. To the extent any member of the class wants to assert additional claims against ECFMG based on other injuries that Igberase caused, she will have the opportunity to opt out of the class and assert those claims individually. And, nothing about the certification of a class in this case has any impact on a class member's ability to assert tort claims, including claims for other injuries, against Igberase himself.

### d. Adequacy

The final 23(a) factor considers adequacy of both the Plaintiffs and counsel to represent the class. The "principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the

class." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). ECFMG does not challenge counsel's adequacy, and the Court finds that they have the requisite experience and skill necessary to represent the class.

As to the named Plaintiffs, the Court's inquiry focuses on whether the class representatives have conflicts of interest with the putative class members. *See New Directions Treatment Svcs. v. City of Reading*, 390 F.3d 313 (3d Cir. 2007). Only a "fundamental" conflict of interest will impact the adequacy analysis, meaning a conflict that arises because some class members benefitted from conduct that harmed other class members. *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). No such conflict exists here. No member of the class benefitted from Igberase's deception or from ECFMG's conduct. The most that can be said is that some members of the class might not have suffered any emotional damage. But no one benefitted.

ECFMG contends that Plaintiffs are not adequate because they sought to represent a class in a different case about Igberase and ultimately dismissed that case without prejudice. The Court does not know why they made that decision. Nor, apparently, does ECFMG because its argument just speculates about whether they might do the same in this case. Without far more context, the Court has no basis to make any determination about Plaintiffs' commitment to this case based on a decision that they made in another case.

ECFMG also contends that, during their depositions, Plaintiffs did not understand what ECFMG does. Yet none of the Plaintiffs demonstrated a complete lack

of knowledge of the case. They just showed confusion about some details. A class representative's lack of knowledge about her case does not make her inadequate, as long as she has "minimal knowledge about the case and [can] make the requisite decisions required of a plaintiff." *In re Suboxone Antitrust Litig.*, MDL No. 2445, 2019 WL 4735520, at * 22 (E.D. Pa. Sept. 27, 2019). Finally, ECFMG claims that some members of the class might not have suffered emotional distress. However, that does not render the Plaintiffs inadequate or suggest a conflict between any Plaintiff and the class she seeks to represent.

### 3. Rule 23(c)(4)/*Gates* factors

Having determined that Plaintiffs can satisfy the Rule 23(a) factors, the Court turns to the question of whether to certify an issues class under Rule 23(c)(4). "Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to treat common things in common and to distinguish the distinguishable." *Gates*, 655 F.3d at 272. "Courts frequently use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication." *Suboxone*, 2019 WL 4735520, at *40 (quote omitted). An issue class need not "seek to prove all of [the] required liability elements through common evidence." *Id.* at *44. Instead, the question is whether one can sever the issues to be certified from the issues not to be certified. *Id.* at * 45.

Here, any duty that applied to ECFMG and ECFMG's potential breach of that duty focus on ECFMG's conduct, not on any individual member of the

class. On the other hand, questions about causation and any damages focus on each individual class member.

### a.    Option A (liability class)

Plaintiffs' claims for negligence and NIED require them to prove the four elements of negligence: duty; breach; causation; and damages. *See Brewington for Brewington v. City of Phila.*, 199 A.3d 348, 355 (Pa. 2018); *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1010 (Pa. 2003). The Court cannot certify a class that encompasses elements of causation and damages because those issues are too individualized.

"[C]ausation . . . often require[s] individual proof." *Gates*, 655 F.3d at 264. Certainly, that is the case here. Indeed, it is all but impossible to separate questions of causation and harm from the individual damages that any plaintiff suffered. After all, prevailing on causation implies that a harm was indeed caused. *See, e.g.*, *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 465 (D.N.J. 2009) ("without a common injury, there can be no common causation, as there is nothing to cause.").

In Pennsylvania, courts use the "substantial factor" test to determine causation. *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977) (citing to Restatement (Second) of Torts § 431). When evaluating whether negligent conduct is a substantial factor in causing the injury, courts consider the other factors that might contribute to the harm, the extent of the effect of those other factors, whether the actor's conduct created a force or series of forces which are continuous and active up to the time of the harm, or whether instead the actor created a situation harmless unless acted upon by other forces for

which the actor is not responsible, and lapse of time between an actor's conduct and the harm. *See Hall v. Millersville Univ.*, 400 F. Supp. 3d 252, 273 (E.D. Pa. 2019) (citing Restatement (Second) of Torts § 433). These considerations render causation a highly individualized inquiry, rather than common to all class members, and therefore disfavor certification of causation. *See, e.g., Barnes v. American Tobacco Co.*, 161 F.3d 127, 145 (3d Cir. 1998) (issues of causation had to be resolved individually); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

Given the individual nature of the causation and damages inquiry, the Court will not certify a class to tackle liability as a whole. There would be little efficiency to be gained from such a certification because the evidence in the class action portion of the case would overlap with the evidence in the individual portion of the case. Presenting the evidence twice would eliminate any efficiency. Also, a jury hearing the class action part of the case would have to hear and consider the same evidence as the jury (or juries) hearing the individual part of the case: whether Igberase's ability to pose as a doctor caused emotional harm and the extent of that harm. Because two juries would be hearing the same evidence, there would be a substantial risk (if not a certainty) of violating the Seventh Amendment's Reexamination Clause. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1182) ("Seventh Amendment problems are inherent when separate juries determine fact of damage and the amount of damages.").

At the hearing, Plaintiffs argue that the Court can draw a distinction between harm, meaning "an invasion

of a legally protected interest," and damages when considering the elements of negligence and then certify the liability elements. (Tr. at 32:21-34:5.) Plaintiffs' argument, however, suggests that an improper touching would be negligent, even if it did not cause any damages. That is wrong. A plaintiff cannot prove a negligence claim without proving damage, even if there was some invasion of a legally protected interest. *See Troutman v. Tabb*, 427 A.2d 673, 677 (Pa. Super. Ct. 1981).

### b. Option B (specific issues)

Having rejected Option A, the Court turns to Plaintiffs' Option B, the certification of nine specific issues. Of the issues that Plaintiffs propose, the Court will not certify the Damages Issues for the reasons discussed above. In addition, Plaintiffs ask the Court to certify a class to answer the question of whether ECFMG faces liability for assisting Igberase in committing fraud, but that is not one of the claims in the case, a fact that Plaintiffs confirmed at oral argument. (Tr. at 7:12-8:24.) Because that question is not at issue in this case, the Court will not certify it.

The remaining issues, however, all relate to whether ECFMG had a relevant legal duty and whether it breached that duty. An analysis of the *Gates* factors reinforces that these issues are appropriate for certification. *First*, the questions of duty and breach favor issue certification because they are questions of law and/or fact common to all class members and subject to common proof. All of the proposed class members are identical in terms of their legal relationship to ECFMG. In other words, barring any exceptional circumstances, which neither party has raised, whatever duty (if any)

ECFMG owes to one proposed class member, ECFMG owes the same duty (if any) to the next proposed class member. Moreover, whether ECFMG has breached this duty is a common question of fact for each prospective class member, as the question looks to ECFMG's own conduct and not the conduct of individual class members. As such, these types of issue are amenable to certification.

*Second*, there are efficiencies to be gained by certifying a class on these issues because it will allow for a single trial with a single, preclusive determination about ECFMG's conduct, rather than the presentation of the same evidence about ECFMG again, and again, and again to separate juries. Moreover, there do not appear to be any realistic procedural alternatives to gain similar efficiencies. For example, the Court has considered whether non-mutual collateral estoppel might have all, or at least some, of the same impact and permit trial of these issues to a single jury. It would not because there is no guarantee it would apply. Indeed, if a court or jury ruled in ECFMG's favor, ECFMG could not use that decision in a subsequent case against a different plaintiff. *See Jean Alexander Cosmetics, Inc. v L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (application of collateral estoppel requires, among other things, the party being precluded to have been represented in prior case). The Court explored other alternatives with the parties but found none.

*Third*, and finally, certification of a class on issues related to duty and breach will not trigger any of the problems about which courts must be mindful under *Gates*. Partial certification will not damage any class member's statutory or constitutional rights. There are

no indivisible remedies that partial certification could impact. The individual proceedings that will remain, which will focus on causation and damages, need not impact each other. And, partial certification does not raise problems under the Seventh Amendment because the jury in any individual proceeding will not have to reexamine any of the evidence about ECFMG's conduct. It will instead take that conduct, and the first jury's determination about its legal significance, as a given and decide whether and to what extent it impacted a particular plaintiff.

In its Opposition, ECFMG points to the possibility of a statute-of-limitations defense as a reason for the Court not to certify an issues class. However, at oral argument, ECFMG conceded that it has no basis to claim that any member of the class is subject to such a defense. ECFMG just speculates that someone **might** be subject to the defense. (Tr. at 61:23-62:22.) Such speculation is not enough. In any event, any statute of limitations defense would focus on when a class member was aware of the harm she suffered. So, if any class member's personal situation triggers the statute of limitations, then ECFMG can raise that issue in a proceeding that focuses on that person.

## IV. CONCLUSION

The Court's goal is to move this case efficiently, treating like things alike and different things differently. Here, that means certifying a class of Igberase's patients, beginning with his enrollment at Howard, on the issues of whether ECFMG owed class members or relevant third parties a duty and whether ECFMG breached those duties. The Court will therefore issue an

appropriate Order, consistent with Rule 23(c)(1), certifying such a class.

**BY THE COURT:**


*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

March 23, 2020

No. 21-_____

# In the Supreme Court of the United States

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

*Respondents*.

**On Petition for a Writ of Certiorari to the
United States Court of Appeals for the
Third Circuit**

**CERTIFICATE OF COMPLIANCE**

In accordance with Supreme Court Rule 33.1(h), I certify that the foregoing Petition for a Writ of Certiorari contains 6,255 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 23, 2021

_____

WILLIAM R. PETERSON
    *Counsel of Record*
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, Texas 77002
(713) 890-5188
william.peterson@morganlewis.com
*Counsel for Petitioner*



2311 Douglas Street
Omaha, Nebraska 68102-1214

1-800-225-6964
(402) 342-2831
Fax: (402) 342-4850

E-Mail Address:
contact@cocklelegalbriefs.com

Web Site
www.cocklelegalbriefs.com

No. 21-_____

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
Petitioner,
v.
MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,
Respondents.

**AFFIDAVIT OF SERVICE**

I, Andrew Cockle, of lawful age, being duly sworn, upon my oath state that I did, on the 23rd day of December, 2021, send out from Omaha, NE 6 package(s) containing 3 copies of the PETITION FOR A WRIT OF CERTIORARI in the above entitled case. All parties required to be served have been served by third-party commercial carrier for delivery within 3 calendar days.  Packages were plainly addressed to the following:

SEE ATTACHED

**To be filed for:**

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103

William R. Peterson
  Counsel of Record
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite
  4000
Houston, TX 77002
(713) 890-5188
william.peterson
  @morganlewis.com

Counsel for Petitioner

Subscribed and sworn to before me this 23rd day of December, 2021.
I am duly authorized under the laws of the State of Nebraska to administer oaths.



GENERAL NOTARY-State of Nebraska
RENEE J. GOSS
My Comm. Exp. September 5, 2023

_____
Notary Public

_____
Affiant

JA4822

41674

Patrick A. Thronson
Brenda A. Harkavy
JANET, JANET & SUGGS, LLC
4 Reservoir Circle, Suite 200
Baltimore, Maryland 21208
(410) 653-3200
bharkavy@jjsjustice.com
pthronson@jjsjustice.com

Paul M. Vettori
LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
pvettori@lawpga.com

Brent Ceryes
SCHOCHOR, FEDERICO AND STATON
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000
bceryes@sfspa.com

Scott L. Nelson
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St. NW
Washington, D.C. 20009
(202) 588-1000
snelson@citizen.org

Nicholas M. Centrella
Robin S. Weiss
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Philadelphia, Pennsylvania 19102
(215) 864-9600
ncentrella@conradobrien.com
rweiss@conradobrien.com

Cory L. Zajdel
Z LAW, LLC
2345 York Rd. Suite B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com

*Counsel for Respondents*
*Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans*

No. 21-948

In the

# Supreme Court of the United States

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
*Petitioner,*

v.

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, AND DESIRE EVANS,
*Respondents.*

On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Third Circuit

**BRIEF OF THE CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA AS
*AMICUS CURIAE* IN SUPPORT OF
PETITIONER**

Tara S. Morrissey
Tyler S. Badgley
U.S. CHAMBER
LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716

Gilbert C. Dickey
*Counsel of Record*
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
(704) 343-2396
*gdickey@mcguirewoods.com*

i

## QUESTION PRESENTED

Whether, when an action involves both common and individual questions, a court may certify common questions for class treatment under Rule 23(b)(3) without finding that common questions predominate over the individual questions.

ii

# TABLE OF CONTENTS

QUESTION PRESENTED...........................................i

TABLE OF AUTHORITIES......................................iii

INTEREST OF *AMICUS CURIAE*...........................1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................................................2

ARGUMENT..............................................................4

I.    The Question Presented Is Important ............5

II.   This Court's Intervention Is Needed to Resolve a Split on this Important Question ........................................................10

III.  The Decision Below Is Inconsistent With Rule 23 ........................................................12

CONCLUSION .......................................................16

iii

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc.* v. *Windsor*,
   521 U.S. 591 (1997) .................................... 4, 11, 12

*AT&T Mobility LLC* v. *Concepcion*,
   563 U.S. 333 (2011) ................................. 5

*Blue Chip Stamps* v. *Manor Drug Stores*,
   421 U.S. 723 (1975) ................................. 5

*Califano* v. *Yamaski*,
   442 U.S. 682 (1979) ........................... 4, 6

*Castano* v. *Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .......................... 3, 7, 10

*Chavez* v. *Plan Benefit Servs., Inc.*,
   957 F.3d 542 (5th Cir. 2020) ............................... 12

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013) ..................................... 2, 4, 6, 7

*Coopers & Lybrand* v. *Livesay*,
   437 U.S. 463 (1978) ................................. 5

*INS* v. *Nat'l Ctr. for Immigrants' Rights, Inc.*,
   502 U.S. 183 (1991) ............................... 14

*Martin* v. *Behr Dayton Thermal Prods., LLC*,
   896 F.3d 405 (6th Cir. 2018) ........................... 3, 11

*In re Methyl Tertiary Butyl Ether
   (MTBE) Prods.*,
   2007 WL 1791258 (S.D.N.Y. June 15, 2007) ......... 8

iv

*Murphy* v. *Smith*,
    138 S. Ct. 784 (2018) ........................................... 13

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)............................. 3, 11

*POM Wonderful LLC* v. *Coca-Cola Co.*,
    573 U.S. 102 (2014) ............................................ 15

*Shady Grove Orthopedic Assocs., P.A.* v.
    *Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................ 5

*Valentino* v. *Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ........................... 3, 11

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ....................................... 4, 6, 7

## Rules

Fed. R. Civ. P. 23(b) *et seq.*............................... 7, 13, 15

Fed. R. Civ. P. 23(c) *et seq.* ........................... 13, 14, 15

## Other Authorities

Adele, *Dukes* v. *Wal-Mart*: Implications
    for Employment Practices Liability
    Insurance (July 2011) ........................................... 9

Carlton Fields Class Action Survey (2021),
    available at https://classactionsurvey.com........ 6, 9

Brian T. Fitzpatrick, *An Empirical Study of Class
    Action Settlements and Their Fee Awards,*
    7 J. Empirical Legal Stud. 811 (Dec. 2010)........... 6

v

Henry J. Friendly, *Federal Jurisdiction:
    A General View* 120 (1973)....................................5

Sherman, *Segmenting Aggregate Litigation:
    Initiatives and Impediments for
    Reshaping the Trial Process,*
    25. Rev. Litig. 691 (2006).......................................8

1

## INTEREST OF *AMICUS CURIAE**

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber's members have a strong interest in promoting fair and predictable legal standards. They have been and continue to be defendants in putative class actions.  The Chamber's members thus have a strong interest in ensuring that courts undertake the rigorous analysis required by Federal Rule of Civil Procedure 23.  The Chamber has filed *amicus curiae* briefs in several recent Rule 23 class action cases including *Tyson Foods, Inc.* v. *Bouaphakeo*, No. 14-

---

* Pursuant to Supreme Court Rule 37.6, *amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.  Counsel of record for all parties were timely notified more than 10 days prior to the filing of this brief.  All parties have consented to the filing of this brief.

2

1146; *Comcast Corp.* v. *Behrend*, No. 11-864; and
*Walmart Stores, Inc.* v. *Dukes*, No. 10-277.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

This case presents a critical question of class-action procedure: whether a district court can certify an issues class under Federal Rule of Civil Procedure 23(c)(4) even though no cause of action satisfies Rule 23(b)(3)'s predominance and superiority requirements. The Third Circuit's decision below wrongly held that it could, and that Rule 23(b)(3) applied only to the issues identified for class proceedings under Rule 23(c)(4).

The Third Circuit's approach would permit a torrent of abusive class actions. This Court has already recognized that a Rule 23(b)(3) damages class action extends class treatment to circumstances "in which class-action treatment is not as clearly called for," and therefore Rule 23(b)(3) imposes critical procedural safeguards. *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34 (2013) (internal quotations omitted). The decision below, however, permits certification of a damages class action even when no cause of action can satisfy Rule 23(b)(3)'s requirements. This decision will mean that class certification will be possible in virtually every case. The inevitable result will be an increase in abusive class actions designed to impose massive settlement pressure through class certification regardless of the merits of the underlying claims.

The decision below also deepens a circuit split on the proper reading of Rule 23. The Fifth Circuit

3

recognizes that Rule 23(c)(4) permits class proceedings on certain issues only when a cause of action as a whole satisfies the predominance and superiority requirements of Rule 23(b)(3). See *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996). In contrast, the Second, Sixth, and Ninth Circuits agree with the decision below that Rule 23(c)(4) permits class proceedings on certain issues even if a cause of action cannot satisfy Rule 23(b). See *Martin* v. *Behr Dayton Thermal Prods., LLC*, 896 F.3d 405, 413 (6th Cir. 2018); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *Valentino* v. *Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The answer to the crucial question whether a damages class action can proceed where no cause of action satisfies Rule 23(b)(3) should not turn on where a case is filed. This Court's review is necessary to establish a uniform answer to that question.

Finally, the decision below misreads the text of Rule 23 and undermines the protections guaranteed by that Rule. Rule 23(c)(4) does not establish an alternative route to class certification. Instead, it creates a tool that can be used to manage a class action that meets the requirements of Rules 23(a) and (b). The structure of Rule 23 confirms this understanding. Rule 23(a) establishes four prerequisites that all class actions must meet. Rule 23(b) identifies the three kinds of class actions and the requirements to bring each of those kinds of class actions. Rule 23(c) then provides a set of procedures and tools to administer a class action that satisfies the requirements for certification in Rule 23(a) and (b). If Rule 23(c)(4) established a new kind of class action instead of a tool to allow a class that has already met the requirements to

4

proceed only on some issues, it would not have been placed among these management tools.

This Court's review of this important question is needed.

## ARGUMENT

This Court has recognized that abuse of class action procedures burdens both defendants and absent class members. See, *e.g.*, *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 363–64 (2011); *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33–34 (2013); *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 629 (1997). As an "exception to the usual rule" that cases are litigated individually, a case should be permitted to proceed as a class action only after a court has conducted a "rigorous analysis" to ensure that it meets Rule 23's requirements for class certification. *Dukes*, 564 U.S. at 349, 351 (quoting *Califano* v. *Yamaski*, 442 U.S. 682, 700–01 (1979)).

The decision below undermines these essential protections. The Third Circuit found that Rule 23(c)(4) permits the certification of a class action to address certain issues even when no cause of action can satisfy the requirements of Rule 23(a) and (b). This holding permits a party seeking certification in a damages case to avoid the crucial protections of Rule 23(b)(3), which requires that common issues must predominate and that class proceedings must be the superior method to resolve a dispute. The holding will result in an increase in abusive class actions aimed to extract large settlements, even though the underlying claims are meritless. This Court's intervention is needed.

5

## I.    The Question Presented Is Important.

This Court's review is needed to resolve a question of critical importance. The decision below will permit the certification of a class in nearly any case. The resulting shakedown class actions that fail to comply with the protections established in Rule 23(b)(3) will harm businesses, customers, employees, and the judicial system.

Class-action defendants face enormous pressure to settle. The certification of a class often results in a massive increase in the potential liability and costs faced by a defendant. *See Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense."). This increased potential liability and cost may force the defendant to enter what Judge Friendly called "blackmail settlements." Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973); see also *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 350 (2011) (noting the "risk of 'in terrorem' settlements that class actions entail"). The risk of a massive loss means that "even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to the prospect of success at trial." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 740 (1975); see also *Shady Grove Orthopedic Assocs., P.A.* v. *Allstate Ins. Co.*, 559 U.S. 393, 445 n.3 (2010) (Ginsburg, J., dissenting) ("A court's decision to certify

6

a class . . . places pressure on the defendant to settle even unmeritorious claims.").

It is unsurprising, then, that most class action defendants settle even when a claim is meritless. See Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 812 (Dec. 2010) ("virtually all cases certified as class actions and not dismissed before trial end in settlement"). In 2019, for example, companies reported that they settled 60.3% of class actions. See Carlton Fields Class Action Survey, at 26 (2021), available at https://classactionsurvey.com. The previous year they reported settling an even higher 73%. *Id.* The same appears to be true in cases where issues were certified for class treatment even though the case does not satisfy Rule 23(b)(3). Counsel for *amicus curiae* was unable to find any case that proceeded to trial after the certification of this kind of issues class.

This Court has repeatedly emphasized the importance of ensuring that Rule 23's requirements are satisfied. Class action litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33 (quoting *Yamasaki*, 442 U.S. at 700–01). A plaintiff seeking to invoke this exception "must affirmatively demonstrate his compliance" with Rule 23's requirements. *Id.* (quoting *Dukes*, 564 U.S. at 350).

These requirements are especially important in a Rule 23(b)(3) damages class action. Rule 23(b)(3) authorizes a damages class action only where "the

7

questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This Court has recognized that this kind of class action is an "adventuresome innovation" that "is designed for situations 'in which class-action treatment is not as clearly called for.'" *Comcast*, 569 U.S. at 34 (quoting *Dukes*, 564 U.S. at 362). So "[i]f anything," certification under Rule 23(b)(3) should be "even more demanding" than other provisions of Rule 23. *Id.*

The approach adopted by the Third Circuit below would extend class treatment far beyond even the "adventuresome innovation" of Rule 23(b)(3). Discarding Rule 23(b)(3), the Third Circuit held that a class can be certified based on common issues even when those common issues do not predominate over individual issues for the cause of action as a whole. *See* Pet. App. 24a. In other words, the Third Circuit found that Rule 23(c)(4) creates an "additional pathway[]" that looks only to "particular issues" identified for class treatment. Pet. App. 13a.

The Third Circuit's approach would work a massive expansion of the settlement pressure inherent in class-action litigation. This Court has recognized that "any competently crafted class complaint literally raises common questions." *Dukes*, 564 U.S. at 349 (quotation marks and citation omitted). Looking only to common issues to certify a class under Rule 23(c)(4) would permit a court to "sever issues until the remaining common issue[s] predominate." *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th

8

Cir. 1996). As a result, defendants could face the immense pressure to settle caused by class certification in nearly every case.

This pressure to settle remains even though an issues class would not result in a single damages award. See Pet. App. 31a–32a (arguing that the incentive to bring abusive class actions depends on a damages award). Class actions place outsized settlement pressure on defendants because of the massive liability that could result from a single adverse decision. An issues class proceeding will result in a ruling that binds the defendant in litigation with class members. Even without a final damages award, this kind of all-or-nothing proceeding could result in a massive increase in the liability faced by the defendant, creating pressure to settle even unmeritorious claims.

The Third Circuit's approach would also undercut the bellwether process that federal courts have developed to promote the resolution of complicated multi-district litigation. This process sends a handful of representative cases to a jury. Sherman, *Segmenting Aggregate Litigation: Initiatives and Impediments for Reshaping the Trial Process*, 25. Rev. Litig. 691, 696 (2006). These bellwether trials promote settlement by providing guidance on how juries are likely to assess the arguments in the remaining cases. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 2007 WL 1791258, at *2 (S.D.N.Y. June 15, 2007). A key feature of this process is that bellwether trials lack preclusive effect—permitting a defendant to gain information about the likely value of claims without facing the

9

unfair pressures exacted by a single resolution applying in all cases. But if these key issues can be resolved in a way that binds the defendant in all future cases, the defendant will face enormous pressure to settle without the valuable information that bellwether proceedings provide to both sides.

The costs of this new category of class action will reverberate through the entire economy. Class actions already impose huge costs. In 2019, these costs totaled more than $2.64 billion. See Carlton Fields Class Action Survey 4. Defense costs in a single class action can run into nine figures. See Adele, *Dukes* v. *Wal-Mart*: Implications for Employment Practices Liability Insurance 1 (July 2011) (noting defense costs of $100 million). Under the Third Circuit's decision, businesses will have to expend substantial resources to defend against a new category of class action. But they will not bear those expenses alone. Instead, the costs would ultimately be passed to consumers through higher prices.

The increased costs resulting from the Third Circuit's approach will not be accompanied by any improvement in the resolution of cases. By definition, the Third Circuit's holding that Rule 23(b)(3) does not need to be satisfied for a cause of action means that class proceedings can go forward even when common issues do not predominate and class treatment is not a superior method of resolving the dispute. So the substantial costs resulting from class treatment will be imposed with no countervailing benefit through efficient resolution of a multitude of disputes.

10

## II.    This Court's Intervention Is Needed to Resolve a Split on this Important Question.

This Court's intervention is needed to resolve the proper application of Rule 23(c)(4).  The circuit courts have reached contradictory holdings on whether Rule 23(c)(4) authorizes the certification of an issues class when no cause of action satisfies Rule 23(b)(3).  Only this court can provide the certainty class-action defendants need on whether Rule 23(c)(4) can be used to evade the protections of Rule 23(b)(3).

In the Fifth Circuit, Rule 23(c)(4) cannot be used to certify an issues class that fails predominance under Rule 23(b)(3).  That Court explained that "[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Castano*, 84 F.3d at 745 n.21.  An alternative reading that looked only to the issues singled out under Rule 23(c)(4) would "allow[] a court to sever issues until the remaining common issue predominates over the remaining individual issues," thus "eviscerat[ing] the predominance requirement of rule 23(b)(3)." *Id*.  That model would result in "automatic certification in every case where there is a common issue." *Id*.

In contrast, the Second, Sixth, and Ninth Circuits allow a court to certify a class under Rule 23(c)(4) even when a cause of action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement.  The Second Circuit found that "a court may employ

11

subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006). Similarly, the Ninth Circuit announced that Rule 23(c)(4) permits a court to certify a class action on some issues "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted." *Valentino* v. *Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). And the Sixth Circuit rejected "[a] requirement that predominance must first be satisfied for the entire cause of action." *Martin* v. *Behr Dayton Thermal Prods., LLC*, 896 F.3d 405, 413 (6th Cir. 2018).

In this case, the Third Circuit joined the Second, Sixth, and Ninth circuits in holding that Rule 23(c)(4) can be used to certify a class even when no cause of action satisfies Rule 23(b)(3). It announced that Rule 23(c)(4) provides an "additional pathway[]" to class certification. Pet. App. 13a. According to the Third Circuit, that pathway permits a party to single out "'particular issues' for class treatment." Pet. App. 14a. The party seeking class certification need not show that the case or any cause of action satisfies the requirements of Rule 23(b)(3). Instead, that party may show that particular "*issues* 'satisfy Rule 23(a)'s prerequisites' and that those issues are 'maintainable under Rule 23(b)(1), (2), or (3).'" Pet. App. 14a (quoting *Amchem*, 521 U.S. at 614).

This Court's intervention is needed to resolve this dispute between the circuits. The circuits that have read Rule 23(c)(4) to create a new kind of issues

class action have expanded the number of cases where a class can be certified. As a result, they have expanded the reach of the enormous pressure to settle that accompanies class certification. Whether a defendant faces that pressure should not turn on where a case was filed. Class-action defendants need the certainty about the reach of those pressures that only this Court can provide.

### III.    The Decision Below Is Inconsistent With Rule 23.

A district court's duty to rigorously analyze the class-certification criteria "is not some pointless exercise . . . [i]t matters." *Chavez* v. *Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020). Contrary to the decision below, Rule 23(c)(4) does not create a new "pathway" to certify an issues class that falls short of Rule 23(b)(3)'s requirements. It merely creates a discretionary case-management tool that a district court can employ when a case otherwise satisfies the class-certification requirements.

Rule 23 establishes two sets of requirements that every case must satisfy to proceed as a class action. Rule 23(a) first establishes four "prerequisites" to bringing a class action—numerosity, commonality, typicality, and adequacy. These requirements are "applicable to all class actions." *Amchem*, 521 U.S. at 613.

A party seeking class certification who has satisfied the Rule 23(a) prerequisites "must" then "show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* at 614. These three provisions

13

establish the three "types of class actions" that a party can bring. Fed R. Civ. P. 23(b).

Importantly, Rule 23(b)(3) provides the only avenue for a damages claim to proceed as a class action. To satisfy that provision, the district court must find that common questions "predominate over" individualized ones and that "a class action is superior to other available methods" of "adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These predominance and superiority requirements help limit class certification to cases where class litigation is the best route to resolve the case.

Rule 23(c) then provides district courts with tools to manage a class action that has satisfied Rule 23(a) and (b). Consistent with that structure, Rule 23(c)(4) permits a district court to permit a class action that has satisfied Rule 23(a) and (b) to proceed as a class action "with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

The Third Circuit's alternative view that Rule 23(c)(4) permits the authorization of a class action on certain issues and that Rule 23(b)(3)'s requirements for a damages class action apply to those issues only—rather than to the cause of action as a whole—contradicts the text of Rule 23. To begin, this creation of an issues class action under Rule 23(c)(4) cannot be reconciled with its placement among the other case-management tools in Rule 23(c). *See Murphy* v. *Smith*, 138 S. Ct. 784, 789 (2018) (looking to the "surrounding statutory structure" and "other provisions" to interpret statutory text). Each of the provisions of Rule 23(c) provides a tool or procedure for a district

14

court to manage an existing or proposed class action. Rule 23(c)(1) requires a court to decide whether to certify a class "[a]t an early practicable time," and announces that a certification order must "define the class and the class claims, issues, or defenses, and must appoint class counsel." Fed. R. Civ. P. 23(c)(1). Rule 23(c)(2) establishes notice requirements for class actions, including individual notice to members of a Rule 23(b)(3) class. Rule 23(c)(3) requires findings about class membership in the judgments for each of the three types of class action permitted by Rule 23(b). And Rule 23(c)(5) permits the division of a class into subclasses.

Like these provisions, Rule 23(c)(4) provides a tool for the management of a class action, not a new "pathway" to establish a class action. The Rules Committee would not have placed Rule 23(c)(4) in the middle of a series of procedures and management tools if it had meant to create a whole new type of class action. This placement confirms that Rule 23(c)(4) is a case management tool that allows a district court to limit class treatment to particular issues when a case has already satisfied Rule 23(a) and (b).

This understanding is confirmed by the absence of the kind of language Rule 23 uses to create a new kind of class action in Rule 23(c)(4). Rule 23(b) is explicit about the creation of three different types of class actions and the requirements for each type. Rule 23(b) is entitled "types of class actions." See *INS* v. *Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (explaining that the title of a statute or section can help clarify meaning). It begins by explaining that a class action can be brought "if Rule

15

23(a) is satisfied and if" the conditions for one of the three types of class action have been met. Fed. R. Civ. P. 23(b). It then lays out detailed requirements for each of these three kinds of class action.

Rule 23(c)(4), on the other hand, makes no reference to a "type[] of class action." Nor does it lay out the requirements to bring a class action under Rule 23(b)(4), where it ought to be under the Third Circuit's reading of the rule. It merely announces that "when appropriate" a court may permit class proceedings "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). This contrast in the language of Rule 23(c)(4) and Rule 23(b) indicates that Rule 23(b) establishes the only paths to class certification. See *POM Wonderful LLC* v. *Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (explaining that the provision of rules for some cases implies the exclusion of other cases). The Rules Committee would have placed the provision in Rule 23(b) or, at the very least, used language similar to Rule 23(b) if it had meant to create a new kind of class action.

What's more, the other provisions of Rule 23(c) assume that Rule 23(b) establishes the only three types of class action. For example, Rule 23(c)(2) provides notice requirements "[f]or any class certified under Rule 23(b)(1) or (b)(2)" and a different set of notice requirements "[f]or any class certified under Rule 23(b)(3)." Fed. R. Civ. P. 23(c)(2). And Rule 23(c)(3) imposes rules for the judgment in "any class action certified under Rule 23(b)(1) or (b)(2)" and different requirements for "any class action certified under Rule 23(b)(3)." Fed. R. Civ. P. 23(c)(3). But Rule 23(c) does not include any similar rules for the

16

administration of an issues class under Rule 23(c)(4). This absence of any rules for the management of a Rule 23(c)(4) class action confirms that it does not establish a separate type of class action.

The Third Circuit's approach is irreconcilable with the text and structure of Rule 23. It allows class action plaintiffs to evade the limitations of Rule 23(b)(3) simply by labelling a proceeding as an issues class action. This is not a superior way of resolving any cause of action, and this Court's intervention is warranted.

## CONCLUSION

The petition for a writ of certiorari should be granted.

17

Respectfully submitted,

Gilbert C. Dickey
   *Counsel of Record*
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
(704) 343-2396
*gdickey@mcguirewoods.com*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716

Tara S. Morrissey
Tyler S. Badgley
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for* Amicus Curiae *Chamber of Commerce of the United States of America*

January 28, 2022



Supreme Court of the United States
United States Courts of Appeals

## CERTIFICATE OF COMPLIANCE

No. 21-948

EDUCATIONAL COMMISSION FOR FOREIGN
MEDICAL GRADUATES,

*Petitioner,*

v.

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; AND DESIRE EVANS,

*Respondents.*

As required by Supreme Court Rule 33.1(h), I certify that the Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Petitioner contains 3,987 words, excluding the parts of the Brief that are exempted by Supreme Court Rule 33.1(d).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2022.

_____

Emily Mullins
Becker Gallagher Legal Publishing, Inc.
8790 Governor's Hill Drive, Suite 102
Cincinnati, OH 45249
(800) 890-5001

BECKER GALLAGHER LEGAL PUBLISHING INCORPORATED
(800) 890.5001
www.beckergallagher.com

8790 Governor's Hill Drive
Suite 102
Cincinnati, Ohio 45249

Franklin Square
1300 I Street, NW, Suite 400E
Washington, DC 20005

JA4847

Sworn to and subscribed before me by said Affiant
on the date designated below.

Date: _Janey 28, 2022_

_Jon N. Gallly_
Notary Public

[seal]

JOHN D. GALLAGHER
Notary Public, State of Ohio
My Commission Expires
February 14, 2023



BECKER GALLAGHER
Briefs and Records

Supreme Court of the United States
United States Courts of Appeals

## CERTIFICATE OF SERVICE

I, Emily Mullins, hereby certify that 1 unbound copy and 40 bound copies of the foregoing Brief of the Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Petitioner in 21-948, *Educational Commission for Foreign Medical Graduates v. Monique Russell; Jasmine Riggins; Elsa M. Powell; and Desire Evans*, were sent via Next Day Service to the U.S. Supreme Court, and 3 copies were sent via Next Day and e-mail service to the following parties listed below, this 28th day of January, 2022:

William Robert Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana Street
Suite 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com

*Counsel for Petitioner*

Patrick A. Thronson
Janet, Janet & Suggs, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

BECKER GALLAGHER LEGAL PUBLISHING INCORPORATED
(800) 890.5001
www.beckergallagher.com

8790 Governor's Hill Drive
Suite 102
Cincinnati, Ohio 45249

Franklin Square
1300 I Street, NW, Suite 400E
Washington, DC 20005

JA4849

Paul M. Vettori
Law Offices of Peter G. Angelos, P.C.
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, MD 21201
(410) 649-2000
pvettori@lawpga.com

Brent Ceryes
Schochor, Federico and Staton
The Paulton
1211 St. Paul Street
Baltimore, MD 21202
(410) 234-1000
bceryes@sfspa.com

Scott L. Nelson
Public Citizen Litigation Group
1600 20th St. NW
Washington, D.C. 20009
(202) 588-1000
snelson@citizen.org

Nicholas M. Centrella
Robin S. Weiss
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102
(215) 864-9600
ncentrella@conradobrien.com
rweiss@conradobrien.com

Cory L. Zajdel
Z Law, LLC
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977
clz@zlawmaryland.com

*Counsel for Respondents*

Gilbert C. Dickey
   *Counsel of Record*
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
(704) 343-2396
gdickey@mcguirewoods.com

Tara S. Morrissey
Tyler S. Badgley
U.S. Chamber Litigation Center
1615 H Street NW
Washington, DC 20062
(202) 463-5337

Matthew A. Fitzgerald
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716

*Counsel for Amicus Curiae*

All parties required to be served have been served.

I further declare under penalty of perjury that the foregoing is true and correct. This Certificate is executed on January 28, 2022.

Emily Mullins
Becker Gallagher Legal Publishing, Inc.
8790 Governor's Hill Drive, Suite 102
Cincinnati, OH 45249
(800) 890-5001

Subscribed and sworn to before me by the said Affiant on the date below designated.

Date: _Janry 28, 2022_

Notary Public

[seal]

JOHN D. GALLAGHER
Notary Public, State of Ohio
My Commission Expires
February 14, 2023

No. 21-948

IN THE

# Supreme Court of the United States

---

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, AND DESIRE EVANS,
*Respondents*.

---

On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Third Circuit

---

## RESPONDENTS' BRIEF IN OPPOSITION

---

PATRICK A. THRONSON
  *Counsel of Record*
BRENDA A. HARKAVY
JANET, JANET & SUGGS
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

SCOTT L. NELSON
PUBLIC CITIZEN
  LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Respondents*

*(Additional Counsel Listed on Inside Cover)*

April 2022

PAUL M. VETTORI
LAW OFFICES OF PETER G.
  ANGELOS
One Charles Center
100 N. Charles Street, 20th Fl.
Baltimore, MD 21201
(410) 649-2000


CORY L. ZAJDEL
Z LAW LLC
2345 York Rd, Suite B-13
Timonium, MD 21093
(443) 213-1977

KAREN E. EVANS
DAVID E. HAYNES
THE COCHRAN FIRM
1100 New York Avenue N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

BRENT P. CERYES
JONATHAN SCHOCHOR
SCHOCHOR, FEDERICO
  & STATON
The Paulton
1211 St. Paul Street
Baltimore, MD 21202
(410) 234-1000


NICHOLAS M. CENTRELLA
ROBIN S. WEISS
CONRAD O'BRIEN PC
1500 Market Street
Suite 3900
Philadelphia, PA 19102
(215) 864-9600

i

## QUESTION PRESENTED

Whether it is ever permissible for a court to certify one or more issues for classwide resolution pursuant to Rules 23(b)(3) and 23(c)(4), where common questions predominate over individual ones for the certified issues but not necessarily for the case, or a cause of action asserted in it, as a whole?

ii

# TABLE OF CONTENTS

QUESTION PRESENTED ...........................................i

TABLE OF CONTENTS..............................................ii

TABLE OF AUTHORITIES ......................................iii

INTRODUCTION ...................................................... 1

STATEMENT................................................................ 3

REASONS FOR DENYING THE WRIT................... 7

I.   The posture of this case, with class
     certification and dispositive motions
     unresolved, makes it especially unsuitable
     for review........................................................ 7

II.  There is no intercircuit conflict. ...................... 9

     A. The decision below reflects the
        consensus view of Rule 23(c)(4)................. 9

     B. The Fifth and Eighth Circuits concur
        with the consensus view. .......................... 12

III. A careful, extensive rulemaking process
     concluded there is no circuit split on Rule
     23(c)(4) that warrants attention.................... 23

IV.  ECFMG's view of issue-class certification
     lacks textual support. ................................... 27

V.   ECFMG's dire predictions about issue-
     class certification ignore its longstanding
     use and the other procedural protections
     in Rule 23. ...................................................... 31

VI.  This Court has repeatedly denied certiorari
     on the question ECFMG raises...................... 32

CONCLUSION.......................................................... 33

iii

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ........................... 19, 20

*Behr Dayton Thermal Prods., LLC v. Martin*,
  139 S. Ct. 1319 (2019) ........................................... 33

*Bolin v. Sears, Roebuck & Co.*,
  231 F.3d 970 (5th Cir. 2000) ................................. 17

*Brownback v. King*,
  141 S. Ct. 740 (2021) ............................................ 28

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ................................. 17

*Castano v. Am. Tobacco Co.*,
  160 F.R.D. 544 (E.D. La. 1995) ............................. 13

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) .......................... *passim*

*Corley v. Entergy Corp.*,
  220 F.R.D. 478 (E.D. Tex. 2004) ........................... 18

*Corley v. Entergy Corp.*,
  222 F.R.D. 316 (E.D. Tex. 2004) ........................... 18

*Corley v. Orangefield Indep. Sch. Dist.*,
  152 Fed. Appx. 350 (5th Cir. 2005)....................... 18

*Corley v. United States*,
  556 U.S. 303 (2009) ............................................... 31

*Ebert v. Gen. Mills, Inc.*,
  823 F.3d 472 (8th Cir. 2016) ........................... 22, 23

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011)............................... 1, 30

iv

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ............................................... 23

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ................. 9, 28, 30, 31

*Healthplan Servs., Inc. v. Gunnells*,
  542 U.S. 915 (2004) .............................................. 33

*In re A.H. Robins*,
  880 F.2d 709 (4th Cir. 1989) ................................. 30

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ........................... 16, 17

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006)................... 9, 28, 30, 31

*In re Rodriguez*,
  695 F.3d 360 (5th Cir. 2012) ........................... 16, 17

*In re St. Jude Med., Inc.*,
  522 F.3d 836 (8th Cir. 2008) ..................... 10, 21, 22

*Jenkins v. Raymark Indus., Inc.*,
  782 F.2d 468 (5th Cir. 1986) .............. 15, 16, 29, 32

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) ................................. 10

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ................................. 29

*Martin v. Behr Dayton Thermal Prods. LLC*,
  896 F.3d 405 (6th Cir. 2018) ................. 9, 28, 30, 32

*McReynolds v. Merrill Lynch, Pierce, Fenner &
  Smith, Inc.*,
  672 F.3d 482 (7th Cir. 2012) ................................... 9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v.
  McReynolds*,
  568 U.S. 887 (2012) .............................................. 33

v

*Microsoft Corp. v. Baker*,
  137 S. Ct. 1702 (2017) ........................................... 24

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009) ............................................... 24

*Pella Corp. v. Saltzman*,
  562 U.S. 1178 (2011) ............................................. 33

*Prantil v. Arkema Inc.*,
  986 F.3d 570 (5th Cir. 2021) ................................. 20

*Reitman v. Champion Petfoods, USA, Inc.*,
  830 F. Appx. 880 (9th Cir. 2020).......................... 10

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003)................................ 9, 29

*Smith v. Texaco, Inc.*,
  88 F. Supp. 2d 663 (E.D. Tex. 2000) ..................... 19

*Smith v. Texaco, Inc.*,
  263 F.3d 394 (5th Cir. 2001) ................................. 19

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ............................................... 11

*Va. Mil. Inst. v. United States*,
  508 U.S. 946 (1993) ................................................. 8

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ................................... 9

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................... 32

**Rules**

Fed. R. Civ. P. 23 ............................................. *passim*

vi

## Rulemaking Sources

Advisory Committee on Civil Rules, Introductory
    Memorandum for Mini-Conference on Rule 23
    Issues (Sept. 11, 2015)........................................ 25

Advisory Committee on Civil Rules,  Minutes
    (Nov. 5, 2015)....................................................... 24

Advisory Committee on Civil Rules, Report to
    the Standing Committee (Dec. 11, 2015)............ 26

Advisory Committee on Civil Rules, Rule 23
    Subcommittee Report (Apr. 2015) ........................ 25

Advisory Committee on Civil Rules, Rule 23
    Subcommittee Report (Nov. 2015)........................ 25

Committee on Rules of Practice and Procedure,
    Minutes (Jan. 7, 2016)........................................ 26

Committee on Rules of Practice and
    Procedure, Minutes (June 12–13,
    2017)....................................................... 25, 26, 27

Judicial Conference of the United States,
    Report of the Proceedings of the Judicial
    Conference of the United States
    (Sept. 12, 2017)..................................................... 26

Lawyers for Civil Justice, Repairing the
    Disconnect Between Class Actions and Class
    Members (Aug. 13, 2014) ..................................... 25

Supreme Court of the United States, Order
    Amending the Federal Rules of Civil Procedure
    (Apr. 26, 2018) ..................................................... 26

## Treatises

Newberg on Class Actions (5th ed. 2020) ................ 11

Restatement (Second) of Torts § 324A (1965)............ 6

vii

**Other Authorities**

Elizabeth Chamblee Burch, Constructing Issue
   Classes, 101 Va. L. Rev. 1855 (2015) .................. 11

Elizabeth J. Cabraser & Samuel Issacharoff,
   The Participatory Class Action,
   92 N.Y.U. L. Rev. 846 (2017) ................................ 11

Jay Tidmarsh & Roger H. Trangsrud, *Modern
   Complex Litigation* 490 (2d ed. 2010) ................... 11

1

## INTRODUCTION

This case involves claims that petitioner Educational Commission for Foreign Medical Graduates (ECFMG) negligently certified the medical credentials of an impostor. The district court certified an issue class under Federal Rule of Civil Procedure 23(c)(4) to resolve whether ECFMG owed, and breached, duties to patients examined and treated by the impostor. On ECFMG's interlocutory appeal, the United States Court of Appeals for the Third Circuit vacated the certification and remanded for further proceedings to determine whether any class could be certified. Those proceedings are ongoing.

Meanwhile, having prevailed in the Third Circuit, and with both class certification and its own summary judgment motion pending in the district court, ECFMG asks this Court to disrupt a consensus among circuits, rulemakers, and scholars that issue classes may potentially be certified in cases where Rule 23(b)'s requirements would not permit certification for an entire cause of action. This Court has repeatedly denied certiorari petitions raising this issue, and ECFMG offers no compelling reasons for the Court to change course and intervene here, in an appeal in which ECFMG has already prevailed.

The Third Circuit's careful decision concluded the district court failed to conduct a sufficiently rigorous analysis of Rule 23(b) and two of the nine factors the Third Circuit articulated in *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011) to guide a court's exercise of discretion on issue-class certification. The court's decision, however, left open the possibility that, on a proper showing, the district court could certify an issue class. ECFMG contends the Third

2

Circuit's embrace of the consensus view on the proper analysis of Rule 23(b)(3) predominance for a Rule 23(c)(4) certification—under which predominance is analyzed with respect to the certified issues, not the entire case— "deepens" an "entrenched" circuit split. This view, ECFMG claims, conflicts with decisions of the Fifth and Eighth Circuits, which, ECFMG asserts, prohibit certification of an issue class unless the class's cause of action as a whole satisfies Rule 23(b)(3).

ECFMG's argument relies on out-of-context dicta in a footnote in *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996). Properly understood, the *Castano* footnote is consistent with the consensus approach to issue-class certification. Recent Fifth and Eighth Circuit precedents, moreover, also align with the consensus approach.

Federal judicial rulemakers have also rejected ECFMG's proposed approach to issue-class certification. Just four years ago, the Advisory Committee on Civil Rules thoroughly examined the issues raised here, in regular deliberations and through a specially convened Rule 23 Subcommittee. It concluded that amending Rule 23 to provide the relief ECFMG seeks from this Court would be unnecessary and counterproductive and that the circuits were coalescing on a common approach to Rule 23(c)(4) issue classes. And the Committee expressly declined to adopt ECFMG's preferred approach—that issues can only be certified for class treatment if an entire action or cause of action is certified—which lacks support in the text, structure, and history of Rule 23. Changes to Rule 23(c)(4) therefore were not included in the Rule 23 amendments ultimately approved by the Judicial Conference and adopted by this Court.

3

This Court should not disrupt the outcome of the rulemaking process by granting review to resolve a conflict that does not exist, in a case where the lower courts have not yet decided the certification issue.

## STATEMENT

ECFMG is "the central certification agency for graduates of foreign medical schools." (App. 5a.) As Respondents allege, ECFMG negligently investigated and certified a Nigerian national, Oluwafemi Charles Igberase a/k/a John Nosa Akoda (among other aliases), as eligible to enter a medical residency program, despite knowing Igberase/"Akoda" had fraudulently represented his identity and credentials. (App. 6a–9a.) Rather than informing state medical boards, residency programs, and hospitals of Igberase's fraud, ECFMG repeatedly attested that Igberase held a valid ECFMG certification. As a result, "[f]or years, a man using the name 'John Charles Akoda' passed himself off as an OB/GYN." (App. 38a.)

Igberase is now a convicted felon. (App. 41a.) ECFMG consistently refers to him as "Dr. Akoda." But "[a]n error does not become truth by reason of multiplied propagation."[1] He is not "Akoda" and not a doctor. (App. 9a.)

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans, four of Igberase's unknowing patients, sued ECFMG in the Court of Common Pleas of Philadelphia, seeking compensation for emotional harm. They assert two causes of action—negligence and negligent infliction of emotional distress—on behalf of a putative class. They allege Igberase

---

[1] Mohandas K. Gandhi, *Young India 1924-1926*, at 1285 (1927).

4

"touched them without informed consent" and "performed inappropriate examinations of a sexual nature while utilizing inappropriate and explicit sexual language." (App. 41a–42a.) This case is about much more than use of a fake name and Social Security number. (Pet. 5.)

ECFMG removed the case to the United States District Court for the Eastern District of Pennsylvania. After substantial discovery, Plaintiffs moved for certification under Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) of a class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." (App. 42a.) Plaintiffs requested certification of the issue of liability for the two causes of action—or, in the alternative, certification of nine issues common to the class. (App. 42a–43a.)

In an extensive analysis approved by the Third Circuit and not at issue here, the district court first found Respondents had properly defined an ascertainable class that satisfied the four requirements of Rule 23(a). (App. 48a–56a.)

The district court then applied the practical considerations articulated in *Gates* to determine the appropriateness of an issue class under Rule 23(c)(4), but did not expressly find that the proposed issue class satisfied Rule 23(b)(3). (App. 56a–61a.) [2] It declined to certify the issue of liability for the class members' causes of action, finding that resolving liability would require deciding too many individualized questions of causation and harm. (App. 57a–59a.) However, the court found that common issues concerning "whether

_____

[2] The *Gates* factors are listed at App. 17a–18a.

5

ECFMG had a relevant legal duty and whether it breached that duty" were appropriate for certification. (App. 59a.)

Applying *Gates*, the court concluded that the "questions of duty and breach favor issue certification because they are questions of law and/or fact common to all class members and subject to common proof." (App. 59a–60a.) The court found that all class members are "identical in terms of their legal relationship to ECFMG," such that "ECFMG owes the same duty (if any)" to all. (App. 59a–60a.) And whether ECFMG breached its duty "is a common question of fact for each prospective class member," because it turns on ECFMG's conduct, not that of individual class members. (App. 60a.)

Examining the utility of class certification in resolving the action, the district court concluded "there are efficiencies to be gained" through certifying a class on duty and breach. (Pet 60a.) Doing so would permit "a single, preclusive determination about ECFMG's conduct" and avoid repetitive presentation of the same extensive evidence to one jury after another. (*Id.*) Moreover, no other similarly efficient "procedural alternatives" were available. (*Id.*) Finally, the court concluded that certifying an issue class would not "trigger any of the problems about which courts must be mindful under *Gates*," including impairment of a class member's statutory or constitutional rights. (App. 60a.)

The district court accordingly certified an issue class under Rule 23(c)(4), comprising all patients treated by Igberase after he entered a residency program in 2007. (App. 36a.) The certification identified four issues for classwide resolution: (1) whether

6

ECFMG undertook or otherwise owed a duty to class members; (2) whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable to class members pursuant to Restatement (Second) of Torts § 324A; (3) whether ECFMG breached any duty that it owed to class members; and (4) whether ECFMG breached any duty that it owed to hospitals and state medical boards. (*Id.*)

The Third Circuit granted ECFMG leave to appeal under Rule 23(f). It vacated the district court's class certification order on two grounds: "[T]he District Court did not determine whether the duty and breach elements of Plaintiffs' claim satisfied Rule 23(b)(3)," and (2) "the Court also failed to rigorously consider several *Gates* factors," namely "the effect certification of the issue class will have on the effectiveness and fairness of resolution of remaining issues" and "what efficiencies would be gained by resolution of the certified issues." (App. 23a–24a.)

In so holding, the Third Circuit emphasized that issue-class certification requires that the issues certified satisfy Rules 23(a) and (b), and that class resolution of those issues is appropriate in light of the practical considerations outlined in *Gates*. "Rule 23(a) and Rule 23(b) decide if the proposed issues *can* be brought or maintained as [a] class action," it held, "while the *Gates* factors determine whether they *should*." (App. 22a.)

At the same time, the court agreed with the district court's determination that plaintiffs seeking issue-class certification need not "prove that their cause of action as a whole satisfies Rule 23(b)(3)." (App. 23a.) The Third Circuit thus adhered to the "broad view,"

7

under which "[a] majority of the courts of appeals have concluded that in appropriate cases Rule 23(c)(4) can be used even though full Rule 23(b)(3) certification is not possible due to the predominance infirmities." (App. 28a–29a.) It rejected the "narrow view" ECFMG attributed to *Castano*—under which issue class certification is prohibited "if Rule 23(b)(3) predominance has not been satisfied for the cause of action as a whole"—because it has not been adopted by any other circuit, has been rejected by the Advisory Committee on Civil Rules, and "subsequent caselaw from the Fifth Circuit suggests that any potency the narrow view once held has dwindled." (App. 30a. & n.7.)

Accordingly, the Third Circuit remanded to the district court to analyze all *Gates* factors and determine whether the proposed issue classes satisfied Rule 23(b)(3). (App. 32a.)

## REASONS FOR DENYING THE WRIT

## I. The posture of this case, with class certification and dispositive motions unresolved, makes it especially unsuitable for review.

Petitioner seeks this Court's intervention *in medias res*. After the Third Circuit vacated the district court's class certification and remanded it for further consideration, the district court requested supplemental briefing from the parties on class certification.[3] The parties have submitted two rounds of supplemental briefing.[4] The district court has yet to issue a decision on class certification following remand. The standard for certifying an issue class would be best

---

[3] Order, ECF No. 77, *Russell v. Educ. Comm'n Foreign Med. Graduates*, No. 2:18-cv-05629-JDW (E.D. Pa. Nov. 9, 2021).

[4] *Id.* at ECF Nos. 79, 80, 95, 96.

considered in the context of a decision granting or denying certification, the propriety of which turns on resolution of a legal question suitable for this Court's determination. Those features are missing here. Meanwhile, whichever answer the Court were to give to the question ECFMG presents would merely result in affirmance of the Third Circuit's decision vacating the original certification order.

ECFMG has also filed several *Daubert* motions and a lengthy motion for summary judgment regarding the claims of the named plaintiffs. The latter seeks dismissal based on an alleged lack of duty, proximate cause, and entitlement to emotional harm damages.[5] Plaintiffs have opposed these motions,[6] and they, too, have yet to be heard.[7]

The district court's decisions on these matters may well change the shape and scope of the case. For example, the district court may deny certification, modify the issues to be certified, determine that the issues of duty and breach can only be certified as to one of the two causes of action, or even rule that Plaintiffs lack a claim altogether. Complicated additional proceedings may follow, including efforts to substitute class representatives and merits appeals.

The Court should not ground an extraordinary intervention into settled class-action doctrine on such shifting sands. This court "generally awaits final judgment in the lower courts before exercising our

---

[5] *Id.* at ECF Nos. 81–83, 87.

[6] *Id.* at ECF Nos. 93–94.

[7] Argument on summary judgment and reargument of class certification was to be held on March 29, 2022 but was canceled. *Id.* at ECF No. 102.

certiorari jurisdiction." *Va. Mil. Inst. v. United States*, 508 U.S. 946 (1993) (opinion of Scalia, J., respecting denial of certiorari). Here, there is no operative class certification decision, let alone a final judgment. Further developments below could alter or moot the issues ECFMG presents. If ECFMG is ultimately dissatisfied with the judgment, its objections can be addressed together, if need be, on appeal from a final judgment.

## II. There is no intercircuit conflict.

### A. The decision below reflects the consensus view of Rule 23(c)(4).

The view of Rule 23(c)(4) expressed by the Third Circuit below conforms to a broad agreement among the circuits that Rule 23(c)(4) certification is not, as ECFMG asserts, limited to circumstances where a cause of action or an action as a whole satisfies Rule 23(b)(3)'s requirements. *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003) ("[E]ven if individualized determinations were necessary to calculate damages, Rule (23)(c)(4)(A) would still allow the court to maintain the class action with respect to other issues."); *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 443 (4th Cir. 2003) (rejecting view that an issue class can be certified only if the entire action meets Rule 23(b)(3)'s requirements).

As discussed above, the Third Circuit in this case endorsed the consensus position, applying Rule 23(b)(3)'s predominance and superiority requirements

10

to the issues certified, while employing the *Gates* factors as a guide to the appropriateness of issue certification. The Seventh and Eighth Circuits have similarly declined to adopt a rigid requirement that Rule 23(b)(3)'s criteria must be assessed with respect to an entire cause of action if an issue narrower than a cause of action is proposed for certification. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012); *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008).

Although ECFMG points to differences in the way courts have expressed the consensus view, it identifies no conflict among the "plurality" of circuits endorsing the consensus position—let alone explains how any alleged differences among these circuits would result in a different outcome. *Kartman v. State Farm Mutual Automobile Insurance Co.*, which Petitioner identifies as an example of the Seventh Circuit's "mixed" authority (Pet. 21–22), concerned certification of a Rule *23(b)(2)* class on "liability." 634 F.3d 883, 895 (7th Cir. 2011). The court held that Rule 23(b)(2) was "not appropriately invoked for adjudicating common issues in an action for *damages*." *Id.* Neither Rule 23(b)(3) and (c)(4) was "implicated," the court held. *Id.*

Petitioner also misquotes *Reitman v. Champion Petfoods, USA, Inc.*, 830 F. Appx. 880 (9th Cir. 2020). an unpublished Ninth Circuit disposition, as holding that "predominance was not required for certifying a class under Rule 23(c)(4)." (Pet. 19.) The quoted statement reflects the appellate court's characterization of the *district court's* position, not its own. *Reitman*, 830 F. App'x at 882. The court of appeals approvingly cited *Valentino*—the other "side" of the fictive intracircuit split ECFMG posits (see Pet. 19)—in affirming the district court's refusal to certify a liability-only issue

class where numerous individualized liability issues would make issue certification inefficient.

Academic authorities have noted the circuits' "emerging consensus" on a practical approach to Rule 23(c)(4) issue certification that does not depend on whether a cause of action as a whole meets the Rule 23(b)(3) criteria.[8] As Professor Samuel Issacharoff (Reporter of the ALI Principles of the Law of Aggregate Litigation) and Elizabeth Cabraser have concluded:

> [B]y now all federal circuits, including the Fifth Circuit, have endorsed the class treatment of specific issues (either by explicitly invoking Rule 23(c)(4), or approving the classwide adjudication of an identified liability issue as a case management technique) in a variety of contexts.[9]

This view, shared by nine circuits,[10] aligns with that of major treatises on civil procedure and class actions, which agree that Rule 23(c)(4) certification should depend on the practical benefits of class resolution of a common issue.[11]

This Court's most recent relevant precedent, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), expressly recognized the utility of class actions to resolve

---

[8] *See, e.g.*, Elizabeth C. Burch, *Constructing Issue Classes*, 101 Va. L. Rev. 1855, 1892 (2015).

[9] Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. Rev. 846, 870–71 (2017).

[10] The Tenth, Eleventh, D.C. and Federal Circuits have not spoken definitively on the question presented.

[11] *See, e.g.* 2 Newberg on Class Actions § 4:91 (5th ed. 2020); 5 James Wm. Moore, Moore's Federal Practice § 23.86 (3d ed. 2011); Jay Tidmarsh & Roger H. Transgrud, *Modern Complex Litigation* 490 (2d ed. 2010).

12

"important questions common to all class members," even where "other important matters will have to be tried separately." *Id*. at 453 (citation omitted). The issue class authorized by Rule 23(c)(4) provides a practical mechanism for such adjudication that assists district judges in managing complex litigation, consistent with all the requirements of Rule 23.

## B. The Fifth and Eighth Circuits concur with the consensus view.

### 1. ECFMG misreads *Castano*.

ECFMG's claim that the circuits are divided rests principally on a footnote in the Fifth Circuit's 25-year-old decision in *Castano*. But a careful reading of *Castano*, the authorities it relies on, and subsequent Fifth Circuit precedents confirms that issues can indeed be certified without a finding that an action or cause of action, as a whole, satisfies Rule 23(b)(3) predominance.[12]

In *Castano*, the district court certified a class—called a "Frankenstein's monster" by Prof. Charles

---

[12] At times, the Petition appears to contend that issue certification requires satisfying predominance as to the entire *action*, not just a cause of action—regardless of the scope of the issue proposed to be certified. *See* Pet. i (question presented refers to "action" not "cause of action"); *but see* Pet. 31 (contending that "when the *claim* is considered as a whole, the individual issues—including causation, injury, and damages—[must] predominate over the narrow (allegedly-common) issues of duty and breach" (emphasis added)). No circuit supports the whole-action view seemingly advanced in the question presented, and it is unclear whether that question even encompasses ECFMG's seeming endorsement, in the body of the Petition, of applying Rule 23(b)'s requirements on the cause-of-action level rather than the certified-issue level in an issue class action.

Alan Wright[13]—of all individuals in the United States who became addicted to nicotine from 1943 onward, along with their spouses, children, and significant others. *Castano*, 84 F.3d at 737. The Fifth Circuit called it "what may be the largest class action ever attempted in federal court." *Castano*, 84 F.3d at 737. Plaintiffs sought relief "solely for the injury of nicotine addiction," under the "novel and wholly untested theory that the defendants fraudulently failed to inform consumers that nicotine is addictive and manipulated the level of nicotine in cigarettes to sustain their addictive nature." *Id.* at 737.

The district court certified the proposed class, pursuant to Rules 23(b)(3) and (c)(4), on "the liability issues of fraud, breach of warranty (express or implied), intentional tort, negligence, strict liability and consumer protection and punitive damages issues." *Castano v. Am. Tobacco Co.*, 160 F.R.D. 544, 560 (E.D. La. 1995), *rev'd*, 84 F.3d 734 (5th Cir. 1996).

Under the courts' proposed four-phase trial plan, a jury would in the first phase determine 11 issues of "core liability," including the fraud cause of action. *Castano*, 84 F.3d at 738. The next three proposed phases were to involve a complex process of calculating compensatory and punitive damages. *Id.* The district court did not discuss in detail how individual plaintiffs' claims would be tried. *Id.*

Importantly, the district court expressly declined to certify numerous other issues, including the reliance element of the plaintiffs' cause of action for fraud. *Id.* at 740. The district court reasoned those "issues are so overwhelmingly replete with individual

_____

[13] *Castano*, 84 F.3d at 745 n.19.

14

circumstances that they quickly outweigh predominance and superiority." *Id.* Paradoxically, however, the district court also found "it would be premature to hold that individual reliance issues predominate over common issues," because it mistakenly thought it was precluded under this Court's precedent from inquiring into the merits of the fraud claim, and because it was possible state law would permit a presumption of reliance. *Id.* at 739. Thus, "the court was convinced that it could certify the class and defer the consideration of how reliance would affect predominance." *Id.*

The Fifth Circuit found that the district court had erred in finding predominance and superiority *as to the issues certified*, for two main reasons: the district court "failed to consider how variations in state law affect predominance and superiority" and its "predominance inquiry did not include consideration of how a trial on the merits would be conducted." *Castano*, 84 F.3d at 740.

Footnote 21, which is dicta, related to the district court's finding that predominance was satisfied as to the entire issue of fraud liability, even as it deferred the question of whether reliance—an element of fraud liability— affected predominance. This illogical result, according to the relevant text of the Fifth Circuit's opinion, contravened circuit precedent and the Advisory Committee notes to Rule 23, which states "a fraud class action cannot be certified when individual reliance will be an issue." *Id.* at 745. And it posed case management problems: "after the class trial, [the district court] might have decided that reliance must be proven in individual trials. The court then would have been faced with the difficult choice of decertifying the class after phase 1 and wasting judicial resources, or continuing with a class action that would have failed

15

the predominance requirement of rule 23(b)(3)." *Castano*, 84 F.3d at 745.

Footnote 21 is specifically directed to this simultaneous certification of fraud liability while bracketing out an element of liability for analysis as to predominance in future proceedings. It reads:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

*Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 (5th Cir. 1996) (citations omitted) (emphasis added).

As footnote 21 discloses, *Castano* found fault with the district court *not* for certifying the issue of liability for fraud, but for purporting to certify it while omitting a key element of liability (reliance) from the predominance analysis. Read in its proper context, footnote 21 stands for a simple proposition: in certifications pursuant to Rule 23(b)(3) and (c)(4), a district court must actually do what it says it is doing. A court cannot "nimbly" excise an element of liability from the

16

Rule 23(b)(3) predominance analysis while at the same time purporting to certify the entire issue of liability for classwide treatment.[14]

*Castano* does not preclude certifying issues other than a cause of action in appropriate circumstances. Indeed, in *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir. 1986), which *Castano* cites extensively with approval (including in footnote 21 itself), the Fifth Circuit had affirmed certification of the "state of the art" defense "and defense-related questions, including product identification, product defectiveness, gross negligence and punitive damages" in a complex asbestos case. In *Jenkins*, no cause of action was certified for classwide treatment, and there was no determination that a cause of action (let alone an action) as a whole satisfied predominance. And *Castano* nowhere suggests any reservations about the result in *Jenkins*.[15]

Rather, according to *Castano*—and courts that have explicitly adopted the broad view of (c)(4) certification—*the contours of the predominance analysis map onto what is certified*. If an action is certified, predominance is determined with reference to the entire case. If a cause of action or a narrower issue within an

---

[14] This is especially true when, as in *Castano*, a district court concludes the excised element (there, reliance) appears to involve many individual questions to be certified.

[15] In *Jenkins,* the district court's trial plan, which the Fifth Circuit approved, was to conduct mini-trials of seven to ten plaintiffs if the plaintiffs prevailed at the issues trial. *Id.* at 471. As *Jenkins* illustrates, the Chamber of Commerce's assertion that issues classes "undercut" bellwether proceedings lacks merit. (Chamber Br. 8.)

action is certified, predominance is determined with reference to the cause of action or issue itself.

### 2. More recent Fifth Circuit decisions align with the consensus view.

The most recent Fifth Circuit decisions on Rule 23(c)(4)—especially *In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012), and *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)—confirm that the Fifth Circuit embraces the consensus approach to issue-class certification.

In *Rodriguez*, the Fifth Circuit affirmed the "narrow class certification" of a Rule 23(b)(2) class on the issue of injunctive relief even though damages claims arising from the same causes of action did not satisfy Rule 23(b)(3)'s predominance requirement. 695 F.3d at 363. The court stated that "Rule 23(c)(4) explicitly recognizes the flexibility that courts need in class certification by allowing certification 'with respect to particular issues' and division of the class into subclasses." *Id.* at 369 n.13 (quoting *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000)). The court focused on whether the certified issue, not the action as a whole, satisfied Rule 23(b).

*In re Deepwater Horizon*—the last occasion on which the Fifth Circuit analyzed Rule 23(c)(4)—also shows that the Fifth Circuit does not adhere to the view reflected in ECFMG's erroneous reading of the *Castano* footnote. Over objections that a district court's certification of a class did not comport with Rule 23(b)(3) because common issues did not predominate, *Deepwater Horizon* held that certification was "in accordance with … Rule 23(c)(4)." 739 F.3d at 806; *see also id.* at 815–16. The Fifth Circuit stated that "'determining liability on a class-wide basis, with

18

separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.'" *Id.* at 806 n.66 (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (Posner, J.), *cert. denied*, 571 U.S. 1196 (2014)). Revealingly, *Deepwater Horizon* approvingly cited decisions of "many circuits" that had "divided and tried" "common and individual issues" "by means of … Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination." *Id.* at 816.

ECFMG, by contrast, cites only three dated appellate decisions as evidence of the Fifth Circuit's "steadfast adherence" to its "side" of the putative split. All support Respondents' interpretation of *Castano* and indicate no circuit split exists.

The most recent of these cases is a *nonprecedential*, unpublished opinion from 2005, *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. Appx. 350 (5th Cir. 2005). *Corley* affirmed a district court's denial of certification of a proposed class of "all present owners of land in Louisiana, Mississippi, and Texas over which Defendants have strung (or buried) fiber optic cable, and over which communications other than electricity-related communications have occurred," on all claims, for liability and damages, pursuant to 23(b)(1)–(3). *Corley v. Entergy Corp.*, 222 F.R.D. 316, 318 (E.D. Tex. 2004). The district court also declined to certify a "composite class," which would have involved "certify[ing] the class under Rule 23(b)(2) on liability and, in turn, certify[ing] the class under Rule 23(b)(3) on damages." *Corley v. Entergy Corp.*, 220 F.R.D. 478, 490 (E.D. Tex. 2004). The district court denied this request because

19

"[t]he lack of a class-wide damages formula, the proximate cause requirement for Plaintiffs' RICO claims, and the limitations question prevent the court from finding that common issues predominate over individual issues for any of Plaintiffs' claims." *Id*. at 491.

The Fifth Circuit's brief, unpublished affirmance held the district court had correctly denied certification of the entire case under Rule 23(b)(3) due to the necessity of individual damages calculations, and held that certifying liability under Rule 23(b)(2) and damages under Rule 23(b)(3) fared no better. 152 F. App'x at 355–56. The single sentence in which the court cited *Castano* did not rule out the possibility of more narrowly tailored issue certification in other circumstances.

The second Fifth Circuit opinion ECFMG points to as evidence of the putative circuit split was withdrawn and is not good law. *Smith v. Texaco, Inc.*, 263 F.3d 394, 409 (5th Cir. 2001), *opinion withdrawn, cause dismissed*, 281 F.3d 477 (5th Cir. 2002). The plaintiffs did not seek certification pursuant to Rule 23(c)(4) and the district court opinion did not mention 23(c)(4). *See Smith v. Texaco, Inc.*, 88 F. Supp. 2d 663 (E.D. Tex. 2000). The appellate opinion mentions *Castano* and Rule 23(c)(4) only in passing. 263 F.3d at 409.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), the third Fifth Circuit case ECFMG cites to support the putative split, is nearly twenty-four years old. In *Allison*, plaintiffs sought certification of the "case" under Rule 23(b)(2) and 23(b)(3). *Id.* at 408. The district court rejected certification of the entire case under either provision. *See id*.

The plaintiffs in *Allison* also proposed "tentative" certification of the issue of liability for classwide

treatment, which would sever—but only temporarily—issues of damages from class proceedings. But the plaintiffs specifically "preserve[d] the claims for compensatory and punitive damages as a class action issue." *Id.* at 421. According to the court, this decision "ha[d] significant implications for certification of the remaining issues," and ultimately foreclosed certification:

> [U]nder the plaintiffs' theory, certification of the first stage of the pattern or practice claim would be appropriate presumably because individual-specific issues would be "severed"—*but only temporarily*—under Rule 23(c)(4), making issues common to the class predominant (at least theoretically) for the purposes of meeting the (b)(3) requirements. But such an attempt to "manufacture predominance through the nimble use of subdivision (c)(4)" is precisely what *Castano* forbade.

*Id.* at 421–22 (emphasis added). *Allison* thus forbids a court from certifying an action *as a whole* by "temporarily" excluding the issue of damages in the predominance analysis. But by emphasizing the adverse consequences of retaining damages as a class issue, *Allison* indicates that plaintiffs may have been successful seeking certification only on the issue of liability, rather than both liability and damages. Issue-by-issue predominance analysis is perfectly acceptable under—and, indeed, required by—*Allison* and *Castano*, if discrete issues rather than a claim or action as a whole are proposed for certification.

In short, ECFMG's reliance on these decades-old (and mostly nonprecedential) opinions does nothing to overcome the Fifth Circuit's recent precedents

expressing support for the consensus view of Rule 23(c)(4).[16]

### 3. ECFMG's attempt to draft the Eighth Circuit into its putative circuit split is unfounded.

ECFMG compounds its misconception of *Castano* by advancing a novel and erroneous argument that the Eighth Circuit is on the same side of the "split" as the Fifth Circuit. The two cases it cites expressly undermine its argument.

*In re St. Jude Medical*, a 2008 decision, arose from injuries allegedly caused by a recalled prosthetic heart valve. 522 F.3d at 837. The district court certified a nationwide class for claims based on violations of Minnesota consumer protection law. *Id.* at 838. The class was certified on both liability and damages. *Id.*

The Eighth Circuit reversed, faulting the district court for inadequately considering the individual issues of fraud and misrepresentation implicated in the certification. Examining whether individual issues predominated *within the issue of liability*, it found they did not, because "[w]hether each plaintiff even received a representation from St. Jude about the efficacy of the heart valve is likely to be a significant issue in each case of alleged liability." *Id.* at 838–39. *St. Jude* also held that individual issues outweighed common issues as to compensatory and medical

---

[16] The Fifth Circuit's most recent citation of *Castano*, in *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 & n.27 (5th Cir. 2021), does not involve issue classes, but merely holds that when a court is determining whether to certify an entire action, or entire causes of action within that action, it should analyze predominance "claim-by-claim," a point not contested in any circuit.

monitoring damages proposed for certification under Rule 23(b)(3). *See id.* at 841.

In dicta, the Eighth Circuit discussed the possibility of certification under Rule 23(c)(4), an issue not considered by the district court, which "did not limit its class certification to specific *issues* that may be amenable to class-wide resolution." *Id.* Reflecting then-common misconceptions about *Castano*, the court of appeals stated "there [was] a conflict in authority on whether such a class may properly be certified under Rule 23," with *Castano* on one side and *Nassau* and *Valentino* on the other. *Id.*

*St. Jude* declined to take a "side," noting that "[e]ven courts that have approved 'issue certification' have declined to certify such classes where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation." *Id.* (citation omitted). "Given the individual issues discussed above," the court concluded, "we think this is such a case." *Id.* at 841.

The Eighth Circuit thus did not reject the consensus position of the circuits. Its analysis is fully consistent with the consensus view that an issue class may not be certified when the issues proposed for certification would not themselves satisfy Rule 23(b)(3) and when issue certification would not serve interests of efficiency.

*Ebert v. General Mills, Inc.*, the other case ECFMG cites as evidence of the Eighth Circuit's view, concerned a district court's "hybrid" certification of liability under Rule 23(b)(2) and damages under (b)(3) in a toxic tort case. 823 F.3d 472, 477, 480 (8th Cir. 2016). The Eighth Circuit concluded that too many individualized issues of liability and damages existed to

warrant certification. *Id.* at 479–80. It analyzed predominance within the issue of liability itself, concluding that "even on the certified issue of liability, there are determinations contained within that analysis that are not suitable for class-wide determination," such as whether a property was subject to vapor contamination for which the defendant was responsible. *Id.* at 479. Neither the district court nor the Eighth Circuit in *Ebert* referenced *Castano*.

*Ebert* nowhere predicates issue-class certification on an entire cause of action satisfying predominance. *Ebert* expressly acknowledges the possibility of issue-class certification in the absence of broader (b)(3) predominance in the first sentence of its discussion section: "A class action serves to conserve the resources of the court and the parties by permitting *an issue* that may affect every class member to be litigated in an economical fashion." 823 F.3d at 477 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)) (emphasis added). *Ebert* is fully consistent with certification of issues that, analyzed on their own terms, satisfy predominance.

## III. A careful, extensive rulemaking process concluded there is no circuit split on Rule 23(c)(4) that warrants attention.

As the Third Circuit recognized, "the Advisory Committee on Civil Rules appears to agree that issues can be certified for class treatment even if predominance cannot be satisfied for the action as a whole." (App. 30a n.7.) The federal judiciary's rulemaking bodies have roundly rejected ECFMG's claims (1) that a circuit split exists concerning Rule 23(c)(4); and (2) that Rule 23 should be amended to adopt the approach ECFMG advocates. As the Advisory Committee on

24

Civil Rules concluded, "[d]issonance in the courts has subsided" regarding issue classes; "[t]here seems little need to undertake work to clarify the law"; and amending Rule 23(c)(4) "might well create new complications."[17] The Petition never mentions the conclusion of the Advisory Committee on Civil Rules and its Rule 23 Subcommittee that the "entrenched" circuit split is nonexistent.  The Court should not introduce needless complication into class-action jurisprudence when the rulemaking bodies Congress authorized to consider the issue have concluded it would be unwarranted.

Congress entrusted stewardship of the Federal Rules of Civil Procedure to the federal judiciary, under the rulemaking process described by the Rules Enabling Act. This process "has important virtues," in that it "draws on the collective experience of bench and bar" and "facilitates the adoption of measured, practical solutions." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 114 (2009). Congress's "determination" to entrust the civil rules to the rulemaking process "is entitled to [the Court's] full respect, in deed as well as in word." *Id.* at 119 (Thomas, J., concurring). Changes in the Civil Rules "are to come from rulemaking, … not judicial decisions in particular controversies or inventive litigation ploys." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1714 (2017).

The rulemaking process has already rejected the argument that disagreement among the circuits requires clarification of Rules 23(b)(3) and (c)(4). In 2011, the Advisory Committee on Civil Rules formed

---

[17] Advisory Comm., Minutes, Nov. 5, 2015, at 23, https://www.uscourts.gov/sites/default/files/2015-11-05-minutes _civil_rules_meeting_final_0.pdf.

a Rule 23 Subcommittee to consider whether Rule 23 required amendments considering developments in decisional law.[18] The Subcommittee began considering whether to amend Rule 23(c)(4) in August 2014, when a group of corporate counsel and defense bar practitioners proposed amending the Rule to incorporate what they deemed the approach of the *Castano* footnote.[19]

After considering the issue, the Subcommittee reported in 2015 that "recent reports suggest that all the circuits are coming into relative agreement that in appropriate cases Rule 23(c)(4) can be used even though full Rule 23(b)(3) certification is not possible due to the predominance requirement."[20] The Subcommittee then considered amending Rule 23 to confirm the "broad view" that predominance as to an entire claim or action is *not* a prerequisite to Rule 23(c)(4) certification.[21] It concluded such an amendment was unnecessary, because there was already consensus on the

---

[18] Judicial Conference of the United States, Standing Committee on Rules of Practice and Procedure, Minutes, June 12–13, 2017, at 27, https://www.uscourts.gov/file/24103/download.

[19] Lawyers for Civil Justice, Repairing the Disconnect Between Class Actions and Class Members: Why Rules Governing "No-Injury" Cases, Certification Standards for Issue Classes, and Notice Need Reform (Aug. 13, 2014), http://www.uscourts.gov/file/17648/download.

[20] Rule 23 Subcomm. Report 39, in Advisory Comm. on Civ. Rules, Agenda Book, Apr. 9–10, 2015, at 281 (emphasis added), https://www.uscourts.gov/sites/default/files/fr_import/CV2015-04.pdf.

[21] Rule 23 Subcomm., Introductory Memorandum for Mini-Conference on Rule 23 Issues, Sept. 11, 2015, at 40, in Advisory Comm. on Civ. Rules, Agenda Book, Nov. 5–6, 2015, at 226, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf.

26

"broad view" and "[t]he various circuits seem to be in accord about the propriety of [issue class] treatment '[w]hen appropriate,' as Rule 23(c)(4) now says."[22] The Advisory Committee accordingly advised the Standing Committee on Rules of Practice and Procedure that there was no need to amend Rule 23(c)(4).[23] It reported "[t]he Subcommittee has concluded that whatever disagreement among the circuits there may have been on this issue at one time, it has since subsided."[24] In endorsing amendments to other parts of Rule 23, the Standing Committee expressly took note that "[a]fter extensive consideration and study, the [Rule 23] Subcommittee narrowed the list of issues to be addressed" and "declined to address … issue classes."[25]

The Judicial Conference unanimously approved the Rule 23 amendments in September 2017, and this Court followed suit in April 2018.[26] They went into effect unchanged on December 1, 2018.

---

[22] Rule 23 Subcomm. Report 4, in Advisory Comm. on Civ. Rules, Agenda Book, Nov. 5–6, 2015, at 5, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf.

[23] *See* Comm. on Rules of Practice and Procedure, Minutes, Jan 7, 2016, at 11–12, https://www.uscourts.gov/file/20044/download; Advisory Comm. on Civ. Rules, Report to the Standing Committee, Dec. 11, 2015, at 27 (emphasis added), https://www.uscourts.gov/sites/default/files/2015-12-11-cv_rules_committee_report_0.pdf.

[24] *Id.* at 12.

[25] Standing Committee, Minutes, June 12–13, 2017, at 27–28, https://www.uscourts.gov/file/24103/download.

[26] Judicial Conference of the United States, Report of the Proceedings of the Judicial Conference of the United States, September 12, 2017, at 23, https://www.uscourts.gov/sites/default/files/17-sep_final_0.pdf; Supreme Court of the United States, Order Amending the Federal Rules of Civil Procedure,
*(Footnote continued)*

27

All told, the deliberations of the Advisory Committee and Rule 23 Subcommittee involved "nearly two dozen meetings and bar conferences and … a mini-conference in September 2015 to gather additional feedback from a variety of stakeholders," as well as extensive written submissions. [27] A multi-year rulemaking process resulted in a considered judgment, without dissent, that the circuits were in accord, and no clarification of Rule 23(c)(4) was required. This Court need not second-guess this reasoned determination.

## IV. ECFMG's view of issue-class certification lacks textual support.

ECFMG's argument that Rule 23(b)(3)'s requirements must be satisfied by a cause of action as a whole, even when only specific issues are certified, contradicts the plain terms of the Rule.

Rule 23(b) sets forth requirements for a "class action" to be "maintained." Rule 23(c)(4), in turn, allows "an action" to be "maintained *as a class action* with respect to particular issues" (emphasis added). In other words, the action is a "class action" only as to those issues.

A court cannot meaningfully consider whether maintaining that "class action" satisfies Rule 23(b)(3)'s predominance requirement without taking into account the bounds Rule 23(c)(4) places on the "class action." That is, the court must determine whether a "class action" limited to the certified issues satisfies predominance, not whether the rest of the

---

Rules 5, 23, 62, and 65.1, at 6-12, Apr. 26, 2018, https://www.supremecourt.gov/orders/courtorders/frcv18_5924.pdf.

[27] Standing Committee, Minutes, June 12–13, 2017, at 27, https://www.uscourts.gov/file/24103/download.

action—which is not a class action—does so. Accordingly, in applying Rule 23(b)(3) in the context of a Rule 23(c)(4) issues class, a court must consider whether common questions of law or fact predominate with respect to the issues that fall within the class action.

As originally adopted, Rule 23(c)(4) made this point explicitly. It stated: "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Fed. R. Civ. P. 23(c)(4) (1966). As the Second and Fourth Circuits explained, that language means that other provisions of Rule 23 must be applied after taking into account the class action's limitation to particular issues. *See Nassau*, 461 F.3d at 226; *Gunnells*, 348 F.3d at 439. This "sequencing directive" was eliminated in 2007 revisions of the Rules, but "the Advisory Committee made clear that the changes to the Rule's language were 'stylistic only.' Fed. R. Civ. P. 23(c)(4) adv. comm. n. to 2007 amend." *Martin*, 896 F.3d at 413.

Other elements of the Rule also support Respondents' interpretation. The title of section (c) of Rule 23 refers to "issues classes." For classes certified under Rule 23(b)(3), a court is required to direct notice to class members on a variety of matters, including "the class *claims, issues, or defenses*." Fed. R. Civ. P. 23(c)(1) (emphasis added). Rule 23(e) provides for settlement of "class claims, issues, or defenses" only with court approval. "Claim" is synonymous with "cause of action." *See* Cause of Action, Black's Law Dictionary (11th ed. 2019); *Brownback v. King*, 141 S. Ct. 740, 751 (2021) (Sotomayor, J., concurring). In its use of the

disjunctive, Rule 23 contemplates certification of issues other than claims, let alone entire actions.[28]

Likewise, the Advisory Committee Notes to Rule 23(c)(4) confirm the provision is intended to allow certification of issues without a finding of predominance as to an entire claim. The relevant note states in its entirety:

> This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Fed. R. Civ. P. 23 advisory committee note to subdivision (c)(4).

Read closely, this note indicates the proper inquiry in such a case is whether predominance is satisfied within the issue of "liability to the class," not the action or claim as a whole. For if a court determined that common liability questions predominated over all

---

[28] Petitioner mistakenly asserts Rule 23(c)(4) is at work in "nearly every" (b)(3) class action, and there is no distinction between partial and full (b)(3) certification. (Pet. 23–24, 28.) Neither proposition is correct. For example, entire actions have long been certified under Rule 23(b)(3) where damages can be calculated simply and efficiently (e.g., through a classwide damages model), without the need for individualized proceedings. *See, e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). This differs from cases in which classwide litigation of issues is followed by individual proceedings to determine damages, as contemplated by the district court. *See, e.g.*, *Jenkins*, 782 F.2d at 471.

30

individual questions in the action or claim (e.g., damages), the action would "retain its 'class' character" not "only through the adjudication of liability to the class," but on *all issues*, including damages. The entire action would be certified as to Rule 23(b)(3), and Rule 23(c)(4) would not be implicated at all. Restricting the scope of certification to a discrete issue like liability necessarily implies the scope of the predominance inquiry is likewise narrowed.

The Rule's structure and context, and the purposes evident from its text, thus indicate it cannot be read to allow certification of an issue class only when Rule 23(b)(3) would permit certification of an entire action or cause of action. Rule 23(c)(4)'s broad grant of authority to certify issues "when appropriate" incorporates the "flexibility in application" generally appropriate under Rule 23. *Gunnells*, 348 F.3d at 424 (quoting *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989)). The Rule permits courts to give common treatment to common issues to advance fair and efficient resolution of a case even when a broader certification would be impermissible. *Gates*, 655 F.3d at 273.

Permitting issue certification only when an entire cause of action can be certified under Rule 23(b)(3) would undermine that objective and "render[] subsection (c)(4) virtually null." *Nassau*, 461 F.3d at 226; *accord Martin*, 896 F.3d at 413. If an entire cause of action satisfied Rule 23(b)(3)'s requirements of predominance and superiority, a district court would not need to certify a narrower issue class. Moreover, under ECFMG's portrayal of the *Castano* footnote's approach, "a court considering the manageability of a class action—a requirement for predominance under Rule 23(b)(3)(D)—[would have] to pretend that subsection (c)(4)—a provision specifically included to

make a class action more manageable—does not exist until after the manageability determination [has been] made." *Nassau*, 461 F.3d at 227 (quoting *Gunnells*, 348 F.3d at 439). Thus, "a court could only use subsection (c)(4) to manage cases that the court had already determined would be manageable *without* consideration of subsection (c)(4)." *Id.* (emphasis added by *Nassau*). Such a reading would leave Rule 23(c)(4) "without any practical application, thereby rendering it superfluous." *Gunnells*, 348 F.3d at 439. Accepting ECFMG's reading would thus violate one of the most basic interpretive canons: that a rule or statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citations and quotation marks omitted).

## V. ECFMG's dire predictions about issue-class certification ignore its longstanding use and the other procedural protections in Rule 23.

ECFMG and its amicus curiae, the Chamber of Commerce, posit that issue-class certification will proceed willy-nilly, risking great economic harm, if the Third Circuit's opinion is permitted to stand. These arguments fail to recognize both the longstanding use of Rule 23(c)(4) as a tool for efficiently and fairly deciding significant common issues, and the paucity of appellate opinions or other evidence to indicate Rule 23(c)(4) has led to runaway judgments since it was enacted in 1966.

ECFMG and the Chamber falsely contend the circuit consensus on Rule 23(c)(4) enables a "new" or less stringent path for class certification. In fact, courts have employed issue-class certification for decades to

32

advance the resolution of damages class actions—including in the Fifth Circuit, which affirmed such a certification in *Jenkins* in 1986. The Chamber adduces studies and data on class-action settlements, but none of them are specific to Rule 23(c)(4) certification.

Other aspects of class-action jurisprudence ensure fair and efficient use of issue-class certification. This Court's jurisprudence on commonality, for example, requires identification of a common issue as to which "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," ensuring that class proceedings "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The requirement of rigorous analysis of all elements, including Rule 23(b)(3) predominance and superiority, along with the availability of interlocutory appeal under Rule 23(f), provide additional protections from casual or misguided use of issue-class certification. ECFMG has already benefited from these protections in this very case.

## VI. This Court has repeatedly denied certiorari on the question ECFMG raises.

This Court has repeatedly denied certiorari to resolve the claimed inter-circuit conflict over the interaction between the predominance requirement of Rule 23(b)(3) and Rule 23(c)(4), including as recently as 2019. This case marks at least the fifth time in the last eighteen years that class-action defendants have asked the Court to grant certiorari to resolve the claimed interpretive division over Rule 23(c)(4). *See Martin v. Behr Dayton Thermal Products, LLC*, No. 17-472 (filed Oct. 12, 2018); *Healthplan Servs., Inc. v. Gunnells,* No. 03-1282 (filed Mar. 11, 2004); *Merrill*

33

*Lynch, Pierce, Fenner & Smith, Inc. v. McReynolds*, No. 12-113 (filed July 25, 2012); *Pella Corp. v. Saltzman*, No. 10-355 (filed Sept. 13, 2010).

These petitions, like ECFMG's, asked the Court to determine whether certification of an issue class under Rule 23(c)(4) requires a finding that the action or cause of action as a whole satisfies Rule 23(b)(3)'s predominance requirement. As here, the petitioners in each of these cases asserted that the circuits were irreconcilably split over whether Rule 23(c)(4) allows a court to certify an issue class without finding that the entire action or cause of action would satisfy Rule 23(b)(3). This Court denied certiorari in each case.[29]

No subsequent developments support granting the Petition. The Third Circuit's embrace of the consensus position in this case makes the alleged split even less real or compelling. And the disposition below, which vacated certification of the class, together with the pending dispositive and renewed certification motions, renders this case an unsuitable vehicle for addressing the issue.

## CONCLUSION

For the foregoing reasons, Respondents respectfully request the petition for a writ of certiorari be denied.

---

[29] *See Behr Dayton Thermal Products, LLC v. Martin*, 139 S. Ct. 1319 (2019); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McReynolds*, 568 U.S. 887 (2012); *Pella Corp. v. Saltzman*, 562 U.S. 1178 (2011); *Healthplan Servs., Inc. v. Gunnells*, 542 U.S. 915 (2004).

Respectfully submitted,

PATRICK A. THRONSON
  *Counsel of Record*
BRENDA A. HARKAVY
JANET, JANET & SUGGS
4 Reservoir Circle,
Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

SCOTT L. NELSON
PUBLIC CITIZEN
  LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

PAUL M. VETTORI
LAW OFFICES OF PETER G.
  ANGELOS
One Charles Center
100 N. Charles Street
20th Floor
Baltimore, MD 21201
(410) 649-2000

BRENT P. CERYES
JONATHAN SCHOCHOR
SCHOCHOR, FEDERICO
  & STATON
The Paulton
1211 St. Paul Street
Baltimore, MD 21202
(410) 234-1000

CORY L. ZAJDEL
Z LAW LLC
2345 York Rd, Suite B-13
Timonium, MD 21093
(443) 213-1977

NICHOLAS M. CENTRELLA
ROBIN S. WEISS
CONRAD O'BRIEN PC
1500 Market Street
Suite 3900
Philadelphia, PA 19102
(215) 864-9600

KAREN E. EVANS
DAVID E. HAYNES
THE COCHRAN FIRM
1100 New York Avenue N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Respondents*

April 2022

No. 21-948

IN THE

# Supreme Court of the United States

---

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, AND DESIRE EVANS,

*Respondents.*

---

## CERTIFICATE OF WORD COUNT

As required by Supreme Court Rule 33.1(h), I certify that the accompanying Respondents' Brief in Opposition contains 8,709 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

Executed on April 8, 2022.

---

PATRICK A. THRONSON
JANET, JANET & SUGGS
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200

*Counsel of record for Respondents*



2311 Douglas Street
Omaha, Nebraska 68102-1214

E-Mail Address:
contact@cocklelegalbriefs.com

1-800-225-6964
(402) 342-2831
Fax: (402) 342-4850

Web Site
www.cocklelegalbriefs.com

No. 21-948

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES,
Petitioner,
v.
MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, AND DESIRE EVANS,
Respondents

**AFFIDAVIT OF SERVICE**

I, Andrew Cockle, of lawful age, being duly sworn, upon my oath state that I did, on the 8th day of April, 2022, send out from Omaha, NE 1 package(s) containing 3 copies of the RESPONDENTS' BRIEF IN OPPOSITION in the above entitled case. All parties required to be served have been served by third-party commercial carrier for delivery within 3 calendar days. Packages were plainly addressed to the following:

SEE ATTACHED

**To be filed for:**

PATRICK A. THRONSON
 Counsel of Record
BRENDA A. HARKAVY
JANET, JANET & SUGGS
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
(410) 653-3200
pthronson@jjsjustice.com

SCOTT L. NELSON
PUBLIC CITIZEN
 LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Attorneys for Respondents

Subscribed and sworn to before me this 8th day of April, 2022.
I am duly authorized under the laws of the State of Nebraska to administer oaths.



GENERAL NOTARY-State of Nebraska
RENEE J. GOSS
My Comm. Exp. September 5, 2023

_____
Notary Public

_____
Affiant

JA4897

42262

William Robert Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana Street
Suite 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com
Counsel of Record for Petitioner Educational
Commission for Foreign Medical Graduates

No. 21-948

## In the
# Supreme Court of the United States

---

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

*Respondents*.

---

**On Petition for a Writ of Certiorari to the
United States Court of Appeals for the
Third Circuit**

---

**REPLY FOR PETITIONER**

---

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103

William R. Peterson
*Counsel of Record*
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5188
william.peterson
    @morganlewis.com

*Counsel for Petitioner*

i

# TABLE OF CONTENTS

Page

Table of Contents.......................................................i

Table of Authorities ............................................. ii

Reply for Petitioner...............................................1

Argument ............................................................2

I.  No Case Certified Under Rule 23(c)(4) Has
    Ever Proceeded to Final Judgment. ..................2

II.  Respondents Incorrectly Describe the
     Positions of the Circuits...................................3

    A.  After Rule 23(b)(3) is satisfied, Rule
    23(c)(4) permits adjudicating common
    issues classwide. ......................................4

    B.  The Seventh Circuit's authority is
    mixed. .......................................................8

    C.  Respondents cannot deny the
    significant variations within the
    plurality......................................................9

    D.  The D.C. Circuit recently and
    correctly recognized certification
    under Rule 23(c)(4) as "an unsettled
    and fundamental issue of law.".............11

III.  This Court Does Not Defer to the Advisory
      Committee's Decision Not to Amend the
      Rules. ..............................................................12

IV.  Respondents' View Renders Rule 23(b)(3)
     Practically Superfluous....................................13

V.  Certiorari Is Warranted Now. .........................15

Conclusion.............................................................16

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allison v. Citgo Petroleum Corp.*, 151 F.3d
402 (5th Cir. 1998)...............................................6

*Amchem Prods., Inc. v. Windsor*, 521 U.S.
591 (1997) ........................................................12

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153
(1988) ...............................................................12

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th
Cir. 1996) ....................................................5, 6, 7

*Comcast Corp. v. Behrend*, 569 U.S. 27
(2013) ...........................................................2, 8

*Ebert v. Ge.n Mills, Inc.*, 823 F.3d 472 (8th
Cir. 2016) .......................................................7, 8

*In re Deepwater Horizon*, 739 F.3d 790 (5th
Cir. 2014) ...........................................................6

*In re Med. Transp. Mgmt., Inc.*, No. 21-8006,
2022 WL 829169 (D.C. Cir. Mar. 17, 2022) ..1, 11

*In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012) .........6

*In re St. Jude Med., Inc.*, 522 F.3d 836 (8th
Cir. 2008) ...........................................................8

iii

*Jenkins v. Raymark Indus., Inc.*, 782 F.2d
    468 (5th Cir. 1986)................................................5

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ...............................9

*Martin v. Behr Dayton Thermal Prods. LLC*,
    896 F.3d 405 (6th Cir. 2018) ............................10

*McReynolds v. Merrill Lynch, Pierce, Fenner
    & Smith, Inc.*, 672 F.3d 482 (7th Cir.
    2012).....................................................................8

*Reitman v. Champion Petfoods, USA, Inc.*,
    830 F. Appx. 880 (9th Cir. 2020)..................9, 10

*Simpson v. Dart*, 23 F.4th 706 (7th Cir. 2022) ........9

*Smilow v. Sw. Bell Mobile Sys., Inc.*, 323
    F.3d 32 (1st Cir. 2003)........................................5

*Tasion Commc'ns, Inc. v. Ubiquiti Networks,
    Inc.*, 308 F.R.D. 630 (N.D. Cal. 2015) ...............10

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.
    442 (2016) ...........................................................4

*United States v. Vonn*, 535 U.S. 55 (2002).............12

**RULES**

Fed. R. Civ. P.
    1..........................................................................3
    23...........................................................*passim*

iv

S. Ct. R. 10 ................................................................2

**OTHER AUTHORITIES**

Elizabeth J. Cabraser & Samuel Issacharoff,
*The Participatory Class Action*, 92
N.Y.U.L. Rev. 846 (2017)...............................4, 14

Laura J. Hines, *Challenging the Issue Class
Action End-Run*, 52 Emory L.J. 709
(2003) ...........................................................6, 14

1

## REPLY FOR PETITIONER

Respondents cannot deny that ECFMG's petition presents an important question on which this Court has provided no guidance. And just weeks ago the D.C. Circuit, in granting a Rule 23(f) petition, recognized the question presented by this petition as "important" and "'an unsettled and fundamental issue of law relating to class actions." *In re Med. Transp. Mgmt., Inc.*, No. 21-8006, 2022 WL 829169, at *1 (D.C. Cir. Mar. 17, 2022).

Respondents' suggestion that the Court wait until after a final judgment to grant review provides no basis to deny the petition. As *Amicus* Chamber of Commerce has documented (at 6), it appears that no case certified under Rule 23(c)(4) has proceeded to trial. The time for this Court's review is now, at the class certification stage, not following some hypothetical final judgment.

Respondents do not deny that the question presented is dispositive of class certification. If an ordinary Rule 23(b)(3) analysis applies, then certification should have been denied and a different judgment entered below.

This Court has already acknowledged the importance of the limits imposed by Rule 23(b)(3). But the decision below renders Rule 23(b)(3)'s predominance test practically meaningless. Under the decision below, class counsel should always

2

choose the easier route of certification under Rule
23(c)(4).

The petition squarely presents an "important
question of federal law that has not been, but should
be, settled by this Court" and on which the circuits
disagree. S. Ct. R. 10(a),(c). Immediate review is
warranted.

## ARGUMENT

### I.    No Case Certified Under Rule 23(c)(4) Has Ever Proceeded to Final Judgment.

Respondents' suggestion (at 8–9) that this
Court wait for an appeal from a final judgment is
truly an argument that this Court should never
review the issue at all.

Counsel has identified no case involving a
class certified under respondents' view of Rule
23(c)(4) that has ever proceeded to trial. Counsel for
*Amicus* Chamber of Commerce represents the same.
Amicus Br. 6. Nor do respondents cite any case.

This fact should confirm both the importance
of the issue and the danger of using Rule 23(c)(4) to
certify classes that could not otherwise be certified
under Rule 23(b)(3). Rule 23(b)(3) is, itself, an
"adventuresome innovation" for which certification
should be particularly "demanding." *Comcast Corp.
v. Behrend*, 569 U.S. 27, 34 (2013). The further
innovation of using Rule 23(c)(4) to evade Rule
23(b)(3)'s requirements appears to have compelled

3

settlement in every case in which it has been permitted.

As a result, little precedent exists regarding how trial (and subsequent individual proceedings) should be conducted in a case involving "partial Rule 23(b)(3) certification"—a concept on which the Federal Rules provide no guidance. The procedural uncertainty brings heightened settlement pressure to bear, and it does so in cases ineligible for certification under the ordinary test. Certification under Rule 23(c)(4) undercuts "just . . . determination" of cases on their merits. Fed. R. Civ. P. 1.

The "paucity of appellate opinions or other evidence to indicate Rule 23(c)(4) has led to runaway judgments," BIO 31, only reveals the danger. These opinions and judgments do not exist because certification compels settlement. This fact confirms both the importance of the issue and that if this Court wishes to grant certiorari, it must do so now.

## II.   Respondents Incorrectly Describe the Positions of the Circuits.

Respondents' description of a uniform, harmonious position among the circuits is incorrect. The circuits disagree. At most, four circuits—the Second, Third, Sixth, and Ninth—share respondents' interpretation at a high level, and even within these circuits, there is significant disagreement.

4

## A. After Rule 23(b)(3) is satisfied, Rule 23(c)(4) permits adjudicating common issues classwide.

If Rule 23(b)(3)'s requirements (including predominance) are satisfied for a cause of action,[1] Rule 23(c)(4) allows common issues to be adjudicated on a classwide basis and individual issues to be adjudicated in individual proceedings. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately[.]").

The Question Presented is not whether Rule 23(c)(4) permits less than all of the issues in a claim to be adjudicated on a classwide basis but whether Rule 23(c)(4) permits this *when Rule 23(b)(3) cannot be satisfied for the cause of action*.

Respondents misread the circuits' positions because they erroneously treat any decision allowing a limited class as supporting their view of the law.

Consider, for example, respondents' reliance on the statement that "all federal circuits, including the Fifth Circuit, have endorsed the class treatment of specific issues." BIO 11 (quoting Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U.L. Rev. 846, 871 (2017)). This sentence says nothing about endorsing "class

---

[1] ECFMG understands "action" within Rule 23 to refer to a cause of action and uses the term in this sense in the Question Presented.

5

treatment of specific issues" without first satisfying Rule 23(b)(3).

Respondents' assumption that any decision allowing class treatment of specific issues embraces their position causes them to misread the cases.

### 1. The First Circuit decision cited by Respondents supports ECFMG.

For example, respondents rely on *Smilow v. Southwestern Bell Mobile Systems, Inc.*, which held that "common questions predominate" over individual issues. 323 F.3d 32, 40 (1st Cir. 2003).

Because common issues predominated, Rule 23(c)(4) "allow[ed] the court to maintain the class action with respect to [common] issues" while allowing "individualized determinations . . . to calculate damages." *Id.* at 41. This analysis captures ECFMG's view perfectly and offers no support for respondents.

### 2. The Fifth Circuit adheres to its view in *Castano* that Rule 23(b) must be satisfied for the cause of action as a whole.

Respondents commit the same error in discussing *Jenkins v. Raymark Industries, Inc.*, which upheld the district court's finding that "the certified questions 'predominate,' under Rule 23(b)(3)" within the cases as a whole. 782 F.2d 468,

6

472 (5th Cir. 1986); *see also* Laura J. Hines, *Challenging the Issue Class Action End-Run*, 52 Emory L.J. 709, 731–32 (2003) ("[*Jenkins*] cannot be read as actually authorizing such an expansive interpretation of (c)(4)(A). There is simply no evidence the Fifth Circuit believed that its predominance analysis could be conducted only as to the certified common issues, rather than as compared to the individual issues remaining for later proceedings." (citations omitted)).

Nor do other Fifth Circuit decisions undercut *Castano*. *In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012), and *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014), merely stand for the (undisputed) proposition that Rule 23(c)(4) allows adjudication of some issues on a classwide basis and others on an individual basis. Neither holds that doing so is allowed when Rule 23(b)(3) cannot be satisfied for a claim.

*Deepwater Horizon* held that the district court did not abuse its discretion in concluding that "common issues nonetheless predominated over the issues unique to individual claimants." 739 F.3d at 816. Only because of this predominance, Rule 23(c)(4) permitted (common) liability issues to be tried on a classwide basis and "'issues relating to damages' could and would be 'severed and tried separately.'" *Id.* at 806; *see also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421–22 (5th Cir. 1998) (rejecting Rule 23(c)(4) certification under *Castano* because "when considered as a whole, the

7

plaintiffs' [claim] implicates predominantly individual-specific issues").

*Castano* is unambiguous: "The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Respondents' attempts to introduce uncertainty in the Fifth Circuit's position is incorrect.

> **3.    The Eighth Circuit has indicated support for the position that the predominance inquiry cannot ignore individual issues.**

*Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016), indicates that the Eighth Circuit shares ECFMG's view of Rule 23(c)(4).

*Ebert* rejects certification precisely because the district court "narrow[ed] and separat[ed]" issues in order to "manufactur[e] a case that would satisfy the Rule 23(b)(3) predominance inquiry." *Id.* at 479. Certification of the common issues was impermissible because "individual issues [would]

8

predominate on the matters of liability and damages." *Id.*

The analysis—comparing the common and individual issues—is inconsistent with respondents' position (and that of the decision below) that a district court can disregard uncertified issues in conducting a predominance inquiry.[2]

### B.   The Seventh Circuit's authority is mixed.

The Seventh Circuit's position is far from clear.   The decision cited by respondents, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), says nothing about the interaction of Rule 23(b)(3) and Rule 23(c)(4).

If anything, the case appears to imply that Rule 23(c)(4) is a separate form of class certification, independent of any of subsection of Rule 23(b).   *See id.* at 492 (reversing "the denial of class certification under Rules 23(b)(2) and (c)(4)").

But a party seeking certification must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33. If *McReynolds* truly reflects the Seventh Circuit's

---

[2] In any event, respondents' suggestion (at 10) that the Eight Circuit adopted their view in *In re St. Jude Medical, Inc.*, 522 F.3d 836 (8th Cir. 2008), is incorrect.  The decision makes clear that it was not adopting a position on the "conflict in authority" that it recognized.  *Id.*

view that Rule 23(c)(4) allows class certification independent of Rule 23(b), then certiorari is all the more warranted.

When the Seventh Circuit has discussed the interplay between Rule 23(b)(3) and Rule 23(c)(4), its statements have been consistent with ECFMG's view of the law. *Kartman v. State Farm Mutual Automobile Insurance Co.* holds that an "'issues' class under Rule 23(c)(4)" would need to satisfy "the requirements for certification of a damages class under Rule 23(b)(3)." 634 F.3d 883, 886 (7th Cir. 2011) (rejecting an issues class as inappropriate because the requirements of Rule 23(b)(3) were not satisfied). And recently, *Simpson v. Dart* cited Rule 23(c)(4) for the proposition that if the requirements of Rule 23(b) are "satisfied as to some of the class representative's claims but not others," then only the claims for which Rule 23(b)(3) is satisfied "become 'class claims.'" 23 F.4th 706, 713 (7th Cir. 2022). The decision offers no support for respondents' view that certification is allowed without a claim satisfying Rule 23(b)(3).

### C. Respondents cannot deny the significant variations within the plurality.

Even within the circuits that generally share respondents' position, there is significant disagreement. Pet. 17–20.

Respondents accuse ECFMG of misquoting *Reitman v. Champion Petfoods, USA, Inc.*, 830 F.

10

Appx. 880 (9th Cir. 2020).  BIO 10.  Although the quoted sentence (that predominance is unnecessary) describes the district court's analysis, the opinion's preceding sentence states that "the district court applied the correct standard." *Id.* at 882.

District courts within the Ninth Circuit regularly hold that "a Rule 23(c)(4) issues class" need not meet "the predominance requirement of Rule 23(b)(3)." *E.g.*, *Tasion Communications, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015)

This view contrasts with the Sixth Circuit's requirement of "a robust application of predominance and superiority." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018).

Nor do respondents answer the fact that the Third Circuit's position is unique: no other circuit applies its "*Gates* factor" test.  And respondents offer no defense for the statement in the decision below— not adopted by any other circuit—that Rule 23(a) must be evaluated only with respect to certified issues. App. 14a.

Even among the four circuits respondents characterize as agreeing with them, there is significant disagreement.

**D.    The D.C. Circuit recently and correctly recognized certification under Rule 23(c)(4) as "an unsettled and fundamental issue of law."**

Only weeks ago, on March 17, the D.C. Circuit granted a Rule 23(f) petition presenting the same issue presented in this petition: "[W]hether the requirements of predominance and superiority must exist as to the entire claim, or only regarding the issue certified for class treatment." *In re Med. Transp. Mgmt., Inc.*, No. 21-8006, Dkt. 1 at 17 (D.C. Cir. Mar. 17, 2022).

The D.C. Circuit recognized that issue certification under Rule 23(c)(4) is "an unsettled and fundamental issue of law relating to class actions." *In re Med. Transp. Mgmt., Inc.*, 2022 WL 829169, at *1 (internal quotation marks omitted).

This recent decision refutes respondents' suggestion that there is settled law in this area or that guidance from this Court is unnecessary. And the D.C. Circuit is right. Whether Rule 23(c)(4) allows Rule 23(b)(3)'s requirements to be evaded is an unsettled and fundamental question. Certiorari is warranted.

12

### III. This Court Does Not Defer to the Advisory Committee's Decision Not to Amend the Rules.

The heart of respondents' opposition appears to be that this Court should defer to the Advisory Committee on Civil Rules. BIO 23–27.

This Court has never, to the best of counsel's knowledge, cited (much less provided any deference to) a decision of the Advisory Committee not to propose an amendment to the rules.

This Court has relied on the Advisory Committee Notes as a source of legislative intent. *See United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002) ("a reliable source of insight . . . especially when, as here, the rule was enacted precisely as the Advisory Committee proposed"); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 165–66 n.9 (1988) ("relevant in determining the meaning of the document Congress enacted").

But there is a significant difference between considering notes transmitted to Congress accompanying an enacted rule and the (unadopted) deliberations of a body that chose not to propose an amendment. These deliberations are not the product of the full "extensive deliberative process involving many reviewers: a Rules Advisory Committee, public commenters, the Judicial Conference, this Court, the Congress." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

13

No deference is owed by this Court to the decision *not* to propose an amendment, and to the extent that the Advisory Committee views the law as settled and harmonious, it is incorrect.

## IV. Respondents' View Renders Rule 23(b)(3) Practically Superfluous.

The importance of this issue to the ordinary class certification process cannot be overstated.  If respondents are correct, the predominance inquiry of Rule 23(b)(3) should never occur.  When a claim involves individual issues, class counsel should always seek certification of the common issues through Rule 23(c)(4), avoiding any need to prove predominance by comparing the common and individual issues.

Respondents offer no reason why counsel would ever choose to pursue class certification under the ordinary Rule 23(b)(3) test if the less-demanding Rule 23(c)(4) route were available to them.

In a footnote, respondents suggest that there is a difference between cases where "damages can be calculated simply and efficiently (e.g., through a classwide damages model), without the need for individualized proceedings" and cases "in which classwide litigation of issues is followed by individual proceedings to determine damages." BIO 29 n.28.  But respondents fail to connect this distinction to whether certification is under Rule 23(b)(3) or Rule 23(c)(4).  If damages can be calculated on a classwide basis through a common

14

damages model, there is no reason that damages could not be certified as a common "issue" under Rule 23(c)(4). And "individualized damages determinations are a feature of most Rule 23(b)(3) class actions." Cabraser & Issacharoff, *The Participatory Class Action*, 92 N.Y.U.L. Rev. at 870 n.102.

Any classwide proceeding under Rule 23(b)(3) could, if respondents are correct, be achieved more easily through Rule 23(c)(4). Put simply, if respondents are correct, Rule 23(c)(4) "authorize[s] an issue class action end-run around the important procedural safeguard of predominance." Hines, *Challenging the Issue Class Action End-Run*, 52 Emory L.J. at 714.

When discussing the Advisory Committee Notes, respondents quote the note to Rule 23(c)(4) concerning a liability-only class for a fraud claim, BIO 29, but they overlook the connection of this example to the note to Rule 23(b)(3). Pet. 26–28. Read together, Rule 23(c)(4) may be employed *because* predominance exists under Rule 23(b)(3), not *in the absence of* predominance under Rule 23(b)(3).

The "sequence" argument under the prior version of the rules, BIO 28, is easily answered. Under the prior version, after determining that an action "may be brought or maintained as a class action with respect to particular issues," then "the provisions of [Rule 23] shall then be construed and applied accordingly." Fed. R. Civ. P. 23(c)(4) (1966).

15

The step of "constru[ing] and appl[ying]" the provisions comes after determining whether a class action may be "maintained," an inquiry governed by Rule 23(b). The provisions that must be "construed and applied accordingly" are those about how a class action will be conducted, not whether a class action may be brought or maintained.

This understanding does not "nullify" Rule 23(c)(4).  It gives Rule 23(c)(4) its full effect as a crucial manageability tool: Rule 23(c)(4) makes Rule 23(b)(3) classes possible by allowing certification of common issues for class treatment when they predominate over individual issues.  Refusing to distort Rule 23(c)(4) into a new form of class certification does not nullify the provision.

## V.    Certiorari Is Warranted Now.

That this Court has received other petitions on the issue only confirms its persistence and that further percolation is unwarranted and unnecessary.

In the decision below, the Third Circuit adhered to its test—the *Gates* factors—shared by no other circuit and deepened the split further by stating that even Rule 23(a) must be evaluated only with respect to the certified issues.  Pet.App. 14a. No other circuit shares this view of Rule 23(a), and respondents are unwilling to defend it.

The issue has not resolved itself and will continue to create uncertainty for courts and

16

litigants until addressed by this Court. Further percolation is unnecessary.

The fact that these cases are settled rather than tried should only invite further scrutiny from this Court.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

William R. Peterson
*Counsel of Record*
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
T: 713.890.5188
F: 713.890.5001
william.peterson
    @morganlewis.com

*Counsel for Petitioner*

APRIL 2022

No. 21-948

# In the Supreme Court of the United States

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

*Petitioner*,

v.

MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,

*Respondents.*

**On Petition for a Writ of Certiorari to the
United States Court of Appeals for the
Third Circuit**

**CERTIFICATE OF COMPLIANCE**

In accordance with Supreme Court Rule 33.1(h), I certify that the foregoing Reply for Petitioner contains 2,998 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 26, 2022

WILLIAM R. PETERSON
 *Counsel of Record*
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, Texas 77002
(713) 890-5188
william.peterson@morganlewis.com
*Counsel for Petitioner*

JA4920



2311 Douglas Street
Omaha, Nebraska 68102-1214

E-Mail Address:
contact@cocklelegalbriefs.com

1-800-225-6964
(402) 342-2831
Fax: (402) 342-4850

Web Site
www.cocklelegalbriefs.com

No. 21-948

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
Petitioner,
v.
MONIQUE RUSSELL; JASMINE RIGGINS;
ELSA M. POWELL; and DESIRE EVANS,
Respondents.

**AFFIDAVIT OF SERVICE**

I, Andrew Cockle, of lawful age, being duly sworn, upon my oath state that I did, on the 26th day of April, 2022, send out from Omaha, NE 7 package(s) containing 3 copies of the REPLY FOR PETITIONER in the above entitled case. All parties required to be served have been served by third-party commercial carrier for delivery within 3 calendar days.  Packages were plainly addressed to the following:

SEE ATTACHED

**To be filed for:**

Brian W. Shaffer
Elisa P. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103

William R. Peterson
 Counsel of Record
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
(713) 890-5188
william.peterson@morganlewis.com

Counsel for Petitioner

Subscribed and sworn to before me this 26th day of April, 2022.
I am duly authorized under the laws of the State of Nebraska to administer oaths.



GENERAL NOTARY-State of Nebraska
RENEE J. GOSS
My Comm. Exp. September 5, 2023

_____
Notary Public

_____
Affiant                                   JA4921

42342

Patrick A. Thronson
Brenda A. Harkavy
JANET, JANET & SUGGS, LLC
4 Reservoir Circle, Suite 200
Baltimore, Maryland 21208
(410) 653-3200
pthronson@jjsjustice.com
bharkavy@jjsjustice.com

Scott L. Nelson
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St. NW
Washington, D.C. 20009
(202) 588-1000
snelson@citizen.org

Paul M. Vettori
LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
(410) 649-2000
pvettori@lawpga.com

Nicholas M. Centrella
Robin S. Weiss
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Philadelphia, Pennsylvania 19102
(215) 864-9600
ncentrella@conradobrien.com
rweiss@conradobrien.com

Brent Ceryes
SCHOCHOR, FEDERICO AND STATON
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000
bceryes@sfspa.com

Cory L. Zajdel
Z LAW, LLC
2345 York Rd. Suite B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com

Karen E. Evans
David E. Haynes
THE COCHRAN FIRM
1100 New York Avenue N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800
kevans@cochranfirm.com
DHaynes@CochranFirm.com

*Counsel for Respondents Monique Russell, Jasmine Riggins, Elsa M. Powell, and Desire Evans*

(ORDER LIST: 596 U.S.)

**MONDAY, MAY 16, 2022**

**ORDERS IN PENDING CASES**

21M107    NIEVES, JORGE V. DIXON, SEC., FL DOC

21M108    WHITE, JASON E. V. LUMPKIN, DIR., TX DCJ

        The motions to direct the Clerk to file petitions for writs
of certiorari out of time are denied.

21M109    MEYER, WILLIAM V. UNITED STATES

        The motion for leave to file a petition for a writ of
certiorari with the supplemental appendix under seal is granted.

21M110    BENSON, ADA M. V. RIVERSIDE COUNTY SHERIFF, ET AL.

21M111    MARTINEAU, ROCKNEY W. V. ARIZONA

        The motions to direct the Clerk to file petitions for writs
of certiorari out of time are denied.

21M112    PEARSON, FREYA D. V. UNITED STATES

        The motion for leave to file a petition for a writ of
certiorari with the declaration of indigency under seal is
granted.

21M113    SEALED APPELLANT V. SEALED APPELLEE, ET AL.

        The motion for leave to file a petition for a writ of
certiorari under seal is denied.

21M114    HARRIS, GARY D. V. UNITED STATES

        The motion to direct the Clerk to file a petition for a writ
of certiorari out of time is denied.

21-86     AXON ENTERPRISE, INC. V. FTC, ET AL.

21-468    NATIONAL PORK PRODUCERS, ET AL. V. ROSS, KAREN, ET AL.

JA4923

The motions of petitioners to dispense with printing the joint appendices are granted.

21-936      U.S., EX REL. OWSLEY V. FAZZI ASSOCIATES, INC., ET AL.

21-968      FAIRFAX COUNTY SCHOOL BOARD V. DOE, JANE

The Solicitor General is invited to file briefs in these cases expressing the views of the United States.

21-6829     DONMEZ, IBRAHIM V. NYC DEPT. OF CONSUMER, ET AL.

21-7205     HOLLAND, LEE V. UNITED STATES

21-7237     DALEN, JOHN V. SOUTH CAROLINA

The motions of petitioners for reconsideration of orders denying leave to proceed *in forma pauperis* are denied.

21-7408     DINGLE, RANDY V. BAGGETT, TALMAGE S., ET AL.

21-7627     HEARN, GWENDOLYN V. DeJOY, POSTMASTER GEN.

The motions of petitioners for leave to proceed *in forma pauperis* are denied.  Petitioners are allowed until June 6, 2022, within which to pay the docketing fees required by Rule 38(a) and to submit petitions in compliance with Rule 33.1 of the Rules of this Court.

**CERTIORARI GRANTED**

21-857      JONES, MARCUS D. V. HENDRIX, WARDEN

21-1239     SEC, ET AL. V. COCHRAN, MICHELLE

The petitions for writs of certiorari are granted.

**CERTIORARI DENIED**

20-1229     ROBERTSON, JAMES W. V. INTRATEK COMPUTER, INC.

20-1394     PERSONALWEB TECHNOLOGIES, LLC V. PATREON, INC., ET AL.

21-835      FLOWERS, OTHA R. V. UNITED STATES

21-948      ED. COMM'N FOR FOREIGN MEDICAL V. RUSSELL, MONIQUE, ET AL.

21-1056     UNIVERSAL SECURE REGISTRY LLC V. APPLE INC., ET AL.

21-1057      ORACLE CORPORATION V. HEWLETT-PACKARD CO.

21-1068      LION RAISINS, INC., ET AL. V. ROSS, KAREN

21-1074      DI CARLO, MARK A. V. SWARTZ, JAMES R., ET AL.

21-1082      LEONARD, TARRESSE V. UNITED STATES

21-1090      CALVERT, JAMES V. TEXAS

21-1157      SPENCER, DENNIS V. COLORADO

21-1200      PHILLIPS, SHERIF A. V. PITT CTY. MEM. HOSP., INC.

21-1204      CHICO, CA, ET AL. V. ESTATE OF TYLER RUSHING, ET AL.

21-1205      ERIC E. V. LA CTY. DEPT. OF CHILDREN

21-1212      GATSBY, LINSAY L. V. GATSBY, KYLEE D.

21-1216      XU, YAN PING V. SUFFOLK COUNTY, NY, ET AL.

21-1221      S. U. V. C. J.

21-1222      JOSEPH, JOEL D. V. AMERICAN GENERAL LIFE INS. CO.

21-1229      SAVED MAGAZINE, ET AL. V. SPOKANE POLICE DEPT., ET AL.

21-1230      DAKOTA TERRITORY TOURS, ACC V. SEDONA-OAK CREEK AIRPORT

21-1232      NORDBERG, PAUL C. V. MA RETIREMENT SYSTEM

21-1233      JOUBERT, MARK R. V. MILEY, TODD

21-1234      DOMINGUEZ, JOSE V. AMERICAN EXPRESS, FSB

21-1235      GRUNDSTEIN, ROBERT V. SUPREME COURT OF OH

21-1238      RODMAN, INA A. V. OTSUKA AM. PHARMACEUTICAL, INC.

21-1242      CHRONISTER, SHERIFF, ET AL. V. JOSEPH, ANDREW

21-1247      RAFTER, KARINA V. VIRGINIA

21-1249      CASSIDY, JOHN E. V. MASSACHUSETTS

21-1250      PARKER, JAMAL D. V. BLINKEN, SEC. OF STATE, ET AL.

21-1252      HERTA, MARIA V. McBRIDE, JOHN, ET AL.

21-1253      FETNER, PHILIP J. V. McCARTHY, KEVIN R., ET AL.

21-1254      BREGMAN, ALLEN V. FLORIDA

21-1259      JOHN, JAY J. V. DEUTSCHE BANK, ET AL.

21-1263      GERBER, MARVIN V. HERSKOVITZ, HENRY, ET AL.

21-1265      LOWE, CLARENCE V. N. IN COMMUTER TRANSP. DIST.

21-1282      MARTIN, CHRISTOPHER R. V. NEVADA

21-1285      M & N FINANCING CORP., ET AL. V. DEPT. OF FAIR EMPLOY. & HOUSING

21-1289      TAFT, FOSTER V. VENTURA CTY. MED. CTR., ET AL.

21-1298      ALBRECHT, LEONARD, ET AL. V. RIVERSIDE COUNTY, CA, ET AL.

21-1311      PIERNO, RINALDO V. FIDELITY BROKERAGE SERVICES

21-1315      LINGENFELTER, DEBORAH V. KAISER FOUNDATION HEALTH PLAN

21-1332      DAKER, WASEEM V. WARD, TIMOTHY, ET AL.

21-1336      OLSEN, JEFFREY V. UNITED STATES

21-1339      NEBERGALL, CARLTON R. V. FLORIDA

21-1341      TURNER, WYSINGO V. BRANNON-DORTCH, WARDEN

21-1369      PAGE, CARTER V. OATH INC.

21-6804      KEMP, TIMOTHY W. V. ARKANSAS

21-6826      STANDS ALONE, TODD V. UNITED STATES

21-6847      CHILDERS, JOHN W. V. CROW, DIR., OK DOC

21-7019      MYLES, RUNNIE V. JACOBS, JAY, ET AL.

21-7067      BAKER, KIMMIE D. V. ARIZONA

21-7068      WRIGHT, RODNEY K. V. KIJAZAKI, COMM'R, SOCIAL SEC.

21-7124      POLEJEWSKI, PAMELA V. MONTANA

21-7285      COLLIER, IRINA V. UNIV. OF CA, BERKELEY

21-7292      WALKER, JAMES E. V. ILLINOIS

21-7296      GONZALEZ, FRANK C. V. CALIFORNIA

21-7298      CONTE, DENNIS A. V. MARYLAND

21-7300      DAVIDSON, LeMARICUS V. TENNESSEE

21-7314      JONES, WILLIAM V. TEXAS

21-7317      COTA, MICHAEL V. MALONE, JOHN, ET AL.

21-7321      MACK, ERIC L. V. TEXAS

4

21-7325      BRAXTON, MICHAEL T. V. JAMES, WARDEN

21-7336      ALLEN, KARSTEN O. V. MAYO, J., ET AL.

21-7348      PRESCOTT, ANDREW V. APPELLATE COURT OF IL

21-7350      CERDA, ROBERTO V. ILLINOIS

21-7370      MILON, DANTE L. V. HOOPER, WARDEN

21-7377      TORRES, ROSEE, ET VIR V. WELLS FARGO BANK, N.A., ET AL.

21-7379      TERRY, PATRICK J. V. OKLAHOMA

21-7380      BROWN, FRANK H. V. LUMPKIN, DIR., TX DCJ

21-7383      ARMAH, FRANCIS B. V. DOWLING, WARDEN

21-7388      WELLS, AMOS J. V. TEXAS

21-7392      BRANTLEY, JEFFERY N. V. MOODY, ATT'Y GEN. OF FL, ET AL.

21-7394      CARTER, KEITH V. CALIFORNIA

21-7401      EDWARDS, HAROLD V. NEVADA, ET AL.

21-7406      KOZUBAL, MAREK V. MASSACHUSETTS

21-7407      TISDEL, JANECE V. WITNESS PROTECTION

21-7411      PLATT, RICHARD E. V. DIXON, SEC., FL DOC

21-7412      ROBINSON, MARTIN V. SAFFOLD, JUDGE, ET AL.

21-7435      WILLIAMS, RONELL V. KANSAS

21-7441      MALDONADO-ARCE, EDGARDO V. CRISWELL, ADM'R, FEMA

21-7447      LIOUNIS, PETER V. UNITED STATES

21-7472      WALKER, EARNEST E. V. KANSAS

21-7485      STATON, TERRELL V. LAMONT, NED

21-7500      JONES, WILLIAM C. V. TEXAS

21-7511      HERRIOTT, KEVIN E. V. BURTON, WARDEN

21-7518      MYERS, JAY A. V. DIXON, SEC., FL DOC

21-7522      PHILLIPS, JERRY W. V. FRINK, WARDEN

21-7525      PERKINS, JEROME V. PERRY, WARDEN

21-7532      KARUPAIYAN, PALANI V. INTERNATIONAL SOS, ET AL.

JA4927

21-7552     BISHOP, KALVIN V. McGINLEY, SUPT., COAL TOWNSHIP

21-7571     LIVERPOOL, ANTON F. V. CLEVELAND, REGGIE, ET AL.

21-7574     BLACK, DANYEL V. UNITED STATES

21-7575     MORRIS, KEITH V. UNITED STATES

21-7576     WRIGHT, EDWARD V. UNITED STATES

21-7581     HUDSON, ICE TEE V. UNITED STATES

21-7585     McNEIL, JAYSON V. UNITED STATES

21-7588     MARIGNY, GLORIA V. CENTENE MANAGEMENT CO. LLC

21-7605     MANSELL, LWANE A. V. DIXON, SEC., FL DOC, ET AL.

21-7606     SCOTT, MICHAEL L. V. FOX, WARDEN

21-7610     SMITH, TERRY V. FLORIDA, ET AL.

21-7613     WILLIAMS, JAMES E. V. ILLINOIS

21-7615     CODNER, RANDOLPH V. FLORIDA

21-7636     LOPEZ, RAMON V. QUIROS, COMM'R, CT DOC

21-7639     CARLEY, ELIZABETH V. NEVEN, WARDEN, ET AL.

21-7647     BRICE, LLOYD V. CALIFORNIA

21-7651     MARTINEZ, MANUEL V. ILLINOIS

21-7676     JONES, ROBERT C. V. ILLINOIS

          The petitions for writs of certiorari are denied.

21-1044     STIRLING, DIR., SC DOC, ET AL. V. BRYANT, JAMES N.

          The motion of respondent for leave to proceed *in forma
pauperis* is granted.  The petition for a writ of certiorari is
denied.

21-1100     3M CO., ET AL. V. AMADOR, GEORGE

          The motion of Product Liability Advisory Council, Inc. for
leave to file a brief as *amicus curiae* is granted.  The petition
for a writ of certiorari is denied.  Justice Alito took no part
in the consideration or decision of this motion and this

petition.

21-1224      COZZA, LAURA V. PNC BANK, NAT. ASSN.

The petition for a writ of certiorari is denied.  Justice
Alito took no part in the consideration or decision of this
petition.

21-1231      LEFEBURE, PRISCILLA V. D'AQUILLA, SAMUEL

The motion of Louisiana Foundation Against Sexual Assault,
et al. for leave to file a brief as *amici curiae* is granted.
The motion of American Conservative Union for leave to file a
brief as *amicus curiae* is granted.  The petition for a writ of
certiorari is denied.

21-1264      KLAYMAN, LARRY V. JUDICIAL WATCH, INC., ET AL.

The petition for a writ of certiorari is denied.  Justice
Kavanaugh took no part in the consideration or decision of this
petition.

21-1267      CISCO SYSTEMS, INC. V. SRI INTERNATIONAL, INC.

The motion of Comcast Corporation for leave to file a brief
as *amicus curiae* is granted.  The petition for a writ of
certiorari is denied.

21-7286      JOHNSTON, ANDREW J. V. WARD, FRANCES, ET AL.

The motion of petitioner for leave to proceed *in forma
pauperis* is denied, and the petition for a writ of certiorari is
dismissed.  See Rule 39.8.  As the petitioner has repeatedly
abused this Court's process, the Clerk is directed not to accept
any further petitions in noncriminal matters from petitioner
unless the docketing fee required by Rule 38(a) is paid and the
petition is submitted in compliance with Rule 33.1.  See *Martin
v. District of Columbia Court of Appeals*, 506 U. S. 1 (1992)

7

(*per curiam*).  Justice Barrett took no part in the consideration or decision of this motion and this petition.

21-7361    WATSON, TERRY G. V. WITTY, KAREY L., ET AL.

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

21-7365    CLEMENTS, LOUIS M. V. FLORIDA, ET AL.

The petition for a writ of certiorari before judgment is denied.

21-7589    BROWN, MARK A. V. MASON, SUPT., MAHANOY, ET AL.

The petition for a writ of certiorari is denied.  Justice Alito took no part in the consideration or decision of this petition.

## HABEAS CORPUS DENIED

21-7649    IN RE JAMAAL A. McNEIL

The petition for a writ of habeas corpus is denied.

## MANDAMUS DENIED

21-1280    IN RE J. CORY CORDOVA

21-1286    IN RE W. A. GRIFFIN

21-1287    IN RE W. A. GRIFFIN

The petitions for writs of mandamus are denied.

**REHEARINGS DENIED**

| | |
|---|---|
| 21-501 | LIOTT, JAMES V. V. U.S. BANK NATIONAL ASSOCIATION |
| 21-969 | COULTER, JEAN V. PAULISICK, GERRI V., ET AL. |
| 21-989 | COULTER, JEAN V. PAUL L. DUNBAR COMM., ET AL. |
| 21-1015 | CAO, ANGELA V. BSI FINANCIAL SERVICES, ET AL. |
| 21-1076 | THAMILSELVAN, SIVAGNANAM V. THAMILSELVAN, VIJAYALAKSHMI |
| 21-5245 | HAHN, JAMIE P. V. GEORGIA |
| 21-5345 | THURMAN, LEONARD V. MED. TRANSP. MANAGEMENT |
| 21-6765 | OMBE, HITOSHI V. COOK, GEORGE, ET AL. |
| 21-6766 | DeATLEY, ALAN E. V. COLORADO |
| 21-6841 | BENSON, ADA M. V. HEMET POLICE DEPT. |
| 21-6881 | BRESSI, AARON J. V. McCLOUD, TRACY, ET AL. |
| 21-6958 | VORASIANGSUK, VORARUT V. UNITED STATES |
| 21-7043 | BENSON, ADA M. V. ALLSTATE INSURANCE CO. |
| 21-7106 | NYAMUSEVYA, LEONARD V. COURT OF COMMON PLEAS, ET AL. |

The petitions for rehearing are denied.